## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF KEVIN CARMODY IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Kevin Carmody, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.     I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") with an office at 55 East 52nd Street, New York, NY 10055.

2.     On January 14, 2015, The Standard Register Company, a corporation organized under the laws of the State of Ohio ("Standard Register") and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), retained McKinsey RTS to provide consulting services to the Debtors and to assist in their financial management and restructuring.  As a result of this engagement, I learned about the Debtors' business operations.

---

[1]     The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

3.      On February 27, 2015, the Board of Directors of Standard Register appointed me to serve as Chief Restructuring Officer ("CRO") of the Debtors effective as of March 2, 2015.  In this capacity, I have become familiar with the Debtors' day-to-day operations, business affairs, and books and records.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

5.      To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of their chapter 11 cases (collectively, the "Chapter 11 Cases"), the Debtors have requested certain relief in "first day" motions and applications filed with the Bankruptcy Court (collectively, the "First Day Pleadings") concurrently herewith.  The First Day Pleadings, summarized below, seek, among other things, to (a) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (b) authority to continue using cash collateral and enter into a postpetition financing arrangement, (c) preserve valuable relationships with suppliers and customers, (d) maintain employee morale and confidence, and (e) establish certain administrative procedures that will promote a seamless transition into chapter 11.  This relief is critical to the Debtors' chapter 11 efforts.

6.      The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and no committees have been appointed or designated.  Concurrently herewith, the Debtors have

filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

7.      I submit this declaration (the "First Day Declaration") in support of the Debtors' First Day Pleadings.  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and the Debtors' advisors, or my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.  I am over eighteen (18) years of age and I am authorized to submit the First Day Declaration on behalf of the Debtors.  If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated.

8.      To familiarize the Court with the Debtors and the relief sought in the First Day Pleadings, this First Day Declaration is intended to provide a summary overview of the Debtors and the Chapter 11 Cases, and is organized as follows:  Part I provides a brief overview of these cases and the Debtors' contemplated course of action; Part II describes the Debtors' business operations, corporate structure, key liabilities, and estate assets; Part III describes the events leading up to the commencement of the Chapter 11 Cases; and Part IV summarizes the relief sought in the First Day Pleadings.

# I.    BACKGROUND[2]

9.      For over a century, the Debtors' printing services and printed goods have made up a significant part of their business.  However, the demand for many of the printed forms, training and enrollment materials that the Debtors produce and sell have declined as new mobile and web-based communications are integrated with printed materials.  Over the past few years, the Debtors have been taking affirmative steps to navigate the challenging evolution of the printing industry to transform their operations and achieve success in this new media landscape.  The Debtors' management has prudently managed their finances and worked diligently to increase their revenue and EBITDA, meet their large legacy pension funding obligations, achieve performance measures required by financial covenants in their loan documents, and aggressively cut costs.  Most recently, the Debtors consummated a strategic acquisition to consolidate operations and decrease overall costs.  In so doing, the Debtors diversified their services by adding integrated communications capabilities, including mobile and digital media, to better meet their customers' needs, and broadened their customer base to boost revenue.

10.      The next step in the Debtors' transformation is to maximize value by selling their business operations as a going concern under the supervision of the Bankruptcy Court.  The Debtors have the full support of the prepetition secured lenders to pursue the contemplated sale.  The Debtors have initiated and seek to implement a sale process pursuant to which the Debtors' largest secured lender has agreed to serve as a stalking horse bidder for substantially all of the Debtors' assets.

---

[2]     For more information about the Debtors, please see the Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 29, 2013 for the Standard Register Company (the "2013 Form 10-K"), available at http://www.sec.gov/Archives/edgar/data/93456/000009345614000003/a10k12292013.htm, and the Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the quarterly period ended September 28, 2014 for the Standard Register Company (the "2014 Q3 Form 10-Q"), available at http://www.sec.gov/Archives/edgar/data/93456/000009345614000014/q39282014.htm.

11.     The Debtors believe that a chapter 11 process and a sale consummated pursuant to section 363 of the Bankruptcy Code will maximize value for the Debtors' estates and creditors, and provide the most stability for the Debtors' employees, customers, and vendors.

## II.     THE DEBTORS' BUSINESS

### A.     Business Operations

12.     The Debtors are one of the leading providers in the United States of communications services and communications workflow, content and analytics solutions through multiple communication channels, including print, electronic, and internet-based communications, to clients in the healthcare, financial services, manufacturing, retail, and transportation industries.  The Debtors have operations in all U.S. states and Puerto Rico, and currently employ approximately 3,500 full-time employees and 16 part-time employees.  At any given time, the Debtors may have approximately 500 contract workers engaged to provide a variety of manufacturing, sales, operations and other daily business services.  The Debtors have a total of fifty-three (53) production and warehouse facilities in North America, the majority of which are located in the United States.  In 2013, the Debtors introduced two "Centers of Excellence" to improve performance levels in key operational and service areas: (a) a new distribution center in Jeffersonville, Indiana—which is now the Debtors' flagship facility—to implement best practices in printing, kitting and distribution, and (b) a facility in Atlanta, Georgia to develop communications solutions and services for the healthcare industry.  The Debtors' operations are divided between two business units:  (i) healthcare, which accounts for

almost one-third of the Debtors' revenues, and (ii) integrated communications (f/k/a business

solutions), which accounts for the remainder of the Debtors' revenues.[3]

13.     The Debtors' operations generated revenues of approximately $904

million in 2014 and approximately $974 million in 2013 on a pro forma basis,[4] and suffered net

losses of approximately $66 million[5] in 2014 and approximately $7.4 million in 2013,

respectively.

    **(i)**    **Healthcare Unit**

14.     In the healthcare industry, the Debtors service the following types of

clients:  (a) acute care providers, which include primarily hospitals and groups of healthcare

providers, (b) ambulatory care providers, which include as physicians and outpatient surgery

centers, (c) payors and managed care organizations such as Anthem, Medicare, and HMOs, and

(d) facilitators of ancillary services that are prescribed by providers or other non-clinical services

that directly interact with patients such as laboratories.

15.     The Debtors offer the following services to their healthcare clients:

(i) targeted, personalized marketing and educational materials, admission kits, patient

communication boards and overnight stay hospitality kits, and promotional items to support

wellness programs to attract new patients and professionals and educate consumers, (ii) patient

information management solutions that include software modules for patient identity

authentication and registration, documentation management, and medication history to enable

hospitals to effectively manage their paper and electronic records and provide patients with

---

[3]    The healthcare unit accounted for approximately 29% of the Debtors' consolidated revenues in 2014 and 2013, while the integrated communications unit accounted for approximately 71% of the Debtors' consolidated revenues in 2014 and 2013.

[4]    The Debtors' actual revenue was approximately $720 million.

[5]    This represents a preliminary, unaudited figure.

access to discharge instructions and educational materials, (iii) patient identification and safety solutions, including wristbands, laboratory and pharmacy labels, documentation with barcodes, and patient photos and data to help assure the appropriate tests, treatments, and medications are matched with the correct patient, and (iv) document management and printing services, such as clinical documents, operational forms, secure prescriptions, and supplies.

16.    Demand for the Debtors' document management solutions and traditional printing services, which include clinical paper and administrative forms, has been declining due to an increasing demand and need for electronic health records.

(ii)    **Integrated Communications Unit (f/k/a Business Solutions Unit)**

17.    The Debtors' integrated communications (f/k/a business solutions) unit services clients primarily in the financial services, manufacturing, retail, business services, and transportation markets, although collectively its clients span almost every industry.

18.    The Debtors offer the following services to their integrated communications clients:  (i) marketing materials, including the management, production, sourcing, kitting, warehousing, and distribution of a complete range of branded materials to improve sales efforts through various sales and media channels, and analytics to track the efficacy of such materials, (ii) customer onboarding, regulatory notices, letters, sales and transactional communications that require secure, accurate and efficient handling and delivery using print and electronic media, as well as digital services that allow clients to customize and personalize their documents, including critical communications to their customers, (iii) product marking and labeling solutions for products, and (iv) document management and printing services, such as traditional business forms, preprinted documents, and secure documents (using specialized inks, unique constructions, and other proprietary security features to defeat attempts to create fraudulent copies or alterations).

19.     Demand for the Debtors' traditional printing services has declined because of advances in technology and the proliferation of digital, electronic, and internet-based communication and marketing options.

### (iii)    Acquisition of WorkflowOne

20.     On August 1, 2013 Standard Register acquired 100% of the outstanding equity interests of WorkflowOne, LLC ("WorkflowOne").[6]  In connection with the acquisition, Standard Register and its subsidiaries also assumed secured debt in the principal amount of approximately $210 million, and pledged its assets (as described below) to secure that debt. Additionally, Standard Register issued warrants that were subsequently converted into 2.6 million shares of Standard Register's common stock in October 2013.  The transaction was intended to (a) broaden the Debtors' overall customer bases in both industries, (b) expand their array of services and products by adding document management and kitting services as well as promotional and branded merchandise to their portfolio, and (c) extend their business relationships with existing customers while deepening their position in existing markets through opportunities to cross-sell their combined products and services.

