## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS, SHIPPERS AND FREIGHT CARRIERS

The Standard Register Company ("Standard Register") and its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")

hereby move this Court (the "Motion") for entry of an interim order (the "Interim Order") and a

final order (the "Final Order"), substantially in the forms annexed hereto as Exhibit A and

Exhibit B respectively, pursuant to sections 105(a), 363, 503(b)(9), 1107, and 1108 of title 11 of

the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), (a) authorizing, but not directing, the Debtors, in their sole

discretion, to pay certain prepetition claims of critical vendors, shippers and freight carriers in

accordance with the procedures proposed in this Motion, (b) authorizing banks and other

financial institutions to honor and process related checks and transfers, and (c) granting related

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed with the Court concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 503(b)(9), 1107, and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

## BACKGROUND

**A.      General Background**

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to

Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in these cases.

4.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases, can be found in the First Day Declaration.

**B.      The Debtors' Critical Vendors**

5.      In the ordinary course of business, the Debtors make payments to certain essential trade vendors and service providers (the "Critical Vendors") on a regular basis.  If the Critical Vendors are not paid, their unwillingness to continue to service the Debtors could cause an interruption of the Debtors' businesses.[2]  Such interruption could have drastic consequences for the operations of the Debtors' businesses due to the lack of alternative suppliers or service providers in many situations, or the amount of time needed to locate and convert to alternative sources.  Such interruption also could negatively affect the Debtors' revenue and further strain the Debtors' liquidity.

6.      The Debtors have reviewed their business relationships and identified vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' businesses.  In identifying Critical Vendors, the Debtors considered the following three general criteria: (a) whether the Debtors' customers require them to use the particular vendor; (b) whether the vendor would be prohibitively expensive or time-consuming to replace, such as

---

[2]      The Debtors may need to identify vendors as Critical Vendors even if the Debtors' relationships with those vendors are contractual.  Additionally, for contracts of a short duration or where the vendor is operating under a purchase order, there is a risk that failure to pay prepetition amounts may result in the counterparties refusing to renew those contracts or accept a new purchase order.  Moreover, to the extent the Debtors' relationships with Critical Vendors are contractual, the Debtors will likely assume the contracts with those Critical Vendors later in these Chapter 11 Cases, in which case the prepetition obligations owed to those Critical Vendors would be paid in full.  Accordingly, the relief requested herein should only affect the timing of payment of those Critical Vendor Claims (as defined below) and will not prejudice the rights of other parties in interest.

01:16770677.4

where the Debtors' existing inventory, equipment, or manufacturing processes are specifically

tailored to that vendor's products or services; and (c) whether the vendor is a sole-source or

limited-source supplier of goods or services of the quality and quantity required by the Debtors

in a particular market, without whom the Debtors could not continue to operate without

disruption.  The Debtors also considered the financial condition of their vendors and service

providers to the extent such information was known, including each vendor's or supplier's level

of dependence on the Debtors' continued business and whether such vendor or supplier is itself

financially distressed.

   7.  The Critical Vendors provide various products, services and goods essential to the

Debtors' businesses, including but not limited to (a) paper, (b) ink, (c) labels, (d) glue/cohesive,

and (e) mailing/sorting supplies and equipment.  The Debtors' Critical Vendors generally fall

into one or more of the following categories:

   8.  **503(b)(9) Claimants**.  A substantial portion of the Critical Vendors' prepetition

claims (the "Critical Vendor Claims") are for payment with respect to goods delivered to the

Debtors within the 20 days immediately preceding the Petition Date (the "Critical Priority

Claims").  Pursuant to section 503(b)(9) of the Bankruptcy Code, creditors have an

administrative priority claim to the extent of "the value of any goods received by the debtor

within 20 days before the date of commencement of a case under this title in which the goods

have been sold to the debtor in the ordinary course of such debtor's business."  Therefore, the

Critical Vendors that have delivered goods to the Debtors in the ordinary course of business

during the 20-day period prior to the Petition Date have claims that are entitled to administrative

expense priority.  Authorizing the Debtors to pay these Critical Priority Claims now instead of at

the conclusion of these Chapter 11 Cases will assist the Debtors in negotiating with the Critical

Vendors and will thereby increase the likelihood that such vendors will continue to supply the goods and services necessary to operate the Debtors' businesses on favorable pricing and credit terms.

9.      **Subcontracting Services**.  As set forth in the First Day Declaration, approximately 40% of the Debtors' revenue is generated from external sourcing.  In order to provide one integrated and complete service to their customers, the Debtors act as a broker or middleman on behalf of some of their most significant and critical customers (the "Subcontracting Services").  The following is used herein simply as an example.

> Customer A contracts with the Debtors to have generated, printed, and delivered 100 of Customer A's catalogs.  The Debtors then contract with Subcontractor B to generate, print, and deliver the 100 Customer A catalogs.

10.      Using the foregoing example, as of the Petition Date, Subcontractor B may not have been paid by the Debtors for its work in regard to Customer A's catalogs.  If the Debtors fail to pay Subcontractor B for Customer A's catalogs, Subcontractor B may not deliver Customer A's catalogs to the Debtors or Customer A.  This may result in Customer A's refusal to remit payment to the Debtors for the current work as well as Customer A's refusal to provide future work to the Debtors.  In addition, Subcontractor B may refuse to accept any future work for the Debtors, and may be able to instead directly contract with Customer A on a go-forward basis.

