## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE CLAIMS, INCLUDING WAGES, SALARIES AND OTHER COMPENSATION, (II) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF REIMBURSEMENT TO EMPLOYEES FOR EXPENSES INCURRED PREPETITION, (IV) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (V) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS, AND (VI) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS AND THIRD PARTY PROVIDERS

The Standard Register Company ("Standard Register") and its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")

hereby move this Court (the "Motion") for entry of interim and final orders, substantially in the

forms annexed hereto as Exhibit A and Exhibit B, respectively, pursuant to sections 105(a),

363(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and

6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), authorizing, but not directing, the Debtors to

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

(a) pay accrued prepetition wages, salaries and other compensation to their Workforce (as defined below); (b) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, and severance, employee benefit plans and programs, as described below; (c) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (d) pay all related prepetition payroll taxes and other deductions; (e) honor workers' compensation obligations; and (f) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs is administered, insured or paid through a third-party administrator or provider.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed with the Court concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the

relief requested herein are sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rule 9013-1.

## BACKGROUND

**A.      General Background**

2.       On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.       Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in these cases.

4.       Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases, can be found in the First Day Declaration.

**B.      The Debtors' Workforce and Related Obligations**

5.       In connection with operating their businesses, the Debtors currently employ approximately 3,500 full-time employees and 16 part-time employees (collectively, the "Employees").  The Debtors also regularly utilize the services of contract workers (collectively, the "Contract Workers") to provide a variety of manufacturing, sales, operations and other daily business services.  The Contract Workers are provided by Volt Staffing Solutions ("Volt") in the U.S. and Integrated Human Resource Planning S.C. ("Integrated HR") in Mexico, and the number of Contract Workers fluctuates depending on the Debtors' needs.  At any given time, the

Debtors may have approximately 500 Contract Workers engaged.  The Debtors' Employees and Contract Workers are collectively referred to herein as the "Workforce."

6.      The Debtors' Employees are the lifeblood of their business, and their value cannot be overstated.  The management, marketing, sales, manufacturing, and technical skills of the Employees are essential to the Debtors' ability to source materials, research and develop high-quality, competitive products and services, bring those products and services to market, and timely deliver them to their customers.  To a significant extent, the Debtors' success depends upon their ability to attract and retain key personnel.  If the Debtors cannot assure their Employees that the Debtors will promptly pay prepetition Employee Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, Employee Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere, potentially with the Debtors' competitors.  The loss of Employees at this juncture would have a material adverse impact on the Debtors' businesses and ability to maximize value through the prosecution of these Chapter 11 Cases.

7.      Moreover, the Contract Workers fill critical and immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet the needs of their customers while also remaining as cost-efficient as possible.  In such capacity, the Contract Workers fill every type of role with the Debtors, including providing sales, human resources, payroll, marketing and manufacturing personnel as needed.  The Contract Workers are a reliable and cost-efficient component of the Debtors' operations.  Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contract Workers, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

8.      In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce.  The Debtors also provide other benefits to their Employees for the performance of services.  These benefits and obligations are described in more detail below.

**(1)      Workforce Compensation Obligations**

*Employee Compensation Obligations*

9.      In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages.  Approximately 1,630 Employees are paid a fixed salary and approximately 1,870 Employees are paid on an hourly basis.  The Debtors pay the Employees on a bi-weekly basis, a week in arrears, on Friday (unless Friday falls on a federal holiday).  The last date Employees were compensated prior to the Petition Date was March 6, 2015 in the U.S., and March 10, 2015 in Mexico, respectively, with such Employees receiving payment primarily for wages and salaries earned through March 1, 2015.

10.      Over ninety-percent (90%) of the Debtors' Employees elect to have their payroll administered via direct deposit, with the remainder of the Employees electing to receive a physical check.  The Debtors process payroll obligations internally, utilizing a payroll program provided by Ultimate Software ("Ultimate") in the U.S. and NomiPlus software provided by SIASA del Norte S.A. de C.V. ("SIASA").  Ultimate also provides certain other services related to Employee wages and compensation including coordinating the payment of Withholding Obligations (as defined below).  In addition, the Debtors use Automatic Data Processing, Inc. ("ADP") for certain time-tracking services for hourly Employees.  The Debtors are in the process of migrating the services provided by ADP to Ultimate.  Employees are paid from one of the Debtors' disbursement accounts maintained at Bank of America, N.A. or Banco Nacional de

Mexico (together, the "Payroll Accounts").  In the case of Employees paid by direct deposit in the U.S., the Debtors create certain interface reports which they submit to Ultimate directing it to withhold and transfer the appropriate amounts to the various parties.  In Mexico, the Debtors' NomiPlus software calculates the necessary withholdings, and the Debtors remit the appropriate amounts to the appropriate governmental agency.  For Employees receiving checks, the Debtors issue individual checks.

11.     The ongoing services of Ultimate (and ADP before the transition is complete) are imperative to the smooth functioning of the Debtors' payroll system.  As is the ability for the Debtors to continue to print and honor their own payroll checks.  The Debtors pay Ultimate approximately $23,500 per month for its services.  As of the Petition Date, the Debtors estimate that they owe Ultimate approximately $43,000 in outstanding fees in connection with the payroll-related tax and withholding services (the "Ultimate Obligations").  The Debtors pay ADP approximately $16,000 per month for its time-tracking and other payroll-related services.  As of the Petition Date, the Debtors estimate that they owe ADP approximately $19,200 in outstanding fees in connection with these services (the "ADP Obligations").  The Debtors pay SIASA approximately $5,000 per year for its services, and the Debtors owe SIASA approximately $500 in outstanding fees as of the Petition Date (the "SIASA Obligations," and collectively with the ADP Obligations and Ultimate Obligations, the "Payroll Administrator Obligations").

12.     The Debtors' weekly gross payroll on account of the Employees is approximately $4.4 million.  The next scheduled payroll date for Employees is March 20, 2015 in the U.S. and March 18, 2015 in Mexico, respectively, and will include salaries and wages earned prepetition. The Debtors estimate that, as of the Petition Date, they owe approximately $5.8 million on account of accrued and unpaid prepetition salaries and wages (the "Employee Compensation

Obligations"). To the best of the Debtors' understanding, no Employees are owed more than $12,475 in accrued and unpaid general prepetition wages or salaries.

13.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations, and any unpaid Payroll Administrator Obligations. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations and/or Payroll Administrator Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

*Contract Workers Obligations*

14.     As noted above, the Debtors also regularly utilize Contract Workers in the ordinary course of business. The Contract Workers are skilled persons who provide the same types of services as the Debtors' regular Employees, but allow for a more flexible workforce to meet the business' fluctuating staffing needs.

15.     As of the Petition Date, the Debtors estimate that the aggregate amount owing to Volt and Integrated HR on account of the Contract Workers for services performed prior to the Petition Date is approximately $1.9 million (the "Contract Workers Obligations" and collectively with the Employee Compensation Obligations and the Payroll Administrator Obligations, the "Compensation Obligations"). The Debtors would be irreparably harmed without the services of the Contract Workers because such parties play a critical role in the Debtors' day-to-day operations, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contract Workers Obligations.

*Withholding Obligations*

16.      For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, (a) garnishments, child support and service charges, and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums and 401(k) contributions), legally-ordered deductions, and miscellaneous deductions (collectively, the "Deductions").  The Debtors withhold approximately $2.3 million per month on average from Employees' wages on account of Deductions, which the Debtors remit to the appropriate third-party recipients and/or retain on account of "self-insured" benefit programs as further described below.

