# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ORDER (A) AUTHORIZING DEBTORS (I) TO PROVIDE ADEQUATE PROTECTION TO THE DEBTORS' SECURED LENDERS, (II) TO OBTAIN INTERIM POSTPETITION FINANCING ON A SUPERPRIORITY, SECURED AND PRIMING BASIS IN FAVOR OF SILVER POINT FINANCE, LLC, AS ADMINISTRATIVE AGENT FOR PROPOSED DIP TERM LENDERS, AND BANK OF AMERICA, N.A., AS ADMINISTRATIVE AGENT FOR PROPOSED DIP ABL LENDERS, AND (III) TO MODIFY THE AUTOMATIC STAY; AND (B) SCHEDULING, AND ESTABLISHING DEADLINES RELATING TO A FINAL HEARING AND ENTRY OF A FINAL ORDER ON POSTPETITION FINANCING**

The Standard Register Company ("Standard Register") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors") hereby move this Court (the "Motion") for entry of an interim order, substantially in the form annexed hereto as Exhibit A (the "Interim Order") and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure  (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(a) authorizing the Debtors (i) to grant the Secured Lenders (as defined below) adequate

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

protection of their interests in the Prepetition Collateral (as defined below), and (ii) to obtain

interim postpetition financing pursuant to the terms and conditions of both (A) the Super-Priority

Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement to be dated on or

after the entry date of the Interim Order (the "DIP Term Loan Agreement") among the Debtors,

the lenders party thereto (the "DIP Term Lenders"), and Silver Point Finance, LLC ("Silver

Point"), as Administrative Agent (in such capacity, the "DIP Term Agent") (a substantially final

form of which is attached hereto as Exhibit B) in the aggregate principal amount of up to $30

million (the "DIP Term Loans"), and (B) the Post-Petition Loan and Security Agreement to be

dated on or after the entry date of the Interim Order (the "DIP ABL Credit Agreement" and

together with the DIP Term Loan Agreement, the "DIP Loan Agreements") among the Debtors,

the lenders party thereto (the "ABL DIP Lenders," and together with the DIP Term Lenders, the

"DIP Lenders"), and Bank of America N.A. ("BofA"), as Administrative Agent (in such

capacity, "DIP ABL Agent") (a substantially final form of which is attached hereto as Exhibit C)

in the aggregate amount of up to $125 million (the "DIP ABL Loans" and together with the DIP

Term Loans the "DIP Loans"), and (b) scheduling and establishing deadlines related to a final

hearing (the "Final Hearing") and entry of a final order authorizing the Debtors to obtain

postpetition financing.  In support of the Motion, the Debtors rely upon and incorporate by

reference the *Declaration of Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and

Requests for First Day Relief* (the "First Day Declaration") and the *Declaration of  Dermott

O'Flanagan in Support of Sale Motion and Financing Motion* (the "O'Flanagan Declaration"),

each of which was filed concurrently herewith.  In further support of this Motion, the Debtors

respectfully represent:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334(b), and the Amended Standing Order of Reference of the United States District Court for

the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28

U.S.C. § 157(b) and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final

order by the Court in connection with this Motion to the extent that it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.  Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the

relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2.

## BACKGROUND

**A.      General Background**

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of Bankruptcy Code with the United States Bankruptcy Court

for the District of Delaware (the "Bankruptcy Court").  Pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in

possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint

administration of their chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule

1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured

creditors has been appointed in these cases.

4.      Information regarding the Debtors' history and business operations, capital

structure and primary secured indebtedness, and the events leading up to the commencement of

these Chapter 11 Cases can be found in the First Day Declaration.

**B.      The Debtors' Capital Structure**

5.      As of the Petition Date, the Debtors owed approximately $96.3 million (the "ABL

Debt") under that certain Amended and Restated Loan and Security Agreement, dated as of

August 1, 2013 (as amended, the "ABL Credit Facility"), by and among The Standard Register

Company, Standard Register International, Inc., Standard Register Technologies, Inc.,

iMedConsent, LLC, Standard Register of Puerto Rico Inc., and WorkflowOne, LLC[2]

(collectively, the "Obligated Debtors"), BofA, as administrative agent, and the lenders party

thereto (the "ABL Lenders").  The ABL Credit Facility (a) is an asset-based revolving credit

facility providing for up to $125 million in aggregate loans and other financing accommodations,

but limited by a borrowing base calculation, and (b) is secured by a first priority security interest

in and lien on the Obligated Debtors' cash, accounts, deposit accounts, securities accounts,

security entitlements, securities, financial assets, inventory, certain tax refunds, related assets,

and all proceeds from such property and assets (collectively, and as more particularly described

in the Pre-Petition ABL/Term Lender Intercreditor Agreement defined below, the "ABL Priority

Collateral") and by a third priority security interest and lien on substantially all of the

Obligated Debtors' other assets.  The ABL Priority Collateral has a value substantially greater

than the ABL Debt.

6.      As of the Petition Date, the Debtors owed approximately $115.4 million (the

"First Lien Debt") under that certain First Lien Credit Agreement, dated as of August 1, 2013 (as

---

[2]     WorkflowOne, LLC subsequently merged with and into The Standard Register Company.

amended, the "Pre-Petition First Lien Term Loan Agreement"), by and among the Obligated

Debtors (as borrowers and guarantors), Silver Point, as administrative agent (in such capacity,

the "First Lien Term Agent"), and the lenders party thereto (the "First Lien Term Lenders").  The

Pre-Petition First Lien Term Loan Agreement contemplates a term loan in the original principal

amount of approximately $124 million that matures on August 1, 2018.  The Pre-Petition First

Lien Term Loan Agreement is secured by a first priority security interest in and lien on

substantially all of the Obligated Debtors' assets that do not constitute ABL Priority Collateral,

including intercompany debt, owned real property (including all improvements thereon),

equipment and fixtures, certain equity interests, and all proceeds from such property and assets,

including identifiable cash proceeds (collectively, the "Term Loan Priority Collateral," and,

together with the ABL Priority Collateral, the "Prepetition Collateral") and by a second priority

security interest in and lien on the ABL Priority Collateral.

      7.      As of the Petition Date, the Debtors owed approximately $98.6 million (the

"Second Lien Debt") under that certain Second Lien Credit Agreement, dated as of August 1,

2013, (as amended, the "Pre-Petition Second Lien Term Loan Agreement," and, together with

the Pre-Petition First Lien Term Loan Agreement, the "Pre-Petition Term Loan Agreements") by

and among the Obligated Debtors (as borrowers and guarantors), Silver Point, as administrative

agent (in such capacity, the "Second Lien Term Agent," and together with the First Lien Term

Agent, the "Term Agents"), and the lenders party thereto (the "Second Lien Term Lenders," and,

together with the Second Lien Term Lenders, the "Term Lenders").  The Pre-Petition Second

Lien Term Loan Agreement contemplates a term loan with an original principal amount of

approximately $96 million that matures on February 1, 2020.  The Pre-Petition Second Lien

Term Loan Agreement is secured by a second priority security interest in and lien on the Term

Loan Priority Collateral and by a third priority security interest in and lien on the ABL Priority Collateral.

8.     The Debtors also have eighteen capital leases in the aggregate amount of approximately $10.9 million in connection with certain office equipment, including printers, copiers, postage meters, and a generator.  The Debtors do not have any other material secured indebtedness.  The Debtors also have unsecured liabilities that exceed $250 million.

9.     The relative rights of the ABL Lenders, on the one hand, and the Term Lenders, on the other, with respect to the ABL Priority Collateral and the Term Loan Priority Collateral are governed by that certain Intercreditor Agreement dated as of August 1, 2013 (as amended, the "Pre-Petition ABL/Term Lender Intercreditor Agreement") by and among the Obligated Debtors, ABL Agent and Term Agents.  Pursuant to the Pre-Petition ABL/Term Lender Intercreditor Agreement, (a) the ABL Lenders' security interest in and liens on the ABL Priority Collateral are senior in priority to the security interests and liens of the Term Lenders with respect to the ABL Priority Collateral, and (b) the Term Lenders' security interest in and on liens on the Term Loan Priority Collateral are senior in priority to the security interest and liens of the ABL Lenders with respect to such Term Loan Priority Collateral.

10.     The relative rights of the First Lien Term Lenders, on the one hand, and the Second Lien Term Lenders, on the other, with respect to the ABL Priority Collateral and the Term Loan Priority Collateral are governed by that certain Intercreditor Agreement dated as of August 1, 2013 (as amended, the "Term Lender Intercreditor Agreement") by and among the Obligated Debtors and Silver Point, as administrative agent under the Pre-Petition Term Loan Agreements.  Pursuant to the Term Lender Intercreditor Agreement, the First Lien Term Lenders have a priority right to payment vis-à-vis the Second Lien Term Lenders.

C.     **Pre-Petition Marketing Process**

11.     Prior to the Petition Date, the Debtors engaged Lazard Middle Market LLC ("Lazard") to assist it in evaluating strategic and financial alternatives to improve liquidity.  The efforts of the Debtors and Lazard to raise new capital are described in the Sale Motion and the O'Flanagan Declaration.

12.     The DIP Lenders have agreed to provide debtor-in-possession financing on the terms set forth in this Motion.  No other party has offered to provide debtor-in-possession financing on any terms.

D.     **DIP Financing Background**

13.     The Debtors have an immediate and urgent need for debtor-in-possession financing to continue to operate their businesses, to pay vendors to supply necessary goods and services, to pay employees, and to satisfy other working capital and operational needs.  All of these cash needs must be met to preserve and maintain the Debtors' going-concern value.  If the Debtors could obtain authority to use cash collateral as defined in section 363(b) of the Bankruptcy Code, the Debtors could fund a portion of their operations, but the Debtors' aggregate cash needs to continue operations exceed the cash collateral they would generate. Without access to debtor-in-possession financing, the Debtors would suffer immediate and irreparable harm by being forced to shut down at least a portion of their businesses, lay off employees, and cease certain operations to the detriment of the Debtors, their estates, and the stakeholders therein.  Based on the need for additional cash to maintain operations and preserve going concern value, the parties agreed on the proposed DIP Loan Agreements.

14.     In general, the Debtors' cash is subject to security interests in favor of the ABL Lenders and the Term Lenders (together, the "Secured Lenders").  As of the Petition Date, the Debtors have approximately $1.5 million of cash on hand, which is subject to the security

01:16786010.8

interests of the Secured Lenders.  All of this cash constitutes ABL Priority Collateral, meaning

that the ABL Lenders have the first priority security interest in and lien on such cash.  Further,

the Term Lenders have a second priority security interest in and lien on such cash.  In addition,

the Debtors will collect accounts receivable during the Chapter 11 Cases, which cash will

constitute proceeds of the Secured Lenders' Prepetition Collateral. The proceeds of accounts

receivable will constitute ABL Priority Collateral.

15.     Lazard sought alternative DIP financing from seven other potential lenders.  None

of those potential lenders offered to provide DIP financing on any terms.  They were unwilling to

provide unsecured administrative credit or credit secured only by junior liens.  They were also

unwilling to offer credit on priming terms only to engage in a contested priming battle with the

existing lenders.  As a result, the Debtors were unable to find any DIP financing other than the

proposed DIP Loans.

16.     The Debtors propose to use the proceeds of the DIP Loans for necessary liquidity

to operate in chapter 11.  The Debtors, therefore, seek an order authorizing the Debtors to enter

into the DIP Loan Agreements and to borrow money thereunder.  Attached as Exhibit D is the

Debtors' projected 13-week cash flow (the "Cash Flow Projections"), which will be updated

every two weeks.  As indicated in the Cash Flow Projections, the Debtors believe that use of

cash collateral would not be sufficient to fund their operations and pay all administrative

expenses during these Chapter 11 Cases.  Accordingly, the Debtors need the DIP Loans if they

are to continue operating long enough to complete a sale as a going concern or confirm a chapter

11 plan.

17.     The DIP Term Loan Agreement contemplates a multiple draw term loan

providing for up to $30 million aggregate principal amount of DIP Term Loans.  The DIP Term

Loan will be secured by (a) a first-priority senior priming lien on the Term Loan Priority

Collateral and, subject to certain sharing provisions in the Interim Order, the Debtors'

unencumbered assets,[3] subject to the Carve-Out (as defined below); and (b) liens on the ABL

Priority Collateral that are junior to the liens in favor of the ABL Agent and the ABL DIP Agent

with respect to the ABL Priority Collateral, the ABL Adequate Protection Liens (as defined

below), and Permitted Senior Liens (as defined in the DIP ABL Credit Agreement), subject to

the Carve-Out.  The DIP Term Loan will bear interest at LIBOR plus 9.5% per annum (with a

LIBOR floor of 1%) or the Alternative Base Rate (as defined in the DIP Term Loan Agreement)[4]

plus 8.5% per annum, at the Debtors' election, payable in cash or in kind at the Debtors'

election.  The DIP Term Loan matures on September 8, 2015, unless otherwise extended or

shortened under certain circumstances.

18.    The DIP ABL Agreement contemplates a revolving loan providing for up to $125

million aggregate principal amount of loans and other financial accommodations, the provision

of which will be subject to compliance with the 13-week budget created in accordance with the

terms of the DIP ABL Credit Agreement (the "Budget") and the borrowing base formula.  The

DIP ABL Loan will be secured by (a) a first-priority senior priming lien on the ABL Loan

Collateral and, subject to certain sharing provisions in the Interim Order, the Unencumbered

---

[3]    The Obligated Debtors' only material unencumbered assets (the "Unencumbered Assets"), other than causes of
action under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), are (a) 35% of Standard Register's
interests in Debtors Standard Register Holding Company and Standard Register Mexico Holding Company
(together, the "Mexico Holding Debtors"), and (b) Standard Register Technologies, Inc.'s interests in Standard
Register Technologies Canada ULC.  The Mexico Holding Debtors' only assets are their interests in Standard
Register Holding, S. de R.L. de C.V.; Standard Register Servicios, S. de R.L. de C.V.; and Standard Register de
Mexico, S. de R.L. de C.V. (together, the "Mexico Debtors").  The Mexico Holding Debtors' interests in the
Mexico Subsidiaries are unencumbered.  The Mexico Debtors and Standard Register Technologies Canada
ULC do not have any material secured indebtedness.  The liens on Avoidance Actions will be subject to and to
the extent approved by the Final Order. The DIP Loans will be secured by, among other things, a non-
possessory pledge from the Mexico Debtors.

[4]    As of the Petition Date, the Alternative Base Rate is 3.25% per annum.

Assets, and (b) liens on the Term Loan Priority Collateral that are junior to the liens in favor of

the Term Agents and the DIP Term Agent with respect to the Term Loan Priority Collateral, the

Term Adequate Protection Liens (as defined below), and Permitted Senior Liens (as defined in

the DIP ABL Credit Agreement).  The DIP ABL Loan will bear interest (a) at the Base Rate (as

defined in the DIP ABL Credit Agreement)[5] plus 1.25% per annum, or (b) at the Debtors'

election with respect to draws of at least $3 million, at LIBOR plus 2.25%.  The DIP ABL Loan

matures on September 8, 2015, unless otherwise extended or shortened under certain

circumstances.  The liens on Avoidance Actions will be subject to and to the extent approved by

the Final Order.

   19.  The DIP Lenders will also receive a superpriority administrative expense claim

for any unpaid obligations under the DIP Loans.  The DIP ABL Loan and the DIP Term Loan

will share the distributions made on account of the superpriority administrative claims in

accordance with the ABL/Term Intercreditor Agreement; provided, however, that the liens and

superpriority administrative expense claims in favor of the DIP Term Agent shall in all respects

be subject to the Carve-Out, as set forth in the Interim Order.  No security interests, liens, or

superpriority claims in favor of the ABL Agent or the DIP ABL Agent will be subject to the

Carve-Out.

   20.  The ABL Debt will be paid from the proceeds of the ABL Priority Collateral

collected prior to the Final Hearing and in full in cash after the Final Hearing (as defined below),

or rolled up, through a draw on the DIP ABL Debt.  Pending entry of the Final Order, repayment

of the ABL Loan will generate additional borrowing capacity under the DIP ABL Debt under the

borrowing base formula, which is net of any sums drawn on the ABL Loan.  Repayment of the

---

[5]  As of the Petition Date, the Base Rate is 3.25% per annum.

ABL Loan will be without prejudice to the rights of any third party, including, without limitation, any official committee appointed in the Chapter 11 Cases (each a "Committee"), to seek to clawback such payment if that third party timely and successfully challenges the validity of the liens securing the ABL Credit Facility.  After the Interim Hearing, use of the DIP Term Loans, a multiple-draw facility, will be authorized in full, provided that the Debtors may not use more than $115,000,000 in DIP Loans (other than DIP Credit Extensions) through the date of the Final Hearing.  After the initial funding approved by the Interim Order, the Debtors seek approval at the Final Hearing for the ABL Loan to be fully paid fully and rolled up, and to permit the DIP ABL Loan to serve as a revolver up to the full $125,000,000 limit of the ABL DIP Facility, which, as supplemented by the DIP Term Loan, will have the capacity needed to meet the Debtors' projected operating expenses going forward.

**E.      Overview of Proposed DIP Financing**

21.      As noted above, the cash collateral, including any postpetition proceeds of the Prepetition Collateral, is subject to the liens of the Secured Lenders and is expected to constitute primarily, if not exclusively, ABL Priority Collateral.  The Secured Lenders have refused to consent to the Debtors' use of cash collateral, but have agreed to provide the DIP Loans.  Prior to the Petition Date, the Debtors and the Secured Lenders negotiated the terms whereby the Secured Lenders will fund the Debtors' operations through the DIP Loans.  The Debtors negotiated for the DIP Loans, rather than seeking contested authority to use cash collateral because the Secured Lenders refused to consent to the use of cash collateral and  (a) even if the Debtors were granted authority to use cash collateral over the objections of the Secured Lenders, the projected cash receipts would not be sufficient to fund the Debtors' projected cash needs to continue operations, and (b) the expense and uncertainty that would be created by litigation of a contested cash collateral fight would adversely impact the Debtors' operations and relationships with key

vendors, and generate additional legal expenses.   Moreover, if the cash collateral litigation were

unsuccessful the Debtors would be forced to liquidate immediately.

22.    Based on the basic capital structure established by the DIP Loan Agreements, the

relative rights of the Debtors' creditors will remain largely unchanged.  Thus, the ABL Lenders

will continue to have a priority lien on the ABL Priority Collateral (and consequently most, if not

all, of the cash collateral) and the Term Lenders will continue to have a priority lien on the Term

Loan Priority Collateral, with the Second Lien Term Lenders being subordinate to both the First

Lien Term Lenders and the DIP Term Loan.  The DIP Loans will be layered onto the top of the

existing liens on the Term Loan Priority Collateral and the ABL Priority Collateral, with the DIP

Term Lenders receiving (a) superpriority administrative expense claims, (b) a priming lien on the

Term Loan Priority Collateral, and (c) a junior lien on the ABL Priority Collateral; and the ABL

DIP Lenders receiving (a) superpriority administrative expense claims, (b) a priming lien on the

ABL Priority Collateral, and (c) a junior lien on the Term Loan Priority Collateral.  The relative

rights of the DIP Term Loan Lenders and the ABL DIP Lenders in the collateral securing the

DIP Loans shall be governed by an intercreditor agreement (the "<u>ABL/Term DIP Intercreditor</u>

<u>Agreement</u>").

## F.    Adequate Protection

23.    Because the security interests of the Term Lenders and the ABL Lenders will be

primed by the DIP Loans, the Term Lenders and the ABL Lenders have demanded adequate

protection of their interests in the Prepetition Collateral to the extent of any diminution in the

value of such Prepetition Collateral (the "<u>Collateral Diminution</u>").  In order to avoid a contested

priming fight, the Debtors have agreed to provide the Term Lenders and the ABL Lenders with

the following adequate protection, only to the extent of any Collateral Diminution, and, in the

case of the DIP Term Loan, subject to the Carve-Out (as defined below):

01:16786010.8

(a)     The ABL Lenders shall be granted a superpriority claim under section 507(b) of the Bankruptcy Code, junior to the Superpriority DIP Term Claims (defined below) and the Superpriority DIP ABL Claims (defined below), but with priority in payment over any and all other administrative expense claims of any kind under the Bankruptcy Code (the "<u>Superpriority Adequate Protection Claims</u>");

(b)     The ABL Lenders shall be granted valid, perfected replacement security interests in and liens on all of the collateral that secures the DIP Loans (the "<u>ABL Adequate Protection Liens</u>"); *provided* that the ABL Adequate Protection Liens will attach to Avoidance Actions subject to entry of the Final Order.  The ABL Adequate Protection Liens on ABL Priority Collateral shall be junior and subordinate only to the liens securing the DIP ABL Credit Agreement, and any Permitted Senior Liens (as defined in the DIP ABL Credit Agreement), and in the case of Term Loan Priority Collateral, only to the liens securing the DIP Term Loan Agreement, the liens securing the Pre-Petition Term Loan Agreements, Permitted Senior Liens (as defined in the DIP ABL Credit Agreement), and the Term Adequate Protection Liens (as defined below).  The ABL Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code, and no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any ABL Adequate Protection Liens.

(c)     The Term Loan Lenders shall be granted valid, perfected replacement security interests in and liens on all of the collateral that secures the DIP Loans (the "<u>Term Adequate Protection Liens</u>"); *provided* that the Term Adequate Protection Liens will attach to Avoidance Actions subject to entry of the Final Order.  The Term Adequate Protection Liens shall be junior and subordinate only to the liens that secure the DIP Term Loan Agreement, Permitted Senior Liens (as defined in DIP ABL Credit Agreement), and the Carve-Out (as defined below), and, in the case of ABL Priority Collateral, only to the liens that secure the DIP ABL Credit Agreement, Permitted Senior Liens (as defined in the DIP ABL Credit Agreement), the liens securing the ABL Credit Facility, the ABL Adequate Protection Liens and the Carve-Out. The Term Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code, and no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any Term Adequate Protection Liens.

(d)     The Debtors shall pay the reasonable and documented professional fees and expenses incurred by the ABL Lenders and the Term Lenders (the "<u>Adequate Protection Fees</u>").

### G.    Description of DIP Term Loans

24.    Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of

the DIP Term Loans, as follows:[6]

| Material Provision | Brief Summary |
|---|---|
| Borrowers | The Standard Register Company; Standard Register Holding Company; Standard Register Technologies, Inc.; Standard Register International, Inc.; iMedConsent, LLC; Standard Register of Puerto Rico Inc.; Standard Register Mexico Holding Company; Standard Register Holding, S. de R.L. de C.V.; Standard Register de México, S. de R.L. de C.V.; Standard Register Servicios, S. de R.L. de C.V.; and Standard Register Technologies Canada ULC.  *See* DIP Term Loan Agreement, Preamble. |
| Administrative Agent | Silver Point.  *See* DIP Term Loan Agreement, Preamble. |
| DIP Lenders | Managed funds of Silver Point Capital, L.P. and other Term Lenders who elect to participate in the DIP Term Loan on a *pro rata* basis in proportion to their holdings under the Pre-Petition Term Loan Agreements.  *See* DIP Term Loan |
| Amount | $30,000,000.  *See* DIP Term Loan Agreement §§ 1.1, 2.1. |
| Interest Rate | LIBOR plus 9.5% per annum (with a LIBOR floor of 1%) or the Alternative Base Rate (as defined in the DIP Term Loan Agreement)[7] plus 8.5% per annum, at the Debtors' election.  *See* DIP Term Loan Agreement § 3.2.1. |
| Fees And Expenses | Closing fee of $1,050,000; commitment fee of 1% on the undrawn amount; monitoring fee of $10,000 per month.  *See* DIP Term Loan Agreement § 3.3. Borrowers to pay the Administrative Agent's out-of-pocket costs and expenses.  *See* DIP Term Loan Agreement §§ 1.1, 10.3. |

---

[6]    This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.  For a complete description of the terms and conditions of the DIP Term Loans, reference should be made to the DIP Term Loan Agreement, the Interim Order, and the Final Order.  The summary herein is qualified in its entirety by reference to such documents and such orders.  Interested parties are strongly encouraged to read the operative documents and such orders.  This is a summary only the terms of the DIP Term Loan Agreement, the Interim Order, and the Final Order, as applicable, shall control in all respects.

[7]    As of the Petition Date, the Alternative Base Rate is 3.25% per annum.

| Material Provision | Brief Summary |
|---|---|
| Maturity and Milestones | The earliest to occur of any of the following (the "Term Termination Date"): |

The earliest to occur of any of the following (the "Term Termination Date"):

  (a)    September 8, 2015;

  (b)    Thirty days after the entry of the Interim Order if the Final Order has not been entered prior to or on such date;

  (c)    March 31, 2015, if the Debtors have not provided a draft operational restructuring plan to the Administrative Agent;

  (d)    April 10, 2015, if the order approving the Debtors' proposed bid procedures has not been entered prior to or on such date;

  (e)    April 15, 2015, if the Debtors have not provided a final operational restructuring plan to the Administrative Agent;

  (f)    June 19, 2015, if the order approving the Debtors motion to sell substantially all of their assets (the "Sale Order") has not been entered prior to or on such date;

  (g)    If the sale of the Debtors' assets pursuant to such order has not been closed not later than the earlier of (a) sixty days after the entry of the Sale Order for any reason other (i) than the issuance of a stay pending appeal from the Sale Order, or (ii) the winning bidder failing to close the sale transaction, except as a result of a breach by the Debtors of a representation or covenant in the Purchase Agreement (as defined in the DIP Term Agreement), or (b) the date that is 180 days after the date of the Purchase Agreement;

  (h)    The date that the sale contemplated by the Sale Order closes;

  (i)    The date that the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a plan of reorganization or liquidation is confirmed pursuant to an order entered by the Bankruptcy Court; and

  (j)    The date on which the acceleration of the DIP Term Loans and the termination of the commitments in accordance with the DIP Term Loan Agreement occurs following an Event of Default.

*See* DIP Term Loan Agreement §§ 1.1, 3.1.1, 7.1.20.

| Material Provision | Brief Summary |
|---|---|
| Liens, Collateral, and Priority<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi) | Claims arising under the DIP Term Loan (the "<u>DIP Term Claims</u>") shall have priority and shall be secured by liens and collateral as set forth below, in all instances subject to the Carve-Out (as defined below):<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Term Claims will be entitled to super-priority administrative expense status in the Chapter 11 Cases, with equal Priority to the DIP ABL Claims (the "<u>Superpriority DIP Term Claims</u>"), provided, however, the DIP Term Loan shall be subject to the Carve-Out and the DIP ABL Loan will not be subject to the Carve-Out;<br><br>(b) pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Term Loans will be secured by a perfected first priority lien on all Unencumbered Assets of the Debtors.  The liens on Avoidance Actions will be subject to and to the extent approved by the Final Order;<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Term Loans will be secured by a perfected junior lien on all property and assets of the Debtors that are subject to Permitted Senior Liens (as defined in the DIP ABL Credit Agreement);<br><br>(d) pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Term Loans will be secured by a first priority senior priming lien on the Term Loan Priority Collateral (the "<u>Term Priming Lien</u>") that is senior to and primes (i) the liens securing the obligations under the Pre-Petition Term Loan Agreements and all liens junior thereto, and (ii) any adequate protection liens granted (x) to the Term Lenders after the commencement of the Chapter 11 Cases in respect of the obligations under the Pre-Petition Term Loan Agreements (including any Replacement Liens), and (y) in respect of any liens junior to the liens securing the obligations under the Pre-Petition Term Loan Agreements; and<br><br>(e) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Term Loans will be secured by a perfected lien on the ABL Priority Collateral that is junior to the existing liens of the ABL Lenders.<br><br>*See* DIP Term Loan Agreement § 5.1.4; Interim Order ¶¶ 9, 10.  The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Carve-Out | "Carve-Out" means the sum of (i) all unpaid fees required to be paid (a) to the Clerk of this Court and (b) to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code |

| Material Provision | Brief Summary |
|---|---|
| | not to exceed $25,000, and (iii) in the event of an occurrence and during the continuance of an "Event of Default" as that term is defined in any of the DIP Loan Agreements, and delivery of notice (the "Carve-Out Trigger Notice") to counsel to the Debtors and any Committee (the "Case Professionals Carve-Out") comprising the sum of (A) all allowed unpaid fees, expenses, and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) incurred by the Debtors and any Committee subsequent to receipt of the Carve-Out Trigger Notice, in an aggregate amount not to exceed $350,000 (the "Carve-Out Cap"), plus (B) all allowed and unpaid professional fees and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) incurred or accrued by the Debtors or any Committee prior to receipt of the Carve-Out Trigger Notice, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent professional fee budget (provided that, in the case of lead counsel for the Debtors, such amounts shall not exceed six weeks of its budgeted professional fees and disbursements) (the "Professional Fee Budget") delivered to and approved by the agents under the DIP Loans prior to any Event of Default that is then continuing (to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i)-(iii), to the extent allowed by the Court at any time, *provided* that, following receipt of the Carve-Out Trigger Notice, the Carve-Out shall at all times be subject to an aggregate cap of $4,45,968 (the "Aggregate Carve-Out Cap").  *See* DIP Term Loan Agreement § 1.1; Interim Order ¶ 18. |
| Events of Default | Section 8.1 of the DIP Term Loan Agreement sets forth the Events of Default thereunder, including failure to comply with the approved Budget (subject to the Permitted Variances[8] thereunder) and failure to pay the balance due. |
| Automatic Stay<br><br>Bankruptcy Rule 4001 (c)(1)(B)(iv) | The automatic stay is terminated after 5 business days' written notice to the Debtors, any Committee, and the United States Trustee if there is a declaration of an Event of Default under the DIP Term Loan Agreement.  *See* Interim Order at ¶ 24.  The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |

[8]    The "Permitted Variance" means an unfavorable variance from the Budget not exceeding (a) 10.0% for each line item (other than "payroll", "health & benefits" and "capex"), (b) 5.0% for payroll, (c) 5.0% for health & benefits, (d) 5.0% for capex and (e) 5.0% with respect to cumulative net cash flows of the Debtors and their subsidiaries, in each case for the period from the Petition Date through the measurement date at the end of each week.  All variances shall be tested weekly and measured on a rolling four week basis.

| Material Provision | Brief Summary |
|---|---|
| Limitation On Challenges to the Amount of the Term Loan Debt and the Liens Securing Such Debt<br><br>Bankruptcy Rule 4001(c)(1)(b) (vii), (viii) | The recitals in paragraph 5 of the Interim Order provide stipulations by the Debtors to the validity and priority of the liens securing the Pre-Petition Term Loan Agreements and the amount of the First Lien Debt and the Second Lien Debt (together, the "Term Loan Debt").  Paragraph 27 of the Interim Order provides that these stipulations shall be binding on the Debtors' estates and all parties in interest, including, without limitation, all Committees, *unless* (a) any Committee, or another party in interest (other than the Debtors) with standing and requisite authority, commences a contested matter or adversary proceeding (a "Challenge") challenging the amount, validity or enforceability of the Term Loan Debt, or the perfection or priority of the liens securing the Pre-Petition Term Loan Agreements, no later than the earlier of the date that (i) in the case of a party in interest with requisite standing other than a Committee, 75 days after the Petition Date, and (ii) in the case of any Committee, 60 days after the filing of notice of appointment of a Committee, and (b) to the extent the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.<br><br>The aforementioned provisions shall remain in effect if the Interim Order is |
| Limitation On Use of Proceeds<br><br>Bankruptcy Rule 4001 (c)(1)(B) (viii) | Pursuant to Section 6.17 of the DIP Term Loan Agreement, proceeds must be used in accordance with the Budget (subject to the Permitted Variance).<br><br>Paragraph 19 of the Interim Order allows any official committee of unsecured creditors appointed in the Chapter 11 Cases to use $25,000 of cash to investigate claims against the Term Lenders and the ABL Lenders.  No collateral or loan proceeds can be used to prosecute any such claims.<br><br>The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Indemnification<br><br>Bankruptcy Rule 4001(c)(1)(B) (ix) | Each Debtor shall indemnify and hold harmless, and provide limitations of liability to the Administrative Agent under the DIP Term Loan Agreement (in its capacity as such), the DIP Term Lenders (in their capacities as such), and their representatives and affiliates (in their capacities as such), subject to customary limitations for gross negligence and willful misconduct.<br><br>*See* DIP Term Loan Agreement § 10.4; Interim Order ¶ 7.  The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Availability | Draws may only be made under the DIP Term Loan Agreement when there is no availability under the DIP ABL Credit Agreement.  *See* DIP Term Loan Agreement § 6.17.1. |

## H.    Description of DIP ABL Loans

25.    Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of

the DIP ABL Loans, as follows:[9]

| Material Provision | Brief Summary |
|---|---|
| Borrowers | The Standard Register Company; Standard Register Holding Company; Standard Register Technologies, Inc.; Standard Register International, Inc.; iMedConsent, LLC; Standard Register of Puerto Rico Inc.; Standard Register Mexico Holding Company; Standard Register Holding, S. de R.L. de C.V.; Standard Register de México, S. de R.L. de C.V.; Standard Register Servicios, S. de R.L. de C.V.; and Standard Register Technologies Canada ULC.  *See* DIP ABL Credit Agreement, Preamble. |
| Administrative Agent | BofA.  *See* DIP ABL Credit Agreement, Preamble. |
| DIP Lenders | BofA and Wells Fargo Bank, National Association.  *See* DIP ABL Credit Agreement, Preamble. |
| Amount | $125 million on a final basis.  *See* DIP ABL Credit Agreement § 1.1; Interim Order ¶ 7. |
| Interest Rate | The Base Rate (as defined in the DIP ABL Credit Agreement)[10] plus 1.25% per annum, or at the Debtors' election with respect to draws of at least $3 million, LIBOR plus 2.25%.  *See* DIP ABL Credit Agreement § 2.1. |
| Fees And Expenses | Closing fee of $625,000; commitment fee of .5% on the undrawn amount; letter of credit fee of .25% on the undrawn amount of any issued and outstanding letters of credit.  *See* DIP ABL Credit Agreement § 2.2. Borrowers to pay the Administrative Agent's out-of-pocket costs and expenses.  *See* DIP ABL Credit Agreement § 2.2. |

---

[9]    This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.  For a complete description of the terms and conditions of the DIP ABL Loans, reference should be made to the DIP ABL Credit Agreement, the Interim Order, and the Final Order.  The summary herein is qualified in its entirety by reference to such documents and such orders.  Interested parties are strongly encouraged to read the operative documents and such orders.  This is a summary only the terms of the DIP ABL Credit Agreement, the Interim Order, and the Final Order, as applicable, shall control in all respects.

[10]    As of the Petition Date, the Base Rate is 3.25% per annum.

| Material Provision | Brief Summary |
|---|---|
| Maturity | The DIP ABL Credit Agreement shall terminate on the earliest to occur of any of the following (the "ABL Termination Date"):<br><br>(a)    September 8, 2015;<br><br>(b)    Thirty days after the entry of the Interim Order if the Final Order has not been entered prior to or on such date;<br><br>(c)    April 10, 2015, if the order approving the Debtors' proposed bid procedures has not been entered prior to or on such date;<br><br>(d)    June 19, 2015, if the order approving the Debtors motion to sell substantially all of their assets (the "Sale Order") has not been entered prior to or on such date;<br><br>(e)    Thirty days after the entry of the Sale Order if the sale of the Debtors' assets pursuant to such order has not been closed for any reason other than the issuance of a stay pending appeal from the Sale Order (subject to an extension of an additional 30 days at the request of the DIP Term Lenders);<br><br>(f)    The date on which the Borrowers terminate the ABL DIP Credit Agreement in accordance with section 5.2.1 thereof;<br><br>(g)    The date of closing of a sale of all or substantially all of Borrowers' assets pursuant to Section 363 of the Bankruptcy Code;<br><br>(h)    The effective date of any confirmed Acceptable Plan (as defined in the DIP ABL Credit Agreement);<br><br>(i)    The date that any Borrower files a chapter 11 plan that is not an Acceptable Plan (as defined in the DIP ABL Credit Agreement);<br><br>(j)    The date that any chapter plan filed by a person that is not a Borrower is confirmed, if such chapter 11 plan is not an Acceptable Plan;<br><br>(k)    The date on which any of the Chapter 11 Cases are dismissed or converted by the Court; and<br><br>(l)    The date on which the acceleration of the DIP ABL Loans and the termination of the commitments in accordance with the DIP ABL Credit Agreement occurs following an Event of Default.<br><br>*See* DIP ABL Credit Agreement § 1.1.5. |

| Material Provision | Brief Summary |
|---|---|
| Liens, Collateral, and Priority<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi) | Claims arising under the DIP ABL Loan (the "<u>DIP ABL Claims</u>") shall have priority and shall be secured by liens and collateral as set forth below:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP ABL Claims will be entitled to super-priority administrative expense status in the Chapter 11 Cases, with equal priority to the DIP Term Claims (the "<u>Superpriority DIP ABL Claims</u>");<br><br>(b) pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP ABL Loans will be secured on a perfected first priority lien on all Unencumbered Assets of the Debtors.  The liens on Avoidance Actions will be subject to and to the extent approved by the Final Order;<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP ABL Loans will be secured by a perfected junior lien on all property and assets of the Debtors that are subject to Permitted Senior Liens (as defined in the DIP ABL Credit Agreement);<br><br>(d) pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP ABL Loans will be secured by a first priority senior priming lien on the ABL Priority Collateral (the "<u>ABL Priming Lien</u>") that is senior to and primes (i) the liens securing the ABL Credit Facility and all liens junior thereto, and (ii) any adequate protection liens granted (x) to the ABL Lenders after the commencement of the Chapter 11 Cases in respect of the obligations under the ABL Credit Facility (including any Replacement Liens), and (y) in respect of any liens junior to the liens securing the ABL Credit Facility; and<br><br>(e) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP ABL Loans will be secured by a perfected junior lien on the Term Loan Priority Collateral.<br><br>*See* DIP ABL Credit Agreement § 6.1; Interim Order ¶¶ 9, 10.  The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Carve-Out | Carve-Out has the meaning set forth above.  *See* DIP ABL Credit Agreement Appendix A. |
| Events of Default | Section 11.1 of the DIP ABL Credit Agreement sets forth the Events of Default thereunder, including failure to comply with the approved Budget (subject to the Permitted Variances[11] thereunder) and failure to pay the |

---

[11] The "Permitted Variance" shall have the meaning set forth in the DIP ABL Credit Agreement.

| Material Provision | Brief Summary |
|---|---|
| Automatic Stay<br><br>Bankruptcy Rule 4001 (c)(1)(B) (iv) | The automatic stay is terminated after 5 business days' written notice to the Debtors, any Committee, and the United States Trustee if there is a declaration of an Event of Default under the DIP ABL Credit Agreement. *See* Interim Order at ¶ 24. The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Limitation On Challenges to the Amount of the Term Loan Debt and the Liens Securing Such Debt<br><br>Bankruptcy Rule 4001(c)(1)(b) (vii), (viii) | The recitals in paragraph 5 of the Interim Order provide stipulations by the Debtors to the validity and priority of the liens securing the ABL Credit Facility and the amount of the ABL Debt. Paragraph 27 of the Interim Order provides that these stipulations shall be binding on the Debtors' estates and all parties in interest, including, without limitation, all Committees, *unless* (a) any Committee, or another party in interest (other than the Debtors) with standing and requisite authority, commences a Challenge challenging the amount, validity or enforceability of the ABL Debt, or the perfection or priority of the liens securing the ABL Credit Facility, no later than the earlier of the date that (i) in the case of a party in interest with requisite standing other than a Committee, 75 days after the Petition Date, and (ii) in the case of any Committee, 60 days after the filing of notice of appointment of a Committee, and (b) to the extent the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.<br><br>The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Limitation On Use of Proceeds<br><br>Bankruptcy Rule 4001 (c)(1)(B) (viii) | Pursuant to Section 1.1.3 of the DIP ABL Credit Agreement, proceeds must be used in accordance with the Budget (subject to the Permitted Variance) or as otherwise set forth in such Section.<br><br>Paragraph 19 of the Interim Order allows any official committee of unsecured creditors appointed in the Chapter 11 Cases to use $25,000 of cash to investigate claims against the Term Loan Lenders and the ABL Lenders. No collateral or loan proceeds can be used to prosecute any such claims. The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Indemnification<br><br>Bankruptcy Rule 4001(c)(1)(B) (ix) | Each Debtor shall indemnify and hold harmless, and provide limitations of liability to the Administrative Agent under the DIP ABL Credit Agreement (in its capacity as such), the ABL DIP Lenders (in their capacities as such), and their representatives and affiliates (in their capacities as such), subject to customary limitations for gross negligence and willful misconduct.<br><br>*See* DIP ABL Credit Agreement § 14.2; Interim Order ¶ 7. The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |

## I.    Local Rule 4001-2(a)(i) Statements

26.    In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP

Loan Agreements are highlighted below:

a.    ***Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.***

There is no cross-collateralization.

b.    ***Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.***

There are no such provisions.

c.    ***Provisions that seek to waive, without notice, whatever rights the Debtors' estates may have under 11 U.S.C. § 506(c).***

All rights of the Debtors' estates under section 506(c) are waived, subject to entry of the Final Order.

d.    ***Provisions that immediately grant to the prepetition secured creditors liens on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549.***

Liens will be granted on Avoidance Actions to the extent such liens are approved in the Final Order.

e.    ***Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b).***

Prior to the Final Hearing all collections of ABL Priority Collateral will be applied against the ABL Loan.  The ABL Debt will be paid in full in cash, or "rolled up," promptly after the Final Hearing from draws on the DIP ABL Loan. The Debtors believe that repayment of the amounts outstanding under the ABL Credit Facility is appropriate under the circumstances and will not prejudice the

Debtors or their estates.  First, the Debtors believe that the current amount outstanding under the ABL Credit Facility (*i.e.*, approximately $96.3 million) is less than the value of the ABL Priority Collateral.  Second, the validity, enforceability, and priority of the liens granted by the Debtors under the ABL Credit Facility are subject to the "challenge" rights of third parties, including any Committee.  Moreover, the ABL DIP Lenders are otherwise unwilling to lend and the Debtors have been unable to obtain other financing on reasonable terms sufficient to provide needed liquidity.  Thus, insofar as the satisfaction of the ABL Credit Facility is premised upon the validity of the blanket liens granted by the Debtors thereunder, the Committee will have an opportunity to examine the propriety of such repayment, and to clawback such repayment to the extent that the underlying liens are avoided.  No payment will be made on account of the principal amount owed under the Pre-Petition Term Loan Agreements from draws on the DIP Loans.  Adequate protection payments will be made to the Term Lenders.  All payments made to the Secured Lenders will be subject to recovery if a timely challenge is successfully prosecuted by a third-party, including the Committee, but the Debtors waive the right to pursue any such challenge.

       f.       **Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.**

       Pursuant to paragraph 18 of the Interim Order, each professional employed by the Debtors and any Committee will be entitled to Carve-Out protections that are commensurate with such professional's anticipated efforts in the Chapter 11 Cases; but, in recognition of the fact that the Debtors' professionals are expected to perform more work in connection with the Chapter 11 Cases, the dollar amounts of the Carve-Out protections for the Debtors' professionals are higher than the dollar amounts of the Carve-Out protections afforded to the professionals retained by any Committee.

       g.       **Provisions that prime any secured lien absent consent of the affected lienor.**

       The liens securing the DIP Loans will prime certain of the Secured Lenders' pre-petition liens, but the Secured Lenders have consented to this priority.[12]

       h.       **Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).**

       There are no such provisions.

---

[12]    The liens securing the DIP Loans will also prime existing liens (if any) on the Term Loan Priority Collateral and the ABL Priority Collateral that are not Permitted Senior Liens (as defined in the DIP Loan Agreements). The Debtors do not believe that any such liens exist.

27.    The provisions of the DIP Credit Agreements and the Interim Order were extensively negotiated and are the most favorable that the Debtors were able to negotiate.  The DIP Credit Agreements enable the Debtors to obtain the financing necessary to maintain their operations, and pursue a sale or reorganization that will maximize the value of their estates.

## RELIEF REQUESTED

28.    The Debtors seek entry of an order (a) authorizing the Debtors (i) to grant the Secured Lenders adequate protection of their interests in the Prepetition  Collateral,
(ii) to obtain interim postpetition financing pursuant to the terms and conditions of the DIP Credit Agreements in the principal amount of up to $115 million on an interim basis and $155 million on a final basis, and (b) scheduling and establishing deadlines relating to a final hearing and order authorizing the Debtors to obtain postpetition financing.

## BASIS FOR RELIEF REQUESTED

### A.    The Court Should Authorize the Debtors to Provide Adequate Protection to the Secured Lenders

29.    The Debtors' use of property of their estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

30.    To the extent any prepetition secured creditor has a lien on the Debtors' assets and does not consent to the Debtors' use of those assets, such creditor will be adequate protected.[13]

---

[13]    The Debtors do not believe that any such creditors exist.

The propriety of adequate protection is determined on a case-by-case basis.  *See Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) (*citing MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at \*2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Beker Indus.*, 58 B.R. at 736; *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).  Adequate protection is not expressly defined in the Bankruptcy Code.  Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection.  The flexibility provided by section 361 provides the Court with discretion in fashioning the protection provided to a secured party.  *See Swedeland*, 16 F.3d 552, 564 (3d Cir. 1994).  Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property.  *See* 11 U.S.C. § 361.

31.     The Debtors are providing the Secured Lenders with adequate protection for their consent to the priming liens by the provision of:  (a) the Superpriority Adequate Protection Claims, (b) the Replacement Liens, and (c) the Adequate Protection Fees, all as set forth in the Interim Order.  The Debtors believe that this form of adequate protection reasonably balances the Debtors' need to use the Prepetition Collateral and the Secured Lenders' right to adequate

protection under the Bankruptcy Code.  As a result, the Debtors submit that the proposed terms of the Debtors' use of Prepetition Collateral should be approved in their entirety.

**B.      Approval of the DIP Credit Agreements Is Appropriate Under Section 364 of the Bankruptcy Code**

32.      The Debtors are authorized to operate their businesses under section 1108 of the Bankruptcy Code.  As part of that operation, the Debtors may incur unsecured debt in the ordinary course of business.  11 U.S.C. § 364(a).  The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms.  Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession.  Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d).

33.      The business necessity for obtaining the DIP Loans has been fully described above.  The Debtors will not have the cash needed to pay their current operating expenses absent the DIP Loans.  Even if the Debtors obtained this Court's authorization to use every dollar of cash collateral generated from the Debtors' assets over the objections of the Secured Lenders, the Debtors' projected gross cash collections would be insufficient to fund current operating expenses during the pendency of the Chapter 11 Cases.  During the Chapter 11 Cases, the Debtors' current operating expenses will exceed their cash collections.  The Debtors can operate without drastic cuts in operations only with new financing.

34.      Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such

credit is not available.  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.,*

*Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  This is true especially when time is of the essence.

*See e.g.*, *id.*; *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987); *In re Stacy*

*Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987).  Here, as described in the O'Flanagan

Declaration, the Debtors have searched for debtor-in-possession financing on the most favorable

terms.  No potential lender is willing to provide such financing on an unsecured basis or secured

only by junior liens.  Because the existing secured debt may exceed the value of the Debtors'

assets, the absence of lenders willing to provide unsecured credit or credit secured only by liens

junior to the $310.2 million of existing secured debt is understandable.

35.    The ABL Lenders and certain managed funds of Silver Point Capital, L.P. and

other Term Lenders have combined to propose the needed financing on the most favorable

terms.[14]  The ABL Lenders will provide a new DIP ABL Loan.  The Term Lenders will provide

an additional DIP Term Loan.

36.    As a condition to extending the new revolving credit facility that the Debtors

need, the proposed ABL DIP Lenders require the protections contained in subsections 364(c) and

(d) of the Bankruptcy Code, which the facts in these Chapter 11 Cases support.  Specifically, the

DIP ABL Loan will be secured by (a) a first-priority senior priming lien on the ABL Priority

Collateral and the Debtors' Unencumbered Assets, and (b) a junior lien on the Term Loan

Priority Collateral and all of the Debtors' other assets that are subject to Permitted Senior Liens

(as defined in the DIP ABL Credit Agreement).

37.    Similarly, as a condition to extending the amount of credit that the Debtors need,

the proposed DIP Term Lenders require the protections contained in subsections 364(c) and (d)

---

[14]    The Debtors also sought debtor in possession financing proposals from seven other potential lenders.  No other lender was willing to provide DIP financing.

01:16786010.8

of the Bankruptcy Code, which the facts in these Chapter 11 Cases support.  Specifically, the

DIP Term Loans will be secured by (a) a first-priority senior priming lien on the Term Loan

Priority Collateral and the Debtors' Unencumbered Assets, subject to the Carve-Out, and (b) a

junior lien on the ABL Priority Collateral and all of the Debtors' other assets that are subject to

Permitted Senior Liens (as defined in the DIP ABL Credit Agreement), subject to the Carve-Out.

38.       In addition, all of the DIP Lenders will also receive a superpriority administrative

expense claim for any unpaid obligations under the DIP Loans.  The DIP ABL Loan and the DIP

Term Loan will, subject to certain sharing provisions, be provided superpriority administrative

expense claim status and new liens on Unencumbered Assets; provided, however, all payments

on account of the DIP Term Lenders' super priority claim will be subject to the Carve-Out.

39.       The DIP Loans provide the funding needed to get to a sale of substantially all of

the Debtors' operating assets.  Without the DIP Loans the Debtors would be required to

terminate some or all of their operations (depending on whether the Court authorized the Debtors

to use cash collateral), which would destroy at least a substantial portion of the going concern

value of the Debtors' operations.  Preservation of value generally constitutes the "adequate

protection" needed to prime existing liens.  *See, e.g.*, Norton, et al., 2 *Norton Bankruptcy Law

and Practice 2d.* § 38:7, p.38-17 (1994) (addressing the § 364(d) determination, "Factors

influencing a court's decision will be the viability of the debtor's business and the need to protect

assets against a sharp decline in value"); *Snowshoe*, 789 F.2d at 1087 (§ 364(d) order affirmed on

appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of

its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631

(Bankr. S.D.N.Y. 1992) (funds from lender given "priming" lien used to improve collateral is

transferred into value.  "This value will serve as adequate protection. . . ."); *In re Hubbard Power

*& Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re Devlin*, 185 B.R. 376, 378 (Bankr.

M.D. Fla. 1995) (chapter 11 debtor-motel operator authorized to incur debt with superpriority

status to replace air-conditioning unit, boiler, and hot water heaters because such expenses were

necessary to preserve value and maintain operations).  In any event, the only parties that the

Debtors are aware of whose liens are being primed are the Secured Lenders, and they have

consented to the priming lien to preserve the going concern value of their collateral.

C.    **Approval of the DIP Loans Is Supported by the Exercise of Sound Business Judgment**

40.    Generally, courts give broad deference to business decisions of a debtor in

possession.  *See, e.g.*, *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th

Cir. 1985).  Moreover, a bankruptcy court generally will respect a debtor in possession's

business judgment regarding the need for and the proposed use of funds.  As the court noted in *In*

*re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990):

> A court's discretion under section 364 is to be utilized on grounds
> that permit reasonable business judgment to be exercised so long as
> the financing agreement does not contain terms that leverage the
> bankruptcy process and powers or its purpose is not so much to
> benefit the estate as it is to benefit a party in interest.

Without the ability to incur secured debt, the debtor in possession would be placed at a

competitive disadvantage and its efforts to reorganize could be seriously impaired.

41.    In the present case, the Debtors' decision to obtain the DIP Loans represents an

exercise of sound business judgment in the continued effort to maximize the value of their

operating business.  Without such credit the Debtors would be unable to operate and the value of

their business as a going concern would be destroyed.

42.     In particular, the Debtors believe that repayment of the amounts outstanding

under the ABL Credit Facility is appropriate under the circumstances and will not prejudice the

Debtors or their estates.

43.     First, the Debtors believe that the current amount outstanding under the ABL

Credit Facility (*i.e.*, approximately $96.3 million) is less than the value of the ABL Priority

Collateral.  Second, the validity, enforceability, and priority of the liens granted by the Debtors

under the ABL Credit Facility are subject to the "challenge" rights of third parties, including any

Committee.  Thus, insofar as the satisfaction of the ABL Credit Facility is premised upon the

validity of the blanket liens granted by the Debtors thereunder, the Committee will have an

opportunity to examine the propriety of such repayment, and to clawback such repayment to the

extent that the underlying liens are avoided.

44.     Hence, there should be no prejudice from the proposed repayment to other

creditors of these estates because the ABL Lenders already assert security interests in the assets

that the Debtors propose to pledge to the ABL DIP Lenders that are providing the funds to

satisfy the ABL Credit Facility with the DIP ABL Loans.  *See, e.g.*, *Hartford Underwriters Ins.*

*Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 4-5 (2000) (recognizing that administrative

expense claims allowable under section 503(b) of the Bankruptcy Code "do not have priority

over secured claims").

45.     Courts have permitted debtors to use postpetition financing to pay prepetition

claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims

of the prepetition lender are fully secured.  As the United States District Court for the District of

Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a
> [roll up] is the payment of a pre-petition debt with the proceeds of a post-petition

loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (quoting *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)).  *See also*, *e.g.*, *In re UniTek Global Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

## D.    Immediate Relief Is Justified

46.    Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain postpetition financing may not be commenced earlier than 14 days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.  Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the Debtors to obtain financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing to consider approval of the Debtors' request to obtain financing through the DIP Loans on a final basis pursuant to the terms of the Final Order.

47.    As described above and in the First Day Declaration, without access to the DIP

Loans, the Debtors will have no ability to operate their business.  In light of the foregoing, the

Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to

support immediate DIP Loan availability pending the entry of the Final Order.  Accordingly, to

forestall the immediate and irreparable harm that would inure to the Debtors' estates, creditors

and parties in interest absent Court approval of this Motion, the Debtors respectfully request that

the Court grant the relief requested herein.

## REQUEST FOR WAIVER OF STAY

48.    To implement the foregoing, the Debtors seek a waiver of any stay of the

effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any

"order authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr.

P. 6004(h).  The relief requested in this Motion is necessary to avoid immediate and irreparable

harm to the Debtors for the reasons set forth herein.  Accordingly, ample cause exists to justify a

waiver of any 14-day stay imposed by Bankruptcy Rule 6004(h).

49.    To implement the foregoing immediately, the Debtors respectfully request a

waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to

apply.

**<u>NOTICE</u>**

50.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the 50 largest unsecured claims on a consolidated basis against the Debtors; (iii) counsel for Silver Point Finance, LLC, in its capacity as administrative agent under the Pre-Petition Term Loan Agreements; (iv) counsel for Bank of America, N.A, in its capacity as administrative agent under the ABL Credit Facility; (v) counsel to the proposed agents under the DIP Credit Agreements; and (vi) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 12, 2015
          Wilmington, Delaware

          _/s/ Maris J. Kandestin_____
          Michael R. Nestor (No. 3526)
          Kara Hammond Coyle (No. 4410)
          Maris J. Kandestin (No. 5294)
          Andrew L. Magaziner (No. 5426)
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
          Rodney Square
          1000 North King Street
          Wilmington, Delaware 19801
          Telephone: (302) 571-6600
          Facsimile: (302) 571-1253
          mnestor@ycst.com
          kcoyle@ycst.com
          mkandestin@ycst.com
          amagaziner@ycst.com

          -and-

          Robert A. Klyman (CA No. 142723)
          Samuel A. Newman (CA No. 217042)
          Jeremy L. Graves (CO No. 45522)
          Sabina Jacobs (CA No. 274829)
          GIBSON, DUNN & CRUTCHER LLP
          333 South Grand Avenue
          Los Angeles, CA 90071-1512
          Telephone: (213) 229-7000
          Facsimile: (213) 229-7520
          rklyman@gibsondunn.com
          snewman@gibsondunn.com
          jgraves@gibsondunn.com
          sjacobs@gibsondunn.com

          *Proposed Counsel to the Debtors and*
          *Debtors in Possession*

01:16786010.8

35

**<u>EXHIBIT A</u>**

**PROPOSED INTERIM ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. ___ |

## INTERIM ORDER (1) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 364; (III) PROVIDING ADEQUATE PROTECTION TO PREPETITION CREDIT PARTIES AND MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (IV) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL BANKRUPTCY RULE 4001-2

This matter is before the Court on the Motion (the "*Motion*") of The Standard Register Company, an Ohio corporation ("*SRC*"), on behalf of itself and its affiliated debtors and debtors in possession (collectively, "*Debtors*") in these chapter 11 cases (the "*Chapter 11 Cases*"), requesting entry of an interim order (this "*Interim Order*") and final order (a "*Final Order*") pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United States Code (the "*Bankruptcy Code*") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "*Bankruptcy Rules*"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "*Local Bankruptcy Rules*"):

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

(1) authorizing Debtors to obtain postpetition financing, consisting of (x) a superpriority, secured, asset-based revolving credit facility in the principal amount of up to $125,000,000 (the "**ABL DIP Facility**") from Bank of America, N.A. ("**BofA**"), in its capacities as administrative and collateral agent (in such capacity, together with its successors in such capacity, "**ABL DIP Agent**") and as a lender, and certain other financial institutions (together with BofA and their respective successors and assigns, "**ABL DIP Lenders**"; and together with ABL DIP Agent, the "**ABL DIP Credit Parties**"), and (y) a superpriority, multiple-draw secured term loan facility in an aggregate principal amount of up to $30,000,000 (the "**Term DIP Facility**," and together with the ABL DIP facility, the "**DIP Financing**") from Silver Point Finance, LLC, in its capacities as administrative and collateral agent (in such capacity, together with its successors in such capacity, the "**Term DIP Agent**"; and together with the ABL DIP Agent, the "**DIP Agents**") and as a lender, and certain other lenders (together with Silver Point Finance, LLC and their respective successors and assigns, the "**Term DIP Lenders**"; together with the Term DIP Agent, the "**Term DIP Credit Parties**");

(2) authorizing Debtors to execute and enter into the DIP Financing Documents (as defined below) and to perform all such other and further acts as may be required in connection with the DIP Financing Documents;

(3) authorizing Debtors to use proceeds of the DIP Financing solely as expressly permitted in the DIP Financing Documents (as defined below) and in accordance with this Interim Order;

(4) granting automatically perfected (i) priming security interests in and liens on all of the DIP Collateral (as defined below) and (ii) non-priming security interests in and liens with respect to Unencumbered Property (as defined below) upon which there are either pre-existing permitted

senior liens or no pre-existing liens, to the DIP Agents for the benefit of the ABL DIP Credit Parties and Term DIP Credit Parties (collectively, the "*DIP Credit Parties*") to the extent provided herein, and granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case on the terms and subject to the relative priorities set forth in the DIP Financing Documents;

(5) providing adequate protection to Pre-Petition Credit Parties (as defined below) to the extent of any diminution in value of their interests in the DIP Collateral (as defined below) and subject to the Carve-Out (as defined below);

(6) authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Financing Documents as such amounts become due and payable;

(7) vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Financing Documents;

(8) subject only to and effective upon entry of the Final Order, waiving the Debtors' ability to surcharge against collateral pursuant to Section 506(c) of the Bankruptcy Code;

(9) scheduling a final hearing (the "*Final Hearing*") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

(10) granting the Debtors such other and further relief as is just and proper.

Based upon the Court's review of the Motion, the exhibits attached thereto, the *Declaration of Kevin Carmody in Support of Debtors' Chapter 11 Petitions and Requests for First Day Relief*, sworn to as of March 12, 2015 (the "*First Day Declaration*"), and the

*Declaration of Dermott O'Flanagan in Support of the Financing Motion*, sworn to as of March 12, 2015 (the "***O'Flanagan Declaration***"); and all matters brought to the Court's attention at the interim hearing, which was held on March __, 2015, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "***Interim Hearing***"), and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, AND ADJUDGED, that**:[2]

1.    <u>Disposition</u>.   The Motion is hereby GRANTED, as and to the extent provided herein.  Any and all objections to the relief requested in the Motion, to the extent not otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

2.    <u>Jurisdiction; Core Proceeding</u>.   This Court has jurisdiction over these Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    <u>Service of Motion and Notice of Interim Hearing</u>.   Debtors have certified that copies of the Motion (together with the annexed copies of the proposed DIP Loan Agreements and Budget (defined below) annexed thereto), and notice of the Interim Hearing have been served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the Office of the United States Trustee (the "***U.S. Trustee***"), counsel for Pre-Petition ABL Agent, the Pre-Petition Term Agents, the 50 largest unsecured creditors of the Debtors, the Internal Revenue Service, all parties who have filed requests for notices under Rule

---

[2]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

2002 of the Bankruptcy Rules, and all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  The foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is appropriate, due and sufficient for all purposes under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (c), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.    Petition Date.  On March 12, 2015 (the "**Petition Date**"), each of Debtors filed with the Court its respective voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and each is continuing to manage its properties and to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed for any Debtor herein.

5.    Debtors' Stipulations.  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in Paragraph 27 below), each Debtor admits, stipulates, acknowledges and agrees as follows:

A.    Pre-Petition ABL Loan Documents.  Pursuant to that certain Amended and Restated Loan and Security Agreement dated August 1, 2013 (as at any time amended or supplemented, the "**Pre-Petition ABL Loan Agreement**"), certain financial institutions in their capacity as lenders (collectively, "**Pre-Petition ABL Lenders**") and BofA in its capacity as administrative and collateral agent for Pre-Petition ABL Lenders (in such capacity, "**Pre-Petition ABL Agent,**" and together with BofA in its capacity as issuer of letters of credit and the Pre-Petition ABL Lenders, "**Pre-Petition ABL Credit Parties**") established a revolving credit facility and issued letters of credit for SRC, SRI, SRT, iMed, WorkflowOne LLC, a Delaware limited

liability company ("***WorkflowOne***"), and SRPR (collectively, whether in the capacity as borrower or guarantor, the "***Pre-Petition Obligors***"), in an aggregate principal amount up to $125,000,000. The Pre-Petition ABL Loan Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "***Pre-Petition ABL Loan Documents***."

B.      Pre-Petition ABL Collateral.  Pursuant to certain Security Documents (as defined in the Pre-Petition ABL Loan Agreement) executed by Pre-Petition Obligors in favor of Pre-Petition ABL Agent, each Pre-Petition Obligor granted to Pre-Petition ABL Agent, for the benefit of Pre-Petition ABL Credit Parties and to secure such Pre-Petition Obligor's obligations and indebtedness under the Pre-Petition ABL Loan Documents, (x) first priority liens on and security interests in the ABL Priority Collateral (as defined in that certain Intercreditor Agreement, dated as of August 1, 2013, among Pre-Petition Obligors, Pre-Petition ABL Agent, and Pre-Petition Term Agents (as at any time amended, the "***Pre-Petition ABL/Term Lender Intercreditor Agreement***")) of the Pre-Petition Obligors (the "***ABL Priority Collateral***") and (y) second priority liens on and security interests in the Term Loan Priority Collateral (as defined in the Pre-Petition ABL/Term Lender Intercreditor Agreement) of the Pre-Petition Obligors (the "***Term Loan Priority Collateral***" and together with the ABL Priority Collateral, the "***Pre-Petition Collateral***", and such liens and security interests, collectively, the "***ABL Security Interests***").

C.      Pre-Petition Term Loan Documents.  Pursuant to that certain First Lien Credit Agreement dated as of August 1, 2013 (as at any time heretofore amended, modified,

restated or supplemented, the "***Pre-Petition First Lien Term Loan Agreement***"), and that certain Second Lien Credit Agreement dated as of August 1, 2013 (as at any time heretofore amended, modified, restated or supplemented, the "***Pre-Petition Second Lien Term Loan Agreement***," and together with the Pre-Petition First Lien Term Loan Agreement, the "***Pre-Petition Term Loan Agreements***"), certain institutions in their capacity as lenders under the First Lien Credit Agreement ("***First Lien Term Lenders***") and under the Second Lien Credit Agreement ("***Second Lien Term Lenders***"; and together with the "***First Lien Term Lenders***," the "***Pre-Petition Term Lenders***") and Silver Point Finance, LLC, in its capacity as administrative and collateral agent for the First Lien Term Lenders (in such capacity, the "***First Lien Term Lender Agent***") and as administrative and collateral agent for the Second Lien Term Lenders ("***Second Lien Term Lender Agent***"; and together with the First Lien Term Lender Agent, the "***Pre-Petition Term Agents***"; and together with Pre-Petition Term Lenders, "***Pre-Petition Term Credit Parties***") made term loans to SRC and WorkflowOne, as borrowers under the Pre-Petition Term Loan Agreements, in an aggregate principal amount of approximately $210,313,153.26. Pursuant to each Subsidiary Guaranty (as defined in the Pre-Petition Term Loan Agreements), SRI, SRT, iMed and SRPR unconditionally and absolutely guaranteed payment of all obligations owing by SRC and WorkflowOne under the Pre-Petition Term Loan Agreements.

The Pre-Petition First Lien Term Loan Agreement, together with any other agreement, note, instrument, guaranty, pledge and document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "***Pre-Petition First Lien Term Loan Documents***." The Pre-Petition Second Lien Term Loan Agreement, together with any other agreement, note, instrument, guaranty, pledge and document executed at any time in connection therewith, in each

case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "***Pre-Petition Second Lien Term Loan Documents***," and together with the Pre-Petition First Lien Term Loan Documents, the "***Pre-Petition Term Loan Documents***."

        D.    <u>Pre-Petition Term Loan Collateral</u>.    Pursuant to certain Security Documents (as such term is defined in the Pre-Petition Term Loan Agreements) executed by Pre-Petition Obligors in favor of Pre-Petition Term Agents, each Pre-Petition Obligor granted to each Pre-Petition Term Agent, for itself and the Pre-Petition Term Lenders for which it serves as agent, and to secure Pre-Petition Obligors' obligations under the Pre-Petition Term Loan Documents, (x) second priority security interests in and continuing liens upon the ABL Priority Collateral and (y) first priority security interests in and continuing liens upon the Term Loan Priority Collateral (collectively, the "***Term Loan Security Interests***" and together with the ABL Security Interests, the "***Pre-Petition Security Interests***").[3]  The Pre-Petition Security Interests (i) are valid, binding, properly perfected, enforceable liens and security interests in the Pre-Petition Collateral, (ii) are not subject to avoidance, recovery, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) are subject and subordinate only to (a) the DIP Liens (as defined below) in the manner set forth herein, (b) the Carve-Out (as defined below) to which the DIP Liens and Pre-Petition Security Interests are subject, and (c) valid, perfected and unavoidable liens permitted under the Pre-Petition Loan Documents (as defined below) to the extent such

---

[3]      The relative priorities of the security interests and liens in favor of the First Lien Term Lender Agent and the Second Lien Term Lender Agent are as set forth in a certain Intercreditor Agreement dated as of August 1, 2013, among SRC and certain of its subsidiaries, and Pre-Petition Term Agents (as at any time amended, the "***Term Lender Intercreditor Agreement***").

permitted liens are senior to or pari passu with the liens of the Pre-Petition Term Agents and the ABL Agent on the Pre-Petition Collateral.

        E.      <u>Pre-Petition ABL/Term Lender Intercreditor Agreement</u>.  Pursuant to the Pre-Petition ABL/Term Lender Intercreditor Agreement, the parties agreed, among other things, that (x) the security interests and liens of Pre-Petition ABL Agent upon the ABL Priority Collateral would be senior in all respects and prior to the security interests and liens of Pre-Petition Term Agents in such property and (y) the respective security interests and liens of Pre-Petition Term Agents upon the Term Loan Priority Collateral would be senior in all respects and prior to the security interests and liens of the Pre-Petition ABL Agent in such property.

        F.      <u>Pre-Petition ABL Debt and Pre-Petition Term Debt</u>.  As of the Petition Date, Pre-Petition Obligors, jointly and severally, were justly and lawfully indebted and liable (x) under the Pre-Petition ABL Loan Documents to Pre-Petition ABL Credit Parties for revolving credit loans in the approximate principal amount of $93,203,975 (the "***Pre-Petition ABL Loans***"), for fees, expenses, and other charges associated with depository accounts, credit cards and other banking products and services, and on a contingent basis in the approximate amount of $3,570,509 for  standby letters of credit (the "***Pre-Petition LCs***"; together with the Pre-Petition ABL Loans, all other obligations of any Pre-Petition Obligor in respect of indemnities, guaranties and other payment assurances given by any Pre-Petition Obligor for the benefit of Pre-Petition ABL Credit Parties, and all interest, fees, costs, legal expenses and all other amounts heretofore or hereafter accruing thereon or at any time chargeable to any Pre-Petition Obligor in connection therewith, collectively referred to as the "***Pre-Petition ABL Debt***"); and (y) under (i) the Pre-Petition First Lien Term Loan Documents to the First Lien Term Lenders and the First Lien Term Lender Agent for term loans in the approximate principal

amount of $113,594,130.19  (the *"Pre-Petition First Lien Term Loans"*) and (ii) the Pre-Petition Second Lien Term Loan Documents to the Second Lien Term Lenders and the Second Lien Term Lender Agent for term loans in the approximate principal amount of $96,719,023.07  (the *"Pre-Petition Second Lien Term Loans,"* together with the Pre-Petition First Lien Term Loans, the *"Pre-Petition Term Loans"*; together with all other obligations of any Pre-Petition Obligor in respect of indemnities, guaranties and other payment assurances given by any Pre-Petition Obligor for the benefit of Pre-Petition Term Credit Parties, and all interest, fees, costs, legal expenses and all other amounts heretofore or hereafter accruing thereon or at any time chargeable to any Pre-Petition Obligor in connection therewith, collectively referred to as the *"Pre-Petition Term Debt"*). Each Debtor acknowledges and stipulates that the Pre-Petition ABL Debt and the Pre-Petition Term Debt (collectively, the *"Pre-Petition Debt"*) are due and owing to Pre-Petition ABL Credit Parties and Pre-Petition Term Credit Parties (collectively, the *"Pre-Petition Credit Parties"*) without any defense, offset, recoupment or counterclaim of any kind; the Pre-Petition Debt constitutes the legal, valid and binding obligation of each Pre-Petition Obligor, enforceable in accordance with its terms; and none of the Pre-Petition Debt or any payments made to any Pre-Petition Credit Party or applied to the obligations owing under any Pre-Petition ABL Loan Documents or Pre-Petition Term Loan Documents (collectively, the *"Pre-Petition Loan Documents"*) prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

G.   <u>Cash Collateral</u>.   Subject to the Pre-Petition ABL/Term Lender Intercreditor Agreement, all or substantially all cash, securities or other property of Pre-Petition

Obligors (and the proceeds therefrom) as of the Petition Date, including, without limitation, all amounts on deposit or maintained by any Pre-Petition Obligor in any account with any Pre-Petition ABL Credit Party (each a "***Depository Institution***"), was subject to rights of setoff and valid, perfected, enforceable first-priority liens under the Pre-Petition ABL Loan Documents and applicable law, and is included in the Pre-Petition Collateral, and therefore the Pre-Petition Obligors' cash balances are cash collateral of the Pre-Petition Credit Parties within the meaning of Section 363(a) of the Bankruptcy Code.  All such cash (including, without limitation, all proceeds of Pre-Petition Collateral and together with all proceeds of property encumbered by liens and security interests granted under this Interim Order), is referred to herein as "***Cash Collateral***."

        H.    <u>Releases</u>.  Subject to paragraph 27 below, the Debtors  hereby absolutely and unconditionally forever waive, discharge and release each of the Pre-Petition Credit Parties of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, debts, accounts, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, or setoff rights that it may have against any Pre-Petition Credit Party or any of its respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates and that arise out of or relate to any of the Pre-Petition Loan Documents or any acts, inaction, or transactions thereunder, whether disputed or undisputed, at law or in equity, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Pre-Petition Debt

or any payments made on account of the applicable Pre-Petition Debt, or the validity, enforceability, priority or non-avoidability of the applicable Pre-Petition Security Interests securing the applicable Pre-Petition Debt.

I.    As of the Petition Date (i) the aggregate value of the ABL Priority Collateral exceeds the aggregate amount of the Pre-Petition ABL Debt and (ii) the aggregate value of the Term Priority Collateral exceeds the aggregate amount of the Pre-Petition First Lien Term Loans.

J.    Need for Financing.  An immediate and ongoing need exists for Debtors to obtain DIP Financing in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors, suppliers and customers, to pay payroll obligations, to satisfy other working capital and operational needs so as to maximize the value of their respective businesses and assets as debtors in possession under Chapter 11 of the Bankruptcy Code. Debtors do not have sufficient available resources of working capital to operate their businesses in the ordinary course without post-petition financing. Debtors' ability to maintain business relationships with vendors and customers, to pay employees, and otherwise to fund operations is essential to Debtors' viability and preservation of the going concern value of their businesses pending a sale of their assets.

6.    Findings Regarding the DIP Financing.

A.    Good Cause.  Good cause has been shown for the entry of this Interim Order and authorization for Debtors to obtain DIP Credit Extensions (defined below) pursuant to the DIP Loan Agreements (defined below) as hereinafter provided during the Interim Period.  Each Debtor's need for financing of the type afforded by the DIP Loan Agreements is immediate and critical.  Entry of this Interim Order will preserve the assets of each Debtor's estate and their

value and is in the best interests of Debtors, their creditors and their estates.  The terms of the

proposed financing are fair and reasonable, reflect each Debtor's exercise of business judgment,

and are supported by reasonably equivalent value and fair consideration.

B.    Proposed DIP Facilities.  Debtors have requested (i) ABL DIP Lenders to

establish the ABL DIP Facility pursuant to which Debtors may obtain loans from time to time

("*ABL DIP Loans*") and letters of credit in an aggregate amount of ABL DIP Loans and letters

of credit outstanding not to exceed at any time the lesser of (x) $125,000,000, minus the amount

of the Pre-Petition ABL Debt at such time and (y) the Borrowing Base (as defined in the ABL

DIP Loan Agreement), and (ii) Term DIP Lenders (together with ABL DIP Lenders, the "*DIP*

*Lenders*") to establish the Term DIP Facility (together with the ABL DIP Facility, the "*DIP*

*Financing*") in favor of Debtors pursuant to which Debtors may obtain loans (the "*Term DIP*

*Loans*"; and together with the ABL DIP Loans, the "*DIP Loans*") in an aggregate principal

amount not to exceed $30,000,000, with all DIP Loans and related obligations secured by,

subject to the ABL/Term DIP Intercreditor Agreement (as defined below), all real and personal

property of Debtors, wherever located and whether created, acquired or arising prior to, on or

after the Petition Date.  DIP Lenders are willing to establish the DIP Facilities upon the terms

and conditions set forth herein and in a certain Post-Petition Loan and Security Agreement to be

entered into by Debtors and ABL DIP Credit Parties, substantially in the form attached to the

Motion (together with all schedules, exhibits and annexes thereto, and as at any time amended,

the "*ABL DIP Loan Agreement*"), and in a certain Super-Priority Priming Debtor In Possession

Term Loan Credit Agreement and Security Agreement to be entered into by Debtors and Term

DIP Credit Parties, substantially in the form attached to the Motion (together with all schedules,

exhibits and annexes thereto, and as at any time amended, the "***Term DIP Loan Agreement***";

and together with the ABL DIP Loan Agreement, the "***DIP Loan Agreements***").

       C.     <u>No Credit Available on More Favorable Terms</u>.  Despite diligent efforts, Debtors

have been unable to obtain financing on more favorable terms from sources other than the DIP

Lenders under the DIP Financing Documents and are unable to obtain adequate unsecured credit

allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The

Debtors are also unable to obtain secured credit allowable under Sections 364(c)(1),  364(c)(2)

and (c)(3) of the Bankruptcy Code without granting priming liens under Section 364(d)(1) of the

Bankruptcy Code and the Superpriority Claims (as defined in paragraph 4(a) below) under the

terms and conditions set forth in this Interim Order and in the DIP Financing Documents.

       D.     <u>Budget</u>.  Debtors have prepared and annexed to the Motion a budget (as at any

time amended or supplemented with the written consent of each DIP Agent, the "***Budget***"),

which sets forth, among other things, the projected cash receipts and disbursements for the

periods covered thereby and which Debtors believe in good faith to be realistic and achievable.

DIP Credit Parties are relying upon the Budget in entering into the DIP Loan Agreements and

Pre-Petition Credit Parties are relying upon the Budget in consenting to the terms of this Interim

Order.  The Debtors shall provide an updated 13-week Budget every two (2) weeks covering the

next 13-week period, which shall be subject to the approval requirements in the DIP Financing

Documents, including a statement of the actual amounts of each line item for the preceding two

(2) weeks together with a variance analysis from the previously delivered Budget.  All references

restricting the use of loan proceeds to payment of amounts set forth in the Budget shall mean the

most recent approved Budget, subject to the "Permitted Variances" as defined in the DIP

Financing Documents.

E.      Certain Conditions to DIP Facility.  ABL DIP Lenders' willingness to make ABL

DIP Loans and other extensions of credit pursuant to the ABL DIP Loan Agreement

(collectively, the "***ABL DIP Credit Extensions***") and Term DIP Lenders' willingness to make

Term DIP Loans pursuant to the Term DIP Loan Agreement (collectively, the "***Term DIP Credit***

***Extensions***"; together with the ABL DIP Credit Extensions, the "***DIP Credit Extensions***"), are

conditioned upon, among other things, (i) Debtors obtaining Court approval of the DIP Loan

Agreements and all obligations of Debtors and all rights and remedies of DIP Credit Parties

thereunder; (ii) Debtors' provision of adequate protection for Pre-Petition Credit Parties' interests

in the Pre-Petition Collateral pursuant to Sections 361 and 363 of the Bankruptcy Code; and (iii)

each DIP Agent receiving, on behalf of its DIP Credit Parties and as security for the prompt

payment of all DIP Credit Extensions made by its DIP Credit Parties, a security interest in and

lien upon, subject to the ABL/Term DIP Intercreditor Agreement (as defined below), all of each

Debtor's pre-petition and post-petition real and personal property, including, without limitation,

all of each Debtor's cash, accounts, inventory, equipment, fixtures, general intangibles,

documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, commercial tort

claims, investment property, intellectual property, real property and leasehold interests, contract

rights, and books and records relating to any assets of such Debtor and all proceeds (including,

without limitation, insurance proceeds) of the foregoing, whether such assets were in existence

on the Petition Date or were thereafter created, acquired or arising and wherever located (all such

real and personal property, including, without limitation, all Pre-Petition Collateral and the

proceeds thereof, being collectively hereinafter referred to as the "***DIP Collateral***"), and that

such security interests and liens have the priorities hereinafter set forth.  Subject to entry of the

Final Order, the DIP Collateral shall include Avoidance Claims and Avoidance Proceeds, as defined in Paragraph 9(d).

F. <u>Interim Hearing</u>. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2, Debtors have requested in the Motion that the Court hold the Interim Hearing to consider authorizing Debtors to obtain DIP Loans during the period (the "***Interim Period***") from the date of entry of this Order through the date on which the final hearing on the Motion pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) scheduled pursuant to Paragraph 35 of this Interim Order (the "***Final Hearing***") is concluded, for purposes specified in the Budget.

G. <u>Finding of Good Faith</u>. Based upon the record presented at the Interim Hearing, the DIP Financing has been negotiated in good faith and at arm's length between Debtors, on the one hand, and DIP Credit Parties, on the other. All of the DIP Obligations (as defined below), including, without limitation, all DIP Credit Extensions made pursuant to the DIP Loan Agreements and all other liabilities and obligations of any Debtors under this Interim Order or in respect of credit card debt, overdrafts and related liabilities arising from treasury, depository, credit card and cash management services, or in connection with any automated clearing house transfers of funds, owing to the DIP Credit Parties shall be deemed to have been extended by DIP Credit Parties in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code. The DIP Credit Parties shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

H. <u>Immediate Entry</u>. Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.

Absent granting the interim relief sought by the Motion, each Debtor's estate will be immediately and irreparably harmed pending the Final Hearing. Debtors' consummation of the DIP Facilities in accordance with the terms of this Interim Order and the DIP Loan Agreements is in the best interests of each Debtor's estate and is consistent with each Debtor's exercise of its fiduciary duties.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

       7.    <u>Authorization of Interim Financing; Use of Proceeds</u>.

       A.    The Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Loan Agreements in substantially the form annexed to the Motion (with such changes, if any, as were made prior to or as a result of the Interim Hearing or are otherwise authorized to be made as amendments to either of the DIP Loan Agreements in accordance with this Interim Order) and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by DIP Credit Parties to give effect to the terms thereof (the DIP Loan Agreements, that certain ABL-TL DIP Intercreditor Agreement (the "***ABL/Term DIP Intercreditor Agreement***") and such other instruments, security agreements, assignments, pledges, mortgages and other documents, as at any time amended, being collectively called the "***DIP Financing Documents***").

       B.    Debtors are hereby authorized to borrow money pursuant to the DIP Financing Documents, on the terms and subject to the conditions, lending formulae and sub-limits set forth in any DIP Financing Document and this Interim Order, up to an aggregate principal amount outstanding at any time equal to (i) $125,000,000 in the case of ABL DIP

Credit Extensions and (ii) $30,000,000 in the case of Term DIP Credit Extensions, in each case together with applicable interest, protective advances, expenses, fees and other charges payable in connection with such DIP Credit Extensions, and to incur any and all liabilities and obligations under the DIP Financing Documents and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Financing Documents (including any obligations, to the extent provided for in the DIP Financing Documents, to indemnify the DIP Agents or the DIP Lenders), provided that Debtors shall be entitled to receive Term DIP Loans under the Term DIP Financing only if and to the extent that Debtors certify that, as of the date of such certification, they expect to have no further borrowing availability under the ABL DIP Facility to provide necessary working capital and only in accordance with the Budget and the DIP Financing Documents; and Debtors are hereby authorized to satisfy all conditions precedent and perform all obligations hereunder and under the DIP Financing Documents in accordance with the terms hereof and thereof; provided, however, that, during the Interim Period and subject to all of the terms and conditions in the DIP Loan Agreement, Debtors may use DIP Loans and other DIP Credit Extensions to the extent necessary to avoid immediate and irreparable harm to Debtors, which, for purposes hereof, shall mean DIP Loans used (a) to pay (or in the case of contingent obligations, cash collateralize) amounts owed by any Debtor at any time to any DIP Lenders under any of the DIP Financing Documents, including, without limitation, costs, fees and expenses at any time due thereunder, (b) to make disbursements specified in the Budget and in amounts not to exceed the Permitted Variances provided in the DIP Loan Agreements, (c) to make adequate protection and other payments to Pre-Petition Credit Parties to the extent authorized or required herein, (d) for any other purposes specified in the Budget, (e) to pay other expenses that are required or authorized to be paid, prior to the Final Hearing, under any of the

DIP Financing Documents, and (f) to pay the Carve-Out (as defined below), <u>provided further,</u> that during the Interim Period and so long as no Event of Default (as defined below) has occurred, notwithstanding the Budget, the Debtors may not use more than $115,000,000 in DIP Loans and other DIP Credit Extensions. Each Debtor is hereby authorized to unconditionally guarantee (on a joint and several basis) the foregoing borrowings and extensions of credit and each other Debtor's other obligations and liabilities under the DIP Financing Documents, including, without limitation, costs, fees, and other expenses and amounts provided for in the DIP Financing Documents, in accordance with the terms of the DIP Financing Documents.

C.    In addition to the DIP Credit Extensions described above, Debtors are authorized to incur credit card debt, overdrafts and related liabilities arising from treasury, depository, credit card and cash management services, including any automated clearing house fund transfers provided to or for the benefit of any Debtor by any ABL DIP Credit Party (or any of their respective affiliates), provided that nothing herein shall require any ABL DIP Credit Party to incur overdrafts or to provide any such services or functions to any Debtor.

D.    No DIP Credit Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Loans or other DIP Credit Extensions, and each DIP Credit Party may rely upon each Debtor's representations that the amount of DIP Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the DIP Financing Documents, and Bankruptcy Rule 4001(c)(2). As provided in the ABL DIP Loan Agreement, the Pre-Petition LCs shall be treated as having been issued under the ABL DIP Loan Agreement, shall constitute part of the ABL DIP Credit Extensions, shall be entitled to all of the benefits and security of the ABL DIP Financing Documents, the DIP Collateral and this

Interim Order, and from and after entry of this Interim Order shall cease to be regarded as part of the Pre-Petition ABL Debt.

E.    Upon entry of the Final Order, Debtors may obtain and use the proceeds of ABL DIP Loans only for purposes specified in the ABL DIP Loan Agreement and proceeds of the Term DIP Loans only for purposes specified in the Term DIP Loan Agreement. Without limiting the generality of the foregoing sentence, no proceeds of any DIP Loan shall be used to (i) make any payment in settlement or satisfaction of any pre-petition claim (excluding the Pre-Petition Debt) or administrative claim (excluding the DIP Obligations (defined below)), unless in compliance with the Budget and permitted under the DIP Financing Documents, and with respect to the payment of any pre-petition claim not provided for under the DIP Financing Documents or any non-ordinary course administrative claim, separately approved by the Court upon notice to, and no objection from, the DIP Credit Parties and subject to compliance with the Budget; (ii) except as expressly provided or permitted hereunder, to make any distributions not in compliance with the Budget, or as otherwise approved by the DIP Agents, including without limitation, to make any payment or distribution to any Non-Debtor affiliate, equity holder, or insider of any Debtor, provided that in no event shall any management, advisory, consulting or similar fees be paid to or for the benefit of any affiliate that is not a Debtor, equity holder or insider; or (iii) to make any payment otherwise prohibited by this Interim Order.

8.    Execution, Delivery and Performance of DIP Financing Documents.  The DIP Financing Documents may be executed and delivered on behalf of each Debtor by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute the DIP Financing Documents for and on behalf of such Debtor; the DIP Credit Parties shall be authorized to rely upon any such person's

execution and delivery any of the DIP Financing Documents as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Financing Documents or amendments thereto by any such person on behalf of such Debtor shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company, or other entity action (as applicable) of such Debtor. Upon execution and delivery thereof, each of the DIP Financing Documents shall constitute valid and binding obligations of each Debtor, enforceable against each Debtor in accordance with their terms for all purposes during its Chapter 11 Case, any subsequently converted case of such Debtor under Chapter 7 of the Bankruptcy Code (each, a "*Successor Case*"), and after the dismissal of its Chapter 11 Case. No obligation, payment, transfer or grant of security under the DIP Financing Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including, without limitation, under Sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.    In furtherance of the provisions of Paragraph 7 of this Interim Order, each Debtor is authorized and directed to do and perform all acts; to make, execute and deliver all instruments and documents (including, without limitation, security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements, amendments, waivers, consents, other modifications, and intellectual property filings); and to pay all fees, costs and expenses, in each case as may be necessary or, in the opinion of either DIP Agent, desirable to give effect to any of the terms and conditions of the DIP Financing Documents, to validate the perfection of the DIP

Liens (as defined below), or as may otherwise be required or contemplated by the DIP Financing Documents.

9.      DIP Liens.  As security for Debtors' payment and performance of all ABL DIP Credit Extensions and all Term DIP Credit Extensions, all interest, costs, expenses, fees and other charges at any time or times payable by any Debtor to any DIP Credit Party in connection with any DIP Credit Extensions or otherwise pursuant to any of the DIP Financing Documents, all reimbursement obligations and other indebtedness in respect of the Pre-Petition LCs, and all other indebtedness and obligations under any of the DIP Financing Documents (including, without limitation, liabilities of Debtors at any time or times associated with any ABL DIP Credit Party's provision after the Petition Date of Bank Products in accordance with (and as defined in) the ABL DIP Loan Agreement (to the extent any of the foregoing is owed to any of the ABL DIP Credit Parties, they are collectively called "***ABL DIP Obligations***"; to the extent any of the foregoing is owed to any of the Term DIP Credit Parties, the "***Term DIP Obligations***"; and all of the foregoing is collectively called the "***DIP Obligations***"), each DIP Agent shall have, for itself and for the benefit of the DIP Credit Parties for which it serves, and is hereby granted, valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens upon all of the DIP Collateral, subject to the provisions in Paragraph 9(d) (collectively, the "***DIP Liens***") and in the priorities set forth herein and in the ABL/Term DIP Intercreditor Agreement. Subject to the provisions of Paragraph 18 hereof and the ABL/Term DIP Intercreditor Agreement, the DIP Liens shall be:

A.      Unencumbered Property.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, first priority senior liens on, and security interests in, all DIP Collateral that is not otherwise subject to valid, perfected,

enforceable and unavoidable liens on the Petition Date (collectively, the "*Unencumbered Property*"), provided that the lien on Avoidance Proceeds and Avoidance Claims (as defined below) will be granted subject to entry of the Final Order.  Subject to subsection (d) below, proceeds realized from any collection, sale, lease or other disposition of Unencumbered Property, whether such collection or disposition is made by a Debtor or a DIP Agent, shall be shared by DIP Agents (for the benefit of their respective DIP Credit Parties) in accordance with the ABL/Term DIP Intercreditor Agreement, it being understood that Unencumbered Property shall be remitted (i) to the Term DIP Agent to the extent such Unencumbered Property is of a type that would be Term Priority Collateral and (ii) to the ABL DIP Agent to the extent such Unencumbered Property is of a type that would be ABL Priority Collateral (the "*Allocation Mechanism*").

B.    Liens Junior to Certain Other Liens.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, (i) in the case of ABL DIP Agent, valid, binding, continuing, enforceable, fully perfected security interests and liens upon the Term Loan Priority Collateral, which security interests and liens shall be junior to (but only to) (x) security interests and liens in favor of the Pre-Petition Term Agents and the Term DIP Agent with respect to the Term Loan Priority Collateral, (y) the Term Adequate Protection Liens (as defined below), and (z) Permitted Senior Liens (as defined on the date hereof in the ABL DIP Loan Agreement), but shall be senior to the security interests and liens in favor of Pre-Petition ABL Agent with respect to the Term Loan Priority Collateral and the ABL Adequate Protection Liens (as defined below) with respect to the Term Loan Priority Collateral; and (ii) in the case of Term DIP Agent, valid, binding, continuing, enforceable, fully perfected security interests and liens upon the ABL Priority Collateral, which security interests and liens shall be junior to (but only to) (x) security interests

and liens in favor of the Pre-Petition ABL Agent and ABL DIP Agent with respect to the ABL Priority Collateral and (y) the ABL Adequate Protection Liens, and (z) Permitted Senior Liens (as defined on the date hereof in the ABL DIP Loan Agreement), but shall be senior to the security interests and liens in favor of the Pre-Petition Term Agents with respect to the ABL Priority Collateral and the Term Adequate Protection Liens with respect to the ABL Priority Collateral.

C.      Priming DIP Liens.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, (i) in the case of ABL DIP Agent, valid, binding, continuing, enforceable, fully perfected security interests and liens upon the ABL Priority Collateral, which security interests and liens shall be prior and senior in all respects to (x) the security interests and liens in favor of Pre-Petition ABL Agent with respect to the ABL Priority Collateral, (y) the security interests and liens in favor of Pre-Petition Term Agents with respect to the ABL Priority Collateral, and (z) the ABL Adequate Protection Liens with respect to the ABL Priority Collateral; and (ii) in the case of Term DIP Agent, valid, binding, continuing, enforceable, fully perfected security interests and liens upon the Term Loan Priority Collateral, which security interests and liens shall be prior and senior in all respects to (x) the security interests and liens in favor of Pre-Petition Term Agents with respect to the Term Loan Priority Collateral, (y) the security interests and liens in favor of Pre-Petition ABL Agent with respect to the Term Loan Priority Collateral, and (z) the Term Adequate Protection Liens with respect to the Term Loan Priority Collateral.

D.      Liens on Avoidance Claims and Proceeds.  Subject to the entry of the Final Order, valid, binding, continuing, enforceable, fully perfected security interests and liens upon all of Debtors' claims and causes of action pursuant to Sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (the "*Avoidance Claims*") and any proceeds or

other property (the "***Avoidance Proceeds***") recovered in connection with the successful prosecution, settlement or collection of any Avoidance Claims.  To the extent that the liens on Avoidance Claims and Avoidance Proceeds are approved in the Final Order, the Avoidance Proceeds will be shared among DIP Agents (for the benefit of their respective DIP Credit Parties), with 46% to be remitted to ABL DIP Agent and 54% to be remitted to Term DIP Agent.

     E. <u>Liens Senior to Certain Other Liens</u>. The DIP Liens and the Adequate Protection Liens (as defined below) unless the Adequate Protection Liens are successfully challenged pursuant to Paragraph 27, below, shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any Debtor or its estate under Section 551 of the Bankruptcy Code, (B) any lien or security interest of any lessor or landlord under agreement or applicable state law, (C) any liens or security interests granted by any Debtor to other persons or entities or otherwise arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of Debtors, or (D) any intercompany or affiliate liens or security interests of Debtors; (ii) subordinated to or made *pari passu* with any other lien or security interest under Section 363 or 364 of the Bankruptcy Code or otherwise; or (iii) subject to Sections 510, 549 or 550 of the Bankruptcy Code.  In no event shall any person or entity who pays (or, through the extension of credit to any Debtor, causes to be paid) any of the DIP Obligations or the obligations and indebtedness of the Pre-Petition ABL Credit Parties or the Pre-Petition Term Credit Parties, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, any DIP Credit Party by the terms of any DIP Financing Documents or this

Interim Order unless such person or entity contemporaneously causes Full Payment of the Pre-Petition Debt owed to such DIP Credit Party to be made.

      10.    <u>Superpriority Claims</u>.

      A.    <u>Scope of Superpriority Claims</u>.  All DIP Obligations shall constitute joint and several allowed superpriority claims (the "***Superpriority Claims***") against each Debtor (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all other obligations, liabilities and indebtedness of each Debtor, whether now in existence or hereafter incurred by any Debtor, and over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order approving the grant), 507, 546(c), 552(b) 726, 1113 or 1114 of the Bankruptcy Code. Such Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre-petition and post-petition property of Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, all Avoidance Proceeds received or recovered in respect of any Avoidance Claims; <u>provided</u>, <u>however</u>, that the Superpriority Claims in favor of the Term DIP Credit Parties shall be subject to  the Carve-Out (as defined below).

      B.    <u>Sharing</u>.  Other than with respect to Avoidance Proceeds (which are subject to Paragraph 9(d) above), if any distribution is made on account of the Superpriority Claims of any DIP Credit Party payable from or from the proceeds of any Unencumbered

Property, all DIP Credit Parties shall be entitled to a share hereof based on the Allocation Mechanism.

11.    Repayment.

A.    Repayment of Pre-Petition ABL Debt.  Upon entry of the Final Order and subject to Paragraph 27 of this Interim Order, Debtors shall pay in full in cash, by way of a dollar-for-dollar roll-up, all Pre-Petition ABL Debt to the Pre-Petition ABL Credit Parties from the amount available to be drawn under the ABL DIP Loans.

B.    Repayment of DIP Obligations.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Financing Documents and as provided herein, without offset or counterclaim.  Without limiting the generality of the foregoing, in no event shall any Debtor be authorized to offset or recoup any amounts owed, or allegedly owed, by any Pre-Petition Credit Party or any DIP Credit Party to any Debtor or any of its respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of each Pre-Petition Credit Party or DIP Credit Party that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by any Pre-Petition Credit Party or DIP Credit Party.

12.    Cash Collateral.

A.    Dominion Account. Each Debtor shall cause all Cash Collateral to be promptly deposited in an account designated by ABL DIP Agent (the "***Dominion Account***"). Prior to the deposit of Cash Collateral to the Dominion Account, each Debtor shall be deemed to hold such proceeds in trust for the benefit of ABL DIP Credit Parties.  ABL DIP Agent shall be entitled to apply such Cash Collateral to the payment of the Pre-Petition ABL Debt or the ABL DIP Obligations as authorized by this Interim Order and the ABL DIP Loan Agreement, and any

Cash Collateral so applied shall have the effect of creating borrowing availability under, as and to the extent provided in, the ABL DIP Loan Agreement.

B.    Use of Cash Collateral.  Prior to Full Payment[4] of the DIP Obligations, Debtors shall not be authorized to use any Cash Collateral, to pay Pre-Petition ABL Debt and ABL DIP Obligations indefeasibly and in full and thereafter to pay Pre-Petition Term Debt and Term DIP Obligations. If the Cash Collateral derives from a sale of both ABL Priority Collateral and Term Loan Priority Collateral, the provisions of the Pre-Petition ABL/Term Lender Intercreditor Agreement shall apply regarding the allocation of such Cash Collateral; and, if a contract is entered into for the sale of assets of one or more Debtors comprising both ABL Priority Collateral and Term Loan Priority Collateral, Pre-Petition Credit Parties and DIP Credit Parties shall promptly initiate an allocation analysis and effort at an agreement in accordance with the Pre-Petition ABL/Term Lender Intercreditor Agreement and the ABL/Term DIP Intercreditor Agreement.

13.    Adequate Protection of Pre-Petition ABL Agent.  As adequate protection for any Collateral Diminution (as defined below) suffered by any Pre-Petition ABL Credit Party, Pre-Petition ABL Agent is entitled, pursuant to Sections 105, 361, 363 and 364 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral in an amount equal to the Collateral Diminution (the "***ABL Adequate Protection Claims***").  As used in this Interim Order, "***Collateral Diminution***" shall mean an amount equal (and limited) to the aggregate diminution of the fair market value of any of the Pre-Petition Collateral (including Cash

---

[4] As used herein, the term "Full Payment," as applied to DIP Obligations, Pre-Petition ABL Debt, or Pre-Petition Term Debt, shall mean full and final payment of such indebtedness in cash, the cash collateralization of any contingent obligations as and to the extent required by the applicable loan documents, termination of any commitments to lend under any of the applicable loan documents, expiration of the Challenge Deadline (as defined below) without a challenge having been timely asserted, and, in the case of the DIP Obligations, termination of the relevant DIP Facility.

Collateral) from and after the Petition Date for any reason provided for in the Bankruptcy Code, including, without limitation, any such diminution resulting from the use of Cash Collateral, the priming of any Pre-Petition ABL Agent's or Pre-Petition Term Agents' security interests in and liens on the Pre-Petition Collateral by the DIP Liens pursuant to the DIP Financing Documents and this Interim Order, the depreciation, sale, loss or use by any Debtor (or any other decline in value) of such Pre-Petition Collateral, the amount of any fees and expenses paid to retained professionals in these Chapter 11 Cases, in accordance with the Budget, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code.  Pre-Petition ABL Agent is hereby granted, subject to the rights of third parties preserved under Paragraph 27, the following for the benefit of Pre-Petition ABL Credit Parties:

A.    <u>ABL Adequate Protection Liens</u>.  Pre-Petition ABL Agent, for the benefit of Pre-Petition ABL Credit Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by any Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "***ABL Adequate Protection Liens***"); provided that the ABL Adequate Protection Lien will attach to Avoidance Claims and Avoidance Proceeds subject to entry of the Final Order.  The ABL Adequate Protection Liens on ABL Priority Collateral shall be junior and subordinate only to the ABL DIP Liens and any Permitted Senior Liens (as defined on the date hereof in the ABL DIP Loan Agreement), and in the case of Term Loan Priority Collateral, only to the Term DIP Liens, the Pre-Petition Term Liens, Permitted Senior Liens (as defined on the date hereof in the ABL DIP Loan Agreement), and the Term Adequate Protection Liens (as defined below).  The ABL Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the

Final Order), 510, 549, or 550 of the Bankruptcy Code, and no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any ABL Adequate Protection Liens.

        B.      <u>Priority of ABL Adequate Protection Claims</u>.  The ABL Adequate Protection Claims, if any, will be allowed as superpriority administrative claims pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, which, subject to  the Superpriority Claims and any break-up fees and expense reimbursement obligations of the Debtors ("***Bid Protections***") approved by the Court under the Purchase Agreement dated March 12, 2015, among Silver Point Finance, LLC, SRC and other parties signatory thereto, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of each Debtor, and any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code; <u>provided that</u>,  prior to the entry of a Final Order, the ABL Adequate Protection Claims shall not be payable from or have recourse to Avoidance Claims or Avoidance Proceeds.

        C.      <u>Application of Proceeds of Pre-Petition Accounts</u>.  Until the roll up of the Pre-Petition ABL Loan after entry of the Final Order pursuant to Paragraph 11(a), above, all collections and proceeds of accounts receivable and other rights to payment from the proceeds of ABL Priority Collateral will be presumed to constitute and arise from ABL Priority Collateral under the Pre-Petition ABL/Term Loan Intercreditor Agreement existing on the Petition Date (the "***Pre-Petition Accounts***") or arise from the sale, lease or other disposition of inventory of such Pre-Petition Obligor existing on the Petition Date (the "***Pre-Petition Inventory***") or from

such Pre-Petition Obligor's provision of services, including, without limitation, all payments by account obligors indebted to such Pre-Petition Obligor with respect to transactions entered into or concluded prior to the Petition Date, and will be applied to pay (or in the case of contingent obligations, to cash collateralize) the Pre-Petition ABL Debt in such order of application as Pre-Petition ABL Agent shall elect, in its discretion, until Full Payment of the Pre-Petition ABL Debt, and then applied to the ABL DIP Obligations in such order of application as ABL DIP Agent may elect in its discretion until Full Payment thereof.  Pre-Petition ABL Agent shall be entitled to assume that all deposits to the Dominion Account and all collections of accounts receivable received by a Pre-Petition Obligor after the Petition Date constitute proceeds of Pre-Petition Accounts or Pre-Petition Inventory, until such time as the Pre-Petition ABL Agent has received and applied to the Pre-Petition ABL Debt an amount equal to the aggregate balance of the Pre-Petition Accounts and Pre-Petition Inventory on the books and records of Pre-Petition Obligors as of the Petition Date.

   D. <u>Fees and Expenses of Professionals for Pre-Petition ABL Credit Parties</u>. As additional adequate protection, Debtors shall pay (i) the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, financial advisors, and auditors) payable to or incurred by any Pre-Petition ABL Credit Party under and pursuant to the Pre-Petition ABL Loan Documents arising prior to the Petition Date, and (ii) on a current basis, the reasonable professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) payable to or incurred by any Pre-Petition ABL Credit Party under and pursuant to the Pre-Petition ABL Loan Documents arising on or subsequent to the Petition Date and in compliance with the Budget.  Debtors shall pay the

fees, expenses and disbursements set forth in this Paragraph 7(e)  no later than ten (10) days (the "***Review Period***") after the receipt by counsel for Debtors, counsel for the Official Committee of Unsecured Creditors (the "***Committee***")*,* if appointed, counsel for the Term DIP Agent, and the United States Trustee ("***U.S. Trustee***") of invoices therefor (the "***Invoiced ABL Fees***") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that Debtors, the Committee, the Term DIP Agent, and the U.S. Trustee may dispute the payment of any portion of the Invoiced ABL Fees (the "***Disputed Invoiced ABL Fees***") if, within the Review Period, (i) Debtors pay in full the Invoiced ABL Fees, including the Disputed Invoiced ABL Fees, and (ii) a Debtor, the Committee, the Term DIP Agent, or the United States Trustee submits (to the applicable professional, the Debtors, the Committee, the Term DIP Agent and the U.S. Trustee), on at least ten (10) days prior written notice to Pre-Petition ABL Agent and any affected Pre-Petition ABL Lender, a written objection setting forth the specific objections to the Disputed Invoiced ABL Fees.  If the objection to any portion of the Disputed Invoiced ABL Fees is sustained and not subject to any appeal then the amount of the reduction in fees which have already been paid will be applied to reduce the ABL DIP Loan balance.

        E.    <u>Reservation of Rights</u>.  Nothing herein shall be deemed to be a waiver by any Pre-Petition Credit Party of its right to request additional or further protection of its interests in any Pre-Petition Collateral, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner for any Debtor or the conversion or dismissal of any of these Chapter 11 Cases, or to request any other relief in these cases; nor shall anything herein or in any of the ABL DIP Financing Documents constitute an admission by a Pre-Petition ABL Credit Party regarding

the quantity, quality or value of any DIP Collateral securing the Pre-Petition ABL Debt or constitute a finding of adequate protection with respect to the interests of Pre-Petition ABL Agent in any DIP Collateral.  Pre-Petition ABL Credit Parties shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale, encumbering or other disposition of any of the DIP Collateral, to the extent that the protection afforded by this Interim Order to Pre-Petition ABL Agent's interests in any DIP Collateral proves to be inadequate.

14.     <u>Adequate Protection of Pre-Petition Term Agents</u>.  As adequate protection for any Collateral Diminution, each Pre-Petition Term Agent is entitled, pursuant to Sections 105, 361, 363 and 364 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral, including any Cash Collateral, in an amount equal to the Collateral Diminution (which shall include the amount of any fees and expenses of retained professionals in these Chapter 11 Cases, paid in accordance with the Budget) (the "***Term Adequate Protection Claim***").  As adequate protection for the Term Adequate Protection Claim, if any, each Pre-Petition Term Agent is hereby granted, subject to the rights of third parties preserved under Paragraph 27, the following:

A.     <u>Term Adequate Protection Liens</u>.  Each Pre-Petition Term Agent, for the benefit of its Pre-Petition Term Credit Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by any Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) to secure the Term Adequate Protection Claims, valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "***Term Adequate Protection Liens***"); provided that the Term Adequate Protection Lien will attach to Avoidance Claims and Avoidance Proceeds

subject to entry of the Final Order.  The Term Adequate Protection Liens shall be junior and subordinate only to the Term DIP Liens, Permitted Senior Liens (as defined on the date hereof in the ABL DIP Loan Agreement), and the Carve-Out, and also, in the case of ABL Priority Collateral, to the ABL DIP Liens, Permitted Senior Liens (as defined on the date hereof in the ABL DIP Loan Agreement), the Pre-Petition ABL Liens and the ABL Adequate Protection Liens (as defined below). The Term Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code, and no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any Term Adequate Protection Liens.

B.      Priority of Term Adequate Protection Claims.   The Term Adequate Protection Claims, if any, will be allowed as superpriority administrative claims as pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, which, subject to the Carve-Out, the Bid Protections, and the Superpriority Claims, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of each Debtor, and any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code (the "***Term Adequate Protection Claims***"),  provided that,  prior to the entry of a Final Order, the Term Adequate Protection Claims shall not be payable from or have recourse to Avoidance Claims or Avoidance Proceeds.

C.      Pre-Petition Term Agents Fees and Expenses.   As additional adequate protection, Debtors shall pay in cash (i) the reasonable and documented professional fees and

expenses (including, but not limited to, the fees and disbursements of counsel, accountants, outside consultants,  financial advisors, and other professionals) payable to or incurred by any Pre-Petition Term Credit Party under and pursuant to the Pre-Petition Term Loan Documents arising prior to the Petition Date, (ii) on a current basis, the reasonable professional fees and expenses (including, but not limited to, the fees and disbursements of one primary counsel and one financial consultant) payable to or incurred by any Pre-Petition Term Credit Party under and pursuant to the Pre-Petition Term Loan Documents arising on or subsequent to the Petition Date and in compliance with the Budget, and (iii) current cash payments payable under the Pre-Petition First Lien Term Loan Agreement (including interest at the Base Rate, plus the First Lien Applicable Margin for Loans accruing interest at the Base Rate, plus a margin of 2% per annum, with such interest payable monthly) shall be made to the First Lien Term Lender Agent.  The payment of the fees, expenses and disbursements set forth in this Paragraph 14(c) shall be made no later than the Review Period after the receipt by counsel for Debtors, counsel for the Committee, counsel for the ABL DIP Agent, and the U.S. Trustee of invoices thereof (the "***Invoiced Term Fees***") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that Debtors, the Committee, the ABL DIP Agent and the U.S Trustee may dispute the payment of any portion of the Invoiced Term Fees (the "***Disputed Invoiced Term Fees***") if, within the Review Period, (i)  Debtors pay in full the Invoiced Term Fees, including the Disputed Invoiced Term Fees, and (ii) a Debtor, the Committee, ABL DIP Agent or the United States Trustee submits (to the applicable professional, the Debtors, Committee, ABL DIP Agent, and the U.S. Trustee), on at least ten (10) days prior written notice to each Pre-Petition Term Agent and any affected Pre-Petition Term Lender a

written objection setting forth the specific objections to the Disputed Invoiced Term Fees. If the objection to any portion of the Disputed Invoiced Term Fees is sustained and not subject to any appeal then the amount of the reduction in fees which have already been paid will be applied to reduce the Term DIP Loan balance.

D.   <u>Reservation of Rights</u>.  Nothing herein shall be deemed to be a waiver by any Pre-Petition Credit Party of its right to request additional or further protection of its interests in any Pre-Petition Term Collateral, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner for any Debtor or the conversion or dismissal of any of these Chapter 11 Cases, or to request any other relief in these cases; nor shall anything herein or in any of the Term DIP Financing Documents constitute an admission by a Pre-Petition Credit Party regarding the quantity, quality or value of any DIP Collateral securing the Pre-Petition Term Debt or constitute a finding of adequate protection with respect to the interests of Pre-Petition Term Agents in any DIP Collateral.  Each Pre-Petition Credit Party shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale, encumbering or other disposition of any of the DIP Collateral, to the extent that the protection afforded by this Interim Order to Pre-Petition Credit Parties' interests in any DIP Collateral proves to be inadequate.

15.   <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted (a) to a DIP Agent on behalf of any DIP Credit Party or (b) subject only to the potential challenges by third-parties as permitted but limited by Paragraph 27, below, to either Pre-Petition ABL Agent or Pre-Petition Term Agents on behalf of any Pre-Petition Credit Party, in each case pursuant to the provisions of this Interim Order or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such

claim or charge arising out of or based on, directly or indirectly, Sections 506(c) (subject to entry of the Final Order approving the grant) or the "equities of the case" exception of 552(b) of the Bankruptcy Code.

16.    <u>Fees and Expenses of Estate Professionals</u>.    Subject to the Professional Fee Budget, for so long as no Event of Default (as defined below) has occurred and is continuing, each Debtor is authorized to use DIP Loans to pay such compensation and expense reimbursement (collectively, "***Professional Fees***") of professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants) retained by any Debtor with Court approval (the "***Debtors Professionals***") or the Committee with Court approval (the "***Committee Professionals***"; the Debtors Professionals and Committee Professionals are referred to collectively as the "***Professionals***"), to the extent that such compensation and expense reimbursement is allowed and approved by the Court (including through any interim compensation procedures approved by the Court); provided, however, that, notwithstanding anything herein or in any other order of this Court to the contrary, no proceeds of any DIP Loans or any Cash Collateral shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below).

17.    <u>Section 506(c) Claims</u>.    Effective upon entry of a Final Order, no costs or expenses of administration shall be imposed upon any DIP Credit Party, any Pre-Petition Credit Party or any of the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Credit Party or Pre-Petition Credit Party, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Credit Party or Pre-Petition Credit Party.

18.    <u>Carve-Out</u>. Notwithstanding anything in this Interim Order, any DIP Financing Documents, or any other order of this Court to the contrary, prior to Full Payment of the DIP Obligations, the DIP Liens in favor of Term DIP Agent, the Superpriority Claims in favor of the Term DIP Credit Parties, the Term Loan Security Interests, the Adequate Protection Liens in favor of the Pre-Petition Term Agents, and the Adequate Protection Claims in favor of the Pre-Petition Term Credit Parties shall be subject and subordinate in all respects to the payment of the following Carve-Out.  As used in this Interim Order, "***Carve-Out***" means the sum of (i) all unpaid fees required to be paid (a) to the Clerk of this Court and (b) to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, and (iii)  in the event of an occurrence and during the continuance of an "Event of Default" as that term is defined in any of the DIP Financing Documents (an "***Event of Default***"), and delivery (which may be by email) of notice (the "***Carve-Out Trigger Notice***") to counsel to the Debtors and the Committee (as defined below), the "***Case Professionals Carve-Out,***" comprising the sum of (A) all allowed unpaid fees, expenses, and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) incurred by the Debtors and any committee appointed under Section 1102(a)(1) of the Bankruptcy Code in the Chapter 11 Cases (a "***Committee***") subsequent to receipt of the Carve-Out Trigger Notice, in an aggregate amount not to exceed $350,000 (the "***Carve-Out Cap***"), plus (B) all allowed and unpaid professional fees and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) incurred or accrued by the Debtors or any Committee prior to receipt of the Carve-Out Trigger Notice, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent

professional fee budget (the "***Professional Fee Budget***") delivered to and approved by the DIP Agents prior to any Event of Default that is then continuing (to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i)-(iii), to the extent allowed by the Court at any time, provided that, following receipt of the Carve-Out Trigger Notice, the Carve-Out shall at all times be subject to an aggregate cap of $4,450,968 (the "***Aggregate Carve-Out Cap***"), provided further, that nothing in this Interim Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation of any Professional, whether or not in excess of the Aggregate Carve-Out Cap.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Financing Documents, until Full Payment of the DIP Obligations, the Carve-Out shall be senior to all liens and claims in favor of any Term DIP Credit Party securing the DIP Financing, the Superpriority Claims in favor of any Term DIP Credit Party, and the Term Adequate Protection Liens and  Term Adequate Protection Claims, it being understood and agreed that the Carve-Out shall be allocated 100% against and assessable solely from the Term Loan Priority Collateral and that no pre-petition or post-petition claims or liens in favor of any ABL DIP Credit Party or any Pre-Petition ABL Credit Party shall be subject to or otherwise affected by the Carve-Out.  A current 13-week Professional Fee Budget is attached hereto as Exhibit 1.  In no event shall the Carve-Out, or the funding of the DIP Loans to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations, the Pre-Petition ABL Debt or the Pre-Petition Term Debt.

19.    Excluded Professional Fees.  Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, nor the proceeds of the DIP Financing in any respect, including without limitation any DIP Credit Extensions, Cash Collateral, Letters of Credit or DIP

Collateral shall be used to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following (each a "***Prohibited Purpose***"): (a) objecting to or contesting the validity or enforceability of this Interim Order or any DIP Obligations, Pre-Petition ABL Lender Debt or Pre-Petition Term Lender Debt, <u>provided</u> that the Committee may spend up to $25,000 (the "***Investigation Budget***") for the fees and expenses incurred in connection with the investigation of, but not the litigation, objection or any challenge to, any Pre-Petition Security Interest, Pre-Petition ABL Lender Debt, Pre-Petition Term Lender Debt, or Pre-Petition Loan Documents; (b) asserting or prosecuting any claim or cause of action against any DIP Lender, either DIP Agents, or any Pre-Petition Credit Party, other than to enforce the terms of a DIP Facility or this Interim Order; (c) seeking to modify any of the rights granted under this Interim Order to any DIP Lender or either DIP Agent or any Pre-Petition Credit Party; or (d) objecting to, contesting, delaying, preventing or interfering with in any way with the exercise of rights and remedies by any DIP Credit Party or Pre-Petition Credit Party with respect to any DIP Collateral or Pre-Petition Collateral after the occurrence and during the continuance of an Event of Default, provided that Debtors may contest or dispute whether an Event of Default has occurred and shall be entitled to any notice provisions provided in this Interim Order.

    20.   <u>Preservation of Rights Granted Under This Interim Order</u>.

    A.   <u>Protection from Subsequent Financing Order</u>.  There shall not be entered in any of these Chapter 11 Cases or in any Successor Case any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is (i) secured by a security interest, mortgage or collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority

administrative status that is equal or senior to the Superpriority Claims granted to DIP Credit Parties herein; provided, however, that nothing herein shall prevent the entry of an order that specifically provides for, as a condition to the granting of the benefits of clauses (i) or (ii) above, the Full Payment of all of the DIP Obligations, in the manner required by the DIP Loan Agreements, from the proceeds of such credit or indebtedness, and the termination of any funding commitments under the ABL DIP Facility.

        B.     <u>Rights Upon Dismissal, Conversion or Consolidation</u>.   If any of the Chapter 11 Cases are dismissed, converted or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of any of the Chapter 11 Cases shall affect the rights or remedies of any DIP Credit Party under the DIP Financing Documents or the rights or remedies of any DIP Credit Party or Pre-Petition Credit Party under this Interim Order, and all of the respective rights and remedies hereunder and thereunder of each DIP Credit Party and each Pre-Petition Credit Party shall remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, or substantively consolidated. Unless and until Full Payment of all DIP Obligations and Adequate Protection Claims has occurred, it shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, the Adequate Protection Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until Full Payment of all DIP Obligations and all Adequate Protection Claims, (ii) such Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such

dismissal, remain binding on all parties in interest, (iii) the other rights granted by this Interim Order shall not be affected, including the rights granted by Paragraph 26 of this Interim Order, and (iv) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

      C.    <u>Survival of Interim Order</u>.  The provisions of this Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases or any Successor Case.

      D.    <u>No Discharge</u>.  None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in any of these Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Debtor has waived such discharge.

      E.    <u>Credit Bid Rights</u>.  Following entry of the Final Order, but without prejudice to any successful challenge brought prior to the Challenge Deadline (defined below), the DIP Lenders, the Pre-Petition Term Credit Agreement Parties and the Pre-Petition ABL Credit Parties shall each have the right to credit bid up to the full amount of the applicable outstanding DIP Obligations, Pre-Petition Term Debt (as applicable) and Pre-Petition ABL Debt (as applicable), in each case including any accrued interest, in any sale of the DIP Collateral (or any part thereof) or Pre-Petition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing same, and whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, subject in each case to the Pre-Petition ABL/Term Lender Intercreditor

Agreement and the ABL/Term DIP Intercreditor Agreement.  For the avoidance of doubt, without prejudice to any successful challenge brought prior to the Challenge Deadline (defined below), no plan of reorganization or liquidation, nor any order entered in connection with a sale of any Debtor's assets under Section 363 of the Bankruptcy Code, in any of these Chapter 11 Cases shall limit or otherwise restrict the right of Pre-Petition ABL Agent, each Pre-Petition Term Agent, or either DIP Agent, subject to any limitations or conditions in the Pre-Petition ABL/Term Lender Intercreditor Agreement and the ABL/Term DIP Intercreditor Agreement, to credit bid for all or any part of the Pre-Petition Collateral or DIP Collateral.

        F.    <u>No Marshaling</u>.  In no event shall any DIP Credit Party or Pre-Petition Credit Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral; and in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of any Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

        G.    <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar order establishing a deadline for the filing of proofs of claims entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, no DIP Credit Party shall be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Agreements and the other DIP Financing Documents applicable thereto without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Financing Documents or prejudice or otherwise adversely affect any DIP

Credit Party's rights, remedies, powers or privileges under any of the DIP Financing Documents or this Interim Order.

      21.   <u>Automatic Perfection of Liens</u>.  The DIP Liens, and subject to the third party challenge rights in Paragraph 27, the ABL Adequate Protection Liens and the Term Adequate Protection Liens shall be deemed valid, binding, enforceable and duly perfected upon entry of this Interim Order.  Neither any Pre-Petition Credit Party nor any DIP Credit Party shall be required to file any UCC 1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including taking possession of any of the DIP Collateral) in order to validate the perfection of any DIP Liens, the ABL Adequate Protection Liens or the Term Adequate Protection Liens, but all of such filings and other actions are hereby authorized by the Court.  The DIP Agents shall be deemed to have "control" over all deposit accounts for all purposes of perfection under the Uniform Commercial Code.  If Pre-Petition ABL Agent, either Pre-Petition Term Agent or either DIP Agent shall, in its discretion, choose to file or record any such mortgages, deeds of trust, security deeds, notices of lien, or UCC-1 financing statements, or take any other action to evidence the perfection of any part of the DIP Liens, the ABL Adequate Protection Liens or the Term Adequate Protection Liens, each Debtor and its respective officers are directed to execute any documents or instruments as Pre-Petition ABL Agent, either Pre-Petition Term Agent or either DIP Agent shall request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.  Any Pre-Petition Credit Party or DIP Credit Party may, in its discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which any Debtor is organized or has or maintains any DIP Collateral or an office, and each filing office is directed to accept such certified copy of this Interim Order for

filing and recording.  Any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more counterparties or requires the payment of any fees or obligations to any governmental entity, in order for a Debtor to pledge, grant, sell, assign or otherwise transfer any such interest or the proceeds thereof is hereby found to be (and shall be deemed to be) inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting either DIP Agent a security interest in and lien on such interest, or the proceeds of any assignment and/or sale thereof by any Debtor, in accordance with the terms of the applicable DIP Financing Documents and this Interim Order.

22.    <u>Reimbursement of Expenses</u>.  All reasonable costs and expenses incurred by a DIP Agent (or, to the extent provided by the applicable DIP Loan Agreements, any DIP Lender) in connection with (i) the negotiation and drafting of any DIP Financing Documents or any amendments thereto, (ii) the preservation, perfection, protection and enforcement of a DIP Agent's and any DIP Lender's rights hereunder or under any DIP Financing Documents, (iii) the collection of any DIP Obligations, or (iv) the monitoring of these Chapter 11 Cases, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, consultants, financial advisors, appraisers and other professionals incurred by a DIP Credit Party Agent in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations owing to such DIP Credit Party and shall be paid by Debtors (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the applicable DIP Financing Documents and the Budget. The payment of the fees, expenses and disbursements set forth in this Paragraph 22 shall be made no later than the Review Period after the receipt by counsel for Debtors, counsel for the Committee, counsel to each DIP Agent, and the U.S. Trustee

of invoices thereof (the "***Invoiced DIP Agent Fees***") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided, however, that Debtors, the Committee, the DIP Agents, and the U.S. Trustee may dispute the payment of any portion of the Invoiced DIP Agent Fees (the "***Disputed Invoiced DIP Agent Fees***") if, within the Review Period, (i)  Debtors pay in full the Invoiced DIP Agent Fees, including the Disputed Invoiced DIP Agent Fees, and (ii) a Debtor, the Committee, a DIP Agent, or the United States Trustee submits  (to the applicable professional, the Debtors, the Committee, the DIP Agents, and the U.S. Trustee) , on at least ten (10) days prior written notice to each affected Pre-Petition Credit Party of any hearing on such motion or other pleading, a written objection setting forth the specific objections to the Disputed Invoiced DIP Agent Fees.

23.    <u>Amendments to DIP Financing Documents</u>.  Debtors and DIP Credit Parties are hereby authorized to implement, in accordance with the terms of the applicable DIP Financing Documents and without further order of the Court, any amendments to and modifications of any of such DIP Financing Documents on the following conditions: (i) the amendment or modification must not constitute a material change to the terms of such DIP Financing Documents, (ii) copies of the amendment or modification must be served upon counsel for the Committee (and, prior to the appointment of a Committee, upon each Debtor's 30 largest unsecured creditors), the U.S. Trustee, and other interested parties specifically requesting such notice, and (iii) notice of the amendment must be filed with the Court. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "material change" shall mean a change to a DIP Financing Document that operates to shorten a DIP Facility or the maturity of the DIP Obligations, to increase the

aggregate amount of the commitments of DIP Lenders under such DIP Facility, to increase the rate of interest other than as currently provided in or contemplated by such DIP Financing Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to a DIP Agent following the occurrence of an Event of Default.  Without limiting the generality of the foregoing, any amendment of a DIP Loan Agreement to postpone or extend any date or deadline therein (including, without limitation, the expiration of the term of a DIP Facility) shall not constitute a "material change" and may be effectuated by Debtors and the applicable DIP Credit Parties without the need for further approval of the Court.

      24.    <u>Events of Default; Remedies</u>.

      A.    <u>Events of Default</u>.  The occurrence of any "Event of Default" under (and as defined in) either of the DIP Loan Agreements, subject to the ABL/Term DIP Intercreditor Agreement, shall constitute an Event of Default under this Interim Order.

      B.    <u>Default Remedies</u>.  Upon the occurrence of an Event of Default and during the continuance thereof, (i) either DIP Agent may file with the Court and serve upon Debtors, counsel for Debtors, counsel for the Committee and the U.S. Trustee a written notice (a "***Default Notice***") describing the Events of Default that exist, in which event effective five (5) business days thereafter, DIP Credit Parties shall be fully authorized, in their sole discretion, to terminate further DIP Credit Extensions under the DIP Facilities, demand payment of all DIP Obligations, and hold and apply any balances in any accounts of Debtors to the payment or cash collateralization of any of the DIP Obligations, subject to the ABL/Term DIP Intercreditor Agreement; (ii)  each Agent shall be deemed to have received complete relief from the automatic stay imposed by Section 362(a) of the Bankruptcy Code with respect to all of the Collateral, effective following the expiration of the Default Notice period, unless the Court has determined

that an Event of Default has not occurred and/or is not continuing. Unless otherwise ordered by the Court, any party in interest's sole recourse with respect to opposing such modification of the automatic stay under Section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default. Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted to Agents, each Agent may, subject to the ABL/Term DIP Intercreditor Agreement, Pre-Petition ABL/Term Lender Intercreditor Agreement and Term Lender Intercreditor Agreement, enforce its DIP Liens, the Pre-Petition Security Interests, and the Adequate Protection Liens with respect to the Collateral, take all other actions and exercise all other remedies under the DIP Financing Documents, the Pre-Petition Loan Documents and applicable law that may be necessary or deemed appropriate to collect any of its DIP Obligations and/or the Pre-Petition Debt, proceed against or realize upon all or any portion of the Collateral as if these Chapter 11 Cases or any superseding Chapter 7 case was not pending, and otherwise enforce any of the provisions of this Interim Order. Any Agent's delay or failure to exercise rights and remedies under the DIP Financing Documents or this Interim Order shall not constitute a waiver of such Agent's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Loan Agreement. In furtherance of Paragraph 18 above, the Term DIP Credit Parties shall provide for cash payment of any Carve-Out in an amount not to exceed the Aggregate Carve-Out Cap from the proceeds of the Term Loan Priority Collateral before any sums are paid to the Term DIP Credit Parties from such proceeds.

        C.    <u>Rights Cumulative</u>. The rights, remedies, powers and privileges conferred upon DIP Credit Parties pursuant to this Interim Order shall be in addition to and cumulative with those contained in the applicable DIP Financing Documents.

25.     <u>Loan Administration</u>.

A.     <u>Continuation of Pre-petition Procedures</u>.  Subject to the ABL/Term DIP Intercreditor Agreement, all previous petition practices and procedures for the payment and collection of proceeds of the ABL Priority Collateral and the Term Loan Priority Collateral, the turnover of cash, and the delivery of property to the Pre-petition ABL Agent and the Pre-Petition Term Agent, including any lockbox and/or blocked depository bank account arrangements are hereby approved and shall continue without interruption after the commencement of the Chapter 11 Cases.

B.     <u>Inspection Rights</u>.  Representatives of each DIP Agent shall be authorized, with prior notice to Debtors, to visit the business premises of any Debtor and its subsidiaries to (i) inspect any Collateral, (ii) inspect and make copies of any books and records of any Debtor, and (iii) verify or obtain supporting details concerning the financial information to be provided by any Debtor hereunder or under any of the DIP Financing Documents, and Debtors shall facilitate the exercise of such inspection rights.

C.     <u>DIP Agents' Right to Retain Professionals</u>.  Each DIP Agent shall be authorized to retain attorneys (including local counsel in the United States and Mexico and ERISA counsel), appraisers, consultants, auditors, field examiners, and financial advisors, at Debtors' expense, which attorneys, appraisers, consultants, auditors, field examiners, and financial advisors shall be afforded reasonable access to the Collateral and each Debtor's business premises and records, during normal business hours, for purposes of monitoring the businesses of Debtors, verifying each Debtor's compliance with the terms of the DIP Financing Documents and this Interim Order, and analyzing or appraising all or any part of the Collateral.

26.      <u>Modification of Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified and lifted to the extent necessary to implement the provisions of this Interim Order and the DIP Financing Documents, thereby permitting each Agent to receive collections and proceeds of Collateral for application to the DIP Obligations, Pre-Petition ABL Debt or Pre-Petition Term Debt as and to the extent provided herein, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens or Adequate Protection Liens, and to enforce the DIP Liens and Adequate Protection Liens as and to the extent authorized by this Interim Order.

27.      <u>Effect of Stipulations on Third Parties; Deadline for Challenges</u>.

A.      Each Debtor's admissions, stipulations, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall be binding upon such Debtor and any successor thereto (including, without limitation any Chapter 7 trustee or Chapter 11 trustee or examiner appointed or elected for such Debtor) under all circumstances and for all purposes.

B.      Each Debtor's admissions, stipulations, agreements and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order shall be binding upon all other parties in interest (including, without limitation, any Committee) under all circumstances and for all purposes unless (a) the Committee or another party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) having requisite standing has timely and properly filed an adversary proceeding or contested matter by no later than the Challenge Deadline (as defined below) (A) objecting to or challenging the amount, validity, perfection, enforceability,

priority or extent of the Pre-Petition ABL Debt, Pre-Petition Term Debt, or any Pre-Petition

Credit Party's Liens or (B) otherwise asserting any defenses, claims, causes of action,

counterclaims or offsets against any Pre-Petition Credit Party or its respective agents, affiliates,

subsidiaries, directors, officers, representatives, attorneys or advisors, and (b) the Court rules in

favor of the plaintiff in any such timely and properly filed adversary proceeding or contested

matter.  As used herein, the term "***Challenge Deadline***" means the date that is the later of (i) in

the case of a party in interest with requisite standing other than the Committee, 75 days after the

Petition Date, (ii) in the case of any Committee, 60 days after the filing of notice of appointment

of a Committee (and subject to the Investigation Budget), (iii) any such later date agreed to in

writing by DIP Agents, in their sole discretion, and (iv) any such later date ordered by the Court

for the cause shown after notice and an opportunity to be heard, <u>provided</u> that such order is

entered before the expiration of any applicable period as set forth in clause (i) or (ii) of this

sentence.

        C.      If no such adversary proceeding or contested matter is timely and properly

filed as of the applicable Challenge Deadline against a Pre-Petition Credit Party or the Court

does not rule in favor of the plaintiff in any such proceeding, then in these Chapter 11 Cases and

in any Successor Case, then each Debtor's admissions, stipulations, agreements and releases

contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of

this Interim Order, shall be binding on all parties in interest. If any such adversary proceeding or

contested matter is properly filed as of such dates, each Debtor's admissions, stipulations,

agreements and releases contained in this Interim Order, including, without limitation, those

contained in Paragraph 5 of this Interim Order, shall nonetheless remain binding and preclusive

on such party except to the extent that such admissions, stipulations, agreements and releases

were expressly challenged in such adversary proceeding or contested matter and the plaintiff prevails on the merits.  Nothing contained in this Interim Order shall vest or confer any person or entity, including any Committee, with standing or authority to pursue or commence any such adversary proceeding or contested matter.

D.     Notwithstanding anything else contained in this Order, if an adversary proceeding or contested matter is timely and properly filed as of the applicable Challenge Deadline against a Pre-Petition Credit Party, the entity prosecuting that timely adversary proceeding or motion can, if successful, challenge the adequate protection provided with respect to any lien avoided and payments made to any Pre-Petition Credit Party and all of the provisions regarding Adequate Protection Claims and Adequate Protection Liens in this Order are qualified by this reservation of the rights of third parties.  If the Adequate Protection payments made exceed the amount of adequate protection to which any Pre-Petition Credit Party is entitled, that excess shall be applied to that Pre-Petition Credit Party's allowed secured claim.

28.     <u>Debtors' Waivers</u>.  At all times during the Chapter 11 Cases, and whether or not an Event of Default has occurred, Debtors irrevocably waive any right that they may have to seek authority (i) to use Cash Collateral except to the extent expressly permitted in this Interim Order; (ii) until Full Payment of all DIP Obligations, Pre-Petition ABL Debt and Pre-Petition Term Debt,  to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from a DIP Credit Party on the terms and conditions set forth herein; (iii) to challenge the application of any payments authorized by this Interim Order pursuant Section 506(b) of the Bankruptcy Code or assert that the value of the ABL Priority Collateral is less than the amount of the Pre-Petition ABL Debt; (iv) to propose or support a plan of reorganization or liquidation that does not provide for the indefeasible payment

in full and satisfaction of all Obligations under both the ABL DIP Facility and the Term DIP Facility, and, subject to entry of the Final Order, all Pre-Petition ABL Debt on or before the effective date of such plan; (v) to challenge that any security interests, claims or liens arising on account of intercompany transactions are junior and subordinate to all DIP Obligations and Pre-Petition Security Interests; or (vi) to seek relief under the Bankruptcy Code, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of any DIP Credit Party or any Pre-Petition Credit Party as provided in this Interim Order or any of the DIP Financing Documents, as applicable, or a DIP Credit Party's exercise of such rights or remedies, in each case subject to the terms of the ABL/Term Intercreditor Agreement.

29.    <u>Intercreditor Agreements</u>.  The provisions of the Pre-Petition ABL/Term Lender Intercreditor Agreement, Term Lender Intercreditor Agreement, and ABL/Term DIP Intercreditor Agreement (as each may be amended by agreement of the parties thereto) shall continue in full force and effect during the pendency of the Chapter 11 Cases or any Successor Case, and all DIP Credit Parties shall be bound by the terms and provisions set forth in the Intercreditor Agreement to which they are a party except to the extent of any inconsistency with the provisions of this Interim Order, in which event the provisions of this Interim Order shall govern and control. All of the types and items of property that are included within the ABL Priority Collateral or Term Loan Priority Collateral (as those terms are defined in the ABL/Term Intercreditor Agreement) and that are created, acquired or arise after the Petition Date shall constitute ABL Priority Collateral and Term Loan Priority Collateral, as applicable, for all purposes of the Pre-Petition ABL/Term Lender Intercreditor Agreement and this Interim Order.

30.    <u>Service of Interim Order</u>.  Promptly after the entry of this Interim Order, Debtors shall mail, by first class mail, a copy of this Interim Order, the Motion (and all exhibits attached to the Motion), and a notice of the Final Hearing, to (without duplication) counsel for each Agent, the U.S. Trustee, counsel for the Committee (or, if the Committee has not been formed and selected counsel as of the entry of this Interim Order, then the 30 largest unsecured creditors of each Debtor), the Internal Revenue Service, all parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules, and all parties known by a Debtor to hold or assert a lien on any assets of a Debtor, and shall file a certificate of service regarding same with the Clerk of the Court. Such service shall constitute good and sufficient notice of the Final Hearing.

31.    <u>No Deemed Control</u>. In determining to make any DIP Credit Extension under a DIP Loan Agreement, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, any Final Order or the DIP Financing Documents, no DIP Credit Party and no Pre-Petition Credit Party shall be deemed to be in control of any Debtor or its operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, <u>et</u> <u>seq.</u>, as amended, or any similar state or federal statute) with respect to the operation or management of such Debtor.

32.    <u>Exculpation</u>.  Nothing in this Interim Order, the DIP Financing Documents, or any other document related to the DIP Facilities shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Credit Party or any Pre-Petition Credit Party any liability for any claims arising from the pre-petition or post-petition activities of any Debtor in the operation of its business or in connection with its restructuring efforts.  So long as a DIP Credit Party or Pre-Petition Credit Party complies with its obligations under the applicable DIP

Financing Documents and its obligations, if any, under this Interim Order and applicable law (i) such DIP Credit Party or Pre-Petition Credit Party shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person or entity; and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by Debtors.

33.    <u>Authorization to File Master Proof of Claim</u>.  The Pre-Petition ABL Agent and the Pre-Petition Term Agents shall not be required shall be required to file any proof of claim with respect to any of the Pre-Petition Debt, all of which shall be due and payable in accordance with the Pre-Petition Term Loan Agreements and the Pre-Petition ABL Loan Documents and the other financing documents applicable thereto without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of the  Pre-Petition Term Loan Agreements or the Pre-Petition ABL Loan Documents or prejudice or otherwise adversely affect any Pre-Petition Term Credit Parties'  rights, remedies, powers or privileges under any of the Pre-Petition Term Loan Agreements, the Pre-Petition ABL Loan Documents, or this Interim Order. Notwithstanding the preceding sentence, if the Pre-Petition ABL Agent or the Pre-Petition Term Agents so elect, and in order to facilitate the processing of claims, to ease the burden upon the Court and interested parties and to reduce unnecessary expense to Debtors' estates that would be incurred by requiring each Pre-Petition Credit Party to file a separate proof claim in each Chapter 11 Case, Pre-Petition ABL Agent and each Pre-Petition Term Agent shall be authorized and empowered (but not required) to (i) file in each Chapter 11 Case a master proof of claim (a "**_Master Proof of Claim_**") on behalf of Pre-Petition ABL Lenders and Pre-Petition Term Lenders on account of their respective claims

against Debtors, and (ii) collect and receive any monies or other property payable or distributable on account of any such claims and to share such payments or property with Pre-Petition Credit Parties and Pre-Petition Term Credit Parties in accordance with their respective Pre-Petition Loan Documents. Upon the filing of a Master Proof of Claim, each Pre-Petition Credit Party on whose behalf such Master Proof of Claim was filed shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claim against Debtors under the applicable Pre-Petition Loan Documents, and the claim of each Pre-Petition Credit Party (and each of its respective successors and assigns) named in such Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each Chapter 11 Case. Neither Pre-Petition ABL Agent nor either Pre-Petition Term Agent shall be required to amend a Master Proof of Claim filed by it to reflect a change in the holder of a claim set forth therein or a reallocation among such holders of the claims asserted therein and resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph and each Master Proof Claim are intended solely for the purpose of administrative convenience and shall not affect any right of any Pre-Petition Credit Party (or its respective successors in interest) to vote separately on any plan of reorganization or liquidation proposed in any of these Chapter 11 Cases.  Neither Pre-Petition ABL Agent nor either Pre-Petition Term Agent shall be required to file with a Master Proof of Claim any instruments, agreements or other documents evidencing the obligations owing by Debtors to any Pre-Petition Credit Party, which instruments, agreements or other documents will be provided upon written request to counsel for Pre-Petition ABL Agent or Pre-Petition Term Agents, as applicable.

      34.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Interim Order shall be binding upon all parties in interest in these Chapter 11 Cases, including, without

limitation, DIP Credit Parties and Debtors and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of DIP Credit Parties and their respective successors and assigns. In no event shall any DIP Credit Party or Pre-Petition Credit Party have any obligation to make DIP Credit Extensions to, or permit the use of the Collateral (including Cash Collateral) by, any Chapter 7 trustee, Chapter 11 trustee or similar responsible person appointed or elected for the estate of any Debtor.

35.    <u>Final Hearing</u>.    The Final Hearing shall be held at __:00 o'clock _.m., on _____, at Courtroom ___, United States Bankruptcy Court, 824 Market Street North, Wilmington, Delaware 19801.  The Final Hearing may be adjourned or postponed without further notice except announcement in open Court.  If no objection to the Motion or this Interim Order is timely filed and asserted at the Final Hearing, then this Interim Order shall continue in effect in accordance with its terms subject to such modifications as the Court may make at the Final Hearing and that are acceptable to DIP Credit Parties.  If any or all of the provisions of this Interim Order are modified, vacated or stayed as the result of any objection timely filed and asserted at the Final Hearing, then, without limiting the provisions of Paragraph 27 hereof, any DIP Obligations incurred prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and DIP Credit Parties shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP

Liens and Superiority Claims granted herein and pursuant to the DIP Financing Documents with respect to all such DIP Obligations.

36.     <u>Objection Deadline</u>.  If any party in interest shall have an objection to any of the provisions of this Interim Order, such party may assert such objection at the Final Hearing, if a written statement setting forth the basis for such objection is filed with the Court and concurrently served upon the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; counsel for Debtors, Gibson Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071-3197, Attn: Robert Klyman, Esq. (rklyman@gibsondunn.com) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com); counsel for ABL DIP Agent, Parker Hudson Rainer & Dobbs LLP, 1500 Marquis Two Tower, 285 Peachtree Center Avenue, Atlanta, Georgia 30303, Attn: C. Edward Dobbs, Esq. (edobbs@phrd.com) and, Richards Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark Collins, Esq. (collins@rlf.com); and counsel for Term DIP Agent, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Dr., Suite 2700, Chicago, Illinois 60606, Attn: Ron E. Meisler, Esq. (ron.meisler@skadden.com) and, Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 920 N. King Street, Wilmington, DE 19801, Attn: Sarah E. Pierce, Esq. (sarah.pierce@skadden.com) (so that such objections and responses are filed on or before __:00 _.m., prevailing Eastern time on _____, 2015. If an objecting party shall fail to appear at the Final Hearing and assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

37.    <u>Insurance</u>.  To the extent Pre-Petition ABL Agent and/or either Pre-Petition Term Agent is listed as loss payee under any Debtor's insurance policies, ABL DIP Agent and/or Term DIP Agent shall also deemed to be the loss payee under such Debtor's insurance policies and, subject to the ABL/Term Intercreditor Agreement, shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies.

38.    <u>DIP Collateral Rights</u>.  Except as expressly permitted in this Interim Order and the DIP Financing Documents, in the event that any person or entity holds a lien on or security interest in DIP Collateral that is junior or subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full and in cash and the complete satisfaction of all DIP Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the applicable DIP Lenders, and shall immediately turnover such proceeds to the DIP Lenders for application in accordance with this Interim Order and the DIP Financing Documents.

39.    <u>Conditions Precedent</u>.  The DIP Lenders shall have no obligation to make any DIP Loans under the respective DIP Financing Documents unless the conditions precedent to making such extensions of credit under the respective DIP Financing Documents have been satisfied in full or waived in accordance with such DIP Financing Documents.

40.    <u>No Impact on Certain Contracts or Transactions</u>.  No rights of any entity in connection with a contract or transaction of the kind listed in Sections 555, 556, 559, 560 or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Interim Order.

41.    <u>Effectiveness; Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable <u>nunc</u> <u>pro</u> <u>tunc</u> to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

42.    <u>Inconsistencies</u>.    To the extent that any provisions in the DIP Financing Documents are expressly inconsistent with any of the provisions of this Interim Order, the provisions of this Interim Order shall govern and control.

43.    <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

44.    <u>Retention of Jurisdiction</u>.  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for any Debtor notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

Dated: March _____, 2015
        Wilmington, Delaware

_____

UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Standard Register**
*Advisors: Fee Schedule*

| | 8-Mar-15 | 15-Mar-15 | 22-Mar-15 | 29-Mar-15 | 5-Apr-15 | 12-Apr-15 | 19-Apr-15 | 26-Apr-15 | 3-May-15 | 10-May-15 | 17-May-15 | 24-May-15 | 31-May-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | - | - | - | - | - | 3,068 | - | - | - | 2,918 | - | - | - |
| Plus: New Billings: Lazard | 100 | - | - | - | 100 | - | - | - | 100 | - | - | - | 100 |
| Plus: New Billings: McKinsey | 1,400 | - | - | - | 600 | - | - | - | 750 | - | - | - | 750 |
| Plus: New Billings: Gibson Dunn | 1,000 | - | - | - | 1,000 | - | - | - | 750 | - | - | - | 1,000 |
| Plus: New Billings: Dinnsmore | - | - | - | - | 125 | - | - | - | 125 | - | - | - | 125 |
| Plus: New Billings: Local Counsel | - | - | - | - | 150 | - | - | - | 150 | - | - | - | 150 |
| Plus: New Billings: Palisades | 75 | - | - | - | 75 | - | - | - | 75 | - | - | - | - |
| Plus: New Billings: Silver Point Financial Advisor | | | | | | | | | | | | | |
|   Andrews Advisory | 50 | - | - | - | 100 | - | - | - | 100 | - | - | - | 75 |
|   Legal Counsel (Skadden) | 550 | - | - | - | 350 | - | - | - | 250 | - | - | - | 250 |
| Plus: New Billings: Unsecured Creditor Committee | | | | | | | | | | | | | |
|   Legal Counsel | - | - | - | - | 100 | - | - | - | 100 | - | - | - | 100 |
|   Financial Advisor | - | - | - | - | 100 | - | - | - | 100 | - | - | - | 100 |
| Plus: Bank of America | | | | | | | | | | | | | |
|   Financial Advisor | - | - | - | - | 100 | - | - | - | 100 | - | - | - | 100 |
|   Legal Counsel | - | - | - | - | 150 | - | - | - | 150 | - | - | - | 150 |
| Plus: Claims Agent | 35 | - | - | - | 150 | - | - | - | 200 | - | - | - | 40 |
| Plus: New Billings: [Other] | 150 | - | - | - | 68 | - | - | - | 68 | - | - | - | 68 |
| **Total Invoicing: Advisors** | 3,360 | - | - | - | 3,168 | - | - | - | 3,018 | - | - | - | 3,008 |
| Less: Payments: Lazard | (100) | | | | (80) | | | | (80) | | | | (80) |
| Less: Payments: McKinsey | (1,400) | | | | | (480) | | | | (600) | | | |
| Less: Payments: Gibson Dunn | (1,000) | | | | | (800) | | | | (600) | | | |
| Less: Payments: Denzmore | | | | | | (100) | | | | (100) | | | |
| Less: Payments: Local Counsel | - | | | | | (120) | | | | (120) | | | |
| Less: Payments: Palisades | (75) | | | | | (60) | | | | (60) | | | |
| Less: Payments: Silver Point Financial Advisor | | | | | | | | | | | | | |
|   Andrews Advisory | (50) | | | | | (100) | | | | (100) | | | |
|   Legal Counsel (Skadden) | (550) | | | | | (350) | | | | (250) | | | |
| Less: Payments: Unsecured Creditor Committee | | | | | | | | | | | | | |
|   Legal Counsel | - | | | | | (80) | | | | (80) | | | |
|   Financial Advisor | - | | | | | (80) | | | | (80) | | | |
| Less: Bank of America | | | | | | | | | | | | | |
|   Financial Advisor | - | | | | | (100) | | | | (100) | | | |
|   Legal Counsel | | | | | | (150) | | | | (200) | | | |
| Less: Claims Agent | (35) | | | | | (150) | | | | (150) | | | |
| Less: Payments: [Other] | (150) | | | | | (68) | | | | (68) | | | |
| **Total Payments: Advisors** | (3,360) | - | - | - | (80) | (2,638) | - | - | (80) | (2,508) | - | - | (80) |
| **Ending Invoice Balance: Advisors** | - | - | - | - | 3,088 | 430 | - | - | 2,938 | 410 | - | - | 2,928 |
|   Less Holdback Adjustment | - | - | - | - | (20) | (430) | - | - | (20) | (410) | - | - | (20) |
| **Ending Invoice Balance: Advisors** | - | - | - | - | 3,068 | - | - | - | 2,918 | - | - | - | 2,908 |
| **Beginning Balance: Holdback** | - | - | - | - | - | 540 | 540 | 540 | 540 | 1,040 | 1,040 | 1,040 | 1,040 |
| Plus: New Billings: Lazard | | | | | 20 | | | | 20 | | | | 20 |
| Plus: New Billings: McKinsey | | | | | 120 | | | | 150 | | | | 150 |
| Plus: New Billings: Gibson Dunn | | | | | 200 | | | | 150 | | | | 200 |
| Plus: New Billings: Denzmore | | | | | 25 | | | | 25 | | | | 25 |
| Plus: New Billings: Local Counsel | | | | | 30 | | | | 30 | | | | 30 |
| Plus: New Billings: Palisades | | | | | 15 | | | | 15 | | | | - |
| Plus: New Billings: Silver Point | | | | | | | | | | | | | |
|   Financial Advisor | | | | | 20 | | | | 20 | | | | 15 |
|   Legal Counsel (Skadden) | | | | | 70 | | | | 50 | | | | 50 |
| Plus: New Billings: Unsecured Creditor Committee | | | | | | | | | | | | | |
|   Legal Counsel | | | | | 20 | | | | 20 | | | | 20 |
|   Financial Advisor | | | | | 20 | | | | 20 | | | | 20 |
| Total Holdbacks during week | - | - | - | - | 540 | - | - | - | 500 | - | - | - | 530 |
| Total Holdback Balance before payment | - | - | - | - | 540 | 540 | 540 | 540 | 1,040 | 1,040 | 1,040 | 1,040 | 1,570 |
| Less: Holdback: Lazard | | | | | | | | | | | | | |
| Less: Holdback: McKinsey | | | | | | | | | | | | | |
| Less: Holdback: Gibson Dunn | | | | | | | | | | | | | |
| Less: Holdback: Denzmore | | | | | | | | | | | | | |
| Less: Holdback: Local Counsel | | | | | | | | | | | | | |
| Less: Holdback: Palisades | | | | | | | | | | | | | |
| Less: Holdback: Silver Point Financial Advisor | | | | | | | | | | | | | |
|   Financial Advisor | | | | | | | | | | | | | |
|   Legal Counsel (Skadden) | | | | | | | | | | | | | |
| Less: Holdback: Unsecured Creditor Committee | | | | | | | | | | | | | |
|   Legal Counsel | | | | | | | | | | | | | |
|   Financial Advisor | | | | | | | | | | | | | |
| Less: Payment of Holdback | | | | | | | | | | | | | |
| **Ending Holdback Balance: Advisors** | - | - | - | - | 540 | 540 | 540 | 540 | 1,040 | 1,040 | 1,040 | 1,040 | 1,570 |
| **Total Professional Fee Balance** | - | - | - | - | 3,608 | 540 | 540 | 540 | 3,958 | 1,040 | 1,040 | 1,040 | 4,478 |

# **EXHIBIT B**

## **DIP ABL CREDIT AGREEMENT**

Execution Version

# SUPER-PRIORITY PRIMING DEBTOR IN POSSESSION DELAYED DRAW TERM LOAN CREDIT AGREEMENT,

dated as of March 12, 2015,

among

THE STANDARD REGISTER COMPANY,
STANDARD REGISTER INTERNATIONAL, INC.,
STANDARD REGISTER TECHNOLOGIES, INC.,
IMEDCONSENT, LLC,
STANDARD REGISTER OF PUERTO RICO INC.,
STANDARD REGISTER HOLDING COMPANY,
STANDARD REGISTER TECHNOLOGIES CANADA ULC,
STANDARD REGISTER MEXICO HOLDING COMPANY,
STANDARD REGISTER HOLDING, S. de R.L. de C.V.
STANDARD REGISTER de MEXICO, S. de R.L. de C.V.
STANDARD REGISTER SERVICIOS, S. de R.L. de C.V.

as Borrowers,

THE SUBSIDIARY GUARANTORS FROM TIME TO TIME PARTIES HERETO,
as the Subsidiary Guarantors,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME PARTIES HERETO,
as the Lenders,

and

SILVER POINT FINANCE, LLC,
as the Administrative Agent and the Collateral Agent.

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND ACCOUNTING TERMS ..........................................2
    1.1    Defined Terms ........................................................................ 2
    1.2    Use of Defined Terms .......................................................... 32
    1.3    Cross-References .................................................................. 32
    1.4    Accounting and Financial Determinations............................ 32
ARTICLE 2 LOANS, CLOSING RATE AND NOTES .............................................. 32
    2.1    Loans.................................................................................... 32
    2.2    Loan Rate ............................................................................ 32
    2.3    Continuation and Conversion Elections................................ 33
    2.4    Funding ................................................................................ 33
    2.5    Register; Notes .................................................................... 33
ARTICLE 3 REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ................ 34
    3.1    Repayments and Prepayments; Application .......................... 34
    3.2    Interest Provisions ............................................................... 36
    3.3    Fees ..................................................................................... 37
    3.4    Nature of Obligations.......................................................... 38
ARTICLE 4 CERTAIN LIBO RATE AND OTHER PROVISIONS .......................... 39
    4.1    LIBO Rate Lending Unlawful .............................................. 39
    4.2    Deposits Unavailable ........................................................... 39
    4.3    Increased LIBO Rate Loan Costs, etc .................................. 40
    4.4    Funding Losses .................................................................... 40
    4.5    Increased Capital Costs ....................................................... 40
    4.6    Taxes ................................................................................... 41
    4.7    Payments, Computations; Proceeds of Collateral, etc .......... 44
    4.8    Sharing of Payments ............................................................ 45
    4.9    Setoff................................................................................... 45
    4.10   Replacement of Lenders ...................................................... 46
    4.11   Change in Lending Office..................................................... 46
ARTICLE 5 CONDITIONS TO LOANS .................................................................... 47
    5.1    Conditions to Close ............................................................. 47
    5.2    Conditions to Each Loan ...................................................... 50
ARTICLE 6 REPRESENTATIONS AND WARRANTIES ........................................ 52
    6.1    Organization and Qualification............................................ 52
    6.2    Power and Authority ............................................................ 52
    6.3    Legally Enforceable Agreement .......................................... 53
    6.4    Capital Structure ................................................................. 53
    6.5    Reserved.............................................................................. 53
    6.6    Business Locations; Agent for Process................................. 53
    6.7    Status of Obligations; Perfection and Priority of Security Interests ............... 53
    6.8    Financial Information........................................................... 54
    6.9    Brokers ................................................................................ 54
    6.10   Governmental Approvals ..................................................... 54
    6.11   Compliance with Applicable Laws ....................................... 54

6.12    Litigation..................................................................................54
6.13    No Defaults..............................................................................55
6.14    Investment Company Act..........................................................55
6.15    Margin Stock............................................................................55
6.16    Reserved...................................................................................55
6.17    Use of Proceeds........................................................................55
ARTICLE 7 COVENANTS ............................................................................56
7.1    Affirmative Covenants..............................................................56
7.2    Negative Covenants ..................................................................64
ARTICLE 8 EVENTS OF DEFAULT.............................................................68
8.1    Listing of Events of Default.......................................................68
8.2    [Reserved]................................................................................73
8.3    Action if Event of Default..........................................................73
ARTICLE 9 THE ADMINISTRATIVE AGENT ..............................................73
9.1    Actions......................................................................................73
9.2    Exculpation...............................................................................74
9.3    Successor...................................................................................76
9.4    Loans by the Administrative Agent ............................................77
9.5    Credit Decisions........................................................................77
9.6    Copies, etc.................................................................................77
9.7    Reliance by Administrative Agent..............................................77
9.8    Defaults.....................................................................................78
9.9    Posting of Approved Electronic Communications ......................78
9.10   Proofs of Claim.........................................................................79
9.11   Intercreditor Agreements...........................................................80
ARTICLE 10 MISCELLANEOUS PROVISIONS............................................80
10.1   Waivers, Amendments, etc ........................................................80
10.2   Notices; Time............................................................................81
10.3   Payment of Costs and Expenses ................................................82
10.4   Indemnification.........................................................................82
10.5   Survival.....................................................................................83
10.6   Severability................................................................................83
10.7   Headings....................................................................................84
10.8   Execution in Counterparts, Effectiveness, etc ...........................84
10.9   Governing Law; Entire Agreement.............................................84
10.10  Successors and Assigns..............................................................84
10.11  Sale and Transfer of Loans; Participations in Loans; Notes...........84
10.12  Other Transactions....................................................................87
10.13  Forum Selection and Consent to Jurisdiction ............................88
10.14  Waiver of Jury Trial..................................................................88
10.15  Confidentiality..........................................................................88
10.16  Counsel Representation..............................................................90
10.17  Patriot Act.................................................................................90
10.18  Authorization of Administrative Agent ......................................90
10.19  Releases.....................................................................................90
10.20  Pre-Petition Term Loan Facility ................................................91

ARTICLE 11 CERTAIN COLLATERAL ADMINISTRATION .......................................... 92

    11.1    Insurance of Collateral; Condemnation Proceeds .................................... 92

    11.2    Protection of Collateral ........................................................................... 93

    11.3    Defense of Title to Collateral .................................................................. 93

SCHEDULE I -       Disclosure Schedule

SCHEDULE II-      Percentages and Amounts; LIBOR Office; Domestic Office

SCHEDULE III-     Term Loan Commitments

SCHEDULE IV-     Post Closing Obligations

EXHIBIT A   -     Form of Note

EXHIBIT A-1      Closing Date Budget

EXHIBIT B   -     Form of Continuation/Conversion Notice

EXHIBIT C   -     Form of Lender Assignment Agreement

EXHIBIT D   -     Form of Compliance Certificate

EXHIBIT E   -     Reserved

EXHIBIT F   -     Form of Pledge and Security Agreement

EXHIBIT G   -     [Reserved]

EXHIBIT H   -     Form of Interim Financing Order

EXHIBIT I    -     [Reserved]

EXHIBIT J   -     Initial 13 Week Profession Fee Budget

SUPER-PRIORITY PRIMING DEBTOR IN POSSESSION DELAYED DRAW TERM LOAN CREDIT AGREEMENT

THIS SUPER-PRIORITY PRIMING DEBTOR IN POSSESSION DELAYED DRAW TERM LOAN CREDIT AGREEMENT, dated as of March 12, 2015 (this "Agreement"), is by and among THE STANDARD REGISTER COMPANY, an Ohio corporation and a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, with its chief executive office and principal place of business at 600 Albany Street, Dayton, Ohio 45417 ("Standard Register"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holdings"), STANDARD REGISTER OF PUERTO RICO INC., a Delaware corporation ("SR Puerto Rico"), STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"), STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"), STANDARD REGISTER HOLDING, S. de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable*, incorporated under the laws of Mexico ("SR MX Holdings"), STANDARD REGISTER de MEXICO, S. de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable*, incorporated under the laws of Mexico ("SR Mexico"), STANDARD REGISTER SERVICIOS, S. de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable*, incorporated under the laws of Mexico ("SR Servicios"; each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, a "Borrower" and collectively, jointly and severally, the "Borrowers"), together with any Subsidiaries of the Borrowers who become a party hereto as Subsidiary Guarantors (the "Subsidiary Guarantors", and collectively with the Borrowers, the "Credit Parties"), the various financial institutions and other Persons from time to time parties hereto and listed on the signature pages hereto and their respective successors and assigns and permitted assigns which become "Lenders" as provided herein (the "Lenders"), and SILVER POINT FINANCE, LLC, as the administrative agent (in such capacity, the "Administrative Agent"), and as the collateral agent (in such capacity, the "Collateral Agent"), for the Lenders.  Capitalized terms not otherwise defined are used as defined in Section 1.1 hereof.

W I T N E S S E T H:

WHEREAS, On March 12, 2015 (the "Petition Date"), the Borrowers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having competent jurisdiction over the Cases from time to time, the "Bankruptcy Court") and commenced cases numbered [    ], [    ], [    ], [    ], [    ], [    ], [    ], [    ] and [    ] respectively (each, a "Case," and, collectively, the "Cases"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code (in such capacities, collectively, the "Debtors");

WHEREAS, the Debtors are parties to that certain Amended and Restated Loan and Security Agreement dated August 1, 2013 (as amended, supplemented or otherwise modified through the Closing Date, the "Prepetition ABL Credit Agreement") by and among, *inter alia*, Standard Register, the subsidiary guarantors a party thereto, Bank of America, N.A., as

administrative agent thereunder and the lenders thereunder (the "Prepetition Revolving Lenders") pursuant to which the Prepetition Revolving Lenders provided Revolver Loans (as defined therein) and other financial accommodations to the Debtors;

WHEREAS, concurrently herewith on the Closing Date and in connection with the Cases, the Debtors are obtaining a senior secured super priority debtor in possession asset based revolving credit facility in the maximum committed amount of $125,000,000 (as more particularly described below, the "ABL DIP Facility") from the Prepetition Revolving Lenders, the proceeds of which will be used by Borrowers (i) to fund working capital and other general corporate expenses (including the administration of the Cases) in accordance with the Budget (subject to Permitted Variances), and (ii) to refund and repay the outstanding Obligations under and as defined in the Prepetition ABL Credit Agreement upon entry by the Bankruptcy Court of the Final Financing Order;

WHEREAS, the Borrowers desire to obtain term loans from time to time during the term of this Agreement in order (i) to fund working capital and other general corporate expenses (including the administration of the Cases) in accordance with the Budget (subject to Permitted Variances) if and to the extent of insufficient availability under the ABL DIP Credit Facility, and (ii) to pay certain fees, administrative costs and expenses incurred in connection with the Cases and the debtor-in-possession financing contemplated hereunder (including those of the Administrative Agent and Lenders and their counsel and financial advisors (if any));

WHEREAS, the Borrowers have requested that the Lenders provide a term loan credit facility for the purposes described above, and the Lenders are willing to do so on the terms and conditions set forth herein;

WHEREAS, the parties are, concurrently herewith entering into the ABL-TL DIP Intercreditor Agreement which shall govern the relative rights and priority of Liens securing each of the ABL DIP Facility and this Facility;

WHEREAS, the Borrowers, are affiliated and engaged in interrelated businesses, and each Borrower will derive substantial direct and indirect benefit from extensions of credit pursuant to this Agreement;

NOW, THEREFORE, the parties hereto agree as follows.

## ARTICLE 1
## DEFINITIONS AND ACCOUNTING TERMS

1.1    Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"ABL Administrative Agent" means Bank of America, N.A., in its capacity as administrative agent under the ABL DIP Facility or such other administrative agent designated as such from time to time under the ABL DIP Credit Agreement.

"ABL Availability" means on any date, the principal amount of Revolver Loans (as defined in the ABL DIP Credit Agreement) that the Borrowers and their Subsidiaries are entitled to borrow on such date under the ABL DIP Credit Agreement.

"ABL Bank Product Obligations" has the meaning ascribed to the term "Bank Product Obligations" (or such corresponding term) in the ABL DIP Credit Agreement.

"ABL DIP Credit Agreement" means that certain Post Petition Loan and Security Agreement dated as of the Closing Date by and among the Borrowers, the ABL Lenders party thereto and Bank of America, N.A., as administrative agent, as such agreement may, in accordance herewith and the ABL-TL DIP Intercreditor Agreement be amended, supplemented, waived or otherwise modified from time to time.

"ABL DIP Documents" has the meaning ascribed to the term "Loan Documents" (or such corresponding term) as defined in the ABL DIP Credit Agreement, as the same may be amended, restated, supplemented, waived, otherwise modified, extended, renewed, refinanced or replaced from time to time in accordance with the terms of the ABL-TL DIP Intercreditor Agreement and the Financing Orders.

"ABL DIP Facility" is defined in the recitals and means the collective reference to the ABL DIP Credit Agreement and the other ABL DIP Documents, and any amendments, supplements, modifications, extensions, renewals or restatements thereof (in each case, in accordance with the ABL-TL DIP Intercreditor Agreement and the Financing Orders), together with the ABL Revolving Loans and other financial accommodations made pursuant thereto or in connection therewith and the Liens created thereby and the other provisions contained therein.

"ABL Lender" has the meaning ascribed to the term "Lender" (or such corresponding term) as defined under the ABL DIP Credit Agreement.

"ABL Letters of Credit" has the meaning ascribed to the term "Letter of Credit" (or such corresponding term) as defined under the ABL DIP Credit Agreement.

"ABL Loans" means "Revolver Loans" as defined in the ABL DIP Credit Agreement.

"ABL Obligations" has the meaning ascribed to the term "Obligations" (or such corresponding term) as defined in the ABL DIP Credit Agreement.

"ABL Priority Collateral" has the meaning set forth in the ABL-TL DIP Intercreditor Agreement.

"ABL-TL DIP Intercreditor Agreement" means that certain Intercreditor Agreement, dated the date hereof, executed and delivered by the Administrative Agent, the Second Lien Administrative Agent, the ABL Administrative Agent and the Credit Parties, pursuant to the terms of this Agreement, as amended, restated, supplemented, amended and restated, replaced or otherwise modified from time to time.

3

"Acquisition" means the acquisition by the Purchaser of all or substantially all of the Borrowers' assets and properties pursuant to and in accordance with the Purchase Agreement and the Sale Order.

"Additional Mortgage" means each mortgage, deed of hypothec, debenture, pledge, deed of trust or agreement executed and delivered by any Credit Party in favor of the Collateral Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement in form and substance satisfactory to the Administrative Agent, under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Adjusted Net Earnings" means, with respect to any fiscal period, the consolidated net income (or loss) for such fiscal period of the Borrowers, all as reflected on the financial statement of Standard Register supplied to the Lenders pursuant to Section 7.1.3 hereof, but excluding:

> (i)      any income or loss arising from the sale of capital assets outside the Ordinary Course of Business;

> (ii)     any income arising from any write-up of assets during such period;

> (iii)    income or loss of any Subsidiary accrued prior to the date it became a Subsidiary;

> (iv)    income or loss of any Person, substantially all the assets of which have been acquired in any manner by a Borrower, realized by such Person prior to the date of such acquisition;

> (v)     income or loss of any entity (other than a Subsidiary Guarantor of a Borrower) in which such Borrower has an ownership interest unless such income has actually been received by such Borrower in the form of cash Distributions;

> (vi)    any portion of the income of any Subsidiary which for any reason is unavailable for payment of Distributions to a Borrower or a Subsidiary Guarantor; and

> (vii)   any income or loss arising from extraordinary items, all as determined in accordance with GAAP.

Notwithstanding the foregoing, for purposes of calculating Adjusted Net Earnings, Inventory shall be accounted for on a first in, first out basis.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 9.3.

"Affected Lender" is defined in Section 4.10.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly,

4

(a)     to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or

(b)     to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Agreement" means, on any date, this Super-Priority Priming Debtor In Possession Delayed Draw Term Loan Credit Agreement as originally in effect on the Closing Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

"Alternate Base Rate" means, on any date and with respect to all Base Rate Loans, a fluctuating rate of interest per annum (rounded upward, if necessary, to the next highest 1/16 of 1%) equal to the higher of

(a)     the greater of (I) 1.50% per annum and (II) the greater of (x) the Base Rate in effect on such day and (y) the Federal Funds Rate in effect on such day *plus* ½ of 1%; and

(b)     the LIBO Rate (Reserve Adjusted) for an Interest Period of one (1) month *plus* 1.00%.

Changes in the rate of interest on that portion of any Loans maintained as Base Rate Loans will take effect simultaneously with each change in the Alternate Base Rate.

"Applicable Law" means, with respect to any Person, all laws (including, without limitation, the Bankruptcy Code, as applicable), rules, regulations and legally binding governmental guidelines applicable to the Person and its Property, conduct, transaction, agreement or matter in question, including all applicable statutory law and common law, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities (having the force of law) and such Person's Organic Documents.

"Applicable Margin" means, with respect to (1) all Loans maintained as LIBO Rate Loans, 9.50% per annum, and (2) all Loans maintained as Base Rate Loans, 8.50% per annum.

"Approved Fund" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"Approved Insurer" means any independent insurer with a minimum general policyholder rating of "A" and a minimum financial rating of "7" published in *Best's Key Rating Guide and/or Best's Insurance Reports* issued by the A. M. Best Company or any successor nationally recognized rating organization.

"Asset Sale Prepayment Event" means any sale of any business units, assets or other property of a Borrower or any of its Subsidiaries not in the Ordinary Course of Business (including any Disposition of any Capital Securities of any Subsidiary of a Borrower owned by such Borrower or a Subsidiary, including any sale of any Capital Securities of any Subsidiary) or to the extent otherwise expressly provided under the Financing Orders.  Notwithstanding the foregoing, the term "Asset Sale Prepayment Event" shall not include any (a) transaction permitted by Section 7.2.2, or (b) the Disposition of ABL Priority Collateral (as defined in the ABL-TL DIP Intercreditor Agreement); provided, that this clause (b) shall only apply prior to a Discharge of ABL Obligations (as defined in the ABL-TL DIP Intercreditor Agreement).

"Assignee Lender" means each future Lender which signs a Lender Assignment Agreement pursuant to Section 10.11.

"Authorized Officer" means, relative to any Credit Party, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Administrative Agent pursuant to Section 5.1(b).

"Avoidance Actions" means the Credit Parties' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Base Rate" means, at any time, an annual rate equal to the rate of interest in effect for such day as publicly announced from time to time by JPMorgan Chase as its "prime rate" for Dollars loaned in the United States.  The "prime rate" is a rate set by JPMorgan Chase based upon various factors including JPMorgan Chase's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.

"Base Rate Loan" means a Loan bearing interest at a fluctuating rate determined by reference to the Alternate Base Rate.

"Borrower" and "Borrowers" are defined in the preamble to this Agreement.

"Borrower's Knowledge" means the knowledge of the Chief Financial Officer, Chief Executive Officer, Corporate Controller, or Senior Manager of Treasury Operations of the applicable Borrower or Borrowers.

"Budget" means, as applicable, (a) an initial 13-week cash forecast and budget commencing with the week during which the Petition Date occurs, of the Borrowers' and their Subsidiaries' consolidated projected  (i) cash receipts and cash operating disbursements for such 13-week period, on a weekly basis, (which such forecasts of cash receipts and cash operating disbursements shall be in form and substance satisfactory to the Administrative Agent (after reasonable consultation with the Required Lenders)), (ii) operating cash flow for such 13-week period, and (iii) a statement of the actual amounts of each line item for the preceding two (2)

6

weeks together with a variance analysis from the previously delivered Budget, together with an explanation of any material variances or material prospective changes to such Budget, (b) back up schedules and supporting information consistent with past practice, and (c) an updated Budget for each successive 13-week period thereafter, which shall, in each case, include detailed line item receipts and expenditures, including the amount of professional fees and expenses for each professional, together with appropriate supporting schedules and information. The Budget (including, for the avoidance of doubt, the initial Budget and any updated Budget) shall be in form and substance acceptable to the Administrative Agent. The Budget in effect on the Closing Date is attached hereto as Exhibit A-1.

"Business Day" means (a) any day which is neither a Saturday nor Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York and (b) relative to the making, continuing, prepaying or repaying of any LIBO Rate Loans, any day which is a Business Day described in clause (a) above, and which is also a day on which dealings in Dollars are carried on in the London interbank Eurodollar market.

"Capital Expenditures" means, for any period, (a) the additions to property, plant and equipment and other capital expenditures of the Borrowers and their consolidated Subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the Borrowers for such period prepared in accordance with GAAP and (b) Capitalized Lease Liabilities or Synthetic Lease Obligations incurred by a Borrower and its consolidated Subsidiaries during such period.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital (including all capital stock, partnership, membership or other equity interests in such Person), whether now outstanding or issued after the Closing Date and whether or not certificated.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Carve Out" shall have the meaning given such term in the Interim Financing Order (or, when entered, the Final Financing Order).

"Cash Equivalent Investment" means, at any time: (i) marketable direct obligations issued or unconditionally guaranteed by the United States government and backed by the full faith and credit of the United States government having maturities of not more than 12 months from the date of acquisition; (ii) domestic certificates of deposit and time deposits having maturities of not more than 12 months from the date of acquisition, bankers' acceptances having maturities of not more than 12 months from the date of acquisition and overnight bank deposits, in each case issued by any commercial bank organized under the laws of the United States, any state thereof or the District of Columbia, which at the time of acquisition are rated A-1 (or better)

by S&P or P-1 (or better) by Moody's, and (unless issued by a Lender) not subject to offset rights in favor of such bank arising from any banking relationship with such bank; (iii) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (i) and (ii) entered into with any financial institution meeting the qualifications specified in clause (ii) above; and (iv) commercial paper having at the time of investment therein or a contractual commitment to invest therein a rating of A-1 (or better) by S&P or P-1 (or better) by Moody's, and having a maturity within 9 months after the date of acquisition thereof.

"Casualty Event" means, with respect to any Collateral, any loss of or damage to, or any condemnation or other taking by a Governmental Authority of property for which such Collateral for which a Borrower or any of its Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation. Notwithstanding the foregoing, the term "Casualty Event" shall not include any transaction permitted by Section 7.2.2.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Change in Control" means the occurrence of any of the following events after the date of this Agreement: (a) any Person or group (other than the Permitted Holders) shall own beneficially (as defined in Rule 13d-3 of the SEC under the Exchange Act or any successor provision thereto) more than 50% of the aggregate Voting Power of Standard Register, (b) any "Change in Control" or similar event or circumstance, however defined or designated, under any Material Contract; (c) the first day on which a majority of the members of the Board of Directors of Standard Register are not Continuing Directors; or (d) the sale of all, or substantially all, the assets of the Borrowers (on a consolidated basis).

"Closing Date" means the date on which all the conditions precedent set forth in Section 5.1 hereof are satisfied or waived by the Required Lenders in writing (which, in no event, shall be more than three (3) Business Days following the date the Bankruptcy Court enters the Interim Financing Order (or such later date as the Administrative Agent shall agree in its sole discretion)).

"Closing Date Loan" means a Loan in the amount of $1,050,000 deemed made and funded on the Closing Date in order to pay the closing fee set forth in Section 3.3.1 hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of the Property and interests in Property described in any of the Security Documents as security for the payment or performance of any of the Obligations, subject to the Intercreditor Agreements and the Financing Orders.

"Communications" is defined in clause (a) of Section 9.9.

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of Standard Register, substantially in the form of Exhibit D hereto, together with such changes thereto as the Administrative Agent may (acting at the written request of the

Required Lenders) from time to time request for the purpose of monitoring the Borrowers' compliance with the covenants contained herein.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness (or, solely for purposes of the definition of Investment, other obligations) of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of Standard Register, substantially in the form of Exhibit B hereto.

"Continuing Director" means, at any date, an individual (a) who is a member of the Board of Directors of Standard Register on the date hereof, (b) who, as at such date, has been a member of such Board of Directors for at least the twelve preceding months, or (c) who has been nominated to be a member of such Board of Directors by a majority of the other Continuing Directors then in office.

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrowers, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Covered Plans" is defined in the definition of "EBITDAP".

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Credit Party in substantially the form of Exhibit C to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Credit Parties" means the collective reference to the Borrowers and the Subsidiary Guarantors.

"Debt Incurrence Prepayment Event" means any issuance or incurrence by a Borrower or any of its Subsidiaries of any Indebtedness (but excluding any Indebtedness permitted to be issued or incurred under Section 7.2.9).

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Accounts" means all of a Person's demand, time, savings, passbook, money market or other depository accounts, and all certificates of deposit, maintained by such Person with any bank, savings and loan association, credit union or other depository institution.

"<u>Disclosure Schedule</u>" means the Disclosure Schedule attached hereto as <u>Schedule I</u>, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrowers with the written consent of the Required Lenders.

"<u>Disposition</u>" (or similar words such as "<u>Dispose</u>") means any sale, transfer, lease, sale-leaseback, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Credit Party) in a single transaction or series of transactions.

"<u>Disqualified Capital Securities</u>" means any Capital Securities which, by its terms (or by the terms of any security or other Capital Securities into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change in control or asset sale so long as any right of the holders thereof upon the occurrence of a change in control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable), in each case, prior to the date that is ninety-one (91) days after the Stated Maturity Date, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, prior to the date that is ninety-one (91) days after the Stated Maturity Date, except as a result of a change in control or an asset sale or the death, disability, retirement, severance or termination of employment or service of a holder who is an employee or director of Holdings or a Subsidiary, in each case so long as any such right of the holder (1) is not effective during the continuance of an Event of Default and is not effective to the extent that such redemption would result in a Default or an Event of Default or (2) is subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable, (c) requires the payment of any cash dividend or any other scheduled cash payment constituting a return of capital, in each case, prior to the date that is ninety-one (91) days after the Stated Maturity Date, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Capital Securities, in each case, prior to the date that is ninety-one (91) days after the Stated Maturity Date; <u>provided</u> that if such Capital Stock is issued to any plan for the benefit of employees of a Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute a Disqualified Capital Securities solely because it may be required to be repurchased by such Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"<u>Distribution</u>" means, in respect of any entity, (i) any payment of any dividends or other distributions on Capital Securities of the entity (except distributions in such Capital Securities) and (ii) any purchase, redemption or other acquisition or retirement for value of any Capital Securities of the entity or any Affiliate of the entity unless made contemporaneously from the net proceeds of the sale of Capital Securities.

"<u>Dollar</u>" and the sign "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Office</u>" means the office of a Lender designated as its "Domestic Office" on <u>Schedule II</u> hereto or in a Lender Assignment Agreement, or such other office within the United

States as may be designated from time to time by written notice from such Lender to the Administrative Agent and the Borrowers.

"EBITDAP" means, for any fiscal period of Standard Register, an amount equal to:

(a)    the sum for such fiscal period of:

(i)    Adjusted Net Earnings, plus

(ii)    provision for taxes based on income and franchise taxes to the extent deducted in the calculation of Adjusted Net Earnings, plus

(iii)    interest expense, to the extent deducted in the calculation of Adjusted Net Earnings, plus

(iv)    depreciation and amortization expense, to the extent deducted in the calculation of Adjusted Net Earnings, plus

(v)    the total "net periodic benefit costs" attributable to the qualified defined benefit plans of the Borrowers and their Subsidiaries as such plans are in effect at the Closing Date to the extent covering the U.S. employees of the Borrowers and their Subsidiaries as of the Closing Date (the "Covered Plans"), to the extent such costs are deducted in accordance with GAAP in the calculation of Adjusted Net Earnings of the Borrowers on a basis consistent with the Borrowers' consolidated financial statements for the fiscal year ended December 31, 2012, plus

(vi)    [reserved], plus,

(vii)    non-recurring non-cash losses, to the extent deducted in the calculation of Adjusted Net Earnings, plus,

(viii)    Allowed Integration Costs, to the extent deducted in the calculation of Adjusted Net Earnings, not to exceed on a cumulative basis beginning with the 2014 Fiscal Year (i) $38,310,000 through the end of the 2014 Fiscal Year, (ii) $48,411,000 through the end of the 2015 Fiscal Year. (iii) $53,005,000 through the end of the 2016 Fiscal Year, (iv) $57,895,000 through the end of the 2017 Fiscal Year and (v) $59,895,000 through the end of the 2018 Fiscal Year, provided that, the aggregate annual Allowed Integration Costs added back pursuant to this clause (viii) shall not exceed $7,500,000 for any of the 2016, 2017 and 2018 Fiscal Years, plus,

(ix)    non-cash stock compensation expenses, to the extent deducted in the calculation of Adjusted Net Earnings, plus

(x)    professional fees paid by Borrowers in connection with the administration of the Cases in accordance with the Professional Fee Budget, subject to Permitted Variances,

*minus*

(b)    the sum for such fiscal period of:

11

(i)      interest income (except to the extent deducted in determining interest expense);

(ii)     non-recurring income and gains, to the extent added in the calculation of Adjusted Net Earnings; and

(iii)    non-cash gains or income to the extent added in the calculation of Adjusted Net Earnings.

"Eligible Assignee" means any Person (other than an Ineligible Assignee).

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA that is maintained for employees of the Borrowers or any member of the Borrowers' Controlled Group.

"Environmental Laws" means all applicable foreign, federal, state, provincial or local statutes, laws, ordinances, codes, rules and regulations (including consent decrees and administrative orders), now or hereafter in effect and relating to public health and safety and protection of the environment, including CERCLA.

"Equipment" means all of a Credit Party's machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal Property (other than Inventory) of every kind and description, whether now owned or hereafter acquired by a Credit Party and wherever located, and all parts, accessories and special tools therefor, all accessions thereto, and all substitutions and replacements thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to sections of ERISA also refer to any successor sections thereto.

"Event of Default" is defined in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Deposit Account" means any Deposit Account established solely for the purpose of funding payroll, payroll taxes and other compensation and benefits to employees.

"Excluded Taxes" means any of the following Taxes imposed, deducted or withheld with respect to any Secured Party on payments under this Agreement or any Loan Document: (i) net income and franchise Taxes imposed by any Governmental Authority under the laws of which such Secured Party is organized, in which it maintains its principal office or its applicable lending office, or in which it is engaged in business (other than as a result of having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) any U.S. federal withholding tax imposed under FATCA, (iii) any branch profits Tax imposed by the United States or any comparable Tax imposed by any foreign jurisdiction, and (iv) any withholding Taxes imposed by the United States except to the extent that such withholding

Taxes are imposed as a result of a change in any applicable statute, treaty, regulation or other Applicable Law or any official interpretation of any of the foregoing occurring after the Closing Date (or in the case of an Assignee Lender, after the date of the assignment, except to the extent that the applicable assigning Lender was entitled to receive additional amounts with respect to any such Tax).

"Exemption Certificate" is defined in clause (e) of Section 4.6.

"Facility" means the collective reference to this Agreement, the Loan Documents and any other notes, guarantees, collateral documents and account control agreements, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings hereof, together with the Loans, extensions of credit and other financial accommodations made pursuant thereto or in connection therewith and the Liens created thereunder and the other provisions contained herein and therein.

"Family Holders" means John Q. Sherman and William C. Sherman, and their descendants and trusts for their benefit.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to

(a)    the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; or

(b)    if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Filing Agent" is defined in Section 5.8.

"Filing Statements" is defined in Section 5.8.

"Final Financing Order" means, with respect to the Cases, a Final Order in substantially the form of the Interim Financing Order and otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, authorizing and approving on a final basis, among other things, the matters and provisions in the Interim Financing Order and providing that this Agreement and the Loan Documents would remain valid and enforceable against the Credit Parties would survive any dismissal, conversion or substantive consolidation of any of the Cases and would not adversely affect the rights or remedies of any Lender under the Loan Documents and that the Liens securing the Obligations would remain valid and

perfected and enjoy the same priority as such Liens had prior to the dismissal, conversion or consolidation of such Case.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the such order shall be in effect or (ii) no motion or application for a stay of such order shall be filed and pending or such motion or application shall have been denied or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed such order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court order or timely motion to seek review or rehearing of such order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding such order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible.

"Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

"First Day Orders" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within five (5) Business Days of the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"First/Second Lien Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 1, 2013, executed and delivered by the Prepetition First Lien Term Loan Agent, the Second Lien Administrative Agent and the Credit Parties, pursuant to the terms of the Prepetition Term Loan Facilities, as amended, supplemented or otherwise modified through the Closing Date.

"Fiscal Month" means any calendar month ending on the last day of such calendar month.

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (*e.g.*, the "2015 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"FLSA" means the Fair Labor Standards Act of 1938.

"Foreign Subsidiary" means any Subsidiary of a Borrower that is not a Subsidiary organized or incorporated under the laws of the United States, a state thereof or the District of Columbia.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Governmental Approvals" means all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to, all Governmental Authorities.

"Governmental Authority" means the government of the United States, any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" is defined in clause (g) of Section 10.11.

"Hazardous Material" means

(a)    any "hazardous substance", as defined by CERCLA;

(b)    any "hazardous waste", as defined by the RCRA; or

(c)    any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means:

(a)    all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments or upon which interest payments are customarily made;

(b)     all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, banker's acceptances, performance, surety or appeal bonds (or similar obligations) issued for the account of such Person;

(c)     all Capitalized Lease Liabilities of such Person;

(d)     all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person;

(e)     net hedging obligations of such Person;

(f)     whether or not so included as liabilities in accordance with GAAP, (i) all obligations of such Person to pay the deferred purchase price of property or services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person) of the date of purchase of such goods and services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to Property used or acquired by such Person), (ii) indebtedness secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, and (iii) all trade accounts payable whether incurred in the Ordinary Course of Business or otherwise;

(g)     obligations arising under Synthetic Leases;

(h)     all Disqualified Capital Securities of such Person;

(i)     all Contingent Liabilities of such Person; and

(j)     all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 10.4.

"Indemnified Parties" is defined in Section 10.4.

16

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Ineligible Assignee" means a natural Person, a Borrower, any Subsidiary of a Borrower and a Family Holder.

"Intellectual Property" has the meaning set forth in the Security Agreement.

"Intellectual Property Claim" means the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that a Credit Party's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other Property is violative of any ownership or other right to use any Intellectual Property of such Person.

"Intercreditor Agreements" means the (i) First/Second Lien Intercreditor Agreement, (ii) the ABL-TL DIP Intercreditor Agreement and (iii) the Prepetition ABL/TL Intercreditor Agreement.

"Interest Period" means, relative to any LIBO Rate Loan, the period beginning on (and including) the date on which such LIBO Rate Loan is made or continued as, or converted into, a LIBO Rate Loan pursuant to Sections 2.2 or 2.3 and shall end on (but exclude) the day which numerically corresponds to such date one month thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in either case as the Borrowers may select in its relevant notice pursuant to Sections 2.2 or 2.3; provided, that,

   (a)   the Borrowers shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than ten (10) different dates;

   (b)   if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and

   (c)   no Interest Period for any Loan may end later than the Stated Maturity Date for such Loan.

"Interim Financing Order" means an interim order or orders of the Bankruptcy Court entered in the Cases (i) authorizing and approving, among other things, on an interim basis, this Agreement, the other Loan Documents (including any guarantees of the Obligations hereunder), the ABL DIP Facility, the ABL DIP Documents, the extension of credit to the Borrowers in accordance with the terms hereof and thereof, and the transactions contemplated hereby and thereby, (ii) granting Liens on the Collateral, with the applicable priority thereof, and the Superpriority Claims, each as described in Section 6.7 and in the ABL-TL DIP Intercreditor Agreement, in favor of the Collateral Agent for the ratable benefit of the Secured Parties, and (iii) finding that the Lenders are extending credit to the Borrowers in good faith within the meaning of Section 364(e) of the Bankruptcy Code, substantially in the form of Exhibit H hereto (and as more fully described in Section 5.1.16 hereof), as such order or orders may be extended,

amended, supplemented or modified in a manner satisfactory to the Required Lenders in their sole discretion.  The Interim Financing Order shall, among other things, (i) limit borrowings under the ABL DIP Facility to amounts set forth in the Budget (subject to Permitted Variances) and so long as no Event of Default has  occurred and is continuing, an amount no greater than $140,000,000; (ii) approve the payment by the Borrowers of all the fees provided for herein, in the Loan Documents and under the ABL DIP Facility, including, but not limited to the fees and expenses of the administrative agents under the Prepetition First Lien Term Loan Agreement and under the Second Lien Credit Agreement and their advisors, (iii) lift the automatic stay to permit the Borrowers to perform their respective obligations, and the Administrative Agent and the ABL Agent to exercise their respective remedies with respect to the Facility and the ABL DIP Facility, as applicable, (iv) permit the use of cash collateral of the Facility and loans under the ABL DIP Facility solely to pay expenditures pursuant to the Budget (subject to Permitted Variances) and otherwise on terms satisfactory to the Administrative Agent, (v) contain findings, subject to typical reservation of rights for non-debtor parties in Bankruptcy Court, that the obligations arising under the Prepetition Term Loan Facilities are due and owing and not subject to any defense, counterclaim, or setoff, that the liens and security interests securing the obligations arising under the Prepetition Term Loan Facilities are valid and duly perfected, and that any challenge by (a) third parties must be made within 60 days after the Petition Date, (b) 75 days following entry of the Interim Financing Order, if no statutory committee is appointed in the Cases (a "Committee"), or be forever barred, (c) any such later date agreed to in writing by the Administrative Agent and the ABL Agent, provided that in no event shall the Committee shall be permitted to expend no more than $25,000 to investigate or prosecute any such challenge; (vi) have such other findings, orders, and relief typical for financings of the type contemplated herein; and (vii) and otherwise be in form and substance satisfactory to the Administrative Agent.

"Inventory" means as defined in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in a Credit Party's business (but excluding Equipment).

"Investment" means any acquisition of all or substantially all assets of a Person; any acquisition of record or beneficial ownership of any Capital Securities of a Person; any advance or capital contribution to or other investment in a Person.

"Junior Financing" is defined in Section 7.2.14.

"Knowledge" means the actual knowledge of an individual engaging in the business of the Credit Parties in the Ordinary Course of Business, without special investigation or inquiry.

"Lender Assignment Agreement" means an assignment agreement substantially in the form of Exhibit C hereto.

"Lenders" is defined in the preamble.

"Lender's Environmental Liability" means any and all losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages, (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees and expenses at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent or any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

(a)     any Hazardous Material on, in, under or migrating from all or any portion of any Property of a Borrower or any of its Subsidiaries or the groundwater thereunder to the extent caused by Releases from a Borrower's or any of its Subsidiaries' or any of their respective predecessors' properties;

(b)     any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in Section 7.1.7 (as relates to Environmental Laws and Releases);

(c)     any violation or claim of violation by a Borrower or any of its Subsidiaries of any Environmental Laws; or

(d)     the imposition of any Lien for damages caused by, or the recovery of any costs with respect to, the cleanup, Release of Hazardous Material by a Borrower or any of its Subsidiaries, or in connection with any property owned by such Borrower or any of its Subsidiaries.

"LIBO Rate" means, relative to any Interest Period for LIBO Rate Loans, an annual rate equal to the greater of (i) 1.00% and (ii) the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the beginning of the relevant Interest Period by reference to the ICE Benchmark Administration London Interbank Offered Rate for deposits in Dollars (as set forth by any service which has been nominated by the ICE Benchmark Administration as an authorized information vendor for the purpose of displaying such rates or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the ICE Benchmark Administration as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this clause (ii), the interest rate determined in accordance with this clause (ii) shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the beginning of such Interest Period.

"LIBO Rate Loan" means a Loan bearing interest, at all times during an Interest Period applicable to such Loan, at a rate of interest determined by reference to the LIBO Rate (Reserve Adjusted).

19

"LIBO Rate (Reserve Adjusted)" means, relative to any Loan to be made, continued or maintained as, or converted into, a LIBO Rate Loan for any Interest Period, a rate per annum determined pursuant to the following formula:

$$\text{LIBO Rate (Reserve Adjusted)} = \frac{\text{LIBO Rate}}{1.00 - \text{LIBOR Reserve Percentage}}$$

The LIBO Rate (Reserve Adjusted) for any Interest Period for LIBO Rate Loans will be determined by the Administrative Agent on the basis of the LIBOR Reserve Percentage in effect two Business Days before the first day of such Interest Period.

"LIBOR Office" means the office of a Lender designated as its "LIBOR Office" on Schedule II hereto or in a Lender Assignment Agreement, or such other office designated from time to time by written notice from such Lender to the Borrowers and the Administrative Agent, whether or not outside the United States, which shall be making or maintaining the LIBO Rate Loans of such Lender.

"LIBOR Reserve Percentage" means, relative to any Interest Period for LIBO Rate Loans, the reserve percentage (expressed as a decimal) equal to the maximum aggregate reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) specified under regulations issued from time to time by the F.R.S. Board and then applicable to assets or liabilities consisting of or including "Eurocurrency Liabilities", as currently defined in Regulation D of the F.R.S. Board, having a term approximately equal or comparable to such Interest Period.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or security interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any Capitalized Lease Liability and any assignment, deposit arrangement or financing lease intended as security.

"Loan Documents" means, collectively, this Agreement, the Notes, the Security Documents, each other agreement pursuant to which the Administrative Agent is granted a Lien to secure all or any part of the Obligations, each Subsidiary Guaranty, the Intercreditor Agreements and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Loans" is defined in Section 2.1.

"Margin Stock" shall have the meaning ascribed to it in Regulation U of the Board of Governors of the Federal Reserve System.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the Borrowers and their Subsidiaries taken as a whole  (other than as a direct result of the events leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the

20

Cases and the continuation and prosecution thereof), (b) the rights and remedies of any Secured Party under any Loan Document, (c) the ability of any Credit Party to perform its Obligations under any Loan Document, (d) the legality, validity or enforceability of this Agreement or any other Loan Document or (e) the validity, perfection or priority of Liens with respect to any material portion of the Collateral in favor of the Collateral Agent for the benefit of the Secured Parties (it being understood and agreed that a delisting of the publicly traded equity securities of Standard Register shall not, in and of itself, constitute a Material Adverse Effect).

"Material Contract" means an agreement to which a Credit Party is a party (other than the Loan Documents) (i) which is deemed to be a material contract as provided in Regulation S-K promulgated by the SEC under the Securities Act of 1933 or (ii) for which breach, termination, cancellation, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect, in each case excluding any contract that is rejected by a Credit Party in accordance with Section 365 of the Bankruptcy Code, with the Administrative Agent's consent..

"Maturity Date" means the earliest of (i) the Stated Maturity Date; (ii) thirty days after the entry of the Interim DIP Financing Order if the Final DIP Financing Order has not been entered prior to or on such date; (iii) April 10, 2015, if the Sale Procedures Order has not been entered prior to or on such date; (iv) June 19, 2015, if the Sale Order has not been entered prior to or on such date; (v) sixty days after the entry of the Sale Order if the sale of the Borrowers' assets pursuant to such order has not been closed for any reason other than (x) the issuance of a stay pending appeal from the Sale Order (in which case, the sixty-day period referred to in this clause (v) shall automatically be extended to the earlier of (A) the fifth business day following the day such stay ceases to be in effect or (B) the Stated Maturity Date, or (y) the winning bidder has failed to consummate the Acquisition, except as a result of a breach by Sellers of a representation or covenant in the Purchase Agreement; (vi) the "Termination Date" under and as defined in the Purchase Agreement occurs; (vii) the Sale Closing Date; (viii) the date that is 180 days after the date of the Purchase Agreement; (ix) the date that the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a plan of reorganization or liquidation is confirmed pursuant to an order entered by the Bankruptcy Court; and (x) the date the Stated Maturity Date is accelerated pursuant to Section 8.3 hereof.

"Money Borrowed" means, as applied to any Person, (i) Indebtedness arising from the lending of money by any other Person to such Person; (ii) Indebtedness, whether or not in any such case arising from the lending of money by another Person to such Person, (A) which is represented by notes payable or drafts accepted that evidence extensions of credit, (B) which constitutes obligations evidenced by bonds, debentures, notes or similar instruments, or (C) upon which interest charges are customarily paid (other than accounts payable) or that was issued or assumed as full or partial payment for Property; (iii) Indebtedness that constitutes a Capitalized Lease Liability; (iv) reimbursement obligations with respect to letters of credit or guaranties of letters of credit and (v) Indebtedness of such Person under any guaranty of obligations that would constitute Indebtedness for Money Borrowed under clauses (i) through (iii) hereof, if owed directly by such Person.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means (a) each mortgage, deed of hypothec, debenture, pledge, deed of trust or agreement executed and delivered by any Credit Party in favor of the Collateral Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement in form and substance satisfactory to the Administrative Agent, under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time, and (b) each Additional Mortgage delivered pursuant hereto.

"Multiemployer Plan" has the meaning set forth in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds" means, with respect to any Prepayment Event, (a) the gross cash proceeds (including payments from time to time in respect of installment obligations, if applicable) received by or on behalf of a Borrower or any of its Subsidiaries in respect of such Prepayment Event or issuance, as the case may be, less (b) the sum of:

> (i)     the amount, if any, of all taxes paid or estimated to be payable by such Borrower or any of its Subsidiaries in connection with such Prepayment Event,

> (ii)    the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by such Borrower or any of its Subsidiaries, provided that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such a Prepayment Event occurring on the date of such reduction;

> (iii)   the amount of any Indebtedness secured by a Lien on the assets that are the subject of such Prepayment Event to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event;

> (iv)    [reserved]; and

> (v)     reasonable and customary fees.

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means a promissory note of the Borrowers payable to any Lender, in the form of Exhibit A hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrowers to such Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrowers and each other Credit Party to the Secured Parties arising under or in connection with a Loan Document, including, but not limited to, the principal of and premium, if any, and interest (including interest accruing (or which would have

accrued) during the pendency of any insolvency or like proceeding under the Bankruptcy Code, whether or not allowed in such proceeding) on the Loans as well as all fees and expenses (including attorneys' fees and expenses) and indemnity payable to the Secured Parties hereunder.

"Ordinary Course of Business" means, with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"Organic Document" means, relative to any Credit Party, as applicable, its certificate or articles of incorporation, articles and memorandum of association, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Credit Party's Capital Securities.

"OSHA" means the Occupational Safety and Hazard Act of 1970.

"Other Taxes" means any and all present or future stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of, or otherwise with respect to, any Loan Document, but excluding, for the avoidance of doubt, any such Taxes arising in connection with any transfer, assignment or participation of any rights or obligations under this Agreement, or any change in lending office by any Lender, except if such transfer, assignment, participation or change in lending office is done at the request of a Borrower.

"Participant" is defined in clause (d) of Section 10.11.

"Participant Register" is defined in clause (d) of Section 10.11.

"Patent Security Agreement" means any Patent Security Agreement executed and delivered by any Credit Party in substantially the form of Exhibit A to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified.

"Patriot Act" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended and supplemented from time to time.

"Payment Items" means all checks, drafts, or other items of payment payable to any Borrower, including proceeds of any of the Collateral.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA, and to which a Borrower or any corporation, trade or business that is, along with such Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Percentage" means, relative to any Lender, the percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement, as such percentage may be adjusted from time to time (x) in accordance with Section 4.8 or (y) pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender and delivered pursuant to Section 10.11.

"Permitted Contingent Obligations" means Contingent Liabilities (i) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (ii) [reserved]; (iii) existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (iv) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (v) [reserved]; (vi) arising under the Loan Documents; (vii) incurred by any Credit Party in respect of Indebtedness of any Credit Party otherwise permitted hereunder; provided that (A) no Contingent Liability of the ABL Obligations or the Prepetition Term Loan Facilities or any Subordinated Indebtedness shall be permitted unless such party providing such Contingent Liability shall have also provided a Contingent Liability of the Obligations on the terms set forth herein, and (B) if the Indebtedness benefitting from the Contingent Liability is subordinated to the Obligations, such Contingent Liability shall be subordinated to the Subsidiary Guaranty of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness; or (viii) in an aggregate amount of $250,000.

"Permitted ABL Agent Discretion" means the ABL Administrative Agent's reasonable (from the perspective of a secured asset based lender with advance rates based on current assets) credit judgment based upon its consideration of any factor which ABL Administrative Agent believes (a) will or could reasonably be expected to materially and adversely affect in any respect the value of any ABL Priority Collateral, the enforceability or priority of any Liens in favor of ABL Administrative Agent or the amounts which ABL Administrative Agent and ABL Lenders would be likely to recover in the liquidation of such ABL Priority Collateral; (b) suggests that any collateral report, financial information or certificate delivered to ABL Administrative Agent by or on behalf of any Borrower with respect to any ABL Priority Collateral is incomplete, inaccurate or misleading in any material and adverse respect; or (c) creates or reasonably could be expected to create or result in a Default or Event of Default under the ABL DIP Credit Agreement.  In exercising such judgment, ABL Administrative Agent may consider factors already included or tested in determining Eligible Accounts and Eligible Inventory (each as defined in the ABL DIP Credit Agreement as of the date hereof) or in calculating the Borrowing Base or ABL Availability, as well as any of the following: (i) changes in collection history and dilution with respect to the Accounts (as defined in the ABL DIP Credit Agreement), (ii) changes in demand for, and pricing of, Inventory, (iii) changes in any concentration of risk with respect to the Accounts, (iv) changes in turnover statistics with respect to Inventory and/or Accounts, including actual versus historical and projected rates, and (v) any other factors, events, contingencies or circumstances that arise (or first become known to ABL Administrative Agent) after the Petition Date and that change the credit risk of lending to any Borrower on the security of the ABL Priority Collateral included in the Borrowing Base in any respect; provided, however, that (a) ABL Administrative Agent shall not increase the Availability Reserve (as defined in the ABL DIP Credit Agreement) solely in response to factors that already have been taken into account in excluding from the Borrowing Base calculation the

whole or any part of any Accounts or Inventory; and (b) the amount of any addition made to the Availability Reserve pursuant to clause (viii) of the definition thereof shall bear a reasonable relationship to the impact of any such factors that ABL Administrative Agent seeks to mitigate.

"Permitted Liens" means:

(a)    Liens existing on the date hereof and listed on Part 1.1 of the Disclosure Schedule, other than Liens referred to in clause (c) of this definition;

(b)    subject to the ABL-TL DIP Intercreditor Agreement,] Liens securing ABL Obligations (as defined in the ABL-TL DIP Intercreditor Agreement);

(c)    subject to the First/Second Lien Intercreditor Agreement, Liens securing Indebtedness of the type permitted under clause (a) and clause (c) of Section 7.2.9;

(d)    Capitalized Lease Liabilities in existence and in the amounts outstanding on the Closing Date, as such amounts are reduced in accordance with the Budget;

(e)    Liens for Taxes which accrued post-petition and are not yet due and payable or are being Properly Contested;

(f)    statutory Liens arising after the Petition Date (other than Liens for Taxes, imposed under ERISA or in favor of the Pension Benefit Guaranty Corporation) arising in the Ordinary Course of Business, but only if payment of the obligations secured thereby is not yet due or is being Properly Contested;

(g)    Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of tenders, bids, leases, contracts (except those relating to Indebtedness for borrowed money), statutory obligations and other similar obligations, or arising after the Petition Date as a result of progress payments under government contracts, as long as such Liens are at all times junior to Liens granted under the Security Documents;

(h)    Liens arising in the Ordinary Course of Business that are subject to Lien Waivers;

(i)    easements, rights-of-way, restrictions, covenants or other agreements of record, and other similar charges or encumbrances on real property, that do not secure any monetary obligation and do not interfere with the Ordinary Course of Business;

(j)    bankers' Liens with respect to depository account arrangements entered into in the Ordinary Course of Business securing obligations not past due;  and

(k)    Liens in respect of the Carve Out or otherwise created pursuant to the Financing Orders.

"Permitted Variances" means an unfavorable variance from the Budget not exceeding (a) 10.0% for each line item (other than "payroll", "health & benefits", "postage" and "Audit

Expense"), (b) 5.0% for payroll, (c) 5.0% for health & benefits, (d) 5.0% for postage, (e) 0.0% for Audit Expense, and (f) 5.0% with respect to cumulative net cash flows of the Borrowers and their subsidiaries (excluding amounts relating to payroll, health & benefits and postage), in each case for the period from the Petition Date through the measurement date at the end of each week. All variances shall be tested weekly on the Friday of such week, beginning with the four week period ending on April 3, 2015, and measured on a rolling four week basis thereafter.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Platform" is defined in Section 7.1.3.

"Prepayment Event" means any Asset Sale Prepayment Event, Casualty Event or Debt Incurrence Prepayment Event.

"Prepetition ABL Credit Agreement" is defined in the recitals to this Agreement.

"Prepetition ABL/TL Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of August 1, 2013, executed and delivered by Bank of America, N.A. as administrative agent under the Prepetition ABL Credit Facility, the Prepetition First Lien Term Loan Agent, the Second Lien Administrative Agent and the Credit Parties, pursuant to the terms of the Prepetition Term Loan Facilities, as amended, supplemented or otherwise modified through the Closing Date.

"Prepetition First Lien Term Loan Agent" means Silver Point Finance, LLC, as administrative agent under the Prepetition First Lien Term Loan Agreement.

"Prepetition First Lien Term Loan Agreement" means that certain First Lien Credit Agreement dated as of August 1, 2013 by and among Borrowers (as a Borrower or a Subsidiary Guarantor thereunder, as applicable), WorkflowOne LLC, the subsidiary guarantors party thereto, the lenders party thereto, and the Prepetition First Lien Term Loan Agent, as amended, restated, supplemented, or modified through the Closing Date.

"Prepetition Revolving Lenders" is defined in the recitals hereto.

"Prepetition Term Loan Facilities" means the documents governing, evidencing, securing or otherwise executed in connection with the Prepetition First Lien Term Loan Agreement and the Second Lien Credit Agreement together, in each case, with the loans, terms, agreements and Liens made, arising or existing in connection therewith.

"Professional Fee Budget" is defined in Section 7.1.3(k).

"Properly Contested" means in the case of any Indebtedness of a Credit Party (including any Taxes) that is not paid as and when due or payable by reason of such Credit Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Credit Party has established appropriate reserves as

shall be required in conformity with GAAP, (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in a forfeiture of any assets of such Credit Party; (iv) no Lien is imposed upon any of such Credit Party's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the Indebtedness results from, or is determined by the entry, rendition or issuance against a Credit Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Credit Party, such Credit Party forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed and whether tangible or intangible.

"Public Lender" is defined in Section 7.1.3.

"Purchase Agreement" means that certain Asset Purchase Agreement dated on or about the date hereof by and among the Purchaser, the Debtors (as sellers) as amended, supplemented or otherwise modified with the consent of the Administrative Agent and the Required Lenders.

"Purchaser" means Standard Acquisition Holdings, LLC, a Delaware Limited Liability Company, and its designee, successors or assigns.

"Qualified Equity Interests" means any Capital Securities that are not a Disqualified Capital Securities.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Register" is defined in clause (a) of Section 2.5.

"Release" means a "release", as such term is defined in CERCLA or any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Replacement Lender" is defined in Section 4.10.

"Replacement Notice" is defined in Section 4.10.

"Reportable Event" means any of the events set forth in Section 4043(b) of ERISA.

"Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of the then outstanding Loans.

"Restricted Investment" means any Investment by a Credit Party or Subsidiary, other than (i) Investments in the Borrowers or in any Subsidiary Guarantor formed or acquired after the Closing Date; (ii) Cash Equivalents that are pledged as Collateral; and (iii) loans and advances permitted under Section 7.2.11.

"Restrictive Agreement" means an agreement (other than any of the Loan Documents) that, if and for so long as a Credit Party or any Subsidiary of such Credit Party is a party thereto, would prohibit, condition or restrict such Credit Party's or Subsidiary's right to incur or repay Indebtedness for Money Borrowed (including any of the Obligations); grant Liens upon any of such Credit Party's or Subsidiary's assets (including Liens granted in favor of the Collateral Agent pursuant to the Loan Documents); declare or make Distributions; amend, modify, extend or renew any agreement evidencing Indebtedness for Money Borrowed (including any of the Loan Documents); or repay any Indebtedness owed to any Credit Party.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"Sale Closing Date" means the date the Acquisition is consummated.

"Sale Covenants" is defined in Section 7.1.20.

"Sale Motion" is defined in Section 5.1.19.

"Sale Order" means an order of the Bankruptcy Court approving the Sale Motion, the Purchase Agreement, and the Acquisition and providing for the payment in full in cash of the Obligations under the Facility on the Sale Closing Date.

"SEC" means the Securities and Exchange Commission.

"Second Lien Administrative Agent" means the "Administrative Agent" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of August 1, 2013, among Standard Register, the other Borrowers (as subsidiary guarantors thereunder), the various financial institutions and other Persons from time to time party thereto as lenders, the Second Lien Administrative Agent and the other Persons party thereto as agents, as amended, supplemented or otherwise modified through the Closing Date.

"Second Lien Loans" means the "Loans" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof) and references herein to "Term A Second Lien Loan", "Term B Second Lien Loan" and "Term C Second Lien Loan" shall mean "Term A Loan", "Term B Loan" and "Term C Loan" as defined in the Second Lien Credit Agreement as of the date hereof.

"Secured Parties" means, collectively, the Lenders, the Administrative Agent and (in each case) each of their respective successors, transferees and assigns.

28

"Security Agreement" means the Pledge and Security Agreement dated as of the date hereof executed and delivered by an Authorized Officer of each Borrower and its Subsidiaries, substantially in the form of Exhibit F hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Security Documents" means, collectively, (a) the Financing Orders, (b) the Subsidiary Guaranty, (c) the Security Agreement, (d) each Mortgage and Additional Mortgage, (e) the Copyright Security Agreement, (f) the Patent Security Agreement, (g) the Trademark Security Agreement and (h) each other security agreement or other interest or document executed and delivered pursuant to Section 7.1.7 or any of the Security Documents to secure any of the Obligations.

"Silver Point" means Silver Point Finance, LLC.

"SPC" is defined in clause (g) of Section 10.11.

"Stated Maturity Date" means September 8, 2015.

"Subordinated Indebtedness" means Indebtedness incurred by a Credit Party that (i) is expressly subordinate and junior in right of payment to full payment of all Obligations, (ii) has a stated maturity at least one year after the stated maturity date of the Second Lien Loans, (iii) does not provide for payment of interest in cash or otherwise than through the capitalization thereof, and (iv) is otherwise on terms satisfactory to the Administrative Agent.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of a Borrower.

"Subsidiary Guarantor" means each Subsidiary that has executed and delivered to the Administrative Agent the Subsidiary Guaranty (including by means of a delivery of a supplement thereto).

"Subsidiary Guaranty" means the subsidiary guaranty dated as of the date hereof executed and delivered by an Authorized Officer of each Subsidiary pursuant to the terms of this Agreement, in the form and substance acceptable to the Administrative Agent, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Superpriority Claim" means a superpriority administrative expense claim with priority over any and all other obligations, liabilities and indebtedness, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 552(b), 726, 1113 or 1114 of the Bankruptcy Code.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means any and all taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings (including backup withholdings), now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Term Loan Commitment" means mean the commitment of a Lender to make or otherwise fund Loans hereunder pursuant to Section 2.1, as the same may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.11; and "Term Loan Commitments" means such commitments of all such Lenders in the aggregate.  The amount of each Lender's Term Loan Commitment as of the Closing Date is set forth on Schedule III.  The aggregate amount of the Term Loan Commitments as of the Closing Date is $30,000,000.

"Term Loan Priority Collateral" is defined in the ABL-TL DIP Intercreditor Agreement.

"Termination Date" means the date on which all Obligations have been indefeasibly paid in full in cash.

"Terrorism Laws" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"Trademark Security Agreement" means any Trademark Security Agreement dated as of the date hereof executed and delivered by any Credit Party substantially in the form of Exhibit B to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Transactions" means, collectively, the filing of the Sale Motion, the consummation of the Acquisition, the execution and delivery by the parties of the Purchase Agreement, the filing of the Cases, the filing of the First Day Motions, the execution and delivery of this Agreement and the other Loan Documents, the closing and effectiveness of the ABL DIP Facility and the making of any Revolver Loans thereunder on the Closing Date, the payment of the fees and

expenses incurred in connection with any of the foregoing transactions that are required to be paid on the Closing Date and all other transactions contemplated under any of the foregoing.

"Transaction Documents" means, collectively, this Agreement and the other Loan Documents, the Financing Orders, the Purchase Agreement, the ABL DIP Documents and each other document delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"type" means, relative to any Loan, the portion thereof, if any, being maintained as a Base Rate Loan or a LIBO Rate Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"Upstream Payment" means a Distribution by a Subsidiary of a Credit Party to such Credit Party.

"Voting Power" means, with respect to any Person, the power ordinarily (without the occurrence of a contingency) to elect the members of the Board of Directors (or Persons performing similar functions) of such Person.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"wholly owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by Applicable Laws) is owned directly or indirectly by a Borrower.

"Wind Down Amount" means the sum of (i) allowed, accrued and unpaid professional fees in accordance with the Professional Fee Budget not to exceed $2,600,000 (if allowed prior to or after the consummation of the Purchase Agreement), plus (ii) $225,000, plus (iii) the amount of unpaid fees of Lazard Fréres & Co. LLC accrued as of the Sale Closing Date in connection with, and due upon the consummation of, the transactions contemplated by the Purchase Agreement, as approved by the Bankruptcy Court and accepted by the Administrative Agent in its sole discretion, plus (iv) the amount of unpaid valid sale and use taxes payable by a Borrower and incurred after the Petition Date, plus (v) the amount of management incentive plan

payments approved by the Bankruptcy Court and accepted by the Administrative Agent in its sole discretion.

"Wind Down Funding Loan" means a Loan in an amount equal to the Wind Down Amount, deemed requested by Borrowers and made by the Lenders on the Sale Closing Date immediately prior to the consummation of the Acquisition in accordance with Section 5.2 hereof.

1.2    Use of Defined Terms.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

1.3    Cross-References.  Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

1.4    Accounting and Financial Determinations.  Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under Section 7.2.17 and the definitions used in such calculations) shall be made, in accordance with those generally accepted accounting principles in effect in the United States ("GAAP").  Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Borrowers and their Subsidiaries (and, to the extent applicable and unless otherwise specified, any predecessor company), in each case without duplication.

## ARTICLE 2
## LOANS, CLOSING RATE AND NOTES

2.1    Loans.  On the terms and subject to the satisfaction (or waiver in writing by the Administrative Agent) of the conditions precedent set forth in Section 5.1 hereof and in reliance upon the representations and warranties set forth herein and in the other Loan Documents, each Lender having a Term Loan Commitment identified on Schedule III agrees, severally and not jointly, from time to time upon receipt of a written request from Standard Register (on behalf of the Borrowers) during the period commencing on the Closing Date and ending on the Maturity Date, to make a term loan (each a "Loan") in Dollars to the Borrowers, in a principal amount that, together with all prior Loans made by such Lender will not result in such Lender exceeding its Term Loan Commitment; provided that the Borrowers may request no more than five (5) such Loans during each successive 30 day period.  Amounts prepaid or repaid in respect of Loans may not be reborrowed.  All Loans shall constitute a single class of Loans for all purposes hereunder. The Term Loan Commitment of each Lender shall automatically be reduced or terminate, as the case may be, by the amount of and after giving effect to the funding of each Loan made by such Lender.   The outstanding principal amount of all Loans, together with accrued and unpaid interest thereon, shall be due and payable on the Maturity Date.

2.2    Loan Rate; Borrowing Procedures.  All of the Loans shall be LIBO Rate Loans with an Interest Period of one (1) month.  Each Loan shall be made pursuant to a written request by Standard Register on behalf of the Borrowers, delivered to Administrative Agent and received

by Administrative Agent no later than 11:00 a.m. on the Business Day that is three (3) Business Days prior to the requested funding date for such Loan, which request shall specify the requested amount of such Loan and the requested funding date (which shall be a Business Day).

2.3    Continuation and Conversion Elections.    By delivering a Continuation / Conversion Notice to the Administrative Agent on or before 1:00 p.m., New York time, on a Business Day, the Borrowers may from time to time irrevocably elect, on not less than one (1) Business Days' notice in the case of Base Rate Loans, or three (3) Business Days' notice in the case of LIBO Rate Loans, and in either case not more than five (5) Business Days' notice, that all, or any portion in an aggregate minimum amount of $1,000,000 and an integral multiple of $250,000 be, in the case of Base Rate Loans, converted into LIBO Rate Loans, or in the case of LIBO Rate Loans, converted into Base Rate Loans or continued as LIBO Rate Loans (in the absence of delivery of a Continuation/Conversion Notice with respect to any LIBO Rate Loan at least three (3) Business Days (but not more than five (5) Business Days) before the last day of the then current Interest Period with respect thereto, such LIBO Rate Loan shall, on such last day, automatically convert to a Base Rate Loan); provided that, (i) each such conversion or continuation shall be pro rated among the applicable outstanding Loans of all Lenders that have made such Loans, and (ii) no portion of the outstanding principal amount of any Loans may be continued as, or converted into, LIBO Rate Loans when any Default has occurred and is continuing.    Each such irrevocable request may be made by telephone confirmed promptly by facsimile to the Administrative Agent of the applicable Continuation/Conversion Notice.    The conversion of a Base Rate Loan into a LIBO Rate Loan or a LIBO Rate Loan into a Base Rate Loan shall not effect a novation of the Loan so converted.

2.4    Funding.    Each Lender may, if it so elects, fulfill its obligation to continue or convert LIBO Rate Loans hereunder by causing one of its foreign branches or Affiliates (or an international banking facility created by such Lender) to make or maintain such LIBO Rate Loan; provided that, such LIBO Rate Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrowers to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility.    In addition, the Borrowers hereby consent and agree that, for purposes of any determination to be made for purposes of Sections 4.1, 4.2, 4.3 or 4.4, it shall be conclusively assumed that each Lender elected to fund all LIBO Rate Loans by purchasing Dollar deposits in its LIBOR Office's interbank Eurodollar market.

2.5    Register; Notes.    The Register shall be maintained on the following terms:

(a)    Each Borrower hereby designates the Administrative Agent to serve as such Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record the Loans issued by the Borrowers hereunder and held by each Lender (and SPC), each repayment in respect of the principal amount of the Loans, and each assignment or transfer of an interest in any Loan made pursuant to Section 10.11, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 10.11.    Failure to make any recordation, or any error in such recordation, shall not affect any Credit Party's Obligations.    The entries in the Register shall be conclusive and binding in the absence of manifest error, and the Borrowers, the

33

Administrative Agent, and the Lenders (including any SPC) shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary. Any assignment or transfer of the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to <u>Section 10.11</u>. No assignment or transfer of a Lender's (or SPC's) Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

(b)    Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to each Lender a Note evidencing the Loans held by, and payable to the order of, such Lender in a maximum principal amount equal to such Lender's Percentage of the Loan. Each Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, *inter alia*, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby. Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Credit Party absent manifest error; provided that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Credit Party.

## ARTICLE 3
## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

3.1    <u>Repayments and Prepayments; Application</u>.  The Borrowers agree that the Loans shall be repaid and prepaid pursuant to the following terms.

3.1.1    <u>Repayments and Prepayments</u>.  The Borrowers shall repay in full the unpaid principal amount of each Loan on the Maturity Date.  Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)    From time to time on any Business Day, the Borrowers may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans; provided that, (i) all such voluntary prepayments shall require, in the case of Base Rate Loans at least the same Business Day's prior notice (such notice to be delivered before noon New York time on such day), and in the case of LIBO Rate Loans at least three (3) Business Days' prior notice (such notice to be delivered before noon New York time on such day), and in either case not more than five (5) Business Days' prior irrevocable notice to the Administrative Agent (which notice may be telephonic so long as such notice is confirmed in writing within 24 hours thereafter and such notice to be delivered before noon New York time on such day); and (ii) all such voluntary partial prepayments shall be, in the case of LIBO Rate Loans, in an aggregate minimum amount of $100,000 and an integral multiple of $50,000 and, in the case of Base Rate Loans, in an aggregate minimum amount of $100,000 and an integral multiple of $50,000.  Each notice of prepayment sent pursuant to this clause shall

specify the prepayment date and the principal amount of each Loan (or portion thereof) to be prepaid.  Each such notice shall be irrevocable and shall commit the Borrowers to prepay such Loan (or portion thereof) by the amount stated therein on the date stated therein.   All prepayments under this clause shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(b)    [Reserved].

(c)    On each occasion that a Prepayment Event occurs, the Borrowers shall, within one (1) Business Day after the occurrence of a Debt Incurrence Prepayment Event and within two (2) Business Days after the occurrence of any other Prepayment Event, prepay, in accordance with Section 3.1.2 below, the principal amount of Loans in an amount equal to 100% of the Net Cash Proceeds from such Prepayment Event.  If all or substantially all of the Capital Securities of any Credit Party are sold or any Credit Party is sold as a going concern on any date, the sale proceeds shall be allocated as set forth in the applicable Intercreditor Agreements.

(d)    [Reserved].

(e)    Immediately upon the occurrence of the Maturity date, including any acceleration of the Stated Maturity Date of any Loans pursuant to Section 8.3, or otherwise, the Borrowers shall repay all the Loans, unless, pursuant to Section 8.3, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

Each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, except as may be required by Section 4.4.

3.1.2   Application.  Amounts prepaid pursuant to Section 3.1.1 shall be applied as set forth in this Section.

(a)    Subject to clause (b), each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, first, to the principal amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to Section 4.4.

(b)    At any time that a payment or prepayment is made pursuant to Section 3.1.1 hereof, all payments remitted to Administrative Agent by the Credit Parties and all proceeds of Collateral received by the Collateral Agent shall be applied as follows:

first, to pay any fee and expenses (including cost or expense reimbursements) or indemnities then due to the Administrative Agent or the Collateral Agent from the Credit Parties under the Loan Documents, until paid in full,

second, to pay interest due in respect of all Loans until paid in full,

third, to pay the principal of all Loans until paid in full,

fourth, to pay any other Obligations owing to any Lender,

fifth, to Borrowers (to be wired to the applicable designated account) or such other Person entitled thereto under applicable law.

The Administrative Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive.

3.2    Interest Provisions.    Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

3.2.1    Rates.    Subject to Section 2.3, pursuant to an appropriately delivered Continuation/Conversion Notice, the Borrowers may elect that the Loans accrue interest at a rate per annum:

(a)    on that portion maintained from time to time as a Base Rate Loan, equal to the sum of the Alternate Base Rate, from time to time in effect plus the Applicable Margin; and

(b)    on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus the Applicable Margin.

All LIBO Rate Loans shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to such LIBO Rate Loan.

3.2.2    Post-Default Rates.

(a)    If any amount of principal of any Loan is not paid when due (without regard to applicable grace periods), whether at stated maturity, by acceleration, or otherwise, then such amount shall bear interest (after as well as before judgment) at a rate per annum at all times equal to the rate of interest that otherwise would be applicable to such Loan plus 2% per annum, to the fullest extent permitted by law;

(b)    If any amount (other than principal of any Loan) payable by the Borrowers under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall bear interest (after as well as before judgment) at a rate per annum at all times equal to the Base Rate from time to time in effect, plus the Applicable Margin for Loans accruing interest at the Base Rate, plus a margin of 2% per annum, to the fullest extent permitted by law;

(c)    [Reserved]; and

36

(d)    After the date that any other Event of Default has occurred for any reason and be continuing, the Borrowers shall pay interest (after as well as before judgment) on all outstanding Obligations at a rate per annum equal to (a) in the case of principal on any Loan, the rate of interest that otherwise would be applicable to such Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, the Base Rate from time to time in effect, <u>plus</u> the Applicable Margin for Loans accruing interest at the Base Rate, plus a margin of 2% per annum, in each case, to the fullest extent permitted by law.

3.2.3    <u>Payment Dates</u>.    Interest accrued on each Loan shall be payable, without duplication:

(a)    on the Maturity Date;

(b)    except as set forth in clause (c) below, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

(c)    with respect to Base Rate Loans, on the last Business Day of each month occurring after the Closing Date;

(d)    with respect to LIBO Rate Loans, on the last day of each applicable Interest Period;

(e)    with respect to any Base Rate Loans converted into LIBO Rate Loans on a day when interest would not otherwise have been payable pursuant to clause (c), on the date of such conversion; and

(f)    on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to <u>Section 8.2</u> or <u>Section 8.3</u>, immediately upon such acceleration.

(g)    Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

3.3    <u>Fees</u>.  The Borrowers shall pay to the Administrative Agent,

3.3.1    for the ratable account of the Lenders, on the Closing Date, a closing fee in the amount of $1,050,000;

3.3.2    for the ratable account of the Lenders, a commitment fee in an amount equal to 1.00% per annum times the result of (i) the aggregate amount of the Term Loan Commitments hereunder, *less* (ii) the average aggregate outstanding principal balance of Loans during the immediately preceding month (or portion thereof), which commitment fee shall be due and payable on the first day of each month from and after the Closing Date up to the first day of the month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full; and

3.3.3    for its own account, a collateral monitoring fee in the amount of $10,000, payable in advance on the Closing Date, and on the first Business Day of each month thereafter.

3.3.4    All such fees shall be non-refundable.

3.4    <u>Nature of Obligations</u>.

3.4.1    <u>Joint and Several Nature</u>.  Each Borrower shall be liable for, on a joint and several basis, and hereby guarantees the timely payment by all other Borrowers of, all of the Loans and other Obligations, regardless of which Borrower actually may have received the proceeds of any Loan or other extensions of credit hereunder or the amount of such Loans received or the manner in which Administrative Agent or any Lender accounts for such Loans or other extensions of credit on its books and records, it being acknowledged and agreed that Loans to any Borrower inure to the mutual benefit of all Borrowers and that the Administrative Agent and Lenders are relying on the joint and several liability of Borrowers in extending the Loans and other financial accommodations hereunder.  Each Borrower hereby unconditionally and irrevocably agrees that upon default in the payment when due (whether at stated maturity, by acceleration or otherwise) of any principal of, interest owed on, or other amount owing with respect to any of the Loans or other Obligations, such Borrower shall forthwith pay the same, without notice or demand.

3.4.2    <u>Unconditional Nature of Liability</u>.  Each Borrower's liability hereunder with respect to, and guaranty of the Obligations (as provided for in <u>Section 3.4.1</u> above) shall be absolute, unconditional and irrevocable irrespective of (i) any lack of validity, legality or enforceability of any Loan Document, (ii) the failure of any Secured Party (A) to assert any claim or demand or to enforce any right or remedy against the Borrowers or any other Person (including a guarantor) under the provisions of any Loan Document or otherwise, or (B) to exercise any right or remedy against any other borrower (including the Borrowers) of, or collateral securing, any Obligations, (iii) any change in the time, manner or place of payment of, or in any other term of, all or any part of the Obligations, or any other extension, compromise or renewal of any Obligation, (iv) any reduction, limitation, impairment or termination of any Obligations (except in the case of the occurrence of the Termination Date) for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and each Borrower hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Obligations or otherwise, (v) any amendment to, rescission, waiver, or other modification of, or any consent to or departure from, any of the terms of any Loan Document, (vi) any addition, exchange or release of any collateral or of any Person that is (or will become) a borrower (including the Borrowers hereunder) of the Obligations, or any surrender or non-perfection of any collateral, or any amendment to or waiver or release or addition to, or consent to or departure from, any other guaranty held by any Secured Party securing any of the Obligations; or (vii) any other circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, the Borrowers, any surety or any guarantor.

3.4.3    <u>Partial Release of Liability for Obligations</u>.  No payment or payments made by an Credit Party or received or collected by the Administrative Agent from the Borrowers or any other Person by virtue of any action or proceeding or any setoff or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to

modify, reduce, release or otherwise affect the liability of the Borrowers for the balance of Obligations remaining due under this Agreement, and the Borrowers shall remain liable for the payment and performance of all Obligations until the Termination Date.

       3.4.4    <u>Postponement of Subrogation, Etc</u>.  Each Borrower agrees that it will not exercise any rights which it may acquire by way of rights of subrogation under any Loan Document to which it is a party, nor shall any Borrower seek or be entitled to seek any contribution or reimbursement from any Credit Party, in respect of any payment made under any Loan Document or otherwise, until following the Termination Date.  Any amount paid to the Borrowers on account of any such subrogation rights prior to the Termination Date shall be held in trust for the benefit of the Secured Parties and shall immediately be paid and turned over to the Administrative Agent for the benefit of the Secured Parties in the exact form received by the applicable Borrower (duly endorsed in favor of the Administrative Agent, if required), to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement; <u>provided</u>, <u>however</u>, that if a Borrower has made payment to the Secured Parties of all or any part of the Obligations and the Termination Date has occurred, then at the Borrowers' written request, the Administrative Agent (on behalf of the Secured Parties) will, at the expense of the Borrowers, execute and deliver to the Borrowers appropriate documents (in form and substance satisfactory to the Administrative Agent and without recourse and without representation or warranty) necessary to evidence the transfer by subrogation to the Borrowers of an interest in the Obligations resulting from such payment.  In furtherance of the foregoing, at all times prior to the Termination Date, the Borrowers shall refrain from taking any action or commencing any proceeding against any Credit Party (or its successors or assigns, whether in connection with a bankruptcy proceeding or otherwise) to recover any amounts in respect of payments made under <u>Section 3.4.1</u> to any Secured Party.

# ARTICLE 4
## CERTAIN LIBO RATE AND OTHER PROVISIONS

       4.1    <u>LIBO Rate Lending Unlawful</u>.    If any Lender shall determine (which determination shall, upon notice thereof to the Borrowers and the Administrative Agent, be conclusive and binding on the Borrowers) that the introduction of or any change in or in the interpretation of any law makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a LIBO Rate Loan, the obligations of such Lender to make, continue or convert any such LIBO Rate Loan shall, upon such determination, forthwith be suspended until such Lender shall notify the Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding LIBO Rate Loans payable to such Lender shall automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

       4.2    <u>Deposits Unavailable</u>.  If the Administrative Agent shall have determined that (a) Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or (b) by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate Loans; then, upon notice from the Administrative Agent to the Borrowers and the Lenders, the obligations of all Lenders under <u>Section 2.3</u> and <u>Section 2.4</u> to make or continue any Loans as, or

to convert any Loans into, LIBO Rate Loans shall forthwith be suspended until the Administrative Agent shall notify the Borrowers and the Lenders that the circumstances causing such suspension no longer exist.

4.3    Increased LIBO Rate Loan Costs, etc.    Each Borrower agrees, jointly and severally, to reimburse each Secured Party for any increase in the cost to such Secured Party of, or any reduction in the amount of any sum receivable by such Secured Party in respect of, such Secured Party's Loans hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, LIBO Rate Loans) that arise in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in after the Closing Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority, except for such changes with respect to increased capital costs  (which are governed by Section 4.5), any Indemnified Taxes or any Excluded Taxes.  Each affected Secured Party shall promptly notify the Administrative Agent and the Borrowers in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Secured Party for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrowers directly to such Secured Party within five days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

4.4    Funding Losses.    In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a LIBO Rate Loan) as a result of:

(a)    any conversion or repayment or prepayment of the principal amount of any LIBO Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article 3 or otherwise;

(b)    any Loans not being continued as, or converted into, LIBO Rate Loans in accordance with the Continuation/Conversion Notice therefor; or

(c)    any LIBO Rate Loans not being prepaid in accordance with any notice delivered pursuant to clause (a) of Section 3.1.1 (as a result of a revocation of such notice or as a result of such payment not being made);

but in each case other than due to such Lender's failure to fulfill its obligations hereunder then, upon the written notice of such Lender to the Borrowers, the Borrowers shall, within ten (10) days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense.  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

4.5    Increased Capital Costs.    In the event that any Lender shall determine (which determination shall, absent demonstrable error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change

40

therein or the adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law), or change in the administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof (<u>provided</u> that, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in law" for the purposes of the foregoing, regardless of the date enacted, adopted or issued), or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law): (i) affects or would affect the amount of capital required or expected to be maintained by any Lender or any Person controlling such Lender, and such Lender determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans held by such Lender is reduced to a level below that which such Lender or such controlling Person could have achieved but for the occurrence of any such circumstance, (ii) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Tax on the overall net income of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (iii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to LIBOR Rate Loans that are reflected in the definition of Adjusted LIBOR Rate); or (iv) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrower shall promptly pay to such Lender, within three (3) Business Days of receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender on an after tax basis for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this <u>Section 4.5</u>, which statement shall be conclusive and binding upon all parties hereto absent demonstrable error.  In determining such amount, such Lender may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

     4.6    <u>Taxes</u>.  Each Borrower covenants and agrees as follows with respect to Taxes.

(a)       Any and all payments by or on account of the Borrowers or any other Credit Party under any Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes except to the extent that deduction or withholding of such Taxes is required by Applicable Law.  In the event that any such Taxes are required by Applicable Law to be deducted or withheld from any payment required to be made by or on behalf of the Borrowers or any other Credit Party under any Loan Document, then:

(i)       subject to <u>clause (f)</u>, if such Taxes are Indemnified Taxes or Other Taxes, the Borrowers and each Credit Party shall increase the amount of such payment so that each Secured Party receives an amount equal to the amount it would have received had no such deduction or withholding been made; and

(ii)       the Borrowers or the Administrative Agent (as applicable) shall withhold the full amount of such Taxes from such payment (as increased pursuant to <u>clause (a)(i)</u>) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with Applicable Law.

(b)       In addition, the Borrowers shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with Applicable Law, or at the option of the Administrative Agent, timely reimburse it for the payment of Other Taxes.

(c)       The Borrowers shall furnish to the Administrative Agent, as promptly as reasonably practicable after any such payment is made, an official receipt (or a certified copy thereof) or other proof of payment satisfactory to the Administrative Agent, acting reasonably, evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)       Subject to clause (f), the Borrowers, jointly and severally, shall indemnify each Secured Party for any Indemnified Taxes and Other Taxes (including Indemnified Taxes and Other Taxes imposed or asserted on, or attributable to, amounts payable under this Section 4.6) paid by such Secured Party, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority.  With respect to the indemnification provided in this <u>Section 4.6(d)</u>, such indemnification shall be made within 10 days after the date such Secured Party makes written demand therefor.

(e)       Each Lender making Loans to the Borrowers, on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent, but only to the extent that such Lender is legally entitled to do so), shall deliver to the Borrowers and the Administrative Agent either (i) in the case of a Non-U.S. Lender, two duly completed copies of either (x) Internal Revenue Service Form W-8BEN-E, W-8BEN or W-8IMY claiming eligibility of a Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in clause (e)(i), (x) a certificate to the effect that such Non-U.S. Lender

is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Standard Register within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (referred to as an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W-8BEN-E, W-8BEN or W-8IMY or applicable successor form, or (iii) in the case of a Lender that is not a Non-U.S. Lender, two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, and (iv) in the case of any Lender, such documentation as is reasonably requested by the Borrowers or the Administrative Agent to comply with FATCA. The Administrative Agent shall deliver to the Borrowers such IRS forms as are required to ensure that payments made to the Administrative Agent are not subject to withholding, but only to the extent that the Administrative Agent is legally entitled to do so. Each Lender agrees to promptly notify the Borrowers and the Administrative Agent in writing of any change in circumstances which would modify or render invalid any claimed exemption or reduction. In addition, each Lender shall timely deliver to the Borrowers and the Administrative Agent two further copies of such Form W-8BEN-E, W-8BEN, W-8IMY, W-8ECI or W-9 or successor forms on or before the date that any previously executed form expires or becomes obsolete, or after the occurrence of any event requiring a change in the most recent form delivered by such Person to the Borrowers.

(f)     The Borrowers shall not be obligated to pay any additional amounts to any Secured Party pursuant to clause (a)(i), or to indemnify any Secured Party pursuant to clause (d), in respect of United States federal withholding Taxes to the extent imposed as a result of (i) the failure, inability or ineligibility of such Secured Party to deliver to the Borrowers the form or forms and/or an Exemption Certificate, as applicable to such Secured Party, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding Tax or the information or certifications made therein by the Secured Party being untrue or inaccurate on the date delivered in any material respect, or (iii) the Secured Party designating a successor lending office at which it maintains its Loans which has the effect of causing such Secured Party to become obligated for Tax payments in excess of those in effect immediately prior to such designation; provided that, the Borrowers shall be obligated to pay additional amounts to any such Secured Party pursuant to clause (a)(i), and to indemnify any such Secured Party pursuant to clause (d), in respect of United States federal withholding Taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding Tax resulted from a change in any applicable statute, treaty, regulation or other Applicable Law or any official interpretation of any of the foregoing occurring after the Closing Date (or in the case of an Assignee Lender, after the date of the assignment, except to the extent that the applicable assigning lender was entitled to receive additional amounts with respect to such United States Federal withholding Taxes), which change rendered such Secured Party no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding Tax, (ii) the redesignation of the Secured Party's lending office was made at the request of a Borrower or (iii) the obligation to pay any additional amounts to any such Secured Party pursuant

to clause (a)(i) or to indemnify any such Secured Party pursuant to clause (d) is with respect to an Assignee Lender that becomes an Assignee Lender as a result of an assignment made at the request of a Borrower.

(g)      In the event that any Lender or the Administrative Agent determines in its sole discretion that it has received a refund in respect of Taxes or Other Taxes as to which it has been paid additional amounts by the Borrowers pursuant to clause (a) or indemnified by the Borrowers pursuant to clause (d) and such Lender or the Administrative Agent, as applicable, determines in its good faith judgment that such refund is attributable to such additional amounts or indemnification, then such Lender or Administrative Agent shall promptly notify the Administrative Agent and the Borrowers, and shall, within 30 Business Days of receipt of such refund remit to the Borrowers, net of all out-of-pocket expenses (including Taxes) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrowers, upon request of the Lender or the Administrative Agent, shall repay to the Lender or the Administrative Agent the amount paid over pursuant to this clause (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority and, provided further, that in no event will the Lender or the Administrative Agent be required to pay any amount pursuant to this clause (g) the payment of which would place the Lender or Administrative Agent in a less favorable net after-Tax position than it would have been if the Indemnified Taxes or Other Taxes had not been imposed and the corresponding additional amounts or indemnification payment not been made.  Neither the Lenders nor the Administrative Agent shall be obligated to disclose information regarding its tax affairs or computations, including their tax returns, to the Borrowers in connection with this clause (g) or any other provision of this Section that such Lender or the Administrative Agent deems confidential.

4.7      Payments, Computations; Proceeds of Collateral, etc.  (a)  Unless otherwise expressly provided in a Loan Document, all payments by the Borrowers pursuant to each Loan Document shall be made by the Borrowers to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment.  All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. New York time on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrowers.  Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day. The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party.  All interest (including interest on LIBO Rate Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days (or, in the case of interest on a Base Rate Loan (calculated at other than the Federal Funds Rate), 365 days or, if appropriate, 366 days).  Payments due on other than a Business Day shall (except as otherwise required by clause (b) of the proviso in the definition of "Interest Period") be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

44

(b)    After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon written direction from the Required Lenders, shall (subject to the provisions of the Intercreditor Agreements), apply all amounts received under the Loan Documents (including from the proceeds of Collateral) or under Applicable Law shall be applied upon receipt to the Obligations as follows: (i) first, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Administrative Agent, in its capacity as the Administrative Agent (including the fees and expenses of counsel to the Administrative Agent), (ii) second, after payment in full in cash of the amounts specified in clause (b)(i), to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Loan Documents, and all costs and expenses owing to the Secured Parties pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) third, after payment in full in cash of the amounts specified in clauses (b)(i) and (b)(ii), to the ratable payment of the principal amount of the Loans then outstanding, (iv) fourth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iii), to the ratable payment of all other Obligations owing to the Secured Parties, and (v) fifth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iv), and following the Termination Date, to each applicable Credit Party or any other Person lawfully entitled to receive such surplus.

4.8    <u>Sharing of Payments</u>.  If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u> or <u>4.6</u>) in excess of its pro rata share of payments obtained by all Secured Parties, such Secured Party shall purchase for cash at face value from the other Secured Parties such participations in Loans held by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u> that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party which has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered.  The Borrowers agree that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to <u>Section 4.9</u>) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrowers in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

4.9    <u>Setoff</u>.  Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default described in <u>clauses (b)</u> through <u>(d)</u> of <u>Section 8.1.8</u> or, with the consent

of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) each Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of such Borrower then or thereafter maintained with such Secured Party; provided that, any such appropriation and application shall be subject to the provisions of Section 4.8 and to the Intercreditor Agreements.  Each Secured Party agrees promptly to notify the Borrowers and the Administrative Agent in writing after any such appropriation and application made by such Secured Party; provided that, the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under Applicable Law or otherwise) which such Secured Party may have.

4.10    Replacement of Lenders.  If any Lender (an "Affected Lender") fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of a greater percentage of the Lenders than the Required Lenders and such election, consent, amendment, waiver or other modification is otherwise consented to by the Required Lenders, the Borrowers may, within 30 days of receipt by the Borrowers of such demand or notice, as the case may be, give notice (a "Replacement Notice") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans and/or Notes to an Eligible Assignee (a "Replacement Lender") designated in such Replacement Notice; provided, however, that no Replacement Notice may be given by the Borrowers if (i) such replacement conflicts with any Applicable Law or regulation, or (ii) any Event of Default shall have occurred and be continuing at the time of such replacement.  Within 30 days of its receipt of such Replacement Notice, the Affected Lender shall assign, in accordance with Section 10.11, the portion of its Loans, Notes (if any), and other rights and obligations under this Agreement and all other Loan Documents designated in the replacement notice to such Replacement Lender; provided, however, that (i) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender, (ii) the purchase price paid by such Replacement Lender shall be in the amount of such Affected Lender's Loans designated in the Replacement Notice, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts and including any call premiums, owing to such Affected Lender hereunder and (iii) the Borrowers shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in Section 10.11).  Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents.  Each assignment pursuant to this Section 4.10 shall be effective upon the satisfaction of the conditions specified in this Section 4.10 without further action on the part of the applicable Affected Lender.

4.11    Change in Lending Office.  If any Lender makes a demand upon the Borrowers for (or if the Borrowers are otherwise required to pay) amounts pursuant to Section 4.3, 4.5 or 4.6, or gives notice pursuant to Section 4.1 requiring a conversion of such Lender's LIBO Rate Loans to Base Rate Loans or suspending such Lender's obligation to hold Loans as, or to convert Loans into, LIBO Rate Loans, then such Lender shall use reasonable efforts to designate a

different lending office with respect to its rights and obligations hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate the need for such notice or reduce amounts payable or to be withheld in the future, as applicable; and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

## ARTICLE 5
## CONDITIONS TO LOANS

5.1    Conditions to Close.  This Agreement shall be effective upon the satisfaction of the following conditions precedent:

5.1.1    Resolutions, etc.  The Administrative Agent shall have received from each Credit Party, (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to:

(a)    resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, all aspects of the Transactions applicable to such Person and the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

(b)    the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

(c)    the full force and validity of each Organic Document of such Person and copies thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

5.1.2    Delivery of Notes.  The Administrative Agent shall have received, for the account of each Lender that has requested a Note, such Lender's Note(s) duly executed and delivered by an Authorized Officer of each Borrower.

5.1.3    Reserved.

5.1.4    Security Agreements.  The Administrative Agent shall have received executed counterparts of the Security Agreement, each dated as of the Closing Date, duly executed and delivered by the Borrowers and each Subsidiary, together with:

(a)    to the extent not previously delivered to the Administrative Agent, certificates (in the case of Capital Securities that are securities (as defined in the UCC)) evidencing all of the issued and outstanding capital Securities owned by each Credit Party in its Subsidiaries directly owned by each Credit Party, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, if any Capital Securities (in the case of Capital Securities that are uncertificated securities (as defined in the UCC)), confirmation and evidence satisfactory to the Administrative Agent that the security interest therein has been transferred to and perfected by the Administrative Agent for the benefit of the Secured Parties in accordance with Articles 8 and 9 of the UCC and all laws otherwise applicable to the perfection of the pledge of such Capital Securities; and

(b)    Filing Statements suitable in form for naming each Borrower and each Subsidiary Guarantor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or as the Required Lenders may require to perfect the security interests of the Administrative Agent pursuant to such Security Agreement..

5.1.5    <u>Mexican Collateral Documents</u>.   The Administrative Agent shall have received executed counterparts of that certain Non-Possessory Pledge Agreement dated as of the Closing Date, duly executed and delivered by each of SR MX Holdco, SR MX Holdings and SR Mexico.

5.1.6    <u>Reserved</u>.

5.1.7    <u>Filing Agent, etc</u>.   All Uniform Commercial Code financing statements or other similar financing statements and Uniform Commercial Code (Form UCC-3) termination statements required pursuant to the Loan Documents (collectively, the "<u>Filing Statements</u>"), shall have been delivered to CT Corporation System or another similar filing service company acceptable to the Required Lenders (the "<u>Filing Agent</u>").

5.1.8    <u>Intercreditor Agreement</u>.   The Administrative Agent shall have received the ABL-TL DIP Intercreditor Agreement, fully executed by all parties thereto.

5.1.9    <u>Patriot Act Disclosures</u>.   The Administrative Agent and each Lender shall have received all Patriot Act Disclosures requested by them prior to execution of this Agreement.

5.1.10    <u>Compliance with Warranties, No Default, etc</u>.   The Administrative Agent shall have received a certificate of an Authorized Officer of Standard Register to the effect that both before and after giving effect to the consummation of the Transactions:

(a)    the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)    no Default shall have then occurred and be continuing.

5.1.11  Reserved.

5.1.12  Reserved.

5.1.13  Fees.  The Administrative Agent shall have received the fees required to be paid at the Closing by the Borrowers hereunder.

5.1.14  No Litigation.  Except for the Cases, there shall be no action, suit, investigation litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority that could reasonably be expected to materially and adversely affect the transactions contemplated by this Agreement and the other Loan Documents.

5.1.15  Closing Certificate.  The Administrative Agent shall have received a certificate of an Authorized Officer of Standard Register certifying that each of the conditions precedent herein have been satisfied.

5.1.16  Interim Financing Order.  The Administrative Agent shall have received a certified copy of the Interim Financing Order.  The Interim Financing Order shall (i) have been entered with the consent or non-objection of a majority in dollar amount (as determined by the Administrative Agent) of the "Loans" as defined in and as outstanding under the Prepetition Term Loan Facilities, (ii) be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect, (iii) authorize the Loans and the extensions of credit under the ABL DIP Facility in amounts satisfactory to the Administrative Agent. The Interim Financing Order shall further provide that (a) the automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated, terminated and modified (but solely with respect to the Facility), effective following five Business Days' written notice to the Borrowers and the Initial Guarantors and any other applicable notice parties (the "Default Notice Period") of the occurrence of an Event of Default, unless the Bankruptcy Court has determined that such Event of Default has not occurred and/or is not continuing, (b) any party in interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default and be entitled to an emergency hearing before the Bankruptcy Court, with proper notice to the Lenders and the Administrative Agent, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, (c) the rights and remedies of the Administrative Agent and the Lenders specified in the Interim Financing Order are cumulative and not exclusive of any rights or remedies that the Administrative Agent and Lenders may have hereunder or otherwise, and (d) the Credit Parties shall cooperate fully with the Lenders and the Administrative Agent in any permitted exercise of rights and remedies, whether against the Collateral or otherwise.

5.1.17  Compliance with Interim Financing Order; No Trustee.  The Credit Parties shall be in compliance in all respects with the Interim Financing Order.  No trustee or examiner shall have been appointed with respect to the Debtors or any of their respective properties.

5.1.18  First Day Motion/Financing Orders.  All motions and orders submitted to the Bankruptcy Court on or about the Petition Date (or within five days thereof) shall be in form and substance satisfactory to the Administrative Agent, and the Administrative Agent shall be

reasonably satisfied with any cash collateral arrangements applicable to any material pre-Petition Date secured obligations of the Credit Parties.

5.1.19   <u>Sale Motion</u>.   A motion (the "<u>Sale Motion</u>"), in form and substance acceptable to the Administrative Agent, seeking Bankruptcy Court approval of the Purchase Agreement, subject only to higher and better offers, shall have been filed with the Bankruptcy Court.

5.1.20   <u>Other Motions and Orders</u>.   All other motions filed or orders entered by the Bankruptcy Court in the Cases shall be in form and substance reasonably satisfactory to the Administrative Agent.

5.1.21   <u>Initial Budget</u>.   The Administrative Agent shall have received and approved the initial Budget and the initial Professional Fee Budget.

5.1.22   <u>No Defaults</u>.   No Default shall then exist.

5.1.23   <u>Know Your Customer</u>.   Any information reasonably required by a Lender and any other Secured Party to enable it to meet its internal "know your customer" compliance requirements and normal operating procedures shall have been delivered.

5.1.24   <u>Representations and Warranties</u>.   The representations and warranties of the Credit Parties contained in <u>Article VI</u> or any other Loan Document shall be true and correct in all material respects on and as of the Closing Date (except to the extent that any such representation and warranty (x) is qualified as to materiality, in which case such representation and warranty shall be true and correct in all respects on and as of the date of such Credit Extension, or (y) specifically refers to an earlier date, in which case such representation or warranty is true and correct as of such earlier date).

5.1.25   <u>ABL DIP Facility</u>.   The ABL DIP Facility shall have been entered into (pursuant to ABL DIP Documents in form and substance acceptable to the Administrative Agent) and, but for the effectiveness of this Facility, be in full force and effect with a minimum ABL Availability thereunder on the Closing Date of not less than $12,500,000.

5.2   <u>Conditions to Each Loan</u>.   The obligation of each Lender to make its Loans hereunder on any date (other than the Closing Date Loan, which shall be deemed made on the Closing Date upon the effectiveness of this Agreement irrespective of any conditions set forth in this <u>Section 5.2</u> and the Wind Down Funding Loan, which shall be funded on or about the Sale Closing Date subject only to <u>Section 5.2.9</u> below) is subject to satisfaction of the following conditions precedent:

5.2.1   The representations and warranties of the Credit Parties contained in Article VI or any other Loan Document shall be true and correct in all material respects on and as of the date of such Delayed Draw Loan (except to the extent that any such representation and warranty (x) is qualified as to materiality, in which case such representation and warranty shall be true and correct in all respects on and as of the date of such Delayed Draw Loan, or (y) specifically refers to an earlier date, in which case such representation or warranty is true and correct as of such earlier date);

5.2.2   No Default shall exist, or would result from such proposed Loan or from the application of the proceeds thereof;

5.2.3   The Administrative Agent shall have received a written request for such Loan in accordance with the requirements hereof;

5.2.4   The Interim Financing Order (or Final Financing Order, as the case may be) shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect.  If either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, none of the making of such Loan, the grant of Liens and Superpriority Claims hereunder or the performance by any Credit Party of any of its respective obligations under any of the Loan Documents shall be the subject of a then presently effective stay;

5.2.5   The Final DIP Financing Order shall have been entered within 30 days of entry of the Interim Financing Order substantially in the form of and containing, among other things, the provisions present in the Interim Financing Order (including, without limitation, the granting of Liens contemplated under the Security Documents). The Final Financing Order shall have been entered on such notice to such parties as may be reasonably satisfactory to the Administrative Agent and as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, order of the Bankruptcy Court, and any applicable local bankruptcy rules.  The Final Financing Order must otherwise be in full force and effect and, unless otherwise waived by the Administrative Agent, no appeal or petition for review, rehearing, or certiorari with respect to the Final Financing Order may be pending;

5.2.6   The Borrowers shall certify (a) that they are in compliance with (i) the Budget and that all Loans shall have been and will be used solely in accordance with the Budget, subject to Permitted Variances, and (ii) all covenants under the Loan Documents, and (b) as of the date such Loan is requested, ABL Availability under the ABL DIP Credit Agreement is expected to be zero on the requested date of funding the applicable Loan and Borrowers are expected to have insufficient cash on hand to pay the amounts set forth in the Budget with respect to which such Loan request is being made;

5.2.7   Standard Register's existing directors' and officers' insurance coverage shall be acceptable to the Administrative Agent in its sole discretion, or Standard Register shall have obtained additional directors' and officers' insurance coverage, or modified its existing coverage, in either case so as to be acceptable to the Administrative Agent in its sole discretion; it being acknowledged by the Administrative Agent that that that certain "Extended Reporting period Elect (pre-paid)" endorsement to the Borrowers' directors' and officers' liability policies received by Administrative Agent on Tuesday, March 10, 2015 is acceptable;

5.2.8   Each request for a Loan submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in Section 5.2 have been satisfied on and as of the date of the applicable Loan; and

5.2.9    With respect to the Wind Down Funding Loan only, all conditions precedent to closing (other than, for the avoidance of doubt, any condition that the Wind Down Amount be funded) under (i) Purchase Agreement, or (ii) to the extent applicable, an Alternative Transaction (as defined in the Purchase Agreement), have been fully satisfied or otherwise waived in writing by the Purchaser (with the consent of the Administrative Agent) and the Acquisition is otherwise ready to be consummated in accordance with the terms of the Purchase Agreement or the terms of a definitive agreement relating to an Alternative Transaction, as applicable.

Borrowers hereby request, authorize and direct Lenders to make the Closing Date Loan and the Wind Down Funding Loan on the Closing Date and on or about the Sale Closing Date, respectively.  The Closing Date Loan and the Wind Down Funding Loan constitute Loans made pursuant to this Agreement for all purposes.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

In order to induce the Secured Parties to enter into this Agreement, each Borrower represents and warrants to each Secured Party on the Closing Date and on each date a Loan is made hereunder, as set forth in this Article.

6.1    <u>Organization and Qualification</u>.  Each Borrower and each of its Subsidiaries is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Borrower and each of its Subsidiaries is duly qualified and is authorized to do business and is in good standing as a foreign corporation in each state and jurisdiction in which the failure of any the Borrower or any of such Subsidiaries to be so qualified would have a Material Adverse Effect.

6.2    <u>Power and Authority</u>.  Upon the entry of the Interim DIP Financing Order, each Borrower and each of its Subsidiaries is duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which it is a party.  The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary corporate, limited liability company or analogous action and do not and will not (i) require any consent or approval of any of the holders of the Capital Securities of any Borrower or any of its Subsidiaries; (ii) contravene the Organic Documents of any Borrower or any of its Subsidiaries; (iii) violate, or cause any Borrower or any of its Subsidiaries to be in default under, any provision of any Applicable Law, order, writ, judgment, injunction, decree, determination or award in effect having applicability to such Borrower or any of its Subsidiaries; (iv) result in a breach of or constitute a default under (a) any indenture or loan or credit agreement or (b) any other agreement, lease or instrument to which a Borrower or any of its Subsidiaries is a party or by which it or its Properties may be bound or affected the consequence of which would constitute a Material Adverse Effect; or (v) result in, or require, the creation or imposition of any Lien (other than Permitted Liens) upon or with respect to any of the Properties now owned or hereafter acquired by a Borrower or any of its Subsidiaries.

6.3    <u>Legally Enforceable Agreement</u>.    Upon the entry of the Interim DIP Financing Order and thereafter upon the entry of the Final DIP Financing Order, this Agreement is and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of each Borrower and each of its Subsidiaries signatories thereto enforceable against them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by principles of equity affecting the enforcement of creditors' rights.

6.4    <u>Capital Structure</u>.    As of the date hereof, <u>Part 6.4</u> of the Disclosure Schedule states (i) the correct name of each Subsidiary, its jurisdiction of incorporation and the percentage of its Capital Securities having voting powers owned by each Person, (ii) the name of each corporate Affiliate of each Credit Party and the nature of the affiliation and (iii) the number of authorized and issued Capital Securities (and treasury shares) of each Credit Party and each of its Subsidiaries as of the close of such Borrower's most recently ended Fiscal Month. As of the date hereof, each Credit Party has good title to all of the shares it purports to own of the Capital Securities of each of its Subsidiaries, free and clear in each case of any Lien other than Permitted Liens. As of the date hereof: (x) all such Capital Securities have been duly issued and are fully paid and non-assessable; and (y) since December 30, 2014, no Credit Party has made, or obligated itself to make, any Distribution except as shown in <u>Part 6.4</u> of the Disclosure Schedule. Except as shown in <u>Part 6.4</u> of the Disclosure Schedule neither any Credit Party nor any Subsidiary holds, and no shares of the capital stock of any Credit Party or any Subsidiary are subject to, outstanding options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any Capital Securities or obligations convertible into, or any powers of attorney relating to such Capital Securities.

6.5    <u>Reserved</u>.

6.6    <u>Business Locations; Agent for Process</u>.    <u>Part 6.6</u> of the Disclosure Schedule contains a true and complete list of the following information, as of the date hereof: (i)the chief executive office of each Credit Party and each of its Subsidiaries including any other executive offices of each Credit Party and each of its Subsidiaries during the 5-year period preceding the date of this Agreement and (ii) the agent for service of process of each Borrower and each of its Subsidiaries in their respective states of organization. All of the plant facilities and warehouses of each Credit Party and its Subsidiaries effective as of the date hereof are listed in <u>Part 6.6</u> of the Disclosure Schedule.

6.7    <u>Status of Obligations; Perfection and Priority of Security Interests</u>.    Subject to the Interim Financing Order and the entry by the Bankruptcy Court of the Final Financing Order, the Security Documents are effective to create in favor of the Collateral Agent, for the benefit of the Lenders, legal, valid and enforceable Liens on, and security interests in, the Collateral described therein to the extent intended to be created thereby. The Interim Financing Order is (and the Final Financing Order when entered will be) effective to create in favor of the Collateral Agent legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral with the priorities set forth in <u>Section 6.7</u> hereof and in the Interim Financing Order. The Obligations and the Liens securing the Obligations, subject to the ABL-TL DIP Intercreditor Agreement, are entitled to and have the priority set forth in the Financing Orders. The priorities set forth in the Financing Orders are subject, in each case, only to the Carve-Out and the Permitted Senior Liens

(as defined therein). All of the Liens and security interests described in the Financing Orders shall be valid, effective, enforceable and perfected as of the date that the Bankruptcy Court enters the Interim Financing Order without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents and without further action by an Person. Each Credit Party shall execute and deliver to the Administrative Agent (for recordation or filing, as appropriate) such mortgages and pledges (and other security instruments), and be authorized pursuant to the Financing Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Administrative Agent) to evidence and secure the Obligations.

6.8     Financial Information. Since January 31, 2015, there has been no change in the condition, financial or otherwise, of any Borrower (other than commencement of the Cases) that could reasonably be expected to have a Material Adverse Effect. No financial statement of operations of any Borrower and its Subsidiaries delivered to the Administrative Agent or any Lenders by Borrowers on or prior to the Closing Date contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading. No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading. There is no fact or circumstance that any Borrower has failed to disclose to the Administrative Agent in writing that could reasonably be expected to have a Material Adverse Effect.

6.9     Brokers. Except for fees disclosed in writing to the Administrative Agent and paid on the Closing Date in connection with the Transactions, there are no claims against the Borrowers for brokerage commissions, finder's fees or investment banking fees in connection with the transactions contemplated by this Agreement or any of the other Loan Documents.

6.10     Governmental Approvals. Subject to the entry of the Interim Financing Order, each Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Approvals necessary to utilize the Loans hereunder and to consummate the transactions contemplated hereby and the other Loan Documents, except for issues relating to licenses, certificates of occupancy and other matters that are not reasonably likely to have a Material Adverse Effect.

6.11     Compliance with Applicable Laws. Each Borrower and each of its Subsidiaries has duly complied with, and its Properties, business operations and leaseholds are in compliance in all material respects with, the provisions of all Applicable Law, including all Terrorism Laws, necessary to consummate the transactions contemplated hereby and the other Loan Documents and there have been no citations, notices or orders of noncompliance issued to the Borrowers or any of the Subsidiaries with respect to the transactions contemplated hereby and the other Loan Documents under any such law, rule or regulation that could be reasonably expected to have a Material Adverse Effect.

6.12     Litigation. Except for the Cases and as set forth in Part 6.12 of the Disclosure Schedule, there are no actions, suits, proceedings or investigations pending or, to the Borrower's Knowledge, threatened on the date hereof, against or affecting any Borrower or any of its Subsidiaries, or the business, operations, Properties, prospects, profits or condition of the

Borrower or any of its Subsidiaries, (i) which relates to the transactions contemplated hereby and the other Loan Documents and (ii) which, if determined adversely to a Borrower or any of its Subsidiaries, could reasonably be expected to have a Material Adverse Effect.

6.13    No Defaults.  No event has occurred and no condition exists which would, upon or immediately after the execution and delivery of this Agreement or any Credit Party's performance hereunder, constitute a Default or an Event of Default, except for conditions that could not reasonably be expected to have a Material Adverse Effect.

6.14    Investment Company Act.  Each Borrower is not an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940.

6.15    Margin Stock.  Neither the Borrowers nor any of their Subsidiaries is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

6.16    Reserved.

6.17    Use of Proceeds.

6.17.1 No Borrower nor any other Credit Party shall use the proceeds of any Loan for any purpose other than (i) to fund working capital and other corporate purposes of the Borrowers and their Subsidiaries (including to pay fees and expenses associated with the Facility) that are due and payable or will become due and payable within the two week period following the date of funding of the requested Loan and in strict accordance with the Budget, subject to Permitted Variances, and (ii) to fund the sale process described in Section 7.20 hereof.  Loans shall be made hereunder and proceeds used by Borrowers only (i) except with respect to the Closing Date Loan and the Wind Down Funding Loan, when ABL Availability is expected to be zero on the requested date of funding the applicable Loan, and (ii) only in strict accordance with the most recent Budget approved by the Administrative Agent, subject to Permitted Variances and the Financing Orders. The Borrowers shall not use the proceeds of any Loan to make any payment in respect of the Prepetition ABL Obligations.

6.17.2 Proceeds of ABL Loans shall be used by the Credit Parties solely (i) to fund working capital and other corporate purposes of the Borrowers and their Subsidiaries in accordance with the Budget, subject to Permitted Variances, (ii) to fund the sale process described in Section 7.20 hereof, and (iii) for such other purposes as are consistent with the Budget (including to pay certain ABL Obligations as specified therein from time to time) or as expressly authorized in the Financing Orders.

6.17.3 Except as specifically set forth in Section 5.1.16 with respect to a challenge in connection with a Default Notice Period, none of the proceeds of the Loans or any ABL Loans shall be used in connection with (i) the initiation, prosecution or furtherance of any claims, causes of action, adversary proceedings or other litigation against the Administrative Agent, the Collateral Agent, any Lender or any of their respective Affiliates, (ii) any challenge to the validity or enforceability the Prepetition Term Loan Facilities or the Loan Documents or the validity, perfection, priority or enforceability of any Liens securing the Prepetition Term Loan

Facility or the Obligations, (iii) any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to prevent, enjoin, hinder or otherwise delay the Administrative Agent's or Collateral Agent's enforcement of any of the Loan Documents or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); or (iv) any purpose prohibited by the Bankruptcy Code or inconsistent with the Financing Orders.

# ARTICLE 7
# COVENANTS

7.1    <u>Affirmative Covenants</u>.  Each Borrower (for itself and its Subsidiaries) hereby covenants and agrees that, on the Closing Date and thereafter, until the Loans, together with interest, fees and all other Obligations incurred hereunder (other than contingent indemnification obligations for which no claim has been identified), are paid in full, unless the Required Lenders have otherwise consented in writing, the Borrowers will, and will cause their Subsidiaries to, perform or cause to be performed the obligations set forth below.

7.1.1    <u>Visits and Inspections</u>.    The Borrowers will, and will cause each of their Subsidiaries to, permit representatives of the Administrative Agent, from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default exists) upon reasonable prior notice to the Borrowers, to visit and inspect the Properties of the Borrowers and each of their Subsidiaries, inspect, audit, examine, conduct appraisals, and make extracts from such Borrower's and each Subsidiary's books and records, and discuss with its officers, its employees and its independent accountants, such Borrower's and each Subsidiary's business, financial condition, business prospects and results of operations.  Up to two such visit prior to the Stated Maturity Date shall be at the Borrowers' expense; except when a Default exists, in which case all such visits shall be at the Borrowers' expense.  Representatives of each Lender shall be authorized to accompany Administrative Agent on each such visit and inspection and to participate with Administrative Agent therein, but at their own expense, unless a Default exists.  Neither Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

7.1.2    <u>Notices</u>.  Notify the Administrative Agent and the Lenders in writing, within five (5) days after the Borrower's Knowledge thereof, (i) of the commencement of any litigation affecting any Credit Party or any of its Properties, whether or not the claims asserted in such litigation are considered by the Credit Parties to be covered by insurance, and of the institution of any administrative proceeding, to the extent that such litigation or administrative proceeding, if determined adversely to such Credit Party, would reasonably be expected to have a Material Adverse Effect; (ii) of any material labor dispute to which any Credit Party may become a party, any strikes or walkouts relating to any of its plants or other facilities; (iii) of any material default by any Credit Party under or termination of any material contract, or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness of such Credit Party exceeding $500,000; (iv) of the existence of any Default; (v) of any default by any Person under any note or other evidence of Indebtedness payable to a Credit Party in an amount exceeding $500,000; (vi) of any judgment against any Credit Party in an amount exceeding $500,000; (vii) of the assertion by any Person of any intellectual property

claim, the adverse resolution of which could reasonably be expected to have a Material Adverse Effect; (viii) of any violation or asserted violation by any Credit Party of any Applicable Law (including ERISA, OSHA, FLSA or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect; (ix) of any Release by a Credit Party or on any Property owned or occupied by a Credit Party which could reasonably be expected to have a Material Adverse Effect; (x) of the discharge of the Borrowers' independent accountants or any withdrawal of resignation by such independent accountants from their acting in such capacity; (xi) of the issuance or incurrence of any Indebtedness; (xii) of sale of any Equity Interests of a Borrower or any Subsidiary; (xiii) of any disposition of any assets or Property or any interest therein to or in favor of any Person; or (xiv) copies of all notices, requests and other documents (including amendments, waivers and other modifications) received by any Credit Party or any Subsidiary under or pursuant to any ABL DIP Document and, from time to time upon request by the Administrative Agent, such information and reports regarding the ABL Loans as the Administrative Agent may reasonably request.  In addition, the Credit Parties shall give the Administrative Agent at least five (5) Business Days prior written notice of any Credit Party's opening of any new chief executive office.

7.1.3    <u>Financial and Other Reporting</u>.  Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all its financial transactions; and cause to be prepared and to be furnished to the Administrative Agent and the Lenders the following (all to be prepared in accordance with GAAP applied on a consistent basis, unless the Borrowers' certified public accountants concur in any change therein, such change is disclosed to the Administrative Agent and is consistent with GAAP and, if required by the Required Lenders, the financial covenants set forth in <u>Section 7.2.17</u> are amended in a manner requested by the Required Lenders to take into account the effects of such change):

(a)    if directed in writing by the Administrative Agent on or prior to March 20, 2015, Standard Register shall use commercially reasonable best efforts to obtain audited balance sheets of Standard Register and its Subsidiaries as of the end of its Fiscal Year ended December 31, 2014 and the related statements of income, shareholders' equity and cash flow, on a consolidated basis, setting forth in each case in comparative form the corresponding consolidated figures for the preceding Fiscal Year and certified by the principal financial officer of Standard Register as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations of the Borrowers and their Subsidiaries for such Fiscal Year (subject only to changes from audit and year end adjustment and except that such statements need not contain notes), to be delivered to the Administrative Agent no later than May 1, 2015, the costs of which shall be incurred by the Borrowers in accordance with the Budget;

(b)    as soon as available, and in any event within 30 days after the end of each of the first 3 Fiscal Quarters in any Fiscal Year, excluding the last Fiscal Quarter of the Standard Register's Fiscal Year, unaudited balance sheets of the Borrowers and their Subsidiaries and the related unaudited consolidated statements of income and cash flow in each case for such Fiscal Quarter and for the portion of Standard Register's Fiscal Year then elapsed, on a consolidated basis, setting forth in each case in comparative form, the corresponding figures for the preceding Fiscal Year and certified by the

principal financial officer of Standard Register as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations of the Borrowers and their Subsidiaries for such Fiscal Quarter and period subject only to changes from audit and year-end adjustments and except that such statements need not contain notes;

(c)     as soon as available, and in any event within 30 days after the end of each Fiscal Month hereafter (except information for the last Fiscal Month of any Fiscal Quarter shall be due at the time specified in subparagraph (b) above and information for the last Fiscal Month of any Fiscal Year shall be due in preliminary form at the time specified in subparagraph (b) above and in final form at the time specified in subparagraph (a) above), unaudited balance sheets of Standard Register and its Subsidiaries and the related unaudited consolidated statements of income and cash flow in each case for such month and for the portion of Standard Register's Fiscal Year then elapsed, on a consolidated basis, setting forth in each case in comparative form, the corresponding figures for the preceding Fiscal Year and certified by the principal financial officer of Standard Register as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations of the Borrowers and their Subsidiaries for such Fiscal Month and period subject only to changes from audit and year-end adjustments and except that such statements need not contain notes;

(d)     promptly following the mailing or receipt of any material notice or report delivered under any of the Prepetition Term Loan Facilities or under the ABL DIP Facility, copies of such notice or report;

(e)     (i) As soon as practicable in advance of filing with the Bankruptcy Court or delivering to the official creditors' committee appointed in a Case, if any, or to the United States Trustee for the District of Delaware, as the case may be, the Final Financing Order, all other proposed orders and pleadings related to the Cases, the Facility and/or any sale contemplated in accordance with Section 7.1.20 hereof (all of which must be in form and substance satisfactory to the Administrative Agent), any plan of reorganization or liquidation and/or any disclosure statement related thereto and (ii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Official Creditors' Committee appointed in any Case, if any, or to the United States Trustee for the District of Delaware, as the case may be, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrowers or other Indebtedness of the Credit Parties that may be filed with the Bankruptcy Court or delivered to the official creditors' committee appointed in the Case, if any, or to the United States Trustee for the District of Delaware;

(f)     within 15 days after the end of each Fiscal Quarter, information reasonably satisfactory to the Administrative Agent supporting the information set forth in the certificate delivered pursuant to subsection (e) above;

(g)     an updated Budget and an updated Professional Fee Budget every two weeks in form and substance acceptable to the Administrative Agent;

(h)    promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which Standard Register has made generally available to its shareholders and copies of any regular, periodic and special public reports or registration statements which Standard Register files with the SEC or any Governmental Authority which may be substituted therefor, or any national securities exchange;

(i)    within two (2) Business Days of the delivery thereof, copies of any Borrowing Base Certificate (as defined in ABL DIP Credit Agreement) delivered to the ABL Administrative Agent;

(j)    concurrently with the delivery of the financial information pursuant to clauses (b) and (c), a Compliance Certificate, executed by the chief financial or accounting officer of Standard Register, (i) stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that Standard Register or a Credit Party has taken or proposes to take with respect thereto), (ii) stating that no Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate (or, if a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied with Section 7.1.17) and (iii) certifying that it is in compliance with the then current Budget and that all ABL Loans shall have been and will be used solely in accordance with the Budget, subject to Permitted Variances;

(k)    an initial 13 week professional fee budget and an updated professional fee budget for each successive 13-week period thereafter (the "Professional Fee Budget") setting forth in reasonable detail and specificity the projected fees and reimbursable expenses of any and all professionals retained by or on behalf of the Debtors, the Committee, the ABL Lenders and the Lenders;

(l)    Borrowers shall provide to the Administrative Agent, at the time or times reasonably requested by the Administrative Agent, but in no event less than Friday of each week after the Closing Date, a report on the status of Borrowers' efforts and progress with respect to the Sale Covenants and such other information regarding the same as the Administrative Agent may reasonably request; provided, however, that the Borrowers shall not be required to provide information to the Administrative Agent (or its advisors) if the Administrative Agent or any Affiliate thereof submits a bid or has a bid submitted on its behalf in connection with the sale contemplated under Section 7.1.20 hereof, for so long as such bid remains open, including any credit bid, if the Borrowers determine, in their reasonable business judgment, that providing such information or consulting with the Administrative Agent or such advisor regarding any issue, selection, or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to goal of maximizing value for the Debtors' estates from the sale process; and

(m)    such other reports and information (financial or otherwise) as the Administrative Agent may reasonably request from time to time in connection with the Cases, any Collateral or any Credit Party's financial condition or business.

Promptly after the sending or filing thereof, the Borrowers shall also provide to the Administrative Agent copies of any annual report to be filed in accordance with ERISA in connection with each Pension Plan, any filing made with PBGC under section 4043 of ERISA, the annual funding notice issued under section 101(f) of ERISA, and such other data and information (financial and otherwise) as the Administrative Agent, from time to time, may reasonably request bearing upon or related to the Collateral or each Borrower's and each of its Subsidiaries' financial condition or results of operations.

Each Borrower hereby acknowledges that (i) the Administrative Agent will make available to the Lenders any Communications by posting the Communications on IntraLinks or another similar electronic system ("Platform") and (ii) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrowers, the Credit Parties and/or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.    The Borrowers hereby agree that (a) all Communications that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (b) by marking Communications "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as not containing any material non-public information with respect to the Credit Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Communications constitute any proprietary, nonpublic and/or confidential information, they shall be treated as set forth in Section 10.15); (c) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (d) the Administrative Agent shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

7.1.4    Landlord and Storage Agreements.    Upon the reasonable request of the Administrative Agent, provide the Administrative Agent with copies of:  (i) any of the existing agreements, and (ii) any future agreements, between any Credit Party and any landlord, warehouseman or bailee which owns any premises at which any Collateral may, from time to time, be kept.

7.1.5    Reserved.

7.1.6    Taxes.  Pay and discharge all Taxes prior to the date on which such Taxes become delinquent or penalties attach thereto, except and to the extent only that such Taxes are being Properly Contested, or that such Taxes are in an aggregate amount of less than $500,000, and are filed and paid in good faith as to the Borrower's Knowledge as such Taxes become due.

7.1.7    Compliance with Applicable Laws.  Comply with all Applicable Law, including ERISA, all Environmental Laws, FLSA, OSHA, Terrorism Laws, and all laws, statutes, regulations and ordinances regarding the collection, payment and deposit of Taxes, and obtain and keep in force any and all Governmental Approvals necessary to the ownership of its Properties or to the conduct of its business, but only to the extent that any such failure to comply (other than failure to comply with Terrorism Laws), obtain or keep in force could be reasonably

expected to have a Material Adverse Effect.  Without limiting the generality of the foregoing, if any Release shall occur at or on any of the Properties of a Borrower or any of its Subsidiaries, the Borrowers shall, or shall cause the applicable Subsidiary to, act promptly and diligently to investigate the extent of, and to make appropriate action with respect to such Release, whether or not ordered or otherwise directed to do so by any Governmental Authority.

7.1.8    Insurance.   In addition to the insurance required herein with respect to the Collateral, maintain, with any Approved Insurers, (i) insurance with respect to the Credit Parties' Properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, or larceny, embezzlement or other criminal misappropriation insurance) and in such amounts as is customary in the business of such Borrower or such Subsidiary and (ii) business interruption insurance in an amount not less than $20,000,000.

7.1.9    Final Financing Order.  The Final Financing Order shall be entered within 30 days of entry of the Interim Financing Order substantially in the form of and containing, among other things, the provisions present in the Interim Financing Order (including, without limitation, the granting of Liens contemplated under the Security Documents). The Final Financing Order shall have been entered on such notice to such parties as satisfactory to the Administrative Agent and as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, order of the Bankruptcy Court, and any applicable local bankruptcy rules.

7.1.10    Payment of Obligations.   Subject to the Financing Orders, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (i) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets accruing, imposed or arising after the Petition Date, unless the same are being Properly Contested; and (ii) all lawful claims which, if unpaid, would by law become a Lien upon its property and perfection thereof is excepted by 11 USC §362.

7.1.11    Preservation of Existence, Etc.   (i) Except as otherwise provided by the Financing Orders, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization except in a transaction permitted by Section 7.2.1 or Section 7.2.2; (ii) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation or non-renewal of which could reasonably be expected to have a Material Adverse Effect.

7.1.12    Maintenance of Properties.  (i) Except as otherwise provided by the Financing Orders, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (ii) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) use the standard of care typical in the industry in the operation and maintenance of its facilities.

7.1.13  <u>Compliance with Terms of Leaseholds</u>.   Make all payments and otherwise perform all obligations in respect of all leases of real property to which a Borrower or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, (i) where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect and (ii) with respect to any unexpired leases and executory contracts that were rejected by a Borrower pursuant to Section 365 of the Bankruptcy Code as consented to in writing by the Administrative Agent and as authorized by the Bankruptcy Court after notice and hearing.

7.1.14  <u>Lien Searches</u>.   Promptly following receipt of the acknowledgment copy of any financing statements filed under the UCC in any jurisdiction by or on behalf of Lenders, deliver to Agent completed requests for information listing such financing statement and all other effective financing statements filed in such jurisdiction that name a Borrower as debtor, together with copies of such other financing statements.

7.1.15  <u>Material Contracts</u>.   Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, enforce each such Material Contract in accordance with its terms, and cause each of its Subsidiaries to do so, except, in any case, (i) where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (ii) with respect to unexpired leases and executory contracts that were rejected by a Borrower pursuant to Section 365 of the Bankruptcy Code, as consented to in writing by the Administrative Agent and as authorized by the Bankruptcy Court after notice and hearing.

7.1.16  <u>Books and Records</u>.   Each Borrower will, and will cause each of its Subsidiaries to, maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP (or in the case of a Foreign Subsidiary, generally accepted accounting principles in the jurisdiction of organization of such Foreign Subsidiary) consistently applied shall be made of all financial transactions and matters involving the assets and business of such Borrower and such Subsidiaries.

7.1.17  <u>Future Subsidiary Guarantors, Security, etc</u>.   Each Borrower will, and will cause each of its Subsidiaries to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under Applicable Law, or that the Administrative Agent (acting at the written direction of the Required Lenders) may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Permitted Liens) of the Liens created or intended to be created by the Loan Documents.   Each Borrower will cause any subsequently acquired or organized Subsidiary to execute, within twenty (20) Business Days of its acquisition or organization (or such longer period as the Administrative Agent may agree in its sole discretion), a supplement to the Subsidiary Guaranty (in the form of Annex I thereto) and each other applicable Loan Document in favor of the Secured Parties.   In addition, from time to time, the Borrowers will, at their sole cost and expense, promptly secure the Obligations by pledging or creating, or causing to be

pledged or created, perfected Liens with respect to such of its assets and properties as the Required Lenders shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrowers and their Subsidiaries (including real and personal property acquired subsequent to the Closing Date). Each Borrower shall deliver or cause to be delivered to the Administrative Agent all customary instruments and documents (including legal opinions, title insurance policies and lien searches) to evidence compliance with this Section.

7.1.18  Further Mortgages and Insurance.  The Borrowers will, upon written request from the Administrative Agent, in respect of any owned real property, deliver to the Administrative Agent counterparts of each Additional Mortgage, duly executed and delivered by the applicable Credit Party, together with:

(a)     evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of each Additional Mortgage as may be necessary or desirable to create a valid, perfected first priority Lien against the properties purported to be covered thereby;

(b)     mortgagee's title insurance policies in favor of the Collateral Agent for the benefit of the Secured Parties in amounts and in form and substance as shall be customary for similar properties, with respect to the real and, if any, other property purported to be covered by each Additional Mortgage, insuring that title to such property is marketable and that the interests created by each Additional Mortgage constitute valid first Liens thereon free and clear of all defects and encumbrances;

(c)     opinions addressed to the Administrative Agent and all Lenders from local real estate counsel to the Credit Parties in the jurisdictions where such real estate is located; and

(d)     a certificate of an Authorized Officer of Standard Register certifying as to compliance with Section 7.1.8,

provided, that the Borrowers shall be permitted 60 days following such written request from the Administrative Agent (or such longer period as the Administrative Agent shall agree) to comply with the provisions of this Section 7.1.18.

7.1.19.  Consultants.  The Borrowers will, upon written request from the Administrative Agent, provide the Administrative Agent with reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by any Borrower in any of the Cases.

7.1.20  Covenants.  The Borrowers will complete the tasks set forth below (the "Sale Covenants"), in each case within the time limits specified therein (unless such time period is extended in writing by the Administrative Agent in consultation with the Required Lenders):

(a)     Not later than two Business Days after the parties execute the Purchase Agreement, Borrowers shall file and serve one or more motions, each in form and substance acceptable to the Required Lenders, seeking approval of the Sale Procedures Order and the Sale Order (each as defined below);

(b)     After the parties execute the Purchase Agreement, and in no event later than April 10, 2015, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Required Lenders, approving the bid procedures (the "Sale Procedures Order");

(c)     Not later than June 19, 2015, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Purchaser, approving the Sale Motion and the Purchase Agreement pursuant to sections 363(f) and 363(m) of the Bankruptcy Code (the "Sale Order");

(d)     The Acquisition shall be consummated not later than the earlier of (i) 60 days after the entry of the Sale Order if the Acquisition has not closed for any reason other than (i) the issuance of a stay pending appeal from the Sale Order (in which case, the sixty-day period referred to in this clause shall automatically be extended to the earlier of (A) the fifth business day following the day such stay ceases to be in effect or (B) the Termination Date (as defined in the Purchase Agreement), or (ii) the winning bidder has failed to consummate the Acquisition, except as a result of a breach by the Sellers (as defined in the Purchase Agreement) of a representation or covenant in the Purchase Agreement or (ii)180 days after the parties execute the Purchase Agreement; and

(e)     No later than March 31, 2015, the Sellers (as defined in the Purchase Agreement) shall deliver a draft operating and business plan to Borrowers and to Administrative Agent for comment and approval.  No later than April 15, 2015, Sellers shall deliver to Buyers a final operating and business plan together with a copy to the Administrative Agent.

7.1.21  Post-Closing Condition.  The Borrowers will execute and deliver the documents and complete the tasks set forth on Schedule IV, in each case within the time limits specified on such schedule (unless such time period is extended in writing by the Administrative Agent in its sole discretion).

7.2     Negative Covenants.  Each Borrower (for itself and its Subsidiaries) hereby covenants and agrees that, on the Closing Date and thereafter, until the Loans, together with interest, fees and all other Obligations incurred hereunder (other than contingent indemnification obligations for which not claim has been identified), are paid in full, unless the Required Lenders have otherwise consented in writing, such Borrower shall not and shall not permit any of its Subsidiaries to:

7.2.1   Fundamental Changes.  (i) Merge, reorganize, consolidate or amalgamate with any Person, or liquidate, wind up its affairs or dissolve itself, except for mergers or consolidations of any Credit Party into another Credit Party or any Subsidiary into a Credit Party (with such Credit Party being the survivor thereof); provided, however, that such Borrower shall be the survivor of any merger or consolidation involving such Borrower; (ii) change any Credit Party's name or conduct business under any new fictitious name; or (iii) change any Credit Party's Federal Employer Identification Number.

7.2.2    Disposition of Assets.  Make any Asset Disposition, except (i) sales of Inventory in the Ordinary Course of Business; (ii) sales or other dispositions of items of Equipment which are obsolete, worn out or no longer useful in any Borrower's business; (iii) other dispositions of Collateral that are consented to in writing by DIP Agent and are authorized by the Court after notice and hearing; and (iv) the rejection pursuant to Section 365 of the Bankruptcy Code of unexpired leases and executory contracts that are consented to in writing by DIP Agent and are authorized by the Court after notice and hearing.

7.2.3    Tax Consolidation.  File or consent to the filing of any consolidated income tax return with any Person other than the Borrowers and their Subsidiaries.

7.2.4    Accounting Changes.    Subject to the terms of the paragraph identified as "Accounting Terms" in Section 1.4, make any significant change in accounting treatment or reporting practices, except as may be permitted or required by GAAP and/or applicable requirements of the SEC, or establish a fiscal year different from the Fiscal Year, unless the Borrowers have notified the Administrative Agent of any such change and complied with all disclosure and other requirements of Applicable Law.

7.2.5    Organizational Documents.  Amend, modify or otherwise change any of the terms or provisions in (i) any of its Organization Documents as in effect on the date hereof or (ii) the Purchase Agreement, except for changes that do not affect in any way such the rights and obligations of the applicable Borrower or any of its Subsidiaries to enter into and perform the Loan Documents to which it is a party and to pay all of the Obligations and that do not otherwise have a Material Adverse Effect.

7.2.6    Restrictive Agreements.  Enter into or become party to any Restrictive Agreement other than (i) a Restrictive Agreement relating to secured Indebtedness permitted hereunder, as long as the restrictions apply only to collateral for such Indebtedness; and (ii) a Restrictive Agreement constituting customary restrictions on assignment in leases and other contracts.

7.2.7    Conduct of Business.  Engage in any business other than the business engaged in by it on the Closing Date and any business or activities which are substantially similar, related or incidental thereto or reasonably evolve therefrom.

7.2.8    Liens.  Create or permit any Liens on any of the now owned or hereafter acquired Collateral except for Permitted Liens.

7.2.9    Indebtedness.  Create, incur, guarantee or suffer to exist any Indebtedness, except:

(a)    the Obligations;

(b)    (i) ABL Obligations arising under the ABL DIP Facility (other than (x) ABL Bank Product Obligations consisting only of corporate credit cards and corporate cash management services and (y) fees owed by the Borrowers pursuant to the Prepetition ABL Credit Agreement in an amount not to exceed $1,000,000) and, subject to the Prepetition ABL/TL Intercreditor Agreement, the "Revolver Loans" and other "Obligations" as defined in and outstanding under the Prepetition ABL Credit Agreement on the Closing Date, in an aggregate principal amount under this clause (i) not to exceed

$125,000,000 at any one time outstanding, and (ii) ABL Bank Product Obligations arising in the Ordinary Course of Business after the Petition Date (excluding, for the avoidance of doubt, any ABL Loans or ABL Letters of Credit);

(c)    (i) (I) Second Lien Loans in an aggregate principal amount not to exceed $96,719,023.07, plus (II) the payment of interest, fees and other amounts with respect to the Second Lien Loans in the form of additional Indebtedness;

(d)    obligations under and as defined in the Existing First Lien Loan Agreement in an aggregate principal amount not to exceed $113,594,130.19;

(e)    Indebtedness of a Borrower owing to another Borrower; provided that if such Indebtedness is owed by any of SR MX Holdco, SR MX Holdings, SR Mexico or SR Canada, such Indebtedness shall be evidenced by a promissory note, the sole original of which is pledged to the Collateral Agent as security for the Obligations;

(f)    Indebtedness outstanding on the date hereof and listed on Part 7.2.9 of the Disclosure Schedule, other than Indebtedness referred to in clauses (a), (b), (c) and (d) of this Section 7.2.9;

(g)    Permitted Contingent Liabilities arising after the Petition Date; and

(h)    trade accounts payable incurred by a Borrower in the Ordinary Course of Business after the Petition Date and not in contravention of the Bankruptcy Code, any order of the Bankruptcy Court, in an aggregate amount not to exceed $17,400,000 at any time.

7.2.10  Restricted Investments.  Make any Restricted Investment.

7.2.11  Loans.  Make any loans or other advances of money to any Person, except (i) advances to an officer or employee for salary, travel expenses, commissions or similar items, in each case in the Ordinary Course of Business, (ii) prepaid expenses and extensions of trade credit made in the Ordinary Course of Business; and (iii) deposits with financial institutions permitted hereunder.

7.2.12  Distributions; Upstream Payments.

(a)    Declare or make any Distributions, except Upstream Payments; or

(b)    Create or suffer to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment.

7.2.13  Affiliate Transactions.  Enter into or be party to any transaction with an Affiliate, except (i) transactions contemplated by the Loan Documents and the Transaction Documents; (ii) payment of reasonable compensation to officers and employees for services actually rendered, and loans and advances permitted by Section 7.2.11; (iii) payment of customary directors' fees and indemnities; (iv) transactions solely among Credit Parties and wholly owned Subsidiaries;

and (v) transactions with Affiliates that were consummated prior to the Closing Date, as shown on Part 7.2.13 of the Disclosure Schedule.

7.2.14  Restrictions on Payment of Indebtedness.  Directly or indirectly, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal and interest shall be permitted and cancellations of Indebtedness for no value shall be permitted) obligations under the Prepetition Term Loan Facilities or any other Indebtedness that is or is required to be subordinated, in right of payment or as to Collateral, to the Obligations pursuant to the terms of the Loan Documents or the Financing Orders (collectively, "Junior Financing") or make any payment in violation of any subordination terms of any Junior Financing documentation or any other Indebtedness in existence prior to the Petition Date other than (i) the Pre-Petition ABL Obligations and the Pre-Petition Term Obligations in accordance with the Financing Orders, (ii) payments to critical vendors to the extent approved by the Final Order of the Court or any "Order Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers and Freight Carriers" and otherwise reflected in the Budget, and (iii) payment of Indebtedness secured by a valid, perfected and unavoidable Lien on any Collateral, but only to the extent such Lien is senior in priority to Liens in favor of the Administrative Agent on Term Loan Priority Collateral and such payment is approved by Final Order of the Court.

7.2.15  Amendments to Certain Indebtedness.  Amend, supplement or otherwise modify (a) any document, instrument or agreement relating to (i) the ABL DIP Facility that is in violation of the ABL-TL DIP Intercreditor Agreement or any Financing Order, or that otherwise limits, restricts, reduces or impairs ABL Availability in any material respect, or (ii) any Subordinated Indebtedness, or (b) the Budget without the prior written consent of Administrative Agent and the Required Lenders.

7.2.16  Sale-Leaseback and Pension Obligations.  (a) Create, incur, assume or suffer to exist any obligations as lessee for the rental or hire of real or personal property in connection with any sale and leaseback transaction, or (b) make for any Fiscal Year more than the minimum required statutory pension contributions required to be made in respect of such Fiscal Year with respect to any Borrower's qualified defined benefit cost covering the Borrower's U.S. employees, as reflected in the most current approved Budget.

7.2.17  Financial Covenants.  The Borrowers shall not permit any of the events set forth below in clauses (a) and (b) to occur:

(a)  Minimum EBITDAP.  Permit EBITDAP for the twelve fiscal months ending as of the last day of any period set forth below to be less than the amount set forth under the column "EBITDAP Level" opposite such last day:

| Fiscal Month Ending | EBITDAP Level |
| --- | --- |
| March 31, 2015 | $52,500,000 |
| April 30, 2015 | $50,000,000 |

and each month end thereafter

67

(b)    Maximum Capex.  Make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrowers and their Subsidiaries in the ordinary course of business not exceeding $1,000,000 in any fiscal month; provided that (i) if the aggregate amount of Capital Expenditures made in any fiscal month shall be less than the maximum amount of Capital Expenditures permitted under this Section 7.2.17(b) for such fiscal month (before giving effect to any carryover), then the entire amount of such shortfall may be added to the amount of Capital Expenditures permitted under this Section 7.2.17(b) for the immediately following month only, and (ii) in determining whether any amount is available for carryover, the amount expended in any fiscal month shall first be deemed to be from the applicable limitation for such month and then from the amount carried forward to the extent applicable.

7.2.18  Chapter 11 Claims.  Iincur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is (x) senior to (except, as set forth in the Financing Orders with respect to the ABL DIP Facility) or (y) *pari passu* with, the Obligations hereunder, in each case except for the Carve-Out.

7.2.19  Employee Plans.  Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Petition Date.

7.2.20  Modifications to DIP Financing Orders.  Seek or consent to any amendment, supplement or any other modification of any of the terms of the Financing Orders after such Financing Orders are entered by the Bankruptcy Court without the prior written consent of Administrative Agent (and with respect to any material change, the Required Lenders).

7.2.21  Filing of Motions and Applications.  Without the prior written consent of the Administrative Agent (and with respect to any material change or modification, Required Lenders), apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Financing Orders, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Financing Orders, or (c) permit any Indebtedness or claim to be *pari passu* with or senior to any of the Obligations, except as expressly stated in the Financing Orders.

## ARTICLE 8
## EVENTS OF DEFAULT

8.1    Listing of Events of Default.  Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

8.1.1  Non-Payment of Obligations.  Borrowers shall default in the payment or prepayment when due of:

(a)    any principal of any Loan; or

(b)    any interest or fee described in Article 3 or any other monetary Obligation.

68

8.1.2    <u>Misrepresentations</u>.   Any representation, warranty or other written statement to the Administrative Agent or any Lender that is made by any Credit Party in this Agreement or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished.

8.1.3    <u>Non-Performance of Certain Covenants and Obligations</u>.   The Borrowers shall default in the due performance or observance of any of its obligations under <u>Section 7.1.3</u>, <u>Section 7.1.11</u>, <u>Section 7.1.20</u> or <u>Section 7.2</u>.

8.1.4    <u>Non-Performance of Other Covenants and Obligations</u>.   Any Credit Party shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue unremedied for a period of 30 days after the earlier of (a) the date of the Borrower's Knowledge of such default or (b) notice thereof given to the Borrowers by the Administrative Agent or any Lender.

8.1.5    <u>Default on Other Indebtedness</u>.   (i) A default or breach occurs under any other agreement, document or instrument entered into either (x) prepetition and which is affirmed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) post-petition that is not cured within any applicable grace period therefor, and in each case, that results in any Indebtedness with a principal or stated amount, individually or in the aggregate in excess of $250,000 ("<u>Material Indebtedness</u>") (including, without limitation, under the ABL DIP Facility, the Prepetition ABL DIP Facility, the ABL DIP Facility or the Prepetition Term Loan Facilities) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, or (ii) a Credit Party or any Subsidiary thereof shall fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness when and as the same shall become due and payable (after giving effect to any applicable grace or cure period).

8.1.6    <u>Judgments</u>.   Any judgment or order (i) for the payment of money individually or in the aggregate in excess of $500,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has not denied or objected to its responsibility to cover such judgment or order) shall be rendered against a Borrower or any of its Subsidiaries after the Petition Date and, in each case, such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 45 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order, or (ii) for any non-monetary judgment with respect to a post-petition event which causes or would reasonably be expected to cause a Material Adverse Effect.

8.1.7    <u>Change in Control</u>.   Any Change in Control shall occur.

8.1.8    <u>Reserved</u>.

8.1.9    <u>Impairment of Security, etc</u>.   Any Loan Document shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally

valid, binding and enforceable obligation of any Credit Party party thereto (or any Credit Party shall so assert in writing); any Lien shall (except in accordance with the terms of any Loan Document), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Credit Party subject thereto in respect of any material portion of the Collateral (as defined in the Security Agreement); any Credit Party or any other party shall contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected first priority Lien with respect to any material portion of the Collateral.

8.1.10  ERISA.  A Reportable Event shall occur which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the Pension Benefit Guaranty Corporation of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan, or if any Pension Plan or Covered Plan shall be terminated or any such trustee shall be requested or appointed, or if a Borrower or any Subsidiary is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from such Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan.

8.1.11  Budget. The Borrowers, any Subsidiaries or any other Credit Party shall fail to comply with the then current Budget as approved by the Administrative Agent, subject to Permitted Variances or shall fail to obtain the approval of Administrative Agent with respect to any updated Budget.

8.1.12  Priming Liens.  Except as expressly permitted in the Financing Orders or with respect to the Carve Out, an order of the Bankruptcy Court shall be entered granting (i) any Superpriority Claim in the Case that is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against the Borrowers or any Credit Party under the Loan Documents or (ii) any Lien or security interest on any of the Collateral that is *pari passu* with or senior to the Liens and security interests securing the Obligations.

8.1.13  Dismissal of Case; Inability to Credit Bid.  (i) The Bankruptcy Court shall dismiss any of the Cases or convert any of the Cases to a case under chapter 7 of the Bankruptcy Code or any Credit Party shall file a motion or other pleading (or shall fail to oppose or otherwise acquiesce to such a pleading) seeking the dismissal of any Case under section 1112 of the Bankruptcy Code or otherwise, in each case without the consent of the Administrative Agent and the Required Lenders, or (ii) any order is entered or the Bankruptcy Court shall prohibit or otherwise unduly restrict the ability of the lenders under the Prepetition Term Loan Facilities to credit bid the loans outstanding thereunder.

8.1.14  Appointment of Trustee, Etc.  The Bankruptcy Court shall appoint in any of the Cases a trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of any Credit Party (powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

8.1.15  <u>Payment of Prepetition Indebtedness</u>.   Except as expressly permitted by Financing Orders, and other than such payments expressly authorized by the Bankruptcy Court or as otherwise permitted by this Agreement or the Budget (including in connection with adequate protection payments), or as otherwise agreed to by the Administrative Agent (after reasonable consultation with the Required Lenders), if any Credit Party shall make any payment of prepetition Indebtedness other than (1) in accordance with "first day" or "second day" orders entered with the consent of (or non-objection by) the Administrative Agent (in each case after reasonable consultation with the Required Lenders) or other orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Administrative Agent (in each case after reasonable consultation with the Required Lenders), (2) in connection with the assumption of executory contracts and unexpired leases with the consent of (or non-objection by) the Administrative Agent (after reasonable consultation with the Required Lenders), (3) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date and (4) in respect of other payments of prepetition Indebtedness authorized by order of the Bankruptcy Court entered with the consent of (or non-objection by) the Administrative Agent (in each case after reasonable consultation with the Required Lenders) in an aggregate amount not to exceed $100,000.

8.1.16  <u>Third Party Relief from Automatic Stay</u>.  If the Bankruptcy Court shall enter an order or orders (i) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure or repossession (or the granting of a deed in lieu of foreclosure or the like) on any material assets of a Credit Party or permit other actions that would, in the aggregate, constitute a Material Adverse Effect or (ii) permitting a third party to commence or continue prepetition litigation against a Credit Party for any purpose other than liquidating the amount of a disputed prepetition general unsecured claim involving potential liability not covered by insurance, in excess of $100,000 in the aggregate.

8.1.17  <u>Modification to Financing Orders, Etc.</u>.  If an order of the Bankruptcy Court shall be entered reversing, staying, vacating or otherwise amending, supplementing or modifying any of the Financing Orders (in each case without the written consent of the Administrative Agent and the Required Lenders in their sole discretion).

8.1.18  <u>Sale Covenants</u>.  The Borrowers shall (i) fail to achieve, satisfy or otherwise comply with any of the Sale Covenants set forth in <u>Section 7.1.20</u>, (ii) breach of any provision of the Purchase Agreement or (iii) fail to comply with the Sale Order or take any action inconsistent with the Sale Order.

8.1.19  <u>Sale of Assets; Etc.</u>.  (i) A Credit Party shall file any motion seeking authority to consummate a sale of assets of any Credit Party or any of its Subsidiaries (other than any such sale of assets that is permitted by the Loan Documents) having a value in excess of $100,000 outside the ordinary course of business, or any sale of any part of the Collateral pursuant to Section 363 of the Bankruptcy Code, in each case without the Required Lenders' consent or unless expressly provided for in the Budget, or (ii) the Borrowers shall file (or support or fail to oppose) a motion seeking, or the Bankruptcy Court shall enter, an order, authorizing the sale of all or substantially all of the Borrowers' assets (unless such order contemplates payment in full in cash of the Obligations and all obligations then outstanding under the Prepetition First Lien

Term Loan Agreement upon consummation of such sale, whether pursuant to a plan of reorganization or otherwise).

8.1.20    Use of Cash Collateral and Financing.    Any Credit Party shall file any motion or other request with the Bankruptcy Court seeking the authority to, or the Bankruptcy Court shall enter any order authorizing any Credit Party to, (i) use any cash proceeds of any of the Collateral upon the liquidation or Disposition thereof, or (ii) obtain any financing under section 364 of the Bankruptcy Code other than the Loans or the ABL DIP Facility, in each case, without the prior written consent of the Administrative Agent and the Required Lenders.

8.1.21    Cessation of Operations.    Any Credit Party shall cease all or any material part of its business operations material to the Credit Parties, taken as a whole.

8.1.22    Termination of Purchase Agreement.    The Purchase Agreement is terminated (other than in connection with the consummation of the Acquisition or with the written consent of the Required Lenders) or the Seller thereunder is in default thereof.

8.1.24    Noncompliance with Financing Orders.    Any Credit Party shall fail to comply with any terms of any Financing Order or any other order of the Bankruptcy Court.

8.1.25    Reorganization Plan.    A plan of reorganization that is not an Acceptable Reorganization Plan shall be confirmed in any Case, or any Loan Party shall propose or support or fail to oppose any such plan or any motion or other pleading that seeks to extend the Maturity Date, or the Bankruptcy Court shall enter an order terminating the exclusive right of the Borrowers to file any plan of reorganization.    For purposes of this Section, an Acceptable Reorganization Plan means a plan of reorganization that provides for the payment in full in cash of the Obligations (other than contingent indemnification obligations not yet due and payable) and all obligations then outstanding under the First Lien Prepetition Term Loan Agreement on the effective date of such plan of reorganization, contains release and indemnification provisions relating to the Administrative Agent and the Lenders that are reasonably acceptable to the Administrative Agent and does not contain any provisions that are materially inconsistent with such payment, release and indemnification provisions.

8.1.26    Venue Change.    Unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to any Case and such order shall not be reversed or vacated within 10 days.

8.1.27    Pleadings Contrary to the Facility.    Any Credit Party shall file a motion or other pleading seeking relief that if granted could reasonably be expected to result in the occurrence of an Event of Default (unless such relief, if granted (or the relevant transaction) would result in payment in full in cash of the Obligations immediately upon consummation of the matter addressed by such motion or pleading, whether pursuant to a plan of reorganization or otherwise).

8.1.28    DIP Liquidity Defaults.    An order shall be entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any Lender of any amounts received in respect of the Obligations, or Borrowers shall not have sufficient liquidity (including Loans available hereunder and ABL Availability) for a period of 30 consecutive days to pay, or

shall otherwise fail to pay as and when due and payable, all costs and expenses of administration that are incurred by such Borrower in the Cases, other than fees and expenses covered by the Carve-Out.

8.2     [Reserved].

8.3     Action if Event of Default.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, if any Event of Default shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent may, and upon the written direction of the Required Lenders, shall, subject to giving 5 Business Days' written notice to Borrowers and any other applicable notice parties under the Financing Orders, declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable, whereupon the full unpaid amount of such Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment.

## ARTICLE 9
## THE ADMINISTRATIVE AGENT

9.1     Actions.

(a)     Each Lender hereby appoints Silver Point as its Administrative Agent under and for purposes of each Loan Document.  Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and to appoint other agents or sub-agents to assist in its actions under the Loan Documents and the Administrative Agent shall not be liable for the acts and omissions of such agents as long as they are appointed with due care and without gross negligence or willful misconduct.  Each Lender further authorizes the Administrative Agent, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, subject to the terms and conditions of Article 9), to exercise such powers hereunder and thereunder as are delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents).

(b)     The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders in accordance with the terms of this Agreement (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.1). Each Lender hereby indemnifies (which indemnity shall be payable within thirty (30) days of demand therefor, to the extent not reimbursed by the Borrowers or any

73

other Credit Party, and without limiting the Borrowers' and Credit Parties' obligations under this Agreement and which indemnity shall survive any termination of this Agreement) the Administrative Agent and its officers, directors, employees and agents, pro rata according to the proportionate amount of Loans held by such Lender, from and against any and all liabilities, obligations, losses, damages, claims, penalties, judgments, costs, disbursements or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Loan Document or any action taken or omitted to be taken by the Administrative Agent under the Loan Documents, (including reasonable attorneys' fees and expenses), and as to which the Administrative Agent, is not reimbursed by the Borrowers; provided that, no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct. By executing a Lender Assignment Agreement, each future Lender (acting for itself and on behalf of each Affiliate thereof which becomes a Secured Party from time to time) shall be deemed to ratify the power of attorney granted to the Administrative Agent hereunder.

9.2    Exculpation.  Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Credit Party of its Obligations. Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action. The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

To the fullest extent permitted by Applicable Law, no Credit Party or Lender shall assert, and each Credit Party and Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or the transactions contemplated hereby or thereby, shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers unless it is indemnified to its satisfaction and the Administrative Agent

shall have no liability to any person for any loss occasioned by any delay in taking or failure to take any action while it is awaiting an indemnity satisfactory to it.

The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Credit Parties.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; provided, however, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrowers that in the sole reasonable judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

The Administrative Agent shall not be under any obligation to exercise any of its rights or powers vested in it by this Agreement or the other Loan Documents, at the request, order or direction of the Required Lenders unless the same is given pursuant to the express provisions of this Agreement or the other Loan Documents and the Required Lenders shall have offered to the Administrative Agent security or indemnity reasonably satisfactory to the Administrative Agent against the costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) which might be incurred therein or thereby.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith without gross negligence or willful misconduct.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future Secured Parties concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole reasonable discretion may cause the Administrative Agent to be considered an "owner or operator" under any Environmental Laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any Hazardous Material into the environment.

9.3    Successor. The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrowers and all Lenders.  The Administrative Agent may be removed at any time upon the affirmative vote of the Required Lenders.  If the Administrative Agent at any time shall resign or be removed, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder.  In the case of the Administrative Agent's resignation, if no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become

effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of the reasonable fees and expenses (including attorney's fees and expenses) of the resigning or removed Administrative Agent), such successor Administrative Agent shall be entitled to receive from the retiring or removed Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring or removed Administrative Agent.  The retiring or removed Administrative Agent shall cooperate in all respects with the transition of the Administrative Agent role to the successor Administrative Agent and shall, following such transition, be discharged from its duties and obligations under the Loan Documents.  After any retiring or removed Administrative Agent's resignation or removal, as applicable, hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and Section 9.1, Section 10.3 and Section 10.4 shall continue to inure to its benefit.

9.4    Loans by the Administrative Agent.  The Administrative Agent shall have the same rights and powers with respect to (x) the Loans held by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent. The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrowers or any Subsidiary or Affiliate of the Borrowers as if the Administrative Agent were not the Administrative Agent hereunder.

9.5    Credit Decisions.  Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrowers, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend the Loans.  Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.

9.6    Copies, etc.  The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrowers pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrowers).  The Administrative Agent will distribute to each Lender each document or instrument received (other than notices delivered pursuant to Articles 2 and 3) for its account and copies of all other communications received by the Administrative Agent from the Borrowers for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

9.7    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or

sent by or on behalf of the proper Person, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders or all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.

9.8    Defaults.  The Administrative Agent shall not be deemed to have Knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrowers specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to the provisions of Section 10.1) take such action and exercise such remedies with respect to such Default as shall be directed by the Required Lenders pursuant to any of the Loan Documents; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action (including, without limitation, credit bidding the Loans of all Lenders hereunder), or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders.

9.9    Posting of Approved Electronic Communications.

(a)    Each Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrowers, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Section 7.1.3, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Continuation/Conversion Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, each Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents (including, for the avoidance of doubt, Section 7.1.3) but only to the extent requested by the Administrative Agent.

2457464da27dd653

(b)     In accordance with Section 7.1.3, the Borrowers further agree that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar Platform.

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

(e)     Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

9.10    Proofs of Claim.  The Lenders and the Borrowers hereby agree that after the occurrence of an Event of Default pursuant to Section 8.1.8, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any of the Credit Parties, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall

have made any demand on any of the Credit Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

>        (a)        to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent and other agents appointed by the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and such other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and such other agents hereunder) allowed in such judicial proceeding; and

>        (b)        to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder.   Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.   Further, nothing contained in this Section shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that the Administrative Agent has not acted within ten days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

9.11     Intercreditor Agreements. Each Lender (a) agrees to be bound by the provisions of each of the Intercreditor Agreements, and (b) authorizes and instructs Administrative Agent to enter into amendments, restatements, amendments and restatements of, or to supplement or otherwise modify either of the Intercreditor Agreements with the consent of the Required Lenders or enter into one or more other intercreditor agreements having terms reasonably satisfactory to Administrative Agent and either in form and substance substantially similar to the existing Intercreditor Agreements or reasonably satisfactory to the Required Lenders, from time to time, in connection with the incurrence of Refinancing Debt in respect of the Pre-Petition Term Loans (each as defined in the Intercreditor Agreements).

## ARTICLE 10
## MISCELLANEOUS PROVISIONS

10.1     Waivers, Amendments, etc.   The provisions of each Loan Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in

writing and consented to by the Borrowers and the Required Lenders; <u>provided</u>, that no such amendment, modification or waiver shall:

      (a)     modify <u>clause (b)</u> of <u>Section 4.7</u>, <u>Section 4.8</u> (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

      (b)     increase the aggregate amount of any Loans held by a Lender or extend the Stated Maturity Date for any Lender's Loan, in each case without the consent of such Lender (it being agreed, however, that any vote to rescind any acceleration made pursuant to <u>Section 8.2</u> and <u>Section 8.3</u> of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

      (c)     reduce (by way of forgiveness), the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in <u>Article 3</u> payable to any Lender or extend the date on which interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender (provided that, the vote of Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under <u>Section 3.2.2</u>);

      (d)     make any change to the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders;

      (e)     [reserved]; or

      (f)     affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) unless consented to by the Administrative Agent.

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any Credit Party in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

     10.2   <u>Notices; Time</u>.  All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrowers, the Administrative Agent or a Lender, to the applicable Person at its address or facsimile number set forth on <u>Schedule II</u> hereto or set forth in the Lender Assignment Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.  The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by

facsimile (or electronic transmission) shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

10.3    Payment of Costs and Expenses. Each Borrower agrees, jointly and severally, to pay promptly, and in any event within thirty (30) days after written demand therefor to the extent incurred after the Closing Date, (a) any consents, amendments, waivers or other modifications of this Agreement and the other Loan Documents; (b) the reasonable and documented fees, expenses and disbursements of counsel to the Administrative Agent in connection with the administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters in connection therewith; (c) all the actual costs and expenses of creating and perfecting Liens in favor of the Collateral Agent, for the benefit of the Lenders pursuant hereto, including filing and recording fees, search fees, title insurance premiums and fees, expenses and disbursements of counsel to the Administrative Agent; (d) all the actual reasonable and documented costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (e) all the actual reasonable costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, advisors and agents in each case employed or retained by the Administrative Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (f) all other actual reasonable costs and expenses incurred by the Administrative Agent in connection with the any consents, amendments, waivers or other modifications of this Agreement and the other Loan Documents and the transactions contemplated thereby; and (g) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees and expenses and costs of settlement, incurred by the Administrative Agent and the Required Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Loan Documents by reason of such Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Subsidiary Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

10.4    Indemnification. In consideration of the execution and delivery of this Agreement by each Secured Party, each Borrower hereby, jointly and severally, indemnifies, exonerates and holds each Secured Party and each of their respective affiliates and their and their affiliates' officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all losses, claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, judgments, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (collectively, the "Indemnified Liabilities") as a result of, or arising out of, or relating to:

(a)    the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the

monitoring of the Borrowers' and the other Credit Parties' compliance with the terms of the Loan Documents;

(b)     any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto;

(c)     any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Credit Party or any Subsidiary thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

(d)     (i) the Release from any real property owned or operated by any Credit Party or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), or (ii) each Lender's Environmental Liability (the indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Credit Party or its Subsidiaries by foreclosure or by a deed in lieu of foreclosure for any Lender's Environmental Liability); in each case of clauses (i) and (ii), other than any Release or Lender's Environmental Liability first caused and first created after the Administrative Agent completes the sale and the transfer of the respective real property pursuant to a foreclosure or deed in lieu of foreclosure;

provided that the Borrowers shall not be required to indemnify any Indemnified Party to the extent the applicable Indemnified Liability arises by reason of such Indemnified Party's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Credit Party agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under Applicable Law. To the extent permitted by Applicable Law, the Borrowers and each other Credit Party shall not assert, and hereby waive, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.

10.5    Survival.  The obligations of the Borrowers under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Section 9.1, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4), the occurrence of the Termination Date and the resignation or removal of the Administrative Agent.    The representations and warranties made by each Credit Party in each Loan Document shall survive the execution and delivery of such Loan Document.

10.6    Severability.  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining

provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

10.7    Headings.    The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

10.8    Execution in Counterparts, Effectiveness, etc.    This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any documents for which originals are required for any filing or perfection) and all of which shall constitute together but one and the same agreement.    This Agreement shall become effective when counterparts hereof executed on behalf of the Borrowers shall have been received by the Administrative Agent.

10.9    Governing Law; Entire Agreement.    EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.    The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

10.10    Successors and Assigns.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that, the Borrowers may not assign or transfer its rights or obligations hereunder without the consent of all Lenders.

10.11    Sale and Transfer of Loans; Participations in Loans; Notes.    Each Lender may assign, or sell participations in, its Loans to one or more other Persons in accordance with the terms set forth below.

(a)    Any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it); provided that:

(i)    the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless (A) the Administrative Agent otherwise consents; (B) such assignment is an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it, (C) such assignment is an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender or (D) such assignment is to one or more Eligible Assignees managed by an Affiliate of such Eligible Assignee(s) and the aggregate amount of such assignments is not less than $1,000,000;

84

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned; and

(iii)    the parties to each assignment shall (A) electronically execute and deliver to the Administrative Agent a Lender Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) with the consent of the Administrative Agent, manually execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with, in either case, a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and if the Eligible Assignee is not a Lender, administrative details information with respect to such Eligible Assignee and applicable tax forms.

(b)     Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>clause (c)</u>, from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Lender Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender Assignment Agreement, subject to Section 10.5, be released from its obligations under this Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement which by their terms survive the termination of this Agreement).  If the consent of the Borrowers to an assignment or to an Eligible Assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified in this Section), the Borrowers shall be deemed to have given their consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly refused by the Borrowers prior to such tenth day.

(c)     The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to clause (a) of Section 2.5 and at the request of the Borrowers give the Borrowers notice of such assignments.  The Register shall be available for inspection by the Borrowers and any Lender (in respect of its own position only), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Any Lender may, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to one or more banks or other entities other than an Ineligible Assignee (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any

85

agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the items set forth in clauses (a) through (e) of Section 10.1, in each case except as otherwise specifically provided in a Loan Document.  Subject to clause (e), the Borrowers agree that each Participant shall be entitled to the benefits of Sections 4.3, 4.4, 4.5, 4.6, 7.1.3, 10.3 and 10.4 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b), (it being understood that the documentation required under Section 4.6(e) shall be delivered to the participating Lender).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 4.9 as though it were a Lender, provided such Participant agrees to be subject to Sections 4.8 and 4.10 as though it were a Lender.  Each Lender shall, as agent of the Borrowers solely for the purpose of this Section, record in book entries maintained by such Lender the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  If requested by the Administrative Agent or the Borrowers, such Lender shall make the Participant Register available to the Administrative Agent or to the Borrowers either (i) upon the exercise by a Participant of remedies hereunder or (ii) to the extent necessary to establish that the Participant's interests in the obligations under the Agreement is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(e)    A Participant shall not be entitled to receive any greater payment under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, as of the time of the sale of such participation, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.  A Participant shall not be entitled to the benefits of Section 4.6 unless the Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with the requirements set forth in Section 4.6 as though it were a Lender that acquired its interest by assignment.  In addition, if at the time of the sale of such participation, any greater Taxes subject to payment under Section 4.6 would apply to the Participant than applied to the applicable Lender, then such Participant shall not be entitled to any payment under Section 4.6 with respect to the portion of such Taxes as exceeds the Taxes applicable to the Lender at the time of the sale of the participation unless the Participant's request for the Borrowers' prior written consent for the Participation described in the first sentence of this clause states that such greater Taxes would be applicable to such Participant, it being understood that the Participant shall be entitled to additional payments under Section 4.6 to the extent such Lender selling the participation would be entitled to any payment resulting from a change in law occurring after the time the participation was sold.

86

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender ("Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrowers, the option to provide to the Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrowers pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, the Borrowers or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrowers) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  The Borrowers acknowledge and agree, subject to the next sentence, that, to the fullest extent permitted under Applicable Law, each SPC, for purposes of Sections 4.3, 4.4, 4.5, 4.6, 4.8, 4.9, 10.3 and 10.4, shall be considered a Lender (provided, in the case of Section 4.6, that the SPC complies with the requirements of such Section as if it were a Lender that acquired its interest by assignment).  The Borrowers shall not be required to pay any amount under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4 that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

10.12    Other Transactions.  Nothing contained herein shall preclude the Administrative Agent or any other Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with a Borrower or any of its Affiliates in which such Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

10.13   <u>Forum Selection and Consent to Jurisdiction</u>.   ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u> THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION (ACTING AT THE WRITTEN DIRECTION OF THE REQUIRED LENDERS), IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.   THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN <u>SECTION 10.2</u>. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

10.14   <u>Waiver of Jury Trial</u>.   **THE ADMINISTRATIVE AGENT, EACH LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER OR THE BORROWER IN CONNECTION THEREWITH.   THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN DOCUMENTS.**

10.15   <u>Confidentiality</u>.

(a)      Subject to the provisions of clause (b) of this Section, each Lender agrees that it will follow its customary procedures in an effort not to disclose without the prior consent of the Borrowers (other than to its employees, auditors, advisors or counsel, or to another Lender if the Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender) any information which is now or in the future furnished pursuant to this Agreement or any other Loan Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this clause by the respective Lender or any other Person to whom such Lender has provided such information as permitted by this Section, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state, provincial or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, (vi) to any pledgee referred to in clause (f) of Section 10.11 or any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Loans or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section, (vii) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section) and (viii) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender.

(b)      The Borrowers hereby acknowledge and agree that each Lender may share with any of its Affiliates, and such Affiliates may share with such Lender, any information related to the Borrowers or any of their Subsidiaries, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender.

Notwithstanding the foregoing paragraphs of this Section, any party to this Agreement (and each Affiliate, director, officer, employee, agent or representative of the foregoing or such Affiliate) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials of any kind (including opinions or other tax analyses) that are provided to such party relating to such tax treatment or tax structure.  The foregoing language is not intended to waive any confidentiality obligations otherwise applicable under this Agreement except with respect to the information and materials specifically referenced in the preceding sentence.  This authorization does not extend to disclosure of any other information, including (a) the identity of participants or potential participants in the transactions contemplated herein, (b) the existence or status of any negotiations, or (c) any financial, business, legal or personal information of or regarding a party or its affiliates, or of or regarding any participants or potential participants in the transactions

contemplated herein (or any of their respective affiliates), in each case to the extent such other information is not related to the tax treatment or tax structure of the transactions contemplated herein.

10.16    <u>Counsel Representation</u>.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS AGREEMENT, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING THE BORROWER TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS AGREEMENT SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE ADMINISTRATIVE AGENT OR THE OTHER SECURED PARTIES ARE HEREBY WAIVED BY THE BORROWER.

10.17    <u>Patriot Act</u>.  Each Lender hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Patriot Act.

10.18    <u>Authorization of Administrative Agent</u>.  Each Lender agrees that any action taken by the Administrative Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Administrative Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

10.19    <u>Releases</u>.  (a)  Upon the entry of the Final Financing Order, in consideration of the agreements of the Administrative Agent and the Lenders contained herein and the making of any Loans by Lenders, Borrowers, pursuant to this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself, its Subsidiaries and their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the Administrative Agent and each Lender and their respective successors and assigns, and their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (all such parties being hereinafter referred to collectively as the "<u>Releasees</u>" and individually as a "<u>Releasee</u>"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "<u>Pre-Petition Released Claim</u>" and collectively, "<u>Pre-Petition Released Claims</u>") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which a Borrower, or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the this Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

(b)     Upon the earlier of (i) the entry of the Final Financing Order or (ii) the entry of an order of the Bankruptcy Court extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the entry of the Interim Financing Order, the Borrowers, on behalf of themselves, their Subsidiaries and their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by Borrowers pursuant to this Section 10.19.  If a Borrower or any of its Subsidiaries violates the foregoing covenant, Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(c)     Upon (i) the receipt by the Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Lenders to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (ii) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of the Lenders contained herein and the making of any Loans by the Lenders, Borrowers and each of their Subsidiaries hereby covenants and agrees to execute and deliver in favor of each Lender (and the Administrative Agent) a valid and binding termination and release agreement, in form and substance satisfactory to such Lender (or Administrative Agent).  If a Borrower or any of its Subsidiaries violates such covenant, Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(d)     Each Borrower understands, acknowledges and agrees that the releases set forth above in Section 10.19(a) and Section 10.19 (b) hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.  The Borrowers agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 10.19(a) hereof and, when made, Section 10.19(b) hereof.

10.20  Pre-Petition Term Loan Facility.The Borrowers and each other Credit Party agrees and acknowledges that (i) this Agreement and the Loan Documents are separate and distinct from the Prepetition First Lien Term Loan Agreement, (ii) the Prepetition First Lien Term Loan Agreement continues in full force and effect, (iii) by entering into this Agreement and each other Loan Document, none of the Administration Agent, nor the Lenders waives, and each expressly reserves, any and all claims, causes of action, defenses, rights and remedies it has or may have pursuant to any or all of the Prepetition First Lien Term Loan Agreement, and any intercreditor or subordination agreement, the Bankruptcy Code, and/or under applicable law against or with respect to any Credit Party and any other Person or entity; (iv) the Obligations of the Credit Parties, and the rights, benefits, privileges, remedies, claims, Liens, security interests and priorities of the Administrative Agent and Lenders arising under or in connection with this Agreement, each other Loan Document and the Financing Orders, are in addition to, and are not intended as a waiver or substitution for, the rights, benefits, privileges, remedies, claims, liens,

security interests and priorities granted to such parties under the Prepetition First Lien Term Loan Agreement and any intercreditor or subordination agreement, the Bankruptcy Code, and/or under applicable law, all of which are expressly reserved by the Administrative Agent and the Lenders.

## ARTICLE 11
## CERTAIN COLLATERAL ADMINISTRATION

11.1    <u>Insurance of Collateral; Condemnation Proceeds</u>. Each Credit Party shall maintain and pay for insurance upon all Collateral, wherever located, covering casualty, hazard, public liability, theft, malicious mischief and the other risks covered under the policies listed in <u>Part 11.1</u> of the Disclosure Schedule, in the amounts and with the insurance companies listed in Part <u>11.1</u> of the Disclosure Schedule (which describes all insurance of the Credit Parties in effect on the date hereof with respect to Collateral) similar to those maintained by companies of similar size and similarly situated.   The Credit Parties have the right to substitute valid and enforceable policies issued by any Approved Insurer so long as such policies insure the same risks and are in the same amounts or such other amounts reasonably determined by such Credit Party and consistent with past practices and in accordance with industry standards for companies in the same or similar industry and of the size and owning Properties comparable to the Credit Parties. All proceeds constituting Term Loan Priority Collateral payable under each such policy shall be applied in accordance with and subject to <u>Section 3.1.1(c)</u> to reduce the Loans.   The Credit Parties shall deliver copies of such policies to the Administrative Agent.   Each policy insuring the Collateral (except fidelity coverage against theft and malicious mischief) will (a) include a loss payee endorsement satisfactory to the Administrative Agent, naming the Administrative Agent and the ABL Administrative as sole loss payees and (b) additional insured as appropriate. Each such policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days prior written notice to the Administrative Agent in the event of cancellation of the policy for any reason whatsoever (except that in the case of cancellation for non-payment of the premium, the insurer shall give 10 days' prior written notice to the Administrative Agent) and a clause specifying that the interest of the Administrative Agent shall not be impaired or invalidated by any act or neglect of any Credit Party or the owner of the property in which the Collateral is stored or by the occupation of the premises for purposes more hazardous than are permitted by said policy.   If any Credit Party fails to provide and pay for such insurance, the Administrative Agent may, at its option, but shall not be required to, procure the same and charge each Credit Party therefor.   Each Credit Party agrees to deliver to the Administrative Agent, promptly as rendered, true copies of all claims and reports relating to claims submitted to insurance companies issuing policies insuring the Term Loan Priority Collateral.   For so long as no Event of Default exists, each Credit Party shall have the right to settle, adjust and compromise any claim with respect to any insurance maintained by each Credit Party with respect to the Term Loan Priority Collateral <u>provided</u> that all proceeds thereof are applied in the manner specified in this Agreement, and the Administrative Agent agrees promptly to provide any necessary endorsement to any checks or drafts issued in payment of any such claim.   At any time that an Event of Default exists, only the Administrative Agent shall be authorized to settle, adjust and compromise such claims.   The Administrative Agent shall have all rights and remedies with respect to such policies of insurance on the Collateral as are provided for in this Agreement and the other Loan Documents, and consistent with the applicable insurance policies.

11.2    <u>Protection of Collateral</u>.    All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes imposed under any Applicable Law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by the Administrative Agent to any Person to realize upon any Collateral shall be borne and paid by Credit Parties.    The Administrative Agent shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in the Administrative Agent's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at the Credit Parties' sole risk.

11.3    <u>Defense of Title to Collateral</u>.  Each Credit Party shall at all times defend its title to the Collateral and the Collateral Agent's Liens therein against all Persons and all claims and demands whatsoever other than Permitted Liens.

*Balance of Page Intentionally Left Blank*
*Signature Pages Follow*

IN WITNESS WHEREOF, the parties hereto have caused this Super-Priority Priming Debtor In Possession Delayed Draw Term Loan Credit Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**THE STANDARD REGISTER COMPANY**

By:_____
Name/ Joseph P. Morgan, Jr. _____
Title: President_____

**STANDARD REGISTER INTERNATIONAL, INC.**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President_____

**STANDARD REGISTER TECHNOLOGIES, INC.**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President_____

**IMEDCONSENT, LLC**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President_____

**STANDARD REGISTER OF PUERTO RICO INC.**

By:_____
Name: Joseph P. Morgan, Jr_____
Title: President_____

**STANDARD REGISTER HOLDING COMPANY**

By: _____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER TECHNOLOGIES CANADA ULC**

By: _____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER MEXICO HOLDING COMPANY**

By: _____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER HOLDING  S.de R.L. de C.V.**

By: _____
Name: Joseph P. Morgan, Jr _____
Title: Sole Manager _____

**STANDARD REGISTER de MEXICO, S.de R.L. de C.V.**

By: _____
Name: Joseph P. Morgan, Jr _____
Title: Sole Manager _____

**STANDARD REGISTER SERVICIOS, S.de
R.L. de C.V.**

By:_____
Name: Joseph P. Morgan, Jr_____
Title: President

SILVER POINT FINANCE, LLC,
as the Administrative Agent

By: _____

    Name:   Frederick H. Fogel
    Title:    Authorized Signatory

SILVER POINT FINANCE, LLC,
as the Collateral Agent

By: _____

    Name:
    Title:    Frederick H. Fogel
              Authorized Signatory

SPCP GROUP, LLC,
as Lender

By: _____

   Name:   Frederick H. Fogel
   Title:    Authorized Signatory


SPCP Group III, LLC,
as Lender

By: _____

   Name:   Frederick H. Fogel
   Title:    Authorized Signatory

## SCHEDULE I – DISCLOSURE SCHEDULE

## Part 1.1

## Permitted Liens

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| **The Standard Register Company** | Ohio | Original | Dell Financial Services L P | Equipment | 9/2/1999 | AP0173158 |
| | | Continuation | | | 8/16/2004 | 20042290188 |
| | | Continuation | | | 9/1/2009 | 20092440238 |
| | | Continuation | | | 8/7/2014 | 20142190183 |
| | Ohio | Original | Dell Financial Services L P | Equipment | 8/16/2004 | 00080506210 |
| | | Continuation | | | 8/14/2009 | 20092260604 |
| | | Continuation | | | 7/17/2014 | 20141980099 |
| | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 5/6/2005 | 00089172634 |
| | | Continuation | | | 11/13/2009 | 20093200240 |
| | | Continuation | | | 1/9/2015 | 20150120289 |
| | Ohio | Original | Crown Credit Company | Equipment | 7/29/2005 | 00091762619 |
| | | Continuation | | | 4/30/2010 | 20101200138 |
| | Ohio | Original | Cisco Systems Capital Corporation | Equipment | 7/31/2008 | 00128601421 |
| | | Continuation | | | 7/25/2013 | 20132060159 |
| | Ohio | Original | E.I. DuPont de Nemours and Company | Equipment | 1/13/2009 | 00132195010 |
| | | Continuation | | | 11/08/2013 | 20133120307 |
| | Ohio | Original | OCE Financial Services, Inc. | Equipment | 3/8/2010 | 0140650511 |
| | Ohio | Original | OCE Financial Services, Inc. | Equipment | 3/10/2010 | 00140702370 |
| | | Amendment | | | 3/10/2010 | 20100690284 |
| | Ohio | Original | OCE Financial Services, Inc. | Equipment | 3/13/2010 | 00140773915 |
| | Ohio | Original | OCE Financial Services, Inc. | Equipment | 3/13/2010 | 00140774038 |
| | Ohio | Original | OCE Financial Services, Inc. | Equipment | 3/23/2010 | 0140946710 |
| | | Original | Fujifilm | Equipment | 3/24/2010 | 00141018835 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 4/1/2010 | 00141232920 |
| | | Continuation | | | 12/30/2014 | 20143650112 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 7/7/2010 | 00143421276 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 7/12/2010 | 00143506105 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 9/14/2010 | 00144942261 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 10/28/2010 | 00145854306 |
| | | Amendment | | | 7/26/2011 | 20112070245 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 2/3/2011 | 00147980981 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 2/3/2011 | 00147981660 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 3/24/2011 | 00148941526 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 4/4/2011 | 00149168436 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 4/4/2011 | 0149168769 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 4/4/2011 | 00149168870 |
| | Ohio | Original | Northstar Recycling Company, Inc. | Equipment | 7/1/2011 | 00151348917 |
| | | Amendment | | | 1/7/2015 | 20150070211 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 8/1/2011 | 00151988791 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 8/8/2011 | 00152119872 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 8/24/2011 | 00152428918 |
| | Ohio | Original | Hewlett-Packard Financial Services Company | Equipment | 9/9/2011 | 00152738400 |
| | Ohio | Original | Xerox Corporation | Equipment | 9/12/2011 | 00152775418 |
| | Ohio | Original | Northstar Recycling Group, Inc. | Equipment | 10/4/2011 | 00153275035 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 12/5/2011 | 00154600956 |
| | Oho | Original | OCE North America, Inc. | Equipment | 12/9/2011 | 00154757987 |
| | Ohio | Original | OCE North America, Inc. | Equipment | 12/21/2012 | 00163605341 |
| | Ohio | Original | Software Professionals, Inc. | Equipment | 1/9/2013 | 00164068948 |
| | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 8/1/203 | 00169251154 |
| | Ohio | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 8/9/2013 | 00169495372 |
| | Ohio | Original | Silver Point Finance, LLC, as Second Lien Administrative Agent | All Assets | 8/9/2013 | 00169495605 |
| | Ohio | Original | Xerox Corporation | Equipment | 9/10/2013 | 00170202801 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 9/19/2013 | 00170412058 |
| | Ohio | Original | Xerox Corporation | Equipment | 11/15/2013 | 00171866656 |
| | Ohio | Original | Xerox Corporation | Equipment | 11/15/2013 | 00171866767 |
| | Ohio | Original | Xerox Corporation | Equipment | 11/15/2013 | 00171866878 |
| | Ohio | Original | Xerox Corporation | Equipment | 11/20/2013 | 00171987692 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 7/24/2014 | 00178085768 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 7/24/2014 | 00178089251 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 11/14/2014 | 00180974545 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181530758 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181530869 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|--------|--------------|----------------|---------------|------------|-----------|-------------|
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181532449 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181532661 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181532994 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181544363 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181544474 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181544585 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181544818 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181547399 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181547400 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181547622 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181547733 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181547844 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181548290 |
| | Ohio | Original | Canon Solutions America, Inc. | Equipment | 12/9/2014 | 00181548301 |
| | Ohio | Original | Fujifilm North America Corporation | Equipment | 12/18/2014 | 00181796912 |
| | Ohio | Original / Consignment | Georgia-Pacific Consumer Products LP | Equipment | 2/6/2015 | 00182855989 |
| | Ohio | Original | Hewlett-Packard Company | Equipment | 2/25/2015 | 00183283824 |
| | Ohio | Original / Consignment | Zeller-Gmelin Corporation | Equipment | 2/25/2015 | 00193268642 |
| | Arkansas Washington County | State Tax Lien | Department of Finance Administration | | 6/6/2014 | L120-00000555 |
| | Arkansas Washington County | Assessment | The Department of Workforce Services | | 7/23/2014 | L121-00000174 |
| **Standard Register** | Indiana | Original | Fujifilm North America Corporation | Equipment | 3/31/2014 | 201400002481345 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| **The Standard Regiser Company** | Pennsylvania | Original | Fujifilm North America Corporation | Equipment | 7/30/2014 | 2014073006327 |
| **Standard Register Technologies, Inc.** | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 4/1/2010 | 00141233043 |
| | Ohio | Continuation | Bank of America, N.A., as Agent | | 12/30/2014 | 20143650111 |
| | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 8/1/2013 | 00169250819 |
| | Ohio | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 8/9/2013 | 00169495261 |
| | Ohio | Original | Silver Point Finance, LLC, as Second Lien Administrative Agent | All Assets | 8/9/2013 | 00169495594 |
| **Standard Register International, Inc.** | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 4/1/2010 | 00141232819 |
| | Ohio | Continuation | Bank of America, N.A., as Agent | | 12/30/2014 | 20143650109 |
| | Ohio | Original | Bank of America, N.A., as Agent | All Assets | 8/1/2013 | 00169251265 |
| | Ohio | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 8/9/2013 | 00169495483 |
| | Ohio | Original | | All Assets | 8/9/2013 | 00169495716 |
| **iMedConsent, LLC** | Delaware | Original | Bank of America, N.A., as Agent | All Assets | 7/26/2011 | 20112888074 |
| | Delaware | Original | Bank of America | All Assets | 8/1/2013 | 20132995026 |
| | Delaware | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 8/1/2013 | 20132999739 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| | Delaware | Original | Silver Point Finance, LLC, as Second Lien Administrative Agent | All Assets | 8/1/2013 | 20133000453 |
| **Standard Register of Puerto Rico Inc.** | Delaware | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 3/2/2011 | 20110777543 |
| | Delaware | Assignment | Silver Point Finance, LLC, as First Lien Administrative Agent | | 8/1/2013 | 20133002475 |
| | Delaware | Amendment | Silver Point Finance, LLC, as First Lien Administrative Agent | | 8/28/2014 | 20143467388 |
| | Delaware | Original | Silver Point Finance, LLC, as Second Lien Administrative Agent | All Assets | 3/3/2011 | 20110795081 |
| | Delaware | Original | Bank of America, N.A., as Agent | All Assets | 8/1/2013 | 20132994771 |
| | Delaware | Amendment | Bank of America, N.A., as Agent | | 7/16/2014 | 20142828085 |
| | Delaware | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 8/1/2013 | 20133002319 |
| | Delaware | Amendment | Silver Point Finance, LLC, as First Lien Administrative Agent | | 8/28/2014 | 20143467420 |
| **Workflowone LLC** | Delaware | Original | CIT Technologies Corporation d/b/a CIT Systems Leasing | Equipment | 12/29/2005 | 54052750 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| | Delaware | Continuation | CIT Technologies Corporation d/b/a CIT Systems Leasing | | 9/17/2010 | 2010 3249467 |
| | Delaware | Amendment | CIT Technologies Corporation d/b/a CIT Systems Leasing | | 4/25/2012 | 2012 1595588 |
| | Delaware | Original | The Bank of New York Mellon, as First Lien Administrative Agent | All Assets | 3/2/2011 | 2011 0777535 |
| | Delaware Secretary of State | Assignment | The Bank of New York Mellon, as First Lien Administrative Agent | | 8/1/2013 | 2013 3001782 |
| | Delaware | Original | Silver Point Finance, LLC, as Second Lien Administrative Agent | All Assets | 3/3/2011 | 2011 0795016 |
| | Indiana Elkhart County | Original Fixture Filing | The Bank of New York Mellon, as First Lien Administrative Agent | | 3/15/2011 | 28231 |
| | | Assignment | | | 8/20/2013 | 29160 |
| | Indiana Elkhart County | Original Fixture Filing | Silver Point Finance, LLC, as Administrative Agent | | 3/25/2011 | 28232 |
| | | Amendment | | | 8/30/2013 | 29159 |
| | Indiana Elkhart County | Original Fixture Filing | Bank of America, N.A., as Administrative Agent | | 8/30/2013 | 29161 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|--------|-------------|----------------|---------------|------------|-----------|-------------|
| | Pennsylvania York County | Original Fixture Filing | The Bank of New York Mellon, as First Lien Administrative Agent | | 3/16/2011 | 2011013964 Book 2119, Page 6695 |
| | | Assignment | | | 8/13/2013 | 2013046017 |
| | Pennsylvania York County | Original Fixture Filing | Silver Point Finance, LLC, as Administrative Agent | | 3/16/2011 | 2011013946, Book 2119, Page 6709 |
| | | Continuation | | | 8/13/2013 | 2013046018 |
| | Pennsylvania York County | Original Fixture Filing | Bank of America, N.A., as Administrative Agent | | 8/19/2013 | 2013047235 |
| | Delaware | Original | Georgia-Pacific Consumer Products LP | Equipment | 5/27/2011 | 2011 2025669 |
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 8/29/2011 | 2011 3345066 |
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 10/4/2011 | 2011 3810184 |
| | Delaware | Amendment | Raymond Leasing Corporation | | 10/5/2011 | 201138389391 |
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 10/4/2011 | 2011 3810267 |
| | Delaware | Amendment | Raymond Leasing Corporation | | 10/5/2011 | 201138389342 |
| | Delaware | Origianl | Raymond Leasing Corporation | Equipment | 11/02/2011 | 2011 4230945 |
| | Delaware | Original | OCE North America, Inc. | Equipment | 10/31/2011 | 2011 4531714 |
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 1/17/2012 | 2012 0197444 |
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 1/24/2012 | 2012 0299885 |

| Debtor | Jurisdiction | Type of filing | Secured Party | Collateral | File Date | File Number |
|---|---|---|---|---|---|---|
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 1/25/2012 | 2012 0301111 |
| | Delaware | Original | CIT Finance LLC | Equipment | 11/02/2012 | 2012 4396380 |
| | Delaware | Original | Dainippon Screen Graphics (USA), LLC | Equipment | 12/27/2012 | 2012 5064268 |
| | Delaware | Original | Raymond Leasing Corporation | Equipment | 1/29/2013 | 2013 0370610 |
| | Delaware | Original | Fujifilm North America Corporation | Equipment | 5/1/2013 | 2013 1659649 |
| | Delaware | Amendment | Raymond Leasing Corporation | | 8/1/2013 | 2013 3004364 |
| | Delaware | Original | Bank of America, N.A., as Agent | All Assets | 8/1/2013 | 2013 2994250 |
| | Delaware | Original | Silver Point Finance, LLC, as First Lien Administrative Agent | All Assets | 8/1/2013 | 2013 3000743 |
| | Delaware | Consignment | Fujifilm North America Corporation | Equipment | 2/4/2014 | 2014 0459180 |
| | Delaware | Original | Xerox Corporation | Equipment | 2/21/2014 | 2014 0682336 |
| | California Alameda County | UCC-1 Fixture Filing | Silver Point Finance, LLC | | 9/13/2013 | 2013306164 |
| | California Alameda County | UCC-1 Fixture Filing | Silver Point Finance, LLC | | 9/13/2013 | 2013306166 |
| | California Alameda County | UCC-1 Fixture Filing | Bank of America | | 9/13/2013 | 2013306164 |
| **WorkflowOne of Puerto Rico Inc.** | Delaware | Original | Silver Point Finance, LLC, as Second Lien Administrative Agent | All Assets | 3/3/2011 | 2011 0795081 |

**Part 6.4**

**Capital Structure of Borrower**

**Subsidiaries**

| Subsidiary | Shareholder(s) | Jurisdiction of Incorporation | % of Equity Owned |
|---|---|---|---|
| Standard Register Technologies, Inc. | The Standard Register Company | Ohio | 100% |
| Standard Register Holding Company | The Standard Register Company | Ohio | 100% |
| Standard Register International, Inc. | The Standard Register Company | Ohio | 100% |
| Standard Register Mexico Holding Company | The Standard Register Company | Ohio | 100% |
| Standard Register Technologies Canada ULC | The Standard Register Company | Nova Scotia | 100% |
| Standard Register de Mexico, S. de R.L. de C.V. | Standard Register Mexico Holding Company<br><br>Standard Register Holding, S. de R.L. de C.V | Mexico | 0.03%<br><br>99.97% |
| Standard Register Holding, S. de R.L. de C.V | Standard Register Mexico Holding Company<br><br>Standard Register Holding Company | Mexico | 90%<br><br>10% |
| Standard Register Servicios, S. de R.L. de C.V. | Standard Register Mexico Holding Company<br><br>Standard Register Holding, S. de R.L. de C.V | Mexico | 0.03%<br><br>99.97% |

| iMedConsent, LLC | The Standard Register Company | Delaware | 100% |
| Standard Register of Puerto Rico Inc. | The Standard Register Company | Delaware | 100% |

**<u>Corporate Affiliates</u>**

The Standard Register Company entered into a joint venture with Veri-Code Systems, Inc.  The joint venture entity is Veri-Code Systems, LLC.  The Standard Register Company owns 25% of Veri-Code Systems, LLC.

**Issued Capital Securities**

| Entity | Authorized Capital Securities | Issued Capital Securities |
|---|---|---|
| The Standard Register Company | 110,450,000 | 9,199,496* |
| Standard Register International, Inc. | 1500 | 100 |
| Standard Register Technologies, Inc. | 1500 | 10 |
| Standard Register Holding Company | 1500 | 20 |
| Standard Register Mexico Holding Company | 1500 | 20 |
| Standard Register Technologies Canada ULC | 100,000 | 1 |
| Standard Register de Mexico, S. de R.L. de C.V. | 2 | 1 - Standard Register Holdings, S. de R.L. de C.V.<br><br>1 - Standard Register Mexico Holding Company |
| Standard Register Holding, S. de R.L. de C.V | 2 | 1 - Standard Register Holding Company.<br><br>1 - Standard Register Mexico Holding Company |
| Standard Register Servicios, S. de R.L. de C.V. | 2 | 1 - Standard Register Holdings, S. de R.L. de C.V.<br><br>1 - Standard Register Mexico Holding Company |
| iMedConsent, LLC d/b/a Dialog Medical | --- | 100%** |
| Standard Register of Puerto Rico Inc. | 2,500 common shares | 100 |

|  | 2,500 preferred shares |  |
| --- | --- | --- |
| Veri-Code Systems, LLC | --- | 25%*** |

\* As of March 1, 2015
\*\* Per Operating Agreement, 100% of the membership interests are owned by The Standard Register Company.
\*\*\* Per Operating Agreement, 25% of the membership interests are owned by The Standard Register Company.

**Distributions**

None.

**Options, Warrants and Rights to Acquire Capital Securities**

1. The Standard Register Company 1995 Incentive Stock Option Plan.

2.  The Standard Register Company Management Incentive Compensation Plan, as amended.

3. The Standard Register Company Amended and Restated 2002 Equity Incentive Plan.

4.  The Standard Register Company 2005 Deferred Compensation Plan.

5. The Standard Register Company 2011 Equity Incentive Plan, as amended.

As of February 27, 2015, there were 559,439 outstanding stock options and 493,537 exercisable stock options under The Standard Register Company 1995 Incentive Stock Option Plan, The Standard Register Company Management Incentive Compensation Plan, as amended, The Standard Register Company Amended and Restated 2002 Equity Incentive Plan, The Standard Register Company 2005 Equity Incentive Plan and The Standard Register Company 2011 Equity Incentive Plan, as amended.

**Part 6.6**

**Chief Executive Office/Service of Process Agents**

| Company | State | Agent for Service of Process |
|---|---|---|
| The Standard Register Company | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register Holding Company | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register International, Inc. | Ohio | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| Standard Register Technologies, Inc. | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register Mexico Holding Company | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register Technologies Canada ULC | Nova Scotia | Barry D. Horne<br>P.O. Box 730<br>Halifax, Nova Scotia B3J2V1 |
| Standard Register de Mexico, S. de R.L. de C.V | Mexico | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| Standard Register Holding, S. de R.L. de C.V. | Mexico | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| Standard Register Servicios, S. de R.L. de C.V. | Mexico | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| iMedConsent, LLC | Delaware | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801 |

Standard Register of Puerto Rico Inc.        Delaware        Corporation Service Company
                                                             2711 Centerville Road,
                                                             Suite 400
                                                             Wilmington DE 19808

- The chief executive office of iMedConsent, LLC is 30 Perimeter Park Dr., Suite 200, Atlanta, GA 30341.

- The chief executive office of Standard Register Technologies Canada is Purdy's Wharf Tower II, 1300-1969 Upper Water Street, PO Box 730 Halifax NS B3J 2V1.

- The chief executive office of Standard Register de Mexico, S. de R.L.., Standard Register Holding, S. de R.L., Standard Register Servicios, S. de R.L. is Carretera Huinalá KM 28 #404, Apodaca, Nuevo León, Mexico.

- The chief executive office of each other Credit Party and/or Subsidiary is located at 600 Albany Street, Dayton, Ohio 45417.

## Plant Facilities and Warehouses

|     | **Street** | **City, State** | **Zip Code** |
| --- | --- | --- | --- |
| 1. | 81 Parker Dr | Avon, MA | 02322 |
| 2. | 1255 Terminus Dr, Suite 400 | Lithia Springs, GA | 30122 |
| 3. | 496 E Whitmore Ave | Modesto, CA | 95358 |
| 4. | 5002 D Street NW  Suite 106 | Auburn, WA | 98001 |
| 5. | 2203 Sherrill Dr | Statesville, NC | 28625 |
| 6. | 3655 S School Ave | Fayetteville, AR | 72701 |
| 7. | 2908 Commodore Dr | Carrollton), TX | 75007 |
| 8. | 121 Mount Zion Rd | York, PA | 17402 |
| 9. | 7576 Kingspointe Pkwy, S 140 | Orlando, FL | 32809 |
| 10. | 2700 Blue Water Rd, Suite 850 | Eagan, MN | 55121 |
| 11. | 325 Butler Dr | Murfreesboro, TN | 37130 |
| 12. | 3159 Rider Trail South | Earth City, MO | 63044 |
| 13. | 2142 S Dixie Blvd | Radcliff, KY | 40160 |
| 14. | 5131 Tampa West Blvd | Tampa, FL | 33634 |
| 15. | 1803 Rocky River North | Monroe, NC | 28110 |
| 16. | 91-489 C Komohana St | Kapolei, HI 96707 | 96817 |
| 17. | 11685 E 53rd Ave | Denver, CO | 80239 |
| 18. | 259 Hartford Turnpike | Tolland, CT | 06084 |
| 19. | 1750 Miller Ave | Shelbyville, IN | 46176 |
| 20. | 3885 Seaport Blvd, Suite 40 | Sacramento, CA | 95691 |
| 21. | 600 N Albany St. | Dayton, OH | 45408 |

| | | | |
|---|---|---|---|
| 22. | 9670 US Highway 69N | Tyler, TX | 75706 |
| 23. | 2505 Arctic Blvd, Suite 200 | Anchorage, AK | 99503 |
| 24. | 700 Patrol Road | Jeffersonville IN | 47130 |
| 25. | 120 Campbell St. | Dayton, OH | 45417 |
| 26. | 325 Busser Road | Emigsville, PA | 47130 |
| 27. | 5775 Brisa Street | Livermore, CA | 94550 |
| 28. | 425 S Rockefeller Ave | Ontario, CA | 91761 |
| 29. | 18300 E 28th Ave (CEVA-Denver) | Aurora, CO | 80011 |
| 30. | 5601 NW 72nd Ave (CEVA) | Miami (CEVA), FL | 33166 |
| 31. | 1650 Westfork Dr. | Lithia Springs, GA | 30057 |
| 32. | 1302 Eisenhower Drive North | Goshen, IN | 46526 |
| 33. | 10400 Hickman Rd (Citi) | Des Moines, IA | 50325 |
| 34. | 1401 Bedford Rd (CEVA) | N. Kansas City, KS | 64116 |
| 35. | 1-5 Sassacus Drive | Westborough, MA | 01581 |
| 36. | 7 Costco Way | Monroe Township, NJ | 08831 |
| 37. | 6275 S Pearl, Ste 1400 (CEVA) | Las Vegas, NV | 89074 |
| 38. | 515 West Sycamore Street | Coldwater, OH | 45828 |
| 39. | 3125 Lewis Centre Way | Grove City, OH | 43123 |
| 40. | 304-306 N Meridian Ave | Oklahoma City, OK | 73017 |
| 41. | 18620 NE San Rafael (WBG) | Portland, OR | 97230 |
| 42. | 155 Crown Court (CEVA-Pittsburgh) | Oakdale, PA | 15071 |
| 43. | Ceva-Lot 26 Campeche St. | Carolina, PR | 00983 |
| 44. | 1609 S. Bluebell Road | Brenham, TX | 77833 |
| 45. | 10735 West Little York Rd | Houston, TX | 77040 |
| 46. | 4808 Eastover Circle | Mesquite, TX | 75149 |
| 47. | 4517 West 1730 South | Salt Lake City, UT | 84126 |
| 48. | 6849 S. 212th St (WBG) | Kent, WA | 98032 |
| 49. | 1251 N. Fruitridge Ave | Terre Haute IN | 47408 |
| 50. | 125 S. Wacker Dr St LLB005 | Chicago IL | 60606 |
| 51. | Carretera Hulnala KM 28 #404 | Apodaca, Nueva Leon, MX | 66634 |
| 52. | Calle Séptima #300 Ste 910 | Apodaca, Nueva Leon, MX | 66603 |
| 53. | 11175 East 55th Ave, #5 | Denver, CO | 80239 |
| 54. | 1880 Matheson Blvd East-3PL | Mississauga, Ontario | L4W-SN4 |
| 55. | 1816 C- West Pointe Dr-3PL | Charlotte, NC | 28214 |
| 56. | 5101 Decatur Blvd St W-3PL | Indianapolis, IN | 46241 |
| 57. | 7701 Commerce Blvd-3PL | Panama City, FL | 32404 |
| 58. | 4640 Hickory Hill Rd-3PL | Memphis, TN | 38141 |
| 59. | 12134 Esther Lama Dr St 200-3PL | El Paso, TX | 79913 |
| 60. | 855 N..Wood Dale Rd -3PL | Wood Dale, IL | 60191 |
| 61. | Pro Tans de Mexico Ave. Palermo #140 | Apodaca, Nueva Leon, MX | 66600 |
| 62. | Carr a Hulnala KM 2.8 #404 –A -3PL | Cd.Juarez Chih C.P  MX | 32690 |

## **Part 6.12**

**Litigation**

None.

**Part 7.2.9**

**Existing Debt**

Borrowers are party to eighteen (18) capital leases in the aggregate amount of $10.6 million in connection with certain office equipment, including printers, copiers, postage meters and a generator.

## Part 7.2.13

### Affiliate Transactions

John Q. Sherman, II, a director of the Company, sells product to the Company pursuant to a sourcing and supply contract with Fifth Third Bank, a customer of the Company.

## Part 11.1

## Insurance Policies

| Coverage | Insurer | Policy Expiration |
|---|---|---|
| Director's and Officer's Primary | Zurich | 05.31.14 to 05.31.15 – Policy        0204 |
| D&O Excess – 1ST Layer | XL | 05.31.14 to 05.31.15 – Policy        8314 |
| D&O Excess – 2ND Layer | Navigators | 05.31.14 to 05.31.15 – Policy        96IV |
| Side A D&O Excess | Allied World | 05.31.14 to 05.31.15 – Policy      -0235 |
| Fiduciary Liability – Primary | Continental Casualty (CNA) | 05.31.14 to 05.31.15 – Policy 5      9555 |
| Fiduciary Liability – Excess 1ST Layer | Travelers | 05.31.14 to 05.31.15 – Policy    9663 |
| Fiduciary Liability – Excess 2ND Layer | Federal Insurance Company (Chubb) | 05.31.14 to 05.31.15 – Policy    364 |
| Employment Practices Liability | Continental Casualty (CNA) | 05.31.14 to 05.31.15 – Policy    5490 |
| Kidnap/Ransom & Extortion | Federal Insurance Company (Chubb) | 05.31.14 to 05.31.17 – Policy    8015 |
| Crime Policy | Continental Casualty (CNA) | 05.31.13 to 05.31.16 – Policy      95-13 |
| Foreign Prop (Mexico) / Casualty / Liability | CHUBB | 07.01.14 to 07.01.15 – Policy    406-4 |
| International WorldNet DIC / DIL | Vigilante Insurance (Subsidiary of Chubb) | 07.01.14 to 07.15.15 – Policy    4007 &       7CIN |
| All Risk Property (Incl BI) | FM Global | 06.30.14 to 06.30.15 – Policy    414 |
| Flood – Sacramento Only | WRIGHT National Flood Insurance Company – Coordinated by FM Global | 06.30.14 to 06.30.15 – Policy        3600 |
| General Liability | National Fire Insurance of Hartford (CNA) | 07.01.14 to 07.01.15 – Policy    0466 |
| Automobile Liability | National Fire Insurance of Hartford (CNA) | 07.01.14 to 07.01.15 – Policy    0421 |
| Primary Excess Liability (Lead Umbrella) | Continental Casualty Company (CNA) | 07.01.14 to 07.01.15 – Policy 5    2535 |
| Second Layer Excess Liability (Umbrella 15 xs 25) | Fireman's Fund Ins. (USA sub of Allianz SE) | 07.01.14 to 07.01.15 – Policy    4457 |
| Workers' Compensation & Employers' Liability | Liberty Mutual | 07.01.14 to 07.01.15 – Policy        5-014 |
| Ohio XS Work Comp & Employers' Liability | Safety National | 10.01.14 to 10.01.16 – Policy    1878 |
| Prof Liability (E & O) Primary & Cyber | Beazley | 12.01.14 to 12.01.15 – Policy    0201 |
| Prof Liability (E & O) 1ST Excess | Columbia Casualty Company (CNA) | 12.01.14 to 12.01.15 – Policy    1658 |
| Prof Liability (E & O) 2ND Excess | Illinois National Ins Co (AIG) | 12.01.14 to 12.01.15 – Policy      -22-92 |
| Kidnap / Ransom & Extortion | National Union Fire Insurance | 07.31.12 to 07.31.15 |

| | Company of Pittsburgh (Chartis / AIG) | |
|---|---|---|
| Life Insurance | Grupo Nacional Provincial | 07.01.14 to 07.01.15 Policy        5381 |
| Medical Insurance | Grupo Nacional Provincial | 07.01.14 to 07.01.15 Policy 4      -8164 |
| Medical Insurance | Grupo Nacional Provincial | 07.01.14 to 07.01.15 Policy 4      -8166 |
| Medical Insurance | Grupo Nacional Provincial | 07.01.14 to 07.01.15 Policy        -8166 |
| Building Insurance | Chubb de Mexico Compañia de Seguros | 07.01.14 to 07.01.15 Policy          406-4 |
| Transportation Merchandise | HDI Seguros SA de CV | 02.05.15 to 02.05.16 Policy  -7461 |

SCHEDULE II

PERCENTAGES, LIBOR OFFICE AND DOMESTIC OFFICE

Silver Point Finance, LLC,
as Administrative Agent
2 Greenwich Plaza
Greenwich, CT 06380
Attention: Arbarb Khalid
Telephone: (203)542-4441
Facsimile: (201) 719-2157

| NAME AND NOTICE ADDRESS OF LENDER | LIBOR OFFICE | DOMESTIC OFFICE | LOAN PERCENTAGE |
|---|---|---|---|
| SPCP Group, LLC<br>    Two Greenwich Plaza,<br>    1st Floor<br>    Greenwich, CT 06830 | Same. | Same. | 94.127% |
| SPCP Group III, LLC<br>    Two Greenwich Plaza, 1st Floor<br>    Greenwich, CT 06830 | Same. | Same. | 5.873% |
| **TOTAL** | | | **100.0%** |

SCHEDULE III

TERM LOAN COMMITMENTS

| NAME AND NOTICE ADDRESS OF LENDER | LOAN AMOUNT |
|---|---|
| SPCP Group, LLC | $28,238,021.74 |
| SPCP Group III, LLC | $1,761,978.26 |
| **TOTAL** | **$30,000,000** |

## SCHEDULE IV

## POST-CLOSING CONDITIONS

To the extent not delivered on the Closing Date, each applicable Borrower shall perform the obligations set forth below, as soon as reasonably practicable, but in no event later than the date specified after the Closing Date applicable to each item set forth below.  Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Credit Agreement.

1.  Insurance Matters.  The Borrowers will deliver on or prior to the date that is ten (10) Business Days after the Closing Date, certificates of insurance evidencing the existence of insurance to be maintained by the Borrowers and their Subsidiaries pursuant to Section 7.1.8 and, if applicable, the designation of the Administrative Agent as an additional insured or lender loss payee, as the case may be, thereunder, in each case in a form and substance acceptable to the Administrative Agent.

2.  Mortgages. The Borrowers will, as reasonably requested by the Administrative Agent, deliver to the Administrative Agent a Mortgage on any real property owned by any Borrower, in each case in a form and substance acceptable to the Administrative Agent.

3.  Deposit Account Control Agreements. The Borrowers will deliver on or prior the date that is within thirty (30) days of the Closing Date (or such later date to which the Administrative Agent may agree in its sole discretion), to the Administrative Agent a deposit account control agreements for each of the Deposit Accounts as described on Schedule 4(b) to the Security Agreement, in each case in a form and substances acceptable to the Administrative Agent.

4.  IP Security Agreements. The Borrowers will deliver on or prior to the date that is within thirty (30) days of the Closing Date (or such later date to which the Administrative Agent may agree in its sole discretion), to the Administrative Agent copyright security agreements, patent security agreements and trademark security agreements, in each case in form and substance acceptable to the Administrative Agent.

**EXHIBIT A**

**FORM OF NOTE**

U.S.$_____._                                              _____ __ , 20__

FOR VALUE RECEIVED, each of the undersigned, THE STANDARD REGISTER COMPANY, an Ohio corporation ("Standard Register"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holdings"), and STANDARD REGISTER OF PUERTO RICO INC., a Delaware corporation ("SR Puerto Rico"), STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"), STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"), STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR MX Holdings"), STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR Mexico"), STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR Servicios"; each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, a "Borrower" and collectively, jointly and severally, the "Borrowers") as co-borrowers under the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement referred to below, jointly and severally promises to pay [Name of Lender] (the "Lender") on the Stated Maturity Date, without duplication, the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "DIP Credit Agreement"), among the Borrowers, the other Credit Parties party thereto, the various financial institutions and other Persons from time to time parties thereto as Lenders, and Silver Point Finance, LLC, as Administrative Agent. Terms used in this Note, unless otherwise defined herein, have the meanings provided in the DIP Credit Agreement.

The Borrowers also jointly and severally promise to pay, without duplication, interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the DIP Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the DIP Credit Agreement.

This Note is issued pursuant to the DIP Credit Agreement and evidences Indebtedness incurred under, the DIP Credit Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Borrowers are

A-1

permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

A-2

THIS TERM NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

BORROWERS:

THE STANDARD REGISTER COMPANY

By: _____
     Name:
     Title:

STANDARD REGISTER INTERNATIONAL, INC.

By: _____
     Name:
     Title:

STANDARD REGISTER TECHNOLOGIES, INC.

By: _____
     Name:
     Title:

IMEDCONSENT, LLC

By: _____
     Name:
     Title:

STANDARD REGISTER OF PUERTO RICO INC.

By: _____
    Name:
    Title:


STANDARD REGISTER MEXICO HOLDING COMPANY


By: _____
    Name:
    Title:


STANDARD REGISTER TECHNOLOGIES CANADA ULC


By: _____
    Name:
    Title:


STANDARD REGISTER HOLDINGS, S de R.L. de C.V.


By: _____
    Name:
    Title:


STANDARD REGISTER de MEXICO, S de R.L. de C.V.


By: _____
    Name:
    Title:

STANDARD REGISTER SERVICIOS,
S de R.L. de C.V.


By: _____
     Name:
     Title:

LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# **EXHIBIT A-1**

## **CLOSING DATE BUDGET**

[See attached.]

## EXHIBIT B

## FORM OF NOTICE OF CONVERSION/CONTINUATION

Date _____

Silver Point Finance LLC, as Agent
2 Greenwich Plaza
Greenwich, CT 06830
Attention: _____

Ladies and Gentlemen:

This Continuation/Conversion Notice is delivered to you pursuant to Section 2.3 of the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "DIP Credit Agreement"),among THE STANDARD REGISTER COMPANY, an Ohio corporation ("Standard Register"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holdings"), and STANDARD REGISTER OF PUERTO RICO INC., a Delaware corporation ("SR Puerto Rico"), STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"), STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"), STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR MX Holdings"), STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR Mexico"), STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR Servicios"; each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, a "Borrower" and collectively, jointly and severally, the "Borrowers"), Silver Point Finance LLC, as administrative agent for certain Lenders from time to time parties thereto, and such Lenders. Terms used herein, unless otherwise defined herein, have the meanings provided in the DIP Credit Agreement.

The Borrower hereby requests that on _____ __, 20__,

(1)     $_____ of the presently outstanding principal amount of the Loans originally made on _____ __, 20_, presently being maintained as [Base Rate Loans] [LIBO Rate Loans],

(2)     be [converted into] [continued as],

(3)     [LIBO Rate Loans having an Interest Period of [1][2][3][6] months] [Base Rate Loans].

B-1

The Borrower hereby:

(a)    certifies and warrants that no Default has occurred and is continuing; and

(b)    agrees that if prior to the time of the [continuation] [conversion] requested hereby any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the Administrative Agent.

Except to the extent, if any, that prior to the time of the [continuation] [conversion] requested hereby the Administrative Agent shall receive written notice to the contrary from the Borrower, each matter certified to herein shall be deemed once again to be certified as true and correct in all material respects at the date of such [continuation] [conversion] as if then made.

913198.04-CHISR01A - MSW

IN WITNESS WHEREOF, the Borrowers have caused this Continuation/Conversion Notice to be executed and delivered, and the certifications and warranties contained herein to be made, by its duly Authorized Officer this ___ day of _____, 20___.

BORROWERS:

THE STANDARD REGISTER COMPANY

By: _____
     Name:
     Title:

STANDARD REGISTER
INTERNATIONAL, INC.

By: _____
     Name:
     Title:

STANDARD REGISTER
TECHNOLOGIES, INC.

By: _____
     Name:
     Title:

IMEDCONSENT, LLC

By: _____
     Name:
     Title:

STANDARD REGISTER OF PUERTO
RICO INC.

By: _____
     Name:
     Title:

STANDARD REGISTER MEXICO
HOLDING COMPANY


By: _____
    Name:
    Title:


STANDARD REGISTER
TECHNOLOGIES CANADA ULC


By: _____
    Name:
    Title:


STANDARD REGISTER HOLDINGS,
S de R.L. de C.V.


By: _____
    Name:
    Title:


STANDARD REGISTER de MEXICO,
S de R.L. de C.V.


By: _____
    Name:
    Title:


STANDARD REGISTER SERVICIOS,
S de R.L. de C.V.


By: _____
    Name:
    Title:

## EXHIBIT C

## FORM OF LENDER ASSIGNMENT AGREEMENT

_____, 20__

To:      The Standard Register Company,
         as the Borrower
         600 Albany Street
         Dayton, Ohio 45417
         Attention:

         Silver Point Finance LLC, as Agent
         2 Greenwich Plaza
         Greenwich, CT 06830
         Attention:

Gentlemen and Ladies:

This Lender Assignment Agreement (the "Assignment and Acceptance") is dated as of the Effective Date set forth below and is entered into by and between *[Insert name of Assignor]* (the "Assignor") and *[Insert name of Assignee]* (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto are hereby agreed to be incorporated herein by reference and made a part of this Assignment and Acceptance.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the DIP Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights, benefits, obligations, liabilities and indemnities in its capacity as a Lender under (and in connection with) the DIP Credit Agreement and any other Loan Documents to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including without limitation any letters of credit and guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the DIP Credit Agreement, the other Loan Documents or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

C-1

This agreement shall be effective as of the Effective Date upon the written consent of the Administrative Agent and, unless an Event of Default shall have occurred and be continuing, the Borrower being subscribed in the space indicated below.

1.    Assignor:

2.    Assignee:

[and is an Affiliate/Approved Fund of *[identify Lender]*[1]]

3.    Borrowers:    THE STANDARD REGISTER COMPANY, STANDARD REGISTER INTERNATIONAL, INC., STANDARD REGISTER TECHNOLOGIES, INC., IMEDCONSENT, LLC, STANDARD REGISTER HOLDING COMPANY, STANDARD REGISTER OF PUERTO RICO INC., STANDARD REGISTER MEXICO HOLDING COMPANY, STANDARD REGISTER TECHNOLOGIES CANADA ULC, STANDARD REGISTER HOLDINGS, S de R.L. de C.V., STANDARD REGISTER de MEXICO, S de R.L. de C.V., and STANDARD REGISTER SERVICIOS, S de R.L. de C.V.

4.    Administrative Agent:    Silver Point Finance, LLC, as the administrative agent under the DIP Credit Agreement

5.    DIP Credit Agreement:    Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "DIP Credit Agreement"), among the Borrowers, the other Credit Parties party thereto, the various financial institutions and other Persons from time to time parties thereto as Lenders, and Silver Point Finance, LLC, as Administrative Agent.

6.    Assigned Interest:

| Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans |
|---|---|---|
| $ | $ | % |
| $ | $ | % |

Effective Date:                                                    [Month] __, 20_

---

[1]    Select as applicable.

The terms set forth in this Assignment and Acceptance are hereby agreed to as of the Effective Date:

ASSIGNOR:

[NAME OF ASSIGNOR]


By: _____
    Name:
    Title:


ASSIGNEE:

[NAME OF ASSIGNEE]


By: _____
    Name:
    Title:

Consented to and Accepted:
SILVER POINT FINANCE, LLC,
    as the Administrative Agent

By: _____
    Name:
    Title:


[Consented to:
THE STANDARD REGISTER COMPANY

By: _____
    Name:
    Title:[2]          ]

---

[2]    Include to the extent the consent of the New Borrower is required under the DIP Credit Agreement.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.  <u>Representations and Warranties</u>.

1.1.  <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) except as provided in clause (a) above, assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the DIP Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of each Borrower, or any of their Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by each Borrower, any of their Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.  <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the DIP Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the DIP Credit Agreement (subject to receipt of such consents as may be required under the DIP Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the DIP Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the DIP Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 7.1.3 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) attached to the Assignment and Acceptance is any documentation, including any tax forms, required to be delivered by it pursuant to the terms of the DIP Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.  <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance. This Assignment and Acceptance shall be deemed to be a contract made under, governed by, and construed in accordance with, the laws of the State of New York (including for such purposes Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York) without regard to conflicts of laws principles.

## EXHIBIT D

## FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered pursuant to clause [(b)/(c)] of Section 7.1.3 of the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "DIP Credit Agreement"),among THE STANDARD REGISTER COMPANY, an Ohio corporation ("Standard Register"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holdings"), and STANDARD REGISTER OF PUERTO RICO INC., a Delaware corporation ("SR Puerto Rico"), STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"), STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"), STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR MX Holdings"), STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR Mexico"), STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability corporation organized under the laws of Mexico ("SR Servicios"; each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, a "Borrower" and collectively, jointly and severally, the "Borrowers"), Silver Point Finance LLC, as administrative agent for certain Lenders from time to time parties thereto, and such Lenders. Terms used herein, unless otherwise defined herein, have the meanings provided in the DIP Credit Agreement.

Standard Register hereby certifies, represents and warrants that, as of _____ __, 20__ (the "Computation Date"):

1.    No Default had occurred and was continuing.[3]

2.    Minimum EBITDAP:

a.    The minimum EBITDAP permitted pursuant to Section 7.2.17 of the DIP Credit Agreement on the Computation Date was $_____. The actual EBITDAP was $_____, as computed on Attachment I hereto, and, accordingly, the covenant [has] [has not] been complied with.

3.    No Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate.[4]

---

[3]    If a Default has occurred, specify the details of such Default and the action that the Borrower or an Obligor has taken or proposes to take with respect thereto.

4.      Standard Register is in compliance with the Budget and all ABL Loans have been and are being used solely in accordance with the Budget, subject to Permitted Variances.

---

[4]    Required only in the case of a Compliance Certificate delivered pursuant to clause (ii) of Section 7.1.3(j). If a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, the Borrower must certify that such Subsidiary has complied with Section 7.1.17 of the DIP Credit Agreement.

D-2

IN WITNESS WHEREOF, Standard Register has caused this Compliance Certificate to be executed and delivered, and the certifications and warranties contained herein to be made on behalf of Standard Register, by the chief financial or accounting Authorized Officer of the Standard Register as of the date first set forth above.

THE STANDARD REGISTER COMPANY

By: _____
     Name:
     Title:

EBITDAP

1.  The sum for such fiscal period of the following:                                                                         $_____

    (a)  Adjusted Net Earnings, <u>plus</u>                                                                       $_____

    (b)  provision for taxes based on income and franchise taxes to the extent  $_____
deducted in the calculation of Adjusted Net Earnings, <u>plus</u>

    (c)  interest expense, to the extent deducted in the calculation of Adjusted  $_____
Net Earnings, <u>plus</u>

    (d)  depreciation and amortization expense, to the extent deducted in the  $_____
calculation of Adjusted Net Earnings, <u>plus</u>

    (e)  the total "net periodic benefit costs" attributable to the qualified  $_____
defined benefit plans of the Borrowers and their Subsidiaries as such
plans are in effect at the Closing Date to the extent covering the U.S.
employees of the Borrowers and their Subsidiaries as of the Closing
Date (the "<u>Covered Plans</u>"), to the extent such costs are deducted in
accordance with GAAP in the calculation of Adjusted Net Earnings of
the Borrowers on a basis consistent with the Borrowers' consolidated
financial statements for the fiscal year ended December 31, 2012, <u>plus</u>

    (f)  non-recurring non-cash losses, to the extent deducted in the  $_____
calculation of Adjusted Net Earnings, <u>plus</u>,

    (g)  Allowed Integration Costs, to the extent deducted in the calculation of  $_____
Adjusted Net Earnings, not to exceed on a cumulative basis beginning
with the 2014 Fiscal Year (i) $38,310,000 through the end of the 2014
Fiscal Year, (ii) $48,411,000 through the end of the 2015 Fiscal Year.
(iii) $53,005,000 through the end of the 2016 Fiscal Year, (iv)
$57,895,000 through the end of the 2017 Fiscal Year and (v)
$59,895,000 through the end of the 2018 Fiscal Year, <u>provided</u> that,
the aggregate annual Allowed Integration Costs added back pursuant
to this clause (viii) shall not exceed $7,500,000 for any of the 2016,
2017 and 2018 Fiscal Years, <u>plus</u>,

    (h)  non-cash stock compensation expenses, to the extent deducted in the  $_____
calculation of Adjusted Net Earnings,

2.  <u>minus</u>, the sum for such fiscal period of the following:

    (a)  interest income (except to the extent deducted in determining interest  $_____
expense);

    (b)  non-recurring income and gains, to the extent added in the calculation  $_____
of Adjusted Net Earnings; and

    (c)  non-cash gains or income to the extent added in the calculation of  $_____
Adjusted Net Earnings.

3.  EBITDAP: The sum of Item 1 minus the sum of Item 2                                                 $_____

**<u>EXHIBIT E</u>**

[RESERVED]

913198.04-CHISR01A - MSW

# EXHIBIT F

## FORM OF PLEDGE AND SECURITY AGREEMENT

[See attached.]

913198.04-CHISR01A - MSW

*EXECUTION VERSION*

**DEBTOR-IN-POSSESSION**

**SECURITY AGREEMENT**

**dated as of March 12, 2015**

**among**

**THE STANDARD REGISTER COMPANY,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**STANDARD REGISTER INTERNATIONAL, INC.,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**STANDARD REGISTER TECHNOLOGIES, INC.,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**IMEDCONSENT, LLC,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**STANDARD REGISTER OF PUERTO RICO, INC.,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**STANDARD REGISTER HOLDING COMPANY,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**STANDARD REGISTER MEXICO HOLDING COMPANY,**
**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**and**

**SILVER POINT FINANCE, LLC,**

**as Collateral Agent**

**Notwithstanding anything herein to the contrary, the liens and security interests granted to Agent pursuant to this Agreement and the exercise of any right or remedy by Agent hereunder, are subject to (a) the provisions of the Intercreditor Agreement, dated as of August 1, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL/Term Loan Intercreditor Agreement"), among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent and the Grantors (as defined in the ABL/Term Loan Intercreditor Agreement) from time to time party thereto, (b) the provisions of the Intercreditor Agreement, dated as of August 1, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Term Lender Intercreditor Agreement"), among Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent and the Grantors (as defined in the Term Lender Intercreditor Agreement) from time to time party thereto and (c) the provisions of the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "ABL-TL DIP Intercreditor Agreement" and, together with the ABL/Term Intercreditor Agreement and the Term Lender Intercreditor Agreement, the "Intercreditor Agreements"), among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as Term Loan Agent and the Grantors (as defined in the ABL-TL DIP Intercreditor Agreement) from time to time party thereto.  In the event of any conflict between the terms of the Intercreditor Agreements and/or the Order, and the terms of this Agreement, the terms of the Intercreditor Agreements and/or the Order shall govern and control.**

## DEBTOR-IN-POSSESSION SECURITY AND PLEDGE AGREEMENT

**THIS DEBTOR-IN-POSSESSION SECURITY AND PLEDGE AGREEMENT** (this "Agreement") is entered into as of March 12, 2015 among The Standard Register Company, an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("Parent"), Standard Register International, Inc., an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("International"), Standard Register Technologies, Inc. an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("Technologies"), iMedConsent, LLC a Delaware limited liability company, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("iMed"), Standard Register of Puerto Rico Inc., a Delaware corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("Puerto Rico"), Standard Register Holding Company, an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("Standard Holdings"), Standard Register Mexico Holding Company, an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("Mexico" and together with Parent, International, Technologies, iMed, Puerto Rico and Standard Holdings, and together with any successors, each individually a "Grantor", and collectively, the "Grantors") and Silver Point Finance, LLC, as collateral agent for the Secured Parties (together with its successors and assigns in such capacity, the "Collateral Agent").

## RECITALS

A.      On March 12, 2015, the Grantors filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and

have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

        B.      The Grantors are each a party to that certain Superpriority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Grantors, and the foreign Subsidiaries of Parent, each a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as borrowers, the Lenders from time to time party thereto, Silver Point Finance, LLC, as Administrative Agent, the Collateral Agent and the other Persons party thereto from time to time.

        C.      It is a condition to the obligations of the Lenders to make the Loans under the Credit Agreement that each Grantor execute and deliver the applicable Loan Documents, including this Agreement.  This Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of all of the Obligations.

        D.      The execution, delivery and performance of this Agreement and the grant of security interests, pledges and Liens on all the Collateral to secure the Obligations have been authorized pursuant to Section 364 of the Bankruptcy Code by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

        E.      To supplement the Financing Orders without in any way diminishing or limiting the effect of the Financing Orders or the security interests, pledges and Liens granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interests, pledges and Liens. Subject to the entry of the Interim Financing Order, the Obligations shall constitute a Superpriority Claim.

        NOW, THEREFORE, in consideration of these premises, the mutual agreements contained herein and in the Credit Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Definitions</u>.

        (a)     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement.  With reference to this Agreement, unless otherwise specified herein: (i) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined, (ii) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms, (iii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iv) the word "will" shall be construed to have the same meaning and effect as the word "shall", (v) any definition of, or reference to, any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document, as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (vi) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (vii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this

3

Agreement in its entirety and not to any particular provision hereof, (viii) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to this Agreement, (ix) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (x) the term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form, (xi) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including", (xii) Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement and (xiii) where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

(b)      The following terms shall have the meanings set forth in the UCC:  Accession, Account, Account Debtor, Adverse Claim, As-Extracted Collateral, Certificated Security, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Financial Asset, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Company Security, Investment Property, Letter-of-Credit Right, Manufactured Home, Payment Intangible, Proceeds, Securities Account, Securities Entitlement, Securities Intermediary, Security, Software, Supporting Obligation and Tangible Chattel Paper.

(c)      In addition, the following terms shall have the meanings set forth below:

"Collateral" has the meaning provided in Section 2 hereof.

"Control" means the manner in which "control" is achieved under the UCC with respect to any Collateral for which the UCC specifies a method of achieving "control".

"Equity Interest" means the interest of (i) a shareholder in a corporation, (ii) a partner (whether general or limited) in a partnership (whether general, limited or limited liability), (iii) a member in a limited liability company, or (iv) any other Person having any other form of equity security or ownership interest in any Person.

"Government Contract" means a contract between any Grantor and an agency, department or instrumentality of the United States or any state, municipal or local Governmental Authority located in the United States or all obligations of any such Governmental Authority arising under any Account now or hereafter owing by any such Governmental Authority, as Account Debtor, to any Grantor.

"Intellectual Property" means, all of the following in any jurisdiction throughout the world: (a) patents, patent applications and inventions, including all renewals, extensions, combinations, divisions or reissues thereof; (b) trademarks, service marks, trade names, trade dress, logos, internet domain names and other business identifiers, together with the goodwill symbolized by any of the foregoing, and all applications, registrations, renewals and extensions thereof; (c) copyrights and all works of authorship including all registrations, applications,

4

renewals, extensions and reversions thereof; (d) all computer software, source code, executable code, data, databases and documentation thereof; (e) all trade secret rights in information, including trade secret rights in any formula, pattern, compilation, program, device, method, technique or process, that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (f) all other intellectual property or proprietary rights in any discoveries, concepts, ideas, research and development, know-how, formulae, patterns, inventions, compilations, compositions, manufacturing and production processes and techniques, program, device, method, technique, technical data, procedures, designs, recordings, graphs, drawings, reports, analyses, specifications, databases, and other proprietary or confidential information, including customer lists, supplier lists, pricing and cost information, business and marketing plans and proposals and advertising and promotional materials; and (g) all rights to sue at law or in equity for any infringement or other impairment or violation thereof and all Proceeds of the foregoing.

"Issuer" means the issuer of any Pledged Equity.

"Pledged Equity" means, with respect to each Grantor, 100% of the issued and outstanding Equity Interests of each direct and indirect Subsidiary of the Parent that is directly owned by such Grantor including the Equity Interests of the Subsidiaries owned by such Grantor as set forth on Part 6.4 of the Disclosure Schedule (as updated from time to time in accordance with the Credit Agreement), in each case together with the certificates (or other agreements or instruments), if any, representing such shares, and all options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, the following:

(1)    all Equity Interests representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and

(2)    in the event of any consolidation or merger involving any Issuer and in which such Issuer is not the surviving Person, all shares of each class of the Equity Interests of the successor Person formed by or resulting from such consolidation or merger, to the extent that such successor Person is a direct Subsidiary of a Grantor.

"Real Estate Asset" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Grantor in any real property.

"Vehicles" means all cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title under the laws of any state, all tires and all other appurtenances to any of the foregoing.

"Vessel" means any watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water (including, without limitation, those whose primary purpose is the maritime transportation of cargo or which are otherwise engaged, used or useful in any business activities of the Grantors) which are owned by and registered (or to be owned and registered) in the

name of any of the Grantors, including, without limitation, any Vessel leased or otherwise registered in the foregoing parties' names, pursuant to a lease or other operating agreement constituting a capital lease obligation, in each case together with all related spares, equipment and any additional improvements, vessel owned, bareboat chartered or operated by a Grantor other than Vessels owned by an entity other than a Grantor and which are managed under Vessel management agreements.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if perfection or the effect of perfection or non perfection or the priority of any security interest on any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

"USPTO" means the United States Patent and Trademark Office.

"Work" means any work that is subject to copyright protection pursuant to Title 17 of the United States Code.

2.    Grant of Security Interest in the Collateral.

(a)    Generally.  As Collateral security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of all of the Obligations, each Grantor hereby grants to the Collateral Agent, for the benefit of itself as the Collateral Agent and for the Pro Rata benefit of Lenders and the other Secured Parties, a continuing security interest in and Lien upon all of the following Property and interests in Property of such Grantor, in each case, whether now owned or existing or hereafter created, acquired or arising and wheresoever located (collectively, the "Collateral"):

      (i)    All Accounts;

      (ii)    All Goods, including Inventory, Equipment and Fixtures;

      (iii)    All Real Estate Assets;

      (iv)    All Instruments;

      (v)    All Chattel Paper, including Electronic Chattel Paper;

      (vi)    All Documents;

      (vii)    All General Intangibles, including Intellectual Property;

      (viii)    All Deposit Accounts;

      (ix)    All Commercial Tort Claims, including those shown on Schedule 2;

      (x)    All Letter-of-Credit Rights;

      (xi)    All Supporting Obligations;

6

(xii)    All Investment Property, including Pledged Equity but in any event subject to the limitations set for the in the definition of Pledged Equity;

(xiii)    All monies, whether or not in the possession or under the control of the Collateral Agent, a Lender, or a bailee or Affiliate of the Collateral Agent or a Lender;

(xiv)    to the extent not otherwise included above, all other property and assets of any kind or nature;

(xv)    All accessions to, substitutions for and all replacements, products and cash and non cash proceeds of (i) through (xiv) above, including proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral and claims against any Person for loss of, damage to or destruction of any of the Collateral; and

(xvi)    All books and records (including customer lists, files, correspondence, tapes, computer programs, print outs, and other computer materials and records) of such Grantor pertaining to any of (i) through (xv) above.

(b)    Specific Grants.  Without limiting the generality of the foregoing, to further secure the prompt payment and performance of all Obligations, each Grantor hereby grants to the Collateral Agent, for the benefit of itself as the Collateral Agent and for the Pro Rata benefit of Lenders and other Secured Parties, a continuing security interest in and Lien upon all amounts credited to any Deposit Account of such Grantor, including sums in any blocked, lockbox, sweep or collection account.

3.    Representations and Warranties.  Each Grantor hereby represents and warrants to the Collateral Agent, for the benefit of the Secured Parties, that on the Closing Date, on each date a Loan is made under the Credit Agreement and until the Termination Date that the following representations and warranties are true and correct:

(a)    Security Interest/Priority.  The provisions of this Agreement are effective to create legal, valid and enforceable Liens on the Collateral (having the priority provided for in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable) in favor of the Collateral Agent, for the benefit of the Secured Parties, in all right, title and interest in the Collateral of each Grantor, enforceable against such Grantor. The provisions of the Interim Financing Order (or the Final Financing Order, when applicable) are effective to create legal, valid and enforceable Liens on the Collateral (having the priority provided for in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable) in favor of the Collateral Agent, for the benefit of the Secured Parties, in all right, title and interest in the Collateral of each Grantor, enforceable against such Grantor. Upon (i) filing of financing statements and other filings in appropriate form in the applicable filing office for each Grantor and (ii) the taking of possession or control by the Collateral Agent of the Collateral with respect to which a security interest may be perfected only by possession or control under the UCC (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required hereunder or under the Credit Agreement), the Liens created hereunder shall constitute valid and fully perfected security interests in, all right, title and interest of the Grantors hereunder in the

7

Collateral, in each case subject to no Liens other than Permitted Liens and with the priorities set forth in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable). Upon entry into the Interim Financing Order (or the Final Financing Order, when applicable), the Liens created hereunder shall constitute under the UCC valid and fully perfected security interests in, all right, title and interest of the Grantors hereunder in the Collateral, in each case subject to no Liens other than Permitted Liens and with the priorities set forth in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable). Pursuant to Section 364 of the Bankruptcy Code and the Interim Financing Order (or the Final Financing Order, when applicable), all Obligations of each Grantor under this Agreement and the Credit Agreement and each other Loan Document at all times shall constitute allowed super-priority administrative expense claims in the Cases having priority over all administrative expenses or other claims of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Financing Order, to the extent therein approved), 507(a), 507(b), 546(c), 552(b), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of each Grantor, their estates, and any successor trustee or estate representative in the Cases or any subsequent proceeding or case under the Bankruptcy Code, subject to no Liens other than Permitted Liens. No Grantor has authenticated any agreement authorizing any secured party thereunder to file a financing statement, except to perfect Permitted Liens.

(b)    _Types of Collateral_.  None of the Collateral consists of, or is the Proceeds of, (i) As-Extracted Collateral, (ii) Consumer Goods, (iii) Farm Products, (iv) Manufactured Homes, (v) standing timber, (vi) an aircraft, airframe, aircraft engine or related property, (vii) an aircraft leasehold interest, (viii) a Vessel or (ix) any other interest in or to any of the foregoing.

(c)    _Accounts_.  (i) Each Account of the Grantors and the papers and documents relating thereto are genuine and in all material respects what they purport to be, (ii) each Account arises out of (A) a bona fide sale of goods sold and delivered by such Grantor (or is in the process of being delivered) or (B) services theretofore actually rendered by such Grantor to, the account debtor named therein, (iii) no Account of a Grantor is evidenced by any Instrument or Chattel Paper unless such Instrument or Chattel Paper, to the extent requested by the Collateral Agent, has been endorsed over and delivered to, or submitted to the control of, the Collateral Agent, (iv) no surety bond was required or given in connection with any Account of a Grantor or the contracts or purchase orders out of which they arose, (v) the right to receive payment under each Account is assignable and (vi) no Account Debtor has any defense, set-off, claim or counterclaim against any Grantor that can be asserted against the Collateral Agent, whether in any proceeding to enforce the Collateral Agent's rights in the Collateral otherwise, except defenses, setoffs, claims or counterclaims that are not, in the aggregate, material to the value of the Accounts.

(d)    _Equipment and Inventory_.  With respect to any Equipment and/or Inventory of a Grantor, each such Grantor has exclusive possession and control of such Equipment and Inventory of such Grantor except for (i) Equipment leased by such Grantor as a lessee, (ii) Equipment or Inventory in transit with common carriers or (iii) Equipment and/or Inventory in the possession or control of a warehouseman, bailee or any agent or processor of such Grantor. No Inventory of a Grantor is held by a Person other than a Grantor pursuant to consignment, sale or return, sale on approval or similar arrangement. The completion of the manufacturing process

8

of such Inventory by a Person other than the applicable Grantor would be permitted under any contract to which such Grantor is a party or to which the Inventory is subject.

(e)     <u>Authorization of Pledged Equity</u>.  All Pledged Equity (i) is duly authorized and validly issued, (ii) is fully paid and, to the extent applicable, nonassessable and is not subject to the preemptive rights of any Person, (iii) is beneficially owned as of record by a Grantor and (iv) constitutes all the issued and outstanding shares of all classes of the equity of such Issuer issued to such Grantor, to the extent required to be pledged hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable).

(f)     <u>No Other Equity Interests, Instruments, Etc</u>.  As of the Closing Date, (i) no Grantor owns any certificated Equity Interests in any Subsidiary that are required to be pledged and delivered to the Collateral Agent hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable) except as set forth on Part 6.4 of the Disclosure Schedule (as updated from time to time in accordance with the Credit Agreement), and (ii) no Grantor holds any Instruments, Documents or Tangible Chattel Paper required to be pledged and delivered to the Collateral Agent pursuant to <u>Section 4(k)</u> of this Agreement other than as set forth on Part 6.4 of the Disclosure Schedule (as updated from time to time in accordance with the Credit Agreement). All such Certificated Securities, Instruments, Documents and Tangible Chattel Paper have been delivered to the Collateral Agent to the extent required by the terms of this Agreement, the Orders and the other Loan Documents.

(g)     <u>Partnership and Limited Liability Company Interests</u>.  Except as previously disclosed to the Collateral Agent, none of the Collateral consisting of an interest in a partnership or a limited liability company (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an Investment Company Security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

(h)     <u>Contracts; Agreements; Licenses</u>.  Except as could not reasonably be expected to have a Material Adverse Effect, no Grantor has any contracts or licenses which are non-assignable by their terms, or as a matter of law, or which prevent the granting of a security interest therein.

(i)     <u>Consents; Etc.</u>  In the event that the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it is necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the request of the Collateral Agent, such Grantor agrees to use its best efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

(j)     <u>Commercial Tort Claims</u>.  As of the Closing Date, no Grantor has any Commercial Tort Claims other than as set forth on <u>Schedule 2</u> (as updated from time to time in accordance herewith).

(k)     <u>Copyrights, Patents and Trademarks</u>.

9

(i)       All Intellectual Property of such Grantor is valid, subsisting, unexpired, enforceable and has not been abandoned.

(ii)      No holding, decision or judgment has been rendered by any Governmental Authority that would limit, cancel or question the validity of any Intellectual Property of any Grantor.

(iii)     All applications pertaining to the copyrights, patents and trademarks of each Grantor have been duly and properly filed, and all registrations or letters pertaining to such copyrights, patents and trademarks have been duly and properly filed and issued.

(iv)      No Grantor has made any assignment or agreement in conflict with the security interest in the Intellectual Property of any Grantor hereunder.

(v)       Each Grantor and each of its Subsidiaries, own, or possess the right to use, all of the Intellectual Property that is reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.

(vi)      No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed by any Grantor or any of its Subsidiaries infringes upon any rights held by any other Person.

(vii)     No proceeding, claim or litigation regarding any of the foregoing is pending or, to the best knowledge of such Grantor, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.    <u>Covenants</u>.  Each Grantor hereby covenants and agrees that so long as any Commitment is in effect and until the Termination Date, such Grantor shall:

(a)      <u>Maintenance of Perfected Security Interest; Further Information</u>.

(i)       Maintain the security interest created by this Agreement and the Interim Financing Order (or the Final Financing Order, when applicable) as a security interest with respect to Collateral with the priorities set forth in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable) (subject only to Permitted Liens) and shall defend such security interest against the claims and demands of all Persons whomsoever (other than the holders of Permitted Liens).

(ii)      From time to time furnish to the Collateral Agent upon the Collateral Agent's or any Lender's reasonable request (and without further order from the Bankruptcy Court), statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as the Collateral Agent or such Lender may reasonably request, all in reasonable detail.

(b)      <u>Deposit Accounts and Securities Accounts</u>.  <u>Schedule 4(b)</u> sets forth all Deposit Accounts and all securities accounts maintained by each Grantor and its Subsidiaries on the Closing Date.  The Grantors shall take all actions necessary to establish the Collateral Agent's control of each Deposit Account (other than an Excluded Deposit Account) or securities account

10

owned or established by a Grantor after the Closing Date by obtaining either (a) a deposit account control agreement with each applicable depositary bank for any such Deposit Account, in form and substance satisfactory to the Collateral Agent or (b) a securities account control agreement with each applicable securities intermediary for any such securities account, in form and substance satisfactory to the Collateral Agent.  A Grantor shall be the sole account holder of each such Deposit Account or securities account and shall not allow any other Person (other than the ABL Agent and the Collateral Agent) to have control over such Deposit Account or securities account or any property deposited therein or held in custody by the securities intermediary.  The Grantors shall promptly notify the Collateral Agent of any opening or closing of a Deposit Account, other than an Excluded Deposit Account, or securities account and, with the consent of the Collateral Agent and to the extent necessary, will amend Schedule 4(b) to reflect same.

(c)    Administration of Accounts.  Each Grantor shall keep accurate and complete records of its Accounts and all payments and collections thereon.

(d)    Administration of Inventory.  Each Grantor shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions.

(e)    Administration of Equipment.

(i)    Each Grantor shall keep accurate and complete records of its Equipment, including kind, quality, quantity, cost, acquisitions and dispositions thereof, and shall submit to the Collateral Agent, on such periodic basis as the Collateral Agent may request (and without further order from the Bankruptcy Court), a current schedule thereof, in form satisfactory to the Collateral Agent.

(ii)    No Grantor shall sell, lease or otherwise dispose of any Equipment, without the prior written consent of the Collateral Agent, other than a sale or other disposition of assets permitted under Section 7.2.2 of the Credit Agreement.

(iii)    The Equipment is in good operating condition and repair, and all necessary replacements and repairs have been made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Each Grantor shall ensure that the Equipment is mechanically and structurally sound, and capable of performing the functions for which it was designed, in accordance with manufacturer specifications.

(f)    Certificated Securities and Pledged Equity.  Subject to the terms of the Intercreditor Agreements, deliver to the Collateral Agent promptly upon the receipt thereof by or on behalf of a Grantor, all certificates and instruments constituting Certificated Securities or Pledged Equity. Prior to delivery to the Collateral Agent, all such certificates constituting Pledged Equity shall be held in trust by such Grantor for the benefit of the Collateral Agent pursuant hereto.  All such certificates representing Pledged Equity shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank.  The Collateral Agent shall have the right, at any time, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent or any of its nominees or endorse for

11

negotiation any or all of the Securities Collateral.  In addition, the Collateral Agent shall have the right at any time to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations.

(g)    Filing of Financing Statements, Notices, etc.  Each Grantor shall execute and deliver to the Collateral Agent and/or file such agreements, assignments or instruments (including affidavits, notices, reaffirmations and amendments and restatements of existing documents, as the Collateral Agent may reasonably request) and do all such other things as the Collateral Agent may reasonably deem necessary or appropriate (and without further order from the Bankruptcy Court) (i) to assure to the Collateral Agent its security interests hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable), including (A) such instruments as the Collateral Agent may from time to time reasonably request in order to perfect and maintain the security interests granted hereunder in accordance with the UCC and under the Interim Financing Order (or the Final Financing Order, as applicable), including, without limitation, financing statements (including continuation statements), (B) with regard to copyrights, a Notice of Grant of Security Interest in copyrights substantially in the form of Exhibit A or other form acceptable to the Collateral Agent, (C) with regard to patents, a Notice of Grant of Security Interest in patents for filing with the USPTO substantially in the form of Exhibit B or other form acceptable to the Collateral Agent and (D) with regard to trademarks, a Notice of Grant of Security Interest in trademarks for filing with the USPTO substantially in the form of Exhibit C or other form acceptable to the Collateral Agent, (ii) to consummate the transactions contemplated hereby and (iii) to otherwise protect and assure the Collateral Agent of its rights and interests hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable).  Furthermore, each Grantor also hereby irrevocably makes, constitutes and appoints Agent, its nominee or any other person whom Agent may designate, as such Grantor's attorney in fact with full power and for the limited purpose to prepare and file (and, to the extent applicable, sign) in the name of such Grantor any financing statements, or amendments and supplements to financing statements, renewal financing statements, notices or any similar documents which in Agent's reasonable discretion would be necessary or appropriate in order to perfect and maintain perfection of the security interests granted hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable), such power, being coupled with an interest, being and remaining irrevocable until the Termination Date. Each Grantor hereby agrees that a carbon, photographic or other reproduction of this Agreement or any such financing statement is sufficient for filing as a financing statement by the Collateral Agent without notice thereof to such Grantor wherever the Collateral Agent may in its sole discretion desire to file the same.

(h)    Commercial Tort Claims.  Except as shown on such Schedule 2, no Grantor has a Commercial Tort Claim.  The Grantors shall promptly notify the Collateral Agent in writing if any Grantor has a Commercial Tort Claim, shall promptly amend Schedule 2 to include such claim, and shall take such actions as the Collateral Agent deems appropriate to subject such claim to a duly perfected Lien in favor of the Collateral Agent (for the benefit of Lenders).

(i)    Issuance or Acquisition of Equity Interests in Partnerships or Limited Liability Companies.

12

(i)    Not without executing and delivering, or causing to be executed and delivered, to the Collateral Agent (or bailee on behalf of such Collateral Agent under the Intercreditor Agreements) such agreements, documents and instruments as the Collateral Agent may reasonably require (and without any further order of the Bankruptcy Court), issue or acquire any Pledged Equity consisting of an interest in a partnership or a limited liability company that (A) is dealt in or traded on a securities exchange or in a securities market, (B) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (C) is an investment company security, (D) is held in a Securities Account or (E) constitutes a Security or a Financial Asset.

(ii)    Without the prior written consent of the Collateral Agent, subject to the Intercreditor Agreements, no Grantor will (A) vote to enable, or take any other action to permit (i) any amendment or termination of any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially changes the rights of such Grantor with respect to any Investment Property or Equity Interest or adversely affects the validity, perfection or priority of the Collateral Agent's security interests, (ii) any applicable Issuer to issue any Investment Property or Equity Interests constituting partnership or limited liability company interests, except for those additional Investment Property or Equity Interests constituting partnership or limited liability company interests that will be subject to the security interest granted herein in favor of the Secured Parties, (iii) waive any default under or breach of any terms of organizational document relating to the issuer of any Equity Interest, or (B) enter into any agreement or undertaking, except in connection with a disposition permitted under <u>Section 7.2.2</u> of the Credit Agreement, restricting the right or ability of such Grantor or the Collateral Agent to sell, assign or transfer any Investment Property or Pledged Equity or Proceeds thereof.  The Grantors will defend the right, title and interest of the Collateral Agent in and to any Investment Property and Pledged Equity against the claims and demands of all Persons whomsoever.

(iii)    If any Grantor shall become entitled to receive or shall receive (A) any Certificated Securities (including, without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the ownership interests of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any Investment Property, or otherwise in respect thereof, or (B) any sums paid upon or in respect of any Investment Property upon the liquidation or dissolution of any Issuer, such Grantor shall accept the same as the agent of the Secured Parties, hold the same in trust for the Secured Parties, segregated from other funds of such Grantor, and, subject to the terms of the Intercreditor Agreements, promptly deliver the same to the Collateral Agent (or bailee on behalf of such Collateral Agent under the Intercreditor Agreements), on behalf of the Secured Parties, in accordance with the terms hereof.

(j)    <u>Intellectual Property</u>.

(i)    Not do any act or omit to do any act whereby any material copyright may become invalidated and (A) not do any act, or omit to do any act, whereby any material

copyright may become injected into the public domain; (B) notify the Collateral Agent immediately if it knows that any material copyright may become injected into the public domain or of any materially adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any court or tribunal in the United States or any other country) regarding a Grantor's ownership of any such copyright or its validity; (C) take all necessary steps as it shall deem appropriate under the circumstances, to maintain and pursue each application (and to obtain the relevant registration) of each material copyright owned by a Grantor and to maintain each registration of each material copyright owned by a Grantor including, without limitation, filing of applications for renewal where necessary; and (D) promptly notify the Collateral Agent of any material infringement, misappropriation, dilution or impairment of any copyright of a Grantor of which it becomes aware and take such actions as it shall reasonably deem appropriate under the circumstances to protect such copyright, including, where appropriate, the bringing of suit for infringement, dilution or impairment or seeking injunctive relief and seeking to recover any and all damages for such infringement, misappropriation, dilution or impairment.

(ii)     Not make any assignment or agreement in conflict with the security interest in the copyrights of each Grantor hereunder (except as permitted by the Credit Agreement).

(iii)     (A) Continue to use each material trademark on each and every trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such trademark in full force free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under such trademark, (C) employ such trademark with the appropriate notice of registration, if applicable, (D) not adopt or use any mark that is confusingly similar or a colorable imitation of such trademark unless the Collateral Agent, for the benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Agreement, and (E) not (and not permit any licensee or sublicensee thereof to) do any act or omit to do any act whereby any such trademark may become invalidated.

(iv)     Not do any act, or omit to do any act, whereby any material patent may become abandoned or dedicated.

(v)     Notify the Collateral Agent and the Secured Parties immediately if it knows that any application or registration relating to any material patent or trademark may become abandoned or dedicated, or of any materially adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the USPTO or any court or tribunal in any country) regarding such Grantor ownership of any patent or trademark or its right to register the same or to keep and maintain the same.

(vi)     Take all reasonable and necessary steps, including, without limitation, in any proceeding before the USPTO, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each material patent

14

and trademark, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(vii)    Promptly notify the Collateral Agent and the Secured Parties after it learns that any material patent or trademark included in the Collateral is infringed, misappropriated, diluted or impaired by a third party and, to the extent determined to be advisable by the relevant Grantor, promptly sue for infringement, misappropriation, dilution or impairment, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation, dilution or impairment, or to take such other actions as it shall reasonably deem appropriate under the circumstances to protect such patent or trademark.

(viii)    Not make any assignment or agreement in conflict with the security interest in the patents or trademarks of each Grantor hereunder (except as permitted by the Credit Agreement).

(ix)    Grants to the Collateral Agent a royalty free license to use such Grantor's Intellectual Property in connection with the enforcement of the Collateral Agent's rights hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable), but only to the extent any license or agreement granting such Grantor rights in such Intellectual Property do not prohibit such use by the Collateral Agent.

Notwithstanding the foregoing, the Grantors may, in their reasonable business judgment, fail to maintain, pursue, preserve or protect any Intellectual Property which is not material to their businesses.

(k)    <u>Certain After-Acquired Collateral</u>.    The Grantors shall promptly notify the Collateral Agent in writing if, after the Closing Date, any Grantor obtains any interest in any Collateral consisting of Deposit Accounts (other than Excluded Deposit Accounts), or Chattel Paper, Documents, Instruments, or Letter-of-Credit Rights and, upon the Collateral Agent's request, subject to the Intercreditor Agreements, shall promptly take such actions as the Collateral Agent deems appropriate to effect the Collateral Agent's duly perfected Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver.  If any Collateral is in the possession of a third party, at the Collateral Agent's request, Grantors shall obtain an acknowledgment that such third party holds the Collateral for the benefit of the Collateral Agent.

(l)    <u>Protection of Collateral</u>.    All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes imposed under any Applicable Law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by the Collateral Agent to any Person to realize upon any Collateral shall be borne and paid by Grantors.  The Collateral Agent shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in the Collateral Agent's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at the Grantors' sole risk.

15

(m)    <u>Defense of Title to Collateral</u>.  Each Grantor shall at all times defend its title to the Collateral and the Collateral Agent's Liens therein against all Persons and all claims and demands whatsoever other than Permitted Liens.

(n)    <u>Further Assurances</u>.

(i)    Without any further order of the Bankruptcy Court and promptly upon the request of the Collateral Agent and at the sole expense of the Grantors, duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Collateral Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted and of the rights and powers granted under the Interim Financing Order (or the Final Financing Order, as applicable), including, without limitation, (A) the assignment of any agreement to which a Grantor is a party, (B) with respect to Government Contracts, assignment agreements and notices of assignment, in form and substance satisfactory to the Collateral Agent, duly executed by any Grantors party to such Government Contract in compliance with the Assignment of Claims Act (or analogous state Applicable Law), and (C) all applications, certificates, instruments, registration statements, and all other documents and papers the Collateral Agent may reasonably request and as may be required by law in connection with the obtaining of any consent, approval, registration, qualification, or authorization of any Person deemed necessary or appropriate for the effective exercise of any rights under this Agreement and under the Interim Financing Order (or the Final Financing Order, as applicable); <u>provided</u> that no Grantor shall be required to take any action to perfect a security interest in any Collateral that the Collateral Agent reasonably determines in its sole discretion that the costs and burdens to the Grantors of perfecting a security interest in such Collateral (including any applicable stamp, intangibles or other taxes) are excessive in relation to value to the Lenders afforded thereby.

(ii)    From time to time upon the Collateral Agent's reasonable request (and without any further order of the Bankruptcy Court), promptly furnish such updates to the information disclosed pursuant to this Agreement, the Interim Financing Order (or the Final Financing Order, when applicable) and the Credit Agreement, including any Schedules hereto or thereto, such that such updated information is true and correct as of the date so furnished.

5.    <u>Authorization to File Financing Statements</u>.    Each Grantor hereby authorizes the Collateral Agent at any time and from time to time (without further order of the Bankruptcy Court) to prepare and file such financing statements (including continuation statements) or amendments thereof or supplements thereto or other instruments as the Collateral Agent may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereunder in accordance with the UCC and under the Interim Financing Order (or the Final Financing Order, as applicable), which such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of Collateral that describes such property in any other manner as the Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted herein and in the Interim Financing Order (or the Final

16

Financing Order, when applicable), including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired" or "all personal property, whether now owned or hereafter acquired." Each Grantor hereby ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements relating to the Collateral if filed prior to the date hereof.

6.    Remedies.

(a)    General Remedies.    Upon the occurrence of an Event of Default and during continuation thereof, the Collateral Agent on behalf of the Secured Parties shall have, in addition to the rights and remedies provided herein, in the Loan Documents, in any other documents relating to the Obligations, or by any Applicable Law (including, but not limited to, levy of attachment, garnishment and the rights and remedies set forth in the UCC of the jurisdiction applicable to the affected Collateral), the Collateral Agent may, at the same or different times, in each case without further order of or application to the Bankruptcy Court, exercise the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights and remedies are asserted and regardless of whether the UCC applies to the affected Collateral), the Bankruptcy Code, the Interim Financing Order of the Final Financing Order and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, and further, the Collateral Agent may, with or without judicial process or the aid and assistance of others, (i) enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Grantors to assemble and make available to the Collateral Agent at the expense of the Grantors any Collateral at any place and time designated by the Collateral Agent which is reasonably convenient to both parties, (iv) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice, hearing or process of law, all of which each of the Grantors hereby waives to the fullest extent permitted by Applicable Law, at any place and time or times, sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels any or all Collateral held by or for it at public or private sale (which in the case of a private sale of Pledged Equity, shall be to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof), at any exchange or broker's board or elsewhere, by one or more contracts, in one or more parcels, for money, upon credit or otherwise, at such prices and upon such terms as the Collateral Agent deems advisable, in its sole discretion (subject to any and all mandatory legal requirements). Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sale shall be deemed to have been made in a commercially reasonable manner and, in the case of a sale of Pledged Equity, that the Collateral Agent shall have no obligation to delay sale of any such securities for the period of time necessary to permit the Issuer of such securities to register such securities for public sale under the Securities Act of 1933. The Collateral Agent or any other Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by Applicable Law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold.

17

Neither the Collateral Agent's compliance with Applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale. To the extent the rights of notice cannot be legally waived hereunder, each Grantor agrees that any requirement of reasonable notice shall be met if such notice, specifying the place of any public sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to the Parent in accordance with the notice provisions of Section 10.2 of the Credit Agreement at least 10 days before the time of sale or other event giving rise to the requirement of such notice. Each Grantor further acknowledges and agrees that any offer to sell any Pledged Equity which has been (A) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of New York, New York (to the extent that such offer may be advertised without prior registration under the Securities Act of 1933), or (B) made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act of 1933, and the Collateral Agent may, in such event, bid for the purchase of such securities. The Collateral Agent shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by Applicable Law, any Secured Party may be a purchaser at any such sale. To the extent permitted by Applicable Law, each of the Grantors hereby waives all of its rights of redemption with respect to any such sale. Subject to the provisions of Applicable Law, the Collateral Agent may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by Applicable Law, be made at the time and place to which the sale was postponed, or the Collateral Agent may further postpone such sale by announcement made at such time and place. To the extent permitted by Applicable Law, each Grantor waives all claims, damages and demands it may acquire against the Collateral Agent or any Secured Party arising out of the exercise by them of any rights hereunder and in the Interim Financing Order (or the Final Financing Order, when applicable) except to the extent any such claims, damages or demands result solely from the gross negligence or willful misconduct of the Collateral Agent or any other Secured Party as determined by a final non-appealable judgment of a court of competent jurisdiction, in each case against whom such claim is asserted. Each Grantor agrees that the internet shall constitute a "place" for purposes of Section 9-610(b) of the UCC and that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the UCC.

(b)     Investment Property/Pledged Equity. Subject to the terms of the Intercreditor Agreements, upon the occurrence of an Event of Default and during the continuation thereof, the Collateral Agent shall have the right to receive any and all cash dividends, payments or distributions made in respect of any Investment Property or Pledged Equity or other Proceeds paid in respect of any Investment Property or Pledged Equity, and any or all of any Investment Property or Pledged Equity may, at the option of the Collateral Agent, be registered in the name of the Collateral Agent or its nominee, and the Collateral Agent or its nominee may thereafter exercise (i) all voting, corporate and other rights pertaining to such Investment Property, or any such Pledged Equity at any meeting of shareholders, partners or members of the relevant Issuers or otherwise and (ii) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property or Pledged Equity as if it

18

were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property or Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate, partnership or limited liability company structure of any Issuer or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property or Pledged Equity, and in connection therewith, the right to deposit and deliver any and all of the Investment Property or Pledged Equity with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it; but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and the Collateral Agent and the other Secured Parties shall not be responsible for any failure to do so or delay in so doing. Subject to the terms of the Intercreditor Agreements, in furtherance thereof, each Grantor hereby authorizes and instructs each Issuer with respect to any Collateral consisting of Investment Property and/or Pledged Equity to (A) comply with any instruction received by it from the Collateral Agent in writing that (1) states that an Event of Default has occurred and is continuing and (2) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying following receipt of such notice and prior to notice that such Event of Default is no longer continuing, and (B) except as otherwise expressly permitted hereby, pay any dividends, distributions or other payments with respect to any Investment Property or Pledged Equity directly to Collateral Agent. Subject to the terms of the ABL/Term Loan Intercreditor Agreement and the ABL-TL DIP Intercreditor Agreement, unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given notice to the relevant Grantor of the Collateral Agent's intent to exercise its corresponding rights pursuant to this <u>Section 6</u>, each Grantor shall be permitted to receive all cash dividends, payments or other distributions made in respect of any Investment Property and any Pledged Equity, in each case paid in the normal course of business of the relevant Issuer and consistent with past practice, to the extent permitted in the Credit Agreement, and to exercise all voting and other corporate, company and partnership rights with respect to any Investment Property and Pledged Equity to the extent not inconsistent with the terms of this Agreement and the other Loan Documents.

(c)    <u>Contracts</u>.    Upon the occurrence of an Event of Default and during the continuation thereof, the Collateral Agent shall be entitled to (but shall not be required to): (i) proceed to perform any and all obligations of the applicable Grantor under any agreement to which a Grantor is a party and exercise all rights of such Grantor thereunder as fully as such Grantor itself could, (ii) do all other acts which the Collateral Agent may deem necessary or proper to protect its security interest granted hereunder and in the Interim Financing Order (or the Final Financing Order, when applicable), provided such acts are not inconsistent with or in violation of the terms of any of the Credit Agreement, of the other Loan Documents or Applicable Law, and (iii) sell, assign or otherwise transfer any such agreement in accordance with the Credit Agreement, the Interim Financing Order (or the Final Financing Order, when applicable), the other Loan Documents and Applicable Law, subject, however, to the prior approval of each other party to such Material Contract, to the extent required under the Interim Financing Order (or the Final Financing Order, when applicable).

19

(d)      Nonexclusive Nature of Remedies.  Failure by the Collateral Agent or the Secured Parties to exercise any right, remedy or option under this Agreement, any other Loan Document, any other document relating to the Obligations, the Interim Financing Order (or the Final Financing Order, when applicable) or as provided by Applicable Law, or any delay by the Collateral Agent or the Secured Parties in exercising the same, shall not operate as a waiver of any such right, remedy or option.  No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Collateral Agent or the Secured Parties shall only be granted as provided herein.  To the extent permitted by Applicable Law, neither the Collateral Agent, the Secured Parties, nor any party acting as attorney for the Collateral Agent or the Secured Parties, shall be liable hereunder nor in the Interim Financing Order (or the Final Financing Order, when applicable) for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct hereunder as determined by a final non-appealable judgment of a court of competent jurisdiction.  The rights and remedies of the Collateral Agent and the Secured Parties under this Agreement shall be cumulative and not exclusive of any other right or remedy which the Collateral Agent or the Secured Parties may have.

(e)      Retention of Collateral.  In addition to the rights and remedies hereunder and in the Interim Financing Order (or the Final Financing Order, when applicable), the Collateral Agent may, in compliance with Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of Applicable Law of the relevant jurisdiction, accept or retain the Collateral in satisfaction of the Obligations.  Unless and until the Collateral Agent shall have provided such notices, however, the Collateral Agent shall not be deemed to have retained any Collateral in satisfaction of any Obligations for any reason.

(f)      Waiver; Deficiency.  Each Grantor hereby waives, to the extent permitted by Applicable Laws, all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any Applicable Laws in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof.  In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the Collateral Agent or the Secured Parties are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the default rate set forth in Section 3.2.2(a) of the Credit Agreement, together with the costs of collection and the fees, charges and disbursements of counsel.  Any surplus remaining after the full payment and satisfaction of the Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

(g)      Registration Rights.

(i)      If the Collateral Agent shall determine that in order to exercise its right to sell any or all of the Collateral it is necessary or advisable to have such Collateral registered under the provisions of the Securities Act (any such Collateral, the "Restricted Securities Collateral"), the relevant Grantor will cause each applicable Issuer (and the officers and directors thereof) that is a Grantor or a Subsidiary of a Grantor to (A) execute and deliver all such instruments and documents, and do or cause to be done all such other acts as may be, in the opinion of the Collateral Agent, necessary or advisable

20

to register such Restricted Securities Collateral, or that portion thereof to be sold, under the provisions of the Securities Act, (B) use its commercially reasonable efforts to cause the registration statement relating thereto to become effective and to remain effective for a period of one year from the date of the first public offering of such Restricted Securities Collateral, or that portion thereof to be sold, and (C) make all amendments thereto and/or to the related prospectus which, in the opinion of the Collateral Agent, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto.  Each Grantor agrees to cause each applicable Issuer (and the officers and directors thereof) to comply with the provisions of the securities or "Blue Sky" laws of any and all jurisdictions which the Collateral Agent shall designate and to make available to its security holders, as soon as practicable, an earnings statement (which need not be audited) which will satisfy the provisions of the Securities Act.

(ii)    Each Grantor agrees to use its commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Restricted Securities Collateral valid and binding and in compliance with any and all other Applicable Laws.  Each Grantor further agrees that a breach of any of the covenants contained in this Section 6 will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 6 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement.

7.    Rights of the Collateral Agent.

(a)    Power of Attorney.  In addition to other powers of attorney contained herein, each Grantor hereby designates and appoints the Collateral Agent, on behalf of the Secured Parties, and each of its designees or agents, as attorney-in-fact of such Grantor, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuance of an Event of Default:

(i)    to demand, collect, settle, compromise, adjust, give discharges and releases, all as the Collateral Agent may reasonably determine;

(ii)    to commence and prosecute any actions at any court for the purposes of collecting any Collateral and enforcing any other right in respect thereof;

(iii)    to defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as the Collateral Agent may deem reasonably appropriate;

(iv)    to receive, open and dispose of mail addressed to a Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods

21

giving rise to the Collateral of such Grantor on behalf of and in the name of such Grantor, or securing, or relating to such Collateral;

(v)    to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the goods or services which have given rise thereto, as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes;

(vi)    to adjust and settle claims under any insurance policy relating thereto;

(vii)    to execute and deliver all assignments, conveyances, statements, financing statements, continuation financing statements, security agreements, affidavits, notices and other agreements, instruments and documents that the Collateral Agent may determine necessary in order to perfect and maintain the security interests and liens granted in this Agreement and in order to fully consummate all of the transactions contemplated herein;

(viii)    to institute any foreclosure proceedings that the Collateral Agent may deem appropriate;

(ix)    to sign and endorse any drafts, assignments, proxies, stock powers, verifications, notices and other documents relating to the Collateral;

(x)    to exchange any of the Pledged Equity or other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the Issuer thereof and, in connection therewith, deposit any of the Pledged Equity with any committee, depository, transfer agent, registrar or other designated agency upon such terms as the Collateral Agent may reasonably deem appropriate;

(xi)    to vote for a shareholder resolution, or to sign an instrument in writing, sanctioning the transfer of any or all of the Pledged Equity into the name of the Collateral Agent or one or more of the Secured Parties or into the name of any transferee to whom the Pledged Equity or any part thereof may be sold pursuant to Section 6 hereof;

(xii)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(xiii)    to direct any parties liable for any payment in connection with any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct;

(xiv)    to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral;

(xv)    in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may request to evidence the security interests created hereby in such Intellectual Property and the goodwill and General Intangibles of such Grantor relating thereto or represented thereby; and

22

(xvi)   do and perform, at the Collateral Agent's option and Grantors' expense (including reasonably attorneys' fees), at any time, or from time to time, all such other acts and things as the Collateral Agent may reasonably deem to be necessary, proper or convenient in connection with the Collateral and to effect the intent of this Agreement and the Interim Financing Order (or the Final Financing Order, when applicable).

This power of attorney is a power coupled with an interest and shall be irrevocable until the Termination Date.  The Collateral Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Collateral Agent in this Agreement, and shall not be liable for any failure to do so or any delay in doing so.  The Collateral Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  This power of attorney is conferred on the Collateral Agent solely to protect, preserve and realize upon its security interest in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers.

(b)      Assignment by the Collateral Agent.  The Collateral Agent may from time to time assign the Obligations to a successor the Collateral Agent appointed in accordance with the Credit Agreement, and such successor shall be entitled to all of the rights and remedies of the Collateral Agent under this Agreement in relation thereto.

(c)      Collateral Agent's Duty of Care.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Collateral Agent hereunder, the Collateral Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Grantors shall be responsible for preservation of all rights in the Collateral, and the Collateral Agent shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Grantors.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Collateral Agent shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral.  In the event of a public or private sale of Collateral pursuant to Section 6 hereof, the Collateral Agent shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters, or (ii) taking any steps to clean, repair or otherwise prepare the Collateral for sale.

(d)      Liability with Respect to Accounts.    Anything herein to the contrary notwithstanding, each of the Grantors shall remain liable under each of the Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account.  Neither the Collateral Agent nor any Secured Party shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement, the Interim Financing Order (or the Final Financing Order, when applicable) or the receipt by the Collateral

23

Agent or any Secured Party of any payment relating to such Account pursuant hereto, nor shall the Collateral Agent or any Secured Party be obligated in any manner to perform any of the obligations of a Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(e)    <u>Releases of Collateral</u>.

(i)    If any Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Credit Agreement, then the Collateral Agent, at the request and sole expense of such Grantor, shall promptly execute and deliver to such Grantor all releases and other documents, and take such other action, reasonably necessary for the release of the Liens created hereby or by any other Security Document on such Collateral.

(ii)    Subject to the terms of the Intercreditor Agreements, the Collateral Agent may release any of the Pledged Equity from this Agreement or may substitute any of the Pledged Equity for other Pledged Equity without altering, varying or diminishing in any way the force, effect, lien, pledge or security interest of this Agreement as to any Pledged Equity not expressly released or substituted.

8.    <u>Application of Proceeds</u>.   Subject to the terms of the Interim Financing Order (or the Final Financing Order, when applicable) and the Intercreditor Agreements and after the exercise of remedies provided for in the Credit Agreement (or after the Loans have automatically become immediately due and payable), any payments in respect of the Obligations and any proceeds of the Collateral, when received by the Collateral Agent or any Secured Party in cash or Cash Equivalent Investments will be applied, subject to the Intercreditor Agreements, in reduction of the Obligations in the order set forth in the Credit Agreement.

9.    <u>Continuing Agreement</u>.

(a)    This Agreement shall remain in full force and effect until the Termination Date, at which time this Agreement shall be automatically terminated (other than obligations under this Agreement which expressly survive such termination) and the Collateral Agent shall, upon the request and at the expense of the Grantors, forthwith release all of its liens and security interests hereunder and shall execute and deliver all UCC termination statements and/or other documents reasonably requested by the Grantors evidencing such termination.

(b)    This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Obligations is rescinded or must otherwise be restored or returned by the Collateral Agent or any Secured Party as a preference, fraudulent conveyance or otherwise under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), all as though such payment had not been made; provided that in the event payment of all or any part of the

24

Obligations is rescinded or must be restored or returned, all reasonable costs and expenses (including without limitation any reasonable legal fees and disbursements) incurred by the Collateral Agent or any Secured Party in defending and enforcing such reinstatement shall be deemed to be included as a part of the Obligations.

10.    Amendments; Waivers; Modifications, etc.  This Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in Section 10.1 of the Credit Agreement.

11.    Successors in Interest.    This Agreement shall be binding upon each Grantor, its successors and assigns and shall inure, together with the rights and remedies of the Collateral Agent and the Secured Parties hereunder, to the benefit of the Collateral Agent and the Secured Parties and their successors and permitted assigns.

12.    Notices.  All notices required or permitted to be given under this Agreement shall be in conformance with Section 10.2 of the Credit Agreement; provided that notices and communications to the Grantors shall be directed to the Grantors, at the address of SRC set forth in Section 10.2 of the Credit Agreement.

13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  Delivery of an executed counterpart of a signature page of this Agreement by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.  Without limiting the foregoing, to the extent a manually executed counterpart is not specifically required to be delivered, upon the request of any party, such fax transmission or electronic mail transmission shall be promptly followed by such manually executed counterpart.

14.    Headings.  The headings of the sections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

15.    Governing Law; Submission to Jurisdiction; Venue; WAIVER OF JURY TRIAL.    The terms of Sections 10.9, 10.13, and 10.14 of the Credit Agreement with respect to governing law, submission to jurisdiction, venue and waiver of jury trial are incorporated herein by reference, mutatis mutandis, and the parties hereto agree to such terms.

16.    Severability.  If any provision of this Agreement is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

17.    Entirety.  This Agreement, the other Loan Documents and the other documents relating to the Obligations represent the entire agreement of the parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to the Loan Documents, any other documents relating to the Obligations, or the transactions contemplated herein and therein.

25

18.     Other Security.  To the extent that any of the Obligations are now or hereafter secured by property other than the Collateral (including, without limitation, securities owned by a Grantor), or by a guarantee, endorsement or property of any other Person, then the Collateral Agent shall have the right to proceed against such other property, guarantee or endorsement upon the occurrence of any Event of Default, and the Collateral Agent shall have the right, in its sole discretion, to determine which rights, security, liens, security interests or remedies the Collateral Agent shall at any time pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or the Obligations or any of the rights of the Collateral Agent or the Secured Parties under this Agreement, under any other of the Loan Documents or under any other document relating to the Obligations.

19.     Joinder.  At any time after the date of this Agreement, one or more additional Persons may become party hereto by executing and delivering to the Collateral Agent a joinder agreement in form acceptable to the Collateral Agent.  Immediately upon such execution and delivery of such joinder agreement (and without any further action), each such additional Person will become a party to this Agreement as an "Grantor" and have all of the rights and obligations of a Grantor hereunder and this Agreement and the schedules hereto shall be deemed amended by such joinder agreement.

20.     Consent of Issuers of Pledged Equity.   Any Grantor that is an Issuer hereby acknowledges, consents and agrees to the grant of the security interests in such Pledged Equity by the applicable Grantors pursuant to this Agreement and in the Interim Financing Order (or the Final Financing Order, when applicable), together with all rights accompanying such security interest as provided by this Agreement, the Interim Financing Order (or the Final Financing Order, when applicable) and Applicable Law, notwithstanding any anti-assignment provisions in any operating agreement, limited partnership agreement or similar organizational or governance documents of such Issuer.

21.     Joint and Several Obligations of Grantors.

        (a)     Each of the Grantors is accepting joint and several liability hereunder in consideration of the financial accommodations to be provided by the Lenders under the Credit Agreement, for the mutual benefit, directly and indirectly, of each of the Grantors and in consideration of the undertakings of each of the Grantors to accept joint and several liability for the obligations of each of them.

        (b)     Each of the Grantors jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a primary obligor, joint and several liability with the other Grantors with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that (i) all the Obligations shall be the joint and several obligations of each of the Grantors without preferences or distinction among them and (ii) a separate action may be brought against each Grantor to enforce this Agreement whether or not the Borrowers, any other Grantor or any other person or entity is joined as a party.

        (c)     Notwithstanding any provision to the contrary contained herein, in any other of the Loan Documents, to the extent the obligations of a Grantor shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or

26

federal law relating to fraudulent conveyances or transfers) then the obligations of such Grantor hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state and including, without limitation, any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign)).

22.    <u>Marshaling</u>.  No Secured Party shall be under any obligation to marshal any assets in favor of any Borrower or any other Grantor or against or in payment of any or all of the Obligations.  To the extent that Borrowers make a payment or payments to any Secured Party or any of such Persons receives payment from the proceeds of any Collateral or exercises its right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person, then to the extent of any loss by any Secured Party, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment or proceeds had not been made or received and any such enforcement or setoff had not occurred.  The provisions of the immediately preceding sentence of this <u>Section 22</u> shall survive the Termination Date.

23.    <u>Injunctive Relief</u>.

(a)    Each Grantor recognizes that, in the event such Grantor fails to perform, observe or discharge any of its obligations or liabilities under this Agreement or any other Loan Document, any remedy of law may prove to be inadequate relief to the Collateral Agent and the other Secured Parties.  Therefore, each Grantor agrees that the Collateral Agent and the other Secured Parties, at the option of the Collateral Agent and the other Secured Parties, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

(b)    The Collateral Agent, the other Secured Parties and each Grantor hereby agree that no such Person shall have a remedy of punitive or exemplary damages against any other party to a Loan Document and each such Person hereby waives any right or claim to punitive or exemplary damages that they may now have or may arise in the future in connection with any dispute under this Agreement or any other Loan Document, whether such dispute is resolved through arbitration or judicially.

24.    <u>Secured Parties</u>.  Each Secured Party that is not a party to the Credit Agreement who obtains the benefit of this Agreement shall be deemed to have acknowledged and accepted the appointment of the Collateral Agent pursuant to the terms of the Credit Agreement, and with respect to the actions and omissions of the Collateral Agent hereunder or otherwise relating hereto that do or may affect such Secured Party, the Collateral Agent and each of its Affiliates shall be entitled to all of the rights, benefits and immunities conferred under <u>Section 9</u> of the Credit Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

27

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

THE STANDARD REGISTER COMPANY

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

STANDARD REGISTER INTERNATIONAL, INC.

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

STANDARD REGISTER TECHNOLOGIES, INC.

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

IMEDCONSENT, LLC

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

[Signature Page to Debtor-in-Possession Security Agreement]

STANDARD REGISTER HOLDING COMPANY

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

STANDARD REGISTER MEXICO HOLDING
COMPANY

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

STANDARD REGISTER OF PUERTO RICO
INC.

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

[Signature Page to Debtor-in-Possession Security Agreement]

Accepted and agreed to as of the date first above written.

SILVER POINT FINANCE, LLC, as Collateral Agent

By: _____

Name: _____Frederick H. Fogel_____

Title:        Authorized Signatory

<u>EXHIBIT  A</u>

[FORM OF]

NOTICE
OF
GRANT OF SECURITY INTEREST
IN
COPYRIGHTS

United States Copyright Office

Ladies and Gentlemen:

      Please be advised that pursuant to the  Debtor-in-Possession Security and Pledge Agreement dated as of March 12, 2015 (as amended, modified, extended, restated, renewed, replaced, or supplemented from time to time, the "<u>Agreement</u>") by and among the Grantors party thereto (each an "<u>Grantor</u>" and collectively, the "<u>Grantors</u>") and Silver Point Finance, LLC, in its capacity as administrative agent pursuant to the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement ("<u>Agent</u>") for the Secured Parties referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon the copyrights and copyright applications shown on <u>Schedule 1</u> attached hereto to Agent for the ratable benefit of the Secured Parties.

      The undersigned Grantor and Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the foregoing copyrights and copyright applications (a) may only be terminated in accordance with the terms of the Agreement and (b) is not to be construed as an assignment of any copyright or copyright application.

                     Very truly yours,

                     [GRANTOR]

                     By:_____
                     Name:_____
                     Title:_____

Acknowledged and Accepted:

Silver Point Finance, LLC, as Agent

By:_____
Name: _____
Title: _____

EXHIBIT  B

[FORM OF]

NOTICE
OF
GRANT OF SECURITY INTEREST
IN
PATENTS

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the  Debtor-in-Possession Security and Pledge Agreement dated as of March 12, 2015 (as amended, modified, extended, restated, renewed, replaced, or supplemented from time to time, the "Agreement") by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Silver Point Finance, LLC, in its capacity as administrative agent pursuant to the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement ("Agent") for the Secured Parties referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon the patents and patent applications shown on Schedule 1 attached hereto to Agent for the ratable benefit of the Secured Parties.

The undersigned Grantor and Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the foregoing patents and patent applications (a) may only be terminated in accordance with the terms of the Agreement and (b) is not to be construed as an assignment of any patent or patent application.

Very truly yours,

[GRANTOR]

By: _____
Name: _____
Title: _____

Acknowledged and Accepted:

Silver Point Finance, LLC, as Agent

By: _____
Name: _____
Title: _____

912788.03-CHISR01A - MSW

EXHIBIT  C

[FORM OF]

NOTICE
OF
GRANT OF SECURITY INTEREST
IN
TRADEMARKS

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the  Debtor-in-Possession Security and Pledge Agreement dated as of March 12, 2015 (as amended, modified, extended, restated, renewed, replaced, or supplemented from time to time, the "Agreement") by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Silver Point Finance, LLC, in its capacity as administrative agent pursuant to the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement ("Agent") for the Secured Parties referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon the trademarks and trademark applications shown on Schedule 1 attached hereto to Agent for the ratable benefit of the Secured Parties.

The undersigned Grantor and Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the foregoing trademarks and trademark applications (a) may only be terminated in accordance with the terms of the Agreement and (b) is not to be construed as an assignment of any trademark or trademark application.

Very truly yours,

[GRANTOR]

By:_____
Name:_____
Title:_____


Acknowledged and Accepted:

Silver Point Finance, LLC, as Agent

By:_____
Name: _____
Title: _____

<u>SCHEDULE 2</u>

COMMERCIAL TORT CLAIMS

None.

SCHEDULE 4(b)

ACCOUNTS

Part 1 - Deposit Accounts

| Name and Address of Bank | Account No. | Account Holder | Purpose | Excluded Deposit Account |
|---|---|---|---|---|
| Key Bank 303 Broadway St., Suite 1700 Cincinnati, OH 44114 | 074 | The Standard Register Company | General Operating Account | No |
| First Citizens Bank 3300 Cumberland Blvd., Suite 100 Atlanta, GA 30339 | 9201 | The Standard Register Company | General Operating Account | No |
| First Citizens Bank 3300 Cumberland Blvd., Suite 100 Atlanta, GA 30339 | 3101 | The Standard Register Company | General Operating Account | No |
| First Citizens Bank 3300 Cumberland Blvd., Suite 100 Atlanta, GA 30339 | 4201 | The Standard Register Company | General Operating Account | No |
| Royal Bank of Canada | 6912 | Standard Register Technologies, Inc. | General Operating Account | No |
| Banamex | 1815 | Standard Register Holding S de R.L. de C.V. | General Operating Account | No |
| Banamex | 3370 | Standard Register Servicios, S. de R.L. de C.V. | General Operating Account | No |
| Banamex | 7856 | Standard Register de Mexico, S de R.L. de C.V. | General Operating Account | No |
| Banamex | 5551 | Standard Register de Mexico, S de R.L. de C.V. | General Operating Account | No |
| Banamex | 6637 | Standard Register Holding S de R.L. de C.V. | General Operating Account | No |

2

| | | | | |
|---|---|---|---|---|
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 0637 | The Standard<br>Register Company | AR Lockbox | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 5541 | The Standard<br>Register Company | WorkflowOne<br>AP | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 5558 | The Standard<br>Register Company | Payroll<br>Account | Yes |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 5566 | The Standard<br>Register Company | Standard<br>Register AP | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4060 | The Standard<br>Register Company | Standard<br>Register<br>Fixed Asset | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4073 | The Standard<br>Register Company | Postage<br>Account<br>Sacramento | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4086 | The Standard<br>Register Company | Postage<br>Account<br>Dallas | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4099 | The Standard<br>Register Company | WorkflowOne<br>Concentration | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4109 | Then Standard<br>Register Company | Standard<br>Register<br>Concentration | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4112 | The Standard<br>Register Company | Medical FSA<br>Account | Yes |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4125 | The Standard<br>Register Company | Medical<br>Account | Yes |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4138 | The Standard<br>Register Company | Tax | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4141 | The Standard<br>Register Company | Workers<br>Compensation | Yes |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4154 | The Standard<br>Register company | Postage<br>Account<br>Charlotte | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4167 | The Standard<br>Register Company | Postage<br>Account | No |

3

| | | | | |
|---|---|---|---|---|
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 4170 | The Standard Register Company | Standard Register Tolland | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 6268 | The Standard Register Company | SRC Customer Concentration | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 1474 | The Standard Register Company | Standard Register Holding S de R.L. de C.V. | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 61487 | The Standard Register Company | Standard Register Servicios, S de R.L. de C.V. | No |
| Bank of America<br>312 Walnut Street<br>Cincinnati, OH 45202 | 1490 | The Standard Register Company | Standard Register de Mexico S de R.L. de C.V. | No |
| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 0126 | The Standard Register Company | Customer Postage Concentration | No |
| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 9815 | The Standard Register Company | Limited Incoming ACHs | No |
| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 0097 | The Standard Register Company | Flexible Spending | No |
| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 0273 | The Standard Register Company | Limited Income ACHs | No |
| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 9803 | The Standard Register Company | Utilities | No |
| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 6693 | The Standard Register Company | Lockbox | No |

4

| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 4113 | The Standard Register Company | Lockbox | No |
|---|---|---|---|---|
| Fifth Third Bank 1 S. Main Street Dayton, OH 45402 | 2708 | The Standard Register Company | AP Disbursement Account | No |
| Fifth Third Bank 1 S. Main Street Dayton, OH 45402 | 2466 | The Standard Register Company | Main Concentration Account | No |
| Fifth Third Bank 1 S. Main Street Dayton, OH 45402 | 2581 | The Standard Register Company | Workers Compensation & Sales Tax | No |

Part 2 - Securities Accounts

None.

5

**<u>EXHIBIT G</u>**

[RESERVED]

**<u>EXHIBIT H</u>**

**FORM OF INTERIM FINANCING ORDER**

[See attached.]

## EXHIBIT I

[RESERVED]

**<u>EXHIBIT J</u>**

**INITIAL 13 WEEK PROFESSION FEE BUDGET**

[See attached.]

913198.04-CHISR01A - MSW

*EXECUTION VERSION*

---

**DEBTOR-IN-POSSESSION**

**SECURITY AGREEMENT**

**dated as of March 12, 2015**

**among**

**THE STANDARD REGISTER COMPANY,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**STANDARD REGISTER INTERNATIONAL, INC.,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**STANDARD REGISTER TECHNOLOGIES, INC.,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**IMEDCONSENT, LLC,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**STANDARD REGISTER OF PUERTO RICO, INC.,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**STANDARD REGISTER HOLDING COMPANY,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**STANDARD REGISTER MEXICO HOLDING COMPANY,**
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**and**

**SILVER POINT FINANCE, LLC,**

**as Collateral Agent**

**Notwithstanding anything herein to the contrary, the liens and security interests granted to Agent pursuant to this Agreement and the exercise of any right or remedy by Agent hereunder, are subject to (a) the provisions of the Intercreditor Agreement, dated as of August 1, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>ABL/Term Loan Intercreditor Agreement</u>"), among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent and the Grantors (as defined in the ABL/Term Loan Intercreditor Agreement) from time to time party thereto, (b) the provisions of the Intercreditor Agreement, dated as of August 1, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Term Lender Intercreditor Agreement</u>"), among Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent and the Grantors (as defined in the Term Lender Intercreditor Agreement) from time to time party thereto and (c) the provisions of the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "<u>ABL-TL DIP Intercreditor Agreement</u>" and, together with the ABL/Term Intercreditor Agreement and the Term Lender Intercreditor Agreement, the "<u>Intercreditor Agreements</u>"), among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as Term Loan Agent and the Grantors (as defined in the ABL-TL DIP Intercreditor Agreement) from time to time party thereto.  In the event of any conflict between the terms of the Intercreditor Agreements and/or the Order, and the terms of this Agreement, the terms of the Intercreditor Agreements and/or the Order shall govern and control.**

## DEBTOR-IN-POSSESSION SECURITY AND PLEDGE AGREEMENT

**THIS DEBTOR-IN-POSSESSION SECURITY AND PLEDGE AGREEMENT** (this "<u>Agreement</u>") is entered into as of March 12, 2015 among The Standard Register Company, an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>Parent</u>"), Standard Register International, Inc., an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>International</u>"), Standard Register Technologies, Inc. an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>Technologies</u>"), iMedConsent, LLC a Delaware limited liability company, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>iMed</u>"), Standard Register of Puerto Rico Inc., a Delaware corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>Puerto Rico</u>"), Standard Register Holding Company, an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>Standard Holdings</u>"), Standard Register Mexico Holding Company, an Ohio corporation, a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code ("<u>Mexico</u>" and together with Parent, International, Technologies, iMed, Puerto Rico and Standard Holdings, and together with any successors, each individually a "<u>Grantor</u>", and collectively, the "<u>Grantors</u>") and Silver Point Finance, LLC, as collateral agent for the Secured Parties (together with its successors and assigns in such capacity, the "<u>Collateral Agent</u>").

## RECITALS

A.    On March 12, 2015, the Grantors filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and

have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

        B.      The Grantors are each a party to that certain Superpriority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Grantors, and the foreign Subsidiaries of Parent, each a debtor and a debtor-in-possession in a case under Chapter 11 of the Bankruptcy Code, as borrowers, the Lenders from time to time party thereto, Silver Point Finance, LLC, as Administrative Agent, the Collateral Agent and the other Persons party thereto from time to time.

        C.      It is a condition to the obligations of the Lenders to make the Loans under the Credit Agreement that each Grantor execute and deliver the applicable Loan Documents, including this Agreement.  This Agreement is given by each Grantor in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of all of the Obligations.

        D.      The execution, delivery and performance of this Agreement and the grant of security interests, pledges and Liens on all the Collateral to secure the Obligations have been authorized pursuant to Section 364 of the Bankruptcy Code by the Interim Financing Order and, upon the entry thereof, the Final Financing Order.

        E.      To supplement the Financing Orders without in any way diminishing or limiting the effect of the Financing Orders or the security interests, pledges and Liens granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interests, pledges and Liens. Subject to the entry of the Interim Financing Order, the Obligations shall constitute a Superpriority Claim.

        NOW, THEREFORE, in consideration of these premises, the mutual agreements contained herein and in the Credit Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Definitions.

     (a)     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement.  With reference to this Agreement, unless otherwise specified herein: (i) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined, (ii) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms, (iii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iv) the word "will" shall be construed to have the same meaning and effect as the word "shall", (v) any definition of, or reference to, any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document, as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (vi) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (vii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this

3

Agreement in its entirety and not to any particular provision hereof, (viii) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to this Agreement, (ix) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (x) the term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form, (xi) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including", (xii) Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement and (xiii) where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

(b)    The following terms shall have the meanings set forth in the UCC:  Accession, Account, Account Debtor, Adverse Claim, As-Extracted Collateral, Certificated Security, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Financial Asset, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Company Security, Investment Property, Letter-of-Credit Right, Manufactured Home, Payment Intangible, Proceeds, Securities Account, Securities Entitlement, Securities Intermediary, Security, Software, Supporting Obligation and Tangible Chattel Paper.

(c)    In addition, the following terms shall have the meanings set forth below:

"Collateral" has the meaning provided in Section 2 hereof.

"Control" means the manner in which "control" is achieved under the UCC with respect to any Collateral for which the UCC specifies a method of achieving "control".

"Equity Interest" means the interest of (i) a shareholder in a corporation, (ii) a partner (whether general or limited) in a partnership (whether general, limited or limited liability), (iii) a member in a limited liability company, or (iv) any other Person having any other form of equity security or ownership interest in any Person.

"Government Contract" means a contract between any Grantor and an agency, department or instrumentality of the United States or any state, municipal or local Governmental Authority located in the United States or all obligations of any such Governmental Authority arising under any Account now or hereafter owing by any such Governmental Authority, as Account Debtor, to any Grantor.

"Intellectual Property" means, all of the following in any jurisdiction throughout the world: (a) patents, patent applications and inventions, including all renewals, extensions, combinations, divisions or reissues thereof; (b) trademarks, service marks, trade names, trade dress, logos, internet domain names and other business identifiers, together with the goodwill symbolized by any of the foregoing, and all applications, registrations, renewals and extensions thereof; (c) copyrights and all works of authorship including all registrations, applications,

4

renewals, extensions and reversions thereof; (d) all computer software, source code, executable code, data, databases and documentation thereof; (e) all trade secret rights in information, including trade secret rights in any formula, pattern, compilation, program, device, method, technique or process, that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (f) all other intellectual property or proprietary rights in any discoveries, concepts, ideas, research and development, know-how, formulae, patterns, inventions, compilations, compositions, manufacturing and production processes and techniques, program, device, method, technique, technical data, procedures, designs, recordings, graphs, drawings, reports, analyses, specifications, databases, and other proprietary or confidential information, including customer lists, supplier lists, pricing and cost information, business and marketing plans and proposals and advertising and promotional materials; and (g) all rights to sue at law or in equity for any infringement or other impairment or violation thereof and all Proceeds of the foregoing.

"Issuer" means the issuer of any Pledged Equity.

"Pledged Equity" means, with respect to each Grantor, 100% of the issued and outstanding Equity Interests of each direct and indirect Subsidiary of the Parent that is directly owned by such Grantor including the Equity Interests of the Subsidiaries owned by such Grantor as set forth on Part 6.4 of the Disclosure Schedule (as updated from time to time in accordance with the Credit Agreement), in each case together with the certificates (or other agreements or instruments), if any, representing such shares, and all options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, the following:

> (1)    all Equity Interests representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and

> (2)    in the event of any consolidation or merger involving any Issuer and in which such Issuer is not the surviving Person, all shares of each class of the Equity Interests of the successor Person formed by or resulting from such consolidation or merger, to the extent that such successor Person is a direct Subsidiary of a Grantor.

"Real Estate Asset" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Grantor in any real property.

"Vehicles" means all cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title under the laws of any state, all tires and all other appurtenances to any of the foregoing.

"Vessel" means any watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water (including, without limitation, those whose primary purpose is the maritime transportation of cargo or which are otherwise engaged, used or useful in any business activities of the Grantors) which are owned by and registered (or to be owned and registered) in the

5

name of any of the Grantors, including, without limitation, any Vessel leased or otherwise registered in the foregoing parties' names, pursuant to a lease or other operating agreement constituting a capital lease obligation, in each case together with all related spares, equipment and any additional improvements, vessel owned, bareboat chartered or operated by a Grantor other than Vessels owned by an entity other than a Grantor and which are managed under Vessel management agreements.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if perfection or the effect of perfection or non perfection or the priority of any security interest on any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

"USPTO" means the United States Patent and Trademark Office.

"Work" means any work that is subject to copyright protection pursuant to Title 17 of the United States Code.

2.    Grant of Security Interest in the Collateral.

(a)    Generally.  As Collateral security for the prompt and complete payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of all of the Obligations, each Grantor hereby grants to the Collateral Agent, for the benefit of itself as the Collateral Agent and for the Pro Rata benefit of Lenders and the other Secured Parties, a continuing security interest in and Lien upon all of the following Property and interests in Property of such Grantor, in each case, whether now owned or existing or hereafter created, acquired or arising and wheresoever located (collectively, the "Collateral"):

      (i)      All Accounts;

      (ii)      All Goods, including Inventory, Equipment and Fixtures;

      (iii)      All Real Estate Assets;

      (iv)      All Instruments;

      (v)      All Chattel Paper, including Electronic Chattel Paper;

      (vi)      All Documents;

      (vii)      All General Intangibles, including Intellectual Property;

      (viii)      All Deposit Accounts;

      (ix)      All Commercial Tort Claims, including those shown on Schedule 2;

      (x)      All Letter-of-Credit Rights;

      (xi)      All Supporting Obligations;

6

(xii)   All Investment Property, including Pledged Equity but in any event subject to the limitations set for the in the definition of Pledged Equity;

(xiii)   All monies, whether or not in the possession or under the control of the Collateral Agent, a Lender, or a bailee or Affiliate of the Collateral Agent or a Lender;

(xiv)   to the extent not otherwise included above, all other property and assets of any kind or nature;

(xv)   All accessions to, substitutions for and all replacements, products and cash and non cash proceeds of (i) through (xiv) above, including proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral and claims against any Person for loss of, damage to or destruction of any of the Collateral; and

(xvi)   All books and records (including customer lists, files, correspondence, tapes, computer programs, print outs, and other computer materials and records) of such Grantor pertaining to any of (i) through (xv) above.

(b)   Specific Grants.   Without limiting the generality of the foregoing, to further secure the prompt payment and performance of all Obligations, each Grantor hereby grants to the Collateral Agent, for the benefit of itself as the Collateral Agent and for the Pro Rata benefit of Lenders and other Secured Parties, a continuing security interest in and Lien upon all amounts credited to any Deposit Account of such Grantor, including sums in any blocked, lockbox, sweep or collection account.

3.   Representations and Warranties.   Each Grantor hereby represents and warrants to the Collateral Agent, for the benefit of the Secured Parties, that on the Closing Date, on each date a Loan is made under the Credit Agreement and until the Termination Date that the following representations and warranties are true and correct:

(a)   Security Interest/Priority.   The provisions of this Agreement are effective to create legal, valid and enforceable Liens on the Collateral (having the priority provided for in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable) in favor of the Collateral Agent, for the benefit of the Secured Parties, in all right, title and interest in the Collateral of each Grantor, enforceable against such Grantor. The provisions of the Interim Financing Order (or the Final Financing Order, when applicable) are effective to create legal, valid and enforceable Liens on the Collateral (having the priority provided for in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable) in favor of the Collateral Agent, for the benefit of the Secured Parties, in all right, title and interest in the Collateral of each Grantor, enforceable against such Grantor. Upon (i) filing of financing statements and other filings in appropriate form in the applicable filing office for each Grantor and (ii) the taking of possession or control by the Collateral Agent of the Collateral with respect to which a security interest may be perfected only by possession or control under the UCC (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required hereunder or under the Credit Agreement), the Liens created hereunder shall constitute valid and fully perfected security interests in, all right, title and interest of the Grantors hereunder in the

7

Collateral, in each case subject to no Liens other than Permitted Liens and with the priorities set forth in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable). Upon entry into the Interim Financing Order (or the Final Financing Order, when applicable), the Liens created hereunder shall constitute under the UCC valid and fully perfected security interests in, all right, title and interest of the Grantors hereunder in the Collateral, in each case subject to no Liens other than Permitted Liens and with the priorities set forth in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable). Pursuant to Section 364 of the Bankruptcy Code and the Interim Financing Order (or the Final Financing Order, when applicable), all Obligations of each Grantor under this Agreement and the Credit Agreement and each other Loan Document at all times shall constitute allowed super-priority administrative expense claims in the Cases having priority over all administrative expenses or other claims of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Financing Order, to the extent therein approved), 507(a), 507(b), 546(c), 552(b), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of each Grantor, their estates, and any successor trustee or estate representative in the Cases or any subsequent proceeding or case under the Bankruptcy Code, subject to no Liens other than Permitted Liens. No Grantor has authenticated any agreement authorizing any secured party thereunder to file a financing statement, except to perfect Permitted Liens.

(b)    _Types of Collateral_.  None of the Collateral consists of, or is the Proceeds of, (i) As-Extracted Collateral, (ii) Consumer Goods, (iii) Farm Products, (iv) Manufactured Homes, (v) standing timber, (vi) an aircraft, airframe, aircraft engine or related property, (vii) an aircraft leasehold interest, (viii) a Vessel or (ix) any other interest in or to any of the foregoing.

(c)    _Accounts_.  (i) Each Account of the Grantors and the papers and documents relating thereto are genuine and in all material respects what they purport to be, (ii) each Account arises out of (A) a bona fide sale of goods sold and delivered by such Grantor (or is in the process of being delivered) or (B) services theretofore actually rendered by such Grantor to, the account debtor named therein, (iii) no Account of a Grantor is evidenced by any Instrument or Chattel Paper unless such Instrument or Chattel Paper, to the extent requested by the Collateral Agent, has been endorsed over and delivered to, or submitted to the control of, the Collateral Agent, (iv) no surety bond was required or given in connection with any Account of a Grantor or the contracts or purchase orders out of which they arose, (v) the right to receive payment under each Account is assignable and (vi) no Account Debtor has any defense, set-off, claim or counterclaim against any Grantor that can be asserted against the Collateral Agent, whether in any proceeding to enforce the Collateral Agent's rights in the Collateral otherwise, except defenses, setoffs, claims or counterclaims that are not, in the aggregate, material to the value of the Accounts.

(d)    _Equipment and Inventory_.  With respect to any Equipment and/or Inventory of a Grantor, each such Grantor has exclusive possession and control of such Equipment and Inventory of such Grantor except for (i) Equipment leased by such Grantor as a lessee, (ii) Equipment or Inventory in transit with common carriers or (iii) Equipment and/or Inventory in the possession or control of a warehouseman, bailee or any agent or processor of such Grantor. No Inventory of a Grantor is held by a Person other than a Grantor pursuant to consignment, sale or return, sale on approval or similar arrangement. The completion of the manufacturing process

8

of such Inventory by a Person other than the applicable Grantor would be permitted under any contract to which such Grantor is a party or to which the Inventory is subject.

(e)    Authorization of Pledged Equity.  All Pledged Equity (i) is duly authorized and validly issued, (ii) is fully paid and, to the extent applicable, nonassessable and is not subject to the preemptive rights of any Person, (iii) is beneficially owned as of record by a Grantor and (iv) constitutes all the issued and outstanding shares of all classes of the equity of such Issuer issued to such Grantor, to the extent required to be pledged hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable).

(f)    No Other Equity Interests, Instruments, Etc.  As of the Closing Date, (i) no Grantor owns any certificated Equity Interests in any Subsidiary that are required to be pledged and delivered to the Collateral Agent hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable) except as set forth on Part 6.4 of the Disclosure Schedule (as updated from time to time in accordance with the Credit Agreement), and (ii) no Grantor holds any Instruments, Documents or Tangible Chattel Paper required to be pledged and delivered to the Collateral Agent pursuant to Section 4(k) of this Agreement other than as set forth on Part 6.4 of the Disclosure Schedule (as updated from time to time in accordance with the Credit Agreement). All such Certificated Securities, Instruments, Documents and Tangible Chattel Paper have been delivered to the Collateral Agent to the extent required by the terms of this Agreement, the Orders and the other Loan Documents.

(g)    Partnership and Limited Liability Company Interests.  Except as previously disclosed to the Collateral Agent, none of the Collateral consisting of an interest in a partnership or a limited liability company (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an Investment Company Security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

(h)    Contracts; Agreements; Licenses.  Except as could not reasonably be expected to have a Material Adverse Effect, no Grantor has any contracts or licenses which are non-assignable by their terms, or as a matter of law, or which prevent the granting of a security interest therein.

(i)    Consents; Etc.  In the event that the Collateral Agent desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it is necessary to obtain any approvals or consents of any Governmental Authority or any other Person therefor, then, upon the request of the Collateral Agent, such Grantor agrees to use its best efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

(j)    Commercial Tort Claims.  As of the Closing Date, no Grantor has any Commercial Tort Claims other than as set forth on Schedule 2 (as updated from time to time in accordance herewith).

(k)    Copyrights, Patents and Trademarks.

9

(i)        All Intellectual Property of such Grantor is valid, subsisting, unexpired, enforceable and has not been abandoned.

(ii)        No holding, decision or judgment has been rendered by any Governmental Authority that would limit, cancel or question the validity of any Intellectual Property of any Grantor.

(iii)        All applications pertaining to the copyrights, patents and trademarks of each Grantor have been duly and properly filed, and all registrations or letters pertaining to such copyrights, patents and trademarks have been duly and properly filed and issued.

(iv)        No Grantor has made any assignment or agreement in conflict with the security interest in the Intellectual Property of any Grantor hereunder.

(v)        Each Grantor and each of its Subsidiaries, own, or possess the right to use, all of the Intellectual Property that is reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.

(vi)        No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed by any Grantor or any of its Subsidiaries infringes upon any rights held by any other Person.

(vii)        No proceeding, claim or litigation regarding any of the foregoing is pending or, to the best knowledge of such Grantor, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.        <u>Covenants</u>.  Each Grantor hereby covenants and agrees that so long as any Commitment is in effect and until the Termination Date, such Grantor shall:

(a)        <u>Maintenance of Perfected Security Interest; Further Information</u>.

(i)        Maintain the security interest created by this Agreement and the Interim Financing Order (or the Final Financing Order, when applicable) as a security interest with respect to Collateral with the priorities set forth in the Intercreditor Agreements and in the Interim Financing Order (or the Final Financing Order, when applicable) (subject only to Permitted Liens) and shall defend such security interest against the claims and demands of all Persons whomsoever (other than the holders of Permitted Liens).

(ii)        From time to time furnish to the Collateral Agent upon the Collateral Agent's or any Lender's reasonable request (and without further order from the Bankruptcy Court), statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as the Collateral Agent or such Lender may reasonably request, all in reasonable detail.

(b)        <u>Deposit Accounts and Securities Accounts</u>.  <u>Schedule 4(b)</u> sets forth all Deposit Accounts and all securities accounts maintained by each Grantor and its Subsidiaries on the Closing Date.  The Grantors shall take all actions necessary to establish the Collateral Agent's control of each Deposit Account (other than an Excluded Deposit Account) or securities account

10

owned or established by a Grantor after the Closing Date by obtaining either (a) a deposit account control agreement with each applicable depositary bank for any such Deposit Account, in form and substance satisfactory to the Collateral Agent or (b) a securities account control agreement with each applicable securities intermediary for any such securities account, in form and substance satisfactory to the Collateral Agent.  A Grantor shall be the sole account holder of each such Deposit Account or securities account and shall not allow any other Person (other than the ABL Agent and the Collateral Agent) to have control over such Deposit Account or securities account or any property deposited therein or held in custody by the securities intermediary.  The Grantors shall promptly notify the Collateral Agent of any opening or closing of a Deposit Account, other than an Excluded Deposit Account, or securities account and, with the consent of the Collateral Agent and to the extent necessary, will amend Schedule 4(b) to reflect same.

(c)     Administration of Accounts.  Each Grantor shall keep accurate and complete records of its Accounts and all payments and collections thereon.

(d)     Administration of Inventory.  Each Grantor shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions.

(e)     Administration of Equipment.

(i)     Each Grantor shall keep accurate and complete records of its Equipment, including kind, quality, quantity, cost, acquisitions and dispositions thereof, and shall submit to the Collateral Agent, on such periodic basis as the Collateral Agent may request (and without further order from the Bankruptcy Court), a current schedule thereof, in form satisfactory to the Collateral Agent.

(ii)     No Grantor shall sell, lease or otherwise dispose of any Equipment, without the prior written consent of the Collateral Agent, other than a sale or other disposition of assets permitted under Section 7.2.2 of the Credit Agreement.

(iii)     The Equipment is in good operating condition and repair, and all necessary replacements and repairs have been made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Each Grantor shall ensure that the Equipment is mechanically and structurally sound, and capable of performing the functions for which it was designed, in accordance with manufacturer specifications.

(f)     Certificated Securities and Pledged Equity.  Subject to the terms of the Intercreditor Agreements, deliver to the Collateral Agent promptly upon the receipt thereof by or on behalf of a Grantor, all certificates and instruments constituting Certificated Securities or Pledged Equity. Prior to delivery to the Collateral Agent, all such certificates constituting Pledged Equity shall be held in trust by such Grantor for the benefit of the Collateral Agent pursuant hereto.  All such certificates representing Pledged Equity shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank.  The Collateral Agent shall have the right, at any time, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent or any of its nominees or endorse for

11

negotiation any or all of the Securities Collateral.  In addition, the Collateral Agent shall have the right at any time to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations.

(g)    <u>Filing of Financing Statements, Notices, etc.</u>  Each Grantor shall execute and deliver to the Collateral Agent and/or file such agreements, assignments or instruments (including affidavits, notices, reaffirmations and amendments and restatements of existing documents, as the Collateral Agent may reasonably request) and do all such other things as the Collateral Agent may reasonably deem necessary or appropriate (and without further order from the Bankruptcy Court) (i) to assure to the Collateral Agent its security interests hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable), including (A) such instruments as the Collateral Agent may from time to time reasonably request in order to perfect and maintain the security interests granted hereunder in accordance with the UCC and under the Interim Financing Order (or the Final Financing Order, as applicable), including, without limitation, financing statements (including continuation statements), (B) with regard to copyrights, a Notice of Grant of Security Interest in copyrights substantially in the form of <u>Exhibit A</u> or other form acceptable to the Collateral Agent, (C) with regard to patents, a Notice of Grant of Security Interest in patents for filing with the USPTO substantially in the form of <u>Exhibit B</u> or other form acceptable to the Collateral Agent and (D) with regard to trademarks, a Notice of Grant of Security Interest in trademarks for filing with the USPTO substantially in the form of <u>Exhibit C</u> or other form acceptable to the Collateral Agent, (ii) to consummate the transactions contemplated hereby and (iii) to otherwise protect and assure the Collateral Agent of its rights and interests hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable).  Furthermore, each Grantor also hereby irrevocably makes, constitutes and appoints Agent, its nominee or any other person whom Agent may designate, as such Grantor's attorney in fact with full power and for the limited purpose to prepare and file (and, to the extent applicable, sign) in the name of such Grantor any financing statements, or amendments and supplements to financing statements, renewal financing statements, notices or any similar documents which in Agent's reasonable discretion would be necessary or appropriate in order to perfect and maintain perfection of the security interests granted hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable), such power, being coupled with an interest, being and remaining irrevocable until the Termination Date. Each Grantor hereby agrees that a carbon, photographic or other reproduction of this Agreement or any such financing statement is sufficient for filing as a financing statement by the Collateral Agent without notice thereof to such Grantor wherever the Collateral Agent may in its sole discretion desire to file the same.

(h)    <u>Commercial Tort Claims</u>.  Except as shown on such Schedule 2, no Grantor has a Commercial Tort Claim.  The Grantors shall promptly notify the Collateral Agent in writing if any Grantor has a Commercial Tort Claim, shall promptly amend <u>Schedule 2</u> to include such claim, and shall take such actions as the Collateral Agent deems appropriate to subject such claim to a duly perfected Lien in favor of the Collateral Agent (for the benefit of Lenders).

(i)    <u>Issuance or Acquisition of Equity Interests in Partnerships or Limited Liability Companies</u>.

(i)     Not without executing and delivering, or causing to be executed and delivered, to the Collateral Agent (or bailee on behalf of such Collateral Agent under the Intercreditor Agreements) such agreements, documents and instruments as the Collateral Agent may reasonably require (and without any further order of the Bankruptcy Court), issue or acquire any Pledged Equity consisting of an interest in a partnership or a limited liability company that (A) is dealt in or traded on a securities exchange or in a securities market, (B) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (C) is an investment company security, (D) is held in a Securities Account or (E) constitutes a Security or a Financial Asset.

(ii)     Without the prior written consent of the Collateral Agent, subject to the Intercreditor Agreements, no Grantor will (A) vote to enable, or take any other action to permit (i) any amendment or termination of any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially changes the rights of such Grantor with respect to any Investment Property or Equity Interest or adversely affects the validity, perfection or priority of the Collateral Agent's security interests, (ii) any applicable Issuer to issue any Investment Property or Equity Interests constituting partnership or limited liability company interests, except for those additional Investment Property or Equity Interests constituting partnership or limited liability company interests that will be subject to the security interest granted herein in favor of the Secured Parties, (iii) waive any default under or breach of any terms of organizational document relating to the issuer of any Equity Interest, or (B) enter into any agreement or undertaking, except in connection with a disposition permitted under Section 7.2.2 of the Credit Agreement, restricting the right or ability of such Grantor or the Collateral Agent to sell, assign or transfer any Investment Property or Pledged Equity or Proceeds thereof.  The Grantors will defend the right, title and interest of the Collateral Agent in and to any Investment Property and Pledged Equity against the claims and demands of all Persons whomsoever.

(iii)     If any Grantor shall become entitled to receive or shall receive (A) any Certificated Securities (including, without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the ownership interests of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any Investment Property, or otherwise in respect thereof, or (B) any sums paid upon or in respect of any Investment Property upon the liquidation or dissolution of any Issuer, such Grantor shall accept the same as the agent of the Secured Parties, hold the same in trust for the Secured Parties, segregated from other funds of such Grantor, and, subject to the terms of the Intercreditor Agreements, promptly deliver the same to the Collateral Agent (or bailee on behalf of such Collateral Agent under the Intercreditor Agreements), on behalf of the Secured Parties, in accordance with the terms hereof.

(j)     Intellectual Property.

(i)     Not do any act or omit to do any act whereby any material copyright may become invalidated and (A) not do any act, or omit to do any act, whereby any material

13

copyright may become injected into the public domain; (B) notify the Collateral Agent immediately if it knows that any material copyright may become injected into the public domain or of any materially adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any court or tribunal in the United States or any other country) regarding a Grantor's ownership of any such copyright or its validity; (C) take all necessary steps as it shall deem appropriate under the circumstances, to maintain and pursue each application (and to obtain the relevant registration) of each material copyright owned by a Grantor and to maintain each registration of each material copyright owned by a Grantor including, without limitation, filing of applications for renewal where necessary; and (D) promptly notify the Collateral Agent of any material infringement, misappropriation, dilution or impairment of any copyright of a Grantor of which it becomes aware and take such actions as it shall reasonably deem appropriate under the circumstances to protect such copyright, including, where appropriate, the bringing of suit for infringement, dilution or impairment or seeking injunctive relief and seeking to recover any and all damages for such infringement, misappropriation, dilution or impairment.

(ii)    Not make any assignment or agreement in conflict with the security interest in the copyrights of each Grantor hereunder (except as permitted by the Credit Agreement).

(iii)    (A) Continue to use each material trademark on each and every trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such trademark in full force free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under such trademark, (C) employ such trademark with the appropriate notice of registration, if applicable, (D) not adopt or use any mark that is confusingly similar or a colorable imitation of such trademark unless the Collateral Agent, for the benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Agreement, and (E) not (and not permit any licensee or sublicensee thereof to) do any act or omit to do any act whereby any such trademark may become invalidated.

(iv)    Not do any act, or omit to do any act, whereby any material patent may become abandoned or dedicated.

(v)    Notify the Collateral Agent and the Secured Parties immediately if it knows that any application or registration relating to any material patent or trademark may become abandoned or dedicated, or of any materially adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the USPTO or any court or tribunal in any country) regarding such Grantor ownership of any patent or trademark or its right to register the same or to keep and maintain the same.

(vi)    Take all reasonable and necessary steps, including, without limitation, in any proceeding before the USPTO, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each material patent

14

and trademark, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

      (vii)    Promptly notify the Collateral Agent and the Secured Parties after it learns that any material patent or trademark included in the Collateral is infringed, misappropriated, diluted or impaired by a third party and, to the extent determined to be advisable by the relevant Grantor, promptly sue for infringement, misappropriation, dilution or impairment, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation, dilution or impairment, or to take such other actions as it shall reasonably deem appropriate under the circumstances to protect such patent or trademark.

      (viii)    Not make any assignment or agreement in conflict with the security interest in the patents or trademarks of each Grantor hereunder (except as permitted by the Credit Agreement).

      (ix)    Grants to the Collateral Agent a royalty free license to use such Grantor's Intellectual Property in connection with the enforcement of the Collateral Agent's rights hereunder and under the Interim Financing Order (or the Final Financing Order, as applicable), but only to the extent any license or agreement granting such Grantor rights in such Intellectual Property do not prohibit such use by the Collateral Agent.

Notwithstanding the foregoing, the Grantors may, in their reasonable business judgment, fail to maintain, pursue, preserve or protect any Intellectual Property which is not material to their businesses.

      (k)    <u>Certain After-Acquired Collateral</u>.  The Grantors shall promptly notify the Collateral Agent in writing if, after the Closing Date, any Grantor obtains any interest in any Collateral consisting of Deposit Accounts (other than Excluded Deposit Accounts), or Chattel Paper, Documents, Instruments, or Letter-of-Credit Rights and, upon the Collateral Agent's request, subject to the Intercreditor Agreements, shall promptly take such actions as the Collateral Agent deems appropriate to effect the Collateral Agent's duly perfected Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver. If any Collateral is in the possession of a third party, at the Collateral Agent's request, Grantors shall obtain an acknowledgment that such third party holds the Collateral for the benefit of the Collateral Agent.

      (l)    <u>Protection of Collateral</u>.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes imposed under any Applicable Law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by the Collateral Agent to any Person to realize upon any Collateral shall be borne and paid by Grantors. The Collateral Agent shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in the Collateral Agent's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at the Grantors' sole risk.

15

(m)    <u>Defense of Title to Collateral</u>.  Each Grantor shall at all times defend its title to the Collateral and the Collateral Agent's Liens therein against all Persons and all claims and demands whatsoever other than Permitted Liens.

(n)    <u>Further Assurances</u>.

(i)    Without any further order of the Bankruptcy Court and promptly upon the request of the Collateral Agent and at the sole expense of the Grantors, duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Collateral Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted and of the rights and powers granted under the Interim Financing Order (or the Final Financing Order, as applicable), including, without limitation, (A) the assignment of any agreement to which a Grantor is a party, (B) with respect to Government Contracts, assignment agreements and notices of assignment, in form and substance satisfactory to the Collateral Agent, duly executed by any Grantors party to such Government Contract in compliance with the Assignment of Claims Act (or analogous state Applicable Law), and (C) all applications, certificates, instruments, registration statements, and all other documents and papers the Collateral Agent may reasonably request and as may be required by law in connection with the obtaining of any consent, approval, registration, qualification, or authorization of any Person deemed necessary or appropriate for the effective exercise of any rights under this Agreement and under the Interim Financing Order (or the Final Financing Order, as applicable); <u>provided</u> that no Grantor shall be required to take any action to perfect a security interest in any Collateral that the Collateral Agent reasonably determines in its sole discretion that the costs and burdens to the Grantors of perfecting a security interest in such Collateral (including any applicable stamp, intangibles or other taxes) are excessive in relation to value to the Lenders afforded thereby.

(ii)    From time to time upon the Collateral Agent's reasonable request (and without any further order of the Bankruptcy Court), promptly furnish such updates to the information disclosed pursuant to this Agreement, the Interim Financing Order (or the Final Financing Order, when applicable) and the Credit Agreement, including any Schedules hereto or thereto, such that such updated information is true and correct as of the date so furnished.

5.    <u>Authorization to File Financing Statements</u>.    Each Grantor hereby authorizes the Collateral Agent at any time and from time to time (without further order of the Bankruptcy Court) to prepare and file such financing statements (including continuation statements) or amendments thereof or supplements thereto or other instruments as the Collateral Agent may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereunder in accordance with the UCC and under the Interim Financing Order (or the Final Financing Order, as applicable), which such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of Collateral that describes such property in any other manner as the Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted herein and in the Interim Financing Order (or the Final

16

Financing Order, when applicable), including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired" or "all personal property, whether now owned or hereafter acquired." Each Grantor hereby ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements relating to the Collateral if filed prior to the date hereof.

6.    Remedies.

(a)    General Remedies.    Upon the occurrence of an Event of Default and during continuation thereof, the Collateral Agent on behalf of the Secured Parties shall have, in addition to the rights and remedies provided herein, in the Loan Documents, in any other documents relating to the Obligations, or by any Applicable Law (including, but not limited to, levy of attachment, garnishment and the rights and remedies set forth in the UCC of the jurisdiction applicable to the affected Collateral), the Collateral Agent may, at the same or different times, in each case without further order of or application to the Bankruptcy Court, exercise the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights and remedies are asserted and regardless of whether the UCC applies to the affected Collateral), the Bankruptcy Code, the Interim Financing Order of the Final Financing Order and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, and further, the Collateral Agent may, with or without judicial process or the aid and assistance of others, (i) enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Grantors to assemble and make available to the Collateral Agent at the expense of the Grantors any Collateral at any place and time designated by the Collateral Agent which is reasonably convenient to both parties, (iv) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice, hearing or process of law, all of which each of the Grantors hereby waives to the fullest extent permitted by Applicable Law, at any place and time or times, sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels any or all Collateral held by or for it at public or private sale (which in the case of a private sale of Pledged Equity, shall be to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof), at any exchange or broker's board or elsewhere, by one or more contracts, in one or more parcels, for money, upon credit or otherwise, at such prices and upon such terms as the Collateral Agent deems advisable, in its sole discretion (subject to any and all mandatory legal requirements). Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sale shall be deemed to have been made in a commercially reasonable manner and, in the case of a sale of Pledged Equity, that the Collateral Agent shall have no obligation to delay sale of any such securities for the period of time necessary to permit the Issuer of such securities to register such securities for public sale under the Securities Act of 1933.  The Collateral Agent or any other Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by Applicable Law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold.

17

Neither the Collateral Agent's compliance with Applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale. To the extent the rights of notice cannot be legally waived hereunder, each Grantor agrees that any requirement of reasonable notice shall be met if such notice, specifying the place of any public sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to the Parent in accordance with the notice provisions of <u>Section 10.2</u> of the Credit Agreement at least 10 days before the time of sale or other event giving rise to the requirement of such notice. Each Grantor further acknowledges and agrees that any offer to sell any Pledged Equity which has been (A) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of New York, New York (to the extent that such offer may be advertised without prior registration under the Securities Act of 1933), or (B) made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act of 1933, and the Collateral Agent may, in such event, bid for the purchase of such securities. The Collateral Agent shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by Applicable Law, any Secured Party may be a purchaser at any such sale. To the extent permitted by Applicable Law, each of the Grantors hereby waives all of its rights of redemption with respect to any such sale. Subject to the provisions of Applicable Law, the Collateral Agent may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by Applicable Law, be made at the time and place to which the sale was postponed, or the Collateral Agent may further postpone such sale by announcement made at such time and place. To the extent permitted by Applicable Law, each Grantor waives all claims, damages and demands it may acquire against the Collateral Agent or any Secured Party arising out of the exercise by them of any rights hereunder and in the Interim Financing Order (or the Final Financing Order, when applicable) except to the extent any such claims, damages or demands result solely from the gross negligence or willful misconduct of the Collateral Agent or any other Secured Party as determined by a final non-appealable judgment of a court of competent jurisdiction, in each case against whom such claim is asserted. Each Grantor agrees that the internet shall constitute a "place" for purposes of Section 9-610(b) of the UCC and that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the UCC.

(b)    <u>Investment Property/Pledged Equity</u>. Subject to the terms of the Intercreditor Agreements, upon the occurrence of an Event of Default and during the continuation thereof, the Collateral Agent shall have the right to receive any and all cash dividends, payments or distributions made in respect of any Investment Property or Pledged Equity or other Proceeds paid in respect of any Investment Property or Pledged Equity, and any or all of any Investment Property or Pledged Equity may, at the option of the Collateral Agent, be registered in the name of the Collateral Agent or its nominee, and the Collateral Agent or its nominee may thereafter exercise (i) all voting, corporate and other rights pertaining to such Investment Property, or any such Pledged Equity at any meeting of shareholders, partners or members of the relevant Issuers or otherwise and (ii) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property or Pledged Equity as if it

18

were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property or Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate, partnership or limited liability company structure of any Issuer or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property or Pledged Equity, and in connection therewith, the right to deposit and deliver any and all of the Investment Property or Pledged Equity with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it; but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and the Collateral Agent and the other Secured Parties shall not be responsible for any failure to do so or delay in so doing.  Subject to the terms of the Intercreditor Agreements, in furtherance thereof, each Grantor hereby authorizes and instructs each Issuer with respect to any Collateral consisting of Investment Property and/or Pledged Equity to (A) comply with any instruction received by it from the Collateral Agent in writing that (1) states that an Event of Default has occurred and is continuing and (2) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying following receipt of such notice and prior to notice that such Event of Default is no longer continuing, and (B) except as otherwise expressly permitted hereby, pay any dividends, distributions or other payments with respect to any Investment Property or Pledged Equity directly to Collateral Agent.  Subject to the terms of the ABL/Term Loan Intercreditor Agreement and the ABL-TL DIP Intercreditor Agreement, unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given notice to the relevant Grantor of the Collateral Agent's intent to exercise its corresponding rights pursuant to this <u>Section 6</u>, each Grantor shall be permitted to receive all cash dividends, payments or other distributions made in respect of any Investment Property and any Pledged Equity, in each case paid in the normal course of business of the relevant Issuer and consistent with past practice, to the extent permitted in the Credit Agreement, and to exercise all voting and other corporate, company and partnership rights with respect to any Investment Property and Pledged Equity to the extent not inconsistent with the terms of this Agreement and the other Loan Documents.

(c)    <u>Contracts</u>.    Upon the occurrence of an Event of Default and during the continuation thereof, the Collateral Agent shall be entitled to (but shall not be required to):  (i) proceed to perform any and all obligations of the applicable Grantor under any agreement to which a Grantor is a party and exercise all rights of such Grantor thereunder as fully as such Grantor itself could, (ii) do all other acts which the Collateral Agent may deem necessary or proper to protect its security interest granted hereunder and in the Interim Financing Order (or the Final Financing Order, when applicable), provided such acts are not inconsistent with or in violation of the terms of any of the Credit Agreement, of the other Loan Documents or Applicable Law, and (iii) sell, assign or otherwise transfer any such agreement in accordance with the Credit Agreement, the Interim Financing Order (or the Final Financing Order, when applicable), the other Loan Documents and Applicable Law, subject, however, to the prior approval of each other party to such Material Contract, to the extent required under the Interim Financing Order (or the Final Financing Order, when applicable).

(d)    <u>Nonexclusive Nature of Remedies</u>.  Failure by the Collateral Agent or the Secured Parties to exercise any right, remedy or option under this Agreement, any other Loan Document, any other document relating to the Obligations, the Interim Financing Order (or the Final Financing Order, when applicable) or as provided by Applicable Law, or any delay by the Collateral Agent or the Secured Parties in exercising the same, shall not operate as a waiver of any such right, remedy or option.  No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Collateral Agent or the Secured Parties shall only be granted as provided herein.  To the extent permitted by Applicable Law, neither the Collateral Agent, the Secured Parties, nor any party acting as attorney for the Collateral Agent or the Secured Parties, shall be liable hereunder nor in the Interim Financing Order (or the Final Financing Order, when applicable) for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct hereunder as determined by a final non-appealable judgment of a court of competent jurisdiction.  The rights and remedies of the Collateral Agent and the Secured Parties under this Agreement shall be cumulative and not exclusive of any other right or remedy which the Collateral Agent or the Secured Parties may have.

(e)    <u>Retention of Collateral</u>.  In addition to the rights and remedies hereunder and in the Interim Financing Order (or the Final Financing Order, when applicable), the Collateral Agent may, in compliance with Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of Applicable Law of the relevant jurisdiction, accept or retain the Collateral in satisfaction of the Obligations.  Unless and until the Collateral Agent shall have provided such notices, however, the Collateral Agent shall not be deemed to have retained any Collateral in satisfaction of any Obligations for any reason.

(f)    <u>Waiver; Deficiency</u>.  Each Grantor hereby waives, to the extent permitted by Applicable Laws, all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any Applicable Laws in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof.  In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the Collateral Agent or the Secured Parties are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the default rate set forth in <u>Section 3.2.2(a)</u> of the Credit Agreement, together with the costs of collection and the fees, charges and disbursements of counsel.  Any surplus remaining after the full payment and satisfaction of the Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

(g)    <u>Registration Rights</u>.

(i)    If the Collateral Agent shall determine that in order to exercise its right to sell any or all of the Collateral it is necessary or advisable to have such Collateral registered under the provisions of the Securities Act (any such Collateral, the "<u>Restricted Securities Collateral</u>"), the relevant Grantor will cause each applicable Issuer (and the officers and directors thereof) that is a Grantor or a Subsidiary of a Grantor to (A) execute and deliver all such instruments and documents, and do or cause to be done all such other acts as may be, in the opinion of the Collateral Agent, necessary or advisable

20

to register such Restricted Securities Collateral, or that portion thereof to be sold, under the provisions of the Securities Act, (B) use its commercially reasonable efforts to cause the registration statement relating thereto to become effective and to remain effective for a period of one year from the date of the first public offering of such Restricted Securities Collateral, or that portion thereof to be sold, and (C) make all amendments thereto and/or to the related prospectus which, in the opinion of the Collateral Agent, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto.  Each Grantor agrees to cause each applicable Issuer (and the officers and directors thereof) to comply with the provisions of the securities or "Blue Sky" laws of any and all jurisdictions which the Collateral Agent shall designate and to make available to its security holders, as soon as practicable, an earnings statement (which need not be audited) which will satisfy the provisions of the Securities Act.

(ii)      Each Grantor agrees to use its commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Restricted Securities Collateral valid and binding and in compliance with any and all other Applicable Laws.  Each Grantor further agrees that a breach of any of the covenants contained in this <u>Section 6</u> will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this <u>Section 6</u> shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement.

7.      <u>Rights of the Collateral Agent</u>.

(a)      <u>Power of Attorney</u>.  In addition to other powers of attorney contained herein, each Grantor hereby designates and appoints the Collateral Agent, on behalf of the Secured Parties, and each of its designees or agents, as attorney-in-fact of such Grantor, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuance of an Event of Default:

(i)      to demand, collect, settle, compromise, adjust, give discharges and releases, all as the Collateral Agent may reasonably determine;

(ii)      to commence and prosecute any actions at any court for the purposes of collecting any Collateral and enforcing any other right in respect thereof;

(iii)      to defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as the Collateral Agent may deem reasonably appropriate;

(iv)      to receive, open and dispose of mail addressed to a Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the goods

21

giving rise to the Collateral of such Grantor on behalf of and in the name of such Grantor, or securing, or relating to such Collateral;

(v)     to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the goods or services which have given rise thereto, as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes;

(vi)    to adjust and settle claims under any insurance policy relating thereto;

(vii)   to execute and deliver all assignments, conveyances, statements, financing statements, continuation financing statements, security agreements, affidavits, notices and other agreements, instruments and documents that the Collateral Agent may determine necessary in order to perfect and maintain the security interests and liens granted in this Agreement and in order to fully consummate all of the transactions contemplated herein;

(viii)  to institute any foreclosure proceedings that the Collateral Agent may deem appropriate;

(ix)    to sign and endorse any drafts, assignments, proxies, stock powers, verifications, notices and other documents relating to the Collateral;

(x)     to exchange any of the Pledged Equity or other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the Issuer thereof and, in connection therewith, deposit any of the Pledged Equity with any committee, depository, transfer agent, registrar or other designated agency upon such terms as the Collateral Agent may reasonably deem appropriate;

(xi)    to vote for a shareholder resolution, or to sign an instrument in writing, sanctioning the transfer of any or all of the Pledged Equity into the name of the Collateral Agent or one or more of the Secured Parties or into the name of any transferee to whom the Pledged Equity or any part thereof may be sold pursuant to Section 6 hereof;

(xii)   to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(xiii)  to direct any parties liable for any payment in connection with any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct;

(xiv)   to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral;

(xv)    in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may request to evidence the security interests created hereby in such Intellectual Property and the goodwill and General Intangibles of such Grantor relating thereto or represented thereby; and

22

(xvi)   do and perform, at the Collateral Agent's option and Grantors' expense (including reasonably attorneys' fees), at any time, or from time to time, all such other acts and things as the Collateral Agent may reasonably deem to be necessary, proper or convenient in connection with the Collateral and to effect the intent of this Agreement and the Interim Financing Order (or the Final Financing Order, when applicable).

This power of attorney is a power coupled with an interest and shall be irrevocable until the Termination Date.  The Collateral Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Collateral Agent in this Agreement, and shall not be liable for any failure to do so or any delay in doing so.  The Collateral Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  This power of attorney is conferred on the Collateral Agent solely to protect, preserve and realize upon its security interest in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers.

(b)   <u>Assignment by the Collateral Agent</u>.  The Collateral Agent may from time to time assign the Obligations to a successor the Collateral Agent appointed in accordance with the Credit Agreement, and such successor shall be entitled to all of the rights and remedies of the Collateral Agent under this Agreement in relation thereto.

(c)   <u>Collateral Agent's Duty of Care</u>.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Collateral Agent hereunder, the Collateral Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Grantors shall be responsible for preservation of all rights in the Collateral, and the Collateral Agent shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Grantors.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Collateral Agent shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral.  In the event of a public or private sale of Collateral pursuant to <u>Section 6</u> hereof, the Collateral Agent shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters, or (ii) taking any steps to clean, repair or otherwise prepare the Collateral for sale.

(d)   <u>Liability with Respect to Accounts</u>.   Anything herein to the contrary notwithstanding, each of the Grantors shall remain liable under each of the Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account.  Neither the Collateral Agent nor any Secured Party shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement, the Interim Financing Order (or the Final Financing Order, when applicable) or the receipt by the Collateral

23

Agent or any Secured Party of any payment relating to such Account pursuant hereto, nor shall the Collateral Agent or any Secured Party be obligated in any manner to perform any of the obligations of a Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(e)     Releases of Collateral.

(i)     If any Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Credit Agreement, then the Collateral Agent, at the request and sole expense of such Grantor, shall promptly execute and deliver to such Grantor all releases and other documents, and take such other action, reasonably necessary for the release of the Liens created hereby or by any other Security Document on such Collateral.

(ii)     Subject to the terms of the Intercreditor Agreements, the Collateral Agent may release any of the Pledged Equity from this Agreement or may substitute any of the Pledged Equity for other Pledged Equity without altering, varying or diminishing in any way the force, effect, lien, pledge or security interest of this Agreement as to any Pledged Equity not expressly released or substituted.

8.     Application of Proceeds.    Subject to the terms of the Interim Financing Order (or the Final Financing Order, when applicable) and the Intercreditor Agreements and after the exercise of remedies provided for in the Credit Agreement (or after the Loans have automatically become immediately due and payable), any payments in respect of the Obligations and any proceeds of the Collateral, when received by the Collateral Agent or any Secured Party in cash or Cash Equivalent Investments will be applied, subject to the Intercreditor Agreements, in reduction of the Obligations in the order set forth in the Credit Agreement.

9.     Continuing Agreement.

(a)     This Agreement shall remain in full force and effect until the Termination Date, at which time this Agreement shall be automatically terminated (other than obligations under this Agreement which expressly survive such termination) and the Collateral Agent shall, upon the request and at the expense of the Grantors, forthwith release all of its liens and security interests hereunder and shall execute and deliver all UCC termination statements and/or other documents reasonably requested by the Grantors evidencing such termination.

(b)     This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Obligations is rescinded or must otherwise be restored or returned by the Collateral Agent or any Secured Party as a preference, fraudulent conveyance or otherwise under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), all as though such payment had not been made; provided that in the event payment of all or any part of the

24

Obligations is rescinded or must be restored or returned, all reasonable costs and expenses (including without limitation any reasonable legal fees and disbursements) incurred by the Collateral Agent or any Secured Party in defending and enforcing such reinstatement shall be deemed to be included as a part of the Obligations.

10.    Amendments; Waivers; Modifications, etc.    This Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in Section 10.1 of the Credit Agreement.

11.    Successors in Interest.    This Agreement shall be binding upon each Grantor, its successors and assigns and shall inure, together with the rights and remedies of the Collateral Agent and the Secured Parties hereunder, to the benefit of the Collateral Agent and the Secured Parties and their successors and permitted assigns.

12.    Notices.    All notices required or permitted to be given under this Agreement shall be in conformance with Section 10.2 of the Credit Agreement; provided that notices and communications to the Grantors shall be directed to the Grantors, at the address of SRC set forth in Section 10.2 of the Credit Agreement.

13.    Counterparts.    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.    Delivery of an executed counterpart of a signature page of this Agreement by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.  Without limiting the foregoing, to the extent a manually executed counterpart is not specifically required to be delivered, upon the request of any party, such fax transmission or electronic mail transmission shall be promptly followed by such manually executed counterpart.

14.    Headings.    The headings of the sections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

15.    Governing Law; Submission to Jurisdiction; Venue; WAIVER OF JURY TRIAL.    The terms of Sections 10.9, 10.13, and 10.14 of the Credit Agreement with respect to governing law, submission to jurisdiction, venue and waiver of jury trial are incorporated herein by reference, mutatis mutandis, and the parties hereto agree to such terms.

16.    Severability.    If any provision of this Agreement is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

17.    Entirety.    This Agreement, the other Loan Documents and the other documents relating to the Obligations represent the entire agreement of the parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to the Loan Documents, any other documents relating to the Obligations, or the transactions contemplated herein and therein.

18.    <u>Other Security</u>.  To the extent that any of the Obligations are now or hereafter secured by property other than the Collateral (including, without limitation, securities owned by a Grantor), or by a guarantee, endorsement or property of any other Person, then the Collateral Agent shall have the right to proceed against such other property, guarantee or endorsement upon the occurrence of any Event of Default, and the Collateral Agent shall have the right, in its sole discretion, to determine which rights, security, liens, security interests or remedies the Collateral Agent shall at any time pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or the Obligations or any of the rights of the Collateral Agent or the Secured Parties under this Agreement, under any other of the Loan Documents or under any other document relating to the Obligations.

19.    <u>Joinder</u>.  At any time after the date of this Agreement, one or more additional Persons may become party hereto by executing and delivering to the Collateral Agent a joinder agreement in form acceptable to the Collateral Agent.  Immediately upon such execution and delivery of such joinder agreement (and without any further action), each such additional Person will become a party to this Agreement as an "Grantor" and have all of the rights and obligations of a Grantor hereunder and this Agreement and the schedules hereto shall be deemed amended by such joinder agreement.

20.    <u>Consent of Issuers of Pledged Equity</u>.    Any Grantor that is an Issuer hereby acknowledges, consents and agrees to the grant of the security interests in such Pledged Equity by the applicable Grantors pursuant to this Agreement and in the Interim Financing Order (or the Final Financing Order, when applicable), together with all rights accompanying such security interest as provided by this Agreement, the Interim Financing Order (or the Final Financing Order, when applicable) and Applicable Law, notwithstanding any anti-assignment provisions in any operating agreement, limited partnership agreement or similar organizational or governance documents of such Issuer.

21.    <u>Joint and Several Obligations of Grantors</u>.

        (a)    Each of the Grantors is accepting joint and several liability hereunder in consideration of the financial accommodations to be provided by the Lenders under the Credit Agreement, for the mutual benefit, directly and indirectly, of each of the Grantors and in consideration of the undertakings of each of the Grantors to accept joint and several liability for the obligations of each of them.

        (b)    Each of the Grantors jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a primary obligor, joint and several liability with the other Grantors with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that (i) all the Obligations shall be the joint and several obligations of each of the Grantors without preferences or distinction among them and (ii) a separate action may be brought against each Grantor to enforce this Agreement whether or not the Borrowers, any other Grantor or any other person or entity is joined as a party.

        (c)    Notwithstanding any provision to the contrary contained herein, in any other of the Loan Documents, to the extent the obligations of a Grantor shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or

26

federal law relating to fraudulent conveyances or transfers) then the obligations of such Grantor hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state and including, without limitation, any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign)).

22.    Marshaling.  No Secured Party shall be under any obligation to marshal any assets in favor of any Borrower or any other Grantor or against or in payment of any or all of the Obligations.  To the extent that Borrowers make a payment or payments to any Secured Party or any of such Persons receives payment from the proceeds of any Collateral or exercises its right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person, then to the extent of any loss by any Secured Party, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment or proceeds had not been made or received and any such enforcement or setoff had not occurred.  The provisions of the immediately preceding sentence of this Section 22 shall survive the Termination Date.

23.    Injunctive Relief.

(a)    Each Grantor recognizes that, in the event such Grantor fails to perform, observe or discharge any of its obligations or liabilities under this Agreement or any other Loan Document, any remedy of law may prove to be inadequate relief to the Collateral Agent and the other Secured Parties.  Therefore, each Grantor agrees that the Collateral Agent and the other Secured Parties, at the option of the Collateral Agent and the other Secured Parties, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

(b)    The Collateral Agent, the other Secured Parties and each Grantor hereby agree that no such Person shall have a remedy of punitive or exemplary damages against any other party to a Loan Document and each such Person hereby waives any right or claim to punitive or exemplary damages that they may now have or may arise in the future in connection with any dispute under this Agreement or any other Loan Document, whether such dispute is resolved through arbitration or judicially.

24.    Secured Parties.  Each Secured Party that is not a party to the Credit Agreement who obtains the benefit of this Agreement shall be deemed to have acknowledged and accepted the appointment of the Collateral Agent pursuant to the terms of the Credit Agreement, and with respect to the actions and omissions of the Collateral Agent hereunder or otherwise relating hereto that do or may affect such Secured Party, the Collateral Agent and each of its Affiliates shall be entitled to all of the rights, benefits and immunities conferred under Section 9 of the Credit Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

27

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

THE STANDARD REGISTER COMPANY

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____


STANDARD REGISTER INTERNATIONAL, INC.

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____


STANDARD REGISTER TECHNOLOGIES, INC.

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____


IMEDCONSENT, LLC

By: _____
Name: Joseph P. Morgan, Jr. _____
Title: President _____

STANDARD REGISTER HOLDING COMPANY

By: _____

Name: Joseph P. Morgan, Jr. _____

Title: President _____


STANDARD REGISTER MEXICO HOLDING
COMPANY

By: _____

Name: Joseph P. Morgan, Jr. _____

Title: President _____


STANDARD REGISTER OF PUERTO RICO
INC.

By: _____

Name: Joseph P. Morgan, Jr. _____

Title: President _____


[Signature Page to Debtor-in-Possession Security Agreement]

Accepted and agreed to as of the date first above written.

SILVER POINT FINANCE, LLC, as Collateral Agent

By: _____

Name: _____Frederick H. Fogel_____

Title:        Authorized Signatory

<u>EXHIBIT  A</u>

[FORM OF]

NOTICE
OF
GRANT OF SECURITY INTEREST
IN
COPYRIGHTS

United States Copyright Office

Ladies and Gentlemen:

Please be advised that pursuant to the  Debtor-in-Possession Security and Pledge Agreement dated as of March 12, 2015 (as amended, modified, extended, restated, renewed, replaced, or supplemented from time to time, the "<u>Agreement</u>") by and among the Grantors party thereto (each an "<u>Grantor</u>" and collectively, the "<u>Grantors</u>") and Silver Point Finance, LLC, in its capacity as administrative agent pursuant to the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement ("<u>Agent</u>") for the Secured Parties referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon the copyrights and copyright applications shown on <u>Schedule 1</u> attached hereto to Agent for the ratable benefit of the Secured Parties.

The undersigned Grantor and Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the foregoing copyrights and copyright applications (a) may only be terminated in accordance with the terms of the Agreement and (b) is not to be construed as an assignment of any copyright or copyright application.

Very truly yours,

[GRANTOR]

By:_____
Name:_____
Title:_____


Acknowledged and Accepted:

Silver Point Finance, LLC, as Agent

By:_____
Name: _____
Title: _____

EXHIBIT  B

[FORM OF]

NOTICE
OF
GRANT OF SECURITY INTEREST
IN
PATENTS

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the  Debtor-in-Possession Security and Pledge Agreement dated as of March 12, 2015 (as amended, modified, extended, restated, renewed, replaced, or supplemented from time to time, the "Agreement") by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Silver Point Finance, LLC, in its capacity as administrative agent pursuant to the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement ("Agent") for the Secured Parties referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon the patents and patent applications shown on Schedule 1 attached hereto to Agent for the ratable benefit of the Secured Parties.

The undersigned Grantor and Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the foregoing patents and patent applications (a) may only be terminated in accordance with the terms of the Agreement and (b) is not to be construed as an assignment of any patent or patent application.

Very truly yours,

[GRANTOR]

By: _____
Name: _____
Title: _____

Acknowledged and Accepted:

Silver Point Finance, LLC, as Agent

By: _____
Name: _____
Title: _____

EXHIBIT  C

[FORM OF]

NOTICE
OF
GRANT OF SECURITY INTEREST
IN
TRADEMARKS

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the  Debtor-in-Possession Security and Pledge Agreement dated as of March 12, 2015 (as amended, modified, extended, restated, renewed, replaced, or supplemented from time to time, the "Agreement") by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Silver Point Finance, LLC, in its capacity as administrative agent pursuant to the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement ("Agent") for the Secured Parties referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon the trademarks and trademark applications shown on Schedule 1 attached hereto to Agent for the ratable benefit of the Secured Parties.

The undersigned Grantor and Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the foregoing trademarks and trademark applications (a) may only be terminated in accordance with the terms of the Agreement and (b) is not to be construed as an assignment of any trademark or trademark application.

Very truly yours,

[GRANTOR]

By: _____

Name: _____

Title: _____


Acknowledged and Accepted:

Silver Point Finance, LLC, as Agent

By: _____

Name: _____

Title: _____

<u>SCHEDULE 2</u>

COMMERCIAL TORT CLAIMS

None.

SCHEDULE 4(b)

ACCOUNTS

Part 1 - Deposit Accounts

| Name and Address of Bank | Account No. | Account Holder | Purpose | Excluded Deposit Account |
|---|---|---|---|---|
| Key Bank 303 Broadway St., Suite 1700 Cincinnati, OH 44114 | 0074 | The Standard Register Company | General Operating Account | No |
| First Citizens Bank 3300 Cumberland Blvd., Suite 100 Atlanta, GA 30339 | 9201 | The Standard Register Company | General Operating Account | No |
| First Citizens Bank 3300 Cumberland Blvd., Suite 100 Atlanta, GA 30339 | 3101 | The Standard Register Company | General Operating Account | No |
| First Citizens Bank 3300 Cumberland Blvd., Suite 100 Atlanta, GA 30339 | 4201 | The Standard Register Company | General Operating Account | No |
| Royal Bank of Canada | 6912 | Standard Register Technologies, Inc. | General Operating Account | No |
| Banamex | 1815 | Standard Register Holding S de R.L. de C.V. | General Operating Account | No |
| Banamex | 3370 | Standard Register Servicios, S. de R.L. de C.V. | General Operating Account | No |
| Banamex | 7856 | Standard Register de Mexico, S de R.L. de C.V. | General Operating Account | No |
| Banamex | 5551 | Standard Register de Mexico, S de R.L. de C.V. | General Operating Account | No |
| Banamex | 6637 | Standard Register Holding S de R.L. de C.V. | General Operating Account | No |

2

| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 0637 | The Standard Register Company | AR Lockbox | No |
|---|---|---|---|---|
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 5541 | The Standard Register Company | WorkflowOne AP | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 5558 | The Standard Register Company | Payroll Account | Yes |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 5566 | The Standard Register Company | Standard Register AP | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4060 | The Standard Register Company | Standard Register Fixed Asset | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4073 | The Standard Register Company | Postage Account Sacramento | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4086 | The Standard Register Company | Postage Account Dallas | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4099 | The Standard Register Company | WorkflowOne Concentration | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4109 | Then Standard Register Company | Standard Register Concentration | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4112 | The Standard Register Company | Medical FSA Account | Yes |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4125 | The Standard Register Company | Medical Account | Yes |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4138 | The Standard Register Company | Tax | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4141 | The Standard Register Company | Workers Compensation | Yes |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4154 | The Standard Register company | Postage Account Charlotte | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4167 | The Standard Register Company | Postage Account | No |

3

| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 4170 | The Standard Register Company | Standard Register Tolland | No |
|---|---|---|---|---|
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 6268 | The Standard Register Company | SRC Customer Concentration | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 1474 | The Standard Register Company | Standard Register Holding S de R.L. de C.V. | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 1487 | The Standard Register Company | Standard Register Servicios, S de R.L. de C.V. | No |
| Bank of America 312 Walnut Street Cincinnati, OH 45202 | 1490 | The Standard Register Company | Standard Register de Mexico S de R.L. de C.V. | No |
| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 0126 | The Standard Register Company | Customer Postage Concentration | No |
| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 9815 | The Standard Register Company | Limited Incoming ACHs | No |
| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 0097 | The Standard Register Company | Flexible Spending | No |
| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 0273 | The Standard Register Company | Limited Income ACHs | No |
| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 9803 | The Standard Register Company | Utilities | No |
| PNC Bank 500 First Avenue 5th Floor Pittsburgh, PA 15219 | 6693 | The Standard Register Company | Lockbox | No |

4

| PNC Bank<br>500 First Avenue<br>5th Floor<br>Pittsburgh, PA 15219 | 4113 | The Standard Register Company | Lockbox | No |
|---|---|---|---|---|
| Fifth Third Bank<br>1 S. Main Street<br>Dayton, OH 45402 | 2708 | The Standard Register Company | AP Disbursement Account | No |
| Fifth Third Bank<br>1 S. Main Street<br>Dayton, OH 45402 | 2466 | The Standard Register Company | Main Concentration Account | No |
| Fifth Third Bank<br>1 S. Main Street<br>Dayton, OH 45402 | 2581 | The Standard Register Company | Workers Compensation & Sales Tax | No |

Part 2 - Securities Accounts

None.

5

2480822v2

**Execution Version**

## **ABL/TL DIP INTERCREDITOR AGREEMENT**

This ABL/TL DIP INTERCREDITOR AGREEMENT is dated as of March 12, 2015, and entered into by and among **BANK OF AMERICA, N.A.**, in its capacity as agent under the ABL Credit Agreement (in such capacity, the "Initial ABL Agent"), and **SILVER POINT FINANCE, LLC**, as Administrative Agent and Collateral Agent under the Term Loan Documents (in such capacities, the "Initial Term Loan Agent"). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1.

## **RECITALS**

On March 12, 2015 (the "Petition Date"), the Borrowers (as defined below) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having competent jurisdiction over the Cases from time to time, the "Bankruptcy Court") and commenced cases numbered [____], [___], [___], [___], [___], [___], [___] and [____] respectively (each, a "Case," and, collectively, the "Cases"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

The Borrowers, the ABL Lenders, and the Initial ABL Agent have entered into that certain Post-Petition Loan and Security Agreement dated on or about the date hereof (as further amended, restated, supplemented or modified from time to time, the "Initial ABL Loan Agreement");

The Borrowers, the subsidiary guarantors party thereto, the Term Loan Lenders, and the Initial Term Loan Agent have entered that certain Super-Priority Priming Debtor In Possession Delayed Draw Term Loan Credit Agreement dated on or about the date hereof (as further amended, restated, supplemented or modified from time to time, the "Initial Term Loan Agreement");

The ABL Obligations are to be secured (i) by first priority Liens on the ABL Priority Collateral and (ii) by Liens on the Term Loan Priority Collateral that are junior in priority to the Liens of the Term Loan Claimholders on the Term Loan Priority Collateral, as set forth herein and in the Financing Orders;

The Term Loan Obligations are to be secured (i) by Liens on the Term Loan Priority Collateral that are senior to the Liens of the ABL Claimholders on the Term Loan Priority Collateral and (ii) by Liens on the ABL Priority Collateral that are junior in priority to the Liens of the ABL Claimholders on the ABL Priority Collateral, as set forth herein and in Financing Orders.

The ABL Loan Documents, the Term Loan Documents and the Financing Orders each provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral and certain other matters; and

The ABL Agent, as authorized and directed by the ABL Lenders and the ABL Loan Documents, and the Term Loan Agent, as authorized and directed by the Term Loan Lenders and the Term Loan Documents, have agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## I.    DEFINITIONS.

1.1    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>ABL Agent</u>" means the Initial ABL Agent, any successor or other agent under any ABL Loan Agreement, and, if there is more than one administrative agent and collateral agent pursuant to the ABL Loan Agreement following the refinancing or replacement of the Initial ABL Loan Agreement, then the agent appointed as "ABL Agent" for purposes of this Agreement pursuant to the terms of the ABL Loan Agreement and any successor or replacement agent, provided that for purposes of Section 5.6, the term "ABL Agent" shall also include the "ABL Agent" under (and as defined in) the Pre-Petition Intercreditor Agreement.

"<u>ABL Claimholders</u>" means, at any relevant time, (a) the holders of ABL Obligations at that time, including, without limitation, the ABL Lenders, the ABL Agent under the ABL Loan Agreement, the Bank Product Providers and the Letter of Credit Issuer, and (b) for purposes of Section 5.6, the "ABL Claimholders" under (and as defined in) the Pre-Petition Intercreditor Agreement.

"<u>ABL Collateral</u>" means all of the assets and property of any Grantor, whether real, personal or mixed, whether existing, arising, created or acquired prior to, on or after the Petition Date, with respect to which a Lien is granted or purported to be granted as security for any ABL Obligations, whether pursuant to the ABL DIP Documents or the Financing Orders.

"<u>ABL Default</u>" means an "Event of Default" (as defined in the ABL Loan Agreement).

"<u>ABL Lenders</u>" means the "Lenders" under and as defined in the ABL Loan Agreement or any other Person which extends credit under the ABL Loan Agreement.

"<u>ABL Loan Agreement</u>" means collectively, (a) the Initial ABL Loan Agreement and (b) any other credit agreement or credit agreements, one or more debt facilities, one or more indentures and/or commercial paper facilities, in each case, with banks or other institutional or commercial lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell such receivables to) such lenders against such receivables), letters of credit, bankers' acceptances, or other borrowings, that has been incurred to increase, replace (whether

upon or after termination or otherwise), refinance or refund in whole or in part from time to time the ABL Obligations outstanding under the Initial ABL Loan Agreement or any other agreement or instrument referred to in this clause, whether or not such increase, replacement, refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the Initial ABL Loan Agreement or any other agreement or instrument referred to in this clause, in each case, unless (x) such agreement or instrument expressly provides that it is not intended to be and is not an ABL Loan Agreement, or (y) such agreement or instrument is not a Permitted Refinancing Agreement.  Any reference to the ABL Loan Agreement hereunder shall be deemed a reference to any ABL Loan Agreement then in existence.

"ABL Loan Documents" means, collectively (a) the "Loan Documents" (as defined in the ABL Loan Agreement), (b) all Bank Product Agreements, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement, and (c) for purposes of Section 5.6, the "ABL Loan Documents" under (and as defined in) the Pre-Petition Intercreditor Agreement.

"ABL Obligations" means the "Obligations" (as defined in the ABL Loan Agreement).

"ABL Priority Collateral" means all now owned or hereafter acquired ABL Collateral that constitutes:

(a)    Accounts, other than Accounts which arise from the sale, license, assignment or other disposition of Term Loan Priority Collateral;

(b)    Instruments, Chattel Paper and other contracts (including all government contracts and all General Intangibles and other rights related thereto), in each case, evidencing or substituted for, any Accounts referred to in the preceding clause (a);

(c)    guarantees, Letter of Credit Rights, letters of credit, security and other credit enhancements in each case for Accounts referred to in the preceding clause (a);

(d)    Inventory and Documents for any Inventory;

(e)    Investment Property to the extent related to any other items in this definition;

(f)    claims, causes of action and Commercial Tort Claims to the extent related to any other items in this definition;

(g)    Deposit Accounts and Securities Accounts and Security Entitlements, Securities and Financial Assets credited thereto (including all cash, other funds, Investment Property, or other property held in or on deposit therein, except to the extent constituting identifiable Proceeds of the Term Loan Priority Collateral);

(h)    tax refunds and similar tax payments (except to the extent such refund is (i) the refund of a tax paid upon the sale of Term Loan Priority Collateral or (ii) the

refund of an ad valorem tax based upon the value of any Term Loan Priority Collateral; and for the avoidance of doubt, it being understood that any refund of state, federal or local income taxes shall constitute ABL Priority Collateral);

(i) Money and cash (in each case, except to the extent constituting identifiable proceeds of the Term Loan Priority Collateral);

(j) General Intangibles, Instruments, books and Records and Supporting Obligations in each case to the extent reasonably related to any other items in this definition; and

(k) Accessions and Proceeds (including, without limitation, insurance proceeds (which includes business interruption insurance)) of each of the foregoing in clauses (a) through (j) (in each case, except to the extent constituting Term Loan Priority Collateral).

"ABL Security Documents" means any agreement, document or instrument pursuant to which a Lien is granted securing any ABL Obligations or under which rights or remedies with respect to such Liens are governed.

"ABL Standstill Period" has the meaning set forth in Section 3.2(a)(i).

"Access and Use Period" means, the period, after the commencement of an Enforcement Period by the ABL Agent, which begins on the earlier of (a) the day on which the ABL Agent provides the Term Loan Agent with the written notice of its election to request access to a parcel of Mortgaged Premises pursuant to Section 3.3(b) or the ABL Agent provides the Term Loan Agent with an Enforcement Notice with respect to Collateral located at other premises, and (b) the third Business Day after the Term Loan Agent provides the ABL Agent with notice that the Term Loan Agent (or its agent) has obtained possession or control of a parcel of Mortgaged Premises or otherwise has obtained possession or control of any of the Term Loan Priority Collateral at other premises, regardless of location, and ends on the earliest of (A) the 180th day after the first date (the "Initial Access Date") on which the Term Loan Agent first makes available physical access to, the ABL Priority Collateral or the Term Loan Priority Collateral, as applicable, located on such Mortgaged Premises or located at other premises plus such number of days, if any, after the Initial Access Date that the ABL Agent is stayed or otherwise prohibited by law or court order from exercising remedies with respect to Collateral located on such Mortgaged Premises or such other premises; (B) the date on which all or substantially all of the ABL Priority Collateral located on such Mortgaged Premises or such other premises is sold, collected or liquidated; (C) the termination of such Enforcement Period; and (D) the Discharge of ABL Obligations.

"Account Agreements" means any lockbox account agreement, pledged account agreement, blocked account agreement, securities account control agreement, or any similar deposit or securities account agreements among the Term Loan Agent and/or the ABL Agent, one or more Grantors, and the relevant financial institution depository or securities intermediary.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, a Person shall be deemed to

4

"control" or be "controlled by" a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through ownership of equity interests, by contract or otherwise.

"Agents" means the ABL Agent and the Term Loan Agent.

"Agreement" means this Intercreditor Agreement, as amended, restated, renewed, extended, supplemented or otherwise modified from time to time.

"Bank Product Debt" means Indebtedness and other Obligations relating to or arising from Bank Products, provided that for purposes of Section 5.6, the term "Bank Product Debt" shall also include the "Bank Product Debt" under (and as defined in) the Pre-Petition Intercreditor Agreement.

"Bank Product Agreements" means those agreements entered into from time to time by a Grantor with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Provider" shall mean any ABL Lender or Affiliate of an ABL Lender that provides any Bank Products to any Grantor; provided, however, that if, at any time, an ABL Lender ceases to be an ABL Lender under the ABL Loan Agreement, then, from and after the date on which it ceases to be an ABL Lender thereunder, neither it nor any of its Affiliates shall constitute Bank Product Providers and the obligations with respect to Bank Products provided by such former ABL Lender or any of its Affiliates shall no longer constitute Bank Product Debt.

"Bank Products" has the meaning assigned to that term in the ABL Loan Agreement as in effect on the date of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrowers" means, collectively, jointly and severally, The Standard Register Company, an Ohio corporation, Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, Standard Register Holding Company, an Ohio corporation, Standard Register Of Puerto Rico Inc., a Delaware corporation, Standard Register Mexico Holding Company, an Ohio corporation, Standard Register Technologies Canada ULC, an unlimited company organized under the laws of Nova Scotia, Standard Register Holdings, S de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable*, incorporated under the laws of Mexico, Standard Register de Mexico, S de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable*, incorporated under the laws of Mexico, Standard Register Servicios, S de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable*, incorporated under the laws of Mexico, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code.

5

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are closed.

"Capital Lease" means, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which in accordance with GAAP is required to be reflected as a liability on the balance sheet of such Person.

"Capital Stock" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person and all rights, warrants or options exchangeable for or convertible into any of the items described in clauses (a) through (e) above; provided that with respect to the foregoing, Capital Stock shall exclude any debt securities convertible into Capital Stock, whether or not such debt securities include any right of vote or participation with Capital Stock.

"Claimholder" means any Term Loan Claimholder or ABL Claimholder, as applicable.

"Collateral" means any and all of the assets and property of any Grantor, whether real, personal or mixed, which constitute ABL Collateral or Term Loan Collateral.

"Conforming Plan of Reorganization" means any Plan of Reorganization whose provisions are consistent with the provisions of this Agreement.

"Discharge of ABL Obligations" means, except to the extent otherwise expressly provided in Section 5.5:

(a)    payment in full in cash of all ABL Obligations (other than contingent obligations or contingent indemnification obligations except as provided in clause (e) below);

(b)    termination or expiration of all commitments, if any, to extend credit under the ABL Loan Documents;

(c)    termination, cash collateralization (in an amount and manner reasonably satisfactory to the ABL Agent, but in no event greater than 105% of the aggregate undrawn face amount thereof, plus commissions, fees, and expenses) or backstop of all letters of credit issued under the ABL Loan Agreement in compliance with the terms of the ABL Loan Agreement;

(d)    cash collateralization (in an amount and manner reasonably satisfactory to the ABL Agent) of the ABL Obligations constituting Bank Product Debt;

6

(e)      cash collateralization (or support by letter of credit) for any costs, expenses and contingent indemnification obligations consisting of ABL Obligations not yet due and payable but with respect to which a claim has been threatened or asserted under any ABL Loan Documents (in an amount and manner reasonably satisfactory to the ABL Agent); and

(f)      Discharge of Pre-Petition ABL Obligations.

"Discharge of Pre-Petition ABL Obligations" has the meaning ascribed to the term "Discharge of ABL Obligations" in the Pre-Petition Intercreditor Agreement.

"Discharge of Pre-Petition Term Loan Obligations" has the meaning ascribed to the term "Discharge of Term Loan Obligations" in the Pre-Petition Intercreditor Agreement.

"Discharge of Term Loan Obligations" means, except to the extent otherwise expressly provided in Section 5.5,

(a)      payment in full in cash of all Term Loan Obligations (other than contingent obligations or indemnification obligations, in each case for which no claim has been asserted);

(b)      cash collateralization for any costs, expenses and contingent indemnification obligations consisting of Term Loan Obligations not yet due and payable but with respect to which a claim has been threatened or asserted under any Term Loan Documents (in an amount and manner reasonably satisfactory to the Term Loan Agent); and

(c)      Discharge of Pre-Petition Term Loan Obligations.

"Disposition" means any sale, lease, exchange, transfer or other disposition of any Collateral.

"Enforcement Action" means, collectively or individually for one or more of the ABL Agent and the Term Loan Agent, when an ABL Default or Term Loan Default, as applicable, has occurred and is continuing, to enforce or attempt to enforce any right or power to repossess, replevy, attach, garnish, levy upon, collect the Proceeds of, foreclose or realize in any manner whatsoever its Lien upon, sell, liquidate or otherwise dispose of, or otherwise restrict or interfere with the use of, exercise any remedies with respect to, any material amount of Collateral, whether by judicial enforcement of any of the rights and remedies under the ABL Loan Documents, the Term Loan Documents, the Financing Orders and/or under any applicable law, by self-help repossession, by non-judicial foreclosure sale, lease, or other disposition, by set-off (provided, however, that so long as the commitments under the ABL Loan Documents have not been terminated or suspended, cash sweeps that are permitted pursuant to the terms of the ABL Loan Documents relating to dominion over bank accounts shall not be deemed to constitute a set-off or Enforcement Action for any purposes of this Agreement), by notification to account obligors of any Grantor, by any sale, lease, or other disposition implemented by any Grantor following an ABL Default or a Term Loan Default, as applicable, in connection with which the ABL Agent or the Term Loan Agent, as applicable, has agreed to release its Liens on

the subject property, or otherwise, but in all cases excluding (i) the establishment of borrowing base reserves, collateral ineligibles, or other conditions for advances, (ii) the changing of advance rates or advance sublimits, (iii) the imposition of a default rate or late fee, (iv) the collection and application of Accounts or other monies deposited from time to time in Deposit Accounts or Securities Accounts, in each case, to the extent constituting ABL Priority Collateral or Term Loan Collateral, as the case may be, against the ABL Obligations or the Term Loan Obligations pursuant to the provisions of the ABL Loan Documents or the Term Loan Documents (including, without limitation, the notification of account debtors, depositary institutions or any other Person to deliver proceeds of Collateral to the ABL Agent or any "cash dominion event" or mandatory prepayment event under the ABL Loan Documents), (v) the cessation of lending pursuant to the provisions of the ABL Loan Documents, (vi) the consent by the ABL Agent to disposition by any Grantor of any of the ABL Priority Collateral or the consent by the Term Loan Agent to disposition by any Grantor of any Term Loan Priority Collateral, and (vii) the acceleration of the Term Loan Obligations or the ABL Obligations.

"Enforcement Notice" means a written notice delivered by (i) the ABL Agent, at a time when an ABL Default has occurred and is continuing, to the Term Loan Agent announcing that the ABL Agent intends to commence an Enforcement Action against the ABL Priority Collateral and specifying the relevant event of default; or (ii) the Term Loan Agent, at a time when a Term Loan Default has occurred and is continuing, to the ABL Agent announcing that the Term Loan Agent intends to commence an Enforcement Action against the Term Loan Priority Collateral and specifying the relevant event of default.

"Enforcement Period" means the period of time following the receipt by either the ABL Agent or the Term Loan Agent of an Enforcement Notice from the other until the earliest of (a) in the case of an Enforcement Period commenced by the Term Loan Agent, the Discharge of Term Loan Obligations, (b) in the case of an Enforcement Period commenced by the ABL Agent, the Discharge of ABL Obligations, (c) the ABL Agent or the Term Loan Agent (as applicable) agrees in writing to terminate the Enforcement Period, or (d) the date on which the ABL Default or the Term Loan Default that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the ABL Agent or the Term Loan Agent, as applicable, or waived in writing.

"Exigent Circumstances" means with respect to an ABL Purchase (as defined in Section 5.6), an event or circumstance that constitutes an "Event of Default" under and as defined in the ABL Loan Agreement or that occurs during such Event of Default that materially and imminently threatens the ability of the ABL Agent to realize upon all or a material part of the ABL Collateral, such as, without limitation, fraudulent removal, concealment or abscondment thereof, destruction (other than to the extent covered by insurance) or material waste thereof.

"Final Financing Order" means, with respect to the Cases, a Final Order in substantially the form of the Interim Financing Order and otherwise in form and substance satisfactory to the Term Loan Agent and the ABL Agent, authorizing and approving on a final basis, among other things, the matters and provisions in the Interim Financing Order.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of such order shall be in effect or (ii) no motion or application for a stay of such order shall be filed and pending or such motion or application shall have been denied or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed such order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court order or timely motion to seek review or rehearing of such order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding such order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible.

"Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"Grantors" means Borrowers and each other Person that has or may from time to time hereafter execute and deliver an ABL Security Document or a Term Loan Security Document as a grantor of a Lien and as a result thereof has shall be deemed to be bound by the provisions of this Agreement as a Grantor.

"Indebtedness" means and includes all Obligations that constitute "Debt," "Indebtedness," "Obligations," "Liabilities" or any similar term within the meaning of the ABL Loan Agreement or the Term Loan Agreement, as applicable.

"Initial ABL Agent" has the meaning assigned to that term in the Preamble.

"Initial ABL Loan Agreement" has the meaning assigned to that term in the Recitals.

"Initial Access Date" has the meaning assigned to that term in the definition of the term "Access and Use Period."

"Initial Term Loan Agent" has the meaning assigned to that term in the Preamble.

"Initial Term Loan Agreement" has the meaning assigned to that term in the Recitals.

"Intellectual Property" means, all of the following in any jurisdiction throughout the world: (a) patents, patent applications and inventions, including all renewals, extensions, combinations, divisions, or reissues thereof; (b) trademarks, service marks, trade names, trade dress, logos, internet domain names and other business identifiers, together with the goodwill symbolized by any of the foregoing, and all applications, registrations, renewals and extensions thereof; (c) copyrights and all works of authorship including all registrations, applications, renewals, extensions and reversions thereof; (d) all computer software, source code, executable code, data, databases and documentation thereof; (e) all trade secret rights in information, including trade secret rights in any formula, pattern, compilation, program, device, method, technique, or process, that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (f) all other intellectual property or proprietary rights in any discoveries, concepts, ideas, research and development, know-how, formulae, patterns, inventions, compilations, compositions, manufacturing and production processes and techniques, program, device, method, technique, technical data, procedures, designs, recordings, graphs, drawings, reports, analyses, specifications, databases, and other proprietary or confidential information, including customer lists, supplier lists, pricing and cost information, business and marketing plans and proposals and advertising and promotional materials; and (g) all rights to sue at law or in equity for any infringement or other impairment or violation thereof and all Proceeds of the foregoing.

"Interim Financing Order" shall have the meanings given such term in the Term Loan Agreement and the term "Interim DIP Financing Order" in the ABL Loan Agreement, as such order has been or is actually entered by the Bankruptcy Court.

"Letter of Credit Issuer" means Bank of America, N.A., and its successors and assigns, as issuer of letters of credit under the ABL Loan Agreement.

"Lien" means any mortgage, pledge, hypothec, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory, judicial or other), charge or other security interest or any other security agreement (including, without limitation, any conditional sale or other title retention agreement and any Capital Lease having substantially the same economic effect as any of the foregoing and any right of set-off or recoupment).

"Mortgaged Premises" means any real property which shall now or hereafter be subject to a Term Loan Mortgage and/or an ABL Mortgage.

"New Agent" has the meaning assigned to that term in Section 5.5.

"New Debt Notice" has the meaning assigned to that term in Section 5.5.

"Non-Conforming Plan of Reorganization" means any Plan of Reorganization whose provisions are materially inconsistent with the provisions of this Agreement, including any plan of reorganization that purports to re-order (whether by subordination, invalidation, or

otherwise) or otherwise disregard, in whole or part, the provisions of <u>Article II</u> (including the Lien priorities of <u>Section 2.1</u>), the provisions of <u>Article IV</u>, or the provisions of <u>Article VI</u>, unless such Plan of Reorganization has been accepted by the voluntary required vote, if any, of each class of ABL Claimholders and Term Loan Claimholders.

"Obligations" means all present and future loans, advances, liabilities, obligations, covenants, duties, and debts from time to time owing by any Grantor to any agent or trustee (including the ABL Agent or the Term Loan Agent), the ABL Claimholders, the Term Loan Claimholders or any of them or their respective Affiliates, arising from or in connection with the ABL Loan Documents, the Term Loan Documents or Bank Products, whether for principal, interest or payments for early termination, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to the Grantors, including, without limitation, the "Obligations", as defined in the ABL Loan Agreement, and the "Obligations", as defined in the Term Loan Documents.

"Permitted Refinancing" means any Refinancing the governing documentation of which constitutes Permitted Refinancing Agreements.

"Permitted Refinancing Agreements" means, with respect to either the ABL Loan Agreement or the Term Loan Agreement, as applicable, any credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to increase, replace (including exchanges) (whether upon or after termination or otherwise) refinance or refund in whole or in part the Obligations outstanding under the ABL Loan Agreement, the Term Loan Agreement, whether or not such increase, replacement, refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the ABL Loan Agreement, the Term Loan Agreement or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not a Permitted Refinancing Agreement, as such financing documentation may be amended, restated, supplemented or otherwise modified from time to time and that would not be prohibited by Section 5.3(c) or Section 5.3(d), as applicable.  The agents or representatives of the holders of indebtedness under any Permitted Refinancing Agreements shall execute and deliver a joinder to this Agreement in the form and substance attached as Exhibit A to the Pre-Petition Intercreditor Agreement (with any necessary changes to such form to conform such form to this Agreement).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan of Reorganization" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any of the Cases.

"Pledged Collateral" has the meaning set forth in Section 5.4(a).

"Pre-Petition ABL Agent" has the meaning ascribed to the term "ABL Agent" in the Pre-Petition Intercreditor Agreement.

"Pre-Petition ABL Loan Agreement" has the meaning ascribed to the term "ABL Loan Agreement" in the Pre-Petition Intercreditor Agreement.

"Pre-Petition ABL Obligations" has the meaning ascribed to the term "ABL Obligations" in the Pre-Petition Intercreditor Agreement.

"Pre-Petition Intercreditor Agreement" means the Intercreditor Agreement dated as of August 1, 2013, between and among certain Borrowers, Bank of America, N.A., as ABL agent, and Silver Point Finance, LLC, as first lien agent and second lien agent.

"Pre-Petition Term Loan Obligations" has the meaning ascribed to the term "Term Loan Obligations" in the Pre-Petition Intercreditor Agreement.

"Real Estate Asset" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Grantor in any real property.

"Records" means all present and future "records" (as defined in Article 9 of the UCC).

"Refinance" means, in respect of any Indebtedness, to restate, refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness (including, without limitation, debt securities) in exchange or replacement for, such Indebtedness, in any case in whole or in part and such term shall include, without limitation, increasing the amount borrowable thereunder, altering the maturity date thereof and adding subsidiaries as borrowers or guarantors thereunder, in each case, whether or not such refinancing, extension, renewal, defeasance, amendment, modification, supplementing, restructuring, replacement, exchange, refunding or repayment occurs (i) with the original parties to the documents governing such Indebtedness, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination of the documents governing such Indebtedness or the repayment of such Indebtedness.  "Refinanced" and "Refinancing" shall have correlative meanings.

"Secured Parties" means the ABL Claimholders and the Term Loan Claimholders.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Term Loan" means a loan or other extension of credit made pursuant to the Term Loan Credit Agreement.

"Term Loan Agent" means the Initial Term Loan Agent, any successor or other agent under any Term Loan Agreement, and, if there is more than one administrative agent and collateral agent pursuant to the Term Loan Agreement following the refinancing or replacement of the Initial Term Loan Agreement, then the agent appointed as "Term Loan Agent" for purposes of this Agreement pursuant to the terms of the Term Loan Agreement and any successor or replacement agent.

"Term Loan Agreement" means collectively, (a) the Initial Term Loan Agreement and (b) any other credit agreement or credit agreements with banks or other institutional or commercial lenders providing for term loans that has been incurred to increase, replace (whether upon or after termination or otherwise), refinance or refund in whole or in part from time to time the Term Loan Obligations outstanding under the Initial Term Loan Agreement or any other agreement or instrument referred to in this clause, whether or not such increase, replacement, refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the Initial Term Loan Agreement or any other agreement or instrument referred to in this clause, in each case, unless such agreement or instrument expressly provides that it is not intended to be and is not a Term Loan Agreement, or such agreement or instrument is not a Permitted Refinancing Agreement.  Any reference to the Term Loan Agreement hereunder shall be deemed a reference to any Term Loan Agreement then in existence.

"Term Loan Claimholders" means, at any relevant time, the holders of Term Loan Obligations at that time, including, without limitation, the Term Loan Lenders and the Term Loan Agent.

"Term Loan Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, whether existing, arising, created or acquired prior to, on or after the Petition Date, with respect to which a Lien is granted or purported to be granted as security for any Term Loan Obligations, whether pursuant to the Term Loan Documents or the Financing Orders.

"Term Loan Default" means an "Event of Default" as defined in the Term Loan Credit Agreement.

"Term Loan Documents" means the "Loan Documents" as defined in the Term Loan Credit Agreement.

"Term Loan General Intangibles" means all General Intangibles which are not ABL Priority Collateral.

"Term Loan Lenders" means any Person which extends credit under the Term Loan Agreement.

"Term Loan Mortgages" means a collective reference to each mortgage, deed of trust and other document or instrument under which any Lien on real property owned or leased

13

by any Grantor is granted to secure any Term Loan Obligations or under which rights or remedies with respect to any such Liens are governed.

"Term Loan Obligations" means all "Obligations" as defined in the Term Loan Credit Agreement.

"Term Loan Pledged Collateral" means (a) the Capital Stock of each Subsidiary of a Grantor, and (b) Capital Stock owned by any Grantor in any joint venture, partnership or similar non-publicly owned Person that is not a Subsidiary of a Grantor.

"Term Loan Priority Collateral" means all now owned or hereafter acquired Term Loan Collateral, wherever located, that constitutes:

(a)     Equipment and Documents for any Equipment;

(b)     Real Estate Assets;

(c)     claims, causes of action and Commercial Tort Claims, except those referenced in clause (f) in the definition of ABL Priority Collateral;

(d)     Term Loan General Intangibles;

(e)     Term Loan Pledged Collateral;

(f)     Deposit Accounts and Securities Accounts holding solely identifiable proceeds of the Term Loan Priority Collateral and all cash and other funds held in or on deposit therein and Investment Property related thereto solely to the extent constituting identifiable proceeds of the Term Loan Priority Collateral;

(g)     Investment Property which are not ABL Priority Collateral;

(h)     all other Collateral other than ABL Priority Collateral;

(i)     Instruments, books and Records and Supporting Obligations in each case to the extent reasonably related to any of the foregoing; and

(j)     Accessions and Proceeds (including, without limitation, insurance proceeds) of each of the foregoing in clauses (a) through (1) (in each case, except to the extent constituting ABL Priority Collateral).

"Term Loan Security Documents" means any agreement, document or instrument pursuant to which a Lien is granted securing any Term Loan Obligations or under which rights or remedies with respect to such Liens are governed.

"Term Loan Standstill Period" has the meaning ascribed to such term in Section 3.1.

"UCC" means the Uniform Commercial Code (or any similar equivalent legislation) as in effect from time to time in the State of New York; provided, however, that, at

14

any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Agents' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other that the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

1.2    UCC Terms.  The following terms shall have the meanings assigned to them in Article 8 or 9 of the UCC (provided that if a term is defined in Article 8 of the UCC and Article 9 of the UCC, such term shall have the meaning assigned to it in Article 9 of the UCC): "Accessions", "Accounts", "Chattel Paper", "Commercial Tort Claims", "Deposit Accounts", "Documents", "Equipment", "Financial Assets", "General Intangibles", "Instruments", "Inventory", "Investment Property", "Letter of Credit Rights", "Money", "Proceeds", "Security", "Securities Entitlements", "Securities Accounts" and "Supporting Obligations".

1.3    Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise:

(a)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, modified, renewed or extended;

(b)    any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)    the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)    all references herein to Sections or Articles shall be construed to refer to Sections or Articles of this Agreement;

(e)    all uncapitalized terms have the meanings, if any, given to them in the UCC, as now or hereafter enacted in the State of New York (unless otherwise specifically defined herein);

15

   (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights;

   (g) any reference herein to a Person in a particular capacity or capacities excludes such Person in any other capacity or individually;

   (h) any reference herein to any law shall be construed to refer to such law as amended, modified, codified, replaced, or re-enacted, in whole or in part, and in effect on the pertinent date; and

   (i) in the compilation of periods of time hereunder from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to, but not through."

## II. LIEN PRIORITIES.

   2.1 <u>Relative Priorities</u>.  Irrespective of the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Term Loan Obligations granted on the Collateral or of any Liens securing the ABL Obligations granted on the Collateral (including, in each case, irrespective of whether any such Lien is granted (or secures Obligations relating to the period) after commencement of the Cases, and whether during the Cases or in the event of the dismissal or conversion of any of the Cases to chapter 7 or otherwise) and notwithstanding any provision of any UCC, or any other applicable law, or the ABL Loan Documents or the Term Loan Documents or any defect or deficiencies in, or failure to attach or perfect, the Liens securing the ABL Obligations or the Term Loan Obligations or any other circumstance whatsoever, the ABL Agent, on behalf of the ABL Claimholders and the Term Loan Agent, on behalf of the Term Loan Claimholders, hereby agree that:

   (a) any Lien of the ABL Agent on the ABL Priority Collateral securing the ABL Obligations, whether such Lien is now or hereafter held by or on behalf of the ABL Agent or any other ABL Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the ABL Priority Collateral securing any Term Loan Obligations, in each case in the manner set forth in this <u>Section 2.1</u>; and

   (b) any Lien of the Term Loan Agent on the Term Loan Priority Collateral securing the Term Loan Obligations, whether such Lien is now or hereafter held by or on behalf of the Term Loan Agent, any other Term Loan Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects to all Liens on the Term Loan Priority Collateral securing any ABL Obligations, in each case in the manner set forth in this <u>Section 2.1</u>.

   2.2 <u>Prohibition on Contesting Liens and Claims</u>.  The Term Loan Agent, on behalf of each Term Loan Claimholder, and the ABL Agent, on behalf of each ABL Claimholder, consents to the granting of Liens in favor of the other to secure the ABL Obligations and the Term Loan Obligations, as applicable, and agrees that no Claimholder will

be entitled to, and it will not (and shall be deemed to have irrevocably, absolutely, and unconditionally waived any right to), contest (directly or indirectly) or support (directly or indirectly) any other Person in contesting, in any proceeding (including any of the Cases): (a) the attachment, perfection, priority, validity or enforceability of any Lien in the Collateral held by or on behalf of any of the ABL Claimholders to secure the payment of the ABL Obligations or any of the Term Loan Claimholders to secure the payment of the Term Loan Obligations, (b) the priority, validity or enforceability of the ABL Obligations or the Term Loan Obligations, including the allowability or priority of the Term Loan Obligations or the ABL Obligations, as applicable, in any of the Cases, (c) the amount, nature or extent of the ABL Obligations and the Term Loan Obligations, or (d) the validity or enforceability of the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the ABL Agent, on behalf of the ABL Claimholders, or the Term Loan Agent, on behalf of the Term Loan Claimholders, to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the Obligations as provided in Sections 2.1, 3.1, 3.2, 3.5 and 4.1.

2.3     No New Liens.  So long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, whether or not any of the Cases have been dismissed or converted to a case under Chapter 7, the parties hereto agree, subject to Article VI hereof and the Financing Orders, that the Grantors shall not, and shall not permit any other Grantor to:

(a)     grant or permit any additional Liens on any asset or property to secure any Term Loan Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the ABL Obligations; or

(b)     grant or permit any additional Liens on any asset or property to secure any ABL Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Term Loan Obligations.

To the extent any additional Liens are granted on any asset or property pursuant to this Section 2.3, the priority of such additional Liens shall be determined in accordance with Section 2.1. In addition, to the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available hereunder, the ABL Agent, on behalf of the ABL Claimholders, and the Term Loan Agent, on behalf of Term Loan Claimholders, agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

2.4     Similar Liens.  The parties hereto agree that it is their intention that the ABL Collateral and the Term Loan Collateral be identical except as otherwise provided herein. In furtherance of the foregoing and of Section 8.8, the parties hereto agree, subject to the other provisions of this Agreement, upon request by the ABL Agent or the Term Loan Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Collateral and the Term Loan Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Loan Documents and the Term Loan Documents.

17

2.5     Acknowledgement of Lien Subordination.

(a)     The Term Loan Agreement shall expressly provide that each Term Loan Lender thereunder (i) consents to the subordination of Liens provided for in this Agreement, (ii) authorizes and directs the Term Loan Agent to enter into this Agreement on its behalf, and (iii) that any action taken by the Term Loan Agent pursuant to this Agreement shall be binding upon such Term Loan Lender.

(b)     The ABL Loan Agreement shall expressly provide that each ABL Lender thereunder (i) consents to the subordination of Liens provided for in this Agreement, (ii) authorizes and directs the ABL Agent to enter into this Agreement on its behalf, and (iii) that any action taken by the ABL Agent with the consent of the required ABL Lenders pursuant to this Agreement shall be binding upon such ABL Lender.

2.6     Conflict with Financing Orders.    Any conflict or ambiguity as between this Agreement and the Financing Orders shall, to the extent legally enforceable as between the parties hereto, be resolved in favor of the Financing Orders.

## III.    EXERCISE OF REMEDIES; ENFORCEMENT.

3.1     Restrictions on the Term Loan Agent and the Term Loan Claimholders.

(a)     Until the Discharge of ABL Obligations has occurred, subject to the limited extent provided in Article VI, the Term Loan Agent and the other Term Loan Claimholders:

(i)     will not exercise or seek to exercise (but instead shall be deemed to have hereby irrevocably, absolutely and unconditionally waived for the duration of the Term Loan Standstill Period) any rights, powers, or remedies with respect to any ABL Priority Collateral (including (A) any right of set-off or any right under any Account Agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Term Loan Agent or any Term Loan Claimholder is a party, (B) any right to undertake self-help re-possession or non-judicial disposition of any ABL Priority Collateral (including any partial or complete strict foreclosure) or any other Enforcement Action with respect to the ABL Priority Collateral, and/or (C) any right to institute, prosecute or otherwise maintain any action or proceeding with respect to such rights, powers or remedies (including any action of foreclosure)); provided, however, that a Term Loan Agent may exercise any or all of such rights, powers, or remedies after a period of at least 180 days has elapsed since the later of: (i) the date on which the Term Loan Agent declared the existence of a Term Loan Default, accelerated (to the extent such amount was not already due and owing) the payment of the principal amount of all Term Loan Obligations, and demanded payment thereof and (ii) the date on which the ABL Agent received the Enforcement Notice from the Term Loan Agent relating to such action; provided further, however, that (A) neither the Term Loan Agent nor any other Term Loan Claimholder shall exercise any rights or remedies with respect to the ABL Priority

18

Collateral if, notwithstanding the expiration of such 180 day period, the ABL Agent or the other ABL Claimholders shall have commenced whether before or after the expiration of such 180 day period, and be diligently pursuing the exercise of their rights, powers, or remedies with respect to all or any material portion of such ABL Priority Collateral (prompt written notice of such exercise to be given to the Term Loan Agent) and (B) such 180 day period shall be extended to the extent the ABL Agent or such other ABL Claimholders shall have been stayed by operation of law or by any court order from pursuing any such exercise of remedies (the period during which the Term Loan Agent and the other Term Loan Claimholders may not pursuant to this Section 3.1(a)(i) exercise any rights, powers, or remedies with respect to the ABL Priority Collateral, the "Term Loan Standstill Period");

(ii)    subject to the Financing Orders, will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or complete strict foreclosure) brought by the ABL Agent or any other ABL Claimholder relating to the ABL Priority Collateral or any other exercise by the ABL Agent or any other ABL Claimholder of any rights, powers and remedies relating to the ABL Priority Collateral, including any sale, lease, exchange, transfer, or other disposition of the ABL Priority Collateral, whether under the ABL Loan Documents or as a matter of law or equity, or the exercise of the right of the ABL Agent to set off or credit bid the ABL Obligations or the Pre-Petition ABL Obligations to the extent permitted by and in compliance with this Agreement and the Financing Orders;

(iii)    subject to their rights under clause (a)(i) above (and under clause (vi) of Section 3.1(c)), will not object to the forbearance by the ABL Agent or the ABL Claimholders from bringing or pursuing any Enforcement Action with respect to the ABL Priority Collateral;

(iv)    except as may be permitted in Section 3.1(c), Section 3.5, or the proviso below, irrevocably, absolutely and unconditionally waive any and all rights the Term Loan Agent and Term Loan Claimholders may have as a junior lien creditor to object (or seek or be awarded any relief of any nature whatsoever based on any such objection) to the manner in which the ABL Agent or the ABL Claimholders (a) enforce or collect (or attempt to collect) the ABL Obligations or (b) realize or seek to realize upon or otherwise enforce the Liens in and to the ABL Priority Collateral securing the ABL Obligations, regardless of whether any action or failure to act by or on behalf of the ABL Agent or ABL Claimholders is adverse to the interest of the Term Loan Agent or the Term Loan Claimholders; provided that the Term Loan Agent and the other Term Loan Claimholders expressly reserve and retain any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior to or subsequent to any disposition of any Collateral, on the ground(s) that any such disposition of Collateral (x) would not be or was not "commercially reasonable" within the meaning of any applicable UCC and/or (y) would not or did not comply with any other requirement under any applicable

19

UCC or under any other applicable law governing the manner in which a secured creditor (including one with a Lien on real property) is to realize on its collateral; and

(v)    subject to <u>Section 3.1(a)</u> and <u>(c)</u> and <u>Section 3.5</u>, acknowledge and agree that no covenant, agreement or restriction contained in the Term Loan Security Documents or any other Term Loan Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the ABL Agent or the ABL Claimholders with respect to the ABL Priority Collateral as set forth in this Agreement.

(b)    Until the Discharge of ABL Obligations has occurred, the ABL Agent and the other ABL Claimholders shall, subject to the Financing Orders, have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make, in connection therewith (including voluntary Dispositions of ABL Priority Collateral by the respective Grantors after an ABL Default) determinations regarding the release, disposition, or restrictions with respect to the ABL Priority Collateral without any consultation with or the consent of the Term Loan Agent or any Term Loan Claimholder; <u>provided</u>, <u>however</u>, that the Lien securing the Term Loan Obligations shall remain on the Proceeds (other than those properly applied to the ABL Obligations in accordance with <u>Section 4.1</u>) of such Collateral released or disposed of subject to the relative priorities described in <u>Section 2.1</u>. In exercising rights, powers, and remedies with respect to the ABL Priority Collateral, the ABL Agent and the ABL Claimholders may, subject to the Financing Orders enforce the provisions of the ABL Loan Documents and exercise rights, powers, and/or remedies thereunder and/or available as a matter of law or equity, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the ABL Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

(c)    Notwithstanding anything to the contrary contained herein, the Term Loan Agent and any Term Loan Claimholder may:

(i)    file a claim or statement of interest with respect to the Term Loan Obligations;

(ii)    subject to the Financing Orders, take any action (not adverse to the priority status of the Liens on the ABL Priority Collateral, or the rights of the ABL Agent or any of the ABL Claimholders to exercise rights, powers, and/or remedies in respect thereof, including those under <u>Article VI</u>) in order to create, perfect, preserve or protect (but not, except to the extent permitted in <u>Section 3.1(a)(i)</u> after the expiration of the Term Loan Standstill Period, enforce) its Lien on any of the ABL Priority Collateral;

(iii)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made

by any person objecting to or otherwise seeking the disallowance of the claims of the Term Loan Claimholders, including any claims secured by the ABL Priority Collateral, if any, in each case in accordance with the terms of this Agreement and the Financing Orders;

(iv)    file (x) any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors in the Cases not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws of any applicable jurisdiction) and (y) any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors of the Grantors solely with respect to the Term Loan Priority Collateral;

(v)    vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments, obligations, and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement; provided, however, that no Term Loan Claimholder may cast any vote to accept or take any other act to support the confirmation or approval of, any Non-Conforming Plan of Reorganization, and pursuant to Section 8.10 of this Agreement, the ABL Agent shall be entitled to demand specific performance of this provision and obtain an order directing a Term Loan Claimholder that votes in favor of any Non-Conforming Plan of Reorganization to change its vote and vote against any Non-Conforming Plan of Reorganization;

(vi)    subject to the Financing Orders, exercise any of its rights, powers and/or remedies with respect to any of the ABL Priority Collateral after the termination of the Term Loan Standstill Period to the extent permitted by Section 3.1(a)(i);

(vii)    exercise any of its rights, powers and/or remedies with respect to any of the Collateral to the extent permitted by Section 5.6; and

(viii)    take any action described in clauses (iii), (iv), (vi) and (vii) of the definition of "Enforcement Action".

The Term Loan Agent, on behalf of the Term Loan Claimholders, agrees that it will not take or receive any ABL Priority Collateral (including Proceeds) in connection with the exercise of any right or remedy (including set-off) with respect to ABL Priority Collateral in their capacity as a creditor in violation of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in Sections 3.1(a)(i) and 3.5, and this Section 3.1(c), the sole right of the Term Loan Agent and the Term Loan Claimholders with respect to the ABL Priority Collateral is to hold a Lien on such Collateral pursuant to the Term Loan Security Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, in accordance with Section 4.1.

(d)    Except as otherwise specifically set forth in Sections 3.1(a), 3.1(c) and 3.4 and Article VI, the Term Loan Agent and the Term Loan Claimholders, with respect to the ABL Priority Collateral, may exercise rights and remedies as unsecured creditors against any Grantor and subject to Section 3.2, may exercise rights and remedies with respect to the Term Loan Priority Collateral, in each case, in accordance with the terms of the Term Loan Documents, the Financing Orders and applicable law; provided, however, that in the event that the Term Loan Agent or any Term Loan Claimholder becomes a judgment Lien creditor in respect of ABL Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Term Loan Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the ABL Obligations) as the other Liens securing the Term Loan Obligations are subject to this Agreement.

(e)    Nothing in this Agreement shall prohibit the receipt by the Term Loan Agent or any other Term Loan Claimholders of the required payments of interest, principal and other amounts owed in respect of the Term Loan Obligations so long as such receipt is not the direct or indirect result of the exercise by the Term Loan Agent or any Term Loan Claimholders of rights or remedies as a secured creditor (including set-off) with respect to ABL Priority Collateral or enforcement in contravention of this Agreement or the Financing Orders of any Lien held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the ABL Agent or the ABL Claimholders may have against any Grantor under the ABL Loan Documents.

3.2    Restrictions on the ABL Agent and ABL Claimholders.

(a)    Until the Discharge of Term Loan Obligations has occurred, subject to the limited extent provided in Article VI, the ABL Agent and the other ABL Claimholders:

(i)    will not exercise or seek to exercise (but instead shall be deemed to have hereby irrevocably, absolutely and unconditionally waived for the duration of the ABL Standstill Period) any rights, powers, or remedies with respect to any Term Loan Priority Collateral (including (A) any right of set-off or any right under any Account Agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the ABL Agent or any ABL Claimholder is a party, (B) any right to undertake self-help re-possession or non-judicial disposition of any Term Loan Priority Collateral (including any partial or complete strict foreclosure) or any other Enforcement Action with respect to the Term Loan Priority Collateral, and/or (C) any right to institute, prosecute or otherwise maintain any action or proceeding with respect to such rights, powers, or remedies (including any action of foreclosure)); provided, however, that the ABL Agent may exercise any or all of such rights, powers, or remedies after a period of at least 180 days has elapsed since the later of: (i) the date on which the ABL Agent declared the existence of an ABL Default, accelerated (to the extent such amount was not already due and owing) the payment of the principal amount of all ABL Obligations, and demanded payment thereof and (ii) the date on which the Term Loan Agent received the Enforcement Notice from the ABL Agent relating to such action; provided, further, however,

that (A) neither the ABL Agent nor any other ABL Claimholder shall exercise any rights or remedies with respect to the Term Loan Priority Collateral if, notwithstanding the expiration of such 180 day period, the Term Loan Agent or the other Term Loan Claimholders shall have commenced, whether before or after the expiration of such 180 day period, and be diligently pursuing the exercise of their rights, powers or remedies with respect to all or any material portion of such Term Loan Priority Collateral (prompt notice of such exercise to be given to the ABL Agent by the Term Loan Agent) and (B) such 180 day period shall be extended to the extent the Term Loan Agent or such other Term Loan Claimholders shall have been stayed by operation of law or by any court order from pursuing any such exercise of remedies (the period during which the ABL Agent and the other ABL Claimholders may not pursuant to this Section 3.2(a)(i) exercise any rights, powers or remedies with respect to the Term Loan Priority Collateral, the "ABL Standstill Period"); provided, finally, however, that the ABL Agent, independent in all respects of the preceding provisos, may exercise the rights provided for in Section 3.3 (with respect to any Access and Use Period) and Section 3.4 (with respect to any Access and Use Period);

(ii)     subject to the Financing Orders, will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or complete strict foreclosure) brought by the Term Loan Agent or any other Term Loan Claimholder relating to the Term Loan Priority Collateral or any other exercise by the Term Loan Agent or any other Term Loan Claimholder of any rights, powers and remedies relating to the Term Loan Priority Collateral, including any sale, lease, exchange, transfer, or other disposition of the Term Loan Priority Collateral, whether under the Term Loan Documents or as a matter of law or equity, or the exercise of the right of the Term Loan Agent to set off or credit bid Term Loan Obligations or the Pre-Petition Term Loan Obligations to the extent permitted by and in compliance with this Agreement and the Financing Orders, subject to the Term Loan Agent's and the other Term Loan Claimholders' obligations under Section 3.3 and Section 3.4;

(iii)     subject to their rights under clause (a)(i) above (and under clause (vi) of Section 3.2(c)), will not object to the forbearance by the Term Loan Agent or the Term Loan Claimholders from bringing or pursuing any Enforcement Action with respect to the Term Loan Priority Collateral;

(iv)     except as may be permitted in Section 3.2(c), Section 3.5, or the proviso below, and subject to Sections 3.3 and 3.4, to the extent permitted by applicable law, irrevocably, absolutely and unconditionally waive any and all rights the ABL Agent and ABL Claimholders may have as a junior lien creditor to object (and seek or be awarded any relief of any nature whatsoever based on any such objection) to the manner in which the Term Loan Agent or the Term Loan Claimholders (a) enforce or collect (or attempt to collect) the Term Loan Obligations or (b) realize or seek to realize upon or otherwise enforce the Liens in and to the Term Loan Priority Collateral securing the Term

Loan Obligations, regardless of whether any action or failure to act by or on behalf of the Term Loan Agent or Term Loan Claimholders is adverse to the interest of the ABL Claimholders; provided that the ABL Agent and the other ABL Claimholders expressly reserve and retain any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior to or subsequent to any disposition of any Collateral, on the ground(s) that any such disposition of Collateral (x) would not be or was not "commercially reasonable" within the meaning of any applicable UCC and/or (y) would not or did not comply with any other requirement under any applicable UCC or under any other applicable law governing the manner in which a secured creditor (including one with a Lien on real property) is to realize on its collateral; and

(v)     subject to Sections 3.2(a) and (c) and Sections 3.3, 3.4, and 3.5, acknowledge and agree that no covenant, agreement or restriction contained in the ABL Security Documents or any other ABL Loan Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Term Loan Agent or the Term Loan Claimholders with respect to the Term Loan Priority Collateral as set forth in this Agreement.

(b)     Until the Discharge of Term Loan Obligations has occurred, the Term Loan Agent and the Term Loan Claimholders shall, subject to the Financing Orders, have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make, in connection therewith (including voluntary Dispositions of Term Loan Priority Collateral by the respective Grantors after a Term Loan Default) determinations regarding the release, disposition, or restrictions with respect to the Term Loan Priority Collateral without any consultation with or the consent of the ABL Agent or any ABL Claimholder but subject to the Term Loan Agent's and the Term Loan Claimholders' obligations under Sections 3.3 and 3.4; provided, however, that the Lien securing the ABL Obligations shall remain on the Proceeds (other than those properly applied to the Term Loan Obligations in accordance with Section 4.1) of such Collateral released or disposed of subject to the relative priorities described in Section 2.1. In exercising rights, powers, and remedies with respect to the Term Loan Priority Collateral, the Term Loan Agent and the Term Loan Claimholders may, subject to the Financing Orders enforce the provisions of the Term Loan Documents and exercise rights, powers and/or remedies thereunder and/or available as a matter of law or equity, all in such order and in such manner as they may determine in the exercise of their sole discretion but subject to the Term Loan Agent's and the Term Loan Claimholders' obligations under Sections 3.3 and 3.4. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the Term Loan Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights, powers and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

(c)     Notwithstanding anything to the contrary contained herein, the ABL Agent and any ABL Claimholder may:

(i)     file a claim or statement of interest with respect to the ABL Obligations in any of the Cases;

(ii)     subject to the Financing Orders take any action (not adverse to the priority status of the Liens on the Term Loan Priority Collateral, or the rights of the Term Loan Agent or any of the Term Loan Claimholders to exercise rights, powers and/or remedies in respect thereof, including those under Article VI) in order to create, perfect, preserve or protect (but, subject to the provisions of Sections 3.3 and 3.4, not enforce) its Lien on any of the Term Loan Priority Collateral;

(iii)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the ABL Claimholders, including any claims secured by the Term Loan Priority Collateral, if any, in each case in accordance with the terms of this Agreement and the Financing Orders;

(iv)     file (x) any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors in the Cases or under applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws of any applicable jurisdiction) and (y) any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors of the Grantors solely with respect to the ABL Priority Collateral;

(v)     vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement; provided, however, that no ABL Claimholder may cast any vote to accept or take any other act to support the confirmation or approval of, any Non-Conforming Plan of Reorganization, and pursuant to Section 8.10 of this Agreement, the Term Loan Agent shall be entitled to demand specific performance of this provision and obtain an order directing an ABL Claimholder that votes in favor of any Non-Conforming Plan of Reorganization to change its vote and vote against any Non-Conforming Plan of Reorganization;

(vi)     subject to the Financing Orders exercise any of its rights, powers, and/or remedies with respect to any of the Term Loan Priority Collateral to the extent permitted by Sections 3.2(a)(i), 3.3 and 3.4; and

(vii)     take any action described in clauses (i) through (vii) of the definition of "Enforcement Action".

The ABL Agent, on behalf of the ABL Claimholders, agrees that no ABL Claimholder will take or receive any Term Loan Priority Collateral (including Proceeds) in connection with the exercise of any right or remedy (including set-off) with respect to any Term Loan Priority Collateral in its capacity as a creditor in violation of this Agreement. Without limiting the

25

generality of the foregoing, unless and until the Discharge of Term Loan Obligations has occurred, except as expressly provided in Sections 3.2(a)(i), 3.3, 3.4, 3.5 and 6.2 and this Section 3.2(c), the sole right of the ABL Agent and the ABL Claimholders with respect to the Term Loan Priority Collateral is to hold a Lien on such Collateral pursuant to the ABL Security Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, in accordance with Section 4.1.

(d)     Except as otherwise specifically set forth in Sections 3.2(a), 3.2(c) and 3.5 and Article VI, the ABL Agent and the ABL Claimholders with respect to the Term Loan Priority Collateral, may exercise rights and remedies as unsecured creditors against any Grantor and subject to Section 3.1, may exercise rights and remedies with respect to the ABL Priority Collateral, in each case, in accordance with the terms of the ABL Loan Documents and applicable law; provided, however, that in the event that any the ABL Agent or ABL Claimholder becomes a judgment Lien creditor in respect of Term Loan Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the ABL Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Term Loan Obligations) as the other Liens securing the ABL Obligations are subject to this Agreement.

(e)     Nothing in this Agreement shall prohibit the receipt by the ABL Agent or any ABL Claimholders of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not the direct or indirect result of the exercise by the ABL Agent or any ABL Claimholders of rights or remedies as a secured creditor (including set-off) with respect to Term Loan Priority Collateral or enforcement in contravention of this Agreement or the Financing Orders of any Lien held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Term Loan Agent or the Term Loan Claimholders may have against the Grantors under the Term Loan Documents.

3.3     Collateral Access Rights.

(a)     The ABL Agent and the Term Loan Agent agree not to commence Enforcement Action until an Enforcement Notice has been given to either the ABL Agent or Term Loan Agent, as applicable. Subject to the provisions of Sections 3.1 and 3.2, the ABL Agent may join in any judicial proceedings commenced by a Term Loan Agent, and a Term Loan Agent may join in any judicial proceedings commenced by the ABL Agent, provided, however, that the ABL Agent shall not interfere with the Enforcement Action of any Term Loan Agent with respect to any Term Loan Priority Collateral, and a Term Loan Agent shall not interfere with the Enforcement Action of the ABL Agent with respect to the ABL Priority Collateral.

(b)     If the Term Loan Agent, or any agent or representative of the Term Loan Agent, or any receiver, shall, after any Term Loan Default, obtain possession or physical control of any of the Mortgaged Premises or any of the tangible Term Loan Priority Collateral located on any premises other than a Mortgaged Premise, the Term Loan Agent shall promptly notify the ABL Agent in writing of that fact, and the ABL Agent shall, within ten (10) Business Days thereafter, notify the Term Loan Agent in writing as to whether the ABL Agent desires to

exercise access rights under this Agreement. In addition, if the ABL Agent, or any agent or representative or the ABL Agent, or any receiver, shall obtain possession or physical control of any of the Mortgaged Premises or any of the tangible Term Loan Priority Collateral located on any premises other than a Mortgaged Premise, following the delivery to the Term Loan Agent of an Enforcement Notice, then the ABL Agent shall promptly notify the Term Loan Agent in writing that the ABL Agent is exercising its access rights under this Agreement and its rights under Sections 3.3 and 3.4 under either circumstance. Upon delivery of such notice by the ABL Agent to the Term Loan Agent, the parties shall confer in good faith to coordinate with respect to the ABL Agent's exercise of such access rights. Consistent with the definition of "Access and Use Period," access rights will apply to differing parcels of Mortgaged Premises at differing times, in which case, a differing Access and Use Period will apply to each such property.

(c)    During any pertinent Access and Use Period and subject to the Financing Orders, the ABL Agent and its agents, representatives and designees shall have an irrevocable, non-exclusive right to have access to, and a rent-free right to use, the Term Loan Priority Collateral (including any Intellectual Property constituting Term Loan Priority Collateral) for the purpose of (i) copying, using or preserving any and all information relating to any of the ABL Priority Collateral, (ii) arranging for and effecting the sale or disposition of ABL Priority Collateral located on such parcel, including the completion of the manufacture and packaging of (A) work-in-process, (B) raw materials and (C) inventory production, and other preparation of such ABL Priority Collateral for sale or disposition, (iii) selling (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any Grantor's business), and (iv) storing or otherwise dealing with the ABL Priority Collateral, in each case without notice to, the involvement of or interference by the Term Loan Agent or any Term Loan Claimholder or liability to the Term Loan Agent or any Term Loan Claimholder. During any such Access and Use Period, the ABL Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process and sell the ABL Priority Collateral, as well as to engage in bulk sales of ABL Priority Collateral. The ABL Agent shall take proper and reasonable care of any Term Loan Priority Collateral that is used by the ABL Agent during the Access and Use Period and repair and replace any damage (ordinary wear and tear excepted consistent with prior operating experience) caused by the ABL Agent or its agents, representatives or designees, and the ABL Agent shall comply with all applicable laws in all material respects in connection with its use or occupancy of the Term Loan Priority Collateral. The ABL Agent and the ABL Claimholders shall reimburse and indemnify and hold harmless the Term Loan Agent on behalf of the Term Loan Claimholders within 30 days of demand therefore for any injury or damage to Persons or property (ordinary wear and tear excepted consistent with prior operating experience) caused by the acts or omissions of Persons under its control; provided, however, that the ABL Agent and the ABL Claimholders will not be liable for any diminution in the value of the Mortgaged Premises caused by the absence of the ABL Priority Collateral therefrom. In no event shall the ABL Claimholders or the ABL Agent have any liability to the Term Loan Claimholders and/or to the Term Loan Agent hereunder as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by the ABL Agent of its rights under this Agreement. The ABL Agent and the Term Loan Agent shall cooperate and use reasonable efforts to ensure that the activities of the ABL Agent during the Access and Use

27

Period as described above do not interfere materially with the activities of the other as described above, including the right of Term Loan Agent to commence foreclosure of the Term Loan Mortgages and to show the Term Loan Priority Collateral to prospective purchasers and to ready the Term Loan Priority Collateral for sale.

          (d)     Consistent with the definition of the term "Access and Use Period," if any order or injunction is issued or stay is granted or is otherwise effective by operation of law that prohibits the ABL Agent from exercising any of its rights hereunder, then the Access and Use Period granted to the ABL Agent under this Section 3.3 shall be stayed during the period of such prohibition and shall continue thereafter for the number of days remaining as required under such definition. The Term Loan Agent shall not foreclose or otherwise sell or dispose of any of the Term Loan Priority Collateral during the Access and Use Period, as applicable, unless the buyer agrees in writing to acquire the Term Loan Priority Collateral subject to the terms of Sections 3.3 and 3.4 of this Agreement and agrees therein to comply with the terms of this Section 3.3. The rights of ABL Agent and the ABL Claimholders under this Section 3.3 and Section 3.4 during the Access and Use Period shall continue notwithstanding such foreclosure, sale or other disposition by the Term Loan Agent.

          (e)     The ABL Agent and the ABL Claimholders shall have the right to bring an action to enforce their rights under this Section 3.3 and Section 3.4, including, without limitation, an action seeking possession of the applicable Collateral and/or specific performance of this Section 3.3 and Section 3.4.

          3.4    Term Loan General Intangibles Rights/Access to Information. Subject to the Financing Orders, the Term Loan Agent grants and consents to the grant by any Grantor (to the full extent of their rights and interests therein but without any representation, warranty or other obligation on the part of the Term Loan Agent whatsoever) to the ABL Agent and its agents, representatives and designees (a) an irrevocable non-exclusive royalty-free, rent-free license and lease (which will be binding on any successor or assignee of any Term Loan Priority Collateral) to use (in the case of any Equipment, in place or onsite and not to be removed) during any applicable Access and Use Period, all of the Term Loan Priority Collateral, including any computer or other data processing Equipment and Term Loan General Intangibles (including any Intellectual Property constituting Term Loan Priority Collateral), to collect all Accounts included in ABL Priority Collateral, to copy, use, or preserve any and all information relating to any of the ABL Priority Collateral, and to complete the manufacture, packaging and sale of (i) work-in-process, (ii) raw materials and (iii) complete inventory and (b) an irrevocable royalty-free license (which will be binding on any successor or assignee of the Term Loan General Intangibles) to use any and all Term Loan General Intangibles at any time in connection with its Enforcement Action; provided, however, that (A) the royalty-free, rent-free license and lease granted in clause (a) with respect to the applicable Term Loan Priority Collateral (exclusive of any Term Loan General Intangibles), shall immediately expire upon the end of (1) the Access and Use Period applicable to such Term Loan Priority Collateral located on any Mortgaged Premises and (2) the applicable Access and Use Period with respect to any Term Loan Priority Collateral not located on any Mortgaged Premises and (B) the royalty-free license granted in clause (b) with respect to any Term Loan General Intangibles shall immediately expire upon the end of the applicable Access and Use Period; provided, however, that such expiration shall be without prejudice to the sale or other disposition of the ABL Priority Collateral in accordance with applicable law.

       3.5    <u>Set-Off and Tracing of and Priorities in Proceeds</u>.  The Term Loan Agent, on behalf of the Term Loan Claimholders, acknowledge and agree that, to the extent the Term Loan Agent or any Term Loan Claimholder exercises its rights of set-off against any ABL Priority Collateral, the amount of such set-off shall be held and distributed pursuant to <u>Section 4.1</u>. The ABL Agent, on behalf of the ABL Claimholders, acknowledges and agrees that, to the extent the ABL Agent or any ABL Claimholder exercises its rights of set-off against any Term Loan Priority Collateral, the amount of such set-off shall be held and distributed pursuant to <u>Section 4.1</u>. The ABL Agent, for itself and on behalf of the ABL Claimholders, and each Term Loan Agent, for itself and on behalf of the Term Loan Claimholders, further agree that prior to an issuance of an Enforcement Notice, any Proceeds of Collateral, whether or not deposited under Account Agreements, which are used by any Grantor to acquire other property which is Collateral shall not (solely as between the Agents, the ABL Claimholders and the Term Loan Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired. In addition, unless and until the Discharge of ABL Obligations occurs, subject to <u>Section 4.2,</u> the Term Loan Agent and the Term Loan Claimholders each hereby consents to the application, prior to the receipt by the ABL Agent of an Enforcement Notice, of cash or other Proceeds of Collateral (except to the extent constituting identifiable Proceeds of the Term Loan Priority Collateral), deposited under Account Agreements to the repayment of ABL Obligations pursuant to the ABL Loan Documents.

## IV.   PAYMENTS.

       4.1    <u>Application of Proceeds</u>.

       (a)    Except as otherwise provided in the Financing Orders, so long as the Discharge of ABL Obligations has not occurred, all Proceeds of any collection, sale, foreclosure or other realization upon or any other Enforcement Action by either Agent or any ABL Claimholder or any Term Loan Claimholder with respect to ABL Priority Collateral shall be delivered to the ABL Agent and shall be applied or further distributed in the following order of application:

       (1)    *first*, to the ABL Agent or Pre-Petition ABL Agent for application to the ABL Obligations or Pre-Petition ABL Obligations in accordance with the Financing Orders and the terms of the relevant ABL Loan Documents until the Discharge of ABL Obligations has occurred;

       (2)    *second*, to the Term Loan Agent for application to the Term Loan Obligations in accordance with the terms of the relevant Term Loan Documents until the Discharge of Term Loan Obligations has occurred; and

       (3)    *third*, to the extent of any surplus remaining after payment in full in cash of the amounts described in the foregoing clauses, to the relevant Grantor or its successors or assigns, or as a court of competent jurisdiction may direct.

In addition, upon the Discharge of ABL Obligations, the ABL Agent shall deliver to the Term Loan Agent any Collateral and Proceeds of Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements, to be applied by the Term Loan Agent to the Term Loan Obligations in such order as specified in the Term Loan Documents or as a court of competent jurisdiction may otherwise direct.

(b)     Except as otherwise provided in the Financing Orders, so long as the Discharge of Term Loan Obligations has not occurred, all Proceeds of any collection, sale, foreclosure or other realization upon or any other Enforcement Action by either Agent or any ABL Claimholder or any Term Loan Claimholder with respect to Term Loan Priority Collateral shall be delivered to the Term Loan Agent and shall be applied or further distributed in the following order of application:

(1)     *first*, to the Term Loan Agent for application to the Term Loan Obligations in accordance with the terms of the relevant Term Loan Documents until the Discharge of Term Loan Obligations has occurred;

(2)     *second*, to the ABL Agent for application to the ABL Obligations in accordance with the terms of the relevant ABL Loan Documents until the Discharge of ABL Obligations has occurred; and

(3)     *third*, to the extent of any surplus remaining after payment in full in cash of the amounts described in the foregoing clauses, to the relevant Grantor or its successors or assigns, or as a court of competent jurisdiction may direct.

In addition, upon the Discharge of Term Loan Obligations, the Term Loan Agent shall deliver to the ABL Agent any Collateral and Proceeds of Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements to be applied by the ABL Agent to the ABL Obligations in such order as specified in the ABL Security Documents or as a court of competent jurisdiction may otherwise direct.

Notwithstanding anything to the contrary contained above or in the definition of the ABL Priority Collateral or Term Loan Priority Collateral, but subject to the proviso below, in the event that Proceeds of Collateral are received from (or are otherwise attributable to the value of) any collection, sale, foreclosure or other realization upon or any other Enforcement Action that involves a combination of ABL Priority Collateral and Term Loan Priority Collateral, the ABL Agent and the Term Loan Agent shall use commercially reasonable efforts in good faith to allocate such Proceeds to the ABL Priority Collateral and the Term Loan Priority Collateral. If the ABL Agent and the Term Loan Agent are unable to agree on such allocation within five (5) Business Days (or such other period of time as the ABL Agent and the Term Loan Agent agree) of the consummation of such collection, sale, foreclosure or other realization upon or any other Enforcement Action, either the ABL Agent or the Term Loan Agent may request the appointment of an independent third party appraisal firm mutually acceptable to the ABL Agent and the Term Loan Agent acting in good faith to appraise the value of ABL Priority Collateral and the Term Loan Priority Collateral resulting in such Proceeds, in which case, the allocation of such Proceeds shall be based on such valuation of the ABL Priority Collateral and the Term

Loan Priority Collateral, which valuations shall be completed as promptly as possible following the selection of such independent third party by the ABL Agent and the Term Loan Agent.  If the ABL Agent and the Term Loan Agent fail to mutually agree on the allocation of the Proceeds to the ABL Priority Collateral and the Term Loan Priority Collateral or upon the appointment of any such independent third party appraisal firm (without relieving any party from its obligations under this Section 4.1), the portion of such Proceeds that shall be allocated as Proceeds of ABL Priority Collateral for purposes of this Agreement shall be an amount equal to (i) the net book value of such ABL Priority Collateral consisting of Accounts as determined on a basis consistent with the financial statements of the Grantors in accordance with generally accepted accounting principles, consistently applied, (ii) the orderly liquidation value of such ABL Priority Collateral consisting of Inventory based on and consistent with the then most current appraisal thereof received by the ABL Agent with respect thereto, and (iii) to the extent the Proceeds of ABL Priority Collateral include Proceeds of Collateral other than Accounts and Inventory, the appraised value of such other Collateral based on and consistent with the then most current appraisal received by the ABL Agent with respect thereto.  Notwithstanding the foregoing, if there is a sale of all or substantially all of the Collateral pursuant to that certain Purchase Agreement filed with the Bankruptcy Court on or about the Petition Date (or an Alternative Transaction, as defined therein), or any purchase agreement substantially similar thereto, an amount of cash proceeds realized from such sale shall be paid to the ABL Agent at the closing thereof sufficient to cause (and to actually cause) Discharge of ABL Obligations.

        4.2    Payments Over in Violation of Agreement.    So long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, any Collateral (including assets or Proceeds subject to Liens referred to in the final sentence of Section 2.3) received by any Agent or any Term Loan Claimholders or ABL Claimholders in connection with the exercise of any right, power, or remedy (including set-off) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over either to the Term Loan Agent for the benefit of the Term Loan Claimholders or the ABL Agent for the benefit of the ABL Claimholders, as applicable, in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. In the event a Discharge of ABL Obligations has occurred, any Collateral (including assets or Proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the ABL Agent or ABL Claimholders in connection with the exercise of any right, power, or remedy (including set-off) relating to the Collateral shall be segregated and held in trust and forthwith paid over to the Term Loan Agent for the benefit of the Term Loan Claimholders, in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. In the event a Discharge of Term Loan Obligations has occurred, any Collateral (including assets or Proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Term Loan Agent or Term Loan Claimholders in connection with the exercise of any right, power, or remedy (including set-off) relating to the Collateral shall be segregated and held in trust and forthwith paid over to the ABL Agent for the benefit of the ABL Claimholders, in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. Each Agent is hereby authorized by the other Agent to make any such endorsements as agent for the other Agent or any Term Loan Claimholders or ABL Claimholders, as applicable. This authorization is coupled with an interest and is irrevocable until the Discharge of ABL Obligations and Discharge of Term Loan Obligations.

4.3     Application of Payments.  Subject to the other terms of this Agreement, all payments received by (a) the ABL Agent or the ABL Claimholders may be applied, reversed and reapplied, in whole or in part, to the ABL Obligations to the extent provided for in the ABL Loan Documents and (b) the Term Loan Agent or the Term Loan Claimholders may be applied, reversed and reapplied, in whole or in part, to the Term Loan Obligations to the extent provided for in the Term Loan Documents.

4.4     Revolving Nature of ABL Obligations; Delayed Draw Nature of Term Loan.  The Term Loan Agent, on behalf of the Term Loan Claimholders, acknowledges and agrees that the ABL Loan Agreement includes a revolving commitment and that the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed.  The ABL Agent, on behalf of the ABL Claimholders, acknowledges and agrees that the Term Loan Agreement includes a delayed draw commitment and that the amount of the Term Loan Obligations that may be outstanding at any time or from time to time may be increased.

## V.     OTHER AGREEMENTS.

5.1     Releases.

(a)     (i)     If, in connection with (A) any exercise of remedies or Enforcement Action (including as provided for in Section 3.1(b)), or (B) any sale, transfer or other disposition of all or any portion of the ABL Priority Collateral (other than in connection with a Refinancing as described in Section 5.5), so long as, in the case of this clause (B), such sale, transfer or other disposition is then not prohibited by the ABL Documents (or consented to by the requisite ABL Lenders) and by the Term Loan Documents (or consented to by the requisite Term Loan Lenders of each class), irrespective of whether an ABL Default has occurred and is continuing, the ABL Agent, on behalf of any of the ABL Claimholders, releases any of its Liens on any part of the ABL Priority Collateral, then the Liens, if any, of the Term Loan Agent, for the benefit of the Term Loan Claimholders, on the Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that, to the extent the Proceeds of such ABL Priority Collateral are not applied to reduce ABL Obligations, the Term Loan Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement. The Term Loan Agent, on behalf of the Term Loan Claimholders, at the Grantors' expense, promptly shall execute and deliver to the ABL Agent or such Grantor such termination statements, releases and other documents as the ABL Agent or such Grantor may request in writing to effectively confirm such release.

(ii)     If, in connection with (A) any exercise of remedies or Enforcement Action (including as provided for in Section 3.2(b)), or (B) any sale, transfer or other disposition of all or any portion of the Term Loan Priority Collateral (other than in connection with a refinancing as described in Section 5.5), so long as, in the case of this clause (B), such sale, transfer or other disposition is then not prohibited by the Term Loan Documents (or is consented to by the requisite Term Loan Lenders of each class) or by the ABL Documents (or is consented to by the requisite ABL Lenders), irrespective of whether a Term Loan Default has occurred and is continuing, the Term Loan Agent, on behalf of

32

the applicable Term Loan Claimholders, release any of their Liens on any part of the Term Loan Priority Collateral, then the Liens, if any, of the ABL Agent, for the benefit of the ABL Claimholders, on the Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that the provisions of Sections 3.3 and 3.4 shall continue, to the extent such Sections are applicable at the time of such sale, transfer or other disposition; provided further that, to the extent the Proceeds of such Term Loan Priority Collateral are not applied to reduce Term Loan Obligations, the ABL Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement. The ABL Agent, on behalf of the ABL Claimholders, at the Grantors' expense, promptly shall execute and deliver to the Term Loan Agent or such Grantor such termination statements, releases and other documents as the Term Loan Agent or such Grantor may request in writing to effectively confirm such release.

(b)    Until the Discharge of ABL Obligations and Discharge of Term Loan Obligations shall occur, the ABL Agent, on behalf of the ABL Claimholders, and the Term Loan Agent, on behalf of the Term Loan Claimholders, as applicable, hereby irrevocably constitutes and appoints each of the other Agents and any officer or agent of the other Agents, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the other Agent or such holder or in the Agent's own name, from time to time in such Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release. This power is coupled with an interest and is irrevocable in favor of (i) the ABL Agent until the Discharge of ABL Obligations, and (ii) in favor of the Term Loan Agent until the Discharge of the Term Loan Obligations.

(c)    Until the Discharge of ABL Obligations and Discharge of Term Loan Obligations shall occur, to the extent that the Agents or the ABL Claimholders or the Term Loan Claimholders (i) have released any Lien on Collateral and such Lien is later reinstated or (ii) obtain any new Liens from any Grantor or any Grantor takes any action to perfect a Lien, then, in accordance with Section 2.3, the Grantors shall grant or perfect a Lien on any such Collateral, subject to the Lien priority provisions of this Agreement, to the other Agent, for the benefit of the ABL Claimholders or Term Loan Claimholders, as applicable.

5.2    Insurance.

(a)    Unless and until the Discharge of ABL Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the ABL Loan Documents, (i) the ABL Agent, on behalf of the ABL Claimholders, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Collateral, (ii) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the ABL Priority Collateral and to the extent required by the ABL Loan Documents shall be paid

to the ABL Agent for the benefit of the ABL Claimholders pursuant to the terms of the ABL Loan Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, if the Discharge of ABL Obligations has occurred, and subject to the rights of the Grantors under the Term Loan Security Documents, to the Term Loan Agent for the benefit of the Term Loan Claimholders to the extent required under the Term Loan Security Documents and then, to the extent no Term Loan Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (iii) if the Term Loan Agent or any Term Loan Claimholders shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to ABL Priority Collateral in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such Proceeds over to the ABL Agent in accordance with the terms of Section 4.2.

(b)    Unless and until the Discharge of Term Loan Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the Term Loan Documents, (i) the Term Loan Agent, on behalf of the Term Loan Claimholders, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Term Loan Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Collateral; (ii) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the Term Loan Priority Collateral and to the extent required by the Term Loan Documents shall be paid to the Term Loan Agent for the benefit of the Term Loan Claimholders pursuant to the terms of the Term Loan Documents and thereafter, if the Discharge of Term Loan Obligations has occurred, and subject to the rights of the Grantors under the ABL Loan Documents, to the ABL Agent for the benefit of the ABL Claimholders to the extent required under the ABL Security Documents and then, to the extent no ABL Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct and (iii) if the ABL Agent or any ABL Claimholders shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to Term Loan Priority Collateral in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such Proceeds over to the Term Loan Agent in accordance with the terms of Section 4.2.

(c)    To effectuate the foregoing, and to the extent that the pertinent insurance company agrees to issue such endorsements, the Agents shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to policies which insure Collateral hereunder.

5.3    Amendments to ABL Loan Documents and Term Loan Documents; Refinancing.

(a)    Subject to Sections 5.3(c) and 5.3(d), the ABL Loan Documents and Term Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms, all without affecting the Lien subordination or other provisions of this Agreement and the Financing Orders and (ii) the ABL Obligations may be Refinanced without notice to, or the consent of the Term Loan Agent or the Term Loan Claimholders and without affecting the Lien subordination or other provisions of this Agreement, and the Term Loan

Obligations may be Refinanced without notice to, or consent of, the ABL Agent or the ABL Claimholders and without affecting the Lien subordination and other provisions of this Agreement; provided, however, that, in each case, the lenders or holders of such Refinancing debt bind themselves in a writing addressed to the Term Loan Agent and the Term Loan Claimholders or the ABL Agent and the ABL Claimholders, as applicable, to the terms of this Agreement; provided further, however, that, if such Refinancing debt is secured by a Lien on any Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof regardless of whether or not such writing is provided. For the avoidance of doubt, the sale or other transfer of Indebtedness is not restricted by this Agreement but the provisions of this Agreement shall be binding on all holders of ABL Obligations and Term Loan Obligations.

(b)      Subject to Sections 5.3(c) and 5.3(d), the ABL Agent and the Term Loan Agent shall each use good faith efforts to notify the other party of any written amendment or modification to the ABL Documents and Term Loan Documents, but the failure to do so shall not create a cause of action against the party failing to give such notice or create any claim or right on behalf of any third party.

(c)      Without the consent of the Term Loan Agent, the ABL Claimholders will not be entitled to agree (and will not agree) to any amendment to or modification of the ABL Loan Documents, whether in a Refinancing or otherwise that (i) is not permitted by the Term Loan Agreements as in effect on the date hereof; (ii) results in the ABL Obligations under the ABL Loan Agreement having a maturity date that is prior to the maturity date of the ABL Loan Agreement as in effect on the date hereof; (iii) results in the "Applicable Margin" for ABL Obligations outstanding under the ABL Loan Agreement (whether in the form of interest rate margins, original issue discount (equal to interest based on an assumed four year life to maturity), upfront fees (which shall be deemed to constitute a like amount of original issue discount) or the imposition of any Base Rate or LIBOR floor, but excluding the impact of arrangement, structuring or other fees payable in connection therewith that are not shared with all ABL Claimholders), exceeding the Applicable Margin for the related type of such ABL Obligations by more than 300 basis points above the "Applicable Margin" for such type of ABL Obligations as provided in the ABL Loan Agreement as in effect on the date hereof (but excluding any increase resulting from imposition of interest at the default rate as in effect on the date hereof); or (iv) limits or prohibits payments otherwise permitted to be made under the ABL Credit Agreement as in effect on the date hereof on account of the Term Loan Obligations.

(d)      Without the consent of the ABL Agent, the Term Loan Agent and the Term Loan Claimholders will not be entitled to agree (and will not agree) to any amendment to or modification of the Term Loan Documents, whether in a Refinancing or otherwise, that (i) is not permitted by the ABL Loan Agreement as in effect on the date hereof (or, if less restrictive to the Term Loan Claimholders, on the date of such amendment or modification); (ii) results in the Term Loan Obligations having a maturity date that is prior to or a Weighted Average Life that is shorter than, the maturity date and the Weighted Average Life, respectively, of the Term Loan Obligations under the Term Loan Credit Agreement as in effect on the date hereof; (iii) results in the "Applicable Margin" for Term Loan Obligations outstanding under the Term Loan Credit Agreement (whether in the form of interest rate margins, original issue discount (equal to interest based on an assumed four-year life to maturity), upfront fees (which shall be deemed to constitute a like amount of original issue discount) or the imposition of any Base Rate or LIBOR

35

floor in excess of 1.5% and 0.5%, respectively, but excluding the impact of arrangement, structuring or other fees payable in connection therewith that are not shared with all Term Loan Claimholders), exceeding the "Applicable Margin" for the related type of such Term Loan Obligations by more than 300 basis points above the "Applicable Margin" for such type of Term Loan Obligations as provided in the Term Loan Credit Agreement as in effect on the date hereof (but excluding any increase resulting from imposition of interest at the default rate as in effect on the date hereof); (iv) limits or prohibits payments or the incurrence of debt otherwise permitted to be made or incurred under the Term Loan Agreements as in effect on the date hereof on account of the ABL Obligations; (v) increases the amount of any scheduled principal payment of the Term Loan Obligations; (vi) accelerates the timing or increases the frequency of any scheduled principal payment or any interest payment of the Term Loan Obligations; (vii) adds any additional mandatory redemption, put or prepayment provisions or amends in any material respect any existing mandatory redemption, put or prepayment provisions of the Term Loan Credit Agreement to increase the amount of or accelerate the timing or increase the frequency of the prepayment provisions contemplated thereby; or (viii) modifies any covenant in a manner or adds any representation, covenant or default that is materially adverse to any ABL Lender. For avoidance of doubt, any amendment to or modification of the Term Loan Documents, whether in a Refinancing or otherwise, the effect of which is to permit or cause the capitalization of interest otherwise permitted to be paid in cash with respect to the Term Loan Obligations or to add or permit the payment of any fees through capitalization with respect thereto shall not be restricted pursuant to this Section 5.3(d) or otherwise.

(e)     So long as the Discharge of ABL Obligations has not occurred, the Term Loan Agent agrees that each applicable Term Loan Security Document shall include the following language (or similar language acceptable to the ABL Agent): "Notwithstanding anything herein to the contrary, the liens and security interests granted to Silver Point Finance, LLC, as Collateral Agent, pursuant to this Agreement and the exercise of any right or remedy by Silver Point Capital, as Collateral Agent hereunder, are subject to the provisions of the ABL/TL DIP Intercreditor Agreement dated as of March 12, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as Term Loan Agent and the Grantors (as defined in the Intercreditor Agreement) from time to time party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(f)     So long as the Discharge of Term Loan Obligations has not occurred, the ABL Agent agrees that each applicable ABL Security Document shall include the following language (or similar language acceptable to the Term Loan Agent): "Notwithstanding anything herein to the contrary, the liens and security interests granted to Bank of America, N.A., as Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by Bank of America, N.A., as Collateral Agent hereunder, are subject to the provisions of the ABL/TL DIP Intercreditor Agreement dated as of March 12, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as Term Loan Agent and the Grantors (as defined in the Intercreditor Agreement) from time to time party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(g)     So long as the Discharge of Term Loan Obligations has not occurred, the ABL Agent agrees (i) that neither the ABL Agent nor any ABL Claimholder shall be entitled to amend or shall agree to amend the ABL Documents in any manner that shortens the time periods of any Sale Benchmarks (as defined in the ABL Loan Agreement as in effect on the date hereof) without the prior written consent of the Term Loan Agent, and (ii) that any amendment or modification made by Term Loan Lenders to the Sale Covenants (as defined in the Term Loan Agreement and which correspond to the Sale Benchmarks under the ABL Documents) extending the deadlines of any such Sale Covenant by up to 30 days each, shall be deemed to and shall have the automatic and immediate effect of amending the corresponding Sale Benchmarks in the ABL Loan Agreement by a like amount, all without further consent, notice or action by any Person; provided, however, that the deadline for closing a Sale (as defined in the ABL Loan Agreement) may not be extended to a date after August 19, 2015, without the prior written consent of the ABL Agent.

5.4     Bailees for Perfection.

(a)     Each Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon (such Collateral, which shall include without limitation Account Agreements, Instruments and Capital Stock, being the "Pledged Collateral") as (i) in the case of the ABL Agent, the collateral agent for the ABL Claimholders under the ABL Loan Documents or, in the case of the Term Loan Agent, the collateral agent for the applicable Term Loan Claimholders under the Term Loan Documents and (ii) non-fiduciary gratuitous bailee for the benefit of and on behalf of the other Agents (such bailment being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the ABL Loan Documents and the Term Loan Documents, respectively, subject to the terms and conditions of this Section 5.4. The Term Loan Agent and the Term Loan Claimholders hereby appoint the ABL Agent as their non-fiduciary gratuitous bailee for the purposes of perfecting their security interest in all Deposit Accounts and Securities Accounts of the Grantors. The ABL Agent and the other ABL Claimholders hereby appoint the Term Loan Agent as their non-fiduciary gratuitous bailee for the purposes of perfecting their security interest in all Pledged Collateral in which the Term Loan Agent has a perfected security interest under the UCC. Each of the ABL Agent and the Term Loan Agent hereby accepts such appointments pursuant to this Section 5.4(a) and acknowledges and agrees that it shall act for the benefit of the other Claimholders with respect to any Pledged Collateral and that any proceeds received by such Agent with respect to any Pledged Collateral shall be applied in accordance with Article IV. In furtherance of the foregoing, each Grantor hereby grants a security interest in the Pledged Collateral, all Deposit Accounts and all Securities Accounts to (x) the Term Loan Agent for the benefit of the ABL Claimholders and (y) the ABL Agent for the benefit of the Term Loan Claimholders.

(b)     Neither Agent shall have any obligation whatsoever to the other Agent, to any other ABL Claimholder, or to any other Term Loan Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The duties or responsibilities of the respective Agents under this Section 5.4 shall be limited solely to holding the Pledged Collateral

as bailee in accordance with this <u>Section 5.4</u> and delivering the Pledged Collateral or Proceeds thereof upon a Discharge of ABL Obligations or Discharge of Term Loan Obligations, as applicable, as provided in paragraph (d) below.

(c)     Neither Agent acting pursuant to this <u>Section 5.4</u> shall have by reason of the ABL Loan Documents, the Term Loan Documents, this Agreement or any other document a fiduciary relationship in respect of the other Agent, any other ABL Claimholder or any other Term Loan Claimholder.

(d)     Upon the Discharge of ABL Obligations or the Discharge of Term Loan Obligations, as applicable, the Agent under the ABL Loan Agreement or applicable Term Loan Agreement that has been discharged shall deliver the remaining Pledged Collateral (if any) in its possession together with any necessary endorsements, <u>first</u>, to the other Agent to the extent the other Obligations remain outstanding, and <u>second</u>, to the applicable Grantor to the extent the Discharge of ABL Obligations and the Discharge of Term Loan Obligations have occurred (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as otherwise required by law. Each Agent further agrees to take, at Grantors' expense, all other action reasonably requested by the other Agent in connection with the other Agent obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct. Notwithstanding anything to the contrary contained in this Agreement, any obligation of the Agent, which has been discharged, to make any delivery to the other Agent under this <u>Section 5.4(d)</u> or <u>Section 5.5</u> is subject to (i) the order of any court of competent jurisdiction, or (ii) any automatic stay imposed in connection with any of the Cases.

(e)     Subject to the terms of this Agreement, (i) so long as the Discharge of ABL Obligations has not occurred, the ABL Agent shall be entitled to deal with the Pledged Collateral or Collateral within its "control" in accordance with the terms of this Agreement and other ABL Loan Documents, but only to the extent that such Collateral constitutes ABL Priority Collateral, as if the Liens of the Term Loan Agent on behalf of the Term Loan Claimholders did not exist, and (ii) so long as the Discharge of Term Loan Obligations has not occurred, the Term Loan Agent shall be entitled to deal with the Pledged Collateral or Collateral within its "control" in accordance with the terms of this Agreement and other Term Loan Documents, but only to the extent that such Collateral constitutes Term Loan Priority Collateral, as if the Liens of the ABL Agent on behalf of the ABL Claimholders did not exist.

5.5     <u>When Discharge of ABL Obligations and Discharge of Term Loan Obligations Deemed to Not Have Occurred</u>.    If at any time after the Discharge of ABL Obligations or a Discharge of Term Loan Obligations, the Grantors shall enter into any Permitted Refinancing of any ABL Obligation or Term Loan Obligation, as applicable, then such Discharge of ABL Obligations or the Discharge of Term Loan Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such first Discharge of ABL Obligations or the Discharge of Term Loan Obligations in order to effectuate such discharge among (i) the agent(s) and other claimholders under the facility to be discharged, (ii) the agents and other claimholders under the new facility, and (iii) the Grantors, and, from and after the date on which the New Debt Notice is delivered to the appropriate Agent in accordance with the next sentence, the obligations under such Permitted Refinancing shall automatically be treated as ABL Obligations or Term

Loan Obligations for all purposes of this Agreement, as applicable, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the ABL Agent and the Term Loan Agent, as applicable, under such new ABL Loan Documents or Term Loan Documents, as applicable, shall be the ABL Agent or Term Loan Agent, as applicable, for all purposes of this Agreement). Upon receipt of a notice (the "New Debt Notice") stating that the Grantors have entered into new ABL Loan Documents or new Term Loan Documents (which notice shall include a complete copy of the relevant new documents and provide the identity of the new Agent, such agent, the "New Agent"), each other Agent, upon written request of the New Agent, shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Grantors or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the then terms of this Agreement based on the Lien priorities and related rights and obligations previously held by the former Agent replaced by the New Agent and (b) deliver to the New Agent (if appropriate, based on the Lien priorities and related rights and obligations previously held by the former Agent replaced by the New Agent) any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral (if appropriate, based on the Lien priorities and related rights and obligations previously held by the former Agent replaced by the New Agent)). In accordance with Section 5.3(a), the New Agent shall agree in a writing addressed to the other Agent and the ABL Claimholders or the Term Loan Claimholders, as applicable, to be bound by the terms of this Agreement.

      5.6     Option to Purchase ABL Obligations.

      (a)     If (i) the ABL Obligations have been accelerated, (ii) the ABL Agent delivers a notice of its intent to sell or otherwise dispose of all or a material portion of the Collateral, (iii) any Case is converted to chapter 7, (iv) the Term Loan Obligations have been accelerated and written notice thereof has been timely provided to the ABL Agent, or (v) there has been a payment default under the ABL Loan Agreement or the Term Loan Documents (and written notice thereof has been timely provided to the ABL Agent), any or all of the Term Loan Claimholders shall have the option (the "Purchase Option") to purchase from the ABL Claimholders all (and not less than all) of the ABL Obligations, Pre-Petition ABL Obligations and Bank Product Debt. The ABL Agent agrees that it will give the Term Loan Agent written notice (the "ABL Enforcement Notice") not less than ten Business Days prior to commencing any Enforcement Action with respect to Collateral or any acceleration of the ABL Obligations (which notice shall be effective for all Enforcement Actions taken after the date of such notice so long as the ABL Agent is diligently pursuing in good faith such Enforcement Actions, or diligently attempting in good faith to vacate any stay of enforcement rights of the Liens on all or a material portion of the Collateral); provided, however, in the event of any Exigent Circumstance that results in any such acceleration or enforcement, the ABL Agent shall not be required to give such ten Business Days' notice and shall instead give such notice as soon as practicable. In order for the Purchase Option to be exercised, the Term Loan Agent, on behalf of the Term Loan Claimholders exercising such option, must provide a written notice (the "ABL Purchase Notice") to the ABL Agent in a manner so that the ABL Purchase Notice is actually received by the ABL Agent no later than 5:00 p.m. (prevailing eastern time) on the tenth Business Day following the provision of the ABL Enforcement Notice by the ABL Agent. The ABL Purchase Notice from the Term Loan Agent to the ABL Agent shall be irrevocable. Upon

receipt of any such ABL Purchase Notice, the ABL Agent shall not commence, or, if previously commenced, shall not continue (to the extent possible), any Enforcement Actions, accelerate the ABL Obligations or the Bank Product Debt or exercise any other remedies under <u>Article III</u> of this Agreement; <u>provided</u>, <u>however</u>, the ABL Agent shall be able to commence, or if previously commenced, continue any Enforcement Action in the event that (i) any Exigent Circumstance occurs or (ii) the ABL Purchase (as defined below) is not consummated on or before the date specified in the ABL Purchase Notice in accordance with this <u>Section 5.6</u>.

(b)     On or before the date specified by the Term Loan Agent in the ABL Purchase Notice (which shall be a Business Day not less than five Business Days, nor more than ten (10) Business Days, after receipt by the ABL Agent of the ABL Purchase Notice), the ABL Claimholders shall, subject to any required approval of any court or other governmental authority then in effect, sell to the Term Loan Claimholders electing to purchase pursuant to this <u>Section 5.6</u> (the "<u>Term Claimholder Purchasing Parties</u>"), and the Term Loan Claimholder Purchasing Parties shall purchase (the "<u>ABL Purchase</u>") from the ABL Claimholders all (and not less than all) of the ABL Obligations, Pre-Petition ABL Obligations and Bank Product Debt; <u>provided</u>, that the ABL Purchase shall not in any way affect any rights of the ABL Claimholders with respect to indemnification and other obligations of the Grantors under the ABL Loan Documents that are expressly stated to survive the termination of the ABL Loan Documents (the "<u>Surviving ABL Obligations</u>").

(c)     Without limiting the obligations of the Grantors under the ABL Loan Documents to the ABL Claimholders with respect to the Surviving ABL Obligations, on the date of the ABL Purchase, the Term Claimholder Purchasing Parties shall (i) pay to the ABL Claimholders as the purchase price (the "<u>ABL Purchase Price</u>") the full amount of all ABL Obligations (other than contingent indemnification obligations), plus the full amount of all Pre-Petition ABL Obligations (other than contingent indemnification obligations), plus the amount of all Bank Product Debt then due and payable, (ii) furnish cash or cash equivalents, and any interest or other income earned thereon, to the ABL Agent in such amounts as the ABL Agent determines is reasonably necessary to cash collateralize any Bank Product Debt not then due and payable, without prejudice to the right of such ABL Claimholders to terminate any such Bank Products at any time, (iii) furnish cash or cash equivalents, and any interest or other income earned thereon, to the ABL Agent in such amounts as the ABL Agent determines is reasonably necessary to cash collateralize any ABL Obligations and Pre-Petition ABL Obligations that are outstanding letters of credit under the ABL Loan Agreement and the Pre-Petition ABL Loan Agreement (not to exceed 105% of the aggregate undrawn face amount of such letters of credit), and (iv) furnish cash or cash equivalents, and any interest or other income earned thereon, to the ABL Agent in such amounts as the ABL Agent determines is reasonably necessary to cash collateralize for any costs, expenses and contingent indemnification obligations not yet due and payable but with respect to which a claim has been threatened or asserted under any ABL Loan Document.

(d)     The ABL Purchase Price and any cash collateral pursuant to <u>Section 5.6(c)</u> shall be remitted by wire transfer in immediately available funds to such account of the ABL Agent as it shall designate to the Term Claimholder Purchasing Parties. The ABL Agent shall, promptly following its receipt thereof, distribute the amounts received by it in respect of the ABL Purchase Price to the ABL Claimholders in accordance with the ABL Loan

Agreement and Pre-Petition ABL Loan Agreement, as applicable, and the terms of the Bank Product Debt. Interest shall be calculated to but excluding the day on which the ABL Purchase occurs if the amounts so paid by the Term Claimholder Purchasing Parties to the account designated by the ABL Agent are received in such account prior to 2:00 p.m., New York City time, and interest shall be calculated to and including such day if the amounts so paid by the Term Claimholder Purchasing Parties to the account designated by the ABL Agent are received in such account later than 2:00 p.m., New York City time.

(e)     The ABL Purchase shall be made without representation or warranty of any kind by the ABL Claimholders as to the ABL Obligations, Pre-Petition ABL Obligations or the Bank Product Debt, the ABL Collateral or otherwise and without recourse to the ABL Claimholders, except that the ABL Claimholders shall represent and warrant: (i) the amount of the ABL Obligations, Pre-Petition ABL Obligations and Bank Product Debt being purchased and cash collateralized, (ii) that the ABL Claimholders own the ABL Obligations, Pre-Petition ABL Obligations and Bank Product Debt free and clear of any Liens and (iii) that the ABL Claimholders have the right to assign the ABL Obligations, Pre-Petition ABL Obligations and Bank Product Debt and the assignment is duly authorized.

## VI.    CREDIT BIDDING.

6.1     The Term Loan Claimholders agree that the ABL Claimholders shall have the right to credit bid under Section 363(k) of the Bankruptcy Code (or any other similar provision of any Bankruptcy Law) with respect to any Disposition of the ABL Priority Collateral and the ABL Claimholders agree that the Term Loan Claimholders shall have the right to credit bid under Section 363(k) of the Bankruptcy Code (or any other similar provision of any Bankruptcy Law) with respect to any Disposition of the Term Loan Priority Collateral; provided that the Claimholders shall not be deemed to have agreed to any credit bid by other Claimholders in connection with the Disposition of Collateral consisting of both Term Loan Priority Collateral and ABL Priority Collateral except as may be allowed pursuant to this Section 6.1.1 or Section 6.22. The Term Loan Agent, for itself and on behalf of the other Term Loan Claimholders, agrees that, except as provided in Section 6.22, so long as the Discharge of ABL Obligations has not occurred (or will not occur immediately upon consummation of such Disposition), no Term Loan Claimholder shall, without the prior written consent of the ABL Agent, credit bid under Section 363(k) of the Bankruptcy Code with respect to any Disposition of ABL Priority Collateral or any Disposition consisting of both Term Loan Priority Collateral and ABL Priority Collateral except as may be allowed pursuant to this Section.  The ABL Agent, for itself and on behalf of the other ABL Claimholders, agrees that, except as provided in Section 6.2.2, so long as the Discharge of Term Loan Obligations has not occurred (or will not occur immediately upon consummation of such Disposition), no ABL Claimholder shall, without the prior written consent of the Term Loan Agent, credit bid under Section 363(k) of the Bankruptcy Code with respect to any Disposition of the Term Loan Priority Collateral or any Disposition consisting of both Term Loan Priority Collateral and ABL Priority Collateral except as may be allowed pursuant to this Section.

6.2     The Term Loan Agent, for itself and on behalf of the other Term Loan Claimholders, shall, without the prior written consent of the ABL Agent, have the right to credit bid all or any portion of the Term Loans in connection with any Disposition under Section

363(k) of the Bankruptcy Code consisting of both Term Loan Priority Collateral and ABL Priority Collateral, provided that any such credit bid provides for and results in Discharge of ABL Obligations at closing. The ABL Agent, for itself and on behalf of the other ABL Claimholders, shall, without the prior written consent of the Term Loan Agent, have the right credit bid all or any portion of the ABL Obligations in connection with any Disposition under Section 363(k) of the Bankruptcy Code consisting of both Term Loan Priority Collateral and ABL Priority Collateral, provided that any such credit bid provides for and results in Discharge of Term Loan Obligations at closing.

## VII.    RELIANCE; WAIVERS; ETC.

7.1    <u>Reliance</u>.    Other than any reliance on the terms of this Agreement, the ABL Agent, on behalf of the ABL Claimholders, acknowledges that it and the other ABL Claimholders have, independently and without reliance on the Term Loan Agent or any Term Loan Claimholder, and based on documents and information deemed by it appropriate, made its own credit analysis and decision to enter into ABL Loan Documents and be bound by the terms of this Agreement, and it will continue to make its own credit decision in taking or not taking any action under the ABL Loan Documents or this Agreement. Other than any reliance on the terms of this Agreement, the Term Loan Agent, on behalf of the Term Loan Claimholders acknowledges that they and the other Term Loan Claimholders have, independently and without reliance on the ABL Agent or any other ABL Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the other Term Loan Documents and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the Term Loan Documents or this Agreement.  The Term Loan Agent and the ABL Agent represents and warrants to the other parties hereto that it is authorized and/or directed under the Term Loan Agreement and the ABL Loan Agreement, as the case may be, to enter into this Agreement.

7.2    <u>No Warranties or Liability</u>.    The ABL Agent, on behalf of itself and the ABL Claimholders, acknowledges and agrees that the Term Loan Agent and the Term Loan Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the other Term Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided in this Agreement, the Term Loan Agent and the Term Loan Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Term Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.  The Term Loan Agent, on behalf of itself and the Term Loan Claimholders, acknowledges and agrees that the ABL Agent and the other ABL Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the other ABL Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the ABL Agent and the other ABL Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective ABL Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Term Loan Agent and the Term Loan Claimholders shall have no duty to the ABL Agent or any of the ABL Claimholders, and the ABL Agent and the other ABL Claimholders shall have no duty to the Term Loan Agent or any

of the other Term Loan Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements any Grantor (including the ABL Loan Documents and the Term Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

7.3    <u>No Waiver of Lien Priorities</u>.

(a)    No right of the Agents, the other ABL Claimholders or the other Term Loan Claimholders to enforce any provision of this Agreement or any ABL Loan Document or Term Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Grantor or by any act or failure to act by such Agents, ABL Claimholder or Term Loan Claimholders or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the ABL Loan Documents or any of the Term Loan Documents, regardless of any knowledge thereof which the Agents or the ABL Claimholders or Term Loan Claimholders, or any of them, may have or be otherwise charged with.

(b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Grantors under the ABL Loan Documents and Term Loan Documents and subject to the provisions of <u>Sections 5.3(a)</u>, <u>5.3(c)</u> and, as applicable, <u>5.3(c)</u>, the Agents, the other ABL Claimholders and the other Term Loan Claimholders may, at any time and from time to time in accordance with the ABL Loan Documents and Term Loan Documents and/or applicable law, without the consent of, or notice to, the other Agent or the ABL Claimholder or the Term Loan Claimholders (as applicable), without incurring any liabilities to such Persons and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy is affected, impaired or extinguished thereby) do any one or more of the following:

(i)    change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Obligations or any Lien or guaranty thereof or any liability of any Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the Agents or any rights or remedies under any of the ABL Loan Documents or the Term Loan Documents;

(ii)    sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral (except to the extent provided in this Agreement) or any liability of any Grantor or any liability incurred directly or indirectly in respect thereof;

(iii)    settle or compromise any Obligation or any other liability of any Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and

43

however realized to any liability in any manner or order that is not inconsistent with the terms of this Agreement; and

(iv)    exercise or delay in or refrain from exercising any right or remedy against any security or any Grantor or any other Person, elect any remedy and otherwise deal freely with any Grantor.

7.4    <u>Obligations Unconditional</u>.    All rights, interests, agreements and obligations of the ABL Agent, the Term Loan Agent, the ABL Claimholders and the Term Loan Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any ABL Loan Documents or any Term Loan Documents;

(b)    except, in each case, as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the ABL Obligations or Term Loan Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Loan Document or any Term Loan Document;

(c)    except as otherwise expressly set forth in this Agreement, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Loan Obligations or any guaranty thereof;

(d)    the status (including the dismissal or conversion to Chapter 7) of any of the Cases; or

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the ABL Agent, the ABL Obligations, any ABL Claimholder, the Term Loan Agent, the Term Loan Obligations or any Term Loan Claimholder in respect of this Agreement.

## VIII.    MISCELLANEOUS.

8.1    <u>Conflicts</u>. In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Loan Document or any Term Loan Document, the provisions of this Agreement shall govern and control.

8.2    <u>Effectiveness; Continuing Nature of this Agreement; Severability</u>. This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of Lien subordination (as opposed to an agreement of debt or claim subordination), and the ABL Claimholders and Term Loan Claimholders may continue, at any time and without notice to the other Agent, to extend credit and other financial accommodations and lend monies to or for the benefit of any Grantor in reliance hereon. Each of the Agents, on behalf of the ABL Claimholders or the Term Loan Claimholders, as applicable, hereby irrevocably, absolutely, and unconditionally waives any right any Claimholder may have under

applicable law to revoke this Agreement or any of the provisions of this Agreement. Consistent with, but not in limitation of, the preceding sentence, each of the Agents, on behalf of the ABL Claimholders and the Term Loan Claimholders, as applicable, irrevocably acknowledges that this Agreement constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to any Grantor shall include such Grantor as debtor and debtor-in-possession and any receiver or trustee for any Grantor (as applicable) in the Cases. This Agreement shall terminate and be of no further force and effect:

> (a)   with respect to the ABL Agent, the ABL Claimholders and the ABL Obligations, the date of the Discharge of ABL Obligations; and

> (b)   with respect to the Term Loan Agent, the Term Loan Claimholders and the Term Loan Obligations, the date of the Discharge of Term Loan Obligations.

8.3   <u>Amendments; Waivers</u>. Except for the execution and delivery of any joinder agreement or other joinder document, in each case, substantially in the form of <u>Exhibit A</u> hereto and delivered in accordance with the provisions hereof, no amendment, modification or waiver of any of the provisions of this Agreement by the Term Loan Agent or the ABL Agent shall be deemed to be made unless the same shall be in writing signed on behalf of the Term Loan Agent and the ABL Agent or their authorized agents (it being understood that for any amendment in connection with the removal or departure of an Agent in accordance with the terms of the relevant ABL Loan Documents or Term Loan Documents such Agent need not consent to such amendment) and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, (i) no Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights are directly and adversely affected, and (ii) the appointment of a new Agent and the resignation of a departing Agent may be evidenced by a joinder agreement, substantially in the form of <u>Exhibit A</u> hereto to which each Borrower will be deemed to have agreed by virtue of its signature below.

8.4   <u>Information Concerning Financial Condition of the Grantors and Their Subsidiaries</u>. The ABL Claimholders, on the one hand, and the Term Loan Claimholders, on the other hand, shall not be responsible for keeping any other party informed of (a) the financial condition of the Grantors and all endorsers and/or guarantors and other Grantors of the ABL Obligations or the Term Loan Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Term Loan Obligations. Neither the ABL Claimholders, on the one hand, nor the Term Loan Claimholders, on the other hand, shall have any duty to advise the other of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that either the ABL Agent or any of the other ABL Claimholders, on the one hand, or the Term Loan Agent or any of the other Term Loan Claimholders, on the other hand, undertakes at any time or from time to time to provide any such

45

information to any of the others, it or they shall be under no obligation, (i) to make, and shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) to provide any additional information or to provide any such information on any subsequent occasion, (iii) to undertake any investigation, or (iv) to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5     Subrogation.

(a)     With respect to the value of any payments or distributions in cash, property or other assets that the Term Loan Agent on behalf of any of the Term Loan Claimholders actually pays over to the ABL Agent or the ABL Claimholders under the terms of this Agreement, the Term Loan Claimholders shall be subrogated to the rights of the ABL Claimholders; provided, however, that the Term Loan Agent, on behalf of the Term Loan Claimholders, hereby agree not to assert or enforce all such rights of subrogation they may acquire as a result of any payment hereunder until the Discharge of ABL Obligations has occurred. The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the Term Loan Claimholders that are paid over to the ABL Claimholders pursuant to this Agreement shall not reduce any of the Term Loan Obligations. Notwithstanding the foregoing provisions of this Section 8.5(a), none of the Term Loan Claimholders shall have any claim against any of the ABL Claimholders for any impairment of any subrogation rights herein granted to the Term Loan Claimholders.

(b)     With respect to the value of any payments or distributions in cash, property or other assets that any of the ABL Claimholders actually pays over to the Term Loan Agent under the terms of this Agreement, the ABL Claimholders shall be subrogated to the rights of the Term Loan Claimholders; provided, however, that the ABL Agent, on behalf of the ABL Claimholders, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Term Loan Obligations has occurred. The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the ABL Claimholders that are paid over to the Term Loan Claimholders pursuant to this Agreement shall not reduce any of the ABL Obligations. Notwithstanding the foregoing provisions of this Section 8.5(b), none of the ABL Claimholders shall have any claim against any of the Term Loan Claimholders for any impairment of any subrogation rights herein granted to the ABL Claimholders.

8.6     SUBMISSION TO JURISDICTION; WAIVERS.

(a)     ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PERSON ARISING OUT OF OR RELATING HERETO SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, THE DESIGNATED TERM LOAN AGENT, FOR ITSELF AND ON

46

BEHALF OF THE TERM LOAN CLAIMHOLDERS AND THE ABL AGENT, FOR ITSELF AND ON BEHALF OF THE ABL CLAIMHOLDERS, IRREVOCABLY:

(1)    AGREES THAT THE ONLY NECESSARY PARTIES TO ANY AND ALL JUDICIAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE THE ABL AGENT AND THE DESIGNATED TERM LOAN AGENT, EXCEPT WHERE IN ANY SUCH JUDICIAL PROCEEDING RELIEF (INCLUDING INJUNCTIVE RELIEF OR THE RECOVERY OF MONEY) IS BEING SOUGHT DIRECTLY AGAINST OR FROM ANOTHER PERSON AND EXCEPT THAT, IN ANY SUCH JUDICIAL PROCEEDINGS BETWEEN THE DESIGNATED TERM LOAN AGENT AND THE ABL AGENT THAT DOES NOT SEEK ANY RELIEF AGAINST OR FROM THE GRANTORS, THE GRANTORS SHALL NOT BE NECESSARY PARTIES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AND CONSISTENT WITH THE PROVISIONS OF SECTIONS 8.14 AND 8.17, NONE OF THE ABL CLAIMHOLDERS (OTHER THAN THE ABL AGENT) OR THE TERM LOAN CLAIMHOLDERS SHALL BE NECESSARY OR OTHERWISE APPROPRIATE PARTIES TO ANY SUCH JUDICIAL PROCEEDINGS, UNLESS IN SUCH JUDICIAL PROCEEDING SUMS ARE BEING SOUGHT TO BE RECOVERED DIRECTLY FROM SUCH PERSONS, INCLUDING PURSUANT TO SECTION 4.2.

(2)    ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;

(3)    WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*;

(4)    AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PERSON (AND IN THE CASE OF A PARTY, AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.7); AND

(5)    AGREES THAT SERVICE AS PROVIDED IN CLAUSE (4) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PERSON IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(b)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN

CONNECTION WITH THIS AGREEMENT, ANY OF THE ABL LOAN DOCUMENTS OR ANY OF THE TERM LOAN DOCUMENTS. EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE ABL LOAN DOCUMENTS AND THE TERM LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.6.

8.7    Notices.  All notices permitted or required under this Agreement need be sent only to the Term Loan Agent and the ABL Agent, as applicable, in order to be effective and otherwise binding on any applicable Claimholder. If any notice is sent for whatever reason to the other Term Loan Claimholders or the ABL Claimholders, such notice shall also be sent to the applicable Agent. Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by overnight courier service and signed for against receipt thereof, upon receipt of facsimile during normal business hours, or three Business Days after depositing it in the United States certified mails (return receipt requested) with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.8    Further Assurances.  The ABL Agent, on behalf of the ABL Claimholders, and the Term Loan Agent, on behalf of the Term Loan Claimholders, and the Grantors, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested), at the Grantors' expense, as the ABL Agent or the Term Loan Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement. Without limiting the generality of the foregoing, all such Persons agree upon request by the ABL Agent or the Designated Term Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Priority Collateral or the Term Loan Priority Collateral, and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Loan Documents and the Term Loan Documents.

8.9    APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.10    Specific Performance.  Each of the ABL Agent and the Term Loan Agent may demand specific performance of this Agreement. The ABL Agent, on behalf of itself and the ABL Claimholders, and the Term Loan Agent, on behalf of itself and the Term Loan Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any

48

action which may be brought by the ABL Agent or the other ABL Claimholders or the Term Loan Agent or the Term Loan Claimholders, as applicable. Without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance, the ABL Agent may seek such relief as if it were the "holder" of the claims of a Term Loan Claimholder under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by a Term Loan Claimholder, and the Term Loan Agent may seek such relief as if it were the "holder" of the claims of an ABL Claimholder under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by an ABL Claimholder.

8.11    Headings.    Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

8.12    Counterparts.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

8.13    Authorization.    By its signature, each party hereto represents and warrants to the other parties hereto that the individual signing this Agreement on its behalf is duly authorized to execute this Agreement. The Term Loan Agent hereby represents that it is authorized to, and by its signatures hereon do, bind the other Term Loan Claimholders to the terms of this Agreement. The ABL Agent hereby represents that it is authorized to, and by its signature hereon does, bind the other ABL Claimholders to the terms of this Agreement.

8.14    No Third Party Beneficiaries.    This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of (and shall be binding upon) each of the Agents, the other ABL Claimholders and the other Term Loan Claimholders and their respective successors and assigns. Without limiting the generality of the foregoing, each of the Term Loan Credit Agreement, and the ABL Loan Agreement shall expressly refer to this Agreement and acknowledge that its provisions shall be binding on the Term Loan Agent, and the other Term Loan Claimholders (and their respective successors and assigns) and on the ABL Agent and the other ABL Claimholders (and their respective successors and assigns), as applicable, and, in any event, this Agreement shall be binding on the Agents, the other ABL Claimholders, and the other Term Loan Claimholders and their respective successors and assigns as if its provisions were set forth in their entirety in the Term Loan Credit Agreement and the ABL Loan Agreement.

8.15    Provisions Solely to Define Relative Rights.    The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Claimholders on the one hand and the Term Loan Claimholders on the other hand. No Grantor or any other creditor thereof shall have any rights hereunder, and no Grantor may rely on the terms hereof. Nothing in this Agreement is intended to or shall impair as between the Grantors and the ABL Agent and the other ABL Claimholders, or as between the Grantors and the Term Loan

Agent and the other Term Loan Claimholders, the obligations of any Grantor, which are absolute and unconditional, to pay principal, interest, fees and other amounts as provided in the other ABL Loan Documents and the other Term Loan Documents, respectively, including as and when the same shall become due and payable in accordance with their terms.

        8.16   <u>Marshalling of Assets</u>.  The Term Loan Agent, on behalf of the Term Loan Claimholders, hereby irrevocably, absolutely, and unconditionally waives any and all rights or powers any Term Loan Claimholder may have at any time under applicable law or otherwise to have the ABL Priority Collateral, or any part thereof, marshaled upon any foreclosure or other enforcement of the ABL Agent's Liens. The ABL Agent, on behalf of the ABL Claimholders, hereby waives irrevocably, absolutely, and unconditionally any and all rights any ABL Claimholder may have at any time under applicable law or otherwise to have the Term Loan Priority Collateral, or any part thereof, marshaled upon any foreclosure or other enforcement of the Term Loan Agent's Liens.

8.17   <u>Exclusive Means of Exercising Rights under this Agreement</u>.

        (a)   The Term Loan Claimholders shall be deemed to have irrevocably appointed the Term Loan Agent as their respective and exclusive agent hereunder. Consistent with such appointment, the Term Loan Claimholders shall be deemed to have agreed that only the Term Loan Agent (and not any individual Claimholder or group of Claimholders) shall have the exclusive right to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement). Specifically, but without limiting the generality of the foregoing, each Term Loan Lender or group of Term Loan Lenders shall not be entitled to take or file, but instead shall be precluded from taking or filing, any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement) or in otherwise relation to the Collateral.

        (b)   The ABL Claimholders shall be deemed to have irrevocably appointed the ABL Agent, as their respective and exclusive agent hereunder. Consistent with such appointment, the ABL Claimholders further shall be deemed to have agreed that only the ABL Agent (and not any individual Claimholder or group of Claimholders) shall have the exclusive right to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); <u>provided</u>, that (i) ABL Claimholders holding obligations in respect of Bank Products may exercise customary netting rights with respect thereto, (ii) cash collateral may be held pursuant to the terms of the ABL Loan Documents (including any relating to Bank Products) and any such individual ABL Claimholder may act against such Collateral, and (iii) subject to the provisions of this Agreement, the ABL Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them. Specifically, but without limiting the generality of the foregoing, each ABL Lender or group of ABL Lenders, shall not be entitled to take or file, but instead shall be precluded from taking or filing, any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce

50

the provisions of this Agreement) or in otherwise relation to the Collateral, except solely as provided in the proviso in the preceding sentence.

8.18    Interpretation.    This Agreement is a product of negotiations among representatives of, and has been reviewed by counsel to, the Term Loan Agent, the ABL Agent, Borrowers and the other Grantors from time to time parties hereto, and is the product of those Persons on behalf of themselves and the Term Loan Claimholders (in the case of the Term Loan Claimholders) and the ABL Claimholders (in the case of the ABL Claimholders). Accordingly, this Agreement's provisions shall not be construed against, or in favor of, any party or other Person merely by virtue of that party or other Person's involvement, or lack of involvement, in the preparation of this Agreement and of any of its specific provisions.

8.19    Certain Terms Concerning ABL Agent and Term Loan Agent.    Neither the ABL Agent nor the Term Loan Agent shall have any liability or responsibility for the actions or omissions of any other Secured Party, or for any other Secured Party's compliance with (or failure to comply with) the terms of this Agreement. Neither the ABL Agent nor the Term Loan Agent shall have individual liability to any Person if it shall mistakenly pay over or distribute to any Secured Party (or the Issuers) any amounts in violation of the terms of this Agreement, so long as the ABL Agent or the Term Loan Agent, as the case may be, is acting in good faith and without willful misconduct or gross negligence.

8.20    Additional ABL Lenders or Term Loan Lenders.    Each Person that becomes an ABL Lender or a Term Loan Lender after the date hereof shall become a party to this Agreement upon execution and delivery by such Person of a joinder agreement substantially in the form attached hereto as Exhibit A.

8.21    Limited Effect on Existing Intercreditor Agreements.    Nothing in this Agreement is intended or shall be construed to amend, alter, limit, diminish or otherwise affect the rights, remedies, terms or agreements set forth in any other subordination or intercreditor agreement to which the ABL Agent and the Term Loan Agent are parties, including, without limitation, in connection with the Pre-Petition Term Loan Obligations and the Pre-Petition ABL Obligations under the Pre-Petition Intercreditor Agreement, except that by their signatures below, each of Bank of America, N.A., in its capacity as ABL Agent under (and as defined in) the Pre-Petition Intercreditor Agreement, and Silver Point Finance, LLC, in its capacities as First Lien Agent and Second Lien Agent under (and as defined in) the Pre-Petition Intercreditor Agreement, hereby agree as follows:

(a)    They have no objection to the financings or liens contemplated by the Financing Orders, the ABL Loan Agreement or the Term Loan Agreement and agree that consummation of the transactions described therein is permitted by and does not violate in any respect the Pre-Petition Intercreditor Agreement, and

(b)    (i) Discharge of ABL Obligations under (and as defined in) the Pre-Petition Intercreditor Agreement shall not occur unless and until (in addition to the other requirements therefor) Discharge of ABL Obligations under (and as defined in) this Agreement occurs, and (ii) Discharge of Term Loan Obligations under (and as defined in) the Pre-Petition

Intercreditor Agreement shall not occur unless and until (in addition to the other requirements therefor) Discharge of Term Loan Obligations under (and as defined in) this Agreement occurs.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed this ABL/TL DIP Intercreditor Agreement as of the date first written above.

**ABL AGENT:**

**BANK OF AMERICA, N.A.,**
as ABL Agent

By: _____
      Name:  Andrew A. Doherty
      Title:  Senior Vice President

**Notice Address:**

300 Galleria Parkway, Suite 800
Atlanta, Georgia 30339
Attention:  Andrew Doherty or current account
            manager
Fax No.  404-607-3277

with copies (which shall not constitute notice) to:

Parker, Hudson, Rainer & Dobbs LLP
285 Peachtree Center Avenue, NE
1500 Marquis Two Tower
Atlanta, Georgia 30303
Attn:  C. Edward Dobbs
Fax No.: 404-522-8409

[Intercreditor Agreement – Standard Register]

**FIRST LIEN AGENT:**

**SILVER POINT FINANCE, LLC**

By: _____

Name:          Frederick H. Fogel
Title: Authorized Signatory

Notice Address: 2 Greenwich Plaza
                Greenwich, CT 06830
                Attention: Arbab Khalid
                Telephone: (203) 542-4441
                Facsimile: (203) 719-2157

**ACKNOWLEDGED AND AGREED TO BY:**

**BORROWERS:**

**THE STANDARD REGISTER COMPANY**

By: _____
   Name:  Gerard D. Sowar
   Title:   Executive Vice President, General
   Counsel and Secretary

**STANDARD REGISTER INTERNATIONAL,
INC.**

By: _____
   Name:  Gerard D. Sowar
   Title:  Secretary

**STANDARD REGISTER TECHNOLOGIES,
INC.**

By: _____
   Name:  Gerard D. Sowar
   Title:  Secretary

**IMEDCONSENT, LLC**

By: _____
   Name:  Gerard D. Sowar
   Title:  Secretary

**STANDARD REGISTER OF PUERTO RICO
INC.**

By: _____
   Name:  Gerard D. Sowar
   Title:  Secretary

**STANDARD REGISTER HOLDING
COMPANY**

By: _____
Name: Gerard D. Sowar
Title: Secretary


**STANDARD REGISTER TECHNOLOGIES
CANADA ULC**

By: _____
Name: Gerard D. Sowar
Title: Secretary


**STANDARD REGISTER MEXICO HOLDING
COMPANY**

By: _____
Name: Gerard D. Sowar
Title: Secretary


**STANDARD REGISTER HOLDING S.de R.L
de C.V.**

By: _____
Name: Gerard D. Sowar
Title: Secretary


**STANDARD REGISTER de MEXICO, S.de
R.L. de C.V.**

By: _____
Name: Gerard D. Sowar

Title: Secretary

**STANDARD REGISTER SERVICIOS, S.de R.L. de C.V.**

By: _____
Name: Gerard D. Sowar
Title: Secretary

## Exhibit A

### Form of Joinder Agreement

[FORM OF] JOINDER AGREEMENT NO. [__] dated as of [_____], 20[__] (the "Joinder Agreement") to the ABL/TL DIP Intercreditor Agreement dated as of March 12, 2015 (the "Intercreditor Agreement") by and among **BANK OF AMERICA, N.A.**, in its capacity as agent under the ABL Loan Agreement (in such capacity, the "Initial ABL Agent"), and **SILVER POINT FINANCE, LLC**, as Administrative Agent and Collateral Agent under the Term Loan Agreement (in such capacities, the "Initial Term Loan Agent").

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

[B.      [The Borrowers] propose(s) to refinance or replace the indebtedness under the [Initial ABL Loan Agreement] [Initial Term Loan Agreement] and the Person identified in the signature pages hereto as the ["Initial ABL Agent"] ["Initial Term Loan Agent"] (the "New Agent") will serve as the agent, trustee, or other representative for the holders of such refinancing/replacement [ABL Obligations] [Term Loan Obligations] (the "Refinancing Obligations").]

### OR

[B.      Pursuant to the definition of [Initial ABL Agent] [Initial Term Loan Agent], [NAME OF RESIGNING AGENT] wishes to resign as agent and the Person identified in the signature pages hereto as the [Initial ABL Agent] [Initial Term Loan Agent] (the "New Agent") wishes to serve as the replacement agent, trustee, or other representative for the holders of the [ABL Obligations] [Term Loan Obligations].]

C.      The New Agent wishes to become a party to the Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the holders of the [ABL Obligations] [Term Loan Obligations], the rights and obligations of [Initial ABL Agent] [Initial Term Loan Agent] thereunder.  The New Agent is entering into this Joinder Agreement in accordance with the provisions of the Intercreditor Agreement in order to become [ABL Agent] [Term Loan Agent] thereunder.

Accordingly, [NAME OF RESIGNING AGENT, if applicable], the New Agent, and Borrowers agree as follows, for the benefit of the New Agent, Borrowers and each other party to the Intercreditor Agreement:

Section 1.  Accession to the Intercreditor Agreement.  The New Agent (a) hereby accedes and becomes a party to the Intercreditor Agreement as an Agent for the holders of the [ABL Obligations] [Term Loan Obligations], (b) agrees, for itself and on behalf of the holders of such [ABL Obligations] [Term Loan Obligations], to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of an Agent under the Intercreditor Agreement.

387 of 641

Section 2.  <u>Representations, Warranties and Acknowledgement of the New Agent</u>.  The New Agent represents and warrants to each other Agent and to the Secured Parties that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as [Initial ABL Agent] [Initial Term Term Loan Agent] with respect to the [ABL Obligations] [Term Loan Obligations], (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement and (c) the [ABL Loan Documents] [Term Loan Documents] relating to such [ABL Obligations] [Term Loan Obligations] provide that, upon the New Agent's entry into this Joinder Agreement, the secured parties in respect of such [ABL Obligations] [Term Loan Obligations] will be subject to and bound by the provisions of the Intercreditor Agreement.

Section 3.  <u>Counterparts</u>.  This Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Joinder Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Joinder Agreement or such other document or instrument, as applicable.

Section 4.  <u>Benefit of Agreement</u>.  **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Intercreditor Agreement.**

Section 5.  <u>Governing Law</u>.  **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

Section 6.  <u>Severability</u>.  In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 7.  <u>Notices</u>.  All communications and notices hereunder shall be in writing and given as provided in <u>Section 8.7</u> of the Intercreditor Agreement.  All communications and notices hereunder to the New Agent shall be given to it at the address set forth under its signature hereto, which information supplements <u>Section 8.7</u> of the Intercreditor Agreement.

Section 8.  <u>Expenses</u>.  The Borrowers agree to reimburse each Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for each Agent.

IN WITNESS WHEREOF, the New Agent has duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW AGENT], as [ABL
AGENT] [TERM LOAN AGENT]  with
respect to [NAME OF AGREEMENT]
and holders of the [ABL Obligations]
[Term Loan Obligations] thereunder


By:   _____
        Name:
        Title:

Address for notices:


_____

_____

_____

attention of:   _____

Telecopy:   _____

Acknowledged by:

BANK OF AMERICA, N.A.,
as Initial ABL Agent


By: _____
　　　Name:
　　　Title:



SILVER POINT FINANCE, LLC, as
Initial Term Loan Agent


By: _____
　　　Name:
　　　Title:

**NON-POSSESSORY     PLEDGE AGREEMENT** (the "<u>Agreement</u>") entered into by and among:

(i) Standard Register Holding, S. de R.L. de C.V. ( "<u>SR MX Holding</u>"), a *sociedad de responsabilidad limitada de capital variable*, incorporated and existing under the laws of Mexico, as pledgor;

(ii) Standard Register de Mexico, S. de R.L. de C.V. ("<u>SR Mexico</u>"), a *sociedad de responsabilidad limitada de capital variable* incorporated and existing under the laws of Mexico, as pledgor;

(iii) Standard Register Servicios, S. de R.L. de C.V. ("<u>SR Servicios</u>" and, together with SR MX Holding and SR Mexico, collectively, the "<u>Pledgors</u>" and each a "<u>Pledgor</u>"), a *sociedad de responsabilidad limitada de capital variable* incorporated and existing under the laws of Mexico, as pledgor; and

(iv) Silver Point Finance, LLC (the "<u>Agent</u>" or the "<u>Pledgee</u>" and together with the Pledgors, the "<u>Parties</u>"), a Delaware limited liability company, formed and existing under the laws of Delaware, as pledgee;

for the purposes set forth herein and pursuant to the following Recitals, Representations and Clauses:

**CONTRATO   DE   PRENDA   SIN TRANSMISIÓN DE POSESIÓN** (el "<u>Contrato</u>") celebrado entre:

(i) Standard Register Holding, S. de R.L. de C.V. ("<u>SR MX Holding</u>"), una *sociedad de responsabilidad limitada de capital variable*, constituida y existente de conformidad con las leyes de Mexico, como deudor prendario;

(ii) Standard Register de Mexico, S. de R.L. de C.V. ("<u>SR Mexico</u>"), una *sociedad de responsabilidad limitada de capital variable*, constituida y existente de conformidad con las leyes de Mexico, como deudor prendario;

(iii) Standard Register Servicios, S. de R.L. de C.V. ("<u>SR Servicios</u>" y conjuntamente con SR MX Holding y SR Mexico, los "<u>Deudores Prendarios</u>" y cada uno el "<u>Deudor Prendario</u>"), una *sociedad de responsabilidad limitada de capital variable*, constituida y existente de conformidad con las leyes de Mexico, como deudor prendario; y

(iv) Silver Point Finance, LLC (el "<u>Agente</u>" o "<u>Acreedor Prendario</u>" y conjuntamente con los Deudores Prendarios, las "<u>Partes</u>"), una sociedad de responsabilidad limitada de Delaware, constituida y existente de conformidad con las leyes de Delaware, como acreedor prendario;

para los fines aquí descritos y de conformidad con los siguientes Antecedentes, Declaraciones y Cláusulas:

## RECITALS

**WHEREAS**, the Agent and the Pledgors entered into that certain Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement for an amount of

## ANTECEDENTES

**PRIMERO.** El Agente y los Deudores Prendarios celebraron cierto Contrato de Crédito Preferente (*Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement*) por un monto de

US$30,000,000.00 (thirty million dollars 00/100 legal currency of the United Stated of America), dated as of March 12, 2015 (as amended, modified or supplemented in accordance with its terms from time to time, the "Credit Agreement"), by and among The Standard Register Company, an Ohio corporation, Standard Register International, Inc. an Ohio corporation, Standard Register Technologies, Inc. an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, Standard Register Holding Company, an Ohio corporation, Standard Register of Puerto Rico, Inc., a Delaware corporation, Standard Register of Mexico Holding Company, an Ohio corporation, Standard Register Technologies of Canada ULC, an unlimited company organized under the laws of Nova Scotia, the Pledgors (each of the foregoing, a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code, a "Borrower" and collectively, jointly and severally, the "Borrowers"), any Subsidiaries of the Borrowers who become a party thereto as Subsidiary Guarantors, the various financial institutions and other Persons from time to time parties thereto and their respective successors and assigns and permitted assigns which become "Lenders" as provided therein (the "Lenders") and the Pledgors, as the administrative agent and the collateral agent for the Lenders, whereby the Agent and the Lenders agreed to provide term loans to the Pledgors and the other borrowers party thereto in order to fund working capital and other general corporate expenses and to pay certain fees, administrative costs and expenses incurred in connection with the Cases and the debtor-in-possession financing contemplated thereunder. A copy of the Credit Agreement is attached hereto as Exhibit A. Capitalized terms not otherwise defined in this Agreement shall have the meanings

US$30,000,000.00 (treinta millones de dólares 00/100 moneda del curso legal de los Estados Unidos de América), de fecha 12 de marzo de 2015 (según el mismo sea modificado o reexpresado de tiempo en tiempo de conformidad con sus términos, el "Contrato de Crédito"), entre The Standard Register Company, una sociedad de Ohio, Standard Register International, Inc. Una sociedad de Ohio, Standard Register Technologies, Inc. Una sociedad de Ohio, iMedConsent, LLC, una sociedad de responsabilidad limitada de Delaware, Standard Register Holding Company, una sociedad de Ohio, Standard Register of Puerto Rico, Inc., una sociedad de Delaware, Standard Register of Mexico Holding Company, una sociedad de Ohio, Standard Register Technologies of Canada ULC, una sociedad ilimitada constituida de conformidad con las leyes de Nova Scotia, los Deudores Prendarios (cada uno de los anteriores, un deudor y un deudor en posesión conforme al capítulo 11 del Código de Bancarrota (Bankruptcy Code), un "Deudor" y colectivamente, conjunta y solidariamente, los "Deudores"), cualesquier Subsidiarias de los Deudores que se vuelvan partes del mismo como Subsidiarias Garantes, las diversas instituciones financieras y otras Personas que de tiempo en tiempo sean partes del mismo y sus respectivos sucesores y cesionarios y cesionarios permitidos que se convierta en "Acreditantes" según lo dispuesto en la mismo (los "Acreditantes") y los Deudores Prendarios, como agente administrativo y de garantías para los Acreditantes, en virtud del cual el Agente y los Acreditantes acordaron otorgar préstamos a largo plazo a los Deudores Prendarios y a otros deudores que lleguen a ser parte del mismo, con el fin de financiar capital de trabajo y otros gastos corporativos generales y para pagar ciertos honorarios, costos y gastos administrativos incurridos en relación con los Casos y el

ascribed to them in the Credit Agreement;

préstamo al deudor en posesión en términos del mismo. Una copia del Contrato de Crédito se adjunta al presente como <u>Anexo A</u>. Los términos con mayúscula que no se encuentren definidos de otra forma en este Contrato, tendrán los significados que se atribuyen a los mismos en el Contrato de Crédito.

**WHEREAS,** each Pledgor has agreed to enter into this Agreement in order to grant a security interest on the Pledged Assets (as defined herein) and create a first priority non-possessory pledge in favor of the Pledgee with respect to the Pledged Assets, to secure *(i)* the complete and timely performance of each Pledgor's obligations under the Credit Agreement and any other Loan Documents, *(ii)* the complete and timely fulfillment of all obligations of each Pledgor under this Agreement, and *(iii)* the payment of any amounts, penalties, documented costs and expenses, paid for, incurred or disbursed by the Pledgee, in connection with the enforcement of its rights under this Agreement and the other documents (each one of the items described in subsections *(i)*, *(ii)*, and *(iii)* above, jointly, the "<u>Secured Obligations</u>").

**SEGUNDO.** Cada uno de los Deudores Prendarios acordó celebrar este Contrato con el objeto de otorgar una garantía sobre los Bienes Pignorados (según dicho término se define más adelante), y crear una prenda sin transmisión de posesión, en primer lugar y grado de prelación en favor del Acreedor Prendario con respecto a los Bienes Pignorados, con el fin de garantizar *(i)* el cumplimiento total y oportuno de las obligaciones de cada uno de los Deudores Prendarios de conformidad con el Contrato de Crédito y cualesquier otros Documentos del Préstamo, *(ii)* el cumplimiento total y oportuno de las obligaciones cada uno de los Deudores Prendarios en términos de este Contrato, y *(iii)* el pago de cualesquiera cantidades, penas, costos y gastos documentados, que hayan sido pagados o erogados por o en los que haya incurrido el Acreedor Prendario, en relación con el ejercicio de sus derechos conforme a este Contrato y los demás documentos (cada uno de los conceptos descritos en los incisos *(i)*, *(ii)* y *(iii)* anteriores, conjuntamente, las "<u>Obligaciones Garantizadas</u>").

## REPRESENTATIONS

## DECLARACIONES

I. Each Pledgor hereby represents, through its representative, that:

I. Cada uno de los Deudores Prendarios en este acto declara, a través de su representante, que:

(a) it is a *sociedad de responsabilidad limitada de capital variable* duly incorporated in accordance with the laws of México;

(a) es una sociedad de responsabilidad limitada de capital variable constituida de conformidad con las leyes de México;

3

(b) it has all requisite corporate and legal power and authority to enter into this Agreement, and has taken all necessary corporate actions to authorize the execution, delivery and performance of this Agreement;

(c) its attorney-in-fact has all necessary powers and authority to execute this Agreement, with powers and authority to perform ownership acts (*actos de dominio*), and no such powers and authority have been revoked or limited in any manner whatsoever;

(d) this Agreement constitutes a legal, valid, and binding obligation of such Pledgor, enforceable against it in accordance with the terms hereof;

(e) it is the sole and legitimate owner of the Pledged Assets, which are free and clear of any Liens as of the date hereof; and

(f) except for the registration of this Agreement in the RUG, no further registration, filing or action is needed for the Pledge to constitute a first priority pledge and to become enforceable vis-à-vis third parties.

II. The Pledgee hereby represents, through its representative, that:

(a) it is a Delaware limited liability company duly incorporated and existing under the laws of Delaware; and

(b) its representative has all necessary powers and authority to execute this Agreement, and no such powers and authority have been revoked or limited in any manner whatsoever.

(b) cuenta con todos los requisitos corporativos y poderes y facultades necesarios para celebrar el presente Contrato, y ha obtenido todas las autorizaciones corporativas necesarias para celebrar y cumplir con este Contrato;

(c) su representante cuenta con todos los poderes y facultades necesarios para celebrar este Contrato, incluyendo poderes y facultades para actos de dominio, y dichos poderes y facultades no han sido revocados o limitados de forma alguna;

(d) este Contrato constituye una obligación legal, válida y vinculante para dicho Deudor Prendario, y exigible en su contra de conformidad con los términos del presente Contrato;

(e) es el único y legítimo propietario de los Bienes Pignorados, mismos que a la fecha están libres de cualesquier Gravámenes; y

(f) salvo por el registro de este Contrato en el RUG, no es necesario ningún registro, presentación o acción adicional a fin de que la Prenda constituya una prenda en primer lugar y grado y surta efectos frente a terceros.

II. El Acreedor Prendario declara, a través de su representante, que:

(a) es una sociedad de responsabilidad limitada de Delaware constituida de conformidad con las leyes de Delaware;

(b) cuenta con todos los requisitos corporativos y poderes y facultades necesarios para celebrar el presente Contrato, y ha obtenido todas las autorizaciones corporativas necesarias para celebrar y cumplir con este Contrato;

4

NOW THEREFORE, in consideration of the Recitals and Representations that have been set forth above, the Parties hereto agree as follows:

EN VIRTUD DE LO ANTERIOR, con base en los Antecedentes y Declaraciones de las Partes que han quedado consignados anteriormente, las Partes otorgan las siguientes:

## CLAUSES

## CLÁUSULAS

### FIRST. DEFINED TERMS.

### PRIMERA. TÉRMINOS DEFINITDOS.

Section 1.1. Defined terms. Capitalized terms not otherwise defined in this Section or in any other Clause or Section of this Agreement shall have the meanings ascribed to them in the Credit Agreement.

Sección 1.1. Términos Definidos. Los términos con mayúscula inicial que no se encuentren definidos de otra forma en este Contrato, tendrán los significados que se atribuyen a los mismos en el Contrato de Crédito.

"Agreement" has the meaning set forth in the preface of this Agreement.

"Contrato" tiene el significado que se establece en el proemio de este Contrato.

"Applicable Laws" means any law, statute, jurisprudence, treaty rule, regulation, order, writ, arbitration award, agency or official requirement, resolution, license or permit of any Governmental Authority.

"Ley Aplicable" significa cualquier ley, estatuto, jurisprudencia, tratado, reglamento, orden, resolución judicial, laudo arbitral, requerimiento judicial, resolución, licencia o permiso de cualquier Autoridad Gubernamental.

"Business Day" means any day other than a Saturday, a Sunday, a federal holiday in the United States of America or a day on which banks in the City of New York, United States of America, or Mexico City, Mexico, are authorized or obligated by Applicable Law to close.

"Día Hábil" significa cualquier día excepto sábado, domingo, un día feriado nacional en los Estados Unidos de América o cualquier otro día en que los bancos de la Ciudad de Nueva York, Estados Unidos de América, o en la Ciudad de México, estén autorizados u obligados para cerrar conforme a la Ley Aplicable.

"Credit Agreement" has the meaning set forth in the Recitals of this Agreement.

"Contrato de Crédito" tiene el significado que se establece en los Antecedentes de este Contrato.

"Governmental Authority" means any federal, state, municipal or other government, governmental department, commission, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial,

"Autoridad Gubernamental" significa cualquier gobierno federal, estatal, municipal o cualquier otro gobierno, departamento gubernamental, comisión, corte, agencia o dependencia o subdivisión política de cualquiera de los mismos, o cualquier entidad, funcionario o interventor

regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States of America or Mexico, or another foreign entity or government.

"LGTOC" means the Mexican General Law of Negotiable Instruments and Credit Transactions (*Ley General de Títulos y Operaciones de Crédito*).

"Mexico" means the United Mexican States.

"Mexican Notary Public" means Mr. Francisco I. Hugues Vélez, notary public number 212 of Mexico City, Federal District.

"Parties" has the meaning set forth in the preface of this Agreement.

"Pledged Assets" has the meaning set forth in Section 2.1 of this Agreement.

"Pledge" has the meaning set forth in Section 2.1 of this Agreement.

"Pledgee" or "Agent" has the meaning set forth in the preface of this Agreement.

"Pledgor" has the meaning set forth in the preface of this Agreement.

"RUG" means the *Registro Único de Garantías Mobiliarias*, as a special section of the Public Registry of Commerce of the Federal District (*Registro Público de Comercio del Distrito Federal*).

"Secured Obligations" has the meaning set forth in the Recitals of this Agreement.

que ejerza funciones ejecutivas, legislativas, judiciales, regulatorias o administrativas o que pertenezcan a cualquier gobierno o corte, en cada caso relacionados ya sea con un estado de los Estados Unidos de América o México u otra entidad o gobierno extranjero.

"LGTOC" significa la Ley General de Títulos y Operaciones de Crédito.

"México" significa los Estados Unidos Mexicanos.

"Notario Público Mexicano" significa el Señor Francisco I. Hugues Vélez, notario público número 212 de la Ciudad de México, Distrito Federal.

"Partes" tiene el significado que se establece en el proemio de este Contrato.

"Bienes Pignorados" tiene el significado que se establece en la Sección 2.1 de este Contrato.

"Prenda" tiene el significado que se establece en la Sección 2.1 de este Contrato.

"Acreedor Prendario" o "Agente" tiene el significado que se establece en el proemio de este Contrato.

"Deudor Prendario" tiene el significado que se establece en el proemio de este Contrato.

"RUG" significa el Registro Único de Garantías Mobiliarias, una sección especial del Registro Público de Comercio del Distrito Federal.

"Obligaciones Garantizadas" tiene el significado que se establece en los Antecedentes de este Contrato.

6

## SECOND. CREATION OF THE PLEDGE; REGISTRATION.

Section 2.1. Creation of the Pledge.

(a) Subject to the terms and conditions set forth herein and in the applicable provisions in the LGTOC, for purposes of securing the complete and timely payment, as well as the payment and performance of the Secured Obligations, each Pledgor hereby grants a security interest on and creates a first priority non-possessory pledge (the "Pledge") in favor of the Pledgee over any and all assets, rights and goods, either presently owned by such Pledgor or acquired by the latter at any future date, including any such assets, rights and goods used by such Pledgor in the ordinary course of its preponderant activities (collectively, the "Pledged Assets"); provided that the Pledged Assets are hereby generically identified in accordance with article 354 of the LGTOC.

(b) The Pledged Assets shall include all the assets and rights referred to in article 355 of the LGTOC, including, but not be limited to, *(i)* all existing, pending or future products deriving from the Pledged Assets, and *(ii)* cash and all assets and rights that any Pledgor receives or may be entitled to receive as proceeds from the sale of any of the Pledged Assets, to the extent such sale is permitted pursuant to the Loan Documents or as an indemnification in case of loss of any of the Pledged Assets.

## SEGUNDA. CONSTITUCIÓN DE LA PRENDA; REGISTRO.

Sección 2.1.   Constitución de la Prenda.

(a) Sujeto a los términos y condiciones previstos en el presente y a las disposiciones aplicables de la LGTOC, a efecto de garantizar el pago y el cumplimiento total y oportuno de las Obligaciones Garantizadas, cada uno de los Deudores Prendarios en este acto otorga una garantía y constituye una prenda sin transmisión de posesión en primer lugar y grado (la "Prenda") a favor del Acreedor Prendario, sobre todos sus activos, derechos y bienes, ya sea actualmente propiedad de dicho Deudor Prendario o adquiridos por este último en un futuro, incluyendo cualesquier activos, derechos o bienes utilizados por dicho Deudor Prendario en el curso ordinario de sus actividades principales (conjuntamente, los "Bienes Pignorados"); en el entendido que los Bienes Pignorados son identificados genéricamente en el presente, de conformidad con el artículo 354 de la LGTOC.

(b) Los Bienes Pignorados incluirán todos los activos y derechos mencionados en el artículo 355 de la LGTOC, incluyendo sin limitación, *(i)* todos los productos existentes, pendientes o futuros derivados de los Bienes Pignorados, y *(ii)* las cantidades y todos los activos y derechos que cualquier Deudor Prendario reciba o tenga derecho a recibir como resultado de la venta de cualquiera de los Bienes Pignorados, en la medida en que dicha venta esté permitida conforme a los Documentos del Préstamo o como indemnización en caso de pérdida de cualquiera de los Bienes Pignorados.

7

Section 2.2. Notarization; Registration; Acknowledgements.

(a) The Parties hereby agree that *(i)* each Pledgor representative's signature will be ratified before the Mexican Notary Public, and *(ii)* the Pledgee representative's signature will be ratified before a notary public in the United States of America.

(b) Each Pledgor hereby agrees to deliver to the Pledgee evidence that the registration of this Agreement before the RUG has been completed, no later than 5 (five) Business Days following the date on which this Agreement has been filed for registration with the RUG.

(c) The Pledgee hereby agrees and authorizes the Mexican Notary Public to *(i)* notarize this Agreement and/or ratify each Pledgor representative's signature, *(ii)* register *(dar de alta)* the Pledgee before the RUG in preparation for the registration of this Agreement, and *(iii)* file this Agreement for registration with the RUG for a duration of 5 (five) years.

(d) Each Pledgor acknowledges and agrees that the Pledge shall be governed by the dispositions provided in Title Second, Chapter IV, Section Seventh of the LGTOC.

### THIRD. POSSESSION; CONSERVATION OF THE PLEDGES ASSETS.

Section 3.1. Possession and Conservation of the Pledged Assets.

(a) Each Pledgor shall hold possession of the Pledged Assets, as applicable, at all times, pursuant to article 346 of the LGTOC and shall be subject to all obligations and liabilities set forth in articles 361 and 380 of

Sección 2.2. Protocolización; Registro; Certificaciones.

(a) Las Partes en este acto acuerdan que *(i)* la firma del representante de cada uno de los Deudores Prendarios será ratificada ante el Notario Público Mexicano, y *(ii)* la firma del representante del Acreedor Prendario será ratificada ante un notario público en los Estados Unidos de América.

(b) Cada Deudor Prendario en este acto acuerda entregar al Acreedor Prendario evidencia de que el registro de este Contrato en el RUG fue completado, a más tardar dentro de los 5 (cinco) Días Hábiles siguientes a la fecha en la cual este Contrato fue presentado para registro en el RUG.

(c) El Acreedor Prendario en este acto acuerda y autoriza al Notario Público Mexicano a, *(i)* protocolizar este Contrato y/o ratificar la firma del representante de cada uno de los Deudores Prendarios, *(ii)* dar de alta al Acreedor Prendario en el RUG en anticipación al registro de este Contrato, y *(iii)* presentar este Contrato para su registro en el RUG por una duración de 5 (cinco) años.

(d) Cada Deudor Prendario reconoce y acuerda que la Prenda estará sujeta a las disposiciones del Título Segundo, Capítulo IV, Sección Séptima de la LGTOC.

### TERCERA. POSESIÓN; CONSERVACIÓN DE LOS BIENES PIGNORADOS.

Sección 3.1. Posesión y Conservación de los Bienes Pignorados.

(a) Cada uno de los Deudores Prendarios deberá mantener la posesión de los Bienes Pignorados en todo momento, según sea aplicable, de conformidad con el artículo 346 de la LGTOC y estará sujeto a todas

8

the LGTOC.

(b) Each Pledgor shall pay all conservation, maintenance, administrative and collection costs and expenses incurred in connection with the Pledged Assets.

## FOURTH. USE AND DISPOSITION OF THE PLEDGED ASSETS.

Section 4.1. Use of the Pledged Assets. For purposes of article 356 of the LGTOC, each Pledgor shall *(i)* be allowed to exercise all the rights related to the Pledged Assets, unless it receives a notice from the Pledgee that a Default or Event of Default has occurred; and, *(ii)* not assign, transfer or convey any of the Pledged Assets, or create or allow the existence of Liens over any of the Pledged Assets (other than the Pledge), unless otherwise permitted under the Loan Documents.

## FIFTH. COVENANTS OF THE PLEDGORS.

Section 5.1. Covenants of the Pledgors. During the term of this Agreement, each Pledgor shall:

(a) at all times and at such Pledgor' sole cost and expense, enter into and deliver any documents that may be necessary, and carry out all actions that may be reasonably required in writing by the Pledgee, in order to create and/or maintain the Pledge (as well as its first priority status) in order to allow the Pledgee to exercise any of its rights

las obligaciones y responsabilidades establecidas en los artículos 361 a 380 de la LGTOC.

(b) Cada Deudor Prendario cubrirá todos los gastos y costos de conservación, mantenimiento, administración y cobranza en los que se incurra en relación con los Bienes Pignorados.

## CUARTA. USO Y DISPOSICIÓN DE LOS BIENES PIGNORADOS.

Sección 4.1. Uso de los Bienes Pignorados. De conformidad con los términos del artículo 356 de la LGTOC, cada uno de los Deudores Prendarios deberá *(i)* estar facultado para ejercer todos los derechos relacionados con los Bienes Pignorados, salvo en caso de que reciba una notificación del Acreedor Prendario en la que indique que ha ocurrido un Incumplimiento o un Evento de Incumplimiento; y *(ii)* abstenerse de ceder, transferir o enajenar cualquiera de los Bienes Pignorados, así como de crear o permitir la existencia de Gravámenes respecto de cualquiera de los bienes Pignorados (distintos a la Prenda), salvo que esté permitido en términos de los Documentos del Préstamo.

## QUINTA. OBLIGACIONES DE LOS DEUDORES PRENDARIOS.

Sección 5.1. Obligaciones de los Deudores Prendarios. Durante la vigencia del presente Contrato, cada Deudor Prendario deberá:

(a) en todo momento y a cuenta de dicho Deudor Prendario, celebrar y entregar cualquier documento que sea necesario, y llevar a cabo todas las acciones que sean solicitadas razonablemente por escrito por el Acreedor Prendario, con el fin de crear y/o mantener la Prenda (así como su calidad en primer lugar y grado) con el fin

9

hereunder;

(b) not carry out any action (or allow any third party to carry out any action on its behalf) that may affect or impair the registration, validity or enforceability of the Pledge or that may decrease or affect the value of the Pledged Assets; and

(c) at all times, and at its sole cost and expense, defend the Pledged Assets against any and all claims, lawsuits and proceedings that arise against it by any person or before any Governmental Authority, court or arbitration body (either foreign or domestic). The Pledgee shall have the right (but not the obligation) to defend the Pledged Assets, in the understanding that such Pledgor shall reimburse all costs and expenses incurred by the Pledgee in connection with such defense, provided that such amounts shall henceforth become part of the Secured Obligations.

## SIXTH. FORECLOSURE.

Section 6.1. Foreclosure.

(a) Upon the occurrence of a Default or an Event of Default under the Credit Agreement or any of the Loan Documents, the Pledgee shall be entitled to foreclose the Pledge, at such Pledgor' expense and exercise any and all of its rights pursuant to the procedure set forth in Book Fifth, Title Third-Bis of the Commercial Code (*Código de Comercio*).

(b) The proceeds resulting from the sale, adjudication, or any other payment, with respect to all or part of the Pledged Assets,

de permitir que el Acreedor Prendario ejercite cualquiera de sus derechos conforme al presente;

(b) no realizar ninguna acción (o autorizar a terceros para llevar a cabo cualquier acción en su nombre) que pueda afectar o poner en peligro el registro, validez o exigibilidad de la Prenda o que puedan disminuir o afectar el valor de los Bienes Pignorados; y

(c) en todo momento, a su propio costo, defender los Bienes Pignorados contra cualesquiera y todas las reclamaciones, demandas y procedimientos que pudieran surgir en su contra por cualquier persona o ante cualquier Autoridad Gubernamental, tribunal u órgano de arbitraje (ya sea extranjero o nacional). El Acreedor Prendario tendrá el derecho (pero no estará obligado) de defender de los Bienes Pignorados, en el entendido que dicho Deudor Prendario reembolsará todos los costos y gastos incurridos por el Acreedor Prendario en relación con dicha defensa, dichos montos formarán parte de la Obligaciones Garantizadas.

## SEXTA. EJECUCIÓN.

Sección 6.1. Ejecución.

(a) Ante un Incumplimiento o Evento de Incumplimiento en términos del Contrato de Crédito. o de cualquiera de los Documentos del Préstamo, el Acreedor Prendario estará facultado para ejecutar la Prenda, a cuenta de dicho Deudor Prendario, y para ejercer todos y cada uno de sus derechos de conformidad con el procedimiento previsto en el Libro Quinto, Título Tercero-Bis del Código de Comercio.

(b) El producto de la venta, adjudicación o cualquier otro pago, respecto de todos o una parte de los Bienes Pignorados, será

10

shall be applied by the Pledgee in accordance with the relevant provisions in the Credit Agreement or any other Loan Documents.

Section 6.2. Appointment of an Expert Appraiser.

(a) For purposes of article 1414 Bis of the Commercial Code, the Parties hereby agree to submit themselves to the following procedure in order to appoint the expert appraiser: *(i)* the Pledgee shall deliver to each Pledgor a list of 3 (three) expert appraisers (it being understood that each such expert appraiser must be authorized by the National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*)); and *(ii)* within 5 (five) Business Days following the receipt of such list, the Pledgors shall give written notice to the Pledgee selecting 1 (one) of the 3 (three) expert appraisers nominated by the Pledgor; in the understanding that the lack of notice by the Pledgors within the aforementioned term, shall entitle the Pledgee to appoint any of the appraisers nominated in the list mentioned in subsection *(i)* above. The fees and expenses of the expert appraiser shall be borne by the Pledgors.

(b) In the event that a Pledgor fails to pay the costs and expenses of the expert appraiser, the Pledgee may pay such costs and expenses (without being obligated to do so), in which case, the Pledgee may recover such reasonable and duly documented costs and expenses, plus interests calculated per annum at a rate equal to the default interest rate set forth in the Credit Agreement; provided that *(i)* such interests shall be calculated as of the date in which such payment was made by the Pledgee, until the

aplicado por el Acreedor Prendario de conformidad con lo dispuesto en el Contrato de Crédito o cualesquier otros Documentos del Préstamo.

Sección 6.2. Designación de Perito Valuador.

(a) Para efectos de lo dispuesto en el Artículo 1414 Bis del Código de Comercio, las Partes acuerdan sujetarse al siguiente procedimiento para la designación del perito valuador: *(i)* el Acreedor Prendario proporcionará a cada uno de los Deudores Prendarios una lista de 3 (tres) peritos valuadores (en el entendido que cada uno de ellos deberá estar autorizado por la Comisión Nacional Bancaria y de Valores); y *(ii)* dentro de los 5 (cinco) Días Hábiles siguientes a la fecha en que haya recibido dicha lista, los Deudores Prendarios deberán notificar por escrito al Acreedor Prendario su selección de 1 (uno) de los 3 (tres) peritos valuadores designados por el Acreedor Prendario; en el entendido que la falta de entrega de la notificación de los Deudores Prendarios en el plazo antes mencionado, dará derecho al Acreedor Prendario de seleccionar a cualquiera de los peritos valuadores propuestos en la lista mencionada en el sub-inciso *(i)* anterior. Los honorarios y gastos del perito valuador serán por cuenta de los Deudores Prendarios.

(b) En caso que uno de los Deudores Prendarios no pague los costos y gastos del perito valuador, el Acreedor Prendario podrá pagarlos (pero no estará obligado a hacerlo), en cuyo caso, el Acreedor Prendario podrá recuperar dichos costos y gastos, razonables y debidamente documentados, más intereses a razón de una tasa de interés anual igual a la tasa de intereses moratorios que se contempla en el Contrato de Crédito; en el entendido que *(i)* dichos intereses se calcularán a partir de la

date in which such amounts are fully reimbursed to the Pledgee, and *(ii)* such amounts shall be part of the Secured Obligations.

(c) The Parties agree that the Pledgee shall apply any proceeds resulting from the sale, collection or other liquidation of all or part of the Pledged Assets as a result of the foreclosure of the pledge created hereunder, to the payment of the Secured Obligations, pursuant to the following:

*First.-* To the payment of all costs, taxes and expenses relating to such sale including, without limitation, all expenses of the Pledgee (including fees and expenses of counsel) and all disbursements and advances made by the Pledgee in connection therewith;

*Second.-* To the Pledgee, for the payment of the Secured Obligations in the order that such Pledgee deems appropriate in its sole discretion; and

*Third.-* After payment in full of all the Secured Obligations, the balance, if any, shall be delivered to the Pledgors.

## SEVENTH. TERM.

Section 7.1. Term. This Agreement and the Pledge created hereby shall remain in full force and effect as of the date hereof and until the date in which all of the Secured Obligations are paid and satisfied in full, pursuant to the terms of the Loan Documents. Upon the termination of this Agreement, the Pledgee shall execute

fecha en que dicho pago fuere efectuado por el Acreedor Prendario, hasta la fecha en que se reembolse en su totalidad el importe de dichas cantidades al Acreedor Prendario, y *(ii)* dichas cantidades se considerarán parte de las Obligaciones Garantizadas.

(c) Las Partes convienen que el Acreedor Prendario aplicará cualquier producto que resulte de la venta, cobro u otra liquidación de todos o cualquier parte de los Bienes Pignorados como resultado de la ejecución de la prenda que se constituye conforme a este Contrato, al pago de las Obligaciones Garantizadas, de conformidad con lo siguiente:

*Primero.-* Al pago de todos los costos, impuestos y gastos relacionados con dicha venta, incluyendo de manera enunciativa mas no limitativa, todos los gastos del Acreedor Prendario (incluyendo honorarios y gastos documentados del asesor legal), y todas las disposiciones y anticipos realizados por el Acreedor Prendario en relación con lo anterior;

*Segundo.-* Al Acreedor Prendario, para el pago de las Obligaciones Garantizadas en el orden que el Acreedor Prendario, a su entera discreción, considere apropiado; y

*Tercero.-* Habiendo pagado la totalidad de las Obligaciones Garantizadas, el remanente, en caso de existir, será entregado a los Deudores Prendarios.

## SÉPTIMA. VIGENCIA.

Sección 7.1. Vigencia. Este Contrato y la Prenda que se constituye conforme al mismo permanecerán en pleno vigor y efectos a partir de la fecha de celebración del presente Contrato y hasta la fecha en que todas las Obligaciones Garantizadas sean pagadas y cumplidas en su totalidad, de conformidad con los términos de los

and/or deliver to the Pledgors, at its sole cost and expenses, any documents (provided to the Pledgee) that are reasonably requested to evidence such termination.

Documentos del Préstamo. A la terminación del presente Contrato, el Acreedor Prendario celebrará y/o entregará a los Deudores Prendarios, a cuenta de éstos, cualesquier documentos (proporcionados al Acreedor Prendario) que razonablemente soliciten para acreditar dicha terminación.

### EIGHTH. MISCELLANEOUS.

### OCTAVA. MISCELÁNEOS.

Section 8.1. Indivisibility. The first priority Pledge created hereby is indivisible and secures the complete and timely payment and performance of all the Secured Obligations, notwithstanding that any person as of this date or in the future, secures the payment and compliance of the Secured Obligations totally or partially by means of other pledges or other security interests (including any other Security Documents). Each Pledgor hereby expressly waives its right to divide or reduce the Pledge as a result of partial payment of the Secured Obligations under article 349 of the LGTOC.

Sección 8.1. Indivisibilidad. La Prenda en primer lugar y grado constituida conforme al presente Contrato es indivisible y garantiza el pago y el cumplimiento total y oportuno de todas las Obligaciones Garantizadas, no obstante que cualquier persona, en esta fecha o en un futuro, garantice total o parcialmente el pago y cumplimiento de las Obligaciones Garantizadas mediante la constitución de otras prendas u otras garantías (incluyendo cualquier otro Documento de Garantía). Cada Deudor Prendario expresamente renuncia a cualquier derecho que pudiera tener para dividir o reducir la Prenda derivado del pago parcial de las Obligaciones Garantizadas, de conformidad con lo previsto por el artículo 349 de la LGTOC.

Section 8.2. Resignation; Cumulative Remedies.

Sección 8.2. Renuncia; Derechos Acumulativos.

(a) No failure by the Pledgee to exercise any rights specified in this Agreement and no delay in exercising any such rights, shall be deemed or operate as a waiver of such rights. Likewise, any individual or partial exercise by the Pledgee of any rights under this Agreement shall not preclude any other additional exercise or further exercise of the same or the exercise of any other right.

(a) El hecho de que el Acreedor Prendario no ejerza cualquiera de sus derechos conforme a este Contrato o se demore en ejercer cualquiera de los mismos, no significa ni se entenderá como una renuncia de dichos derechos. Asimismo, el ejercicio individual o parcial de cualquier derecho por parte del Acreedor Prendario conforme a este Contrato no impedirá el ejercicio adicional o posterior del mismo o el ejercicio de cualquier otro derecho.

(b) The rights and remedies of the Pledgee provided in this Agreement, in other Loan

(b) Los derechos y recursos del Acreedor Prendario previstos en el presente Contrato,

13

Documents or any related agreement, instrument or document *(i)* are cumulative and are in addition to, and not exclusive of, any rights or remedies available to the Pledgee under Applicable Law, this Agreement or any related agreement, instrument or document, and *(ii)* are not conditional or contingent on any exercise by the Pledgee of any of its rights or remedies under this Agreement or under the other Loan Documents or any related agreement, instrument or document against any Pledgor or against any other person.

Section 8.3. <u>Costs and Expenses</u>. All reasonable and documented expenses, fees and taxes originated under this Agreement and its release upon the complete payment and performance of the Secured Obligations shall be for the account of the Pledgors. Likewise, the Pledgors agree to reimburse the Pledgee for any reasonable cost it may incur in connection with the foreclosure of the Pledge created hereunder, including any default and all manner of participation in or other involvement with performance by the Pledgee of any obligations of any Pledgor in respect of the Pledged Assets that any Pledgor has failed or refused to perform, bankruptcy, insolvency, receivership, foreclosure, winding up or liquidation proceedings, judicial or regulatory proceedings, restructuring or other negotiations or proceedings (whether or not the restructuring or transaction contemplated thereby is consummated), or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement in respect of any of the Pledged Assets. The enforcement of this Section, and all such costs and expenses

en los demás Documentos del Préstamo o en cualquier otro contrato, instrumento o documento relacionado con éstos *(i)* son acumulativos y en adición a, y no exclusivos de, cualesquier derechos o recursos disponibles al Acreedor Prendario de conformidad con la Ley Aplicable, el presente Contrato o cualquier otro contrato, instrumento o documento relacionado con los mismos, y *(ii)* no están condicionados, ni son contingentes al ejercicio por parte del Acreedor Prendario de cualquiera de sus derechos o recursos derivados del presente Contrato o de los otros Documentos del Préstamo o cualquier contrato, instrumento o documento relacionado con éstos, en contra de cualquier Deudor Prendario o contra cualquier otra persona.

Sección 8.3. <u>Gastos y Costos</u>. Todos los gastos, honorarios e impuestos razonables y documentados, derivados del presente Contrato y su liberación contra el pago y cumplimiento total de las Obligaciones Garantizadas, serán por cuenta de los Deudores Prendarios. Asimismo, los Deudores Prendarios acuerdan reembolsar al Acreedor Prendario cualquier costo razonable en el que haya incurrido en relación con la ejecución de la Prenda constituida conforme al presente, incluyendo cualquier incumplimiento y todo tipo de participación en o cualquier otro compromiso con el cumplimiento por el Acreedor Prendario de las obligaciones de cualquier Deudor Prendario en relación con los Bienes Pignorados que cualquier Deudor Prendario haya incumplido o se haya negado a realizar, bancarrota, insolvencia, quiebra, ejecución, liquidación o procedimientos de liquidación, procedimientos judiciales o regulatorios, quiebra, reestructura u otras negociaciones o procedimientos (ya sea que la reestructura o procedimientos contemplada se haya consumado o no), o cualquier venta o

shall be Secured Obligations entitled to the benefits of the collateral security provided pursuant hereto.

Section 8.4. Notices. All notices, requests, and other communications submitted by the Parties must be made in writing, and will be considered validly made when they are made *(i)* personally, with return receipt; *(ii)* through a specialized courier, with return receipt from an internationally recognized courier; or *(iii)* through fax or e-mail, followed by specialized courier or personal delivery, with an internationally recognized courier, with return receipt. All the notices, requests, and other communications must be sent to the following addresses and fax numbers or e-mail addresses, and will have effect once they are personally delivered or if at the time of the delivery being rejected as the corresponding return receipt points out:

If to Pledgors

The Standard Register Company,
600 Albany Street, Dayton, Ohio 45408-1442
Attention: Gerard Sowar
Telephone: +1 (937) 221-1940
Facsimile: +1 (937) 221-3431
E-mail: gerard.sowar@standardregister.com

with a copy (which shall not constitute notice) to:

---

intento de venta, o cualquier cambio, ejecución, cobro, compromiso o acuerdo en relación con cualquiera de los Bienes Pignorados. La ejecutabilidad de esta Sección, y todos los costos y gastos se considerarán Obligaciones Garantizadas con derecho a los beneficios de la garantía constituida conforme al presente.

Sección 8.4. Notificaciones. Todas las notificaciones, solicitudes y demás comunicaciones que entreguen las Partes deberán ser realizadas por escrito, y se considerarán debidamente entregadas cuando *(i)* se entreguen personalmente, con acuse de recibo; *(ii)* se hagan mediante servicios de mensajería especializada, con acuse de recibo de un servicio de mensajería reconocido internacionalmente; o *(iii)* se hagan mediante fax o correo electrónico, seguido de entrega mediante un servicio de mensajería especializada o personalmente, con un servicio de mensajería reconocido internacionalmente, y acuse de recibo. Todas las notificaciones, solicitudes, y demás comunicaciones deberán ser enviadas a las siguientes direcciones y números de fax o direcciones de correo electrónico, y serán efectivas una vez que sean entregadas personalmente o si son rechazadas al momento de ser entregas según se señale en el acuse de recibo correspondiente:

Si es a los Deudores Prendarios

The Standard Register Company,
600 Albany Street, Dayton, Ohio 45408-1442
Atención: Gerard Sowar
Teléfono: +1 (937) 221-1940
Facsimile: +1 (937) 221-3431
Correo electrónico:
gerard.sowar@standardregister.com

con copia (que no constituirá notificación) para:

15

Von Wobeser & Sierra
Guillermo González Camarena 1100,
7th floor, Santa Fe Centro de Ciudad,
01210, Mexico City, Federal District
Attention: Javier Eduardo Lizardi Calderón
Telephone: 5258-1021
Facsimile: 5258-1098
E-mail: jlizardi@vwys.com.mx

If to Pledgee

Silver Point Finance, LLC,
as Agent
2 Greenwich Plaza
Greenwich, CT 06380
Attention: Arbarb Khalid
Telephone: (203) 542-4441
Facsimile: (201) 719-2157
E-mail: akhalid@silverpoint.com
Tax Identification Number: 13-4251708

with a copy (which shall not constitute
notice) to:

Skadden, Arps, Slate, Meagher & Flom
LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention: Kimberly A. DeBeers and Ron E.
Meisler
Facsimile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com
and ron.meisler@skadden.com

If any of the Parties changes its domicile, it
must notify the other Parties hereto, at least
10 (ten) Business Days prior to the date of
making any change, otherwise, and up until
5 (five) Business Days after the
corresponding party has notified the other
Parties, it will be understood that all
notifications and notices made hereunder
will be effective if they are sent to the last
domicile notified to all Parties.

---

Von Wobeser & Sierra
Guillermo González Camarena 1100,
Piso 7, Santa Fe Centro de Ciudad,
01210, México, Distrito Federal
Atención: Javier Eduardo Lizardi Calderón
Teléfono: 5258-1021
Facsímile: 5258-1098
Correo electrónico: jlizardi@vwys.com.mx

Si es al Acreedor Prendario

Silver Point Finance, LLC,
como Agente
2 Greenwich Plaza
Greenwich, CT 06380
Atención: Arbarb Khalid
Teléfono: (203) 542-4441
Facsímile: (201) 719-2157
Correo electrónico:
akhalid@silverpoint.com
Número de Identificación Fiscal: 13-4251708

con copia (que no constituirá notificación)
para:

Skadden, Arps, Slate, Meagher & Flom
LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Atención: Kimberly A. DeBeers y Ron E.
Meisler
Facsímile: +1 (312) 407-8576
Correo electrónico:
kimberly.debeers@skadden.com y
ron.meisler@skadden.com

Si cualquiera de las Partes cambia su
domicilio, deberá notificar a las demás
Partes del presente, por lo menos con 10
(diez) Días Hábiles previos a la fecha en
que se pretenda hacer el cambio, de lo
contrario, y hasta 5 (cinco) Días Hábiles
después de que la parte correspondiente
haya notificado a las demás Partes, se
entenderá que todas las notificaciones y
avisos hechos conforme al presente surtirán

16

Section 8.5. Amendments. No amendment, termination or waiver of any or all provision of this Agreement shall be effective, unless the same shall be in writing and executed by the Pledgee and each Pledgor and, consequently, such waiver or consent shall only be effective for the specific case and purposes set forth therein.

Sección 8.5. Modificaciones. Ninguna modificación, terminación o renuncia a cualesquiera o a todas las disposiciones de este Contrato surtirá efecto alguno, salvo que dicha modificación, terminación o renuncia se realice por escrito y sea firmado por el Acreedor Prendario y cada uno de los Deudores Prendarios y, en consecuencia, dicha renuncia o consentimiento únicamente surtirá efectos para los casos y propósitos específicos que se establezcan en los mismos.

Section 8.6. Assignment.

Sección 8.6. Cesión.

(a) The rights and obligations of any Pledgor under this Agreement may not be assigned or delegated to third parties without the prior written consent of the Pledgee and any such assignment or delegation in violation of this Section 8.6 shall be null and void *ab initio*.

(a) Los derechos y obligaciones de cualquier Deudor Prendario derivados de este Contrato no podrán cederse o delegarse a terceros sin el previo consentimiento por escrito del Acreedor Prendario; si se realiza cualquier cesión o delegación en contravención a lo previsto en esta Sección 8.6, la misma será considerada nula y sin efecto *ab initio*.

(b) The Pledgee will have the right at any time to assign its rights under this Agreement, to any of its Affiliates, or following a Default or Event of Default, to any third parties, by means of simple written notice to the Pledgors (without any additional formalities).

(b) El Acreedor Prendario tendrá derecho en cualquier momento a ceder sus derechos conforme a este Contrato, a cualquiera de sus Afiliadas, o después de un Incumplimiento o Evento de Incumplimiento, a cualquier tercero, mediante notificación por escrito a los Deudores Prendarios (sin ninguna otra formalidad).

Section 8.7. Headings.

Sección 8.7. Encabezados

The headings used in this Agreement are for convenience of reference only and shall not be used to interpret any of the provisions of this Agreement.

Los encabezados utilizados en este Contrato son únicamente para efectos de referencia y no deberán utilizarse para interpretar las disposiciones de este Contrato.

17

Section 8.8. Severability.

The Parties agree that if any provision hereof results to be invalid or illegal, to the extent allowed by Applicable Law, such provision shall be considered as not included herein, remaining the rest of the provisions hereof being valid and fully applicable.

Section 8.9. Governing Law; Jurisdiction.

This Agreement shall be governed by and construed in accordance with the laws of Mexico. For the interpretation, performance and enforcement of this Agreement, each of the parties hereto, hereby irrevocably submits to the jurisdiction of the competent federal courts sitting in Mexico City, Federal District, Mexico, and expressly waives any other jurisdiction to which it may be entitled now or hereafter, by reason of its present or future domicile.

Section 8.10. Language.

In case of conflict or inconsistencies between the English column and the Spanish column, the Spanish version shall control.

IN WITNESS WHEREOF, the Parties have executed this Agreement, through their duly authorized signatories, on March 12, 2015

[Remainder of page intentionally left blank; signature pages follow]

Sección 8.8. Independencia de las Disposiciones

Las Partes acuerdan que si cualquiera de las disposiciones del presente resulta inválida o ilegal, en la medida permitida por la Ley Aplicable, dicha disposición será considerada como no incluida en el presente, permaneciendo el resto de las disposiciones del presente, válidas y completamente aplicables.

Sección 8.9. Ley Aplicable; Jurisdicción.

Este Contrato estará regido por y se interpretará de conformidad con las leyes de México. En relación con la interpretación, cumplimiento y ejecución de este Contrato, cada una de las partes de este Contrato se somete en este acto de manera irrevocable a la jurisdicción de los tribunales competentes ubicados en la Ciudad de México, Distrito Federal, México, y renuncia de manera expresa a cualquier otra jurisdicción que pudiera corresponderle en virtud de su domicilio presente o futuro o por cualquier otra razón.

Sección 8.10. Idioma.

En caso de conflicto o inconsistencias entre la columna en inglés y la columna en español, la versión en español prevalecerá.

DE CONFORMIDAD CON LO ANTERIOR, las Partes celebran este Contrato, a través de sus representantes legales, el 12 de marzo de 2015.

[Se deja intencionalmente en blanco; siguen páginas de firma]

18

**SILVER POINT FINANCE, LLC,**
as Pledgee/como Acreedor Prendario

By/Por:
Title/Cargo:

Frederick H. Fogel
Authorized Signatory

*[This signature page corresponds to the Non-Possessory Pledge Agreement dated March \_11\_, 2015, entered into by and between Silver Point Finance, LLC, Standard Register Holdings, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V. and Standard Register Servicios, S. de R.L. de C.V. / Esta hoja de firmas corresponde al Contrato de Prenda sin Transmisión de Posesión de fecha \_11\_ de marzo de 2015, celebrado entre Silver Point Finance, LLC, Standard Register Holdings, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V. y Standard Register Servicios, S. de R.L. de C.V.]*

**STANDARD REGISTER HOLDING, S. DE R.L. DE C.V.,**
as Pledgor/como Deudor Prendario

By/Por: Javier Eduardo Lizardi Calderón
Title/Cargo: Attorney-in-fact/Apoderado

**STANDARD REGISTER DE MEXICO, S. DE R.L. DE C.V.,**
as Pledgor/como Deudor Prendario

By/Por: Javier Eduardo Lizardi Calderón
Title/Cargo: Attorney-in-fact/Apoderado

**STANDARD REGISTER SERVICIOS, S. DE R.L. DE C.V.,**
as Pledgor/como Deudor Prendario

By/Por: Javier Eduardo Lizardi Calderón
Title/Cargo: Attorney-in-fact/Apoderado

[This signature page corresponds to the Non-Possessory Pledge Agreement dated March 11, 2015, entered into by and between Silver Point Finance, LLC, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V. and Standard Register Servicios, S. de R.L. de C.V. / Esta hoja de firmas corresponde al Contrato de Prenda sin Transmisión de Posesión de fecha 11 de marzo de 2015, celebrado entre Silver Point Finance, LLC, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V. y Standard Register Servicios, S. de R.L. de C.V.]

**EXHIBIT C**

**DIP TERM LOAN CREDIT AGREEMENT**

---

## POST-PETITION LOAN AND SECURITY AGREEMENT

Dated: March 12, 2015

---

---

**THE STANDARD REGISTER COMPANY,
STANDARD REGISTER INTERNATIONAL, INC.,
STANDARD REGISTER TECHNOLOGIES, INC.,
IMEDCONSENT, LLC,
STANDARD REGISTER OF PUERTO RICO INC.,
STANDARD REGISTER HOLDING COMPANY,
STANDARD REGISTER TECHNOLOGIES CANADA ULC,
STANDARD REGISTER MEXICO HOLDING COMPANY,
STANDARD REGISTER HOLDINGS, S de R.L. de C.V.
STANDARD REGISTER de MEXICO, S de R.L. de C.V.
STANDARD REGISTER SERVICIOS, S de R.L. de C.V.**

as Borrowers,

**CERTAIN FINANCIAL INSTITUTIONS,**
as Lenders,

and

**BANK OF AMERICA, N.A.,**
as Administrative and Collateral Agent

---

---

---

## TABLE OF CONTENTS

SECTION 1. DIP FACILITY ......................................................................................2
   1.1.   Commitment. .............................................................................................2
   1.2.   Letters of Credit. .......................................................................................4
   1.3.   Sections 364(c)(1) and 503(b) Priority. .....................................................10

SECTION 2. INTEREST, FEES AND CHARGES ......................................................10
   2.1.   Interest. ....................................................................................................10
   2.2.   Fees. ........................................................................................................12
   2.3.   Computation of Interest and Fees. ............................................................14
   2.4.   Reimbursement Obligations. ....................................................................14
   2.5.   Bank Charges. .........................................................................................15
   2.6.   Illegality. .................................................................................................15
   2.7.   Increased Costs. .......................................................................................16
   2.8.   Capital Adequacy. ...................................................................................17
   2.9.   Funding Losses. .......................................................................................18
   2.10.   Maximum Interest. ..................................................................................18

SECTION 3. LOAN ADMINISTRATION .................................................................19
   3.1.   Manner of Borrowing and Funding Revolver Loans. .................................19
   3.2.   Defaulting DIP Lender. ............................................................................23
   3.3.   Special Provisions Governing LIBOR Loans. ............................................24
   3.4.   Borrowers' Representative. .......................................................................25
   3.5.   All Revolver Loans to Constitute One Obligation. .....................................25

SECTION 4. PAYMENTS ........................................................................................25
   4.1.   General Repayment Provisions. ................................................................25
   4.2.   Repayment of Revolver Loans. .................................................................26
   4.3.   Mandatory Prepayments. ..........................................................................27
   4.4.   Payment of Other Obligations. .................................................................28
   4.5.   Marshaling; Payments Set Aside. .............................................................28
   4.6.   Allocation of Payments and Collections. ...................................................28
   4.7.   Dominion Account. ..................................................................................30
   4.8.   Loan Account; Account Stated. .................................................................30
   4.9.   Taxes. ......................................................................................................30
   4.10.   DIP Lender Tax Information. ...................................................................33
   4.11.   Nature and Extent of Each Borrower's Liability. .......................................34

SECTION 5. TERM AND TERMINATION OF COMMITMENTS ..............................37
   5.1.   Term of Commitments ..............................................................................37
   5.2.   Termination. ............................................................................................37

SECTION 6. COLLATERAL SECURITY ..................................................................38
   6.1.   Grant of Security Interest. .........................................................................38
   6.2.   Lien on Deposit Accounts; Cash Collateral. ..............................................39

6.3.   Lien on Real Estate. ...........................................................................................39
6.4.   Other Collateral. ..............................................................................................39
6.5.   Lien Perfection; Further Assurances. ..............................................................40
6.6.   Limitations. ......................................................................................................40

SECTION 7. COLLATERAL ADMINISTRATION .....................................................40
7.1.   General Provisions. ..........................................................................................40
7.2.   Administration of Accounts. ............................................................................42
7.3.   Administration of Inventory. ...........................................................................44
7.4.   Administration of Equipment. .........................................................................45
7.5.   Borrowing Base Certificates. ..........................................................................45

SECTION 8. REPRESENTATIONS AND WARRANTIES ..........................................46
8.1.   General Representations and Warranties. ........................................................46
8.2.   Complete Disclosure. .......................................................................................53
8.3.   Reaffirmation of Representations and Warranties. ..........................................53
8.4.   Survival of Representations and Warranties. ...................................................53

SECTION 9. COVENANTS AND CONTINUING AGREEMENTS ............................53
9.1.   Affirmative Covenants. ....................................................................................53
9.2.   Negative Covenants. ........................................................................................60

SECTION 10. CONDITIONS PRECEDENT ................................................................64
10.1.   Conditions Precedent to Initial Revolver Loans. ............................................64
10.2.   Conditions Precedent to All Credit Extensions. ..............................................67
10.3.   Inapplicability of Conditions. ..........................................................................69
10.4.   Limited Waiver of Conditions Precedent. .......................................................69

SECTION 11. EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT ...............69
11.1.   Events of Default. .............................................................................................69
11.2.   Remedies upon Default. ...................................................................................74
11.3.   License. .............................................................................................................76
11.4.   Setoff. ...............................................................................................................76
11.5.   Remedies Cumulative; No Waiver; Disclosures to Committee. ......................77
11.6.   Consent to Receivership. .................................................................................78

SECTION 12. DIP AGENT ............................................................................................78
12.1.   Appointment, Authority and Duties of DIP Agent. .........................................78
12.2.   Agreements Regarding Collateral. ...................................................................81
12.3.   Reliance By DIP Agent. ...................................................................................81
12.4.   Action Upon Default. .......................................................................................81
12.5.   Ratable Sharing. ...............................................................................................82
12.6.   Indemnification of DIP Agent. ........................................................................83
12.7.   Limitation on Responsibilities of DIP Agent. .................................................84
12.8.   Successor DIP Agent and Co-DIP Agents. .....................................................84
12.9.   Consents, Amendments and Waivers; Overadvances. .....................................85
12.10. Due Diligence and Non-Reliance. ...................................................................88

12.11. Representations and Warranties of DIP Lenders. ..............................................88
12.12. Required DIP Lenders. ..................................................................................89
12.13. Several Obligations. ......................................................................................89
12.14. DIP Agent in its Individual Capacity. ............................................................89
12.15. Third Party Beneficiaries. ..............................................................................89
12.16. Notice of Transfer. ........................................................................................90
12.17. Replacement of Certain DIP Lenders. ...........................................................90
12.18. Remittance of Payments and Collections. .....................................................91
12.19. Bank Product Providers. ................................................................................91
12.20. Intercreditor Agreements. .............................................................................92

SECTION 13. BENEFIT OF AGREEMENT; ASSIGNMENTS AND PARTICIPATIONS ..........92
13.1.   Successors and Assigns. ...............................................................................92
13.2.   Participations. ...............................................................................................92
13.3.   Assignments. .................................................................................................94
13.4.   Tax Treatment. ..............................................................................................95

SECTION 14. MISCELLANEOUS ....................................................................................96
14.1.   Power of Attorney. ........................................................................................96
14.2.   General Indemnity. ........................................................................................96
14.3.   Survival of All Indemnities. ..........................................................................97
14.4.   Modification of Agreement. ..........................................................................97
14.5.   Severability. ..................................................................................................97
14.6.   Cumulative Effect; Conflict of Terms. ..........................................................97
14.7.   Execution in Counterparts. ............................................................................98
14.8.   Consent. .........................................................................................................98
14.9.   Notices and Communications. .......................................................................98
14.10. Performance of Borrowers' Obligations. .......................................................99
14.11. Credit Inquiries. ..........................................................................................100
14.12. Time of Essence. .........................................................................................100
14.13. Indulgences Not Waivers. ...........................................................................100
14.14. Entire Agreement; Appendix A, Exhibits and Schedules. ...........................100
14.15. Interpretation. .............................................................................................100
14.16. Obligations of DIP Lenders Several. ..........................................................100
14.17. Confidentiality. ...........................................................................................100
14.18. Governing Law; Consent to Forum. ............................................................101
14.19. Waivers by Borrowers. ...............................................................................102
14.20. Patriot Act Notice. ......................................................................................103
14.21. Cumulative Effect; Conflict of Terms. ........................................................103
14.22. No Advisory or Fiduciary Responsibility. ...................................................103

LIST OF EXHIBITS AND SCHEDULES

| Exhibit A | Form of Revolver Note |
|---|---|
| Exhibit B | Form of Notice of Conversion/Continuation |
| Exhibit C | Form of Notice of Borrowing |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | Form of Assignment and Acceptance |
| Exhibit F | Form of Notice of Assignment |
| Exhibit G | Letter of Credit Application Form |
| Exhibit H | Fiscal Calendar |
| Exhibit I | Borrowing Base Certificate |
|  |  |
| Schedule 1.1 | Commitments |
| Schedule 1.2.1 | Existing Letters of Credit |
| Schedule 7.1.1 | Location of Inventory |
| Schedule 8.1.4 | Capital Structure of Borrowers |
| Schedule 8.1.5 | Corporate Names |
| Schedule 8.1.6 | Chief Executive Office/Service of Process Agents |
| Schedule 8.1.12 | Tax Identification Numbers of Borrowers and Subsidiaries |
| Schedule 8.1.21 | Pension Plans |
| Schedule 8.1.23 | Labor Contracts |
| Schedule 9.1.21 | Post Closing Covenants |
| Schedule 14.9 | DIP Lender Addresses |

## POST-PETITION LOAN AND SECURITY AGREEMENT

**THIS POST-PETITION LOAN AND SECURITY AGREEMENT** (this "Agreement") is made on March 12, 2015, by and among **THE STANDARD REGISTER COMPANY**, an Ohio corporation (individually and, in its capacity as the representative of the other Borrowers pursuant to **Section 3.4** hereof, "SRC"); **STANDARD REGISTER INTERNATIONAL, INC.**, an Ohio corporation ("SRI"); **STANDARD REGISTER TECHNOLOGIES, INC.**, an Ohio corporation ("SRT"); **IMEDCONSENT, LLC**, a Delaware limited liability company ("iMed"); **STANDARD REGISTER OF PUERTO RICO INC** f/k/a WorkflowOne of Puerto Rico Inc., a Delaware corporation ("SRPR"); **STANDARD REGISTER HOLDING COMPANY**, an Ohio corporation ("SR Holding"); **STANDARD REGISTER MEXICO HOLDING COMPANY**, an Ohio corporation ("SR MX Holdco"); **STANDARD REGISTER TECHNOLOGIES CANADA ULC**, an unlimited company organized under the laws of Nova Scotia ("SR Canada"); **STANDARD REGISTER HOLDINGS, S de R.L. de C.V.**, a limited liability company organized under the laws of Mexico ("SR MX Holdings"); **STANDARD REGISTER de MEXICO, S de R.L. de C.V.**, a limited liability company organized under the laws of Mexico ("SR Mexico"); **STANDARD REGISTER SERVICIOS, S de R.L. de C.V.**, a limited liability company organized under the laws of Mexico ("SR Servicios", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "Borrower" and each a Chapter 11 debtor-in-possession, and collectively, "Borrowers"); the financial institutions party to this Agreement from time to time as lenders and their respective successors and permitted assigns (collectively, "DIP Lenders"); and **BANK OF AMERICA, N.A.**, a national banking association, as collateral and administrative agent for DIP Lenders (together with its successors in such capacity, "DIP Agent").  Capitalized terms used in this Agreement have the meanings assigned to them in Appendix A, General Definitions.

### R e c i t a l s :

SRC, SRI, SRT, iMed and SRPR (collectively, "U.S. Borrowers"), Bank of America, N.A., in its capacity as agent (together with its successors and assigns in such capacity, "Pre-Petition ABL Agent") for certain financial institutions party thereto from time to time in their capacities as lenders (collectively, "Pre-Petition ABL Lenders"), and such Pre-Petition ABL Lenders are parties to that certain Amended and Restated Loan and Security Agreement dated August 1, 2013 (as at any time amended, modified, restated, or supplemented, the "Pre-Petition ABL Loan Agreement"), pursuant to which Pre-Petition ABL Lenders have made loans and other extensions of credit to U.S. Borrowers secured by all or substantially all of the real and personal property of U.S. Borrowers.

Prior to the Petition Date (as defined below), WorkflowOne, LLC, a Delaware limited liability company ("WorkflowOne") and an original borrower under the Pre-Petition ABL Loan Agreement, merged into SRC effective December 31, 2014, with SRC as the surviving corporation.

On the Petition Date, each Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case" and, collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (together with any other court

having jurisdiction over any of the Chapter 11 Cases or any proceeding therein from time to time, the "Court"), as Case Numbers 15-_____, 15-_____, 15-_____, 15-_____, 15-_____, 15-_____,15-_____, 15-_____, 15-_____, and 15-_____. In connection with the filing of the Chapter 11 Cases, Borrowers have requested that DIP Lenders extend financing to U.S. Borrowers in accordance with the provisions of this Agreement.

DIP Lenders are willing to make loans and other extensions of credit to U.S. Borrowers, subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in orders of the Court approving the proposed financing.

NOW, THEREFORE, for good and valuable consideration, the parties hereto hereby agree as follows:

**SECTION 1.  DIP FACILITY**

Subject to the terms and conditions of, and in reliance upon the representations and warranties made in, this Agreement and the other DIP Loan Documents, DIP Lenders severally agree to the extent and in the manner hereinafter set forth to make their respective Pro Rata shares of the Commitments available to U.S. Borrowers, in an aggregate amount of $125,000,000 (subject to the limitations set forth herein), as follows:

**1.1.    Commitment.**

1.1.1.  Revolver Loans.  Each DIP Lender agrees, severally to the extent of its Commitment and not jointly with the other DIP Lenders, upon the terms and subject to the conditions set forth herein, to make Revolver Loans to U.S. Borrowers on any Business Day during the period from the Closing Date through the Commitment Termination Date in the amounts shown as in the DIP Budget (with Permitted Variances), not to exceed in aggregate principal amount outstanding at any time such DIP Lender's Commitment at such time; provided, however, that, subject to the entry and terms of the Interim DIP Financing Order and to Borrowers' satisfaction of each of the conditions precedent set forth in **Section 10**, initial Borrowings may be obtained by U.S. Borrowers on a revolving basis as of the Closing Date and during the Interim Period.  Upon entry of the Final DIP Financing Order, and subject to Borrowers' satisfaction of each of the conditions precedent set forth in **Section 10**, the full amount of the DIP Facility shall be available for Borrowings on a revolving basis in accordance with this Agreement. The Revolver Loans may be repaid and re-borrowed in accordance with the provisions of this Agreement.  No Borrower other than a U.S. Borrower shall be entitled to request a Revolver Loan under the DIP Facility, and in no event shall DIP Lenders have any obligation to honor a request by any U.S. Borrower for a Revolver Loan (a) if any Default or Event of Default exists or would result therefrom; (b) if U.S. Borrowers have not furnished to DIP Agent the Borrowing Base Certificate required pursuant to **Section 7.5** hereof; (c) on or after the Commitment Termination Date, (d) if at the time of such proposed funding the aggregate principal amount of all of the Revolver Loans then outstanding exceeds, or would exceed after the funding of such Revolver Loan, the Borrowing Base; provided, however, that the foregoing shall not impair DIP Agent's right to make Protective Advances or DIP Lenders' right to fund deemed requests for Revolver Loans as further provided herein. Each Borrowing of Revolver Loans shall be funded by DIP Lenders on a Pro Rata basis in accordance with their

2

respective Commitments. The Revolver Loans shall bear interest as set forth in **Section 2.1** hereof. The initial Revolver Loan shall consist solely of Base Rate Loans. Each subsequent Revolver Loan shall, at the option of U.S. Borrowers, be made or continued as, or converted into, part of one or more Borrowings that, unless specifically provided herein, shall consist entirely of Base Rate Loans or LIBOR Loans.

       1.1.2.  <u>Out of Formula Loan</u>.  If the unpaid balance of Revolver Loans outstanding at any time exceeds the Borrowing Base at such time (an "<u>Out of Formula Condition</u>"), and DIP Lenders, in their sole and absolute discretion, are nonetheless willing to make a Revolver Loan (an "<u>Out of Formula Loan</u>"), each such Out of Formula Loan shall nevertheless constitute Obligations secured by the Collateral and shall be entitled to all benefits of the DIP Loan Documents. Any funding of an Out of Formula Loan or sufferance of an Out of Formula Condition shall not constitute a waiver of the Default or Event of Default caused thereby. In the event that DIP Lenders are willing, in their sole and absolute discretion, to make an Out of Formula Loan, each such Out of Formula Loan shall be payable on demand and shall bear interest as provided in **Section 2.1.5**.

       1.1.3.  <u>Use of Proceeds</u>.  All proceeds of Revolver Loans, and any Cash Collateral that is permitted to be used by Borrowers pursuant to the DIP Financing Orders, shall be used by Borrowers during the pendency of the Chapter 11 Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such Cash Collateral set forth in the Interim DIP Financing Order): (a) to pay expenses and fees required to be paid to the office of the clerk of the Court or the office of the U.S. Trustee; (b) to pay Professional Fees subject to any limitations in the DIP Financing Orders and the DIP Budget, allowance by the Court, a Borrower's receipt of an itemized billing and expense statement from a Professional Person, as applicable, and DIP Agent's right to object to the allowance or payment of any such Professional Fees; (c) to pay any of the Obligations; (d) to pay taxes with respect to any ABL Priority Collateral to the extent nonpayment thereof is secured by a Lien senior to DIP Agent's Liens thereon; (e) to pay the Pre-Petition ABL Obligations to the extent authorized by the Court; (f) with DIP Lender's consent after the occurrence of an Event of Default, to fund the costs of an orderly liquidation of the Collateral; and (g) to pay other expenses that are incurred during the pendency of the Chapter 11 Cases and described in the DIP Budget not to exceed the Permitted Variances or that are authorized by the Court in orders entered in the Chapter 11 Cases that are acceptable to DIP Agent, but excluding payment of any Pre-Petition Term Loan Obligations and any Term DIP Obligations other than interest accruing on the Term DIP Obligations and on the Pre-Petition First Lien Term Loan Obligations not to exceed the amount shown on the DIP Budget. Notwithstanding anything to the contrary contained herein, in no event shall proceeds of Revolver Loans be used to pay Professional Fees incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (i) seeking damages from DIP Agent, any DIP Lender, Pre-Petition ABL Agent or any Pre-Petition ABL Lender on account of any alleged cause of action arising on, before or after the Petition Date; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) any of the Obligations or Pre-Petition ABL Obligations, or (B) any of the Liens granted to DIP Agent under any of the DIP Loan Documents or to Pre-Petition ABL Agent under any of the Pre-Petition ABL Loan Documents, or to either of them under the DIP Financing Orders; (iii) declaring any

of the DIP Loan Documents or Pre-Petition ABL Loan Documents to be invalid, not binding or unenforceable in any respect; (iv) preventing, enjoining, hindering or otherwise delaying DIP Agent's or Pre-Petition ABL Agent's enforcement of any of the DIP Loan Documents or Pre-Petition ABL Loan Documents, or any realization upon any Collateral or any Pre-Petition ABL Collateral, as applicable (unless such enforcement or realization is in direct violation of an explicit provision in any of the DIP Financing Orders); (v) declaring any Liens granted or purported to be granted under any of the DIP Loan Documents or Pre-Petition ABL Loan Documents to have a priority other than the priority set forth therein or in the DIP Financing Orders; (vi) objecting to the amount or method of calculation by DIP Agent, any DIP Lender, Pre-Petition ABL Agent, or any Pre-Petition ABL Lender of the Pre-Petition ABL Obligations or any of the Obligations, or any accounting rendered by DIP Agent, any DIP Lender, Pre-Petition ABL Agent, or any Pre-Petition ABL Lender with respect to any of those obligations; or (vii) seeking to use the cash proceeds of any of the Collateral or of any of the Pre-Petition ABL Collateral other than as expressly authorized by the DIP Financing Orders, without the prior written consent of Pre-Petition ABL Lenders or DIP Lenders, as applicable.  Nothing in this **Section 1.1.3** shall be construed to waive DIP Agent's right to object to any requests, motions or applications made in or filed with the Court, including any applications for interim or final allowances of Professional Fees.

      1.1.4.  <u>Revolver Notes</u>.  The Revolver Loans made by each DIP Lender and interest accruing thereon shall be evidenced by the records of DIP Agent and such DIP Lender.  At the request of any DIP Lender, Borrowers shall deliver a Revolver Note to such DIP Lender, which shall be payable to such DIP Lender (or the assignee of such DIP Lender), shall be executed by each Borrower, and shall be completed in conformity with this Agreement. All outstanding principal amounts and accrued interest under the Revolver Loans shall be due and payable as set forth in **Section 4.2** hereof.

      1.1.5.  <u>Termination of Commitments</u>.  The Commitments shall terminate on the Revolver Maturity Date, unless sooner terminated in accordance with this Agreement.  On the Commitment Termination Date, Borrowers shall make Full Payment of all Obligations, and any right of Borrowers to use Cash Collateral shall automatically terminate.

    **1.2.**    **Letters of Credit.**

      1.2.1.  <u>Existing Letters of Credit</u>. **<u>Schedule 1.2.1</u>** attached hereto reflects all Existing Letters of Credit as of the Petition Date. On and after the Closing Date, each Existing Letter of Credit shall be deemed to have been issued hereunder and shall cease to be regarded as part of the Pre-Petition ABL Obligations, shall constitute a Letter of Credit for all purposes hereof, and accordingly shall be entitled to all of the benefits and security of this Agreement and the other DIP Loan Documents. All fees heretofore paid in respect of such Existing Letter of Credit shall be deemed to have been paid on account of Pre-Petition ABL Obligations, and any unpaid fees in respect of such Existing Letters of Credit accrued as of the Closing Date and accruing subsequent thereto shall be deemed to be part of the Obligations.

      1.2.2.  <u>Agreement to Issue</u>.  Subject to the terms and conditions of this Agreement, Letter of Credit Issuer shall issue for the account of U.S. Borrowers one or more

Letters of Credit from time to time during the term of this Agreement, at the request of U.S. Borrowers.

      1.2.3.  <u>Amounts; Outside Expiration Date</u>.  Letter of Credit Issuer shall not have any obligation to issue any Letter of Credit at any time if: (i) the issuance of such Letter of Credit would cause the Unused DIP Letter of Credit Subfacility to be exceeded; (ii) the maximum undrawn amount of the requested Letter of Credit and all commissions, fees, and charges due from Borrowers in connection with the issuance thereof would exceed Availability at such time; or (iii) such Letter of Credit has an expiration date less than thirty (30) days prior to the DIP Commitment Termination Date or more than twelve (12) months from the date of issuance for standby letters of credit and 180 days for documentary letters of credit; <u>provided</u> that such Letter of Credit may have an expiration date after the DIP Commitment Termination Date if (a) each of DIP Agent and Letter of Credit Issuer consent in writing prior to the issuance thereof, and (b) all Obligations associated with any such Letter of Credit are Cash Collateralized or otherwise supported in a manner satisfactory to DIP Agent and such Letter of Credit Issuer on or prior to the DIP Commitment Termination Date.  With respect to any Letter of Credit which contains any "evergreen" or automatic renewal provision, each DIP Lender shall be deemed to have consented to any such extension or renewal unless any such DIP Lender shall have provided to DIP Agent, written notice that such DIP Lender declines to consent to any such extension or renewal at least thirty (30) days prior to the date on which Letter of Credit Issuer is entitled to decline to extend or renew such Letter of Credit.  If all of the requirements of this **Section 1.2** are met and no Default or Event of Default has occurred and is continuing, no DIP Lender shall decline to consent to any such extension or renewal.

      1.2.4.  <u>Other Conditions</u>.  In addition to conditions precedent contained in **Section 10**, the obligation of Letter of Credit Issuer to issue any Letter of Credit is subject to the following conditions precedent having been satisfied in a manner reasonably satisfactory to DIP Agent:

      (i)  U.S. Borrowers shall have delivered to Letter of Credit Issuer, at such times and in such manner as such Letter of Credit Issuer may prescribe, an application containing the information described on **Exhibit G** (which shall be delivered in form and substance satisfactory to such Letter of Credit Issuer and reasonably satisfactory to DIP Agent for the issuance of such Letter of Credit) and such other documents as may be required pursuant to the terms thereof, and the form and terms of the proposed Letter of Credit shall be reasonably satisfactory to DIP Agent and Letter of Credit Issuer, and the Letter of Credit shall be issued only for purposes authorized in **Section 1.1.3**;

      (ii)  As of the date of issuance, no order of any Governmental Authority shall purport by its terms to enjoin or restrain Letter of Credit Issuer or money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that such proposed Letter of Credit Issuer refrain from, the issuance of letters of credit generally or the issuance of such Letters of Credit; and

(iii)    If a Defaulting DIP Lender exists, such Defaulting DIP Lender or Borrowers have entered into arrangements satisfactory to DIP Agent and Letter of Credit Issuer to eliminate any Fronting Exposure associated with such Defaulting DIP Lender.

### 1.2.5.  Issuance of Letters of Credit.

(i)    Request for Issuance.  A U.S. Borrower requesting a Letter of Credit must notify DIP Agent of such requested Letter of Credit at least three (3) Business Days prior to the proposed issuance date.  Such notice shall be irrevocable and must specify the original face amount of such Letter of Credit requested, the Business Day of issuance of such requested Letter of Credit, whether such Letter of Credit may be drawn in a single or in partial draws, the Business Day on which such requested Letter of Credit is to expire, the purpose for which such Letter of Credit is to be issued, and the beneficiary of such requested Letter of Credit.  U.S. Borrowers shall attach to such notice the proposed form of such Letter of Credit.

(ii)    Responsibilities of DIP Agent; Issuance.  As of the Business Day immediately preceding the requested issuance date of a Letter of Credit, DIP Agent shall determine the amount of the applicable Unused DIP Letter of Credit Subfacility and Availability.  If (x) the face amount of such requested Letter of Credit is less than the Unused DIP Letter of Credit Subfacility and (y) the amount of such requested Letter of Credit and all commissions, fees, and charges due from Borrowers in connection with the issuance thereof would not exceed Availability, DIP Agent shall cause Letter of Credit Issuer to issue such requested Letter of Credit on the requested issuance date so long as the other conditions hereof are met.

(iii)    No Extensions or Amendment.  DIP Agent shall not be obligated to cause Letter of Credit Issuer to extend or amend any Letter of Credit issued pursuant hereto unless the requirements of this **Section 1.2** are met as though a new Letter of Credit were being requested and issued.

### 1.2.6.  Payments Pursuant to Letters of Credit.  Each Borrower agrees jointly and severally to reimburse Letter of Credit Issuer immediately for any draw under any Letter of Credit and to pay Letter of Credit Issuer the amount of all other charges and fees payable to such Letter of Credit Issuer in connection with any Letter of Credit immediately when due, irrespective of any claim, setoff, defense or other right which any Borrower may have at any time against such Letter of Credit Issuer or any other Person.  Each drawing under any Letter of Credit shall constitute a request by Borrowers to DIP Agent for a Revolver Loan in the amount of such drawing.  The funding date with respect to such Borrowing shall be the date of such drawing.

### 1.2.7.  Indemnification; Exoneration; Power of Attorney.

(i)    Assumption of Risk by Borrowers.  As among Borrowers, DIP Lenders, and DIP Agent, Borrowers assume all risks of the acts and omissions of, or misuse of any of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, DIP Lenders and DIP Agent shall not

6

be responsible for: (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any Person in connection with the application for and issuance of and presentation of drafts with respect to any of the Letters of Credit, even if any such document should prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (C) the failure of the beneficiary of any Letter of Credit to comply duly with conditions required in order to draw upon such Letter of Credit; (D) errors, omissions, interruptions, or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any Letter of Credit or of the proceeds thereof; (G) the misapplication by the beneficiary of any Letter of Credit of the proceeds of any drawing under such Letter of Credit; (H) any consequences arising from causes beyond the control of DIP Lenders or DIP Agent, including any act or omission, whether rightful or wrongful, of any present or future *de jure* or *de facto* Governmental Authority or (I) Letter of Credit Issuer's honor of a draw for which the draw or any certificate fails to comply in any respect with the terms of the Letter of Credit. None of the foregoing shall affect, impair or prevent the vesting of any rights or powers of DIP Agent or any DIP Lender under this **Section 1.2.7(i)**.

(ii) <u>Exoneration</u>. Without limiting the foregoing, no action or omission whatsoever by DIP Agent or any DIP Lender (excluding any DIP Lender in its capacity as a Letter of Credit Issuer) shall result in any liability of DIP Agent or any DIP Lender to any Borrower, or relieve any Borrower of any of its obligations hereunder to any such Person. In connection with its administration and enforcement of rights or remedies under any Letters of Credit or Letter of Credit Documents, Letter of Credit Issuer shall be entitled to act, and shall be fully protected in acting, upon any certification, documentation or communication in whatever form believed by such Letter of Credit Issuer, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person. Letter of Credit Issuer may consult with and employ legal counsel, accountants and other experts to advise it concerning its obligations, rights and remedies, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such experts. Letter of Credit Issuer may employ agents and attorneys-in-fact in connection with any matter relating to any Letters of Credit or Letter of Credit Documents, and shall not be liable for the negligence, default, or misconduct of any such agents and attorneys-in-fact selected by such Letter of Credit Issuer with reasonable care.

(iii) <u>Rights Against Letter of Credit Issuer</u>. Nothing contained in this Agreement is intended to limit any Borrower's rights, if any, with respect to Letter of Credit Issuer which arise as a result of any Letter of Credit Documents.

(iv) <u>Account Party</u>. Borrowers hereby authorize and direct any Letter of Credit Issuer to name one or more Borrowers as the "Account Party" therein and to deliver to DIP Agent all instruments, documents and other writings and property received

by such Letter of Credit Issuer pursuant to the Letter of Credit, and to accept and rely upon DIP Agent's instructions and agreements with respect to all matters arising in connection with such Letter of Credit or the application therefor.

1.2.8.  Participations.

(i)      Immediately upon the issuance by Letter of Credit Issuer of any Letter of Credit, each DIP Lender shall be deemed to have irrevocably and unconditionally purchased and received from such Letter of Credit Issuer, without recourse or warranty, an undivided interest and participation equal to the Pro Rata share of such DIP Lender (a "Participating DIP Lender") in all Letter of Credit Outstandings arising in connection with such Letter of Credit and any security therefor or guaranty pertaining thereto, but in no event greater than an amount which, when added to such DIP Lender's Pro Rata share of all Revolver Loans and Letter of Credit Outstandings then outstanding, exceeds such DIP Lender's Commitment.

(ii)     If Letter of Credit Issuer makes any payment under a Letter of Credit and Borrowers do not repay or cause to be repaid the amount of such payment on the applicable reimbursement date, such Letter of Credit Issuer shall promptly notify DIP Agent, which shall promptly notify each Participating DIP Lender, of such payment and each Participating DIP Lender shall promptly (and in any event within one (1) Business Day after its receipt of notice from DIP Agent) and unconditionally pay to DIP Agent, for the account of such Letter of Credit Issuer, in immediately available funds, the amount of such Participating DIP Lender's Pro Rata share of such payment, and DIP Agent shall promptly pay such amounts to such Letter of Credit Issuer.  If a Participating DIP Lender does not make its Pro Rata share of the amount of such payment available to DIP Agent, on a timely basis as herein provided, such Participating DIP Lender agrees to pay to DIP Agent for the account of such Letter of Credit Issuer, forthwith **on demand**, such amount together with interest thereon at the Federal Funds Rate until paid.  The failure of any Participating DIP Lender to make available to DIP Agent for the account of such Letter of Credit Issuer such Participating DIP Lender's Pro Rata share of the Letter of Credit Outstandings shall not relieve any other Participating DIP Lender of its obligation hereunder to make available to DIP Agent its Pro Rata share of the Letter of Credit Outstandings, but no Participating DIP Lender shall be responsible for the failure of any other Participating DIP Lender to make available to DIP Agent its Pro Rata share of the Letter of Credit Outstandings on the date such payment is to be made.

(iii)    Whenever Letter of Credit Issuer receives a payment on account of the Letter of Credit Outstandings, including any interest thereon, as to which DIP Agent has previously received payments from any DIP Lender for the account of such Letter of Credit Issuer, such Letter of Credit Issuer shall promptly pay to each Participating DIP Lender which has funded its participating interest therein, in immediately available funds, an amount equal to such Participating DIP Lender's Pro Rata share thereof.

(iv)     The obligation of each Participating DIP Lender to make payments to DIP Agent for the account of Letter of Credit Issuer in connection with such Letter of Credit Issuer's payment under a Letter of Credit shall be absolute, unconditional and

8

irrevocable, not subject to any counterclaim, setoff, qualification or exception whatsoever (other than for such Letter of Credit Issuer's gross negligence or willful misconduct), and shall be made in accordance with the terms and conditions of this Agreement under all circumstances and irrespective of whether or not any or all Borrowers may assert or have any claim for any lack of validity or unenforceability of this Agreement or any of the other Loan Documents; the existence of any Default or Event of Default; any draft, certificate or other document presented under a Letter of Credit having been determined to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; the existence of any setoff or defense any Obligor may have with respect to any of the Obligations; or the termination of the Commitments.

(v)       Neither Letter of Credit Issuer nor any of its officers, directors, employees or agents shall be liable to any Participating DIP Lender for any action taken or omitted to be taken under or in connection with any Letter of Credit Documents except as a result of actual gross negligence or willful misconduct on the part of such Letter of Credit Issuer.  Letter of Credit Issuer does not assume any responsibility for any failure or delay in performance or breach by any or all Borrowers or any other Person of any of their respective obligations under any of the Letter of Credit Documents.  Letter of Credit Issuer does not make to Participating DIP Lenders any express or implied warranty, representation or guaranty with respect to the Collateral, any Letter of Credit Documents, or any Obligor.  Letter of Credit Issuer shall not be responsible to any Participating DIP Lender for any recitals, statements, information, representations or warranties contained in, or for the execution, validity, genuineness, effectiveness or enforceability of or any of the Letter of Credit Documents; the validity, genuineness, enforceability, collectibility, value or sufficiency of any of the Collateral or the perfection of any Lien therein; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Borrower, any other Obligor, or any Account Debtor.  In connection with its administration of and enforcement of rights or remedies under any of the Letter of Credit Documents, Letter of Credit Issuer shall be entitled to act, and shall be fully protected in acting upon, any certification, notice or other communication in whatever form believed by such Letter of Credit Issuer, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person.  Letter of Credit Issuer may consult with and employ legal counsel, accountants and other experts and to advise it concerning its rights, powers and privileges under any Letter of Credit Documents and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such experts. Letter of Credit Issuer may employ agents and attorneys in fact in connection with any matter relating to any Letter of Credit Documents and shall not be liable for the negligence, default or misconduct of any such agents or attorneys in fact selected by such Letter of Credit Issuer with reasonable care; nor shall Letter of Credit Issuer have any liability to any Participating DIP Lender by reason of Letter of Credit Issuer's refraining to take any action under any of the Letter of Credit Documents without having first received written instructions from the Required DIP Lenders to take such action.

(vi)      Upon the request of any Participating DIP Lender, Letter of Credit Issuer shall furnish to such Participating DIP Lender copies (to the extent then available to such

Letter of Credit Issuer) of each outstanding Letter of Credit and related Letter of Credit Documents and all other documentation pertaining to such Letter of Credit as may be in the possession of such Letter of Credit Issuer and reasonably requested from time to time by such Participating DIP Lender.

1.2.9. <u>Supporting Letter of Credit; Cash Collateral</u>.  If, notwithstanding the provisions of **Section 1.2.3**, any Letter of Credit is outstanding at any time (a) that an Event of Default under **Section 11.1.1** exists or (b) within twenty (20) Business Days prior to the Commitment Termination Date, then Borrowers shall, at Letter of Credit Issuer's or DIP Agent's request, Cash Collateralize all outstanding Letters of Credit.  Borrowers shall, **on demand** by Letter of Credit Issuer or DIP Agent from time to time, Cash Collateralize the Fronting Exposure of any Defaulting DIP Lender.  If Borrowers fail to provide any Cash Collateral as required hereunder, DIP Lenders may (and shall upon direction of DIP Agent) advance, as Revolver Loans, the amount of the Cash Collateral required (whether or not the Commitments have terminated, an Out of Formula Condition exists or an Out of Formula Loan results therefrom, or the conditions in **Section 10** are satisfied).

1.3.    <u>**Sections 364(c)(1) and 503(b) Priority**</u>.  All Revolver Loans, Letters of Credit and other credit accommodations made or issued hereunder to, and all Bank Product Obligations owing by, any Borrower shall constitute and be deemed a cost and expense of administration in the Chapter 11 Cases and shall be entitled to administrative status under Section 503(b) of the Bankruptcy Code and priority under Section 364(c)(1) of the Bankruptcy Code ahead of all other costs and expenses of administration incurred in any of the Chapter 11 Cases or in any superseding Chapter 7 case, as and to the extent set forth in each DIP Financing Order.

**SECTION 2.  INTEREST, FEES AND CHARGES**

2.1.    <u>**Interest**</u>.

2.1.1. <u>Rates of Interest</u>.  Borrowers jointly and severally agree to pay interest in respect of all unpaid principal amounts of the Revolver Loans from the respective dates such principal amounts are advanced until paid (whether at stated maturity, on acceleration or otherwise) at a rate per annum equal to (i) for Revolver Loans made or outstanding as Base Rate Loans, the Applicable Margin <u>plus</u> the Base Rate in effect from time to time; or (ii) for Revolver Loans made or outstanding as LIBOR Loans, the Applicable Margin <u>plus</u> the LIBOR Rate for the applicable Interest Period selected by a Borrower in conformity with this Agreement. Upon determining the LIBOR Rate for any Interest Period requested by Borrowers, DIP Agent shall promptly notify Borrowers thereof by telephone and promptly confirm the same in writing.  Such determination shall, absent manifest error, be final, conclusive and binding on all parties and for all purposes.  The applicable rate of interest for all Revolver Loans (or portions thereof) bearing interest based upon the Base Rate shall be increased or decreased, as the case may be, by an amount equal to any increase or decrease in the Base Rate, with such adjustments to be effective as of the opening of business on the day that any such change in the Base Rate becomes effective.  Interest on each Revolver Loan shall accrue from and including the date on which such Revolver Loan is made, converted to a Revolver Loan of another Type or continued as a LIBOR Loan to (but excluding) the date of any repayment thereof. If a Revolver Loan is repaid on the same day made, one (1) day's interest shall accrue. The Base Rate on the date

hereof is 3.25% per annum, and, therefore, the rate of interest in effect on the date hereof, expressed in simple interest terms, is 6.50% per annum for Base Rate Revolver Loans.

2.1.2.  <u>Conversions and Continuations</u>.

(i)    Borrowers may on any Business Day, subject to the giving of a proper Notice of Conversion/Continuation as hereinafter described, elect (A) to continue all or any part of a LIBOR Loan by selecting a new Interest Period therefor, to commence on the last day of the immediately preceding Interest Period, or (B) to convert all or any part of a Revolver Loan of one Type into a Revolver Loan of another Type; <u>provided</u>, <u>however</u>, that no outstanding Revolver Loans may be converted into or continued as LIBOR Loans when any Default or Event of Default exists.  Any conversion of a LIBOR Loan into a Base Rate Loan shall be made on the last day of the Interest Period for such LIBOR Loan.  Any conversion or continuation made with respect to less than the entire outstanding balance of the Revolver Loans must be allocated among DIP Lenders on a Pro Rata basis, and the Interest Period for Revolver Loans converted into or continued as LIBOR Loans shall be coterminous for each DIP Lender.

(ii)    Whenever any Borrower desires to convert or continue Revolver Loans under **Section 2.1.2(i)**, SRC shall give DIP Agent written notice (which may be by internet or telephonic notice promptly confirmed in writing) substantially in the form of **Exhibit B**, signed by an authorized officer of such Borrower, at least one (1) Business Day before the requested conversion date, in the case of a conversion into a Base Rate Loan, and at least three (3) Business Days before the requested conversion or continuation date, in the case of a conversion into or continuation of a LIBOR Loan.  Promptly after receipt of a Notice of Conversion/Continuation, DIP Agent shall notify each DIP Lender in writing of the proposed conversion or continuation.  Each such Notice of Conversion/Continuation shall be irrevocable and shall specify the aggregate principal amount of the Revolver Loans to be converted or continued, the date of such conversion or continuation (which shall be a Business Day) and whether such Revolver Loans are being converted into or continued as LIBOR Loans (and, if so, the duration of the Interest Period to be applicable thereto) or Base Rate Loans.  If, upon the expiration of any Interest Period in respect of any LIBOR Loans Borrowers shall have failed to deliver the Notice of Conversion/Continuation, Borrowers shall be deemed to have elected to convert such LIBOR Loans to Base Rate Loans.

2.1.3.  <u>Interest Periods</u>.  In connection with the making or continuation of, or conversion into, each Borrowing of LIBOR Loans, Borrowers shall select an interest period (each an "<u>Interest Period</u>") to be applicable to such LIBOR Loan, which interest period shall commence on the date such LIBOR Loan is made and shall be for a period of thirty (30) days; <u>provided</u>, <u>however</u>, that:

(i)    the initial Interest Period for a LIBOR Loan shall commence on the date of such Borrowing (including the date of any conversion from a Revolver Loan of another Type) and each Interest Period occurring thereafter in respect of such Revolver Loan shall commence on the date on which the next preceding Interest Period expires;

(ii)    if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day, provided that, if any Interest Period in respect of LIBOR Loans would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(iii)    any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall expire on the last Business Day of such calendar month; and

(iv)    no Interest Period shall extend beyond the Revolver Maturity Date.

2.1.4.    Interest Rate Not Ascertainable.    If, due to any circumstance affecting the London interbank market, DIP Agent determines that adequate and fair means do not exist for ascertaining LIBOR Rate on any applicable date or any Interest Period is not available on the basis provided herein, then, and in any such event, DIP Agent shall forthwith give notice (by telephone and promptly confirmed in writing which may be by electronic means) to Borrowers of such determination.    Until DIP Agent notifies Borrowers that the circumstances giving rise to the suspension described herein no longer exist, the obligation of DIP Lenders to make LIBOR Loans shall be suspended, and such affected Revolver Loans then outstanding shall, at the end of the then applicable Interest Period or at such earlier time as may be required by Applicable Law, bear the same interest as Base Rate Loans.

2.1.5.    Default Rate of Interest.    After the occurrence of any Event of Default and if DIP Agent or the Required DIP Lenders in their discretion so elect, the Obligations shall bear interest at the Default Rate (whether before or after any judgment).    Each Borrower acknowledges that the cost and expense to DIP Agent and DIP Lenders due to an Event of Default are difficult to ascertain and that the Default Rate is a fair and reasonable estimate to compensate DIP Agent and DIP Lenders for such cost and expense (each Borrower further acknowledging that the Default Rate may not be the only compensation that DIP Agent and DIP Lenders require to cover costs and expenses incurred in connection with any waiver, forbearance or other agreement after the occurrence of an Event of Default).

**2.2.    Fees.**    In consideration of DIP Lenders' establishment of the Commitments in favor of Borrowers, and DIP Agent's agreement to serve as collateral and administrative agent hereunder, Borrowers, jointly and severally, agree to pay the following fees:

2.2.1.    Closing Fee.    On the Closing Date, Borrowers shall pay to DIP Agent, for the Pro Rata benefit of DIP Lenders, a closing fee in the amount of $625,000.

2.2.2.    Unused Commitment Fee.    Borrowers shall pay to DIP Agent, for the Pro Rata benefit of DIP Lenders, a fee equal to the Unused Commitment Fee Rate times the amount by which the Revolver Commitments exceed the average daily balance of Revolver Loans and stated amounts of Letters of Credit during any month.    Such fee shall be payable in arrears, on the first day of each month and on the Commitment Termination Date; but if the Commitments are terminated on a day other than the first day of a month, then any such fee

12

payable for the month in which termination shall occur shall be paid on the effective date of such termination.

2.2.3.  <u>Letter of Credit Fee</u>.  Borrowers shall pay to DIP Agent, for the Pro Rata benefit of the DIP Lenders, for each Letter of Credit issued or deemed issued hereunder after the Petition Date, a fee (the "<u>Letter of Credit Fee</u>") equal to the Letter of Credit Fee Percentage per annum in effect from time to time and to DIP Agent for the benefit of Letter of Credit Issuer a fronting fee of twenty-five (25) basis points per annum of the undrawn face amount of such Letter of Credit, and to Letter of Credit Issuer, all reasonable out of pocket costs, fees and expenses incurred by such Letter of Credit Issuer in connection with the application for, processing of, issuance of, or amendment to such Letter of Credit, which costs, fees and expenses shall not include any additional "fronting fee" to such Letter of Credit Issuer.  The Letter of Credit Fee shall be payable monthly in arrears on the first day of each month following any month in which a Letter of Credit is outstanding and on the Commitment Termination Date.  The Letter of Credit Fee shall be computed on the basis of a 360 day year for the actual number of days elapsed.

2.2.4.  <u>Audit and Appraisal Fees</u>.  Borrowers shall reimburse DIP Agent and DIP Lenders for all reasonable costs and expenses incurred by DIP Agent and DIP Lenders in connection with all audits, inspections, examinations and appraisals with respect to any Obligor or Collateral as DIP Agent shall deem appropriate in the exercise of its reasonable credit judgment; <u>provided</u>, <u>however</u>, Borrowers shall only be obligated to reimburse DIP Agent for up to four (4) field examinations and up to two (2) Inventory Appraisals per Fiscal Year; and <u>provided</u> <u>further</u> that upon and during the continuance of an Event of Default, Borrowers shall be obligated to reimburse DIP Agent for any and all field examinations and Inventory Appraisals conducted by DIP Agent or a third party on its behalf.  The foregoing fees shall be due and payable ten (10) days after Borrowers receive invoices therefor from DIP Agent; <u>provided</u>, <u>however</u>, upon and during the continuance of an Event of Default, such fees shall be due and payable on demand.  On the Closing Date, Borrowers shall pay to DIP Agent all appraisal and audit fees incurred by DIP Agent prior to the Closing Date in connection with the consummation of the transactions evidenced hereby together with all reasonable out of pocket expenses incurred by DIP Agent in connection therewith, which fees and expenses shall be described in reasonable detail in an invoice from DIP Agent delivered to Borrowers not less than one (1) Business Day prior to the Closing; <u>provided</u> that failure to provide such invoice within such time period shall not relieve Borrowers of their obligation to pay DIP Agent for such fees and expenses.  Borrowers agree to pay DIP Agent's then standard charges for examination activities, including the standard charges of DIP Agent's internal examination and appraisal groups (such customary charges are currently $1,100 per day per employee for each day that an employee of DIP Agent shall be engaged in any field examination or audit, plus all reasonable out of pocket expenses incurred in connection therewith), as well as the charges of any third party used for such purposes.

2.2.5.  <u>General Provisions</u>.  All fees shall be fully earned by the identified recipient thereof pursuant to the foregoing provisions of this Agreement on the due date thereof (and, in the case of a Letter of Credit, upon each issuance, renewal or extension of such Letter of Credit) and, except as otherwise set forth herein or required by Applicable Law, shall not be subject to rebate, refund or proration.  All fees provided for in **Section 2.2** are and shall be

deemed to be compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.

**2.3.    Computation of Interest and Fees.**  All interest, fees and other charges provided for in this Agreement that are calculated as a per annum percentage of any amount, shall be calculated daily and shall be computed on the actual number of days elapsed over a year of 365/366 days for Base Rate Loans and 360 days for LIBOR Loans and all fees and charges.  For purposes of computing interest and other charges hereunder, all Payment Items and other forms of payment received by DIP Agent shall be deemed applied by DIP Agent on account of the Obligations (subject to final payment of such items) on the Business Day that DIP Agent receives such items in immediately available funds in the Payment Account, and DIP Agent shall be deemed to have received such Payment Item on the date specified in **Section 4.1** hereof. DIP Agent's determination of any interest, fees, charges or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.

**2.4.    Reimbursement Obligations.**

2.4.1.  Borrowers shall reimburse DIP Agent (and to the extent provided in **Section 4.6.2**, DIP Lenders) for all Extraordinary Expenses. Borrowers shall also reimburse DIP Agent and, during any period that an Event of Default then exists, each DIP Lender, for all accounting, appraisal and other fees and expenses (including reasonable attorneys' fees) incurred by DIP Agent or any DIP Lender in connection with (i) the negotiation and preparation of any of the DIP Loan Documents, any amendment or modification thereto, any waiver of any Default or Event of Default thereunder, or any restructuring or forbearance with respect thereto; (ii) the monitoring and administration of and actions relating to any of the Chapter 11 Cases, any Collateral, any of the DIP Loan Documents and the transactions contemplated thereby, to the extent that such fees and expenses are expressly provided for in this Agreement or any of the other DIP Loan Documents; (iii) action taken to perfect or maintain the perfection or priority of any of DIP Agent's Liens with respect to any of the Collateral; (iv) subject to the limits of **Section 2.2.4**, each audit, inspection, examination or appraisal with respect to any Obligor or Collateral, whether prepared by DIP Agent's personnel or a third party; (v) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral; (vi) subject to the provisions of **Section 14.2** of this Agreement, any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against DIP Agent, any DIP Lender, any Obligor or any other Person) in any way arising out of or relating to any of the Collateral (or the validity, perfection or priority of any of DIP Agent's Liens thereon), any of the DIP Loan Documents, or the validity, allowance or amount of any of the Obligations; (vii) the protection or enforcement of any rights or remedies of DIP Agent or any DIP Lender in any of the Chapter 11 Cases; (viii) any actions taken to maintain any insurance required hereunder or under any other DIP Loan Document; and (ix) any other action taken by DIP Agent or any DIP Lender to enforce any of the rights or remedies of DIP Agent or such DIP Lender against any Obligor or any Account Debtors to enforce collection of any of the Obligations or payments with respect to any of the Collateral.  All amounts chargeable to Borrowers under this **Section 2.4** shall constitute Obligations that are secured by all of the Collateral and shall be payable ten (10) days after Borrowers receive demand therefor from DIP Agent or applicable DIP Lender; provided, however, upon and during the continuance of an Event of Default, such fees and expenses shall be due and payable **on demand**.  Borrowers shall

also reimburse DIP Agent for reasonable expenses incurred by DIP Agent in its administration of any of the Collateral to the extent and in the manner provided in **Section 7** hereof or in any of the other DIP Loan Documents. The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the DIP Loan Documents regarding the reimbursement by Borrowers of costs, expenses or liabilities suffered or incurred by DIP Agent or any DIP Lender.

        2.4.2.  If at any time DIP Agent or (with the consent of DIP Agent) any DIP Lender shall agree to indemnify any Person against losses or damages that such Person may suffer or incur in its dealings or transactions with any or all of Borrowers, or shall guarantee any liability or obligation of any or all of Borrowers to such Person, or otherwise shall provide assurances of any Borrower's payment or performance under any agreement with such Person, including indemnities, guaranties or other assurances of payment or performance given by DIP Agent or any DIP Lender with respect to Bank Products or Letters of Credit, then the Contingent Obligation of DIP Agent or any DIP Lender providing any such indemnity, guaranty or other assurance of payment or performance, together with any payment made or liability incurred by DIP Agent or any DIP Lender in connection therewith, shall constitute Obligations that are secured by the Collateral and, subject to the provisions of **Section 14.2** of this Agreement, Borrowers shall repay, **on demand**, any amount so paid or any liability incurred by DIP Agent or any DIP Lender in connection with any such indemnity, guaranty or assurance.  Nothing herein shall be construed to impose upon DIP Agent or any DIP Lender any obligation to provide any such indemnity, guaranty or assurance except to the extent provided in **Section 1.2** hereof.  The foregoing agreement of Borrowers shall apply whether or not such indemnity, guaranty or assurance is in writing or oral and regardless of any Borrower's knowledge of the existence thereof, and shall be in addition to any provision of the DIP Loan Documents regarding reimbursement by Borrowers of costs, expenses or liabilities suffered or incurred by DIP Agent or any DIP Lender.

        **2.5.**    **Bank Charges.**  Borrowers shall pay to DIP Agent, within ten (10) days after invoice prior to the occurrence of an Event of Default or **on demand** upon and during the continuance of an Event of Default, any and all fees, costs or expenses which DIP Agent or any DIP Lender pays to a bank or other similar institution (including any fees paid by DIP Agent or any DIP Lender to any DIP Participant) arising out of or in connection with (i) the forwarding to any Borrower or any other Person on behalf of any Borrower by DIP Agent or any DIP Lender of proceeds of any Revolver Loan made by DIP Lenders to any Borrower pursuant to this Agreement and (ii) the depositing for collection by DIP Agent or any DIP Lender of any Payment Item received or delivered to DIP Agent or any DIP Lender on account of the Obligations.  Each Borrower acknowledges and agrees that DIP Agent may charge such costs, fees and expenses to Borrowers based upon DIP Agent's good faith estimate of such costs, fees and expenses as they are incurred by DIP Agent or any DIP Lender.

        **2.6.**    **Illegality.**  Notwithstanding anything to the contrary contained elsewhere in this Agreement, if (i) any change in any law or regulation or in the interpretation thereof by any Governmental Authority charged with the administration thereof shall make it unlawful for a DIP Lender to make or maintain a LIBOR Loan or to give effect to its obligations as contemplated hereby with respect to a LIBOR Loan or (ii) at any time such DIP Lender determines that the making or continuance of any LIBOR Loan has become impracticable as a result of a contingency occurring after the date hereof which adversely affects the London

interbank market, then such DIP Lender shall give, after such determination, DIP Agent and Borrowers notice thereof and may thereafter (a) declare that LIBOR Loans will not thereafter be made by such DIP Lender, whereupon any request by a U.S. Borrower for a LIBOR Loan shall be deemed a request for a Base Rate Loan unless such DIP Lender's declaration shall be subsequently withdrawn (which declaration shall be withdrawn promptly after the cessation of the circumstances described in clause (i) or (ii) above); and (b) require that all outstanding LIBOR Loans made by such DIP Lender be converted to Base Rate Loans, under the circumstances of clause (i) or (ii) of this **Section 2.6** insofar as such DIP Lender determines the continuance of LIBOR Loans to be impracticable, in which event all such LIBOR Loans shall be converted automatically to Base Rate Loans as of the date of any Borrower's receipt of the aforesaid notice from such DIP Lender.

2.7. <u>**Increased Costs.**</u>

2.7.1. If, by reason of any Change in Law:

(i)    any Recipient shall be subject to Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (b), (c) or (d) of the definition of Excluded Taxes, or (iii) Connection Income Taxes) with respect to any Revolver Loan, Letter of Credit, Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(ii)    any reserve (including any imposed by the Board of Governors), special deposits or similar requirement against assets of, deposits with or for the account of, or credit extended by, any DIP Lender or Letter of Credit Issuer shall be imposed or deemed applicable or any other condition affecting its LIBOR Loans, a Letter of Credit, any of the DIP Loan Documents or its obligation to make LIBOR Loans, to participate in Letter of Credit obligations or to extend any other credit hereunder shall be imposed on such DIP Lender or Letter of Credit Issuer;

and as a result thereof there shall be any increase in the cost to such DIP Lender of agreeing to make or making, funding or maintaining LIBOR Loans (except to the extent already included in the determination of the applicable LIBOR Rate for LIBOR Loans), or to increase the costs to such DIP Lender or Letter of Credit Issuer of participating in, issuing or maintaining any Letter of Credit, or there shall be a reduction in the amount received or receivable by such DIP Lender or Letter of Credit Issuer, then such DIP Lender or Letter of Credit Issuer shall, promptly after determining the existence or amount of any such increased costs or reduced amounts for which such DIP Lender or Letter of Credit Issuer seeks payment hereunder, give Borrowers a certificate as to the amount of such increased cost or reduced amounts thereof (with a copy to DIP Agent) and, provided that any such additional amount shall be applicable to all customers of such DIP Lender or Letter of Credit Issuer under loan facilities of the type provided for under this Agreement, Borrowers shall pay to DIP Agent for the account of such DIP Lender or Letter of Credit Issuer an additional amount sufficient to indemnify such DIP Lender or Letter of Credit Issuer against such increased costs or reduced amounts within ten (10) days after the receipt of such certificate; <u>provided</u>, <u>however</u>, Borrowers shall pay such

amount on the date of the receipt of such certificate upon and during the continuance of an Event of Default hereunder.

2.7.2. DIP Agent will promptly notify SRC and DIP Lenders if, in connection with a Borrowing of, conversion to or continuation of a LIBOR Loan, (a) DIP Agent determines that (i) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable Revolver Loan amount or Interest Period, or (ii) adequate and reasonable means do not exist for determining LIBOR for the applicable Interest Period; or (b) the Required DIP Lenders determine for any reason that LIBOR for the applicable Interest Period does not adequately and fairly reflect the cost to DIP Lenders of funding such Revolver Loan. Thereafter, the obligation of DIP Lenders to make or maintain LIBOR Loans shall be suspended to the extent of the affected LIBOR Loan or Interest Period until DIP Agent (upon instruction by the Required DIP Lenders) revokes the notice. Upon receipt of such notice, SRC may revoke any pending request for a Borrowing, conversion or continuation of a LIBOR Loan or, failing that, will be deemed to have submitted a request for a Base Rate Loan.

For purposes of this **Section 2.7**, all references to a DIP Lender or Letter of Credit Issuer shall be deemed to include any bank holding company or bank parent of such DIP Lender or Letter of Credit Issuer.

**2.8.** **Capital Adequacy.** If any DIP Lender or Letter of Credit Issuer determines that after the date hereof any Change in Law has the effect of reducing the return on any DIP Lender's or Letter of Credit Issuer's capital to a level below that which such DIP Lender or Letter of Credit Issuer could have achieved (taking into consideration such DIP Lender's and its holding company's policies or such Letter of Credit Issuer's and its holding company's policies with respect to capital adequacy immediately before such adoption, change or compliance and assuming that such DIP Lender's or Letter of Credit Issuer's capital was fully utilized prior to such adoption, change or compliance) but for such Change in Law:

(i) DIP Agent shall promptly, after its receipt of a certificate from such DIP Lender or Letter of Credit Issuer setting forth such DIP Lender's or Letter of Credit Issuer's determination of such occurrence, give notice thereof to Borrowers and DIP Lenders; and

(ii) provided that any such additional fee shall be applicable to all customers of such DIP Lender or Letter of Credit Issuer under loan facilities of the type provided for under this Agreement, Borrowers shall pay to DIP Agent, for the account of such DIP Lender or Letter of Credit Issuer, as an additional fee from time to time, within ten (10) days of such notice prior to the occurrence of an Event of Default or on demand upon and during the continuance of an Event of Default, such amount as such DIP Lender or Letter of Credit Issuer certifies to be the amount reasonably calculated to compensate such DIP Lender or Letter of Credit Issuer for such reduction.

Such certificate will set forth, in reasonable detail, the nature of the occurrence giving rise to such compensation, the additional amount or amounts to be paid to such DIP Lender or Letter of Credit Issuer (including the basis for such DIP Lender's or Letter of Credit Issuer's determination of such amount), and the method by which such amounts were determined. In

determining such amount, such DIP Lender or Letter of Credit Issuer may use any reasonable averaging and attribution method.  For purposes of this **Section 2.8**, all references to a DIP Lender or Letter of Credit Issuer shall be deemed to include any bank holding company or bank parent of such DIP Lender or Letter of Credit Issuer.  Notwithstanding the foregoing, Borrowers shall not be liable to DIP Agent, any DIP Lender or Letter of Credit Issuer for any amounts claimed under this **Section 2.8** in connection with events that occurred more than 180 days before Borrowers' receipt of a DIP Lender's or Letter of Credit Issuer's certificate claiming entitlement to such compensation.

2.9.  **Funding Losses.**  If for any reason (other than due to a default by a DIP Lender or as a result of a DIP Lender's refusal to honor a LIBOR Loan request due to circumstances described in **Section 2.6** or **2.7** hereof) (i) a Borrowing of, or conversion to or continuation of, LIBOR Loans does not occur on the date specified therefor in a Notice of Borrowing or Notice of Conversion/ Continuation (whether or not withdrawn), (ii) if any repayment (including any conversions pursuant to **Section 2.1.2** hereof) of any of its LIBOR Loans occurs on a date that is not the last day of an Interest Period applicable thereto, (iii) a DIP Lender (other than a Defaulting DIP Lender) is required to assign a LIBOR Loan prior to the end of its Interest Period pursuant to **Section 12.17**, or (iv) if for any reason Borrowers default in their obligation to repay LIBOR Loans when required by the terms of this Agreement, then Borrowers shall jointly and severally pay to DIP Agent, for the ratable benefit of the affected DIP Lenders, within ten (10) days after DIP Agent's or an affected DIP Lender's demand therefor, DIP Agent's customary administrative charges and to each DIP Lender all resulting losses and expenses, including loss of anticipated profits and any loss or expense arising from liquidation or redeployment of funds or from fees payable to terminate deposits of matching funds. Borrowers shall pay such amount upon presentation by DIP Agent of a statement setting forth the amount and DIP Agent's calculation thereof pursuant hereto, which statement shall be deemed true and correct absent manifest error.  For purposes of this **Section 2.9**, all references to a DIP Lender shall be deemed to include any bank holding company or bank parent of such DIP Lender.  DIP Lenders shall not be required to purchase Dollar deposits in any interbank or offshore Dollar market to fund any LIBOR Loan, but this **Section 2.9** shall apply as if each DIP Lender had purchased such deposits.

2.10.  **Maximum Interest.**  Regardless of any provision contained in any of the DIP Loan Documents, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by DIP Agent and DIP Lenders pursuant to the terms of this Agreement or any of the other DIP Loan Documents and that are deemed interest under Applicable Law exceed the highest rate permissible under any Applicable Law.  No agreements, conditions, provisions or stipulations contained in this Agreement or any of the other DIP Loan Documents or the exercise by DIP Agent of the right to accelerate the payment or the maturity of all or any portion of the Obligations, or the exercise of any option whatsoever contained in any of the DIP Loan Documents, or the prepayment by any or all Borrowers of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle DIP Agent or any DIP Lender to charge or receive, in any event, interest or any charges, amounts, premiums or fees deemed interest by Applicable Law (such interest, charges, amounts, premiums and fees referred to herein collectively as "Interest") in excess of the Maximum Rate and in no event shall any Borrower be obligated to pay Interest exceeding such Maximum Rate, and all agreements,

18

conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel any Borrower to pay Interest exceeding the Maximum Rate shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such Maximum Rate.  If any Interest is charged or received in excess of the Maximum Rate ("Excess"), each Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and such Excess, to the extent received, shall be applied first to reduce the principal Obligations and the balance, if any, returned to Borrowers, it being the intent of the parties hereto not to enter into a usurious or otherwise illegal relationship. The right to accelerate the maturity of any of the Obligations does not include the right to accelerate any Interest that has not otherwise accrued on the date of such acceleration, and DIP Agent and DIP Lenders do not intend to collect any unearned Interest in the event of any such acceleration.  Each Borrower recognizes that, with fluctuations in the rates of interest set forth in **Section 2.1.1** of this Agreement and in the Maximum Rate, such an unintentional result could inadvertently occur.  All monies paid to DIP Agent or any DIP Lender hereunder or under any of the other DIP Loan Documents, whether at maturity or by prepayment, shall be subject to any rebate of unearned Interest as and to the extent required by Applicable Law.  By the execution of this Agreement, each Borrower covenants that (i) the credit or return of any Excess shall constitute the acceptance by such Borrower of such Excess, and (ii) no Borrower shall seek or pursue any other remedy, legal or equitable, against DIP Agent or any DIP Lender, based in whole or in part upon contracting for, charging or receiving any Interest in excess of the Maximum Rate.  For the purpose of determining whether or not any Excess has been contracted for, charged or received by DIP Agent or any DIP Lender, all Interest at any time contracted for, charged or received from any or all Borrowers in connection with any of the DIP Loan Documents shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Obligations.  Borrowers, DIP Agent and DIP Lenders shall, to the maximum extent permitted under Applicable Law, (i) characterize any non-principal payment as an expense, fee or premium rather than as Interest and (ii) exclude voluntary prepayments and the effects thereof.  The provisions of this **Section 2.10** shall be deemed to be incorporated into every DIP Loan Document (whether or not any provision of this Section is referred to therein).  All such DIP Loan Documents and communications relating to any Interest owed by any or all Borrowers and all figures set forth therein shall, for the sole purpose of computing the extent of Obligations, be automatically recomputed by Borrowers, and by any court considering the same, to give effect to the adjustments or credits required by this **Section 2.10**.

## SECTION 3.  LOAN ADMINISTRATION

    **3.1.**   **Manner of Borrowing and Funding Revolver Loans**.  Borrowings under the Commitments established pursuant to **Section 1.1** hereof shall be made and funded as follows:

        3.1.1.  Notice of Borrowing.

        (i)      Whenever U.S. Borrowers desire to make a Borrowing under **Section 1.1** of this Agreement, U.S. Borrowers shall give DIP Agent prior written notice (which may be by internet or telephonic notice promptly confirmed in writing) of such Borrowing request (a "Notice of Borrowing"), which shall be in the form of **Exhibit C** annexed hereto and signed by an authorized officer of SRC.  Such Notice of Borrowing shall be

given by such U.S. Borrower no later than 12:00 noon at the office of DIP Agent designated by DIP Agent from time to time (a) on the Business Day of the requested funding date of such Borrowing, in the case of Base Rate Loans, and (b) at least three (3) Business Days prior to the requested funding date of such Borrowing, in the case of LIBOR Loans.  Notices received after 12:00 noon shall be deemed received on the next Business Day. The Revolver Loans made by each DIP Lender on the Closing Date shall be made as Base Rate Loans and thereafter may be made or continued as or converted into Base Rate Loans or LIBOR Loans. Each Notice of Borrowing (or telephonic notice thereof) shall be irrevocable and shall specify (a) the principal amount of the Borrowing, (b) the date of Borrowing (which shall be a Business Day), (c) whether the Borrowing is to consist of Base Rate Loans or LIBOR Loans, (d) in the case of LIBOR Loans, the duration of the Interest Period to be applicable thereto, and (e) the account of U.S. Borrowers to which the proceeds of such Borrowing are to be disbursed. U.S. Borrowers may not request any LIBOR Loans if an Event of Default exists.

(ii)     Unless payment is otherwise timely made by Borrowers, the becoming due of any amount required to be paid under this Agreement or any of the other DIP Loan Documents with respect to any Obligations (whether as principal, accrued interest, fees or other charges, including Extraordinary Expenses, Bank Product Obligations, and the repayment of any Letter of Credit Outstandings) shall be deemed irrevocably to be a request (without any requirement for the submission of a Notice of Borrowing) for Revolver Loans on the due date of, and in an aggregate amount required to pay, such Obligations, and the proceeds of such Revolver Loans may be disbursed by way of direct payment of the relevant Obligation and shall bear interest as a Revolver Loan.  Neither DIP Agent nor any DIP Lender shall have any obligation to Borrowers to honor any deemed request for a Revolver Loan after the Commitment Termination Date, when an Out of Formula Condition exists or would result therefrom, or when any condition precedent set forth in **Section 10** hereof is not satisfied, but may do so in their discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default and regardless of whether such Revolver Loan is funded after the Commitment Termination Date. DIP Lenders may fund Professional Fees as provided in the DIP Financing Orders, and all such fundings, if made, shall constitute Revolver Loans. In addition, DIP Agent may, at its option, charge such Obligations against any operating, investment or other account of a Borrower maintained with DIP Agent or any of its Affiliates.

(iii)     As an accommodation to Borrowers, DIP Agent and DIP Lenders may permit electronic requests for Borrowings and shall permit electronic transmittal of instructions, authorizations, agreements or reports to DIP Agent by Borrowers.  Neither DIP Agent nor any DIP Lender shall have any liability to any Borrower for any loss or damage suffered by such Borrower as a result of DIP Agent's or any DIP Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it electronically and purporting to have been sent to DIP Agent or DIP Lenders by a Borrower, and neither DIP Agent nor any DIP Lender shall have any duty to verify the origin of any such communication or the identity or authority of the Person sending it.

(iv)    If Borrowers maintain any disbursement account with DIP Agent or any Affiliate of DIP Agent, then presentation for payment of any Payment Item when there are insufficient funds to cover it shall be deemed to be a request by U.S. Borrowers for a Revolver Loan on the date of such presentation, in the amount of the Payment Item. The proceeds of such Revolver Loan may be disbursed directly to the disbursement account or other appropriate account.

3.1.2.    Fundings by DIP Lenders.  Subject to its receipt of notice from DIP Agent of a Notice of Borrowing as provided in **Section 3.1.1(i)** (except in the case of a deemed request by a U.S. Borrower for a Revolver Loan as provided in **Sections 3.1.1(ii)**, **3.1.1(iv)** or **3.1.3(ii)** hereof, in which event no Notice of Borrowing need be submitted), each DIP Lender shall timely honor its Commitment by funding its Pro Rata share of each Borrowing of Revolver Loans that is properly requested by a U.S. Borrower and that such U.S. Borrower is entitled to receive under this Agreement.  DIP Agent shall endeavor to notify DIP Lenders of each Notice of Borrowing (or deemed request for a Borrowing pursuant to **Sections 3.1.1(ii)** or **3.1.1(iv)** hereof) by 12:00 noon on the proposed funding date (in the case of Base Rate Loans) or by 3:00 p.m. at least two (2) Business Days before the proposed funding date (in the case of LIBOR Loans).  Each DIP Lender shall deposit with DIP Agent an amount equal to its Pro Rata share of the Borrowing requested or deemed requested by such U.S. Borrower at DIP Agent's designated bank in immediately available funds not later than 2:00 p.m. on the date of funding of such Borrowing, unless DIP Agent's notice to DIP Lenders is received after 12:00 noon on the proposed funding date, in which event DIP Lenders shall deposit with DIP Agent their respective Pro Rata shares of the requested Borrowing on or before 11:00 a.m. of the next Business Day.  Subject to its receipt of such amounts from DIP Lenders, DIP Agent shall make the proceeds of the Revolver Loans received by it available to such U.S. Borrower by disbursing such proceeds in accordance with such U.S. Borrower's disbursement instructions set forth in the applicable Notice of Borrowing.  Neither DIP Agent nor any DIP Lender shall have any liability on account of any delay by any bank or other depository institution in treating the proceeds of any Revolver Loan as collected funds or any delay in receipt, or any loss, of funds that constitute a Revolver Loan, the wire transfer of which was initiated by DIP Agent in accordance with wiring instructions provided to DIP Agent.  Unless DIP Agent shall have been notified in writing by a DIP Lender prior to the proposed time of funding that such DIP Lender does not intend to deposit with DIP Agent an amount equal such DIP Lender's Pro Rata share of the requested Borrowing (or deemed request for a Borrowing pursuant to **Sections 3.1.1(ii)**, or **3.1.1(iv)** hereof), DIP Agent may assume that such DIP Lender has deposited or promptly will deposit its share with DIP Agent, and DIP Agent may in its discretion disburse a corresponding amount to such U.S. Borrower on the applicable funding date.  If a DIP Lender's Pro Rata share of such Borrowing or of any settlement pursuant to **Section 3.1.3(i)** is not in fact deposited with DIP Agent, then, if DIP Agent has disbursed to such U.S. Borrower an amount corresponding to such share, then such DIP Lender agrees to pay, and in addition Borrowers jointly and severally agree to repay, to DIP Agent forthwith on demand such corresponding amount, together with interest thereon, for each day from the date such amount is disbursed by DIP Agent to or for the benefit of such U.S. Borrower until the date such amount is paid or repaid to DIP Agent, (a) in the case of Borrowers, at the interest rate applicable to such Borrowing and (b) in the case of such DIP Lender, at the Federal Funds Rate.  If such DIP Lender repays to DIP Agent such corresponding amount, such amount so repaid shall constitute a Revolver Loan, and if both such DIP Lender and Borrowers shall have repaid such corresponding amount, DIP Agent shall promptly return to

Borrowers such corresponding amount in same day funds. A notice from DIP Agent submitted to any DIP Lender with respect to amounts owing under this **Section 3.1.2** shall be conclusive, absent manifest error.

3.1.3.  <u>Settlement and Settlement Loans</u>.

(i)    In order to facilitate the administration of the Revolver Loans under this Agreement, DIP Lenders agree (which agreement shall be solely between DIP Lenders and DIP Agent and shall not be for the benefit of or enforceable by any Borrower) that settlement among them with respect to the Revolver Loans may take place on a periodic basis on dates determined from time to time by DIP Agent (each a "<u>Settlement Date</u>"), which may occur before or after the occurrence or during the continuance of a Default or Event of Default and whether or not all of the conditions set forth in **Section 10** of this Agreement have been met. On each Settlement Date, payment shall be made by or to each DIP Lender in the manner provided herein and in accordance with the Settlement Report delivered by DIP Agent to DIP Lenders with respect to such Settlement Date so that, as of each Settlement Date and after giving effect to the transaction to take place on such Settlement Date, each DIP Lender shall hold its Pro Rata share of all Revolver Loans and participations in Letter of Credit Outstandings then outstanding. DIP Agent shall request settlement with DIP Lenders on a basis not less frequently than once every five (5) Business Days.

(ii)    Between Settlement Dates, DIP Agent may request BofA to advance, and BofA may, but shall in no event be obligated to, advance to U.S. Borrowers out of BofA's own funds the entire principal amount of any Borrowing of Revolver Loans requested or deemed requested pursuant to this Agreement (any such Revolver Loan funded exclusively by BofA being referred to as a "<u>Settlement Loan</u>"). Each Settlement Loan shall constitute a Revolver Loan hereunder and shall be subject to all of the terms, conditions and security applicable to other Revolver Loans, except that all payments thereon shall be payable to BofA solely for its own account. The obligation of Borrowers to repay such Settlement Loans to BofA shall be evidenced by the records of BofA and need not be evidenced by any promissory note. DIP Agent shall not request BofA to make any Settlement Loan if (a) DIP Agent shall have received written notice from any DIP Lender that one or more of the applicable conditions precedent set forth in **Section 10** hereof will not be satisfied on the requested funding date for the applicable Borrowing or (b) the requested Borrowing would exceed the amount of Availability on the funding date or would cause the then outstanding principal balance of all Settlement Loans to exceed 12.5% of the aggregate Commitments. BofA shall not be required to determine whether the applicable conditions precedent set forth in **Section 10** hereof have been satisfied or the requested Borrowing would exceed the amount of Availability on the funding date applicable thereto prior to making, in its sole discretion, any Settlement Loan. On each Settlement Date, or, if earlier, upon demand by DIP Agent for payment thereof, the then outstanding Settlement Loans shall be immediately due and payable. As provided in **Sections 3.1.1(ii)** and **3.1.1(iv)**, U.S. Borrowers shall be deemed to have requested (without the necessity of submitting any Notice of Borrowing) Revolver Loans to be made on each Settlement Date in the amount of all outstanding Settlement Loans and to have DIP Agent cause the proceeds of such Revolver Loans to be applied to the

22

repayment of such Settlement Loans and interest accrued thereon.  DIP Agent shall notify DIP Lenders of the outstanding balance of Revolver Loans prior to 12:00 noon on each Settlement Date, and each DIP Lender (other than BofA) shall deposit with DIP Agent (without setoff, counterclaim or reduction of any kind) an amount equal to its Pro Rata share of the amount of Revolver Loans deemed requested in immediately available funds not later than 2:00 p.m. on such Settlement Date, and without regard to whether any of the conditions precedent set forth in **Section 10** hereof are satisfied or the Commitment Termination Date has occurred. The proceeds of Settlement Loans may be used solely for purposes for which Revolver Loans generally may be used in accordance with **Section 1.1.3** hereof.  If any amounts received by BofA in respect of any Settlement Loans are later required to be returned or repaid by BofA to any or all Borrowers or any other Obligor or their respective representatives or successors-in-interest, whether by court order, settlement or otherwise, other DIP Lenders shall, upon demand by BofA with notice to DIP Agent, pay to DIP Agent for the account of BofA, an amount equal to each other DIP Lender's Pro Rata share of all such amounts required to be returned by BofA.

3.1.4. <u>Disbursement Authorization</u>.    Each U.S. Borrower hereby irrevocably authorizes DIP Agent to disburse the proceeds of each Revolver Loan requested by any U.S. Borrower, or deemed to be requested pursuant to **Section 3.1.1** or **Section 3.1.3(ii)**, as follows:  (i) the proceeds of each Revolver Loan requested under **Section 3.1.1(i)** shall be disbursed by DIP Agent in accordance with the terms of the written disbursement letter from U.S. Borrowers in the case of the initial Borrowing, and, in the case of each subsequent Borrowing, by wire transfer to such bank account as may be agreed upon by any U.S. Borrower and DIP Agent from time to time or elsewhere if pursuant to a written direction from such Borrower; and (ii) the proceeds of each Revolver Loan requested under **Sections 3.1.1(ii)**, **3.1.1(iv)** or **3.1.3(ii)** shall be disbursed by DIP Agent by way of direct payment of the relevant interest or other Obligation.  Any Revolver Loan proceeds received by any U.S. Borrower or in payment of any of the Obligations shall be deemed to have been received by all Borrowers.

**3.2.    <u>Defaulting DIP Lender</u>.**

3.2.1. <u>Reallocation of Pro Rata Share; Amendments</u>.  For purposes of determining DIP Lenders' obligations to fund or participate in Revolver Loans or Letters of Credit, DIP Agent may exclude the Commitments and Revolver Loans of any Defaulting DIP Lender(s) from the calculation of Pro Rata shares.  A Defaulting DIP Lender shall have no right to vote on any amendment, waiver or other modification of a DIP Loan Document, except as provided in **Section 12.9.1**.

3.2.2. <u>Payments; Fees</u>.  DIP Agent may, in its discretion, receive and retain any amounts payable to a Defaulting DIP Lender under the DIP Loan Documents, and a Defaulting DIP Lender shall be deemed to have assigned to DIP Agent such amounts until all Obligations owing to DIP Agent, non-Defaulting DIP Lenders and other DIP Secured Parties have been paid in full.  DIP Agent, in its discretion, may use such amounts to cover the Defaulting DIP Lender's defaulted obligations, to Cash Collateralize such Defaulting DIP Lender's Fronting Exposure, to readvance the amounts to U.S. Borrowers, or to repay Obligations.  A DIP Lender shall not be entitled to receive any fees accruing hereunder during the period in which it is a Defaulting DIP Lender, and the unfunded portion of its Commitment

23

shall be disregarded for purposes of calculating the unused commitment fee under **Section 2.2.2**. If any Letter of Credit Outstandings owing to a Defaulted DIP Lender are reallocated to other DIP Lenders, fees attributable to such Letter of Credit Outstandings under **Section 2.2.3** shall be paid to such other DIP Lenders.  DIP Agent shall be paid all fees attributable to Letter of Credit Outstandings that are not reallocated.

3.2.3.  Status; Cure.  DIP Agent may determine in its discretion that a DIP Lender constitutes a Defaulting DIP Lender and the effective date of such status shall be conclusive and binding on all parties, absent manifest error.  Borrowers, DIP Agent and Letter of Credit Issuer may agree in writing that a DIP Lender has ceased to be a Defaulting DIP Lender, whereupon Pro Rata shares shall be reallocated without exclusion of the reinstated DIP Lender's Commitments and Revolver Loans, and the Revolver Commitments and other exposures under the Revolver Commitments shall be reallocated among DIP Lenders and settled by DIP Agent (with appropriate payments by the reinstated DIP Lender, including payment of any breakage costs for reallocated LIBOR Loans) in accordance with the readjusted Pro Rata shares.  Unless expressly agreed by Borrowers, DIP Agent and Letter of Credit Issuer, no reinstatement of a Defaulting DIP Lender shall constitute a waiver or release of claims against such DIP Lender. The failure of any DIP Lender to fund a Revolver Loan, to make a payment in respect of Letter of Credit Outstandings or otherwise to perform obligations hereunder shall not relieve any other DIP Lender of its obligations under any DIP Loan Document, and no DIP Lender shall be responsible for any default by another DIP Lender.

### 3.3.    Special Provisions Governing LIBOR Loans.

3.3.1.  Number of LIBOR Loans.  In no event may the number of LIBOR Loans outstanding at any time to any DIP Lender exceed seven (7).

3.3.2.  Minimum Amounts.  Each Borrowing of LIBOR Loans pursuant to **Section 3.1.1(i)**, and each continuation of or conversion to LIBOR Loans pursuant to **Section 2.1.2** hereof, shall be in a minimum amount of $3,000,000 and integral multiples of $500,000 in excess of that amount.

3.3.3.  LIBOR Lending Office.  Each DIP Lender's initial LIBOR Lending Office is set forth opposite its name on **Schedule 14.9** hereto.  Each DIP Lender shall have the right at any time and from time to time to designate a different office of itself or of any Affiliate as such DIP Lender's LIBOR Lending Office, and to transfer any outstanding LIBOR Loans to such LIBOR Lending Office.  No such designation or transfer shall result in any liability on the part of Borrowers for increased costs or expenses resulting solely from such designation or transfer (except any such transfer that is made by a DIP Lender pursuant to **Section 2.6** or **Section 2.7** hereof, or otherwise for the purpose of complying with Applicable Law).  Increased costs or expenses resulting from a change in Applicable Law occurring subsequent to any such designation or transfer shall be deemed not to result solely from such designation or transfer.  To the extent commercially feasible, each DIP Lender shall designate an alternate LIBOR Lending Office with respect to LIBOR Loans to reduce the risk of Borrowers' liability to such DIP Lender under **Sections 2.7** and **2.8** and to avoid the type of advance under **Section 2.6**, so long as such designation is not commercially unreasonable under the circumstances.

3.3.4.  <u>Funding of LIBOR Loans</u>.  Each DIP Lender may, if it so elects, fulfill its obligation to make, continue or convert LIBOR Loans hereunder by causing one of its foreign branches or Affiliates (or an international banking facility created by such DIP Lender) to make or maintain such LIBOR Loans; <u>provided</u>, <u>however</u>, that such LIBOR Loans shall nonetheless be deemed to have been made and to be held by such DIP Lender, and the obligation of Borrowers to repay such LIBOR Loans shall nevertheless be to such DIP Lender for the account of such foreign branch, Affiliate or international banking facility.  The calculation of all amounts payable to DIP Lender under **Sections 2.7** and **2.9** shall be made as if each DIP Lender had actually funded or committed to fund its LIBOR Loans through the purchase of an underlying deposit in an amount equal to the amount of such LIBOR Loans and having a maturity comparable to the relevant Interest Period  for such LIBOR Loans; <u>provided</u>, <u>however</u>, each DIP Lender may fund its LIBOR Loans in any manner it deems fit and the foregoing presumption shall be utilized only for the calculation of amounts payable under **Section 2.7** and **Section 2.9**.

3.4.    **Borrowers' Representative.**  Each Borrower hereby irrevocably appoints SRC, and SRC agrees to act under this Agreement, as the agent and representative of SRC and each other Borrower for all purposes under this Agreement, including requesting Borrowings, selecting whether any Revolver Loan or portion thereof is to bear interest as a Base Rate Loan or a LIBOR Loan, and receiving account statements and other notices and communications to Borrowers (or any of them) from DIP Agent.  DIP Agent may rely, and shall be fully protected in relying, on any Notice of Borrowing, disbursement instructions, reports, information, Borrowing Base Certificate, or any other notice or communication made or given by SRC, whether in its own name, on behalf of any Borrower, or on behalf of "the Borrowers," and DIP Agent shall have no obligation to make any inquiry or request any confirmation from or on behalf of any other Borrower as to the binding effect on such Borrower of any such Notice of Borrowing, instruction, report, information, Borrowing Base Certificate, or other notice or communication, nor shall the joint and several character of Borrowers' liability for the Obligations be affected; <u>provided</u> that the provisions of this **Section 3.4** shall not be construed so as to preclude any U.S. Borrower from directly requesting Borrowings or any Borrower from taking other actions permitted to be taken by "a Borrower" hereunder.  DIP Agent may maintain a single Loan Account in the name of "SRC" hereunder, and each future Borrower shall be deemed to have agreed to such arrangement and to have confirmed that such arrangement shall have no effect on the joint and several character of such Borrower's liability for the Obligations.

3.5.    **All Revolver Loans to Constitute One Obligation.**  The Revolver Loans, Letter of Credit Outstandings and other Obligations shall constitute one general obligation of Borrowers and (unless otherwise expressly provided in any DIP Security Document) shall be secured by DIP Agent's Lien upon all of the Collateral; <u>provided</u>, <u>however</u>, that DIP Agent and each DIP Lender shall be deemed to be a creditor of each Borrower and the holder of a separate claim against each Borrower to the extent of any Obligations jointly and severally owed by Borrowers to DIP Agent or such DIP Lender.

# SECTION 4. PAYMENTS

4.1.    **General Repayment Provisions.**  All payments (including all prepayments) of principal of and interest on the Revolver Loans, Letters of Credit and other Obligations that are

payable to DIP Agent or any DIP Lender shall be made to DIP Agent in Dollars without any offset or counterclaim and free and clear of (and without deduction for) any present or future Taxes, and, with respect to payments made other than by application of balances in the Payment Account, in immediately available funds not later than 12:00 noon on the due date (and payment made after such time on the due date to be deemed to have been made on the next succeeding Business Day).  All payments received by DIP Agent shall be distributed by DIP Agent in accordance with **Section 4.6** hereof, subject to the rights of offset that DIP Agent may have as to amounts otherwise to be remitted to a particular DIP Lender by reason of amounts due DIP Agent from such DIP Lender under any of the DIP Loan Documents.  Borrowers agree that, subject to the terms herein, in the Intercreditor Agreements, and in the DIP Financing Orders, DIP Agent shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against the Obligations, in such manner as DIP Agent deems advisable, but whenever possible, any prepayment of Revolver Loans shall be applied first to Base Rate Loans and then to LIBOR Loans.

    4.2.    <u>**Repayment of Revolver Loans.**</u>

        4.2.1. <u>Payment of Principal</u>.   The outstanding principal amounts with respect to the Revolver Loans shall be repaid as follows:

    (i)    On each date that a Borrower (or a representative of creditors of a Borrower), DIP Agent or a DIP Lender shall receive any cash proceeds of ABL Priority Collateral consisting of Accounts or Inventory, to the extent of such proceeds, <u>provided</u> that, until the Court enters the Final DIP Financing Order or other order authorizing the roll up of the Pre-Petition ABL Obligations into the Obligations, such proceeds shall be presumed to constitute and arise from Pre-Petition ABL Priority Collateral and shall be applied first to the Pre-Petition ABL Obligations before application to the Obligations.

    (ii)    Any portion of the Revolver Loans consisting of the principal amount of Base Rate Loans shall be paid by Borrowers to DIP Agent, for the Pro Rata benefit of DIP Lenders (or, in the case of Settlement Loans, for the sole benefit of BofA) unless timely converted to a LIBOR Loan in accordance with this Agreement, immediately upon (a) the Revolver Maturity Date, and (b) in the case of Settlement Loans, the earlier of BofA's demand for payment or on each Settlement Date with respect to all Settlement Loans outstanding on such date.

    (iii)    Any portion of the Revolver Loans consisting of the principal amount of LIBOR Loans shall be paid by Borrowers to DIP Agent, for the Pro Rata benefit of DIP Lenders, unless converted to a Base Rate Loan or continued as a LIBOR Loan in accordance with the terms of this Agreement, immediately upon (a) the last day of the Interest Period applicable thereto and (b) the Revolver Maturity Date.  In no event shall Borrowers be authorized to make a voluntary prepayment with respect to any Revolver Loan outstanding as a LIBOR Loan prior to the last day of the Interest Period applicable thereto unless (x) otherwise agreed in writing by DIP Agent or Borrowers are otherwise expressly authorized or required by any other provision of this Agreement to pay any LIBOR Loan outstanding on a date other than the last day of the Interest Period applicable thereto, and (y) Borrowers pay to DIP Agent, for the Pro Rata benefit of DIP

Lenders, concurrently with any prepayment of a LIBOR Loan, any amount due DIP Agent and DIP Lenders under **Section 2.9** hereof as a consequence of such prepayment.

(iv)     Notwithstanding anything to the contrary contained elsewhere in this Agreement, if an Out of Formula Condition shall exist, Borrowers shall, on the sooner to occur of DIP Agent's demand or the first Business Day after Borrowers' Knowledge of such Out of Formula Condition, repay the outstanding Revolver Loans that are Base Rate Loans in an amount sufficient to reduce the aggregate unpaid principal amount of all Revolver Loans by an amount sufficient to eliminate the Out of Formula Condition; and, if such payment of Base Rate Loans is not sufficient to eliminate the Out of Formula Condition, then Borrowers shall immediately, at Borrowers' option, either (a) deposit with DIP Agent, for the Pro Rata benefit of DIP Lenders, for application to any outstanding Revolver Loans bearing interest as LIBOR Loans as the same become due and payable (whether at the end of the applicable Interest Periods or on the Revolver Maturity Date) cash in an amount sufficient to eliminate such Out of Formula Condition, to be held by DIP Agent pending disbursement of same to DIP Lenders, but subject to DIP Agent's Lien thereon and rights of offset with respect thereto, or (b) pay the Revolver Loans outstanding as LIBOR Loans to the extent necessary to eliminate such Out of Formula Condition and also pay to DIP Agent for the Pro Rata benefit of DIP Lenders any and all amounts required by **Section 2.9** hereof to be paid by reason of the prepayment of a LIBOR Loan prior to the last day of the Interest Period applicable thereto.

4.2.2.  Payment of Interest.  Interest accrued on the Revolver Loans shall be due and payable on (i) the first calendar day of each month (for the immediately preceding month), computed through the last calendar day of the preceding month, with respect to any Revolver Loan (whether a Base Rate Loan or LIBOR Loan) and (ii) the last day of the applicable Interest Period in the case of a LIBOR Loan. All accrued interest shall be paid by Borrowers on the Commitment Termination Date. With respect to any Base Rate Loan converted into a LIBOR Loan pursuant to **Section 2.1.2** on a day when interest would not otherwise have been payable with respect to such Base Rate Loan, accrued interest to the date of such conversion on the amount of such Base Rate Loan so converted shall be paid on the conversion date.

**4.3.     Mandatory Prepayments.**

4.3.1.  Collections of Proceeds.  In the event any proceeds are received from any sale, lease, collection, or other disposition of any Collateral or from any loss, destruction or condemnation of any Collateral, in each case exclusive of proceeds of Inventory, but inclusive of Term Loan Priority Collateral, such proceeds shall be applied as a mandatory prepayment of the Obligations with the effect stated in **Section 4.3.2**, provided that if the proceeds are derived from (i) Pre-Petition ABL Priority Collateral, such proceeds may be applied first to the Pre-Petition ABL Obligations or (ii) Term Loan Priority Collateral, such proceeds shall be applied first to the Full Payment of the Term Loan Obligations in accordance with the Intercreditor Agreements, then to the Pre-Petition ABL Obligations until Full Payment thereof, and then to the Obligations until Full Payment thereof; provided, however, that so long as no Event of Default exists, Borrowers shall not be required to prepay any portion of such proceeds on account of any LIBOR Loan on any day that is not the last day of the applicable Interest

Period if such prepayment would trigger payment of any amount under **Section 2.9** so long as such portion of such proceeds is deposited into a segregated Deposit Account of Borrowers maintained with BofA until such time as such prepayment would not trigger payment of any amount under **Section 2.9**.

        4.3.2.  <u>Application of Prepayments</u>.  Prepayments made pursuant to **Section 4.3.1** and applied to the Obligations shall reduce both the Obligations, if applied to the Revolver Loans, shall reduce the Revolver Commitments on a dollar-for-dollar basis, and shall be applied first to Base Rate Loans and then to LIBOR Loans in direct order of maturity.

        **4.4.**   **Payment of Other Obligations.**   The balance of the Obligations requiring the payment of money, including the Letter of Credit Outstandings and Extraordinary Expenses incurred by DIP Agent or any DIP Lender, shall be repaid by Borrowers to DIP Agent for allocation among DIP Agent and DIP Lenders at the times for payment provided in the DIP Loan Documents, or, if no time of payment is otherwise specified in the DIP Loan Documents, **on demand**.

        **4.5.**   **Marshaling; Payments Set Aside.**   Neither DIP Agent nor any DIP Lender shall be under any obligation to marshal any assets in favor of any Borrower or any other Obligor or against or in payment of any or all of the Obligations.  To the extent that any Borrower makes a payment or payments to DIP Agent or any DIP Lender or any of such Persons receives payment from the proceeds of any Collateral or exercises its right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person, then to the extent of any loss by DIP Agent or DIP Lenders, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment or proceeds had not been made or received and any such enforcement or setoff had not occurred. The provisions of the immediately preceding sentence of this **Section 4.5** shall survive Full Payment of the Obligations.

        **4.6.**   **Allocation of Payments and Collections.**

        4.6.1.  <u>Application</u>.  Payments made by Borrowers hereunder and collections of proceeds of Collateral shall be applied as among the Obligations, Pre-Petition ABL Obligations and Term Loan Obligations as set forth herein and in the DIP Financing Orders and, to the extent applied to the Obligations, shall be applied (a) <u>first</u>, as specifically required or authorized herein; (b) <u>second</u>, to Obligations then due and owing; and (c) <u>third</u>, as determined by DIP Agent in its discretion.

        4.6.2.  <u>Post-Default Allocation</u>.  Notwithstanding anything in any DIP Loan Document to the contrary, during an Event of Default, monies to be applied to the Obligations, whether arising from payments by Obligors, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(i)  first, to DIP Agent to pay principal and accrued interest on any portion of the Revolver Loans which DIP Agent may have advanced on behalf of any DIP Lender and for which DIP Agent has not been reimbursed by such DIP Lender or any Borrower;

(ii)  second, to BofA to pay the principal and accrued interest on any portion of the Settlement Loans outstanding, to be shared with any DIP Lenders (other than Defaulting DIP Lenders) that have acquired a participating interest in such Settlement Loans;

(iii)  third, to the extent that Letter of Credit Issuer has not received from any Participating DIP Lender a payment as required by **Section 1.2.8** hereof, to Letter of Credit Issuer to pay all amounts owing to such Letter of Credit Issuer pursuant to **Section 1.2.8** hereof;

(iv)  fourth, to DIP Agent to pay the amount of Extraordinary Expenses and amounts owing to DIP Agent pursuant to **Section 14.10** hereof that have not been reimbursed to DIP Agent by any Borrower or any DIP Lender, together with interest accrued thereon at the rate applicable to Revolver Loans;

(v)  fifth, to DIP Agent to pay any Indemnified Amount that has not been paid to DIP Agent by any Obligor or any DIP Lender, together with interest accrued thereon at the rate applicable to Revolver Loans;

(vi)  sixth, to DIP Agent to pay any fees due and payable to DIP Agent;

(vii)  seventh, to DIP Lenders (other than Defaulting DIP Lenders) for any Indemnified Amount that they have paid to DIP Agent and any Extraordinary Expenses that they have reimbursed to DIP Agent or themselves incurred, to the extent that such DIP Lenders have not been reimbursed by any Obligor therefor;

(viii)  eighth, to Letter of Credit Issuer to pay principal and interest with respect to Letter of Credit Outstandings (or if any of the Letter of Credit Outstandings are contingent and an Event of Default then exists, deposited in the Cash Collateral Account to Cash Collateralize such Letter of Credit Outstandings), which payment shall be shared with Participating DIP Lenders in accordance with **Section 1.2.8(iii)** hereof;

(ix)  ninth, to DIP Lenders (other than Defaulting DIP Lenders) in payment of the unpaid principal and accrued interest in respect of the Revolver Loans, and to Bank Product Obligations arising under Hedge Agreements (including Cash Collateralization thereof) up to the amount of the Bank Product Reserve existing therefor;

(x)  tenth, to all other Bank Product Obligations; and

(xi)  eleventh, to all remaining Obligations.

Amounts shall be applied to payment of each category of Obligations only after Full Payment of amounts payable from time to time under all preceding categories. If amounts are insufficient to satisfy a category, they shall be paid ratably among outstanding Obligations in such category.

Monies and proceeds obtained from an Obligor shall not be applied to its Excluded Swap Obligations, but appropriate adjustments shall be made with respect to amounts obtained from other Obligors to preserve the allocations in any applicable category. DIP Agent shall have no obligation to calculate the amount of any Bank Product Obligation and may request a reasonably detailed calculation thereof from the applicable Bank Product Provider. If such Bank Product Provider fails to deliver the calculation within five (5) days following request, DIP Agent may assume the amount is zero. The allocations set forth in this **Section 4.6** are solely to determine the rights and priorities of DIP Agent and DIP Lenders as among themselves and may be changed by DIP Agent and DIP Lenders without notice to or the consent or approval of any Borrower or any other Person. This Section is not for the benefit of or enforceable by any Obligor, and each Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds subject to this **Section 4.6**.

4.6.3. <u>Erroneous Allocation</u>. DIP Agent shall not be liable for any allocation, application or distribution of payments made by it in good faith and, if any such allocation, application or distribution is subsequently determined to have been made in error, the sole recourse of any DIP Lender or other Person to whom payment was due but not made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any DIP lender, such DIP Lender hereby agrees to return any such erroneous payments received by it).

**4.7.    Dominion Account.** The ledger balance in the Dominion Accounts shall be immediately transferred to the Payment Account as of the end of a Business Day and shall be applied to the Obligations at the beginning of the next Business Day. If a credit balance results from such application, it shall not accrue interest in favor of Borrowers and shall be made available to Borrowers as long as no Default or Event of Default exists. Each Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds, and agrees that DIP Agent shall have the continuing, exclusive right to apply and reapply same against the Obligations, in such manner as DIP Agent deems advisable, except as otherwise stated in **Sections 4.3** and **4.6.1.**

**4.8.    Loan Account; Account Stated.** DIP Agent shall maintain, in accordance with its customary practices, an account or accounts (each a "<u>Loan Account</u>") evidencing the Debt of Borrowers hereunder. Any failure of DIP Agent to record anything in a Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrowers to pay any amount owing hereunder. DIP Agent may maintain a single Loan Account in the name of one Borrower, and each other Borrower confirms that such arrangement shall have no effect on its liability for the Obligations. Entries made in a Loan Account shall constitute presumptive evidence of the information contained therein. If any information contained in a Loan Account is provided to or inspected by any Person, the information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies DIP Agent in writing within thirty (30) days after receipt or inspection that specific information is subject to dispute.

**4.9.    Taxes.**

4.9.1. <u>Payments Free of Taxes; Obligation to Withhold; Tax Payment</u>.

(i)      All payments of Obligations by Obligors shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If Applicable Law (as determined by DIP Agent in its discretion) requires the deduction or withholding of any Tax from any payment by DIP Agent or an Obligor, then DIP Agent or such Obligor shall be entitled to make such deduction or withholding based on information and documentation provided pursuant to **Section 4.10**.

(ii)     If DIP Agent or any Obligor is required by the Code to withhold or deduct Taxes, including backup withholding and withholding taxes, from any payment, then (i) DIP Agent shall pay the full amount that it determines is to be withheld or deducted to the relevant Governmental Authority pursuant to the Code, and (ii) to the extent the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Obligor shall be increased as necessary so that the Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If DIP Agent or any Obligor is required by any Applicable Law other than the Code to withhold or deduct Taxes from any payment, then (i) DIP Agent or such Obligor, to the extent required by Applicable Law, shall timely pay the full amount to be withheld or deducted to the relevant Governmental Authority, and (ii) to the extent the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Obligor shall be increased as necessary so that the Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

4.9.2.  <u>Payment of Other Taxes</u>.  Without limiting the foregoing, Borrowers shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at DIP Agent's option, timely reimburse DIP Agent for payment of, any Other Taxes.

4.9.3.  <u>Tax Indemnification</u>.

(i)      Each Borrower shall indemnify and hold harmless, on a joint and several basis, each Recipient against any Indemnified Taxes (including those imposed or asserted on or attributable to amounts payable under this Section) payable or paid by a Recipient or required to be withheld or deducted from a payment to a Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Each Borrower shall indemnify and hold harmless DIP Agent against any amount that a DIP Lender or Letter of Credit Issuer fails for any reason to pay indefeasibly to DIP Agent as required pursuant to this Section.  Each Borrower shall make payment within ten (10) days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to Borrowers by a DIP Lender or Letter of Credit Issuer (with a copy to DIP Agent), or by DIP Agent on its own behalf or on behalf of any Recipient, shall be conclusive absent manifest error.

31

(ii)     Each DIP Lender and Letter of Credit Issuer shall indemnify and hold harmless, on a several basis, (i) DIP Agent against any Indemnified Taxes attributable to such DIP Lender or Letter of Credit Issuer (but only to the extent Borrowers have not already paid or reimbursed DIP Agent therefor and without limiting Borrowers' obligation to do so), (ii) DIP Agent and Obligors, as applicable, against any Taxes attributable to such DIP Lender's failure to maintain a DIP Participant register as required hereunder, and (iii) DIP Agent and Obligors, as applicable, against any Excluded Taxes attributable to such DIP Lender or Letter of Credit Issuer, in each case, that are payable or paid by DIP Agent or an Obligor in connection with any Obligations, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   Each DIP Lender and Letter of Credit Issuer shall make payment within (10) days after demand for any amount or liability payable under this Section.   A certificate as to the amount of such payment or liability delivered to any DIP Lender or Letter of Credit Issuer by DIP Agent shall be conclusive absent manifest error

4.9.4.   Evidence of Payments.        If DIP Agent or an Obligor pays any Taxes pursuant to this Section, then upon request, DIP Agent shall deliver to SRC or SRC shall deliver to DIP Agent, respectively, a copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any return required by Applicable Law to report the payment, or other evidence of payment reasonably satisfactory to DIP Agent or SRC, as applicable.

4.9.5.   Treatment of Certain Refunds.   Unless required by Applicable Law, at no time shall DIP Agent have any obligation to file for or otherwise pursue on behalf of a DIP Lender or Letter of Credit Issuer, or to pay to any DIP Lender or Letter of Credit Issuer, any refund of Taxes withheld or deducted from funds paid for the account of a DIP Lender or Letter of Credit Issuer.   If a Recipient determines in its discretion that it has received a refund of any Taxes as to which it has been indemnified by Borrowers or with respect to which a Borrower has paid additional amounts pursuant to this Section, such Recipient shall pay Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that Borrowers agree, upon request such the Recipient, to repay the amount paid over to Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient if such Recipient is required to repay such refund to the Governmental Authority. Notwithstanding anything herein to the contrary, no Recipient shall be required to pay any amount to Borrowers if such payment would place such Recipient in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.   In no event shall DIP Agent or any Recipient be required to make its tax returns (or any other information relating to its taxes that it deems confidential) available to any Obligor or other Person. Each party's obligations under this **Section 4.9** or **Section 4.10** shall survive the resignation or replacement of DIP Agent or any assignment of rights by or replacement of a DIP Lender or Letter of Credit

Issuer, the termination of the Commitments, and the repayment, satisfaction, discharge or Full Payment of any Obligations.

**4.10.    DIP Lender Tax Information.**

4.10.1. Status of DIP Lenders.  Any DIP Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments of Obligations shall deliver to Borrowers and DIP Agent properly completed and executed documentation reasonably requested by Borrowers or DIP Agent as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any DIP Lender, if reasonably requested by Borrowers or DIP Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrowers or DIP Agent to enable them to determine whether such DIP Lender is subject to backup withholding or information reporting requirements.  Notwithstanding the foregoing, such documentation (other than documentation described in **Sections 4.10.2(ii)(a), (b)** and **(d)**) shall not be required if a DIP Lender reasonably believes delivery of the documentation would subject it to any material unreimbursed cost or expense or would materially prejudice its legal or commercial position.

4.10.2. Documentation.  Without limiting the foregoing, if any Borrower is a U.S. Person,

(i)    Any DIP Lender that is a U.S. Person shall deliver to Borrowers and DIP Agent on or prior to the date on which such DIP Lender becomes a DIP Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or DIP Agent), executed originals of IRS Form W-9, certifying that such DIP Lender is exempt from U.S. federal backup withholding Tax;

(ii)    Any Foreign DIP Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and DIP Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign DIP Lender becomes a DIP Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or DIP Agent), whichever of the following is applicable:

(a)    in the case of a Foreign DIP Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any DIP Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (y) with respect to other payments under the DIP Loan Documents, IRS Form W-8BEN establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(b)    executed originals of IRS Form W-8ECI;

(c)    in the case of a Foreign DIP Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form satisfactory to DIP Agent to the effect that such Foreign DIP Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10

33

percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code ("U.S. Tax Compliance Certificate"), and (y) executed originals of IRS Form W-8BEN; or

(d)    to the extent a Foreign DIP Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate in form satisfactory to DIP Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign DIP Lender is a partnership and one or more direct or indirect partners of such Foreign DIP Lender are claiming the portfolio interest exemption, such Foreign DIP Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner;

(iii)    any Foreign DIP Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and DIP Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign DIP Lender becomes a DIP Lender hereunder (and from time to time thereafter upon the reasonable request of Borrowers or DIP Agent), executed originals of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Borrowers or DIP Agent to determine the withholding or deduction required to be made; and

(iv)    if payment of an Obligation to a DIP Lender would be subject to U.S. federal withholding Tax imposed by FATCA if such DIP Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code), such DIP Lender shall deliver to Borrowers and DIP Agent at the time(s) prescribed by law and otherwise as reasonably requested by Borrowers or DIP Agent such documentation prescribed by Applicable Law (including Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or DIP Agent as may be necessary for them to comply with their obligations under FATCA and to determine that such DIP Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.    Solely for purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date hereof.

4.10.3.  Redelivery of Documentation.   If any form or certification previously delivered by a DIP Lender pursuant to this Section expires or becomes obsolete or inaccurate in any respect, such DIP Lender shall promptly update the form or certification or notify Borrowers and DIP Agent in writing of its inability to do so.

**4.11.  Nature and Extent of Each Borrower's Liability.**

4.11.1.  Joint and Several Liability.  Each Borrower shall be liable for, on a joint and several basis, and hereby guarantees the timely payment by all other Borrowers of, all

of the Revolver Loans and other Obligations (except its Excluded Swap Obligations), regardless of which Borrower actually may have received the proceeds of any Revolver Loans or other extensions of credit hereunder or the amount of such Revolver Loans received or the manner in which DIP Agent or any DIP Lender accounts for such Revolver Loans or other extensions of credit on its books and records, it being acknowledged and agreed that Revolver Loans to any U.S. Borrower inure to the mutual benefit of all Borrowers and that DIP Agent and DIP Lenders are relying on the joint and several liability of Borrowers in extending the Revolver Loans and other financial accommodations hereunder.    Each Borrower hereby unconditionally and irrevocably agrees that upon default in the payment when due (whether at stated maturity, by acceleration or otherwise) of any principal of, interest owed on, or other amount owing with respect to any of the Revolver Loans or other Obligations, such Borrower shall forthwith pay the same, without notice or demand.

     4.11.2. <u>Unconditional Nature of Liability</u>.    Each Borrower's joint and several liability hereunder with respect to, and guaranty of, the Revolver Loans and other Obligations shall, to the fullest extent permitted by Applicable Law, be unconditional irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Obligations or of any promissory note or other document evidencing all or any part of the Obligations, (ii) the absence of any attempt to collect any of the Obligations from any other Obligor or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance or granting of any indulgence by DIP Agent or any DIP Lender with respect to any provision of any instrument evidencing or securing the payment of any of the Obligations, or any other agreement now or hereafter executed by any other Borrower and delivered to DIP Agent or any DIP Lender, (iv) the failure by DIP Agent to take any steps to perfect or maintain the perfected status of its security interest in or Lien upon, or to preserve its rights to or interests in, any of the Collateral or other security for the payment or performance of any of the Obligations or DIP Agent's release of any Collateral or any of its Liens upon any Collateral, (v) DIP Agent's or DIP Lenders' election, in any proceeding instituted under the Bankruptcy Code, for the application of Section 1111(b)(2) of the Bankruptcy Code, (vi) any borrowing or grant of a security interest by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code, (vii) the release or compromise, in whole or in part, of the liability of any Obligor for the payment of any of the Obligations, (viii) any amendment or modification of any of the DIP Loan Documents or waiver of any Default or Event of Default thereunder, (ix) any increase in the amount of the Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, or any decrease in the same, or (x) any other circumstance that might constitute a legal or equitable discharge or defense of any Borrower; <u>provided</u>, <u>however</u>, nothing contained in the foregoing shall limit Borrowers' right to institute an action for any alleged breach by DIP Agent or any DIP Lender of any of its obligations hereunder.    Under no circumstances shall any Borrower be construed to have waived defenses based upon payment, willful misconduct, gross negligence or general principles of equity and fairness. After the occurrence and during the continuance of any Event of Default, DIP Agent may proceed directly and at once, without notice to any Obligor, against any or all of Obligors to collect and recover all or any part of the Obligations, without first proceeding against any other Obligor or against any Collateral or other security for the payment or performance of any of the Obligations, and each Borrower waives any provision that might otherwise require DIP Agent under Applicable Law to pursue or exhaust its remedies against any Collateral or Obligor before pursuing another

Obligor.  Each Borrower consents and agrees that DIP Agent shall be under no obligation to marshal any assets in favor of any Obligor or against or in payment of any or all of the Obligations.

          4.11.3.  <u>Partial Release of Liability for Obligations</u>.  No payment or payments made by an Obligor or received or collected by DIP Agent from a Borrower or any other Person by virtue of any action or proceeding or any setoff or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Borrower for the balance of Obligations remaining due under this Agreement, and each Borrower shall remain jointly and severally liable for the payment and performance of all Revolver Loans and other Obligations until Full Payment of the Obligations.

          4.11.4.  <u>Contribution</u>.  Each Borrower is unconditionally obligated to repay the Obligations as a joint and several obligor under this Agreement.  If, as of any date, the aggregate amount of payments made by a Borrower on account of the Obligations and proceeds of such Borrower's Collateral that are applied to the Obligations <u>exceeds</u> the aggregate amount of Revolver Loan proceeds actually used by such Borrower in its business (such excess amount being referred to as an "<u>Accommodation Payment</u>"), then, unless DIP Agent agrees otherwise, each of the other Borrowers (each such Borrower being referred to as a "<u>Contributing Borrower</u>") shall be obligated to make contribution to such Borrower (the "<u>Paying Borrower</u>") in an amount equal to (A) the product derived by multiplying the sum of each Accommodation Payment of each Paying Borrower by the Allocable Percentage (as defined below) of the Contributing Borrower from whom contribution is sought less (B) the amount, if any, of the then outstanding Accommodation Payment of such Contributing Borrower (such last mentioned amount which is to be subtracted from the aforesaid product to be increased by any amounts theretofore paid by such Contributing Borrower by way of contribution hereunder, and to be decreased by any amounts theretofore received by such Contributing Borrower by way of contribution hereunder); <u>provided</u>, <u>however</u>, that a Paying Borrower's recovery of contribution hereunder from the other Borrowers shall be limited to that amount paid by such Paying Borrower in excess of its Allocable Percentage of all Accommodation Payments then outstanding of all Borrowers.  As used herein, the term "<u>Allocable Percentage</u>" shall mean, on any date of determination thereof, a fraction the denominator of which shall be equal to the number of Borrowers who are parties to this Agreement on such date and the numerator of which shall be one (1); <u>provided</u>, <u>however</u>, that such percentages shall be modified in the event that contribution from a Borrower is not possible by reason of insolvency, bankruptcy or otherwise by reducing such Borrower's Allocable Percentage equitably and by adjusting the Allocable Percentage of the other Borrowers proportionately so that the Allocable Percentages of all Borrowers at all times equals 100%.  DIP Agent and DIP Lenders shall have the right, at any time in their discretion, to condition Revolver Loans and Letters of Credit upon a separate calculation of Availability for each U.S. Borrower and to restrict the disbursement of such Revolver Loans and Letters of Credit to such U.S. Borrower.

          4.11.5.  <u>Qualified ECP</u>.  Each Obligor that is a Qualified ECP when its guaranty of or grant of Lien as security for a Swap Obligation becomes effective hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide funds or other support to each Specified Obligor with respect to such Swap Obligation as may be needed by

such Specified Obligor from time to time to honor all of its obligations under the DIP Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP's obligations and undertakings under this **Section 4.11.5** voidable under any applicable fraudulent transfer or conveyance act).  The obligations and undertakings of each Qualified ECP under this **Section 4.11.5** shall remain in full force and effect until Full Payment of all Obligations.  Each Obligor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support or other agreement" for the benefit of, each Obligor for all purposes of the Commodity Exchange Act.

4.11.6.  Subordination.   Each Borrower hereby subordinates any claims, including any right of payment, subrogation, contribution and indemnity, that it may have from or against any other Obligor, and any successor or assign of any other Obligor, including any trustee, receiver or debtor-in-possession, howsoever arising, due or owing or whether heretofore, now or hereafter existing, to the Full Payment of the Obligations.

## SECTION 5.  TERM AND TERMINATION OF COMMITMENTS

**5.1.    Term of Commitments**   Subject to each DIP Secured Party's right to cease making Revolver Loans and other extensions of credit to Borrowers when any Default or Event of Default exists or upon termination of the Commitments as provided in **Section 5.2** hereof, the Commitments shall be in effect for a period beginning on the Closing Date and ending on the close of business on the Revolver Maturity Date.

**5.2.    Termination.**

5.2.1.  Termination by Borrowers.   Upon at least ten (10) days prior written notice to DIP Agent, any Borrower may, at its option, terminate the Commitments.  Any notice of termination given by Borrowers shall be irrevocable unless DIP Agent otherwise agrees in writing.  Borrowers may elect to terminate the Commitments in their entirety only.  No section of this Agreement, Type of Revolver Loan or other type of credit extension available hereunder, or Commitment may be terminated by Borrowers singly.

5.2.2.  Effect of Termination.   On the effective date of termination of the Commitments by DIP Agent or by Borrowers, all of the Obligations shall be immediately due and payable, and any DIP Lender may terminate its and its Affiliates' Bank Products (including, only with the consent of DIP Agent, any Cash Management Services).  All undertakings, agreements, covenants, warranties and representations of each Borrower contained in the DIP Loan Documents shall survive any such termination, and DIP Agent shall retain its Liens in the Collateral and all of its rights and remedies under the DIP Loan Documents, notwithstanding such termination, until Full Payment of the Obligations.  Notwithstanding Full Payment of the Obligations, DIP Agent shall not be required to terminate its Liens unless it receives Cash Collateral or a written agreement, in each case satisfactory to it, protecting DIP Agent and DIP Lenders from the dishonor or return of any Payment Items previously applied to the Obligations. Upon Full Payment of the Obligations and DIP Agent's receipt of an agreement or Cash Collateral in accordance with the preceding sentence, DIP Agent will, at Borrowers' sole expense, (i) promptly release any Lien obtained by DIP Agent after the Petition

Date with respect to the Collateral (other than such Cash Collateral, if any), and (ii) execute and file, to the extent obtained or recorded by DIP Agent after the Petition Date, such Lien releases and UCC termination statements as may be reasonably necessary to give effect to the foregoing. The provisions of **Sections 1.2, 2.1, 2.4, 2.7, 2.8, 4.5, 4.9, 4.10, 12, 14.2** and this **Section 5.2.2**, and all obligations of Borrowers to indemnify DIP Agent or any DIP Lender pursuant to this Agreement or any of the other DIP Loan Documents, and each provision of a DIP Loan Document expressly stating that such provision survives Full Payment of the Obligations or termination of the Commitments shall in all events survive Full Payment of the Obligations and termination of the Commitments.

## SECTION 6.  COLLATERAL SECURITY

6.1.    <u>**Grant of Security Interest.**</u> To secure the prompt payment and performance of all Obligations, each Borrower hereby grants to DIP Agent, for the benefit of DIP Secured Parties, a continuing security interest in and Lien upon all real and personal Property of such Borrower, including all of the following Property, whether now owned or hereafter acquired, and wherever located (irrespective of whether the same existed on or was created or acquired after the Petition Date):

      (a)     all Accounts;

      (b)     all Chattel Paper, including Electronic Chattel Paper;

      (c)     all Commercial Tort Claims;

      (d)     all Deposit Accounts;

      (e)     all Documents;

      (f)     all General Intangibles, including Intellectual Property;

      (g)     all Goods, including Inventory, Equipment and Fixtures;

      (h)     all Real Estate;

      (i)     all Instruments;

      (j)     all Investment Property;

      (k)     all Letter-of-Credit Rights;

      (l)     all Supporting Obligations;

      (m)     all cash, whether or not in the possession or under the control of DIP Agent or a DIP Lender or a bailee or Affiliate of DIP Agent or a DIP Lender, including any Cash Collateral;

(n)     all accessions to, substitutions for, and all replacements, products, and cash and non-cash Proceeds of the foregoing, including Proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral;

(o)     subject to entry of the Final DIP Financing Order so providing, all Avoidance Actions and all proceeds thereof; and

(p)     all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

The security interests and Liens granted to DIP Agent pursuant to the provisions of this Agreement and pursuant to any of the other DIP Loan Documents shall be in addition to and not in lieu of all Liens conferred upon DIP Agent pursuant to the terms of the DIP Financing Orders. Subject to the entry of the Interim DIP Financing Order, the Obligations shall constitute a Superpriority Claim.

**6.2.** **Lien on Deposit Accounts; Cash Collateral.**

6.2.1. Deposit Accounts.   To further secure the prompt payment and performance of all Obligations, each Borrower hereby grants to DIP Agent, for the benefit of DIP Secured Parties, a continuing security interest in and Lien upon all amounts credited to any Deposit Account of such Borrower, including any sums in any blocked or lockbox accounts or in any accounts into which such sums are swept.   Each Borrower hereby authorizes and directs each bank or other depository to deliver to DIP Agent all balances in any Deposit Account maintained by such Borrower, without inquiry into the authority or right of DIP Agent to make such request.

6.2.2. Cash Collateral.   Any Cash Collateral may be invested, at DIP Agent's discretion, in Cash Equivalents, but DIP Agent shall have no duty to do so, regardless of any agreement or course of dealing with any Borrower, and shall have no responsibility for any investment or loss.   Each Borrower hereby grants to DIP Agent, for the benefit of the DIP Lenders and the other DIP Secured Parties, as security for the Obligations, a security interest in all Cash Collateral held from time to time and all proceeds thereof, whether such Cash Collateral is held in a Cash Collateral Account or elsewhere.   DIP Agent may apply Cash Collateral to the payment of any Obligations, in such order as DIP Agent may elect, as such Obligations become due and payable.   Each Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of DIP Agent.

**6.3.** **Lien on Real Estate.**   All of the Obligations shall be secured by Liens granted pursuant to the DIP Financing Orders on all Real Estate of each Borrower or other Obligor. If so requested by DIP Agent, each Borrower shall (and shall cause each other Obligor to) execute a Mortgage in favor of DIP Agent, for the benefit of DIP Secured Parties, in form and substance satisfactory to DIP Agent, with respect to each parcel of Real Estate to confirm and evidence of record Liens on such Real Estate in favor of DIP Agent.

**6.4.** **Other Collateral.**

6.4.1. Commercial Tort Claims. Each Borrower shall promptly notify DIP Agent in writing if such Borrower has a Commercial Tort Claim and shall take such actions as

DIP Agent deems appropriate to subject such claim of record to duly perfected, first priority Liens in favor of DIP Agent for the benefit of DIP Secured Parties.

        6.4.2. <u>Certain After-Acquired Collateral</u>. Each Borrower shall promptly notify DIP Agent in writing if, after the Closing Date, such Borrower obtains any interest in any Collateral consisting of Deposit Accounts, Chattel Paper, Documents, Instruments, Intellectual Property, Investment Property or Letter-of-Credit Rights and, upon DIP Agent's request, shall promptly take such actions as DIP Agent deems appropriate to effect of record DIP Agent's duly perfected Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver, <u>provided</u> that such Liens shall nevertheless be valid and perfected without the necessity of any such filing pursuant to the DIP Financing Orders and shall have priorities consistent with the DIP ABL/Term Loan Intercreditor Agreement.  If any Collateral is in the possession of a third party (including Term DIP Agent), at DIP Agent's request, Borrowers shall obtain an acknowledgment that such third party holds the Collateral for the benefit of DIP Agent.

      **6.5.**    **<u>Lien Perfection; Further Assurances</u>.**  All Liens granted to DIP Agent under the DIP Loan Documents are for the benefit of DIP Secured Parties.  Promptly after DIP Agent's request therefor, each Borrower shall execute or cause to be executed and deliver to DIP Agent such instruments, assignments, title certificates or other documents as are necessary under the UCC or other Applicable Law to perfect of record (or continue the perfection of) DIP Agent's Liens upon the Collateral, and shall take such other action as may be reasonably requested by DIP Agent to give effect to or carry out the intent and purposes of this Agreement, <u>provided</u> that such Liens shall nevertheless be valid and perfected without the necessity of any such filing pursuant to the DIP Financing Orders.  Unless prohibited by Applicable Law, each Borrower hereby authorizes DIP Agent to execute and file any such financing statement on such Borrower's behalf.  The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.  Each Borrower authorizes DIP Agent to file any financing statement that describes the Collateral as "all assets" or "all personal property" of such Borrower, or words to similar effect, and ratifies any action taken by DIP Agent before the Closing Date to effect or perfect its Lien on any Collateral.

      **6.6.**    **<u>Limitations</u>**.  The Liens on Collateral granted hereunder are given as security only and shall not subject DIP Agent or any DIP Lender to, or in any way modify, any obligation or liability of any Borrower relating to any Collateral.

## SECTION 7.  COLLATERAL ADMINISTRATION

      **7.1.**    **<u>General Provisions</u>.**

        7.1.1. <u>Location of Inventory</u>. As of the date hereof, all Inventory (other than Inventory in transit) shall be kept by Borrowers at one or more of the business locations of Borrowers (including owned, leased and other third-party locations of Borrowers) identified in **Schedule 7.1.1**, except that each Borrower may make sales or other dispositions of Collateral in accordance with **Section 9.2.2**.

### 7.1.2. Insurance of Collateral; Condemnation Proceeds.

(i)     Each Borrower shall maintain and pay for insurance upon all Collateral, wherever located, in accordance with the requirements of the Pre-Petition ABL Loan Agreement, including those policies in the amounts and with the insurance companies listed in **Schedule 7.1.2** to the Pre-Petition ABL Loan Agreement. Subject to the terms of the Intercreditor Agreements, all proceeds payable under each such policy shall be applied to reduce the Pre-Petition ABL Obligations and the Obligations, whether such proceeds are payable to Borrowers or to DIP Agent.  From time to time upon request, Borrowers shall deliver copies of such policies to DIP Agent.  Unless DIP Agent shall agree in writing otherwise, each policy insuring the Collateral (except fidelity coverage against theft and malicious mischief) will (a) include a loss payee endorsement satisfactory to DIP Agent, naming DIP Agent as loss payee and (b) additional insured as appropriate.   Each such policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than thirty (30) days prior written notice to DIP Agent in the event of cancellation of the policy for any reason whatsoever (except that in the case of cancellation for non-payment of the premium, the insurer shall give ten (10) days' prior written notice to DIP Agent) and a clause specifying that the interest of DIP Agent shall not be impaired or invalidated by any act or neglect of any Borrower or the owner of the property in which the Collateral is stored or by the occupation of the premises for purposes more hazardous than are permitted by said policy.  If any Borrower fails to provide and pay for such insurance, DIP Agent may, at its option, but shall not be required to, procure the same and charge each Borrower therefor.  Each Borrower agrees to deliver to DIP Agent, promptly as rendered, true copies of all claims and reports relating to claims submitted to insurance companies issuing policies insuring the Collateral.  For so long as no Default or Event of Default exists, each Borrower shall have the right to settle, adjust and compromise any claim with respect to any insurance maintained by each Borrower with respect to the Collateral; provided that all proceeds thereof are applied in the manner specified in this Agreement, and DIP Agent agrees promptly to provide any necessary endorsement to any checks or drafts issued in payment of any such claim.  At any time that an Event of Default exists, only DIP Agent shall be authorized to settle, adjust and compromise such claims.  DIP Agent shall have all rights and remedies with respect to such policies of insurance on the Collateral as are provided for in this Agreement and the other DIP Loan Documents, and consistent with the applicable insurance policies.

(ii)     Subject to the terms of the Intercreditor Agreements, any proceeds of insurance referred to in this **Section 7.1.2** and any awards arising from condemnation of any Collateral shall be paid to DIP Agent and shall be applied to the payment of the Pre-Petition ABL Obligations and the Obligations in such order as DIP Agent may elect in its discretion.

(iii)     If requested by Borrowers in writing within fifteen (15) days after DIP Agent's receipt of any insurance proceeds or condemnation awards relating to any loss or destruction of Equipment or Real Estate, and subject to the terms of the Intercreditor Agreements, Borrowers may use such proceeds or awards to repair or replace such Equipment or Real Estate (and until so used, the proceeds shall be held by DIP Agent as

Cash Collateral) as long as (a) no Default or Event of Default exists; (b) such repair or replacement is promptly undertaken and concluded, in accordance with plans satisfactory to DIP Agent; (c) replacement buildings are of comparable size, quality and utility to the destroyed buildings; (d) the repaired or replaced Property is free of Liens, other than Permitted Liens that are not Purchase Money Liens; and (e) Borrowers comply with disbursement procedures for such repair or replacement as DIP Agent may reasonably require.

7.1.3. <u>Protection of Collateral</u>.    All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes imposed under any Applicable Law on any of the Collateral or in respect of the sale thereof, and all other payments required to be made by DIP Agent to any Person to realize upon any Collateral shall be borne and paid by Borrowers.  DIP Agent shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in DIP Agent's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other Person whomsoever, but the same shall be at Borrowers' sole risk.

7.1.4. <u>Defense of Title to Collateral</u>.  Each Borrower shall at all times defend its title to the Collateral and DIP Agent's Liens therein against all Persons and all claims and demands whatsoever other than Permitted Liens.

**7.2.    <u>Administration of Accounts</u>.**

7.2.1. <u>Records and Schedules of Accounts</u>.  Each Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit to DIP Agent on such periodic basis as DIP Agent shall request a "Sales and Collections Report" for the preceding period, in the form mutually agreed upon.  Borrowers shall also provide to DIP Agent on or before the 15th day of each Fiscal Month a detailed aged trial balance of all Accounts existing as of the last day of the preceding Fiscal Month, specifying the names, face value and dates of invoices for each Account Debtor obligated on an Account so listed ("<u>Schedule of Accounts</u>"), and, upon DIP Agent's request therefor, copies of proof of delivery and a copy of all documents, including repayment histories and present status reports relating to the Accounts so scheduled and such other matters and information relating to the status of then existing Accounts as DIP Agent shall reasonably request.  In addition, if Accounts in an aggregate face amount in excess of $1,000,000 cease to be Eligible Accounts in whole or in part on account of discounts, disputes, returns, Insolvency Proceedings or Liens, Borrowers shall notify DIP Agent of such occurrence promptly (and in any event within two (2) Business Days) after Borrowers' Knowledge of such occurrence, and the Borrowing Base shall thereupon be adjusted to reflect such occurrence, and, at Borrowers' option, Borrowers may submit an updated Borrowing Base Certificate reflecting such adjustments.  Upon the request of DIP Agent, each Borrower shall deliver to DIP Agent copies of invoices or invoice registers related to all of such Borrower's Accounts.

7.2.2. <u>Discounts, Disputes and Returns</u>.  If any Borrower grants any discounts, allowances or credits that are not shown on the face of the invoice for the Account involved, Borrowers shall report such discounts, allowances or credits, as the case may be, to

DIP Agent as part of the next required Schedule of Accounts and, if reasonably requested by DIP Agent, explaining in detail the reason for the dispute or return, all claims related thereto, and the amount in controversy. Upon and during the continuance of an Event of Default, DIP Agent shall have the right to settle or adjust all disputes and claims directly with the Account Debtor and to compromise the amount or extend the time for payment of any Accounts comprising a part of the Collateral upon such terms and conditions as DIP Agent may deem advisable in its reasonable credit judgment, and to charge the deficiencies, costs and expenses thereof, including attorneys' fees, to Borrowers.

7.2.3. <u>Taxes</u>. If an Account of any Borrower includes a charge for any Taxes payable to any governmental taxing authority, DIP Agent is authorized, in its sole discretion if such Borrower has failed to do so, to pay the amount thereof to the proper taxing authority for the account of such Borrower and to charge Borrowers therefor; <u>provided</u>, <u>however</u>, that neither DIP Agent nor DIP Lenders shall be liable for any Taxes that may be due by any or all Borrowers.

7.2.4. <u>Account Verification</u>. Whether or not a Default or an Event of Default exists, DIP Agent shall have the right at any time, at reasonable intervals, to verify the validity, amount or status of any Accounts of any Borrower by mail, telephone, or other written communication. Subject to DIP Agent's rights under **Section 7.2.6**, all such communications shall be conducted in the name of such Borrower or any other entity designated by DIP Agent (but not in the name of DIP Agent, any DIP Lender or any other bank or lending institution). So long as no Default or Event of Default exists, verifications of Accounts shall be conducted at the sole cost and expense of DIP Agent and DIP Lenders. Borrowers shall cooperate fully with DIP Agent in an effort to facilitate and promptly conclude any such verification process.

7.2.5. <u>Deposit Accounts and Securities Accounts</u>.

(i) Borrowers shall maintain at all times Dominion Accounts pursuant to lockbox or other arrangements acceptable to DIP Agent and, in the case of any such Dominion Account and lockbox arrangement, with such bank as may be selected by Borrowers and be acceptable to DIP Agent. Borrowers shall obtain a deposit account control agreement (in form and substance satisfactory to DIP Agent) from each lockbox servicer and Dominion Account bank that maintains a Deposit Account of each Borrower, establishing DIP Agent's control over and Lien in the lockbox and any such Dominion Account, requiring immediate deposit of all remittances received in the lockbox to a Dominion Account, and waiving offset rights of such servicer or bank, except for customary administrative charges. All funds in each Dominion Account shall be immediately transferred to the Payment Account and shall be applied to the Obligations at the beginning of the next Business Day in accordance with **Section 4.7**. DIP Agent and DIP Lenders assume no responsibility to Borrowers for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank. Borrowers shall request in writing and otherwise take commercially reasonable steps to ensure that all payments on Accounts or otherwise relating to Collateral are made directly to a Dominion Account (or a lockbox relating to a Dominion Account). If a Borrower or any Subsidiary receives Cash or Payment Items with respect to any ABL Priority Collateral, or, subject to the

terms of the Intercreditor Agreements, any other Collateral, it shall hold same in trust for Pre-Petition ABL Agent and DIP Agent and promptly (not later than the next Business Day) deposit same into a Dominion Account.  For avoidance of doubt, no Dominion Account shall constitute an Excluded Deposit Account.

       (ii)     Each Borrower shall, if so requested at any time by DIP Agent, obtain a securities account control agreement (in form and substance satisfactory to DIP Agent) from each securities intermediary that maintains a securities account of such Borrower, establishing DIP Agent's control over and Lien in the securities account, requiring acknowledgement that the securities intermediary has custody, control or possession of such securities account on behalf of DIP Agent and will comply with entitlement orders originated by DIP Agent with respect to such securities account, and has such other terms and conditions as DIP Agent may reasonably require.

       7.2.6.  <u>Collection of Accounts and Proceeds of Collateral</u>.  To expedite collection, Borrowers shall endeavor in the first instance to make collection of Borrowers' Accounts.  All Payment Items received by any Borrower in respect of its Accounts, together with the proceeds of any other Collateral, shall be held by such Borrower as trustee of an express trust for the benefit of Pre-Petition ABL Agent and DIP Agent, and such Borrower shall immediately deposit same in kind in a Dominion Account.  DIP Agent retains the right at all times during the continuance of a Default or an Event of Default to notify Account Debtors of any or all Borrowers that Accounts have been assigned to DIP Agent and to collect Accounts directly in its own name and to charge to Borrowers the collection costs and expenses incurred by DIP Agent or DIP Lenders, including reasonable attorneys' fees.

**7.3.**    <u>**Administration of Inventory.**</u>

       7.3.1.  <u>Records and Reports of Inventory</u>.  Each Borrower shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions, and shall submit to DIP Agent inventory and reconciliation reports in form and detail satisfactory to DIP Agent, on such periodic basis as DIP Agent may request.  Each Borrower shall conduct a physical inventory at least once per calendar year (and on a more frequent basis if requested by DIP Agent when an Event of Default exists) and periodic cycle counts consistent with historical practices, and shall provide to DIP Agent a report based on each such inventory and count promptly upon completion thereof, together with such supporting information as DIP Agent may request.  DIP Agent may participate in and observe each physical count.

       7.3.2.  <u>Returns of Inventory</u>.  No Borrower shall return any Inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (i) such return is in the Ordinary Course of Business; (ii) no Default, Event of Default or Out of Formula Condition exists or would result therefrom; (iii) DIP Agent is promptly notified if the aggregate Value of all Inventory returned in any month exceeds $250,000; and (iv) any payment received by a Borrower for a return is promptly remitted to DIP Agent for application to the Pre-Petition ABL Obligations or the Obligations as elected by DIP Agent in its discretion.

       7.3.3.  <u>Acquisition, Sale and Maintenance</u>.  Each Borrower shall take all steps to assure that all Inventory is produced in accordance with Applicable Law, including the

FLSA.  No Borrower shall sell any Inventory on approval or any other basis under which the customer may return or require such Borrower to repurchase such Inventory, except pursuant to a consignment arrangement so long as the amount of Inventory sold on consignment does not exceed $500,000 in the aggregate at any time.  Borrowers shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all Applicable Law, and shall make current rent payments (within applicable grace periods provided for in leases) at all locations where any Collateral is located.

**7.4.**    **Administration of Equipment.**

7.4.1.  Record and Schedules of Equipment.  Each Borrower shall keep accurate and complete records of its Equipment, including kind, quality, quantity, cost, acquisitions and dispositions thereof, and shall submit to DIP Agent, on such periodic basis as DIP Agent may request, a current schedule thereof, in form satisfactory to DIP Agent.  Promptly upon request, each Borrower shall deliver to DIP Agent evidence of its ownership interest in any Equipment.

7.4.2.  Dispositions of Equipment.  Borrowers shall not sell, lease or otherwise dispose of any Equipment, without the prior written consent of DIP Agent (but subject to the Intercreditor Agreements), other than replacement of Equipment that is worn, damaged or obsolete with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens other than Permitted Liens.

7.4.3.  Condition of Equipment.  Each Borrower shall service and maintain its Equipment in the Ordinary Course of Business to ensure that such Equipment is generally capable of performing the functions for which such Equipment type was designed, in accordance with manufacturer specifications, and is available to support the business of such Borrower.

**7.5.**    **Borrowing Base Certificates.**  On or before the Closing Date, and thereafter on Wednesday of each week, Borrowers shall deliver to DIP Agent (and DIP Agent shall promptly deliver a copy of the same to each DIP Lender) a Borrowing Base Certificate prepared as of the last day of the prior week in the form attached as **Exhibit I**, and at such other times as DIP Agent may request. All calculations of Availability in connection with any Borrowing Base Certificate shall originally be made by Borrowers and certified to DIP Agent by SRC, provided that DIP Agent shall have the right to review and adjust any such calculation (i) to reflect its reasonable estimate of declines in value of any of the Eligible Accounts and Eligible Inventory described therein and (ii) to the extent that such calculation is not in accordance with this Agreement or does not accurately reflect the amount of the Availability Reserve; and provided further, that errors in the Borrowing Base Certificate (whether or not known to the certifying officers of Borrowers) shall be promptly corrected.

## SECTION 8.  REPRESENTATIONS AND WARRANTIES

**8.1.**    <u>**General Representations and Warranties.**</u>    To induce DIP Agent and DIP Lenders to enter into this Agreement and to make available the Commitments, Revolver Loans and Letters of Credit, each Borrower warrants and represents to DIP Secured Parties that:

8.1.1.  <u>Organization and Qualification</u>.    Each Borrower and each of its Subsidiaries are entities duly organized, validly existing and in good standing under the laws of the jurisdiction of their respective organization.  Each Borrower and each of its Subsidiaries are duly qualified and are authorized to do business and are in good standing as a foreign corporation in each state or jurisdiction in which the failure of any such Borrower or any of such Subsidiaries to be so qualified would have a Material Adverse Effect.

8.1.2.  <u>Power and Authority</u>.    Subject to the entry of the Interim DIP Financing Order, and thereafter upon the entry of the Final DIP Financing Order, each Borrower and each of its Subsidiaries is duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other DIP Loan Documents.  The execution, delivery and performance of this Agreement and each of the other DIP Loan Documents have been duly authorized by all necessary action and do not and will not (i) require any consent or approval of any of the holders of the Equity Interests of any Borrower or any of its Subsidiaries; (ii) contravene the Organization Documents of any Borrower or any of its Subsidiaries; (iii) violate, or cause any Borrower or any of its Subsidiaries to be in default under, any provision of any Applicable Law, order, writ, judgment, injunction, decree, determination or award in effect having applicability to such Borrower or any such Subsidiary; (iv) result in a breach of or constitute a default under (a) any indenture or loan or credit agreement or (b) any other agreement, lease or instrument to which any Borrower or any of its Subsidiaries is a party or by which it or its Properties may be bound or affected the consequence of which would constitute a Material Adverse Effect; or (v) result in, or require, the creation or imposition of any Lien (other than Permitted Liens) upon or with respect to any of the Properties now owned or hereafter acquired by any Borrower or any of its Subsidiaries.

8.1.3.  <u>Legally Enforceable Agreement</u>.    Subject to the entry of the Interim DIP Financing Order, and thereafter upon the entry of the Final DIP Financing Order, this Agreement is, and each of the other DIP Loan Documents when delivered under this Agreement will be, legal, valid and binding obligations of each Borrower and each of its Subsidiaries signatories thereto enforceable against them in accordance with the respective terms of such DIP Loan Documents, except as the enforceability thereof may be limited by principles of equity affecting the enforcement of creditors' rights.

8.1.4.  <u>Capital Structure</u>.    **Schedule 8.1.4** reflects, as of the date hereof, (i) the correct name of each Borrower and each Subsidiary, its jurisdiction of incorporation and the percentage of its Equity Interests having Voting Powers owned by each Person, (ii) the name of each corporate Affiliate of each Borrower and the nature of the affiliation, and (iii) the number of authorized and issued Equity Interests (and treasury shares) of each Borrower and each of its Subsidiaries as of the date of the Pre-Petition ABL Loan Agreement.  As of the date hereof, each Borrower has good title to all of the shares it purports to own of the Equity Interests of each of its Subsidiaries, free and clear in each case of any Lien other than Permitted Liens.  As of the date

46

hereof (x) all such Equity Interests have been duly issued and are fully paid and non-assessable; and (y) since the date of the financial statements of Borrowers referred to in **Section 8.1.9** hereof, no Borrower has made, or obligated itself to make, any Distribution except as shown in **Schedule 8.1.4**. Except as shown in **Schedule 8.1.4**, no Borrower nor any Subsidiary holds, and no shares of the capital stock of any Borrower or any Subsidiary are subject to, outstanding options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any Equity Interests or obligations convertible into, or any powers of attorney relating to such Equity Interests.

8.1.5.  <u>Corporate Names</u>.  During the 5-year period preceding the date of this Agreement: (i) no Borrower nor any of its Subsidiaries has been known as or used any corporate, fictitious or trade names except those listed on **Schedule 8.1.5**; and (ii) except as set forth on **Schedule 8.1.5**, no Borrower nor any of its Subsidiaries has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

8.1.6.  <u>Business Locations; Agent for Process</u>.  **Schedule 8.1.6** contains a true and complete list of the following information, as of the date hereof: (i) the chief executive office of each Borrower and each of its Subsidiaries including any other executive offices of such Borrower and each of its Subsidiaries during the 5-year period preceding the date of this Agreement, and (ii) the agent for service of process of each Borrower and each of its Subsidiaries in their respective states of organization.  All of the plant facilities and warehouses of each Borrower and its Subsidiaries effective as of the date hereof are listed on **Schedule 7.1.1**.

8.1.7.  <u>Title to Properties; Priority of Liens</u>.  As of the date hereof, each Borrower and each of its Subsidiaries has good and marketable title to and fee simple ownership of, or valid and subsisting leasehold interests in, all of its real Property, and good title to all of its personal Property (other than the Collateral), including all Property reflected in the financial statements referred to in **Section 8.1.9** or delivered pursuant to **Section 9.1.4**.  Each Borrower has good title to all Collateral in each case free and clear of all Liens except Permitted Liens.  Each Borrower has paid or discharged all lawful claims which, if unpaid, might become a Lien against any Collateral of such Borrower that is not a Permitted Lien.  Upon entry of the Interim DIP Financing Order by the Court, the Liens granted to DIP Agent pursuant to this Agreement are first priority Liens in and upon the Collateral subject only to Permitted Senior Liens.

8.1.8.  <u>Accounts</u>.  DIP Agent may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by a Borrower with respect to any Account as of the date of the most current Borrowing Base Certificate and Schedule of Accounts submitted pursuant to **Section 7.2.1**.  Unless otherwise specifically stated in the Borrowing Base Certificate or Schedule of Accounts, Borrowers make each of the following warranties (subject to the limitation in the last paragraph of this **Section 8.1.8**) as of the date of each Borrowing Base Certificate and Schedule of Accounts with respect to each Account included in the computation of the Borrowing Base:

(i)     The Account is genuine and in all respects what it purports to be, and it is not evidenced by a judgment;

(ii)     The Account arises out of a completed, bona fide sale and delivery of Inventory (or appropriate agreement respecting storage entered into in the Ordinary Course of Business) or rendition of services by a U.S. Borrower in the Ordinary Course of Business and substantially in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto and forming a part of the contract between such U.S. Borrower and the Account Debtor;

(iii)    The Account is for a sum certain maturing as stated in the invoice covering such sale or rendition of services, a copy of which has been furnished or is available to DIP Agent on request;

(iv)    The Account, and DIP Agent's security interest therein, is not subject to any claims for offset (except claims for offset netted out in the computation of Eligible Accounts included in the Borrowing Base Certificate), Lien (other than Permitted Liens), deduction, defense, dispute, counterclaim or any other adverse condition except conditions in the Ordinary Course of Business or claims where the amount in controversy is immaterial, and each such Account is absolutely owing to a U.S. Borrower and is not contingent in any respect or for any reason;

(v)     The contract under which such Account arose does not expressly condition or restrict a U.S. Borrower's right to assign its right to payment thereunder to DIP Agent, unless such U.S. Borrower has obtained the Account Debtor's consent to such collateral assignment of rights to payment or complied with any conditions to such assignment of rights of payment (regardless of whether under the UCC or other Applicable Law any such restrictions are ineffective to prevent the grant of a Lien upon such Account in favor of DIP Agent);

(vi)    No U.S. Borrower has made any agreement with any Account Debtor thereunder for any extension, compromise, settlement or modification of any such Account or any deduction therefrom, except discounts or allowances which are granted by such U.S. Borrower for prompt payment or otherwise in the Ordinary Course of Business and which are reflected in the calculation of the net amount of each respective invoice related thereto and are reflected in the Schedules of Accounts submitted to DIP Agent pursuant to  (and to the extent required by) **Section 7.2.1** hereof or accounted for in the computation of Eligible Accounts included in the Borrowing Base Certificate;

(vii)   There are no facts, events or occurrences which are reasonably likely to impair the validity or enforceability of any such Account or reduce the amount payable thereunder from the face amount of the invoice with respect thereto;

(viii)  The Account Debtor had the capacity to contract when the Account arose, continues to meet such Borrower's customary credit standards, is Solvent, is not contemplating or subject to an Insolvency Proceeding, and has not failed, or suspended or ceased doing business; and

(ix)    There are no proceedings or actions which are threatened or pending against any Account Debtor thereunder and which are reasonably likely to result in any material adverse change in the collectibility of such Account.

For purposes of determining whether an Account is an Eligible Account, the foregoing representations are made regardless of whether Borrowers' Knowledge exists with respect to an event or condition that would constitute a breach of any of such representations.  For all other purposes of this Agreement (including the purpose of determining whether an Event of Default has occurred hereunder), the representations are only made to the extent of Borrowers' Knowledge.

8.1.9.  <u>Financial Statements</u>.  The consolidated and consolidating balance sheets as of January 31, 2015, and related statements of income and cash flow of each Borrower and its Subsidiaries delivered to DIP Agent and DIP Lenders by Borrowers for the month ending January 31, 2015*, were prepared in accordance with GAAP consistently applied except to the extent provided in the notes to such financial statements and subject, in the case of the unaudited financial statements and reports, to normal year-end adjustments and the absence of footnotes, and fairly present in all material respects the financial positions and results of each Borrower and its Subsidiaries at the dates and for the periods indicated.  Any projections included in the DIP Budget have been and will be prepared in good faith, and are based on reasonable assumptions in light of the circumstances at such time.  Since January 31, 2015, there has been no change in the condition, financial or otherwise, of any Borrower (other than commencement of the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect.  No financial statement of operations of any Borrower and its Subsidiaries delivered to DIP Agent or DIP Lenders by Borrowers on or prior to the Closing Date contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading.

8.1.10.  <u>Full Disclosure</u>.  No DIP Loan Document, financial statement referred to in **Section 8.1.9** hereof or other written statement made by any Borrower contains any untrue statement of a material fact or omits any material fact necessary to make the statements contained herein or therein not materially misleading.  To Borrowers' Knowledge, there is no fact or circumstances in existence on the date hereof which any Borrower has failed to disclose to DIP Agent in writing that may reasonably be expected to have a Material Adverse Effect.

8.1.11.  <u>Surety Obligations</u>.  No Borrower nor any of its Subsidiaries is obligated as surety or indemnitor under any surety or similar bond or other contract to assure payment, performance or completion of performance of any undertaking or obligation of any Person, excluding obligations entered into in the Ordinary Course of Business and excluding all leases.

8.1.12.  <u>Taxes</u>.  The FEIN of each Borrower and each of its Subsidiaries as of the date hereof is as shown on **<u>Schedule 8.1.12</u>**.  To Borrowers' Knowledge, each Borrower and each of its Subsidiaries has filed all federal, state and local tax returns and other reports such Borrower and each of its Subsidiaries are required by law to file (or with respect to amounts in the aggregate which are less than $100,000, are undertaking good faith efforts to make any such filings) and have paid, or made provision for the payment of, all Taxes upon such Borrower and

49

its Subsidiaries and their respective income and Properties as and when such Taxes are due and payable, except to the extent being Properly Contested.  To Borrowers' Knowledge, the provision for Taxes on the books of each Borrower and each of its Subsidiaries are adequate for all years not closed by applicable statutes, and for their respective current Fiscal Years.

8.1.13.  <u>Brokers</u>.  There are no claims against any Borrower for brokerage commissions, finder's fees or investment banking fees in connection with the transactions contemplated by this Agreement or any of the other DIP Loan Documents.

8.1.14.  <u>Intellectual Property</u>.  Each Borrower and each of its Subsidiaries owns or has the lawful right to use all Intellectual Property necessary for the present and planned future conduct of its business without any conflict with the rights of others likely to have a Material Adverse Effect; and there is no objection to, or pending or threatened Intellectual Property Claim with respect to any Borrower's or any Subsidiary's right to use any such Intellectual Property (and no Borrower is aware of any grounds for challenge or objection thereto) that is reasonably likely to have a Material Adverse Effect.

8.1.15.  <u>Governmental Approvals</u>.  Each Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Approvals necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its Properties as now owned or leased by it, except for issues relating to licenses, certificates of occupancy and other matters that are not reasonably likely to have a Material Adverse Effect.

8.1.16.  <u>Compliance with Laws</u>.  Each Borrower and each of the Subsidiaries has duly complied with, and its Properties, business operations and leaseholds are in compliance in all material respects with, the provisions of all Applicable Law; there have been no citations, notices or orders of noncompliance issued to any Borrower or any of the Subsidiaries under any such law, rule or regulation that could be reasonably expected to have a Material Adverse Effect; and no Inventory has been produced in violation of the FLSA except for items of noncompliance that are not reasonably likely to have a Material Adverse Effect.

8.1.17.  <u>Burdensome Contracts</u>.  No Borrower nor any of the Subsidiaries is a party or subject to any contract, agreement, or charter or other corporate restriction, which has or could be reasonably expected to have a Material Adverse Effect.  No Borrower nor any of the Subsidiaries is a party or subject to any Restrictive Agreement.

8.1.18.  <u>Litigation</u>.  Except for the Chapter 11 Cases, there are no actions, suits, proceedings or investigations pending or, to Borrowers' Knowledge, threatened on the date hereof, against or affecting any Borrower or any of the Subsidiaries, or the business, operations, Properties, prospects, profits or condition of any Borrower or any of the Subsidiaries, (i) which relates to any of the DIP Loan Documents or any of the transactions contemplated thereby or (ii) which, if determined adversely to any Borrower or any of the Subsidiaries, could reasonably be expected to have a Material Adverse Effect.  To Borrowers' Knowledge, no Borrower nor any of the Subsidiaries is in default on the date hereof with respect to any order, writ, injunction, judgment, decree or rule of any Governmental Authority or arbitration board or tribunal.

8.1.19. <u>No Defaults</u>.   No event has occurred and no condition exists which would, upon or immediately after the execution and delivery of this Agreement or any Borrower's performance hereunder, constitute a Default or an Event of Default; and no Borrower nor any of its Subsidiaries is in default, and no event has occurred and no condition exists which constitutes or which with the passage of time or the giving of notice or both would constitute a default, under any Material Contract or in the payment of any Debt of any Borrower or a Subsidiary to any Person for Money Borrowed, except solely as a result of the filing of the Chapter 11 Cases or for conditions that could not reasonably be expected to have a Material Adverse Effect.

8.1.20. <u>Leases</u>.   No Borrower has any capitalized and operating lease of that constitutes a Material Contract.

8.1.21. <u>Pension Plans</u>.   Except as disclosed on **Schedule 8.1.21**, no Borrower nor any of its Subsidiaries has any Plan on the date hereof.  Except as disclosed on **Schedule 8.1.21**, (i) each Borrower and each of its Subsidiaries is in full compliance with the requirements of ERISA and the regulations promulgated thereunder with respect to each Plan in all material respects; (ii) no fact or situation that is reasonably likely to have a Material Adverse Effect exists in connection with any Plan; and (iii) no Borrower or any of its Subsidiaries has any withdrawal liability in connection with a Multi-employer Plan.

8.1.22. <u>Trade Relations</u>.   To Borrowers' Knowledge, there exists no actual or threatened termination, cancellation or limitation of, or any materially adverse modification or change in, the business relationship between any Borrower and any customer or any group of customers whose purchases individually or in the aggregate are material to the business of such Borrower, or with any material supplier or group of suppliers, which in either case is reasonably likely to have a Material Adverse Effect.

8.1.23. <u>Labor Relations</u>.   Except as described on **Schedule 8.1.23**, no Borrower nor any of the Subsidiaries is a party to any collective bargaining agreement on the date hereof.  To Borrowers' Knowledge on the date hereof, (i) there are no grievances, disputes or controversies with any union or any other organization of any Borrower's or any Subsidiary's employees reasonably likely to have a Material Adverse Effect, or (ii) any threats of strikes, work stoppages or any asserted pending demands for collective bargaining by any union or organization.

8.1.24. <u>Investment Company Act</u>.   No Borrower (i) is an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940 or (ii) is subject to regulation under the Interstate Commerce Act or any other Applicable Law regarding its authority to incur Debt.

8.1.25. <u>Margin Stock</u>.   No Borrower nor any of its Subsidiaries (i) is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

8.1.26. <u>Insurance</u>.   The properties of Borrowers and their respective Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of any Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrowers or the applicable Subsidiary operate.

8.1.27. <u>Casualty, Etc.</u>   Neither the businesses nor the properties of any Borrower or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

8.1.28. <u>DIP Security Documents</u>.   The provisions of any DIP Security Documents are effective to create in favor of DIP Agent for the benefit of DIP Lenders a legal, valid and enforceable first priority Lien in and upon the ABL Priority Collateral and, in the case of the Term Loan Priority Collateral, a legal, valid and enforceable Lien with the priority set forth in the DIP Financing Orders (subject to Permitted Liens) on all right, title and interest of the respective Borrowers in the Collateral described therein.   No filing or other action will be necessary to perfect or protect such Liens.

8.1.29. <u>OFAC</u>.   No Borrower or Subsidiary, nor to the knowledge of any Borrower or Subsidiary, any director, officer, employee or affiliate thereof, or any agent or representative acting at the direction thereof, is a Person currently the subject of any Sanctions. No Borrower or Subsidiary is located, organized or resident in a Designated Jurisdiction.

8.1.30. <u>Compliance with Environmental Laws</u>.   No Borrower's or any Subsidiary's past or present operations, Real Estate owned or controlled by any Borrower or any Subsidiary, or other Properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up; (ii) neither any Borrower nor any Subsidiary has received any Environmental Notice; and (iii) neither any Borrower nor any Subsidiary has any contingent liability with respect to any Environmental Release, environmental pollution or hazardous material on any Real Estate now or previously owned or controlled by any Borrower or any Subsidiary, in each case except as could not, individually or in the aggregate be reasonably expected to have a Material Adverse Effect.

8.1.31. <u>Chapter 11 Cases</u>.   The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof, and the hearing for the approval of the Interim DIP Financing Order has been given as identified in the certificate of service filed with the Court.

8.1.32. <u>DIP Financing Orders</u>.   The Interim DIP Financing Order and, after it has been entered, the Final DIP Financing Order, and the transactions contemplated by this Agreement and the other DIP Loan Documents are in full force and effect, and have not, in whole or in part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or

proceeding in any jurisdiction, and each Borrower is in compliance with each DIP Financing Order.

**8.2.    Complete Disclosure.**  No DIP Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading.  There is no fact or circumstance that any Borrower has failed to disclose to DIP Agent in writing that could reasonably be expected to have a Material Adverse Effect.

**8.3.    Reaffirmation of Representations and Warranties.**  Each representation and warranty contained in this Article 8 shall be deemed to be reaffirmed by each Borrower on each day that any U.S. Borrower requests or is deemed to have requested an extension of credit hereunder, unless Borrowers have notified DIP Agent prior to any such extension of credit that Borrowers are no longer able to make any such representation or warranty and except for changes in the nature of a Borrower's business or operations, or, if applicable, any of its Subsidiaries' businesses or operations, that may occur after the date hereof in the Ordinary Course of Business so long as DIP Agent has consented to such changes or such changes are not violative of any provision of this Agreement or any other DIP Loan Document.  Notwithstanding the foregoing, representations and warranties which by their terms are applicable only to a specific date shall be deemed made only at and as of such date.

**8.4.    Survival of Representations and Warranties.**  All representations and warranties of Borrowers contained in this Agreement or any of the other DIP Loan Documents shall survive the execution, delivery and acceptance thereof by DIP Agent, DIP Lenders and the parties thereto and the closing of the transactions described therein or related thereto.

## SECTION 9.  COVENANTS AND CONTINUING AGREEMENTS

**9.1.    Affirmative Covenants.**  For so long as there are any Commitments outstanding and thereafter until Full Payment of the Obligations, each Borrower covenants that, unless the Required DIP Lenders have otherwise consented in writing, it shall and shall cause each Subsidiary to:

9.1.1.  Visits and Inspections.  Permit representatives of DIP Agent, from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to a Borrower, to visit and inspect the Properties of such Borrower and each of its Subsidiaries, inspect, audit, examine, conduct appraisals, and make extracts from each Borrower's and each Subsidiary's books and records, and discuss with its officers, its employees and its independent accountants, such Borrower's and each Subsidiary's business, financial condition, business prospects and results of operations.  Such visits, inspections, audits, examinations and appraisals shall be at DIP Agent's or Borrowers' expense as provided in **Section 2.2.4**.  Representatives of each DIP Lender shall be authorized to accompany DIP Agent on each such visit and inspection and to participate with DIP Agent therein, but at their own expense, unless a Default or Event of Default exists.  Neither DIP Agent nor any DIP Lender shall have any duty to make any such inspection, nor to share any results of any inspection, appraisal or report with any Borrower, and shall not incur any liability to any Borrower or any other Person by reason of its failure to

conduct or delay in conducting any such inspection. Each Borrower acknowledges that all inspections, appraisals and reports are prepared by DIP Agent and DIP Lenders solely for their purposes, and no Borrower shall be entitled to rely upon them.

9.1.2. <u>Notices</u>. Notify DIP Agent and DIP Lenders in writing, within five (5) days after Borrowers' Knowledge thereof, (i) of the commencement of any litigation affecting any Obligor or any of its Properties, whether or not the claims asserted in such litigation are considered by any Borrower to be covered by insurance, and of the institution of any administrative proceeding, to the extent that such litigation or administrative proceeding, if determined adversely to such Obligor, would reasonably be expected to have a Material Adverse Effect; (ii) of any material labor dispute to which any Obligor may become a party, and any strikes or walkouts relating to any of its plants or other facilities; (iii) of any Post-Petition material default by any Obligor under, termination or expiration of any Material Contract, or of any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Debt of such Obligor exceeding $500,000; (iv) of the existence of any Default or Event of Default; (v) of any Post-Petition default by any Person under any note or other evidence of Debt payable to an Obligor in an amount exceeding $500,000; (vi) of any Post-Petition judgment against any Obligor in an amount exceeding $1,000,000; (vii) of the assertion by any Person of any Intellectual Property Claim, the adverse resolution of which could reasonably be expected to have a Material Adverse Effect; (viii) of any violation or asserted violation by any Borrower of any Applicable Law (including ERISA, OSHA, FLSA or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect; (ix) of any Environmental Release by an Obligor or on any Property owned or occupied by an Obligor which could reasonably be expected to have a Material Adverse Effect; (x) of the discharge of any Borrower's independent accountants or any withdrawal of resignation by such independent accountants from their acting in such capacity; (xi) the issuance or incurrence of any Debt; (xii) the issuance or sale of any Equity Interests of any Borrower or any Subsidiary; (xiii) any disposition of any assets or Property or any interest therein to or in favor of any Person in excess of $500,000 other than sales of Inventory in the Ordinary Course of Business; (xiv) whether any Obligor fails to constitute a Qualified ECP Obligor; and (xv) copies of all notices, requests and other documents (including amendments, waivers and other modifications) received by any Obligor or any Subsidiary under or pursuant to any Term Loan Documents and, from time to time upon request by DIP Agent, such information and reports regarding the Term Loans as DIP Agent may request.  In addition, Borrowers shall give DIP Agent at least five (5) Business Days prior written notice of any Borrower's opening of any new chief executive office.

9.1.3. <u>Bankruptcy Case Notices</u>.  Each Borrower shall provide, or shall cause its counsel in the Chapter 11 Cases to provide, DIP Agent's and DIP Lenders' counsel with copies of all pleadings, motions, reports, applications and other papers filed by such Borrower with the Court as well as copies of all billing and expense statements received from any Professional Person.  Each Borrower shall include counsel for DIP Agent and counsel for each DIP Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Chapter 11 Cases.

9.1.4. <u>Financial and Other Reporting</u>.  Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP reflecting all its financial transactions; and cause to be prepared and to be furnished

to DIP Agent and DIP Lenders the following (all to be prepared in accordance with GAAP applied on a consistent basis, unless such Borrower's certified public accountants concur in any change therein, such change is disclosed to DIP Agent and is consistent with GAAP):

(i)     as soon as available, but in no event later than April 30, 2015, unaudited balance sheets of Borrowers and their respective Subsidiaries as of the end of Fiscal Year 2014 and the related statements of income, shareholders' equity and cash flow, on a Consolidated basis, setting forth in each case in comparative form, the corresponding figures for the preceding Fiscal Year, and certified by the principal financial officer of SRC as prepared in accordance with GAAP and fairly presenting the Consolidated financial position and results of operations of Borrowers and their Subsidiaries for such Fiscal Year subject only to changes from audit and year end adjustments and except that such statements need not contain notes;

(ii)    as soon as available, and in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters in any Fiscal Year, excluding the last Fiscal Quarter of Borrowers' Fiscal Year, unaudited balance sheets of Borrowers and their Subsidiaries and the related unaudited Consolidated Statements of income and cash flow in each case for such Fiscal Quarter and for the portion of Borrowers' Fiscal Year then elapsed, on a Consolidated basis, setting forth in each case in comparative form, the corresponding figures for the preceding Fiscal Year, and certified by the principal financial officer of Borrowers as prepared in accordance with GAAP and fairly presenting the Consolidated financial position and results of operations of Borrowers and their Subsidiaries for such Fiscal Quarter and period subject only to changes from audit and year end adjustments and except that such statements need not contain notes;

(iii)   as soon as available, and in any event within thirty (30) days after the end of each Fiscal Month hereafter, unaudited balance sheets of Borrowers and their Subsidiaries and the related unaudited Consolidated Statements of income and cash flow in each case for such month and for the portion of Borrowers' Fiscal Year then elapsed, on a Consolidated basis, setting forth in each case in comparative form, the corresponding figures for the preceding Fiscal Year, and certified by the principal financial officer of SRC as prepared in accordance with GAAP and fairly presenting the Consolidated financial position and results of operations of Borrowers and their Subsidiaries for such Fiscal Month and period subject only to changes from audit and year end adjustments and except that such statements need not contain notes;

(iv)    [Reserved];

(v)     not later than fifteen (15) days after each Fiscal Month, if so requested by DIP Agent, (a) a listing of all of each Borrower's trade payables as of the last Business Day of such Fiscal Month, specifying the name of and balance due each trade creditor, and, at DIP Agent's request, monthly detailed trade payable agings in the form customarily prepared by Borrowers and approved by DIP Agent and (b) Inventory reports by each location of Borrowers and their respective Subsidiaries;

(vi)    promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which any Borrower has made generally available to its shareholders and copies of any regular, periodic and special public reports or registration statements which any Borrower files with the SEC or any Governmental Authority which may be substituted therefor, or any national securities exchange;

(vii)    all information, reports and other documents provided at any time by a Borrower to Term DIP Agent or to a Term DIP Lender, promptly after the sending of such information, reports or other documents;

(viii)    an initial 13-week professional fees budget and an updated professional fees budget for each successive 13-week period thereafter (the "Professional Fees Budget") setting forth in reasonable detail and specificity the projected fees and reimbursable expenses of the Professionals;

(ix)    (i) As soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the United States Trustee for the District of Delaware, as the case may be, the Final DIP Financing Order, all other proposed orders and pleadings related to the Chapter 11 Cases, the DIP Facility and/or any sale contemplated in accordance with **Section 9.1.18** hereof (all of which must be in form and substance satisfactory to DIP Agent), any Chapter 11 Plan and/or any disclosure statement related thereto and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the United States Trustee for the District of Delaware, as the case may be, all other notices, filings, motions, pleadings or other information concerning the financial condition of Borrowers or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the United States Trustee for the District of Delaware;

(x)    An updated DIP Budget and an updated Professional Fee Budget every two (2) weeks, each in form and substance satisfactory to DIP Agent: and

(xi)    such other reports and information (financial or otherwise) as DIP Agent may reasonably request from time to time in connection with any Collateral or any Obligor's financial condition or business.

Concurrently with the delivery of the financial statements described in clause (i) of this **Section 9.1.4**, or more frequently if requested by DIP Agent or any DIP Lender during any period that a Default or Event of Default exists, Borrowers shall cause to be prepared and furnished to DIP Agent and DIP Lenders a Compliance Certificate executed by the chief financial officer of SRC.

Promptly after the sending or filing thereof, Borrowers shall also provide to DIP Agent copies of any annual report to be filed in accordance with ERISA in connection with each Plan and such other data and information (financial and otherwise) as DIP Agent, from time to time, may reasonably request bearing upon or related to the Collateral or any Borrower's and each of its Subsidiaries' financial condition or results of operations.

Borrowers hereby acknowledge that (i) DIP Agent or BofA will make available to DIP Lenders and Letter of Credit Issuer materials and/or information provided by or on behalf of Borrowers hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>") and (ii) certain of DIP Lenders (each, a "<u>Public DIP Lender</u>") may have personnel who do not wish to receive material non-public information with respect to Borrowers or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Borrowers hereby agree that (a) all Borrower Materials that are to be made available to Public DIP Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (b) by marking Borrower Materials "PUBLIC," Borrowers shall be deemed to have authorized DIP Agent, Letter of Credit Issuer and DIP Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Borrowers or their securities for purposes of United States Federal and state securities laws; (c) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (d) DIP Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

> 9.1.5. <u>Landlord and Storage Agreements</u>. Upon the reasonable request of DIP Agent, provide DIP Agent with copies of: (i) any of the existing agreements, and (ii) any future agreements, between any Borrower and any landlord, warehouseman or bailee which owns any premises at which any Collateral may, from time to time, be kept or that otherwise may possess or handle any Collateral.

> 9.1.6. <u>Taxes</u>. Pay and discharge all Post-Petition Taxes prior to the date on which such Taxes become delinquent or penalties attach thereto, except and to the extent only that such Taxes are being Properly Contested or, that such Taxes are in an aggregate amount of less than $250,000, and are filed and paid in good faith as, to Borrowers' Knowledge, such Taxes become due.

> 9.1.7. <u>Compliance with Law</u>. Comply with (a) each DIP Financing Order and all other orders entered by the Court in the Chapter 11 Cases, and (b) all Applicable Law, including ERISA, all Environmental Laws, FLSA, OSHA, Anti-Terrorism Laws, and all laws, statutes, regulations and ordinances regarding the collection, payment and deposit of Taxes, and obtain and keep in force any and all Governmental Approvals necessary to the ownership of its Properties or to the conduct of its business, but only to the extent that any such failure to comply (other than failure to comply with Anti-Terrorism Laws), obtain or keep in force could be reasonably expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, if any Environmental Release shall occur at or on any of the Properties of any Borrower or any of its Subsidiaries, Borrowers shall, or shall cause the applicable Subsidiary to, act promptly and diligently to investigate and report to DIP Agent and all appropriate Governmental Authorities the extent of, and to take appropriate remedial action to eliminate, such Environmental Release, whether or not ordered or otherwise directed to do so by any Governmental Authority.

9.1.8.  Insurance.  In addition to the insurance required herein with respect to the Collateral, maintain, with any Approved Insurers, (i) insurance with respect to each Borrower's and each of its Subsidiaries' respective Properties and businesses against such casualties and contingencies of such type (including product liability, workers' compensation, or larceny, embezzlement or other criminal misappropriation insurance) and in such amounts, and with such coverages and deductibles, as are customary in the respective business of such Borrower or such Subsidiary and (ii) business interruption insurance in an amount not less than $20,000,000, with deductibles and subject to a collateral insurance assignment satisfactory to DIP Agent as security for the Obligations.

9.1.9.  Collateral.  Notwithstanding anything to the contrary, Borrowers shall execute and deliver to DIP Agent, for the benefit of DIP Secured Parties, Mortgages, deposit accounts control agreements, Lien Waivers and other DIP Security Documents to the extent provided to any Term DIP Agent or executed in respect of any Delayed Draw Term DIP Loans.

9.1.10.  Payment of Administrative Expenses.  Pay and discharge as the same shall become due and payable, all its Post-Petition obligations and liabilities, including all tax liabilities, assessments and governmental charges or levies upon it or its Properties or assets, unless being Properly Contested, provided that the foregoing shall not be construed to override any provisions herein or in any DIP Financing Order regarding any impermissible use of Cash Collateral or proceeds of any Revolver Loan or as a consent by any DIP Secured Party to any surcharge of any Collateral under Section 506(c) of the Bankruptcy Code or otherwise to pay any such obligation or liability.

9.1.11.  Preservation of Existence, Etc.  Except as otherwise provided in the DIP Financing Orders, (i) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization except in a transaction permitted by **Section 9.2.1** or **9.2.2**; (ii) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation or non-renewal of which could reasonably be expected to have a Material Adverse Effect.

9.1.12.  Maintenance of Properties.  Except as otherwise provided in the DIP Financing Orders, (i) maintain, preserve and protect all of its material Properties necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (ii) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) use the standard of care typical in the industry in the operation and maintenance of its facilities.

9.1.13.  Compliance with Terms of Leaseholds.  Make all payments and otherwise perform all obligations arising after the Petition Date in respect of all leases of real property to which such Borrower or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such

leases to be forfeited or cancelled, notify DIP Agent of any default by any party with respect to such leases and cooperate with DIP Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect or upon rejection of such lease, with the prior written consent of DIP Agent, pursuant to a Final Order of the Court entered under Section 365 of the Bankruptcy Code.

9.1.14.  Lien Searches. Promptly following receipt of the acknowledgment copy of any financing statements filed under the UCC in any jurisdiction by or on behalf of DIP Lenders, deliver to DIP Agent completed requests for information listing such financing statement and all other effective financing statements filed in such jurisdiction that name such Borrower as debtor, together with copies of such other financing statements.

9.1.15.  Material Contracts.  Except as otherwise permitted under Section 365 of the Bankruptcy Code, and except as to any Material Contract rejected by any Borrower, with the prior written consent of DIP Agent, pursuant to a Final Order of the Court entered upon proper notice and an opportunity to be heard, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, enforce each such Material Contract in accordance with its terms, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; and promptly notify DIP Agent of any material modification of a Material Contract or termination of a Material Contract.

9.1.16.  Debtor-in-Possession Obligations.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules, Local Court Rules, and any order of the Court.

9.1.17.  DIP Budget.  Comply with the terms of the DIP Budget, subject to any Permitted Variances.

9.1.18.  Sale.  Diligently pursue and prosecute the Sale such that:

(i)  Not later than two (2) Business Days after all of the parties thereto have executed the Purchase Agreement, Borrowers shall file and serve the Sale Motions, each in form and substance acceptable to DIP Agent and the Required DIP Lenders, seeking approval of the Sale Procedures Order and the Sale Order (each as defined below);

(ii)  After the parties thereto have executed the Purchase Agreement, and in no event later than April 10, 2015, the Court shall have entered an order, in form and substance satisfactory to DIP Agent and the Required DIP Lenders, approving the bid procedures for the Sale (the "Sale Procedures Order");

(iii)  Not later than June 19, 2015, the Court shall have entered an order, in form and substance satisfactory to DIP Agent and the Required DIP Lenders, approving the Sale Motion and the Purchase Agreement pursuant to Sections 363(f) and 363(m) of the Bankruptcy Code (the "Sale Order");

(iv)    The Sale shall be consummated not later than the earlier of (i) thirty (30) days after the entry of the Sale Order if the Sale has not closed for any reason other than (i) the issuance of a stay pending appeal from the Sale Order (in which case, the 30-day period referred to in this clause shall automatically be extended to the earlier of (A) the fifth business day following the day such stay ceases to be in effect or (B) the Termination Date (as defined in the Purchase Agreement), (ii) the winning bidder has failed to consummate the Sale, except as a result of a breach by Sellers of a representation or covenant in the Purchase Agreement, or (iii) 180 days after the parties have executed the Purchase Agreement; and

(v)    Borrowers shall provide to DIP Agent, at the time or times reasonably requested by DIP Agent, but in no event less than Friday of each week after the Closing Date, a report on the status of the Sale and such other information regarding the Sale as DIP Agent may reasonably request.

9.1.19.  Consultants.  Provide DIP Agent and DIP Lenders with reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by any Borrower in any of the Chapter 11 Cases.

9.1.20.  Term DIP Facility.  Keep and maintain the Term DIP Facility in full force and effect in an amount not less than $30,000,000; promptly obtain advances thereunder on any date that Availability is less than Borrowers' aggregate funding needs; and use the proceeds of each such advance solely for purposes and in amounts (subject to Permitted Variances) set forth in the DIP Budget or permitted by this Agreement or the DIP Financing Orders.

9.1.21.  Post-Closing Covenants.  Promptly after DIP Agent's request therefor, execute and deliver the documents and complete the tasks set forth on **Schedule 9.1.21**, in each case as provided in such schedule.

**9.2.    Negative Covenants.**  For so long as there are any Commitments outstanding and thereafter until Full Payment of the Obligations, each Borrower covenants that, unless the Required DIP Lenders have otherwise consented in writing, it shall not and shall not permit any of its Subsidiaries to:

9.2.1.  Fundamental Changes.  (i) Merge, reorganize, combine, consolidate or amalgamate with any Person, or liquidate, wind up its affairs or dissolve itself and (ii) shall not change any Borrower's name or conduct business under any new fictitious name or change any Borrower's FEIN.

9.2.2.  Disposition of Assets.  Make any Asset Disposition, except (i) sales of Inventory in the Ordinary Course of Business; (ii) sales or other dispositions of items of Equipment which are obsolete, worn out or no longer useful in any Borrower's business; (iii) other dispositions of Collateral that are consented to in writing by DIP Agent and the Required DIP Lenders and are authorized by the Court after notice and hearing; and (iv) the rejection pursuant to Section 365 of the Bankruptcy Code of unexpired leases and executory contracts that

are consented to in writing by DIP Agent and are authorized by the Court after notice and hearing.

9.2.3.  Tax Consolidation.  File or consent to the filing of any consolidated income tax return with any Person other than Borrowers and their Subsidiaries.

9.2.4.  Accounting Changes.  Subject to the terms of the paragraph identified as "Accounting Terms" in Appendix A, make any significant change in accounting treatment or reporting practices, except as may be permitted or required by GAAP and/or applicable requirements of the SEC, or establish a fiscal year different from the Fiscal Year, unless such Borrower has notified DIP Agent of any such change and complied with all disclosure and other requirements of Applicable Law.

9.2.5.  Organization Documents.  Amend, modify or otherwise change any of the terms or provisions in any of its Organization Documents as in effect on the date hereof, except for changes that do not affect in any way such Borrower's or any of its Subsidiaries' rights and obligations to enter into and perform the DIP Loan Documents to which it is a party and to pay all of the Obligations and that do not otherwise have a Material Adverse Effect.

9.2.6.  Restrictive Agreements.  Enter into or become party to any Restrictive Agreement.

9.2.7.  Conduct of Business.  Engage in any business other than the business engaged in by it on the Petition Date and any business or activities which are substantially similar, related or incidental thereto or reasonably evolve therefrom.

9.2.8.  Liens.  Create or permit any Liens on any of the now owned or hereafter acquired Collateral except for the following (collectively, "Permitted Liens"):

(i)      Liens in favor of DIP Agent securing the Obligations;

(ii)     Post-Petition Liens for Taxes not yet due or being Properly Contested;

(iii)    Post-Petition Purchase Money Liens securing Purchase Money Debt permitted by **Section 9.2.9**;

(iv)     Post-Petition statutory Liens (other than Liens for Taxes, imposed under ERISA or in favor of the Pension Benefit Guaranty Corporation) arising in the Ordinary Course of Business, but only if (i) payment of the obligations secured thereby is not yet due or is being Properly Contested and (ii) such Liens do not materially impair the value or use of the Property or materially impair operation of the business of such Borrower or any Subsidiary;

(v)      Post-Petition Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of tenders, bids, leases, contracts (except those relating to Debt for Money Borrowed), statutory obligations and other similar obligations, or arising as a result of progress payments under government contracts, as long as such Liens are at all times junior to DIP Agent's Liens;

(vi)    Post-Petition Liens arising in the Ordinary Course of Business that are at all times junior to the Liens in favor of DIP Agent;

(vii)    easements, rights-of-way, restrictions, covenants or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not secure any monetary obligation and do not interfere with the Ordinary Course of Business;

(viii)    bankers' Liens with respect to depository account arrangements entered into in the Ordinary Course of Business securing obligations not past due and Liens of a collecting bank on Payment Items in the course of collection;

(ix)    Liens in existence on the Petition Date, but only if and to the extent such Liens are permitted under the Pre-Petition ABL Loan Agreement, including Liens on the Collateral securing the Term Loan Obligations subject to the terms of the Pre-Petition ABL/Term Loan Intercreditor Agreement;

(x)    Liens granted to Term DIP Agent for the benefit of Term DIP Lenders under the Term DIP Loan Documents and approved by the DIP Financing Orders, subject to the DIP ABL/Term Loan Intercreditor Agreement; and

(xi)    other Liens expressly granted and approved in the DIP Financing Orders.

9.2.9.    Debt.    Create, incur, guarantee or suffer to exist any Debt, except the following (without duplication):

(i)    the Pre-Petition ABL Obligations and the Term Loan Obligations and other Debts outstanding on the Petition Date that are reflected in the schedules filed by each Borrower in the Chapter 11 Cases;

(ii)    the Obligations, including Bank Product Obligations;

(iii)    Permitted Contingent Obligations arising after the Petition Date;

(iv)    the Term DIP Obligations in an aggregate principal amount not to exceed $30,000,000 on any date;

(v)    indebtedness that is incurred in the Ordinary Course of Business by a Borrower during the pendency of its Chapter 11 Case not in contravention of the Bankruptcy Code or any order of the Court, is included (and does not exceed amounts shown) in the DIP Budget, and that is not secured by a Lien upon any Collateral except as expressly provided in the DIP Financing Orders;

(vi)    indebtedness of a Borrower owing to another Borrower; provided that if such indebtedness is owed by SR MX Holdco, SR MX Holdings, SR Mexico, SR Servicios or SR Canada, such indebtedness shall be evidenced by a promissory note, in form and substance satisfactory to DIP Agent, duly executed and delivered by such company and the sole original of which is pledged by any holder of such note to DIP Agent as security for the Obligations; and

(vii)    Professional Fees, fees payable to the Office of the United States Trustee, and fees payable to the Clerk of the Court.

9.2.10.  <u>Restricted Investments</u>.  Make any Restricted Investment.

9.2.11.  <u>Loans</u>.   Make any loans or other advances of money to any Person, except (i) advances to an officer or employee for salary, travel expenses, commissions and similar items in the Ordinary Course of Business; (ii) prepaid expenses and extensions of trade credit made in the Ordinary Course of Business; (iii) deposits with financial institutions permitted hereunder; and (iv) intercompany loans permitted by **Section 9.2.9(vi)**, <u>provided</u> that such loan is in an amount and for a purpose permitted under the DIP Budget.

9.2.12.  <u>Distributions</u>.  Declare or make any Distribution, except Upstream Payments; or create or suffer to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except for restrictions under the DIP Loan Documents, under Applicable Law or in effect on the Closing Date as shown on **<u>Schedule 8.1.18</u>** to the Pre-Petition ABL Loan Agreement.

9.2.13.  <u>Affiliate Transactions</u>.   Enter into or be party to any transaction with an Affiliate, except (i) transactions authorized by the DIP Loan Documents; (ii) payment of reasonable compensation to officers and employees for services actually rendered, and loans and advances permitted by **Section 9.2.11**; (iii) payment of customary directors' fees and indemnities; and (iv) transactions solely among Borrowers and other Obligors.

9.2.14.  <u>Restrictions on Payment of Certain Debt</u>.   Make any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to any Pre-Petition Debt other than (i) the Pre-Petition ABL Obligations and the Pre-Petition Term Obligations in accordance with the DIP Financing Orders or a Final Order of the Court, (ii) payments to critical vendors to the extent approved by Final Order of the Court and reflected in the DIP Budget, or (iii) payment of Debt secured by a valid, perfected and unavoidable Lien on any Collateral, but only to the extent such Lien is senior in priority to Liens in favor of DIP Agent on ABL Priority Collateral, such payment is approved by Final Order of the Court, and such payment is reflected in the DIP Budget.

9.2.15.  <u>Restrictions on Payment of Term Loan Obligations</u>.  Make (i) any payment (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) in respect of any Term Loan Obligations from the proceeds of the ABL Priority Collateral until Full Payment of the Pre-Petition ABL Obligations and the Obligations or (ii) any voluntary prepayment with respect of any Term Loan Obligations from the proceeds of Revolver Loans.

9.2.16.  <u>Amendments to Certain Debt</u>.

(i)    <u>Subordinated Debt</u>.   Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt.

(ii)    <u>Pre-Petition Term Loan Documents</u>.  Amend, supplement or otherwise modify any Pre-Petition Term Loan Document except to the extent permitted under the

Pre-Petition ABL/Term Loan Intercreditor Agreement and authorized by a Final Order of the Court.

(iii)    Term DIP Loan Documents.  Amend, supplement or otherwise modify any Term DIP Loan Document except to the extent not prohibited under the DIP ABL/Term Loan Intercreditor Agreement and (to the extent required) authorized by a Final Order of the Court.

9.2.17.  Lease Obligations.  Create, incur or assume after the Petition Date any obligations as lessee (i) for the rental or hire of real or personal Property in connection with any sale and leaseback transaction, or (ii) for the rental or hire of other real or personal Property of any kind under leases or agreements to lease having an original term of one year or more.

9.2.18.  Employee Plans.  Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Petition Date.

9.2.19.  Modifications to DIP Financing Orders.  Seek or consent to any amendment, supplement or any other modification of any of the terms of the DIP Financing Orders after such Orders are entered by the Court without the prior written consent of DIP Agent (and with respect to any material change, the Required DIP Lenders).

9.2.20.  Filing of Motions and Applications.  Without the prior written consent of DIP Agent (and with respect to any material change or modification, Required DIP Lenders), apply to the Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the DIP Loan Documents or the DIP Financing Orders, (b) refrain from taking any action that is required to be taken by the terms of any of the DIP Loan Documents or the DIP Financing Orders, or (c) permit any Debt or Claim to be *pari passu* with or senior to any of the Obligations, except as expressly stated in the DIP Financing Orders.

9.2.21.  Superpriority Claim.  Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is *pari passu* with or senior to the claims of DIP Agent and DIP Lenders against Borrowers, except as expressly stated in the DIP Financing Orders.

9.2.22.  Use of Proceeds.  Use any proceeds of Revolver Loans or Cash Collateral for a purpose that is not specifically permitted by this Agreement and the DIP Financing Orders and expressly set forth in the DIP Budget.

9.2.23.  DIP Budget.  Amend or modify the DIP Budget without the prior written consent of DIP Agent and the Required DIP Lenders.

## SECTION 10.  CONDITIONS PRECEDENT

**10.1.  Conditions Precedent to Initial Revolver Loans.**  DIP Lenders shall not be required to fund any Revolver Loan or other extensions of credit requested by any U.S. Borrower, unless, on or before March 12, 2015, each of the following conditions has been satisfied:

10.1.1.  <u>Loan Documents</u>.  Each of the other DIP Loan Documents shall have been duly executed and delivered to DIP Agent by each of the signatories thereto (and, with the exception of the Notes, in sufficient counterparts for each DIP Lender) and accepted by DIP Agent and DIP Lenders, and each Obligor shall be in compliance with all of the terms thereof.

10.1.2.  <u>Borrowing Base Certificate</u>.  DIP Agent shall have received from Borrowers the Borrowing Base Certificate in accordance with **Section 7.5**.

10.1.3.  <u>Evidence of Perfection and Priority of Liens</u>.  DIP Agent shall have received acknowledgments of all filings or recordations necessary to perfect its Liens in the Collateral;

10.1.4.  <u>Incumbency Certificates</u>.  DIP Agent shall have received a certificate of a duly authorized officer of each Borrower, certifying (i) that attached copies of such Borrower's Organization Documents are true and complete, and in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution and delivery of the DIP Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this DIP Facility; and (iii) to the title, name and signature of each Person authorized to sign the DIP Loan Documents.  DIP Agent may conclusively rely on this certificate until it is otherwise notified by the applicable Borrower in writing.

10.1.5.  <u>Organization Documents</u>.  DIP Agent shall have received copies of the Organization Documents of each Borrower, and all amendments thereto, certified by the Secretary of State or other appropriate official of the jurisdiction of each Borrower's organization.

10.1.6.  <u>Good Standing Certificates</u>.  DIP Agent shall have received such good standing certificates for each Borrower as agreed to by DIP Agent and SRC.

10.1.7.  <u>Officer's Certificates</u>.  DIP Agent shall have received certificates, in form and substance satisfactory to it, from a knowledgeable Senior Officer of each Borrower certifying that, after giving effect to the initial Revolver Loans and the other Initial Transactions, (i) no Default or Event of Default exists or will occur after giving effect to the Initial Transactions; (ii) the representations and warranties set forth in **Section 8** are true and correct in all material respects, <u>provided</u>, <u>however</u>, that any representation or warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects; (iii) such Borrower has complied with all agreements and conditions to be satisfied by it under the DIP Loan Documents; (iv) either (a) all consents, licenses and approvals required in connection with the consummation by such Obligor of the Initial Transactions, and the execution, delivery and performance by such Obligor and the validity against such Obligor of the DIP Loan Documents to which it is a party, have been obtained and are in full force and effect and are attached to such certificate, or (b) no such consents, licenses or approvals are so required.

10.1.8. <u>DIP ABL/Term Loan Intercreditor Agreement</u>. DIP Agent shall have received the DIP ABL/Term Loan Intercreditor Agreement duly executed by all of the parties thereto.

10.1.9. <u>Compliance with Laws and DIP Loan Documents</u>. DIP Agent shall have determined or received assurances satisfactory to it that none of the DIP Loan Documents or any of the transactions contemplated thereby violate any Applicable Law, court order or agreement binding upon any Obligor.

10.1.10. <u>Patriot Act Disclosures</u>. DIP Agent and each DIP Lender shall have received all Patriot Act Disclosures requested by them prior to execution of this Agreement.

10.1.11. <u>No Default or Event of Default</u>. No Default or Event of Default shall exist, or would result from such proposed Revolver Loan or other extension of credit or from the application of the proceeds thereof.

10.1.12. <u>Representations and Warranties</u>. The representations and warranties of Borrowers contained in **Section 8** of this Agreement and in any other DIP Loan Document shall be true and correct in all material respects on and as of the Closing Date (except to the extent that any such representation and warranty (x) is qualified as to materiality, in which case such representation and warranty shall be true and correct in all material respects on and as of the date of such Revolver Loan or other credit extension, or (y) specifically refers to an earlier date, in which case such representation or warranty is true and correct as of such earlier date).

10.1.13. <u>No Material Adverse Effect</u>. Since the Petition Date, no event has occurred that has or could reasonably be expected to have either a Material Adverse Effect on any Borrower's business, finances, assets or prospects or on the Collateral.

10.1.14. <u>Payment of Fees</u>. Borrowers shall have paid all fees and expenses to be paid hereunder to DIP Agent and DIP Lenders on the Closing Date (or shall have made arrangements reasonably acceptable to DIP Agent to have all such fees and expenses paid with proceeds of Revolver Loans on the Closing Date).

10.1.15. <u>Letter of Credit Conditions</u>. With respect to the issuance of any Letter of Credit on the Closing Date, each of the conditions required in connection therewith hereunder shall have been satisfied.

10.1.16. <u>Joint Administration of Chapter 11 Cases</u>. The Court has entered an order providing for the joint administration of the Chapter 11 Cases.

10.1.17. <u>Motions and First Day Orders</u>. All motions filed and First Day Orders entered by the Court in any of the Chapter 11 Cases on or prior to the Closing Date shall be in form and substance reasonably satisfactory to DIP Agent and the Required DIP Lenders ,and DIP Agent shall be reasonably satisfied with any cash collateral arrangements applicable to any material pre-Petition Date secured obligations of Borrowers.

10.1.18. <u>Interim DIP Financing Order</u>. Following proper notice thereof, the interim hearing on the DIP Financing Motion shall have been held, with the presentation of

66

evidence and with any objections to the DIP Financing Motion or to the proposed Interim DIP Financing Order resolved in a manner satisfactory to DIP Agent (and with respect to any material change from the Initial Approved Form of the Interim DIP Financing Order, the Required DIP Lenders), the Interim DIP Financing Order shall have been entered by the Court in the Chapter 11 Cases no later than fifteen (15) days after the Petition Date, and Borrowers shall be in compliance with the Interim DIP Financing Order.

10.1.19. <u>Availability Under DIP Facility</u>.    After effecting the initial Revolver Loans and the other Initial Transactions (including any such Revolver Loans made to pay or otherwise reimburse DIP Agent and DIP Lenders for all fees, costs and expenses payable on the Closing Date), Availability under the DIP Facility equals or exceeds $16,000,000.

10.1.20. <u>DIP Budget</u>.    DIP Agent and DIP Lenders shall have reviewed and approved the DIP Budget and the Professional Fees Budget, each of which shall be in the Initial Approved Form.

10.1.21. <u>No Litigation</u>.    Except for the Chapter 11 Cases, no action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Agreement, or which is related to or arises out of, this Agreement or any of the other DIP Loan Documents or the consummation of the transactions contemplated hereby or thereby.

10.1.22. <u>Term DIP Facility</u>.    The Term DIP Documents shall be in form and substance satisfactory to DIP Agent, shall have been duly executed and delivered by all of the signatories thereto, all provisions of the Term DIP Documents are in full force and effect, and Term DIP Lenders are ready and willing to fund the Delayed Draw Term DIP Loans in accordance with the Term DIP Loan Documents and the Financing Orders.

Execution and delivery to DIP Agent by a DIP Lender of a counterpart of this Agreement shall be deemed confirmation by such DIP Lender that (i) all conditions precedent in this **Section 10.1** have been fulfilled to the satisfaction of such DIP Lender, (ii) the decision of such DIP Lender to execute and deliver to DIP Agent an executed counterpart of this Agreement was made by such DIP Lender independently and without reliance on DIP Agent or any other DIP Lender as to the satisfaction of any condition precedent set forth in this **Section 10.1**, and (iii) all documents sent to such DIP Lender for approval consent, or satisfaction were and are acceptable to such DIP Lender.

**10.2.    Conditions Precedent to All Credit Extensions.**    DIP Agent and DIP Lenders shall not be required to fund any Revolver Loans or grant any other accommodation to or for the benefit of any U.S. Borrower, and Letter of Credit Issuer shall not be required to issue any Letter of Credit, unless and until each of the conditions set forth in **Section 10.1** and of the following conditions has been and continues to be satisfied:

10.2.1. <u>Representation and Warranties</u>.    The representations and warranties of each Borrower in the DIP Loan Documents shall be true and correct on the date of, and upon giving effect to, the funding of any Revolver Loan or extension of credit, except for

representations and warranties that expressly relate to an earlier date (in which case such representations and warranties shall have been true and correct on and as of such earlier date).

10.2.2.  <u>No Defaults</u>.  No Default or Event of Default exists at the time, or would result from the funding, of any Revolver Loan or other extension of credit.

10.2.3.  <u>Satisfaction of Conditions in Other Documents</u>.  The request for Revolver Loans or other extensions of credit shall be in accordance with the DIP Budget (and Permitted Variances) and the DIP Financing Orders, and each of the conditions precedent to funding set forth in any other DIP Loan Document shall have been and remain satisfied as of the funding date.

10.2.4.  <u>No Litigation</u>.   Except for the Chapter 11 Cases, no action, proceeding, contested matter, investigation, regulation or legislation shall have been instituted, threatened or proposed before any court, governmental agency or legislative body to enjoin, restrain or prohibit, or to obtain damages in respect of this Agreement, or which is related to or arises out of, this Agreement or any of the other DIP Loan Documents or the consummation of the transactions contemplated hereby or thereby.

10.2.5.  <u>No Material Adverse Effect</u>.   No event shall have occurred or circumstance or condition shall exist that has or could reasonably be expected to have a Material Adverse Effect.

10.2.6.  <u>Notice of Borrowing and Borrowing Base Certificate</u>.  DIP Agent shall have received the Notice of Borrowing and each Borrowing Base Certificate required by the terms of this Agreement.

10.2.7.  <u>Letter of Credit Conditions</u>.  With respect to the issuance of any Letter of Credit after the Closing Date, each of the conditions required in connection therewith hereunder shall have been satisfied.

10.2.8.  <u>Payment of Fees</u>.  Each Borrower shall have paid all fees and expenses then due and payable as provided for herein or in any of the other DIP Loan Documents.

10.2.9.  <u>Cash Collateral</u>.  Each Borrower shall have, at the time of the delivery of each Notice of Borrowing for a proposed Revolver Loan, remitted to DIP Agent all cash on hand and all Cash Collateral available to such Borrower except for the amounts held by DIP Agent in the Cash Collateral Account, if any, and except for cash proceeds of Term Loan Priority Collateral.

10.2.10.  <u>Interim DIP Financing Order</u>.  With respect to all Revolver Loans and other extensions of credit requested on or after the Closing Date but before the expiration of the Interim Period, the Interim DIP Financing Order shall have been entered, shall be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed after its entry, without the prior written consent of DIP Agent and the Required DIP Lenders.

10.2.11.  Final DIP Financing Order.  With respect to all Revolver Loans and other extensions of credit requested after the expiration of the Interim Period, following proper notice and a hearing thereon, the final hearing on the DIP Financing Motion shall have been held, with the presentation of evidence and the resolution of any objections to the DIP Financing Motion or to the proposed Final DIP Financing Order in a manner satisfactory to DIP Agent (and with respect to any material change to the form of Interim DIP Financing Order entered by the Court, Required DIP Lenders), and the Final DIP Financing Order shall have been entered on or before the expiration of the Interim Period, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed after its entry without the prior written consent of DIP Agent and Required DIP Lenders.

**10.3.    Inapplicability of Conditions.**    None of the conditions precedent set forth in **Sections 10.1** or **10.2** shall be conditions to the obligation of (i) each Participating DIP Lender to make payments to Letter of Credit Issuer pursuant to **Section 1.2.8**, (ii) each DIP Lender to deposit with DIP Agent such DIP Lender's Pro Rata share of a Borrowing in accordance with **Section 3.1.2**, (iii) each DIP Lender to fund its Pro Rata share of a Revolver Loan to repay outstanding Settlement Loans to BofA as provided in **Section 3.1.3(ii)**, (iv) each DIP Lender to pay any amount payable to DIP Agent or any other DIP Lender pursuant to this Agreement, or (v) DIP Agent to pay any amount payable to any DIP Lender pursuant to this Agreement.

**10.4.    Limited Waiver of Conditions Precedent.**    If DIP Lenders shall make any Revolver Loans or otherwise extend any credit to any U.S. Borrower under this Agreement or if Letter of Credit Issuer shall issue a Letter of Credit, in each case at a time when any of the foregoing conditions precedent are not satisfied (regardless of whether the failure of satisfaction of any such conditions precedent was known or unknown to DIP Agent, DIP Lenders or Letter of Credit Issuer), the funding of such Revolver Loan or the issuance of such Letter of Credit shall not operate as a waiver of the right of DIP Agent and DIP Lenders to insist upon the satisfaction of all conditions precedent with respect to each subsequent Borrowing or issuance of a Letter of Credit requested by any U.S. Borrower or a waiver of any Default or Event of Default as a consequence of the failure of any such conditions to be satisfied, unless DIP Agent, with the prior written consent of Required DIP Lenders, in writing waives the satisfaction of any condition precedent, in which event such waiver shall only be applicable for the specific instance given and only to the extent and for the period of time expressly stated in such written waiver.

## SECTION 11.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

**11.1.    Events of Default.**    The occurrence or existence of any one or more of the following events or conditions shall constitute an "Event of Default" (each of which Events of Default shall be deemed to exist unless and until waived by DIP Agent and DIP Lenders in accordance with the provisions of **Section 12.9** hereof):

11.1.1.  Payment of Obligations.  Borrowers shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise).

11.1.2.  Misrepresentations.  Any representation, warranty or other written statement to DIP Agent or any DIP Lender that is made by any Borrower in this Agreement or in

any other DIP Loan Document or furnished in compliance with or in reference to any of the DIP Loan Documents, proves to have been false or misleading in any material respect when made or furnished or when reaffirmed pursuant to **Section 8.3** hereof.

11.1.3. <u>Breach of Specific Covenants</u>.  (i) Any Borrower shall fail or neglect to perform, keep or observe any covenant contained in **Sections 6.5**, **6.6**, **7.1.2**, **7.2.1**, **7.2.5**, **7.2.6**, **7.3.1**, **7.5**, **9.1.1**, **9.1.2(i)**, **(iv)** and **(viii)**, **9.1.20**, or **9.2** hereof on the date that such Borrower is required to perform, keep or observe such covenant or (ii) any Borrower shall fail or neglect to perform, keep or observe any covenant contained in **Section 9.1.4** hereof on the date such Borrower is required to perform, keep or observe such covenant; <u>provided</u>, <u>however</u>, the foregoing shall not constitute an Event of Default so long as the breach of such covenant is cured to DIP Agent's and Required DIP Lenders' satisfaction within two (2) Business Days after (i) any Senior Officer's receipt of written notice of any such breach from Agent or (ii) any Senior Officer obtaining actual knowledge of any such breach; and <u>provided further</u>, <u>however</u>, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any such covenant which is not capable of being cured or which is a willful breach by any Borrower.

11.1.4. <u>Breach of Other Covenants</u>.  Any Borrower shall fail or neglect to perform, keep or observe any covenant contained in this Agreement (other than a covenant which is dealt with specifically elsewhere in this **Section 11.1**) and the breach of such other covenant is not cured to DIP Agent's and the Required DIP Lender's satisfaction within fifteen (15) Business Days after the sooner to occur of any Senior Officer's receipt of notice of such breach from DIP Agent or the date of Borrowers' Knowledge of such failure or neglect; <u>provided</u>, <u>however</u>, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such fifteen (15) Business Day period or which is a willful breach by any Borrower.

11.1.5. <u>Default Under Other DIP Loan Documents</u>.  Any Borrower or any other Obligor shall default in the due and punctual observance or performance of any liability or obligation to be observed or performed by it under any of the other DIP Loan Documents, and such default shall not have been cured within the applicable grace and cure period, if any, provided in such other DIP Loan Documents; <u>provided</u>, <u>however</u>, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any liability or obligation which is not capable of being cured or which is a willful breach by any Borrower.

11.1.6. <u>Other Defaults</u>.  There shall occur any default or event of default on the part of any Borrower or any Subsidiary under any Post-Petition agreement, document or instrument to which such Borrower or such Subsidiary is a party or by which such Borrower or such Subsidiary or any of their respective Properties is bound, creating or relating to any Debt (other than the Obligations) in excess of $250,000 if the payment or maturity of such Debt may be accelerated in consequence of such event of default or demand for payment of such Debt may be made.

11.1.7.  <u>Uninsured Losses</u>.  Any loss, theft, damage or destruction of any of the Inventory not fully covered (subject to such deductibles as DIP Agent shall have permitted) by insurance if the amount not covered by insurance exceeds $100,000.

11.1.8.  <u>Material Adverse Effect</u>.  There shall occur any event or condition that has a Material Adverse Effect.

11.1.9.  <u>Business Disruption; Condemnation</u>.  There shall occur a cessation of a substantial part of the business of any Obligor for a period which may be reasonably expected to have a Material Adverse Effect; or any Obligor shall suffer the loss or revocation of any license or permit now held or hereafter acquired by such Obligor which is necessary to the continued or lawful operation of its business and such loss or revocation may be reasonably expected to have a Material Adverse Effect; or any Obligor shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs for a period which may be reasonably expected to have a Material Adverse Effect; or any material lease or agreement pursuant to which any Obligor leases or occupies any premises on which any Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect or results in an Out of Formula Condition; or any material part of the Collateral shall be taken through condemnation or the value of such Collateral shall be materially impaired through condemnation and, in either case, Borrowers shall not have received compensation.

11.1.10.  <u>Change of Control</u>.  There shall occur a Change of Control with respect to SRC or any other Borrower.

11.1.11.  <u>ERISA</u>.  A Reportable Event shall occur which DIP Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the Pension Benefit Guaranty Corporation of any Plan or for the appointment by the appropriate United States district court of a trustee for any Plan, or if any Plan shall be terminated or any such trustee shall be requested or appointed, or if any Borrower or any Subsidiary is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from such Borrower's or such Subsidiary's complete or partial withdrawal from such Plan; and any such event may be reasonably expected to have a Material Adverse Effect.

11.1.12.  <u>Challenge to DIP Loan Documents</u>.  Any Obligor or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the DIP Loan Documents, the legality, validity or enforceability of any of the Obligations, or the perfection or priority of any Lien granted to DIP Agent, or any of the DIP Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by DIP Agent and DIP Lenders in accordance with the terms thereof.

11.1.13.  <u>Judgment</u>.  One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate $250,000 shall be entered against any Borrower or any other Obligor after the Petition Date and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii)

there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

11.1.14. <u>Criminal Forfeiture</u>.  Any Borrower or any of its Senior Officers is criminally indicted or convicted for (i) a felony committed in the conduct of any Borrower's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act), in each case that could lead to forfeiture of any material Property or any Collateral.

11.1.15. <u>Status of Debt</u>.  If (i) the Obligations shall at any time fail to constitute "Senior Debt", "Designated Senior Debt" or any similar designation under and as defined in any agreement or instrument governing any Debt that is subordinated to the Obligations, (ii) the subordination provisions of any agreement or instrument governing any Debt in a principal amount in excess of $250,000 that is subordinated to the Obligations shall for any reason (other than as a result of any action or inaction of DIP Agent or any DIP Lender) be revoked or invalidated, or otherwise cease to be in full force and effect, unless such Debt would otherwise be permitted to be incurred as "Senior Debt" at such time, or any Obligor shall contest in any manner the validity or enforceability thereof, or (iii) any Debt other than the Debt evidenced by this Agreement and/or Bank Product Obligations shall be designated as an "ABL Facility" or any similar designation under and as defined in the Pre-Petition Term Loan Documents.

11.1.16. <u>Insolvency Proceeding Defaults</u>.  Any Borrower shall breach any financial, affirmative, and negative covenant in the DIP Loan Documents; any Borrower shall fail to comply with any of the provisions of the DIP Financing Orders or any other order entered by the Court; Borrowers shall fail to achieve any of the Sale Benchmarks, breach any material provision of the Purchase Agreement, or fail to comply in any material respect with the Sale Procedures Order or Sale Order; the Purchase Agreement or any similar agreement entered into in connection with an Alternative Transaction (as defined in the Purchase Agreement) is terminated (other than in connection with the consummation of the Sale or such Alternative Transaction or with the written consent of the Required DIP Lenders) or any Seller is in default thereof; unless otherwise approved by DIP Agent and the Required DIP Lenders, an order of the Court shall be entered providing for a change in venue with respect to any Chapter 11 Case, and such order shall not be reversed or vacated within ten (10) days after its entry; any Borrower shall make an expenditure not authorized by the DIP Budget, subject to the Permitted Variances; a trustee shall be appointed in any of the Chapter 11 Cases; a responsible officer or an examiner shall be appointed in any of the Chapter 11 Cases with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7, or the filing, or not opposing, by any Borrower of a motion seeking such relief; any Borrower shall make a payment on account of a Pre-Petition Debt other than in accordance with an order of the Court and permitted by the DIP Budget (and any Permitted Variances), including in connection with adequate protection payments, in connection with the assumption of executory contracts and unexpired leases, or in respect of payroll and related expenses and employee benefits accrued as of the Petition Date; the Court shall enter an order terminating the exclusive right of any Borrower to file a Chapter 11 Plan; any Borrower shall obtain Court approval of a disclosure statement for a Chapter 11 Plan other than an Acceptable Plan or a

Confirmation Order shall be entered with respect to a Chapter 11 Plan (regardless of the proponent of such Chapter 11 Plan) if such Chapter 11 Plan is not an Acceptable Plan; Borrowers shall enter into an agreement for, or shall file (or support or fail to oppose) a motion seeking, or the Court shall enter, an order authorizing, a sale of all or substantially all of Borrowers' assets for a cash price or other terms that will not result in Full Payment of the Obligations and the Pre-Petition ABL Obligations (and Cash Collateralization of any Contingent Obligations) at the closing of such sale unless the terms are otherwise acceptable to DIP Agent and DIP Lenders in their sole and absolute discretion; any Borrower shall file a motion seeking authority to consummate a sale of assets of such Borrower or any of its Subsidiaries (other than any such sale of assets that is permitted by the DIP Loan Documents) having a value in excess of $100,000 outside the Ordinary Course of Business, or any sale of any part of the Collateral pursuant to Section 363 of the Bankruptcy Code, in each case without the Required DIP Lenders' consent or unless expressly provided for in the DIP Budget; any substantial part of a Borrower's assets, other than the Collateral, shall be sold by such Borrower, and, as a consequence of such sale, such Borrower is not able to continue its business operations in substantially the same manner as was conducted by it prior to such sale; without the prior written consent of DIP Agent and the Required DIP Lenders, any Borrower shall file a motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, either of the DIP Financing Orders after entry by the Court or either of the DIP Financing Orders is amended, vacated, stayed, reversed or otherwise modified, whether on appeal or otherwise; the Court shall enter an order granting any Person, other than DIP Agent, relief from the automatic stay to permit foreclosure on or repossession of any material assets of any Borrower or to permit the commencement or continuation of Pre-Petition litigation against any Borrower for any purpose other than to liquidate the amount of a disputed claim involving potential liability not covered by insurance and in excess of $250,000 in the aggregate; an order shall be entered for the substantive consolidation of the Estate of any Borrower with any other Person, unless such Person is another Borrower, and such order granting substantive consolidation provides that the assets of such Borrower shall remain subject to the Liens of DIP Lenders and Pre-Petition ABL Lenders securing the Obligations and the Pre-Petition ABL Obligations, respectively; any order is entered prohibiting or otherwise unduly restricting, or the Bankruptcy Court shall prohibit or otherwise unduly restrict, the ability of Pre-Petition ABL Lenders to credit bid the Pre-Petition ABL Obligations outstanding under the Pre-Petition ABL Loan Documents; the DIP Facility shall cease to be in full force and effect, the Court shall declare the DIP Facility to be null and void, any Borrower shall contest the validity or enforceability of the DIP Facility, any Borrower shall deny in writing that such Borrower has any further liability or obligation under the DIP Facility, or DIP Lenders shall cease to have the benefit of the Liens granted by either of the DIP Financing Orders; an order shall be entered by the Court avoiding or requiring disgorgement by DIP Agent or any DIP Lender of any amounts received in respect of the Obligations; any Borrower shall not have sufficient Availability, together with unused commitments under the Term DIP Loan Documents, for a period of thirty (30) consecutive days to pay, or shall otherwise fail to pay as and when due and payable, all costs and expenses of administration that are incurred by such Borrower in the Chapter 11 Cases, other than fees and expenses covered by the Carve-Out; a Borrower shall file any motion or other request with the Court seeking authority to use any cash proceeds of the Collateral or the Pre-Petition ABL Collateral or to obtain any financing under Section 364(d) of the Bankruptcy Code secured by a priming Lien, or Lien of equal priority with DIP Agent's Liens, upon any Collateral, in each case without DIP Agent's

prior written consent; except as permitted in the DIP Financing Orders, the Court enters any order in any of the Chapter 11 Cases granting to any Person a Superpriority Claim or Lien *pari passu* with or senior to that granted to DIP Agent under the DIP Financing Orders; any Borrower or another party in interest on behalf of a Borrower shall file any action, suit or other proceeding or contested matter challenging the validity, perfection or priority of any Liens of DIP Agent securing the Obligations or any Liens of Pre-Petition ABL Agent securing the Pre-Petition ABL Obligations, or the validity or enforceability of any of the DIP Loan Documents or Pre-Petition ABL Loan Documents, or asserting any Avoidance Actions against DIP Agent, any DIP Lender, Pre-Petition ABL Agent or any Pre-Petition ABL Lender, or seeking to recover any monetary damages from DIP Agent, any DIP Lender, Pre-Petition ABL Agent or any Pre-Petition ABL Lender; any Borrower shall file a motion or other pleading seeking relief that, if granted, could reasonably be expected to result in the occurrence of an Event of Default (unless such relief, if granted (or the relevant transaction) would result in Full Payment of the Obligations and the Pre-Petition ABL Obligations immediately upon consummation of the matter addressed by such motion or pleading, whether pursuant to a Chapter 11 Plan or otherwise); or without DIP Lenders' consent, any Borrower discontinues or suspends all or any material part of its business operations or commences an orderly wind-down or liquidation of its business.

11.1.17. Default under Term DIP Loan Documents. There shall occur any default or event of default on the part of any Borrower or any Subsidiary under any Term DIP Loan Document; provided, however, that, in the event such default or event of default is waived by Term DIP Agent and Term DIP Lenders (and DIP Agent is provided with a copy of the writing by Term DIP Agent confirming such waiver) and such default or event of default is not otherwise a Default or Event of Default hereunder except by operation of this **Section 11.1.17**, such default or event of default shall not constitute an Event of Default hereunder.

**11.2.    Remedies upon Default.** Upon and after the occurrence of an Event of Default and for so long as such Event of Default shall exist, subject to giving five (5) Business Days' written notice to Borrowers and any other applicable notice parties under the DIP Financing Orders (in either event, the "Default Notice Period"), DIP Agent may in its discretion (and, upon receipt of written direction of the Required DIP Lenders, shall) exercise from time to time the following rights and remedies (without prejudice to the rights of DIP Agent or any DIP Lender to enforce its claim against any or all Obligors):

11.2.1. The right to declare the principal of and any accrued interest on the Revolver Loans and all other Obligations owing under any of the DIP Loan Documents to be immediately due and payable, whereupon the same shall become due and payable without diligence, presentment, demand, protest or notice of any kind (all of which each Borrower expressly waives).

11.2.2. The right to terminate, reduce or condition any Commitment.

11.2.3. The right to require Borrowers to Cash Collateralize Letter of Credit Obligations, Bank Product Obligations and other Obligations that are contingent or not yet due and payable, and, if Borrowers fail promptly to deposit such Cash Collateral, DIP Agent may advance the required Cash Collateral as Revolver Loans (whether or not an Out of Formula Condition exists or is created thereby or such Revolver Loan constitutes an Out of Formula

74

Loan, or the conditions in **Section 10** are satisfied); <u>provided</u>, <u>however</u>, that no DIP Lender shall be required to fund any such Revolver Loan that would cause such DIP Lender's Pro Rata share of the Revolver Loans to exceed its Revolver Commitment.

11.2.4.   All of the rights and remedies of a secured party under the UCC or under other Applicable Law, and all other legal and equitable rights to which DIP Agent may be entitled under any of the DIP Loan Documents and Applicable Law, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in this Agreement or any of the other DIP Loan Documents or authorized by Applicable Law, and none of which shall be exclusive.

11.2.5.   The right to collect all amounts at any time payable to a Borrower from any Account Debtor or other Person at any time indebted to such Borrower.

11.2.6.   The right to take immediate possession of any of the Collateral, and to (i) require Borrowers to assemble the Collateral, at Borrowers' expense, and make it available to DIP Agent at a place designated by DIP Agent which is reasonably convenient to both parties, and (ii) enter any premises where any of the Collateral shall be located and to keep and store the Collateral on said premises until sold (and if said premises be the Property of a Borrower, then such Borrower agrees not to charge DIP Agent for storage thereof).

11.2.7.   The right to sell or otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by Applicable Law, in lots or in bulk, for cash or on credit, all as DIP Agent, in its sole discretion, may deem advisable.  Each Borrower agrees that any requirement of notice to Borrowers or any other Obligor of any proposed public or private sale or other disposition of Collateral by DIP Agent shall be deemed reasonable notice thereof if given at least ten (10) days prior thereto, and each such sale may be at such location or locations as DIP Agent may designate in said notice.  DIP Agent shall have the right to conduct such sales on any Borrower's or any other Obligor's premises, without charge therefor, and such sales may be adjourned from time to time in accordance with Applicable Law.  DIP Agent shall have the right to sell, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit or any combination thereof, and DIP Agent may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Obligations.  The proceeds realized from any sale or other disposition of any Collateral may be applied, after allowing two (2) Business Days for collection, first to any Extraordinary Expenses incurred by DIP Agent, second to interest accrued with respect to any of the Obligations; and third, to the principal balance of the Obligations.  If any deficiency shall arise, Obligors shall remain jointly and severally liable to DIP Agent and DIP Lenders therefor.

11.2.8.   The right to the appointment of a receiver, without notice of any kind whatsoever, to take possession of all or any portion of the Collateral and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver.]

11.2.9.   The right to require Borrowers to deposit with DIP Agent funds equal to the Letter of Credit Outstandings and, if Borrowers fail promptly to make such deposit,

DIP Agent may (and shall upon the direction of Required DIP Lenders) advance such amount as a Revolver Loan (whether or not an Out of Formula Condition exists or is created thereby). Any such deposit or advance shall be held by DIP Agent as Cash Collateral to fund future payments with respect to any Letter of Credit Outstandings. At such time as the Letter of Credit Outstandings have been paid or terminated and all Letters of Credit have been drawn upon or expired, any amounts remaining in such reserve shall be applied against any outstanding Obligations, or, if all Obligations have been indefeasibly paid in full, returned to Borrowers.

Until the Default Notice Period has expired, and Borrowers have failed to cure such Event of Default during such period to the extent such Event of Default is curable, DIP Agent shall not be entitled to exercise any of the foregoing remedies under the DIP Loan Documents or Applicable Law on account of such Event of Default, other than to contest an assertion by any Borrower that such Event of Default has not occurred or is not continuing. Notwithstanding anything to the contrary herein, during such Default Notice Period, no Borrower shall have any right to request or obtain further Borrowings or other extensions of credit under the DIP Facility, unless consented to by DIP Agent and DIP Lenders.

**11.3.  License.**  DIP Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person), after the occurrence and during the continuance of an Event of Default, any or all Intellectual Property of each Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Each Borrower's rights and interests under Intellectual Property shall inure to DIP Agent's benefit.

**11.4.  Setoff.**  In addition to any Liens granted under any of the DIP Loan Documents and any rights and remedies now or hereafter available under Applicable Law (including other rights of setoff), DIP Agent and each DIP Lender (and each of their respective Affiliates) is hereby authorized by Borrowers at any time that an Event of Default exists, without notice to Borrowers or any other Person (any such notice being hereby expressly waived) to set off and to appropriate and to apply any and all deposits, general or special (including Debt evidenced by certificates of deposit whether matured or unmatured (but not including trust accounts)) and any other Debt at any time held or owing by DIP Agent, such DIP Lender or any of their Affiliates to or for the credit or the account of any Borrower against and on account of the Obligations of Borrowers arising under the DIP Loan Documents to DIP Agent, such DIP Lender or any of their Affiliates, including all Revolver Loans and Letter of Credit Outstandings and all claims of any nature or description arising out of or in connection with this Agreement, irrespective of whether or not (i) DIP Agent or such DIP Lender shall have made any demand hereunder, (ii) DIP Agent, at the request or with the consent of Required DIP Lenders, shall have declared the principal of and interest on the Revolver Loans and other amounts due hereunder to be due and payable as permitted by this Agreement and even though such Obligations may be contingent or unmatured, or (iii) the Collateral for the Obligations is adequate. Notwithstanding the foregoing, each of DIP Agent and DIP Lenders agrees with each other that it shall not, without the express consent of Required DIP Lenders, and that it shall (to the extent that it is lawfully entitled to do so) upon the request of Required DIP Lenders, exercise its setoff rights hereunder against any accounts of any Borrower now or hereafter maintained with DIP Agent, such DIP Lender or any Affiliate of

any of them, but no Borrower shall have a claim or cause of action against DIP Agent or any DIP Lender for any setoff made without the consent of Required DIP Lenders, and the validity of any such setoff shall not be impaired by the absence of such consent.  If any party (or its Affiliate) exercises the right of setoff provided for hereunder, such party shall be obligated to share any such setoff in the manner and to the extent required by **Section 12.5**.

**11.5.    Remedies Cumulative; No Waiver; Disclosures to Committee**.

11.5.1. All covenants, conditions, provisions, warranties, guaranties, indemnities, and other undertakings of Borrowers contained in this Agreement and the other DIP Loan Documents, or in any document referred to herein or contained in any agreement supplementary hereto or in any schedule or contained in any other agreement between DIP Agent or any DIP Lender and any or all Borrowers, heretofore, concurrently, or hereafter entered into, shall be deemed cumulative to and not in derogation or substitution of any of the terms, covenants, conditions, or agreements of Borrowers herein contained.  The rights and remedies of DIP Agent and DIP Lenders under this Agreement and the other DIP Loan Documents shall be cumulative and not exclusive of any rights or remedies that DIP Agent or any DIP Lender would otherwise have. All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations.

11.5.2. Neither (i) the failure or delay of DIP Agent or any DIP Lender to require strict performance by any Borrower of any provision of any of the DIP Loan Documents or to exercise or enforce any rights, Liens, powers, or remedies under any of the DIP Loan Documents or Applicable Law or with respect to any Collateral, (ii) the making of any Revolver Loan during a Default, Event of Default or other failure to satisfy any conditions precedent, nor (iii) acceptance by DIP Agent or any DIP Lender of any payment or performance by a Borrower under any DIP Loan Documents in a manner other than that specified therein shall not operate as a waiver of such performance, Liens, rights, powers and remedies or a course of dealing, but all such requirements, Liens, rights, powers, and remedies shall continue in full force and effect until all Revolver Loans and all other Obligations owing or to become owing from any Borrower to DIP Agent and DIP Lenders shall have been fully satisfied.  None of the undertakings, agreements, warranties, covenants and representations of Borrowers contained in this Agreement or any of the other DIP Loan Documents and no Event of Default by any Borrower under this Agreement or any other DIP Loan Documents shall be deemed to have been suspended or waived by DIP Agent or any DIP Lender, unless such suspension or waiver is by an instrument in writing specifying such suspension or waiver and is signed by a duly authorized representative of DIP Agent or such DIP Lender and directed to Borrowers.

11.5.3. If DIP Agent or any DIP Lender shall accept performance by a Borrower, in whole or in part, of any obligation that a Borrower is required by any of the DIP Loan Documents to perform only when a Default or Event of Default exists, or if DIP Agent or any DIP Lender shall exercise any right or remedy under any of the DIP Loan Documents that may not be exercised other than when a Default or Event of Default exists, DIP Agent's or DIP Lender's acceptance of such performance by a Borrower or DIP Agent's or DIP Lender's exercise of any such right or remedy shall not operate to waive any such Default or Event of Default or to preclude the exercise by DIP Agent or any DIP Lender of any other right or

remedy, unless otherwise expressly agreed in writing by DIP Agent or such DIP Lender, as the case may be.

        11.5.4. DIP Agent and any DIP Lender may discuss any Borrower's business and financial condition and assets and liabilities with any Committee.

    **11.6.**  **Consent to Receivership.**  Effective on and at all times after the Commitment Termination Date, and subject to DIP Agent obtaining appropriate stay relief, each Borrower irrevocably (a) stipulates and agrees that DIP Agent and Pre-Petition ABL Agent (collectively, the "<u>Agents</u>") may seek the appointment of a receiver for ABL Priority Collateral in the United States District Court for the Southern District of Ohio, the United States District Court for the District of Delaware, or any other judicial forum selected by an Agent (in each case, the "Receivership Court") on an expedited basis under Rule 65 of the Federal Rules of Civil Procedure or other Applicable Law or rules, (b) stipulates and agrees that absent appointment of a receiver, there is imminent danger that such ABL Priority Collateral will decline speedily in value and may dissipate or be lost, causing irreparable injury to the interests of Agents in such ABL Priority Collateral and leaving Agents without an adequate remedy at law, and that other good and sufficient grounds exist for appointment of such receiver, (c) waives any right that such Borrower may have to contest or to oppose the appointment of a receiver for such ABL Priority Collateral and irrevocably consents to the appointment of such a receiver by a Receivership Court, and (d) stipulates and agrees that among other things, any receiver that is appointed may be authorized to (i) enter any business premises and other facilities where any of such ABL Priority Collateral is located and to use such premises or other facilities to the extent necessary to foreclose upon and liquidate such ABL Priority Collateral, subject to the terms of the Intercreditor Agreements, (ii) collect, sell and otherwise dispose of such ABL Priority Collateral, subject to the terms of the Intercreditor Agreements, and (iii) borrow money from either of Pre-Petition ABL Lenders or DIP Lenders, with such borrowings to be treated as costs and expenses associated with protecting and preserving the Collateral that will constitute Pre-Petition ABL Lender Debt or Obligations (as applicable) secured by all of the Collateral.  Nothing herein shall be construed as an election of remedies or to require any Agent to pursue one remedy prior to exercising any other remedy, and each Agent shall be fully authorized to exercise any and all of its remedies separately and in any order or concurrently, to the fullest extent permitted by the Pre-Petition ABL Loan Documents, the DIP Loan Documents and Applicable Law and consistent with the Intercreditor Agreements.

**SECTION 12.  DIP AGENT**

    **12.1.**  <u>**Appointment, Authority and Duties of DIP Agent.**</u>

        12.1.1. Each DIP Lender hereby irrevocably appoints and designates BofA as DIP Agent to act as herein specified.  DIP Agent may, and each DIP Lender irrevocably authorizes DIP Agent to, enter into all DIP Loan Documents to which DIP Agent or such DIP Lender is or is intended to be a party and all amendments hereto and all DIP Security Documents at any time executed by any Borrower, for the benefit of DIP Agent and the Pro Rata benefit of DIP Lenders and, except as otherwise provided in this **Section 12**, to exercise such rights and powers under this Agreement and the other DIP Loan Documents as are specifically delegated to DIP Agent by the terms hereof and thereof, together with such other rights and powers as are

reasonably incidental thereto. Each DIP Lender agrees that any action taken by DIP Agent or the Required DIP Lenders in accordance with the provisions of this Agreement or any of the other DIP Loan Documents, and the exercise by DIP Agent or the Required DIP Lenders of any of the rights or powers set forth herein or therein, together with such other rights and powers as are reasonably incidental thereto, shall be authorized and binding upon all DIP Lenders. Without limiting the generality of the foregoing, DIP Agent shall have the sole and exclusive right and authority to (i) act as the disbursing and collecting agent for DIP Lenders with respect to all payments and collections arising in connection with this Agreement and the other DIP Loan Documents; (ii) execute and deliver as DIP Agent each DIP Loan Document and accept delivery of each such agreement delivered by any or all Borrowers or any other Obligor; (iii) act as collateral agent for DIP Lenders for purposes of the perfection of all security interests and Liens created by this Agreement or the DIP Security Documents with respect to all material items of the Collateral and, subject to the direction of Required DIP Lenders, for all other purposes stated therein; provided that DIP Agent hereby appoints, authorizes and directs each DIP Lender to act as a collateral sub-agent for DIP Agent and the other DIP Lenders for purposes of the perfection of all security interests and Liens with respect to a Borrower's Deposit Accounts maintained with, and all cash and Cash Equivalents held by, such DIP Lender; (iv) subject to the direction of Required DIP Lenders, manage, supervise or otherwise deal with the Collateral; and (v) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any of the Collateral under the DIP Loan Documents relating thereto, Applicable Law or otherwise. The duties of DIP Agent shall be ministerial and administrative in nature, and DIP Agent shall not have by reason of this Agreement or any other DIP Loan Document a fiduciary relationship with any DIP Secured Party (or any DIP Lender's Participants). Unless and until its authority to do so is revoked in writing by Required DIP Lenders, DIP Agent alone shall be authorized to determine whether any Accounts or Inventory constitute Eligible Accounts or eligible Inventory (basing such determination in each case upon the meanings given to such terms in **Appendix A**), or whether to impose or release any reserve, and to exercise its own credit judgment in connection therewith, which determinations and judgments, if exercised in good faith, shall exonerate DIP Agent from any liability to DIP Secured Parties or any other Person for any errors in judgment.

12.1.2.  DIP Agent (which term, as used in this sentence, shall include reference to DIP Agent's officers, directors, employees, attorneys, agents and Affiliates and to the officers, directors, employees, attorneys and agents of DIP Agent's Affiliates) shall not: (i) have any duties or responsibilities except those expressly set forth in this Agreement and the other DIP Loan Documents or (ii) be required to take, initiate or conduct any litigation, foreclosure or collection proceedings hereunder or under any of the other DIP Loan Documents except to the extent directed to do so by the Required DIP Lenders during the continuance of any Event of Default. The conferral upon DIP Agent of any right or power hereunder shall not imply a duty on DIP Agent's part to exercise any such right or power unless instructed to do so by the Required DIP Lenders in accordance with this Agreement.

12.1.3.  DIP Agent may perform any of its duties by or through its agents and employees and may employ and consult with DIP Agent Professionals and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by a DIP Agent Professional. DIP Agent shall not be responsible for the negligence

or misconduct of any such agents, employees or DIP Agent Professionals selected by DIP Agent with reasonable care.

    12.1.4. The rights, remedies, powers and privileges conferred upon DIP Agent hereunder and under the other DIP Loan Documents may be exercised by DIP Agent without the necessity of the joinder of any other parties unless otherwise required by Applicable Law. If DIP Agent shall request instructions from the Required DIP Lenders with respect to any act or action (including the failure to act) in connection with this Agreement or any of the other DIP Loan Documents, DIP Agent shall be entitled to refrain from such act or taking such action unless and until DIP Agent shall have received instructions from Required DIP Lenders; and DIP Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no DIP Secured Party shall have any right of action whatsoever against DIP Agent as a result of DIP Agent acting or refraining from acting hereunder or under any of the DIP Loan Documents pursuant to or in accordance with the instructions of the Required DIP Lenders except for DIP Agent's own gross negligence or willful misconduct in connection with any action taken by it. Notwithstanding anything to the contrary contained in this Agreement, DIP Agent shall not be required to take any action that is in its opinion contrary to Applicable Law or the terms of any of the DIP Loan Documents or that would in its opinion subject it or any of its officers, employees or directors to personal liability; provided, however, that if DIP Agent shall fail or refuse to take action that is not contrary to Applicable Law or to any of the terms of any of the DIP Loan Documents even if such action in DIP Agent's opinion would subject it to potential liability, the Required DIP Lenders may remove DIP Agent and appoint a successor DIP Agent in the same manner and with the same effect as is provided in this Agreement with respect to DIP Agent's resignation.

    12.1.5. DIP Agent shall promptly, upon receipt thereof, forward to each DIP Lender (i) copies of any significant written notices, reports, certificates and other information received by DIP Agent from any Obligor (but only if and to the extent such Obligor is not required by the terms of the DIP Loan Documents to supply such information directly to DIP Lenders) with respect to any Borrower or any Collateral, (ii) copies of the results of any field audits or Inventory Appraisals with respect to any Borrower, and (iii) copies of any Borrowing Base Certificate delivered by Borrowers (all such documents described in subparagraphs (i) through (iii) being hereinafter referred to collectively as the "Reports"). DIP Agent shall have no liability to any DIP Secured Party for any errors in or omissions from any Report, unless such error or omission was the direct result of DIP Agent's willful misconduct. Each DIP Lender agrees (a) that neither BofA nor DIP Agent makes any representation or warranty as to the accuracy or completeness of any Report and that neither BofA nor DIP Agent shall be liable for any information contained in or omitted from any Report; (b) that the Reports are not intended to be comprehensive audits or examinations, and that DIP Agent or any other Person performing any audit or examination will inspect only specific information regarding Borrowers, the Obligations or the Collateral and will rely significantly upon Borrowers' books and records as well as upon representations of Borrowers' officers and employees; and (c) to keep all Reports confidential and strictly for such DIP Lender's internal use, and not to distribute any Report (or the contents thereof) to any Person (except to such DIP Lender's Participants, attorneys and accountants) or use any Report in any manner other than administration of the Revolver Loans and other Obligations. Each DIP Lender agrees to indemnify and hold harmless DIP Agent and any other Person preparing a Report from any action such DIP Lender may take

as a result of or any conclusion it may draw from any Report, as well as from any Claims arising as a direct or indirect result of DIP Agent furnishing a Report to such DIP Lender.

    **12.2.**  <u>**Agreements Regarding Collateral.**</u>  DIP Secured Parties hereby irrevocably authorize DIP Agent, at its option and in its discretion, to release any Lien upon any Collateral (i) upon Full Payment of the Obligations; (ii) which is sold or disposed of in accordance with the terms of this Agreement if Borrowers certify to DIP Agent that the disposition is made in compliance with the terms of this Agreement (and DIP Agent may rely conclusively on any such certificate, without further inquiry); (iii) having a value of less than $1,000,000 in the aggregate during any 12 month period; (iv) which constitutes Term Loan Priority Collateral, if required to pursuant to the Intercreditor Agreements; or (v) if approved or ratified by Required DIP Lenders. DIP Agent shall, if directed to do so by Required DIP Lenders, release any Lien upon any Collateral having a value of less than $1,000,000 in the aggregate during any 12 month period. Except as expressly authorized or required by this Agreement or Applicable Law, DIP Agent shall not execute any release or termination of any Lien upon any of the Collateral without the prior written authorization of all DIP Lenders and other DIP Secured Parties.  DIP Agent shall have no obligation whatsoever to any of the DIP Secured Parties to assure that any of the Collateral exists or is owned by a Borrower or is cared for, protected or insured or has been encumbered, or that DIP Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected or enforced or entitled to any particular priority or to exercise any duty of care with respect to any of the Collateral.

    **12.3.**  <u>**Reliance By DIP Agent.**</u>  DIP Agent shall be entitled to rely, and shall be fully protected in so relying, upon any certification, notice or other communication (including any thereof by telephone, telex, telegram, telecopier message or cable) believed by it to be genuine and correct and to have been signed, sent or made by or on behalf of the proper Person or Persons, and upon advice and statements of DIP Agent Professionals.  As to any matters not expressly provided for by this Agreement or any of the other DIP Loan Documents, DIP Agent shall in all cases be fully protected in acting or refraining from acting hereunder and thereunder in accordance with the instructions of Required DIP Lenders, and such instructions of Required DIP Lenders, and any action taken or failure to act pursuant thereto shall be binding upon DIP Secured Parties.

    **12.4.**  <u>**Action Upon Default.**</u>  DIP Agent shall not be deemed to have knowledge of the occurrence of a Default or an Event of Default unless DIP Agent has received written notice from the Required DIP Lenders or any or all Borrowers specifying the occurrence and nature of such Default or Event of Default.  If DIP Agent shall receive such a notice of a Default or an Event of Default or shall otherwise acquire actual knowledge of any Default or Event of Default, DIP Agent shall promptly notify DIP Lenders in writing, and DIP Agent shall take such action and assert such rights under this Agreement and the other DIP Loan Documents, or shall refrain from taking such action and asserting such rights, as the Required DIP Lenders shall direct from time to time.  If any DIP Lender shall receive a notice of a Default or an Event of Default or shall otherwise acquire actual knowledge of any Default or Event of Default, such DIP Lender shall promptly notify DIP Agent and the other DIP Lenders in writing.  As provided in **Section 12.3** hereof, DIP Agent shall not be subject to any liability by reason of acting or refraining to act pursuant to any request of the Required DIP Lenders except for DIP Agent's own willful misconduct or gross negligence in connection with any action taken by it.  Before directing DIP

Agent to take or refrain from taking any action or asserting any rights or remedies under this Agreement and the other DIP Loan Documents on account of any Event of Default, the Required DIP Lenders shall consult with and seek the advice of (but without having to obtain the consent of) each other DIP Lender, and promptly after directing DIP Agent to take or refrain from taking any such action or asserting any such rights, the Required DIP Lenders will so advise each other DIP Lender of the action taken or refrained from being taken and, upon request of any DIP Lender, will supply information concerning actions taken or not taken.  In no event shall the Required DIP Lenders, without the prior written consent of each DIP Lender, direct DIP Agent to accelerate and demand payment of the Revolver Loans held by one DIP Lender without accelerating and demanding payment of all other Revolver Loans or to terminate the Commitments of one or more DIP Lenders without terminating the Commitments of all DIP Lenders.  Each DIP Secured Party agrees that, except as otherwise provided in any of the DIP Loan Documents and without the prior written consent of the Required DIP Lenders, such DIP Secured Party will not take any Enforcement Action, accelerate or otherwise enforce its portion of the Obligations under any DIP Loan Documents. Without limiting the generality of the foregoing, none of DIP Secured Parties may exercise any right that any DIP Secured Party might otherwise have under Applicable Law to credit bid at foreclosure sales, Section 363 sales, UCC sales or other similar sales or dispositions of any of the Collateral except as authorized by the Required DIP Lenders.  Notwithstanding anything to the contrary set forth in this **Section 12.4** or elsewhere in this Agreement, each DIP Lender shall be authorized to take such action to preserve or enforce its rights against any Obligor where a deadline or limitation period is otherwise applicable and would, absent the taking of specified action, bar the enforcement of Obligations held by such DIP Lender against such Obligor, including the filing of proofs of claim in any Insolvency Proceeding.

      **12.5.**   **Ratable Sharing.**   If any DIP Lender shall obtain any payment or reduction (including any amounts received as adequate protection of a bank account deposit treated as cash collateral under the Bankruptcy Code) of any Obligation of Borrowers hereunder (whether voluntary, involuntary, through the exercise of any right of set off or otherwise) in excess of its Pro Rata share of payments or reductions on account of such Obligations obtained by all DIP Lenders, such DIP Lender shall forthwith (i) notify the other DIP Lenders and DIP Agent of such receipt and (ii) purchase from the other DIP Lenders such participations in the affected Obligations as shall be necessary to cause such purchasing DIP Lender to share the excess payment or reduction, net of costs incurred in connection therewith, on a Pro Rata basis; provided that if all or any portion of such excess payment or reduction is thereafter recovered from such purchasing DIP Lender or additional costs are incurred, the purchase shall be rescinded and the purchase price restored to the extent of such recovery or such additional costs, but without interest.  Each Borrower agrees that any DIP Lender so purchasing a participation from another DIP Lender pursuant to this **Section 12.5** may, to the fullest extent permitted by Applicable Law, exercise all of its rights of payment (including the right of set off) with respect to such participation as fully as if such DIP Lender were the direct creditor of Borrowers in the amount of such participation; provided that no DIP Lender shall set off against any Dominion Account without DIP Agent's prior consent.  Notwithstanding the foregoing, if a Defaulting DIP Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the amount thereof to DIP Agent for application under **Section 3.2.2**, and such Defaulting

DIP Lender shall provide a written statement to DIP Agent describing the Obligation affected by such payment or reduction.

    **12.6.**    <u>**Indemnification of DIP Agent**</u>.

        12.6.1. Each DIP Lender agrees to indemnify and defend DIP Agent Indemnitees (to the extent not reimbursed by Borrowers under this Agreement, and without limiting the indemnification obligation of Borrowers under this Agreement), on a Pro Rata basis, and to hold each of DIP Agent Indemnitees harmless from and against, any and all Claims which may be imposed on, incurred by or asserted against any of DIP Agent Indemnitees in any way related to or arising out of this Agreement or any of the other DIP Loan Documents or any other document contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby (including the costs and expenses which Borrowers are obligated to pay under **Section 14.2** hereof or amounts DIP Agent may be called upon to pay in connection with any lockbox or Dominion Account arrangement contemplated hereby) or the enforcement of any of the terms hereof or thereof or of any such other documents; <u>provided</u> that no DIP Lender shall be liable to any DIP Agent Indemnitee for any of the foregoing to the extent that they result solely from the willful misconduct or gross negligence of such DIP Agent Indemnitee.

        12.6.2. Without limiting the generality of the foregoing provisions of this **Section 12.6**, if DIP Agent should be sued by any receiver, trustee in bankruptcy, debtor-in-possession or other Person on account of any alleged preference or fraudulent transfer received or alleged to have been received from any Borrower or any other Obligor as the result of any transaction under the DIP Loan Documents, then in such event any monies paid by DIP Agent in settlement or satisfaction of such suit, together with all Extraordinary Expenses incurred by DIP Agent in the defense of same, shall be promptly reimbursed to DIP Agent by each DIP Lender to the extent of its Pro Rata share.

        12.6.3. Without limiting the generality of the foregoing provisions of this **Section 12.6**, if at any time (whether prior to or after the Commitment Termination Date) any action or proceeding shall be brought against any of DIP Agent Indemnitees by an Obligor or by any other Person claiming by, through or under an Obligor, to recover damages for any act taken or omitted by DIP Agent under any of the DIP Loan Documents or in the performance of any rights, powers or remedies of DIP Agent against any Obligor, any Account Debtor, the Collateral or with respect to any Revolver Loans, or to obtain any other relief of any kind on account of any transaction involving any DIP Agent Indemnitees under or in relation to any of the DIP Loan Documents, each DIP Lender agrees to indemnify, defend and hold DIP Agent Indemnitees harmless with respect thereto and to pay to DIP Agent Indemnitees such DIP Lender's Pro Rata share of such amount as any of DIP Agent Indemnitees shall be required to pay by reason of a judgment, decree, or other order entered in such action or proceeding or by reason of any compromise or settlement agreed to by DIP Agent Indemnitees, including all interest and costs assessed against any of DIP Agent Indemnitees in defending or compromising such action, together with attorneys' fees and other legal expenses paid or incurred by DIP Agent Indemnitees in connection therewith; <u>provided</u>, <u>however</u>, that no DIP Lender shall be liable to any DIP Agent Indemnitee for any of the foregoing to the extent that they arise solely from the willful misconduct or gross negligence of such DIP Agent Indemnitee.  In DIP Agent's

discretion, DIP Agent may also reserve for or satisfy any such judgment, decree or order from proceeds of Collateral prior to any distributions therefrom to or for the account of DIP Lenders.

**12.7.** **Limitation on Responsibilities of DIP Agent.**  DIP Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall have received further assurances to its satisfaction from DIP Lenders of their indemnification obligations under **Section 12.6** hereof against any and all Claims which may be incurred by DIP Agent by reason of taking or continuing to take any such action.  DIP Agent shall not be liable to any DIP Secured Party (or any DIP Lender's participants) for any action taken or omitted to be taken under or in connection with this Agreement or the other DIP Loan Documents except as a result of actual gross negligence or willful misconduct on the part of DIP Agent.  DIP Agent does not assume any responsibility for any failure or delay in performance or breach by any Obligor or any DIP Secured Party of its obligations under this Agreement or any of the other DIP Loan Documents.  DIP Agent does not make to any DIP Secured Party, and no DIP Secured Party makes to DIP Agent or the other DIP Secured Parties, any express or implied warranty, representation or guarantee with respect to the Revolver Loans, the Collateral, the DIP Loan Documents or any Obligor.  Neither DIP Agent nor any of its officers, directors, agents, attorneys or employees shall be responsible to any DIP Secured Party, and no DIP Secured Party or any of its officers, directors, employees, attorneys or agents shall be responsible to DIP Agent or the other DIP Secured Parties, for: (i) any recitals, statements, information, representations or warranties contained in any of the DIP Loan Documents or in any certificate or other document furnished pursuant to the terms thereof; (ii) the execution, validity, genuineness, effectiveness or enforceability of, any of the DIP Loan Documents; (iii) the validity, genuineness, enforceability, collectibility, value, sufficiency or existence of any Collateral, or the perfection or priority of any Lien therein; or (iv) the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Obligor or any Account Debtor.  Neither DIP Agent nor any of its officers, directors, employees, attorneys or agents shall have any obligation to any DIP Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any Obligor of any of the duties or agreements of such Obligor under any of the DIP Loan Documents, or the satisfaction of any conditions precedent contained in any of the DIP Loan Documents.  DIP Agent may consult with and employ DIP Agent Professionals and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such DIP Agent Professionals.

**12.8.** **Successor DIP Agent and Co-DIP Agents.**

12.8.1. Subject to the appointment and acceptance of a successor DIP Agent as provided below, DIP Agent may resign at any time by giving at least thirty (30) days written notice thereof to each DIP Lender and Borrowers.  Upon receipt of any notice of such resignation, the Required DIP Lenders, after prior consultation with (but without having to obtain consent of) each DIP Lender, shall have the right to appoint a successor DIP Agent which shall be (i) a DIP Lender, (ii) a United States based Affiliate of a DIP Lender or (iii) a commercial bank that is organized under the laws of the United States or of any State thereof and has a combined capital surplus of at least $200,000,000 and, provided no Default or Event of Default then exists, is reasonably acceptable to Borrowers (and for purposes hereof, any successor to BofA shall be deemed acceptable to Borrowers).  Upon the acceptance by a successor DIP Agent of an appointment to serve as a DIP Agent hereunder, such successor DIP

Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent without further act, deed or conveyance, and the retiring DIP Agent shall be discharged from its duties and obligations hereunder.  After any retiring DIP Agent's resignation hereunder as DIP Agent, the provisions of this **Section 12** (including the provisions of **Section 12.6** hereof) shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as DIP Agent.  Notwithstanding anything to the contrary contained in this Agreement, any successor by merger or acquisition of the stock or assets of BofA shall continue to be DIP Agent hereunder, unless such successor shall resign in accordance with the provisions hereof.

     12.8.2.  It is the purpose of this Agreement that there shall be no violation of any Applicable Law denying or restricting the right of financial institutions to transact business as agent or otherwise in any jurisdiction.  It is recognized that, in case of litigation under any of the DIP Loan Documents, or in case DIP Agent deems that by reason of present or future laws of any jurisdiction DIP Agent might be prohibited from exercising any of the powers, rights or remedies granted to DIP Agent or DIP Lenders hereunder or under any of the DIP Loan Documents or from holding title to or a Lien upon any Collateral or from taking any other action which may be necessary hereunder or under any of the DIP Loan Documents, DIP Agent may appoint an additional Person as a separate collateral agent or co-collateral agent which is not so prohibited from taking any of such actions or exercising any of such powers, rights or remedies. If DIP Agent shall appoint an additional Person as a separate collateral agent or co-collateral agent as provided above, each and every remedy, power, right, claim, demand or cause of action intended by any of the DIP Loan Documents to be exercised by or vested in or conveyed to DIP Agent with respect thereto shall be exercisable by and vested in such separate collateral agent or co-collateral agent, but only to the extent necessary to enable such separate collateral agent or co-collateral agent to exercise such powers, rights and remedies, and every covenant and obligation necessary to the exercise thereof by such separate collateral agent or co-collateral agent shall run to and be enforceable by either of them.  Should any instrument from DIP Lenders be required by the separate collateral agent or co-collateral agent so appointed by DIP Agent in order more fully and certainly to vest in and confirm to him or it such rights, powers, duties and obligations, any and all of such instruments shall, on request, be executed, acknowledged and delivered by DIP Lenders whether or not a Default or Event of Default then exists.  In case any separate collateral agent or co-collateral agent, or a successor to either, shall die, become incapable of acting, resign or be removed, all the estates, properties, rights, powers, duties and obligations of such separate collateral agent or co-collateral agent, so far as permitted by Applicable Law, shall vest in and be exercised by DIP Agent until the appointment of a new collateral agent or successor to such separate collateral agent or co-collateral agent.

   **12.9.**  **Consents, Amendments and Waivers; Overadvances.**

     12.9.1. No amendment or modification of any provision of this Agreement or any other DIP Loan Document shall be effective without the prior written agreement of the Required DIP Lenders and Borrowers, and no waiver of any Default or Event of Default shall be effective without the prior written consent of the Required DIP Lenders; provided, however, that

(i)     without the prior written consent of DIP Agent, no amendment or waiver shall be effective with respect to any provision of any of the DIP Loan Documents (including this **Section 12**) to the extent such provision relates to the rights, remedies, duties, discretion or immunities of DIP Agent;

(ii)    without the prior written consent of Letter of Credit Issuer, no amendment to the provisions of **Sections 1.2** and, without the prior written consent of BofA, no amendment to the provisions of **Section 3.1.3** shall be effective;

(iii)   without the prior written consent of each affected DIP Lender (including a Defaulting DIP Lender), no amendment, modification or waiver shall be effective that would (a) increase the Commitment of such DIP Lender or (b) reduce the amount of, or waive or delay or extend the time for any payment or repayment of, any principal, interest or fees payable to such DIP Lender;

(iv)    without the prior written consent of all DIP Lenders (except a Defaulting DIP Lender as provided in **Section 3.2** of this Agreement), (a) no amendment, modification or waiver shall be effective that would alter the provisions of **Sections 4.6**, **4.7** or **12.9.1**, (b) no amendment, modification or waiver shall be effective that would amend (1) the definitions of "Pro Rata" or "Required DIP Lenders," or any provision of this Agreement obligating DIP Agent to take certain actions at the direction of the Required DIP Lenders, or any provision of any of the DIP Loan Documents regarding the Pro Rata treatment or obligations of DIP Lenders or (2) the definition of "Borrowing Base" (and the other defined terms used in such definition) if the effect would be to increase the amount of Availability, (c) no amendment, modification or waiver shall be effective that would increase any advance rate above the levels in effect on the Closing Date, (d) no amendment, modification or waiver shall be effective that would subordinate the payment of any of the Obligations to any other Debt or the priority of any Liens granted to DIP Agent under any of the DIP Loan Documents to Liens granted to any other Person, except for Liens granted by an Obligor to financial institutions with respect to amounts on deposit with such financial institutions to cover returned items, processing and analysis charges and other charges in the Ordinary Course of Business that relate to deposit accounts with such financial institutions, (e) no amendment, modification or waiver shall be effective that would release any Obligor from liability for any of the Obligations, or (f) no amendment, modification or waiver shall be effective that would release all or substantially all of the Collateral; and

(v)     **Schedule 2** to the Pre-Petition ABL Loan Agreement may be amended or supplemented from time to time in accordance with the definition of "Specified Account Debtor".

No DIP Lender shall be authorized to amend or modify any Note held by it, unless such amendment or modification is consented to in writing by all DIP Lenders; provided, however, that the foregoing shall not be construed to prohibit an amendment or modification to any provision of this Agreement that may be effected pursuant to this **Section 12.9.1** by agreement of Borrowers and the Required DIP Lenders even though such an amendment or modification results in an amendment or modification of the Notes

by virtue of the incorporation by reference in each of the Notes of this Agreement. The making of any Revolver Loans hereunder by any DIP Lender during the existence of a Default or Event of Default shall not be deemed to constitute a waiver by such DIP Lender of such Default or Event of Default. Any waiver or consent granted by any DIP Lender hereunder shall be effective only if in writing and then only in the specific instance and for the specific purpose for which it was given.

        12.9.2. In connection with any proposed amendment to any of the DIP Loan Documents or waiver of any of the terms thereof or any Default or Event of Default thereunder, no Borrower shall solicit, request or negotiate for or with respect to any such proposed amendment or waiver of any of the provisions of this Agreement or any of the other DIP Loan Documents unless each DIP Lender shall be informed thereof by Borrowers or DIP Agent (to the extent known by DIP Agent) and shall be afforded an opportunity of considering the same and supplied by Borrowers with sufficient information to enable each DIP Lender to make an informed decision with respect thereto. No Borrower will, directly or indirectly, pay or cause to be paid any remuneration or other thing of value, whether by way of supplemental or additional interest, fee or otherwise, to any DIP Lender (in its capacity as a DIP Lender hereunder) as consideration for or as an inducement to the consent to or agreement by such DIP Lender with any waiver or amendment of any of the terms and provisions of this Agreement or any of the other DIP Loan Documents unless such remuneration or thing of value is concurrently paid, on the same terms, on a Pro Rata basis to all DIP Lenders.

        12.9.3. DIP Agent may require DIP Lenders to honor requests by U.S. Borrowers for Out of Formula Loans (in which event, and notwithstanding anything to the contrary set forth in **Section 1.1.1** or elsewhere in this Agreement, DIP Lenders shall continue to make Revolver Loans up to their Pro Rata share of the Commitments) and to forbear from requiring Borrowers to cure an Out of Formula Condition, (1) when no Event of Default exists (or if an Event of Default exists, when the existence of such Event of Default is not known by DIP Agent), if and for so long as (i) such Out of Formula Condition does not continue for a period of more than fifteen (15) consecutive days, following which no Out of Formula Condition exists for at least fifteen (15) consecutive days before another Out of Formula Condition exists (provided, however, there shall not be more than four (4) of such fifteen (15) day Out of Formula Condition periods during any Fiscal Year), (ii) the amount of the Revolver Loans outstanding at any time does not exceed the aggregate Commitments at such time, and (iii) the Out of Formula Condition (including the Out of Formula Condition after the making of any such Revolver Loan pursuant to this **Section 12.9.3**) is not known by DIP Agent at the time in question to exceed $10,000,000; and (2) regardless of whether or not an Event of Default exists, if DIP Agent discovers the existence of an Out of Formula Condition not previously known by it to exist, DIP Lenders shall be obligated to continue making such Revolver Loans as directed by DIP Agent only (A) if the amount of the Out of Formula Condition is not increased by more than $2,500,000 above the amount determined by DIP Agent to exist on the date of discovery thereof and (B) for a period not to exceed five (5) Business Days. Notwithstanding the foregoing, the sum of (I) the aggregate amount of Out of Formula Loans plus (II) the aggregate amount of Protective Advances made pursuant to **Section 12.9.4** then outstanding, shall not exceed an aggregate amount equal to 10% of the Borrowing Base. In no event shall any Borrower or any other Obligor be deemed to be a beneficiary of this **Section 12.9.3** or authorized to enforce any of the provisions of this **Section 12.9.3**. The Required DIP Lenders may at any time revoke DIP

Agent's authority to make further Out of Formula Loans by written notice to DIP Agent. Absent such revocation, DIP Agent's determination that funding of an Out of Formula Loan is appropriate shall be conclusive.

12.9.4. DIP Agent shall be authorized, in its discretion, at any time that any conditions in **Section 10** are not satisfied, to make Revolver Loans ("Protective Advances") (i) up to an aggregate amount of 10% of the Borrowing Base outstanding at any time, if DIP Agent deems such Protective Advances necessary or desirable to preserve or protect Collateral, or to enhance the collectibility or repayment of Obligations; or (ii) to pay any other amounts chargeable to Obligors under any DIP Loan Documents, including costs, fees and expenses. Notwithstanding the foregoing, the sum of (I) the aggregate amount of Protective Advances plus (II) the aggregate amount of Out of Formula Loans made pursuant to **Section 12.9.3** then outstanding, shall not exceed an aggregate amount equal to 10% of the Borrowing Base. Notwithstanding anything herein to the contrary, each DIP Lender shall participate in each Protective Advance on a Pro Rata basis. The Required DIP Lenders may at any time revoke DIP Agent's authority to make further Protective Advances by written notice to DIP Agent. Absent such revocation, DIP Agent's determination that funding of a Protective Advance is appropriate shall be conclusive.

**12.10. Due Diligence and Non-Reliance.** Each DIP Lender hereby acknowledges and represents that such DIP Lender has, independently and without reliance upon DIP Agent or the other DIP Lenders, and based upon such documents, information and analyses as such DIP Lender has deemed appropriate, made its own credit analysis of each Obligor and its own decision to enter into this Agreement and the other DIP Loan Documents and to fund the Loans to be made by such DIP Lender hereunder and to purchase participations in the Letter of Credit Outstandings pursuant to **Section 1.2.8** hereof, and each DIP Lender has made such inquiries concerning the DIP Loan Documents, the Collateral and each Obligor as such DIP Lender feels necessary and appropriate, and has taken such care on its own behalf as would have been the case had such DIP Lender entered into this Agreement and the other DIP Loan Documents without the intervention or participation of the other DIP Lenders or DIP Agent. Each DIP Lender hereby further acknowledges and represents that the other DIP Lenders and DIP Agent have not made any representations or warranties to such DIP Lender concerning any Obligor, any of the Collateral or the legality, validity, sufficiency or enforceability of any of the DIP Loan Documents. Each DIP Lender also hereby acknowledges that it will, independently and without reliance upon the other DIP Lenders or DIP Agent, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making Loans and in taking or refraining to take any other action under this Agreement or any of the other DIP Loan Documents. Except for notices, reports and other information expressly required to be furnished to DIP Lenders by DIP Agent hereunder, DIP Agent shall not have any duty or responsibility to provide any DIP Lender with any notices, reports or certificates furnished to DIP Agent by any Obligor or any credit or other information concerning the affairs, financial condition, business or Properties of any Obligor (or any of its Affiliates) which may come into possession of DIP Agent or any of DIP Agent's Affiliates.

**12.11. Representations and Warranties of DIP Lenders.** By its execution of this Agreement, each DIP Lender hereby represents and warrants to each Borrower and the other DIP Lenders that it has the power to enter into and perform its obligations under this Agreement and

the other DIP Loan Documents, and that it has taken all necessary and appropriate action to authorize its execution and performance of this Agreement and the other DIP Loan Documents to which it is a party, each of which will be binding upon it and the obligations imposed upon it herein or therein will be enforceable against it in accordance with the respective terms of such documents.

12.12. **Required DIP Lenders.**  As to any provisions of this Agreement or the other DIP Loan Documents under which action may or is required to be taken upon direction or approval of the Required DIP Lenders, the direction or approval of the Required DIP Lenders shall be binding upon each DIP Lender to the same extent and with the same effect as if each DIP Lender had joined therein.  Notwithstanding anything to the contrary contained in this Agreement, Borrowers shall not be deemed to be a beneficiary of, or be entitled to enforce, sue upon or assert as a defense to any of the Obligations, any provisions of this Agreement that requires DIP Agent or any DIP Lender to act, or conditions their authority to act, upon the direction or consent of the Required DIP Lenders; and any action taken by DIP Agent or any DIP Lender that requires the consent or direction of the Required DIP Lenders as a condition to taking such action shall, insofar as Borrowers are concerned, be presumed to have been taken with the requisite consent or direction of the Required DIP Lenders.

12.13. **Several Obligations.**  The obligations and commitments of each DIP Lender under this Agreement and the other DIP Loan Documents are several, and neither DIP Agent nor any DIP Lender shall be responsible for the performance by any other DIP Lender of its obligations or commitments hereunder or thereunder.  Notwithstanding any liability of DIP Lenders stated to be joint and several to third Persons under any of the DIP Loan Documents, such liability shall be shared, as among DIP Lenders, Pro Rata according to the respective Commitments of DIP Lenders.

12.14. **DIP Agent in its Individual Capacity.**  With respect to its obligation to lend under this Agreement, the Revolver Loans made by it and each Note issued to it, BofA, as a DIP Lender, shall have the same rights and powers hereunder and under the other DIP Loan Documents as any other DIP Lender or holder of a Note and may exercise the same as though it were not performing the duties specified herein in its capacity as DIP Agent; and the terms "DIP Lenders," "Required DIP Lenders," or any similar term shall, unless the context clearly otherwise indicates, include BofA in its capacity as a DIP Lender.  BofA and its Affiliates may each accept deposits from, maintain deposits or credit balances for, invest in, lend money to, act as trustee under indentures of, serve as financial advisor to, and generally engage in any kind of business with any Borrower or any other Obligor, or any Affiliate of a Borrower or any other Obligor, as if it were any other bank and without any duty to account therefor (or for any fees or other consideration received in connection therewith) to the other DIP Lenders. In their individual capacities, BofA and its Affiliates may receive information regarding a Borrower, its Affiliates and its Account Debtors (including information subject to confidentiality obligations), and each DIP Lender agrees that BofA and its Affiliates shall be under no obligation to provide such information to DIP Lenders, if acquired in such individual capacity and not as DIP Agent hereunder.

12.15. **Third Party Beneficiaries.**  This **Section 12** is an agreement solely among DIP Lenders and DIP Agent, and shall survive Full Payment of the Obligations. This **Section 12** is

not intended to confer any rights or benefits upon any Borrower or any other Person except DIP Lenders and DIP Agent, and no Person (including any or all Borrowers) other than DIP Lenders and DIP Agent shall have any right to enforce any of the provisions of this **Section 12** except as expressly provided in **Section 12.17** hereof.  As between Borrowers and DIP Agent, any action that DIP Agent may take or purport to take on behalf of DIP Lenders under any of the DIP Loan Documents shall be conclusively presumed to have been authorized and approved by DIP Lenders as herein provided.

 12.16. **Notice of Transfer.** DIP Agent may deem and treat a DIP Lender party to this Agreement as the owner of such DIP Lender's portion of the Revolver Loans for all purposes, unless and until a written notice of the assignment or transfer thereof executed by such DIP Lender has been received by DIP Agent.

 12.17. **Replacement of Certain DIP Lenders.** If a DIP Lender ("Affected DIP Lender") (i) is a Defaulting DIP Lender, (ii) shall have requested compensation from Borrowers under **Section 2.7** to recover increased costs incurred by such DIP Lender (or its parent or holding company) which are not being incurred generally by the other DIP Lenders (or their respective parents or holding companies), (iii) shall have delivered a notice pursuant to **Section 2.6** hereof claiming that such DIP Lender is unable to extend LIBOR Loans to U.S. Borrowers for reasons not generally applicable to the other DIP Lenders, or (iv) fails to give its consent to any amendment, waiver or action for which consent of all DIP Lenders or each DIP Lender affected thereby was required and the Required DIP Lenders consented, then, in any such case and in addition to any other rights and remedies that DIP Agent, any other DIP Lender or any Borrower may have against such Affected DIP Lender, any Borrower or DIP Agent may, within 120 days after such event, make written demand on such Affected DIP Lender (with a copy to DIP Agent in the case of a demand by a Borrower and a copy to Borrowers in the case of a demand by DIP Agent) for the Affected DIP Lender to assign, and such Affected DIP Lender shall assign pursuant to one or more duly executed Assignment and Acceptances within five (5) Business Days after the date of such demand, to one or more DIP Lenders willing to accept such assignment or assignments, or to one or more Eligible Assignees designated by DIP Agent, all of such Affected DIP Lender's rights and obligations under this Agreement (including its Commitments and all Revolver Loans owing to it) in accordance with **Section 13** hereof.  DIP Agent is hereby irrevocably authorized to execute one or more Assignment and Acceptances as attorney-in-fact for any Affected DIP Lender which fails or refuses to execute and deliver the same within five (5) Business Days after the date of such demand.  The Affected DIP Lender shall be entitled to receive, in cash and concurrently with execution and delivery of each such Assignment and Acceptance, all amounts owed to the Affected DIP Lender hereunder or under any other DIP Loan Document, including the aggregate outstanding principal amount of the Revolver Loans owed to such Affected DIP Lender, together with accrued interest thereon and any fees owed to such Affected DIP Lender through the date of such assignment.  Upon the replacement of any Affected DIP Lender pursuant to this **Section 12.17**, such Affected DIP Lender shall cease to have any participation in, entitlement to, or other right to share in the Liens of DIP Agent in any Collateral, and such Affected DIP Lender shall have no further liability to DIP Agent, any DIP Lender or any other Person under any of the DIP Loan Documents (except as provided in **Section 12.6** hereof as to events or transactions which occur prior to the replacement of such Affected DIP Lender), including any commitment to make Revolver Loans or purchase participations in Letter of Credit Outstandings.

**12.18.  Remittance of Payments and Collections.**

12.18.1.  All payments by any DIP Lender to DIP Agent shall be made not later than the time set forth elsewhere in this Agreement on the Business Day such payment is due; provided, however, that if such payment is due on demand by DIP Agent and such demand is made on the paying DIP Lender after 12:00 noon on such Business Day, then payment shall be made by 12:00 noon on the next Business Day.  Payment by DIP Agent to any DIP Lender shall be made by wire transfer, promptly following DIP Agent's receipt of funds for the account of such DIP Lender and in the type of funds received by DIP Agent; provided, however, that if DIP Agent receives such funds at or prior to 12:00 noon, DIP Agent shall pay such funds to such DIP Lender by 2:00 p.m. on such Business Day, but if DIP Agent receives such funds after 12:00 noon, DIP Agent shall pay such funds to such DIP Lender by 2:00 p.m. on the next Business Day.

12.18.2.  If any DIP Secured Party fails to pay any amount when due by it to DIP Agent pursuant to the terms hereof, such amount shall bear interest, from the due date until paid in full, at the rate determined by DIP Agent as customary for interbank compensation for two (2) Business Days and thereafter at the Default Rate.  In no event shall any Borrower be entitled to receive any credit for any interest paid by DIP Agent to any DIP Lender, or by any DIP Lender to DIP Agent, at the Federal Funds Rate as provided herein, nor shall any Defaulting DIP Lender be entitled to interest on any amounts held by DIP Agent pursuant to **Section 3.2**.

12.18.3.  If DIP Agent pays any amount to a DIP Lender in the belief or expectation that a related payment has been or will be received by DIP Agent from an Obligor and such related payment is not received by DIP Agent, then DIP Agent shall be entitled to recover such amount from each DIP Lender that receives such amount.  If DIP Agent determines at any time that any amount received by it under this Agreement or any of the other DIP Loan Documents must be returned to an Obligor or paid to any other Person pursuant to any Applicable Law, court order or otherwise, then, notwithstanding any other term or condition of this Agreement or any of the other DIP Loan Documents, DIP Agent shall not be required to distribute such amount to any DIP Lender. If any amounts received and applied by DIP Agent to any Obligations are later required to be returned by DIP Agent pursuant to Applicable Law, each DIP Lender shall pay to DIP Agent, **on demand**, such DIP Lender's Pro Rata share of the amounts required to be returned.

**12.19.  Bank Product Providers.**  Each Bank Product Provider, by delivery of a notice to DIP Agent of a Bank Product, agrees to be bound by **Section 4.6** and this **Section 12**.  Each Bank Product Provider shall indemnify and hold harmless DIP Agent Indemnitees, to the extent not reimbursed by Obligors, against all Claims that may be incurred by or asserted against any DIP Agent Indemnitee in connection with such provider's Bank Product Obligations.  Except as otherwise expressly set forth herein or in any DIP Security Document, no Bank Product Provider shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other DIP Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a DIP Lender and, in such case, only to the extent expressly provided in the DIP Loan Documents.  Notwithstanding any other provision of this Agreement to the contrary, DIP Agent shall not be

required to calculate the amount or verify the payment of, or that other satisfactory arrangements have been made with respect to, Bank Product Obligations, nor shall DIP Agent have any knowledge thereof unless DIP Agent has received written notice of such Bank Product Obligations, together with such supporting documentation as DIP Agent may request, from the applicable Bank Product Provider, as the case may be.  On the last Business Day of each March, June, September and December (or at the end of each month, if requested by DIP Agent), each Bank Product Provider shall deliver to DIP Agent written notice setting forth a reasonably detailed calculation of the liabilities and obligations of the Obligors in respect of each Bank Product (and, with respect to any Hedge Agreement, the mark-to-market exposure thereunder) of such Bank Product Provider at such time.

      **12.20.  Intercreditor Agreements.**  Each DIP Lender (a) agrees to be bound by the provisions of each of the Intercreditor Agreements, and (b) authorizes and instructs DIP Agent to enter into amendments, restatements, amendments and restatements of, or to supplement or otherwise modify either of the Intercreditor Agreements with the consent of the Required DIP Lenders or enter into one or more other intercreditor agreements having terms reasonably satisfactory to DIP Agent and either in form and substance substantially similar to the existing Intercreditor Agreements or reasonably satisfactory to the Required DIP Lenders, from time to time, in connection with the incurrence of Refinancing Debt in respect of the Pre-Petition Term Loans.

## SECTION 13.  BENEFIT OF AGREEMENT; ASSIGNMENTS AND PARTICIPATIONS

      **13.1.  Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Borrowers, DIP Agent and DIP Lenders and their respective successors and assigns (which, in the case of DIP Agent, shall include any successor DIP Agent appointed pursuant to **Section 12.8** hereof), except that (i) no Borrower shall have the right to assign its rights or delegate performance of any of its obligations under any of the DIP Loan Documents and (ii) any assignment by any DIP Lender must be made in compliance with **Section 13.3** hereof.  DIP Agent may treat the payee of any Note as the owner thereof for all purposes hereof unless and until such payee complies with **Section 13.3** in the case of an assignment thereof or, in the case of any other transfer, a written notice of the transfer is filed with DIP Agent.  Any assignee or transferee of a Note agrees by acceptance thereof to be bound by all the terms and provisions of the DIP Loan Documents.  Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent is the holder of a Note, shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note or of any Note or Notes issued in exchange therefor.

      **13.2.  Participations.**

          13.2.1.  Permitted Participants; Effect.  Any DIP Lender may, in the ordinary course of its business and in accordance with Applicable Law, at any time sell to one or more banks or other financial institutions (each a "Participant") a participating interest in any of the Obligations owing to such DIP Lender, any Commitment of such DIP Lender or any other interest of such DIP Lender under any of the DIP Loan Documents.  In the event of any such sale by a DIP Lender of participating interests to a Participant, such DIP Lender's obligations under the DIP Loan Documents shall remain unchanged, such DIP Lender shall remain solely

responsible to the other parties hereto for the performance of such obligations, such DIP Lender shall remain the holder of any Note for all purposes under the DIP Loan Documents, all amounts payable by Borrowers under this Agreement and any of the Notes shall be determined as if such DIP Lender had not sold such participating interests, and Borrowers and DIP Agent shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under the DIP Loan Documents. If a DIP Lender sells a participation to a Person other than an Affiliate of such DIP Lender, then such DIP Lender shall give prompt written notice thereof to Borrowers, DIP Agent and the other DIP Lenders. A Participant that would be a Foreign DIP Lender if it were a DIP Lender shall not be entitled to the benefits of **Section 4.9** unless each Borrower agrees otherwise in writing.

13.2.2.  <u>Voting Rights</u>.  Each DIP Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the DIP Loan Documents other than an amendment, modification or waiver with respect to any Revolver Loans or Commitment in which such Participant has an interest which forgives principal, interest or fees or reduces the stated interest rate or the stated rates at which fees are payable with respect to any such Revolver Loan or Commitment, postpones the Commitment Termination Date, or any date fixed for any regularly scheduled payment of interest or fees on such Revolver Loan or Commitment, or releases from liability any Borrower or releases any substantial portion of any of the Collateral.

13.2.3.  <u>Participant Register</u>.  Each DIP Lender that sells a participation shall, acting as a non-fiduciary agent of Borrowers (solely for tax purposes), maintain a register in which it enters the Participant's name, address and interest in Commitments, Revolver Loans (and stated interest) and Letter of Credit Outstandings.  Entries in the register shall be conclusive, absent manifest error, and such DIP Lender shall treat each Person recorded in the register as the owner of the participation for all purposes, notwithstanding any notice to the contrary.  No DIP Lender shall have an obligation to disclose any information in such register except to the extent necessary to establish that a Participant's interest is in registered form under the Code.

13.2.4.  <u>Benefit of Set-Off</u>.  Each Borrower agrees that each Participant shall be deemed to have the right of set-off provided in **Section 11.4** hereof in respect of its participating interest in amounts owing under the DIP Loan Documents to the same extent and subject to the same requirements under this Agreement (including **Section 12.5**) as if the amount of its participating interest were owing directly to it as a DIP Lender under the DIP Loan Documents; <u>provided</u> that each DIP Lender shall retain the right of set-off provided in **Section 11.4** hereof with respect to the amount of participating interests sold to each Participant.  DIP Lenders agree to share with each Participant, and each Participant by exercising the right of set-off provided in **Section 11.4** agrees to share with each DIP Lender, any amount received pursuant to the exercise of such Participant's right of set-off, such amounts to be shared in accordance with **Section 12.5** hereof as if each Participant were a DIP Lender.

13.2.5.  <u>Notices</u>.    Each DIP Lender shall be solely responsible for notifying its Participants of any matters relating to the DIP Loan Documents to the extent that any such notice may be required, and neither DIP Agent nor any other DIP Lender shall have any obligation, duty or liability to any Participant of any other DIP Lender.  Without limiting the

93

generality of the foregoing, neither DIP Agent nor any DIP Lender shall have any obligation to give notices or to provide documents or information to a Participant of another DIP Lender.

    **13.3.**   **Assignments.**

          **13.3.1.**  Permitted Assignments.  Subject to its giving at least two (2) Business Days prior notice to DIP Agent and Borrowers, any DIP Lender may, in accordance with Applicable Law, at any time assign to any Eligible Assignee all or any part of its rights and obligations under the DIP Loan Documents, so long as (i) each assignment is of a constant, and not a varying, ratable percentage of all of the transferor DIP Lender's rights and obligations under the DIP Loan Documents with respect to the Revolver Loans and the Letter of Credit Outstandings and, in the case of a partial assignment, is in a minimum principal amount of $5,000,000 (unless otherwise agreed by DIP Agent in its sole discretion) and integral multiples of $1,000,000 in excess of that amount; (ii) except in the case of an assignment in whole of a DIP Lender's rights and obligations under the DIP Loan Documents or an assignment by a DIP Lender to another DIP Lender, immediately after giving effect to any assignment, the aggregate amount of the Commitments retained by the transferor DIP Lender shall in no event be less than $5,000,000 (unless otherwise agreed by DIP Agent in its sole discretion); and (iii) the parties to each such assignment shall execute and deliver to DIP Agent, for its acceptance and recording, an Assignment and Acceptance.  The consent of Borrowers (except upon and during the continuance of an Event of Default) and DIP Agent shall be required prior to an assignment becoming effective with respect to an Eligible Assignee that is not a DIP Lender or an Affiliate of a DIP Lender (such consent of Borrowers and DIP Agent not to be unreasonably withheld or delayed).  Nothing contained herein shall limit in any way the right of any DIP Lender to assign all or any portion of the Revolver Loans owing to it to any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors and any Operating Circular issued by such Federal Reserve Bank; provided that, in the case of this clause (ii), any payment in respect of such assigned Revolver Loans made by Borrowers to the assigning DIP Lender in accordance with the terms of this Agreement shall satisfy Borrowers' obligations hereunder in respect of such assigned Revolver Loans to the extent of such payment, but no such assignment shall release the assigning DIP Lender from its obligations hereunder.

          **13.3.2.**  Effect; Effective Date.  Upon (i) delivery to DIP Agent of a notice of assignment substantially in the form attached as **Exhibit F** hereto, together with any consents required by **Section 13.3.1**, and (ii) payment of a $3,500 fee to DIP Agent for processing any assignment to an Eligible Assignee that is not an Affiliate of the transferor DIP Lender, such assignment shall become effective on the effective date specified in such notice of assignment. On and after the effective date of such assignment, such Eligible Assignee shall for all purposes be a DIP Lender party to the Agreement and any other DIP Loan Document executed by DIP Lenders and shall have all the rights and obligations of a DIP Lender under the DIP Loan Documents to the same extent as if such Eligible Assignee was an original party thereto, and no further consent or action by Borrowers, DIP Lenders or DIP Agent shall be required to release the transferor DIP Lender with respect to the Commitment (or portion thereof) of such DIP Lender and Obligations assigned to such Eligible Assignee.  Upon the consummation of any assignment to an Eligible Assignee pursuant to this **Section 13.3.2**, the transferor DIP Lender, DIP Agent and Borrowers shall make appropriate arrangements so that replacement Notes are issued to such transferor DIP Lender and new Notes or, as appropriate, replacement Notes, are

issued to such Eligible Assignee, in each case in principal amounts reflecting their respective Commitments, as adjusted pursuant to such assignment.  If the transferor DIP Lender shall have assigned all of its interests, rights and obligations under this Agreement pursuant to **Section 13.3.1** hereof, such transferor DIP Lender shall no longer have any obligation to indemnify DIP Agent with respect to any transactions, events or occurrences that transpire after the effective date of such assignment, and each Eligible Assignee to which such transferor shall make an assignment shall be responsible to DIP Agent to indemnify DIP Agent in accordance with this Agreement with respect to transactions, events and occurrences transpiring on and after the effective date of such assignment to it.

13.3.3.  <u>Dissemination of Information</u>.  Each Borrower authorizes each DIP Lender and DIP Agent to disclose to any Participant, any Eligible Assignee or any other Person acquiring an interest in the DIP Loan Documents by operation of law (each a "<u>Transferee</u>"), and any prospective Transferee, any and all information in DIP Agent's or such DIP Lender's possession concerning each Borrower, the Subsidiaries of each Borrower or the Collateral, subject to appropriate confidentiality undertakings on the part of such Transferee.

13.3.4.  <u>Certain Assignees</u>.  No assignment or participation may be made to a Borrower, Affiliate of a Borrower, Defaulting DIP Lender, or natural person.   Any assignment by a Defaulting DIP Lender shall be effective only upon payment by the Eligible Assignee or Defaulting DIP Lender to DIP Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as DIP Agent deems appropriate), to satisfy all funding and payment liabilities then owing by such Defaulting DIP Lender hereunder.  If an assignment by a Defaulting DIP Lender shall become effective under Applicable Law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting DIP Lender for all purposes until such compliance occurs.

13.3.5.  <u>Register</u>.   DIP Agent, acting as a non-fiduciary agent of Borrowers (solely for tax purposes), shall maintain (a) a copy (or electronic equivalent) of each Assignment and Acceptance delivered to it, and (b) a register for recordation of the names, addresses and Commitments of, and the Revolver Loans, interest and Letter of Credit Outstandings owing to, each DIP Lender.  Entries in the register shall be conclusive, absent manifest error, and Borrowers, DIP Agent and DIP Lenders shall treat each lender recorded in such register as a DIP Lender for all purposes under the DIP Loan Documents, notwithstanding any notice to the contrary.  DIP Agent may choose to show only one Borrower as the borrower in the register, without any effect on the liability of any Obligor with respect to the Obligations. The register shall be available for inspection by Borrowers or any DIP Lender, from time to time upon reasonable notice

**13.4.    Tax Treatment.**  If any interest in any DIP Loan Document is transferred to any Transferee that is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor DIP Lender shall cause such Transferee, concurrently with the effectiveness of such transfer, to comply with the provisions of **Section 4.10** hereof.

## SECTION 14.  MISCELLANEOUS

**14.1.  <u>Power of Attorney</u>.**  Each Borrower hereby irrevocably designates, makes, constitutes and appoints DIP Agent (and all Persons designated by DIP Agent) as such Borrower's true and lawful attorney (and agent in fact) and DIP Agent, or DIP Agent's designee, may, without notice to such Borrower and in either such Borrower's or DIP Agent's name, but at the cost and expense of Borrowers:

14.1.1.  At such time or times as DIP Agent or said designee, in its sole discretion, may determine, endorse such Borrower's name on any Payment Item or proceeds of the Collateral which come into the possession of DIP Agent or under DIP Agent's control.

14.1.2.  At any time that an Event of Default exists: (i) demand payment of the Accounts from the Account Debtors, enforce payment of the Accounts by legal proceedings or otherwise, and generally exercise all of such Borrower's rights and remedies with respect to the collection of the Accounts; (ii) settle, adjust, compromise, discharge or release any of the Accounts or other Collateral or any legal proceedings brought to collect any of the Accounts or other Collateral; (iii) sell or assign any of the Accounts and other Collateral upon such terms, for such amounts and at such time or times as DIP Agent deems advisable; (iv) take control, in any manner, of any Payment Item or proceeds relating to any Collateral; (v) prepare, file and sign such Borrower's name to a proof of claim in any Insolvency Proceeding or similar document against any Account Debtor or to any notice of Lien, claim of a mechanic's Lien, assignment, release or satisfaction of any Lien or similar document in connection with any of the Collateral; (vi) receive, open and dispose of all mail addressed to such Borrower and to notify postal authorities to change the address for delivery thereof to such address as DIP Agent may designate; (vii) endorse the name of such Borrower upon any of the Payment Items or proceeds relating to any Collateral and deposit the same to the account of DIP Agent on account of the Obligations; (viii) endorse the name of such Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to any Accounts or Inventory of any Obligor and any other Collateral; (ix) use such Borrower's stationery and sign the name of such Borrower to verifications of the Accounts and notices thereof to Account Debtors; (x) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Accounts, Inventory, Equipment or any other Collateral; (xi) make and adjust claims under policies of insurance; (xii) take all action as may be necessary to obtain the payment of any letter of credit or banker's acceptance of which such Borrower is a beneficiary; and (xiii) do all other acts and things necessary, in DIP Agent's determination, to fulfill such Borrower's obligations under this Agreement.

**14.2.  <u>General Indemnity</u>.**  Each Borrower hereby agrees to indemnify and defend the DIP Indemnitees and to hold the DIP Indemnitees harmless from and against any third party Claim ever suffered or incurred by any of such DIP Indemnitees arising out of or related to this Agreement or any of the other DIP Loan Documents or the issuance of any Letter of Credit, the performance by DIP Agent or DIP Lenders or Letter of Credit Issuer of their duties or the exercise of any of their rights or remedies under this Agreement or any of the other DIP Loan Documents or in connection with the issuance of any Letter of Credit, or as a result of any Borrower's failure to observe, perform or discharge any of its duties hereunder or under any

other DIP Loan Document. Each Borrower shall also indemnify and defend the DIP Indemnitees against and save the DIP Indemnitees harmless from all Claims of any Person arising out of, related to or with respect to any transactions entered into pursuant to this Agreement or any other DIP Loan Document or DIP Agent's Lien upon the Collateral. Without limiting the generality of the foregoing, this indemnity shall extend to any Claims asserted against or incurred by any of the DIP Indemnitees by any Person under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials or other toxic substances. Additionally, if any Taxes (excluding any Excluded Tax) shall be payable by DIP Agent or any Obligor on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the other DIP Loan Documents or the issuance of any Letter of Credit, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrowers will pay (or will promptly reimburse DIP Agent, Letter of Credit Issuer and DIP Lenders for the payment of) all such Taxes, including any interest and penalties thereon, and will indemnify and hold DIP Indemnitees harmless from and against all liability in connection therewith. The foregoing indemnities shall not apply to Claims incurred by any of the DIP Indemnitees as a direct and proximate result of their own gross negligence or willful misconduct or that arise out of any disputes arising solely out of the relationship between DIP Agent and any DIP Lender.

**14.3.    Survival of All Indemnities.**    Notwithstanding anything to the contrary in this Agreement or any of the other DIP Loan Documents, the obligation of each Borrower and each DIP Lender with respect to each indemnity given by it in this Agreement, whether given by such Borrower to DIP Indemnitees or by any DIP Lender to any DIP Agent Indemnitees, shall survive the Full Payment of the Obligations and the termination of any of the Commitments.

**14.4.    Modification of Agreement.**    This Agreement may not be modified, altered or amended, except by an agreement in writing signed by Borrowers and DIP Agent and DIP Lenders (or, where otherwise expressly allowed by **Section 12** hereof, the Required DIP Lenders in lieu of DIP Agent and DIP Lenders); provided, however, that no consent, written or otherwise, of any Borrower shall be necessary or required in connection with any amendment of any of the provisions of **Sections 1.2.8**, **4.6** or **12** (other than **Section 12.17**) or any other provision of this Agreement that affects only the rights, duties and responsibilities of DIP Lenders and DIP Agent as among themselves so long as no such amendment imposes any additional obligations on Borrowers.

**14.5.    Severability.**    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**14.6.    Cumulative Effect; Conflict of Terms.**    The provisions of the Other DIP Agreements and the DIP Security Documents are hereby made cumulative with the provisions of this Agreement. Without limiting the generality of the foregoing, the parties acknowledge that this Agreement and the other DIP Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters and that such limitations, tests and

measures are cumulative and each must be performed, except as may be expressly stated to the contrary in this Agreement.  Except as otherwise provided in any of the other DIP Loan Documents by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in direct conflict with, or inconsistent with, any provision in any of the other DIP Loan Documents, the provision contained in this Agreement shall govern and control.

      **14.7.**   **Execution in Counterparts.**   This Agreement and any amendments hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Any electronic signature, contract formation on an electronic platform and electronic record-keeping shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the Georgia Uniform Electronic Transactions Act, or any similar state law based on the Uniform Electronic Transactions Act.

      **14.8.**   **Consent.**   Whenever DIP Agent's, DIP Lenders' or the Required DIP Lenders' consent is required to be obtained under this Agreement or any of the other DIP Loan Documents as a condition to any action, inaction, condition or event, DIP Agent and each DIP Lender shall be authorized to give or withhold its consent in its sole and absolute discretion and to condition its consent upon the giving of additional collateral security for the Obligations, the payment of money, or any other matter.

      **14.9.**   **Notices and Communications.**

      14.9.1.   <u>Notice Address</u>.   Subject to **Section 3.1.4**, all notices and other communications by or to a party hereto shall be in writing and shall be given as follows:

      If to any Borrower:

        The Standard Register Company
        600 Albany Street
        Dayton, Ohio 45417
        Attention:  Benjamin T. Cutting, Chief Financial Officer
        Telecopier No.:  (937) 221-1995

      If to DIP Agent or Letter of Credit Issuer:

        Bank of America, N.A.
        300 Galleria Parkway, Suite 800
        Atlanta, Georgia 30339
        Attention:  Andrew Doherty or current account manager
        Telecopier No.:  (404) 607-3277

If to any DIP Lender:

> To the address set forth on **Schedule 14.9** to the Pre-Petition ABL Loan Agreement (or in the case of a Person who becomes a DIP Lender after the Closing Date, at the address shown on its Assignment and Acceptance).

Each such notice or other communication shall be effective only (i) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (ii) if given by mail, three (3) Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (iii) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to DIP Agent pursuant to **Sections 1.2, 3.1** or **5.2.2** shall be effective until actually received by the individual to whose attention at DIP Agent such notice is required to be sent. Any written notice or other communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by SRC shall be deemed received by all Borrowers.

> 14.9.2. <u>Electronic Communications; Voice Mail</u>. Electronic mail and internet websites may be used only for routine communications, such as financial statements, Borrowing Base Certificates and other information required by **Section 9.1.4**, administrative matters, distribution of DIP Loan Documents for execution, and matters permitted under **Section 3.1.4**. DIP Agent and DIP Lenders make no assurances as to the privacy and security of electronic communications. Electronic and voice mail may not be used as effective notice under the DIP Loan Documents.

> 14.9.3. <u>Non-Conforming Communications</u>. DIP Agent and DIP Lenders may rely upon any notices purportedly given by or on behalf of any Borrower even if such notices were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation. Each Borrower shall indemnify and hold harmless each DIP Indemnitee from any liabilities, losses, costs and expenses arising from any telephonic communication purportedly given by or on behalf of such Borrower.

**14.10. <u>Performance of Borrowers' Obligations</u>.** If any Borrower shall fail to discharge any covenant, duty or obligation hereunder or under any of the other DIP Loan Documents, DIP Agent may, in its sole discretion at any time or from time to time, for Borrowers' account and at Borrowers' expense, pay any amount or do any act required of any Borrower hereunder or under any of the other DIP Loan Documents or otherwise lawfully requested by DIP Agent to enforce any of the DIP Loan Documents or Obligations, preserve, protect, insure or maintain any of the Collateral, or preserve, defend, protect or maintain the validity or priority of DIP Agent's Liens in any of the Collateral, including the payment of any judgment against any Borrower, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord claim, or any other Lien upon or with respect to any of the Collateral. All payments that DIP Agent may make under this Section and all out-of-pocket costs and expenses (including Extraordinary Expenses) that DIP Agent pays or incurs in connection with any action taken by it hereunder shall be reimbursed to DIP Agent by Borrowers **on demand** with interest from the date such payment is made or such costs or expenses are incurred to the date of payment thereof

at the Default Rate. Any payment made or other action taken by DIP Agent under this Section shall be without prejudice to any right to assert, and without waiver of, an Event of Default hereunder and to proceed thereafter as provided herein or in any of the other DIP Loan Documents.

      **14.11.  Credit Inquiries.**  Each Borrower hereby authorizes and permits DIP Agent and DIP Lenders (but DIP Agent and DIP Lenders shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning such Borrower or any Subsidiaries.

      **14.12.  Time of Essence.**  Time is of the essence of this Agreement, the Other DIP Agreements and the DIP Security Documents.

      **14.13.  Indulgences Not Waivers.**  DIP Agent's or any DIP Lender's failure at any time or times hereafter, to require strict performance by any Borrower of any provision of this Agreement or any other DIP Loan Document shall not waive, affect or diminish any right of DIP Agent or any DIP Lender thereafter to demand strict compliance and performance therewith.

      **14.14.  Entire Agreement; Appendix A, Exhibits and Schedules.**  This Agreement and the other DIP Loan Documents, together with all other instruments, agreements and certificates executed at any time by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written.  **Appendix A**, each of the Exhibits and each of the Schedules attached hereto are incorporated into this Agreement and by this reference made a part hereof.

      **14.15.  Interpretation.**  No provision of this Agreement or any of the other DIP Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having, or being deemed to have, structured, drafted or dictated such provision.

      **14.16.  Obligations of DIP Lenders Several.**  The obligations of each DIP Lender hereunder are several, and neither DIP Agent nor any DIP Lender shall be responsible for the obligations or Commitment of any other DIP Lender.  Nothing contained in this Agreement and no action taken by DIP Agent or any DIP Lender pursuant hereto shall be deemed to constitute DIP Agent and any of DIP Lenders to be a partnership, association, joint venture or any other kind of entity.  The amounts payable at any time hereunder to each DIP Lender shall be a separate and independent debt, and each DIP Lender shall be entitled, to the extent not otherwise restricted hereunder, to protect and enforce its rights arising out of this Agreement and any of the other DIP Loan Documents, and it shall not be necessary for DIP Agent or any other DIP Lender to be joined as an additional party in any proceeding for such purpose.

      **14.17.  Confidentiality.**  DIP Agent and DIP Lenders each agrees to (i) keep any proprietary, nonpublic and/or confidential information that is delivered or made available by Borrowers to it (and that is either marked confidential or that a reasonable person at the time of disclosure would assume, under the circumstances to be confidential), including information made available to DIP Agent or any DIP Lender in connection with a visit or investigation by

any Person contemplated in **Section 9.1.1** hereof, confidential from any Person other than their respective Affiliates and individuals employed or retained by DIP Agent or such DIP Lender (including any of their respective legal counsel, auditors or other professional advisors, and any professional advisors retained by any of their respective legal counsel) who are engaged in evaluating, approving, structuring, administering or otherwise giving professional advice with respect to the Chapter 11 Cases and any proceeding therein, any of the Revolver Loans or Collateral or in connection with any other debt or securities offering or any financial accommodation for Borrowers or any of their Affiliates and (ii) use such proprietary, nonpublic and/or confidential information of Borrowers only for the purpose of evaluating, appraising, structuring, administering, enforcing or otherwise giving professional advice with respect to any of the Revolver Loans or Collateral or in connection with any other debt or securities offering or any financial accommodation for Borrowers or any of their Affiliates, and for no other purpose; provided, however, that nothing herein shall prevent DIP Agent or any DIP Lender from disclosing such confidential information (i) to any party to this Agreement from time to time or any Participant, (ii) pursuant to the order of any court or administrative agency, (iii) upon the request or demand of any regulatory agency or authority having jurisdiction over DIP Agent or such DIP Lender, (iv) which has been publicly disclosed other than by an act or omission of DIP Agent or any DIP Lender except as permitted herein, (v) to the extent reasonably required in connection with any litigation, including the Chapter 11 Cases and any contested matter or adversary proceeding commenced in any of the Chapter 11 Cases (with respect to any of the DIP Loan Documents or any of the transactions contemplated thereby) to which DIP Agent, any DIP Lender or their respective Affiliates may be a party, (vi) to the extent reasonably required to comply with any provisions of the Bankruptcy Code, the Bankruptcy Rules or the Local Court Rules, (vii) to the extent reasonably required in connection with the exercise of any remedies hereunder, (viii) to any actual or proposed Participant, Assignee or other Transferee of all or part of a DIP Lender's rights hereunder so long as such Transferee has agreed in writing to be bound by the provisions of this Section, and (ix) to the National Association of Insurance Commissioners or any similar organization or to any nationally recognized rating agency that requires access to information about a Lender's portfolio in connection with ratings issued with respect to such Lender.  DIP Agent and DIP Lenders shall each be responsible for (i) any failure by any of its Affiliates and/or individuals employed or retained by it to treat any proprietary, nonpublic and/or confidential information of Borrowers confidentially and in accordance with this Agreement, and (ii) the use by any of its Affiliates and/or individuals employed or retained by it of any such proprietary, nonpublic and/or confidential information of Borrowers for any purpose other than the purposes permitted by this **Section 14.17**.

   **14.18.  Governing Law; Consent to Forum.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia; provided, however, that if any of the Collateral shall be located in any jurisdiction other than Georgia, the laws of such jurisdiction shall govern the method, manner and procedure for foreclosure of DIP Agent's Lien upon such Collateral and the enforcement of DIP Agent's other rights and remedies in respect of such Collateral to the extent that the laws of such jurisdiction are different from or inconsistent with the laws of the State of Georgia.  As part of the consideration for new value received, and regardless of any present or future domicile or principal place of business of Borrowers, any DIP Lender or DIP Agent, each Borrower hereby consents and agrees that the state courts for the State of Georgia, or, at DIP Agent's option, the United States District Court for the Northern District of Georgia, shall have**

jurisdiction to hear and determine any claims or disputes among any Borrower, DIP Agent and any DIP Lender pertaining to this Agreement or to any matter arising out of or related to this Agreement. Each Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Borrower hereby waives any objection that such Borrower may have based upon lack of personal jurisdiction, improper venue or <u>forum</u> <u>non</u> <u>conveniens</u> and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Each Borrower hereby waives personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaint and other process may be made by certified mail addressed to such Borrower at the address set forth in this Agreement and that service so made shall be deemed completed upon the earlier of such Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mail, proper postage prepaid. Nothing in this Agreement shall be deemed or operate to affect the right of DIP Agent to serve legal process in any other manner permitted by law, or to preclude the enforcement by DIP Agent of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction. Nothing herein shall limit the right of DIP Agent or any DIP Lender to bring proceedings against any Obligor in any other court, nor limit the right of any party to serve process in any other manner permitted by Applicable Law. Nothing in this Agreement shall be deemed to preclude enforcement by DIP Agent of any judgment or order obtained in any forum or jurisdiction.

14.19.  <u>Waivers by Borrowers</u>.  To the fullest extent permitted by Applicable Law, each Borrower waives (i) the right to trial by jury (which DIP Agent and each DIP Lender hereby also waives) in any action, suit, proceeding or counterclaim of any kind arising out of or related to any of the DIP Loan Documents, the Obligations or the Collateral; (ii) presentment, demand and protest and notice of presentment, notice of protest, notice of default (except as expressly required by the DIP Loan Documents), and notices of non payment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by DIP Agent on which such Borrower may in any way be liable; (iii) notice prior to taking possession or control of the Collateral or any bond or security which might be required by any court prior to allowing DIP Agent to exercise any of DIP Agent's remedies; (iv) the benefit of all valuation and appraisement laws; (v) any claim against DIP Agent or any DIP Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, DIP Loan Documents or transactions relating thereto; and (vi) notice of acceptance hereof. Each Borrower acknowledges that the foregoing waivers are a material inducement to DIP Agent's and each DIP Lender's entering into this Agreement and that DIP Agent and DIP Lenders are relying upon the foregoing waivers in their future dealings with Borrowers. Each Borrower warrants and represents that it has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**14.20.  Patriot Act Notice.**  DIP Agent and DIP Lenders hereby notify Borrowers that pursuant to the requirements of the Patriot Act, DIP Agent and DIP Lenders are required to obtain, verify and record information that identifies each Borrower, including its legal name, address, tax ID number and other information that will allow DIP Agent and DIP Lenders to identify such Borrower in accordance with the Patriot Act.  DIP Agent and DIP Lenders will also require information regarding each personal guarantor, if any, and may require information regarding each Borrower's management and owners, such as legal name, address, social security number and date of birth.   Each Borrower shall, promptly upon request, provide all documentation and other information as DIP Agent, Letter of Credit Issuer or any DIP Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

**14.21.  Cumulative Effect; Conflict of Terms.**   The provisions of the DIP Loan Documents are cumulative.  The parties acknowledge that the DIP Loan Documents may use several limitations, tests or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided.  Except as otherwise provided in another DIP Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another DIP Loan Document, the provision herein shall govern and control.

**14.22.  No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated by any DIP Loan Document, each Borrower acknowledges and agrees that (a)(i) the DIP Facility and any related services by DIP Agent, any DIP Lender or any of their Affiliates are arm's-length commercial transactions between such Borrower and such Person; (ii) such Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate; and (iii) such Borrower is capable of evaluating and understanding, and does understand and accept, the terms, risks and conditions of the transactions contemplated by the DIP Loan Documents; (b) each of DIP Agent, DIP Lenders, and their respective Affiliates has been and is acting, and will continue to act, solely as a principal in connection with the DIP Facility, is not the financial advisor, agent or fiduciary for such Borrower, any of its Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the DIP Loan Documents except as expressly set forth therein; and (c) DIP Agent, DIP Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Borrower and its Affiliates, and have no obligation to disclose any of such interests to such Borrower or its Affiliates.  To the fullest extent permitted by Applicable Law, each Borrower hereby waives and releases any claims that it may have against DIP Agent, DIP Lenders and any of their respective Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by a DIP Loan Document.

[SIGNATURES FOLLOW]

**IN WITNESS WHEREOF**, this Agreement has been duly executed on the day and year specified at the beginning of this Agreement.

<u>**BORROWERS**</u>:

**THE STANDARD REGISTER COMPANY**

By:_____
Name: Joseph P. Morgan, Jr._____
Title: President_____

**STANDARD REGISTER INTERNATIONAL, INC.**

By:_____
Name: Joseph P. Morgan, Jr_____
Title: President_____

**STANDARD REGISTER TECHNOLOGIES, INC.**

By:_____
Name: Joseph P. Morgan, Jr_____
Title: President_____

**IMEDCONSENT, LLC**

By:_____
Name: Joseph P. Morgan, Jr_____
Title: President_____

**STANDARD REGISTER OF PUERTO RICO INC.**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER HOLDING COMPANY**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER TECHNOLOGIES CANADA ULC**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER MEXICO HOLDING COMPANY**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: President _____

**STANDARD REGISTER HOLDING    S de R.L. de C.V.**

By:_____
Name: Joseph P. Morgan, Jr _____
Title: Sole Manager _____

[Signature Page to Post-Petition Loan and Security Agreement]

**STANDARD REGISTER de MEXICO, S de R.L. de C.V.**

By: _____

Name: Joseph P. Morgan, Jr _____

Title: Sole Manager _____

**STANDARD REGISTER SERVICIOS, S de R.L. de C.V.**

By: _____

Name: Joseph P. Morgan, Jr _____

Title: Sole Manager _____

[Signature Page to Post-Petition Loan and Security Agreement]

**DIP AGENT AND DIP LENDERS:**

**BANK OF AMERICA, N.A.**, as DIP Agent and
DIP Lender

By: _____

Name:  Andrew A. Doherty
Title: Senior Vice President

**WELLS FARGO BANK, NATIONAL
ASSOCIATION**, as DIP Lender

By:_____
Name:  Todd R. Nakamoto
Title:  Duly Authorized Signer

# APPENDIX A

# GENERAL DEFINITIONS

When used in the Post-Petition Loan and Security Agreement dated March 12, 2015 (as at any time amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), by and among **THE STANDARD REGISTER COMPANY**, an Ohio corporation ("SRC"), **STANDARD REGISTER INTERNATIONAL, INC.**, an Ohio corporation ("SRI"), **STANDARD REGISTER TECHNOLOGIES, INC.**, an Ohio corporation ("SRT"), **IMEDCONSENT, LLC**, a Delaware limited liability company ("iMed"), and **STANDARD REGISTER OF PUERTO RICO INC**, f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation  ("SRPR"); **STANDARD REGISTER HOLDING COMPANY**, an Ohio corporation ("SR Holding"); **STANDARD REGISTER MEXICO HOLDING COMPANY**, an Ohio corporation ("SR MX Holdco"); **STANDARD REGISTER TECHNOLOGIES CANADA ULC**, an unlimited company organized under the laws of Nova Scotia ("SR Canada"); **STANDARD REGISTER HOLDINGS, S de R.L. de C.V.**, a limited liability company organized under the laws of Mexico ("SR MX Holdings"); **STANDARD REGISTER de MEXICO, S de R.L. de C.V.**, a limited liability company organized under the laws of Mexico ("SR Mexico"); **STANDARD REGISTER SERVICIOS, S de R.L. de C.V.**, a limited liability company organized under the laws of Mexico ("SR Servicios", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico; each a "Borrower" and collectively, "Borrowers"), each financial institution listed on the signature pages attached thereto and its successors and assigns which become "DIP Lenders" as provided therein (such financial institutions and their respective successors and assigns referred to collectively herein as "DIP Lenders" and individually as a "DIP Lender"), and **BANK OF AMERICA, N.A.** ("DIP Agent"), in its capacity as collateral and administrative agent for itself and the Lenders, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

ABL Priority Collateral – collectively, (i) the Pre-Petition ABL Priority Collateral and (ii) all "ABL Priority Collateral" as defined in the DIP ABL/Term Loan Intercreditor Agreement.

Acceptable Plan - a Chapter 11 Plan that provides for allowance of all Claims in favor of DIP Agent and DIP Lenders as fully secured Claims; Full Payment of all Pre-Petition ABL Obligations and Obligations on the effective date of such Chapter 11 Plan; an effective date no later than forty-five (45) days after the date of entry of the Confirmation Order with respect to such Chapter 11 Plan; and a full and complete release of any and all claims that each Borrower or its Estate might have or assert against DIP Agent or any DIP Lender (whether arising prior to or after the Petition Date), including all claims that arise under any provision in Chapter 5 of the Bankruptcy Code; or which is otherwise acceptable to DIP Agent and DIP Lenders in their sole and absolute discretion.

Accounts Formula Amount - on any date of determination thereof for the applicable calculation period, an amount equal to 85% of the Value of Eligible Billed Accounts on such date plus 85% of the Value of Eligible Unbilled Accounts; provided that (a) the Value of Eligible Unbilled Accounts in any calculation of the Borrowing Base shall not exceed the lesser of (i) $37,500,000 or (ii) 33.3% of the Value of the Eligible Billed Accounts included in the

1

Borrowing Base for the immediately preceding month (or other then applicable calculation period) and (b)(i) the Value of Eligible Billed Accounts consisting of Undocumented Invoice & Storage Accounts that are added to the Borrowing Base in any calendar month shall not exceed $6,000,000, (ii) the Value of Eligible Billed Accounts consisting of Undocumented Invoice & Storage Accounts that are added to the Borrowing Base at any one time shall not exceed $18,000,000 and (iii) all Undocumented Invoice & Storage Accounts added to the Borrowing Base in any prior calendar months having a Value in excess of $6,000,000 shall be removed from the Borrowing Base after a period of ninety (90) days following the inclusion thereof.

Acquisition - any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (ii) the acquisition of in excess of 50% of the Equity Interests of any Person, or otherwise causing any Person to become a Subsidiary or (iii) a merger or consolidation or any other combination with another Person (other than with a Person that is a Subsidiary); provided that a Borrower is the surviving entity.

Affiliate - a Person (other than a Subsidiary):  (i) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, another Person; (ii) which beneficially owns or holds 10% or more of any class of the Equity Interests of a Person; or (iii) 10% or more of the Equity Interests with power to vote of which is beneficially owned or held by another Person or a Subsidiary of another Person.  For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of any Equity Interest, by contract or otherwise.  Except that, with respect to SRC, the applicable percentage for determining this status shall be 20%, not 10%.

Agreement - the Post-Petition Loan and Security Agreement referred to in the first sentence of this **Appendix A**, all Exhibits and Schedules thereto and this **Appendix A**, including any amendments, modifications, restatements or supplements thereof or thereto.

Anti-Terrorism Laws – any laws relating to terrorism or money laundering, including the Patriot Act.

Applicable Law - all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, DIP Loan Document or Material Contract in question, including all applicable common law and equitable principles; all provisions of all applicable local, state, federal and foreign constitutions, statutes, codes, ordinances, rules, regulations, orders, decrees and judgments of Governmental Authorities; orders, judgments and decrees of all arbitrators; and all consent orders, judgments and decrees having the force of law.

Applicable Margin - a percentage equal to 1.25% with respect to Revolver Loans that are Base Rate Loans, 2.25% with respect to Revolver Loans that are LIBOR Loans, and 2.25% with respect to the Letter of Credit Fee Percentage.

Applicable Unused Commitment Margin – for any month, 0.50%.

Approved Insurer – any independent insurer with a minimum general policyholder rating of "A" and a minimum financial rating of "7" published in *Best's Key Rating Guide* and/or

2

*Best's Insurance Reports* issued by the A. M. Best Company or any successor nationally recognized rating organization.

Asset Disposition - a sale, lease, license, consignment, transfer or other disposition of Property of any Borrower, including a disposition of Property in connection with a sale-leaseback transaction or Synthetic Lease.

Assignment and Acceptance - an assignment and acceptance entered into by a DIP Lender and an Eligible Assignee and accepted by DIP Agent, in the form of **Exhibit E** or otherwise satisfactory to DIP Agent.

Availability - on any date, the amount that U.S. Borrowers are entitled to borrow as Revolver Loans on such date, such amount being the difference derived when the sum of the principal amount of Revolver Loans then outstanding (including any amounts that DIP Agent or DIP Lenders may have paid for the account of Borrowers pursuant to any of the DIP Loan Documents and that have not been reimbursed by Borrowers and any outstanding Settlement Loans) is subtracted from the Borrowing Base on such date.  If the amount outstanding is equal to or greater than the Borrowing Base, Availability is zero.

Availability Reserve - on any date of determination thereof, an amount equal to the sum of the following (without duplication):   (i) the Inventory Reserve; (ii) the Letter of Credit Reserve; (iii) the Bank Product Reserve; (iv) the Rent and Charges Reserve; (v) the Dilution Reserve; (vi) the Pre-Petition ABL Obligations Reserve; (vii) mandatory prepayments pursuant to **Section 4.3** hereof; and (viii) such additional reserves as DIP Agent in its Permitted Discretion may elect to impose from time to time.

Average Revolver Loan Balance – for any month, the amount obtained by adding the aggregate of the unpaid balance of the Pre-Petition ABL Obligations, Revolver Loans and Letter of Credit Outstandings at the end of each day during such month and by dividing such sum by the number of days in such month.

Avoidance Actions - means Borrowers' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

Bank Product - any of the following products, services or facilities extended after the Petition Date to any Borrower or Subsidiary by a DIP Lender or any of its Affiliates: (i) Cash Management Services; (ii) products under Hedge Agreements; (iii) commercial credit card and merchant card services; (iv) credit cards, debit cards and purchase cards; and (v) other banking products or services as may be requested by any Borrower or Subsidiary, other than Letters of Credit.

Bank Product Obligations - Debt, obligations and other liabilities with respect to Bank Products owing by a Borrower or Subsidiary to a Bank Product Provider; provided, that Bank Product Obligations of an Obligor shall not include its Excluded Swap Obligations.

3

Bank Product Provider - (a) BofA or any of its Affiliates; and (b) any other DIP Lender or Affiliate of a DIP Lender that is providing a Bank Product, provided such provider delivers written notice to DIP Agent, in form and substance satisfactory to DIP Agent, within ten (10) days following the later of the Closing Date or creation of the Bank Product, (i) describing the Bank Product and setting forth the maximum amount to be secured by the Collateral and the methodology to be used in calculating such amount, and (ii) agreeing to be bound by **Section 12.19** of the Agreement.

Bank Product Reserve - as of any date of determination, the aggregate amount of reserves established by DIP Agent from time to time in its discretion in respect of Bank Product Obligations.

Bankruptcy Code - title 11 of the United States Code.

Bankruptcy Rules – the Federal Rules of Bankruptcy Procedure.

Base Rate - on any day, a per annum rate equal to the greater of (i) the Prime Rate for such day; (ii) the Federal Funds Rate for such day, plus 0.50%; or (iii) the LIBOR Rate for a one month interest period as determined on such day, plus 1.00%.

Board of Governors - the Board of Governors of the Federal Reserve System.

BofA – Bank of America, N.A. and its successors and assigns.

BofA Indemnitees - BofA and its officers, directors, employees, Affiliates, agents and attorneys.

Borrower Materials – as defined in **Section 9.1.4** of the Agreement.

Borrowers' Knowledge – the actual knowledge of a Senior Officer of a Borrower, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates.

Borrowing - a borrowing consisting of Revolver Loans of one Type made on the same day by DIP Lenders (or by BofA in the case of a Borrowing funded by Settlement Loans) or a conversion of a Revolver Loan or Loans of one Type from DIP Lenders on the same day.

Borrowing Base - on any date of determination thereof, an amount equal to the lesser of: (i) the aggregate amount of the Commitments on such date minus the sum of (x) the Pre-Petition ABL Obligations Reserve on such date and (y) the Letter of Credit Outstandings on such date, or (ii) an amount equal to (a) the sum of the Accounts Formula Amount on such date plus (b) the Inventory Formula Amount, minus in each of clauses (i) and (ii), the Availability Reserve on such date.

Borrowing Base Certificate - a certificate, in the form attached as **Exhibit I**, by which Borrowers shall certify to DIP Agent and DIP Lenders, with such frequency as set forth in

**Section 7.5**, the amount of the Borrowing Base as of the date of the certificate and the calculation of such amount.

Business Day - any day excluding Saturday, Sunday and any other day that is a legal holiday under the laws of the State of Georgia or North Carolina or is a day on which banking institutions located in such state are closed; provided, however, that when used with reference to a LIBOR Loan (including the making, continuing, prepaying or repaying of any LIBOR Loan), the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits on the London interbank market.

Capitalized Lease Obligation - any Debt represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

Carve-Out - shall have the meaning given to it in the Interim DIP Financing Order (or, when applicable, the Final DIP Financing Order).

Cash Collateral - cash or Cash Equivalents, and any interest or other income earned thereon, that constitutes Collateral or proceeds of Collateral or is delivered to DIP Agent to Cash Collateralize any Obligations and as security for the Obligations to the extent provided in the Agreement.

Cash Collateral Account - a demand deposit, money market or other account established by DIP Agent at such financial institution as DIP Agent may select in its discretion, which account shall be in DIP Agent's name and subject to a Lien in favor of DIP Agent for the benefit of DIP Secured Parties.

Cash Collateralize, Cash Collateralized or Cash Collateralization - the delivery of cash to DIP Agent, as security for the payment of Obligations, in an amount equal to (i) with respect to Letter of Credit Outstandings, 105% of the aggregate Letter of Credit Outstandings, and (b) with respect to any inchoate, contingent or other Obligations (including Bank Product Obligations), 105% of DIP Agent's good faith estimate of the amount due or to become due, including fees, expenses and indemnification hereunder.

Cash Equivalents - (i) marketable direct obligations issued or unconditionally guaranteed by the United States government and backed by the full faith and credit of the United States government having maturities of not more than 12 months from the date of acquisition; (ii) domestic certificates of deposit and time deposits having maturities of not more than 12 months from the date of acquisition, bankers' acceptances having maturities of not more than 12 months from the date of acquisition and overnight bank deposits, in each case issued by BofA or any commercial bank organized under the laws of the United States, any state thereof or the District of Columbia, which at the time of acquisition are rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and (unless issued by a DIP Lender) not subject to offset rights in favor of such bank arising from any banking relationship with such bank; (iii) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (i) and (ii) entered into with any bank described in clause (ii) above; and (iv) commercial paper issued by BofA or having at the time of investment therein or a contractual commitment to invest

therein a rating of A-1 (or better) by S&P or P-1 (or better) by Moody's, and having a maturity within 9 months after the date of acquisition thereof.

Cash Management Order - a "first day order" presented to the Court at or about the time of the commencement of the Chapter 11 Cases that authorizes the continuation of Borrowers' Pre-Petition cash management relationship with DIP Agent, PNC Bank, Fifth Third Bank, First Citizens Bank, KeyBank and any other banks identified in such order (collectively, the "Cash Management Banks"), which order shall include, among other things, provisions authorizing each Cash Management Bank, in the Ordinary Course of Business, to set off against Deposit Accounts maintained by any Borrower with such Cash Management Bank all fees and expenses for cash management services provided to such Borrower by such Cash Management Bank, Bank Products, analysis charges and other fees and expenses arising or incurred in connection therewith, in each case whether the foregoing are incurred or arise before or after the Petition Date, and which order shall be in form and substance satisfactory to each such Cash Management Bank in its sole and absolute discretion.

Cash Management Services - any services provided from time to time by any DIP Lender or any of its Affiliates to any Borrower or Subsidiary in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox and stop payment services.

CERCLA - the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq. and its implementing regulations.

Change in Law - the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

Change of Control - the occurrence of any of the following events after the date of the Agreement: (a) any Person or group shall own beneficially (as defined in Rule 13d-3 of the SEC under the Exchange Act or any successor provision thereto) more than 50% of the aggregate Voting Power of SRC (other than an ownership by any Person or group who beneficially own in excess of 30% of the aggregate Voting Power of SRC on the date hereof); (b) any "Change of Control," "Change in Control" or similar event or circumstance, however defined or designated, under the Pre-Petition Term Loan Documents or under any other agreement or document governing any Debt with an aggregate principal amount in excess of $5,000,000 shall occur; (c) the first day on which a majority of the members of the Board of Directors of SRC are not Continuing Directors; or (d) the sale of all, or substantially all, the assets of Borrowers (on a consolidated basis) to any other Persons.

Chapter 11 Cases - as defined in the recitals to the Agreement.

Chapter 11 Plan - a plan of reorganization or liquidation filed in any of the Chapter 11 Cases under Section 1121 of the Bankruptcy Code.

Claims - any and all claims, demands, liabilities, obligations, losses, damages, penalties, actions, interest, judgments, suits, awards, remedial response costs, expenses or disbursements of any kind or nature whatsoever (including reasonable attorneys', accountants', consultants' or paralegals' fees and expenses and Extraordinary Expenses) at any time (including after Full Payment of the Obligations, replacement of DIP Agent or any DIP Lender, or the Petition Date) incurred by any DIP Indemnitee or asserted against any DIP Indemnitee by any Obligor or other Person, in any way relating to (a) any Revolver Loans, Letters of Credit, DIP Loan Documents, Borrower Materials, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any DIP Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any DIP Loan Documents or Applicable Law, (e) failure by any Obligor to perform or observe any terms of any DIP Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto, (f) any actual or alleged Environmental Release on or from any property owned or operated by any Borrower or any Subsidiary and any other liability arising under any Environmental Law relating to any Borrower or any Subsidiary and their respective Property, or (g) any of the Chapter 11 Cases.

Closing Date - the date on which all the conditions precedent set forth in **Section 10** of the Agreement are satisfied or waived by the Required DIP Lenders in writing (which, in no event, shall be more than three (3) Business Days following the date the Court enters the Interim DIP Financing Order (or such later date as DIP Agent shall agree in its sole discretion)).

Code – the Internal Revenue Code of 1986.

Collateral – all of the Property and interests in Property in which a security interest is granted in **Sections 6.1, 6.2**, **6.3** and **6.4** of the Agreement and all Property described in any DIP Security Document as security for the payment or performance of any of the Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations, whether or not such Property or interest in Property was in existence on or was created, acquired or arose after the Petition Date; and all Property in which a Lien is granted in any of the DIP Financing Orders as security for the payment or performance of any of the Obligations, whether or not such Property or interest in Property was in existence on or acquired by a Borrower after the Petition Date, including the ABL Priority Collateral.

Commitment - at any date for any DIP Lender, the obligation of such DIP Lender to make Revolver Loans and to purchase participations in Letter of Credit Outstandings pursuant to the terms and conditions of this Agreement, which shall not exceed the principal amount set forth opposite such DIP Lender's name under the heading "Commitment" on **Schedule 1.1** hereto or the signature page of the Assignment and Acceptance by which it became a DIP Lender, as modified from time to time pursuant to the terms of this Agreement or to give effect to any applicable Assignment and Acceptance.

<u>Commitments</u> - the aggregate principal amount of the Commitments of all DIP Lenders, the maximum amount of which shall be $125,000,000.

<u>Commitment Termination Date</u> - the date that is the soonest to occur of (i) the Revolver Maturity Date; (ii) thirty (30) days after the entry of the Interim DIP Financing Order if the Final DIP Financing Order has not been entered on or before such date; (iii) the date on which a Borrower terminates the Commitments pursuant to **Section 5.2.1** of the Agreement; (iv) the date on which the Commitments are terminated pursuant to **Section 11.2.2** of the Agreement; (v) the effective date of any confirmed Acceptable Plan or the date of entry of a Confirmation Order with respect to any other Chapter 11 Plan; (vi) the date of filing by any Borrower of a Chapter 11 Plan that is not an Acceptable Plan; (vii) the date of entry of a Confirmation Order with respect to a Chapter 11 Plan filed by a Person other than a Borrower if such Chapter 11 Plan is not an Acceptable Plan; (viii) the effective date of any sale of all or substantially all of the Collateral; (ix) the date on which DIP Agent is granted relief from the automatic stay (after giving effect to any notice required for DIP Agent to enforce its Liens as described in any DIP Financing Order); or (x) the date on which any of the Chapter 11 Cases are dismissed or converted by the Court.

<u>Committee</u> - an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

<u>Commodity Exchange Act</u> - the Commodity Exchange Act (7 U.S.C. §§ 1 <u>et</u> <u>seq.</u>), as amended from time to time, and any successor statute.

<u>Compliance Certificate</u> - a Compliance Certificate to be provided by Borrowers to DIP Agent in accordance with, and in the form annexed as **<u>Exhibit D</u>** to, the Agreement, and the supporting schedules to be annexed thereto.

<u>Confirmation Order</u> - an order entered by the Court confirming a Chapter 11 Plan in any of the Chapter 11 Cases.

<u>Connection Income Taxes</u> - Other Connection Taxes that are imposed on or measured by net income (however denominated), or are franchise or branch profits Taxes.

<u>Consolidated</u> - the consolidation in accordance with GAAP of the accounts or other items as to which such term applies.

<u>Contingent Obligation</u> - with respect to any Person, any obligation of such Person arising from any guaranty, indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take or pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligations or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the

8

primary obligor, (C) to purchase Property, Securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

Continuing Director - at any date, an individual (a) who is a member of the Board of Directors of SRC on the date hereof, (b) who, as at such date, has been a member of such Board of Directors for at least the twelve preceding months, or (c) who has been nominated to be a member of such Board of Directors by a majority of the other Continuing Directors then in office.

Control or controlled by or under common control - possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of Voting Stock, by contract or otherwise, but not solely by being an officer or director of that Person); provided, however, that in any event any Person which beneficially owns, directly or indirectly, 10% or more (in number of votes) of the Equity Interests having ordinary Voting Power with respect to a corporation shall be conclusively presumed to control such corporation.

Copyrights - all copyrights, whether registered or unregistered and whether published or unpublished, in force under the laws of the United States, any other country or any political subdivision thereof, including all copyrights registered in the United States Copyright Office or in any office or agency of the United States of America, or any State thereof or any other country or any political subdivision thereof, or otherwise, and registrations and recordings thereof and all applications for registration thereof, whether pending or in preparation, and all copyright licenses.

Court - shall have the meaning ascribed to such term in the recitals of the Agreement.

CWA - the Clean Water Act, 33 U.S.C. §§ 1251 et seq.

Debt - as applied to a Person means, without duplication: (i) all items which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person as of the date as of which Debt is to be determined, including Capitalized Lease Obligations; (ii) all Contingent Obligations of such Person; (iii) all reimbursement obligations in connection with letters of credit or letter of credit guaranties issued for the account of such Person; (iv) in the case of Borrowers (without duplication), the Obligations; (v) all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person; (vi) net obligations of such Person under any Hedge Agreement; (vii) whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (including

9

all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person) (excluding trade accounts payable in the Ordinary Course of Business and not outstanding for more than 120 days after such payable was due unless, if such payable is outstanding more than 120 days after such payable was due, they are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted) of the date of purchase of such goods and services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to Property used or acquired by such Person), and indebtedness secured by (or for which the holder of such debt has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including debt arising under conditional sales or other title retention agreements), whether or not such debt shall have been assumed by such Person or is limited in recourse; (viii) obligations arising under Synthetic Leases; (ix) all Disqualified Equity Interests of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.  The Debt of a Person shall include any recourse Debt of any partnership or joint venture in which such Person is a general partner or joint venturer.

Default - an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

Default Rate - on any date, a fluctuating rate per annum which is equal to the Base Rate in effect for such date plus the Applicable Margin plus 2.0% with respect to the principal amount of the Obligations bearing interest as a Base Rate Loan and (ii) the applicable LIBOR Rate in effect on such date for each LIBOR Loan outstanding plus the Applicable Margin plus 2.0%.

Defaulting DIP Lender – any DIP Lender that (a) has failed to comply with its funding obligations hereunder, and such failure is not cured within two (2) Business Days; (b) has failed to pay to DIP Agent or any DIP Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due; (c) has notified DIP Agent or any Borrower that such DIP Lender does not intend to comply with its funding obligations hereunder or under any other credit facility, or has made a public statement to that effect; (d) has failed, within three (3) Business Days following request by DIP Agent or any Borrower, to confirm in a manner satisfactory to DIP Agent and Borrowers that such DIP Lender will comply with its funding obligations hereunder; or (e) has, or has a direct or indirect parent company that has, become the subject of an Insolvency Proceeding (including reorganization, liquidation, or appointment of a receiver, custodian, administrator or similar Person by the Federal Deposit Insurance Corporation or any other regulatory authority); provided, however, that a DIP Lender shall not be a Defaulting DIP Lender solely by virtue of a Governmental Authority's ownership of an equity interest in such DIP Lender or parent company unless the ownership provides immunity for such DIP Lender from jurisdiction of courts within the United States or from enforcement of judgments or writs of attachment on its assets, or permits such DIP Lender or Governmental Authority to repudiate or otherwise to reject such DIP Lender's agreements.

Delayed Draw Term DIP Loan – one or more advances made by Term DIP Lenders from time to time to any Borrower in accordance with the Term DIP Loan Agreement, up to an aggregate amount of $30,000,000.

Designated Jurisdiction - any country or territory that is the subject of any Sanction.

Deposit Account – each of a Person's demand, time, savings, passbook, money market or other depository accounts, and all certificates of deposit, maintained by such Person with any bank, savings and loan association, credit union or other depository institution.

Dilution Percent - the percent, determined for Borrowers' most recent Fiscal Quarter, equal to (a) bad debt write-downs or write-offs, discounts, returns, promotions, credits, credit memos and other dilutive items with respect to Accounts, divided by (b) gross sales.

Dilution Reserve – on any date an amount equal to the outstanding amount of Eligible Accounts on such date multiplied by a percentage that is equal to each percentage point (or part thereof) that the Dilution Percent on such date exceeds 5% (for example, if the Dilution Percent on such date is 6.5%, then the applicable percentage of the multiplier in calculating the Dilution Reserve would be 1.5%).

DIP ABL/Term Loan Intercreditor Agreement - that certain ABL/TL DIP Intercreditor Agreement dated as of March 12, 2015, by and among DIP Agent, Term DIP Agent, certain Borrowers, and the other parties from time to time party thereto, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

DIP Agent - as defined in the recitals to the Agreement, and includes any successor agent.

DIP Agent Indemnitees – DIP Agent in its capacity as collateral and administrative agent for DIP Lenders under the DIP Loan Documents and all of DIP Agent's present and future Affiliates, officers, directors, employees, agents and attorneys.

DIP Agent Professionals - attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by DIP Agent in connection with any of the DIP Loan Documents, any of the transactions contemplated or effected thereunder, or any of the Chapter 11 Cases.

DIP Budget - as applicable, (a) an initial 13-week cash forecast and budget commencing with the week during which the Petition Date occurs, of Borrowers' and their Subsidiaries' consolidated projected  (i) cash receipts and cash operating disbursements for such 13-week period, on a weekly basis, (which such forecasts of cash receipts and cash operating disbursements shall be in form and substance satisfactory to DIP Agent (after reasonable consultation with Required DIP Lenders)), (ii) operating cash flow for such 13-week period, and (iii) a statement of the actual amounts of each line item for the preceding two (2) weeks together with a variance analysis from the previously delivered DIP Budget, together with an explanation of any material variances or material prospective changes to such DIP Budget, (b) back up schedules and supporting information consistent with past practice, and (c) an updated DIP Budget for each successive 13-week period thereafter, which shall, in each case, include detailed

line item receipts and expenditures, including the amount of Professional Fees and expenses for each Professional Person, together with appropriate supporting schedules and information. The DIP Budget (including, for the avoidance of doubt, the initial DIP Budget and any updated DIP Budget) shall be in form and substance acceptable to DIP Agent. The DIP Budget in effect on the Closing Date is attached to the Interim DIP Financing Order.

DIP Facility - the credit facility established by DIP Agent, DIP Lenders and Letter of Credit Issuer in favor of Borrowers in accordance with the Agreement and pursuant to which the Commitments are established.

DIP Financing Motion - the motion of Borrowers filed with the Court seeking approval of the DIP Facility and entry of the DIP Financing Orders.

DIP Financing Orders - collectively, the Interim DIP Financing Order and the Final DIP Financing Order.

DIP Indemnitees - DIP Agent Indemnitees, DIP Lender Indemnitees, and BofA Indemnitees.

DIP Lender Indemnitees – each DIP Lender, each Bank Product Provider and each of their respective officers, directors, employees, Affiliates, agents and attorneys.

DIP Lenders – the Persons defined as "DIP Lenders" in the preamble to the Agreement, BofA (whether in its capacity as a provider of Revolver Loans under **Section 1** of the Agreement or as the provider of Settlement Loans under **Section 3.1.3** of the Agreement), and any other Person who may from time to time become a "DIP Lender" under the Agreement, and their respective successors and permitted assigns.

DIP Loan Documents - the Agreement, any Other DIP Agreements, and any DIP Security Documents.

DIP Secured Parties - DIP Agent, DIP Lenders, Letter of Credit Issuer, and Bank Product Providers after the Petition Date.

DIP Security Documents - collectively, the Agreement as it relates to a security interest in the Collateral, and all other mortgage instruments, security agreements or similar instruments heretofore or hereafter executed by any Borrower or other Person and granting to DIP Agent, for the benefit of DIP Secured Parties, a Lien upon any Collateral to secure any of the Obligations.

Disbursements - for any period, the aggregate amount of all payments made by Borrower (and with respect to Professional Fees not yet paid pending approval of the Court, incurred by the Estate) during such period.

Disqualified Equity Interests - any Equity Interests which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change in control or asset sale so long as any right of the holders thereof

upon the occurrence of a change in control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are then accrued and payable), in each case, prior to the date that is ninety-one (91) days after the Commitment Termination Date, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, prior to the date that is ninety-one (91) days after the Commitment Termination Date, except as a result of a change in control or an asset sale or the death, disability, retirement, severance or termination of employment or service of a holder who is an employee or director of a Borrower or a Subsidiary, in each case so long as any such right of the holder (1) is not effective during the continuance of an Event of Default and is not effective to the extent that such redemption would result in a Default or an Event of Default or (2) is subject to the prior repayment in full of the Revolver Loans and all other Obligations that are then accrued and payable, (c) requires the payment of any cash dividend or any other scheduled cash payment constituting a return of capital, in each case, prior to the date that is ninety-one (91) days after the Commitment Termination Date, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Commitment Termination Date; provided that if such Equity Interests are issued to any plan for the benefit of employees of any Borrower or its Subsidiary or by any such plan to such employees, such Equity Interests shall not constitute a Disqualified Equity Interests solely because they may be required to be repurchased by any Borrower or its Subsidiary in order to satisfy applicable statutory or regulatory obligations.

Distribution - in respect of any entity, (i) any declaration or payment of any dividends, interest or other distributions on Equity Interests of the entity (except distributions in such Equity Interests), (ii) any distribution, advance or repayment of Debt to a holder of Equity Interests, and (ii) any purchase, redemption or other acquisition or retirement for value of any Equity Interests of the entity or any Affiliate of the entity unless made contemporaneously from the net proceeds of the sale of Equity Interests.

Document - shall have the meaning given to "document" in the UCC to the extent such meaning relates to Inventory.

Documented Invoice & Storage Accounts - Invoice & Storage Accounts for which (a) a bill-and-hold agreement has been executed and delivered to DIP Agent by the applicable U.S. Borrower and the Account Debtor, in form and substance satisfactory to DIP Agent, or (b) the related underlying storage agreement between the applicable U.S. Borrower and the Account Debtor, in form and substance satisfactory to DIP Agent.

Dollars and the sign $ - lawful money of the United States of America.

Domestic Subsidiary - a Subsidiary of a Borrower (other than a Subsidiary that is a Borrower) that is incorporated under the laws of a state of the United States or the District of Columbia.

Dominion Account – a Deposit Account established by a Borrower at BofA or another bank acceptable to DIP Agent, into which the proceeds from any Collateral may be collected or

concentrated from time to time and over which DIP Agent has exclusive control for withdrawal purposes.

Eligible Account - an Account which arises in the Ordinary Course of Business of a U.S. Borrower's business from the sale of Inventory or rendition of services, is payable in Dollars, is subject to DIP Agent's duly perfected Lien, and is deemed by DIP Agent, in its reasonable credit judgment, to be an Eligible Account.  Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:  (i) it arises out of a sale made or services rendered by a U.S. Borrower to a Subsidiary or an Affiliate of any U.S. Borrower or to a Person controlled by an Affiliate of any U.S. Borrower; (ii) (A) for any Account, other than an Account of a Specified Account Debtor, it is due or unpaid more than ninety (90) days after the original invoice date, or (B) for any Account of a Specified Account Debtor, it is due or unpaid more than 120 days after the original invoice date; provided that all such Accounts  of a Specified Account Debtor due or unpaid more than ninety (90) days but less than 120 days after the original invoice date shall not to exceed $4,000,000 at any time; (iii) 50% or more of the Accounts from the Account Debtor are not deemed Eligible Accounts hereunder; (iv) the total unpaid Accounts of the Account Debtor exceed 20% of the aggregate amount of all Eligible Accounts, in each case to the extent of such excess; (v) any covenant, representation or warranty contained in the Agreement has been breached; (vi) the Account Debtor is also a U.S. Borrower's creditor (other than DIP Lenders) or supplier, or the Account Debtor has disputed liability with respect to such Account, or the Account Debtor has made any claim with respect to any other Account due from such Account Debtor to a U.S. Borrower, or the Account otherwise is or may become subject to any right of setoff, counterclaim, reserve or chargeback, provided that, the Accounts of any such U.S. Account Debtor shall be ineligible only to the extent of such offset, counterclaim, disputed amount, reserve or chargeback; (vii) an Insolvency Proceeding has been commenced by or against the Account Debtor or the Account Debtor has failed, suspended business or ceased to be Solvent, or is subject to Sanctions or any specially designated nationals list maintained by OFAC; or the U.S. Borrower is not able to bring suit or enforce remedies against the Account Debtor through judicial process; (viii) the invoice relating thereto is sent to a location outside the United States of America, Puerto Rico or Canada; (ix) it arises from a sale to the Account Debtor on a bill and hold, guaranteed sale, sale or return, sale on approval, consignment or any other repurchase or return basis (other than Invoice & Storage Accounts); (x) the Account Debtor is the United States of America or any department, agency or instrumentality thereof unless U.S. Borrowers have complied with all federal assignment of claims laws with respect thereto; (xi) the Account Debtor is located in any state which imposes conditions on the right of a creditor to collect accounts receivable unless such U.S. Borrower has either qualified to transact business in such state as a foreign entity or filed a Notice of Business Activities Report or other required report with the appropriate officials in such state for the then current year; (xii) the Account Debtor is located in a state in which such U.S. Borrower is deemed to be doing business under the laws of such state and which denies creditors access to its courts in the absence of qualification to transact business in such state or of the filing of any reports with such state, unless such U.S. Borrower has qualified as a foreign entity authorized to transact business in such state or has filed all required reports; (xiii) the Account is subject to a Lien other than a Permitted Lien; (xiv) the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by such U.S. Borrower and accepted by the Account Debtor or the Account otherwise does not represent a final sale or a final rendition of services (other than Invoice & Storage

Accounts); (xv) the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment; (xvi) the Account represents a progress billing or a retainage (other than Invoice & Storage Accounts); (xvii) such U.S. Borrower has made any agreement with the Account Debtor for any deduction therefrom, except for discounts or allowances granted by any U.S. Borrower for prompt payment or otherwise made in the Ordinary Course of Business and which discounts or allowances are reflected in the calculation of the face value of each invoice related to such Account; (xviii) the Account is an Account acquired pursuant to an Acquisition unless DIP Agent has completed a field audit and examination with respect to such Account and has satisfied itself that such Account should be treated as an Eligible Account; (xix) a performance bond supports the obligations of a U.S. Borrower with respect to an Account (other than performance bonds supported by a Letter of Credit); or (xx) the Account represents, in whole or in part, a billing for interest, fees or late charges; provided that such Account shall be ineligible only to the extent of the amount of such billing.

Eligible Assignee - a Person that is (a) a DIP Lender or Affiliate of a DIP Lender; (b) a financial institution approved by DIP Agent in its discretion that extends revolving credit facilities of this type in its ordinary course of business; and (c) Silver Point Finance, LLC or its designee.

Eligible Billed Accounts – all Eligible Accounts other than Eligible Unbilled Accounts.

Eligible Inventory - Inventory owned by a U.S. Borrower that DIP Agent, in its reasonable credit judgment, deems to be Eligible Inventory.  Without limiting the foregoing, no Inventory shall be Eligible Inventory unless it (i) is finished goods or raw materials, and not work-in-process, packaging or shipping materials, shipping labels, samples, display items, bags, replacement parts or manufacturing supplies; (ii) is not held on consignment (other than consigned Inventory for which Required Consignee Documentation has been delivered to DIP Agent; provided that the amount of all such consigned Inventory that may be included as Eligible Inventory shall not exceed $500,000 in the aggregate at any time) nor subject to any deposit or downpayment; (iii) is in new and saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale; (iv) is not slow-moving, perishable, obsolete or unmerchantable, and does not constitute returned or repossessed goods; (v) meets all standards imposed by any Governmental Authority, has not been acquired from an entity subject to Sanctions or any specially designated nationals list maintained by OFAC, and does not constitute hazardous materials under any Environmental Law; (vi) conforms with the covenants and representations herein; (vii) is subject to DIP Agent's duly perfected, first priority Lien, and no other Lien; (viii) is within the continental United States, Puerto Rico or Canada, is not in transit except between locations of Borrowers, and is not consigned to any Person; (ix) is not subject to any warehouse receipt or negotiable Document; (x) is not located on leased premises or in the possession of a warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person, unless the lessor or such Person has delivered a Lien Waiver with respect to the Pre-Petition ABL Loan Agreement or an appropriate Rent and Charges Reserve has been established; (xi) to the extent the manufacture, sale, distribution or disposition of such Inventory is in any manner governed by or subject to a License Agreement, such License Agreement in full force and effect; and (xii) is not subject to any License Agreement or other arrangement that restricts DIP Agent's right to manufacture, sell, distribute or otherwise dispose of such Inventory unless (A) the customer with respect to such Inventory is contractually obligated to purchase such Inventory or

15

(B) the aggregate amount of Inventory that is subject to such License Agreement or other arrangement does not exceed $500,000 at any time.

Eligible Unbilled Accounts – Eligible Accounts which (i) have been earned by a U.S. Borrower's shipment of goods to an Account Debtor and which are accrued on a U.S. Borrower's books and records but which have not been billed by such U.S. Borrower (provided that such U.S. Borrower retains the right to bill the applicable Account Debtor at any time, to the extent it is permitted to do so pursuant to the underlying customer agreement), (ii) are evidenced by a purchase order from the Account Debtor, (iii) are reflected on such U.S. Borrower's books and records in form reasonably satisfactory to DIP Agent, (iv) remain unbilled for no longer than the earlier of (a) thirty (30) days after the date on which such U.S. Borrower's right to payment under such Eligible Accounts was earned or (b) thirty (30) days after the date on which such Eligible Accounts were first included in the Borrowing Base, and (v) DIP Agent determines to be Eligible Unbilled Accounts in its reasonable credit judgment.

Enforcement Action – any action to enforce any Obligations (other than Bank Product Obligations) or DIP Loan Documents or to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, setoff or recoupment, credit bid, action in an Obligor's Insolvency Proceeding, or otherwise).

Environmental Agreement - each agreement of any Borrower with respect to any Real Estate, pursuant to which such Borrower agrees to indemnify and hold harmless DIP Agent and DIP Lenders from liability under any Environmental Laws.

Environmental Laws - all Applicable Law, all programs, permits, guidance documents promulgated by regulatory agencies, and orders and consent decrees having the force of law, now or hereafter in effect and relating to human health and safety or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

Environmental Notice - a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

Environmental Release - a release as defined in CERCLA or under any applicable Environmental Laws.

Equipment - all of each Borrower's machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal Property (other than Inventory) of every kind and description, whether now owned or hereafter acquired by such Borrower and wherever located, and all parts, accessories and special tools therefor, all accessions thereto, and all substitutions and replacements thereof.

Equity Interest - the interest of (i) a shareholder in a corporation, (ii) a partner (whether general or limited) in a partnership (whether general, limited or limited liability), (iii) a member

in a limited liability company, or (iv) any other Person having any other form of equity security or ownership interest.

ERISA - the Employee Retirement Income Security Act of 1974, and all rules and regulations from time to time promulgated thereunder.

ERISA Affiliate - any trade or business (whether or not incorporated) under common control with a Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

Estate - For each Borrower, the estate created in such Borrower's Chapter 11 Case pursuant to Section 541(a) of the Bankruptcy Code.

Event of Default - as defined in **Section 11** of the Agreement.

Excluded Deposit Account – collectively, Deposit Accounts established solely for the purpose of funding payroll, payroll taxes and other compensation and benefits to employees.

Excluded Swap Obligation - with respect to an Obligor, each Swap Obligation as to which, and only to the extent that, such Obligor's guaranty of or grant of a Lien as security for such Swap Obligation is or becomes illegal under the Commodity Exchange Act because the Obligor does not constitute an "eligible contract participant" as defined in the act (determined after giving effect to any keepwell, support or other agreement for the benefit of such Obligor and all guarantees of Swap Obligations by other Obligors) when such guaranty or grant of Lien becomes effective with respect to the Swap Obligation.  If a Hedge Agreement governs more than one Swap Obligation, only the Swap Obligation(s) or portions thereof described in the foregoing sentence shall be Excluded Swap Obligation(s) for the applicable Obligor.

Excluded Tax - (a) Taxes imposed on or measured by a Recipient's net income (however denominated), franchise Taxes and branch profits Taxes (i) as a result of such Recipient being organized under the laws of, or having its principal office or applicable Lending Office located in, the jurisdiction imposing such Tax, or (ii) constituting Other Connection Taxes; (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of a DIP Lender with respect to its interest in a Loan or Commitment pursuant to a law in effect when such DIP Lender acquires such interest (except pursuant to an assignment request by SRC under **Section 12.17**) or changes its Lending Office, except to the extent that, pursuant to **Section 4.9** of the Agreement, amounts with respect to such Taxes were payable to its assignor immediately prior to such assignment or to such DIP Lender immediately prior to its change in Lending Office; (c) Taxes attributable to a Recipient's failure to comply with **Section 4.10** of the Agreement; and (d) U.S. federal withholding Taxes imposed pursuant to FATCA.

Existing Letters of Credit - those Letters of Credit set forth on **Schedule 1.2.1**, each of which was in existence on the Petition Date.

Extraordinary Expenses - all costs, expenses, fees or advances that DIP Agent or any DIP Lender may suffer or incur, whether prior to or after the occurrence of an Event of Default, and whether prior to, after or during the pendency of the Chapter 11 Cases or any other Insolvency

Proceeding of an Obligor, including those relating to, on account of or in connection with (i) the audit, inspection, repossession, storage, repair, appraisal, insuring, completion of the manufacture of, preparing for sale, advertising for sale, selling, collecting or otherwise preserving or realizing upon any Collateral; (ii) the defense of DIP Agent's Lien upon any Collateral or the priority thereof or any adverse claim with respect to the Loans, the DIP Loan Documents or the Collateral asserted by any Obligor, any receiver or trustee for any Obligor or any creditor or representative of creditors of any Obligor; (iii) any action, arbitration or other proceeding (whether instituted by or against DIP Agent, any DIP Lender, any Borrower, any representative of creditors of any Borrower or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of DIP Agent's Liens with respect to any Collateral), the DIP Loan Documents, the Obligations, or other Claims; (iv) the settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral (whether or not such Liens are Permitted Liens); (v) the collection or enforcement of any of the Obligations; (vi) any Enforcement Action; (vii) the negotiation, documentation, and closing of any modification, waiver, workout, restructuring or forbearance agreement with respect to any DIP Loan Document or any Obligations; (viii) amounts advanced by DIP Agent pursuant to **Sections 7.1.3** or **12.9.4** of the Agreement; (ix) the enforcement of any of the provisions of any of the DIP Loan Documents; and (x) any payment under a guaranty, indemnity or other payment agreement provided by DIP Agent or (with DIP Agent's consent) any DIP Lender, which is reimbursable to DIP Agent or such DIP Lender by a Borrower pursuant to **Section 2.4.2** of the Agreement.  Such costs, expenses and advances may include transfer fees, field exam fees, taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any or all Borrowers or independent contractors in liquidating any Collateral, travel expenses, all other fees and expenses payable or reimbursable by Borrowers or any other Obligor under any of the DIP Loan Documents, and all other fees and expenses associated with the enforcement of rights or remedies under any of the DIP Loan Documents, but excluding compensation paid to employees (including inside legal counsel who are employees) of DIP Agent.

FATCA – the Foreign Account Tax Compliance Act, 26 U.S.C. §§ 1471 et seq.

Federal Funds Rate - (i) the weighted average of interest rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on the applicable Business Day (or on the preceding Business Day, if the applicable day is not a Business Day), as published by the Federal Reserve Bank of New York on the next Business Day; or (ii) if no such rate is published on the next Business Day, the average rate (rounded up, if necessary, to the nearest 1/8 of 1%) charged to BofA on the applicable day on such transactions, as determined by DIP Agent.

FEIN - with respect to any Person, the Federal Employer Identification Number of such Person.

Final DIP Financing Order - with respect to the Chapter 11 Cases, a Final Order in substantially the form of the Interim DIP Financing Order and otherwise in form and substance reasonably satisfactory to DIP Agent and the Required DIP Lenders, authorizing and approving on a final basis, among other things, the matters and provisions in the Interim DIP Financing

Order, and providing that, in the event of a dismissal, conversion or substantive consolidation of any of the Chapter 11 Cases, (i) the Agreement and the other DIP Loan Documents shall remain valid and enforceable against all Obligors, (ii) the rights and remedies under the DIP Loan Documents, the DIP Financing Orders and Applicable Law shall not be adversely affected, and (iii) the Liens granted to any of Pre-Petition ABL Secured Parties and DIP Secured Parties under the DIP Loan Documents and the DIP Financing Orders shall remain valid and perfected and shall enjoy the same priority as such Liens enjoyed prior to such dismissal, conversion or substantive consolidation of such Chapter 11 Case.

Final Order - an order or judgment of the Court as entered on its docket that has not been reversed, stayed pursuant to any applicable Bankruptcy Rule or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari, or seek re-argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari, or motion for re-argument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired.

First Day Orders - all orders entered or to be entered by the Court granting the relief requested in the motions filed with the Court on the Petition Date or within five (5) Business Days after the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance reasonably satisfactory to DIP Agent and the Required DIP Lenders.

Fiscal Month - Borrowers' fiscal month, as shown on Borrowers' Fiscal Calendar attached as **Exhibit I**, subject to revisions as permitted in **Section 9.2.4** of the Agreement.

Fiscal Quarter - Borrowers' fiscal quarter, as shown on Borrowers' Fiscal Calendar attached as **Exhibit I**, subject to the revisions as permitted in **Section 9.2.4** of the Agreement.

Fiscal Year - Borrowers' fiscal year as shown on Borrowers' Fiscal Calendar attached as **Exhibit I**, subject to revisions as permitted in **Section 9.2.4** of the Agreement.

FLSA - the Fair Labor Standards Act of 1938.

Foreign DIP Lender - any Lender that is not a U.S. Person.

Foreign Plan - any employee benefit plan or arrangement (a) maintained or contributed to by a Borrower or any Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of a Borrower or any Subsidiary.

Foreign Subsidiary - a Subsidiary that is a "controlled foreign corporation" under Section 957 of the Code, such that a guaranty by such Subsidiary of the Obligations or a Lien on the assets of such Subsidiary to secure the Obligations would result in material tax liability to a Borrower.

Fronting Exposure - a Defaulting DIP Lender's interest in Letter of Credit Outstandings, Settlement Loans and Protective Advances, except to the extent Cash Collateralized by the Defaulting DIP Lender or allocated to other DIP Lenders hereunder.

Full Payment - with respect to the Obligations and the Pre-Petition ABL Obligations, (a) the full and indefeasible cash payment thereof, including any interest, fees and other charges accruing or incurred prior to or during the pendency of the Chapter 11 cases or any other Insolvency Proceeding (whether or not allowed in the proceeding); (b) if any such Pre-Petition ABL Lender Debt or Obligations are Letter of Credit Outstandings or inchoate or contingent in nature, Cash Collateralization thereof (or delivery of a standby letter of credit acceptable to DIP Agent in its discretion, in the amount of required Cash Collateral); (c) a release in form and substance satisfactory to DIP Agent of any Claims of each Borrower against DIP Agent and DIP Lenders, or Pre-Petition ABL Agent and Pre-Petition ABL Lenders, as applicable, arising on or before the payment date. No Revolver Loans shall be deemed to have been paid in full unless all Commitments related to such Revolver Loans have expired or been terminated; and (d) the expiration of the Challenge Deadline under (and as defined in) the DIP Financing Orders without any challenge having been timely asserted.

GAAP - generally accepted accounting principles in the United States of America in effect from time to time.

General Intangibles - the following general intangibles of a Borrower, whether now owned or hereafter created or acquired by a Borrower: (i) all choses in action and causes of action except to the extent relating exclusively to equipment, real estate or intellectual property of a Borrower, (ii) all company or other business records, licenses, franchises, customer lists, permits and operational manuals relating to Accounts and Inventory; (iii) tax refund claims except claims relating exclusively to equipment, real estate or intellectual property of a Borrower, (iv) insurance refunds and premium rebates relating exclusively to business interruption insurance and insurance on the Collateral; (v) all claims under guaranties, security interests or other security held by or granted to a Borrower to secure payment of any of a Borrower's Accounts by an Account Debtor; (vi) all rights to indemnification relating to Inventory and Accounts; and (vii) all other intangible property of a Borrower of every kind and nature excluding such other intangible property relating to equipment or real estate of a Borrower and excluding all inventions, blueprints, designs, patents, patent applications, trademarks, trademark applications, trade names, trade secrets, service marks, goodwill, brand names, copyrights, and registrations.

Governmental Approvals - all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to all Governmental Authorities.

Governmental Authority - any federal, state, local, municipal, foreign or other governmental department, bureau, agency, tribunal, authority, body, commission, court, instrumentality, political subdivision, central bank, or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for or pertaining to any governmental, judicial, investigative, regulatory or self-regulatory authority, in each case whether associated with the United States, a state, district or territory thereof, or a foreign entity

or government (including any supra-national bodies such as the European Union or European Central Bank).

Hedge Agreement - any and all agreements, or documents now existing or hereafter entered into by any Borrower that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging any Borrower's exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations or commodity prices.

Indemnified Amount - in the case of DIP Agent Indemnitees, the amount of any loss, cost, expenses or damages suffered or incurred by DIP Agent Indemnitees and against which DIP Lenders or any Obligor have agreed to indemnify DIP Agent Indemnitees pursuant to the terms of the Agreement or any of the other DIP Loan Documents; in the case of DIP Lender Indemnitees, the amount of any loss, cost, expenses or damages suffered or incurred by DIP Lender Indemnitees and against which DIP Lenders or any Obligor have agreed to indemnify DIP Lender Indemnitees pursuant to the terms of the Agreement or any of the other DIP Loan Documents.

Indemnified Taxes - (a) Taxes, other than Excluded Taxes, imposed on or relating to any payment of an Obligation; and (b) to the extent not otherwise described in clause (a), Other Taxes.

Initial Approved Form - with respect to any order of the Court, the form of such order that was filed with the Court or circulated to the DIP Lenders prior to any hearing at which the Court considered entry of such order; and with respect to the DIP Budget and the Professional Fees Budget, the forms of DIP Budget and the Professional Fees Budget that were attached to the DIP Financing Motion; in each case as and to the extent approved by the DIP Agent and the Required DIP Lenders.

Initial Transactions - collectively, (a) the making of the initial Revolver Loans and the issuance of any new Letters of Credit hereunder on or about the Closing Date and (b) the payment of the fees and expenses incurred by DIP Agent and DIP Lenders in connection with negotiating and documenting the DIP Facility, seeking and obtaining Court approval of the DIP Facility, preparing for the closing on the DIP Facility, and consummating the foregoing.

Insolvency Proceeding - any action, case or proceeding commenced under any state, federal or foreign law by or against a Person, or any agreement of such Person, for (i) the entry of an order for relief under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), (ii) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property, (iii) an assignment or trust mortgage for the benefit of creditors of such Person, or (iv) the liquidation, dissolution or winding up of the affairs of such Person.

Intellectual Property - all intellectual and similar Property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all

embodiments or fixations thereof and all related documentation, applications, registrations and franchises; and all licenses or other rights to use any of the foregoing.

Intellectual Property Claim - the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that a Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other Property violates of any ownership or other right to use any Intellectual Property of such Person.

Intercreditor Agreements – collectively, the Pre-Petition ABL/Term Loan Intercreditor Agreement and the DIP ABL/Term Loan Intercreditor Agreement.

Interest Period - shall have the meaning ascribed to it in **Section 2.1.3** of the Agreement.

Interim DIP Financing Order - an interim order or orders of the Court entered in the Chapter 11 Cases authorizing and approving, among other things, on an interim basis, the Agreement, the other DIP Loan Documents, the DIP Facility, the Term DIP Facility, the Term DIP Loan Documents, the extensions of credit to Borrowers in accordance with the terms thereof, and the transactions contemplated thereby and granting Liens on the Collateral, with the applicable priority thereof, and the Superpriority Claims, each as described therein and in the DIP ABL/Term Loan Intercreditor Agreement, in favor of DIP Agent for the ratable benefit of DIP Secured Parties and in favor of Term DIP Agent for the ratable benefit of Term DIP Lenders, as such order or orders may be extended, amended, supplemented or modified in a manner satisfactory to the Required DIP Lenders in their sole discretion. The Interim DIP Financing Order shall, among other things, (i) limit borrowings under the DIP Facility and the Term DIP Facility to amounts set forth in the DIP Budget (subject to Permitted Variances) and so long as no Event of Default has occurred and is continuing; (ii) approve the payment by Borrowers of all the fees provided for in the Agreement, in the other DIP Loan Documents and under the DIP Facility, including, but not limited to, the fees and expenses of Pre-Petition ABL Agent under the Prepetition ABL Loan Documents and its advisors, (iii) find that DIP Lenders are extending credit to Borrowers in good faith within the meaning of Section 364(e) of the Bankruptcy Code, (iv) lift the automatic stay to permit each Borrower to perform its respective obligations, and DIP Agent and Term DIP Agent to exercise their respective remedies with respect to the DIP Facility and the Term DIP Facility, as applicable, (v) permit the use of loans under the Term DIP Facility and Revolver Loans under the DIP Facility solely to pay expenditures pursuant to the DIP Budget (subject to Permitted Variances) and otherwise on terms satisfactory to DIP Agent, (vi) provide that the Carve-Out shall apply solely to the Liens securing the Term Loan Priority Collateral and not to any Liens securing the ABL Priority Collateral, (vii) contain findings, subject to typical reservation of rights for non-debtor parties in bankruptcy court, that the Pre-Petition ABL Obligations are due and owing and not subject to any defense, counterclaim, or setoff, that the Liens securing the Pre-Petition ABL Obligations are valid and duly perfected, and that any challenge must be brought by (a) any party in interest with requisite standing, other than a statutory committee appointed in the Chapter 11 Cases (a "Committee"), within seventy-five (75) days after the Petition Date, (b) in the case of a Committee, sixty (60) days after the date on which notice of the appointment of such Committee is filed with the Court, (c) any such later date agreed to in writing by DIP Agent and the Term DIP Agent, or (d) any such later date ordered by the Court for cause shown after notice and an opportunity to be heard, or be forever barred; provided that in no event shall the Committee shall

be permitted to expend no more than $25,000 to investigate or prosecute any such challenge; (viii) have such other findings, orders, and relief typical for financings of the type contemplated herein; and (ix) otherwise be in form and substance satisfactory to DIP Agent.

Interim Period - the period commencing on the date that the Interim DIP Financing Order is entered by the Court and ending on the sooner to occur of (a) the date that the Final DIP Financing Order is entered by the Court or (b) the date that is thirty (30) days after the date that the Interim DIP Financing Order is entered by the Court.

Inventory Appraisal – an appraisal, in form and substance satisfactory to DIP Agent, conducted by an appraisal company with qualifications and standing acceptable to DIP Agent pursuant to which such appraisal company determines the net orderly liquidation value of Inventory expected to be realized at an orderly, negotiated sale of Inventory held within a reasonable period of time, net of all liquidation expenses.

Inventory Formula Amount – on any date of determination, an amount equal to the least of (i) 65% of the Value of Eligible Inventory, (ii) 85% of the NOLV Percentage of the Value of Eligible Inventory, and (iii) $40,000,000.

Inventory Reserve – reserves established by DIP Agent to reflect factors that may negatively impact the Value of Inventory, including change in salability, obsolescence, seasonality, theft, shrinkage, imbalance, change in composition or mix, markdowns and vendor chargebacks.

Investment - any Acquisition; any acquisition of record or beneficial ownership of any Equity Interests of a Person; or any advance or capital contribution to or other investment in a Person.

Invoice & Storage Accounts – Accounts arising out of bill-and-hold transactions of the type customarily engaged in by U.S. Borrowers in the Ordinary Course of Business as of the date hereof in which the goods were sold pursuant to a specific purchase order, contract or other agreement and the applicable Account Debtor is contractually obligated to pay for such goods upon receipt of an invoice, and which otherwise constitute Eligible Billed Accounts.

Knowledge – with respect to any Person, including a Senior Officer, the actual knowledge of such Person, without special investigation or inquiry.

Letter of Credit – a commercial/documentary letter of credit, or standby letter of credit issued or, in the case of the Existing Letters of Credit, deemed issued pursuant to the Agreement.

Letter of Credit Documents - any and all agreements, instruments and documents required by Letter of Credit Issuer to be executed by any or all U.S. Borrowers or any other Person and delivered to Letter of Credit Issuer for the issuance of any Letter of Credit.

Letter of Credit Fee Percentage - a per annum percent equal to the Applicable Margin for LIBOR Rate Loans.

Letter of Credit Issuer – BofA or any Affiliate of BofA.

Letter of Credit Outstandings - on any date of determination thereof, an amount equal to the sum of (i) all amounts then due and payable by any Borrower on such date by reason of any payment made on or before such date by Letter of Credit Issuer under any Letter of Credit, including any Existing Letter of Credit, plus (ii) the aggregate undrawn amount of all Letters of Credit then outstanding, including the Existing Letters of Credit, or to be issued by Letter of Credit Issuer under a letter of credit application theretofore submitted to Letter of Credit Issuer.

Letter of Credit Reserve - at any date, the aggregate of all Letter of Credit Outstandings on such date, other than Letter of Credit Outstandings that are fully Cash Collateralized.

LIBOR Lending Office - with respect to a DIP Lender, the office designated as a LIBOR Lending Office for such DIP Lender on **Schedule 14.9** (or on any Assignment and Acceptance, in the case of an assignee) and such other office of such DIP Lender or any of its Affiliates that is hereafter designated by written notice to DIP Agent.

LIBOR Loan - a Revolver Loan, or portion thereof, during any period in which it bears interest at a rate based upon the applicable LIBOR Rate.

LIBOR Rate - for any Interest Period with respect to a LIBOR Loan, the per annum rate of interest (rounded up, if necessary, to the nearest 1/8th of 1%), determined by DIP Agent at approximately 11:00 a.m. (London time) two (2) Business Days prior to commencement of such Interest Period, for a term comparable to such Interest Period, equal to (i) the ICE Benchmark Administration London Interbank Offered Rate (the "ICE LIBOR"), as published by Reuters (or other commercially available source designated by DIP Agent); or (ii) if the ICE LIBOR is not available for any reason, the interest rate at which Dollar deposits in the approximate amount of the LIBOR Loan would be offered by Bank's, London branch to major banks in the London interbank Eurodollar market. If the Board of Governors imposes a Reserve Percentage with respect to LIBOR deposits, then the LIBOR Rate shall be the foregoing rate, divided by 1 minus the Reserve Percentage.

License Agreement - any agreement between a Borrower and a Licensor pursuant to which such Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Collateral, any use of Property or any other conduct of business of such Borrower.

Licensor - any Person from whom a Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Borrower's manufacture, marketing, sale or other distribution of any Collateral, any use of Property or any other conduct of business of such Borrower.

Lien - a Person's interest in Property securing an obligation owed to, or a claim by, such Person, whether such interest is based on common law, statute or contract, including any lien, security interest, pledge, hypothecation, assignment, trust, reservation, encroachment, easement, right-of-way, covenant, condition, restriction, lease, or other title exception or encumbrance affecting Property.

Lien Waiver - an agreement, in form and substance satisfactory to DIP Agent, by which (i) for any material Collateral located on leased premises, the lessor waives or subordinates any

Lien it may have on the Collateral, and agrees to permit DIP Agent to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (ii) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for DIP Agent, and agrees to deliver the Collateral to DIP Agent upon request; (iii) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges DIP Agent's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to DIP Agent upon request; and (iv) for any Collateral subject to a Licensor's Intellectual Property rights, the Licensor grants to DIP Agent the right, vis-à-vis such Licensor, to enforce DIP Agent's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable License.

Loan - a Revolver Loan (and each Base Rate Loan and LIBOR Loan comprising such Loan).

Loan Account - the loan account or accounts established by DIP Agent on its books pursuant to **Section 4.8** of the Agreement.

Local Court Rules – the rules of procedure adopted by the Court, as such rules may be modified or amended from time to time.

Margin Stock - shall have the meaning ascribed to it in Regulation U of the Board of Governors.

Material Adverse Effect - the effect of any event or condition which, alone or when taken together with other events or conditions occurring or existing concurrently therewith, (i) has a material adverse effect upon the business, operations, Properties or condition (financial or otherwise) of Borrowers and their Subsidiaries (taken as a whole), other than as a direct result of the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and of the Chapter 11 Cases and the continuation and prosecution thereof; and (ii) (A) has or may be reasonably expected to have any material adverse effect upon the validity or enforceability of the Agreement or any of the other DIP Loan Documents; (B) has or may be reasonably expected to have a material adverse effect upon the value of the Collateral (considered as a whole) or on the Liens of DIP Agent with respect to the Collateral or the priority of any such Liens; (C) materially impairs or may be reasonably expected to materially impair the ability of Obligors (considered as a group) to perform their obligations under the Agreement or any of the other DIP Loan Documents, including repayment of the Obligations when due; or (D) materially impairs or may be reasonably expected to materially impair the ability of DIP Agent or any DIP Lender to enforce or collect the Obligations or realize upon any of the Collateral in accordance with the DIP Loan Documents and Applicable Law.

Material Contract - an agreement to which an Obligor is a party (other than the DIP Loan Documents) (i) which is deemed to be a material contract as provided in Regulation S-K promulgated by the SEC under the Securities Act of 1933 or (ii) for which breach, termination, cancellation, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect, in each case excluding any contract that is rejected, with the prior

written consent of DIP Agent, by an Obligor in accordance with an order entered by the Court under Section 365 of the Bankruptcy Code.

Maximum Rate - the maximum non-usurious rate of interest permitted by Applicable Law that at any time, or from time to time, may be contracted for, taken, reserved, charged or received on the Debt in question or, to the extent that at any time Applicable Law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate. Notwithstanding any other provision hereof, the Maximum Rate shall be calculated on a daily basis (computed on the actual number of days elapsed over a year of 365 or 366 days, as the case may be).

Money Borrowed - as applied to any Person, (i) Debt arising from the lending of money by any other Person to such Person; (ii) Debt, whether or not in any such case arising from the lending of money by another Person to such Person, (A) which is represented by notes payable or drafts accepted that evidence extensions of credit, (B) which constitutes obligations evidenced by bonds, debentures, notes or similar instruments, or (C) upon which interest charges are customarily paid (other than accounts payable) or that was issued or assumed as full or partial payment for Property; (iii) Debt that constitutes a Capitalized Lease Obligation; (iv) reimbursement obligations with respect to letters of credit or guaranties of letters of credit; and (v) Debt of such Person under any guaranty of obligations that would constitute Debt for Money Borrowed under clauses (i) through (iii) hereof, if owed directly by such Person.

Moody's - Moody's Investors Services, Inc., and its successors.

Mortgage - each mortgage, deed of trust or deed to secure debt pursuant to which a Borrower or other Obligor grants to DIP Agent Liens upon the Real Estate owned by such Borrower, as security for the Obligations.

Multiemployer Plan - has the meaning set forth in Section 4001(a)(3) of ERISA.

NOLV Percentage - the net orderly liquidation value of Inventory, expressed as a percentage, expected to be realized at an orderly, negotiated sale held within a reasonable period of time, net of all liquidation expenses, as determined from the most recent Inventory Appraisal.

Notes - each Revolver Note and any other promissory note executed by any Borrower at the request of DIP Agent or any DIP Lender to evidence any of the Obligations.

Notice of Borrowing - as defined in **Section 3.1.1(i)** of the Agreement.

Obligations - in each case, whether now in existence or hereafter arising, (i) the principal of, and interest and premium, if any, on, the Revolver Loans; (ii) all Letter of Credit Outstandings and all other obligations of any Obligor to DIP Agent or Letter of Credit Issuer arising in connection with the issuance of any Letter of Credit; (iii) interest, expenses, fees, indemnification obligations, Extraordinary Expenses and other amounts payable by any Obligor under any of the DIP Loan Documents; (iv) all Bank Product Obligations; and (iv) all other Debts, covenants, duties and obligations (including Contingent Obligations) now or at any time or times hereafter owing by any Borrower to DIP Agent or any DIP Lender under or pursuant to the Agreement or any of the other DIP Loan Documents, whether evidenced by any note or other writing, whether arising from any extension of credit, opening of a letter of credit,

acceptance, loan, guaranty, indemnification or otherwise, whether allowed in any of the Chapter 11 Cases or any other Insolvency Proceeding, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several, chargeable to any or all Obligors under the Agreement or under any of the other DIP Loan Documents; provided, that Obligations of an Obligor shall not include its Excluded Swap Obligations.

Obligor - each Borrower and any other Person that is at any time liable for the payment of the whole or any part of the Obligations or that has granted in favor of DIP Agent a Lien upon any of such Person's Property to secure payment of any of the Obligations.

OFAC - Office of Foreign Assets Control of the U.S. Treasury Department.

Ordinary Course of Business - with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any DIP Loan Document or under Applicable Law.

Organization Documents - with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, operating agreement, members agreement, partnership agreement, voting trust, or similar agreement or instrument governing the formation or operation of such Person.

OSHA - the Occupational Safety and Hazard Act of 1970.

Other Connection Taxes - Taxes imposed on a Recipient due to a present or former connection between it and the taxing jurisdiction (other than connections arising from the Recipient having executed, delivered, become party to, performed obligations or received payments under, received or perfected a Lien or engaged in any other transaction pursuant to, enforced, or sold or assigned an interest in, any Revolver Loan or DIP Loan Document).

Other DIP Agreements - the Notes and any and all agreements, instruments and documents (other than the Agreement and any DIP Security Documents), heretofore, now or hereafter executed by any Borrower, any other Obligor or any other Person and delivered to DIP Agent or any DIP Lender in respect of or in connection with any transactions contemplated by or relating to the Agreement.

Other Taxes - all present or future stamp, court, documentary, intangible, recording, filing, excise, property or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to, any DIP Loan Document, except Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 12.17** of the Agreement).

Out of Formula Condition - as defined in **Section 1.1.2** of the Agreement.

Out of Formula Loan - a Revolver Loan made when an Out of Formula Condition exists or the amount of any Revolver Loan which, when funded, results in an Out of Formula Condition.

Participant - as defined in **Section 13.2.1** of the Agreement.

Participating DIP Lender - as defined in **Section 1.2.8(i)** of the Agreement.

Patents - all United States and foreign patents and applications made for letters patent under the laws of the United States, any other country or any political subdivision thereof.

Patriot Act – the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

Payment Account - an account maintained by DIP Agent to which all monies from time to time deposited to a Dominion Account shall be transferred and all other payments shall be sent in immediately available federal funds.

Payment Items - all checks, drafts, or other items of payment payable to a Borrower, including those constituting proceeds of any of the Collateral.

Permitted Contingent Obligations - Contingent Obligations (i) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (ii) arising from Hedge Agreements permitted hereunder; (iii) existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (iv) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (v) arising under the DIP Loan Documents; or (vi) in an aggregate amount of $250,000 or less at any time.

Permitted Discretion – DIP Agent's reasonable (from the perspective of a secured asset based lender with advance rates based on current assets) credit judgment based upon its consideration of any factor which DIP Agent believes (a) will or could reasonably be expected to adversely affect in any respect the value of any ABL Priority Collateral, the enforceability or priority of any Liens in favor of DIP Agent or the amounts which DIP Agent and DIP Lenders would be likely to recover in the liquidation of such ABL Priority Collateral; (b) suggests that any collateral report, financial information or certificate delivered to DIP Agent by or on behalf of any Borrower with respect to any ABL Priority Collateral is incomplete, inaccurate or misleading in any material respect; or (c) creates or reasonably could be expected to create or result in a Default or Event of Default. In exercising such judgment, DIP Agent may consider factors already included or tested in determining Eligible Accounts and Eligible Inventory or in calculating the Borrowing Base or Availability, as well as any of the following: (i) changes in collection history and dilution with respect to the Accounts, (ii) changes in demand for, and pricing of, Inventory, (iii) changes in any concentration of risk with respect to the Accounts, (iv) changes in turnover statistics with respect to Inventory and/or Accounts, including actual versus historical and projected rates, and (v) any other factors, events, contingencies or circumstances that arise (or first become known to DIP Agent) after the Petition Date and that change the credit risk of lending to any Borrower on the security of the ABL Priority Collateral included in the Borrowing Base in any respect; provided, however, that (a) DIP Agent shall not increase the Availability Reserve solely in response to factors that already have been taken into account in excluding from the Borrowing Base calculation the whole or any part of any Accounts or

Inventory; and (b) the amount of any addition made to the Availability Reserve pursuant to clause (viii) of the definition thereof shall bear a reasonable relationship to the impact of any such factors that DIP Agent seeks to mitigate.

Permitted Liens – has the meaning specified in **Section 9.2.8** of the Agreement.

Permitted Senior Liens – (i) with respect to the Term Loan Priority Collateral, (x) those Pre-Petition and Post-Petition Liens in favor of Pre-Petition Term Agents or Term DIP Agent and (y) those Liens on Term Loan Priority Collateral that are Permitted Liens under (and as defined in) the Pre-Petition Term Loan Agreements, were in existence on the Petition Date, and, as of the Petition Date, had priority over the Liens of Pre-Petition Term Agents with respect to any Pre-Petition Term Priority Collateral (but only to the extent of such Pre-Petition Term Priority Collateral); and (ii) with respect to the ABL Priority Collateral, those Liens that are Permitted Liens under (and as defined in) the Pre-Petition ABL Loan Agreement, were in existence on the Petition Date, and, as of the Petition Date, had priority over the Liens of Pre-Petition Agent with respect to any Pre-Petition ABL Priority Collateral (but only to the extent of such Pre-Petition ABL Priority Collateral).

Permitted Variances - an unfavorable variance from the DIP Budget not exceeding (a) 10.0% for each line item (other than "payroll", "health & benefits", "postage" and "Audit Expense"), (b) 5.0% for payroll, (c) 5.0% for health & benefits, (d) 5.0% for postage, (e) 0.0% for Audit Expense, and (f) 5.0% with respect to cumulative net cash flows of Borrowers and their Subsidiaries (excluding amounts relating to payroll, health & benefits and postage), in each case for the period from the Petition Date through the measurement date at the end of each week.  All variances shall be tested weekly on the Friday of such week, beginning with the four week period ending on April 3, 2015, and measured on a rolling four week basis thereafter.

Person - an individual, partnership, corporation, limited liability company, limited liability partnership, joint venture, joint stock company, land trust, business trust, association, or unincorporated organization, Governmental Authority, or other entity.

Petition Date – March 12, 2015.

Plan - an employee benefit plan now or hereafter maintained for employees of any or all Borrowers that is covered by Title IV of ERISA.

Post-Petition - any date or time after the date and time of the commencement of the Chapter 11 Cases.

Pre-Petition - any date or time prior to the date and time of the commencement of the Chapter 11 Cases.

Pre-Petition ABL Agent - shall have the meaning ascribed to such term in the recitals of the Agreement.

Pre-Petition ABL Collateral – the "Collateral" as such term is defined by the Pre-Petition ABL Loan Agreement, to the extent such collateral was in existence on the Petition Date.

Pre-Petition ABL Copyright Security Agreement – the ABL Copyright Security Agreement dated as of August 9, 2013, among SRC, WorkflowOne and Pre-Petition ABL Agent, as at any time amended, modified, restated or supplemented.

Pre-Petition ABL Lenders - shall have the meaning ascribed to such term in the recitals of the Agreement.

Pre-Petition ABL Loan Agreement - shall have the meaning ascribed to such term in the recitals to the Agreement.

Pre-Petition ABL Loan Documents - the "Loan Documents" as such term is defined in the Pre-Petition ABL Loan Agreement.

Pre-Petition ABL Obligations - all of U.S. Borrowers' "Obligations" under (and as defined in) the Pre-Petition ABL Loan Agreement.

Pre-Petition ABL Obligations Reserve - on any date, the aggregate of all Pre-Petition ABL Obligations outstanding on such date.

Pre-Petition ABL Patent Security Agreement – the ABL Patent Security Agreement dated as of August 9, 2013, between SRC and Pre-Petition ABL Agent, as at any time amended, modified, restated or supplemented.

Pre-Petition ABL Priority Collateral – the "ABL Priority Collateral" as that term is defined in the Pre-Petition ABL/Term Loan Intercreditor Agreement to the extent such Collateral was in existence on the Petition Date, and all proceeds thereof whether created, acquired or arising on, before or after the Petition Date.

Pre-Petition ABL Secured Parties – the "Secured Parties" as defined in the Pre-Petition ABL Loan Agreement.

Pre-Petition ABL/Term Loan Intercreditor Agreement - that certain Intercreditor Agreement dated as of August 1, 2013, by and among Pre-Petition ABL Agent, Pre-Petition Term Agents, U.S. Borrowers, and the other parties from time to time party thereto, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

Pre-Petition ABL Trademark Security Agreement – the ABL Trademark Security Agreement dated as of August 9, 2013, among SRC, WorkflowOne and Pre-Petition ABL Agent, as at any time amended, modified, restated or supplemented.

Pre-Petition First Lien Term Loan Obligations – the "Obligations" as such term is defined in the First Lien Credit Agreement dated as of August 1, 2013, among SRC, WorkflowOne, certain Subsidiary guarantors, financial institutions parties thereto from time to time, and Pre-Petition Term Agent, as at any time amended, modified, restated or supplemented.

Pre-Petition Term Agents - Silver Point Finance, LLC, and its successors and assigns, in its capacities as "Term Administrative Agents" as such term is defined in the ABL/Term Intercreditor Agreement.

<u>Pre-Petition Term Loan Agreements</u> – has the meaning assigned to it in the Interim DIP Financing Order.

<u>Pre-Petition Term Loan Documents</u> - the "Term Loan Documents" as such term is defined in the Pre-Petition ABL/Term Loan Intercreditor Agreement.

<u>Pre-Petition Term Loans</u> - shall mean the term loans made pursuant to the Pre-Petition Term Loan Documents.

<u>Pre-Petition Term Loan Obligations</u> – "Term Loan Obligations" as such term is defined in the Pre-Petition ABL/Term Loan Intercreditor Agreement.

<u>Prime Rate</u> – the rate of interest announced by BofA from time to time as its prime rate. Such rate is set by BofA on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate.  Any change in such rate publicly announced by BofA shall take effect at the opening of business on the day specified in the public announcement of such change.

<u>Pro Rata</u> - with respect to any DIP Lender, a percentage (rounded to the ninth decimal place) determined (a) by dividing the amount of such DIP Lender's Revolver Commitment by the aggregate outstanding Revolver Commitments; or (b) following termination of the Revolver Commitments, by dividing the amount of such DIP Lender's Revolver Loans and Letter of Credit Outstandings by the aggregate outstanding Revolver Loans and Letter of Credit Outstandings or, if all Revolver Loans and Letter of Credit Outstandings have been paid in full and/or Cash Collateralized, by dividing such DIP Lender's and its Affiliates' remaining Obligations by the aggregate remaining Obligations.

<u>Professional Fees Budget</u> - as defined in **Section 9.1.4(viii)** of the Agreement.

<u>Professional Fees</u> - the fees and reimbursable expenses of Professional Persons.

<u>Professional Person</u> - a Person who is an attorney, financial advisor, accountant, appraiser, auctioneer or other professional person and who is retained, with Court approval, by (a) a Borrower pursuant to Section 327 of the Bankruptcy Code or (b) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

<u>Properly Contested</u> - in the case of any Debt of an Obligor (including any Taxes) that is not paid as and when due or payable by reason of such Obligor's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Debt is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Obligor has established appropriate reserves as shall be required in conformity with GAAP, (iii) the non-payment of such Debt will not have a Material Adverse Effect and will not result in a forfeiture of any assets of such Obligor; (iv) no Lien is imposed upon any of such Obligor's Property with respect to such Debt unless such Lien is at all times junior and subordinate in priority to the Liens in favor of DIP Agent (except only with respect to property Taxes that have priority as a matter of Applicable Law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the Debt results from, or is

determined by the entry, rendition or issuance against an Obligor or any of its Property of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Obligor, such Obligor forthwith pays such Debt and all penalties, interest and other amounts due in connection therewith.

Property - any interest in any kind of property or asset, whether real, personal or mixed and whether tangible or intangible.

Protective Advances – as defined in **Section 12.9.4** of the Agreement.

Purchase Agreement - that certain Asset Purchase Agreement dated as of March 12, 2015, by and among Purchaser and Sellers, in form and substance satisfactory to DIP Agent and DIP Lenders, and, among other terms and conditions, providing for and assuring Full Payment of the Obligations and the Pre-Petition ABL Obligations, as amended, supplemented or otherwise modified at any time with the consent of DIP Agent and the Required DIP Lenders.

Purchaser – Standard Acquisition Holdings, LLC, and its successors and permitted assigns.

Purchase Money Debt - (i) Debt (other than the Obligations) for payment of any of the purchase price of fixed assets; (ii) Debt (other than the Obligations) incurred within ninety (90) days before or after acquisition of any fixed assets, for the purpose of financing any of the purchase price thereof; (iii) Capitalized Lease Obligations; and (iv) any renewals, extensions or refinancings (but not increases) thereof.

Purchase Money Lien - a Lien that secures Purchase Money Debt, encumbering only the fixed assets acquired with such Debt and constituting a capital lease or a purchase money security interest under the UCC.

Qualified ECP - an Obligor with total assets exceeding $10,000,000, or that constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" under Section 1a(18)(A)(v)(II) of such Act.

Qualified Equity Interests - any Equity Interests that are not Disqualified Equity Interests.

RCRA - the Resource Conservation and Recovery Act. 42 U.S.C. §§ 6991-6991i.

Real Estate – all right, title and interest (whether as owner, lessor or lessee) of any Obligor in each parcel of real Property or any buildings, structures, parking areas or other improvements thereon and any fixtures relating thereto.

Recipient – DIP Agent, any Letter of Credit Issuer, any DIP Lender or any other recipient of proceeds of Collateral or a payment to be made by an Obligor on account of and for application to any Obligations.

Refinancing Conditions - the following conditions for Refinancing Debt:  (i) it is in an aggregate principal amount that does not exceed the principal amount of the Debt being

extended, renewed or refinanced plus the amount of premiums paid thereon and the fees and expenses incurred in connection therewith; (ii) it has a final maturity no sooner than, a weighted average life no less than, and an interest rate no greater than, the Debt being extended, renewed or refinanced; (iii) it is subordinated to the Obligations at least to the same extent as the Debt being extended, renewed or refinanced; (iv) the representations, covenants and defaults applicable to it are more onerous or restrictive in any material respect for any Borrower, Subsidiary, or DIP Lenders than those applicable to the Debt being extended, renewed or refinanced; (v) no additional Lien is granted to secure it; (vi) no additional Person is obligated on such Debt; (vii) upon giving effect to it, no Default or Event of Default exists; and (viii) with respect to a refinancing of the Pre-Petition Term Loans, the representative(s) of the holders of such Debt shall have joined the Pre-Petition ABL/Term Loan Intercreditor Agreement in accordance with its terms or entered into an intercreditor agreement with DIP Agent on substantially similar terms as set forth in the Pre-Petition ABL/Term Loan Intercreditor Agreement.

    Refinancing Debt - Money Borrowed that is the result of an extension, renewal or refinancing of Debt permitted under **Section 9.2.9** of the Agreement; provided that each of the Refinancing Conditions has been satisfied.

    Regulation D - Regulation D of the Board of Governors.

    Rent and Charges Reserve - the aggregate of (i) all past due rent and other amounts owing by an Obligor to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any Collateral; and (ii) a reserve of up to three months' rent and other charges that could be payable to any such Person as determined by DIP Agent, unless such Person has executed a Lien Waiver; provided that no reserve shall be established for any such rent or other charges payable by a Person who executed and delivered a Lien Waiver in connection with the Pre-Petition ABL Loan Agreement.

    Reportable Event - any of the events set forth in Section 4043(b) of ERISA, other than events for which the thirty (30) day notice period has been waived.

    Required Consignee Documentation – with respect to any consignee, (i) a fully-executed copy of the current consignment agreement between the applicable Obligor and such consignee, (ii) a fully-executed consignment UCC filing authorization agreement in form and substance satisfactory to DIP Agent by and between the applicable Obligor and such consignee, (iii) satisfactory evidence that a UCC-1 financing statement naming such consignee as debtor, the applicable Obligor as secured party, and the Inventory subject to the respective consignment as the collateral, and in all respects satisfactory to DIP Agent in its discretion, has been filed in the proper filing office, (iv) evidence that a UCC-3 financing statement amendment has been filed with respect to the financing statement described in clause (iii) above, assigning the rights of the applicable Obligor, as secured party, to DIP Agent, (v) notice of the applicable Obligor's interest, and DIP Agent's security interest, in the consigned Inventory shall have been delivered to each Person with a perfected Lien in the Inventory of such consignee, and (vi) all other documents, instruments, certificates and agreements as DIP Agent may reasonably require with regard to such consignee.

Required DIP Lenders – DIP Secured Parties holding more than 50% of (a) the aggregate outstanding Revolver Commitments; or (b) following termination of the Revolver Commitments, the aggregate outstanding Revolver Loans and Letter of Credit Outstandings or, if all Revolver Loans and Letter of Credit Outstandings have been Paid in Full, the aggregate remaining Obligations; provided, however, that (i) at any time there are two or more DIP Lenders, "Required DIP Lenders" must include at least two DIP Lenders (who are not Affiliates of one another) and (ii) Commitments, Revolver Loans and other Obligations held by a Defaulting DIP Lender and its Affiliates shall be disregarded in making such calculation, but any related Fronting Exposure shall be deemed held as a Revolver Loan or Letter of Credit Outstanding by such DIP Secured Party that funded the applicable Revolver Loan or issued the applicable Letter of Credit.

Restricted Investment - any Investment by a Borrower or Subsidiary, other than (i) Investments in Subsidiaries to the extent such Investments are in existence on the Closing Date and Investments in any Borrower or any Obligor; (ii) Cash Equivalents that are subject to DIP Agent's Lien and control, pursuant to documentation in form and substance satisfactory to DIP Agent; (iii) loans and advances permitted under **Section 9.2.11** of the Agreement; (iv) Investments in an aggregate amount not to exceed $500,000 in any Fiscal Year so long as both before and after giving effect to such Investment, no Default or Event of Default shall have occurred and be continuing; (v) Investments in wholly-owned Subsidiaries in an aggregate amount not to exceed $500,000 in any Fiscal Year so long as both before and after giving effect to such Investment, no Default or Event of Default shall have occurred and be continuing; and (vi) additional Investments in wholly-owned Subsidiaries consisting of obsolete, worn-out or surplus Equipment no longer used or usable in the business of any Borrower.

Restrictive Agreement - an agreement (other than any of the DIP Loan Documents) that, if and for so long as an Obligor or any Subsidiary of such Obligor is a party thereto, would prohibit, condition or restrict such Obligor's or Subsidiary's right to incur or repay Debt for Money Borrowed (including any of the Obligations); grant Liens upon any of such Obligor's or Subsidiary's assets (including Liens granted in favor of DIP Agent pursuant to the DIP Loan Documents); declare or make Distributions; amend, modify, extend or renew any agreement evidencing Debt for Money Borrowed (including any of the DIP Loan Documents); or repay any Debt owed to any Obligor.

Revolver Commitment - for any DIP Lender, its obligation to make Revolver Loans up to the maximum principal amount shown on **Schedule 1.1** to the Agreement, or as hereafter determined pursuant to each Assignment and Acceptance to which it is a party.

Revolver Commitments - the aggregate amount of commitments of DIP Lenders hereunder.

Revolver Loan - a loan made by DIP Lenders (and each Base Rate Loan and LIBOR Loan comprising such Revolver Loan) as provided in **Section 1.1** of the Agreement (including any Out of Formula Loan), a Protective Advance or a Settlement Loan funded solely by BofA.

Revolver Maturity Date – September 8, 2015, or such later date as DIP Agent and DIP Lenders may agree in writing in their discretion.

34

Revolver Note - a note to be executed by Borrowers in favor of each DIP Lender in the form of **Exhibit A** attached hereto, which shall be in the face amount of such DIP Lender's Revolver Commitment and which shall evidence all Revolver Loans made by such DIP Lender to Borrowers pursuant to the Agreement.

S&P - Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc. and any successor thereto.

Sale – a sale of all or substantially all of Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, pursuant to and in accordance with the Purchase Agreement and the Sale Order and upon terms and conditions satisfactory to DIP Agent, Pre-Petition ABL Agent, each DIP Lender and each Pre-Petition ABL Lender in their respective discretion, providing for and assuring payment of, among other terms, Full Payment of the Obligations and the Pre-Petition ABL Obligations.

Sale Benchmarks – shall mean each of the milestones or benchmarks set forth in subsections (i) through (iv) of **Section 9.1.18** of the Agreement.

Sale Motion - a motion or motions filed by Borrowers with the Court under Section 363 of the Bankruptcy Code, in form and substance satisfactory to Borrowers, DIP Agent, Pre-Petition ABL Agent, each DIP Lender and each Pre-Petition ABL Lender in their respective discretion, seeking Court approval of the process for conducting the Sale and of the terms and conditions of the Sale.

Sale Order – as defined in **Section 9.1.18(iii)** of the Agreement.

Sale Procedures Order – as defined in **Section 9.1.18(ii)** of the Agreement.

Sanction - any international economic sanction administered or enforced by the United States Government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority.

Schedule of Accounts - as defined in **Section 7.2.1** of the Agreement.

SEC - Securities and Exchange Commission.

Security - shall have the same meaning as in Section 2(1) of the Securities Act of 1933.

Sellers – collectively, each of the Persons identified as a "Seller" in the Purchase Agreement.

Senior Officer - the chairman of the board of directors, the president, the chief executive officer, the chief financial officer, controller, or senior manager of treasury operations of, or in-house legal counsel to, a Borrower.

Settlement Date - as defined in **Section 3.1.3(i)** of the Agreement.

Settlement Loan - as defined in **Section 3.1.3(ii)** of the Agreement.

Settlement Report - a report delivered by DIP Agent to DIP Lenders summarizing the amount of the outstanding Revolver Loans as of the Settlement Date and the calculation of the Borrowing Base as of such Settlement Date.

Solvent - as to any Person, such Person (i) owns Property whose fair saleable value is greater than the amount required to pay all of such Person's Debts (including contingent Debts), (ii) is able to pay all of its Debts as such Debts mature, (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage, (iv) such Person has not incurred and does not intend to incur, or believe that it will incur, debts including current obligations beyond its ability to pay such debts as they become due (whether at maturity or otherwise) and (v) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code.

Specified Account Debtor – each Account Debtor approved by DIP Agent and set forth on **Schedule 2**, provided that SRC may request in writing that **Schedule 2** be supplemented to add an Account Debtor, and such Schedule shall be so updated upon the prior written consent of DIP Agent.

Specified Obligor - an Obligor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to **Section 4.11** of the Agreement).

Subordinated Debt - Debt incurred by a Borrower that is expressly subordinate and junior in right of payment to full payment of all Obligations, and is on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to DIP Agent.

Subsidiary - any Person in which more than 50% of its outstanding Voting Stock or more than 50% of all Equity Interests is owned directly or indirectly by a Borrower, by one or more other Subsidiaries of a Borrower, or by a Borrower and one or more other Subsidiaries.

Superpriority Claim - a claim against a Borrower in any of the Chapter 11 Cases which is an administrative expense claim having priority and right to payment over all other administrative expenses and unsecured claims against such Borrower of any kind or nature, whether now existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

Swap Obligation - with respect to an Obligor, its obligations under a Hedge Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

Synthetic Lease - as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any Property (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the Property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

Taxes - all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

Term DIP Agent - Silver Point Finance, LLC, and its successors and assigns.

Term DIP Facility - the credit facility established by Term DIP Agent and Term DIP Lenders in favor of SRC and Workflow in accordance with the Term DIP Loan Documents and pursuant to which the Delayed Draw Term DIP Loans are made available to Borrowers by Term DIP Lenders.

Term DIP Lenders - the financial institutions party to the Term DIP Loan Agreement from time to time as lenders and their respective successors and permitted assigns.

Term DIP Loan Agreement - that certain Super-Priority Priming Debtor In Possession Delayed Draw Term Loan Credit Agreement dated as of March 12, 2015, among Borrowers, Term DIP Agent and Term DIP Lenders, as at any time amended, modified, restated or supplemented.

Term DIP Loan Documents –  the Term DIP Loan Agreement and any and all other agreements, instruments and documents heretofore, now or hereafter executed by any Borrower or any other Person and delivered to Term DIP Loan Agent or any Term DIP Loan Lender in respect of or in connection with the Term DIP Loan Agreement or with any transactions contemplated by or relating to the Term DIP Loan Agreement, as any of the foregoing may at any time or times be amended, modified, restated or supplemented.

Term DIP Obligations – the "Obligations" as such term is defined in the Term DIP Loan Agreement.

Term Loan Agents – the Pre-Petition Term Agents and the Term DIP Agent.

Term Loan Documents – means the Pre-Petition Term Loan Documents plus the Term DIP Loan Documents.

Term Loan Obligations – means the Pre-Petition Term Loan Obligations plus the Term DIP Obligations.

Term Loan Priority Collateral - as such term is defined in the Intercreditor Agreements.

Trademarks - all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos, or other source or business identifiers, whether currently in use or not, all registrations and recordings thereof and all applications in connection therewith, whether pending or in preparation for filing, including registrations, recordings and applications in the United States Patent and Trademark Office or in any office or agency of the United States of America, or any State thereof or any other country or political subdivision thereof.

Transferee - as defined in **Section 13.3.3** of the Agreement.

Type - any type of a Revolver Loan determined with respect to the interest option applicable thereto, which shall be either a LIBOR Loan or a Base Rate Loan.

UCC - the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Georgia or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

Undocumented Invoice & Storage Accounts – all Invoice & Storage Accounts other than Documented Invoice & Storage Accounts.

Unused Commitments – on any date of calculation, the amount by which the Commitments exceed the Average Revolver Loan Balance for the applicable month.

Unused Commitments Fee Rate – a per annum rate equal to 0.50%.

Unused DIP Letter of Credit Subfacility – on any date, an amount equal to $10,000,000 minus the sum of (i) the aggregate undrawn amount of all outstanding Letters of Credit plus, without duplication, (ii) the aggregate unpaid reimbursement obligations oustanding on such date with respect to all Letters of Credit.

Upstream Payment - a Distribution by a Subsidiary of a Borrower to such Borrower or by any Borrower to SRC.

U.S. Borrowers – as defined in the Recitals.

U.S. Person - "United States Person" as defined in Section 7701(a)(30) of the Code.

U.S. Tax Compliance Certificate - as defined in **Section 4.10.2(ii)(c)** of the Agreement.

U.S. Trustee - the United States Trustee for the District of Delaware.

Value – (i) for Inventory, its value determined on the basis of the lower of cost or market, calculated on a first-in, first out basis, and excluding any portion of cost attributable to intercompany profit among U.S. Borrowers and their Affiliates; and (ii) for Accounts, the face amount of such Accounts, less any and all returns, rebates, discounts (which may, at DIP Agent's option, be calculated on shortest terms), credits, allowances or Taxes (including sales, excise or other taxes) at any time issued, owing or claimed by Account Debtors, granted, outstanding or payable in connection with, or any interest accrued on the amount of, such Accounts at such date; provided, however, if any of such amounts reduced the amount of any Account in calculating its eligibility pursuant to the definition of "Eligible Accounts," such amounts shall not be deducted again in determining the Value

Voting Power - with respect to any Person, the power ordinarily (without the occurrence of a contingency) to elect the members of the board of directors (or Persons performing similar functions) of such Person.

Voting Stock - Equity Interests of any class or classes of a corporation or other entity the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the corporate directors or Persons performing similar functions.

WorkflowOne – as defined in the recitals to the Agreement.

**Accounting Terms.**   Unless otherwise specified herein, all terms of an accounting character used in the Agreement shall be interpreted, all accounting determinations under the Agreement shall be made, and all financial statements required to be delivered under the Agreement shall be prepared in accordance with GAAP, applied on a basis consistent with the most recent audited Consolidated financial statements of Borrowers and the Subsidiaries heretofore delivered to DIP Agent and DIP Lenders and using the same method for inventory valuation as used in such audited financial statements, except for any change required by GAAP or permitted under **Section 9.2.4** of the Agreement.

**Other Terms.**   All other terms contained in the Agreement shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein, including Account, Account Debtor, Chattel Paper, Electronic Chattel Paper, Commercial Tort Claim, Deposit Account, Document, General Intangible, Goods, Inventory, Equipment, Fixtures, Instrument, Investment Property, Letter-of-Credit Right, Supporting Obligation, and Proceeds.

**Certain Matters of Construction.**   The terms "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole and not to any particular section, paragraph or subdivision.   Any pronoun used shall be deemed to cover all genders.   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."   The section titles, table of contents and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of the Agreement.   All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations; to any of the DIP Loan Documents shall include any and all modifications thereto and any and all restatements, extensions or renewals thereof; to any Person shall mean and include the successors and permitted assigns of such Person; to "including" and "include" shall be understood to mean "including, without limitation" (and, for purposes of the Agreement and each other DIP Loan Document, the parties agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters to matters similar to the matters specifically mentioned); or to the time of day shall mean the time of day on the day in question in Atlanta, Georgia, unless otherwise expressly provided in the Agreement.   A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by DIP Agent pursuant to the Agreement or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Required DIP Lenders.   Whenever the phrase to the best of Borrowers' Knowledge or words of similar import relating to the knowledge or awareness of Borrowers are used herein, such phrase shall mean and refer to Borrowers' Knowledge as previously defined. The discretion of DIP Agent or any DIP Lender means the sole and absolute discretion of such Person. All calculations of Value, fundings of Revolver Loans, and payments of Obligations shall be in Dollars and, unless the context otherwise requires, all determinations made from time to time under the DIP Loan Documents shall be made in light of the circumstances existing at such time.   Calculations used in preparing

Borrowing Base Certificates shall be consistent with the methods of valuation and calculation employed in determining the Borrowing Base under (and as defined in) the Pre-Petition ABL Loan Agreement.  Borrowers shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by DIP Agent or any DIP Lender under any DIP Loan Document.   No provision of any DIP Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.

**EXHIBIT A**

**FORM OF REVOLVER NOTE**

U.S. $_____.\_\_                                                                    _____ \_\_\_, 2015

FOR VALUE RECEIVED, each of the undersigned, THE STANDARD REGISTER COMPANY, an Ohio corporation ("SRC"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), and STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation ("SRPR"); STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holding"); STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"); STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"); STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR MX Holdings"); STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Mexico"); STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Servicios", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "Borrower" and collectively, "Borrowers"), hereby unconditionally promises to pay to _____ (herein, together with any registered assigns thereof, called the "Holder") the principal sum of $_____ or such lesser sum as may constitute Holder's Pro Rata share of the outstanding principal amount of all Revolver Loans pursuant to the terms of the DIP Loan Agreement (as defined below) on the date on which such outstanding principal amounts become due and payable pursuant to **Section 4.2** of the DIP Loan Agreement, in strict accordance with the terms thereof. Each Borrower likewise unconditionally promises to pay to Holder interest from and after the date hereof on Holders' Pro Rata share of the outstanding principal amount of Revolver Loans at such interest rates, payable at such times, and computed in such manner as are specified in **Sections 2.1** and **4.2** of the DIP Loan Agreement, in strict accordance with the terms thereof.

This Revolver Note ("Note") is issued pursuant to, and is one of the "Revolver Notes" referred to in, the Post-Petition Loan and Security Agreement dated _____, 2015 (as the same may be amended from time to time, the "DIP Loan Agreement"), among Borrowers, Bank of America, N. A., as collateral and administrative agent (in such capacity, "DIP Agent") for itself and the financial institutions from time to time parties thereto as lenders ("DIP Lenders"), and Holder is and shall be entitled to all benefits thereof and of all DIP Loan Documents executed and delivered in connection therewith. All capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to such terms in the DIP Loan Agreement.

The repayment of the principal balance of this Note is subject to the provisions of **Section 4.2** of the DIP Loan Agreement. The entire unpaid principal balance and all accrued interest on this Note shall be due and payable immediately upon the termination of the Commitments as set forth in **Section 5.2** of the DIP Loan Agreement.

All payments of principal and interest shall be made in Dollars in immediately available funds as specified in the DIP Loan Agreement.

Upon or after the occurrence of an Event of Default and for so long as such Event of Default exists, the principal balance and all accrued interest of this Note may be declared (or shall become) due and payable in the manner and with the effect provided in the DIP Loan Agreement, and the unpaid principal balance hereof shall bear interest at the Default Rate as and when provided in **Section 2.1.5** of the DIP Loan Agreement.  Each Borrower agrees to pay, and save Holder harmless against, any liability for the payment of, all costs and expenses, including, but not limited to, reasonable attorneys' fees, if this Note is collected by or through an attorney-at-law.

All principal amounts of Revolver Loans made by Holder to U.S. Borrowers pursuant to the DIP Loan Agreement, and all accrued and unpaid interest thereon, shall be deemed outstanding under this Note and shall continue to be owing by Borrowers until paid in accordance with the terms of this Note and the DIP Loan Agreement.

In no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof or otherwise, shall the amount paid or agreed to be paid to Holder for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto; and, in the event of any such payment inadvertently paid by Borrowers or inadvertently received by Holder, such excess sum shall be, at Borrowers' option, returned to Borrowers forthwith or credited as a payment of principal, but shall not be applied to the payment of interest.  It is the intent hereof that Borrowers not pay or contract to pay, and that Holder not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Borrowers under Applicable Law.

Time is of the essence of this Note.  To the fullest extent permitted by Applicable Law, each Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of non-payment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under Applicable Law, but if any provision of this Note shall be prohibited or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note.  No delay or failure on the part of Holder in the exercise of any right or remedy hereunder shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise by Holder of any right or remedy preclude any other right or remedy.  Holder, at its option, may enforce its rights against any Collateral securing this Note without DIP Agent or Holder enforcing its rights against any Borrower, any Guarantor of the indebtedness evidenced hereby or any other property or indebtedness due or to become due to a Borrower.  Each Borrower agrees that, without releasing or impairing such Borrower's liability hereunder, Holder or DIP Agent may at any time release, surrender, substitute or exchange any Collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

2

The rights of Holder and obligations of Borrowers hereunder shall be construed in accordance with and governed by the laws (without giving effect to the conflict of law principles thereof) of the State of Georgia.  This Note is intended to take effect as an instrument under seal under Georgia law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Borrower has caused this Note to be executed under seal and delivered by its duly authorized officers on the date first above written.

**BORROWERS:**

**THE STANDARD REGISTER COMPANY**

By:_____

Name: _____

Title: _____

**STANDARD REGISTER INTERNATIONAL, INC.**

By:_____

Name: _____

Title: _____

**STANDARD REGISTER TECHNOLOGIES, INC.**

By:_____

Name: _____

Title: _____

**IMEDCONSENT, LLC**

By:_____

Name: _____

Title: _____

**STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc.**

By:_____

Name: _____

Title: _____

**STANDARD REGISTER HOLDING COMPANY**

By: _____

Name: _____

Title: _____


**STANDARD REGISTER TECHNOLOGIES CANADA ULC**

By: _____

Name: _____

Title: _____


**STANDARD REGISTER MEXICO HOLDING COMPANY**

By: _____

Name: _____

Title: _____


**STANDARD REGISTER HOLDINGS, S de R.L. de C.V.**

By: _____

Name: _____

Title: _____


**STANDARD REGISTER de MEXICO, S de R.L. de C.V.**

By: _____

Name: _____

Title: _____

**STANDARD REGISTER SERVICIOS, S de R.L. de C.V.**

By: _____

Name: _____

Title: _____

## EXHIBIT B

## FORM OF NOTICE OF CONVERSION/CONTINUATION

Date _____, 2015

Bank of America, N.A., as Agent

_____

_____

Attention: _____

Re:    Post-Petition Loan and Security Agreement dated _____, 2015, by and among THE STANDARD REGISTER COMPANY, an Ohio corporation ("SRC"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), and STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation ("SRPR"); STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holding"); STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"); STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"); STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR MX Holdings"); STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Mexico"); STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Servicios", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "Borrower" and collectively, "Borrowers"); Bank of America, N.A., as collateral and administrative agent for certain DIP Lenders from time to time parties thereto; and such DIP Lenders (as at any time amended, the "DIP Loan Agreement")

Gentlemen:

This Notice of Conversion/Continuation is delivered to you pursuant to **Section 2.1.2(ii)** of the DIP Loan Agreement.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings attributable thereto in the DIP Loan Agreement.  SRC, on behalf of U.S. Borrowers, hereby gives notice of its request as follows:

Check as applicable:

☐ A conversion of Revolver Loans from one Type to another, as follows:

(i)    The requested date of the proposed conversion is _____, 2015 (the "Conversion Date");

(ii)    The Type of Revolver Loans to be converted pursuant hereto are presently _____ [select either LIBOR Loans or Base Rate Loans] in

the principal amount of $_____ outstanding as of the Conversion Date;

(iii)    The portion of the aforesaid Revolver Loans to be converted on the Conversion Date is $_____ (the "<u>Conversion Amount</u>");

(iv)    The Conversion Amount is to be converted into a _____ [select either a LIBOR Loan or a Base Rate Loan] (the "<u>Converted Loan</u>") on the Conversion Date.

(v)    [In the event U.S. Borrower selects a LIBOR Loan:] U.S. Borrower hereby requests that the Interest Period for such Converted Loan be for a duration of _____ [insert length of Interest Period].

☐ A continuation of LIBOR Loans for new Interest Period, as follows:

(i)    The requested date of the proposed continuation is _____, 2015 (the "<u>Continuation Date</u>");

(ii)    The aggregate amount of the LIBOR Loans subject to such continuation is $_____;

(iii)    The duration of the selected Interest Period for the LIBOR Loans which are the subject of such continuation is: _____ [*select duration of applicable Interest Period*];

SRC, on behalf of itself and Borrowers, hereby ratifies and reaffirms all of its liabilities and obligations under the DIP Loan Documents and certifies that to Borrowers' Knowledge no Default or Event of Default exists on the date hereof.

SRC, on behalf of itself and Borrowers, has caused this Notice of Conversion/Continuation to be executed and delivered by their duly authorized representative, this _____ day of _____, 2015.

_____

By:_____
Name: _____
Title: _____

2

## EXHIBIT C

## FORM OF NOTICE OF BORROWING

Date _____, 2015

Bank of America, N.A., as Agent
_____
_____
Attention: _____

Re:    Post-Petition Loan and Security Agreement dated _____, 2015, by and among THE STANDARD REGISTER COMPANY, an Ohio corporation ("SRC"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), and STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation ("SRPR"); STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holding"); STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"); STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"); STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR MX Holdings"); STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Mexico"); STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Servicios", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "Borrower" and collectively, "Borrowers"); Bank of America, N.A., as collateral and administrative agent for certain DIP Lenders from time to time parties thereto; and such DIP Lenders (as at any time amended, the "DIP Loan Agreement")

Gentlemen:

This Notice of Borrowing is delivered to you pursuant to **Section 3.1.1(i)** of the DIP Loan Agreement.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings attributable thereto in the DIP Loan Agreement.  SRC, on behalf of itself and U.S. Borrowers, hereby requests a Revolver Loan in the aggregate principal amount of $_____, to be made on _____, 2015.

Check as applicable:

☐ Base Rate Loans in the aggregate principal amount of $_____

☐ LIBOR Loans in the aggregate principal amount of $_____, with Interest Periods as follows:

(i)    As to $_____, an Interest Period of _____ month(s);

(ii)     As to $_____, an Interest Period of _____ months;

(iii)    As to $_____, an Interest Period of _____ months.

SRC, on behalf of itself and Borrowers, hereby (i) ratifies and reaffirms all of its liabilities and obligations under the DIP Loan Documents; (ii) certifies that all of the conditions applicable to the Revolver Loan requested herein as set forth in the DIP Loan Agreement have been satisfied as of the date hereof and will remain satisfied to the date of such Revolver Loan; (iii) represents that Borrowers are in compliance with the DIP Budget (with any Permitted Variances) and Borrowing Base and that the proceeds of such Revolver Loan shall be used solely pursuant to the DIP Budget and DIP Financing Orders (and not for any purpose prohibited under the DIP Loan Documents or the DIP Financing Orders), in each case, subject to any Permitted Variance; (iv) certifies that all representations and warranties of Borrowers in the DIP Loan Documents were true and correct in all material respects when made and continue to be true and correct in all material respects on the date hereof; (v) certifies that Borrowers are in compliance with all covenants under the DIP Loan Documents; and (vi) represents that there is no Default or Event of Default in existence at the time of, or after giving effect to the making of, the requested Revolver Loan.

SRC, on behalf of itself and Borrowers, has caused this Notice of Borrowing to be executed and delivered by their duly authorized representative, this _____ day of _____, 2015.

**THE STANDARD REGISTER COMPANY**


By:_____
Name: _____
Title: _____

<u>**EXHIBIT D**</u>

**COMPLIANCE CERTIFICATE**

[Letterhead of Borrower]

_____, 2015

Bank of America, N.A., as Agent

_____
_____

Attention: _____

      The undersigned, the chief financial officer of THE STANDARD REGISTER COMPANY, an Ohio corporation ("<u>SRC</u>"), gives this certificate to Bank of America, N.A. ("<u>DIP Agent</u>") in accordance with the requirements of **Section 9.1.4** of that certain Post-Petition Loan and Security Agreement dated _____, 2015, among SRC, STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("<u>SRI</u>"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("<u>SRT</u>"), IMEDCONSENT, LLC, a Delaware limited liability company ("<u>iMed</u>"), and STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation ("<u>SRPR</u>"); STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("<u>SR Holding</u>"); STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("<u>SR MX Holdco</u>"); STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("<u>SR Canada</u>"); STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("<u>SR MX Holdings</u>"); STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("<u>SR Mexico</u>"); STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("<u>SR Servicios</u>", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>"); DIP Agent; and the DIP Lenders referenced therein (as at any time amended, the "<u>DIP Loan Agreement</u>"). Capitalized terms used in this Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the DIP Loan Agreement.

      **Based upon my review of the balance sheets and statements of income of SRC and its Subsidiaries for the [Fiscal Year] [Fiscal Quarter] [Fiscal Month] [quarterly period] ending _____, 2015, copies of which are attached hereto, I hereby certify that, to Borrower's Knowledge:**

           1.    No Default exists on the date hereof, other than: _____ _____ [if none, so state]; and

           2.    No Event of Default exists on the date hereof, other than _____ _____ [if none, so state].

3.        Each Borrower is in compliance with the current DIP Budget, and all Revolver Loans have been and will be used solely in accordance with the DIP Budget, subject to Permitted Variances.

Very truly yours,

_____

Chief Financial Officer

<u>**EXHIBIT E**</u>

**FORM OF ASSIGNMENT AND ACCEPTANCE**

Dated as of _____, 2015

Reference is made to the Post-Petition Loan and Security Agreement dated _____, 2015 (at any time amended, the "<u>DIP Loan Agreement</u>"), among THE STANDARD REGISTER COMPANY, an Ohio corporation ("<u>SRC</u>"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("<u>SRI</u>"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("<u>SRT</u>"), IMEDCONSENT, LLC, a Delaware limited liability company ("<u>iMed</u>"), and STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation ("<u>SRPR</u>"); STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("<u>SR Holding</u>"); STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("<u>SR MX Holdco</u>"); STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("<u>SR Canada</u>"); STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("<u>SR MX Holdings</u>"); STANDARD REGISTER de MEXICO, S de C.V. , a limited liability company organized under the laws of Mexico ("<u>SR Mexico</u>"); STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("<u>SR Servicios</u>", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>"); BANK OF AMERICA, N.A., in its capacity as collateral and administrative agent ("<u>DIP Agent</u>") for the financial institutions from time to time party to the DIP Loan Agreement ("<u>DIP Lenders</u>"); and such DIP Lenders.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the DIP Loan Agreement.

_____    ("<u>Assignor</u>")    and
_____ ("<u>Assignee</u>") agree as follows:

1.    Assignor hereby irrevocably sells and assigns to Assignee and Assignee hereby irrevocably purchases and assumes from Assignor (a) a principal amount of $_____ of Assignor's outstanding Revolver Loans and $_____ of Assignor's participations in Letter of Credit Outstandings and (b) the amount of $_____ of Assignor's Revolver Commitment (which represents ____% of the total Revolver Commitments), together with (x) all of Assignor's rights and obligations in its capacity as a DIP Lender under the DIP Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified above of all of such outstanding rights and obligations of Assignor thereunder (including, without limitation, the Letters of Credit) and (y) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of Assignor (in its capacity as a DIP Lender) against any Person, whether known or unknown, arising under or in connection with the DIP Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (x) above (all of the foregoing items

being, collectively, the "Assigned Interest"). This Assignment and Acceptance shall be effective as of the date ("Effective Date") indicated in the corresponding Assignment Notice delivered to DIP Agent, provided such Assignment Notice is executed by Assignor, Assignee, DIP Agent and SRC, if applicable. From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date. Each such sale and assignment is without recourse to Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by Assignor.

2.      Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) except as set forth herein, assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the DIP Loan Agreement or any other DIP Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any of their Subsidiaries or Affiliates or any other Person obligated in respect of any DIP Loan Document or (iv) the performance or observance by Borrowers, any of their Subsidiaries or Affiliates or any other Person of any of their respective obligations under any DIP Loan Document. *[Assignor is attaching the Note[s] held by it and requests that DIP Agent exchange such Note[s] for new Notes payable to Assignee [and Assignor].]*

3.      Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a DIP Lender under the DIP Loan Agreement, (ii) from and after the Effective Date, it shall be bound by the provisions of the DIP Loan Agreement as a DIP Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a DIP Lender thereunder, (iii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type; (b) confirms that it has received copies of the DIP Loan Agreement and such other DIP Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and purchase the Assigned Interest; (c) agrees that it has and shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions to enter into this Assignment and Acceptance and purchase the Assigned Interest and in taking or not taking action under the DIP Loan Documents; (d) confirms that it is an Eligible Assignee; (e) appoints and authorizes DIP Agent to take such action as agent on its behalf and to exercise such powers under the DIP Loan Agreement as are delegated to DIP Agent by the terms thereof, together with such powers as are incidental thereto; (f) agrees that it will observe and perform all obligations that are required to be performed by it as a "DIP Lender" under the DIP Loan Documents; and

(g) represents and warrants that the assignment evidenced hereby will not result in a non-exempt "prohibited transaction" under Section 406 of ERISA.

4.      From and after the Effective Date, DIP Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

5.      This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by the laws of the State of Georgia.  If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity, and the remaining provisions of this Assignment and Acceptance shall remain in full force and effect.

6.      Each notice or other communication hereunder shall be in writing, shall be sent by messenger, by telecopy or facsimile transmission or by first-class mail, shall be deemed given when sent and shall be sent as follows:

(a)     If to Assignee, to the following address (or to such other address as Assignee may designate from time to time):

_____
_____
_____

(b)     If to Assignor, to the following address (or to such other address as Assignor may designate from time to time):

_____
_____
_____
_____

Payments hereunder shall be made by wire transfer of immediately available Dollars as follows:

If to Assignee, to the following account (or to such other account as Assignee may designate from time to time):

_____
ABA No._____
_____
Account No._____
Reference: _____

If to Assignor, to the following account (or to such other account as Assignor may designate from time to time):

_____

_____

_____

ABA No._____

For Account of:_____

Reference: _____

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed and delivered by their respective duly authorized officers, as of the date first above written.

_____

("Assignor")

By:_____

Title: _____

_____

("Assignee")

By:_____

Title: _____

## EXHIBIT F

## FORM OF NOTICE OF ASSIGNMENT

Reference is made to (i) the Post-Petition Loan and Security Agreement dated _____, 2015 (as at any time amended, the "DIP Loan Agreement") among THE STANDARD REGISTER COMPANY, an Ohio corporation ("SRC"), STANDARD REGISTER INTERNATIONAL, INC., an Ohio corporation ("SRI"), STANDARD REGISTER TECHNOLOGIES, INC., an Ohio corporation ("SRT"), IMEDCONSENT, LLC, a Delaware limited liability company ("iMed"), and STANDARD REGISTER OF PUERTO RICO INC., f/k/a WorkflowOne of Puerto Rico, Inc., a Delaware corporation ("SRPR"); STANDARD REGISTER HOLDING COMPANY, an Ohio corporation ("SR Holding"); STANDARD REGISTER MEXICO HOLDING COMPANY, an Ohio corporation ("SR MX Holdco"); STANDARD REGISTER TECHNOLOGIES CANADA ULC, an unlimited company organized under the laws of Nova Scotia ("SR Canada"); STANDARD REGISTER HOLDINGS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR MX Holdings"); STANDARD REGISTER de MEXICO, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Mexico"); STANDARD REGISTER SERVICIOS, S de R.L. de C.V., a limited liability company organized under the laws of Mexico ("SR Servicios", and together with SRC, SRI, SRT, iMed, SRPR, SR Holding, SR MX Holdco, SR Canada, SR MX Holdings, and SR Mexico, each a "Borrower" and collectively, "Borrowers"); BANK OF AMERICA, N.A. in its capacity as collateral and administrative agent ("DIP Agent") for the financial institutions from time to time party to the DIP Loan Agreement ("DIP Lenders"); and such DIP Lenders, and (ii) the Assignment and Acceptance dated as of _____, 2015 (the "Assignment Agreement") between _____ ("Assignor") and _____ ("Assignee").  Except as otherwise defined herein, capitalized terms used herein which are defined in the DIP Loan Agreement are used herein with the respective meanings specified therein.

Assignor hereby notifies Borrowers and DIP Agent of Assignor's intent to assign to Assignee pursuant to the Assignment Agreement (a) a principal amount of $_____ of Assignor's outstanding Revolver Loans and $_____ of Assignor's participations in Letter of Credit Outstandings, and (b) the amount of $_____ of Assignor's Revolver Commitment (which represents _____% of the total Revolver Commitments) (the foregoing items being, collectively, the "Assigned Interest"), together with an interest in the DIP Loan Documents corresponding to the Assigned Interest.  The Assignment Agreement shall be effective as of the date ("Effective Date") indicated below, provided this Assignment Notice is executed by Assignor, Assignee, DIP Agent and SRC, if applicable.  Pursuant to the Assignment Agreement, Assignee has expressly assumed all of Assignor's obligations under the DIP Loan Agreement and the other DIP Loan Documents to the extent of the Assigned Interest, as of the Effective Date.

For purposes of the DIP Loan Agreement, DIP Agent shall deem Assignor's share of the Revolver Commitment to be reduced by $_____ and $_____, respectively, and Assignee's share of the Revolver Commitment to be increased by $_____.

The address of the Assignee to which notices, information and payments are to be sent under the terms of the DIP Loan Agreement is:

_____

_____

_____

_____

Assignee's LIBOR Lending Office address is as follows:

_____

_____

_____

_____

This Notice is being delivered to Borrowers and DIP Agent pursuant to **Section 13.3** of the DIP Loan Agreement.  Please acknowledge your receipt of this Notice by executing and returning to Assignee and Assignor a copy of this Notice.

IN WITNESS WHEREOF, the undersigned have caused the execution of this Notice, as of _____, 2015.

_____
("Assignor")

By:_____
Title: _____

_____
("Assignee")

By:_____
Title: _____

ACKNOWLEDGED AND AGREED TO
AS OF THE DATE SET FORTH ABOVE:

**BORROWERS:**\*

**THE STANDARD REGISTER COMPANY**

By:_____
Name: _____
Title: _____


**STANDARD REGISTER INTERNATIONAL, INC.**

By:_____
Name: _____
Title: _____


**STANDARD REGISTER TECHNOLOGIES, INC.**

By:_____
Name: _____
Title: _____


**IMEDCONSENT, LLC**

By:_____
Name: _____
Title: _____


**STANDARD REGISTER OF PUERTO RICO INC.**,
f/k/a WorkflowOne of Puerto Rico, Inc.

By:_____
Name: _____
Title: _____

**STANDARD REGISTER HOLDING COMPANY**

By: _____
Name: _____
Title: _____


**STANDARD REGISTER TECHNOLOGIES CANADA ULC**

By: _____
Name: _____
Title: _____


**STANDARD REGISTER MEXICO HOLDING COMPANY**

By: _____
Name: _____
Title: _____


**STANDARD REGISTER HOLDINGS, S de R.L. de C.V.**

By: _____
Name: _____
Title: _____


**STANDARD REGISTER de MEXICO, S de R.L. de C.V.**

By: _____
Name: _____
Title: _____

**STANDARD REGISTER SERVICIOS, S de**
**R.L. de C.V.**


By:_____

Name: _____

Title: _____



\* No signature required by a Borrower when a Default or an Event of Default exists.

**BANK OF AMERICA, N.A.**,
as DIP Agent


By: _____
Name: _____
Title: _____

## EXHIBIT G

## LETTER OF CREDIT APPLICATION FORM

Application and Agreement for Standby Letter of Credit
TO: Bank of America, N.A. ("Bank of America")

For Bank of America Use Only

L/C No. _____

_____

1. **Application.**

_____ ("Applicant") requests Bank of America to issue an irrevocable standby letter of credit ("Letter of Credit") as follows:

☐ Full text teletransmission        ☐ Airmail with brief preliminary teletransmission advice        ☐ Airmail        ☐ Courier

2. Applicant Address:        3. For Account of (Name and address, if different from Applicant):

_____        _____
_____        _____
_____        _____
_____        _____
_____        _____

4. Advising Bank:        5. In favor of (Beneficiary Name and Address):

_____        _____
_____        _____
_____        _____
_____        _____
_____        _____
_____        _____

6. Amount: _____        ( _____ )
(in words and figures)

Currency _____
(if left blank, U.S. Dollars)

7. Expiration Date. Drafts to be drawn on and presented at Bank of America's Address set forth in the Letter of Credit on or before: _____

☐ If this box is marked, Applicant authorizes Bank of America to effect payment of any sums due under this Application and Agreement by means of debiting Applicant's account with Bank of America set forth below. This authorization does not effect the obligation of Applicant to pay such sums when due, if there are insufficient funds in such account to make such payment when due, or if Bank of America fails to debit the account, and this authorization does not affect any setoff rights of Bank of America at law or in equity. Applicant's account number with Bank of America is _____

8. Available by drafts drawn at sight on Bank of America when accompanied by the following documentation:

a. The original Letter of Credit.

b. The signed statement of the Beneficiary worded as follows (state wording that is to appear in the statement accompanying the draft; specify if such wording must be exact):   **issue Standby Letter of Credit per approved drafted Letter of Credit**

Special Instructions:

In consideration of Bank of America's issuing the Letter of Credit at the request of Applicant, Applicant agrees to the following:

**1. Applicant Payments.**

(a) Applicant shall pay Bank of America, on demand, all amounts paid by Bank of America under or in respect of the Letter of Credit.

(b) On each fee payment date, so long as any undrawn amount of the Letter of Credit remains available, Applicant shall pay Bank of America a Letter of Credit fee. The fee payment date(s) shall be the date(s) as Applicant and Bank of America may agree, or in the absence of such agreement, the fee payment date shall be the date on which Bank of America issues the Letter of Credit. The fee shall be at such rate per annum as Applicant and Bank of America may agree or, in the absence of such agreement, at the rate customarily charged by Bank of America at the time such fee is payable, based upon Applicant's creditworthiness, as determined by Bank of America in its sole discretion. The applicable Letter of Credit fee shall be calculated and payable on the undrawn amount of the Letter of Credit as of each fee payment date, and shall be for the period commencing on such fee payment date and ending on the day preceding the next fee payment date (or the expiration date of the Letter of Credit, if the case may be), both dates inclusive. The Letter of Credit fee will be computed on the basis of a 360-day year and actual days elapsed. Bank of America shall not be required to refund any portion of the Letter of Credit fee paid for any period during which (a) the Letter of Credit expires or otherwise terminates or (b) the undrawn amount of the Letter of Credit is reduced by drawings or by amendment.

(c) Applicant shall pay Bank of America, on demand, commissions and fees for amendments to, payments under, extensions of or cancellation of the Letter of Credit, and other services in the amounts Applicant and Bank of America may agree or, in the absence of such agreement, in the amounts customarily charged by Bank of America on the date of Bank of America's demand.

(d) All payments and deposits of any kind by Applicant under this Application and Agreement, including prepayments, shall be made at the banking center or office Bank of America may designate from time to time. Bank of America shall have no obligation to pay Applicant interest on any such payment, prepayment or deposit made by Applicant under its Application and Agreement

(e) (i) All payments and deposits by Applicant under this Application and Agreement will be in the currency in which the Letter of Credit is payable, except that Bank of America may, at its option, require payments and deposits by Applicant under this Application and Agreement to be made in U.S. Dollars if the Letter of Credit is payable in a foreign currency

(ii) The amount of each payment and each deposit by Applicant under this Application and Agreement in U.S. Dollars for a Letter of Credit payable in a foreign currency shall be determined by converting the relevant amount to U.S. Dollars at the Conversion Rate in effect

(A) with respect to each payment under Section 1(a) of this Agreement, on the date the payment is made by Bank of America under or in respect of the Letter of Credit, and

(B) with respect to each payment not falling under the preceding clause (A) and each deposit, on the date of Bank of America's demand for such payment or deposit.

(iii) If a U.S Dollar deposit by Applicant under this Application and Agreement for a Letter of Credit payable in a foreign currency becomes less than the U.S. Dollar equivalent of the undrawn amount of the Letter of Credit because of any variation in rates of exchange, Applicant shall deposit with Bank of America, on demand, additional amounts in U.S. Dollars so that the total amount deposited by Applicant under this Application and Agreement is not less than the U.S. Dollar equivalent of the undrawn amount of the Letter of Credit, determined by using the Conversion Rate on the date of Bank of America's latest demand.

(iv) "Conversion Rate" means the rate quoted by Bank of America for the purchase from Bank of America of the relevant foreign currency with U.S. Dollars

(f) Applicant shall reimburse or compensate Bank of America, on demand, for all costs incurred, losses suffered and payments made by Bank of America which are applied or located by Bank of America to the Letter of Credit (as determined by Bank of America) by reason of any and all present or future reserve, capital, deposit, assessment or similar requirements against (or against any class of or change in or in the amount of) assets or liabilities of, or commitments or extensions of credit by, Bank of America.

(g) Applicant shall pay interest, on demand, on any amount not paid when due under this Application and Agreement from the due date until payment in full at a rate per annum equal the rate of interest publicly announced from time to time by Bank of America as its prime rate, plus three percentage points (not to exceed the maximum rate permitted by applicable law). The prime rate is set by Bank of America based on various factors, including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some credits. Bank of America may price credit at, above or below the prime rate. Any change in Bank of America's prime rate shall take effect the opening of business on the day specified in Bank of America's public announcement of a change in Bank of America's prime rate. Interest will be computed on the basis of a 30-day year and actual days elapsed.

**2. Deposit Events.** Upon the occurrence of any of the following events, Applicant shall deposit with Bank of America, on demand (except that such demand shall not be required in the event of an occurrence described in (b) below) and as cash security for Applicant's obligations to Bank of America under this Application and Agreement, an amount equal to the undrawn amount of the Letter of Credit:

(a) Applicant defaults under any provision of this Application and Agreement;

(b) Any bankruptcy or similar proceeding is commenced with respect to Applicant;

(c) Any default occurs under any other agreement involving the borrowing of money or the extension of credit under which Applicant may be obligated as borrower, installment purchaser or guarantor, if such default consists of the failure to pay any indebtedness when due or if such default permits or causes the acceleration of any indebtedness or the termination of any commitment to lend or to extend credit.

(d) Applicant or any of its affiliates defaults on any other obligation to Bank of America;

(e) In the opinion of Bank of America, any material adverse change occurs in Applicant's business, operations, financial condition or ability to perform its obligations under this Application and Agreement;

(f) Any guarantee of Applicant's obligations under this Application and Agreement terminates, is revoked or its validity is contested by the guarantor, or any of the events set forth in (b) through (e) above occur with respect to the guarantor rather than the Applicant;

(g) Any court order, injunction or other legal process is issued restraining or seeking to restrain drawing or payment under the Letter of Credit.

**3. Charge to Accounts.** If Bank of America is unable to debit the account, if any, specified on the Application, Applicant authorizes Bank of America to charge any of Applicant's accounts with Bank of America, or any affiliate of Bank of America, for all amounts then due and payable to Bank of America under this Application and Agreement.

**4. Indemnities.**

(a) Applicant will indemnify and hold Bank of America (such term to include for purposes of this Section 4 affiliates of Bank of America and its affiliates' officers, directors, employees and agents) harmless from and against (i) all loss or damage arising out of the issuance by Bank of America, or any other action taken by any such indemnified party in connection with the Letter of Credit including any loss or damage arising in whole or in part on the negligence of the party seeking indemnification, but excluding any loss or damage resulting from the gross negligence or willful misconduct of the party seeking indemnification, and (ii) all costs and expenses (including reasonable attorneys' fees and located costs of in-house counsel and legal expenses) of all claims or legal proceedings arising out of the issuance by Bank of America of the Letter of Credit or incident to the collection of amounts owed by Applicant hereunder or the enforcement of the rights of Bank of America hereunder, including, without limitation, legal proceedings related to any court order, injunction, or other process or decree restraining or seeking to restrain Bank of America from paying any amount under the Letter of Credit. Additionally, Applicant will indemnify and hold Bank of America harmless from and against all claims, losses, damages, costs, costs or expenses (including reasonable attorneys' fees and allocated costs of in-house counsel, and legal expenses) arising out of Applicant's failure to timely procure licenses or comply with laws, rules, regulations or orders with respect to the subject or failure of Applicant relating to or affecting the Letter of Credit

(b) If any award, judgment or order is given or made for the payment of any amount due under this Application and Agreement and such award, judgment or order is expressed in a currency other than the currency required under this Application and Agreement. Applicant shall indemnify Bank of America against and hold Bank of America harmless from all loss and damage incurred by Bank of America as a result of any variation in rates of exchange between the date of such award, judgment or order and the date of payment (or, in the case of partial payments, the date of each partial payment thereof) in the required currency

(c) Each of these indemnities shall constitute an obligation separate and independent from the other obligations contained in this Application and Agreement, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by Bank of America from time to time, and shall continue in full force and effect notwithstanding any award, judgment or order for a liquidated sum in respect of an amount due under this Application and Agreement.

**5. Governing Law and Rules.**

(a) The Letter of Credit will be subject to and governed by the most current version, in effect on the date the Letter of Credit is issued, of the International Chamber of Commerce publication "International Standby Practices", except as Applicant may otherwise instruct in the Application and as Bank of America may otherwise agree within the text of the Letter of Credit as issued. The Letter of Credit will also be subject to, and this Application and Agreement will be governed by, the laws of the state in the United States where Bank of America issues the Letter of Credit, providing, however, that, with respect to the Letter of Credit, Bank of America may agree, on Applicant's request, to specify in the Letter of Credit a different state's laws as the governing law. In any event, each choice of law shall be without reference to the chosen state's provisions regarding conflicts of laws

(b) Applicant and Bank of America agree, to the extent permitted under applicable law to waive any right to a trial by jury in any action or proceeding with respect to any dispute or controversy under this Application and Agreement and hereby agree that such action or proceeding will be tried before a judge without a jury.

**6. Applicant Status.** The word "Applicant" in this Application and Agreement refers to each signer (other than Bank of America) of this Application and Agreement. If this Application and Agreement is signed by more than one Applicant, their obligations under this Application and Agreement shall be joint and several

**7. Representations and Warranties.** Applicant represents and warrants to Bank of America that it has the authority to enter into this Application and Agreement and that such Agreement will not violate or conflict with any of the provisions of its constituent documents or any other agreement or undertaking to which it is a party or to which it is bound.

**8. Miscellaneous.**

(a) No delay, extension of time, renewal, compromise or other indulgence which may occur or be granted by Bank of America shall impair the rights and powers of Bank of America hereunder. Bank of America shall not be deemed to have waived any of its rights hereunder, unless Bank of America shall have signed such waiver in writing.

(b) Any notice from Bank of America to Applicant shall be deemed given when mailed, postage paid, or when delivered to a courier, fee paid by shipper, addressed to Applicant at the address furnished by Applicant to Bank of America pursuant to this Application, or when confirmed by electronic confirmation to Bank of America as having been delivered via facsimile or other teletransmission. Any notice from Applicant to Bank of America shall be effective upon receipt by Bank of America.

(c) Each provision of this Application and Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Application and Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Application and Agreement

(d) Any and all payments made to Bank of America hereunder shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding income or franchise taxes imposed by the United States and any political subdivisions thereof (such nonexcluded taxes being herein called "Taxes"). If Applicant shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 8(d)), Bank of America shall receive an amount equal to the sum Bank of America would have received had no such deductions been made, (ii) Applicant shall make such deductions, and (iii) Applicant shall pay the full amount deducted to the relevant authority in accordance with applicable law. Applicant will indemnify Bank of America for the full amount of Taxes (including, without limitation, any Taxes imposed by any jurisdiction on amounts payable under this Section 8(d)) paid by Bank of America and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date Bank of America makes written demand therefor. Within 30 days after the date of any payment of Taxes Applicant will furnish to Bank of America the original or a certified copy of a receipt evidencing payment thereof.

(e) This Application and Agreement shall be binding upon Applicant, its successors and assigns, and shall inure to the benefit of Bank of America, its successors, transferees and assigns, provided that any assignment by Applicant of any of its rights or obligations under this Application and Agreement without the prior written consent of Bank of America shall be void

(f) Unless the Applicant has specified in the Application that the wording of the Letter of Credit must be exact, Applicant understands that the final form of the Letter of Credit may vary from the wording specified in the Application, and Applicant authorizes Bank of America to make such changes, not materially inconsistent with the Application, which Bank of America deems necessary or appropriate. Applicant understands that the risk to Applicant is greater if Applicant requests a standby letter of credit which requires only a draft, rather than a standby letter of credit which requires supporting documentation

(g) In the event of any change or modification, with the consent of Applicant, which consent may be given by any means of submission acceptable to Bank of America. including, without limitation, computer, facsimile or telex, relative to the Letter of Credit or any instrument called for hereunder, including any waiver made or in good faith believed by Bank of America to have been made by Applicant of any term hereof or the noncompliance of any such instruments with the terms of the Letter of Credit, this Application and Agreement shall be binding upon Applicant with regard to the Letter of Credit as so changed or modified, and to any action taken by Bank of America or any of its correspondents relative thereto. No term or provision of this Application and Agreement can be changed orally, but only in a writing and signed by Applicant and Bank of America

(h) Bank of America assumes no liability or responsibility for the consequences arising out of delay and/or loss in transit of any message, letter or documentation, or for delay, mutilation or other error arising in the transmission of any teletransmission. In no event shall Bank of America be liable for any special, indirect, consequential or exemplary damages

(i) If Applicant includes in the Application any language describing events or conditions that would not be possible for Bank of America to verify solely from the documents required to be presented under the Letter of Credit, Applicant acknowledges and agrees that Bank of America has no obligation to verify compliance with such requirements

NOTICE OF FINAL AGREEMENT. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

This Application and Agreement is executed by Applicant on _____

ame of Applicant

```
                                                    Title
```

ame of Applicant (if any, co-signing with the Applicant above)

```
                                                    Title
```

WHERE SPECIMEN SIGNATURES OF THE APPLICANT NAMED ABOVE ARE NOT ON FILE WITH BANK
F AMERICA, THE FOLOWING SIGNATURE VERIFICATION IS REQUIRED.)

e above signature of an officer, partner or agent of each Applicant indicated above confirms to that on file
th us and such officer, partner or agent is fully authorized to sign this Agreement for such Applicant.

```
        BANK (Full Name)          (Bank Address)
```

uthorized Signature/Title (Specimen signature of the signer must be on file with Bank of America)
-35-0521NSBW    05-2007

| COMMISSION | ☐ Trade Operations |  | Mail Code# |  |
|---|---|---|---|---|
|  | ☐ Per Standard Fee Schedule | ☐ Other |  | ☐ Charge Banking Center |
|  | ☐ Charge Directly | ☐ Commissions and Charges only |  | ☐ Drawings, Commissions and Charges |

APPROVING OFFICER (Printed Name)                    PHONE #

OFFICER TELEPHONE #                    FAX #

DDA APPLICANT A/C #

APPROVING BANK OFFICER SIGNATURE

OFFICER -- INTEROFFICE ADDRESS

OFFICER NUMBER AND COST CENTER NUMBER

Bank of America, N ..

## EXHIBIT H

### FISCAL CALENDAR

In 2015, each Borrower's fiscal calendar began on Wednesday, December 28, 2014, with the closing of each fiscal month, quarter and year determined as follows:

     A.    <u>Fiscal Month</u> - Each fiscal month of each Borrower consists of a four-week period, with each third month consisting of five weeks. Thus, March, June, September and December contain five weeks, while the remaining months contain four weeks. The closing of the fiscal month occurs on the last Sunday of each four-week or five-week period.

     B.    <u>Fiscal Quarter</u> - Each fiscal quarter of each Borrower consists of a thirteen-week period. The closing of the fiscal quarter occurs on the last Sunday of each thirteen-week period.

     C.    <u>Fiscal Year</u> – Each Borrower's fiscal year consists of a 52-week period. The fiscal year of each Borrower closes on the last Sunday of the 52-week period. Every several years, the fiscal year will include fifty-three (53) weeks so the fiscal year-end remains within one week of the calendar year end. In such years, the fiscal months of November and December will both include five weeks.

See the attached "2015 Sales/Fiscal Calendar" for the corresponding dates included within each fiscal period of 2015.

# <u>EXHIBIT I</u>

## BORROWING BASE CERTIFICATE



Borrowing Certificate

| Customer Name: | The Standard Register Company |
|---|---|
| Assignment #: | C/R # |
| Report Date: | |

| ACCOUNTS RECEIVABLE  Loan # | |
|---|---|
| Dates Covered: (Monthly) :  Fiscal Month of | |
| **Collateral** | |
| **1.  Beginning Balance** | |
| 2.   Sales (+) | |
| 3.   Credit Memos (-) | |
| 4.   Adjustments (+) | |
| 5.   Adjustments (-) | |
| 6.   Net Collections - Includes Non A/R Cash (-) | |
| 7.   Discounts (-) | |
| 8.   Non A/R Cash/Overpayments (+) | |
| 9.   Unapplied Cash (-) | |
| **10. Current Balance** | |
| 11. Ineligible | |
| 12. Eligible A/R (10-11) | |
| 13. A/R Availability                                           85% | |
| 14. Cash Applied to A/R, not to Revolver | |
| Less Collateral Reserve (Dilution) amount > 5%        2.20% | |
| | |
| **15. A/R Availability Plus Cash Applied to A/R, not to Revolver** | |
| **Inventory** | |
| **Raw Materials** | |
| Gross RM Inv | |
| less: RM Ineligibles | |
| Eligible RM Inv. | |
| **Avail Inv (@RM advance rate)**                    38.51% | |
| | |
| **Finished Goods** | |
| Gross FG Inv | |
| less: FG Ineligibles | |
| Eligible FG Inv. | |
| **Avail Inv (@FG advance rate)**                    59.93% | |
| **Finished Goods availability        (less rent reserve of  …..)**        112,976 | |
| | |
| **Gross WIP** | |
| **Avail WIP: ($0)** | |
| | |
| **Total Inventory Availability** | |
| Inventory Subline | |
| **Total Inventory Availability (after subline)** | |
| **Loan** | |
| **16. Beginning Balance** | |
| 17. Cash (Checks/ACH) (-) | |
| 18. Net Cash (Wire) (-) | |
| 19. Adjustments (-/+) | |
| 20. Advance (+) | |
| **21. Current Revolving LoanBalance** | |
| | |
| **22. Total Availability (#15 (A/R) + Total Inventory Availability)** | |
| 23. Less: Other Collateral Reserves | |
| **26. Total Availability After Reserves (#22-#23)** | |
| **Total Credit Line\*** | |
| **Qualified Availability (< of total credit line and total avail)** | |
| Less Total Revolving Loan Balance | |
| Less Letters of Credit | |
| **Remaining Availability** | |
| | |
| | |

The foregoing information is delivered to Bank of America, N.A., ("**Agent**") in accordance
with the Amended and Restated  Loan and Security Agreement (the "**Loan Agreement**")
dated as of 8/1/13 among The Standard Register Company, the other borrowers party
thereto, the lenders party thereto and Agent.  I hereby certify that the information contained
herein is true and correct as of the "Report Date" shown above.  Nothing contained herein
shall constitute  a waiver, modification, or limitation of any of the terms or conditions
set forth in the Loan Agreement
**Brackets are not necessary for negative numbers**
**Unless what you want is different than what field indicates.**

Prepared by: _____

Title: _____

Approved by: _____

Title: _____

**Schedule 1.1**

**COMMITMENTS
AND APPLICABLE PERCENTAGES**

| Lender | Commitment | Applicable Commitment Percentage |
|---|---|---|
| Bank of America, N.A. | $  75,000,000.00 | 60.000000000% |
| Wells Fargo Bank, National Association | $  50,000,000.00 | 40.000000000% |
| **Total** | $125,000,000.00 | 100.000000000% |

**Schedule 1.2.1**

**EXISTING LETTERS OF CREDIT**

| Borrower | L/C No. | Face Amount | Expiration | Beneficiary |
|----------|---------|-------------|------------|-------------|
| SRC | xxx5736 | $2,240,000.00 | 08/01/15 | Liberty Mutual Insurance Company |
| SRC | xxx9821 | $279,000.00 | 02/14/16 | Ohio Bureau of Workers |
| SRC | xxx4946 | $500,000.00 | 07/01/15 | The Travelers Indemnity Company |
| SRC | xxxx2868 | $165,072.00 | 08/31/15 | Deutsche Bank Mexico S.A. |
| SRC | xxxx3773 | $386,437.50 | 12/31/15 | The Cincinnati Insurance Company |
| **Total:** | | **$3,570,509.50** | | |

**Schedule 7.1.1**

**Borrowers' Inventory Locations**

|     | **Street** | **City, State** | **Zip Code** |
| --- | --- | --- | --- |
| 1. | 81 Parker Dr | Avon, MA | 02322 |
| 2. | 1255 Terminus Dr, Suite 400 | Lithia Springs, GA | 30122 |
| 3. | 496 E Whitmore Ave | Modesto, CA | 95358 |
| 4. | 5002 D Street NW  Suite 106 | Auburn, WA | 98001 |
| 5. | 2203 Sherrill Dr | Statesville, NC | 28625 |
| 6. | 3655 S School Ave | Fayetteville, AR | 72701 |
| 7. | 2908 Commodore Dr | Carrollton), TX | 75007 |
| 8. | 121 Mount Zion Rd | York, PA | 17402 |
| 9. | 7576 Kingspointe Pkwy, S 140 | Orlando, FL | 32809 |
| 10. | 2700 Blue Water Rd, Suite 850 | Eagan, MN | 55121 |
| 11. | 325 Butler Dr | Murfreesboro, TN | 37130 |
| 12. | 3159 Rider Trail South | Earth City, MO | 63044 |
| 13. | 2142 S Dixie Blvd | Radcliff, KY | 40160 |
| 14. | 5131 Tampa West Blvd | Tampa, FL | 33634 |
| 15. | 1803 Rocky River North | Monroe, NC | 28110 |
| 16. | 91-489 C Komohana St | Kapolei, HI 96707 | 96817 |
| 17. | 11685 E 53rd Ave | Denver, CO | 80239 |
| 18. | 259 Hartford Turnpike | Tolland, CT | 06084 |
| 19. | 1750 Miller Ave | Shelbyville, IN | 46176 |
| 20. | 3885 Seaport Blvd, Suite 40 | Sacramento, CA | 95691 |
| 21. | 600 N Albany St. | Dayton, OH | 45408 |
| 22. | 9670 US Highway 69N | Tyler, TX | 75706 |
| 23. | 2505 Arctic Blvd, Suite 200 | Anchorage, AK | 99503 |
| 24. | 700 Patrol Road | Jeffersonville IN | 47130 |
| 25. | 120 Campbell St. | Dayton, OH | 45417 |
| 26. | 325 Busser Road | Emigsville, PA | 47130 |
| 27. | 5775 Brisa Street | Livermore, CA | 94550 |
| 28. | 425 S Rockefeller Ave | Ontario, CA | 91761 |
| 29. | 18300 E 28th Ave (CEVA-Denver) | Aurora, CO | 80011 |
| 30. | 5601 NW 72nd Ave (CEVA) | Miami (CEVA), FL | 33166 |
| 31. | 1650 Westfork Dr. | Lithia Springs, GA | 30057 |
| 32. | 1302 Eisenhower Drive North | Goshen, IN | 46526 |
| 33. | 10400 Hickman Rd (Citi) | Des Moines, IA | 50325 |
| 34. | 1401 Bedford Rd (CEVA) | N. Kansas City, KS | 64116 |
| 35. | 1-5 Sassacus Drive | Westborough, MA | 01581 |
| 36. | 7 Costco Way | Monroe Township, NJ | 08831 |

| 37. | 6275 S Pearl, Ste 1400 (CEVA) | Las Vegas, NV | 89074 |
| 38. | 515 West Sycamore Street | Coldwater, OH | 45828 |
| 39. | 3125 Lewis Centre Way | Grove City, OH | 43123 |
| 40. | 304-306 N Meridian Ave | Oklahoma City, OK | 73017 |
| 41. | 18620 NE San Rafael (WBG) | Portland, OR | 97230 |
| 42. | 155 Crown Court (CEVA-Pittsburgh) | Oakdale, PA | 15071 |
| 43. | Ceva-Lot 26 Campeche St. | Carolina, PR | 00983 |
| 44. | 1609 S. Bluebell Road | Brenham, TX | 77833 |
| 45. | 10735 West Little York Rd | Houston, TX | 77040 |
| 46. | 4808 Eastover Circle | Mesquite, TX | 75149 |
| 47. | 4517 West 1730 South | Salt Lake City, UT | 84126 |
| 48. | 6849 S. 212th St (WBG) | Kent, WA | 98032 |
| 49. | 1251 N. Fruitridge Ave | Terre Haute IN | 47408 |
| 50. | 125 S. Wacker Dr St LLB005 | Chicago IL | 60606 |
| 51. | Carretera Hulnala KM 28 #404 | Apodaca, Nueva Leon, MX | 66634 |
| 52. | Calle Séptima #300 Ste 910 | Apodaca, Nueva Leon, MX | 66603 |
| 53. | 11175 East 55th Ave,  #5 | Denver, CO | 80239 |
| 54. | 1880 Matheson Blvd East-3PL | Mississauga, Ontario | L4W-SN4 |
| 55. | 1816 C- West Pointe Dr-3PL | Charlotte, NC | 28214 |
| 56. | 5101 Decatur Blvd St W-3PL | Indianapolis, IN | 46241 |
| 57. | 7701 Commerce Blvd-3PL | Panama City, FL | 32404 |
| 58. | 4640 Hickory Hill Rd-3PL | Memphis, TN | 38141 |
| 59. | 12134 Esther Lama Dr St 200-3PL | El Paso, TX | 79913 |
| 60. | 855 N..Wood Dale Rd -3PL | Wood Dale, IL | 60191 |
| 61. | Pro Tans de Mexico Ave. Palermo #140 | Apodaca, Nueva Leon, MX | 66600 |
| 62. | Carr a Hulnala KM 2.8 #404 –A -3PL | Cd.Juarez Chih C.P  MX | 32690 |

**Schedule 8.1.4**

**Capital Structure of Borrowers**

**Subsidiaries**

| Subsidiary | Shareholder(s) | Jurisdiction of Incorporation | % of Equity Owned |
|---|---|---|---|
| Standard Register Technologies, Inc. | The Standard Register Company | Ohio | 100% |
| Standard Register Holding Company | The Standard Register Company | Ohio | 100% |
| Standard Register International, Inc. | The Standard Register Company | Ohio | 100% |
| Standard Register Mexico Holding Company | The Standard Register Company | Ohio | 100% |
| Standard Register Technologies Canada ULC | The Standard Register Company | Nova Scotia | 100% |
| Standard Register de Mexico, S. de R.L. de C.V. | Standard Register Mexico Holding Company<br><br>Standard Register Holding, S. de R.L. de C.V | Mexico | 0.03%<br><br>99.97% |
| Standard Register Holding, S. de R.L. de C.V | Standard Register Mexico Holding Company<br><br>Standard Register Holding Company | Mexico | 90%<br><br>10% |
| Standard Register Servicios, S. de R.L. de C.V. | Standard Register Mexico Holding Company<br><br>Standard Register Holding, S. de R.L. de C.V | Mexico | 0.03%<br><br>99.97% |

| | | | |
|---|---|---|---|
| iMedConsent, LLC | The Standard Register Company | Delaware | 100% |
| Standard Register of Puerto Rico Inc. | The Standard Register Company | Delaware | 100% |

## Corporate Affiliates

The Standard Register Company entered into a joint venture with Veri-Code Systems, Inc.  The joint venture entity is Veri-Code Systems, LLC.  The Standard Register Company owns 25% of Veri-Code Systems, LLC.

**Issued Capital Securities**

| Entity | Authorized Capital Securities | Issued Capital Securities |
|---|---|---|
| The Standard Register Company | 110,450,000 | 9,199,496* |
| Standard Register International, Inc. | 1500 | 100 |
| Standard Register Technologies, Inc. | 1500 | 10 |
| Standard Register Holding Company | 1500 | 20 |
| Standard Register Mexico Holding Company | 1500 | 20 |
| Standard Register Technologies Canada ULC | 100,000 | 1 |
| Standard Register de Mexico, S. de R.L. de C.V. | 2 | 1 - Standard Register Holdings, S. de R.L. de C.V.<br><br>1 - Standard Register Mexico Holding Company |
| Standard Register Holding, S. de R.L. de C.V | 2 | 1 - Standard Register Holding Company.<br><br>1 - Standard Register Mexico Holding Company |
| Standard Register Servicios, S. de R.L. de C.V. | 2 | 1 - Standard Register Holdings, S. de R.L. de C.V.<br><br>1 - Standard Register Mexico Holding Company |
| iMedConsent, LLC d/b/a Dialog Medical | --- | 100%** |
| Standard Register of Puerto Rico Inc. | 2,500 common shares | 100 |

| | 2,500 preferred shares | |
|---|---|---|
| Veri-Code Systems, LLC | --- | 25%*** |

\* As of March 1, 2015
\** Per Operating Agreement, 100% of the membership interests are owned by The Standard Register Company.
\*** Per Operating Agreement, 25% of the membership interests are owned by The Standard Register Company.

## **Distributions**

None.

## **Options, Warrants and Rights to Acquire Capital Securities**

1. The Standard Register Company 1995 Incentive Stock Option Plan.

2.  The Standard Register Company Management Incentive Compensation Plan, as amended.

3. The Standard Register Company Amended and Restated 2002 Equity Incentive Plan.

4.  The Standard Register Company 2005 Deferred Compensation Plan.

5. The Standard Register Company 2011 Equity Incentive Plan, as amended.

As of February 27, 2015, there were 559,439 outstanding stock options and 493,537 exercisable stock options under The Standard Register Company 1995 Incentive Stock Option Plan, The Standard Register Company Management Incentive Compensation Plan, as amended, The Standard Register Company Amended and Restated 2002 Equity Incentive Plan, The Standard Register Company 2005 Equity Incentive Plan and The Standard Register Company 2011 Equity Incentive Plan, as amended.

**Schedule 8.1.5**

**Corporate Names**


The following is a list of all other names (including corporate, fictitious or trade names) used by any Credit Party or any of its Subsidiaries at any time during the past five years:

1.    Standard Register
2.    PathForward
3.    Copy Concepts, Ltd.
4.    Copy Concepts
5.    SMARTworks
6.    Stanfast
7.    Industramark
8.    iMedconsent, LLC
9.    Dialog Medical
10.    WorkflowOne
11.    Workflow One of Puerto Rico
12.    Workflow of Delaware
13.    Wilmer

The following is a list of the mergers, consolidations and asset purchase transactions for all or substantially all of the assets to which any Credit Party or any of its Subsidiaries have been parties and the surviving or acquiring entity, as applicable, in the last 5 years:

1.    Asset Purchase Agreement by and among The Standard Register Company, Fusion Graphics, Inc., John Prikkel III, Robert F. Freund, Charles R. Norman, the Elizabeth K. Norman Trust and the Vanessa A. Norman Trust, dated June 1, 2010, pursuant to which The Standard Register Company acquired substantially all of the assets of Fusion Graphics, Inc.

2.    Agreement and Plan of Merger by and among The Standard Register Company, Dialog Acquisition LLC and iMedConsent, LLC (d/b/a Dialog Medical) dated July 6, 2011, pursuant to which iMedConsent, LLC became a wholly owned Subsidiary of The Standard Register Company.

3.    WorkflowOne LLC and WorkflowOne of Puerto Rico Inc. acquired certain assets of and assumed certain obligations with respect to the Debtors in connection with the Third Amended Joint Chapter 11 Plan of Workflow Management Inc. and its Affiliated Debtors, effective March 2, 2011, and the related Asset Purchase and Sale Agreement, dated January 21, 2011, by and between the Debtors and Workflow Holdings, LLC. See In re: Workflow Management Inc., et al., Debtors, Chapter 11, Case No. 10-74617 (SCS) (Jointly Administered), United States Bankruptcy Court Eastern District of Virginia – Norfolk Division.

4.      WorkflowOne LLC has been merged with and into The Standard Register Company
        and its separate existence has been terminated.

**Schedule 8.1.6**

**Chief Executive Office/Service of Process Agents**

| Company | State | Agent for Service of Process |
|---|---|---|
| The Standard Register Company | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register Holding Company | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register International, Inc. | Ohio | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| Standard Register Technologies, Inc. | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register Mexico Holding Company | Ohio | CT Corporation<br>1300 East Ninth Street<br>Cleveland, Ohio 44114 |
| Standard Register Technologies Canada ULC | Nova Scotia | Barry D. Horne<br>P.O. Box 730<br>Halifax, Nova Scotia B3J2V1 |
| Standard Register de Mexico, S. de R.L. de C.V | Mexico | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| Standard Register Holding, S. de R.L. de C.V. | Mexico | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| Standard Register Servicios, S. de R.L. de C.V. | Mexico | Gerard D. Sowar<br>600 Albany Street<br>Dayton, Ohio 45417 |
| iMedConsent, LLC | Delaware | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801 |

Standard Register of Puerto Rico Inc.        Delaware        Corporation Service Company
                                                             2711 Centerville Road,
                                                             Suite 400
                                                             Wilmington DE 19808

- The chief executive office of iMedConsent, LLC is 30 Perimeter Park Dr., Suite 200, Atlanta, GA 30341.

- The chief executive office of Standard Register Technologies Canada is Purdy's Wharf Tower II, 1300-1969 Upper Water Street, PO Box 730 Halifax NS B3J 2V1.

- The chief executive office of Standard Register de Mexico, S. de R.L.., Standard Register Holding, S. de R.L., Standard Register Servicios, S. de R.L. is Carretera Huinalá KM 28 #404, Apodaca, Nuevo León, Mexico.

- The chief executive office of each other Credit Party and/or Subsidiary is located at 600 Albany Street, Dayton, Ohio 45417.

## Schedule 8.1.12

**Tax Identification Numbers of Borrowers and Subsidiaries**

| Company | Federal Employer Identification Number |
|---|---|
| The Standard Register Company | 31-0455440 |
| Standard Register Holding Company | 02-0623186 |
| Standard Register International, Inc. | 22-3891861 |
| Standard Register Technologies, Inc. | 02-0623180 |
| Standard Register Mexico Holding Company | 20-4101624 |
| iMedConsent, LLC | 58-2556337 |
| Standard Register of Puerto Rico Inc. | 27-5160578 |

**Schedule 8.1.21**

**Pension Plans**

Qualified Plans
1.  Standard Register Company Stanreco Retirement Plan


Non-Qualified Plan
2.  The Standard Register Deferred Compensation Plan.
3.  The Standard Register Company Non-Qualified Retirement Plan.
4.  The Standard Register Company Officers' Supplemental Non-Qualified Retirement Plan.
5.  The Standard Register Company Supplemental Executive Retirement Plan.
6.  The Standard Register Company 2005 Deferred Compensation Plan.
7.  The Standard Register Company 401(k) Employee Savings Plan.

**Schedule 8.1.23**

**Labor Relations**

1. Agreement by and between The Standard Register Company and the Graphics Communications Union, Local 594S, subordinate to the Graphic Communications Conference of the International Brotherhood of Teamsters, District 9 Counsel, dated May 1, 2014 and ending April 30, 2016.

2. Sideletter Agreement by and between The Standard Register Company and the Graphics Communications Union, Loan 594S, subordinate to the Graphic Communications Conference of the International Brotherhood of Teamsters, District 9 Counsel, dated August _, 2014 and ending April 30, 2016.

3. Agreement by and between The Standard Register Company and the Graphic Communications Conference/ International Brotherhood of Teamsters, Loan 197-M, dated February 2, 2015 and ending August 31, 2016.

**Schedule 9.1.21**

**POST-CLOSING COVENANTS**

At any time following the Closing, each of Borrowers shall, promptly upon the request of DIP Agent, do the following:

1.      With respect to any parcel of Real Estate of such Borrower:

(a)      Execute and deliver to DIP Agent, in form and substance satisfactory to DIP Agent, a new Mortgage or an amendment to an existing Mortgage, which mortgage or amendment shall be duly recorded, at Borrowers' expense, in each office where such recording is required to constitute a fully perfected Lien on the Real Estate covered thereby;

(b)      Assist and cooperate with DIP Agent in obtaining, in DIP Agent's discretion, a mortgagee's title insurance policy or an endorsement to an existing policy in favor of DIP Agent for the benefit of DIP Secured Parties in an amount and in form and substance as shall be customary for similar properties, with respect to such Real Estate and, if any, other property purported to be covered by such Mortgage or amendment, insuring that title to such property is marketable and that the interests created by such Mortgage constitute valid Liens thereon free and clear of all defects and encumbrances (other than Liens in favor of Pre-Petition Term Agents and Term DIP Agent pursuant to the Pre-Petition Term Loan Documents and the Term DIP Loan Documents);

(c)      Provide opinions addressed to DIP Agent and all DIP Lenders from local real estate counsel to Borrowers in the jurisdictions where such Real Estate is located; and

(d)      Provide a life-of-loan flood hazard determination and, if such Real Estate is located in a special flood hazard area, an acknowledged notice to Borrowers and flood insurance by an insurer acceptable to DIP Agent.

2.      Seek to obtain duly executed Lien Waivers.

3.      Obtain a duly executed security agreement, in form and substance satisfactory to DIP Agent, from each of SR MX Holdings, SR Mexico, and SR Servicios, granting DIP Agent, for its benefit and the benefit of all DIP Secured Parties, Liens upon all of the assets of SR MX Holdings, SR Mexico, and SR Servicios.

4.      Assist and cooperate with DIP Agent in obtaining (i) a deposit account control agreement, in form and substance satisfactory to DIP Agent, with respect to each Deposit Account (including Dominion Accounts), other than Excluded Deposit Accounts, in which any Borrower deposits any proceeds of Collateral, duly executed by such Borrower and the applicable depositary bank, or (ii) in the case of each existing deposit account control agreement

in favor of Pre-Petition ABL Agent, an amendment thereto duly executed by the applicable Borrower and the applicable depositary bank, in form and substance satisfactory to Pre-Petition ABL Agent and DIP Agent.

**Schedule 14.9**

**DIP LENDER ADDRESSES**

Bank of America, N.A.
300 Galleria Parkway, Suite 800
Atlanta, GA 30339
Attention: Andrew Doherty or current account manger
Fax No.: (404) 607-3277

Wells Fargo Bank, National Association
2450 Colorado Ave., Suite 3000
West Santa Monica, CA 90404
Attention: Syndicated Finance Division Manager

**Notwithstanding anything herein to the contrary, the liens and security interests granted to DIP Agent pursuant to this Agreement and the exercise of any right or remedy by DIP Agent hereunder are subject to (a) the provisions of that certain Intercreditor Agreement dated as of March 12, 2015, among Bank of America, N.A., as ABL Agent, and Silver Point Finance, LLC, as Administrative Agent and Collateral Agent, and (b) the provisions of that certain Intercreditor Agreement dated as of August 1, 2013, among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent, and the parties identified as "Grantors" from time to time therein. In the event of any conflict between the terms of such Intercreditor Agreements and the terms of this Agreement, the terms of such Intercreditor Agreements shall govern and control.**

## ABL PATENT SECURITY AGREEMENT

This ABL PATENT SECURITY AGREEMENT, dated as of March 12, 2015 (this "Agreement"), is made by THE STANDARD REGISTER COMPANY, an Ohio corporation ("Grantor"), individually and as successor by merger to WorkflowOne LLC, in favor of BANK OF AMERICA, N.A., as the administrative agent (together with its successor(s) thereto in such capacity, the "DIP Agent") for each of the DIP Secured Parties.

## W I T N E S S E T H:

WHEREAS, Grantor and the other parties thereto as borrowers, the various financial institutions from time to time parties thereto as lenders, and DIP Agent have entered into that certain Post-Petition Loan and Security Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "ABL DIP Loan Agreement");

WHEREAS, pursuant to the ABL DIP Loan Agreement, Grantor is required to execute and deliver this Agreement and to grant to DIP Agent a continuing security interest in all of the Patent Collateral (as defined below) to secure all Obligations;

WHEREAS, Grantor has duly authorized the execution, delivery and performance of this Agreement; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees, for the benefit of each DIP Secured Party, as follows:

SECTION 1.   Definitions.   Unless otherwise defined herein or the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings provided in the ABL DIP Loan Agreement.

SECTION 1.1.   "Patent Collateral" means (i) all United States and foreign patents and applications now or hereafter made for letters patent under the laws of the United States, any other country or any political subdivision thereof, including, but not limited to, any of the foregoing referred to on Schedule I, and all rights corresponding thereto throughout the world,

(ii) all reissues, divisions, continuations, continuations-in-part, extensions, and reexaminations of any of the foregoing; (iii) the right to sue for past, present and future infringements of any of the foregoing, and (iv) all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

SECTION 2.  <u>Grant of Security Interest</u>.  Grantor hereby grants to DIP Agent, for its benefit and the ratable benefit of each other DIP Secured Party, a continuing security interest in all Patent Collateral, whether now or hereafter existing or acquired by Grantor, including, without limitation, the patents set forth in <u>Schedule I</u> attached hereto.

SECTION 3.  <u>Security Agreement</u>.  This Agreement has been executed and delivered by Grantor for the purpose of registering the security interest of DIP Agent in the Patent Collateral with the United States Patent and Trademark Office.  The security interest granted hereby has been granted as a supplement to, and not in limitation of, the security interests granted to the "Administrative Agent" for its benefit and the ratable benefit of each other "Secured Party" under (and as defined in) that certain ABL Trademark Security Agreement dated as of August 9, 2013, among Grantor, WorkflowOne LLC ("WorkflowOne"), and Administrative Agent and that certain Security and Pledge Agreement dated as of August 1, 2013, among Grantor, WorkflowOne, and the other parties identified as "Grantors" therein, and Administrative Agent. Such Security Agreements (and all rights and remedies of Administrative Agent and each Secured Party thereunder) shall remain in full force and effect in accordance with their respective terms.

SECTION 4.  <u>Release of Liens</u>.  Upon (i) the disposition of any Patent Collateral in accordance with Section 9.2.2 of the ABL DIP Loan Agreement or (ii) the occurrence of the Full Payment of all Obligations, the security interests granted herein shall automatically terminate with respect to (A) such Patent Collateral (in the case of clause (i)) or (B) all Patent Collateral (in the case of clause (ii)).  Upon such disposition or Full Payment of all Obligations, DIP Agent will, at Grantor's sole expense, deliver to Grantor, without any representations, warranties or recourse of any kind whatsoever, all Patent Collateral held by DIP Agent hereunder, and execute and deliver to Grantor such documents (in form and substance reasonably satisfactory to DIP Agent) as Grantor shall reasonably request to evidence such termination.

SECTION 5.  <u>Acknowledgment</u>.  Grantor does hereby further acknowledge and affirm that the rights and remedies of DIP Agent with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the ABL DIP Loan Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.

SECTION 6.  <u>DIP Loan Document</u>.  This Agreement is a DIP Loan Document executed pursuant to the ABL DIP Loan Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

SECTION 7.  <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered by an authorized officer as of the date first above written.

GRANTOR:

THE STANDARD REGISTER COMPANY

By:_____

Name: Joseph P. Morgan, Jr.

Title:  President and Chief Executive Officer

Accepted and agreed to as of the date first above written.

BANK OF AMERICA, N.A., as Administrative Agent

By: _____
Name: Andrew A. Doherty
Title: Senior Vice President

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| SECURITY DOCUMENT | United States of America | 08/185362 | 24-Jan-94 | 6000728 | 14-Dec-99 | ClientResp |
| MULTIPURPOSE TUCK LABEL/FORM | United States of America | 08/744432 | 08-Nov-96 | RE37521 | 22-Jan-02 | ClientResp |
| CONSTRUCTION OR A BUSINESS FORM HAVING A REMOVABLE LABEL | United States of America | 08/749378 | 06-Nov-96 | 5756175 | 26-May-98 | ClientResp |
| IMPROVED SECURITY DOCUMENT | United States of America | 09/179145 | 26-Oct-98 | 6167147 | 26-Dec-00 | ClientResp |
| PRINTING SYSTEM AND METHOD FOR PRINTING DOCUMENTS AND FORMS | United States of America | 08/402031 | 10-Mar-95 | 6362897 | 26-Mar-02 | ClientResp |
| FORM HAVING DETACHABLE WRISTBAND AND LABELS | United States of America | 08/506802 | 25-Jul-95 | 5653472 | 05-Aug-97 | ClientResp |
| CONSTRUCTION FOR A LAMINATED WINDOW LABEL | United States of America | 08/653429 | 24-May-96 | 5873607 | 23-Feb-99 | ClientResp |
| SECURITY DOCUMENT | United States of America | 08/611378 | 05-Mar-96 | 5853197 | 29-Dec-98 | ClientResp |
| COMPUTERIZED COMPREHENSIVE DOCUMENT AUDIT | United States of America | 08/622000 | 25-Mar-96 | 5953702 | 14-Sep-99 | ClientResp |
| INK JET IMAGING OF HEAVY INK COVERAGE PRINTED ARTICLES | United States of America | 08/726628 | 07-Oct-96 | 5916667 | 29-Jun-99 | ClientResp |
| PRINTER WITH INTERNAL DOCUMENT DATA CONSTRUCTION | United States of America | 08/808948 | 19-Feb-97 | 5971632 | 26-Oct-99 | ClientResp |
| PRINTER WITH INTERNAL DOCUMENT DATA CONSTRUCTION | United States of America | 09/568379 | 10-May-00 | RE38111 | 06-May-03 | ClientResp |
| HEAT RESISTANT SECURITY DOCUMENT | United States of America | 08/790198 | 30-Jan-97 | 5912205 | 15-Jun-99 | ClientResp |
| STAR SYSTEM | United States of America | 08/992495 | 04-Nov-97 | 6076080 | 13-Jun-00 | ClientResp |
| BUSINESS FORM INCLUDING A LABEL | United States of America | 09/514681 | 28-Feb-00 | 6409871 | 25-Jun-02 | ClientResp |
| BUSINESS FORM INCLUDING A LABEL | United States of America | 09/003652 | 07-Jan-98 | 6053535 | 25-Apr-00 | ClientResp |
| OVER-WRAP LABEL | United States of America | 08/821910 | 21-Mar-97 | 6073377 | 13-Jun-00 | ClientResp |
| BUSINESS FORM OR MAILER WITH CARBONLESS IMAGING | United States of America | 09/093218 | 08-Jun-98 | 6123253 | 26-Sep-00 | ClientResp |

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| BUSINESS FORM OR MAILER WITH CARBONLESS IMAGING | United States of America | 09/686292 | 11-Oct-00 | 6322106 | 27-Nov-01 | ClientResp |
| BUSINESS FORM OR MAILER WITH CARBONLESS IMAGING | United States of America | 09/496772 | 03-Feb-00 | 6158651 | 12-Dec-00 | ClientResp |
| MACHINE-READABLE SECURITY DOCUMENT AND METHOD OF PRPARING THE SAME | United States of America | 09/504227 | 15-Feb-00 | 6161869 | 19-Dec-00 | ClientResp |
| MACHINE-READABLE SECURITY DOCUMENT AND METHOD OF PRPARING THE SAME | United States of America | 09/179069 | 26-Oct-98 | 6095425 | 01-Aug-00 | ClientResp |
| CELLOUSE SUBSTRATES WITH TRANSPARENTIZED AREA AND METHOD OF MAKING SAME | United States of America | 09/104589 | 25-Jun-98 | 6143120 | 07-Nov-00 | ClientResp |
| CELLULOSE SUBSTRATES WITH TRANSPARENTIZED AREA AND METHOD OF MAKING SAME | United States of America | 09/104573 | 25-Jun-98 | 6103355 | 15-Aug-00 | ClientResp |
| DUAL FACE PRESSURE SENSITIVE LABEL | United States of America | 08/761706 | 06-Dec-96 | 5846624 | 08-Dec-98 | ClientResp |
| SELF MAILER WITH RETURN ENVELOPE FORMED FROM A SINGLE CUT SHEET | United States of America | 08/152741 | 15-Nov-93 | 6129389 | 10-Oct-00 | ClientResp |
| SHIPPING ENVELOPE | United States of America | 09/678921 | 04-Oct-00 | 6644538 | 11-Nov-03 | ClientResp |
| SHIPPING ENVELOPE | United States of America | 09/224639 | 06-Jan-99 | 6152357 | 28-Nov-00 | ClientResp |
| BUSINESS FORM WITH INTEGRATED LAMINATION | United States of America | 08/660818 | 10-Jun-96 | 5837337 | 17-Nov-98 | ClientResp |
| 4-UP POCKET | United States of America | 09/373931 | 13-Aug-99 | 6547914 | 15-Apr-03 | ClientResp |
| PROCESS FOR THE FORMATION OF A HEAT-TRANSFERABLE SECURITY STAMP | United States of America | 10/058917 | 28-Jan-02 | 6733867 | 11-May-04 | ClientResp |
| PROCESS FOR THE FORMATION OF A HEAT-TRANSFERABLE SECURITY STAMP | United States of America | 09/482672 | 13-Jan-00 | 6410082 | 25-Jun-02 | ClientResp |
| SHIPMENT FORM INCLUDING REUSABLE ADHESIVE | United States of America | 09/354504 | 15-Jul-99 | 6290261 | 18-Sep-01 | ClientResp |
| SHIPMENT FORM | United States of America | 09/248537 | 11-Feb-99 | 6092842 | 25-Jul-00 | ClientResp |
| CONTROLLED SUBSTANCE DISPENSING FORM | United States of America | 09/228605 | 12-Jan-99 | 6086108 | 11-Jul-00 | ClientResp |
| LAMINATION BY RADIATION THROUGH A PLY | United States of America | 09/187702 | 06-Nov-98 | 6569280 | 27-May-03 | ClientResp |

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| MULTI-FUNCTIONAL TRANSPARENTIZED SECURE MARKS ON PAPER | United States of America | 09/300118 | 27-Apr-99 | 6358596 | 19-Mar-02 | ClientResp |
| IMAGE BONDING TREATMENT FOR RETROREFLECTIVE SURFACES | United States of America | 10/010489 | 13-Nov-01 | 6416911 | 09-Jul-02 | ClientResp |
| IMAGE BONDING TREATMENT FOR RETROREFLECTIVE SURFACES | United States of America | 09/309454 | 11-May-99 | 6376135 | 23-Apr-02 | ClientResp |
| METHOD OF PRODUCING PDF DOCUMENTS IN A WWW ENVIRONMENT | United States of America | 09/361506 | 27-Jul-99 | 6591289 | 08-Jul-03 | ClientResp |
| METHOD OF PRODUCING PDF DOCUMENTS IN A WWW ENVIRONMENT | United States of America | 10/443411 | 22-May-03 | 6886025 | 26-Apr-05 | ClientResp |
| OPTICALLY DECODABLE SECURITY DOCUMENT | United States of America | 09/276980 | 26-Mar-99 | 6139066 | 31-Oct-00 | ClientResp |
| SECURITY IMAGE ELEMENT FILING SCHEME | United States of America | 09/277813 | 26-Mar-99 | 6050607 | 18-Apr-00 | ClientResp |
| SECURITY IMAGE ELEMENT FILING SCHEME | United States of America | 09/496704 | 02-Feb-00 | 6254007 | 03-Jul-01 | ClientResp |
| DEVICE FOR CONSTELLATION PATTERN RECOGNITION IN A VOID PANTO | United States of America | 09/291537 | 14-Apr-99 | 6209923 | 03-Apr-01 | ClientResp |
| DEVICE FOR CONSTELLATION PATTERN RECOGNITION IN A VOID PANTO | United States of America | 09/524441 | 14-Mar-00 | 6394358 | 28-May-02 | ClientResp |
| SECURITY LABELS FOR SPECIMEN CONTAINER (AMENDED) | United States of America | 09/289354 | 09-Apr-99 | 6276725 | 21-Aug-01 | ClientResp |
| APPARATUS AND METHOD FOR IN-LINE FOLDING AND AFFIXING | United States of America | 09/322631 | 28-May-99 | 6378588 | 30-Apr-02 | ClientResp |
| METHOD OF TRANSPARENTIZING A CELLULOSE SUBSTRATE | United States of America | 09/477685 | 06-Jan-00 | 6692819 | 17-Feb-04 | ClientResp |
| PRISMATIC PRINTING | United States of America | 09/731082 | 06-Dec-00 | 6318759 | 20-Nov-01 | ClientResp |
| PRISMATIC PRINTING | United States of America | 09/487078 | 19-Jan-00 | 6206429 | 27-Mar-01 | ClientResp |
| LASERABLE FOLD-OVER CARBONLESS FORM | United States of America | 09/629294 | 31-Jul-00 | 6626755 | 30-Sep-03 | ClientResp |
| ANTISTATIC COMPOSITION FOR USE IN A LABEL CONSTRUCTION | United States of America | 09/558760 | 21-Apr-00 | 6497933 | 24-Dec-02 | ClientResp |

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| IMPROVED Z-FOLDED BUSINESS FORM | United States of America | 09/792506 | 23-Feb-01 | 6601756 | 05-Aug-03 | ClientResp |
| REDUCTION OF ADHESIVE OOZE BY PATTERN OVERCOATING | United States of America | 09/847748 | 02-May-01 | 6686014 | 03-Feb-04 | ClientResp |
| SECURE DOCUMENT WITH SELF-AUTHENTICATING, ENCRYPTABLE FONT | United States of America | 10/324525 | 19-Dec-02 | 6886863 | 03-May-05 | ClientResp |
| VARIABLY IMAGED FOLD OVER GIFT CARD | United States of America | 10/712598 | 13-Nov-03 | 6802538 | 12-Oct-04 | ClientResp |
| VARIABLY IMAGED FOLD OVER GIFT CARD | United States of America | 09/841675 | 24-Apr-01 | 6682099 | 27-Jan-04 | ClientResp |
| UV CURABLE CF INK | United States of America | 09/734351 | 11-Dec-00 | 6620227 | 16-Sep-03 | ClientResp |
| WATERPROOF CARD OR LABEL | United States of America | 09/862644 | 22-May-01 | 6677022 | 13-Jan-04 | ClientResp |
| SIMULATED SECURITY THREAD BY CELLULOSE TRANSPARENTIZATION | United States of America | 09/935933 | 23-Aug-01 | 6607813 | 19-Aug-03 | ClientResp |
| TUCK LABEL EASY OPEN PULL TAB | United States of America | 09/804879 | 13-Mar-01 | 6394500 | 28-May-02 | ClientResp |
| SAMPLING KIT FORM | United States of America | 09/997111 | 29-Nov-01 | 6713142 | 30-Mar-04 | ClientResp |
| DOCUMENT SECURITY PROTECTION ANALYSIS ASSISTANT | United States of America | 10/079679 | 20-Feb-02 | 7937326 | 03-May-11 | ClientResp |
| REVERSIBLE AND REUSABLE AUTHENTICATION SYSTEM FOR SECURE DOCUMENTS | United States of America | 10/068516 | 06-Feb-02 | 6783991 | 31-Aug-04 | ClientResp |
| WINGED WRISTBAND | United States of America | 10/192892 | 11-Jul-02 | 6641048 | 04-Nov-03 | ClientResp |
| PRINTABLE IDENTIFICATION BAND WITH TOP STRIP FOR RFID CHIP ATTACHMENT | United States of America | 10/054035 | 22-Jan-02 | 6836215 | 28-Dec-04 | ClientResp |
| DOCUMENT AUDIT ANALYSIS SYSTEM AND PROCESS | United States of America | 10/224840 | 21-Aug-02 | 7949539 | 24-May-11 | ClientResp |
| FOLDABLE INFORMATION CARD WITH POCKET FOR STORAGE | United States of America | 10/164211 | 06-Jun-02 | 7200960 | 10-Apr-07 | ClientResp |

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| SECURE WINDOW MAILER AND METHOD OF MAKING | United States of America | 10/458952 | 11-Jun-03 | 7073704 | 11-Jul-06 | ClientResp |
| TWO-WAY SHIPPING LABEL CONSTRUCTION | United States of America | 10/267020 | 08-Oct-02 | 6761791 | 13-Jul-04 | ClientResp |
| TWO-WAY SHIPPING LABEL CONSTRUCTION | United States of America | 10/849601 | 20-May-04 | 7303212 | 04-Dec-07 | ClientResp |
| COMBINATION SHIPPING LABEL AND PACKING SLIP FORM | United States of America | 10/693469 | 24-Oct-03 | 7475912 | 13-Jan-09 | ClientResp |
| WRISTBAND FORM WITH OVERLAMINATE LABEL | United States of America | 10/685095 | 10-Oct-03 | 7534477 | 19-May-09 | ClientResp |
| OPTICALLY VARIABLE WATER BASED INKS | United States of America | 10/690172 | 21-Oct-03 | 7029525 | 18-Apr-06 | ClientResp |
| DATA CARRIER FOR HEALTH RELATED INFORMATION | United States of America | 10/822386 | 12-Apr-04 | 7758080 | 20-Jul-10 | ClientResp |
| DATA CARRIER FOR HEALTH RELATED INFORMATION | United States of America | 12/797090 | 09-Jun-10 | | | Allowed |
| DUPLEX-PRINTABLE PLS OVERLAP FORM | United States of America | 11/010586 | 13-Dec-04 | 7246823 | 24-Jul-07 | ClientResp |
| DOUBLE POSTCARD INTERMEDIATE | United States of America | 11/041473 | 24-Jan-05 | 7530488 | 12-May-09 | ClientResp |
| CHEMICALLY REACTIVE SECURITY INK, A METHOD OF USE OF SUCH INK, AND SECURITY DOCUMENTS INCORPORATING SUCH INK | United States of America | 11/754630 | 29-May-07 | 8622436 | 07-Jan-14 | ClientResp |
| WRISTBAND FORM INCLUDING A WRISTBAND AND AN EXTENSION THEREFOR | United States of America | 11/529653 | 28-Sep-06 | 7765728 | 03-Aug-10 | ClientResp |
| WRISTBAND FORM INCLUDING A WRISTBAND AND AN EXTENSION THEREFOR | United States of America | 12/826092 | 29-Jun-10 | 8327566 | 11-Dec-12 | ClientResp |
| DOUBLE MAILER INTERMEDIATE | United States of America | 13/759299 | 05-Feb-13 | | | FINAL REJ |
| DOUBLE MAILER INTERMEDIATE | United States of America | 12/360317 | 27-Jan-09 | 8388024 | 05-Mar-13 | ClientResp |
| BUSINESS FORM AND METHOD OF MAKING | United States of America | 12/761648 | 16-Apr-10 | 8371615 | 12-Feb-13 | ClientResp |

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| THERMOCHROMIC INK AND DOCUMENT PRINTED THEREWITH | United States of America | 12/917865 | 02-Nov-10 | | | Appealed |
| IN-MOLD LABELED ARTICLE AND METHOD | United States of America | 12/946378 | 15-Nov-10 | | | FINAL REJ |
| IN-MOLD LABELED ARTICLE AND METHOD | Mexico | MX/a/2011/0 12084 | 11-Nov-11 | | | Pending |
| GRAPHIC IMAGE FUSION | United States of America | 10/389831 | 17-Mar-03 | 7166249 | 23-Jan-07 | ClientResp |
| GRAPHIC IMAGE FUSION | United States of America | 11/001548 | 01-Dec-04 | 7927688 | 19-Apr-11 | ClientResp |
| GRAPHIC IMAGE FUSION | United States of America | 09/521127 | 07-Mar-00 | 6544634 | 08-Apr-03 | ClientResp |
| GRAPHIC IMAGE FUSION | United States of America | 11/167574 | 27-Jun-05 | 7369048 | 06-May-08 | ClientResp |
| GRAPHIC IMAGE FUSION | United States of America | 12/056694 | 27-Mar-08 | 7806158 | 05-Oct-10 | ClientResp |
| GRAPHIC IMAGE FUSION | United States of America | 12/056682 | 27-Mar-08 | 8062737 | 22-Nov-11 | ClientResp |
| GRAPHIC IMAGE FUSION | Brazil | PI0518797-4 | 02-Aug-05 | | | Pending |
| GRAPHIC IMAGE FUSION | Mexico | MX/a/2007/0 06502 | 02-Aug-05 | 278806 | 07-Sep-10 | ClientResp |
| GRAPHIC IMAGE FUSION | European Patent Convention | 05778217.9 | 02-Aug-05 | 1824673 | 07-Dec-11 | ClientResp |
| GRAPHIC IMAGE FUSION | European Patent Convention | 06847448.5 | 28-Jan-08 | | | Published |
| GRAPHIC IMAGE FUSION | Canada | 2588897 | 02-Aug-05 | 2588897 | 20-Nov-12 | ClientResp |
| GRAPHIC IMAGE FUSION | Germany | 05778217.9 | 02-Aug-05 | 1824673 | 07-Dec-11 | ClientResp |
| GRAPHIC IMAGE FUSION | France | 05778217.9 | 02-Aug-05 | 1824673 | 07-Dec-11 | ClientResp |
| GRAPHIC IMAGE FUSION | United Kingdom | 05778217.9 | 02-Aug-05 | 1824673 | 07-Dec-11 | ClientResp |
| GRAPHIC IMAGE FUSION | Netherlands | 05778217.9 | 02-Aug-05 | 1824673 | 07-Dec-11 | ClientResp |
| GRAPHIC IMAGE FUSION | Poland | 05778217.9 | 02-Aug-05 | 1824673 | 07-Dec-11 | ClientResp |
| IN-MOLD LABELING SYSTEMS WITH POLYMERIC LABEL RECEPTOR AND IN-MOLD LABELING METHODS THEREWITH | United States of America | 13/275637 | 18-Oct-11 | 8828301 | 09-Sep-14 | ClientResp |
| DISPLAY BOARD ASSEMBLY | United States of America | 13/406801 | 28-Feb-12 | | | RCE FILED |
| INFORMATION SYSTEM AND METHOD INCORPORATING A PORTABLE DIGITAL MEDIA DEVICE | United States of America | 13/356124 | 23-Jan-12 | | | Appealed |
| SECURITY DOCUMENT | United States of America | 13/606183 | 07-Sep-12 | | | Published |

**Patents**

| Invention Title | Country | App. No. | Filing Date | Patent No. | Issue Date | Status |
|---|---|---|---|---|---|---|
| COVERT LASER IMAGED UV SECURITY FEATURE | United States of America | | | | | Unfiled |
| SYSTEMS, METHODS, AND APPARATUS FOR MARKING, VERIFYING, AND AUTHENTICATING CONSUMER PRODUCTS | United States of America | 13/836766 | 15-Mar-13 | | | FINAL REJ |
| EVENT DEPENDENT ENCRYPTION | United States of America | | | | | Unfiled |
| SECURITY DOCUMENTS WITH REVERSIBLE THERMOCHROMIC AND IRREVERSIBLE FRICTION-ACTIVATED INK | United States of America | | | | | Unfiled |
| METHODS FOR MOLDING THREE-DIMENSIONAL PARTS WITH APPLICATION OF FORMABLE IN-MOLD LABELS | United States of America | | | | | Unfiled |
| SYSTEM AND METHOD FOR SIGNATURE CAPTURE | United States of America | 14/492679 | 22-Sep-14 | | | Pending |
| IMAGE PROTECTED PRESSURE SENSITIVE LABEL | United States of America | 08/329536 | 26-Oct-94 | 6017408 | 25-Jan-00 | ClientResp |
| MAILER INTERMEDIATE | United States of America | 09/678888 | 04-Oct-00 | 6409075 | 25-Jun-02 | ClientResp |
| LASER IMAGABLE CARBAONLESS FORM | United States of America | 09/726827 | 30-Nov-00 | 6573216 | 03-Jun-03 | ClientResp |
| STRIPE COATED LINERLESS LABELS | United States of America | 09/649109 | 28-Aug-00 | 6830795 | 14-Dec-04 | ClientResp |
| SCRATCH THERMOCHROMIC | | | | | | Initiated |

**Notwithstanding anything herein to the contrary, the liens and security interests granted to DIP Agent pursuant to this Agreement and the exercise of any right or remedy by DIP Agent hereunder are subject to (a) the provisions of that certain Intercreditor Agreement dated as of March 12, 2015, among Bank of America, N.A., as ABL Agent, and Silver Point Finance, LLC, as Administrative Agent and Collateral Agent, and (b) the provisions of that certain Intercreditor Agreement dated as of August 1, 2013, among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent, and the parties identified as "Grantors" from time to time therein. In the event of any conflict between the terms of such Intercreditor Agreements and the terms of this Agreement, the terms of such Intercreditor Agreements shall govern and control.**

<u>ABL TRADEMARK SECURITY AGREEMENT</u>

This ABL TRADEMARK SECURITY AGREEMENT, dated as of March 12, 2015 (this "<u>Agreement</u>"), is made by THE STANDARD REGISTER COMPANY, an Ohio corporation (<u>Grantor</u>"), individually and as successor by merger to WorkflowOne LLC, in favor of BANK OF AMERICA, N.A., as the administrative agent (together with its successor(s) thereto in such capacity, "<u>DIP Agent</u>") for each of the DIP Secured Parties.

<u>W I T N E S S E T H:</u>

WHEREAS, Grantor and the other parties thereto as borrowers, the various financial institutions from time to time parties thereto as lenders, and DIP Agent have entered into that certain Post-Petition Loan and Security Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>ABL DIP Loan Agreement</u>");

WHEREAS, pursuant to the ABL DIP Loan Agreement, Grantor is required to execute and deliver this Agreement and to grant to DIP Agent a continuing security interest in all of the Trademark Collateral (as defined below) to secure all Obligations;

WHEREAS, Grantor has duly authorized the execution, delivery and performance of this Agreement; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees, for the benefit of each DIP Secured Party, as follows:

SECTION I.   <u>Definitions</u>.   Unless otherwise defined herein or the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings as used or provided in the ABL DIP Loan Agreement.

SECTION 1.1.   "<u>Trademark Collateral</u>" means:

(a) (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification

marks, collective marks, logos and other source or business identifiers, and all goodwill of the business associated therewith, now existing or hereafter adopted or acquired including those referred to Schedule I attached hereto whether currently in use or not, all registrations and recordings thereof and all applications in connection therewith, whether pending or in preparation for filing, including registrations, recordings and applications in the United States Patent and Trademark Office or in any office or agency of the United States of America, or any State thereof or any other country or political subdivision thereof or otherwise, and all common-law rights relating to the foregoing, and (ii) the right to obtain all reissues, extensions or renewals of the foregoing (collectively referred to as the "Trademark");

(b) all trademark licenses for the grant by or to Grantor of any right to use any trademark, including any trademark license referred to in Schedule I;

(c) all of the goodwill of the business connected with the use of, and symbolized by the items described in, clause (a), and to the extent applicable clause (b);

(d) the right to sue third parties for past, present and future infringements of any Trademark Collateral described in clause (a) and, to the extent applicable, clause (b); and

(e) all Proceeds of, and rights associated with, the foregoing, including any claim by Grantor against third parties for past, present or future infringement or dilution of any Trademark, Trademark registration or Trademark license, or for any injury to the goodwill associated with the use of any such Trademark or for breach or enforcement of any Trademark license and all rights corresponding thereto throughout the world.

SECTION 2.  Grant of Security Interest.  Grantor hereby grants to DIP Agent, for its benefit and the ratable benefit of each other DIP Secured Party, a continuing security interest in the Trademark Collateral, whether now or hereafter existing or acquired by Grantor, including, without limitation, the trademarks set forth in Schedule I attached hereto.

SECTION 3.   Security Agreement.  This Agreement has been executed and delivered by Grantor for the purpose of registering the security interest of DIP Agent in the Trademark Collateral with the United States Patent and Trademark Office.  The security interest granted hereby has been granted as a supplement to, and not in limitation of, the security interests granted to the "Administrative Agent" for its benefit and the ratable benefit of each other "Secured Party" under (and as defined in) that certain ABL Trademark Security Agreement dated as of August 9, 2013, among Grantor, WorkflowOne LLC ("WorkflowOne"), and Administrative Agent and that certain Security and Pledge Agreement dated as of August 1, 2013, among Grantor, WorkflowOne, and the other parties identified as "Grantors" therein, and Administrative Agent. Such Security Agreements (and all rights and remedies of Administrative Agent and each Secured Party thereunder) shall remain in full force and effect in accordance with their respective terms.

SECTION 4.   Release of Liens.  Upon (i) the disposition of any Trademark Collateral in accordance with Section 9.2.2 of the ABL DIP Loan Agreement or (ii) the

occurrence of the Full Payment of all Obligations, the security interests granted herein shall automatically terminate with respect to (A) such Trademark Collateral (in the case of clause (i)) or (B) all Trademark Collateral (in the case of clause (ii)).  Upon such disposition or Full Payment of all Obligations, DIP Agent will, at Grantor's sole expense, deliver to Grantor, without any representations, warranties or recourse of any kind whatsoever, all Trademark Collateral held by DIP Agent hereunder, and execute and deliver to Grantor such documents (in form and substance reasonably satisfactory to DIP Agent) as Grantor shall reasonably request to evidence such termination.

SECTION 5.  <u>Acknowledgment</u>.  Grantor does hereby further acknowledge and affirm that the rights and remedies of DIP Agent with respect to the security interest in the Trademark Collateral granted hereby are more fully set forth in the ABL DIP Loan Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.

SECTION 6.  <u>DIP Loan Document</u>.  This Agreement is a DIP Loan Document executed pursuant to the ABL DIP Loan Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

SECTION 7.  <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered by an authorized officer as of the date first above written.

GRANTOR:

THE STANDARD REGISTER COMPANY

By:_____

Name:  Joseph R. Morgan, Jr._____

Title:  President and Chief Executive Officer_____

Accepted and agreed to as of the date first above written.

BANK OF AMERICA, N.A., as Administrative Agent

By: _____
Name: Andrew A. Doherty
Title: Senior Vice President

**Trademarks**

| Trademark | Country | App. No. | Filing Date | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|---|---|
| CELEBRATE HEALTH | United States of America | 85/338778 | 06-Jun-11 | 4123123 | 03-Apr-12 | Registered |
| CHECK+PLUS | United States of America | 75/125169 | 25-Jun-96 | 2184613 | 25-Aug-98 | Renewed |
| COMPATIBLE FILING PRODUCTS HEALTHCARE BUSINESS SOLUTIONS & Design | United States of America | 77/621203 | 25-Nov-08 | 3721059 | 08-Dec-09 | Registered |
| COMPATIBLE FILING PRODUCTS HEALTHCARE BUSINESS SOLUTIONS & Design | United States of America | 77/857967 | 27-Oct-09 | 3930221 | 08-Mar-11 | Registered |
| COPY BAN + | United States of America | 74/326050 | 28-Oct-92 | 1866346 | 06-Dec-94 | Renewed |
| COPY BAN+ | Australia | 729633 | 12-Mar-97 | 729633 | 14-Jan-98 | Renewed |
| COPYBAN | United States of America | 75/585067 | 09-Nov-98 | 2370146 | 25-Jul-00 | Renewed |
| COPYBAN CAPTURE | United States of America | 75/585069 | 09-Nov-98 | 2370147 | 25-Jul-00 | Renewed |
| DATASEAL | United States of America | 73/784426 | 03-Mar-89 | 1639041 | 26-Mar-91 | Registered |
| DES GENS EXCEPTIONNELS, DES RESULTATS CONCRETS | Canada | 1244335 | 20-Jan-05 | TMA660932 | 17-Mar-06 | Registered |
| DOCULABEL | United States of America | 74/427525 | 19-Aug-93 | 1930197 | 24-Oct-95 | DO NOT MAINTAIN |
| EXCEPTIONAL PEOPLE, PROVEN RESULTS | Canada | 1087223 | 22-Dec-00 | TMA647530 | 08-Sep-05 | Registered |
| EXCEPTIONAL PEOPLE, PROVEN RESULTS | United States of America | 78/040079 | 20-Dec-00 | 3090851 | 09-May-06 | Registered |
| E-Z LOAD | United States of America | 75/016020 | 08-Nov-95 | 2086418 | 05-Aug-97 | Renewed |
| GLOBAL IMAGE. LOCAL PRESENCE. | Mexico | 450303 | 29-Sep-00 | 871959 | 29-Sep-00 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | Mexico | 450302 | 29-Sep-00 | 684507 | 30-Jan-01 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | New Zealand | 624067 | 27-Sep-00 | 624067 | 04-May-00 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | New Zealand | 624068 | 27-Sep-00 | 624068 | 04-May-00 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | South Africa | 19271 | 27-Sep-00 | 2000/19271 | 27-Sep-00 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | United States of America | 76/041057 | 04-May-00 | 2893683 | 12-Oct-04 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | Australia | 851837 | 29-Sep-00 | 851837 | 15-Jul-02 | DO NOT MAINTAIN |

## Trademarks

| Trademark | Country | App. No. | Filing Date | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|---|---|
| GLOBAL IMAGE. LOCAL PRESENCE. | Canada | 1078158 | 11-Oct-00 | 584043 | 18-Jun-03 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | China (People's Republic) | 2000/160897 | | 1799613 | 28-Jun-02 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | European Community | 1901396 | 26-Sep-00 | 001901396 | 31-Jan-02 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | China (People's Republic) | 2000/160900 | 20-Oct-00 | 1955940 | 21-Nov-02 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | China (People's Republic) | 2000/160899 | 02-Oct-00 | 1964093 | 21-Aug-02 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | Mexico | 473110 | 27-Feb-01 | 776511 | 31-Jan-03 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | Mexico | 473111 | 27-Feb-01 | 698145 | 30-Apr-01 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | European Community | 2747491 | 28-Jun-02 | 002747491 | 16-Apr-04 | DO NOT MAINTAIN |
| GLOBAL IMAGE. LOCAL PRESENCE. | South Africa | 19272 | 27-Sep-00 | 2000/19272 | 27-Sep-00 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | Mexico | 452061 | 10-Oct-00 | 770930 | 28-Nov-02 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | Mexico | 452060 | 10-Oct-00 | 747631 | 21-May-02 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | New Zealand | 624680 | 06-Oct-00 | 624680 | 04-Apr-02 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | New Zealand | 624681 | 06-Oct-00 | 624681 | 10-Jun-02 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | South Africa | 2000/19893 | 06-Oct-00 | 2000/19893 | 21-Oct-05 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | South Africa | 2000/19894 | 06-Oct-00 | 2000/19894 | 21-Oct-05 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | Australia | 852581 | 06-Oct-00 | 852581 | 03-Aug-01 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | Canada | 1077737 | 06-Oct-00 | 583988 | 18-Jun-03 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | European Community | 1907765 | 05-Oct-00 | 001907765 | 10-Dec-02 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | Mexico | 527965 | 16-Jan-02 | 740492 | 26-Mar-02 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | China (People's Republic) | 2001009026 | 15-Jan-01 | 1985543 | 07-Dec-04 | DO NOT MAINTAIN |
| GLOBALPRINT NETWORK | New Zealand | 646565 | 04-Oct-01 | 646565 | 04-Oct-01 | DO NOT MAINTAIN |

**Trademarks**

| Trademark | Country | App. No. | Filing Date | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|---|---|
| GRAFILM | United States of America | 75/659697 | 12-Mar-99 | 2389388 | 26-Sep-00 | Renewed |
| IMAGE SEAL | United States of America | 440556 | 27-Sep-93 | 1878237 | 07-Feb-95 | Renewed |
| INDUSTRAMARK | United States of America | 77/693380 | 18-Mar-09 | 3797124 | 01-Jun-10 | Registered |
| INDUSTRAMARK | Mexico | 1011682 | 09-Jun-09 | 1120251 | 10-Sep-09 | Registered |
| INDUSTRAMARK | Mexico | 1011680 | 09-Jun-09 | 1120456 | 11-Sep-09 | Registered |
| INDUSTRAMARK | Mexico | 1011679 | 09-Jun-09 | 1142794 | 12-Feb-10 | Registered |
| INDUSTRAMARK | Mexico | 1028557 | 21-Aug-09 | 1170631 | 27-Jul-10 | Registered |
| INDUSTRAMARK | Mexico | 1028558 | 21-Aug-09 | 1136997 | 11-Jan-10 | Registered |
| KANT SLIP & DESIGN | Canada | 158810 | 26-Aug-32 | 57061 | 11-Apr-33 | RENEWED |
| LASER LOCK | United States of America | 106902 | 18-Oct-90 | 1705839 | 04-Aug-92 | Renewed |
| LinkUp | United States of America | 188447 | 25-Jul-91 | 1745117 | 05-Jan-93 | Renewed |
| ONEMARK | United States of America | 85/395063 | 11-Aug-11 | | | Published |
| ONEMARK | United States of America | 85/324785 | 19-May-11 | 4230825 | 23-Oct-12 | Registered |
| ORGANIZE, MANAGE, MIGRATE, THE "LESS PAPER" STRATEGY | Canada | 843492 | 28-Apr-97 | 518215 | 19-Oct-99 | DO NOT MAINTAIN |
| PATHFORWARD | Canada | 1158054 | 05-Nov-02 | 619664 | 15-Sep-04 | Registered |
| PATIENT LINKUP | United States of America | 75/201385 | 21-Nov-96 | 2350440 | 16-May-00 | Renewed |
| POST RITE | United States of America | 73/087332 | 17-May-76 | 1057607 | 01-Feb-77 | Renewed |
| POST RITE Stylized | United States of America | 71/688669 | 01-Jun-55 | 625417 | 17-Apr-56 | Renewed |
| PRINTCONCIERGE | United States of America | 78/332187 | 24-Nov-03 | 2974213 | 19-Jul-05 | Renewed |
| PROFILEONE | United States of America | 85/477589 | 21-Nov-11 | 4388812 | 20-Aug-13 | Registered |
| PSMAILERS & Design | United States of America | 77/152551 | 10-Apr-07 | 3394278 | 11-Mar-08 | Registered |
| RELIZON | Canada | 1262115 | 21-Jun-05 | TMA682456 | 27-Feb-07 | Registered |
| RELIZON and Design | Canada | 1087224 | 22-Dec-00 | TMA660815 | 15-Mar-06 | Registered |
| S DESIGN | Brazil | 820981320 | 11-Aug-98 | 820981320 | 28-Aug-01 | DO NOT MAINTAIN |
| S DESIGN | Canada | 1082678 | 15-Nov-00 | 578284 | 26-Mar-03 | Registered |
| S DESIGN | United States of America | 75/372929 | 14-Oct-97 | 2355736 | 06-Jun-00 | Renewed |
| S DESIGN | Puerto Rico | | 24-Aug-98 | 43657 | 13-Jun-00 | Renewed |
| S DESIGN | Mexico | 341637 | 29-Jul-98 | 596246 | 11-Dec-98 | Renewed |
| S LOGO | United States of America | 75/352502 | 05-Sep-97 | 2393852 | 10-Oct-00 | Renewed |
| S STANDARD REGISTER & Design | Mexico | 359796 | 11-Jan-99 | 605875 | 12-Apr-99 | Renewed |

**Trademarks**

| Trademark | Country | App. No. | Filing Date | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|---|---|
| SCRIP PLUS | United States of America | 75/781028 | 20-Aug-99 | 2452062 | 15-May-01 | Renewed |
| SIMPLICITY SERIES | United States of America | 74/062777 | 25-May-90 | 1773586 | 25-May-93 | Registered |
| SMARTWORKS | Canada | 1070526 | 10-Aug-00 | 651743 | 27-Oct-05 | Registered |
| SMARTWORKS | United States of America | 75/115912 | 07-Jun-96 | 2296325 | 30-Nov-99 | Renewed |
| SMARTWORKS | Canada | 827237 | 29-Oct-96 | TMA537116 | 14-Nov-00 | Renewed |
| SMARTWORKS | Mexico | 278010 | 25-Oct-96 | 543557 | 07-Jun-96 | Renewed |
| SMARTWORKS | New Zealand | 311155 | 16-Jun-99 | 311155 | 16-Jun-99 | Renewed |
| SMARTWORKS | New Zealand | 311156 | 16-Jun-99 | 311156 | 16-Jun-99 | Renewed |
| SMARTWORKS | New Zealand | 311157 | 16-Jun-99 | 311157 | 16-Jun-99 | Renewed |
| SMARTWORKS | United States of America | 75/374407 | 14-Oct-97 | 2291987 | 16-Nov-99 | Renewed |
| SMARTWORKS | United States of America | 76/015559 | 03-Apr-00 | 2810964 | 03-Feb-04 | Renewed |
| SMARTWORKS SIMPLYPRINT | United States of America | 77/566335 | 10-Sep-08 | 3772642 | 06-Apr-10 | Registered |
| SMARTWORKS.COM | European Community | 1823137 | 11-Aug-00 | 001823137 | 17-Dec-02 | Renewed |
| SMOOTHSEAL | United States of America | 74/522084 | 04-May-94 | 1965957 | 02-Apr-96 | Renewed |
| SRC ACCUTRAC | United States of America | 74/584939 | 12-Oct-94 | 2157093 | 12-May-98 | Renewed |
| STANDARD REGISTER | United States of America | 256238 | 31-Mar-80 | 1223196 | 11-Jan-83 | Renewed |
| STANDARD REGISTER | United States of America | 061882 | 02-Sep-75 | 1059208 | 15-Feb-77 | Renewed |
| STANDARD REGISTER | Canada | 749397 | 14-Mar-94 | 471057 | 13-Feb-97 | Renewed |
| STANDARD REGISTER | European Community | 1090018 | 23-Feb-99 | 1090018 | 25-Jul-00 | Renewed |
| STANDARD REGISTER | South Africa | 98/01724 | 10-Feb-98 | 98/01724 | 07-Jan-03 | Renewed |
| STANDARD REGISTER | South Africa | 98/01725 | 10-Feb-98 | 98/01725 | 03-Oct-01 | Renewed |
| STANDARD REGISTER | South Africa | 98/01726 | 10-Feb-98 | 98/01726 | 07-Jan-03 | Renewed |
| STANDARD REGISTER | South Africa | 98/01727 | 10-Feb-98 | 98/01727 | 07-Jan-03 | Renewed |
| STANDARD REGISTER | South Africa | 98/01728 | 10-Feb-98 | 98/01728 | 03-Oct-01 | Renewed |
| STANDARD REGISTER | United States of America | 75/846073 | 09-Nov-99 | 2497671 | 16-Oct-01 | Renewed |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | European Community | A0023566 | 08-Mar-11 | 1089302 | 08-Mar-11 | Protected |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Canada | 1518714 | 10-Mar-11 | TMA862722 | 16-Oct-13 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Int'l Registration - Madrid Protocol Only | A0023566 | 08-Mar-11 | 1089302 | 08-Mar-11 | Registered |

## Trademarks

| Trademark | Country | App. No. | Filing Date | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|---|---|
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163527 | 16-Mar-11 | 1237025 | 06-Sep-11 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163528 | 16-Mar-11 | 1237026 | 06-Sep-11 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163531 | 16-Mar-11 | 1264571 | 02-Feb-12 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163533 | 16-Mar-11 | 1277016 | 30-Mar-12 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163535 | 16-Mar-11 | 1233401 | 17-Aug-11 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163537 | 16-Mar-11 | 1263477 | 27-Jan-12 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163538 | 16-Mar-11 | 1253220 | 22-Nov-11 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163540 | 16-Mar-11 | 1225403 | 29-Jun-11 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | Mexico | 1163542 | 16-Mar-11 | 1300869 | 27-Jul-12 | Registered |
| STANDARD REGISTER ADVANCING YOUR REPUTATION and Design | United States of America | 85/977064 | 08-Feb-12 | 4215539 | 25-Sep-12 | Registered |
| STANFAST | United States of America | 479179 | 07-May-84 | 1316939 | 29-Jan-85 | DO NOT MAINTAIN |
| STANSET | United States of America | 120352 | 18-May-61 | 0739019 | 09-Oct-62 | Renewed |
| STARTA SYSTEM | United States of America | 73/386518 | 17-Sep-82 | 1241169 | 07-Jun-83 | Renewed |
| STATUSQUE | United States of America | 78/267491 | 26-Jun-03 | 2928303 | 22-Feb-05 | DO NOT MAINTAIN |
| SUPER SAFETY | United States of America | 118371 | 12-May-19 | 129604 | 09-Mar-20 | Renewed |
| THERMACOLOR | Canada | 792880 | 19-Sep-95 | 535587 | 24-Oct-00 | DO NOT MAINTAIN |
| TOTALVANTAGE | United States of America | 85/887435 | 27-Mar-13 | 4517216 | 22-Apr-14 | Renewed |
| TOTALVANTAGE | United States of America | 86/146708 | 18-Dec-13 | 4592085 | 26-Aug-14 | Renewed |
| TRANSMARK | United States of America | 75/811206 | 29-Sep-99 | 2426546 | 06-Feb-01 | Renewed |
| W Stylized | United States of America | 73/381257 | 23-Aug-82 | 1242816 | 21-Jun-83 | Renewed |

**Trademarks**

| Trademark | Country | App. No. | Filing Date | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|---|---|
| WILMER | United States of America | 73/281708 | 14-Oct-80 | 1208210 | 14-Sep-82 | Renewed |
| WILMER Stylized | United States of America | 77/182441 | 16-May-07 | 3384417 | 19-Feb-08 | Registered |
| WILMER Stylized | United States of America | 77/182428 | 16-May-07 | 3497803 | 09-Sep-08 | Renewed |
| WORKFLOWONE | United States of America | 78/723236 | 29-Sep-05 | 3348180 | 04-Dec-07 | Registered |
| WORKFLOWONE | United States of America | 78/723831 | 30-Sep-05 | 3133093 | 22-Aug-06 | Registered |
| WORKFLOWONE | United States of America | 78/723880 | 30-Sep-05 | 3224243 | 03-Apr-07 | Registered |
| ZIPSET | United States of America | 608960 | 18-Jan-51 | 573949 | 05-May-53 | Renewed |

**Notwithstanding anything herein to the contrary, the liens and security interests granted to DIP Agent pursuant to this Agreement and the exercise of any right or remedy by DIP Agent hereunder are subject to (a) the provisions of that certain Intercreditor Agreement dated as of March 12, 2015, among Bank of America, N.A., as ABL Agent, and Silver Point Finance, LLC, as Administrative Agent and Collateral Agent, and (b) the provisions of that certain Intercreditor Agreement dated as of August 1, 2013, among Bank of America, N.A., as ABL Agent, Silver Point Finance, LLC, as First Lien Agent and Second Lien Agent, and the parties identified as "Grantors" from time to time therein. In the event of any conflict between the terms of such Intercreditor Agreements and the terms of this Agreement, the terms of such Intercreditor Agreements shall govern and control.**

## ABL COPYRIGHT SECURITY AGREEMENT

This ABL COPYRIGHT SECURITY AGREEMENT, dated as of March 12, 2015 (this "Agreement"), is made by THE STANDARD REGISTER COMPANY, an Ohio corporation ("Grantor"), individually and as successor by merger to WorkflowOne LLC, in favor of BANK OF AMERICA, N.A., as the administrative agent (together with its successor(s) thereto in such capacity, the "DIP Agent") for each of the DIP Secured Parties.

## W I T N E S S E T H:

WHEREAS, Grantor and the other parties thereto as borrowers, the various financial institutions from time to time parties thereto as lenders, and DIP Agent have entered into that certain Post-Petition Loan and Security Agreement, dated as of March 12, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "ABL DIP Loan Agreement");

WHEREAS, pursuant to the ABL DIP Loan Agreement, Grantor is required to execute and deliver this Agreement and to grant to DIP Agent a continuing security interest in all of the Copyright Collateral (as defined below) to secure all Obligations;

WHEREAS, Grantor has duly authorized the execution, delivery and performance of this Agreement; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees, for the benefit of each DIP Secured Party, as follows:

SECTION 1.  Definitions.  Unless otherwise defined herein or the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings provided in the ABL DIP Loan Agreement.

SECTION 1.1.  "Copyright Collateral" means all copyrights owned by Grantor, whether registered or unregistered and whether published or unpublished, now or hereafter in force under the laws of the United States, any other country or any political subdivision thereof, including all of Grantor's right, title and interest in and to all copyrights registered in the United

States Copyright Office or in any office or agency of the United States of America, or any State thereof or any other country or any political subdivision thereof, or otherwise, and also including the copyrights referred to in <u>Schedule I</u>, and registrations and recordings thereof and all applications for registration thereof, whether pending or in preparation, all copyright licenses, including each copyright license referred to <u>Schedule I</u>, the right to sue for past, present and future infringements of any of the foregoing, all rights corresponding thereto, all extensions and renewals of any thereof and all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and Proceeds of suit, which are owned or licensed by Grantor.

     SECTION 2.  <u>Grant of Security Interest</u>.  Grantor hereby grants to DIP Agent, for its benefit and the ratable benefit of each other DIP Secured Party, a continuing security interest in all Copyright Collateral, whether now or hereafter existing or acquired by Grantor, including, without limitation, the copyrights set forth in <u>Schedule I</u> attached hereto.

     SECTION 3.  <u>Security Agreement</u>.  This Agreement has been executed and delivered by Grantor for the purpose of registering the security interest of DIP Agent in the Copyright Collateral with the United States Copyright Office.  The security interest granted hereby has been granted as a supplement to, and not in limitation of, the security interests granted to the "Administrative Agent" for its benefit and the ratable benefit of each other "Secured Party" under (and as defined in) that certain ABL Trademark Security Agreement dated as of August 9, 2013, among Grantor, WorkflowOne LLC ("WorkflowOne"), and Administrative Agent and that certain Security and Pledge Agreement dated as of August 1, 2013, among Grantor, WorkflowOne, and the other parties identified as "Grantors" therein, and Administrative Agent. Such Security Agreements (and all rights and remedies of Administrative Agent and each Secured Party thereunder) shall remain in full force and effect in accordance with their respective terms.

     SECTION 4.  <u>Release of Liens</u>.  Upon (i) the disposition of Copyright Collateral in accordance with Section 9.2.2 of the ABL DIP Loan Agreement or (ii) the occurrence of the Full Payment of all Obligations, the security interests granted herein shall automatically terminate with respect to (A) such Copyright Collateral (in the case of clause (i)) or (B) all Copyright Collateral (in the case of clause (ii)).  Upon such disposition or Full Payment of all Obligations, DIP Agent will, at Grantor's sole expense, deliver to Grantor, without any representations, warranties or recourse of any kind whatsoever, all Copyright Collateral held by DIP Agent hereunder, and execute and deliver to Grantor such documents (in form and substance reasonably satisfactory to DIP Agent) as Grantor shall reasonably request to evidence such termination.

     SECTION 5.  <u>Acknowledgment</u>.  Grantor does hereby further acknowledge and affirm that the rights and remedies of DIP Agent with respect to the security interest in the Copyright Collateral granted hereby are more fully set forth in the ABL DIP Loan Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.

     SECTION 6.  <u>DIP Loan Document</u>.  This Agreement is a DIP Loan Document executed pursuant to the ABL DIP Loan Agreement and shall (unless otherwise expressly

indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

SECTION 7.   <u>Counterparts</u>.   This Agreement may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered by an authorized officer as of the date first above written.

GRANTOR:

THE STANDARD REGISTER COMPANY

By:_____

Name:  Joseph P. Morgan, Jr._____

Title:  President and Chief Executive Officer_____

Accepted and agreed to as of the date first above written.

BANK OF AMERICA, N.A., as Administrative Agent

By: _____

Name: Andrew A. Doherty

Title: Senior Vice President

## Copyrights

| Title | Country | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|
| HEALTH CARE FORMS MANAGEMENT | United States of America | TX0000089672 | 7-Aug-78 | valid and subsisting |
| ACCUSERV | United States of America | TX0003632358 | 19-Nov-93 | valid and subsisting |
| BAR CODES: DISTRIBUTIVE TRAINING | United States of America | TX0003679508 | 19-Nov-93 | valid and subsisting |
| BEND KNEES WHEN LIFTING | United States of America | VA0000058439 | 29-Aug-80 | valid and subsisting |
| THE STANDARD REGISTER COMPANY CHECK CONVERSION PROGRAM | United States of America | TX0001284934 | 16-Feb-84 | valid and subsisting |
| CHECK CONVERSION PROGRAM: USER'S DOCUMENTATION | United States of America | TX0001284935 | 16-Feb-84 | valid and subsisting |
| CUSTOMER FOCUSED PRESENTATION | United States of America | TX0003678577 | 19-Nov-93 | valid and subsisting |
| DISTRIBUTIVE TRAINING: NEGOTIATING SKILLS | United States of America | TXu000629311 | 3-Dec-93 | valid and subsisting |
| DOCUMENT MANAGEMENT CONTINUUM | United States of America | TX0004927415 | 8-Feb-99 | valid and subsisting |
| ELECTRONIC SYSTEMS PRODUCTS | United States of America | TX0003685659 | 19-Nov-93 | valid and subsisting |
| FINANCIAL FUNCTIONS | United States of America | TXu000628412 | 19-Nov-93 | valid and subsisting |
| FORM MANUFACTURING | United States of America | TX0003685656 | 19-Nov-93 | valid and subsisting |
| FORMS MANAGEMENT: DISTRIBUTIVE TRAINING | United States of America | TX0003679509 | 19-Nov-93 | valid and subsisting |
| HEALTH CARE MARKETING | United States of America | TX0003632356 | 19-Nov-93 | valid and subsisting |
| LISTENING AND QUESTIONING | United States of America | TXu000628411 | 19-Nov-93 | valid and subsisting |
| MAILING SYSTEMS PRODUCTS | United States of America | TX0003685657 | 19-Nov-93 | valid and subsisting |
| PRESSURE SENSITIVE PRODUCTS | United States of America | TX0003685658 | 19-Nov-93 | valid and subsisting |
| PREVENT BACK INJURY | United States of America | VA0000058440 | 29-Aug-80 | valid and subsisting |
| PRODUCT KNOWLEDGE SERIES: QUALITY INVOICING | United States of America | TX0003685262 | 19-Nov-93 | valid and subsisting |
| SECURE DOCUMENTS | United States of America | TX0003685373 | 19-Nov-93 | valid and subsisting |
| SELLING SKILLS SERIES: CLOSING | United States of America | TX0003700897 | 19-Nov-93 | valid and subsisting |
| STANDARD REGISTER COMPANY CHECK CONVERSION PROGRAM | United States of America | TX0001284934 | 16-Feb-84 | valid and subsisting |
| STANDARD REGISTER DISTRIBUTIVE TRAINING: HOSPITALITY MARKETING | United States of America | TX0003679234 | 19-Nov-93 | valid and subsisting |
| STAR WALK | United States of America | TXu000651295 | 19-Sep-94 | valid and subsisting |
| STORAGE AND DISTRIBUTION | United States of America | TX0003679448 | 19-Nov-93 | valid and subsisting |
| T.R.I.C.S. | United States of America | TX0002758890 | 7-Nov-89 | valid and subsisting* |
| T.R.I.C.S. | United States of America | TX0002693504 | 7-Nov-89 | valid and subsisting* |
| INFORM INTEGRATION | United States of America | TXU000864260 | 7-May-98 | valid and subsisting** |

## Copyrights

| Title | Country | Regis. No. | Regis. Date | Status |
|---|---|---|---|---|
| FUNDTRACK | United States of America | TXU000853297 | 6-May-98 | valid and subsisting** |
| PRESSURE SEAL EQUIPMENT | United States of America | VA0001188645 | 8-Oct-02 | valid and subsisting |
| RSVP:  REYNOLDS SOURCE FOR VENDOR PRODUCTS:  VERSION 1995 | United States of America | TXU000697635 | 24-Oct-94 | valid and subsisting*** |
| RSVP (REYNOLDS SOURCE FOR VENDOR PRODUCTS) FEBRUARY 96 UPDATE | United States of America | TXU000742574 | 26-Apr-96 | valid and subsisting*** |
| RSVP. | United States of America | TXU000816309 | 14-Aug-97 | valid and subsisting*** |
| RSVP (REYNOLDS SOURCE FOR VENDOR PRODUCTS) FEBRUARY 1998 UPDATE | United States of America | TXU000883864 | 1-May-98 | valid and subsisting*** |

* Registered in the name of Graphics Express, Inc.  Assignments from Planetprint.com, Inc, Planetprint Dallas.com, Inc, David G. Dillon, Phil Shirley, Brian Stone and Keith M. Nickoloff to Standard Register Holding Company, and from Standard Register Holding Company to Standard Register Company recorded against these properties.

** Registered in the name of Inform Graphics.  Assignment from Inform Graphics, Inc. to SFI of Delaware, LLC. Assignment from WorkFlow Solutions, LLC and Relizon Company to WorkFlowOne, LLC recorded against this property.  ABL copyright security agreement from Standard Register Company and WorkFlowOne LLC to Bank of America, NA recorded against these properties as well as all other properties on this list.

*** Registered in the name of Reynolds & Reynolds Company.  Assignment from WorkFlow Solutions, LLC & Relizon Company to WorkFlowOne, LLC recorded against this property.

# **EXHIBIT D**

## **CASH FLOW PROJECTIONS**

**Standard Register Cash Flow Projections**

| | Forecast 8-Mar-15 | Forecast 15-Mar-15 | Forecast 22-Mar-15 | Forecast 29-Mar-15 | Forecast 5-Apr-15 | Forecast 12-Apr-15 | Forecast 19-Apr-15 | Forecast 26-Apr-15 | Forecast 3-May-15 | Forecast 10-May-15 | Forecast 17-May-15 | Forecast 24-May-15 | Forecast 31-May-15 | 31-May-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total (Customer) Receipts / Inflows | 20,441 | 19,029 | 20,441 | 16,549 | 22,733 | 21,143 | 20,475 | 16,780 | 24,087 | 19,209 | 20,969 | 15,646 | 21,184 | 258,387 |
| Mexico Loan | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| **Total Inflows** | 20,441 | 19,029 | 20,441 | 16,549 | 22,733 | 21,143 | 20,475 | 16,780 | 24,087 | 19,209 | 20,969 | 15,646 | 21,184 | 258,387 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll | (10,401) | (538) | (7,679) | (539) | (8,601) | (539) | (7,679) | (539) | (8,601) | (539) | (7,679) | (539) | (8,601) | (59,243) |
| Health & Benefits | (1,066) | (1,039) | (1,039) | (2,741) | (1,039) | (1,039) | (1,039) | (1,039) | (1,039) | (539) | (1,039) | (539) | (1,039) | (10,513) |
| Paper | (2,094) | (2,235) | (2,366) | (1,758) | (1,293) | (1,247) | (1,293) | (1,923) | (2,169) | (1,103) | (1,336) | (1,088) | (1,038) | (23,814) |
| Leases-Rent | (538) | (30) | (35) | (585) | (35) | (35) | (35) | (35) | (35) | (35) | (35) | (35) | (35) | (3,122) |
| Leases - Equipment | (844) | (657) | (708) | (1,092) | (936) | (703) | (716) | (934) | (1,042) | (698) | (671) | (758) | (583) | (2,603) |
| Freight | (1,538) | (3,844) | (4,669) | (1,829) | (1,820) | (1,478) | (2,244) | (1,634) | (1,546) | (1,544) | (2,795) | (2,039) | (2,058) | (10,857) |
| Postage | (112) | (780) | (1,043) | (261) | (298) | (275) | (231) | (233) | (139) | (380) | (368) | (246) | (1,478) | (2,773) |
| Utilities | (4) | (155) | (558) | (591) | (236) | (388) | (10) | (101) | (456) | (10) | (480) | (231) | (158) | (3,675) |
| Taxes (inc Payroll) | (87) | (671) | (38) | (371) | (13) | (10) | (293) | (233) | (263) | (21) | (21) | (27) | (231) | (6,196) |
| Customer Rebates | (183) | (226) | (229) | (143) | (315) | (118) | (219) | (191) | (245) | (331) | (251) | (245) | (371) | (3,075) |
| Employee T&E | (1,546) | (579) | (608) | (557) | (814) | (452) | (702) | (792) | (821) | (700) | (565) | (994) | (177) | (2,373) |
| Production Materials | (1,187) | (714) | (498) | (892) | (976) | (1,544) | (324) | (107) | (969) | (478) | (89) | (807) | (694) | (10,225) |
| IT Vendor | (3,187) | (5,448) | (7,865) | (11,111) | (5,136) | (4,607) | (66,036) | (6,274) | (5,255) | (4,187) | (4,921) | (5,842) | (880) | (2,373) |
| Subcon | — | (440) | (200) | (437) | (354) | (366) | (334) | (328) | (144) | (529) | (409) | (353) | (5,842) | (77,361) |
| Temp Help | (775) | (1,273) | (1,325) | (1,385) | (2,732) | (1,280) | (2,116) | (1,376) | (1,450) | (1,387) | (1,327) | (1,160) | (343) | (4,468) |
| Other (Ordinary Course) | (1,257) | | | | | | | | | | | | (1,257) | (17,882) |
| **Subtotal Operating Disbursements** | (26,316) | (15,033) | (26,444) | (20,373) | (28,933) | (13,631) | (23,249) | (27,844) | (24,820) | (14,279) | (21,253) | (13,443) | (26,674) | (272,243) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Pension Payments (Qualified and Non-Qualified) | — | — | — | (2,158) | — | — | — | — | — | — | — | — | — | (2,158) |
| Principal Payments | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| 1st Lien Interest | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| 2nd Lien Interest | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Revolver Interest & LC Fees | (3,535) | (1,688) | (23) | (44) | (230) | (65) | (68) | (72) | (82) | (72) | (74) | (75) | (85) | (2,752) |
| Professional Fees | (3,560) | | (500) | | (80) | (2,636) | | (500) | (80) | (2,508) | | | (80) | (8,747) |
| Audit Fees | — | — | — | — | — | — | — | — | — | — | — | — | — | (1,000) |
| PBGC Admin Claim Cost | — | — | (70) | (70) | — | — | — | (70) | — | — | — | (70) | — | (210) |
| Standard Register Mexico | — | — | — | — | — | (450) | — | — | — | — | — | — | — | (450) |
| **Subtotal Non-Operating Disbursements** | (3,535) | (1,688) | (614) | (4,435) | (2,467) | (2,703) | (518) | (642) | (162) | (2,580) | (74) | (75) | (235) | (15,316) |
| **Total Disbursements** | (29,851) | (16,721) | (26,467) | (16,549) | (31,400) | (16,334) | (23,767) | (18,486) | (24,982) | (16,859) | (21,376) | (13,518) | (26,859) | (287,559) |
| **Cash Flow** | (9,410) | 2,308 | (6,326) | (4,439) | (8,667) | 4,808 | (3,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (29,172) |
| Post Petition 4 Week Collection Paydown | (9,410) | (19,029) | (16,549) | (16,549) | (22,733) | | | | | | | | | (78,452) |
| **Adjusted Cash Flow** | (9,410) | (16,721) | (26,467) | (20,988) | (31,000) | 4,808 | (3,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (107,624) |
| | | | | | | | | | | | | | | |
| Beginning Cash | | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 |
| Cash Flow | (9,410) | (16,721) | (26,467) | (20,988) | (31,000) | 4,808 | (3,293) | (1,705) | (895) | 2,350 | (357) | 2,129 | (5,675) | (107,624) |
| Cash for draw / (pay down) on DIP Loans | 11,025 | 16,721 | 26,467 | 20,988 | 31,000 | (4,808) | 3,293 | 1,705 | 895 | (2,350) | 357 | (2,129) | 5,675 | 109,239 |
| **Ending Cash Balance** | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 | 1,615 |
| | | | | | | | | | | | | | | |
| Beginning Revolver Loan Balance: ABL DIP | | 16,721 | 43,188 | 64,176 | 93,024 | 88,215 | 86,311 | 88,016 | 88,911 | 86,561 | 84,283 | 82,154 | | |
| Net Borrowings / (Repayments) | 16,721 | 16,721 | 26,467 | 20,988 | 28,848 | (4,808) | (1,904) | 895 | 895 | (2,350) | (2,279) | (2,129) | 5,675 | 87,829 |
| Revolver Loan Balance: ABL DIP | 16,721 | 43,188 | 64,176 | 93,024 | 88,215 | 86,311 | 88,016 | 88,911 | 86,311 | 84,283 | 82,154 | 87,829 | | 87,829 |
| Rollup of Pre-Petition Amount (Including LCs) | | | | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 | 23,465 |
| **Total Outstanding ABL DIP Revolver** | 16,721 | 43,188 | 64,176 | 116,489 | 111,680 | 109,776 | 111,481 | 112,377 | 110,027 | 107,748 | 105,620 | 111,294 | | 111,294 |
| | | | | | | | | | | | | | | |
| Beginning Revolver Loan Balance: Delay Draw Term Loan | | | | 2,553 | 2,553 | 5,197 | 7,749 | 7,749 | 7,749 | 7,749 | 7,749 | 10,385 | | |
| Net Borrowings / (Repayments) | | | | 2,553 | 2,553 | 2,553 | | | | | 2,636 | | | |
| **Total Outstanding Delay Draw Term Loan** | | | | 2,553 | 2,553 | 7,749 | 7,749 | 7,749 | 7,749 | 7,749 | 10,385 | 10,385 | 10,385 | 10,385 |
| | | | | | | | | | | | | | | |
| Ending Balance : ABL DIP Revolver | | 16,721 | 43,188 | 64,176 | 116,489 | 111,680 | 109,776 | 111,481 | 112,377 | 110,027 | 107,748 | 105,620 | 111,294 | 111,294 |
| Ending Balance : Delay Draw Term Loan | | | | | 2,553 | 2,553 | 7,749 | 7,749 | 7,749 | 7,749 | 7,749 | 10,385 | 10,385 | 10,385 |
| **Total Outstanding DIP** | | 16,721 | 43,188 | 64,176 | 119,041 | 114,233 | 117,525 | 119,231 | 120,126 | 117,776 | 118,133 | 116,004 | 121,679 | 121,679 |
| | | | | | | | | | | | | | | |
| Beginning Revolver Loan Balance: Bank of America | 87,322 | 98,347 | 79,318 | 59,178 | 42,628 | 19,895 | | | | | | | | 87,322 |
| Post Petition 4 Week Collection Paydown | | (19,029) | (20,141) | (16,549) | (22,733) | | | | | | | | | |
| Net Borrowings / (Repayments) | 11,025 | | | | | | | | | | | | | 11,025 |
| Pre-Petition Revolver Loan Balance: Bank of America | 98,347 | 79,318 | 59,178 | 42,628 | 19,895 | | | | | | | | | 98,347 |
| Letters of Credit / Reserves | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | | | | | | | | | 3,571 |
| **Total Outstanding (end of period)** | 101,918 | 82,889 | 62,748 | 46,199 | 23,465 | | | | | | | | | |