## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**Sale Procedures Hearing Date:**
    March [ ], 2015 at [   ] (ET)
**Sale Procedures Objection Deadline:**
    March [ ], 2015 at [ ] (ET)
**Sale Hearing Date:**
    June [ ], 2015 at [ ] (ET)
**Sale Objection Deadline:**
    June [ ], 2015 at [ ] (ET)

**DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING SALE PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS; (E) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND (F) GRANTING CERTAIN RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE**

The Standard Register Company ("Standard Register") and its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")

hereby move this Court (the "Motion"), pursuant to sections 105(a), 363, and 365 of title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the

---

[1]     The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), for entry of (a) an order, substantially in the form

annexed hereto as Exhibit A (the "Sale Procedures Order"), (i) authorizing and approving certain

proposed bidding and sale procedures, substantially in the form annexed hereto as Exhibit B (the

"Sale Procedures") in connection with the proposed sale (the "Sale") of substantially all of the

Debtors' assets, certain stalking horse bid protections, certain proposed assumption and

assignment procedures in connection with the Sale, and certain notice procedures, substantially

in the form annexed hereto as Exhibit C (the "Sale Notice"), (ii) scheduling a hearing (the "Sale

Hearing") to consider final approval of the Sale, and (iii) granting related relief; and

(b) following the Sale Hearing, an order substantially in the form annexed hereto as Exhibit D

(the "Sale Order") (i) approving the Sale to the Successful Bidder (or, if the Successful Bidder

fails to consummate the Sale within sixty (60) days after entry of the Sale Order, to the Back-Up

Bidder), (ii) authorizing the assumption and assignment of certain executory contracts and

unexpired leases (collectively, the "Assumed Contracts"), and (iii) granting related relief.  In

support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of

Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and Requests for First Day

Relief* (the "First Day Declaration") and the *Declaration of Andrew Torgove in Support of the

Sale Motion* (the "Torgove Declaration"), both of which were filed concurrently herewith.  In

further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334(b), and the *Amended Standing Order of Reference* of the United States District Court for

the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28

U.S.C. § 157(b) and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final

order by the Court in connection with this Motion to the extent that it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.  Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the

relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy

Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Delaware (the "Court").  Pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in

possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint

administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to

Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of

unsecured creditors has been appointed in these cases.

4.      Information regarding the Debtors' history and business operations, capital

structure and primary secured indebtedness, and the events leading up to the commencement of

these Chapter 11 Cases can be found in the First Day Declaration.

## THE DEBTORS' SALE EFFORTS

5.      The Debtors, in consultation with their professional advisors, diligently evaluated

a number of options to address their liquidity concerns prior to the commencement of these

Chapter 11 Cases.  Based on the Debtors' evaluation, and in an exercise of the Debtors' business

judgment, the Debtors concluded that a sale of all or substantially all of their assets was the best way to maximize value for their creditors.  To that end, prior to the Petition Date, the Debtors and their professional advisors commenced marketing initiatives that generated interest from several parties.

6.      As part of that process, the Debtors and their advisors have worked closely with any and all potential strategic and financial buyers, many of which have conducted site visits at the Debtors' facilities and entered into confidentiality agreements as part of their due diligence in conjunction therewith.

7.      As described in the Torgove Declaration, the Debtors engaged Lazard Middle Market LLC ("Lazard") in December 2014 to provide investment banking services including exploring restructuring, financing and M&A alternatives.  Since then, the Debtors, with Lazard's assistance, have explored a range of strategic and financial alternatives to address covenant defaults and a projected liquidity shortfall.  The Debtors worked to evaluate various in-court and out-of-court alternatives.  Ultimately, the Debtors, with the assistance of Lazard, determined that a sale of substantially all of the Debtors' assets as a going concern would maximize the value available to the Debtors' creditors.

8.      Lazard conducted extensive due diligence on the Debtors' assets and operations, including frequent onsite meetings and an extensive dialogue with the Debtors' senior management team.  Shortly after Lazard's engagement, Standard Register hired McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") to assist with the development of a strategic business plan and to provide interim management services, including Kevin Carmody as the Debtors' Chief Restructuring Officer ("CRO").

9.      Due to the Debtors' severe liquidity constraints, Lazard and the Debtors did not engage in a complete pre-filing marketing process of the Debtors' business.  However, the Debtors and Lazard were approached by several potential strategic buyers that expressed an interest in evaluating the transaction.  These potential strategic buyers signed non-disclosure agreements and conducted due diligence in consideration for a potential acquisition of the Debtors' business operations as a going concern.

10.     As part of this process, Lazard worked with McKinsey RTS and the Debtors to establish a virtual data room to facilitate due diligence conducted by potential buyers.  One of the potential buyers conducted extensive on-site diligence, including meetings with management and the Debtors' advisor.  This strategic buyer ultimately submitted a term sheet and draft of an asset purchase agreement and actively pursued the stalking horse position.  Other potential strategic buyers engaged in due diligence on a more limited scale.

11.     In addition to the potential strategic buyers, the lenders under that certain First Lien Credit Agreement, dated as of August 1, 2013 (the "Prepetition First Lien Credit Agreement" and the lenders thereunder, the "Prepetition First Lien Lenders") provided a term sheet for (a) the acquisition of the Debtors and (b) debtor-in-possession financing.  Lazard in conjunction with the Debtors' other professionals, negotiated with the Prepetition First Lien Lenders and the potential strategic buyer on their respective asset purchase agreements.  These agreements, as subsequently modified, were presented to the Strategy Committee of Standard Register's Board of Directors (the "Board"), which determined that the proposal of the Prepetition First Lien Lenders provided more value and greater certainty of consideration than the strategic buyer's proposal.  At the direction of the Strategy Committee, Lazard and the Debtors' other professionals proceeded to finalize an asset purchase agreement with the Stalking

Horse (defined below), which ultimately resulted in the Stalking Horse APA (defined below), which was unanimously approved by the Board.  The Debtors executed the Stalking Horse APA shortly before filing their Chapter 11 Cases on the Petition Date.

## STALKING HORSE APA

12.     The Debtors have engaged in extensive, good faith and arms' length negotiations with the Stalking Horse regarding the terms of the Stalking Horse APA (defined below).  These negotiations culminated in the execution of that certain Asset Purchase Agreement among the Debtors and a group led by an affiliate of Silver Point Capital, L.P., as the buyer and stalking horse bidder (the "Stalking Horse"), dated as of March 11, 2015 (the "Stalking Horse APA"), a copy of which is annexed hereto as Exhibit E, pursuant to which, and subject to Court approval, the Stalking Horse has agreed to purchase substantially all of the Debtors' assets (collectively, the "Transferred Assets") in exchange for aggregate consideration in amount of approximately $275,000,000 of the Closing Date (as defined in the Stalking Horse APA) (assuming the Closing Date is June 26, 2015), which includes the assumption of the Assumed Liabilities (as defined in and pursuant to the terms of the Stalking Horse APA).  It is contemplated that the Prepetition First Lien Lenders will satisfy a substantial portion of the Purchase Price by a credit bid of the obligations under the Prepetition First Lien Credit Agreement.

