**<u>EXHIBIT E</u>**

**STALKING HORSE APA**

*EXECUTION VERSION*

---

**ASSET PURCHASE AGREEMENT**

by and among

**STANDARD ACQUISITION HOLDINGS, LLC,**

as a Buyer,

**THE STANDARD REGISTER COMPANY,**

**STANDARD REGISTER INTERNATIONAL, INC.,**

**STANDARD REGISTER TECHNOLOGIES, INC.,**

**STANDARD REGISTER HOLDING COMPANY,**

**STANDARD REGISTER MEXICO HOLDING COMPANY,**

**IMEDCONSENT, LLC,**

**STANDARD REGISTER OF PUERTO RICO INC.,**

**STANDARD REGISTER HOLDING, S. DE R.L. DE C.V.,**

**STANDARD REGISTER SERVICIOS S. DE R.L. DE C.V.,**

**STANDARD REGISTER DE MEXICO, S. DE R.L. DE C.V.,**

and

**STANDARD REGISTER TECHNOLOGIES CANADA ULC,**

as the Sellers

Dated as of March 12, 2015

---

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..................................................................................2

    Section 1.1    Certain Defined Terms.............................................................2
    Section 1.2    Table of Definitions .............................................................10

ARTICLE II PURCHASE AND SALE................................................................12

    Section 2.1    Purchase and Sale of Assets.................................................12
    Section 2.2    Excluded Assets ...................................................................14
    Section 2.3    Assumed Liabilities..............................................................15
    Section 2.4    Excluded Liabilities..............................................................16
    Section 2.5    Consents to Certain Assignments ........................................17
    Section 2.6    Contract Designation ...........................................................18
    Section 2.7    Consideration .......................................................................20
    Section 2.8    Minimum Deposit.................................................................20
    Section 2.9    Closing .................................................................................21
    Section 2.10    Tax Allocation .....................................................................24
    Section 2.11    Designated Buyer(s).............................................................25
    Section 2.12    Withholding .........................................................................25

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER .............25

    Section 3.1    Organization.........................................................................26
    Section 3.2    Authority..............................................................................26
    Section 3.3    No Conflict; Required Filings and Consents ................................26
    Section 3.4    Transferred Assets ...............................................................27
    Section 3.5    Financial Statements; No Undisclosed Liabilities ......................27
    Section 3.6    Absence of Certain Changes or Events.................................29
    Section 3.7    Compliance with Law; Permits............................................29
    Section 3.8    Litigation.............................................................................30
    Section 3.9    Employee Plans....................................................................30
    Section 3.10    Labor and Employment Matters ..........................................31
    Section 3.11    Insurance .............................................................................33
    Section 3.12    Real Property .......................................................................33
    Section 3.13    Intellectual Property.............................................................35
    Section 3.14    Taxes ...................................................................................36
    Section 3.15    Environmental Matters.........................................................38
    Section 3.16    Material Contracts................................................................39
    Section 3.17    Accounts Receivable; Inventory...........................................40
    Section 3.18    Customers and Suppliers......................................................41
    Section 3.19    Certain Payments.................................................................41
    Section 3.20    Brokers.................................................................................42

TABLE OF CONTENTS
(Continued)

Page

Section 3.21    Exclusivity of Representations and Warranties ............................42

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER ..............42

Section 4.1    Organization .............................................................................42
Section 4.2    Authority ...................................................................................42
Section 4.3    No Conflict; Required Filings and Consents ............................42
Section 4.4    Financing ..................................................................................43
Section 4.5    Brokers .....................................................................................43
Section 4.6    Buyer's Investigation and Reliance .........................................43

ARTICLE V COVENANTS ............................................................................44

Section 5.1    Conduct of Business Prior to the Closing ...............................44
Section 5.2    Covenants Regarding Information ...........................................47
Section 5.3    Notification of Certain Matters ...............................................48
Section 5.4    Intercompany Arrangements ...................................................49
Section 5.5    Employee Matters ....................................................................49
Section 5.6    Consents and Filings; Further Assurances ..............................51
Section 5.7    Refunds and Remittances ........................................................53
Section 5.8    Public Announcements .............................................................53
Section 5.9    Bankruptcy Court Filings and Approval ..................................53
Section 5.10   Name Change ...........................................................................55
Section 5.11   Assumed Liabilities; Adequate Assurance of Future
               Performance .............................................................................55
Section 5.12   Sale Free and Clear .................................................................56
Section 5.13   Intellectual Property License ..................................................56
Section 5.14   Intellectual Property Registrations .........................................56
Section 5.15   Wind-Down Amount ...............................................................56
Section 5.16   Creation of Mexico Buyer.......................................................57
Section 5.17   Business Plan ...........................................................................57
Section 5.18   D&O Insurance ........................................................................57
Section 5.19   Disclosure Schedule Update ...................................................57
Section 5.20   Transition Services ..................................................................58
Section 5.21   Employee Incentive Plan ........................................................58

ARTICLE VI TAX MATTERS...........................................................................58

Section 6.1    Transfer Taxes .........................................................................58
Section 6.2    Tax Cooperation.......................................................................59
Section 6.3    Certain Tax Elections...............................................................59
Section 6.4    Apportionment of Certain Taxes .............................................59

TABLE OF CONTENTS
(Continued)

Page

ARTICLE VII CONDITIONS TO CLOSING ...................................................................60

    Section 7.1    General Conditions ...............................................................60
    Section 7.2    Conditions to Obligations of the Sellers .............................60
    Section 7.3    Conditions to Obligations of the Buyer ..............................61

ARTICLE VIII TERMINATION ......................................................................................62

    Section 8.1    Termination..........................................................................62
    Section 8.2    Effect of Termination..........................................................64
    Section 8.3    Break-Up Fee; Expense Reimbursement Amount ..............65

ARTICLE IX GENERAL PROVISIONS ..........................................................................66

    Section 9.1    Nonsurvival of Representations, Warranties and
                Covenants ............................................................................66
    Section 9.2    Fees and Expenses ..............................................................66
    Section 9.3    Transition of Permits..........................................................66
    Section 9.4    Amendment and Modification .............................................66
    Section 9.5    Waiver .................................................................................67
    Section 9.6    Notices ................................................................................67
    Section 9.7    Interpretation.......................................................................68
    Section 9.8    Entire Agreement ................................................................68
    Section 9.9    Parties in Interest................................................................69
    Section 9.10   Governing Law ....................................................................69
    Section 9.11   Submission to Jurisdiction ..................................................69
    Section 9.12   Disclosure Generally...........................................................70
    Section 9.13   Personal Liability ................................................................70
    Section 9.14   Assignment; Successors ......................................................70
    Section 9.15   Enforcement ........................................................................70
    Section 9.16   Currency .............................................................................71
    Section 9.17   Severability .........................................................................71
    Section 9.18   Waiver of Jury Trial ...........................................................71
    Section 9.19   Counterparts........................................................................71
    Section 9.20   Facsimile or .pdf Signature ................................................71
    Section 9.21   Time of Essence ..................................................................71
    Section 9.22   No Punitive Damages .........................................................71
    Section 9.23   No Presumption Against Drafting Party ..............................71

Exhibit 1       Form of Joinder
Exhibit 2       Form of Sale Order
Exhibit 3       Form of Sale Procedures Order
Exhibit 4       Escrow Agreement
Exhibit 5       Form of US Bill of Sale

# TABLE OF CONTENTS
(Continued)

Page

| | | |
|---|---|---|
| Exhibit 6 | Form of US Assumption Agreement | |
| Exhibit 7 | Form of IP Assignment Agreement | |
| Exhibit 8 | Form of Domain Transfer Agreement | |
| Exhibit 9 | Form of Mexico P&A Agreement | |
| Exhibit 10 | Form of Mexico Assumption Agreement | |
| Exhibit 11 | Form of Mexico Lease Assignments | |
| Exhibit 12 | Form of Mexico IP Assignment Agreement | |
| Exhibit 13 | Form of Certificate of Non-Foreign Status | |
| Exhibit 14 | Form of Certificate of US Real Property Interest | |

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of March 12, 2015 (this "Agreement"), by and among The Standard Register Company, an Ohio corporation ("Seller Parent"), Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, Standard Register of Puerto Rico Inc., a Delaware corporation, Standard Register Holding, S. de R.L. de C.V., a Mexican limited company, Standard Register Servicios S. de R.L. de C.V., a Mexican limited company, Standard Register de Mexico, S. de R.L. de C.V., a Mexican limited company, and Standard Register Technologies Canada ULC, a Nova Scotia unlimited liability company (Seller Parent together with the foregoing entities, each a "Seller" and collectively, the "Sellers") and Standard Acquisition Holdings, LLC, a Delaware Limited Liability Company (the "US Buyer").

## RECITALS

A.    Following the Auction, if US Buyer is the Successful Bidder, US Buyer will form, or procure that its Affiliates or owners form, one or more entities established under the laws of Mexico (each, a "Mexico Buyer" and collectively the "Mexico Buyers" and together with the US Buyer, the "Buyers"), and cause each Mexico Buyer to execute a joinder in the form attached hereto as Exhibit 1 to become party to this Agreement (the "Joinder").

B.    The Sellers are engaged in the business of aligning communications with corporate standards and priorities of its customers by providing market specific insights and a portfolio of solutions to address the changing business landscape in healthcare, financial services, commercial and industrial markets (the "Business").

C.    Seller Parent and each of the other Sellers intend to file voluntary petitions for relief commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

D.    The Sellers believe, following consultation with their financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of certain of the Sellers' assets as provided herein is necessary to preserve and maximize value, and is in the best interest of the Sellers, their creditors, and equity holders.

E.    The Sellers desire to sell to the Buyers all of the Transferred Assets and transfer to the Buyers the Assumed Liabilities and the Buyers desire to purchase from the Sellers the Transferred Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth.

F.    The Transferred Assets held by the Sellers shall be sold, transferred, assigned, conveyed and delivered by the Sellers established under the laws of the United States, or any state thereof, to the US Buyer (the "US Transferred Assets") and the Transferred Assets held by a Seller established under the laws of Mexico (each, a "Mexico Seller" and, collectively, the

"Mexico Sellers") shall be sold, transferred, assigned, conveyed and delivered by the Mexico Sellers to the applicable Mexico Buyer (collectively, the "Mexico Transferred Assets").

G.    The Assumed Liabilities held by the Sellers shall be sold, transferred, assigned, conveyed and delivered by the Sellers established under the laws of the United States, or any state thereof, to the US Buyer, and the Assumed Liabilities held by the Sellers established under the laws of Mexico shall be sold, transferred, assigned, conveyed and delivered by such Mexico Seller to the applicable Mexico Buyer.

H.    The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, as further set forth herein.  The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Certain Defined Terms.  For purposes of this Agreement:

"ABL Credit Facility" means the credit facility pursuant to that certain Amended and Restated Loan and Security Agreement dated as of August 1, 2013 among Seller Parent, the subsidiary guarantors party thereto, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto, as amended, restated, supplemented, or modified from time to time.

"ABL Term Intercreditor" means that certain Intercreditor Agreement dated as of August 1, 2013 by and among Seller Parent and certain of its affiliates, Bank of America, N.A., and Silver Point Finance, LLC.

"Action" means any claim, action, suit, arbitration or proceeding by or before any Governmental Authority, other than an Avoidance Action.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"Alternative Transaction" means at any time within the later of twelve (12) months after the Petition Date and twelve (12) months following the Termination Date, the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of a material portion of Sellers' assets, in a transaction or series of transactions with one or more Persons other than Buyers.

2

"<u>Ancillary Agreements</u>" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the US Bill of Sale, the US Assumption Agreement, the IP Assignment Agreement, the Domain Transfer Agreement, the Mexico Closing Documents and the Escrow Agreement.

"<u>Antitrust Law</u>" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"<u>Auction</u>" shall have the meaning set forth in the Sale Procedures.

"<u>Avoidance Actions</u>" means any and all claims for relief of the Sellers under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer, or similar laws.

"<u>Back-Up Bidder</u>" has the meaning set forth in the Sale Procedures.

"<u>Bankruptcy Case</u>" means the bankruptcy cases commenced by the Sellers under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, Sections 101 et seq., as in effect or as may be amended from time to time.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the city of New York.

"<u>Business Employees</u>" means all individuals employed by the Sellers immediately prior to the Closing Date whose duties relate primarily to the Business regardless of the company payroll on which such individuals are listed, including Mexico Sellers Personnel.

"<u>Buyer Material Adverse Effect</u>" means any event, change, occurrence or effect that would prevent, materially delay or materially impede the performance by the Buyers of their obligations under this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Competing Bid</u>" shall mean any bid contemplating an Alternative Transaction.

"<u>Contract</u>" means any contract, agreement, Lease, insurance policy, capitalized lease, license, sublicense, sales order, purchase order, instrument, or other commitment, that is binding on any Person or any part of its property under applicable Law.

"<u>control</u>," including the terms "<u>controlled by</u>" and "<u>under common control with</u>," means the possession, directly or indirectly, of the power to direct or cause the direction of the

management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Transferred Contracts to be assumed and assigned to the Buyers, as determined pursuant to the process set forth in the Sale Procedures Order.

"Cure Claims Cap" means $12,200,000.

"DIP ABL Credit Agreement" means that certain Post-Petition Loan and Security Agreement, dated as of March 12, 2015, among the Lenders (as defined therein) and Bank of America, N.A.

"DIP Credit Agreement" means that certain Super-Priority Priming Debtor In Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015, by and among the Sellers, the subsidiary guarantors from time to time parties thereto, the various financial institutions and other persons from time to time parties thereto and Silver Point Finance, LLC.

"DIP Credit Parties" has the meaning given to it in the Interim Financing Order (as defined in the DIP Credit Agreement) as it may be modified by the Final Financing Order (as defined in the DIP Credit Agreement).

"DIP Obligations" has the meaning given to it in the Interim Financing Order (as defined in the DIP Credit Agreement) as it may be modified by the Final Financing Order (as defined in the DIP Credit Agreement).

"Employee Plans" means all "employee benefit plans" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, and all other compensation and benefit plans, contracts, policies, programs, practices and arrangements of the Sellers (other than routine administrative procedures) in connection with the Business in effect as of the date hereof, whether written or unwritten, formal or informal, including all pension, retirement, supplemental retirement, profit-sharing, savings and thrift, bonus, stock bonus, stock option or other cash or equity-based incentive or deferred compensation, employment, severance pay, change in control, vacation, sick leave, paid time off, welfare, fringe and medical, surgical, hospitalization, accident death and dismemberment and life insurance plans, contracts, policies, programs, practices or arrangements in which any of the Business Employees or their dependents participate.

"Encumbrance" means any charge, claim, mortgage, lien, encumbrance, option, pledge, security interest or other restriction of any kind.

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or

threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters covered or regulated by, or for which liability is imposed under, Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of or prevention of harm to the environment or natural resources, or the protection of human health and safety, ecological planning or zoning including Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means all employers, trades or businesses (whether or not incorporated) that would be treated together with the Sellers as a single employer for purposes of Section 4001 of ERISA or Sections 414 (b), (c), (m) or (o) of the Code.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied, or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that the Buyers in their sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by the Buyers.

"First Lien Term Loan Facility" means the credit facility pursuant to that certain First Lien Credit Agreement dated as of August 1, 2013 by and among Seller Parent, WorkflowOne LLC, the subsidiary guarantors party thereto, the lenders party thereto, and Silver Point Finance, LLC, as amended, restated, supplemented, or modified from time to time.

"Full Payment" has the meaning given to it in the Interim Financing Order (as defined in the DIP Credit Agreement) as it may be modified by the Final Financing Order (as defined in the DIP Credit Agreement).

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency, court or commission or any other judicial or arbitral body, including, without limitation the Bankruptcy Court.

"Hazardous Materials" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law relating to pollution, waste, or the environment; or (b) can form the basis of any Liability under any Law relating to pollution, waste, or the environment.

"Infringe" means infringe, misappropriate or otherwise violate.

"Initial Credit Bid" means a credit bid by the Agent (as defined in the First Lien Term Loan Facility) or a subagent of such Agent under the First Lien Term Loan Facility on behalf of the related Lenders (as defined in the First Lien Term Loan Facility) in the full amount of the indebtedness under such First Lien Term Loan Facility.

"Intellectual Property" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S. and foreign (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("Patents"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"); (d) rights in computer programs (whether in source code, object code, or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing ("Software"); (e) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies ("Trade Secrets"); (f) rights of publicity, privacy rights, and rights to personal information; (g) all rights in the foregoing and in other similar intangible assets; (h) all applications and registrations for any of the foregoing; and (i) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" with respect to the Sellers means the actual (but not constructive or imputed) knowledge of the persons listed in Schedule 1.1(a) of the Disclosure Schedules as of

the date of this Agreement after due inquiry (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"Law" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority.

"Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity (other than those Leases rejected pursuant to that certain Debtors' First Omnibus Motion for Order Authorizing Rejection of Certain Unexpired Leases Effective as of the Petition Date).

"Leased Real Property" means the leasehold interests held by Sellers under the Leases (other than any Leases withdrawn pursuant to Section 2.6).

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that would individually or in the aggregate (a) result in, or is reasonably likely to result in, a material adverse effect on the business, properties, liabilities, financial condition, results of operations or prospects of the Business or Transferred Assets, taken as a whole, or the Assumed Liabilities or (b) prevent, materially delay or materially impede the performance by the Sellers of their obligations under this Agreement or the consummation of the transactions contemplated hereby, other than any event, change, condition, occurrence or effect or arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry in which the Business operates, (ii) changes in general economic, financial market or geopolitical conditions, (iii) natural disasters or calamities, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (vi) the announcement, pendency or consummation of the transactions contemplated by this Agreement, (vii) the filing of the Bankruptcy Case and any actions approved by the Bankruptcy Court, or (viii) any action taken by the Sellers which is required by this Agreement; provided, however, that changes or developments set forth in clauses (i), (ii) or (iv) may be taken into account in determining whether there has been or is Material Adverse Effect if such changes or developments have a disproportionate impact on the Transferred Assets, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent in nature, scope and magnitude with past practice and custom of the Sellers, as such practice and custom is, or may have been, reasonably modified as a result of the Bankruptcy Case, and taken in the ordinary course of normal, day-to-day operations in compliance with applicable Law in all material respects, in each case subject to (a) the filing of the Bankruptcy Case, (b) any Orders of the Bankruptcy Court, and (c) the conduct of

the auction process as contemplated by the bidding procedures set forth in the Sale Procedures Order.

"Owned Real Property" means the owned real property described in Schedule 3.12(a) of the Disclosure Schedules, including all improvements and structures thereon and appurtenances belonging thereto.

"Party" or "Parties" means, individually or collectively, the Buyers and the Sellers.

"Permitted Encumbrance" means (a) statutory liens for current Taxes not yet due and delinquent (or which may be paid without interest or penalties) or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations as to which there is no default on the part of the Seller for a period with respect to amounts not yet overdue (provided that such amounts arising or accruing prior to Closing remain Excluded Liabilities), or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) with respect to the Real Property, minor title defects or irregularities that do not, individually or in the aggregate, materially impair the value or use of such Real Property, (d) as to any Lease, any Encumbrance affecting solely the interest of the landlord thereunder and not the interest of the tenant thereunder, which do not materially impair the value or use of such Lease, and (e) other exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and encumbrances that do not materially interfere with the use or value of the Transferred Assets that are Owned Real Property subject to such encumbrances (the Encumbrances in clauses (d) and (e), the "Lease Encumbrances").

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Petition Date" means the date on which the Sellers commence the Bankruptcy Case.

"Pre-Petition ABL Debt" has the meaning given to it in the Interim Financing Order (as defined in the DIP Credit Agreement) as it may be modified by the Final Financing Order (as defined in the DIP Credit Agreement).

"Qualified Leave Recipient" means any Business Employee who is employed by Sellers in the Business and who is absent from work as of immediately prior to the Closing Date as a result of an approved leave of absence, including (a) those on military leave and family and medical leave, (b) those on other approved leaves of absence, but only to the extent they have reemployment rights guaranteed under federal or state Law, under any applicable collective bargaining agreement or under any leave of absence policy of the Sellers and (c) those on short-term disability under the Sellers' short-term disability program.

"Real Property" shall mean the Leased Real Property and the Owned Real Property.

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"Return" means any return, declaration, report, statement, information statement and other document, including any schedule or attachment thereto or amendment thereof, required to be filed with any Governmental Authority with respect to Taxes.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, the form of which Order is attached hereto as Exhibit 2, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to the Buyers and the Sellers.

"Sale Procedures" means the bidding procedures set forth in the Sale Procedures Order, to be entered by the Bankruptcy Court.

"Sale Procedures Hearing" means the hearing conducted by the Bankruptcy Court to approve the Sales Procedures Order.

"Sale Procedures Order" means the form of order attached hereto as Exhibit 3, or once entered, the Order of the Bankruptcy Court, which Order shall be substantially in the form attached hereto as Exhibit 3, with such changes as may be required by the Bankruptcy Court that are in form and substance reasonably satisfactory to the Buyers and the Sellers.

"Second Lien Term Loan Facility" means the credit facility pursuant to that certain Second Lien Credit Agreement dated as of August 1, 2013 by and among Seller Parent, WorkflowOne LLC, the subsidiary guarantors party thereto, the lenders party thereto, and Silver Point Finance, LLC, as amended, restated, supplemented, or modified from time to time.

"Subsidiary" means, with respect to any Person, any other Person of which at least 50% of the outstanding voting securities or other voting equity interests are owned or controlled by such Person or by one or more of its respective Subsidiaries.

"Successful Bidder" shall have the meaning set forth in the Sale Procedures.

"<u>Taxes</u>" means (a) any and all U.S. federal, state and local, foreign, and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, export and import fees and charges, registration fees, tonnage, vessel, deposits, or other taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls, or charges of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto, wherever and whenever imposed, (b) any and all liability for the payment of any items described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group (or being included) in any Return related to such group, (c) any and all liability for the payment of any amounts as a result of any successor or transferee liability, in respect of any items described in clause (a) or (b) above, and (d) any and all liability for the payment of any items described in clause (a) or (b) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"<u>Term Loan Facilities</u>" means the First Lien Term Loan Facility and the Second Lien Term Loan Facility.

"<u>Transferred Contracts</u>" means all Contracts and Leases of each Seller that relate to the Business and which are listed in <u>Schedule 1.1(b)</u> of the Disclosure Schedules, which schedule shall be provided by US Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6.

"<u>Wind-Down Amount</u>" means an amount specified in the Wind-Down Budget which shall be funded pursuant to the DIP Credit Agreement to Seller Parent prior to Closing to be held in trust and administered by the Sellers in accordance with Section 5.15 and the Wind-Down Budget; <u>provided</u> that any remaining amount of the Wind-Down Amount not required to fund the costs of winding down the Sellers' estates after the Closing Date in accordance with Section 5.15 shall be promptly delivered by the Sellers to the Buyers.

"<u>Wind-Down Budget</u>" means a budget as set forth in the DIP Credit Agreement.

Section 1.2   <u>Table of Definitions</u>.   The following terms have the meanings set forth in the Sections referenced below:

<table><tr><td><u>Definition</u></td><td><u>Location</u></td></tr><tr><td>Agreement</td><td>Preamble</td></tr><tr><td>Allocation</td><td>Section 2.10(a)</td></tr><tr><td>Allocation Dispute</td><td>Section 2.10(a)</td></tr><tr><td>Allocation Dispute Notice</td><td>Section 2.10(a)</td></tr></table>

10

| Definition | Location |
|---|---|
| Antitrust Authority | Section 5.6(a) |
| Apportioned Taxes | Section 6.4 |
| Assumed Liabilities | Section 2.3(a) |
| Balance Sheet | Section 3.5(e) |
| Bankruptcy Court | Recitals |
| Break-Up Fee | Section 8.3(a) |
| Business | Recitals |
| Business Permits | Section 2.1(g) |
| Business Plan | Section 5.17 |
| Buyer Default Termination | Section 2.8 |
| Buyer Plans | Section 5.5(f) |
| Buyers | Recitals |
| Cash Component | Section 2.7(a) |
| Closing | Section 2.9(a) |
| Closing Date | Section 2.9(a) |
| Company SEC Documents | Section 3.5(a) |
| Copyrights | Section 1.1 |
| Designated Buyer | Section 2.11(a) |
| Disclosure Schedules | ARTICLE III |
| Dispute | Section 2.10(a) |
| Disputed Cure Claims | Section 2.6(c) |
| Domain Transfer Agreement | Section 2.9(b)(iii) |
| Employee Incentive Plan | Section 5.21 |
| Employment Offer | Section 5.5(b) |
| Escrow Agent | Section 2.8 |
| Escrow Agreement | Section 2.8 |
| Exchange Act | Section 3.5(a) |
| Excluded Assets | Section 2.2 |
| Excluded Liabilities | Section 2.4 |
| Executory Contract | Section 2.6(a) |
| Executory Contract List | Section 2.6(a) |
| Expense Reimbursement Amount | Section 8.3(b) |
| Foreign Benefit Plan | Section 3.9(g) |
| HSR Act | Section 3.3(b) |
| IMSS | Section 3.10(k) |
| INFONAVIT | Section 3.10(k) |
| Inventory | Section 2.1(f) |
| IP Assignment Agreement | Section 2.9(b)(iii) |
| Joinder | Recitals |
| Lease Assignment Documents | Section 2.9(b)(ix) |
| Lease Encumbrances | Section 1.1 |
| Lender Owner | Section 2.7(b) |
| Material Contracts | Section 3.16(a) |
| Mexico Assumption Agreement | Section 2.9(b)(iv) |
| Mexico Buyer | Recitals |

| Definition | Location |
|---|---|
| Mexico Buyers | Recitals |
| Mexico Closing Documents | Section 2.9(b)(iv) |
| Mexico Lease Assignments | Section 2.9(b)(iv) |
| Mexico P&A Agreement | Section 2.9(b)(iv) |
| Mexico Seller | Recitals |
| Mexico Sellers | Recitals |
| Mexico Sellers Personnel | Section 5.5(j)(i) |
| Mexico Transferred Assets | Recitals |
| MFLL | Section 5.5(j)(i) |
| Minimum Deposit | Section 2.8 |
| MSSL | Section 5.5(j)(i)(A) |
| Neutral Firm | Section 2.10(a) |
| Non-Transferred Mexico Sellers Employee | Section 5.5(j)(i) |
| Permits | Section 3.7(b) |
| Phase I Assessments | Section 5.2(b) |
| Post-Closing Tax Period | Section 6.4 |
| Pre-Closing Tax Period | Section 6.4 |
| Purchase Price | Section 2.7(a) |
| Sale Motion | Section 5.9(a) |
| SAR | Section 3.10(k) |
| SEC | Section 3.5(a) |
| Securities Act | Section 3.5(a) |
| Seller | Preamble |
| Seller Financial Statements | Section 3.5(b) |
| Seller Parent | Preamble |
| Sellers | Preamble |
| Software | Section 1.1 |
| Termination Date | Section 8.1 |
| Trade Secrets | Section 1.1 |
| Trademarks | Section 1.1 |
| Transfer Taxes | Section 6.1 |
| Transferred Assets | Section 2.1 |
| Transferred Employee | Section 5.5(b) |
| Undisputed Cure Claims | Section 2.6(a) |
| US Assumption Agreement | Section 2.9(b)(ii) |
| US Bill of Sale | Section 2.9(b)(i) |
| US Buyer | Preamble |
| US Transferred Assets | Recitals |

# ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers established under the laws of the United States, or any state thereof, as to the US Transferred Assets, and Mexico Sellers, as to the

Mexico Transferred Assets, and as to any Transferred Assets held by Standard Register Technologies Canada ULC as designated by US Buyer, shall sell, assign, transfer, convey and deliver to the applicable Buyer all of the Sellers' right, title and interest as of the Closing Date in and to the Transferred Assets, and the Buyers shall purchase, acquire, accept and pay for the Transferred Assets and assume the applicable Assumed Liabilities. "Transferred Assets" shall mean all right, title and interest of the Sellers to or under the properties and assets of Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible (but excluding in each case, for the avoidance of doubt, any Excluded Assets), including all right, title and interest of the Sellers in, to or under:

(a)     all Transferred Contracts, but only to the extent designated as Transferred Contracts pursuant to Section 2.6;

(b)     all Real Property and other interests in real property, together in each case with the Sellers' right, title and interest in and to all structures, facilities or improvements located thereon and all easements, licenses, rights and appurtenances relating to the foregoing;

(c)     all Intellectual Property owned, licensed, used or held for use by or on behalf of a Seller, including all Intellectual Property listed on Schedule 3.13(a)(i) of the Disclosure Schedules;

(d)     all accounts receivable, notes receivable and other receivables due to the Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(e)     all machinery, equipment, furniture, furnishings, parts, spare parts, vehicles and other tangible personal property owned by the Sellers;

(f)     all raw materials, works-in-progress, finished goods, supplies, packaging materials and other inventories owned by the Sellers (the "Inventory");

(g)     all Permits held by the Sellers (the "Business Permits"), but only to the extent such Permits may be transferred under applicable Law;

(h)     all books of account, general, financial, accounting and personnel records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, manuals and customer and supplier correspondence owned by the Sellers relating to the Business;

(i)     telephone, telex and telephonic facsimile numbers and other directory listings used by the Sellers;

(j)     all goodwill associated with the Transferred Assets or the Business;

(k)     except for the Wind-Down Amount (other than amounts to be returned to the Buyers as set forth in Section 5.15(e) and Section 5.15(f)), all of the Sellers' cash and cash equivalents, and bank accounts;

(l)        to the extent related to the Transferred Assets or Business and except as set forth in Section 2.2(c), all rights, claims or causes of action of the Sellers against third parties arising out of events occurring prior to the Closing, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to the Sellers;

(m)        all copies of Tax records related to the Transferred Assets or the Business;

(n)        with respect to the Sellers, all rights to Tax refunds, credits or similar benefits relating to the Transferred Assets or the Business;

(o)        the equity interests listed in Schedule 2.1(o) of the Disclosure Schedules;

(p)        all of the rights and claims of the Sellers available under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code solely with respect to trade obligations paid prior to the Petition Date, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing, (such rights and claims not to be prosecuted by the Buyers or any other entity); and

(q)        all credits, prepaid expenses, security deposits, other deposits, refunds, prepaid assets or charges, rebates, setoffs, and loss carryforwards of the Sellers.

At any time at least one (1) Business Day prior to the Closing, the Buyers may, in their discretion by written notice to the Sellers, designate any of the Transferred Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Assets so designated; provided, that there shall be no reduction in the Purchase Price if they elect to designate any Transferred Asset as an Excluded Asset. Notwithstanding any other provision hereof, the Liabilities of the Sellers under or related to any Transferred Asset excluded under this paragraph will constitute Excluded Liabilities.

Section 2.2    Excluded Assets.    Notwithstanding anything contained in Section 2.1 to the contrary, the Sellers are not selling, and the Buyers are not purchasing, any assets other than the Transferred Assets, and without limiting the generality of the foregoing, the term "Transferred Assets" shall expressly exclude the following assets of the Sellers, all of which shall be retained by the Sellers (collectively, the "Excluded Assets"):

(a)        the Sellers' documents prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case, Returns or Tax work papers or records, and any books and records that any Seller is required by Law to retain;

(b)        all accounting records (including records relating to Taxes) and internal reports to the extent relating to the business activities of the Sellers that are not Transferred Assets;

(c)    except those described in Section 2.1(p), all Avoidance Actions;

(d)    all insurance policies and binders;

(e)    all rights, claims and causes of action relating to any Excluded Asset or any Excluded Liability;

(f)    except those described in Section 2.1(o), shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(g)    all of Sellers' rights under any Employee Plan and the assets thereof;

(h)    except to the extent designated as a Transferred Contract at Closing, all contracts between a Seller, on the one hand, and any direct or indirect Affiliate of such Seller, on the other hand, and all intercompany receivables owed to a Seller by any direct or indirect Affiliate of such Seller, including contracts or intercompany receivables relating to Taxes;

(i)    the assets of the Sellers listed in Schedule 2.2(i) of the Disclosure Schedules; and

(j)    all rights of the Sellers under this Agreement and the Ancillary Agreements.

Section 2.3    Assumed Liabilities.

(a)    In connection with the purchase and sale of the Transferred Assets pursuant to this Agreement, at the Closing, the applicable Buyer shall assume and pay, discharge, perform or otherwise satisfy only the following Liabilities (excluding in each case, for the avoidance of doubt, any Excluded Liabilities) (the "Assumed Liabilities"):

(i)    any Liabilities for Transfer Taxes to be paid by such Buyer pursuant to Section 6.1;

(ii)    all Liabilities of the Sellers under the Transferred Contracts and the transferred Business Permits to be performed on or after, or in respect of periods following, the Closing Date;

(iii)    the Cure Claims up to the Cure Claims Cap unless agreed as set forth in Section 2.6;

(iv)    all Liabilities for the trade payables arising after the Petition Date, or subject to administrative expense status under section 503(b)(9) of the Bankruptcy Code with the vendors provided to the US Buyer prior to the date hereof;

(v)    all Liabilities (i) arising under the Employee Incentive Plan to the extent not paid pursuant to the DIP Budget (as defined in the DIP Credit Agreement); and (ii) assumed by the Buyers pursuant to Section 5.5; and

15

(vi)    all Liabilities for the customer programs listed on Schedule 2.3(a)(vi) of the Disclosure Schedules to the extent US Buyer agrees to assume such obligations in its sole discretion.

(b)    Notwithstanding anything in this Agreement to the contrary, the Sellers hereby acknowledge and agree that the Buyers are not assuming from the Sellers, nor are in any way responsible for, the Excluded Liabilities. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Buyers or the Sellers as compared to the rights and remedies that such third party would have had against the Sellers or the Buyers absent the Bankruptcy Case or Buyers assumption of such Assumed Liabilities. Other than the Assumed Liabilities, the Buyers are not assuming and shall not be liable for any Liabilities of the Sellers.

Section 2.4    Excluded Liabilities.    Notwithstanding any other provision of this Agreement to the contrary, the Buyers are not assuming any Liability that is not an Assumed Liability (the "Excluded Liabilities"), including the following:

(a)    any and all Liabilities for Taxes arising from or with respect to (i) the Transferred Assets or the operation of the Business that are incurred in, or attributable to, any taxable period, or portion thereof, ending on or prior to the Closing Date, or (ii) the transactions contemplated by this Agreement that occur on the Closing Date, other than Transfer Taxes that are Assumed Liabilities;

(b)    any and all Liabilities of the Sellers under any Contract of the Sellers that is not a Transferred Contract whether accruing prior to, at, or after the Closing Date;

(c)    any and all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(d)    any Liability retained by the Sellers pursuant to Section 5.5 or arising in respect of or relating to Business Employees (whether arising before or after the Closing) or any Employee Plan, whenever arising, except for Liabilities assumed by the Buyers pursuant to Section 5.5;

(e)    any and all Liabilities in any way attributable to (i) the employment or service of current or former employees, directors or consultants of the Sellers or any current or former Subsidiary of the Sellers who is not a Transferred Employee, regardless of whether such Liability is attributable to the period before, on or after the Closing Date, (ii) the employment of Transferred Employees to the extent attributable to the period at or before the Closing, or (iii) any Employee Plans;

(f)    without impacting the scope of Section 2.4(e), any pension or retirement Liability of the Sellers to their current or former employees;

(g)    all Liabilities arising under any collective bargaining laws, agreements or arrangements;

(h)    any non-ordinary course Liability of the Sellers arising in the Bankruptcy Case;

(i)    any indebtedness for borrowed money, or guarantees thereof, of the Sellers;

(j)    any Liability to distribute to any Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(k)    any and all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of the Sellers or of any third party relating to the Business or Transferred Assets on or before the Closing Date, (iii) any formerly owned, leased or operated properties of the Sellers, or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(l)    any and all Liability for: (i) costs and expenses incurred by the Sellers or owed in connection with the administration of the Bankruptcy Case (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of the Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and (iii) all costs and expenses arising out of or related to any third party claims against the Sellers, pending or threatened, including any warranty or product claims;

(m)    other than as set forth in Section 2.3(a)(i), any Liabilities for Taxes of Sellers arising on or after the Closing;

(n)    any Liability of the Sellers under this Agreement or the Ancillary Agreements; and

(o)    any Liability or obligation to the extent solely relating to an Excluded Asset.

Section 2.5    Consents to Certain Assignments.

(a)    Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which any Seller is a party or by which it is bound, or in any way adversely affect the rights of the Sellers or, upon transfer, the Buyers under such asset, permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, permit, claim, or right irrespective of the consent or

lack thereof of a third party.  If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers shall use their reasonable best efforts (which efforts will be subject to any winding-down of operations and related capabilities of the Sellers post-Closing), and the Buyers shall cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing, provided, that the Sellers shall not have any liability to the Buyers arising out of or relating to the failure to obtain any such consent on a post-Closing basis.

(b)     If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the reasonable best efforts of the Sellers, any consent is not obtained prior to Closing and as a result thereof the Buyers shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder, (ii) any attempted assignment of a Transferred Asset would adversely affect the rights of the Sellers thereunder so that the Buyers would not in fact receive all the rights and benefits contemplated, or (iii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in each case, the Sellers shall, subject to any approval of the Bankruptcy Court that may be required, at the request of the Buyers cooperate with Buyers in any lawful and commercially reasonable arrangement under which the Buyers would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyers; provided, that all reasonable out-of-pocket expenses of such cooperation and related actions shall be paid by the Buyers.  Seller Parent shall promptly pay to the Buyers when received all monies received by the Sellers under such Transferred Asset or any claim or right or any benefit arising thereunder and the Buyers shall indemnify and promptly pay the Sellers for all Liabilities of the Sellers associated with such arrangement, if requested.

Section 2.6     Contract Designation.

(a)     No later than March 31, 2015, Sellers shall deliver to the Buyers a true, correct and complete, to the best of the Sellers' knowledge, list (the "Executory Contract List") of all Contracts related to the Transferred Assets or otherwise used, or held for use, in connection with the Business as it is conducted by the Sellers (each, an "Executory Contract"). The Executory Contract List shall describe the monetary amounts that must be paid and nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyers to assume the Transferred Contracts pursuant to this Agreement ("Undisputed Cure Claims").  The Sellers will use commercially reasonable efforts to provide the Buyers with copies of each such Contract so as to permit Buyer to review such Contracts to determine such other commercial information related to the Contracts listed thereon as Buyer desires.

(b)     Subject to the entry of the Sale Procedures Order and to the terms and provisions thereof, no later than the tenth (10th) Business Day following entry of the Sale Procedures Order, a copy of the Executory Contract List, which shall be in form and substance

reasonably acceptable to Buyers, shall be served on all necessary parties. The Executory Contract List shall identify the Undisputed Cure Claim, if any, associated with each Contract listed therein, shall identify the Buyers, and shall indicate that the Buyers will, if necessary, provide evidence of adequate assurance of future performance at the Sale Hearing. Any counterparty to an Executory Contract included on the Executory Contract List shall have the time period prescribed by the Sale Procedures Order, or, if no such time period is given, a reasonable amount of time prior to the Auction, to object to the Cure Claims listed on the Executory Contract List and to adequate assurance of future performance.

(c)    To the extent a counterparty to an Executory Contract objects or otherwise challenges the Undisputed Cure Claims determined by Sellers and asserts a different monetary amount that must be paid and/or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyers to assume such Executory Contract pursuant to this Agreement, the difference between the Undisputed Cure Claims determined by Sellers and such amounts and/or nonmonetary obligations determined by such counterparty shall be referred to as the "Disputed Cure Claims."

(d)    On or prior to the third (3rd) Business Day before Closing, Buyers may designate in writing any Executory Contract as a Transferred Contract to be assumed by it pursuant to this Agreement or remove any Executory Contract previously designated by Buyers as a Transferred Contract. The Buyers shall be obligated to pay at Closing any Undisputed Cure Claims associated with the assumption of a Transferred Contract that is an Executory Contract or such other amount as agreed to between the applicable Buyer and the counterparty. The Disputed Cure Claims shall only be paid pursuant to an Order of the Bankruptcy Court or mutual agreement between the Buyers and the counterparty to the applicable Transferred Contract. To the extent any Transferred Contract is subject to a Cure Claim, the Buyers shall pay such Cure Claim directly to the applicable counterparty; provided, however, that the Buyers' obligation to pay Cure Claims in connection with the Transferred Contracts shall not exceed the Cure Claims Cap unless otherwise agreed to between the applicable Buyer and the counterparty. In no event shall the Sellers be responsible for curing any defaults under the Transferred Contracts or otherwise satisfying the Cure Claims relating to the Transferred Contracts. Notwithstanding anything contained herein to the contrary, Buyers shall only assume, and shall only be responsible for, Contracts designated by it as Transferred Contracts, and which Transferred Contracts are in fact assumed and assigned to the Buyers at Closing, pursuant to this Section 2.6.

(e)    Sellers shall use commercially reasonable efforts to reduce, and shall use commercially reasonable efforts to cooperate with Buyers in its efforts to reduce, the Disputed Cure Claims and negotiate rent reductions with respect to Leases that are Transferred Contracts. Such efforts shall include providing Buyers with access to relevant business records, personnel, equipment, and Buyers' other reasonable requests in order to allow Buyers to assist with evaluating the Disputed Cure Claims, in each case, at Sellers' sole cost and expense prior to the Closing and at Buyers' sole cost and expense if such assistance, access and cooperation occurs during the post-Closing period.

(f)     At any time at least two (2) Business Days prior to Closing, the Buyer, in its discretion by written notice to Sellers, may exclude from being assigned pursuant hereto any Contracts or Leases, and, in such circumstances, such Contracts or Leases shall not constitute Transferred Contracts and shall be Excluded Assets, and Buyers shall not acquire any rights or assume any Liabilities with respect thereto pursuant to Section 2.3 hereof.  Upon Buyers' reasonable request, Sellers shall use commercially reasonable efforts to provide additional information as to the Liabilities under the Contracts and Leases sufficient for Buyers to make an informed assessment whether to designate such Contracts or Leases as Excluded Assets.

Section 2.7     Consideration.

(a)     The aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Transferred Assets to the Buyers at the Closing, shall consist of: (i) cash consideration necessary to result in Full Payment of (A) the DIP Obligations (to the extent the DIP Obligations have not been satisfied pursuant to Section 2.7(b)) and (B) Pre-Petition ABL Debt ((A) and (B) collectively, the "Cash Component"), and (C) the Initial Credit Bid ((A)-(C) collectively, the "Purchase Price"), and (ii) the assumption of the Assumed Liabilities.  The amount of the Purchase Price together with the Assumed Liabilities is estimated to be $275,000,000 as of the Closing Date (assuming a Closing Date of June 26, 2015), including an estimated Cash Component of $130,000,000 and an estimated Initial Credit Bid of $113,000,000.

(b)     To the extent any of the Purchase Price will be paid to a lender under the DIP Credit Agreement that is a direct or indirect owner of a Buyer (a "Lender Owner"), the Buyers may deduct from the Purchase Price and be deemed as having paid to the Sellers such amount as otherwise would have been distributed in cash to such Lender Owner.  In the event of a dispute over the obligations owed to a Lender Owner under the DIP Credit Agreement, the Buyers shall have no obligation to otherwise fund the Purchase Price with cash relating to such amount that would be paid to the Lender Owner until final resolution of any and all disputes over such obligations owed to such Lender Owner under the DIP Credit Agreement.

Section 2.8     Minimum Deposit.  Within five (5) Business Days of entry of the Sale Procedures Order, the Buyers shall deliver to Seller Parent a federal reference number evidencing the wire transfer of a deposit into escrow of an amount in cash equal to Two Million Dollars ($2,000,000) (such amount, the "Minimum Deposit") in immediately available funds with U.S. Bank National Association (the "Escrow Agent") pursuant to the terms of an escrow agreement in substantially the form attached hereto as Exhibit 4 (the "Escrow Agreement") by and among the Escrow Agent, Seller Parent and the US Buyer.  Prior to Closing, US Buyer shall prepare and Seller Parent and US Buyer shall execute a Joint Written Direction (as defined in the Escrow Agreement) directing the Escrow Agent to, subject to the occurrence of the Closing, deliver the Minimum Deposit to pay amounts necessary (i) for Full Payment of the DIP Obligations, or (ii) for the Full Payment of Pre-Petition ABL Debt.  If this Agreement is terminated pursuant to Section 8.1(d)(i) or (iii) in accordance with Section 8.2(b) (a "Buyer Default Termination"), US Buyer shall prepare and Seller Parent and US Buyer shall execute a Joint Written Direction (as defined in the Escrow Agreement) instructing the Escrow Agent to, within two (2) Business Days after such instruction, pay the Minimum Deposit to Seller Parent,

20

and if this Agreement is terminated for any reason other than Section 8.1(d)(i) or (iii), the Minimum Deposit shall be returned to the Buyers.  If this Agreement is terminated prior to Closing for any reason other than a Buyer Default Termination, US Buyer shall prepare and Seller Parent and US Buyer shall execute a Joint Written Direction (as defined in the Escrow Agreement) instructing the Escrow Agent to, within two (2) Business Days after such instruction, return the Minimum Deposit to the Buyer.  The Minimum Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller or the Buyer.  The Sellers, on the one hand, and Buyers, on the other hand, shall take, or cause to be taken, all actions, necessary, proper or advisable to consummate the Escrow Agreement and the actions contemplated thereby.  All costs associated with the Escrow Agreement shall be borne by the Buyers.

Section 2.9    Closing.

(a)    The sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY, at 10:00 a.m. New York time on the fifth (5th) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date), or at such other place or at such other time or on such other date as the Sellers and the Buyers mutually may agree in writing. The day on which the Closing takes place is referred to as the "Closing Date."

(b)    At or prior to the Closing, the Sellers shall deliver or cause to be delivered to the applicable Buyer:

(i)    to the US Buyer (or a Designated Buyer), one or more bills of sale substantially in the form of Exhibit 5 (the "US Bill of Sale"), duly executed by the applicable Sellers;

(ii)    to the US Buyer (or a Designated Buyer), one or more assumption agreements, substantially in the form of Exhibit 6 (the "US Assumption Agreement"), duly executed by the applicable Sellers;

(iii)    (A) one or more intellectual property assignment agreements substantially in the form of Exhibit 7 (the "IP Assignment Agreement") and (B) a domain transfer agreement substantially in the form of Exhibit 8 (the "Domain Transfer Agreement"), in each case duly executed by the applicable Sellers;

(iv)    to the applicable Mexico Buyer, (A) one or more purchase and assignment agreements, substantially in the form of Exhibit 9 (the "Mexico P&A Agreement"); (B) one or more assignment and assumption agreements, substantially in the form of Exhibit 10 (the "Mexico Assumption Agreement"); (C) one or more lease assignment agreements, substantially in the form of Exhibit 11 (the "Mexico Lease Assignments"); and (D) if applicable, one or more IP assignment agreements, substantially in the form of Exhibit 12, in each of cases (A)-(D), duly executed by the applicable Mexico Sellers (the "Mexico Closing Documents");

(v)  a certified copy of the Sale Order;

(vi)  a duly executed certificate of non-foreign status of each of the Sellers, other than the Mexico Sellers and Standard Register Technologies Canada ULC, in the form and manner that comply with the requirements of Section 1445(b)(2) of the Code and Treasury Regulations Section 1.1445-2(b), substantially in the form of <u>Exhibit 13</u>. Notwithstanding anything to the contrary contained herein, if any such Seller fails to provide such a certificate, the Buyers shall proceed with the Closing and shall be entitled to withhold from the consideration payable pursuant to this Agreement to such Seller the requisite amounts in accordance with Section 1445 of the Code;

(vii)  a duly executed certificate of each Mexico Seller and Standard Register Technologies Canada ULC, certifying that none of the Transferred Assets transferred by such Seller constitutes "United States real property interest" within the meaning of Section 897(c) of the Code and the Treasury Regulations promulgated thereunder, as set forth on <u>Exhibit 14</u>.  Notwithstanding anything to the contrary contained herein, if any such Seller fails to provide such a certificate, the Buyers shall proceed with the Closing and shall be entitled to withhold from the consideration payable pursuant to this Agreement to such Seller the requisite amounts in accordance with Section 1445 of the Code;

(viii)  bargain and sale deeds, with covenants against grantor's acts, in recordable form for all Owned Real Property, duly executed by the applicable Sellers;

(ix)  one or more instruments of assignment and assumption, substantially in form and substance customary in similar transactions, with respect to all Leased Real Property (the "<u>Lease Assignment Documents</u>"), duly executed by the applicable Sellers;

(x)  such Transfer Tax Returns as prepared by US Buyer and provided to the Sellers in accordance with Section 6.1, duly executed by applicable the Sellers, which the Sellers are required to execute and deliver (subject to their rights to review, comment and approve) in accordance with the provisions of Section 6.1;

(xi)  to the applicable Mexico Buyer, the Mexico formal invoices (*facturas*) issued by Mexico Seller as owner of the Mexico Transferred Assets, in compliance with applicable Mexico Tax Law and consistent with the Allocation pursuant to Section 2.10 hereof;

(xii)  a duly executed certificate of an executive officer of Seller Parent certifying the fulfillment of the conditions set forth in Section 7.3(a); and

(xiii)  all other documents, instruments or writings of conveyance reasonably necessary or customary to consummate the Agreement, including any further documents, instruments or writings required to convey any Mexico Transferred Assets, to be prepared by the Buyers; <u>provided</u> such documents are (A) in form and substance reasonably acceptable to the applicable Seller, (B) required to be executed only by the Sellers or an agent of Sellers (in his or her capacity as such) and (C) identified and provided by Buyers to Sellers in a form acceptable to such Buyers at least seven (7) Business Days before the Closing Date.

(c)      At or prior to the Closing, the Buyers shall deliver or cause to be delivered (including by directing the delivery of the Minimum Deposit in accordance with Section 2.8):

(i)      to the Persons indicated in a payoff letter to be delivered in connection with the Closing, the amount required for the Full Payment of Pre-Petition ABL Debt; and

(ii)      to the Persons indicated in a payoff letter to be delivered in connection with the Closing, the amount required for the Full Payment of the DIP Obligations (to the extent such obligations are not discharged pursuant to Section 2.7(b));

(iii)      to Seller Parent,

(A)      evidence that the amount of the Initial Credit Bid will be credited; and

(B)      an amount in cash equal to the Purchase Price, by wire transfer of immediately available funds to a bank account or bank accounts designated in writing by Seller Parent to the Buyers at least two (2) Business Days prior to the Closing Date, *less*

(1)      any amount paid pursuant to clause (i) above in respect of the Full Payment of Pre-Petition ABL Debt;

(2)      any amount paid pursuant to clause (ii) above in respect of the Full Payment of the DIP Obligations (including any amounts discharged pursuant to Section 2.7(b)); and

(3)      the Initial Credit Bid;

(iv)      to the Sellers, the Bill of Sale, duly executed by the applicable Buyers;

(v)      to the Sellers, the Assumption Agreement, duly executed by the applicable Buyers;

(vi)      to the Sellers, the Mexico Closing Documents, duly executed by the applicable Buyers;

(vii)      to the Sellers, the Lease Assignment Documents, duly executed by the applicable Buyers;

(viii)      to the Sellers, (A) the IP Assignment Agreement and (B) the Domain Transfer Agreement, in each case duly executed by the applicable Buyers; and

(ix)      to the Sellers, a duly executed certificate of an executive officer of US Buyer certifying the fulfillment of the conditions set forth in Section 7.2(a).

Section 2.10    Tax Allocation.

(a)    The Purchase Price (plus Assumed Liabilities and any other consideration payable pursuant to this Agreement, to the extent properly taken into account under the Code), shall be allocated among the Transferred Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Allocation"). The Allocation shall be prepared by the Buyers and delivered to the Sellers as promptly as reasonably practicable, and in any event no later than thirty (30) days prior to the Closing Date. The Allocation shall be considered final and binding on the Parties unless Seller Parent conveys written objections (an "Allocation Dispute Notice") to the Buyers within ten (10) Business Days of receipt of the Allocation.  The Buyers and Seller Parent shall endeavor in good faith to resolve any such disagreement within ten (10) days following the delivery of the Allocation Dispute Notice, and if resolution of such disagreement is reached, the Allocation shall immediately become final and binding.  If the Buyers and Seller Parent are unable to completely resolve any such disagreement within ten (10) days, the unresolved issues (the "Allocation Dispute") shall be resolved by the Neutral Firm in accordance with Section 2.10(b).  Upon the Allocation becoming final and binding, the Buyers and the Sellers agree to (i) be bound by the Allocation, (ii) act in accordance with the Allocation for all applicable Tax purposes (including filing IRS Form 8594 with their U.S. federal income Return for the taxable year that includes the Closing Date and any other Returns required under U.S. or foreign Tax Law, and in the course of any Tax audit, review or litigation), and (iii) take no position and cause their Affiliates to take no position inconsistent with the Allocation for all applicable Tax purposes, unless otherwise required by applicable Law or unless the other Parties consent thereto.

(b)    If the Buyers and the Sellers are unable to completely resolve any Allocation Dispute within the ten (10) day period referred to in Section 2.10(a), the unresolved issues (and only such unresolved issues) (such unresolved issues collectively, the "Dispute") shall be promptly submitted for resolution to Deloitte LLP (the "Neutral Firm").  The Neutral Firm shall be instructed to resolve any outstanding Dispute; provided, that the Neutral Firm's determination of any amount subject to the Dispute shall be no (i) less than the lesser of the amounts claimed by the Buyers and Seller Parent, respectively, or (ii) greater than the greater of the amounts claimed by the Buyers and Seller Parent, respectively.  The Parties shall instruct the Neutral Firm to render its determination with respect to the entire Dispute within fourteen (14) days of the referral of the Dispute thereto, and the determination of the Neutral Firm shall be final and binding upon the Parties for all purposes of this Agreement.  The fees and expenses of the Neutral Firm shall be borne by the Buyer, on the one hand, and the Sellers, on the other hand, in the same proportion that the dollar amount subject to the Dispute which is not resolved in favor of the Buyers and the Sellers, as applicable, bears to the total dollar amount subject to the Dispute resolved by the Neutral Firm.  For illustration purposes only, if the total amount of the Dispute is One Hundred Thousand Dollars ($100,000), and the Sellers are awarded Twenty Five Thousand Dollars ($25,000) by the Neutral Firm, the Sellers shall bear seventy-five percent (75%) and the Buyers shall bear twenty-five percent (25%) of the Neutral Firm's fees and expenses.

Section 2.11    Designated Buyer(s).

(a)      In connection with the Closing, the Buyers shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.11, one (1) or more wholly-owned Subsidiaries or Affiliates to (i) purchase specified Transferred Assets (including specified Transferred Contracts) and pay the corresponding Purchase Price amount and Cure Claims, as applicable, (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such wholly-owned Subsidiary or Affiliate of the Buyers that shall be properly designated by the Buyers in accordance with this clause, a "Designated Buyer"). At the Closing, the Buyers shall, or shall cause their Designated Buyer(s) to, honor their obligations at the Closing.  Any reference to the Buyers made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any.  After the Closing, all obligations of the Buyers and their Designated Buyer(s) under this Agreement shall be several and not joint and the only party with Liability as to a particular Assumed Liability is the Buyer or the Designated Buyer assuming such obligation at the Closing and no other Buyer or Designated Buyer.

(b)      The above designation in Section 2.11(a) shall be made by the Buyers by way of a written notice to be delivered to the Sellers in no event later than three (3) Business Days prior to Closing which written notice shall contain appropriate information about the Designated Buyer(s) and shall indicate which Transferred Assets, Assumed Liabilities and Transferred Employees the Buyers intend such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in a form acceptable to the Sellers, agreeing to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and authorizing the Buyers to act as such Designated Buyer(s)' agent for all purposes hereunder.

Section 2.12    Withholding.  Notwithstanding anything in this Agreement to the contrary, the Buyers and the Escrow Agent shall be entitled to deduct and withhold from the consideration otherwise payable to the Sellers pursuant to this Agreement such Taxes as may be required to be deducted and withheld from such consideration under the Code or any other applicable provision of U.S. or foreign Tax Law.  To the extent that any amounts are so deducted or withheld by a Buyer or the Escrow Agent, as the case may be, such deducted and withheld amounts shall be (a) remitted by the Buyer or the Escrow Agent, as the case may be, to the applicable Governmental Authority and (b) treated for all purposes of this Agreement as having been paid to the Seller in respect of which such deduction and withholding was made by the Buyer or the Escrow Agent, as the case may be.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

Except as set forth in the Disclosure Schedules attached hereto (collectively, as updated pursuant to Section 5.19, the "Disclosure Schedules"), each of the Sellers jointly and severally represent and warrant to the Buyers as follows:

Section 3.1    <u>Organization</u>.  Each Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to own, lease and operate the Transferred Assets and to carry on the Business as it is now being conducted and to perform its obligations hereunder and under any Ancillary Agreement. Each Seller is qualified or authorized to do business and is in good standing under the Laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing is the result of the filing of the Bankruptcy Case or as would not be material to the conduct of the Business.  Neither Seller Parent nor any other Seller has any Subsidiaries other than those Subsidiaries that are Parties to this Agreement.

Section 3.2    <u>Authority</u>.  Subject to the Bankruptcy Case and to the extent that any Bankruptcy Court approval is required (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon their execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 3.3    <u>No Conflict; Required Filings and Consents</u>.

(a)    The execution, delivery and performance by each Seller of this Agreement and each of the Ancillary Agreements to which such Seller will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by each Seller with any of the provisions hereof, do not and will not:

(i)    conflict with or violate the certificate of incorporation or bylaws or other similar organizational documents of such Seller;

(ii)    conflict with or violate any Law applicable to such Seller, the Business or any of the Transferred Assets or by which such Seller, the Business or any of the Transferred Assets may be bound or affected;

(iii)    conflict with or violate any Order of any Governmental Authority; or

(iv)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Transferred Contract of Sellers;

except (A) in each case, for the Bankruptcy Case and to the extent that any Bankruptcy Court approval is required, and (B) in the case of clause (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent, materially delay or materially impede the performance by the Sellers of their obligations under this Agreement or the Ancillary Agreements to which each Seller will be a party or the consummation of the transactions contemplated hereby or thereby, or that arise as a result of any facts or circumstances relating to the Buyers or any of its Affiliates.

(b)    The Sellers are not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the Ancillary Agreements to which each Seller will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for any filings required to be made under the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) for requisite Bankruptcy Court approval, (iii) for entry of the Sale Order, and (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or to prevent, materially delay or materially impede the performance by the Sellers of their obligations under this Agreement or the Ancillary Agreements to which each Seller will be a party or the consummation of the transactions contemplated hereby or thereby.

Section 3.4    Transferred Assets.

(a)    Except as would not be expected to materially impact the Business, each Seller, as applicable, has indefeasible title to, and owns and possesses all material rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b)    This Agreement and the instruments and documents to be delivered by the Sellers to the Buyers at or following the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to the Buyers good title to the Transferred Assets, free and clear of all Encumbrances (other than Lease Encumbrances), claims, and interests, other than Assumed Liabilities, subject to (A) the Bankruptcy Case and (B) entry of the Sale Order.

Section 3.5    Financial Statements; No Undisclosed Liabilities.

(a)    Seller Parent has filed or otherwise transmitted all forms, reports, statements, certifications and other documents (including all exhibits, amendments and

supplements thereto) required to be filed by it with the Securities and Exchange Commission (the "SEC") since January 1, 2012 (all such forms, reports, statements, certificates and other documents filed since January 1, 2012 and prior to the date hereof, collectively, the "Company SEC Documents").  As of their respective dates, or, if amended, as of the date of the last such amendment, each of the Company SEC Documents complied as to form in all material respects with the applicable requirements of the Securities Act of 1933, as amended, and the regulations promulgated thereunder (the "Securities Act") and the Securities Exchange Act of 1934, as amended, and the applicable rules and regulations promulgated thereunder, (the "Exchange Act) as the case may be, each as in effect on the date so filed.  As of their respective filing dates (or, if amended or superseded by a subsequent filing prior to the date hereof, as of the date of such amendment or superseding filing), none of the Company SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated or incorporated by reference therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)    The consolidated financial statements of Seller Parent (including any related notes thereto) included in the Company SEC Documents together, in the case of a year-end statement, with reports thereon by Battelle Rippe Kingston LLP, Certified Public Accountants, the independent auditors of Seller Parent for the periods included therein, including in each case a consolidated balance sheet, a consolidated statement of income, a consolidated statement of stockholders' equity and a consolidated statement of cash flows, and accompanying notes (the "Seller Financial Statements") have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of Seller Parent and its Subsidiaries at the respective dates thereof and the results of their operations and cash flows for the periods indicated. The consolidated balance sheets (including the related notes) included in the Seller Financial Statements fairly present in all material respects the consolidated financial position of Seller Parent and its Subsidiaries as at the respective dates thereof, and the consolidated statements of income, consolidated statements of stockholders' equity and consolidated statements of cash flows (in each case including the related notes) included in such Seller Financial Statements present fairly in all material respects the consolidated results of operations, stockholders' equity and cash flows of Seller Parent and its Subsidiaries for the respective periods indicated, except as otherwise noted therein. The unaudited consolidated financial statements of Seller Parent (including any related notes thereto) included in Seller Parent's Quarterly Reports on Form 10-Q filed with the SEC since December 29, 2013 have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or may be permitted by the SEC under the Exchange Act) and fairly present in all material respects the consolidated financial position of Seller Parent and its Subsidiaries as of the respective dates thereof and the results of their operations and cash flows for the periods indicated (subject to normal period-end adjustments).

(c)    Seller Parent maintains disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) designed to ensure that material information relating to Seller Parent, including its Subsidiaries, is made known to the chief executive officer and the chief financial officer of Seller Parent by others within those entities.  Seller Parent maintains internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act)

28

designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

(d)     There are no outstanding or unresolved comments in comment letters from the SEC staff with respect to any of the Company SEC Documents.  To the Knowledge of Sellers, as of the date hereof, none of the Company SEC Documents are the subject of ongoing SEC review.

(e)     To the Knowledge of the Sellers, neither Seller Parent nor any of its Subsidiaries has any material Liabilities or obligations of any nature, whether or not accrued, known or unknown, contingent or otherwise, and whether required by GAAP to be disclosed or reflected on or reserved against a consolidated balance sheet (or the notes thereto) of Seller Parent and its Subsidiaries, except for liabilities and obligations (i) reflected or reserved against in Seller Parent's consolidated balance sheet as of September 28, 2014 (or the notes thereto) (the "Balance Sheet") included in the Company SEC Documents, (ii) incurred in the Ordinary Course of Business since the date of the Balance Sheet, (iii) which have been discharged or paid in full prior to the date of this Agreement and (iv) incurred pursuant to the transactions contemplated by this Agreement.

Section 3.6     Absence of Certain Changes or Events.  Since December 31, 2013 through the date of this Agreement, there has not been, with respect to the Sellers or the Business, any change, event, circumstance or effect that, by itself or in conjunction with all other such changes, whether or not arising in the Ordinary Course of Business, has had or would be reasonably expected to have a Material Adverse Effect.

Section 3.7     Compliance with Law; Permits.

(a)     The Business is being conducted in material compliance with, and Sellers have in all material respects complied with, all applicable Laws relating to the operation of the Business and the Transferred Assets.  None of the Sellers has received any material notice or written claims from any Governmental Authority within the last three (3) years preceding the date hereof relating to any non-compliance of the Business or the Transferred Assets with any applicable Law and there are no such notices or claims pending or, to the Knowledge of Sellers, any such notice or claims threatened.

(b)     The Sellers are in possession of all permits, licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate the Transferred Assets and to carry on the Business as currently conducted, except for Permits that are not material.  All material Permits held by the Sellers: (i) are valid and in full force and effect and no Seller is in default under, or in violation of, any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyers' ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to Sellers' Knowledge, threatened and (ii) subject to entry of the Sale Order, each such Permit may be transferred or reissued to the

appropriate Buyers in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

(c)    No representation or warranty is made under this Section 3.7 with respect to ERISA, Taxes or environmental matters, which are covered exclusively by Section 3.9, Section 3.14 and Section 3.15, respectively.

Section 3.8    <u>Litigation</u>.  As of the date hereof, except for the Bankruptcy Case, and any Order entered in the Bankruptcy Case, there is no material Action by or against any Seller in connection with the Business or the Transferred Assets pending, or to the Knowledge of the Sellers, threatened.

Section 3.9    <u>Employee Plans</u>.

(a)    <u>Schedule 3.9</u> of the Disclosure Schedules sets forth all material Employee Plans.  The Seller has made available to the Buyers a true and complete copy of the following documents:  (i) each writing constituting an Employee Plan, (ii) the current summary description of each Employee Plan and any material modifications thereto and (iii) the most recent determination or opinion letter from the IRS, if any, with respect to any Employee Plan intended to be qualified under Section 401(a) of the Code.

(b)    With respect to the Employee Plans: (i) each of the Employee Plans has been operated and administered in all material respects in accordance with applicable Law and administrative or governmental rules and regulations, including ERISA and the Code, except where non-compliance has not resulted in pending or threatened claims or will not have a Material Adverse Effect, and (ii) there are no pending or threatened claims by, on behalf of or against any Employee Plan (other than routine claims for benefits).

(c)    Each Employee Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of the Sellers, no event has occurred, either by reason of any action or failure to act, which would cause the loss of any such qualification.

(d)    None of the Employee Plans is subject to Title IV of ERISA, is a multiemployer plan (within the meaning of Section 3(37) of ERISA) or provides post-employment welfare benefits except to the extent required by Section 4980B of the Code or similar state Law.

(e)    Neither Seller nor any ERISA Affiliate has or could become subject to any Liability under Title I or Title IV of ERISA that could become a Liability of Buyers or their respective Affiliates.

(f)    The consummation of the transactions contemplated by this Agreement, whether alone or together with any other event, will not (i) entitle any Transferred Employee to severance pay, unemployment compensation or any other payment or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any Transferred Employee.

(g)     With respect to each Employee Plan established or maintained outside of the United States of America primarily for benefit of current or former employees of Sellers or any of their respective subsidiaries residing outside the United States of America (a "Foreign Benefit Plan"): (i) all employer and employee contributions to each Foreign Benefit Plan required by law or by the terms of such Foreign Benefit Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Benefit Plan, the liability of each insurer for any Foreign Benefit Plan funded through insurance or the book reserve established for any Foreign Benefit Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Foreign Benefit Plan and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; and (iii) each Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

(h)     All contributions and premiums required by Law or by the terms of any Employee Plan have been timely made to any funds or trusts established thereunder or in connection therewith in all material respects, except for quarterly contributions to the defined benefit pension plan in an amount not exceeding One Million Dollars ($1,000,000) in the aggregate.

Section 3.10    Labor and Employment Matters.

(a)     Except as set forth on Schedule 3.10 of the Disclosure Schedules, the Seller is not a party to any labor or collective bargaining contract that pertains to any Business Employees.  There are no material pending or, to the Knowledge of the Sellers, threatened Actions concerning labor matters with respect to the Business.  No employees of the Sellers are represented by any labor union, labor organization or works council with respect to their employment with the Sellers.  Prior to the date hereof, the Sellers have not taken any action at any single site of employment in the ninety (90)-day period prior to the Closing Date that would constitute a "mass layoff" or "plant closing" within the meaning of the WARN Act, or any similar applicable state or local Law.

(b)     Since January 1, 2012, there are no material unfair labor practice charges, work stoppages, slowdowns, strikes, lockouts, grievances, picketings, or other similar activities relating to labor matters pending, or to the Knowledge of Sellers, threatened against any Seller.

(c)     No labor union, labor organization, or group of employees of any Seller has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority. To the Knowledge of Sellers, there are no labor union organizing activities with respect to any employees of any Seller.

(d)    Prior to the execution date of this Agreement, the Sellers have satisfied any material legal or contractual requirement to provide notice to, or to enter into any consultation procedure with, any labor union or other organization, which is representing any employee, in connection with the execution of this Agreement or the transactions contemplated by this Agreement.

(e)    To the Knowledge of Sellers, each Seller is in compliance in all material respects with all applicable laws respecting employment and employment practices, including all laws respecting terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants and exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, the payment of social security and other employment taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance.

(f)    Each employee of the Sellers has all work permits, immigration permits, visas or other authorizations, each as required by applicable Law for such employee given the duties and nature of such employee's employment.

(g)    Each of the Sellers is not and has not been: (i) a "contractor" or "subcontractor" (as defined by Executive Order 11246), (ii) required to comply with Executive Order 11246 or (iii) required to maintain an affirmative action plan.

(h)    To the Knowledge of the Sellers, no key employee of any of the Sellers is in any respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation:  (i) to any of the Sellers or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by any such Seller or (B) to the knowledge or use of trade secrets or proprietary information.

(i)    The Sellers are not delinquent in payments to any employees or former employees for any services or amounts required to be reimbursed or otherwise paid.

(j)    The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any collective bargaining agreement, employment agreement, consulting agreement or any other labor-related agreement to which the Sellers are a party.

(k)    The Mexico Sellers are in material compliance with all of their obligations, including any and all payments, under any and all social security and labor Law (including their contribution obligations to the Mexico Social Security Institute ("IMSS") and/or contributions to the National Workers' Housing Fund Institute ("INFONAVIT") and the National Pension Fund System ("SAR")).  To the Knowledge of the Sellers, all the employees of the Mexico Sellers have contractual employment relationships with one or more of the Mexico Sellers, and none of the Mexico Sellers' employees has been hired as service providers

(*prestadores de servicios*) or through agency or commission agreements (*contratos de agencia o comision mercantil*).

(l)     Schedule 3.10(l) of the Disclosure Schedules contains a true and complete list and description of the following information for each employee of the Mexico Sellers engaged in the Business on the date hereof, categorized by function: (i) an identification number; (ii) current annual terms of compensation (identifying incentive or bonus compensation separately); (iii) employment status; (iv) years of service; and (v) identity of employer.

Section 3.11    Insurance.  Schedule 3.11 of the Disclosure Schedules sets forth a true and complete list of all material insurance policies in force with respect to the Business and the Transferred Assets.

Section 3.12    Real Property.

(a)     Schedule 3.12(a) of the Disclosure Schedules lists the street address of each parcel of Owned Real Property.  The applicable Seller has good, valid and marketable fee simple title to the Owned Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)     Schedule 3.12(b) of the Disclosure Schedules lists (i) the street address of each parcel of Leased Real Property, (ii) if applicable, the unit designation of the space leased under the applicable Lease, (iii) the identity of the lessor of each such parcel of Leased Real Property, (iv) if applicable, the identity of each sublessee or occupant other than Sellers at each such parcel of Leased Real Property, (v) the commencement date and, to the extent readily available, expiration date under the Lease for each such parcel of Leased Real Property, (vi) the base rent under the Lease for each such parcel of Leased Real Property and (vii) the security deposit, if any, deposited pursuant to the terms of the Lease for each such parcel of Leased Real Property.  The Seller party thereto has a valid leasehold estate in all Leased Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances.

(c)     Subject to the approval of the Bankruptcy Court pursuant to the Sale Order and the assumption and assignment of the Leases pursuant thereto, each of the Leases relating to Leased Real Property is a valid and subsisting leasehold interest of the applicable Seller, free of subtenancies and other occupancy rights and Encumbrances (other than Permitted Encumbrances), except as set forth in Schedule 3.12(c) of the Disclosure Schedules, and, except as limited by the Bankruptcy Code, is a binding obligation of the applicable Seller, enforceable against such Seller in accordance with its terms, and is in full force and effect.  To the Knowledge of Sellers, following the assumption and upon the assignment of such Leases by Sellers to Buyers in accordance with the provisions of Section 365 of the Bankruptcy Code and the requisite Order of the Bankruptcy Court, there will be no monetary defaults thereunder and no circumstances or events which, with notice or the passage of time or both, would constitute defaults under such leases except, in either instance, for defaults which, individually or in the aggregate, do not or would not reasonably be expected to have a material impact on the use of such property or are unenforceable due to operation of Section 365(b)(2) of the

Bankruptcy Code or have been or shall be cured pursuant to Section 365 (b)(1) of the Bankruptcy Code and the provisions of this Agreement.

(d)    To the Knowledge of Sellers, there are no defects in the plants, stores, buildings, improvements and structures, fixtures or equipment located on or at the Real Property which would substantially impair the conduct of the Business by Buyers immediately following the Closing relative to the conduct of the Business on the date hereof.

(e)    The Sellers have not granted to any Person (other than pursuant to this Agreement) any right to occupy or possess or otherwise encumber any portion of the Real Property other than as set forth in Schedule 3.12(e) of the Disclosure Schedules.  Sellers' interests with respect to the Leases have not been assigned or pledged and are not subject to any Encumbrances, other than as collateral for the Sellers secured indebtedness under the First Lien Credit Agreement, the ABL Credit Facility, the DIP Credit Agreement, the DIP ABL Credit Agreement and Permitted Encumbrances.  No Seller has vacated or abandoned any portion of the Real Property or given notice to any Person of their intent to do the same.

(f)    No Seller is a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than the Buyers.

(g)    To the Knowledge of the Sellers, there is no Contract to which Sellers are a party, other than the Transferred Contracts, affecting any of the Real Property for which the Buyers will be responsible or liable after Closing, except those which (i) are terminable on not more than sixty (60) days' notice without premium or penalty or (ii) require payment of less than $100,000 per month per location but will expire or be terminated within one (1) year of the Closing.

(h)    To the Knowledge of the Sellers, the Sellers have not received any written notice in the past two (2) years of any pending, threatened or contemplated condemnation proceeding affecting any of the Real Property or any part thereof or of any sale or other disposition of any of the Real Property or any part thereof in lieu of condemnation.

(i)    To the Knowledge of the Sellers, the Sellers have not received any written notices in the past two (2) years from any Governmental Authority stating or alleging that any improvements located on the Real Property have not been constructed in compliance with applicable Law or are being operated in violation of applicable Law.

(j)    To the Knowledge of the Sellers, the Sellers have not received any written notices in the past two (2) years from any Governmental Authority requiring or advising as to the need for any material repair, alteration, restoration or improvement in connection with the Real Property.

(k)    To the Knowledge of Sellers, the Real Property is in all material respects in good condition and repair and adequate in all material respects for the continued conduct of the business to which it relates.

(l)     With respect to the Leased Real Property, to the Knowledge of the Sellers:

(i)     the Leases are in full force and effect; none of the Sellers have received any written notice or oral notice that any material default, or condition which with the passage of time would constitute a default, exists under the Leases, except such notices as to which the alleged defaults have been cured or otherwise resolved;

(ii)     true, correct and complete copies of the Leases have been delivered to Buyers prior to the date hereof and such Leases have not been amended or modified since that date;

(iii)     none of the Leased Real Property has been pledged by any of the Sellers or is subject to any Encumbrance (other than pursuant to this Agreement; Permitted Encumbrances and Encumbrances in favor of Sellers' lenders); and

(iv)     none of the Sellers have given any notice to any landlord under any of the Leases indicating that it will not be exercising any extension or renewal options under the Leases.  All security deposits required under the Leases have been paid to and are being held by the applicable landlord under the Leases.

(m)     Since January 1, 2014, none of the Real Property has been affected in any way as a result of flood, fire, explosion or other casualty which would reasonably be expected to result in a Material Adverse Effect.

Section 3.13    Intellectual Property.

(a)     Schedule 3.13(a) of the Disclosure Schedules sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending Patent applications, (ii) registered Trademarks and applications to register any Trademarks, (iii) registered Copyrights and applications for registration of Copyrights, and (iv) domain name registrations, in each case, which are owned by or registered to a Seller.  Sellers are the sole and exclusive beneficial and record owners of all of the Intellectual Property set forth in Schedule 3.13(a) of the Disclosure Schedules, and all such Intellectual Property are subsisting, enforceable and, to the Knowledge of Sellers, valid (and there has been no Action asserted or, to the Knowledge of Sellers, threatened challenging the scope, validity or enforceability of any such Intellectual Property).

(b)     The Sellers own, or have a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances), all material Intellectual Property used or held for use in the Business.

(c)     The conduct of the Business (including the products and services of the Sellers) does not Infringe (and, in the past three (3) years, has not Infringed), in any material respect, any Person's Intellectual Property rights, and there has been no such Action asserted or, to the Knowledge of Sellers, threatened against any Seller or, to the Knowledge of Sellers, any other Person.

(d)     To the Knowledge of Sellers, no Person is Infringing, in any material respect, any Intellectual Property owned, used, or held for use by Sellers in the conduct of the Business, and no such Actions have been asserted or threatened against any Person by any Seller or, to the Knowledge of Sellers, any other Person.

(e)     Each Seller takes reasonable measures to protect the confidentiality of material Trade Secrets.

(f)     Each Seller has at all times complied, in all materials respects, with all applicable Laws, as well as its own rules, policies, and procedures, relating to privacy, data protection, and the collection and use of personal information collected, used, or held for use by the Sellers.  No Actions have been asserted or, to the Knowledge of Sellers, threatened against a Seller alleging a violation of any Person's privacy or personal information or data rights.  Each Seller takes reasonable measures to ensure that such information is protected against unauthorized access, use, modification, or other misuse.

(g)     The consummation of the transactions contemplated by this Agreement will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use, or hold for use any material Intellectual Property as owned, used, or held for use by Sellers in the conduct of the Business.

(h)     In the past three (3) years, (i) the Sellers have not experienced any material defects in the Software used in the Business, (ii) to the Knowledge of Sellers, there have been no material security breaches in Sellers' information technology systems, and (iii) there have been no disruptions in any of the Sellers' information technology systems that materially adversely affected the Business.  With respect to the Software used or held for use in the Business, to the Knowledge of the Sellers, no such Software (A) contains any device or feature designed to disrupt, disable or otherwise impair the functioning of any Software or information technology systems, or (B) is subject to the terms of any "open source" or other similar license that provides for any source code of any Software included in the Transferred Assets to be disclosed, licensed, publicly distributed or dedicated to the public.

Section 3.14   Taxes.   Except as set forth in Schedule 3.14 of the Disclosure Schedules:

(a)     There are no Taxes of the Sellers for which the Buyers will become liable as a result of the transactions contemplated by this Agreement, except as agreed to by the Parties explicitly in this Agreement.

(b)     All income and other material Returns relating to the Transferred Assets and the Business that were required to be filed have been duly and timely filed, and all such Returns were true, correct and complete in all material respects when filed. Subject to any obligation of the Sellers under the Bankruptcy Code, all Taxes relating to the Business or the Transferred Assets (i) that were due and payable have been duly and timely paid and (ii) that accrued and are not yet due and payable, have had adequate provision in accordance with GAAP made for their payment.

(c)     All material Taxes relating to the Business or the Transferred Assets required to be withheld and paid, including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or third party, have been duly and timely withheld and remitted to the appropriate Governmental Authority.

(d)     There is no action, suit, claim, assessment, or audit, pending, proposed in writing, or, to the Sellers' Knowledge, threatened with respect to Taxes relating to the Business or the Transferred Assets.  No Governmental Authority has made a claim in writing that the Business and/or the Transferred Assets may be subject to Tax, or that a Return relating to the Business and/or the Transferred Assets may be required to be filed, in a jurisdiction where no such Returns have been filed.

(e)     There are no Encumbrances for Taxes upon the Transferred Assets other than Permitted Encumbrances described in clause (a) of the definition thereof.

(f)     No Tax election has been made with respect to any of the Business or the Transferred Assets that has, or may have, continuing effect on the Business or any Transferred Asset after the Closing Date.

(g)     No property relating to the Business or the Transferred Assets is "tax-exempt use property" within the meaning of Section 168(h) of the Code or property that the Buyers will be required to treat as being owned by another Person pursuant to Section 168(f)(8) of the Internal Revenue Code of 1954 as in effect immediately prior to the enactment of the Code.

(h)     No waiver, extension, or comparable consent regarding the application of the statute of limitations with respect to any Taxes or Returns relating to the Business or the Transferred Assets is outstanding, nor is there pending any request for such a waiver, extension, or comparable consent.

(i)     None of the Mexico Sellers is, or would be at the Closing Date, a transferor of a "United States real property interest" (within the meaning of Section 897(c) of the Code).

(j)     With respect to any entity that is classified as a partnership for U.S. federal income tax purposes an interest in which constitutes a Transferred Asset, (i) such entity has complied in all material respects with all provisions of Tax Law applicable to it, (ii) none of the Sellers, any representative or Affiliate of any Seller that acts as "tax matters partner" within the meaning of Section 6231(a)(7) of the Code with respect to such entity, or to the knowledge of a Seller, any interest holder in such entity, has received any notice of any action, suit, claim, assessment, or audit, pending, proposed in writing, or, to the knowledge of a Seller, otherwise threatened, with respect to Taxes relating to such entity that has not been settled in full or which may have a continuing effect after the Closing Date, (iii) no Governmental Authority has made a claim in writing that such entity may be subject to Tax, or that a Return relating to such entity may be required to be filed, in a jurisdiction where no such Returns have been filed, (iv) no  interest in any such entity held by any Seller has associated with it a negative capital account or any deficit restoration obligation, and (v) such entity has in effect,

or the transferee of any such interest will be entitled to make, a Section 754 of the Code election with respect thereto.

(k)    The representations and warranties contained in this Section 3.14 are the only representations and warranties being made with respect to Taxes.

Section 3.15    Environmental Matters.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Sellers and the Business are, and have been, in compliance with all applicable Environmental Laws.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Sellers and the Business are, and have been, in compliance with all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.  All such Environmental Permits are in full force and effect and there is no claim or action currently pending or, to the Knowledge of the Sellers, threatened, that is or would reasonably be expected to result in the cancellation, revocation or other adverse or limiting modification of any such Environmental Permit.

(c)    There is no Environmental Claim pending or, to the Knowledge of Sellers, threatened against or affecting any Seller or the Business that is or would reasonably be expected to have a Material Adverse Effect.

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there are no actions, activities, circumstances, facts, conditions, events or incidents, including the presence of any Hazardous Material, which would be reasonably likely to form the basis of any Environmental Claim against or affecting any Seller or the Business that is or would reasonably be expected to be material to the Business.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there has been no material Release by any Seller, or to Sellers' Knowledge, by any third party, of any Hazardous Materials in, on, at, under or from, or affecting any Owned Real Property or Leased Real Property.

(f)    No Seller is subject to or a party to any Order under Environmental Law or with respect to the Release of, or exposure to, Hazardous Materials, excluding such Orders that have been fully settled and resolved without future obligation to the Sellers or the Business.

(g)    Within fourteen (14) days of the date hereof, the Sellers shall have made available correct and complete copies of all material environmentally related audits, studies, reports, analyses and results of investigations that have been performed with respect to the Owned Real Property or Leased Real Property within the last five (5) years and that are in their possession or control.

Section 3.16   Material Contracts.

(a)   Schedule 3.16 of the Disclosure Schedules lists a true, correct and complete list of each of the following Contracts (collectively with the Leases that are Transferred Contracts, the "Material Contracts"):

(i)   any Contract that would be required to be filed by Seller Parent as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act or disclosed by Seller Parent on a Current Report on Form 8-K;

(ii)   Contracts with any Affiliate or current or former officer, director, or employee of any Seller (other than employment related Contracts);

(iii)   Contracts relating to the acquisition by any Seller of any operating business, real property, capital expenditures (including capital expenditures relating to information technology systems) or securities of any other Person (other than any Seller) (including investment in joint ventures and minority equity investments but excluding accounts receivable or other forms of trade credit) for aggregate consideration in excess of $250,000 pursuant to which there are remaining liabilities, including contingent liabilities;

(iv)   all Contracts relating to indebtedness for borrowed money;

(v)   collective bargaining agreements or other labor related agreements or arrangements;

(vi)   Contracts regarding a guaranty, undertaking to be liable for the debts of any Person other than a Seller or provision of an indemnity in respect of liabilities, obligations or commitments of any Person other than a Seller, in each case in excess of $500,000;

(vii)   any Contract (or group of related Contracts) the performance of which, in the twelve (12) months preceding the date hereof has resulted in, or in the twelve (12) months following the Agreement would reasonably be expected to result in, consideration or payment in excess of $2,000,000 per annum to or from any Seller;

(viii)   any Contract pursuant to which a Seller (A) is granted or obtains or agrees to grant or obtain any right to use or otherwise exploit any material Intellectual Property, (B) is restricted in its right to use or register any material Intellectual Property, or (C) permits or agrees to permit any other Person to use, enforce or register any material Intellectual Property, including any license agreements, coexistence agreements and covenants not to sue;

(ix)   any material Contract or consent decree with or from any Governmental Authority;

(x)   Contracts which are capital leases as determined pursuant to GAAP and involve annual payments by any Seller in excess of $100,000;

(xi)     any Contract with a non-solicitation or special pricing arrangement;

(xii)    any Contract with the customers and suppliers required to be listed on Schedule 3.18(a) or 3.18(b) of the Disclosure Schedules;

(xiii)   any Contract providing for the sale, transfer or other disposition of any material asset or other property owned, leased or held for use by any Seller or its Affiliates, other than Inventory, that but for such Contract, would constitute a Transferred Asset pursuant to this Agreement;

(xiv)    Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation (whether in base salary, commission, or otherwise), severance or bonus arrangements providing for annual payments in excess of $150,000;

(xv)     any Contract with a sole source supplier, pursuant to which such supplier provides to a Seller equipment, materials or services that are necessary for the sale, performance, manufacturing or support of the Business;

(xvi)    any material agreement relating to any strategic alliance, joint development, joint marketing, partnership, joint venture or similar arrangement; and

(xvii)   all Contracts that limit or purport to limit in any respect the ability of the Business to compete in any line of business or with any Person or in any geographic area or during any period of time.

(b)      Sellers have made available to Buyers a true, correct and complete copy of each Contract listed on Schedule 3.16 of the Disclosure Schedule, as amended to date, and a written summary setting forth the terms and conditions of each oral Material Contract. Each Material Contract is valid and binding on the Sellers and, to the Knowledge of the Sellers, the counterparties thereto, and is in full force and effect.  To the Knowledge of Sellers, no party has repudiated any provision of a Material Contract or given written notice that a Material Contract has terminated or will be terminating and, excluding the effect of the filing and administration of the Bankruptcy Case or the insolvency or financial condition of the Sellers, no Seller is in breach of, or default under, in any material respect, a Material Contract to which it is a party.  To the Knowledge of the Sellers, the assignment of each Material Contract to Buyers will not result in any penalty, premium or variation of the rights, remedies, benefits or obligations of any party thereunder.

Section 3.17   Accounts Receivable; Inventory.

(a)      The accounts receivable shown in the Seller Financial Statements and that constitute Transferred Assets arose in the Ordinary Course of Business. Allowances for doubtful accounts have been prepared in accordance with GAAP and in accordance with the past practices of the Sellers.  The accounts receivable of the Business constituting Transferred Assets arising after December 31, 2014, and prior to the Closing Date arose or will arise in the Ordinary Course of Business.  The accounts receivable of the Business constituting Transferred Assets are not

subject to any material claim of offset, recoupment, set off or counter-claim and, to the Knowledge of Sellers, there are no specific facts or circumstances (whether asserted or unasserted) that could give rise to any such claim in any such case, except to the extent otherwise reflected in the allowances for doubtful accounts as provided for in the Seller Financial Statements or, with respect to accounts receivable arising after December 31, 2014, and prior to the Closing Date, as determined in the Ordinary Course of Business. The Business does not have any accounts receivable from any director, officer or employee or Affiliate of any Seller.

(b)     The Inventory is of a quality and quantity usable and merchantable and, with respect to finished goods, of a quality saleable at customary gross margins, in the Ordinary Course of Business, except for obsolete items or as otherwise reflected in the reserves in the Seller Financial Statements.  The Inventory is adequate for the conduct of the Business.

Section 3.18    Customers and Suppliers.

(a)     Listed in Schedule 3.18(a) of the Disclosure Schedules are the twenty (20) largest customers of the Business, taken as a whole, by revenue for the year ended December 31, 2014, and set forth next to each such customer is the approximate percentage of net revenue of the Business represented by such customer for such period. As of the date hereof, no Seller has received any written notice, or, to the Knowledge of Sellers, has any reason to believe, that any of the customers listed on Schedule 3.18(a) of the Disclosure Schedules has materially decreased since December 31, 2014, or will materially decrease, its purchase of the products, equipment, goods and services of the Business. From December 31, 2014, to the date hereof, to the Knowledge of Sellers, there has been no termination, cancellation, or material limitation of, or any material modification or change in, the business relationship between any Seller and any customer listed on Schedule 3.18(a) of the Disclosure Schedules.

(b)     Listed in Schedule 3.18(b) of the Disclosure Schedules are the twenty (20) largest suppliers of services, raw materials, supplies, merchandise and other goods for the Business, taken as a whole, by cost for the year ended December 31, 2014. No Seller has received any written notice, or, to the Knowledge of Sellers, has any reason to believe, that any such supplier will not provide such services or sell such raw materials, supplies, merchandise and other goods to the Business at any time after the Closing on terms and conditions materially similar to those used in its current sales to the Sellers, subject only to general and customary price increases or decreases and the effects of the filing and administration of the Bankruptcy Cases.

Section 3.19    Certain Payments. Since January 1, 2012, none of the Sellers (nor, to the Knowledge of Sellers, any of their respective directors, executives, representatives, agents or employees) (a) has used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) has violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) has established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

Section 3.20    <u>Brokers</u>.    Except for Lazard Middle Market LLC, the fees, commissions and expenses of which will be paid by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Sellers.

Section 3.21    <u>Exclusivity of Representations and Warranties</u>. Neither the Sellers nor any of their Affiliates or Representatives is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied (including, but not limited to, any relating to financial condition or results of operations of the Business or maintenance, repair, condition, design, performance, value, merchantability or fitness for any particular purpose of the Transferred Assets), except as expressly set forth in this Article III and the Disclosure Schedules, and the Sellers hereby disclaim any such other representations or warranties.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyers hereby represent and warrant to the Sellers as follows; <u>provided</u>, that Mexico Buyers shall only make such representations and warranties, at the earliest, as of the date the applicable Mexico Buyer executes and delivers a Joinder:

Section 4.1    <u>Organization</u>.    Each Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement.

Section 4.2    <u>Authority</u>.    Each Buyer has the corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by the Buyers of this Agreement and each of the Ancillary Agreements to which they will be a party and the consummation by the Buyers of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action and this Agreement has been, and upon their execution each of the Ancillary Agreements to which the Buyers will be a party will have been, duly executed and delivered by the Buyers and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon their execution each of the Ancillary Agreements to which the Buyers will be a party will constitute, the legal, valid and binding obligations of the Buyers, enforceable against the Buyers in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3    <u>No Conflict; Required Filings and Consents</u>.

(a)    The execution, delivery and performance by the Buyers of this Agreement and each of the Ancillary Agreements to which a Buyer will be a party, and the consummation

of the transactions contemplated hereby and thereby, or compliance by each Buyer with any of the provisions hereof, do not and will not:

(i)     conflict with or violate the certificate of incorporation or bylaws of a Buyer;

(ii)    conflict with or violate any Law applicable to the Buyers or by which any property or asset of the Buyers are bound or affected;

(iii)   conflict with or violate any Order of any Governmental Authority; or

(iv)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any material contract or agreement to which a Buyer is a party;

except, in the case of clause (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect or that arise as a result of any facts or circumstances relating to the Sellers or any of their Affiliates.

(b)     The Buyers are not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyers of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for any filings required to be made under the HSR Act or other applicable Antitrust Law or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

Section 4.4     Financing.   The Buyers shall have at the Closing, sufficient funds to permit the Buyers to consummate the transactions contemplated by this Agreement and the Ancillary Agreements, and to pay all related fees and expenses.  Notwithstanding anything to the contrary contained herein, the Buyers acknowledge and agree that their obligations to consummate the transactions contemplated hereby are not contingent upon their ability to obtain any third-party financing.

Section 4.5     Brokers.   The fees, commissions and expenses of any broker, finder or investment banker engaged by or on behalf of the Buyers in connection with the transactions contemplated hereby will be paid by the Buyers.

Section 4.6     Buyer's Investigation and Reliance.     The Buyers are sophisticated purchasers and have made their own independent investigation, review and analysis regarding the Business, the Transferred Assets, the Assumed Liabilities and the transactions contemplated hereby, which investigation, review and analysis was conducted by the Buyers together with expert advisors, including legal counsel, that it has engaged for such purpose.  The

Buyers and its Representatives have been provided with reasonable access to the Representatives, properties, offices, plants and other facilities, books and records of the Sellers relating to the Business and other information that they have requested in connection with their investigation of the Business, the Transferred Assets, the Assumed Liabilities and the transactions contemplated hereby.  Neither the Sellers nor any of their Affiliates or Representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information concerning the Business, the Transferred Assets or the Assumed Liabilities contained herein or made available in connection with the Buyers' investigation of the foregoing, except as expressly set forth in this Agreement.  The Buyers acknowledge that, should the Closing occur, the Buyers shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.  The Buyers acknowledge and agree that the representations and warranties in Article III are the result of arms' length negotiations between sophisticated parties.

### ARTICLE V
### COVENANTS

Section 5.1    <u>Conduct of Business Prior to the Closing</u>.

(a)    Except (1) as otherwise contemplated by this Agreement, (2) as set forth on Schedule 5.1 of the Disclosure Schedules, (3) as required by the Bankruptcy Code or arising out of the Bankruptcy Case, (4) as otherwise required by Law or any Order, or (5) with the prior written consent of the US Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), from the date of this Agreement until the Closing Date, the Sellers shall:

(i)    the Sellers shall use commercially reasonable efforts, taking into account the Bankruptcy Case, to conduct the Business in the Ordinary Course of Business and preserve the material business relationships with customers, suppliers, distributors and others with whom the Sellers deal in the Ordinary Course of Business;

(ii)    use commercially reasonable efforts to maintain the Transferred Assets in good working condition and repair (normal wear and tear excepted), pay expenses and payables of the Business and collect accounts receivable of the Business;

(iii)    use commercially reasonable efforts to (A) comply in all material respects with all Laws and Transferred Contracts, (B) maintain all material Permits relating to the Business and (C) pay all applicable Taxes that Sellers are required to pay (taking into account any relief pursuant to the Bankruptcy Case); and

(iv)    use commercially reasonable efforts to transfer, assign, record or perfect in its name good title to any Transferred Assets that are not presently held or recorded in its name.

(b)    From the date of this Agreement until the Closing Date or earlier termination of this Agreement, the Sellers shall not, in connection with the Business without the prior written consent of the US Buyer (which consent shall not be unreasonably withheld, conditioned or delayed):

(i)    sell, transfer, lease, sublease, encumber or otherwise dispose of any Transferred Assets or any interest therein, other than immaterial dispositions and Inventory sold or disposed of in the Ordinary Course of Business;

(ii)    acquire any corporation, partnership, limited liability company, other business organization or division thereof;

(iii)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(iv)    enter into any transaction relating to (i) the acquisition of fixed assets that will constitute Transferred Assets in excess of $100,000 or (ii) the incurrence of Liabilities that will constitute Assumed Liabilities in excess of $250,000 other than accounts payable relating to the acquisition of Inventory in the Ordinary Course of Business;

(v)    amend their certificate of incorporation, by-laws or comparable organizational documents;

(vi)    enter into or amend any Contract that would be a Material Contract or amend the DIP ABL Credit Agreement;

(vii)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of this Agreement, the Sale Procedures, the Sale Order or the consummation of the transactions contemplated hereby;

(viii)    fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire, unless the Buyers have indicated that they wish the Sellers to reject such Lease and such Lease does not relate to a facility where the Buyers intend to conduct transition services pursuant to Section 5.20 (so long as during the post-Closing period the Buyers remit the amounts required by Section 5.20 relating to such Lease);

(ix)    grant, announce or effectuate any increase or modification in the salaries, bonuses or other benefits payable or to be provided to any Business Employees, other than (A) as required by Law, or (B) as required pursuant to any plans, programs or agreements existing on the date hereof;

(x)    materially modify or amend any Transferred Contract or modify, waive, release or assign any material rights or claims thereunder, in each case whether in connection with any extension, renewal or replacement of such Transferred Contract, or otherwise;

(xi)    engage in (A) any trade loading practices or any other promotional sales or discount activity with any customers or distributors with the intent of accelerating to pre-Closing periods sales to customers or distributors that would otherwise be expected (based on past practice) to occur in post-Closing periods, (B) any practice (including providing any discount, accommodation or other concession outside the Ordinary Course of Business) with the intent of accelerating to pre-Closing periods collections of accounts receivable that would otherwise be expected (based on past practice) to be made in post-Closing periods, (C) any

45

practice with the intent of postponing to post-Closing periods payments with respect to any Transferred Assets or Assumed Liabilities that would otherwise be expected (based on past practice) to be made in pre-Closing periods or (D) any other promotional sales, discount activity or deferred revenue activity outside the Ordinary Course of Business;

        (xii)   (A) reject or terminate any Material Contract or seek Bankruptcy Court approval to do so, or (B) fail to use commercially reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract, except in each case, to the extent the Buyers have indicated that they wish the Sellers to reject such Contract and in the case of a Material Contract that is a Lease, only to the extent such Lease does not relate to a facility where the Buyers intend to conduct transition services pursuant to Section 5.20 (so long as during the post-Closing period the Buyers remit the amounts required by Section 5.20 relating to such Lease); provided that prior to the Closing Date, Sellers may reject or terminate any Material Contract that is readily replaceable (and so replaced) at no more than the same cost, without disruption to the operation of the Business and otherwise on terms and conditions consistent with such rejected or terminated Material Contract, following consultation with Buyers regarding such rejection or termination;

        (xiii)   with respect to any Transferred Asset (A) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (B) fail to use reasonable best efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

        (xiv)   modify, amend or terminate any of the Leases unless (x) any such modification or amendment shall be to the benefit of Sellers or waive, release or assign any material rights or claims to the extent included in the Leases or (y) the Buyers have indicated that they wish the Sellers to reject such Lease, except in the Ordinary Course of Business and if such Lease does not relate to a facility where the Buyers intend to conduct transition services pursuant to Section 5.20 (so long as during the post-Closing period the Buyers remit the amounts required by Section 5.20 relating to such Lease);

        (xv)   enter into, establish, adopt, amend, terminate or fund any Employee Plan or any arrangement that would be an Employee Plan if in effect on the date of this Agreement, in respect of any present or former officer or employee or other similar service provider of or to the Sellers or their Affiliates;

        (xvi)   grant or acquire, or dispose of or permit to lapse, any rights to any material Intellectual Property, or disclose or agree to disclose to any Person, other than Representatives of the Buyers, any material Trade Secret;

        (xvii) hire, terminate (other than for cause) or transfer any Business Employee participating in the Employee Incentive Plan;

        (xviii) hire any Business Employee with annual compensation over $75,000;

(xix)    compromise, settle or agree to settle, or consent to judgment in, any one or more Actions or institute any Action concerning any material Intellectual Property;

(xx)    make, revoke or change any election relating to Taxes, file any amended Return, request, enter into or obtain any Tax ruling with or from a Governmental Authority, or execute or file, or agree to execute or file, with any Governmental Authority any agreement or other document extending, or having the effect of extending, the period of assessment or collection of any Taxes, in each case, that could reasonably have any adverse Tax effect on the Buyers or any of their Affiliates, for any taxable period, or portion thereof, starting after the Closing Date;

(xxi)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP; or

(xxii)    agree or commit to any of the foregoing.

(c)    From the date of this Agreement until the Closing Date or earlier termination of this Agreement, the Sellers shall not without the prior written consent of the US Buyer (which consent shall be granted in US Buyer's sole discretion):

(i)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(ii)    enter into any Contract that provides for "exclusivity" or any similar requirement or under which Buyers would after the Closing be restricted in any respect, with respect to distribution, licensing, marketing, purchasing or development of products or services;

(iii)    subject any of the Transferred Assets to any Encumbrance (other than any Encumbrance under the DIP ABL Credit Agreement and DIP Credit Agreement and Permitted Encumbrances);

(iv)    authorize, or make any commitment with respect to, any single capital expenditure that is in excess of $250,000 or capital expenditures that are, in the aggregate, in excess of $750,000 for the Business taken as a whole; or

(v)    other than the DIP Credit Agreement or the ABL DIP Credit Agreement, incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness, in each case that would constitute an Assumed Liability.

Section 5.2    Covenants Regarding Information.

(a)    From the date hereof until the Closing Date, upon reasonable request, the Sellers shall afford the Buyers and its Representatives reasonable access to make investigation of the properties (including, at the Buyers' sole cost and discretion, the performance of Phase I Environmental Site Assessments ("Phase I Assessments"),

47

environmental compliance audits, and, if recommended by a Phase I Assessment, Phase II Environmental Site Investigations), offices, plants and other facilities, books and records (including Tax records) of the Sellers, and shall furnish the Buyers with such financial, operating and other data and information, and access to all the officers, key employees, accountants and other Representatives of Sellers as the Buyers may reasonably request and to make extracts and copies of such books and records.  In addition, Sellers shall cooperate to allow Buyers reasonable access to employees in order to determine their designation of Transferred Employees.  Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be required to disclose any information to the Buyers or their Representatives if such disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws.  Subject to the foregoing and upon reasonable notice, Sellers shall also afford Buyers reasonable access, during normal business hours, to the Business, to all operations of the Business and to all Transferred Assets and Assumed Liabilities.  Upon the Buyers' reasonable request, the Sellers agree to cooperate with Buyers to obtain an affidavit of title, in such form as may be reasonably required by the Buyers' title insurance company, to allow such company to issue an owner's title insurance policy in favor of the Buyers with respect to all Owned Real Property, subject only to Permitted Encumbrances.

(b)    From and after the date hereof, Sellers shall within one (1) Business Day (i) advise Buyers, and communicate to Buyers the terms (unless expressly prohibited by the terms thereof) of, any proposal or other communication regarding a proposal for the acquisition of the Business or any of the Transferred Assets that any Seller or any of their respective directors, officers, managers, employees, representatives or Affiliates has made, may receive or has become aware of and (ii) furnish Buyers with a true, complete and correct copy of any such written proposal or communication and any document relating thereto, unless expressly prohibited by the terms thereof.

(c)    The Sellers shall use commercially reasonable efforts to cause its employees to, on a timely basis, provide all reasonable cooperation requested by the Buyers and/or any potential lender that is reasonably necessary and customary to assist the Buyers in connection with such financing, including (i) requesting its certified independent auditors to provide auditors' reports and customary comfort letters with respect to financial information relating to the Sellers in customary form and (ii) causing appropriate personnel of the Sellers to participate at reasonable times in a reasonable number of sessions with prospective lenders; provided, that the Sellers shall not be required to produce and deliver any financial statements or other financial information not currently completed in the Ordinary Course of Business. Any and all reasonable and documented out-of-pocket costs and expenses incurred at the request of the US Buyer in connection with any cooperation, investigation or other matter related to this Section 5.2 shall be borne by the Buyers.

Section 5.3    Notification of Certain Matters.  Until the Closing, each party hereto shall promptly notify the other party in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Article VII of this Agreement becoming incapable of being satisfied.

Section 5.4    <u>Intercompany    Arrangements</u>.    All intercompany and intracompany accounts or Contracts between the Business, on the one hand, and the Sellers and its Affiliates, on the other hand, shall be cancelled without any consideration or further liability to any party and without the need for any further documentation, immediately prior to the Closing.

Section 5.5    <u>Employee Matters</u>.

(a)    With respect to each Business Employee, not later than April 30, 2015, the Sellers shall provide the Buyers with a list setting forth, to the extent such information is permitted to be disclosed under applicable Law and reasonably available: (i) title or job/position, (ii) job designation (i.e., salaried or hourly), (iii) location of employment, (iv) employment status (active, on leave or on unpaid leave), (v) with respect to Mexico Sellers Personnel, date of hire (seniority), and (vi) annual base rate of compensation for all salaried employees and any bonus amount that he or she has received for the fiscal year ended December 31, 2014, and also, to the extent known, with respect to the Mexico Sellers Personnel, whether any bonus payment has been made during 2015.

(b)    Prior to the Closing, the Buyers shall provide (or cause one of their Subsidiaries to provide) to all Business Employees (including each Qualified Leave Recipient) other than Mexico Sellers Personnel not already subject to a written employment agreement with a Seller an offer of employment on an "at will" basis (the "<u>Employment Offer</u>"), in each case to commence immediately following the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; <u>provided</u> that such Qualified Leave Recipient returns to active status within thirty (30) days following the Closing Date. Each Business Employee or Qualified Leave Recipient who accepts the Employment Offer and who becomes an active employee of the Buyers or of one of its Subsidiaries shall be a "<u>Transferred Employee</u>." The Sellers shall reasonably cooperate with the Buyers in effecting the Transferred Employees' transfer of employment from the Sellers to the Buyers or a Subsidiary of the Buyers as contemplated hereby. Within ten (10) days prior to the anticipated Closing Date, Sellers shall provide Buyers with a list of any applicable individuals who are expected to be Qualified Leave Recipients as of the Closing Date and shall update that list from time to time through the Closing Date as necessary. Each offer of employment made pursuant to this Section 5.5 shall be contingent upon the Closing and the issuance of the Sale Order.

(c)    The Buyers shall assume and pay all unpaid wages and salaries, in respect of Transferred Employees, which are earned or accrued during the payroll period in which the Closing Date occurs. The Sellers shall retain all Liabilities relating to unpaid wages, salaries, commissions and other amounts, earned or accrued by or in respect of Business Employees that are not assumed by the Buyers as described in the preceding sentence.

(d)    To the extent permitted by Law, all unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date or, if later, the date on which such Transferred Employee becomes an employee of the Buyer, be transferred to and assumed by the Buyers and the Buyers shall honor such accrued vacation on the same basis as under the Sellers' vacation policy as in effect immediately prior

to the Closing. To the extent the Sellers are not permitted by Law to transfer accrued vacation of Transferred Employees, such accrued vacation shall be paid out by the Buyers to the Transferred Employees at the time of Closing.

(e)    The Buyers shall assume all health plan coverage obligations under Section 4980B of the Code with respect to all "M&A qualified beneficiaries" as defined in Treasury Regulation section 54.4980B-9.

(f)    The Buyers shall cause the employee benefit plans of the Buyers or their Affiliates in which Transferred Employees participate (collectively, the "<u>Buyer Plans</u>") to grant the Transferred Employees not already subject to a written employment agreement with a Seller credit for their service with the Sellers and their Affiliates prior to the Closing Date (i) under any Buyer Plans in which they are otherwise eligible to participate (except for benefit accrual service under any defined benefit pension plan or to the extent that such crediting would result in duplication of benefits), and (ii) for purposes of vacation accrual and severance.

(g)    As soon as practicable following the Closing Date, with respect to the Employee Plans that are tax-qualified defined contribution plans, the Buyers shall permit the Transferred Employees to roll over their account balances and outstanding loan balances, if any, thereunder into an "eligible retirement plan" within the meaning of Section 402(c)(8)(B) of the Code maintained by the Buyers or an Affiliate.

(h)    From and after the Closing Date, the Sellers shall retain all (i) employment obligations with regard to those employees and former employees of the Sellers (or who are otherwise related to the Business) who are not Transferred Employees, and (ii) any Liabilities related to any Transferred Employees to the extent not assumed by the Buyers in this Section 5.5 or under Section 2.3.

(i)    Without limitation of Section 9.9, nothing in this Section 5.5 shall (i) be treated as an amendment of, or undertaking to amend, any Employee Plan, (ii) obligate the Buyer, the Sellers, or any of their respective Affiliates to retain the employment of any particular employee, or (iii) confer any rights or benefits on any Person, including any Transferred Employee, other than the Parties to this Agreement.

(j)    <u>Mexico Employee Matters</u>:

(i)    Notwithstanding the foregoing, as of the Closing Date, the applicable Mexico Buyer will become the employer of the employees of Mexico Sellers (y) as of the Closing Date (all such current workers are separately identified in <u>Schedule 5.5(j)</u> of the Disclosure Schedules, which may be updated by Mexico Buyer no later than five (5) days prior to the Closing Date in order to reflect the exclusion of any Non-Transferred Mexico Seller Employees, and are referred hereafter as "<u>Mexico Sellers Personnel</u>") and (z) whose transfer is confirmed by the Mexico Buyers (any Business Employee that will not become an employee of the Mexico Buyer, a "<u>Non-Transferred Mexico Sellers Employee</u>") and will do so by means of any of the following alternatives, as determined by Mexico Buyer in its sole discretion:

(A)    an "employer substitution" as provided for under the Mexico Federal Labor Law (the "<u>MFLL</u>") and the Mexico Social Security Law (the "<u>MSSL</u>").

Accordingly, subject to the provisions of the MFLL, (1) no severance will be payable to the Mexico Sellers Personnel who are transferred by Mexico Seller pursuant to such employer substitution, (2) Mexico Buyer will maintain the labor conditions and recognize the seniority of all Mexico Sellers Personnel and agrees to pay them after the date of this Agreement upon the same basis as the salaries, fringe benefits and any other compensation, which they are receiving as of the date of the Closing Date, and (3) Mexico Sellers shall, at the time required by applicable Law, pay the mandatory Mexico profit sharing accrued to the Closing Date in accordance to the MFLL, (4) all severance costs and payments related to the termination of the Non-Transferred Mexico Sellers Employees shall be solely borne and made by Mexico Buyers on the Closing Date, and (5) Mexico Sellers shall deliver to Mexico Buyer evidence that the employment terminations relating to the Non-Transferred Mexico Seller Employees were completed in accordance with applicable Law, in form and substance reasonably satisfactory to Mexico Buyers; or

(B)    the termination of all employment relationships with the Mexico Sellers Personnel and the Non-Transferred Mexico Sellers Employees immediately prior to Closing, in which case, subject to the provisions of the MFLL and the MSSL, (1) all severance costs and payments shall be solely borne and made by Mexico Buyers on the Closing Date, (2) Mexico Sellers shall deliver to Mexico Buyer evidence that the employment terminations were completed in accordance with applicable Law, in form and substance reasonably satisfactory to Mexico Buyers, and (3) Mexico Buyers (or any of its designees) shall offer employment to the Mexico Sellers Personnel.

(ii)    Mexico Seller and Mexico Buyer agree to provide each other information and assistance, and execute such documents as are reasonably necessary and required by applicable Mexico Law related to the transfer of the Mexico Sellers Personnel and/or the Non-Transferred Mexico Sellers Employees, including agreements with the union (if applicable) and notices to each of the Mexico Sellers Personnel and/or the Non-Transferred Mexico Sellers Employees, as well as notices to IMSS, INFONAVIT, SAR and any other governmental agency, within the time periods established by applicable Mexico Law.

Section 5.6    Consents and Filings; Further Assurances.

(a)    Except as set forth in Schedule 5.6 of the Disclosure Schedules, each of the Parties shall use all reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm Buyers' ownership of the Transferred Assets as promptly as practicable, including to use commercially reasonable efforts to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from customers and other parties. Without limiting the generality of the previous sentence, the Parties shall use commercially reasonable efforts to (i) obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly (and in no event later than three (3) Business Days after the determination that US Buyer is the Successful Bidder) make all necessary filings, and thereafter make any other required

submissions, with respect to this Agreement required under the HSR Act or any other applicable Law, including any other Antitrust Law; (iii) comply at the earliest practicable date with any request under the HSR Act, or other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "Antitrust Authority"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities under the HSR Act or other Antitrust Law with respect to any such filing; (iv) not extend any waiting period under the HSR Act or enter into any agreement with an Antitrust Authority not to consummate the transactions contemplated hereby; and (v) defend and resolve any investigation or other inquiry of any Governmental Authority under all applicable Laws, including by defending against and contesting administratively and in court any litigation or adverse determination initiated or made by a Governmental Authority under applicable law.  The Buyers shall pay all filing fees and other charges for the filing under the HSR Act or other Antitrust Law by the Parties.

(b)     Each of the Parties shall promptly notify the other Parties of any communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority.  Seller shall not agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting.  The Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods, including under the HSR Act.  Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

(c)     From time to time, whether at or following the Closing, the Sellers and the Buyers shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyers all the right, title, and interest in, to or under the Transferred Assets, to provide Buyers and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements. Each of the Parties will use its commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

Section 5.7      Refunds and Remittances.

(a)      After the Closing: (i) if the Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to the Buyers in accordance with the terms of this Agreement, the Sellers promptly shall remit, or shall cause to be remitted, such amount to the Buyers and (ii) if the Buyers or any of their Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Sellers or any of their Affiliates in accordance with the terms of this Agreement, the Buyers promptly shall remit, or shall cause to be remitted, such amount to the Sellers.

(b)      In the event that, after the Closing Date, (i) either Party reasonably believes Sellers or any their Affiliates have retained ownership of an asset intended to be conveyed to Buyers as a Transferred Asset as contemplated by this Agreement, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall and shall cause their controlled Affiliates to convey, assign or transfer promptly such Transferred Asset to Buyers, and the Parties hereto shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to Buyers or their designees or (ii) either Party reasonably believes an Excluded Asset has been conveyed to Buyers, Buyers shall convey, assign or transfer promptly such Excluded Asset to the Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designee.

Section 5.8      Public Announcements.      On and after the date hereof and through the Closing Date, the Parties shall consult with each other before making any press release, securities filing or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyers nor the Sellers shall make any press release, securities filing or any public statement prior to obtaining the Seller Parent's (in the case of the Buyer) or the Buyer's (in the case of the Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure may be required by applicable Law or any listing agreement of any party hereto.

Section 5.9      Bankruptcy Court Filings and Approval.

(a)      Not later than two (2) Business Days after the date this Agreement is executed, Seller Parent and each of the other Sellers shall file voluntary petitions for relief commencing a case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and file and serve one or more motions, each in form and substance reasonably acceptable to the Buyer, seeking approval of the Sale Procedures Order and the Sale Order (together, the "Sale Motion").

(b)      Seller Parent and each of the other Sellers shall use reasonable best efforts to cause the Bankruptcy Court to enter (i) the Sale Procedures Order on or prior to the date that is thirty (30) days after the Petition Date and (ii) the Sale Order on or prior to the date that is ninety-three (93) days after the date hereof, which Sale Order shall approve a sale to the

Successful Bidder at any Auction conducted under the Sale Procedures Order or to Buyers if there are no other qualified bidders.

(c)     The Buyers agree that they will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order and the Sale Order and, consistent with Section 5.11 below, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(d)     The Sellers and the Buyers acknowledge that this Agreement and the sale of the Transferred Assets and the assumption of the Assumed Liabilities are subject to Bankruptcy Court approval.  The Sellers and the Buyers acknowledge that to obtain such approval, (i) the Sellers must demonstrate that they have taken reasonable steps to obtain the highest, best, or otherwise financially superior offer possible for the Transferred Assets and (ii) the Buyers must provide adequate assurance of future performance with respect to the Transferred Contracts.

(e)     From the date hereof until the entry of the Sale Procedures Order, the Buyers agree and acknowledge that the Sellers and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to the Buyers and its Affiliates, agents and Representatives) relating to a Competing Bid; provided that Sellers shall (i) promptly (and in any event within one (1) day) notify Buyers of any Competing Bid, or any indication that any Person is considering making, a Competing Bid (ii) promptly (and in any event within one (1) day) notify Buyers of the identity of any Person making a Competing Bid (or considering making a Competing Bid) and provide a copy of any Competing Bid (or, where no such copy is available, a reasonably detailed description of such Competing Bid), (iii) subject to applicable Law, keep Buyers informed on a current basis of the status of any Competing Bid (or the consideration of any Competing Bid) and any developments, discussions and negotiations related thereto (including by updating any copies of a Competing Bid provided to Buyers), (iv) provide reasonable updates regarding the Sellers', and their Affiliates and Representatives', efforts in soliciting and encouraging submission of any Competing Bid and (v) ensure Buyers have been provided all information provided to such Persons or its Representatives making a Competing Bid.

(f)     The Buyers agree and acknowledge that, after entry of the Sale Procedures Order, the Sellers and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to the Buyers and its Affiliates, agents and Representatives) in accordance with the terms of the Sale Procedures Order.

(g)     The Sellers shall, to the extent reasonably practicable, give Buyers advanced notice and proposed drafts of all pleadings, motions, orders, other papers, hearings, and other proceedings relating to this Agreement and the transactions contemplated hereby,

and shall provide Buyers and their counsel with a reasonably opportunity to review such papers prior to filing with the Bankruptcy Court.

(h)     The Sellers shall use reasonable best efforts to serve notices of assumption of the Transferred Contracts, including designation of Cure Claims, on all necessary parties by the twenty-eighth (28th) Business Day following the Sale Procedures Hearing.

(i)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Sellers shall immediately notify Buyers of such appeal or stay request and shall provide to Buyers promptly a copy of the related notice of appeal or order of stay.  Sellers shall also provide Buyers with written notice of any motion or application filed in connection with any appeal from such orders. The Sellers agree to take all action as may be reasonable and appropriate to defend against such appeal or stay request and the Sellers and Buyers agree to use their reasonable efforts to obtain an expedited resolution of such appeal or stay request; provided that nothing herein shall preclude the parties hereto from consummating the transactions contemplated hereby, if the Sale Order shall have been entered and has not been stayed and the Buyers, in their sole and absolute discretion, waive in writing the condition that the Sale Order be a Final Order.

(j)     After entry of the Sale Order, to the extent the Buyers are the Successful Bidder at the Auction, neither the Buyers nor the Sellers shall take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 5.10   Name Change.  The Sellers shall, as promptly as practicable (but in no event later than thirty (30) Business Days) after the Closing, cease using and displaying any trademarks that are included in the Transferred Assets, and in accordance with such requirement, the Sellers shall use commercially reasonable efforts to, no later than sixty (60) Business Days after the Closing, legally change their corporate and business names (to the extent such names include such trademarks or a confusingly similar trademarks) to names that are not confusingly similar to such trademarks, and file notices of such name changes with the Bankruptcy Court.  Subject to the approval of the Bankruptcy Court to change Seller Parent's name for purposes of the Bankruptcy Case (which approval Seller Parent shall seek and use commercially reasonable efforts to obtain promptly following the Closing), under no circumstance shall the Sellers, after the Closing, use or otherwise exploit the trademarks included in the Transferred Assets or any other indicia confusingly similar to the trademarks included in the Transferred Assets, copyrights included in the Transferred Assets, or any work substantially similar to the copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.

Section 5.11   Assumed Liabilities; Adequate Assurance of Future Performance.  The Parties agree that they will promptly take commercially reasonable actions to provide the evidence required to establish that the Buyers can provide adequate assurance of future performance of the Transferred Contracts, including such affidavits, non-confidential financial information and other documents or information as may be necessary or

desirable for filing with the Bankruptcy Court and making the Buyer's and Sellers' Representatives available to testify before the Bankruptcy Court.

Section 5.12    <u>Sale Free and Clear</u>.  The Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances, against or created by the Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and (b) the Buyers are not successors to any Seller or the bankruptcy estate by reason of any theory of law or equity, and the Buyers shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement.  On the Closing Date, the Transferred Assets shall be transferred to the Buyers free and clear of all obligations, Liabilities and Encumbrances (other than Lease Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

Section 5.13    <u>Intellectual Property License</u>. To the extent that Sellers own or license any Intellectual Property that is used or held for use in the Business and that is not a Transferred Asset, Sellers hereby grant to Buyers, effective as of the Closing, a non-exclusive, royalty-free, fully paid-up, perpetual, irrevocable, worldwide, sublicensable license to use and otherwise exploit such Intellectual Property. The foregoing license shall be freely assignable and transferable by Buyers.

Section 5.14    <u>Intellectual Property Registrations</u>.    Prior to the Closing Date, the Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (i) where Intellectual Property of any Seller is still recorded in the name of legal predecessors of any Seller or any Person other than a Seller or (ii) where, to the Knowledge of the Sellers, the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to any Seller's Intellectual Property, are materially incorrect for any other reason.

Section 5.15    <u>Wind-Down Amount</u>.    On and after the Closing Date, the Sellers shall hold the Wind-Down Amount in trust for the benefit of persons entitled to be paid costs covered by the Wind-Down Amount in accordance with the Wind-Down Budget and the following provisions:

(a)    All claims for costs to be paid from the Wind-Down Amount pursuant to the Wind-Down Budget must be submitted to the Sellers and the Buyers in writing.

(b)    Upon the submission of any such claims for costs to be paid from the Wind-Down Amount, the Buyers shall have ten (10) days to object in writing to any such claim on the basis that it is not (i) consistent in kind or amount with the Wind-Down Budget or (ii) reasonably necessary for the winding-down of the Sellers' estates.

(c)    In the event that an objection is made by the Buyers and an agreement cannot be reached between the claimant and the Buyers, the amount of any such payment still

in dispute shall be determined, on application by the Buyers or the Sellers, and on notice to the Buyers and any affected beneficiary of the Wind-Down Amount, by Order of the Bankruptcy Court.  The costs of any such application shall be paid:  (i) in the case of the Sellers, from the Wind-Down Amount; (ii) in the case of the claimant, by the claimant; and (iii) in the case of the Buyers, by the Buyers, unless the Buyers are successful in their complaint, in which case their costs of the application shall be paid from the Wind-Down Amount.

(d)    Once the amount of any such claim has either been agreed to or determined by the Bankruptcy Court, as set forth above, the Sellers shall promptly pay such claim from the Wind-Down Amount.

(e)    Subsequent to the Closing Date, the Sellers shall reduce the amount of the Wind-Down Amount as and to the extent that the Sellers may agree, or the Bankruptcy Court, on application by the Buyers or otherwise, determines, that it, or portions of it, are no longer required to fund the wind-down costs of the Sellers' estates and by distributing to the Buyers the amount of such reductions.

(f)    All right, title and interest in and to any amounts in the Wind-Down Amount that are not used to pay costs associated with winding-down the Sellers' estates and shall vest absolutely in the Buyers as at the Closing Date and shall promptly be distributed to the Buyers in accordance with this Section 5.15.

Section 5.16    Creation of Mexico Buyer.  Prior to Closing, if US Buyer is the Successful Bidder, US Buyer will form, or procure that its Affiliates form, one or more entities to serve as Mexico Buyers.  Any such entity formed to be a Mexico Buyer shall be permitted to join this Agreement by executing a Joinder hereto.

Section 5.17    Business Plan.  No later than March 31, 2015, the Sellers shall deliver a draft of a business plan to Buyers (the "Business Plan").  No later than April 15, 2015, the Business Plan, in a form reasonably acceptable to Buyers, shall have been submitted to the board of directors of Seller Parent for consideration.

Section 5.18    D&O Insurance.  Prior to Closing, Seller Parent shall have obtained tail directors' and officer's insurance coverage, the cost and premium of which shall be added to amounts included in the Wind-Down Budget, extending the terms of Seller Parent's existing directors' and officers' insurance coverage for a period of six years, such tail policy to take effect as of the later of the Closing Date and the completion of any wind-down of the Sellers.

Section 5.19    Disclosure Schedule Update.  The Sellers may, upon the prior written consent of the US Buyer (which consent shall not be unreasonably withheld), within fourteen (14) days of the date hereof, update the Disclosure Schedules relating to Article III hereof; provided that (a) such update and revision shall not disclose factors or circumstances that constitute a Material Adverse Effect, (b) the Sellers shall not update the introduction to the Disclosure Schedules, (c) the Sellers shall not update Schedules 3.3(b), 3.10(a), 3.10(j) or 3.16(a)(v) of the Disclosure Schedules, and (d) the Sellers shall not update the Disclosure Schedules to include any action, event or occurrence taking place after the date hereof.  The

Parties hereto agree that additions to the Disclosure Schedules pursuant to this Section 5.19 shall not be considered a failure of the representations and warranties of Sellers set forth in this Agreement to be true and correct as of the Closing Date or the date hereof, and the Disclosure Schedules as updated and revised in accordance with this Section 5.19 shall supersede the version of the Disclosure Schedules delivered by Sellers to Buyers on the date hereof.

Section 5.20    Transition Services.  If requested by the Buyers, (a) to the extent the Sellers have access thereto and/or possession thereof, the Sellers shall permit any Transferred Employees to work at any facility that is an Excluded Asset and (b) the Sellers and the Buyers shall negotiate, in good faith, on a post-closing transition services agreement on terms that are mutually acceptable to the Parties, in each of case (a) and (b), in order to provide for the movement of any Transferred Assets, transfer of customer relationships and employees and such other assistance as the Buyers may reasonably need to facilitate any separation of the Transferred Assets from Excluded Assets; provided that any such transition services to be provided by the Sellers shall be subject to any winding-down of operations and related capabilities of the Sellers post-Closing. The cost of transition services (including the post-Closing costs during the transition period of maintaining the Leases that would have been rejected but for the Buyers' intention to use the facilities related to such Leases to conduct transition services) shall be borne by the applicable Buyer or Designated Buyer.  The Sellers will not reject any Lease relating to a location for which the Buyers are requesting transition services; provided that during the post-Closing period while the Buyers are using the transition services, the Buyers shall remit the amounts required by this Section 5.20.

Section 5.21    Employee Incentive Plan.  The Sellers and the Buyers may determine to seek Bankruptcy Court authorization to implement an employee incentive plan, in a mutually agreed upon form (which form shall be agreed by each of the Parties in their sole discretion) (the "Employee Incentive Plan").

## ARTICLE VI
## TAX MATTERS

Section 6.1    Transfer Taxes.  Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by the Buyers.  The Sellers and the Buyers shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes.  The Buyers shall prepare and file all necessary Returns or other documents with respect to all such Transfer Taxes.  In the event any such Return requires execution by the Sellers, the Buyers shall prepare and deliver to the Sellers for their review, comment and approval, which approval shall not be unreasonably withheld, conditioned or delayed, a copy of such Return at least ten (10) Business Days before the due date thereof (taking into account any valid extension), and upon the Sellers' approval thereof, the Sellers shall promptly execute such Return and deliver it to the Buyer, which shall cause it to be filed.

Section 6.2    <u>Tax Cooperation</u>.  The Buyers and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as  is reasonably necessary for the filing of all Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax; <u>provided</u>, <u>however</u>, that neither the Buyers nor any Seller shall be required to disclose the contents of its Returns to any Person.  Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 6.2 shall be borne by the Party requesting it.

Section 6.3    <u>Certain Tax Elections</u>.

(a)    Notwithstanding any other provisions in this Agreement, the Buyers and the Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer.

(b)    The Buyers and the Sellers agree (i) to use the "standard procedure" described in Section 4 of IRS Revenue Procedure 2004-53, 2004-2 C.B. 320 with respect to the Sellers' Tax filing and payment obligations relating to the Business and the Business Employees and (ii) that US Buyer shall file (or cause to be filed) an IRS Form W-2 for each Business Employee with respect to the portion of the year during which such Business Employee is employed by US Buyer that includes the Closing Date, excluding the portion of such year that such Business Employee was employed by the Sellers or their respective Affiliates.

Section 6.4    <u>Apportionment of Certain Taxes</u>.  All real property, personal property and similar ad valorem Taxes, if any, levied with respect to the Transferred Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "<u>Apportioned Taxes</u>") shall be apportioned between the Sellers and the Buyers based on the number of days of such taxable period ending on and including the Closing Date (such portion of such taxable period, the "<u>Pre-Closing Tax Period</u>") and the number of days of such taxable period after the Closing Date (such portion of such taxable period, the "<u>Post-Closing Tax Period</u>").  The Sellers shall be responsible for the proportionate amount of such Apportioned Taxes that is attributable to the Pre-Closing Tax Period, and the Buyers shall be responsible for the proportionate amount of such Apportioned Taxes that is attributable to the Post-Closing Tax Period.  Any Apportioned Taxes shall be timely paid, and all applicable Returns shall be timely filed, as provided by applicable Law.  The paying Party shall be entitled to reimbursement from the non-paying Party for the non-paying Party's portion of the Apportioned Taxes in accordance with this Section 6.4.  Upon payment of any such Apportioned Taxes, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under this Section 6.4, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying Party shall make such reimbursement by wire transfer in immediately available funds within ten (10) days of receipt of such statement to an account designated by the paying Party.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1   <u>General Conditions</u>.  The respective obligations of the Buyers and the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (<u>provided</u>, that such waiver shall only be effective as to the obligations of such Party):

(a)   No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent), that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

(b)   Any waiting period (and any extension thereof) under the HSR Act applicable to the transactions contemplated by this Agreement and the Ancillary Agreements shall have expired or shall have been terminated.  All other material consents of, or registrations, declarations or filings with, any Governmental Authority legally required for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements shall have been obtained or filed.

(c)   The Bankruptcy Court shall have entered the Sale Order, and the Sale Order and the Sale Procedures Order shall each be a Final Order.

Section 7.2   <u>Conditions to Obligations of the Sellers</u>.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Seller Parent in its sole discretion:

(a)   The representations and warranties of the Buyers contained in this Agreement or any Ancillary Agreement or any certificate delivered pursuant hereto shall be true and correct both when made and as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.  The Buyers shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement or any Ancillary Agreement to be performed or complied with by it prior to or at the Closing.  The Sellers shall have received from the Buyers a certificate to the effect set forth in the preceding sentences, signed by a duly authorized officer thereof.

(b)   The Sellers shall have received an executed counterpart of each document listed in Section 2.9(c), signed by each party other than the Sellers.

(c)   The Wind-Down Amount shall have been funded to Seller Parent.

Section 7.3    Conditions to Obligations of the Buyer.  The obligations of the Buyers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyers in their sole discretion:

(a)    The representations and warranties of the Sellers contained in this Agreement or any Ancillary Agreement or any certificate delivered pursuant hereto shall be true and correct both when made and as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The Sellers shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement or any Ancillary Agreement to be performed or complied with by them prior to or at the Closing.  The Buyers shall have received from the Sellers a certificate to the effect set forth in the preceding sentences, signed by duly authorized officers thereof.

(b)    The Buyers shall have received an executed counterpart of each document listed in Section 2.9(b), signed by each party other than the Buyer.

(c)    The Bankruptcy Court shall have approved and authorized the assumption and assignment of the Material Contracts that are Transferred Contracts, subject to Section 2.5.

(d)    The total aggregate value of the Cure Claims (including all Disputed Cure Claims) has been finally determined by the Buyers with the parties to the Transferred Contracts and does not exceed $14,000,000.

(e)    No "Event of Default" (as such term is defined in the DIP Credit Agreement) shall have occurred and is continuing as of the Closing Date.

(f)    The aggregate amount of the Cash Component shall not exceed $140,000,000.

(g)    The aggregate amount of the Assumed Liabilities pursuant to Section 2.3(a)(iv) shall not exceed $18,000,000.

(h)    There shall not have occurred and be continuing any changes, effects or circumstances constituting, or which would reasonably be likely to result in, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE VIII
## TERMINATION

Section 8.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing (the date on which this Agreement terminates in accordance with its terms, the "<u>Termination Date</u>"):

(a)    by mutual written consent of the Buyers and Seller Parent;

(b)    either Seller Parent or Buyers, if:

(i)    any Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable; <u>provided</u>, that the Party so requesting termination shall have complied with Section 5.6; or

(ii)    the Sellers enter into a definitive agreement with respect to an Alternative Transaction because the Buyer is not the Successful Bidder at the Auction; <u>provided</u>, <u>however</u>, that if the Buyer is the Back-Up Bidder, then Buyer may not terminate this Agreement pursuant to this Section 8.1(b)(ii) for a period of sixty (60) days from the entry of the Sale Order (for the avoidance of doubt, nothing in this Section 8.1(b)(ii) shall restrict the ability of the Buyers to terminate this Agreement in accordance with any other provision of this Agreement);

(c)    by the Buyers, if:

(i)    the Buyers are not in material breach of this Agreement and the Sellers breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement or any Ancillary Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 7.3, (B) cannot be or has not been cured within fifteen (15) days following delivery of written notice of such breach or failure to perform and (C) has not been waived by the Buyer;

(ii)    the Bankruptcy Case is not filed by Sellers within five (5) Business Days of the execution hereof;

(iii)    the Sale Hearing is not held on or before June 19, 2015, or if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)    the Bankruptcy Court has not entered the Sale Procedures Order on or before April 10, 2015, unless otherwise extended by agreement of the Parties;

(v)    the Auction is not held on or before June 15, 2015;

(vi)    the Closing shall not have occurred by the date that is one hundred eighty (180) days after the date hereof; <u>provided</u>, that the right to terminate this Agreement under

this Section 8.1(c)(vi) shall not be available to the Buyers if they shall have been the cause of the failure of the Closing to occur on or prior to such date;

    (vii) the Bankruptcy Court has not entered the Sale Order on or before June 19, 2015, or if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

    (viii) if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

    (ix) Sellers withdraw or seek authority to withdraw the Sale Motion;

    (x) a "Termination Date" (as defined in the DIP Credit Agreement) occurs and within five (5) Business Days thereof, (A) the Sellers have not obtained replacement financing and/or (B) the Bankruptcy Court has not (1) authorized the Sellers to use cash collateral in an amount sufficient to fund the Sellers through the Closing and (2) enjoined the Agent and the Lenders (each as defined under the DIP ABL Credit Agreement) from exercising remedies under the DIP ABL Credit Agreement;

    (xi) a Material Adverse Effect has occurred;

    (xii) notices of assumption of the Transferred Contracts, including designation of Cure Claims, are not served on all material parties by the twenty-eighth (28th) Business Day following the Sale Procedures Hearing;

    (xiii) (A) the Buyers have provided the Sellers with written notice that they are prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing set forth in Section 7.1 and Section 7.2 have been satisfied (or waived by the Sellers), other than those conditions that by their nature can only be satisfied at the Closing, and (C) the Closing Date does not occur within ten (10) Business Days of the Buyers providing the Sellers with such notice;

    (xiv) the Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any other party; or

    (xv) for any reason (including, without limitation, an order of the Bankruptcy Court), the Buyers are unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the Liabilities under the Term Loan Facilities in satisfaction of all or any portion of the Purchase Price (other than the Cash Component) as set forth in Section 2.7;

    (d) by Seller Parent, if:

    (i) Sellers are not in material breach of this Agreement and the Buyers breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement or any Ancillary Agreement and such breach or failure to perform (A) has rendered the satisfaction of any condition set forth in Section 7.3 impossible and (B)

Buyers has failed to cure such breach within fifteen (15) days following receipt of notification thereof by Seller;

(ii)    the Closing shall not have occurred by the date that is three hundred sixty-five (365) days after the date hereof; provided, that the right to terminate this Agreement under this Section 8.1(d)(ii) shall not be available to Seller Parent if any Seller shall have been the cause of the failure of the Closing to occur on or prior to such date; or

(iii)    (A) the Sellers have provided the Buyers with written notice that they are prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing set forth in Section 7.1 and Section 7.3 have been satisfied (or waived by the Buyer), other than those conditions that by their nature can only be satisfied at the Closing, and (C) the Closing Date does not occur within ten (10) Business Days of the Sellers providing the Buyers with such notice.

The Party seeking to terminate this Agreement pursuant to this Section 8.1 (other than Section 8.1(a)) shall, if such Party is Seller Parent, give prompt written notice of such termination to the Buyer, and if such Party is a Buyer, give prompt written notice of such termination to the Sellers.

Section 8.2    Effect of Termination.

(a)    In the event of termination of this Agreement as provided in Section 8.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Section 3.20 and Section 4.5 relating to broker's fees and finder's fees, Section 5.8 relating to public announcements, Section 9.2 relating to fees and expenses, Section 9.6 relating to notices, Section 9.9 relating to third-party beneficiaries, Section 9.10 relating to governing law, Section 9.11 relating to submission to jurisdiction and this Article VIII and (ii) that nothing herein shall relieve any Party from liability for any willful and material breach of this Agreement or any agreement made as of the date hereof or subsequent thereto pursuant to this Agreement.

(b)    In the event of termination of this Agreement as provided in Section 8.1(d)(i) or (iii), the Minimum Deposit shall be retained by the Sellers for their own account. Notwithstanding anything to the contrary contained in this Agreement, if any Buyer shall default under or breach any of its obligations in this Agreement, the Minimum Deposit shall constitute Sellers' full and complete liquidated damages; provided that the Sellers specifically reserve the right to seek specific performance against the Buyers in respect of any claim against the Buyers arising under this Agreement pursuant to Section 9.15.  The Sellers shall be entitled to pursue both a grant of specific performance and the Minimum Deposit as liquidated damages hereunder; provided, further, that the Sellers shall not be entitled to both specific performance and the Minimum Deposit and in the event that the Buyers are compelled to, and in fact, consummate the transaction pursuant to Section 9.15, the Minimum Deposit shall not be paid over to the Sellers as damages and instead shall be applied in respect of the Purchase Price as provided in Section 2.8.

(c)    If the Buyers are not the Successful Bidder or the Back-Up Bidder at the Auction, the Sellers shall promptly (but in any event within two (2) Business Days of such

termination) cause the Escrow Agent to return to Buyers the Minimum Deposit by wire transfer of immediately available funds, and the return thereof shall, except as specified in Section 8.2(d) or Section 8.3, constitute the sole and exclusive remedy of Buyers in the event of such a termination hereunder.

(d)    If, following entry of the Sale Procedures Order, this Agreement is terminated in the circumstances set forth in Section 8.3(a) or Section 8.3(b), then the Sellers, jointly and severally, shall pay to Buyers the Break-Up Fee and/or the Expense Reimbursement Amount, as applicable, subject to and in accordance with Section 8.3(a) and Section 8.3(b), and Buyers' right to enforce payment thereof shall survive the termination of this Agreement.

Section 8.3    Break-Up Fee; Expense Reimbursement Amount.

(a)    If this Agreement is terminated following entry of the Sale Procedures Order pursuant to Section 8.1(b)(ii), then the Sellers, jointly and severally, shall pay in cash to the Buyers, subject to the consummation of the Alternative Transaction upon the closing of such Alternative Transaction, a break-up fee of 2.0% of the Purchase Price (the "Break-Up Fee") by wire transfer of immediately available funds to the account specified by the Buyers to the Sellers in writing.

(b)    If this Agreement is terminated in accordance with the terms set forth in Section 8.1 (other than any termination pursuant to Section 8.1(a), Section 8.1(b)(i) or Section 8.1(d)), then the Sellers, jointly and severally, shall pay to the Buyers in cash not later than (i) in the case of a termination pursuant to Section 8.1(b)(ii), the closing of an Alternative Transaction and (ii) two (2) Business Days following receipt of documentation supporting the request for reimbursement of out-of-pocket costs, fees and expenses, an amount equal to the reasonable out-of-pocket costs, fees and expenses incurred by the Buyers and its Affiliates (including fees and expenses of legal, accounting and financial advisors) in connection with the development, execution, delivery and approval by the Bankruptcy Court of this Agreement and the transactions contemplated hereby in an amount not to exceed 1.5% of the Purchase Price (the "Expense Reimbursement Amount"), in each case by wire transfer of immediately available funds to an account specified by the Buyers to the Sellers in writing.  The Sellers' obligation to pay the Expense Reimbursement Amount pursuant to the terms of this Section 8.3(b) shall be subordinate to the obligations under the DIP Credit Agreement and DIP ABL Credit Agreement and to the "Carve-Out" (as defined therein).

(c)    The obligations of the Sellers to pay the Break-Up Fee and the Expense Reimbursement Amount as provided herein shall be entitled to superpriority administrative expense status pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general administrative expense claims and superpriority administrative expense claims granted such status pursuant to Sections 503(b)(1) and 507(a)(2) other than superpriority administrative expense claims granted in favor of the DIP Credit Parties, in the Bankruptcy Case.

(d)    The Sellers agree and acknowledge that the Buyer's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other

resources by the Buyers and their Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to the Sellers and, in the Sellers' reasonable business judgment, is necessary for the preservation of the value of the Sellers' estate.  The Sellers further agree and acknowledge that the Break-Up Fee and Expense Reimbursement Amount are reasonable in relation to Buyers' efforts, Buyers' lost opportunities from pursuing this transaction, and the magnitude of the transactions contemplated hereby.  The provision of the Break-Up Fee and the Expense Reimbursement Amount is an integral part of this Agreement, without which the Buyers would not have entered into this Agreement.  The Sellers' obligation to pay the Break-Up Fee and Expense Reimbursement Amount shall be joint and several among the Sellers.

## ARTICLE IX
## GENERAL PROVISIONS

Section 9.1    Nonsurvival of Representations, Warranties and Covenants. The respective representations, warranties and covenants of the Sellers and the Buyers contained in this Agreement and the Ancillary Agreements and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing or Termination Date; provided, that this Section 9.1 shall not limit any covenant or agreement of the Parties that by its terms requires performance after the Closing.

Section 9.2    Fees and Expenses.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  In the event of termination of this Agreement, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by the other.  The Buyers shall pay the cost of all filing fees with respect to any consents from any Governmental Authority, including with any Antitrust Authority or in regard to any Antitrust Law, payable upon or in connection with, and all surveys, title insurance policies and title reports obtained in connection with, this Agreement and the transactions contemplated hereby.

Section 9.3    Transition of Permits.  To the extent that the Buyers have not, using reasonable best efforts obtained all of the Permits that are necessary for the Buyers to take title to all of the Transferred Assets at the Closing and thereafter operate all aspects of the Business at the Closing, Sellers shall, to the extent permitted by applicable Laws, use reasonable best efforts (which efforts shall be subject to any winding-down of operations and related capabilities of the Sellers post-Closing) to maintain after the Closing such Permits that the Buyers reasonably request, at the Buyers' sole expense, until the Buyers have obtained such Permits.  The Buyers shall indemnify the Sellers for and hold the Sellers harmless against any claim, expense, or liability incurred without bad faith or willful misconduct on the part of the Sellers in connection with the Buyers' use of such Permits.

Section 9.4    Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.5    Waiver.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 9.6    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via e-mail transmission to the e-mail address(es) given below during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i)    if to the Sellers, to:

The Standard Register Company
600 Albany Street
Dayton, Ohio 45417
Attention:  General Counsel
E-mail:  Gerald.Sowar@standardregister.com

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention:  Barbara L. Becker
Facsimile: (212) 351-6202
E-mail:  bbecker@gibsondunn.com

(ii)    if to the Buyer, to:

Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830
Attention:  General Counsel
Facsimile: (203) 542-4524
E-mail:  creditadmin@silverpointcapital.com
Email:  adinello@silverpointcapital.com
Email:  tmontague@silverpointcapital.com
Email: ops-spintralinks@silverpointcapital.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention:  Kimberly A. deBeers
Attention: Ron E. Meisler
Facsimile: (312) 407-8576
E-mail: kimberly.debeers@skadden.com
E-mail: ron.meisler@skadden.com

Section 9.7    Interpretation.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  References to days mean calendar days unless otherwise specified.

Section 9.8    Entire Agreement.  This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any

document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.  Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party to this Agreement shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

            Section 9.9   <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including employees of the Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

            Section 9.10   <u>Governing Law</u>.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York; <u>provided</u>, <u>however</u>, to the extent required by the law of Mexico or any state thereof, or Canada, certain Ancillary Agreements shall be governed by the law of Mexico, or an applicable state thereof, or Canada.

            Section 9.11   <u>Submission to Jurisdiction</u>.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Case is closed, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in a Delaware state court or a federal court sitting in Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the

venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 9.12 <u>Disclosure Generally</u>. Notwithstanding anything to the contrary contained in the Disclosure Schedules or in this Agreement, the information and disclosures contained in any Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other Disclosure Schedule as though fully set forth in such Disclosure Schedule for which applicability of such information and disclosure is reasonably apparent on its face. The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation or to mean that such information is required to be disclosed by this Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement.

Section 9.13 <u>Personal Liability</u>. This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect stockholder of the Sellers or the Buyers or any officer, director, employee, Representative or investor of any Party hereto.

Section 9.14 <u>Assignment; Successors</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of the Buyers, and by the Buyers without the prior written consent of Seller Parent, and any such assignment without such prior written consent shall be null and void; <u>provided</u>, <u>however</u>, that no assignment shall limit the assignor's obligations hereunder. Notwithstanding the foregoing, Buyers may, assign any of their rights and/or obligations under this Agreement to any of their Affiliates, subject to Buyers providing evidence reasonably satisfactory to Seller Parent that any such assignee has the ability to fully discharge perform and discharge the obligations of the assignor hereunder. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 9.15 <u>Enforcement</u>. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement; <u>provided</u>, that the Sellers shall not be entitled to both specific performance and the Minimum Deposit and in the event that the Buyers are compelled to, and in fact, consummate the transaction pursuant to this Section 9.15, the Minimum Deposit shall not be paid over to the Sellers as damages and instead shall be applied in respect of the Purchase Price as provided in Section 2.8. Each of the Parties hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

Section 9.16    <u>Currency</u>.  All references to "dollars" or "$" or "US$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 9.17    <u>Severability</u>.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.18    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.19    <u>Counterparts</u>.  Notwithstanding anything else herein to the contrary, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

Section 9.20    <u>Facsimile or .pdf Signature</u>.  This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

Section 9.21    <u>Time of Essence</u>.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement. When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Section 9.22    <u>No Punitive Damages</u>.  The Parties hereto expressly acknowledge and agree that no Party hereto shall have any liability under any provision of this Agreement for any punitive damages relating to the breach or alleged breach of this Agreement.

Section 9.23    <u>No Presumption Against Drafting Party</u>.  Each of the Buyers and the Sellers acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the Sellers and the Buyers have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**THE STANDARD REGISTER COMPANY**

By: _____
    Name: Joseph P. Morgan, Jr.
    Title: President

**STANDARD REGISTER INTERNATIONAL, INC.**

By: _____
    Name: Joseph P. Morgan, Jr.
    Title: President

**STANDARD REGISTER TECHNOLOGIES, INC.**

By: _____
    Name: Joseph P. Morgan, Jr.
    Title: President

**STANDARD REGISTER HOLDING COMPANY**

By: _____
    Name: Joseph P. Morgan, Jr.
    Title: President

**STANDARD REGISTER
TECHNOLOGIES CANADA ULC**

By: _____
      Name: Joseph P. Morgan, Jr.
      Title: President

**STANDARD REGISTER MEXICO
HOLDING COMPANY**

By: _____
      Name: Joseph P. Morgan, Jr.
      Title: President

**STANDARD REGISTER HOLDING, S.
DE R.L. DE C.V.**

By: _____
      Name: Joseph P. Morgan, Jr.
      Title: Sole Manager

**STANDARD REGISTER SERVICIOS, S.
DE R.L. DE C.V.**

By: _____
      Name: Joseph P. Morgan, Jr.
      Title: Sole Manager

**STANDARD REGISTER DE MEXICO, S.
DE R.L. DE C.V.**

By: _____
      Name: Joseph P. Morgan, Jr.
      Title: Sole Manager

**IMEDCONSENT, LLC**

By: _____

    Name: Joseph P. Morgan, Jr.
    Title: President

**STANDARD REGISTER OF PUERTO RICO INC.**

By: _____

    Name: Joseph P. Morgan, Jr.
    Title: President

STANDARD ACQUISITION HOLDINGS, LLC

By:_____

      Name:
      Title:      Frederick H. Fogel
                  Authorized Signatory

Exhibit 1

## FORM OF JOINDER

This FORM OF JOINDER dated as of [●], 2015 (this "Joinder") is to the Asset Purchase Agreement dated as of March 12, 2015 (the "Purchase Agreement"), by and among The Standard Register Company, an Ohio corporation ("Seller Parent"), Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, Standard Register of Puerto Rico Inc., a Delaware corporation, Standard Register Holding, S. de R.L. de C.V., a Mexican limited company, Standard Register Servicios S. de R.L. de C.V., a Mexican limited company, Standard Register de Mexico, S. de R.L. de C.V., a Mexican limited company, and Standard Register Technologies Canada ULC, a Nova Scotia unlimited liability company (Seller Parent together with the foregoing entities, each a "Seller" and collectively, the "Sellers") and Standard Acquisition Holdings, LLC, a Delaware Limited Liability Company (the "US Buyer").

WHEREAS, pursuant to Section 5.16 of the Purchase Agreement, US Buyer, or one or more Affiliates of US Buyer, caused the formation of [**MEXICO BUYER**] ("Mexico Buyer"), a [____], and is required to cause Mexico Buyer to become party to the Purchase Agreement through the execution of this Joinder.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and of other good and valuable consideration the sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.1.  Definitions.  Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Purchase Agreement.

Section 1.2.  Joinder.  In accordance with the terms of the Purchase Agreement, Mexico Buyer irrevocably agrees to join and become a party to the Purchase Agreement and be bound by and comply with the terms and provisions of the Purchase Agreement applicable to it, in each case with the same force and effect as if it had originally been a party thereto.

Section 1.3.  Full Force of Purchase Agreement.  Except as expressly supplemented hereby, the Purchase Agreement shall remain in full force and effect in accordance with its terms.

Section 1.4.  Governing Law.  This Joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

Exhibit 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. ___ |

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] dated March 12, 2015 of the above-captioned debtors and debtors-in-possession (the "Debtors") for, among other things, entry of an order (the "Order") (i) approving the sale of substantially all of the Debtors' assets (the "Sale Transaction") free and clear of all claims,[3] liabilities, interests, encumbrances, liens, financing statements, mortgages, mechanics' liens, lis pendens, and all other documents or agreements evidencing interests in and/or claims against such assets (collectively, the "Encumbrances"), except to the extent set forth in the Asset Purchase Agreement (the "Stalking

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Stalking Horse APA (as defined herein), as applicable.

[3] For purposes of this Order, the term "claim" shall have the meaning ascribed to such term in Bankruptcy Code section 101(5).

01:16789821.5

911963.05-CHISR01A - MSW

Horse APA") pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11

U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 6004, and 6006 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases (the "Transferred

Contracts") identified by the Debtors and more fully described in the Asset Purchase Agreement

dated as of March 12, 2015 (as amended from time to time and attached hereto as Exhibit A) by

and between the Debtors (collectively, the "Sellers"), on the one hand, and Standard Acquisition

Holdings, LLC ("US Buyer") and/or their designees,[4] on the other hand, for the purchase of the

Transferred Assets[5] and the assumption of the Assumed Liabilities (as defined in the Stalking

Horse APA), and (iii) granting certain related relief; and the Court having held a hearing on [•],

2015 (the "Sale Hearing") to approve the Sale Transaction; and the Court having reviewed and

considered (a) the Motion, (b) the declarations filed by the Debtors in support of the Motion,

(c) the objections to the Motion, (d) all responses to any objections and replies in further support

of the Motion, and (e) the arguments of counsel made, and the evidence proffered or adduced, at

the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of

the Debtors, their estates and creditors, and other parties in interest; and upon the record of the

Sale Hearing and the Chapter 11 Cases; and after due deliberation thereon; and good cause

appearing therefore, it is hereby

---

[4]   Following the Auction, if the US Buyer is the Successful Bidder, the US Buyer will form, or procure that its
      affiliates or owners form, (a) one or more entities established under the laws of Mexico (each a "Mexico Buyer"
      and, collectively, the "Mexico Buyers") and (b) certain designees, including, Designated Buyers, all of which
      shall become parties to the Stalking Horse APA.  The US Buyers, the Mexico Buyers, and their designees,
      including without limitation, any Designated Buyers, are collectively referred to herein as the "Buyers".

[5]   The Transferred Assets consist of substantially all of the assets of the Sellers other than the Excluded Assets
      referenced in section 2.2 of the Stalking Horse APA.

911963.05-CHISR01A - MSW

**FOUND AND DETERMINED THAT**:[6]

A.      **Jurisdiction and Venue**.  The court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

C.      **Petition Date**.  On March 12, 2015 (the "Petition Date"), The Standard Register Company and 10 of its subsidiaries each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

D.      **Entry of Sale Procedures Order**.  On [•], 2015, this Court entered an order (the "Sale Procedures Order") (A) approving bidding and auction procedures (the "Sale Procedures"), (B) approving break-up fee and expense reimbursement provisions, (C) authorizing the Assumption and Assignment Procedures, including notice of proposed cure amounts (the "Cure Amounts"), (D) approving the form and manner of notice of all procedures, protections, schedules, and agreements, and (E) scheduling the Sale Hearing.

---

[6]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

01:16789821.5
911963.05-CHISR01A - MSW

E.     **Compliance with Sale Procedures Order**.  As demonstrated by (i) the First Day Declaration [Docket No. [•]], (ii) the *Declaration of Andrew Torgove in Support of the Sale Motion*, filed on March 12, 2015 [Docket No. [•]], (iii) the testimony and other evidence proffered or adduced at the Sale Hearing, and (iv) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Transferred Assets and conducted the sale process in compliance with the Sale Procedures Order, and the Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner.  The Debtors and their professionals have actively marketed the Transferred Assets and conducted the sale process in compliance with the Sale Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.  The Buyers, the Prepetition Term Loan Lenders, and the Prepetition Term Loan Agents (as defined below) acted in compliance with the terms of the Sale Procedures.  In accordance with the Sale Procedures, the Debtors determined that the bid submitted by the Buyers and memorialized by the Stalking Horse APA is the Successful Bid (as defined in the Sale Procedures).

F.     **Notice**.  As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures (including the objection deadline with respect to any Cure Amount) and the assumption and assignment of the Transferred Contracts and the Cure Amounts has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 and in compliance with the Sale Procedures Order, (ii) such notice was good, sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale

Transaction, or the assumption and assignment of the Transferred Contracts or the Cure Amounts is or shall be required.  With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined in the Motion) in [•] on [•], 2015, was sufficient and reasonably calculated under the circumstances to reach such entities.

G.  **Corporate Authority**.  Each Debtor (i) has full corporate power and authority to execute the Stalking Horse APA and all other documents contemplated thereby, and the Sale of the Transferred Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Stalking Horse APA, (iii) has taken all corporate action and formalities necessary to authorize and approve the Stalking Horse APA and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, as required by their respective organizational documents, and (iv) no governmental, regulatory or other consents or approvals, other than those expressly provided for in the Stalking Horse APA, are required for the Debtors to enter into the Stalking Horse APA and consummate the Sale Transaction.

H.  **Opportunity to Object**.  A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including:  (i) the Office of the United States Trustee; (ii) counsel for the Buyers; (iii) counsel for the official committee of unsecured creditors appointed in these chapter 11 cases; (iv) upon entry of this Order, all entities known to have expressed an interest in a transaction with respect to the Transferred Assets during the past six months; (v) all entities known to have asserted any Encumbrances on the Transferred Assets; (vi) all federal, state, local, and foreign regulatory or taxing authorities or recording offices that have a reasonably known

911963.05-CHISR01A - MSW

interest in the relief requested by the Motion; (vii) all parties to the Transferred Contracts; (viii) the United States Attorney's office; (ix) the Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) the Prepetition Lenders; and (xii) all entities filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these Chapter 11 Cases.

I.      **Sale in Best Interest**.  Consummation of the sale of the Transferred Assets at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

J.      **Business Justification**.  Sound business reasons exist for the Sale Transaction.  Entry into the Stalking Horse APA, and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Transferred Contracts, constitutes each Debtor's exercise of sound business judgment and such acts are in the best interests of each Debtor, its estate, and all parties in interest.  The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale Transaction.  Such business reasons include, but are not limited to, the following:  (i) the Sale Transaction is the only viable alternative to liquidation; (ii) the Stalking Horse APA constitutes the highest and best offer for the Transferred Assets; (iii) the Stalking Horse APA and the closing thereon will present the best opportunity to realize the value of the Transferred Assets on a going concern basis and avoid decline and devaluation of the Transferred Assets; (iv) unless the Sale Transaction and all of the other transactions contemplated by the Stalking Horse APA are concluded expeditiously, as provided for in the Motion and pursuant to the Stalking Horse APA, recoveries to creditors may be diminished; and (v) any plan likely would not have yielded as favorable an economic result.

K.      The terms and conditions of the Stalking Horse APA, including, without

limitation, the consideration to be realized by the Debtors, are fair and reasonable.  Approval of

the Motion, the Stalking Horse APA, and the transactions contemplated thereby, including,

without limitation, the Sale Transaction and the assumption and assignment of the Transferred

Contracts, is in the best interests of the Debtors, their estates and creditors, and all other parties

in interest.

L.      **Arms-Length Sale**.  The Stalking Horse APA was negotiated, proposed,

and entered into by the Debtors and the Buyers without collusion, in good faith, and from arm's-

length bargaining positions.  Neither the Debtors nor the Buyers have engaged in any conduct

that would cause or permit the Stalking Horse APA to be avoided under section 363(n) of the

Bankruptcy Code.  Specifically, the Buyers have not acted in a collusive manner with any person

and the purchase price was not controlled by any agreement among bidders.  The Buyers are not

"Insiders" of the Debtors as defined in Bankruptcy Code section 101(31).

M.      **Good Faith Purchaser**.  The Buyers are good faith purchasers for value

and, as such, are entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any

other applicable or similar bankruptcy and non-bankruptcy law.  Specifically:  (i) the Buyers

recognized that the Debtors were free to deal with any other party interested in purchasing the

Transferred Assets; (ii) the Buyers complied in all respects with the provisions in the Sale

Procedures Order; (iii) the Buyers agreed to subject their bid to the competitive bid procedures

set forth in the Sale Procedures Order; (iv) all payments to be made by the Buyers in connection

with the Sale Transaction have been disclosed; (v) no common identity of directors, or officers

exists among the Buyers and the Debtors; (vi) the negotiation and execution of the Stalking

Horse APA was at arm's-length and in good faith, and at all times each of the Buyers and the

Debtors were represented by competent counsel of their choosing; (vii) the Buyers did not in any way induce or cause the chapter 11 filing of the Debtors; and (viii) the Buyers have not acted in a collusive manner with any person.  The Buyers will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Stalking Horse APA.

N.     **DIP Facilities**.  On [•], the Court entered a "Final Order (I) Authorizing Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; and (IV) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363" [Docket No. [•]] (the "DIP Order") approving, on a final basis, the Debtors' entry into (i) that certain Post Petition Loan and Security Agreement dated as of March 12, 2015 by and among the Debtors, the lenders party thereto and Bank of America, N.A., as administrative agent and (ii) that certain Super-Priority Priming Debtor in Possession Term Loan Credit Agreement dated as of March 12, 2015 among The Standard Register Company, as the borrower, the subsidiary guarantors from time to time parties thereto, various financial institution and other persons from time to time party thereto, as lenders, and Silver Point Finance, LLC, as administrative agent and collateral agent (collectively, the "DIP Credit Agreements").

O.     **Prepetition Term Loan Lenders' Secured Claims.**  As of the Petition Date, the Debtors owed the following amounts under its prepetition term loan credit agreements:

(i)     Approximately $113,594,130.19 in principal, plus accrued interest, pursuant to that certain First Lien Credit Agreement (the "Prepetition First Lien Credit Agreement") dated as of August 1, 2013 among The Standard Register Company, as borrower, the

911963.05-CHISR01A - MSW

other Debtors, as guarantors, various financial institutions and other persons from time to time party thereto, as lenders (the "Prepetition First Lien Lenders"), and Silver Point Finance, LLC, as administrative agent (in its capacity as such, the "Prepetition First Lien Agent"); and

(ii)    Approximately $96,719,023.07 in principal, plus accrued interest, pursuant to that certain Second Lien Credit Agreement (the "Prepetition Second Lien Credit Agreement" and, together with the Prepetition First Lien Credit Agreement, the "Prepetition Credit Agreements") dated as of August 1, 2013 among The Standard Register Company, as borrower, the other Debtors, as guarantors, various financial institutions and other persons from time to time party thereto, as lenders (the "Prepetition Second Lien Lenders" and, together with the Prepetition First Lien Lenders, the "Prepetition Term Loan Lenders"), and Silver Point Finance, LLC, as administrative agent (in its capacity as such, the "Prepetition Second Lien Agent" and, together with the Prepetition First Lien Agent, the "Prepetition Term Loan Agents").

The Debtors are also parties to that certain Amended and Restated Loan and Security Agreement dated as of August 1, 2013 (the "ABL Credit Agreement") among the Debtors, as borrowers, the financial institutions party thereto from time to time, as lenders (the "ABL Lenders"), and Bank of America, N.A., as administrative agent, lead arranger, and bookrunner (the "ABL Agent"). The relative rights and priorities of the Prepetition Term Loan Lenders, on the one hand, and the ABL Lenders, on the other, set forth in that certain Intercreditor Agreement dated as of August 1, 2013 (the "ABL Term Intercreditor") among the Debtors, the ABL Agent, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent.

P.    The Prepetition First Lien Lenders hold an allowed secured claim in the aggregate amount of not less than $113,594,130.19, which claim is not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, plus such additional amounts to the extent allowed under the DIP Order (the "Allowed First Lien Claim"), and pursuant to the Sale Procedures and the DIP Order

were authorized to credit bid any or all of such Allowed First Lien Claim at the Auction.  The

Prepetition Second Lien Lenders hold an allowed secured claim in the aggregate amount of not

less than $96,719,023.07, plus accrued interest (the "Allowed Second Lien Claim"), which claim

is not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the

Bankruptcy Code or applicable non-bankruptcy law, and pursuant to the Sale Procedures and the

DIP Order were authorized to credit bid any or all of such Allowed Second Lien Claim at the

Auction

        Q.     **Credit Bid**.  Pursuant to their agreement under the Stalking Horse APA

and Bankruptcy Code sections 363(b) and 363(k), the Buyers, in addition to the other

consideration offered under the Stalking Horse APA, credit bid $113,594,130.19 million in

principal of the Allowed First Lien Claim (the "Credit Bid").  With respect to the Credit Bid, the

Court finds and determines that:

(i)     The Prepetition First Lien Credit Agreement and other "Loan Documents" (as defined therein) authorize the Prepetition First Lien Agent's submission of the Credit Bid on behalf of the Prepetition First Lien Lenders;

(ii)    The "Required Lenders" (as defined in the Prepetition First Lien Credit Agreement"), validly and properly directed the Prepetition First Lien Agent, or a sub-agent of the Prepetition First Lien Agent, to submit the Credit Bid;

(iii)   The Credit Bid was a valid and proper offer pursuant to the Sale Procedures Order;

(iv)   There is no cause to limit the amount of the Credit Bid pursuant to section 363(k) of the Bankruptcy Code;

(v)    The Debtors valued each dollar of the Credit Bid as equivalent to one dollar of cash, and such valuation represents a reasonable exercise of the Debtors' business judgment; and

(vi)   Subject to the occurrence of the Closing Date, the Credit Bid is binding on the Prepetition First Lien Lenders.

R.    **Free and Clear**.  The Debtors may sell the Transferred Assets free and clear of all obligations and Encumbrances (other than Permitted Encumbrances[7] and the Assumed Liabilities) because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code section 363(f)(l)–(5) has been satisfied.  Those holders of Encumbrances who did not object or withdrew objections to the Sale Transaction are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their interests and/or claims, if any, attach to the cash proceeds of the Sale Transaction ultimately attributable to the property against or in which they assert an interest or Encumbrance with the same priority, validity, force, and effect as they attached to such property immediately before the Closing Date.

S.    The transfer of the Transferred Assets to the Buyers will be a legal, valid, and effective transfer of the Transferred Assets, and in the case of the Transferred Assets, will vest the Buyers with all right, title, and interest to such assets free and clear of any and all Encumbrances, including without limitation, any and all liens, claims, interests, and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to

---

[7]    As used herein, "Permitted Encumbrance" means, as to any Lease, any Encumbrance affecting solely the interest of the landlord thereunder and not the interest of the tenant thereunder, which do not materially impair the value or use of such Lease, and other exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and encumbrances that do not materially interfere with the use or value of the Transferred Assets that are Owned Real Property subject to such encumbrances.

or subsequent to the commencement of the chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or the Buyers' interest in the Transferred Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date or to transaction contemplated by the Stalking Horse APA that occurs on the Closing Date, other than Transfer Taxes that are Assumed Liabilities.

T.    The Buyers would not have entered into the Stalking Horse APA and would not consummate the transactions contemplated hereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Transferred Contracts, (i) if the transfer of the Transferred Assets were not free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (subject only, in the case of the Buyers with respect to the Transferred Assets, to the Permitted Encumbrances and the Assumed Liabilities), including, without limitation, rights or claims based on any taxes or successor or transferee liability or (ii) if the Buyers would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability (subject only, in the case of the Buyers with respect to the Transferred Assets, to the Permitted Encumbrances, and the Assumed Liabilities).  The Buyers will not consummate the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Transferred Contracts, unless this Court expressly orders that none of the Buyers, their affiliates, their present or contemplated members or shareholders, or the Transferred Assets will have any

liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes, successor or transferee liability.

U.      Not transferring the Transferred Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (subject only, in the case of the Buyers with respect to the Transferred Assets, to the Permitted Encumbrances) including, without limitation, rights or claims based on any taxes, successor, or transferee liability, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Transferred Assets other than pursuant to a transfer that is free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

V.      Without limiting the generality of the foregoing, none of the Buyers, their affiliates, their respective present or contemplated members or shareholders, or the Transferred Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests relating to any federal, state, local, or foreign income tax liabilities, that the Debtors incur in connection with the consummation of the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Transferred Contracts, other than Transfer Taxes that are Assumed Liabilities.

W.      **Assumption of Executory Contracts and Unexpired Leases**.  Without in any way limiting any lease or contract counterparty's rights under section 365 of the Bankruptcy

Code, the (i) transfer of the Transferred Assets to the Buyers and (ii) assignment to the Buyers of the Transferred Contracts, will not subject the Buyers to any liability whatsoever prior to the Closing Date (defined below) or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Transferred Contracts to the Buyers in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Transferred Contracts is the best interests of the Debtors, their estates, and their creditors.  The Transferred Contracts being assigned to the Buyers are an integral part of the Transferred Assets being purchased by the Buyers and, accordingly, such assumption and assignment of Transferred Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

X.     **Cure/Adequate Assurance**.  The Buyers have (i) cured, or have provided adequate assurance of cure upon Closing, of any default existing prior to the date of Closing under any of the Transferred Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts set forth on Schedule [•] hereto, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of Closing under any of the Transferred Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B).  The Buyers have provided or will provide adequate assurance of future performance of and under the Transferred Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C).  Pursuant to 11 U.S.C. § 365(f), the Transferred Contracts to be assumed

and assigned under the Stalking Horse APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyers notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

Y.     **Prompt Consummation**.  The sale of the Transferred Assets must be approved and consummated promptly in order to preserve the value of the Transferred Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Sellers and the Buyers intend to close the Sale Transaction as soon as reasonably practicable.

Z.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transaction contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Transferred Contracts, prior to, and outside of, a chapter 11 plan of reorganization.  Confirmation of a chapter 11 plan is not feasible, and the Debtors' estates will suffer irreparable harm if the relief requested in the Motion is not granted on an expedited basis.  In addition, consummation of the Sale Transaction will prevent the continuing accrual of interest and fees to the Debtors' postpetition lenders.

AA.     **No Fraudulent Transfer**.  The Stalking Horse APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. The Buyers is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates and there is no continuity between the Buyers and the Debtors.  The Sale Transaction does not amount to a consolidation, merger or de facto merger of the Buyers and any of the Debtors.

BB.    The consideration provided by the Buyers for the Transferred Assets pursuant to the Stalking Horse APA (i) is fair and reasonable, (ii) is the highest and best offer for the Transferred Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act, as in effect in any jurisdiction of the United States).

CC.    **Buyers Are Not Insiders and No Successor Liability**.  From the petition date through the date immediately prior to the Closing Date, the Buyers were not "insiders" or "affiliates" of the Debtors, as those terms are defined in the Bankruptcy Code, and there has been no common identity of incorporators or directors existing between the Buyers and the Debtors. The transfer of the Transferred Assets and the assumption of the Assumed Liabilities (including any individual elements of the Sale Transaction) to the Buyers, except as otherwise set forth in the Stalking Horse APA, does not, and will not, subject the Buyers to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, or vicarious liability.  Pursuant to the Stalking Horse APA, the Buyers are not purchasing all of the Debtors' assets in that, among other things, the Buyers are not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyers are not holding themsleves out to the public as a continuation of the Debtors.  The Sale

Transaction does not amount to a consolidation, merger, or de facto merger of the Buyers and the Debtors and/or the Debtors' estates.  There is not substantial continuity between the Buyers and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyers.  The Buyers are not a mere continuation of the Debtors or the Debtors' estates, and the Buyers do not constitute successors to the Debtors or the Debtors' estates.

DD.    **Legal, Valid Transfer**.  The transfer of the Transferred Assets to the Buyers will be a legal, valid, and effective transfer of the Transferred Assets, and will vest the Buyers with all right, title, and interest of the Debtors to the Transferred Assets free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), as set forth in the Stalking Horse APA.  The Transferred Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estate within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Transferred Assets.

EE.    **Stalking Horse APA Not Modified**.  The terms of the Stalking Horse APA, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects and the terms of the Order shall not modify the terms of the Stalking Horse APA.

FF.    **Not a *Sub Rosa* Plan**.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a plan of reorganization or liquidation for the Debtors.

GG.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

It is therefore **ORDERED, ADJUDGED, AND DECREED THAT**:

**GENERAL PROVISIONS**

1.      The Motion is GRANTED and APPROVED, as set forth herein.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**APPROVAL OF THE SALE OF THE TRANSFERRED ASSETS**

3.      The Stalking Horse APA, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved.

4.      Pursuant to 11 U.S.C. § 363(b), the sale of the Transferred Assets to the Buyers free and clear of all obligations and Encumbrances (except Permitted Encumbrances and the Assumed Liabilities), and the transactions contemplated thereby is approved in all respects.

**SALE AND TRANSFER OF TRANSFERRED ASSETS**

5.      Pursuant to 11 U.S.C. § 363(b), the Debtors are hereby authorized and directed to sell the Transferred Assets to the Buyers and consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, the Stalking Horse APA, and to transfer and assign all right, title, and interest (including common law rights) to all property, licenses, and rights to be conveyed to the Buyers in accordance with and subject to the terms and conditions of the Stalking Horse APA, and are further authorized and directed to execute and deliver, and are empowered to perform under, consummate, and implement, the Stalking Horse APA together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse APA, including, without limitation, the related

911963.05-CHISR01A - MSW

documents, exhibits, and schedules, and to take all further actions as may be reasonably requested by the Buyers for the purposes of assigning, transferring, granting, conveying, and conferring to the Buyers or reducing to possession, the Transferred Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Stalking Horse APA.

6.        Pursuant to 11 U.S.C. § 363 (b) and 363(f), the Transferred Assets shall be transferred to the Buyers upon the Closing Date free and clear of all obligations and Encumbrances (except for Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever, including without limitation, rights or claims based on any taxes or successor or transferee liability, including, without limitation, all claims arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising before or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, claims otherwise arising under federal, state, or foreign tax laws or doctrines of successor or transferee liability, with all such Encumbrances to attach to the cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force, and effect which they now have as against the Transferred Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

7.        Following the Closing, the Debtors and/or the Buyers are authorized to execute and file a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, and Encumbrances in the Transferred Assets of any kind or nature whatsoever.  On the Closing Date,

911963.05-CHISR01A - MSW

this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance, and transfer of the Transferred Assets or a bill (or bills) of sale transferring good and marketable title in such Transferred Assets to the Buyers.  On the Closing Date, this Order also shall be construed as, and constitute for any and all purposes, a complete and general assignment of all right, title, and interest of the Debtors and each bankruptcy estate to the Buyers in the Transferred Contracts.  Each and every federal, state, local, and foreign governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA.

8.    All entities who are presently, or on the Closing Date may be, in possession of some or all of the Transferred Assets are hereby directed to surrender possession of the Transferred Assets to the Buyers on the Closing Date.

9.    All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Transferred Assets to the Buyers in accordance with the Stalking Horse APA and this Order; provided, however, that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order, or from enforcing its rights under section 365 of the Bankruptcy Code.

10.    This Order (a) shall be effective as a determination that, upon the Closing of the Sale Transaction, all interests, claims, and Encumbrances of any kind or nature whatsoever existing as to the Debtors or the Transferred Assets prior to the Closing of the Sale Transaction have been unconditionally released, discharged, and terminated (other than any Permitted Encumbrances or Assumed Liabilities), and that the conveyances described herein have been

effected and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local, and foreign officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Transferred Assets.

11.    Except as expressly permitted by the Stalking Horse APA or this Order, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding Encumbrances or other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, against or in a Debtor or the Transferred Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Assets or the operation of the Transferred Assets before the Closing Date, or the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Transferred Contracts, are forever barred, estopped, and permanently enjoined from asserting against the Buyers, their successors and assigns, their respective property and the Transferred Assets, such persons' or entities' Encumbrances or other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability.

12.     On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances on the Transferred Assets, if any, as such Encumbrances may have been recorded or otherwise exist.

13.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Transferred Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Transferred Contracts.

14.     Subject to the terms and conditions of this Order, the transfer of the Transferred Assets to the Buyers pursuant to the Stalking Horse APA constitutes a legal, valid, and effective transfer of the Transferred Assets, and shall vest the Buyers with all right, title, and interest of the Debtors in and to the Transferred Assets free and clear of all Encumbrances of any kind or nature whatsoever (other than Permitted Encumbrances and the Assumed Liabilities).

## NO SUCCESSOR LIABILITY

15.     The Buyers are not "successors" to the Debtors or their estates by reason of any theory of law or equity, and the Buyers shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities, with respect to the Transferred Assets or otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability.  Except to the extent the Buyers assume Assumed Liabilities and the Buyers are ultimately permitted to assume the Transferred Contracts pursuant

01:16789821.5                              22

to the Stalking Horse APA, neither the purchase of the Transferred Assets by the Buyers nor the fact that the Buyers are using any of the Transferred Assets previously operated by the Debtors will cause the Buyers to be deemed successors in any respect to the Debtors' businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine.

16.     The Buyers have given substantial consideration under the Stalking Horse APA, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyers and which shall be deemed to have been given in favor of the Buyers by all holders of Encumbrances (except for Permitted Encumbrances and the Assumed Liabilities) in or against the Debtors or the Transferred Assets. Upon consummation of the Sale Transaction, the Buyers shall not be deemed to (a) be the successor to the Debtors, (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego, or substantial continuation of the Debtors.

17.     Except to the extent the Buyers otherwise specifically agreed in the Stalking Horse APA or this Order, the Buyers shall not have any liability, responsibility, or obligation for any claims, liabilities, or other obligations of the Debtors or their estates, including without limitation, any claims, liabilities, or other obligations related to the Transferred Assets prior to Closing Date. Under no circumstances shall the Buyers be deemed successors of or to the Debtors for any Encumbrances (except for Permitted Encumbrances and the Assumed Liabilities) against, in, or to the Debtors or the Transferred Assets. For the purposes of

paragraphs 15 through 17 of this Order, all references to the Buyers shall include their affiliates, subsidiaries, and shareholders.

**GOOD FAITH**

18.     The transactions contemplated by the Stalking Horse APA are undertaken by the Buyers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale Transaction shall not affect the validity of the sale of the Transferred Assets to the Buyers.  The Buyers are purchasers in good faith of the Transferred Assets and are entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

19.     As good faith purchasers of the Transferred Assets, the Buyers have not entered into an agreement with any other potential bidders at the Auction, and have not colluded with any other bidders, potential bidders, or any other parties interested in the Transferred Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyers, and the Sale Transaction may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

20.     The Buyers, Prepetition First Lien Agent, and the Prepetition First Lien Lenders are released from any liability related to or arising from the submission of the Credit Bid.

**ASSUMPTION AND ASSIGNMENT OF TRANSFERRED CONTRACTS**

21.     Pursuant to 11 U.S.C. § 105(a) and 365, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment to the Buyers,

and the Buyers' assumption on the terms set forth in the Stalking Horse APA, of the Transferred

Contracts is hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f) with

respect thereto are hereby deemed satisfied.

22.     The Debtors are hereby authorized and directed in accordance with

11 U.S.C. § 105(a), 363, and 365 to (a) assume and assign to the Buyers, effective upon the

Closing Date of the Sale Transaction, the Transferred Contracts free and clear of all

Encumbrances of any kind or nature whatsoever (except for Permitted Encumbrances) and

(b) execute and deliver to the Buyers such documents or other instruments as may be necessary

to assign and transfer the Transferred Contracts to the Buyers.

23.     The Transferred Contracts shall be transferred to, and remain in full force

and effect for the benefit of, the Buyers in accordance with their respective terms,

notwithstanding any provision in any such Transferred Contract (including those of the type

described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or

conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be

relieved from any further liability with respect to the Transferred Contracts after such assignment

to and assumption by the Buyers.

24.     Upon the Debtors' assignment of the Transferred Contracts under the

provisions of this Order, no default shall exist under any Transferred Contract and no

counterparty to any such Transferred Contract shall be permitted to declare or enforce a default

by the Debtor or the Buyers thereunder or otherwise take action against the Buyers as a result of

any of the Debtors' financial condition, change in control, bankruptcy, or failure to perform any

of its obligations under the relevant Transferred Contract.  Any provision in an Transferred

Contract that prohibits or conditions the assignment or sublease of such Transferred Contract

(including the granting of a lien therein) or allows the counterparty thereto to terminate,

recapture, impose any penalty, condition on renewal or extension, or modify any term or

condition upon such assignment or sublease, constitutes an unenforceable anti-assignment

provision that is void and of no force and effect only in connection with the assumption and

assignment of such Transferred Contract to the Buyers.  The failure of the Debtors or the Buyers

to enforce at any time one or more terms or conditions of any Transferred Contract shall not be a

waiver of such terms or conditions, or of the Debtors' and the Buyers' rights to enforce every

term and condition of the Transferred Contract.

       25.     All defaults or other obligations of the Debtors under the Transferred

Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration

clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy

Code) shall be cured on the Closing Date or as soon thereafter as reasonably practicable.  Until

the Closing Date, the Debtors shall timely perform all obligations under unexpired leases, in

accordance with section 365(d)(3) of the Bankruptcy Code.

       26.     Each non-Debtor party to a Transferred Contract hereby is forever barred,

estopped, and permanently enjoined from raising or asserting against the Debtors or the Buyers,

or the property of any of them, any assignment fee, default, breach, or claim of pecuniary loss, or

condition to assignment, arising under or related to the Transferred Contracts, existing as of the

date of the Sale Hearing, or arising by reason of the consummation of transactions contemplated

by the Stalking Horse APA, including, without limitation, the Sale Transaction and the

assumption and assignment of the Transferred Contracts.  Any party that may have had the right

to consent to the assignment of a Transferred Contract is deemed to have consented to such

assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if

such party failed to object to the assumption and assignment of such Transferred Contract.

27.    To the extent a counterparty to an Assigned Contract failed to timely

object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any

such counterparty shall be prohibited from challenging, objecting to, or denying the validity and

finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely

revive any Transferred Contract to which it relates.

**ADDITIONAL PROVISIONS**

28.    The consideration provided by the Buyers for the Transferred Assets under

the Stalking Horse APA shall be deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state,

territory, possession, or the District of Columbia.

29.    On the Closing Date, the Debtors and the Buyer are authorized to take

such actions as may be necessary to obtain a release of any and all Encumbrances (other than

Permitted Encumbrances and the Assumed Liabilities) on the Transferred Assets.  This Order (a)

shall be effective as a determination that, on the Closing Date, (i) all Encumbrances of any kind

or nature whatsoever existing as to the Transferred Assets prior to the Closing Date have been

unconditionally released, discharged, and terminated, and that the conveyances described herein

have been effected, and (ii) the right of the Prepetition First Lien Lenders and Prepetition First

Lien Agent to credit bid the Allowed First Lien Claim was assigned to the Buyers, as sub-agent

to the Prepetition First Lien Agent, by the Prepetition First Lien Agent and at the direction of

"Required Lenders" (as defined in the Prepetition First Lien Credit Agreement), and (b) to the

greatest extent permitted by applicable law, shall be binding upon and shall govern the acts of all

01:16789821.5

entities including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, local, and foreign officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Transferred

Assets.  The Buyers and the Debtors shall take such further steps and execute such further

documents, assignments, instruments, and papers as shall be reasonably requested by the other to

implement and effectuate the transactions contemplated in this paragraph.  All interests of record

as of the date of this Order shall be forthwith deemed removed and stricken as against the

Transferred Assets.  All entities described in this paragraph are authorized and specifically

directed to strike all such recorded liens, claims, rights, interests, and encumbrances against the

Transferred Assets (other than any Permitted Encumbrances or Assumed Liabilities) from their

records, official and otherwise.

       30.     If any person or entity that has filed statements or other documents or

agreements evidencing Encumbrances or interests in any of the Transferred Assets (other than

any Permitted Encumbrances or Assumed Liabilities) does not deliver to the Debtors or the

Buyers prior to the Closing Date, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, releases of liens and easements, and

any other documents necessary for the purpose of documenting the release of all Encumbrances

and other interests that the person or entity has or may assert with respect to any of the

Transferred Assets, the Debtors and/or the Buyers are hereby authorized to execute and file such

statements, instruments, releases, and other documents on behalf of such persons or entity with respect to any of the Transferred Assets.

31.    The Debtors will cooperate with the Buyers and the Buyers will cooperate with the Debtors, in each case to ensure that the transaction contemplated in the Stalking Horse APA is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Stalking Horse APA (including, without limitation, adding such specific assets to such documents as may be reasonably requested by the Buyers pursuant to the terms of the Stalking Horse APA).

32.    The Buyers shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Transferred Assets other than the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Stalking Horse APA, the Buyers shall not be liable for any claims against the Debtors or any of their predecessors or affiliates other than the Assumed Liabilities, and the Buyers shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors, the Transferred Assets, or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing Date.

33.    Under no circumstances shall the Buyers be deemed successors to the Debtors for any Encumbrance against or in the Debtors or the Transferred Assets of any kind or nature whatsoever.  The sale, transfer, assignment, and delivery of the Transferred Assets and the

Transferred Contracts shall not be subject to any Encumbrance, and Encumbrances of any kind or nature whatsoever (except the Permitted Encumbrances) shall remain with, and continue to be obligations of, the Debtors.  All persons holding Encumbrances against, on, or in the Debtors or the Transferred Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever (except Permitted Encumbrances) against the Buyers, its officers, directors, shareholders and professionals, their property, their successors and assigns, or the Transferred Assets with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Transferred Assets.  Following the Closing Date, no holder of an Encumbrance in the Debtors shall interfere with the Buyers' title to or use and enjoyment of the Transferred Assets and the Transferred Contracts based on or related to such Encumbrance, or any actions that the Debtors may take in their Chapter 11 Cases.

34.    On the Closing Date, prior to payment or repayment of any other claims, interests, or obligations of the Debtors, other than the "Carve-Out" (as defined in the DIP Credit Agreements) if triggered, all outstanding "Obligations" (as defined in the DIP Credit Agreements) owed by the Debtor under the DIP Credit Agreements will be paid in full and in cash from the proceeds of the Sale Transaction pursuant to the Stalking Horse APA.

35.    Consistent with the terms of the Stalking Horse APA, on and after the Closing Date, the Debtors shall hold the Wind-Down Amount in trust for the benefit of persons entitled to be paid costs covered by the Wind-Down Amount in accordance with the Wind-Down Budget and the following provisions:

(a)     All claims for costs to be paid from the Wind-Down Amount pursuant to the Wind-Down Budget must be submitted to the Debtors and the Buyers or their designees in writing.

(b)     Upon the submission of any such claims for costs to be paid from the Wind-Down Amount, the Buyers or their designees shall have ten (10) days to object in writing to any such claim on the basis that it (i) is not consistent in kind or amount with the Wind-Down Budget or (ii) is not reasonably necessary for the winding-down of the Debtors' estates.

(c)     In the event that an objection is made by the Buyers or their designees and an agreement cannot be reached between the claimant and the Buyers or their designees, the amount of any such payment still in dispute shall be determined, on application by the Buyers (or their designees) or the Debtors, and on notice to the Buyers (or their designees) and any affected beneficiary of the Wind-Down Amount, by order of this Court.  The costs of any such application shall be paid:  (i) in the case of the Debtors, from the Wind-Down Amount; (ii) in the case of the claimant, by the claimant; and (iii) in the case of the Buyers or their designees, by the Buyers (or their designees), unless the Buyers (or their designees) are successful in its complaint, in which case its costs of the application shall be paid from the Wind-Down Amount.

(d)     Once the amount of any such claim has either been agreed to or determined by this Court, as set forth above, the Debtors shall promptly pay such claim from the Wind-Down Amount.

(e)     Subsequent to the Closing Date, the Debtors shall reduce the amount of the Wind-Down Amount as and to the extent that the Debtors may agree, or this Court, on application by the Buyers (or their designees) or otherwise, determines, that it, or portions of it, are no longer required to fund the wind-down costs of the Debtors' estates and by distributing to the Buyers the amount of such reductions.

(f)     All right, title, and interest in and to any amounts in the Wind-Down Amount that are not used to pay costs set forth in the Wind-Down Budget associated with winding-down the Debtors' estates shall vest absolutely in the Buyers as at the Closing Date and shall promptly be distributed to the US Buyer.

36.     The terms and provisions of the Stalking Horse APA and this Order shall

not be subject to rejection and shall be binding in all respects upon, and shall inure to the benefit

of, the Debtors and their respective affiliates, successors, assigns, estates, and creditors; the

Buyers and their respective affiliates, successors, and assigns; and any affected third parties

including, but not limited to, all persons asserting Encumbrances on the Transferred Assets to be

sold to the Buyers pursuant to the Stalking Horse APA, notwithstanding any subsequent

appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s)

such terms and provisions likewise shall be binding.

37.     The failure specifically to include any particular provisions of the Stalking

Horse APA in this Order shall not diminish or impair the effectiveness of such provision, it being

the intent of the Court that the Stalking Horse APA be authorized and approved in its entirety.

38.     The Stalking Horse APA and any related agreements, documents or other

instruments may be modified, amended, or supplemented by the parties thereto, in a writing

signed by both parties, and in accordance with the terms thereof, without further order of the

Court, provided that any such modification, amendment or supplement does not have a material

adverse effect on the Debtors' estates.

39.     Nothing contained in any plan of reorganization or liquidation confirmed

in these Chapter 11 Cases or any order of this Court confirming such plans or in any other order

in these Chapter 11 Cases, including any order entered after any conversion of these Chapter 11

Cases to a case under chapter 7 of the Bankruptcy Code, shall alter, conflict with, or derogate,

the provisions of the Stalking Horse APA or the terms of this Order.  The provisions of this

Order and the Stalking Horse APA and any actions taken pursuant hereto or thereto shall survive

entry of any order which may be entered confirming or consummating any plan of reorganization

of the Debtors, or which may be entered converting these Chapter 11 Cases from chapter 11 to

chapter 7 of the Bankruptcy Code, and the terms and provisions of the Stalking Horse APA as

well as the rights and interests granted pursuant to this Order and the Stalking Horse APA shall

continue in these Chapter 11 Cases or any superseding case and shall be specifically performable

and enforceable against and binding upon the Debtors and their estates and the Buyers and their

respective successors and permitted assigns, including any trustee, responsible officer, or other

fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter

11 of the Bankruptcy Code.

40.     The provisions of this Order are nonseverable and mutually dependent.

41.     To the extent applicable, the automatic stay pursuant to section 362 of the

Bankruptcy Code is hereby lifted, without further order of the court, to the extent necessary (a) to

allow the Buyers to give the Debtors any notice provided for in the Stalking Horse APA, and (b)

to allow the Buyers to take any and all actions permitted by the Stalking Horse APA.

42.     There are no brokers involved in consummating the Sale Transaction and

no brokers' commissions are due.

43.     Compliance with Laws relating to bulk sales and transfers is not necessary

or appropriate under the circumstances.

44.     The Debtors and each other person having duties or responsibilities under

the Stalking Horse APA or this Order, and their respective agents, representatives, and attorneys,

are authorized and empowered to carry out all of the provisions of the Stalking Horse APA, to

issue, execute, deliver, file, and record, as appropriate, the Stalking Horse APA and any related

agreements, and to take any action contemplated by the Stalking Horse APA or this Order, and to

issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments,

releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as

are consistent with, and necessary or appropriate to, implement, effectuate and consummate the

Stalking Horse APA and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Stalking Horse APA and this Order and the transactions contemplated thereby and hereby.

45.     Nothing in the Stalking Horse APA or this Sale Order is intended to limit or in any way impair the indemnification and exculpation rights of the Prepetition First Lien Agent, the Prepetition Second Lien Agent, or the agents under the DIP Credit Agreements.

46.     Notwithstanding the provisions of Bankruptcy Rules 6004 and 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal being foreclosed as moot.

47.     This Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of the Stalking Horse APA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Transferred Assets to the Buyers free and clear of Encumbrances (other than Permitted Encumbrances), or compel the performance of other obligations owed by the Buyers or the Debtors, (b) compel delivery of the purchase price or performance of other obligations owed to

the Debtors, (c) resolve any disputes arising under or related to the Stalking Horse APA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Buyers against (i) claims made related to any of the Excluded Liabilities, (ii) any claims of successor or vicarious liability related to the Transferred Assets or Transferred Contracts, or (iii) any Encumbrances asserted on or in the Debtors or the Transferred Assets, of any kind or nature whatsoever.

48.     To the extent that any provision of the Stalking Horse APA conflicts with or is in any way inconsistent with any provision of this Order, this Order shall govern and control.

Dated: _____, 2015
            Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

<u>Exhibit 3</u>

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. ___** |

**ORDER (I) ESTABLISHING SALE PROCEDURES RELATING TO THE  SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) APPROVING BID
PROTECTIONS; (III) ESTABLISHING PROCEDURES RELATING TO THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS;
(IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES,
PROTECTIONS, SCHEDULES, AND AGREEMENTS; (V)
SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE;
AND (VI) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for an order (the "<u>Order</u>") (i) approving

the proposed auction and bidding procedures (the "<u>Sale Procedures</u>"), which are attached as

<u>Exhibit A</u> hereto, for the potential sale of substantially all of the Debtors' assets (the

"<u>Transferred Assets</u>"); (ii) approving a break-up fee (the "<u>Break-Up Fee</u>") and expense

reimbursement (the "<u>Expense Reimbursement Amount</u>" and, together with the Break-Up Fee,

the "<u>Bid Protections</u>"); (iii) establishing procedures for the assumption and assignment of certain

---

[1]    The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion, the Sale Procedures or the Stalking Horse APA.

executory contracts and unexpired leases, including notice of proposed cure amounts (the

"<u>Assumption and Assignment Procedures</u>"); (iv) approving the form and manner of notice of all

procedures, protections, schedules, and agreements; and (v) scheduling a hearing (the "<u>Sale</u>

<u>Hearing</u>") to approve such sale (the "<u>Sale Transaction</u>"); and the Court having considered the

Motion, and the arguments of counsel made, and the evidence adduced, at the hearing on the

Motion (the "<u>Sale Procedures Hearing</u>"); and it appearing that the relief requested in the Motion

is in the best interests of the Debtors, their estates, their creditors, and all other interested parties;

and upon the record of the Sale Procedures Hearing and the Chapter 11 Cases, and after due

deliberation thereon, and good cause appearing therefore, it is hereby,

### FOUND, CONCLUDED AND DECLARED THAT:[3]

A.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion

in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief

requested in the Motion are Bankruptcy Code sections 105, 363, and 365.  Such relief is also

warranted pursuant to Bankruptcy Rules 2002, 6004 and 6006, and 9014.

B.      The relief granted herein is in the best interests of the Debtors, their estates, and

other parties in interest.

C.      The Debtors have articulated good and sufficient business reasons for the Court to

(i) approve the Sale Procedures, (ii) approve the Bid Protections, (iii) approve the Assumption

and Assignment Procedures, (iv) approve the form and manner of notice of the Motion, the

Auction, and the Sale Hearing, and (v) set the date of the Auction and the Sale Hearing.

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To
the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To
the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D. Due, sufficient, and adequate notice of the Sale Procedures Hearing, the relief requested in the Motion, the relief granted herein, the Sale Procedures, the Assumption and Assignment Procedures, and the Auction has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required.

E. The Sale Procedures, substantially in the form attached hereto, and incorporated herein by reference as if fully set forth herein, are fair, reasonable, and appropriate; were negotiated in good faith by the Debtors and the Stalking Horse Purchaser; and represent the best way to maximize the value of the Debtors' estates.

F. The Debtors have demonstrated a compelling business justification for the payment of the Bid Protections under the circumstances set forth in the Stalking Horse APA. The Break-Up Fee and the Expense Reimbursement Amount, to the extent payable under the Stalking Horse APA, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, (ii) are of substantial benefit to the Debtors' estates, (iii) are reasonable and appropriate, including in light of the size and nature of the Sale Transaction and the efforts that have been and will be expended by the Stalking Horse, (iv) have been negotiated by the parties and their respective advisors at arm's-length and in good faith, and (v) are necessary to ensure that the Stalking Horse will continue to pursue the proposed Sale Transaction. The Bid Protections are a material inducement for, and condition of, the Stalking Horse's entry into, the Stalking Horse APA. The Stalking Horse is unwilling to commit to purchase the Transferred Assets under the terms of the Stalking Agreement unless the Stalking Horse Purchaser is assured payment of the Bid Protections in accordance with the Stalking Horse APA.

G.      The Assumption and Assignment Procedures are reasonable and appropriate.

**IT IS THEREFORE, ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED, as set forth herein.

2.      The Sale Procedures, as attached hereto, are approved and incorporated into this Order by reference, as though fully set forth herein.  Accordingly, the failure to recite or reference any particular provision of the Sale Procedures shall not diminish the effectiveness of such provision, it being the intent of the Court that the Sale Procedures be authorized and approved in their entirety.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Sale Procedures.

**The Bid Deadline**

3.      Except as expressly set forth herein or in the Sale Procedure, for a Bid to be a Qualified Bid, the following parties must receive such Bid in writing **on or before June 1, 2015 at 5:00 p.m. (prevailing Eastern Time)** or such earlier date as may be agreed to by the Debtors (the "Bid Deadline"):  (a) counsel to the Debtors, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  Barbara Becker, bbecker@gibsondunn.com and Robert A. Klyman, rklyman@gibsondunn.com) and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19081 (Attn: Michael R. Nestor, mnestor@ycst.com); (b) Lazard, 600 Fifth Avenue, Suite 800, New York, NY 10020 (Attn: Andrew Torgove, andrew.torgove@lazard.com); (c) counsel to (i) the Prepetition Term Loan Agent and (ii) the Stalking Horse, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Kimberly DeBeers, kimberly.debeers@skadden.com and Ron Meisler, ron.meisler@skadden.com); and (d) counsel to the Committee.

4.     Notwithstanding anything herein to the contrary, (a) the Stalking Horse is deemed a Qualified Bidder for all purposes and (b) the Prepetition Second Lien Lenders (or any assignee(s) or designee(s) thereof) and the Prepetition Term Loan Agent on behalf thereof (the "Second Lien Bidders") are deemed Qualified Bidders to the extent they elect to submit a bid at the Auction as provided in paragraph 25 hereof.  In the event there are no other Qualifying Bids, the Debtors shall accept the bid of the Stalking Horse.

## Notice of the Sale Transaction and the Sale Hearing

5.     Within five (5) days after the entry of this Order, or as soon thereafter as practicable (the "Mailing Date"), the Debtors (or their agents) shall serve the Motion, the Stalking Horse APA, this Order, and the Sale Procedures by first-class mail, postage prepaid upon (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Prepetition Term Loan Agent; (c) counsel to the agents under the ABL Facility; (d) counsel to the agents under the Debtors' debtor-in-possession financing facility; (e) counsel to the Committee; (g) all counterparties to the Transferred Contracts; (g) all entities with recorded claims, liens, interests, or encumbrances against the Debtors' right, title, and interest in the Transferred Assets and any other entities reasonably known to have asserted any such claim, liens, interests, or encumbrances; (h) all entities reasonably known to have expressed a bona fide interest in acquiring the Transferred Assets during the six (6) months preceding the date hereof; (i) the Internal Revenue Service; (k) the Office of the United States Attorney for the District of Delaware; and (j) all sales tax authorities of all states and the District of Columbia and all other taxing authorities or recording offices with a reasonably known interest in the relief requested in this Motion.

01:16789814.2

6.      On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid the Sale Notice upon all other known creditors of the Debtors.  The Debtors shall also post the Sale Notice and this Order on the website of the Debtors' claims and noticing agent, available at

http://cases.primeclerk.com/standardregister.

7.      The Debtors shall publish notice of the proposed Sale Transaction once in (a) the Dayton Business Journal and (b) the national edition of *The New York Times* or *USA Today*, as determined by the Debtors, in their sole discretion, and such local newspapers as the Debtors deem appropriate on the Mailing Date or as soon as practicable thereafter.  Such publication notice shall be sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

8.      Within one (1) day after the Auction or, if there are no Qualified Bids, the Bid Deadline, the Debtors shall file with this Court a notice of the that identifies the Successful Bidder and provides notice that, at the Sale Hearing, the Debtors will seek to assume and assign the Transferred Contracts to the Successful Bidder effective upon the occurrence of the Closing.

9.      The Debtors' proposed notices of (a) this Motion, (b) the proposed Sale Transaction, (c) the assumption and assignment of, and Cure Amounts for, the executory contract and unexpired leases to be assumed and assigned to the Successful Bidder, (d) the Stalking Horse APA, (e) the Successful Bidder, and (f) the Sale Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of each, and no further notice of, or hearing on, each is necessary or required.

01:16789814.2

10.     If no Qualified Bids are received by the Bid Deadline, the Sale Hearing to approve the sale of the Transferred Assets to the Stalking Horse shall be held on [**June 4], 2015 at [_____]. (prevailing Eastern Time).**

11.     If there is an Auction, the Sale Hearing to approve the sale of the Transferred Assets to the Successful Bidder shall be held on [**June 12], 2015 at [_____] p.m. (prevailing Eastern Time).**

12.     Objections, if any, to the sale of the Transferred Assets to the Stalking Horse must be filed and served on counsel for the Debtors by **[May 21], 2015 at 4:00 p.m. (prevailing Eastern Time)**.

13.     Objections, if any, to the selection of the Successful Bidder (if not the Stalking Horse Purchaser) or to the conduct of the Auction must be filed and served on counsel for the Debtors by [**June 10,] 2015 at 4:00 p.m. (prevailing Eastern Time)**.

### The Auction

14.     The Auction shall take place on **June 8, 2015 at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser and its counsel, the Prepetition Term Loan Agent, and the Committee.

15.     Only the Debtors, the Prepetition Term Loan Agent, the Committee, the Stalking Horse, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction (such attendance to be in person).  Notwithstanding the foregoing, creditors may observe, but not participate in, the Auction, provided that they provide the Debtors written notice of their intention to attend the Auction on or before the Bid Deadline.

01:16789814.2

Such written notice must be sent to counsel to the Debtors at rklyman@gibsondunn.com,

mnestor@ycst.com, and to the financial advisor to the Debtors at andrew.torgove@lazard.com.

16.     The Stalking Horse and the other Qualified Bidders will be entitled to

make any Bids at the Auction.  Notwithstanding anything herein to the contrary, if at least one

Qualified Bid (other than a Bid submitted by the Stalking Horse) is submitted by the Bid

Deadline, the Second Lien Bidders may, without having submitted a Qualified Bid by the Bid

Deadline, participate in, and submit a Bid at, the Auction; provided that any Bid submitted by the

Second Lien Bidders at the Auction must include (but need not be limited to) a credit bid of all

or a portion of the obligations under the Prepetition Second Lien Credit Agreement.

17.     The Debtors and their professionals shall direct and preside over the

Auction, and the Auction shall be transcribed.  Each Qualified Bidder participating in the

Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or

sale of any of the assets described herein, (b) has reviewed, understands, and accepts the Sale

Procedures, and (c) has consented to the core jurisdiction of the Bankruptcy Court.

### Assumption and Assignment Procedures

18.     No later than 14 days after entry of this Order, the Debtors shall file with

the Court and serve on each party to a Transferred Contract a Contract Notice that shall (a) state

the cure amounts that the Debtors believe are necessary to assume such Transferred Contracts

pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (b) notify the non-Debtor

party that such party's contract or lease may be assumed and assigned to a purchase of the

Transferred Assets at the conclusion of the Auction; (c) state the date of the Sale Hearing; and

(d) state a deadline by which the non-Debtor party shall file an objection to the Cure Amount or

to the assumption and assignment of the Transferred Contracts.  The presence of a contract,

lease, or agreement on the Contract Notice does not constitute an admission that such contract,

lease, or agreement is an executory contract.  The Debtors reserve all of their rights, claims,

defenses, and causes of action with respect to all contracts, leases, and agreements listed on the

Contract Notice.

19.    Any objection to the Cure Amount or to assumption and assignment,

including with respect to adequate assurance of future performance (a "Contract Objection")

must be filed with the Court and served on (a) the Debtors' counsel (Gibson, Dunn & Crutcher

LLP, 200 Park Avenue, New York, NY 10166 (Attn:  Barbara Becker,

bbecker@gibsondunn.com and Robert A. Klyman, rklyman@gibsondunn.com) and Young

Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19081 (Attn:

Michael R. Nestor, mnestor@ycst.com)), and (b) counsel to (i) Stalking Horse and (ii) the

Prepetition Term Loan Agent (Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker

Drive, Chicago, IL 60606 (Attn: Ron Meisler, ron.meisler@skadden.com and Christopher M.

Dressel, christopher.dressel@skadden.com)), **so as to be received on or before [May 8], 2015**

**at 4:00 p.m. (prevailing Eastern Time)**.  Any Contract Objection must state the basis for such

objection and state with specificity what Cure Amount the party to the Transferred Contract

believes is required (in all cases with appropriate documentation in support thereof).  If no Cure

Objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling

notwithstanding anything to the contrary in any Transferred Contract or other document as of the

date of the Cure Notice.  The Cure Notice shall also provide that Contract Objection to any Cure

Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing,

as determined by the Debtors.  If a Successful Bidder that is not the Stalking Horse Purchaser

prevails at the Auction, then the deadline to object to assumption and assignment (including on

grounds of adequate assurance of future performance) shall be extended to the date of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall not be extended.

20.     Unless a non-Debtor party to any executory contract or unexpired lease, files an objection to the Cure Amount by the applicable objection deadline, then such counterparty shall be (a) forever barred from objecting to the Cure Amount and (b) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the schedule to the Cure Notice, against the Debtors, the Stalking Horse, or any Successful Bidder or any other assignee of the relevant contract.

21.     Unless a non-Debtor party to any Transferred Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse or other Successful Bidder, then such counterparty shall be deemed to have consented to the assumption and assignment to the Stalking Horse or other Successful Bidder and will be forever barred from objecting to such assumption and assignment on account of Cure Amount, lack of adequate assurance, or any other grounds.

**The Stalking Horse APA**

22.     Any obligations of the Debtors set forth in the Stalking Horse APA that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein.

23.     Pursuant to sections 105, 363, 503, and 507 of the Bankruptcy Code, the Debtors are hereby authorized to pay the Break-Up Fee and the Expense Reimbursement Amount pursuant to the terms and conditions set forth in the Stalking Horse APA and the Sale

01:16789814.2

Procedures.  Specifically, the Break-Up Fee and Expense Reimbursement Amount shall be paid

to the Stalking Horse Bidder pursuant to sections 8.2 and 8.3 of the Stalking Horse APA.

24.    Upon entry of this Order, the Break-Up Fee and Expense Reimbursement

Amount (if earned pursuant to the Stalking Horse APA) shall, until paid in full as set forth in the

Stalking Horse APA, be entitled to superpriority administrative expense status pursuant to

sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general

administrative expense claims and superpriority administrative expense claims granted such

status pursuant to sections 503(b)(1) and 507(a)(2), but junior in all respects to the Debtors'

debtor-in-possession credit facilities.  The Debtors' obligation to pay the Break-Up Fee and

Expense Reimbursement Amount pursuant to the terms of the Stalking Horse APA shall survive

termination of the Stalking Horse APA.

## Related Relief

25.    This Order shall constitute findings of fact and conclusions of law and

shall take effect immediately upon execution hereof.

26.    This Order shall be binding on the Debtors, including any chapter 7 or

chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.  Certain provisions

of this Order that relate to bid protections shall inure to the benefit of the Stalking Horse and its

affiliates, successors, and assigns.

27.    Notwithstanding anything in this Order or the Sale Procedures to the

contrary, if at least one Qualified Bid (other than the Stalking Horse Bid) is submitted by the Bid

Deadline, the Second Lien Bidders may, without having submitted a Qualified Bid by the Bid

Deadline, participate in, and submit a bid at, the Auction; provided that any bid submitted by the

01:16789814.2

Second Lien Bidders after the Bid Deadline must include (but need not be limited to) a credit bid of all or a portion of the obligations under the Prepetition Second Lien Credit Agreement.

28.     In the event the Stalking Horse is not the Successful Bidder, the Stalking Horse shall have standing to object to the sale of the Transferred Assets or any portion thereof (including the conduct of the Auction and interpretation of these Sale Procedures) at the Sale Hearing.

29.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

30.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including any matter, claim or dispute arising from or relating to the Expense Reimbursement Amount, the Break-Up Fee, the Stalking Horse APA, and the Sale Procedures.

Dated: _____, 2015
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

01:16789814.2

**SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT**

## SALE PROCEDURES

Set forth below are the sale procedures (the "Sale Procedures") to be employed with respect to the potential sale (the "Sale") of substantially all of the assets (the "Transferred Assets") of The Standard Register Company and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), in jointly administered Case No.15-[_____] (the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the District of Delaware (the "Court"). Pursuant to the Sale Procedures Order (defined below), the Court has approved Standard Acquisition Holdings, LLC, formed by Silver Point Finance, LLC, in its capacity as administrative agent under the Prepetition First Lien Credit Agreement (defined below), as directed by the "Required Lenders" under the Prepetition First Lien Credit Agreement (defined below), as the buyer and stalking horse bidder (the "Stalking Horse"), as the buyer and stalking horse bidder for the Transferred Assets, as set forth more fully in that certain Asset Purchase Agreement among the Stalking Horse and the Debtors, dated as of March 11, 2015 (the "Stalking Horse APA").

On March 11, 2015, the Debtors filed a motion pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") for entry of an order (a) approving and authorizing (i) the Sale Procedures, (ii) certain Bid Protections (defined below) for the Stalking Horse, and (iii) the form and manner of notice of the Sale Hearing (defined below); (b) approving and authorizing (i) the Sale of the Transferred Assets free and clear of all liens, claims, and encumbrances, (ii) the Stalking Horse APA, (iii) the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief (the "Sale Motion").[1]

On _____, 2015, the Court entered an order (the "Sale Procedures Order") approving the Sale Procedures. The Sale Procedures Order set _____, 2015 as the date the Court will conduct the Sale Hearing. At the Sale Hearing, the Debtors will seek entry of an order (the "Sale Order") authorizing and approving the Sale of the Transferred Assets to the Successful Bidder and, if such Successful Bidder fails to consummate the Sale within sixty (60) days after entry of the Sale Order, to the Back-Up Bidder (defined below), without further order of the Court.

The Debtors reserve the right to (a) seek approval of the Sale of the Transferred Assets through a single transaction or through separate transactions in the event that the combination of such Sales is determined by the Debtors, in their discretion, but after consultation with (i) Silver Point Finance, LLC, as administrative agent (the "Prepetition Term Loan Agent") under that certain First Lien Credit Agreement, dated as of August 1, 2013 (the "Prepetition First Lien Credit Agreement" and the lenders thereunder, the "Prepetition First Lien Lenders"), and that

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or, if not defined therein, in the Stalking Horse APA.

certain Second Lien Credit Agreement, dated as of August 1, 2013 (the "Prepetition Second Lien Credit Agreement"),[2] and (ii) the statutorily appointed official committee of unsecured creditors, if one is appointed (the "Committee" and, together with the Prepetition Term Loan Agent, the "Consultation Parties") and (b) waive or modify some of the Sale Procedures to the extent such waiver or modification is in the best interests of the Debtors' estates as determined by the Debtors, in their discretion, but after consultation with the Consultation Parties.

## STALKING HORSE APA

On March 11, 2015, the Debtors entered into the Stalking Horse APA pursuant to which the Stalking Horse proposes to acquire all right, title and interest of the Debtors in, to or under substantially all Transferred Assets (including Intellectual Property) of the Debtors of every kind and description, wherever located, real, personal or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the Business, as the same shall exist on the Closing Date (but, for the avoidance of doubt, excluding any Excluded Assets).

Pursuant to the Stalking Horse APA, the Stalking Horse will provide the Debtors with consideration for the Transferred Assets, as defined in the Stalking Horse APA, for consideration in the aggregate amount of the Purchase Price and the assumption of Assumed Liabilities. The Sale Procedures Order, pursuant to which the Court approved the Sale Procedures, entitles the Stalking Horse to a break-up fee (the "Break-Up Fee") and an expense reimbursement (the "Expense Reimbursement Amount" and, together with the Break-Up Fee, the "Bid Protections") under the terms of the Stalking Horse APA. The Bid Protections are intended to provide an incentive for and to compensate the Stalking Horse for entering into the Stalking Horse APA with knowledge of the risks that arise from its participating in the subsequent bidding process, and absent which the Stalking Horse would not have entered into the Stalking Horse APA. The Bid Protections shall be payable on the terms and conditions set forth in the Stalking Horse APA and the Sale Procedures Order. The transaction contemplated by the Stalking Horse APA is subject to competitive bidding, as set forth herein, and approval by the Court pursuant to sections 363 and 365 of the Bankruptcy Code.

## BID DEADLINE

All offers, solicitations, or proposals (each, a "Bid") must be submitted in writing on or before [June 1], 2015 (the "Bid Deadline"). To properly submit a Bid, a Qualified Bidder (defined below) must deliver written copies of its Bid to the following parties (collectively, the "Notice Parties") by the Bid Deadline: (a) proposed counsel to the Debtors, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn: Barbara Becker, bbecker@gibsondunn.com and Robert A. Klyman, rklyman@gibsondunn.com) and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19081 (Attn: Michael R. Nestor, mnestor@ycst.com); (b) Lazard, 600 Fifth Avenue, Suite 800, New York, NY 10020 (Attn: Andrew Torgove, andrew.torgove@lazard.com); (c) counsel to (i) the

---

[2]  The Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement are collectively referred to herein as the "Prepetition Term Loan Credit Agreements" and the lenders thereunder the "Prepetition Term Loan Lenders."

Prepetition Term Loan Agent and (ii) the Stalking Horse, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Kimberly DeBeers, kimberly.debeers@skadden.com and Ron Meisler, ron.meisler@skadden.com); and (d) counsel to the Committee.  Unless determined otherwise by the Debtors, after consultation with the Consultation Parties, a Bid delivered after the Bid Deadline shall not constitute a Qualified Bid.

Notwithstanding anything herein to the contrary, if at least one Qualified Bid (other than a Bid submitted by the Stalking Horse (such Bid, the "Stalking Horse Bid") is submitted by the Bid Deadline, the Prepetition Second Lien Lenders (or any assignee(s) or designee(s) thereof) and the Prepetition Term Loan Agent on behalf thereof (the "Second Lien Bidders") may, without having submitted a Qualified Bid by the Bid Deadline, participate in, and submit a Bid at, the Auction; provided that any Bid submitted by the Second Lien Bidders at the Auction must include (but need not be limited to) a credit bid of all or a portion of the obligations under the Prepetition Second Lien Credit Agreement.

## PARTICIPANT REQUIREMENTS

To participate in the process detailed herein and to otherwise be considered for any purpose hereunder, each Bid and each bidder (a "Bidder") submitting a Bid must be determined by the Debtors to have satisfactorily provided the Debtors with each of the following (unless such requirement, other than the "Confidentiality Agreement" requirement set forth in clause (c) below, is waived by the Debtors, in their sole discretion) on or before the Bid Deadline (the "Participant Requirements"):

    (a)    Identification of Bidder.  Identification of the Bidder and/or any of the Principals (defined below), corporate officers or other representatives that are authorized to appear for and act on behalf of the Bidder with respect to the contemplated transaction.

    (b)    Corporate Authority.  Written evidence of the Bidder's authority to enter into the contemplated transaction and submit a Bid as well as the Bidder's acknowledgement and acceptance of the terms set forth in the Sale Procedures.  In the event that the Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction (an "Acquisition Entity"), then the Bidder must furnish written evidence, reasonably acceptable to the Debtors, of the approval of the contemplated transaction by the equity holder(s) or members of such Bidder (the "Principals").

    (c)    Confidentiality Agreement.  An executed confidentiality agreement (the "Confidentiality Agreement") in form and substance acceptable to the Debtors and their counsel.

    (d)    Proof of Financial Ability to Perform.  Written evidence, reasonably acceptable to the Debtors, that the Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance of all obligations to be assumed in such contemplated transaction.  Such information may include, among other things, the following:

(i)     the Bidder's or, in the case of an Acquisition Entity, the Principals', current financial statements (audited if they exist);

(ii)    contact names and numbers for verification of financing sources;

(iii)   evidence of the Bidder's or Principals' internal resources and written evidence of a commitment for debt or equity funding that is needed to close the contemplated transaction; and

(iv)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

## DESIGNATION AS QUALIFIED BIDDER

A "Qualified Bidder" is a Bidder that satisfies the Participant Requirements and that the Debtors determine (a) has submitted by the Bid Deadline a Bid that constitutes a bona fide offer that would result in greater value than the value that the Debtors would receive under the Stalking Horse APA and (b) is determined by the Debtors to be able to consummate the Sale as proposed in the Purchase Agreement (defined below) if selected as a Successful Bidder or a Back-Up Bidder.

As soon as practicable after the Debtors receive from a Bidder the information required under paragraphs (a) through (d) above related to Participant Requirements, the Debtors shall determine whether such Bidder is a Qualified Bidder and shall advise such Bidder of their determination.  Notwithstanding anything herein to the contrary, (a) the Stalking Horse is deemed a Qualified Bidder for all purposes and (b) the Prepetition Second Lien Lenders (or any assignee(s) or designee(s) thereof) and the Prepetition Term Loan Agent on behalf thereof are deemed Qualified Bidders to the extent they elect to submit a Bid at the Auction as provided in the section above under the heading "Bid Deadline."

Each Qualified Bidder must, at its sole cost and expense, make all filings required to be made under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") on or before [June 1], 2015.  Unless otherwise agreed to by the Debtors, in consultation with the Consultation Parties, any Qualified Bidder, other than the Stalking Horse and the Second Lien Bidders, that fails to do so shall automatically cease to be a Qualified Bidder as of such date.

## ACCESS TO DUE DILIGENCE MATERIALS

The Debtors have designated Lazard, 600 Fifth Avenue, Suite 800, New York, NY 10020 (Attn:  Andrew Torgove, andrew.torgove@lazard.com) to coordinate all reasonable requests for additional information and due diligence access from (a) Qualified Bidders and (b) potential Bidders who submit to the Debtors (i) an executed confidentiality agreement in form and

substance reasonably satisfactory to the Debtors and (ii) reasonable evidence demonstrating such party's financial capability to consummate the Sale of the Transferred Assets.  In addition, the Debtors reserve the right not to provide due diligence access to any Bidder that the Debtors conclude in their reasonable business judgment is not likely to become a Qualified Bidder.  The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Bidders in connection with the sale of the Transferred Assets.  Due diligence information will be furnished to the Stalking Horse and other Qualified Bidders through an electronic data room.  If the Debtors furnish any material information related to the Debtors not previously given to the Stalking Horse, then the Debtors shall place such information in the data room.  The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline.  Notwithstanding anything herein to the contrary, the Debtors reserve the right to withhold information or restrict access to certain materials in any data room if providing such information or materials to a Qualified Bidder would, in the Debtors' business judgment, put the Debtors at a competitive disadvantage.

## DUE DILIGENCE FROM BIDDERS

Each Bidder shall comply with all reasonable requests for information from the Debtors regarding such Bidder and its contemplated transaction.  Failure by a Bidder to provide such information will be a basis for the Debtors to deem that Bidder not to be a Qualified Bidder and to prohibit that Bidder from participating in any Auction.

## BIDDING PROCESS

The Debtors shall:  (a) determine whether a Bidder is a Qualified Bidder; (b) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions herein; (c) receive offers from Qualified Bidders; and (d) negotiate any offers made to purchase the Transferred Assets.  Subject to the Sale Procedures Order, the Debtors shall have the right to adopt such other rules for the Sale Procedures (including rules that may depart from those set forth herein), that, in the Debtors' reasonable discretion, after consultation with the Consultation Parties, will better promote the goals of the Sale Procedures.  With respect to all material decisions that the Debtors have the power to make under these Sale Procedures, the Debtors will confer with the Consultation Parties.

## BID REQUIREMENTS

Except as set forth above under the headings "Bid Deadline" and "Designation as Qualified Bidder," to participate in the Auction (defined below), a Qualified Bidder must submit a Bid by the Bid Deadline that the Debtors determine satisfies each of the following conditions (each such Bid, a "Qualified Bid"):

(a)    Written Submission of Purchase Agreement and Commitment to Close.  The Debtors shall file with the Court the Stalking Horse APA, which shall be used by each Qualified Bidder in submitting its respective Purchase Agreement along with the Marked Agreement (defined below).  Each Qualified Bid must be in writing and include:  (i) a purchase agreement signed by the Qualified Bidder (the "Purchase Agreement"); (ii) a blackline reflecting the Qualified Bidder's

proposed changes to the Stalking Horse APA (the "Marked Agreement"); and (iii) a written commitment demonstrating that the Qualified Bidder will be able to close the transaction proposed in its Purchase Agreement on the terms and conditions set forth therein.

(b)     Identification of Contracts and Leases to be Assumed. Each Qualified Bid must include a comprehensive list of the Debtors' executory contracts and unexpired leases (collectively, the "Assumed Contracts") that the applicable Qualified Bidder desires to assume, and a packet of information, including financial information, that will be provided to the nondebtor counterparties to such Contracts and Leases sufficient to demonstrate adequate assurance of future performance.

(c)     Cure Amounts of Assumed Contracts. Each Qualified Bid must include a Purchase Agreement that provides for the payment by the Qualified Bidder of all Cure Amounts (defined below) associated with the Assumed Contracts as part of the Qualified Bid.

(d)     Irrevocable. Each Qualified Bid must be irrevocable until the Debtors have designated a Qualified Bid as the Successful Bid (defined below) and the Back-Up Bid (defined below) (the "Termination Date"). The Back-Up Bid(s) will remain open until the earlier of (i) the Closing Date of the Sale with the Successful Bidder(s) or (ii) the sixtieth (60th) day after entry of the Sale Order; provided, however, that if the Debtors deliver the Back-Up Notice during such 60-day period, the Back-Up Bidder shall have the obligations set forth in paragraph (h)(B) below.

(e)     Contingencies. No Qualified Bid may be conditioned on obtaining financing, regulatory contingencies (other than on the condition that any applicable waiting period under the HSR Act be satisfied, which may occur subsequent to the Bid Deadline, provided that the Bidder makes all necessary filings under the HSR Act by the deadline set forth above), any internal approval, or on the outcome or review of due diligence; provided, however, that the timing and likelihood of receiving regulatory approval will be a consideration in determining the highest and best Bid.

(f)     Not Burdensome. The terms of the Sale under the Purchase Agreement must not be materially more burdensome or conditional than the terms of the Sale under the Stalking Horse APA.

(g)     Same or Better Terms. Each Bid must be on terms that, in the Debtors' business judgment and after consulting with the Consultation Parties, are the same as or better than the terms of the Stalking Horse APA and shall satisfy the "Minimum Bid" requirements set forth in clause (l) below.

(h)     Closing. The Purchase Agreement must provide that (A) (1) the Closing Date shall occur on or before [August 11], 2015, unless otherwise agreed to by the

Debtors, after consultation with the Consultation Parties, and (2) within one (1) business day after the Auction has concluded, the Qualified Bidder, if deemed the Successful Bidder, shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, including, but not limited to, the applicable Purchase Agreement; and (B) if the Qualified Bidder is deemed the Back-Up Bidder, then (1) the Closing Date shall occur within five (5) business days after the Debtors provide written notice of their intent to close the Sale under the Purchase Agreement (the "Back-Up Notice") and (2) within one (1) business day after the Debtors send the Back-Up Notice, the Qualified Bidder shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Back-Up Bid was made, including, but not limited to, the applicable Purchase Agreement.

(i)     Financing Sources.  Each Qualified Bid must contain written evidence of a firm commitment for financing or other evidence of the financial wherewithal of such Qualified Bidder (with appropriate contact information for such financing sources), which the Debtors reasonably believe provides the Qualified Bidder with the ability to consummate the Sale and provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code .

(j)     No Fees Payable to Qualified Bidder.  With the exception of the Qualified Bid submitted by the Stalking Horse, no Qualified Bid may request or otherwise entitle the Qualified Bidder to any break-up fee, expense reimbursement amount or similar type of payment.  Further, by submitting a Qualified Bid, a Qualified Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Sale Procedures.[3]

(k)     Good Faith Deposit.  Each Qualified Bid other than the Stalking Horse Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of The Standard Register Company in the amount of not less than ten percent (10%) of the amount of the stated purchase price in the Qualified Bid, to be held in escrow until (i) in the case of a Qualified Bidder other than the Successful Bidder or the Back-Up Bidder, the Termination Date and (ii) in the case of the Back-Up Bidder, until the earlier of (A) the Closing Date of the Sale with the Successful Bidder(s) or (B) the [sixtieth (60th)] day after entry of the Sale Order (unless, during such 60-day period, the Debtors deliver the Back-Up Notice, in which case the Good Faith Deposit of the Back-Up Bidder shall be treated as described under the heading "Return of Good Faith

---

[3]     The Stalking Horse APA provides for the Break-Up Fee and the Expense Reimbursement.  As noted herein, such Bid Protections shall only be available, to the extent approved by the Court, to the Stalking Horse.  A Qualified Bidder should therefore remove any provisions relating to a break-up fee, expense reimbursement or similar type of payment from any Purchase Agreement submitted with its Bid.

Deposit" below).  The Stalking Horse APA governs the terms of the Good Faith Deposit that must accompany the Stalking Horse APA.

(l)     <u>Minimum Initial Overbid</u>.  Any Qualified Bid must provide for a purchase price with respect to the Sale that is in an amount not less than the sum of (i) the amount of the Purchase Price and the assumption of Assumed Liabilities, as defined in the Stalking Horse APA, (ii) the amount of the Break-Up Fee, (iii) the amount of the Expense Reimbursement Amount, and (iv) the amount of the Minimum Bid Increment (as defined below) (collectively, the "<u>Minimum Initial Overbid</u>"), to be paid in cash or wire transfer on the Closing Date.

(m)     <u>Purchase of Transferred Assets and Assumption of Liabilities</u>.  Each Qualified Bid must provide for (i) the purchase of all or substantially all of the Transferred Assets, as defined in the Stalking Horse APA and (ii) the payment or assumption of all or substantially all of the Assumed Liabilities, as defined in the Stalking Horse APA.

(n)     <u>Disclosure</u>.  Each Qualified Bid must fully disclose the identity of each entity that will be bidding for the Transferred Assets or otherwise participating in connection with such Qualified Bid, the complete terms of any such participation, and any connections or agreements between such entity and the Debtors and their affiliates (as defined in section 101 of the Bankruptcy Code) and/or any officer, director, or direct or indirect equity security holder of the Debtors and their affiliates (as defined in Bankruptcy Code section 101).

If any Bid is determined by the Debtors not to be a Qualified Bid, the Bidder shall be refunded its Good Faith Deposit within three (3) business days after such determination.

Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors, and the Bidder submitting that Bid will not be permitted to participate in the Auction (as defined below); <u>provided</u>, <u>however</u>, that if the Debtors receive a Bid that is not a Qualified Bid, the Debtors, after consultation with the Consultation Parties, may provide such Qualified Bidder with the opportunity to remedy any deficiencies.

<div align="center"><b>ADEQUATE ASSURANCE</b></div>

No later than 14 days after entry of the Sale Procedures Order, the Debtors shall file with the Court and serve on each party to a Assumed Contract a Contract Notice that shall (a) state the Cure Amounts that the Debtors believe are necessary to assume such Assumed Contracts pursuant to section 365 of the Bankruptcy Code (the "<u>Cure Amount</u>"); (b) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchase of the Transferred Assets at the conclusion of the Auction; (c) state the date of the Sale Hearing; and (d) state a deadline by which the non-Debtor party shall file an objection to the Cure Amount or to the assumption and assignment of the Assumed Contracts.  The presence of a contract, lease, or agreement on the Contract Notice does not constitute an admission that such contract, lease, or agreement is an executory contract.  The Debtors reserve all of their rights, claims, defenses, and

causes of action with respect to all contracts, leases, and agreements listed on the Contract Notice.

Any objection to the Cure Amount or to assumption and assignment, including with respect to adequate assurance of future performance (a "Contract Objection") must be filed with the Court and served on (a) the Debtors' counsel (Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166 (Attn:  Barbara Becker, bbecker@gibsondunn.com and Robert A. Klyman, rklyman@gibsondunn.com) and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19081 (Attn: Michael R. Nestor, mnestor@ycst.com)), and (b) counsel to (i) Stalking Horse and (ii) the Prepetition Term Loan Agent (Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Ron Meisler, ron.meisler@skadden.com and Christopher M. Dressel, christopher.dressel@skadden.com)), so as to be received on or before [May 8], 2015 at 4:00 p.m. (prevailing Eastern Time).  Any Contract Objection must state the basis for such objection and state with specificity what Cure Amount the party to the Assumed Contract believes is required (in all cases with appropriate documentation in support thereof).  If no Cure Objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assumed Contract or other document as of the date of the Cure Notice.  The Cure Notice shall also provide that Contract Objection to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.  If a Successful Bidder that is not the Stalking Horse Purchaser prevails at the Auction, then the deadline to object to assumption and assignment (including on grounds of adequate assurance of future performance) shall be extended to the date of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall not be extended.

Unless a non-Debtor party to any executory contract or unexpired lease, files an objection to the Cure Amount by the applicable objection deadline, then such counterparty shall be (a) forever barred from objecting to the Cure Amount and (b) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the schedule to the Cure Notice, against the Debtors, the Stalking Horse, or any Successful Bidder or any other assignee of the relevant contract.

Unless a non-Debtor party to any Assumed Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse or other Successful Bidder, then such counterparty shall be deemed to have consented to the assumption and assignment to the Stalking Horse or other Successful Bidder and will be forever barred from objecting to such assumption and assignment on account of Cure Amount, lack of adequate assurance, or any other grounds.

Nondebtor parties to the Assumed Contracts may request, in writing, a copy of the information that is provided to the Debtors by a Qualified Bidder in connection with the applicable Qualified Bid that include the Qualified Bidder's intent to assume any such Assumed Contracts in its Qualified Bid to demonstrate adequate assurance of future performance by such Qualified Bidder.  Such requests may be directed to the Debtors via electronic mail to Robert Klyman, Esq. (rklyman@gibsondunn.com), Michael Nestor, Esq. (mnestor@ycst.com), and Andrew Torgove (andrew.torgove@lazard.com).  Any such requests from nondebtor parties to Assumed Contracts (collectively, the "Contract Notice Parties") received on or before May 21,

2015 that provide an electronic mail address where such information may be sent will receive such information via electronic mail on or before May 23, 2015.  Any such requests received after May 21, 2015 will be sent to such Contract Notice Parties on or before the second business day after receipt of such request by the Debtors.  Notwithstanding the forgoing, any requests for adequate assurance of future performance that require the provision of confidential and/or proprietary information of a Qualified Bidder will be provided to a Contract Notice Party to the applicable Assumed Contract, subject to execution by the nondebtor counterparty of a confidentiality agreement, in a form acceptable to the Debtors and the applicable Qualified Bidder providing the requested information.

## CREDIT BIDDING

Qualified Bidders holding allowed secured claims against the Debtors may make one or more credit bids of some or all of their allowed secured claims.  Without limiting the forgoing, (a) the Stalking Horse may (i) credit bid up to the full amount of the outstanding obligations under the Prepetition First Lien Credit Agreement, and in addition, (ii) credit bid, at each round of the Auction, the full amount of the Break-Up Fee and the Expense Reimbursement Amount, and (b) the Second Lien Bidders may credit bid up to the full amount of the outstanding obligations under the Prepetition Second Lien Credit Agreement.

Any and all Bids, other than those submitted by or on behalf of (i) the Stalking Horse, (ii) the Second Lien Bidders, and (iii) another Qualified Bidder holding allowed secured claims against the Debtors (but only to the extent of such allowed secured claims), shall be in cash unless otherwise provided in these Sale Procedures.  Any and all credit bids submitted by a party other than the Stalking Horse shall include a cash component that is sufficient to pay the amount of the Bid Protections.

## AUCTION

If no Qualified Bid other than the Qualified Bid submitted by the Stalking Horse is received by the Bid Deadline, then (a) the Auction will not be held, (b) the Stalking Horse will be deemed the Successful Bidder, (c) the Qualified Bid submitted by the Stalking Horse will be deemed the Successful Bid, and (d) at the Sale Hearing on _____, 2015 at __:_.m. (prevailing Eastern Time), the Debtors will seek approval of the Court for authority to consummate the proposed Sale of the Transferred Assets to the Stalking Horse as contemplated in the Stalking Horse APA.

Only if a Qualified Bid (other than the Qualified Bid submitted by the Stalking Horse) is received by the Bid Deadline shall the Debtors conduct an auction (the "Auction").  The Auction shall commence on **June 8, 2015 at 10:00 a.m.** (prevailing Eastern Time), at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, or such other location designated by the Debtors.

The Debtors shall provide copies of the Initial Bid (defined below) to (i) the Stalking Horse, (ii) all Qualified Bidders, and (iii) counsel for Bank of America, N.A., in its capacity as administrative agent for the lenders under that certain Amended and Restated Loan and Security

Agreement dated as of August 1, 2013, as soon as reasonably practicable after the Bid Deadline, but in any event not later than 48 hours after the Bid Deadline.

Prior to the commencement of the Auction, the Debtors shall determine (in their discretion, but after consultation with the Consultation Parties) which Qualified Bid represents the then-highest or otherwise best Bid (the "Initial Bid").

The determination of which Qualified Bid constitutes the Initial Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, among other things, the following:  (a) the amount and nature of the consideration; (b) the proposed assumption of any liabilities; (c) the ability of the Qualified Bidder to close the proposed transaction; (d) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (e) any purchase-price adjustments; (f) the impact of the contemplated transaction on any actual or potential litigation; (g) the net economic effect of any changes from the Stalking Horse APA, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"); (h) the net after-tax consideration to be received by the Debtors' estates; and (i) such other considerations the Debtors deem relevant in their reasonable discretion (collectively, the "Bid Assessment Criteria").

The Auction shall be conducted according to the following procedures:

**(1)    Participation at the Auction**

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  Except as set forth in the following paragraph, only the authorized representatives and respective counsel and advisors of each of the Qualified Bidders, the Debtors, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, and the Committee shall be permitted to attend the Auction.

Creditors may attend (but not participate in or at) the Auction provided that they provide the Debtors written notice of their intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel to the Debtors at rklyman@gibsondunn.com, mnestor@ycst.com, and andrew.torgove@lazard.com.

Each Qualified Bidder participating in the Auction will be required to confirm that it has not engaged in any collusion regarding the Sale Procedures, the Auction or the proposed transaction.

**(2)    Terms of Overbids**

Qualified Bidders will be permitted to increase their Bids at each round of the Auction. Bidding shall begin with the Initial Bid and subsequently continue in minimum increments of at least five hundred thousand dollars ($500,000) (or such other amount that the Debtors determine appropriate to facilitate the Auction) (the "Minimum Bid Increment").

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Initial Bid. All Overbids shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.

To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

### (a)    Minimum Overbid Increment

Any Overbid after the Initial Bid shall be made in increments of at least the Minimum Bid Increment.

### (b)    Remaining Terms are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth herein. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher Qualified Bid as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid.

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors and the Consultation Parties demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

### (c)    Consideration of Overbids

The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: (i) facilitate discussions between the Debtors and individual Qualified Bidders; (ii) allow individual Qualified Bidders to consider how they wish to proceed; (iii) consider and determine the current highest or otherwise best Overbid at any given time during the Auction; and (iv) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may require to demonstrate that they have sufficient internal resources or sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

### (d)    Stalking Horse Bidder May Credit Bid the Amount of the Bid Protections

The Bid Protections will be taken into account in each round of bidding and added to the bid of the Stalking Horse Bidder. The Stalking Horse Bidder shall be permitted to credit bid the full amount of the Bid Protections pursuant to any Overbid in connection with each round of bidding in the Auction.

    (3)      **Additional Procedures**

The Debtors, in their reasonable discretion, and in consultation with the Consultation Parties, may adopt rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Sale Procedures, the Sale Procedures Order or the Bankruptcy Code.

Each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous Bid at the Auction. Bidding at the Auction will continue until such time as the highest or otherwise best offer is determined in accordance with these Sale Procedures.

The Debtors will, from time to time, in an open forum, advise Qualified Bidders participating in the Auction of the then-highest or otherwise best Bid(s).

    (4)      **Consent to Jurisdiction as Condition to Bid**

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

    (5)      **Closing the Auction**

Upon conclusion of the bidding, the Auction shall be closed and no additional Bids may be considered following the closing of the Auction. The Debtors shall immediately review the final Overbid of each Qualified Bidder on the basis of financial and contractual terms and the factors relevant to the Sale, including those factors affecting the speed and certainty of consummating the proposed sale, and identify the highest or otherwise best offer for the Transferred Assets (the "Successful Bid" and the entity submitting such Successful Bid, the "Successful Bidder") and the next highest or otherwise best offer after the Successful Bid (the "Back-Up Bid" and the entity submitting such Back-Up Bid, the "Back-Up Bidder"). The Debtors will notify the Qualified Bidders and Notice Parties of such determination within one business day following the closing of the Auction.

    (6)      **The Debtors Shall Preside Over the Auction**

The Debtors and their professionals shall direct and preside over the Auction. The Debtors shall arrange for the actual bidding at the Auction to be transcribed, and the Auction shall be conducted openly, pursuant to the terms set forth herein.

The Debtors, in consultation with the Consultation Parties, will evaluate all options and determine which Qualified Bid is in the best interests of the Debtors, their estates, and their creditors.

<div align="center">

**ACCEPTANCE OF SUCCESSFUL BID**

</div>

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (a) such Bid is declared the Successful Bid at the Auction, (b) definitive documentation has

been executed in respect thereof, and (c) the Court enters an order approving the Sale to the applicable Successful Bidder.

Within one (1) business day after the closing of the Auction, the Debtors shall file with the Court and serve upon all Qualified Bidders and entities that have requested notice in these Chapter 11 Cases a notice identifying the Successful Bidder(s) and the Back-Up Bidder(s).

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Debtors' acceptance of such Bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court.

The Debtors will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Successful Bid and the Back-Up Bid were selected in accordance with these Sale Procedures, (b) the Auction was fair in substance and procedure, and (c) consummation of the Sale, contemplated by the Successful Bid will provide the highest or otherwise best Bid and is in the best interests of the Debtors and their creditors.

The Debtors may seek the Sale of the Transferred Assets through a single transaction or through separate transactions under separate Purchase Agreements with different purchasers in the event that the combination of such Sales is determined by the Debtors, in their discretion, but after consultation with the Consultation Parties, to constitute the highest or otherwise best Bid for the Transferred Assets.

## "AS IS, WHERE IS"

The sale of the Transferred Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the Stalking Horse APA, as to the Stalking Horse, or the applicable Purchase Agreement, as to another Successful Bidder. The Stalking Horse and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Transferred Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Transferred Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Transferred Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Sale Procedures and (a) as to the Stalking Horse, the terms of the Sale of the Transferred Assets set forth in the Stalking Horse APA, or (b) as to another Successful Bidder, the terms of the Sale of the Transferred Assets set forth in the applicable Purchase Agreement.

## FREE AND CLEAR SALE

Except as otherwise provided in the Stalking Horse APA, the applicable Purchase Agreement of another Successful Bidder, or the Sale Order, all of the Debtors' right, title, and

interest in and to the Transferred Assets thereunder shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Encumbrances") in accordance with Bankruptcy Code section 363, with such Encumbrances to attach to the net proceeds of the sale of the Transferred Assets.

## SALE HEARING

A hearing to approve the Sale of the Transferred Assets to the Successful Bidder shall be conducted by the Court on _____, 2015 at __:__.m. (prevailing Eastern Time) located at 824 North Market Street, __th Floor, Courtroom No. ___, Wilmington, DE 19801 (the "Sale Hearing").  Following the approval of the Sale of the Transferred Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved Sale within sixty (60) days after the  entry of the Sale Order (except where the sole cause of any delay of the Closing Date is the result of a default by the Debtors), the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid and the Debtors shall be authorized, but not required, to consummate the sale with the Back-Up Bidder without further notice or orders of the Court.  The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing or notation on any applicable hearing agenda, provided that the Debtors first consult with the Consultation Parties.

## RETURN OF GOOD FAITH DEPOSIT

The Good Faith Deposit of a Successful Bidder shall be applied to the Purchase Price, as defined in the applicable Purchase Agreement.  The Good Faith Deposit of the Back-Up Bidder shall be retained by the Debtors until the earlier of (a) the Closing Date of the Sale with the Successful Bidder(s) or (b) the sixtieth (60th) day after entry of the Sale Order and thereafter returned to the Back-Up Bidder (unless, during such 60-day period, the Debtors deliver the Back-Up Notice).  The Good Faith Deposits of all other Qualified Bidders shall be held by the Debtors until the designation of the Successful Bidder and the Back-Up Bidder, and thereafter returned to the respective Qualified Bidders.  If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit, in addition to all other remedies provided for in the applicable Purchase Agreement.

Following the giving of the Back-Up Notice, the Good Faith Deposit of the Back-Up Bidder shall be applied to the Purchase Price as defined in the applicable Purchase Agreement. If the Back-Up Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Back-Up Bidder, the Debtors shall be entitled to retain the Good Faith Deposit, in addition to all other remedies provided for in the applicable Purchase Agreement.

## MODIFICATIONS AND RESERVATIONS

The Debtors may, after consultation with the Consultation Parties, (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before entry of orders of the Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient,

(ii) not in conformity with the requirements of the Bankruptcy Code, the Sale Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors, their estates and their creditors.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of their estates, their creditors, and other parties in interest thereof that are not inconsistent with the Sale Procedures Order, the Sale Procedures, or the Bankruptcy Code.

The Sale Procedures may be materially modified only upon the express written consent of the Debtors (in consultation with the Consultation Parties) or by order of the Court.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Sale Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) that submits a Bid or has a Bid submitted on its behalf for so long as such Bid remains open, including any credit bid, if the Debtors determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection, or determination is (a) likely to have a chilling effect on the potential bidding or (b) otherwise contrary to the goal of maximizing value from the sale process for the Debtors' estates, their creditors, and all other parties in interest.

## RESERVATION OF RIGHTS OF THE DEBTORS

Subject to the Sale Procedures Order, the Debtors reserve the right as they may determine to be in the best interests of their estates to:  (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Sale Procedures Order or the requirements of the Bankruptcy Code or any other orders entered by the Court, or (iii) contrary to the best interests of the Debtors and their estates or stakeholders, as applicable; (e) impose additional terms and conditions with respect to any or all Bidders other than the Stalking Horse; (f) adjourn the Auction and/or Sale Hearing in open court without further notice; (g) with the consent of the Stalking Horse, remove a portion of the Transferred Assets from the Auction; and (h) consider or accept Bids for less than all of the Transferred Assets, so long as the Bids comply with the Overbid requirements.

Exhibit 4

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT**, dated as of [_____], 2015 ("Escrow Agreement"), is by and among Standard Acquisitions Holdings, LLC, a Delaware limited liability company ("Depositor");  The Standard Register Company, an Ohio corporation ("Recipient"); and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as escrow agent hereunder ("Escrow Agent").

## BACKGROUND

A.  Depositor, Recipient and certain other persons have entered into an Asset Purchase Agreement (as amended, the "Underlying Agreement"), dated as of March 12, 2015**.**   The Underlying Agreement provides that Depositor shall deposit the Escrow Funds (defined below) in a segregated escrow account to be held by Escrow Agent until disbursed in accordance with the terms of the Underlying Agreement and this Escrow Agreement.

B.  Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

C.  Depositor and Recipient have appointed the Representatives (as defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent and this Escrow Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      Definitions.  The following terms shall have the following meanings when used herein:

"Court Order" shall mean a judgment, order, award or determination of a court of competent jurisdiction, which judgment, order, award or determination is accompanied by a written instruction from the Representative of the instructing party given to effectuate such judgment, order, award or determination, and the Escrow Agent shall be entitled to conclusively rely upon any such certification and instruction and shall have no responsibility to review the judgment, order, award or determination to which such certification and instruction refers.

"Escrow Funds" shall mean the funds deposited with Escrow Agent pursuant to Section 3 of this Agreement, together with any interest and other income thereon.

"Indemnified Party" shall have the meaning set forth in Section 11.

1

"<u>Joint Written Direction</u>" shall mean a written direction executed by the Representatives and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Escrow Agreement.

"<u>Depositor Representative</u>" shall mean the person(s) so designated on Schedule C hereto or any other person designated in a writing signed by Depositor and delivered to Escrow Agent and the Recipient Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

"<u>Representatives</u>" shall mean the Depositor Representative and the Recipient Representative.

"<u>Recipient Representative</u>" shall mean the person(s) so designated on Schedule C hereto or any other person designated, in a writing signed by Recipient and delivered to Escrow Agent and the Depositor Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

2.      <u>Appointment of and Acceptance by Escrow Agent</u>.  Depositor and Recipient hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with Section 3 below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

3.      <u>Deposit of Escrow Funds</u>.  Simultaneously with the execution and delivery of this Escrow Agreement, Depositor, on behalf of the Recipient, will transfer the Escrow Funds in the amount of $ [_____], by wire transfer of immediately available funds, to an account designated by Escrow Agent.

4.      <u>Disbursements of Escrow Funds</u>.  Escrow Agent shall disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with, a Joint Written Direction or Court Order.  Such Joint Written Direction or Court Order shall contain complete payment instructions, including wiring instructions or an address to which a check shall be sent. Prior to any disbursement, Escrow Agent shall have received reasonable identifying information regarding the Recipient such that Escrow Agent may comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal Revenue Service ("<u>IRS</u>") Form W-9 or original IRS Form W-8, as applicable.  All disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Indemnified Parties pursuant to Section 10 and Section 11 below.

5.      <u>Suspension of Performance; Disbursement into Court</u>.  If, at any time, (i) there shall exist any dispute between Depositor, Recipient or the Representatives with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) Depositor and Recipient have not,

2

within 10 calendar days of the furnishing by Escrow Agent of a notice of resignation pursuant to Section 7 hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

     a.     suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed; or

     b.     petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction, in any venue convenient to Escrow Agent, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Depositor, Recipient or the Representatives, their respective owners, shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

     6.     <u>Investment of Funds</u>.  Based upon Depositor's and Recipient's prior review of investment alternatives, in the absence of further specific written direction to the contrary, the Escrow Agent is directed to initially invest and reinvest the Escrow Funds in the investment indicated on Schedule B hereto.  Depositor and Recipient  may jointly provide written instructions changing the investment of the Escrow Funds to the Escrow Agent; provided, however, that no investment or reinvestment may be made except in the following:  (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United State of America; (b) U.S. dollar denominated deposit accounts and certificates of deposits issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which such deposits are either (i) insured by the Federal Deposit Insurance Corporation or a similar governmental agency, or (ii) with domestic commercial banks which have a rating on their short-term certificates of deposit on the date of purchase of "A-1" or "A-l+" by S&P or "P-1" by Moody's and maturing no more than 360 days after the date of purchase (ratings on holding companies are not considered as the rating of the bank); (c) repurchase agreements with any bank, trust company, or national banking association (including Escrow Agent and its affiliates); or (d) institutional money market funds, including funds managed by Escrow Agent or any of its affiliates; <u>provided</u> that the Escrow Agent will not be directed to invest in investments that the Escrow Agent in its sole discretion determines are not consistent with the Escrow Agent's policy or practices.  Depositor and Recipient acknowledge that the Escrow Agent does not have a duty

3

nor will it undertake any duty to provide investment advice.

If Escrow Agent has not received a join written instruction from the Depositor and the Recipient at any time that an investment decision must be made, Escrow Agent is directed to invest the Escrow Funds, or such portion thereof as to which no written investment instruction has been received, in the investment indicated on Schedule B hereto.  All investments shall be made in the name of Escrow Agent.  Notwithstanding anything to the contrary contained herein, Escrow Agent may, without notice to Depositor and Recipient, sell or liquidate any of the foregoing investments at any time for any disbursement of Escrow Funds permitted or required hereunder. All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds.  Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Escrow Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Escrow Funds.  With respect to any Escrow Funds received by Escrow Agent after twelve o'clock, p.m., Central Standard Time, Escrow Agent shall not be required to invest such funds or to effect any investment instruction until the next day upon which banks in St. Paul, Minnesota and the New York Stock Exchange are open for business.

7.      Resignation of Escrow Agent.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving ten (10) days prior written notice to the Depositor and Recipient specifying a date when such resignation shall take effect.  Upon any such notice of resignation, Depositor and Recipient jointly shall appoint a successor Escrow Agent hereunder prior to the effective date of such resignation.  If the Depositor and Recipient fail to appoint a successor Escrow Agent within such time, the Escrow Agent shall have the right to petition a court of competent jurisdiction to appoint a successor Escrow Agent, and all costs and expenses (including without limitation attorneys' fees) related to such petition shall be paid jointly and severally by Depositor and Recipient.  The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.  After any retiring Escrow Agent's resignation, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement.

8.      Binding Effect; Successors.  This Escrow Agreement shall be binding upon the respective parties hereto and their heirs, executors, successors or assigns.  If the Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this Escrow Agreement) to another corporation, the successor or transferee corporation without any further act shall be the successor Escrow Agent.

9.      Liability of Escrow Agent.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied.  The Escrow Agent has no

4

fiduciary or discretionary duties of any kind. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement, including without limitation any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein.  The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the sole cause of any loss to the Depositor or Recipient.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages or penalties (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action.  Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control, including without limitation acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the Underlying Agreement, or to appear in, prosecute or defend any such legal action or proceeding.  Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the advice of such counsel.  Depositor and Recipient, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel. Depositor and Recipient agree to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request in connection with its duties hereunder.

The Escrow Agent is authorized, in its sole discretion, to comply with any court order with respect to the Escrow Funds, without determination by the Escrow Agent of such court's jurisdiction in the matter.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled,

set aside or vacated.

10.    Indemnification of Escrow Agent.  From and at all times after the date of this Escrow Agreement, Depositor and Recipient, jointly and severally, shall, to the fullest extent permitted by law, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, penalties, costs and expenses of any kind or nature (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation Depositor, Recipient and the Representatives, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance in connection with this Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.  Depositor and Recipient further agree, jointly and severally, to indemnify each Indemnified Party for all costs, including without limitation reasonable attorney's fees, incurred by such Indemnified Party in connection with the enforcement of Depositor's and Recipient's indemnification obligations hereunder; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.  Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any indemnifiable action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Depositor and Recipient jointly and severally.  The obligations of Depositor and Recipient under this Section 10 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

The parties agree that neither the payment by Depositor or Recipient of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between Depositor and Recipient, the respective rights and obligations of Depositor and Recipient under the Underlying Agreement.

11.    Compensation of Escrow Agent.

(a)    Fees and Expenses.  Depositor agrees to compensate Escrow Agent on demand for its services hereunder in accordance with Schedule A attached hereto.  The obligations of Depositor under this Section 11 shall survive any termination of this Escrow Agreement and the

6

resignation or removal of Escrow Agent.

(b)    <u>Disbursements from Escrow Funds to Pay Escrow Agent</u>.  Escrow Agent is authorized to, and may disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent or any Indemnified Party is entitled to seek indemnification hereunder).  Escrow Agent shall notify Depositor and Recipient of any disbursement from the Escrow Funds to itself or any Indemnified Party in respect of any compensation or reimbursement hereunder and shall furnish Depositor and Recipient copies of related invoices and other statements.

(c)    <u>Security and Offset</u>.  Recipient, Depositor and the Representatives hereby grant to the Escrow Agent and Indemnified Parties a security interest in, lien upon and right of offset against the Escrow Funds with respect to any compensation or reimbursement due any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds are insufficient to cover such compensation and reimbursement, Depositor and Recipient shall promptly pay such amounts to Escrow Agent or any Indemnified Party upon receipt of an itemized invoice.

12.    <u>Representations and Warranties</u>.  Depositor and Recipient each respectively make the following representations and warranties to Escrow Agent:

(a)    it has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder; and this Escrow Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms; and

(b)    each of the applicable persons designated on Schedule C attached hereto have been duly appointed to act as authorized representatives hereunder and individually have full power and authority to execute and deliver any Joint Written Direction, to amend, modify or waive any provision of this Escrow Agreement and to take any and all other actions as authorized representatives under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party, provided that any change in designation of such authorized representatives shall be provided by written notice delivered to each party to this Escrow Agreement.

13.    <u>Identifying Information</u>.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Escrow Agent requires documentation to verify its formation and existence as a legal entity. The Escrow Agent may ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.  The parties acknowledge that a portion of the identifying information set forth herein is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the

7

"Act"), and each agrees to provide any additional information requested by the Escrow Agent in connection with the Act or any other legislation or regulation to which Escrow Agent is subject, in a timely manner.

14.    Consent to Jurisdiction and Venue.  In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree to the personal jurisdiction by and venue in the state and federal courts in the State of New York and waive any objection to such jurisdiction or venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

15.    Notices.  All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered (i) by personal delivery, or (ii) by national overnight courier service, or (iii) by certified or registered mail, return receipt requested, or (iv) via facsimile transmission, with confirmed receipt or (v) via email by way of a PDF attachment thereto of a manually executed document.  Notice shall be effective upon receipt except for notice via email, which shall be effective only when the recipient, by return email or notice delivered by other method provided for in this Section 15, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section 15.) Such notices shall be sent to the applicable party or parties at the address specified below:

If to Depositor or Depositor Representative at:

                         _____
                         _____
                         _____
                         Telephone:
                         Facsimile:
                         E-mail:

If to Recipient or Recipient Representative at:

                         _____
                         _____
                         _____
                         Telephone:
                         Facsimile:
                         E-mail:

With copies to:            Gibson, Dunn & Crutcher LLP
                         200 Park Avenue
                         New York, NY 10166
                         Attention: Barbara Becker
                         Telephone: (212) 351-4062
                         Facsimile: (212) 3512-6202
                         Email: bbecker@gibsondunn.com

If to the Escrow Agent at:   U.S. Bank National Association, as Escrow Agent
ATTN:  Global Corporate Trust Services
Address: _____
Telephone: _____
Facsimile: _____
E-mail: _____

and to:

U.S. Bank National Association
ATTN: _____
Trust Finance Management

_____
_____
Telephone: _____
Facsimile: _____
E-mail: _____

or to such other address as each party may designate for itself by like notice and unless otherwise provided herein shall be deemed to have been given on the date received.

     16.   <u>Optional Security Procedures.</u>  In the event funds transfer instructions, address changes or change in contact information are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule C hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes. If the Escrow Agent is unable to contact any of the designated representatives identified in Schedule C, the Escrow Agent is hereby authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to any one or more of Depositor's or Recipient's executive officers ("<u>Executive Officers</u>"), as the case may be, which shall include the titles of Chief Executive Officer, President and Vice President, as the Escrow Agent may select. Such Executive Officer shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. Depositor and Recipient agree that the Escrow Agent may at its option record any telephone calls made pursuant to this Section. The Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Depositor or Recipient to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.  The Escrow Agent may apply any of the Escrow Funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. Depositor and Recipient acknowledge

that these optional security procedures are commercially reasonable.

17.     Amendment, Waiver and Assignment.  None of the terms or conditions of this Escrow Agreement may be changed, waived, modified, discharged, terminated or varied in any manner whatsoever unless in writing duly signed by each party to this Escrow Agreement. No course of conduct shall constitute a waiver of any of the terms and conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion. Except as provided in Section 8 hereof, this Escrow Agreement may not be assigned by any party without the written consent of the other parties.

18.     Severability.  To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

19.     Governing Law.  This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of laws principles thereof.

20.     Entire Agreement, No Third Party Beneficiaries.  This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds. Nothing in this Escrow Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

21.     Execution in Counterparts, Facsimiles.  This Escrow Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction. The delivery of copies of this Escrow Agreement and any Joint Written Instruction and their respective signature pages by PDF or facsimile transmission shall constitute effective execution and delivery as to the parties and may be used in lieu of originals for all purposes.

22.     Termination.   This Escrow Agreement shall terminate upon the distribution of all the Escrow Funds pursuant to any applicable provision of this Escrow Agreement, and Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

23.     Dealings.  The Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may buy, sell, and deal in any of the securities of the Depositor or Recipient and become pecuniarily interested in any transaction in which the Depositor or Recipient may be interested, and contract and lend money to the Depositor or Recipient and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement.  Nothing herein shall

10

preclude the Escrow Agent from acting in any other capacity for the Depositor or Recipient or for any other entity.

24.    <u>Brokerage Confirmation Waiver</u>.  Depositor and Recipient acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant either the right to receive brokerage confirmations for certain security transactions as they occur, Depositor and Recipient specifically waive receipt of such confirmations to the extent permitted by law.  The Escrow Agent will furnish the Depositor and Recipient periodic cash transaction statements that include detail for all investment transactions made by the Escrow Agent.

25.    <u>Tax Reporting</u>.   Escrow Agent shall have no responsibility for the tax consequences of this Agreement and Depositor and Recipient shall consult with independent counsel concerning any and all tax matters.  Depositor and Recipient shall provide Escrow Agent Form W-9 and an original Form W-8, as applicable, for each payee, together with any other documentation and information requested by Escrow Agent in connection with Escrow Agent's reporting obligations under applicable IRS regulations. If such tax documentation is not so provided, Escrow Agent shall withhold taxes as required by the IRS. Recipient and Depositor have determined that any interest or income on Escrow Funds shall be reported on an accrual basis and deemed to be for the account of Depositor.  Depositor and Recipient shall prepare and file all required tax filings with the IRS and any other applicable taxing authority; provided that the parties further agree that:

(a)    <u>Escrow Agent IRS Reporting</u>.  Depositor shall accurately provide the Escrow Agent with all information requested by the Escrow Agent in connection with the preparation of all applicable Form 1099 and Form 1042-S documents with respect to all distributions as well as in the performance of Escrow Agent's reporting obligations under the Foreign Account Tax Compliance Act and Foreign Investment in Real Property Tax Act or other applicable law or regulation.

(b)    <u>Withholding Requests and Indemnification</u>.  Depositor and Recipient jointly and severally agree to (i) assume all obligations imposed now or hereafter by any applicable tax law or regulation with respect to payments or performance under this Agreement, (ii) request the Escrow Agent in writing with respect to withholding and other taxes, assessments or other governmental charges, and advise Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations, and (iii) indemnify and hold the Escrow Agent harmless pursuant to Section 10 hereof from any liability or obligation on account of taxes, assessments, additions for late payment, interest, penalties, expenses and other governmental charges that may be assessed or asserted against Escrow Agent.

(c)    <u>Imputed Interest</u>.  To the extent that IRS imputed interest regulations apply, Depositor and Recipient shall so inform Escrow Agent, provide Escrow Agent with all imputed interest calculations and direct Escrow Agent to disburse imputed interest amounts as Depositor and Recipient deem appropriate**.** Escrow Agent shall rely solely on such provided calculations

11

and information and shall have no responsibility for the accuracy or completeness of any such calculations or information.

**26.** <u>WAIVER OF TRIAL BY JURY</u>.    EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR (2) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY SUCH PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES TO THIS AGREEMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES HERETO HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT EACH HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A CONSENT BY ALL PARTIES TO A TRIAL BY THE COURT.

27.    <u>Publicity</u>.  No party will (a) use any other party's proprietary indicia, trademarks, service marks, trade names, logos, symbols, or brand names, or (b) otherwise refer to or identify any other party in advertising, publicity releases, or promotional or marketing publications, or correspondence to third parties without, in each case, securing the prior written consent of such other party.

**IN WITNESS WHEREOF**, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

**STANDARD ACQUISITION HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

**THE STANDARD REGISTER COMPANY**

By: _____
Name: _____
Title: _____

**U.S. BANK NATIONAL ASSOCIATION**
**as Escrow Agent**

By: _____
Name: _____
Title: _____

13

## SCHEDULE A

**Schedule of Fees for Services as Escrow Agent**

**SCHEDULE B**

**U.S. BANK NATIONAL ASSOCIATION**
**Investment Authorization Form**

## SCHEDULE C

Each of the following person(s) is a **Depositor Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Depositor's behalf (only one signature required):

| _____ | _____ | _____ |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| _____ | _____ | _____ |
|---|---|---|
| Name | Specimen signature | Telephone No |

| _____ | _____ | _____ |
|---|---|---|
| Name | Specimen signature | Telephone No |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations:

| _____ | _____ |
|---|---|
| Name | Telephone Number |

Each of the following person(s) is a **Recipient Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Recipient's behalf (only one signature required):

| _____ | _____ | _____ |
|---|---|---|
| Name | Specimen signature | Telephone No |

| _____ | _____ | _____ |
|---|---|---|
| Name | Specimen signature | Telephone No |

| _____ | _____ | _____ |
|---|---|---|
| Name | Specimen signature | Telephone No |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations

| _____ | _____ |
|---|---|
| Name | Telephone Number |

Exhibit 5

# BILL OF SALE[1]

This BILL OF SALE ("Bill of Sale") is made as of [_____], 2015, by and among The Standard Register Company, an Ohio corporation, Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, and Standard Register of Puerto Rico Inc., a Delaware corporation (collectively, "Sellers") and Standard Acquisition Holdings, LLC, a Delaware limited liability company ("Buyer").

## RECITALS

A.      Sellers, Buyer and the other parties thereto have entered into that certain Asset Purchase Agreement, dated as of March 12, 2015 (the "Purchase Agreement"), pursuant to which Sellers are to sell and Buyer (or the relevant Designated Buyer) is to purchase the US Transferred Assets.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement; and

B.      Sellers have agreed to execute and deliver this Bill of Sale to Buyer for the purpose of transferring to and vesting in Buyer title to the US Transferred Assets as set forth herein.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements contained herein and in the Purchase Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      Subject to the terms and conditions of the Purchase Agreement, Sellers do hereby sell, convey, transfer, assign, deliver and vest in Buyer (or the relevant Designated Buyer), its successors and assigns, and Buyer (or the relevant Designated Buyer) hereby accepts from Sellers, free and clear of all obligations, Liabilities and Encumbrances (other than Lease Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code, all of Sellers' right, title and interest in and to the US Transferred Assets[2] (other than US Transferred Assets that are Leases or transferred pursuant to the IP Assignment Agreement or Domain Transfer Agreement).

---

[1] Multiple bills of sales with particular Sellers conveying to a particular Buyer or Designated Buyer may be executed at the request of US Buyer to facilitate appropriate post-closing structure and appropriate changes will be made to this form. In addition, the Canadian Seller may need a customized conveyance document.

[2] Use of this term may be expanded to include any Canadian assets.

2.      Sellers hereby irrevocably constitute and appoint Buyer, its successors and assigns, as Sellers' true and lawful attorney (and agent-in-fact), with full power of substitution, in Sellers' name and stead, on behalf of and for the benefit of Buyer, its successors and assigns, to: (a) demand and receive any and all of the US Transferred Assets and to give receipts and releases for and in respect of the US Transferred Assets, or any part thereof, (b) from time to time to institute and prosecute in Sellers' name, at the sole expense and for the benefit of Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Buyer, its successors and assigns, may require for the collection or reduction to possession of any of the US Transferred Assets and (c) endorse a Seller's name on any payment, instrument, notice or other similar document or agreement relating to the US Transferred Assets. Sellers acknowledge that the foregoing powers are coupled with an interest and shall be irrevocable by Sellers.

3.      Sellers hereby covenant that, from time to time after the delivery of this instrument, at Buyer's request, Sellers will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Buyer may reasonably require to convey, transfer to and vest in Buyer, and to put Buyer in possession of, any of the US Transferred Assets.

4.      Nothing in this Bill of Sale shall alter any liability or obligation of Sellers or Buyer arising under the Purchase Agreement, which shall govern the representations, warranties and obligations of the parties with respect to the US Transferred Assets.

5.      This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.      Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any Person other than Buyer and its respective successors and permitted assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of Buyer and its respective successors and assigns.

7.      This Bill of Sale shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

8.      This Bill of Sale may be executed in two or more counterparts, including by facsimile or .pdf signature, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

[The remainder of this page has been intentionally left blank.]

IN WITNESS WHEREOF, the parties have executed this Bill of Sale as of the date first written above.

THE STANDARD REGISTER COMPANY


By: _____
     Name:
     Title:


STANDARD REGISTER INTERNATIONAL, INC.


By: _____
     Name:
     Title:


STANDARD REGISTER TECHNOLOGIES, INC.


By: _____
     Name:
     Title:


STANDARD REGISTER HOLDING COMPANY


By: _____
     Name:
     Title:

STANDARD REGISTER MEXICO HOLDING
COMPANY


By: _____
      Name:
      Title:


IMEDCONSENT, LLC


By: _____
      Name:
      Title:


STANDARD REGISTER OF PUERTO RICO
INC.


By: _____
      Name:
      Title:

STANDARD ACQUISITION HOLDINGS, LLC


By: _____
      Name:
      Title:

Exhibit 6

## ASSIGNMENT AND ASSUMPTION AGREEMENT[1]

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [_____], 2015, is made by and among The Standard Register Company, an Ohio corporation, Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, and Standard Register of Puerto Rico Inc., a Delaware corporation (collectively, the "Assignors") and Standard Acquisition Holdings, LLC, a Delaware limited liability company (the "Assignee").

### RECITALS

A.      The Assignors, the Assignee and the other parties thereto have entered into that certain Asset Purchase Agreement, dated as of March 12, 2015 (the "Purchase Agreement"), pursuant to which the Assignors have agreed to sell and the Assignee (or the relevant Designated Buyer) has agreed to purchase the US Transferred Assets.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement; and

B.      Pursuant to the Purchase Agreement, the Assignors have agreed to assign and the Assignee (or the relevant Designated Buyer) has agreed to assume the Assumed Liabilities held by the Assignors.

### AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements contained herein and in the Purchase Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      Subject to the terms and conditions of the Purchase Agreement, the Assignee (or the relevant Designated Buyer) hereby agrees to pay, discharge, perform or otherwise satisfy when due and payable, and assumes and agrees to be bound by, the Assumed Liabilities (which do not include any Excluded Liabilities) held by the Assignors, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

2.      Subject to the terms and conditions of the Purchase Agreement, the Assignors hereby contribute, convey, transfer and assign to the Assignee (or the relevant Designated Buyer) all of the Assignors' rights, duties and obligations under their Assumed Liabilities, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

---

[1] Multiple Assignment and Assumption Agreements with particular Sellers assigning to a particular Buyer or Designated Buyer may be executed at the request of US Buyer to facilitate appropriate post-closing structure and appropriate changes will be made to this form. In addition, the Canadian Seller may need a customized assignment document.

3.      Nothing in this Agreement shall alter any liability or obligation of the Assignors or the Assignee arising under the Purchase Agreement, which shall govern the representations, warranties and obligations of the parties with respect to the US Transferred Assets and the Assumed Liabilities held by the Assignors.

4.      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.      Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any Person, other than the parties hereto, and their successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

6.      This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

7.      This Agreement may be executed in two or more counterparts, including by facsimile or .pdf signature, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

[The remainder of this page has been intentionally left blank.]

2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

THE STANDARD REGISTER COMPANY


By: _____
      Name:
      Title:


STANDARD REGISTER
INTERNATIONAL, INC.


By: _____
      Name:
      Title:


STANDARD REGISTER TECHNOLOGIES,
INC.


By: _____
      Name:
      Title:


STANDARD REGISTER HOLDING
COMPANY


By: _____
      Name:
      Title:

STANDARD REGISTER MEXICO
HOLDING COMPANY

By: _____
    Name:
    Title:

IMEDCONSENT, LLC

By: _____
    Name:
    Title:

STANDARD REGISTER OF PUERTO
RICO INC.

By: _____
    Name:
    Title:

STANDARD ACQUISITION HOLDINGS, LLC


By: _____
     Name:
     Title:

Exhibit 7

# INTELLECTUAL PROPERTY ASSIGNMENT[1]

This INTELLECTUAL PROPERTY ASSIGNMENT (this "Assignment") is made and entered into as of [_____], 2015, (the "Effective Date") by and among Standard Register Company, an Ohio corporation, Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, and Standard Register of Puerto Rico Inc., a Delaware corporation (collectively, "Assignors") and Standard Acquisition Holdings, LLC, a Delaware limited liability company ("Assignee"). Any capitalized terms used herein but not otherwise defined herein shall have the meaning as defined in the Purchase Agreement (as defined below).

WHEREAS, Assignors and Assignee and the other parties thereto have entered into that certain Asset Purchase Agreement, dated as March 12, 2015 (the "Purchase Agreement"), pursuant to which Assignors have agreed to sell, assign, transfer, convey and deliver to Assignee all of the Assignors' right, title and interest as of the date hereof in and to the Transferred Assets and Assignee has agreed to purchase, acquire, accept and pay for the Transferred Assets, including, without limitation, certain Intellectual Property;

WHEREAS, in connection with the Purchase Agreement, the parties to the Purchase Agreement desire that Assignors sell, assign, transfer, convey and deliver to Assignee all of the right, title and interest of Assignors in and to all of the following that are included in the Transferred Assets: (a) trade names, trademarks and service marks, business names, corporate names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("Patents"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"); (d) all rights in the foregoing and in other similar intangible assets; and (e) all applications and registrations for any of the foregoing, including, without limitation, the Trademarks, Patents and Copyrights set forth on Attachment A attached hereto (collectively, the "Assigned IP"); and

WHEREAS, Assignee wishes to acquire and accept all of Assignors' right, title and interest in and to the Assigned IP, and Assignors wish to sell, assign, transfer, convey and deliver to Assignee all of such right, title and interest in and to the Assigned IP to Assignee.

NOW, THEREFORE, for good and valuable consideration, including, without limitation, for and in exchange for the payment of the Purchase Price set forth in the Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Transfer of Assigned IP.  Assignors do hereby sell, assign, transfer, convey and

---

[1] Multiple IP Assignment Agreements with particular Sellers assigning to a particular Buyer or Designated Buyer may be executed at the request of US Buyer to facilitate appropriate post-closing structure and appropriate changes will made to this form. In addition, the Canadian Seller and Mexico Sellers, as applicable, may need a customized assignment document.

deliver to Assignee and its successors and assigns, and Assignee does hereby acquire and accept, all of Assignors' right, title and interest in and to the Assigned IP, free and clear of all obligations, Liabilities and Encumbrances to the fullest extent permitted by Section 363 of the Bankruptcy Code, throughout the universe and all rights corresponding thereto (including, without limitation, with respect to the Copyrights included in the Assigned IP, all works based upon, derived from, or incorporating such Copyrights and all the rights embraced therein, including but not limited to, the right to license, use, duplicate, reproduce, copy, distribute, display, license, adapt, modify, and prepare derivative works from the Copyrights in perpetuity in any and all media and by any and all means, whether now known or hereafter devised), together with all income, royalties or payments now or hereafter due or payable in relation to the Assigned IP and all rights and remedies (including the right to sue for and recover damages and rights to injunctive relief and other remedies) against past, present, and future infringement, misappropriation, or other violation relating to the Assigned IP, including, without limitation, any and all causes of action (whether in law or equity) and enforcement rights, whether currently pending, filed, or otherwise, relating to the Assigned IP, in each case, for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns or other legal representatives.

2.      Further Assurances.  Assignors covenant and agree that, at any time and from time to time upon the request of Assignee, at Assignee's expense, Assignors shall provide any further necessary documentation (including, without limitation, executing and delivering all papers, instruments and assignments) and do all further acts reasonably requested by Assignee to confirm, vest and perfect title in and to the Assigned IP in Assignee, its successors and assigns, including, without limitation, all documents necessary to record in the name of Assignee the assignment of the Trademarks and Patents included in the Assigned IP with the United States Patent and Trademark Office and the Copyrights included in the Assigned IP with the United States Copyright Office and, with respect to any equivalent foreign rights, with any other appropriate foreign or international office or registrar.

3.      Authorization.  Assignors hereby authorize and request the (a) Register of Copyrights of the United States, and the corresponding entity or agency in any applicable foreign country, to record Assignee as assignee and owner of the entire right, title and interest in and to the Copyrights included in the Assigned IP (including those listed on Attachment A), and (b) Commissioner of Patents and Trademarks to record Assignee as assignee and owner of the entire right, title and interest in and to the Trademark and Patents included in the Assigned IP (including those listed on Attachment A).

4.      Entire Agreement.  This Assignment, and the Purchase Agreement, including the Exhibits, Schedules and Attachments hereto and thereto, constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the parties hereto with respect to the subject matter hereof and thereof

5.      Successors and Assigns.  Subject to Section 9.14 of the Purchase Agreement, this Assignment will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

6.      No Third-Party Beneficiaries. Nothing in this instrument, express or implied, is

intended or shall be construed to confer upon, or give to, any Person, other than the parties hereto, and their successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

7.    <u>Governing Law and Venue</u>.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Assignment and all disputes or controversies arising out of or relating to this Assignment or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

8.    <u>Counterparts</u>.  Notwithstanding anything else herein to the contrary, this Assignment may be executed in two or more counterparts (including by facsimile or .pdf or other electronic format signature), all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the Assignee.

*Remainder of page intentionally left blank*

.

IN WITNESS WHEREOF, Assignors and Assignee have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

ASSIGNORS:          THE STANDARD REGISTER COMPANY


By: _____
     Name:
     Title:


STANDARD REGISTER INTERNATIONAL, INC.


By:_____
     Name:
     Title:


STANDARD REGISTER TECHNOLOGIES, INC.


By:_____
     Name:
     Title:


STANDARD REGISTER HOLDING COMPANY


By:_____
     Name:
     Title:

STANDARD REGISTER MEXICO HOLDING
COMPANY


By: _____
     Name:
     Title:


IMEDCONSENT, LLC


By:_____
     Name:
     Title:


STANDARD REGISTER OF PUERTO RICO
INC.


By: _____
     Name:
     Title:

5

## CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF _____

                                                   ss:

COUNTY OF _____

On this ___ day of _____ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to within the instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Signature and Seal

6

ASSIGNEE:                    STANDARD ACQUISITION HOLDINGS, LLC


By:        _____
           Name:
           Title:

**Attachment A**

Patents and Patent Applications

| Country | Title | App. Date/ Reg. Date | Patent No./App. No. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Trademark Registrations and Applications

| Country | Mark | App. Date/ Reg. Date | Reg. No./App. No. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Copyright Registrations and Applications

| Country | Title | Reg. No./App. No. |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

| Country | Title | Reg. No./App. No. |
|---------|-------|-------------------|
|         |       |                   |
|         |       |                   |

9

<div align="right"><u>Exhibit 8</u></div>

<div align="center">

**DOMAIN TRANSFER AGREEMENT**[1]

</div>

**DOMAIN TRANSFER AGREEMENT** made as of [_____], 2015, by and among Standard Register Company, an Ohio corporation, Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, and Standard Register of Puerto Rico Inc., a Delaware corporation (collectively, "<u>Assignors</u>") and Standard Acquisition Holdings, LLC, a Delaware limited liability company ("<u>Assignee</u>").  Any capitalized terms used herein but not otherwise defined herein shall have the meaning as defined in the Agreement (as defined below).

<div align="center">

**RECITALS**

</div>

Assignee and Assignors and the other parties thereto have entered into that certain Asset Purchase Agreement, dated as of March 12, 2015 (as amended, the "<u>Agreement</u>"), pursuant to which Assignors have agreed to sell, assign, transfer, convey and deliver to Assignee all of the Assignors' right, title and interest as of the date hereof in and to the Transferred Assets and Assignee has agreed to purchase, acquire, accept and pay for the Transferred Assets, including, without limitation, certain domain names.  Pursuant to the Agreement, Assignors have agreed to execute such instruments as Assignee may reasonably request in order to more effectively assign, transfer, grant, convey, assure and confirm to Assignee and its successors and assigns, or to aid and assist in the collection of or reducing to possession by Assignee of, all of such assets.

In accordance therewith, Assignors desire to sell, assign, transfer, convey and deliver to Assignee, and Assignee desires to accept the transfer and assignment of, all of Assignors' worldwide right, title and interest in, to and under Assignors' domestic and foreign domain names and domain name applications which constitute Transferred Assets, including without limitation the domain names listed on <u>Schedule A</u> annexed hereto and incorporated herein by reference (all of the foregoing being referred to herein as the "<u>Domain Names</u>").

<div align="center">

**AGREEMENT**

</div>

     1.  NOW, THEREFORE, for good and valuable consideration, including without limitation for and in exchange for the payment of the Purchase Price set forth in the Agreement, the receipt and sufficiency of which is hereby acknowledged, Assignors do hereby sell, assign, transfer, convey and deliver to Assignee and Assignee hereby accepts the transfer and assignment of, all of Assignors' worldwide right, title and interest in, to and under the Domain Names free and clear of all obligations, Liabilities and Encumbrances to the fullest extent permitted by Section 363 of the Bankruptcy Code.  Assignors hereby agree to promptly, fully and in good faith undertake any necessary steps and procedures required by the registrar of each Domain Name to effectuate the transfer of ownership of the Domain Names from Assignors to

---

[1] Multiple Domain Transfer Agreements with particular Sellers assigning to a particular Buyer or Designated Buyer may be executed at the request of US Buyer to facilitate appropriate post-closing structure and appropriate changes will made to this form. In addition, the Canadian Seller and Mexico Sellers, as applicable,  may need a customized assignment document.

Assignee.  Without limiting the foregoing, Assignors agree to (i) cooperate with Assignee to transfer the Domain Names electronically from Assignors' accounts to Assignee's account as promptly as reasonably practicable (such that Assignee will be listed as the registrant of the Domain Names in the WHOIS database), and (ii) complete, execute, notarize (as necessary) and deliver at any future date any additional documents that are reasonably necessary to perfect the Assignee's ownership of the Domain Names (including, but not limited to, any transfer documents required by a domain name registrar).

2.  Assignors hereby authorize and request the applicable domain name registration authorities to transfer the Domain Names from the Assignors to the Assignee.

3.  This Domain Transfer Agreement, and the Agreement, including the Exhibits and Schedules hereto and thereto, constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the parties hereto with respect to the subject matter hereof and thereof

4.  Subject to Section 9.14 of the Agreement, this Domain Transfer Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

5.  Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any Person, other than the parties hereto, and their successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

6.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Domain Transfer Agreement and all disputes or controversies arising out of or relating to this Domain Transfer Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

7.  Notwithstanding anything else herein to the contrary, this Domain Transfer Agreement may be executed in two or more counterparts (including by facsimile or .pdf or other electronic format signature), all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the Assignee.

[The remainder of this page has been intentionally left blank.]

IN WITNESS WHEREOF, Assignors have caused their duly authorized officers to execute this Domain Transfer Agreement as of the date first above written.

THE STANDARD REGISTER COMPANY


By: _____
      Name:
      Title:


STANDARD REGISTER INTERNATIONAL, INC.


By:_____
      Name:
      Title:


STANDARD REGISTER TECHNOLOGIES, INC.


By:_____
      Name:
      Title:


STANDARD REGISTER HOLDING COMPANY


By:_____
      Name:
      Title:


STANDARD REGISTER MEXICO HOLDING COMPANY


By:_____
      Name:
      Title:

IMEDCONSENT, LLC


By:_____
    Name:
    Title:


STANDARD REGISTER OF PUERTO RICO INC.


By: _____
    Name:
    Title:

## CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF _____

                                              ss:

COUNTY OF _____


       On this _____ day of _____ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to within the instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Signature and Seal

IN WITNESS WHEREOF, Assignee has caused their duly authorized officers to execute this Domain Transfer Agreement as of the date first above written.

STANDARD ACQUISITION HOLDINGS, LLC

By: _____
       Name:
       Title:

**SCHEDULE A**

Exhibit 9

**CONTRATO DE COMPRAVENTA Y CESIÓN** (EL "<u>CONTRATO</u>") QUE CELEBRAN, POR UNA PARTE, **[MEXICO SELLER]** (EL "<u>VENDEDOR</u>"), COMO VENDEDOR; Y POR LA OTRA, **[MEXICO BUYER]** (EL "<u>COMPRADOR</u>" Y, CONJUNTAMENTE CON EL VENDEDOR, LAS "<u>PARTES</u>"), COMO COMPRADOR; AL TENOR DE LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS:

**PURCHASE AND ASSIGNMENT AGREEMENT** (THIS "<u>AGREEMENT</u>") ENTERED INTO BY AND BETWEEN **[MEXICO SELLER]** (THE "<u>SELLER</u>"), AS SELLER; AND **[MEXICO BUYER]** (THE "<u>PURCHASER</u>", AND TOGETHER WITH THE SELLER, THE "<u>PARTIES</u>"), AS PURCHASER; IN ACCORDANCE WITH THE FOLLOWING REPRESENTATIONS AND CLAUSES:

## <u>DECLARACIONES</u>

## <u>REPRESENTATIONS</u>

**I.** Declara el Vendedor que:

**I.** Seller hereby represents that:

**(a)** Es una [sociedad de responsabilidad limitada de capital variable] debidamente constituida y existente de conformidad con las leyes de los Estados Unidos Mexicanos ("<u>México</u>").

**(a)** It is a [*sociedad de responsabilidad limitada de capital variable*] duly organized and existing under the laws of the United Mexican States ("<u>Mexico</u>").

**(b)** Su representante cuenta con las facultades suficientes para representarlo y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna.

**(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof.

**(c)** Es el único y legítimo propietario o titular del equipo, activos, inventario y cuentas por cobrar descritas en el <u>Apéndice I</u> del presente (los "<u>Activos Transmitidos</u>").

**(c)** It is the sole and lawful owner of all the equipment, assets, inventory and accounts receivable described in <u>Schedule I</u> hereto (the "<u>Transferred Assets</u>").

**(d)** Desea vender, ceder y transferir todos los derechos y obligaciones derivados del Contrato de Arrendamiento a favor del Comprador.

**(d)** It desires to sell, assign and convey all the Transferred Assets to Purchaser.

**II.** Declara el Comprador que:

**II.** Purchaser hereby represents that:

**(a)** Es una [●] debidamente constituida y existente de conformidad con las leyes de México.

**(a)** It is a [●] duly organized and existing under the laws of Mexico.

**(b)** Su representante cuenta con las facultades suficientes para representarla y celebrar el presente Contrato, y a esta fecha dichas

**(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked,

1

facultades no le han sido revocadas, limitadas o modificadas en forma alguna.

**(c)** Desea comprar y adquirir del Vendedor todos los Activos Transmitidos.

De conformidad con los antecedentes y declaraciones que preceden, las Partes convienen en sujetarse a las siguientes:

<div align="center">

**CLÁUSULAS**

</div>

**1. OBJETO; COOPERACIÓN.**

**(a)** El Vendedor en este acto vende, cede y transfiere al Comprador y este último adquiere del Vendedor todos sus derechos, titularidad e intereses sobre los Activos Transmitidos, libres de cualquier gravamen, carga u obligación.

**(b)** El Vendedor en este acto se obliga a, de tiempo en tiempo a partir de la firma de este instrumento, a solicitud del Comprador, realizar, celebrar, reconocer y completar, o causar que sea realizado, celebrado, reconocido y completado, cualesquier actos, entregas, transferencias, cesiones, poderes y actos confirmatorios que el Comprador pueda razonablemente requerir para que la entrega, transmisión y asunción del Comprador, y para poner al Comprador en posesión, de cualquiera de los derechos y obligaciones transmitidos conforme al presente.

**(c)** Respecto de Activos Transmitidos que sean cuentas por cobrar:

(i) A más tardar dentro de los [cinco] ([5]) días siguientes a la celebración de este Contrato, el Vendedor se obliga a notificar por escrito a todos los terceros correspondientes (con copia al Comprador) sobre la cesión de los derechos de cobro derivados de las cuentas por cobrar cedidas al Comprador como parte de los Activos Transmitidos, instruyendo a dichos terceros para que realicen cualesquier pagos relacionados con las referidas cuentas por cobrar directamente al Comprador mediante

limited or modified in any way as of the date hereof.

**(c)** It desires to purchase and acquire from Seller all Transferred Assets.

In consideration of the preceding recitals and representations, the Parties agree as follows:

<div align="center">

**CLAUSES**

</div>

**1. PURPOSE; COOPERATION.**

**(a)** Seller hereby sells, assigns and transfers to Purchaser, and Purchaser purchases and acquires from Seller, all the Seller's right, title and interest in the Transferred Assets, free and clear of any lien, encumbrance or liability.

**(b)** Seller hereby covenants that, from time to time after the execution of this instrument, at Purchaser's request, will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Purchaser may reasonably require to convey, transfer to and vest in Purchaser, and to put Purchaser in possession of, any of the rights and obligations transferred hereunder.

**(c)** With respect to Transferred Assets that are accounts receivable:

(i) No later than [five] ([5]) days following the execution of this Agreement, Seller shall notify in writing all relevant third parties (with a copy to Lessee) of the assignment of the Seller's collection rights under accounts receivable assigned to Purchaser as part of the Transferred Assets, instructing such third parties to make any payments related to the aforementioned accounts receivable directly to Purchaser through wire transfer to the following account:

<div align="center">2</div>

transferencia electrónica de fondos a la siguiente cuenta: [●] (la "Cuenta del Comprador"); y

[●] (the "Purchaser's Account"); and

(ii) A más tardar dentro de los [tres] ([3]) días siguientes a la fecha en que el Vendedor haya recibido de cualquier tercero un pago relacionado con cualquier cuenta por cobrar cedida al Comprador como parte de los Activos Transmitidos, el Vendedor deberá entregar dicho pago al Comprador mediante transferencia electrónica de fondos a la Cuenta del Comprador.

(ii) No later than [three] ([3]) days following the date on which Seller may have received payment by any third party in connection with any account receivable assigned to Purchaser as part of the Transferred Assets, Seller shall deliver any such payment to Purchaser through wire transfer to the Purchaser's Account.

## 2. CONTRAPRESTACIÓN.

## 2. CONSIDERATION.

**(a)** Como contraprestación por la cesión del Contrato de Arrendamiento, en este acto el Comprador paga al Vendedor las cantidades mencionadas en el Apéndice II (conjuntamente, la "Contraprestación").

**(a)** As consideration for the sale and assignment of the Transferred Assets, Purchaser hereby pays to Seller the amounts indicated in Schedule II hereof (collectively, the "Consideration").

**(b)** De acuerdo con las leyes fiscales aplicables, contra el pago de la Contraprestación el Vendedor deberá entregar al Comprador una o más facturas (según corresponda, dependiendo de cada tipo de Activo Transmitido).

**(b)** Pursuant to applicable tax laws, upon payment of the Consideration, Seller shall deliver to Purchaser one or more invoices (as applicable, depending on each type of Transferred Asset).

## 3. DISPOSICIONES GENERALES.

## 3. GENERAL PROVISIONS.

**3.1.** Enmiendas y Modificaciones; Renuncia. Este Contrato no podrá ser enmendado, modificado o suplementado de ninguna manera, ya sea por conducta alguna o de cualquier otra forma, excepto mediante instrumento por escrito específicamente designado como una modificación del presente, firmado por cada una de las Partes. Ninguna falta o demora de cualquier Parte en el ejercicio de cualquier derecho o recurso conforme al presente Contrato constituirá una renuncia al mismo; ni el ejercicio individual o parcial de cualquier derecho o facultad, o el abandono o interrupción de acciones para el cumplimiento forzoso de dicho derecho o facultad, o alguna conducta, excluirán cualquier otro derecho o

**3.1.** Amendment and Modification; Waiver. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other right or power or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be

3

facultad o el ejercicio de cualquier otro derecho a partir de aquéllos, o el ejercicio de cualquier otro derecho o facultad. Cualquier acuerdo de cualquiera de las Partes respecto de dicha renuncia será válido únicamente si consta en instrumento por escrito firmado y celebrado por un funcionario debidamente facultado actuando en representación de la Parte respectiva.

valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**3.2.** <u>Notificaciones</u>. Todas las notificaciones y comunicaciones conforme al presente deberán ser por escrito y se entenderán debidamente entregadas (a) en la fecha de entrega, si fueren entregadas personalmente, o mediante facsímile, una vez confirmada la recepción por facsímile o de cualquier otra forma, (b) el Día Hábil inmediato siguiente a la fecha de envío, si hubiera sido entregado utilizando un servicio de entrega al día siguiente (*next-day*) por un servicio de mensajería (*next-day courier*) reconocido, (c) el día de la transmisión, si fuera entregado mediante transmisión de correo electrónico a la dirección de correo indicada más adelante, en horas hábiles de un Día Hábil y, si no fuera el caso, entonces el Día Hábil inmediato siguiente, o (d) al momento de la confirmación de recepción o el quinto (5to) Día Hábil siguiente a la fecha de depósito si fuera entregado mediante correo certificado (*registered or certified mail*), con solicitud de acuse de recibo y porte pagado, lo que ocurra primero. Todas las notificaciones conforme al presente deberán ser entregadas a los domicilios indicados a continuación, o de acuerdo con cualesquier otras instrucciones que sean indicadas por escrito por la Parte que recibirá la notificación de que se trate:

**3.2.** <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i) si al Vendedor, a:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Atención: Chief Restructuring Officer
Facsímile: [●]
E-mail: [●]

(i) if to the Seller, to:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Attention: Chief Restructuring Officer
Facsimile: [●]
E-mail: [●]

4

con copia (que no constituirá notificación) para:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Atención: Barbara L. Becker
Facsímile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) si al Comprador, a:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830
Atención: General Counsel
Facsimile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Atención: Kimberly A. DeBeers and Ron E. Meisler
Facsímile: + 1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

Para efectos de esta Sección, "Día Hábil" significa cualquier día que no sea un sábado, domingo o cualquier otro día en que los bancos estén requeridos o autorizados por ley para cerrar en la ciudad de Nueva York [y en la Ciudad de México].

**3.3.** Ley Aplicable. Este Contrato se regirá en todos sus aspectos por, e interpretará conforme a, las leyes de México.

**3.4.** Jurisdicción. Para la interpretación y cumplimiento del presente Contrato, las Partes acuerdan someterse expresa e irrevocablemente

---

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Barbara L. Becker
Facsimile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) if to the Purchaser, to:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830
Attention: General Counsel
Facsimile: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention: Kimberly A. DeBeers and Ron E. Meisler
Facsimile: + 1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

For purposes of this Section, "Business Day" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the city of New York [and in Mexico City].

**3.3.** Governing Law. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of Mexico.

**3.4.** Jurisdiction. For the interpretation and compliance of this Agreement, the Parties expressly and irrevocably submit to the

5

a la jurisdicción de los tribunales federales ubicados en la Ciudad de México, Distrito Federal, renunciando expresamente a cualquier otro fuero que pudiera corresponderles por razón de su domicilio presente o futuro, o por cualquier otra razón.

jurisdiction of the federal courts sitting in Mexico City, Federal District, expressly waiving any other jurisdiction to which they may be entitled by reason of their present or future domicile, or by any other reason.

**3.5.** <u>Partes Interesadas</u>. Este Contrato obliga y beneficia a las Partes del mismo, así como a sus respectivos causahabientes o cesionarios permitidos.

**3.5.** <u>Parties in Interest</u>. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**3.6.** <u>Ejemplares</u>. Este Contrato podrá ser firmado en dos o más ejemplares, todos los cuales deberán ser considerados uno y constituirán el mismo instrumento, y surtirá sus efectos cuando uno o más ejemplares hayan sido firmados por cada una de las Partes.

**3.6.** <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties.

**3.7.** <u>Idioma</u>. En caso de conflicto o inconsistencias entre la columna en inglés y la columna en español, la versión en español prevalecerá.

**3.7.** <u>Language</u>. In case of conflict or inconsistencies between the English column and the Spanish column, the Spanish version shall control.

[*Siguen páginas de firmas*]

[*Signature pages follow*]

6

DE CONFORMIDAD CON LO ANTERIOR, las Partes celebraron este Contrato el [●].

IN WITNESS WHEREOF, the Parties have executed this Agreement as of [●].

Exhibit 10

| | |
|---|---|
| **CONTRATO DE CESIÓN Y ASUNCIÓN DE CUENTAS POR PAGAR** (EL "<u>CONTRATO</u>") QUE CELEBRAN, POR UNA PARTE, **[MEXICO SELLER]** (EL "<u>CEDENTE</u>"), COMO CEDENTE; Y POR LA OTRA, **[MEXICO BUYER]** (EL "<u>CESIONARIO</u>" Y, CONJUNTAMENTE CON EL CEDENTE, LAS "<u>PARTES</u>"), COMO CESIONARIO; AL TENOR DE LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS: | **ACCOUNTS PAYABLE ASSIGNMENT AND ASSUMPTION AGREEMENT** (THIS "<u>AGREEMENT</u>") ENTERED INTO BY AND BETWEEN **[MEXICO SELLER]** (THE "<u>ASSIGNOR</u>"), AS ASSIGNOR; AND **[MEXICO BUYER]** (THE "<u>ASSIGNEE</u>", AND TOGETHER WITH THE ASSIGNOR, THE "<u>PARTIES</u>"), AS ASSIGNEE; IN ACCORDANCE WITH THE FOLLOWING REPRESENTATIONS AND CLAUSES: |

| **DECLARACIONES** | **REPRESENTATIONS** |
|---|---|
| **I.** Declara el Cedente que: | **I.** Assignor hereby represents that: |
| **(a)** Es una [sociedad de responsabilidad limitada de capital variable] debidamente constituida y existente de conformidad con las leyes de los Estados Unidos Mexicanos ("<u>México</u>"). | **(a)** It is a [*sociedad de responsabilidad limitada de capital variable*] duly organized and existing under the laws of the United Mexican States ("<u>Mexico</u>"). |
| **(b)** Su representante cuenta con las facultades suficientes para representarlo y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna. | **(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof. |
| **(c)** Está obligado al pago de las cuentas por pagar descritas en el <u>Apéndice I</u> del presente (las "<u>C/P Transmitidas</u>"). | **(c)** It is obligated to deliver payment under the accounts payable described in <u>Schedule I</u> hereto (the "<u>Transferred A/P</u>"). |
| **(d)** El [●], cada uno de los terceros con derecho a recibir pago conforme a las C/P Transmitidas (los "Acreedores") consintió la cesión de las mismas a favor del Cesionario. Copias de los consentimientos de los correspondientes Acreedores se adjuntan al presente como <u>Anexo A</u>. | **(d)** On [●], each of the third parties entitled to receive payment under the Transferred A/P (the "Creditors") consented to their assignment to Assignee. Copies of the relevant Creditors' consents are attached hereto as <u>Exhibit A</u>. |
| **(e)** Desea ceder las C/P Transmitidas al Cesionario. | **(e)** It desires to assign all the Transferred A/P to Assignee. |
| **II.** Declara el Cesionario que: | **II.** Assignee hereby represents that: |

1

**(a)** Es una [●] debidamente constituida y existente de conformidad con las leyes de México.

**(b)** Su representante cuenta con las facultades suficientes para representarla y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna.

**(c)** Desea adquirir del Cedente y asumir todas las C/P Transmitidas.

De conformidad con los antecedentes y declaraciones que preceden, las Partes convienen en sujetarse a las siguientes:

**CLÁUSULAS**

**1. OBJETO; COOPERACIÓN.**

**(a)** El Cedente en este acto cede y transfiere al Cesionario y este último adquiere del Cedente y asume todas sus obligaciones de pago conforme a las C/P Transmitidas.

**(b)** El Cesionario asume todas las obligaciones de pago bajo las C/P Transmitidas en los mismos términos y condiciones en los que estaba obligado el Cedente e igualmente el Cesionario se obliga a hacer los asientos necesarios en sus registros o libros de contabilidad para reconocer a los Acreedores como acreedores del Cesionario en los términos en los que estaba obligado el Cedente.

**(c)** El Cedente en este acto se obliga a, de tiempo en tiempo a partir de la firma de este instrumento, a solicitud del Cesionario, realizar, celebrar, reconocer y completar, o causar que sea realizado, celebrado, reconocido y completado, cualesquier actos, entregas, transferencias, cesiones, poderes y actos confirmatorios que el Cesionario pueda razonablemente requerir para que la entrega, transmisión y asunción del Cesionario, y para poner al Cesionario en posesión, de cualquiera

**(a)** It is a [●] duly organized and existing under the laws of Mexico.

**(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof.

**(c)** It desires to acquire from Assignor and assume all Transferred A/P.

In consideration of the preceding recitals and representations, the Parties agree as follows:

**CLAUSES**

**1. PURPOSE; COOPERATION.**

**(a)** Assignor hereby assigns and transfers to Assignee, and Assignee acquires from Assignor and assumes, all the Assignor's payment obligations under the Transferred A/P.

**(b)** Assignee assumes all payment obligations under the Transferred A/P in the same terms and conditions in which Assignor was obliged thereunder, and Assignee further undertakes to make the necessary entries in its accounting records or books to recognize the Creditors as Assignee's creditors pursuant to the terms under which Assignor was obliged.

**(c)** Assignor hereby covenants that, from time to time after the execution of this instrument, at Assignee's request, will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Assignee may reasonably require to convey, transfer to and vest in Assignee, and to put Assignee in possession of, any of the obligations transferred hereunder, and/or in

2

de las obligaciones transmitidas conforme al presente, y/o en relación con su liberación contra el pago respectivo.

connection with their discharge upon payment.

**(d)** [De conformidad con los consentimientos por escrito de los Acreedores], el Cedente se obliga a notificar por escrito a cada uno de ellos (con copia al Cesionario) sobre la cesión y asunción de las C/P Transmitidas a más tardar dentro de los [cinco] ([5]) días siguientes a la celebración de este Contrato.

**(d)** [In accordance with the Creditors' written consents], Assignor shall notify in writing each of the Creditors (with a copy to Assignee) of the assignment and assumption of the Transferred A/P within [five] ([5]) days following the execution of this Agreement.

## 2. DISPOSICIONES GENERALES.

## 2. GENERAL PROVISIONS.

**2.1.** Enmiendas y Modificaciones; Renuncia. Este Contrato no podrá ser enmendado, modificado o suplementado de ninguna manera, ya sea por conducta alguna o de cualquier otra forma, excepto mediante instrumento por escrito específicamente designado como una modificación del presente, firmado por cada una de las Partes. Ninguna falta o demora de cualquier Parte en el ejercicio de cualquier derecho o recurso conforme al presente Contrato constituirá una renuncia al mismo; ni el ejercicio individual o parcial de cualquier derecho o facultad, o el abandono o interrupción de acciones para el cumplimiento forzoso de dicho derecho o facultad, o alguna conducta, excluirán cualquier otro derecho o facultad o el ejercicio de cualquier otro derecho a partir de aquéllos, o el ejercicio de cualquier otro derecho o facultad. Cualquier acuerdo de cualquiera de las Partes respecto de dicha renuncia será válido únicamente si consta en instrumento por escrito firmado y celebrado por un funcionario debidamente facultado actuando en representación de la Parte respectiva.

**2.1.** Amendment and Modification; Waiver. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other right or power or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**2.2.** Notificaciones. Todas las notificaciones y comunicaciones conforme al presente deberán ser por escrito y se entenderán debidamente entregadas (a) en la fecha de entrega, si fueren entregadas personalmente, o mediante facsímile, una vez confirmada la recepción por facsímile o de cualquier otra forma, (b) el Día

**2.2.** Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile or otherwise, (b) on the first Business Day following the date of dispatch if

3

Hábil inmediato siguiente a la fecha de envío, si hubiera sido entregado utilizando un servicio de entrega al día siguiente (*next-day*) por un servicio de mensajería (*next-day courier*) reconocido, (c) el día de la transmisión, si fuera entregado mediante transmisión de correo electrónico a la dirección de correo indicada más adelante, en horas hábiles de un Día Hábil y, si no fuera el caso, entonces el Día Hábil inmediato siguiente, o (d) al momento de la confirmación de recepción o el quinto (5to) Día Hábil siguiente a la fecha de depósito si fuera entregado mediante correo certificado (*registered or certified mail*), con solicitud de acuse de recibo y porte pagado, lo que ocurra primero. Todas las notificaciones conforme al presente deberán ser entregadas a los domicilios indicados a continuación, o de acuerdo con cualesquier otras instrucciones que sean indicadas por escrito por la Parte que recibirá la notificación de que se trate:

delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i) si al Cedente, a:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Atención: Chief Restructuring Officer
Facsímile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Atención: Barbara L. Becker
Facsímile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) si al Cesionario, a:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830

(i) if to the Assignor, to:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Attention: Chief Restructuring Officer
Facsimile: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Barbara L. Becker
Facsimile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) if to the Assignee, to:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830

4

Atención: General Counsel
Facsimile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Atención: Kimberly A. DeBeers and Ron E. Meisler
Facsímile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

Para efectos de esta Sección, "Día Hábil" significa cualquier día que no sea un sábado, domingo o cualquier otro día en que los bancos estén requeridos o autorizados por ley para cerrar en la ciudad de Nueva York [y en la Ciudad de México].

**2.3.** Ley Aplicable. Este Contrato se regirá en todos sus aspectos por, e interpretará conforme a, las leyes de México.

**2.4.** Jurisdicción. Para la interpretación y cumplimiento del presente Contrato, las Partes acuerdan someterse expresa e irrevocablemente a la jurisdicción de los tribunales federales ubicados en la Ciudad de México, Distrito Federal, renunciando expresamente a cualquier otro fuero que pudiera corresponderles por razón de su domicilio presente o futuro, o por cualquier otra razón.

**2.5.** Partes Interesadas. Este Contrato obliga y beneficia a las Partes del mismo, así como a sus respectivos causahabientes o cesionarios permitidos.

**2.6.** Ejemplares. Este Contrato podrá ser firmado en dos o más ejemplares, todos los cuales deberán ser considerados uno y constituirán el mismo instrumento, y surtirá sus efectos cuando uno o más ejemplares hayan

Attention: General Counsel
Facsimile: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention: Kimberly A. DeBeers and Ron E. Meisler
Facsimile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

For purposes of this Section, "Business Day" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the city of New York [and in Mexico City].

**2.3.** Governing Law. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of Mexico.

**2.4.** Jurisdiction. For the interpretation and compliance of this Agreement, the Parties expressly and irrevocably submit to the jurisdiction of the federal courts sitting in Mexico City, Federal District, expressly waiving any other jurisdiction to which they may be entitled by reason of their present or future domicile, or by any other reason.

**2.5.** Parties in Interest. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**2.6.** Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by

5

sido firmados por cada una de las Partes.

each of the Parties.

**2.7.** <u>Idioma</u>. En caso de conflicto o inconsistencias entre la columna en inglés y la columna en español, la versión en español prevalecerá.

**2.7.** <u>Language</u>. In case of conflict or inconsistencies between the English column and the Spanish column, the Spanish version shall control.

[*Siguen páginas de firmas*]

[*Signature pages follow*]

6

DE CONFORMIDAD CON LO ANTERIOR, las Partes celebraron este Contrato el [●].

IN WITNESS WHEREOF, the Parties have executed this Agreement as of [●].

GA #96031v4

Exhibit 11

**CONTRATO DE CESIÓN** (EL "CONTRATO") QUE CELEBRAN, POR UNA PARTE, **[MEXICO SELLER]** (EL "CEDENTE"), COMO CEDENTE; Y POR LA OTRA, **[MEXICO BUYER]** (EL "CESIONARIO" Y, CONJUNTAMENTE CON EL CEDENTE, LAS "PARTES"), COMO CESIONARIO; AL TENOR DE LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS:

**ASSIGNMENT AGREEMENT** (THIS "AGREEMENT") ENTERED INTO BY AND BETWEEN **[MEXICO SELLER]** (THE "ASSIGNOR"), AS ASSIGNOR; AND **[MEXICO BUYER]** (THE "ASSIGNEE", AND TOGETHER WITH THE ASSIGNOR, THE "PARTIES"), AS ASSIGNEE; IN ACCORDANCE WITH THE FOLLOWING REPRESENTATIONS AND CLAUSES:

## DECLARACIONES

**I.** Declara el Cedente que:

**(a)** Es una [sociedad de responsabilidad limitada de capital variable] debidamente constituida y existente de conformidad con las leyes de los Estados Unidos Mexicanos ("México").

**(b)** Su representante cuenta con las facultades suficientes para representarlo y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna.

**(c)** Con fecha [●], el Cedente, como arrendatario, celebró un Contrato de Arrendamiento con [●] (el "Arrendador"), en su carácter de arrendador, respecto del arrendamiento de [descripción del inmueble arrendado] (el "Contrato de Arrendamiento"). Una copia del Contrato de Arrendamiento se adjunta al presente como Anexo A.

**(d)** El Contrato de Arrendamiento constituye una obligación válida y vinculante a cargo de las partes del mismo, y se encuentra vigente a la fecha del presente.

**(e)** El [●], el Arrendador consintió la cesión de todos los derechos y obligaciones del Cedente conforme al Contrato de Arrendamiento a favor del Cesionario. Una copia del consentimiento

## REPRESENTATIONS

**I.** Assignor hereby represents that:

**(a)** It is a [sociedad de responsabilidad limitada de capital variable] duly organized and existing under the laws of the United Mexican States ("Mexico").

**(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof.

**(c)** On [●], Assignor, as lessee, entered into a Lease Agreement with [●] (the "Lessor"), regarding the lease of [description of leased premises] (the "Lease Agreement"). A copy of the Lease Agreement is attached hereto as Exhibit A.

**(d)** The Lease Agreement is a valid and binding obligation of the parties thereto, and remains in effect as of the date hereof.

**(e)** On [●], Lessor consented to the assignment of all rights and obligations of Assignor under the Lease Agreement to Assignee. A copy of the Lessor's consent is attached hereto as

1

del Arrendador se adjunta al presente como Anexo B.

(f) Desea ceder los derechos y obligaciones derivados del Contrato de Arrendamiento a favor del Cesionario.

II. Declara el Cesionario que:

(a) Es una [●] debidamente constituida y existente de conformidad con las leyes de México.

(b) Su representante cuenta con las facultades suficientes para representarla y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna.

(c) Desea adquirir todos los derechos y obligaciones del Cedente conforme al Contrato de Arrendamiento.

De conformidad con los antecedentes y declaraciones que preceden, las Partes convienen en sujetarse a las siguientes:

## CLÁUSULAS

## 1. CESIÓN; COOPERACIÓN.

(a) El Cedente cede en este acto al Cesionario y este último adquiere del Cedente la totalidad de los derechos y obligaciones del Cedente conforme al Contrato de Arrendamiento, libres de cualquier gravamen, carga u obligación.

(b) El Cedente en este acto se obliga a, de tiempo en tiempo a partir de la firma de este instrumento, a solicitud del Cesionario, realizar, celebrar, reconocer y completar, o causar que sea realizado, celebrado, reconocido y completado, cualesquier actos, entregas, transferencias, cesiones, poderes y actos confirmatorios que el Cesionario pueda razonablemente requerir para que la entrega, transmisión y asunción del Cesionario, y para poner al Cesionario en posesión, de cualquiera

del Arrendador se adjunta al presente como Exhibit B.

(f) It desires to assign all of its rights and obligations under the Lease Agreement to Assignee.

II. Assignee hereby represents that:

(a) It is a [●] duly organized and existing under the laws of Mexico.

(b) Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof.

(c) It desires to acquire all Assignor's rights and obligations under the Lease Agreement.

In consideration of the preceding recitals and representations, the Parties agree as follows:

## CLAUSES

## 1. ASSIGNMENT; COOPERATION.

(a) Assignor hereby transfers to Assignee, and Assignee acquires from Assignor, all the Assignor's rights and obligations under the Lease Agreement, free and clear of any lien, encumbrance or liability.

(b) Assignor hereby covenants that, from time to time after the execution of this instrument, at Assignee's request, will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Assignee may reasonably require to convey, transfer to and vest in Assignee, and to put Assignee in possession of, any of the rights and

2

de los derechos y obligaciones transmitidos conforme al presente.

**(c)** [De conformidad con el Contrato de Arrendamiento y el consentimiento por escrito del Arrendador], el Cedente se obliga a notificar por escrito al Arrendador (con copia al Cesionario) sobre la cesión de los derechos y obligaciones del Cesionario conforme al Contrato de Arrendamiento a más tardar dentro de los [cinco] ([5]) días siguientes a la celebración de este Contrato.

## 2. CONTRAPRESTACIÓN.

**(a)** Como contraprestación por la cesión del Contrato de Arrendamiento, en este acto el Cesionario paga al Cedente la contraprestación mencionada en el <u>Apéndice I</u> (la "<u>Contraprestación</u>").

**(b)** De acuerdo con las leyes fiscales aplicables, contra el pago de la Contraprestación el Cedente deberá entregar al Cesionario la factura respectiva.

## 3. DISPOSICIONES GENERALES.

**3.1.** <u>Enmiendas y Modificaciones; Renuncia</u>. Este Contrato no podrá ser enmendado, modificado o suplementado de ninguna manera, ya sea por conducta alguna o de cualquier otra forma, excepto mediante instrumento por escrito específicamente designado como una modificación del presente, firmado por cada una de las Partes. Ninguna falta o demora de cualquier Parte en el ejercicio de cualquier derecho o recurso conforme al presente Contrato constituirá una renuncia al mismo; ni el ejercicio individual o parcial de cualquier derecho o facultad, o el abandono o interrupción de acciones para el cumplimiento forzoso de dicho derecho o facultad, o alguna conducta, excluirán cualquier otro derecho o facultad o el ejercicio de cualquier otro derecho a partir de aquéllos, o el ejercicio de cualquier otro derecho o facultad. Cualquier acuerdo de

obligations transferred hereunder.

**(c)** [In accordance with the Lease Agreement and the Lessor's written consent], Assignor shall notify in writing the Lessor (with a copy to Assignee) of the assignment of the Assignor's rights and obligations under the Lease Agreement within [five] ([5]) days following the execution of this Agreement.

## 2. CONSIDERATION.

**(a)** As consideration for the assignment of the Lease Agreement, Assignee hereby pays to Assignor the amount indicated in <u>Schedule I</u> hereof (the "<u>Consideration</u>").

**(b)** Pursuant to applicable tax laws, upon payment of the Consideration, Assignor shall deliver to Assignee the relevant invoice.

## 3. GENERAL PROVISIONS.

**3.1.** <u>Amendment and Modification; Waiver</u>. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other right or power or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

3

cualquiera de las Partes respecto de dicha renuncia será válido únicamente si consta en instrumento por escrito firmado y celebrado por un funcionario debidamente facultado actuando en representación de la Parte respectiva.

**3.2.** <u>Notificaciones</u>. Todas las notificaciones y comunicaciones conforme al presente deberán ser por escrito y se entenderán debidamente entregadas (a) en la fecha de entrega, si fueren entregadas personalmente, o mediante facsímile, una vez confirmada la recepción por facsímile o de cualquier otra forma, (b) el Día Hábil inmediato siguiente a la fecha de envío, si hubiera sido entregado utilizando un servicio de entrega al día siguiente (*next-day*) por un servicio de mensajería (*next-day courier*) reconocido, (c) el día de la transmisión, si fuera entregado mediante transmisión de correo electrónico a la dirección de correo indicada más adelante, en horas hábiles de un Día Hábil y, si no fuera el caso, entonces el Día Hábil inmediato siguiente, o (d) al momento de la confirmación de recepción o el quinto (5to) Día Hábil siguiente a la fecha de depósito si fuera entregado mediante correo certificado (*registered or certified mail*), con solicitud de acuse de recibo y porte pagado, lo que ocurra primero. Todas las notificaciones conforme al presente deberán ser entregadas a los domicilios indicados a continuación, o de acuerdo con cualesquier otras instrucciones que sean indicadas por escrito por la Parte que recibirá la notificación de que se trate:

**3.2.** <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i) si al Cedente, a:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Atención: Chief Restructuring Officer
Facsímile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

(i) if to the Assignor, to:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Attention: Chief Restructuring Officer
Facsimile: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

4

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Atención: Barbara L. Becker
Facsímile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) si al Cesionario, a:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830
Atención: General Counsel
Facsimile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Atención: Kimberly A. DeBeers and Ron E. Meisler
Facsímile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

Para efectos de esta Sección, "Día Hábil" significa cualquier día que no sea un sábado, domingo o cualquier otro día en que los bancos estén requeridos o autorizados por ley para cerrar en la ciudad de Nueva York [y en la Ciudad de México].

**3.3.** Ley Aplicable. Este Contrato se regirá en todos sus aspectos por, e interpretará conforme a, las leyes de México.

**3.4.** Jurisdicción. Para la interpretación y cumplimiento del presente Contrato, las Partes acuerdan someterse expresa e irrevocablemente a la jurisdicción de los tribunales federales ubicados en la Ciudad de México, Distrito Federal, renunciando expresamente a cualquier

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Barbara L. Becker
Facsimile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) if to the Assignee, to:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor
Greenwich, CT 06830
Attention: General Counsel
Facsimile: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention: Kimberly A. DeBeers and Ron E. Meisler
Facsimile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

For purposes of this Section, "Business Day" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the city of New York [and in Mexico City].

**3.3.** Governing Law. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of Mexico.

**3.4.** Jurisdiction. For the interpretation and compliance of this Agreement, the Parties expressly and irrevocably submit to the jurisdiction of the federal courts sitting in Mexico City, Federal District, expressly waiving any other jurisdiction to which they

5

otro fuero que pudiera corresponderles por razón de su domicilio presente o futuro, o por cualquier otra razón.

may be entitled by reason of their present or future domicile, or by any other reason.

**3.5.** <u>Partes Interesadas</u>. Este Contrato obliga y beneficia a las Partes del mismo, así como a sus respectivos causahabientes o cesionarios permitidos.

**3.5.** <u>Parties in Interest</u>. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**3.6.** <u>Ejemplares</u>. Este Contrato podrá ser firmado en dos o más ejemplares, todos los cuales deberán ser considerados uno y constituirán el mismo instrumento, y surtirá sus efectos cuando uno o más ejemplares hayan sido firmados por cada una de las Partes.

**3.6.** <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties.

**3.7.** <u>Idioma</u>. En caso de conflicto o inconsistencias entre la columna en inglés y la columna en español, la versión en español prevalecerá.

**3.7.** <u>Language</u>. In case of conflict or inconsistencies between the English column and the Spanish column, the Spanish version shall control.

[*Siguen páginas de firmas*]

[*Signature pages follow*]

6

DE CONFORMIDAD CON LO ANTERIOR, las Partes celebraron este Contrato el [●].

IN WITNESS WHEREOF, the Parties have executed this Agreement as of [●].

7

Exhibit 12

| | |
|---|---|
| **CONTRATO DE CESIÓN DE DERECHOS DE PROPIEDAD INTELECTUAL** (EL "<u>CONTRATO</u>") QUE CELEBRAN, POR UNA PARTE, **[MEXICO SELLER]** (EL "<u>CEDENTE</u>"), COMO CEDENTE; Y POR LA OTRA, **[MEXICO BUYER]** (EL "<u>CESIONARIO</u>" Y, CONJUNTAMENTE CON EL CEDENTE, LAS "<u>PARTES</u>"), COMO CESIONARIO; AL TENOR DE LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS: | **INTELLECTUAL PROPERTY RIGHTS ASSIGNMENT AGREEMENT** (THIS "<u>AGREEMENT</u>") ENTERED INTO BY AND BETWEEN **[MEXICO SELLER]** (THE "<u>ASSIGNOR</u>"), AS ASSIGNOR; AND **[MEXICO BUYER]** (THE "<u>ASSIGNEE</u>", AND TOGETHER WITH THE ASSIGNOR, THE "<u>PARTIES</u>"), AS ASSIGNEE; IN ACCORDANCE WITH THE FOLLOWING REPRESENTATIONS AND CLAUSES: |

| **DECLARACIONES** | **REPRESENTATIONS** |
|---|---|
| **I.** Declara el Cedente que: | **I.** Assignor hereby represents that: |
| **(a)** Es una [sociedad de responsabilidad limitada de capital variable] debidamente constituida y existente de conformidad con las leyes de los Estados Unidos Mexicanos ("<u>México</u>"). | **(a)** It is a [*sociedad de responsabilidad limitada de capital variable*] duly organized and existing under the laws of the United Mexican States ("<u>Mexico</u>"). |
| **(b)** Su representante cuenta con las facultades suficientes para representarlo y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna. | **(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof. |
| **(c)** Es el único y legítimo titular de los derechos de propiedad intelectual e industrial listados en el <u>Apéndice I</u> de este Contrato (los "<u>Derechos PI</u>"), mismos que se encuentran registrados o en trámite de registro ante el Instituto Mexicano de la Propiedad Industrial (el "<u>IMPI</u>"), y a la fecha de firma del Contrato, se encuentran surtiendo plenos efectos legales. | **(c)** Is the sole and lawful owner of the intellectual and industrial property rights listed in <u>Schedule I</u> hereof (the "<u>IP Rights</u>"), which are either duly registered before the Mexican Institute of Industrial Property (*Instituto Mexicano de la Propiedad Industrial*) ("<u>IMPI</u>") or whose registration has been applied for but is pending, and as to this date are fully effective. |
| **(d)** Desea ceder los Derechos PI a favor del Cesionario. | **(d)** It desires to assign the IP Rights to Assignee. |
| **II.** Declara el Cesionario que: | **II.** Assignee hereby represents that: |
| **(a)** Es una [●] debidamente constituida y existente de conformidad con las leyes de México. | **(a)** It is a [●] duly organized and existing under the laws of Mexico. |

1

**(b)** Su representante cuenta con las facultades suficientes para representarla y celebrar el presente Contrato, y a esta fecha dichas facultades no le han sido revocadas, limitadas o modificadas en forma alguna.

**(b)** Its representative has enough authority to act on its behalf and enter into this Agreement, and such authority has not been revoked, limited or modified in any way as of the date hereof.

**(c)** Desea adquirir los Derechos PI del Cedente.

**(c)** It desires to acquire the IP Rights from Assignor.

De conformidad con los antecedentes y declaraciones que preceden, las Partes convienen en sujetarse a las siguientes:

In consideration of the preceding recitals and representations, the Parties agree as follows:

## <u>CLÁUSULAS</u>

## <u>CLAUSES</u>

## 1. CESIÓN; COOPERACIÓN.

## 1. ASSIGNMENT; COOPERATION.

**(a)** El Cedente cede en este acto al Cesionario y este último adquiere del Cedente la totalidad de los Derechos PI, libres de cualquier gravamen, carga u obligación.

**(a)** Assignor hereby transfers to Assignee, and Assignee acquires from Assignor, all the IP Rights, free and clear of any lien, encumbrance or liability.

**(b)** El Cedente en este acto se obliga a, de tiempo en tiempo a partir de la firma de este instrumento, a solicitud del Cesionario, realizar, celebrar, reconocer y completar, o causar que sea realizado, celebrado, reconocido y completado, cualesquier actos, entregas, transferencias, cesiones, poderes y actos confirmatorios que el Cesionario pueda razonablemente requerir para que la entrega, transmisión y asunción del Cesionario, y para poner al Cesionario en posesión, de cualquiera de los Derechos PI.

**(b)** Assignor hereby covenants that, from time to time after the execution of this instrument, at Assignee's request, will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Assignee may reasonably require to convey, transfer to and vest in Assignee, and to put Assignee in possession of, any of the IP Rights.

## 2. CONTRAPRESTACIÓN.

## 2. CONSIDERATION.

**(a)** Como contraprestación por la cesión de los Derechos PI, en este acto el Cesionario paga al Cedente la contraprestación mencionada en el <u>Apéndice II</u> (la "<u>Contraprestación</u>").

**(a)** As consideration for the assignment of the IP Rights, Assignee hereby pays to Assignor the amount indicated in <u>Schedule II</u> hereof (the "<u>Consideration</u>").

**(b)** De acuerdo con las leyes fiscales aplicables, contra el pago de la Contraprestación el Cedente deberá entregar al Cesionario la factura respectiva.

**(b)** Pursuant to applicable tax laws, upon payment of the Consideration, Assignor shall deliver to Assignee the relevant invoice.

2

## 3. INSCRIPCIÓN.

**(a)** Este Contrato será registrado ante el IMPI y/o cualquier otra autoridad gubernamental competente.

**(b)** De conformidad con lo establecido en el Reglamento de la Ley de Propiedad Industrial, cualquier información relativa a la Contraprestación será omitida en el ejemplar de este Contrato que sea exhibido ante el IMPI.

## 4. DISPOSICIONES GENERALES.

**4.1.** Enmiendas y Modificaciones; Renuncia. Este Contrato no podrá ser enmendado, modificado o suplementado de ninguna manera, ya sea por conducta alguna o de cualquier otra forma, excepto mediante instrumento por escrito específicamente designado como una modificación del presente, firmado por cada una de las Partes. Ninguna falta o demora de cualquier Parte en el ejercicio de cualquier derecho o recurso conforme al presente Contrato constituirá una renuncia al mismo; ni el ejercicio individual o parcial de cualquier derecho o facultad, o el abandono o interrupción de acciones para el cumplimiento forzoso de dicho derecho o facultad, o alguna conducta, excluirán cualquier otro derecho o facultad o el ejercicio de cualquier otro derecho a partir de aquéllos, o el ejercicio de cualquier otro derecho o facultad. Cualquier acuerdo de cualquiera de las Partes respecto de dicha renuncia será válido únicamente si consta en instrumento por escrito firmado y celebrado por un funcionario debidamente facultado actuando en representación de la Parte respectiva.

**4.2.** Notificaciones. Todas las notificaciones y comunicaciones conforme al presente deberán ser por escrito y se entenderán debidamente entregadas (a) en la fecha de entrega, si fueren entregadas personalmente, o mediante facsímile, una vez confirmada la recepción por

## 3. REGISTRATION.

**(a)** This Agreement shall be recorded before the IMPI and/or any other competent governmental authority.

**(b)** Pursuant to the Regulations under the Industrial Property Law (*Reglamento de la Ley de Propiedad Industrial*), any information relating to the Consideration shall be excluded from the copy of this Agreement to be filed with the IMPI.

## 4. GENERAL PROVISIONS.

**4.1.** Amendment and Modification; Waiver. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other right or power or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**4.2.** Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by facsimile, upon written confirmation of receipt by facsimile or otherwise, (b) on the first

3

facsímile o de cualquier otra forma, (b) el Día Hábil inmediato siguiente a la fecha de envío, si hubiera sido entregado utilizando un servicio de entrega al día siguiente (*next-day*) por un servicio de mensajería (*next-day courier*) reconocido, (c) el día de la transmisión, si fuera entregado mediante transmisión de correo electrónico a la dirección de correo indicada más adelante, en horas hábiles de un Día Hábil y, si no fuera el caso, entonces el Día Hábil inmediato siguiente, o (d) al momento de la confirmación de recepción o el quinto (5to) Día Hábil siguiente a la fecha de depósito si fuera entregado mediante correo certificado (*registered or certified mail*), con solicitud de acuse de recibo y porte pagado, lo que ocurra primero. Todas las notificaciones conforme al presente deberán ser entregadas a los domicilios indicados a continuación, o de acuerdo con cualesquiera otras instrucciones que sean indicadas por escrito por la Parte que recibirá la notificación de que se trate:

Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i) si al Cedente, a:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Atención: Chief Restructuring Officer
Facsímile: [●]
E-mail: [●]

(i) if to the Assignor, to:

[Mexico Seller and]
The Standard Register Company
600 Albany Street, Dayton, Ohio 45417
Attention: Chief Restructuring Officer
Facsimile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Atención: Barbara L. Becker
Facsímile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Barbara L. Becker
Facsimile: +1 (212) 354-6202
E-mail: bbecker@gibsondunn.com

(ii) si al Cesionario, a:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor

(ii) if to the Assignee, to:

[Mexico Buyer and]
Standard Acquisition Holdings, LLC
c/o Silver Point Finance, LLC
2 Greenwich Plaza, First Floor

4

Greenwich, CT 06830
Atención: General Counsel
Facsimile: [●]
E-mail: [●]

con copia (que no constituirá notificación) para:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Atención: Kimberly A. DeBeers and Ron E. Meisler
Facsímile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

Para efectos de esta Sección, "Día Hábil" significa cualquier día que no sea un sábado, domingo o cualquier otro día en que los bancos estén requeridos o autorizados por ley para cerrar en la ciudad de Nueva York [y en la Ciudad de México].

**4.3.** Ley Aplicable. Este Contrato se regirá en todos sus aspectos por, e interpretará conforme a, las leyes de México.

**4.4.** Jurisdicción. Para la interpretación y cumplimiento del presente Contrato, las Partes acuerdan someterse expresa e irrevocablemente a la jurisdicción de los tribunales federales ubicados en la Ciudad de México, Distrito Federal, renunciando expresamente a cualquier otro fuero que pudiera corresponderles por razón de su domicilio presente o futuro, o por cualquier otra razón.

**4.5.** Partes Interesadas. Este Contrato obliga y beneficia a las Partes del mismo, así como a sus respectivos causahabientes o cesionarios permitidos.

**4.6.** Ejemplares. Este Contrato podrá ser firmado en dos o más ejemplares, todos los cuales deberán ser considerados uno y constituirán el mismo instrumento, y surtirá sus

---

Greenwich, CT 06830
Attention: General Counsel
Facsimile: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention: Kimberly A. DeBeers and Ron E. Meisler
Facsimile: +1 (312) 407-8576
E-mail: kimberly.debeers@skadden.com and ron.meisler@skadden.com

For purposes of this Section, "Business Day" shall mean any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the city of New York [and in Mexico City].

**4.3.** Governing Law. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of Mexico.

**4.4.** Jurisdiction. For the interpretation and compliance of this Agreement, the Parties expressly and irrevocably submit to the jurisdiction of the federal courts sitting in Mexico City, Federal District, expressly waiving any other jurisdiction to which they may be entitled by reason of their present or future domicile, or by any other reason.

**4.5.** Parties in Interest. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**4.6.** Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when

efectos cuando uno o más ejemplares hayan sido firmados por cada una de las Partes.

**4.7.** <u>Idioma</u>. En caso de conflicto o inconsistencias entre la columna en inglés y la columna en español, la versión en español prevalecerá.

[*Siguen páginas de firmas*]

one or more counterparts have been signed by each of the Parties.

**4.7.** <u>Language</u>. In case of conflict or inconsistencies between the English column and the Spanish column, the Spanish version shall control.

[*Signature pages follow*]

6

DE CONFORMIDAD CON LO ANTERIOR, las Partes celebraron este Contrato el [●].

IN WITNESS WHEREOF, the Parties have executed this Agreement as of [●].

7

Exhibit 13

# CERTIFICATE OF NON-FOREIGN STATUS
## UNDER SECTION 1445 OF THE INTERNAL REVENUE CODE

Reference is hereby made to that certain Asset Purchase Agreement (as may be amended, the "Agreement"), dated as of March 12, 2015, by and among The Standard Register Company, an Ohio corporation ("Seller Parent"), Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, Standard Register of Puerto Rico Inc., a Delaware corporation, Standard Register Holding, S. de R.L. de C.V., a Mexican limited company, Standard Register Servicios S. de R.L. de C.V., a Mexican limited company, Standard Register de Mexico, S. de R.L. de C.V., a Mexican limited company, and Standard Register Technologies Canada ULC, a Nova Scotia unlimited liability company (Seller Parent together with the foregoing entities, each a "Seller" and collectively, the "Sellers") and Standard Acquisition Holdings, LLC, a Delaware Limited Liability Company (the "US Buyer").Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Section 1445 of the Internal Revenue Code of 1986 (the "Code") provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.  For United States tax purposes (including Section 1445 of the Code), the owner of a disregarded entity (which has legal title to a United States real property interest under local law) will be the transferor of the property and not the disregarded entity.  To inform US Buyer, and each of its affiliates, that withholding of tax is not required upon the disposition of a United States real property interest by [[Seller Parent] [Debtor Seller]], the undersigned hereby certifies under penalties of perjury the following on behalf of [[Seller Parent] [Debtor Seller]]:

1.    [[Seller Parent] [Debtor Seller]] is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and the Treasury Regulations);

2.    [[Seller Parent] [Debtor Seller]] is not a disregarded entity as defined in Treasury Regulations Section 1.445-2(b)(2)(iii);

3.    [[Seller Parent] [Debtor Seller]]'s United States employer identification number is [ ]; and

4.    [[Seller Parent] [Debtor Seller]]'s office address is [ ].

[[Seller Parent] [Debtor Seller]] understands that this certification may be disclosed to the Internal Revenue Service by US Buyer and its affiliates, and that any false statement contained herein could be punished by fine, imprisonment, or both.

       Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of [[Seller Parent] [Debtor Seller]].


By:_____
     Name:
     Title:



Dated: _____, 2015

Exhibit 14

**CERTIFICATE OF NON-UNITED STATES REAL PROPERTY INTEREST
UNDER SECTION 1445 OF THE INTERNAL REVENUE CODE**

Reference is hereby made to that certain Asset Purchase Agreement (as may be amended, the "Agreement"), dated as of March 12, 2015, by and among The Standard Register Company, an Ohio corporation ("Seller Parent"), Standard Register International, Inc., an Ohio corporation, Standard Register Technologies, Inc., an Ohio corporation, Standard Register Holding Company, an Ohio corporation, Standard Register Mexico Holding Company, an Ohio corporation, iMedConsent, LLC, a Delaware limited liability company, Standard Register of Puerto Rico Inc., a Delaware corporation, Standard Register Holding, S. de R.L. de C.V., a Mexican limited company, Standard Register Servicios S. de R.L. de C.V., a Mexican limited company, Standard Register de Mexico, S. de R.L. de C.V., a Mexican limited company, and Standard Register Technologies Canada ULC, a Nova Scotia unlimited liability company (Seller Parent together with the foregoing entities, each a "Seller" and collectively, the "Sellers") and Standard Acquisition Holdings, LLC, a Delaware Limited Liability Company (the "US Buyer").Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Section 1445 of the Internal Revenue Code of 1986 (the "Code") provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.  To inform Mexico Buyer, and each of its affiliates, that withholding of tax is not required upon the disposition of the Mexico Transferred Assets by [Mexico Seller], the undersigned hereby certifies under penalties of perjury the following on behalf of [Mexico Seller]:

1.    None of the Mexico Transferred Assets constitutes United States real property interest, within the meaning of Section 897(c) of the Code and the Treasury Regulations promulgated thereunder;

2.    [Mexico Seller]'s United States employer identification number is [ ]; and

3.    [Mexico Seller]'s office address is [ ].

[Mexico Seller] understands that this certification may be disclosed to the Internal Revenue Service by Mexico Buyer and its affiliates, and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of [Mexico Seller].

By:_____
    Name:
    Title:

Dated: _____, 2015