## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF ANDREW TORGOVE
## IN SUPPORT OF THE SALE MOTION

I, Andrew Torgove, make this Declaration under 28 U.S.C. § 1746 and state as follows:

1.      I am a managing director and head of the distressed advisory and restructuring practice of Lazard Middle Market LLC ("Lazard"), investment banker to The Standard Register Company ("Standard Register") and the other above-captioned debtors and debtors in possession (collectively, the "Debtors").  I submit this Declaration in support of (a) the proposed sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") to Standard Acquisition Holdings, LLC (the "Stalking Horse") pursuant to that certain Asset Purchase Agreement among the Debtors and the Stalking Horse dated as of March 11, 2015 (the "Stalking Horse APA") or to the successful bidder offering the highest or otherwise best offer for the Assets in accordance with the proposed "Bid Procedures Order" annexed to the Sale Motion (defined below) as Exhibit B, all as more fully described in the *Debtors' Motion for (I) an Order (A) Authorizing and Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Authorizing and Approving Stalking Horse Protections, (C)*

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

*Authorizing and Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale, (D) Scheduling an Auction and a Sale Approval Hearing, and (E) Approving the Form and Manner of the Notice of the Sale Hearing and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale* (the "Sale Motion"), and (b) the Debtors' proposed entry into (A) the Super-Priority Priming Debtor in Possession Delayed Draw Term Loan Credit Agreement (the "DIP Term Loan Agreement") among the Debtors, the lenders party thereto (the "DIP Term Lenders"), and Silver Point Finance, LLC ("Silver Point"), as Administrative Agent, in the amount of up to $30 million (collectively, the "DIP Term Loans"), and (B) the Postpetition Loan and Security Agreement (the "DIP ABL Credit Agreement" and together with the DIP Term Loan Agreement, the "DIP Loan Agreements") among the Debtors, the lenders party thereto (the "DIP ABL Lenders," and together with the DIP Term Lenders, the "DIP Lenders"), and Bank of America N.A. ("BofA"), as Administrative Agent, in the amount of up to $125 million (the "DIP ABL Loans" and together with the DIP Term Loans the "DIP Loans"), all as more fully described in the *Debtors' Motion for Order (A) Authorizing Debtors (I) to Provide Adequate Protection to the Debtors' Secured Lenders, (II) to Obtain Interim Postpetition Financing an a Superpriority, Secured and Priming Basis in Favor of Silver Point Finance, LLC, as Administrative Agent for Proposed DIP Term Lenders, and Bank of America, N.A., as Administrative Agent for Proposed DIP ABL Lenders, and (III) to Modify the Automatic Stay; and (B) Scheduling, and Establishing Deadlines Relating to a Final Hearing and Entry of a Final Order on Postpetition Financing* (the "Financing Motion").

2.      Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

### Qualifications of Declarant and Lazard

3.      I have more than 19 years of experience advising corporations and other constituents on restructuring transactions.  I also have considerable experience with mergers, acquisitions and financings.  I have prepared various valuation reports and testified as both a fact and expert witness on numerous occasions.  The primary individuals at Lazard responsible for day-to-day discussions with the Debtors relating to general restructuring advice, financing efforts, and the Sale have been Dermott O'Flanagan, Nicholas Verhein, and me.

4.      Lazard is a nationally recognized special situations investment banking firm focused on middle market companies.  Lazard is a wholly owned indirect subsidiary of Lazard Freres & Co. LLC, one of the largest and preeminent investment banking and financial advisory firms in the world.  Overall, since 1990, Lazard's professionals have been involved in over 250 restructuring transactions, representing over $1 trillion in debtor assets.

5.      I joined Lazard in 2006 as a managing director.  Prior to joining Lazard, from 2004 to 2006, I was a managing director at Stairway Capital, a $330 million fund focused on buying distressed middle market companies, with a focus on purchasing senior debt positions. Before that, from 1996 to 2004, I was a managing director in Houlihan Lokey Howard & Zukin's restructuring practice and co-head of the company's distressed mergers and acquisitions practice in New York.  I have extensive experience representing companies, creditors, and other constituents in complex restructuring, mergers, acquisitions and financing transactions across a wide range of industries. I have personally served as an investment banker in over 20

transactions involving the sale of all or substantially all of a company's assets, resulting in sale proceeds ranging from under $100 million to over $500 million.

**Prepetition Interest in the Debtors' Assets**

6.     The Debtors engaged Lazard in December 2014 to provide investment banking services including exploring restructuring, financing and M&A alternatives.  Since then, the Debtors, with Lazard's assistance, have explored a range of strategic and financial alternatives to address covenant defaults and a projected liquidity shortfall.  The Debtors worked to evaluate various in-court and out-of-court alternatives.  Ultimately, the Debtors, with the assistance of Lazard, determined that a sale of substantially all of the Debtors' assets as a going concern would maximize the value available to the Debtors' creditors.

7.     Lazard conducted extensive due diligence on the Debtors' assets and operations, including frequent onsite meetings and an extensive dialogue with the Debtors' senior management team.  Shortly after Lazard's engagement, Standard Register hired McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") to assist with the development of a strategic business plan.

