## **EXHIBIT C**

## **ENGAGEMENT LETTER**

EXECUTION COPY

## AMENDED AND RESTATED AGREEMENT

Joseph Morgan, Jr.
President & Chief Executive Officer
The Standard Register Company
600 Albany Street
Dayton, OH 45417-3405

Dear Mr. Morgan:

This amended and restated letter (the "Agreement"), dated March 2, 2015, (the "Effective Date"), is between McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") and The Standard Register Company (the "Company"), amends and restates that certain agreement dated January 14, 2015 between McKinsey RTS and the Company and sets forth the terms of McKinsey RTS's engagement to provide certain engagement staff to the Company as expressly contemplated by this Agreement (the "Engagement"). McKinsey RTS and the Company are collectively referred to in this Agreement as the "Parties," and each a "Party".

    1.    SERVICES.

    (a)    McKinsey RTS will provide Kevin Carmody to serve as the Company's Chief Restructuring Officer ("CRO"), reporting directly to the Company's Board of Directors (the "Board").

    (b)    McKinsey RTS will also provide the Company with the additional individuals set forth on Schedule 1 as well as certain other employees of McKinsey RTS as the need arises (collectively, "Retained Staff"), to assist in the performance of the CRO's duties as further set forth below. The CRO and the Retained Staff together are (the "Engagement Staff").

    (c)    The Engagement Staff's duties shall collectively be referred to as McKinsey RTS's services (the "Services").

    (d)    The duties of the Engagement Staff will be as follows:

- Developing a strategic business plan with the Company's CFO and other key functional leaders that can be used to facilitate discussions with the Company's lenders and certain other stakeholders;

- Developing a short-term cash flow forecasting process and implementing cash management strategies;

- Establishing a weekly financial reporting package that provides additional transparency into the Company's near term cash position, including a forecast to actual variance analysis;

- Supporting counsel for the Company ("Counsel") with the development of various strategic and restructuring alternatives;

- Providing strategic advice to support the overall restructuring process;

- Participating in stakeholder discussions, negotiations and diligence meetings along with Counsel and the Company's financial advisor;

- Evaluating certain near term operational cost reduction and value enhancement opportunities (e.g., SG&A and procurement);

- Working with Counsel on supporting data in order for Counsel to prepare first day motions, the petitions for relief and other documents and evidence needed to implement any Chapter 11 bankruptcy case filed by the Company;

- Providing testimony and other litigation support as requested by Counsel in connection matters upon which McKinsey RTS is providing services; and

- Assisting with all such other restructuring matters as may be requested by Counsel that fall within McKinsey RTS's expertise and that are mutually agreed upon between the Parties

(e)    To fulfill its responsibilities on a timely basis the Engagement Staff will rely on the Company's timely cooperation regarding the Engagement, including the Company's making available to the Engagement Staff all relevant data, information and personnel, performing any tasks or responsibilities assigned to the Company and notifying McKinsey RTS of any issues or concerns the Company may have relating to the Services. The Engagement Staff are entitled to reasonably rely on the accuracy and validity of the data disclosed to them or supplied to them by employees and representatives of the Company. The Engagement Staff are under no obligation to update data submitted to them or review any other areas unless specifically requested by the Board to do so. The Company understands and acknowledges that McKinsey RTS's delivery of the Services and the Fees (as defined below) charged hereunder are dependent upon timely decisions and approvals by the Company and its management.    The Company shall be responsible for any delays, additional costs or other deficiencies caused by not completing its responsibilities.

(f)    In rendering the Services hereunder, McKinsey RTS and the Engagement Staff are not assuming any responsibility for the Company's underlying business decision

to pursue (or not to pursue) any strategy or to effect (or not to effect) any transaction. The Company agrees neither McKinsey RTS nor the Engagement Staff: (i) shall have any obligation or responsibility to provide accounting, audit, legal or regulatory services, or to otherwise advise with respect to the tax consequences of any proposed transaction directly or indirectly related to the Services hereunder; and (ii) are not being requested to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the American Institute of CPAs ("AICPA"), the Securities and Exchange Commission ("SEC") or other state or national professional or regulatory body. Further, Neither McKinsey RTS nor the Engagement Staff can guarantee that any proposed restructuring or strategic plan will be successful, accepted by the Company's creditors or other stakeholders or is the best course of action for the Company.

