IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| THE STANDARD REGISTER COMPANY, *et al.*, | ) Case No. 15-10541 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket Nos. 6, 55 |
| | ) Obj. Deadline: 3/25/15, 4:00 p.m. |
| | ) Hearing Date: 4/1/15, 10:00 a.m. |
| | ) |

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICE; (B) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMEN FOR POSTPETITION SERVICES; AND (C) ESTABLISHING PROCEDURES FOR RESOLVING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE OF PAYMENT**

American Electric Power ("AEP"), The Connecticut Light and Power Company ("CL&P"), Duke Energy Florida, Inc. ("DEF"), Duke Energy Indiana, Inc. ("DEI"), Georgia Power Company ("Georgia Power"), NStar Electric & Gas Corporation ("NStar") and Yankee Gas Services Company ("Yankee Gas") (collectively, the "Utilities"), by counsel, hereby object to the *Debtors' Motion For Interim and Final Orders (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment For Postpetition Services; and (C) Establishing Procedures For Resolving Requests For Additional Adequate Assurance of Payment* (the "Utility Motion"), and set forth the following:

## Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

With respect to Section 366(c) of the Bankruptcy Code, it specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. Despite the foregoing, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $591,520 that purportedly represents two weeks of the Debtors' estimated utility charges (the "Bank Account"). The Bank Account, however, would not be available to utility providers that held prepetition deposits or other security. As Section 366(c)(4) allows utilities to recoup prepetition security against prepetition debt without notice or court order, it is not clear why utilities with prepetition security would be precluded from accessing the Bank Account.

Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment, the Court

2

should reject it as an insufficient form of adequate assurance of payment for the following reasons:

(i)   Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section 366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities have no control over: (A) when the Bank Account will be terminated; or (B) If the Bank Account will remain in place if there is an event of a default by the Debtors on their use of DIP financing (this is in complete contrast to the $350,000 Carve-Out received by the Debtors' professionals in the DIP Financing pleadings, which remains in place even if there is an event of default);

(ii) In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request;

(iii)It is underfunded from the outset because the Utilities issue monthly bills;

(iv) The Debtors propose utilities that held prepetition deposits or other security reflecting at least two-weeks of utility charges would not have access to the Bank Account; and

(v) The Debtors are not required to replenish the Bank Account following pay-outs.

The post-petition deposits sought by the Utilities in these jointly-administered cases are the following deposits that the Utilities are authorized to obtain from all of the customers in their service territories pursuant to applicable state law:  (A) AEP – $78,181 (2-month); (B) CL&P – $24,215 (45-day); (C) DEF – $4,645 (2-month); (D) DEI – $93,295 (2-month); (E) Georgia Power – $10,330 (2-month); (F) NStar – (to be supplemented[1]); and (G) Yankee Gas – $4,885 (45-day).

Based on all the foregoing, this Court should deny the Utility Motion because the amounts of the post-petition deposit requests of the Utilities are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.   On March 12, 2015 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

4

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    Proper notice of the Utility Motion was not provided to the Utilities prior to the Court entering the *Interim Order (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment For Postpetition Services; and (C) Establishing Procedures For Resolving Requests For Additional Adequate Assurance of Payment* (the "Interim Utility Order") on March 13, 2015.

5.    Because the Utilities were not properly or timely served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on March 13, 2015, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by

---

[1]    Exhibit "C" to the Utility Motion lists two accounts with NStar. However, NStar has thus far been unable to identify any Debtor accounts.

5

the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.    In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is a bank account containing $591,520 that purportedly represents two weeks of the Debtors' estimated utility charges (the "Bank Account"). Utility Motion at ¶ 9. The foregoing proposal is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

7.    The Debtors propose that no amount would be included in the Bank Account on behalf of utilities that held prepetition deposits or other security of at least two-weeks of utility charges. Utility Motion at ¶ 9. As Section 366(c)(4) of the Bankruptcy Code provides that utilities can recoup prepetition deposits against prepetition debt without notice or court order, it is not clear why the Debtors are seeking exclude utilities with prepetition security from accessing the Bank Account.

