**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*: | : | Chapter 11 |
| | : | |
| THE STANDARD REGISTER COMPANY, *et al.*[1] | : | Case No. 15-10541 (BLS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Hearing Date: 4/1/2015 at 10:00 a.m.** |
| | : | **Objection Deadline: 3/25/15 at 4:00 p.m.** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING SALE PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS; (E) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND(F) GRANTING CERTAIN RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE (D.I. 23)**

In support of his Objection to the Debtors' Motion For (i) an Order (a) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (b) Approving Bid Protections; (c) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (d) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (e) Scheduling a Hearing to Consider the Proposed Sale; and (f) Granting Certain Related Relief; and (ii) an Order (a) Approving the Sale of Substantially All of the Debtors'

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).

Assets and (b) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale (the "Motion"), Andrew R. Vara, Acting United States Trustee for Region 3 ("U.S. Trustee"), by undersigned counsel, avers as follows:

1.      This Court has jurisdiction to hear this Objection.

2.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3.      In furtherance of her case supervisory responsibilities, as well as pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to raise and be heard on this Objection.

4.      The Debtor commenced this case on March 12, 2015 (the "Petition Date") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors' cases were ordered jointly administered on March 13, 2015.

5.      An official committee of unsecured creditors was been formed on March 24, 2015.

6.      On the Petition Date, the Debtor filed the Motion, seeking among other things to designate "a group led by Silver Point Capital, L.P." as the Stalking Horse bidder in connection with a sale of substantially all of the Debtors' and the estate's assets, including without limitation, avoidance actions and related claims and causes of action with respect to trade

obligations paid before the Petition Date.

7.    The Stalking Horse is an affiliate of Silver Point Capital, L.P., certain funds it controls, and additional loan participants (collectively, "Silver Point"), a pre-petition secured creditor claiming to hold a first-lien security interest in substantially all of the Debtor's assets except certain ABL Priority Collateral,[2] on which Silver Point allegedly holds a second-lien security interest.  Silver Point is also the term loan lender for debtor-in-possession financing that the Court has approved on an interim basis. [3]

8.    The proposed $275 million purchase price would be paid with a combination of cash (apparently at minimum the approximately $125 million necessary to extinguish the senior pre- and post-petition liens on the ABL Priority Collateral), and a credit bid of (i) Silver Point's allegedly secured claim of approximately $115.4 million under the first lien term loan and (ii) up to $30 million of debtor-in-possession term loans made by Silver Point under the terms of debtor-in-possession financing approved by the Court on an interim basis.

9.    The Debtor seeks pre-approval of a Break-Up Fee of 2% of the purchase price, payable to the Stalking Horse upon the sale of the assets to a competing bidder.  The Debtor also seeks pre-approval of an Expense Reimbursement of up to 1.5% of the purchase price, payable to the Stalking Horse if the Stalking Horse asset purchase agreement ("APA") is terminated other than  by mutual consent, because of a governmental order prohibiting the sale, or pursuant to a

---

[2] As described in the Debtors' motion for authority to use cash collateral and obtain debtor-in-possession financing (the "DIP Financing Motion"), the ABL Priority Collateral consists of certain Debtors' cash, accounts, deposit accounts, securities accounts, security entitlements, securities, financial assets, inventory, certain tax refunds, related assets and all proceeds from such property and assets.   The DIP Financing Motion also recites that the value of the ABL Priority Collateral exceeds the Debtors' obligations to the ABL lender.

[3] As described in the DIP Financing Motion, Silver Point Capital is also the administrative agent for certain second lien term loan lenders holding a claim of approximately $98.6 million.  It is not clear which (if any) of the second lien term loan lenders are participants in the first lien term loan.  However, as described in the Motion, the Stalking Horse does not include the second lien term loan lenders, who are already deemed to be a qualified bidder if they desire to submit a bid for the Debtors' assets.

termination right exercisable by the Debtors.

10.    While break-up fees serve as "protections" to a stalking horse purchaser, they concomitantly serve as "discouragements" to potential bidders who would only be permitted to transact business on a playing field that is tilted in favor of the stalking horse.   Break-up fees are permitted, if at all, *only* when the Court has determined that they were an actual and necessary cost and expense of preserving the estate.  *See Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).

