IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 15-10541(BLS)<br>)<br>) Jointly Administered<br>)<br>) **Objection deadline: 3/27/15 at 4:00 pm (ET)**<br>) **Hearing: 4/1/15 at 10:00 am (ET)**<br>) |

**OBJECTION OF THE PENSION BENEFIT GUARANTY CORPORATION TO DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING SALE PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS; (E) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND (F) GRANTING CERTAIN RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES IN CONNECTION WITH THE SALE (D.I. 23)</u>**

Pension Benefit Guaranty Corporation ("PBGC"), a creditor in the above-captioned proceeding, hereby files this objection to the Debtors' Motion for (I) an Order (A) Establishing Sale Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de Mexico, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a) and Standard Register Technologies Canada ULC (n/a).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

Amounts; (D) Approving Form and Manner of Notice of all Procedures, Protections, Schedules, and Agreements; (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially all of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale ("Motion") filed on March 12, 2015 (D.I. 23).[2]

PBGC objects to the Motion because the bid procedures proposed by the Debtors ("Bid Procedures")[3] fail to take into account the possibility that a Qualified Bidder may wish to assume all or some portion of the defined benefit pension plan sponsored by The Standard Register Company, a Debtor. Similarly, the Bid Procedures do not expressly provide that the Debtors will credit the value of any pension liabilities assumed when determining the highest and best bid.

PBGC also objects to the Bid Procedures because they include restrictive provisions that will chill bidding. Under the Bid Procedures, the Debtors have the right to unilaterally decide whether interested parties should be given *any* access to the due diligence materials necessary to formulate a Qualified Bid, and even if interested parties are granted access to such materials, the Debtors can, in their sole discretion, restrict the due diligence materials that will be provided.

PBGC has communicated its concerns with the Bid Procedures to the Debtors and has provided the Debtors with proposed language that will resolve at least some of its objections. While PBGC hopes that a consensual resolution is possible, it nonetheless files this objection as a protective measure to preserve its rights because the parties have not yet reached an agreement.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3] *See* Motion, Exhibit B (D.I. 23-2).

## I.    BACKGROUND

### A.  PBGC and ERISA

PBGC is a wholly-owned United States government corporation, and an agency of the United States, that administers and enforces the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA").  *See* 29 U.S.C. §§ 1301-1461 (2012).  PBGC guarantees the payment of certain pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA.  When an underfunded plan terminates, PBGC generally becomes trustee of the plan and supplements any assets remaining in the plan with its insurance funds to pay to the retired employees their pension benefits, subject to statutory limits.  *See* 29 U.S.C. §§ 1321-1322, 1342, 1361.  PBGC's insurance funds are made up of, among other things, (i) the agency's recoveries of terminated pension plan's underfunding and (ii) premiums paid by pension plan sponsors.

ERISA provides the exclusive means for a plan sponsor to terminate a pension plan — a standard termination or a distress termination.  *See* 29 U.S.C. § 1341(a)(1); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999).  A standard termination requires sufficient assets to pay all of the pension plan's promised benefits.  *See* 29 U.S.C. § 1341(b)(1)(D).  A distress termination requires a showing, among other things, that the plan sponsor and each controlled group member satisfy one of the three financial distress criteria: (i) liquidation in bankruptcy; (ii) inability to reorganize in bankruptcy unless the pension plan terminates; or (iii) inability to pay debts when due and continue in business unless the pension plan terminates.  *See* 29 U.S.C. § 1341(c)(2)(B).  Separate from a standard or distress termination, PBGC can initiate termination of a pension plan pursuant to section 4042 of ERISA ("PBGC-initiated termination").  *See* 29 U.S.C. § 1342.

3

Upon a distress termination or a PBGC-initiated termination, the contributing sponsor and its controlled group members are subject to certain liabilities with regard to the terminated pension plan, for which they are jointly and severally liable to PBGC: (i) the unfunded benefit liabilities of the pension plan, 29 U.S.C. § 1362(a), (b); (ii) any unpaid flat-rate and variable-rate premiums, 29 U.S.C. § 1307; and (iii) termination premiums at the rate of $1,250 per plan participant per year for three years, 29 U.S.C. § 1306(a)(7). If the plan termination occurs while the plan sponsor and any controlled group members are attempting to reorganize in Chapter 11, and they ultimately obtain confirmation of a Chapter 11 plan of reorganization, their obligation to PBGC for termination premiums does not arise until after the Chapter 11 plan is confirmed and the Debtor exits bankruptcy. *See* 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5), 1141.

Finally, because PBGC typically becomes the statutory trustee of the terminated pension plan, it has authority to collect all amounts owed to the pension plan, including any unpaid minimum funding contributions for which the plan sponsor and controlled group members are jointly and severally liable. *See* 29 U.S.C. §§ 1082(b)(2), 1342(d), 1362(c); 26 U.S.C. § 412(b)(2).

