**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*:<br><br>The Standard Register Company, *et al.*,[1] | Chapter 11<br><br>Case No. 15-10541-BLS<br><br>(Jointly Administered)<br><br><u>Proposed</u> Hearing: April 1, 2015 at 10:00 a.m. (ET)<br><u>Proposed</u> Objection Deadline: At the Hearing |

**EMERGENCY MOTION OF VOLT CONSULTING GROUP, LTD. FOR THE ENTRY OF AN ORDER: (I) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(1), TO THE EXTENT REQUIRED, TO TERMINATE ITS CONTRACT WITH THE DEBTORS; OR, ALTERNATIVELY, (II) REQUIRING THE DEBTORS TO ASSUME OR REJECT THE CONTRACT UNDER 11 U.S.C. § 365(d)(2) AND PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE**

Volt Consulting Group, Ltd. ("<u>Volt</u>") hereby moves on an emergency basis for the entry of an order: (i) granting relief from the automatic stay under 11 U.S.C. § 362(d)(1),[2] to the extent the stay applies; or, alternatively, (ii) requiring the Debtors to assume or reject Volt's contract under § 365(d)(2) and provide adequate assurance of future performance in the interim. In support of the motion, Volt respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. Volt manages thirty-five (35) staffing companies (the "<u>Vendors</u>") that supply contract workers to the Debtors. Volt oversees the invoicing, billing, coordination, and – most importantly – payment of these Vendors for the Debtors. In exchange, Volt receives a

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company, Standard Register Technologies, Inc., Standard Register International, Inc., iMedConsent, LLC, Standard Register or Puerto Rico Inc., Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., and Standard Register Technologies Canada ULC.

[2] All statutory citations are to title 11 of the United States Code, unless otherwise stated.

1

management fee.  This fee is deducted from the wages the Debtor is supposed to pay Volt, which Volt remits to the Vendors.

2. On the petition date, Volt was owed over $2 million by the Debtors.  Except for its management fee, Volt would have paid this money to the Vendors who supplied the Debtors' contract workers.  Critically, regardless of whether Volt is paid by the Debtors, the Vendors are required by state law to pay the Debtors' contract workers.  Thus, the Debtors' non-payment of Volt has had (and continues to have) a knock-on effect that filters down to the Vendors.  Moreover, the Debtors' pre-petition defaults are preventing Volt from fulfilling the Debtors' current orders, as the Vendors are reluctant to provide workers due to their lack of confidence they will be paid.

3. The Debtors' motion to pay certain pre-petition wages (the "<u>Wage Motion</u>") [D.I. 14] seeks authorization to pay Volt an unspecified amount of the pre-petition debt at an unspecified time, and reserves to the Debtors discretion whether to pay anything at all.  *See* Volt's limited objection to the Wage Motion (the "<u>Limited Objection</u>") [D.I. 107].  Volt values its longstanding relationship with the Debtors and wants to continue doing business with them.  And the Debtors have informed Volt that its services are essential.  However, the inadequate and non-committal nature of the Wage Motion, coupled with the Debtors' failure to provide any assurances to Volt concerning the assumption of its contract, is making it impossible for Volt to give the Vendors the confidence they need to do business with the Debtors, and jeopardizing Volt's valuable business relationships with the Vendors.

4. As such, it is respectfully submitted Volt should be granted relief from the automatic stay to terminate its contract with the Debtors.  Alternatively, the Debtors should be compelled to make an immediate decision to assume or reject the contract, and to provide adequate assurance of post-petition performance (such as cash-in-advance) in the interim.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought are §§ 362 and 365 of the Bankruptcy Code.

6. Pursuant to Local Rule 9013-1(h), Volt consents to the entry of final orders by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders consistent with Article III of the United States Constitution.

## BACKGROUND

7. On March 17, 2004, Volt's nominal predecessor entered into a contract (the "Contract") with The Standard Register Company ("Standard") to administer the process of identifying and securing contract workers for Standard. *See* Rothenberg Decl., Exhibit A, p. 50, at section III.A. On June 28, 2011, following a name change recorded with the Delaware Division of Corporations, the parties agreed that all references to Volt's predecessor in the Contract would be deemed to refer to Volt. *See* Rothenberg Decl., Exhibit A, p. 47, section 1.

8. Under the terms of the Contract, Standard agreed to pay Volt for its administrative services. *See* Rothenberg Decl., Exhibit A, at p. 7, section IV.B, and p. 36, section 4.2 of the Compensation Exhibit to the Contract. Upon receipt of payment from Standard, Volt remits payment to the Vendors. *See* Rothenberg Decl., Exhibit A, at p. 3, section III.C, and p. 19, section 4.3 of the Compensation Exhibit. Volt invoices Standard weekly and Standard is required to pay Volt within thirty (30) days of invoice date. *See* Rothenberg Decl., Exhibit A, pp. 19 – 20, and p. 38. In the event of default, the Contract may be terminated upon thirty (30) days written notice. *See* Rothenberg Decl., Exhibit A., at p. 2.

