# EXHIBIT A

MANAGED SERVICES PROGRAM
FULL SUPPLIER CONTRACT
MASTER AGREEMENT

This "Agreement" is effective as of ___3/17___, 2004 between The Standard Register Company ("Customer"), an Ohio corporation, having a principal office at 600 Albany Street, Dayton, Ohio 45408-1442, and ProcureStaff, Ltd. ("ProcureStaff"), a Delaware corporation, having its principal office at 560 Lexington Avenue, 15th Floor, New York, New York 10022.

WHEREAS, Customer desires that ProcureStaff acting solely as agent for Customer (i) contract with staffing suppliers to provide contingent worker services for Customer, (ii) perform supplier neutral management of staffing suppliers who provide contingent workers on assignment to Customer; (iii) provide electronic time and expense reporting services for contingent workers provided by staffing suppliers under this Agreement; and (iv) provide consolidated, centralized billing, reporting and approved payment processing procedures for work performed by staffing suppliers, who supply staffing services to Customer.

NOW THEREFORE, for good and valuable consideration the sufficiency of which is hereby acknowledged, the parties agree as follows:

## I. DEFINITIONS

Unless otherwise indicated, the following terms shall have the meanings given below in this Agreement and all Exhibits or attachments hereto.

| | |
|---|---|
| Administration Services | The services performed by ProcureStaff as described in Section III PROCURESTAFF'S DUTIES AND OBLIGATIONS. |
| Assignment Manager | The Company employee authorized and responsible for requesting and selecting a Contingent Worker to provide Services for Company and responsible for approval of time reported by the Contingent Worker using the Electronic Time Reporting System. |
| Consolidated Billing | A centralized statement of charges containing the information reported from all Suppliers in the Electronic Billing and all Supplier invoices for reimbursable costs/expenses rendered to, for or on behalf of Customer. |
| Contingent Worker | An hourly temporary employee or other temporary personnel employed by a Supplier and assigned to Customer who directly provides or performs Services for Customer under a Supplier Agreement. |
| Contingent Worker Services | Work performed for Customer by Contingent Workers provided by a Suppler on a non-permanent hourly-paid basis. |
| Customer-referred | Identification by an Assignment Manager of an individual not employed by |

Exhibit A, p. 1

| | |
|---|---|
| Service | a Supplier and referral of that individual to a Supplier selected by Customer for the purpose of engaging the individual as a Contingent Worker. |
| Electronic Billing | A Customer billing statement generated through the Electronic Time Reporting System. Electronic billing may include Travel and Living or other approved expenses incurred by Contingent Workers. |
| Electronic Time and Expense Reporting System | ProcureStaff's web-based time and expense reporting and approval system for Contingent Workers, as set forth in or developed under the Statement of Work, for Contingent Worker Services as described in this Agreement. |
| MSP | ProcureStaff's Managed Services Program as described in this Agreement, by which a Supplier provides Contingent Workers to perform Services for Customer. |
| Management Personnel | ProcureStaff employees who perform Administration Services under this Agreement. |
| Program Manager | Customer's representative authorized to administer this agreement on behalf of Customer and to negotiate and agree to changes, if any, to Supplier Agreements between ProcureStaff and Suppliers. |
| Services | Work performed by a Contingent Worker, including: (i) programming, system analysis, technical writing, drafting and other temporary information technology or engineering, (ii) clerical and administrative services or (iii) any other Contingent Worker Services required by Customer which the parties agree shall be included under this Agreement. |
| Staffing Services | The provision by a Supplier of Contingent Workers to perform Services for a Customer, along with the administrative services required to maintain the Contingent Worker as Supplier's employee. |
| Supplier | A company that provide hourly temporary employees and other temporary staffing and consulting personnel to Customer |
| Supplier Agreement | The agreement to be entered into between a Supplier and ProcureStaff, substantially in the form of Exhibit D to this Agreement, by which Suppliers will be engaged to provide Staffing Services to Customer. |

## II.    TERM

A. The term of this Agreement shall commence on _____ and shall terminate on _____ (the "Initial Term"). This Agreement may be terminated by either party in the event of material breach by the other party, which breach shall not have been cured to the reasonable satisfaction of the non-defaulting party within thirty (30)

days after written notice to the other party specifying with reasonable particularity such material breach and the action necessary to cure the breach.

B. This Agreement shall continue after the expiration of the Initial Term for successive terms of one year each (an "Extension Term") if both parties so agree in a written amendment executed at least sixty (60) days before the expiration of the Initial Term or any Extension Term to further extend the term.

C. If for reason other than material breach of this Agreement Customer terminates the MSP with ProcureStaff prior to the one year anniversary date of go live, Customer agrees to pay ProcureStaff the actual cost of implementation, system configuration and on-site staff with a cap not to exceed $40,000, payable within 30 days of notice to ProcureStaff. The parties shall enter into a written certification to each other as to the "go live" date of the MSP.

D. Anytime after the one-year anniversary date of this Agreement, either party may terminate this Agreement for its convenience upon thirty (30) days prior written notice to the other party.

E. This Agreement will automatically terminate prior to its expiration date, without notice, if any proceeding under any bankruptcy, reorganization, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction is filed by or against either party.

## III. PROCURESTAFF'S DUTIES AND OBLIGATIONS

A. ProcureStaff shall administer the entire process of managing the process of identifying and securing Contingent Workers from Suppliers.

B. Using its Electronic Time Reporting System as the sole basis for determining time worked by Contingent Workers, ProcureStaff shall furnish a Consolidated Billing Invoice to Customer.

C. Upon receipt of payment from Customer of the amount set forth in the Consolidated Billing, ProcureStaff, acting as agent for Customer, shall pay those Supplier invoices reflected in the Consolidated Billing from Customer supplied funds, it being acknowledged that ProcureStaff's receipt of funds from Customer is a condition precedent to ProcureStaff's obligation to make any payment to Suppliers.

D. All funds received from Customer pursuant to the Consolidated Billing provisions of this Agreement shall be deposited by ProcureStaff into a non-interest-bearing account designated "Standard Register/ProcureStaff Escrow Account," the funds in which shall be held for the benefit of, and shall be used by ProcureStaff only to pay, Suppliers who provide Staffing Services to Customer, provided, however, that ProcureStaff may pay to itself, simultaneously with paying such Suppliers, the fees which ProcureStaff is permitted to retain under this Agreement. ProcureStaff and

Customer agree that ProcureStaff's title to such funds (except as to the amount of such fees) shall be nominal only and that ProcureStaff shall have no equitable interest in the funds deposited in such account, except as to ProcureStaff's fees, it being the express intention of the parties that the balance of such funds shall be held by ProcureStaff as an escrowee solely for the benefit of the Suppliers who have supplied Staffing Services to Customer.  ProcureStaff shall not commingle funds it receives from its other customers or third parties with the funds that are deposited into the Standard Register/ProcureStaff Escrow Account..

E.  This Agreement covers only the Administration Services to be performed by ProcureStaff.

F.  ProcureStaff will comply with all applicable Customer policies and procedures in performing Administration Services.

G.  ProcureStaff shall recruit, interview, select and hire all of its Management Personnel. Management Personnel must meet all standards of Customer prior to assignment to Customer.    Specific standards for personnel qualifications of its Management Personnel shall be mutually established by Customer and ProcureStaff.

H.  ProcureStaff shall immediately give written notice to Customer of any and all impending or existing labor complaints, disputes or controversies and the progress thereof involving its Management Personnel, which might impact the performance of Administrative Services.  ProcureStaff shall use reasonable efforts to resolve any such complaint, dispute or controversy.

I.  ProcureStaff warrants that  Customer shall have no liability or bargaining obligation under any collective bargaining agreement covering any Management Personnel. ProcureStaff agrees to provide Customer with copies of any existing collective bargaining agreements covering any Management Personnel and ProcureStaff and agrees to provide Customer with prompt notice of any union organization with respect to any Management Personnel.

J.  ProcureStaff shall inform the Management Personnel that private or proprietary information of Customer may become available to them.  Prior to placement with Customer, ProcureStaff shall instruct the Management Personnel to maintain the confidentiality of such information and require the Management Personnel to agree to do so by signing an agreement to that effect.  In addition, ProcureStaff shall require Suppliers to inform Contingent Workers that private or proprietary information of Customer may become available to them and, prior to placement with Customer, to instruct the Contingent Workers to maintain the confidentiality of such information and to require the Contingent Workers to agree to do so by signing the Contingent Worker Agreement Regarding Intellectual Property attached as Exhibit E.

K. ProcureStaff shall maintain in effect during the term of this Agreement all applicable federal, state, and/or local licenses and permits which may be required to be maintained by employers.

L. ProcureStaff is, and shall at all times be, deemed to be an independent service provider and all Management Personnel assigned by ProcureStaff to Customer shall remain employees of ProcureStaff, subject to ProcureStaff's right of direction, control, discipline, right to hire and fire and matters pertaining to merit increases and promotions. Neither ProcureStaff nor its employees, agents or representatives will be entitled or eligible, by reason of providing services under this Agreement or any purchase orders hereunder, to participate in any benefits or privileges given or extended by Customer to its employees. Customer shall, however, acting for and on behalf of ProcureStaff, have the right to instruct any Management Personnel performing services on Customer property concerning pertinent safety and site regulations.

M. All regulations and rules of Customer which may be in effect at the job site regarding employment, passes, badges, and conduct on the property shall be observed by ProcureStaff's Management Personnel.

N. ProcureStaff shall require each Supplier to submit all required documentation to ProcureStaff before authorizing a Contingent Worker to begin work on assignment at Customer.

O. All Administration Services performed hereunder by ProcureStaff shall be subject to the inspection and approval of a designated representative of Customer. ProcureStaff agrees to provide only experienced, trained, and qualified Management Personnel for the performance of Administration Services and all Administration Services shall be of good quality and workmanship.

P. Any assignment of this Agreement or any rights, interest or payment hereunder, by operation of law or otherwise, without the prior written consent of Customer shall be void, except that if Customer fails to render payment to ProcureStaff for Contingent Worker Services due to Customer's bankruptcy, insolvency or any claimed inability or refusal to pay, ProcureStaff may assign to the Supplier all actions and/or remedies available to it under the law so as to enable the Supplier to recover any such amounts lawfully due to it from Customer. ProcureStaff shall not subcontract or delegate the performance of any of its Administrative Services except with the prior written consent of Customer. Customer may terminate this Agreement without liability to ProcureStaff except for any unpaid Services or Administrative Services upon ten (10) days' prior written notice to ProcureStaff upon the occurrence of any of the following events, without the prior written consent of ProcureStaff: (i) the sale of substantially all of the assets or stock of ProcureStaff, (ii) the merger, consolidation or reorganization of ProcureStaff into any other entity which is not controlled by the present shareholders of ProcureStaff, and (iii) the subcontracting or delegation by ProcureStaff of its Administrative Services or MSP.

Q. ProcureStaff shall require all Suppliers to execute and deliver to ProcureStaff a signed Supplier Agreement substantially in the form of Exhibit D, with any changes to which both ProcureStaff and Customer agree. All such Supplier Agreements shall be maintained by ProcureStaff. In addition, ProcureStaff shall require each Supplier to carry insurance in the form and limits set forth in the Insurance Section of the Supplier Agreement.

R. Notwithstanding the foregoing, if any prospective Supplier does not meet ProcureStaff's financial, insurance, status, business continuity and stability qualification criteria, or does not carry and maintain the insurance limits specified in the Supplier Agreement, or in ProcureStaff's reasonable opinion does not appear to meet ProcureStaff's and Customer's qualification criteria (an "Unapproved Supplier"), ProcureStaff shall so advise Customer's Program Manager and ascertain whether Customer desires ProcureStaff to do business with such Unapproved Supplier. If Customer desires ProcureStaff to transact business with such Unapproved Supplier and Customer's Program Manager signs a form to be developed by the parties indicating Customer's acceptance of the Unapproved Supplier, ProcureStaff shall have no responsibility to Customer with respect to such Unapproved Supplier or its Contingent Workers or other personnel other than the obligation to collect and pay its invoices which have been approved and funded by Customer and to include the Unapproved Supplier in the reports required in this Agreement. In such case where billing is through ProcureStaff, ProcureStaff shall be entitled to receive from Customer and Supplier the fees specified in Exhibit B. The form referred to above will include a direction from Customer that unless a Supplier agrees to such fees, its purchase orders, written or verbal, will be cancelled by Customer. If Customer does not assume all such liability and responsibility, then ProcureStaff need not transact business with such Unapproved Supplier.

S. ProcureStaff shall have no liability or responsibility for any Supplier or for any Contingent Worker who is engaged by Customer outside the MSP described in Exhibit A; however, ProcureStaff shall notify the Customer's Program Manager and shall provide consolidated billing, payment and reports if requested by Customer. If Customer desires ProcureStaff to transact business with such Supplier and Customer's Program Manager signs a form to be developed by the parties indicating Customer's acceptance of the Supplier, ProcureStaff shall have no responsibility to Customer with respect to such Supplier or its Contingent Workers or other personnel other than the obligation to collect and pay its invoices which have been approved by Customer and to include the Supplier in the reports required in this Agreement. In such case where billing is through ProcureStaff, ProcureStaff shall be entitled to receive from Customer and Supplier the fees specified in Exhibit B. The form referred to above will include a direction from Customer that unless a Supplier agrees to such fees, its purchase orders, written or verbal, will be cancelled by Customer. If Customer does not assume all such liability and responsibility, then ProcureStaff need not transact business with such Supplier.

## IV.    CUSTOMER'S DUTIES AND OBLIGATIONS

A.  Customer shall require all Assignment Managers (or an authorized designee) to review and approve (or reject and state a reason) all Contingent Workers' time reported in the Electronic Time Reporting System within three (3) business days from receipt of the time reports by the Contingent Worker.  Time not approved or rejected within three (3) business days may be deemed by ProcureStaff to have been approved and may be included in the Consolidated Billing.  Customer agrees to pay for all time included in the Consolidated Billing.

B.  Customer shall pay or authorize ProcureStaff to deduct from payment to Suppliers for the services performed hereunder the fees in accordance with the terms provided in Exhibit B.

C.  Customer shall provide the Management Personnel and the Contingent Workers assigned to work on-site suitable and safe places of work which shall comply with all applicable federal, state, and local health and safety laws, including OSHA.

D.  Customer shall not allow any Management Personnel or Contingent Workers to handle Customer's cash, securities or other valuables without ProcureStaff's prior written consent.

E.  Customer agrees to comply with the Fair Labor Standards Act, Americans with Disabilities Act, Title VII of the Civil Rights Act, Age Discrimination in Employment Act, Illegal Immigration reform and Immigrant Responsibility Act, Family and Medical Leave Act, American Competitiveness and Workplace Improvement Act and any and all other federal, state and local laws, statutes, ordinances, rules, regulations, codes, orders and/or programs.

## V.  CUSTOMER / PROCURESTAFF PROPERTY

A.  Unless otherwise agreed to in writing, all tools, equipment, materials, drawings, computer programs, or other data of every description furnished to ProcureStaff by Customer (unless paid for by ProcureStaff) and any replacement thereof, or any materials affixed or attached thereto, shall be the property of Customer. ProcureStaff shall not substitute any property for Customer property, and shall not use such property except in connection with providing services hereunder. Such property shall be subject to removal at Customer's request, in which event ProcureStaff shall prepare such property for shipment and shall deliver it as directed by Customer in the same condition as originally received by ProcureStaff, reasonable wear and tear excepted, all at Customer's expense.

B.  ProcureStaff's confidential or proprietary software programs which are used by ProcureStaff to perform its Administration Services under this Agreement, including, but not limited to, REX, VSG-Gold™, HRP, HRPM, VoltTrak, Platinum, Vector, Consol and all enhancements, improvements, revisions, corrections, additions, subtractions, updates, modifications, derivative works, adaptations, versions, productions,

transmissions, arrangements, changes and translations, and their framework and infrastructure, and all related software, source code, and object code, all scripts and applets, web content, navigational buttons, server configurations, algorithms, processes, and any and all patent rights, copyright and trademark rights, trade secrets and common law rights and all other attendant intellectual property rights and other rights, title and interest therein (except Customer's data stored therein), are and shall remain the sole property of ProcureStaff and no right, title or interest of any kind or description shall be transferred to Customer. All of the foregoing shall be deemed confidential and proprietary to ProcureStaff and shall be considered and maintained as confidential by Customer.

## VI.   ORDER PLACEMENT

All orders under this Agreement shall be provided by Customer through ProcureStaff's web-based Human Resource Procurement System and secured with a purchase order.

## VII.   WORKERS' COMPENSATION AND LIABILITY INSURANCE AND INDEMNIFICATION

A. ProcureStaff shall, at its sole cost and expense, procure and will maintain in effect throughout the term of this Agreement, at a minimum, the following insurance coverage covering ProcureStaff's Administration Services:

1. Commercial General Liability with Additional Insured Status ("CGL"): $2,000,000 General Aggregate and $1,000,000 Each Occurrence;
2. Business Automobile Liability with Additional Insured Status ("Auto"): $1,000,000 Each Occurrence, Any Auto;
3. Worker's Compensation: Statutory Limits with Waiver of Subrogation or Alternate Employer Endorsement;
4. Employer's Liability: $1,000,000;
5. Professional Liability (E&O): $2,000,000;
6. Employee Dishonesty/Crime Bond: $1,000,000 Includes loss to Customer; and
7. Umbrella/Excess Policy: $3,000,000 with respect to CGL, Auto and Employer's Liability.

B. ProcureStaff will furnish Customer with a certificate of insurance evidencing the coverage required under this Article. Each certificate of insurance shall provide a thirty day written notice of cancellation or material change in policy be sent to Customer. ProcureStaff also agrees to notify Customer thirty days prior to any changes in coverage which would affect coverage limits and other items agreed upon between Customer and ProcureStaff under this Article.

C. Maintenance of insurance by ProcureStaff as specified in this Article shall in no way be interpreted as relieving ProcureStaff of any responsibility whatsoever for liability arising under this Agreement or otherwise for the acts and omissions of ProcureStaff

and ProcureStaff may carry, at its own expense, such additional insurance as it deems necessary.

D. ProcureStaff shall require all Suppliers, at each Supplier's sole cost and expense, to procure and maintain in effect throughout the term of this Agreement, at a minimum, insurance coverage as specified in the Supplier Agreement.

E. ProcureStaff shall not be responsible for the acts or omissions of any of the Suppliers or for their performance under the Supplier Agreements, and ProcureStaff's insurance shall not be deemed to cover or be excess to the insurance of any Supplier. ProcureStaff shall process any claims on behalf of Customer for claims against Suppliers and shall pursue any such claims with reasonable diligence (but shall not be required to resort to litigation), but ProcureStaff shall not itself be liable for any such claims, whether covered by insurance or not. On request of Customer, ProcureStaff shall assign any such claim to Customer.

F. ProcureStaff shall be responsible for administration of the MSP and for monitoring Suppliers' compliance with the program and, at the request of Customer terminating the services of any Supplier who fails to comply. ProcureStaff shall have no responsibilities and/or liabilities for the actual performance or non-performance, work product or results of any Supplier or Contingent Worker, including but not limited to any deliverable, product and/or task produced or provided by any Contingent Worker. Customer shall have sole responsibility for determining whether the services provided by Suppliers or Contingent Workers are satisfactory and/or in accordance with the agreement between each Supplier and ProcureStaff.

## VIII. INDEMNIFICATION / LIMITATION OF LIABILITY

A. To the extent not caused by the negligent or deliberate acts or omissions of ProcureStaff, Customer agrees to indemnify, defend and hold ProcureStaff harmless from and against any and all claims, demands, causes of action, damages and/or losses of any sort or kind, in law or in equity, including but not limited to attorney's fees and costs or expenses of suit, arising out of, resulting from and/or related in any way to Customer's obligations under this Agreement, including but not limited to acts or omissions of Customer or Customer's employees whether arising out of tort or contract, except as to claims for non-payment of Supplier Invoices for which Customer has already paid ProcureStaff.

B. ProcureStaff agrees to indemnify, defend and hold Customer harmless from and against all claims, demands, causes of action, damages, and/or losses of any sort or kind, in law or in equity, including but not limited to attorney's fees and costs or expenses of suit, that may be made as a result of ProcureStaff's acts or omissions or those of its officers, employees, subcontractors or agents to the extent of claims made: (i) by anyone for injuries to persons or damage to property or other cause of action; (ii) in connection with the Administration Services contemplated by this Agreement; (iii) under any statute or common law or otherwise, arising out of or in connection

with the Administration Services contemplated by this Agreement or any information obtained in connection with the performance of such Administration Services, and (iv) the failure by ProcureStaff to maintain the Standard Register/ProcureStaff Escrow Account or its failure to pay when due from Customer for these Services. None of the foregoing indemnifications shall apply to the extent that any loss or injury is caused by or results from the negligent or intentional act of Customer or Customer's employees.

C. **NEITHER PROCURESTAFF NOR CUSTOMER SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT, EVEN IF THE PARTIES HAVE BEEN APPRISED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING.**

IX. **PROTECTION OF PROCURESTAFF'S DATA SYSTEMS**

Customer agrees that neither it nor any of its employees shall modify or attempt to modify or disable any of ProcureStaff's Proprietary Software nor install or attempt to install any back door, time bomb, drop dead device, virus, Trojan horse or worm (as such terms are commonly understood with respect to data systems generally) or other destructive or disabling code or components or other similar software routine designed to permit unauthorized access, disable, erase or otherwise harm ProcureStaff's Proprietary Software, or perform similar actions; but will use the software only in the manner in which it was designed to be used and only for the intended purposes and in the manner for which access is granted.

X. **ADDITIONAL TERMS AND CONDITIONS**

A. This Agreement, including all matters expressly incorporated by reference, when signed by both parties, constitutes the entire and only agreement between the parties respecting the subject matter hereof, and there are merged herein all prior and pre-existing representations and agreements by and between Customer and ProcureStaff.

B. No term or provision of this Agreement may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against whom the enforcement of such changes, waivers, discharge or termination is sought.

C. Except as otherwise specified herein, neither party may assign this Agreement or any interest, payment or rights hereunder, except to an affiliate as defined in the Securities Exchange Act, without the other party's prior written consent. Except for the prohibition on assignment contained in the preceding sentence, this Agreement shall be binding upon and insure to the benefits of the heirs, successors, representatives and assigns of the parties hereto.

D. If any section, subsection, sentence, or clause of this Agreement shall be adjudged illegal, invalid or unenforceable, the remainder of the Agreement shall continue to be in full force and effect.

E. During the term of this Agreement and for a period of one (1) year following the termination or expiration hereof, neither party shall solicit, interview, hire, or discuss employment prospects with any officer or employee of the other party engaged in providing services hereunder, or who is otherwise involved with the Administration Services without the prior written approval of the other party.

F. Neither party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such failure or delay is caused by fire, flood, explosion, war, strike, embargo, government requirement, civil or military authority, act of God, act or omission of carriers or other similar causes beyond its control and occurring without the fault or negligence of the delayed or non-performing party ("Force Majeure Conditions").

G. The construction, interpretation, and performance of this Agreement and all transactions under it shall be governed by the laws of the State of New York, excluding its choice of law rules and excluding the Convention for the International Sale or Goods. The parties agree that the provisions of the New York Uniform Commercial Code apply to this Agreement and all transactions under it, including agreements and transactions relating to the furnishing of services, the lease or rental of equipment or material, and the license of software. Any dispute or controversy arising out of or related to this Agreement or any breach hereof, or the termination of this Agreement, shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association, pursuant to the Federal Arbitration Act, applying the law as set forth in the Governing Law paragraph of this Agreement. The arbitrator shall be entitled to award reasonable attorney's fees and costs to the prevailing party. Judgment upon any award may be entered in any court having jurisdiction. Should the foregoing arbitration agreement be unenforceable for any reason, ProcureStaff and Customer hereby waive their respective rights(s) to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding, and/or hearing.

H. Volt Services Group division of Volt Technical Resources, LLC, a subsidiary of Volt Information Sciences, Inc., may also provide the services of Contingent Workers to Customer under a separate Supplier Agreement between ProcureStaff and Volt Services Group, and Volt Services Group shall be deemed a Supplier with respect to the Contingent Workers Volt Services Group assigns to Customer.

I. The following exhibits are hereby referenced and incorporated into this Agreement, except to the extent their terms are different, in which case this Agreement shall control:

Exhibit A     Statement of Work

| Exhibit B | Compensation |
|-----------|--------------|
| Exhibit C | Process Metrics and Trend Reports |
| Exhibit D | Supplier Agreement |
| Exhibit E | Contingent Worker Agreement Regarding Intellectual Property |
| Exhibit F | Electronic Transaction Agreement |

J. <u>NO RIGHT OF SET-OFF</u>. Customer understands and agrees that ProcureStaff will pay Suppliers only after funding is received from Customer. If Customer wishes ProcureStaff not to pay all or part of any Supplier invoice, Customer must notify ProcureStaff prior to funding. Customer shall not be entitled to set off any amount owing at any time to ProcureStaff for services rendered by one Supplier against any amount owed to ProcureStaff for services rendered by another Supplier. Neither party shall be entitled to set off any amount owing at any time to the other party under this Agreement from monies owed under any other agreement between the parties or any of their affiliates.

K. <u>AGREEMENT FOR SERVICES</u>. This Agreement provides for the furnishing of Administration Services only. ProcureStaff shall utilize its computer systems to provide such services as provided in Section III above, which Administration Services shall be performed in accordance with Exhibit A.

L. <u>ACCEPTANCE OF TERMS AND CONDITIONS</u>: This Agreement shall become binding only when signed by both parties. The program shall be implemented in accordance with an implementation schedule to be agreed upon by the parties.

M. <u>INTEGRATION</u>: This Agreement is intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and is intended also as a complete and exclusive statement of the terms of their agreement. No course of prior dealings between the parties and no usage of trade shall be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity for rejection. Any terms and conditions of sale appearing on ProcureStaff's or Customer's acknowledgment forms or quotations shall have no effect whatsoever and are hereby deemed null and void.

**The Standard Register Company**                    **ProcureStaff, Ltd.**

Signature: _____                Signature: _____

Name: _Craig Brown_____                Name: __Steven Shaw_____

Title: __Chief Financial Officer_____            Title: __President_____

Date: __03/05/2004_____                Date: ___3/17/2004_____

**Exhibit A**

**STATEMENT OF WORK**

**1.  General**

1.1  ProcureStaff, acting in accordance with the provisions of this Agreement, shall administer the entire process of qualifying Suppliers to supply technical, professional, medical, clinical, engineering, light industrial, clerical, administrative, finance, accounting and other staffing and consulting services to Customer as may be requested under the terms of a Contingent Worker Services Agreement substantially in the form of Exhibit D between each Supplier and ProcureStaff as agent for Customer (the "Supplier Agreement"); shall provide electronic time and expense reporting services; shall provide consolidated, centralized billing as required; and shall provide reporting and approved payment processing procedures under this Agreement as part of the MSP.

1.2  Customer shall notify all incumbent and future Suppliers of ProcureStaff's administration of the MSP and shall require all Suppliers to accept ProcureStaff's Supplier Agreement substantially in the form set out in Exhibit D.

