# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-10541 (BLS)<br><br>Jointly Administered<br><br>Hearing Date: April 13, 2015 at 10:00 a.m. (ET)<br><br>Re: Docket No. 124 |

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF VOLT CONSULTING GROUP, LTD. FOR THE ENTRY OF AN ORDER: (I) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(D)(1), TO THE EXTENT REQUIRED, TO TERMINATE ITS CONTRACT WITH THE DEBTORS; OR, ALTERNATIVELY, (II) REQUIRING THE DEBTORS TO ASSUME OR REJECT THE CONTRACT UNDER 11 U.S.C. § 365(D)(2) AND PROVIDE <u>ADEQUATE ASSURANCE OF FUTURE PERFORMANCE</u>**

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

01:16925160.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ............................................................................................................................ 3

    A.     General Background ................................................................................................ 3

    B.     Specific Background ................................................................................................ 3

OBJECTION .................................................................................................................................. 5

    A.     Volt Is Not Entitled to Terminate or Suspend Performance Under the Contract ............... 5

         (a)    Volt Has Failed to Allege "Cause" To Terminate ........................................................ 5

         (b)    Volt's Request to Suspend Performance Should Be Denied ..................................... 8

    B.     Volt's Request to Compel the Debtors to Assume or Reject the Contract is Premature and Should be Denied ....................................................................... 10

    C.     Volt is Adequately Protected and Cannot Compel the Debtors to Prepay for Services ................................................................................................................ 11

    D.     Standard Register Should Not Be Prematurely Forced to Cure the Contract ................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong World Industries, Inc. v. Adams*,
  961 F.2d 405 (3d Cir. 1992) .................................................................................................. 10

*Chrysler LLC v. Plastech Engineered Prods. (In re Plastech Engineered Prods.)*,
  382 B.R. 90 (E.D. Mich. 2008) ................................................................................................. 6

*Cont'l Energy Assocs. Ltd. P'ship v. Hazleton Fuel Mgmt. Co.
  (In re Cont'l Energy Assocs. Ltd. P'ship)*,
  178 B.R. 405 (Bankr. M.D. Pa. 1995) .................................................................................. 8, 9

*In re Continental Energy Associates Limited Partnership*,
  178 B.R. 405 (Bankr. M.D. Pa. 1995) .................................................................................... 13

*In re Kmart Corp.*,
  359 F.2d 866 (7th Cir. 2004) .................................................................................................. 10

*In re Lehman*,
  Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 23, 2009) ............................................................. 9

*In re Lucre, Inc.*,
  339 B.R. 648 (Bankr. W.D. Mich. 2006) .................................................................................. 8

*In re Physician Health Corp.*,
  262 B.R. 290 (Bankr. D. Del. 2001) ................................................................................. 11, 12

*In re Pursuit Athletic Footwear, Inc.*,
  193 B.R. 713 (Bankr. D. Del. 1996) ......................................................................................... 6

*In re Sweetwater*,
  40 B.R. 733 (Bankr. D. Utah 1984) .......................................................................................... 5

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
  907 F.2d 1280 (2d Cir. 1990) ................................................................................................... 5

**Statutes**

11 U.S.C. § 362(d)(1) ..................................................................................................................... 4

The Standard Register Company ("Standard Register") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this objection (the "Objection") to the *Emergency Motion of Volt Consulting Group, Ltd. for the Entry of an Order: (I) Granting Relief from the Automatic Stay Under 11 U.S.C. § 362(d)(1), to the Extent Required, to Terminate its Contract with the Debtors; or, Alternatively, (II) Requiring the Debtors to Assume or Reject the Contract Under 11 U.S.C. § 365(d)(2) and Provide Adequate Assurance of Future Performance* [Docket No. 124] (the "Motion") filed by Volt Consulting Group, Ltd. ("Volt"). In support of this Objection, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1. By its Motion, Volt seeks permission from this Court to terminate a contract that requires Volt to provide staffing services and place contract workers in Standard Register's offices. In the alternative, Volt seeks to force Standard Register to immediately assume or reject that contract. Neither form of relief is legally justified and either one would severely jeopardize the Debtors' efforts to maximize the value of their assets for all creditors. As Volt argues in its own papers, the contract workers supplied by Volt through its vendors are not run-of-the mill "temp" workers; they form a critical part of Standard Register's business infrastructure. (Motion ¶ 16-17.) Moreover, Standard Register is paying Volt for its services in the ordinary course and has remained current on post-petition obligations to Volt. In addition, Standard Register has even made certain expedited invoice payments post-petition in an effort to assure Volt of Standard Register's ability to pay post-petition.

