# Exhibit 1

**Carmody Declaration**

01:16925160.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | Hearing Date: April 13, 2015 at 10:00 a.m. (ET) |
| | Re: Docket No. 124 |

**DECLARATION OF KEVIN CARMODY IN SUPPORT OF DEBTORS' OBJECTION TO EMERGENCY MOTION OF VOLT CONSULTING GROUP, LTD. FOR THE ENTRY OF AN ORDER: (I) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(D)(1), TO THE EXTENT REQUIRED, TO TERMINATE ITS CONTRACT WITH THE DEBTORS; OR, ALTERNATIVELY, (II) REQUIRING THE DEBTORS TO ASSUME OR REJECT THE CONTRACT UNDER 11 U.S.C. § 365(D)(2) AND PROVIDE <u>ADEQUATE ASSURANCE OF FUTURE PERFORMANCE</u>**

I, Kevin Carmody, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.    I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC with an office at 55 East 52nd Street, New York, NY 10055. On February 27, 2015, the Board of Directors of Standard Register appointed me to serve as Chief Restructuring Officer of the Debtors effective as of March 2, 2015. In this capacity, I have become familiar with the Debtors' day-to-day operations, business affairs, and books and records.

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

2. I submit this declaration in support of the *Debtors' Objection to Emergency Motion of Volt Consulting Group, Ltd. for the Entry of an Order: (I) Granting Relief from the Automatic Stay Under 11 U.S.C. § 362(d)(1), to the Extent Required, to Terminate its Contract with the Debtors; or, Alternatively, (II) Requiring the Debtors to Assume or Reject the Contract Under 11 U.S.C. § 365(d)(2) and Provide Adequate Assurance of Future Performance*.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge. If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge.

4. A true and correct copy of the Managed Services Program Full Supplier Contract Master Agreement between The Standard Register Company and ProcureStaff, Ltd., dated March 17, 2004, is attached hereto as Exhibit A. Volt Consulting Group, Ltd. ("Volt") is a party to this agreement as the successor in interest to ProcureStaff, Ltd.

5. At any given time, Standard Register may have up to 500 contract workers engaged throughout multiple locations. The contract workers placed at Standard Register by Volt, through the staffing companies it oversees, are absolutely critical to Standard Register's business. If Volt were to stop supplying contract workers, Standard Register would have extreme difficulty meeting its staffing needs, especially during peak business times. Standard Register would be forced to set up its own direct relationships with the staffing companies now coordinated through Volt. Until those relationships could be established, Standard Register would face delays in processing orders and the added cost of training and transferring existing workers to new locations. Standard Register could lose millions in revenue due to disrupted customer relationships, which would hurt the long-term prospects of the business and materially undermine the sale process.

6. Volt asserts that it has received some complaints from its vendors due to unpaid pre-petition amounts owed to Volt that would have been passed along to those vendors if paid. Standard Register is informed that certain vendors have refused to send workers to Standard Register and that Volt has established other vendor agreements to offset these issues. Volt continues to perform under the Contract and Standard Register is satisfied with the level of service provided by Volt post-petition to date. Standard Register would face significantly greater hardship if the Contract were terminated or if Volt suspended or reduced its performance thereunder.

7. Termination of the Contract would irreparably injure Standard Register. Standard Register could lose millions in revenue due to disrupted customer relationships, which would hurt the long-term prospects of the business and materially undermine the sale process. It would be also be forced to incur the substantial cost of relocating personnel to handle work assignments currently staffed by Volt.

8. In the post-petition period, Debtors have made payments to Volt of approximately $366,376.46, which have substantially reduced Volt's net pre-petition claim.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 2, 2015

*/s/ Kevin Carmody*
Kevin Carmody

# **Exhibit A**

01:16925164.1

# MANAGED SERVICES PROGRAM
# FULL SUPPLIER CONTRACT
# MASTER AGREEMENT

This "Agreement" is effective as of __3/17__, 2004 between The Standard Register Company ("Customer"), an Ohio corporation, having a principal office at 600 Albany Street, Dayton, Ohio 45408-1442, and ProcureStaff, Ltd. ("ProcureStaff"), a Delaware corporation, having its principal office at 560 Lexington Avenue, 15th Floor, New York, New York 10022.

