## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al*,[1] | Case No.  15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | D.I. 23 |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE RELIEF SOUGHT IN THE DEBTORS' SALE MOTION

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors-in-possession (the "Debtors") hereby submits this objection (the "Objection") to the Debtors' motion [D.I. 23] (the "Sale Motion")[2] seeking entry of an order *(I) (A) Establishing Sale Procedures Relating to the Sale of Substantially all of the Debtors' Assets* [the "Bid Procedures"]*; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (D) Approving Form and Manner of Notice of all Procedures, Protections, Schedules, and Agreements; (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Certain Related Relief; and (II) (A) Approving the Sale of Substantially all of the Debtors' Assets and (B)*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Sale Motion.

*Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale*.  In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.      As outlined in detail below, the Committee objects to the proposed Bid Procedures and sale process.  The Committee, only recently appointed in these Chapter 11 Cases, is in the process of investigating the Debtors' complex prepetition capital structure and transactions apparently designed solely to benefit Silver Point Finance, LLC (collectively with its affiliates, "Silver Point") and (other) insiders to the detriment of unsecured creditors.  In August 2013, The Standard Register Company ("Standard Register") – with a balance sheet showing a shareholders deficit of approximately $121 million[3] – engaged in its largest transaction ever and acquired 100% of the outstanding equity interests of WorkflowOne, LLC ("WorkflowOne")[4] and assumed $210 million in Silver Point's secured debt in WorkflowOne (the "WorkflowOne Transaction").  The WorkflowOne Transaction appears to bear all signs of a fraudulent conveyance, breaches of fiduciary duty and other transgressions (thus rendering Silver

---

[3] *See* 10Q filed by Standard Register on Mar. 31, 2013.

[4] Prior to the merger, on September 29, 2010, Workflow Management Inc., Workflow Holdings Corporation, WF Capital Holdings, Inc., WF Holdings, Inc., Workflow Direct, Inc., Workflow Management Acquisition II Corp., WFIH, Inc., WFMI, Inc., Workflow of Florida, Inc., Workflow Solutions LLC, SFI of Puerto Rico, Inc., Old FGS, Inc., Old UE, LLC, The Relizon Company, Relizon Wisconsin Inc., Relizon (Texas) Ltd., LLP, Relizon SNE Inc., Relizon KNE Inc., Relizon de Mexico Inc., Formcraft Holdings General Partner, Inc., and Formcraft Holdings Limited Partner, Inc. (collectively, the "Workflow Debtors") filed chapter 11 petitions in the Eastern District of Virginia, Norfolk Division (the "Workflow Bankruptcy Court").  Prior to the bankruptcy cases of the Workflow Debtors, Silver Point acquired substantially all of Workflow Debtors' secured debt.  The Workflow Debtors' cases were administratively consolidated under the case of Workflow Management Inc., Case No. 10-74617, and presided over by Chief Judge Stephen C. St. John.  The Workflow Debtors' assets included certain real property interests. The Workflow Bankruptcy Court confirmed a liquidating chapter 11 plan for the Workflow Debtors on February 25, 2011 and no discharge was entered. On or about March 2, 2011, WorkflowOne, LLC acquired substantially all of the Workflow Debtors' assets in connection with the Workflow Debtors' confirmed chapter 11 plan, Silver Point held the majority stake in WorkflowOnce LLC upon emergence. On February 11, 2014, the Workflow Debtors' bankruptcy case was closed.

Point's debt subject to subordination) based on an overwhelming post-closing increase of Standard Register's secured debt (primarily to Silver Point) and a low likelihood and ability to repay or operate under overly restrictive covenants.[5]

2.      Upon completion of the WorkflowOne Transaction, Silver Point not only was the Debtors' largest secured creditor, but it controlled 29.6% of Standard Register's common stock.[6] Furthermore, in October 2013, as a result of the WorkflowOne Transaction, Silver Point designated at least two of its representatives to the Debtors' board of directors (the "Board"), including its Compensation Committee and Audit Committee.

3.      Within less than 16 months after the closing of the WorkflowOne Transaction, the Debtors were faced with covenant issues and what they claim were severe liquidity issues. These issues were driven by a deterioration in revenue, decline in performance, customer losses and higher than projected costs of achieving the anticipated synergies. Silver Point then advised the Debtors to prepare for chapter 11 with a credit bid in hand from Silver Point. By that time the Debtors had run out of time to market their assets.

4.      Understanding that its prepetition conduct would receive heightened scrutiny in chapter 11 and be subject to a potential challenge, Silver Point attempted to isolate itself from management. Prior to the Petition Date, one of Silver Point's designees (an employee of Silver Point) to the Board (Mr. DiNello) resigned. Mr. DiNello, an investment professional at Silver Point who joined Silver Point in January 2006 was quickly replaced by Frederic F. Brace, another Silver Point designee who previously, among other things, served as Executive Vice President, Chief Administrative Officer and Chief Restructuring Officer of The Great Atlantic &

---

[5] The Debtors suffered net losses of approximately $66 million in 2014 and approximately $7.4 million in 2013.  *See* Carmody Declaration, ¶ 13.

[6] *See* Schedule 13D filed by Silver Point Capital, L.P. on Aug. 12, 2013.

Pacific Tea Company, and Chief Financial Officer and Chief Restructuring Officer of UAL Corp.   Mr. Peiser (another member of the Board appointed by Silver Point) also started professing to the Board his independence from Silver Point.   Nonetheless, as of the Petition Date, two of Silver Point's Board designees remained on the Board and Silver Point held approximately 20% of the Debtors' equity.[7]

5.      Despite its status as the Debtors' largest secured creditor, significant equity holder, and its Board affiliations, Silver Point (through the Debtors) now declares in the Sale Motion that Standard Acquisition Holdings, LLC (a special purpose vehicle created by Silver Point shortly before the Petition Date (the "Insider Bidder")) is not an insider of the Debtors, and seeks to impose an expedited, controlled, and unfair sale process riddled with roadblocks and barriers to entry and obtain unreasonable fees and benefits in the form of Bid Protections in the event the Insider Bidder does not prevail at auction.   The Debtors selected the Insider Bidder as their stalking horse bidder despite the fact that non-insider prospective purchasers expressed serious interest in the Debtors' assets prior to the Petition Date.   The Debtors apparently did not have enough time to permit other parties to conduct sufficient due diligence prior to selecting the Insider Bidder and entering into the Insider APA.

6.      The Debtors' sale process resembles an orchestrated scheme designed to protect the alleged secured lenders and their investment in the Debtors at the expense of unsecured creditors and, at the same time, hinder the Committee's investigation rights and prevent the Debtors from realizing maximum value for their businesses.   Certain key provisions of the Bid Procedures improperly benefit the Insider Bidder to the disadvantage of the Debtors' estates as a whole.

---

[7] *See* Schedule 13D filed by Silver Point Capital, L.P. on March 12, 2015.

7.    First, the proposed Bid Procedures significantly limit prospective bidders' ability to conduct due diligence, especially for prospective bidders who are not yet involved in the process or who recently became involved in the process. The bid deadline is approximately 80 days from the Petition Date and the Debtors do not have a business plan or forward looking projections, both of which are necessary elements to any M&A transaction.

8.    Second, extension of the sale-related deadlines will enable the Debtors, with the Committee's input, to conduct a more robust sale process and, for the first time, consider alternatives to the current proposal.

9.    Third, certain provisions of the Bid Procedures improperly benefit the Insider Bidder to the significant disadvantage of the Debtors' estates as a whole. For instance, the Bid Procedures enable (and in some instances require) the Insider Bidder to credit bid its questionable "debt" for clearly unencumbered assets (including NOLs, Chapter 5 causes of action, the assets of five (5) of the Debtors who are not parties to the pre-petition financing agreements[8], substantial equity in foreign subsidiaries, and other assets).[9] Thus, absent the proposed sale, unsecured creditors could look to the Debtors' unencumbered assets as a potentially meaningful source of recovery. The Bid Procedures and proposed Insider Bidder's credit bid, however, do not appear to allocate any value for the unencumbered assets for the benefit of unsecured creditors.

