**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  15-10541 (BLS)<br><br>(Jointly Administered)<br><br>Re: Doc. Nos. 5 and 56 |

**LIMITED OBJECTION[2] AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE RELIEF REQUESTED IN THE DEBTORS' CASH MANAGEMENT MOTION**

The Official Committee of Unsecured Creditors (the "Committee") of The Standard Register Company ("Standard Register") and its affiliated debtors and debtors-in-possession (collectively with Standard Register, the "Debtors"), hereby submits this limited objection (the "Objection") to the *Debtors' Motion for Order Authorizing (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims; and (E) Interim Waiver of Section 345(B) Deposit and Investment*

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440) ("Standard Register"); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    The Committee's deadline to object to the Cash Management Motion was extended upon consent of Debtors' counsel.

*Requirements* [Docket No. 5] (the "Cash Management Motion").[3]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

As of the Petition Date, the Debtors had significant unencumbered assets, including but not limited to the assets of five subsidiaries of Standard Register that were wholly unencumbered prepetition and 35% of the Debtors' ownership interests in their foreign subsidiaries.  By the Cash Management Motion, the Debtors seek (a) the unbridled authority to shift cash among the various Debtors, potentially hiding cash in entities beyond the Court's jurisdictional reach without any meaningful accountability and regardless of whether the transferred cash was previously unencumbered, and (b) approval to grant superpriority administrative expense claim status to postpetition inter-Debtor cash transfers potentially shifts previously unencumbered value from one Debtor (or worse non-debtor foreign affiliates) to Debtors whose assets are encumbered.  The proposed relief would risk shifting substantial unencumbered value into the hands of the Debtors' lenders, at the expense of the estates and unsecured creditors, and should not be approved.

## BACKGROUND

**A.    The Chapter 11 Cases.**

1.    On March 12, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  No trustee or examiner has been appointed in the Chapter 11 Cases.

2.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are

---

[3]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Cash Management Motion.

continuing to manage their financial affairs as debtors in possession.

3.      On March 24, 2015, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.  *See* Docket No. 99.  The Committee is comprised of seven members: (a) Pension Benefit Guaranty Corporation, (b) Timothy V. Webb, (c) Georgia-Pacific Consumer Products LP, (d) Gary Becker, (e) Mark A. Platt, (f) Veritiv Corporation, and (g) The Flesh Company.  On the same day, the Committee selected Lowenstein Sandler LLP and Polsinelli PC to serve as its co-counsel.

**B.      Debtors' Prepetition Indebtedness and Intercompany Claims.**

4.      As of the Petition Date, certain of the Debtors (the "Prepetition Obligor Debtors") had drawn $92.7 million from the ABL Loan (as defined in the Carmody Declaration) and approximately $3.6 million of outstanding letters of credit.  *See Declaration of Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [D.I. 2] ("Carmody Declaration") at ¶ 26.  The ABL Loan is allegedly secured by a "first priority security interest in, and lien on, the borrowers' and guarantors' cash, accounts, deposit accounts, securities accounts, security entitlements, securities, financial assets, inventory, certain tax refunds, related assets, and all proceeds from such property and assets (collectively, the "ABL Collateral") and by a second priority interest in, and lien on, substantially all of the borrowers' and guarantors' other assets."  *Id.*

5.      The Prepetition Obligor Debtors are also the borrowers and/or guarantors under the First Lien Term Loan (as defined in the Carmody Declaration) in the original principal amount of $124 million and the Second Lien Term Loan (as defined in the Carmody Declaration) in the original principal amount of $96 million (collectively, the "Prepetition Term Loans" and collectively with the ABL Loan, the "Prepetition Facilities").  *Id.* at ¶ 27-28.  The

Prepetition Term Loans are allegedly secured by first- and second- priority security interests in and liens on substantially all of the Prepetition Obligor Debtors' assets other than ABL Collateral (the "Term Loan Collateral") and by a second priority interest in and lien on the ABL Collateral. *Id.* The Debtors are further obligated under the Second Lien Credit Agreement (as defined in the Carmody Declaration) with an original principal amount of $96 million. *Id.* at ¶ 28.

