1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3   IN RE:                          )   Case No. 15-10541 (BLS)
                                    )   Chapter 11
4   THE STANDARD REGISTER COMPANY,  )
    INC., *et al.*,                 )
5                                   )
                  Debtors.          )   Courtroom No. 1
6                                   )   824 Market Street
                                    )   Wilmington, Delaware 19801
7                                   )
                                    )   April 1, 2015
8                                   )   10:00 A.M.

9                         TRANSCRIPT OF HEARING
                BEFORE HONORABLE BRENDAN L. SHANNON
10                 UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12
    For the Debtors:          Young Conaway Stargatt & Taylor, LLP
13                            By:  MICHAEL NESTOR, ESQUIRE
                              1000 North King Street
14                            Wilmington, Delaware 19801

15                            Gibson, Dunn & Crutcher LLP
                              By:  MICHAEL ROSENTHAL, ESQUIRE
16                            333 South Grand Avenue
                              Los Angeles, California 90071
17
    ECRO:                     DANA MOORE
18
    Transcription Service:    Reliable
19                            1007 N. Orange Street
                              Wilmington, Delaware 19801
20                            Telephone:  (302) 654-8080
                              E-Mail:  gmatthews@reliable-co.com
21

22  Proceedings recorded by electronic sound recording:
    transcript produced by transcription service.
23

24

25

1    For Silverpoint:          Skadden Arps Slate Meagher & Flom
                               By:  RON MEISLER, ESQUIRE
2                              155 North Wacker Drive
                               Chicago, Illinois 60606
3
     For the Committee:        Lowenstein Sandler
4                              By:  SHARON LEVINE, ESQUIRE
                               65 Livingston Avenue & 6 Becker
5                              Farm Road
                               Roseland, New Jersey 07068
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2                                                              Page

3    NOTICE OF AGENDA MATTERS:
     For the Debtors, by Mr. Nestor                           4
4    For the Debtors, by Mr. Rosenthal                      5,22
     For Silverpoint, by Mr. Meisler                         14
5    For the Committee, by Ms. Levine                        19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   THE CLERK:  All rise.

2   THE COURT:  Please be seated.  Good morning.

3   MR. NESTOR:  May I please the Court, Your Honor,

4   Michael Nestor of Young Conaway Stargatt & Taylor as proposed

5   counsel for the Debtors.  Your Honor, we are here today at

6   the second day hearing.  I don't think anything is going

7   forward.  I did call Your Honor's Chambers to let you know

8   that.

9   THE COURT:  I appreciate that.

10   MR. NESTOR:  Okay.  So everything has been kicked to

11   the 13th.  We submitted a COC on the utilities order.  I'm not

12   sure if Your Honor had a chance to look at that.

13   THE COURT:  I think I signed that this morning.  If

14   you don't see it on the docket by noon, then just give a

15   call, but I know I have seen it.

16   MR. NESTOR:  Okay.  Thank you, Your Honor.  At this

17   time, Your Honor, I would like to introduce Michael

18   Rosenthal.  I know he needs no introduction in this Court.

19   THE COURT:  Good to see you again.

20   MR. NESTOR:  He is going to be here on a regular

21   basis and so he is going to give Your Honor, kind of, a

22   30,000 foot view of where we are and where we are going.

23   THE COURT:  That would be terrific.

24   MR. NESTOR:  Thank you, Your Honor.

25   THE COURT:  Mr. Rosenthal, welcome.  It's good to

1   see you.

2            MR. ROSENTHAL:  Nice to see you.  Your Honor,

3   although this is not the first day hearing, Judge Sontchi

4   heard the first day.  I would like to spend a little bit of

5   time so we are both familiar with the case.

6            THE COURT:  I think that would be helpful.  I have

7   had an opportunity to review the transcript from the first

8   day hearing and I have read the first day affidavit as well,

9   but I still would benefit from the context that, I think, you

10  are about to provide.

