## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*:<br><br>The Standard Register Company, *et al.*,[1] | Chapter 11<br><br>Case No. 15-10541-BLS<br><br>(Jointly Administered)<br><br>**Hearing: April 13, 2015 at 10:00 a.m. (ET)**<br>**Related Dkt. Nos: 124, 187, 188.** |

**REPLY OF VOLT CONSULTING GROUP, LTD. IN SUPPORT OF MOTION FOR THE ENTRY OF AN ORDER: (I) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(1), TO THE EXTENT REQUIRED, TO TERMINATE ITS CONTRACT WITH THE DEBTORS; OR, ALTERNATIVELY, (II) REQUIRING THE DEBTORS TO ASSUME OR REJECT THE CONTRACT UNDER 11 U.S.C. § 365(d)(2) AND PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE**

Volt Consulting Group, Ltd. ("Volt"), in reply to the *Debtors' Objection To Emergency Motion of Volt Consulting Group, Ltd. For The Entry of An Order: (I) Granting Relief From The Automatic Stay Under 11 U.S.C. § 362(D)(1), To The Extent Required, To Terminate Its Contract With The Debtors; or, Alternatively, (II) Requiring The Debtors To Assume or Reject The Contract Under 11 U.S.C. § 365(D)(2) And Provide Adequate Assurance of Future Performance* (the "Objection") [D.I. 187], respectfully represents as follows:[2]

### PRELIMINARY STATEMENT

1.      The Debtors' Objection is premised on an inherent contradiction.  On the one hand, they acknowledge the workers supplied by Volt "form a critical part of [their] business[.]"[3]

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company, Standard Register Technologies, Inc., Standard Register International, Inc., iMedConsent, LLC, Standard Register or Puerto Rico Inc., Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., and Standard Register Technologies Canada ULC.

[2] The Official Committee of Unsecured Creditors filed a joinder to the Debtors' Objection (D.I. 188).  Since the joinder does not include any arguments not contained in the Objection, it is not separately addressed.

[3] *See*, Objection, at ¶ 1.

On the other, they assert that the reason they have not already decided whether to assume Volt's Contract[4] is "obvious[.]"[5] They "are working to sell…their assets…and…will not be in position to decide whether…Volt's Contract should be assumed before a winning bidder is…identified."[6] Respectfully, it makes no sense to suggest the Debtors are unable to decide whether a sale of their business should include a contract they assert is "a critical part of [their] business[.]"[7]

2.      The Debtors also make the customary arguments that they need a "breathing spell" to consider their contracts and granting Volt's motion (the "Motion")[8] would "open the floodgates." First, it appears the Debtors incurred attorneys' fees of over $3 million before these cases were even filed, and retained an investment banker to negotiate the stalking horse asset purchase agreement ("APA") in December 2014. In other words, this is a carefully strategized bankruptcy that has been months in the planning. As such, the Debtors' claim that they need "a breathing spell to assess their executory contracts"[9] is questionable at best.

3.      Second, the Debtors argue that "forcing" them to decide whether to assume or reject Volt's Contract "would *necessarily* open the floodgate with respect to more than 10,000 other contracts and leases."[10] However, it appears Volt is one of just *two* named suppliers whose prepetition claims the Debtors have sought to pay.[11] In addition, the Debtors' Wage Motion and Objection confirm beyond doubt that Volt is among a handful of indispensable suppliers. Under

---

[4] All capitalized terms not otherwise defined herein have the same meaning given to them in Volt's motion (D.I. 124).
[5] *See*, Objection, at ¶ 27.
[6] *Id.*
[7] *See*, Objection, at ¶ 1.
[8] *See*, D.I. 124.
[9] *See*, Objection, at ¶ 6.
[10] *Id.* (emphasis added).
[11] The other supplier is Integrated Human Resource Planning S.C., which is also identified in the Wage Motion (D.I. 14). The Debtors' motion to pay the prepetition claims of critical vendors (D.I. 9) does not specifically identify any critical vendor, and their motion to pay the prepetition claims of foreign vendors (D.I. 12) does not specifically identify any foreign vendor. The only other named entities whose prepetition debts the Debtors are seeking to pay appear to be their insurers (D.I. 8) and the taxing authorities (D.I. 7).

these circumstances, the Debtors' efforts to equate Volt's Contract with their 10,000 other contracts is nothing more than facile exaggeration.

