## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15- 10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. 15, 59, and 104; and 23, 106, 119, and 200. |

## DECLARATION OF KEVIN CARMODY IN SUPPORT OF DEBTORS' SALE MOTION AND MOTION TO APPROVE POSTPETITION FINANCING

I, Kevin M. Carmody, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.     I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") with an office at 55 East 52nd Street, New York, NY 10055.  Since March 2, 2015, I have served as Chief Restructuring Officer of the Debtors.

2.     I submit this declaration (the "Declaration") in support of (1) *the Debtors' Motion for (I) an Order (a) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (b) Approving Bid Protections; (c) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (d) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (e) Scheduling a Hearing to Consider the*

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

*Proposed Sale; and (f) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale* [Docket No. 23] (the "Sale Motion") , and (2) the *Debtors' Motion for Order (A) Authorizing Debtors (I) To Provide Adequate Protection To The Debtors' Secured Lenders, (II) To Obtain Interim Postpetition Financing On A Superpriority, Secured and Priming Basis In Favor of Silver Point Finance, LLC, as Administrative Agent For Proposed DIP Term Lenders, and Bank of America, N.A., as Administrative Agent For Proposed DIP ABL Lenders, and (III) To Modify The Automatic Stay; and (B) Scheduling, and Establishing Deadlines Relating To A Final Hearing and Entry of A Final Order On Postpetition Financing* [Docket No. 15] (the "DIP Financing Motion" and together with the Sale Motion, the "Motions")[2] of The Standard Register Company ("Standard Register" or the "Company") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the matters set forth herein.  I am over eighteen (18) years of age and I am authorized to submit the Declaration on behalf of the Debtors.  If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated.

4.  On March 12, 2015, I submitted a declaration [Docket No. 2] (the "First Day Declaration") providing, among other things, a summary overview of the Debtors and the

---

[2]    Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Sale Motion or DIP Financing Motion, as applicable.

Chapter 11 Cases.  My statements in the First Day Declaration are hereby incorporated by reference as though fully set forth herein.

A.      <u>The Strategy Committee and the Board</u>

5.      In January 2015, a committee consisting of a subset of directors from the Standard Register's board of directors (the "<u>Board</u>") was formed to discuss and consider restructuring alternatives for the Debtors (the "<u>Strategy Committee</u>").  Jake Brace, Bob Peiser, and Eric McCarthey are the members of the Strategy Committee.  I meet with the Strategy Committee regularly; in the period leading up to the Debtors' bankruptcy filing, we met multiple times each week.  The Strategy Committee functions as an efficient working group or sounding board for the consideration of the Debtors' restructuring options without requiring the convening of the full board.  Most of the Strategy Committee's work is tactical in nature.  At all times, significant restructuring decisions have been made and continue to be made by the full Board.

6.      Throughout my tenure as CRO, regular meetings have been held to keep the Board informed of developments in the restructuring process.  I participate in a standing call with the Board each Friday, and also communicate regularly with board members as the need arises. With the Company's advisors, I have worked closely to provide the Board and Strategy Committee with the information they require to proactively manage the restructuring process.

B.      <u>Pressure from Vendors and Customers</u>

7.      The Debtors' operations rely on a vendor base that is highly fragmented and in many instances provides highly customized products.  Many vendors and customers continue to be extremely concerned about the length of the Chapter 11 Cases and any attendant disruptions to business.  Even prior to filing the Chapter 11 Cases, the Company received calls from vendors and customers daily on account of significant uncertainty regarding the Company's

strategy going forward.  The Company's ability to respond to the concerns of its vendors and customers during the months leading up to the bankruptcy filing was limited because we could not definitively articulate a clear path forward to address the Company's liquidity and capital structure challenges.  Nevertheless, during this period the Company was in constant communication with vendors and customers to reassure them that the Company was pursuing a specific strategic course of action to stabilize the business.  Particularly in light of these reassurances, had the Debtors entered bankruptcy without the certainty of liquidity that the DIP Loans provided, the results would have likely been disastrous.  The Debtors would have suffered a rapid diminution in both customers and vendors willing to do business with them, leading to an accelerated decrease in cash flow and ultimately a value-destroying liquidation.

8.    Furthermore, the Company's customers rely on us to supply a variety of critical and often custom products on a just-in-time basis.  As such, they are highly sensitive to a risk of disruption in the supplies provided by the Company.  Many critical customers have informed us that the fact that we have a clearly articulated process with a definite end date for a going concern transaction has been critical to their decision to continue their business relationship with Standard Register.  An open-ended process with a higher perceived likelihood of liquidation would have negatively impacted these vital business relationships.

9.    External pressure in dealing with customers and vendors was correlated with the Company's precarious liquidity situation.  Prior to the bankruptcy filing, the Company faced additional liquidity constraints following from the applicable covenants in the prepetition credit agreements.  For example, while approximately $15 million of borrowing capacity remained under the Pre-Petition ABL Loans at the time of the Debtors' bankruptcy filing, the Debtors were effectively prevented from accessing this capacity by a covenant.  If availability

under the facility fell below $15.6 million, a fixed charge coverage ratio requirement would have applied, which the Debtors would have failed.  A failure of this covenant would have triggered an 8-K disclosure requirement.  Such a disclosure would have added to the uncertainty as to the Company's future and exacerbated the concerns of customers and vendors.

10.     As anticipated in the DIP Budget, after the commencement of the Chapter 11 Cases many of the Debtors' vendors have significantly contracted the time period over which they are willing to extend credit to the Debtors.  Some vendors require cash on delivery, while others have imposed restrictive credit limits.  Post-filing, we received several hundred calls from our vendors.

