IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 15, 59, 104, and 203** |

## DEBTORS' REPLY IN SUPPORT OF MOTION FOR POSTPETITION FINANCING

The Standard Register Company ("Standard Register") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors") hereby submit this Reply in support of their motion for debtor-in-possession financing [Docket No. 15] (the "DIP Financing Motion")[2] and respectfully represent as follows:

### PRELIMINARY STATEMENT

1.     The Debtors have presented the Court, their creditors, and parties in interest with a restructuring solution that represents the best possible outcome under the circumstances. Indeed, this much does not appear to be in dispute: the Debtors are significantly overburdened with secured debt, and any recovery by unsecured creditors ordinarily would be, at best, a tenuous proposition. Nevertheless, the Debtors have secured the agreement of their prepetition secured lenders to provide postpetition financing sufficient to effect a sale of substantially all assets through a value-maximizing process. The Debtors require postpetition financing to

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Financing Motion.

01:16952682.1

continue operating while they conduct the sale process, and that financing, itself the product of arm's-length, good-faith negotiations with the prepetition secured lenders, is potentially imperiled by the Committee's objections. Indeed, this Court's interim approval of the DIP Loans has not only allowed the Debtors to avert an imminent liquidity crisis, but has buoyed the Debtors' operations by allowing for a smooth transition into chapter 11 and setting the stage for the Debtors to sell their businesses as a going concern.

2. The DIP Loans are each a unified whole to which the Debtors must either agree or not. That is the relevant issue here, and the Committee does not make any serious effort to argue that the Debtors' decision was anything other than a good-faith business judgment. Simply put, this funding could not have been obtained without the assurances and other protections provided by the proposed Final Order. And no other party was willing to provide funding on any terms. The Debtors believe that this additional investment from their lenders is sufficient to meet ongoing operating and restructuring expenses, including those of the Committee and its professionals, but only if the Debtors are able to proceed as scheduled and within the present budgetary constraints. Certain of the Committee's objections seek substantial deviation from this course and, because such deviations necessarily would imperil the restructuring more generally and are unwarranted in all events, the Committee's objections should be overruled. To be sure, in a perfect world, the Debtors would not have granted their postpetition lenders each and every concession set forth in the Final Order. But the absolute need for postpetition financing, the potential for a protracted, and likely fatal, priming fight if the Debtors were even able to procure (which they were not) and then to attempt to proceed with financing from a third party, and the understandable requirement of the Debtors' postpetition lenders to be adequately protected, amply justifies the terms of the deal as a whole and should be approved by the Court.

**BACKGROUND**

A.     **General Background**

3.     On March 12, 2015 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

4.     The Debtors' chapter 11 cases (the "Chapter 11 Cases") are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. An official committee of unsecured creditors (the "Committee") was appointed on March 24, 2015.

5.     Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the *Declaration of Kevin Carmody In Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 2] (the "First Day Declaration").

6.     This Reply is further supported by the O'Flanigan Declaration [Docket No. 16], the *Declaration of Kevin Carmody in Support of Debtors' Sale Motion and Motion to Approve Postpetition Financing* that was filed contemporaneously herewith (the "Supplemental Carmody Declaration"), and the *Declaration of Andrew Torgove in Support of Debtors' Sale Motion and Postpetition Financing Motion* that was filed contemporaneously herewith (the "Supplemental Torgove Declaration").

B.     **The Court's Approval of the DIP Loans on an Interim Basis**

7.     The background relating to the Debtors' need for the DIP Loans and the terms of the DIP Loans is set out in detail in the DIP Financing Motion. On March 13, 2015 this Court

approved the DIP Financing Motion on an interim basis. *See* Docket No. 59. The Debtors now seek entry of the Final Order that approves the DIP Loans.

