## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re                        :     Chapter 11
:
THE STANDARD REGISTER COMPANY,   :     Case No. 15-10541 (BLS)
*et al.*,                            :
:     (Jointly Administered)
:
Debtors.             :     **Re: Docket Nos. 23, 106, 119, and 200.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY OF SILVER POINT FINANCE, LLC TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE RELIEF SOUGHT IN THE SALE MOTION

Silver Point Finance, LLC ( "**Silver Point**"), as administrative agent under the Prepetition First Lien Credit Agreement[1] and Prepetition Second Lien Credit Agreement, and on behalf of Standard Acquisition Holdings, LLC, as the Stalking Horse, hereby replies to the objection (the "**Objection**") of the Official Committee of Unsecured Creditors (the "**Committee**") to the relief sought in the Sale Motion (Docket No. 200). With respect to the Objection, Silver Point respectfully represents as follows:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Debtors' Motion for (I) an Order (A) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (D) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale (Docket No. 23) (the "**Sale Motion**").

## PRELIMINARY STATEMENT

1.          Silver Point has been a stakeholder in Standard Register since 2013, when it received a substantial secured debt and minority equity stake as part of Standard Register's acquisition of WorkflowOne Holdings, LLC (together with its affiliates and predecessors, "**Workflow**"). Although Standard Register has not performed to the level that Silver Point and other stakeholders had hoped, Silver Point believes that an appropriate section 363 sale process can revitalize the Company and establish a foundation for long-term profitability. Silver Point therefore supports the Company's turnaround efforts and is working collaboratively with the Company to facilitate an efficient, value-maximizing restructuring and sale.

2.          The Committee apparently does not appear to share these priorities. While Silver Point respects the Committee's independent role in these chapter 11 cases, its blunderbuss Objection unfairly maligns Silver Point's participation in these cases and questions Silver Point's motives without any substantial evidence—all without offering any constructive alternatives to the proposed sale process. Because of its undue skepticism concerning Silver Point's motives, the Committee would have the Debtors abandon their carefully planned sale process in favor of a rudderless exploration of unspecified alternatives over a prolonged period of time. The Committee makes no allowance for, and indeed appears to welcome, the costs and disruption associated with a prolonged and turbulent stay in chapter 11.

3.          The Committee postulates a baroque conspiracy theory, according to which Silver Point coordinated a series of manipulative transactions beginning before 2010 and culminating in its current effort to purportedly wrest control of the Debtors through the Stalking Horse APA. *See, e.g.*, Obj. ¶ 6 ("The Debtors' sale process resembles an orchestrated scheme designed to protect the alleged secured lenders . . . at the expense of unsecured creditors."); Obj. ¶ 61 (speculating as to Silver Point's "true motives"). Put briefly, the Committee portrays the sale

2

transaction as an insider sale imposed on an unwitting or helpless debtor as part of a loan-to-own strategy.

4.      The Committee's Objection is rich with innuendo and speculation but short on facts and law. The Committee repeatedly pleads facts which, though amenable to its theory of the case, are contrary to the evidence that will be produced at the Sale Procedures hearing. Although Silver Point will not duplicate the Debtors' efforts by submitting a comprehensive response to the Objection,[2] it respectfully submits this reply to address four issues on which it has particular insight.

5.      *First*, Silver Point is neither a statutory nor non-statutory insider. Silver Point does not currently hold and never has held 20% of the Debtors' voting securities, nor does Silver Point fall within any of the other categories enumerated in the statutory definition of "insider." As to non-statutory insider status, there is no evidence—beyond the Committee's rank speculation— that Silver Point and the Debtors negotiated the Stalking Horse APA other than at arm's length. Indeed, the Committee conveniently ignores the abundant evidence showing that the Debtors preferred and keenly pursued another potential bidder for the stalking horse position, with Silver Point's encouragement and support. The Debtors turned to Silver Point to negotiate a Stalking Horse APA only after that bidder failed to agree to terms acceptable to the Debtors.

