## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15- 10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 15, 59, and 104; and Docket Nos. 23, 106, 119, and 200.** |

## DECLARATION OF ANDREW TORGOVE IN SUPPORT OF DEBTORS' SALE MOTION AND MOTION TO APPROVE POSTPETITION FINANCING

I, Andrew Torgove, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am Managing Director of the firm Lazard Middle Market LLC ("LMM"), a wholly-owned subsidiary of Lazard Frères & Co. LLC ("Lazard Frères" and together with LMM, "Lazard") which has an office at 600 Fifth Avenue, Eighth Floor, New York, New York 10020.

2.      I am authorized to make this declaration on behalf of LMM and in support of (1) *the Debtors' Motion for (I) an Order (a) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (b) Approving Bid Protections; (c) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (d) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (e)*

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

*Scheduling a Hearing to Consider the Proposed Sale; and (f) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale* [Docket No. 23] (the "Sale Motion"), and (2) *Debtors' Motion for Order (A) Authorizing Debtors (I) To Provide Adequate Protection To The Debtors' Secured Lenders, (II) To Obtain Interim Postpetition Financing On A Superpriority, Secured and Priming Basis In Favor of Silver Point Finance, LLC, as Administrative Agent For Proposed DIP Term Lenders, and Bank of America, N.A., as Administrative Agent For Proposed DIP ABL Lenders, and (III) To Modify The Automatic Stay; and (B) Scheduling, and Establishing Deadlines Relating To A Final Hearing and Entry of A Final Order On Postpetition Financing* [Docket No. 15] (the "DIP Financing Motion" and together with the Sale Motion, the "Motions")[2] of The Standard Register Company ("Standard Register") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.[3]

3.       As described in my prior declaration (Docket No. 25), Lazard Frères (and its subsidiary LMM) are U.S. operating subsidiaries of a preeminent international financial advisory and asset management firm; they have dedicated professionals who provide restructuring services to their clients.  Lazard was retained by Standard Register on December 29, 2014.  The Debtors engaged Lazard to provide investment banking services including exploring restructuring, financing and M&A alternatives.

---

[2]    Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Sale Motion or DIP Financing Motion, as applicable.

[3]    Certain disclosures herein relate to matters within the personal knowledge of other professionals at Lazard and are based on information provided by them.

4.      Throughout the course of the pre-petition and post-petition periods, the Board and its Strategy Committee have received updates and engaged in detailed discussions regarding the strategic alternatives available to the Debtors.  Beginning in the first days of 2015, the Debtors and their advisors have focused on pursuing all strategic options for Standard Register. In order to provide the Debtors with some breathing room in order to pursue a longer term solution to their liquidity issues, the Debtors obtained a short-term amendment through February 27 to certain covenants to the pre-petition Term Loans with Silver Point.

5.      In connection with this amendment, Silver Point encouraged the Debtors to pursue all options, but indicated its willingness to serve as a stalking horse bidder and provide DIP financing if the Debtors were unable to find suitable alternatives.  Silver Point also stated that they wanted the Debtors to prepare for a possible filing by February 27.  The Debtors considered both in-court and out-of-court alternatives to filing for bankruptcy, quickly established a virtual data room, and undertook negotiations with several potential strategic bidders prior to the Petition Date.  These efforts included intensive due diligence, multiple on-site meetings, and negotiations over a term sheet and asset purchase agreement with an alternative stalking horse bidder.  Ultimately, these negotiations could not be finalized prior to the Petition Date.

6.      Silver Point supported these negotiations, and stated to me that it preferred that the Debtors find a stalking horse bidder other than Silver Point.  Because these negotiations were not complete by the time at which the Debtors' business and liquidity needs required the imminent filing of a bankruptcy petition, Silver Point and the Debtors simultaneously negotiated, and ultimately agreed upon, the terms of the DIP Financing and Stalking Horse APA.  The

Debtors negotiated these agreements in good faith and at arms' length, and the Debtors obtained the best possible terms under the circumstances.

7.      Since the Petition Date, the Debtors have reached out to over 100 strategic and financial buyers, and the marketing process is proceeding expeditiously.  The Sale Procedures allow for a fully open and competitive post-petition marketing and bidding process. This bidding process has included continued engagement with the strategic bidders who pursued a purchase of the Debtors prior to the Petition Date, and several additional bidders also undertaking due diligence.  I believe that the time permitted under the sales milestones is sufficient to run a robust auction and sales process that will deliver the best value available for the estate.

