## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | **Re: Docket Nos. 23, 106, 119, and 200** |

### DEBTORS' REPLY IN SUPPORT OF MOTION FOR AN ORDER (A) ESTABLISHING SALE PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS; (E) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND (F) GRANTING CERTAIN RELATED RELIEF

The Standard Register Company ("Standard Register") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby submit this Reply in further support of their sale motion [Docket No. 23] (the "Motion")[2] and respectfully represent as follows:

---

[1]    The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    Any capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

## PRELIMINARY STATEMENT[3]

1.     The Debtors have presented the Court, their creditors, and parties in interest with a solution to the Debtors' liquidity crisis that represents the best possible outcome under the circumstances.  Because they filed for chapter 11 protection with adequate postpetition financing, a stalking horse bidder, and the certainty of a sale in June, the Debtors have been able to stabilize their customer and vendor base and provide comfort to their employees, thereby preserving the going concern value of the Debtors' businesses.  It is vital to the Debtors' ability to maximize value for their estates that there is no deviation from this clear path to a timely sale. Any delay from the Debtors' proposed course will result in material harm to the Debtors' enterprise value with no corresponding benefit to offset such harm.

2.     Months before the Petition Date, the Debtors explored various restructuring options, including the possibility of an internal reorganization as an alternative to a sale. However, the Debtors' significant secured and unsecured debt and pension obligations, relative to the Debtors' revenue and earnings capacity, rendered an internal reorganization not feasible, leaving a sale as the best way to maximize value.  Accordingly, before the Petition Date, the Debtors—with the consent and encouragement of their secured lenders—engaged in Herculean efforts (over a 6-week period culminating just days before the filing) to negotiate an acceptable asset purchase agreement with a particular, well-qualified, strategic buyer (herein defined as the First Strategic Bidder).  Through these negotiations, it became apparent that, even if a deal were to be reached with such buyer, the purchase would have to be structured through a section 363 sale because the prospective buyer (and, frankly any other prospective buyer that expressed

---

[3]    This Reply is supported by the *Declaration of Kevin Carmody in Support of Debtors' Sale Motion and Motion to Approve Postpetition Financing* (the "Carmody Declaration") and the *Declaration of Andrew Torgove in Support of Debtors' Sale Motion and Postpetition Financing Motion* (the "Torgove Declaration"), both of which are filed contemporaneously herewith.

interest in the Debtors) was unwilling to assume the Debtors' pension obligations. Despite their best efforts, however, the Debtors were unable to reach an acceptable agreement with the First Strategic Bidder before the Petition Date.

3.       When at the last minute no deal with the First Strategic Bidder could be negotiated, the Debtors' prepetition secured lenders stepped up to negotiate and enter into the Stalking Horse APA and to provide postpetition financing. Although certainly not perfect, the Stalking Horse APA and DIP financing provided by the lenders were the best proposals that were available to the Debtors under the circumstances. Most importantly, they enabled the Debtors to avert an imminent liquidity crisis and set the stage for a value-maximizing auction process under the auspices of the Bankruptcy Code. With the Stalking Horse APA, the Debtors could credibly assure their customers, vendors, employees, and other constituencies that the auction process would conclude with an acquisition by a well-capitalized buyer with sufficient resources to ensure continuity of the Debtors' business operations under new ownership. The Stalking Horse APA is the product of arm's-length, good-faith negotiations with the lenders and provides substantial consideration through a cash component, a partial credit bid, and the assumption of liabilities. It also presents an opportunity for the Debtors to conduct a robust auction, with the constituency-calming safety net of the Stalking Horse APA. The Debtors' business judgment should not be second-guessed by the Committee based on conjecture and speculation untethered to reality.

4.       The Stalking Horse APA has to be viewed in totality and not in parts. Unfortunately, the Debtors were not given the opportunity, and few debtors are given the opportunity, to cherry-pick the pieces they particularly like and reject those that are not so favorable. The Debtors exercised their sound business judgment in executing the Stalking Horse

APA and the Committee has no compelling arguments to the contrary.  In a perfect world, the

Debtors would have executed a stalking horse APA with a higher purchase price and more

favorable terms.  But under the circumstances, the terms of the Stalking Horse APA represent the

best terms the Debtors could secure from a committed buyer.  Accordingly, the Debtors

determined, in their business judgment and for the reasons stated herein, that the Stalking Horse

APA offered substantial value to their estates and the opportunity to solicit higher bids in the

course of the sale process.  The old adage is appropriate here: a bird in the hand (i.e., a

committed stalking horse bid) is worth two in the bush (indeed, with one in hand, the Debtors

could have a flock at the Auction).

5.      The Committee also takes issue with the Debtors' proposed sale timeline.  The

Debtors communicated this timeline to their customers, vendors, employees, and other

constituencies, and it is reasonable and sufficient to support a value-maximizing sale process.

