## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: May 12, 2015 at 10:00 a.m. (ET)**<br>**Objection Deadline: May 4, 2015 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 105, 363(b) AND 503(c) OF THE BANKRUPTCY CODE, (I) APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN; (II) AUTHORIZING THE DEBTORS TO PAY INCENTIVE BONUSES TO CERTAIN EMPLOYEES; AND (III) GRANTING RELATED RELIEF

The Standard Register Company and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby move this Court (this "Motion") for entry of an order (the "Proposed Order") (i) approving the Debtors' key employee incentive plan (the "KEIP"), (ii) authorizing the Debtors to pay incentive bonuses to certain employees as provided in the KEIP, and (iii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware, the Debtors consent to entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments in connection herewith consistent with Article III of the

United States Constitution.

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory and legal predicates for the relief requested herein are sections 105, 363(b)

and 503(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

Code").

## GENERAL BACKGROUND

3.      On March 12, 2015 (the "Petition Date"), each of the Debtors commenced

a voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Delaware (the "Court").  Pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in

possession.  No request for a trustee or examiner has been made in these chapter 11 cases

(collectively, the "Chapter 11 Cases").

4.      On March 24, 2015, the United States Trustee for the District of Delaware

appointed the statutory committee of unsecured creditors pursuant to section 1102 of the

Bankruptcy Code (the "Committee").

5.      Information regarding the Debtors' history and business operations,

capital structure and primary secured indebtedness, and the events leading up to the

commencement of these Chapter 11 Cases is set forth in the *Declaration of Kevin Carmody in*

*Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 2], which was filed on the Petition Date.

## THE DEBTORS' SALE EFFORTS

6.      The Debtors, in consultation with their professional advisors, diligently evaluated a number of options to address their liquidity concerns prior to the commencement of these Chapter 11 Cases.  As part of that process, the Debtors and their advisors worked closely with any and all potential strategic and financial buyers, many of which conducted on-site visits at the Debtors' facilities prior to the Petition Date and some of which entered into confidentiality agreements as part of their due diligence in conjunction therewith.

7.      In furtherance of their overall objective to maximize value for all interested parties, the Debtors engaged Lazard Middle Market LLC ("Lazard") in December 2014 to provide investment banking services in connection with the contemplated sale of substantially all of the Debtors' assets.  Subsequent thereto, the Debtors, with Lazard's assistance, explored a range of strategic and financial alternatives to address covenant defaults and a liquidity shortfall, and, simultaneously therewith, evaluated various in-court and out-of-court alternatives.  Ultimately, the Debtors, with the assistance of Lazard, determined that a sale of substantially all of the Debtors' assets as a going concern would maximize the value available to the Debtors' creditors.

8.      Lazard conducted extensive due diligence on the Debtors' assets and operations, and in furtherance thereof conducted numerous onsite visits and frequently engaged in strategic planning with the Debtors' senior management team, but due to the Debtors' severe liquidity constraints, Lazard and the Debtors did not implement a comprehensive marketing process prior to the Petition Date.  Notwithstanding these conditions, the Debtors and Lazard

were approached by several potential strategic buyers that expressed an interest in evaluating a potential transaction.

9.      As more fully described in the *Debtors' Motion for (I) an Order (A) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (D) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale* [Docket No. 23] (the "Sale Motion"), filed on the Petition Date, one of the potential buyers conducted extensive on-site diligence and participated in lengthy meetings with management and the Debtors' advisors regarding the potential transaction.  Ultimately, this strategic buyer submitted a term sheet and draft asset purchase agreement and actively pursued a stalking horse position.

10.     In addition to potential strategic buyers, certain lenders under that certain First Lien Credit Agreement (as defined in the Sale Motion), dated as of August 1, 2013, provided a term sheet for (a) the acquisition of the Debtors and (b) debtor-in-possession financing.  Lazard, in conjunction with the Debtors' other professionals, negotiated with the Prepetition First Lien Lenders (as defined in the Sale Motion) and the potential strategic buyer on their respective asset purchase agreements.  These agreements, as subsequently modified, were presented to the Strategy Committee of Standard Register's Board of Directors (the "Strategy Committee"), which determined that the proposal put forth by the Prepetition First

Lien Lenders provided more value and greater certainty of consideration than the strategic

buyer's proposal.  At the direction of the Strategy Committee, Lazard and the Debtors' other

professionals proceeded to finalize an asset purchase agreement with a group led by an affiliate

of Silver Point Capital, L.P. (the "Stalking Horse"), which ultimately resulted in an executed

Asset Purchase Agreement, dated March 11, 2015 (the "Stalking Horse APA").

