```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3   IN RE:                          )  Case No. 15-10541 (BLS)
                                    )  Chapter 11
4   THE STANDARD REGISTER COMPANY,  )
    INC., et al.,                   )
5                                   )
                    Debtors.        )  Courtroom No. 1
6                                   )  824 Market Street
                                    )  Wilmington, Delaware 19801
7                                   )
                                    )  April 13, 2015
8                                   )  10:00 A.M.

9                       TRANSCRIPT OF HEARING
              BEFORE HONORABLE BRENDAN L. SHANNON
10                 UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12
    For the Debtors:            Young Conaway Stargatt & Taylor, LLP
13                              By:  MICHAEL NESTOR, ESQUIRE
                                1000 North King Street
14                              Wilmington, Delaware 19801

15                              Gibson, Dunn & Crutcher LLP
                                By:  MICHAEL ROSENTHAL, ESQUIRE
16                                   BRIAN LUTZ, ESQUIRE
                                     JEREMY GRAVES, EQUIRE
17                                   SAMUEL NEWMAN
                                333 South Grand Avenue
18                              Los Angeles, California 90071

19  ECRO:                       DANA MOORE

20  Transcription Service:      Reliable
                                1007 N. Orange Street
21                              Wilmington, Delaware 19801
                                Telephone:  (302) 654-8080
22                              E-Mail:  gmatthews@reliable-co.com

23
    Proceedings recorded by electronic sound recording:
24  transcript produced by transcription service.

25
```

```
 1  For Silver Point:        Skadden Arps Slate Meagher & Flom
                             By:  RON MEISLER, ESQUIRE
 2                           155 North Wacker Drive
                             Chicago, Illinois 60606
 3
    For the Committee:       Lowenstein Sandler
 4                           By:  SHARON LEVINE, ESQUIRE
                                  ANDREW BELLMANN, ESQUIRE
 5                           65 Livingston Avenue & 6 Becker
                             Farm Road
 6                           Roseland, New Jersey 07068

 7  For U.S. Trustee:        Office of United States Trustee
                             By:  MARK KENNEY, ESQUIRE
 8                           844 King Street
                             Wilmington, Delaware 19801
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                   INDEX

2                                                                Page

3 NOTICE OF AGENDA MATTERS:
  For the Debtors, by Mr. Rosenthal                              4
4 For Creditors Committee, by Ms. Levine                        14
  For U.S. Trustee, by Mr. Kenney                               26
5 For the Debtors, by Mr. Lutz                                  36
  For the Creditors Committee, by Mr. Bellmann                  42
6 For Silverpoint, by Mr. Meisler                               93
  For the Debtors, by Mr. Graves                               110
7 For the Debtors, by Mr. Newman                               114

8                                                            Further
   WITNESS FOR THE        Direct Cross Redirect Recross Redirect
9  DEBTORS:
   Andrew Torgove          38    39

10
                                                            Further
11 WITNESS FOR THE        Direct Cross Redirect Recross Redirect
   COMMITTEE:
12 David MacGreevey        48    57    61       62      63
   Leon Szlezinger               68    77       78

13
   EXHIBITS:
14 Torgove & Carmody Affidavits                                38
   DIP Amendment

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  All rise.

2        THE COURT:  Please be seated.  Good morning.  Mr.

3   Rosenthal.

4        MR. ROSENTHAL:  These are always too high for me,

5   Your Honor.  I need to get taller.  Good morning, Your Honor.

6        THE COURT:  Good morning.

7        MR. ROSENTHAL:  Michael Rosenthal on behalf of the

8   Debtors.  I'm from Gibson Dunn & Crutcher.  And in the

9   Courtroom with me today since this is the first time that

10  some of the officers have appeared, it is Kevin Carmody from

11  McKinsey who is the Debtors' chief restructuring officer.

12       THE COURT:  Welcome.

13       MR. ROSENTHAL:  And Andrew Torgove of Lazard who is

14  the Debtors' chief investment banker.

15       THE COURT:  Welcome.

16       MR. ROSENTHAL:  Also with me are my colleagues Brian

17  Lutz, Jeremy Graves and Sam Newman.

18       THE COURT:  Very good.

19       MR. ROSENTHAL:  We have a full docket this morning,

20  Your Honor, so we appreciate your time.  As an overview, I'd

21  like to make a recommendation about how to handle the

22  hearing.  We'd like to take up the most contentious issues

23  first, the sale and financing issues.  And we'd like to take

24  them up at the same time because we think that there will be

25  the same witnesses on these.

1        THE COURT:  A lot of the points travel together.

2        MR. ROSENTHAL:  Correct.  Then after we are

3  completed, have completed the sale and DIP hearings and we'll

4  present a few final orders on first day motions and finally

5  some argument on lift stay motion.

6        There have been a number of CNO's filed.

7        THE COURT:  I think that I've signed all the orders

8  that relate to the CNO's and they should be on the docket or

9  they should be headed for the docket this morning.  If

10 they're not there today then give me a call.  But I don't

11 have any issues with the matters that were presented under

12 CNO.

13       MR. ROSENTHAL:  Right; thank you, Your Honor.

14 Returning to the sale of financing issues let me give you a

15 little background and then I'm going to turn it over to my

16 partner Mr. Lutz to introduce some evidence.

17       As you know, the Debtors engaged Lazard, McKinsey

18 and Gibson Dunn to evaluate their restructuring alternatives

19 prior to the filing.  They determined they didn't have

20 sufficient financial wherewithal to effectuate an internal

21 reorganization even if they could manage to accomplish a debt

22 to equity conversion or trying to use the cram down

23 provisions of Chapter 11.  They were simply going to run out

24 of cash and couldn't pay the PBGC the annual amounts due

25 them.

1        So they engaged in a targeted or an extensive pre-

2    filing marketing and diligence effort.  Now when we were the

3    first time I appeared before you, the Court observed that you

4    didn't think that there had been much marketing done.  I

5    think the declarations will show Your Honor that there was a

6    pretty extensive effort.  It was targeted.  And it was

7    targeted to what the Debtors thought was the most likely

8    buyer and we got near deal right to the break and we didn't

9    get a deal.

10       When that buyer fell through the Debtors began in

11   earnest completing negotiations with Silver Point because

12   they concluded that it would be incredibly destabilizing to a

13   business to enter Chapter 11 in a free fall.  They needed to

14   give their customers and their vendors and their employees

15   the comfort of knowing that there was an exit from this case

16   and it wasn't going to languish forever and ever.  That's one

17   of the reasons, Your Honor, that the Debtors negotiated not

18   just the stalking horse APA but an amply sized debtor-in-

19   possession financing.

20       There has been some discussion in the papers the

21   Court will know about how perhaps this financing is

22   oversized.  I suggest to the Court it is definitely not

23   oversized.  It was sized based on a worst case situation that

24   vendors would put the Debtor on COD.  The fact that we could

25   headline to the vendors and the customers that we had ample

1  financing during the case is actually what I think has led;

2  at least, in the early phases of the case to a reduced use of

3  cash.  But we expect a lot of that to be taken up as we make

4  the critical vendor payments that the Court has already

5  approved.

6        Both of these items gave a lot of comfort, we think,

7  to the customers and our vendors.  And that's why we've been

8  able, for the most part, to keep our business stabilized.

9  Everyone has an expectation that this June auction will occur

10  on time.  Your Honor, just a little bit about each of the DIP

11  and sale motion.

12        On the DIP, I think the declarations and the memos

13  demonstrate we need financing to continue operations.  And

14  the reality is that the DIP lenders at the table here are the

15  only game in town.  Do we have the most ideal DIP that's ever

16  been negotiated by a Debtor?  No.  Do we have the most ideal

17  terms?  Could we have, would we have been happy with

18  additional concessions?  Absolutely.  But we didn't have that

19  option.

20        What we had was one party at the table.  We

21  approached pre-filing, six or seven lenders about whether

22  they would be willing to extend debtor-in-possession

23  financing.  No lender was willing to be a party to a priming

24  fight.  And no lender was willing to extend financing behind

25  $315 million dollars of debt.

1    So we did what Debtors in our situation always do.

2 They negotiate as hard as they can with as much leverage as

3 they have, which sometimes isn't much, and you arrive at the

4 best deal that you can.  And our best deal in this case

5 included not just the financing package, but which was a

6 bridge, but it was a bridge to an exit which is the stalking

7 horse APA.

8    With respect to the sale process, we think the

9 issues are very straightforward there as well.  We have a

10 stalking horse bid.  Again, it was the only party that we

11 were able to bring to the table before we filed.  The bid is

12 for approximately $273 million dollars when you take into

13 consideration cash, assumption of liabilities, and credit bid

14 rights.

15    And, again, if we had been able to get there with

16 someone else, perhaps we would have been standing before you

17 with a third party buyer instead of the secured lenders as

18 the buyer.  But we were unable to do that.  So there have

19 been two basic objections that have been raised.  One is the

20 timeline and the second is that the business would be, that a

21 longer sale process is in the best interest.

22    We propose a 90 day timeline, Your Honor, because we

23 think that's more than adequate.  Our investment banker at

24 Lazard believes that 90 days is more than enough time to

25 conduct a robust auction; particularly given that we started

1  this process before filing.  We have a complete data room.

2  We have we think already in the data room and signed NDA's

3  with the most likely candidates.  The Jeffries gave us a few

4  additional names.  The Lazard team is tracking that down.

5         In fact, Your Honor, we think that this timeline

6  which is basically from filing about 90 days to auction and

7  95 days; 90 days to bid and 94, 95 days to auction is

8  significantly more than what has been the case in Delaware

9  over the past three years.  We sort of looked at some of the

10  cases.  We looked at 75 cases.

11         THE COURT:  I know you've got a chart.

12         MR. ROSENTHAL:  We found the average time from the

13  petition date the sale was less than 60 days.

14         THE COURT:  [inaudible].

15         MR. ROSENTHAL:  There you go.  With respect to

16  whether an extended timeframe would be helpful or maximize

17  value, you will hear from Mr. Carmody that, in fact, a delay

18  in the sale -- you'll hear from Mr. Torgove that a delay in

19  the sale process is not necessary to induce the appropriate

20  buyers.  You'll hear from Mr. Carmody that a delay in the

21  sale process, in fact, will damage the business because of

22  the customer's expectation that this is going to come to an

23  end.  And because of the fact that every single day we spend

24  in bankruptcy more and more customers leave; more and more

25  vendors have questions; more and more employees leave.

1        That's one of the reasons you're going to see,

2   incidentally, any day now a management incentive plan motion

3   because we are concerned some of our employees have left and

4   some of our employees are being poached as we stand here.

5        THE COURT:  Well there are two elements to the

6   Committee objection and, frankly, the other players as well,

7   but particularly the Committee.  The first is obviously the

8   timeline and the sufficiency of the marketing and sale

9   process.  And the second were specific elements of the

10  proposal that include a breakup fee or a secured lender that

11  include a substantial expense reimbursement, the mechanics,

12  who ought to credit bid.  So there are obviously -- I mean I

13  understand the timeline issues, but there are those elements

14  as well.  And I expect the Debtors' presentation will deal

15  with them as well.

16       MR. ROSENTHAL:  It will, Your Honor, that's what I'm

17  getting to next.  So another significant part of the attack

18  are the bid protections.  And here, again, the Debtors find

19  themselves in a not unusual situation where they have a

20  bidder at the table.  They want to keep the bidder at the

21  table.  They want to induce that bidder to put a stalking

22  horse bid on the table.  And the bidder wants our

23  protections.

24       We attempted to the extent that we had leverage to

25  do so.  We attempted to reduce the breakup fee request and to

1  reduce the expense reimbursement.  What you see is the result

2  of those negotiations.  And what I would caution the Court is

3  that it's very easy to say that breakup fee should be less

4  and non-existent.  Expense reimbursement should be less or

5  non-existent.  But if that causes the stalking horse to walk

6  we're back to a freefall and back to a liquidation.  And the

7  stalking horse sale, the sales procedure order is tied to the

8  DIP until we run out of money.

9       One of the things that has come up throughout the

10 papers, Your Honor, is have the Debtors and their management

11 team comply with their fiduciary duties.  And we have talked

12 about what the standard is.  We've talked about business

13 judgment.  The Committee has talked about inherent fairness.

14 Frankly, I think this is a red herring.  I don't care what

15 the standard is.  I think that the company has complied with

16 that standard.

17      The company's board is not an interested board --

18      THE COURT:  Yeah I think and I will hear from the

19 Committee on this.  But I don't necessarily regard the

20 fiduciary duty element of this; at least, in the context that

21 we're in to be a productive inquiry for a couple of reasons.

22 First, as a practical matter the application of fiduciary

23 duties and the business judgment rule at a minimum occupy a

24 very different functional role than they do three blocks down

25 the street at the Chancery.

1        So when a Debtor proposes in a Bankruptcy Court I'm

2   not certain if that has the same in a typical scenario

3   implication of fiduciary duties as it does outside of

4   bankruptcy.  It is a complicated inquiry and I think it

5   unnecessarily complicates the discussion that we're in about

6   whether or not this is consistent with fiduciary duties or

7   not.  The issue is more of a bankruptcy question I think than

8   a traditional corporate governance and corporate law

9   question, and I think that; so I'll be happy to hear from the

10  Committee on that.

11       I've had this inquiry, this concept before, but you

12  know one of the challenges that I have with at least some of

13  this, and you can point to prepetition conduct and we can

14  debate about whether or not that in a different case or in a

15  typical case might implicate fiduciary duties.  But in a case

16  such as this for example if the Debtor were to make a

17  proposal and come in and say Judge we want you to approve

18  this sale, this financing arrangement, etcetera, one or two

19  things will happen.

20       I will approve it by final order reflecting that I

21  found that it is consistent with their best business

22  judgment, etcetera; end of inquiry about fiduciary duties,

23  absent an appeal or I will deny it.  And while the denial

24  might -- I'm not sure that my denial on a full record means

25  that the party that asked for something and it got denied has

1  breached their fiduciary duties.  So I don't want to spend

2  too much time on this, but I have seen that.

3          I understand the issue and there may be nuances

4  where it has particular application, but as a general

5  proposition I understand the dynamic as you've described it.

6  It's not unfamiliar to, you know, your colleagues on the

7  other side for the Committee.  It's not, you know, unfamiliar

8  to the lender, etcetera.  I'm not certain that this is a

9  fiduciary duty issue; at least at this stage.

10          But, again, I'm happy to hear from the Committee on

11  that point.  But most of the issues, I think, are the

12  traditional concepts that we're discussing now.

13          MR. ROSENTHAL:  Thank you, Your Honor.  I mean I

14  think the reality is, is that the company was presented, was

15  in financial straits and presented with the option of filing

16  a freefall liquidating or filing with a stalking horse.  And

17  this is the stalking horse we had and that stalking horse was

18  willing to bring the other lenders along with DIP financing

19  to get to the end of the game.

20          Your Honor, with that background we'd like to put on

21  our case in chief and I'd like to turn it over to my partner

22  Brian Lutz.

23          THE COURT:  Ms. Levine, did you wish to be heard?

24          MS. LEVINE:  Your Honor, can we open a little

25  [indiscernible]?

1       THE COURT:  Briefly, yes.

2       MS. LEVINE:  Your Honor, just to set the table a

3  little bit also and it may streamline the testimony.  The

4  Committee's concern is that we believe the DIP is

5  inappropriate and obviously Your Honor has the right to

6  either approve it or not approve it.  But we're going to talk

7  to you a little bit about why we think it shouldn't be

8  approved under its present terms.

9       We think the issues with regard to the sale may be a

10  little bit different.  Your Honor, has the right to approve

11  it or not approve it, but I think Your Honor also has the

12  right to modify it if you deem it appropriate and approve it

13  as modified.  And one of the things we'll note and one of the

14  things you'll hear from us is that in both the DIP and the

15  sale the outside deadline is actually September 8th.  So there

16  is room here to potentially run a fair more open process.

17       With regard to the specifics that we were talking

18  about with regard to the DIP, Your Honor, the Committee's

19  primary concern is that it appears to be granting liens on

20  assets that were not previously encumbered. We're looking at

21  the avoidance actions, the foreign stock, and the Mexican

22  assets.  If under the existing sale process which is what we

23  seem to have today, there's no recovery for general unsecured

24  creditors, then unsecured creditors through this Chapter 11

25  process are actually being put in a worse position not even

1  a neutral position in order to let this DIP and the sale

2  process go forward.

3          In addition to that, Your Honor, the marshalling

4  arguments seem to be a red herring because what that does is

5  that lets the secured creditor take away what we argued

6  should be unencumbered assets to pay those first with regard

7  to the DIP.

8          THE COURT:  In a liquidation scenario or otherwise.

9          MS. LEVINE:  No it's in a; in other words they will

10 -- the way we read the papers they're going to use the

11 unencumbered assets as collateral for the DIP and then credit

12 bid the DIP and take those assets and take that value.  And

13 then if you read the assets purchase agreement, Your Honor,

14 there's a cap on 503(b)(9) claims, lease claims, cure claims,

15 and our administration, and I'll get to the Committee

16 professionals in a minute which is a separate issue but tied

17 into this.  So it looks like we're not only giving nothing to

18 unsecured creditors, but we're creating a scenario that

19 likely creates an administratively insolvent estate.

20         So if we had done this out of Court we'd have

21 foreclosures and it would be whatever it would be.  But by

22 taking it to bankruptcy we're not maximizing asset values for

23 the benefit of the parties and paying the cost of that

24 maximizing.  What we're doing here is giving nothing to the

25 general unsecured creditors and potentially creating a worst

1  administrative insolvency than we had on day one when the

2  petition was filed.

3       Your Honor, we would also note that the DIP order

4  prevents a credit bid what we would call [indiscernible]

5  protections.  In other words, if in fact they credit bid we

6  lose the challenge period.  So we heard Your Honor with

7  regard to the DNO and the breach of fiduciary duty, equitable

8  subordination and all those things, and we agree that that's

9  not necessarily an issue for today.  The Committee is doing

10 its investigation.  It's looking at what it would normally

11 look at in connection with its challenge rights.  But we

12 don't think that procedurally any of that should go away

13 today.

