## EXHIBIT A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. __ |

## ORDER (I) AUTHORIZING THE PRIVATE SALE BY THE DEBTORS OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE PURCHASE AGREEMENT; AND (III) GRANTING RELATED RELIEF

Upon consideration of the *Debtors' Motion For Order (i) Authorizing the Private Sale by the Debtors of the Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (ii) Approving the Purchase Agreement, and (III) Granting Related Relief* (the "Motion")[2] of the above captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing the private sale (the "Sale") of certain real property located at 325 Busser Rd., York County, PA 17318 along with certain improvements and fixtures

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Error! No

(collectively, the "Property") on an "as is, where is" basis, free and clear of any and all liens,

claims, encumbrances, and other interests to SB Busser, LLC (or an affiliate thereof) (the

"Purchaser") pursuant to the terms and conditions of the Contract to Purchase and Sell

Commercial Real Estate, dated as of March 4, 2015 (the "Purchase Agreement"), by and

between The Standard Register Company (the "Seller") and the Purchaser, a copy of which is

attached hereto as Exhibit 1, (ii) authorizing and approving the terms of the Purchase Agreement

and (iii) granting certain related relief; and a hearing (the "Hearing") on the Motion and the Sale

contemplated therein having been held before the Court on May 12, 2015; and it appearing from

the affidavit of service filed with the Court and from the record that due and sufficient notice of

the Motion, the Hearing, and the relief sought in connection therewith having been provided to

all parties in interest; and it further appearing that no other or further notice hereof is required;

and this Court having reviewed and considered the Motion and any objections thereto; and this

Court having heard statements of counsel and the evidence presented at the Hearing in support of

the relief requested in the Motion; and it appearing that the relief requested in the Motion is in

the best interest of the Debtors' estates, their creditors, and other parties in interest; and it further

appearing that the legal and factual bases set forth in the Motion and at the Hearing establish just

cause for the relief granted herein; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is hereby GRANTED as set forth herein.

2.      The Purchase Agreement and the transactions contemplated thereby, including

payment of the brokerage fee, shall be, and hereby are, approved; provided, however, the

indemnification provision of Section 11 of the Purchase Agreement is void and shall have no

force or effect as against any of the Debtors.

Error! No

3.      Subject to paragraph 4 below, the Debtors shall be, and hereby are, authorized to sell the Property to the Purchaser upon the terms and conditions set forth in the Purchase Agreement free and clear of any liens, claims, or encumbrances on the Property; provided, that any liens, claims or encumbrances on the Property shall attach to the proceeds of the Sale with the same priority, validity, force and effect as they attached to the Property immediately before the closing date of the sale (the "Closing Date").

4.      The net proceeds from the sale of the Property will be utilized by the Debtors in accordance with the terms of the order authorizing postpetition financing [Docket No. 290] (the "DIP Financing Order") or any post-petition financing order in effect at the time such Sale closes, and the applicable DIP Financing Documents.[3]  Specifically, on the Closing Date, the net sale proceeds shall be used to make a prepayment of Term DIP Obligations.  To the extent that the amount of net sale proceeds exceeds the amount of Term DIP Obligations outstanding as of the Closing Date, then such excess shall be paid on the Closing Date to the First Lien Term Agent on behalf of the First Lien Term Lenders and shall be applied in accordance with Section 3.1 of the Pre-Petition First Lien Term Loan Agreement; provided, however, that such payment, if any, received by the First Lien Term Lenders shall be subject to any remedy that may be available against them in the event of a timely and successful challenge pursuant to paragraph 28 of the DIP Financing Order.

5.      Pursuant to 11 U.S.C. § 363(m), the Purchaser shall be, and hereby is, deemed to have purchased the Property in "good faith."

6.      Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Order shall not be stayed for 14 days after the entry hereof,

---

[3]   Certain capitalized terms used but not defined paragraph 4 hereof shall have the meanings ascribed to such terms in the DIP Financing Order.

Error! No

but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in such rules is hereby expressly waived and shall not apply.

7.      Any and all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

8.      The terms and provisions of this Order shall be binding in all respects upon the Debtors, their estates, all creditors, officers, directors, advisors, members, managers, and all holders of equity in the Debtors, all holders of any claim(s) (whether known or unknown) against the Debtors, any holders of liens, claims, encumbrances, or interest against or on all or any portion of the Property, the Purchaser, and all successors and assigns of the Purchaser, and any trustees, if any, subsequently appointed in the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Chapter 11 Cases.

9.      This Court shall retain jurisdiction over the parties for the purpose of enforcing the terms and provisions of this Order.

Dated: May ___, 2015
       Wilmington, Delaware

_____
Brendan L. Shannon
Chief United States Bankruptcy Judge

**Error! No**

## **EXHIBIT 1**

Purchase Agreement

## CONTRACT TO PURCHASE AND SELL
## COMMERCIAL REAL ESTATE

This CONTRACT TO PURCHASE AND SELL COMMERCIAL REAL ESTATE (the "**Contract**") is made as of the date of the last signature on this Contract (the "**Effective Date**"), by and between THE STANDARD REGISTER COMPANY, an Ohio corporation (the "**Seller**"), and SB BUSSER, LLC, a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania (the "**Purchaser**").

1.      Legal Description and Address of Property.  Purchaser agrees to buy and Seller agrees to sell the following, which constitutes all of the acreage Seller owns at this address in York County, Pennsylvania (collectively, the "**Property**"):

(a)      Real Estate.   Approximately 5.045 acres (including a building containing approximately 67,193 square feet) (the "**Building**") located at 325 Busser Rd., York County, PA 17318, as shown on the attached **Exhibit A**.

