# EXHIBIT B



EXHIBIT

B

# CARESOURCE
## DELEGATED SERVICES AGREEMENT

BY AND BETWEEN
CARESOURCE
AND

# THE STANDARD REGISTER COMPANY

# CARESOURCE
## DELEGATED SERVICES AGREEMENT

This Delegated Services Agreement (the **"Agreement"**) by and between **CARESOURCE**, an **OHIO** not-for-profit corporation with its principal office located at **230 North Main Street, Dayton, OH 45402** (**"CARESOURCE"**), and The Standard Register Company with its principal office located at 600 Albany Street, Dayton, Ohio 45417 (**"CONTRACTOR"**) is effective as of **the last date of execution by either CARESOURCE or CONTRACTOR** (the **"Effective Date"**).

> **WHEREAS,** CARESOURCE contracts directly or indirectly with others to provide, arrange for or administer the provision of certain care management and/or health care services to its members; and

> **WHEREAS,** CARESOURCE wishes to engage CONTRACTOR to provide the services set forth herein under the terms and conditions set forth herein; and

> **WHEREAS,** CARESOURCE and CONTRACTOR desire to memorialize their agreement and understanding with respect to CARESOURCE's engagement of CONTRACTOR as an independent contractor;

> **NOW, THEREFORE,** in consideration of the mutual covenants and conditions hereinafter set forth and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows, as the terms apply to the Services being provided by the CONTRACTOR:

## DEFINITIONS

As used in this Agreement and in the Exhibits and Attachments and Addenda hereto, the following terms shall have the meanings set forth below.

a.  <u>CMS</u>. The Centers for Medicare and Medicaid Services.

b.  <u>Covered Persons</u>.  Any individual, or eligible dependent of such individual, whether referred to as "Insured," "Subscriber," "Member," "Participant," "Enrollee," "Dependent" or otherwise who is enrolled in one of CARESOURCE's benefit products and who is eligible to receive Services.

c.  <u>Quality Improvement</u>.  The processes established and operated by CARESOURCE or its designee relating to the quality of Services.

# ARTICLE 1
## AGREEMENT TERMS

**1.1**    <u>Scope of Services and Pricing</u>. Subject to the terms and conditions contained herein, CONTRACTOR shall provide the services set forth in the Exhibit A, (the "Services") and in any subsequent Statements of Work ("SOW") to CARESOURCE, in a manner consistent with industry standards, for the costs set forth in Exhibit A-1 and/or the applicable SOW. CONTRACTOR shall comply with the Performance Standards and all other obligations set forth in Exhibit B. The Service Level Warranties and Penalties contained in Exhibit F shall apply to CONTRACTOR's provision of Services under this Agreement. If any provision or term of Exhibit A and/or any SOW is inconsistent with any provision or term of this Agreement, this Agreement shall govern. All references in this Agreement to a SOW shall also include Exhibit A, as Exhibit A shall be deemed to be the first SOW hereunder.

**1.2**    <u>Payment Terms</u>. CARESOURCE shall pay CONTRACTOR for the Services in accordance with the pricing set forth on Exhibit A-1 to this Agreement. Payment will be made within thirty (30) days of the CARESOURCE Accounts Payable Department's receipt of an invoice. CONTRACTOR shall remit monthly invoices to CARESOURCE for Services rendered in accordance with the pricing set forth on **Exhibit A-1** or a SOW. Invoices shall be submitted via U.S. mail at CareSource, Accounts Payable, P.O. Box 8738, Dayton, OH 45401-8738 or via email at <u>accountspayable@caresource.com</u>. Any travel by CONTRACTOR must be pre-approved by CARESOURCE following the CARESOURCE Travel Policy, which shall be made available to CONTRACTOR upon request. If CARESOURCE does not pay CONTRACTOR the undisputed invoiced amount for any charge within the above stated days of its due date and CARESOURCE has not remedied such nonpayment within ten (10) days of its receipt of written notice from CONTRACTOR, CONTRACTOR may, at its sole option, suspend the performance of its duties under this Agreement on any undisputed overdue accounts.

# ARTICLE 2
## CONTRACTOR RESPONSIBILITIES

**2.1**    <u>Use of Outside Consultants and Sub-Contractors</u>. With prior written approval of CARESOURCE, CONTRACTOR may contract with outside consultants or sub-contractors to support the delivery of the Services outlined in this Agreement. CONTRACTOR shall remain ultimately responsible for the performance of the outside consultants and sub-contractors and such consultants and sub-contractors shall be subject to all the terms and conditions of this Agreement applicable to CONTRACTOR.

CARESOURCE encourages the development of Minority and Women Owned Businesses (MBE/WBE) particularly those headquartered in the markets we serve. CARESOURCE encourages CONTRACTOR to subcontract with MBE/WBE suppliers with CARESOURCE approval to support the delivery of the Services outlined in this Agreement. CARESOURCE requires that MBE/WBE suppliers be provided maximum practicable opportunities to participate in any subcontracts awarded by CONTRACTOR. MBE/WBE supplier must have credible third party certification. CONTRACTOR shall report actual MBE/WBE subcontract results on a quarterly basis to CARESOURCE on the form provided by CARESOURCE.

**2.2**    **State Executive Orders and Directives on Offshore Outsourcing.** CONTRACTOR shall comply with the applicable State executive orders or directives governing offshore outsourcing (Ohio Executive Order 2011-12K, attached hereto as Exhibit E). CONTRACTOR hereby certifies, by its signature on this Agreement, that it: (1) has reviewed and understands the applicable executive orders or directives, (2) shall abide by those requirements in the performance of this Agreement, (3) shall perform no services required under this Agreement outside of the United States, (4) shall immediately notify CARESOURCE of any change or shift in the location of services performed by CONTRACTOR or its Subcontractors under this Agreement, and (5) no services shall be changed or shifted to one or more locations that are outside of the United States. If CONTRACTOR or any of its subcontractors perform services under this Agreement outside of the United States, the performance of such services shall be treated as a material breach of this Agreement, and CARESOURCE shall not be obligated to pay and shall not pay for such services.

**2.3**    **Records and Inspection.**

(a) Inspection of Work Performed. For any purpose related to the Services provided pursuant to the terms of this Agreement, the United States Department of Health and Human Services ("HHS"), the Comptroller General, the Ohio Department of Job and Family Services, CARESOURCE and/or CARESOURCE'S authorized representatives or third party auditors, including CARESOURCE'S Independent Review Organization, or their designees (collectively, the "Auditing Parties") shall at all reasonable times and within ten (10) days of a written request, have the right to enter CONTRACTOR's premises, or any other places, where the services hereunder are being performed (including all computers, telephone systems, and third party hosted software systems), and shall have access, upon reasonable request, to any and all documents, whether electronic or in paper form, related to the work performed pursuant to this Agreement. Upon fifteen (15) days prior written notice and at all reasonable times, the Auditing Parties must be allowed to inspect, monitor, or otherwise evaluate the work being performed and to the extent that the access will not reasonably interfere or jeopardize the safety or operation of the systems or facilities. CONTRACTOR must provide all reasonable facilities and assistance for the Auditing Parties.

(b) Examination of Records. For ten (10) years after the CONTRACTOR provides any Services under this Agreement (the "Audit Period"), the Auditing Parties may examine and copy any of CONTRACTOR's books, records, documents and papers pertinent to establishing CONTRACTOR's compliance with this Agreement and with applicable laws and rules. The Auditing Parties must provide CONTRACTOR with reasonable notice, but not less than ten days, before examining CONTRACTOR's books and records. This provision also applies to the books, records, accounts, documents and papers, in print or electronic form, of any parent, affiliated or subsidiary organization of CONTRACTOR.

(c) Retention of Records. CONTRACTOR must maintain at least until the end of the Audit Period all pertinent financial and accounting records (including time sheets, payroll records, and information pertaining to the Contract and to the Services, equipment, and commodities provided under this Agreement) pertaining to this Agreement according to generally accepted accounting principles and other procedures specified in this Section 2.3. Financial and accounting records must be made available, upon request, to the Auditing Parties at any time during the Audit Period. If

an audit, litigation, claim, investigation, or other action involving CONTRACTOR's records is initiated before the end of the Audit Period, the records must be retained until all issues arising out of the audit, litigation, claim, investigation, or other action are resolved or until the end of the Audit Period, whichever is later.

(d) Audit Resolution. If necessary, CONTRACTOR and the Auditing Parties will meet to review each audit report promptly after issuance. CONTRACTOR will respond to each audit report in writing within thirty (30) days from receipt of the report, unless a different response time is specified in the report. CONTRACTOR and the CARESOURCE must develop, agree upon and monitor an action plan to promptly address and resolve any deficiencies, concerns, and/or recommendations in the audit report.

(e) Errors.

    (i)    If the audit demonstrates any payment errors in the documents provided to CARESOURCE or the State, then CONTRACTOR will issue one or more credit memos to CARESOURCE for the amount paid in error until the amount is refunded in full.

    (ii)    In addition to other available remedies, if the difference between the payment received and the correct payment amount is greater than ten percent (10%), then CONTRACTOR shall pay all of the reasonable costs of the audit.

**2.4**   **Cooperation with Third Parties.** In addition to the obligations set forth in Section 2.3, CONTRACTOR personnel must cooperate with CARESOURCE's Independent Review Organization, the State and its agents and other contractors including, but not limited to, ODJFS or its designees, the State's Quality Assurance personnel, National Committee for Quality Assurance (NCQA) personnel, URAC personnel, United States Department of Health and Human Services (HHS), or CMS personnel. As reasonably requested in writing by CARESOURCE and/or the authorized third party, CONTRACTOR will provide to CARESOURCE and the State's agents or other contractors reasonable access to CONTRACTOR'S project personnel, systems, whether electronic or in paper form, and facilities to the extent that the access relates to activities specifically associated with this Agreement. Such access will not interfere with or jeopardize the safety or operation of the systems or facilities and will not unnecessarily or unreasonably interfere with, delay or otherwise impede CONTRACTOR'S performance under this Agreement with requests for access.

**2.5**   **Insurance.** CONTRACTOR will maintain and have in force for the duration of this Agreement the minimum insurance and coverage limits set forth in Exhibit C and shall comply with the insurance requirements set forth in Exhibit C.

**2.6**   **Privacy.** CONTRACTOR will comply with all applicable privacy laws and regulations in performing the Services under this Agreement, including without limitation, the Health Insurance Portability and Accountability Act and the privacy regulations promulgated thereunder ("HIPAA"). The parties acknowledge and agree that CONTRACTOR will not electronically transmit individually identifiable health information in connection with any standard "transaction" (as defined under HIPAA) under this Agreement. CONTRACTOR is a business associate of CARESOURCE, as that term is defined by

HIPAA and its implementing regulations. CONTRACTOR agrees comply with the terms of the Business Associate Agreement executed July 21, 2014.

**X BAA APPLICABLE**
**☐ BAA NOT APPLICABLE**

CONTRACTOR understands and acknowledges that pursuant to HIPAA regulations, CONTRACTOR may incur sanctions for unauthorized uses or disclosures of PHI. CONTRACTOR hereby certifies, by its signature on this Agreement, that neither it nor its subcontractors engage in offshore subcontracting that involves receiving, processing, transferring, handling, storing, or accessing PHI.

**Personally Identifiable Information (PII).** To the extent that the work under this Agreement requires the CONTRACTOR to have access to Personally Identifiable Information (PII), the CONTRACTOR shall after receipt thereof, treat such PII as confidential and safeguard such information from unauthorized use and disclosure. PII is any unique number or other identifying information that uniquely identifies an individual. The CONTRACTOR agrees to execute a Confidentiality Agreement protecting PII, when necessary, and further agrees not to appropriate such PII for its own use or to disclose such information to third parties unless specifically authorized by CARESOURCE in writing.

