**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*: | : | Chapter 11 |
| | : | |
| THE STANDARD REGISTER COMPANY, *et al.*[1] | : | Case No. 15-10541 (BLS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Hearing Date: 5/12/15 at 10:00 a.m. |
| | : | Objection Deadline: 5/4/15 at 4:00 p.m. |
| | : | Extended by Agreement to 5/6/15 |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION
FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 105, 363(b) AND
503(c) OF THE BANKRUPTCY CODE, (I) APPROVING THE DEBTORS'
KEY EMPLOYEE INCENTIVE PLAN; (II) AUTHORIZING THE DEBTORS
TO PAY INCENTIVE BONUSES TO CERTAIN EMPLOYEES; AND
(III) GRANTING RELATED RELIEF (D.I. 308)**

In support of his Objection to the Debtors' Motion for Entry of an Order, Pursuant to Sections 105, 363(b) and 503(c) of the Bankruptcy Code, (I) Approving the Debtors' Key Employee Incentive Plan; (II) Authorizing the Debtors to Pay Incentive Bonuses to Certain Employees; and (III) Granting Related Relief (the "KEIP Motion"), Andrew R. Vara, Acting United States Trustee for Region 3 ("U.S. Trustee"), by undersigned counsel, avers as follows:

1. This Court has jurisdiction to hear this Objection.

2. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a).

*Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. In furtherance of his case supervisory responsibilities, as well as pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to raise and be heard on this Objection.

## FACTUAL BACKGROUND

4. The Debtors commenced this case on March 12, 2015 (the "Petition Date") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' cases were ordered jointly administered on March 13, 2015.

5. The U.S. Trustee appointed an official committee of unsecured creditors on March 24, 2015.

6. On April 19, 2015, the Debtors filed the KEIP Motion, together with a motion for authority to file a Summary of the proposed Key Employee Incentive Plan under seal (the "Seal Motion").

7. The KEIP Motion publicly discloses only the following essential aspects of the proposed KEIP:

    (a) 49 senior level or executive employees of the Debtors, comprising less than 2% of the Debtors' workforce, have been identified as KEIP Participants. The Debtors acknowledge in the KEIP Motion that certain of the KEIP Participants are "likely" insiders. [2]

---

[2] Negotiations with secured lenders and the Creditors' Committee after the Debtors filed the KEIP Motion may have modified the pool of KEIP Participants.

(b) The KEIP sets forth several levels at which compensation may be paid. The KEIP establishes a "Target Opportunity" of approximately $3,620,053, equally divided between an "ambitious" revenue goal and an "ambitious" EBITDARP[3] goal for fiscal year 2015. A maximum of approximately $4,344,064 would be payable under the KEIP.

(c) KEIP Participants will earn 80% of the Revenue Target Opportunity if applicable revenue is approximately 98% of the goal, up to a maximum of 120% of the Revenue Target Opportunity if applicable revenue is approximately 102% of the goal, with intermediate amounts interpolated on a straight line formula. No payments will be made on account of the revenue goal if the 98% threshold is not met.

(d) KEIP Participants will earn 80% of the EBITDARP Target Opportunity if applicable EBITDARP is approximately 95% of the goal, up to a maximum of 120% of the EBITDARP Target Opportunity if applicable EBITDARP is approximately 109% of the goal, again with intermediate amounts interpolated on a straight line formula. No payments will be made on account of the EBITDARP goal if the 95% threshold is not met.

**BASIS FOR RELIEF**

8. The Debtors do not disclose in the KEIP Motion, and seek by the separately filed Seal Motion to avoid publicly disclosing the KEIP Participants' names, job titles, responsibilities, current salaries, and proposed incentive payment amounts, nor do they disclose the actual revenue and EBITDARP goals that will entitle KEIP Participants to incentive

---

[3] Earnings before interest, taxes, depreciation, amortization, restructuring, and pension amortization and settlement.

payments. Indeed, the Debtors seek authority to file the entire KEIP Summary under seal, limiting public knowledge of the KEIP's terms to the Debtors' description in the KEIP Motion. The public would be permitted to see only a summary of the sealed KEIP Summary. The U.S. Trustee has filed a separate objection to the Seal Motion.

9. The Debtors do not explain in the KEIP Motion how the revenue and EBITDARP targets were established, leaving the U.S. Trustee, the Court, and other parties in interest to speculate on the degree of difficulty in achieving those targets and whether those performance goals virtually guarantee the KEIP Participants will receive payments under the KEIP. Nor do they provide information on any possible correlation or difference between the financial performance goals under the KEIP and the financial performance covenants established under the extant debtor-in-possession financing.

