## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 15-10541-BLS |
| The Standard Register Company, et al.[1] | : | (Jointly Administered) |
| | : | Hearing Date: |
| Debtors. | : | June 17, 2015 at 10:00 AM |
| | : | Objection Deadline: |
| | : | May 8, 2015 at 4:00 PM |
| | : | Re: D.I. Nos. 286 & 307 |

### OBJECTION BY CARESOURCE MANAGEMENT GROUP CO. TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO WHICH CARESOURCE MANAGEMENT GROUP CO. IS A PARTY

CareSource Management Group Co. ("CareSource"), by and through undersigned counsel, hereby objects to the proposed assumption and assignment by The Standard Register Company, *et al.* (the "Debtors") of the executory contracts to which CareSource is a party. CareSource also requests that the Court enter an Order preserving all of the rights of CareSource related to the executory contracts, including the rights of setoff and all claims, charges, options, liens and any other rights or defenses of any type that CareSource may have with respect to the executory contracts.

In support of this objection, CareSource respectfully states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and pursuant to the Order of Reference entered in this District. Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding, pursuant to 28 U.S.C.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company, Standard Register Technologies, Inc., Standard Register International, Inc., iMedConsent, LLC, Standard Register or Puerto Rico Inc., Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., and Standard Register Technologies Canada ULC.

§ 157(b)(2). The statutory predicate for the CareSource Objection is § 365 of the Bankruptcy Code and related Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules.

2.        Pursuant to Local Rule 9013-1(h), CareSource states that it consents to the entry of final orders by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders consistent with Article III of the United States Constitution.

## BACKGROUND

3.        The Debtor and related entities filed Chapter 11 cases on March 12, 2015 and these cases are being jointly administered. The Debtors are operating as a Debtors-in-Possession pursuant to the provisions of 11 U.S.C. § 1107.

4.        The Debtors' pre-petition business activities included providing printing services and printed materials.

5.        CareSource is a managed care company servicing the needs of health care consumers. CareSource is headquartered in Dayton, Ohio.

6.        CareSource and the Debtors entered into a Master Services Agreement that was effective on July 22, 2014. CareSource and the Debtors executed Amendment No. 1 to the Master Services Agreement effective on October 15, 2014. CareSource and the Debtors executed Amendment No. 2 to the Master Services Agreement effective on December 30, 2014. Copies of the Master Services Agreement, Amendment No. 1 to the Master Services Agreement and Amendment No. 2 to the Master Services Agreement are attached collectively as Exhibit A[2] and are incorporated by reference. These documents are collectively referred to as the "Master Services Agreement".

---

[2] All pricing information in the Master Services Agreement and all other information in the Master Services Agreement that in the opinion of CareSource might be proprietary or confidential to either CareSource or the Debtor has been redacted.

8868348v1

7.      As explained later in more detail, the Debtors agreed pursuant to the Master Services Agreement to provide certain printing services and printed products to CareSource upon terms and conditions contained in the Master Services Agreement.

8.      CareSource and the Debtors executed a Delegated Services Agreement effective on January 14, 2015 (the "Delegated Services Agreement"). A copy of the Delegated Services Agreement is attached to this Motion as Exhibit B[3] and is incorporated by reference.

9.      The Delegated Services Agreement contains certain information that is the same as or similar to information contained in the Master Services Agreement. However, the Delegated Services Agreement also contains additional information that is necessary for CareSource and the Debtors to comply with applicable health care laws and regulations, including certain privacy requirements.

10.     CareSource and the Debtors also executed a Non-Disclosure Agreement (the "Non-Disclosure Agreement").

11.     The Master Services Agreement, the Delegated Services Agreement, and the Non-Disclosure Agreement are collectively referred to as the "Agreements".

12.     Paragraph 6.3 of the Master Services Agreement provides in part as follows (in this paragraph the term "CONTRACTOR" refers to the Debtors):

> **6.3    Indemnification.** Contractor shall indemnify CARESOURCE against and hold CARESOURCE harmless from all liability and loss, and against all claims and action, including but not limited to court costs and attorneys' fees, as a result of third party claims based on or arising out of injury or death to persons, or damage or loss of property, caused by the negligent acts or willful misconduct of Contractor in connection with the performance of this Agreement.

---

[3] All pricing information in the Delegated Services Agreement and all other information in the Delegated Services Agreement that in the opinion of CareSource might be proprietary or confidential to either CareSource of the Debtors has been redacted.

8868348v1

13.     On November 12-14, 2014, the Debtors produced misprinted materials for CareSource. These misprinted materials contained errors that have created issues and damages for CareSource and that will continue to create issues and damages (the "Printing Error Claims"). The Printing Error Claims result from the mistakes and negligence of the Debtors.

