LEASE

THE PARAGON LP,
a Colorado limited partnership
(as Landlord)

and

THE STANDARD REGISTER COMPANY
An Ohio corporation
(as Tenant)

EXHIBIT 1

LEASE

THE PARAGON, LP,
a Colorado limited partnership
(as Landlord)

and

THE STANDARD REGISTER COMPANY
An Ohio corporation
(as Tenant)

1.  **PREMISES**

2.  **TERM**

3.  **RENT**

4.  **COMPLETION OR REMODELING OF THE PREMISES**

5.  **OPERATING EXPENSES AND TAXES**

6.  **SERVICES**

7.  **QUIET ENJOYMENT**

8.  **DEPOSIT**

9.  **CHARACTER OF OCCUPANCY**

10. **MAINTENANCE, ALTERATIONS AND REENTRY BY LANDLORD**

11. **ALTERATIONS AND REPAIRS BY TENANT**

12. **MECHANICS' LIENS**

13. **SUBLETTING AND ASSIGNMENT**

14. **DAMAGE TO PROPERTY**

15. **INDEMNITY TO LANDLORD/INSURANCE**

16. **SURRENDER AND NOTICE**

17. **INSURANCE, CASUALTY, AND RESTORATION OF PREMISES**

18. **CONDEMNATION**

i

EXHIBIT 1

19.    DEFAULT BY TENANT

20.    DEFAULT BY LANDLORD

21.    SUBORDINATION AND ATTORNMENT

22.    REMOVAL OF TENANT'S PROPERTY

23.    HOLDING OVER:  TENANCY MONTH-TO-MONTH

24.    PAYMENTS AFTER TERMINATION

25.    STATEMENT OF PERFORMANCE

26.    MISCELLANEOUS

27.    AUTHORITIES FOR ACTION AND NOTICE

28.    RULES AND REGULATIONS

29.    PARKING

30.    RIGHT OF FIRST REFUSAL

31.    BROKERAGE

32.    TIME OF ESSENCE

33.    RIDER

34.    RENEWAL OPTION

35.    TERMINATION OPTION

RIDER

EXHIBIT A  FLOOR PLAN

EXHIBIT B  LEGAL DESCRIPTION

EXHIBIT C  COMMENCEMENT CERTIFICATE

EXHIBIT D  RULES AND REGULATIONS

EXHIBIT E  WORK LETTER & E1 APPROVED FLOOR PLAN

EXHIBIT F  SILVERPOINT LIEN WAVIER

EXHIBIT G BANK OF AMERICA LIEN WAIVER

EXHIBIT 1

## OFFICE BUILDING LEASE

THIS LEASE is made this _____ day of January, 2014 by and between THE PARAGON, LP, a Colorado limited partnership ("Landlord") and THE STANDARD REGISTER COMPANY, an Ohio corporation ("Tenant").

## W I T N E S S E T H:

  1. PREMISES. In consideration of the payment of rent and the keeping and performance of the covenants and agreements by Tenant, as hereinafter set forth, Landlord hereby leases and demises unto Tenant the premises located on the second floor of the Building known as Suite 208, comprised of approximately 12,254 rentable square feet (hereinafter referred to as the "Premises"), as depicted on the plat hereto attached as Exhibit A, and being a part of the building known as Paragon Building, located at 7100 East Belleview Avenue, Greenwood Village, Colorado (the "Building"), together with a non-exclusive right, subject to the provisions hereof, to use all appurtenances thereto, including, but not limited to, any plazas, common areas, or other areas on the real property (described more particularly on Exhibit B "Real Property") designated by Landlord for the exclusive or non-exclusive use of the tenants of the Building. The Building, Real Property, plazas, common areas, other areas, and appurtenances are hereinafter collectively sometimes called the "Building Complex."

  2. TERM. The term of the Lease shall commence at 12:01 a.m. on the 1st day of April, 2014 and shall terminate at 12:00 midnight on the 31st day of August, 2019 (said term is referred to herein as the "Primary Lease Term").

  3. RENT. Tenant shall pay the annual rental (the "Base Rent") for the Primary Lease Term, payable in monthly installments due on the first day of each month during the term hereof, as follows:

| Term | Rentable Square Feet | Amount per Rentable Square Foot | Monthly Rental Rate | Term Rental |
|---|---|---|---|---|
| Month 01-05 | 12,254 | $17.00 | $0.00** | $0.00** |
| Month 06-17 | 12,254 | $17.00 | $17,359.83 | $208,318.00 |
| Month 18-29 | 12,254 | $17.50 | $17,870.42 | $214,445.00 |
| Month 30-41 | 12,254 | $18.00 | $18,381.00 | $220,572.00 |
| Month 42-53 | 12,254 | $18.50 | $18,891.58 | $226,699.00 |
| Month 54-65 | 12,254 | $19.00 | $19,402.17 | $232,826.00 |

  All rents shall be paid in advance, without notice, set off, abatement, or diminution, at the office of Landlord at 7100 East Belleview Avenue, Suite 350, Greenwood Village, Colorado 80111, or at such place as Landlord from time to time designates in writing.

  Contemporaneously with the execution of this Lease, Tenant shall submit one (1) month of prepaid Base Rent to Landlord in the total amount of Seventeen Thousand, Three Hundred Fifty-Nine and 83/100ths Dollars ($17,359.83). This prepaid Base Rent shall be credited against

1

EXHIBIT 1

Tenant's monthly payment of Base Rent for the first month that Base Rent is due from Tenant under this Lease.

\*\* Tenant's obligation to pay Base Rent shall be conditionally abated during months 1-5; provided, however, the abatement herein provided is conditioned upon Tenant's full and timely performance of all of its obligations under this Lease. If at any time during the Primary Lease Term an Event of Default by Tenant occurs and Landlord proceeds with recovering possession of the Premises and/or termination of the Lease, then such abatement shall immediately become void, and Tenant shall promptly pay to Landlord, in addition to all other amounts due to Landlord under this Lease, the full amount of all payments herein abated.

4.    COMPLETION OR REMODELING OF THE PREMISES.

A.    The Premises shall be delivered to Tenant in "turn-key" condition, with all remodeling of or tenant finish work to be completed in the Premises, performed by Landlord, in accordance with the Rider and work letter attached to this Lease. Except as set forth in the Rider and work letter, Landlord shall have no obligations for any other work necessary for the preparation of Tenant's use of the Premises, and upon completion of Landlord's required remodeling and tenant finish work, Tenant shall accept the Premises in their "as is" condition on the date the Primary Lease Term commences (nothing in this provision shall negate the obligation of Landlord to complete punch-list items identified by Tenant within five (5) business days after complete possession of the Premises is delivered to Tenant. If Landlord is delayed in delivering the Premises to Tenant due to the failure of a prior occupant to vacate the same, then (a) the obligation for the payment of rent and the commencement of the Primary Lease Term hereof shall be postponed until Landlord delivers the Premises to Tenant whereupon all of the covenants, conditions, and agreements contained herein shall be in full force and effect, and (b) Rent shall be abated (once it becomes payable) for each day beyond April 1, 2014 that the Premises are not delivered to Tenant in the conditioned required by the terms of this Lease and the Primary Lease Term shall be extended on a day for day basis. The postponement of Tenant's obligation to pay rent and other sums hereunder, and the aforementioned abatement of Rent, shall be in full settlement of all claims which Tenant may otherwise have by reason of such delay of delivery.

B.    If the commencement of the Primary Lease Term is delayed pursuant to subparagraph A above or any provision of the Rider, and such commencement date would otherwise occur on other than the first day of the month, the commencement date of the Primary Lease Term shall be further delayed until the first day of the following month and Tenant shall pay proportionate rent at the same monthly rate set forth herein (also in advance) for any partial month in which Rent is to be paid. In the event said commencement date is so delayed, the expiration of the term hereof shall be extended so that the Primary Lease Term will continue for the full period set forth in Paragraph 2 hereof. As soon as the Primary Lease Term commences, Landlord and Tenant shall execute a commencement certificate in the form attached hereto as **Exhibit C,** which may be requested by either party, setting forth the exact date on which the Primary Lease Term commenced and the expiration date of the Primary Lease Term.

EXHIBIT 1

C.      Occupying and conducting Tenant's business from the Premises shall be conclusive evidence as against Tenant that the Premises were in the condition agreed upon between Landlord and Tenant and acknowledgment of satisfactory completion of any fix-up or remodeling, as the case may be, which Landlord has agreed in writing to perform; provided, however, nothing in this provision shall negate Landlord's obligation to correct any punch-list items identified by Tenant within five (5) business days after complete possession of the Premises is delivered to Tenant.

D. Subject to the terms and conditions of this Paragraph, Tenant shall have the right to enter and occupy the Premises from and after the date that is Thirty (30) days prior to the commencement of the Primary Lease Term, as reasonably estimated by Landlord (the "Early Access Date"), solely for purposes of installing Tenant's computer systems, telephone equipment, cabling, furniture, fixtures and special equipments (but not to operate Tenant's business), and such early entry for such purposes shall not trigger the commencement of the Primary Lease Term. Tenant agrees (i) any such early entry by Tenant shall be at Tenant's sole risk, (ii) Tenant shall not unreasonably interfere with Landlord or other tenants in the Building, (iii) Tenant shall comply with and be bound by all provisions of the Lease during the period of any such early entry, except for the payment of Base Rent, Taxes and Operating Expenses, (iv) prior to entry upon the Premises by Tenant, Tenant agrees to pay for and provide to Landlord certificates evidencing the existence and amounts of liability insurance carried by Tenant, which coverage must comply with the provisions of the Lease relating to insurance, (v) Tenant and its agents and contractors agree to comply with all laws, rules, regulations, ordinances and all other similar items required to perform its work during the early entry on the Premises, and (vi) Tenant agrees to indemnify, protect, defend (with counsel selected by Landlord) and save the Landlord, its employees, agents, consultants and contractors harmless from and against any and all liens, liabilities, losses, damages, costs, expenses, demands, actions, causes of action and claims (including, without limitation, attorneys' fees and legal costs) arising out of the early entry, use, construction, or occupancy of the Premises by Tenant or its agents, employees or contractors.

5.      OPERATING EXPENSES AND TAXES.

In addition to Base Rent, Tenant shall reimburse Landlord for certain of the Taxes and Operating Expenses of the Building Complex, such reimbursement to be in the manner, at the times, and in the amounts set forth in this Section 5.

A.      Taxes.  If the amount of Taxes billed for any calendar year beginning with the calendar year 2015 and falling partly or wholly within the Term of this Lease shall be in excess of the Taxes for the calendar year 2014 (the "Tax Base Amount"), then the Rent payable by Tenant for such year shall be increased by Tenant's pro rata share ("Pro Rata Share") of such difference, such Pro Rata Share being 7.3779% percent and such share calculated on the basis that the rentable area of floor space in the Premises (approximately 12,254 rentable square feet) bears to the total rentable area of floor space in the Building as of the date hereof (approximately 166,090). If there is a change in the total Building rentable area as a result of an addition to the Building, partial destruction, modification or similar cause, which event causes a reduction or increase on a permanent basis, Landlord shall cause adjustments in the computations as shall be necessary to provide for any such changes. Landlord's system for measurement applied to all

3

EXHIBIT 1

tenants shall be used to determine rentable area. In determining the amount of Taxes for any calendar year, the amount of special assessments to be included shall be limited to the amount of the installment (plus any interest payable thereon) of such special assessment which would have been required to have been paid during such calendar year if Landlord had elected to have such special assessment paid over the maximum period of time permitted by law, if such election is available to Landlord. Except as provided in the second sentence of Subsection 5.C.(1) hereof, all reference to Taxes "for" and "billed for" a particular calendar year shall be deemed to refer to Taxes levied, assessed, billed or otherwise imposed for such calendar year, without regard to the dates when any such Taxes are due and payable.

As used in this Lease, the term "Taxes" means any and all general and special taxes and impositions of every kind and nature whatsoever levied, assessed, or imposed upon, or with respect to, the Building Complex, any leasehold improvements, fixtures, installations, additions, and equipment whether owed by Landlord or Tenant, or either because of or in connection with the Landlord's ownership and operation of the Building and the Property, including, without limitation, real estate taxes, personal property taxes, sewer rents, water rents, general or special assessments, and duties or levies charged or levied upon or assessed against the Building and the Property and personal property, transit taxes, all costs and expenses (including legal fees and court costs) charged for the protest or reduction of property taxes or assessments in connection with the Property and the Building (but only to the extent a credit is recognized by Tenant), or any tax or excise on rent or any other tax (however described) on account of rental received for use and occupancy of any or all of the Building, and the Property, whether any such taxes are imposed by the United States, the State of Colorado, the County of Arapahoe, or any local governmental municipality, authority, or agency or any political subdivision of any thereof. Taxes shall not include any income, capital stock, succession, transfer, franchise, gift, estate, and inheritance taxes; provided, however, if at any time during the Term hereof, a tax or excise specifically on rents, however described (herein called "Rent Tax"), is levied or assessed by the State of Colorado or any political subdivision thereof, on account of the Rent hereunder or the interest of Landlord under this Lease in substitution for any taxes based on the assessed value of the real estate, such Rent Tax shall constitute Taxes; provided, further, in no event shall Tenant be obligated (i) to pay for any calendar year any greater amount by way of such Rent Tax than would have been payable by Tenant had the rentals paid to Landlord under all Building leases (being the rentals upon which such Rent Tax is imposed) had been the sole taxable income of Landlord for the calendar year in question, or (ii) to pay or to reimburse Landlord for any tax of any kind assessed against Landlord on account of any such Rent Tax having been reimbursed to Landlord.

B.    Operating Expenses. If, in any calendar year falling partly or wholly within the Term of this Lease, the Operating Expenses paid or accrued by Landlord shall be higher than Landlord's Operating Expenses for the calendar year 2014 (the "Operating Expense Base Amount"), then the Rent payable by Tenant for such calendar year shall be increased by an amount equal to Tenant's Pro Rata Share of such difference calculated on the basis of the percentage set forth in Subsection 5.A. above. Operating Expenses for any calendar year during which actual occupancy of the Building is less than ninety five percent (95%) of the total rentable area of floor space in the Building shall be appropriately adjusted to reflect ninety five

4

EXHIBIT 1

percent (95%) occupancy of the existing total rentable area of floor space in the Building during such period.

As used in this Lease, the term "Operating Expenses" means any and all expenses, costs, and disbursements (other than Taxes) that are paid or accrued by Landlord in connection with the leasing, management, maintenance, operation, or repair of the Building Complex (including, without limitation):

(a)  Costs of supplies, including, but not limited to, the cost of relamping all lighting installed as a part of the Building Standard work or located in common areas of the Building Complex. "Building Standard" means the level of tenant finish improvements or the level of Building services, as the context may require, customarily offered from time to time by Landlord to all tenants of the Building;

(b)  Costs incurred in connection with obtaining and providing energy for the Building Complex, including, but not limited to, costs of propane, butane, natural gas, steam, electricity, solar energy, fuel oils, coal or any other energy sources;

(c)  Costs of water and sanitary and storm drainage services;

(d)  Costs of janitorial and security services;

(e)  Costs of general maintenance and repairs, including costs under climate control and other mechanical maintenance contracts and repairs and replacements of equipment used in connection with such maintenance and repair work;

(f)  Costs of maintenance and replacement of landscaping;

(g)  Insurance premiums, including fire and all-risk coverage, together with loss of rent endorsement, the part of any claim required to be paid under the deductible portion of any insurance policies carried by Landlord in connection with the Building Complex (where Landlord is unable to obtain insurance without such deductible from a major insurance carrier at reasonable rates), public liability insurance and any other insurance carried by Landlord on the Building Complex or any component parts thereof (all such insurance shall be in such amounts as may be required by any Mortgagee, as defined in Section 20 hereof, or as Landlord may reasonably determine);

(h)  Labor costs associated with operation and maintenance of the Building Complex, including wages and other payments, costs to Landlord of workmen's compensation and disability insurance, payroll taxes, welfare fringe benefits, and all legal fees and other costs or expenses incurred in resolving any labor dispute associated with the operation and maintenance of the Building Complex;

(i)  Professional building management fees including rental for the Manager's office space and costs of supplying the Manager with necessary office equipment and storage space in the Building;

5

EXHIBIT 1

(j)     The costs of any easement serving the Building Complex, including without limitation monthly access easement fees.

