## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. 308 & 410 |

## REPLY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 105, 363(b) AND 503(c) OF THE BANKRUPTCY CODE, (I) APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN; (II) AUTHORIZING THE DEBTORS TO PAY INCENTIVE BONUSES TO CERTAIN EMPLOYEES; AND (III) GRANTING RELATED RELIEF

The Standard Register Company and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby file this reply (the "Reply") in support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 105, 363(b) and 503(c) of the Bankruptcy Code, (I) Approving the Debtors' Key Employee Incentive Plan; (II) Authorizing the Debtors to Pay Incentive Bonuses to Certain Employees; and (III) Granting Related Relief* (the "KEIP Motion")[2] [Docket No. 308] and in response to the objection (the "Objection") [Docket No. 410] filed by the Office of the United States Trustee for the District of Delaware (the "UST") with respect thereto.  In support of this Reply and the KEIP Motion, the Debtors respectfully represent as follows:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the KEIP Motion.

## PRELIMINARY STATEMENT

1.      The KEIP is an integral part of the Debtors' goals of incentivizing their key employees, rightsizing and positioning their business for success, and maximizing value through the Sale Process.  The KEIP is the result of extensive analysis by the Debtors and is tailored to achieve the Debtors' Revenue and EBITDARP goals; thus, the KEIP is in complete accord with established precedent and, importantly, is supported by the Debtors' major stakeholders.  Indeed, the Committee and the Stalking Horse (as defined below) have been actively involved in the KEIP's construction and subsequent negotiation related thereto, and each supports the program and the benefits that will result from the KEIP Participants' incentivized work performance.  Moreover, the Debtors did not receive a single formal objection from an economic stakeholder in these Chapter 11 Cases, which speaks volumes regarding the merits of the KEIP and its designated objectives.

2.      The KEIP Participants have been working tirelessly to implement the Debtors' marketing efforts, position the Debtors to achieve specified metrics, preserve value for the Transferred Assets, continue normal operations, and maximize recoveries through the Sale Process.  Their efforts are critical not only to the stabilization and growth of the Debtors' business in a chapter 11 environment, but also to the Debtors' ability to satisfy the requirements of the Stalking Horse APA and to secure higher or better offers than that represented by the Stalking Horse APA.  The cost to the estates to secure these benefits is minimal because, although the KEIP is an obligation of the Debtors, the Buyer is required to assume the KEIP obligation as part and parcel of a qualified bid such that the KEIP is an expense that will likely be covered by the Buyer.

01:17070864.3

3.      Moreover, particularly in light of the commercial pressures that a chapter 11 case exerts on a debtor's business and its relationships with its customers and vendors, the Revenue and EBITDARP goals set forth in the KEIP are not "lay-ups" by any means, as suggested by the UST.  Rather, for the Debtors to achieve these goals, the KEIP Participants will have to work above and beyond to assuage the fears of the Debtors' customer and vendor base, expand margins, keep expenses in check and maintain a strong contract backlog while, at the same time, the KEIP Participants will have to undertake new tasks specifically related to the sale process and the Chapter 11 Cases.  Accordingly, the KEIP fully complies with applicable law and should be approved.

## VOLUNTARY MODIFICATIONS TO THE KEIP

4.      In response to informal comments made by the Committee and Silver Point Finance, LLC, in its capacity as administrative agent under the Debtors' First Lien Credit Agreement and Second Lien Credit Agreement and as a representative of the Debtors' stalking horse (the "Stalking Horse"), the Debtors agreed to revise the KEIP in several respects to secure their support for the program.  The Debtors have made the following noteworthy changes to the KEIP:

- Despite doing a yeoman's job guiding the Debtors through the most significant crisis period in the 103-year history of the company, the Chief Executive Officer of the Debtors has been removed from the list of KEIP Participants.  In his place, with the consent of the Committee and the Stalking Horse, 6 non-executive key employees have been added.[3]

---

[3] The removal of the CEO and the addition of the non-executive key employees reduces the total potential spend on the KEIP from $3,620,053 to $3,397,075 (without consideration of the potential 20% increase if the Revenue and EBITDARP goals are exceeded or of the potential decrease associated with the change to a *pro rata* calculation of the Target Opportunities).  Because of the desire to limit the aggregate KEIP spend, these employees had not previously been part of the KEIP even though they occupied key roles.  The addition of these employees has been made possible by the generous agreement of the Debtors' CEO to his removal from the program.

