**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. 308, 310, 384, 410, 465, and 466 |

**DECLARATION OF KEVIN CARMODY IN SUPPORT OF KEIP MOTION AND
RELATED MOTION TO SEAL**

I, Kevin M. Carmody, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS"), with an office at 55 East 52nd Street, New York, NY 10055. Since March 2, 2015, I have served as Chief Restructuring Officer (the "CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. As a Practice Leader, I have a proven track record of assisting distressed clients drive aggressive financial and operational transformations to maximize stakeholder value. I also have deep experience successfully negotiating consensual out of court restructurings and navigating clients through the chapter 11 process. I have over fifteen years of restructuring advisory and crisis management experience, have served as an executive in the C-suite of my client organizations, and have testified as an expert witness in federal and state courts.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

01:17071595.8

3. I submit this declaration (this "Declaration") in support of (A) the *Debtors' Motion for Entry of an Order, Pursuant to Sections 105, 363(b) and 503(c) of the Bankruptcy Code, (I) Approving the Debtors' Key Employee Incentive Plan; (II) Authorizing the Debtors to Pay Incentive Bonuses to Certain Employees; and (III) Granting Related Relief* [Docket No. 308] (the "KEIP Motion");[2] and (B) the *Debtors' Motion for Entry of an Order, Pursuant to Section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1(b), Authorizing the Debtors to File a Summary of Their Key Employee Incentive Plan, Including the Exhibits Attached Thereto, Under Seal and (II) Directing Parties to Redact Confidential Information* (the "Seal Motion").

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the matters set forth herein. I am over eighteen (18) years of age and am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated.[3]

5. On March 12, 2015, I submitted a declaration [Docket No. 2] (the "First Day Declaration") providing, among other things, a summary overview of the Debtors and the Chapter 11 Cases. My statements in the First Day Declaration are hereby incorporated by reference as though fully set forth herein.

**A.    Development of the KEIP**

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the KEIP Motion or the *Reply in Support of Debtors' Motion for Entry of an Order, Pursuant to Sections 105, 363(b) and 503(c) of the Bankruptcy Code, (I) Approving the Debtors' Key Employee Incentive Plan; (II) Authorizing the Debtors to Pay Incentive Bonuses to Certain Employees; and (III) Granting Related Relief*, filed concurrently herewith, as applicable.

[3] Certain disclosures herein relate to matters within the personal knowledge of other professionals employed by the Debtors and are based on information provided by them.

6. Prior to the Petition Date, the Debtors hired McKinsey RTS to, among other things, assist with the development of a strategic business plan, advise and assist the Debtors and their professionals in the restructuring of the Debtors' debts and business, and provide interim management services during these Chapter 11 Cases. In conjunction with that engagement, I was elected to serve as the Debtors' CRO and began serving in that capacity. McKinsey RTS is a leading global consulting firm specializing in turnaround and crisis management for large companies experiencing financial difficulty.

7. The Debtors also hired Compensation Strategies, Inc. ("CSI") to assist in structuring an appropriate KEIP based on the Debtors' industry and the circumstances of these cases. I am advised that CSI is a compensation consulting firm that focuses solely on executive and board pay.

8. Collectively, the Debtors and the Debtors' professionals reviewed the Debtors' needs during the restructuring process and the necessary features of an appropriate incentive plan. In concert, the Debtors and their professionals designed the KEIP, cognizant of the Debtors' goals of maximizing value for the Transferred Assets through the Sale Process, enhancing the Debtors' financial condition, and ensuring effective management during these Chapter 11 Cases. The Debtors designed the KEIP in a reasonable, cost-effective manner to appropriately incentivize certain personnel essential to these Chapter 11 Cases and the success thereof.

9. Prior to filing the KEIP Motion and finalizing the KEIP, the Debtors worked to ensure that the KEIP was tailored to incentivize the Debtors' key employees to achieve the Debtors' revenue and EBITDARP goals. With active input from the Debtors' Board of Directors, the form of the KEIP underwent several rounds of revisions before being submitted

to the Board of Directors for final approval. On April 17, 2015, the Board of Directors approved the KEIP on the terms summarized in the KEIP Motion.

