REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: June 8, 2015 at 9:30 a.m. (ET) |
| | Objection Deadline: June 1, 2015 at 4:00 p.m. (ET) |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING THE COMMITTEE STANDING AND AUTHORIZING THE COMMITTEE TO COMMENCE AND PROSECUTE CERTAIN ACTIONS ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") appointed in the bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for an order granting the Committee standing and authority to commence, prosecute, and, if appropriate, settle an action or actions based upon the allegations set forth in the proposed draft adversary complaint substantially in the form annexed hereto as Exhibit 1 (the "Complaint").[2]

As set forth in the Complaint, the Committee seeks to pursue colorable and plausible claims set forth in the Complaint, on behalf of the Debtors' estates, against (a) Silver Point

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] Defined terms not otherwise defined herein shall have the meaning ascribed to them in the Complaint attached hereto as Exhibit 1. Further, defendant parties defined herein shall include those party defendants included in such definitions as set forth in the Complaint. To the extent that the definition of any term defined herein is inconsistent with the definition ascribed to such term in the Complaint, the definition in the Complaint shall govern.

Capital, L.P. ("SPC")[3] and the various other defendants (collectively with SPC, the "Term Loan Defendants") that are parties to the Debtors' prepetition first- and second-lien term loans (the "Prepetition Term Loans"), including, among others, a number of SPC's affiliates (the "Silver Point Defendants"); (b) the agent and lenders (the "Prepetition ABL Defendants") under the Debtors' prepetition asset-backed revolving credit facility (the "Prepetition ABL Facility"); (c) certain of the Debtors' directors and officers (the "Director and Officer Defendants") as of Standard Register's August 1, 2013 acquisition (the "WorkflowOne Acquisition") of WorkflowOne, LLC ("WorkflowOne"); (d) WFSR Holdings, LLC, f/k/a Workflow Holdings, LLC ("WF Holdings"), the seller in the WorkflowOne Acquisition; and (e) such additional persons and entities as the Committee may identify through discovery (collectively with the Term Loan Defendants, the Prepetition ABL Defendants, the Director and Officer Defendants, and WF Holdings, the "Defendants"). In support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    In accordance with its fiduciary duties to the Debtors' unsecured creditors, the Committee has undertaken an investigation of, among other things, (a) potential claims and causes of action related to the WorkflowOne Acquisition and (b) the extent, validity, priority, and perfection of the Term Loan Defendants' and the Prepetition ABL Defendants' alleged liens.

2.    Immediately after the Committee was appointed less than two months ago, the Committee requested discovery from the Debtors and certain Silver Point and Prepetition ABL Defendants. Although certain documents responsive to the Committee's discovery requests have been provided, the production is incomplete as of the filing of this Motion. For instance, all

---

[3]    The term "Silver Point" used throughout this Motion refers to SPC and/or its affiliates and is used in the interest of brevity where direct references to specific SPC-affiliated entities are not necessary.

parties subject to the Committee's discovery requests have not fully responded to the Committee's discovery requests, and the Debtors and certain Silver Point Defendants have refused to provide privilege logs specifically setting forth documents withheld and the basis thereof on the asserted ground that there is insufficient time to prepare the log (notwithstanding the fact that Silver Point and the Debtors are the ones that imposed the tight deadline of May 26, 2015 by which the Committee must file a challenge or assert claims against Silver Point and the other prepetition lenders).[4]  As such, discovery remains ongoing, with documents produced as recently as three days before the filing of this Motion.

3.     Notwithstanding the fact that discovery is incomplete, the Committee's preliminary investigation has revealed that the Committee and/or the Debtors' estates hold a number of colorable and very plausible causes of action against the Defendants, which actions could profoundly impact the Debtors' estates and creditor recoveries.   The Committee is prepared to pursue the causes of action in light of the Debtors' inability to do so.

## JURISDICTION AND STATUTORY PREDICATES

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Standing Order of the United States District Court for the District of Delaware referring all cases and proceedings arising under the Bankruptcy Code to the Bankruptcy Judges of this District.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 502, 506, 510, 544, 547, 548, 550, and 551.

---

[4] The lenders extended the challenge deadline to July 8, 2015 to provide themselves more time to prepare a response to this Motion (filed on May 18, 2015).

## BACKGROUND

### A.    The Chapter 11 Filings, Appointment of the Committee and Discovery

5.    On March 12, 2015 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    The Debtors operate on a large scale and internationally. According to the Debtors, they are one of the leading providers in the United States of communications services and communications workflow, content and analytics solutions through multiple communication channels, including print, electronic, and internet-based communications, to clients in the healthcare, financial services, manufacturing, retail, and transportation industries. *Declaration Of Kevin Carmody In Support Of The Debtors' Chapter 11 Petitions And Requests For First Day Relief*, ¶12. *See* D.I. 3. The Debtors have a total of fifty-three (53) production and warehouse facilities in North America. *Id.*

7.    The Debtors' operations are divided between two main business units: (i) healthcare, which accounts for almost one-third of the Debtors' revenues, and (ii) integrated communications (*f/k/a* business solutions), which accounts for the remainder of the Debtors' revenues. *Id.*

8.    These Chapter 11 Cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). *See* D.I. 46.

9.      No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. On March 24, 2015, the Office of the United States Trustee for Region 3 appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. *See* D.I. 99.

10.     On March 26, 2015, just two days after its appointment, and then on April 17, 2015, the Committee served discovery requests upon the Debtors and certain Silver Point Defendants. *See* D.I. 181-184, 331-32. Subsequently, the Committee made additional and supplemented requests upon the Debtors, and certain of the Silver Point and ABL Defendants. Although the Debtors, Silver Point and the ABL Defendants produced a number of documents responsive to the Committee's discovery requests, their production are incomplete as of the filing of this Motion. The Debtors' document production remains underway, with documents produced as recently as May 15, 2015, three days before the filing of this Motion.

11.     Additional discovery may be necessary. First, the Committee's prior discovery requests were limited to the Debtors and to certain Silver Point Defendants given the extremely short time within which the Committee was afforded to conduct its investigation. Second, both the Debtors and the Silver Point Defendants have refused to provide responsive documents to certain specific requests made by the Comittee. Third, the Committee is unable to ascertain the extent to which the Debtors' and the Silver Point Defendants' respective productions are incomplete because, by correspondence dated May 13, 2015, they each have refused to provide the Committee with privilege logs detailing the type, amount, scope, and propriety of withheld documents. Citing the expedited timeline of these Chapter 11 Cases (a timeline Silver Point itself mandated by imposing a short challenge deadline), the Debtors and the Silver Point Defendants have taken the position that it would be unreasonable and unduly burdensome to produce a privilege log in connection with the Committee's investigation.

50409555.1

12. Notwithstanding the Debtors' and the Silver Point Defendants' attempts to stifle and limit the Committee's investigation, the Committee has uncovered facts and circumstances that support very colorable and plausible claims that the Debtors' estates hold against third parties.

13. Among other things, the Committee has determined that (a) certain of the Debtors incurred fraudulent obligations and made fraudulent transfers through their assumption of WorkflowOne's massive secured debt as part of the WorkflowOne Acquisition in exchange for less than reasonably equivalent value, and which transactions left the Debtors insolvent and with unreasonable small capital, (b) the Director and Officer Defendants breached their fiduciary duties in approving and engaging in the WorkflowOne Acquisition, and (c) the Prepetition ABL Defendants and/or the Term Loan Defendants do not appear to have valid and enforceable liens on certain of the Debtors' assets.

14. In order to understand the Debtors' prepetition activity and the Defendants' prepetition conduct, the Committee has reviewed, among other things, minutes of meetings of the Board, communications and financial information and data available through the Debtors' SEC filings and produced in discovery. Based upon its review of this information provided to date, the Committee believes the causes of action set forth in the Complaint are colorable, plausible, and meritorious.

**B.** **Standard Register's Pre-Acquisition Capital Structure and Operations [Complaint, ¶¶60-67]**

15. Prior to the WorkflowOne Acquisition, Standard Register had very little interest-bearing debt. Although its defined benefit pension plan was underfunded, its capital structure was manageable. Standard Register's only funded long-term debt consisted of

outstanding borrowings of approximately $50 million under a $100 million Prepetition ABL Facility.