---

[6]     Prior to the merger, on September 29, 2010, Workflow Management Inc., Workflow Holdings Corporation, WF Capital Holdings, Inc., WF Holdings, Inc., Workflow Direct, Inc., Workflow Management Acquisition II Corp., WFIH, Inc., WFMI, Inc., Workflow of Florida, Inc., Workflow Solutions LLC, SFI of Puerto Rico, Inc., Old FGS, Inc., Old UE, LLC, The Relizon Company, Relizon Wisconsin Inc., Relizon (Texas) Ltd., LLP, Relizon SNE Inc., Relizon KNE Inc., Relizon de Mexico Inc., Formcraft Holdings General Partner, Inc., and Formcraft Holdings Limited Partner, Inc. (collectively, the "Workflow Debtors") filed chapter 11 petitions in the Eastern District of Virginia, Norfolk Division (the "Workflow Bankruptcy Court").  The cases were administratively consolidated under the case of Workflow Management Inc., Case No. 10-74617, and presided over by Chief Judge Stephen C. St. John.  The Workflow Debtors' assets included certain real property interests.  The Workflow Bankruptcy Court confirmed a liquidating chapter 11 plan for the Workflow Debtors on February 25, 2011 and no discharge was entered.  On or about March 2, 2011, WorkflowOne, LLC acquired substantially all of the Workflow Debtors' assets in connection with the Workflow Debtors' confirmed chapter 11 plan.  On February 11, 2014, the Workflow Debtors' bankruptcy case was closed.

**B.      Corporate Structure**

21.      Standard Register is a publicly traded company that is incorporated in Ohio and is headquartered in Dayton, Ohio.  Standard Register has ten direct and indirect subsidiaries, six of which are U.S. entities.  A chart depicting the Debtors' corporate structure is annexed hereto as <u>Exhibit A</u>.

22.      Standard Register owns 100% of the equity in the following Debtors: (1) Standard Register International, Inc., an Ohio corporation that does not currently conduct business, (2) Standard Register Technologies, Inc., an Ohio corporation that serves as a holding company ("<u>Standard Register Technologies</u>"), (3) Standard Register Holding Company, an Ohio corporation that serves as a holding company, (4) Standard Register Mexico Holding Company, an Ohio corporation that serves as a holding company, (5) iMedConsent, LLC, a Delaware limited liability company  that provides solutions for managing patient informed consent process, and (6) Standard Register of Puerto Rico Inc. (f/k/a WorkflowOne of Puerto Rico Inc.), a Delaware corporation.

23.      Standard Register Technologies owns 100% of the equity in Standard Register Technologies Canada ULC, a Nova Scotia unlimited liability company  that distributes printed products in Canada.

24.      Standard Register Holding Company owns 10% and Standard Register Mexico Holding Company owns 90% of the equity in Standard Register Holding, S. de R.L. de C.V., a Mexican limited liability company that serves as a holding company.  Standard Register Holding, S. de R.L. de C.V. owns 99.97% and Standard Register Mexico Holding Company owns 0.03% of the equity in Standard Register de Mexico, S. de R.L. de C.V., a Mexican limited liability company that manufactures labels in Mexico.  Standard Register Holding, S. de R.L. de C.V. owns 99.97% and Standard Register Mexico Holding Company owns 0.03% of the equity

in Standard Register Servicios, S. de R.L. de C.V., a Mexican limited liability company that provides employees to Standard Register de Mexico, S. de R.L. de C.V.

25.     Additionally, Standard Register owns 24% of the equity in Veri-Logic LLC, a provider of industrial bar code and radio frequency (RFID) technologies.

## C.     Key Liabilities

### (i)     Debtors' Prepetition Secured Indebtedness

26.     The Debtors are obligated on a certain Amended and Restated Loan and Security Agreement, dated as of August 1, 2013 (the "ABL Loan") by and among the Standard Register, WorkflowOne, the subsidiary guarantors named therein, Bank of America, N.A. ("BofA"), as administrative agent, and the lenders named therein (the "ABL Lenders"), which provides up to $125 million in aggregate loans and other financing accommodations in the form of an asset-based revolving credit facility that will mature on August 1, 2018.  The ABL Loan is limited by a borrowing base calculation and is secured by a first priority security interest in, and lien on, the borrowers' and guarantors' cash, accounts, deposit accounts, securities accounts, security entitlements, securities, financial assets, inventory, certain tax refunds, related assets, and all proceeds from such property and assets (collectively, the "ABL Collateral") and by a second priority interest in, and lien on, substantially all of the borrowers' and guarantors' other assets.  The ABL Loan contains a fixed charge coverage covenant test of 1:1 that becomes applicable if the sum of available un-borrowed credit plus certain cash balances falls below 12.5% of the aggregate commitments or $12.5 million, whichever is greater.  As of the Petition Date, the Debtors have drawn $92.7 million[7] from the ABL Loan.

---

[7]     In addition, there are outstanding letters of credit in the amount of approximately $3.6 million.

27.     As described above, in connection with the WorkflowOne acquisition, the Debtors assumed secured debt in the amount of $210 million, which was previously owed by WorkflowOne under two credit agreements.  First, the Debtors are obligated under that certain First Lien Credit Agreement, dated as of August 1, 2013 (as amended, the "First Lien Term Loan"), by and among Standard Register, WorkflowOne, the subsidiary guarantors named therein, Silver Point Finance, LLC ("Silver Point"), as administrative agent, and the lenders named therein (the "First Lien Lenders").  The First Lien Term Loan is a term loan in the original principal amount of approximately $124 million that will mature on August 1, 2018 (the "First Lien Term Debt").  The First Lien Term Loan is secured by a first priority security interest in, and lien on, substantially all of the borrowers' and guarantors' assets that do not constitute ABL Collateral, including intercompany debt, owned real property (including all improvements thereon), equipment and fixtures, certain equity interests, and all proceeds from such property and assets (collectively, the "Term Loan Collateral") and by a second priority interest and lien on the ABL Collateral.  As of the Petition Date, the Debtors owe approximately $115.3 million in principal, plus accrued interest, on the First Lien Term Debt.[8]

28.     Second, the Debtors are obligated on that certain Second Lien Credit Agreement, dated as of August 1, 2013, (as amended, the "Second Lien Term Loan," and, together with the First Lien Term Loan, the "Term Loans" and, together with the ABL Loan, the "Secured Debt Obligations") by and among Standard Register, WorkflowOne, the subsidiary guarantors named therein, Silver Point, as administrative agent, and the lenders named therein (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Term Loan Lenders").  The Second Lien Term Loan is a term loan with an original principal amount of

---

[8]     This amount includes principal and accrued interest.

approximately $96 million that will mature on February 1, 2020 (the "Second Lien Term Debt").

The Second Lien Term Loan is secured by a first priority security interest in, and lien on, the

Term Loan Collateral and by a second priority interest in, and lien on, the ABL Collateral.  As of

the Petition Date, the Debtors owe approximately $98.6 million in principal, plus accrued

interest, on the Second Lien Term Debt.

29.    The Term Loans both require the Debtors to comply with the following

quarterly financial covenants: a required minimum earnings level, a total leverage ratio, and a

fixed charge coverage ratio.  The Debtors were in compliance with all covenants as of the third

quarter of 2014.  On January 21, 2015, the Debtors entered into a First Amendment to the First

Lien Credit Agreement and a First Amendment to the Second Lien Credit Agreement, pursuant

to which, among other things, the Tern Loan Lenders (a) agreed to extend,  through and

including February 27, 2015, the test for compliance with each of the maximum total leverage

ratio, the minimum fixed charge coverage ratio and the minimum EBITDA financial covenants,

under the First Lien Term Loan and the Second Lien Term Loan, for the fiscal quarter ending on

or about December 31, 2014 and (b) limited the Standard Register's reinvestment rights with

respect to the proceeds of collateral dispositions.

30.    The relative rights of the ABL Lenders, on the one hand, and the Term

Loan Lenders, on the other, with respect to the ABL Collateral and the Term Loan Collateral are

governed by that certain Intercreditor Agreement, dated as of August 1, 2013 (the "ABL/Term

Loan Intercreditor Agreement") by and among Standard Register and certain other Debtors,

BofA, as administrative agent under the ABL Loan, and Silver Point, as administrative agent

under the Term Loans.  The relative rights of the First Lien Lenders, on the one hand, and the

Second Lien Lenders, on the other, with respect to the ABL Collateral and the Term Loan

Collateral are governed by that certain Intercreditor Agreement dated as of August 1, 2013 (the "First Lien/Second Lien Intercreditor Agreement") by and among Standard Register and certain other Debtors, and Silver Point, as administrative agent under the Term Loans.  Pursuant to the First Lien/Second Lien Intercreditor Agreement, the First Lien Lenders have a priority right to payment vis-à-vis the Second Lien Lenders.

31.     The Debtors have eighteen (18) capital leases in the aggregate amount of $10.6 million[9] in connection with certain office equipment, including printers, copiers, postage meters, and a generator.