11.      In other cases, the subcontractors provide one piece of a larger package that is delivered to the Debtors' customers.  The customers require each of the pieces to be included and will not pay the Debtors for a package that is incomplete.  Thus, although the component provided by a particular might be a relatively small component of the job, it is critical to the

01:16770677.4

Debtors' ability to receive the associated revenue that each of the components be delivered to the Debtors' customers in a timely fashion.

12.     The Debtors' failure to provide the Subcontracting Services to their customers would create chaos within the Debtors' operations and be devastating to their customers and the Debtors' businesses.  If the Debtors are not authorized to pay many of the prepetition claims incurred as a result of the Subcontracting Services, there is a high likelihood of default under the applicable agreements and an opportunity for the non-Debtor parties to transact business directly, essentially squeezing the Debtors out of a significant segment of their business.

13.     On average, the Debtors' Subcontracting Services generate approximately $350 million in revenues a year.  Although it is difficult to precisely determine the prepetition amount outstanding on account of the Subcontracting Services at any given moment, the Debtors estimate that the outstanding amount as of the Petition Date is approximately $23.1 million.  The Subcontracting Services generate net profit to the Debtors and their estates.

14.     **Specialized Material Providers**.  Some of the Critical Vendors provide a certain style and/or quality of paper, ink, or other materials to the Debtors that is essential for producing the Debtors' products and often times unique for use with different types of the Debtors' equipment.  In some cases, it is theoretically possible for the applicable materials to be substituted with materials provided by a different vendor.  However, the volume and just-in-time nature of the Debtors' operations prevent the Debtors from being able to switch materials without missing critical delivery deadlines for their customers because of the time delays associated with modifying the Debtors' processes to accommodate the substituted materials.

15.     **Customized Material Providers**.  Certain of the Debtors' customers require the Debtors to deliver a particular product that the Debtors can only purchase from a Critical

Vendor.  In other instances, the Debtors' customers have approved certain specifications for their orders; if the Debtors had to find new sources to meet or exceed such specifications, then it would cause disruption to the Debtors' businesses by potentially delaying production and/or delivery.  Due to the time-sensitive nature of many of the Debtors' products, such delays may result in the Debtors being unable to perform their contractual obligations and could have a dramatic effect on the Debtors' ability to maximize revenue and the value of their business operations.

16.    **Preferred Price Vendors**.  Prior to the Petition Date, the Debtors negotiated a reduced cost for the goods and services of certain Critical Vendors.  To benefit from future low costs, the Debtors may be required to pay the prepetition claims of such Critical Vendors in order to induce them to continue to sell their goods or services to the Debtors on favorable terms.  The Debtors believe that the cost savings associated with continuing to do business with these vendors on favorable terms exceeds the amount they will pay on account of the associated Critical Vendor Claims.

17.    **Partially Paid Vendors**.  On limited occasions the Debtors advance a portion of the purchase price for particular goods prior to the delivery date.  The Debtors then advance additional amounts at pre-determined milestones.  If the Debtors are unable to make the final payments to secure delivery of these products, which are worth far more to the Debtors than the amounts that remain due, the amounts previously paid will be lost to the detriment of the Debtors' estates.

18.    The Debtors are seeking authority to pay only Critical Vendors that agree to (a) supply goods or services to the Debtors on the most favorable terms and practices (including any pricing related terms such as allowances, rebates, or discounts) that existed in the one (1) year

01:16770677.4

period prior to the Petition Date between such Critical Vendor and the relevant Debtor, as determined by the Debtors (the "Customary Trade Terms") and (b) not cancel on less than ninety (90) days' notice any contract or agreement whereby it provides goods and/or services to the Debtors.

19.     If any Critical Vendor accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, any payments made will be deemed an avoidable postpetition transfer under Section 549 of the Bankruptcy Code and, therefore, will be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim will be reinstated as a prepetition claim in the amount so recovered.

20.     To ensure that the Critical Vendors understand the terms upon which they are accepting payment of their Critical Vendor Claims, and as a condition to receiving payment of any of their Critical Vendor Claims, the Debtors propose to send a Trade Agreement (as defined below) to each Critical Vendor, which will be countersigned by such Critical Vendor.  The Debtors will maintain a record of: (a) the name of each Critical Vendor paid on account of prepetition Critical Vendor Claims, (b) the amount paid to each Critical Vendor, and (c) the goods or services provided by such Critical Vendor.

21.     The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is necessary for the Debtors to maintain liquidity for operations and preserve the customer base and vendor network that is essential to the Debtors' efforts to maximize the value of their estates.  The Debtors believe that preserving working capital through the retention or reinstatement of Customary Trade Terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses.  Conversely, a

deterioration of trade credit and disruption or cancellation of deliveries of goods and services would hinder the Debtors' operations and undermine their ability to generate revenue and ultimately to maximize the value of these estates.