17.      In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Employee Withholding Taxes") and to remit the same to the applicable taxing authorities.  In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "Employer Payroll Tax Obligations," and together with Employee Withholding Taxes, the "Payroll Tax Obligations").  Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and Ultimate remits the same to the applicable taxing authorities.  The Debtors withhold approximately $4 million per month on average in Employee Withholding Taxes, and Debtors' average monthly payment for Employer Payroll Tax Obligations is approximately $1.2 million.  The amounts in satisfaction of

the Payroll Tax Obligations are transferred to Ultimate in advance of the respective payroll processing day.

18.     Certain of the Debtors' Employees are members of unions (collectively, the "Union Members").  The Union Members belong to two different unions (together, the "Unions"):  Graphic Communications Conference (IBT) Local 594S located in York, Pennsylvania (the "York Union") and Graphic Communications Conference (IBT) Local 197-M located in Fayetteville, Arkansas (the "Fayetteville Union").  In total, there are approximately 120 Union Members which comprise approximately 3.5% of the Employees.  Out of these 120 Union Members, approximately 87 are with the York Union and approximately 33 are with the Fayetteville Union.  Pursuant to agreements with the Unions, the Debtors withhold dues from Union Members' paychecks and remit such amounts to the Unions.  Approximately $5,270 in aggregate dues is withheld from Union Members' paychecks on a monthly basis.

19.     The Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy Payroll Tax Obligations (collectively, the "Withholding Obligations") and to remit amounts withheld on behalf of third parties post-petition in the ordinary course of business.

*Reimbursable Expense Obligations*

20.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment (the "Reimbursable Expense Obligations").  The Reimbursable Expense Obligations typically include expenses for, among other things, air travel, meals, parking, mileage and certain other business related expenses.  All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the

Debtors in accordance with the Debtors' reimbursement policy, as described in more detail below.  In some cases, Employees pay for such expenses directly from their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses.  In other cases, Employees incur expenses on corporate-authorized credit cards, on which Employees are personally liable, and likewise submit itemized expense reimbursement requests.  In both cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

21.     The Debtors process expense and reimbursement claims on a rolling basis.  It is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations outstanding as of the Petition Date because Employees may have expenses that they have yet to submit to the Debtors for reimbursement.  On average, over the past year, the Debtors have paid approximately $830,000 per month on account of the Reimbursable Expense Obligations.  As of the Petition Date, the Debtors estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations is approximately $850,000.

22.     Employees incurred Reimbursable Expense Obligations as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming Employees who incurred the Reimbursable Expense Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.  The Debtors also seek authority to continue their reimbursement policy in the ordinary course during the administration of the Chapter 11 Cases.

Deferred Compensation

23.     As of the Petition Date, the Debtors maintain two deferred compensation plans (together, the "Deferred Compensation Plans").[2]  Both Deferred Compensation Plans have been frozen by the Debtors to disallow any additional deferrals of compensation.  No additional deferral elections have been allowed since 2012.  As of the Petition Date, the Deferred Compensation Plans have approximately 28 participants with combined balances of approximately $3 million.

24.     The Deferred Compensation Plans are funded by certain of the Debtors' investments (the "Investments").  In connection with managing the Investments, as well as the Deferred Compensation Plans, the Debtors pay The Todd Organization of Ohio ("Todd") certain fees.  The annual administrative fee paid by the Debtors in connection with the Investments and the Deferred Compensation Plans is approximately $47,500.  As of the Petition Date, the Debtors owed Todd approximately $9,400 in administrative fees incurred prior to the Petition Date in connection with the Deferred Compensation Plans (the "Todd Administrative Fee Obligation").

25.     Many complex and material issues relate to and impact the Deferred Compensation Plans.  At this time Debtors request authority, but not direction, to pay the Todd Administrative Fee Obligation as and when it comes due and in the ordinary course.  Payment of the Todd Administrative Fee Obligation will ensure that the value on the Investments is maintained by the Debtors.  The Debtors will, at the appropriate time, seek any additional relief they believe appropriate with respect to the Deferred Compensation Plans when such issues and developments can more fully be assessed.

Severance

---

[2]     Section 409A of the Internal Revenue Code was added in 2005.  In summary, before section 409A was added, Employees could seek to make certain withdrawals (with a penalty) from the Deferred Compensation Plans. After 2005, the ability to withdraw any funds was more limited.  The two Deferred Compensation Plans account for this change in the law.

01:16770676.8

26.     All full-time, regular U.S. Employees who have been with the Debtors for at least six (6) months may be eligible under the employee severance pay plan (the "Severance Plan"). The Severance Plan provides for severance pay in the event an Employee's job is eliminated due to automation, corporate reorganization, downsizing, outsourcing, the sale of part or all of the company or a similar event.  Base severance pay is one (1) week.  Supplemental severance pay is awarded on the basis of seniority and in exchange for a signed waiver and release.[3]  The Severance Plan further provides for any severance payments to be reduced by any amounts mandated under federal or state law as a result of a mass layoffs or similar event.  Approximately 34 former Employees (collectively, the "Former Employees") are eligible for severance payments under the Severance Plan (the "Severance Obligations").  The total amount outstanding on account of Severance Obligations as of the Petition Date is approximately $400,000.  The approximate monthly amount paid to such Former Employees on account of the Severance Obligations is $80,000.  The Former Employees receiving the Severance Obligations consist of both former management and non-management level individuals.  To the best of the Debtors' understanding, approximately three (3) of the Former Employees are owed more than $12,475 on account of the Severance Obligations.  These Former Employees held both management and non-management positions with the Debtors before their termination.

27.     Satisfying the Debtors' Severance Obligations is an integral component of the Debtors' efforts to sustain Employee morale and maintain the confidence of current Employees. Therefore, the Debtors seek authority, but not direction, to continue to make ordinary course payments, subject to a final order, to *non-insiders* under the Severance Plan up to the statutory

---

[3]     Certain legacy employees from the prior acquisition of WorkflowOne, LLC and certain members of management are not subject to the Severance Plan but rather have existing employment agreements and/or severance agreements which provide for severance pay.  The Debtors do not seek authority herein to pay any severance amounts except those owed under the Severance Plan.

priority limit of $12,475 per Former Employee, pursuant to section 507(a)(4) of the Bankruptcy Code.  The remaining obligations of the Severance Plan are minimal in comparison to the goodwill that will be retained with respect to the Employees in the event such payments are discontinued at this time.  Nothing herein seeks authorization to make payments to insiders under the Severance Plan or to continue the program on a post-petition basis, although the Debtors reserve all rights to seek authority to continue the Severance Plan in the ordinary course of business, to the extent appropriate.

*Defined Benefit Plan*

28.      The Debtors maintain a defined benefit plan, the Stanreco Retirement Plan (the "Stanreco Plan").  Based on the most recent Form 5500 filed with the Department of Labor, there are approximately 8,500 participants in the Stanreco Plan.

29.      Many complex and material issues relate to and impact the Stanreco Plan.  At this time the Debtors do not request authority to pay any amounts in connection with the Stanreco Plan.  The Debtors will, at the appropriate time, seek any additional relief that they believe is appropriate with respect to the Stanreco Plan when such issues and developments can more fully be assessed.

**(2)      Incentive Programs**

30.      In the ordinary course of business, the Debtors have typically maintained discretionary incentive and bonus programs for their Employees (collectively, the "Incentive Programs").  The Incentive Programs under which amounts are owed to Employees as of the Petition Date are described below.