13.     The Debtors have determined that the Stalking Horse's offer for the Transferred Assets, pursuant to the Stalking Horse APA, is fair, reasonable and in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and that the floor established for the proposed Sale of the Transferred Assets, subject to higher and better bids pursuant to an open auction process approved by the Court, affords the Debtors the best opportunity to maximize value for their creditors.

14.     To ensure that the Debtors receive the highest or otherwise best offer for the Sale of the Transferred Assets as soon as practicable, the Debtors and the Debtors' proposed CRO, with the assistance of the Debtors' proposed professional advisors, including Lazard and McKinsey RTS, will continue their prepetition marketing efforts on a postpetition basis such that they will be able to implement the Sale Procedures as expeditiously as possible following the entry of the Sale Procedures Order.  If the Debtors receive competitive offers based on the proposed qualification criteria described below for Qualified Bidders and Qualified Bids, the Debtors intend to conduct an auction (the "Auction") as described herein to determine the highest or otherwise best offer for the Transferred Assets.  The primary purpose of the sale process and Auction is to provide for the Sale of the Transferred Assets to the party that submits the highest or otherwise best offer for the Transferred Assets in accordance with the Sale Procedures, as described more fully below.

15.     Local Rule 6004-1(b)(iv) states that the a sale motion "must highlight material terms, including but not limited to (a) whether the proposed form of sale order and/or the underlying purchase agreement constitutes a sale or contains [certain highlighted provisions], (b) the location of any such provision substantially in the proposed form of order or purchase agreement, and (c) the justification for the inclusion of any such provision."  In addition, Local Rule 6004-1(c) provides that "[a] debtor may file a Sale Procedures Motion seeking approval of an order . . . approving bidding and auction procedures either as part of the Sale Motion or by a separate motion filed in anticipation of an auction and a proposed sale."  Pursuant to Local Rule 6004-1(c)(i), a motion seeking approval of bidding and auction procedures must highlight certain provisions contained in the proposed order approving such procedures.

16.     In accordance with Local Rule 6004-1, the Debtors hereby highlight the relevant

provisions of both the Stalking Horse APA and the Sale Procedures Order below, along with

additional material terms thereof for the convenience of all interested parties.  The Stalking

Horse APA contemplates the Sale of the Transferred Assets, subject to higher and better bids, on

the following material terms:[2]

| | |
|---|---|
| Buyers / Sale to Insiders | Standard Acquisition Holdings, LLC and one or more entities established under the laws of Mexico by Standard Acquisition Holdings, LLC after execution of the Stalking Horse APA, which newly formed entities will execute joinders to the Stalking Horse APA.  Standard Acquisition Holdings, LLC is not a statutory insider of the Debtors.[3] |
| Sellers | The Standard Register Company and its affiliated Debtors |
| Purchase Price <br><br> Stalking Horse APA Section 2.7(a) | The aggregate consideration for the Sale of the Transferred Assets to the Stalking Horse shall consist of: (i) cash consideration necessary to result in Full Payment of (A) the DIP Obligations (to the extent the DIP Obligations have not been satisfied pursuant to Section 2.7(b) of the Stalking Horse APA) and (B) Prepetition ABL Debt, and (C) the Initial Credit Bid ((A)-(C) collectively, the "Purchase Price"), and (ii) the assumption of the Assumed Liabilities.  The amount of the Purchase Price together with the Assumed Liabilities is estimated to be $275,000,000 as of the Closing Date (assuming a Closing Date of June 26, 2015). |
| Agreements with Management | The Stalking Horse APA does not contain any agreements or representations with individual members of the Debtors' management team. |
| Releases | Any releases to be provided to the Stalking Horse will be included in the Sale Order. |
| Private Sale/No Competitive Bidding | The Debtors intend to execute a public auction process for the sale of the Transferred Assets. |
| Break-Up Fee and | In the event that the Debtors accept an overbid from a third party for |

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse APA.

[3]     The Stalking Horse is not an insider of the Debtors as such term is defined in 11 U.S.C. § 101(31).  However, until December 24, 2014, an employee of Silver Point Finance, L.P., which the Debtors understand to be an affiliate of Silver Point Capital, LLC and Standard Acquisition Holdings, LLC, served on the Board of Directors of Standard Register.  Additionally, Silver Point Capital, L.P. owns approximately 1,647,233 shares, or approximately 18%, of Common Stock in Standard Register as of the date hereof.

| | |
|---|---|
| Expense Reimbursement Amount (Bid Protections)<br><br>Stalking Horse APA Section 8.3 | the Transferred Assets and close the Sale with such third party, the Stalking Horse will receive a break-up fee in the amount of two percent (2%) of the Purchase Price (the "Break-Up Fee"). The Stalking Horse is also entitled to the reimbursement of its actual and reasonable expenses, including attorney's fees, in an amount not to exceed one and one-half percent (1.5%) of the Purchase Price (the "Expense Reimbursement Amount" and together with the Break-Up Fee, the "Bid Protections") if the Stalking Horse APA is terminated other than by mutual consent, because of a governmental order prohibiting the Sale, or pursuant to a termination right exercisable by the Debtors.<br><br>The Break-Up Fee and the Expense Reimbursement Amount as provided herein shall be entitled to superpriority administrative expense status pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general administrative expense claims and superpriority administrative expense claims granted such status pursuant to Sections 503(b)(1) and 507(a)(2), in the Bankruptcy Case, other than superpriority administrative expense claims granted in favor of the DIP Credit Parties. |
| Closing and Other Deadlines<br><br>Sale Procedures; Sale Procedures Order | The deadlines related to the Closing and other milestones are set forth in the Sale Procedures Order and the Sale Procedures, in that those documents must be acceptable to the Stalking Horse as set forth in the Stalking Horse APA. |
| Good Faith Deposit<br><br>Stalking Horse APA Section 2.8 | The Stalking Horse is required to provide a good faith deposit in the amount of $2 million in connection with the Stalking Horse APA. Entities seeking to submit a "Qualified Bid" are required to submit a deposit of 10% of the total purchase price of their Bid. |
| Interim Arrangements with Proposed Buyer | The Debtors have filed or will file a motion to approve postpetition financing provided by an affiliate of the Stalking Horse Purchaser. |
| Use of Proceeds | The Stalking Horse APA does not impose requirements on the Debtors in connection with the use of proceeds from the Sale. |
| Tax Exemption Under Bankruptcy Code Section 1146(a) | Not applicable. |
| Record Retention<br><br>Stalking Horse APA Section 2.2 | All of the Debtors' (i) documents in connection with the Stalking Horse APA or the transactions contemplated hereby or relating to the Bankruptcy Case, Returns or Tax work papers or records, and any books and records that any Seller is required by Law to retain; (ii) all accounting records (including records relating to Taxes) and internal reports to the extent relating to the business activities of the Sellers that are not Transferred Asset; and (iii) all insurance policies and binders are Excluded Assets. |