8.     Due to the Debtors' severe liquidity constraints, Lazard and the Debtors did not engage in a complete pre-filing marketing process of the Debtors' business.  However, the Debtors and Lazard were approached by several potential strategic buyers that expressed an interest in evaluating the transaction.  These potential strategic buyers signed non-disclosure agreements and conducted due diligence in consideration for a potential acquisition of the Debtors' business operations as a going concern.

9.     As part of this process, Lazard worked with McKinsey RTS and the Debtors to establish a virtual data room to facilitate due diligence conducted by potential buyers.

4

One of the potential buyers conducted extensive on-site diligence, including meetings with management and the Debtors' advisor.  This strategic buyer ultimately submitted a term sheet and draft of an asset purchase agreement and actively pursued the stalking horse position.  Other potential strategic buyers engaged in due diligence on a more limited scale.

10.      In addition to the potential strategic buyers, the lenders under that certain First Lien Credit Agreement, dated as of August 1, 2013 (the "Prepetition First Lien Credit Agreement" and the lenders thereunder, the "Prepetition First Lien Lenders") provided a term sheet for (a) the acquisition of the Debtors and (b) debtor-in-possession financing.  Lazard in conjunction with the Debtors' other professionals, negotiated with the Prepetition First Lien Lenders and the potential strategic buyer on their respective asset purchase agreements.  These agreements, as subsequently modified, were presented to the Restructuring Committee of Standard Register's Board of Directors, which determined that the proposal of the Prepetition First Lien Lenders provided more value and greater certainty of consideration than the strategic buyer's proposal.  At the direction of the Restructuring Committee, Lazard and the Debtors' other professionals proceeded to finalize an asset purchase agreement with the Stalking Horse, which ultimately resulted in the Stalking Horse APA.

### The Stalking Horse APA

11.      It is my opinion that the Stalking Horse APA was negotiated at arms' length as part of good faith negotiations between the Debtors and the Stalking Horse.  The Stalking Horse APA does not contain special treatment for the Debtors, the Debtors' estates, the Stalking Horse, or their respective affiliates or insiders.  The Stalking Horse APA was unanimously approved by the Board of Directors of Standard Register.

12.      The Stalking Horse APA provides for a break-up fee of 2% of the Purchase Price (defined below) (the "Break-Up Fee").  It is my opinion that the Break-Up Fee is

fair and reasonable.  The aggregate consideration offered by the Stalking Horse is approximately

$275 million (the "Purchase Price"), assuming a closing date of June 26, 2015, which includes

the assumption of Assumed Liabilities (as defined in the Stalking Horse APA).

13.     The Debtors have determined that the offer by the Stalking Horse for the

Assets, pursuant to the Stalking Horse APA, is fair, reasonable and in the best interest of the

Debtors' estates, their creditors, and all other parties in interest, and that the floor established for

the proposed Sale of the Assets, subject to higher or otherwise better bids pursuant to an open

auction process approved by the Court, affords the Debtors the best opportunity to maximize

value for their creditors.

### The Sale Procedures

14.     It is my opinion the sale procedures outlined in the Sale Motion and

embodied in the proposed Sale Procedures Order (the "Sale Procedures") will allow the Debtors

to maximize recoveries for their creditors under the circumstances.  The Sale Procedures are

designed to establish a fair, open, and competitive postpetition bidding process.  Furthermore,

the Sale Procedures will allow for a bidding process involving some or all of the parties that

originally expressed interest in purchasing the Debtors, as well as parties that did not participate

in the prepetition marketing process.

15.     The Debtors propose to solicit bids for the Assets in accordance with the

Sale Procedures summarized below.  The Sale Procedures describe, among other things, the

assets available for sale, the manner in which bidders and bids become "qualified," the

coordination of diligence efforts among Qualified Bidders and the Debtors, the receipt and

negotiation of bids received, the conduct of an auction (the "Auction"), and the selection and

approval of the Successful Bidder and the selection of the Back-Up Bid.

16.     The Bid Procedures were developed consistent with the Debtors'
competing needs to promote participation and active bidding, and to comply with the terms and
conditions of the Stalking Horse APA, the Debtors' prepetition credit facilities, and the Debtors'
post-petition financing facility, and the risk of business disruption associated with a prolonged
stay in chapter 11.  The Bid Procedures reflect the Debtors' objective of conducting the Auction
in a controlled, but fair and open, manner, while enabling the Debtors to select that highest or
otherwise best offer for the Assets.

17.     To ensure that the Debtors receive the highest or otherwise best offer for
the Sale of the Assets, the Debtors, with the assistance of Lazard, McKinsey RTS, and their other
professional advisors, will continue their marketing efforts through implementation of the Bid
Procedures as set forth herein and will contact other potential strategic investors and financial
investors, including existing stakeholders, that might be interested in purchasing the Assets.  If
the Debtors receive competitive offers based on the qualification criteria described below for
Qualified Bidders and Qualified Bids, the Debtors intend to conduct the Auction as described
herein to determine the highest or otherwise best offer for the Assets.  The primary purpose of
the sale process and the Auction is to facilitate the Sale of the Assets to the bidder that submits
the highest or otherwise best offer for the Assets in accordance with the Sale Procedures, as
described more fully below.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*/s/ Andrew Torgove*
Andrew Torgove