(g)    Notwithstanding anything to the contrary contained herein, neither McKinsey RTS nor the CRO shall be required to perform any tasks, actions or functions, and shall not be required to assume any roles, assignments or capacities, that (in any such case) could give rise to fiduciary status (within the meaning of Section 3(21) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") to either McKinsey RTS, the CRO or any other Indemnified Party (as defined below) in respect of any employee benefit plan subject to Title I of ERISA ("Plan"). Without limiting the generality of the immediately preceding sentence and for the avoidance of doubt, neither McKinsey RTS nor the CRO shall be required to make any discretionary decision in respect of the management or control over any of the assets of any Plan, or the administration or interpretation of any Plan, the selection of any service providers for any Plan, review or exercise any discretion in respect of any claims relating to any Plan, appointing or removing any fiduciaries of any Plan, or to resolve any questions regarding any of the foregoing. Neither McKinsey RTS nor the CRO shall be a "named fiduciary" of any Plan (within the meaning of Section 402(a) of ERISA). If McKinsey RTS or the CRO is advised by counsel of McKinsey RTS's choice that certain tasks, actions, functions, roles, assignments or capacities could give rise to fiduciary status under ERISA, neither McKinsey RTS nor the CRO shall be required to perform such tasks, actions or functions, nor assume such roles, assignments or capacities, and the failure to so perform or assume shall not give rise to a breach of this Agreement

(h)    During the term of the Engagement, priorities may shift or unexpected events may occur which will necessitate changes to the Services. In this event, McKinsey RTS and the Company will jointly discuss the anticipated impact on the Services and agree on any appropriate adjustments, including to the scope of work, timeframe, budget and fees.

2.    COMPENSATION. The Company shall compensate McKinsey RTS for its professional fees and expenses, including payment of a retainer, in connection with the Services for the Engagement based on the hourly rates set forth in Schedule 1 attached hereto (the "Fees"). To commence work under this Agreement and for this Engagement, McKinsey RTS shall immediately be paid a total retainer in the amount of $750,000

(which shall include any retainer amounts previously paid under the agreement between the parties dated January 14, 2015). McKinsey RTS shall bill Company on a monthly basis. All invoiced amounts shall be applied against the retainer. McKinsey RTS shall issue periodic statements for replenishing the retainer. These statements, which shall be due upon receipt by the Company, shall be submitted with sufficient frequency that a retainer balance shall always be maintained. The retainer shall remain in place until work under this Agreement is concluded, or this Agreement is amended in writing. All retainer balances shall be credited against any outstanding amounts due upon termination of the Engagement, with the remainder to be returned to the Company upon satisfaction of all payment obligations due under this Agreement.

3.    CONFIDENTIALITY.    McKinsey RTS will keep confidential any confidential information furnished by the Company to McKinsey RTS in connection with the Services ("Confidential Information"). McKinsey RTS will disclose Confidential Information only to its employees and agents who have a need to know and are bound to keep it confidential and will use Confidential Information only for purposes of performing the Services. Confidential Information shall not include information that is or becomes publicly available, already known to McKinsey RTS, independently acquired or developed by McKinsey RTS or legally required to be disclosed. In performing the Services, McKinsey RTS will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information. Additionally, in the event that McKinsey RTS is required or requested to disclose Confidential Information under applicable law (whether by oral question, interrogatory, subpoena, civil investigation demand or otherwise), or by order or act of any court or governmental or regulatory authority or body, McKinsey RTS shall provide prompt written notice thereof, to the extent legally permissible, to the Company, and McKinsey RTS may, without liability hereunder, disclose only that portion of the Confidential Information which McKinsey RTS reasonably believes it is required to disclose.