6

8.    The Debtors' proposed Final Utility Order provides that upon confirmation of any Chapter 11 Plan, all amounts in the Bank Account shall be immediately available for the Debtors' use, in their sole discretion.    Proposed Final Utility Order at ¶ 9.    As the Utilities bill the Debtors in arrears and the proposed two-week Bank Account is insufficient to cover their monthly billing charges, the Bank Account, if approved, should not be released until the Debtors confirm payment in full of their post-petition utility expenses.

9.    The proposed Final Utility Order also provides that any payment to be made therein would be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith. Proposed Final Utility Order at ¶ 15.    It is not clear if the Debtors and their secured lenders are trying to subordinate all of the post-petition payments made to the Utilities to the secured lenders' liens or just the proposed amount contained in the Bank Account.    At a minimum, all post-petition payments made by the Debtors to the Utilities, including any post-petition security, should not be subordinated to the lenders' liens or subject to subsequent disgorgement by the secured lenders.    If the Debtors want the Utilities to provide post-petition utility goods/services, any and all post-petition payments made to the Utilities should be free and clear of any and all liens,

7

otherwise all of the relief sought in the Utility Motion is nothing more than a subterfuge.

10.   The Utility Motion does not address why the Bank Account would be undercapitalized at only a supposed two-week deposit amount when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contract to bill the Debtors monthly.

11.   Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business . . . constitutes sufficient adequate assurance of future payment . . . ." Utility Motion at ¶ 10.

### Facts Regarding the Debtors

12.   The Debtors provide communications services through multiple communication channels, including print, electronic, and internet-based communications to clients in the healthcare, financial services, manufacturing, retail and transportation industries.  *Declaration of Kevin Carmody In Support of the Debtors' Chapter 11 Petitions and Requests For First Day Relief* ("First Day Declaration") at ¶ 12.

13.   The Debtors' suffered net losses of approximately

8

$66 million in 2014 and $7.4 million in 2013.  First Day Declaration at ¶ 13.

14.    On August 1, 2013, Debtor The Standard Register Company ("Standard Register") acquired 100% of the outstanding equity interests of WorkflowOne, LLC ("WorkflowOne").  In connection with the acquisition, Standard Register and its subsidiaries also assumed secured debt in the principal amount of approximately $210 million, and pledged its assets to secure the debt.  First Day Declaration at ¶ 20.

<h3 align="center">The Debtors' Prepetition Secured Indebtedness</h3>

15.    The Debtors are obligated on a certain Amended and Restated Loan and Security Agreement dated as of August 1, 2013 (the "ABL Loan") by and among Standard Register, WorkflowOne, the subsidiary guarantors named therein, Bank of America, N.A. ("BofA"), as administrative agent, and the lenders named therein (the "ABL Lenders"), which provides up to $125 million in aggregate loans and other financing accommodations in the form of an asset-based revolving credit facility that will mature on August 1, 2018.  The ABL Loan is limited by a borrowing base calculation and is secured by a first priority security interest in, and lien on, the borrowers' and guarantors' cash, accounts, deposit accounts, securities accounts, security entitlements, securities, financial assets, inventory, certain tax refunds, related assets, and all proceeds from such property and assets

9

(collectively, the "ABL Collateral") and by a second priority interest in, and lien on, substantially all of the borrowers' and guarantors' other assets.  As of the Petition Date, the Debtors have drawn $92.7 million from the ABL Loan.  First Day Declaration at ¶ 26.

16.    In connection with the WorkflowOne acquisition, the Debtors assumed secured debt in the amount of $210 million, which was previously owed by WorkflowOne under two credit agreements. First, the Debtors are obligated under the First Lien Credit Agreement dated as of August 1, 2013 (as amended, the "First Lien Term Loan") by and among Standard Register, WorkflowOne, the subsidiary guarantors named therein, Silver Point Finance, LLC ("Silver Point"), as administrative agent, and the lenders named therein (the "First Lien Lenders").  The First Lien Term Loan is a term loan in the original principal amount of approximately $124 million that will mature on August 1, 2018 (the "First Lien Term Debt").  The First Lien Term Loan is secured by a first priority security interest in, and lien on, substantially all of the borrowers' and guarantors' assets that do not constitute ABL Collateral, including intercompany debt, owned real property, equipment and fixtures, certain equity interests, and all proceeds from such property and assets (collectively, the "Term Loan Collateral") and by a second priority interest and lien on the ABL Collateral.  As of the Petition Date, the Debtors owe

10

SL1 1358818v1 018560.00192

approximately $115.3 million in principal, plus accrued interest, on the First Lien Term Debt. First Day Declaration at ¶ 27.