11.    Citing *O'Brien* for the proposition that bid protections *may* be awarded where they induce the stalking horse bidder to make an initial bid or adhere to its bid after the Court orders an auction and where they promote more competitive bidding, the Debtors assert that Silver Point expressly conditioned its willingness to enter into the Stalking Horse APA on the Debtor's agreement to, and the Court's approval of, the Break-up Fee and the Expense Reimbursement.   The Debtors also assert that the Break-Up Fee and Expense Reimbursement enable the Debtors to set a "floor" on bidding for their assets and then seek higher offers.

12.    The Debtors commit a logical fallacy by asserting that the proposed Break-Up Fee and Expense Reimbursement induced Silver Point to make an initial bid.  Silver Point was already induced to bid on the ABL Priority Collateral by the risk of foreclosure by the over-secured senior lienholder, as such a foreclosure would extinguish Silver Point's junior lien. Silver Point is further induced to bid on all of the Debtors' assets by its own need to liquidate its collateral as the lowest possible cost.  Silver Point will achieve significant savings by conducting a "friendly foreclosure" through a Section 363 sale in bankruptcy court, over the cost of proceeding against the Debtors' assets in each of dozens of state courts nationwide, as well as in the courts of Mexico and Canada.  Those savings provide all of the inducement necessary for

4

Silver Point to serve as the stalking horse for the sale of its collateral.

13.     The Debtors commit a second logical fallacy by asserting that proposed Break-Up Fee and Expense Reimbursement are appropriate because Silver Point's bid establishes a "floor" on the sale price of the Debtor's assets, enabling the Debtors to seek better offers without losing Silver Point's purchase commitment.  Silver Point holds a first lien on all of the Debtors' assets except the ABL Priority Collateral (on which it holds a second lien and has an independent inducement to satisfy the first lien).  Its stalking hose bid merely establishes the lowest price that Silver Point will accept to release its liens on the subject assets.  At any lesser price, Silver Point can simply reject all purchase offers and foreclose on its collateral.  At any greater price, up to the full amount of its secured claim, Silver Point already benefits from repayment of its claim. At any price in excess of Silver Point's secured claim, the proceeds should inure to the benefit of other creditors (including Silver Point, in its capacity as agent for the second lien lenders), rather than to Silver Point.  Because Silver Point in its capacity as a secured creditor has already established the floor price and benefits from any increase in the sale price of the Debtors' assets, there is no basis under Section 503(b)for paying Silver Point a Break-Up Fee in its capacity as a stalking horse bidder.

14.     Reimbursement of certain reasonable expenses actually incurred by a stalking horse bidder may be appropriate in certain circumstances.  However, where the stalking horse bidder is also a secured creditor, any provision for reimbursement of expenses incurred as a stalking horse must contain safeguards to (a) ensure segregation of such expenses from any expenses incurred as a secured creditor and (b) avoid any double-dipping by the creditor.

15.     Moreover, the amount reserved for such purely "stalking horse" expenses must not be grossly disproportionate to the reasonable expenses the stalking horse is likely to incur.

5

Potential competing bidders should not be required to make a minimum initial overbid that includes an excessive reserve for expense reimbursement. Such a requirement does not encourage or catalyze bidding; it discourages and chills bidding.

16. Here, the proposed 1.5% Expense Reimbursement on a $275 million sale amounts to $4.125 million. Short of protracted litigation over the proposed sale, this amount is far greater than the expenses Silver Point will actually and reasonably incur in its capacity as a stalking horse bidder. Requiring a potential bidder to include such a large expense reimbursement as part of its initial overbid serves to discourage and chill bidding. The proposed expense reimbursement should be capped at a significantly lower amount in order to be reasonable.

17. The U.S. Trustee respectfully submits that because Silver Point is already recovering expenses in its capacity as a secured creditor and DIP financing lender, a $750,000 reserve for Stalking Horse Expense Reimbursement should be more than adequate. To the extent any greater amount is sought, the Debtors and Silver Point should be required to provide an itemized, good-faith estimate and expense budget.

18. The U.S. Trustee leaves the Debtors to their burden of proof and reserves all discovery rights.

WHEREFORE, the United States Trustee respectfully requests that this Court deny the

Motion or, alternatively, approve it only with modifications thereto in light of the U.S. Trustee's

objections, and grant such other relief as this Court deems appropriate.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**Region 3**

Dated: March 25, 2015                    **BY:**   /s/ Mark S. Kenney
                                                   Mark S. Kenney
                                                   Trial Attorney
                                                   Office of the United States Trustee
                                                   J. Caleb Boggs Federal Building
                                                   844 King Street, Suite 2207, Lockbox 35
                                                   Wilmington, DE 19801
                                                   (302) 573-6491
                                                   (302) 573-6497 (Fax)