### B. The Debtors' Pension Plan

The Standard Register Company ("SRC") sponsors The Stanreco Retirement Plan ("Pension Plan" or "Plan"), a single-employer defined benefit pension plan covered under Title IV of ERISA. Upon information and belief, all Debtors are members of SRC's controlled group. As of June 29, 2008, the Pension Plan was frozen so that, after that day, participants cannot accrue any more benefits under the Plan and no new participants may join the Plan. Nonetheless,

the Plan covers an estimated 8,502 of the Debtors' current and retired employees and is underfunded by an estimated $271,400,000. PBGC's investigation into the status and funding level of the Pension Plan is ongoing.

Because the Debtors filed their Chapter 11 petitions with this Court only two weeks ago, PBGC has not yet filed claims against the Debtors for their statutory obligations to the Pension Plan and PBGC. The agency anticipates filing claims against each of the Debtors for the following statutory liabilities, as explained above: (i) the unfunded benefit liabilities of the Pension Plan; (ii) due and unpaid minimum funding contributions owed to the Pension Plan; and (iii) statutory premiums owed to PBGC. PBGC's claim for the unfunded benefit liabilities of the Pension Plan will be contingent upon the termination of the Pension Plan. Termination, however, is not the preferred outcome for the Pension Plan, nor should it be treated as a *fait accompli*.

**C.  The Debtors' Bankruptcy Proceedings**

On March 12, 2015, the Debtors filed voluntary Chapter 11 petitions with this Court, along with their First-Day Motions, including this Motion. A hearing on certain relief sought in the Motion – specifically the approval of the Bid Procedures and the buyer protections asserted therein – is scheduled for April 1, 2015.

## II.  ARGUMENT

When selling estate assets, a debtor has a duty to obtain the highest price or greatest overall benefit possible for the estate. *See In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (citing *In re Atlanta Packaging Prods., Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); *see also In re Reading Broad, Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (noting

that "the purpose of a bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors and equity holders").

To that end, "it is the overarching objective of sales in bankruptcy to maximize value to the estate." *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009). Accordingly, bid procedures should be designed to facilitate an open and fair sale process. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Dura Auto. Sys.*, No. 06-11202 (KJC), 2007 Bankr. Lexis 2764, at *253 (Bankr. D. Del. Aug. 15, 2007).

### A. The Bid Procedures Should Be Modified To Encourage Assumption Of The Pension Plan.

The Stalking Horse APA states that the Stalking Horse will not assume the Pension Plan. *See* Motion, Exhibit D (D.I. 23-4) at §§ 2.2(g), 2.4(f). The Debtors acknowledge that they "did not engage in a complete pre-filing marketing process of the Debtors' business." Motion at ¶ 9. It is therefore premature to foreclose the possibility that a potential bidder may wish to assume all or part of the Pension Plan's liabilities as part of a Qualified Bid.

It is in the interest of the Debtors' estates and their creditors to attract this class of bidder. PBGC is by far the largest creditor of the Debtors. Assumption of any liabilities relating to the Pension Plan would effectively eliminate or reduce PBGC's claims against each of the Debtors, thereby providing significant value to the Debtors' respective estates and increasing recoveries for other creditors. In order to encourage Qualified Bidders to assume the Pension Plan, the Debtors should make two modifications to the Bid Procedures.

First, the Bid Procedures should require all bidders to expressly state their intention with respect to the Pension Plan. If a potential bidder does not assume the Pension Plan in its entirety, the bidder should state whether it intends to hire any former employees of the Debtors, and, if so,

whether it intends to assume liabilities and assets of the Pension Plan relating to those employees.

Second, the Bid Procedures should provide that, in determining the Successful Bid, the Debtors will give credit for the value of the Pension Plan liabilities a Qualified Bidder agrees to assume. The highest and best bid for the Debtors' assets should be the one that provides the greatest total amount of consideration to the Debtors, including any pension liabilities transferred to the Successful Bidder.[4]

Additionally, PBGC requests that the Court direct the Debtors to timely provide PBGC with copies of all Qualified Bids that propose to assume all or any portion of the Pension Plan's liabilities. PBGC further requests that the Court direct any Successful Bidder who proposes to assume all or any portion of the Pension Plan's liabilities to timely provide PBGC with sufficient information in advance of the Sale hearing so that the agency may assure itself of the Successful Bidder's financial ability to maintain the assumed Pension Plan (or any portion thereof) on an ongoing basis.