9.  As of the petition date, Volt was owed approximately $2 million by Standard. *See* Littman Decl., ¶ 3. With the exception of its management fee, Volt would have paid this money to the Vendors. As of March 26, 2015, Volt had forty-five (45) open orders for workers from the Debtors. Volt was only able to fill six (6) because the Vendors are unwilling to do business with the Debtors due to their failure to pay the Vendors' workers' pre-petition wages. In addition, several Vendors are threatening to withdraw contract workers already on assignment to the Debtors. The Debtors' pre-petition defaults, together with their ongoing failure to provide any formal assurances concerning the assumption of Volt's contract, are thus hampering Volt's ability to perform under the Contract, and jeopardizing Volt's valuable business relationships with the Vendors. *See* Littman Decl., ¶¶ 4 – 7.

**RELIEF REQUESTED**

10.  This Motion seeks the entry of an order, on an emergency basis: (i) granting relief from the automatic stay under 11 U.S.C. § 362(d)(1), to the extent the stay applies, so Volt can terminate the Contract; or, alternatively, (ii) requiring the Debtors to assume or reject the Contract under § 365(d)(2) on or before April 3, 2015, and provide adequate assurance of future performance (such as cash in advance) prior to assumption or rejection.

**BASIS FOR RELIEF REQUESTED**

**A.  Volt is Entitled to Relief from the Automatic Stay to Terminate the Contract under § 362(d), or alternatively, to Suspend Performance Pending the Debtors' Decision to Assume or Reject the Contract.**

11.  Prior to the petition date, Standard was in default under the Contract and owed over $2 million in wages for contract workers Volt sourced from the Vendors. Assuming, *arguendo*, that Volt is required to seek relief from the automatic stay to terminate the Contract, this Court is empowered to grant such relief. *Cf.*, *Matter of W. Electronics Inc.,* 852 F.2d 79, 82 (3d Cir. 1988) (assuming, without deciding, that government was required to seek relief from the

automatic stay under § 362(d) to terminate its contract with the debtor, and lifting the stay to permit contract termination.)

12.     "Under 11 U.S.C. § 362(d)(1), the automatic stay can be lifted 'for cause, including the lack of adequate protection of an interest in property of such party in interest[.]'" *Rocco v. J.P. Morgan Chase Bank*, 255 F. App'x 638, 641 (3d Cir. 2007). "Except for lack of adequate protection, 'cause' is not defined by § 362(d)(1)." *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007). "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *Id.*

13.     Volt is sympathetic to the challenges faced by the Debtors and the importance of "breathing room," especially early on. However, although this is a large chapter 11 case, it has involved surprisingly little litigation. The deadline for objecting to the Debtors' "first day" motions was March 25, 2015. *See*, Notices of Hearing [D.I. 61, 62]. Including Volt's Limited Objection to the Wage Motion, a total of just four (4) objections and one (1) joinder were filed.[3] According to the docket, the Debtors are represented by at least nine (9) attorneys and two (2) law firms. Clearly, the Debtors are not so overwhelmed as to be unable to decide whether to assume or reject Volt's Contract.

14.     The Debtors' have been assuring Volt's personnel that Volt is critical to their operations and will be a part of their future. However, Volt's treatment to date is difficult to reconcile with these assurances. Meanwhile, Volt is coming under intense daily pressure from the Vendors, who have been forced to pay the Debtors' contract workers, but have not been paid

---

[3] *See*, D.I. 100 (objection of certain utility companies to motion prohibiting discontinuance of service and approving adequate protection payments), 103 (joinder to objection of utility companies), 104 (limited objection to motion for DIP financing), 106 (objection to motion to establish bidding procedures), and 107 (limited objection of Volt to the Wage Motion.).

themselves. Many of the Vendors are small and medium sized businesses. As a result, they are suffering severe liquidity crises and may face bankruptcy themselves. Moreover, under state laws the Vendors' principals may face personal liability for the wages of the Debtors' contract workers. In addition, apart from Standard, Volt uses the same Vendors to supply contract workers to other clients. *See* Littman Decl., ¶ 6. As such, the current situation is threatening Volt's valuable relationships with the Vendors, who are essential to its business.