1.3  ProcureStaff shall furnish a core team of on-site personnel (the "On-Site Team") to be located at a mutually agreed upon Customer location, who shall administer and manage the procurement process. Customer shall at no charge to ProcureStaff, provide at Customer's offices, mutually agreed-upon office space, office furniture and telephones on-site as required for the On-Site Team. Customer shall assist ProcureStaff in locating rent-free space and services at other Customer sites if Customer requests ProcureStaff to maintain staff at other mutually agreed upon sites if volume warrants. Customer shall be responsible for all telephone/communications charges made from phone lines provided by Customer related to the On-Site Team's provision of services under this Agreement. Customer shall provide the On-Site Team reasonable access to Customer's internal e-mail system to the extent necessary for ProcureStaff to perform its functions under this Agreement. Customer shall permit the On-Site Team to gain access to or exit from the assigned office space location during normal working hours and shall permit Contingent Workers to gain access to their work locations. It is expressly understood and agreed that the entry of the On-Site Team is subject to all applicable rules and regulations of Customer.

1.4  ProcureStaff and Customer shall establish procedures for the provision of Administration Services hereunder as mutually agreed upon between ProcureStaff and Customer. Such procedures may be modified from time to time by mutual agreement. Customer shall be available to ProcureStaff for consultation concerning any issues related to the Administration Services being performed by ProcureStaff.

1.5  ProcureStaff shall furnish reports to Customer related to the activity under this Agreement as mutually agreed upon. The types and format of such reports shall be agreed between ProcureStaff and Customer from time to time.

**Exhibit A, p. 13**

1.6 Incumbent Clerical and Light Industrial Customer-Referred Contingent Workers will be assigned to ProcureStaff as of the date ProcureStaff first makes its systems available for unrestricted use by Customer's employees.

1.7 All new Customer-referred Staffing will be directed to ProcureStaff and ProcureStaff will place all Customer-referred candidates either with ProcureStaff or with an affiliate of ProcureStaff under the terms of a Supplier Agreement.

## 2. Consolidated Billing Service, Invoicing and Payment

2.1 Unless it is impractical or infeasible, ProcureStaff will make available electronic time reporting and approval for Contingent Workers as set forth in this Agreement. Time reported to ProcureStaff and approved by an authorized Customer employee will be used to generate electronic billing for the services of Contingent Workers.

2.2 ProcureStaff shall make available consolidated invoicing via electronic medium or hard copy for all Contingent Workers furnishing services hereunder, provided the applicable Supplier uses ProcureStaff's electronic time reporting system or furnishes the requisite information to ProcureStaff in a timely manner and in a format approved by ProcureStaff. Customer shall require that all Suppliers utilize ProcureStaff's electronic time reporting system and accept it as the sole basis for payment for the Services of their Contingent Workers.

2.3 ProcureStaff shall furnish to Customer consolidated billing statements according to Customer instructions, that combine the information based on electronic time reporting, invoices from all Suppliers for charges and reimbursable costs/expenses rendered to, for or on behalf of Customer ("Supplier Invoices"), and applicable sales and use taxes into a centralized statements of charges ("Consolidated Billing").

## 3. Description of Services—MSP Solution

3.1   Standard Consol System Features Includes:

- On-line Requisition
- Resume or Profile Submittal & Tracking
- Interview Scheduling (if applicable)
- Candidate Selection and On-boarding / Off-boarding
- Purchase Order Creation
- Time and Expense Reporting
- Consolidated Invoices and Supplier Payments

3.2   Implementation Includes:

- Standard Consol Configuration
- Standard Job Descriptions

**Exhibit A, p. 14**

- Nomenclature
- The Standard Register Company Branding
- Business And Configuration Requirements And Sign-Off
- Collection Of Accounting And Billing Data Requirements And Processes
- Supplier Qualification, Contracts And On-Boarding
- Testing For Standard Configuration Changes
- UAT Testing For Configured System (Including Billing) And Client Approval
- Training Provided To Users And Suppliers One Week Prior To "Go Live" (In-Person Or Via Webex)

3.3     ProcureStaff will provide each of the following services:

Pre-Implementation –

3.3.1.  In-depth Needs Analysis related to: Customer managers, Suppliers, Locations, Commodity Spend, Systems and Integration, Internal Policies and Procedures.

3.3.2.  Implementation and Resource Planning:   Identification of implementation team members and work locations, development of Detailed Implementation Project Plan – including activities, owners and timeline – and Functional Requirement Documents (FRD's).

Implementation –

3.3.3.  Migration of Contingent Worker, Supplier and Customer data into Web based tool

3.3.4.  Competitive and Tiered Supplier Sourcing via Web system:   Jointly develop process flow including -- Posting of Request For Quotation's ("RFQ") to Suppliers, review and qualification of resumes, follow up on candidates submitted, scheduling of interviews, notification of candidate selection and non selection status, closing of RFQ and assisting in the completion of required documents.  Light industrial or clerical/administrative orders at sites defined by Customer may be sourced via Tiered Supplier Sourcing.  All other orders will be sourced via Competitive Sourcing.

3.3.5.  Processing of Requisitions and Purchase Orders:  Jointly develop process flows, including – receipt and review of all requisitions, processing of requisitions into purchase orders, sending purchase orders to Suppliers and system updates.

3.3.6.  Time and Expense Reporting and Approvals:  Develop process flow for Suppliers, Customer managers, and Contingent Workers to enter time and expenses into on-line time card and expense reports for approval, provide access to Suppliers and Customer managers for time entry, track and report on approved time, pending time or rejected time as agreed, or alternative means to ensure all time is captured

**Exhibit A, p. 15**

and approved via the HRP/Consol time system.  Develop alternative method for those without access to the web or as back-up procedure.

3.3.7.  Billing and Accounts Payable Administration and Processing:  Develop process flow to include review of each Supplier's on-line time card against PO bill and time limits, verification of authorization of travel and living expenses against PO, submittal of weekly EDI files to Customer, receipt of payment from Customer, payment to Suppliers and resolution of billing or payment disputes.

3.3.8.  Delivery of Management and Supplier Reports:  Identify and develop Customer reports including, but not limited to, Purchase Order, RFQ, Supplier submittals and performance, financial and savings and organizational activities.

3.3.9.  Develop Internal and External Processes and Procedures:  On-site Operational Procedures and On-line Guides for managers and Suppliers.

Post-Implementation –

3.3.10  Supplier Management:  Qualify Suppliers in accordance with ProcureStaff's qualification criteria (unless Customer elects to use Customer specified criteria), enter into Contingent Worker Services Agreement with approved Suppliers, track Supplier's performance and report Supplier metrics.

3.3.11  On-site Relationship Management:  Serve as a resource to Customer managers on MSP related services, assist in the completion and review of RFQ's, post RFQ's to Suppliers, review and evaluate candidate resumes, forward resumes to Customer manager for review and potential interview, assist in all aspects of engaging and disengaging Contingent Workers.

3.3.12  On-going review of processes and procedures and identification of required action by ProcureStaff and Customer

3.3.13  Quarterly and Annual reviews of Program Operations with Customer and ProcureStaff management

3.4  ProcureStaff Dedicated Resources –

3.4.1  ProcureStaff and Customer shall mutually agree on a core team to manage the MSP.  Initially ProcureStaff will provide one full-time dedicated employee to manage Customer's MSP.

3.4.2  During the Pre-Implementation and Implementation phases, ProcureStaff will provide:

3.4.2.1.  Business Consultant or Project Management services for up to 240 hours (approximately 20 hours per week for 12 weeks)

        3.4.2.2.   Supplier Management Support for up to 120 hours (approximately 10 hours per week for 12 weeks)

        3.4.2.3.   Up to four (4) visits to Customer's site by the Business Consultant or Project Manager during the 12 week period

3.4.3.  Except if caused by an event referred in 2.4 of the Compensation section of this Agreement (Exhibit B), any changes (additions or reductions) in the number of on-site personnel must be mutually agreed upon in writing prior to executing the change.

3.5.    Additional tasks To Be Performed by ProcureStaff–

3.5.1.  Market and educate Customer managers, Suppliers and others on Customer's MSP Program and related policies.

3.5.2.  Profile embedded contingent workers, Customer managers and organizations to understand skill set requirements for Contingent Workers.

3.5.3.  Review new RFQ's, post RFQ's to Suppliers, review resumes or profiles submitted, submit qualified resumes or profiles to managers, follow up and schedule interviews, negotiate bill rates, conduct on-going communications with Customer manager and Suppliers on RFQ or candidate status, offer of assignment and updating of system as required.

3.5.4.  Provide passwords to Suppliers and access to web based time reporting system for Contingent Workers and on-line Supplier procedures or other mutually agreed to time reporting method

3.5.5.  Provide Customer and Suppliers with metrics to measure the performance of Suppliers and Contingent Workers.  Metrics will be mutually agreed upon by Customer and ProcureStaff and communicated to Suppliers

3.5.6.  Coordinate all interactions with Suppliers concerning individual Contingent Workers including: pay rate increases; time reporting issues, performance issues, terminations and job completion

3.6.    Miscellaneous

3.6.1.  Customer agrees to require its managers to utilize ProcureStaff's Administration Services under this Agreement.

3.6.2.  ProcureStaff and Customer will jointly develop written procedures/processes for requesting and assigning Contingent Workers  through the Customer MSP.

3.6.3.  ProcureStaff agrees to develop mutually agreed upon informational materials regarding MSP to be distributed within Customer.

3.6.4.  ProcureStaff will manage a process established with Customer to ensure that Supplier maintains all compliance documentation required by Customer that is reviewed and accepted by each Supplier or Contingent Worker either on-line or through written documents, which may include:  Drug Screening Results, Contingent Worker Agreement Regarding Intellectual Property, Customer Contingent Worker Integrity Policy, Contingent Worker Profile, Acknowledgement of Temporary Work Assignment, HIPAA Compliance Documents, or any other document required by Customer.  ProcureStaff will require each Supplier to collect and maintain these documents.

3.6.5.  ProcureStaff will conduct periodic audits to confirm Suppliers are maintaining compliance documents and proper auditable payment records for their Contingent Workers.

3.6.6.  ProcureStaff and Customer will jointly create program and performance benchmark metrics within the first three (3) months following implementation and will use them to measure the following quarterly results.

3.6.7.  ProcureStaff agrees to issue a mutually agreed upon Customer Satisfaction Survey semi-annually to all Customer managers using the MSP to obtain Contingent Workers.

3.6.8.  Additional services that are not outlined in this Scope of Work shall be mutually agreed upon and both parties will agree to the timeframe, process, and compensation as the opportunities become available

**Exhibit A, p. 18**

**Exhibit B:**

## COMPENSATION

1. **Definitions.**  For the purpose of this Exhibit the following definitions shall apply:

   1.1. "RFQ" -- any Request For Quotation issued by ProcureStaff to Suppliers for the purpose of soliciting submittal of potential candidates to serve as Contingent Workers under this Agreement

   1.2. "Submit Rate" -- the hourly rate which the Suppliers submit to ProcureStaff for Contingent Worker candidates

   1.3. "Bill Rate" -- the final rate negotiated and included on the Purchase Order from Customer to ProcureStaff.  This rate includes all of ProcureStaff's Processing Fees.  If the Customer Fee is zero, the Bill Rate and the Submit Rate will be the same.

2. **Processing Fees**

   2.1 ProcureStaff will withhold a fee of 2.99% from the Submit Rate paid to the Supplier.

   2.2 The Bill Rate invoiced to Customer for Customer-referred Service Contingent Workers will equal the Contingent Worker's Direct Labor Rate plus a negotiated markup. ProcureStaff will deduct a processing fee of 2.99% from amounts paid to the Contingent Worker's Supplier.   No additional Fees will be charged to Customer.

   2.3 If Customer desires to have ProcureStaff expand its On-Site Team to additional sites, ProcureStaff may initiate discussions regarding changes in on-site personnel or renegotiation of the compensation terms of this Agreement.  If the parties are unable to reach an agreement regarding any changes to the on-site personnel or the compensation terms of this Agreement, the party initiating the discussions may terminate this Agreement on 60 days prior written notice.

3. **Optional Services**

   3.1. Additional on-site personnel will be provided by ProcureStaff at Customer's request to perform administrative and management services at cost plus 34%

   3.2. Additional System Configuration/Integration outside the agreed upon scope of this Statement of Work will be billed at a rate of $121.50 per hour.

4. **Payment Terms**

   4.1. ProcureStaff will bill Customer weekly via EDI for approved Supplier hours and related expenses.

## Exhibit A, p. 19

4.2. Customer will pay ProcureStaff within fifty-five (55) calendar days of receipt of weekly EDI invoice at Customer's Accounts Payable department.

4.3. ProcureStaff will then pay Suppliers within ten (10) business days from receipt of payment from Customer for approved hours and expenses.

**Exhibit D**

## CONTINGENT WORKER SERVICE AGREEMENT

Between:     ProcureStaff, Ltd.
               560 Lexington Avenue
               New York, NY 10022
               (Hereinafter "ProcureStaff")

And:

               _____
               Supplier Name

               _____

               _____

               _____

               Supplier Address
               (Hereinafter "Supplier")

WHEREAS, Supplier represents that it has the capability of providing temporary employees/ personnel to perform services to Client, Inc. ("Customer"), according to the terms and conditions of this Agreement;

NOW THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound, ProcureStaff and the Supplier agree as follows:

**Definitions:**

For the purposes of this Agreement and the services provided hereunder the following definitions will apply:

| | |
|---|---|
| Bill Rate: | Hourly charge to Customer for Services of a Contingent Worker. |
| Contingent Worker: | Supplier's employee who directly provides / performs Services to / for Customer under Customer's day-to-day supervision, direction and control. |
| Contingent Worker Services | Work performed for Customer by Contingent Workers provided by a Suppler on a non-permanent hourly-paid basis. |
| Customer: | Client, Inc., the company to which Supplier is providing Contingent Worker Services and a third-party beneficiary to this Agreement. |
| Managed Services Program or MSP: | The program administered by ProcureStaff and described in this Agreement by which a Supplier provides Contingent Workers to perform Services for Customer |
| ProcureStaff: | ProcureStaff, Ltd., acting as Program Administrator, is responsible for management of Contingent Worker Services provided to Customer by third parties. ProcureStaff will be the payment processor of Supplier's invoices which shall all be submitted to ProcureStaff for Customer. |
| Services: | (i) programming, system analysis, technical writing, drafting and other temporary information technology or engineering services provided by a Contingent Worker, (ii) clerical and administrative services provided by a Contingent Worker or (iii) any other Contingent Worker Services required by Customer which the parties agree shall be included under this Agreement. |

## Exhibit A, p. 21

1. **Term**

The term of this Agreement shall commence on _____ 20___, which shall be the effective date of this Agreement, and shall continue thereafter for a period of two (2) years. Both ProcureStaff and Supplier shall have the right to terminate this Agreement at any time upon thirty (30) days written notice to the other. Either party may terminate this Agreement at any time and without prior notice if the other party repudiates or materially breaches its obligations under this Agreement unless the repudiation or breach is cured within 10 days after written notice specifying the facts complained of. If ProcureStaff terminates this Agreement, it may do so in part, and direct Supplier to continue to perform services under one or more previously issued purchase orders and in compliance with this the terms of this Agreement which would by nature survive such termination.

2. **Scope of Work/Responsibilities**

This Agreement sets forth general terms and conditions under which Supplier will supply Contingent Workers to perform Services for Customer. This Agreement includes all Attachments which are incorporated herein by reference.

Supplier agrees:

2.1. To provide qualified temporary employees, who are classified as form W-2 employees of Supplier pursuant to Internal Revenue Service guidelines, as Contingent Workers to perform specific Services at the request of Customer or ProcureStaff. Supplier shall check the background and references of all such prospective Contingent Workers, and shall comply with all applicable laws in doing so. Contingent Workers provided by Supplier shall be qualified to perform the Services pursuant to Customer's directions and instructions.. Supplier, in its sole discretion as the employer, shall have the unrestricted right to hire and terminate Supplier's Contingent Workers provided hereunder.

2.2. To maintain and be responsible for all administrative matters incidental to its relationship as employer of Contingent Workers provided under this Agreement, including but not limited to, the following:

(1) Payroll preparation, check processing and payroll distribution;

(2) FICA, FUTA, SUTA and any additional required payroll withholdings;

(3) Verification/Administration of W-4 and I-9 information;

(4) Handling of any Supplier Benefit Plan (enrollment/claims processing);

(5) W-2 processing, federal, state, local tax reports and compliance;

Supplier shall compute its Contingent Workers' wages and withhold all applicable federal, state and local taxes, including but not limited to federal Social Security payments. Supplier shall remit its Contingent Workers' withholdings to the proper government authorities and make employer contributions for FICA and federal and state unemployment insurance payments and otherwise meet all other statutory obligations as the employer of the Contingent Workers.

2.3. That all Contingent Workers providing services to Customer under this Agreement shall be employees of the Supplier. Supplier shall at all times act as an independent contractor to Customer and independent, common law employer of Supplier's Contingent Workers. None of Supplier's Contingent Workers shall be considered employees of Customer or ProcureStaff. Supplier shall have the sole right and responsibility to recruit, hire, discipline and terminate individuals assigned to the

positions requested by Customer, although Customer may terminate or change any assignment for any lawful reason by way of notice and request to Supplier.

2.4. That Customer and ProcureStaff shall not be responsible for and shall not interfere with employment-related matters reserved to Supplier and normally incident to Supplier's employer-employee relationship. If Customer is dissatisfied with the performance of any Contingent Worker, Customer or ProcureStaff will notify Supplier of such dissatisfaction for Supplier to discuss directly with its Contingent Worker.

2.5. To indemnify and hold Customer and ProcureStaff harmless for any payroll liability to the Supplier's Contingent Workers.

2.6. Supplier will comply with all applicable Customer policies and procedures.

2.7. Supplier shall maintain all necessary personnel and payroll records for Contingent Workers, including documents required under the Immigration Reform and Control Act of 1986 and any amendments thereto. Supplier certifies to Customer and ProcureStaff that each Contingent Worker is authorized to be employed in the United States of America. Upon request by ProcureStaff, Supplier shall provide confirmation that Supplier has verified each Contingent Worker's authorization to be employed in the United States of America. ProcureStaff shall notify Supplier in advance if ProcureStaff's Customer has notified ProcureStaff that a position is subject to export control laws.

2.8. Supplier shall recruit, interview, select and hire all of its Contingent Workers. Customer shall have the right, but not the obligation, to select for assignment only those Contingent Workers that Customer, in its sole discretion, believes to best meet all standards of Customer. Specific standards for personnel qualifications shall be established by Customer and provided to Supplier. ProcureStaff reserves the right to require Supplier to supply verification of education and experience and to request references for all Contingent Workers. If, at any time, any of the Contingent Workers do not perform the services specified in a manner which is satisfactory to Customer, ProcureStaff and/or Customer shall so notify Supplier and it shall be Supplier's responsibility to remove any such Contingent Workers from assignment.

2.9. Supplier shall immediately give written notice to ProcureStaff of any and all known impending or existing labor complaints, disputes or controversies and the progress thereof involving its Contingent Workers. Supplier shall use every commercially reasonable efforts to resolve any such complaint, dispute or controversy.

2.10. Supplier warrants that ProcureStaff and Customer shall have no liability or bargaining obligation under any collective bargaining agreement covering any Contingent Worker. Supplier agrees to provide ProcureStaff with copies of any collective bargaining agreements existing covering any Contingent Worker and agrees to provide ProcureStaff with prompt notice of any union organizing activity with respect to any Contingent Worker.

2.11. Supplier shall inform each Contingent Worker that private or proprietary information of Customer may become available to him or her and, prior to placement with Customer, instruct the Contingent Worker to maintain the confidentiality of such information and require the Contingent Worker to agree to do so by signing the Contingent Worker Agreement Regarding Intellectual Property attached to this Agreement. Supplier must maintain signed copies and deliver them to ProcureStaff when and in such manner as ProcureStaff may direct.

2.12. Supplier shall maintain in effect during the term of this Agreement all applicable federal, state, and/or local licenses and permits which may be required to be maintained by employers or by companies engaged in the same business as Supplier.

**Exhibit A, p. 23**

2.13. Supplier shall inform each Contingent Worker that all regulations and rules of Customer which may be in effect at the job site regarding employment, passes, badges, and conduct on the property shall be observed by Supplier's Contingent Workers. Customer shall have the right to reject or direct the removal of any Contingent Worker whom Customer determines to be unqualified, whose productivity is below acceptable levels, or whose workmanship is substandard or for any legal reason as requested by Customer. ProcureStaff will give Supplier notice of such rejections or removals, and thereafter any additional time of persons so rejected or removed will not be charged to ProcureStaff or Customer.

2.14. Supplier shall meet and/or confer with all Supplier's Contingent Workers assigned to Customer to review pay and benefits and other conditions of work and to address other pertinent matters arising under Supplier's employment relationship with such Contingent Workers.

2.15. Supplier shall not permit any Contingent Worker to begin Services before the assignment has been administratively processed by ProcureStaff, and all required documentation has been submitted to ProcureStaff and ProcureStaff has issued an authorization authorizing the Contingent Worker to begin work on assignment at Customer.

2.16. Any assignment by Supplier of this Agreement, or any rights, interest or payment hereunder, without the prior written consent of ProcureStaff, shall be void. Supplier shall not subcontract any work under this Agreement.

2.17. Supplier shall keep accurate records of all labor and other costs charged to ProcureStaff and ProcureStaff and Customer shall have access, at all reasonable times, to all records, correspondence, account books, invoices, canceled checks, insurance audits, payrolls and other records relating in any way to the amounts billed to ProcureStaff under this Agreement. ProcureStaff and Customer shall have the right both to verify reports prepared by Supplier and also to perform an original audit of Supplier's records related to the provision of Services for a period of three years following (a) the termination of the assignment of a Contingent Worker, or (b) the termination of this agreement, whichever comes earlier. In the event that an audit of Supplier records reveals any non-compliance with this Agreement, ProcureStaff, at its election may choose to immediately terminate this Agreement. This right of termination is in addition to any and all other rights and remedies to which ProcureStaff may be entitled.

2.18. ProcureStaff's failure to adjust or correct Supplier's billing on a current basis, regardless of reason, shall in no way prejudice ProcureStaff's right to make appropriate adjustments supported by or substantiated either in reports submitted by Supplier or upon audit of Supplier. In connection with either reports submitted by Supplier or estimated or actual audit adjustments prepared by ProcureStaff, ProcureStaff may withhold payment of amounts due to Supplier which are reasonable and necessary to offset potential audit adjustments due ProcureStaff.

2.19. All orders under this Agreement shall be processed through the MSP and provided through ProcureStaff's web-based Human Resource Procurement System and secured with a purchase order (or other agreed upon release mechanism, which shall be deemed a purchase order for purposes of this Agreement) issued through ProcureStaff. Any purchase order may be terminated at any time by ProcureStaff without terminating this Agreement.

2.20. Supplier shall be required to use the MSP to provide Contingent Workers to Customer and agrees to work with the designated ProcureStaff on-site representatives for this purpose. For purposes of this Agreement "Direct Sourcing" is any activity that results in Customer's engagement of a Contingent Worker outside of the MSP or any action by a Supplier to attempt to place a Contingent Worker outside of the MSP. Direct Sourcing includes, but is not limited to: Supplier negotiating directly with a Customer manager to engage candidate(s) from Supplier (regardless of who initiates the contact), Supplier giving resumes directly to a Customer manager, Supplier recommending a particular candidate to a Customer manager either before or after that candidate was submitted on a requirement.

Direct Sourcing will be tracked and reported by ProcureStaff to Customer for determination. Repeated Non-Compliant placements made by an Approved Supplier may result in the termination of this Agreement.

**3. Legal Employer**

3.1. Supplier is, and shall at all times be, a legal entity and deemed to be an independent contractor, and all Contingent Workers assigned by Supplier to Customer shall remain employees of Supplier, and shall be subject to Supplier's right of administrative management including employment, discipline and matters pertaining to merit increases and promotions. Neither Supplier nor its employees, agents or representatives will be entitled or eligible, by reason of providing services under this Agreement or any purchase orders hereunder, to participate in any benefits or privileges given or extended by Customer to its employees.

3.2. Customer shall exercise day-to-day supervision, direction and control of Services performed by Contingent Workers and of Contingent Workers' compliance with Customer's regulations, including pertinent safety regulations and all other statutory requirements. Customer shall determine whether Services performed by Contingent Workers are satisfactory and in accordance with Customer's requirements.

**4. Fees**

Effective, _____ 20___ ProcureStaff will deduct an administration fee of 2.99% from each payment by ProcureStaff to Supplier for the Services of each Contingent Worker.

**5 Billing**

5.1 ProcureStaff's preferred invoicing method is electronic. For time reporting, invoices are generated automatically through ProcureStaff's Electronic Time and Expense Reporting System used to track and approve Contingent Worker labor; therefore, the Supplier must not submit invoices for labor unless otherwise instructed. ProcureStaff will bill Customer weekly for all approved time reported through its Electronic Time Reporting System. For Travel & Living or other reimbursable expenses (together, "T&L"), Contingent Workers shall, whenever possible, use ProcureStaff's Electronic Expense Reporting System which will generate electronic billing for approved expenses. Therefore, unless otherwise instructed, Supplier must not submit invoices for T&L. ProcureStaff will bill Customer weekly for all T&L approved during the previous week.

5.2 ProcureStaff or Customer, at their sole discretion, may require Supplier to submit manual invoices for any properly billable charge or expense. ProcureStaff will notify Supplier and will mutually agree with Supplier on the form and method of delivery of such manual invoices.

5.3 ProcureStaff will pay Supplier upon payment by Customer according to the terms of the Section of this Agreement headed Payment.

5.4 Supplier agrees that any expenses submitted will not include any mark-up and must be submitted via ProcureStaff's Electronic Expense Reporting System or, at ProcureStaff's option, documented on a Customer-approved expense report.

5.5 At ProcureStaff's election, the parties will institute electronic purchasing and payment options such as EDI or EFT.

**6. Payment**

**Exhibit A, p. 25**

6.1. Where applicable, sales and use tax will be billed to Customer by ProcureStaff and remitted to Supplier. If the Services provided by Supplier to Customer are subject to sales, use, or a similar tax that Supplier is obligated or permitted to collect from Customer, such tax shall be separately identified by Supplier in accordance with the law of the applicable taxing jurisdiction, itemizing the taxing jurisdiction(s), rate of tax and dollar amount of the tax for each line item contained or to be contained on Supplier's invoice or the consolidated billing. ProcureStaff shall include the amounts of sales tax billed by Supplier in the Consolidated Billing to Customer and will separately identify the tax amount when billing Customer and will pay the amount of such tax to Supplier after receipt of payment of such tax from Customer. The Parties agree that ProcureStaff, for sales, use, or similar tax purposes, is not the vendor, dealer, retailer, buyer or purchaser of the Services, that ProcureStaff is not purchasing the Services from Supplier for resale to Customer, and that Supplier has the sole responsibility for reporting and remitting the tax to the appropriate taxing jurisdiction.