2. Volt points to no authority for the proposition that a vendor should be entitled to terminate or demand immediate assumption or rejection of an executory contract less than 30

days into a chapter 11 case, particularly under these facts. As a result, the Debtors respectfully submit that the Motion should be denied.

3. Significantly, Volt has failed to identify *any* injury—much less substantial and irreparable injury—that would warrant such extraordinary relief. Volt claims that some vendors are reluctant to supply workers, making it more difficult for Volt to perform under the Contract. But Standard Register, not Volt, would be the party irreparably harmed by any interruption in service from those Vendors. Nowhere does Volt provide any explanation regarding the substantial hardship to Volt.

4. Furthermore, the alleged harms described by Volt and its vendor subcontractors are hardly unusual in a large bankruptcy case. Like every other creditor, Volt wants to get its pre-petition debt paid first and gain certainty about its business relationship with the Debtors. But Volt is not entitled to jeopardize the Debtors' efforts to maximize estate value for all creditors by terminating a valuable executory contract or jumping ahead of other creditors to have its contract cured and assumed.

5. What is more, Volt's claims are belied by the fact that Standard Register has been behind on payments for more than six weeks and the subject of a well-publicized bankruptcy case since March 12, yet Standard Register has not noticed substantial disruption in Volt's performance to date. Volt's histrionics appear motivated more by an effort to extort post-petition payment on pre-petition claims than a legitimate concern about their ability to perform between now and a more appropriate time for the consideration of assumption or rejection.

6. At this early stage of these chapter 11 cases, the Debtors are entitled to a breathing spell to assess their executory contracts make a reasonable determination regarding whether such contracts should or should not be assumed or rejected. Forcing the Debtors to do so prematurely

and without justification will not only prejudice the Debtors with respect to the Volt contract, it would necessarily open the floodgate with respect to more than 10,000 other contracts and leases to which the Debtors are a party.

## BACKGROUND

### A. General Background

7. On March 12, 2015 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Court"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

8. On March 24, 2015, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in the Chapter 11 Cases.

9. Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 2] (the "First Day Declaration").

### B. Specific Background

10. On or about March 17, 2004, Standard Register entered into that certain Managed Services Program Full Supplier Contract Master Agreement (the "Contract") with ProcsureStaff, Ltd., as predecessor in interest to Volt. A copy of the Contract is attached as Exhibit A to the declaration of Kevin Carmody ("Carmody Decl."), attached hereto as Exhibit 1. The Contract

requires Volt to provide staffing services by overseeing dozens of separate staffing companies that supply contract workers to Standard Register.

11. At any given time, Standard Register may have up to 500 contract workers engaged throughout multiple locations. The contract workers placed at Standard Register by Volt, through the staffing companies it oversees, are absolutely critical to Standard Register's business. If Volt were to stop supplying contract workers, Standard Register would have extreme difficulty meeting its staffing needs, especially during peak business times. Standard Register would be forced to set up its own direct relationships with the staffing companies now coordinated through Volt. Until those relationships could be established, Standard Register would face delays in processing orders and the added cost of training and transferring existing workers to new locations. Standard Register could lose millions in revenue due to disrupted customer relationships, which would hurt the long-term prospects of the business and materially undermine the sale process. (Carmody Dec. ¶ 4.)