WHEREAS, Customer desires that ProcureStaff acting solely as agent for Customer (i) contract with staffing suppliers to provide contingent worker services for Customer, (ii) perform supplier neutral management of staffing suppliers who provide contingent workers on assignment to Customer; (iii) provide electronic time and expense reporting services for contingent workers provided by staffing suppliers under this Agreement; and (iv) provide consolidated, centralized billing, reporting and approved payment processing procedures for work performed by staffing suppliers, who supply staffing services to Customer.

NOW THEREFORE, for good and valuable consideration the sufficiency of which is hereby acknowledged, the parties agree as follows:

## I. DEFINITIONS

Unless otherwise indicated, the following terms shall have the meanings given below in this Agreement and all Exhibits or attachments hereto.

| | |
|---|---|
| Administration Services | The services performed by ProcureStaff as described in Section III PROCURESTAFF'S DUTIES AND OBLIGATIONS. |
| Assignment Manager | The Company employee authorized and responsible for requesting and selecting a Contingent Worker to provide Services for Company and responsible for approval of time reported by the Contingent Worker using the Electronic Time Reporting System. |
| Consolidated Billing | A centralized statement of charges containing the information reported from all Suppliers in the Electronic Billing and all Supplier invoices for reimbursable costs/expenses rendered to, for or on behalf of Customer. |
| Contingent Worker | An hourly temporary employee or other temporary personnel employed by a Supplier and assigned to Customer who directly provides or performs Services for Customer under a Supplier Agreement. |
| Contingent Worker Services | Work performed for Customer by Contingent Workers provided by a Supplier on a non-permanent hourly-paid basis. |
| Customer-referred | Identification by an Assignment Manager of an individual not employed by |

| | |
|---|---|
| Service | a Supplier and referral of that individual to a Supplier selected by Customer for the purpose of engaging the individual as a Contingent Worker. |
| Electronic Billing | A Customer billing statement generated through the Electronic Time Reporting System. Electronic billing may include Travel and Living or other approved expenses incurred by Contingent Workers. |
| Electronic Time and Expense Reporting System | ProcureStaff's web-based time and expense reporting and approval system for Contingent Workers, as set forth in or developed under the Statement of Work, for Contingent Worker Services as described in this Agreement. |
| MSP | ProcureStaff's Managed Services Program as described in this Agreement, by which a Supplier provides Contingent Workers to perform Services for Customer. |
| Management Personnel | ProcureStaff employees who perform Administration Services under this Agreement. |
| Program Manager | Customer's representative authorized to administer this agreement on behalf of Customer and to negotiate and agree to changes, if any, to Supplier Agreements between ProcureStaff and Suppliers. |
| Services | Work performed by a Contingent Worker, including: (i) programming, system analysis, technical writing, drafting and other temporary information technology or engineering, (ii) clerical and administrative services or (iii) any other Contingent Worker Services required by Customer which the parties agree shall be included under this Agreement. |
| Staffing Services | The provision by a Supplier of Contingent Workers to perform Services for a Customer, along with the administrative services required to maintain the Contingent Worker as Supplier's employee. |
| Supplier | A company that provide hourly temporary employees and other temporary staffing and consulting personnel to Customer |
| Supplier Agreement | The agreement to be entered into between a Supplier and ProcureStaff, substantially in the form of Exhibit D to this Agreement, by which Suppliers will be engaged to provide Staffing Services to Customer. |

## II. TERM

    A. The term of this Agreement shall commence on _____ and shall terminate on _____ (the "Initial Term"). This Agreement may be terminated by either party in the event of material breach by the other party, which breach shall not have been cured to the reasonable satisfaction of the non-defaulting party within thirty (30)

days after written notice to the other party specifying with reasonable particularity such material breach and the action necessary to cure the breach.

B. This Agreement shall continue after the expiration of the Initial Term for successive terms of one year each (an "Extension Term") if both parties so agree in a written amendment executed at least sixty (60) days before the expiration of the Initial Term or any Extension Term to further extend the term.

C. If for reason other than material breach of this Agreement Customer terminates the MSP with ProcureStaff prior to the one year anniversary date of go live, Customer agrees to pay ProcureStaff the actual cost of implementation, system configuration and on-site staff with a cap not to exceed $40,000, payable within 30 days of notice to ProcureStaff. The parties shall enter into a written certification to each other as to the "go live" date of the MSP.

D. Anytime after the one-year anniversary date of this Agreement, either party may terminate this Agreement for its convenience upon thirty (30) days prior written notice to the other party.