---

[8] Those Debtors are: Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., Standard Register Technologies Canada ULC (collectively, the "Unencumbered Debtors").

[9] Silver Point also seeks to provide the Debtors with post-petition financing in order to encumber all previously unencumbered assets, including all chapter 5 causes of action and the proceeds thereof, and to obtain additional protections. The inappropriateness of Silver Point's postpetition credit facility is addressed in the Committee's objection to *Debtors' Motion For Order (A) Authorizing Debtors (I) To Provide Adequate Protection To The Debtors' Secured Lenders, (II) To Obtain Interim Postpetition Financing On A Superpriority, Secured And Priming Basis In Favor Of Silver Point Finance, LLC, as Administrative Agent For Proposed Dip Term Lenders, And Bank Of America, N.A., As Administrative Agent For Proposed DIP ABL Lenders, And (III) To Modify The Automatic Stay; And (B) Scheduling, And Establishing Deadlines Relating To A Final Hearing And Entry Of A Final Order On Postpetition Financing* (the "DIP Motion") [Docket No. 15].

10.    <u>Fourth</u>, the Insider Bidder should not be entitled to any Bid Protections because it is not necessary to induce a bid from a secured lender and significant equity owner of the Debtors, especially where it appears that a number of non-insider parties are seriously interested in exploring the opportunity to make a bid.  Moreover, the Insider Bidder's fees and expenses for preparing its bid are already covered by the expense reimbursement provisions of the Debtors' financing agreements, and are unnecessary given Silver Point's multi-year involvement, deep knowledge and control of the Debtors.

11.    Accordingly, the Debtors' request for approval of the Bid Procedures does not pass muster under any standard, especially the heightened scrutiny test required for insider transactions.  Therefore, the Bid Procedures should not be approved unless modified to address the issues raised by this Objection.

## **<u>BACKGROUND</u>**

12.    On March 12, 2015 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et. seq. (the "<u>Bankruptcy Code</u>").  The Chapter 11 Cases are being jointly administered and no trustee or examiner has been appointed.  *See* D.I. 46

13.    The Committee was appointed on March 24, 2015.  The Committee consists of seven members: the Pension Benefit Guaranty Corporation, (b) Timothy V. Webb, (c) Georgia-Pacific Consumer Products LP, (d) Gary Becker, (e) Mark A. Platt, (f) Veritiv Corporation, and (g) The Flesh Company.  *See* D.I. 99.

14.    The Debtors operate on a large scale and internationally.  According to the Debtors, they are one of the leading providers in the United States of communications services and communications workflow, content and analytics solutions through multiple communication

channels, including print, electronic, and internet-based communications, to clients in the healthcare, financial services, manufacturing, retail, and transportation industries. *Declaration Of Kevin Carmody In Support Of The Debtors' Chapter 11 Petitions And Requests For First Day Relief* ("Carmody Declaration"), ¶12. The Debtors have a total of fifty-three (53) production and warehouse facilities in North America. *Id*.

15. The Debtors' operations are divided between two main business units: (i) healthcare, which accounts for almost one-third of the Debtors' revenues, and (ii) integrated communications (*f/k/a* business solutions), which accounts for the remainder of the Debtors' revenues. *Id*.

16. Through their healthcare division which focuses on healthcare clients the Debtors offer (i) targeted, personalized marketing and educational materials, admission kits, patient communication boards and overnight stay hospitality kits, and promotional items to support wellness programs to attract new patients and professionals and educate consumers, (ii) patient information management solutions that include software modules for patient identity authentication and registration, documentation management, and medication history to enable hospitals to effectively manage their paper and electronic records and provide patients with access to discharge instructions and educational materials, (iii) patient identification and safety solutions, including wristbands, laboratory and pharmacy labels, documentation with barcodes, and patient photos and data to help assure the appropriate tests, treatments, and medications are matched with the correct patient, and (iv) document management and printing services, such as clinical documents, operational forms, secure prescriptions, and supplies. *Id*. at ¶15.

17. The Debtors' integrated communications (*f/k/a* business solutions) unit focuses on other industries and provides (i) marketing materials, including the management, production,

sourcing, kitting, warehousing, and distribution of a complete range of branded materials to improve sales efforts through various sales and media channels, and analytics to track the efficacy of such materials, (ii) customer onboarding, regulatory notices, letters, sales and transactional communications that require secure, accurate and efficient handling and delivery using print and electronic media, as well as digital services that allow clients to customize and personalize their documents, including critical communications to their customers, (iii) product marking and labeling solutions for products, and (iv) document management and printing services, such as traditional business forms, preprinted documents, and secure documents (using specialized inks, unique constructions, and other proprietary security features to defeat attempts to create fraudulent copies or alterations). *Id*. at ¶18.

18.     In addition to the Debtors' business assets, the Debtors' assets include approximately $150 million in net operating loss carryforwards (the "NOLs"), which are valuable and worth significant potential future income tax savings based on the Debtors' 35% federal corporate tax rate. *Id*. at 39.

**Prepetition Capital Structure**

19.     As of the Petition Date, five of the Debtors were obligors under a first-lien prepetition term loan (the "First-Lien Term Loan") and a second-lien prepetition term loan (the "Second-Lien Term Loan" and collectively with the First-Lien Term Loan, the "Prepetition Term Loans") with Silver Point Finance as agent and various lenders (collectively, the "Prepetition Term Lenders").

20.     The same five Debtors are also the obligors under a prepetition asset-backed revolving facility (the "Prepetition ABL Facility") provided by Bank of America, N.A. and Wells Fargo Bank, N.A. as lenders (collectively the "Prepetition ABL Lenders" and collectively with the Prepetition Term Lenders, the "Prepetition Lenders").

**The Prepetition Lenders' Involvement and Control**

21.    Prior to August 2013, Standard Register was a borrower under an ABL facility with the Prepetition ABL Lenders with an outstanding balance of approximately $45 million.  In August 2013, Standard Register acquired 100% of the outstanding equity interests of WorkflowOne.  In connection with this ill-conceived acquisition of a much larger and heavily indebted competitor, Standard Register and its subsidiaries assumed WorkflowOne's secured debt (owed to Silver Point) in the principal amount of approximately $210 million, and pledged its assets to secure that debt.  Additionally, Standard Register issued warrants to the lenders under the Second-Lien Term Loan convertible into 2,645,952 shares of common stock.  *See* Form 8-K dated Aug. 2, 2013.  As a result of the WorkflowOne acquisition and exercising of the warrants issued in connection with that transaction, Silver Point controlled 29.6% of the common stock of the lead Debtor.  *See* Schedule 13D filed by Silver Point Capital, L.P. on Aug. 12, 2013.

22.    Silver Point's acquisition of a substantial equity position[10] in the Debtors enabled Silver Point to quickly obtain two seats on the Debtors' Board (*i.e.*, appoint two of its members[11]) who sat on the Debtors' Audit Committee and Compensation Committee . The acquisition was a substantial undertaking for Standard Register, whose liabilities exceeded its assets by approximately $121 million[12].

23.    At the time of Standard Register's acquisition of WorkflowOne, Silver Point owned a substantial portion of the equity of WorkflowOne and held $210 million in secured

---

[10] *See* Alexandr Oleinic, Silver Point Buys Standard Register Shares for an Employee, INSIDERMONKEY.COM, Nov. 4, 2013 http://www.insidermonkey.com/blog/silver-point-buys-standard-register-shares-for-an-employee-279774/ (last viewed Mar. 25, 2015).

[11] In October 2013 two designates of Silver Point were appointed to the Debtors' board of directors: Anthony J. DiNello and Robert A. Peiser.  *See* NOTICE OF ANNUAL MEETING OF SHAREHOLDERS OF THE STANDARD REGISTER COMPANY, dated March 14, 2014.