6.    Five of the Debtors are not parties to (either as borrowers or guarantors) or otherwise obligated under the Prepetition Term Loans or the ABL Loan: Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., Standard Register Technologies Canada ULC (collectively, the "Unencumbered Debtors"). Moreover, the Prepetition Lenders' security interests do not extend to, among other unencumbered assets, (a) the assets of the Unencumbered Debtors or (b) 35% of the Prepetition Obligor Debtors' ownership interests in their foreign subsidiaries (the "Unencumbered Equity Interests").

7.    Prior to the Petition Date, the Debtors engaged in three primary types of intercompany transactions and transfers ("Intercompany Transactions"): (a) C*entral Receipts and Disbursements*, in which Standard Register pays for inventory and supplies and occasionally collects receivables; (b) *Centrally Billed Expenses*, in which Standard Register pays expenses such as insurance premiums and then allocates the expenses to the appropriate affiliates; and (c) *Intercompany Funding*, in which certain of the Debtors' non-debtor affiliates receive capital advances that are then repaid in the ordinary course of the Debtors' business. *See* Cash Management Motion at ¶¶ 10-14.

**C.    DIP Term Loan and Cash Management Motion.**

8.    On the Petition Date, the Debtors filed a motion seeking authority to obtain post-

petition financing [D.I. 15] (the "<u>DIP Motion</u>") and the Cash Management Motion.

9.    Under the DIP Motion, the Debtors sought authority to enter into an agreement providing for a $125 million revolving credit facility (a complete roll-up of the ABL Loan) and a $30 million multiple draw term loan facility (collectively, the "<u>DIP Financing</u>").  *See* Carmody Declaration at ¶ 105.  The proposed security for the DIP Financing includes substantially all of the assets of all of the Debtors, including the Unencumbered Debtors.

10.    The Debtors seek authority through the Cash Management Motion to continue use of their existing (i) bank accounts, books, records and business forms; and (ii) cash management system.  *See* Cash Management Motion at ¶ 17.  The Debtors also seek authority to continue their system of Intercompany Transactions between and among the Debtors and non-debtor affiliates.  *Id.*  The Debtors also seek authority for all claims between the individual Debtors and non-debtor affiliates ("<u>Intercompany Claims</u>") to be awarded administrative expense priority status.  *Id.* at ¶ 39.

11.    In support for their request to continue processing Intercompany Claims, the Debtors assert that "discontinuing the Intercompany Transactions would disrupt the Debtors' estates, harming their creditors and other parties in interest."  *Id.* at ¶ 14.  To this end, the Debtors request that all Intercompany Claims arising after the Petition Date be awarded super priority administrative expense status.  *Id.* at ¶ 39.  The Debtors further assert that this relief will "ensure that each individual Debtor will not fund, at the expense of its own creditors, the operations of another Debtor."  *Id.*

12.    On March 13, 2015, the Court issued an order granting the Cash Management Motion on an interim basis.  *See* Docket No. 56.

<strong><u>LIMITED OBJECTION</u></strong>

13.     The Committee objects to the provisions of the Cash Management Motion that would (a) allow the DIP Lenders (as defined in the DIP Motion) to obtain priming liens on and security interests in previously unencumbered assets without providing a means to trace and unwind such Intercompany Transactions, and (b) authorizing the Debtors to continue Intercompany Transactions absent  a comprehensive reporting and tracking system preventing the Debtors from hiding cash in inaccessible entities (including offshore affiliates) and a provision entitling transferor entities to recoup transferred cash.

**A.     The Cash Management Motion Permits Previously Unencumbered Assets to Become Encumbered Without Recourse.**

14.     By the Cash Management Motion, the Debtors seek authority for the Unencumbered Debtors (and potentially any non-Debtor affiliates) to make Intercompany Transfers to other Debtors and vice versa.  In exchange for these transfers, the Cash Management Motion contemplates that the transferor of an Intercompany Transfer would obtain an administrative expense claim against the transferee.  *See* Cash Management Motion at ¶ 39. Under this proposal, material amounts of previously unencumbered cash that would otherwise be available to pay unsecured prepetition claims against the transferor entities (which may or may not be Debtors) could be transferred to Debtors whose assets are subject to the DIP Lenders' liens.  Moreover, the transferor would receive only a claim against an entity that may have no cash of its own, with no guaranty of repayment.