11           MR. ROSENTHAL:  That's great.  So, Your Honor, the

12  Debtors are in the business of providing communication

13  services and work flow solutions.  They do this through

14  print, electronic and internet based communications.

15           THE COURT:  Let me ask you a question.  When I read

16  this, I wasn't certain whether or not they are in the, are

17  they content creators or do they get content from their

18  customers and format it in a way, for example, on the

19  healthcare side?

20           MR. ROSENTHAL:  I believe they received content and

21  then they format it, and they help their clients with the

22  communication aspect of it.  So, for example, if there is a

23  wellness initiative program that a hospital wants to provide

24  to a set of consumers.

25           THE COURT:  Sure.

1          MR. ROSENTHAL:  They would take that material and

2    they would figure out how to send that marketing, provide

3    that marketing, whether it's electronically or whatever.

4          THE COURT:  Okay.  Thanks.

5          MR. ROSENTHAL:  Your Honor, the Debtors are one of

6    the leaders in this space.  They have two main markets.

7    First, they provide integrated communication services to the

8    financial retail, industrial and services industry.  So, for

9    example, you would know some of these things.  We just talked

10   about direct marketing that they help with direct marketing.

11   They print things such as document forms, they create secure

12   websites with links so that not everyone can get onto them,

13   prevent fraudulent use.

14         THE COURT:  Right.

15         MR. ROSENTHAL:  They send out customer

16   communications of regulatory issues, of billing issues, of

17   pre-enrollment for certain programs and the like.  They do

18   marketing and labeling of compliance labels.  So, for

19   example, you see some of the labels that are on products,

20   hazardous materials labels and the like, they provide that.

21         The second basic line is to the healthcare industry

22   and they provide to physicians, acute care providers,

23   hospitals, secondary care providers such as ambulatory

24   providers, labs, things like that.  A number of

25   communications services, again, you know, if you spend any

1  time in the hospital, unfortunately, you would know those.

2  So if you have an ID band so that everybody knows that you

3  are the one who should get the medicine at the particular

4  point in time.

5       THE COURT:  Those are the bar code red bands that

6  tie into data processing so that once the bar code is swiped,

7  you know that at that hour the patient got the correct dose.

8       MR. ROSENTHAL:  Correct and part of that is that

9  that information goes into a web base program so that people

10 who access it know what happened when what medication was

11 given, when, who did it and the like.  In addition to that,

12 as I said, they do this distribution of targeted marketing

13 materials about things like hospitality, what you are going

14 to need for the hospital, wellness programs and things of

15 this sort.  So that is their basic business.

16      In terms of structure the Debtors consist of 11

17 entities, six US, there is some Mexican entities and one

18 Canadian entity.  They are all direct or indirect subs of the

19 Standard Register Company, which is a public company.  It was

20 on NASDAQ.  It was delisted shortly before the filing.  If

21 you look at the declaration of Kevin Carmody, the exhibit to

22 that has the work chart.

23      The company is an old company.  It was founded in

24 1912 and headquartered in Dayton, Ohio.  It employs 3,400 or

25 3,500 employees and it has, at any point in time,

1    approximately 500 contract workers that help administer the

2    programs.  They have 53 production and warehouse facilities

3    in North America, the majority of them in the US.  They have

4    operations all through the US, Puerto Rico, Mexico and

5    Canada.

6              In terms of its financial condition, revenues last

7    year were approximately $900 million dollars, which was down

8    from the prior year where it was closer to $1 billion

9    dollars.  Losses last year were around $66 million dollars,

10   the prior year they were $7 million.  In terms of its debt

11   structure, it has an asset based loan to --

12             THE COURT:  That's the first priority ABL?

13             MR. ROSENTHAL:  Correct, ABL, $93 million dollars,

14   that was, as the Court knows from the first hearing, that was

15   part of the rollup that was approved by Judge Sontchi.  So

16   it's about $93 million dollars, in addition there's about a

17   $3 and a half million dollar LC facility associated with it.