> **A.      The Objection Fails to Provide Valid Legal or Factual Reasons Why the Debtors Should not be Ordered to Assume or Reject the Contract.**

4.      According to the Debtors' first day declaration, Lazard Middle Market, LLC ("Lazard") negotiated the APA prior to the petition date.[12]  Lazard was engaged in December 2014.  *See*, Lazard engagement letter (D.I. 89-3).  The engagement letter expressly contemplated the Debtors' bankruptcy filing.  *Id.*, at p. 4.  Furthermore, it appears the Debtors incurred $3,343,800.91 in legal fees in the three months before the petition date.[13]  In sum, this bankruptcy has been planned since *at least* late last year, and was not filed in response to some unforeseen crisis, as many are.  Thus, the Debtors' insistence that they should not be required to make a determination concerning Volt's Contract due to "the mere infancy of these cases"[14] is unpersuasive.

5.      Equally unpersuasive is the familiar refrain that early assumption or rejection "could severely jeopardize…the sale process and the recovery available to all creditors."[15]  Clearly, assumption of a contract that is, in Standard's words, "a critical part of [its] business infrastructure"[16] will not jeopardize the sale of its business or creditors' recoveries.  If anything, by postponing this decision (and prolonging the damage being done to Volt's relationship with the Vendors) the *Debtors'* dilatory approach will jeopardize the sale process and creditors' recoveries.

---

[12] *See*, Carmody Decl. (D.I. 2), at ¶ 43.
[13] This number is arrived at by adding the advance payments received by the Debtors' attorneys prior to the petition date, and subtracting the unused portion of the advance payments.  *See*, R. Klyman Decl. (D.I. 85-3), ¶¶ 8 – 9.
[14] *See*, Objection, at ¶ 27.
[15] *See*, Objection, at ¶ 27.
[16] *See*, Objection, at ¶ 1.

6.      Notably, the Debtors' Chief Restructuring Officer has asserted that if Volt stopped supplying workers "Standard Register could lose millions in revenue[.]"[17]  Thus, the losses the Debtors claim they would incur exceed the cost of assuming the Contract.  As such, accepting their arguments as true, the Debtors' procrastination concerning Volt's predicament lacks a sound financial basis.  Clearly, there must be some other reason for the Debtors' opposition to the Motion.  Of course, the most obvious answer is that the Debtors simply lack the financial ability to assume that Contract.  That, in turn, supports Volt's entitlement to suspend performance post-petition unless it is adequately protected.

**B.      Volt Should be Permitted to Suspend Performance Post-petition or, at a Minimum, the Debtors Should be Ordered to Pay Volt Cash in Advance.**

7.      The Debtors do not even attempt to confront the reasoning in the case cited by Volt in support of its right to suspend performance.  *See*, *In re Lucre, Inc.*, 339 B.R. 648 (Bankr. W.D. Mich. 2006) ("*Lucre*").  Instead, they simply dismiss *Lucre* as non-binding and, in opposition, offer a non-binding, unpublished, and unfurnished hearing transcript.[18]  In any event, as explained in the Motion, *Lucre* held that if pre-petition defaults are irrelevant to a creditor's obligation to perform post-petition, then the existence of § 365(b)(4) is superfluous.  339 B.R., at 657-8.  And it *is* binding law that statutes should not be interpreted in such a manner.  *Cf.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("of course we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.").

8.      The Debtors do not cite a single opinion, reported or unreported, that disagreed with *Lucre.*  Indeed, the only legal authority offered by the Debtors that declined to follow *Lucre* is an uninformative and conclusory excerpt from a 2009 hearing transcript.  No explanation of

---

[17] *See*, Carmody Decl. (D.I. 187-1), at ¶ 5.
[18] *See*, Objection, ¶ 21 (*citing In re Lehman,* Case No. 08-13555, Tr. at 110:17-18).

that *extempore* ruling is given, and the Debtors fail to explain what relief was sought or which aspect of *Lucre* was under consideration.  Indeed, the Debtors fail to even provide the transcript.

9.      The Debtors also assert that, apart from *Lucre*, "nearly all other courts to have considered this issue" hold that a creditor must perform post-petition and pre-assumption regardless of the existence of a pre-petition default.[19]  Despite this sweeping claim, the Debtors only cite one case, which was actually relied on by Volt.  *In re Cont'l Energy Associates Ltd. P'ship*, 178 B.R. 405 (Bankr. M.D. Pa. 1995).  However, the circumstances under which the creditor in *Continental* was required to perform were starkly different to those here.  In *Continental*, as a form of post-petition adequate assurance, the debtor offered to pay cash in advance.  178 B.R., at 407.  While expressing concern about "the Fifth Amendment rights of an entity to be compensated for property," *Continental* held that because "the Debtor is now paying…the contract amount in advance," the creditor's "Fifth Amendment rights are vigilantly being guarded[.]"  *Id.*  In other words, the fact the creditor was required to perform post-petition was inextricably linked to the fact it was being paid cash in advance.