11.     I believe that the Debtors' access to the liquidity necessary to continue their operations and visibility to a focused, short term process with an expectation of a going concern sale is an essential factor in sustaining the Debtors' ability to obtain favorable postpetition credit terms from many vendors and maintain relationships with customers.

**C.     Liquidity and Preservation of Cash**

12.     Throughout my tenure as an advisor to the Company and as CRO, the Company has been in crisis mode.  Prior to filing the petitions, we were running out of cash quickly and did not have much time to solve our liquidity crisis.  As a result, in the months before the Debtors' bankruptcy filing, every effort was made to preserve cash and maintain liquidity.  I worked closely with Bob Ginnan, the Company's former CFO, and the finance group to enhance the Debtors' cash forecasting capabilities and implement a liquidity management system.  We regularly evaluated whether certain payments could be postponed in order to preserve liquidity.  As CRO, I was heavily involved in the decision-making process as to the timing of certain payments, as were the CFO and treasurer.

13.     In order to preserve liquidity, we have delayed payments to certain vendors.  For example, there is an outstanding $3.5 million dollar demand payment from a number of our paper vendors that the Company has not made.  The Debtors are under constant pressure to make these payments.  The Company's determination to delay these payments accounts for some favorable variances when comparing the Debtors' projected cash flow with actual cash flow.

**D.     Terms of the DIP Loans and the APA**

14.     The terms of the DIP Loans and the APA were the result of hard-fought, contested arms-length negotiations between the Debtors and the lenders.  Throughout our negotiations with Silver Point and Bank of America, we pushed back on all material points.  For example, the Company strongly pushed back on the lenders' requests for additional collateral and their proposed variance covenants in connection with the DIP Budget.  Despite our sustained efforts to push back on these and other terms, the consistent feedback we received from the lenders was that the proposed terms were the ones that they required, and that without these proposed terms the lenders would be unwilling to extend the DIP Loans.  Similarly, the lenders insisted that certain of their terms be incorporated into the projections underlying the DIP Budget.  Because the Company's precarious liquidity position and lack of access to alternative financing were widely understood, under the circumstances the lenders had significant negotiating leverage over the Company.

15.     With likely no other options for obtaining DIP financing, the Debtors were faced with a stark decision.  We could either negotiate the best available financing in the market or we could liquidate the Company.  The decision that we reached as a Company, with direction from the Board, was that it was better to obtain the DIP Loans, which we believed (and which

Lazard later confirmed during its DIP marketing efforts) were the best financing available in the marketplace, to reorganize properly through a Chapter 11 filing, ensure the survival of the Company, and preserve enterprise value as an ongoing operation.  I firmly believe that the financing obtained by the Debtors was the best financing available to us at the time and was absolutely essential to enable the Company to operate during bankruptcy.

16.     The terms of the DIP Loans include three "milestone" dates requiring that the Debtors obtain approval of sales procedures by April 10,[3] approval of a sale by June 19, and closing of a sale by September 8.  The milestones in the sale process were supported by the Company in order to strike an appropriate balance between maximizing value with a thorough, robust post-petition sales process and limiting the duration of the Chapter 11 Cases.

17.     Far from generating any additional value, a delay in the timeline of the auction process would actually undercut the overall enterprise value of the Company.  While the Company is in bankruptcy, numerous new business proposals outstanding with customers have been placed on hold indefinitely, and the pipeline of such business opportunities is effectively dried up.  This situation is of particular concern because several of the Company's key contracts expire in 2015.  As such, after considered, informed discussion, the Board determined that the milestone dates were an effective strategy for striking this balance.  The Company remains under enormous pressure from customers, vendors, employees, and other stakeholders.  As previously discussed, our customer and other business relationships are fragile, and these parties have continued to transact business with the Company in significant part because of the timeline and their expectation that the business will be sold through the Chapter 11 process within the anticipated period.  A delay in the sale process or any material changes in the DIP Loans would

---

[3]     The Debtors are currently engaged in negotiations regarding an extension of this date.

upset this relied-upon expectation and strain these relationships.  If we are unable to maintain our customer and other business relationships, the value of the business would deteriorate quickly. In this sense, the enterprise value of the business is like a melting ice cube: the longer the Company is in bankruptcy, the greater the risk to the Company's survival.  I believe the Company will suffer significant harm if the milestones set forth above are extended.

**E.**     **Size of the DIP Loans**

18.     The Debtors, with the assistance of their advisors and after extensive internal discussion and analysis, developed the DIP Budget by conducting a comprehensive review of the Debtors' operations and cash flow needs.  The DIP Budget reflects the Debtors' carefully considered projection of anticipated expenditures during the course of the Chapter 11 Cases, plus a reasonable cushion given the uncertainties of operating in bankruptcy.

19.     The Debtors carefully considered the appropriate size of the DIP Term Loan Facility and determined, in light of their DIP Budget and anticipated borrowing constraints under the DIP ABL Loans, that a $30 million DIP Term Loan was both necessary and sufficient to fund the Debtors' operations.  The maximum draw projected in the financial model underlying the DIP Budget was approximately $25 million dollars, and the additional capacity of the loan was included as a cushion to account for any unforeseen circumstances.

20.     The fact that the Debtors have outperformed their initial DIP budget in the initial few weeks of the bankruptcy in no way means that the Debtors will not need access to the $30 million under the DIP Term Loan.  The Debtors face increasing pressure on their supply chain as they determine whether to ultimately make substantial payments to vendors that have been delayed.  Furthermore, there is still substantial risk associated with cash receipts from customers as we continue to operate in bankruptcy.  While we hope to not need to fully draw

8

down the DIP Term Loan, I continue to believe that the size of the facility is appropriate under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Kevin  Carmody

Executed this 10th day of April 2015