C.  **The Committee's Objection**

8.  On April 6, 2015 the Committee filed an objection (the "Objection") to the entry of a final order approving the DIP Financing Motion under seal. As of the time of this filing, a redacted copy of the Committee's objection has not been filed on the docket. The Committee's Objection raises a litany of issues that are often raised out of Pavlovian reflex in chapter 11 cases. However, as discussed below, such DIP facility provisions are customary and proper when entered into in a debtor's sound business judgment.

D.  **The Raymond Objection**

9.  On March 25, 2015 Raymond Leasing Corporation and Raymond Storage Concepts, Inc. (together, "Raymond") filed a limited objection to the DIP Financing Motion [Docket No. 104]. The Raymond objection is properly characterized as a reservation of rights. Raymond seeks to confirm that the DIP Loans will not prime any of Raymond's liens, to the extent that Raymond has any liens that constitute validly perfected liens as of the Petition Date. Pursuant to the Debtors' proposed Final Order, the DIP Loans do not prime "a security interest or lien . . . which was in existence on the Petition Date; was a duly perfected, valid and enforceable security interest or lien; is not subject to avoidance or subordination; and as of the Petition Date was, and at all times thereafter remains, senior in priority to the Pre-Petition Security Interests." Thus, to the extent that Raymond has any validly perfected liens as of the Petition Date that are senior to the liens of the Secured Lenders, these liens will not be primed by the DIP Loans. To the extent that Raymond has any liens that are not senior to the liens of the Secured Lenders, it is appropriate to prime those liens with the DIP Loans since they are already junior to the existing liens of the Secured Lenders.

# REPLY

## A. Entry Into the DIP Loans Is an Appropriate Exercise of the Debtors' Business Judgment

10. As noted in the DIP Financing Motion, bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve a debtor's request to obtain postpetition financing. *See, e.g.*, *In re United States Mineral Prods. Co.*, Case No. 01-2471 (JFK), 2005 WL 5887218, at *2 (Bankr. D. Del. Nov. 29, 2005) (approving financing based on debtor's and trustee's exercise of "prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that court should defer to debtor's "reasonable business judgment"). As Judge Gross recently explained:

> [C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender. . . . Under the [Business Judgment Rule], courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision. The business judgment rule under Delaware law and the law of numerous other jurisdictions establishes a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.
>
> Under this formulation, the business judgment rule governs unless the opposing party can show one of four elements: (1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent.

*In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).[3] The Committee has not even attempted to show (nor could it) that one of these exceptions applies on these facts.

11. In fact, even in *Ames Department Stores*, a case on which the Committee heavily relies, the Court concluded that the case law reflects that a court's discretion under Bankruptcy Code section 364 "is to be utilized on grounds that permit reasonable business judgment to be

---

[3] Although the Court in the *Los Angeles Dodgers* case ultimately found that the Dodgers' decision was not entitled to protection under the business judgment rule, that determination was based upon the determination that the transaction was tainted by self-dealing. *See Los Angeles Dodgers*, 457 B.R. at 313. The Committee has not made any such allegations in this situation, nor can it.

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *Ames Dep't Stores*, 115 B.R. at 40.

12.  As described in the First Day Declaration, "the Debtors have an immediate and urgent need for debtor-in-possession financing to continue to operate their business." *Id.* at ¶ 105.  Indeed, "the Debtors' aggregate cash needs to continue operations exceed the cash collateral they [are expected to] generate." *Id.*  As described in the O'Flanagan Declaration, the Debtors sought debtor-in-possession financing from several sources and "[n]o party, other than the DIP Lenders, was willing to provide a proposal on terms reasonably acceptable to the Debtors and with sufficient flexibility to support the sale process primarily because of their unwillingness to engage in a contested priming fight with the Debtors' existing secured lenders." *Id.* ¶ 11.  Indeed, the "DIP Loan Agreements represent the most favorable terms that the Debtors were able to negotiate with respect to debtor-in-possession financing." *Id.* ¶ 12.