6.      *Second*, there is no cause to limit Silver Point's right to credit bid. The Committee asserts that Silver Point has orchestrated a loan-to-own scheme like in the recent *Fisker* and *Free Lance-Star* cases. But even a cursory examination of the facts reveals that there is little

---

[2]    Silver Point reserves its right to respond to any points raised in the Objection at the hearing on the Sale Procedures Order.

3

resemblance between those cases and this one. Most significantly, Silver Point has held its prepetition debt for years—nearly ten years, in fact, if one includes its legacy investment in Workflow. The Committee's potential future challenge to the validity of Silver Point's liens is an equally unsuitable basis to limit Silver Point's present right to credit bid. To date, the Committee has asserted no such challenge. The procedural relief sought in the proposed Sale Procedures Order does not prejudice the Court's ability to fashion appropriate relief if and when a challenge is asserted.

7.      *Third*, the Committee mischaracterizes the consideration provided in the Stalking Horse APA. Silver Point does not propose to credit bid on assets unencumbered by its prepetition liens.

8.      *Finally*, the provision of the Sale Procedures allowing the Second Lien Bidders (as defined therein) to bid at auction without submitting a bid by the bid deadline is an appropriate and non-prejudicial mechanism to make the sale process more efficient. Because Silver Point has already negotiated a complete purchase agreement with the Debtors, the Debtors do not require the same assurances of earnestness and financial wherewithal from Silver Point that they do from other bidders. Imposing these requirements on the Second Lien Bidder would result in needless expenditure of resources without materially benefiting any other party.

**REPLY TO OBJECTION**

## I.      Silver Point Is Not An Insider of the Debtors

9.      The Committee blithely declares that Silver Point is "undoubtedly an insider of the Debtors." Obj. ¶ 34. Perhaps because this conclusion is so obvious to the Committee, the Objection is bereft of any meaningful factual or legal support for it. While the Objection is peppered with conclusory allegations that Silver Point controlled the Debtors, the Committee's

argument that Silver Point is an insider consists of just four short bullet points, unaccompanied by citation to authority or evidence. *See id.* ¶ 35.[3] In actuality, Silver Point is neither a statutory nor non-statutory insider of the Debtors.

### A.  Silver Point Is Not a Statutory Insider

10.    The Bankruptcy Code enumerates several specific categories of insiders, including directors, officers, general partners, and affiliates. *See* 11 U.S.C. § 101(31)(B). The Committee does not expressly allege that Silver Point is a statutory insider, and most of the statutory insider categories are clearly inapplicable to Silver Point.

11.    The Committee does, however, make numerous imprecise, conflicting, and, in some cases, simply erroneous assertions concerning Silver Point's equity position in Standard Register. *See, e.g.*, Obj. ¶ 24 (asserting that, as of the Petition Date, Silver Point "owned approximately 18% of the Debtors' common stock" and "held as much as a 20% equity stake in the Debtors"); Obj. ¶ 35 (stating that Silver Point held "approximately 20%" of the Debtors' equity following the Petition Date). The Committee overstates the size of Silver Point's equity interest by eliding the distinction between Standard Register's two classes of stock.[4] Although the Committee cites Silver Point's March 12, 2015 Schedule 13D for the proposition that Silver Point held "as much as a 20% equity stake in the Debtors," Obj. ¶ 24, that filing actually shows

---

[3]    Specifically, the Committee identifies the following "[e]armarks" of Silver Point's insider status: (a) Silver Point designated three directors; (b) Silver Point holds a significant minority equity state; (c) Standard Register assumed Silver Point's secured debt, this greatly increasing Standard Register's long-term indebtedness; and (d) Silver Point sold a substantial amount of stock before the Petition Date. Obj. ¶ 35.

[4]    Standard Register's stock consists of two classes: common stock and Class A stock. The two classes are largely identical, except that each share of Class A stock carries five times the voting power as a share of common stock and is subject to certain transfer restrictions.

that Silver Point held 20% of the *common stock*. *See* Standard Register Co., Schedule 13D at 13 & n.1 (Mar. 12, 2015) [hereinafter, March 2015 13D].