## A.      **Lazard's Initial Role**

8.      At the outset of Lazard's engagement, Lazard's work was focused on advising the Debtors' pursuit of a potential amendment to the Pre-Petition Term Loan Agreements.  Standard Register had a legitimate concern that the covenants of the Pre-Petition Term Loan Agreements (the "Pre-Petition Term Loan Covenants") would be breached in the near-term.  A breach of the Pre-Petition Term Loan Covenants would trigger an Event of Default under the Pre-Petition Term Loan Agreements, which in turn would trigger a cross-default of the Pre-Petition ABL.

9.      Lazard and I assisted the Debtors in negotiations with Silver Point in the first three weeks of January 2015.  This assistance included preparing and delivering an in-person presentation to Silver Point on January 12, 2015, which was also attended by Silver Point's counsel, Standard Register's counsel, and several individuals in key leadership roles at Standard Register.  The January 12 presentation to Silver Point discussed Standard Register's

liquidity position, a possible default on the Pre-Petition Term Loan Covenants, the need for additional time to find a holistic, value-maximizing, and long-term solution for the Debtors' financial concerns. In the course of this meeting, Standard Register also requested a waiver of the Pre-Petition Term Loan Covenants.

10.     Without an amendment and waiver from Silver Point, Standard Register was at risk of breaching the Pre-Petition Term Loan Covenants, as well as the financial covenants of the Pre-Petition ABL. An event of default under the Pre-Petition Term Loan Covenants also would also have triggered an 8-K disclosure obligation, put Standard Register at risk of receiving a qualified opinion from its financial auditors, and jeopardized customer relationships. These events, in combination, would have had significant negative impacts on the Debtors and their businesses. Based on management's analysis, the Debtors were likely to suffer a separate event of default under the Prepetition ABL Credit Agreement in late January 2015.

11.     Lazard, Gibson Dunn, and management updated the Board regarding the potential effects of a waiver, the strategic alternatives to pursue during the "breathing room" period afforded by the waiver, and the requirements of a bankruptcy filing. The strategic alternatives considered included a long term amendment of the Pre-Petition Term Loan Covenants, refinancing the Pre-Petition Term Loan and/or the Pre-Petition ABL, obtaining out-of-court pension relief from the PBGC, restructuring through a plan of reorganization, a sale outside of bankruptcy either for all of the Debtors' assets or a portion of the Debtors' assets, and a § 363 sale process either with or without Silver Point as the stalking horse bidder.

12.     In between the January 12 meeting with Silver Point and this update to the Board, Standard Register also retained McKinsey RTS.

13.     As part of the negotiations of the Pre-Petition Term Loan Amendment, Silver Point indicated that if the Company was unable to find an alternative solution, it would require that the Debtors would have to be prepared to file for bankruptcy at the expiration of the Pre-Petition Term Loan Amendment.  In that event, Silver Point stated that it would be willing to serve as a stalking horse bidder, but Silver Point encouraged the Debtors to pursue all available strategic options during this "breathing room" period.

14.     After extensive negotiations, the Debtors and Silver Point entered into an Amendment to the Pre-Petition Term Loan Agreements on January 21, 2015 (the "Pre-Petition Term Loan Amendment").  The Pre-Petition Term Loan Amendment provided for a short-term waiver of the Debtors' test for compliance with the Pre-Petition Term Loan Covenants until February 27, 2015.  The Pre-Petition Term Loan Amendment was publicly disclosed on January 22, 2015.

15.     Lazard also contacted six lenders to determine whether they would provide alternative DIP financing.  After lengthy discussions with each potential alternative lender regarding Standard Register's financial situation and existing debt structure, none of these lenders expressed a willingness to pursue DIP financing.  These lenders indicated that they were unwilling to engage in a priming fight or take a junior position to the Pre-Petition Term Loans and Pre-Petition ABL or to refinance the Pre-Petition ABL.

16.     Following the Pre-Petition Term Loan Amendment, I discussed with Anthony DiNello, the primary negotiator for Silver Point, whether a further extension of the Debtors' compliance with the Pre-Petition Loan Covenants was possible.  Silver Point did not indicate whether it would accept this proposal.

17.     At the behest of the Strategy Committee of the Standard Register Board, the Debtors continued to vigorously evaluate their strategic options prior to filing for bankruptcy. In the weeks leading up to the Petition Date, the Debtors' professionals advised Standard Register management and its Board regarding all strategic alternatives available to the Debtors on a regular basis, including refinancing the company's debt with Silver Point, obtaining a long-term waiver of the Debtors' compliance with the Pre-Petition Term Loan Covenants, a sale of assets in order to pay down the Pre-Petition Term Loan or Pre-Petition ABL, a sale of the company outside of bankruptcy, and a plan of reorganization, among others. I also discussed all of these options extensively with Anthony DiNello prior to the Petition Date, and he indicated that Silver Point would support any solution that would deliver significant value to the company and its various stakeholders. I understood from Mr. DiNello that Silver Point was not interested in owning the company, and welcomed and encouraged the Company to find any reasonable alternative to Silver Point serving as a stalking horse bidder in a Chapter 11 bankruptcy.