The Committee has not presented any evidence to the contrary.  Indeed, an extended marketing

period here would provide no meaningful value to the Debtors' estates, while the resulting delay

would significantly undermine the Debtors' enterprise value.  If sustained, the Committee's

objections threaten to derail the Debtors' value-maximizing efforts and to force the Debtors into

a liquidation to the detriment of all stakeholders.

## BACKGROUND

6.      Beginning in the first days of 2015 and through the Petition Date, the Debtors and

their advisors began vigorously evaluating all strategic alternatives, both in and out of

bankruptcy, to address the Debtors' significant liquidity issues. (Torgove Decl. ¶¶ 4, 5, 17;

Carmody Decl. ¶ 12 ("Throughout my tenure as an advisor to the Company and as CRO, the

Company has been in crisis mode.").)  Among other alternatives, the Debtors considered long-

term amendments to prepetition loan agreements, out-of-court pension relief from the PBGC, restructuring through a chapter 11 plan of reorganization, a sale outside of bankruptcy of all or a portion of the Debtors' assets, and a section 363 sale. (Torgove Decl. ¶¶ 11, 17.)  By mid-January, the Debtors had obtained a short-term amendment to their secured prepetition loan agreements with the first and second lien lenders (in its capacity as agent, "Silver Point") and with the ABL lenders to avert a covenant default and provide the Debtors with breathing room to consider long-term solutions to their financial difficulties. (Carmody Decl. ¶ 12; Torgove Decl. ¶¶ 4, 8, 9, 10, 14.)  As part of their negotiations in connection with this amendment, Silver Point encouraged the Debtors to pursue all available strategic options, but indicated its willingness to serve as a stalking horse bidder and, in conjunction with the ABL lenders, provide DIP financing if the Debtors were unable to find an alternative solution by the time the amendment expired. (Torgove Decl. ¶¶ 5, 13.)

7.      After executing the amendment, the Debtors and their advisors focused their efforts on conducting a sale of the Debtors' assets—either through a sale out of bankruptcy or with a strategic buyer who would serve as a stalking horse bidder in bankruptcy. (Torgove Decl. ¶ 18.)

**A.      Intense Prepetition Diligence Efforts and Negotiations With Strategic Buyers**

8.      The day after the Debtors signed the amendment, a potential bidder (the "First Strategic Bidder"), who had already become familiar with the Debtors' businesses by conducting significant diligence in the preceding six months, contacted the Debtors to express its strong interest in pursuing intensive diligence and negotiations in order to acquire the Debtors' assets. (Torgove Decl. ¶¶ 19, 20.)  The First Strategic Bidder and the Debtors immediately commenced a thorough, expedited, and intense diligence process. (Torgove Decl. ¶¶ 21, 22, 27.)  With Silver

Point's support, these diligence efforts led to active negotiations over the sale terms and the exchange of several draft term sheets of an asset purchase agreement. (Torgove Decl. ¶¶ 22, 23.) It was apparent that both the Debtors and the First Strategic Bidder were eager to consummate a deal and the Debtors came very close, but were unable to reach agreement over certain key pricing, closing, and indemnification terms. (Torgove Decl. ¶ 24.)  Despite extensive efforts by the Debtors and their advisors, less than a week before the Petition Date, it was determined that a deal with the First Strategic Buyer would not be achievable. (Torgove Decl. ¶¶ 5, 6, 24.)

9.     Additionally, the Debtors were contacted by a second strategic bidder, who also conducted diligence and proposed several potential transactions with the Debtors, none of which were ultimately acceptable. (Torgove Decl. ¶ 25.)  Two additional potential bidders approached the Debtors to express interest, but neither made reasonably acceptable offers to the Debtors. (Torgove Decl. ¶ 26.)

**B.     Selection of the Stalking Horse Bidder**

10.     The Debtors believed that a stalking horse bid from a strategic buyer was preferable to a stalking horse bid from Silver Point, but it became clear that no acceptable deal could be reached with a strategic bidder prior to the Petition Date.  Still, the Debtors determined that obtaining a stalking horse bid, even if from Silver Point, was far preferable than entering chapter 11 in a freefall with no stalking horse, and that such stalking horse bid would provide substantial benefits, including, among other things, certainty of closing, timing, and consideration, and would provide comfort to customers, vendors, and employees. (Torgove Decl. ¶ 28.)

11.     The Debtors therefore focused their efforts on striking a stalking horse arrangement with Silver Point "as the only remaining viable candidate to be a stalking horse

bidder" (Torgove Decl. ¶ 28) to ensure that the Debtors' entry into chapter 11 would not trigger a value-destroying freefall. The Debtors and their advisors engaged in arms-length negotiations with Silver Point—which had repeatedly indicated that its primary goal was to support the disposition of the Debtors' assets to an acceptable third-party bidder—and ultimately culminated in the Stalking Horse APA. While the Debtors will readily admit that they wish they had been able to negotiate more favorable terms in the Stalking Horse APA, the absence of a viable competing bidder and the Debtors' firmly held view that entering chapter 11 with a stalking horse was far preferable to a freefall bankruptcy imposed constraints on the Debtors' negotiating leverage. The Stalking Horse APA contains the best possible terms the Debtors could obtain from Silver Point under the circumstances. (Torgove Decl. ¶ 28.)