11.     Pursuant to the Stalking Horse APA, the Stalking Horse has agreed to

purchase substantially all of the Debtors' assets (collectively, the "Transferred Assets") for

aggregate consideration in the amount of approximately $275,000,000 to be paid on the Closing

Date (as defined in the Stalking Horse APA) (assuming the Closing Date is June 26, 2015),

which includes the assumption of the Assumed Liabilities (as defined in, and pursuant to the

terms of, the Stalking Horse APA), subject to higher and better offers for the Transferred Assets

that may be forthcoming and submitted pursuant to an open auction process recently approved by

the Court.

12.     To ensure that the Debtors receive the highest or otherwise best offer for

the Transferred Assets as soon as practicable, the Debtors, their advisors and their senior

management team have implemented, and will continue to implement, their marketing efforts on

a postpetition basis.  If the Debtors receive competitive offers based on the proposed

qualification criteria described in the Sale Motion, and approved by the Court, the Debtors intend

to conduct an auction (the "Auction") to determine the highest or otherwise best offer for the

Transferred Assets.  The primary purpose of the sale process (such process, the "Sale Process")

and the Auction is to provide for the sale (the "Sale") of the Transferred Assets to the party that

submits the highest or otherwise best offer for the Transferred Assets (such party, the "Buyer")

in accordance with the sale procedures recently approved by the Court.

13.     The Debtors' ability to preserve the value of the Transferred Assets, as well as those assets that may ultimately be excluded from the going concern Sale, continue normal operations, and maximize recovery through the Sale Process hinges upon their ability to retain key employees and incentivize employee performance.  The assistance of the Debtors' executives, officers, and managers during the ongoing marketing and Sale Process is vital to the Debtors' efforts to secure higher or better offers than that memorialized in the Stalking Horse APA.

## DEVELOPMENT OF THE KEIP

14.     Prior to the Petition Date, the Debtors hired McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey") to assist with the development of a strategic business plan and to provide interim management services, including Kevin Carmody as the Debtors' Chief Restructuring Officer (the "CRO").  The Debtors also hired Compensation Strategies, Inc. ("CSI") to assist in structuring an appropriate KEIP based on the Debtors' industry and circumstances.  McKinsey is a leading global consulting firm specializing in turnaround management for large companies experiencing financial difficulty, and CSI is a compensation consulting firm that focuses solely on executive and board pay.

15.     Collectively, CSI, McKinsey and the Debtors, with the assistance of the CRO, reviewed the Debtors' needs during the restructuring process and the necessary features of an incentive plan.  In concert with the Debtors, CSI and McKinsey assisted in designing the KEIP, cognizant of the Debtors' goals of maximizing value for the Transferred Assets through the Sale Process, enhancing the Debtors' financial condition, and ensuring effective management during these Chapter 11 Cases.  The Debtors, CSI and McKinsey designed the KEIP in a reasonable, cost-effective way to appropriately incentivize certain personnel essential to these Chapter 11 Cases and the success thereof.

16.    CSI and McKinsey also worked closely with the Debtors and their legal advisors to ensure that the KEIP was competitive within the industry and that the incentives set for the KEIP Participants (as defined below) were appropriate.  The Debtors, CSI, McKinsey, and the Debtors' other advisors, as applicable, reviewed incentive-based programs that have been court approved for other large companies going through chapter 11 in recent years, and these market comparisons, in combination with consideration of the specific circumstances of these cases, formed the basis of the Debtors' KEIP.  With active input from and involvement of the Debtors' board of directors (the "Board of Directors"), the form of the KEIP underwent several rounds of revisions before being submitted to the Board of Directors for final approval.  On April 17, 2015, the Board of Directors approved the KEIP on the terms summarized herein.