14      And we think it's interesting that the sale

15 objection deadline for the Silver Point bid is May 21 when

16 currently even if we don't ask for any extensions, May 23 is

17 the challenge deadline.  So, in essence, they've already

18 shortened our challenge by two days.  In addition to that

19 they haven't granted the Committee standing under either of

20 the order which means that basically we should be filing

21 something in a week or so if we're going to have it heard

22 with an ample opportunity for Your Honor to actually consider

23 it.

24      In addition to that, there's no tolling of the

25 challenge period while a standing motion is pending.  In

1  addition to that, June 10 is the deadline for sale objections

2  relating to things that happened at the auction and other

3  bids.  But it's unclear to us why June 10 shouldn't just be

4  the Committee's deadline as well with regard to the Silver

5  Point bid.  A challenge is a default under the DIP and it

6  also triggers the right for Civil Court to withdraw the APA

7  or the stalking horse bid.

8          In addition to that, Your Honor, the carve out is a

9  little bit illusory because it does come junior to the ABL

10 loan.  And we think it's interesting also that just last

11 night the ABL loan got two points more expensive.

12         THE COURT:  What?

13         MS. LEVINE:  The asset base DIP loan apparently

14 there was a typo it said in the papers so the filing last

15 night increased the interest rate on the asset base loan by

16 two points.

17         THE COURT:  Is that in the Debtors' reply?

18         MS. LEVINE:  I believe it was, Your Honor.

19         THE COURT:  Okay.  I didn't see that in the reply.

20 I read the reply this morning.  Where is that?

21         MR. ROSENTHAL:  No, Your Honor, I don't think it was

22 in the reply.  This was something that was raised to us last,

23 what's today Monday, Wednesday or Thursday that the intent

24 had been to have the default rate of interest for the ABL

25 loan and it was a two point differential from where it was;

1  two point differential.  The Debtors pushed back on it.

2  There was one reference in a long series of documents related

3  to the DIP that had a reference that maybe it was two points

4  higher.  But I think we would have had an argument with the

5  Court, but our dilemma was we needed an amendment to the DIP

6  loan on Friday that there's a sale hearing was supposed; the

7  sale procedures order was supposed to have been entered by

8  the 10th.

9       So we needed an amendment.  And we thought that even

10  if we didn't need that amendment at some point, we were going

11  to need amendments.  And we were going to get to have to give

12  this two points.  There was a legitimate dispute about what

13  the parties intended.  So rather than face a default which

14  would have to have been, you know, which people would have

15  found out about and it would have created negative

16  repercussions, we did agree to an amendment which increased

17  the ABL interest rate by two percent.

18       THE COURT:  I understand.  Okay thank you.  Ms.

19  Levine.

20       MS. LEVINE:  Your Honor, the cap on investigating on

21  leads of $25,000.00 seems a little bit slight in this case.

22  The history is convoluted; even the hearings are convoluted.

23       Your Honor, with regard to the budgeted amounts for

24  the Committee's professionals even aside from the fact that

25  the carve out seems to come after the asset base loan, the

1   proposed amount is a $100,000.00 for Committee counsel and

2   Delaware co-counsel, a $100,000.00 a month for both the

3   Committee's investment banker and financial advisor.  Whereas

4   if you take a look at the Debtors' numbers McKinsey is at

5   $750 a month, Gibson Dunn Crutcher $750 to a million, Lazard

6   is a $110 a month with a likely backend fee of about $5

7   million; take it or leave it.  The Debtors' corporate counsel

8   is at a $125 a month and the Debtors' Delaware counsel is at

9   a $150 a month and that's over and above $3.2 million dollars

10  paid the week before the filing for retainers to these

11  various professionals.  And even Silver Point's

12  professionals, Your Honor, were paid legal fees of $1.6

13  million or paid legal fees of $1.6 million in a budget for

14  May, June and July and received $1.5 million during the 75

15  days prior to the bankruptcy with a million of that coming

16  right before the bankruptcy filing.

17          Other things, Your Honor, they give us news of an

18  amendment, but they don't give us an opportunity to be heard

19  or to toll the amendment while Your Honor considers it if

20  there is an objection.  We don't get simultaneous notice of

21  notices that are required to be given to the lenders and the

22  Debtors.  And the variance is overly restrictive.  For most

23  of the variances in the DIP credit agreement, it appears that

24  the variance is 10% which if you do the chart is within

25  market.  But for two which are a little bit confusing to us,

1  the variance is 5%.  And the two where the variance is 5% is

2  postage and payroll.

3       So what the Debtor is really saying or what the DIP

4  lender is really saying is if you do really well we're going

5  to [indiscernible] a default which in our mind causes us

6  concern about suppressing value.

7       THE COURT:  Your point with me that if the business

8  is going toll tilt and they're paying overtime and --

9       MS. LEVINE:  It's more than that, Your Honor.  In

10  the payroll line is commission.  So if they're selling then

11  they're going to blow the budget.  And the other thing is

12  postage.  So if they're shipping then they're going to blow

13  the budget.  And it's ironic because if they're selling then

14  they should have ample more receivables to cover that.  And

15  if they're shipping postage, Your Honor, is actually a pass

16  through.  So it's really nothing more than a timing issue.

17       With regard to just a couple more issues on the

18  sale.  The breakup fee of 2% is $5.14 million.  Even the

19  Debtors in their opening have referred this is sort of a

20  protective credit bid, so they're going to do this with or

21  without the breakup fee and with or without the expense

22  reimbursement.  Also it's unclear to us how much of the

23  expense reimbursement may be double counted in the $1.6

24  million that Silver Point received in the three months prior

25  to the bankruptcy filing.

1      The cash deposit required by Silver Point is $2

2   million.  Other qualified bids are required to bid 10% which

3   brings them up to $28.5 million. We think substantially less

4   than that is good faith enough to open up the bidding

5   process.  We also think they can drop the over bids from $500

6   to $275.  That's really going to make a, if it's going to

7   make a difference.  They also require that competing bids

8   designate all of the executory contracts and leases to be

9   assumed and rejected.  But the stalking horse bid currently

10  doesn't have those designations.

11      The backup bidders are not required to stay in place

12  pending a closing which seems a little bit unusual.  With

13  regard to the timeline we discussed it briefly, but we would

14  ask for 60 days to the extent Your Honor approves this for

15  everything.  Including switching the objection to the

16  Committee to object to the bid to the same day everybody else

17  is objecting.  So take May 21 and make it two days before the

18  sale hearing.  Take the June 1 bid deadline and make it July

19  31.  Take the June 4 sale hearing and push it to August 3.

20  Take the June 8 auction and push it to August 7th.  And then

21  take the June 10 objection deadline and put it two days prior

22  to the sale hearing.  And then take the auction and perhaps

23  push it to August 11th which would allow the sale order to get

24  entered by August 14th and allow a closing well in advance of

25  the September [indiscernible] date under both the DIP and the

1  existing asset purchase agreement.

2          Your Honor, it's unclear from the bid procedures

3  order, but we would obviously also ask that the Committee and

4  its members and their professionals be permitted to attend

5  the auction.  We don't really want to debate whether we're

6  targeted or not targeted prepetition marketing process was

7  appropriate or not appropriate.  The fact is we understand

8  that the Debtor did try hard to get to closure with one

9  bidder.  It didn't work.

10          We think that we need to run a robust sale process

11  post-bankruptcy so we can bring other people to the table.

12  And we've already gotten calls as we indicated at the first

13  day of the case, Your Honor, from several other bidders who

14  were interested in getting into the process.  There was no

15  teaser or SIM until after the filing of the case.  And the

16  business plan, Your Honor, as we understand it is still not

17  complete which is very important; particularly, for a

18  financial bearer to understand what the numbers are.

19          Importantly, similar with the DIP we don't believe

20  that the credit bid should be permitted to pay down

21  unencumbered assets.  Again, we want a reservation of rights

22  with regard to all the Radnor issues.  We think it's

23  interesting that in the form of order --

24          THE COURT:  Let me ask you a question.  I've been

25  trying to noodle through on the mechanics of that issue your

1 | point is that Silver Point as of the petition date or as of

2 | today does not have liens on certain assets there or

3 | otherwise unencumbered and, therefore, presumably available

4 | to unsecured creditors for distribution.  The DIP

5 | contemplates a collateral package that would be on all

6 | existing collateral as well as new collateral, previously

7 | unencumbered.

8 | Now it's not unusual that a DIP be included for

9 | purposes of a credit bid.  Can you walk me through because I

10 | think that this implicates the marshalling argument.

11 | MS. LEVINE:  Yes that's exactly correct, Your Honor.

12 | So our concern is I'll give you a simple example.  Assets

13 | here are covered by the prepetition liens and assets here are

14 | not.  So if we get a DIP which the Committee is positing is

15 | not necessarily benefitting unsecured creditors.  They now

16 | have a lien on this group of assets and this group of assets.

17 | If they credit bid they're taking all the assets.

18 | Our argument is that they should only get a post-

19 | petition lien on the prepetition collateral package because

20 | they're not really bidding anything to the unsecured

21 | creditors.

22 | THE COURT:  You'd agree with me though that's not a

23 | typical DIP financing arrangement that somebody takes a lien

24 | on the assets that they --

25 | MS. LEVINE:  Correct, Your Honor, but that's not,

1  but in a typical DIP financing arrangement even in a case

2  where there's not a substantial recovery to unsecured

3  creditors, there is generally some benefit to the unsecured

4  creditors by virtue of that DIP financing.  Here, we're

5  leaving behind probably as far as we can tell it's at least

6  $400 million dollars in claims.  In addition to that, we're

7  potentially creating an administratively insolvent estate.

8          And, Your Honor, we would submit that based upon the

9  form of order that was submitted last night it didn't address

10 any of the Committee's concerns.  But it does allow the asset

11 base lender now to credit bid at the auction which wasn't

12 previously part of their rights and to announce at the

13 auction.  So what that says is they too like us are afraid

14 that Silver Point has the absolute right to call in event of

15 default under the DIP and withdraw its bid.

16         The other thing we found unusual, Your Honor, is

17 there is some environmental issues here.  We're not sure

18 whether or to what extent they're material.  But there seems

19 to be an express prohibition against any bidder performing a

20 phase two and we're not exactly sure why that would be

21 something that we would want, if we want to encourage people

22 to do whatever they need to do to bid.

23         Your Honor, so just briefly in conclusion we think

24 that -- we understand that Your Honor probably doesn't have

25 the ability to modify the DIP so, therefore, we are asking

1  that it be denied.  We think that Your Honor does have the

2  ability to modify the sale procedures.  To the extent you

3  don't think it's appropriate to deny, then we would ask that

4  you modify them.  What the Committee really wants here is a

5  fair and open process and an opportunity not only to promote

6  the highest and best offer for the assets, but to conduct its

7  investigation to the extent appropriate, bring appropriate

8  causes of action, and appropriate time.  Thank you.

9       THE COURT:  Mr. Kenney.  Actually before I hear from

10 Mr. Kenney, Mr. Rosenthal, can you just give me a little bit

11 of context on one issue -- and this will only take a second -

12 - between the proposed timeline the Debtors have for an

13 auction and the sale hearing and the closing date.  Can you

14 give me some reason why that process, why there's that

15 anticipated [indiscernible] --

16      MR. ROSENTHAL:  I think the thought, Your Honor, if

17 a third party bidder comes in I think the thought is that if

18 a third party bidder comes in, it might take a little longer

19 to get all the documents finalized and everything done.  And

20 in addition we've got an HSR period that will not have run.

21      THE COURT:  Okay.

22      MR. ROSENTHAL:  So you take those two -- can I take

23 a couple things off the table because I wish Ms. Levine would

24 have called me because some of these things --

25      THE COURT:  Why don't we do this.  Mr. Kenney can

1  infer.  Hang on just a second.  I've just been advised that

2  we have a problem with CourtCall.  We're going to take a 60

3  second break and we'll CourtCall back in.  And then, Mr.

4  Kenney, we'll begin with you.  I apologize for the

5  interruption.  Stand in recess.

6      [10:36:56 - 10:40:38]

7          THE CLERK:  All rise.

8          THE COURT:  Please be seated.  Mr. Kenney, good

9  morning.

10         MR. KENNEY:  Good morning, Your Honor, Mark Kenney

11 for the United States Trustee.  Your Honor, my objection on

12 the bidding procedures [indiscernible] Committees I'm solely

13 looking at the breakup fee and the expense reimbursement.

14 And I think this is something that they touched on a little

15 bit in that the whole concept of a breakup fee is that's for

16 someone who absolutely needs that as an inducement to get

17 them to the table to sign a stalking horse agreement or

18 somebody to put the Debtor in a sales mode.

19         And what we have here essentially, Your Honor, is a

20 friendly foreclosure.  And Silver Point is going to foreclose

21 on these assets whether it's friendly or whether it's

22 adversarial.  And coming into the Bankruptcy Court they're

23 saving a lot of money instead of having to go into a number

24 of different counties and a number of different states where

25 they could have hundreds of separate asset foreclosure

1   actions, so this saves them a lot of money.  They don't need

2   a breakup fee to induce them to come to the table and to sign

3   an agreement.

4           The Debtors have --

5           THE COURT:  The Committee has made certain

6   observations with respect to whether Silver Point is either a

7   statutory or a non-statutory insider.  Do I need to get to

8   that inquiry or is the question more does this particular

9   bidder need the incentive of a breakup fee?

10          MR. KENNEY:  Your Honor, I think anytime you have a

11  lender, a breakup fee to the lender is suspect if they are an

12  insider.  And I know there seems to be an open question on

13  that.  And I didn't go there because from what I saw in the

14  first day papers they weren't.  But the Committee has brought

15  up they looked at the SEC filings.  And I don't know if

16  Silver Point is an insider.  I would say that if they are an

17  insider we don't even need to consider whether it's necessary

18  to induce them.  I think the breakup fee should come off the

19  table immediately if they're an insider.

20          THE COURT:  From your office's point of view, is

21  there a difference as a matter of law or as a practical

22  matter between a breakup fee and an expense reimbursement?

23          MR. KENNEY:  Your Honor, a very limited expense

24  reimbursement is something we might look at a little bit

25  differently because a breakup fee is something that it's

1  supposedly to induce and to come to the table in the first

2  place.  An expense reimbursement is something that is

3  supposed to be for specific documents and expenses incurred

4  in getting to a transaction.  Of course, here, as a secured

5  lender who is looking at having to take possession of its

6  collateral anyway, I think they're incurring a lot of those

7  costs anyway.

8           And I think what's missing is and I understand the

9  Debtors negotiate the best that they can.  They're not

10  exactly in a position holding the upper hand.  You know the

11  secured creditor basically is holding all the cards and

12  saying you know we're going to liquidate our collateral

13  whether it's friendly or not.  But it seems to me, Your

14  Honor, once they establish a floor price, the floor price is

15  basically the amount of money they're going to need to let go

16  of their collateral and let some other party take it away

17  from them.

18           And I think that in most cases, Your Honor, the

19  secured creditor wants other people to come in.  If somebody

20  comes in with more money, they're going to do something --

21  well for lack of a better term, Your Honor, I think the word

22  is they're going to salivate.  You know they're going to

23  welcome any higher bids.  And, therefore, they don't need the

24  inducement of a breakup fee to get them to the table.  And

25  they don't need a breakup fee to consult them for the risk of

1   not getting their collateral.  If somebody else makes a bid

2   that they don't like they can simply bid more on their credit

3   bid up to the point that they cover their debt in full.

4           I think if there's some risk to them if they're not

5   going to cover their debt in full, they should be happy to do

6   it.  If we have an estate that might be solvent, again

7   they're already in there.  You know their inducement is to

8   make sure the assets don't go for too little money.  So

9   essentially all that their stalking horse bid does is kind of

10  ring fence the assets and say we're not going to let them go

11  for anything less than this amount.

12          It seems to me once you get above that they have

13  every reason in the world to want other people to come in and

14  bid on them.  And even the expense reimbursement, Your Honor,

15  I said at 20% of what they're seeking is probably generous

16  because every dollar of expense reimbursement that they're

17  requiring somebody to reserve for is an additional dollar

18  somebody has to bid for.  If you made somebody put up $4

19  million dollars as an expense reimbursement and then it turns

20  out that their reimbursable expenses that they haven't

21  already extracted from the Debtor elsewhere are only a

22  $100,000.00, then you may have discouraged people and kept

23  them away from the bidding in the first place.

24          And the goal here is to attract bidders not to repel

25  them.  And the difficulty is that when you set it up with a

1  breakup fee to a stalking horse who is already the lender and

2  has every incentive to want other people to bid and then

3  layer onto that an expense reimbursement of an amount that,

4  you know, I don't know how the lender could spend that much

5  money short of having all of those professionals turn their

6  files to death then why are you trying to repel other bidders

7  and chill the bid.

8          THE COURT:  Thank you.

9          MR. ROSENTHAL:  Let me try to take a couple issues

10 off the table.

11         THE COURT:  Then we'll turn to witnesses.

12         MR. ROSENTHAL:  I don't think we're creating

13 administrative insolvency.  The APA provides for either the

14 assumption of post-petition liabilities or the funding of

15 those liabilities with a significant wind down payment at the

16 closing somewhere in the $8.5 million dollar range.

17         On the statutory insider questions so it's not quite

18 as simple as looking at the 13(d)'s or Silver Point's

19 ownership of the common stock is 20%.  But we have two

20 classes of voting stock at both.  We have a Class A stock

21 that holds five votes as compared to each vote as a common.

22 They have none of the Class A stocks.  So their actual

23 percentage on an aggregate basis is 13%.

24         Ms. Levine complained about the March 23 objection

25 deadline.  We were actually going to tell the Court Silver

1  Point pointed this out to us that because we have now

2  extended the bid deadline to the 11th and the auction to the

3  15th we think that June 1 for an objection deadline on the

4  sale.  There's a subsequent objection deadline for June 16th

5  for whoever we end up choosing at the auction, so basically

6  two bites of the apple.

7         The June 1 date is after the expiration of the

8  Committee's period.  The Court did raise a good question, I

9  think, about the procedure of what happens if the Committee

10  does file a claim complaint trying to object to the ability

11  of the lenders to credit bid or to the validity leading prior

12  to the liens.  We'll have to address that down the road.