(b)      Appurtenances.  All of Seller's interest in and to all streets, alleys and other public or private ways adjacent to the real estate described in subsection (a) above, and appurtenant easements, right-of way and privileges belonging to and inuring to the benefit of the Parcels; and

(c)      Improvements and Fixtures.  All improvements, fixtures and equipment located on the real estate described in subsection (a) above except for the equipment listed on **Exhibit B**, which will remain the property of Seller and which will be removed from the Property by the Seller prior to the Closing Date (as hereinafter defined).

Purchaser acknowledges that the acreage and square feet figures listed in this Contract are approximates only, and Purchaser agrees to accept the Property and the improvements as they are presently configured.

2.      Purchase Price and Earnest Money.  The Purchase Price for the Property shall be Two Million Two Hundred Thousand Dollars ($2,200,000.00), which shall be paid as follows:

(a)      Earnest Money Deposit.  Within three business days after the Effective Date, Purchaser shall deposit Fifty Thousand Dollars ($50,000.00) (the "**Earnest Money**") with Mercantile Title Agency, Inc., an Ohio corporation (the "**Title Company**") whose address is: 255 E. Fifth Street, Ste. 1900, Cincinnati, OH 45202. The Title Company shall hold the Earnest Money in escrow in an interest bearing account at a financial institution approved by Purchaser and Seller.  The account shall be opened under Purchaser's taxpayer identification number and all interest which accrues on the Earnest Money shall be added to and become a part of the Earnest Money.  If Purchaser terminates this Contract as provided in Section 4, then the Earnest Money shall be refunded to Purchaser.  After the expiration of the Due Diligence Period, the Earnest Money shall be non-refundable, and it shall be applied only as provided in this Section or in Section 12.

(b)    Terms of Escrow.  Purchaser and Seller agree to sign all forms which the Title Company reasonably requires in connection with the Earnest Money and other escrow deposits, including Internal Revenue Service and bank account forms and reports.

(c)    Balance.  On the Closing Date (defined in Section 5, below), the Title Company shall deliver the Earnest Money Deposit and any accrued interest to Seller, and Purchaser shall pay the balance of the Purchase Price at the Closing by wire transfer of immediately available funds.

3.    Purchaser's Conditions to Closing.  The "**Due Diligence Period**" shall begin on the Effective Date and expire on the sixtieth (60th) day after the Effective Date (the "**Due Diligence Deadline**"), during which time Purchaser may perform any investigation reasonably necessary to permit Purchaser to evaluate the physical condition and legal aspects of the Property ("**Due Diligence**").  The Due Diligence may include, but shall not be limited to, the performance of environmental studies, verification of the permissibility of Purchaser's intended use under applicable zoning regulations, verification of the availability of adequately utilities, and preliminary engineering and space planning to confirm the feasibility of the Property for Purchaser's intended use.

(a)    Due Diligence.  Purchaser shall obtain the Due Diligence information at its sole cost and expense and promptly deliver copies of all such information to Seller including, but not limited to, the Phase I ESA report and title abstract for the Property if Purchaser obtains such reports.  At any time prior to the Due Diligence Deadline, Purchaser shall have the right to deliver written notice to Seller objecting to the physical condition, condition of title and/or legal aspects of the Property and specifically describing the reason for each such objection, as more fully discussed in Section 4.

(c)    Access to the Property.  In order to conduct the Due Diligence, Purchaser shall have access to the Property after reasonable advance notice to Seller, subject to the following qualifications:

(i)    All entry to the Property must be scheduled in advance through David Clapper, Director, Facilities Management and Security, The Standard Register Company, at (937) 221-3300.  No destructive testing, borings or intrusive sampling shall be conducted, without Seller's express prior approval; and Seller shall have the right to have a representative present at the time of each inspection.

(ii)    All entries, analysis, inspections and testing shall be at Purchaser's sole risk and expense.

(iii)    Purchaser shall restore the Property to its condition immediately before Purchaser's entry and Purchaser shall indemnify and hold Seller harmless from any lien, claim, suit or action for non-payment, personal injury or property damage caused by or occurring to Purchaser or its agents or representatives and/or invitees at the Property.  The obligations in this subparagraph (c) shall survive the termination of this Agreement.

4.      Confirmation / Objection Notices. If Purchaser is satisfied with the results of its Due Diligence, it will deliver written notice to Seller (a "**Confirmation Notice**"), confirming that all Due Diligence conditions have been satisfied or waived. If Purchaser is not satisfied with the results of its Due Diligence for any reason in Purchaser's absolute and sole discretion, Purchaser shall deliver written notice to Seller either (i) describing the Due Diligence conditions that have not been satisfied or waived (an "**Objection Notice**") or (ii) terminating this Contract (a "**Termination Notice**"). If Purchaser does not deliver a Confirmation Notice, Objection Notice, or a Termination Notice to Seller by 5:00 p.m. Eastern Standard Time on the Due Diligence Deadline, then the Purchaser's Due Diligence conditions shall be conclusively presumed to have been satisfied or waived and Purchaser shall be deemed to have delivered a Confirmation Notice. If Purchaser delivers an Objection Notice within the Due Diligence Period, Seller shall have no obligation to cure any matter described in the Objection Notice, except to remove mortgages, judgment liens or similar encumbrances which can be removed by the payment of a definite sum not to exceed eighty percent (80%) of the Purchase Price in the aggregate. However, Seller shall have up to ten (10) business days after its receipt of an Objection Notice ("**Seller's Election Period**") to deliver written notice to Purchaser (the "**Notice of Intent**") that Seller will attempt to cure any matter described in an Objection Notice. If Seller does not deliver this Notice of Intent within Seller's Election Period, or if Seller delivers the Notice of Intent but subsequently notifies Purchaser that it cannot complete the cure, or if Seller does not complete the cure within sixty (60) days after the delivery of the Objection Notice, then Purchaser shall have until 5:00 p.m. Eastern Standard Time on the fifth (5th) business day after any of these events to deliver to Seller either a Confirmation Notice or a Termination Notice. Unless Purchaser's Confirmation Notice is delivered within such five (5) business day time period, this Contract shall immediately and automatically terminate; in which case the Title Company shall promptly refund the Earnest Money (including all accrued interest) to Purchaser. Purchaser shall return the originals or copies of all materials compiled as a part of the Due Diligence to Seller and both parties shall be relieved from any further liability under this Contract, except the obligations that expressly survive this Contract.