The CONTRACTOR agrees to allow access only to those employees who need the PII to perform services under this Agreement and agrees that PII will be used solely for the purpose of performing services under this Agreement. The CONTRACTOR shall ensure that its employees will not discuss, divulge or disclose any such PII to any person or entity except those persons within the CONTRACTOR's organization directly concerned with the performance of the Agreement.

The CONTRACTOR shall comply with the provisions of this clause, promptly report any breaches to CARESOURCE, and implement immediate, appropriate corrective actions to contain and prevent recurrence.

CARESOURCE may terminate this Agreement for default if CONTRACTOR or any of its agents fails to comply with the provisions of this clause. CARESOURCE may also exercise any other rights and remedies provided by law or this Agreement, including criminal and civil penalties.

The CONTRACTOR shall include this clause in all appropriate subcontracts. However, such provision in the subcontracts shall not relieve CONTRACTOR of its obligation to assure compliance with the provisions of this clause.

2.7     **Compliance with Law; Prohibited Affiliations; Licensure.** CONTRACTOR shall, at all times during the term of this Agreement and at CONTRACTOR's own expense, comply with all applicable federal, state, and local laws, rules and regulations, and CMS Instructions and shall maintain in force any licenses and permits required for performance under this Agreement. CONTRACTOR certifies that CONTRACTOR, its employees, agents, and subcontractors performing services under this Agreement are qualified, duly licensed professionals operating within the applicable scope of practice and are not suspended and/or debarred from doing business with state and/or federal government programs. CONTRACTOR agrees that any employees, agents, or subcontractors performing services under this

Agreement have been cleared of debarment from the following websites, prior to sending a consultant to CARESOURCE for service:

* https://www.sam.gov/
* http://oig.hhs.gov/fraud/exclusions.asp

CONTRACTOR shall check these websites on a monthly basis during the term of this Agreement with regard to its employees, agents, and subcontractors performing Services hereunder. If CONTRACTOR learns of a suspension and/or debarment during the term of this Agreement, CONTRACTOR must notify CARESOURCE within five (5) days of the CONTRACTOR's knowledge of such event. CONTRACTOR's failure to complete the required checks may result in a corrective action plan or other remedy as set forth in the exhibits hereto.

CONTRACTOR shall abide by and comply with the Federal False Claims Act, 31 U.S.C. 3729, *et seq*, requirements and any applicable state false claims statutes and shall report any concerns or allegations of fraud, waste or abuse in accordance with the CARESOURCE Corporate Compliance Plan, which can be accessed on CARESOURCE's website (http://www.CARESOURCE.com) .

**2.8    Goods/Condition of Goods/Delivery.**

(a)     If CONTRACTOR is responsible for delivering Goods to CARESOURCE pursuant to this Agreement, all Goods must be packaged in the manner as specified by CARESOURCE and shipped in the manner and by the route and carrier designated by CARESOURCE. If CARESOURCE does not specify the manner in which the Goods must be packaged, CONTRACTOR shall package the goods in commercially acceptable packaging. If CARESOURCE does not specify the manner of shipment, route or carrier, CONTRACTOR shall ship the Goods at the lowest possible transportation rates, consistent with CONTRACTOR's obligation to meet the delivery schedule set forth in Exhibit A. CARESOURCE's payment for the Goods shall not constitute its acceptance of the Goods. CARESOURCE shall have the right, but not the obligation, to inspect the Goods and to reject any of the goods which are in CARESOURCE's judgment defective. Goods so rejected and goods supplied in excess of quantities ordered may be returned to the CONTRACTOR at its expense. The fact that CARESOURCE failed to inspect or test any Goods shall not affect any of the CARESOURCE's rights.

(b)     Contractor warrants and represents to CARESOURCE that each item of goods provided pursuant to this agreement shall: (i) strictly conform to the requirements of this Agreement, (ii) be free from defects in workmanship, materials and design, (iii) be new. Unless otherwise agreed upon in writing by both parties, no surplus, rebuilt, reconditioned, or used goods shall be provided. As soon as is commercially reasonable after notice is provided by CARESOURCE, CONTRACTOR shall, at its option, either (a) replace, (b) repair, or (c) issue a credit, for any Goods that do not conform to the Goods Warranty. The Goods Warranty shall expire one (1) year from the date the Goods are delivered to CARESOURCE or stored by CONTRACTOR on behalf of CARESOURCE. CONTRACTOR makes no warranty to CARESOURCE regarding

the accuracy, adequacy, substance, wording or legality of the contents of the Goods that are provided by CARESOURCE.

(c)   THE WARRANTIES CONTAINED IN THIS SECTION ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE FOR THE GOODS.

(d)   Freight Terms for all shipments to CARESOURCE or CARESOURCE Third Party Designation:   FOB Destination, freight allowed with title of Goods to pass at CareSource Dock.  CONTRACTOR will select the carrier and process all in-transit damage claims and handle all other carrier related issues.  In the event CARESOURCE requests expedited shipments or a collect shipment, CONTRACTOR will use the freight account provided by CARESOURCE.

**2. 9**   **Financial Information and Audits.**  CONTRACTOR shall provide its most recent annual reviewed financial statements to CARESOURCE prior to execution of this Agreement and upon request by CARESOURCE.  CARESOURCE shall have the right to audit CONTRACTOR'S financials upon thirty (30) days written notice to CONTRACTOR.

**2.10**   **Contractor Agents.**  CARESOURCE shall have the right to prohibit any CONTRACTOR employee, subcontractor, independent contractor, or agent from providing services hereunder for any reason, at any time. Upon telephone, email, or written notice from CARESOURCE that a CONTRACTOR employee, subcontractor, independent contractor, or agent shall be prohibited from providing said services, CONTRACTOR shall immediately cease using such prohibited individuals to provide said services.

**2.11**   **Training.**  CONTRACTOR agrees that any of its employees, subcontractors, independent contractors, or agents providing services pursuant to this Agreement shall complete all required CARESOURCE training prior to the provision of any services pursuant to this Agreement.

**2.12**   **Delegated Entity Responsibilities.**  A delegated entity is any entity not part of CARESOURCE or CARESOURCE'S corporate family that has contracted with CARESOURCE to perform program requirements on behalf of CARESOURCE.  As CARESOURCE remains legally responsible for all services performed by the delegated entity, CARESOURCE has created a delegation oversight process (Exhibit D); this process allows CARESOURCE to monitor services and provide oversight of delegated entity.

CONTRACTOR agrees that it has entered into this Agreement whereby CARESOURCE has engaged CONTRACTOR to provide certain delegated services in support of this Agreement, which shall be performed in accordance with the terms of this Agreement, Exhibit B, and the Delegation Services Attachment appended hereto as Exhibit D. CONTRACTOR agrees to comply with the reporting requirements, performance evaluation requirements, and corrective actions set forth in Exhibit D. CONTRACTOR shall not submit any information to ODJFS unless directed by CARESOURCE.  CONTRACTOR shall not submit any written material to

CARESOURCE members or providers without written approval from CARESOURCE. CARESOURCE may revoke the delegation to CONTRACTOR if CARESOURCE or CMS determines that the CONTRACTOR has not performed satisfactorily, as set forth more fully in Exhibit D. Any delegation herein of activities or functions from CARESOURCE to CONTRACTOR shall be conducted in a manner consistent with applicable CMS regulations and CARESOURCE's contractual obligations with CMS.

**2.13**  **Rights of CARESOURCE Members.**  As applicable, neither CONTRACTOR nor any assistant or employee of CONTRACTOR shall discriminate in violation of any law in the treatment of CARESOURCE members on the basis of race, age within the scope of CONTRACTOR'S practice, marital status, disability, color, national origin, ancestry, religion, sex, health status, sexual preference, military status, veteran's status or presence of handicap, source of payment, or need for health services.  CONTRACTOR will observe, protect and promote the rights of CARESOURCE members as patients. CONTRACTOR will comply with any state laws regarding the right of patients to make decisions regarding medical care. CONTRACTOR agrees that in no event shall it bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against a Covered Person for services provided pursuant to this Agreement which are the obligation of CARESOURCE.

**2.14**  **Grievance System.**  CARESOURCE shall maintain and administer a grievance system for CARESOURCE members.  Complaints received by CARESOURCE concerning services rendered by CONTRACTOR and/or its employees will be resolved in accordance with the grievance procedure.  CONTRACTOR agrees to cooperate with CARESOURCE in the resolution of complaints made by CARESOURCE members and comply with all final determinations made by CARESOURCE. CONTRACTOR shall, from time-to-time, request that CARESOURCE provide it with the most recent, and up-to-date version of the Grievance Procedure.

**ARTICLE 3**
**INTELLECTUAL PROPERTY**

**3.1**  **Intellectual Property Rights.** Each Party shall retain ownership of all of its respective intellectual property associated with the Services provided pursuant to this Agreement. Notwithstanding the foregoing, CARESOURCE shall have all ownership right, title, and interest, including ownership of copyright, in all work products created, designed, developed, derived, documented, installed, or delivered to CARESOURCE that is either (a) developed exclusively for CARESOURCE, or (b) derived solely form the specifications or other information provided to CONTRACTOR by CARESOURCE and resulting from CONTRACTOR's activities under this Agreement (the "Work Product").

**3.2**  **CARESOURCE Intellectual Property Warranty.**  CARESOURCE warrants that CARESOURCE is the copyright owner or has secured the right to reproduce in copies and to distribute copies of all copyrighted works printed pursuant to this Agreement.  Further, CARESOURCE warrants that the work to be printed pursuant to this Agreement has not been

altered, defaced, mutilated or otherwise modified without the permission of the author in violation of any right of the author recognized under common law or state law.

**3.3** **Press Releases and Publicity.** Except as expressly permitted herein, neither party shall publish, distribute, or use the other party's name (or the name of any division, affiliate or subsidiary thereof), logo, trademark, service mark, or trade dress for the purpose of advertising, making a news release, creating a business reference, creating a website content or for products or service endorsement without prior written approval of the other party.

**ARTICLE 4**
**CONFIDENTIALITY**

**4.1** **Confidentiality.** CONTRACTOR and CARESOURCE understand that during the course of this Agreement, either party may receive from the other or contribute to the production of information or material proprietary to one party or designated as confidential by that party ("Confidential Information"). During and after the term of this Agreement, each party shall hold in confidence and not directly or indirectly reveal, publish, disclose, or transfer any Confidential Information to any person or entity without the prior written consent of the other party. CONTRACTOR agrees not to utilize or disclose Confidential Information for any purposes, except in the course of CONTRACTOR's rendering of services to CARESOURCE or as compelled by law, provided that each party shall use reasonable efforts to give advance notice of such compelled use or disclosure to the other, and shall cooperate in connection with any efforts to prevent or limit the scope of such compelled use or disclosure. CONTRACTOR agrees to advise its employees, agents and subcontractors with access to the Confidential Information of its confidentiality obligations under this Agreement. Notwithstanding anything contrary in the terms of any applicable non-disclosure Agreement, any trade secrets, personal health information of either party or its constituents, whether oral, visual or written, shall constitute Confidential Information even if not marked as such. The terms and conditions of this Agreement shall be deemed to be Confidential Information.

CONTRACTOR maintains a strict Confidentiality Policy. In regard to any CARESOURCE data, files are kept in a secured server area and deleted within 180 days or sooner, per CARESOURCE instructions. These files are only accessible by authorized personnel and are not used for any reason other than the sole purpose of its intended use. Data is not sold, given to, or lent out to another party.