10. The Debtors do not disclose in the KEIP Motion the dates and amounts of any bonuses or incentive compensation already paid to KEIP Participants during the one-year period preceding the petition date. Similarly, they do not disclose whether the KEIP is in lieu of, or in addition to, other bonuses or incentive compensation that may be earned by KEIP Participants.

11. The Debtors assert that payments under the KEIP would be made only after the closing of a sale of the Debtors' assets, and would be paid only by the buyer of the Debtors' assets, and only if the buyer agreed to make such payments, and therefore be without cost to the Debtors or their estates.

(a) KEIP Motion Paragraph 21 states that "after the Sale closes, all KEIP Payments will be the ultimate responsibility of the Buyer, as the KEIP conditions payment on the Buyer assuming the Debtors' responsibilities under the KEIP upon closing or making appropriate payments at that time."

(b) KEIP Motion Paragraph 26 states that the Buyer must agree to either pay (or provide cash to the Debtors to pay) the amount due to each Participant or employ such Participant under terms that (i) would not enable the Participant to refuse such employment or to terminate such employment for Good Reason, and (ii) include assumption of the Debtors' KEIP obligations to the Participant.

(c) KEIP Motion Paragraph 37 states in part that "any payout under the KEIP will ultimately be the Buyer's responsibility, as payment is contingent on the Buyer making KEIP payments or assuming such responsibilities in conjunction with the Sale."

(d) KEIP Motion Paragraph 48 states in part that "the overall cost of the KEIP is reasonable, especially given (i) the Buyer's responsibilities with respect thereto…."

12. Despite these statements, the absence of obligation by the Debtors and their estates under the KEIP is not so clear.

(a) The proposed form of order annexed to the KEIP Motion provides that all amounts earned and payable thereunder shall have administrative expense priority under Sections 503(a) and 507(a)(2), and the KEIP Motion asserts that the KEIP meets the requirements of Section 503(c)(3). This appears to contradict the four separate statements in the KEIP Motion that the cost of the KEIP will be borne solely by the Buyer.

(b) Section 5.21 of the Asset Purchase Agreement ("APA") executed among the Debtors and stalking horse Buyer Standard Acquisition Holdings, LLC ("Stalking Horse APA") provides for the *possibility* of the Debtors and the Buyer agreeing on a form of Employee Incentive Plan and to seek the Court's approval therefor. However, no provision of the Stalking Horse APA obligates the Buyer to agree to any form of

Employee Incentive Plan.  Under Stalking Horse APA Section 5.21, the Debtors and the Buyer each have sole discretion not to agree to any form of Employee Incentive Plan.

(c)     Stalking Horse APA Section 2.3(a)(v) describes as an Assumed Liability "all Liabilities (i) arising under the Employee Incentive Plan to the extent not paid pursuant to the DIP Budget … ; and (ii) assumed by the Buyers pursuant to Section 5.5." This suggests that the Stalking Horse Buyer may decline to assume Employee Incentive Plan obligations, either altogether or with respect to particular KEIP Participants.

(i)     The KEIP Motion does not disclose the circumstances under which KEIP incentive payments would be made pursuant to the DIP Budget rather than by the Buyer.

(ii)    The KEIP Motion does not explain why KEIP payments made "pursuant to the DIP Budget" would somehow not be funded by the Debtors and their estates, rather than the Stalking Horse Buyer.

13.    The bidding procedures previously approved by the Court do not require competing bidders to agree to fund a KEIP.  Indeed, under the approved bidding procedures, competing bidders may mark up the proposed form of APA and may therefore eliminate any provisions relating to an Employee Incentive Plan.

(a)     Paragraph (d) of the Bid Requirements section of the Bidding Procedures annexed to the Order Establishing Sale Procedures provides as follows:

> <u>Accrued Payments to Employees</u> Each Qualified Bid must provide, as to each employee of the Debtors, for either (a) the hiring of such employee and the assumption of all obligations of the Debtors, other than those funded through the Budget (as provided in the interim order approving postpetition financing [Docket No. 59] and in such final order thereon,

such budget, the "DIP Budget"), to such employee relating to postpetition, unpaid wages, salaries, commissions and other amounts, earned or accrued by or in respect of such employee, or (b) payment to the Debtors, in cash, for the amounts owed by the Debtors, other than those funded through the DIP Budget, to such employee relating to postpetition, unpaid wages, salaries, commissions and other amounts, earned or accrued by or in respect of such employee.