14.     On or about February 5, 2015, CareSource sent to the Debtors a Correction Action Plan Notification (the "CAP") describing the Printing Error Claims and also describing certain other problems with the performance by the Debtors pursuant to the Agreements. The Debtors responded to the CAP and acknowledge their fault in the errors that resulted in the Printing Error Claims. A copy of the CAP is attached as Exhibit C[4] and is incorporated by reference.

15.     Also, pursuant to the terms of Exhibit A of the Master Services Agreement, the Debtors owe CareSource a percentage of the total amount invoiced by the Debtors to CareSource from the Effective Date of the Master Services Agreement through March 31, 2015 (the "Incentive Claim"). There is a formula in the Master Services Agreement that determines the amount of the Incentive Claim, but the amount of the Incentive Claim is not disclosed here for reasons of confidentiality. Part of the Incentive Claim arose pre-petition and part of the Incentive Claim arose post-petition. The Incentive Claim was to be paid to CareSource on May 1, 2015.

16.     The Printing Error Claims and the Incentive Claim are collectively referred to as the "CareSource Claims".

17.     In addition to the defaults of the Debtors regarding the Agreements that created the CareSource Claims, the Debtors have also failed to perform in accordance with the Agreements in many other ways (the "Performance Defaults"). The Performance Defaults are summarized in Exhibit D[5] which is attached and is incorporated by reference.

---

[4] All confidential information contained in the CAP has been redacted.
[5] All confidential information in Exhibit D has been redacted.

8868348v1

18.     The Performance Defaults have not been resolved by the Debtors taking the necessary corrective actions as required by the Agreements.

19.     The Agreements are executory contracts for purposes of 11 U.S.C. § 365.

20.     The Debtors filed a motion on March 12, 2015 requesting the following relief:

> (I) an Order (A) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (D) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale

(the "Sale Motion"; D.I. No. 23).

21.     Pursuant to the Sale Motion, the Debtors have requested, among other things, the authority to sell substantially all of the Debtors' assets to an affiliate of Silver Point Capital, L.P. (the "Stalking Horse" or the "Purchaser"). In addition, the Sale Motion requested the approval of procedures for the assumption and assignment of executory contracts and unexpired leases.

22.     The Court entered the following Order on April 15, 2015:

> Order (I) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Approving the Maximum Reimbursement Amount; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale; and (VI) Granting Certain Related Relief

(the "Sale Procedures Order"; D.I. No. 286).

8868348v1

23.     Pursuant to the terms of the Sale Procedures Order, the Debtors were authorized to, among other things, provide notice of the proposed assumption and assignment of certain executory contracts and unexpired leases.

24.     On April 17, 2015 the Debtors filed and served the following pleading:

> Notice of (I) Entry into Stalking Horse Agreement and (II) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale of Substantially All of the Debtors' Assets

(the "Assumption and Assignment Notice"; D.I. No. 307).

25.     The Assumption and Assignment Notice provided that the Debtors proposed to assume and assign to the Stalking Horse the Master Services Agreement and the Non-Disclosure Agreement. The Assumption and Assignment Notice indicated, contrary to their express acknowledgement of liability for the CareSource Claims, that no cure amounts were owed by the Debtors to CareSource regarding either the Master Services Agreement or the Non-Disclosure Agreement.

26.     CareSource also received a second version of the Assumption and Assignment Notice. In the second version, the Debtors proposed to assume and assign to the Stalking Horse the Delegated Services Agreement and the Non-Disclosure Agreement. The second version indicated that no cure amounts were owed by the Debtors to CareSource regarding either the Delegated Services Agreement or the Non-Disclosure Agreement. This second version of the Assumption and Assignment Notice does not appear to have been filed with the Court.

27.     For purposes of this objection, CareSource understands that the Debtors propose to assume and assign all of the Agreements and that no cure amount is proposed to be paid in conjunction with any of the Agreements.

8868348v1

28.     On May 4, 2015, CareSource filed (under seal) a Motion for Relief from Stay to Setoff Mutual Pre-Petition Claims (the "CareSource Stay Relief Motion") (D.I. No. 389).  *See* CareSource's Motion to File Under Seal (the "CareSource Seal Motion"))(D.I. No. 388). By these motions, CareSource requests authority to set off the CareSource Claims against certain invoices owed by CareSource to the Debtors.  CareSource hereby incorporates by reference, as if fully set forth herein, the CareSource Stay Relief Motion.