(j)     [Intentionally Omitted.]

(k)     The costs of capital improvements and structural repairs and replacements made in or to the Building Complex in order to conform to any applicable laws, ordinances, rules, regulations or orders of any governmental or quasi-governmental authority having jurisdiction over the Building Complex that are enacted after the commencement of the Primary Lease Term (herein "Required Capital Improvements") and the costs of any capital improvements and structural repairs and replacements designed primarily to reduce Operating Expenses or to reduce the rate of increase in Operating Expenses (herein "Cost Savings Improvements"). The expenditures for Required Capital Improvements and Cost Savings Improvements shall be reimbursed to Landlord in equal installments over the useful life of such capital improvement or structural repair or replacement (as determined by Landlord) together with interest on the balance of the unreimbursed expenditure at the Prime Rate in effect on the date the expenditure was incurred by Landlord, plus three percent (3%); provided, however, that the amount to be reimbursed by Tenant for any Cost Savings Improvement shall be equal in any year to the reduction or estimated savings in Operating Expenses as a result thereof;

(l)     Costs incurred by Landlord or its agents in engaging experts or other consultants to assist them in making the computations required hereunder; and

(m)     Rental payments or acquisition costs, allocated over the useful life, for machinery or equipment, including vehicles, necessary to timely and economically perform the cleaning and maintenance functions imposed on Landlord together with the interest on such acquisition costs at the Prime Rate in effect as of the acquisition date on the balance of the unrecovered acquisition costs over the useful life of such machinery or equipment.

Notwithstanding any provision herein to the contrary, "Operating Expenses" shall not include:

(1)     Costs of work (including, without limitation, painting and decorating and tenant change work, and permit, license and inspection costs), which Landlord performs for any tenant or in any tenant's space in the Building other than work of a kind and scope which Landlord would be obligated to furnish to all tenants whose leases contain a rental adjustment provision similar to this one;

(2)     Costs of repairs or other work occasioned by fire, windstorm or other insured casualty to the extent of insurance proceeds received or otherwise reimbursed to Landlord;

(3)     Leasing commissions, advertising expenses, and other costs incurred in leasing space in the Building (including, without limitation, costs associated with a management office);

6

EXHIBIT 1

(4)     Costs of repairs or rebuilding necessitated by condemnation;

(5)     Interest, principal, points and fees on debt or amortization payments on any loan, mortgage or deed of trust or any other debt instrument , and any costs associated with Landlord's loan transactions (including, without limitation, appraisals environmental reports, and surveys);

(6)     Depreciation on the Building Complex (or any part thereof);

(7)     Any settlement, payment or judgment incurred by Landlord or the Building manager that is not covered by insurance proceeds;

(8)     Cost of any damage to the Building Complex caused directly by Landlord's willful misconduct or gross negligence, as established by a court of law, which is not covered by insurance proceeds;

(9)     Costs of capital improvements, replacements or equipment and any depreciation or amortization expenses thereon, except to the extent expressly permitted in item (k) above;

(10)    Marketing costs, including leasing commissions, attorneys' fees in connection with the negotiation and preparation or enforcement of letters, deal memos, letters of intent, leases, subleases and/or assignments, space planning costs, and other costs and expenses incurred in connection with lease, sublease and/or assignment negotiations and transactions with present or prospective tenants or other occupants of the Building or Building Complex;

(11)    Costs incurred by Landlord due to the violation by Landlord of the terms and conditions of any lease of space in the Building or the Building Complex;

(12)    Interest, fines or penalties incurred as a result of Landlord's failure to make payments when due;

(13)    Landlord's general corporate overhead and general administrative expenses not related to the operation of the Building Complex;

(14)    Any bad debt loss, rent loss or reserves for bad debts or rent loss, or reserves for equipment or capital replacement;

(15)    The cost or expense of any services or benefits provided generally to other tenants in the Building Complex and not provided or available to Tenant; or

(16)    Taxes.

Notwithstanding anything contained herein to the contrary, from and after the Initial Deposit Year (as defined below), Tenant's obligation to pay its Pro Rata Share of increases in

7

EXHIBIT 1

Operating Expenses shall not increase more than five percent (5%) over the amount paid in the preceding year; provided, however, that such five percent (5%) cap on increases shall only apply to those Operating Expenses that are within Landlord's reasonable control, and such five percent (5%) cap expressly excludes those items that are not within Landlord's reasonable control, including Taxes, insurance, snow removal and utilities.

           C.     The adjustments provided for in Subsections 5.A. to Taxes shall be made as follows (provided, however, nothing herein shall be construed to require Tenant to pay Taxes for any year prior to 2015):

           (1)     In the case of calculations made pursuant to Subsection 5.A. above, such calculation shall be made promptly following receipt by Landlord of the bills (meaning in the case of annual general real estate taxes, the statement for same) for Taxes for each calendar year in question. In the event of a subsequent adjustment of Taxes for a previous calendar year by the taxing authority which adjustment has resulted in a corresponding adjustment payment by or to Landlord, the same shall constitute an adjustment to Taxes paid during the calendar year when such adjustment payment is made. If, pursuant to such calculations, the Tenant's Pro Rata Share of Taxes due as adjusted by the taxing authority are more than the Tenant's Pro Rata Share of the Taxes paid by Tenant, Tenant shall pay to Landlord, within thirty (30) days following the furnishing (the "upward adjustment date") of each such calculation to Tenant, Tenant's Pro Rata Share of such difference.

           (2)     Commencing with the first calendar month next succeeding each upward adjustment date, Tenant shall pay to Landlord on the first day of each calendar month until the next upward adjustment date (which period between adjustment dates is herein called a "Tax Deposit Year") one-twelfth of the amount of Tenant's Pro Rata Share of the excess (the "Tax Excess") of: (i) Taxes most recently billed (as reported in the calculation furnished pursuant to foregoing clause C(1) above) over (ii) the Tax Base Amount, and shall also pay with each such first monthly payment for a Tax Deposit Year an amount equal to one-twelfth of Tenant's Pro Rata Share of such Tax Excess multiplied by the number of calendar months between (y) the month preceding the month in which Landlord received the bills for Taxes and (z) the first such monthly payment date. Amounts paid under this Subsection (2) in any Tax Deposit Year shall be credited against any amounts payable by Tenant under the foregoing Subsection (1) on account of Taxes billed to Landlord for the same Tax Deposit Year, and provided there is any surplus remaining after the credit to Tenant and provided Tenant shall not then be in default under any of the provisions of this Lease, Landlord shall, at Landlord's option, either refund the amount of such surplus to Tenant within thirty (30) days following the end of such Tax Deposit Year or apply such surplus amount against any other amounts then due from Tenant to Landlord to the extent such surplus was actually received by Landlord from Tenant.

           D.     The adjustments provided for in Subsections 5.B. to Operating Expenses shall be made as follows:

           (1)     In the case of calculations made pursuant to Subsection 5.B. such calculation shall be made as promptly as practicable following each calendar year in question, and bills therefor shall be furnished to Tenant. Any subsequent adjustment of Operating

EXHIBIT 1

Expenses for such calendar year which results in a corresponding adjustment payment by or to Landlord, shall constitute an adjustment to Operating Expenses during the calendar year when such adjustment is made. If, pursuant to such calculations, the Operating Expenses so paid exceed the Operating Expense Base Amount, Tenant shall pay Landlord within thirty (30) days of furnishing (the "upward adjustment date") of such calculation to Tenant, Tenant's Pro Rata Share of such difference, calculated on the basis of the percentage determined in Subsection 5.A.

(2)     As soon as practicable after the close of the calendar year in which the Commencement Date occurs, Landlord shall supply Tenant with written notice of Landlord's estimate of the Operating Expenses that will be incurred or accrued during such calendar year immediately following the calendar year of the Commencement Date (the "Initial Deposit Year") in excess of the Operating Base Cost amount. On or before the first day of each month during such Initial Deposit Year, Tenant shall pay to Landlord one-twelfth of Tenant's Pro Rata Share of such estimated excess amount. If the monthly deposit amount is not determined in time for Tenant to make the first payment on January 1 of the Initial Deposit Year, then the first monthly payment shall be due on the first day of the month immediately following the date Landlord supplies Tenant with notice of the excess amount (but not less than 30 days after such notice from Landlord) and the first monthly payment(s) shall also include a payment equal to one-twelfth of such additional sum multiplied by the number of calendar months which have elapsed during the Initial Deposit Year prior to the date Tenant makes its first payment. If the total of the estimated payments made by Tenant during the Initial Deposit Year are less than Tenant's obligation under this Lease for Operating Expenses for such Initial Deposit Year, then Tenant, within thirty (30) days of the billing therefor, shall pay such deficiency to Landlord. In the event the total of the Tenant's estimated payments for the Initial Deposit Year exceed Tenant's obligation for excess Operating Expenses for such year, then the surplus shall be handled in the manner provided in the last sentence of Subsection 5.D.(3).

(3)     Commencing with the calendar year following the Initial Deposit Year and during each calendar year of the Term of this Lease, Tenant shall pay to Landlord on the first day of each month of each calendar year (hereinafter sometimes called an "Expense Deposit Year") one-twelfth of the amount, if any, of Tenant's Pro Rata Share of the excess of Operating Expenses paid during the preceding calendar year over the Operating Expense Base Amount. In the event the monthly amount so payable by Tenant during any calendar year is not determined until after January 1 of such calendar year, then until such monthly amount is determined, Tenant shall continue to pay a monthly amount equal to the monthly payments required of Tenant with respect to adjusted (estimated in the case of the Initial Deposit Year) Operating Expenses for the preceding calendar year, and when such current calendar year's monthly amount is so determined, Tenant shall, upon being advised thereof, pay any deficiency between the monthly payments theretofore made during such period and the current monthly payment; provided that in the first calendar year in which Tenant is required to pay additional sums for Operating Expenses under this subsection (3), the first monthly payment shall also include a payment equal to one-twelfth of such additional sum multiplied by the number of calendar months which have elapsed during such calendar year prior to the first monthly payment due date(s) for such additional sum. If the advice shows a surplusage rather than a deficiency between the amount paid and the amount due, and provided Tenant is not then in default under any of the provisions of this Lease, Landlord shall, at Landlord's option, either

9

EXHIBIT 1

refund the amount of such surplusage to the Tenant within thirty (30) days following such advice, or apply such amount against any other amounts then due from Tenant to Landlord to the extent actually received by Landlord from Tenant.

        E.    Audit and Adjustment Procedures.

        (1)    The annual determination and statement of Taxes and Operating Expenses shall be prepared in accordance with generally accepted accounting principles. In the event of any dispute as to any Rent due hereunder, Tenant shall have the right to inspect Landlord's accounting records relative to Taxes and Operating Expenses at the office in which Landlord maintains its records during normal business hours at any time within three (3) months days following the furnishing by Landlord to Tenant of such statement, and Landlord agrees that its employees and agents shall cooperate with Tenant's inspection and provide a reasonable amount of detail via email. Unless Tenant shall take written exception of any item in any such statement within such three (3) month-period, such statement shall be considered as accepted by Tenant. If Tenant makes such timely written exception, a certification as to the proper amount of Rent shall be made by a Certified Public Accountant mutually agreeable to the Landlord and Tenant (which certification shall be final and conclusive). Tenant agrees to pay the cost of such certification unless it is determined that Landlord's original determination of both Taxes and Operating Expenses was in error by more than seven percent (7%) over Tenant's actual obligation.

        (2)    In the event of the termination of this Lease by expiration of the stated Term or for any other cause or reason prior to the determination of an adjustment to Rent permitted by this Lease, Tenant's agreement to pay its Pro Rata Share of increases in Taxes and Operating Expenses up to the time of termination shall survive termination of this Lease, and Tenant shall pay all amounts due to Landlord within thirty (30) days after being billed therefor. In the event of termination of this Lease by expiration of the stated Term or for any other cause or reason whatsoever, except default by Tenant of any of the terms or provisions of this Lease, prior to the determination of adjustments as hereinabove set forth in Section 5, Landlord's agreement to refund any excess Rent paid by Tenant up to the time of termination shall survive termination of the Lease, and Landlord shall pay the amount due, adjusted by the amounts of any applicable offsets, to Tenant within thirty (30) days of Landlord's determination of such amount. This covenant shall survive the expiration or termination of this Lease.

        (3)    All calculations to be made under this Section 5 shall be made, furnished, handled, and (where applicable) billed separately.

        (4)    Subject to the rights of Landlord hereunder, any refund to which Tenant may be entitled under the provisions of any of subsections 5.C.(1), 5.C.(2), 5.D.(1), 5.D.(2) and 5.D.(3) may not be used by Tenant to offset any payments of Base Rent or other payments then due or that become due Landlord under this Lease.

        (5)    If the Term of this Lease commences on any day other than the first day of January, or if the Term of this Lease ends on any day other than the last day of December, any payment due to Landlord by reason of an increase in Taxes or Operating

10

EXHIBIT 1

Expenses shall be prorated on the basis by which the number of days in such partial year bears to 365.

(6)     All sums which Tenant is required to pay or discharge pursuant to this Section 5 of this Lease in addition to Base Rent, together with any interest or other sums which may be added for late payment thereof, shall constitute "Rent" hereunder.

6.     SERVICES.

A.     Subject to the provisions of subparagraph D below, Landlord, without charge, except as provided herein, and in accordance with standards from time to time prevailing for the Building, agrees: (1) to furnish running water at those points of supply for general use of tenants of the Building; (2) to furnish to public areas of the Building Complex heated or cooled air (as applicable), electrical current, janitorial services, and maintenance to the extent Landlord deems necessary; (3) to furnish, during Ordinary Business Hours, as hereinafter defined, such heated or cooled air to the Premises as may, in the judgment of Landlord, be reasonably required for the comfortable use and occupancy of the Premises, provided that the recommendations of Landlord's engineer regarding occupancy and use of the Premises are complied with by Tenant and, with respect to cooled air, provided the same is used only for standard office use, as well as any necessary air for Tenant's network room or closet; (4) to furnish, subject to availability and capacity of building systems, unfiltered treated cooling tower water for use in Tenants' packaged HVAC systems, provided that such systems are equipped with Landlord-approved strainers, pumping systems and controls, and that such systems are connected only after approval of Landlord's engineer; (5) to provide, during Ordinary Business Hours, the general use of passenger elevators for ingress and egress to and from the Premises (at least one such elevator shall be available at all times, except in the case of emergencies or repair); (6) to provide janitorial services for the Premises to the extent of the Building Standard tenant finish work items contained therein (including such window washing of the outside of exterior windows as may, in the judgment of Landlord, be reasonably required), but unless and until the Building Standard changes, such janitorial services shall be provided after Ordinary Business Hours on Monday through Thursday and Sunday only, except for Legal Holidays; and (7) to cause electric current to be supplied to the Premises for all of Tenant's Standard Electrical Usage, as hereinafter defined. "Tenant's Standard Electrical Usage", as used herein, shall mean and refer to weekly electrical consumption in an amount equal to multiplying three and one-half (3.5) watts/square foot by sixty (60) hours and by then multiplying the product thereof by the number of rentable square feet in the Premises. "Ordinary Business Hours" as used herein shall mean and refer to 7:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 1:00 p.m. on Saturdays, Legal Holidays excepted. "Legal Holidays," as used herein, shall mean New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

B.     "Excess Usage" shall be defined as any usage of electricity (1) during other than Ordinary Business Hours; or (2) in an amount in excess of Tenant's Standard Electrical Usage; or (3) for "Special Equipment"; or (4) for any requirement for standard HVAC services during other than Ordinary Business Hours. "Special Equipment," as used herein, shall mean (a) any equipment consuming more than 0.5 kilowatts at rated capacity, (b) any equipment requiring a voltage other than 120 volts, single phase, or (c) equipment that requires the use of

11

EXHIBIT 1

self-contained HVAC units. Tenant shall reimburse Landlord for reasonable costs incurred by Landlord in providing services for Excess Usage, which costs are subject to change from time to time. Computation of Landlord's cost for providing such services will be made by Landlord's engineer, based on his engineering survey of Tenant's Excess Usage. Tenant shall also reimburse Landlord for all costs of supplementing the Building HVAC System and/or extending or supplementing any electrical service, as Landlord may determine is necessary, as a result of Tenant's Excess Usage. Prior to installation or use by Tenant of any equipment which will result in Excess Usage or operation of the Premises for extended hours on an ongoing basis, Tenant shall notify Landlord of such intended installation or use and obtain Landlord's consent therefor. In addition to the foregoing, Tenant, at Tenant's option, upon such notice or at any time thereafter, may request Landlord, at Tenant's sole cost and expense, to install a check meter and/or flow meter to assist in determining the cost to Landlord of Tenant's Excess Usage. If Tenant desires electric current and/or heated or cooled air to the Premises during periods other than Ordinary Business Hours, Landlord will use reasonable efforts to supply the same, but at the expense of Tenant, at Landlord's standard rate as established by it, from time to time, for such services. Not less than forty-eight (48) hours' prior notice shall be given by Tenant to Landlord of Tenant's desire for such services. It is also understood and agreed that Tenant shall pay the cost of replacing light bulbs and/or tubes and ballast used in all lighting in the Premises other than Building Standard lighting.