- The KEIP has been revised to provide that an employee who is not hired by the Buyer will only receive a KEIP payment, assuming the performance targets are satisfied, equal to the percentage of the year the employee worked for the Debtors, rather than a full year's KEIP payment.

- The KEIP has been similarly revised as it relates to employees hired by the Buyer but terminated without Cause (as defined in the KEIP) before the end of the year.  Such employees will only get a *pro rata* portion of their Target Opportunity and, in another change, only if the Debtors meet their end of year performance targets.  In contrast, pursuant to the original KEIP, it was only required that the Debtors meet their targets through the month before the date the employee was terminated.

- The Debtors have confirmed that the KEIP is an obligation to be assumed by the Buyer and is not payable from the DIP Budget, the Wind-Down Budget, or any other encumbered asset, or the proceeds thereof. [4]

- The Debtors revised the definitions of "Cause" and "Good Reason" under the KEIP.  The revised definition of Cause is broader in scope and, accordingly, more employees may be terminated for Cause and such employees will not be entitled to any KEIP payment.  Similarly, the Debtors limited the definition of Good Reason, thereby limiting an employee's right to quit for Good Reason yet retain their KEIP benefits.

- Finally, the Debtors have added a requirement that, if the Buyer does not hire a KEIP Participant and assume his KEIP obligation, the amount due to such KEIP Participant would be paid into escrow.[5]

5.      As a result of the aforementioned negotiations and modifications, the Committee and Stalking Horse fully support the KEIP and the UST is the only objecting party.

## REPLY

### I.      The KEIP Does Not Include "Easy" Targets

---

[4]      Defined terms used in this sentence but not otherwise defined herein shall have the meanings ascribed to such terms in the *Final Order (I) Authorizing Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. § 364; and (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364* [Docket No. 290] (the "Final DIP Order").

[5]      This change was made in response to the request of the UST that funds due to non-hired employees from the Buyer be placed into escrow.

6.      The UST's argument that the Revenue and EBITDARP targets "may be too easy to reach" is misplaced.  Objection at ¶ 16.  As set forth in the KEIP Motion, the Debtors developed the KEIP with tremendous input from their professionals, all of whom have extensive restructuring experience, over a period of several months with an intense focus on maximizing value for the Transferred Assets, enhancing the Debtors' financial condition, and ensuring effective management during these Chapter 11 Cases.  The KEIP was developed as a reasonable, cost-effective way to appropriately incentivize certain personnel who are essential to realizing these goals.

7.      The KEIP performance metrics will require intense work from the Participants to achieve.  Far from being "lay-ups", as suggested by the UST, the performance metrics will require the KEIP Participants go the extra mile in their efforts for the Debtors during a tumultuous period.  Carmody Decl. ¶ 13.  Indeed, as noted in the Carmody Declaration, the Revenue and EBITDARP targets are far from given.  *Id.* ¶ 11.  If the Debtors' key employees are not incentivized to put in maximum effort during these Chapter 11 Cases, there is a substantial risk that Revenue and EBITDARP will actually decline, and thereby materially harm the Debtors' estates to an extent that far exceeds the relatively minimal cost of the KEIP.  *Id.*  But, if the Debtors' key employees dedicate themselves to the task, the Debtors may achieve or even exceed the Revenue and EBITDARP targets to the benefit of all of the Debtors' constituencies. *Id.*

8.      The KEIP also contemplates the payment of proportionally-adjusted incentives in the event that certain proportions of the Revenue and EBITDARP Target Opportunities are met. But, clearly there is little margin for failure.  Thus, for example, if the Debtors realize less than 98% of the Revenue goal, the KEIP Participants will not receive any distribution and, if the

Debtors realize only 98% of the Revenue goal, the KIEP Participants will only receive 80% of

the Revenue Target Opportunity.  On the other hand, upside performance from the Revenue goal

is also recognized as KEIP Participants can realize 120% of the Revenue Target Opportunity if

the Debtors realize 102% of the Revenue goal.  The strict confines required for any bonus

opportunity, considered in the context of these Chapter 11 Cases, will require the KEIP

Participants to remain intensely focused and dedicated to maximizing the value of the Debtors'

estates in order to receive any payout.  As the numbers indicate, the KEIP targets are designed to

incentivize the KEIP Participants to over-achieve, which is especially necessary given the

additional challenges these Chapter 11 Cases present in addition to the KEIP Participants'

normal workload.