B.     **Voluntary Modifications to the KEIP**

10.     Upon receiving feedback regarding the KEIP from the Debtors' major constituents, including the Committee and Silver Point Finance, LLC ("Silver Point"), the Debtors have made the following noteworthy modifications to the KEIP since the KEIP Motion was filed:

- Despite doing a yeoman's job guiding the Debtors through the most significant crisis period in the 103-year history of the company, the Chief Executive Officer of the Debtors has been removed from the list of KEIP Participants. In his place, with the consent of the Committee and the Stalking Horse, 6 non-executive key employees have been added;[4]

- The KEIP has been revised to provide that an employee who is not hired by the Buyer will only receive a KEIP payment—assuming the performance targets are satisfied—equal to the percentage of the year the employee worked for the Debtors, rather than a full year's KEIP payment;

- The KEIP has been similarly revised to provide that employees hired by the Buyer who are terminated without Cause (as defined in the KEIP) before the end of the year will only receive a *pro rata* portion of their Target Opportunity, which shall be conditioned on the Debtors meeting their end of year performance targets. The initial KEIP, as summarized in the KEIP Motion, only required the Debtors to meet targets through the month before the date on which the employee was terminated;

- The Debtors have confirmed that the KEIP must be assumed by the Buyer and, under no circumstance, is payable from the DIP Budget, the Wind-Down Budget, or any other encumbered asset, or the proceeds thereof;

- The Debtors have revised the definitions of "Cause" and "Good Reason" under the KEIP. The revised definition of "Cause" is broader in scope

---

[4] The removal of the CEO and the addition of the non-executive key employees reduces the total potential spend on the KEIP from $3,620,053 to $3,397,075 (without consideration of the potential 20% increase if the Revenue and EBITDARP goals are exceeded or of the potential decrease associated with the change to a *pro rata* calculation of the Target Opportunities). Because of the desire to limit the aggregate KEIP spend, these employees had not previously been part of the KEIP even though they occupied key roles. The addition of these employees has been made possible by the generous agreement of the Debtors' CEO to his removal from the program.

and, accordingly, more employees may be terminated for "Cause" and, in those instances, such individuals will not be entitled to a KEIP payment. Similarly, the Debtors have agreed to limit the definition of "Good Reason," thereby limiting an employee's right to quit for Good Reason yet retain their KEIP benefits; and

- Finally, the Debtors have added a requirement that, if the Buyer does not hire a KEIP Participant and assume his KEIP obligation, the amount due to such KEIP Participant would be paid into escrow.[5]

11. With these changes, the KEIP is more cost-effective and explicit regarding the Buyer's responsibilities and obligations. The revised KEIP is fully supported by the Committee and Silver Point.

C. **The Revenue and EBITDARP Targets**

12. The KEIP provides Revenue and EBITDARP Target Opportunities to the KEIP Participants. These bonus opportunities were determined following extensive consideration by the Debtors and their professionals, and require the KEIP Participants to guide the Company towards ambitious, and specific Revenue and EBITDARP targets. These targets are far from a slam dunk. If the Debtors' key employees are not incentivized to put in maximum effort during these Chapter 11 Cases, there is a substantial risk that Revenue and EBITDARP will actually decline, and thereby materially harm the Debtors' estates to an extent that far exceeds the relatively minimal cost of the KEIP. But, if the Debtors' key employees dedicate themselves to the task, the Debtors may achieve or even exceed the Revenue and EBITDARP targets to the benefit of all of the Debtors' constituencies.

13. As set forth in the KEIP Motion, the KEIP contemplates the payment of proportionally-adjusted incentives in the event that certain proportions of the Revenue and EBITDARP Target Opportunities are met. But, clearly there is little margin for failure. Thus,

---

[5] This change was made in response to the request of the UST that funds due to non-hired employees from the Buyer be placed into escrow.