16.     SRC was the borrower and four of its subsidiaries, the Prepetition Obligor Debtors, were guarantors under the Prepetition ABL Facility.   Prior to the WorkflowOne Acquisition, the Prepetition ABL Facility was secured by Prepetition ABL Liens on the Prepetition Obligor Debtors' accounts receivable, inventories, fixed assets, and certain other assets.

17.     Other than the Prepetition Obligor Debtors, no other Debtors or affiliates of the Debtors were borrowers or obligors under the Prepetition ABL Facility.   Six of the Debtors were not parties to the Prepetition ABL Facility.

18.     Shortly prior to the WorkflowOne Acquisition, Standard Register had negative shareholders' equity of approximately ($121 million).

19.     In the first half of 2013 (the two quarters preceding the WorkflowOne Acquisition), Standard Register generated approximately $8.8 million of cash flow from operations (even after paying $11.9 million of pension contributions), used $6.3 million of cash to make capital improvements, and made $1.2 million of net principal repayments on the Prepetition ABL Facility.

20.     Before making pension and other post-employment benefits contributions, Standard Register generated over $148 million of net cash flow from operations from 2010 through the first half of 2013.   In total, from 2010 through the first half of 2013, Standard Register's operations generated approximately $52.4 million of cash, even after paying $95.7 million of pension and postretirement benefit contributions, and Standard Register used $39.7

million of cash generated by operations to fund capital expenditures over the same period, as set forth below:

| ($ millions) | 2010 | 2011 | 2012 | 1H2013 | Total |
|---|---|---|---|---|---|
| Net Cash Provided By Operating Activities | $ 11.8 | $ 13.3 | $ 18.5 | $ 8.8 | $ 52.4 |
| Net Cash Used in Investing Activities | (10.5) | (17.2) | (5.8) | (6.2) | (39.7) |
| Net Cash (Used In) Provided by Financing Activities | (3.1) | 5.1 | (13.4) | (3.1) | (14.5) |
| *Effect of Exchange Rate Changes* | (0.1) | (0.2) | 0.1 | 0.0 | (0.2) |
| Net Change in Cash | $ (1.9) | $ 1.0 | $ (0.6) | $ (0.5) | $ (2.0) |
| *Memo: Pension and OPEB Contributions* | *27.8* | *28.7* | *27.3* | *11.9* | *95.7* |

### C.    WorkflowOne [Complaint, ¶¶40-59]

21.    Prior to the WorkflowOne Acquisition, WorkflowOne was a commercial printer and a competitor of Standard Register. Prior to 2009, twenty of the Workflow Debtors (predecessors to WorkflowOne) were borrowers and/or guarantors under a $111 million (plus other obligations) Workflow First-Lien Facility and (b) a $140 million Workflow Second-Lien Loan (of which Silver Point affiliates held approximately $111 million). Both loans, the Workflow Secured Loans, constituted the Workflow Debtors' primary secured indebtedness.

22.    During the fourth quarter of 2008, the Workflow Debtors were unable to make the substantial interest payments due under the Workflow First-Lien Facility, necessitating entry into forbearance agreements and later capitalization of interest on the Workflow Second-Lien Loan. Shortly thereafter, Silver Point Finance replaced Credit Suisse as agent under the Workflow Second-Lien Loan.

23.    In the second quarter of 2009, the Workflow Debtors sought to restructure their secured indebtedness by first obtaining short-term covenant relief through amendments to the Workflow Secured Loans, and second through undertake a high-yield bond issuance to pay off the Workflow First-Lien Facility and a portion of the Workflow Second-Lien Loan. However, the Workflow Debtors could not obtain the consent of certain Silver Point affiliates, whose consent was necessary to undertake the transaction due to their controlling position.

24.     During the period prior to September 2010, Silver Point affiliates began acquiring portions of the Workflow First-Lien Facility.  In the spring of 2010, the Workflow Debtors sought and reached an agreement with certain of their first-lien lenders to extend the maturity date of the first tranche of their first-lien revolver, but the sole lender under the other, $6.8 million tranche – a Silver Point affiliate that also held a controlling position in the Workflow Second-Lien Loan – refused to extend the maturity of the second tranche.

25.     As a result of Silver Point's refusal to consent to either a refinancing transaction or extend the maturity of the second revolver tranche of the Workflow First-Lien Facility, the Workflow Debtors were forced into bankruptcy to avoid a default and foreclosure.

26.     On September 29, 2010, Workflow Debtors filed chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Virginia.  In the affidavit in support of their bankruptcy petitions and first-day pleadings, the Workflow Debtors alleged that Silver Point "ha[d] frustrated the [Workflow Debtors'] refinancing efforts" and that "no deal could be reached with" Silver Point.

27.     Silver Point rushed the Workflow Debtors through their chapter 11 proceeding by, *inter alia*, seeking to terminate or otherwise limit the Workflow Debtors' exclusivity periods during which only the Workflow Debtors could propose a chapter 11 plan. The Workflow Debtors' chapter 11 plan of reorganization (the "Workflow Plan") was confirmed by order dated February 25, 2011.

28.     Through the Workflow Plan, WF Holdings, a defendant in the Complaint and an entity affiliated with Silver Point, purchased all of the assets of the Workflow Debtors pursuant to section 363 of the Bankruptcy Code. In addition, through the Workflow Plan, the Workflow Secured Loans were converted into first- and second-lien notes issued by WF

Holdings and secured by first and second liens on the acquired assets.  Further, pursuant to the Workflow Plan, Silver Point obtained approximately 33% of the membership interests in WF Holdings.

29.    WF Holdings did not assume the Workflow Debtors' underfunded defined-benefit pension plan, which was left with the Workflow Debtors and terminated by the Pension Benefit Guaranty Corporation (the "PBGC") – ███████████████████ ███████████████████████████████ ███████████████████.

30.    ████████████████████████████████ ████████████████████████████████) the bulk of the New Workflow Loans and Silver Point Finance became the agent under the New Workflow First-Lien Loan.  As noted earlier, ████████████████████████████████ ██████████.

**D.    The WorkflowOne Acquisition (the Fraudulent Conveyance Transaction) and Transaction Bonuses [Complaint, ¶¶68-93, ¶¶120-123]**

31.    ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████.



32.

33.

34.

35.    For example, Morgan and Ginnan had a significant personal interest in pursuing the WorkflowOne Acquisition by virtue of their interest in maintaining their senior officer positions and receiving significant bonuses and other compensation upon consummation of the acquisition. In fact, by virtue and through the WorkflowOne Acquisition, Morgan's and Ginnan's total compensation more than doubled in 2013 as compared to 2012. Both Morgan and Ginnan received transaction related bonuses of $900,000 and $325,000, respectively. Their total 2013 compensation packages were on par with those of the CEO and CFO of Cenveo, a competitor with nearly double the Debtors' revenues.

36.    Notwithstanding their knowledge of, among other things, the deteriorating state of the industry, Gi

50409555.1

██████████████████████████████████████████

████████████████████.

37.   ██████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████.

38.   The Board and the Director and Officer Defendants nevertheless agreed to pay $218 million, including incurring $210 million of assumed debt secured by new liens on Standard Register's assets, for WorkflowOne, notwithstanding WorkflowOne's deteriorating revenues and the fact that the value of WorkflowOne was significantly and materially less than $218 million.   The midpoint enterprise valuation implied by applying traditional valuation methodologies to WorkflowOne was just $134 million, ████████████████████████

████████████████████.

39.   As consideration for the WorkflowOne Acquisition:

- SRC paid $1.00 to WF Holdings in exchange for 100% of the equity interests in WorkflowOne,
- SRC became an additional borrower under the New Workflow First-Lien Loan, which was converted into the First-Lien Term Loan term loan at the closing of the WorkflowOne Acquisition,
- SRC became an additional borrower under the New Workflow Second-Lien Loan, which was reduced in principal amount to $86,246,740.38 (as modified, the "Second-Lien Term Loan").
- the maturity date of the Prepetition Term Loans was amended to August 1, 2018.
- the other Prepetition Obligor Debtors became guarantors of the Prepetition Term Loans,
- Standard Register issued equity and warrants to Silver Point valued at approximately $8 million,

- SRC agreed to assume all of WorkflowOne's other liabilities, and
- all of the Prepetition Obligor Debtors granted first and second SR Term Loan Liens on certain of their assets in support of their newly assumed obligations under the Prepetition Term Loans.