32.     The Debtors do not have any material secured indebtedness other than that described herein.

**(ii)     Pension Plan Liabilities**

33.     The Debtors administer a qualified[10] pension plan that covers certain U.S. employees but is frozen and no longer available to new participants (the "Qualified Pension Plan" and the obligations thereunder, the "Pension Obligations").  The Qualified Pension Plan is currently underfunded in the approximate amount of at least $193.6 million.[11]  The Debtors made contributions to the Qualified Pension Plan of approximately $24.7 million in 2013 and $37.2 in 2014, respectively.  The Debtors' projected contribution requirement for 2015 is $24.8 million.[12]

---

[9]    This amount is as of February 28, 2015.

[10]    The Debtors also have non-qualified pension plans, which are unfunded and have no plan assets.

[11]    This amount is as of February 28, 2015.

[12]    The Debtors are only able to provide this preliminary estimate at this time.

(iii)    **Trade Debt**

34.    The Debtors produce approximately half of their products at their

production facilities, while the remaining products are primarily sourced from the Debtors'

preferred suppliers.  For example, the Debtors purchase raw paper in a wide variety of weights,

grades, and colors from various paper mills located in the United States and Canada.  Pressure-

sensitive materials, carbonless paper, inks, and printing supplies are purchased from leading

vendors including International Paper, XPEDX, and Georgia-Pacific.  As of the Petition Date,

the Debtors owe approximately $72.7 million[13] in unsecured trade debt.

D.    **Key Assets**

(i)    **Cash**

35.    The Debtors collectively have 32 bank accounts, which contain a total of

approximately $1.5 million in cash.[14]

(ii)    **Owned and Leased Property**

36.    The Debtors own the facility in which their corporate office is located at

600 Albany Street, Dayton, Ohio 45417.  They lease their second office facility in Dayton, Ohio

(formerly, the corporate office of WorkflowOne).  The Debtors also own and/or lease various

other production facilities and warehouses, the majority of which are located in the United

States.

37.    Prior to the Petition Date, the Debtors entered into various lease

agreements for with respect to certain properties.  Following Standard Register's acquisition of

WorkflowOne in 2013, the Debtors commenced a restructuring process to streamline their

operations and to implement various savings and efficiency initiatives, including the

---

[13]    This amount is as of February 28, 2015.

[14]    This amount includes cash in the Debtors' postage accounts.

consolidation of facilities and warehouses.  Certain leased properties were vacated in the course

of this restructuring process.  Because the Debtors no longer occupy and use these vacant

properties, the Debtors will seek, at the appropriate time, the Court's authorization to reject the

currently unexpired lease agreements related thereto.

### (iii)    Intellectual Property

38.    The Debtors own numerous patents and trademarks related to documents,

equipment, systems, labels, and security products that provide a competitive advantage or

generate license income.  None of these, individually, have a material effect on the Debtors'

business.

### (iv)    Net Operating Loss Carryforwards

39.    The Debtors' net operating loss carryforwards (the "NOLs") are currently

estimated to be approximately $100,401,084 for 2001 through 2013, plus approximately $50

million for 2014, which are collectively worth significant potential future income tax savings

based on the Debtors' 35% federal corporate tax rate.  Additional state tax savings may also be

available by utilizing the Debtors' NOLs.  These tax savings and the accompanying increase in

the Debtors' cash flow are valuable assets of the Debtors' estates.

### III.    EVENTS LEADING UP TO THE CHAPTER 11 CASES

### A.    Liquidity Concerns and Amendments to the Term Loans

40.    Because of declining demand in the printing space, the Debtors have

struggled to achieve their revenue and EBITDA targets.  At the same time, as revenue and

EBITDA were declining, the Debtors still needed to maintain relatively large fixed costs on

account of the required interest payments on their secured debt, together with the required

Qualified Pension Plan contributions, and the necessary capital expenditures and investments

that the Debtors have had to make to finance their operations while they are still integrating

WorkflowOne.   Although the Debtors have been making timely interest payment and are not in payment default, they are increasingly under financial pressure.

41.     Prior to the Petition Date, the Debtors engaged Lazard Middle Market LLC ("Lazard") to provide general restructuring advice and assist in evaluating strategic and financial alternatives.  To provide time for the Debtors and Lazard to evaluate strategic alternatives, the Debtors sought amendments (collectively, the "Amendments") to the Term Loans because they were concerned that they would not be able to comply with certain leverage ratio covenants for the period ending December 31, 2014, as a result of the significant decline in earnings.  While the Amendments provided short-term relief from the potential covenant defaults, by deferring the testing period from December 31, 2014 to February 27, 2015, the Debtors remained highly levered and burdened by significant cash disbursements on account of their obligations.

**B.     Prepetition Sale Negotiations**

42.     Prior to the Petition Date, the Debtors and Lazard were approached by a small number of potential strategic buyers that expressed an interest in evaluating an asset sale and/or merger with the Debtors.  These potential strategic buyers signed non-disclosure agreements and conducted due diligence in consideration for a potential acquisition of the Debtors' business operations as a going concern.  No buyer expressed a willingness to assume the Pension Obligations.

43.     As the Debtors and their advisors evaluated their strategic alternatives, two bidders, a strategic buyer, the First Lien Lenders were negotiating to become the stalking horse bidder to acquire substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The Debtors, in consultation with their professionals, determined that the proposal of the First Lien Lenders provided greater value and greater certainty of consideration

than the other proposal.  Lazard, in conjunction with the Debtors' other professionals, negotiated

the proposed terms of the sale with the First Lien Lenders, and such negotiations ultimately

resulted in the proposed asset purchase agreement (the "Stalking Horse APA") entered into by

and between the Debtors and the First Lien Lenders.

**C.     Proposed Postpetition Financing and Cash Flow Projections**

44.     In connection with the proposed sale under the Stalking Horse APA,

certain of the First Lien Lenders and the ABL Lenders jointly agreed to provide the Debtors with

postpetition debtor-in-possession financing to fund the Debtors' postpetition marketing and sale

process.  A copy of the Debtors' projected 13-week cash flow (the "Cash Flow Projections") is

annexed hereto as Exhibit B.  The Cash Flow Projections were prepared at my direction and

represent a reasonable estimate of the Debtors' projected cash flow needs over the next thirteen

weeks.  As shown in the Cash Flow Projections, without the immediate ability to use all

available cash collateral and immediate access to debtor-in-possession financing, the Debtors

will not have sufficient funds to, among other things, pay suppliers and employees and fund

other operational costs.

45.     The Debtors seek bankruptcy protection to facilitate an orderly sale of

substantially all of their assets to the First Lien Lenders as the stalking horse bidder, or another

qualified bidder that comes forward with the highest or otherwise best offer, to maximize value

for the Debtors' creditors and other parties in interest.

**IV.     FIRST DAY PLEADINGS**[15]

46.     Concurrently with the filing of their chapter 11 petitions, the Debtors have

filed a number of First Day Pleadings seeking relief that the Debtors believe is necessary to

---

[15]   Capitalized terms used but not otherwise defined in this Section IV shall have the meanings ascribed to such
terms in the applicable First Day Pleading.

enable them to operate in chapter 11 with minimal disruption and loss of productivity, while also preserving value for all interested parties.  The Debtors respectfully request that the relief requested in each First Day Pleading be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases. A summary of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.  I have reviewed each First Day Pleading discussed below and the facts set forth therein are true and correct to the best of my knowledge and belief, and based upon appropriate reliance on corporate officers and advisors.

A.    **Debtors' Motion for Order Authorizing the Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

47.    In the Joint Administration Motion, the Debtors request entry of an order providing for the joint administration of the Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court provide for joint administration by (a) establishing a joint docket and file for the Chapter 11 Cases; (b) approving the filing of a joint pleading caption; (c) approving combined notices to creditors; and (d) directing that an entry be made on the docket of Standard Register to reflect the joint administration of the Chapter 11 Cases.

48.    Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in the Chapter 11 Cases will jointly affect all Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

49.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      Debtors' Motion for Order Authorizing (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expenses Status for Postpetition Intercompany Claims; and (E) Limited Waiver of Section 345(b) Deposit and Investment Requirements (the "<u>Cash Management Motion</u>")**

50.     In the Cash Management Motion, the Debtors request entry of an order authorizing , among other things, (a) the continued use of their Cash Management System (including as required under the Debtors' proposed postpetition lending facilities and in accordance with the budget and the payment of related prepetition obligations, (b) maintenance of existing bank accounts, including a waiver of certain operating guidelines relating to bank accounts, (c) the continued use of existing business forms, (d) the continued performance of intercompany transactions and grant of administrative status for postpetition intercompany claims, and (e) an interim waiver of the deposit and investment requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' bank accounts.

51.     As described in detail in the Cash Management Motion, the Debtors' business requires the collection, payment, and transfer of funds through numerous bank accounts.  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "<u>Cash Management System</u>").  Like other large businesses, the Debtors designed their Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made.  The Debtors' financial

personnel manage the Cash Management System from the Debtors' treasury department in

Dayton, Ohio.  The Debtors' Cash Management System is comprised of approximately 40 bank

accounts.  Each general category of accounts is described in the Cash Management Motion and a

diagram of the Cash Management System is annexed as Exhibit B thereto.