22.     Additionally, the relief requested herein also may help avoid the institution and prosecution of numerous reclamation claims, suits and motions that would otherwise be disruptive and distracting to the Debtors' efforts to maximize the value of these estates.

23.     Simply put, failure to pay prepetition claims owed to Critical Vendors could critically damage the Debtors, their estates, their creditors and other parties in interest and undermine the prospects for a successful emergence from chapter 11.  Without customary trade credit terms, the Debtors could lose an inexpensive and existing source of financing.  Indeed, failure to pay Critical Vendor Claims may result in Critical Vendors ceasing to do business with the Debtors altogether.

**C.    The Debtors' Shippers**

24.     The services provided by certain common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing services warehousemen, and certain other third-party service providers, including Cass Information Systems, Inc. ("CASS"),[3] a shipping procurement company engaged by the Debtors (collectively, the "Shippers") are essential to the day-to-day operations of the Debtors.  At any given time, there are numerous shipments en route to or from the Debtors.  Therefore, certain Shippers are currently in possession of goods, inventory, materials, equipment or other items that are vital to the Debtors' operations.  If the Debtors do not pay the prepetition claims of the

---

[3]    The Debtors contract with CASS to administer the majority of the shipping services they require in the ordinary course of their business. CASS pays each of the Shippers who provide services to the Debtors and bills the Debtors for such services. The Debtors are not able to obtain the shipping services they require or obtain the property held by the Shippers without the services of CASS.

Shippers (the "Shipper Claims"), the Shippers might assert possessory liens against the Debtors'
property and refuse to deliver or release such property to the Debtors until they are paid.  Such
an outcome could cause significant disruptions to the operation of the Debtors' businesses that
would impede their ability to operate successfully in chapter 11.

25.    The Debtors further estimate that the value of the supplies and materials in
possession of the Shippers substantially exceeds the amounts the Debtors owe to the Shippers.
The inability to ship or receive essential materials for use in the ordinary course of the Debtors'
business would leave the Debtors' business moribund and likely unable to function.

26.    The Debtors require the services of CASS to pay the Shippers for both prepetition
and postpetition services.  Failure to pay the amounts owed CASS, and thus the failure of CASS
to pay the Shippers, would preclude the Debtors from obtaining the property currently in the
possession of the Shippers and would make it difficult, if not impossible, for the Debtors to
obtain shipping services postpetition.

27.    The Debtors' operations are time sensitive and the ability to deliver timely to their
customers is essential to the Debtors' businesses.  The failure to grant the relief sought herein
could severely impede the Debtors' ability to maintain their operations in the ordinary course of
business and consequently, negatively affect their primary sources of revenue.

28.    Permitting the Debtors to make payment of Shipper Claims, including CASS, will
enable the Debtors to continue their operations without the serious disruptions that would result
if the Shippers asserted their possessory liens on the Debtors' property that is currently in the
possession or control of the Shippers, or failed to ship or store the property owned by the Debtors
after the Petition Date.

## RELIEF REQUESTED

29.     The Debtors seek entry of the Interim Order and the Final Order authorizing the Debtors to pay, in their discretion, Critical Vendor Claims and Shipper Claims in the amount of up to $20 million in the aggregate,[4] approximately $17.2 million of which relates to Critical Vendor Claims and $2.8 million of which relates to Shipper Claims.  Specifically, the Debtors seek authority, (a) upon entry of the Interim Order, to pay up to an aggregate amount of $15 million (the "Interim Claims Cap") on account of such Critical Vendor Claims and Shipper Claims, and (b) upon entry of the Final Order, to pay up to the aggregate amount of $20 million (with the Interim Claims Cap, the "Vendor Claims Caps") on account of such Critical Vendor Claims and Shipper Claims.

30.     The Debtors propose to condition the payment of all Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and/or services to the Debtors on terms that are consistent with the Customary Trade Terms between the parties. However, the Debtors reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, to the extent the Debtors determine that such trade terms are (a) necessary to procure essential goods and/or services or (b) otherwise in the best interests of the Debtors' estates.

31.     The Debtors propose to send a letter to the Critical Vendors, along with a copy of the Interim or Final Order, setting forth the following information and proposing the following terms as a basis for the parties' post-petition trade relationship (the "Trade Agreement"):

a.      The amount of such Critical Vendor's estimated prepetition claim (after accounting for any setoffs, other credits, and discounts thereto), which shall be mutually determined in good faith by the Critical Vendor and the Debtors.  Such

---

[4]    The Debtors reserve the right to seek to increase the Vendor Claims Cap if necessary, subject to this Court's approval.

amount shall be used only for purposes of the Interim or Final Order and shall not be deemed a claim allowed by the Court.  Further, the rights of all parties in interest to object to a claim of a Critical Vendor shall be fully preserved until further order of the Court;

b.      The Critical Vendor's agreement to be bound by the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis within one (1) year of the Petition Date, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor;

c.      The Critical Vendor's agreement to provide goods and/or services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Critical Vendor in accordance with such terms;

d.      The Critical Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates, or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods and/or services provided to the Debtors prior to the Petition Date.  To the extent the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to release such Lien;

e.      The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Interim Order or, if entered, the Final Order, and consents to be bound thereby;

f.      The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims;

g.      The Critical Vendor's agreement that any funds received shall be used first to satisfy any claim the vendor may have under section 503(b)(9) of the Bankruptcy Code, and only after any 503(b)(9) claim is satisfied in full, to satisfy any general unsecured claim held by such Critical Vendor;

h.      The Critical Vendor's agreement that nothing in the Trade Agreement grants an allowed claim with respect to any unpaid amounts, and that the Critical Vendor retains responsibility to file a timely proof of claim with respect to any amounts that are alleged to remain unpaid; and

i.      The Critical Vendor's acknowledgement that, if it subsequently refuses to supply goods and/or services to the Debtors on Customary Trade Terms, the Debtors reserve all rights to recover sums paid in excess of post-petition obligations in the event a Trade Agreement is terminated.