01:16770676.8

*Bonuses*

31.     The Debtors maintain a number of bonus programs for Employees in the customer service, business development, management, and general sales groups (collectively, the "Bonus Programs").  Bonuses earned under the Bonus Programs (the "Bonuses") may be paid out monthly, quarterly, or yearly depending on the Bonus Program.  When payable, Bonuses generally range from 5-35% of an eligible Employee's annual earnings.  For all of the Employees who receive them, the Bonuses are an important aspect of their overall compensation. Maintaining the historical prepetition practices with regard to the Bonuses is essential to ensuring that the Debtors can retain their Workforce and continue to operate their businesses and maximize value through the prosecution of these Chapter 11 Cases.

32.     As of the Petition Date, the Debtors estimate that approximately $250,000 has accrued under one of the Debtors' sales Bonus Program in the U.S., and the Debtors estimate that approximately $40,000 has accrued under multiple Bonus Programs in Mexico.  The Debtors do not believe that there are any Bonus Program payments owed to insiders.

33.     Therefore, the Debtors seek authority, but not direction, to honor their obligations under the applicable Bonus Programs and to maintain all Bonus Programs in the ordinary course of the Debtors' business, subject to a final order.

*Commissions*

34.     Approximately 430 Employees receive some form of commission as part of their compensation, with the salaries of approximately 100 Employees being entirely commission based (collectively, the "Commissions").  The Employees who are eligible for the Commissions are sales representatives and sales management team members.  On average the Debtors pay approximately $2 million per month in Commissions.  Because Commissions vary based on

actual sales figures, it is difficult to estimate the total amount of accrued and unpaid

Commissions as of the Petition Date.  Nevertheless, the Debtors believe it is essential to pay any

prepetition Commissions in order to sustain the confidence and morale of its sales force.  The

Commissions are an essential part of the overall compensation provided for Employees—and in

the case of some Employees the *only* significant form of compensation.  Just as with the regular

salaries, the Commissions are vital to retaining the Debtors' Workforce.  Therefore, the Debtors

seek authority, but not direction, to pay the Commissions in full, but not to exceed $12,475 per

Employee on an interim basis.

*Equity Incentive Plan*

35.     The Debtors maintain an equity compensation plan (the "Equity Incentive Plan").

In aggregate, as of the Petition Date, there were approximately 1,107,143 securities to be issued

and/or vest upon exercise of outstanding options and rights issued pursuant to such Equity

Incentive Plan.

36.     The Equity Incentive Plan is structured to incentivize award recipients to deliver

superior corporate performance to the Debtors at no cost to the Debtors' creditors.  These non-

cash awards align Employee and board member interests with the interests of the Debtors'

financial stakeholders by linking compensation to the Debtors' corporate performance.

Moreover, the awarded equity's ratable vesting schedule stresses long-term corporate growth and

stability over short-term gains.  Employees are encouraged to take steps to improve the Debtors'

long-term performance.  They receive little gain from a short-term bump in valuation.

37.     Accordingly, the Debtors request authority, but not direction, to continue the

Equity Incentive Plan in the ordinary course after the Petition Date solely to provide for

continued vesting and issuance of already outstanding options and rights.

*Profit Sharing Plan*

38.    As required under Mexican law, the Debtors have established a profit sharing plan (the "Profit Sharing Plan," and collectively with the Bonuses, the Commissions, and the Equity Incentive Plan, the "Incentive Obligations") through which Employees receive a percentage of corporate profits each year.  The Debtors account for their obligations under the Profit Sharing Plan on a monthly basis and pay the amounts in the second quarter for the prior calendar year. The Debtors estimate that the current accrued amount outstanding under the Profit Sharing Plan is approximately $22,000.

39.    Accordingly, the Debtors request authority, but not direction, to honor their obligations under the Profit Sharing Plan and continue the Profit Sharing Plan in the ordinary course after the Petition Date.

### (3)    Employee Benefit Programs

40.    In the ordinary course of business, the Debtors implement various benefit plans and policies for their Employees that can be divided into the following categories, all as are described in more detail below: (a) prescription and medical benefits (the "Medical Plans," such term to include the PPO Plan, the HSA Plan, the HRA Plan, the Kaiser HMO Plan, the Triple-S Plan, the Grupo Nacional Plan and the Stop-Loss Plan, all as such terms are defined below), dental care (the "Dental Plan"), vision care (the "Vision Plan", and collectively with the Medical Plans and the Dental Plan, the "Health Plans"); (b) basic life and accidental death and dismemberment insurance, supplemental life insurance, short- and long-term disability insurance, and other voluntary insurance plans (collectively, the "Income Protection Plans"); (c) sick/emergency time ("PTO") and vacation time ("Vacation Time"); (d) retirement savings 401(k) plan ("401(k) Plan"); (e) flexible spending account plan ("FSA Plan"); (f) car allowance

program (the "Car Allowance Program"); (g) employee assistance program ("EAP"); a workers'
compensation plan (the "Workers' Compensation Plan");[4] (i) a food coupon program (the "Food
Coupon Program"); and (j) a savings fund program (the "Savings Fund Program," and
collectively with the Health Plans, Income Protection Plans, PTO, Vacation Time, the 401(k)
Plan, the FSA Plan, and the Car Allowance Program, the EAP, the Workers' Compensation Plan,
and the Food Coupon Program, the "Employee Benefits Plans").  In certain instances, the
Debtors deduct specified amounts from the participating Employees' wages in connection with
the Employee Benefits Plans.  All obligations with respect to the Employee Benefits Plans are
hereinafter referred to as the "Employee Benefits Obligations."  There are no Employee Benefits
Obligations owed by the Debtors to retired Employees.

*Health Plans*

41.    Employee contributions to the Health Plans have been and are collected through
payroll deductions from participating Employees.  The Debtors believe that it is necessary and
appropriate to continue to honor their obligations to current Employees under the Health Plans.
The Debtors request authority, but not direction, to pay all prepetition amounts due under the
Health Plans.  The Debtors also request authority, but not direction, to continue to offer the
Health Plans and honor their obligations thereunder in the ordinary course during the
administration of the Chapter 11 Cases.

*Medical Plan*

42.    The Debtors offer Employees and eligible dependents three self-insured Medical
Plans administered by Anthem Blue Cross ("Anthem"): a preferred provider network ("PPO
Plan"), a health reimbursement account plan ("HRA Plan"), and a high deductible/health savings

---

[4]    A discussion of the premiums owed under the Workers' Compensation Plan is set forth in the concurrently-filed
motion seeking authorization to continue the Debtors' prepetition insurance programs and pay premiums, as
applicable, in conjunction therewith.

account plan ("HSA Plan").  In addition to these three Medical Plans, the Debtors also offer

Employees in California and Hawaii the option of selecting a Kaiser HMO plan (the "Kaiser

HMO Plan").  Employees in Puerto Rico are offered insurance through Blue Cross Blue Shield

of Puerto Rico (the "Triple-S Plan").  Finally, Employees in Mexico are offered insurance

through Grupo Nacional Provincial (the "Grupo Nacional Plan").  The Kaiser HMO Plan and

Triple-S Plan are fully insured plans.  A Vision Plan and Dental Plan are also administered, as

discussed below.

43.     The PPO Plan provides a network of health care providers and facilities which

provide health care services at a reduced fee.  The PPO Plan allows members to secure care from

providers that are not in the network; however, visiting an out-of-network provider requires the

member to pay an increased amount for service.  The PPO plan is structured so members pay a

deductible before the plan will pay expenses.  There is a separate and higher deductible for out-

of-network services.  There are approximately 1,066 Employees enrolled in the PPO Plan.

44.     The HRA Plan is a medical plan paired with a health reimbursement account

(HRA).  The medical plan portion is essentially a PPO with a higher deductible than what is

found in a traditional PPO plan.  The HRA is an account funded exclusively by the Debtors.