| | |
|---|---|
| Sale of Avoidance Actions<br><br>Stalking Horse APA Sections 2.2, 2.1(p) | All Avoidance Actions are Excluded Assets under the Stalking Horse APA, except those with respect to trade obligations paid prior to the Petition Date, and any related claims and actions arising, including any and all proceeds of the foregoing (such rights and claims not to be prosecuted by the Buyers or any other entity). |
| Requested Findings as to Successor Liability<br><br>Stalking Horse APA Section 5.12 | The Stalking Horse APA requires that upon Closing the Stalking Horse shall be fully released from and with respect to the Transferred Assets and is not a successor to any of the Debtors or their estates, and that the Stalking Horse shall not assume or in any way be responsible for any Liability of the Debtors, any of their Affiliates and/or their estates, except as expressly provided in the Stalking Horse APA. |
| Sale Free and Clear<br><br>Stalking Horse APA Section 5.12 | The Transferred Assets shall be transferred to the Stalking Horse free and clear of all obligations, Liabilities and Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code. |
| Sale Free and Clear of Unexpired Leases<br><br>Stalking Horse APA Section 2.6 | The Stalking Horse APA allows the Stalking Horse to select which, if any, unexpired leases to assume and for the Stalking Horse Purchaser to take assignment of the same.  Any such assumption and assignment will be pursuant to section 365 of the Bankruptcy Code. |
| Credit Bid<br><br>Stalking Horse APA Section 2.7<br><br>Sale Procedures | The Stalking Horse APA allows the Stalking Horse to include a credit bid as part of its payment of the Purchase Price.  The Initial Credit Bid Purchase Price is included in the Purchase Price. |
| Relief from Bankruptcy Rule 6004(h) and 6006(d)<br><br>Sale Order;<br>Sale Procedures Order | The Sale Procedures Order and the Sale Order  provide, among other things, that the provisions of Bankruptcy Rule 6004(h) and 6006(d) shall be waived. |
| Employment of the Debtors' Employees<br><br>Stalking Horse APA Section 5.5 | The Stalking Horse may offer employment to certain of the Debtors' employees on the terms provided in the Stalking Horse APA. |

## SALE PROCEDURES

17.     The Debtors propose to solicit bids for the Transferred Assets utilizing the Sale Procedures summarized below.  The Sale Procedures describe, among other things, the Transferred Assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among Qualified Bidders (defined below) and the Debtors, the receipt and negotiation of bids received, the conduct of any Auction, and the selection and approval of the Successful Bidder and the selection of the Back-Up Bid.

18.     The Sale Procedures were developed consistent with the Debtors' competing needs to promote participation and active bidding, and to comply with the terms and conditions of the Stalking Horse APA, the Debtors' prepetition credit facilities, and the Debtors' post-petition financing facility, and the risk of business disruption associated with a prolonged stay in chapter 11.  The Sale Procedures reflect the Debtors' objective of conducting the Auction in a controlled, fair, and open manner, while enabling the Debtors to select that highest or otherwise best offer for the Transferred Assets.

19.     Consistent with Local Rule 6004-1(c)(i), the following sets forth a summary of the key provisions of the Sale Procedures:[4]

| | |
|---|---|
| Provisions Governing Qualification of Bidders<br><br>Sale Procedures at 3-4 | A "Qualified Bidder" is an entity that submits a "Qualified Bid" (as defined in the Sale Procedures).  To participate in the bidding process and receive access to due diligence materials, a party must submit to the Debtors (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors on or before the Bid Deadline (as defined in the Sale Procedures), and (ii) written evidence, reasonably acceptable to the Debtors, that such has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance of all obligations to be assumed in such contemplated transaction.  Only Qualified Bidders that submitted Qualified Bids can participate in the Auction, provided that the |

---

[4]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Procedures.

| | |
|---|---|
| | Stalking Horse and the Second Lien Bidders are deemed Qualified Bidders and may participate in the Auction. |
| <u>Provisions Governing Qualified Bids</u><br><br>Sale Procedures at 5-8 | A Qualified Bid must be accompanied by a good faith deposit in the amount of ten percent (10%) of the proposed purchase price, must be on the same or better terms that those offered in the Stalking Horse APA, and must be accompanied by an asset purchase agreement that is based on and marked against the Stalking Horse APA.  A Qualified Bid must designate the executory contracts and leases to be assumed and provide for the cure costs associated therewith, provide evidence of corporate authority to execute the transaction contemplated by such bid, and be irrevocable.  A Qualified Bid may not contain representations and warranties, covenants or termination rights that are more onerous than those set forth in the Stalking Horse APA.  A Qualified Bid must be meet the Minimum Initial Overbid (as defined in the Sale Procedures) requirement, and must provide for the purchase of all or substantially all of the Transferred Assets.  A Qualified Bid must be submitted to the parties designated in the Sale Procedures on or before the Bid Deadline. |
| <u>Stalking Horse Bid Protections</u><br><br>Sale Procedures at 2 | The Stalking Horse is entitled to the Break-Up Fee and the Expense Reimbursement Amount under the terms of the Stalking Horse APA.  Any Qualified Bid must be in an amount that is equal to or more than the sum of (i) the amount of the Purchase Price and the assumption of Assumed Liabilities, as defined in the Stalking Horse APA, (ii) the amount of the Break-Up Fee, (iii) the amount of the Expense Reimbursement Amount, and (iv) the amount of the Minimum Bid Increment (as defined below), which is $500,000. |
| <u>Modifications of Bidding Qualifications or Auction Procedures</u><br><br>Sale Procedures at 15 | Subject to the Sale Procedures Order, the Debtors reserve the right as they may determine to be in the best interests of their estates to:  (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Sale Procedures Order or the requirements of the Bankruptcy Code or any other orders entered by the Court, or (iii) contrary to the best interests of the Debtors and their estates or stakeholders, as applicable; (e) impose additional terms and conditions with respect to any or all Bidders other than the Stalking Horse; (f) adjourn the Auction and/or Sale Hearing in open court without further notice; (g) with the consent of the Stalking Horse, remove a portion of the Transferred Assets from the Auction; and (h) consider or accept Bids for less than all of the Transferred Assets, so long as the Bids comply with the Overbid requirements. |
| <u>Closing with</u> | If an Auction is held, the Debtors shall be deemed to have accepted a |

| | |
|---|---|
| Alternative Backup-Bidders<br><br>Sale Procedures at 12-13 | Qualified Bid only when (a) such Bid is declared the Successful Bid at the Auction, (b) definitive documentation has been executed in respect thereof, and (c) the Court enters an order approving the Sale to the applicable Successful Bidder.  Within one (1) business day after the closing of the Auction, the Debtors shall file with the Court and serve upon all Qualified Bidders and entities that have requested notice in these Chapter 11 Cases a notice identifying the Successful Bidder(s) and the Back-Up Bidder(s).  Following the approval of the Sale of the Transferred Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved Sale within sixty (60) days after the  entry of the Sale Order (except where the sole cause of any delay of the Closing Date is the result of a default by the Debtors), the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid and the Debtors shall be authorized, but not required, to consummate the sale with the Back-Up Bidder without further notice or orders of the Court. |