4.    USE OF McKINSEY RTS NAME AND DELIVERABLES.    In connection with the Engagement, McKinsey RTS may furnish the Company with information, advice, reports, analyses, presentations or other such materials (the "Deliverables"). The Company understands and agrees that any such Deliverables are furnished or presented solely for the Company's internal use and benefit (limited to management and the Board, the Company's financial advisors and legal counsel) and may not be furnished or conveyed in whole or in part to any person or entity other than as described in this Section 4 without McKinsey RTS's prior written consent or as required by law. The Company may furnish and convey Deliverables to its management, directors, lenders and other stakeholders  (and to their respective financial advisors or legal counsel), in each case only if such persons (i) need to know the information set forth, or embodied in, such Deliverables and (ii) are informed of the confidential nature of the Deliverables; provided, however, that Deliverables branded "McKinsey RTS" may not be furnished, conveyed or presented to any person or entity other than management and the Board, the Company's financial advisors and legal counsel unless (A) Company has

received McKinsey RTS's oral or written consent to furnish or convey such information; and (B) such third parties are informed of the confidential nature of the information and, prior to Company's disclosure, each such third party to whom it seeks to disclose such information executes and delivers to McKinsey RTS a letter agreement in a form reasonably acceptable to McKinsey RTS. The Company further agrees that, without McKinsey RTS's prior written consent, it shall not refer to McKinsey RTS or attribute any information to McKinsey RTS in any document or communication external, or reasonably likely to be disseminated externally, to the Company for any purpose, including in press releases and web sites. The Company also agrees that it shall not, and shall not permit its advisors to, refer to McKinsey RTS or attribute any information to McKinsey RTS, either generically or by name, without McKinsey RTS's prior written approval except as required by law. McKinsey RTS shall not issue any press release which references this Agreement or Company without Company's prior written consent. Finally, the Company acknowledges that: (i) the Deliverables are not intended to, and will not, constitute a report, opinion, valuation or appraisal by McKinsey RTS or the Engagement Staff for purposes of the U.S. securities laws; (ii) the Deliverables were, and will be, prepared at the Company's request and the scope, level of specificity and sufficiency of the Deliverables for a particular purpose has been and will be determined on the basis of instructions and information provided to the Engagement Staff by the Company and publicly-available information, in each case with respect to which McKinsey RTS and the Engagement Staff do not assume responsibility for the accuracy or completeness thereof; and (iii) the Deliverables may contain forward looking statements, which statements are not guarantees of future performance and involve certain risks and uncertainties which are difficult to predict, such that actual future results and trends may differ materially from what is described in forward looking statements due to a variety of factors.

5.   INTELLECTUAL PROPERTY. Upon payment in full of McKinsey RTS's Fees, the Company will own all Deliverables furnished by McKinsey RTS to the Company in connection with the Services, save that McKinsey RTS retains ownership of all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by McKinsey RTS in connection with the Services (the "McKinsey RTS Tools"), it being understood that none of the McKinsey RTS Tools will contain the Company's Confidential Information. To the extent the Deliverables include any McKinsey RTS Tools, McKinsey RTS hereby grants the Company a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to use and copy the McKinsey RTS Tools solely as part of the Deliverables and subject to the above limitations on the use of McKinsey RTS name and Deliverables.

6.   INDEMNIFICATION

(a)   The Company and its affiliates hereby agree (i) to indemnify, hold harmless and defend McKinsey RTS, and its past, present and future affiliates, and each of their respective directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons (collectively, the

"Indemnified Parties" and each individually, an "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, penalties, damages or liabilities (or actions in respect thereof), joint or several, caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Company and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)); and (ii) to reimburse each Indemnified Party for all expenses (including, without limitation, the fees and expenses of counsel and the costs of McKinsey RTS's professional time) as and when they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (whether or not such Indemnified Party is a formal party to any such action, suit, dispute, inquiry, investigation or proceeding), caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Company and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)), and in enforcing this Agreement.  However, the Company and its affiliates shall not be liable under the foregoing indemnity and reimbursement provisions for any loss, claim, damage, penalty or liability which is finally judicially determined by a court of competent jurisdiction on the merits to have resulted primarily and directly from the willful misconduct or gross negligence of such Indemnified Party toward the Company and its affiliates, but pending any such judicial determination, the Company and its affiliates shall continue to be obligated on, and shall continue to perform, its indemnification and reimbursement obligations.