17.   The Debtors are also obligated on the Second Lien Credit Agreement dated as of August 1, 2013 (as amended, the "Second Lien Term Loan" and together with the First Lien Term Loan, the "Term Loans" and together with the ABL Loan, the "Secured Debt Obligations") by and among Standard Register, WorkflowOne, the subsidiary guarantors named therein, Silver Point, as administrative agent, and the lenders named therein (the "Second Lien Lenders" and together with the First Lien Lenders, the "Term Loan Lenders").   The Second Lien Term Loan is a term loan with an original principal amount of approximately $96 million that will mature on February 1, 2020 (the "Second Lien Term Debt").   The Second Lien Term Debt is secured by a first priority security interest in, and lien on, the Term Loan Collateral and by a second priority interest in, and lien on, the ABL Collateral.   As of the Petition Date, the Debtors owe approximately $98.6 million in principal, plus accrued interest, on the Second Lien Term Debt. First Day Declaration at ¶ 28.

18.   As of the Petition Date, the Debtors owe approximately $72.7 million in unsecured trade debt.   First Day Declaration at ¶ 34.

### Events Leading Up To the Debtors' Chapter 11 Cases

19.   Because of declining demand in the printing industry,

11

the Debtors have struggled to achieve their revenue and EBITDA targets. As revenue and EBITDA were declining, the Debtors still needed to maintain relatively large fixed costs on account of the required interest payments on their secured debt, together with the required Qualified Pension Plan contributions, and the necessary capital expenditures and investments that the Debtors have had to make to finance their operations while they are still integrating WorkflowOne.  First Day Declaration at ¶ 40.

20.   While amendments to the Term Loans provided short-term relief from potential covenant defaults, the Debtors remained highly levered and burdened by significant cash disbursements on account of their obligations.  First Day Declaration at ¶ 41.

21.   The Debtors sought bankruptcy protection to facilitate the sale of substantially all of their assets to the First Lien Lenders as the stalking horse bidder, or another qualified bidder that comes forward with the highest or otherwise best offer, to maximize value for the Debtors' creditors and other parties in interest.  First Day Declaration at ¶ 45.

## The Debtors' Post-Petition Financing

22.   On the Petition Date, the Debtors filed the *Debtors' Motion For Order (A) Authorizing Debtors (I) To Provide Adequate Protection To the Debtors' Secured Lenders, (II) To Obtain Interim Postpetition Financing On a Superpriority, Secured and Priming Basis In Favor of Silver Point Finance, LLC, As*

12

*Administrative Agent For Proposed DIP Term Lenders, and Bank of America, N.A., As Administrative Agent For Proposed DIP ABL Lenders, and (III) To Modify the Automatic Stay; and (B) Scheduling and Establishing Deadlines Relating To a Final Hearing and Entry Of a Final Order On Postpetition Financing* (the "Financing Motion").

23.   Through the Financing Motion, the Debtors are seeking authority to enter into DIP Loan Agreements that will provide postpetition financing of (i) $125 million of DIP ABL Loans, and (ii) $30 million of DIP Term Loans. Financing Motion at p. 2.

24.   The Debtors also seek a $350,000 carve-out for the payment of fees and expenses of the Debtors' professionals, in addition to a provision that guarantees payment of their fees up to an event of default, subject to a cap of $4,450,968. Financing Motion at p. 17.

25.   Attached as Exhibit "D" to the Financing Motion is 13-week budget through May 31, 2015 that is referred to as "Cash Flow Projections (the "Budget"). It is unclear from the Budget whether the Debtors have budgeted sufficient sums for the payment of their post-petition utility expenses.

26.   On March 13, 2015, the Court entered the *Interim Order (I) Authorizing Debtors In Possession To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims To Postpetition Lenders*

13

*Pursuant To 11 U.S.C. § 364; (III) Providing Adequate Protection*
*To Prepetition Credit Parties and Modifying Automatic Stay*
*Pursuant To 11 U.S.C. §§ 361, 362, 363, and 364; and (IV)*
*Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(B) and*
*(C) and Local Bankruptcy Rule 4001-2* (the "Interim Financing
Order"). The Interim Financing Order authorized the Debtors to
borrow up to $140 million on an interim basis. Interim Financing
Order at p. 18.