---

[4] These modifications are neither burdensome nor unprecedented. PBGC routinely requests this language in bankruptcy cases involving an ongoing pension plan and a sale of substantially all of the assets of the plan sponsor and/or members of its controlled group. In fact, two of the cases cited by the Debtors in support of the Bid Procedures – *Vertis Holdings* and *Nortel Networks* – include the modifications that PBGC is requesting in this objection. *See* Motion at ¶37; *see also In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (D.I. 206); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) (D.I. 1012).

B. **The Bid Procedures Should Be Modified To Allow Potential Bidders Fair And Equal Access To Due Diligence Materials.**

A potential bidder must have the opportunity to conduct appropriate due diligence into the Debtors' business in order to make an informed decision as to whether it will submit a Qualified Bid and, if so, on what terms. The Bid Procedures contain provisions that inappropriately allow the Debtors to unilaterally restrict a potential bidder's access to due diligence materials. For example, the Bid Procedures allow the Debtors to reserve the right (i) not to provide due diligence access to any Bidder that the Debtors conclude is not likely to become a Qualified Bidder and (ii) to withhold information or restrict access to certain materials in any data room if providing such information or materials to a Qualified Bidder would, in the Debtors' business judgment, put the Debtors at a competitive disadvantage. *See* Bid Procedures at 5. Limiting due diligence access – especially where the Debtor wields all the power to do so without reasonable standards or oversight – will chill bidding and will decrease transparency. To allow potential bidders fair and equal access to all due diligence materials, the "Access to Due Diligence Materials" section on page 5 of the Bid Procedures should be modified as follows:

> "In addition, the Debtors reserve the right not to provide due diligence access to any Bidder that the Debtors**, after consultation with the Consultation Parties**, conclude in their reasonable business judgment is not likely to become a Qualified Bidder."

> "Notwithstanding anything herein to the contrary, **if any Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors, after consultation with the Consultation Parties, will not be required to disclose to such Bidder any trade secrets or proprietary information unless the confidentiality agreement executed by such Bidder contains appropriate provisions to ensure that such trade secrets or proprietary information will not be used for an improper purpose or to gain an unfair competitive advantage**."[5]

---

[5] *See In re Real Mex Rests. Inc.*, Case No. 11-13122 (BLS)(Bankr. Del. Nov. 9, 2011)(D.I. 393). The *Real Mex* bid procedures were cited by the Debtors in support of the Bid Procedures. *See* Motion ¶ 37. Because this language directly addresses the concerns of both PBGC and the Debtors, the language from the *Real Mex* bid procedures, as modified, would be an appropriate compromise on this issue.

The Bid Procedures should be modified as stated above because the proposed modifications ensure a competitive bidding process and, at the same time, protect the Debtors' business information against unnecessary disclosure.

### C. PBGC Reserves Its Rights to Request Copies of All Pension Documents and Data

If circumstances warrant that the Pension Plan be terminated in the future, PBGC reserves its rights to request the Debtors, the Stalking Horse, or any Successful Bidder(s) to timely provide to PBGC employees, agents and representatives copies of and/or access to all pension documents, personnel records, employee files, and any related documents or information for all participants in the Pension Plan. PBGC further reserves its rights to seek appropriate related relief from this Court if necessary.

### D. Statement In Support

PBGC agrees with and supports the arguments against a Break-Up Fee and for a greatly reduced Expense Reimbursement for the Stalking Horse raised in the United States Trustee's Objection to the Motion filed on March 25, 2015. *See* D.I. 106.

### III. CONCLUSION

For the foregoing reasons, PBGC requests that the Bid Procedures set forth in the Motion be modified as stated above. Additionally, PBGC requests that the Court direct the Debtors to timely provide PBGC with copies of all Qualified Bids that propose to assume all or any portion of the Pension Plan's liabilities, and to further direct any Successful Bidder who proposes to assume all or any portion of the Pension Plan's liabilities to timely provide PBGC with sufficient information in advance of the Sale hearing so that PBGC may assess the Successful Bidder's financial ability to maintain the assumed Pension Plan (or any portion thereof) on an ongoing basis.

| | |
|---|---|
| DATED: March 27, 2015<br>Washington, D.C. | Respectfully submitted,<br><br>By: /s/ Courtney L. Morgan<br>ISRAEL GOLDOWITZ<br>Chief Counsel<br>CHARLES L. FINKE<br>Deputy Chief Counsel<br>ANDREA WONG<br>Assistant Chief Counsel<br>COURTNEY L. MORGAN<br>KIRSTEN BENDER<br>Attorneys<br>Office of the Chief Counsel<br>**PENSION BENEFIT GUARANTY CORPORATION**<br>1200 K Street, N.W.<br>Washington, D.C.  20005<br>(202) 326-4020 ext. 3738<br>(202) 326-4112 (fax)<br>morgan.courtney@pbgc.gov and<br>efile@pbgc.gov<br><br>*Attorneys for Pension Benefit Guaranty Corporation* |