15. According to the Debtors' own statements, Volt and the Vendors are critical to the Debtors' operations. As the Wage Motion states:

> [A]ny failure by the Debtors to pay the Employee Obligations[4]…would negatively impact the morale of the Workforce[5] at a critical time for the Debtors and their businesses when the Workforce is most needed. The Workforce is also critical to the Debtors' ability to maintain their operations consistent with past practices, which would be impossible without the continued efforts of the Workforce. The damage to the value of the Debtors' business and, hence, the costs to creditors as a whole, would be immediate and irreparable if the Employee Obligations were not met. *See* Wage Motion (D.I. 14), at ¶¶ 84.

16. In other words, by the Debtors' own admission, Volt is anything but an ordinary creditor. *See also*, Wage Motion (D.I. 14), at ¶ 7 ("the Contract Workers fill critical and immediate business needs of the Debtors[.]"); *id.*, at ¶ 14 ("The Contract Workers are skilled persons who provide the same types of services as the Debtors' regular Employees[.]"); *id.*, at ¶ 15 ("[t]he Debtors would be irreparably harmed without the services of the Contract Workers because such parties play a critical role in the Debtors' day-to-day operations[.]"); *id.*, at ¶ 76

---

[4] In the Wage Motion, "Employee Obligations" are defined to include "Compensation Obligations." *See*, D.I. 14, ¶ 74. In turn, "Compensation Obligations" include "Contract Worker Obligations." *See*, D.I. 14, ¶ 15.

[5] The term "Workforce" is defined in the Wage Motion to include contract workers. *See*, D.I. 14, at ¶ 5.

("The Debtors' success is based in large part on the Workforce."); *id.*, at ¶ 77 (the loss of the Workforce "would disable the Debtors' business operations.").

17. In sum, it is respectfully submitted that the hardships being faced by Volt and the Vendors, contrasted with the Debtors' lethargic approach to what should be a top priority, justifies lifting the stay.

18. Alternatively, at a minimum, Volt should be permitted to suspend performance pending the Debtors' decision to assume or reject the Contract. Concededly, "[a]n executory contract generally remains in effect pending assumption or rejection by the debtor-in-possession." *In re Nat'l Steel Corp.*, 316 B.R. 287, 305 (Bankr. N.D. Ill. 2004). "Along those lines, most courts agree that before an executory contract is assumed or rejected under § 365(a), that contract continues to exist, enforceable by the debtor-in-possession, but not enforceable against the debtor-in-possession." *Id.*

19. However, this uncontroversial proposition does not address the distinct issue of whether a creditor can be forced to perform, post-petition and pre-assumption, when the debtor is *already in default*. At least one bankruptcy court has held that as a matter of statutory construction, § 365 does not require a creditor to continue to perform post-petition and pre-assumption where the debtor is in default prior to the petition date. *See*, *In re Lucre, Inc.*, 339 B.R. 648 (Bankr. W.D. Mich. 2006).

20. In *Lucre*, the creditor sought relief from the automatic stay. *Id.*, at 650. They did not seek to terminate their contract, but merely sought relief from the "ongoing burden" of having to provide post-petition service to the debtor. *Id.*, at 651. The executoriness of the contract having been conceded (*id.*, at 650), the court asked "what, if any, section of the Bankruptcy Code empowers *Lucre*, as debtor-in-possession, to compel [the creditor] to continue

performance under the…agreement notwithstanding *Lucre's* alleged pre-petition breach…?" *Id*., at 655. The Court found none.

      21.      Instead, the Court observed as follows:

> As for the question posed in this case, Section 365 does provide an answer: assumption. Specifically, Sections 365(a) and (b) permit a debtor-in-possession to cure the pre-petition default excusing the other party from continued performance under the executory contract. However, with one exception, there is nothing in Section 365 that permits the trustee or debtor-in-possession to compel performance from the other party prior to actually assuming that contract pursuant to Section 365(a). *Id*., at 657.

      22.      Referring to the "one exception" in §365(b)(4) – which prevents a debtor from demanding goods/services incidental to an unexpired lease prior to assumption without compensating the landlord in accordance with the lease terms – the court held that "[s]ection 365(b)(4) proves by exception the rule that a trustee or debtor-in-possession cannot otherwise demand performance from the other party to the contract when the debtor's pre-petition breach under the contract remains uncured." *Id.*, at 658. "In other words, there is no reason for including Section 365(b)(4) in the Bankruptcy Code if, as [the debtor] would have it, pre-petition defaults are irrelevant to begin with." *Id.*

      23.      In this regard, *Lucre* did nothing more than apply settled (and controlling) canons of statutory construction. *Cf.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("of course we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof."). Explaining the rationale for its ruling, the court observed as follows:

> The mere commencement of the bankruptcy case and the attendant imposition of the automatic stay do not by themselves empower a debtor…to compel from the other party to an executory contract performance the day after the commencement of the bankruptcy case when the debtor had no right to compel that performance the day before. Consequently, it is illogical to contend that the non-debtor party's justifiable refusal to perform under an executory contract post-petition is somehow a violation of the automatic stay. *Id.*, at 660.