6.2. **Subject to the terms and conditions set forth below, Supplier's proper and approved invoices (which term includes electronic billings) are payable from Customer supplied funds ____ (__) calendar days from the receipt of funding by ProcureStaff from Customer and provided that Customer has unconditionally provided available funds to ProcureStaff to pay said invoice, ProcureStaff being only a paying agent for Customer. It is understood and agreed that ProcureStaff's obligation and/or duty to pay Supplier is expressly conditioned upon and shall arise only to the extent that ProcureStaff has received payment from Customer for Services rendered to, for or on behalf of Customer in respect of Supplier's invoice, and that ProcureStaff shall be under no obligation to pay Supplier's charges unless and until Customer pays ProcureStaff for same.**

6.3. **It is the intention of the parties, and Supplier hereby acknowledges, that notwithstanding any contrary payment terms in Supplier's invoice or otherwise provided for in this Agreement, Supplier relies solely and exclusively on Customer and the credit of Customer, not the credit of ProcureStaff, for payment for its Services. Supplier acknowledges that it is Supplier's obligation to verify and to monitor Customer's credit and that Supplier bears all credit risk.**

6.4. Notwithstanding any contrary payment terms listed on Supplier's invoice or otherwise provided for in this Agreement, Supplier agrees that in the event of Customer's failure, refusal or inability (because of insolvency, bankruptcy or otherwise) to pay ProcureStaff for the Services provided by Supplier, ProcureStaff shall have no obligation to pay for any invoice covering such Services, receipt by ProcureStaff of payment from Customer for Supplier's Services being an express condition precedent to ProcureStaff's obligation to make payment to Supplier. It is further agreed that if such invoice is paid by ProcureStaff, but not funded by Customer, then ProcureStaff shall be entitled to recover the full amount of such payment from Supplier or, at ProcureStaff's option, to deduct such amount by offset from any payments then or thereafter due to Supplier and, in such event, ProcureStaff agrees to immediately assign to Supplier all right, title and interest (and Supplier agrees to accept assignment) to that portion of ProcureStaff's receivables due from Customer on account of such services or expenses (or other obligation or liability) and all actions, rights and/or remedies relating to such services or expenses (or other obligation or liability) and Supplier will look to Customer, and not to ProcureStaff, for collection of all amounts owed and ProcureStaff will not be liable to Supplier for

**Exhibit A, p. 26**

nonpayment for same. This provision shall survive the termination of this Agreement and/or any agreement between ProcureStaff and Customer and/or between ProcureStaff and Supplier.

6.5. ProcureStaff will use commercially reasonable efforts to collect from Customer according to the payment terms in ProcureStaff's Agreement with Customer, but shall have no obligation to institute litigation or arbitration proceedings.

6.6. **SUPPLIER VOLUNTARILY RELINQUISHES ANY CLAIM IT MAY HAVE AGAINST, AND EXPRESSLY COVENANTS AND AGREES NOT TO SUE, PROCURESTAFF FOR ANY SERVICES PERFORMED OR EXPENSES ADVANCED BY SUPPLIER OR ITS EMPLOYEES (OR FOR ANY OTHER OBLIGATION OR LIABILITY), EXCEPT TO THE EXTENT THAT CUSTOMER HAS ACTUALLY MADE UNCONDITIONAL PAYMENT TO PROCURESTAFF FOR SUCH SERVICES OR EXPENSES (OR OTHER OBLIGATION OR LIABILITY.** In the event Customer fails to make unconditional payment to ProcureStaff, due to bankruptcy, insolvency, actual or disputed failure of performance, or any claimed inability or refusal to pay for any reason, or in the event ProcureStaff is unable to collect from Customer and any payment is sixty (60) days past due to Supplier, or there is a recovery by Customer's estate in a preference proceeding, ProcureStaff agrees to immediately assign to Supplier (and Supplier agrees to accept assignment of) all right, title and interest to only that portion of ProcureStaff's receivables due from Customer on account of such services or expenses (or other obligation or liability) and all actions, rights and/or remedies relating to such services or expenses (or other obligation or liability) and Supplier will look solely to Customer, and not to ProcureStaff, for collection of all amounts owed and ProcureStaff will not be liable to Supplier for the nonpayment or any expenses in connection with the collection thereof. SUBJECT TO THE TERMS STATED ABOVE, THE SUPPLIER MUST INITIALLY PURSUE ANY NON-PAYMENT ISSUES WITH PROCURESTAFF AND CAN ONLY INITIATE CLAIMS AGAINST THE CUSTOMER FOR NON-PAYMENT UPON VERIFICATION OF NON-PAYMENT BY CUSTOMER TO PROCURESTAFF AS A RESULT OF THE CONDITIONS STATED ABOVE

6.7. All funds received from Customer pursuant to the payment provisions of this agreement and ProcureStaff's agreements with its customers shall be deposited by ProcureStaff into an account designated "ProcureStaff Escrow Account," the funds in which shall be held for the benefit of, and shall be used by ProcureStaff only to pay suppliers who provide services to ProcureStaff's customers, provided, however, that ProcureStaff may pay to itself, simultaneously with paying such suppliers, the fees which ProcureStaff is permitted to retain under its agreements with its customers. ProcureStaff's title to such funds (except as to the amount of such fees) shall be nominal only and ProcureStaff shall have no equitable interest in the funds deposited in such account, except as to ProcureStaff's fees, it being the express intention of the parties that the balance of such funds shall be held by ProcureStaff as an escrowee solely for the benefit of such suppliers. In the event that ProcureStaff fails to render payment to Supplier for any services for which Customer has paid ProcureStaff, due to bankruptcy, insolvency or any claimed inability or refusal to pay, Supplier shall not be prohibited from any and/or all remedies available to it under the law as to such amounts actually paid to ProcureStaff by Customer (as distinguished from amounts not yet paid by Customer to ProcureStaff).

**Exhibit A, p. 27**

6.8. Subject to the terms of the Section <u>Non-Solicitation of ProcureStaff's or Customer's Business or Employees</u>, nothing in this Agreement shall limit or prevent Supplier from offering to Customer services not covered by this Agreement, or from offering Services to any segment of Customer's business not participating in this Agreement

7. **Overtime**

7.1 Customer reserves the right to request a Contingent Worker to work overtime without prior notice to the Contingent Worker or Supplier.

7.2 Contingent Workers will be paid for all hours worked. Overtime will be billed and paid at the agreed upon rate as specified in the applicable purchase order, in compliance with all federal and state laws regulating overtime.

7.3 Supplier represents that all services by Supplier furnished hereunder will be provided in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended, including Section 12(a).

7.4 Supplier also represents that all services by Supplier furnished hereunder will be provided in compliance with all other federal and state laws regulating overtime.

7.5 If Supplier fails to observe any of the provisions of this section, Supplier shall be liable to Customer to repay all payments made to Supplier in consideration of overtime due to Contingent Workers, even if Supplier subsequently pays its Contingent Workers for any uncompensated overtime.

8. **Contingent Worker Benefits**

Supplier will be solely responsible for any benefit offerings (such as holiday, vacation days, insurance, savings plans, etc.) made available by Supplier to its Contingent Workers.

9. **Right to Hire**

Customer may hire Supplier's Contingent Worker as an employee at any time after xxx days from the date such Contingent Worker first began working at Customer. If Customer elects to hire a Contingent Worker any time less than xxx days from assignment start date ProcureStaff will pay Supplier a fee of nn% of annual salary (excluding sign-up or yearly bonuses agreed to be paid by Customer to such contingent worker). ProcureStaff will make payment to Supplier for such fee upon payment to ProcureStaff by Customer.

10. **Supplier Performance**

10.1 Supplier guarantees Contingent Worker(s) performance for any work performed for Customer for the first five (5) business days of an assignment. If a Customer manager is not satisfied with the work performed by the Contingent Worker within the five-business day guarantee period, Customer or ProcureStaff shall so notify Supplier and Supplier agrees to remove that Contingent Worker from assignment with no charge to Customer or ProcureStaff for any work performed by the Contingent Worker during those five days.

10.2 Supplier may be evaluated by Customer or ProcureStaff on a quarterly basis. The performance evaluation may include, but is not limited to, competitive pricing, ability to meet target rates established by ProcureStaff, quality of resume submittals, quality of Contingent Workers provided, and/or overall satisfaction by Customer and ProcureStaff.

11. **Rules, Regulations and Policies**

11.1. Supplier agrees to require each Contingent Worker to acknowledge that they have received and will comply with all applicable Customer Policies. At a minimum, Supplier shall require Contingent Worker

**Exhibit A, p. 28**

to sign the Customer _____ for Contingent Workers attached to this agreement as Attachment ____. Supplier shall also require Contingent Worker to sign any other documents legally and reasonably required by ProcureStaff. Supplier must maintain signed copies and deliver them to ProcureStaff when and in such manner as ProcureStaff may direct.

11.2. Supplier will not discriminate against any Contingent Worker, employee or applicant for employment because of race, color, religion, sex, age, sexual orientation, national origin, or physical or mental disability. Such action will cover all aspects of the employment relationship including, but not limited to the following: Application and initial employment; upgrading, demotion, transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; selection for training, and employee benefit plans. Supplier agrees to post in conspicuous places, available to all employees and applicants at its facilities for employment, notices setting forth the provision of this non-discrimination clause.

11.3. The parties shall comply with all applicable provisions of any federal, state, or local laws and ordinances and all lawful orders, rules, and regulations issued thereunder including, but not limited to, the provisions of Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act, Workers' Compensation and Occupational Disease Acts and the Williams-Steiger Occupational Safety and Health Act of 1970. The parties shall also comply with any provisions, representations or agreements, or contractual clauses required thereby to be included or incorporated by reference or operation of law in the Agreement resulting from acceptance of this Agreement and dealing with Equal Employment Opportunity, Employment of Veterans, Employment of Handicapped, Employment Discrimination Because of Age, Utilization of Disadvantaged Business Enterprises, and the related Acts and Executive Orders as now or hereafter amended or codified. Supplier certifies that it is in compliance with the requirements for non-segregated facilities set forth in 41 CFR Chapter 60-1.8.

## 12. Termination of Contingent Worker Services

Customer reserves the right at any time to terminate the Services of any Contingent Worker for any legal reason. Upon receipt of oral or written notice from ProcureStaff (on behalf of Customer), Supplier shall immediately and without delay, remove any such Contingent Workers assigned to Customer. Supplier shall not reassign or terminate any Contingent Worker assigned to Customer prior to the termination of the purchase order for that Contingent Worker's services except in the event of termination for cause. The foregoing shall not be construed to affect the right of Supplier, in its sole discretion as employer, to reassign and/or terminate the employment its employees. Supplier shall not be liable if any Contingent Worker voluntarily terminates his or her employment with Supplier.

## 13. Supplier Reporting

If requested by ProcureStaff, Supplier agrees to provide ProcureStaff with a detailed monthly report of all Contingent Worker Services at each Customer site. The report may include but not be limited to; each Contingent Worker's name, location of Services, straight time hours worked, overtime hours worked, straight time direct labor hourly rate, overtime labor hourly rate, straight time hourly bill rate, overtime hourly bill rate. Report requirements may change as deemed necessary by Customer and/or ProcureStaff.

## 14. Insurance

14.1 Supplier agrees, at its sole cost and expense, to procure and maintain in full force and continuous effect at all times during the term of this Agreement and the performance of services by Supplier Employees, insurance for itself and its employees, with insurance companies authorized to do business in the state(s) where work is to be performed, covering all operations under this Agreement, of the following types and/or kinds of coverage and maintaining the following minimum policy limits:

14.1.1 Workers' Compensation insurance as prescribed by the law of the state(s) in which the work is performed, including Employer's Liability insurance with limits of at least N million dollars ($N,000,000) for each occurrence;

14.1.2 Automobile Liability insurance with limits of at least N million dollars ($N,000,000) combined single limit for bodily injury and property damage for each occurrence, covering all owned, hired and non-owned vehicles;

14.1.3 General Liability insurance, including Blanket Contractual Liability covering the indemnity provisions of this Agreement, with limits of at least N million dollars ($N,000,000) each occurrence/M million dollars ($M,000,000) aggregate, for bodily injury, personal injury (e.g. slander, libel, wrongful detention, false arrest, etc.) and property damage for each occurrence and Employers Liability Stop Gap Coverage, where applicable;

14.1.4 Employee Dishonesty Coverage under a Crime Policy or Fidelity Bond, with limits of at least N million dollars ($N,000,000) for each occurrence, including loss to ProcureStaff and Customer, covering all Supplier Employees, with ProcureStaff and Customer named as loss payees; and

14.1.5 Professional Liability insurance, insuring Supplier for Errors and Omissions, with limits of at least N million dollars ($N,000,000) for each occurrence.

14.2 The above-mentioned Workers' Compensation, Automobile Liability and General Liability insurance policies shall contain a waiver of subrogation in favor of ProcureStaff and Customer, their respective directors, officers and employees, as to all applicable coverage(s). The Automobile Liability and General Liability insurance policies shall cover Supplier Employees assigned to work for the Customer and must provide for ProcureStaff and Customer to be named as additional insureds, that they be primary and non-contributing and required to respond and pay prior to any other available coverage.

14.3 Supplier shall, prior to the commencement of work under this Agreement, provide to ProcureStaff Certificate(s) of Insurance, from insurance companies acceptable to ProcureStaff, evidencing such coverages as mentioned above. Certificate shall also provide that ProcureStaff will be notified in writing at least thirty (30) days prior to cancellation of any policy, and Supplier shall notify ProcureStaff thirty (30) days prior to any material change in coverage during the term of this Agreement.

14.4 Should any insurance policy Supplier is required to maintain under this Agreement expire or be canceled before completion of the services or work, or termination of this Agreement, and Supplier fails to immediately procure replacement insurance as required, ProcureStaff and Customer reserve the right (but do not have an obligation) to procure such insurance and to deduct the cost thereof from any sum due to Supplier under this Agreement. ProcureStaff's or Customer's exercise of their right under this provision shall not in any way limit their right to demand performance by Supplier or to demand any other remedy provided for or permitted under this Agreement.

15. **Indemnification**

15.1. Supplier shall indemnify and hold ProcureStaff and Customer, and their respective officers, directors, employees and agents (collectively and individually an "Indemnitee") harmless from and against any and all damages, claims, losses, expenses, costs, obligations, and liabilities including, without limiting the generality of the foregoing, liabilities for attorneys' fees ("Loss and Expense"), suffered by an Indemnitee, arising from Supplier's or Contingent Worker's performance under this Agreement to the extent proximately caused by:

15.1.1 Any violations or alleged violations by Supplier or its employees of any applicable laws, orders, ordinances and/or regulations, including but not limited to common law tort and wrongful discharge actions;

**Exhibit A, p. 30**

15.1.2   Supplier's performance under this Agreement, to the extent such loss or expense is attributable to the negligence, fraud or willful misconduct of Supplier;

15.1.3   Supplier's failure to comply with this Agreement;

15.1.4   any negligent or willful act or omission on the part of Supplier, its agents, employees or Contingent Workers resulting in bodily injury, death or property damage;

15.1.5   any bodily injury to or death of a Supplier employee or Contingent Worker occurring during or as a result of or related to or connected with the performance of Contingent Worker Services;

15.1.6   any payments or withholding of taxes, social security taxes, benefits (if applicable), unemployment and any and all other payroll deductions as may be required by law related to Supplier's supply of or Contingent Workers;

15.1.7   Supplier's failure to fully comply with the laws related to employment eligibility in the United States; and/or

15.1.8   any attempt, whether successful or not, by Supplier or Supplier employees acting under the direction and control of Supplier to break into, hack, copy, reverse engineer or otherwise violate the integrity of ProcureStaff's or Customer's data or data systems or to install or introduce any back door, time bomb, drop dead device, virus, Trojan horse, worm (all as such terms are broadly understood with respect to computers and computer or other data processing systems) or other destructive or disabling code or components of any kind designed to permit unauthorized access or to disable, erase, interfere with or otherwise harm Customer's or ProcureStaff's data or data systems, or to perform similar actions.

15.2   The foregoing indemnification shall not apply to the extent such Loss and Expense are proximately caused by or due to 1) the negligent acts or omissions of ProcureStaff, Customer or their respective employees, or 2) the material breach of any material  term of this Agreement by ProcureStaff or Customer.

15.3   Supplier agrees and warrants to ProcureStaff and Customer that all Supplier Personnel it provides to perform Services to, for, or on behalf of Customer shall be properly classified W-2 employees of Supplier and not sub-contractors, Independent Contractors, 1099 workers or any other worker classification other than W-2 employee.  Supplier agrees to indemnify and hold ProcureStaff and Customer harmless from any loss or liability of any kind arising from violation of this provision.  If ProcureStaff or Customer determines that any person provided to perform Services to, for, or on behalf of Customer is not a W-2 employee of Supplier, then this Agreement and all Orders under it may be terminated immediately and Supplier will return to Customer all payments of any kind for all Orders issued under this Agreement, whether completed or not, without offset for any fees paid to or retained by ProcureStaff.

15.4   **NEITHER PROCURESTAFF, CUSTOMER NOR SUPPLIER SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT, EVEN IF THE PARTIES HAVE BEEN APPRISED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING.**

16. **Confidential Data and Disclosures**

16.1   All information learned in connection with the performance of this Agreement or from contact with employees of Customer or ProcureStaff shall be deemed to be confidential information belonging to Customer. During the term of this Agreement and thereafter, Supplier shall not use or disclose such information for any purpose (nor permit its use or disclosure by others who are under Supplier's

supervision or direction) and Supplier shall require all Contingent Workers to execute any reasonable Customer forms agreeing to such confidentiality and non-disclosure, except to the extent the use or disclosure of such information is necessary to perform work pursuant to this Agreement, or unless Supplier demonstrates to the satisfaction of Customer that such information was actually known to Supplier prior to this Agreement, or was independently properly obtained or developed by Supplier apart from any connection with Customer or its employees, directly or indirectly, all without breach of any confidential relationships, or was publicly available. Supplier represents that it has the full and unrestricted right to disclose any information, knowledge and data which it may disclose to Customer in the course of performance of its services hereunder, and that Customer shall have the full and unrestricted right to use, reproduce, and disseminate such information, knowledge and data. Supplier agrees to require its Contingent Workers to execute any reasonable nondisclosure agreements required by Customer.

16.2. ProcureStaff's confidential or proprietary software programs which are used by ProcureStaff to perform its Administration Services (also called the MSP) under this Agreement and ProcureStaff's agreement with Customer, including, but not limited to, REX, VSG-Gold™, HRP, HRPM, VoltTrak, Platinum, Vector, Consol and all enhancements, improvements, revisions, corrections, additions, subtractions, updates, modifications, derivative works, adaptations, versions, productions, transmissions, arrangements, changes and translations, and their framework and infrastructure, and all related software, source code, and object code, all scripts and applets, web content (which term does not include Customer's data or information, which is the property of Customer), navigational buttons, server configurations, algorithms, processes, and any and all patent rights, copyright and trademark rights, trade secrets and common law rights and all other attendant intellectual property rights and other rights, title and interest therein, are and shall remain the sole property of ProcureStaff and no right, title or interest of any kind or description shall be transferred to Supplier. All of the foregoing shall be deemed confidential and proprietary to ProcureStaff and shall be considered and maintained as confidential by Supplier.

## 17. Conflicts of Interest

Supplier represents that there is no conflict of interest between Supplier's performance of this Agreement and Supplier's current or prior employment by or legal obligations to others.

## 18. Captions

The captions appearing in this Agreement have been inserted as a matter of convenience and shall not be construed to define, limit or enlarge its scope or the meaning matter of this Agreement.

## 19. Use of Names

19.1 Supplier will not use Customer's or ProcureStaff's name in any advertising or publicity releases without first securing the prior written approval of the name owner.

19.2 Supplier will not make any presentation or publication relating to Supplier's work hereunder or to information disclosed to Supplier or Contingent Workers by Customer in connection herewith without the prior written consent of Customer. Customer shall have the right to review and modify in advance any such authorized publication, both as to content and time of publication or presentation.

## 20. Additional Terms and Conditions

In the event the Agreement is terminated at Supplier's initiative, other than for a material breach by ProcureStaff or Customer which remains uncured after the expiration of a reasonable cure period, Supplier agrees that any restrictions regarding Customer's employment of Contingent Workers furnished to Customer during the term of this Agreement will be waived. Supplier will release, effective on the termination, any limitation on Contingent Worker's subsequent employment in any manner by Customer.

# Exhibit A, p. 32

21. **Notices**

Notices and other communications by a party under this Agreement, other than time cards, shall be deemed given when deposited in the United States mail, first class, postage paid, addressed as follows:

ProcureStaff Address:    ATTN: Steven Shaw
                         ProcureStaff Ltd
                         560 Lexington Ave.
                         ProcureStaff—15ᵗʰ Fl
                         New York, NY 10022

Customer Address:        ATTN: Director of Purchasing_____
                         The Standard Register Company
                         600 Albany Street
                         Dayton, OH 45408-1442


Supplier Address:        _____

                         _____

                         _____

                         _____


22. **Governing Law**

This Agreement shall be construed in accordance with the substantive laws of the State of New York. This Agreement shall be construed, interpreted and applied in accordance with the laws of the State of New York without regard to its conflicts of laws provisions.

23. **Non-Solicitation of ProcureStaff's or Customer's Business or Employees**

23.1. During the term of ProcureStaff's Contract with Customer to provide MSP services, Supplier agrees not to solicit or attempt to solicit Customer, either directly or indirectly, to provide the same or similar MSP services. This provision shall be deemed waived in the event that Customer issues a Request for Proposal to Supplier for the provision of MSP services.

23.2. Supplier agrees not to solicit employment of . any employee of Customer or of ProcureStaff with whom it is dealing under this Agreement, during and for a period of one (1) year subsequent to the termination of this Agreement, unless prior written consent to do so is obtained from ProcureStaff.

23.3. Supplier acknowledges that Customer may deploy Contingent Workers provided by Supplier to Customer's customers and that such deployment constitutes an introduction by Customer of Supplier to such Customers. During the term of this Agreement and for a period of one (1) year following its termination, Supplier agrees not to solicit the business of or perform the same or substantially similar services as those provided by Customer to its customers for any customer of Customer who was introduced to Supplier by Customer or to whom Customer has deployed Supplier's Contingent Worker. This provision shall not apply to provision of services not of the kind and type as those provided by Customer.

**Exhibit A, p. 33**

23.4. If applicable, Supplier agrees to require each of its employees assigned as a Contingent Worker to Customer to agree in writing to the same restriction on solicitation or performance of Services for Customer's customer as Supplier agrees to in the preceding subsection and will make such agreements available to Customer at Customer's or ProcureStaff's request.

## 24. Miscellaneous

24.1. The following attachments are hereby referenced and incorporated into this Agreement, except to the extent their terms are different, in which case this Agreement shall control:

    24.1.1.  Attachment _____Contingent Worker Agreement Regarding Intellectual Property which shall be executed by all Contingent Workers

24.2. ProcureStaff will provide Supplier with real-time electronic access to time and expense records residing on ProcureStaff's Electronic Time Reporting System which shall provide Supplier with information related to the hours worked and expenses incurred by each Contingent Worker assigned to Customer (including whether such hours or expenses are approved, rejected, open or pending).

24.3. This Agreement, including all matters expressly incorporated by reference, when signed by both parties, constitutes the entire and only agreement between the parties respecting the subject matter hereof, and there are merged herein all prior and pre-existing representations and agreements by and between Customer, Supplier and ProcureStaff. This Agreement is intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and is intended also as a complete and exclusive statement of the terms of their agreement. No course of prior dealings between the parties and no usage of trade shall be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity for rejection. Any terms and conditions of sale appearing on Supplier's acknowledgment forms, invoices or quotations shall have no effect whatsoever and are hereby deemed null and void.

24.4. Neither party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such failure or delay is caused by fire, flood, explosion, war, strike, embargo, government requirement, civil or military authority, act of God, act or omission of carriers or other similar causes beyond its control and occurring without the fault or negligence of the delayed or non-performing party ("Force Majeure Conditions").

24.5. If ProcureStaff terminates this Agreement with Supplier because of Supplier's material breach of any provision of the Agreement, then Customer may hire immediately or reassign to any other supplier any Supplier Contingent Worker with no further obligation to Supplier except to pay for Services already provided, in order to have no interruption in Services rendered to Customer. Supplier agrees that it will waive and make no attempt to enforce or recover any damages from Customer, ProcureStaff, the other supplier to whom Supplier Contingent Worker has been reassigned or Supplier Contingent Worker based on any agreement between the Supplier Contingent Worker and Supplier, and if Supplier does attempt to enforce any such agreement it will indemnify ProcureStaff, Customer, the other Supplier to whom Supplier Contingent Worker has been reassigned and/or Supplier Contingent Worker, as the case may be, for all costs and expenses of any kind incurred in defending such action, including, but not limited to, lost wages and attorneys fees.

24.6. No term or provision of this Agreement may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against whom the enforcement of such changes, waivers, discharge or termination is sought.

24.7. If any section, subsection, sentence, or clause of this Agreement shall be adjudged illegal, invalid or unenforceable, the remainder of the Agreement shall continue to be in full force and effect.

## Exhibit A, p. 34

24.8. When purchase orders relating to Government contracts with the United States of America or any department thereof are involved, Customer, ProcureStaff, or agents of Customer or ProcureStaff shall have access to and the right to examine any directly pertinent books, documents, papers, and records of Supplier involving transactions related to this Agreement until the expiration of three years after final payment hereunder at all reasonable times upon reasonable prior request.

24.9. ProcureStaff and Supplier recognize and agree that Customer is a third-party beneficiary to this Agreement and may enforce its rights either directly itself or indirectly through ProcureStaff.

24.10. Unless and only to the extent otherwise expressly set forth in the applicable Purchase Order, neither ProcureStaff nor Customer shall require Contingent Workers to (i) operate Contingent Worker or Customer owned, non-owned and/or hired motor vehicles during the performance of their day-to-day job duties for Customer or (ii) handle cash, securities or other valuables, without Supplier's prior written consent.

|  | **ProcureStaff, Ltd.** | **Supplier** |
|---|---|---|
| **Name** | | |
| By: _____ | | By: _____ |
| Name: _____ | | Name: _____ |
| Title: _____ | | Title: _____ |
| Date: _____ | | Date: _____ |

**Exhibit A, p. 35**

# AMENDMENT #2 TO
## MANAGED SERVICES PROGRAM FULL SUPPLIER CONTRACT MASTER AGREEMENT BETWEEN
### THE STANDARD REGISTER COMPANY AND PROCURESTAFF, LTD.