12. Volt asserts that it received some complaints from its vendors due to unpaid pre-petition amounts owed to Volt that would have been passed along to those vendors if paid. Standard Register is informed that certain vendors have refused to send workers to Standard Register and that Volt has established other vendor agreements to offset these issues. In any event, Volt continues to perform under the Contract and Standard Register is satisfied with the level of service provided by Volt post-petition to date. Standard Register would face significantly greater hardship if the Contract were terminated or if Volt suspended or reduced its performance thereunder. (Carmody Dec. ¶ 5.)

## OBJECTION

**A.     Volt Is Not Entitled to Terminate or Suspend Performance Under the Contract**

**(a)     Volt Has Failed to Allege "Cause" To Terminate**

13.    As a general rule, when a contract is executory, the sole and exclusive remedy available to the debtor's counterparty is to seek an order compelling the debtor to either reject or assume the contract, rather than seeking relief to terminate. *See In re Sweetwater*, 40 B.R. 733, 745 (Bankr. D. Utah 1984) (holding that exclusive remedies of non-debtor party to executory contract are found in § 365). As discussed above, that remedy should not be afforded to Volt at this point in the case. Furthermore, while it is true that, under 11 U.S.C. § 362(d)(1), the automatic stay may be lifted "for cause, including lack of adequate protection of an interest in property of such [requesting] party in interest", at this time the Court should not provide such relief to Volt either.

14.    Neither the statute nor the legislative history defines the term "for cause." *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990). "The 'facts of each request will determine whether relief is appropriate under the circumstances.'" *Id*. at 1286. It has been held that the court must conduct a "balancing of the harm that would be suffered by the [movant] against the harm that would be suffered by the Debtor and the other constituents in the Chapter 11 case." *Chrysler LLC v. Plastech Engineered Prods. (In re Plastech Engineered Prods.)*, 382 B.R. 90, 115-16 (E.D. Mich. 2008). As the moving party, Volt has the burden to establish a prima facie cause to lift the stay. Only upon such a showing does the burden shift to the Debtors to establish that the stay should not be lifted. *See In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del. 1996).

15. In order to establish a prima facie case, Volt must introduce some evidence that cause to lift the stay exists. But Volt has not alleged any facts or introduced any evidence, instead choosing to rely on speculation about harms suffered by Standard Register and Volt's non-party contract vendors. Volt argues that failure to pay has resulted in Vendors "threatening to withdraw contract workers already on assignment to the Debtors" and that "[t]he Debtors' pre-petition defaults, together with their ongoing failure to provide any formal assurances concerning the assumption of Volt's contract, are thus hampering Volt's ability to perform under the Contract . . ." (Motion ¶ 9.) But these harms would be felt by Standard Register, not by Volt. And Standard Register is satisfied with Volt's post-petition performance to date.

16. Volt also argues that Standard Register's failure to provide assurance about the status of the Contract (less than thirty (30) days into these chapter 11 cases) is "jeopardizing Volt's valuable business relationship with Vendors," citing to paragraphs 4-7 of the Declaration of Becki Littman. However, that declaration provides no support for the assertion that any of Volt's business relationships have been jeopardized. In fact, it says nothing at all about any alleged harm to Volt, beyond the contention that Volt is "coming under intense pressure from Vendors," (*id.* ¶ 6) and that Ms. Littman is "struggling to impart confidence to the Vendors due to Debtors' lack of assurances." (*Id.* at 7.) In fact, paragraphs 4-7 of the Littman Declaration describe the potential harm to *Standard Register* that might realize from Vendors defecting and refusing to provide ongoing services. Standard Register is well aware of the potential harm to it from nonpayment of the approximately $2 million and harm to Standard Register is not a basis for Volt's requested relief.