E. This Agreement will automatically terminate prior to its expiration date, without notice, if any proceeding under any bankruptcy, reorganization, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction is filed by or against either party.

III. **PROCURESTAFF'S DUTIES AND OBLIGATIONS**

A. ProcureStaff shall administer the entire process of managing the process of identifying and securing Contingent Workers from Suppliers.

B. Using its Electronic Time Reporting System as the sole basis for determining time worked by Contingent Workers, ProcureStaff shall furnish a Consolidated Billing Invoice to Customer.

C. Upon receipt of payment from Customer of the amount set forth in the Consolidated Billing, ProcureStaff, acting as agent for Customer, shall pay those Supplier invoices reflected in the Consolidated Billing from Customer supplied funds, it being acknowledged that ProcureStaff's receipt of funds from Customer is a condition precedent to ProcureStaff's obligation to make any payment to Suppliers.

D. All funds received from Customer pursuant to the Consolidated Billing provisions of this Agreement shall be deposited by ProcureStaff into a non-interest-bearing account designated "Standard Register/ProcureStaff Escrow Account," the funds in which shall be held for the benefit of, and shall be used by ProcureStaff only to pay, Suppliers who provide Staffing Services to Customer, provided, however, that ProcureStaff may pay to itself, simultaneously with paying such Suppliers, the fees which ProcureStaff is permitted to retain under this Agreement. ProcureStaff and

Customer agree that ProcureStaff's title to such funds (except as to the amount of such fees) shall be nominal only and that ProcureStaff shall have no equitable interest in the funds deposited in such account, except as to ProcureStaff's fees, it being the express intention of the parties that the balance of such funds shall be held by ProcureStaff as an escrowee solely for the benefit of the Suppliers who have supplied Staffing Services to Customer. ProcureStaff shall not commingle funds it receives from its other customers or third parties with the funds that are deposited into the Standard Register/ProcureStaff Escrow Account..

E. This Agreement covers only the Administration Services to be performed by ProcureStaff.

F. ProcureStaff will comply with all applicable Customer policies and procedures in performing Administration Services.

G. ProcureStaff shall recruit, interview, select and hire all of its Management Personnel. Management Personnel must meet all standards of Customer prior to assignment to Customer. Specific standards for personnel qualifications of its Management Personnel shall be mutually established by Customer and ProcureStaff.

H. ProcureStaff shall immediately give written notice to Customer of any and all impending or existing labor complaints, disputes or controversies and the progress thereof involving its Management Personnel, which might impact the performance of Administrative Services. ProcureStaff shall use reasonable efforts to resolve any such complaint, dispute or controversy.

I. ProcureStaff warrants that Customer shall have no liability or bargaining obligation under any collective bargaining agreement covering any Management Personnel. ProcureStaff agrees to provide Customer with copies of any existing collective bargaining agreements covering any Management Personnel and ProcureStaff and agrees to provide Customer with prompt notice of any union organization with respect to any Management Personnel.

J. ProcureStaff shall inform the Management Personnel that private or proprietary information of Customer may become available to them. Prior to placement with Customer, ProcureStaff shall instruct the Management Personnel to maintain the confidentiality of such information and require the Management Personnel to agree to do so by signing an agreement to that effect. In addition, ProcureStaff shall require Suppliers to inform Contingent Workers that private or proprietary information of Customer may become available to them and, prior to placement with Customer, to instruct the Contingent Workers to maintain the confidentiality of such information and to require the Contingent Workers to agree to do so by signing the Contingent Worker Agreement Regarding Intellectual Property attached as Exhibit E.

K. ProcureStaff shall maintain in effect during the term of this Agreement all applicable federal, state, and/or local licenses and permits which may be required to be maintained by employers.

L. ProcureStaff is, and shall at all times be, deemed to be an independent service provider and all Management Personnel assigned by ProcureStaff to Customer shall remain employees of ProcureStaff, subject to ProcureStaff's right of direction, control, discipline, right to hire and fire and matters pertaining to merit increases and promotions. Neither ProcureStaff nor its employees, agents or representatives will be entitled or eligible, by reason of providing services under this Agreement or any purchase orders hereunder, to participate in any benefits or privileges given or extended by Customer to its employees. Customer shall, however, acting for and on behalf of ProcureStaff, have the right to instruct any Management Personnel performing services on Customer property concerning pertinent safety and site regulations.

M. All regulations and rules of Customer which may be in effect at the job site regarding employment, passes, badges, and conduct on the property shall be observed by ProcureStaff's Management Personnel.