[12] See 10Q filed by Standard Register on Mar. 31, 2013.

debt.  Based on Standard Register's acquisition of WorkflowOne in 2013 and assumption of its secured debt with Silver Point, Silver Point holds approximately $210 in the Debtors' secured obligations under the refinanced Prepetition Term Loans.

24.    Silver Point had an active hand in the Debtors' management until December 24, 2014, at which time it caused one of its employees (Mr. DiNello) to resign from the Board.  *See* Sale Motion, ¶16, fn. 3.  Silver Point's two remaining designees remained on the Board.  Silver Point was very active in trading in the Debtors' equity.[13]  Additionally, Silver Point Capital, L.P. owned a large amount of the Debtors' stock and, as of the Petition Date, it owned approximately 18% of the Debtors' common stock.  *Id.*  As of March 12, 2015, Silver Point held as much as a 20% equity stake in the Debtors.  *See* Schedule 13D filed by Silver Point Capital, L.P. on March 12, 2015.

25.    The prepetition credit facilities placed "severe liquidity constraints" on the Debtors.  *See* Sale Motion, ¶9.  The Prepetition Lenders were unwilling to provide sufficient covenant relief for the Debtors to run a value-maximizing sale process.  As with the Workflow Debtors, Silver Point may have caused the Debtors to file these Chapter 11 Cases and in fact caused the Insider Bidder to be a stalking horse for the Debtors' assets with a credit bid of a portion of Silver Point's Prepetition First Term Loan.  Again, the "loan to own" strategy appears to be in play.

26.    Prior to the Petition Date, in December 2014, the Debtors retained Lazard Middle Market LLC ("Lazard") to provide investment banking services, including exploring restructuring, financing and M&A alternatives.  *See* Sale Motion, ¶7.  In mid-January 2015, the Debtors retained McKinsey Recovery & Transformation Services, U.S., LLC ("McKinsey") to provide consulting services.  *Id.*  Then, in late February 2015, the Board appointed Kevin

---

[13] Silver Point's trading history between June and December 2014 is annexed hereto as Exhibit A.

Carmody of McKinsey as their Chief Restructuring Officer, effective March 2, 2015. The stalking horse agreement with the Insider Bidder was entered into nine days later, on March 11, 2015 (the "Insider APA"). *See* Sale Motion, ¶ 12.

27.     The selection of the Insider Bidder and entry into the Insider APA was admittedly done with virtually no prior marketing, and there appears to have been a lack of adequate response to at least certain third parties who expressed interest in the Debtors' assets and requested due diligence, and, upon information and belief, without any consideration of potential sale alternatives.

28.     In the few weeks prior to the Petition Date, Debtors and Lazard were approached by a "small number" of potential strategic buyers that expressed an interest in evaluating an asset sale and/or merger with the Debtors. *See* Carmody Declaration, ¶42. However, the Debtors did not have much to offer those parties in terms of due diligence. The Debtors had no business plan (and still do not have one), no forward looking projections, no information memorandum or management presentations, all of which constitute necessary information for any M&A transaction. Not surprisingly, only Silver Point was willing to become the stalking horse bidder, as only Silver Point was sufficiently and intimately familiar with the Debtors' business and operations. Even then, to further reduce the sale proceeds available to the Debtors' other creditors, the Debtors developed restrictive Bid Procedures and Silver Point demanded up to $9 million in Bid Protections. *See* Sale Motion, ¶45.

**The Proposed Bid Procedures**

29.     On the Petition Date, the Debtors filed the Sale Motion seeking Court approval of their proposed Bid Procedures. The salient terms of the Bid Procedures include:

- Sale of substantially all of the Debtors' assets, including assets not previously encumbered by the Prepetition ABL Facility or the Prepetition Term Loans (such as NOLs, Standard Register's equity interests in foreign subsidiaries, certain Chapter 5

causes of action and proceeds thereof, and other estate causes of action related to the Debtors' business);[14]

- Designation of the Insider Bidder as the stalking horse bidder;
- Deposit from third parties of 10% of the Purchase Price (approximately $28.5 million) while requiring only a $2 million deposit from the Insider Bidder;
- Insider Bidder's credit bid of outstanding amounts under the Prepetition First-Lien Term Loan and cash consideration limited to the satisfaction of the Debtors' senior obligations under the Prepetition ABL Facility and limited amount of cure obligations related to assumed contracts and leases;
- Special treatment for lenders under the Second-Lien Term Loan in terms of qualification of bids, exception from submitting a bid by the Bid Deadline and requiring the credit bid by lender parties to the Second-Lien Term Loan;
- Establishment of a Sale Objection deadline of May 21, 2015
- Establishment of a Sale Objection deadline of June 10, 2015 related to the conduct of the Auction or sale to a party other than the Initial Bidder;
- Establishment of a Bid Deadline of June 1, 2015;
- Scheduling of an Auction for June 8, 2015;
- Establishment of a Sale Hearing (if no Auction held) on June 4, 2015;
- Establishment of a Sale Hearing (if Auction held) on June 12, 2015;
- Approval of a $5.14 million Break-Up Fee;
- Approval of Expense Reimbursement up to $3.85 million; and
- Establishment of other bidding conditions and the failure to include transparency and meaningful Committee participation in the process.

## OBJECTION

### A.      Evaluation Of The Relief Sought In The Sale Motion

30.     The overriding goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the proceeds received by a debtor's estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003). The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. *See e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See id.; see*

---

[14] The Debtors' foreign subsidiaries include Standard Register Technologies Canada ULC (Nova Scotia UL), Standard Register Holding, S. De R.L. De C.V. (Mexican Limited Liability Company), Standard Register Servicios, S. De R.L. De C.V. (Mexican Limited Liability Company), and Standard Register de Mexico, S. De R.L. de C.V. (Mexican Limited Liability Company).

*also In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring a sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets"). The Bid Procedures fail to meet the goals of establishing an open and fair bidding process designed to maximize the value for the Debtors' estates. In fact, the proposed Bid Procedures and Insider APA contain provisions that will accomplish the opposite result, namely chill bidding, limit participation by prospective bidders, and result in an overall process that is unfairly slanted in favor of the insider secured creditor and equity holder.

31.     The Debtors proclaim that the Bid Procedures are reasonable and appropriate and that they "demonstrate an exercise of the Debtors' sound business judgment." *See* Sale Motion, ¶39. However, the evaluation of Bid Procedures is not governed by the business judgment rule but through the prism of intrinsic fairness and reasonableness. *See In re American Safety Razor Company, LLC* (Bankr. D. Del. Sept. 30, 2010) (Case No. 10-12351) (MFW), Tr. at 132-33 ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters for the debtor – for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case: to determine what is fair for all the parties."). But even if Bid Procedures were subject to the business judgment rule, the Debtors too fail that test.

### B.     The Insider Bidder is an Insider of the Debtors

32.     The Sale Motion filed on the Petition Date and the Bid Procedures require special scrutiny due to the insider status of Silver Point and its Insider Bidder designee. The requested approval of the Insider Bidder as the stalking horse bidder does not pass muster under the heightened scrutiny applicable to transactions involving insiders. That transactions among

debtors and insiders are subject to a heightened standard of scrutiny is not novel. The United States Supreme Court and a majority of Circuit Courts of Appeal have so held. *See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939); *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) ("Insider's dealings with debtor-corporation are ordinarily subject to rigorous or strict scrutiny."); *In re Auto Style Plastics, Inc.*, 269 F.3d 726, 745 (6th Cir. 2001); *In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 1991); *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991); *Brewer v. Erwin & Erwin, P.C.*, 942 F.2d 1462, 1465 (9th Cir. 1991); *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 393 (10th Cir. 1979); *United Hotels Co. of America v. Mealey*, 147 F.2d 816, 819 (2d Cir.1945) (acknowledging that New York law has always subjected to careful scrutiny contracts made by directors having a personal interest); *In re Nugelt*, 142 B.R. 661, 667 (Bankr. D. Del. 1992) ("insider transactions subject to greater scrutiny than arms' length transactions."); *In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr.S.D.N.Y. 1988) ("Sales to fiduciaries are necessarily subject to heightened scrutiny because they are rife with the possibility of abuse."); *Liberty Mutual Insurance Co. v. Leroy Holding Co., Inc.*, 226 B.R. 746, 755 (N.D.N.Y. 1998) ("The conduct of an insider is subject to more rigorous scrutiny.").