15.     The Debtors have made no showing with respect to the ability of any of the Debtors to satisfy administrative expense claims in these Chapter 11 Cases.  It is possible that the Debtors that receive Intercompany Transfers will become administratively insolvent.  This possibility, while inherently troubling for the Debtors, is exacerbated for creditors who would have otherwise been entitled to receive unencumbered assets in payment of their claims.  In

addition to the risk of administrative insolvency leaving Intercompany Transfer-related claims unpaid, the Committee is concerned that the Debtors and Silver Point will use Intercompany Transfers to (a) funnel unencumbered cash to encumbered accounts and (b) move unencumbered cash into foreign subsidiaries beyond the Court's jurisdictional reach, in either instance potentially making it impossible for the Committee to ever recoup the transferred funds in connection with a successful challenge to the liens securing the Prepetition Facilities.

16.     Accordingly, the Debtors should be prohibited from making Intercompany Transfers from any affiliates that were not parties to the Prepetition Term Loans or the ABL Loan, unless (a) the Debtors implement detailed transaction reporting that will enable the Committee to trace the flow of funds and (b) such Intercompany Transfers are subject in all respects to the Committee's investigation and challenge rights in connection with the DIP Financing.

**B.    The Cash Management Motion Provides Insufficient Information in Connection With Intercompany Transactions**

17.     The Cash Management Motion does not provide any information about Intercompany Transactions and the repayment of same.  For example, there is no explanation of which non-Debtor entities will borrow funds, how and when funds are repaid, or whether Standard Register is owed substantial sums from any of the Debtors or non-debtor entities on account of unpaid prepetition transfers.  As such, the Committee is unable to ensure that the proposed Intercompany Transactions are appropriate for these Debtors and their estates.

18.     Accordingly, the Committee must be provided with comprehensive, detailed information and documentation about all intercompany balances owing as of the Petition Date and all Intercompany Transactions.  The Committee requires information (a) projected amounts of cash transferred or expected to be transferred; (b) any interest and fees paid in connection with

Intercompany Transactions; (c) outstanding amounts due to and due from each Debtor and non-debtor entity as of the Petition Date; (d) balance sheets, income statements, and cash flow statements for all Debtors and non-debtor entities; and (e) a detailed explanation of how the Intercompany Transactions are repaid.  In addition, the Committee must be provided with at least three business days' notice of any proposed Intercompany Transfers to any non-Debtor and/or foreign affiliates of the Debtors.

19.     Further, the Committee should also receive, on a weekly basis, reconciliations with respect to each Debtor and non-debtor entity borrower.  The Committee should be provided with historical intercompany loan and cash balance information for each borrower, broken out by Debtor and non-Debtor entities.  This information is significant.  For example, to the extent that a non-Debtor entity borrows funds through an Intercompany Transaction, and subsequently has excess cash on hand, that cash should be used to repay the Intercompany Transaction before other liabilities.

20.     A blackline showing the Committee's requested revisions to the proposed form of order is attached hereto as Exhibit A.

<strong>RESERVATION OF RIGHTS</strong>

21.     The Committee expressly reserves all of its rights to assert additional objections to the Cash Management Motion or to amend or supplement this Objection at any time prior to or at any hearing on the Cash Management Motion.

**WHEREFORE**, the Committee respectfully requests that the Court sustain this Objection, deny the Cash Management Motion, and grant the Committee such other and further relief as the Court deems just and proper.

Dated:  April 6, 2015

Respectfully Submitted,

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Wojciech F. Jung, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973-597-2500
Facsimile:  (973) 597-2400

*-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Proposed Counsel to the Official Committee of Unsecured Creditors*

*-and-*

**POLSINELLI PC**

/s/ *Christopher A. Ward*
Christopher A. Ward (DE Bar No. 3877)
Justin K. Edelson (DE Bar No. 5002)
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

*Proposed Delaware Counsel to the Official Committee of Unsecured Creditors*