18   I think availability on that, the actual amount of the loan

19   is $125 million, but it was only drawn to $93 at the time of

20   the filing.  Then they have term loans that were the result

21   of a merger among --

22             THE COURT:  Work force.

23             MR. ROSENTHAL:  Yeah, with work flow.

24             THE COURT:  Work flow, sorry.

25             MR. ROSENTHAL:  That's right.  Term loans, it's a

1   typical first/second lien situation.  The first is about $115

2   million dollars. They have a first on all the assets not

3   covered by the ABL.

4           THE COURT:  Is it junior then, structurally, to the

5   ABL?

6           MR. ROSENTHAL:  Junior on the assets that are

7   covered by the ABL, yes.

8           THE COURT:  Right.  Okay.

9           MR. ROSENTHAL:  And senior on the other assets with

10  the ABL lenders having a second on those.  The first is $115,

11  the second is about $98.  So, again, as between the first and

12  the second, there is an intercreditor there that governs

13  their relationship.  They have some capital leases, about 18

14  of them with $10 million owed.  Importantly, they have a

15  large unfunded pension obligation of $194 million.  They made

16  contributions last year as required and the year before last

17  year of about $37 million, year before of $24 and they were

18  projected to make contributions this year of about $25.

19          One of the reasons we are here is the inability to

20  make all of these payments given their revenue stream.  Trade

21  debt is in the $72, $73 million dollar range as of the

22  petition date.  So the company experienced --

23          THE COURT:  Is there one more piece?  There is a

24  second lien piece as well, at least described. Did we cover

25  that?

1      MR. ROSENTHAL:  The second lien is $98 million.

2      THE COURT:  So I got about $93 on the ABL.

3      MR. ROSENTHAL:  Correct.

4      THE COURT:  Aggregate two pieces, $210 on work flow.

5      MR. ROSENTHAL:  $93 on the ABL, the work flow first

6  and second lien, both of the first and second liens are work

7  flow.  So the first one is for $115 and the second lien is

8  about $98.

9      THE COURT:  Okay.

10      MR. ROSENTHAL:  So if you have that whole structure,

11  its $93 ABL, $115, $98.

12      THE COURT:  What I did was I double counted because

13  I think I just misread Mr. Carmody's affidavit.  So I was

14  seeing $93, $210 plus $98, but that $98 is actually part of

15  the $210.

16      MR. ROSENTHAL:  Part of the $210.

17      THE COURT:  Got it.  Then, $72 million in trade.

18      MR. ROSENTHAL:  $72 million in trade.  So we are

19  here because of declining demand in the printing business.

20  The Debtors have struggled to achieve their revenue and

21  EBITDA targets.  They still, of course, have their fixed

22  costs, interest payments on the secured debt, pension

23  contributions, CAPEX expenditures.  While they were able to

24  obtain some concessions with respect to covenants, they

25  remain severely cash constrained and the company decided,

1  earlier this year, to hire McKinsey to provide consulting

2  services and to assist in financial restructuring.  Mr.

3  Carmody was, right before the filing, appointed chief

4  restructuring officer.

5          THE COURT:  Right.

6          MR. ROSENTHAL:  They also retained Lazard to

7  evaluate and advise on strategic options.  Your Honor, the

8  company determined, based on the Lazard advice, there was, as

9  you read the Carmody declaration, you will see that there was

10 a process before the filing to identify parties who were

11 interested in acquiring the company.  No one could get to the

12 finish line, no third party could get to the finish line.

13 They first lien lenders stepped to the table with a stalking

14 horse proposal.  We have a hearing on bid procedures on the

15 13th and we have tentatively talked to your clerk about a date

16 in mid-June for the sale hearing.

17         THE COURT:  Did you get a date?

18         MR. ROSENTHAL:  I think the date we have, Your

19 Honor, is June 17th.  Then if an auction is necessary, June

20 15th.