10.      By contrast, Volt is extending post-petition credit of approximately $366,000 to Standard every week.[20]  Volt is *not* being paid cash in advance.  As such, by implication, its Fifth Amendment rights are *not* being "vigilantly guarded."  The Debtors try to distinguish this aspect of *Continental* on the tenuous grounds that the debtor there "<u>offered</u> to prepay[.]  <u>The court did not hold that prepayment was required</u>."  Objection, at ¶ 31 (underlining in original).  In fact, the *Continental* court placed no significance whatsoever on the fact the debtor *offered* to pre-pay.  The court simply held that *because* the creditor was being pre-paid, its constitutional rights were being protected and, therefore, it could be ordered to perform post-petition.  178 B.R., at 407.

---

[19] *See*, Motion, at ¶ 20.
[20] *See*, Littman Decl., ¶ 8 (D.I. 124-2).

Moreover, in *Continental* the debtor had already been ordered to assume the contract within 30 days (*id.*); relief the Debtors here fervently oppose.

11.      Importantly, the Debtors claim – without any supporting evidence whatsoever – that they are "fully capable of assuming the contract."[21]  For the reasons above, it seems unlikely this is true or they would have already done so.  Volt's legitimate concerns concerning the Debtors' creditworthiness are compounded by the fact that under the APA the stalking horse will not be liable for any post-petition payables unrelated to assumed contracts.[22]  At a minimum, given the complete lack of evidence to the contrary, it is respectfully submitted Volt should be permitted to take discovery concerning the Debtors' post-petition liquidity if its request for adequate protection is to be denied.

### C.      The Debtors Fail to Address Volt's Principal Arguments Concerning the Existence of "Cause" to Terminate the Automatic Stay.

12.       Rather than fairly confronting the arguments in Volt's Motion, the Objection cherry-picks the points it addresses and ignores Volt's principal arguments.  For example, the Debtors acknowledge Volt's position that it faces the prospect of being sued by the Vendors[23] but does not even attempt to address this fact, which is now undisputed.

13.      Similarly, as noted in the Motion, "the current situation is threatening Volt's valuable relationships with the Vendors, who are essential to its business."[24]  The Debtors assert that this fact is unsupported because the Littman declaration[25] merely states that Volt "is coming under intense pressure from the Vendors" and is "struggling to impart confidence to the Vendors due to the Debtors' lack of assurances."[26]  The suggestion that a business relationship is not

---

[21] *See*, Objection, at ¶ 18.
[22] *See*, Section 2.4(b) at p. 16 of the APA (D.I. 23-5).
[23] *See*, Objection, at ¶ 33.
[24] *See*, Motion, at ¶ 14.
[25] *See*, D.I. 124-2.
[26] *See*, Objection, at ¶ 16.

under threat when one party is under intense pressure from the other and lacks their confidence strains logic.

14.     In addition, absent an assignment of Volt's rights,[27] the Vendors are dependent on the Court granting the relief sought in the Motion to Volt.  As noted in the Motion:

> Many of the Vendors are small and medium sized businesses. As a result, they are suffering severe liquidity crises and may face bankruptcy themselves. Moreover, under state laws the Vendors' principals may face personal liability for the wages of the Debtors' contract workers.[28]

15.     As a factual matter, this is completely undisputed by the Debtors.  And as a legal matter, the Debtors do not suggest that harm to third parties, particularly those in the position of the Vendors, cannot constitute "cause" to terminate the automatic stay.  However, even if the Court finds "cause" is lacking to lift the stay to permit Volt to terminate the Contract, it is respectfully submitted that, at a minimum, Volt should be allowed to suspend performance unless or until the Contract is assumed, or the Debtors should be ordered to pay cash-in-advance.

*[Signature page follows]*

---

[27] *See*, Rothenberg Decl., Exhibit A, at p. 51 (D.I. 124-4).
[28] *See*. Motion, ¶ 14.

Dated: Wilmington, Delaware
       April 8, 2015

Respectfully submitted,

*/s/ Peter M. Sweeney*
Peter M. Sweeney (DE # 3671)
BLAKELEY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 415-9908
Email: psweeney@blakeleyllp.com

– and –

David M. Mannion
BLAKELEY LLP
54 W. 40th Street
New York, NY 10018
Telephone: (917) 472-9587
Email: dmannion@blakeleyllp.com

*Attorneys for Volt Consulting Group, Ltd.*