13.  The Committee's principal objection to the decision to obtain the DIP Loans relates to the amount of availability under the DIP Term Loan Agreement.  The Committee argues without any evidence that the $30 million in delayed-draw availability under the DIP Term Loan Agreement is oversized because the initial Budget shows a maximum draw of $10.4 million during the first 13 weeks of the case.[4]  According to the Committee, the DIP Term Loan Agreement was therefore "crafted only to facilitate a credit bid sale for the benefit of Silver Point, at the expense of unsecured creditors."  Obj. ¶ 22.  This baseless assertion is nothing more than naked muckraking.  The Debtors absolutely needed financing beyond that provided by the ABL DIP Lenders.  The Committee does not seriously contest this point.  The Debtors sought

---

[4]  The Committee conveniently ignores the fact that the Debtors will need financing beyond the initial 13 weeks of the case.

01:16952682.1

that financing from the ABL DIP Lenders and others. No party other than the DIP Term Lenders was willing to provide the financing on any terms. The Committee also has not presented any credible evidence to suggest that the Debtors' business judgment in sizing the DIP Term Loans at $30 million was grossly negligent. To the contrary, the Debtors, in consultation with their advisors, carefully considered the size of the DIP Term Loans in light of the Debtors' anticipated and unanticipated capital needs and determined, in the sound exercise of their business judgment, that $30 million is the right amount. *See* Supplemental Carmody Decl. ¶ [19]. Even if the Debtors needed less than $30 million in additional funding under the DIP Term Loans, the amount of required funding doesn't alter the lenders' ability to require the same set of protections as those found in the DIP Loans.

14. The best the Committee can do is take pot shots at the Debtors' Budget in an effort to suggest that the Debtors do not need all of the projected funds for business purposes (yet, ironically, complain at the same time that the Debtors need to borrow more money to fund the Committee's scorched-earth litigation strategy). For example, the Committee complains about the Debtors' pre-filing assumption that the Debtors would experience a post-filing credit crunch as their vendors reduced credit terms; and points to the Debtors' postpetition performance as evidence that the Debtors artificially front-loaded their projected cash needs. Besides having the benefit of hindsight and myopically focusing only on the timing and not the amount of the Debtors' projected cash needs, the Committee's argument conveniently ignores the reality that the Debtors' access to sufficient liquidity through the DIP Term Loans is the primary reason that many of their vendors have been willing to extend postpetition credit to the Debtors. *See* Supplemental Carmody Decl. ¶ [11]. The Committee's other arguments similarly and strangely complain about the Debtors' excellent postpetition performance; with the Committee suggesting

that the Debtors should have risked their business and more than 3,000 jobs by agreeing to a DIP facility sized only to account for a best-case business outcome.

15. There is similarly no evidence to support the allegation that the DIP Term Loans "exist solely as a pretext to enable Silver Point to expand its collateral base in contemplation of a credit bid in the Sale" (Obj. at 13) and that allegation should be disregarded. Instead, the DIP Loans have allowed the Debtors to avert a liquidity crisis and afforded the Debtors the opportunity to complete a sale of their businesses as a going concern for the benefit their customers, vendors, contract counterparties, and employees. Simply put, the DIP Loans are the reasonable result of a fulsome process and therefore should be approved.

**B.    The Business Terms of the DIP Loans Are Reasonable**

16. A sizable chunk of the Committee's objection is given over to why, in the Committee's opinion, the fees under the DIP Term Loan Agreement are excessive.[5] Specifically, and without citing any evidence, the Committee states that the closing fee of $1,050,000 is "well above market at 3.5%." Obj. ¶ 33. That is simply not true. *Cf.* Supplemental Torgove Decl. ¶ [39].

17. The Committee goes on to argue that the closing fee is inappropriate in light of the Debtors' projected borrowing needs, and complains about the commitment fee on the undrawn amount. Cobbling these arguments together, the Committee asserts that the "aggregate interest and fees under the DIP Term Loans total upwards of 50% per annum." Obj. ¶ 33.