12.    The Committee's imprecision concerning Silver Point's equity holdings is troubling because ownership of "20 percent or more of the outstanding voting securities of the debtor" renders one an "affiliate," and therefore an insider, of the debtor. 11 U.S.C. §§ 101(2)(A); 101(31)(E). The Objection insinuates, even if it does not allege outright, that Silver Point is an insider of Standard Register by virtue of this 20% test. Not so. As of the Petition Date, Silver Point owned 18% of Standard Register's total outstanding equity interests—that is, its common stock and Class A stock together.[5] Because Silver Point holds no Class A stock, Silver Point's share of the total voting power is only approximately 13%.[6] Indeed, Silver Point never held more than 20% of Standard Register's voting power.[7] Moreover, certain voting trusts held for the benefit of descendants of the Company's founders collectively control the majority of the Company's voting power. *See* Voluntary Petition at 33, *In re Standard Register Co.*, No. 15-10541 (BLS) (Bankr. D. Del. Mar. 12, 2015), ECF No. 1.

---

[5]    As of its last quarterly report, Standard Register reported 8,227,050 shares of common stock and 944,996 shares of Class A stock outstanding. *See* Standard Register Co., Quarterly Report at 1 (Form 10-Q) (Oct. 31, 2014). As of March 12, 2015, Silver Point held 1,647,233 shares of common stock and no shares of Class A stock. *See* March 2015 13D, *supra*, at 3. Thus, Silver Point held 20% of the common stock and 18% of the total equity interests.

[6]    In calculating an entity's share of the debtor's "voting equity securities," courts take into account the relative voting rights of different classes of equity. *See UVAS Farming Corp. v. Lariana Invs., N.V. (In re UVAS Farming Corp.)*, 89 B.R. 889, 891-92 (Bankr. D.N.M. 1988). However, even if Silver Point's share of the "voting equity securities" of Standard Register was calculated by comparing the number of shares of stock owned by Silver Point against the total number of common and Class A shares issued and outstanding, Silver Point still would not reach the 20% threshold.

[7]    Following the Standard Register–Workflow transaction, Silver Point held 30% of the common stock, none of the Class A stock, and 18% of the total voting power. The underlying data is set forth in SEC filings from the relevant time period. *See* Standard Register Co., Schedule 13D at 2 & n.1 (Oct. 25, 2013); Standard Register Co., Quarterly Report at 1 (Form 10-Q) (Oct. 27, 2013).

6

13.     The Committee also suggests, mysteriously, that Silver Point's "*sale* of equity in the Debtors prior to the Petition Date" demonstrates Silver Point's insider status. Obj. ¶ 35 (emphasis added). The Committee cites no authority for this proposition, which is illogical. A stockholder's disposition of voting securities can hardly increase its control over a debtor.

**B.     Silver Point Does Not Control the Debtors and Is Not a Non-Statutory Insider**

14.     Third Circuit case law recognizes a category of "non-statutory" insiders—persons whose close relationship with the debtor enables them to negotiate from a non-arm's length position and therefore "'coerce [debtor] into . . . transactions that were not in [debtor's] best interest.'" Obj. ¶ 34 (alterations in original) (quoting *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 399 (3d Cir. 2009)). Courts do not apply non-statutory insider status lightly, however. "In the context of a lender-defendant, courts have refused to apply insider status absent a showing of a high level of control by the lender." *Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse* (*In re Champion Enters., Inc.*), No. 09-14014 (KG), 2010 WL 3522132, at *6 (Bankr. D. Del. Sept. 1, 2010). Measured against this standard, Silver Point never approached the level of control necessary to establish insider status.[8]

---

[8]   The distinction between non-statutory insider status and the "person in control" prong of the statutory definition has sometimes proven elusive. *See* 11 U.S.C. §101(31)(B)(iii). Although both categories require a high degree of control, *Champion*, 2010 WL 3522132, at *6, only the "person in control" standard requires actual, day-to-day managerial control, *see Winstar*, 554 F.3d at 396 & n.5. The Committee does not allege that the Silver Point exercised that level of control over Standard Register and the evidence will not even remotely support such a finding.