**B.      Pre-Petition Negotiations With Strategic Bidders**

18.     After the Debtors entered into the Pre-Petition Term Loan Amendment, Lazard's engagement focused on conducting a sale of the Debtors' assets—either through a sale short of bankruptcy, or through reaching a deal with a strategic buyer who would agree to serve as a stalking horse bidder in bankruptcy.

19.     The day following the Pre-Petition Term Loan Amendment, a potential bidder (the "First Strategic Bidder") contacted the Debtors to express its strong interest in pursuing intensive diligence and negotiations in order to acquire the Debtors' assets.

20.     The First Strategic Bidder had already become familiar with the Debtors' businesses by conducting significant diligence on the Debtors' businesses in the preceding six

months, but was previously unable to reach agreement on the terms of a transaction as a result of its unwillingness to assume the Debtors' pension obligations.

21.     The Debtors actively negotiated with the First Strategic Bidder in the weeks leading up to the Petition Date.  The negotiations with the First Strategic Bidder commenced in earnest when it provided the Debtors with a Letter of Interest on January 30 that indicated that the First Strategic Bidder would undertake a thorough, expedited diligence process.  The First Strategic Buyer was given full access to thousands of documents in the Company's data room, conducted extensive management interviews, and relied on a team of analysts at a financial advisor to review the materials.  The First Strategic Bidder's negotiations and investigation included an all-day meeting between dozens of top management from the Debtors and the First Strategic Bidder, several on-site meetings between both parties' management, several plant visits, and numerous data requests between their retained professionals.

22.     In connection with the negotiations prior to the Petition Date, the Debtors and the First Strategic Bidder exchanged several draft term sheets of an asset purchase agreement in connection with the First Strategic Bidders' pursuit of becoming an alternative stalking horse bidder.

23.     I discussed the First Strategic Bidder's proposed transaction in late February and early March 2015 with Anthony DiNello of Silver Point.  We discussed the details of the proposed transaction, including its price, structure, price adjustments, and certain contingencies related to the Debtors' potential environmental liabilities.  Although DiNello told me that Silver Point fully supported the Debtors' efforts to obtain a favorable stalking horse bid from a strategic

buyer so that Silver Point would not have to serve as the stalking horse bidder, we agreed that the details of the First Strategic Bidder's proposal were not yet adequate.

24.     Lazard also conducted its own analysis of the First Strategic Bidder's proposed transaction, and presented its findings to the Board at several meetings throughout the course of the negotiations.  Although the Strategy Committee, the Board, its professionals, and I believed that a stalking horse bid from a strategic buyer was preferable to a stalking horse bid from Silver Point, the Debtors were unable to reach agreement with the First Strategic Bidder as a result of certain key terms that resulted in uncertainty regarding the final purchase price, including the company's environmental liabilities.  Despite extensive efforts by the Company and its advisors, less than a week before the petition date, it was determined that a deal with First Strategic Buyer would not be achievable.

25.     Similarly, the day following the Pre-Petition Term Loan Amendment, a second potential bidder (the "Second Strategic Bidder") contacted me regarding initiating diligence on the Debtors' business.  The Second Strategic Bidder signed a non-disclosure agreement on February 10, retained professionals, conducted diligence, and proposed several potential structures for a transaction with the Debtors, including through a formal presentation to the Debtors.  These proposed transaction structures were ultimately not acceptable to the Debtors or Silver Point.

26.     In addition, a third potential bidder approached the Debtors regarding its interest in a potential transaction, signed a non-disclosure agreement on February 12, retained professionals, conducted diligence, and expressed interest in potentially becoming a stalking horse bidder.  A fourth potential bidder signed a non-disclosure agreement, and expressed initial interest in Standard Register.

27.    The Debtors, Lazard, and McKinsey were intensely engaged in the efforts to sell the Debtors' assets in the period between the Pre-Petition Term Loan Amendment and the Petition Date.  Ultimately, however, a suitable replacement option for Silver Point's Stalking Horse APA was not finalized by the Petition Date.

28.    Only after it became clear that a deal would not be reached with any of the potential strategic bidders did the company turn its efforts to negotiating a stalking horse bid from Silver Point.  The negotiations with Silver Point were arms-length and contentious, and the Debtors' advisors pushed back on all material terms that Silver Point insisted upon.  Ultimately, we obtained the best possible terms from Silver Point under the circumstances.  After determining that no acceptable deal could be reached with other strategic buyers, the Debtors evaluated whether to pursue a stalking horse bid or pursue a sale process without one.  The Debtors considered the many benefits of having a stalking horse bid, including, among other things, certainty of closing and timing, obtaining cash consideration, and providing comfort to vendors, customers and employees.  The Debtors determined that obtaining a stalking horse bid would provide substantial benefits.  Consequently, we turned our full attention to Silver Point as the only remaining viable candidate to be a stalking horse bidder.  The Debtors obtained a proposal from Silver Point and ultimately designated Silver Point as its stalking horse bidder in the days immediately prior to filing for chapter 11.