12.    Despite the Committee's objections, the Debtors' advisors are confident that the terms of the Stalking Horse APA, including the Break-Up Fee and the Expense Reimbursement Amount, are reasonable under the circumstances and will not impede a fully open and competitive postpetition marketing and bidding process. (Torgove Decl. ¶¶ 7, 36, 37, 38.)

C.    **Stalking Horse APA and DIP Financing as a Package Deal**

13.    Recognizing their severe need for liquidity, the Debtors sought to obtain DIP financing to support them during their chapter 11 proceedings. Given that the Debtors already had substantial prepetition debt obligations to Silver Point and their primary ABL lenders (Bank of America and Wells Fargo), the Debtors knew that either they would have to identify an outside DIP lender willing to subordinate its DIP lien position to over $300 million in secured debt or the Debtors and such outside lender would have to engage in a priming fight with an uncertain outcome. With full knowledge of the difficulty of identifying a lender willing to take a subordinate position and the problematic and delaying nature of a priming fight, the Debtors

nevertheless instructed their advisors to search the market for a DIP financing proposal from a third-party lender.  At the same time, the Debtors entered into DIP financing negotiations with their secured lenders.  As feared, no other lender was willing to provide an alternative DIP financing proposal, let alone even begin the diligence that would have been necessary to develop such a proposal.

14.    However, the Debtors' good faith and arms' length negotiations with Silver Point and the ABL lenders did result in an acceptable DIP financing agreement.  As with the Stalking Horse APA, the DIP financing agreement with the Debtors' secured lenders, while not ideal, represents the best postpetition financing option that was available to the Debtors under the circumstances.[4] (Torgove Decl. ¶¶ 5, 6, 34; Carmody Decl. ¶ 15 ("We could either negotiate as hard as possible and accept the best available financing in the market, or we could liquidate the Company.").)  Most importantly, it provides the Debtors with sufficient liquidity to meet the Debtors' cash requirements, assures the Debtors' customers, suppliers, and employees that the Debtors will be able to satisfy postpetition obligations, and buys the Debtors sufficient time to fully market their assets to alternative bidders.

15.    Ultimately, with the DIP financing and the Stalking Horse APA in hand, the Debtors were in a position to file an organized, planned chapter 11 case.  Through these agreements, the Debtors has the opportunity to implement a robust sale process to bring potential buyers to the foreground, with the comfort that, even if no higher or otherwise better offers emerge at the auction, the assets will be sold to Silver Point under the terms in the Stalking Horse APA, which provides substantial consideration to the Debtors' estates—through a combination of cash, assumption of liabilities, and a credit bid.  These agreements provide a

---

[4]    The terms of such DIP financing are described in the Debtors' motion to approve postpetition financing [Docket No. 15].

definite path forward, thereby preserving jobs, business relationships, and other value for the Debtors and their creditors, and avoid a freefall into chapter 11, which is exactly the trajectory the Committee effectively advocates through its objection.  This package is a unified whole and the Committee's ill-conceived effort to cherry-pick provisions is driving the Debtors toward the worst possible result—default, foreclosure, and liquidation.

**D.      Thorough Postpetition Marketing Efforts**

16.      The Debtors' marketing efforts are already proceeding expeditiously. (Torgove Decl. ¶ 7.)  Since the Petition Date, the Debtors and their advisors have engaged in intensive marketing efforts. (Torgove Decl. ¶ 29.)  Within a week of the Petition Date, the Debtors distributed a teaser presentation to approximately 115 strategic and financial buyers, including approximately 40 potential buyers suggested by Jefferies (the Committee's chapter 11 advisor), which Lazard determined would be most likely to buy some or all of the Debtors' assets. (Torgove Decl. ¶¶ 30.)  The Debtors have also distributed a confidential information memorandum with additional detail about the Debtors' businesses, to approximately 15 buyers who signed non-disclosure agreements. (Torgove Decl. ¶ 31.)

17.      Additionally, the Debtors and their advisors have continued to engage in full-scale diligence efforts with the First Strategic Bidder and the other potential strategic bidders who expressed interest in the Debtors before the Petition Date. (Torgove Decl. ¶ 32.)  For example, several of these prepetition strategic bidders have made additional extended visits to the Debtors' headquarters. (Torgove Decl. ¶ 32.)

18.      In short, the Debtors are continuing to pursue all viable proposals for the Debtors' businesses, including proposals from groups of bidders seeking to acquire portions of the

Debtors' businesses, and are exhausting all options in an effort to maximize the value that can be obtained in consideration for their assets. (Torgove Decl. ¶ 33.)