## THE ELIGIBLE EMPLOYEES

17.    The Debtors have identified forty-nine (49) senior level or executive employees (collectively, the "KEIP Participants")[2] whose institutional knowledge and skill are essential to the Debtors' ability to maximize value for all interested parties through the Sale Process or otherwise.  In addition to their normal responsibilities related to the Debtors' operations and business activities, the KEIP Participants have been required to assume supplemental responsibilities as a result of these Chapter 11 Cases.  The Debtors submit that payments made under the KEIP are necessary to reward key employees for their efforts to advance the Sale Process, satisfy the Bankruptcy Code reporting requirements, and ensure effective and value maximizing management of the Debtors' business during these Chapter 11 Cases.  In the Debtors' business judgment, it is absolutely critical that the KEIP Participants

---

[2]    To protect the privacy of the KEIP Participants and preserve company morale, the names of the KEIP Participants, their positions, salaries and target bonuses will only be provided to the Court, the Office of the United States Trustee for the District of Delaware, and proposed counsel to the Official Committee of Unsecured Creditors.

remain incentivized to perform their normal business duties and satisfy the additional—and indeed monumental—responsibilities that have been thrust upon them as a result of these Chapter 11 Cases and, particularly, the contemplated Sale.

18.　　The KEIP Participants comprise less than 2% of the Debtors' current workforce, and the bonus incentive for each KEIP Participant is an amount keyed to their respective salary levels and their relative contribution to the value maximized through these Chapter 11 Cases.

## DESCRIPTION OF THE KEIP

19.　　For the reasons set forth above, the Debtors believe that the implementation of the KEIP is the best way to align employees' interests with those of the Debtors and their creditors in a manner that maximizes the value of the Debtors' estates. Accordingly, the Debtors seek entry of an order (i) authorizing the Debtors to pay incentive bonuses to certain employees as provided in the KEIP, (ii) approving the Debtors' KEIP, and (iii) granting related relief.

20.　　The proposed KEIP is based on the metrics identified in the Key Employee Incentive Plan – Summary, attached hereto as Exhibit B (the "Summary"),[3] which has been filed under seal and will be provided on a confidential basis to the Court, the Office of the United States Trustee for the District of Delaware, the Debtors' postpetition lenders, and counsel to the Official Committee of Unsecured Creditors.

21.　　Importantly, after the Sale closes, all KEIP payments will be the ultimate responsibility of the Buyer, as the KEIP conditions payment on the Buyer assuming the Debtors' responsibilities under the KEIP upon closing or making appropriate payments at that time.

---

[3]　　The Summary is qualified in all respects by reference to the KEIP itself, which shall control.

22.     The KEIP establishes a target opportunity (the "Target Opportunity") of approximately $3,620,053, which will be paid if certain financial performance goals are achieved.  A maximum potential payout of approximately $4,344,064 will be paid if all financial performance goals are surpassed.  The Target Opportunity is split into two equal sub-opportunities:  (i) a bonus opportunity based on achieving ambitious revenue targets established by the Debtors' business plan for fiscal year 2015 (the "Revenue Target Opportunity") and (ii) a bonus opportunity based on achieving ambitious earnings targets measured by earnings before interest, taxes, depreciation, amortization, restructuring, and pension amortization and settlement ("EBITDARP") for fiscal year 2015 (the "EBITDARP Target Opportunity").   The financial performance goals for each Target Opportunity are set forth in the Summary.

23.     The KEIP contemplates payment of all earned incentives as follows:

a.      within thirty-five (35) days following the closing date of the Sale for those KEIP Participants who are not offered employment by the Buyer and for those who are offered employment by the Buyer on terms that would entitle the KEIP Participants to refuse or terminate such employment for Good Reason (as defined in the KEIP) or on terms that do not include assumption of the Debtors' KEIP obligations to such KEIP Participants.  For this group, incentives will be earned if the Debtors' actual performance through the end of the month immediately preceding the closing date of the Sale equals or exceeds the target for such period based on the Debtors' 2015 business plan; or

b.      upon closing of fiscal year 2015 (but in no case later than fifty (50) days following closing of fiscal year 2015) for those KEIP Participants who are hired by the Buyer on terms that would not entitle the KEIP Participant to refuse or terminate such employment for Good Reason (as defined in the KEIP) and on terms that include assumption of the Debtors' KEIP obligation to such KEIP Participants, provided that the Buyers' actual performance through the end of fiscal year 2015 equals or exceeds the target for such period based on the Debtors' 2015 business plan.  For this group, KEIP Participants who are subsequently terminated by the Buyer without Cause (as defined in the KEIP) or KEIP Participants who subsequently terminate their employment for Good Reason (as defined in the KEIP) shall receive payment for the full year at the same time as other KEIP Participants who remain employed by the Buyer upon closing of fiscal year 2015, provided that the Buyer's actual performance through the end of the

month immediately preceding the termination equals or exceeds the target for such period based on the Debtors' 2015 business plan.