13  Right now, there is no such complaint filed.  And whether the

14  Committee would have standing to bring that is, again,

15  another issue down the road.  We've done our own analysis of

16  that as well of the strength of the clients.

17         Ms. Levine said that the, was talking about the

18  budget for the Committee.  It is true.  It is $200,000.00 a

19  month for basically five months, so it's a million dollars.

20  She wasn't right; she was talking about other professionals

21  have higher budgets plus they have their retainers.  The

22  retainers are a decrease from the budget so those budgets are

23  complete whether they're paid from new funds or retainer

24  funds.

25         Ms. Levine said we have no provision for backup

1  bidders to remain in place.  It's no true.  The backup

2  bidder, the number two bidder is obligated to keep its bid

3  open for 60 days so we know if the first bidder is going to

4  close.  The Committee was unclear she said whether the

5  Committee can attend the auction.  Of course the Committee

6  can attend the auction.

7        We can talk more if the Court wants about the

8  unencumbered, giving the unencumbered property.  I think it's

9  absolutely standard for a DIP lender to get essentially all

10 the assets including unencumbered assets as collateral for

11 their loan.  And we all believe that there's not sufficient

12 value to cover all of the secured debt.  So to give that as a

13 replacement lien for the secured creditors is covered for

14 diminution.

15        THE COURT:  I don't disagree with that as a general

16 proposition.  The issue is, to be blunt, you know is this a

17 grab.  And I'm not sure you can answer that from the podium

18 right now.  I'll certainly hear from parties with respect to

19 that, but that's kind of the issue that a similar concept

20 arises in the context of a roll-up sometimes.  You know so

21 we're rolling up and we're just, and normally roll-ups while

22 they're disliked by the Office of the United States Trustee

23 and Committees, etcetera, often a roll-up in a different case

24 is not economically neutral, but it's not as significant as

25 it might be because it's typically not grasping wide fields

1  of additional collateral.  It's just prepetition debt, post-

2  petition debt.

3         We'll deal with everything post-petition.  The DIP

4  order will cover everything.  Again, this is not a pitch for

5  roll-ups.  But you know often they're not that controversial.

6  And I've dealt with them a few times where you know the

7  problem with a roll-up is that it becomes objectionable when

8  it's really valuable.  When the roll-up will extend to

9  additional collateral and give you additional rights that you

10  didn't have; not you but a lender that changes the economic

11  structure of the case on a go forward basis.

12         And so the concern I have here is that there's a DIP

13  loan that's being made.  And I've seen the Committee

14  objection with respect to the we decide the terms, but first

15  whether it's necessary and, more specifically, whether it's

16  too much and too expensive.  But the extension to

17  unencumbered assets is again not an unusual situation for a

18  DIP lender lending into a Chapter 11 case.  But the question

19  is whether or not there is demonstrable and maybe unfair

20  improvement in a lender/bidder's position by the assertion of

21  these kind of claims for purposes of very promptly credit

22  bidding them, you know, just a couple of months later.

23         Again, I don't think I need an answer on that

24  question as long as we understand what the question is.  Part

25  of it is a legal or a philosophical question of what works.

1  And then the question that I was asking Ms. Levine and I

2  would go to you guys on as well is exactly how will that

3  work.  How will the assertion of that credit bid as it

4  relates to DIP collateral work so that it just means that the

5  credit bid can then extend to everything and everywhere that

6  the Debtor may have.  And again what are the consequences of

7  that as an economic and practical matter.

8          So I haven't directly addressed this issue before;

9  certainly have seen plenty of credit bids that have different

10 swirly components to them.

11         MR. ROSENTHAL:  I think the contemplation, Your

12 Honor, is that the DIP portion would be paid in cash.  So

13 that if there's and it wouldn't be done for a credit bid.  So

14 the thought is that at the time of the closing --

15         THE COURT:  Just forgive them.

16         MR. ROSENTHAL:  Well it's not exactly that because

17 the first lien holders are effectively the stalking horse.

18 And the vast majority of the DIP is going to be owed to the

19 ABL lenders which are entirely different parties.  So they're

20 going to get paid in cash.  So it's estimated that at the

21 time there will be about a $122 million is what I've heard

22 most recently from the McKinsey folks; a $122 million in

23 outstanding DIP.

24         Now the ABL loan facility is a $125 million dollar

25 facility.  There's a question of whether the original

1  borrowing base would allow it to go to $125 but with this new

2  borrowing perhaps it can.  So let's say it's all from the ABL

3  loan because that's within the limit of the ABL loan, so that

4  would all get repaid.  And in addition to that, there would

5  be a cash infusion to the Debtor for the wind down budget

6  another $8 or $9 million dollars.  So that's not really

7  involved in the credit bid.  And the DIP loan is whatever the

8  DIP loan is.  So it's entitled to be repaid.  It's a post-

9  petition administrative expense anyway.

10        MS. LEVINE:  Your Honor, just a [indiscernible]

11  point not responding.

12        THE COURT:  Yeah sure.

13        MS. LEVINE:  I just want to confirm that Your Honor

14  is not making a ruling today with regard to the insider

15  status because then that will substantially limit --

16        THE COURT:  I'm not; no I'm not.  I just asked the

17  question particularly for Mr. Kenney.  I think the insider

18  inquiry has application well beyond the breakup fee, expense

19  reimbursement issue.  And that really was what I focused on.

20  To me I think pretty consistent with Mr. Kenney's

21  observations the insider status might be dispositive if it

22  were obvious and agreed to.  As a general proposition

23  insiders don't get expense reimbursements and breakup fees,

24  or at least breakup fees.

25        On the theory that they're typically not needed to

1   be incentivized, a management team would almost never get a

2   breakup fee in this Court anyway as a matter of principle.

3   So when Mr. Kenney was going through is concerns with respect

4   to it, I think that his analysis and his objection is not

5   based on the insider issue.  I don't think I need to

6   necessarily reach that.  I certainly don't think that I have

7   sufficient record to address that one way or the other today.

8        My point was just to ask him whether or not the U.S.

9   Trustee's objection was predicated upon an insider theory and

10  clearly it's not.  His point is just as a matter again of

11  economics or business.  His point is does not seem under this

12  record that Silver Point needs to be incentivized to step out

13  onto the dance floor, so I understand that.  Okay.  Mr. Lutz.

14       MR. LUTZ:  Thank you, Your Honor, Brian Lutz from

15  Gibson Dunn on behalf of the Debtors.  We're going to attempt

16  to streamline and move things along.  We're going to submit

17  as evidence the declarations that had been provided already;

18  four declarations: two from Mr. Carmody and two from Mr.

19  Torgove.  All of them except one are in the binders that have

20  been provided to Your Honor.

21       THE COURT:  I have them.

22       MR. LUTZ:  Can I submit the fourth one that happens

23  not to be in the binder?

24       THE COURT:  That would be great.  Thank you.

25       MR. LUTZ:  The one that I just submitted to you is

1 Mr. Carmody's first day declaration which is docket number

2 two.  I just have a very short direct examination of Mr.

3 Torgove just to address two very, very narrow issues that are

4 from his declarations.

5          THE COURT:  Let me do two things.  First, my

6 understanding is the Debtor has two witnesses today, is that

7 correct?

8          MR. LUTZ:  Yes.

9          THE COURT:  Is that Mr. Torgove and Mr. Carmody?

10          MR. LUTZ:  Yes.  And I'm sorry I should have

11 clarified.  We're submitting the declarations, of course,

12 subject to cross examination.

13          THE COURT:  Of course.  Does the Committee have any

14 witnesses today?

15          MS. LEVINE:  Your Honor, [indiscernible] on what

16 comes in on direct, we have Leon Szlezinger from Jeffries

17 with us.

18          THE COURT:  Your financial advisor?

19          MS. LEVINE:  Yes.  And he can agree [indiscernible].

20          THE COURT:  Okay.  All right well we'll see how that

21 plays out.  I just want to know for purposes of managing.

22 Does any other party expect to call a witness for purposes of

23 today's matters?  Very well; second, I would ask are there

24 any objections to the admission of the Torgove and Carmody

25 affidavits?  Both of those gentlemen are here today and will

1   be put on the stand.  Okay they're both admitted.

2      [Torgove & Carmody Affidavits received into evidence]

3          And then --

4          MR. LUTZ:  Mr. Torgove I was going to call.

5          THE COURT:  Okay we'll call Mr. Torgove.

6              ANDREW TORGOVE, DEBTORS' WITNESS, SWORN

7          THE CLERK:  Please state and spell your name for the

8   record.

9          MR. TORGOVE:  Andrew Torgove; T-o-r-g-o-v as in

10  Victor - e.

11         THE COURT:  Welcome.  Do you have a binder up there

12  for him?

13         MR. LUTZ:  I'm not sure he's going to need it.

14         THE COURT:  Okay.

15         MR. LUTZ:  If he does we can --

16         THE COURT:  He probably will for cross.

17         MR. LUTZ:  We'll get it to him.

18                      DIRECT EXAMINATION

19  BY MR. LUTZ:

20  Q.  Thank you, Mr. Torgove, for being here.  Mr. Torgove, you

21  submitted a declaration, two declarations in support of the

22  DIP financing motion and the sales procedures motion, is that

23  right?

24  A.  That's correct.

25  Q.  And one of the topics that was generally addressed in

1  your declarations is The Standard Register DIP financing

2  motion, is that right?

3  A.   That's correct.

4  Q.   I just have two clarifying questions from your

5  declarations.   First, did the Debtors seek DIP financing in

6  light of the Debtors' projected cash shortfall?

7  A.   Yes.

8  Q.   And, second, were the terms of the DIP financing the most

9  favorable terms that the Debtors were able to negotiate?

10  A.   Yes.

11        MR. LUTZ:   I have no further questions.

12        THE COURT:   Ms. Levine.

13        MS. LEVINE:   Your Honor, brief cross examination.

14        THE COURT:   Sure.

15                    CROSS EXAMINATION

16  BY MS. LEVINE:

17  Q.   Good morning, Mr. Torgove; Sharon Levine, Lowenstein

18  Sandler for the Committee, how are you?

19  A.   Fine.

20  Q.   Mr. Torgove, prepetition where you started to look at

21  whether or not you needed DIP financing, the DIP financing

22  became [indiscernible] discussing because there was an

23  impending default under the prepetition financing facility,

24  is that correct or at least one of the factors?

25  A.   It was one of the factors, yes.

1  Q.  The default, however, was what we call a little

2  [indiscernible] and not a big DR payment default, correct?

3  A.  It was a leverage default, leverage test default from the

4  order of 2014.

5  Q.  Thank you.

6        MS. LEVINE:  No further questions, Your Honor.

7        THE COURT:  Any redirect?

8        MR. LUTZ:  Not from me.

9        THE COURT:  I wish all my hearings were like this.

10  I may regret that statement in a little while.  Mr. Lutz.

11        MR. LUTZ:  We have nothing further.

12        THE COURT:  Well I think you need to tender Mr.

13  Carmody.

14        MR. LUTZ:  Oh I'm sorry.

15        THE COURT:  If the Committee wishes to examine.

16        MR. LUTZ:  I'm sorry; my apologies.  You intend to

17  have [indiscernible]?

18        MS. LEVINE:  Yes.

19        THE COURT:  Please remain standing.  We'll swear the

20  witness.

21          ANDREW BELLMANN, DEBTORS' WITNESS, SWORN

22        THE CLERK:  Please state and spell your full name.

23        MS. LEVINE:  Actually, Your Honor, we don't need to

24  cross examine Mr. Carmody.  We're just going to put on Mr.

25  MacGreevey.

1          THE COURT:  Very well, you may step down.  The

2    witness was so intimidating.

3          MS. LEVINE:  We just have one --

4          THE COURT:  Well let me just ask as a matter of

5    process because typically we would call Committee witnesses

6    after the Debtor has rested with respect to both motions.

7    And I think I'd like to make sure we're all on the same page.

8    I'm happy to be flexible about it and it may be an

9    appropriate time.

10          MS. LEVINE:  I'm not sure what other witnesses.

11          MR. LUTZ:  Yeah of course subject to cross

12    examination of the Committee's witnesses.

13          THE COURT:  Okay, fine.  You may call your witness.

14          MS. LEVINE:  Your Honor, we'd like to offer --

15          MR. LUTZ:  In rebuttal to the extent that

16    [indiscernible].

17          MS. LEVINE:  Your Honor, we'd like to offer a

18    proffer from Mr. MacGreevey and from Mr. Szlezinger.  And

19    with the Court's permission I'll turn the podium over to

20    Andrew Bellmann to read into the record.

21          THE COURT:  Okay any objection to proceeding by way

22    of proffer?

23          MR. LUTZ:  No.

24          THE COURT:  Very well.

25          MR. BELLMANN:  Good morning, Your Honor, Andrew

1  Bellmann on behalf of the Committee.  As Ms. Levine noted, we

2  have two proffers.  The first is of Mr. David MacGreevey of

3  Zolfo Cooper, the Committee's financial advisor.  Mr.

4  MacGreevey is in the Courtroom today and available for cross

5  examination.

6       If called to the stand, Mr. MacGreevey would testify

7  that he is a managing director at Zolfo Cooper LLC, a

8  financial advisory firm with principle offices located at

9  1114 Avenue of the Americas, 41st Floor, New York, New York

10 10036 as well as at other locations.  Mr. MacGreevey would

11 further testify that [indiscernible] he has been advised in

12 more than 30 Chapter 11 cases most involving --

13      THE COURT:  [indiscernible].

14      MR. BELLMANN:  Pardon me?

15      THE COURT:  Let's do the merits.

16      MR. BELLMANN:  Understood.  Mr. MacGreevey would

17 testify that on March 24th, 2015 the Committee appointed in

18 these cases retained Zolfo and that he's reviewed the motion

19 for post-petition financing, the credit agreement, and the

20 declarations submitted by the Debtors in connection with the

21 motion.  Based upon the review of those documents, the record

22 in these cases, and discussions with the Debtors'

23 professionals Mr. MacGreevey would testify that in his view

24 the proposed financing as currently structured is overly

25 burdensome and to an extent may not be necessary.

1    Mr. MacGreevey would testify that first the value of

2 the prepetition ABL collateral, the Debtors' cash, accounts

3 receivable, inventory, and the program property plant

4 equipment is sufficient to provide the DIP ABL lenders with

5 adequate collateral.  The Debtors admit in the DIP motion

6 that the ABL DIP lenders primary collateral "heavy value

7 substantially greater than the value of their claims."  In

8 fact, as of February 28th, 2015 the Debtors' balance sheet

9 reflects more than $200 million dollars of cash, accounts

10 receivable and inventory.

11    In comparison, the maximum amount to be drawn in the

12 DIP ABL during latest projection period is a $116.1 million

13 dollars.  As such, there's no need to extend the ABL under

14 its collateral by granting liens on previously unencumbered

15 assets including avoidance actions, 35% of the Debtors'

16 equity interest in foreign subsidiaries, and the assets of

17 the Debtors who were not previously parties to the

18 prepetition ABL facility.

19    Mr. MacGreevey would further testify that the

20 Debtors request for $30 million dollars in the form of a DIP

21 term loan appears to be excessive.  During the first 17 weeks

22 of the Chapter 11 cases the budget reflects a maximum

23 principle balance under the DIP term loan of approximately

24 $13.9 million dollars with the first draw of $800,000.00

25 coming two months into the process.  The projected need for

1  this DIP appears to be the product of a budget that was built

2  on a number of flawed assumptions that exaggerate or front

3  load the Debtors' projected cash needs.

4        For example, the original DIP budget assumes that

5  all creditors of the Debtor immediately demand

6  [indiscernible] COD payment terms.  The Debtors would expend

7  $20 million dollars on critical vendor obligations during the

8  first weeks of the bankruptcy.  And the customers with

9  prepaid postage deposits would demand refunds totaling $3

10 million dollars in the early stages of the Chapter 11 cases.

11       Based on these assumptions the Debtor assumes net

12 cash flow for the first four weeks of the case negative $16

13 million dollars.  In reality through the fourth week of the

14 case, the Debtors' net cash flow was positive $27.8 million

15 dollars; for variance, a favorable variance of $43.8 million

16 dollars.  To put this significant variance into context is

17 equivalent to 65% of the Debtors' average total revenue for a

18 four week period.

19       The effective [indiscernible] assumptions on the DIP

20 borrowing need is also significant.  While the Debtors

21 originally projected to draw approximately a $119 million

22 dollars on the DIP through the first four weeks of the case

23 ended April 5th, the actual borrowings as of that date were

24 approximately $72 million dollars; a favorable variance of

25 $47 million dollars or nearly 40% in just four weeks.

1        Importantly, while the Debtors may contend these

2   variances are temporary in nature is becoming increasingly

3   unlikely that these assumptions will ever become a reality,

4   unlikely that these assumptions will ever become reality as

5   customers and vendors gain a level of comfort with the

6   Debtors' Chapter 11 prospects.  For these reasons, the budget

7   appears overly conservative.

8        Mr. MacGreevey would further testify that the DIP

9   loans also impose overly restricted covenants including with

10  restrictive permitted variances under the budget.  Line item

11  expenditure variances generally 5% are unnecessarily

12  stringent and create the potential for default even roll over

13  on cash flows on [indiscernible] are even favorable to

14  budget.  In Mr. MacGreevey's experience permitted variances

15  and DIP budgets generally range from 10 to 15% and often are

16  measured only a total net cash variances as opposed to

17  individual line items.

18       Mr. MacGreevey would further testify that the DIP

19  term loan is expensive given the [indiscernible] for the DIP

20  term loan particularly the size of the closing fee, the

21  commitment fee and the interest rate.  Zolfo's analysis of

22  the proposed DIP term loan indicates that the lenders will

23  earn approximately a 63% in term rate of return if the

24  Debtors perform as projected under the revised budget.  If

25  Zolfo's analysis is correct and the DIP budget is overly

1   conservative, the [indiscernible] rate of return that the DIP

2   term loan lenders earn could, in fact, be much higher.