5.      Closing.      Promptly after Purchaser's (actual or deemed) delivery of a Confirmation Notice, the parties will close the purchase of the Property (the "**Closing**") at a mutually agreed time (the "**Closing Date**"), but in no case later than thirty (30) days following the expiration of the Due Diligence Period, unless the Closing Date is extended under the provisions described in Section 4. The parties shall conduct the Closing through escrow, by delivering all funds and documents to the Title Company (the "**Closing Agent**").

(a)      Seller's Closing Obligations. At the Closing, Seller shall deliver the following items to the Closing Agent:

(i)      A transferable and recordable Special Warranty Deed conveying marketable title in fee simple to Purchaser, subject to the following (the "**Permitted Exceptions**"): (A) general and special taxes and assessments not yet due, payable or delinquent; (B) building and zoning laws, ordinances, and state and federal regulations; (C) matters created by or resulting from the acts or omissions of Purchaser; (D) any easements, conditions, restrictions of record or other encumbrances approved in

3

writing by Purchaser during the course of its Due Diligence; and (E) any other easements, conditions, restrictions of record or other encumbrances not objected to by Purchaser in an Objection Notice;

(ii)   A copy of Seller's corporate resolutions, duly certified by the Secretary of the Seller, authorizing the execution, delivery and performance of this Contract;

(iii)   Original Certificates of Good Standing for Seller issued by the Secretaries of State of Ohio and the Commonwealth of Pennsylvania;

(iv)   An affidavit to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445, including Seller's tax identification number;

(v)   A Settlement Statement in the form described in subparagraph (c) of this Section 5;

(vi)   Completed real estate transfer tax declarations, as required to complete the transfer of the Property; and

(vii)   Any other items reasonably required by the Closing Agent to complete the transaction described in this Contract.

(b)   Purchaser's Closing Obligations.   The Purchaser shall deliver the following items to the Closing Agent:

(i)   A copy of Purchaser's authorizing resolutions or consent, duly certified by the Secretary of the Purchaser, authorizing the execution, delivery and performance of this Contract;

(ii)   An original Certificate of Good Standing for Purchaser issued by the Secretary of the State of Purchaser's formation;

(iii)   A Settlement Statement in the form described in subparagraph (c) of this Section 5;

(iv)   The entire amount of the Purchase Price, increased or decreased by the Earnest Money and the net adjustments from or due Purchaser, as shown on the Settlement Statement; and

(v)   Any additional documents reasonably required by Seller or the Closing Agent in order to complete the transaction described in this Contract.

(c)   Prorations and Adjustments.   The parties intend that the Purchase Price will be net to Seller, except for proration of the real estate taxes.  Accordingly, the Closing Agent shall prepare a "Settlement Statement" showing the following charges, prorations and adjustments: (i) real estate taxes and any other amounts levied by reason

of events occurring prior to the Closing (collectively, the "**Taxes**"), which shall be prorated as of the date of Closing (in the manner described in the following paragraph); (ii) any title search fees, title insurance premiums, recording fees and associated costs, all of which shall be charged to Purchaser; (iii) all other expenses of Purchaser's inspections, including any survey, engineering fees, insurance premiums and other costs, which shall be charged to Purchaser; (iv) the Closing Agent's escrow closing fee, which shall be charged to Purchaser; (v) the real estate commission, which shall be charged to Seller; (vi) the transfer tax applicable to the transfer of title to the Property including, but not limited to, all state, county and local municipality taxes, which shall be split equally between Purchaser and Seller; and (vii) any other amounts agreed on by the parties.

(d)     Method of Tax Proration. The Taxes shall be prorated on the basis of all Taxes which are a lien (but not delinquent) as of the Closing Date and the assessments shall be prorated on the basis of all special Taxes or assessments for improvements completed as of the Closing Date, which are due and payable as of the Closing Date. The proration shall be based upon the most recently available tax rates, assessments and valuations.   Purchaser understands and agrees that the Property may be reassessed effective upon the change of ownership, and Purchaser understands that Purchaser will be responsible for all taxes based upon that reassessment, as well as any other taxes accruing after the Closing Date.

6.     Possession.     At Closing, Seller will transfer possession of the Property to Purchaser in "AS IS, WHERE IS" CONDITION WITH ALL FAULTS, (WHETHER LATENT, PATENT OR DETECTABLE) AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, RELATING TO THE CONDITION OF THE PROPERTY OR OTHERWISE. Purchaser understands and agrees that Seller has not committed to remove any personal property from the Property and therefore the Property may not be broom clean and may contain certain abandoned items of personal property.

7.     Seller's Limited Warranties. Seller makes the following limited representations and warranties to Purchaser and it is a Condition of Closing that these representations and warranties will also be true and correct as of the Closing Date:

(a)     Organization and Authority. Seller has the power and authority to execute this Contract and to sell and convey the Property. The corporate officer executing this Contract on Seller's behalf warrants that he or she is duly authorized to sign and deliver this Agreement on Seller's behalf and that this Contract creates a binding obligation of Seller, which is fully enforceable in accordance with its terms.

(b)     No Notices. To Seller's knowledge, within the twelve (12) month period preceding the Effective Date, Seller has not received any written notices of: (i) any pending or contemplated change in the zoning classification of the Property; (ii)  any government agency or court order requiring the repair, alteration or correction of any existing condition concerning the Property; or (iii) any planned or commenced public improvements that may result in special assessments or otherwise have a material adverse effect on the Property.