**4.2** **Exclusions.** Notwithstanding anything to the contrary, each party shall not have any obligation with respect to any Confidential Information of the other party or any portion thereof which the receiving party can establish:

(1) is or becomes publicly available through no wrongful act of the receiving party;

(2) was lawfully obtained by the receiving party from a third party without any obligation to maintain the Confidential Information as proprietary or confidential;

(3) was previously known to the receiving party without any obligation to keep it confidential; or

(4) was independently developed by the receiving party.

**4.3**      **Survival.**  The terms of this Article 4 shall survive the expiration or earlier termination of this Agreement for a period of three (3) years; provided however that confidentiality obligations with respect to trade secrets and personal health information shall continue in perpetuity.

## ARTICLE 5
## SECURITY AND DISASTER RECOVERY

**5.1**      **Security Controls.**  If the services provided under this Agreement permit CONTRACTOR to be in custody of sensitive, Protected Health Information (PHI), CARESOURCE employee-specific data, or other personally identifiable information (PII), CONTRACTOR or its applicable downstream subcontractors shall implement effective controls that provide reasonable protection of, and restricted access to, the data wherever it is stored, processed, or transferred within CONTRACTOR'S or its applicable downstream subcontractors' span of control.  CARESOURCE reserves the right to evaluate CONTRACTOR'S or its applicable downstream subcontractors' security controls built into the services provided pursuant to this Agreement.

**5.2**      **Audits and Assessments.**  If a SSAE-16 (Statement on Standards for Attestation Engagements No. 16) audit has been conducted on CONTRACTOR'S or its applicable downstream subcontractors' behalf by a qualified third party within the previous two years to formally evaluate the effectiveness of CONTRACTOR'S or its applicable downstream subcontractors' data security controls, CONTRACTOR or its applicable downstream subcontractors shall provide a copy of said auditor's report to CARESOURCE for review.  If CONTRACTOR or its applicable downstream subcontractors have arranged for some other type of third party assessment of the effectiveness of security controls, CONTRACTOR or its applicable downstream subcontractors shall provide the details of said assessment and shall include a detailed definition of the scope of the audit as well as its independent conclusions regarding effectiveness. CARESOURCE reserves the right to audit these controls either on-site or via a security self-assessment survey on a semi-annual basis , except where required under applicable laws or in the event of a breach of confidentiality.

**5.3**      **Review by CARESOURCE.**  If proposed services and products are considered critical to supporting CARESOURCE business operations, CARESOURCE reserves the right to review and assess, once annually, the adequacy of CONTRACTOR'S or its applicable downstream subcontractors' disaster recovery plans, insofar as those plans will encompass contingency plans for the services and products provided in support of CARESOURCE'S business.

5.4   **Implementation of Controls.** If CONTRACTOR'S or its applicable downstream subcontractors' security controls or disaster recovery plans are found to be insufficient, and CONTRACTOR cannot show reasonable mitigation or compensating controls, CONTRACTOR shall implement or require its applicable subcontractors to implement adequate controls or disaster recovery plans, the sufficiency of which to be determined jointly by the Parties and within a reasonable time period established by the Parties. If CONTRACTOR or its applicable downstream subcontractors fail to implement effective controls or disaster recovery plans within the established timeframe, CARESOURCE reserves the right to immediately terminate this Agreement without further financial obligation, other than the financial obligations pursuant to Section 6.2(d). If CONTRACTOR's or its applicable downstream subcontractors' security controls or disaster plans change within the life of this Agreement, CONTRACTOR must notify CARESOURCE immediately. If CARESOURCE determines that these security controls or disaster recovery plans are insufficient, and CONTRACTOR cannot show reasonable mitigation or compensating controls, then CONTRACTOR or its applicable downstream subcontractor will be afforded reasonable time to implement effective controls or disaster recovery plans the sufficiency of which to be determined jointly by the Parties and within a reasonable time period established by the Parties. If CONTRACTOR or its applicable downstream subcontractor fail to implement effective controls or disaster recovery plans within the agreed upon timeframe, CARESOURCE reserves the right to immediately terminate this agreement without financial obligation.

5.5   **Third Party Vendor Software Utilization.** Pursuant to the terms of this Agreement, CONTRACTOR may utilize third party vendor software in the provision of the Services CONTRACTOR understands and acknowledges that said software may, as applicable, be integrated with CARESOURCE systems to ensure accuracy and completeness of the services performed hereunder. CONTRACTOR agrees that it shall fully cooperate in a detailed architectural review of the third party vendor software in addition to the terms of this Article 5. If software architecture is found to be insufficient, CONTRACTOR shall work with such third party vendor and will use commercially reasonable efforts to remedy the identified deficiencies, the sufficiency of which to be determined jointly by the Parties and within a reasonable time period established by the Parties. If CONTRACTOR fails to implement effective software architecture within the established timeframe, CARESOURCE reserves the right to immediately terminate this Agreement without further financial obligation.

## ARTICLE 6
## GENERAL TERMS

6.1   **Term.** The term of this Agreement (the "**Term**") shall begin on the Effective Date and end three (3) years after the Effective Date, unless otherwise terminated as set forth herein.

6.2   **Termination.**

(a)   **Termination For Cause.** Either party may terminate this Agreement for cause. In the event of termination of this Agreement for cause, this Agreement shall terminate

immediately upon receipt of written notice from the terminating party or at such later date as determined by the terminating party. Cause shall mean:

i.  habitual neglect, material breach of the terms of this Agreement, or continued failure by either party to perform its duties under this Agreement;

ii.  failure by either party to maintain licenses or permits required to perform its duties under this Agreement, to comply with applicable laws or regulations;

iii.  failure of CONTRACTOR to confirm that any individual providing Services hereunder has been cleared of debarment prior to providing such Services; or to notify CARESOURCE of any such debarment as provided herein;

iv.  failure of CONTRACTOR to maintain required liability coverage protection;

v.  any material misrepresentation or falsification of any information submitted by CONTRACTOR to CARESOURCE; or filing of voluntary or involuntary bankruptcy of either party or either party being placed in receivership.

**(b)**  **Termination Without Cause.** CARESOURCE may terminate this Agreement without cause by giving CONTRACTOR written notice at least sixty (60) days prior to the effective date of termination. All of the rights and duties of the parties shall continue during such notice period.

**(c)**  **CONTRACTOR Termination.** CONTRACTOR may terminate this Agreement if (i) CARESOURCE changes any security policies or procedures to which CONTRACTOR cannot comply; (ii) there are changes in local, state, or federal laws and regulations such that CONTRACTOR cannot comply with the terms of this Agreement. CONTRACTOR may terminate this Agreement as of a date specified in a written notice of termination referencing this Section and stating CONTRACTOR's intent to terminate this Agreement.

**(d)**  **Rights and Obligations Upon Termination.** Upon termination of this Agreement for any reason, the rights of each party hereunder shall terminate, except as provided herein or in any Amendment to this Agreement. Any such termination, however, shall not release the parties from obligations under this Agreement prior to the effective date of termination. CONTRACTOR agrees to provide Services to CARESOURCE members through the last day of this Agreement and accept payment from CARESOURCE, pursuant to this Agreement, through the day of termination of this Agreement. If CARESOURCE initiates the expiration or termination of this Agreement, CARESOURCE shall be obligated to purchase from CONTRACTOR: (i) any raw materials acquired by CONTRACTOR for use in the production of the Goods that are not usable for other customers of CONTRACTOR, which will be validated to CARESOURCE prior to any charges being assessed (ii) any Goods produced or Services performed for which CARESOURCE has issued a purchase order

prior to the termination date of this Agreement and, (iii) per such other post-termination obligations as set forth in the Exhibits or Statements of Work, and CARESOURCE shall immediately pay all undisputed outstanding invoices. CARESOURCE shall notify CONTRACTOR of the address to which CONTRACTOR shall ship such raw material and/or Goods. This section shall survive the termination of this Agreement.

(e)     **Sanctions; Revocation of Delegation.** As set forth in Exhibits D and H, sanctions may be imposed for inadequate performance, including revocation of the delegation if CARESOURCE or the Ohio Department of Job and Family Services (ODJFS) determines that the delegation is not in the best interest of the members.

6.3     **Indemnification.** CONTRACTOR agrees to unconditionally indemnify fully, hold harmless and defend, at CONTRACTOR's sole expense, CARESOURCE, its parent, special member, subsidiaries, joint venturers, partners and affiliates and its and their agents, officers, directors stockholders, employees, representatives, successors and assigns (herein collectively referred to as "CARESOURCE") from and against all liabilities, claims and damages of any kind (including but not limited to any judgment, settlement, fine, or demand), resulting from third party claims, arising directly out of injury or death to persons, or damage or loss of property , gross negligence or willful actions, or otherwise wrongful acts or omissions of CONTRACTOR, CONTRACTOR's subcontractors, subsidiaries, joint venturers, partners or affiliates and their respective agents, officers, directors, employees, representatives, successors and assigns. The obligations contained in this section shall survive the termination of the Agreement.

6.4     **Notices.** Notices given pursuant to this Agreement shall be delivered by first class mail, postage prepaid and addressed as follows:

If to CARESOURCE:

CARESOURCE
Attn: Office of General Counsel
P.O. Box 8738
Dayton, OH 45401-8738

If to CONTRACTOR:
Company Name: The Standard Register Company
Attn: Legal Services
Address: 600 Albany Street
City, State Zip: Dayton, OH 45417
Phone: 937.221.1000
Fax: 937.913.5599
Email: legalservices@standardregister.com

6.5     **Entire Agreement; Amendment.** This Agreement constitutes the entire understanding of the parties and supersedes all prior representations and understandings, whether oral or written with respect to the Services performed under this Agreement.   Any changes,

amendments, or alterations will not be effective unless mutually agreed upon in writing signed by authorized representatives of both parties.

6.6     **Severability.** The covenants set forth in this Agreement will be construed as separate and independent covenants. If any part or provision of any covenant is held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability will not render invalid, void or unenforceable any other part or provision of this Agreement.

6.7     **Waiver.** Waiver by either party of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach.

6.8     **Assignment.** This Agreement may not be assigned except by prior written agreement of the parties, which shall not be unreasonably withheld. Notwithstanding the foregoing, CARESOURCE may assign this Agreement or delegate any rights or obligations to any affiliated entity within the CARESOURCE Family of Companies.

6.9     **Independent Parties.** This Agreement is not intended to and is not to be construed to create any relationship between the parties other than that of independent parties contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither party shall hold itself out as the other's agent for any purpose, and shall have no authority to bind the other to any obligation. Each party agrees to assume complete responsibility for itself and its own employees with regard to federal or state employer's liability, workers' compensation, social security, and unemployment insurance, occupational safety and health administration requirements and all other federal, state and local laws. In addition, each party agrees to be responsible for its own comprehensive public liability and property damage.

6.10    **Tax Duties and Responsibilities.** CONTRACTOR is responsible for the payment of all required taxes, whether Federal, state, or local in nature, including, but not limited to, income taxes, social security taxes, unemployment compensation taxes, and any other fees, charges, licenses, or other payments required by law.

6.11    **No Third Party Beneficiaries.** This Agreement inures to the benefit of CARESOURCE and CONTRACTOR only, and no third party shall enjoy the benefits of this Agreement or shall have any rights under it except as is expressly provided in this Agreement.

6.12    **Applicable Law and Venue.** Any and all matters of dispute between the parties to this Agreement whether arising from the Agreement itself or arising from alleged extra contractual facts prior to, during or subsequent to the Agreement, including without limitation, fraud, misrepresentation, negligence or any other alleged tort or violation of the contract, shall be governed by, construed and enforced in accordance with the laws of the State of Ohio, without regard to the conflict of laws or the legal theory upon which such matter is asserted. Montgomery County, Ohio shall be the sole proper venue of any litigation or proceeding between the parties which arises out of or is in connection with any right, duty, or obligation under this Agreement.