(b)     The U.S. Trustee respectfully submits that the foregoing provision does not encompass obligations under an Earned Incentive Plan as described in Stalking Horse APA Section 5.21, and in fact undermines the provision in Section 5.21 that the Buyer have sole discretion not to agree to any form of Employee Incentive Plan.  One would anticipate that the discretion granted to the Stalking Horse Buyer under APA Section 5.21 would also be granted to all other potential bidders.

(c)     The U.S. Trustee further respectfully submits that the foregoing provision does not provide adequate notice to parties in interest -- especially potential bidders --  of the Debtors' intention to deprive competing bidders of the discretion granted to the Stalking Horse Buyer in Section 5.21 of the Stalking Horse APA to decline to approve any form of Employee Incentive Plan, and of their intention to bind any competing bidder to any agreement by the Stalking Horse Buyer to assume liability for a KEIP, thereby barring competing bidders from excising Section 5.21 of the Stalking Horse APA from their own markups of the APA.

14.     The KEIP Motion is silent as to who will bear responsibility for funding payments under the KEIP if the Court approves it but the acquirer – whether the Stalking Horse Buyer or any other successful bidder -- declines to approve an Employee Incentive Agreement or declines to make payments to particular KEIP Participants.  The KEIP Motion is equally silent as to who will bear responsibility for payments under the KEIP if the sale of the Debtors' assets does not

close for any reason.

15. When a bonus plan described as an incentive plan sets the performance bar so low that the lowest targets are well within reach, it is a not a true incentive plan; it is a disguised retention plan. *In re Hawker Beechcraft, Inc.*, 479 B. R. 308, 313, fn.7 (Bankr. S.D.N.Y. 2012) (noting that while targets were not "lay-ups", "they are more like free throws than half court flings at the buzzer").

16. Although the Debtors have disclosed under seal the allegedly "ambitious" revenue and EBITDARP targets as well as the thresholds at which bonus payments will accrue, they have not produced any evidence that the performance targets provide a *bona fide* incentive that is difficult to reach; they may have actually set the performance bar too low. If the targets are within easy reach, participants will not be required to "stretch" to reach it. Whether one characterizes the minimum target as a "lay-up" (*see In re Dana Corp.*, 358 B.R. 567, 583 (Bankr. S.D.N.Y. 2006)) or as a "free throw" (*see Hawker Beechcraft*), or simply "not difficult to reach," the revenue and EBITDARP targets described in the KEIP Motion may be too easy to reach and virtually risk-free to the KEIP Participants.

17. The Debtors have not provided sufficient information to determine whether the payments described in the KEIP are justified by the facts and circumstances of this case, as required by Bankruptcy Code Section 503(c)(3). Even assuming that certain incentive payments might be justified by the facts and circumstance of this case, the Debtors have not provided sufficient information to assess the degree of difficulty in earning the proposed revenue-based and EBITDARP-based bonuses. The terms set forth in the sealed Summary of the KEIP do not disclose how those targets were developed, any differences from revenue-based and earnings-based targets previously used in any of the Debtors' prior incentive-based compensation plans ,

and the reasons for such differences.  The Debtors also not explained any potential variance from or correlation to the financial performance levels the Debtors must achieve to avoid default under their existing debtor-in-possession financing.

18.     In addition to setting performance target levels that may be insufficient to justify payment of incentive bonuses, the Debtors articulate an incorrect legal standard for evaluation of the KEIP.  Although the Debtors assert that the KEIP meets the requirements of Code Section 503(c)(3), they argue that the applicable standard is the business judgment rule.  In this regard, the Debtors overlook and fail to accord proper meaning to the restrictions imposed by Section 503(c).  The Debtors are seeking authority to incur an administrative expense for the KEIP.  Section 503(c) represents a legislative effort to rein in unbridled severance, retention and other payments, especially but not exclusively to insiders, that deplete estates.

19.     Section 503(b)(1)(A)(i) provides in relevant part that after notice and a hearing, the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case shall be allowed as an administrative expense.

20.     Administrative expenses are given priority status and paid ahead of other unsecured claims. See 11 U.S.C. § 507. *In re Insilco Technologies, Inc.*, 309 B.R. 111,114 (Bankr. D. Del. 2004).  In order to hold administrative expenses to a minimum and to maximize the value of an estate, Section 503(b) is narrowly construed.  *See, e.g., In re N.P. Min. Co., Inc.*, 963 F.2d 1449, 1454 (11th Cir. 1992); *In re Philadelphia Mortgage Trust,* 117 B.R. 820, 828 (Bankr. E.D. Pa. 1990).  To qualify for administrative priority status, an expense must arise from a transaction that accorded the estate an actual benefit. *Insilco Technologies, citing Calpine*

*Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-533 (3d Cir.1999) and *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001).