## RELIEF REQUESTED

29.     CareSource requests the entry of an order denying the Debtors' proposed assumption and assignment of the Agreements to the Stalking Horse or to any other proposed assignee of the Agreements.  CareSource also requests that the Court enter an Order preserving all of the rights of CareSource related to the Agreements, including the rights of setoff and all claims, charges, options, liens and any other rights or defenses of any type that CareSource may have with respect to the Agreements.

## BASIS FOR RELIEF REQUESTED

30.     CareSource is entitled to an Order denying the Debtors' proposed assumption and assignment of the Agreements to the Stalking Horse or to any other proposed assignee of the Agreements for the following reasons.

31.     11 U.S.C. § 365 provides in relevant part as follows:

(a)     Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)

(1)     If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

8868348v1

(A)     cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

32.     The CareSource Claims are defaults under the terms of the Agreements, and therefore must be cured pursuant to § 365. The CareSource Claims are monetary in nature.  The Debtors have acknowledged liability for the CareSource Claims.

33.     The Debtors have not cured the defaults, including the Performance Defaults, associated with the CareSource Claims.

34.     The Debtors have not provided CareSource with adequate assurance that either the Debtors or the Purchase will promptly cure the defaults associated with the CareSource Claims.

35.     The Debtors have not compensated CareSource for its pecuniary loss associated with the CareSource Claims.

36.     The Debtors have not provided CareSource with adequate assurance that either the Debtors or the Purchaser will promptly compensate CareSource for its pecuniary loss associated with the CareSource Claims.

8868348v1

37.    The Debtors have not provided CareSource with adequate assurance that either the Debtors or the Purchaser will promptly cure the Performance Defaults.

38.    The Debtors have not provided CareSource assurance that the Purchaser will adequately perform the Agreements after the proposed assumption and assignment of the Agreements.

39.    The authority contained in § 365(a) is not unlimited. Notably, any executory contract that is to be assumed and assigned must be unaltered, defaults in the contracts must be promptly cured or adequate assurance of a prompt cure must be provided and adequate assurance of the future performance must be provided. The Debtors' proposed assumption and assignment of the Agreements does not comply with any of these requirements of § 365.

40.    The Debtors have many obligations and responsibilities in the Agreements, as the business relationship between CareSource and the Debtors is broad and complex. The Debtors' obligations and responsibilities include (a) indemnification of CareSource by the Debtors for economic damage to CareSource caused by the Debtors' negligent acts, (b) payment or crediting of the Incentive Claim to CareSource by May 1, 2015, and (c) meeting certain performance standards. The CareSource Claims and the Performance Defaults have been admitted and acknowledged by the Debtors, but have been ignored by the Debtors in their proposed assumption and assignment of the Agreements. By ignoring the defaults, and seeking to bar a cure claim through the Assumption and Assignment Notice, the Debtors are, in effect, attempting to assign the Agreements with modifications of the parties' respective obligations – which is not permissible.

41.    In addition, the Debtors' proposed assignment of the Agreements is to be free and clear of all "pledges, liens, security interests, encumbrances, claims, charges, options and interests

thereon" per the Sale Procedures incorporated in the Sale Procedures Order.  CareSource holds

claims against the Debtors pursuant to the CareSource Claims and the Performance Defaults. Any

proposed assignment of the Agreements that attempts to restrict, alter or eliminate any of the

CareSource Claims or the Performance Defaults also amounts to an impermissible modification of

the Agreements.  Accordingly, all of the claims and rights of CareSource related to the Agreements

must be preserved and not altered or impaired in any way.

42.    When a debtor in possession assumes a contract pursuant to § 365, the contract

must be assumed in its entirety and without modification. *NLRB v. Bildisco & Bildisco*, 465 U.S.

513, 531 (1984); *In re Best Payphones, Inc.*, 2007 Bankr. LEXIS 1677 (Bankr. S.D.N.Y.); *In re*

*Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) (noting "The [debtor] . . . may not blow hot

and cold.  If he accepts the benefits he must adopt the burdens"). Similarly, a debtor in possession

seeking to assign a contract under § 365 must also assign the contract in whole with all the benefits

*and burdens*.  *Best Payphones*, 2007 Bankr. LEXIS 1677, at *36 ("The trustee can only assign

what he assumes, and the assignee cannot impose terms, implicitly or explicitly, that render

performance less onerous to the assignee or more onerous to the non-debtor party to the contract.");

*Fleming*, 499 F.3d at 308 ("'[A]n assignment is intended to change only who performs an

obligation, not the obligation to be performed.'" (citing *Medtronic Ave., Inc. v. Advanced*

*Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001))); *see also In re Cajun Elec. Power Co-*

*Op., Inc.*, 230 B.R. 693, 710 (Bankr. M.D. La. 1999) ("The rule that an executory contract must

be assumed or assigned in toto has been recognized on several occasions by the Fifth Circuit . . .

an executory contract must be assumed or assigned in its entirety. . . .").