C.     If Tenant requires janitorial services other than those required to be provided to other tenants of the Building Complex generally, Tenant shall separately pay for such services monthly upon billings by Landlord, or Tenant shall, at Landlord's option, separately contract for such services with the same company furnishing janitorial services to Landlord. Notwithstanding the foregoing, Tenant shall have the right, subject to Landlord's prior written consent and such rules, regulations and requirements as Landlord may impose (including but not limited to the requirement that such janitors belong to a trade union), to employ janitors, other than those employed by Landlord, to perform such additional services.

D.     Tenant agrees that Landlord shall not be liable for failure to supply any such heating, air conditioning, elevator, electrical, janitorial, lighting or other services during any period Landlord is required to reduce or curtail such services pursuant to any applicable laws, rules, or regulations, including regulations of any utility now or hereafter in force or effect; it is further understood that Landlord may discontinue, reduce, or curtail such services, or any of them (either temporarily or permanently), at such times as it may be necessary by reason of accident, repairs, alterations, improvements, strikes, lockouts, riots, acts of God, application of applicable laws, statutes, or rules and regulations or due to any other happening beyond the control of Landlord.  In the event of any interruption, reduction, or discontinuance of Landlord's services (either temporary or permanent) for the foregoing permitted reasons, Landlord shall not be liable for damages to person or property as a result thereof nor shall the occurrence of any such event in any way be construed as an eviction of Tenant; or cause or permit an abatement, reduction or setoff of rent; or operate to release Tenant from any of Tenant's obligations hereunder.

E.     Tenant agrees to notify promptly the Landlord or its representative of any accidents or defects in the Building of which Tenant becomes aware including defects in pipes,

12

EXHIBIT 1

electrical wiring, and HVAC equipment. In addition, Tenant shall provide Landlord with prompt notification of any matter or condition which may cause injury or damage to the Building or any person or property therein.

7.      QUIET ENJOYMENT. So long as Tenant is not in default under this Lease, Tenant shall be entitled to the quiet enjoyment and peaceful possession of the Premises, subject to the terms and provisions of the Lease.

8.      DEPOSIT. It is hereby agreed that, concurrently with the execution of this Lease, Tenant has deposited with Landlord and will keep on deposit at all times during the term of this Lease, the sum of Zero Dollars ($0.00), the receipt of which is hereby acknowledged, as security for the payment by Tenant of all rent and other amounts herein agreed to be paid and for the faithful performance of all the terms, conditions, and covenants of this Lease.

If, at any time during the term of this Lease, Tenant shall be in default in the performance of any provision of this Lease, Landlord shall have the right to use said deposit, or so much thereof as necessary, in payment of any rent or other amount in default as aforesaid, in reimbursement of any expense incurred by Landlord, and in payment of any damages incurred by Landlord by reason of Tenant's default. In such event, Tenant shall, on written demand of Landlord, forthwith remit to Landlord a sufficient amount in cash to restore said deposit to an amount equal to: (i) the Base Rent if Tenant's default occurs thereafter, plus the monthly amount of Tenant's Pro Rata Share of increases in Operating Expenses then payable by Tenant pursuant to Paragraph 5.B hereof, times (ii) the number of months' worth of Base Rent represented by the initial deposit. In the event said deposit has not been utilized as aforesaid, said deposit, or as much thereof as has not been utilized for such purposes, shall be refunded to Tenant or to whomever is then the holder of Tenant's interest in this Lease, without interest, within sixty (60) days of the full performance of this Lease by Tenant. Landlord shall have the right to co-mingle said deposit with other funds of Landlord. Landlord may deliver the funds deposited herein by Tenant to the purchaser of Landlord's interest in the Premises in the event such interest is sold and, thereupon, Landlord shall be discharged from further liability with respect to such deposit. Tenant agrees that if a Mortgagee (as defined in Paragraph 20) succeeds to Landlord's interest in the Premises by reason of foreclosure or deed-in-lieu of foreclosure, Tenant shall have no claim against said Mortgagee for the Security Deposit, or any portion thereof, unless such Mortgagee has actually received the same from Landlord. If claims of Landlord exceed said deposit, Tenant shall remain liable for the balance of such claims.

9.      CHARACTER OF OCCUPANCY. Tenant covenants and agrees to occupy the Premises as general offices (the "Permitted Use") and for no other purpose, and to use them in a careful, safe, and proper manner; to pay on demand for any damage to the Premises caused by misuse or abuse thereof by Tenant, Tenant's agents or employees, or of any other person entering upon the Premises under express or implied invitation of Tenant (excluding Landlord, janitor, and Landlord's other agents, employees and contractors). Tenant, at Tenant's expense, shall comply with all laws, codes, rules, and regulations of the United States, the State of Colorado, and of the County of Arapahoe ("Applicable Laws"), now in effect, or which may hereafter be in effect, which pertain specifically to Tenant's business and/or any alterations made to the Premises by Tenant after the commencement of the Primary Lease Term. Tenant shall not

13

EXHIBIT 1

commit waste or suffer or permit waste to be committed or permit any nuisance on or in the Premises. Tenant agrees that it will not store, keep, use, sell, dispose of or offer for sale in, upon or from the Premises any article or substance which may be prohibited by any insurance policy in force from time to time covering the Building nor shall Tenant keep, store, produce or dispose of on, in or from the Premises or the Building any substance which may be deemed a hazardous substance or infectious waste under any state, local or federal rule, statute, law, regulation or ordinance as may be promulgated or amended from time to time.  Notwithstanding any provision herein to the contrary, Tenant shall be permitted to use and store customary office and cleaning supplies in the Premises, provided that the same are used, stored, handled and disposed of in compliance with all Applicable Laws.

           10.     MAINTENANCE, ALTERATIONS AND REENTRY BY LANDLORD.

           A.     Unless otherwise expressly provided herein, Landlord shall not be required to make any improvements or repairs of any kind or character to the Premises during the Primary Lease Term, or any extension thereof, except (i) such repairs to HVAC, mechanical, life safety and electrical other systems in the Premises (to the extent such systems are Building Standard) as may be deemed necessary by Landlord for normal maintenance operations of the Building Complex; and (ii) such repairs caused by the gross negligence or willful misconduct of the Landlord, and/or its agents, employees, contractors and/or invitees.  Landlord shall maintain all structural components and systems of the Building Complex, shall provide upkeep, maintenance, and repairs to all Common Areas in the Building Complex and all exterior portions of the Building adjacent to the Premises, and shall cause the removal of snow and ice from the accessways and parking lots in a commercially reasonable manner for properties located in the Denver, Colorado metropolitan area.  Landlord shall maintain the Building Complex as a first-class office building complex.

           B.     Provided that Landlord provides Tenant with no less than two business days' prior notice (except in cases of emergency when prior notice is impractical), Tenant covenants and agrees to permit Landlord its employees, representatives and agents at any time to enter the Premises to examine and inspect the same or, if Landlord so elects, to perform any obligations of Tenant hereunder which Tenant shall fail to perform or to perform such cleaning, maintenance, janitorial services, repairs, additions, or alterations as Landlord may deem necessary or proper for the safety, improvement, or preservation of the Premises or of other portions of the Building Complex or as may be required by governmental authorities through any code, rule, regulation, ordinance, and/or law and to show the Premises to prospective tenants (limited to the last nine months of the Term, and only if Tenant has not exercised any renewal options available to it), purchasers, investors and lenders.  Any such reentry shall not constitute an eviction or entitle Tenant to abatement of rent.  Furthermore, Landlord shall at all times have the right at Landlord's election to make such alterations or changes in other portions of the Building Complex as Landlord may from time to time deem necessary and desirable as long as such alterations and changes do not unreasonably interfere with Tenant's use and occupancy of the Premises.  Landlord may use one or more of the street entrances to the Building Complex and such public areas thereof as may be necessary, in Landlord's determination to complete such alterations or changes.  In all cases of entry pursuant to this Paragraph 10(B), Landlord shall use commercially reasonable efforts to minimize disruption to Tenant's business.

EXHIBIT 1

11.    ALTERATIONS AND REPAIRS BY TENANT.

A.    Tenant covenants and agrees not to make any Alterations in or additions to the Premises, including installation of any equipment or machinery therein which requires modification of or additions to any existing electrical outlet or which would increase Tenant's usage of electricity beyond the Tenant's Standard Electrical Usage (all such alterations are referred to herein collectively as "Alterations") without in each such instance first obtaining the written consent of Landlord. Landlord's consent to any Alterations by Tenant or Landlord's approval of the plans, specifications and working drawings for Tenant's Alterations shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities now in effect or which may hereafter be in effect. Tenant, at its expense, shall pay all engineering and design costs incurred by Landlord attributable to the Alterations and obtain all necessary governmental permits and certificates required for any Alterations to which Landlord has consented and shall cause such alterations to be completed in compliance therewith and with all applicable laws and requirements of public authorities and all applicable requirements of Landlord's insurance carriers. All Alterations which Tenant is permitted to make shall be performed in a good and workmanlike manner, using new materials and equipment at least equal in quality to the original installations in the Premises. All repair and maintenance work required to be performed by Tenant pursuant to the provisions of subparagraph B below and any Alterations permitted by Landlord pursuant to the provisions hereof, including, but not limited to, any installations desired by Tenant for Tenant's telegraphic, telephonic or electrical connections, shall be done at Tenant's expense by Landlord's employees or, with Landlord's consent, by persons requested by Tenant and authorized in writing by Landlord. If Landlord authorizes persons requested by Tenant to perform such work, prior to the commencement of any such work, on request, Tenant shall deliver to Landlord certificates issued by insurance companies qualified to do business in the State of Colorado, evidencing that workmen's compensation, public liability insurance, and property damage insurance, all in the amounts, with companies and on forms satisfactory to Landlord, are in force and effect and maintained by all contractors and subcontractors engaged by Tenant to perform such work. All such policies shall name Landlord and any Mortgagee (as defined in Paragraph 20) as an additional insured. Each such certificate shall provide that the same may not be canceled or modified without ten (10) days' prior written notice to Landlord and such Mortgagee. Further, Landlord and such Mortgagee shall have the right to post notices in the Premises in locations which will be visible by parties performing any work on the Premises stating that Landlord is not responsible for the payment for such work and setting forth such other information as Landlord may deem necessary. Alterations, repair, and maintenance work shall be performed in a manner which will not unreasonably interfere with, delay, or impose any additional expense upon Landlord in the maintenance or operation of the Building or upon other tenants' use of their premises.

B.    Tenant shall keep the Premises in as good order, condition, and repair and in an orderly state, as when they were entered upon, loss by fire or other casualty or ordinary wear excepted.  Subject to Landlord's obligation to make repairs in the event of certain casualties, as set forth in Paragraph 18 below, Landlord shall have no obligation for the repair or replacement of any portion of the interior of the Premises which is damaged or wears out during

15

EXHIBIT 1

the term hereof regardless of the cause therefor (excluding the gross negligence or willful misconduct of Landlord and/or its agents, employees and/or contractors), including but not limited to carpeting, draperies, window coverings, wall coverings, painting or any of Tenant's property or betterments in the Premises.

C.     All Alterations and permanent fixtures installed in the Premises, including, by way of illustration and not by limitation, all partitions, paneling, carpeting, drapes or other window coverings, and light fixtures (but not including movable office furniture not attached to the Building), shall be deemed a part of the real estate and the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof without molestation, disturbance, or injury at the end of the Primary Lease Term, or any extension thereof, whether by lapse of time or otherwise, unless Landlord (by notice given to Tenant at the time Landlord approves the Alteration(s)),shall elect to have Tenant remove all or any of the Alterations, and in such event, Tenant, at the end of the Term, shall remove at Tenant's expense the Alterations specified by Landlord and restore the Premises to their condition prior to the making of the same, reasonable wear and tear excepted.

12.     MECHANICS' LIENS. Tenant shall pay or cause to be paid all costs for work done by Tenant or caused to be done by Tenant on the Premises (including work performed by Landlord or its contractor at Tenant's request following the commencement of the Primary Lease Term, but excluding the completion of punch-list items associated with Landlord's pre-commencement work in the Premises) of a character which will or may result in liens on Landlord's interest therein and Tenant will keep the Premises free and clear of all mechanics' liens, and other liens on account of work done for Tenant or persons claiming under it. Tenant hereby agrees to indemnify, defend, and save Landlord harmless of and from all liability, loss, damage, costs, or expenses, including attorneys' fees, on account of any claims of any nature whatsoever including claims or liens of laborers or materialmen or others for work performed for or materials or supplies furnished to Tenant or persons claiming under Tenant. Should any liens be filed or recorded against the Premises or any action affecting the title thereto be commenced as a result of such work (which term includes the supplying of materials), Tenant shall cause such liens to be removed of record within thirty (30) days after notice from Landlord. If Tenant desires to contest any claim of lien, Tenant shall furnish to Landlord adequate security of at least one hundred fifty percent (150%) of the amount of the claim, plus estimated costs and interest and, if a final judgment establishing the validity or existence of any lien for any amount is entered, Tenant shall pay and satisfy the same at once. If Tenant shall be in default in paying any charge for which a mechanic's lien or suit to foreclose the lien has been recorded or filed and shall not have given Landlord security as aforesaid, Landlord may (but without being required to do so) pay such lien or claim and any costs, and the amount so paid, together with reasonable attorney's fees incurred in connection therewith, shall be immediately due from Tenant to Landlord.

13.     SUBLETTING AND ASSIGNMENT.

A.     Tenant shall neither sublet any part of the Premises nor assign this Lease or any interest herein without the written consent of Landlord first being obtained, which consent, will not be unreasonably withheld, conditioned or delayed provided that: (1) Tenant has

16

EXHIBIT 1

complied with the provision of subparagraph D below and Landlord has declined to exercise its rights thereunder; (2) the proposed subtenant or assignee is engaged in a business and the Premises will be used in a manner which is in keeping with the then standards of the Building and does not conflict with any exclusive use rights granted to any other tenant; (3) the proposed subtenant or assignee has a reputation and standing in the business community consistent with the image of tenants in a first-class office building and has reasonable financial worth in light of the responsibilities involved and Tenant shall have provided Landlord with reasonable proof thereof; (4) Tenant is not in default hereunder at the time it makes its request for such consent; (5) the proposed subtenant or assignee is not a governmental or quasi-governmental agency; or (6) the proposed subtenant or assignee is not a tenant under, or is not currently negotiating, a lease with Landlord in any Building owned by Landlord in the southeast Denver metropolitan area (including the Building). Notwithstanding anything contained herein to the contrary, Tenant acknowledges that if the use of the Premises by any proposed subtenant or assignee would require compliance by Landlord and the Building with any current or future laws to a greater extent than that required prior to the proposed occupancy by such subtenant or assignee, Landlord, at its sole option, may refuse to grant such consent, unless, as an express condition thereof, Tenant and/or such assignee or subtenant bears the entire cost of such greater compliance.