## II.     The KEIP Meets the Business Judgment Standard, as Required by Section 503(c)(3) of the Bankruptcy Code

9.      Contrary to the UST's contentions, the applicable standard for whether the

Debtors should be permitted to implement the KEIP pursuant to section 503(c)(3) of the

Bankruptcy Code is whether the plan is justified by the facts and circumstances of these Chapter

11 Cases, a standard that relies on the Debtors' reasonable business judgment.  *See, e.g.*, *In re*

*LCI Holding Co.*, Case No. 12-13319, 2013 Bankr. LEXIS 988, at *4 (Bankr. D. Del. Mar. 15,

2013) (approving performance-based bonus plan under section 503(c)(3) because the debtors

"appropriately exercised their *business judgment*.") (emphasis added); *In re Global Home*

*Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) (holding that if a plan is "intended to

incentivize management, the analysis utilizes the more liberal *business judgment review* under §

363.") (emphasis added); *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012)

("Section 503(c)(3) limits payments made to the Debtors' employees outside of the ordinary

course unless such payments are justified by 'the facts and circumstances of the case.'  Courts

have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no

different than the *business judgment standard* under section 363(b).") (citations omitted)

(emphasis added); *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (same).

10.     The proposed KEIP is justified by the unique facts and circumstances of these

Chapter 11 Cases.  First, the Debtors' ability to preserve the value of their assets would be

severely undermined if the Debtors are unable to properly incentivize certain critical employees.

These individuals are intimately familiar with Debtors' business and the Sale Process, which

makes them so critical to the Debtors' business that the Debtors must retain them even if they are

not fully committed to the job.  Carmody Decl. ¶ 19.  However, authorizing the Debtors to

implement the KEIP will provide these KEIP Participants with a tangible incentive, collectively,

to row hard to maximize the value of the Debtors' estates.  *Id.* ¶ 13.

11.     Second, the cost of the KEIP is minimal, especially given (i) the value to be

realized from the achievement of the Debtor's Revenue and EBITDARP goals, (ii) the potential

for securing higher or otherwise better offers for the Transferred Assets, and (iii) the fact that the

Buyer will bear the cost of the KEIP.  *Id.* ¶ 15.  Accordingly, the Debtors believe that

implementing the KEIP is a reasonable exercise of the Debtors' business judgment, in

compliance with section 503(c)(3) of the Bankruptcy Code.  *Id.*

12.     The UST mistakenly asserts that the KEIP payments must be approved under

section 503(b) of the Bankruptcy Code as administrative expenses that "are necessary to preserve

the value of the estate."  Objection at ¶ 20.  However, the UST provides no persuasive rationale

for overturning the current legal framework for evaluating incentive plans under section 503(c)

of the Bankruptcy Code.  Regardless, as discussed above and detailed in the KEIP Motion, the

KEIP is necessary to preserve the value of the Debtors' estates.  The Debtors are already

experiencing the poaching of employees and customers.  The KEIP Participants are essential to preserving the Debtors' business value pending the Sale and the KEIP will properly incentivize the KEIP Participants to do everything in their power to maintain and increase business performance and stem any further business deterioration.  Carmody Decl. ¶ 19.  In addition, many of the KEIP Participants play a key role in the due diligence that potential buyers are conducting, and it is therefore critical that they be incentivized to go the extra mile to respond to extensive diligence requests in order to promote an active auction that increases the consideration paid for the Debtors' assets.  *Id.* ¶ 18.  Therefore, the KEIP also satisfies even the stricter standard proposed by the UST.

13.     It should be noted that, contrary to the UST's contention, the Debtors did not seek approval of the KEIP under section 105(a) of the Bankruptcy Code due to the "difficulty of complying with Section 503(c) of the Code."  Objection at ¶ 23.  The Debtors submit that the KEIP is necessary and appropriate under established law and is similar in form to targeted incentive programs that have previously been recognized by this and other courts.  KEIP Motion ¶ 49.  In the 24-page KEIP Motion, the Debtors dedicated a mere eight lines to a discussion of section 105(a) of the Bankruptcy Code, and did so only to further emphasize that the KEIP is critical to their ability to maximize returns to creditors.  The Debtors did not seek approval of the KEIP under 105(a) as an alternative to approval under section 503(c) but, rather, included it as a supplement.  As such, the UST's Objection on this point is misguided.