01:17071595.8

5

for example, if the Debtors realize less than 98% of the revenue goal, the KEIP Participants will not receive any distribution and, if the Debtors realize only 98% of the revenue goal, the KEIP Participants will only receive 80% of the Revenue Target Opportunity.  On the other hand, upside performance from the revenue goal is also recognized as KEIP Participants can realize 120% of the Revenue Target Opportunity if the Debtors realize 102% of the revenue goal.  As such, the bonus opportunities under the KEIP are closely tied to each percentage of the Debtors' revenue goal between 98% and 102%.

14.     I, on behalf of the Debtors, believe that the Target Opportunities are specifically calibrated to properly incentivize the KEIP Participants to overachieve, and can only be achieved if these critical employees to thoroughly dedicate themselves to maximizing value for all interested parties.  In order to receive any payout, the KEIP Participants will have to work above and beyond their standard responsibilities to assuage the fears of the Debtors' customer and vendor base, expand margins, keep expenses in check and maintain a strong contract backlog and, at the same time, the KEIP Participants will have to undertake new tasks specifically related to the sale process and the Chapter 11 Cases.

15.     For that reason, I believe that implementing the KEIP at this juncture of these cases is vital to motivating the KEIP Participants because such individuals have taken on a substantial and increased workload in connection with the Debtors' bankruptcy filing.  This increased workload includes, among other things, providing key information to the Debtors' advisors and potential Buyers throughout the Sale Process, playing a critical role in meeting the Debtors' significant reporting requirements, and otherwise assisting the Debtors' advisors with administration of the Chapter 11 Cases.  All of these duties compliment the everyday

responsibilities that the KEIP Participants must satisfy while maintaining the Debtors' operations during this challenging time.

16. I believe that the KEIP is properly structured to incentivize and motivate the KEIP Participants and is justified by the facts and circumstances of these Chapter 11 Cases. First, the cost of the KEIP is minimal, especially given (i) the value to be realized from the achievement of the Debtor's Revenue and EBITDARP goals, (ii) the potential for securing higher or otherwise better offers for the Transferred Assets, and (iii) the fact that the Buyer will bear the cost of the KEIP. Second, the Revenue and EBITDARP Target Opportunities serve and promote the primary goal of maximizing the Debtors' operations and the ultimate value of the estates through a swift and orderly Sale Process. I further believe that the KEIP is well-designed to incentivize the KEIP Participants to outperform in the short term, despite the substantial hurdles they face as a result of these Chapter 11 Cases, to bring significant benefits to the Debtors' estates and all stakeholders. Accordingly, I believe that implementing the KEIP is a reasonable exercise of the Debtors' business judgment, in compliance with section 503(c)(3) of the Bankruptcy Code.

**D.** **The Buyer's Obligations Under the KEIP**

17. While the KEIP is, as proposed, an obligation of the Debtors, the Sale Procedures require any Buyer to assume the KEIP or to fund the relevant financial obligations into escrow and, accordingly, the KEIP is an expense that is not likely to diminish estate resources. Indeed, the KEIP, as recently revised, explicitly provides that KEIP payments will not be paid through the DIP Budget, the Wind-Down Amount, cash collateral, other encumbered assets, or any proceeds thereof. I believe that the structure of the Sale Procedures shields the estates from the cost of the KEIP because any Bidder that wishes to be designated as a Qualified Bidder must agree to satisfy all accrued and valid payments owing to employees. .

### E. Efforts Expended by the KEIP Participants

18. Since the Petition Date, the KEIP Participants have expended considerable amounts of time and energy above and beyond their normal duties to maximize the value of the estates and to minimize administrative costs. Examples of the considerable additional efforts expended by the KEIP Participants include:

(a) providing extensive assistance to the Debtors' advisors throughout the Sale Process by, among other things, responding to diligence requests and participating in information sharing with prospective purchasers;

(b) carefully managing the Debtors' key vendors and customers to ensure sufficient production is in the supply chain despite the chapter 11 filing;

(c) imposing strong discipline on disbursements to minimize cash burn and work within the very tight budget constraints that the Debtors' postpetition financing requires;

(d) actively participating in the preparation of the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs;

(e) organizing efficient dismissal of certain other employees minimizing post-petition payroll costs; and

(f) diligently providing outreach and mentoring to retain critical employees.