40.     As a result of the WorkflowOne Acquisition, the Prepetition Obligor Debtors incurred $210,000,000 of new SR Term Loan Obligations to the Term Loan Defendants ($123,753,259.62 under the First-Lien Term Loan and $86,246,740.38 under the Second-Lien Term Loan).     Through the assumption of the Prepetition Term Loans, Standard Register approximately quintupled its long-term funded debt overnight.

41.     In addition to the exorbitant principal obligations Standard Register incurred, the Prepetition Term Loans significantly limited Standard Register's financial flexibility in the face of secular headwinds and meaningful risk in implementing a financial turnaround.  For example, the First-Lien Term Loan (a) required the Debtors to make principal amortization payments of $2,500,000 per quarter (prior to the WorkflowOne Acquisition, Standard Register had no ongoing principal amortization requirements because its only long-term debt was a revolving credit facility), (b) required the Debtors to make mandatory repayments of between 50% and 75% of their excess cash flow and the proceeds of asset sales, (c) bears interest at adjusted LIBOR plus 7.00%, and the Second-Lien Term Loan bears interest at adjusted LIBOR plus 8.65%.

42.     Due to the massive amount of debt the Debtors incurred through the WorkflowOne Acquisition, the Debtors' interest expense skyrocketed.  During the first three quarters of 2014, the Debtors' interest expense was approximately $15 million, or approximately $20 million on an annualized basis, as compared to $1.2 million in the first half of 2013 (prior to the WorkflowOne Acquisition).

43.    Based on ongoing secular headwinds, significant risks to the financial projections for the combined company, and the burdens imposed by the Prepetition Term Loans, the Director and Officer Defendants should have realized that the WorkflowOne Acquisition would leave the Debtors unreasonably overleveraged and posed a material and unreasonable risk that the Debtors would be unable to satisfy their debts as they came due.

44.    Moreover,



45.    Prior to the WorkflowOne Acquisition,

. From 2010 through the first half of 2013 (immediately before the WorkflowOne Acquisition), the Debtors paid approximately $96 million of pension contributions.    As of June 30, 2013, Standard Register's pension benefit liability was approximately $239 million.

46.    Because Silver Point knew that the WorkflowOne Acquisition would leave the Debtors significantly overleveraged, that the Debtors faced a significant risk that they

would be unable to repay their debts, and that the Debtors would thereafter need to use a chapter 11 proceeding to eliminate their pension liability (in addition to other liabilities), Silver Point did not act in good faith in extending the Prepetition Term Loans to the Prepetition Obligor Debtors through the WorkflowOne Acquisition.

47.     By seizing on the Board's and the Director and Officer Defendants' desire to do any deal so long as Standard Register was the acquirer, Silver Point positioned itself to ████████████████████████████████████████████████████████████████ ███████████████, and obtain the full benefit of the Standard Register's operating cash flow for itself.

**E.     Silver Point's Ownership and Influence [Complaint, ¶¶ 124-142]**

48.     In addition to assuming WorkflowOne's obligations under the Prepetition Term Loans, the Debtors also issued warrants to the lenders under the Second-Lien Term Loan (primarily Silver Point affiliates) convertible into 2,645,952 shares of common stock in SRC. As a result of the WorkflowOne Acquisition, Silver Point obtained control of approximately 29.6% of the common stock of SRC.

49.     Silver Point also obtained the right to appoint, and did appoint, two directors to the Board. Silver Point's initial appointees to the Board were Anthony DiNello (a Silver Point employee and a member of the audit committee) and Robert Peiser, an outside director.  Peiser, a member of the corporate governance and nominating committee of the Board and the chair of the compensation committee, ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████.

50.     Peiser (and later, Frederic Brace, who succeeded DiNello on the Board ███████████████████████████) are members of the Board's three-member strategy

committee formed in January 2015 to evaluate the Debtors' strategic alternatives, which

eventually led to the commencement of these Chapter 11 Cases.

51.     Commencing in May 2014, with two of Silver Point's appointees on the

Board (including DiNello, a Silver Point employee), ████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Petition Date.

52.     Between June 11, 2014 and December 5, 2014, Silver Point sold 364,200

shares of SRC's common stock, as reflected on the chart annexed to the Complaint as Exhibit A.

In total, between May 5, 2014 and December 5, 2014, Silver Point sold 556,800 shares of SRC's

common stock, comprising nearly 20% of all of the Debtors' shares traded during that period.

Silver Point's sales of stock were among the largest sales involving the Debtors' stock during

that period.

53.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████.  On December 24, 2014, DiNello resigned from the Board in an apparent

attempt to isolate Silver Point from the Debtors' management.  It is safe to infer that at this point

Silver Point was planning its strategy to force the Debtors into bankruptcy.

54.     On December 27, 2014, the Debtors retained Lazard Middle Market LLC

to, among other things, identify and evaluate potential candidates for a sale transaction.

55.     On January 21, 2015, the Debtors, Silver Point Finance, and certain of the

Term Loan Defendants entered into amendments to the Term Loan Amendments, pursuant to

which, among other things, (a) the testing date for certain covenants under the Prepetition Term

Loans was extended from December 31, 2014 to February 27, 2015 and (b) the Debtors' right to reinvest the proceeds of asset dispositions were further restricted. ██████████████████ ████████████████████████████.

56.    Instead, on January 27, 2015, Silver Point provided the Debtors with a term sheet for debtor-in-possession financing and a proposed stalking horse bid for substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, as it had contemplated prior to entering into the WorkflowOne Acquisition.  Due to Silver Point's refusal to provide longer-term covenant relief, the selection of a Silver Point affiliate as the stalking horse bidder was made with absolutely no prior marketing of the Debtors' assets, thereby impairing the Debtors' ability to maximize the value of their assets for the benefit of all stakeholders (as opposed to its own interests).

57.    As it had done with the Workflow Debtors (██████████████████ █████████████████████████), Silver Point caused the Debtors to commence these Chapter 11 Cases on March 12, 2015 to effectuate an acquisition of the Debtors' assets free and clear of liens and claims (including but not limited to the Debtors' underfunded pension liability) pursuant to section 363 of the Bankruptcy Code, with a Silver Point affiliate credit bidding a substantial portion of the Prepetition Term Loans as the stalking horse purchaser.

## RELIEF REQUESTED

58.    The Committee seeks entry of an order substantially in the form attached as **Exhibit 2** granting it authority and standing to assert, prosecute and, if appropriate, settle causes of action against the Defendants in this Court, and to take such other action as may be necessary or appropriate in connection therewith (the "Proposed Order").

## BASIS FOR RELIEF

59.     In chapter 11 cases where no trustee has been appointed, the Bankruptcy Code provides that a debtor-in-possession enjoys the powers that would otherwise vest in a bankruptcy trustee. *See* 11 U.S.C. § 1107(a). In conjunction therewith, a debtor is vested with the fiduciary duty to maximize the value of the estate for purposes of distribution to all parties in interest. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc) ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors"); *see also In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (holding that a debtor has a fiduciary duty to refrain from conduct that may damage the estate); *In re Commodore Int'l, Ltd.*, 262 F.3d 96, 99 (2d Cir. 2001) (finding that a debtor-in-possession "has an obligation to pursue all actions that are in the best interests of creditors and the estate").

60.     It is well settled, however, in this and other circuits that, under appropriate circumstances, bankruptcy courts may allow an official committee to commence and pursue litigation on behalf of the estate. *See Cybergenics*, 330 F.3d at 580; *Official Committee of Unsecured Creditors v. Barron (In re Polaroid Corp.)*, 2004 Bankr. Lexis 841, 2004 WL 1397582 (Bankr. D. Del. June 22, 2004); *Official Committee of Unsecured Creditors v. Cablevision Systems Corp. (In re Valley Media, Inc.)*, 2003 Bankr. Lexis 940, 2003 WL 21956410 (Bankr. D. Del. Aug. 14, 2003).

61.     Where no trustee has been appointed, the fiduciary duty of the debtors' management may require them to seek avoidance of transfers the debtor itself made, which "immediately gives rise to the proverbial problem of the fox guarding the henhouse." *Cybergenics*, 330 F. 3d at 573-74. Suspecting that "if managers can devise any opportunity to

50409555.1

avoid bringing a claim that would amount to reputational self-immolation, they will seize it" is natural. *Id*. at 573.