52.     The relief requested in the Cash Management Motion is vital to ensuring

the Debtors' seamless transition into bankruptcy.  I believe that the relief requested in the Cash

Management Motion is in the best interests of the Debtors' estates, their creditors, and all other

parties in interest, and will enable the Debtors to continue to operate their businesses in chapter

11 with minimal disruption, thereby benefiting all parties in interest.  Accordingly, for the

reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors I

respectfully submit that the Cash Management Motion should be approved.

**C.      Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries and Other Compensation, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on a Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, and (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers (the "Employee Wage and Benefits Motion")**

53.     In the Employee Wage and Benefits Motion, the Debtors are requesting

entry of an order authorizing, but not directing, the Debtors to (a) pay prepetition claims and

honor obligations incurred or related to, among other things, Compensation Obligations,

Withholding Obligations, Reimbursable Expense Obligations, Todd Administrative Fee

Obligations, Severance Obligations, Incentive Obligations and Employee Benefits Obligations,

and all fees and costs incident to the foregoing, including amounts owed to third-party

administrators (collectively, the "Employee Obligations") and (b) maintain, continue and honor,

in the ordinary course of business, the Employee Benefit Plans, including the Debtors' workers'

compensation insurance plan, the Incentive Programs and the Equity Incentive Plan (collectively, the "Employee Plans and Programs").

54.    The Debtors' Employees and Contract Workers are collectively referred to herein as the "Workforce."

55.    The Employees are the lifeblood of the Debtors' business, and their value cannot be overstated. The management, marketing, sales, manufacturing, and technical skills of the Employees are essential to the Debtors' ability to source materials, research and develop high-quality, competitive products and services, bring those products and services to market, and timely deliver them to their customers. To a significant extent, the Debtors' success depends upon their ability to attract and retain key personnel. If the Debtors cannot assure their Employees that the Debtors will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, Employee Benefits Obligations, the Debtors believe that certain Employees will likely seek employment elsewhere, potentially with the Debtors' competitors. The loss of Employees at this juncture would have a material adverse impact on the Debtors' businesses and ability to maximize value through the prosecution of these Chapter 11 Cases and the pursuit of a section 363 sale.

56.    Moreover, the Contract Workers fill critical and immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet the needs of their customers while also remaining as cost-efficient as possible. In such capacity, the Contract Workers fill every type of role with the Debtors, including providing sales, human resources, payroll, marketing and manufacturing personnel as needed. The Contract Workers are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contract Workers, it

is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

57.      Accordingly, for the reasons set forth herein and expanded on in the Employee Wage and Benefits Motion, on behalf of the Debtors I respectfully submit that the relief requested in the Employee Wage and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption, thereby maximizing value for the estates.

**D.      Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers, and Freight Carriers (the "Critical Vendors Motion")**

58.      In the Critical Vendors Motion, the Debtors request entry of interim and final orders, respectively, authorizing the Debtors to pay, in their discretion, Critical Vendor Claims and Shipper Claims in the amount of up to $20 million in the aggregate, approximately $17.2 million of which relates to Critical Vendor Claims and $2.8 million of which relates to Shipper Claims.

59.      **Critical Vendors**.  In the ordinary course of business, the Debtors make payments to certain essential trade vendors and service providers (collectively, the "Critical Vendors") on a regular basis.  If the Critical Vendors are not paid and such Critical Vendors refuse to continue conducting business with the Debtors, the Debtors' business operations will be irreparably harmed.  Any interruption to the Debtors' business relationship with the Critical Vendors could have drastic consequences for the operations of the Debtors' businesses due to the lack of alternative suppliers or service providers in many situations, or the amount of time needed to locate and convert to alternative sources.  Such interruption also could negatively

affect the Debtors' revenue, drive down interest in the Debtors' assets from potential purchasers, and further strain the Debtors' liquidity.

60.     The Debtors are seeking authority to pay only Critical Vendors that agree to (a) supply goods or services to the Debtors on the most favorable terms and practices (including any pricing related terms such as allowances, rebates, or discounts) that existed in the one (1) year period prior to the Petition Date between such Critical Vendor and the relevant Debtor, as determined by the Debtors (the "Customary Trade Terms") and (b) not cancel on less than ninety (90) days' notice any contract or agreement whereby it provides goods and/or services to the Debtors.

61.     The proposed order annexed to the Critical Vendor Motion contemplates that with respect to any Critical Vendor that accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, any payments made will be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, will be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim will be reinstated as a prepetition claim in the amount so recovered.

62.     To ensure that the Critical Vendors understand the terms upon which they are accepting payment of their Critical Vendor Claims, and as a condition to receiving payment of any of their Critical Vendor Claims, the Debtors propose to send a Trade Agreement to each Critical Vendor, which will be countersigned by such Critical Vendor.  In the event the Critical Vendor Motion is approved, the Debtors will maintain a record of: (a) the name of each Critical Vendor paid on account of prepetition Critical Vendor Claims, (b) the amount paid to each Critical Vendor, and (c) the goods or services provided by such Critical Vendor.

63.     The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is necessary for the Debtors to maintain liquidity for operations and preserve the customer base and vendor network that is essential to maximizing value for the estates.  The Debtors believe that preserving working capital through the retention or reinstatement of Customary Trade Terms will enable the Debtors to maintain their competitiveness, whereas a deterioration of trade credit and disruption or cancellation of deliveries of goods and services would hinder the Debtors' operations and undermine their ability to generate revenue and ultimately to maximize value for the estates.

64.     **Shippers**.  The services provided by certain common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing services warehousemen, and certain other third-party service providers, including Cass Information Systems, Inc. ("CASS"),[16] a shipping procurement company engaged by the Debtors (collectively, the "Shippers"), are essential to the Debtors' day-to-day operations.  At any given time, there are numerous shipments being made to, or from, the Debtors.  Therefore, certain Shippers are currently in possession of goods, inventory, materials, equipment or other items that are vital to the Debtors' operations.  If the Debtors do not pay the prepetition claims of the Shippers (collectively, the "Shipper Claims"), the Shippers might assert possessory liens against the Debtors' property and refuse to deliver or release such property to the Debtors until they are paid.  Such an outcome could cause significant disruptions to the operation of the Debtors' businesses that would impede their ability to operate successfully in chapter 11.

---

[16]   The Debtors contract with CASS to administer the majority of the shipping services they require in the ordinary course of their business. CASS pays each of the Shippers who provide services to the Debtors and bills the Debtors for such services. The Debtors are not able to obtain the shipping services they require or obtain the property held by the Shippers without the services of CASS.

65.     The Debtors further estimate that the value of the supplies and materials in possession of the Shippers substantially exceeds the amounts the Debtors owe to the Shippers. The inability to ship or receive essential materials for use in the ordinary course of the Debtors' business would likely render the Debtors inoperable.

66.     The Debtors require the services of CASS to pay the Shippers for both prepetition and postpetition services.  Failure to pay the amounts owed CASS, and consequently CASS' inability to pay the Shippers, would preclude the Debtors from obtaining the property currently in the possession of the Shippers and would make it difficult, if not impossible, for the Debtors to obtain shipping services postpetition.

67.     The Debtors' operations are time sensitive and the ability to deliver timely to their customers is essential to the Debtors' businesses and maintaining goodwill in the marketplace.

68.     Permitting the Debtors to make payment of Shipper Claims, including CASS, will enable the Debtors to continue their operations without the serious disruptions that would result if the Shippers asserted their possessory liens on the Debtors' property that is currently in the possession or control of the Shippers, or failed to ship or store the property owned by the Debtors after the Petition Date.

69.     Absent the relief sought in the Critical Vendors Motion, the Debtors' ability to maintain their operations in the ordinary course of business will be severely compromised, thus negatively affecting their primary sources of revenue.  Accordingly, for the reasons set forth herein and in the Critical Vendors Motion, on behalf of the Debtors I respectfully submit that the relief requested in the Critical Vendors Motion is in the best interest of the Debtors' estates and creditors, and should therefore be granted.

E.    **Debtors' Motion for Entry of Order Authorizing Payment of Prepetition Claims of Foreign Vendors (the "<u>Foreign Vendors Motion</u>")**

70.    In the Foreign Vendors Motion, the Debtors seek entry of an order authorizing the Debtors to pay, in their sole discretion, the Foreign Claims (defined below) in the amount of up to $1.6 million.

71.    As explained above, a portion of the Debtors' operations are located in Mexico.  The Mexico operations are run by Standard Register Holding, S. De R.L. De C.V., Standard Register Servicios, S. De R.L. De C.V., and Standard Register de Mexico, S. De R.L. De C.V. (collectively, the "<u>Mexican Debtors</u>").

72.    While the automatic stay is not, by its terms, limited in its geographical scope, as a practical matter, the ability to enforce its provisions may be limited to creditors that are subject to the jurisdiction of the United States bankruptcy courts.  In this case, certain foreign vendors and service providers (collectively, the "<u>Foreign Vendors</u>") may lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of the Bankruptcy Court. These Foreign Vendors, primarily located in Mexico, provide goods and services that are essential to the Debtors' operations.  Many of the Foreign Vendors have long-standing relationships with the Debtors and provide unique or customized goods and services that cannot be obtained from other sources without significant delay and cost.