Once agreed to and accepted by a Critical Vendor, the Trade Agreement shall govern the parties' post-petition trade relationship.

32.     The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors to the extent that the Debtors determine, in their discretion, that such agreements are necessary to their postpetition operations.  In the event the Debtors do not or are unable to enter into a Trade Agreement with any Critical Vendor, however, the Debtors nevertheless seek authority to pay such vendor's Critical Vendor Claim if the Debtors determine, in their sole discretion, that such payment is necessary to prevent irreparable harm to the Debtors' business operations.  For those Critical Vendors who have agreed to provide goods and/or services to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis.

33.     If a Critical Vendor fails to comply with any Trade Agreement entered into with the Debtors, the Debtors reserve all rights to recover sums paid in excess of post-petition obligations in the event a Trade Agreement is terminated.

34.     The Debtors also seek authority to pay all Shipper Claims.  In 2014, the Debtors disbursed more than $38.6 million to Shippers.  The Debtors generally make these payments on a weekly basis.  Although it is difficult to estimate with precision the obligations outstanding at any given moment, the Debtors estimate that the amount of outstanding prepetition obligations owed to such Shippers on account of obligations arising prior to the Petition Date is approximately $2.8 million.

35.     Finally, the Debtors seek entry of an order authorizing banks and other financial institutions to receive, process, honor, and pay checks or electronic transfers used by the Debtors

01:16770677.4

13

to pay the foregoing and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion.

<strong><u>BASIS FOR RELIEF REQUESTED</u></strong>

**A.**     **Payment of the Critical Priority Claims Will Aid the Debtors in Negotiating with the Critical Vendors and Will Not Harm the Debtors' Estates**

36.     Pursuant to section 503(b)(9) of the Bankruptcy Code, the Critical Priority Claims are entitled to administrative claim status. Because these administrative claims were incurred in the ordinary course of the Debtors' businesses, the Debtors believe that they are authorized to pay the Critical Priority Claims pursuant to section 363(c)(1) of the Bankruptcy Code (even if such payments are made to Critical Vendors). However, the Debtors also believe that they are not required to reconcile or pay these claims prior to the conclusion of these cases. Accordingly, for the avoidance of doubt, the Debtors request that the Court enter an order stating that the Debtors are authorized, but not required, to pay the Critical Priority Claims in the ordinary course of the Debtors' businesses, pursuant to the terms outlined above. Authorizing the Debtors to make these required payments now, as opposed to at the conclusion of these cases, will enable the Debtors to leverage this obligation in order to obtain favorable trade terms that will enhance the Debtors' liquidity.

**B.**     **Payment of the Critical Vendor Claims is Warranted Pursuant to Section 363 of the Bankruptcy Code**

37.     The Court may authorize payment of the Critical Vendor Claims pursuant to section 363 of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides that a debtor may "after notice and a hearing, use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of that debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV*

*Co. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court determining an application pursuant to section 363(b) must find from the evidence a good business reason to grant such application); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (standard for determining a section 363(b) motion is whether the debtor has a "good business reason" for the requested relief); *In re James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing a contractor to pay prepetition claims of some suppliers who were potential lien claimants pursuant to section 363 because the payments were necessary for the general contractors to release funds owed to the debtors).   "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

38.    Numerous courts have also used their section 105(a) equitable powers under the necessity of payment doctrine to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and to preserve the going concern value of the Debtors.  *See, e.g.*, *In re Lehigh Co. & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").  The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor,"  which is consistent with the paramount goal of chapter 11: "facilitating the continued

operation and rehabilitation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).  *See also In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized").

39.     The Debtors respectfully submit that similar relief is warranted in these Chapter 11 Cases.  As the foregoing authority provides, where the ability to promptly pay prepetition claims of Critical Vendors is necessary to prevent disruption to the Debtors' business operations, courts are fully empowered to authorize such payments.  Further, the satisfaction of the prepetition claims of the Critical Vendors will enable the Debtors to preserve the value of their estates and safeguard the confidence and goodwill of their suppliers and service providers. Without the requested relief, which is based on a rational exercise of the Debtors' business judgment, the Debtors' efforts to maximize the value of these estates will be jeopardized.  The relief requested in this Motion contemplates the payment of Critical Vendor Claims of those Critical Vendors who agree to provide postpetition goods to the Debtors on Customary Trade Terms or other terms acceptable to the Debtors, and is therefore consistent with and appropriate under section 363 of the Bankruptcy Code.