Unused HRA Funds roll-over each year and are added to the next year's deposit up to a

maximum of $4,500 (Employee only), $6,000 (Employee plus spouse or child(ren)) or $7,500

(family).  Members can use the HRA to pay for out-of-pocket medical expenses not covered by

the health plan.  Within the HRA, Anthem manages the account and automatically uses this

account to pay for incurred expenses as part of the claim adjudication process.  Any balance an

Employee has in an HRA may not be rolled over or used for another health plan.  There are

approximately 765 Employees enrolled in the HRA Plan.

45.     The HSA Plan is a high deductible health plan (HDHP) with a Health Savings

Account (HSA) attached.  A HDHP is a health insurance policy that requires covered individuals

to pay a high out-of-pocket deductible for medical care (at least $1,300) before any costs will be

paid by the plan.  Per IRS requirements, participation in a HDHP is required for individuals to

use a health savings account.  A health saving account is a part of an Employee's health plan,

into which deposits can be made by the employer or the Employee.  These funds can then be

used to pay for a variety of the individual's medical expenses.  There are approximately 934

Employees enrolled in the HSA Plan.

46.     All three of the Anthem plans are funded on a self-insured basis.  Under this

arrangement the Debtors are responsible for paying all claims and administrative costs, even if

the actual costs exceed the estimated costs.  On average, the Debtors pay approximately $1.6

million per month in medical and prescription claims.  Anthem provides administrative services

for which the Debtors pay approximately $175,000 per month.[5]  In addition, the Debtors pay a

monthly premium of $55,000 to Anthem for a "stop-loss" insurance plan (the "Stop-Loss Plan").

The terms of the Stop-Loss Plan limit the Debtors' liability on account of any one claim to

$450,000.  There is no annual limit.

47.     The Kaiser HMO Plan offered to Employees in California and Hawaii is a Health

Maintenance Organization plan ("HMO").  An HMO is a health insurance plan where

Employees receive services exclusively through a network of doctors and other medical

professionals.  Only visits to providers and facilities within the HMO network are covered by the

policy.  There are approximately 166 Employees enrolled in the Kaiser HMO Plan.

---

[5]     The administrative fee paid to Anthem covers the Anthem Medical Plans, the Dental Plan, and the FSA Plan as
discussed *infra*.

48.    The Kaiser HMO Plan is fully-insured.  The Debtors contract with Kaiser for the coverage and the Debtors are then charged a monthly premium throughout the year.  If expenses exceed the revenue generated by the premium, Kaiser makes up the difference to pay the claims. On average, the Debtors pay approximately $122,000 per month in premiums to cover the Kaiser HMO Plan.

49.    For approximately five (5) Employees in Puerto Rico, the Debtors offer the Triple-S Plan which is fully insured and has a monthly premium of approximately $3,600.

50.    Finally, the Debtors offer Employees in Mexico the Grupo Nacional Plan, which covers approximately 67 individual Employees plus the families of approximately five (5) managerial Employees' families.  In connection with the Grupo Nacional Plan, the Debtors pay Grupo Nacional Provincial approximately $50,000 per year, paid one year in advance, and the Debtors estimate that there are no amounts outstanding as of the Petition Date in connection with such plan.

51.    As of the Petition Date, the Debtors owe approximately $1.2 million on account of the Medical Plans.  This figure includes both premiums and estimated claims under the fully insured and self-insured Medical Plans.

*Dental Plan*

52.    The Debtors also offer their Employees the Dental Plan, which is a self-insured plan administered by Anthem (the administration fee discussed above also covers the Dental Plan).  Approximately 2,524 Employees participate in the Dental Plan.  On average, the Debtors pay approximately $100,000 per month in dental claims.  As of the Petition Date, approximately $50,000 remained outstanding in connection with the Dental Plan.

01:16770676.8

*Vision Plan*

53.     The Debtors offer a Vision Plan administered by Anthem.  Approximately 2,260 Employees participate in the Vision Plan.  The estimated monthly payment by the Debtors for the Vision Plan is approximately $35,000.  These amounts are inclusive of the participating Employees' contributions.  The Debtors estimate that as of the Petition Date they owe approximately one month's premium in connection with the Vision Plan.

*Income Protection Plans:  Life and AD&D Insurance*

54.     The Debtors maintain certain Income Protection Plans including primary life and accidental death and dismemberment insurance (the "Life and AD&D Insurance") through Metlife in the U.S. and through Grupo Nacional Provincial in Mexico.  All benefits-eligible Employees have Life and AD&D Insurance.  Life and AD&D Insurance costs the Debtors approximately $26,000 per month in the U.S., and the Debtors pay approximately $5,000 per year in Mexico.  The Debtors estimate that as of the Petition Date they owe approximately one month's premium on account of the U.S. plan, and nothing is currently owed under the Mexican plan.  In addition, certain of the Debtors' Employees choose elective coverage such as supplemental, spousal and dependent life insurance.  While the Employees ultimately pay the full cost of such elective benefits, the costs are not withheld prior to the billing date.  Thus, the Debtors expect to need approximately $82,500 in order to front these expenses on a monthly basis.

55.     As part of the Income Protection Plans, the Debtors also offer benefits-eligible U.S. Employees short and long term disability insurance ("Disability Insurance").  Disability Insurance costs the Debtors approximately $33,500 per month.  The Debtors estimate that as of

the Petition Date they owe approximately one month's premium in connection with their

Disability Insurance.

*PTO and Vacation Time*

56.     Non-exempt Employees in the U.S. are eligible for a certain amount of PTO per

year for sick days and/or personal emergencies.  These Employees receive five (5) days of PTO

every calendar year.[6]  PTO does not accrue, roll over or get paid out unless state or local law

require otherwise.

57.     Employees in the U.S. and Mexico also receive Vacation Time.  The rate at which

an Employee accrues Vacation Time varies depending on the Employee's length of employment.

In the U.S., 3.08 hours accrue per pay period zero through four years of service, 4.62 hours

accrue per pay period for five through 11 years of service, 6.15 hours accrue per pay period for

12 through 24 years of service, and 7.69 hours accrue per pay period for 25 or more years of

service.  In Mexico, hourly Employees receive seven days the first year of employment and then

an additional two days accrue each subsequent year.  Salaried Employees receive ten days the

first year and then an additional two days accrue each subsequent year.

58.     Except for Employees in Mexico, Vacation Time does not roll over from one

calendar year to the next.  Unless required by local law, and except with respect to additional

Vacation Time that an Employee has purchased and that remains unused at the time of

termination, an Employee is not entitled to a cash payment for accrued Vacation Time in the

event that such Employee is terminated from the Debtors' employment or leaves the Debtors'

employment prior to using his or her Vacation Time.

---

[6]     Employees who have been with the Debtors for less than one year will accrue PTO at a different rate during the
first year of employment.

59.     As of the Petition Date, the Debtors estimate that the value of accrued and unused or unpaid PTO and Vacation Time is approximately $3.2 million.

60.     The Debtors request that they be authorized, but not directed, to continue to honor their PTO and Vacation Time policies going forward, and with regard to any PTO and Vacation Time that accrued prepetition, including to the extent that Employees may use prepetition PTO and Vacation Time throughout the administration of these cases in accordance with prepetition policies.

*The 401(k) Plan*

61.     The Debtors maintain the 401(k) Plan, a retirement savings plans for eligible Employees pursuant to section 401 of the Internal Revenue Code.  Fidelity Management Trust Company (the "Trustee") serves as the trustee and record keeper of the 401(k) Plan.  Employees participating in the 401(k) Plan may contribute up to 100% of their pay or the federal statutory cap of $18,000 per year.  Approximately 5,000 individuals, comprised of both Employees and Former Employees, currently participate in the 401(k) Plan, and the total approximate monthly amount withheld from the participating Employees' paychecks for 401(k) contributions is $1.2 million.