## NOTICE PROCEDURES FOR THE SALE, THE SALE PROCEDURES, THE AUCTION, AND THE SALE HEARING

20.    The Debtors also request approval of the Sale Notice to facilitate the sale process and enable the Debtors to provide interested parties with adequate and sufficient notice of the proposed Auction and the Sale Hearing.

21.    The Debtors propose to give notice of the Sale Procedures Order, the Auction and the Sale Hearing in the following manner.  Within five (5) days after the entry of this Order, or as soon thereafter as practicable (the "Mailing Date"), the Debtors (or their agents) shall serve the Motion, the Stalking Horse APA, this Order, and the Sale Procedures by first-class mail, postage prepaid upon (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Prepetition Term Loan Agent; (c) counsel to the agents under the ABL Facility; (d) counsel to the agents under the Debtors' debtor-in-possession financing facility; (e) counsel to the Committee; (g) all counterparties to the Transferred Contracts; (g) all entities with recorded claims, liens, interests, or encumbrances against the Debtors' right, title, and interest in

the Transferred Assets and any other entities reasonably known to have asserted any such claim, liens, interests, or encumbrances; (h) all entities reasonably known to have expressed a bona fide interest in acquiring the Transferred Assets during the six (6) months preceding the date hereof; (i) the Internal Revenue Service; (k) the Office of the United States Attorney for the District of Delaware; and (j) all sales tax authorities of all states and the District of Columbia and all other taxing authorities or recording offices with a reasonably known interest in the relief requested in this Motion.

22.     On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid the Sale Notice upon all other known creditors of the Debtors.  The Debtors shall also post the Sale Notice and this Order on the website of the Debtors' claims and noticing agent, available at http://cases.primeclerk.com/standardregister.

23.     The Debtors shall publish notice of the proposed Sale Transaction once in (a) the Dayton Business Journal and (b) the national edition of The New York Times or USA Today, as determined by the Debtors, in their sole discretion, and such local newspapers as the Debtors deem appropriate on the Mailing Date or as soon as practicable thereafter.  Such publication notice shall be sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

24.     If no Qualified Bids are received by the Bid Deadline, the Debtors propose that the Sale Hearing to approve the sale of the Transferred Assets to the Stalking Horse be held on [June 4], 2015 at [_____]. (prevailing Eastern Time).  To the extent that the Debtors received Qualified Bids The Auction shall take place on **June 8, 2015 at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Gibson, Dunn & Crutcher LLP, 200

Park Avenue, New York, NY 10166, or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser and its counsel, the Prepetition Term Loan Agent, and the Committee.  If there is an Auction, the Debtors propose that the Sale Hearing to approve the sale of the Transferred Assets to the Successful Bidder be held on [June 12], 2015 at [_____] p.m. (prevailing Eastern Time).  The Debtors propose that Objections, if any, to the sale of the Transferred Assets to the Stalking Horse must be filed and served on counsel for the Debtors by [May 21], 2015 at 4:00 p.m. (prevailing Eastern Time).  The Debtors propose that Objections, if any, to the selection of the Successful Bidder (if not the Stalking Horse Purchaser) or to the conduct of the Auction must be filed and served on counsel for the Debtors by [June 10], 2015 at 4:00 p.m. (prevailing Eastern Time).

25.    Only the Debtors, the Prepetition Term Loan Agent, the Committee, the Stalking Horse, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction (such attendance to be in person).  Notwithstanding the foregoing, creditors may observe, but not participate in, the Auction, provided that they provide the Debtors written notice of their intention to attend the Auction on or before the Bid Deadline.  Such written notice must be sent to counsel to the Debtors at rklyman@gibsondunn.com, mnestor@ycst.com, and to the financial advisor to the Debtors at andrew.torgove@lazard.com.

26.    The Stalking Horse and the other Qualified Bidders will be entitled to make any Bids at the Auction.  Notwithstanding anything herein to the contrary, if at least one Qualified Bid (other than a Bid submitted by the Stalking Horse) is submitted by the Bid Deadline, the Second Lien Bidders may, without having submitted a Qualified Bid by the Bid Deadline, participate in, and submit a Bid at, the Auction; provided that any Bid submitted by the Second

Lien Bidders after the Bid Deadline must include (but need not be limited to) a credit bid of all

or a portion of the obligations under the Prepetition Second Lien Credit Agreement.

27.    The Debtors and their professionals shall direct and preside over the Auction, and

the Auction shall be transcribed.  Each Qualified Bidder participating in the Auction must

confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of

the assets described herein, (b) has reviewed, understands, and accepts the Sale Procedures, and

(c) has consented to the core jurisdiction of the Bankruptcy Court.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

28.    To facilitate and consummate the Sale of the Transferred Assets, the Debtors seek

authority to assume and assign the Assumed Contracts following the Auction, if any, pursuant to

section 365(f) of the Bankruptcy Code under the Asset Purchase Agreement.  Due to the nature

of the bidding process, it is impossible for the Debtors to currently identify the Assumed

Contracts that will require assumption and assignment to the Successful Bidder.  As such, the

Debtors further seek authority to establish the assumption and assignment procedures (the

"Assumption and Assignment Procedures") described herein.

29.    No later than three business days after entry of this Order, the Debtors shall file

with the Court and serve on each party to a Transferred Contract a Contract Notice that shall (a)

state the cure amounts that the Debtors believe are necessary to assume such Transferred

Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (b) notify the

non-Debtor party that such party's contract or lease may be assumed and assigned to a purchase

of the Transferred Assets at the conclusion of the Auction; (c) state the date of the Sale Hearing;

and (d) state a deadline by which the non-Debtor party shall file an objection to the Cure Amount

or to the assumption and assignment of the Transferred Contracts.  The presence of a contract,

lease, or agreement on the Contract Notice does not constitute an admission that such contract,

lease, or agreement is an executory contract. The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to all contracts, leases, and agreements listed on the Contract Notice.