(b)     If for any reason the foregoing indemnification or reimbursement is held by a court of competent jurisdiction to be unavailable to any Indemnified Party or insufficient fully to indemnify or reimburse any such Indemnified Party or to hold it harmless in respect of any losses, claims, damages, penalties, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company and its affiliates shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, penalties, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company and its affiliates, on the one hand, and McKinsey RTS, on the other hand, in connection with the matters contemplated by this Agreement.  If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company and its affiliates shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company and its affiliates, on the one

hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. The Company, its affiliates and McKinsey RTS agree that it would not be just and equitable if contribution pursuant to this Section 6(b) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 6(b). Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of Fees (but not expenses) actually received by McKinsey RTS from the Company and its affiliates pursuant to this Agreement.

(c)     The Company and its affiliates shall not, without the prior written consent of McKinsey RTS which shall not be unreasonably delayed or withheld, settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification, reimbursement of expenses or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto).

(d)     The Company and its affiliates agree that neither McKinsey RTS nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company, its affiliates or any person or entity asserting claims on behalf of or in right of the Company and its affiliates caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, or any actions taken or omitted to be taken by an Indemnified Party or the Company and its affiliates in connection with this Agreement or the Engagement (including, without limitation, any acts taken or omitted to be taken by an Indemnified Party as a representative, agent, fiduciary or in any other capacity of, or in connection with any services provided to or termination of, any employee benefit plan (including any defined contribution plan)), except for losses, claims, damages, penalties or liabilities incurred by the Company and its affiliates which are finally judicially determined by a court of competent jurisdiction on the merits to have resulted primarily and directly from the willful misconduct or gross negligence of McKinsey RTS or any other Indemnified Party. In no event, however, shall McKinsey RTS's or any other Indemnified Party's liability to the Company or its respective affiliates, successors, or any person claiming on behalf of or in right of the Company, including Company's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors, exceed, when taken together with all losses for which McKinsey RTS or such other Indemnified Party is liable in connection with this Agreement or the Engagement, the amount of Fees actually received by McKinsey RTS in connection with the Engagement.

(e)     The indemnity, reimbursement, and other obligations and agreements of the Company and its affiliates set forth in this Section 6: (i) shall apply to any Services provided by McKinsey RTS in connection with the Engagement (whether provided prior to, on or after the Effective Date) and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company and its affiliates may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and

effect regardless of any investigation made by or on behalf of the Company, its affiliates or any Indemnified Party, or any other person or entity, (iv) shall survive the completion of the Services described in, and any expiration or termination of the relationship established by, this Agreement and (v) shall be binding on any successor or assign of the Company and its affiliates.  In no event shall any Indemnified Party be responsible for any loss profits or special, punitive, exemplary, indirect or consequential damages.

      (f)    In addition to the indemnification, reimbursement, contribution and insurance provisions set forth herein, the CRO, and any Retained Staff acting as officers, will be entitled to the benefit of the most favorable indemnification, reimbursement, contribution and insurance provisions provided by the Company and its affiliates to any of the directors and officers (or persons holding similar positions) in the Company's charter, by-laws or other organizational documents, by contract or otherwise.

### 7.    INSURANCE

      (a)    As a condition of McKinsey RTS accepting the Engagement, the Company agrees to ensure that the CRO and any Retained Staff who are acting as officers (the "Insured Staff") are covered under the Company's existing directors and officers liability insurance (the "D&O Policy") to the maximum extent of the coverage provided to those of the Company's personnel in similar positions of which such policy limit shall be in an amount acceptable to and agreed by McKinsey RTS.