27.   The Interim Financing Order also approved the $350,000
Carve-Out.   Interim Financing Order at pp. 37-38.

## The Debtors' Critical Vendor Motion

28.   On the Petition Date, the Debtors filed the *Debtors'*
*Motion for Interim and Final Orders Authorizing Debtors to Pay*
*Certain Prepetition Claims of Critical Vendors, Shippers and*
*Freight Carriers* (the "Critical Vendor Motion").   Through the
Critical Vendor Motion, the Debtors sought authority to pay
certain prepetition claims of supposed "critical vendors" and
shippers in the aggregate amount of $20 million, with
approximately $17.2 million relating to Critical Vendor claims
and $2.8 million relating to Shipper Claims.   Critical Vendor
Motion at ¶ 29.   The Debtors state in paragraph 19 of the Utility
Motion that uninterrupted utility service is vital to the
Debtors' continued business operations.   However, the Debtors do
not consider their utility providers to be Critical Vendors for

14

the purposes of the Critical Vendor Motion.

29.   On March 13, 2015, the Court entered the *Interim Order Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers and Freight Carriers* (the "Interim Critical Vendor Order").   The Interim Critical Vendor Order authorized the Debtors, on an interim basis, to pay Critical Vendor Claims in an amount not to exceed $12.2 million, and pay Shipper Claims in an amount not to exceed $2.8 million.

**The Sale Motion**

30.   On the Petition Date, the Debtors filed the *Debtors' Motion For (I) An Order (A) Establishing Sale Procedures Relating To the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating To the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (D) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (E) Scheduling a Hearing To Consider the Proposed Sale; and (F) Granting Certain Related Relief; and (II) An Order (A) Approving the Sale of Substantially All Of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases In Connection With the Sale* (the "Sale Motion").

31.   The Debtors have negotiated the terms of an asset purchase agreement (the "Stalking Horse APA") with a group led by

15

an affiliate of Silver Point Capital, L.P., as the buyer and stalking horse bidder (the "Stalking Horse"), pursuant to which the Stalking Horse has agreed to purchase substantially all of the Debtors' assets in exchange for aggregate consideration in the amount of approximately $275 million, which includes the assumption of certain assumed liabilities.  The Stalking Horse (the First Lien Lenders) will satisfy a substantial portion of the purchase prices by a credit bid of the obligations under the Prepetition First Lien Credit Agreement.  Sale Motion at ¶ 12.

32.    Through the Sale Motion, the Debtors propose that if no qualified bids are received, the sale hearing to approve the sale of the Transferred Assets to the Stalking Horse shall take place on June 4, 2015.  If qualified bids are received, the auction shall take place on June 8, 2015.  If there is an auction, the Debtors propose that the sale hearing to approve the sale of the Transferred Assets to the successful bidder be held on June 12, 2015.  Sale Motion at ¶ 24.

## Facts Concerning the Utilities

33.    Each of the Utilities provided the Debtors with prepetition utility goods and/or services and has continued to provide the Debtors with utility goods and/or services since the Petition Date.

34.    Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services

16

before the Utility issues a bill for such charges.  Once a bill
is issued, the Debtors have approximately 20 to 30 days to pay
the applicable bill. If the Debtors fail to timely pay the bill,
a past due notice is issued and, in most instances, a late fee
may be subsequently imposed on the account. If the Debtors fail
to pay the bill after the issuance of the past due notice, the
Utilities issue a notice that informs the Debtors that they must
cure the arrearage within a certain period of time or its service
will be disconnected.  Accordingly, under the Utilities' billing
cycles, the Debtors could receive at least two months of unpaid
charges before the utility could cease the supply of goods and/or
services for a post-petition payment default.