8

24. Although *Lucre* has not been widely followed, research has not disclosed any case that disagreed with its analysis. In addition, research has not disclosed any case from the Third Circuit or Delaware that analyzed whether a creditor can be compelled to perform post-petition and pre-assumption where the debtor is already in default and the creditor could not have been compelled to perform prior to the petition date. Since *Lucre's* interpretation of § 365 rests on controlling canons of statutory interpretation, it is respectfully submitted that it should be followed by this Court.

**B. Alternatively, Volt is Entitled to the Immediate Assumption or Rejection of its Contract with the Debtors.**

25. If the Court declines to lift the stay so Volt can terminate the Contract, it is respectfully submitted the Debtors should be compelled to make a prompt decision, on or before April 3, 2015, to assume or reject it. Under § 362(d)(2), "the court, on the request of any party to [an executory] contract…may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." "In deciding whether to accelerate the debtor's decision, the court must balance the interests of the contracting party against the interests of the debtor and its estate." *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001).

26. Here, it is respectfully submitted that the Debtors' interest in assumption – which would placate the Vendors refusing to supply workers due to their lack of confidence caused by the Debtor's pre-petition defaults – and Volt's interest in assumption are aligned. Indeed, given the emphatic language used by the Debtors in the Wage Motion, it is difficult to see why they have not sought to assume the Contract sooner. In any event, the Debtors cannot plausibly assert that they cannot afford to address this situation now. To the contrary, they cannot afford *not* to address it now.

  **C. If Volt's Request for Relief from the Stay is Denied, and Volt is Compelled to Perform Despite the Debtors' Default, Volt is Entitled to Adequate Protection During the Period Prior to Assumption or Rejection.**

  27. "The distorting effect of the Bankruptcy Code upon outcomes which would otherwise be expected outside the context of bankruptcy at times gives bankruptcy law the aura of an 'Alice through the Looking Glass' world." *In re Macomb Occupational Health Care, LLC*, 300 B.R. 270, 283 n. 11 (Bankr. E.D. Mich. 2003). "However, bankruptcy proceedings do not transpire in some exotic land which is exempt from the laws which govern the rest of the world." *Id.* For example, the bankruptcy code should not be construed to deprive a creditor of its Fifth Amendment right to be compensated for property. *See e.g.*, *In re Continental Energy Assocs. Ltd. Pshp.*, 178 B.R. 405 (Bankr. M.D. Pa. 1995).

  28. In *Continental*, the debtor sought an injunction compelling a creditor to continue performance under a supply contract until the debtor decided to assume or reject it. 178 B.R., at 407. The debtor was in arrears under the contract for $15 million on the petition date. *Id.* As a form of adequate assurance, the debtor offered to pay the creditor cash in advance to ensure the creditor's post-petition performance would be fully compensated. *Ibid.* Importantly, while expressing concern about "the Fifth Amendment rights of an entity to be compensated for property," the *Continental* court noted that because, *inter alia,* "the Debtor is now paying to [the creditor] the contract amount in advance," the creditor's "Fifth Amendment rights are vigilantly being guarded[.]" 178 B.R., 407.

  29. Similarly, since the Debtors owe Volt close to $2 million from before the petition date, it is respectfully submitted that, at an absolute minimum, they should be ordered to pay cash-in-advance if they require Volt's services post-petition and pre-assumption or rejection. Otherwise, Volt will be unable to provide the services contemplated by the Contract due to the Vendors' lack of trust created by the Debtors' pre-petition defaults.

**CONCLUSION**

30. Given the imminent and irreparable harm being suffered by Volt and the Vendors, contrasted with the Debtors' sluggish and inexplicable failure to address this situation, it is respectfully submitted the balance of the hardships tips in favor of Volt and the stay should be lifted so it can terminate the Contract. At a minimum though, Volt should be permitted to suspend services while the Debtors decide whether to assume the Contract. Alternatively, the Debtors should be ordered to address this situation immediately – for the benefit of Volt, the Vendors, and the bankruptcy estates – and make a decision to assume or reject the Contract no later than April 3rd. And if Volt is ordered to perform under the Contract while it awaits a decision on assumption, the Debtors should be ordered to pay cash in advance.

Dated: Wilmington, Delaware
March 27, 2014

Respectfully submitted,

*/s/ Peter M. Sweeney*
Peter M. Sweeney (DE # 3671)
BLAKELEY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 415-9908
Email: psweeney@blakeleyllp.com

– and –

David M. Mannion
BLAKELEY LLP
54 W. 40th Street
New York, NY 10018
Telephone: (917) 472-9587
Email: dmannion@blakeleyllp.com

*Attorneys for Volt Consulting Group, Ltd.*