WHEREAS, The Standard Register Company ("Customer") and ProcureStaff, Ltd. ("ProcureStaff") have entered into a Managed Services Program Full Supplier Contract Master Agreement ("Agreement") dated March 5, 2004 under which ProcureStaff provides, among other things, supplier neutral management of staffing suppliers who provide contingent workers on assignment to Customer, and

WHEREAS, Customer and ProcureStaff have agreed to certain changes to the agreement,

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, and in accordance with Section X, Paragraph B of the Agreement, Customer and ProcureStaff agree to make the following change to the Agreement:

| Exhibit B- Compensation, Section 4 Payment Terms | | |
|---|---|---|
| Section | Action | |
| 4.2 | Replace | Replace: "Customer will pay ProcureStaff within fifty-five (55) calendar days of receipt of weekly EDI invoice at Customer's Accounts Payable department. "<br><br>With:<br><br>"Customer will pay ProcureStaff within thirty (30) calendar days of receipt of weekly EDI invoice at Customer's Accounts Payable department. " |
| **Exhibit D- CONTINGENT WORKER SERVICE AGREEMENT** | | |
| 10.1 | Replace | Replace: "Supplier guarantees Contingent Worker(s) performance for any work performed for Customer for the first five (5) business days of an assignment. If a Customer manager is not satisfied with the work performed by the Contingent Worker within the five-business day guarantee period, Customer or ProcureStaff shall so notify Supplier and Supplier agrees to remove that Contingent Worker from assignment with no charge to Customer or ProcureStaff for any work performed by the Contingent Worker during those five days."<br><br>With:<br><br>"Supplier guarantees Contingent Worker(s) performance for any work performed for Customer for the first two (2) business days of an assignment. If a Customer manager is not satisfied with the work performed by the Contingent Worker within the two-business day guarantee period, Customer or ProcureStaff shall so notify Supplier and Supplier agrees to remove that Contingent Worker from assignment with no charge to Customer or ProcureStaff for any work performed by the Contingent Worker during those two days." |
| 14.1.5 | Deletes | Delete 14.1.5 Professional Liability insurance, insuring Supplier for Errors and Omissions |

13 August, 2004

## Exhibit A, p. 36

## AMENDMENT #2 TO
## MANAGED SERVICES PROGRAM FULL SUPPLIER CONTRACT MASTER AGREEMENT
### BETWEEN
## THE STANDARD REGISTER COMPANY AND PROCURESTAFF, LTD.

In all other respects the terms and conditions of the Managed Services Program Full Supplier
Contract Master Agreement between the parties shall remain unchanged.

**ProcureStaff, Ltd.**                                **The Standard Register Company**

Name: _Joseph Knestrict_                             Signature: _____

Title: _Manager, Vendor Mgt Group_                   Title: _Director of Procurement_

Date: _August 16, 2004_                              Date: _8/13/04_

13 August, 2004

## Exhibit A, p. 37

# AMENDMENT NO. 6
## TO MANAGED SERVICES PROGRAM FULL SUPPLIER CONTRACT
## MASTER AGREEMENT
## BETWEEN
## THE STANDARD REGISTER COMPANY AND PROCURESTAFF, LTD.

The Standard Register Company ("Standard Register") and ProcureStaff, Ltd. ("ProcureStaff") hereby amend and modify the Managed Service Program Full Supplier Contract Master Agreement, as previously amended, dated March 17, 2004, made by and between them (the "Agreement") in the following particulars. This Amendment No. 6 to the Agreement (the "Amendment") shall be effective as of June 2, 2006.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, and in accordance with Section X (B) of the Agreement, Standard Register and ProcureStaff agree to the following changes to the Agreement:

| Section | Action | Change |
|---|---|---|
| **Managed Service Program Full Supplier Contract Agreement** | | |
| II A. | Update | Update the first sentence of Section II A. Term to read as follows; the rest of section stays as is: "The term of this Agreement shall commence on March 17, 2004 and shall terminate on March 16, 2007 (the "Initial Term")." |
| **Exhibit B – Compensation** | | |
| 4.1 | Replace | Replace Section 4.1 with the following: "ProcureStaff will invoice Customer weekly via EDI for approved Supplier hours and related expenses.  Standard Register shall have no obligation to pay for Supplier hours or expenses invoiced by ProcureStaff more than 90 days after they have been approved by Standard Register's Assignment Manager, where the delay in invoicing was caused by an act or omission of ProcureStaff and not by any reason attributable to Standard Register." |
| **Exhibit D – Supplier Agreement** | | |
| | Modify | Issue the attached "General Amendment #2 To Contingent Worker Service Agreement for The Standard Register Company Between ProcureStaff, Ltd. and Supplier" (which pertains to reimbursement of travel expenses) to all current Suppliers and modify the "Contingent Worker Service Agreement" to reflect the changes in the Amendment. |

In all other respects the terms and conditions of the Agreement between Standard Register and ProcureStaff shall remain unchanged.

Accepted by:                                          Accepted by:

**The Standard Register Company**                    **ProcureStaff, Ltd.**

_____                      _____
Authorized Signature                                 Authorized Signature

RICHARD L BALL                                       Janet A. WHITCOMB
Name (please type or print)                          Name

DIRECTOR OF PROCUREMENT                              EX. VICE PRESIDENT
Title                                                Title

6/16/06                                              6/23/2006
Date                                                 Date

© 2006, ProcureStaff, Ltd.

June 9, 2006

# GENERAL AMENDMENT #2 TO CONTINGENT WORKER SERVICE AGREEMENT
## FOR THE STANDARD REGISTER COMPANY
## BETWEEN PROCURESTAFF, LTD. AND SUPPLIER

WHEREAS, ProcureStaff, Ltd. ("ProcureStaff") and the Supplier named below have entered into a Contingent Worker Service Agreement, to which this Amendment is attached (the "Agreement"), for Supplier to provide Contingent Workers to perform services for The Standard Register Company ("Standard Register"), and

WHEREAS, Standard Register has instructed ProcureStaff to make certain changes to the Agreement,

NOW THEREFORE, in accordance with Section 24.6 of the Agreement, and for good and valuable consideration, the sufficiency of which is hereby acknowledged, Supplier agrees to the following changes to the Agreement:

| Section | Action | Change |
|---------|--------|--------|
| 5.1 | Replace | Replace all text beginning with the words: "The Contingent Worker will not be reimbursed for travel . . ." to the end of subsection 5.1 with:<br><br>"For Travel & Living or other reimbursable expenses (together, "T&L"), Contingent Workers shall, whenever possible, use ProcureStaff's Electronic Expense Reporting System which will generate electronic billing for approved expenses. Therefore, unless otherwise instructed, Supplier must not submit invoices for T&L. ProcureStaff will bill Customer weekly for all T&L approved during the previous week." |

In all other respects the terms and conditions of the Agreement between Supplier and ProcureStaff shall remain unchanged. This Agreement may be executed in counterparts by the individual parties and all such counterparts, taken together, shall constitute a single agreement binding on all signatories hereto.

Accepted by:                                        Accepted by:

_The Standard Register Company_

**ProcureStaff, Ltd.**

_____        _____
Authorized Signature                                Authorized Signature

_Richard L. Vail_
Name (please type or print)                        Name

_Director of Procurement_
Title                                                        Title

_6/16/06_
Date                                                        Date

## AMENDMENT NO. 7 TO
## MANAGED SERVICES PROGRAM FULL SUPPLIER CONTRACT MASTER AGREEMENT
## BETWEEN THE STANDARD REGISTER COMPANY AND PROCURESTAFF, LTD.

The Standard Register Company ("Standard Register") and ProcureStaff, Ltd. ("ProcureStaff") hereby amend and modify the Managed Service Program Full Supplier Contract Master Agreement, as previously amended, dated March 17, 2004, made by and between them (the "Agreement") in the following particulars. This Amendment No. 7 to the Agreement (the "Amendment") shall be effective as of March 1, 2007.

For good and valuable consideration, the sufficiency of which is hereby acknowledged, and in accordance with Section X(B) of the Agreement, Standard Register and ProcureStaff agree to the following changes to the Agreement:

| Section | Action | Change |
|---|---|---|
| Managed Service Program Full Supplier Contract Master Agreement | | |
| II.B | Replace | Replace Section II.B Term with the following: "This Agreement shall continue after the expiration of the Initial Term for three years, through March 16, 2010 (an "Extension Term")." Thereafter, this Agreement shall continue after the expiration of the Extension Term for successive terms of one year each (a "Term") unless either party objects in a written notice delivered to the other party at least sixty days before the expiration of the Extension Term or any additional Term." |
| Exhibit B – Compensation | | |
| 2.1 | Replace | Replace Section 2.1 Processing Fees with the following: "For the IT category, ProcureStaff will withhold a fee of 1.85% from the Submit Rate paid to the Supplier. For all other categories, ProcureStaff will withhold a fee of 2.99% from the Submit Rate paid to the Supplier." |
| 2.3 | Add | Add new Section 2.3 Processing Fees as follows: "ProcureStaff will provide one full-time on-site employee to fully support the IT category, to be placed at Standard Register's Dayton, Ohio location. For all other categories, ProcureStaff will provide MSP program support on a national and full-time basis from ProcureStaff's Operations Optimization Center (OOC) located in Denver, Colorado. |
| Exhibit D – Supplier Agreement | | |
| | Modify | Issue the attached "General Amendment #3 To Contingent Worker Service Agreement for The Standard Register Company Between ProcureStaff, Ltd. and Supplier" to all current Suppliers and modify the "Contingent Worker Service Agreement" to reflect the changes in the Amendment. |

In all other respects the terms and conditions of the Agreement between Standard Register and ProcureStaff shall remain unchanged.

This Amendment may be executed simultaneously in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Amendment by fax (in counterparts or otherwise) will be sufficient to bind the parties to the terms and conditions of this Amendment.

Accepted by:
**The Standard Register Company**

Accepted by:
**ProcureStaff, Ltd.**

_____
*Authorized Signature*

_____
*Authorized Signature*

Craig J. Brown
*Name (please type or print)*

_____
*Name*

CFO
*Title*

_____
*Title*

2/22/07
*Date*

_____
*Date*

© 2007, ProcureStaff, Ltd.

**Exhibit A, p. 40**

## GENERAL AMENDMENT #3 TO CONTINGENT WORKER SERVICE AGREEMENT
## FOR THE STANDARD REGISTER COMPANY
## BETWEEN PROCURESTAFF, LTD. AND SUPPLIER

WHEREAS, ProcureStaff, Ltd. ("ProcureStaff") and the Supplier named below have entered into a Contingent Worker Service Agreement (the "Agreement"), for Supplier to provide Contingent Workers to perform services for The Standard Register Company ("Standard Register"), and

WHEREAS, Standard Register has instructed ProcureStaff to make certain changes to the Agreement,

NOW THEREFORE, in accordance with Section 24.6 of the Agreement, and for good and valuable consideration, the sufficiency of which is hereby acknowledged, Supplier agrees to the following changes to the Agreement:

| Section | Action | Change |
|---|---|---|
| 4. | Replace | Replace Section 4. Fees with:<br>"For IT positions, ProcureStaff will deduct an administration fee of 1.85% from each payment by ProcureStaff to Supplier for the Services of and conversion fees paid for each Contingent Worker.  For all other positions, ProcureStaff will deduct an administration fee of 2.99% from each payment by ProcureStaff to Supplier for the Services of and conversion fees paid for each Contingent Worker." |
| 9. | Replace | Replace Section 9. Right to Hire with:<br>"For Clerical/Administrative and Light Industrial positions, Customer may hire Supplier's Contingent Worker as an employee at any time after 60 calendar days from the date such Contingent Worker first begins working at Customer, for no fee.  If Customer elects to hire a Contingent Worker for Clerical/Administrative and Light Industrial positions any time 60 calendar days or less from assignment start date, Customer will pay Supplier a conversion fee of $1,000.<br><br>For IT positions, Customer may hire Supplier's Contingent Worker as an employee at any time after 182 calendar days from the date such Contingent Worker first begins working at Customer, for no fee.  If Customer elects to hire a Contingent Worker for IT positions any time 182 calendar days or less from assignment start date, Customer will pay Supplier a conversion fee equal to 10% of the initial annual salary offered to such Contingent Worker by Customer. |
| | | For Heavy Industrial positions, Customer may hire Supplier's Contingent Worker as an employee at any time.  No fee will be paid by Customer to Supplier for Heavy Industrial positions filled in this manner.<br><br>Neither Customer nor ProcureStaff will incur any other fee, charge, expense or any other liability in connection with Customer converting Contingent Worker to become a Customer employee.<br><br>Supplier agrees to release any Contingent Worker hired by Customer from any and all restrictive covenants to enable the Contingent Worker to accept Customer's job offer pursuant to these terms. |

## GENERAL AMENDMENT #3 TO CONTINGENT WORKER SERVICE AGREEMENT
### FOR THE STANDARD REGISTER COMPANY
### BETWEEN PROCURESTAFF, LTD. AND SUPPLIER

| | | |
|---|---|---|
| | | ProcureStaff will pay Supplier for any applicable fee (less the deduction by ProcureStaff of the ProcureStaff processing fee) upon payment to ProcureStaff by Customer." |

In all other respects the terms and conditions of the Agreement between Supplier and ProcureStaff shall remain unchanged.

This Amendment may be executed simultaneously in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Amendment by fax (in counterparts or otherwise) will be sufficient to bind the parties to the terms and conditions of this Amendment.

**Accepted by:**                           **Accepted by:**

                                           **ProcureStaff, Ltd.**

_____           _____
                    *Supplier*

*Authorized Signature*                     *Authorized Signature*

CRAIG J. BROWN                             Joseph Kresefsky
*Name (please type or print)*                 *Name*

CFO                                        Associate Director, Vendor Management Organization
*Title*                                    *Title*

2/22/07                                    _____
*Date*                                     *Date*

# AMENDMENT NO. 8 TO
## MANAGED SERVICES PROGRAM FULL SUPPLIER CONTRACT MASTER AGREEMENT BETWEEN THE STANDARD REGISTER COMPANY AND PROCURESTAFF, LTD.

The Standard Register Company ("Standard Register") and ProcureStaff, Ltd. ("ProcureStaff") hereby amend and modify the Managed Service Program Full Supplier Contract Master Agreement, as previously amended, dated March 17, 2004, made by and between them (the "Agreement") in the following particulars. This Amendment No. 8 to the Agreement (the "Amendment") shall be effective as of May 21, 2007.

For good and valuable consideration, the sufficiency of which is hereby acknowledged, and in accordance with Section X(B) of the Agreement, Standard Register and ProcureStaff agree to the following changes to the Agreement:

| Section | Action | Change |
|---------|--------|--------|
| **Exhibit D – Supplier Agreement** | | |
| | Modify | Issue the attached "General Amendment #3 To Contingent Worker Service Agreement for The Standard Register Company Between ProcureStaff, Ltd. and Supplier" to all current Suppliers and modify the "Contingent Worker Service Agreement" to reflect the changes in the Amendment. |

In all other respects the terms and conditions of the Agreement between Standard Register and ProcureStaff shall remain unchanged.

This Amendment may be executed simultaneously in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Amendment by fax (in counterparts or otherwise) will be sufficient to bind the parties to the terms and conditions of this Amendment.

Accepted by:                                    Accepted by:

**The Standard Register Company**               **ProcureStaff, Ltd.**

_____                _____
Authorized Signature                            Authorized Signature

RICHARD L. BALL                                 JANET A. WHITCOMB
Name (please type or print)                     Name

DIRECTOR OF PROCUREMENT                          EXECUTIVE VICE PRESIDENT
Title                                            Title

5/30/07                                          5/30/07
Date                                             Date

© 2007, ProcureStaff, Ltd.

May 21, 2007

## Exhibit A, p. 44

## GENERAL AMENDMENT #3 TO CONTINGENT WORKER SERVICE AGREEMENT
## FOR THE STANDARD REGISTER COMPANY
## BETWEEN PROCURESTAFF, LTD. AND SUPPLIER

WHEREAS, ProcureStaff, Ltd. ("ProcureStaff") and the Supplier named below have entered into a Contingent Worker Service Agreement (the "Agreement"), for Supplier to provide Contingent Workers to perform services for The Standard Register Company ("Standard Register"), and

WHEREAS, Standard Register has instructed ProcureStaff to make certain changes to the Agreement,

NOW THEREFORE, in accordance with Section 24.6 of the Agreement, and for good and valuable consideration, the sufficiency of which is hereby acknowledged, Supplier agrees to the following changes to the Agreement:

| Section | Action | Change |
|---------|--------|--------|
| 1. | Replace | Replace the first sentence of Section 1. Term with:<br>"The term of this Agreement shall continue through March 16, 2010 (an "Extension Term"). Thereafter, this Agreement shall continue after the expiration of the Extension Term for successive terms of one year each (a "Term") unless either party objects in a written notice delivered to the other party at least sixty days before the expiration of the Extension Term or any additional Term." |
| 2.6 | Replace | Replace Subsection 2.6 with:<br>"Supplier will comply with all applicable Customer policies and procedures. All Travel and Living Expenses ("T&L") incurred by a Contingent Worker during the performance of Services under this Agreement must be pre-approved by Customer and must comply with Customer's Business Expense Reporting Policy, a copy of which will be made available by Customer upon request by Supplier and subject to change from time to time. Copies of receipts are required for any individual expense in excess of $25.00. Mileage expense on personal cars is not to exceed the amount allowed by the IRS at the time the travel occurs." |
| 4. | Replace | Replace Section 4. Fees with:<br>"For IT positions, ProcureStaff will deduct an administration fee of 1.85% from each payment by ProcureStaff to Supplier for the Services of and conversion fees paid for each Contingent Worker. For all other positions, ProcureStaff will deduct an administration fee of 2.99% from each payment by ProcureStaff to Supplier for the Services of and conversion fees paid for each Contingent Worker." |
| 9. | Replace | Replace Section 9. Right to Hire with:<br>"For Clerical/Administrative and Light Industrial positions, Customer may hire Supplier's Contingent Worker as an employee at any time after 60 calendar days from the date such Contingent Worker first begins working at Customer, for no fee. If Customer elects to hire a Contingent Worker for Clerical/Administrative and Light Industrial positions any time 60 calendar days or less from assignment start date, Customer will pay Supplier a conversion fee of $1,000.<br><br>For IT positions, Customer may hire Supplier's Contingent Worker as an employee at any time after 182 calendar days from the date such Contingent Worker first begins working at Customer, for no fee. If Customer elects to hire a Contingent Worker for IT positions any time 182 calendar days or less from assignment start date, Customer will pay Supplier a conversion fee equal to the percentage of the initial salary offered to such Contingent Worker by Customer as follows: 15% if hired within 60 days; 10% if hired between 61 and 120 days; 5% if hired between 121 and 182 days.<br><br>For Heavy Industrial positions, Customer may hire Supplier's Contingent Worker as an employee at any time. No fee will be paid by Customer to Supplier for Heavy Industrial positions filled in this manner.<br><br>Neither Customer nor ProcureStaff will incur any other fee, charge, expense or any other liability in connection with Customer converting Contingent Worker to become a Customer employee.<br><br>Supplier agrees to release any Contingent Worker hired by Customer from any and all restrictive covenants to enable the Contingent Worker to accept Customer's job offer pursuant to these terms.<br><br>ProcureStaff will pay Supplier for any applicable fee (less the deduction by ProcureStaff of the |

## Exhibit A, p. 45

## GENERAL AMENDMENT #3 TO CONTINGENT WORKER SERVICE AGREEMENT
## FOR THE STANDARD REGISTER COMPANY
## BETWEEN PROCURESTAFF, LTD. AND SUPPLIER

| | | |
|---|---|---|
| | | ProcureStaff processing fee of 1.85% of the actual conversion fee paid by Customer for IT positions and 2.99% of the conversion fee of $1,000 for Clerical/Administrative and Light Industrial positions) upon payment to ProcureStaff by Customer." |
| 12a. | Add | Add new Section 12a. to read as follows: |
| | | **"12a.    No Guarantee of Utilization** |
| | | 12a.1.    Estimates or forecasts furnished by ProcureStaff or Customer shall not constitute commitments.  No officer or employee of ProcureStaff or Customer is authorized to make any representation or guarantee of the volume of work that will be offered to Supplier.   Nothing in this Agreement obligates ProcureStaff or Customer to issue any requests to Supplier for candidates to perform Services for Customer nor to accept any candidates submitted by Supplier.   Neither ProcureStaff nor Customer promises or guarantees that either will use Supplier's services at any time for any purpose. |
| | | 12a.2.    Supplier acknowledges that it has entered into this Agreement voluntarily, and all expenses Supplier incurs as a result of this Agreement, including, but not limited to, the cost of insurance, are normal and usual costs of conducting Supplier's business and do not impose any obligation on, or imply any commitment by, ProcureStaff or Customer to purchase, acquire or contract for any goods or services of any kind from Supplier. |
| | | 12a.3.    If ProcureStaff or Customer do purchase, acquire or contract for any goods or services from Supplier, there is no guarantee of the volume of such goods or services to be purchased, acquired or contracted for, and either ProcureStaff or Customer, in their sole and absolute discretion can cease purchasing, acquiring or contracting for goods or services from Supplier at any time and for any reason or no reason." |

In all other respects the terms and conditions of the Agreement between Supplier and ProcureStaff shall remain unchanged.

This Amendment may be executed simultaneously in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Amendment by fax (in counterparts or otherwise) will be sufficient to bind the parties to the terms and conditions of this Amendment.  This Amendment shall be effective on the first date signed below.

**Accepted by:**                                                    **Accepted by:**

                                                                            **ProcureStaff, Ltd.**

_____          _____
*Supplier*

_____          _____
*Authorized Signature*                                       *Authorized Signature*

_____          _____
*Name (please type or print)*                            *Name*

_____          _____
*Title*                                                                  *Title*

_____          _____
*Date*                                                                  *Date*

© 2007, ProcureStaff, Ltd.                                              May 21, 2007

# Exhibit A, p. 46

**AMENDMENT NO. NINE TO**
**MANAGED SERVICES PROGRAM**
**FULL SUPPLIER CONTRACT MASTER AGREEMENT**
**BETWEEN**
**THE STANDARD REGISTER COMPANY**
**AND**
**PROCURESTAFF, LTD.**

WHEREAS, this Amendment Nine (the "Amendment") is effective upon the last date of signature by the parties, (the "Effective Date"), to the Managed Services Program Full Supplier Contract Master Agreement dated as of March 17, 2004 (the "Agreement") by and between The Standard Register Company ("Customer") and Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. (formerly known as ProcureStaff, Ltd.) (hereinafter "Volt Consulting").

WHEREAS, by Certificates of Amendment, dated July 23, 2009 and January 11, 2011, ProcureStaff, Ltd. has affected a name change to Volt Consulting Group, Ltd., pursuant to the General Corporation Law of the State of Delaware and recorded with the Division of Corporations, State of Delaware;

WHEREAS, Customer and Volt Consulting desire to make the following changes to the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, receipt of which is hereby acknowledged, and in accordance with Section X(B) of the Agreement, the parties agree as follows:

1. All references to ProcureStaff, Ltd. within the Agreement shall refer to Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. ("Volt Consulting"). The parties acknowledge and agree that this paragraph shall constitute sufficient notice of name change under the terms of the Agreement.

2. Section II(B), Term, is deleted and replaced it in its entirety by the following:

   The new termination date for this Agreement shall be March 16, 2013.

3. Amend Exhibit B, Compensation, by adding the following Section 5:

   Volume Rebate:

   5.1

   For the first $816,493.23 of Customer spend through the MSP in which Volt Consulting levies an administrative fee of 2.99%, Volt Consulting shall pay Customer a rebate of 1.0%. The first month in which the volume rebate applies will commence on the Effective Date and will end on June 30, 2011.

   For all Customer spend after the first $816,493.23 in which Volt Consulting levies an administrative fee of 2.99%, Volt Consulting shall pay Customer a .25% rebate. Each subsequent month in which the rebate applies after the first month stated above shall start and end on the first and last day of the applicable month. For example, after the first month, the subsequent month in which the volume rebate applies will commence on July 1, 2011 and will end on July 31, 2011. Volt Consulting shall have thirty (30) days from the conclusion of each month to process the rebate payment and provide Customer the rebate.

   The parties acknowledge and agree that any and all spend in the IT category in which Volt Consulting levies an administrative fee of 1.85% is excluded from the rebate.

Copyright © 2011 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. - Amendment No. 9
The Standard Register Company MSP Full Supplier Contract Master Agreement

Exhibit A, p. 47

Except as modified herein, all other terms and conditions of the Agreement and previous Amendments shall remain unchanged and in full force and effect. In the event of any conflict or inconsistency between provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control and any terms in the Agreement which are different from or inconsistent with the provisions of this Amendment shall be deemed to be void and of no effect whatsoever.

This Amendment may be executed simultaneously in two (2) or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Amendment by fax (in counterparts or otherwise) will be sufficient to bind the parties to the terms and conditions of this Amendment.

IN WITNESS WHEREOF, the parties hereto are authorized signatories and have executed this Amendment No. Nine to the Agreement as of the dates set forth below.

| VOLT CONSULTING MANAGED SERVICE PROGRAMS, a division of VOLT CONSULTING GROUP, LTD. | THE STANDARD REGISTER COMPANY |
|---|---|
| AUTHORIZED SIGNATURE: | AUTHORIZED SIGNATURE: |
| Stanley D. Cameron | |
| PRINT NAME: | PRINT NAME: |
| Director of Contracts | |
| TITLE: | TITLE: |
| JUNE 28, 2011 | |
| DATE: | DATE: |

Copyright © 2011 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. - Amendment No. 9
The Standard Register Company MSP Full Supplier Contract Master Agreement

Exhibit A, p. 48

AMENDMENT NO. TEN TO
MANAGED SERVICES PROGRAM
FULL SUPPLIER CONTRACT MASTER AGREEMENT
BETWEEN
THE STANDARD REGISTER COMPANY
AND
VOLT CONSULTING MANAGED SERVICE PROGRAMS,
A DIVISION OF VOLT CONSULTING GROUP, LTD.

WHEREAS, this Amendment Ten (the "Amendment") is effective upon the last date of signature by the parties, (the "Effective Date"), to the Managed Services Program Full Supplier Contract Master Agreement dated as of March 17, 2004 (the "Agreement") by and between The Standard Register Company ("Customer") and Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. (hereinafter "Volt Consulting").

WHEREAS, Customer and Volt Consulting desire to extend the term of the Agreement and have Volt Consulting provide supplier neutral management of staffing suppliers who provide direct hire staffing services to Customer;

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, receipt of which is hereby acknowledged, and in accordance with Section X(B) of the Agreement, the parties agree as follows:

1. Section II(B), Term, is deleted and replaced it in its entirety by the following:

   The new termination date for this Agreement shall be March 16, 2014 ("Extension Term"). Thereafter, this Agreement shall continue after the expiration of the Extension Term for successive terms of one (1) year each (a "Term") unless either party objects in a written notice delivered to the other party at least sixty (60) days before the expiration of an Extension Term or any additional Term.

2. The first WHEREAS clause is deleted and replaced in its entirety by the following:

   a. WHEREAS, Customer desires that Volt Consulting acting solely as agent for Customer (i) contract with staffing suppliers to provide contingent worker services for Customer and direct hire placements at Customer, (ii) perform supplier neutral management of staffing suppliers who provide contingent workers on assignment to Customer and direct hire workers for permanent placement at Customer; (iii) provide electronic time and expense reporting services for contingent workers provided by staffing suppliers under this Agreement; and (iv) provide consolidated, centralized billing, reporting and approved payment processing procedures for work performed by staffing suppliers, who supply staffing services to Customer.