17. Moreover, even assuming that continued uncertainty about the Contract is continuing to harm Volt's business (which Volt nowhere supports by declaration), Volt has

failed to explain how termination improves Volt's position. Termination results in Volt's entire claim being classified as a pre-petition unsecured claim, the loss of ongoing business and hundreds of contract workers losing their jobs. The alternative is that Volt continues to perform and be paid in the ordinary course, with the possibility that the Contract will be assumed and Standard Register's default will be cured as an administrative expense. As such, the balancing of harms clearly cannot favor *termination* in particular as a remedy.[2]

18. In contrast to the negligible or nonexistent harm that Volt faces under the status quo, termination of the Contract would irreparably injure Standard Register. Standard Register could lose millions in revenue due to disrupted customer relationships, which would hurt the long-term prospects of the business and materially undermine the sale process. It would be also be forced to incur the substantial cost of relocating personnel to handle work assignments currently staffed by Volt. (Carmody Decl. ¶ 6.) Volt cites no authority for the proposition that the stay should be lifted within the first thirty (30) days of a case permitting a party to terminate a contract where the debtor is continuing to make post-petition payments and is fully capable of assuming the contract. The balance of harms strongly favors Standard Register, and Volt's request to lift the automatic stay to terminate the Contract should be denied.[3]

---

[2] In fact, Volt does not actually desire to terminate the Contract at all. In previous papers filed before this Court, Volt asked this Court to require Standard Register to assume the Contract – which is the outcome it truly seeks. (D.I. 107.) Volt simply uses the threat of termination to extract what it really wants, which is immediate assumption of the Contract.

[3] The Court should also deny Volt's request to terminate the Contract as premature. Under Section II.A of the Contract, the Contract may only be terminated by Volt "thirty (30) days after written notice to the other party specifying with reasonable particularity such material breach and the action necessary to cure the breach." (Motion, Exhibit A, D.I. 124-4.) Volt has not provided any such notice to Standard Register. Neither has Volt given any explanation for why it should be entitled to circumvent the clear language of the Contract, which entitles Standard Register to a 30-day cure period. Volt should not be allowed to obtain from the Court greater rights than it bargained for in the Contract. In light of the fact that Volt has failed to provide Standard Register with the contractually required notice, the claim for relief is not ripe and must be denied.

### (b) Volt's Request to Suspend Performance Should Be Denied

19. Relying on a single case from the Western District of Michigan, which Volt concedes "has not been widely followed," (Motion ¶ 24), Volt argues that if the Contract is not terminated, Volt should be permitted to suspend performance under the Contract due to Standard Register's *pre*-petition breach. See *In re Lucre, Inc.*, 339 B.R. 648 (Bankr. W.D. Mich. 2006). As with the request for termination, Volt's only interest in this form of relief is to gain leverage over Standard Register in order to force an early decision on assumption or rejection. Volt's request should be rejected for three separate reasons:

20. First, *Lucre* is not binding on this Court and should not be followed. Contrary to *Lucre*, nearly all other courts to have considered this issue have held that a counterparty must perform an executory contract pending the debtor's decision to assume or reject the agreement, notwithstanding a debtor's pre-petition default. For example, in *Cont'l Energy Assocs. Ltd. P'ship v. Hazleton Fuel Mgmt. Co. (In re Cont'l Energy Assocs. Ltd. P'ship)*, 178 B.R. 405 (Bankr. M.D. Pa. 1995), the court compelled a counterparty to continue to supply natural gas to the debtor until such time as the debtor assumed or rejected the contract. *Id*. at 408. There, just as in *Lucre*, the debtor was in pre-petition arrearage in excess of $15 million. *Id*. at 407. The court reasoned that if the counterparty was permitted to withhold performance, then:

> Not only does this saddle an ailing company with an additional burden which it is unlikely to overcome, it pressures the Debtor to surrender the 'breathing space' normally allowed to it to consider the assumption or rejection of the contract. As a matter of its very existence, the Debtor is influenced to immediately assume the contract with all of its administrative burdens.

*Id*. at 408. Indeed, that appears to be precisely Volt's strong-arm tactic in this case.

21. Volt states that "[a]lthough *Lucre* has not been widely followed, research has not disclosed any case that disagreed with its analysis." Yet in *In re Lehman*, Case No. 08-13555

(Bankr. S.D.N.Y. Sept. 23, 2009), Judge Peck held that "[t]he Court rejects the *Lucre* decision as nonbinding and non-persuasive." (Tr. at 110:17-18.)  This Court should do the same.