N. ProcureStaff shall require each Supplier to submit all required documentation to ProcureStaff before authorizing a Contingent Worker to begin work on assignment at Customer.

O. All Administration Services performed hereunder by ProcureStaff shall be subject to the inspection and approval of a designated representative of Customer. ProcureStaff agrees to provide only experienced, trained, and qualified Management Personnel for the performance of Administration Services and all Administration Services shall be of good quality and workmanship.

P. Any assignment of this Agreement or any rights, interest or payment hereunder, by operation of law or otherwise, without the prior written consent of Customer shall be void, except that if Customer fails to render payment to ProcureStaff for Contingent Worker Services due to Customer's bankruptcy, insolvency or any claimed inability or refusal to pay, ProcureStaff may assign to the Supplier all actions and/or remedies available to it under the law so as to enable the Supplier to recover any such amounts lawfully due to it from Customer. ProcureStaff shall not subcontract or delegate the performance of any of its Administrative Services except with the prior written consent of Customer. Customer may terminate this Agreement without liability to ProcureStaff except for any unpaid Services or Administrative Services upon ten (10) days' prior written notice to ProcureStaff upon the occurrence of any of the following events, without the prior written consent of ProcureStaff: (i) the sale of substantially all of the assets or stock of ProcureStaff, (ii) the merger, consolidation or reorganization of ProcureStaff into any other entity which is not controlled by the present shareholders of ProcureStaff, and (iii) the subcontracting or delegation by ProcureStaff of its Administrative Services or MSP.

Q. ProcureStaff shall require all Suppliers to execute and deliver to ProcureStaff a signed Supplier Agreement substantially in the form of Exhibit D, with any changes to which both ProcureStaff and Customer agree. All such Supplier Agreements shall be maintained by ProcureStaff. In addition, ProcureStaff shall require each Supplier to carry insurance in the form and limits set forth in the Insurance Section of the Supplier Agreement.

R. Notwithstanding the foregoing, if any prospective Supplier does not meet ProcureStaff's financial, insurance, status, business continuity and stability qualification criteria, or does not carry and maintain the insurance limits specified in the Supplier Agreement, or in ProcureStaff's reasonable opinion does not appear to meet ProcureStaff's and Customer's qualification criteria (an "Unapproved Supplier"), ProcureStaff shall so advise Customer's Program Manager and ascertain whether Customer desires ProcureStaff to do business with such Unapproved Supplier. If Customer desires ProcureStaff to transact business with such Unapproved Supplier and Customer's Program Manager signs a form to be developed by the parties indicating Customer's acceptance of the Unapproved Supplier, ProcureStaff shall have no responsibility to Customer with respect to such Unapproved Supplier or its Contingent Workers or other personnel other than the obligation to collect and pay its invoices which have been approved and funded by Customer and to include the Unapproved Supplier in the reports required in this Agreement. In such case where billing is through ProcureStaff, ProcureStaff shall be entitled to receive from Customer and Supplier the fees specified in Exhibit B. The form referred to above will include a direction from Customer that unless a Supplier agrees to such fees, its purchase orders, written or verbal, will be cancelled by Customer. If Customer does not assume all such liability and responsibility, then ProcureStaff need not transact business with such Unapproved Supplier.

S. ProcureStaff shall have no liability or responsibility for any Supplier or for any Contingent Worker who is engaged by Customer outside the MSP described in Exhibit A; however, ProcureStaff shall notify the Customer's Program Manager and shall provide consolidated billing, payment and reports if requested by Customer. If Customer desires ProcureStaff to transact business with such Supplier and Customer's Program Manager signs a form to be developed by the parties indicating Customer's acceptance of the Supplier, ProcureStaff shall have no responsibility to Customer with respect to such Supplier or its Contingent Workers or other personnel other than the obligation to collect and pay its invoices which have been approved by Customer and to include the Supplier in the reports required in this Agreement. In such case where billing is through ProcureStaff, ProcureStaff shall be entitled to receive from Customer and Supplier the fees specified in Exhibit B. The form referred to above will include a direction from Customer that unless a Supplier agrees to such fees, its purchase orders, written or verbal, will be cancelled by Customer. If Customer does not assume all such liability and responsibility, then ProcureStaff need not transact business with such Supplier.