33.    "[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein." *In re Papercraft Corp.*, 211 B.R. 813, 823 (W.D. Pa. 1997) (explaining how insider transactions are subjected to rigorous scrutiny, requiring a showing of inherent fairness), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *In re Ultimate Escapes Holdings, LLC*, No. 12-50849 (BLS), 2014 WL 5861765, at *9 (Bankr. D. Del. Nov. 12, 2014) (entire fairness must be proven where independence of

decision making is at risk due to "extraneous considerations or influences"); *In re Enron Corp.*, 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b)."); *In re Biderman Indus., U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (insider transactions under § 363(b) "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse"). This demanding approach is far from novel.

34.    Here, despite the Insider Bidder's self-serving declaration (and request for a finding of the Court) that it is a non-insider of the Debtors, the Insider Bidder is undoubtedly an insider of the Debtors. *See In re Washington Mut., Inc.*, 461 B.R. 200, 263 (Bankr. D. Del. 2011) ("Insiders of a corporation are not limited to officers and directors, but may include 'temporary insiders' who have 'entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.'") (*citing Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983)); *cf. N.J. Carpenters Pension Fund v. info GRP., Inc*., No. Civ. A. 5334-VCN, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011) (*de facto* control can be found to exist through contact with board of directors sufficient to give rise to fiduciary duties); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 399 (3d Cir. 2009) (determining that major creditor was non-statutory insider based on findings that creditor had "the ability to coerce [debtor] into a series of transactions that were not in [debtor's] best interests).

35.    Earmarks of the Insider Bidder's status as an insider of the Debtors include among other things:

- Silver Point's designation of three parties (one of whom was its employee) to the Debtors' board of directors, including to various sub-committees thereof;
- Silver Point's significant equity position in the Debtors (as much as 29.6% prior to the Petition Date and approximately 20% following the Petition Date);

- The Debtors' assumption of Silver Point's secured debt, which quintupled Standard Register's long-term debt; and
- Silver Point's substantial sale of equity in the Debtors prior to the Petition Date (*see* Exhibit A).

36.    As such, the Committee respectfully submits that the Insider Bidder is an insider of the Debtors and, as such, the transaction requires rigorous scrutiny.

### C.    The Court Should not Approve the Insider Bidder as a Stalking Horse Under the Proposed Bid Procedures and Insider APA

37.    "Creditor and Court oversight of the debtors' action outside the ordinary course of business, including asset marketing and sales, is not only appropriate, but is required by the law." *In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 4, 2014) (Case No. 14-10979) (CSS) Tr. at 21:15-18.

38.    The Court cannot anoint the Insider Bidder as a stalking horse bidder under the structure proposed by the Bid Procedures and terms of the Insider APA.  The selection of a stalking horse bidder – and granting it special rights and protections – is justified only when the stalking horse bidder sets the floor for other bidders and the stalking horse bid is beneficial to the estate and is intended to maximize value of the debtors' assets.  Approval of the Insider Bidder as the stalking horse bidder under the terms and conditions of the proposed Bid Procedures and Insider APA at this juncture provides no benefit to the estate.

39.    First, prior to the Petition Date and prior to the Debtors' selection of the Insider Bidder as their stalking-horse bidder, other parties expressed serious interest in the Debtors' assets.  The Committee needs time to explore those proposals and whether those proposals are superior to the Insider APA.

40.     <u>Second</u>, the Debtors have not disclosed to the Committee, or other parties in interest, the actual consideration proposed by the Insider Bidder, for example, the precise amount of its alleged credit bid is defined as "initial" and may be changing.

41.     <u>Third</u>, the Committee needs to investigate the Insider Bidder's and Silver Point's extensive relationship with the Debtors, their non-debtor affiliates, and other secured lenders. Permitting the Insider Bidder to credit bid could severely limit the Committees' rights and remedies and unfairly place the Prepetition Lenders (particularly Silver Point) in a superior position.

42.     <u>Finally</u>, the Committee has not yet been made privy to the stalking horse bidder's negotiations with the Debtors and has not concluded whether the benefits of the proposed bid are not outweighed by the proposed Bid Procedures and the lack of unsecured creditor recovery proposed by the Insider APA.

43.     Because the Debtors seek to sell substantially all of their assets in an expeditious process pursuant to Bankruptcy Code § 363 (the Sale Motion having been filed on the Petition Date), and thereby avoid the safeguards afforded by a plan confirmation process under the Bankruptcy Code, the transaction requires closer scrutiny than a typical sale of assets outside the ordinary course of business. *In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004) (stating that a sale of all, or substantially all, of the assets of a Chapter 11 estate in the absence of a confirmed plan, while not forbidden, is subject to close scrutiny by creditors and the court); *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003).

44.     The criteria for approving the sale of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code requires that a valid business justification exist for the sale, that the price represents fair value and that the parties negotiated and entered

into the sale transaction in good faith. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D. Del. 1999). Courts often rely on the price paid for assets at a competitive public auction to determine whether a purchase price constitutes fair value. *Abbotts Dairies*, 788 F.2d at 149.

45.     Under the sought to be established Bid Procedures, selection of the Insider Bidder as the stalking horse serves no valid purpose and does not further the goal of meaningful Committee participation in the Chapter 11 process.

**D.     Inadequate Marketing Timeline and Process**

46.     The deadlines associated with the sale must also be extended by at least sixty (60) days to ensure that all parties-in-interest have a fair opportunity to perform due diligence and submit a bid. *In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 4, 2014) (Case No. 14-10979) (CSS) Tr. at 20:16-20 (holding that "…the proposed timelines must be stretched…to allow for sufficient time for any interested party to develop an alternative transaction… and the…committee to…get up to speed."). The Debtors admit that "Lazard and the Debtors did not engage in a complete pre-filing marketing process of the Debtors' business." *See* Sale Motion, ¶ 9. The Debtors also admit that they were "approached by several potential strategic buyers," that only "[o]ne of the potential buyer[] conducted extensive on-site diligence," and that "[o]ther potential strategic buyers engaged in due diligence on a more limited basis." *Id.* ¶¶ 9 & 10. Based on the financial constraints placed on the Debtors by the Prepetition Lenders, the Debtors were unable to properly market their assets for sale or consider alternative solutions to their apparent liquidity constraints. *See* generally *Id.* ¶ 9. *See* also *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) ("Hybrid if unchecked of its purchase, might well have frozen out other suitors for *Fisker's* assets.").

47.     Through the Sale Motion the Debtors seek to establish an expedited sale process, to wit: the Debtors request a bid deadline of June 1, 2015, an auction on June 8, 2015, sale hearing on June 12, 2015, and closing of the sale by August 11, 2015.  While these deadlines may not at first blush appear rushed, they are in fact unreasonably short under the circumstances: (i) the lack of adequate prepetition marketing process, (ii) lack of a business plan, go forward projections, information memorandum or management presentations, which are crucial components of any bidder's due diligence and analysis, (iii) the complicated nature of the Debtors' businesses, which include multiple foreign subsidiaries and operations, (iv) the analysis of the Debtors' business segments as stand-alone businesses, and (v) the uncertainty around the scope and validity of prepetition liens asserted by the Prepetition Lenders and Silver Point in particular, whose alleged secured claims are subject to the Insider Bidder's credit bid.  The Committee submits that all parties will benefit from an extension of the sale-related deadlines.