21         THE COURT:  Okay.

22         MR. ROSENTHAL:  So, Your Honor, the early goals of

23 the case, as with any big Chapter 11 case or stabilize the

24 business is about and the value of the business is its

25 customer base.  So we have to demonstrate to the customers

1  that we have the financial wherewithal to get through until

2  we can implement an exit plan and the exit plan is the sale,

3  which is why it's important that we do it as quickly as

4  possible.  We have limited financing available through the

5  DIP.  It's a fragile customer base and we have to be very

6  sensitive to that.

7          So, Your Honor, we hope that in the next three

8  months we can present to the Court a sale that will maximize

9  the value to all constituencies.  The Lazard team is

10  currently and McKinsey is currently in the process of

11  conducting discussions with potential third party buyers and

12  there are some who are kicking the tires.  We hope that we

13  will have a blowing and going auction, similar to others you

14  have seen.

15          THE COURT:  Don't start.  It looks fine down there.

16  It looks a bomb went off up here.

17          MR. ROSENTHAL:  Well congratulations by the way on

18  that short hearing that you had, which was very successful.

19          THE COURT:  My enthusiasm for a sale process is at

20  its low point, so you might not want to raise that.  You have

21  a while till your bid procedures hearing.  I will probably

22  rally by that.

23          MR. ROSENTHAL:  Well, anyway, we have a full day, a

24  full docket on the 13th and we look forward to this case

25  before you.  If you, you know, ever have any questions or

1  whatever, please give me a call.

2         THE COURT:  We will.  The main thing is I am aware

3  that we've got a number of different items that are coming

4  off on for the 13th.  The one thing I would ask and you folks

5  are very good about this is just keep me posted about what it

6  is you expect to see coming.  I have time set aside for you,

7  but you folks know better than I do that if it's an issue of

8  multiple witnesses and the whole dog and pony show, that's a

9  lot of time.  If there are argument fights over bidding

10 procedures, etc., that's a different time line.  The more

11 that you know, the better.

12        I am also assuming and aware that there are dialogue

13 and discussion going on with the Committee that's been

14 recently appointed and other stakeholders in the exercise.

15 So the more warning you can give me about the resources and

16 the time that you will need before me, I will certainly

17 accommodate, it's just easier if I know, okay.

18        MR. ROSENTHAL:  Absolutely.  We will not only do

19 that, but we are also sensitive to the fact that if we are

20 going to resolve something, you don't need to be spending a

21 lot of time reviewing it.  So we will try to get to you as

22 soon as we can if we have reached a consensual resolution.

23        THE COURT:  Sounds good.

24        MR. ROSENTHAL:  Thank you for your time.

25        THE COURT:  Mr. Nestor where does that leave us for

1  today?  Do we have any other matters?  I think that I have

2  signed the orders that are relevant to your issues, right?

3        MR. NESTOR:  Just so the record is clear, Your

4  Honor, everything else that could possibly be on for today is

5  either resolved or adjourned to the 13th.

6        THE COURT:  Yes, sir, welcome.

7        MR. MEISLER:  Thank you, Your Honor.  Your Honor,

8  Ron Meisler of Skadden Arps.  I am here on behalf of

9  Silverpoint Finance, LLC.  I also wanted to just make a

10  couple of comments to introduce myself and to also round out

11  the picture, especially since we are the company's largest

12  secured lender.  Your Honor, we are also a minority equity

13  holder and we have been a partner with Standard Register

14  since 2013.

15        Your Honor, it's going to be shown on April 13th that

16  we are not an insider.  We have been supportive of the

17  company since our involvement and as discussed in more detail

18  in the Carmody declaration, unfortunately, due to a difficult

19  business environment, the company's business plans fell well

20  short of target and Silverpoint has been there to support the

21  company.  Your Honor, I am coming before you today because I

22  want you to see I've got no tail, I've got no horns and I

23  don't bring a trident with me.

24        THE COURT:  I've dealt with Silverpoint.

25        MR. MEISLER:  That's good, so you already know how

1  collaborative we are.