---

[5] The Committee also argues that the Budget compliance covenants are "unnecessarily stringent." Obj. ¶ 64. While the Debtors would naturally prefer looser Budget compliance covenants, the Debtors developed the Budget and are comfortable that they can remain in compliance with these covenants.

18. The Committee's position is pure alchemy.[6] First, as noted above, the Debtors, in the sound exercise of their business judgment, have appropriately sized availability under the DIP Term Loan Agreement at $30 million and the closing fee is 3.5% of that amount. The commitment fee is only 1% per annum on the undrawn amount—a market rate for a DIP facility of this size. *See* Supplemental Torgove Decl. ¶ [40]. The Committee does not even assert that the interest rate under the DIP Term Loan Agreement is above-market. Putting this all together, although the Debtors would of course rather pay less to obtain necessary financing, the market simply does not allow them to do so.

C.  **The DIP Loans Permit the Committee to Fulfill its Fiduciary Obligations**

19. The Committee also complains of the brevity of its investigation period and seeks additional fees, budgetary concessions, and other accommodations in furtherance of its efforts to discharge its fiduciary duties.

20. As an initial matter, the funding provided to the Committee pursuant to the Budget should be sufficient given the projected duration of these Chapter 11 Cases and in light of the forthcoming sale. The postpetition financing has been sized appropriately to permit the Committee to discharge its fiduciary obligations given the course of these Chapter 11 Cases.

21. The Committee's request that the deadline to bring an action challenging the Secured Lenders' liens be extended from 60 days to 120 days is also inappropriate. The Committee has not advanced any colorable reasons as to why it cannot conduct an adequate investigation within the allotted 60 days. The Debtors have already produced more than 3,700 documents in response to the Committee's discovery requests, and they have produced three

---

[6] The Committee's 50% figure appears to be largely driven by amortizing the closing fee over the relatively short duration of the Debtors' expected stay in chapter 11, and on an amount that is below the Debtors' anticipated borrowings. As best as the Debtors can tell, the Committee would therefore have no issues with the fees and expenses if the Debtors planned to languish in chapter 11 for a longer period and to waste additional estate resources on restructuring expenses—such as the expenses required to litigate with the Committee.

witnesses for deposition (and the Committee has deposed a SilverPoint representative). Whatever facts there are to be discovered in order to determine whether to bring an action can be discovered in the 60-day period, and any extension of this period will only give rise to unnecessary delay and expense, to the detriment of the Debtors' stakeholders.

22.     Moreover, the Committee's assertion that it should be granted automatic standing to assert challenges to any prepetition secured liens ignores long-standing authority otherwise. Obj. ¶ 57.  It is well established in the Third Circuit "to be granted derivative standing, the moving party must demonstrate that (i) the debtor-in-possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the debtor-in-possession; (ii) the moving party has alleged colorable claims; and (iii) the moving party has received leave to sue from the bankruptcy court." *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 Bankr. LEXIS 2155, at *17 (Bankr. D. Del. May 13, 2014).  Under these requirements, the court must act as a gatekeeper to prevent waste of estate assets for pursuit of meritless claims and claims that are not likely to benefit the estate in light of the cost of litigation.  *See In re Centaur, LLC*, No. 10-10799, 2010 Bankr. LEXIS 3918, at *15 (Bankr. D. Del. Nov. 5, 2010).  The Committee should not be granted such standing merely as a consequence of filing its Objection.

**D.     The Sale-Related DIP Milestones are Appropriate**

23.     The Committee makes vague and unsupported allegations that the Debtors' proposed timeline "is unreasonably aggressive and should be extended by at least 60 days. . . ." Obj. ¶ 32.  There is no basis for the Committee's assertion.  The sale-related milestones are fully reasonable for the reasons set forth in the Debtors' reply in support of their sale motion, which was filed contemporaneously herewith.