       1.     *Silver Point Never Held a Controlling Position on Standard Register's Board*

15.    The first and most obvious indication that Silver Point lacked the power to "coerce [Standard Register] into . . . transactions that were not in [Standard Register's] best interests," *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.), 554 F.3d 382, 399 (3d Cir. 2009)*, is that Silver Point never held a controlling position on Standard Register's board. Although the Committee dwells on Silver Point's board designation rights, Silver Point's designated directors did not replace a single incumbent director. Following the Workflow–Standard Register transaction, Standard Register's board increased in size from seven to nine to accommodate Silver Point's two designated directors; but none of the seven incumbent directors left the board. *See* The Standard Register Co., Current Report at 3 (Form 8-K) (Aug. 1, 2013) (describing changes in board composition as a result of the Standard Register–Workflow Transaction). Thus, the seven directors who collectively controlled the board prior to the Workflow–Standard Register transaction continued to control the board thereafter. In fact, the incumbent directors collectively had over 100 years of service on Standard Register's board prior to the closing of the transaction, with only one having been appointed during the previous five years. *See* Standard Register Co., Proxy Statement at 2-4 (Schedule 14A) (Mar. 21, 2013).[9]

16.    Moreover, the evidence will show that Silver Point's board designees have no other affiliation with Silver Point.[10] Neither is a current or former Silver Point employee or

---

[9]   One of the incumbent directors, Julie Klapstein, voluntarily resigned from the board in November 2014. *See* Standard Register Co., Current Report at 2 (Form 8-K) (Nov. 3, 2014).

[10]  A Silver Point employee served on the board until December 24, 2014. He resigned before Standard Register engaged in substantive restructuring negotiations with Silver Point and had recused himself from any discussion surrounding such potential negotiations beginning in December 2014.

receives any compensation from Silver Point. Neither serves as a Silver Point designee on any other board.

      2.    *Standard Register and Silver Point Negotiated the Stalking Horse APA and Sale Procedures at Arm's Length*

      (a)    Standard Register Pursued Alternatives to Silver Point's Stalking Horse Bid

17.    The Committee baldly alleges that Silver Point installed itself as stalking horse bidder against the wishes of a helpless debtor, *see, e.g.*, Obj. ¶ 25, but the evidence will show the opposite. The Debtors thoroughly explored—and actually preferred—a stalking horse transaction with a strategic bidder and entered into the Stalking Horse APA with Silver Point only after the strategic bidder failed to deliver terms acceptable to the Debtors, despite extensive negotiations. By the same token, Silver Point made clear that it was prepared to withdraw its stalking horse bid had the other alternative bidder met the Debtors' terms.

18.    The Committee ignores the participation of the strategic bidder. It claims: "The Debtors were contacted by other interested parties about a potential transaction. The Debtors chose not to pursue them." Obj. ¶ 74; *see also* Obj. ¶ 27 (claiming that the "selection of the Insider Bidder" was made "with virtually no prior marketing" and "without any consideration of potential sale alternatives"). The Committee's argument is simply untrue. It mischaracterizes the Debtors' statement that they were unable to run a *full* prepetition marketing effort as an admission that *no* efforts were made to consider alternatives to the Stalking Horse APA. In reality, the Debtors actively pursued an alternative to the Stalking Horse APA and turned to Silver Point only when that transaction fell through. And, contrary to the Committee's assertion that the Debtors "did not have much to offer [potential strategic bidders] in terms of due diligence," Obj. ¶ 28, the evidence will show that the potential strategic bidder "conducted extensive on-site diligence, including meetings with management." Sale Motion ¶ 10.