## C.    **Post-Petition Marketing**

29.    Since the Petition Date, Lazard and the Debtors have continued to engage in intensive marketing of the Debtors' assets.

30.    Within a week of the Petition Date, Lazard completed and distributed a teaser presentation to approximately 115 strategic and financial buyers, including approximately

40 potential buyers suggested by the Official Committee of Unsecured Creditors.  Lazard

determined which potential buyers to approach based on our assessment of which businesses are

most likely to consider a strategic acquisition of all or some of the Debtors' assets.  Only a very

small number of interested parties have independently contacted Silver Point, the Debtors, or

Lazard regarding their interest in discussing acquiring all or some of the Debtors' assets.

31.    Lazard has also completed a confidential information memorandum that

provides greater detail regarding the Debtors' business segments.  To date, approximately 15

buyers have signed non-disclosure agreements and have received the confidential information

memorandum.

32.    The Debtors and its advisors have continued to engage in full-scale

diligence efforts with the First Strategic Bidder and the other strategic bidders that were engaged

in diligence prior to the Petition Date.  For example, several of these pre-petition strategic

bidders have made additional visits to the Debtors' headquarters.

33.    Lazard has pursued all viable proposals for the Debtors' businesses,

including proposals from groups of bidders that seek to acquire pieces of the Debtors' businesses

rather than the entire company.  I believe that we are doing everything reasonably possible in the

auction and sales process to maximize the value to be obtained for the Debtors' assets.

**D.    The DIP Financing, Sale Procedures, & Bid Protections Are Reasonable**

34.    The negotiations of the Stalking Horse APA and DIP Loans were subject

to protracted arms-length negotiations between the Debtors, Silver Point, and their respective

counsel and advisors.  The Debtors and their advisors sought to achieve terms that would protect

the value of the estates, and were not beholden to Silver Point's demands.  The Debtors actively

negotiated the terms of the Sales Procedure timeline, the Break-Up Fee, the Expense

Reimbursement Fee, and the DIP Term Loan Agreement's closing fee and commitment fee.  In connection with these negotiations, Lazard provided guidance to the Debtors regarding whether a proposed term was within the range of comparisons in the marketplace.

35.    The Debtors and its professionals arrived at the timeline for the Sale Procedures based on their assessment of what was a reasonable time period during which to market the company.  The Debtors' need to avoid further deterioration of their business was also taken into consideration.  Due in part to the intense level of due diligence that occurred prior to the Petition Date, and the resulting knowledge base and prior preparation of the Debtors' professionals for further requests, I believe a sale timeline of approximately 90 days from the Petition Date is reasonable and appropriate under the circumstances.  I believe that we can run a full and robust auction and sales process in this time.  Indeed, I was the one who suggested that the approximately 90 day auction process would be reasonable and appropriate.

36.    Even though the Debtors pushed back on Silver Point's insistence on a break-up fee in the APA, I consider the Break-Up Fee of 2% of the Purchase Price under the Stalking Horse APA to be reasonable based on my experience in the market.  I have reviewed the break-up fees under 28 stalking horse bid agreements over the past 18 months that are similar in nature to the Stalking Horse APA, and 2% fell within the market range based on comparable transactions.

37.    Even though the Debtors pushed back on Silver Point's insistence on an expense reimbursement provision in the APA, I consider the Expense Reimbursement Amount of up to 1.5% of the Purchase Price under the Stalking Horse APA to be reasonable based on my experience in the market.  I have reviewed the expense reimbursement amounts under 28

stalking horse bid agreements over the past 18 months that are similar in nature to the Stalking Horse APA, and 1.5% fell within the market range based on comparable transactions.

38.     Based on my extensive experience in transactions with stalking horse bids similar to Silver Point's, I consider the Minimum Initial Overbid of $500,000 to be within a reasonable market range of overbid amounts.  In addition, I do not consider a Minimum Initial Overbid of $500,000 to be a deterrent to potential bidders in a transaction of this size.

39.     I consider the DIP Term Loan Agreement to include a reasonable closing fee of $1,050,000, which is within a market range.

40.     I consider the DIP Term Loan Agreement to include a reasonable commitment fee of 1.0%, which is within a market range.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

_/s/ Andrew Torgove_
Andrew Torgove
Managing Director

Executed this 10th day of April, 2015