**E.      Timely Sale Process Is Necessary to Preserve Going Concern Value**

19.      The current timeline is sufficient to conduct a robust sale process.  In deciding on the proposed timeline, the Debtors and their advisors had twin goals: providing a fair and reasonable marketing period for the company and avoiding further deterioration of their businesses while in bankruptcy. (Torgove Decl. ¶ 35.)  The longer the period between the Petition Date and the sale to a viable buyer, the more likely that the Debtors' enterprise value will suffer.  Given the intense level of due diligence that occurred before the Petition Date and the resulting knowledge base and prior preparation, the Debtors' advisors are confident that the Debtors' proposed Sale Procedures allow for a fully open and competitive postpetition marketing and bidding process, and that the contemplated sale timeline "is sufficient to run a robust auction and sales process that will deliver the best value available for the estate." (Torgove Decl. ¶¶ 7, 35; Carmody Decl. ¶ 16 ("The milestones in the sale process were supported by the Company in order to strike an appropriate balance between maximizing value with a thorough, robust post-petition sales process and limiting the duration of the Chapter 11 Cases.").)

20.      Contrary to the Committee's baseless contentions, extending the sale process will do more harm than good.  Indeed, an extension of the sale process is not in the best interests of the Debtors, and any delays will cause further deterioration of their businesses.  In short, delay undermines enterprise value with no meaningful corresponding benefit to the auction process.

21.      Before the Petition Date, the Debtors were in constant communication with their vendors and customers because of the uncertainty presented by the Debtors' capital and liquidity challenges. (Carmody Decl. ¶ 7.)  The Debtors' customer and other business relationships are

fragile, but the Debtors reassured their customers, vendors, and employees that, although the Debtors intended to file a chapter 11 case, they intended to do so with a firm exit plan that included adequate financing and an orderly but competitive sale process that would preserve business continuity and going concern value. (Carmody Decl. ¶ 17.)  Many critical customers have informed the Debtors that the company's clearly articulated process, with a definite end date for a going concern transaction, has been a critical consideration in their decision to continue their business relationships with the Debtors. (Carmody Decl. ¶ 8.)  These parties have continued to transact business with the Debtors in significant part because of the timeline and their expectation that the business will be timely sold under section 363 within the anticipated period. (Carmody Decl. ¶ 17.)

22.     On the other hand, an open-ended process with a higher perceived likelihood of liquidation would have negatively impacted the Debtors' vital business relationships. (Carmody Decl. ¶ 8.)  The Debtors would have suffered a rapid diminution in both customers and vendors willing to do business with them, leading to an accelerated decrease in cash flow and ultimately a value-destroying liquidation. (Carmody Decl. ¶ 7.)  Even with the more controlled process, many vendors and customers continue to be extremely concerned about the length of the Debtors' chapter 11 cases and any attendant disruptions in business. (Carmody Decl. ¶ 7.)

23.     A focused, short-term process with the expectation of a going concern sale is essential for the Debtors' ability to maintain favorable postpetition credit terms from many of their vendors and maintain relationships with their customers. (Carmody Decl. ¶ 11.)  A delay in the sale process would strain the Debtors' relationships with, and upset the expectations of, these customers and vendors.  (Carmody Decl. ¶ 17.)  Without these business relationships, the value of the Debtors' businesses will deteriorate quickly. (Carmody Decl. ¶ 17 ("[T]he enterprise value

of the business is like a melting ice cube:  the longer the Company is in bankruptcy, the greater

the risk to the Company's survival.").)  Far from generating any additional value, a delay in the

auction process would actually undercut the overall enterprise value of the Debtors' businesses

because of the loss of customers and lost opportunities. (Carmody Decl. ¶ 17.)

24.    By the Motion, the Debtors seek the Court's approval of the Sale Procedures,

which the Debtors developed in consultation with their advisors, in order to proceed with a

public, competitive auction process to solicit and select the highest and best offers for the sale of

their businesses as a going concern.

## **REPLY**

### A.    **The Proposed Sale Process Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved**

25.    The proposed sale process, developed with input from the Debtors' advisors,

represents a sound exercise of the Debtors' business judgment, and the Court should not permit

the Committee to substitute its uninformed views, or those of its advisors, for the business

judgment of the Debtors.  Likewise, the Debtors' decision to execute the Stalking Horse APA

represents a sound exercise of the Debtors' business judgment, and the Court should not permit

the Committee to substitute its uninformed views, or those of its advisors, for the business

judgment of the Debtors.

26.    It is well established that a debtor's decision to sell property out of the ordinary

course of business enjoys the strong presumption "that in making a business decision the

directors . . . acted on an informed basis, in good faith and in an honest belief that the action

taken was in the best interests of the company."  *In re Integrated Res., Inc.,* 147 B.R. 650, 656

(Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)); *see also*

*In re Bridgeport Hldgs., Inc.,* 388 B.R. 548, 567 (Bankr. D. Del. 2008) (holding that directors

enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets). Thus, if the proposed sale process satisfies the business judgment rule, then it should be approved under section 363(b)(1) of the Bankruptcy Code.