24.    The KEIP also contemplates the payment of proportionally-adjusted incentives in the event that certain proportions of the Revenue and EBITDARP Target Opportunities are met.  For example, if the Debtors realize approximately 98% of the revenue goal, the KEIP Participants will receive 80% of the Revenue Target Opportunity; on the other hand, if the Debtors realize approximately 102% of the revenue goal, the KEIP Participants will receive 120% of the Revenue Target Opportunity.  Adjustments within this 98%-102% range will be determined using a straight-line interpolation formula.  The KEIP Participants will not receive anything on account of the Revenue Target Opportunity if the Debtors achieve less than approximately 98% of the revenue goal and will receive no more than 120% of the Revenue Target Opportunity if the Debtors realize more than 102% of the revenue goal.

25.    Similarly, the KEIP Participants will earn 80% of the EBITDARP Target Opportunity if the Debtors achieve approximately 95% of the EBITDARP goal, and the KEIP Participants will earn a maximum of 120% of the EBITDARP Target Opportunity if the Debtors achieve approximately 109% of the EBITDARP goal.  KEIP Participants will likewise receive proportional percentages of the EBITDARP Target Opportunity if EBITDARP is somewhere in between that percentage range, and the KEIP Participants will not receive anything on account of EBITDARP Target Opportunity if the Debtors achieve less than approximately 95% of the EBITDARP goal.

26.    Finally, it is worth reiterating that the Buyer of the Debtors' assets must agree that it will, as to each KEIP Participant, either pay (or provide cash to the Debtors to pay) the amount due to such KEIP Participant or employ such KEIP Participant pursuant to terms that (a) would <u>not</u> entitle the KEIP Participant to refuse such employment, or terminate such

employment, for Good Reason (as defined in the KEIP) and (b) include assumption of the

Debtors' KEIP obligations to such KEIP Participant.

27.    KEIP Participants currently play, and will continue to play, a pivotal role

in the Debtors' business operations and in the Sale Process, and incentivizing their performance

will ensure that the Sale is pursued and implemented in an efficient, and value-maximizing

manner, and that the Debtors achieve the highest revenue and EBITDARP results possible under

the circumstances.

28.    Achieving the EBITDARP and Revenue Target Opportunities will not be

easy; to the contrary, meeting these thresholds will require significant efforts by the KEIP

Participants.  With respect to the Sale Process, the Debtors' advisors have already begun an

extensive marketing effort which has enabled the Debtors to execute the Stalking Horse APA.

The Debtors' advisors will continue to market the Transferred Assets and will need ongoing

extensive assistance from the KEIP Participants to support and respond to diligence requests, as

applicable, and explain the Debtors' business operations to prospective purchasers; this effort

will maximize the likelihood that the Debtors receive higher and better bids.  Simultaneously, the

KEIP Participants will have to work diligently to enable the Debtors to achieve ambitious

revenue and EBITDARP results under the difficult circumstances that a chapter 11 presents.

Given the challenges confronting the Debtors and the significant competition within the Debtors'

industry, key vendors and customers will have to be managed carefully to ensure sufficient

production is in the supply chain despite the chapter 11 filing.  And, all of this must be

accomplished under the umbrella of the very tight budget constraints that the Debtor's

postpetition financing requires.

## RELIEF REQUESTED

29.     By this Motion, the Debtors seek entry of an order (i) approving the

Debtors' KEIP, (ii) authorizing the Debtors to pay incentive bonuses to certain employees as

provided in the KEIP, and (iii) granting related relief.  The Debtors submit that the KEIP will

incentivize the KEIP Participants—each of whom is critical to the success of these Chapter 11

Cases—to maximize value in the Sale Process for the benefit of all stakeholders.

## BASIS FOR RELIEF

30.     A company's decision to file for chapter 11 necessarily creates difficulties

for its employees and can lead to low morale and, consequently, low productivity.