3          Mr. MacGreevey would further testify that as with

4   the ABL loan the value of the prepetition term loan

5   collateral is sufficient to provide the DIP term lenders with

6   adequate collateral.  [indiscernible] the DIP term loan is

7   secured by all the property plant and equipment of the

8   company including nine owned facilities, as well as a second

9   lien on the more than $200 million dollars of cash, accounts

10  receivable, and inventory.

11         In comparison, the maximum amount to be drawn on the

12  DIP term loan during the projection period is just $13.9

13  million dollars.  And the maximum amount to be drawn under

14  the DIP ABL and the DIP term loan on a combined basis is

15  $122.8 million dollars.  Further, the DIP lenders enjoy the

16  comfort of an executed asset purchase agreement whereby the

17  buyer who's also an affiliate of the DIP term loan lenders

18  has agreed to a purchase price that is far in excess of the

19  DIP lender's loan exposure by at least a $145 million

20  dollars.  As such, the extension of the term lenders

21  collateral package to include previously unencumbered

22  collateral is not warranted under the circumstances.

23         Mr. MacGreevey would further testify that in his

24  view the previously unencumbered collateral proposed to

25  secure the DIP loans and, in particular, the DIP term loan is

1  an attempt by the lenders to envelope these previously

2  unencumbered assets into their credit bid through the

3  Debtors' assets through a Section 363 process.

4        In sum, Mr. MacGreevey would testify that for these

5  and other reasons set forth in the Committee's objection to

6  the DIP motion, the DIP motion should not be approved as

7  proposed.  That completes the proffer of Mr. MacGreevey who

8  is available for cross examination.

9        UNIDENTIFIED SPEAKER:  Could we just take a minute

10 to confer?

11       THE COURT:  Yeah why don't we do this, two things.

12 We'll just take a five minute break and if you need more time

13 then I'm happy to accommodate.  I'll accept the proffer.  And

14 it's obviously not just the Debtor.  Any party that wishes to

15 cross may do so.  Second, I kind of fast forwarded you

16 through the witnesses' background which is kind of my

17 practice but I did not necessarily anticipate whether the

18 Debtor has any issues with the witnesses' qualification or

19 background.  And if you wish, you're welcome to examine on

20 that or expand the proffer to readdress that issue.  Then

21 we'll move on to the meat of the matter, but I didn't want to

22 cut anybody off.

23       So why don't we do this, we'll take five minutes and

24 we'll reconvene for cross.  Stand in recess.

25     [Recess 11:09:40 - 11:26:52]

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Ready to proceed.

3   Welcome.  Please swear the witness.

4        ANDREW MACGREEVEY, COMMITTEE'S WITNESS, SWORN

5          THE CLERK:  Please state and spell your full name.

6          MR. MACGREEVEY:  It's David MacGreevey; M-a-c-G-r-e-

7   e-v like victor, e-y.

8          THE COURT:  Welcome.  Mr. Lutz.

9          MR. LUTZ:  Thanks.

10                        CROSS EXAMINATION

11   BY MR. LUTZ:

12   Q.  Hi, Mr. MacGreevey, how are you?

13   A.  Good morning.

14   Q.  Thanks for being here.  I just have a couple of questions

15   based on your proffer read by your counsel.  Your proffer

16   addresses, part of your proffer addresses the DIP budget that

17   supported the DIP financing in this case, is that right?

18   A.  Correct.

19   Q.  And your understanding is that McKinsey was responsible

20   for putting together that DIP budget, is that right?

21   A.  That's my understanding.

22   Q.  And your understanding of that is based on reviewing the

23   filings in this case?

24   A.  Discussions with McKinsey.

25   Q.  And you've reviewed Mr. Carmody's declaration submitted

1  in this case, is that right?

2  A.  Correct.

3  Q.  So you're familiar generally with the contents of those

4  declarations?

5  A.  Yes, generally.

6  Q.  Your understanding is that McKinsey spent several weeks,

7  six weeks putting together the DIP budget, is that right?

8  A.  It may have been.  I know they were retained in January

9  at some point.

10 Q.  And you understand that McKinsey, among other things,

11 spoke with management in putting together the DIP budget, is

12 that right?

13 A.  Yes.

14 Q.  They spent a lot of time putting together the DIP budget?

15 A.  Yes.

16 Q.  Part of your proffer, I think, it went quickly, but I

17 think one of the things that was said was that you believe

18 that the DIP budget contained overly aggressive assumptions,

19 is that right?

20 A.  Overly conservative.

21 Q.  Overly, excuse me, overly conservative assumptions, is

22 that right?

23 A.  Correct.

24 Q.  And you had a chance, obviously, to dig into the DIP

25 budget, right?

1  A.  We looked at the DIP budget filed at the time of the

2  bankruptcy to reforecast as of March 27th, as well as the

3  reforecast as of April 10th that came out Friday night.

4  Q.  Have you been on site in Dayton?

5  A.  No.

6  Q.  Have you met with Joe Morgan, the company's CEO?

7  A.  No.

8  Q.  Have you met with Ben Cutting the company's CFO?

9  A.  No.

10 Q.  Have you met with Bob Ganan [*phonetic*], the company's

11 former CFO?

12 A.  We have not.

13 Q.  Have you met with Jim Vaughn, the company's treasurer?

14 A.  No.

15 Q.  Have you met with Greg Greve, the company's head of

16 operations?

17 A.  No.

18 Q.  Have you met with anybody at management in connection

19 with your analysis of the DIP budget?

20 A.  We haven't been out to Dayton.  We've had telephone calls

21 with the professionals McKinsey and Lazard.  There may have

22 been members of management on those calls.  I can't recall.

23 Q.  Have you personally had a conversation with a member of

24 management about the contents of the DIP budget?

25 A.  No, not directly.

1  Q.  Have you met with customers of Standard Register

2  concerning the DIP budget?

3  A.  No.

4  Q.  Or the assumptions in the DIP budget?

5  A.  No.

6  Q.  Or the company's performance over time after the DIP

7  budget was put in place?

8  A.  No.

9  Q.  Part of your proffer, I believe, addresses what you call

10 variance of the company's performance relative to the budget,

11 is that right?

12 A.  That's correct.  Their actual performance in the first

13 four weeks relative to their projections.

14 Q.  Right and you recognize in your proffer that the company

15 has performed in a positive variance relative to budget in

16 that limited period of time?

17 A.  In that four week period, correct.

18 Q.  Have you conducted any analysis as to how the company

19 would have performed had it not had a DIP budget in place

20 during those four weeks?

21 A.  No.

22 Q.  Any analysis of how customers would have reacted had a

23 DIP budget not been in place?

24 A.  I'm not sure you can do an analysis on that.  It sounds

25 like speculation.  You can speculate how customers and

1 vendors would react in one situation versus another.

2 Q.  And have you done that?

3 A.  Have we speculated on that, no.

4 Q.  Have you conducted any kind of analysis as to how the

5 company would have performed in this four week period if it

6 had not had a DIP budget?

7 A.  No.

8 Q.  Are you aware that the company has certain critical

9 vendor payments that have not been paid but the company

10 expects to pay during the bankruptcy period?

11 A.  I understand the company has a $20 million dollar maximum

12 critical vendor payment program and it projects to make those

13 payments originally projected in the first four weeks of the

14 case, now projected beginning April 19th and for the four

15 weeks thereafter.

16 Q.  Do you know approximately how much of those critical

17 vendor payments to date have not been paid?

18 A.  I believe the majority have not been paid yet.

19 Q.  The majority of the $20 million.

20 A.  Have not been paid.

21 Q.  And you understand that the company, in fact, intends to

22 make those payments during the bankruptcy period?

23 A.  I understand that the company is entertaining critical

24 vendor status with their foreign vendors.  I don't know how

25 much they actually intend to make of those $20 million.

1  They've budgeted for all $20 million.

2  Q.  And your understanding is that the vast majority of that

3  $20 million has not been paid in that four weeks that

4  commenced since the -- that lapsed since the commencement of

5  the bankruptcy?

6  A.  Correct.

7  Q.  I also heard your proffer you made some statements about

8  Silver Point using a lien on the unencumbered assets of the

9  DIP as part of the credit bid, did I get that right?

10  A.  Correct.

11  Q.  Can you explain your understanding of that portion of

12  your proffer just so we have it clear?

13  A.  Yeah I think the thought process is to the extent that

14  these unencumbered assets are now part of the DIP, the

15  debtor-in-possession financing package, that they can be

16  rolled into the purchase of the company as opposed to the

17  ultimate buyer of the company paying for those assets

18  separately.

19  Q.  What's the basis for your understanding that the lien on

20  the unencumbered assets is going to be rolled over and used

21  as current and can't be rolled over and used as part of the

22  credit bid?

23  A.  I think it's a concern of ours.

24  Q.  Which the basis of your understanding that that's the way

25  it works because I think it's not how it works.

1  A.  Basic understanding is looking at the purchase agreement,

2  the sale motion.

3  Q.  Have you looked at all the papers that were filed on that

4  issue in this case?

5  A.  I read the sale motion.

6  Q.  Your proffer addresses this issue -- your proffer

7  addresses the issue of the use of unencumbered assets as part

8  of the DIP collateral.

9  A.  Yes.

10  Q.  And my understanding is that -- or let me ask you this.

11  Have you worked on a case where a DIP loan is collateralized

12  by, not collateralized by unencumbered assets?

13  A.  So we're currently representing the Committee

14  [indiscernible] and the avoidance actions remain unencumbered

15  there.  We're wrapping up the Committee's representation for

16  Exide and the preferences and avoidance actions remain

17  unencumbered there and [indiscernible] general unsecured

18  creditors trust.  We're wrapping up the Committee's

19  representation on debt stores where the preferences remain

20  available for unsecured creditors.

21  Q.  Is it your understanding that it's generally the case

22  that a DIP loan will be secured by previously unencumbered

23  assets, generally?

24  A.  I think in some circumstances you could have security of

25  a previously encumbered.  In some circumstances it leaves

1  them unencumbered.

2  Q.  Have you done any analysis of the number of cases in

3  which DIP loans were secured, were not secured by

4  unencumbered assets; assets that previously were

5  unencumbered?

6  A.  Well it's a lot of DIP loans, so no we haven't looked

7  back at that.  But what we've done is we've looked at a

8  recent exposure in Committee cases in this district and

9  thought about that meaning how I divided that

10 [indiscernible].

11 Q.  Well anything broader than the cases that you've worked

12 on?  Did you look at, canvass the market?

13 A.  Yeah we did database.  And we've looked at for debtor-in-

14 possession financing provider in 2014.  And, again, certain

15 of those cases the unencumbered will remain unencumbered.

16 And certain of them the unencumbered or portions thereof will

17 be become [indiscernible] of the DIP.

18 Q.  What basic portion, what do you mean?  How many of the

19 cases that you looked at in your database involve cases where

20 the DIP loans included previously unencumbered assets as

21 collateral?

22 A.  I can't recall.

23 Q.  I think you also mentioned in your proffer and correct me

24 if I'm wrong because it went very quickly.  But you believe

25 the rate of return on the DIP is about 64%?

1  A.  In what way?  I'm sorry. My understanding is that the

2  company draws it as they require it.

3  Q.  Sixty-four percent internal rate of return is pretty

4  good, right?

5  A.  Terrific.

6  Q.  Are you aware of any other lenders who said hey, this is

7  a 64 percent internal rate of return, what a jump on us?

8  A.  My understanding from attending Mr. Torgrove's deposition

9  is that they talked to six other potential lenders.  I

10  assumed that they outlined to them their potential need for

11  DIP financing.  I don't know if they ever entertained term

12  sheets from those lenders or expressly stated this is going

13  to be a 64 percent return case.  So I don't know.

14  Q.  What you do know is that no other lenders, other than the

15  existing secured lenders, were willing to provide DIP

16  financing?

17  A.  Yeah, my understanding is under the circumstances where

18  there would have been a priming issue that the other six

19  lenders were not interested in participating.

20          MR. LUTZ:  Okay.  No further questions.

21          THE COURT:  Further cross.

22          MR. MEISLER:  Your Honor, Ron Meisler of Skadden

23  Arps on behalf of Silver Point Finance, LLC.

24          THE COURT:  Welcome.

25                    CROSS-EXAMINATION

1  BY MR. MEISLER:

2  Q.  Mr. McGreevy, I want to go back on the question with

3  respect to DIP's and encumbering previously unencumbered

4  assets.

5  A.  Okay.

6  Q.  Mr. McGreevy, have you been involved in DIP financing in

7  many different cases?

8  A.  Yes.

9  Q.  In your experience, have you seen a DIP loan that is

10 limited solely to prepetition previously encumbered assets?

11 A.  I can't recall.

12 Q.  Do you think --

13 A.  There is certainly significant experiences or a number of

14 experiences where they leave the avoidance actions as

15 unencumbered.

16 Q.  Are the avoidance actions all the unencumbered assets or

17 do you think that avoidance actions are --

18 A.  So, and I didn't mean to cut you off there, but the DIP

19 lender also left 35 percent of the equity in the foreign subs

20 as unencumbered.

21 Q.  Do you think it's typical for 35 percent of equity in

22 foreign subsidiaries to be unencumbered in a prepetition

23 loan?

24 A.  It's something that we have seen before.  I can't

25 handicap whether we have seen it more often than not.

1          THE COURT:  I'd like some clarity.  Mr. Meisler, you

2     are welcome to provide it if you want.  I'm not trying to

3     intrude or step on the examination of the witness, but there

4     are a couple different things that I am trying to get my head

5     around.  The first is, I think your last question was is it

6     unusual for 35 percent of the equity in a foreign subsidiary

7     to be left out of a prepetition loan.  I think that's

8     something I have certainly seen before.  It's often driven by

9     regulations in foreign countries about ownership, etc.  Leave

10    that aside.

11         The inquiry about situations where a Debtor comes in

12    and, I guess I am trying to draw a distinction between a

13    situation that we commonly see where you got a lead lender or

14    lead lender group that has a first lien on everything and

15    they are making the DIP loan.  That is somebody with a lien

16    on everything who is, effectively, priming themselves with a

17    DIP.  It's not unusual, but in that situation, typically,

18    other than avoidance actions, there are no unencumbered

19    assets.  So the argument comes down to a question about

20    avoidance actions, do I have that right?

21         MR. MEISLER:  That's correct.

22         THE COURT:  Okay.  So in this situation we have a

23    Debtor that has assets other than avoidance actions.  I

24    understand avoidance actions and we have this discussion all

25    the time, but these are unencumbered assets of value that I

1  am not in a position to determine.  The DIP lender is making

2  a loan saying I want a first lien on unencumbered assets, the

3  equity of the subsidiaries plus, obviously, the avoidance

4  actions.  I think that's what we are looking at here, right?

5          MR. MEISLER:  That's right, Your Honor.

6          THE COURT:  Okay.  Then, the witness's testimony is

7  a concern that these are liens, leave avoidance actions out

8  of it for a minute, but the liens that will attach to the

9  unencumbered prepetition assets are advantaging Silver Point

10 or the bidder/lender for insufficient value or that there is

11 not much of a return.  I guess there are two different

12 theories.  It's not necessary and that it's too much value.

13         MR. MEISLER:  I think that is correct.

14         THE COURT:  I think I understand the testimony.  I'm

15 just trying to keep up with you guys.

16         MR. MEISLER:  Understood, Your Honor.  If I could

17 unpack it because I actually think it's not that difficult

18 and also to put in nuance, it's not always the case that a

19 lender has blanket liens on all assets.

20         THE COURT:  Sure.

21         MR. MEISLER:  In fact, in complicated financing

22 transactions there are many instances where there are certain

23 pools of collateral that are outside the security package,

24 outside of the collateral package.  This is an instance

25 that's consistent with that approach.  In this instance,

1   there is a handful of assets that are outside of the

2   collateral pool.  As can be noted in our adequate protection

3   package, the second lien lenders don't get cash interest on

4   their second liens and there is a reason for that.  The

5   reason is that we are uncertain that the collateral pool for

6   the prepetition lenders is sufficient to satisfy the

7   principal amount and accrued interest on their loan.

8          So, Your Honor, as we were asked to provide DIP

9   financing, which is new money financing, and as we were doing

10  the credit underwriting to make that loan, and Your Honor to

11  be clear, we are making that loan because when Bank of

12  America and Wells Fargo were asked to make that loan and they

13  were making it pursuant to an asset based loan --

14         MS. LEVINE:  Your Honor.

15         THE COURT:  He's testifying, but I asked.

16         MS. LEVINE:  Okay.

17         MR. MEISLER:  They weren't able to extend the amount

18  of debt that the Debtors were seeking.  So we were approached

19  to ask if we could fill the gap between where the formula,

20  under the ABL reached, which at its max was approximately

21  $116 million dollars, to where the Debtors needed as far as

22  they were projecting for cash needs.  We were there for the

23  Debtors with respect to that amount.

24         When we did the credit underwriting, we believed

25  that there was significant uncertainty as to the value of the

1  prepetition collateral pool being able to satisfy our

2  prepetition loans; therefore, when we agreed to extend new

3  money loans, we needed that extra collateral pool to support

4  the credit extension.

5         THE COURT:  I understand the issue.  So you are

6  welcome to examine the witness further if you had any other

7  questions, but I think you responded to my --

8         MR. MEISLER:  Your Honor, I don't have any further

9  questions.

10        MS. LEVINE:  Your Honor, brief re-direct.

11        THE COURT:  Sure.

12                     RE-DIRECT EXAMINATION

13 BY MS. LEVINE:

14 Q.  Good morning, Mr. McGreevy.

15 A.  Good morning.

16 Q.  You just heard counsel talk about the adequately

17 protecting new money loans, did you hear that testimony or

18 that oral argument?

19 A.  I did.

20 Q.  Currently, with regard to the term loan, how much has

21 been drawn on the term loan?

22 A.  The DIP term loan?

23 Q.  Yes, the Silver Point term loan.

24 A.  $1.05 million.

25 Q.  And what was that money used for?

1  A.   To pay the closing fee.

2  Q.   And under the term loan, is there also an unused line

3  facility fee?