5

(c)     Litigation.  To Seller's knowledge, there are no actions, suits or other proceedings pending or threatened which affect the Property or which, if adversely determined, would materially adversely impact Seller's ability to carry out its obligations under this Contract.

(d)     Limitations and Caveat.  Seller will convey the Property at Closing in "AS IS, WHERE IS" condition at Closing, with all faults and without recourse to the Seller. Seller makes no covenant, representation or warranty, whether express or implied, which is not expressly set out in this Section 7, and the Seller specifically disclaims any and all representations and warranties with respect to the Property including but not limited to matters pertaining to: (i) the physical condition of the Property; or (ii) the suitability of the Property for any use; or (iii)  the existence or adequacy of permits and approvals with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements; or (iv) access to rail or other transportation; or (v) environmental conditions, such as the presence or absence of hazardous substances on the Property.  Extensive provisions of local, state and federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of hazardous substances.  Because the evaluation of environmental requirements is highly technical, Seller recommends that Purchaser obtain an ASTM compliant Phase I Environmental Site Analysis concerning the Property and relevant adjoining properties. This Contract is not intended to and does not obligate Seller to repair or cure any defect(s).

(e)     Seller's Knowledge.  All references to the "knowledge" of the Seller refer only to the actual knowledge of David Clapper, Director of Facilities Management and Security, and shall not be construed, by imputation or otherwise, to refer to the knowledge of any other employee or agent of the Seller or to impose upon the Seller any duty to investigate any matter known or not known to Mr. Clapper.

8.     Purchaser's Limited Warranties.  Purchaser makes the following limited representations and warranties to Seller and covenants that they will remain true and correct through the Closing Date:

(a)     Power and Authority.  Purchaser has full power and authority to execute and deliver this Contract.  The signatory executing this Contract on Purchaser's behalf warrants that he is duly authorized to sign and deliver this Agreement on Purchaser's behalf and that this Contract creates a binding obligation of Purchaser, which is fully enforceable in accordance with its terms.

(b)     Purchaser's Acknowledgment.  Purchaser acknowledges that: (i) it has been afforded the opportunity to conduct investigations and studies of the Property as Purchaser deems necessary and prudent for the purpose of acquiring the Property; (ii) the Property is to be sold and conveyed to, and purchased and accepted by Purchaser, in "AS IS, WHERE-IS" condition, with all faults, without recourse to the Seller; (iii) Purchaser assumes the risk that adverse past, present or future physical characteristics and conditions may not have been revealed by its inspection or investigation; (iv) Purchaser assumes all responsibility for any damages caused by the conditions on the Property upon

transfer of title and waives any claim or cause of action which it otherwise might assert, including without limitation under the common law or federal or state securities, trade regulation, environmental or other laws, by reason of this Contract, the events giving rise to this Contract and the transactions provided for herein or contemplated hereby or thereby, except for claims or causes of action brought under this Contract arising out of the breach by Seller of any of Seller's obligations under this Contract or the breach by Seller of any of the representations or covenants made by Seller in this Contract; and (v) Purchaser is relying solely on its title insurance policy with respect to all matters pertaining to title to the Property.  Neither the Seller nor anyone acting on behalf of the Seller has made any representation or express or implied warranty with respect to the Property.

      (c)     Covenant Not to Sue.  Purchaser, for itself, its successors and assigns and their members, managers, partners, and shareholders, and each of their respective successors and assigns (each, a "**Covenantor**") covenants not to claim, sue for or otherwise directly or indirectly attempt to recover from Seller or any of its affiliates, employees, agents, successors or assigns (each, a "**Releasee**"), any amounts, obligations or liabilities arising from environmental conditions present at the Property or in any improvements situated thereon.  This covenant includes a promise not to claim, sue for or otherwise attempt to recover, damages, liabilities, reasonable attorneys' fees, costs, fines, penalties and expenses of every kind and nature whatsoever, now known or unknown, direct or indirect, which the Covenantors incur or pay in connection with the presence or alleged presence of Hazardous Materials (as defined below) in, on, under, about, originating from or relating to the Property including, without limitation, any such claims under or on account of (i) Environmental Law (as defined below) or (ii) this Contract.  The term "**Hazardous Materials**" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde form insulation and polychlorinated biphenyls.  The term "**Environmental Laws**" means all applicable federal, state, and local environmental, health, chemical use, safety and sanitation laws, statutes, ordinances, codes, rules, regulations, judicial or administrative interpretations, decisions, orders and directives (whether now or in the future enacted, promulgated or issued) relating to the protection of human health, safety or the environment or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials.

      9.     DEP Release of Liability.  In the event that Purchaser's Due Diligence discloses the presence of any Hazardous Materials on the Property, Purchaser may elect to pursue a release of Seller and Purchaser by the Pennsylvania Department of Environmental Protection ("**DEP**") from liability for the identified Hazardous Materials under the Pennsylvania Land Recycling and Environmental Remediation Standards Act, 35 P.S. § 6026.101, et seq. ("**Act 2**").  In such event, Seller shall cooperate in good faith with Purchaser in the negotiation and execution of a release under Act 2.  Notwithstanding anything herein to the contrary: (a) Seller shall not be obligated to incur any cost or expense in accordance with this Section 9; (b) Purchaser shall indemnify and

hold Seller harmless for any liability and other costs or expenses incurred by Seller resulting from Seller's or Purchaser's actions in accordance with this Section 9; (c) Seller not be obligated to perform any remediation or take any other action with regard to any such Hazardous Materials; and (c) the rights and obligations of Purchaser and Seller under this Section 9 shall not act to extend the Due Diligence Period or the Closing Date.