**6.13**   **Counterparts and Signatures.** Each of the representatives signing this Agreement on behalf of the respective parties hereto represents and warrants that he or she has been duly authorized to execute and deliver this Agreement and that upon execution and delivery hereto, this Agreement shall be binding and enforceable in accordance with its terms against such party for whom such representative has signed.

**6.14**   **Limitation of Liability.**

**(a)**   IN NO EVENT SHALL CONTRACTOR BE LIABLE TO CARESOURCE OR TO ANY THIRD PARTY FOR CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF CONTRACTOR IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT AS STATED IN SECTION 6.3 OR FINES ASSESSED AGAINST CARESOURCE ARISING FROM CONTRACTOR'S BREACH OF ITS OBLIGATIONS SET FORTH IN THE BUSINESS ASSOCIATE AGREEMENT BY AND BETWEEN CARESOURCE AND CONTRACTOR, CONTRACTOR'S AGGREGATE LIABILITY TO CARESOURCE FOR ACTUAL DAMAGES OR LOSSES UNDER THE APPLICABLE EXHIBITS OR SOW SHALL NOT EXCEED THREE MILLION DOLLARS.

**(b)**   EXCEPT AS STATED IN SECTION 6.3 OF THIS AGREEMENT, CONTRACTOR SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY FREIGHT CARRIER OR DELIVERY SERVICE, INCLUDING BUT NOT LIMITED TO, THE UNITED STATES POSTAL SERVICE, UNITED PARCEL SERVICE, ANY FREIGHT CARRIER, AND ANY DELIVERY SERVICE.

**(c)**   CONTRACTOR shall not be responsible for the loss or destruction of any CARESOURCE electronic data owned by CARESOURCE unless due to the negligence or willful actions of CONTRACTOR. In the event of a conflict between this Subsection (c) and the Business Associate Agreement entered into between the parties, the Business Associate Agreement shall prevail.

**6.15**   **Force Majeure.** If either party is prevented, hindered or delayed in the performance or observance of any of its obligations under this Agreement by reason of any circumstance beyond its reasonable control including, but not limited to, fire, flood, earthquake, labor disputes, riots, civil disorders, rebellions or revolutions in any country or the inability to obtain materials and freight and carrier/delivery disruptions ("Force Majeure"), that party will be excused from any further performance or observance of the obligations so affected for as long as such circumstances prevail and that party continues to use all commercially reasonable efforts to recommence performance whenever and to whatever extent possible without delay (including compliance with the parties' Disaster Recovery Plans). The foregoing may serve to delay but shall never excuse payment of money owed by a party to the other party. The party affected by a Force Majeure event will advise the other party in reasonable detail of the event (including the estimated duration of the event) as promptly as practicable(and in any event within four business hours after occurrence of the event) and keep the other party reasonably apprised of progress in resolving the event.

6.16   **Counterparts and Signatures.** Each of the representatives signing this Agreement on behalf of the respective parties hereto represents and warrants that he or she has been duly authorized to execute and deliver this Agreement and that upon execution and delivery hereto, this Agreement shall be binding and enforceable in accordance with its terms against such party for whom such representative has signed.

## SIGNATURES

**IN WITNESS WHEREOF,** CARESOURCE  AND CONTRACTOR, by their duly authorized representatives, have executed this Agreement as of the Effective Date.

**CARESOURCE**

By: _Bobby Jones_

Names: _Bobby Jones_

Title: _COO_

Address: _230  N. Main St_

City, State, Zip: _Dayton, Ohio 45402_

Date: _1/14/15_


**THE STANDARD REGISTER COMPANY:**

By: _____

Names: _Joseph P. Morgan, Jr._

Title: _President & CEO_

Address: _600 Albany Street_

City, State, Zip: _Dayton, OH  45417_

Federal Tax ID No.: _31-0455440_

NPI: _____

Medicaid Provider #: _____

Date: _1/13/15_

APPROVED
LEGAL

SCHEDULE OF EXHIBITS

Exhibit A        Scope of Services

Exhibit A-1      Fees and Service Rates for Contracted Services

Exhibit B        Performance Standards

Exhibit C        Insurance

Exhibit D        Delegation Services Attachment

Exhibit E        Ohio Executive Order 2011- 12K

Exhibit F        Service Level Warranties and Remedies

Exhibit G        Medicaid Delegation Subcontract Addendum

Exhibit H        Medicare Amendment

<u>Exhibit A</u>

<u>Scope of Services</u>

Subject to the terms and conditions contained herein, CONTRACTOR shall provide the Services set forth herein to CARESOURCE, in a manner consistent with industry standards set forth in **Exhibit A-1**. If any services, functions or responsibilities not specifically described herein are required for the proper performance and provision of CONTRACTOR'S Services, they shall be deemed to be included within the scope of this Agreement to the same extent as if specifically described herein.

CONTRACTOR shall provide CARESOURCE with an "Enterprise Documentation Management Program" that includes the production, fulfillment, and management of various types of materials including items that are deemed delegated by the State of Ohio for Ohio Medicaid and MyCare programs. The delegated items include the following listing of items. The listing is subject to change and CARESOURCE shall notify CONTRACTOR of such change upon notification from the State:

- Materials that have member identification information:
  - o   New Member Kit
  - o   ID Cards
  - o   Explanation of Benefits (EOB)
  - o   Notice of Action (NOA) Mailing
  - o   Care Advance/Utilization Management (Cincom)
  - o   Other items as deemed delegated by the State of Ohio

CONTRACTOR is responsible for various required and AdHoc reports that will be described in the program requirements documents. The parties will mutually agree on the report format, including reporting by product line, unless mandated by a particular agency.

In addition to the reports described in the program requirements documents, CONTRACTOR will provide an annual evaluation report with a comprehensive review of the past year's activities and level of performance and identify ongoing ability to perform the delegated activity. The report will be due no later than the 3rd week of the month following the anniversary of the contract.

## Monthly Performance Reviews:

Ongoing performance reviews will occur monthly to ensure that the parties are keep abreast of changes within each organization, continue to establish forward-looking goals and strategy, and regularly review opportunities for continuous improvement.

## PROGRAM IMPLEMENTATION:

### Methodology

CONTRACTOR employs a strategic three-phased approach to implement CARESOURCE product categories from a current process and/or production method to a desired state, building a strategy that reduces cost, impacts revenue minimizes risk and achieves organizational optimization.

- Phase I – Assess and analyze current state
- Phase II – Design and develop the optimal solution
- Phase III – Implement and manage the program

     Key assessment, design and implementation steps include:
  - Finalized Strategy with Recommended Solution
  - Complete Production and Technical Analysis/ Design
  - Finalize Project Plan
  - Program Design and Development
  - Program Unit Testing
  - Integration Testing
  - Go Live – Full Production

## PHASE I- ASSESSMENT (2-4 weeks)

This phase of the project defines CARESOURCE's high level scope, production and technical requirements. The assessment will be conducted either on-site or via conference calls and will include interview sessions with a CONTRACTOR Solutions Architect to understand CARESOURCE needs and architect a solution.

CONTRACTOR will provide:
- application inventory list template
- SFTP Upload Site for transferring test data
- Assessment Questionnaire

CARESOURCE will provide:
- Completed application inventory list
- Data Mapping
- Completed Assessment Questionnaire
- Test Data Files
- Critical color requirements
- Print output samples
- eServices requirements

CONTRACTOR will provide to CARESOURCE a finalized strategy with a recommended solution.

## PHASE 2- DESIGN AND DEVELOPMENT

## PROGRAM REQUIREMENTS DOCUMENT ("PRD") (4-6 weeks)

CONTRACTOR will develop the technical and production specifications for each of the product categories that are produced and managed by CONTRACTOR. The PRD will provide

details regarding the entire process of implementing each product category including product specifications for producing and fulfilling specific requirements, pricing, establishing reporting requirements and managing the product category. Each PRD will be tracked with a control number, approved and signed by a designated representative of both parties. Parties will agree to develop a shared location that is accessible to both Parties to store the approved PRD. CONTRACTOR is responsible for updating the PRD as necessary to update any changes in process or requirements for a particular product category. CONTRACTOR will obtain additional sign off by a designated representative of both parties on any updated PRD.

During this phase all of the production and technical requirements for each application are defined and the interview process has a deep focus on application and production rules with a focus on the following:

- Inbound and outbound file transmission protocols

- File processing rules

- Production components

- eService requirements such as:

  - Online repository

  - PDF Pushback

  - Email notifications

  - Marketing message editor

- Warehousing and Logistics requirements

- Mail, Presort, and Delivery Requirements

- Quality Assurance, Control Marks and Testing

- Data Retention policies

- Application Service Levels

- Reporting

- Invoicing

CONTRACTOR will provide:
- Complete & Approved Program Requirements Documents
  - Detailed Project Plans and Timelines
  - Review and sign PRD
CARESOURCE will provide:
  - Project objectives

- Formal Project scope
- Record layouts
- Data Mapping documents
- Detailed Business Requirements
- Review and sign PRD

Both parties receive a copy of the final signed PRD

## PHASE 3- PROGRAM MANAGEMENT
### IMPLEMENTATION (4-6 weeks)

The Implementation phase is the process of utilizing the Program Requirements Document(s) to create the individual software applications. This requires receiving and processing the test input data to create all required custom output files. This phase includes internal unit and system testing. The outcome of this phase is the fully functional software applications ready for User Acceptance Testing.

CARESOURCE will provide:
- Complete and comprehensive test data

CONTRACTOR will provide:
- Weekly Project Status Meetings

- Electronic output samples.
- Print output samples
- eServices output

### USER ACCEPTANCE (2 weeks)

The User Acceptance phase includes sample review and feedback; program adjustments for correction and changes and the output of revised electronic and physical samples. This process is repeated as necessary to ensure all samples meet the user acceptance criteria established within each Program Requirements Document.

CARESOURCE will provide:
- Samples review and feedback
- Change approval as necessary
- Final sample approval

CONTRACTOR will provide:
- Updated electronic output samples
- Updated print output samples
- Updated eServices output samples

### GO LIVE

The Go-Live phase includes activities required to execute the first live production run. These include receiving the first live data transmission, data processing, sample production and approval as necessary, eServices, image processing and reporting as defined with the Program Requirements Document(s).

CARESOURCE will provide:
- Live production data
- Approvals as necessary

CONTRACTOR will provide:
- Updated electronic output samples
- Updated print output samples
- Updated eServices output samples

## Print Production-Project Scope

SOLUTION OBJECTIVES

Consistent quality and service that meets CARESOURCE's needs

Implement a repeatable automated production process

Comply with current brand standards

Communicate with CARESOURCE in a clear and professional manner

Integrate with appropriate existing applications

Protect and secure CARESOURCE data

STANDARD REGISTER SUPPLIED COMPONENTS

CARESOURCE is responsible for a ninety (90) day supply of all Standard Register supplied components. A ninety (90) day supply is defined as a quarterly portion of the annual volume based on monthly historical usage.

CARESOURCE SUPPLIED COMPONENTS

All CARESOURCE supplied marketing inserts will need to be tested and approved by the Standard Register facility prior to live production.

For production, CARESOURCE supplied materials must arrive five (5) business days prior to the scheduled production run. Shipping requirements for such materials will be supplied to the CARESOURCE by the Account Service team and will include size/weight specifications, along with required labeling.

Shipping / Receiving Requirements: The following guidelines will apply to material shipped to CONTRACTOR's facility. Failure to follow the shipping specifications will result in non-acceptance of

the CARESOURCE supplied components.

Skid/Receiving Requirements:
1. Skid size is 42 x 36. The open end is on the 36" side.