21.     The Debtors' assertion that the KEIP is a Section 363(b) transaction governed by the business judgment rule ignores the pivotal holding of *O'Brien Envtl. Energy, Inc.*, that the allowability of administrative expenses "depends upon the requesting party's ability to show that the [expenses] were actually necessary to preserve the value of the estate. Therefore, we conclude that *the business judgment rule should not be applied as such in the bankruptcy context*. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination." 181 F.3d at 535 (emphasis added). The proposed KEIP payments, like the break-up fees under consideration in *O'Brien Envtl. Energy, Inc.*, are administrative expenses and their allowance must be determined under administrative expense jurisprudence rather than the more lenient business judgment rule.

22.     The Debtors must demonstrate that the proposed KEIP payments are necessary to preserve the value of the estate and are permissible under the statutory test. The Debtors have not yet met this burden with respect to the KEIP.

23.     Knowing the difficulty of complying with Section 503(c) of the Code, the Debtors also seek approval of the KEIP under Section 105(a) of the Code. This is inappropriate. It is well-settled law that a party cannot use a more general provision of a statute to avoid the requirements of a more specific provision. This principle was recently restated by the Supreme Court in *Law v. Siegel*, --- U.S. ---, 134 S. Ct. 1188 (2014). In discussing the principle that Section 105(a) of the Bankruptcy Code may not be used to circumvent explicit mandates of the Bankruptcy Code, the Supreme Court noted that it was "simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition

found elsewhere." 134 S. Ct. at 1194. See also *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, --- U.S. --- , 132 S. Ct. 2065, 2071 (2012)(where a general permission or prohibition in a statue is contradicted by a specific one, "the specific provision is construed as an exception to the general one.").

24. Also instructive is a recent decision of the Bankruptcy Court of the Southern District of New York, *In re AMR Corp.*, 497 B.R. 690 (Bankr. S.D.N.Y. 2013). There, the Court rejected a plan provision to pay a departing CEO amounts in excess of the Section 503(c)(2) severance limits, holding that, under § 1129(a)(1) of the Code, "the Court cannot approve a payment [under a plan] that is clearly prohibited by another, more specific part of the Bankruptcy Code. Id. at 696 (*citing RadLAX Gateway Hotel* and *In re Adelphia Communs. Corp.*, 441 B.R. 6, 13, n. 18 (Bankr. S.D.N.Y. 2010)(noting that meeting the requirements of Section 503(c) was the only method of approving a severance payment to a debtor's insider in the context of a Chapter 11 case).

25. The *AMR* Court further noted that "it is not surprising then that courts disfavor attempts to bypass the requirements of Section 503(c) given the history and intent of the section." 497 B.R. at 696. The history referenced by the Court is that Section 503(c) was added to the Bankruptcy Code in 2005 as a part of the BAPCPA amendments, to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process." *Id., quoting In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012)(*citing In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)).

26. The specific provisions of Section 503(c) preclude resort to the general provisions of Section 105(a), as well as those of Section 363(b). If the Court considers the KEIP Motion at all, the Court must do so under the specific provisions of Section 503(c)(3).

27. If, notwithstanding assertions to the contrary in the KEIP Motion, the cost of the KEIP will in any way be borne by the Debtors or their estates, the Debtors must establish that the proposed KEIP targets provide a *bona fide* incentive that is difficult to reach and that the KEIP is justified by the facts and circumstances of this case. Additionally, the Debtors should be required to establish or disclose the following:

(a) The methodology used to establish the performance goals and bonus amounts proposed in the KEIP;

(b) all other compensation paid to each KEIP Participant in the twelve months preceding the Petition Date; and

(c) the existence, terms and conditions of any other bonus or incentive payment plans and amounts paid thereunder.

28. The Debtors should also be required to produce copies of any reports or other materials prepared by any professional in connection with promulgating the KEIP or establishing the performance goals thereunder.

The U.S. Trustee leaves the Debtors to their burden of proof and reserves all discovery rights.

WHEREFORE, the United States Trustee respectfully requests that the Court deny the KEIP Motion and grant such other relief as may be appropriate and just.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**Region 3**

Dated: May 6, 2015       BY:  /s/ Mark S. Kenney
                              Mark S. Kenney
                              Trial Attorney
                              Office of the United States Trustee
                              J. Caleb Boggs Federal Building
                              844 King Street, Suite 2207, Lockbox 35
                              Wilmington, DE 19801
                              (302) 573-6491
                              (302) 573-6497 (Fax)