43.    Among the reasons that a contract must be assigned in its entirety under § 365 is

that a debtor will be relieved of its obligations under the contract pursuant to § 365(k), and the

proceeds from the sale will pass to the estate free and clear. Therefore, the Purchaser must assume

all the obligations and burdens so that the rights of CareSource are protected.  The Third Circuit

stated in *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76 (3d Cir.

1999) that:

> In the bankruptcy context, however, Code § 365(k) changes the common
> law rule by effecting a novation by operation of law whether or not the
> obligee consents to the substitution. . . . But consistent with the basic
> concept of a contract's assignment, under which every contractual assignee
> takes the entire bundle of rights *and* obligations under the contract, such a
> forced novation is dependent on just such a total undertaking by the
> assignee. Code § 365(k) (emphasis added) provides: Assignment by the
> trustee to an entity *of a contract* or lease assumed  under this section relieves
> the trustee and the estate from any liability for any breach of such contract
> or lease occurring after such assignment.
>
> Where Congress uses legal terms that have "accumulated settled meaning"
> under common law, it must be presumed (unless of course the statute
> dictates otherwise) that Congress meant to employ that established
> meaning. . . . Hence we construe the terms in Code § 365(k) to incorporate
> the general common law of assignments. In particular, we will follow the
> dominant consensus of common law jurisdictions, rather than the law of any
> particular jurisdiction. . . .
>
> That dominant consensus conforms to the clear meaning of the language
> involved: that an assignment of a contract as such involves a commitment
> by the assignee to perform all obligations under the contract, as well as to
> acquire all rights created by the contract.

*Id*. at 80-81. Thus, the Debtors cannot assume and assign the Agreements under § 365 unless the

Purchaser assumes all the obligations, and those obligations include the necessity of the Debtors

to cure the CareSource Claims and the Performance Defaults.

44.     Similarly, the proposed assignment of the Agreements free and clear of any claims

or interests of CareSource is inappropriate.  A Debtor cannot accomplish a result by section 363(f)

that is not authorized by section 365.  The sale and assignment of the Agreements free and clear

of the rights of CareSource would materially alter the provisions of the Agreements, as the

11

CareSource Claims and the Performance Defaults are a part of the Agreements. Further, the CareSource rights of setoff regarding the CareSource Claims arise from the Agreements and cannot be properly severed from the Agreements or altered or eliminated either by section 363 or section 365.

45.     In this case, the Debtors are seeking to assume and assign the Agreements under § 365 and are seeking to be relieved of all liability after such assignment. However, the Purchaser is proposing to take the Agreements without all benefits and burdens, because there is no proposed cure of the CareSource Claims or the Performance Defaults.

46.     Just as the Debtors' attempt to avoid the cure obligations related to the Agreements is an indirect and impermissible attempt to modify the Agreements, the failure to address the cure obligations is troubling.  The Debtors are aware of their defaults, and yet they filed the Assumption and Assignment Notice that directly violates the mandates of § 365. A debtor in possession must promptly cure defaults or provide adequate assurance of a prompt cure. The same standard applies to pecuniary loss arising from a default.  By asserting that there are no cure amounts owed to CareSource, the Debtors have ignored their obligations under § 365. Similarly, the failure to address and acknowledge the Performance Defaults directly violates the Debtors' obligations under § 365.

47.     The CareSource Claims are monetary in nature and these claims must be paid promptly, or provisions for the prompt payment of these claims must be made. CareSource has proposed arrangements for the payment of the pre-petition portion of the Incentive Claim in the CareSource Relief From Stay Motion. The post-petition portion of the Incentive Claim could be paid in the same way as CareSource proposes for the payment of the pre-petition portion. CareSource also has proposed arrangements for the payment of the Printing Error Claims. The

CareSource proposals on these issues would be acceptable to CareSource and would satisfy the Debtors' obligations under § 365. Since the Debtors have not made any proposal for the payment of the CareSource Claims, the requirements of § 365 regarding these claims have not been satisfied.