    B.  If this Lease is assigned, or if the Premises or any part thereof is sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect the rent from the assignee, subtenant, or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy, or collection shall be deemed an acceptance of the assignee, subtenant, or occupant as the Tenant hereof or a release of Tenant from further performance by Tenant of covenants on the part of Tenant herein contained. Consent by Landlord to any one Assignment or sublease shall not in any way be construed as relieving Tenant from obtaining the Landlord's express written consent to any further Assignment or sublease. Notwithstanding the consent of Landlord to any sublease or Assignment, Tenant shall not be relieved from its primary obligations hereunder to Landlord, including, but not limited to the payment of all Base Rent and Tenant's Pro Rata Share of increases in Taxes and Operating Expenses. Landlord's consent to any requested sublease or Assignment shall not waive Landlord's right to refuse to consent to any other such request or to terminate this Lease if such request is made, all as provided herein. If Tenant collects any rental from a subtenant or assignee in excess of the Base Rent and Tenant's Pro Rata Share of increases in Taxes and Operating Expenses for any monthly period, Tenant shall pay to Landlord on a monthly basis, as and when Tenant receives the same, all such excess amounts received by Tenant.

    C.  Notwithstanding any provision herein to the contrary, Tenant shall be permitted (without having to obtain Landlord's consent), to assign this Lease or sublet the Premises (in whole or part) to an Affiliate. For purposes of this Paragraph 13(C), an "**Affiliate**" means any entity that (i) controls, is controlled by, or is under common control with Tenant, (ii) results from the transfer of all or substantially all of Tenant's assets or stock, or (iii) results from the merger or consolidation of Tenant with another entity. Furthermore, the transfer of stock or membership interests in Tenant shall not be deemed an assignment of the Lease or the subletting of the Premises.

17

EXHIBIT 1

D.      Tenant hereby agrees that in the event it desires to sublease all or any portion of the Premises or assign this Lease to any party, in whole or in part, (herein "Assignment"), and the terms of Paragraph 13(C) are not applicable, Tenant shall notify Landlord not less than thirty (30) days prior to the date Tenant desires to sublease such portion of the Premises or assign this Lease ("Tenant's Notice").

E.      All documents utilized by Tenant to evidence any subletting or assignment to which Landlord has consented shall be subject to prior approval by Landlord or its counsel. Tenant shall pay on demand all of Landlord's costs and expenses, including reasonable attorneys' fees, incurred in determining whether or not to consent to any requested sublease or Assignment and in reviewing and approving such documentation, provided, however, such costs and expenses shall not be in excess of $1,500.00.

F.      Landlord and Tenant understand that notwithstanding certain provisions to the contrary contained herein, a trustee or debtor in possession under the Bankruptcy Code of the United States may have certain rights to assume or assign this Lease. If a trustee in bankruptcy is entitled to assume control over Tenant's rights under this Lease and assigns such rights to any third party, Landlord will be entitled under the Bankruptcy Code to Adequate Assurance of future performance of the terms and provisions of this Lease. For purposes of any such assumption or assignment, the parties hereto agree that the term "Adequate Assurance" shall include at least the following: Any proposed assignee of this Lease must assume and agree to be bound by the terms, provisions, and covenants of this Lease.

14.     DAMAGE TO PROPERTY. Tenant shall neither hold nor attempt to hold Landlord liable for any injury or damage, either proximate or remote, occurring through or caused by fire, water, steam, or any repairs, alterations, injury, accident, or any other cause to the Premises, to any furniture, fixtures, Tenant improvements, or other personal property of Tenant kept or stored in the Premises, or in other parts of the Building Complex not herein demised, whether by reason of the negligence or default of the owners or occupants thereof or any other person or otherwise and the keeping or storing of all property of Tenant in the Building Complex and/or Premises shall be at the sole risk of Tenant. Nothing in the foregoing shall be construed to negate the Landlord's repair, maintenance and restoration obligations set forth in this Lease, nor negate the Landlord's indemnification obligations set forth in this Lease. Tenant shall obtain and maintain throughout the term of this Lease "all risk" or "multi-peril" insurance on and for the full cost of replacement of all of Tenant's property and betterments in the Premises, including, without limitation all furniture, fixtures, personal property and all tenant finish in excess of Building Standard items.

15.     INDEMNITY/ INSURANCE.

A.      Tenant hereby agrees to indemnify, defend, and save Landlord harmless of and from all liability, loss, damages, costs, or expenses, including attorneys' fees, on account of injuries to the person or property of Landlord or of any other tenant in the Building Complex or to any other person rightfully in said Building Complex for any purpose whatsoever, where the injuries are caused by the negligence, misconduct or breach of this Lease by the Tenant, Tenant's

18

EXHIBIT 1

agents, servants, or employees or of any other person entering upon the Premises under express or implied invitation of Tenant (while such other person is in the Premises or is otherwise under the control of Tenant) or where such injuries are the result of the violation of the provisions of this Lease by the Tenant, Tenant's agents, servants, or employees or of any other person entering upon the Premises under express or implied invitation of Tenant (while such other person is in the Premises or is otherwise under the control of Tenant). Landlord hereby agrees to indemnify, defend, and save Tenant harmless of and from all liability, loss, damages, costs, or expenses, including attorneys' fees, on account of injuries to the person or property of Tenant or of any other person upon or in the  Building Complex or to any other person rightfully in said Building Complex for any purpose whatsoever, where the injuries are caused by the negligence, misconduct or breach of this Lease by the Landlord, Landlord's agents, servants, or employees or of any other person entering upon the Building Complex under express or implied invitation of Landlord (while such other person is at the Building Complex or is otherwise under the control of Landlord) or where such injuries are the result of the violation of the provisions of this Lease by the Landlord or Landlord's agents, servants, or employees or of any other person entering upon the Building Complex under express or implied invitation of Landlord (while such other person is at the Building Complex or is otherwise under the control of Landlord). The indemnity obligations set forth in this Lease shall survive termination or earlier expiration of this Lease.

B.      Tenant shall, during the entire term hereof, keep in full force and effect a policy of general liability insurance with respect to the leased premises, and the business operated by Tenant and any sub-tenants of Tenant in the leased premises in which the limits of general liability shall be not less than One Million Dollars ($1,000,000.00) per occurrence combined single limit/Two Million Dollars ($2,000,000.00) general aggregate. Landlord shall be included as an additional insured with respect to general liability coverage. Should any of the above-described policies be cancelled before the expiration date thereof, notice will be delivered in accordance with policy provisions, provided that Tenant shall provide Landlord with evidence of new insurance prior to the cancellation or expiration of the previous insurance (Tenant shall be in compliance with the foregoing requirement if such evidence is faxed or emailed to Landlord at 303-984-9874 and ksmith@westsideinv.com (or other updated fax number and e-mail address provided to Tenant) on the day of cancellation or expiration of the previous insurance, with such evidence to subsequently follow by mail or overnight delivery). Prior to occupancy of the Premises, and thereafter from time to time, Tenant shall deliver certificates evidencing that such insurance, as required under Paragraph 14 and this Paragraph 15, is in force and effect. The limits of said insurance shall not, under any circumstances, limit the liability of Tenant hereunder.

16.     SURRENDER AND NOTICE.  Upon the expiration or other termination of the term of this Lease, Tenant shall promptly quit and surrender to Landlord the Premises broom clean, in good order and condition, ordinary wear and tear and loss by fire or other casualty excepted unless due to the negligence of Tenant, and Tenant shall remove all of its movable furniture and other effects and such Alterations, as Landlord shall require Tenant to remove pursuant to Paragraph 11 hereof.  In the event Tenant fails to vacate the Premises on a timely basis as required, Tenant shall be responsible to Landlord for all costs actually incurred by Landlord as a result of such failure, including, but not limited to, any amounts required to be paid to third parties who were to have occupied the Premises.

19

EXHIBIT 1

17.     INSURANCE, CASUALTY, AND RESTORATION OF PREMISES.

A.      Landlord shall secure and maintain (a) casualty insurance on the Premises (excluding any Alterations made by Tenant after the commencement of the Primary Lease Term), and on the shell and core of the Building, and (b) general liability insurance coverage in such amounts, from such companies, and on such terms and conditions, including loss of rental insurance for such period of time as Landlord reasonably deems appropriate, from time to time, but in no event shall the casualty coverage be less than the full replacement value of the Building and Premises, and in no event shall the liability insurance be less than what prudent owners of similar buildings in the Denver, CO area maintain.

B.      If the Premises or the Building shall be so damaged by fire or other casualty as to render the Premises wholly untenantable or inaccessible and if such damage shall be so great that a competent architect, in good standing, selected by Landlord shall certify in writing to Landlord and Tenant within sixty (60) days of said casualty that the Premises, with the exercise of reasonable diligence, cannot be made fit for occupancy within one hundred eighty (180) working days from the happening thereof, then this Lease shall cease and terminate from the date of the occurrence of such damage and Tenant shall thereupon surrender to Landlord the Premises and all interest therein hereunder and Landlord may reenter and take possession of the Premises and remove Tenant therefrom. Tenant shall pay rent, duly apportioned, up to the time of the damage. If, however, the damage shall be such that said architect shall certify within said sixty (60) day period that the Premises can be made tenantable within said one hundred eighty (180) day period, then, except as hereinafter provided, Landlord shall repair the damage so done with all reasonable speed.

C.      If the Premises shall be slightly damaged by fire or other casualty, but not so as to render the same wholly untenantable, or inaccessible, or to require a repair period in excess of one hundred eighty (180) days, then, Landlord, after receiving notice in writing of the occurrence of the casualty, except as hereafter provided, shall cause the same to be repaired with reasonable promptness. If the estimated repair period as established in accordance with the provisions of subparagraph B above exceeds one hundred eighty (180) days, then the provisions of subparagraph B shall control notwithstanding the fact that the Premises are not wholly untenantable or inaccessible.

D.      In case the Building throughout shall be so injured or damaged, whether by fire or otherwise (though said Premises may not be affected, or if affected, can be repaired within said one hundred eighty (180) days), that, within sixty (60) days after the happening of such injury, Landlord shall decide not to reconstruct or rebuild said Building, then, notwithstanding anything contained herein to the contrary, upon notice in writing to that effect given by Landlord to Tenant within said sixty (60) days, Tenant shall pay the rent, properly apportioned up to the date of casualty, this Lease shall terminate from the date of delivery of said written notice, and both parties hereto shall be freed and discharged of all further obligations hereunder.

20

EXHIBIT 1

E.      Notwithstanding any provision herein to the contrary, if the Premises (and access thereto) are not fully restored within one hundred eighty (180) days after the date of casualty, the Tenant shall have the right to terminate this Lease upon written notice to Landlord.

F.      Tenant's rent shall equitably abate from the date of damage (and/or the Premises being inaccessible), through and during any such period of repair and restoration.

18.     CONDEMNATION.  If the entire Premises or substantially all of the Premises or any portion of the Building Complex which shall render the Premises untenantable and/or inaccessible shall be taken by right of eminent domain or by condemnation or shall be conveyed in lieu of any such taking, then this Lease, at the option of either Landlord or Tenant exercised by either party giving notice to the other of such termination within thirty (30) days after such taking or conveyance, shall forthwith cease and terminate and the rent shall be duly apportioned as of the date of such taking or conveyance, or the date Tenant is unable to use or access the Premises, whichever occurs first. Tenant thereupon shall surrender the Premises and all interest therein under this Lease to Landlord and Landlord may reenter and take possession of the Premises or remove Tenant therefrom. In the event less than all of the Premises shall be taken by such proceeding, Landlord shall promptly repair the Premises as nearly as possible to its condition immediately prior to said taking, unless Landlord elects not to reconstruct or rebuild as described in subparagraph D of Paragraph 17 above. In the event of any such taking or conveyance, Landlord shall receive the entire award or consideration for the portion of the Building so taken. Notwithstanding anything to the contrary in this Paragraph 18, Tenant shall have the right to (a) terminate this Lease if the Premises are reduced by more than 10% of the rentable square footage; and (b) claim separately from the condemning authority such compensation as may be recoverable by Tenant in its own right for Tenant's personal property and trade fixtures, and for relocation and restoration costs incurred by Tenant, provided that any such award or consideration does not decrease Landlord's award or consideration.  If neither party terminates this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation and Tenant's Proportionate Share shall be adjusted based upon the square footage of the Premises remaining.

19.     DEFAULT BY TENANT.

A.      Each one of the following events is herein referred to as an "Event of Default":

(1)     Any failure by Tenant to pay the rent or any other monetary sums required to be paid hereunder on the date such sums are due shall be deemed a default. Notwithstanding the foregoing, Tenant may cure a default under this provision at any time prior to five (5) business days after written notice of such default is given by Landlord exercising its remedies as to such default under this Lease; provided, however, Tenant shall not be entitled to more than two (2) notices of a delinquency in payment during any calendar year and, if thereafter during such calendar year any rent or other amounts owing hereunder are not paid when due, an

21

EXHIBIT 1

Event of Default shall be deemed to have occurred immediately even though no notice thereof is given;

(2)     [Intentionally Omitted];

(3)     This Lease or the estate of Tenant hereunder shall be transferred in contravention of Paragraph 13;

(4)     This Lease or the Premises or any part thereof shall be taken upon execution or by other process of law directed against Tenant or shall be taken upon or subject to any attachment at the instance of any creditor of or claimant against Tenant and said attachment shall not be discharged or disposed of within thirty (30) business days after the levy thereof;

(5)     The filing of any petition or the commencement of any case or proceeding by the Tenant under any provision or chapter of the Federal Bankruptcy Act, the Federal Bankruptcy Code, or any other federal or state law relating to insolvency, bankruptcy, or reorganization or the adjudication that the Tenant is insolvent or bankrupt or the entry of an order for relief under the Federal Bankruptcy Code with respect to Tenant;

(6)     The filing of any petition or the commencement of any case or proceeding described in subparagraph (5) above against the Tenant, unless such petition and all proceedings initiated thereby are dismissed within sixty (60) days from the date of such filing; the filing of an answer by Tenant admitting the allegations of any such petition; the appointment of or taking possession by a custodian, trustee or receiver for all or any assets of the Tenant, unless such appointment is vacated or dismissed within sixty (60) days from the date of such appointment;

(7)     The execution by the Tenant of an assignment for the benefit of creditors; the convening by Tenant of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; or the failure of the Tenant generally to pay its debts as they mature;

(8)     [Intentionally Omitted];

(9)     [Intentionally Omitted];

(10)     Tenant shall fail to perform any of the other agreements terms, covenants, or conditions hereof on Tenant's part to be performed and such non-performance shall continue for a period of thirty (30) days after written notice thereof by Landlord to Tenant or, if such performance cannot be reasonably had within such thirty (30) day period, Tenant shall not in good faith have commenced such performance within such thirty (30) day period and shall not diligently proceed therewith to completion (not to exceed ninety (90) days; provided, however, if Tenant repeatedly (i.e., more than two (2) times in any given 12-month period) fails to perform a specific agreement, covenant or condition hereof during the term of this Lease, Tenant shall no longer have the opportunity to cure any subsequent failure of such specific agreement, covenants

22

EXHIBIT 1

or condition, and an Event of Default shall be deemed to have occurred immediately upon such failure.

        B.    Remedies of Landlord. If any one or more Event of Default shall happen, then Landlord shall have the right at Landlord's election, then or at any time thereafter, either:

        (1)    (a)    Without demand or notice, to reenter and take possession of the Premises or any part thereof and repossess the same as of Landlord's former estate and expel Tenant and those claiming through or under Tenant and remove the effects of both or either, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or preceding breach of covenants or conditions. Should Landlord elect to reenter, as provided in this subparagraph (1), or should Landlord take possession pursuant to legal proceedings or pursuant to any notice provided for by law, Landlord may, from time to time, without terminating this Lease, relet the Premises or any part thereof, either alone or in conjunction with other portions of the Building of which the Premises are a part, in Landlord's or Tenant's name but for the account of Tenant, for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the term of this Lease (provided, however, Tenant shall have no continuing liability for any greater term) and on such conditions and upon such other terms (which may include concessions of free rent and alteration and repair of the Premises) as Landlord in its uncontrolled discretion, may determine and Landlord may collect and receive the rents therefor. Landlord shall in no way be responsible or liable for any failure to relet the Premises, or any part thereof, or for any failure to collect any rent due upon such reletting. No such reentry or taking possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention is given to Tenant. No notice from Landlord hereunder or under a forcible entry and detainer statute or similar law shall constitute an election by Landlord to terminate this Lease unless such notice specifically so states. Landlord reserves the right following any such reentry and/or reletting to exercise its right to terminate this Lease by giving Tenant such written notice, in which event the Lease will terminate as specified in said notice.