### III.     The Buyer's Obligations Under the KEIP are Clear

14.     As the UST correctly recognized in the Objection, payments under the KEIP "would be made only after the closing of a sale of the Debtors' assets, and would be paid only by the buyer of the Debtors' assets . . . ."  Objection ¶ 11.  Taken together, the Sale Procedures

approved by the Court on April 15, 2015[6] and the order approving the KEIP will mandate the

Buyer's assumption of the KEIP obligations.  Such obligations are not discretionary, nor are they

payable from the DIP Budget, the Wind-Down Amount, or any other encumbered asset or the

proceeds thereof.[7]

> 15.    The Sale Procedures provide, in relevant part, as follows:

> > Each Qualified Bid must provide, as to each employee of the
> > Debtors, for either (a) the hiring of such employee and the
> > assumption of all obligations of the Debtors, other than those
> > funded through the Budget (as provided in the interim order
> > approving postpetition financing [Docket No. 59] and in such final
> > order thereon, such budget, the "DIP Budget"), to such employee
> > relating to postpetition, unpaid wages, salaries, commissions and
> > other amounts, earned or accrued by or in respect of such
> > employee, or (b) payment to the Debtors, in cash, for the amounts
> > owed by the Debtors, other than those funded through the DIP
> > Budget, to such employee relating to postpetition, unpaid wages,
> > salaries, commissions and other amounts, earned or accrued by or
> > in respect of such employee.

Sale Procedures at 7 (emphasis added).  Thus, under the Sale Procedures, and as discussed more

fully in the Carmody Declaration, any bid that does not provide for the payment or assumption of

the KEIP will not be qualified.  Carmody Decl. ¶ 17.  While a competing bidder that submits a

Qualified Bid (as defined in the Sale Procedures) may later increase or modify its bid, it may not

do so in a way that would render its bid unqualified.  Thus, any Qualified Bid, at any stage of the

Auction, must capture and account for the KEIP payments.  Moreover, the Stalking Horse has

already agreed to pay or assume the KEIP payments if it is the Buyer.

---

[6]    The Sale Procedures are attached to the *Order (I) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Approving the Maximum Reimbursement Amount; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale; and (VI) Granting Certain Related Relief* [Docket No. 286].

[7]    Defined terms used in this sentence but not otherwise defined herein shall have the meanings ascribed to such terms in Final DIP Order.

## <u>CONCLUSION</u>

16.    The KEIP has been proposed by the Debtors in an exercise of their sound business judgment for the purpose of maximizing the proceeds of the Sale for the benefit of all creditors of the estate.  Accordingly, to the extent applicable, the KEIP satisfies section 503(c) of the Bankruptcy Code and is otherwise justified by the facts of these Chapter 11 Cases.  Those parties with the greatest economic stake have not objected to the KEIP Motion, and the Debtors respectfully request that the Court overrule the Objection of the UST on the merits.

[*remainder of page intentionally left blank*]

01:17070864.3

WHEREFORE, the Debtors respectfully request that the Court overrule the

Objection, enter an order approving the KEIP Motion, and grant the Debtors such other and

further relief as the Court deems appropriate.

Dated:    May 11, 2015
          Wilmington, Delaware          */s/ Kara Hammond Coyle*
                                        Michael R. Nestor (No. 3526)
                                        Kara Hammond Coyle (No. 4410)
                                        Maris J. Kandestin (No. 5294)
                                        Andrew L. Magaziner (No. 5426)
                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone:    (302) 571-6600
                                        Facsimile:    (302) 571-1253

                                        -and-

                                        Michael A. Rosenthal (NY No. 4697561)
                                        Robert A. Klyman (CA No. 142723)
                                        Samuel A. Newman (CA No. 217042)
                                        Jeremy L. Graves (CO No. 45522)
                                        Sabina Jacobs (CA No. 274829)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        333 South Grand Avenue
                                        Los Angeles, CA 90071-1512
                                        Telephone: (213) 229-7000
                                        Facsimile: (213) 229-7520

                                        *Counsel to the Debtors and*
                                        *Debtors in Possession*

01:17070864.3