19. Based on my experience, the work I have done in these Chapter 11 Cases, and my first-hand observations of the KEIP Participants' efforts, it is my opinion that the KEIP is calibrated to promote appropriate incentives for the KEIP Participants, all of whom are essential to the Debtors' Sale Process. The KEIP Participants are intimately familiar with Debtors' business and the Sale Process, which makes them so critical to the Debtors' business that the Debtors must retain them even if they are not fully committed to the job. In no uncertain terms, it my belief that absent the KEIP, the Debtors' non-insider workforce would be jeopardized, and any potential for realizing favorable financial targets would be significantly undermined.

**F.     The KEIP Contains Confidential Commercial Information**

20. The KEIP Summary and KEIP Exhibits contain confidential commercial information that has never been disclosed to the Debtors' competitors. I believe that forcing the Debtors to disclose this information now, at a critical juncture in the Sale Process, would cause an extreme and competitive risk to the Debtors' business at a time when the Debtors are already plagued by the copious issues that naturally arise during the chapter 11 process. Moreover, I do not believe that it will be necessary to disclose this information at the hearing because copies of the KEIP Summary and KEIP Exhibits were provided to the Court, the UST, proposed counsel to the Committee, and counsel to the Debtors' postpetition lenders. If this information must be disclosed either at the hearing or in the statement of financial affairs, the Debtors would present this information, in camera, in the case of the hearing, or on a redacted basis, in the case of the statement of financial affairs.

21. The KEIP Summary contains confidential non-public information regarding the Debtors' 2015 business plan (the "Business Plan"), including forecasted

EBITDARP and revenue targets, and the names and salaries of, and proposed incentive payments to, the Debtors' most essential employees. On a pre-petition basis, the parent company Debtor, which is a public company, did not disclose projections in its annual or quarterly earnings releases and certainly should not be required to do so now at this critical juncture in the Sale Process.

22. The Business Plan is a highly confidential and proprietary document and I believe the release of the Business Plan would impair the Debtors' ability to compete. In fact, doing so would jeopardize the Sale Process, as such company specific information is only available to bidders (and their representatives) who agree to be bound by strict non-disclosure agreements. If this information were to be generally provided to the market, competitors not involved in the Sale Process could take advantage of it.

23. The KEIP Exhibits contain sensitive non-public information regarding the identities of the KEIP Participants and the salaries they receive. I believe that protecting this wage information is crucial to the Debtors since its disclosure could be very damaging to the Debtors' business and impair value in connection with the Sale Process. Disclosing the names, salary levels, and incentives of the KEIP Participants, the Debtors' most valued employees, would make them plum pickings for competitors willing to forego the Sale Process and impact the Debtors' business by hiring the Participants and taking advantage of their skills and contacts. I believe that the loss of KEIP Participants to the Debtors' competitors at this challenging time would impair the Debtors' business operations and would negatively affect the Debtors' efforts to maximize the value of their estates through a sale, or otherwise, thereby causing commercial injury to the Debtors, their value, and their stakeholders.

24. Moreover, public disclosure of the names of the KEIP Participants, along with sensitive salary and compensation information, may cause dissension among the ranks of the Debtors' other employees and harm or distress to the Participants themselves, thus lowering employee morale and further disrupting the functioning of the Debtors' business, once again resulting in commercial injury to the Debtors and their estates.

25. For these reasons, I believe the KEIP Summary and KEIP Exhibits should be filed under seal.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: Wilmington, Delaware
        May 11, 2015

The Standard Register Company

By: */s/ Kevin Carmody*
Name:   Kevin Carmody
Title:    Chief Restructuring Officer