62.     Courts following *Cybergenics* in the Third Circuit have determined that derivative standing will be conferred when a creditor or creditors' committee demonstrates:  (i) a colorable claim; (ii) a debtor's unjustified refusal to pursue that claim; and (iii) permission of the bankruptcy court to commence the action. *In re Washington Mutual, Inc.*, 461 B.R. 200, 254 (Bankr. D. Del. 2011); *In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (Bankr. D. Del. 2004); *Valley Media*, 2003 Bankr. Lexis 940, at *5-*6.  The burden is on the creditor or the creditors' committee to demonstrate that these prerequisites to standing have been satisfied.  *G-I Holdings, Inc.*, 313 B.R. at 629.

63.     One of the concerns underpinning the *Cybergenics* decision to confer standing upon a creditors' committee was that a debtor-in-possession may be reluctant to pursue types of claims against its own management. *Id*., at 573-74.  Indeed, when there is no trustee in place, a debtor's management enjoys the powers afforded a debtor-in-possession under 11 U.S.C. § 1107(a).

64.     Notwithstanding that *Cybergenics* and its progeny appear to address derivative standing to pursue avoidance actions against a debtor's directors and officers, there is nothing to suggest that derivative standing should not be applied to claims outside the scope of avoidance actions so long as the creditor or creditors' committee show that a debtor has a colorable claim that it unjustifiably refuses to pursue and the Court enters an appropriate order granting the creditors' committee derivative standing. *See, e.g., Washington Mutual*, 461 B.R. at 254-67 (determining that equity committee had established a colorable claim for equitable

subordination or disallowance of claims); *Official Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies, Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003) (finding that the creditors' committee had standing to pursue claims against the debtor's pre-petition lenders and related parties for claims based on (i) the lenders' status as insiders, including equitable subordination, (ii) preference, (iii) fraudulent conveyance, (iv) deepening insolvency; (v) aiding and abetting the debtors' breach of their fiduciary duty; (vi) declaratory relief regarding equity in repurchased receivables; and (vii) disgorgement of fees, expenses and other payments related to the foregoing claims). *See also Order Granting the Creditors' Committee Standing to Prosecute Actions on Behalf of the Debtors' Estates Against the Debtors' Management Defendants . . .*, entered in *In Re Syntax-Brillian Corp.*, Case No. 08-11407 (Bankr. D. Del. Nov. 25, 2008) [D.I. 677] (granting standing to the creditors' committee to pursue claims and actions against the debtors' directors and officers for breach of fiduciary duties based upon their failure to implement adequate financial procedures and controls and to exercise proper oversight over the debtors' operations resulting in substantial damage to the debtors and ultimately their creditors.); *Emergency Motion of Debtors for Entry of an Order (I) Granting the Creditors' Committee Standing to Prosecute Actions on Behalf of the Debtors' Estates . . .*, *Syntax-Brillian, supra*. [D.I. 644].

65.     Thus, courts may confer upon a creditors' committee the authority to pursue claims against a debtor's directors and officers that fall outside the scope of avoidance actions. Therefore, provided the Committee demonstrates that the Debtors have colorable claims against the Defendants that the Debtors refuse, explicitly or implicitly, to pursue, the Committee should be authorized to proceed as requested herein.

50409555.1

66.     As will be shown herein, the Committee has significant, colorable claims, in the form of the causes of action set forth in the Complaint, against the Defendants.

**A.      The Causes of Action Assert Colorable Claims.**

67.     As a result of its investigation, the Committee has determined that the Debtors' estates have colorable claims against the Defendants that, if successful, would significantly benefit the estates.

68.     To establish the colorable claim element of the derivative standing test, the Court must determine "whether the Committee has asserted 'claims for relief that on appropriate proof would support a recovery.'" *G-I Holding*, 313 B.R. at 631 (quoting *STN Ent.*, 779 F.2d at 905). "'Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'" *Id. (quoting In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (internal quotations omitted)).

69.     "The threshold for stating a colorable claim is low and mirrors the standard applicable to a motion to dismiss for failure to state a claim." *Washington Mutual*, 461 B.R. at 255; *In re Centaur, LLC*, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (same); *Adelphia Comm. Corp.*, 330 B.R. at 376 (acknowledging that the burden of showing a colorable claim is a "relatively easy one").

70.     Under Federal Rule of Civil Procedure 8(a)(2), which is incorporated into adversary proceedings by Bankruptcy Rule 7008, a complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotations omitted); *See also In re Optim Energy, LLC*, 2014 WL 1924908, at *6 (Bankr. D. Del.

-21-

May 13, 2014). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Detailed factual allegations are not required." *Id.* (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

71.    The Committee recognizes that is must do more than merely recite the bare elements of a cause of action. *See Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 311 (Bankr. D. Del. 2011). As a review of the Complaint demonstrates, the Committee has alleged more than sufficient factual allegations which, taken as true and with all reasonable inferences, support the conclusion that the claims are plausible. For these reasons and those set forth below, the causes of action, as alleged in the Complaint, are colorable.

i.    **The Avoidance Actions – Fraudulent Transfers [Counts 1 through 4 and Counts 16 through 19]**

72.    The facts set forth in the Complaint support strong, not only plausible, claims for constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code and the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code. §§ 1336.01 et seq 1336.04(A)(2), relating to: (a) the Debtors' assumption of the SR Term Loan Obligations and granting of the SR Term Loan Liens; (b) payment of Transaction Bonuses to certain Director and Officer Defendants in connection with the WorkflowOne Acquisition; and (c) payment of transaction fees on behalf of and for the benefit of WF Holdings in connection with WorkflowOne Acquisition.

73.    A properly plead fraudulent conveyance claim under section 548(a)(1)(B) of the Bankruptcy Code must allege that the debtor was either (a) insolvent on the date the transfers were made or became insolvent as a result of the transfers; (b) engaged in business or a transaction, or was about to engage in business or a transaction, for which any property

remaining with the debtor was an unreasonably small capital, or (c) intended to incur, or believed

that it would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

74.   Similarly, Ohio Rev.Code § 1336.04, provides in pertinent part:[5]

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code § 1336.04(A)(2).  Ohio Rev.Code § 1336.05(A) states:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Ohio Rev.Code § 1336.05(A).

75.   The Ohio Uniform Fraudulent Transfer Act substantially tracks section

548 of the Bankruptcy Code and a finding that the aforementioned transfers are fraudulent is

warranted under either statute. *See The Litig Trust of MDIP Inc. v. De La Rue Cash Systems Inc.*

*(In re MDIP Inc.)*, 332 B.R. 129, 132 (Bankr. D. Del. 2005) (denying defendants' motion for

---

[5]   Pursuant to section 544 of the Bankruptcy Code, the Debtors' estates can assert a fraudulent conveyance action under applicable state law.  Since Standard Register was formed under Ohio law, Ohio Rev. Code applies.

summary judgment for actions brought under section 1336.04(A)(2) of Ohio UFTA and section 548 of the Bankruptcy Code); *In re Grove-Merritt*, 406 B.R. 778, 804-05 (Bankr. S.D. Ohio 2009) (holding that "relevant provisions of the Ohio UFTA are nearly identical to the [Bankruptcy Code] except that the Ohio UFTA extends the reach-back period to four years.")

76.    The allegations, as set forth in the Complaint, sufficiently demonstrate, when taken as true, that the WorkflowOne Acquisition, the incurrence of $210 million in the SR Term Loan Obligations and granting of the SR Term Loan Liens to secure those obligations, and payment of related Transaction Bonuses, constitute fraudulent transfers under federal and state law.

77.    In paragraphs 90 through 103 of the Complaint, the Comittee sets forth detailed facts that Standard Register did not receive reasonably equivalent value in the WorkflowOne Acquisition. It states that three years prior to the WorkflowOne Acquisition the

78.

79.

50409555.1



80. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████.

81. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████.