73.    Based on the substantial experience of the Debtors' management in the industry and their knowledge of the Foreign Vendors, the Debtors believe there is a significant risk that the Foreign Vendors may consider themselves beyond the jurisdiction of the Bankruptcy Court, disregard the automatic stay, and engage in conduct that would disrupt the Debtors' operations.  Indeed, among other things, Foreign Vendors may exercise self-help, which could include reclaiming vital goods already in the Debtors' possession and shutting down the Debtors'

access to essential goods and services needed to maintain the Debtors' businesses as a going

concern.  The Debtors accordingly would be challenged to maintain operations in Mexico absent

the relief sought in the Foreign Vendor Motion.

74.     Foreign Vendors may also attach or foreclose on the Debtors' assets

outside the United States, or sue or otherwise initiate legal actions against one or more of the

Debtors in a foreign court to recover prepetition amounts owed to them.  If these Foreign

Vendors are successful in obtaining a judgment against the Debtors, the Foreign Vendors may

exercise post-judgment remedies.  Because the Debtors may have only limited effective and

timely recourse and no practical ability to remedy this situation (absent payment of amounts

sought by Foreign Vendors), their businesses could be irreparably harmed by any such action to

the detriment of their estates and their creditors.

75.     In light of these consequences, the Debtors have concluded that payment

of the Foreign Claims is essential to avoid disruptions to the Debtors' businesses.  Indeed, the

Debtors calculate that the amount of the Foreign Vendors' prepetition claims (collectively, the

"Foreign Claims")[17] pales in comparison to the potential damage to the Debtors' businesses if

the Debtors' Mexico operations were to shut down without warning.  Therefore, the Debtors'

other creditors will benefit from the Debtors' payments to the Foreign Vendors.

76.     The Debtors propose to pay the prepetition claims of Foreign Vendors

only to the extent necessary and only on such terms and conditions as are appropriate, in the

Debtors' business judgment, to avoid disruptions to their business.  If the Court authorizes

payment of the Foreign Claims, the Debtors estimate that the maximum amount they would pay

to Foreign Vendors is approximately $1.6 million.

---

[17]   The Foreign Claims include all prepetition claims for goods or materials and services provided to the Debtors, as well as import/export fees, customs fees, or duties related to such claims.

**F.      Debtors' Motion for Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "<u>Utilities Motion</u>")**

77.      In the Utilities Motion, the Debtors request entry of interim and final orders (a) prohibiting Utility Providers from altering, refusing or discontinuing utility services, (b) approving the Debtors' proposed adequate assurance of payment for Utility Providers, and (c) approving the Debtors' proposed procedures for resolving additional requests for adequate assurance by Utility Providers.

78.      In conjunction with their day-to-day operations and/or maintenance of their businesses, the Debtors receive traditional utility services from various Utility Providers for, among other things, electricity, water, gas, local and long-distance telecommunication services, data service, waste disposal, sewer service and other similar services (collectively, the "<u>Utility Services</u>").  The Utility Providers include, without limitation, the entities set forth on the list annexed to the Utilities Motion as <u>Exhibit C</u> (the "<u>Utility Providers List</u>").

79.      The Debtors paid an average of approximately $1,183,040 per month on account of all Utility Services during the 2014 calendar year.  The Debtors have consistently made payments to the Utility Providers on a regular and timely basis, and to the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed invoices for Utility Services, other than the payment interruptions that may be caused by the commencement of these Chapter 11 Cases.

80.      I believe and am advised that the requested relief is necessary or else the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first few weeks of the Chapter 11 Cases.  Moreover, a termination of or disruption in Utility Services could significantly disrupt the Debtors' operations and reduce

their revenue and profits, thereby jeopardizing the Debtors' ability to maximize creditor

recoveries.  It is, therefore, critical that Utility Services continue uninterrupted during the

Chapter 11 Cases.

81.     Accordingly, for the reasons set forth herein and in the Utilities Motion,

on behalf of the Debtors I respectfully submit that the relief requested in the Utilities Motion is

in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and

will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**G.     Debtors' Motion for Order (I) Authorizing the Payment of Prepetition Sales, Use, Franchise, Income and Similar Taxes and Fees, and (II) Authorizing Banks to Receive, Process, and Honor Checks Issued and Electronic Payment Requests Related Thereto (the "Tax Motion")**

82.     In the Tax Motion, the Debtors seek entry of an order authorizing, but not

directing, the Debtors to pay any Taxes and Fees in the ordinary course of business, without

regard to whether such obligations accrued or arose before or after the Petition Date; provided

that the Debtors will only pay Taxes and Fees if the Debtors determine, in the exercise of their

business judgment, that nonpayment of such Taxes and Fees will cause immediate and

irreparable harm to the Debtors' estates.

83.     The Debtors conduct business in all U.S. states and Puerto Rico.  In the

ordinary course of business, the Debtors (a) incur and/or collect Taxes; (b) incur Fees in

connection with obtaining licenses and permits necessary to operate their businesses; and (c)

remit such Taxes and Fees to various taxing, licensing, and other governmental authorities

(collectively, the "Taxing Authorities").  The Taxes and Fees may, from time to time, be the

subject of an audit (each an "Audit") by the applicable Taxing Authority, and the amounts

estimated as due or already paid by the Debtors may be subject to upward or downward

adjustment based upon the amount that the applicable Taxing Authority ultimately claims is due

following an Audit.  The Debtors regularly pay the Taxes and Fees in a timely manner on a monthly, quarterly, or annual basis, in each case as required by applicable laws and regulations, and none of the Taxes or Fees the Debtors are seeking authority to pay pursuant to the Taxes Motion are past-due or "catch up" Taxes or Fees.  The Debtors do not hold any funds specifically earmarked for the payment of taxes in a segregated account.

84.     The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during the Chapter 11 Cases. Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations and the value of their assets because the Taxing Authorities could suspend the Debtors' operations, file liens against the Debtors, or seek to lift the automatic stay.  In addition, certain Taxing Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' sale efforts during the pendency of the Chapter 11 Cases.  The Debtors seek authority to pay tax obligations that remaining outstanding as of the Petition Date, and future tax obligations in the ordinary course of business as and when such obligations become due and owing.

85.     Accordingly, for the reasons set forth herein and in the Tax Motion, on behalf of the Debtors I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and creditors because it will enable the Debtors to continue to operate in chapter 11 without disruption.

**H.     Debtors' Motion for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "<u>Insurance Motion</u>")**

86.     In the Insurance Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to (i) continue and renew their Insurance Policies, including their Workers' Compensation Policies, and (ii) honor all of their prepetition and postpetition obligations under and in connection with the Insurance Policies on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date. This would include (i) renewing or obtaining new insurance policies as needed in the ordinary course of business and (ii) paying all premiums owed under the Workers' Compensation Policies and all prepetition amounts arising under the Insurance Policies, including the Broker Fees (collectively, the "<u>Insurance Obligations</u>").

87.     As described in the Insurance Motion, in the ordinary course of their businesses, the Debtors maintain numerous  insurance policies with various insurance providers (collectively, the "<u>Insurers</u>") that provide coverage for, among other things, products liability, general liability, property, automobile, umbrella liability, excess liability, crime, and directors and officers liability (collectively, with the Workers' Compensation Policies, the "<u>Insurance Policies</u>"), as summarized in <u>Exhibit B</u> annexed to the Insurance Motion.  The Debtors incur a total of approximately $2.3 million in the aggregate in annual premiums in connection with maintaining their Insurance Policies as well as other obligations, including their broker fees and premiums and costs related to the Workers' Compensation Policies (collectively, the "<u>Insurance Obligations</u>").

88.     The Insurance Policies are essential to preserving the value of the Debtors' Business and their assets.  In many cases, the insurance coverage provided by the Insurance

Policies is required by various regulations, laws, and contracts that govern the Debtors'

commercial activities.

89.     Accordingly, for the reasons set forth herein and in the Insurance Motion,

on behalf of the Debtors I respectfully submit that the relief requested in the Insurance Motion is

in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and

will enable the Debtors to continue to operate in chapter 11 without disruption.

I.     **Debtors' Motion for Order Authorizing Debtors to Honor and Continue Certain Customer Programs in the Ordinary Course of Business (the "<u>Customer Programs Motion</u>")**

90.     In the Customer Programs Motion, the Debtors request entry of an order

authorizing the Debtors, in their sole discretion, to, among other things, maintain and administer

certain Customer Programs and to honor prepetition obligations thereunder in the ordinary

course of business and in a manner consistent with past practices.

91.     As described in the Customer Programs Motion, prior to the Petition Date,

both in the ordinary course of the Debtors' business and as is customary in the industry, the

Debtors offered and engaged in certain customer and other programs and practices (collectively,

the "<u>Customer Programs</u>").  The Customer Programs include, but are not limited to, the

following: (a) Prepaid Postage Obligations; (b) Warranties and Guarantees; (c) Refunds; (d)

Rebates; (e) Purchasing Group Rebates; and (f) all such other similar policies, programs and

practices of the Debtors, including honoring credit balances.