40.     As detailed above, maintaining the goods and services provided by the Critical Vendors is vital to the Debtors' continuing business operations and the success of these Chapter 11 Cases.  In addition, and as also detailed above, the Debtors have conducted an extensive analysis and review of the Debtors immediate trade needs and supplier base and have concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtors unless their Critical Vendor Claims are paid.  Should any Critical Vendor stop supplying goods or services to the Debtors, or choose to significantly downgrade the Debtors' trade terms, their

businesses would be adversely affected as a result of, among other things, an adverse impact on the Debtors' ability to meet the demands of their customers which in turn, would result in customers seeking products elsewhere and significant lost revenue. As such, the Debtors submit that the amount of the Vendor Claims Cap pales in comparison to the likely damage to the Debtors' businesses and estates should the relief requested herein not be granted. In light of the foregoing, the Debtors submit that payment of the Critical Vendor Claims is plainly in the best interests of their estates and creditors.

41.    Additionally, the Debtors' calculation of the Vendor Claims Cap is also reasonable. To determine the amount of the Vendor Claims Cap, the Debtors considered, among other things, which vendors/service providers: (a) are absolutely needed to continue to operate without disruption; (b) would be prohibitively expensive or difficult to replace under the circumstances; and (c) would present an unacceptable risk to the Debtors' business should they threaten to discontinue providing services or supplies postpetition. The Debtors also considered the financial condition of the vendors/service providers to the extent such information was known, including each vendor's/supplier's level of dependence on the Debtors' continued business and whether such vendor/supplier is itself financially distressed. Once the Debtors gathered this information, they estimated the amounts that would be required to pay each Critical Vendor to ensure the continued supply of goods and services. The Vendor Claims Cap comprises this estimated amount, plus the amount that the Debtors estimate will be required to pay the Shipper Claims. Therefore, the Debtors respectfully submit that the Vendor Claims Cap and the other relief sought herein is fully justified pursuant to sections 105 and 363 of the Bankruptcy Code as well as the "doctrine of necessity."

01:16770677.4

42.     The Critical Goods and Services provided by the Critical Vendors are vital to the Debtors' continuing business operations and their ability to maximize estate assets.  If the relief sought in this Motion is not granted, Critical Vendors may attempt to assert their considerable leverage and deny the Debtors essential goods and services going forward.  Accordingly, in the Debtors' business judgment, the payment of the Critical Vendor Claims as set forth herein is necessary to prevent the immediate and irreparable harm that would arise from a disruption to the Debtors' business operations.

**C.     The Court May Also Authorize Payment of the Critical Vendor Claims as a Valid Exercise of the Debtors' Fiduciary Duties**

43.     The Debtors, operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ*, 273 BR. 487, 497 (Banks. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including operating business's going-concern value." *Id.*

44.     It has been noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only by the preplan satisfaction of a prepetition claim."  The *CoServ* court specifically noted that pre-plan of reorganization satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" and also when the payment was to "sole suppliers of a given product." *Id.* at 497-98. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.
> Second, unless it deals with the claimant, the debtor risks the

> probability of harm, or, alternatively, loss of economic advantage
> to the estate or the debtor's going concern value, which is
> disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor
> can deal with the claimant other than by payment of the claim.

*Id.* at 498.

45.    Payment of the Critical Vendor Claims meets the test set forth in *CoServ*.  As

described above, the Debtors have narrowly tailored the Vendor Claims Cap to encompass only

those Critical Vendors which are essential to the business and operation of each of the Debtors'

businesses.  Any interruption of the Debtors' operations could cost the Debtors' estates hundreds

of thousands of dollars in lost revenues and furthermore, could cause the Debtors to lose a

significant amount of customers.  The harm that would stem from the failure to pay of any of the

Critical Vendors is disproportionate to the amount of the prepetition claims that the Debtors are

seeking to pay hereunder.  Moreover, with respect to each Critical Vendor, the Debtors have

examined other options short of payment of such Critical Vendor Claims and have determined

that to avoid significant disruption of the Debtors' business operations, there exists no practical

or legal alternative to payment of the Critical Vendor Claims.  Therefore, the Debtors can only

meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the

Bankruptcy Code by payment of the Critical Vendor Claims.  Accordingly, the Court should

grant the relief requested herein.

**D.    Payment of the Shipper Claims is Necessary in Light of the Liens the Shippers May Have**

46.    Under most state laws, a shipper or freight carrier may have a lien on the goods in

its possession.  Such liens secure the charges or expenses incurred in connection with the

transportation of such goods.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of

perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is

expressly excluded from the stay imposed by section 362(a) of the Bankruptcy Code.  In fact, to
protect their asserted lien rights, the Shippers may refuse to release goods or equipment in their
possession unless and until their prepetition claims for services have been satisfied.  Therefore,
notwithstanding the stay imposed by section 362 of the Bankruptcy Code, the Shippers could be
entitled to assert and perfect liens against the Debtors' property, which would entitle them to
payment ahead of general unsecured creditors in any event and provide them with authority to
hold the property subject to the asserted liens pending payment, to the direct detriment of the
Debtors and their estates.