62.     The annual administrative fee in connection with the 401(k) Plan is approximately $330,000, which is paid from fees assessed against plan participants.  To the extent that assessed fees are insufficient to cover administrative expenses in connection with the 401(k) Plan, the Debtors may be liable for such expenses.  However, as of the Petition Date, the Debtors do not believe that they owe any amounts in connection with the 401(k) Plan.

63.     Accordingly, the Debtors request authority, but not direction, to maintain the 401(k) Plan in the ordinary course during the administration of the Chapter 11 Cases.

*The Flexible Spending Account Plan*

64.     Under the Debtors' FSA Plan, the Debtors offer their Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care premiums and expenses.  Approximately 590 Employees participate in the FSA Plan with approximately 56 participating in the dependent care account and approximately 530 participating in the health care account.  Employees may set aside up to $5,000 for dependent care and up to $2,550 for medical expenses in a calendar year. Employees participating in the FSA Plan designate approximately $11,000 per month on account of dependent care and approximately $52,200 per month on account of health care.  These amounts are withheld through payroll deductions.  Conexis Benefits Administrators, LP administers the FSA Plan, and its service fee is encompassed in the Anthem administrative fee described above, which is paid to Anthem on account of the Health Plans.  Any unspent amounts in health care or dependent care accounts at the end of the plan year do not roll over to the following year.

65.     As noted above, the Debtors pay Anthem approximately $175,000 per month for the administration of certain of the Debtors' Health Plans, which includes the administration of the FSA Plan.  The Debtors seek authority, but not direction, to continue to pay all prepetition amounts due under the FSA Plan as and when they come due and to continue to honor their obligations thereunder in the ordinary course during the administration of the Chapter 11 Cases.

*Car Allowance Program*

66.     The Debtors provide approximately nine (9) Employees with a monthly car allowance for work and personal use, on which the Debtors expend approximately $7,600 per month in the aggregate (the "<u>Car Allowance Program</u>").  Payments under the Car Allowance

Program are made on a bi-weekly basis through payroll.  As of the Petition Date, approximately $5,800 was outstanding in connection with the Car Allowance Program.   The Debtors seek authority, but not direction, to continue with the Car Allowance Program in place prior to the Petition Date in the ordinary course and honor any payments owed by the Debtors with respect to the Car Allowance Program regardless of when they arose.

*Employee Assistance Program*

67.    The Debtors offer the EAP through Magellan Behavioral Health, Inc. and Magellan Health Services of California, Inc.-Employer Services.  The EAP provides Employees with assistance relating to a variety of issues including marital and family concerns, work-life balance, substance abuse problems and similar type supportive services.  The EAP costs the Debtors approximately $4,830 per month.  The Debtors estimate that as of the Petition Date they owe approximately one month's premium.  The Debtors seek authority, but not direction, to continue the EAP in the ordinary course and honor any payments owed with respect to the EAP regardless of when such obligations arose.

*Workers' Compensation Plan*

68.    The Debtors maintain certain workers' compensation plans (collectively, the "Workers' Compensation Plan") with (a) Liberty Mutual Insurance, to provide coverage in all states except Ohio and Washington and to provide claim administration services in these states, (b) Safety National Casualty Corporation, to provide coverage in Ohio, and (c) Hunter Consulting Company, to provide claim administration services in Ohio.[7]  The Debtors' deductible under the Liberty Mutual Insurance policy is $250,000 per incident, and the Debtors'

---

[7]    The Debtors formerly had a policy with Travelers, and the Debtors' potential liability, discussed below, includes claims associated with this policy.

deductible under the Safety National Casualty Corporation policy is $500,000 per incident. The Debtors are liable for all claim amounts below the respective deductibles.

69.    As of the Petition Date, the Debtors estimate there are approximately $2.5 million in outstanding claims for which the Debtors may be liable. The Debtors seek authority, but not direction, to continue the Workers' Compensation Plan in the ordinary course and honor any payments owed with respect to the Workers' Compensation Plan claims regardless of when such obligations arose.

*Food Coupon Program*

70.    The Food Coupon Program is a tax free assistance program required by Mexican law up to a maximum of approximately $152 per applicable Employee per month. The Debtors fund the Food Coupon Program every two weeks by transferring funds to debit cards for the applicable Employees through a vendor, Prestaciones Universales. Hourly Employees receive 8% of their hourly wages up to the maximum of the $152 monthly limit. Salaried Employees receive 13% of their salaries up to the maximum of the $152 monthly limit. The Debtors pay approximately $11,000 per month in connection with the Food Coupon Program, and the Debtors estimate that they owe approximately $5,500 in accrued obligations under the Food Coupon Program as of the Petition Date.

71.    Accordingly, the Debtors seek authority, but not direction, to continue the Food Coupon Program in the ordinary course and honor any payments owed by the Debtors with respect to the Food Coupon Program regardless of when such obligations arose.

*Savings Fund Program*

72.    The Savings Fund Program is a savings plan whereby Employees in Mexico can designate up to approximately $197 per month to place in a savings account tax free, and in order

for the Employees and the Debtors to receive certain tax benefits, the Debtors are required to provide a matching contribution equal to the amount designated by each Employee.  The Debtors transfer the contributions to Banco Actinver, which administers the Savings Fund Program.  The Debtors monthly obligations under the Savings Fund Program are approximately $4,000, and the Debtors estimate that the current accrued obligations under the Savings Fund Program are approximately $8,000 as of the Petition Date.

73.    The Savings Fund Program is an important component of Mexican Employees' overall compensation, similar to the 401(k) Plan for U.S. Employees.  Accordingly, the Debtors seek authority, but not direction, to continue the Savings Fund Program in the ordinary course and honor any payments owed by the Debtors with respect to the Savings Fund Program regardless of when such obligations arose.

## RELIEF REQUESTED

74.    By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay prepetition claims and honor obligations incurred or related to Compensation Obligations, Withholding Obligations, Reimbursable Expense Obligations, Todd Administrative Fee Obligations, Severance Obligations, Incentive Obligations and Employee Benefits Obligations and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (collectively, the "Employee Obligations") and (b) maintain, continue and honor, in the ordinary course of business, the Employee Benefit Plans, the Incentive Programs, the Workers Compensation Plan and the Equity Incentive Plan (collectively, the "Employee Plans and Programs").

75.    To enable the Debtors to carry out the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions (together, the "Banks"),

Ultimate, ADP and Todd (collectively with the Banks, Ultimate, and ADP, the "Processors"), to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether such checks were presented or electronic-payment requests were submitted prior to or after the Petition Date.[8]

## BASIS FOR RELIEF REQUESTED

76.    The Debtors' success is based in large part on the Workforce.  As stated above, competition for qualified employees is intense in the Debtors' industry.  Thus, it is essential to assure the Employees that the Debtors will honor the Employee Obligations and continue and maintain the Employee Plans and Programs in the ordinary course of business throughout the Chapter 11 Cases.  A failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or, in the case of Contract Workers, the decision to not complete work for the Debtors or accept future hiring proposals.  Loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

77.    Therefore, the Debtors seek authority to pay, in their sole discretion, the Employee Obligations, and to maintain and continue the Employee Plans and Programs, in their sole discretion, and in the ordinary course of business, in the exercise of their business judgment. The relief is necessary to retain the Workforce, the loss of which would disable the Debtors' business operations.