30.     Any objection to the Cure Amount or to assumption and assignment, including with respect to adequate assurance of future performance (a "Contract Objection") must be filed with the Court and served on (a) the Debtors' counsel (Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  Barbara Becker, bbecker@gibsondunn.com and Robert A. Klyman, rklyman@gibsondunn.com) and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19081 (Attn: Michael R. Nestor, mnestor@ycst.com)), and (b) counsel to (i) Stalking Horse and (ii) the Prepetition Term Loan Agent (Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Ron Meisler, ron.meisler@skadden.com and Christopher M. Dressel, christopher.dressel@skadden.com)), **so as to be received on or before [May 27], 2015 at 4:00 p.m. (prevailing Eastern Time)**. Any Contract Objection must state the basis for such objection and state with specificity what cure amount the party to the Transferred Contract believes is required (in all cases with appropriate documentation in support thereof). If no Cure Objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Transferred Contract or other document as of the date of the Cure Notice. The Cure Notice shall also provide that Contract Objection to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors. If a Successful Bidder that is not the Stalking Horse Purchaser prevails at the Auction, then the deadline to object to assumption and assignment (including on grounds of adequate assurance of future

performance) shall be extended to the date of the Sale Hearing; <u>provided</u>, <u>however</u>, that the deadline to object to the Cure Amount shall not be extended.

31.     Unless a non-Debtor party to any executory contract or unexpired lease, files an objection to the Cure Amount by the applicable objection deadline, then such counterparty shall be (a) forever barred from objecting to the Cure Amount and (b) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the schedule to the Cure Notice, against the Debtors, the Stalking Horse, or any Successful Bidder or any other assignee of the relevant contract.

32.     Unless a non-Debtor party to any Transferred Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse or other Successful Bidder, then such counterparty shall be deemed to have consented to the assumption and assignment to the Stalking Horse or other Successful Bidder and will be forever barred from objecting to such assumption and assignment on account of Cure Amount, lack of adequate assurance, or any other grounds.

### **<u>RELIEF REQUESTED</u>**

33.     The Debtors seek entry of (a) the Sale Procedures Order (i) authorizing and approving the  Sale Procedures in connection with the Sale of the Transferred Assets, the Stalking Horse Bid Protections, the Assumption and Assignment Procedures in connection with the Sale, and the Sale Notice, (ii) scheduling the Sale Hearing to consider final approval of the Sale, and (iii) granting related relief; and (b) following the Sale Hearing, the Sale Order (i) approving the Sale to the Successful Bidder (or, if the Successful Bidder fails to consummate the Sale within sixty (60) days after entry of the Sale Order, to the Back-Up Bidder), (ii) authorizing the assumption and assignment of the Assumed Contracts, and (iii) granting related relief.

01:16789816.2

## BASIS FOR RELIEF REQUESTED

A.    **The Sale Procedures Are Appropriate and in the Best Interests of the Debtors, Their Estates, and Their Creditors**

   *(1)    The Sale Procedures Are Reasonable, Appropriate and Will Maximize Value*

34.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp* v. *Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

35.    To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders* v. *Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

36.    The Debtors believe that the Sale Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Transferred Assets because such procedures will ensure a competitive and fair bidding process.  The Debtors also believe that the Sale Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer reasonably available for the Transferred Assets.  The Sale Procedures will allow the Debtors to conduct the Auction—if a Qualified Bid other than the Stalking Horse's Bid is received—in a controlled, fair and open manner that will encourage

participation by financially capable bidders that demonstrate the ability to close the Sale.  The

Debtors believe that the Sale Procedures will encourage bidding, are consistent with other

procedures previously approved by courts in this and other districts, and are appropriate under

the relevant standards governing auction proceedings and bidding incentives in bankruptcy

proceedings.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537; *see also In re Dura Auto.*

*Sys., Inc.*, No. 06-11202 (Bankr. D. Del. July 24, 2007); *In re New Century TRS Holdings, Inc.*,

No. 07-10416 (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, No. 06-10886

(Bankr. D. Del. Sept. 7, 2006).

37.     Similar bidding procedures have been previously approved by bankruptcy courts

in this District.  *See, e.g.*, *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del.

Nov. 2, 2012 (D.I. 206); *In re Northstar Aerospace (USA) Inc.*, Case No. 12-11817 (MFW)

(Bankr. D. Del. June 27, 2012) (D.I. 119); *In re Traffic Control & Safety Corp.*, Case No. 12-

11287 (KJC) (Bankr. D. Del. May 14, 2012) (D.I. 128); *In re Real Mex Rests. Inc.*, Case No. 11-

13122 (BLS) (Bankr. D. Del. Nov. 9, 2011) (D.I. 393); *In re Nortel Networks, Inc.*, Case No. 09-

10138 (KG) (Bankr. D. Del. June 30, 2009) (D.I. 1012); *In re Tweeter Home Etm't Group, Inc.*,

Case No. 07-10787 (PJW) (Bankr. D. Del. June 27, 2007) (D.I. 211).

38.     Additionally, the Debtors are required to complete the auction and sale process on

the timetable set forth in the Sale Procedures and required under the Stalking Horse APA, which

timetable is integral to the sale process and, the Debtors submit, is fair and reasonable in light of

the circumstances of these Chapter 11 Cases.

39.     Accordingly, the Debtors submit that the Sale Procedures are reasonable and

appropriate.  The Debtors also submit that the Sale Procedures demonstrate an exercise of the

Debtors' sound business judgment, as such procedures are designed to maximize the value to be received by the Debtors' estates for the Transferred Assets.

### (2)    The Initial and Subsequent Overbids Are Reasonable and Appropriate

40.    One important component of the Sale Procedures is the "overbid" provisions.  To be deemed a Qualified Bid, the aggregate consideration proposed by a Qualified Bidder must equal or exceed the sum of the amount of (i) the Purchase Price and the assumption of Assumed Liabilities, (ii) the Break-Up Fee and the Expense Reimbursement Amount, and (iii) $500,000.

41.    In the event that the Auction is held, bidding shall commence at the amount of the Initial Bid, and the Qualified Bidders may submit successive bids in increments equal to the amount of the Minimum Initial Overbid and thereafter in an amount equal to the Minimum Bid Increment above the then-highest or otherwise best bid, provided that, among other things, (i) if the then-highest or otherwise best bid was made by the Stalking Horse, such bid shall be deemed to include the sum of the amount of the Break-Up Fee and the Expense Reimbursement Amount and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction.