      (b)    Coverage under the D&O policy shall be conferred upon the Insured Staff as a condition to McKinsey RTS accepting the Engagement.  The Company shall provide true, correct and complete copies of the D&O Policy, and all documentation and other communications regarding the Policy (including any renewal or cancellation thereof) to McKinsey RTS, as well as a copy of the Board of Directors' resolutions of the Company appointing and insuring the Insured Staff.

      (c)    The Company hereby represents and warrants that the D&O Policy is in full force and effect and that no event has occurred that constitutes or, with the passage of time or notice would constitute, an event of default thereunder or that would otherwise give the Insurers any right to cancel the D&O Policy or refuse to pay any claims thereunder.  The Company shall not prejudice the rights of the Insured Staff to any payments which may become due to the Insured Staff under the D&O Policy or under any successor or replacement policy.

      (d)    The Company shall be solely responsible for the payment of premium and any deductible under the D&O policy and shall give immediate written notice to McKinsey RTS of any actual, threatened or proposed cancellation, non-renewal or any material change in coverage, scope or limit of the D&O Policy.

(e)    The Company shall maintain coverage throughout the period during which claims can be made against the Insured Staff.

(f)    The provisions of this Section 7 are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the Insured Staff's rights hereunder.

(g)    The effecting of the insurance set out herein shall not in any way limit, alter, or affect the liability and obligations of the Company under this Agreement.

8.    NON-SOLICITATION OF EMPLOYEES

(a)    The Company acknowledges and agrees that McKinsey RTS has made a significant monetary investment recruiting, hiring and training its personnel. During the term of this Agreement and for a period of two (2) years from the date that McKinsey RTS last renders Services pursuant to this Agreement (the "Restrictive Period"), the Company agrees not to directly or indirectly hire, employ, engage, retain, recruit contract with, or solicit the employment of (or attempt or offer to do any of the foregoing) any of McKinsey RTS's partners, directors and/or other employees, including the CRO (or any other person or entity that had been any of McKinsey RTS's partners, directors and/or other employees within the twelve (12) month period prior to any such action being taken), that have been involved in the Engagement.

(b)    The Company also acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of this provision, and the Company agrees that McKinsey RTS shall have the right to seek a restraining order and/or an injunction for any breach of this non-solicitation provision, without the need for posting a bond. If any provision of this Section 8 is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

9.    COMPANY ACKNOWLEDGMENT.    It is McKinsey RTS's long-standing policy to serve competing clients and clients with potentially conflicting interests as well as counter-parties in merger, acquisition and alliance opportunities, and to do so without compromising McKinsey RTS's professional responsibility to maintain the confidentiality of client information. Consistent with such practice and McKinsey RTS's confidentiality obligations to its other clients, McKinsey RTS is not able to advise or consult with the Company about McKinsey RTS's serving the Company's competitors or other parties. To avoid situations of potential conflict, McKinsey RTS will not assign consultants, who are providing the Services and who receive Confidential Information, to a competitively sensitive project for a significant period of time (typically two years) following an assignment for the Company and shall not share any of the Deliverables or information provided by Company with any other client.

10.    TERM AND TERMINATION.  The Engagement will commence as of the Effective Date and shall continue until the earlier of:  (a) the completion of the Services hereunder or (b) the termination of this Agreement by either Party by giving thirty (30) days' written notice to the other Party. In the event of any termination, the Company will pay McKinsey RTS's Fees and expenses up to the effective date of termination.

11.    RELATIONSHIP OF THE PARTIES.    The Parties intend that an independent contractor relationship will be created by this Agreement.    As an independent contractor, McKinsey RTS will have the complete and exclusive control of the management and operation of its business, including the hiring and paying the wages and other compensation of all its employees and agents, and the paying of all bills, expenses and other charges incurred or payable with respect to the operation of its business. For the avoidance of doubt, McKinsey RTS will not be entitled to receive from the Company (on behalf of the CRO) any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.  McKinsey RTS will be responsible for all employment, withholding, income and other taxes incurred by McKinsey RTS in connection with the operation and conduct of its business.  Nothing in this Agreement is intended to create, nor shall be deemed or construed to create, a fiduciary or agency relationship between McKinsey RTS and the Company, or its Board of Directors.