35.  In order to avoid the need to bring witnesses and have
lengthy testimony regarding the Utilities regulated billing
cycles, the Utilities request that this Court, pursuant to Rule
201 of the Federal Rules of Evidence, take judicial notice of the
Utilities' billing cycles.  Pursuant to the foregoing request and
based on the voluminous size of the applicable documents, the
Utilities' web site links to the tariffs and/or state laws,
regulations and/or ordinances are as follows:

AEP:
    Arkansas:
    https://www.swepco.com/account/bills/rates/SWEPCORatesTariff
    sAR.aspx

DEF:
http://www.duke-energy.com/rates/progress-energy-florida.asp

17

DEI:
http://www.duke-energy.com/indiana-business/rates.asp

Georgia Power:  http://www.georgiapower.com/pricing/gpc_rates.asp

CL&P:  http://www.cl-p.com/Rates/Rates_and_Tariffs/

Yankee Gas:
http://www.yankeegas.com/For_Your_Business/Current_Rates/List_and_Applicability_of_Rates_and_Riders/

NStar:
    Tariffs:
    http://www.nstar.com/docs3/tariffs/100.pdf   (BECo)
    http://www.nstar.com/docs3/tariffs/200.pdf  (Cambridge
    Electric Light Company)
    http://www.nstar.com/docs3/tariffs/300.pdf   (Commonwealth
    Electric Company)
    Regulations:
    http://www.mass.gov/ocabr/docs/dte/cmr/220cmr2600.pdf

36.  Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---|---|---|---|
| AEP | 2 | n/a | $78,181 (2-month) |
| CL&P | 1 | $12,107.56 | $24,215 (45-day) |
| DEF | 1 | n/a | $4,645 (2-month) |
| DEI | 3 | $50,476.47 | $93,295 (2-month) |
| Georgia Power | 4 | $4,262.04 | $10,330 (2-month) |
| NStar | To Be Supplemented | | |
| Yankee Gas | | $7,311.59 | $4,885 (45-day) |

37.   DEF held a prepetition deposit of $1,300 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.   The deposit credit after recoupment can be applied to DEF's post-petition deposit request.

38.   The Debtors have three accounts with Duke Energy Carolinas, LLC ("DEC") that are inactive.   If the Debtors require post-petition utility service from DEC, the Debtors should provide DEC with a two-month deposit as adequate assurance of payment with respect to DEC.   Additionally, DEC holds prepetition deposits totaling $29,590 that it will recoup against prepetition debt estimated at $11,531.29.

19

## Discussion

**A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;
>
> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of

20

the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

      1.   **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

SL1 1358818v1 018560.00192

(i) Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

(ii) In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

(iii) The Debtors propose that the Bank Account would not contain any monies for any utility company that holds prepetition deposits or other security which is in express contravention of Section 366(c)(4) which allows utilities to recoup prepetition deposits against prepetition debt without notice or court order;

(iv) It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have used at least 45 to 60 days of commodity or service.

(v) The Bank Account, unlike the Professionals Carve Out, is subject to the DIP lender's liens.

(vi) The Debtors are not required to replenish the Bank Account following pay-outs.

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

**2.    The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why

22

this Court should modify the amount of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of the Utilities' adequate assurance requests should be modified.  Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

    **B.   THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

      (i) a cash deposit;
      (ii) a letter of credit;

23

(iii) a certificate of deposit;
(iv) a surety bond;
(v) a prepayment of utility consumption; or
(vi) another form of security that is mutually agreed
upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

Although the billing cycles for each of the Utilities are slightly different, they all bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month. Each Utility then provides the Debtors with a certain period of time to pay the bill, the timing of which is set forth in applicable state laws, tariffs, and/or regulations.

Based on the foregoing state-mandated billing cycles, the minimum period of time the Debtors could receive service from the

24

Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their billing cycles.  Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, or applicable contract, permits the Utilities to request from their customers. The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities permit them to request from their customers.

Finally, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain that supposed "critical vendors" and post-petition professionals are favored creditors over the Utilities by ensuring (i) the payment of prepetition critical vendor claims, and that (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition DIP Financing default, by seeking a $350,000 carve-out for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default, which has a cap of $4,450,968.  Therefore, despite the fact that the Utilities continue to provide the Debtors with

25

crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of adequate security for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they are seeking.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities, which are the form and amounts requested herein; and

3.    Providing such other and further relief as the Court deems just and appropriate.

Dated: March 25, 2015        STEVENS & LEE, P.C.

/s/ John D. Demmy_____
John D. Demmy (Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Telephone:  (302) 425-3308
E-mail:    jdd@stevenslee.com

-and-

26

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail:  russj4478@aol.com

*Counsel for American Electric Power, The
Connecticut Light and Power Company,
Duke Energy Florida, Inc., Duke Energy
Indiana, Inc., Georgia Power Company,
NStar Electric & Gas Corporation and
Yankee Gas Services Company*

27