3. Section I, Definitions, is modified as follows:

   a. "Assignment Manager" is deleted and replaced in its entirety by the following:

      "Assignment Manager" The company employee authorized and responsible for requesting and selecting a Contingent Worker and/or Direct Hire Worker to provide Services for Company and responsible for approval of time reported by the Contingent Worker and Direct Hire Fee, as defined in the Compensation Exhibit, submitted by the Supplier using the Electronic Time and Expense Reporting System.

   b. "Consolidated Billing" is deleted and replaced in its entirety by the following:

      A centralized statement of charges and applicable fees containing the information reported from all Suppliers in the Electronic Billing and all Supplier invoices for reimbursable costs rendered to, for or on behalf of Customer

   c. "Direct Hire Worker" is added as follows:

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 49**

"Direct Hire Worker" A Supplier's candidate selected by Customer to become a permanent employee of Customer.

d.  "Electronic Time and Expense Reporting System" is deleted and replaced in its entirety by the following:

Volt Consulting's web-based time and expense reporting and approval system for Contingent Workers and Suppliers who provide Direct Hire Workers, as set forth in or developed under the Statement of Work, for Contingent Worker Services and the provision of Direct Hire Workers as described in this Agreement.

e.  "MSP" is deleted and replaced in its entirety by the following:

"MSP" Volt Consulting's Managed Services Program as described in this Agreement, by which a Supplier provides Contingent Workers and/or Direct Hire Workers to perform Services for Customer.

f.  "Services" is deleted and replaced in its entirety by the following:

"Services" Work performed by either (A) a Contingent Worker, including: (i) programming, system analysis, technical writing, drafting and other temporary information technology or engineering, (ii) clerical and administrative services or (iii) any other Contingent Worker Services required by Customer which the parties agree shall be included under this Agreement, or (B) a Direct Hire Worker.

g.  "Staffing Services" is deleted and replaced in its entirety by the following:

"Staffing Services" The provision by a Supplier of either (A) Contingent Workers to perform Services for Customer, along with the administrative services required to maintain the Contingent Worker as Supplier's employee, and/or (B) employment candidates with the qualifications, experience and requirements which Customer shall establish in the hopes such candidates become Direct Hire Workers.

h.  "Supplier" is deleted and replaced in its entirety by the following:

"Supplier" A company that provides either (A) hourly temporary employees and other temporary staffing and consulting personnel to Customer, and/or (B) candidates for permanent placement with Customer.

4.  Section III, Volt Consulting's Duties and Obligations, is modified as follows:

a.  Section III(A) is deleted and replaced in its entirety by the following:

Volt Consulting shall administer the entire process of managing the process of identifying and securing Contingent Workers and Direct Hire Workers from Suppliers.

b.  Section III(B) is deleted and replaced in its entirety by the following:

Using its Electronic Time and Expense Reporting System as the sole basis for determining time worked by Contingent Workers, Volt Consulting shall furnish a Consolidated Billing Invoice to Customer. The Consolidated Billing Invoice will also include Supplier charges and applicable fees for Direct Hire Workers.

c.  Section III(N) is deleted and replaced in its entirety by the following:

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 50**

Volt Consulting shall require each Supplier to submit all required documentation to Volt Consulting before authorizing either a Contingent Worker to begin work on assignment at Customer or a Direct Hire Worker to commence employment with Customer.

d.  Section III(P) is deleted and replaced in its entirety by the following:

Any assignment of this Agreement or any rights, interest or payment hereunder, by operation of law or otherwise, without the prior written consent of Customer shall be void, except that if Customer fails to render payment to Volt Consulting for Contingent Worker Services or Staffing Services due to Customer's bankruptcy, insolvency or any claimed inability or refusal to pay, Volt Consulting may assign to the Supplier all actions and/or remedies available to it under the law so as to enable the Supplier to recover any such amounts lawfully due to it from Customer. Volt Consulting shall not subcontract or delegate the performance of any of its Administration Services except with the prior written consent of Customer. Customer may terminate this Agreement without liability to Volt Consulting except for any unpaid Services or Administration Services upon ten (10) days' prior written notice to Volt Consulting upon the occurrence of any of the following events, without the prior written consent of Volt Consulting: (i) the sale of substantially all of the assets or stock of Volt Consulting, (ii) the merger, consolidation or reorganization of Volt Consulting into any other entity which is not controlled by the present shareholders of Volt Consulting, and (iii) the subcontracting or delegation by Volt Consulting of its Administration Services or MSP.

e.  Section III(S) is deleted and replaced in its entirety by the following:

Volt Consulting shall have no liability or responsibility for any Supplier or for any Contingent Worker or Direct Hire Worker who is engaged by Customer outside the MSP described in Exhibit A; however, Volt Consulting shall notify the Customer's Program Manager and shall provide consolidated billing, payment and reports if requested by Customer. If Customer desires Volt Consulting to transact business with such Supplier and Customer's Program Manager signs a form to be developed by the parties indicating Customer's acceptance of the Supplier, Volt Consulting shall have no responsibility to Customer with respect to such Supplier or its Contingent Workers or Direct Hire Workers or other personnel other than the obligation to collect and pay its invoices which have been approved by Customer and to include the Supplier in the reports required in this Agreement. In such case where billing is through Volt Consulting, Volt Consulting shall be entitled to receive from Customer and Supplier the fees specified in Exhibit B. The form referred to above will include a direction from Customer that unless a Supplier agrees to such fees, its purchase orders, written or verbal, will be cancelled by Customer. If Customer does not assume all such liability and responsibility, then Volt Consulting need not transact business with such Supplier.

f.  Section III(T) is added as follows:

Volt Consulting shall instruct Suppliers that provide Direct Hire Workers that they are to provide a thirty (30) day placement guarantee for each Direct Hire Worker, which shall commence on the date of hire.  In the event a Direct Hire Worker is terminated, Customer must conduct the termination within the first thirty (30) days for the guarantee to apply. Volt Consulting will invoice Customer for the Direct Hire Fee, defined below, on the thirtieth (30th) day unless Customer notifies Volt Consulting in writing that a Direct Hire Worker voluntarily terminates or is terminated from his/her position.

5.    Section IV, Customer's Duties and Obligations, is modified as follows:

a.  Section IV(C) is deleted and replaced in its entirety by the following:

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

Customer shall provide the Management Personnel and the Contingent Workers assigned to work on-site as well as the Direct Hire Workers suitable and safe places of work which shall comply with all applicable federal, state, and local health and safety laws, including OSHA.

b.   Section IV(F) is added as follows:

Customer shall supervise, direct and control the day-to-day work and/or tasks performed and to be performed by Contingent Workers while assigned to Customer.

c.   Section IV(G) is added as follows:

Customer agrees to pay for the Staffing Services applicable to Direct Hire Workers as set forth in Exhibit B, Compensation.

6.     Section VII, Workers' Compensation and Liability Insurance and Indemnification, is modified as follows:

a.   Section VII(B) is deleted and replaced in its entirety by the following:

Volt Consulting will furnish Customer with a certificate of insurance evidencing the coverage required under this Article. Each certificate of insurance shall provide notice of cancellation or material change in policy be sent to Customer in accordance with policy provisions. Volt Consulting also agrees to notify Customer thirty (30) days prior to any changes in coverage which would affect coverage limits and other items agreed upon between Customer and Volt Consulting under this Article.

b.   Section VII(D) is deleted and replaced in its entirety by the following:

Volt Consulting shall require all Suppliers except for those Suppliers solely providing Direct Hire Workers, at each Supplier's sole cost and expense, to procure and maintain in effect throughout the term of this Agreement, at a minimum, insurance coverage as specified in the Supplier Agreement.

c.   Section VII(E) is deleted and replaced in its entirety by the following:

Volt Consulting shall not be responsible for the acts or omissions of any of the Suppliers or for their performance under the Supplier Agreements, and Volt Consulting's insurance shall not be deemed to cover or be primary, drop-down, or excess to the insurance of any Supplier for the actions, injuries, or property damage caused by Supplier employees or personnel. The failure of any Supplier to carry any required insurance or the insufficiency of any insurance shall not affect the preceding sentence. Volt Consulting shall process any claims on behalf of Customer for claims against Suppliers and shall pursue any such claims with reasonable diligence (but shall not be required to resort to litigation), but Volt Consulting shall not itself be liable for any such claims, whether covered by insurance or not. On request of Customer, Volt Consulting shall assign any such claim to Customer.

d.   Section VII(F) is deleted and replaced in its entirety by the following:

Volt Consulting shall be responsible for administration of the MSP and for monitoring Suppliers' compliance with the program and, at the request of Customer terminating the services of any Supplier who fails to comply. Volt Consulting shall have no responsibilities and/or liabilities for the actual performance or non-performance, work product or results of any Supplier, Contingent Worker, or Direct Hire Worker including but not limited to any deliverable, product and/or task produced or provided by any Contingent Worker or Direct Hire Worker. Customer shall have sole responsibility for determining whether the services provided by Suppliers, Contingent Workers, or

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 52**

Direct Hire Workers are satisfactory and/or in accordance with the agreement between each Supplier and Volt Consulting.

7. Section VIII, Indemnification/Limitation of Liability is modified as follows:

   a. Section VIII(A) is deleted and replaced in its entirety by the following:

   To the extent not caused by the negligent or deliberate acts or omissions of Volt Consulting, Customer agrees to indemnify, defend and hold Volt Consulting harmless from and against claims, demands, causes of action, damages and/or losses of any sort or kind, in law or in equity, including but not limited to attorney's fees and costs or expenses of suit, arising out of, resulting from and/or related in any way to Customer's obligations under this Agreement, including but not limited to acts or omissions of Customer or Customer's employees whether arising out of tort or contract, except as to claims for non-payment of Supplier Invoices for which Customer has already paid Volt Consulting.

   b. Section VIII(B) is deleted and replaced in its entirety by the following:

   Volt Consulting agrees to indemnify, defend and hold Customer harmless from and against claims, demands, causes of action, damages, and/or losses of any sort or kind, in law or in equity, including but not limited to attorney's fees and costs or expenses of suit, that may be made as a result of Volt Consulting's acts or omissions or those of its officers, employees, subcontractors or agents to the extent of claims made: (i) by anyone for injuries to persons or damage to property or other cause of action; (ii) in connection with the Administration Services contemplated by this Agreement; (iii) under any statute or common law or otherwise, arising out of or in connection with the Administration Services contemplated by this Agreement or any information obtained in connection with the performance of such Administration Services, and (iv) the failure by Volt Consulting to maintain the Standard Register/ Volt Consulting Escrow Account or its failure to pay when due from Customer for these Services. None of the foregoing indemnifications shall apply to the extent that any loss or injury is caused by or results from the negligent or intentional act of Customer or Customer's employees.

8. Section X, Additional Terms and Conditions, is modified as follows:

   a. Section X(H) is deleted and replaced in its entirety by the following:

   Volt Workforce Solutions. a division of Volt Management Corp., a subsidiary of Volt Information Sciences, Inc., may also provide the services of Contingent Workers and/or Direct Hire Workers to Customer under a separate Supplier Agreement between Volt Consulting and Volt Workforce Solutions, and Volt Workforce Solutions shall be deemed a Supplier with respect to the Contingent Workers Volt Workforce Solutions assigns to Customer as well as the Direct Hire Workers it places at Customer.

   b. Section X(I) is deleted and replaced in its entirety by the following:

   The following exhibits are hereby referenced and incorporated into this Agreement, except to the extent their terms are different, in which case this Agreement shall control:

   | Exhibit A | Statement of Work |
   |-----------|-------------------|
   | Exhibit B | Compensation |
   | Exhibit C | Process Metrics and Trend Reports |
   | Exhibit D | Supplier Agreement |
   | Exhibit E | Contingent Worker Agreement Regarding Intellectual Property |
   | Exhibit F | Intentionally Omitted |
   | Exhibit G | Contingent Worker Background Verification |
   | Exhibit H | Contingent Worker Agreement Regarding Prescription Drug Policy |

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 53**

9.  Exhibit A, Statement of Work, is modified as follows:

a.  Section 2 Consolidated Billing Service, Invoicing and Payment, Subsection 2.1, is deleted and replaced in its entirety by the following:

Unless it is impractical or infeasible, Volt Consulting will make available its Electronic Time and Expense Reporting System for the electronic time reporting and approval for Contingent Workers and electronic submission and approval of the Direct Hire Fee as set forth in this Agreement. Time and Direct Hire Fees reported to Volt Consulting and approved by an authorized Customer employee will be used to generate electronic billing for the services of Contingent Workers and Supplier placement fees for Direct Hire Workers.

b.  Section 2 Consolidated Billing Service, Invoicing and Payment, Subsection 2.2, is deleted and replaced in its entirety by the following:

Volt Consulting shall make available consolidated invoicing via electronic medium or hard copy for all Contingent Workers furnishing services hereunder as well as for Suppliers furnishing Direct Hire Workers hired by Customer, provided the applicable Supplier uses Volt Consulting's Electronic Time and Expense Reporting System or furnishes the requisite information to Volt Consulting in a timely manner and in a format approved by Volt Consulting. Customer shall require that all Suppliers utilize Volt Consulting's Electronic Time and Expense Reporting System and accept it as the sole basis for payment for the Services of their Contingent Workers and for the Direct Hire Fee.

c.  Section 2 Consolidated Billing Service, Invoicing and Payment, Subsection 2.3, is deleted and replaced in its entirety by the following:

Volt Consulting shall furnish to Customer consolidated billing statements according to Customer instructions, that combine the information based on electronic time reporting, invoices from all Suppliers for charges and applicable fees rendered to, for or on behalf of Customer ("Supplier Invoices"), and applicable sales and use taxes into a centralized statements of charges ("Consolidated Billing").

d.  Section 3, Description of Services – MSP Solution, Post-Implementation, Subsection 3.3.11., On-site Relationship Management, is deleted and replaced in its entirety by the following:

On-site Relationship Management: Serve as a resource to Customer managers on MSP related services, assist in the completion and review of RFQ's, post RFQ's to Suppliers, review and evaluate candidate resumes, forward resumes to Customer manager for review and potential interview, assist in all aspects of engaging and disengaging Contingent Workers and the placement of Direct Hire Workers.

e.  Section 3, Description of Services – MSP Solution, Section 3.5, Additional Tasks to Be Performed by Volt Consulting, Subsection 3.5.3., is deleted and replaced in its entirety by the following:

Review new RFQ's, post RFQ's to Suppliers, review resumes or profiles submitted, submit qualified resumes or profiles to managers, follow up and schedule interviews, negotiate bill rates, and conduct on-going communications with Customer manager and Suppliers on RFQ or candidate status, offer of assignment or permanent placement, as applicable, and updating of system as required.

f.  Section 3, Description of Services – MSP Solution, Section 3.5, Additional Tasks to Be Performed by Volt Consulting, Subsection 3.5.5., is deleted and replaced in its entirety by the following:

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 54**

Provide Customer and Suppliers with metrics to measure the performance of Suppliers, Contingent Workers, and, if applicable, Direct Hire Workers. Metrics will be mutually agreed upon by Customer and Volt Consulting and communicated to Suppliers.

g.  Section 3, Description of Services – MSP Solution, Section 3.5, Additional Tasks to Be Performed by Volt Consulting, Subsection 3.5.6., is deleted and replaced in its entirety by the following:

Coordinate all interactions with Suppliers concerning individual Contingent Workers including: pay rate increases; time reporting issues, performance issues, terminations and job completion. Coordinate all interactions with Suppliers concerning selection and placement of Direct Hire Workers.

h.  Section 3, Description of Services – MSP Solution, Section 3.6, Miscellaneous, Subsection 3.6.2., is deleted and replaced in its entirety by the following:

Volt Consulting and Customer will jointly develop written procedures/processes for requesting and assigning Contingent Workers and for requesting and placing Direct Hire Workers through the Customer MSP.

i.  Section 3, Description of Services – MSP Solution, Section 3.6, Miscellaneous, Subsection 3.6.7., is deleted and replaced in its entirety by the following:

Volt Consulting agrees to issue a mutually agreed upon Customer Satisfaction Survey semi-annually to all Customer managers using the MSP to obtain Contingent Workers and/or Direct Hire Workers.

10. Exhibit B, Compensation, is modified as follows:

a.  Section 1, Definitions, Subsection 1.1, "RFQ", is deleted and replaced in its entirety by the following:

"RFQ" -- any Request For Quotation issued by Volt Consulting to Suppliers for the purpose of soliciting submittal of potential candidates to serve as Contingent Workers or Direct Hire Workers under this Agreement.

b.  Section 1, Definitions, Subsection 1.4, "Direct Hire Fee", is added as follows:

"Direct Hire Fee" – the fee which the Suppliers submit to Volt Consulting for Direct Hire Worker candidates. The Direct Hire Fee is 10% of the candidate's first year's annualized salary plus any applicable guaranteed bonuses for all skill categories. The Direct Hire Fee is due and payable if Customer hires the Direct Hire Worker candidate for any position or project, as originally contemplated or otherwise, within six (6) months after the candidate's interview and is based upon the salary plus guaranteed bonus for the position in which the Direct Hire Worker candidate was hired.

c.  Section 2, Processing Fees, Subsection 2.1, is deleted and replaced in its entirety by the following:

For the IT category, Volt Consulting will withhold a fee of 1.85% from the Submit Rate or Direct Hire Fee paid to the Supplier. For all other categories, Volt Consulting will withhold a fee of 2.99% from the Submit Rate or Direct Hire Fee paid to the Supplier.

d.  Section 4, Payment Terms, Subsection 4.1, is deleted and replaced in its entirety by the following:

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

Volt Consulting will invoice Customer weekly via EDI for approved Supplier hours and related expenses. Customer shall have no obligation to pay for Supplier hours or expenses invoiced by Volt Consulting more than ninety (90) days after they have been approved by Customer's Assignment Manager, where the delay in invoicing was caused by an act or omission of Volt Consulting and not by any reason attributable to Customer.

Volt Consulting will invoice Customer immediately after the thirty (30) day guarantee period for approved Direct Hire Fees.

e.    Section 4, Payment Terms, Subsection 4.3, is deleted and replaced in its entirety by the following:

Volt Consulting will then pay Suppliers within ten (10) business days from receipt of payment from Customer for approved hours and applicable fees.

f.    Section 5, Volume Rebate, Subsection 5.1, is deleted and replaced in its entirety by the following:

For the first $816,493.23 of Customer spend through the MSP in which Volt Consulting levies an administrative fee of 2.99%, Volt Consulting shall pay Customer a rebate of 1.0%. The first month in which the volume rebate applies will commence on the effective date of Amendment No. 9, June 28, 2011, and will end on June 30, 2011.

For all Customer spend after the first $816,493.23 in which Volt Consulting levies an administrative fee of 2.99%, Volt Consulting shall pay Customer a .25% rebate.    Each subsequent month in which the rebate applies after the first month stated above shall start and end on the first and last day of the applicable month.  For example, after the first month, the subsequent month in which the volume rebate applies will commence on July 1, 2011 and will end on July 31, 2011.  Volt Consulting shall have thirty (30) days from the conclusion of each month to process the rebate payment and provide Customer the rebate.

The parties acknowledge and agree that any and all spend 1) in the Contingent Worker IT category in which Volt Consulting levies an administrative fee of 1.85%, and 2) on Direct Hire Workers regardless of whether the administrative fee is 1.85% or 2.99%, is excluded from the rebate.

g.    Section 6, Taxes, is added as follows:

6.1    If Services are subject to sales, use, or a similar tax that Supplier is required or permitted by applicable law to collect from Customer, but excluding any taxes on Supplier's income (collectively "Taxes"), to the extent Supplier submits invoices for Services through a manual process such Taxes shall be separately identified by Supplier in accordance with the law of the applicable taxing jurisdiction, itemizing the taxing jurisdiction(s) and the rate of tax. Regardless of whether Supplier submits invoices or whether Services and associated Taxes are automatically billed to Customer by Volt Consulting based on Services approved by Customer in the Electronic Time and Expense Reporting System, Volt Consulting shall include the amounts of the Taxes in the consolidated invoice to Customer and will separately identify Taxes on Services when billing Customer on behalf of Supplier.  Following receipt of payment of the Taxes from Customer, Volt Consulting, at its sole discretion, will remit such Taxes on behalf of Supplier directly to the applicable taxing authority or, where Volt Consulting deems appropriate, to Supplier in which case Supplier is obligated to remit and report the Taxes to the applicable taxing authority. The parties agree that Volt Consulting, for sales, use, or similar tax purposes, is not the vendor, dealer, retailer, buyer or purchaser of the Services; that Volt Consulting is not purchasing the Services from Supplier for resale to Customer; and that Supplier has the sole legal responsibility for its Taxes notwithstanding the parties' consent to Volt Consulting acting on Supplier's behalf in transmitting the Taxes to the applicable taxing authority, if any. Volt Consulting will prepare and deliver to Supplier appropriate sales tax resale or exemption certificates. Upon request of Volt

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 56**

Consulting or Customer, Supplier shall provide all information required to accurately calculate and report any such Taxes that may be due as a result of the Services.

11. Exhibit C, Process Metrics and Trend Reports, is modified as follows:

    a.  Section 1, Process Metrics, Section 1.1 RFP Processing Interval Metrics, Subsection 1.1.2., is deleted and replaced in its entirety by the following:

    Volt Consulting will review and qualify Contingent Workers and Direct Hire Workers within an average of six (6) hours of receipt of resume or profile from Supplier.

12. Exhibit D, Contingent Worker Service Agreement, is hereby replaced with new Exhibit D, Contingent Worker Service Agreement, attached hereto and incorporated by reference for utilization with all new Suppliers added to the MSP program after the Effective Date of this Amendment. Furthermore, the parties shall issue the attached "General Amendment #4 to Contingent Worker Service Agreement for The Standard Register Company between Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. and Supplier" to all current Suppliers.

13. Exhibit G, Contingent Worker Background Verification, is hereby replaced with new Exhibit G, Contingent Worker Background Verification, attached hereto and incorporated by reference.

Except as modified herein, all other terms and conditions of the Agreement and previous Amendments shall remain unchanged and in full force and effect. In the event of any conflict or inconsistency between provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control and any terms in the Agreement which are different from or inconsistent with the provisions of this Amendment shall be deemed to be void and of no effect whatsoever.

This Amendment may be executed simultaneously in two (2) or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Amendment by fax (in counterparts or otherwise) will be sufficient to bind the parties to the terms and conditions of this Amendment.

IN WITNESS WHEREOF, the parties hereto are authorized signatories and have executed this Amendment No. Ten to the Agreement as of the dates set forth below.

**VOLT CONSULTING MANAGED SERVICE PROGRAMS, a division of VOLT CONSULTING GROUP, LTD.**

**THE STANDARD REGISTER COMPANY**

 

AUTHORIZED SIGNATURE:          AUTHORIZED SIGNATURE:

Stanley D. Cameron

PRINT NAME:          PRINT NAME:

Director of Contracts

TITLE:          TITLE:

DATE:          DATE:

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit D**

**CONTINGENT WORKER SERVICE AGREEMENT**



15 Standard Register
Contingent Worker Se

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 58**

**Exhibit G**

**CONTINGENT WORKER BACKGROUND VERIFICATION**

## Background Verification

Supplier shall complete drug and criminal background checks, as specified below, on all of its Temporary workers assigned to Customer.  To qualify for placement with Customer, all Temporary workers must meet the specified criteria.  Temporary workers placed in assignments involving security sensitive materials, per SRC's customer's requirements, must re-qualify after each 12 month period (timeframe calculated beginning assignment start date).  Supplier shall notify Volt Consulting if any Temporary worker is determined to be unqualified based on the results of a drug or criminal background check (but Supplier shall not reveal any test results, with the exception of notification of prescription drugs, to Volt Consulting or Customer), and Supplier will not permit such Temporary worker to begin an assignment, or, if previously assigned, shall notify Volt Consulting that the Temporary worker is unqualified for assignment to perform services under this Agreement and to remove the Temporary worker from the assignment at the request of Volt Consulting or Customer.  Customer reserves the right to deny site access to any Temporary worker for any lawful reason, and Customer's decision to deny access shall be final and governing between Supplier and Customer.  Supplier shall ensure each Temporary worker is so verified, and Supplier will maintain a record of such verification on file for a period of three years.

## Felony / Misdemeanor & Federal Conviction

Supplier shall obtain federal and county felony conviction information by conducting a check of public records in the counties of residence and employment of the Temporary worker for the prior seven years.  In addition, Supplier shall obtain any separately held city/municipal misdemeanor criminal conviction information.  This federal, county, city, and municipal information is to be updated, for temporary workers placed in assignments involving security sensitive materials, per SRC's customer's requirements, after each 12 month period from the assignment start date.  Misdemeanor or felony convictions that may be job related shall include without limitation the following types of criminal offenses:

- Controlled substances (or alcohol abuse)
- Assault, battery or any other matter involving injury to property or person
- Threats, harassment, or stalking
- Dishonesty (e.g. theft, fraud, embezzlement)
- Dangerous weapons
- Kidnapping, extortion, or bribery
- Offenses related to intellectual property
- Computer related crimes

## Record Checking Requirements

The following record checking requirements are defined more fully below, and Supplier shall conduct all such requirements.

1. Social Security Number ("SS#") Verification.    Verification of name(s) and addresses belonging to the social security number listed in the employment application, conducted through a national credit bureau.

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 59**

2. <u>County Felony and Separately Held City/Municipal Misdemeanor Criminal Conviction Search.</u>  A search of felony and separately held city/municipal criminal conviction information on an individual for known addresses of residence and employment, including unreported addresses discovered through the SS# verification, for the last seven years.

3. <u>Federal Criminal Record Search.</u>  A search of all U.S. Federal District Criminal courts having jurisdiction over all known and discovered (through SS# verification) addresses of residence and employment for the last seven years.

## Drug Testing

1. <u>Certification.</u>  Supplier shall certify that each of its personnel, who are to be assigned to a Customer site are "drug free".  Supplier shall not assign any person to a Customer site in violation of this requirement.  "Drug free" shall mean that Supplier's Temporary workers, its Suppliers, and suppliers have passed a drug screening test no more than thirty days prior to first assignment at a Customer site.  After each 12 month period from the assignment start date, each Temporary worker, placed in assignments involving security sensitive materials, per SRC's customer's requirements, must again be certified "drug free".

2. <u>Drug Screening Test.</u>  The manner and scope of the drug screening, as well as Supplier's and its internal communication or other use of the results, is a matter within the sole discretion of Supplier; provided, however, that any such test shall include screening for the cut off levels set for the seven classes of drugs identified by the Substance Abuse and Mental Health Administration, formerly National Institute of Drug Abuse (NIDA), generally, Cannabinoids, Cocaine Metabolites, Opiates, Phencyclidine, Amphetamines, Barbiturates, and Benzodiazepines. The seven-panel test screens for all of the above as well as alcohol and marijuana.

3. <u>Prescription Drugs.</u>  Supplier shall certify that each of its personnel, who are to be assigned to a Customer site are aware of the Customer policy regarding Prescription Drugs, and sign Attachment C allowing the information to be provided to Volt Consulting and the Customer

    a.  Supplier shall forward Prescription Drug notifications received from its personnel, who are to be assigned to a Customer site, and agrees to follow Customer policy regarding Prescription Drugs

4. <u>Covenants.</u> Supplier covenants and agrees that Supplier, its Temporary workers, suppliers, agents and all others affiliated with Supplier shall not introduce onto Customer's property beer, wine or spirits, narcotic, hallucinogenic, dangerous or illegal drugs, or cannabis.