22. Second, Volt's request for relief is premature.  Standard Register has not complained about or sought to compel Volt's performance.  Therefore, Volt is essentially asking for a declaration that it is not bound by the automatic stay despite the fact that there is no active controversy regarding its future performance.  *Armstrong World Industries, Inc. v. Adams*, 961 F.2d 405, 411 (3d Cir. 1992) ("'[F]there to be an actual controversy the defendant must be so situated that the parties have adverse legal interests.'").  Because there is no active controversy, this matter is not ripe for adjudication, and must be denied.

23. Third, the balance of equities is strongly against Volt.  Once again, it is unclear what Volt or even the Vendors could possibly gain by suspending performance while Standard Register continues to remain current on its post-petition obligations.  To the extent it is not recoverable, that pre-petition debt is a sunk cost and Volt is better off continuing to perform.  *In re Kmart Corp.*, 359 F.2d 866, 873 (7th Cir. 2004) ("To abjure new profits because of old debts would be to commit the sunk-cost fallacy; well-managed businesses are unlikely to do this.  Firms that disdain current profits because of old losses are unlikely to stay in business.").  Volt is using the threat of non-performance as a sword, not a shield.  It is threatening to suspend performance, to the detriment of all parties, in order to force Standard Register to prematurely assume the Contract.  If Volt is allowed to use strong-arm tactics to force early assumption of its contract, every other vendor will seek to do the same, imperiling Standard Register's reorganization and undermining the purpose of the Chapter 11.

**B.      Volt's Request to Compel the Debtors to Assume or Reject the Contract is Premature and Should be Denied**

24.     As an alternative to its request for relief from the automatic stay, Volt requests that the Court compel the Debtors to assume or reject the Contract by April 3, 2015—approximately three weeks after the Petition Date.  In support of this argument, Volt cites only to *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001).

25.     As explained in *Physician Health Corp.*, section 365(d)(2) of the Bankruptcy Code generally allows a debtor to wait until plan confirmation to assume or reject contracts because it is "vitally important to all interested parties that the debtor make a prudent assumption or rejection decision." *Id.* at 292 (citation omitted).  Although a debtor can be required to decide whether to assume or reject a contract earlier, "the court must balance the interests of the contracting party against the interests of the debtor and its estate." *Id.*  The contract counterparty seeking to require a debtor to decide whether to assume or reject an executory contract at an earlier time bears the burden of establishing a compelling reason for such relief. *See id.* at 295 (stating that the debtors would not be forced to decide whether to assume or reject an executory contract on an expedited basis where the movant "failed to establish a compelling reason for the Debtors to decide whether to assume or reject its contract now").

26.     In *Physician Health Corp.*, the creditor argued, among other things, that the debtors had defaulted under the contract pre-petition. *Id.* at 293-94.  However, the court held that a pre-petition default "would not be a reason to compel the Debtors to decide more quickly whether to assume or reject the contract." *Id.* at 294.  The court also emphasized that the case <u>was only five months old</u>, and there was "no evidence that the Debtors [were] being dilatory in [determining whether to assume or reject the creditor's contract]." *Id.* at 295.

27. These Chapter 11 Cases were commenced <u>less than three weeks ago</u>. Volt cannot argue that the Debtors are unreasonably delaying their decision to assume or reject contracts. In fact, other than an outstanding pre-petition balance, Volt has presented no other evidence to support its contention that the Debtors should be forced to assume or reject the Contract at this time. Notwithstanding the lack of supporting evidence, Volt's failure to cite any case law supporting its position, and the mere infancy of these cases, Volt contends that it "is difficult to see why [the Debtors] have not sought to assume the Contract sooner." (Mot. ¶ 26.) The reason is obvious: the Debtors are working to sell substantially all their assets through a competitive sale process and the Debtors will not be in position to decide whether or not Volt's Contract should be assumed before a winning bidder is even identified. There is simply no basis to force this decision outside the sale process and on shortened notice. If Volt and other vendors succeed in forcing Standard Register to prematurely make decisions on assumption and rejection before a final bidder is identified, this could severely jeopardize the success of the sale process and the recovery available to all creditors.