## IV. CUSTOMER'S DUTIES AND OBLIGATIONS

A. Customer shall require all Assignment Managers (or an authorized designee) to review and approve (or reject and state a reason) all Contingent Workers' time reported in the Electronic Time Reporting System within three (3) business days from receipt of the time reports by the Contingent Worker. Time not approved or rejected within three (3) business days may be deemed by ProcureStaff to have been approved and may be included in the Consolidated Billing. Customer agrees to pay for all time included in the Consolidated Billing.

B. Customer shall pay or authorize ProcureStaff to deduct from payment to Suppliers for the services performed hereunder the fees in accordance with the terms provided in Exhibit B.

C. Customer shall provide the Management Personnel and the Contingent Workers assigned to work on-site suitable and safe places of work which shall comply with all applicable federal, state, and local health and safety laws, including OSHA.

D. Customer shall not allow any Management Personnel or Contingent Workers to handle Customer's cash, securities or other valuables without ProcureStaff's prior written consent.

E. Customer agrees to comply with the Fair Labor Standards Act, Americans with Disabilities Act, Title VII of the Civil Rights Act, Age Discrimination in Employment Act, Illegal Immigration reform and Immigrant Responsibility Act, Family and Medical Leave Act, American Competitiveness and Workplace Improvement Act and any and all other federal, state and local laws, statutes, ordinances, rules, regulations, codes, orders and/or programs.

## V. CUSTOMER / PROCURESTAFF PROPERTY

A. Unless otherwise agreed to in writing, all tools, equipment, materials, drawings, computer programs, or other data of every description furnished to ProcureStaff by Customer (unless paid for by ProcureStaff) and any replacement thereof, or any materials affixed or attached thereto, shall be the property of Customer. ProcureStaff shall not substitute any property for Customer property, and shall not use such property except in connection with providing services hereunder. Such property shall be subject to removal at Customer's request, in which event ProcureStaff shall prepare such property for shipment and shall deliver it as directed by Customer in the same condition as originally received by ProcureStaff, reasonable wear and tear excepted, all at Customer's expense.

B. ProcureStaff's confidential or proprietary software programs which are used by ProcureStaff to perform its Administration Services under this Agreement, including, but not limited to, REX, VSG-Gold™, HRP, HRPM, VoltTrak, Platinum, Vector, Consol and all enhancements, improvements, revisions, corrections, additions, subtractions, updates, modifications, derivative works, adaptations, versions, productions,

transmissions, arrangements, changes and translations, and their framework and infrastructure, and all related software, source code, and object code, all scripts and applets, web content, navigational buttons, server configurations, algorithms, processes, and any and all patent rights, copyright and trademark rights, trade secrets and common law rights and all other attendant intellectual property rights and other rights, title and interest therein (except Customer's data stored therein), are and shall remain the sole property of ProcureStaff and no right, title or interest of any kind or description shall be transferred to Customer. All of the foregoing shall be deemed confidential and proprietary to ProcureStaff and shall be considered and maintained as confidential by Customer.

VI. **ORDER PLACEMENT**

All orders under this Agreement shall be provided by Customer through ProcureStaff's web-based Human Resource Procurement System and secured with a purchase order.

VII. **WORKERS' COMPENSATION AND LIABILITY INSURANCE AND INDEMNIFICATION**

A. ProcureStaff shall, at its sole cost and expense, procure and will maintain in effect throughout the term of this Agreement, at a minimum, the following insurance coverage covering ProcureStaff's Administration Services:

1. Commercial General Liability with Additional Insured Status ("CGL"): $2,000,000 General Aggregate and $1,000,000 Each Occurrence;
2. Business Automobile Liability with Additional Insured Status ("Auto"): $1,000,000 Each Occurrence, Any Auto;
3. Worker's Compensation: Statutory Limits with Waiver of Subrogation or Alternate Employer Endorsement;
4. Employer's Liability: $1,000,000;
5. Professional Liability (E&O): $2,000,000;
6. Employee Dishonesty/Crime Bond: $1,000,000 Includes loss to Customer; and
7. Umbrella/Excess Policy: $3,000,000 with respect to CGL, Auto and Employer's Liability.

B. ProcureStaff will furnish Customer with a certificate of insurance evidencing the coverage required under this Article. Each certificate of insurance shall provide a thirty day written notice of cancellation or material change in policy be sent to Customer. ProcureStaff also agrees to notify Customer thirty days prior to any changes in coverage which would affect coverage limits and other items agreed upon between Customer and ProcureStaff under this Article.