48.     The Debtors pay lip service to their need for expediency and suggest, without support, that the sale process as outlined will allow the Debtors to maximize recoveries for their creditors.  The likely reality is, however, that the sale timelines were not selected by the Debtors based on a reasonable belief that additional time would not garner more interest in the assets or reveal better alternatives than the outlined section 363 process.  Instead, the sale deadlines are strategically imposed on the Debtors by Silver Point, whose interest may be contrary to the interests of the Debtors and their other creditors.

49.     Creating a false emergency is not a reason for approval of an expedited sale process.  This case does not present the proverbial "melting ice cube" scenario.  The Insider APA also does not disclose to creditors the amount of expected proceeds from the auction sale available to unsecured creditors.  *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr.

E.D.Pa. 1989).  It also does not ensure that the estates will not become administratively insolvent after the sale.

50.     In fact, Silver Point's position in this case is very similar, if not more egregious, to the position of the lenders in *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) and *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806 (Bankr. E.D.Va. 2014). As in *Free-Lance*, Silver Point purchased the secured debt in Workflow One.  It then exercised undue control over the Debtors and may have pressed the Debtors into an expedited bankruptcy sale process in a "classic loan-to-own scenario."  As in *Free Lance*, the Court should limit Silver Point's control over the sale process by extending the various sale related deadlines and level the playing field for other parties to compete.

**E.      Cause Exists to Deny Silver Point's Credit Bid And Require Only Cash Bids**

51.     In connection with a sale under Bankruptcy Code Section 363(b), the holder of a secured claim may, under certain circumstances, credit bid its secured claim.  11 U.S.C. § 363(k) ("such holder may offset such claim against the purchase price of such property").  The secured claim holder's ability to credit bid is not an absolute, unfettered right.  Courts have, and this Court may, for cause, restrict or condition the secured claim holder's ability to credit bid.  11 U.S.C. § 363(k); *see also In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010) (Bankruptcy Code section 363(k) allows "[a] court [to] deny a lender the right to credit bid in the interest of any policy advanced by the Code").

52.     This Court previously correctly exercised its authority under Bankruptcy Code Section 363(k) to restrict credit bids. *See, e.g., In re Fisker Automotive Holdings Inc.*, 510 B.R. 55, 60-61 (Bankr. D. Del. 2014).  Courts in other jurisdictions have likewise done so.  *See In re The Free Lance-Star Publishing Co. of Fredericksburg*, VA, 512 B.R. 798, 808 (Bankr. E.D. Va. 2014) (restricting credit bid for inequitable conduct and to foster competitive bidding

environment); *In re RML Development, Inc.*, No. 13-29244, 2014 WL 3378578, at *5 (Bankr.

W.D. Tenn. July 10, 2014) (finding cause to limit credit bid to uncontested portion of claim); *In*

*re Daufuskie Island Properties, LLC*, 441 B.R. 60, 64 (Bankr. D. S.C. 2010) (refusing credit bid

where claim is disputed).

53.    Courts have been particularly cognizant of this risk when an investor purchases

secured debt prior to the borrower's bankruptcy and applies pressure to foreclose on its new

collateral in the bankruptcy with a bid that offers little to nothing for the estate. *Fisker*

*Automotive*, 510 B.R. at 61; *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806 (Bankr. E.D.

Va. 2014) (denying right to credit bid where lender purchased its debt prepetition and "pressed

the Debtor 'to walk hand in hand' with it through an expedited bankruptcy sales process" in a

"classic loan-to-own scenario").

54.    Silver Point finds itself in a troubling position in this case.    <u>First</u>, upon

information and belief, Silver Point purchased its secured claims and then pushed the Workflow

Debtors into chapter 11.[15]    <u>Second</u>, in the Workflow Debtors' chapter 11 case, Silver Point used

its secured position and significant leverage to become (in 2011) a significant shareholder and

holder of approximately $210 million in secured debt in the reorganized WorkflowOne.    <u>Third</u>,

upon information and belief, to protect its investment in WorkflowOne at a time of significant

economic decline, Silver Point sought a merger partner.    <u>Fourth</u>, upon information and belief,

Silver Point sought Standard Register as a merger partner as a means to salvage its investment in

---

[15] *See Affidavit of Paul H. Bugutsky, Chief Financial Officer, Executive Vice President and Treasurer of Workflow Management, Inc. in Support of the Chapter 11 Petitions and First Day Pleadings.  In re Workflow Management Inc., et al.*, Case No. 10-74617 (Bankr. E.D.Va. Sept. 29, 2010) at ¶ 77 (stating that Silver Point "has frustrated the Company's refinancing efforts…" and that "no deal could be reached with this Second Lien Lender"). Mr. Bugutsky further testified that [a]ll of the Company's refinancing suggestions have been rebuffed by the controlling Second Lien Lender."  *See* ¶ 7.  He further stated that "The Company has a single Second Lien Lender [Silver Point] who holds a controlling position in the First Lien Credit Facility (Revolver B) that further complicates the Company's refinancing efforts.  This Second Lien Lender has not consented to any refinancing proposals that the Company has made to date.  Without such consent, the Company has been prevented from refinancing its First Lien Credit Facility to obtain amortization relief."  *See* Id.

WorkflowOne.  Through the August 2013 merger, Silver Point became an equity holder of Standard Register and Standard Register assumed all of WorkflowOne's debt owed to Silver Point (approximately $210 million).  <u>Fifth</u>, in October 2013, Silver Point designated two individuals (one being its employee) to sit on the Debtors' Board, as well as various sub-committees.  <u>Sixth</u>, upon information and belief, Silver Point did not extend the Debtors funds necessary to market their assets or consider non-sale alternatives.  Upon information and belief, Silver Point did, however, fund approximately $4 million in bankruptcy-related retainers and agreed with the Debtors' termination of a large number of long-term employees.  <u>Lastly</u>, shortly before the Petition Date, Silver Point sought to cleanse itself from its deep involvement in the Debtors by having one of its employees resign from the Board and the Debtors retained other professionals.  While the Committee was appointed a mere few days ago and discovery may reveal further facts warranting the relief sought herein, these facts alone, as in *Fisker* and *Free Lance*, provide sufficient "cause" required under section 363(k) of the Bankruptcy Code.

55.     Requiring cash bids will also foster a more open and competitive auction process. The Committee understands that interest in the Debtors' assets exists.  Insisting on cash bids from all parties will only ensure a more spirited sale and auction process.

**F.      Silver Point Should Not Be Allowed to Credit Bid at the Auction or Receive any Proceeds of the Sale on Account of its Alleged Liens.**

56.     The Insider Bidder should not be permitted to credit bid not only based on its prior acts as referenced above, but also because the Silver Point's liens and claims have not been proven valid.  Although cause is not defined within section 363, cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29,

2006).  The language of section 363(k) permits the Court to specifically restrict the ability to credit bid.  *Id.*

57.    Because Silver Point's alleged prepetition liens and security interests in the Debtors' assets have not been proven valid (and the Insider Bidder seeks to credit bid Silver Point's claims under the Prepetition First Lien Credit Agreement (*see* Bidding Procedures, pg. 1)), the exercise of the Court's discretion under section 363(k), denying the credit bid, is appropriate.  The Committee is in the process investigating Silver Point's alleged liens and security interests related to the Prepetition Term Loans and, until such time as the Committee is satisfied with, or when the lenders establish, the validity of their alleged liens and security interests, the privilege of a credit bid should not be afforded. At a minimum, the right of Silver Point to credit bid should not be determined at this time.