2          THE COURT:  I am familiar with the process before

3  me.

4          MR. MEISLER:  Terrific.

5          THE COURT:  Let me ask a question.  You touched on

6  an issue that, again, I have not seen or studied, any

7  objections or I anticipate that there may be issues that are,

8  hopefully, being negotiated.  You specifically stated a

9  moment ago that Silverpoint is not an insider.  Is there an

10  argument that Silverpoint is either a statutory or non-

11  statutory insider for purposes of this sale process?

12          MR. MEISLER:  We are anticipating.  We have received

13  substantial discovery requests from the Committee, about 77

14  information requests in total in two different batches.  In

15  those discovery requests that have been propounded upon us,

16  there terms used to taint us as an insider.  Your Honor, we

17  do not fit the statutory definition.

18          Your Honor, at one point up until December 24th, we

19  did have a Silverpoint employee that was on the board, who

20  resigned.  To my knowledge, that was before Lazard was hired.

21  It was certainly before McKinsey was hired.  We stepped off

22  the board because we did understand at that point already

23  that there was a troubled situation approaching or the

24  company was already troubled.  At that time there was no

25  knowledge as to what direction this was hearing, other then

1  there was going to have to be an amendment to the credit

2  agreement in order to deal with potential covenant defaults.

3          THE COURT:  Okay.

4          MR. MEISLER:  Your Honor, I don't believe we

5  forebeared at that time because we didn't have the visibility

6  to know where this was heading.  We simply amended the credit

7  agreement, which happened in the second week of January so

8  that the company didn't have to comply with certain technical

9  covenants.

10         So, Your Honor, I also want to make clear that in

11  addition to not holding a trident or having a tail, this is

12  not a situation where, or let me take a step back, I don't

13  want to have prejudices preordain our involvement or what we

14  do just because we are a fund that has offices in big cities.

15  This is not a situation where we engineered a loan to own

16  strategy.  We will make that case if we have to.

17         As Mr. Rosenthal mentioned, we did not force our DIP

18  upon this company.  We did not force our sale agreement on

19  this company, but rather because of the time constraints and

20  the liquidity constraints, we filled the gap.  B of A and

21  Wells Fargo, who are the ABL DIP lenders, they did not want

22  to go forward with the sizing of the DIP that the company

23  needed.  So we came in to fill that gap.  The ABL DIP

24  lenders, otherwise, would have been lending outside a

25  formula, which was not a place that they were comfortable

1  with.  So we stepped into fill that gap.

2        Your Honor, on the sale agreement, we, in light of

3  the bundle of benefits that we got and in light of the time

4  constraints, again, we filled the gap because there wasn't

5  enough time to get to the terms and conditions that the

6  company was comfortable with, with a strategic bidder, but we

7  do hope that there is going to be a robust and competitive

8  auction.

9        So we believe that we should be aligned with the

10  Committee.  We want to maximize creditor recovery.  We are

11  certainly aligned with the company, and the U.S. Trustee and

12  the ABL DIP lenders who we, very collaborative and

13  successfully, negotiated a resolution upon all issues when we

14  were before your colleague Judge Sontchi and we had a very

15  successful first day hearing.  So, Your Honor, I am really

16  just here today to introduce myself and to make sure that you

17  know that we are here to be supportive.

18        THE COURT:  I appreciate that.  Let me make a

19  comment and I think everybody in the room has heard this

20  before.  As this process plays out, it is an expedited sale

21  process, but within a time line that I have seen before.  I

22  will deal with any issues or concerns with respect to the

23  sufficiency of the process or the timing at a hearing on the

24  13th. So I have no problem with that and I will let that

25  record playout.

1       With respect to issues relating to discovery,

2   scheduling, procedures, some of those mechanical issues, the

3   parties in the Courtroom, I believe, are aware, my practice

4   is to strongly discourage motion practice as it relates to

5   discovery, scheduling issues that sort of thing and I would

6   ask that you get me on the phone.  As a practical matter, you

7   can get me on the phone pretty quickly.  My experience has

8   been that that is a productive way to deal with these issues.