### E. The Collateral Package is Appropriate

24. The Committee also takes issue with the collateral package granted to the DIP Lenders—arguing that the collateral package is "overly broad and constitute[s] nothing more than an attempt by Silver Point to grab as much value as possible through a deliberately flawed sale process." Obj. ¶ 30. Faced with the stark reality that the Debtors were required to provide the collateral package in order to secure the DIP Loans, the Committee makes the unsupported allegation that "the sole reason Silver Point and the ABL DIP Lenders are extending the DIP Financing is to provide the Debtors with sufficient liquidity to operate their business just long enough to survive through the truncated sale process—the sole intended beneficiary of which is Silver Point itself." Obj. ¶ 31. There is of course no evidentiary support for this statement. Moreover, the actual reason that the DIP Lenders agreed to provide the DIP Loans is to support a sale process that maximizes value for the benefit of all creditors—including the unsecured creditors.

#### (i) Liens on the Foreign Debtors' Assets

25. The Committee objects to granting liens on the previously unencumbered equity in and assets of the foreign Debtors. The Committee's objection ignores the reality that the Debtors simply could not obtain postpetition financing without granting liens on the unencumbered assets of the foreign Debtors. Without that postpetition financing, the foreign Debtors would have been forced into immediate liquidation right alongside their U.S. counterparts, to the detriment of their creditors and the creditors of the U.S. entities. With postpetition financing, however, the foreign Debtors have been able to preserve their going concern value for the benefit of their creditors, contract counterparties, and employees. In these circumstances, the business judgment to grant the liens and avoid immediate liquidation was a sound and valid exercise of business judgment that should be respected.

### (ii) Liens on Avoidance Actions

26. The Committee next objects that liens and superpriority claims on the proceeds of avoidance actions are inappropriate—going so far as to take the untenable position that "[a]voidance power actions are not property of the estate that can be pledged, but instead are statutory rights the Debtors hold in trust for the benefit of creditors." Obj. ¶ 35. However, none of the cases cited by the Committee state that proceeds of avoidance actions cannot secure a DIP loan or that unsecured creditors have some unalienable rights to avoidance actions. The proceeds from those actions are simply unencumbered collateral that the Debtors have decided, in their business judgment, to pledge to secure fresh funding needed to maximize value for the benefit of all constituents.

27. Any interest in property that a debtor recovers is property of the estate; that is black letter law. *See* 11 U.S.C. § 541(a)(3) ("Such estate is comprised of all the following property . . . : (3) [a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title."). And, as described in the DIP Financing Motion, Bankruptcy Code section 364(c) explicitly authorizes the grant of liens on unencumbered property and the grant of superpriority claims where a debtor is not otherwise able to obtain needed financing. *See* DIP Financing Motion ¶¶ 32-39. The Committee does not seriously question that this standard has been met here.

28. Put differently, the proceeds of avoidance actions are estate property, and the Committee has not provided any persuasive reason why that property cannot be used to secure financing if a debtor decides that using avoidance actions in that manner is in the estate's best interests. And contrary to the Committee's barefaced assertion that avoidance actions "are not property of the estate that can be pledged," courts in this District have authorized liens on avoidance actions or the proceeds thereof in numerous other cases. *See, e.g.*, *In re Conexant*

*Sys., Inc.*, Case No. 13-10367 (MFW) (Bankr. D. Del. Apr. 19, 2013); *In re School Specialty, Inc.*, Case No. 13-10125 (KJC) (Bankr. D. Del. Feb. 26, 2013); *In re Education Holdings 1, Inc.*, Case No. 13-10101 (BLS) (Bankr. D. Del. Feb. 7, 2013); *In re Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. Jan. 11, 2012); *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept. 8, 2011); *In re Xerium Techs., Inc.*, Case No. 10-11031 (KJC) (Bankr. D. Del. Apr. 28, 2010); *In re Source Interlink Cos.*, Case No. 09-11424) (KG) (Bankr. D. Del May 28, 2009).

### F. The Section 506(c) Waiver is Appropriate

29. The Committee's objection to the waiver of the Debtors' rights under Bankruptcy Code section 506(c) should be overruled. Such waivers are standard with respect to postpetition financings between sophisticated parties, particularly where, as here, the DIP Lenders are funding the Debtors' postpetition expenses.