        (b)        Silver Point Did Not Compel Standard Register's Bankruptcy Filing or Foreclose Consideration of Other Restructuring Alternatives

19.      The Committee's allegation that Silver Point drove the Debtors into bankruptcy in order to preclude the evaluation of other restructuring alternatives is similarly untrue. *See* Obj. ¶¶ 25, 54. First, the Debtors did discuss various alternatives with Silver Point. On January 21, 2015, Silver Point executed amendments to the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement to delay the testing dates for certain financial covenants approximately two months to permit the Debtors time to evaluate strategic alternatives and prepare for a potential bankruptcy filing. Silver Point made clear that it would consider a range of proposals, and the Debtors and Silver Point did in fact discuss several alternatives to a section 363 transaction, including a refinancing of the prepetition credit agreements.

20.      Second, and more fundamentally, the Committee's position rests on a categorical misconception about the obligations of secured lenders in distressed situations. The Committee assumes that a lender exercises illicit influence by failing to relax its loan terms when its borrower falls into distress. *See* Obj. ¶ 25 (citing Silver Point's "unwilling[ness] to provide sufficient covenant relief" as an indicia of control). In fact, the Committee goes even further: it argues that Silver Point's failure to extend additional loans to the Debtors to facilitate a lengthier evaluation of restructuring alternatives is "troubling" and constitutes cause to limit Silver Point's right to credit bid. *See* Obj. ¶ 54. To the contrary, case law clearly establishes that a lender's enforcement of its bargained-for covenants and other contractual rights, which, in this case included mandatory principal and interest payment obligations, is neither inequitable nor an indicia of control. *See Champion*, 2010 WL 3522132 at *7-8; *Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 847 (Bankr. D. Del. 2006); *Johnson v. MBD Park Ridge Bank*

10

*(In re Octagon Roofing)*, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991); *Graham v. Huntington Nat'l Bank (In re Medcorp., Inc.)*, 521 B.R. 259, 272 (Bankr. N.D. Ohio 2014) ("There is a long history of courts being reluctant to find a level of control that is merely a circumstance attendant to the debtor-creditor relationship to be sufficient to confer 'insider' status on a creditor.").

21.    The Committee does not, and cannot, allege that the covenant package in the prepetition term loan agreements is inconsistent with industry standards or that Silver Point enforced its contractual rights in a commercially unreasonably manner. The Committee simply argues that Silver Point should have been more generous. Notably, Standard Register sought not just financial covenant relief but up to $13 million in payment concessions in 2015 alone. Contrary to the Committee's allegations, agreeing to the Company's request for $13 million in concessions under these facts and circumstances would not have been commercially reasonable. In any event, the Committee's wish that Silver Point had acted more liberally is legally and equitably irrelevant.

(c)    Silver Point Did Not Dictate the Sale Procedures

22.    Nor did Silver Point impose the Sale Procedures on the Debtors. While Silver Point actively negotiated the Sale Procedures with the Debtors and other interested parties, the Debtors and their professionals remain responsible for the Company's postpetition marketing efforts. The evidence will show that the Debtors and their professionals devised many of the terms of the Sale Procedures that the Committee finds most controversial. For example, contrary to the Committee's baseless conjecture that Silver Point required an abbreviated sale process to ward off other bidders, *see* Obj. ¶¶ 28, 48, it was the Debtors' investment banker who determined the length of the sale process after balancing the competing goals of encouraging participation and minimizing the costs of a prolonged stay in chapter 11. Likewise, the Debtors, not Silver Point, determined that bidders should make their initial HSR filings by the bid deadline. In short,

11

there is no truth to the Committee's allegation that Silver Point dictated the terms of the Sale Procedures in an effort to chill bidding, and the record will show that Silver Point fully supports Sale Procedures designed to maximize competitive interest. The Committee may disagree with certain aspects of the Sale Procedures, but its allegation of nefarious intent is false and reckless.[11]