27.    The Committee has failed to show that the Debtors have acted improperly in any respect in their efforts to maximize value for the Debtors' estates through a section 363 sale. Here, the Debtors' decision to proceed with the contemplated sale process is the product of sound business judgment. In light of the Debtors' revenues, expenses, and substantial liabilities, including a significant underfunded pension liability, a reorganization that does not include a value-maximizing sale is not a viable alternative. Under the circumstances, a section 363 sale is the only viable option for preserving the Debtors' going concern value for the benefit of all constituents and pursuing such a sale is a sound business judgment by the Debtors.

28.    As previously discussed, the Debtors engaged in extensive prepetition marketing efforts with the goal of signing up a desirable strategic buyer, but the parties could not reach agreement with any strategic buyer by the time the Debtors had to initiate chapter 11 proceedings. Prior to the Petition Date, and even today, no party other than Silver Point has reached an acceptable agreement with the Debtors and agreed to serve as a stalking horse bidder.

29.    Sound business reasons support the Debtors' decision to select Silver Point's offer as the Stalking Horse Bid. The Debtors have been in "crisis mode" since early 2015. Given their liquidity constraints, the Debtors only had time to conduct thorough diligence and serious sale negotiations with one potential strategic buyer—the First Strategic Bidder. Ultimately, the Debtors were unable to resolve a number of critical issues with the First Strategic Bidder and reach an agreement on acceptable terms. Yet, the Debtor's knew that filing a bankruptcy without a stalking horse bidder would have initiated a freefall bankruptcy and would likely have

condemned the Debtors to a downward spiral into liquidation.  The Board's Strategy Committee evaluated and compared the proposals of Silver Point and the First Strategic Bidder, and determined that Silver Point's offer provided more value with greater certainty.

30.     The Debtors' prepetition secured lenders agreed to extend postpetition liquidity— when no other lenders would do so—as a bridge to an exit from their position—but they were unwilling to do so in the context of a freefall chapter 11 case with no acceptable alternative bid. In the absence of an acceptable third-party stalking horse bidder, Silver Point agreed to serve as the stalking horse bidder.  The Debtors, with the help of their advisors, negotiated extensively with Silver Point (and the Debtors' other secured lenders) to obtain a package deal—DIP financing and the Stalking Horse APA—for a controlled sales process.  In the Debtors' business judgment, after input from their advisors, this package deal presents the best value-maximizing path forward for the Debtors, and provides much-needed assurances to the Debtors' employees, customers, and vendors.  It also minimizes the cost burden of the chapter 11 case (assuming, of course, that the Committee's litigation fee can be held in check).

31.     The Committee quibbles with the terms of the package but provides absolutely no evidence of any other options that were available to the Debtors to produce better results. Although the Committee asserts that "other parties expressed serious interest in the Debtors' assets" and that the Committee "needs time to explore those proposals and whether those proposals are superior to the APA" (Comm. Obj. ¶ 39), as noted above, no other parties submitted acceptable proposals to the Debtors.  Indeed, other than Silver Point, no other buyer has offered to serve as the stalking horse bidder on terms that were acceptable to the Debtors. Accordingly, the Debtors' business judgment should be respected.

**B.      The Debtors Will Benefit From Silver Point's Stalking Horse Bid**

32.      Contrary to the Committee's allegations (Comm. Obj. ¶ 38), the Stalking Horse APA provides substantial benefits to the Debtors' estates.

### *(1)      Stalking Horse Bid Increases The Debtors' Prospects*

33.      The existence of the Stalking Horse APA provides stabilizing and value-maximizing comfort to the Debtors' customers, vendors and employees by assuring those constituencies that, even if no other bidder emerges by the Bid Deadline, there is a viable and immediate exit plan for the sale of the Debtors' business.  Moreover, the existence of the Stalking Horse APA substantially improves the Debtors' prospects for higher or otherwise better bids at the Auction.  In this regard, the Stalking Horse APA will hopefully entice other potential buyers to submit bids who may have otherwise been less inclined to participate in the sale process.  As one well-known treatise on bankruptcy law explains:

> This is one of the main benefits to the debtor of obtaining a stalking horse.  By demonstrating to the market that there is a party ready, willing and able to purchase the assets, the debtor is able to show that there is legitimate interest in the assets, and potential purchasers may be more willing to make an offer on an expedited time frame because they know that one party has already conducted due diligence and determined that the assets have value.

1-3 *Collier Guide to Chapter 11* ¶ 3.08.  *See also In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (describing the potential acquirer "as a catalyst . . . which attracts more favorable offers").