Unfortunately, these negative consequences often affect a company's ability to continue its

normal business operations, and impair its ability to maximize sale values and operating revenue,

thereby undercutting potential recovery for its stakeholders.  For this reason, bankruptcy courts

and stakeholders often authorize thoughtful incentive plans designed to reduce disruption to

employees while improving morale and incentivizing job performance.  Courts have routinely

approved payments under these plans pursuant to section 363(b) of the Bankruptcy Code as an

exercise of the Debtors' business judgment.

31.     The Debtors seek approval of the KEIP to maximize their financial

condition, sell the Transferred Assets, and meet their debtor-in-possession duties during these

Chapter 11 Cases.  These needs cannot be met without the support of the KEIP Participants.

Accordingly, the Debtors believe that it is essential that they incentivize the KEIP Participants to

deliver their best performance at this critical juncture for the benefit of the estates.  The KEIP

Participants' advanced skill and institutional knowledge are critical to the Debtors' efforts to

maximize value for all interested parties.

## A.    IMPLEMENTING THE KEIP IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

32.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, a debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment.  See In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to grant such application); see also In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason"); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

33.    The business judgment rule shields a debtor's management's decisions from judicial second guessing.  In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a Debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  Thus, if a debtor's

actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

34.     The Debtors submit that the implementation of the KEIP is a proper exercise of the Debtors' business judgment and is in the best interests of their estates and the interests of all stakeholders in these Chapter 11 Cases.  The KEIP Participants have been asked to perform their normal responsibilities in a uniquely abnormal time for the Debtors – a time when, as a result of the Debtors' chapter 11 filing, long-standing relationships with key employees, customers and suppliers are particularly sensitive.  In addition, the KEIP Participants have been asked to undertake new responsibilities, including working with potential purchasers to assist in the diligence necessary to augment the auction process.  The skills, knowledge and motivation of the KEIP Participants are essential to meeting the Debtors' budgets and revenue and earnings targets, as well as preserving, and indeed maximizing the value of the Debtors' businesses through the proposed Sale.

35.     Furthermore, the KEIP aligns the interests of the KEIP Participants and all stakeholders in these Chapter 11 Cases.  If the Debtors achieve or surpass both revenue and EBITDARP goals, the KEIP Participants will be entitled to up to 120% of the total Target Opportunity; on the other hand, if the Debtors meet only one of the financial performance goals, but miss the other, the KEIP Participants will receive, at best, 0-60% of the total Target Opportunity.  If neither of the minimum revenue or EBITDARP targets is achieved within the requisite margins, the KEIP Participants will not be entitled to any payments.  Under any payout scenario, the total payments available under the KEIP will be calculated based on a sliding scale of revenue and EBITDARP results, as the Revenue and EBITDARP Target Opportunities have

been structured to provide variable levels of recovery for the KEIP Participants depending on the success achieved during the applicable fiscal period.

36.     The Debtors submit that the Transferred Assets can only be successfully sold for a higher and better price, and revenue and EBITDARP results maximized, if the KEIP Participants preserve the value of the Debtors' businesses.  The KEIP and its modest compensation structure are calibrated to meet the KEIP's stated goal:  motivating the KEIP Participants by rewarding them for maximizing value for all parties in interest in these Chapter 11 Cases.  Thus, the KEIP is designed to "achieve the desired performance."  In re Dana Corp., 358 B.R. 567, 576, 583 (Bankr. S.D.N.Y. 2006) (emphasis omitted).

37.     Not only is the KEIP calculated to achieve the desired performance, but the Debtors also submit that all payouts under the KEIP are reasonable.  As referenced above, the maximum amount that could potentially be paid under the KEIP is approximately $4.3 million, and payments under the KEIP would only reach that amount in the event that the Debtors' ambitious revenue and EBITDARP goals are not only met, but surpassed.  Moreover, any payout under the KEIP will ultimately be the Buyer's responsibility, as payment is contingent on the Buyer making KEIP payments or assuming such responsibilities in conjunction with the Sale.  Given the foregoing, the Debtors submit that the KEIP will preserve and optimize the value of the Debtors' assets, and not otherwise diminish the estates' limited resources.