4  A.   I believe its 1 percent.

5  Q.   In addition to that, is there a collateral monitoring

6  fee?

7  A.   I believe its $10,000.00 a month.

8  Q.   What is the source of the funds to pay for all of those

9  fees?

10 A.   Extensively, it would be from the DIP term loan.

11            MS. LEVINE:  Thank you.

12            THE COURT:  Okay.

13                          RE-CROSS EXAMINATION

14 BY UNIDENTIFIED SPEAKER:

15 Q.   Mr. McGreevy, you mentioned that there is a closing fee

16 on the DIP?

17 A.   It is.

18 Q.   Mr. McGreevy, is it unusual for a DIP lender to have a

19 closing fee?

20 A.   It is not.

21 Q.   Mr. McGreevy, is it unusual to have a collateral

22 monitoring fee in a DIP?

23 A.   It's not.

24 Q.   Mr. McGreevy, is it unusual to have an unused line fee in

25 a DIP?

1  A.  No, it's not.

2          UNIDENTIFIED SPEAKER:  Thank you, no further

3  questions.

4                  RE-DIRECT EXAMINATION

5  BY MS. LEVINE:

6  Q.  Other than these fees, has any money been drawn on this

7  term loan?

8  A.  No.

9  Q.  So we are paying for the full amount of the term loan?

10 We are paying a fee on the full amount of the term loan?

11 A.  You pay a closing fee of $1.05 million.

12 Q.  Sorry, the unused line fee, we are paying the unused line

13 fee on the full amount of the term loan?

14 A.  On the $29 million approximately.

15 Q.  Under the budget, as it currently reads, when does the

16 Debtor anticipate it's going to draw on the term loan?

17 A.  I believe there is another $800,000.00 or so drawn, I

18 believe the week of May 17th.

19 Q.  When was it originally budgeted that they would draw on

20 the term loan?

21 A.  I thought it was the fourth or fifth week of the case.

22 Q.  And how much was supposed to be drawn then?

23 A.  Something like $3 or $4 million.  I just can't recall off

24 hand.

25          MS. LEVINE:  Thank you.

1        THE COURT:  Anything further?  Very well.  You may

2   step down.  Thank you, Mr. McGreevy.

3        MR. MCGREEVY:  Thank you.

4        THE COURT:  Ms. Levine, did the Committee intend to

5   call another witness?

6        MS. LEVINE:  Yes, Your Honor, from Jefferies Leon

7   Szlezinger and if Mr. Bellman could read the proffer.

8        THE COURT:  Do you have a copy that you can give to

9   these guys?  I'm not asking for any breach of

10  attorney/client, but if you are going to read it into the

11  record, he's trying to do this on the fly.  You may proceed.

12       MR. BELLMAN:  Thank you, Your Honor.  Pursuant to

13  Your Honor's preference, we will bypass the introductory

14  background stuff, subject to, you know, reserving the right

15  to supplement.  Your Honor, this is the proffer of Leon

16  Szlezinger who is a managing director and joint global head

17  of restructuring and recapitalization at Jefferies, LLC.

18  Jefferies has been retained or proposed to be retained as the

19  Committee's investment banker in this case.

20       Mr. Szlezinger would testify that he and Jefferies

21  professionals have extensive experience in knowledge,

22  analyzing, restricting, negotiating and effecting mergers,

23  acquisitions and divestitures, and providing other financial

24  support related to asset sales both in and out of Chapter 11.

25  Mr. Szlezinger would further testify that in his six year

1  tenure at Jefferies he has been involved in at least 13 M&A

2  transactions, both in and outside of Chapter 11.  Prior to

3  his tenure at Jefferies, Mr. Jefferies was involved in

4  numerous M&A transactions.

5          Mr. Szlezinger would further testify that on March

6  24th, 2015 the Official Committee of Unsecured Creditors

7  appointed in these cases, subject to Court approval, retained

8  Jefferies as its investment banker.  Mr. Szlezinger leads

9  that engagement.  Since its retention, Mr. Szlezinger would

10 testify that Jefferies has reviewed the Debtors' sale motion,

11 the stalking horse APA and the declaration submitted by the

12 Debtors in connection with their sale motion.

13         Based upon his review of the record and documents

14 filed in these cases, as well as discussions with the Debtors

15 retained professionals and prospective purchasers, Mr.

16 Szlezinger would testify that in his view the proposed sale

17 process is not structured in such a way as to maximize the

18 value of the Debtors' businesses.  In particular, Mr.

19 Szlezinger would testify that certain changes to the proposed

20 sale procedures would increase the likelihood of a spirited

21 auction process.  For example, Mr. Szlezinger would testify

22 that potential bidders may disinclined to submit a competing

23 bid or be involved in the process if the secured lenders were

24 permitted to credit bid the large outstanding amounts under

25 their prepetition facilities, together with potentially

1  amounts provided as bid protections.  Placing [indiscernible]

2  rights is likely to encourage auction participation and

3  competitive bidding.

4       Mr. Szlezinger would further testify that the

5  estates would likely benefit from a reasonable extension of

6  the sale deadlines of 60 days given the Debtors' very limited

7  prepetition marketing, the limited progress made with the

8  potential acquirer universe on a post-petition basis and the

9  continued lack of forward looking projections or business

10  plan, which are important elements that bidders ordinary

11  consider in the evaluation process.

12       Mr. Szlezinger would further testify that potential

13  bidders may want to purchase certain components of the

14  Debtors' business, not necessarily the entire business; thus,

15  there is no additional time to conduct due diligence and to

16  [indiscernible] and strategies for any separate businesses.

17  Mr. Szlezinger would testify that the required deposit

18  amount, 10 percent of the purchase price or approximately $28

19  million dollars, is high right over to the stalking horse

20  deposit of just $2 million dollars.

21       In addition, the Debtors may hold onto the deposit

22  for 60 days after entry of a sale order.  These factors may

23  show bidding.  Mr. Szlezinger would further testify that the

24  bid protections, both the break-up fee and the expense

25  reimbursement, which could total approximately $9 million

1  dollars are unnecessary in light of Silver Point's

2  prepetition involvement with Standard Register and pre-

3  existing knowledge of the Debtors' businesses.  Further, Mr.

4  Szlezinger would state that there is strong, that the

5  stalking horse bidder would have been willing to bid for the

6  Debtors' assets without these protections.  In addition, bid

7  protections are particularly inappropriate given the

8  existence of serious interest from other potential buyers of

9  the Debtors' assets who expressed an interest in being the

10  stalking horse bidder.

11         The bid protections are more likely to chill bidding

12  rather than encourage it and often are not provided in cases

13  in which a stalking horse bidder credit bids its prepetition

14  secured claims.  Mr. Szlezinger would testify that for these

15  reasons the bid procedures should not be approved as

16  proposed.  That concludes the proffer of Mr. Szlezinger, who

17  is available for cross.

18         THE COURT:  Do you need a minute.  Sure.  We will

19  break for five minutes.  Stand in recess.

20    [Recess 11:54:25 to 12:02:29]

21         THE COURT:  Please be seated.

22         MS. LEVINE:  Your Honor, Mr. Szlezinger.

23         THE COURT:  Very good.  Swear the witness.  Please,

24  remain standing.

25                      LEON SZLEZINGER, SWORN

1        THE CLERK:  Please state your full name for the

2   record.

3        MR. SZLEZINGER:  Leon Szlezinger, S-z-l-e-z-i-n-g-e-

4   r.

5        THE COURT:  Welcome, sir.

6                      CROSS-EXAMINATION

7   BY MR. LUTZ:

8   Q.  Mr. Szlezinger, thank you for being here.  I just wanted

9   to touch on a couple of points from your proffer, starting

10  with the bid protections.  Did Standard Register, to your

11  knowledge, have any alternative stalking horse bidders who

12  were willing to provide terms without a breakup fee and

13  expense reimbursement?

14  A.  No.

15  Q.  You're familiar with the declaration submitted by Mr.

16  Torgove in this case?

17  A.  Yes.

18  Q.  Did you review Mr. Torgove's deposition in this case?

19  A.  I did.

20  Q.  You understand from his testimony, don't you, that

21  Standard Register pushed back as fast as it could on the

22  request for the inclusion of an expense reimbursement and

23  breakup fee?

24  A.  I believe it says that, correct.

25  Q.  You understand from Mr. Torgove, his testimony in his

1   declaration that he was told by the stalking horse bidders

2   that a bid wouldn't be accepted without those provisions, is

3   that your understanding?

4   A.   That he was told?

5   Q.   Yeah.

6   A.   I think he might have testified to that.

7   Q.   Your testimony or your proffer about the 10 percent that

8   was a required deposit for bidders, correct?

9   A.   Yes.

10  Q.   It's your understanding, isn't it, that a 10 percent

11  deposit is standard in 363 sales processes?

12  A.   Ten percent is relatively standard, but I don't think

13  that's the point that I was making in my proffer.  The

14  proffer, I think as it was read, says 10 percent is high in

15  comparison to the deposit by the stalking horse.

16  Q.   I understand what your proffer says.  I understand from

17  your testimony right now that it is your testimony that 10

18  percent is generally standard in 363 sales processes?

19  A.   I think it's relatively standard.

20  Q.   I want to go to the 60 days.  You say in your proffer

21  that an additional 60 days would be helpful for the sales

22  process, is that right?

23  A.   I think that's what I said, yes.

24  Q.   So what you are suggesting here is rather than

25  approximately a 90 day sales process, you think it should be

1  approximately a 150 day sale process, is that right?

2  A.  I think that within the outside date of September 8th, the

3  deadline should be pushed back within that time scale, yes.

4  Q.  Are you aware of something from a bidder that would

5  happen after 90 days that couldn't happen within a 90 day

6  sale process?

7  A.  Well, I think the point I'm making is that you would

8  foster more auction activity if you had a longer time line

9  because it would enable what is generally to be able to do

10  more diligence, have financing discussions and management to

11  give fulsome presentations as bidders, hopefully, become

12  interested.

13  Q.  Have you spoken to bidders who say that they are unable

14  or unwilling to provide a bid in the 90 day period, but that

15  they would provide a bid and they would be willing to do so

16  if it were extended another 60 days?

17  A.  I was talking to a bidder who said that they would prefer

18  to see a longer time line.

19  Q.  Did they tell you that they wouldn't provide a bid in the

20  90 day period?

21  A.  They did not.

22  Q.  Did they tell you that they were unable to provide a bid

23  in the 90 day period?

24  A.  No, they said they would prefer a longer time line.

25  Q.  Did they say that they were going to, you know, up root

1  and abandon the process if it were limited to a 90 day

2  period?

3  A.   They didn't, they said more time would be better.

4  Q.   You also said that one of the reasons why you think 60

5  days would be preferable is the "limited progress made with

6  the potential acquirer universe on a post-petition basis."

7  A.   I think I, prepetition and post-petition, yes.

8  Q.   I'm just reading the proffer.  It says on a post-petition

9  basis.

10 A.   Yeah.

11 Q.   What is the basis of your knowledge of the post-petition

12 sales process?

13 A.   Regular update conversations that I have had with Lazard

14 and documents being posted to the data room, which show

15 progress through contacting bidders.

16 Q.   Your aware from your investigation or your research that

17 the company has entered into 15 NDA's with potential

18 acquirers, is that right?

19 A.   I think that's right, yes.

20 Q.   And the company has reached out to over 100 potential

21 acquirers to inform them of the process and to start the

22 process of engaging their interests, do you understand that?

23 A.   I think that's 115, I'm not sure that they have reached

24 out to all 115.

25 Q.   Over 100, let's just say.

1  A.  I'm not sure that's necessarily right because in

2  conversation on Thursday of last week I was told by Mr.

3  Torgove that the company was, that Lazard was just making a

4  start on the 40 names that Jefferies had given to Lazard,

5  which would mean that they have reached out to some like 70

6  or 80.

7  Q.  Okay.  Are you aware that of the 15 companies who had

8  entered into NDA's, that they had commenced their diligence

9  process?

10  A.  It depends what you mean by commence their diligence

11  process, but I believe that they had at least all been send a

12  confidential information memorandum.

13  Q.  Is it your understanding that they have also been given

14  access to the data room that's been set up?

15  A.  I think that's right, yes.

16  Q.  Many of them have had meetings with management, do you

17  understand that?

18  A.  Some have had meetings with management.

19  Q.  And you also understand, don't you, that some of the

20  companies who have entered into NDA's are companies who had

21  expressed interest and pursued a potential transaction

22  prepetition, is that right?

23  A.  A few of them, yes.

24  Q.  Including one who almost got to the finish line

25  prepetition, right?

1   A.  I don't want to characterize it that they almost got

2   there or not; they didn't get there.

3   Q.  Let me clarify and thank you. Including one of the

4   companies who is continuing to investigate a potential

5   transaction post-petition is a company with whom the Debtor

6   engaged in substantial negotiations about a potential

7   stalking horse bid prepetition, is that your understanding?

8   A.  That is my understanding.

9          MR. LUTZ:  I have no further questions.

10          THE COURT:  Any re-direct or cross?  Very good.

11          MR. MEISLER:  Thank you, Your Honor, Ron Meisler on

12   behalf of Silver Point Finance, LLC.

13                      CROSS-EXAMINATION

14   BY MR. MEISLER:

15   Q.  Good afternoon, Mr. Szlezinger.

16   A.  Mr. Meisler.

17   Q.  Nice to see you.

18   A.  You to.

19   Q.  Mr. Szlezinger, with respect to the credit bid and the

20   bid protections, you're not saying it's never possible in the

21   context of the credit bid to have bid protections, are you?

22   A.  I mean it's always possible to have something.  I am

23   saying that in this context, I don't feel it's appropriate.

24   Q.  Thank you, but it's true that it is possible, that is

25   your testimony, and it's possible that there could be a

1  circumstance where you could have bid protections with

2  respect to a credit bid?

3  A.  I mean, I suppose it's possible.  I think the real

4  analysis goes to how invested the credit bidder has been in

5  the company, how involved it's been in the company and an

6  analysis of whether or not absent those bid protections, it

7  would be putting forward its stalking horse bid.

8  Q.  Thank you.  Mr. Szlezinger, do you think Standard

9  Register would be better served without Silver Point's

10 stalking horse bid?

11 A.  No, I don't.

12 Q.  Thank you, Mr. Szlezinger.  My last question --

13 A.  Unless, sorry, I was just going to say unless there was,

14 you know, an alternative stalking horse bidder, but in the

15 circumstances we are in now, no, I don't.

16 Q.  Thank you.  Mr. Szlezinger, have you reviewed the DIP

17 credit agreements, the DIP ABL in particular?

18 A.  I wouldn't say I have done an extensive review of them at

19 all, no because the Committee has people looking at those

20 issues.

21 Q.  So Mr. Szlezinger, when you say that September 8th is

22 really the outside date, from where do you get that date that

23 you think the sale procedures should go until September 8th or

24 that you should match the sale procedure to a September 8th

25 date?

1  A.  I think that's a deadline that came from the DIP.

2  Q.  Thank you.  Are you aware that in the DIP ABL credit

3  agreement, there is a covenant that on or prior to June 19th,

4  2015 an order must be entered approving the Debtors' sale of

5  substantially all their assets?

6      MS. LEVINE:  Your Honor, this is outside the scope

7  of the direct.

8      THE COURT:  I'll allow it.

9      THE WITNESS:  I'm sorry, could you repeat the

10  question?

11  BY MR. MEISLER:

12  Q.  Are you aware that there is a covenant in the DIP credit

13  agreement and the ABL in particular that on or prior to June

14  19th, 2015 there must be an order approving the Debtors'

15  motion to sell substantially all of their assets?

16  A.  Yes, I believe.

17  Q.  Are you also aware, Mr. Szlezinger, that the DIP credit

18  agreement has a covenant that says, sorry, this is in the ABL

19  in particular, that says 30 days, the covenant says 30 days

20  after entry of the sale order, if the sale and Debtors'

21  assets pursuant to such an order has not been closed for any

22  reason other than the issuance or the stay pending appeal

23  from the sale order, are you aware of that covenant?

24  A.  Could you just read it again?

25  Q.  That if the buyer and the seller don't close on the

1  transaction 30 days after the sale order has been entered

2  approving the sale, are you aware that that covenant exists?

3  A.   I think I am generally aware.

4  Q.   And if you take June 19th and you add 30 days, Mr.

5  Szlezinger, approximately what date do you get?

6  A.   July 19th.

7  Q.   Terrific and, Mr. Szlezinger, in that context if we took

8  your approach and the sale procedures last until September

9  8th, do you believe that we would have a default under the DIP

10  ABL?

11  A.   Again, I haven't analyzed those defaults.  I think, you

12  know, my testimony has been that you would get more auction

13  activity if you had a longer time line in which they are

14  running the sales process.

15  Q.   Terrific, but, Mr. Szlezinger, do you believe that the

16  sale process would be harmed in the face of a DIP default?

17  A.   I think generally a DIP default would not be a good

18  thing.

19  Q.   Mr. Szlezinger, if I told you that if you went all the

20  way to September you, in fact, would have a DIP default.

21  Would you agree that going to September 8th is, in fact, a bad

22  idea?

23  A.   Again, I think that a DIP default wouldn't be a good

24  thing in the context of a sale.  I agree with that.

25          MR. MEISLER:  Thank you.  That's it, Your Honor.

1    THE COURT:  Re-direct?

2                RE-DIRECT EXAMINATION

3  BY MS. LEVINE:

4  Q.  Mr. Szlezinger, just a couple of questions on re-direct.

5  In the cross-examination by Debtors' counsel, they kept

6  talking about a 90 day time period.  I am assuming that that

7  90 day time period ran from the filing of the petition

8  through the current sale time line.  Isn't it true that the

9  sim was first posted to the data room on April 2nd?

10  A.  Yes, I think that is correct and the sim did not contain

11  projections, which buyers would undoubtedly want to see.  So

12  I would say a possible sim almost.

13  Q.  And has a business plan been posted to the data room as

14  we sit here today to your knowledge?