10.     Indemnity.  Purchaser and its successors and assigns indemnify and hold Seller and its successors, assigns, employees and agents harmless from and against all costs, expenses, damages and losses of any kind or nature: (A) arising out of any environmental contamination or condition which first occurs or is first discovered on or after the Closing Date; or (B) required to remediate any environmental conditions on the Property on or after the Closing Date.

11.     Real Estate Brokers.  Cresa Philadelphia/Jones Lang LaSalle represents Seller in this transaction (collectively, the **Broker**").  Seller agrees to pay a commission equal to four percent (4%) of the Purchase Price at Closing to the Broker.  Seller and Purchaser each hold harmless and indemnify the other against any and all claims, losses, costs, damages, liabilities or expenses, including reasonable attorneys' fees, arising out of claims made by any other real estate salesperson, broker, consultant or any other person or entity claiming entitlement to a commission by virtue of having represented the indemnifying party's interests with respect to this Contract or to the listing, marketing and sale of the Property.

12.     Default/Remedies.  If this Contract is breached for any reason prior to the Closing Date, then the parties shall rely exclusively upon the following remedies:

(a)     PURCHASER'S DEFAULT.  THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO PREDICT THE AMOUNT OF THE ACTUAL DAMAGES WHICH SELLER WOULD SUFFER IF PURCHASER BREACHES ANY REPRESENTATION OR WARRANTY OR OTHERWISE FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS CONTRACT.  THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL PURCHASER'S CONDITIONS, PURCHASER BREACHES THIS CONTRACT BY FAILING TO CLOSE WITHIN THE TIME PERIODS REQUIRED IN THIS CONTRACT, OR IN ANY OTHER MANNER, THEN SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE EARNEST MONEY.  UPON SELLER'S RECEIPT OF SUCH PAYMENT, THIS CONTRACT SHALL BE CANCELED AND THE PARTIES RELEASED FROM ALL FURTHER LIABILITY, EXCEPT THE OBLIGATIONS EXPRESSLY STATED TO SURVIVE TERMINATION.

Initials of Purchaser                    Initials of Seller

(b)     SELLER'S DEFAULT.  IF SELLER CONVEYS THE PROPERTY TO A THIRD PARTY IN VIOLATION OF ITS OBLIGATIONS UNDER THIS CONTRACT, PURCHASER SHALL BE ENTITLED TO SEEK TO ENFORCE ANY AND ALL REMEDIES AVAILABLE IN LAW OR IN

EQUITY. THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO PREDICT THE AMOUNT OF THE ACTUAL DAMAGES WHICH PURCHASER WOULD SUFFER IF SELLER BREACHES ANY OTHER REPRESENTATION OR WARRANTY OR OTHERWISE FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS CONTRACT. THEREFORE, IF SELLER BREACHES THIS CONTRACT FOR ANY REASON OTHER THAN THROUGH CONVEYANCE OF THE PROPERTY TO A THIRD PARTY, PURCHASER SHALL BE ENTITLED TO EITHER: (I) TERMINATE THIS CONTRACT, IN WHICH CASE PURCHASER SHALL RECEIVE THE EARNEST MONEY PLUS LIQUIDATED DAMAGES IN THE AMOUNT OF FIFTY THOUSAND DOLLARS ($50,000); OR (II) SEEK TO ENFORCE SPECIFIC PERFORMANCE OF THIS CONTRACT. IF PURCHASER CHOOSES TO ACCEPT THE LIQUIDATED DAMAGES, SELLER AGREES TO PAY THE LIQUIDATED DAMAGES PROMPTLY AFTER DEMAND, AND UPON PAYMENT TO PURCHASER, THIS CONTRACT SHALL BE CANCELED AND THE PARTIES RELEASED FROM ALL FURTHER LIABILITY.

_____          _____
Initials of Purchaser            Initials of Seller

13.    Casualty/Condemnation.  If any part of the Property is destroyed or damaged by fire or other casualty or taken by eminent domain prior to the Closing, Seller shall notify Purchaser within five (5) days and Purchaser shall have a reasonable opportunity to inspect the Property and evaluate the damage.  If Purchaser, in its reasonable discretion, determines that, as a result of the damage or taking, the Property is no longer suitable for Purchaser's intended use, then Purchaser shall have ten (10) business days after its receipt of Seller's notice ("**Purchaser's Election Period**") to deliver written notice to Seller terminating this Agreement, in which case the Earnest Money and all interest accrued thereon shall be promptly returned to Purchaser and all obligations of the parties under this Agreement shall be terminated, except liabilities which are specifically stated to survive termination.  If Purchaser does not terminate this Agreement within Purchaser's Election Period, then the parties shall close the transaction at the Purchase Price and as contemplated in this Agreement (except that the Closing Date may be extended by the number of days between the casualty or notice of taking and the end of Purchaser's Election Period) and at Closing, Purchaser shall receive an assignment of the proceeds of all insurance payable to Seller in connection with the casualty and/or all awards payable in connection with the eminent domain.

14.    Notices.  All notices required under this Contract shall be in writing and shall be deemed to have been duly given if they are either delivered personally, transmitted via telecopy transmission followed by telephone or electronic confirmation of receipt, or mailed by overnight or same-day express mail delivery service, as follows:

To Purchaser:       SB Busser, LLC
                    Attention:  Timothy J. Kinsley
                    6259 Reynolds Mill Road
                    Seven Valleys, PA  17360

To Seller:        The Standard Register Company
600 Albany Street
Dayton, Ohio 45417-3405
Attn: Gerard D. Sowar, Executive Vice President, General
Counsel and Secretary
Phone: (937) 221-1940
Fax: (937) 221-3431

At all times with a copy to:

Dinsmore & Shohl LLP
Fifth Third Center
One S. Main Street, Suite 1300
Dayton, Ohio 45402
Attn: Merideth Ann Trott
Phone: (937) 449-6420
Fax: (937) 449-6405

15.    Post Closing Obligations. Purchaser's acceptance of the Deed shall extinguish this Contract by operation of merger and therefore, except in the situations where Seller's obligations are expressly stated to survive the Closing, Seller shall have no obligation to Purchaser from and after the Closing Date.