2. Do not double stack.

3. Cartons should not extend beyond the skid.

4. The carton/skid height must not exceed 54".

5. Bills of Lading and packing slips are required and must reflect the CARESOURCE PO number.

6. Packing list must be on the outside of the shipment cartons.

7. All shipments must be shrink-wrapped.


Cartons should be labeled with the following:
1. CARESOURCE name

2. Purchase Order number

3. Quantity per carton

4. Part ID number

5. Description and sample of material affixed to each carton

6. CARESOURCE Service Representative name

7. Cartons should weigh no more than 35 lbs.


POSTAGE

CARESOURCE will establish a postage security deposit with CONTRACTOR which will be based on the estimated postage fees to cover two (2) months of mailing services. CONTRACTOR must receive postage funds three (3) days prior to the mailing. Mail will not be forwarded to the USPS without adequate postage funds. Postage will be funded by wire transfer. CONTRACTOR will invoice CARESOURCE actual postage incurred during the invoiced period. Upon the termination or expiration of the Amendment, CONTRACTOR will refund to the CARESOURCE, within thirty (30) days of account reconciliation, any remaining balance of the postal deposit account.

PRESORT

To qualify for presort discounts, CARESOURCE mailings will be run through Certified Accuracy Support System ("CASS"). The system is used hand in hand with Delivery Point Validation ("DPV") to ensure a correct zip + 4 is assigned to the mailing record, and a correct Intelligent Mail Barcode is created for the mailing record.

PRESORT FAILURES AND UNDELIVERABLE MAIL

If a piece of mail is found to be a USPS "Reject" due to bad address information during postal presorting, then CONTRACTOR will apply full rate postage and mail.

If a piece of mail is deemed undeliverable by the USPS (aka Undeliverable as Addressed or "UAA") after mail is accepted by the USPS, then the USPS will follow standard protocol for any such UAA and redirect the mail piece to the return address identified on such mail piece.

CUSTOMER SERVICE SUPPORT HOURS & SLA

On site CareSource support will be provided as the single point of contact for CARESOURCE end-users. Standard business hours are Monday – Friday, 8 am EST to 5 pm EST. In addition, in-plant Customer Service support is available Monday to Friday from 8:00 AM to 5:00 PM Eastern Standard Time. Standard response time is less than 4 business hours for email and voice mail inquiries.

Assumptions

Project Assumptions are those expectations upon which the Project "path forward" is based and which, if proven incorrect, result in an invalidation of the project budget estimates, schedules and approach. Such an invalidated Project Assumption will usually result in processing of a Change Request to the Project.

- A sample file will be available for testing output variations, business rule exceptions, and file size for processing time, etc. Input files, compressed and/or encrypted, may not exceed 4.5 GB, due to system and software limitations.
- CONTRACTOR utilizes a test SFTP directory. This directory is separate from the production directory to ensure test files are not inadvertently processed as production files. Failure to use this directory and the proper test file naming conventions could result in a data processing error.
- CARESOURCE will furnish and/or return promptly all data, copies, specifications, artworks, proofs, inserts and other materials necessary for timely performance by CONTRACTOR. Delay in furnishing or returning items necessary for production may result in an extension of the turn-around time and/or additional charges for the cost of at overtime rates; however the CARESOURCE will be notified of any additional charges in writing prior to incurring such charges. CARESOURCE acknowledges that SLA penalties will not apply in this scenario.
- There will be CARESOURCE controls in place so CONTRACTOR is notified of changes which

could impact the data file prior to the changes being implemented.

- If the data created by CONTRACTOR used for development purposes differs from the production data provided later by CARESOURCE, then additional development time will be required to adapt to the production data format.

- CONTRACTOR will not repair or alter transmitted production data deemed in error. Live job failures determined to be a result of CARESOURCE data problems will be billed to the CARESOURCE based on the total hours required to analyze the cause of the failure.

- Brand standards are met through a combination of efforts from CONTRACTOR's design organization and Premedia Services, a department within CONTRACTOR's organization. The color standards and file composition are qualified by the CONTRACTOR design team, based on the brand guidelines supplied by CARESOURCE. Color management on a production level is owned by the Premedia Services team. Premedia Services will be engaged during the implementation process to assist with color management and custom workflow accommodations on a file/design level. CONTRACTOR will communicate with existing internal print shops and print providers utilized by CARESOURCE to help ensure the proper file handling processes are followed for correct color and quality output. CONTRACTOR employs pre-flighting, color management and quality assurance software for all items produced through the material management and print management program.
  - Critical color matching to a standard of 3 Delta-E will be achieved based on the following:
    - Brand standards documentation is supplied, identifying all corporate colors needing to be matched
    - Design files are either created by CONTRACTOR or created in one of the following design applications: QuarkXPress or Adobe InDesign
    - Critical/Brand colors are created in the design application as PANTONE or a custom spot color
    - Print samples are provided for any custom spot color or if the color must otherwise match a previous production run.
  - Some colors are unachievable on certain digital presses. CARESOURCE will agree upon one of the following options based on cost and color capability:
  - CONTRACTOR will match to the closest achievable color on the aforementioned digital press. The color will be stored in the CONTRACTOR systems as the standard color and will be matched consistently across all other print platforms.
  - Job will be moved to another press, digital or offset, that is capable of achieving the color. Costs will differ when produced on other production equipment.

- CONTRACTOR will generate all mutually agreed upon output formats. Output will be optimized to meet the CARESOURCEs' mutually agreed upon production and quality control requirements. The resulting test packages will be presented to CARESOURCE for review and approval. Once a live date has been mutually agreed upon, test print runs will be generated and final quality control

approval will be received from CARESOURCE prior to such live date.

- During daily production runs, CARESOURCE business units will receive automatic data confirmation emails after each file has been transmitted to CONTRACTOR. Some projects may require PDF approval by CARESOURCE prior to starting production. Once data file is received and applicable PDFs are approved, production jobs will be automatically added to the production schedule using an enterprise shop floor and job tracking system which will manage all aspects of production: inventory, capacity, service levels, and reporting. After each file has been processed and resulting packages mailed, a production confirmation report will be automatically transmitted to CARESOURCE.

- CONTRACTOR will assign appropriate technical and implementation resources during the scoping and implementation project phases.

- CARESOURCE will be responsible for but not limited to:
  - Sponsorship
  - Project coordination
  - Partnership in the development of a timeline
  - Participation in weekly status meetings
  - Access to data
  - Access to subject matter experts on an "As Needed" basis (Accounts Payable, Technical, Product, etc.)
  - Testing
  - Proof Approval

## Exhibit A-1

### Fees and Service Rates for Contracted Services

CONTRACTOR will price the product category in accordance to the requirements as detailed in the PRD. All products under this Agreement are included in the guaranteed savings program, as detailed in the Master Services Agreement dated July 22, 2014, along with the Incentives. Parties agree to periodically review the current documented savings as compared to the saving guarantee.

Pricing

CARESOURCE will pay applicable fees and expenses incurred in connection with this project as outlined below.

ASSESSMENT PRICING

| Service | Details | Rate | Charge Basis |
|---|---|---|---|
| Assessment | Provides a forum for identifying the objectives, requirements, and pain points of an organization. The assessment provides the opportunity to develop a specific path forward, business strategy, and a solution set. | ███████████ | ███████████ |

DEVELOPMENT PRICING

| Service | Rate | Charge Basis |
|---|---|---|
| Application Development- Print | ███████████ | ███████████ |

| Service | Rate | Charge Basis |
|---------|------|--------------|
| Application Development-eServices | ███████████████ | |

Any proposed development effort and related costs will be discussed by the parties during development of PRDs and will be incorporated into the final PRD that is agreed to by the parties.

PRINT AND ESERVICES PRICING

Due to the large number and variety of applications, pricing will be provided according to each project. The project pricing will either be incorporated into a PRD or separately quoted as a standalone engagement.

Postage and Freight: The parties will agree on postage and freight requirements in advance either via incorporation into a particular PRD or separately quoted for standalone engagements.

CARESOURCE may change the quantities of Goods that have minimum print/build requirements to maintain negotiated pricing for a particular project. The negotiated pricing was predicated on the established minimum Units of Issue determined by both CONTRACTOR and CARESOURCE. If those minimum requirements change during the implementation period by +/- 5% either CONTRACTOR or CARESOURCE may request a revision to the PRD.

After the implementation period, prices may be submitted for review semi-annually from the Effective Date of the PRD in the event there is a +/- 5% change in the Bureau of Labor Statistics of the U.S. Department of Labor, Producer Price Index for Pulp, Paper and Allied Goods WPU0913.

OTHER EXPENSES

CARESOURCE will pay applicable and mutually agreed-upon expenses incurred by CONTRACTOR.

**Storage and Distribution Fees**

Fees associated with receiving, put-away, storage, picking, packing, shipping, and cycle counting for items in an inventory stocking location.

| Expense | Invoice Stored Product |
|---------|------------------------|
| Space and Inbound Freight Fee * |  |
| Inbound Freight | |

| Expense | Invoice Stored Product |
|---|---|
| Distribution Fees | ████████████████████ |
| Finance Fee | ████████████████████ |

* Storage beyond 180 days may include additional charges

**Transportation Preparation Fees**

| Deliverable | Resources | Unit of Measure | Rate |
|---|---|---|---|
| Shipping | The CARESOURCE shipping account number will be utilized for freight. As such, the freight terms will be established as Collect Shipping. | Per line item on each order | ████████ |
| Returns/Restocking Fee | The fee covers restocking and handling. It does not include the shipment cost for transit back to CONTRACTOR. Product is relabeled and restocked as necessary. The same product returned multiple times within a five business day period shall have the fee charged once.<br><br>The fee will not be charged and CONTRACTOR will arrange for the return if the goods are defective or the shipment was otherwise incorrect at the fault of CONTRACTOR.<br><br>CARESOURCE will be provided clear transfer packing and labeling requirements on products sourced and owned by CARESOURCE. In the case that the requirements are not followed, resulting in a re-work situation at the receiving location, CONTRACTOR will charge $50 per hour to remedy for receipt and product put-away. | Per return of an entire order or portion of an order | ████████ |

**Kitting**

CONTRACTOR offers simple Kitting and complex Kitting. Simple Kitting is defined as taking items that exist in storage and co-mingling those items in a carton for labeling and shipment. A simple kit, for marketing collateral would be collating printed pieces, brochures or sell sheets into a kit. Complex Kitting costs and procedures will either be incorporated into the applicable PRD or separately quoted as a standalone special

project. Complex Kitting is defined by requirements for assembly (for example, a die cut piece or box), dimensional products, or unusual and varied sized materials as well.

| Deliverable | Resources | Rate |
|---|---|---|
| Simple or Complex Kitting | Project based by materials and service:<br><br>• Kit component materials<br><br>• Receiving and staging items<br><br>• Finishing/bindery components as required for assembly<br><br>• Miscellaneous materials required to produce the kit<br><br>• Carton, packing or palletizing completed kits<br><br>• Multiple ship-to destinations | ███████ |

██████████████████ will be charged for any item delivered that is not stacked properly or delivered to CONTRACTOR on an incorrect pallet size.

## Exhibit B

## PERFORMANCE STANDARDS

CARESOURCE will monitor CONTRACTOR's performance on a monthly basis and will perform a comprehensive review at least annually or as needed. This review may be onsite as appropriate. CONTRACTOR shall submit to CARESOURCE a monthly report, or as reasonably requested by CARESOURCE, that summarizes the status of the delegated services provided pursuant to this Agreement. The monthly report shall include, at a minimum, a copy of any required reports or logs maintained by CONTRACTOR and it shall set forth any problems, concerns or potential compliance issues that may exist relative to the delegated services provided pursuant to this Agreement.

Oversight:

Annually, there will be a comprehensive audit of CONTRACTOR's ability to provide goods and services according to the standards of CARESOURCE, State of Ohio, CMS, NCQA and URAC, as applicable. The evaluation shall include, but is not limited to, review of CONTRACTOR's program, work plans, policies and procedures and as applicable, random sample file reviews.