48.     The Performance Defaults are material and also must be cured, or the Debtors must provide adequate assurance of a prompt cure. The business relationship between CareSource and the Debtors, as defined by the Agreements, began in July 2014. In the approximately ten (10) months since then, the Debtors' performance has been unsatisfactory in many ways. The circumstances of the Printing Error Claims are a stark example of the Debtors' breach of its obligations under the Agreements. But the mistakes giving rise to the Printing Error Claims are not the sole mistakes and breach by the Debtors. The litany of performance problems described in Exhibit D illustrates the continuous problems that CareSource has experienced in the brief term of the Agreements. The Performance Defaults have been so frequent and so problematic for CareSource that the cumulative effect of the Performance Defaults is serious and material. Material non-monetary defaults must be cured and/or adequate assurance of the prompt cure must be provided. CareSource has given the Debtors many opportunities pre-petition to address and cure the Performance Defaults. The Debtors paid little attention to these pre-petition cure opportunities. Now, although very well aware of the Performance Defaults, the Debtors have again chosen to ignore the Performance Defaults in their effort to assume and assign the Agreements. Thus, the Debtors again fail to meet its burdens under § 365.

49.     In addition to the necessity to properly address the cure issues associated with the CareSource Claims and the Performance Defaults, the Debtors must also provide adequate assurance of the future performance of the Agreements if the Agreements are to be assigned to the

Purchaser. Adequate assurance of future performance is an element of the assumption and assignment process, which must be met in addition to the curing of any defaults under an executory contract per 11 U.S.C. § 365(f)(2). Even in the absence of a default under the contract, adequate assurance of future performance must be afforded before the Debtors can assign an executory contract. *Albany Port Dist. Comm'n. v. Cibro Petroleum Prods., Inc.*, 2004 U.S. Dist. LEXIS 17260 (S.D.N.Y.); *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 52 (Bankr. M.D.N.C. 2003) (refusing to excise a right of first refusal from a lease agreement reasoning that, among other things, absent such provision the non-debtor party "will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance"). Although not defined in the Bankruptcy Code, the phrase "adequate assurance of future performance," which was adopted from Section 2-609(1) of the Uniform Commercial Code, is intended to be given a "practical, pragmatic construction based upon the facts and circumstances of each case." *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001).

50.    As discussed, § 365(k) of the Bankruptcy Code relieves the Debtors from any liability under a contract occurring after assignment. As a result, adequate assurance is necessary to protect CareSource if the Agreements are to be assumed and assigned. *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 175 (Bankr. E.D. Va. 1993) (Section 365(k) alters the common law rule that the original obligor remains ultimately liable after assignment until discharged by performance, consent or otherwise).

51    The Agreements require many levels of performance by the Debtors. As evidenced by the CareSource Claims and the Performance Defaults, the Debtors have not performed well so far. CareSource absolutely needs full and prompt compliance with the Agreements by the Debtors and/or the Purchaser, as the performance of the Agreements is a key and necessary component of

the business activities of CareSource. Despite the many performance failures by the Debtors that have resulted in the CareSource Claims and the Performance Defaults, the Debtors have completely ignored its cure obligations and have provided no explanation or even suggestion about how the performance of the Purchaser under the Agreements will somehow be an improvement. The Debtors knew fully of the CareSource Claims long before the Assumption and Assignment Notice was sent. CareSource advised the Debtors of the Printing Error Claims in January 2015. The Debtor acknowledged its mistakes in February 2015. The Incentive Claim results from the plain language of the Master Services Agreement. The Performance Defaults have been much discussed by CareSource and the Debtors. Yet, despite this knowledge, the Debtors did not disclose or address the CareSource Claims or the Performance Defaults. Nothing has been said about future performance of the Agreements. In this environment and under these circumstances, CareSource has not received <u>any</u> assurance of future performance, and surely not the requisite adequate assurance.

52.     CareSource reserves all rights to amend or modify this Objection based upon any response filed by any party in interest or based upon any additional information obtained by CareSource.

53.     For the reasons provided in this Objection, CareSource is entitled to the entry of an Order denying the proposed assumption and assignment of the Agreements and preserving all claims, of CareSource of any type associated with the Agreements, including all rights of setoff.

Dated:  May 8, 2015                         Respectfully submitted,
        Wilmington, Delaware

                                            CROSS & SIMON, LLC

                                            */s/ Christopher P. Simon*
                                            Christopher P. Simon (No. 3697)
                                            1105 North Market Street, Suite 901
                                            Wilmington, DE  19801
                                            Telephone:  (302) 777-4200
                                            Facsimile:  (302) 777-4224
                                            Email:  csimon@crosslaw.com

                                            -and-

                                            David M. Whittaker, Esq. (0019307)
                                            (*admitted pro hac vice*)
                                            BRICKER & ECKLER LLP
                                            100 South Third Street
                                            Columbus, OH  43215
                                            Telephone:  (614) 227-2355
                                            Facsimile:  (614) 227-2390
                                            Email:  dwhittaker@bricker.com

                                            *Attorneys for CareSource Management Group Co.*