        (b)    If Landlord elects to take possession of the Premises as provided in this subparagraph (1) without terminating the Lease, Tenant shall pay to Landlord (i) the rent and other sums as herein provided, which would be payable hereunder if such repossession had not occurred, less (ii) the net proceeds, if any, of any reletting of the Premises after deducting all of Landlord's expenses incurred in connection with such reletting, including, but without limitation, all repossession costs, brokerage commissions, legal expenses, reasonable attorneys' fees, expenses of employees, alteration, remodeling, and repair costs and expenses of preparation for such reletting. If, in connection with any reletting, the new lease term extends beyond the existing term or the premises covered thereby include other premises not part of the Premises, a fair apportionment of the rent received from such reletting and the expenses incurred in connection therewith, as provided aforesaid, will be made in determining the net proceeds received from such reletting. In addition, in determining the net proceeds from such reletting, any rent concessions will be apportioned over the term of the new lease. Tenant shall pay such amounts to Landlord monthly on the days on which the rent and all other amounts owing hereunder would have been payable if possession had not been retaken and Landlord shall be entitled to receive the same from Tenant on each such day; or

23

EXHIBIT 1

(2)     To give Tenant written notice of intention to terminate this Lease on the date of such given notice or on any later date specified therein and, on the date specified in such notice, Tenant's right to possession of the Premises shall cease and the Lease shall thereupon be terminated, except as to Tenant's liability hereunder as hereinafter provided, as if the expiration of the term fixed in such notice were the end of the term herein originally demised. In the event this Lease is terminated pursuant to the provisions of this subparagraph (2), Tenant shall remain liable to Landlord for damages in an amount equal to the rent and other sums which would have been owing by Tenant hereunder for the balance of the term had this Lease not been terminated less the net proceeds, if any, of any reletting of the Premises by Landlord subsequent to such termination, after deducting all Landlord's expenses in connection with such reletting, including, but without limitation, the expenses enumerated above. Landlord shall be entitled to collect such damages from Tenant monthly on the days on which the rent and other amounts would have been payable hereunder if this Lease had not been terminated and Landlord shall be entitled to receive the same from Tenant on each such day.

C.     Cumulative Remedies. Suit or suits for the recovery of the rents and other amounts and damages set forth hereinabove may be brought by Landlord, from time to time, at Landlord's election, and nothing herein shall be deemed to require Landlord to await the date whereon this Lease or the term hereof would have expired had there been no such default by Tenant or no such termination, as the case may be. Each right and remedy provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, including, but not limited to, suits for injunctive relief and specific performance. The exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise. All such rights and remedies shall be considered cumulative and non-exclusive. All costs incurred by Landlord in connection with collecting any rent or other amount and damages owing by Tenant pursuant to the provisions of this Lease, or to enforce any provision of this Lease, shall also be recoverable by Landlord from Tenant. Further, if an action is brought pursuant to the terms and provisions of the Lease, the prevailing party in such action shall be entitled to recover from the other party any and all reasonable attorneys' fees incurred by such prevailing party in connection with such action.

D.     Notwithstanding any provision herein to the contrary, Landlord shall use commercially reasonable efforts to mitigate its damages upon the occurrence of an Event of Default.

E.     Bankruptcy. Nothing contained in this Paragraph 19 shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization, or dissolution proceeding an amount equal to the maximum allowed by any statute or rule of law governing such a proceeding and in effect at the time when such damages are to be proved, whether or not such amount be greater, equal to, or less than the amounts recoverable, either as damages or rent, referred to in any of the preceding

24

EXHIBIT 1

provisions of this Paragraph. Notwithstanding anything contained in this Paragraph to the contrary, any such proceeding or action involving bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, or appointment of a receiver or trustee, as set forth above, shall be considered to be an Event of Default only when such proceeding, action, or remedy shall be taken or brought by or against the then holder of the leasehold estate under this Lease.

      F.    <u>Late Payment Charge.</u> Any rents or other amounts owing hereunder which are not paid within five (5) business days after the date they are due shall thereafter bear interest at the rate of three percentage points over the Prime Rate then being charged by Wells Fargo Bank, Colorado, or its successor, to its most credit-worthy customers on an unsecured basis for short term loans (the "Prime Rate") or the highest rate permitted by applicable usury law, whichever is lower, until paid. Further, in the event any rents or other amounts owing hereunder are not paid within five (5) business days after written notice, Landlord and Tenant agree that Landlord will incur additional administrative expenses, the amount of which will be difficult if not impossible to determine. Accordingly, Tenant shall pay to Landlord an additional, one-time late charge for any such late payment in the amount of five percent (5%) of such unpaid amount. Any amounts paid by Landlord to cure any defaults of Tenant hereunder, which Landlord shall have the right but not the obligation to do, shall, if not repaid by Tenant within five (5) business days of demand by Landlord, thereafter bear interest at the rate of three percentage points over the Prime Rate or the highest rate permitted by applicable usury law, whichever is lower, until paid.

      G.    WAIVER OF JURY TRIAL. TENANT AND LANDLORD HEREBY WAIVE (TO THE EXTENT ALLOWED BY LAW) ANY RIGHTS TO A TRIAL BY JURY IN SUIT OR SUITS BROUGHT TO ENFORCE ANY PROVISION OF THIS LEASE OR ARISING OUT OF OR CONCERNING THE PROVISIONS OF THIS LEASE.

      20.    DEFAULT BY LANDLORD. Landlord shall be in default under this Lease ("Landlord Default") if Landlord fails to pay any amount due to Tenant under this Lease and does not cure such failure within ten (10) business days after written notice of nonpayment is given to Landlord or Landlord fails to perform or observe any of its other obligations hereunder and such failure continues for a period of thirty (30) days after written notice is given to Landlord specifying the nature of such failure; however, if a non-monetary default cannot reasonably be cured within such thirty (30) day period and if Landlord has diligently begun to cure the default within such thirty (30) day period, Landlord shall have a reasonable time to cure the default (not to exceed a total of 90 days), so long as Landlord is diligently proceeding to complete the cure, and providing necessary reports and updates to Tenant. Notice to Landlord of any such alleged default shall be ineffective unless notice is simultaneously delivered to any holder of a Mortgage and/or Trust Deed affecting all or any portion of the Building Complex ("Mortgagees"), as hereafter provided. Tenant agrees to give all Mortgagees, by certified mail, return receipt requested, a copy of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of Assignment of Rents and Leases, or otherwise, actually given to Tenant (recordation of documents among public records shall not be deemed notice to Tenant), of the address of such Mortgagees. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for

25

EXHIBIT 1

in this Lease, then the Mortgagees shall have an additional thirty (30) days within which to cure such default or, if such default cannot be cured within that time, then such additional time as may be necessary, if, within such thirty (30) days, any Mortgagee has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated while such remedies are being so diligently pursued. In no event will Landlord or any Mortgagee be responsible for any consequential damages incurred by Tenant as a result of any default, including, but not limited to, lost profits or interruption of business as a result of any alleged default by Landlord hereunder. If a Landlord Default occurs, Tenant may pursue any remedies provided in this Lease or any other remedies available at law or in equity. Any sums due to Tenant shall bear from the date originally due at the rate set forth in Paragraph 19(F) above.

## 21.   SUBORDINATION AND ATTORNMENT.

A.      This Lease, at Landlord's option, shall be subordinate to any mortgage or deed of trust (now or hereafter placed upon the Building Complex, or any portion thereof), including any amendment, modification, or restatement of any of such documents, and to any and all advances made under any mortgage or deed of trust and to all renewals, modifications, consolidations, replacements, and extensions thereof. Tenant agrees that with respect to any of the foregoing documents, no documentation, other than this Lease, shall be required to evidence such subordination. At the time it executes this Lease, Landlord shall provide Tenant with evidence of each Mortgagee's consent to this lease, and its agreement to customary non-disturbance provisions benefitting Tenant, provided that the same include customary subordination provisions for lender's benefit.

B.      If any holder of a mortgage or deed of trust shall elect to have this Lease superior to the lien of the holder's mortgage or deed of trust and shall give written notice thereof to Tenant, this Lease shall be deemed prior to such mortgage or deed of trust, whether this Lease is dated prior or subsequent to the date of said mortgage or deed of trust or the date of recording thereof.

C.      In confirmation of such subordination or superior position, as the case may be, and provided that the same include customary non-disturbance provisions for Tenant's benefit, Tenant agrees to execute such documents as may be reasonably required by Landlord or its Mortgagee to evidence the subordination of its interest herein to any of the documents described above, or to evidence that this Lease is prior to the lien of any mortgage or deed of trust, as the case may be, and failing to do so within seven (7) business days after written demand, Tenant does hereby make, constitute, and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead, to do so; provided, however, such appointment of Landlord shall not be exercisable if Tenant has submitted reasonable objections to the form of documents submitted to it for execution.

D.      Tenant hereby agrees to attorn to all successor owners of the Building Complex, whether or not such ownership is acquired as a result of a sale, through foreclosure of a deed of trust or mortgage, or otherwise.

26

EXHIBIT 1

22.    REMOVAL OF TENANT'S PROPERTY.

A.    All movable furniture and personal effects of Tenant not removed from the Premises upon the vacation or abandonment thereof or upon the termination of this Lease for any cause whatsoever (other than Tenant not having access to the Premises) shall conclusively be deemed to have been abandoned and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant or any other person and without obligation to account therefor and Tenant shall pay Landlord all expenses incurred in connection with the disposition of such property.

B.    Concurrently with its execution of this Lease, Landlord agrees to execute and deliver the lien waiver documents set forth in Exhibits F and G attached hereto.

23.    HOLDING OVER: TENANCY MONTH-TO-MONTH. If, after the expiration of this Lease, Tenant shall remain in possession of the Premises and continue to pay rent, and Landlord shall accept such rent, without any express written agreement as to such holding over, then such holding over shall be deemed and taken to be a tenancy from month-to-month, subject to all the terms and conditions hereof on the part of Tenant to be observed and performed and at a monthly rent equivalent to one hundred fifty percent (150%) of the monthly installment of Base Rent paid by Tenant immediately prior to such expiration (Tenant shall also be responsible for payment of all additional rent accruing during the holdover period). All such rent shall be payable in advance on the same day of each calendar month. Such month-to-month tenancy may be terminated by either party upon thirty (30) days' notice prior to the end of any such monthly period. Nothing contained herein shall be construed as obligating Landlord to accept any rental tendered by Tenant after the expiration of the term hereof or as relieving Tenant of its liability pursuant to Paragraph 16 and any holdover without Landlord's consent shall be deemed a default hereunder entitling Landlord to all of its rights and remedies set forth in Paragraph 19 above, including, without limitation, its right to recover damages actually incurred by Landlord during the holdover period. Notwithstanding the foregoing, in the event that Landlord and Tenant negotiate an extended term for this Lease (or a new lease for the Premises or any space owned by Landlord or an affiliate of Landlord) within Sixty (60) days after the expiration of this Lease, all rents paid in excess of the base rent under the new term will be applied to the rent due under the extended term of this Lease or new lease, as applicable.

24.    PAYMENTS AFTER TERMINATION. No payments of money by Tenant to Landlord after the termination of this Lease, in any manner, or after giving of any notice (other than a demand for payment of money) by Landlord to Tenant shall reinstate, continue, or extend the term of this Lease or affect any notice given to Tenant prior to the payment of such money, it being agreed that after the service of notice or the commencement of a suit or other final judgment granting Landlord possession of the Premises, Landlord may receive and collect any sums of rent due or any other sums of money due under the terms of this Lease or otherwise exercise Landlord's rights and remedies hereunder and the payment of such sums of money, whether as rent or otherwise, shall not waive said notice or in any manner affect any pending suit or judgment theretofore obtained.

27

EXHIBIT 1

25.    STATEMENT OF PERFORMANCE. Tenant agrees at any time and from time to time (but not more than three times in any given 12-month period), upon not less than ten (10) business days' prior written request by Landlord, to execute, acknowledge, and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), that there have been no defaults thereunder by Landlord or Tenant (or, if there have been defaults, setting forth the nature thereof), the date to which the rent and other charges have been paid in advance, if any, and such other information as Landlord may reasonably request in regards to the terms of this Lease. It is intended that any such statement delivered pursuant to this Paragraph may be relied upon by any prospective purchaser of all or any portion of Landlord's interest herein or a holder of any mortgage or deed of trust encumbering the Building Complex. Tenant's failure to deliver such statement within such time shall be conclusive upon Tenant that: (i) this Lease is in full force and effect, without modification except as may be represented by Landlord; (ii) there are no uncured defaults in Landlord's performance; and (iii) not more than one (1) month's rent has been paid in advance.

26.    MISCELLANEOUS.

A.    The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Building Complex at the time in question and, in the event of any transfer or transfers of the title thereto, Landlord herein named (and in the case of any subsequent transfers or conveyances, the then grantor) shall be automatically released, from and after the date of such transfer or conveyance, of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed, provided that any funds in the hands of Landlord or the then grantor at the time of such transfer in which Tenant has an interest shall be turned over to the grantee and any amount then due and payable to Tenant by Landlord or the then grantor under any provisions of this Lease shall be paid to Tenant.

B.    The termination or mutual cancellation of this Lease shall not work a merger, and such termination or mutual cancellation shall, at the option of Landlord, either terminate all subleases and subtenancies or operate as an assignment to Landlord of any or all such subleases or subtenancies.

C.    The Tenant agrees that, for the purposes of completing or making repairs or alterations in any portion of the Building, Landlord may use one or more of the street entrances, the halls, passageways, and elevators of the Building.

D.    This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and, except as otherwise provided in this Lease, Tenant shall not be entitled to any setoff of the rent or other amounts owing hereunder against Landlord if Landlord fails to perform its obligations set forth herein; provided, however, the foregoing shall in no way impair the right of Tenant to commence a separate action against Landlord for any violation by Landlord of the provisions hereof so long as notice is first given to Landlord and any holder of a mortgage or deed of trust covering the Building Complex

EXHIBIT 1

or any portion thereof and an opportunity granted to Landlord and such holder to correct such violation as provided in Paragraph 20 above.

E.     If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws effective during the term of this Lease, then and in that event it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid, or unenforceable there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

F.     The caption of each paragraph is added as a matter of convenience only and shall be considered of no effect in the construction of any provision or provisions of this Lease.

G.     Except as herein specifically set forth, all terms, conditions, and covenants to be observed and performed by the parties hereto shall be applicable to and binding upon their respective heirs, administrators, executors, and assigns. The terms, conditions, and covenants hereof shall also be considered to be covenants running with the land to the fullest extent permitted by law.

H.     Tenant and the party executing this Lease on behalf of Tenant represent to Landlord that such party is authorized to do so by requisite action of the board of directors or partners, as the case may be, and agree, upon request, to deliver to Landlord a resolution or similar document or opinion of counsel to that effect.

I.     If there are more than one entity or person which or who are the Tenant under this Lease, the obligations imposed upon Tenant under this Lease shall be joint and several.

J.     No act or thing done by Landlord or Landlord's agents during the term hereof, including, but not limited to, any agreement to accept surrender of the Premises or to amend or modify this Lease, shall be deemed to be binding on Landlord, unless such act or thing shall be by a partner or officer of Landlord, as the case may be, or a party designated in writing by Landlord as so authorized to act. The delivery of keys to Landlord, or Landlord's agents, employees, or officers shall not operate as a termination of this Lease or a surrender of the Premises. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent and all other amounts owing, as herein stipulated, shall be deemed to be other than on account of the earliest stipulated rent or other amounts nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy available to Landlord.