82.    "Reasonably equivalent" value is not defined by the Bankruptcy Code, and it is not based on a strict mathematical formula. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 148 (3d Cir.1996); *In re MDIP,* 332 B.R. at 133. Instead, courts consider the totality of the circumstances. *In re R.M.L., Inc.,* 92 F.3d at 153. Courts have generally considered three factors: (1) whether the transaction was at arm's-length; (2) whether the transferee acted in good faith; and (3) the degree of difference between the fair market value of the assets transferred and the price paid. *Id.* at 145. A court "must examine all aspects of the transaction to measure carefully the value of the

benefits received by the plaintiff." *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt.)*, 320 B.R. 265, 280 (Bankr. D. Del. 2005) (*citing Mellon Bank*, 92 F.3d at 154). *See also In re Tronox, Inc.*, 503 B.R. 239, 295 (Bankr. S.D.N.Y. 2013) (finding that plaintiff easily demonstrated that Tronox received less than reasonably equivalent value). Significantly, given that "reasonable equivalence has a large factual component," dispositive motions are rarely granted on account of fraudulent conveyance claims. *In re MDIP*, 332 B.R. at 133.

83.     Further, Silver Point did not have the required good faith when it burdened the Debtors with massive secured debt in exchange for inadequate consideration. *See Le Café Crème v. Le Roux (In re Le Café Crème)*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000) (noting that under constructive fraudulent law "[g]ood faith is required of both the transferor and the transferee"). Lack of good faith "imports a failure to deal honestly, fairly and openly" and can be found if one of more of the following factors is lacking: "(1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of the others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *S. Indus. V. Jeremias*, 66 A.D.2d 178, 183 (N.Y. App. Div. 1978). Good faith may also be lacking "because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer...." *In re Checkmate Stereo & Elecs., Ltd.*, 9 B.R. 585, 617 (Bankr. E.D.N.Y. 1981). Based on the lack of good faith by the Term Loan Defendants, the Term Loan Defendants cannot establish that the Debtors received "reasonably equivalent value" in the WorkflowOne Acquisition.

84.     The Complaint further asserts that ███████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████.

85.     Thus, the detailed facts and allegations contained in the Complaint (which must be accepted as true), combined with all reasonable inferences therefrom, lead to the very plausible conclusion that the value of WorkflowOne was significantly and materially less than (a) the amount of the SR Term Loan Obligations incurred by the Prepetition Obligor Debtors and (b) the value of the SR Term Loan Liens granted by the Prepetition Obligor Debtors and, therefore, the Prepetition Obligor Debtors did not receive reasonably equivalent value for the incurrence of the SR Term Loan Obligations or the granting of the SR Term Loan Liens.

86.     Further, in paragraphs 104 through 108 of the Complaint, the Committee sets forth facts leading to the very plausible conclusion that Standard Register was rendered insolvent by the WorkflowOne Acquisition.    It states that, prior to the WorkflowOne Acquisition, Standard Register announced that it was suspending quarterly dividends pursuant to Ohio law, which requires that cash dividends be paid only out of a corporation's statutory surplus. Because Standard Register's shareholders' equity had turned negative, there was no longer a surplus from which to pay dividends.

87.     Moreover, the Committee more than adequately alleges facts, not just boilerplate conclusions, demonstrating that immediately following the WorkflowOne Acquisition the Debtors' liabilities exceeded the fair value of their assets. At the time of the WorkflowOne Acquisition, the pro forma combined company had approximately $261 million of funded debt obligations, $7 million of capital lease obligations, $235 million of unfunded

pension liability, $3 million of deferred compensation obligations, and $4 million of reported environmental liabilities, for combined total debt and non-operating liabilities of $511 million.

88.     The Complaint also alleges facts that following the WorkflowOne Acquisition, the Debtors' total debt and non-operating liabilities of $511 million exceeded the midpoint fair value of their assets (based on a comparable companies analysis, comparable transactions analysis, discounted cash flow analysis including synergies, and including net operating losses) by approximately $170 million.

89.     Therefore, the Debtors were left insolvent as a result of the WorkflowOne Acquisition.

90.     Moreover, in paragraphs 109 through 115 of the Complaint, the Committee sets forth more than adequate facts that the WorkflowOne Acquisition left the Debtors with unreasonably small capital. The Committee asserts that following the WorkflowOne Acquisition, the Debtors had total adjusted debt and non-operating liabilities of 6.6 times projected *pro forma* combined 2013 EBITDAP[6] and 6.4 times projected 2014 EBITDAP. Under any of the traditional valuation methodologies, this exceeds the implied valuation range for the Debtors.

91.     In contrast, the Debtors' competitors and comparable companies[7] had a median total adjusted debt of just 1.9 times estimated 2013 EBITDAP. The Debtors' severe undercapitalization was reflected in their leverage ratio and in comparison to their peers. Following the WorkflowOne Acquisition, the ratio of Standard Register's total liabilities-to-

---

[6]  EBITDAP stands for Earnings Before Interest, Taxes, Depreciation, Amortization, and Pension income or expense, a non-GAAP earnings metric commonly used by companies with significant pension obligations.

[7]  For purposes of this analysis, comparable companies include Avery Dennison, Consolidated Graphics, Deluxe, Quad/Graphics, RR Donnelley, and Transcontinental.

50409555.1

capitalization was 147%.[8] By stark contrast, the median of the total liabilities-to-capitalization ratio for comparable companies at the time of the WorkflowOne Acquisition was approximately 29%.

92.    The Complaint further alleges that the excessive debt and other obligations the Debtors incurred through the WorkflowOne Acquisition severely constrained their financial flexibility, including secular declines in print products and related services, the erosion of healthcare service offerings as a result of the widespread implementation of electronic health records, and merger-related risks.

93.    Compounding this issue, the Debtors' cash needs following the WorkflowOne Acquisition were substantial. At the time of the WorkflowOne Acquisition, in addition to debt service in excess of $15 million annually on the Prepetition Term Loans, the Debtors projected that they would incur pension funding obligations of approximately $40 million in each of 2014 and 2015 and cumulative costs to achieve synergies of approximately $34 million over the same period. At the time of the WorkflowOne Acquisition, the combined company's total debt represented approximately 10.7 times its estimated 2014 unlevered free cash flow.

94.    Therefore, the allegations contained in the Complaint are sufficient to establish that the Debtors were left with unreasonably small capital after the WorkflowOne Acquisition.

95.    Lastly, the detailed allegations set forth in the Complaint, including in paragraphs 116 through 119 of the Complaint, are sufficient to demonstrate that, through the WorkflowOne Acquisition, Standard Register incurred debts beyond its ability to pay. For

---

[8]    Total Liabilities includes funded debt, capital leases and underfunded pension obligations. The calculation of the total liabilities-to-capitalization ratio is based on the midpoint valuation under the traditional valuation methodologies.

instance, the Prepetition Term Loans saddled the Debtors with substantial additional expenses, including $10 million of amortization payments per year under the First-Lien Term Loan, mandatory principal payments consuming as much as 75% of the Debtors' excess cash flow, and annual interest expense of approximately $20 million (nearly ten times their annual interest expense before the WorkflowOne Acquisition). This excessive leverage in the Debtors' capital structure severely limited the Debtors' financial flexibility.

96.



97.    The Director and Officer Defendants, with due care and appropriate inquiry, and in the absence of any personal interest, should have known that the WorkflowOne Acquisition had an unreasonably high potential to render the Debtors unable to pay their debts as they became due, given the significant risks inherent in their financial projections (and in particular, their revenue projections).    Accordingly, the Complaint adequately pleads that Standard Register incurred debt beyond its ability to pay.

98.    In light of the fraudulent nature of the WorkflowOne Transaction, and for substantially the same reasons, the Transaction Bonuses and the $5,757,000 in fees paid by Standard Register for the benefit of WF Holdings on account of fees incurred by WF Holdings' professionals are also fraudulent.

ii.     **Objection to the Extent and Validity of Liens Asserted by Term Loan Defendants and Prepetition ABL Defendants [Counts 5 and 11]**

99.     Pursuant to the terms of the final financing order entered in this case [D.I. No. 260], the Debtors have stipulated that Silver Point Finance, as agent under the First-Lien Term Loan and the Second-Lien Term Loans, and the Prepetition ABL Agent hold perfected liens on and security interests in substantially all of the Prepetition Obligor Debtors' assets.  The applicable Defendants have failed to provide the Committee with any documents evidencing that they held a valid and perfected security interest in, or lien on, the ABL Unencumbered Assets and the Term Unencumbered Assets, which are expressly described in Exhibits B and C to the Complaint.