92.     In order to effectuate a smooth transition into chapter 11, the Debtors must

not only deliver their products and services, including corporate stationary, marketing materials

and other printed business documents, promotional marketing products, labels, and healthcare

technology products, but they must also maintain customer loyalty and goodwill through the

Customer Programs.  Indeed, the Debtors implemented the Customer Programs in the ordinary

course of business prior to the Petition Date as a means by which to maintain positive,

productive, and profitable relationships with their customers, encourage new purchases, enhance

customer satisfaction and ensure that the Debtors remain competitive in their industry.  Although

the terms of the Customer Programs may vary among the Debtors' customers, all of the

Customer Programs are designed and implemented to encourage the Debtors' customers to

increase their purchasing frequency and volume, resulting in larger net revenues for the Debtors

and, in return, greater satisfaction for the customers.

93.    Accordingly, the Debtors' ability to honor their Customer Programs in the

ordinary course of business is necessary to retain their customer base and reputation within the

industry at this critical juncture of the sale process.  In connection with the Customer Programs,

the Debtors provide their customers with certain goods and services and, as a result thereof, may

owe certain obligations to their customers and certain subcontractors that provide goods and

services to their customers, arising both prior to and after the Petition Date (collectively, the

"Customer Obligations").

94.    The success and viability of the Debtors' business, and ultimately the

Debtors' ability to maximize value for their estates, are dependent upon the patronage and

loyalty of their customers.  In this regard, the Debtors' Customer Programs are critical, and any

delay in honoring the Debtors' obligations thereunder will severely and irreparably impair

customer relations.  Any failure to honor and pay prepetition Customer Obligations, for even a

brief time, is likely to drive away valuable customers, thereby harming the Debtors' efforts to

maximize value and perhaps reducing interest in the Debtors' assets.

95.    Accordingly, for the reasons set forth herein and in the Customer

Programs Motion, the Debtors seek authority, but not direction, to continue the Customer

Programs, including authority to honor Customer Obligations arising therefrom, in their sole

discretion.  On behalf of the Debtors, I respectfully submit that the relief requested in the

Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all

other parties in interest.

**J.      Debtors' Motion for Entry of an Order (I) Granting Administrative Expense
         Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition
         and Delivered Postpetition and Authority to Satisfy Such Obligations in the
         Ordinary Course of Business, and (II) Granting Related Relief (the "Postpetition
         Goods and Services Motion")**

96.      As a result of the commencement of these Chapter 11 cases, the Debtors

believe that several suppliers of goods and services (collectively, the "Suppliers") with whom, as

of the Petition Date, the Debtors had outstanding prepetition purchase orders (the "Outstanding

Orders") may perceive a risk that they will be treated as prepetition general unsecured creditors

with respect to any shipments made after the Petition Date pursuant to the Outstanding Orders.

As a result, the Suppliers may refuse to deliver such goods or services to the Debtors unless the

Debtors can assure payment.  The Debtors' business depends on the ability to quickly obtain

necessary goods and services from the Suppliers in order to generate their product line.  The

inability to maintain sufficient inventory due to the Suppliers' refusal to deliver goods could

have a significant detrimental impact on the Debtors' business.

97.      Accordingly, for the reasons set forth herein and in Postpetition Goods and

Services Motion, the Debtors seek authority, but not direction, to satisfy their obligations in

connection with the Outstanding Orders.  On behalf of the Debtors, I respectfully submit that the

relief requested in the Postpetition Goods and Services Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest.

K.    **Debtors' Motion for Entry of Interim and Final Orders Establishing Notification Procedures for Dispositions of, or Claims of Worthless Stock Deductions with Respect to, Standard Register Stock (the "<u>NOL Motion</u>")**

98.    In the NOL Motion, the Debtors request that the Court enter interim and final orders establishing notification procedures for (a) certain dispositions of equity securities in Standard Register or of any beneficial ownership thereof (the existing Common Stock and Class A Stock of Standard Register and any beneficial ownership thereof, including options to acquire such stock, collectively, the "<u>Stock</u>") that must be complied with before dispositions of such stock are deemed effective and (b) asserting a claim of worthless stock deduction with respect to the Stock, that must be complied with before such claims of worthless stock deductions are deemed effective.  The Debtors further request that the Court grant relief on an interim and final basis, thereby preserving the status quo in this regard, ordering that any purchase, sale, or other disposition of, or claim of worthless stock deduction with respect to, Stock in violation of the procedures set forth in the NOL Motion (including the notification procedures set forth in the NOL Motion) shall be void *ab initio*.

99.    The Debtors have incurred significant net operating losses ("<u>NOLs</u>"), in the recent past.[18] The Debtors' NOLs are an extremely valuable asset because, under the Internal Revenue Code (the "<u>IRC</u>"), the Debtors can generally carry forward their NOLs to offset their future taxable income for up to 20 taxable years and thereby reduce their future aggregate tax obligations.

100.    The Debtors' NOLs available to be utilized are currently estimated to be approximately $100.4 million for 2001 through 2013, plus approximately $50 million for 2014,

---

[18] NOLs can be used as either "carrybacks" (in which the corporation can generally use the NOLs to offset taxable income for up to two previous taxable years) or "carryovers" (in which the corporation can generally use the NOLs to offset taxable income for up to twenty taxable years into the future).

which are collectively worth significant potential future income tax savings based on the

Debtors' 35% federal corporate tax rate.[19]  Additional state tax savings may also be available by

utilizing the Debtors' corresponding state NOLs.  These potential tax savings and the

accompanying increase in the Debtors' cash flow are valuable assets of the Debtors' estates.

   101. The Debtors' NOLs are valuable assets of their estates that will facilitate

the Debtors' ability to maximize value for the benefit all of their stakeholders.  If the Debtors are

unable to monitor and object to the above-referenced transactions, the Debtors' future use of

their NOLs may be jeopardized.  The Debtors have proposed notice and hearing procedures that

impose minimal burdens on affected entities to achieve a substantial benefit to the Debtors'

estate.

   102. Accordingly, for the reasons set forth herein and in the NOL Motion, on

behalf of the Debtors I respectfully submit that the relief requested in the NOL Motion is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest because, if

granted, the relief requested therein will allow the Debtors to avoid unnecessary tax expense.

**L.** **Debtors' Application for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent (the "156(c) Application")**

   103. In the 156(c) Application, the Debtors seek entry of an order authorizing

the Debtors to retain Prime Clerk LLC ("Prime Clerk") as their Claims and Noticing Agent in

these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and

the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.  It

is my understanding that the Debtors' selection of Prime Clerk to act as the Claims and Noticing

Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents*

*under 28 U.S. C. § 156(c)*, in that the Debtors, with the assistance of their advisors, have

---

[19] The Debtors file consolidated tax returns.

obtained and reviewed engagement proposals from at least two other court-approved claims and

noticing agents to ensure selection through a competitive process. Moreover, I submit, based on

all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and

reasonable given Prime Clerk's quality of services and expertise.

104.    Although the Debtors have not yet filed their schedules of assets and

liabilities, they anticipate that there will be thousands entities to be noticed. In view of the

number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors

submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f)

and is otherwise in the best interests of both the Debtors' estates and their creditors.


**M.    Debtors' Motion for Order (A) Authorizing Debtors (I) To Provide Adequate Protection To The Debtors' Secured Lenders, (II) To Obtain Interim Postpetition Financing On A Superpriority, Secured and Priming Basis In Favor of Silver Point Finance, LLC, as Administrative Agent For Proposed DIP Term Lenders, and Bank of America, N.A., as Administrative Agent For Proposed DIP ABL Lenders, and (III) To Modify The Automatic Stay; and (B) Scheduling, and Establishing Deadlines Relating To A Final Hearing and Entry of A Final Order On Postpetition Financing (the "<u>DIP Motion</u>")**

105.    In the DIP Motion, the Debtors seek postpetition financing in the form of a $125

million revolving credit facility and a $30 multiple draw term loan facility. The Debtors have an

immediate and urgent need for debtor-in-possession financing to continue to operate their

businesses, to pay vendors to supply necessary goods and services, to pay employees, and to

satisfy other working capital and operational needs. All of these cash needs must be met to

preserve and maintain the Debtors' going-concern value. If the Debtors could obtain authority to

use cash collateral as defined in Bankruptcy Code section 363(b), the Debtors could fund a

portion of their operations, but the Debtors' aggregate cash needs to continue operations exceed

the cash collateral they would generate. Without access to debtor-in-possession financing, the

Debtors would suffer immediate and irreparable harm by being forced to shut down at least a

portion of their businesses, lay off employees, and cease certain operations to the detriment of the Debtors, their estates, and the stakeholders therein. Based on the need for additional cash to maintain operations and preserve going concern value, the parties agreed on the proposed DIP Loan Agreements.