47.    To the extent that the amount of a Shipper Claim is less than the value of any
property securing such claim, the Shipper holding lien rights would also arguably be a fully-
secured creditor.  In general, pursuant to section 506 of the Bankruptcy Code, fully secured
creditors are entitled to receive payment in full of (a) their prepetition claims, and (b) the post-
petition interest accruing on such claims to the extent such claims are oversecured.
Consequently, payment of such claims will (a) give the Shippers no more than they would
otherwise be entitled and (b) save the Debtors the interest costs that otherwise may accrue on the
claims during these Chapter 11 Cases.

48.    The Debtors' business is necessarily freight intensive and dependent upon the
timely delivery of their products to customers and receipt of raw materials and goods.  Any
disruption in this system would have deleterious effects on the Debtors' business.  The value of
the Debtors' products in the possession of the Shippers, and the potential injury to the Debtors if
they are not timely released, is likely to substantially exceed the amount of Shipper Claims
asserted by such parties.  Indeed, even if the Shippers did not have valid liens under applicable
state law, their possession (and retention) of the Debtors' products would severely disrupt, and

potentially cripple, the Debtors' relationship with their customers.  For these reasons, in order for the Debtors to preserve and enhance the value of their estates, they must be permitted to make payments on account of certain Shipper Claims.

**E.    The Court Should Authorize Applicable Banks to Honor Checks and Electronic Fund Transfers in Accordance with the Motion**

49.    In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize all applicable banks and other financial institutions (the "Banks") to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this Motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all Banks may rely on the representations of the Debtors with respect to whether any check or transfer issued or made by the Debtors before the Petition Date should be honored pursuant to this Motion (such banks and other financial institutions having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this Motion are dishonored or rejected by the Banks.

**F.    Immediate Relief Is Justified**

50.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990)

01:16770677.4

(discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

51.     Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties.  Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate").  Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions.  *See* 9 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 4001.07[b][3] (16th ed.) (discussing source of "irreparable harm" standard under Rule 4001(c)(2)).  Courts will routinely consider third-party interests when granting such relief.  *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

52.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without Court authorization to pay the Critical Vendor Claims and Shipper Claims.

53.     Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## REQUEST FOR WAIVER OF STAY

54.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable

01:16770677.4

harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample

cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

55.     To implement the foregoing immediately, the Debtors respectfully request a

waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to

apply.

## DEBTORS' RESERVATION OF RIGHTS

56.     Nothing contained herein is intended or should be construed as an admission of

the validity of any claim against the Debtors; a waiver of the Debtors' rights to dispute any

claim; or an approval, assumption, or rejection of any agreement, contract, or lease under section

365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any invoice or

claim with respect to Critical Vendors or Shippers in accordance with applicable law and to

assume or reject any agreements with such parties in accordance with the applicable provisions

of the Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment

made pursuant to the Court's order is not intended and should not be construed as an admission

as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such

claim.

## NOTICE

57.     The Debtors will provide notice of this Motion to: (i) the Office of the United

States Trustee for the District of Delaware; (ii) holders of the 50 largest unsecured claims on a

consolidated basis against the Debtors; (iii) counsel for Silver Point Finance, LLC, in its capacity

as administrative agent under the Debtors' First Lien Credit Agreement and Second Lien Credit

Agreement; (iv) counsel for Bank of America, N.A., in its capacity as administrative agent under

the Debtors' Amended and Restated Loan and Security Agreement; (v) counsel to the agents

01:16770677.4

under the Debtors' proposed debtor-in-possession financing facility; (vi) the Banks; and (vii) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 12, 2015
      Wilmington, Delaware

                                  */s/ Kara Hammond Coyle*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Robert A. Klyman (CA No. 142723)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

01:16770677.4

**EXHIBIT A**

**PROPOSED INTERIM ORDER**

01:16770677.4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. ___ |

**INTERIM ORDER AUTHORIZING THE DEBTORS TO
PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS,
SHIPPERS AND FREIGHT CARRIERS**

Upon the *Debtors' Motion for Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers and Freight Carriers* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that notice of the Motion has been given as set forth in the Motion and

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

01:16770677.4

2

that such notice is adequate and no other or further notice need be given; and the Court having

determined that it may enter a final order consistent with Article III of the United States

Constitution; and the Court having considered the First Day Declaration; and the Court having

found that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and the Court having found that the relief sought in the Motion is in the best

interests of the Debtors, their estates, their creditors and all other parties in interest; and after due

deliberation and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein on an interim basis until such time

as the Court conducts a final hearing on this matter (the "<u>Final Hearing</u>").

2.      The Final Hearing shall take place on _____, 2015 at __:__ _.m.

(prevailing Eastern Time).  Any objections or responses to the Motion shall be filed on or before

4:00 p.m. (prevailing Eastern Time) _____, 2015 and served on the parties required

by Local Rule 2002-1(b).