---

[8]    Concurrently herewith, the Debtors have filed a motion for authority to, among other things, continue utilizing their cash management system (the "Cash Management Motion").

A.      **A Significant Portion of the Employee Obligations is Entitled to Priority Treatment**

78.      Section 507(a)(4)(A) of the Bankruptcy Code grants a priority of up to $12,475

for employee claims for "wages, salaries, or commission, including vacation, severance, and sick

leave pay" earned within 180 days before the Petition Date.  11 U.S.C. § 507(a)(4)(A).

Similarly, section 507(a)(5) of the Bankruptcy Code grants priority to contributions to employee

benefit plans, up to an aggregate amount of $12,475 multiplied by the number of employees

covered less any amounts paid to such employees under section 507(a)(4) of the Bankruptcy

Code.

79.      Indeed, "[w]age priority has been a feature of the bankruptcy law since 1898."  *In*

*re Garden Ridge Corp.*, 2006 Bankr. LEXIS 278 (quoting 4 Alan N. Resnick & Henry J.

Sommer, *Collier on Bankruptcy* ¶ 507.05[1] (15th ed. 2005)).  Its purpose is to "alleviate

hardship on workers . . . who may have no other source of income and "to encourage employees

to stand by an employer in financial difficulty."  This priority extends to certain other "benefits

that are considered akin to compensation, such as vacation, severance and sick leave pay."  *Id.*

80.      The Debtors believe that the substantial portion of the Employee Obligations

relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4)

and (5) of the Bankruptcy Code.  Amounts that are paid on account of priority claims for the

majority of the Employee Obligations would not otherwise be available for distribution to

unsecured creditors.  Therefore, the Debtors' unsecured creditors will not be prejudiced by

permitting priority obligations to be satisfied in the ordinary course of business during the

Chapter 11 Cases rather than at the conclusion of the cases.  Indeed, the Debtors submit that

payment of Employee Obligations at this time enhances value for the benefit of the Debtors and

all interested parties by retaining the Workforce.  While not going to current Employees of the

Debtors, honoring the Severance Obligations is likewise important to sustain morale for the current Workforce and ensure their retention.

## B.    Payment of Certain Withholding Obligations is Appropriate Under Section 541 of the Bankruptcy Code

81.    The Debtors also seek authority to pay the Withholding Obligations to the appropriate entities.  These amounts principally represent the Employees' earnings that governments, the Employees, and the judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541; *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (observing the "well-settled principle that debtors do 'not own an equitable interest in property . . . [they] hold[] in trust for another,' and that therefore funds held in trust are not 'property of the estate.'") (quoting *Begier v. IRS*, 496 U.S. 53, 59 (1990)).  Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Withholding Obligations are not property of the Debtors' estates, the Debtors request that the Court authorize them to remit these amounts to the appropriate parties in the ordinary course of business.

**C.**     **The Debtors Should be Authorized to Pay the Employee Obligations Under Sections 1107(a) and 1108 of the Bankruptcy Code**

82.     The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). "Implicit in the duties" of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

83.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims is a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim is a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

84.     Payment of the Employee Obligations as set forth herein meets each element of the *CoServ* court's standard. As described above, the Employees likely maintain priority claims against the Debtors for certain of the Employee Obligations. In addition, any failure by the Debtors to pay the Employee Obligations as set forth herein would negatively impact the morale of the Workforce at a critical time for the Debtors and their businesses when the Workforce is

01:16770676.8

most needed.  The Workforce is also critical to the Debtors' ability to maintain their operations

consistent with past practices, which would be impossible without the continued efforts of the

Workforce.  The damage to the value of the Debtors' business and, hence, the costs to creditors

as a whole, would be immediate and irreparable if the Employee Obligations were not met.  In

short, the potential harm and economic disadvantage that would stem from the failure to pay the

Employee Obligations as set forth herein is grossly disproportionate to the amount of any

prepetition claims that the Debtors are requesting to pay.

85.     The Debtors have determined that to avoid significant disruption to their business

operations there exists no practical or legal alternative to the payment of the Employee

Obligations as set forth herein.  Therefore, the Debtors can meet their fiduciary duties as debtors-

in-possession under sections 1107(a) and 1108 of the Bankruptcy Code only by payment of the

Employee Obligations as set forth herein.

**D.     Payment of the Employee Obligations is Warranted Pursuant to Section 363 of the Bankruptcy Code**

86.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may "after

notice and a hearing, use, sell, or lease, other than in the ordinary course of business, property of

the estate."  11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the

ordinary course of business must be based upon the sound business judgment of that debtor.  *See*

*Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Co. (In re*

*Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court determining an

application pursuant to section 363(b) must find from the evidence a good business reason to

grant such application); *see also In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr.

S.D.N.Y. 1989) (standard for determining a section 363(b) motion is whether the debtor has a

"good business reason" for the requested relief).  "Where the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-*

*Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60

B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Consistent with a debtor's fiduciary duties, where there

is a sound business purpose for the payment of prepetition obligations, and where the debtor is

able to "articulate some business justification, other than the mere appeasement of major

creditors," courts have authorized debtors to make such payments under section 363(b) of the

Bankruptcy Code.  *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound

business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at

397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of

suppliers who were potential lien claimants).

87.     In addition, the Debtors pay the Employee Obligations in the ordinary course of

business, as permitted by section 363(c) of the Bankruptcy Code.  However, to the extent that the

Court finds that approval is necessary and in an abundance of caution, the Debtors request that

the Court grant the relief requested herein and enter an order authorizing them to pay the

Employee Obligations, consistent with their compensation, vacation, and other benefit policies

and plans, and to permit, but not require, the Debtors, in their discretion, to maintain and

continue the Employee Plans and Programs for their Employees as those practices, programs,

policies, and plans were in effect as of the Petition Date, as such may be modified, terminated,

amended, or supplemented from time to time hereafter.

**E.     Payment of the Employee Obligations is Warranted Pursuant to Section 105(a) of
the Bankruptcy Code and Under the Doctrine of Necessity**

88.     Courts have also authorized payment of prepetition claims in appropriate

circumstances pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the

Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may permit pre-plan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan.  *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *In re Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

89.    Numerous courts have used their section 105(a) powers under the "doctrine of necessity" to authorize payment of prepetition obligations where, as here, such payment is an essential element of the preservation of the debtor-in-possession's potential for rehabilitation. *See In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because the debtor-in-possession has fiduciary duties it must meet, it is logical that the bankruptcy court may "authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate" under section 105(a)); *In re Synteen Techs., Inc.,* 2000 WL 33709667, at *2 (Bankr. D.S.C. Apr. 14, 2000) (courts have permission to "allow payment of a prepetition claim 'when essential to the continued operation of the debtor.'") (citation omitted); *In re Just For Feet, Inc.,* 242 B.R. 821, 824 (D. Del. 1999) (courts have used their equitable power under section 105(a) . . . to authorize the payment of prepetition claims when such payment is deemed necessary to

the survival of a debtor in a chapter 11 reorganization"); *In re NVR L.P.,* 147 B.R. 126, 127

(Bankr. E.D. Va. 1992) ("Under [section 105] the court can permit pre-plan payment of a

prepetition obligation when essential to the continued operation of the debtor"); *In re Eagle-*

*Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of

prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the

Chapter 11 process"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991)

("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of

reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has

developed . . . where bankruptcy courts permit the payment of certain pre-petition claims,

pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such

payment."); *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (affirming bankruptcy

court's order authorizing debtor to pay pre-bankruptcy wages, salaries, employee benefits and

reimbursements, and workers' compensation claims and premiums).