42.    The Debtors believe that such bid increments are reasonable under the circumstances and will enable the Debtors to maximize the value for the Transferred Assets without chilling the bidding process.  The Debtors believe that setting the bid increments at $500,000 strikes the appropriate balance between maximizing value for creditors and avoiding prohibitively large bid increments that would discourage potential bidders from participating in the sale process.

### (3)    The Break-Up Fee and the Expense Reimbursement Amount Are Reasonable and Appropriate

43.    The Break-Up Fee and the Expense Reimbursement Amount were negotiated at arms' length and in good faith and are necessary to secure the Stalking Horse's participation in the Debtors' sale process.  The Debtors have determined that pursuing a going concern sale transaction for the Transferred Assets is in the best interests of the Debtors, their estates and creditors, and therefore submit that agreeing to the Break-Up Fee and the Expense Reimbursement Amount is an actual and necessary cost of preserving the value of their estates.

44.    In the Third Circuit, bid protections, including traditional breakup fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate.  *See, e.g.*, *In re Reliant Energy Channelview* LP, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp.* v. *O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  Accordingly, bid protections may be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the court orders an auction and where they promote more competitive bidding.  *In re O'Brien*, 181 F.3d at 537.

45.    Here, the Break-Up Fee and the Expense Reimbursement Amount should be approved, and accorded administrative expense status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and secured by a first-priority lien on the proceeds of an alternative transaction with the Successful Bidder (if the Stalking Horse is not the Successful Bidder), but junior in all respects to the Debtors' debtor-in-possession credit facilities, until such amounts are paid in full because they provide a clear benefit to the Debtors' estates.  Additionally, the Stalking Horse has expressly conditioned its willingness to enter into the Stalking Horse APA upon the Debtors' agreement to, and the Court's approval of, the Break-Up Fee and the Expense

Reimbursement Amount , as set forth in the Stalking Horse APA.  The Break-Up Fee and the

Expense Reimbursement Amount will enable the Debtors to secure an adequate floor for the

Transferred Assets and, thus, insist that competing bids be materially higher or otherwise better

than the Stalking Horse APA (or any modified agreement that might be entered into with the

Stalking Horse if other Qualified Bids are received).  Accordingly, the Debtors' ability to offer

the Break-Up Fee and the Expense Reimbursement Amount enables them to ensure the sale of

the Transferred Assets to a contractually-committed bidder at a price that the Debtors believe to

be fair, while providing them with the potential of even greater benefit to their estates.

46.     The Debtors submit that the amounts of the Break-Up Fee and the Expense

Reimbursement Amount are reasonable and appropriate in light of the size and nature of the

proposed transaction and the efforts that have been and will be expended by the Stalking Horse,

including conducting the legal and financial diligence necessary to negotiate and enter into the

Stalking Horse APA, which will serve as the baseline for other bids for the Transferred Assets.

47.     In addition, payment of the Break-Up Fee and the Expense Reimbursement

Amount will not diminish the Debtors' estates.  The Debtors do not intend to terminate the

Stalking Horse APA if doing so would trigger an obligation to pay the Break-Up Fee, unless to

accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse

by at least $500,000 plus an amount sufficient to pay the Break-Up Fee, the Expense

Reimbursement Amount, and the Assumed Liabilities, and must otherwise comply with the Sale

Procedures.  With respect to the Expense Reimbursement Amount, only reasonably documented

actual out-of-pocket fees and expenses will be reimbursed by the Debtors and their estates.

48.     The Break-Up Fee, which represents two percent (2%) of the Purchase Price, is

reasonable and falls within the range of bid protections approved by bankruptcy courts in this

District.  Indeed, break-up fees materially higher than the break-up fee in the Stalking Horse

APA are regularly approved in this District.  *See, e.g.*, *In re Vertis Holdings, Inc.*, Case No. 12-

12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (D.I. 206) (court approved break-up fee of 3.0% in

connection with a $258 million sale of assets);  *In re Solyndra LLC*, Case No. 11-12799 (MFW)

(D.I. 1113) (Bankr. D. Del. Sept. 28, 2012) (court approved break-up fee of 2.6% in connection

with $90 million sale of assets); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC)

(Bankr. D. Del. Feb. 14, 2008) (D.I. 101) (court approved break-up fee of approximately 4% or

$500,000 in connection with sale of assets); *In re Global Home Prods. LLC*, Case No. 06-10340

(KG) (Bankr. D. Del. July 14, 2006 (court approved break-up fee of approximately 3.1% or

$650,000 in connection with sale of assets).

### (4)     *The Notice Procedures for the Sale Procedures, the Auction, and the Sale Hearing Are Reasonable and Appropriate*

49.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify

creditors of the Sale, including a disclosure of the time and place of any auction, the terms and

conditions of the Sale, and the deadline for filing any objections thereto.

50.     The Debtors submit that the notice procedures described above fully comply with

Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the

Sale Procedures, the Auction, and the Sale Hearing to the Debtors' creditors and all other

interested parties that are entitled to notice, as well as those parties that have expressed a bona

fide interest in acquiring the Transferred Assets.

51.     Accordingly, the Debtors respectfully request that the Court approve the notice

procedures set forth herein, including the form and manner of service of the Sale Notice, and that

no other or further notice of the Sale Procedures, the Auction, and the Sale Hearing is necessary

or required.

*(5)*     *The Assumption and Assignment Procedures Are Reasonable and Appropriate*

52.     As part of the relief requested herein, the Debtors also seek authority under sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then to the Successful Bidder).  The Sale Procedures Order specifies the Assumption and Assignment Procedures, the process by which the Debtors will serve the Assumption Notice, and the procedures and deadlines for counterparties to the Assumed Contracts to file Contract Objections.

53.     The Assumption and Assignment Procedures ensure that each counterparty will have sufficient notice of such assumption and assignment, and an opportunity to contest the cure amount, if any, for its Assumed Contract, as well as the ability of the Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then the ability of the Successful Bidder) to provide adequate assurance of future performance with respect to such Assumed Contract.

54.     Accordingly, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable, and respectfully request that the Court approve such procedures.

**B.     Approval of the Sale is Appropriate and in the Best Interests of the Debtors' Estates**

*(1)     The Sale is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment*

55.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b).  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See Meyers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware &*

*Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Trans World Airlines, Inc.*, No. 01-

00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2. 2001).

56.     Courts typically consider the following factors in determining whether a proposed

sale satisfies this standard:  (a) whether a sound business justification exists for the sale;

(b) whether adequate and reasonable notice of the sale was given to interested parties;

(c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the

parties have acted in good faith.  *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D.

Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 176); *In re United*

*Healthcare Sys. Inc.*, No. 97-1159, 1997 WL 176574, at *4 & n.2 (D.N.J. Mar. 26, 1997).

57.     A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business may be found where such a sale is necessary to preserve the value of assets

for the estate, its creditors or interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788

F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Food*

*Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that the paramount goal in any

proposed sale of property of the estate is to maximize value).