12.    BANKRUPTCY FILING.  In the event that the Company commences or has commenced a case under chapter 11 of title 11 of the United States Code, the Company will apply to the Bankruptcy Court, on the date of filing or as soon thereafter as practicable, to obtain approval of McKinsey RTS's retention and Retainer, *nunc pro tunc* to the date of filing.  It is understood that in the case of a Chapter 11 bankruptcy, the terms and conditions of this Agreement, particularly the compensation provisions, are subject to (a) prior approval of the Bankruptcy Court to be treated as administrative expenses of the bankruptcy case; and (b) may be subject to a standard of reasonableness.

13.    MISCELLANEOUS. This Agreement and any schedules hereto constitute the entire agreement between the parties, and there are no prior or contemporaneous oral or written representations, understandings or agreements relating to this subject matter that are not fully expressed herein or therein.  This agreement and the Proposals shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles and shall inure to the benefit of and be binding on the successors and assigns of the Company and McKinsey RTS.  The following Sections shall survive the completion or any termination of the Services:  3 (Confidentiality), 4 (Use of McKinsey RTS Name and Deliverables), 5 (Intellectual Property), 6 (Indemnification), 7 (Insurance), 8 (Non-Solicitation of Employees), 9 (Company Acknowledgement), 10 (Term and Termination) and 11 (Relationship of the Parties), 12 (Bankruptcy Filing) and 13 (Miscellaneous) and any other provision which by law or by its nature should survive.  Neither party may assign its rights or obligations under this agreement to any person or entity without the written consent of the other party, not to be unreasonably withheld, provided, however, that either party may assign its rights and

obligations under this agreement to its affiliates upon reasonable written notice to the other party but without the written consent of the other party.  Assignment shall not relieve either party of its obligations hereunder.

*[Remainder of Page Intentionally Left Blank]*

McKinsey Recovery & Transformation Services U.S., LLC

By:

Name: _Kevin Carmody_

Title: _Practice Leader_

ACCEPTED AND AGREED TO

The Standard Register Company

By:

Name: Joseph P. Morgan, Jr.

Title: President & CEO

## Schedule 1

### Fees for Services

In exchange for its services, Company will compensate McKinsey RTS in accordance with the terms of this Agreement, which provides for payment of Fees as follows:

(a) Retainer- $750,000 as described in Section 2 of the Agreement

(b) Hourly rates:  Effective as of January 1, 2015: McKinsey RTS's fees are to be based on the hours worked by McKinsey RTS's personnel at the following hourly rates:

| | | |
|---|---|---|
| i. | Practice Leader: | $875-$1,050 |
| ii. | Senior Vice President: | $675-$810 |
| iii. | Vice President: | $525-$675 |
| iv. | Senior Associate | $435-$525 |
| v. | Associate: | $375-$435 |
| vi. | Analyst: | $250-$350 |
| vii. | Paraprofessional: | $200-$225 |

McKinsey RTS reviews and revises its billing rates on or about January 1 of each year.

(c) Expenses:  The Company will reimburse McKinsey RTS for all reasonable out-of-pocket expenses incurred in connection with the Engagement, such as travel, lodging, case administrators, and working meals.

Schedule 1 *continued*

### Engagement Staff

### Individuals with Executive Positions

| Name | Description | Hourly Rate |
|------|-------------|-------------|
| Kevin Carmody | Chief Restructuring Officer | $950 |

### Retained Staff

| Name | Description | Hourly Rate |
|------|-------------|-------------|
| Mark Hojnacki | Restructuring Executive | $775 |
| Layth Ashoo | Planning and Operations | $640 |
| Sam Jacobs | Planning and Operations | $435 |
| Leviathan Winn | Cash Management | $435 |
| Akanksha Midha | Due Diligence | $390 |

The parties agree that the Retained Staff may be amended by McKinsey RTS from time to time to add or delete staff through notification to the Company in writing.