## Removal of Temporary Workers

Supplier shall remove from Customer any Temporary worker who violates these provisions.

## Retention of Records and Audit

The Agency must maintain records demonstrating its compliance with these background check and drug testing requirements for each individual placed with SRC. SRC reserves the right to audit the Agency's compliance and the Agency will provide these records to SRC upon request.

## Compliance with Applicable Laws and Indemnification

The Agency will implement these background check requirements in a manner that complies with all relevant federal, state, and local laws. The Agency agrees to indemnify and hold Volt Consulting and SRC harmless for all claims damages, losses and liabilities (including claims or demands made by its employees, agents consultants, independent contractors, and applicants) as a result of the Agency's compliance or noncompliance with the foregoing requirements.

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

Exhibit A, p. 60

**GENERAL AMENDMENT #4 TO CONTINGENT WORKER SERVICE AGREEMENT**
**FOR THE STANDARD REGISTER COMPANY**
**BETWEEN**
**VOLT CONSULTING MANAGED SERVICE PROGRAMS,**
**A DIVISION OF VOLT CONSULTING GROUP, LTD.**
**AND SUPPLIER**

WHEREAS, Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd. ("Volt Consulting") (formerly "ProcureStaff") and the Supplier named below have entered into a Contingent Worker Service Agreement, to which this Amendment is attached (the "Agreement"), for Supplier to provide Contingent Workers and/or Direct Hire Workers to perform services for The Standard Register Company ("Standard Register"), and

WHEREAS, Standard Register has instructed Volt Consulting to make certain changes to the Agreement;

NOW THEREFORE, in accordance with Section 24.6 of the Agreement, and for good and valuable consideration, the sufficiency of which is hereby acknowledged, Supplier agrees to the following changes to the Agreement:

| Sec. | Action | Change |
|---|---|---|
| Introductory Information | Modify | Between:<br><br>Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.<br><br>1065 Avenue of the Americas, 20th Floor<br><br>New York, NY 10018<br><br>(Hereinafter "Volt Consulting") |
| Introductory Information | Add | Prior to NOW THEREFORE, the following paragraph is added:<br><br>"WHEREAS, Volt Consulting on behalf of The Standard Register Company ("Customer") wishes to engage Supplier to provide employees/personnel to perform services for Customer; and" |
| Introductory Information | Replace | Prior to NOW THEREFORE, what was the first WHEREAS is deleted in its entirety and replaced with the following:<br><br>"WHEREAS, Supplier represents that it has the capability of providing temporary and/or permanent employees/personnel to perform services to Customer according to the terms and conditions of this Agreement;" |
| Introductory Information | Add | Prior to NOW THEREFORE, the following paragraph is added:<br><br>"WHEREAS, by Certificates of Amendment, dated July 23, 2009 and January 11, 2011, ProcureStaff, Ltd. has affected a name change to Volt Consulting Group, Ltd., pursuant to the General Corporation Law of the State of Delaware and recorded with the Division of Corporations, State of Delaware." |
| Throughout | Modify | Throughout the Agreement, all references to "ProcureStaff" are changed to "Volt Consulting". |
| Throughout | Modify | Throughout the Agreement, all references to "Supplier Employees" are changed to "Supplier employees". |
| Definitions | Add | Add the following Definition:<br><br>"Direct Hire Worker:<br>  A Supplier's candidate selected by Customer to become a permanent employee of Customer." |
| | Modify | The Definition of "Managed Services Program or MSP" is modified as follows: |

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 61**

| | | |
|---|---|---|
| | | "The words "Contingent Workers" are changed to read "Contingent Workers and/or Direct Hire Workers"" |
| | Replace | The definition of "ProcureStaff" is deleted and replaced with: <br> "Volt Consulting: <br> Volt Consulting, acting as Program Administrator, is responsible for management of Contingent Worker Services and coordination of Direct Hire Workers provided to Customer by third parties.  Volt Consulting will be the payment processor of Supplier's invoices which shall all be submitted to Volt Consulting for Customer." |
| | Modify | The Definition of "Services" is modified as follows: <br> - The words "Performed by either (A) a Contingent Worker, including:" are added to the beginning of the definition. <br> - The words "or (B) a Direct Hire Worker" are added to the end of the definition. |
| 2 <br> Scope of Work / Responsibilities | Replace | This sub-section is deleted in its entirety and replaced with the following: <br> "This Agreement sets forth general terms and conditions under which Supplier will supply Contingent Workers to perform Services for Customer and/or provide Direct Hire Workers.  Supplier is expected to commit to a response time of not more than one business day when responding to a service requirement for the provision of  temporary Contingent Workers or Direct Hire Workers as requested by Customer and Volt Consulting.  This Agreement includes all Attachments which are incorporated herein by reference." |
| 2.1 | Replace | This sub-section is deleted in its entirety and replaced with the following: <br> 2.1 "To provide qualified temporary employees, who are classified as form W-2 employees of Supplier pursuant to Internal Revenue Service guidelines, as Contingent Workers, or to provide Direct Hire Workers to perform specific Services at the request of Customer or Volt Consulting." |
| | | 2.2 "Supplier shall check the background and references of all such prospective Contingent Workers and Direct Hire Workers, and shall comply with all applicable laws in doing so. Contingent Workers and Direct Hire Workers provided by Supplier shall be qualified to perform the Services pursuant to Customer's directions and instructions. The Contingent Worker and Direct Hire Worker background verification shall be performed in accordance with Attachment B.  The cost for the Contingent Worker and Direct Hire Worker background verification set forth in Attachment B shall be the responsibility of the Supplier.  Supplier, in its sole discretion as the employer, shall have the unrestricted right to hire and terminate Supplier's Contingent Workers provided hereunder." |
| 2.2 – 2.20 | Modify | Renumber to 2.3 – 2.21. |
| 2.9 | Replace | This sub-section is deleted in its entirety and replaced with: <br> "Supplier shall recruit, interview, select and hire all of its Contingent Workers. For the provisioning of Direct Hire Workers, Supplier shall recruit, interview and select for Customer Direct Hire Workers with Customer's qualifications, experience and requirements. Customer shall have the right, but not the obligation, to select for assignment only those Contingent Workers and/or Direct Hire Workers that Customer, in its sole discretion, believes to best meet all standards of Customer.  Specific standards for personnel qualifications shall be established by Customer and provided to Supplier.  Volt Consulting reserves the right to require Supplier to supply verification of education and experience |

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 62**

| | | |
|---|---|---|
| | | and to request references for all Contingent Workers and/or Direct Hire Workers. If, at any time, any of the Contingent Workers do not perform the services specified in a manner which is satisfactory to Customer, Volt Consulting and/or Customer shall so notify Supplier and it shall be Supplier's responsibility to remove any such Contingent Workers from assignment." |
| 2.16 | Modify | This sub-section is modified as follows: <br><br>- In the first sentence, after the words "permit any Contingent Worker", add the words "or Direct Hire Worker". <br><br>- At the end of the sub-section, add the following: <br>"or Direct Hire Worker to commence employment with Customer." |
| 2.20 | Modify | This sub-section is modified as follows: <br><br>Replace the words "Human Resources Procurement System", with "Electronic Time and Expense Reporting System". |
| 2.21 | Modify | This sub-section is modified as follows: <br><br>Each occurrence, in this sub-section, of the words "Contingent Workers", add the words "and/or Direct Hire Workers". |
| 4<br>Fees | Replace | This sub-section is deleted in its entirety and replaced with the following: <br><br>"For IT positions, including Direct Hire Workers, Volt Consulting will deduct an administration fee of 1.85% from each payment by Volt Consulting to Supplier for the Services of Direct Hire Workers and the Services of and conversion fees paid for each Contingent Worker. For all other positions, including Direct Hire Workers, Volt Consulting will deduct an administration fee of 2.99% from each payment by Volt Consulting to Supplier for the Services of Direct Hire Workers and the Services of and conversion fees paid for each Contingent Worker." <br><br>"For Direct Hire Worker positions, Supplier's direct hire placement fee is 10% of the candidate's first year's annualized salary plus any applicable guaranteed bonuses for all skill categories. The direct hire placement fee applies if Customer hires the Direct Hire Worker candidate for any position or project, as originally contemplated or otherwise, within six (6) months after the candidate's interview and is based upon the salary plus guaranteed bonus for the position in which the Direct Hire Worker candidate was hired. Supplier may submit an invoice for the direct hire placement fee on the thirtieth (30th) day of employment at Customer unless the Direct Hire Worker voluntarily terminates or Customer terminates the Direct Hire Worker from his/her position as detailed in Section 10.2 below. In the event a Direct Hire Worker voluntarily terminates his/her employment with Customer, Supplier shall forfeit the direct hire placement fee and have a non-exclusive opportunity to backfill the position." |
| 5.1<br>Billing | Replace | This sub-section is deleted in its entirety and replaced with the following: <br><br>"Volt Consulting's preferred invoicing method is electronic. For time reporting and direct hire placement fees, invoices are generated automatically through Volt Consulting's Electronic Time and Expense Reporting System used to track and approve Contingent Worker labor and Direct Hire Worker placements; therefore, the Supplier must not submit invoices for labor or direct hire placements unless otherwise instructed. Volt Consulting will bill Customer weekly for all approved time and direct hire placement fees reported through its Electronic Time and Expense Reporting System. For Travel & Living or other reimbursable expenses (together, "T&L"), Contingent Workers shall, whenever possible, use Volt Consulting's Electronic Time and Expense Reporting System which will generate electronic billing for approved expenses. Therefore, unless otherwise instructed, Supplier must not submit invoices for T&L. Volt |

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.<br>Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 63**

| | | Consulting will bill Customer weekly for all T&L approved during the previous week." |
|---|---|---|
| 5.4 | Modify | This sub-section is modified as follows:<br><br>The words "Electronic Expense Reporting System" are changed to "Electronic Time and Expense Reporting System". |
| 5.6 | Modify | This sub-section is modified as follows:<br><br>The words "delayed billing or entry of time may cause undue hardship" are changed to "delayed billing, entry of time or related fees may cause undue hardship". |
| 6.1<br>Payment | Replace | This sub-section is deleted in its entirety and replaced with the following:<br><br>"If Supplier services are subject to sales, use, or a similar tax that Supplier is required or permitted by applicable law to collect from Customer, but excluding any taxes on Supplier's income (collectively "Taxes"), to the extent Supplier submits invoices for Supplier services through a manual process such Taxes shall be separately identified by Supplier in accordance with the law of the applicable taxing jurisdiction, itemizing the taxing jurisdiction(s) and the rate of tax. Regardless of whether Supplier submits invoices or whether Supplier services and associated Taxes are automatically billed to Customer by Volt Consulting based on Supplier services approved by Customer in the Electronic Time and Expense Reporting System, Volt Consulting shall include the amounts of the Taxes in the consolidated invoice to Customer and will separately identify Taxes on Supplier services when billing Customer on behalf of Supplier. Following receipt of payment of the Taxes from Customer, Volt Consulting, at its sole discretion, will remit such Taxes on behalf of Supplier directly to the applicable taxing authority or, where Volt Consulting deems appropriate, to Supplier in which case Supplier is obligated to remit and report the Taxes to the applicable taxing authority. The parties agree that Volt Consulting, for sales, use, or similar tax purposes, is not the vendor, dealer, retailer, buyer or purchaser of the Supplier services; that Volt Consulting is not purchasing the services from Supplier for resale to Customer; and that Supplier has the sole legal responsibility for its Taxes notwithstanding the parties' consent to Volt Consulting acting on Supplier's behalf in transmitting the Taxes to the applicable taxing authority, if any. Volt Consulting will prepare and deliver to Supplier appropriate sales tax resale or exemption certificates. Upon request of Volt Consulting or Customer, Supplier shall provide all information required to accurately calculate and report any such Taxes that may be due as a result of the Supplier services." |
| 6.2 | Modify | This sub-section is modified as follows:<br><br>The words "ten (10) calendar days" are changed to "ten (10) business days". |
| 6.3 | Modify | This sub-section is modified as follows:<br><br>- Sub-section 6.3 now ends with the words "Supplier bears all credit risk."<br><br>- Sub-section number 6.4 is added, beginning with the words "Notwithstanding any contrary payment". |
| 6.5 | Add | The following new sub-section 6.5 is added:<br><br>"If any amount of Customer's payment for Supplier's services is deemed a preference or voidable transaction pursuant to the Federal bankruptcy code or other applicable law by which Volt Consulting is required to return or refund all or part of such payment, Supplier shall promptly return to Volt Consulting any such amount received from Customer or from Volt Consulting on behalf of Customer, as applicable." |
| 6.5-6.8 | Modify | Renumber to 6.6-6.9. |

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 64**

| 10.2 | Add | The following new sub-section 10.2 is added:<br><br>"Supplier shall provide a thirty (30) day placement guarantee for each Direct Hire Worker, which shall commence on the date of hire. Customer shall determine whether Services performed by Direct Hire Workers are satisfactory and in accordance with Customer's requirements." |
| | Modify | The existing sub-section 10.2 is modified as follows:<br><br>- This sub-section is renumbered to 10.3.<br><br>- In the second sentence; after the words "quality of Contingent Workers" add the words "and Direct Hire Workers". |
| 11.1 | Modify | This sub-section is modified as follows:<br><br>The second sentence is changed to read as follows:<br><br>"At a minimum, Supplier shall require Contingent Worker to sign the Contingent Worker Agreement Regarding Intellectual Property for Contingent Workers, and the Contingent Worker Agreement Regarding Prescription Drug Policy, attached to this agreement as Attachment A, and Attachment C respectively." |
| 14.1.1 | Modify | This sub-section is modified as follows:<br><br>At the end of the sub-section, the following words are added;<br><br>"and Employers Liability Stop Gap Coverage, where applicable." |
| 14.1.3 | Modify | This sub-section is modified as follows:<br><br>At the end of the sub-section, the following words are deleted;<br><br>"and Employers Liability Stop Gap Coverage, where applicable." |
| 14.1.4 | Modify | This sub-section is modified as follows:<br><br>The word "joint" is added before the phrase "loss payees". |
| 14.3 | Modify | This sub-section is modified as follows:<br><br>The words "at least thirty (30) days" are changed to "in accordance with policy provisions". |
| 15.1.9<br>Indemnification | Add | The following new sub-section 15.1.9 is added as follows:<br><br>"Supplier's breach of sections 2.12 (IP) and Section 16 (Confidentiality)." |
| 15.3 | Modify | This sub-section is modified as follows:<br><br>- The first sentence is modified by changing the words "Supplier Personnel" to "Supplier personnel, except for Direct Hire Workers,".<br><br>- The third sentence is modified by changing the words "determines that any person" to "determines than any Contingent Worker". |
| 15.4 | Modify | The sub-section is deleted in its entirety and replaced with the following:<br><br>"Except for Supplier's breaches of Confidentiality (section 16) and misappropriation of Customers intellectual property (section 2.12), neither Volt Consulting, Customer nor Supplier shall, under any circumstances, be liable to any other party to this Agreement for consequential, incidental, indirect or special damages arising from or relating to this Agreement, even if the parties have been apprised of the possibility of such damages occurring.  In the event Supplier breaches Confidentiality (section 16) and misappropriation of Customers intellectual property (section 2.12), neither Volt Consulting nor |

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 65**

| | | |
|---|---|---|
| | | Customer shall be liable for consequential, incidental, indirect or special damages." |
| 21<br>Notices | Modify | Notices and other communications by a party under this Agreement, other than time cards, shall be deemed given when deposited in the United States mail, first class, postage paid, addressed as follows:<br>Volt Consulting Address:    ATTN:  Contracts Manager<br>        Volt Consulting Managed Service Programs<br>        Supplier Management Organization<br>        10 Woodbridge Center Drive<br>        Suite 140, Room 2<br>        Woodbridge, NJ 07095<br><br>Customer Address:    ATTN:  Director of Purchasing<br>        The Standard Register Company<br>        600 Albany Street<br>        Dayton, OH 45408-1442<br><br>Supplier Address:<br>        ATTN: |
| 24.1.3 | Add | Add Sub-section 24.1.3 as follows:<br>Attachment "C" Contingent Worker Agreement regarding Prescription Drug Policy which shall be executed by all Contingent Workers. |
| 24.2<br>Miscellaneous | Modify | This sub-section is deleted in its entirety an replaced with:<br>"Volt Consulting will provide Supplier with real-time electronic access to time, fee, and expense records residing on Volt Consulting's Electronic Time and Expense Reporting System which shall provide Supplier with information related to the hours worked and expenses incurred by each Contingent Worker assigned to Customer as well as fees for placement of Direct Hire Workers (including whether such hours, fees, or expenses are approved, rejected, open or pending)." |
| Attachment B | Replace | Attachment B, dated April 2, 2012, is deleted in its entirety and replaced with Attachment B dated December, 2012. |
| Attachment C | Add | Attachment C, dated December, 2012, to be signed by Contingent Worker, is added to the Agreement. |

This agreement may be executed in counterparts by the individual parties and all such counterparts, taken together, shall constitute a single agreement binding on all signatories hereto.

**Supplier:** _____    **Volt Consulting Managed Service Programs,**
                                          **a division of Volt Consulting Group, Ltd.**

Signature: _____    Signature: _____

Name: _____    Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 66**

# CONTINGENT WORKER SERVICE AGREEMENT

Between:        **Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.**

1065 Avenue of the Americas, 20th Floor
New York, NY 10018
(Hereinafter "**Volt Consulting**")

And:        _____
Supplier Name
_____
Supplier Address
_____
(Hereinafter "Supplier")

WHEREAS, Volt Consulting on behalf of The Standard Register Company ("Customer") wishes to engage Supplier to provide employees/personnel to perform services for Customer; and

WHEREAS, Supplier represents that it has the capability of providing temporary and/or permanent employees/personnel to perform services to Customer according to the terms and conditions of this Agreement;

NOW THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound, Volt Consulting and the Supplier agree as follows:

**Definitions:**

For the purposes of this Agreement and the services provided hereunder the following definitions will apply:

| | |
|---|---|
| Bill Rate: | Hourly charge to Customer for Services of a Contingent Worker. |
| Contingent Worker: | Supplier's employee who directly provides / performs Services to / for Customer under Customer's day-to-day supervision, direction and control. |
| Contingent Worker Services | Work performed for Customer by Contingent Workers provided by a Suppler on a non-permanent hourly-paid basis. |
| Customer: | The Standard Register Company, the company to which Supplier is providing Contingent Worker Services and a third-party beneficiary to this Agreement. |
| Direct Hire Worker | A Supplier's candidate selected by Customer to become a permanent employee of Customer. |
| Managed Services Program or MSP: | The program administered by Volt Consulting and described in this Agreement by which a Supplier provides Contingent Workers and/or Direct Hire Workers to perform Services for Customer |
| Volt Consulting: | Volt Consulting, acting as Program Administrator, is responsible for management of Contingent Worker Services and coordination of Direct Hire Workers provided to Customer by third parties. Volt Consulting will be the payment processor of Supplier's invoices which shall all be submitted to Volt Consulting for Customer. |

Standard Register
Contingent Worker Service Agreement

Page 1 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.          (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.          (R 7) 22 April 2010
(R 8) 01 February 2013

**Exhibit A, p. 67**

Services:    Performed by either (A) a Contingent Worker, including: (i) programming, system analysis, technical writing, drafting and other temporary information technology or engineering services provided by a Contingent Worker, (ii) clerical and administrative services provided by a Contingent Worker or (iii) any other Contingent Worker Services required by Customer which the parties agree shall be included under this Agreement, or (B) a Direct Hire Worker.

## 1.  **Term**

The term of this Agreement shall commence as **of the last date in the signature block below**, which shall be the effective date of this Agreement ("Effective Date"), and shall continue for one year (the "Initial Term"). Thereafter, this Agreement shall continue after the expiration of the Initial Term for successive terms of one year each (a "Term") unless either party objects in a written notice delivered to the other party at least sixty days before the expiration of the Initial Term or any additional Term.  Both Volt Consulting and Supplier shall have the right to terminate this Agreement at any time upon thirty (30) days written notice to the other.  Either party may terminate this Agreement at any time and without prior notice if the other party repudiates or materially breaches its obligations under this Agreement unless the repudiation or breach is cured within 10 days after written notice specifying the facts complained of.  If Volt Consulting terminates this Agreement, it may do so in part, and direct Supplier to continue to perform services under one or more previously issued purchase orders and in compliance with this the terms of this Agreement which would by nature survive such termination.

## 2.  **Scope of Work/Responsibilities**

This Agreement sets forth general terms and conditions under which Supplier will supply Contingent Workers to perform Services for Customer and/or provide Direct Hire Workers.  Supplier is expected to commit to a response time of not more than one business day when responding to a service requirement for the provision of  temporary Contingent Workers or Direct Hire Workers as requested by Customer and Volt Consulting.  This Agreement includes all Attachments which are incorporated herein by reference.

Supplier agrees:

2.1.  To provide qualified temporary employees, who are classified as form W-2 employees of Supplier pursuant to Internal Revenue Service guidelines, as Contingent Workers, or to provide Direct Hire Workers to perform specific Services at the request of Customer or Volt Consulting.

2.2.  Supplier shall check the background and references of all such prospective Contingent Workers and Direct Hire Workers, and shall comply with all applicable laws in doing so. Contingent Workers and Direct Hire Workers provided by Supplier shall be qualified to perform the Services pursuant to Customer's directions and instructions. The Contingent Worker and Direct Hire Worker background verification shall be performed in accordance with Attachment B.  The cost for the Contingent Worker and Direct Hire Worker background verification set forth in Attachment B shall be the responsibility of the Supplier.  Supplier, in its sole discretion as the employer, shall have the unrestricted right to hire and terminate Supplier's Contingent Workers provided hereunder.

2.3.  To maintain and be responsible for all administrative matters incidental to its relationship as employer of Contingent Workers provided under this Agreement, including but not limited to, the following:

(1) Payroll preparation, check processing and payroll distribution;

(2) FICA, FUTA, SUTA and any additional required payroll withholdings;

(3) Verification/Administration of W-4 and I-9 information;

(4) Handling of any Supplier Benefit Plan (enrollment/claims processing);

(5) W-2 processing, federal, state, local tax reports and compliance;

Standard Register
Contingent Worker Service Agreement
Page 2 of 16
1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006
Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.    (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.
(R 7) 22 April 2010
(R 8) 01 February 2013

**Exhibit A, p. 68**

Supplier shall compute its Contingent Workers' wages and withhold all applicable federal, state and local taxes, including but not limited to federal Social Security payments. Supplier shall remit its Contingent Workers' withholdings to the proper government authorities and make employer contributions for FICA and federal and state unemployment insurance payments and otherwise meet all other statutory obligations as the employer of the Contingent Workers.

2.4. That all Contingent Workers providing services to Customer under this Agreement shall be employees of the Supplier. Supplier shall at all times act as an independent contractor to Customer and independent, common law employer of Supplier's Contingent Workers. None of Supplier's Contingent Workers shall be considered employees of Customer or Volt Consulting. Supplier shall have the sole right and responsibility to recruit, hire, discipline and terminate individuals assigned to the positions requested by Customer, although Customer may terminate or change any assignment for any lawful reason by way of notice and request to Supplier.

2.5. That Customer and Volt Consulting shall not be responsible for and shall not interfere with employment-related matters reserved to Supplier and normally incident to Supplier's employer-employee relationship. If Customer is dissatisfied with the performance of any Contingent Worker, Customer or Volt Consulting will notify Supplier of such dissatisfaction for Supplier to discuss directly with its Contingent Worker.

2.6. To indemnify and hold Customer and Volt Consulting harmless for any payroll liability to the Supplier's Contingent Workers.

2.7. Supplier will comply with all applicable Customer policies and procedures. All Travel and Living Expenses ("T&L") incurred by a Contingent Worker during the performance of Services under this Agreement must be pre-approved by Customer and must comply with Customer's Business Expense Reporting Policy, a copy of which will be made available by Customer upon request by Supplier and subject to change from time to time. Copies of receipts are required for any individual expense in excess of $25.00. Mileage expense on personal cars is not to exceed the amount allowed by the IRS at the time the travel occurs.

2.8. Supplier shall maintain all necessary personnel and payroll records for Contingent Workers, including documents required under the Immigration Reform and Control Act of 1986 and any amendments thereto. Supplier certifies to Customer and Volt Consulting that each Contingent Worker is authorized to be employed in the United States of America. Upon request by Volt Consulting, Supplier shall provide confirmation that Supplier has verified each Contingent Worker's authorization to be employed in the United States of America. Volt Consulting shall notify Supplier in advance if Volt Consulting's Customer has notified Volt Consulting that a position is subject to export control laws.

2.9. Supplier shall recruit, interview, select and hire all of its Contingent Workers. For the provisioning of Direct Hire Workers, Supplier shall recruit, interview and select for Customer Direct Hire Workers with Customer's qualifications, experience and requirements. Customer shall have the right, but not the obligation, to select for assignment only those Contingent Workers and/or Direct Hire Workers that Customer, in its sole discretion, believes to best meet all standards of Customer. Specific standards for personnel qualifications shall be established by Customer and provided to Supplier. Volt Consulting reserves the right to require Supplier to supply verification of education and experience and to request references for all Contingent Workers and/or Direct Hire Workers. If, at any time, any of the Contingent Workers do not perform the services specified in a manner which is satisfactory to Customer, Volt Consulting and/or Customer shall so notify Supplier and it shall be Supplier's responsibility to remove any such Contingent Workers from assignment.

2.10. Supplier shall immediately give written notice to Volt Consulting of any and all known impending or existing labor complaints, disputes or controversies and the progress thereof involving its Contingent Workers. Supplier shall use every commercially reasonable effort to resolve any such complaint, dispute or controversy.

Standard Register
Contingent Worker Service Agreement

Page 3 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.    (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.

**Exhibit A, p. 69**

2.11. Supplier warrants that Volt Consulting and Customer shall have no liability or bargaining obligation under any collective bargaining agreement covering any Contingent Worker. Supplier agrees to provide Volt Consulting with copies of any collective bargaining agreements existing covering any Contingent Worker and agrees to provide Volt Consulting with prompt notice of any union organizing activity with respect to any Contingent Worker.

2.12. Supplier shall inform each Contingent Worker that private or proprietary information of Customer may become available to him or her and, prior to placement with Customer, instruct the Contingent Worker to maintain the confidentiality of such information and require the Contingent Worker to agree to do so by signing the Contingent Worker Agreement Regarding Intellectual Property attached to this Agreement. Supplier must maintain signed copies and deliver them to Volt Consulting when and in such manner as Volt Consulting may direct.

2.13. Supplier shall maintain in effect during the term of this Agreement all applicable federal, state, and/or local licenses and permits which may be required to be maintained by employers or by companies engaged in the same business as Supplier.

2.14. Supplier shall inform each Contingent Worker that all regulations and rules of Customer which may be in effect at the job site regarding employment, passes, badges, and conduct on the property shall be observed by Supplier's Contingent Workers. Customer shall have the right to reject or direct the removal of any Contingent Worker whom Customer determines to be unqualified, whose productivity is below acceptable levels, or whose workmanship is substandard or for any legal reason as requested by Customer. Volt Consulting will give Supplier notice of such rejections or removals, and thereafter any additional time of persons so rejected or removed will not be charged to Volt Consulting or Customer.