28. Simply put, "[t]he desire to be first is not a convincing reason to compel the Debtors to accelerate their decision." *In re Physician Health Corp.*, 262 B.R. at 295.

**C.    Volt is Adequately Protected and Cannot Compel the Debtors to Prepay for Services**

29. Volt's final request is for adequate protection in the event that the Court denies its other requests. Specifically, Volt requests that the Debtors prepay for any Volt services prior to assumption or rejection of the Contract. (Mot. ¶ 29.)

30. Nowhere in section 365 of the Bankruptcy Code is there a provision for (a) allowance of a contract counterparty to change the terms of a contract or (b) a requirement that a debtor prepay for services pending assumption or rejection by a debtor. If such were the case, a

debtor's liquidity would be exhausted, its operations could grind to a halt, and its going concern value would disappear. Volt's request misstates the purpose and benefits of chapter 11.

31. Volt's analogy to *In re Continental Energy Associates Limited Partnership*, 178 B.R. 405 (Bankr. M.D. Pa. 1995), is inapposite. In *Continental*, the debtors <u>offered</u> to prepay for fuel under a supply contract. *Id.* at 407. The court held that the debtor's <u>proposal</u> was acceptable. *Id.* at 409. <u>The court did not hold that prepayment was required</u>. The court did, however, emphasize the need to "guard the interests of the non-debtor party to the contract" in compelling the non-debtor party to perform prior to the assumption or rejection of the contract. *Id.* at 408.

32. Volt's interests are sufficiently protected here. Pursuant to the Court's interim order granting the Wage Motion, (D.I. 58), the Debtors have already made payments to Volt that have significantly reduced its net pre-petition claim. (Carmody Decl. ¶ 7.) There is no reason to change the terms of the Contract at this time to require prepayment. If the Debtors default on their post-petition obligations, then Volt may at that time seek appropriate relief from the Court at that time. In sum, the relief sought is unwarranted.

**D.    Standard Register Should Not Be Prematurely Forced to Cure the Contract**

33. The parties agree that Volt provides critical services to Standard Register. For this reason, by motion dated March 12, 2015 (the "<u>Wage Motion</u>"), Standard Register "request[ed] authorization, but not direction, to honor and pay any unpaid Contract Workers Obligations" including obligations owed to Volt. (D.I. 14 at 7.) Subsequently, Volt filed an objection asking that "the Debtors should be required – rather than given an *option* – to pay" the entire pre-petition amount owed. (D.I. 107 at 3.) As with the Motion, Volt's objection to the Wage Motion was based on the speculative contention that "Volt's Vendors will suffer serious financial harm

from which many of them will not recover." (*Id*. at 3.)  Volt also cited the fact that these vendors might then look to Volt for payment.  (*Id*.)

34. For all the reasons stated above, Volt should not be permitted to get paid ahead of other creditors without alleging or specifying any hardship or prejudice to Volt.  Furthermore, the fact that a creditor is owed a pre-petition debt does not justify immediate repayment ahead of other creditors.  If it did, every Chapter 11 case would immediately devolve into a frenzied run against debtors and overwhelming grabs for the estate's cash.

35. Volt has failed to explain why its request for immediate payment is anything other than an attempt to circumvent the Bankruptcy Code's priority scheme and rules for orderly repayment of creditors.  The Debtors respectfully submit that Volt's objection to the Wage Motion should be overruled and its Motion should be denied in its entirety.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court deny the Lift Stay Motion.

Dated: April 2, 2015
       Wilmington, Delaware

*/s/ Kara Hammond Coyle*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Michael Rosenthal (NY No. 4697561)
Robert A. Klyman (CA No. 142723)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and Debtors in Possession*