C. Maintenance of insurance by ProcureStaff as specified in this Article shall in no way be interpreted as relieving ProcureStaff of any responsibility whatsoever for liability arising under this Agreement or otherwise for the acts and omissions of ProcureStaff

and ProcureStaff may carry, at its own expense, such additional insurance as it deems necessary.

D. ProcureStaff shall require all Suppliers, at each Supplier's sole cost and expense, to procure and maintain in effect throughout the term of this Agreement, at a minimum, insurance coverage as specified in the Supplier Agreement.

E. ProcureStaff shall not be responsible for the acts or omissions of any of the Suppliers or for their performance under the Supplier Agreements, and ProcureStaff's insurance shall not be deemed to cover or be excess to the insurance of any Supplier. ProcureStaff shall process any claims on behalf of Customer for claims against Suppliers and shall pursue any such claims with reasonable diligence (but shall not be required to resort to litigation), but ProcureStaff shall not itself be liable for any such claims, whether covered by insurance or not. On request of Customer, ProcureStaff shall assign any such claim to Customer.

F. ProcureStaff shall be responsible for administration of the MSP and for monitoring Suppliers' compliance with the program and, at the request of Customer terminating the services of any Supplier who fails to comply. ProcureStaff shall have no responsibilities and/or liabilities for the actual performance or non-performance, work product or results of any Supplier or Contingent Worker, including but not limited to any deliverable, product and/or task produced or provided by any Contingent Worker. Customer shall have sole responsibility for determining whether the services provided by Suppliers or Contingent Workers are satisfactory and/or in accordance with the agreement between each Supplier and ProcureStaff.

## VIII. INDEMNIFICATION / LIMITATION OF LIABILITY

A. To the extent not caused by the negligent or deliberate acts or omissions of ProcureStaff, Customer agrees to indemnify, defend and hold ProcureStaff harmless from and against any and all claims, demands, causes of action, damages and/or losses of any sort or kind, in law or in equity, including but not limited to attorney's fees and costs or expenses of suit, arising out of, resulting from and/or related in any way to Customer's obligations under this Agreement, including but not limited to acts or omissions of Customer or Customer's employees whether arising out of tort or contract, except as to claims for non-payment of Supplier Invoices for which Customer has already paid ProcureStaff.

B. ProcureStaff agrees to indemnify, defend and hold Customer harmless from and against all claims, demands, causes of action, damages, and/or losses of any sort or kind, in law or in equity, including but not limited to attorney's fees and costs or expenses of suit, that may be made as a result of ProcureStaff's acts or omissions or those of its officers, employees, subcontractors or agents to the extent of claims made: (i) by anyone for injuries to persons or damage to property or other cause of action; (ii) in connection with the Administration Services contemplated by this Agreement; (iii) under any statute or common law or otherwise, arising out of or in connection

with the Administration Services contemplated by this Agreement or any information obtained in connection with the performance of such Administration Services, and (iv) the failure by ProcureStaff to maintain the Standard Register/ProcureStaff Escrow Account or its failure to pay when due from Customer for these Services. None of the foregoing indemnifications shall apply to the extent that any loss or injury is caused by or results from the negligent or intentional act of Customer or Customer's employees.

C. **NEITHER PROCURESTAFF NOR CUSTOMER SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT, EVEN IF THE PARTIES HAVE BEEN APPRISED OF THE POSSIBILITY OF SUCH DAMAGES OCCURRING.**

IX. **PROTECTION OF PROCURESTAFF'S DATA SYSTEMS**

Customer agrees that neither it nor any of its employees shall modify or attempt to modify or disable any of ProcureStaff's Proprietary Software nor install or attempt to install any back door, time bomb, drop dead device, virus, Trojan horse or worm (as such terms are commonly understood with respect to data systems generally) or other destructive or disabling code or components or other similar software routine designed to permit unauthorized access, disable, erase or otherwise harm ProcureStaff's Proprietary Software, or perform similar actions; but will use the software only in the manner in which it was designed to be used and only for the intended purposes and in the manner for which access is granted.

X. **ADDITIONAL TERMS AND CONDITIONS**

A. This Agreement, including all matters expressly incorporated by reference, when signed by both parties, constitutes the entire and only agreement between the parties respecting the subject matter hereof, and there are merged herein all prior and pre-existing representations and agreements by and between Customer and ProcureStaff.

B. No term or provision of this Agreement may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against whom the enforcement of such changes, waivers, discharge or termination is sought.