58.    Where the lender's liens have not been proven valid, courts have prevented or conditioned the lender's ability to credit bid or put in place certain protections that safeguard the debtor's unsecured creditors.  *See e.g., Free Lance,* 512 B.R. 798, 806 (capping lender's credit bid in light of questionable liens); *In re Akard St. Fuels, L.P.*, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (denying lender's ability to credit bid and allowing sale free and clear of all liens under section 363(f)(4) where lender's liens were subject to a challenge and lender was "capable of bidding cash at the auction and later recovering the cash if it proved its liens"); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) ("At any such sale, NBC shall not be entitled to offset bid any of its claimed liens or security interests under [section 363(k)] because the validity of its liens and security interests are unresolved"); *In re Miami General Hospital, Inc.*, 81 B.R. 682 (S.D. Fla. 1988) (permitting lender's credit bid but preserving the right of the trustee to file an adversary proceeding or otherwise object to the extent, validity and priority of

the lender's liens); *In re Octagon Roofing*, 125 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (permitting lender's credit bit so long as lender posted irrevocable letter of credit drawn on other bank in order to protect trustee if lien was later set aside).  *See also, Bank of Nova Scotia v. St. Croix Hotel Corp.*, 44 B.R. 277 (D. V.I. 1984).

59.     Here, it is clear that the alleged liens and claims under the Prepetition Term Loans have not been proven valid.  Under the proposed final order approving the DIP Motion, the Committee's challenge deadline does not expire until May 25 2015,[16] and may be further extended.  If the Insider Bidder is permitted to monetize its claims through a credit bid, the Committee's challenge period applicable to the lenders' liens would be severely impaired. Affording the Insider Bidder the right to credit bid prior to the expiration of the challenge period frustrates the statutory charge given to the Committee to investigate prepetition conduct and the important task of pursuing avoidance actions.  *See* 11 U.S.C. § 1103(c)(2), (5); *see also Official Comm. ex rei. Cybergenics v. Chinery*, 330 F.3d 548, 579-80 (3d Cir. 2003) ("Because it helps to ensure that creditors' claims are not frustrated by fraudulent transfers, derivative standing seems clearly to 'give effect to the policy of the legislature.").

60.     Also, as set forth in the Committee's objection to the Debtors' DIP Motion, serious doubts exist with respect to the scope of lenders' liens.  For example, the lenders do not have a lien on the Debtors' NOLs, or on assets of their foreign-based subsidiaries and affiliates. Also, while the Committee's lien review process just began, the Prepetition Term Lenders' liens on the Debtors' equity interest in their foreign subsidiaries may be limited to two-thirds of such equity interest.  *See* David G. Crumbaugh and Joseph M. Kronsnole, *Avoiding Section 956 of the Internal Revenue Code*, www.lw.com/upload/pubContent/_pdf/pub1238_1.pdf (last visited Mar.

---

[16] The proposed challenge deadline is 60 days from the appointment of the Committee, which would be May 23, 2015.  Because May 23, 2015 is a Saturday by operation of Rule 9006(a)(1)(c) of the Federal Rule of Civil Procedure Rule the deadline is automatically extended to May 23, 2015.

30, 2015).  Permitting a credit bid on all of the Debtors' unencumbered assets, including the assets of the non-Debtors' foreign subsidiaries and affiliates would provide a windfall to the lenders at the expense of the Debtors' other creditors. *See In re Package Design & Supply Co.*, 217 B.R. 422, 427 (Bankr. W.D.N.Y. 1998) (recognizing lienor should not capitalize "where the lender's lien did not encumber all prepetition assets and the unencumbered assets added significant value to what the lienor is claiming").

G.      **Silver Point's Credit Bid Bears All Signs of a Nefarious Motive and Undervalues the Debtors' Assets**

61.     Through the Insider APA Silver Points seeks to credit bid for the Debtors' assets and pay cash only to the extent required to pay off the ABL Debt and assume less than $18 million in liabilities related to ongoing contracts.  The structure of the Insider APA raises serious questions about Silver Point's true motives and the value it seeks to ascribe to the Debtors' assets.

62.     First, the Insider APA provides for a credit bid by the Insider Bidder in the full amount of the indebtedness under Silver Point's First-Lien Term Loan, an amount estimated at $113 million.  *See* Insider APA, § 2.7(a).  Second, to further control the marketing process, the Bid Procedures enable Silver Point, under the Second-Lien Term Loan, to submit a credit bid at the Auction without having submitted a Qualified Bid by the Bid Deadline.  *See* Sale Motion, ¶ 26.  By not committing a specified amount under the Prepetition Term Loans as its credit bid, Silver Point is playing chicken with the market and prospective bidders.  The Insider APA confuses potential bidders in that Silver Point reserves the right to credit bid somewhere between $113 million and $210 million on terms that unreasonably favor Silver Point.  Requiring Silver Point to bid cash would eliminate this unnecessary favoritism.

63.    <u>Second</u>, the Bid Procedures unduly favor Silver Point in terms of the Minimum Deposit amount.  Under the Insider APA, the Insider Bidder is required to submit a Minimum Deposit in the amount of $2 million.  *See* Insider APA, § 2.8.  However, the Bid Procedures require competing bidders to submit a Good Faith Deposit of no less than 10% of the stated purchase price (or approximately $27.5 million).  *See* Sale Motion, ¶ 19.  The highly disproportionate amount of the required deposit is meant to restrict other bidder participation particularly because the Debtors may hold the deposit for as long as 60 days after entry of a sale order.  *See* Bid Procedures, p. 7.

64.    <u>Third</u>, as set forth below, the Insider APA and the Bid Procedures do not permit competing bids to vary from the structure of the Insider APA.  Permitting bidders to submit offers that differ in form from the Insider APA (such as an M&A proposal, plan process or splitting the Debtors' two lines of business) could garner higher values for the estates.  In addition, the Bid Procedures and the Insider APA appear to discourage bidders from assuming or otherwise providing a more favorable treatment to the outstanding employee obligations.

65.    <u>Lastly</u>, the Bid Procedures and the Insider APA may aid Silver Point's acquisition of the Debtors' valuable NOLs for no consideration.  The Debtors admit that the NOLs are valuable and worth significant potential future income tax savings based on the Debtors' 35% federal corporate tax rate.  *See* Carmody Declaration, at 39.  Through the Bid Procedures as currently structured, Silver Point seeks to acquire the Debtors' assets for minimal cash consideration and leave the estates subject to its remaining debt.  The Insider Bidder appears to acquire the Debtors' NOLs.  *See* Insider APA, §2.1(n) ("all rights to Tax refunds, credits or similar benefits relating to the Transferred Assets or the Business").  The Insider APA provides the Debtors no consideration for the NOLs.  But even if the NOLs are not acquired by Silver

Point pursuant to the Insider APA, the present structure enables Silver Point to acquire $150 million in the Debtors' valuable NOLs for little or no real consideration after closing.  Skadden, Arps, Slate, Meagher & Flom LLP, *Bankruptcy Court Approves Innovative Plan Preserving Sylondra's Valuable Tax Attributes Over DOJ Objections*, http://www.skadden.com/insights/bankruptcy-court-approves-innovative-plan-preserving-solyndras-valuable-tax-attributes-ove, Oct. 30, 2012 (last visited Apr. 1, 2015).  Silver Point should not be permitted to utilize this strategy to the detriment of the Debtors' terminated employees and other creditors.

      **H.**      **Approval of any Credit Bid Must Not Prejudice the Rights and Remedies of any Party**

      66.      Even if the Insider Bidder is allowed to credit bid any portion of claims based on the Prepetition Term Loans, the Bid Procedures, the order approving the Bid Procedures, and the sale order must make clear that the lenders' alleged liens and security interests are not *ipso facto* found valid by the entry of the Bid Procedures or sale order.  According to *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006), unless this Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent and validity of the lien claim and also prevents any litigation against the lender for avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling or other litigation claims.  Thus, the Committee requests that if the Insider Bidder, or any other alleged secured lender of the Debtors, are allowed to credit bid, the Bid Procedures and all sale related orders include the following language:

> The failure of the Committee to object to a bid put forth by the DIP Lenders, the ABL Lenders, the First Lien Term Lenders or the Second

Lien Term Lenders[17] (collectively, the "Lenders") or the Court's approval of any such credit bid shall not (a) prejudice or impair the rights of the Official Committee of Unsecured Creditors (the "Committee") to challenge the nature, extent, validity, priority, perfection or amount of the Lenders' alleged liens, security interests and claims or (b) release the Lenders from any causes of action which can be brought by or on behalf of the Debtors' estates.