9       First, I think as a threshold matter, I imagine that

10  being available on the phone resolves many discovery issues

11  before it gets to me.  I assume that that discussion, are you

12  really going to take that position because he's going to be

13  on the phone with us in 20 minutes.  That is fine, but also I

14  just think that it keeps the ball moving.  We get motion

15  practice in a time line like this, it gets very difficult for

16  anybody.

17      Two other points.  First is that the Debtor, the

18  stalking horse and the stakeholders are moving forward,

19  again, on a path that has started with the filing, and we

20  will discuss the time line and mechanics of that on the 13th.

21  Given the time line, and I am not hearing anything different

22  form you, it is, frankly, incumbent upon the Debtor and the

23  stalking horse, especially, to be promptly responsive to

24  issues relating to discovery.  I am not telling you, you

25  can't complain about anything, I am not telling you,  you

1  can't negotiate about anything, but, obviously, you know, if

2  this is going to develop, the Committee is entitled to its

3  opportunity to get its arms around, get comfortable with it

4  and investigate it.

5        So I am not hearing anything different from you in

6  that respect and, again, I will certainly allow that process

7  to play out, but I would simply advise the parties that I am

8  available, hopefully, at your pleasure if issues arise.  But,

9  you know, the 13th gives us a couple of weeks from today,

10  which is, obviously, you know, a few weeks into the case

11  already and so I think we can be confident that the process

12  is moving forward.  I appreciate the report.

13        MR. MEISLER:  Terrific, Your Honor.  Thank you very

14  much.

15        THE COURT:  Ms. Levine, good to see you.

16        MS. LEVINE:  Good morning, Your Honor, Sharon Levine

17  with our proposed co-counsel from the Polsinelli Firm.

18        THE COURT:  Welcome.

19        MS. LEVINE:  Justin Edelson.  Your Honor, after the

20  Debtors spoke I actually didn't feel the need to take the

21  podium.

22        THE COURT:  Oh, but you do now.

23        MS. LEVINE:  I do now. So with just a couple of

24  minutes, I review this case as a little bit different.  We

25  were in negotiations with the Debtor with regard to discovery

1  and they have already uploaded substantial documents to the

2  Debtor.  We appreciate that.  One of my colleagues is

3  actually in Dayton today taking depositions and we appreciate

4  that.  We haven't got off to quite such a smooth start with

5  Silverpoint, but we are optimist, especially given Your

6  Honor's comments that that will fall into place relatively

7  quickly.

8         We are concerned about the transaction here and we

9  do think that this may be different than just a failed or

10 under water business that did its best, but innocently fell

11 into bankruptcy and, therefore, it's a typical type of

12 Committee case where you simply, you know, look for your

13 piece in order to extract a cost at the benefit of using the

14 Bankruptcy Court.  What we saw prepetition here, we think,

15 Your Honor, is an insider transaction.

16        We have already gotten calls from two potential

17 bidders who have expressed concern to us that they weren't

18 able to get access to the process prior to the bankruptcy

19 filing.  We are concerned about the fact that Silverpoint is

20 on both sides of this transaction and even though they

21 stepped off the board, they seemed to have controlled it

22 substantially through liquidity and through being the senior

23 lender.  We are also concerned that the credit bid seems to

24 be credit bidding for all of the assets when there seems to

25 be issues with regard to the scope of the liens with regard

1 to what they are getting.

2       We had a similar situation in a case down here in

3 Delaware called Hays Limier where at the end of the day,

4 based upon a similar capital structure that started with

5 virtually no recovery to the unsecured creditors, the

6 unsecured creditors, at the end of the case, were able to get

7 value almost equal to the senior lenders through negotiation,

8 but unfortunately at first, through some litigation.  So,

9 Your Honor, unfortunately, we don't see this as your typical

10 case where it's an easy process.