30. Pursuant to the Budget, the Debtors are paying postpetition expenses on a current basis. Accordingly, the DIP Lenders should not also be subject to surcharge under Bankruptcy Code section 506(c). Specifically, while the Committee implies that the section 506(c) waiver would result in a windfall to the DIP Lenders, the opposite is true. Absent the section 506(c) waiver, the DIP Lenders would effectively be double-charged for this restructuring—once through the DIP Lenders' funding of the case with the proceeds of their collateral, and again if the DIP Lenders' recovery is limited by the use of the very funding the DIP Lenders' provided. It is thus unsurprising that courts have regularly approved similar 506(c) waivers. *See, e.g.*, *In re Real Mex Restaurants, Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 4, 2011).

31. The Committee's arguments that the 506(c) waiver is inappropriate because (a) the "DIP Lenders are extending the DIP Term Loans and DIP ABL Facility solely for their own benefit" and (b) "without making any provision whatsoever to ensure the administrative

01:16952682.1

13

solvency of the Debtors' estates" do not change the analysis. *See* Obj. ¶ 53. First, the DIP Loans are not solely for the benefit of the DIP Lenders—they provide necessary bridge financing designed to get the Debtors to a sale that maximizes value for all constituents and saves thousands of jobs. Second, the professional fee Carve-Out is adequate and appropriate for the reasons discussed below, and access to the Carve-Out will ensure that the Debtors' estates are <u>not</u> administratively insolvent.

33. Further, the DIP Lenders would not provide financing absent a section 506(c) waiver. Accordingly, the Debtors believe, in their business judgment, that the waiver is appropriate given the benefits of securing the DIP Loans. *See In re Antico Mfg. Co.*, 31 B.R. 103, 106 n.1 (Bankr. E.D.N.Y. 1983) (regarding an objection to a 506(c) waiver, the court noted that "[c]ertainly, the paragraph in question is not so detrimental or improper as to jeopardize the loss of the entire financing package").

### G.     The Professional Fee and Carve-Out Provisions are Appropriate

33. The Committee raises several issues with respect to the professional fee and Carve-Out provisions of the proposed Final Order: (i) the Committee asserts that the liens and claims of the ABL Lenders should be subject and subordinate in all respects to the Carve-Out, (ii) the Committee believes that the Final Order needs to "impose an affirmative duty on the DIP Lenders to fund the Carve-Out following an event of default that leads to a cessation of lending" (Obj. ¶ 46), and (iii) the Committee believes the "Carve-Out should not be subject to an aggregate cap"[7] (Obj. ¶ 47).

---

[7] In addition, the Committee contends that any retainers held by the Debtors' professionals must be applied before those professionals should have access to the Carve-Out. The entire $1.5 million in retainers held by Gibson Dunn and McKinsey will not reduce the aggregate cap on the Carve-Out.

34.     The Debtors' decision to exclude the liens of the ABL DIP Lenders and the ABL Lenders from the Carve-Out is a valid exercise of the Debtors' business judgment.  The ABL DIP Lenders and the ABL Lenders would not agree to a carve-out from the ABL Priority Collateral without a concomitant reduction in availability under the ABL DIP Loan.  Thus, if the ABL DIP Lenders' and the ABL Lenders' collateral were subject to the Carve-Out, the Debtors would have been forced to secure a larger commitment under the Term DIP Loan, which was not desirable in the Debtors' business judgment.  In any event, the value of the Term Priority Collateral (which is subject to the Carve-Out), far exceeds the amount of the Carve-Out, with the effect that the professionals will all be sufficiently protected.

35.     The Committee's suggestion that the Carve-Out amount should be funded into escrow on the termination of funding is not necessary, and has not been agreed to by the DIP Lenders.  The professionals are protected in that the proceeds from the disposition of any Term Loan Priority Collateral will be used first to satisfy the Carve-Out and will be paid over to the Term DIP Lenders only after the Carve-Out is satisfied.