## II.    No Cause Exists to Limit Silver Point's Right to Credit Bid

### A.    The Committee's "For Cause" Challenge to Silver Point's Credit Bid Is Premature

23.    In asserting that Silver Point's credit bid should be limited for cause, the Committee fails to distinguish between the procedural relief sought in the proposed Sale Procedures Order and the substantive relief sought in the proposed Sale Order. *See* Obj. ¶¶ 51-56. The Debtors do not seek to auction and sell the assets now. Under the proposed Sale Procedures, the auction and sale hearing are approximately two months away—after the expiration of the challenge period. Because the proposed Sale Procedures Order merely establish a process to market the Debtors' assets and does not approve the sale of the Debtors' assets to the Stalking Horse, the Committee's efforts to limit Silver Point's credit bid for cause are, at best, premature.

### B.    The Committee's "Loan-To-Own" Theory Is Facially Implausible

24.    The centerpiece of the Committee's objection is its clumsy effort to shoehorn this case into the *Fisker/Free Lance-Star* paradigm[12] and establish that the Stalking Horse APA is a

---

[11]    At the suggestion of the Debtors' investment banker, Silver Point agreed to strike the "no-shop" provision of the Stalking Horse APA. The no-shop provision would have prohibited the Debtors from actively marketing the assets between the petition date and the entry of the Sale Procedures Order. Although such provisions are not uncommon in a Stalking Horse APA, Silver Point agreed to omit it in order to facilitate the Debtors' marketing efforts.

[12]    *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014); *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014).

nefarious "'loan-to-own'" plot. Obj. ¶ 53. Because the facts of this case are fundamentally inconsistent with the Committee's theory, the Committee can make this argument only by distorting or ignoring inconvenient facts and filling the gaps with errant speculation.

25.     Unlike the *Fisker* and *Free Lance-Star* lenders, Silver Point did not acquire its stake in the Debtors' business on the eve of the debtor's restructuring. The history of Silver Point's investment in Standard Register dates back to its legacy investment in Workflow nearly ten years ago. In 2010, Workflow filed for bankruptcy, citing the fallout from the 2008 economic crisis and declining demand throughout the industry. *See* Disclosure Statement at 26, *In re Workflow Mgmt. Inc.*, No. 10-74617 (SCS) (Bankr. E.D. Va. Jan. 21, 2011), ECF No. 718.[13] Under Workflow's plan of reorganization, Workflow's assets were sold to an entity controlled in part by its prepetition second lien lenders and in part by its equity sponsor. In exchange for their prepetition secured claims, Workflow's first lien lenders received new notes in the same principal amount as the prepetition first lien debt and its under-secured second lien lenders received a combination of new second lien notes and preferred equity interests. *See id.* at 4-5. The notes were issued by WorkflowOne Holdings, LLC, the purchaser of substantially all of Workflow's assets pursuant to its plan of reorganization. *See id.* In all, Workflow emerged with approximately $140 million of first lien, and $140 million of second lien, debt. *Id.* at 37. Silver Point held a majority of both exit facilities. In August 2013, Standard Register acquired

---

[13]    The Committee's assertion that Silver Point drove Workflow into bankruptcy is based on the same conceptual error it makes in connection with this bankruptcy—namely, that a lender's refusal to relax its contractual rights to permit an out-of-court transaction is tantamount to controlling the debtor's decision to file. The excerpts of the Workflow first-day declaration cited in the Objection show merely that the Workflow lenders declined to consent to an out-of-court refinancing transaction. Although the Committee may believe that a lender's enforcement of its contractual rights in this manner is inherently wrongful, the case law in this district holds the opposite, as discussed above.

Workflow in exchange for the partial assumption of Workflow's secured debt and the issuance of a minority equity stake to Workflow's second lien lenders.