This Court likewise observed in *In re Real Mex Restaurants, Inc.* that "it is the rare case that doesn't benefit from having a stalking horse to provide structure, to be the first one on the dance floor at the sixth grade dance."  (Hr'g Tr. 102:21-24, Nov. 4, 2011.)

### (2)    Stalking Horse Bid Preserves Business Relationships With Customers, Vendors, and Employees

34.     With the Stalking Horse APA, the Debtors were able to communicate—and indeed did communicate—to their employees and suppliers, and most importantly, to their customers, that their bankruptcy filing should not—and would not—disturb the operation of their businesses either on a short-term or long-term basis.  Through the Stalking Horse APA and the related DIP financing, the Debtors have demonstrated to these parties—who are so vital to the value of the Debtors' businesses—that the Debtors have a long-term, reliable solution for their liquidity issues and a committed buyer that will acquire the Debtors' businesses as a going concern even if no higher and better offers are received at the Auction.

### (3)    Stalking Horse Bid Locks In Substantial Consideration and Liquidity

35.     The Stalking Horse APA provides for total consideration of approximately $275 million, which is composed of a $113 million credit bid, a significant cash component to repay the DIP financing (including the rollover of the ABL secured debt) and pay cure, employee and other administrative costs, and the assumption of liabilities.  As such, the Stalking Horse APA provides the Debtors with the certainty of a sale for a total purchase consideration in the amount of approximately $275 million.[5]  Absent the Stalking Horse APA, the Debtors would be proceeding towards the Bid Deadline without any assurance that there would be any bids (and with a resulting impending liquidation as the most realistic alternative) and without any bidding floor.  Such a scenario could result in the conversion of these chapter 11 cases.  The Stalking Horse APA, on the other hand, provides certainty of a sale for an established price and a bidding floor, which, among other things, enables the Debtors to satisfy their administrative obligations.

---

[5]     The purchase price will vary depending on the amount of the DIP outstanding at the Closing Date and other factors fully disclosed in the Stalking Horse APA.

36. Moreover, approval of the Bid Protections and the Sale Procedures that are an integral part of the Stalking Horse APA, are a pre-condition to the DIP financing and, as such, effectively facilitate the Debtors' ability not only to fund their operational costs, but also to continue to market their assets in preparation for a robust auction and sale process. Indeed, the Stalking Horse APA does not contain any "no shop" provisions and Silver Point has consistently encouraged the Debtors to solicit competing bids which, as described above, the Debtors and their advisors have been pursuing diligently. Thus, the Stalking Horse APA (as a package deal along with the DIP financing) will enable the Debtors to expeditiously maximize the benefits of the contemplated sale process. While the Stalking Horse APA may not contain the best possible terms—in a perfect world, a debtor would, of course, have no Break-Up Fees, no Expense Reimbursement Amounts, and more favorable provisions—it represents the best alternative available to the Debtors. The Court should reject out of hand the Committee's argument that the Stalking Horse APA, and its requirements for Bid Protections and acceptable Sale Procedures, should be abandoned in favor of an otherwise highly speculative path that would result in more harm than good to the Debtors and their creditors.

## C.    This Is Not An Expedited Sale Process And The Detriments Of A Protracted Sale Process Outweigh The Potential Benefits Thereof

### (1)    Longer Than Most Sale Processes In Chapter 11

37. The Committee alleges that the Debtors are pursuing and "expedited sale process" without any citations or evidence to demonstrate what constitutes an expedited process as compared to an unexpedited process. (Comm. Obj. ¶ 47.) Here, the proposed sale timeline provides for almost three months between the Petition Date (March 12, 2015) and the Auction date (June 15, 2015), a total of 95 days—more than enough for a fair and robust sales process.

Added to this time period, however, are the weeks of marketing, negotiating, and diligence in which the Debtors and their advisors engaged before the Petition Date.

38.     Indeed, this Court has entered sale orders on much shorter time tables. *See, e.g., In re AmCad Holdings*, Case No. 14-12168 (MFW) (D.I. 222) (Bankr. D. Del. Oct. 31, 2014) (43 days between petition date and sale hearing); *In re FCC Holdings*, Case No. 14-11987 (CSS) (D.I. 166) (Bankr. D. Del. Sept. 22, 2014) (29 days between petition date and sale hearing); *In re Tactical Intermediate Holdings*, Case No. 14-11659 (KG) (D.I. 225) (Bankr. D. Del. Aug. 22, 2014) (46 days between petition date and sale hearing); *In re Victor Oolitic Stone Co.*, Case No. 14-10311 (CSS) (D.I. 158) (Bankr. D. Del. Apr. 16, 2014) (58 days between petition date and sale hearing); *In re Constar Int'l Holdings*, Case No. 13-13281 (CSS) (D.I. 350, 354 & 357) (Bankr. D. Del. Feb. 10, 2014) (54 days between petition date and sale hearing); *In re HSS Holding*, Case No. 13-12740 (BLS) (D.I. 209) (Bankr. D. Del. Dec. 13, 2013) (51 days between petition date and sale hearing); *In re EWGS Intermediary*, Case No. 13-12876 (MFW) (D.I. 181) (Bankr. D. Del. Dec. 5, 2013) (32 days between petition date and sale hearing).