38.     This Court and other courts have recognized that programs such as the KEIP can provide a highly efficient means of maximizing value for a debtor's estate and, accordingly, have approved similar incentive programs.  See In re Universal Cooperatives, Inc., Case No. 14-11187 (MFW) (Bankr. D. Del. Aug. 14, 2014) (approving executive incentive plan in connection with closing of a sale); In re Furniture Brands International, Inc., Case No. 13-

12329 (CSS) (Bankr. D. Del. Oct. 11, 2013) (approving key employee incentive plan in connection with closing of sale and meeting certain liquidity thresholds); In re Allen Family Foods, Inc., Case No. 11-11764 (KJC) (Bankr. D. Del. July 13, 2011) (approving executive and management incentive plan in connection with closing a sale); In re Claim Jumper Restaurants, LLC, Case No. 10-12819 (KG) (Bankr. D. Del. October 21, 2010) (approving executive incentive plan as critical to achieving a sale); In re Magic Brands, LLC, Case No. 10-11310 (BLS) (Bankr. D. Del. May 17, 2010) (approving incentive plan designed to maximize value in a sale); and In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 14, 2008) (approving sale-related incentive payments to senior management).

39.     The proposed KEIP is appropriate in the context of a sale case, such as this, where the debtor has secured a potential purchaser prior to proposing and implementing an incentive program.  In In re Diamond Glass, Inc., Case No. 08-10601 (Bankr. D. Del. 2008) (CSS), the court specifically rejected the notion that an incentive plan was inappropriate or unnecessary when a stalking horse bidder had come forward with a viable proposal to purchase substantially all of the debtors' assets.  There, Judge Sontchi remarked that "even if the only thing management has to do and the covered employees [under the incentive plan] have to do is hold [the] company together for the stalking horse bidder to close, I don't find that in and of itself primarily retentive. . . . Stalking horse cases, stalking horse bidders walk away.  There are material adverse changes that occur. . . . I don't find that just getting to a plan or just getting to a closing by a stalking horse bidder in and of itself is retentive."  Hearing Tr. at 89, In re Diamond Glass, Inc., Case No. 08-10601 (Bankr. D. Del. May 8, 2008).

40.     Moreover, in this instance, the proposed KEIP does far more than simply reward KEIP Participants for closing the Sale with the Stalking Horse.  KEIP payments are

conditioned on the Debtors achieving ambitious fiscal year 2015 revenue and EBITDARP goals.

Thus, the KEIP Participants must do more than simply ensure that the Stalking Horse APA, as

currently proposed, is approved and the underlying Sale closes.  The KEIP Participants must go

above and beyond to, among other things, ensure that the revenue and EBITDARP goals are met

so long as they are employed by the Debtors.  Accordingly, the Debtors submit that

implementing the KEIP is a valid exercise of the Debtors' business judgment and that approval

of the KEIP is in the best interests of the Debtors' stakeholders.

**B.    THE INCENTIVE PLAN SATISFIES THE REQUIREMENTS OF SECTION 503(c) OF THE BANKRUPTCY CODE, TO THE EXTENT THEY APPLY**

41.    Certain of the KEIP Participants are likely insiders within the meaning of

section 101(31) of the Bankruptcy Code and, therefore, the KEIP implicates section 503(c) of the

Bankruptcy Code.  Section 503(c) of the Bankruptcy Code contains three subsections: section

503(c)(1) of the Bankruptcy Code contains a general prohibition of retention plans; section

503(c)(2) of the Bankruptcy Code places limitations on severance payments; and section

503(c)(3) of the Bankruptcy Code sets forth standards governing other transfers.  The Debtors

submit that neither sections 503(c)(1) nor 503(c)(2) of the Bankruptcy Code are applicable to

evaluating the KEIP for the reasons set forth below.  While section 503(c)(3) of the Bankruptcy

Code may be applicable to the KEIP, as described below, that section mirrors section 363(b) of

the Bankruptcy Code.  Thus, the Debtors submit that the standard for evaluating the KEIP

pursuant to section 503(c)(3) of the Bankruptcy Code is the same as the standard applicable

pursuant to section 363(b) of the Bankruptcy Code, as discussed <u>infra</u>.

**1.    The KEIP is Neither a Retention nor Severance Plan**

42.    By the statute's plain language, section 503(c)(1) of the Bankruptcy Code

pertains solely to retention plans of insiders, and section 503(c)(2) of the Bankruptcy Code

addresses only the requirements for severance plans; neither provision applies to performance-based incentive plans.  See, e.g., In re Nobex Corp., No. 05-20050, January 12, 2006, Hearing

Tr. at 67 (Bankr. D. Del. 2006) (MFW.); In re Calpine Corp., No. 05-60200, April 26, 2006

Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006).  Indeed, one court held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case.  As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A).