15  A.  It hasn't.  My understanding is that it's not complete.

16  So buyers that want to look at the future for the business

17  are unable to do so.

18  Q.  Did you request any meetings with management as part of

19  your diligence?

20  A.  Yes, we did a couple of days after we were hired by the

21  Creditors Committee, we requested management presentations

22  and we have not been afforded that opportunity.

23  Q.  In your review of the asset purchase agreement that's

24  currently the credit bid asset purchase agreement or the

25  stalking horse bid, is there any distribution contemplated to

1  unsecured creditors?

2  A.  There is not.

3          MS. LEVINE:  Thank you.

4          MR. LUTZ:  Just one quick question.

5                  RE-CROSS EXAMINATION

6  BY MR. LUTZ:

7  Q.  Is it your understanding that the business plan is going

8  to be available on April 15th?

9  A.  I think it was not specifically said April 15th.  At some

10  point this week I was told that there would be some sort of

11  business plan.

12  Q.  April 15th is this week.

13  A.  Well, April 15th is Wednesday, but I wasn't told it would

14  be on Wednesday.

15  Q.  Is it your understanding that on April 2nd, the date that

16  you testified about, there were approximately 1,100 other

17  documents available to folks who had access to the data room?

18  A.  I'm not sure if 1,100 is --

19  Q.  Is it your understanding there are a lot of documents

20  that were available to bidders or potential bidders who had

21  access to the data room?

22  A.  There is a lot of documents in the data room.

23  Q.  And that was also true on April 2nd, right?

24  A.  Yeah, none of them are financial projections.

25          MR. LUTZ:  Thank you.  No further questions.

1        THE COURT:  Thank you, sir, you may step down.  Why

2   don't we do this; this is a good time to break for lunch.  We

3   will reconvene at 1:30 and I would like to, at least, given

4   that I haven't had argument and I am not sure whether the

5   evidence is closed, but I at least have some observations

6   that I would share with you and perhaps you might discuss

7   during the lunch break and maybe parse some of these issues

8   down.

9        I want to be clear that many, many issues have been

10  raised in the various objections of the U.S. Trustee,

11  particularly the Committee and we haven't touched on the PBGC

12  as well.  I think it would be appropriate for me, at least at

13  this point, to share what my observations are, subject,

14  obviously, to being convinced otherwise.

15       First, with respect to the issue of time line, I am

16  not particularly troubled by the time line that the Debtors

17  have proposed that puts us into June.  The fact of the matter

18  is that more time, I think, is generally better if you are

19  looking to get a buyer, but the fact of the matter is that

20  also that we have to evaluate this within the context of a

21  bankruptcy proceeding.  There is a substantial amount of time

22  that has begun.  I give relatively limited significance to

23  the prepetition marketing effort.  I take it at face value,

24  but, frankly, every case presents a prepetition marketing

25  effort of one form or another.  It hadn't occurred under my

1  review, so I am not really going to attribute that much

2  significance to it.  That becomes a much more significant

3  issue when a Debtor is looking to move on more of a

4  lightening pace.

5         This is, obviously, a large business being sold in a

6  hurry, but this is something that we have seen before.  So at

7  least my instincts are that while I understand the

8  Committees' request that the process be extended out, I am

9  not satisfied on the record before me today that that is

10  necessary or appropriate.  I take it, again, the Debtors'

11  concerns with respect to the risk to the process.  I will

12  note that I don't attribute that much significance to the

13  prospect of a DIP default associated with that.  Milestones

14  and tying the bid procedures together with the DIP order,

15  that is, I guess the state of the art, but it is not the

16  prospect of a DIP default that is leaving me to side with the

17  Debtor on the issue of timing. I am satisfied, at least on

18  the record before, that timing is sufficient.

19         At a later point, and I have done this on a number

20  of occasions, if the record develops that there is interest

21  or that the time line is not sufficient, then I would hear

22  from the Committee or any other party in interest that would

23  seek to push that process out, but at least at this point, it

24  would seem to me that the time line is not inappropriate.  I

25  would also observe that, at least on the record developed

1  before me, it is highly unlikely that I would approve a

2  breakup fee for Silver Point in this situation.

3        For reasons largely stated by the United States

4  Trustee, that I won't necessarily repeat, breakup fees are

5  cautiously given.  We approve them with some regularity, but

6  I think the case law in this jurisdiction and in the Third

7  Circuit require that I make a specific finding that that

8  breakup fee is necessary to preserve property of the estate

9  and I am not, at least, satisfied on the record that I have

10  before me that this is, in fact, necessary.

11        The record does reflect that Silver Point is

12  substantially invested on an equity and a secured creditor

13  basis.  While I think the witness testified without, frankly,

14  much contradiction that the stalking horse opportunity

15  provided by Silver Point in this case is helpful to the

16  Debtor and I think Mr. Szlezinger testified that this would

17  be worse if we didn't have a stalking horse.  The fact of the

18  matter is that under these circumstances, I would not be

19  prepared to approve a breakup fee on the record thus

20  developed before me.

21        With respect to the expense reimbursement, the

22  expense reimbursement is in excess of what I would be

23  prepared to approve. The reason is that it's a lot of money.

24  I recognize that there are costs associated with doing these

25  transactions, but the record also reflects that substantial

1  expenses were reimbursed or paid in connection with the DIP

2  financing and as this hearing has reflected, the DIP

3  financing and the sale transaction in many ways conquer the

4  same ground.

5       So it seems to me that a breakup fee north of $2

6  million, as currently described, you know, $1.5 or actually

7  approaching $4 million dollars, a $1.5 percent amount is

8  beyond what is necessary, beyond what is appropriate.  I

9  realize it's subject to documentation, but that's a larger

10  number then I would be prepared to approve.  The fact that

11  it's subject to documentation does not mean that it won't

12  necessarily have a chilling effect on bidding.  If it comes

13  in lower, the fact of the matter is any competing bidder has

14  to assume it's the full nut.

15       With respect to credit bidding, again, there is

16  nothing, at least in the record before me, that would require

17  me to preclude or impair Silver Point's request to credit

18  bid, but I note that the Committee is doing its investigation

19  and that process will play out.  Clearly, we will be past the

20  expiry of the challenge period, presumably by the time that

21  we get to the auction and sale process unless that period is

22  extended.  I will not entertain extending it today, nor will

23  I entertain a request for standing today, but we have dealt

24  with this issue before.  We dealt with it by agreements

25  between the parties and a number of different structures that

1  I don't think I need to explain to you.

2       The fact of the matter is that the response or the

3  issue that I would be focused on in this context about the

4  Committee investigation and where we go from here is that I

5  am unlikely to be enthusiastic about being placed in a

6  position of considering emergency motion practice on the eve

7  of a Committee deadline. How we deal with that is really up

8  to you, but I am not going to grant standing today and I am

9  not going to extend that period today.

10       Second, with respect to the credit bidding, I leave

11  to the financial advisors and folks that will be running this

12  auction, at least the observation that it may be that there

13  are issues with respect to the validity, extent and priority

14  of Silver Point liens when you get to an auction.  I

15  understand that that is, at least, currently a default

16  element under the DIP as well as withdrawal right of the

17  stalking horse.  I think I need to understand that a little

18  bit more.  So I am not really able to give you comment on

19  that at this point.

20       The fact of the matter is that a Committee is doing

21  its investigation and our local rules, I think good policy

22  require that they be afforded the opportunity to do that.

23  With respect to the liens on previously unencumbered assets,

24  we have talked a good deal about that and I would certainly

25  welcome further guidance from the parties, but to be clear on

1   at least one point, in the face of a Committee objection, I

2   am very unlikely to approve a lien on avoidance actions.  I

3   don't know that I have done so over a Committee objection in

4   the past, but in the context of this case, I would be

5   unlikely to do so today.

6           There is an interplay between that lien on avoidance

7   actions in the sale process, which is whether or not the

8   buyer of a company wants their customers and vendors to be

9   subject to the possibility of Chapter 5 litigation.  That is

10  a separate issue to me, to the inquiry about whether or not

11  the lender is entitled or can be granted liens on avoidance

12  actions.  So, again, my practice in that area is that I would

13  be unlikely to approve or authorize that with respect to at

14  least that category of unencumbered assets.

15          With respect to, I guess, two separate areas, the

16  cap on the investigating liens, which is $25,000.00, which I

17  regard as a plug number, certainly not realistic in the

18  context of this case and the UCC professional budget.  It is

19  generally my practice not to dictate what numbers I would

20  like or what I think is out there.  In the absence of

21  consensus with respect to those elements, especially, and at

22  least some issue with respect to wind down, I am unlikely to

23  approve a 506(c) waiver, particularly over a Committee

24  objection.

25          I do believe that the UCC budget is light.  I know

1  nobody likes giving the UCC funding, but that is you call

2  your congressman, they are a part of the process.  But,

3  again, my practice is that I do not plug in those numbers

4  because I just don't believe that I have any basis to do so.

5  I would also observe that in other situations and in this

6  situation today, if need be, I will reserve to myself the

7  right to allocate amounts that are provided for under the DIP

8  financing budget in order to ensure that the Committee is

9  fairly compensated.  That may be a fee application issue.

10          With respect to a couple little specific issues,

11  it's my expectation that the standard arrangements for

12  attendance at an auction and consultation opportunities and

13  privileges for a Committee will be accorded here.  I expect

14  that the parties will be able to work out objection deadlines

15  in the filing and briefing submissions.  Most of this is

16  ground that parties have plowed before.  I do think that a

17  deposit of 10 percent, while it's a typical number, not

18  unusual, I think that it is high in this context given the

19  amount of the overall transaction.  So I do have some

20  concerns that having to post a deposit of up to $30 million

21  dollars and leave it sitting can have a negative effect on

22  somebody's willingness to even go down that path, but I leave

23  that, again, to the financial advisors and others.  To me,

24  again, on my instincts, that does seem a bit of concern.

25          There was colloquia with respect to budget variance

1    items and a 5 percent versus 10 percent, again, in my

2    experience 10 percent is a relatively common figure, 5

3    percent if there is a reason for it.  I think someone needs

4    to explain it to me, but the concern I have is, at least

5    initially as articulated by the Committee, that this may

6    trigger a default.  Again, where a lender is lending into a

7    post-petition situation that can identify the defaults, the

8    exercise of their remedies is subject to, obviously, motion

9    practice and authority by this Court.  I think I need some

10   guidance on exactly what that issue is.  That may be a

11   smaller issue.

12          I also realize that in my comments I haven't covered

13   everything that everybody has laid out, but, again, it's been

14   difficult to follow with the way that the, and I mean no

15   criticism, but the way that the evidence has kind of come in.

16   We haven't necessarily walked through all of these items, but

17   Mr. Rosenthal, at the beginning of the hearing, I think you

18   had tried to point out a number of issues that were taken off

19   the table.  My goal with my now extended comments today

20   would, at least, be to give the parties something they can

21   confer upon and those issues that remain in material dispute,

22   I would be happy to address, but, hopefully, again, this is

23   nobody's first rodeo in this room.

24          We have seen sales.  This is a sale case.  I accept

25   that.  It will proceed on a schedule and it will proceed in

1  an effort to maximize value for all parties in interest.

2  With those observations I would leave you to lunch and I will

3  see you at 1:30.  We stand in recess.

4     [Recess 12:35:11 to 1:54:40]

5          THE COURT:  Please be seated.  Mr. Rosenthal.

6          MR. ROSENTHAL:  Your Honor, we did have an

7  opportunity visit, right before Court began, with Silver

8  Point.  I think they are prepared to make a proposal.  I can

9  tell it to you, but I think it's better coming from them.

10         THE COURT:  Okay.

11         MR. ROSENTHAL:  Do you want me to hand it up?

12         UNIDENTIFIED SPEAKER:  I think we probably first

13  want to hear all the issues before, unless that's all the

14  issues that are on the table, in this case, yes.

15         THE COURT:  Well, have you conferred with the

16  Committee?

17         UNIDENTIFIED SPEAKER:  We have not.

18         THE COURT:  Here is the thing; that's fine and I

19  appreciate the effort into formulating a proposal.  There are

20  obviously a number of moving parts.  I shared with you the

21  observations I had as to a number of them.  There was

22  obviously, I'm not sure who put the pavlovian reflex line

23  into their brief, but there were a lot of issues that were

24  raised by the Committee, that none of which were terribly

25  surprising.  Whether we respond to each of those is anybody's

1  guess at this point.

2      My goal was to sort of formulae the dynamic and to

3  make it clear to all parties that we were moving forward from

4  today, that there will be a sale process on a particular time

5  line and, at least, some observations about what I thought

6  were fair and appropriate elements of that sale process and

7  the issues in the DIP.  I think what I would rather do is

8  give you 20 minutes to confer with the Committee because I

9  don't feel uncomfortable about putting them in awkward

10  position, but it puts me in an awkward position because I am

11  not necessarily going to negotiate this with you in the way

12  that I think I would be about to start in about five minutes.

13      There are a number of issues.  I don't know

14  precisely what ones have traction, what ones I am obliged to

15  address and rule upon, what ones are susceptible to

16  resolution.  The one thing that I do know is that the

17  Committee and the stakeholders know a lot more about this

18  business and about the process that needs to move forward

19  then I do.   While there may not be consensus about that,

20  where consensus can be achieved right and where it can't,

21  then I will provide either ruling or guidance.  I think you

22  ought to have that discussion with the Committee.  Let's find

23  out where the rubber meets the road and then I can, at least,

24  provide some further guidance to the parties if you need it.

25  Does that sound fair?  All right, 20 minutes.  Stand in

1  recess.  Thank you.

2    [Recess 2:01:15 to 3:04:14]

3           THE COURT:  Please be seated.

4           MR. ROSENTHAL:  Your Honor, thank you for the time

5  for the parties to meet.  There have been discussions going

6  on during the break.  Unfortunately, we don't have a deal to

7  report to you.  There were discussions about every aspect of

8  the points that you raised in addition to a couple other

9  issues.  The parties reached an impasse.

10          THE COURT:  Okay.

11          MR. ROSENTHAL:  I think we need your help on,

12  particularly on the issues that you raised.  There are two

13  other issues that I want to throw into this; one related to a

14  notice of amendment of DIP documents.  I think there have

15  been some productive discussions about that.  The documents

16  already provide for notice of amendments of material changes.

17  The question has arisen about notices of immaterial changes,

18  particularly as they relate to the ABL lender, which has

19  borrowing based determinations all the time and everything.

20  I think the Committee and the ABL DIP lenders are working

21  through those issues.

22          Then there was an issue raised by Ms. Levine by the

23  no phase II's.  So we had a discussion about that.  So let me

24  just report on that.  So the discussion on the environmental

25  phase II's was everyone is permitted to phase I's.  People

1  are permitting to do phase II's, but the Debtors don't want

2  it to be uncontrolled.  So we said to them if you want to do

3  phase II's, come to us with a program for which you want to

4  do.  I put them in touch with one of my environmental

5  partners that they work out a protocol.  We are not paying

6  for the phase II's and everybody seems to be okay with that.

7  So there is a light at the end of that tunnel.  I wish I

8  could report a deal, but we weren't able to get there.

9         THE COURT:  Okay.  What do you want me to do?

10        MR. ROSENTHAL:  Well, I think we should make final

11 arguments and then ask the Court to rule.

12        THE COURT:  Well, I think I'm at a point where I

13 would be prepared to hear what Silver Point has to say, if

14 they are prepared to relate that.  When I asked you to go

15 into the hall with the Committee, it was not necessarily what

16 I expected.  I certainly would have welcomed a resolution,

17 but I'm not going to fault anybody one way or the other at

18 this stage for not reaching consensus.

19        A couple folks stood at the podium today and said

20 well, Your Honor, is binary.  You can approve the DIP or you

21 can't or you can approve the sale or you can't.  This job

22 would be a lot easier if it worked out that way.  I have told

23 you that there are elements of the DIP that I am not

24 comfortable with.  There are elements of the sale process I

25 am not comfortable with.  It doesn't advance the ball for

1 anybody for me to say denied, good luck, try to think of

2 whatever it is I'm thinking of in the future.

3        So I think I am at a point where I would be prepared

4 to hear what, frankly, where the parties are.  There are a

5 lot of moving parts, most of which are susceptible to either

6 disposition or resolution.  I think I have said,

7 unequivocally, it's my expectation this case will move

8 forward from today, but it has to proceed in a way that it is

9 fair and responsive to the issues that have been raised, not

10 just by the Committee, but by the U.S. Trustee and by the

11 PBGC.  I shared with you at least some concepts that I

12 thought would be helpful to the parties to understand.  I

13 would be ready to be further advised from the parties.  Ms.

14 Levine, do you wish to be heard?

15        MS. LEVINE:  Yes, Your Honor.  First, Your Honor,

16 thank you for the break.  It was productive and we

17 appreciated that.  We also under that, at least the last

18 round of the order that we sort of did include the language

19 that was requested by the PBGC.  So if that stays, that issue

20 is resolved as well.

21        With regard to the issues that Your Honor talked

22 about right before the break, we heard Your Honor loud and

23 clear with regard to the time line and the Committee will

24 live with that.  With regard to the breakup and the expense

25 reimbursement, we still believe that in this particular

 1  circumstance it's not really warranted.  I don't know whether

 2  or not the U.S. Trustee has changed their position on that as

 3  well, but right now I think we need Your Honor's help with

 4  that.

 5          With regard to the unencumbered assets, we heard

 6  Your Honor with regard to the avoidance power actions.  I

 7  think we need Your Honor's help with regard to the 35 percent

 8  of the stock and with regard to the Mexican assets.  With

 9  regard to the lien challenge, we think at one point during

10  the discussions, and we understand it was all or nothing, so

11  it may not still be on the table, but we thought we heard

12  Silver Point say that they would be willing to go to 75. If

13  that is the number, we would be willing to accept it.