16.    Assignment of Contract. Neither party has the right to assign its interest in this Contract without the prior written consent of the other, except that Purchaser may assign its rights under this Contract to an entity which is owned or controlled by Purchaser.

17.    Confidentiality Agreement. Purchaser acknowledges that Seller regards any information which Purchaser receives or compiles with respect to the Property as confidential information and Seller has advised Purchaser that the disclosure of this information to anyone other than authorized personnel and related parties could lead to substantial injury and expense. Purchaser agrees to use reasonable efforts to protect the confidentiality of all the confidential information. Purchaser and Seller shall execute a confidentiality agreement in the form attached hereto as **Exhibit C** contemporaneously with the execution of this Contract.

18.    General Provisions. An unsigned copy of this instrument does not constitute an offer by either party. On the Effective Date this Contract shall: (a) include and incorporate all Exhibits attached to this agreement; (b) constitute the entire agreement between the parties and supersede any other oral or written representations, conditions or agreements relating to this transaction, including any letters of intent; (c) not be modified except by the written agreement of the parties; (d) be binding upon and inure to the benefit of each of the parties and their respective legal representatives and permitted successors and assigns; and (e) not be construed to confer any rights, benefits or obligations on any person or entity not a party to this Contract. Time is of the essence in all provisions of this Contract; and if any date specified in this Contract falls upon a Saturday, Sunday or legal holiday observed by the Closing Agent, then the date shall be construed to have been extended until the following business day. Except as otherwise

provided in this Contract, each party shall pay its own fees and expenses in connection with this transaction.

19.    Governing Law. This Contract shall be governed by, construed and enforced in accordance with the laws of the State of Ohio.

20.    Counterparts/Email Transmission. This Contract and the signatures on this Contract may be transmitted by PDF format via email. PDF format copies of signatures shall be deemed to constitute original signatures and PDF format copies of this Contract (or counterparts of this Contract containing the signatures of each the parties) shall be deemed to constitute a single, enforceable agreement.

21.    Index to Exhibits. This Contract includes the Exhibits listed below:

Exhibit A    Property
Exhibit B    Equipment to be Retained by Seller
Exhibit C    Form of Confidentiality Agreement

*See next pages for signatures*

SELLER'S SIGNATURE PAGE

**Seller:**

THE STANDARD REGISTER COMPANY,
an Ohio corporation

By:
Name: Joseph P. Morgan, Jr.
Title: President + CEO
Date: 3/4/15

## PURCHASER'S SIGNATURE PAGE

**Purchaser:**

SB BUSSER, LLC,
a Pennsylvania limited liability company

By:
Name: ROBERT A. KINSLEY
Title: MANAGING PARTNER
Date: 3/2/2015

Exhibit A

Property

## Exhibit B

### List of Equipment to be Retained by Seller

## 1. Items That Transfer With The Sale Of The Building

| | | |
|---|---|---|
| ZEKS Non-cycling air dryer | 186916-M202 | Asset 06610 |
| Sullair Air compressor | LS-20 24KT | Asset 06609 |
| Siemens Switch Gear Power Service | N/A | |
| Atlas/Copco Air Compressor | GA-90 | Asset 06004 |
| Mee Fog Humidification System | Ser# 970104 | |
| ONAN Nat. Gas Emergency generator | Mod 705JB-1RV31-1L | |
| Reverse Osmosis System | | Asset 06099 |
| LED Italia Distillation/Evaporation Unit | | Asset 06613 |
| York Gas Furnace Various ceiling mount heat units A/C units | | |

### Additional Items that stay with the building

Racking Systems
SDS Safety Stations (Various)
Emergency Spill Response Drums/Kits
Ladders
Trash Compactor w/o Roll-off Dumpster
Hand truck/Barrel lift truck/Wire Cart
Warehouse Racking
Office Furniture - desks, file cabinets, chairs, racks
Various supplies of Fluorescent Bulbs
Bailer
TV equipment
Lockers in Locker Room
Small floor polisher and supplies
Security system
Zone Camera security system
Refrigerators, microwaves

## 2. Items to be retained by Seller

| | | |
|---|---|---|
| Press 6 color 22" 90 Didde UV w/parts and pieces | | |
| Press 57 6 color 17" Hamilton w/parts and pieces | | |
| Press 531 3 color 2" Schreiber 1000 UV parts and pieces | | |
| Press 532 4 color 2" Schreiber 1200 parts and pieces | | |
| Press 88 4 color 28" UV Hamilton | | |
| Press 93 6 color 14"/17"/22" UV Ashton w/parts and pieces | | |
| Collator 603 8 station Hamilton Continuous w/parts and pieces | | |
| Collator 49 6 station Hamilton Unit Set w/parts and pieces P[o]ywrapped shrink tunnel and conveyor | | |
| Various pieces of equipment in process of transit to final disposition point | | |
| 2 Printer Digital LG31 | Ser# GC03205743 | |
| NITA Plate transport section transferred to York | | |
| Burgess plate punch transferred to York | | |
| Specialty cabinets w/various contents to York | | |
| Select office equipment segregated not to go w/building | | |
| Wrapped pallets of supplies to move to York or continued operation (Various as marked) | | |
| Inks wrapped on pallets for transfer and use in York | | |
| Workstations for presses tranferred to York | | |
| Pallet handling equipment transferred to York | | |
| Quality specialty tools to be transferred to other plants in the company | | |
| Carbon doctor machine | | |
| Cintas Medical cabinets wall mounted | | |
| Stanford Doctor Machine transferred to York | | Asset06608 |
| Kelva Web cleaner K-50 | Ser# 956305 | |
| Cartridges for Sandens transferred to York | | |
| Oil, Chemical drums for York | | |
| Lantech pallet wrapper to York | | |
| Palletized printing supplies to York | | |
| 4 Various lift jacks (manual) | | |