- CARESOURCE will provide CONTRACTOR with 30 business days advanced notice of commencement of the audit

- CARESOURCE will provide CONTRACTOR with a list of documents that will be audited; CONTRACTOR will send the requested documents to the CARESOURCE within 10 business days of receiving the request.

- CARESOURCE will review the documentation prior to the on-site visit

- CARESOURCE will provide CONTRACTOR with a list of files that will be audited.

- This list will be provided to CONTRACTOR 10 business days prior to the audit.

- CARESOURCE will conduct a summation meeting and will provide an overview of the CARESOURCE findings from the review of documentation and files.

- CARESOURCE will provide CONTRACTOR with a written report of the oversight findings within 7 calendar days from the completion of the on-site visit.

If the audit findings identify noncompliance with the designated standards, a Corrective Action Plan ("CAP") must be developed. CARESOURCE shall view CONTRACTOR's policies and procedures and other documents related to performance of its delegated responsibilities at CONTRACTOR's headquarters on an annual basis upon request.

**Corrective Action Plans (CAP):**

If CARESOURCE receives information through its monitoring plan and/or audit processes that CONTRACTOR or its subcontractors are not operating in accordance with this Agreement, federal or State requirements and is operating in a condition that renders the continuance of its business hazardous to the Covered Persons, CARESOURCE shall request a written and signed CAP from CONTRACTOR. Each CAP shall include, but not be limited to, the following:

- Expected, measurable results indicating completion of the CAP;

- Detailed action plan to complete activities required by the CAP; AND

- Due date for completion of CAP.

A.   Submission of the proposed CAP shall be made by CONTRACTOR to CARESOURCE within two (2) weeks of the notification from CARESOURCE, with a written explanation by CONTRACTOR of:

- CONTRACTOR's noncompliance that necessitated the CAP written agreement; or

- The existence of the condition that renders the continuance of CONTRACTOR's business hazardous to Covered Persons.

B.   Implementation of the CAP shall be completed within thirty (30) days of CONTRACTOR's receipt of written approval of the proposed CAP by CARESOURCE, unless an alternative completion period is approved by CARESOURCE in writing. The CAP shall accomplish the written expected results and such results must be validated by a CARESOURCE audit within the stated time frame in the CAP. Failure of CONTRACTOR or any of its subcontractors to comply with this provision may result at CARESOURCE's discretion, to either (i) impose financial penalties as defined in Exhibit D, or (ii) suspend or revoke the delegation.

C.   CARESOURCE shall cooperate with CONTRACTOR or its subcontractors to correct any failure by CONTRACTOR to comply with regulatory requirements relating to any matters:

- Delegated to CONTRACTOR by CARESOURCE; or

- Necessary for CARESOURCE to ensure compliance with statutory and regulatory requirements

D.   CARESOURCE shall notify its regulatory bodies and request intervention if:

- CARESOURCE does not receive a timely response from CONTRACTOR as required in Section 2A of this Exhibit; or

- CARESOURCE receives a timely response from CONTRACTOR as required above, but CARESOURCE and CONTRACTOR are unable to reach an agreement as to whether CONTRACTOR:

a) is complying with the CAP; or

b) has corrected any problem regarding a practice that is hazardous to Covered Persons of CARESOURCE.

CARESOURCE will monitor CONTRACTOR on an ongoing basis to identify opportunities for improvement. For delegation agreements that have been in effect for more than 12 months, CARESOURCE will work collaboratively with CONTRACTOR to identify and follow up on at least one opportunity for improvement annually, if applicable. Sources for identifying areas for improvement may include but are not limited to: pre-delegation evaluation, annual evaluation or ongoing reports.

When deficiencies are severe or unable to be resolved CARESOURCE reserves the right to withdraw the opportunity for or revoke the delegation arrangement, and terminate this Agreement in accordance with Section 6.2(a).

In the event that a performance deficiency is noted hereunder, in addition to any other remedies CARESOURCE has by reason of contract or law, CONTRACTOR shall (i) validate the remedy for the deficiency within fifteen (15) days of implementation of the CAP unless a longer period is accepted by CARESOURCE in writing; and (ii) within ten (10) days, provide an updated CAP acceptable to CARESOURCE for the remedy of any remaining deficiencies. Failure to cure such performance deficiency shall be a material breach of this Agreement at which point CONTRACTOR shall be subject to the corrective performance metrics listed below, at CARESOURCE's sole discretion.

- Any infractions shall be subject to sanctions as mandated by federal and/or state law.

- 1st infraction within 12 months, CONTRACTOR shall define source of problem and outline a CAP, which will be submitted to CARESOURCE for review and approval.

- 2nd infraction within 12 month or failure to meet requirements in CAP – Additional CAP and payment of any out of pocket expenses CARESOURCE incurs in order to obtain the services of another delegate to fulfill the obligations under this Agreement or any monetary fines or sanctions incurred, specifically as a result of the non-compliance of CONTRACTOR, each month until issue is rectified

- 3rd infraction within 12 months – Additional CAP and continued payment of any out of pocket expenses CARESOURCE incurs in order to obtain the services of another delegate to fulfill the obligations under this Agreement or any monetary fines or sanctions incurred, specifically as a result of the noncompliance of CONTRACTOR, until issue is rectified.

- Any additional breach shall result in termination of Agreement. CONTRACTOR shall be responsible for monetary sanctions imposed by federal and/or state government specifically as a result of the noncompliance of CONTRACTOR, and shall be responsible for any actual expenses CARESOURCE incurs in order to obtain the services of another delegate to fulfill the obligations under this Agreement.

**EXHIBIT C**

CONTRACTOR INSURANCE REQUIREMENTS

CONTRACTOR shall maintain, at its own expense, throughout the period of the Contract and any extensions thereof, the following minimum insurance coverages of the types and in the amounts described below that are applicable to the scope of work being performed:

1.      Workers Compensation and Employer's Liability Insurance. CONTRACTOR must carry Workers' Compensation Insurance (including occupational disease) in compliance with Workers' Compensation statutes of any applicable jurisdiction in which the Work is to be performed. For the attainment of Workers Compensation in monopolistic states, including Ohio, coverage must be secured through the state fund. If CONTRACTOR is a qualified self-insurer in compliance with the laws of the state, this is also acceptable. A certificate of compliance from the appropriate workers' compensation bureau or board must be provided with the certificate of insurance.

CONTRACTOR must also carry Employer's Liability Insurance with minimum limits of $500,000 each accident; $500,000 for disease (per employee); and $500,000 for disease (policy limit).

2.      Commercial General Liability Insurance. CONTRACTOR must carry Commercial General Liability Insurance written on ISO form CG 00 01 10 01 (or its equivalent) with limits of $1,000,000 per occurrence and $2,000,000 in the aggregate. Commercial General Liability coverage shall be maintained for at least two years after completion of CONTRACTOR'S work performed under this contract.

3.      Commercial Auto Liability Insurance. CONTRACTOR shall carry Commercial Automobile Liability Insurance covering all owned, leased and non-owned vehicles used in connection with the work to be performed under this contract, if any, with limits of not less than $1,000,000 combined single limit per accident for bodily injury and property damage.

4.      Requirements common to all policies.

a.              CONTRACTOR shall be solely responsible for reimbursing any deductible amount to the insurer, even if payment is being made on behalf of CARESOURCE as an additional insured on CONTRACTOR'S policy.

b.      CONTRACTOR waives all rights of recovery it may otherwise have against CARESOURCE (including its directors, officers, affiliates and employees) to the extent these damages are covered by any of CONTRACTOR'S insurance policies as required in this contract.

c.      All insurance required hereunder shall be placed with insurers that have a minimum A.M. Best's rating of A-/VIII and shall be insurers authorized to do business in the state of Ohio.

d.      A certificate(s) of insurance showing that CONTRACTOR'S insurance coverage is in compliance with the insurance requirements set forth below must be completed by the CONTRACTOR'S insurance agent, broker, or insurance company, and provided to CARESOURCE. All certificates (other than Ohio workers'

compensation) shall endeavor to provide for thirty (30) days written notice to CARESOURCE prior to cancellation or non-renewal of any insurance coverage referred to therein. The certificate shall reference CARESOURCE's status as an additional insured under both the General Liability and Auto policies.

e.     Failure of CARESOURCE to request certificate(s) or other evidence of full compliance with these insurance requirements (or failure of CARESOURCE to identify and/or object to a deficiency in the certificate(s) that is/are provided by CONTRACTOR) shall not be construed as a waiver of CONTRACTOR'S obligations to maintain such insurance. CARESOURCE shall have the right, but not the obligation, to prohibit CONTRACTOR from beginning performance under this contract until such certificates or other evidence that insurance has been placed in complete compliance with the above insurance requirements is received and approved by CARESOURCE. CONTRACTOR shall provide certified copies of all insurance policies required above within ten (10) days of written request from CARESOURCE.

f.     By requiring insurance herein, CARESOURCE does not represent that coverage and limits will necessarily be adequate to protect CONTRACTOR, and such coverage limits shall not be deemed as a limitation on CONTRACTOR'S liability for services provided to or on behalf of CARESOURCE.

**Exhibit D**
**Delegation Oversight**

This Attachment sets forth the terms and conditions under which CARESOURCE will delegate ***printing and mailing services*** to CONTRACTOR (the "Delegate"). In order to receive approval to perform these activities Delegate must be found to be in compliance with the policies and procedures of CARESOURCE related to the delegated duties and the accrediting body standards for accreditations that CARESOURCE pursues, i.e. The National Committee for Quality Assurance (NCQA) – Utilization Review Accreditation Commission (URAC) standards, and Federal and State regulations, and must receive written approval from CARESOURCE. The terms of this Exhibit will be effective on the Effective Date of the Agreement and will continue in effect until the Agreement is terminated by CARESOURCE or Delegate.

**General Delegation Provisions**

A.  If CARESOURCE has reason to believe that the Delegate is not carrying out the delegated activities in accordance with the terms of this Agreement, CARESOURCE may take such measures as it deems necessary, including but not limited to the following:
1.  Focused audit of the Delegate's performance of the delegated activities, upon advance written notice.
2.  Require the Delegate to submit, within a specified time frame, a corrective action plan to address any compliance or other problems identified by CARESOURCE.
3.  Require the Delegate to implement, by a specified time, a corrective action plan approved by CARESOURCE and with CARESOURCE assistance as needed.
4.  Revoke or change delegation for specific delegated activities.

B.  This Exhibit will automatically terminate upon the termination of the Agreement.

C.  Reporting shall be completed as set forth in the approved PRD as described in Exhibit A.

D.  CARESOURCE may revoke any or all delegated activities if they determine that:
1.  The delegated activities are not being performed to the best of the Delegate's abilities;
2.  The delegated activities are not in accordance with the standards, protocols, policies and procedures established by CARESOURCE;
3.  The Delegate has allowed the termination or lapse of the insurance requirements specified in this Exhibit C;
4.  The Delegate's performance of delegated activities is inconsistent with, or in violation of, state law and regulations or federal law and regulations; or
5.  The Delegate has placed in jeopardy of revocation or non-renewal, CARESOURCE's licensure or accreditation by any accrediting body.

E.  CARESOURCE will provide the Delegate with thirty (30) calendar days' prior written notice specifying the delegated activities which CARESOURCE intends to revoke, unless CARESOURCE determines that the Delegate's continued performance of delegated activities presents a risk of harm to Covered Persons, in which case the delegated activities will be revoked immediately. If the Delegate does not conform to

the applicable standards, protocols, policies and procedures within such thirty (30) calendar day notice period, CARESOURCE will send a second written notice to the Delegate confirming the revocation of the delegated activities, the effective date of such revocation and the period of time such revocation will remain in effect. During this period, the Delegate will take corrective action to conform to all applicable standards, protocols, policies and procedures established by CARESOURCE. At the end of such period, CARESOURCE Delegation Oversight Committee will evaluate the Delegate's corrective action, determine the status of and/or renewal of the delegated activities, and will provide written notice to the Delegate of such determination.