K.     Landlord shall have the right at any time to change the name of the Building, to increase the size of the Building Complex by adding additional real property thereto, to construct other buildings or improvements on any portion of the Building Complex or to

29

EXHIBIT 1

change the location and/or character of or to make alterations of or additions to the Building Complex. In the event any such additional buildings are constructed or Landlord increases the size of the Building Complex, Landlord and Tenant shall execute an Amendment to Lease which incorporates such modifications, additions, and adjustments to Tenant's Pro Rata Share, if necessary. Tenant shall not use the Building's name for any purpose other than as a part of its business address. Any use of such name in the designation of Tenant's business shall constitute a default under this Lease. Landlord also reserves (i) the use of the exterior walls and roof of the Premises and the exclusive use of any space between the ceiling of the Premises and the floor above or the roof of the Building; and (ii) the right to install, maintain, use, repair and replace pipes, conduits and wires leading into or running through the Premises. In exercising its rights pursuant to this Paragraph 26(K), Landlord shall use commercially reasonable efforts to minimize disruption to Tenant's business.

L.    Tenant acknowledges that Landlord shall have the right and does hereby reserve the right at any time and from time to time, in Landlord's reasonable discretion, to alter, expand, reduce, remove, demolish, renovate, rehabilitate, remodel, or construct any existing or new improvements in or at the Building, including without limitation the right to build out any space in the Building, the right to change the shape, size, location, number, design, to alter or relocate the entranceways and lobbies of the Building, or to cause any of the foregoing (collectively, "Landlord's Alterations"). The Tenant further acknowledges that the Landlord's Alterations will result in additional noise and other inconveniences to the Tenant. In all such cases, this Lease shall remain in full force and effect, and none of the foregoing shall be deemed a constructive or actual eviction, or a violation of Tenant's quiet enjoyment, or shall subject Landlord to any liability and Tenant hereby waives any and all claims for damages or for any inconvenience to or interference with Tenant's business, loss or occupancy or quiet enjoyment of the Premises as a result of the Landlord's Alterations, provided that in exercising its rights pursuant to this Paragraph 26(K), Landlord shall use commercially reasonable efforts to minimize disruption to Tenant's business and its use of, and access to, the Premises.

M.    Tenant covenants and agrees that no diminution of light, air, or view of or from the Building or any other building (whether or not constructed or owned by Landlord) shall entitle Tenant to any reduction of rent or other charges under this Lease, result in any liability of Landlord to Tenant, or in any way affect this Lease or Tenant's obligations hereunder.

N.    Notwithstanding anything to the contrary contained herein, Landlord's liability under this Lease for any monetary judgments awarded Tenant shall be limited to Landlord's interest in the Building Complex and the income and proceeds arising in connection therewith.

O.    Tenant acknowledges and agrees that it has not relied upon any statements, representations, agreements, or warranties by Landlord, it agents or employees, except such as are expressed herein and that no amendment or modification of this Lease shall be valid or binding unless expressed in writing and executed by the parties hereto in the same manner as the execution of this Lease.

EXHIBIT 1

P.      Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant (other than the payment of monies), the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist acts, civil disturbances and other causes beyond the reasonable control of the performing party.

Q.      Submission of this instrument for examination or signature by Tenant does not constitute a reservation of or an option for lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

R.      Tenant acknowledges that it has provided Landlord with its (and, if applicable, its guarantor's) financial statement(s) as a material inducement to Landlord's agreement to lease the Premises to Tenant, and that Landlord has relied on the accuracy of such financial statement(s) in entering into this Lease. Tenant represents and warrants that the information contained in such financial statement(s) is true, complete and correct in all material respects.

S.      Tenant represents and warrants to Landlord that neither Tenant nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

T.      No failure by a party to insist upon the strict performance of any agreement, term, covenant or condition hereof or to exercise any right or remedy consequent upon a breach thereof and no acceptance of full or partial rent during the continuance of any such breach shall constitute a waiver of any such breach or of such agreement, term, covenant, or condition. No agreement, term, covenant, or condition hereof to be performed or complied with by a party and no breach thereof shall be waived, altered, or modified, except by written instrument executed by the other party. No waiver of any breach shall affect or alter this Lease but each and every agreement, term, covenant, and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

U.      Waiver of Subrogation. Notwithstanding any provision herein to the contrary, Landlord and Tenant and all parties claiming under them mutually release and discharge each other (as well as the officers, directors, members, partners, managers, agents and employees of each party) from all claims and liabilities arising from or caused by any casualty or hazard, covered or required hereunder to be covered in whole or in part by insurance on the Premises or in connection with activities conducted on the Premises and/or Building Complex (or any part thereof), and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof. Each party agrees to cause its respective insurance

31

EXHIBIT 1

carrier(s) to waive subrogation against the other party with respect to the matters described herein.

V.    Notwithstanding any provision in this Lease to the contrary, if the Premises, or a material portion of the Premises, are made untenantable for a period in excess of five (5) consecutive business days as a result of an interruption, diminishment or termination of services due to Landlord's negligence or willful misconduct (or that of its agents, employees or contractors) and such interruption, diminishment or termination of services is otherwise reasonably within the control of Landlord or Landlord's agents, employees or contractors to correct (a "**Service Failure**"), then Tenant shall be entitled to receive an abatement of the Base Rent and Tenant's Proportionate Share of Taxes and Operating Expenses payable hereunder during the period beginning on the 6th consecutive business day of the Service Failure and ending on the day the interrupted service has been restored. If the entire Premises have not been rendered untenantable by the Service Failure, the amount of abatement shall be equitably prorated.

W.    Tenant shall have access to the Premises, for Tenant and its employees 24 hours per day/7 days per week, subject to such security or monitoring systems as Landlord may reasonably impose, including, without limitation, sign-in procedures and/or presentation of identification cards.

Y.    Notwithstanding any provision in this Lease to the contrary, if Landlord temporarily closes the Premises in connection with the exercise of Landlord's entry, inspection, repair, renovation and other rights set forth in this Lease, for a period in excess of 5 consecutive day(s), Tenant shall be entitled to receive a per diem abatement of Rent during the period beginning on the 6th consecutive day of closure and ending on the date on which the Premises are returned to Tenant in a tenantable condition.

Z.    Notwithstanding any provision in this Lease to the contrary, any right of entry of Landlord (or its agents, employees, contractors or invitees) into the Premises, shall be subject to Landlord providing Tenant with no less than two business days' prior notice (except in cases of emergency when prior notice is impractical, and when Landlord is exercising its entry rights pursuant to Paragraph 19).

27.    AUTHORITIES FOR ACTION AND NOTICE.

A.    Except as herein otherwise provided, Landlord may act in any manner provided for herein by and through Landlord's Building Manager or any other person who shall from time to time be designated in writing.

B.    All notices, demands, statements or communications required or permitted to be given to Landlord hereunder shall be in writing and shall be deemed duly served when delivered personally to any officer of Landlord (or a partner of Landlord if Landlord is a partnership or to Landlord individually if Landlord is a sole proprietor) or manager of Landlord whose principal office is in the Building, or when deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, addressed to Landlord at Landlord's principal office in the

32

EXHIBIT 1

Building or at the most recent address of which Landlord has notified Tenant in writing. All notices, demands, statements or communications required to be given to Tenant hereunder shall be in writing and shall be deemed duly served when delivered personally to Tenant at Standard Register, 600 Albany Street, Dayton, OH 45417, Attn: Legal Department, with copy to Michelle LoMonaco, Real Estate Manager, P.O. Box 283, Windsor, VA 23487 , or five (5) business after being deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, addressed to the foregoing persons and addresses. Either party shall have the right to designate in writing, served as above provided, a different address to which notice is to be mailed. The foregoing shall in no event prohibit notice from being given as provided in Rule 4 of Colorado Rules of Civil Procedure, as the same may be amended from time to time.

28.     RULES AND REGULATIONS. It is further agreed that the rules and regulations set forth on **Exhibit D** attached hereto shall be and are hereby made a part of this Lease and Tenant agrees that Tenant's employees and agents or any others permitted by Tenant to occupy or enter the Premises will at all times abide by said rules and regulations. A breach of any of such rules or regulations shall be deemed an Event of Default under this Lease, if not cured within the cure period set forth in Paragraph 19(A)(10), and, if not so cured, Landlord shall have all remedies as set forth in Paragraph 19 hereof.

29.     PARKING.     During the Term, Tenant shall be provided sixty-five (65) non-assigned surface parking in the Building parking lots.

30.     RIGHT OF FIRST REFUSAL. Landlord hereby grants Tenant a continual right of first refusal (the "Right of First Refusal") to lease space on the second floor of the Building that is contiguous and adjacent to the Premises that becomes available during the Primary Lease Term and any extension thereof (the "Refusal Space"), upon the following terms and conditions:

(1)     Prior to Landlord executing any lease with a bona fide third party for the Refusal Space, Landlord shall deliver to Tenant a written notice identifying a proposed letter of intent which Landlord is willing to accept, subject to this Right of First Refusal (the "Offer Notice"). The Offer Notice shall set forth the date that such proposed lease is to commence (the "Refusal Space Commencement Date"). Tenant agrees to keep the information contained in the lease and/or letter of intent confidential.

(2)     Tenant shall have ten (10) business days from receipt of the Offer Notice to either accept or reject the Refusal Space. If Tenant rejects the Refusal Space or if Landlord has not received the written acceptance or rejection of the Refusal Space from Tenant by 5:00 p.m. (Mountain Time) on the tenth (10) business day as set forth herein, time being of the essence, then Landlord may enter into a lease with such tenant on such terms and conditions substantially as set forth in the Offer Notice. Landlord shall thereafter have no further obligation or liability to Tenant pertaining to the specific Refusal Space offer (it being understood and agreed that if the Refusal Space, or any portion thereof, thereafter becomes available again, the terms of this Paragraph 30 shall apply each and every time the Refusal Space (or portion thereof) becomes available), unless: (i) Landlord and such tenant, or an affiliated entity of such tenant, fail to enter into a lease for said space for any reason within one hundred eighty (180) days after

33

EXHIBIT 1

Tenant's receipt of the Offer Notice; or (ii) the Base Rent agreed-upon with such tenant is less than ninety percent (90%) of the Base Rent set forth in the Offer Notice. In either of the foregoing events Tenant's Right of First Refusal shall be deemed reinstated.

(3) If the Refusal Space is accepted by Tenant in accordance herewith, this Lease shall be amended effective as of the Refusal Space Commencement Date to include the Refusal Space on the same terms and conditions as applicable to the Premises at the time such Right of First Refusal is exercised, except that:

(i) the term shall commence as of the Refusal Space Commencement Date and shall be coterminous with this Lease, as it may be extended;

(ii) Tenant's Pro Rata Share shall be increased based upon the number of rentable square feet in the Refusal Space;

(iii) Tenant will accept the Refusal Space in its "as is" condition without any remodeling work or fix-up work being performed by Landlord, except that Landlord shall provide Tenant with any tenant improvement allowance identified in the Offer Notice, provided, however, that any such tenant improvement allowance shall be reduced proportionately based upon the remaining term of the Lease, if less than as set forth in the Offer Notice; and

(iv) all terms and provisions set forth in this Lease shall commence on the Refusal Space Commencement Date.

(4) Notwithstanding anything to the contrary contained in this Lease, Tenant's Right of First Refusal shall be subordinate to any and all existing rights of first refusals, rights of first offers, renewal option rights and all other similar rights in existence on the Effective Date of this Lease. Tenant's right to exercise the Right of First Refusal shall be conditioned on: (i) Tenant not being in default (beyond any applicable notice and cure period) under the Lease at the time of the exercise of the Right of First Refusal or as of the date on which Tenant's occupancy of the Refusal Space is scheduled to commence; and (ii) there being at least three (3) years remaining in the Primary Lease Term. Notwithstanding the foregoing, if there are less than three (3) years remaining in the Primary Lease Term but the Right of First Refusal would otherwise be available to Tenant hereunder, Tenant shall have the right to exercise its Right of First Refusal provided that Tenant simultaneously extends the term of this Lease for a minimum of three (3) years.

(5) If Landlord has entered into lease negotiations with a third party for space which is greater than but includes the Refusal Space, then, in order to exercise the Right of First Refusal granted herein, Tenant shall be obligated to take all the space the third party would lease under said negotiations. Notwithstanding the foregoing, Tenant must take all of the Refusal Space offered by Landlord to Tenant at any particular time and may not elect to lease a portion thereof.

EXHIBIT 1

31.     BROKERAGE. Tenant hereby represents and warrants that Tenant has not employed any broker in regard to this Lease and that Tenant has no knowledge of any broker being instrumental in bringing about this Lease transaction except CBRE, Inc. ("CBRE") which has acted as Landlord's leasing agent and Cresa Partners, Inc. ("Cresa") which has acted as Tenant's leasing Agent.. Tenant shall indemnify Landlord against any expense incurred by Landlord as a result of any claim for brokerage or other commissions made by any other broker, finder, or agent, whether or not meritorious, employed by Tenant or claiming by, through, or under Tenant. Tenant acknowledges that Landlord shall not be liable for any representations by CBRE or Cresa regarding the Premises, Building, or this lease transaction.

32.     TIME OF ESSENCE. Time is of the essence herein.

33.     RIDER AND EXHIBITS. A Rider consisting of one (1) page, and eight exhibits (A, B, C, D, E, E-1, F and G) are attached hereto and incorporated herein by this reference.

34.     RENEWAL OPTION.  Subject to the terms and provisions of this section, Tenant, at its option, may extend the Primary Lease Term for the Premises for one additional period of Sixty (60) months after the expiration of the Primary Lease Term (the "Premises Renewal Term"). All terms and conditions set forth in this Lease shall continue to apply except the Base Rent shall be adjusted to reflect the prevailing market rates then charged by the Landlord for the Building and Landlord will not be required to perform any Tenant Finish Work and Tenant shall not be entitled to any leasehold improvement or construction allowances. To exercise the renewal option granted hereunder, Tenant must deliver written notice of such exercise (a "Premises Renewal Notice") to Landlord no earlier than twelve (12) full calendar months and no later than nine (9) full calendar months prior to the termination of the Primary Lease Term.   Tenant's failure to deliver to Landlord its Premises Renewal Notice shall automatically terminate Tenants right to extend the Primary Term.  Within thirty (30) days after Tenant delivers the Premises Renewal Notice, Landlord will notify Tenant in writing of the renewal rate (the "Renewal Rate") at which Base Rent will be payable during the Premises Renewal Term (the "Rate Notice"). If Tenant disagrees with the Renewal rate determined by Landlord, Tenant may rescind its Renewal Notice by notice of rescission given within thirty (30) days after Landlord gives its Rate Notice. If Tenant so rescinds its Premises Renewal Notice, than this Lease shall terminate as scheduled at the end of the Primary Lease Term and Tenant shall have no further rights under this Section 34. If Tenant does not so rescind its Premises Renewal Notice, then the Term of the Lease will be extended for the Premises Renewal Term and Base Rent shall be payable during the Premises Renewal Term at the Renewal Rate. If Tenant does not rescind the Premises Renewal Notice, then prior to the commencement of the Premises Renewal Term, Landlord and Tenant will amend the Lease to extend the Term in accordance with this Section 34. Tenant will have no right to extend the Primary Lease Term, and Tenant's Premises Renewal Notice will be ineffective, if a default under the Lease beyond any applicable notice or cure period exists at the time the Premises Renewal Notice is given or at the time the Premises Renewal Term is scheduled to commence. Any termination of the Lease terminates all rights under this section. Tenant's rights regarding the Premises Renewal Term may not be transferred separate and apart from Tenant's interest in the Lease and/or to the Premises.