100.     The dispute over the adequacy of prepetition liens includes, but is not limited to, (i) any properly filed valid mortgages or deeds of trust on the real property and fixtures located thereon, (ii) any evidence that the applicable Defendants have been added to the title of any of the Debtors' vehicles, (iii) any account control agreements related to bank accounts or petty cash, and (iv) any properly filed perfection documents or other document on account of the Debtors' copyrights, commercial torts, tax returns, foreign inventory and equipment, life insurance policies and other assets set forth on Exhibits B and C to the Complaint.

101.     Similarly, certain Pledge and Security Agreements governing the Prepetition Term Loans and the Prepetition ABL Loans exclude certain of the Debtors' assets as collateral, including the Debtors' complete or partial equity ownership in certain foreign subsidiaries, as well as assets related to computer programs and related computer agreements and materials. Therefore, the Committee seeks a declaration that the Term Excluded Assets and ABL Excluded Assets are unencumbered.

50409555.1

102.   For the foregoing reasons, the Committee has a colorable claim to seek a determination as to the validity, perfection, and enforceability of the Term Loan Liens and the Prepetition ABL Liens asserted by the Term Loan Lenders and the Prepetition ABL Lenders, against the Unencumbered Assets, and, to the extent they are determined to be invalid, unperfected, or unenforceable, demand judgment in its favor and against the Term Loan Lenders and the Prepetition ABL Lenders, (a) declaring any of the Term Loan Liens and the Prepetition ABL Liens that were not duly perfected as of the Petition Date, or that are voidable or unenforceable under applicable law, null and void and/or avoided and (b) directing that any Unencumbered Assets or proceeds thereof that have been applied to the Prepetition Term Loans or the Prepetition ABL Loan, as applicable, be disgorged by the recipients thereof and the value thereof returned to the Debtors' estates.

### iii.   Recharacterization and Disallowance of Payments of Postpetition Interest, Fees, and Expenses [Counts 6 and 12]

103.   To the extent the Prepetition Term Loans or the Prepetition ABL Loans, as applicable, were undersecured as of the Petition Date or were rendered undersecured as a result of the Committee's assertions herein and in the Complaint, all postpetition fees, interest, and expenses allowed by the final postpetition financing order and paid to the Prepetition Term Lenders and/or the Prepetition ABL Lenders on account of the voided or avoided obligations should be disallowed or treated as repayment of principal.  Section 506(b) of the Bankruptcy Code provides for certain payments, including of interest, but only to the extent a party is oversecured.

### iv.   The Director and Officer Defendants' Breaches of Fiduciary Duties [Complaint, Count 15]

104.   As set forth more fully in the Complaint, the Debtors' estates have plausible and viable claims against the Director and Officer Defendants for, among other things,

50409555.1

breaches of the fiduciary duties of care, loyalty, and good faith related to the WorkflowOne Acquisition. *See* O.R.C. § 1701.59(b).

> 105.    In relevant part, section 1701.59 of the Ohio Revised Code provides:
>
> A director shall perform the director's duties as a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A director serving on a committee of directors is acting as a director.

O.R.C. § 1701.59(b).

106.    It is well-settled under Ohio Law that "a corporate [director] occupies a position of trust in relation to his corporation. Such relationship imposes upon directors duties in the nature of a fiduciary obligation which includes good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure." *U.S. v. Skeddle*, 940 F. Supp. 1146 (N.D. Ohio 1996) (*citing Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App.3d 178, 181, 542 N.E.2d 671 (1988)).

107.    Further "under long-standing Ohio law, the officers and directors of a corporation that is insolvent or is on the brink of insolvency owe a fiduciary duty to the corporation itself and to its creditors not to waste corporate assets which otherwise could be used to pay corporate debts." *In re National Century Financial Enterprises, Inc.*, 504 F.Supp.2d 287 (S.D. Ohio 2007); *but see In re Amcast Indus. Corp.*, 365 B.R. 91, 96-97 (Bankr. S.D. Ohio 2007) (acknowledging the scope of the director's duty to creditors upon insolvency is not as broad as the duty to the corporation itself).

108.    Further, the duty of care requires directors to "exercise a requisite degree of care in the process of making decisions and in other aspects of their directorial

responsibilities." *In re Regional Diagnostics, LLC*, 372 B.R. 3, 28 (Bankr. N.D. Ohio 2007) (denying motion to dismiss complaint brought by creditors alleging breaches of fiduciary duties related to a leveraged buy-out transaction). "Ohio courts have held that corporate officers may be held personally liable for acts of a corporation if they took part in the act, specifically directed the act to be done, or participated or cooperated in the commission of the act." *In re Antioch Co.*, 456 B.R. 791, 860 (Bankr. S.D. Ohio 2011) *report and recommendation adopted*, 2011 WL 3664564 (S.D. Ohio Aug. 12, 2011) *on reconsideration, sub nom. Antioch C. Litig. Trust v. Morgan*, 2012 WL 6738676 (S.D. Ohio Dec. 31, 2012).

109.     Breaches of fiduciary duty exist where (i) the director has not acted in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, or with the care that an ordinarily prudent person in a like position would use under similar circumstances" and (ii) "the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation. *See* Ohio Rev. Code Ann. §§ 1701.59(C) and 1701.59(D).

110.     Director and Officer Defendants' expectation of personal benefit from the WorkflowOne Acquisition, wasting of corporate assets of an insolvent company, and being uninformed or not sufficiently informed constitute breaches of fiduciary duties. *See Antioch C. Litig. Trust v. Morgan*, 2012 WL 6738676 (S.D. Ohio 2012) ("corporate waste and gross mismanagement are ways in which a corporate director's fiduciary duty can be breached").

111.     Here, the Complaint sets forth specific facts with respect to the Director and Officer Defendants' breaches of fiduciary duties.   Among other things, the Complaint alleges that certain of the Director and Officer Defendants had a personal interest in assuring that

the WorkflowOne Acquisition would be consummated in light of their bonuses and significant increases in compensation linked to the transition as well as their endorsement of unreasonably optimistic projections, which were not prepared in good faith and upon which the acquisition was premised. The Complaint also sets forth facts that the Director and Officer Defendants' approval of the WorkflowOne Acquisition caused damage to the Debtors by rendering them insolvent and unable to pay their debts as they become due, including substantial pension obligations. The company's leverage level following the transaction was materially higher than leverage levels of its competitors. The Complaint also establishes that Standard Register did not receive reasonably equivalent value as a result of the WorkflowOne Acquisition, ████████ ███████████████████████████████████████████████.

112.   The Officer and Director Defendants voted to enter into the WorkflowOne Acquisition despite ██████████████████████████████████████████████████ ██████████ and, to support the acquisition, █████████████████████████████████████ █████████████████████████████████. By failing to fully and adequately inform themselves as to the propriety of the WorkflowOne Acquisition, the Director and Officer Defendants breached their fiduciary duties. Morgan and Ginnan breached their fiduciary duties by, among other things, ███████████████████████████████████████████████ █████████████████████████████████████████████████████, based in past history and the faltering state of the industry, were more aspirational than realistically foreseeable.

113.   These facts present more than sufficient allegations of colorable claims for breaches of fiduciary duties. *See, e.g. In re Antioch Co.*, 456 B.R. 791, 861 (Bankr. S.D. Ohio 2011) *report and recommendation adopted*, 2011 WL 3664564 (S.D. Ohio 2011) *on*

*reconsideration, sub nom. Antioch C. Litig. Trust v. Morgan*, 2012 WL 6738676 (S.D. Ohio 2012) (denying motion to dismiss breach of fiduciary duties claims where the plaintiff alleged that the debtor corporation was injured in the form of increased debt obligations that "started a downward spiral into bankruptcy").

      v.      **Preferential Transfers [Complaint, Count 14]**

114.    In the 90-days prior to the Petition Date, the Debtors became entitled to significant tax refunds, tax credits and other tax attributes for the year 2014, including those generally identified by the Debtors on Schedules B18 and B21 to the Schedules of Assets and Liabilities filed by the Debtors on May 11, 2015 [D.I. 477]. To the extent the Prepetition ABL Lenders' and the Term Loan Defendants' loans were undersecured, granting additional collateral within the preference period was an improvement of the lenders' positions, and thus subject to avoidance under section 547 of the Bankruptcy Code. *See generally, In re Qualia Clinical Service, Inc.*, 652 F. 3d 933 (8th Cir. 2011); *Matter of Clark Pipe and Supply Co., Inc.*, 893 F. 2d 693 (5th Cir. 1990). As such, the Complaint states a colorable claim.

      vi.     **Recharacterization of Second-Lien Term Loan [Complaint, Count 7]**

115.    The Complaint asserts plausible claims for recharacterization of the Second-Lien Term Loan as equity. In *In re Submicron Systems Corp.*, the Third Circuit considered a seven-factor test utilized by the District Court in determining whether to recharacterize a creditor's claim as equity: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. 432 F.3d 448, 455, n.8 (3d Cir. 2006).