106. In general, the Debtors' cash is subject to security interests in favor of the ABL Lenders and the Term Lenders (together, the "Secured Lenders"). As of the Petition Date, the Debtors have approximately $1.5 million of cash on hand, which is subject to the security interests of the Secured Lenders. All of this cash constitutes ABL Priority Collateral, meaning that the ABL Lenders have the priority security interest in and lien on such cash vis-à-vis the Term Lenders. Further, the Term Lenders have a second priority right of payment from such cash. In addition, the Debtors currently forecast approximately $230 million of receivables will be collected by the Debtors over the next 13 weeks, which cash will constitute proceeds of the Secured Lenders' Prepetition Collateral, and all or virtually all of that cash will constitute ABL Collateral.

107. Lazard sought alternative DIP financing from seven other potential lenders. None of those potential lenders offered to provide DIP financing on any terms. They were unwilling to provide unsecured administrative credit or credit secured only by junior liens. They were also unwilling to offer credit on priming terms only to engage in a contested priming battle with the existing lenders. As a result, the Debtors were unable to find any DIP financing other than the proposed DIP Loans.

108. The Debtors propose to use the proceeds of the DIP Loans for necessary liquidity to operate in chapter 11. The Debtors, therefore, seek an order authorizing the Debtors to enter into the DIP Loan Agreements and to borrow money thereunder. As indicated in the Cash Flow

Projections attached as Exhibit B hereto, the Debtors believe that use of cash collateral would not be sufficient to fund their operations and pay all administrative expenses during these Chapter 11 Cases.  Accordingly, the Debtors need the DIP Loans if they are to continue operating long enough to complete a sale as a going concern or confirm a chapter 11 plan.

109.    The DIP Term Loan Agreement contemplates a multiple draw term loan providing for up to $30 million aggregate principal amount of DIP Term Loans.  The DIP Term Loan will be secured by (a) a first-priority senior priming lien and security interest in the Term Loan Collateral and non-priming security liens on and security interest in and the Debtors' unencumbered assets, subject to the Carve-Out, and (b) a junior lien on the ABL Collateral and all of the Debtors' other assets that are subject to Permitted Senior Liens, subject to the Carve-Out.  The DIP Term Loan will bear interest at LIBOR plus 9.5% per annum (with a LIBOR floor of 1%) or the Alternative Base Rate (as defined in the DIP Term Loan Agreement)[20] plus 8.5% per annum, at the Debtors' election, payable in cash or in kind at the Debtors' election.  The DIP Term Loan matures on September 8, 2015, unless otherwise extended or shortened under certain circumstances.

110.    The DIP ABL Agreement contemplates a revolving loan providing for up to $125 million aggregate principal amount of loans and other financial accommodations, the provision of which will be subject to compliance with the 13-week budget created in accordance with the terms of the DIP ABL Credit Agreement (the "Budget") and the borrowing base formula.  The DIP ABL Loan will be secured by (a) a first-priority senior priming lien on the ABL Loan Collateral and the Debtors' Unencumbered Assets, and (b) a junior lien on the Term Loan Collateral and all of the Debtors' other assets that are subject to Permitted Senior Liens.  The

---

[20]    As of the Petition Date, the Alternative Base Rate is 3.25% per annum.

DIP ABL Loan will bear interest (a) at the Base Rate (as defined in the DIP ABL Credit Agreement)[21] plus 1.25% per annum, or (b) at the Debtors' election with respect to draws of at least $3 million, at LIBOR plus 2.25%.  The DIP ABL Loan matures on September 8, 2015, unless otherwise extended or shortened under certain circumstances.

111.    The DIP Lenders will also receive a superpriority administrative expense claim for any unpaid obligations under the DIP Loans.  The DIP ABL Loan and the DIP Term Loan will, subject to certain sharing provisions, be provided super priority administrative claims and their new liens on the Unencumbered Assets subject to a sharing mechanism set forth in the Interim Order and in the ABL/Term DIP Intercreditor Agreement (as defined below); provided, however, that the DIP Term Loans' liens and super priority claim shall in all respects be subject to the Carve-Out, as set forth in the Interim Order.  The DIP ABL Liens and super priority claims will not be subject to the Carve-Out.

112.    Prior to the Final Hearing, all collections of ABL Priority Collateral will be applied against the ABL Loan.  The ABL Debt will be paid in full in cash, or "rolled up," promptly after the Final Hearing (as defined below), from draws on the DIP ABL Loan.  Pending entry of the Final Order, repayment of the ABL Loan will generate additional borrowing capacity under the DIP ABL Loan under the borrowing base formula, which is net of any sums drawn on the ABL Loan.  Repayment of the ABL Loan will be without prejudice to the rights of any third party, including, without limitation, any official committee appointed in the Chapter 11 Cases to seek to clawback such payment if that third party successfully challenges the validity of the liens securing the ABL Credit Facility.  After the Interim Hearing, use of the DIP Term Loans, a multiple-draw facility, will be authorized in full, provided that the Debtors may not use

---

[21]    As of the Petition Date, the Base Rate is 3.25% per annum.

more than $140,000,000 in DIP Loans (other than DIP Credit Extensions) through the date of the

Final Hearing.  After the Interim Hearing, use of the DIP Term Loans, a multiple-draw facility,

will be authorized in full, provided that the Debtors may not use more than $140,000,000 in DIP

Loans (and other DIP Credit Extensions) through the date of the Final Hearing.  After the initial

funding approved by the Interim Order, the Debtors seek approval at the Final Hearing, for the

ABL Loan to be fully paid and rolled up, and to permit the DIP ABL Loan to serve as a revolver

up to the full $125,000,000 amount of the ABL DIP Credit Extensions, which, as supplemented

by the DIP Term Loan, will have the capacity needed to meet the Debtors' projected operating

expenses going forward.

113.    As noted above, the cash collateral, including any postpetition proceeds of the

Prepetition Collateral, is subject to the liens of the Secured Lenders and is expected to constitute

primarily, if not exclusively, ABL Collateral.  The Secured Lenders have refused to consent to

the Debtors' use of cash collateral, but have agreed to provide the DIP Loans.  Prior to the

Petition Date, the Debtors and the Secured Lenders negotiated the terms whereby the Secured

Lenders will fund the Debtors' operations through the DIP Loans.  The Debtors negotiated for

the DIP Loans, rather than seeking contested authority to use cash collateral because the Secured

Lenders refused to consent to the use of cash collateral and  (a) even if the Debtors were granted

authority to use cash collateral over the objections of the Secured Lenders, the projected cash

receipts would not be sufficient to fund the Debtors' projected cash needs to continue operations,

and (b) the expense and uncertainty that would be created by litigation of a contested cash

collateral fight would adversely impact the Debtors' operations and relationships with key

vendors, and generate additional legal expenses.   Moreover, if the cash collateral litigation were

unsuccessful the Debtors would be forced to liquidate immediately.

114.    Based on the basic capital structure established by the DIP Loan Agreements, the relative rights of the Debtors' creditors will remain largely unchanged. Thus, the ABL Lenders will continue to have a priority lien on the ABL Collateral (and consequently most, if not all, of the cash collateral) and the Term Lenders will continue to have a priority lien on the Term Loan Collateral, with the Second Lien Lenders being subordinate to both the First Lien Lenders and the DIP Term Loan. The DIP Loans will be layered onto the top of the existing liens on the Term Loan Collateral and the ABL Collateral, with the DIP Term Lenders receiving (a) superpriority administrative expense claims, (b) a priming lien on the Term Loan Collateral, and (c) a junior lien on the ABL Collateral; and the DIP ABL Lenders receiving (a) superpriority administrative expense claims, (b) a priming lien on the ABL Collateral, and (c) a junior lien on the Term Loan Collateral.

115.    In view of the Debtors' urgent need for liquidity, approval of the DIP Motion is critical to the Debtors' ability to maximize the value of their estates and is otherwise in the best interests of both the Debtors' estates and their creditors.