3.      The Debtors are authorized, but not directed, in the exercise of their reasonable

business judgment, to pay Critical Vendor Claims and Shipper Claims in an amount not to

exceed $12.2 million and $2.8 million, respectively, during the interim period from the date of

this Interim Order until the date that a final order is entered in this matter, unless otherwise

ordered by the Court; *provided*, *however*, that the Debtors shall not make any payment (or series

of payments) to any individual Critical Vendor or Shipper (including any affiliates thereof) in

excess of $250,000 (the "<u>Individual Vendor Limit</u>") unless the Debtors first give notice of such

proposed payment and appropriate back-up documentation and information to the administrative

agent under the Debtors' debtor-in-possession term loan credit facility (the "<u>Term Loan DIP</u>

01:16770677.4

3

Agent") and the Term Loan Agent either grants written consent to such payment or fails to disapprove such payment with five days of the giving of such notice; *provided*, *further*, that the Individual Vendor Limit shall be reduced dollar for dollar for all payments made on account of the prepetition claims of a Critical Vendor or Shipper (including any affiliates thereof) pursuant to another order of the Court.

4.      The Debtors are authorized to pay the Critical Vendor Claims in the ordinary course of business when due, not on an accelerated basis; *provided*, *however*, that any Critical Vendor that accepts payment pursuant to the authority granted in this Interim Order must agree to (a) supply goods and services to the Debtors post-petition on Customary Trade Terms (as defined below) or on such other favorable terms as are acceptable to the Debtors, and (b) not cancel on less than ninety (90) days' notice any contract or agreement whereby it provides goods and/or services to the Debtors.

5.      Any Critical Vendor that accepts payment pursuant to the authority granted in this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order and (b) have waived, to the extent paid, any and all prepetition claims against the Debtors, their assets and their properties.

6.       Any payments with respect to prepetition claims hereunder shall first be used to satisfy any allowed claim of the applicable Critical Vendor or Shipper that is entitled to priority under section 503(b)(9) of the Bankruptcy Code, and thereafter to satisfy the applicable Critical Vendor's or Shipper's general unsecured claims.

7.      The Debtors may, in their discretion, enter into a Trade Agreement with an individual Critical Vendor on the terms set forth in the Motion and hereby incorporated by reference.

01:16770677.4

8.      The Debtors shall condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the one (1) year period preceding the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.

9.      The Debtors may, in their sole discretion, declare a Trade Agreement with an individual Critical Vendor terminated, together with the other benefits to the Critical Vendor as contained in this Interim Order, on the date the Debtors deliver notice to the Critical Vendor that the Critical Vendor (a) has not complied with the terms and provisions of the Trade Agreement or (b) has failed to continue to provide Customary Trade Terms to the Debtors.

10.     If a Trade Agreement is terminated as set forth above or a Critical Vendor or Shipper who has received payment of a prepetition claim later refuses to continue to supply goods and/or services to the Debtors on Customary Trade Terms during the pendency of these Chapter 11 Cases, the Debtors may declare (a) that the payment of the payment of such Critical Vendor Claim or Shipper Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor or Shipper (including by setoff against postpetition obligations), or (b) that the Critical Vendor or Shipper shall immediately return the payment of its Critical Vendor Claim or Shipper Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets or any type whatsoever, it being the explicit intention of the Court to return the parties to their position immediately prior to entry of this Interim Order with respect to all prepetition claims.

01:16770677.4

5

11.     The execution of a Trade Agreement by the Debtors shall not constitute a waiver of any other cause of action, including any avoidance action that may be held by the Debtors.

12.     Upon the Debtors' payment of the Shipper Claims, any lien securing such Shipper Claim shall be immediately released, void, and of no further force and effect, without further action by the Debtors.

13.     Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Critical Vendor Claims and Shipper Claims.

14.     Each of the Banks is authorized to honor checks presented for payment and all fund transfer requests made by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Order and any other order of this Court.

15.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Critical Vendor Claims or Shipper Claims that are dishonored or rejected.

16.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith.

17.     Nothing in the Motion or this Interim Order, or the Debtors' payment of any claims pursuant to this Interim Order, shall be deemed or construed as:  (a) an admission as to the validity of any claim or Lien against the Debtors or their estates; (b) a waiver of the Debtors' right to dispute any claim or Lien; (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (d) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; or (e) a

01:16770677.4

modification of the Debtors' rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

18.     The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor or Shipper paid; (b) the amount paid to each Critical Vendor or Shipper; (c) the type of goods or services provided by each Critical Vendor or Shipper; and (d) other pertinent information.  This matrix shall be updated regularly and provided to the Term Loan DIP Agent no less frequently than weekly.  The Term Loan DIP Agent shall keep the matrix confidential and shall not disclose its contents to anyone, except its professional advisors or as otherwise authorized by the Debtors or this Court.

19.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

20.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

21.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

22.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

23.     This Court shall retain jurisdiction over all matters arising from or related to the interpretation, implementation and enforcement of this Interim Order.

Dated: _____, 2015
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

01:16770677.4

7

# EXHIBIT B

## PROPOSED FINAL ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. ___ |

**FINAL ORDER AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION
CLAIMS OF CRITICAL VENDORS, SHIPPERS AND FREIGHT CARRIERS**

Upon the *Debtors' Motion for Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers and Freight Carriers* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012; and the Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and the Court having

---

[1]  The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC.  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]  All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

determined that it may enter a final order consistent with Article III of the United States Constitution; and the Court having considered the First Day Declaration; and the Court having previously entered the *Interim Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers and Freight Carriers; and (B) Authorizing Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. ___] (the "Interim Order"); and the Court having found that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein on a final basis.