90.     The "doctrine of necessity" is frequently invoked early in reorganization cases,

during the so-called "breathing spell," when preservation of the estate is most critical and often

extremely difficult.  *See* 2 *Collier on Bankruptcy* ¶ 105.02[4][a] (16th ed.) (discussing cases in

which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to

pay prepetition claims immediately).  For example, in *In re Structurlite Plastics Corp.,* 86 B.R.

922 (Bankr. S.D. Ohio 1988), the court embraced "the principle that a bankruptcy court may

exercise its equity powers under section 105(a) to authorize payment of prepetition claims where

such payment is necessary to 'permit the greatest likelihood of survival of the debtor . . . .'"  *Id.*

at 931 (citing *In re Chateaugay Corp.,* 80 B.R. 279, 287 (S.D.N.Y. 1987)).  The court explained

that a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible

to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932. Flexibility of payment is particularly critical when the prepetition creditor provides vital goods or services to the debtor.

91.      Here, the majority of the Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses and maintain their health and well-being. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor the Employee Obligations. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will suffer at precisely the time the Employee support is most critical. Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefits Plans, the Employees' health coverage could be threatened, potentially burdening individual Employees with the costs of health care. At minimum, the loss of health care coverage, or uncertainty regarding coverage, would result in considerable anxiety for Employees at a time when the Debtors need their Employees to perform their jobs at peak efficiency. For all of the foregoing reasons, a sound business purpose exists to pay the Employee Obligations.

92.      In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Workforce, hinder the Debtors' ability to develop quality product and service the needs of their customers, and likely diminish creditor and counterparty confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtors should be focusing on continuing to strengthen their operations. Accordingly, the Debtors must be able to pursue all reasonable measures to retain the Employees

by, among other things, continuing to honor wages, benefits, and related obligations, including

those that accrued prior to the Petition Date, consistent with the terms set forth in the Interim

Order and Final Order attached hereto.

93.    Taken together, the nature of the Employee Obligations, the substantial harm to

the Debtors' businesses that would be caused if those obligations were not honored, the related

potential for loss of value in the Debtors' estates, and the fact that a significant portion of the

obligations in question relates to priority wage claims, lead to the conclusion that the Employee

Obligations fall well within the scope of obligations whose payments may be authorized

pursuant to the doctrine of necessity.

94.    Accordingly, for all of the foregoing reasons, the relief requested herein will

benefit the Debtors' estates and creditors by allowing the Debtors' business operations to

continue without interruption and should therefore be approved.

**F.    The Court Should Authorize Applicable Banks and Other Processors to Honor
Checks and Electronic Fund Transfers in Accordance with the Motion**

95.    In connection with the foregoing, the Debtors respectfully request that the Court

(a) authorize all applicable Processors to receive, process, honor, and pay all checks and transfers

issued by the Debtors in accordance with this Motion, without regard to whether any checks or

transfers were issued before or after the Petition Date; (b) provide that all Processors may rely on

the representations of the Debtors with respect to whether any check or transfer issued or made

by the Debtors before the Petition Date should be honored pursuant to this Motion (such Banks

and other Processors having no liability to any party for relying on such representations by the

Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or

transfers to the extent any checks or transfers that are issued and authorized to be paid in

accordance with this Motion are dishonored or rejected by the Processors.

01:16770676.8

**G.      Immediate Relief Is Justified**

96.      Pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

97.      Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties.  Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate").  Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions.  *See* 9 *Collier on Bankruptcy* ¶ 4001.07[b][3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)). Courts will routinely consider third-party interests when granting such relief.  *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

98.      As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without Court authorization to pay the Employee Obligations and other related relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## REQUEST FOR WAIVER OF STAY

99.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

100.    To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent that they are deemed applicable.

## DEBTORS' RESERVATION OF RIGHTS

101.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to dispute any claim asserted by a member of the Workforce under applicable law and to assume or reject any Workforce agreements in accordance with the applicable provisions of the Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

01:16770676.8

## NOTICE

102.    The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the 50 largest unsecured claims on a consolidated basis against the Debtors; (iii) counsel for Silver Point Finance, LLC, in its capacity as administrative agent under the Debtors' First Lien Credit Agreement and Second Lien Credit Agreement; (iv) counsel for Bank of America, N.A., in its capacity as administrative agent under the Debtors' Amended and Restated Loan and Security Agreement; (v) counsel to the agents under the Debtors' proposed debtor-in-possession financing facility; (vi) the Banks; and (vii) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 12, 2015
          Wilmington, Delaware

<u> /s/ Kara Hammond Coyle</u>
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Robert A. Klyman (CA No. 142723)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

## **EXHIBIT A**

## **PROPOSED INTERIM ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE CLAIMS, INCLUDING WAGES, SALARIES AND OTHER COMPENSATION, (II) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF REIMBURSEMENT TO EMPLOYEES FOR PREPETITION EXPENSES, (IV) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (V) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS, AND (VI) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS AND THIRD PARTY PROVIDERS**

Upon the *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries and Other Compensation, (ii) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (iii) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (iv) Authorizing Payment of Withholding and Payroll-Related Taxes, (v) Authorizing Payment of Workers' Compensation Obligations, and (vi) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

"Debtors"); and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and in consideration of the First Day Declaration; and it appearing that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and a hearing having been held to consider the relief requested in the Motion; and upon the record of the hearing on the Motion and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is granted on an interim basis as set forth herein.

2.      A final hearing (the "Final Hearing") on the Motion shall be held on

_____, 2015 at __:__ __.m (prevailing Eastern Time).  Any objections or responses to the Motion shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2015 and served on the parties required by Local Rule 2002-1(b).

3.      Except as otherwise set forth herein, the Debtors are authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, but not obligated or directed, in the

reasonable exercise of their business judgment and in the ordinary course of business, to pay and honor amounts on account of Employee Compensation Obligations and Contract Workers Obligations (exclusive of Withholding Obligations); *provided*, *however*, that without prejudice to the Debtors' right to seek additional payments at the Final Hearing or any other time subsequent thereto, (a) the Debtors shall not make any payments in excess of $12,475 on account of prepetition obligations to any one Employee, respectively, absent further order of the Court, and (b) the aggregate amount of such payments on account of Employee Compensation Obligations and Contract Workers Obligations (exclusive of Withholding Obligations) shall not exceed $7.8 million unless further ordered by the Court.

4.      The Debtors and any applicable third parties are authorized to continue to allocate and distribute Withholding Obligations to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

5.      The Debtors are authorized, but not directed, to continue to honor their Reimbursable Expense Obligations, including any prepetition obligations, in accordance with the Debtors' stated policies and prepetition practices, and are authorized to satisfy such Reimbursable Expense Obligations in an amount not to exceed $850,000; *provided*, *however*, that satisfaction of prepetition Reimbursable Expense Obligations shall only be allowed to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.

6.      The Debtors are authorized, but not directed, to make payments to non-insiders for Commissions earned prior to the Petition Date, in an aggregate amount not to exceed $2 million, and to continue paying Commissions in the ordinary course of business; *provided*, *however*, that no such Employees receiving Commission payments shall receive payments

exceeding $12,475 in the aggregate, inclusive of other payments for prepetition claims contemplated by this Interim Order.

7.     The Debtors are authorized, but not directed, to honor the obligations under the Profit Sharing Plan in the ordinary course of business and in accordance with the Debtors' prepetition practice, and to make payments under the Profit Sharing Plan earned prior to the Petition Date in an aggregate amount not to exceed $25,000; *provided*, *however*, that no such Employees receiving payments on account of the Profit Sharing Plan shall receive payments exceeding $12,475 in the aggregate, inclusive of other payments for prepetition claims contemplated by this Interim Order.