58.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business

decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or*

*Creditors* v. *Johns-Manville Corp. (In re Johns-Manville Corp)*, 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith* v.

*Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business

judgment rule, then the transaction in question should be approved under section 363(b)(1) of the

Bankruptcy Code.  Indeed, when applying the business judgment standard, courts show great

deference to a debtor's business decisions.  *See Pitt* v. *First Wellington Canyon Assocs. (In re*

*First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this

test, the debtor's business judgment . . . must be accorded deference unless shown that the

bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained

discretion.").

59.    The value of the Transferred Assets will be tested through the auction and sale

process contemplated by the Sale Procedures.  Consequently, the fairness and reasonableness of

the consideration for the Transferred Assets to be paid by the Stalking Horse (or if the Stalking

Horse is not the Successful Bidder, then by the Successful Bidder) ultimately will be

demonstrated by adequate "market exposure" and an open and fair auction and sale process —

the best means for establishing whether a fair and reasonable price is being paid.

60.    Thus, the Debtors submit that the Stalking Horse APA (or if the Stalking Horse is

not the Successful Bidder, then the applicable Purchase Agreement submitted by such Successful

Bidder) will constitute the highest or otherwise best offer for the Transferred Assets, and will

provide a greater recovery for the Debtors' estates than would be provided by any other available

alternative.  As such, the Debtors' determination to sell the Transferred Assets through an

auction and sale process, as provided for in the Sale Procedures, is a valid and sound exercise of

the Debtors' business judgment.

61.    Accordingly, the Debtors respectfully request that the Sale be approved.

**(2)      *The Sale of the Transferred Assets Free and Clear of All Encumbrances (except for Permitted Encumbrances) is Authorized by Section 363(f) of the Bankruptcy Code.***

62.      In the interest of attracting the best bids for the Transferred Assets, the Debtors submit that the Sale should be free and clear of all liens, claims and encumbrances (except for Permitted Encumbrances) in accordance with section 363(f) of the Bankruptcy Code, with any such Liens, Claims and Encumbrances (except for Permitted Encumbrances) attaching to the net proceeds of the Sale, as and to the extent applicable.

63.      Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (a) applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (d) such interest is in bona fide dispute; or
>
> (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

64.      Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

65.      Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Transferred Assets "free and clear" of all liens, claims and encumbrances (except for Permitted Encumbrances).  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");
*see also Citicorp Homeowners Servs., Inc.* v. *Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *In re Dundee Equity Corp.*, No. 89-10233 (FGC), 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).

66.    The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the Sale.  In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be satisfied because each of the parties holding liens on the Transferred Assets, if any, will consent, or absent any objection to Sale, will be deemed to have consented to, the sale and transfer of the Transferred Assets. Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto (except those that have been waived by the Debtors under the Interim DIP Order or the Final DIP Order).

67.    Accordingly, the Debtors respectfully request that the Transferred Assets be sold free and clear of any liens, claims and encumbrances (except for Permitted Encumbrances) pursuant to section 363(f) of the Bankruptcy Code.

**(3)    *The Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then the Successful Bidder) is Entitled to the Full Protection of Section 363(m) and the Sale Does Not Violate Section 363(n)***

68.    Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser.  Specifically, section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

69.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  Additionally, the Third Circuit has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code.  *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490, 497-98 (3d. Cir. 1998).  In *Krebs,* the Third Circuit considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)."  *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Third Circuit in *Krebs* concluded that section 363(m) protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.  Like the franchise agreements protected in *Krebs*, the Assumed Contracts may be assumed and assigned pursuant to section 365.  In light of *Krebs*, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder(s) (or the Back-Up Bidder(s)) with respect to the Assumed Contracts designated for assumption, assignment, and/or sale in the Stalking Horse APA.

70.     Further, as required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide that both the Debtors and the potential purchasers must act in good faith in negotiating the Sale and the assignment of the Assumed Contracts.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase

encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies*, 788

F.2d at 147.  To constitute lack of good faith, a party's conduct in connection with the sale must

usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an

attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach.*

*Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Bedford Springs Hotel, Inc.,* 99 B.R.

302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.,* 186 B.R. 833, 839 (D.N.J. 1995).

Due to the absence of a bright line test for good faith, the determination is based on the facts of

each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings."

*In re Pisces Leasing Corp.,* 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus.,* 572

F.2d at 1998).

71.      Here, the Sale of the Transferred Assets and the assumption, assignment, and/or

sale of the Assumed Contracts will be in good faith.  There is no evidence of fraud or collusion

in the Debtors' marketing process.  To the contrary, as discussed throughout this Motion, and as

will be further demonstrated at the Sale Hearing, the Stalking Horse APA will be the culmination

of a solicitation and negotiation process in which all parties are expected to be represented by

counsel.  The terms and conditions of the Stalking Horse APA were negotiated by the Debtors

and the Stalking Horse at arms' length and in good faith with the assistance of the Debtors'

proposed counsel and other professional advisors.  Moreover, neither the Debtors nor the

Stalking Horse have engaged in any conduct that would cause or permit the Stalking Horse APA

to be avoided under section 363(n) of the Bankruptcy Code.  If, following the Auction, the

Stalking Horse is not the Successful Bidder, the Debtors will have negotiated a Purchase

Agreement with the Successful Bidder in good faith and at arms' length.

72.    All negotiations have been, and will continue to be, conducted on an arm's-length, good-faith basis, and the Sale Procedures are designed to ensure that no party is able to exert undue influence over the process.  Under the circumstances, the Successful Bidder(s) (or the Back-Up Bidder(s)) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.  Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful Bidder(s) (or the Back-Up Bidder(s)) from engaging in any conduct that would cause or permit the Stalking Horse APA, or the Sale of the Transferred Assets to the Successful Bidder(s) (or the Back-Up Bidder(s)) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

73.    All parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard.  Additionally, all Contract Notice Parties will be provided notice of the potential assumption, assignment, and/or sale of their agreements and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

74.    Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then the Successful Bidder) purchased the Transferred Assets in good faith and is entitled to the full protections of sections 363(m) and 363(n) of the Bankruptcy Code.

**(4)    The Debtors' Prepetition and Postpetition Lenders Should be Authorized to Credit Bid on the Transferred Assets under Section 363(k) of the Bankruptcy Code**

75.    Pursuant to section 363(k) of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured

creditor is under-secured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen* v. *KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (stating that interpreting section 363(k) of the Bankruptcy Code to cap credit bids at the economic value of the underlying collateral "is theoretically nonsensical").