2.15. Supplier shall meet and/or confer with all Supplier's Contingent Workers assigned to Customer to review pay and benefits and other conditions of work and to address other pertinent matters arising under Supplier's employment relationship with such Contingent Workers.

2.16. Supplier shall not permit any Contingent Worker or Direct Hire Worker to begin Services before the assignment has been administratively processed by Volt Consulting, and all required documentation has been submitted to Volt Consulting and Volt Consulting has issued an authorization authorizing the Contingent Worker to begin work on assignment at Customer or Direct Hire Worker to commence employment with Customer.

2.17. Any assignment by Supplier of this Agreement, or any rights, interest or payment hereunder, without the prior written consent of Volt Consulting, shall be void. Supplier shall not subcontract any work under this Agreement.

2.18. Supplier shall keep accurate records of all labor and other costs charged to Volt Consulting and Volt Consulting and Customer shall have access, at all reasonable times, to all records, correspondence, account books, invoices, canceled checks, insurance audits, payrolls and other records relating in any way to the amounts billed to Volt Consulting under this Agreement. Volt Consulting and Customer shall have the right both to verify reports prepared by Supplier and also to perform an original audit of Supplier's records related to the provision of Services for a period of three years following (a) the termination of the assignment of a Contingent Worker, or (b) the termination of this agreement, whichever comes earlier. In the event that an audit of Supplier records reveals any non-compliance with this Agreement, Volt Consulting, at its election may choose to immediately terminate this Agreement. This right of termination is in addition to any and all other rights and remedies to which Volt Consulting may be entitled.

2.19. Volt Consulting's failure to adjust or correct Supplier's billing on a current basis, regardless of reason, shall in no way prejudice Volt Consulting's right to make appropriate adjustments supported by or substantiated either in reports submitted by Supplier or upon audit of Supplier. In connection with either reports submitted by Supplier or estimated or actual audit adjustments prepared by Volt

Standard Register
Contingent Worker Service Agreement

Page 4 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.

(R 6) 26 April 2007

(R 7) 22 April 2010
(R 8) 01 February 2013

**Exhibit A, p. 70**

Consulting, Volt Consulting may withhold payment of amounts due to Supplier which are reasonable and necessary to offset potential audit adjustments due Volt Consulting.

2.20. All orders under this Agreement shall be processed through the MSP and provided through Volt Consulting's web-based Electronic Time and Expense Reporting System and secured with a purchase order (or other agreed upon release mechanism, which shall be deemed a purchase order for purposes of this Agreement) issued through Volt Consulting. Any purchase order may be terminated at any time by Volt Consulting without terminating this Agreement.

2.21. Supplier shall be required to use the MSP to provide Contingent Workers and/or Direct Hire Workers to Customer and agrees to work with the designated Volt Consulting on-site representatives for this purpose. For purposes of this Agreement "Direct Sourcing" is any activity that results in Customer's engagement of a Contingent Worker and/or Direct Hire Worker outside of the MSP or any action by a Supplier to attempt to place a Contingent Worker and/or Direct Hire Worker outside of the MSP. Direct Sourcing includes, but is not limited to: Supplier negotiating directly with a Customer manager to engage candidate(s) from Supplier (regardless of who initiates the contact), Supplier giving resumes directly to a Customer manager, Supplier recommending a particular candidate to a Customer manager either before or after that candidate was submitted on a requirement. Direct Sourcing will be tracked and reported by Volt Consulting to Customer for determination. Repeated Non-Compliant placements made by an approved Supplier may result in the termination of this Agreement.

## 3.  Legal Employer

3.1. Supplier is, and shall at all times be, a legal entity and deemed to be an independent contractor, and all Contingent Workers assigned by Supplier to Customer shall remain employees of Supplier, and shall be subject to Supplier's right of administrative management including employment, discipline and matters pertaining to merit increases and promotions. Neither Supplier nor its employees, agents or representatives will be entitled or eligible, by reason of providing services under this Agreement or any purchase orders hereunder, to participate in any benefits or privileges given or extended by Customer to its employees.

3.2. Customer shall exercise day-to-day supervision, direction and control of Services performed by Contingent Workers and of Contingent Workers' compliance with Customer's regulations, including pertinent safety regulations and all other statutory requirements. Customer shall determine whether Services performed by Contingent Workers are satisfactory and in accordance with Customer's requirements.

## 4.  Fees

For IT positions, including Direct Hire Workers, Volt Consulting will deduct an administration fee of 1.85% from each payment by Volt Consulting to Supplier for the Services of Direct Hire Workers and the Services of and conversion fees paid for each Contingent Worker. For all other positions, including Direct Hire Workers, Volt Consulting will deduct an administration fee of 2.99% from each payment by Volt Consulting to Supplier for the Services of Direct Hire Workers and the Services of and conversion fees paid for each Contingent Worker.

For Direct Hire Worker positions, Supplier's direct hire placement fee is 10% of the candidate's first year's annualized salary plus any applicable guaranteed bonuses for all skill categories. The direct hire placement fee applies if Customer hires the Direct Hire Worker candidate for any position or project, as originally contemplated or otherwise, within six (6) months after the candidate's interview and is based upon the salary plus guaranteed bonus for the position in which the Direct Hire Worker candidate was hired. Supplier may submit an invoice for the direct hire placement fee on the thirtieth (30th) day of employment at Customer unless the Direct Hire Worker voluntarily terminates or Customer terminates the Direct Hire Worker from his/her position as detailed in Section 10.2 below. In the event a Direct Hire Worker voluntarily terminates his/her employment with Customer, Supplier shall forfeit the direct hire placement fee and have a non-exclusive opportunity to backfill the position.

Standard Register                                          Page 5 of 16                                          1 October 2004
Contingent Worker Service Agreement                                                                             (R 4) 9 November 2005
                                                                                                               (R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.        (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.        (R 7) 22 April 2010
                                                                                                               (R 8) 01 February 2013

**Exhibit A, p. 71**

**5    Billing**

5.1    Volt Consulting's preferred invoicing method is electronic.  For time reporting and direct hire placement fees, invoices are generated automatically through Volt Consulting's Electronic Time and Expense Reporting System used to track and approve Contingent Worker labor and Direct Hire Worker placements; therefore, the Supplier must not submit invoices for labor or direct hire placements unless otherwise instructed.  Volt Consulting will bill Customer weekly for all approved time and direct hire placement fees reported through its Electronic Time and Expense Reporting System.  For Travel & Living or other reimbursable expenses (together, "T&L"), Contingent Workers shall, whenever possible, use Volt Consulting's Electronic Time and Expense Reporting System which will generate electronic billing for approved expenses.  Therefore, unless otherwise instructed, Supplier must not submit invoices for T&L.  Volt Consulting will bill Customer weekly for all T&L approved during the previous week.

5.2    Volt Consulting or Customer, at their sole discretion, may require Supplier to submit manual invoices for any properly billable charge or expense.  Volt Consulting will notify Supplier and will mutually agree with Supplier on the form and method of delivery of such manual invoices.

5.3    Volt Consulting will pay Supplier upon payment by Customer according to the terms of the Section of this Agreement headed Payment.

5.4    Supplier agrees that any expenses submitted will not include any mark-up and must be submitted via Volt Consulting's Electronic Time and Expense Reporting System or, at Volt Consulting's option, documented on a Customer-approved expense report.

5.5    At Volt Consulting's election, the parties will institute electronic purchasing and payment options such as EDI or EFT.

5.6    Supplier acknowledges that delayed billing, entry of time or related fees may cause undue hardship to Customer.  Therefore, Supplier agrees to require its Contingent Workers to report their time within ninety days of the end of the week in which the time was worked.  Neither Volt Consulting nor Customer shall have any obligation to pay for any time reported after the end of the ninety day period.  It is solely the Supplier's obligation to ensure that its Contingent Workers have properly recorded their time and that it has been approved by the Customer within this ninety days.

**6    Payment**

6.1.    If Supplier services are subject to sales, use, or a similar tax that Supplier is required or permitted by applicable law to collect from Customer, but excluding any taxes on Supplier's income (collectively "Taxes"), to the extent Supplier submits invoices for Supplier services through a manual process such Taxes shall be separately identified by Supplier in accordance with the law of the applicable taxing jurisdiction, itemizing the taxing jurisdiction(s) and the rate of tax. Regardless of whether Supplier submits invoices or whether Supplier services and associated Taxes are automatically billed to Customer by Volt Consulting based on Supplier services approved by Customer in the Electronic Time and Expense Reporting System, Volt Consulting shall include the amounts of the Taxes in the consolidated invoice to Customer and will separately identify Taxes on Supplier services when billing Customer on behalf of Supplier.  Following receipt of payment of the Taxes from Customer, Volt Consulting, at its sole discretion, will remit such Taxes on behalf of Supplier directly to the applicable taxing authority or, where Volt Consulting deems appropriate, to Supplier in which case Supplier is obligated to remit and report the Taxes to the applicable taxing authority. The parties agree that Volt Consulting, for sales, use, or similar tax purposes, is not the vendor, dealer, retailer, buyer or purchaser of the Supplier services; that Volt Consulting is not purchasing the services from Supplier for resale to Customer; and that Supplier has the sole legal responsibility for its Taxes notwithstanding the parties' consent to Volt Consulting acting on Supplier's behalf in transmitting the Taxes to the applicable taxing authority, if any. Volt Consulting will prepare and deliver to Supplier appropriate sales tax resale or exemption certificates. Upon request of Volt Consulting or Customer, Supplier shall provide all information required to accurately calculate and report any such Taxes that may be due as a result of the Supplier services.

Standard Register
Contingent Worker Service Agreement
Page 6 of 16
1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.

**Exhibit A, p. 72**

6.2.  Subject to the terms and conditions set forth below, Supplier's proper and approved invoices (which term includes electronic billings) are payable from Customer supplied funds ten (10) business days from the receipt of funding by Volt Consulting from Customer and **provided that Customer has unconditionally provided available funds to Volt Consulting to pay said invoice, Volt Consulting being only a paying agent for Customer.  It is understood and agreed that Volt Consulting's obligation and/or duty to pay Supplier is expressly conditioned upon and shall arise only to the extent that Volt Consulting has received payment from Customer for Services rendered to, for or on behalf of Customer in respect of Supplier's invoice, and that Volt Consulting shall be under no obligation to pay Supplier's charges unless and until Customer pays Volt Consulting for same.**

6.3.  **It is the intention of the parties, and Supplier hereby acknowledges, that notwithstanding any contrary payment terms in Supplier's invoice or otherwise provided for in this Agreement, Supplier relies solely and exclusively on Customer and the credit of Customer, not the credit of Volt Consulting, for payment for its Services.  Supplier acknowledges that it is Supplier's obligation to verify and to monitor Customer's credit and that Supplier bears all credit risk.**

6.4.  Notwithstanding any contrary payment terms listed on Supplier's invoice or otherwise provided for in this Agreement, Supplier agrees that in the event of Customer's failure, refusal or inability (because of insolvency, bankruptcy or otherwise) to pay Volt Consulting for the Services provided by Supplier, Volt Consulting shall have no obligation to pay for any invoice covering such Services, receipt by Volt Consulting of payment from Customer for Supplier's Services being an express condition precedent to Volt Consulting's obligation to make payment to Supplier. It is further agreed that if such invoice is paid by Volt Consulting, but not funded by Customer, then Volt Consulting shall be entitled to recover the full amount of such payment from Supplier or, at Volt Consulting's option, to deduct such amount by offset from any payments then or thereafter due to Supplier and, in such event, Volt Consulting agrees to immediately assign to Supplier all right, title and interest (and Supplier agrees to accept assignment) to that portion of Volt Consulting's receivables due from Customer on account of such services or expenses (or other obligation or liability) and all actions, rights and/or remedies relating to such services or expenses (or other obligation or liability) and Supplier will look to Customer, and not to Volt Consulting, for collection of all amounts owed and Volt Consulting will not be liable to Supplier for nonpayment for same. This provision shall survive the termination of this Agreement and/or any agreement between Volt Consulting and Customer and/or between Volt Consulting and Supplier.

6.5.  If any amount of Customer's payment for Supplier's services is deemed a preference or voidable transaction pursuant to the Federal bankruptcy code or other applicable law by which Volt Consulting is required to return or refund all or part of such payment, Supplier shall promptly return to Volt Consulting any such amount received from Customer or from Volt Consulting on behalf of Customer, as applicable.

6.6.  Volt Consulting will use commercially reasonable efforts to collect from Customer according to the payment terms in Volt Consulting's Agreement with Customer, but shall have no obligation to institute litigation or arbitration proceedings.

6.7.  **SUPPLIER VOLUNTARILY RELINQUISHES ANY CLAIM IT MAY HAVE AGAINST, AND EXPRESSLY COVENANTS AND AGREES NOT TO SUE, VOLT CONSULTING FOR ANY SERVICES PERFORMED OR EXPENSES ADVANCED BY SUPPLIER OR ITS EMPLOYEES (OR FOR ANY OTHER OBLIGATION OR LIABILITY), EXCEPT TO THE EXTENT THAT CUSTOMER HAS ACTUALLY MADE UNCONDITIONAL PAYMENT TO VOLT CONSULTING FOR SUCH SERVICES OR EXPENSES (OR OTHER OBLIGATION OR LIABILITY.**  In the event Customer fails to make unconditional payment to Volt Consulting, due to bankruptcy, insolvency, actual or disputed failure of performance, or any claimed inability or refusal to pay for any reason, or in the event Volt Consulting is unable to collect from Customer and any payment is sixty (60) days past due to Supplier, or there is a recovery by Customer's estate in a preference proceeding, Volt Consulting agrees to immediately assign to Supplier (and Supplier agrees to accept assignment of) all right, title and interest to only that portion of Volt Consulting's receivables due from Customer on account of such services or expenses (or other obligation or liability) and all actions, rights and/or remedies relating to such services or expenses (or other obligation or liability) and Supplier will look solely to Customer, and not to Volt Consulting, for collection of all amounts owed and Volt

Standard Register                                    Page 7 of 16                                    1 October 2004
Contingent Worker Service Agreement                                                                  (R 4) 9 November 2005
                                                                                                    (R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.        (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs, a division of Volt Consulting Group, Ltd.    (R 7) 22 April 2010
                                                                                                    (R 8) 01 February 2013

Exhibit A, p. 73

Consulting will not be liable to Supplier for the nonpayment or any expenses in connection with the collection thereof.  SUBJECT TO THE TERMS STATED ABOVE, THE SUPPLIER MUST INITIALLY PURSUE ANY NON-PAYMENT ISSUES WITH VOLT CONSULTING AND CAN ONLY INITIATE CLAIMS AGAINST THE CUSTOMER FOR NON-PAYMENT UPON VERIFICATION OF NON-PAYMENT BY CUSTOMER TO VOLT CONSULTING AS A RESULT OF THE CONDITIONS STATED ABOVE.

6.8.  All funds received from Customer pursuant to the payment provisions of this agreement and Volt Consulting's agreements with its customers shall be deposited by Volt Consulting into an account designated "Volt Consulting Escrow Account," the funds in which shall be held for the benefit of, and shall be used by Volt Consulting only to pay suppliers who provide services to Volt Consulting's customers, provided, however, that Volt Consulting may pay to itself, simultaneously with paying such suppliers, the fees which Volt Consulting is permitted to retain under its agreements with its customers. Volt Consulting's title to such funds (except as to the amount of such fees) shall be nominal only and Volt Consulting shall have no equitable interest in the funds deposited in such account, except as to Volt Consulting's fees, it being the express intention of the parties that the balance of such funds shall be held by Volt Consulting as an escrowee solely for the benefit of such suppliers.  In the event that Volt Consulting fails to render payment to Supplier for any services for which Customer has paid Volt Consulting, due to bankruptcy, insolvency or any claimed inability or refusal to pay, Supplier shall not be prohibited from any and/or all remedies available to it under the law as to such amounts actually paid to Volt Consulting by Customer (as distinguished from amounts not yet paid by Customer to Volt Consulting).

6.9.  Subject to the terms of the Section <u>Non-Solicitation of Volt Consulting's or Customer's Business or Employees</u>, nothing in this Agreement shall limit or prevent Supplier from offering to Customer services not covered by this Agreement, or from offering Services to any segment of Customer's business not participating in this Agreement

## 7.  <u>Overtime</u>

7.1  Customer reserves the right to request a Contingent Worker to work overtime without prior notice to the Contingent Worker or Supplier.

7.2  Contingent Workers will be paid for all hours worked. Overtime will be billed and paid at the agreed upon rate as specified in the applicable purchase order, in compliance with all federal and state laws regulating overtime.

7.3  Supplier represents that all services by Supplier furnished hereunder will be provided in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended, including Section 12(a).

7.4  Supplier also represents that all services by Supplier furnished hereunder will be provided in compliance with all other federal and state laws regulating overtime.

7.5  If Supplier fails to observe any of the provisions of this section, Supplier shall be liable to Customer to repay all payments made to Supplier in consideration of overtime due to Contingent Workers, even if Supplier subsequently pays its Contingent Workers for any uncompensated overtime.

## 8.  <u>Contingent Worker Benefits</u>

Supplier will be solely responsible for any benefit offerings (such as holiday, vacation days, insurance, savings plans, etc.) made available by Supplier to its Contingent Workers.

## 9.  <u>Right to Hire</u>

9.1  For Clerical/Administrative and Light Industrial positions, Customer may hire Supplier's Contingent Worker as an employee at any time after 60 calendar days from the date such Contingent Worker first begins working at Customer, for no fee.  If Customer elects to hire a Contingent Worker for

Standard Register
Contingent Worker Service Agreement

Page 8 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.            (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.            (R 7) 22 April 2010
(R 8) 01 February 2013

**Exhibit A, p. 74**

Clerical/Administrative and Light Industrial positions any time 60 calendar days or less from assignment start date, Customer will pay Supplier a conversion fee of $1,000.

9.2    For IT positions, Customer may hire Supplier's Contingent Worker as an employee at any time after 182 calendar days from the date such Contingent Worker first begins working at Customer, for no fee. If Customer elects to hire a Contingent Worker for IT positions any time 182 calendar days or less from assignment start date, Customer will pay Supplier a conversion fee equal to the percentage of the initial salary offered to such Contingent Worker by Customer as follows:  15% if hired within 60 days; 10% if hired between 61 and 120 days; 5% if hired between 121 and 182 days.

9.3    For Heavy Industrial positions, Customer may hire Supplier's Contingent Worker as an employee at any time.  No fee will be paid by Customer to Supplier for Heavy Industrial positions filled in this manner.

9.4    Neither Customer nor Volt Consulting will incur any other fee, charge, expense or any other liability in connection with Customer converting Contingent Worker to become a Customer employee.

9.5    Supplier agrees to release any Contingent Worker hired by Customer from any and all restrictive covenants to enable the Contingent Worker to accept Customer's job offer pursuant to these terms.

9.6    Volt Consulting will pay Supplier for any applicable fee (less the deduction by Volt Consulting of the Volt Consulting processing fee of 1.85% of the actual conversion fee paid by Customer for IT positions and 2.99% of the conversion fee of $1,000 for Clerical/Administrative and Light Industrial positions) upon payment to Volt Consulting by Customer.

## 10.  Supplier Performance

10.1    Supplier guarantees Contingent Worker(s) performance for any work performed for Customer for the first two (2) business days of an assignment.  If a Customer manager is not satisfied with the work performed by the Contingent Worker within the two-business day guarantee period, Customer or Volt Consulting shall so notify Supplier and Supplier agrees to remove that Contingent Worker from assignment with no charge to Customer or Volt Consulting for any work performed by the Contingent Worker during those two days.

10.2    Supplier shall provide a thirty (30) day placement guarantee for each Direct Hire Worker, which shall commence on the date of hire. Customer shall determine whether Services performed by Direct Hire Workers are satisfactory and in accordance with Customer's requirements.

10.3    Supplier may be evaluated by Customer or Volt Consulting on a quarterly basis.  The performance evaluation may include, but is not limited to, competitive pricing, ability to meet target rates established by Volt Consulting, quality of resume submittals, quality of Contingent Workers and Direct Hire Workers provided, and/or overall satisfaction by Customer and Volt Consulting.

## 11.  Rules, Regulations and Policies

11.1.    Supplier agrees to require each Contingent Worker to acknowledge that they have received and will comply with all applicable Customer Policies.  At a minimum, Supplier shall require Contingent Worker to sign the Contingent Worker Agreement Regarding Intellectual Property for Contingent Workers, and the Contingent Worker Agreement Regarding Prescription Drug Policy, attached to this agreement as Attachment A, and Attachment C respectively. Supplier shall also require Contingent Worker to sign any other documents legally and reasonably required by Volt Consulting.  Supplier must maintain signed copies and deliver them to Volt Consulting when and in such manner as Volt Consulting may direct.

11.2.    Supplier will not discriminate against any Contingent Worker, employee or applicant for employment because of race, color, religion, sex, age, sexual orientation, national origin, or physical or mental disability. Such action will cover all aspects of the employment relationship including, but not limited to the following: Application and initial employment; upgrading, demotion, transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; selection for

Standard Register
Contingent Worker Service Agreement

Page 9 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.

(R 6) 26 April 2007

(R 7) 22 April 2010
(R 8) 01 February 2013

## Exhibit A, p. 75

training, and employee benefit plans.  Supplier agrees to post in conspicuous places, available to all employees and applicants at its facilities for employment, notices setting forth the provision of this non-discrimination clause.

11.3. The parties shall comply with all applicable provisions of any federal, state, or local laws and ordinances and all lawful orders, rules, and regulations issued thereunder including, but not limited to, the provisions of Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act, Workers' Compensation and Occupational Disease Acts and the Williams-Steiger Occupational Safety and Health Act of 1970. The parties shall also comply with any provisions, representations or agreements, or contractual clauses required thereby to be included or incorporated by reference or operation of law in the Agreement resulting from acceptance of this Agreement and dealing with Equal Employment Opportunity, Employment of Veterans, Employment of Handicapped, Employment Discrimination Because of Age, Utilization of Disadvantaged Business Enterprises, and the related Acts and Executive Orders as now or hereafter amended or codified.  Supplier certifies that it is in compliance with the requirements for non-segregated facilities set forth in 41 CFR Chapter 60-1.8.

## 12.  Termination of Contingent Worker Services

Customer reserves the right at any time to terminate the Services of any Contingent Worker for any legal reason. Upon receipt of oral or written notice from Volt Consulting (on behalf of Customer), Supplier shall immediately and without delay, remove any such Contingent Workers assigned to Customer.  Supplier shall not reassign or terminate any Contingent Worker assigned to Customer prior to the termination of the purchase order for that Contingent Worker's services except in the event of termination for cause.  The foregoing shall not be construed to affect the right of Supplier, in its sole discretion as employer, to reassign and/or terminate the employment its employees.  Supplier shall not be liable if any Contingent Worker voluntarily terminates his or her employment with Supplier.

## 12a. No Guarantee of Utilization

12a.1. Estimates or forecasts furnished by Volt Consulting or Customer shall not constitute commitments.  No officer or employee of Volt Consulting or Customer is authorized to make any representation or guarantee of the volume of work that will be offered to Supplier.   Nothing in this Agreement obligates Volt Consulting or Customer to issue any requests to Supplier for candidates to perform Services for Customer nor to accept any candidates submitted by Supplier.  Neither Volt Consulting nor Customer promises or guarantees that either will use Supplier's services at any time for any purpose.

12a.2. Supplier acknowledges that it has entered into this Agreement voluntarily, and all expenses Supplier incurs as a result of this Agreement, including, but not limited to, the cost of insurance, are normal and usual costs of conducting Supplier's business and do not impose any obligation on, or imply any commitment by, Volt Consulting or Customer to purchase, acquire or contract for any goods or services of any kind from Supplier.

12a.3. If Volt Consulting or Customer do purchase, acquire or contract for any goods or services from Supplier, there is no guarantee of the volume of such goods or services to be purchased, acquired or contracted for, and either Volt Consulting or Customer, in their sole and absolute discretion can cease purchasing, acquiring or contracting for goods or services from Supplier at any time and for any reason or no reason.

## 13.  Supplier Reporting

If requested by Volt Consulting, Supplier agrees to provide Volt Consulting with a detailed monthly report of all Contingent Worker Services at each Customer site. The report may include but not be limited to; each Contingent Worker's name, location of Services, straight time hours worked, overtime hours worked, straight time direct labor hourly rate, overtime labor hourly rate, straight time hourly bill rate, overtime hourly bill rate. Report requirements may change as deemed necessary by Customer and/or Volt Consulting.

## 14.  Insurance

Standard Register                                          Page 10 of 16                                          1 October 2004
Contingent Worker Service Agreement                                                                              (R 4) 9 November 2005
                                                                                                                (R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.       (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.       (R 7) 22 April 2010
                                                                                                                (R 8) 01 February 2013

**Exhibit A, p. 76**

14.1 Supplier agrees, at its sole cost and expense, to procure and maintain in full force and continuous effect at all times during the term of this Agreement and the performance of services by Supplier employees, insurance for itself and its employees, with insurance companies authorized to do business in the state(s) where work is to be performed, covering all operations under this Agreement, of the following types and/or kinds of coverage and maintaining the following minimum policy limits:

14.1.1 Workers' Compensation insurance as prescribed by the law of the state(s) in which the work is performed, including Employer's Liability insurance with limits of at least one million dollars ($1,000,000) for each occurrence and Employers Liability Stop Gap Coverage, where applicable;

14.1.2 Automobile Liability insurance with limits of at least one million dollars ($1,000,000) combined single limit for bodily injury and property damage for each occurrence, covering all owned, hired and non-owned vehicles;

14.1.3 General Liability insurance, including Blanket Contractual Liability covering the indemnity provisions of this Agreement, with limits of at least one million dollars ($1,000,000) each occurrence/two million dollars ($2,000,000) aggregate, for bodily injury, personal injury (e.g. slander, libel, wrongful detention, false arrest, etc.) and property damage for each occurrence; and

14.1.4 Employee Dishonesty Coverage under a Crime Policy or Fidelity Bond, with limits of at least one million dollars ($1,000,000) for each occurrence, including loss to Volt Consulting and Customer, covering all Supplier employees, with Volt Consulting and Customer named as joint loss payees.

14.2 The above-mentioned Workers' Compensation, Automobile Liability and General Liability insurance policies shall contain a waiver of subrogation in favor of Volt Consulting and Customer, their respective directors, officers and employees, as to all applicable coverage(s). The Automobile Liability and General Liability insurance policies shall cover Supplier employees assigned to work for the Customer and must provide for Volt Consulting and Customer to be named as additional insureds, that they be primary and non-contributing and required to respond and pay prior to any other available coverage.

14.3 Supplier shall, prior to the commencement of work under this Agreement, provide to Volt Consulting Certificate(s) of Insurance, from insurance companies acceptable to Volt Consulting, evidencing such coverages as mentioned above. Certificate shall also provide that Volt Consulting will be notified in writing in accordance with policy provisions prior to cancellation of any policy, and Supplier shall notify Volt Consulting thirty (30) days prior to any material change in coverage during the term of this Agreement.