C. Except as otherwise specified herein, neither party may assign this Agreement or any interest, payment or rights hereunder, except to an affiliate as defined in the Securities Exchange Act, without the other party's prior written consent. Except for the prohibition on assignment contained in the preceding sentence, this Agreement shall be binding upon and insure to the benefits of the heirs, successors, representatives and assigns of the parties hereto.

D. If any section, subsection, sentence, or clause of this Agreement shall be adjudged illegal, invalid or unenforceable, the remainder of the Agreement shall continue to be in full force and effect.

E. During the term of this Agreement and for a period of one (1) year following the termination or expiration hereof, neither party shall solicit, interview, hire, or discuss employment prospects with any officer or employee of the other party engaged in providing services hereunder, or who is otherwise involved with the Administration Services without the prior written approval of the other party.

F. Neither party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such failure or delay is caused by fire, flood, explosion, war, strike, embargo, government requirement, civil or military authority, act of God, act or omission of carriers or other similar causes beyond its control and occurring without the fault or negligence of the delayed or non-performing party ("Force Majeure Conditions").

G. The construction, interpretation, and performance of this Agreement and all transactions under it shall be governed by the laws of the State of New York, excluding its choice of law rules and excluding the Convention for the International Sale or Goods. The parties agree that the provisions of the New York Uniform Commercial Code apply to this Agreement and all transactions under it, including agreements and transactions relating to the furnishing of services, the lease or rental of equipment or material, and the license of software. Any dispute or controversy arising out of or related to this Agreement or any breach hereof, or the termination of this Agreement, shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association, pursuant to the Federal Arbitration Act, applying the law as set forth in the Governing Law paragraph of this Agreement. The arbitrator shall be entitled to award reasonable attorney's fees and costs to the prevailing party. Judgment upon any award may be entered in any court having jurisdiction. Should the foregoing arbitration agreement be unenforceable for any reason, ProcureStaff and Customer hereby waive their respective rights(s) to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding, and/or hearing.

H. Volt Services Group division of Volt Technical Resources, LLC, a subsidiary of Volt Information Sciences, Inc., may also provide the services of Contingent Workers to Customer under a separate Supplier Agreement between ProcureStaff and Volt Services Group, and Volt Services Group shall be deemed a Supplier with respect to the Contingent Workers Volt Services Group assigns to Customer.

I. The following exhibits are hereby referenced and incorporated into this Agreement, except to the extent their terms are different, in which case this Agreement shall control:

    Exhibit A    Statement of Work

    Exhibit B    Compensation
    Exhibit C    Process Metrics and Trend Reports
    Exhibit D    Supplier Agreement
    Exhibit E    Contingent Worker Agreement Regarding Intellectual Property
    Exhibit F    Electronic Transaction Agreement

J. **NO RIGHT OF SET-OFF.** Customer understands and agrees that ProcureStaff will pay Suppliers only after funding is received from Customer. If Customer wishes ProcureStaff not to pay all or part of any Supplier invoice, Customer must notify ProcureStaff prior to funding. Customer shall not be entitled to set off any amount owing at any time to ProcureStaff for services rendered by one Supplier against any amount owed to ProcureStaff for services rendered by another Supplier. Neither party shall be entitled to set off any amount owing at any time to the other party under this Agreement from monies owed under any other agreement between the parties or any of their affiliates.

K. **AGREEMENT FOR SERVICES.** This Agreement provides for the furnishing of Administration Services only. ProcureStaff shall utilize its computer systems to provide such services as provided in Section III above, which Administration Services shall be performed in accordance with Exhibit A.

L. **ACCEPTANCE OF TERMS AND CONDITIONS:** This Agreement shall become binding only when signed by both parties. The program shall be implemented in accordance with an implementation schedule to be agreed upon by the parties.

M. **INTEGRATION:** This Agreement is intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and is intended also as a complete and exclusive statement of the terms of their agreement. No course of prior dealings between the parties and no usage of trade shall be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and an opportunity for rejection. Any terms and conditions of sale appearing on ProcureStaff's or Customer's acknowledgment forms or quotations shall have no effect whatsoever and are hereby deemed null and void.

**The Standard Register Company**      **ProcureStaff, Ltd.**

Signature: _(signed)_      Signature: _(signed)_

Name: Craig Brown      Name: Steven Show

Title: Chief Financial Officer      Title: President

Date: 03/05/2004      Date: 3/17/2004