67.     For the same reasons, Silver Point and the lenders under the Prepetition Term Loans should not receive payment from the proceeds of the sale until such time as their liens are determined to be valid and have the priority alleged.  Entry of any order approving the Bidding Procedures or sale should provide that it is not a waiver of, nor shall it impair the Committee's right to, object to the extent, priority and/or validity of the lenders' alleged liens.  Any order approving the Bidding Procedures or sale order should also expressly state that any and all estate claims against the Prepetition Lenders and management of the Debtors are preserved and left with the estates.

68.     The relief requested herein is particularly appropriate in these cases.  The Committee's challenge and lien review period may not expire until after the scheduled auction and closing in these cases.  Moreover, any action challenging the lenders' liens (or asserting other causes of action) brought by the Committee will most likely not be resolved until after the closing of the sale.  Accordingly, the Committee merely seeks to preserve the *status quo* until it is satisfied that the lenders are not unduly improving their position via a credit bid for the Debtors' assets.

## I.    No Bid Protections are Warranted to the Insider Bidder

69.     The Insider Bidder is not entitled to any Bid Protections.  Section 503(b) of the Bankruptcy Code provides for administrative expense status for "the actual, necessary costs and

---

[17] As each term is defined in the DIP Motion.  Docket No. 15.

expenses of preserving the estate."   11 U.S.C. § 503(b).   Governing Third Circuit law places heavy burden of proof on a party seeking the allowance of Bid Protections.  *In re O'Brien Envtl. Energy*, 181 F.3d 527, 535 (3d Cir. 1999) ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."); *In re Reliant Energy Channelview LP*, 594 F. 3d 200, 206 (3d Cir. 2010) ("[A] break-up fee is not necessary to preserve the value of the estate when the bidder would have bid even without the break-up fee."); *In re RathGibson, Inc.*, Case No. 09-12452 (CSS) (Bankr. D. Del. Mar. 23, 2014) Hr'g Tr. 31-10-14 ("The problem with the fee --the breakup fee and the expense reimbursement isn't the amount it is the parties to whom it benefits.  It is the bidders.  These are DIP bidders.  These are pre-petition lenders.  They have been involved in the case.").

70.    The Debtors seek authority to pay, when triggered, a Break-Up Fee equal to 2% of the Purchase Price and an Expense Reimbursement (together, the "Bid Protections").   See Insider APA, §8.3.  No basis exists for the approval of a $5.14 million plus Break-Up Fee and up to $3.85 million in Expense Reimbursement.   The Debtors have not shown, and cannot show, that the Bid Protections "were actually necessary to preserve the value of the estate" as required by section 503(b)(1)(A) of the Bankruptcy Code, or that they provide any benefit to the estates. The Debtors cannot rely on their business judgment and such judgment is afforded no deference with respect to the Bid Protections.   *O'Brie*n, 181 F.3d at 535(concluding "that the business judgment rule should not be applied" to break-up fees in bankruptcy); *Reliant Energy*, 594 F. 3d 200.

71.    The Break-Up Fee is based on the Purchase Price, defined in the Insider APA as the amount necessary to pay or satisfy "(A) the DIP Obligations (to the extent the DIP

Obligations have not been satisfied pursuant to Section 2.7(b)) and (B) Pre-Petition ABL Debt ((A) and (B) collectively, the "Cash Component"), and (C) the Initial Credit Bid."  *See* Insider APA, §2.7.  Expense Reimbursement consists of fees and expenses of the Insider Buyer "and its Affiliates" up to 1.5% of the Purchase Price.  *Id*. §8.3(b).  By definition, the Bid Protections are payable even if no cash proceeds are realized from the sale for distribution to unsecured creditors.  In fact, Bid Protections may be payable to Silver Point on account of payments made to Silver Point in connection with the Prepetition Term Loans.

72.     A court will grant bid protections including a break-up fee when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.  *See Integrated Resources*, 147 B.R. at 659.  In approving a breakup fee, the court in *In re Fortunoff Fine Jewelry and Silverware, LLC*, 2008 WL 618983 (Bankr. S.D.N.Y. 2008), held that the break-up fee was an actual and necessary expense of preserving the debtors' assets within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code.  The break-up fee was a component of what induced the buyer to submit its bid, which served as a minimum floor bid and provided the debtors with the opportunity to sell their businesses as a going concern.  *See Id*. at *1.  The buyer provided a material benefit to the debtors and their creditors by increasing the likelihood of obtaining the best possible price for the assets.  Thus, the court approved the break-up fee as reasonable.  *Id.  See also Reliant Energy*, 594 F.3d 200 (affirming the bankruptcy court's denial of a break-up as not necessary to preserving the value of the estate); *O'Brien Environmental*, 181 F.3d 527 (same).

73.     Here, the Bid Procedures were not necessary to induce the Insider Bidder to submit the Insider APA.  Silver Point undoubtedly conducted significant due diligence in connection with its acquisition of the secured debt and eventually the assets of the Workflow

Debtors in 2012. Silver Point was a significant equity holder and primary secured creditor of WorkflowOne upon emergence of the Workflow Debtors from chapter 11. Moreover, Silver Point performed significant due diligence in connection with the August 2013 transactions involving the merger of WorkflowOne and Standard Register, including amending its credit facilities which form the basis of its claim in these Chapter 11 Cases. Furthermore, Silver Point designated two members to the Debtors' board of directors in 2013. Silver Point also did significant due diligence in connection with the post-petition financing for which it was reimbursed. In sum, Silver Point was intimately familiar with the Debtors' assets for at least 2 years prior to the Petition Date, including as an equity holder, lender, and board member. *O'Brien*, 181 F.3d at 535, 537 (break-up fees not needed in certain cases where cost of formulating bid is less than estimated value to be gained; affirming finding that stalking horse bidder "had strong financial incentives to undertake the cost of submitting a bid, including the cost of researching the company's worth, even in the absence of any promise of reimbursement"); *In re Integrated Resources, Inc*., 147 B.R. 650, 662–63 (S.D.N.Y. 1992) (Break-up fees must be "reasonably related to the bidder's efforts."). The Insider Bidder did not have to be encouraged to consider purchasing the Debtors' assets.

74. In addition, the Insider Bidder was not the only party interested in the Debtors' assets prior to the Petition Date. The Debtors were contacted by other interested parties about a potential transaction. The Debtors chose not to pursue them. Because the Debtors had other options – and perhaps better options than entering into the Insider APA – the Bid Protections are not necessary and provide no benefit to the estates.

75. Even more egregious than a request of an insider for Bid Protections is the scope of those Bid Protections. The Break-Up Fee is payable on amounts necessary to satisfy the

Debtors' secured debt (to the ABL Lender <u>and</u> to Silver Point), and the Expense Reimbursement includes an unlimited number of the Insider Bidder's and its Affiliates' professionals. This broad request is neither necessary nor provides any benefit to the Debtors' estates.

76.      Finally, the Debtors assert the Bid Protections are appropriate because the Break-Up Fee is the equivalent to two (2%) percent of the Purchase Price and it is a condition to the Insider Bidder's entry into the Insider APA. *See* Sale Motion, ¶¶43-45. As support for the reasonableness of the Break-Up Fee, the Debtors cite four cases where courts appear to have approved a break-up fee. The Debtors fail to mention, however, that <u>none</u> of those cases involved a stalking horse bidder who was a prepetition lender, postpetition lender, significant equity holder and a party who designated at least three individuals to the debtor's board of directors. The Committee submits that neither *In re Vertis Holdings, Inc*., Case No. 12- 12821 (CSS) (Bankr. D. Del.); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del.); *In re Global Motorsport Group, Inc*., Case No. 08-10192 (KJC) (Bankr. D. Del.); or *In re Global Home Prods. LLC*, Case No. 06-10340(KG) (Bankr. D. Del.) supports the Debtors' request for Bid Protections in these Chapter 11 Cases. These Chapter 11 Case are more similar to *In re Event Rentals, Inc*., Case No. 14-10282 (PJW) (Bankr. D. Del.), where the stalking horse bidder, who also was a lender, did not request (and thus did not receive) any bid protections.