11       The Committee is comprised of the PBGC, three former

12 employees who were told that their retiree benefits were

13 going to terminate right at the same time that the company

14 was filing an SCC filing regarding some issues with regard to

15 the prepetition transaction and some bonuses with regard to

16 current employees.  In addition to that, there are two trade

17 creditors who are actually as concerned as some of the other

18 Committee members with regard to the prepetition conduct and

19 what they view as the depression of the value here.

20       The other thing that's interesting here --

21       THE COURT:  Who is your seventh member?  You've got

22 PBGC, three employees, two trades.

23       MS. LEVINE:  Three trades, Your Honor.

24       THE COURT:  Oh, three trades.

25       MS. LEVINE:  In addition --

1        THE COURT:  I know Mr. Kenney only appoints round

2   numbers or odd numbers.

3        MS. LEVINE:  In addition to that, Your Honor, we are

4   not exactly sure of the structure of the sale process. Our

5   understanding is that the Debtor has NOL's that are worth

6   probably, potentially, $150 million dollars.  So doing this

7   as a sale and then leaving an old shell with debt as opposed

8   to potentially using the NOL's to increase value for the

9   benefits of the estate is something that we need to get a

10  little bit further in as well.  So there just seems to be a

11  lot of very, maybe very clever pre-bankruptcy planning that

12  took place here that we would like to see if we could get a

13  closer look at to unlock value for all the stakeholders.

14  Thank you.

15       THE COURT:  All right, Mr. Rosenthal.

16       MR. ROSENTHAL:  Your Honor --

17       THE COURT:  You got your hands full.

18       MR. ROSENTHAL:  Yeah.  We are an open book.  We are

19  going to meet with the Committee and provide the information

20  to them about the NOL's and discuss the NOL's.  We are as

21  interested in protecting the NOL's as they are.  There was a

22  motion filed on the first day.

23       THE COURT:  I saw it.  Judge Sontchi, I think,

24  approved it on an interim basis.

25       MR. ROSENTHAL:  He did and that's up on the 13th on

1  file.  You know, the one thing I want to make clear is if

2  there is a fight between the Committee and Silverpoint about

3  liens and whatever, we understand that fight may have to take

4  place, but it can't take place to the detriment of the

5  business.  We have got to watch out for the business and

6  that's why, from my perspective, we are looking to move

7  through this sale process as quickly as we can, with an

8  efficient process identifying as many bidders.

9        If it works out that it can all be resolved by a

10  sale hearing, and we sell the business and everybody is

11  happy, signed off and litigation goes away, that's fine, but

12  if not, we have sold the business and then there may be

13  ongoing litigation about some of these issues.  We are really

14  focused on the business itself and maximizing value.

15        THE COURT:  A going concern.

16        MR. ROSENTHAL:  Correct.

17        THE COURT:  Maximizing after a sale process.

18        MR. ROSENTHAL:  Correct.

19        THE COURT:  And not allowing the bankruptcy process

20  to impair or, I guess, threaten customer relationships that

21  are the life blood.

22        MR. ROSENTHAL:  Exactly.

23        THE COURT:  Okay.

24        MR. ROSENTHAL:  Thank you, Your Honor.

25        THE COURT:  All right, anything further today?  So

1  we are on for the 13th of April at 10:00 a.m.  Again, to the

2  extent that there are developments, I would just ask that you

3  keep me apprised for purposes of scheduling on the 13th.  All

4  right, we will stand in recess.  Thank you very much for the

5  report.

6     (Court Adjourned)

7

8

9

10

11

12

13

14

15

16                          CERTIFICATE

17

18  I certify that the foregoing is a correct transcript from the

19  electronic sound recording of the proceedings in the above-

20  entitled matter.

21
    /s/Mary Zajaczkowski                    April 4, 2015
22  Mary Zajaczkowski, CET**D-531                    Date

23

24

25