36.     The Committee's argument that the Carve-Out should not be subject to a cap of any kind is a non-starter.  The DIP Lenders will not fund into a case where the Committee has carte blanche to the DIP Lenders' collateral to litigate with them at the DIP Lenders' expense.

### H.     The Prohibition on Marshaling Is Appropriate

37.     In addition, the Committee has argued that this Court should not approve a limitation on marshaling.  There, however, is nothing unreasonable about granting such a waiver, which again is customary.  Courts in this District have granted such relief in other cases.  *See, e.g.*, *In re Xerium Techs., Inc.*, Case No. 10-11031 (KJC) (Bankr. D. Del. Apr. 28, 2010); *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008).

## I. The Adequate Protection Provided to the Secured Lenders is Necessary and Appropriate

38.     Here, the existing lienholders have consented to being "primed" by the postpetition financing and, in consideration for that consent, the Debtors have agreed to provide adequate protection on the terms set forth in the proposed Final Order.  This adequate protection is appropriate under the circumstances and, in particular, avoids costly litigation associated with opposition to postpetition financing from secured lenders.  Indeed, risks and uncertainties associated with potential litigation are legitimate considerations.  *See In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 20, 2008) (factoring priming litigation into approval of postpetition financing).  And absent the consent to postpetition financing provided by the Debtors' prepetition lenders, it is unclear how, if at all, the Debtors would have been able to obtain postpetition financing sufficient to get to a sale as a going concern.

39.     Moreover, as shown in the Budget, the Debtors will be cash flow negative during these Chapter 11 Cases.  Thus, there is a need to provide adequate protection to the Secured Lenders.  As the Committee acknowledges, adequate protection is evaluated on a case-by-case basis and may be provided in many forms.  *See* Obj. ¶ 38 (observing that "adequate protection" has a "'broad and flexible definition'" that "'confers upon the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved'") (quoting *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992)).

40.     Despite acknowledging the propriety of adequate protection generally, the Committee argues that the Secured Lenders are protected by a "substantial equity cushion" and therefore do not require additional adequate protection.  Obj. ¶ 39.  The Committee's objection is misplaced.  The ABL Lenders and the First Lien Term Lenders are oversecured and therefore

will be fully repaid in any scenario, so providing them with adequate protection is (1) required, and (2) harmless.  If the ABL Lenders and First Lien Term Lenders are fully secured today and are fully secured at the conclusion of the case their "diminution" claims will be zero, and they will be paid in full from the sale proceeds.  The adequate protection claims, which are limited to diminution in value, would be zero.  If they are oversecured today and no longer oversecured at the conclusion of the case, they are entitled to adequate protection for that diminution. The Second Lien Term Lenders are subordinate to the ABL Lenders and First Tem Lenders, have no equity cushion, and are entitled to adequate protection for the increased senior secured debt funded through the DIP Loans to enable the Debtors to continue operating.

41.   Morevoer, the Committee has not presented any evidence that there is, in fact, an equity cushion with respect to the Second Lien Debt.  The Committee's unsupported statement that the ABL Priority Collateral has a value in excess of $200 million is a red herring.  Even assuming that the Committee's estimate of value is correct, there are more than $211 million prepetition in claims against that collateral that rank ahead of the Second Lien Debt in addition to the priming claims of the DIP Lenders.  The Second Lien Term Lenders are not protected by an equity cushion and are entitled to adequate protection to the extent of any diminution in the value of their collateral.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in the DIP Financing Motion and such other and further relief as the Court may deem just and proper.

Dated:  April 10, 2015
       Wilmington, Delaware

*/s/ Andrew L. Magaziner*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Michael A. Rosenthal (NY No. 4697561)
Robert A. Klyman (CA No. 142723)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
mrosenthal@gibsondunn.com
rklyman@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and Debtors in Possession*