26.     These facts belie the Committee's contention that "the 'loan to own' strategy appears to be in play." Obj. ¶ 25. A "loan to own" plot requiring ten years and two chapter 11 filings to implement is nonsensical. In *Fisker* and *Free Lance-Star*—the principal authorities on which the Committee relies for its condemnation of loan to own strategies—the secured lender acquired its stake in the debtor mere months before the petition date. *See In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 56-57 (Bankr. D. Del. 2014) (secured lender acquired its claims at a steep discount less than two months before the petition date); *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 802 (Bankr. E.D. Va. 2014) (secured lender began advocating for a section 363 transaction mere weeks after acquiring debt from commercial bank). Here, the Committee's argument is expressly predicated on Silver Point's acquisition of Workflow debt not weeks or months, but years, before this bankruptcy. Obj. ¶¶ 50, 54.[14]

### C.     Silver Point Should Not Be Deprived of Its Right to Credit Bid Based on Unspecified Lien Challenges the Committee May Assert in the Future

27.     The Committee's ongoing investigation of Silver Point's prepetition liens has no bearing on the approval of the Sale Procedures. As noted above, the proposed relief currently before the Court is procedural in nature. Thus, contrary to the Committee's position, approving the Sale Procedures would not permit Silver Point to "monetize its claims through a credit bid" during "the Committee's challenge period." Obj. ¶ 59. If the Committee challenges Silver Point's liens during the challenge period, the Court can determine an appropriate schedule to adjudicate

---

[14]   Although the origin of Silver Point's debt does not merit nearly the emphasis the Committee placed on it, it is worth noting that only a relatively small proportion of Silver Point's prepetition debt was acquired on the secondary market, and that portion was acquired at or near par.

such challenge and consider what, if any, further relief is appropriate. But a hypothetical future challenge to the prepetition liens does not affect the relief before the Court now.

28.    Although the Committee has not yet asserted a proper challenge to the prepetition liens, it is worth noting that the "serious doubts" the Committee alleges with respect to "the scope of [the] lenders' liens" are nothing but banal observations about the prepetition collateral package. Obj. ¶ 60. Silver Point does not purport to have a prepetition lien on the Debtors' NOLs,[15] the assets of the foreign subsidiaries, or a pledge of more than two-thirds of the voting equity interests of such subsidiaries. The Committee's effort to characterize the intentional exclusion of certain assets from the prepetition collateral package as a "serious" issue that the Committee has discovered through investigation is at best an exaggeration.

## III.    The Stalking Horse Does Not Propose to Credit Bid Against Prepetition Unencumbered Assets

### A.    The Committee's Objection Misunderstands the Consideration Contemplated by the Stalking Horse APA

29.    The Committee's assumption that Silver Point seeks to credit bid against the prepetition unencumbered assets is equally mistaken and reflects a general misunderstanding of the terms of the Stalking Horse APA. The consideration contemplated by the Stalking Horse APA comprises three components: (a) cash [16] in an amount necessary to discharge the DIP Obligations;[17] (b) a credit bid of the full amount outstanding under the Prepetition First Lien

---

[15]    As discussed below, Silver Point is also not attempting to buy the Debtors' NOLs. *See* discussion *infra* ¶ 30.

[16]    The cash amount necessary for Discharge of ABL Obligations is estimated in the APA at $130 million. This estimate is predicated on certain assumptions, including the date of the closing, and the actual amount could vary materially.

[17]    Certain terms used in this section and not defined herein or in the Sale Motion are defined in the Motion of Debtors for Order (A) Authorizing Debtors to (I) Provide Adequate Protection to the Debtors' Secured Lenders, (II) to Obtain Interim Postpetition Financing on a Superpriority, Secured and Priming Basis in Favor of Silver

*(cont'd)*

Credit Agreement, or approximately $113 million; and (c) the assumption of certain liabilities (e.g., postpetition trade payables, accrued wages, cure claims and section 503(b)(9) claims), estimated by the Debtors at approximately $32 million. Stalking Horse APA § 2.7.[18]

30.    Importantly, the credit bid component of the purchase price is *not* allocated to any assets on which Silver Point lacks a first-priority prepetition lien, including the ABL Priority Collateral and the prepetition unencumbered assets. As discussed in greater detail in Silver Point's reply in support of the DIP motion, filed concurrently herewith, the Debtors have granted the DIP lenders postpetition liens on all prepetition unencumbered assets, in exchange for the DIP lenders providing up to $55 million in new, incremental postpetition financing. Thus, all assets on which Silver Point lacks a first-priority prepetition lien are encumbered by first-priority postpetition liens securing either the ABL DIP Facility or the DIP Term Loans. In either case, Silver Point will pay cash for these assets in an amount necessary to discharge the DIP Obligations encumbering such assets.