### *(2)     No Material Benefit From a Longer Process*

39.     The Committee further asserts, again without any support, that "all parties will benefit from an extension of the sale-related deadlines." (Comm. Obj. ¶ 47.)  In fact, this statement could not be further from the truth.  The CRO has explained that "the concern is that [the Debtors] need to go through bankruptcy in a timely fashion. . . .  [E]very day [the Debtors are] in bankruptcy, if [the Debtors] don't have a pipeline, the value of business declines."  The CRO further noted about the Debtors' condition:   "We have customers that are absolutely nervous about the length of this bankruptcy and its disruptions to the business. . . . [E]verybody

here is extremely concerned about maintaining the enterprise value and that [the Debtors]

have . . . every day we stay in bankruptcy we destroy value."

### (3)    Longer Process Would Significantly Undermine Enterprise Value

40.    Contrary to the Committee's allegations, the Debtors do more than just "pay lip

service to their need for expediency" and are not "[c]reating a false emergency."  (Comm. Obj.

¶¶ 48, 49.)  Although the Debtors are working feverishly to prevent enterprise value from

deteriorating during the auction process, their businesses have suffered some degradation due to

the chapter 11 filing because some key employees, customers and vendors have already jumped

ship.  Although the Committee seeks to deny these facts, they fall squarely into "the proverbial

'melting ice cube' scenario."  (Comm. Obj. ¶ 49.)  The longer the sale process continues, the

more the Debtors' will deteriorate in bankruptcy, and the more value is jeopardized.  As Lazard

noted, while the costs of extending the sale process are considerable, there are no benefits to a

protracted process.  Lazard explained that the pool of potential bidders for the Debtors' business

is small because only a small number of companies operate in the same space as the Debtors and

only these strategic buyers are likely to be interested in acquiring the Debtors' business as a

going concern.  Lazard has already contacted each of these potential bidders, such that extending

the sale process would not bring additional bidders to the table.

41.    Accordingly, the Committee should not be permitted to force the Debtors into a

needlessly protracted sale process that will not improve the auction results, but will cause further

deterioration of the Debtors' enterprise value.

**D.**    **Terms of the Stalking Horse APA Are Fair and Reasonable**

**(1)**    *The Debtors' Prepetition First and Second Lien Lenders Have a Statutory Right to Credit Bid the Value of Their Allowed Secured Claims*

42.    This Court recently held that "[i]t is beyond peradventure that a secured creditor is entitled to credit bid its allowed claim." *In re Fisker Auto. Holdings, Inc.,* 510 B.R. 55, 59 (Bankr. D. Del. 2014) (citing 11 U.S.C. § 363(k)). A credit bid "is the equivalent of a cash purchase." *In re Spillman Dev. Group, Ltd.,* 401 B.R. 240, 253 (Bankr. W.D. Tex. 2009). *See also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012) (noting that credit bidding advances the "statutory purpose of protecting secured creditors"). "[T]he plain language of [section 363(k)] makes clear that the secured creditor may credit bid its entire claim, including any unsecured deficiency portion thereof," and "logic demands that § 363(k) be interpreted in this way; interpreting it to cap credit bids at the economic value of the underlying collateral is theoretically nonsensical." *Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.),* 432 F.3d 448, 459-60 (3d Cir. 2006) (quoting *In re Morgan House Gen. P'ship*, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997). A secured creditor is entitled to credit bid the full value of its claims unless the Court orders otherwise "for cause." *See* 11 U.S.C. § 363(k). "Cause" can be established if the creditor's liens are in *bona fide* dispute. *See, e.g., In re Merit Group, Inc.,* 464 B.R. 240, 252 (Bankr. D.S.C. 2011) (rejecting objection by creditors' committee to credit bid where there were no pending objections to the creditor's claims and no pending proceedings challenging validity, priority, or extent of its liens). To qualify as a *bona fide* dispute, there must be "some factual grounds to show that there is 'an objective basis' for the dispute," and "merely alleging a dispute" is not sufficient. *In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991).

43.    Indeed, this Court explained in *In re Real Mex Restaurants, Inc.*:

> [C]redit bidding is a right that secured creditors enjoy, consistent
> with, pursuant to and to the fullest extent permitted by Section
> 363(k). . . . [I]t is a right that is respected and that this Court will
> certainly recognize and respect.  Everybody would prefer cash.  So
> be it.  This is a Bankruptcy Court; it's not about what everybody
> would prefer.

(Hr'g Tr. 103:15-18, 21-24, Nov. 4, 2011.)