In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

43.    The KEIP is not intended to provide bonuses for retention or severance pay.  In particular, the KEIP is comprised of only targeted incentive payments to key employees who play critical roles in the Debtors' efforts to maximize the value of the Debtor's business and the value obtained through the Sale Process.  The KEIP Participants are either directly involved with the implementation of the proposed Sale or integrally involved in the management of the Debtors' operations, or both.  The incentive payments in the KEIP are based upon the successful achievement of certain revenue and EBITDARP goals and, indeed, will contribute to the efficient management and expedited completion of these Chapter 11 Cases. Consequently, the KEIP is properly characterized as a performance-based, EBITDARP and revenue driven incentive plan—not a retention plan for insiders subject to the requirements of section 503(c)(1) of the Bankruptcy Code.

44.    The KEIP has been crafted to ensure that it directly incentivizes the KEIP Participants to meet certain performance objectives.  Even if the KEIP has the indirect effect of preventing the KEIP Participants from leaving the Debtors' employment, the Debtors submit that

the retentive elements of the KEIP do not render it a "retention" plan.  All successful incentive-based plans have the hallmark of incentivizing eligible employees to remain with the debtor.  Thus, while the Debtors acknowledge that one benefit of the KEIP may be the continued employment of key employees, this does not convert the KEIP into a "retention" plan, nor does it detract from its primary purpose: to provide incentives to key employees to help the Debtors maximize the value of their estates for the benefit of their creditors during a critical stage of the Sale Process.

45.    The KEIP is not in place solely to retain the KEIP Participants, but, rather, to motivate them.  The Debtors submit that the KEIP is necessary to maintain employee morale and to encourage key employees to remain engaged as the Sale Process unfolds.  Courts in this jurisdiction have approved similar incentive plans containing minimum payment amounts.  See, e.g., In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. May 29, 2007) (approving incentive payments to insiders simply for achieving stalking horse bid that was already in place); In re Global Home Products LLC, Case No. 06-10340 (KG) (Bankr. D. Del. May 30, 2006) (approving management incentive program that required only the closing of a going concern sale).

46.    Finally, the KEIP does not constitute severance for insiders subject to section 503(c)(2) of the Bankruptcy Code, because its benefits are payable for achievement of performance goals, rather than as a result of termination of a KEIP Participant's employment with the Debtors.  See 11 U.S.C. § 503(c)(2).  Under the terms of the KEIP, each KEIP Participant would be eligible for an incentive bonus only so long as the Debtors (or, after the Sale, the Buyer) achieve ambitious revenue or EBITDARP targets during fiscal year 2015, or for as much of the year as the KEIP Participant is employed by the Debtors or the Buyer for those not

offered acceptable roles with the Buyer.  The KEIP will incentivize all KEIP Participants—

whether offered employment by the ultimate Buyer or not—because it contemplates payment of all

earned incentives to all KEIP Participants, whether they are hired or not hired by the Buyer.

Therefore, the KEIP is an incentivizing tool—not a severance plan for insiders subject to the

requirements of section 503(c)(2) of the Bankruptcy Code.

**2.      The KEIP Meets the Requirements of Section 503(c)(3) of the Bankruptcy Code**

47.      The Debtors submit that the KEIP satisfies the applicable standards set

forth in section 503(c)(3) of the Bankruptcy Code since it is precisely calibrated to achieve the

desired performance, is fair and reasonable in scope, and does not discriminate unfairly.

48.      The Debtors' ability to preserve the value of their assets would be

substantially undermined if the Debtors are unable to properly incentivize their employees.  That

the Debtors are essentially now in the business of preserving assets for sale and winding

down their operations makes it virtually impossible to attract any new employees, let alone

those equal to the caliber of the KEIP Participants.  Authorizing the Debtors to implement the

KEIP will provide the KEIP Participants with a greater sense of financial security, thereby

minimizing their need to seek employment elsewhere, which would otherwise distract the KEIP

Participants from performing the important executive, administrative and potential

transition services for the Debtors.  Providing incentives to encourage employees to focus on

the Debtors' objectives, and to motivate them to provide optimal levels of performance, is

necessary to successfully maintain the businesses pending the Sale of the Transferred Assets.