14          THE COURT:  In terms of days?

15          MS. LEVINE:  No, $25,000.00 for the carve out to $75

16  for the carve out for the lien investigation.  The dates

17  were, I had thought that the dates were revised to June 1st,

18  June 11th, June 15th, 16th and 17th.  We appreciated the

19  additional timing and also that the objection deadline now

20  falls after the lien challenge.

21          There was a concept that was talked about with

22  regard to the deposit, taking it down from 10 percent to a

23  flat $10 million, but if whoever is the either highest or

24  second highest bidder at the auction is not Silver Point,

25  they post or agree to a total of $15 as a liquidated damage

1   clause for the estate.  We thought that was creative and we

2   appreciated that, Your Honor.

3          With regard to the lien items and the budget, the

4   payroll, health and benefit and postage reimbursement, the

5   proposal was made to go to $7 and a half.  We still really

6   don't understand why it shouldn't be $10 and we think $10 is

7   market.  So we would ask for Your Honor's ruling there.  With

8   regard to standing and tolling with regard to a challenge,

9   there is nothing on the table.  We think we also heard Your

10  Honor say that that's for another day so we understand that.

11         With regard to amendments to the DIP, we had some

12  conversations, as Debtors' counsel indicated, with the ABL

13  lender.  So long as the amendment is favorable to the Debtor

14  and they give us notice, you know, as soon as practical with

15  regard to that that makes sense.  We know they are talking to

16  their lender every day with regard to the asset based loan.

17  We do think that with regard to the term loan there should

18  be, if allowed amendments, there should be some ability for

19  us to come into Court and be heard even if it's on an

20  expedited basis, but that hasn't been resolved yet.  With

21  regard to the professional fee budget, Your Honor, there

22  doesn't seem to have been any resolution with regard to the

23  Committees' fees.  So that is still an open issue.

24         THE COURT:  Okay.  Mr. Meisler.

25         MR. MEISLER:  Thank you, Your Honor.  Your Honor, we

1  did make a package proposal that we discussed with the

2  Debtors and we discussed with the Committee, and I will try

3  to do this in an expedited fashion.  The time line, Your

4  Honor, you said that was fine and that a breakup fee and

5  expense reimbursement, we reduced our breakup fee from 2

6  percent to 1 percent.  On the expense reimbursement, we

7  reduced our ask from 1 and a half percent, which is

8  approximately $3.7 million dollars to $1.5 million dollars,

9  which is about a half a percent, which is a cap.  We do have

10 to show documentation on our fees and expenses.

11         With respect to credit bidding, Your Honor, we are

12 fine with the way that you mentioned or communicated your

13 observation.  With respect to liens on previously

14 unencumbered assets, Your Honor, this one is a very important

15 one to us.  With respect to avoidance actions, Your Honor, we

16 were fine with your observation with the caveat that you had

17 recognized, which is the buyer/seller may have views about

18 the avoidance actions on vendors or customers.  In our

19 stalking horse bid, we do require any avoidance actions on

20 customers and vendors.

21         You understand the rational for that and so while we

22 are willing to live as the lender without liens on the

23 avoidance actions or the proceeds there of, we would insist

24 upon a standstill with respect to pursuing avoidance actions.

25 This really goes to the Debtors because the avoidance actions

1  are really in their [indiscernible] at this time.  We would

2  insist upon a standstill so that no avoidance actions could

3  be brought during a sale process.  We would also insist that

4  a buyer have the right to require those as our proposal does.

5       With respect to the investigation budget, Ms. Levine

6  did report accurately that we proposed to increase the budget

7  from $25,000.00 to $75,000.00.  There are plenty of examples

8  to support a $75,000.00 investigation budget in case it's

9  much larger than the one --

10       THE COURT:  You can live with that?

11       MR. MEISLER:  Correct, Your Honor.  On the

12  professional fee budget, Ms. Levine did report correctly that

13  we were not willing to change the allocation to the

14  Committee.  We were willing to live with your observation or

15  comment that you would not a 506(c) waiver with respect to

16  the Committees' fees and we would live with that.  We also

17  understand your reservation of rights that you are not bound

18  to the professional fee budget and that you would look at

19  that professional fee budget and you might allocate

20  differently.  We understand that.

21       With respect to attendance at auction, we don't see

22  that as something in dispute.  The same with deposit.  We

23  don't see that as something in dispute.  On the budget

24  variance we did go from a 5 percent on those three line

25  items, payroll, health and benefits and postage.  We moved by

1  50 percent.

2         THE COURT:  I am deeply religious about the

3  proposition one way or the other.  I mean, I said a 10

4  percent variance is typical.  I have certainly seen five.  I

5  have also seen 15.  The issue is less a legal issue and a

6  more practical business issue.  If the business is operating,

7  as a general proposition when we tie these things into a

8  budget, neither the Debtor nor, frankly, I want a structure

9  that is created for what I would call non-material defaults

10  to be triggered with some regularity.  So what is the

11  relationship between these two particular line items that

12  requires them to be treated differently from all others?

13         MR. MEISLER:  Sure.  So we think that those items,

14  in particular, should be very easy to forecast.  They should

15  be fairly fixed numbers and, therefore, we think that there

16  should be tighter governments on those particular line items.

17  Now, unlike what Ms. Levine articulated, if the business is

18  going gang busters, we are going to be thrilled.  We would

19  absolutely be thrilled if payroll increases because people

20  are being paid overtime because there is more product being

21  sold.  That is not our concern.  Our concern would be that

22  for whatever reason, money is going out the door to pay

23  employees that has not been approved.  So people are getting

24  bonuses, they are getting stay bonuses that have not been

25  approved by Your Honor.

1            THE COURT:  Well, that's not going to happen.  I

2   mean, Mr. Rosenthal is going to leave in handcuffs if that

3   sort of thing happens.  That was a joke.  It will be Nestor.

4   It would be Mr. Nestor.  All right, I understand.  That is

5   the kind of thing I am reluctant to get, sort of, into the

6   weeds on, but I have to say that that's not that compelling

7   an explanation.  The reason is this, again, while I think

8   everybody and your plan has as much of a reason as anybody to

9   hope that the business is doing great and going gang busters,

10  but nobody has explained to me, we are not going to see a

11  bonus program that is going to send material dollars out the

12  door unless Mr. Kenny sees it, Ms. Levine sees it and I see

13  it.  If we have got people working over time because we have

14  got lots of work, then that is something that seems like a

15  high class problem.

16          The issue is this, I understand the Committees'

17  point. I don't want to set the Debtor up for some sort of

18  default issue here and the fact that it's been sort of

19  focused on is what's got my attention to it.  The idea that

20  money, well, money goes out the door all the time; that's

21  what a budget is.  So I am not understanding why this would

22  be a different issue than any number of other items, you

23  know, taxes or other stuff that, you know, again, we budget

24  with a high level of confidence, but one of the reasons I

25  have a job is because not all budgeting is perfect and so

1  here we are.

2         I need a little more guidance on that.  That seems

3  to me like a small issue.  We are two and a half points apart

4  on this issue.  I don't really feel strongly about it one way

5  or the other, but if it's becoming this sticking issue, it

6  seems to me that would give me a bell going off that this is

7  going to turn into an issue.  In front of me, either with the

8  default practice or something else.  So I guess I need

9  comfort or guidance on where we are going with this part.

10        MR. MEISLER:  Your Honor, I think we have a

11  heightened sensitivity as the lender because we are the money

12  lender.  We have concern about how our money is being used.

13  We seek credit risk.  So every dollar that gets spent on this

14  DIP is another dollar that's ahead of our prepetition loans.

15  That also goes to the issue, it fits nicely with the

16  unencumbered asset issue.

17        Your Honor, we don't believe that the value of the

18  unencumbered assets is going to be sufficient to cover the

19  DIP loans.  We don't believe it.  Let me parse that even

20  finer.  We don't believe that the value of the unencumbered

21  assets is going to be sufficient to cover the new money

22  portion of the DIP loans.  So, Your Honor, we have heightened

23  sensitivity with respect to the Debtors spending money and we

24  are supportive of the Debtors in the way they are operating,

25  but that's the reason for our ask that there be certain

1  governors and there was heightened sensitivity, as mentioned,

2  to certain of these three line items.

3         THE COURT:  Can you remind me, I thought its

4  postage, its employee wages.

5         MR. MEISLER:  And health and benefits.

6         THE COURT:  Health and benefits.  Can you remind me

7  of the default mechanism here, what is the notice period?  Is

8  it three days?  Is it five?

9         MR. MEISLER:  There are five days.

10        THE COURT:  I know there is a revised version of the

11 order.

12        MR. MEISLER:  That has not changed.

13        THE COURT:  That has not changed, okay.  All right,

14 I understand.

15        UNIDENTIFIED SPEAKER:  I have a couple comments on

16 it.

17        THE COURT:  Okay.

18        MR. MEISLER:  Your Honor, do I need to add any more

19 clarification?  I know Ms. Levine mentioned the assets of

20 Mexico and maybe there was certain other.

21        THE COURT:  I understand.

22        MR. MEISLER:  You do understand, terrific.

23        MS. LEVINE:  Your Honor, there are two comments.  I

24 just wanted an opportunity to respond to them.

25        THE COURT:  Sure and then Mr. Rosenthal can respond.

1          MR. MEISLER:  Your Honor, my colleague just

2    mentioned to me that for clarity, also, I realized I skipped

3    a notice.  The Committee does get notice of amendments.  We

4    are not offering an opportunity to object because with

5    respect to non-material modifications, well, they are just

6    that, they are non-material modifications.  For example, we

7    just amended the DIP creditor agreements because we had a

8    milestone of April 10th as the date that the sale procedures

9    order must be entered and April 12th that the final DIP

10   financing order must be approved and entered.

11         THE COURT:  But didn't I just hear from Mr.

12   Rosenthal that that modification also contemplated then a two

13   point bump in the terms of the --

14         MR. MEISLER:  Your Honor, that's a material

15   modification and that's not the term lenders; that's the ABL

16   lenders amendment.  That is a material modification and I put

17   that in a completely different bucket then non-material

18   amendments.  Thank you, Your Honor.

19         THE COURT:  Ms. Levine.

20         MS. LEVINE:  Your Honor, just two points.  With

21   regard to the lien on avoidance actions, it sounds very

22   reasonable to say just toll them.  Frankly, the Committee

23   really has no intention to be suing vendors or customers

24   during any point in time prior to the sale, but the challenge

25   period expires in advance of the sale and avoidance,

1  technically, Chapter 5 causes of action might be the kinds of

2  causes of action that would come into play there as well.  So

3  we really truly believe that avoidance actions have no place

4  as part of the lenders collateral and we have had

5  conversations with the Debtor about we are not contending to

6  do anything --

7        THE COURT:  I think your comparing apples and

8  oranges.  I don't believe that what Mr. Meisler just

9  described as a limitation on the Committee's ability to

10 pursue its investigation and to file whatever it believes is

11 appropriate in the context as a result of that investigation

12 prior to your expert.  I think, what I understood as comments

13 to be was he does not want Chapter 5 causes of action filed

14 against parties that are likely to be the sorts of vendors or

15 customers that are a sensitivity issue.  I think that's a

16 fair clarification.  I mean, otherwise, the idea that a

17 Chapter 5 tolling would somehow impair your ability to move

18 forward, that doesn't seem consistent with what we are

19 talking about.  Mr. Meisler, have I fairly characterized your

20 comments?

21       MR. MEISLER:  Yes, Your Honor.

22       THE COURT:  Okay.

23       MS. LEVINE:  We agree that we have no intention of

24 brining any of the case type, the actions during this period

25 of time as well.  So that is not really an issue.

1        THE COURT:  I think it's a fair point though.

2        MS. LEVINE:  The 506(c) waiver, if I heard counsel

3   correctly, what he is saying is that he understands that

4   there is not going to be any 506(c) waiver with regard to

5   Committee counsel fees.  We are not asking for that.  We are

6   asking that there be no 506(c) waiver.

7        THE COURT:  That was my understanding and that was

8   my observation.  Mr. Rosenthal.

9        MR. ROSENTHAL:  A couple points.  We just clarified

10  one on the avoidance actions.  I think the way it was said is

11  exactly how the Debtor believed it would transpire and not

12  intended to be any limitation on the Committees' challenge

13  right.  I do want the Court to know that this amendment to

14  add the 2 percent, I did talk to Ms. Levine about it as soon

15  as it came up on Wednesday or Thursday, but we did have to

16  get this done before Friday.

17        The last point, Your Honor that you had had some

18  discussion about was the increase in the variance from 5 to 7

19  and a half percent.  So, I just spoke a little bit with Mr.

20  Carmody.  We thought 5 percent was very tight, but we think

21  we could have lived with.  Seven and a half percent gives us

22  a little more variation.  We do not think that as a business

23  matter, given where we are now and for the next months until

24  the closing that this is likely to be an issue on these

25  particular line items.  The business is doing well, but it's

1  not flourishing, if you will, it's not increasing

2  substantially.  We don't think that there will be a

3  significant deviation.

4         THE COURT:  Independent of Mr. Carmody going on a

5  frolic and detour and starting to hand out money and giving

6  this to people.

7         MR. ROSENTHAL:  Mr. Carmody is not going to be

8  leading me to jail or visiting me in jail.  We are not going

9  to be making any payments to employees other then as approved

10 in the wage order or any subsequent, you know, bonus.

11        MS. LEVINE:  Our point is slightly different and

12 maybe this will resolve it, but --

13        THE COURT:  We need you on the transcript.

14        MS. LEVINE:  Sorry.  The concern that we have is

15 that we understood that under payroll also comes commission

16 salesman.  The commission salesman are not operating under

17 non-competes.  So they can take their relationships and go,

18 and if there is a concern that the commissions are not going

19 to be paid or paid timely, that was what caught our interest

20 with regard to this particular variance limitation.

21        THE COURT:  I would be hard-pressed, and Mr. Meisler

22 is going to stand up and agree with me, I would be hard

23 pressed to believe that an outfit that wasn't to purchase

24 this company wants to put those relationships at risk.

25 Again, I am trying to figure out exactly what it is about

1  this that makes it fall into a different category then all

2  other budget line items.  Again, to the extent that there

3  were a default, as it's currently described, even if the

4  default were called, right, the Debtor would be in here in 24

5  hours and I would tell Silver Point that they have a high

6  class problem.  That, you now, business is good and we are

7  paying our employees.

8          MS. LEVINE:  Your Honor, this horse may be dead.

9          THE COURT:  Also, aren't the commissions presumably

10 factored into the budget?

11         MR. MEISLER:  Yes.

12         THE COURT:  They should be.

13         MS. LEVINE:  Right, our point was that if they had a

14 really good week, then there was going to be more of a

15 variance on the upside, in a good way, and they were going to

16 have to pay more commissions then we would be within the line

17 item.  Your Honor, this horse may be way dead.  Our concern

18 was that it looked to us like it was going to discourage

19 people from selling and depressed value.  We didn't want

20 that, but I think that we have clarified that that's not

21 going to happen.

22         THE COURT:  Yeah, if that's not going to happen, all

23 right, a couple of things.  First, with respect to the 7 and

24 a half percent, what I have heard from the Debtor is that

25 they believe they can live with it.  It doesn't not seem to

1  me that it is likely to create a default because the

2  variance, it seems to me, would be typically associated with,

3  frankly, positive business developments.  If not, and a

4  default is called associated with this, you know, I will be

5  here, but I am not going to micromanage the mechanics of the

6  budget on that line item.

7       With respect to the points raised, again, I really

8  appreciate everybody's colloquia on this in order to try to

9  reach as much of a business resolution as possible.  We are

10 down to a series of short strokes.  With respect to the issue

11 of the liens on previously unencumbered assets, I will

12 authorize that.  We have answered the question with respect

13 to avoidance actions.  It's not my expectation that routine

14 or typical Chapter 5 avoidance actions would be commenced, so

15 I think that there is an understanding that there is

16 stability to the business; that's what we are talking about.

17      Any sort of standstill, I don't think it's tolling

18 because we're not looking at the statute of limitations or

19 anything else at this point, but to the extent that there is

20 a standstill or an agreement that Chapter 5 causes of action

21 are not going to be commenced, I think that's consistent with

22 how I would expect this case would be proceeding anyway.

23 With respect to the Committees' investigation and whatever it

24 is they are going to do, the concept of a standstill has no

25 effect on a Committees' ability to perform its investigation

1   and to act as it deems proper.

2          With respect to the breakup fee, I will not approve

3   a breakup fee.  I understand and I appreciate the

4   accommodation and the reduction, but I am not prepared to

5   approve a breakup fee in the context of these proceedings.

6   For reasons largely stated by the Office of the United States

7   Trustee, I am not satisfied that it's either appropriate or

8   necessary to incentivize Silver Point to take this initial

9   step.  I am sensitive to the issue. It is clearly well within

10  the range of what this Court has previously approved as a

11  breakup fee, but, again, these percentage amounts are

12  significant sums in large cases.

13         We have held and observed in other cases that the

14  percentage, while we typically have a cap of 3 percent, when

15  we look at this as a percentage, that percentage is of less

16  utility in a larger, larger case.  An amount of the better

17  part of $3 million dollars as a breakup fee, here, to me is

18  both chilling and, again, on the record before me not

19  sufficiently warranted to approve for an entity in the

20  position of Silver Point.

21         With respect to the expense reimbursement, I will

22  approve an expense reimbursement of $1.5 million dollars.  I

23  have generally treated expense reimbursements as being

24  different from breakup fees.  Again, the tradition or the

25  practice is that they are subject to documentation and are

1  capped, in this case, at $1.5 million dollars.  It's clear to

2  me that even with an incentive to participate and engage in

3  this exercise, sufficient that a breakup fee is not

4  warranted, there are material expenses that have been

5  incurred by Silver Point and are being incurred.  So an

6  expense reimbursement of $1.5 million dollars, I'd be

7  prepared to approve and authorize.

8          As I said with respect to the liens on previously

9  unencumbered assets, I will allow them. I understand the

10  Committees' concern with respect to them, but it is not

11  unusual for a DIP finance lender to require or look to

12  unencumbered assets in order to secure its post-petition DIP

13  financing extensions.

14          With respect to the professional fee budget,

15  consistent with my practice, I'm not going to plug a number.