| Description | Make | Model | Serial # | Asset # |
|---|---|---|---|---|
| 0-5000x 1 Lb. floor scale | Toledo | Model 8140 | 4369292-4PW | N/A |
| Forklift | Caterpillar #1 | T30D | 5GB6002 | N/A |
| Forklift | Caterpillar #2 | T30D | 5GB6009 | N/A |
| Forklift | Caterpillar #3 | GC25K | AT82C-05294 | N/A |
| Forklift | Hyster 50 | S50XL | C187V7787R | Asset 00724 |
| AED portable unit | Medtronic | Lifepak CR+ | 34094225 | |
| Multi head Stitchers | Bostitch | 18 | 181721 | 6658 |
| Multi head Stitchers | Bostitch | Bronco 18AW374 | 3609 | |
| Carton Strapper | Signode | SureTyer | B1211 | 6532 |
| Carton Strappers SuperTyer | Signode | LB 2330 | PT2085 | 6531 |
| 4 expandable portable conveyor sections | Nestaflex | 2 Model  2/N/A | N/A | |
| 1 expandable portable conveyor sections | Bestflex | N/A | N/A | |
| 1 expandable portable conveyor sections | N/A | N/A | N/A | 176 |
| 6 station continuous feed hot glue padder | Brackett | CP | 10 | 6663 |
| carton sealer w/tape | Little David | N/A | 180264LDR2P2 | N/A |
| single head stitcher | Interlake | S3A314 | 4905 | 6659 |
| multi head paper drill | Nygren Daly | N/A | 714 | 6664 |
| polywrapper, transit section | Hannagata | HP10 | 101647 | 93 |
| Shrink Tunnel, | Shanklin | T7XL | T-86170 | |
| Carton Sealer | Interpack | RSA2024-4 | 6124 | 6667 |
| Carton labeler | Autolabe | 110LH | 50450 | |
| Carton labeler | Autolabe | 110LH | 990045 | 6534 |
| Cutter  parts extra blades | Polar Mohr #1 | 76EM | 6061330 | 6662 |
| Cutter  parts extra blades | Polar Mohr #2 | 76EM | 5661023 | 6661 |
| Coverstock  scorer | Rollem | N/A | E786/388 | N/A |
| Ink Jet Printer for cartons in-line | Marsh | Unicorn | 21493-UP-3617-021 | N/A |
| Ink Jet Printer for cartons in-line | Videojet | 2330 | 080030062WD | N/A |
| Large Floor Scrubber/Charger and parts | Tennant | 5700XP | 5700-7289 | N/A |
| Motorized chain hoist | Demag | 3/4 Ton | 94201790 | S-1572 |
| AccuSet 1500+ SR S-1565 | AGFA | | Printer? | S-1565 |
| Plate Bender | Parker | | | 6570 |
| Plate bender | N/A | | | 6589 |

<u>Exhibit C</u>

**Form of Confidentiality Agreement**

<u>**CONFIDENTIALITY AGREEMENT**</u>

You have requested that we deliver certain information and materials to assist SB Busser, LLC, a Pennsylvania limited liability company ("**Purchaser**") to evaluate the prospective purchase of approximately 5.045 acres (including a building containing approximately 67,193 square feet) located at 325 Busser Rd., York County, PA 17318 (the "**Property**") from The Standard Register Company, an Ohio corporation (the "**Corporation**") (the proposed purchase of the Property is referred to below as the "**Transaction**"). As you know, we believe that the inspections and reports the Purchaser may obtain and review involve information that is highly confidential to the Corporation. Therefore, the Corporation will permit the Purchaser to perform such inspection and obtain such information only on the condition that the Purchaser signs and returns this letter agreement (the "**Confidentiality Agreement**") confirming its obligation to receive and hold the "**Protected Information**" in strictest confidence, subject to the following terms and conditions:

1.      <u>Protected Information</u>.  This Confidentiality Agreement applies to and covers the Protected Information.  For the purposes of this Confidentiality Agreement, the term "Protected Information" means all of the following:

(a)      All of the information which Purchaser obtains in connection with this evaluation of the Transaction, either from the Corporation or otherwise, whether the information is in oral, written, or other form and whether Purchaser obtains it now or in the future, including but not limited to the existence of this Confidentiality Agreement, the identity of the Corporation, the working relationship between the Corporation and Purchaser, Purchaser's possible acquisition of the Property, any potential development and use of the Property, including financial projections, plans, specifications, studies, findings, conclusions and strategies, and all other ideas and information of any kind or nature; any information pertaining to the Property or the condition thereof, and all documentation developed between the parties, including but not limited to letters of intent, contracts and other agreements.

(b)      Any information and written materials, or other documents which Purchaser prepares on the basis of, or incorporating, the Protected Information, including but not limited to reports, memoranda and transmittal letters.

(c)      The fact that the Protected Information has been furnished to Purchaser and the fact that discussions and/or negotiations are taking place concerning the proposed Transaction, including but not limited to any specific or general terms of the proposed Transaction.

The term "Protected Information" does not include information which becomes generally available to the public through any means other than Purchaser's breach of this Confidentiality Agreement.

2.      No Other Use.  Purchaser will not use the Protected Information for Purchaser's own commercial benefit or for any purpose other than the limited purpose of completing the evaluation of the proposed Transaction.  Purchaser shall have no right, title or interest in any item of Protected Information at any time.