F.    Notwithstanding CARESOURCE's right to revoke delegated activities, Delegate's failure to perform the delegated activities will be a breach of the Agreement. In such an event, CARESOURCE may exercise all of its rights and remedies described herein or in the Agreement to enforce the Agreement including the right of termination.

G.    The provisions of this Exhibit regarding revocation of delegated activities shall supersede any inconsistent provisions in the Agreement.

H.    The Parties agree that they will amend this Exhibit in order to conform to any prescribed changes mandated by a federal, state, or local legislative or regulatory body or in the standards of any applicable accrediting body.

**EXHIBIT E**

**OHIO EXECUTIVE ORDER 2011-12K**

**[PLEASE SEE ATTACHED]**

**THIS PAGE INTENTIONALLY LEFT BLANK**



**JOHN R. KASICH**
GOVERNOR
STATE OF OHIO

**Executive Order 2011-12K**

Governing the Expenditure
of Public Funds for Offshore Services

**WHEREAS**, State of Ohio officials and employees must remain passionately focused on initiatives that will create and retain jobs in the United States in general and in Ohio in particular, and must do so especially during Ohio's continuing efforts to recover from the recent recession.

**WHEREAS**, allowing public funds to pay for services provided offshore has the potential to undermine economic development objectives in Ohio.

**WHEREAS**, the expenditure of public funds for services provided offshore may deprive Ohioans and other Americans of critical employment opportunities and may also undermine efforts to attract businesses to Ohio and retain them in Ohio, initiatives in which this State has invested heavily.

**NOW THEREFORE**, I, John R. Kasich, Governor of the State of Ohio, by virtue of the authority vested in me by the Constitution and the laws of this State, do hereby order and direct that:

1. No State Cabinet Agency, Board or Commission ("Executive Agency") shall enter into any contract which uses any public funds within its control to purchase services which will be provided outside the United States. This Executive Order applies to all purchases of services made directly by an Executive Agency and services provided by subcontractors of those providing services purchased by an Executive Agency.

2. This Executive Order will be personally provided, by the Director, Chair or other chief executive official of each Executive Agency, to the Chief Procurement Officer or other individual at that entity responsible for contracts for services.

3. The Department of Administrative Services, through Ohio's Chief Procurement Officer, shall have in place, by July 1, 2011, procedures to ensure all of the following:

   a. All agency procurements officers (APOs), or the person with equivalent duties at each Executive Agency, have standard language in all Executive Agency contracts which:

      i. Reflect this Order's prohibition on the purchase of offshore services.

      ii.  Require service providers or prospective service providers to:

           1.  Affirm that they understand and will abide by the requirements of this Order.
           2.  Disclose the location(s) where all services will be performed by any contractor or subcontractor.
           3.  Disclose the locations(s) where any state data associated with any of the services they are providing, or seek to provide, will be accessed, tested, maintained, backed-up or stored.
           4.  Disclose any shift in the location of any services being provided by the contractor or any subcontractor.
           5.  Disclose the principal location of business for the contactor and all subcontractors who are supplying services to the state under the proposed contracts.

    b.  All APOs confirm that all quotations, statements of work, and other such proposals for services affirm this Order's prohibition on the purchase of offshore services and include all of this Order's disclosure requirements.

      i.  Any such proposal for services lacking the affirmation and disclosure requirements of this Order will not be considered.
      ii.  Any such proposal where the performance of services is proposed to be provided at a location outside the United States by the contractor or any subcontractor will not be considered.

    c.  All procurement manuals, directive, policies, and procedures reflect the requirements of this Order.

    d.  All APOs have adequate training which addresses the terms of this Order.

4.  Nothing in this Order is intended to contradict any state or federal law.  In addition, this Order does not apply to:

    a.  Services necessary to support the efforts of the Department of Development to attract jobs and business to the state of Ohio;
    b.  Academic, instructional, educational, research or other services necessary to support the international missions of Ohio's public colleges and universities; or
    c.  Situations in which the Director of the Department of Administrative Services, or the Director's designee, shall determine that it is an emergency or that it is necessary for the State to waive some or all of the requirements of this Order.  The Director shall establish standards by which Executive Agencies may request a waiver of some or all of the requirements of this Order and by which such requests will be evaluated and may be granted.

5.  Executive Order 2010-09S is hereby rescinded.

I signed this Executive Order on June 21, 2011 in Columbus, Ohio and it will expire on my last day as Governor of Ohio unless rescinded before then.



_____
John R. Kasich, Governor

ATTEST:

_____
Jon Husted, Secretary of State

Page 3 of 3

THIS PAGE INTENTIONALLY LEFT BLANK

**Exhibit F**

**Service Level Warranties and Penalties**

**Performance Guarantees**

CONTRACTOR will provide services in accordance with Exhibit A- Scope of Services.

CONTRACTOR will provide Monthly and Annual Reporting as per the Performance Guarantee and Reporting Grid below.

CONTRACTOR and CARESOURCE will mutually determine the amount of fees at risk for each item not to exceed 10% of the total CONTRACTOR monthly fees for all performance guarantees combined in the month the non-compliance occurs under this Agreement. CONTRACTOR shall not be responsible for any performance guarantees in the event that the failure to meet the guarantee is due solely to the error or omission of CARESOURCE.

| PERFORMANCE STANDARDS and REPORT REQUIREMENTS: | | | |
|---|---|---|---|
| **Standard** | **Target** | **Reported** | **Remedy** |
| CareAdvance and Care Treatment Plans communication fulfillment and mailing:<br>SLA- files received by 7am are mailed the following business day. | 100% Compliance | Weekly | |
| Reporting must be accurate and in accordance with the required timeline as agreed to by the parties in the specifications document or as agreed to for ad hoc reporting requirements. | 100% Compliance | Timeline agreed to in PRD or Ad Hoc with committed completio date | |

| | | | |
|---|---|---|---|
| Provide an annual evaluation report with a comprehensive review of the past year's activities and level of performance: identify ongoing ability to perform the delegated activity due no later than the 3rd week of the month following the anniversary of the contract. | 100% Compliance | Annually | ██████ |
| OH Medicaid New Member Kit and ID cards fulfillment and mailing: SLA- CONTRACTOR ensures the ID cards and NMK are shipped to ensure delivery to members prior to the first day of the month. | 100% Compliance | Monthly | ██████ |
| OH Notice of Action (NOA) fulfillment and mailing: SLA- files received weekly are mailed in 2 business days. | 100% Compliance | Weekly | ██████ |
| OH Explanation of Benefit (EOB) fulfillment and mailing: SLA- files received by 15th of the month must mail before the end of the month. This is an annual mailing and takes place in June. | 100% Compliance | Annually | ██████ |
| | | | |
| | | | |

| | | |
|---|---|---|
| **Corrective Action Plans (CAP):** A CAP is defined as any action required to correct an issue or improve a process that CARESOURCE designates due to a defined deficiency.<br><br>All components within the CAP will be completed by the due date designated in the CAP.<br><br>The total amount of CAP's initiated in one quarter will not exceed 3 CAPS | 100% Compliance | Quarterly |
| **Auditing:** | | |
| The Vendor Quality Audit process will be performed monthly and CARESOURCE will receive a report of the study and results on a monthly basis. | 100% Compliance | Monthly |
| | Total Fees at risk: | |

# EXHIBIT G

## CARESOURCE

### Medicaid Delegation Subcontract Addendum

This Addendum supplements the Base Contract between **CARESOURCE** and Delegated effective **as of the last dated signature set forth below** and runs concurrently with the terms of the Base Contract. This Addendum is limited to the terms and conditions governing the provision of services to or on behalf of **CARESOURCE** in the fulfillment of **CARESOURCE's** contractual responsibilities to the Ohio Department of Medicaid (ODM) in the provision of health care services to Medicaid members.

## ADDENDUM DEFINITIONS

| Agreement/ Base Contract | The contract between the MCP and the subcontractor (delegated entity). |
|---|---|
| Managed Care Plan (MCP) | A Medicaid managed care plan that enters into a provider agreement with ODM to serve Medicaid consumers, which may include dually-eligible consumers who are enrolled in the MyCare Ohio (aka Integrated Care Delivery System- ICDS) Plans. |
| Medicaid | Medical assistance provided under a state plan approved under Title XIX of the Social Security Act. |
| Member | A Medicaid recipient enrolled under the care management system pursuant to ORC 5167. |
| OAC | Ohio Administrative Code. |
| ODM | Ohio Department of Medicaid. |
| ORC | Ohio Revised Code. |

## ADDENDUM PROVISIONS

The provisions of this Medicaid Delegation Subcontract Addendum supersedes any language to the contrary which may appear elsewhere in the Base Contract.

Participating delegated subcontractors agree to abide by all of the following specific terms:

1. Exhibit A describes the services to be provided by the delegated subcontractor, including an implementation timetable, if applicable.

2. Subcontractor agrees to release to the MCP and ODM any information necessary for the MCP to perform any of its obligations under the ODM provider agreement, including, but not limited to compliance with reporting and quality assurance requirements.

3. Subcontractor agrees to provide a report to the MCP, on at least a monthly basis, summarizing the status of the delegated activity, including a copy of any required reports or logs maintained by the subcontractor, the submission dates for any required documentation sent to ODM, and indicating any problems, concerns or potential compliance issues which may exist.

4.  Subcontractor agrees that their applicable facilities and records will be open to inspection by the MCP, ODM or its designee, or other entities as specified in OAC rule 5160-26-06.

5.  The terms of the Base Contract, relating to the beginning date and expiration date or automatic renewal clause, as well as applicable methods of extension, renegotiation and termination apply to this Addendum.

6.  Notwithstanding Item 5 of this Addendum, the MCP must give the subcontractor at least sixty days prior notice for the nonrenewal or termination of the Base Contract except in cases where an adverse finding by a regulatory agency or health or safety risks dictate that the Base Contract be terminated sooner.

7.  Notwithstanding item 5 of this addendum, the subcontractor may non-renew or terminate the Base Contract if one of the following occurs:

    (A)  The subcontractor gives the MCP at least sixty days prior notice for the nonrenewal or termination of the Base Contract the effective date of the nonrenewal or termination must be the last day of the month; or

    (B)  ODM proposed action in accordance with OAC Chapter 5160, including rule 5160-26-10 (G), regardless of whether the action is appealed. The subcontractor's nonrenewal or termination notice must be received by the MCP within fifteen working days prior to the end of the month in which the subcontractor is proposing nonrenewal or termination. If the notice is not received by this date, the subcontractor must extend the nonrenewal or termination date to the last day of the subsequent month.

8.  Subcontractor agrees to provide services through the last day the Base Contract is in effect.

9.  The procedures to be employed upon the ending, nonrenewal, or termination of this Base Contract, apply to this Addendum including the subcontractor's Base Contract to promptly supply any documentation necessary for the settlement of any outstanding claims.

10. Subcontractor agrees the Base Contract and Addendum are governed by, and are construed in accordance with all applicable laws, regulations, and contractual obligations of the MCP.

    (A)  ODM will notify the MCP and the MCP shall notify the subcontractor of any changes in applicable state or federal law, regulations, waiver, or contractual obligation of the MCP.

    (B)  This Base Contract and Addendum shall be amended to conform to such changes by written execution of an amendment which will outline all such applicable contractual obligations which are changed.

    (C)  The MCP shall notify the provider of all applicable contractual obligations.