35

EXHIBIT 1

35.    Termination Option. Tenant shall have the option (the "Termination Option") to terminate this Lease effective as of the expiration of the 39th full calendar month of the Primary Lease Term (the "Early Termination Date"), by delivering written notice of such termination (the "Termination Notice") to Landlord at least nine (9) months prior to the Early Termination Date and paying the Termination Fee (hereinafter defined). The "Termination Fee" means the amount of two (2) month's Rent that would have been due after the Early Termination Date plus an amount of money equal to the sum of Landlord's then-unamortized costs (as described below) with respect to the Premises. Landlord's "then-unamortized costs" means the unamortized balance of all lease transaction costs, including without limitation, reasonable attorneys' fees incurred in connection with the preparation and execution of this Lease, the cost of Tenant Finish Work provided during the Primary Lease Term (as set forth in Exhibit E), real estate commissions, free rent, abated rent, and the Tenant Moving Allowance (as set forth in Exhibit E). The calculation of Landlord's then-unamortized costs will be made by (a) taking the total of all such costs as of the Commencement Date, (b) fully amortizing such amount at 8% interest per annum from the Commencement Date through the initially scheduled end of the Primary Lease Term to establish a monthly payment therefor, and (c) calculating the remaining principal balance of such amortized amount as of the Early Termination Date. Such remaining principal balance is deemed to be Landlord's "then-unamortized costs" with respect to the Premises. The Termination Fee shall be fully earned by Landlord upon its delivery and shall be non-refundable to Tenant. Notwithstanding Tenant's early termination of this Lease pursuant to this Section, Tenant shall remain liable for all obligations which accrue under this Lease through and including the Early Termination Date. Tenant's failure to timely notify Landlord of Tenant's election hereunder or to timely deliver the Termination Fee to Landlord shall automatically extinguish Tenant's option to terminate this Lease. The Termination Option herby granted to Tenant is personal to Tenant and any assignment, except an assignment to an Affiliate, shall automatically terminate the Termination Option of Tenant hereby granted.

[The remainder of this page left blank intentionally.]

EXHIBIT 1

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed the day and year first -above written.

<u>LANDLORD</u>:

THE PARAGON, LP, a
Colorado limited partnership

By:   The Paragon Management, LLC,
      a   Colorado   limited   liability   company,
      its General Partner

By: _____
      Andrew R. Klein, Manager

By: _____
      Otis C. Moore III, Manager


<u>TENANT</u>:

THE STANDARD REGISTER COMPANY,
an Ohio corporation

By: _____
      Joseph P. Morgan, Jr.
      Its:  President & CEO


37

EXHIBIT 1

## EXHIBIT CHECKLIST

RIDER

Exhibit A       Floor Plan

Exhibit B       Legal Description

Exhibit C       Commencement Certificate

Exhibit D       Rules and Regulations

Exhibit E       Work Letter

Exhibit F       Landlord Lien Waiver

Exhibit G       Landlord Lien Waiver

38

EXHIBIT 1

## **RIDER**

THIS RIDER is to that certain lease agreement (the "Lease") by and between THE PARAGON, LP, a Colorado limited partnership ("Landlord"), and THE STANDARD REGISTER COMPANY, an Ohio corporation ("Tenant"), with respect to approximately 12,254 square feet of space (the "Premises") in the building known as Paragon Building, located at 7100 East Belleview Avenue, Greenwood Village, Colorado (the "Building"). In the event of any conflict between the terms and provisions of the Lease and the terms and provisions of this Rider, the terms and provisions of this Rider shall control.

      1.    Paragraph 4 of the printed portion of the Lease is hereby amended by the addition of the following new subparagraph (D):

      D.    Landlord has agreed to complete certain remodeling and tenant finish work in the Premises (the "Tenant Finish Work") as set forth in a work letter, in the form attached hereto as **Exhibit E**, to be executed between Landlord and Tenant concurrently herewith (the "Work Letter"). Landlord shall pay the costs incurred in completing the Tenant Finish Work. If the Premises are not "Ready for Occupancy," as hereafter defined, on the date the Primary Lease Term is to begin due to any reason other than "Tenant Delay," as defined in the Work Letter, Tenant's obligation to pay the Base Rent, its Pro Rata Share of increases in Taxes and Operating Expenses, and other sums owing hereunder shall not commence until the Premises are Ready for Occupancy, whereupon this Lease, and all of the covenants, conditions and agreements herein contained shall be in full force and effect. The postponement of Tenant's obligation to pay rent and other sums herein provided to be paid by Tenant for such period prior to the delivery of the Premises to Tenant, Ready for Occupancy, as hereinafter defined, plus any rent abatement provided for in the Lease, shall be in full settlement of all claims which Tenant might otherwise have by reason of the Premises not being Ready for Occupancy on the date the Primary Lease Term is scheduled to begin. However, if Tenant takes possession of all or any part of the Premises prior to the date the Premises are Ready for Occupancy for the purpose of conducting its usual business therein (which shall not include the early entry rights granted to Tenant pursuant to the Lease and Exhibit E), all terms and provisions of this Lease shall apply, including the obligations for the payment of all rent and other amounts owing hereunder. "Ready for Occupancy" as used herein shall mean the date that Landlord shall have substantially completed the Premises or any remodeling work to be performed by Landlord, to the extent agreed to in the Work Letter. The certificate of the architect in charge of design and supervising the completion or remodeling of the Premises shall control conclusively the date upon which the Premises are Ready for Occupancy, and the obligation to pay rent begins as aforesaid. If the completion of the Premises is delayed as a result of a Tenant Delay, then the Primary Lease Term and Tenant's rental and other obligations hereunder shall commence on the date the Premises would have been Ready for Occupancy if there had been no Tenant Delay.

EXHIBIT 1

EXHIBIT A

FLOOR PLAN

40

EXHIBIT 1

EXHIBIT A

FLOOR PLAN



40 - A

EXHIBIT 1

## EXHIBIT B

### LEGAL DESCRIPTION

That part of Tracts 1 and 2, CLARK COLONY NUMBER THREE, described as follows:

Commencing at the Northeast corner of Section 17, Township 5 South,
Range 67 West of the 6th P.M.;
thence South 00°19'30" West along the East line of said Section 17,
a distance of 340.00 feet;
thence North 89°58'30" West and parallel with the North line of said
Section 17, a distance of 30.00 feet to the TRUE POINT OF
BEGINNING, which point is on the Westerly right of way line of
South Quebec Street;
thence South 00°19'30" West and parallel with the East line of said
Section 17, and along the Westerly right of way line of South
Quebec Street, a distance of 316.50 feet to a point on the South
line of said Tract 2;
thence North 89°54'22" West along the South line of said Tract 2,
a distance of 630.00 feet to the West line of said Tract 2;
thence North 00°19'28" East along the West line of said Tracts 1 and
2, a distance of 605.74 feet to a point that is 50.00 feet South of
the North line of said Section 17, said point also being on the
Southerly right of way line of Belleview Avenue, as described in
Instrument recorded February 7, 1967 in Book 1003 at Page 27,
Arapahoe County records;
thence South 81°50'22" East along the Southerly right of way line
of Belleview Avenue, a distance of 435.93 feet;
thence South 0°19'30" West and parallel with the East line of said
Section 17, a distance of 227.27 feet;
thence South 89°40'30" East, a distance of 198.13 feet to a point
on the TRUE POINT OF BEGINNING,

TOGETHER WITH a non-exclusive easement for ingress and egress over that portion of Lot 3,
BELLEVIEW HEIGHTS,

AND TOGETHER with a non-exclusive easement for ingress and egress over that portion of
Lots 1, 2, and 3, BELLEVIEW GREEN.

41

EXHIBIT 1

EXHIBIT C

COMMENCEMENT CERTIFICATE

THIS COMMENCEMENT CERTIFICATE is attached to and made a part of the Lease dated as of the _____ day of _____, 20____, by and between THE PARAGON, LP, a Colorado limited partnership ("Landlord"), and THE STANDARD REGISTER COMPANY, an Ohio corporation ("Tenant"), with respect to approximately 12,254 square feet of space (the "Premises"). By this Commencement Certificate dated as of the _____ day of _____, _____ (the "Commencement Date"), the parties to the Lease agree as follows with respect to the Premises located in the building known as Paragon Building in Greenwood Village, Colorado (the "Building"):

1.      Any remodeling or tenant finish in the Building or Premises required to be constructed and finished by Landlord in accordance with the terms of the Lease have been satisfactorily completed by Landlord and accepted by Tenant.

2.      The Premises under the Lease have been delivered to and accepted by Tenant as of the Commencement Date, subject to punch-list items identified by Landlord and Tenant, which items are to be corrected by Landlord in accordance with the terms of the Lease.

3.      In accordance with the provisions of the Lease, Tenant's obligation to pay Base Rent and Tenant's Pro Rata Share of increases in Operating Expenses shall commence on the Commencement Date (which payment shall be prorated as set forth in the Lease if the Commencement Date is any day other than the first day of a month).

4.      In accordance with the provisions of Paragraphs 14 and 15, attached is a certificate of insurance evidencing that Tenant is carrying insurance required under Paragraphs 14 and 15 of the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Commencement Certificate to be executed the day and year first above written.

LANDLORD:

THE PARAGON, LP, a
Colorado limited partnership

By:      The Paragon Management, LLC,
         a   Colorado   limited   liability   company,
         its General Partner


By:_____
         Andrew R. Klein, Manager

42

EXHIBIT 1

By:_____
              Otis C. Moore III, Manager


TENANT:

THE STANDARD REGISTER COMPANY,
an Ohio corporation

By:_____
          Joseph P. Morgan, Jr.

           Its:  President & CEO          

43

EXHIBIT 1

## EXHIBIT D

## RULES AND REGULATIONS

1.      The sidewalks, entries, passages, corridors, stairways, and elevators of the Building Complex shall not be obstructed by Tenant or Tenant's agents or employees or used for any purpose other than ingress and egress to and from the Premises, it being understood and agreed that such access may be obtained only via the elevators in the lobby of the Building.

2.      Furniture, equipment, or supplies will be moved in or out of the Building only upon the elevator designated by Landlord and then only during such hours and in such manner as may be prescribed by Landlord. The Landlord shall have the right to approve or disapprove the movers or moving company employed by Tenant and Tenant shall cause said movers to use only the loading facilities and elevator designated by Landlord. In the event Tenant's movers damage the elevator or any part of the Building, Tenant shall forthwith pay to Landlord the amount required to repair said damage.

3.      No safe or article, the weight of which may, in the opinion of Landlord, constitute a hazard or damage to the Building or the Building's equipment, shall be moved into the Premises. Safes and other equipment, the weight of which is not excessive, shall be moved into, from, or about the Building only during such hours and in such manner as shall be prescribed by Landlord and Landlord shall have the right to designate the location of such articles in the Premises.

4.      During the entire term of this Lease, Tenant shall, at Tenant's expense, install and maintain under each and every caster chair a chair pad to protect the carpeting.

5.      No sign, advertisement, or notice shall be inscribed, painted, or affixed on any part of the inside or outside of the Building unless of such color, size, and style and in such place upon or in the Building as shall be first designated by Landlord in writing but there shall be no obligation or duty on Landlord to allow any sign, advertisement or notice to be inscribed, painted, or affixed on any part of the inside or outside of the Building. A lobby directory and standard floor signage in a conspicuous place, with names of tenants, not to exceed one (1) line, will be provided by Landlord, as well as building standard suite entry signage. Any necessary revision in the directory will be made by Landlord at Tenant's expense within a reasonable time after notice from Tenant of the change making the revision necessary. No furniture shall be placed in front of the Building or in any lobby or corridor of the Building (whether included wholly within the Premises, or otherwise), without the prior written consent of Landlord. Landlord shall have the right to remove all non-permitted signs and furniture, without notice to Tenant, at the expense of Tenant. Notwithstanding the foregoing to the contrary, provided space is available Tenant shall be allowed to install one (1) identification sign on each of the existing monument signs, provided that such sign will be subject to Landlord's prior approval as to design and must comply with all applicable building and sign codes and other laws and regulations.

44

EXHIBIT 1

6.      Tenant shall not do or permit anything to be done in the Premises or bring or keep anything therein which would in any way increase the rate of fire insurance on the Building or on property kept therein, constitute a nuisance or waste, obstruct or interfere with the rights of other tenants or in any way injure or annoy them, or conflict with the laws relating to fire or with any regulations of the fire department, fire insurance underwriters, or with any insurance policy upon the Building or any part thereof, or conflict with any of the rules or ordinances of the Department of Health of the City and County where the Building is located.

7.      Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning or taking care of the Premises, without the prior written consent of Landlord.  Landlord shall be in no way responsible to Tenant for any loss of property from the Premises, however occurring, or for any damage done to Tenant's furniture or equipment by the janitor or any of the janitor's staff or by any other person or persons whomsoever other (excluding loss or damage caused by the gross negligence or willful misconduct of Landlord and/or its employees, agents and /or contractors).  The janitor of the Building may at all times keep a passkey and all other agents of Landlord shall at all times be allowed admittance to the Premises, provided notice is provided in accordance with the terms of the Lease.

8.      Water closets and other water fixtures shall not be used for any purpose other than that for which they were intended and any damage resulting to them from misuse on the part of Tenant or Tenant's agents or employees shall be paid for by Tenant.  No person shall waste water by tying back or wedging the faucets or in any other manner.

9.      Except as otherwise allowed by Applicable Laws, no animals shall be allowed in the offices, halls, corridors, and elevators in the Building.  No person shall disturb the occupants of the Building or adjoining buildings or premises by the use of any radio, sound equipment, or musical instrument or by the making of loud or improper noises.

10.     Bicycles or other vehicles shall not be permitted in the offices, halls, corridors, and elevators in the Building nor shall any obstruction of sidewalks or entrances of the Building be permitted.

11.     Tenant shall not allow anything to be placed on the outside of the Building, nor shall anything be thrown by Tenant or Tenant's agents or employees out of the windows or doors or down the corridors, elevator shafts, or ventilating ducts or shafts of the Building.  Tenant, except in case of fire or other emergency, shall not open any outside window.

12.     No additional lock or locks shall be placed by Tenant on any door in the Building, unless written consent of Landlord shall first have been obtained.  Tenant shall have no right to rekey the Premises.  Two keys to the Premises and the toilet rooms, if locked by Landlord, will be furnished by Landlord and neither Tenant nor Tenant's agents or employees shall have any duplicate keys made.  Landlord shall supply Tenant with such additional keys as Tenant may require at Tenant's sole cost and expense.  At the termination of this tenancy, Tenant shall promptly return to Landlord all keys to offices, toilet rooms, or vaults.

45

EXHIBIT 1

13.     No window shades, blinds, screens, draperies, or other window coverings will be attached or detached by Tenant without Landlord's prior written consent. Tenant agrees to abide by Landlord's rules with respect to maintaining uniform curtains, draperies and linings, or blinds at all windows and hallways.

14.     If any Tenant desires telegraphic, telephonic, or other electric connections, Landlord or Landlord's agents will direct the electricians as to where and how the wires may be introduced. Without such directions, no boring or cutting for wires will be permitted. Any such installation and connection shall be made at Tenant's expense (unless otherwise provided in the Lease or the other exhibits made a part thereof).

15.     Tenant shall not install or operate any steam or gas engine or boiler or carry on any mechanical business in the Premises. The use of oil, gas, or inflammable liquids for heating, lighting, or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Building.

16.     Any painting or decorating, as may be agreed to be done by and at the expense of Landlord, shall be done during after regular weekday working hours.

17.     Except as permitted by Landlord, Tenant shall not mark upon, paint signs upon, cut, drill into, drive nails or screws into, or in any way deface the walls, ceilings, partitions, or floors of the Premises or of the Building and any defacement, damage, or injury caused by Tenant or Tenant's agents or employees shall be paid for by Tenant.

18.     [Intentionally Omitted.]

19.     Smoking is prohibited in all inside lobbies, common areas and public areas of the Building Complex and is restricted in all outside plaza areas of the Building Complex to specific locations designated by Landlord as smoking areas.

Tenant agrees that Landlord may amend, modify, delete, or add new and additional rules and regulations of the use and care of the Premises and the Building Complex; provided the same are reasonable, non-discriminatory and apply to all tenants and occupants of the Building Complex. Tenant agrees to comply with all such rules and regulations upon notice to Tenant from Landlord thereof. In the event of any breach of any of the rules and regulations herein set forth or any amendments, modifications, or additions thereto, Landlord shall have all remedies in this Lease provided for in the Event of Default by Tenant. Landlord will give Tenant thirty days prior written notice of any changes to the rules and regulations as set forth herein.