116.    The Third Circuit recognized that the multi-factor test includes pertinent factors, but determined that "[n]o mechanistic scorecard" for a recharacterization inquiry. *SubMicron*, 432 F.3d at 456.    Instead, the Third Circuit explained that the various factors devolve to an "overarching inquiry" of the parties' intent, rather than a strict multi-factor test. *Id.* at 456; *see also Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 519 (Bankr. D. Del. 2011) (reading *SubMicron* to require a recharacterization analysis to focus on the overarching inquiry of the parties' intent, rather than a multi-factor test).

117.    The Complaint asserts that ███████████████████████████████ ██████ at the time of the transaction, and █████████████████████████████ ██████. In addition, unlike the First-Lien Term Loan, the Second-Lien Term Loan accrued PIK interest and did not require any mandatory amortization payments.    These facts lead to the plausible conclusion that the Second Lien Term Loan was effectively and in substance a risky equity investment by the Second-Lien lenders, rather than an extension of credit with a realistic possibility of repayment.

### vii.    Equitable Subordination and Disallowance of Silver Point Claims [Complaint, Counts 9 and 10]

118.    Equitable subordination is a remedy provided in section 510(c) of the Bankruptcy Code and is designed to "undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *U.S. v. State Street Bank and Trust Co., as Trustee for Junior Subordinated Secured PIK Notes, et al. (In re Scott Cable Commc'n)*, 2014 WL 5298031 (Bankr. D. Del. Oct. 15, 2014) (citing *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'n, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (internal citations omitted)).

-37-

119.    The Third Circuit has adopted a "widely-used three-factor test that must be satisfied before deciding whether equitable subordination of a claim is appropriate: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in an injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code." *Scott Cable Commc'n*, 2014 WL 5298031 (*citing, inter alia, Winstar*, 554 F.3d at 411).

120.    The Complaint sets forth a colorable claim with respect to equitable subordination and equitable disallowance of Silver Point's claims and liens.  To support these claims, the Complaint alleges that Silver Point was engaged in significant sales of the Debtors' stock ███████████████████████████████████████████.  This was done at a time where Silver Point's two appointees (one being DiNello, a Silver Point employee) sat on the Debtors' Board.  As members of the Board and fiduciaries, Silver Point's appointees to the Board possessed material non-public information.  Given that Silver Point's dumping of the Debtors' stock occurred at a time when the Debtors faced significant financial troubles, and that Silver Point's sale of stock during that period, as set forth on Exhibit A to the Complaint, constituted almost 20% of the stock transactions, raises serious questions as to whether Silver Point traded the Debtors' stock based on material-non public information.  As recognized by the Court in *Washington Mutual*, 461 B.R. at 254-67, potential insider transactions are grounds for equitable subordination or disallowance of claims.

121.    In addition, as set forth in the Complaint, through the WorkflowOne Acquisition, ████████████████████████████████████████████████████████████ ███████████████████████ – to seize control of Standard Register, offload its underfunded

50409555.1

pension liability onto the PBGC, and obtain the full benefit of the Debtors' operating cash flow for itself. The facts surrounding the Debtors' acquisition of WorkflowOne, all of which are sufficiently and clearly set forth in the Complaint, the pledge of the Debtors' assets as security for the obligations, the following bankruptcy filing that was contemplated in advance of the acquisition and the significant benefits conferred to Silver Point via such actions support a colorable assertion of equitable subordination and disallowance of the Silver Point Claims.

### viii.    Disallowance of Claims [Complaint, Counts 8 and 13]

122.    Finally, through Counts 8 and 13 of the Complaint, the Committee asserts plausible and colorable claims for disallowance of Term Loan Defendants' Claims and the Prepetition ABL Defendants' Claims. Section 502(d) of the Bankruptcy Code provides:

> d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522 (f), 522 (h), 544, 545, 547, 548, 549, or 724 (a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522 (i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

123.    Thus, to the extent the Term Loan Defendants' Claims and the Prepetition ABL Defendants' Claims are avoided or liens disallowed, as asserted in the Complaint, the Term Loan Defendants' Claims and the Prepetition ABL Defendants' Claims must be reduced, or eliminated, as the case may be.

### B.    The Debtors Have Failed or Refused to Pursue the Causes of Action.

124.    Having shown that the Committee has colorable claims against the Defendants, the Committee must also demonstrate that the Debtors unjustifiably failed or refused to pursue the causes of action set forth in the Complaint, which may be implied, or consented to the derivative standing of the Committee, or that the demand was futile because it in essence

asked the directors and officers to sue themselves. *G-I Holdings*, 313 B.R. at 630; *Unsecured Creditors Committee v. Noyes (In re STN Ent.)*, 779 F.2d 901, 904 (2d Cir. 1985). This requirement is satisfied as a demand would be futile for the reasons set forth below.

125.    A debtor's refusal to pursue certain actions can be implied even where no demand has been made. *G-I Holdings*, 313 B.R. at 630; *Nat'l Forge*, 326 B.R. at 544-45 (holding that bankruptcy court was justified in concluding that the debtor would have declined to file claims against directors and officers of the debtor because the debtor's "key employees" who presumably would have been instrumental in asserting such claims, were named as defendants in the complaint). To the extent demand would be futile, it is excused. *Nat'l Forge*, 304 B.R. at 222 (noting that a formal request is not required to obtain a formal refusal).

126.    A debtor's equivocation is irrelevant, because there is no actual need for a committee even to make a demand, or for a debtor to formally refuse. "[I]f the demand is presumptively futile under the circumstances . . . the failure to make the demand . . . does not prevent the court from authorizing [a creditor or] other party in interest from pursuing the matter on behalf of the estate." COLLIER ON BANKRUPTCY at ¶ 1109.05[2][a] (16th Ed. Rev. 2013); *see also G-I Holdings*, 313 B.R. at 630 ("[I]n appropriate circumstances form should not override substance. That is, a debtor's refusal . . . can be implied even where no formal demand has been made by a creditors committee").

127.    This is particularly true when, as here, the Debtors, pursuant to the DIP Order, expressly waived their right to pursue claims against Silver Point and other secured lenders and allowed their claims and liens. *See Final Order (I) Authorizing Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364,(II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C.*

§ 364; and (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (the "DIP Order") [D.I. 290]; Nat'l Forge, 326 B.R. at 544 (finding formal request of debtor to bring action waived under DIP financing orders would have been futile as debtor could not have "seriously entertained the idea"). Thus, it would have been futile to request the Debtors to pursue claims against Silver Point and other prepetition secured lenders. G-I Holdings, 313 B.R. at 630.

128.    The same principle of futility exists with respect to estate claims against the Director and Officer Defendants. The Debtors face significant conflicts of interest which preclude any unbiased business judgment as to the prosecution of the causes of action set forth in the Complaint. Here, the Defendants include certain of the Debtors' current officers and directors. These officers and directors cannot be expected to assert the breach of fiduciary claims against themselves, no matter how meritorious the claims may be. Cybergenics, 330 F.3d at 573 (noting that this "situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. . . . [I]f managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it."); see also G-I Holdings, 313 B.R. at 628. Because managers may be in control of the debtor-in-possession, a conflict of interest may result as to whether a claim should be brought, and the debtor may be unwilling to pursue such claims, Cybergenics, at 573, but "a creditors committee will not be so hesitant." Id., at 574. Further, the current officers and directors cannot be expected to assert the causes of action set forth in the Complaint against their secured lenders who are providing postpetition financing and who is currently serving as the stalking horse bidder in the anticipated sale of the Debtors' assets.