116.    In conclusion, for the reasons stated herein and in each First Day Pleading, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 12, 2015

Kevin Carmody

# EXHIBIT A

## CORPORATE STRUCTURE

# THE STANDARD REGISTER COMPANY

## Chart of Subsidiaries and Affiliates

** denotes a borrower/guarantor under the First and Second Lien Credit Agreements (Silver Point term loans) and the Amended and Restated Loan and Security Agreement (Bank of America/Wells Fargo ABL)*



# EXHIBIT B

## CASH FLOW PROJECTIONS

**Standard Register Cash Flow Projections**

| Line Item | Forecast 8-Mar-15 | Forecast 15-Mar-15 | Forecast 22-Mar-15 | Forecast 29-Mar-15 | Forecast 5-Apr-15 | Forecast 12-Apr-15 | Forecast 19-Apr-15 | Forecast 26-Apr-15 | Forecast 3-May-15 | Forecast 10-May-15 | Forecast 17-May-15 | Forecast 24-May-15 | Forecast 31-May-15 | 31-May-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total (Customer) Receipts / Inflows | 20,441 | 19,029 | 20,441 | 16,549 | 22,733 | 21,143 | 20,475 | 16,780 | 24,087 | 19,209 | 20,969 | 15,646 | 21,143 | 258,387 |
| Mexico Loan | | | | | | | | | | | | | | |
| **Total Inflows** | 20,441 | 19,029 | 20,441 | 16,549 | 22,733 | 21,143 | 20,475 | 16,780 | 24,087 | 19,209 | 20,969 | 15,646 | 21,184 | 258,387 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll | (10,491) | | | (7,679) | (8,601) | | (7,679) | | (8,601) | | (7,679) | | (8,601) | (59,243) |
| Health & Benefits | (1,066) | (538) | (23) | (539) | (1,039) | (539) | (1,039) | (539) | (1,039) | (539) | (1,039) | (539) | (1,039) | (10,513) |
| Paper | (2,094) | (2,235) | (2,741) | (2,366) | (1,758) | (1,247) | (1,293) | (1,923) | (2,169) | (1,103) | (1,336) | (1,088) | (2,462) | (3,814) |
| Leases - Rent | (538) | (30) | (585) | (585) | (35) | (35) | (35) | (585) | (35) | (35) | (35) | (35) | (1,038) | (3,122) |
| Freight | (844) | (657) | (708) | (1,092) | (936) | (703) | (716) | (934) | (1,042) | (698) | (671) | (758) | (583) | (2,603) |
| Postage | (1,538) | (3,844) | (1,839) | (1,829) | (1,820) | (1,478) | (2,244) | (1,634) | (1,546) | (2,035) | (2,795) | (2,039) | (1,058) | (10,837) |
| Utilities | (112) | (780) | (1,043) | (391) | (238) | (275) | (231) | (133) | (239) | (360) | (368) | (246) | (1,478) | (27,273) |
| Taxes (ex Payroll) | (4) | (155) | (558) | (591) | (236) | (388) | (388) | (1,345) | (101) | (456) | (480) | (231) | (231) | (3,675) |
| Customer Rebates | (87) | (671) | (38) | (371) | (13) | (10) | (293) | (901) | (263) | (10) | (21) | (27) | (371) | (6,196) |
| Employee T&E | (183) | (226) | (229) | (143) | (315) | (118) | (219) | (191) | (245) | (331) | (251) | (245) | (177) | (3,075) |
| Production Materials | (1,546) | (579) | (608) | (957) | (814) | (452) | (702) | (792) | (821) | (700) | (565) | (994) | (694) | (2,873) |
| IT/Vendor | (1,187) | (714) | (498) | (492) | (876) | (1,544) | (324) | (107) | (969) | (478) | (89) | (807) | (80) | (10,225) |
| Subcon | (5,187) | (5,448) | (7,865) | (7,865) | (11,111) | (5,195) | (4,607) | (66,036) | (6,274) | (5,255) | (4,387) | (4,921) | (5,842) | (77,361) |
| Temp Help | (378) | (460) | (200) | (437) | (354) | (366) | (334) | (328) | (144) | (529) | (409) | (353) | (343) | (4,468) |
| Other (Ordinary Course) | (1,257) | (1,273) | (1,325) | (1,385) | (876) | (1,280) | (2,116) | (1,376) | (1,450) | (1,387) | (1,327) | (1,160) | (1,257) | (17,882) |
| **Subtotal Operating Disbursements** | (26,316) | (15,033) | (26,444) | (20,373) | (28,933) | (13,631) | (23,249) | (27,844) | (24,820) | (14,279) | (21,253) | (13,443) | (26,674) | (272,243) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Pre-Petition Payments (Qualified and Non-Qualified) | (3,535) | (1,688) | (23) | (614) | (2,467) | (2,703) | (518) | (642) | (162) | (2,580) | (74) | (75) | (235) | (15,316) |
| Principal Payments | | (16,721) | (26,467) | (20,988) | (31,400) | (26,334) | (23,767) | (18,486) | (24,982) | (16,859) | (21,376) | (13,518) | (26,859) | (287,559) |
| 1st Lien Interest | (29,631) | (19,029) | (20,141) | (16,549) | (22,733) | | | | | | | | | (29,172) |
| 2nd Lien Interest | | | | (4,439) | (8,667) | (4,808) | (8,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (78,452) |
| Revolver Interest & LC Fees | (175) | | (44) | (16,549) | (27,233) | | | | | | | | | (107,624) |
| Professional Fees | (3,560) | | | (80) | (230) | (65) | (68) | (72) | (82) | (72) | (74) | (75) | | (2,752) |
| Audit Fees | | | | | | (2,636) | | | (2,508) | | | | (85) | (8,747) |
| PBGC/Admin Claim Cost | | | (500) | (500) | | | (500) | | | | | | (80) | 1,000 |
| Standard Register Mexico | | | (70) | (70) | | (450) | (70) | (70) | | | | | (70) | (210) |
| **Subtotal Non-Operating Disbursements** | (9,410) | (18,409) | (4,935) | (4,439) | (32) | (2,703) | (518) | (642) | (162) | (2,580) | (74) | (75) | (235) | (450) |
| **Total Disbursements** | (9,410) | (19,029) | (16,549) | (16,549) | (31,000) | (23,767) | | | | | | | (26,859) | (287,559) |
| **Cash Flow** | (9,410) | (16,721) | (6,326) | (4,439) | (8,667) | 4,808 | (8,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (29,172) |
| Post Petition 4 Week Collection Paydown | | (19,029) | (20,141) | (16,549) | (27,233) | | | | | | | | | (78,452) |
| **Adjusted Cash Flow** | (9,410) | (16,721) | (26,467) | (20,988) | (31,000) | 4,808 | (8,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (107,624) |
| **Beginning Cash** | | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | |
| Cash Flow | (9,410) | (16,721) | (26,467) | (20,988) | (31,000) | 4,808 | (8,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (107,624) |
| Cash for draw/(pay down) on DIP Loans | 11,025 | 16,721 | 26,467 | 20,988 | 31,000 | (4,808) | 3,293 | 1,705 | 895 | (2,350) | 357 | (2,129) | 5,675 | 109,239 |
| **Ending Cash Balance** | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 |
| Beginning Revolver Loan Balance: ABL DIP | | 16,721 | 43,188 | 64,176 | 93,024 | 88,215 | 86,311 | 88,016 | 88,911 | 86,561 | 84,283 | 82,154 | | |
| Net Borrowings/(Repayments) | 16,721 | 16,721 | 20,988 | 28,848 | (4,808) | (1,904) | 1,705 | 895 | 895 | (2,350) | (2,279) | (2,129) | 5,675 | 87,829 |
| Revolver Loan Balance: ABL DIP | 16,721 | 43,188 | 64,176 | 93,024 | 88,215 | 86,311 | 88,016 | 88,911 | 86,561 | 84,283 | 82,154 | 87,829 | 87,829 |
| Rollup of Pre-Petition Amount (Including LCs) | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 |
| **Total Outstanding ABL DIP Revolver** | 16,721 | 43,188 | 64,176 | 116,489 | 111,680 | 109,776 | 111,481 | 112,377 | 110,027 | 107,748 | 105,620 | 111,294 | 111,294 |
| Beginning Revolver Balance: Delay Draw Term Loan | | | | | 2,553 | 2,553 | 5,197 | 7,749 | 7,749 | 7,745 | 7,749 | 10,385 | | |
| Net Borrowings/(Repayments) | | | | | 2,553 | | 2,553 | 895 | 7,749 | 7,749 | 2,636 | 10,385 | 10,385 | 10,385 |
| **Total Outstanding Delay Draw Term Loan** | | | | | 2,553 | 2,553 | 7,749 | 7,749 | 7,749 | 7,749 | 7,749 | 10,385 | 10,385 | 10,385 |
| Ending Balance: ABL DIP Revolver | 16,721 | 43,188 | 64,176 | 116,489 | 111,680 | 109,776 | 113,481 | 112,377 | 110,027 | 107,748 | 105,620 | 111,294 | 111,294 |
| Ending Balance: Delay Draw Term Loan | | | | | 2,553 | 2,553 | 7,749 | 7,749 | 7,749 | 7,749 | 7,749 | 10,385 | 10,385 | 10,385 |
| **Total Outstanding DIP** | 16,721 | 16,721 | 46,199 | 64,176 | 119,041 | 114,233 | 117,525 | 119,231 | 120,226 | 117,776 | 118,133 | 116,004 | 121,679 | 121,679 |
| Beginning Revolver Loan Balance: Bank of America | 87,322 | 98,347 | 79,318 | 59,178 | 42,628 | | | | | | | | | |
| Post Petition 4 Week Collection Paydown | 11,025 | (19,029) | (20,141) | (16,549) | (22,733) | | | | | | | | | |
| Net Borrowings / (Repayments) | | | | | 19,895 | | | | | | | | | |
| Pre-Petition Revolver Loan Balance: Bank of America | 98,347 | 79,318 | 59,178 | 42,628 | 3,571 | | | | | | | | | |
| Letters of Credit / Reserves | 3,571 | 3,571 | 3,571 | 3,571 | 23,465 | | | | | | | | | |
| **Total Outstanding (end of period)** | 101,918 | 82,889 | 62,748 | 46,199 | 23,465 | | | | | | | | | |