2.      Objections to this Motion, if any, shall be and hereby are OVERRULED.

3.      The Debtors are authorized, but not directed, in the exercise of their reasonable business judgment, to pay Critical Vendor Claims and Shipper Claims in an amount not to exceed $17.2 million and $2.8 million, respectively, in the aggregate (including amounts paid pursuant to the Interim Order), unless otherwise ordered by the Court; *provided, however*, that the Debtors shall not make any payment (or series of payments) to any individual Critical Vendor or Shipper (including any affiliates thereof) in excess of $250,000 (the "Individual Vendor Limit") unless the Debtors first give notice of such proposed payment and appropriate back-up documentation and information to the administrative agent under the Debtors' debtor-in-possession term loan credit facility (the "Term Loan DIP Agent") and the Term Loan Agent either grants written consent to such payment or fails to disapprove such payment with five days

of the giving of such notice; *provided*, *further*, that the Individual Vendor Limit shall be reduced dollar for dollar for all payments made on account of the prepetition claims of to a Critical Vendor or Shipper (including affiliates thereof) pursuant to another order of the Court.

4.      The Debtors are authorized to pay the Critical Vendor Claims in the ordinary course of business when due, not on an accelerated basis; *provided*, *however*, that any Critical Vendor that accepts payment pursuant to the authority granted in this Final Order must agree to (a) supply goods and services to the Debtors post-petition on Customary Trade Terms (as defined below) or on such other favorable terms as are acceptable to the Debtors, and (b) not cancel on less than ninety (90) days' notice any contract or agreement whereby it provides goods and/or services to the Debtors.

5.      Any Critical Vendor that accepts payment pursuant to the authority granted in this Final Order shall be deemed to (a) agree to the terms and provisions of this Final Order and (b) have waived, to the extent paid, any and all prepetition claims against the Debtors, their assets and their properties.

6.      Any payments with respect to prepetition claims hereunder shall first be used to satisfy any allowed claim of the applicable Critical Vendor or Shipper that is entitled to priority under section 503(b)(9) of the Bankruptcy Code, and thereafter to satisfy the applicable Critical Vendor's or Shipper's general unsecured claims.

7.      The Debtors may, in their discretion, enter into a Trade Agreement with an individual Critical Vendor on the terms set forth in the Motion and hereby incorporated by reference.

8.      The Debtors shall condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the

Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the one (1) year period preceding the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.

9.      The Debtors may, in their sole discretion, declare a Trade Agreement with an individual Critical Vendor terminated, together with the other benefits to the Critical Vendor as contained in this Final Order, on the date the Debtors deliver notice to the Critical Vendor that the Critical Vendor (a) has not complied with the terms and provisions of the Trade Agreement or (b) has failed to continue to provide Customary Trade Terms to the Debtors.

10.     If a Trade Agreement is terminated as set forth above or a Critical Vendor or Shipper who has received payment of a prepetition claim later refuses to continue to supply goods and/or services to the Debtors on Customary Trade Terms during the pendency of these Chapter 11 Cases, the Debtors may declare (a) that the payment of the payment of such Critical Vendor Claim or Shipper Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor or Shipper (including by setoff against postpetition obligations), or (b) that the Critical Vendor or Shipper shall immediately return the payment of its Critical Vendor Claim or Shipper Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets or any type whatsoever , it being the explicit intention of the Court to return the parties to their position immediately prior to entry of this Order with respect to all prepetition claims.

11.     The execution of a Trade Agreement by the Debtors shall not constitute a waiver of any other cause of action, including any avoidance action that may be held by the Debtors.

12.	Upon the Debtors' payment of the Shipper Claims, any lien securing such Shipper Claim shall be immediately released, void, and of no further force and effect, without further action by the Debtors.

13.	Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Critical Vendor Claims and Shipper Claims.

14.	Each of the Banks is authorized to honor checks presented for payment and all fund transfer requests made by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Order and any other order of this Court.

15.	The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Critical Vendor Claims or Shipper Claims that are dishonored or rejected.

16.	Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith.

17.	Nothing in the Motion or this Final Order, or the Debtors' payment of any claims pursuant to this Final Order, shall be deemed or construed as:  (a) an admission as to the validity of any claim or Lien against the Debtors or their estates; (b) a waiver of the Debtors' right to dispute any claim or Lien; (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (d) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; or (e) a modification any of the Debtors' rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

18.     The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor or Shipper paid; (b) the amount paid to each Critical Vendor or Shipper; (c) the type of goods or services provided by each Critical Vendor or Shipper; and (d) other pertinent information.  This matrix shall be updated regularly and provided to the Term Loan DIP Agent no less frequently than weekly.  The Term Loan DIP Agent shall keep the matrix confidential and shall not disclose its contents to anyone, except its professional advisors or as otherwise authorized by the Debtors or this Court.

19.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

20.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

21.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

22.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

23.     This Court shall retain jurisdiction over all matters arising from or related to the interpretation, implementation and enforcement of this Final Order.

Dated: _____, 2015
      Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE

01:16770677.4

6