8.     The Debtors are authorized, but not directed, to honor the Employee Benefit Plans in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, and to make any necessary contributions to such programs and pay any unpaid premium, claim, or amount owed as of the Petition Date with respect thereto; *provided*, *however*, that the Debtors may not pay in excess of $4.1 million in the aggregate on account of Employee Benefit Plans and the Employee Benefits Obligations, exclusive of Withholding Obligations.

9.     The Debtors are authorized, but not directed, to satisfy the Todd Administrative Fee Obligations in an aggregate amount not to exceed $9,400.

10.     The Debtors are authorized to continue the Equity Incentive Plan in the ordinary course of business.

11.     The Debtors are authorized, but not directed, to honor all obligations under the Debtors' PTO and Vacation Time policies, including payout of accrued PTO and Vacation Time only where local law requires.

01:16770676.8

12.     The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Compensation Obligations or the Employee Benefits Obligations, including the Payroll Administrator Obligations.

13.     Nothing in the Motion or this Interim Order, nor as a result of any payment made pursuant to this Interim Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, or any other party in interest, to the extent applicable, to contest the validity and amount of any payment made pursuant to this Interim Order.

14.     Each of the Processors is authorized to receive, process, honor, and pay all checks and transfers issued or requested by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Final Order and any other order of this Court.

15.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Compensation Obligations and Employee Benefits Obligations that are dishonored or rejected.

16.     Nothing in the Motion or this Interim Order shall be deemed to permit a violation of section 503(c) of the Bankruptcy Code.

17.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith.

18.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

19.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contents of the Motion.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

22.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2015
        Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE

01:16770676.8

**<u>EXHIBIT B</u>**

**PROPOSED FINAL ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. ___ |

**FINAL ORDER (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
WORKFORCE CLAIMS, INCLUDING WAGES, SALARIES AND OTHER
COMPENSATION, (II) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE
BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON
POSTPETITION BASIS, (III) AUTHORIZING PAYMENT OF REIMBURSEMENT
TO EMPLOYEES FOR PREPETITION EXPENSES, (IV) AUTHORIZING
PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES,
(V) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS,
AND (VI)AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING
<u>TO ADMINISTRATORS AND THIRD PARTY PROVIDERS</u>**

Upon the *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries and Other Compensation, (ii) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (iii) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (iv) Authorizing Payment of Withholding and Payroll-Related Taxes, (v) Authorizing Payment of Workers' Compensation Obligations, and (vi) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

*Providers* (the "Motion")[2] of Standard Register and its affiliated debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "Debtors"); and the Court

having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157

and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware dated as of February 29, 2012; and the Court having found that venue of

these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and

the Court having determined that it may enter a final order consistent with Article III of the

United States Constitution; and in consideration of the First Day Declaration; and it appearing

that notice of the Motion has been given as set forth in the Motion and that such notice is

adequate and no other or further notice need be given; and the Court having entered that certain

*Interim Order (I) Authorizing Payment of Certain Prepetition Workforce Claims, Including*

*Wages, Salaries and Other Compensation, (II) Authorizing Payment of Certain Employee*

*Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III)*

*Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing*

*Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Workers'*

*Compensation Obligations, and (Vi) Authorizing Payment of Prepetition Claims Owing to*

*Administrators or Third Party Providers* [Docket No. ___] (the "Interim Order"); and a hearing

or hearings having been held to consider the relief requested in the Motion; and upon the record

of such hearing or hearings, and all of the proceedings had before the Court; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, their creditors and all other parties in interest; and that the legal and factual

---

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.        The Motion is GRANTED as set forth herein on a final basis.

2.        Except as otherwise set forth herein, the Debtors are authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, but not obligated or directed, in the reasonable exercise of their business judgment and in the ordinary course of business, to pay and honor amounts on account of Employee Compensation Obligations and Contract Workers Obligations (exclusive of Withholding Obligations); *provided*, *however*, that without prejudice to the Debtors' right to seek additional payments at any time subsequent hereto, the aggregate amount of such payments on account of Employee Compensation Obligations and Contract Workers Obligations (exclusive of Withholding Obligations) shall not exceed $7.8 million unless further ordered by the Court.

3.        The Debtors and any applicable third parties are authorized to continue to allocate and distribute Withholding Obligations to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

4.        The Debtors are authorized, but not directed, to continue to honor their Reimbursable Expense Obligations, including any prepetition obligations, to Employees in accordance with the Debtors' stated policies and prepetition practices, and are authorized to satisfy such Reimbursable Expense Obligations in an amount not to exceed $1 million; *provided*, *however*, that satisfaction of prepetition Reimbursable Expense Obligations shall only be allowed to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.

5.      The Debtors are authorized, but not directed, to make payments under the Bonus Programs to non-insiders in an aggregate amount not to exceed $300,000.  The Debtors are further authorized, but not directed, to maintain the Bonus Programs in the ordinary course of business.

6.      The Debtors are authorized, but not directed, to make payments to non-insiders for Commissions earned prior to the Petition Date, in an aggregate amount not to exceed $2.3 million, and to continue paying Commissions in the ordinary course of business.

7.      The Debtors are authorized, but not directed, to honor the obligations under the Profit Sharing Plan in the ordinary course of business and in accordance with the Debtors' prepetition practice, and to make payments under the Profit Sharing Plan earned prior to the Petition Date in an aggregate amount not to exceed $25,000; *provided*, *however*, that no such Employees receiving payments on account of the Profit Sharing Plan shall receive payments exceeding $12,475 in the aggregate, inclusive of other payments for prepetition claims contemplated by this Final Order or those made pursuant to the Interim Order.

8.      The Debtors are authorized, but not directed, to honor the Employee Benefit Plans in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, and to make any necessary contributions to such programs and pay any unpaid premium, claim, or amount owed as of the Petition Date with respect thereto; *provided*, *however*, that the Debtors may not pay in excess of $4.3 million in the aggregate on account of Employee Benefit Plans and the Employee Benefits Obligations, exclusive of Withholding Obligations.

9.      The Debtors are authorized, but not directed, to satisfy the Todd Administrative Fee Obligations in an aggregate amount not to exceed $9,400.

10.     The Debtors are authorized to continue the Equity Incentive Plan in the ordinary course of business.

11.     The Debtors are authorized, but not directed, to honor all obligations under the Debtors' PTO and Vacation Time policies, including payout of accrued PTO and Vacation Time only where local law requires.

12.     The Debtors are authorized, but not directed, to honor Severance Obligations owed to non-insider Former Employees up to the statutory priority limit of $12,475 per Former Employee, pursuant to section 507(a)(4) of the Bankruptcy Code, and in an aggregate amount not to exceed $400,000, and to continue the Severance Plan in the ordinary course of business. No payments in furtherance of Severance Obligations shall be made under section 503(c) of the Bankruptcy Code.

13.     The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Compensation Obligations and the Employee Benefits Obligations, including the Payroll Administrator Obligations.

14.     Nothing in the Motion, the Interim Order, or this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, or any other party in interest, to the extent applicable, to contest the validity and amount of any payment made pursuant to this Final Order.

15.     Each of the Processors is authorized to receive, process, honor, and pay all checks and transfers issued or requested by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Final Order and any other order of this Court.

16.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Compensation Obligations and Employee Benefits Obligations that are dishonored or rejected.

17.     Nothing in the Motion or this Final Order shall be deemed to permit a violation of section 503(c) of the Bankruptcy Code.

18.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

21.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.


Dated: _____, 2015
      Wilmington, Delaware


_____

UNITED STATES BANKRUPTCY JUDGE