76.     Pursuant to section 363(k) of the Bankruptcy Code, the Sale Procedures provide that all Qualified Bidders holding allowed secured claims against the Debtors may make one or more credit bids of some or all of their allowed secured claims.  However, any and all credit bids submitted by a party other than the Stalking Horse shall include a cash component that is sufficient to pay the amount of the Bid Protections.

### (5)     *Appointment of a Consumer Privacy Ombudsman is Not Required*

77.     Section 363(b)(1) of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code if a debtor, in connection with offering a product or a service, discloses a consumer privacy policy prohibiting the transfer of personally identifiable information to persons not affiliated with the debtor, and the sale of an individual's personally identifiable information is inconsistent with such privacy policy.  11 U.S.C. § 363(b)(1).

78.     The Debtors believe that they have not disclosed to any individual any policy prohibiting the transfer of personally identifiable information.  Accordingly, the Debtors submit that the requirements of section 332(b)(l) of the Bankruptcy Code are inapplicable, section 363(b)(1) does not apply to the Sale, and a consumer privacy ombudsman is not required in connection with the relief requested herein.

C.     **Assumption and Assignment of the Assumed Contracts is Authorized by Section 365 of the Bankruptcy Code**

*(1)     The Debtors' Sound Business Judgment Supports the Assumption and Assignment of the Assumed Contracts*

79.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

80.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp.* v. *Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB* v. *Bildisco* & *Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

81.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Official Comm. for Unsecured Creditors* v. *Aust (In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.").

82.     To determine if the business judgment standard is met, the court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009). "This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate." *Id.* (citations omitted). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In re Network Access Solutions Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005). Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003).

83.     In the present case, the Debtors' assumption and assignment of the Assumed Contracts to the Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then the Successful Bidder) meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The assumption and assignment is necessary for the Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then the Successful Bidder) to conduct business going forward, and since no purchaser would take the Transferred Assets

without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the Transferred Assets. Further, upon consummation of the Sale, the Debtors will no longer continue to operate their businesses and will therefore have no use for any of the executory contracts and unexpired leases previously utilized in the ordinary course of their business operations.

84.     Consequently, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable, and respectfully request that the Court approve such procedures and authorize the Debtors to assume and assign the Assumed Contracts in the manner provided for herein.

### (2)     *Adequate Assurance of Future Performance Will be Demonstrated With Respect to the Assumed Contracts*

85.     A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(c)(2).

86.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown South Corp.* v. *McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *In re Rachels Indus. Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *Carlisle Homes, Inc.* v. *Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

87.     Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise

or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

88.     Pursuant to the Sale Procedures, Qualified Bidders are required to provide the Debtors with such financial and other information providing adequate assurance of future performance under any Assumed Contract, in a form requested by the Debtors to allow the Debtors to provide such information, subject to certain protections, to the applicable Contract Notice Party that has requested it in writing.  Moreover, under the Assumption and Assignment Procedures, the Contract Notice Parties will have the opportunity to object to adequate assurance of future performance by the Stalking Horse (or if the Stalking Horse is not the Successful Bidder, then by the Successful Bidder or the Back-Up Bidder).  To the extent that a Contract Notice Party fails to make a request for the provision of adequate assurance of future performance on or before May 21, 2015, the applicable Assumed Contract shall be deemed to have received adequate assurance of future performance.  Contract Notice Parties that request adequate assurance information by May 21, 2015 shall have until May 24, 2015 to object, in writing, to the Debtors, to the information provided.

89.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts as set forth herein should be approved pursuant to section 365 of the Bankruptcy Code.

### *(3)     Any Anti-Assignment Provisions in the Assumed Contracts Should be Deemed Unenforceable*

90.     To facilitate the assumption and assignment the Assumed Contracts in connection with the Sale, the Debtors request that the Sale Order provide that any anti-assignment

provisions in the Assumed Contracts shall not restrict, limit or otherwise prohibit the assumption

and assignment of the Assumed Contracts as provided for herein, and any such provisions are

deemed and found to be unenforceable anti-assignment provisions within the meaning of section

365(f) of the Bankruptcy Code.

91.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,
> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection.

11 U.S.C. § 365(f)(1).

92.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates

provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired

lease.  *See, e.g.*, *Coleman Oil Co., Inc.* v. *The Circle K Corp. (In re The Circle K Corp)*, 127 F.3d

904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from

permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

to do so will effectuate the purposes of section 365") *cert. denied*, 522 U.S. 1148 (1998).

Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the

Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or

terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g.*, *In*

*re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy

Code prohibits enforcement of any lease clause creating a right to terminate lease because it is

being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions,

not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-

assignment effect).

93.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").  Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

94.     Accordingly, any anti-assignment provisions should be deemed not to restrict, limit or prohibit the assumption and assignment of the Assumed Contracts as provided for herein, and any such provisions should be deemed and found to be unenforceable anti-assignment provisions.

## WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)

95.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  *Id.* at 6006(d).  The Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), respectively, in

connection with the Sale.  As described above and in the First Day Declaration and the Torgove

Declaration, time is of the essence with respect to the Sale, as the Debtors lack sufficient funding

to operate their businesses on a prolonged basis.  In order to effectuate the Debtors'

contemplated chapter 11 strategy, as set forth in more detail in the First Day Declaration and the

Torgove Declaration, waiver of Bankruptcy Rules 6004(h) and 6006(d) are necessary and

appropriate under the circumstances.  The Debtors therefore request that the Sale Order be

effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules

6004(h) and 6006(d) be waived.

## NOTICE

96.     The Debtors will provide notice of this Motion to:  (i) the Office of the United

States Trustee for the District of Delaware; (ii) holders of the 30 largest unsecured claims on a

consolidated basis against the Debtors; (iii) counsel for Silver Point Finance, LLC, in its capacity

as administrative agent under the Debtors' First Lien Credit Agreement and Second Lien Credit

Agreement; (iv) counsel for Bank of America, N.A., in its capacity as administrative agent under

the Debtors' Amended and Restated Loan and Security Agreement; (v) counsel to the agents

under the Debtors' proposed debtor-in-possession financing facility; (vi) all entities known by

the Debtors to assert liens with respect to the Transferred Assets; (vii) all entities reasonably

known to have expressed a bona fide interest in acquiring the Transferred Assets during the six

(6) months preceding the date hereof; (viii) the Internal Revenue Service; (ix) the Office of the

United States Attorney for the District of Delaware; (x) all states attorney general in states in

which the Transferred Assets are located; (xi) all taxing authorities or recording offices with a

reasonably known interest in the relief requested in the Motion, including the sales tax

authorities of all states and the District of Columbia; (xii) the Securities and Exchange

Commission; and (xiii) all parties that have filed a notice of appearance and request for service

of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein,

the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 12, 2015
          Wilmington, Delaware

*/s/ Maris J. Kandestin*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Robert A. Klyman (CA No. 142723)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*