14.4 Should any insurance policy Supplier is required to maintain under this Agreement expire or be canceled before completion of the services or work, or termination of this Agreement, and Supplier fails to immediately procure replacement insurance as required, Volt Consulting and Customer reserve the right (but do not have an obligation) to procure such insurance and to deduct the cost thereof from any sum due to Supplier under this Agreement. Volt Consulting's or Customer's exercise of their right under this provision shall not in any way limit their right to demand performance by Supplier or to demand any other remedy provided for or permitted under this Agreement.

## 15. <u>Indemnification</u>

15.1. Supplier shall indemnify and hold Volt Consulting and Customer, and their respective officers, directors, employees and agents (collectively and individually an "Indemnitee") harmless from and against any and all damages, claims, losses, expenses, costs, obligations, and liabilities including, without limiting the generality of the foregoing, liabilities for attorneys' fees ("Loss and Expense"), suffered by an Indemnitee, arising from Supplier's or Contingent Worker's performance under this Agreement to the extent proximately caused by:

Standard Register
Contingent Worker Service Agreement

Page 11 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.                (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.

(R 7) 22 April 2010
(R 8) 01 February 2013

**Exhibit A, p. 77**

15.1.1   Any violations or alleged violations by Supplier or its employees of any applicable laws, orders, ordinances and/or regulations, including but not limited to common law tort and wrongful discharge actions;

15.1.2   Supplier's performance under this Agreement, to the extent such loss or expense is attributable to the negligence, fraud or willful misconduct of Supplier;

15.1.3   Supplier's failure to comply with this Agreement;

15.1.4   any negligent or willful act or omission on the part of Supplier, its agents, employees or Contingent Workers resulting in bodily injury, death or property damage;

15.1.5   any bodily injury to or death of a Supplier employee or Contingent Worker occurring during or as a result of or related to or connected with the performance of Contingent Worker Services;

15.1.6   any payments or withholding of taxes, social security taxes, benefits (if applicable), unemployment and any and all other payroll deductions as may be required by law related to Supplier's supply of or Contingent Workers;

15.1.7   Supplier's failure to fully comply with the laws related to employment eligibility in the United States; and/or

15.1.8   any attempt, whether successful or not, by Supplier or Supplier employees acting under the direction and control of Supplier to break into, hack, copy, reverse engineer or otherwise violate the integrity of Volt Consulting's or Customer's data or data systems or to install or introduce any back door, time bomb, drop dead device, virus, Trojan horse, worm (all as such terms are broadly understood with respect to computers and computer or other data processing systems) or other destructive or disabling code or components of any kind designed to permit unauthorized access or to disable, erase, interfere with or otherwise harm Customer's or Volt Consulting's data or data systems, or to perform similar actions.

15.1.9   Supplier's breach of sections 2.12( IP) and Section 16 ( Confidentiality)

15.2   The foregoing indemnification shall not apply to the extent such Loss and Expense are proximately caused by or due to 1) the negligent acts or omissions of Volt Consulting, Customer or their respective employees, or 2) the material breach of any material  term of this Agreement by Volt Consulting or Customer.

15.3   Supplier agrees and warrants to Volt Consulting and Customer that all Supplier personnel, except for Direct Hire Workers, it provides to perform Services to, for, or on behalf of Customer shall be properly classified W-2 employees of Supplier and not sub-contractors, Independent Contractors, 1099 workers or any other worker classification other than W-2 employee.  Supplier agrees to indemnify and hold Volt Consulting and Customer harmless from any loss or liability of any kind arising from violation of this provision.  If Volt Consulting or Customer determines that any Contingent Worker provided to perform Services to, for, or on behalf of Customer is not a W-2 employee of Supplier, then this Agreement and all Orders under it may be terminated immediately and Supplier will return to Customer all payments of any kind for all Orders issued under this Agreement, whether completed or not, without offset for any fees paid to or retained by Volt Consulting.

15.4   **EXCEPT FOR SUPPLIER'S BREACHES OF CONFIDENTIALITY (Section 16) and MISAPPROPRIATION OF CUSTOMERS INTELLECTUAL PROPERTY(Section 2.12), NEITHER VOLT CONSULTING, CUSTOMER NOR SUPPLIER SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT, EVEN IF THE PARTIES HAVE BEEN APPRISED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING.  IN THE EVENT SUPPLIER BREACHES CONFIDENTIALITY (Section 16) and MISAPPROPRIATION OF CUSTOMERS INTELLECTUAL PROPERTY**

Standard Register                                                                          Page 12 of 16                                                                          1 October 2004
Contingent Worker Service Agreement                                                                                                                                    (R 4) 9 November 2005
                                                                                                                                                                                        (R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.                 (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.         (R 7) 22 April 2010
                                                                                                                                                                                        (R 8) 01 February 2013

**Exhibit A, p. 78**

**(Section 2.12), NEITHER VOLT CONSULTING NOR CUSTOMER SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES.**

**16. Confidential Data and Disclosures**

16.1    All information learned in connection with the performance of this Agreement or from contact with employees of Customer or Volt Consulting shall be deemed to be confidential information belonging to Customer. During the term of this Agreement and thereafter, Supplier shall not use or disclose such information for any purpose (nor permit its use or disclosure by others who are under Supplier's supervision or direction) and Supplier shall require all Contingent Workers to execute any reasonable Customer forms agreeing to such confidentiality and non-disclosure, except to the extent the use or disclosure of such information is necessary to perform work pursuant to this Agreement, or unless Supplier demonstrates to the satisfaction of Customer that such information was actually known to Supplier prior to this Agreement, or was independently properly obtained or developed by Supplier apart from any connection with Customer or its employees, directly or indirectly, all without breach of any confidential relationships, or was publicly available.  Supplier represents that it has the full and unrestricted right to disclose any information, knowledge and data which it may disclose to Customer in the course of performance of its services hereunder, and that Customer shall have the full and unrestricted right to use, reproduce, and disseminate such information, knowledge and data. Supplier agrees to require its Contingent Workers to execute any reasonable nondisclosure agreements required by Customer.

16.2.   Volt Consulting's confidential or proprietary software programs which are used by Volt Consulting to perform its Administration Services (also called the MSP) under this Agreement and Volt Consulting's agreement with Customer, including, but not limited to, REX, VSG-Gold™, HRP, HRPM, VoltTrak, Platinum, Vector, Consol and all enhancements, improvements, revisions, corrections, additions, subtractions, updates, modifications, derivative works, adaptations, versions, productions, transmissions, arrangements, changes and translations, and their framework and infrastructure, and all related software, source code, and object code, all scripts and applets, web content (which term does not include Customer's data or information, which is the property of Customer), navigational buttons, server configurations, algorithms, processes,  and any and all patent rights, copyright and trademark rights, trade secrets and common law rights and all other attendant intellectual property rights and other rights, title and interest therein, are and shall remain the sole property of Volt Consulting and no right, title or interest of any kind or description shall be transferred to Supplier.  All of the foregoing shall be deemed confidential and proprietary to Volt Consulting and shall be considered and maintained as confidential by Supplier.

**17. Conflicts of Interest**

Supplier represents that there is no conflict of interest between Supplier's performance of this Agreement and Supplier's current or prior employment by or legal obligations to others.

**18. Captions**

The captions appearing in this Agreement have been inserted as a matter of convenience and shall not be construed to define, limit or enlarge its scope or the meaning matter of this Agreement.

**19. Use of Names**

19.1    Supplier will not use Customer's or Volt Consulting's name in any advertising or publicity releases without first securing the prior written approval of the name owner.

19.2    Supplier will not make any presentation or publication relating to Supplier's work hereunder or to information disclosed to Supplier or Contingent Workers by Customer in connection herewith without the prior written consent of Customer.  Customer shall have the right to review and modify in advance any such authorized publication, both as to content and time of publication or presentation.

Standard Register
Contingent Worker Service Agreement

Page 13 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.                              (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.                              (R 7) 22 April 2010
                                                                                                                                                                                                                            (R 8) 01 February 2013

**Exhibit A, p. 79**

20. **Additional Terms and Conditions**

In the event the Agreement is terminated at Supplier's initiative, other than for a material breach by Volt Consulting or Customer which remains uncured after the expiration of a reasonable cure period, Supplier agrees that any restrictions regarding Customer's employment of Contingent Workers furnished to Customer during the term of this Agreement will be waived.  Supplier will release, effective on the termination, any limitation on Contingent Worker's subsequent employment in any manner by Customer.

21. **Notices**

Notices and other communications by a party under this Agreement, other than time cards, shall be deemed given when deposited in the United States mail, first class, postage paid, addressed as follows:

Volt Consulting Address: ATTN:  Contracts Manager
Volt Consulting Managed Service Programs
Supplier Management Organization
10 Woodbridge Center Drive
Suite 140, Room 2
Woodbridge, NJ 07095

Customer Address: ATTN:  Director of Purchasing
The Standard Register Company
600 Albany Street
Dayton, OH 45408-1442

Supplier Address:

ATTN:

22. **Governing Law**

This Agreement shall be construed in accordance with the substantive laws of the State of New York.  This Agreement shall be construed, interpreted and applied in accordance with the laws of the State of New York without regard to its conflicts of laws provisions.

23. **Non-Solicitation of Volt Consulting's or Customer's Business or Employees**

23.1. During the term of Volt Consulting's Contract with Customer to provide MSP services, Supplier agrees not to solicit or attempt to solicit Customer, either directly or indirectly, to provide the same or similar MSP services.  This provision shall be deemed waived in the event that Customer issues a Request for Proposal to Supplier for the provision of MSP services.

23.2. Supplier agrees not to solicit employment of any employee of Customer or of Volt Consulting with whom it is dealing under this Agreement, during and for a period of one (1) year subsequent to the termination of this Agreement, unless prior written consent to do so is obtained from Volt Consulting.

23.3. Supplier acknowledges that Customer may deploy Contingent Workers provided by Supplier to Customer's customers and that such deployment constitutes an introduction by Customer of Supplier to such Customers.  During the term of this Agreement and for a period of one (1) year following its termination, Supplier agrees not to solicit the business of or perform the same or substantially similar services as those provided by Customer to its customers for any customer of Customer who was introduced to Supplier by Customer or to whom Customer has deployed Supplier's Contingent Worker.  This provision shall not apply to provision of services not of the kind and type as those provided by Customer.

Standard Register
Contingent Worker Service Agreement

Page 14 of 16

1 October 2004
(R 4) 9 November 2005
(R. 5) 11 May 2006
Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.               (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.
(R 7) 22 April 2010
(R 8) 01 February 2013

**Exhibit A, p. 80**

23.4. If applicable, Supplier agrees to require each of its employees assigned as a Contingent Worker to Customer to agree in writing to the same restriction on solicitation or performance of Services for Customer's customer as Supplier agrees to in the preceding subsection and will make such agreements available to Customer at Customer's or Volt Consulting's request.

## 24. Miscellaneous

24.1. The following attachments are hereby referenced and incorporated into this Agreement, except to the extent their terms are different, in which case this Agreement shall control:

24.1.1.   Attachment "A" Contingent Worker Agreement Regarding Intellectual Property which shall be executed by all Contingent Workers.

24.1.2.   Attachment "B" Contingent Worker Background Verification.

24.1.3.   Attachment "C" Contingent Worker Agreement regarding Prescription Drug Policy which shall be executed by all Contingent Workers.

24.2. Volt Consulting will provide Supplier with real-time electronic access to time, fee, and expense records residing on Volt Consulting's Electronic Time and Expense Reporting System which shall provide Supplier with information related to the hours worked and expenses incurred by each Contingent Worker assigned to Customer as well as fees for placement of Direct Hire Workers (including whether such hours, fees, or expenses are approved, rejected, open or pending).

24.3. This Agreement, including all matters expressly incorporated by reference, when signed by both parties, constitutes the entire and only agreement between the parties respecting the subject matter hereof, and there are merged herein all prior and pre-existing representations and agreements by and between Customer, Supplier and Volt Consulting. This Agreement is intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and is intended also as a complete and exclusive statement of the terms of their agreement. No course of prior dealings between the parties and no usage of trade shall be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity for rejection. Any terms and conditions of sale appearing on Supplier's acknowledgment forms, invoices or quotations shall have no effect whatsoever and are hereby deemed null and void.

24.4. Neither party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such failure or delay is caused by fire, flood, explosion, war, strike, embargo, government requirement, civil or military authority, act of God, act or omission of carriers or other similar causes beyond its control and occurring without the fault or negligence of the delayed or non-performing party ("Force Majeure Conditions").

24.5. If Volt Consulting terminates this Agreement with Supplier because of Supplier's material breach of any provision of the Agreement, then Customer may hire immediately or reassign to any other supplier any Supplier Contingent Worker with no further obligation to Supplier except to pay for Services already provided, in order to have no interruption in Services rendered to Customer. Supplier agrees that it will waive and make no attempt to enforce or recover any damages from Customer, Volt Consulting, the other supplier to whom Supplier Contingent Worker has been reassigned or Supplier Contingent Worker based on any agreement between the Supplier Contingent Worker and Supplier, and if Supplier does attempt to enforce any such agreement it will indemnify Volt Consulting, Customer, the other Supplier to whom Supplier Contingent Worker has been reassigned and/or Supplier Contingent Worker, as the case may be, for all costs and expenses of any kind incurred in defending such action, including, but not limited to, lost wages and attorneys fees.

24.6. No term or provision of this Agreement may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against whom the enforcement of such changes, waivers, discharge or termination is sought.

Standard Register                                             Page 15 of 16                                                      1 October 2004
Contingent Worker Service Agreement                                                                                             (R 4) 9 November 2005
                                                                                                                                (R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.      (R 6) 26 April 2007
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.      (R 7) 22 April 2010
                                                                                                                                (R 8) 01 February 2013

**Exhibit A, p. 81**

24.7. If any section, subsection, sentence, or clause of this Agreement shall be adjudged illegal, invalid or unenforceable, the remainder of the Agreement shall continue to be in full force and effect.

24.8. When purchase orders relating to Government contracts with the United States of America or any department thereof are involved, Customer, Volt Consulting, or agents of Customer or Volt Consulting shall have access to and the right to examine any directly pertinent books, documents, papers, and records of Supplier involving transactions related to this Agreement until the expiration of three years after final payment hereunder at all reasonable times upon reasonable prior request.

24.9. Volt Consulting and Supplier recognize and agree that Customer is a third-party beneficiary to this Agreement and may enforce its rights either directly itself or indirectly through Volt Consulting.

24.10. Unless and only to the extent otherwise expressly set forth in the applicable Purchase Order, neither Volt Consulting nor Customer shall require Contingent Workers to (i) operate Contingent Worker or Customer owned, non-owned and/or hired motor vehicles during the performance of their day-to-day job duties for Customer or (ii) handle cash, securities or other valuables, without Supplier's prior written consent.

**Volt Consulting Managed Service Programs,**
**a division of Volt Consulting Group, Ltd.**          **Supplier Name**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

Standard Register
Contingent Worker Service Agreement                    Page 16 of 16                    1 October 2004
                                                                                        (R 4) 9 November 2005
                                                                                        (R. 5) 11 May 2006

Copyright © 2013 Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.          (R 6) 26 April 2007          (R 7) 22 April 2010
Proprietary and Confidential Information of Volt Consulting Managed Service Programs a, division of Volt Consulting Group, Ltd.          (R 8) 01 February 2013

**Exhibit A, p. 82**

**Attachment A**

## CONTINGENT WORKER AGREEMENT
## REGARDING INTELLECTUAL PROPERTY

In consideration of payment for the performance of work or assignments for The Standard Register Company or any of its affiliates (hereinafter "Company") and other good and valuable consideration, including the use on behalf of Company of its facilities or material, or of private or proprietary information owned by Company or its Suppliers or Customers, I agree to the following provisions:

A.     I hereby assign and agree to assign to Company all my right, title and interest in and to all inventions, discoveries, improvements, ideas, mask works, computer or other apparatus programs and related documentation, and other works of authorship (hereinafter each designated "Intellectual Property"), whether or not patentable, copyrightable or subject to other forms of protection, made, created, developed, written or conceived by me during the period of such work or performance of assignments, whether during or outside of regular working hours, either solely or jointly with another, in whole or in part, either

       1.    In the course of such work or assignment, or
       2.    Which are suggested by or result from any task assigned to me or work performed for or on behalf of Company relating to my assignment, or
       3.    With the use of Company's time, material, facilities, or private or proprietary information;

B.     I will, without charge to Company but at its expense, execute a specific assignment of title to Company and do anything else reasonably necessary to enable Company to secure a patent, copyright registration or other form of protection of said Intellectual Property anywhere in the world;

C.     This Agreement does not constitute a contract of employment, nor does it confer upon me any rights by license or otherwise in any Intellectual Property to which I may have access;

D.     In the event that either my employer or I have previously executed an agreement with Company relating to the work which I am about to undertake, it is understood and agreed that the terms and provisions of this Agreement will supersede any conflicting terms and conditions of such previously executed agreement;

E.     I will keep in confidence and will not, except as required in the conduct of Company's business or as authorized in writing on behalf of Company, publish, disclose or use, during and after the period of my work or assignment, any private or proprietary information of Company or its Suppliers or Customers (including, but not limited to, specifications, drawings, sketches, models, samples, tools, computer or other apparatus programs, technical or business information or data, written, oral or otherwise) which I may in any way acquire, learn, develop or create by reason of such work or assignment;

F.     Upon request by Company, I will exercise reasonable effort to return to Company all Intellectual Property received in tangible form or destroy all such Intellectual Property and certify in writing to such destruction;

G.     I will not disclose to Company or its Suppliers or Customers or any of their employees any information which I consider to be proprietary or confidential, or any information that is or may be proprietary or confidential to any of my employers or other clients.  Except for information owned by Company or its Suppliers or Customers under this Agreement, all specifications, drawings, sketches, models, samples, tools, computer or other apparatus programs, technical or business information or data, written, oral or otherwise, furnished by me to Company under this Agreement or in contemplation of the work or assignment to be performed by me shall not be considered confidential or proprietary;

H.     If my work or assignment involves photographic, visual, and/or audio recording of my presentation, lecture, or demonstrations, including my name, picture, likeness, statement, or voice, I agree that it may be used, in whole or part, either alone or in combination with any other material, by Company or

1 October, 2004

## Exhibit A, p. 83

anyone acting under Company's authority or permission, whether or not Company has any copyright interest in such recording in accordance with this Agreement, and Company shall have the royalty-free right to copy, perform, edit, combine, distribute, exhibit, broadcast, display, modify and use said recording and any copies made thereof and to permit others to do so;

I. I acknowledge that Company may assign me to provide services to Company's Customer and that such deployment constitutes an introduction by Company of me to such Customer; and I agree that during the term of my assignment and for a period of one (1) year following its termination I will not solicit the business of or perform the same or substantially similar services as those provided by Company to its Customers for any Customer of Company to whom I was introduced by Company or to whom I was deployed; and

J. The above terms shall survive termination, cancellation or expiration of this Agreement and the work or assignments for which I was engaged.

I acknowledge that I have read, understood and agreed to the above terms.

Signature: _____

Typed or Printed Name: _____

Social Security Number: _____

Date: _____

Name of Employer: _____

1 October, 2004

**Exhibit A, p. 84**

**Attachment B**

## CONTINGENT WORKER BACKGROUND VERIFICATION

**Background Verification**

Supplier shall complete drug and criminal background checks, as specified below, on all of its Temporary workers assigned to Customer.  To qualify for placement with Customer, all Temporary workers must meet the specified criteria.  Temporary workers placed in assignments involving security sensitive materials, per SRC's customer's requirements, must re-qualify after each 12 month period (timeframe calculated beginning assignment start date). Supplier shall notify Volt Consulting if any Temporary worker is determined to be unqualified based on the results of a drug or criminal background check (but Supplier shall not reveal any test results, with the exception of notification of prescription drugs, to Volt Consulting or Customer), and Supplier will not permit such Temporary worker to begin an assignment, or, if previously assigned, shall notify Volt Consulting that the Temporary worker is unqualified for assignment to perform services under this Agreement and to remove the Temporary worker from the assignment at the request of Volt Consulting or Customer.  Customer reserves the right to deny site access to any Temporary worker for any lawful reason, and Customer's decision to deny access shall be final and governing between Supplier and Customer.  Supplier shall ensure each Temporary worker is so verified, and Supplier will maintain a record of such verification on file for a period of three years.

**Felony / Misdemeanor & Federal Conviction**

Supplier shall obtain federal and county felony conviction information by conducting a check of public records in the counties of residence and employment of the Temporary worker for the prior seven years.  In addition, Supplier shall obtain any separately held city/municipal misdemeanor criminal conviction information.  This federal, county, city, and municipal information is to be updated, for temporary workers placed in assignments involving security sensitive materials, per SRC's customer's requirements, after each 12 month period from the assignment start date. Misdemeanor or felony convictions that may be job related shall include without limitation the following types of criminal offenses:

- Controlled substances (or alcohol abuse)
- Assault, battery or any other matter involving injury to property or person
- Threats, harassment, or stalking
- Dishonesty (e.g. theft, fraud, embezzlement)
- Dangerous weapons
- Kidnapping, extortion, or bribery
- Offenses related to intellectual property
- Computer related crimes

**Record Checking Requirements**

The following record checking requirements are defined more fully below, and Supplier shall conduct all such requirements.

1. Social Security Number ("SS#") Verification.   Verification of name(s) and addresses belonging to the social security number listed in the employment application, conducted through a national credit bureau.

© 2005, The Standard Register Company
Contingent Worker Background Verification as of December 2012

1

**Exhibit A, p. 85**

**Attachment B**

2. <u>County Felony and Separately Held City/Municipal Misdemeanor Criminal Conviction Search.</u>  A search of felony and separately held city/municipal criminal conviction information on an individual for known addresses of residence and employment, including unreported addresses discovered through the SS# verification, for the last seven years.

3. <u>Federal Criminal Record Search.</u>  A search of all U.S. Federal District Criminal courts having jurisdiction over all known and discovered (through SS# verification) addresses of residence and employment for the last seven years.

## Drug Testing

1. <u>Certification.</u>  Supplier shall certify that each of its personnel, who are to be assigned to a Customer site are "drug free".  Supplier shall not assign any person to a Customer site in violation of this requirement.  "Drug free" shall mean that Supplier's Temporary workers, its Suppliers, and suppliers have passed a drug screening test no more than thirty days prior to first assignment at a Customer site.  After each 12 month period from the assignment start date, each Temporary worker, placed in assignments involving security sensitive materials, per SRC's customer's requirements, must again be certified "drug free".

2. <u>Drug Screening Test</u>.  The manner and scope of the drug screening, as well as Supplier's and its internal communication or other use of the results, is a matter within the sole discretion of Supplier; provided, however, that any such test shall include screening for the cut off levels set for the seven classes of drugs identified by the Substance Abuse and Mental Health Administration, formerly National Institute of Drug Abuse (NIDA), generally, Cannabinoids, Cocaine Metabolites, Opiates, Phencyclidine, Amphetamines, Barbiturates, and Benzodiazepines. The seven-panel test screens for all of the above as well as alcohol and marijuana.

3. Prescription Drugs.  Supplier shall certify that each of its personnel, who are to be assigned to a Customer site are aware of the Customer policy regarding Prescription Drugs, and sign Attachment C allowing the information to be provided to Volt Consulting and the Customer

   a. Supplier shall forward Prescription Drug notifications received from its personnel, who are to be assigned to a Customer site, and agrees to follow Customer policy regarding Prescription Drugs

4. <u>Covenants</u>. Supplier covenants and agrees that Supplier, its Temporary workers, suppliers, agents and all others affiliated with Supplier shall not introduce onto Customer's property beer, wine or spirits, narcotic, hallucinogenic, dangerous or illegal drugs, or cannabis.

## Removal of Temporary Workers

Supplier shall remove from Customer any Temporary worker who violates these provisions.

## Retention of Records and Audit

The Agency must maintain records demonstrating its compliance with these background check and drug testing requirements for each individual placed with SRC. SRC reserves the right to audit the Agency's compliance and the Agency will provide these records to SRC upon request.

## Compliance with Applicable Laws and Indemnification

The Agency will implement these background check requirements in a manner that complies with all relevant federal, state, and local laws.  The Agency agrees to indemnify and hold Volt Consulting and SRC harmless for all claims damages, losses and liabilities (including claims or demands made by its employees, agents consultants, independent contractors, and applicants) as a result of the Agency's compliance or noncompliance with the foregoing requirements.

**Exhibit A, p. 86**

**Attachment C**

## Contingent Worker Agreement Prescription Drug Policy

Standard Register ("Customer") is concerned about the safety of all employees, including Contingent Workers. Some prescription drugs may adversely affect judgment, mental alertness, coordination, or the ability to perform assigned job duties, and pose a safety risk to themselves or others, especially if their job requires they operate heavy machinery or moving equipment. Contingent Workers are expected to comply with state and federal law, and refrain from using any drug that would impair their ability to drive or work safely, and to heed physicians' directions and label warnings. It is a violation of Customer's policy for anyone to use prescription drugs illegally.

Following is a list of several prescription drugs that can potentially pose safety risks in the workplace and will fall under the Prescription Drug Use Policy (this is not a complete list and not intended to identify all drugs that may pose a risk in the workplace):

- Hydrocodone (Vicodin)
- Oxycodone (Percocet)
- Propoxyphene (Darvon)
- Hydromorphone (Dilaudid)
- Meperidine (Demerol)
- Diphenoxylate (Lomotil)
- Fetanyl patches
- Barbiturates (i.e. Nembutal)
- Benzodiazepines (i.e. Valium, Xanax)
- Dextroamphetamine (Dexedrine)
- Methylphenidate (i.e. Ritalin and Concerta)
- Amphetamines (Adderall)

If a Contingent Worker is taking a prescription medication that raises safety concerns, they are asked to report their usage to their Employer ("Supplier") who will provide the information to Volt Consulting, who will hold this information in strictest confidence and will not maintain a copy of said information and who will simply, forward the information to the appropriate representative at Customer. The Customer Representative will conduct an individualized review of the safety risks posed by the specific prescription drug.

As part of this review, the Customer Representative may request a medical certification be provided by the Contingent Worker's doctor regarding the effect(s) of the medication on their ability to perform the essential job functions safely. Once receiving the certification, the Customer Representative will make a determination as to whether the Contingent Worker can perform the duties of the role.

If Customer has a reasonable belief that a Contingent Worker is taking a drug that would pose a direct threat or impair their ability to perform their job duties, Customer has the right to request the Contingent Worker be drug tested, as part of Customer's drug testing policy.

**Exhibit A, p. 87**

**Attachment C**

In the case of positive test results due to a prescription drug, Customer may require additional information, regarding any prescription drug that would explain the positive results; and if the Contingent Worker is taking a prescription drug(s) detected per a legitimate prescription written by a medical professional.

The purpose of this policy is to ensure that Contingent Workers are working safely and no risks are posed for anyone that could cause accidents or injuries.   Based on the situation and potential risks to safety, Customer will determine the best course of action.

**I have read and understand the Prescription Drug Use Policy and agree to follow all guidelines set forth by this policy.**

_____                    _____
Contingent Worker Signature                                                            Date

_____
Contingent Worker's Printed Name

**Exhibit A, p. 88**