77.      The Committee submits that granting the Insider Bidder Bid Protections will create a potential large windfall for the Insider Bidder at the direct expense of the Debtors' cash-strapped estates. Similarly, the Debtors overlook the real danger that the excessive Bid Protections will chill the bidding process by discouraging competing bids that must be $9.0 million higher because of them.

78.     Accordingly, the Court should deny the Debtors' request for approval of the Bid

Protections or, at the very least, delay approval of the Bid Protections until the sale hearing. *See,*

*e.g., In re Radioshack Corporation*, Case No. 15-10197 (BLS) (Bankr. D. Del. Mar. 9, 2015)

("The request pursuant to the Motion to approve…the Break-Up Fee and the Expense

Reimbursement is hereby adjourned to a later date…");[18] *In re Dots, LLC*, Case No. 14-11016

(DHS) (Bankr. D. N.J. Feb. 21, 2014) (declining to approve a break-up fee as part of bidding

procedures).[19]

**J.     Other Modifications to Bid Procedures and Insider APA**

79.     Modifications to Bid Procedures are required, including for more Committee

involvement in the process. "[M]y ruling is that the official committees must be substantively

involved on a real-time basis, have the ability to speak directly with potential bidders, and have

consent rights to changes in the procedures." *In re Energy Future Holdings Corp.*, (Bankr. D.

Del. Nov. 4, 2014) (Case No. 14-10979) (CSS) Hrg Tr. p 21:25 – 22:1-5.

**i.     Insufficient Cash Consideration**

80.     The Bidding Procedure fail to provide the liquidity needed to fund distributions

under a confirmable and feasible chapter 11 plan.  Silver Point should not be permitted to credit

bid unless that bid includes a cash component sufficient (a) to satisfy all Chapter 11

administrative expenses and priority claims as part of a Chapter 11 plan, (b) to provide sufficient

funding for the plan process and the expenses that will accrue during the post confirmation wind-

down period, and (c) to provide for a recovery for unsecured creditors sufficient to fund a

distribution under a confirmable and feasible Chapter 11 plan. This request is especially

---

[18] See Order (I) Approving Bid and Sale Procedures, (II) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Scheduling an Auction and Sale Hearing [D.I. 871].

[19] See Supplemental Order Approving Auction Procedures [D.I. 271].

appropriate given that significant value exists in the Debtors' previously unencumbered assets, including avoidance actions under Chapter 5 of the Bankruptcy Code, NOLs, the assets of the Unencumbered Debtors, and significant equity in the Unencumbered Debtors.  While the Insider APA references a certain Wind-Down Amount, it is not at all clear what the Wind-Down Amount will be and whether the Committee will be a participant in determining the Wind-Down Amount.

### ii.     Inability to Propose Alternative Transaction

81.    The Bid Procedures improperly limit third parties' ability to submit an alternative transaction.  For example, the definition of "Qualified Bidder" is limited to parties able to "consummate the Sale as proposed in the Purchase Agreement."  Qualified Bid must also provide for the purchase of all or substantially all of the assets included in the Insider APA and assumption of all or substantially all of the Assumed Liabilities.  The Bid Procedures should enable parties to submit a proposal in a form that is different than the Insider APA, such an offer to acquire the Debtors' assets through a chapter 11 plan, merger, or otherwise.

### iii.    Special Treatment to Second Lien Lenders

82.    The Debtors' request for special treatment for the Second Lien Bidders (as defined in the proposed Bidding Procedures Order, ¶4) is not warranted.  First, the Debtors seek a determination that the Second Lien Bidders are Qualified Bidders.  Second, the Debtors seek to excuse the Second Lien Bidders from the requirement of submitting a bid by the Bid Deadline, and, instead, seek to enable the Second Lien Bidders to submit a bid at the Auction.  *See* proposed Bidding Procedures Order, ¶¶16, 27.  The Debtors further request that any bid submitted by the Second Lien Bidders include a credit bid component.  *Id*. ¶ 27.  These "special treatment" provisions inappropriately favor the Second Lien Bidders (*i.e*., Silver Point) and will chill bidding.

### iv. HSR Filing Requirement

83. In order to be declared a Qualified Bidder, the Bidding Procedures require bidders -- other than Silver Point parties -- to make all necessary filings under the HSR Act by June 1, 2015. Requiring an HSR filing or clearance under HSR is not an appropriate condition to become a Qualified Bidder. The Committee and the Debtors should evaluate the risk associated with HSR as part of the biding process. The court in *In re American Safety Razor Company*, LLC (Bankr. D. Del.) (Case No. 10-12351) (MFW), reopened an auction based on the debtors' automatic disqualification of a strategic bidder for HSR reasons. That bidder then won the auction and did not face any HSR-related delays.

### v. Waiver and Modification of Procedures

84. Any modification or waiver of the Sale Procedures should require Committee consent. "[T]he debtors' proposed *cart blanche* authority to modify the bid procedures is unacceptable. Any material modification of the bid procedures will require either consent of the official committees for court approval which can be sought on an in camera basis." *In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 4, 2014) (Case No. 14-10979) (CSS) Hrg Tr. p 20:11-15.

### vi. Deposit

85. As set forth above, the deposit amount required from other bidders ($27.5 million) is unreasonably high. It should be reduced to $10 million. While formed only a short while ago, the Committee has already heard from potential bidders that the amount of the deposit may chill bidding, especially given that deposits will be held for a considerable period.

### vii. Minimum Overbid

86. The minimum overbid is too high and it may chill bidding. It should be reduced to $250,000.

### viii.  Delivery of Bids

87.    The Committee should receive all bids simultaneously with the Debtors.  The Insider Bidder and its affiliates should not receive copies of third-party bids until prior to the Auction.

### ix.  Objection Deadlines

88.    The Bid Procedures create multiple objection deadlines to the sale.  The Committee submits that, except for objections to the assumption and assignment of contracts and leases, the Bid Procedures should provide for one objection deadline to the sale, which objection should be no less than three (3) business days after the identity of the successful bidder becomes known.  Requiring multiple objections is not only unduly burdensome, but also a waste of limited estate resources.

### x.  Committee Consultation and Consent Rights

89.    The Bid Procedures should be modified to require meaningful and significant consent and consultation rights for the Committee with respect to all aspects of the Debtors' decision making process, including but not limited to (a) exclusion of bidders from due diligence or biding, (b) determination with respect to a Qualified Bidder, (c) determination with respect to a Qualified Bid, Successful Bid or Back-Up Bid, (d) to the form of a confidentiality agreement, (e) determination of adequate diligence from bidders, (f) and such other changes reflected in the proposed marked version of the Bid Procedures and Bid Procedures Order attached hereto as Exhibit B.

### RESERVATION OF RIGHTS

90.    The Committee reserves the right to supplement this Objection at any time prior to the Hearing.   The Committee expressly reserves its rights to raise additional or further

objections to the Sale Motion, the Insider Bidder, the Insider APA, or proposed Bid Procedures at or prior to the Hearing on any subsequent hearing.

**[ *signature page follows* ]**

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court deny the relief sought in the Sale Motion.

Dated: April 6, 2015                         Respectfully Submitted,

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Wojciech F. Jung, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400

*-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Proposed Counsel to the Official Committee of Unsecured Creditors*

*-and-*

**POLSINELLI PC**

/s/ *Christopher A. Ward*
Christopher A. Ward (DE Bar No. 3877)
Justin K. Edelson (DE Bar No. 5002)
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

*Proposed Delaware Counsel to the Official Committee of Unsecured Creditors*