**B.    The Committee's Contention That Silver Point Seeks to Acquire the Debtors' NOLs Is Specious**

31.    The Committee asserts that Silver Point aims to acquire the Debtors' NOLs "for little or no real consideration." Obj. ¶ 65. Silver Point's alleged attempt to acquire the Debtors' NOLs is a prominent theme throughout the Objection. *See* Obj. ¶¶ 9, 29, 65, 80. The Committee is badly confused. Silver Point offers "no consideration" for the NOLs because they will not—

---

*(cont'd from previous page)*

Point Finance, LLC, as Administrative Agent for Proposed DIP Term Lenders, and Bank of America, N.A., as Administrative Agent for Proposed DIP ABL Lenders, and (III) to Modify the Automatic Stay; and (B) Scheduling, and Establishing Deadlines Relating to a Final Hearing and Entry of a Final Order on Postpetition Financing (Docket No. 15).

[18]    This summary is illustrative and is qualified in its entirety by the terms of the Stalking Horse APA.

and cannot—be acquired. NOLs can be *preserved* for the benefit of a loss corporation in some circumstances, but they cannot be *sold* in an asset deal as if they were machines or inventory.

**IV.    The Sale Procedures Reasonably Permit the Second Lien Lenders Bidders to Participate in the Auction Without Submitting a Qualified Bid by the Bid Deadline**

32.    The treatment afforded to the Second Lien Bidders under the Sale Procedures prejudices no one and will make the sale process more efficient. The proposed Sale Procedures contain customary qualification requirements designed to promote an orderly sale process and ensure that participants are capable and serious. Silver Point, having already negotiated a complete purchase agreement with the Debtors, has sufficiently demonstrated its commitment to the sale process and its wherewithal to complete the sale transaction if selected as the successful bidder. In these circumstances, requiring that the Second Lien Bidders satisfy all of the qualification requirements would result in nothing but needless duplication of effort on the part of both Silver Point and the Debtors.

33.    Moreover, the Committee's theory that this provision will suppress bidding by making the amount of Silver Point's credit bid uncertain is incoherent. *See* Obj. ¶ 62. The Committee argues that permitting the Second Lien Bidders to participate at auction without submitting a bid by the bid deadline would "confuse[]" other bidders because Second Lien Bidders could bid any portion of the prepetition second lien claims. *Id.* But that is true regardless of whether the Second Lien Bidders comply with the bid qualification requirements. No Qualified Bidder is locked into the terms of its initial bid. The very point of an auction is that bidders incrementally raise their offers until the highest price is achieved. Even if the Second Lien Bidders were required to submit a Qualified Bid by the Bid Deadline, they would still be permitted to increase their bid at the auction.

WHEREFORE, Silver Point respectfully requests that the Court enter the Sale Procedures Order, overrule the Objection and all other objections thereto, and grant such other and further relief as may be just and proper.

DATED:      Wilmington, Delaware
            April 10, 2015

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:   */s/ Sarah E. Pierce*
       Sarah E. Pierce (I.D. No. 4648)
       One Rodney Square
       P.O. Box 636
       Wilmington, Delaware 19899-0636
       Telephone: (302) 651-3000
       Fax: (302) 651-3001

       - and -

       Ron E. Meisler
       Albert L. Hogan III (*pro hac vice pending*)
       Christopher M. Dressel
       Carl T. Tullson
       155 North Wacker Drive
       Chicago, Illinois 60606
       Telephone: (312) 407-0700
       Fax: (312) 407-041

       *Attorneys for Silver Point Finance, LLC and*
       *Standard Acquisition Holdings, LLC*