44.    Here, there is no objective basis for disputing the validity, priority or extent of the

liens of the Debtors' first and second lien lenders, and no *bona fide* dispute has even been

alleged.  Accordingly, these lenders are entitled to credit bid the allowed amount of their secured

claims unless and until the Court restricts such right for "cause."

### (2)    *The Bid Protections for the Stalking Horse Are Reasonable Under the Circumstances*

45.    The Bid Protections, as provided in the Stalking Horse APA and the proposed

Sale Procedures, are reasonable under the circumstances, and in any event, represent the result of

a protracted, hard fought and arms-length negotiation with Silver Point.  As noted above, in an

ideal world, the Debtors would prefer lower (or no) break-up fees and lower (or no) expense

reimbursement requirements.  However, few debtors have this luxury and the Debtors are not the

exception to the rule.  What is clear is that the Debtors did their best to negotiate the lowest

break-up fees and expense reimbursement possible, but in the end the Stalking Horse APA and

the related DIP financing amounted, in effect, to a take-it or leave-it package and the Debtors, in

the sound exercise of their business judgment and in consultation with their advisors, determined

that the benefits of the package far exceeded the costs.  Under the circumstances, the Debtors

believe that the DIP financing and the Stalking Horse APA—taken as a whole are fair and

reasonable and represent the best alternative available to the Debtors for maximizing the value of

their estates.

01:16952998.1

21

46.    The Bid Protections (including the Break-Up Fee and the Expense

Reimbursement Amount) represent "actual, necessary costs and expenses" of preserving the

Debtors' estates under section 503(b) of the Bankruptcy Code and are consistent with the Third

Circuit's decision in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien*

*Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit Court

of Appeal explained that "the allowability of break-up fees, like that of other administrative

expenses, depends upon the requesting party's ability to show that the fees were actually

necessary to preserve the value of the estate."  181 F.3d at 535 (finding that break-up fees or

expenses are allowable under section 503(b) of the Bankruptcy Code if the fees were actually

necessary to preserve the value of the estate).  A break-up fee can satisfy the *O'Brien* standard if

it will "provide some benefit to the debtor's estate."  *Id.* at 536.

47.    At every stage of the negotiations, Silver Point expressly conditioned its

willingness to enter into the Stalking Horse APA upon the Debtors' agreement to, and the

Court's approval of, the Bid Protections.  Thus, the Bid Protections were necessary to preserve

the value of the Debtors' estate and facilitate a smooth entry into bankruptcy and to jumpstart the

Debtors' contemplated sale process.  This process presents the best opportunity to preserve the

Debtors' 103-year-old business and the jobs of over 3,000 employees.

48.    Finally, the Break-Up Fee (2% of the Purchase Price) and the Expense

Reimbursement Amount (1.5% of the Purchase Price) are well within the range of percentages

routinely approved by this Court in other chapter 11 cases in this District, especially in cases

involving companies similar in size to the Debtors.  *See, e.g., In re Vertis Holdings, Inc.*, Case

No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (D.I. 206) (court approved break-up fee and

expense reimbursement totaling approximately 4.0% in connection with a $258 million sale of

assets);  *In re Solyndra LLC*, Case No. 11-12799 (MFW) (D.I. 1113) (Bankr. D. Del. Sept. 28,

2012) (court approved break-up fee and expense reimbursement totaling approximately 2.5% in

connection with $90 million sale of assets); *In re Global Motorsport Group, Inc.*, Case No. 08-

10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (D.I. 101) (court approved break-up fee and expense

reimbursement totaling approximately 4.0% in connection with sale of assets); *In re Global*

*Home Prods. LLC*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006 (court approved

break-up fee and expense reimbursement totaling approximately 3.1% in connection with sale of

assets); *In re Riverstone Networks, Inc.,* Case No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24,

2006) (approving break-up fee and expense reimbursement totaling 3.59% of the purchase

price); *In re Nobex Corp.*, Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 23, 2006) (approving

4.29% break-up fee); *In re Russell-Stanley Holdings, Inc.,* Case No. 05-12339 (MFW) (Bankr.

D. Del. Sept. 8, 2005) (approving break-up fee and expense reimbursement totaling 3.3% of the

purchase price); *In re Pharmaceutical Formulations, Inc.,* Case No. 05-11910 (MFW) (Bankr. D.

Del. Aug. 8, 2005) (approving break-up fee and expense reimbursement totaling 3.8% of the

purchase price).  Accordingly, the Debtors request that the Court overrule the objections and

approve the proposed Bid Protections.

For the foregoing reasons, the Debtors respectfully ask this Court to overrule the Objections and grant the relief requested in the Motion.

Dated:    April 10, 2015
         Wilmington, Delaware

*/s/ Andrew L. Magaziner*

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Michael A. Rosenthal (NY No. 4697561)
Robert A. Klyman (CA No. 142723)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
mrosenthal@gibsondunn.com
rklyman@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and Debtors in Possession*

101903517.7