Moreover, the overall cost of the KEIP is reasonable, especially given (i) the Buyer's

responsibilities with respect thereto; (ii) the value to be realized from achievement of the

Debtors' revenue and EBITDARP goals; and (iii) the potential for securing higher or otherwise

better offers for the Transferred Assets.

49.    Finally, targeted incentive programs have consistently been recognized by this and other courts as having particular value in motivating management teams and other critical employees.  See, e.g., In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. Dec. 27, 2006) (approving employee incentive plan providing for cash payments as rewards for attainment of collective operational restructuring goals and personal performance goals in support); In re Global Home Products LLC, Case No. 06-10340 (KJC) (Bankr. D. Del. May 30, 2006) (approving management incentive program provided that plan participants fulfilled their obligations to the debtors through the closing of a sale of substantially all of the Debtors' assets); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. Apr. 3, 2006) (approving an employee bonus program providing for cash payments for successful completion of certain individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Feb. 21, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals and personal performance goals); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 20, 2006) (approving "sale-related incentive pay" to officers, contingent on a successful sale of the company for a price in excess of that offered by an existing, stalking horse bidder, in connection with the debtor's pursuit of a sale of the company).

## C.    THE INCENTIVE PLANS MAY ADDITIONALLY BE AUTHORIZED PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE

50.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

51.    As set forth above, the Debtors believe that the KEIP is critical to their ability to maximize returns to creditors.  Simply put, the KEIP is necessary and appropriate,

because it rewards the Debtors' most critical employees—all of whom have been asked to undertake significant and important additional responsibilities since the commencement of the Sale Process—for their efforts in maximizing the value of the Debtors' estates.

52.     The Debtors respectfully submit that the KEIP is an appropriate exercise of the Debtors' business judgment, is necessary and in the best interest of the Debtors, their creditors, and their estates, and should be approved under sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, and allowed as an administrative expense under section 503(b) of the Bankruptcy Code.

## WAIVER OF BANKRUPTCY RULE 6004(h)

53.     Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rule 6004(h), in connection with the relief sought herein.  As described above, obtaining the authority for, and implementing payment of, the incentives described herein is a time-sensitive matter, and the Debtors seek to provide immediate incentives to the KEIP Participants so that the Sale—either to the Stalking Horse or party that comes forth with a higher and better bid—is successfully consummated, revenue and EBITDARP targets are met and surpassed, and, consequently, maximum value is generated for all interested parties.  The Debtors therefore request that the Proposed Order, once entered, be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) be waived.

**NOTICE**

54.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) proposed counsel to the Committee; (iii) counsel for Silver Point Finance, LLC, in its capacity as administrative agent under the Debtors' First Lien Credit Agreement and Second Lien Credit Agreement; (iv) counsel for Bank of America, N.A., in its capacity as administrative agent under the Debtors' Amended and Restated Loan and Security Agreement; (v) counsel to the agents under the Debtors' debtor-in-possession financing facility; and (vi) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Order, in substantially the form attached hereto as Exhibit A, and grant such other and further

relief as the Court may deem just and proper.

Dated:   April 19, 2015
         Wilmington, Delaware            */s/ Andrew L. Magaziner*_____
                                         Michael R. Nestor (No. 3526)
                                         Kara Hammond Coyle (No. 4410)
                                         Maris J. Kandestin (No. 5294)
                                         Andrew L. Magaziner (No. 5426)
                                         YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                         Rodney Square
                                         1000 North King Street
                                         Wilmington, Delaware 19801
                                         Telephone: (302) 571-6600
                                         Facsimile: (302) 571-1253
                                         mnestor@ycst.com
                                         kcoyle@ycst.com
                                         mkandestin@ycst.com
                                         amagaziner@ycst.com

                                         -and-

                                         Michael A. Rosenthal (NY No. 4697561)
                                         Robert A. Klyman (CA No. 142723)
                                         Samuel A. Newman (CA No. 217042)
                                         Jeremy L. Graves (CO No. 45522)
                                         Sabina Jacobs (CA No. 274829)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         333 South Grand Avenue
                                         Los Angeles, CA 90071-1512
                                         Telephone: (213) 229-7000
                                         Facsimile: (213) 229-7520
                                         mrosenthal@gibsondunn.com
                                         rklyman@gibsondunn.com
                                         snewman@gibsondunn.com
                                         jgraves@gibsondunn.com
                                         sjacobs@gibsondunn.com

                                         *Counsel to the Debtors and*
                                         *Debtors in Possession*