16  I will observe that I think in comparison with the amounts

17  that are being charged and budgeted for by the estate

18  professionals that these numbers are clearly light and based

19  upon that I will not approve or authorize a Section 506(c)

20  waiver.  That waiver does not extend simply to fees, but it

21  does extend to simply a right to pursue a Section 506(c)

22  surcharge if circumstances warrant at the appropriate time.

23          It's my belief that the parties have agreed on an

24  investigation budget of $75,000.00; that seems fair to me and

25  appropriate.  As I said, I will allow the budget with the 7.5

1  percent variance as it relates to postage, payroll and health

2  benefits.  I do share the concerns that have been expressed

3  by the Committee and, frankly, by the Debtor that on a week

4  to week basis that much of a swing is still pretty tight, but

5  I am going to assume that the intention is to allow the

6  process to play itself out and to provide, frankly, a lender

7  a measure of comfort and control over moneys that are going

8  out.

9       The interplay of things like commissions, which are

10  different from bonuses; commissions I regard as more routine.

11  So those commissions could swing one way or the other.  What

12  I expect is that the Debtor will have a handle on their

13  financial forecasting and they will be as good and accurate

14  as they can be.  If there are issues with respect to that, I

15  am not difficult to find.  I think that that covers the

16  various items that remained in dispute. I know that we had a

17  discussion about the time line, which I think I have approved

18  and authorized.  It's my expectation that counsel will be

19  able to reach agreement with respect to the dates going

20  forward and I think you have already done so with respect to

21  objections and otherwise.  Mr. Rosenthal.

22       MR. ROSENTHAL:  Just to make sure we have covered

23  everything, so, Your Honor, avoidance actions are not subject

24  to the DIP liens that --

25       THE COURT:  Avoidance actions are not subject to the

1 DIP lien.

2      MR. ROSENTHAL:  Correct, but the other unencumbered

3 assets are.  Got that.  We talked about the deposit, the $10

4 million, plus the $5 is fine, I assume.

5      THE COURT:  I am fine with that.  You know, the

6 testimony, I don't think was really controverted. The issue

7 is this and, again, I would largely defer to the financial

8 advisors.  They seem to be a little bit at logger heads.  Ten

9 percent is a typical number, but these percentages become

10 material, but I think that, again, what has been proposed as

11 a smart and elegant way to deal with that issue in order to

12 maximize the ability for parties to step up without having to

13 pony up and tie up $38 million dollars.

14      MR. ROSENTHAL:  We believe it's large enough to

15 represent a sizeable investment that no one would want to

16 walk away from.  If they are chosen as the stalking horse, I

17 mean as the successful bidder or the backup that goes to $15.

18 Of course, one of the factors that we will be evaluating with

19 any bid is credit worthiness.  I believe we have all of the

20 issues that were raised by the Court and, frankly, that are

21 still open.  What we would need to do is put these changes

22 through the --

23      THE COURT:  If parties want an opportunity to

24 confer, obviously, we would need to deal with the form of the

25 order and close the loop on that.  There are other items and,

1  obviously, certain of these issues are not necessarily agreed

2  to by Silver Point and I understand, [indiscernible], it's

3  good to see you again.  So, I understand that we may need a

4  moment on that, but I do, as I said, have a 4:00 stop and we

5  have a couple other items.

6          MR. ROSENTHAL:  Why don't we just go to the other

7  items now and while that's occurring, I think the discussions

8  can take place.  Different folks are handling those.

9          THE COURT:  Okay.

10          MR. ROSENTHAL:  Your Honor, we do want to, as part

11  of the record, introduce the DIP amendment, which revises

12  some of the dates and also increases that 2 percent.

13          THE COURT:  Okay.

14          MR. ROSENTHAL:  May I approach?

15          THE COURT:  Yes.  Thank you.  Any objection to the

16  admission of the amendment?  It's admitted.

17          MR. ROSENTHAL:  All right, Your Honor, I'll turn it

18  over to Jeremy Graves.

19          MR. GRAVES:  Good afternoon, Your Honor, Jeremy

20  Graves, Gibson Dunn & Crutcher on behalf of the Debtors.  I'm

21  here in support of entry of final orders on three of the

22  Debtors' first day motions.  These are going to be agenda

23  items 4, 5 and 6 in your binder.  That's the cash management,

24  critical vendors and the Debtors' NOL preservation motion.

25          In connection with our reply on Friday, we filed

1  revised versions of the final orders approving each of these

2  motions.  For each, the Committee had objected.  My

3  understanding from Ms. Levine is that they are no longer

4  intending to prosecute those objections.

5        MS. LEVINE:  Your Honor, with regard to the NOL

6  motion, the critical vendor motion, we are not sure why they

7  don't want to give us notice, but we are withdrawing those

8  objections and we will just confer with the Debtor on an

9  ongoing basis.  With regard to the cash management issue,

10 because of the issues with regard to the DIP, we do want

11 reporting with regard to what cash is going between the

12 Debtors and to non-Debtors, the back and forth between the

13 various entities.

14        THE COURT:  I saw the Debtors response on that and I

15 guess I would like some closure in whether we can achieve it

16 right now or otherwise.  The Debtors response was along the

17 lines of this disclosure would be stuff that we are not

18 typically creating or sharing and that will be a substantial

19 burden.  Do I grasp that?

20        MR. GRAVES:  That's correct. If you read the

21 Committees' objection, they ask for a litany of items,

22 reporting on this and that.  If the question relates to a

23 reporting of cash transfers as between the U.S. Debtors and

24 the Mexico Debtors, which I believe is probably the crux of

25 the issue, I don't think that we would have a problem

1  providing the reports of those cash transfers.  We could work

2  with language.

3          MS. LEVINE:  That would be fine, Your Honor.

4          THE COURT:  Okay. I think, again, my approach to

5  this sort of thing typically is that a Committee is entitled

6  to, you know, information, but as a general proposition the

7  goal is to have it be information that the Debtor is

8  typically preparing so that we are not creating a chore for

9  some guy in the treasury department who already has enough to

10 do.  If that works, that's fine.

11         Another observation that I would make is, and again,

12 I don't think I need to tell anybody this, but if there are

13 issues with respect to discovery, sharing of information,

14 process going forward, that sort of thing, I strongly

15 discourage motion practice and letter practice relating to

16 that stuff.  If you have issues with respect to who is

17 getting what, who is being frozen out of the process, what

18 the schedule for different items are, you ought to get me on

19 the phone.  We can usually cut through things.  As we have

20 said, you know, the Committee has observed that this is a

21 large transaction with a fairly tight time line.  I am not

22 interested in a lot of handling back and forth about, you

23 know, who did what, but keep the ball moving.

24         MR. GRAVES:  Thank you, Your Honor. I think that

25 works. I think, to be fair, our disagreement is really to

1   objection rights and not notice rights.  I think that we do

2   intend to provide substantial notice on each of these matters

3   to the Committee.  So they will, I'm sure, get you on the

4   phone if necessary.

5            THE COURT:  I think that's fine, but I think with

6   that resolution on the record, then, it sounds like those

7   three items should be resolved, am I correct?

8            MR. GRAVES:  I believe that is correct.

9            THE COURT:  All right, does anyone else wish to be

10  heard to each of those items 4, 5 and 6 on the agenda?  Very

11  well.  Do you have clean amended orders?

12           MR. GRAVES:  Your Honor, I have clean orders on the

13  critical vendors and the NOL.  I will be happy to hand those

14  up. I may need to work just a little on the language of the

15  reporting and the cash transfers with the Committee and the

16  cash management just to make sure it's agreed on.

17           THE COURT:  That sounds fine.  I will take that

18  under certification at your convenience.

19           MR. GRAVES:  May I approach?

20           THE COURT:  Sure.  Thank you.  Very good.

21           MR. GRAVES:  Thank you, Your Honor.  I will cede the

22  podium to Mr. Newman.

23           THE COURT:  Very good.

24           MR. NEWMAN:  First time I am going to stand up and

25  say something.

1            THE COURT:  Yes, sir.

2            MR. NEWMAN:  I want to tell you how much we

3  appreciate the fact that you are available all the time.  You

4  made that speech to us at the first hearing and you have made

5  it again to us.  We had, as you can expect, a fairly

6  extensive discovery regime going over the past 10 days and I

7  don't believe you got a call.

8            THE COURT:  I did not and you get full credit for

9  that.  You don't need to call me just to tell me your

10  working.

11            MS. LEVINE:  Your Honor, one housekeeping matter

12  that's on the record because we don't want to be in violation

13  of anything.  The Committee filed a motion to seal only

14  because some of the information that was produced to us was -

15  -

16            THE COURT:  I signed that.

17            MS. LEVINE:  Okay.  Thank you.

18            THE COURT:  Mr. Nestor, I would ask tomorrow, if you

19  would have somebody just audit the docket and make sure. I

20  believe I have signed the CNO's.  I know that I have signed

21  the sealing issue.  So if there is anything missing, just

22  give us a call and we will get it on the docket.  Yes, sir.

23            MR. NEWMAN:  Your Honor, thank you.  A couple of

24  things.  A housekeeping matter, number 19 on the docket was

25  the order, the motion seeking leave to file on those replies.

1        THE COURT:  Okay.

2        MR. NEWMAN:  May I approach?

3        THE COURT:  Sure.

4        MR. NEWMAN:  Sam Newman with Gibson Dunn on behalf

5   of the Debtor.  A couple other items. One is number 14, which

6   is the order seeking, an application seeking to employ

7   Lazard.  There were substantial negotiations over the terms

8   of that, if I may approach with a revised order.

9        THE COURT:  Great.

10       MR. NEWMAN:  Just quickly paragraph 4 on page 2,

11  change relating to the payment expectations with respect to

12  financing transactions and the revised agreement agreed that

13  no transaction fee would be approved under the DIP and then

14  certain other modifications were made, which were run by the

15  Committee. I think everyone is in agreement.  Similar change

16  in paragraph 7.

17       THE COURT:  I see it.

18       MR. NEWMAN:  And 9.

19       THE COURT:  Okay.  All right, does anyone else wish

20  to be heard with respect to the Lazard retention?  Very well.

21  I have had an opportunity to review the revised version and I

22  will approve and authorize the relief.

23       MR. NEWMAN:  Great.  Then I would like to next call

24  number 7, which is the final order regarding employee wages.

25  There is one objection from Volt and I'll leave that to call

1  the matter with respect to Volt's objection and request for

2  consent.

3         THE COURT:  Sure.  Yes, sir.

4         MR. SWEENEY:  Peter Sweeney with Blakeley LLP for

5  Volt Consulting.  We had reached a resolution on number 7 to

6  reserve our rights to argue the amount of the claim and to

7  reserve our rights whether to require payment.  So we will

8  reserve those rights for later so that they can go forward

9  with the rest of the motions.

10        THE COURT:  Okay.

11        MR. NEWMAN:  So we would ask that the Court approve

12  the order as blacklined and just note the stipulation on the

13  record that Mr. Sweeney can appear at the next omnibus or

14  thereafter to request any relief he deems appropriate with

15  respect to his client.

16        THE COURT:  That sounds fine.  Does anyone else wish

17  to be heard with respect to the final order regarding

18  employee wages?  Very well.  With the stipulation noted on

19  the record, I will approve and authorize the relief.  The

20  order will issue.

21        MR. NEWMAN:  Then we would also ask Your Honor to

22  call number 18, which is Mr. Sweeney's application for relief

23  from stay, which I will let him speak to and I believe we are

24  continued to the 12th.

25        MR. SWEENEY:  That's right, Your Honor.  We have

1  agreed to continue to the 12th.  We have been working with the

2  Debtors on this motion and since the 30th we were under the

3  understanding that we were going to get some sort of payment

4  plan on the prepetition debt.  We have been having e-mails

5  back and forth through the 6th, but we didn't really realize

6  that we were going to go forward today until the notice of

7  agenda came out.  We have agreed to the continuance until the

8  5th.  Then we also heard today about the lack of liquidity

9  about the prepayment.  So we are still learning about that

10  and we will see if we can reach some of resolution.  If we

11  need to, we will go forward on the 12th.

12        THE COURT:  Very good.  Thank you.

13        MR. NEWMAN:  Your Honor, that's all that I have.

14  Thank you.

15        THE COURT:  That's all the items that we have on the

16  agenda.  Mr. Rosenthal, where do we stand?

17        MR. ROSENTHAL:  Well, how would you like to do this,

18  Your Honor?  We, obviously, have to go back and markup the

19  various orders; however, we do have some changes that I could

20  walk you through now.  Mr. Nestor, does the judge have the

21  last blackline?

22        THE COURT:  I don't know that I have the last

23  blackline.  I got a lot of paper from you all.

24        MR. ROSENTHAL:  Would you like me to walk through

25  the changes to this point or would you like us to go back and

1  give you a consolidated markup?

2          THE COURT:  Why don't we do this; why don't you give

3  me the blacklines.  So, I don't think there is a reason to

4  walk, I think we can more efficiently use our time.  I will

5  review these in chambers.  I would encourage the parties to

6  go back and confer on final forms of the order, consistent

7  with the rulings and agreements that have been made.  Then I

8  would entertain them under certification.  If issues remain

9  with respect to them, I will not be easy to get on the phone

10 tomorrow, but I would, if it boils down to it and if you need

11 me, I would find time.

12         MR. ROSENTHAL:  We do need an order by the 15th.

13         THE COURT:  Right, you will get me on the phone at

14 some point tomorrow if you are at logger heads on the forms

15 of the order, but I have a couple different matters, I have

16 RadioShack and I am not sure what is coming with them.  They

17 tend to show up and they just don't leave.

18         MR. ROSENTHAL:  I think there is a commercial about

19 that.

20         THE COURT:  Well, their back.  So I think I will

21 take these under advisement.  The blacklines will give me a

22 sense of at least where the parties stand right now.  If

23 issues arise, you can get me on the phone, but, otherwise --

24         MR. ROSENTHAL:  May I give you one more blackline,

25 the sale procedures blackline.

1   MR. MEISLER:  Mr. Rosenthal, before you go to the

2   sale procedures, Your Honor, if I could just flag that the

3   Debtors and Silver Point are still working on the carve out.

4   I would classify that as more of a company change because we

5   are just trying to make sure that the numbers works with the

6   budget.  So you will see that number fluctuate.

7   MR. ROSENTHAL:  There are concepts of wind down

8   amount and carve out cap.  They are mathematical and tied to

9   the budget.

10   THE COURT:  I will leave that where it is.  I will

11   let the parties have that discussion and, again, if we need

12   to confer, we can.  You mentioned, Mr. Rosenthal, and I did

13   see that there is $8 plus million on a post-sale basis to

14   move this process forward. Let me at least share with you,

15   this is not a today issue, but I think it is worth

16   understanding now.  I think some of my colleagues have rules

17   about or practices relating to sale cases that are hard and

18   fast about where we go from the sale.  I don't know how this

19   process plays out in this case and I don't have a firm rule.

20   I will tell you this that I strongly prefer plans in

21   Chapter 11 cases where possible.  Certainly, sale cases that

22   lead promptly to a 7, sort of as freefall or to a structured

23   dismissal or even just a dismissal are typically less than

24   ideal for reasons you don't need me to go through. What I

25   would share with the parties and I don't think this is

1  inconsistent with what my colleague downstairs, Judge Carey,

2  mentioned the other day is that to the extent that the sale

3  process plays itself out and the Debtor is basically then,

4  promptly, in a liquidation scenario, proceeds are in or

5  litigation needs to be pursued or something else.

6         Having expressed that my preference is for a plan,

7  in many cases I have encouraged parties to get there as

8  cheaply and as promptly as possible.  I have encouraged and

9  approved combined plan and disclosure proceedings.  The

10 mechanism to get to that stage can seem daunting from where

11 you stand.  You know a lot more than I do, particularly even

12 in a post-sale scenario.  So it may seem simple to me and if

13 it doesn't I will be driven by your judgement, but I would

14 ask that the parties, as you figure out where this case is

15 going, and where that process plays out and what the end game

16 is, I would at least share with you what my preference is.

17        Again, to me, I have seen a number of cases where

18 it's been, I think, better for the administration of justice

19 and for the interest of stakeholders that we have done these

20 just relatively simple structures, under liquidating plan

21 scenarios that, you know, the associates in this room right

22 now have a drawer about this big filled with them that they

23 could turn in by 4:00 today.  To me, that, again, is

24 something that is not just better, doesn't necessarily help

25 my numbers at all, but I do think that it's an appropriate

1  way to try to wrap up these cases.

2        When you talk about a wind down budget and that sort

3  of thing, that does seem to me to be consistent with an

4  understanding that there needs to be a path forward from the

5  sale other then,  you know, just lighting a match to it.  So

6  I leave that as just an observation.  It's the kind of thing

7  also that may factor into some of the discussions that will

8  be leading up to the sale process.

9        MR. ROSENTHAL:  Thank you, Your Honor.  We

10 appreciate that.  We had actually been discussing that with

11 the Young Conaway folks.

12       THE COURT:  You just got to tell me you're ahead of

13 me, right?

14       MR. ROSENTHAL:  I'm not ahead of you. They had head

15 that this was coming down from the Delaware Courts.  I think

16 that is our sense right now. I don't really see a benefit to

17 a conversion.  I don't really want to go to dismissal.  It

18 seems like a simple plan might be the way to go.  We

19 definitely are taking that under consideration.

20       THE COURT:  Very good.  All right, then I will look

21 for orders under certification and if need be, I will take

22 the other blackline and if need be, I would be available at

23 some point tomorrow if the parties do, in fact, reach an

24 impasse.  We will stand in recess and I appreciate everyone's

25 time.

1        MR. ROSENTHAL:  Thank you, Your Honor.

2        THE COURT:  Thank you.

3   (Court Adjourned)

4

5

6                         CERTIFICATE

7

8  I certify that the foregoing is a correct transcript from the

9  electronic sound recording of the proceedings in the above-

10 entitled matter.

11 /s/Mary Zajaczkowski                    April 13, 2015
   Mary Zajaczkowski, CET**D-531                   Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25