3.      Standard of Care.  Purchaser will take all precautions necessary to hold the Protected Information in strictest confidence.  This means that Purchaser will employ similar procedures and use at least the same effort to maintain the confidentiality of the Protected Information as Purchaser uses to protect highly confidential classified information and trade secrets which Purchaser holds in connection with its own business.  Purchaser shall only disclose or reveal Protected Information to Representatives of Purchaser (defined in paragraph 5) who must have access to the Protected Information in order to accomplish the purpose of evaluating the Transaction.  All Protected Information placed in tangible form shall be promptly marked with a legend prominently referring to its confidential nature and the fact that it is owned by the Corporation.

4.      No Disclosure to Third Parties.  Purchaser will not directly or indirectly disclose any Protected Information to any third party (other than official Representatives of Purchaser, as provided in the following paragraph) without our prior formal written consent to each specific disclosure.

5.      Persons Bound.  In order to maintain the secrecy of the Protected Information, Purchaser agrees and confirms that the obligations set out in this Confidentiality Agreement shall also bind all directors, officers, partners and employees of Purchaser and all investment bankers, agents, brokers, legal and financial advisors, affiliates, consultants and any other person or entity associated with Purchaser in connection with its evaluation of the Transaction (collectively, Purchaser's "Representatives") and that each of the Representatives will be required to consent in writing to the terms of this Confidentiality Agreement before they receive the Protected Information.

6.      NO WARRANTIES.  THE PROTECTED INFORMATION IS FURNISHED TO PURCHASER WITHOUT ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY REGARDING ANY MATTER DISCLOSED IN THE PROTECTED INFORMATION, INCLUDING ANY REPRESENTATION OR WARRANTY THAT THE MATERIALS SUPPLIED TO PURCHASER ARE CORRECT AND COMPLETE.  THE CORPORATION WILL NOT BE BOUND BY ANY REPRESENTATIONS OR WARRANTIES OTHER THAN THOSE (IF ANY) WHICH MAY BE INCORPORATED IN A FINAL SALE AGREEMENT EXECUTED BY ALL PARTIES TO THE TRANSACTION.

7.      Indemnity.  Purchaser indemnifies and holds the Corporation harmless from and against all claims, losses, liabilities, costs and expenses of any kind or nature (including reasonable attorneys' fees) arising out of or in any way relating to the breach of other failure to perform Purchaser's obligations under this Confidentiality Agreement.

8.   Return of Materials.   If the Corporation discontinues the discussions and negotiations regarding the Transaction, Purchaser will promptly return all tangible items of the Protected Information to the Corporation, including any and all copies or reproductions of the Protected Information (which includes all notes and other documents Purchaser and its Representatives may have prepared concerning the Protected Information and the evaluation of the Transaction).

9.   No Ongoing Obligation.   This Confidentiality Agreement does not create any ongoing obligation on the part of either the Corporation or Purchaser to continue discussion of the proposed Transaction and/or the negotiation of a final sale contract.   Furthermore, the Corporation does not undertake or accept any obligation to turn over any Protected Information to Purchaser.

11.   Remedies.   Purchaser specifically acknowledges that the Protected Information is confidential, unique and valuable to the Corporation, and that disclosure of the Protected Information or any other breach of this Confidentiality Agreement will likely cause substantial, continuing and irreparable harm to the Corporation, which will not be compensable in damages. Accordingly, Purchaser agrees that, in addition to all other legal remedies available to the Corporation, the Corporation will have the right to seek injunctions or any equitable remedies which they deem necessary to restrain the violation or threatened violation of this Confidentiality Agreement.   If the Corporation institutes any such equitable action, Purchaser agrees and consents to waive the claim or defense that the Corporation has an adequate remedy at law and Purchaser further agrees that the Corporation shall be entitled to specific performance and both temporary and permanent injunctive relief, without posting a bond.   The award of injunctive relief shall not preclude an award for damages or other relief.   In particular, the Corporation shall be entitled to recover all reasonable expenses (including attorneys' fees and costs) which they incur in seeking to enforce this Confidentiality Agreement or in seeking damages for breach of this Confidentiality Agreement.   Purchaser consents to, and by acceptance of this Confidentiality Agreement submits to, the personal jurisdiction of the Court of Common Pleas of Montgomery County, Ohio, and the United States District Court sitting in Dayton, Ohio, for the purposes of any judicial proceedings which are instituted for the enforcement of this Confidentiality Agreement.   Purchaser further agrees that venue is proper in either of these courts.

12.   General Provisions.   This Confidentiality Agreement shall remain in effect until the earlier of the closing of the Transaction or three (3) years after the date that all Protected Information is returned to the Corporation.   This Confidentiality Agreement shall: (a) constitute the entire agreement between the parties and supersede any other oral or written representations, conditions or agreements relating to this transaction; (b) not be modified except by the written agreement of the parties; (c) not be assigned without the prior written consent of all parties; (d) be binding upon and inure to the benefit of each of the parties and their respective legal representatives and permitted successors and assigns; and (e) be governed by, construed and enforced in accordance with the laws of the State of Ohio.

Please execute this letter in the space provided below to indicate that Purchaser accepts the terms and conditions of this Confidentiality Agreement.

Sincerely,

THE STANDARD REGISTER COMPANY,
an Ohio corporation

By: _____
Name: Gerard D. Sowar
Title:  Executive Vice President, General Counsel
        & Secretary

## ACCEPTANCE

Purchaser acknowledges the obligation to maintain the secrecy of the Protected Information and agrees to abide and be bound by the provisions of the preceding Confidentiality Agreement.

SB BUSSER, LLC,
a Pennsylvania limited liability company

By: _____
Name: _____
Title: _____
Date: _____