11.     Subcontractor shall not discriminate in the delivery of Medicaid services based on a member's race, color, religion, gender, genetic information, sexual orientation, age, disability, national origin, military status, ancestry, health status or need for health services.

12.     Subcontractor shall be bound by the same standards of confidentiality that apply to the ODM and the state of Ohio as described in OAC rule 5160:1-1-51.1and 45 CFR Parts 160 and 164, including standards for unauthorized uses or disclosures of protected health information (PHI).

13.     Subcontractor agrees to comply with the provisions for record keeping and auditing in accordance with OAC Chapter 5160-26.

14.     Subcontractor agrees the MCP's payment constitutes payment in full for any covered services or for any other services performed by the subcontractor pursuant to the Base Contract and will not charge the member or ODM any copayment, cost sharing, down-payment, or similar charge, refundable or otherwise. This agreement does not prohibit Nursing Facilities (NFs) or waiver entities from collecting patient liability payments from members as specified in OAC rule 5160:1-3-24 or Federally Qualified Health Centers (FQHCs) and Rural Health Clinics (RHCs) from submitting claims for supplemental payments to ODM as specified in OAC rules 5160-28-07 and 5160-16-05.

15.     Subcontractor agrees not to hold liable both ODM and the member in the event the MCP cannot or will not pay for covered services performed by the subcontractor pursuant to the Base Contract.

16.     Subcontractor and all employees of subcontractor are duly registered, licensed or certified under applicable state and federal statutes and regulations to provide the services are the subject of the Base Contract and subcontractor and all employees of subcontractor are not excluded from participating in federally funded health care programs.

17.     Subcontractor shall be compensated pursuant to the method and in the amounts specified in **Exhibit A-1**.

18.     Provider agrees to provide services to all eligible Medicaid consumer populations as specified in the Ohio Department of Medicaid Provider Agreement. Indicate one or both:

       X  Medicaid non-dual populations       X MyCare Ohio Medicare/Medicaid populations

19.     Provider agrees to provide services to MyCare Ohio consumers within the designated service area.

20.     Any amendment to Exhibit A-1) specified in items 1 and 17 of this Addendum must be agreed to in writing by both parties.

21.     If subcontractor is a third party administrator (TPA), subcontractor agrees to include all elements of this Addendum in its subcontracts and ensures that its subcontractors forward information to ODM as requested.

22.    Subcontractors providing direct services to members agree to identify and where indicated arrange pursuant to the mutually agreed upon policies and procedures between the MCP and subcontractor, for the following at no cost to the member:

      (A)    Sign language services.

      (B)    Oral interpretation and oral translation services.

23.    If the subcontractor has been delegated decision-making authority which may determine the reduction, suspension, denial or termination of services and the subcontractor issues the state hearing notification to the member, the subcontractor must agree to copy the MCP on any notification to a member of the member's right to request a state hearing.

24.    Subcontractor agrees to immediately forward any information regarding a member's appeal or grievance (complaint) as defined in OAC rule 5160-26-08.4 to the MCP for processing.

25.    MCP agrees to provide the subcontractor with copies of all relevant information received from ODM.

26.    Subcontractor agrees not to identify the addressee as a Medicaid consumer on the outside of the envelope when contacting members by mail.

27.    Subcontractor in performance of the subcontract or in the hiring of any employees for the performances of service under the subcontract, shall not by reason of race, color, religion, gender, sexual orientation, age, disability, national origin, military status, health status genetic information or ancestry discriminate against any citizen of Ohio in the employment of a person qualified and available to perform the services to which the subcontract relates.

28.    Subcontractor shall not in any manner discriminate against, intimidate, or retaliate against any employee hired for the performance of services under the subcontract on account of race, color, religion, gender, sexual orientation, age, disability, national origin, military status, health status, genetic information or ancestry.

29.    Subcontractor agrees to cooperate with the MCP's quality assessment and performance improvement (QAPI) program in all the MCP's subcontracts and employment agreements for physician and non-physician providers.

30.   The MCP shall disseminate written policies that include detailed information about the False Claims Act and other provisions named in 42 U.S.C. Section 1396a(a)(68), any related State laws pertaining to civil or criminal penalties whistleblower protection under such laws as well as the MCP's policies and procedures for detecting and preventing fraud, waste, and abuse; and the subcontractor agrees to abide by the MCP's written policies regarding the False Claims Act and the detection and prevention of fraud, waste, and abuse.

31.   Subcontractor must cooperate with the ODM external quality review identified in OAC 5160, including rule 5160-26-07.

32.   Subcontractor must supply, upon request, the business transaction information required under 42 C.F.R. 455.105.

The Ohio Department of Medicaid permits changes to Attachment A by mutual written agreement of both parties and without renegotiation of the Base Contract or this Addendum.

| Signatures | |
|---|---|
| MCP Name: **CARESOURCE** | The Standard Register Company: |
| Signature: | Signature: |
| Printed Name: Bobby Jones | Printed Name: Joseph P. Morgan, Jr. |
| Title: Chief Operating Officer | Title: President & CEO |
| Date: 1/15/15 | Date: 1/13/15 |

APPROVED LEGAL

**Attachment A: Services to be Provided**

The following services are provided for (**CARESOURCE**):

| | |
|---|---|
| ☐ | Credentialing/Recredentialing - (e.g., to begin MM/DD/YY) |
| ☐ | Utilization Management (prior authorization/pre-certification) |
| ☐ | Case Management and/or Waiver Services Coordination - (e.g., To begin MM/DD/YY) |
| ☐ | 24-hour Toll-Free Hotline |
| ☐ | State Hearing Notification - Forms 4043, 4046, and 4066 |
| ☐ | Claims Processing |
| X | Other:Click here to enter text.Print Management and Fulfillment |

| Signatures | |
|---|---|
| MCP Name: **CARESOURCE** | The Standard Register Company: |
| Signature: *Bobby Jones* | Signature: |
| Printed Name: *Bobby Jones* | Printed Name: Joseph P. Morgan, Jr. |
| Title: *COO* | Title: President & CEO |
| Date: *1/14/15* | Date: *1/13/15* |

APPROVED
LEGAL

**EXHIBIT H**
**Medicare Amendment**

WHEREAS, CARESOURCE is a Medicare Advantage Organization. CMS requires that specific terms and conditions be incorporated into the Agreement between a Medicare Advantage Organization and a First Tier Entity or Downstream Entity to comply with the Medicare laws, regulations, and CMS instructions, including, but not limited to, the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 ("MMA"); and

WHEREAS, except as provided herein, all other provisions of the Agreement between CARESOURCE and CONTRACTOR not inconsistent herein shall remain in full force and effect. This amendment shall supersede and replace any inconsistent provisions to such Agreement or provisions of similar concept; to ensure compliance with required CMS provisions, and shall continue concurrently with the term of such Agreement.

NOW, THEREFORE, the parties agree as follows:

**Definitions:**

Centers for Medicare and Medicaid Services ("CMS"): the agency within the Department of Health and Human Services that administers the Medicare program.

Completion of Audit: completion of audit by the Department of Health and Human Services, the Government Accountability Office, or their designees of a Medicare Advantage Organization, Medicare Advantage Organization contractor or related entity.

Downstream Entity: any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services.

Final Contract Period: the final term of the contract between CMS and the Medicare Advantage Organization.

First Tier Entity: any party that enters into a written arrangement, acceptable to CMS, with an MA organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the MA program.

Medicare Advantage ("MA"): an alternative to the traditional Medicare program in which private plans run by health insurance companies provide health care benefits that eligible beneficiaries would otherwise receive directly from the Medicare program.

Medicare Advantage Organization ("MA organization"): a public or private entity organized and licensed by a State as a risk-bearing entity (with the exception of provider-sponsored organizations receiving waivers) that is certified by CMS as meeting the MA contract requirements.

Member or Enrollee: a Medicare Advantage eligible individual who has enrolled in or elected coverage through a Medicare Advantage Organization.

Provider: (1) any individual who is engaged in the delivery of health care services in a State and is licensed or certified by the State to engage in that activity in the State; and (2) any entity that is engaged in the delivery

of health care services in a State and is licensed or certified to deliver those services if such licensing or certification is required by State law or regulation.

Related entity: any entity that is related to the MA organization by common ownership or control and (1) performs some of the MA organization's management functions under contract or delegation; (2) furnishes services to Medicare enrollees under an oral or written agreement; or (3) leases real property or sells materials to the MA organization at a cost of more than $2,500 during a contract period.

**Required Provisions:**

CONTRACTOR agrees to the following as the terms apply to the services being provided by the CONTRACTOR:

1. HHS, the Comptroller General, or their designees have the right to audit, evaluate, and inspect any pertinent information for any particular contract period, including, but not limited to, any books, contracts, computer or other electronic systems (including medical records and documentation of the first tier, downstream, and entities related to CMS' contract with CARESOURCE, (hereinafter, "MA organization") through 10 years from the final date of the final contract period of the contract entered into between CMS and the MA organization or from the date of completion of any audit, whichever is later. [42 C.F.R. §§ 422.504(i)(2)(i) and (ii)]

2. CONTRACTOR will comply with the confidentiality and enrollee record accuracy requirements, including: (1) abiding by all Federal and State laws regarding confidentiality and disclosure of medical records, or other health and enrollment information, (2) ensuring that medical information is released only in accordance with applicable Federal or State law, or pursuant to court orders or subpoenas, (3) maintaining the records and information in an accurate and timely manner, and (4) ensuring timely access by enrollees to the records and information that pertain to them. [42 C.F.R. §§ 422.504(a)(13) and 422.118]

3. Enrollees will not be held liable for payment of any fees that are the legal obligation of the MA organization. [42 C.F.R. §§ 422.504(i)(3)(i) and 422.504(g)(1)(i)]

4. Any services or other activity performed in accordance with a contract or written agreement by CONTRACTOR are consistent and comply with the MA organization's contractual obligations. [42 C.F.R. § 422.504(i)(3)(iii)]

5. CONTRACTOR and any related entity, contractor or subcontractor will comply with all applicable Medicare laws, regulations, and CMS instructions. [42 C.F.R. §§ 422.504(i)(4)(v)]

6. If any of the MA organization's activities or responsibilities under its contract with CMS are delegated to any first tier, downstream and related entity:

(i) The delegated activities and reporting responsibilities are specified in the following Exhibits of the Agreement:

Exhibit A, Exhibit B, Exhibit D, Exhibit F, and Exhibit G

(ii)　　　　　CMS and the MA organization reserve the right to revoke the delegation activities and reporting requirements or to specify other remedies in instances where CMS or the MA organization determine that such parties have not performed satisfactorily.

(iii)　　　　　The MA organization will monitor the performance of the parties on an ongoing basis as specified in the following Exhibits of the Agreement:

Exhibit A, Exhibit B, Exhibit D, Exhibit F, and Exhibit G

(iv)　　　　　The credentials of medical professionals affiliated with the party or parties will be either reviewed by the MA organization or the credentialing process will be reviewed and approved by the MA organization and the MA organization must audit the credentialing process on an ongoing basis.

If the MA organization delegates the selection of providers, contractors, or subcontractor, the MA organization retains the right to approve, suspend, or terminate any such arrangement.
[42 C.F.R. §§ 422.504(i)(4) and (5)]

In the event of a conflict between the terms and conditions above and the terms of a related agreement, the terms above control.

IN WITNESS WHEREOF, the parties hereto have executed this amendment as of the date set forth below each signature.

CARESOURCE                                The Standard Register Company

By: _____       By: _____

Name: _____       Name _Joseph P. Morgan, Jr._____

Title: _____COO_____       Title: _President & CEO_____

Date: ____1/14/15_____       Date: ____1/13/15_____

APPROVED LEGAL