EXHIBIT 1

EXHIBIT E

WORK LETTER

_____ ____, 20___

7100 E. Belleview Avenue, Suite 101
Greenwood Village, Colorado

**Re:**      **Tenant**

**Premises:**   **Approximately 12,254 rentable square feet of space on the second
floor (the "Premises")**

Address:    7100 E. Belleview Avenue, Suite 208, Greenwood Village, Colorado

Gentlemen:

Concurrently herewith, you as Tenant and the undersigned as Landlord have executed a Lease (the "Lease") covering the Premises (the provisions of the Lease are hereby incorporated by reference as if fully set forth herein). In consideration of the execution of the Lease, Landlord and Tenant mutually agree as follows:

1.      Landlord shall deliver the Premises to Tenant in "turn-key" condition, in accordance with the Landlord's Tenant Finish obligations as set forth in Paragraph 1.1 below ("Tenant Finish").

1.1      Landlord and Tenant have previously agreed upon space plans for the Premises, prepared by InterArc 2003, Inc., dated January 7, 2014 ("Approved Space Plans") which set forth the Landlord's Tenant Finish obligations and are attached hereto as Exhibit E-1. Landlord's approval of the Approved Space Plans shall not create a responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities now in effect or which may hereafter be in effect, but Landlord shall be responsible for insuring the Premises are in compliance with all applicable laws, rules and regulations on the date possession of the Premises is delivered to Tenant.

2.      Landlord shall pay the cost of all Landlord's Tenant Finish work completed in accordance with the Approved Space Plans, except as provided below. Without limiting the foregoing, the cost of Landlord's Tenant Finish shall include all costs attributable to design, planning and construction of the Landlord's Tenant Finish, including, but not limited to, services, fees and expenses of the designated architects, planners and engineers; costs of permits and licenses required for completion of the Landlord's Tenant Finish; labor, materials, fees and expenses of Landlord's contractor in completing the Landlord's Tenant Finish; and costs

47

EXHIBIT 1

attributable to building standard tenant finish items prestocked or in place in the Premises which Landlord normally provides to tenants (e.g., ceiling grid, sprinklers, HVAC and similar items which may be referred to as "Building Standard").

      3.    Notwithstanding any provision herein or in the Lease to the contrary, the Lease Commencement Date and Tenant's rental obligations and other obligations will not be delayed or extended by any Tenant Delay. The term "Tenant Delay", as referred to above, shall include, but not be limited to, delay: (i) caused by modifications, revisions and changes to the Approved Space Plans due to changes requested by Tenant (or its agents or employees); (ii) in the delivery, installation or completion of any non-standard items specified by Tenant; or (iii) of any other kind or nature in the completion of the Tenant Finish Work caused by Tenant (or its agents or employees).

4.    Other than as set forth herein, Landlord shall have no obligations for the completion or remodeling of the Premises and Tenant shall accept the Premises in their "as is" condition on the date the Primary Lease Term commences. Tenant's acceptance of the Premises shall be subject to Landlord's obligation to correct the work performed by Landlord as set forth on a construction punch list prepared by Landlord and Tenant in accordance with the terms hereof. Within 5 business days after the commencement of the Primary Lease Term, Landlord and Tenant shall together conduct an inspection of the Premises and prepare a "punch list" setting forth any portions of the work performed by Landlord that are not in conformity with the agreed plans, and Landlord shall use good faith efforts to correct all such items within a reasonable time following the completion of the punch list (such reasonable time not to exceed 30 days).

Notwithstanding anything to the contrary contained in this Work Letter or the Lease, Tenant shall be solely responsible for all costs and expenses associated with the Tenant's telephone/data and telecommunications services, including without limitation all wiring, set up and connection costs and expenses, provided that Landlord shall provide Tenant with an allowance of up to $36,762.00 (the "Moving Allowance") (based on 12,254 RSF x $3.00) that Tenant shall be allowed to use towards Tenant's moving expenses, security system, cabling, furniture, fixtures and equipment (collectively, the "Tenant's Moving Allowance Costs"). Tenant shall provide Landlord with invoices and proof of payment of the invoices and other data establishing the final cost of the Tenant's Moving Allowance Costs reasonably requested by Landlord. The Moving Allowance for the Tenant's Moving Allowance Costs shall be paid to Tenant via a Rent credit.

      5.    Any and all notices required to be given hereunder shall be in writing in accordance with the terms and provisions of Paragraph 27 of the Lease.

Very truly yours,

LANDLORD:

THE PARAGON, LP, a
Colorado limited partnership

48

EXHIBIT 1

By:     The Paragon Management, LLC,
        a   Colorado   limited   liability   company,
        its General Partner

By: _____
        Andrew R. Klein, Manager

By: _____
        Otis C. Moore III, Manager

ACKNOWLEDGED

TENANT:

THE STANDARD REGISTER COMPANY,
an Ohio corporation

By: _____
        Joseph P. Morgan, Jr.

Its: _____ President & CEO _____

49

EXHIBIT 1

EXHIBIT E-1 TO WORK LETTER

APPROVED SPACE PLANS, PREPARED BY INTERARC 2003, INC.,
DATED JANUARY 7, 2014

50

EXHIBIT 1

EXHIBIT E-1 TO WORK LETTER

FLOOR PLAN



50 - E1

EXHIBIT 1

## EXHIBIT F

Silverpoint Lien Waiver

### LANDLORD LIEN WAIVER AGREEMENT

THIS LANDLORD LIEN WAIVER AGREEMENT (this "**Agreement**") is made and entered into as of ____ day of _____, 2013 by and between U.S. Bank National Association, as trustee (as assignee of the Dayton-Montgomery County Port Authority) ("**Landlord**"), and SILVER POINT FINANCE, LLC.

Whereas, The Standard Register Company, an Ohio corporation, (the "**Obligor**") now does or hereafter may store certain of its merchandise, inventory, or other of its personal property at premises (the "**Premises**") owned or leased by the undersigned (the "**Landlord**"), including without limitation, such Premises described on Schedule I attached hereto, which the Landlord leases to the Obligor pursuant to the terms of a lease agreement between the Landlord and the Obligor (the "**Lease**") more particularly described on Schedule II attached hereto.

Whereas, Obligor and Silver Point Finance, LLC, as administrative agent (the "**First Lien Agent**"), among others, are, in connection with the execution and delivery of this Agreement, entering into a First Lien Credit Agreement, dated as of August 1, 2013 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**") with certain financial institutions (the "**First Lien Lenders**").

Whereas, Obligor and Silver Point Finance, LLC, as administrative agent (the "**Second Lien Agent**" together with the First Lien Agent, each an "**Administrative Agent**" and collectively, the "**Administrative Agents**"), among others, are, in connection with the execution and delivery of this Agreement, entering into a Second Lien Credit Agreement, dated as of August 1, 2013 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"; together with the First Lien Credit Agreement, collectively, the "**Credit Agreements**") with certain financial institutions (the "**Second Lien Lenders**" and together with the First Lien Lenders, collectively, the "**Lenders**");

Whereas, the rights and priorities granted to the First Lien Agent and the Second Lien Agent shall be governed by that certain Intercreditor Agreement, August 1, 2013, by and among First Lien Agent, Second Lien Agent and Obligor, pursuant to which the First Lien Agent will act as the designated agent (the "**Designated Term Loan Agent**") for the Administrative Agents on behalf of the lenders to the Credit Agreements.

EXHIBIT 1

Whereas, as a condition to the Lenders entering into any such Credit Facility with the Borrowers, the Lenders require, among other things, that the Obligor grant the Designated Term Loan Agent, for and on behalf of the Lenders, a security interest in and lien on all of Obligor's personal property located on the Premises from time to time (the "**Collateral**").

Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreements, as applicable).

To induce the Lenders (together with their respective agents and assigns) to provide said Credit Agreements, and for other good and valuable consideration, the Landlord hereby agrees, represents, and warrants that:

> 1.    The Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way.

> 2.    To the best knowledge of the Landlord, neither the Obligor nor the Landlord is in default under the Lease, and no event or circumstance has occurred or exists which, with the passage of time or the giving of notice or both, would constitute a default under the Lease.

> 3.    The Landlord agrees that: (a) the Designated Term Loan Agent's lien upon or security interest in the Collateral is prior and superior to any interest, lien or claim of any nature the Landlord may now have or hereafter obtain in the Collateral whether by operation of law, contract or otherwise and the Landlord hereby subordinates to the Designated Term Loan Agent, for the benefit of the Designated Term Loan Agent and the Lenders, any rights, liens or claims it has with respect to the Collateral; (b) the Designated Term Loan Agent (or its designee) may enter the Premises and remove the Collateral from the Premises at any time without hindrance on the part of the Landlord, provided that the Designated Term Loan Agent shall reimburse Landlord for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the Designated Term Loan Agent (or its designee) in connection with its entering the Premises or removing the Collateral; and (c) the Landlord shall deem the Collateral to be personal property and not fixtures, notwithstanding the manner or mode of the attachment of the Collateral to the land.

> 4.    The Landlord shall send to the Designated Term Loan Agent (in the manner provided herein) a copy of any notice or statement sent to the Obligor by the Landlord asserting a default under the Lease. Such copy shall be sent to the Designated Term Loan Agent at the same time such notice or statement is sent

EXHIBIT 1

to the Obligor. Notices shall be sent to the Designated Term Loan Agent by prepaid, registered or certified mail, addressed to the Designated Term Loan Agent at the following address, or such other address as the Agent shall designate to the Landlord in writing:

> Silver Point Finance, LLC
> 2 Greenwich Plaza
> Greenwich, Connecticut 06830
> [Attention: Arbab Khalid
> Telephone: (203) 542-4441
> Facsimile: (203) 861-5010]

5.      The Landlord shall not terminate the Lease or pursue any other right or remedy under the Lease by reason of any default of the Obligor under the Lease, until the Landlord shall have given a copy of such written notice to the Agent as provided above and, in the event any such default is not cured by the Obligor within any time period provided for under the terms and conditions of the Lease, the Landlord will allow the Designated Term Loan Agent (a) thirty (30) days from the expiration of the Obligor's cure period under the Lease within which the Agent shall have the right, but shall not be obligated, to remedy such act, omission or other default and Landlord will accept such performance by the Designated Term Loan Agent and (b) up to an additional ninety (90) days to occupy the Premises; provided that during such period of occupation the Designated Term Loan Agent shall pay to the Landlord the basic rent due under the Lease pro-rated on a per diem basis determined on a 30-day month (provided, that such rent shall exclude any rent adjustments, indemnity payments or similar amounts payable under the Lease for default, holdover status or similar charges).

6.      The agreements contained herein shall continue in force until all of Obligor's obligations and liabilities to the Lenders and the Designated Term Loan Agent are paid and satisfied in full and all financing and/or security arrangements among the Lenders, the Designated Term Loan Agent and the Obligor have been terminated.

7.      The undersigned will notify all successor owners, transferees, purchasers and mortgagees of the Premises of the existence of this agreement. The agreements contained herein may not be modified or terminated orally and shall be binding upon the successors, assigns and personal representatives of the

EXHIBIT 1

undersigned, upon any successor owner or transferee of the Premises, and upon any purchasers, including any mortgagee, from the undersigned.

8.      The Landlord hereby acknowledges and agrees that Silver Point Finance, LLC is acting solely in its capacity as Administrative Agents under the Credit Agreements and the Loan Documents and not in its individual capacity or as a principal.

9.      THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW

EXHIBIT 1

EXECUTED under seal this _____ day of _____, 2013

        LANDLORD:


        By: _____

        Name: _____

        Title: _____

EXHIBIT 1

## EXHIBIT G

Bank of America Lien Waiver

### LANDLORD LIEN WAIVER AGREEMENT

**The Standard Register Company, an Ohio corporation** (the "Obligor") now does or hereafter may store certain of its merchandise, inventory, or other of its personal property at premises (the "Premises") owned or leased by the undersigned (the "Landlord"), including without limitation, such Premises described on Schedule I attached hereto, which the Landlord leases to the Obligor pursuant to the terms of a lease agreement between the Landlord and the Obligor (the "Lease") more particularly described on Schedule II attached hereto.

The Obligor and certain of its affiliates, as Borrowers (collectively, the "Borrowers") have entered or may enter into certain financing arrangements (as modified, renewed, extended, supplemented and replaced from time to time, the "Credit Facility") with certain financial institutions (together with the Agent described below, the "Lenders") and Bank of America, N.A., as agent for the Lenders (in such capacity, together with its successors and assigns, the "Agent") and, as a condition to the Lenders entering into any such Credit Facility with the Borrowers, the Lenders require, among other things, that the Obligor grant the Agent, for and on behalf of the Lenders, a security interest in and lien on all of Obligor's personal property located on the Premises from time to time (the "Collateral").

To induce the Lenders (together with their respective agents and assigns) to provide said Credit Facility, and for other good and valuable consideration, the Landlord hereby agrees, represents, and warrants that:

> 10.    The Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way.

> 11.    To the best knowledge of the Landlord, neither the Obligor nor the Landlord is in default under the Lease, and no event or circumstance has occurred or exists which, with the passage of time or the giving of notice or both, would constitute a default under the Lease.

> 12.    The Landlord agrees that: (a) the Agent's lien upon or security interest in the Collateral is prior and superior to any interest, lien or claim of any nature the Landlord may now have or hereafter obtain in the Collateral whether

EXHIBIT 1

by operation of law, contract or otherwise and the Landlord hereby subordinates to the Agent, for the benefit of the Agent and the Lenders, any rights, liens or claims it has with respect to the Collateral; (b) the Agent (or its designee) may enter the Premises and remove the Collateral from the Premises at any time without hindrance on the part of the Landlord, provided that the Agent shall reimburse Landlord for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the Agent (or its designee) in connection with its entering the Premises or removing the Collateral; and (c) the Landlord shall deem the Collateral to be personal property and not fixtures, notwithstanding the manner or mode of the attachment of the Collateral to the land.

13.    The Landlord shall send to the Agent (in the manner provided herein) a copy of any notice or statement sent to the Obligor by the Landlord asserting a default under the Lease. Such copy shall be sent to the Agent at the same time such notice or statement is sent to the Obligor. Notices shall be sent to the Agent by prepaid, registered or certified mail, addressed to the Agent at the following address, or such other address as the Agent shall designate to the Landlord in writing:

Bank of America, N.A.
300 Galleria Parkway, Suite 800
Atlanta, Georgia 30339
Attention:    Andrew A. Doherty
Telephone:    (404) 607-3219
Telecopy:     (312) 453-4665

14.    The Landlord shall not terminate the Lease or pursue any other right or remedy under the Lease by reason of any default of the Obligor under the Lease, until the Landlord shall have given a copy of such written notice to the Agent as provided above and, in the event any such default is not cured by the Obligor within any time period provided for under the terms and conditions of the Lease, the Landlord will allow the Agent (a) thirty (30) days from the expiration of the Obligor's cure period under the Lease within which the Agent shall have the right, but shall not be obligated, to remedy such act, omission or other default and Landlord will accept such performance by the Agent and (b) up to an additional ninety (90) days to occupy the Premises; provided that during such period of occupation the Agent shall pay to the Landlord the basic rent due under the Lease pro-rated on a per diem basis determined on a 30-day month (provided,

57

EXHIBIT 1

that such rent shall exclude any rent adjustments, indemnity payments or similar amounts payable under the Lease for default, holdover status or similar charges).

15. The agreements contained herein shall continue in force until all of Obligor's obligations and liabilities to the Lenders and the Agent are paid and satisfied in full and all financing and/or security arrangements among the Lenders, the Agent and the Obligor have been terminated.

16. The undersigned will notify all successor owners, transferees, purchasers and mortgagees of the Premises of the existence of this agreement. The agreements contained herein may not be modified or terminated orally and shall be binding upon the successors, assigns and personal representatives of the undersigned, upon any successor owner or transferee of the Premises, and upon any purchasers, including any mortgagee, from the undersigned.

EXHIBIT 1

EXECUTED under seal this _____ day of _____, 2013

LANDLORD:


By: _____

Name: _____

Title: _____

EXHIBIT 1