129.    Furthermore, despite the Debtors' actual or constructive awareness of the potential claims set forth in the Complaint, the Debtors have taken no action to pursue them. The obvious and unavoidable conflict of interest here is independently sufficient to satisfy the demand requirement and obviates the need for any formal demand and refusal. The Debtors' refusal may be implied.

130.    A debtor's refusal to pursue actions on behalf of the estate must be "unjustifiable." *Cybergenics*, 330 F.3d at 566-67. Derivative standing should be granted when a debtor unjustifiably or unreasonably refuses to pursue claims that the Bankruptcy Court finds would benefit the estate. *See Cybergenics*, 330 F.3d at 568; *see also In re The V Companies*, 292 B.R. 290 (B.A.P. 6th Cir. 2003). If a debtor fails to pursue litigation that is likely to benefit its estate, such failure is unjustifiable. *See, e.g., STN Enterprises*, 779 F.2d at 904-05. "The 'unjustifiable failure' of a debtor to bring the suit itself does not require an improper motive for the failure. Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate." *Adelphia*, 330 B.R. at 374, n.19 (citing *STN Ent.*, 779 F.2d at 905). A creditor need only show that a debtor was "unable or unwilling to pursue claims" on the estate's behalf. *In re Newcorn Enterprises Ltd.*, 287 B.R. 744, 749-50 (Bankr. E.D. Mo. 2002); *see also Louisiana World*, 858 F.2d at 253 (finding that "[w]here the interests of an estate and its creditors are impaired by the refusal of a trustee or a debtor-in-possession to initiate adversary proceedings to recover property of the estate, . . . that refusal [is] unjustified").

131.    Relevant factors courts consider in making this analysis include: (1) whether conflicts of interest exist between the debtor and the parties against whom the creditors'

committee's derivative action will be brought; (2) whether the creditors' interests are protected despite the debtor's refusal; (3) whether allowing the creditors' committee to pursue the action on the debtor's behalf will benefit the estate; and (4) whether appointing a trustee and allowing the trustee, as opposed to the creditors' committee, to pursue the action would be more beneficial to the estate. *In re G-I Holdings*, 313 B.R. at 643 (citing *In re Tennessee Valley Steel Corp.*, 183 B.R. 795, 806 (Bankr. E.D. Tenn. 1995)).

132.    In assessing whether the refusal is justified or not, a court should give special consideration to actual or possible conflicts of interest. *Cybergenics*, 330 F.3d at 573 (recalling the adage about the "fox guarding the henhouse"). Often it will not be realistic to order the debtor itself to pursue any claims given management's conflicts of interest. *Id.* Under these circumstances, courts have generally held that a debtor is hopelessly conflicted because the debtor is in essence asked to pursue claims against the very individuals who control the debtor-in-possession. Where the very same individuals who control the debtor are the parties who would be implicated in the suit, they are naturally adverse to such actions, so no presumption insulates management's business judgments from searching scrutiny by the courts. *In re G-I Holdings, Inc.*, 313 B.R. at 628. This is the case here. Many of the Director and Officer Defendants are the current members of senior management and directors of the Debtors. They were involved in approving the WorkflowOne Acquisition, and they were recipients of related transaction bonuses and increased compensation.

133.    Furthermore, in determining whether a debtor's refusal is unjustified, courts generally perform a cost-benefit analysis of the claims to determine whether the creditor's claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued. *Nat'l Forge*, 326 B.R. at 548. Even a "facially

50409555.1

justifiable" reason for failing to prosecute a claim "is insufficient to justify the failure to bring an action if under the circumstances the claim will benefit the estate even after attorney's fees and costs are deducted." *Canadian Pacific Forest Products Ltd. v. J.D. Irving, LTD. (In re The Gibson Group)*, 66 F.3d 1436, 1443 (6th Cir. 1995). In conducting this cost-benefit analysis, courts consider the probability of success and the potential costs of the litigation, including attorneys' fees, and whether it is preferable to appoint a trustee to bring suit instead of having the creditors' committee do so. *Id.*

134.    As discussed above and in the proposed Complaint, the actions and inactions of the Defendants in the 2 years leadings up to the Petition Date reveal a number of real and serious transgressions that, absent the Committee's involvement, will not be remedied. The potential cost of litigating the causes of action set forth in the Complaint is far outweighed by (i) the potential benefit, (ii) the potential avoidance and recovery of significant prepetition obligations and fraudulent asset transfers, including (a) granting of security interests in connection with the WorkflowOne Acquisition (b) bonuses and fees paid to insiders and advisors in connection with the WorkflowOne Acquisition; and (iii) the potential subordination, recharacterization and/or disallowance of the various claims asserted the Silver Point Defendants against the Debtors. If there is no challenge to the alleged misconduct, the interests of the Debtors' estates will not be properly protected and the Debtors' estates will have lost the opportunity to recapture significant value.

C.    **The Committee Seeks Prior Court Approval to Prosecute the Claims**

135.    The final requirement for derivative standing is whether the movant has obtained Court approval prior to asserting claims on behalf of the estate. This factor will be met if the Court grants the relief requested in this Motion. Because the causes of action set forth in

50409555.1

the Complaint are colorable and a formal demand upon the Debtors would be futile, derivative standing to the Committee to commence and prosecute these claims should be granted.

136.    Further, in considering a request for derivative standing, the Court may assess whether the underlying claims are likely to benefit the estate. *See In re G-I Holdings, Inc.*, 2006 WL 1751793, at *10 (citing *STN Enters.*, 779 F.2d at 905-06); *In re Adelphia*, 544 F.3d at 426. In weighing the cost of such litigation against the benefit which the causes of action set forth in the Complaint may generate, the Court should consider what the unsecured creditors are being offered in the absence of such litigation – which is presently <u>zero</u>. The Court, however, need not predict the future of the litigation or conduct a mini-trial. *See Adelphia*, 330 B.R. at 385. The Court need only determine that there is a possible substantial upside to the litigation of the causes of action that would be frustrated if this Motion were denied. *See Nat'l Forge*, 326 B.R. at 549-50 (rejecting argument that cost of the proposed litigation would dissipate estate resources in light of a potential recovery exceeding cost of litigation).

137.    Presently, the proposed sale to a Silver Point affiliate provides minimal value to the estate and no value to unsecured creditors on account of left-behind claims. In fact, the proposed sale to Silver Point may leave the Debtors' estates administratively insolvent. The successful adjudication or settlement of the alleged causes of action would result in a substantial benefit to the estates. This value would include making substantial sale proceeds available to unsecured creditors resulting from the unencumbering of a significant portion all of the Debtors' assets, recovery of bonuses and fees paid to insiders and advisors of the Debtors and the Silver Point Defendants, as well as the disallowance, subordination or recharacterization of claims.

50409555.1

138.    As such, the prosecution of the causes of action set forth in the Complaint, and other causes of action that the Committee may develop through discovery, should be permitted.

## NOTICE AND RESERVATION OF RIGHTS

139.    Notice of this Motion has been given to the following parties: (i) Office of the United States Trustee; (ii) counsel to the Debtors; (iii) counsel to the Prepetition ABL Agent and Agent to the Prepetition Term Loans; and (iv) all parties that have requested notice pursuant to Fed. R. Bankr. P. 2002 in these cases.  The Committee submits that, given the nature of the relief requested, no further notice is requested.

140.    The Committee reserves its rights to seek authority to commence, prosecute, and settle other claims and/or causes of action not discussed herein on behalf of the Debtors' estates against the Defendants or any other party.

141.    No prior request for the relief sought herein has been made by the Committee to this or any other Court.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order granting (i) the Committee leave, standing and authority to commence, prosecute and, if appropriate, settle the causes of action alleged in the Complaint substantially in the form attached hereto as Exhibit 1 against the Defendants on behalf of the Debtors' estates, and to exercise, enforce and prosecute any rights of the Debtors' estates with respect thereto (with any and all recoveries to be for the benefit of the Debtors' estates); and (ii) such other and further relief as the court deems just and proper, including any additional relief necessary in order to implement the foregoing.

Dated: May 18, 2015

50409555.1

Respectfully Submitted,

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973-597-2500
Facsimile:  (973) 597-2400

*-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Counsel to the Committee*

*-and-*

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (No. 3877)
Justin K. Edelson (No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

*Delaware Co-Counsel to the Committee*

50409555.1