```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE


                                .  Chapter 11
IN RE:                          .
                                .  Case No. 15-10541 (BLS)
THE STANDARD REGISTER           .
COMPANY, et al,                 .
                                .  Courtroom No. 3
                                .  824 Market Street
               Debtors.         .  Wilmington, Delaware 19801
                                .
. . . . . . . . . . . . . . .   .  Tuesday, May 12, 2015
```

```
                       TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE BRENDAN L. SHANNON
                 CHIEF UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

```
For the Debtors:             Michael R. Nestor, Esq.
                             YOUNG, CONAWAY, STARGATT
                              & TAYLOR, LLP
                             Rodney Square
                             1000 North King Street
                             Wilmington, Delaware 19801

                             Michael A. Rosenthal, Esq.
                             GIBSON, DUNN & CRUTCHER, LLP
                             333 South Grand Avenue
                             Los Angeles, California 90071
```

(Appearances Continued)

```
Audio Operator:              Electronically Recorded
                             by Dana Moore, ECRO

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:  (Continued)

For the U.S. Trustee:           David L. Buchbinder, Esq.
                                OFFICE OF THE U.S. TRUSTEE
                                844 King Street, Suite 2207
                                Lockbox 35
                                Wilmington, Delaware 19801

For the Official Committee
of Unsecured Creditors:         Wojciech F. Jung, Esq.
                                LOWENSTEIN SANDLER, LLP
                                1251 Avenue of the Americas
                                New York, New York 10020

                                Paul Kizel, Esq.
                                LOWENSTEIN SANDLER, LLP
                                65 Livingston Avenue
                                Roseland, New Jersey 07068

                                Christopher A. Ward, Esq.
                                Justin K. Edelson, Esq.
                                POLSINELLI, LLP
                                222 Delaware Avenue, Suite 1101
                                Wilmington, Delaware 19801

For Silver Point
Finance, LLC, et al:            Ron E. Meisler, Esq.
                                Christopher M. Dressel, Esq.
                                SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM, LLP
                                155 North Wacker Drive
                                Chicago, Illinois 60606

                                Sarah E. Pierce, Esq.
                                SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM, LLP
                                One Rodney Square
                                920 North King Street
                                Wilmington, Delaware 19801

For Bank of America:            Mark D. Collins, Esq.
                                RICHARDS, LAYTON & FINGER, PA
                                One Rodney Square
                                920 North King Street
                                Wilmington, Delaware 19801

(Appearances Continued)
```

```
APPEARANCES:  (Continued)

For Jefferies, LLC:          Thomas A. Labuda, Jr., Esq.
                             SIDLEY AUSTIN, LLP
                             One South Dearborn
                             Chicago, Illinois 60603

APPEARANCES VIA TELEPHONE:

For the Debtors:             Jeremy L. Graves, Esq.
                             GIBSON, DUNN & CRUTCHER, LLP

For Silver Point
Finance, LLC, et al:         Albert L. Hogan, Esq.
                             Carl Tullson, Esq.
                             SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM, LLP

For Bank of America:         C. Edward Dobbs, Esq.
                             James Rankin, Esq.
                             PARKER, HUDSON, RAINER & DOBBS
```

INDEX

|                                                        | Page |
|--------------------------------------------------------|------|
| RESOLVED MATTERS/STATUS UPDATE                         | 5    |
| DEBTORS' MOTION TO APPROVE KEIP/MOTION TO SEAL         | 10   |
|     Argument                       | 47   |
|     Court Decision                 | 59   |
| COMMITTEE'S RETENTION APPLICATIONS                     | 63   |
|     Proffered Testimony of Leon Szlezinger | 71   |
|     Court Decision                 | 96   |
| STATUS CONFERENCE                                      | 102  |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| FOR THE DEBTORS RE:  MOTION TO APPROVE KEIP | | | | |
| KEVIN CARMODY | 23,38 | 28,40 | 46 | |
|     By The Court | 45 | | | |

| Exhibit | Page |
|---------|------|
| Carmody Declaration | 28 |

1          (Proceedings commence at 10:06 a.m.)

2          (Call to order of the Court.)

3              THE COURT:  Be seated.  Mr. Nestor, good morning.

4              MR. NESTOR:  May it please the Court, Your Honor,

5     Michael Nestor of Young, Conaway, Stargatt & Taylor for the

6     debtors.

7              Your Honor, if it pleases the Court, what we'd like to

8     today is just address Items 1 through 5.  I'm not sure whether

9     you had an opportunity to look at some of the orders that were

10    submitted to the Court.  I believe 1 and 2 -- 1, an order has

11    been entered.  2 has been adjourned, with respect to Georgia

12    Pacific.  And I think that we submitted orders on 3, 4, and 5.

13             THE COURT:  I don't think I've seen the orders.  Did I

14    get a CN --

15             MR. NESTOR:  Do you want me to just give them to Ms.

16    Bello.

17             THE COURT:  What's that?

18             MR. NESTOR:  I think we had filed them, but --

19             THE COURT:  I don't have any issues with them.

20             MR. NESTOR:  Okay.

21             THE COURT:  If these matters are resolved -- and I see

22    that there's been coordination on some of them with the U.S.

23    Trustee or with the committee.  If these matters are resolved,

24    I don't have -- I won't have any issues.  I'm just not certain

1    that I've seen the orders.

2             MR. NESTOR:  Okay.

3             THE COURT:  If you don't see them on the docket by

4    this afternoon --

5             MR. NESTOR:  We'll call over.

6             THE COURT:  -- then you may call, and we'll get it

7    taken care of.

8             MR. NESTOR:  Will do, Your Honor.  And what we'd like

9    to do is, Mr. Rosenthal would like to do just an opening of

10   where we are today.

11            THE COURT:  Great.

12            MR. NESTOR:  And then we'll get into the matters that

13   are scheduled for hearing.

14            THE COURT:  Terrific.

15            MR. NESTOR:  Thank you.

16            THE COURT:  Mr. Rosenthal, good morning.  Welcome

17   back.

18            MR. ROSENTHAL:  Good morning.  Thank you.

19            Your Honor, with me and Mr. Nestor is Kevin Carmody,

20   who's the debtors' CRO.

21            THE COURT:  Great.

22            MR. ROSENTHAL:  So, Your Honor, I generally start

23   hearings by giving a little status report of where we've been

24   since the last hearing, so ...

25            THE COURT:  It's helpful.

1          MR. ROSENTHAL:  We were last before the Court when you

2     approved the DIP financing on a final basis and the procedures

3     for selling the debtors' assets.

4          We are currently waiting for the challenge period to

5     expire; that's scheduled to expire on May 26th.  And as you

6     know, there's a status conference on that at the end of this

7     hearing today.

8          THE COURT:  Right.

9          MR. ROSENTHAL:  After Your Honor entered the sales

10     procedure order last week, the diligence process with

11     prospective bidders has gotten into full swing.  We have

12     several very interested strategic and financial bidders that

13     have signed NDAs and are conducting extensive due diligence,

14     and they have been looking at our assets, they've been talking

15     to our employees.  We are hopeful that we will receive multiple

16     qualified bids, and that we'll have a robust auction on June

17     15th.

18          We may, Your Honor, be filing -- just to give you a

19     preview, we may be filing a supplement to the sale motion

20     because we have agreed with Silver Point that bidders would

21     have 90 days after a closing to designate which contracts they

22     want to assume or reject.  And so we want to -- we want to

23     implement an efficient process --

24          THE COURT:  Okay.

25          MR. ROSENTHAL:  -- for that assumption/rejection.

1          THE COURT:  That sounds fine.  That's also, I think,

2     probably helpful to allow -- to convey that information, both

3     to bidders, and also probably to contract counter-parties, to

4     the extent --

5          MR. ROSENTHAL:  Yes, the sooner we can do that, the

6     better.

7          THE COURT:  That sounds fine.

8          MR. ROSENTHAL:  In terms of bankruptcy filings, our

9     schedules were due yesterday.  Schedules and statements were

10    actually filed yesterday; extensive schedules, a lot of

11    notices, as you would expect.

12         We filed a bar date motion, and the Court has set a

13    bar date.  I just want to alert the Court that one of the items

14    in the bar date motion is a bar date for 503(b)(9) claims.

15         THE COURT:  Okay.

16         MR. ROSENTHAL:  And that bar date would expire before

17    the auction, which is important because we need to know what

18    503(b)(9) claims are --

19         THE COURT:  You need to see what the nut is.

20         MR. ROSENTHAL:  Yes.  And in that regard, Your Honor,

21    again, another preview.  We may be filing a motion to clarify

22    whether certain claims related to drop shipments are, in fact,

23    503(b)(9) claims.

24         So we would be -- we would be -- what we would be

25    doing here is we would be picking some claims that do --

1  503(b)(9) claims that have been filed, that relate to drop

2  shipments, and potentially objecting to them, and then seeing

3  if we can tee those up because it's a relatively large number.

4  We need to -- we need to know where the Court stands on these

5  things.

6          THE COURT:  That's probably -- I mean, that sounds

7  like -- I'm not saying that you need to go by way of a

8  declaratory judgment, but that's sort of what you're looking

9  for.  You're looking for a ruling that answers a common fact

10  pattern.

11          MR. ROSENTHAL:  Yes.

12          THE COURT:  Is that basically it?  That sounds fine.

13  It may be, and experience tells us, that a number of the

14  503(b)(9) claimants are probably, as well, general unsecured

15  creditors.  So I would expect -- and I know you would, anyway -

16  - that the committee would be involved in that process.

17  Because the sufficiency of that process, to make sure that

18  people are going to be actually or practically bound by a

19  particular ruling, my interest would be ensuring that there's

20  adequate notice for stakeholders and interested parties in

21  getting to that point.

22          I understand, as a practical matter, the need to fix

23  that bogey.  I mean, it's a hard dollar amount --

24          MR. ROSENTHAL:  Right.

25          THE COURT:  -- it's an admin claim, and it obviously

1    plays into, at a minimum, a sale process, but also, frankly,

2    any plan process, as well.  So that certainly sounds fine to

3    me.  The issue is one of process, and I think you've hit the

4    nail right on the head.

5          MR. ROSENTHAL:  I understand, Your Honor.  And some of

6    those claims -- as you said, some of those claims will actually

7    be cure claims --

8          THE COURT:  Yeah.

9          MR. ROSENTHAL:  -- related to assumed contracts.

10         THE COURT:  Uh-huh.

11         MR. ROSENTHAL:  So we -- we're trying to -- we're

12    trying to deal with a number of different variables.

13         THE COURT:  Okay.

14         MR. ROSENTHAL:  On the business front, the -- happy to

15    report the debtors' operations have largely stabilized, now

16    that we are approximately two months into the case.  It will

17    not surprise you when I say that the success in stabilizing the

18    debtors' business is, in part, due to the key employees who

19    we're here today to approve a KEIP plan for.

20         So that's my brief update of where we are in the case.

21    I think we'd like to take up the KEIP now.

22         THE COURT:  Okay.

23         MR. ROSENTHAL:  Your Honor, as we state in our papers,

24    the KEIP is an integral part of our goal of incentivizing key

25    employees, right-sizing our business for success, and

1    maximizing value.

2         THE COURT:  When we talk about this, if it's all right

3    Mr. Kenney, it seems that it would make sense to talk, both

4    about issues concerning sufficiency of sealing, or the

5    appropriateness of sealing, as well as the merits of the motion

6    itself.  Does that make sense?

7         MR. ROSENTHAL:  Yes, to handle those together.

8         THE COURT:  Mr. Kenney, is that all right with you?

9         MR. KENNEY:  Yes, I think that would be appropriate,

10   Your Honor.

11        THE COURT:  Okay.  We'll just deal with them together

12   because I think the operative considerations kind of are really

13   all of a piece.

14        MR. ROSENTHAL:  That's fine, Your Honor.

15        Your Honor, the KEIP is the -- is a result of an

16   analysis by the debtors and their professionals, and is

17   tailored to specific -- the accomplishment of specific

18   financial goals.

19        While the debtors did hire Compensation Strategies to

20   provide general advice on the KEIP, it's really -- in our

21   circumstance, it was -- it's -- we had to develop a KEIP that

22   fit with the facts and circumstances of our case.  And so we

23   had involvement of Compensation Strategies, we had involvement

24   of Gibson Dunn, we had involvement of MacKenzie, we had

25   involvement of debtors' management, we had involvement from Mr.

1    Carmody, as a CRO.  We had involvement from the strategy

2    committee of the board, and the board, in general.

3            And most importantly, perhaps, we had involvement of

4    the stalking horse buyer, as well as the committee.  And while

5    the stalking horse was involved earlier than the committee,

6    since we filed the motion, we've actually made a number of

7    changes as a result of further discussions with the stalking

8    horse and with the committee.  And with those changes, both

9    Silver Point and -- the lenders, and the committee support the

10   KEIP.  Now, as you know --

11           THE COURT:  I noted those changes are on Pages 3 and 4

12   of your reply, and I think they're in Mr. Carmody's

13   declaration, as well.

14           MR. ROSENTHAL:  They are, Your Honor.  But let me

15   highlight just a couple of them for you.

16           THE COURT:  Well, that's fine.  You're welcome to walk

17   through them --

18           MR. ROSENTHAL:  Yeah, because --

19           THE COURT:  -- because I do believe they're important.

20           MR. ROSENTHAL:  -- what this has left us with is we

21   have -- we still have the U.S. Trustee objecting to the KEIP.

22   But I think, when you look at the KEIP, we've tightened it.

23   We've -- we have made it clear how these obligations are going

24   to get paid.  And we, in response to the stalking horse's views

25   and the committee, I think, have a -- if I can say so -- a

1    better document today than we had before.

2          So the first change, which was requested by the

3    committee, but actually, even before the committee had asked

4    for it, I had heard this from the company's CEO, was that the

5    company's CEO actually be removed from the list of KEIP

6    participants.  And in exchange, we've added some non-executive

7    key employees --

8          THE COURT:  Six of them.

9          MR. ROSENTHAL:  -- six non-executive key employees.

10         The -- Mr. Morgan is the CEO, and he's done an

11   incredible job at this critical point in the company's history.

12   But his decision to remove himself from consideration here, I

13   think, is a magnanimous gesture on his point.

14         The six employees who have been added wouldn't have

15   been part of it, except we were trying to work within dollar

16   constraints before.  This loosened up some dollars.  Still, the

17   aggregate dollars that are being potential dollars for the KEIP

18   have actually gone down, solely as a result of removal of Mr.

19   Morgan and insertion of these six additional.

20         THE COURT:  I saw that.

21         MR. ROSENTHAL:  There have been -- there are two other

22   things have happened that have also been variations to the

23   KEIP, which have potentially lowered the dollar value of the

24   KEIP.

25         The first is that we had a provision that said, if you

1    are not hired by the buyer, and we have met our performance

2    targets through the month immediately preceding the closing,

3    then you will receive a hundred percent of the KEIP.

4    Basically, you can't -- our thought was you can't impact the

5    rest of the year because you're not around, the buyer has not

6    hired you, you've earned your KEIP.

7         As a result of discussions, though, we have revised

8    the KEIP to prove that, if you're not hired, if the targets are

9    met through the end of the last month before the closing, you

10    will receive a pro rata portion of the KEIP, equal the amount

11    of time you were employed, divided by the number of -- you

12    know, the number of days in the year.  So that, effectively,

13    will -- that pro rata calculation will, effectively, reduce the

14    amount payable under the KEIP for those who are not hired.

15         And I will say, Your Honor, on this point, it's not in

16    the papers, but a little color on this, Silver Point was

17    actually okay removing the performance targets for those who

18    are not hired, and we were not.  So we deliberately left those

19    performance targets in for the non-hired.

20         We also had a similar revision for those employees who

21    were hired, but then terminated before year's end.  So there,

22    again, it used to say, if you were terminated -- if you're

23    terminated with cause, you don't get the KEIP.  Sure.  If you

24    quit without good reason, you don't get the KEIP.  But it said,

25    if you were terminated without cause, say on October 31st, that

1    you would get a hundred percent of the KEIP obligation,

2    assuming that we had met our targets through September.

3            Now it says, if you're terminated through October

4    without cause, you only get the KEIP if the company meets its

5    overall annual target, and you only get ten-twelfths of the

6    amount that was --

7            THE COURT:  Right.

8            MR. ROSENTHAL:  Again, a reduction.

9            There were a number of comments, both from the U.S.

10   Trustee, and from the -- Silver Point about whose obligation is

11   this.  And as you know, the Silver Point APA does provide that

12   they will assume -- either assume the obligation to employees

13   under a KEIP, or they will pay the amount owed to the KEIP for

14   those employees that they don't hire.

15           They wanted us to make clear that this payment was not

16   payable from the DIP budget or the wind-down budget, which is

17   something that -- which is a definition that's in the DIP, or

18   any other encumbered asset.  We did make that -- we did make

19   that change.

20           And if the Court goes back to the sale procedures, the

21   sale procedures do obligate a potential bidder, when making a

22   qualified bid, to --

23           THE COURT:  State.

24           MR. ROSENTHAL:  -- address --

25           THE COURT:  Yeah.

1          MR. ROSENTHAL:  -- address either the assumption or

2     the payment of these obligations, depending on whether they

3     take the employee or they leave the employee behind.

4          So the way to look at this KEIP is this:  It is an

5     obligation of the debtor, there's no question about it.  We

6     wouldn't be here, I wouldn't need to stand before you if it

7     wasn't.

8          THE COURT:  Sure.

9          MR. ROSENTHAL:  It's an obligation of the debtor.  But

10    the obligation will, effectively, be paid or assumed by the

11    buyer.

12         THE COURT:  Not under every circumstance.  I mean,

13    unless I'm mistaken -- and I understand what your bid

14    procedures are, but I'm not going to presume or anticipate

15    what's going to happen on a budget.

16         So we have a stalking horse bid, and you know

17    precisely what the effect of that stalking horse bid will be on

18    the estate liability under the KEIP.  Okay?  We know that with

19    confidence.

20         MR. ROSENTHAL:  Uh-huh.

21         THE COURT:  I think you've structured it in a way now

22    that at least you would anticipate that this would be a buyer

23    obligation, one way or the other.  But in theory, you could

24    have a bidder who comes in and says, I don't want anything to

25    do with the KEIP, that's your problem, this is my bid.  And you

1    would do -- your financial advisor would do an economic

2    analysis of somebody that is assuming those obligations versus

3    somebody that is not.  It may not happen, but in theory, a

4    bidder is free to structure its bid as it would.  Am I

5    mistaken?

6            MR. ROSENTHAL:  I don't think so.  I think that, to be

7    qualified bid, you have to cover these obligations.

8            THE COURT:  Okay.

9            MR. ROSENTHAL:  And I think, in subsequent rounds of

10   bidding, you can't take a bid that was qualified and then

11   remove the things that qualified you.

12           So, if somebody put in -- said, I'm going to put up a

13   ten-million-dollar deposit because that's what is required for

14   a qualified bid, in round two, they can't say, oh, by the way -

15   -

16           THE COURT:  I'm taking my --

17           MR. ROSENTHAL:  -- I'm giving you more money, but I'm

18   taking -- I'm only putting in a two-million-dollar deposition.

19   So I think we're covered.

20           Now is there, theoretically, a situation where we

21   might not be -- let me -- I'll give you a situation.  A sale

22   falls apart.  The sale falls apart.  The company -- if the

23   company fails, which we hope it would not --

24           THE COURT:  Sure.

25           MR. ROSENTHAL:  -- and that's our -- if the company

1    fails, it wouldn't -- you know, we won't be -- there wouldn't

2    have been a closing, and we won't meet the target, so there

3    won't be any KEIP owed.

4            The sale falls apart, though, company survives,

5    company does well, company gets to the end of the year --

6            THE COURT:  Company has --

7            MR. ROSENTHAL:  -- the company has met its targets,

8    the KEIP should be paid.

9            THE COURT:  Okay.  That's a pretty attenuated

10   possibility --

11           MR. ROSENTHAL:  Yes, understand.

12           THE COURT:  -- at least today.  Okay.

13           MR. ROSENTHAL:  Understand.

14           THE COURT:  Then I think I understand the dynamics.

15   So the debtors' position is -- and this was one of my questions

16   because it wasn't clear from the original document, and then

17   from the U.S. Trustee's objection, precisely who was going to

18   be responsible or how.  And when I looked at it originally, I

19   think you anticipated one of my questions, which was:  I'm not

20   certain why the estate, other than a matter of disclosure, is

21   really filing this motion because it doesn't seem like it's

22   likely to be immediately an estate liability.  But I understand

23   the clarification.

24           And I think, also, as a practical matter, it is an

25   estate liability.  It is consideration, as a practical matter,

1    that a buyer is going to factor in, and we know where it's

2    going to go.  So, in theory, that assumption is still value

3    being attributed to the estate.

4         MR. ROSENTHAL:  Absolutely.  And I had a discussion

5    with Mr. Kenney about this.  And I think any way you look at

6    it, whether it's -- any way you look at it, it's value that

7    some buyer is paying, that would -- that relates to what we're

8    selling to them, and so that's why we thought it was important

9    to come before you.

10        And then, finally, Your Honor, we have revised the

11   definitions of "cause" and "good reasons" to make it -- to

12   clarify that, if an employee does a bad act, whether or not

13   that has a material, harmful impact on the company, the

14   employee can still be terminated for cause.  It used to say, if

15   you do a bad act, and the board determines that it has had a

16   material, harmful impact on the company, it's not grounds for

17   termination for cause.  But you know, if someone embezzles from

18   the company, whether they materially harm the company or not,

19   that is cause for a for-cause termination.

20        THE COURT:  Yeah.  I mean, and this is always in there

21   in one form or the other.  I usually leave it to a question of

22   employment law.

23        MR. ROSENTHAL:  Right.

24        THE COURT:  You know?  And you know, there's not for

25   cause, which is the overwhelming majority of -- and those are

1    usually even performance-based.

2              MR. ROSENTHAL:  Right.

3              THE COURT:  You know?  If somebody doesn't meet their

4    -- if somebody is just --

5              MR. ROSENTHAL:  And we have that, as well.

6              THE COURT:  Right.

7              MR. ROSENTHAL:  We have that, as well.

8              THE COURT:  Right.  Dumb isn't cause.

9        (Laughter.)

10             MR. ROSENTHAL:  What?

11             THE COURT:  Dumb isn't cause.  But yeah, I mean, cause

12   is wrongful conduct, I think, as I think employment law teaches

13   us.  That's not a bankruptcy proposition.

14             MR. ROSENTHAL:  Right.  So --

15             THE COURT:  So I think I understand.

16             MR. ROSENTHAL:  So we've narrowed that.

17             And we've also narrowed the grounds that an employee

18   can quit for good reason.

19             THE COURT:  Uh-huh.

20             MR. ROSENTHAL:  And we took out the requirement that

21   the ability to quit, if his supervisor is changed, because we

22   know that, on a sale, the supervisor will likely change.

23             We've left in, but modified the requirement that, on a

24   demotion in his duties, the employee can quit for good reason,

25   but there are some -- there are some standards around the kind

1    of demotion, so ...

2          In any event, and finally, Your Honor, we've added --

3    and this was in an attempt to address one of Mr. Kenney's

4    concerns.  We've added a requirement that, if a buyer doesn't

5    hire a participant, that the amounts that would be paid with

6    respect to KEIP obligations --

7          THE COURT:  Would be escrowed.

8          MR. ROSENTHAL:  -- would be paid in escrowed.

9          So, in any event, that brings us -- we now have the

10   support of the committee and Silver Point, and that brings us

11   to the UST's objection.

12         We have discussed this at length with Mr. Kenney, both

13   Mr. Nestor and I; we've had a couple of calls.  We have

14   attempted to address all of his issues.  I have the declaration

15   of Mr. Carmody, I'll get to it in a minute.  And I'd like to

16   put Mr. Carmody on the stand to address just one final thing

17   that Mr. Kenney raised with us.

18         But generally, Your Honor, we believe we have shown

19   that this is an appropriate key employee incentive plan.  The

20   relevant code provision is 503(c)(3).  I think Mr. Kenney

21   correctly pointed out before the hearing today that we could

22   very well, for many of these employees, have just said this is

23   a retention plan, because they're not -- they're not, in any

24   way, senior executives --

25         THE COURT:  Uh-huh.

1          MR. ROSENTHAL:  -- and they wouldn't be covered by

2     503(c)(3).  But the reality is this is a -- that, from our

3     perspective, it's an incentive plan.

4          THE COURT:  Uh-huh.

5          MR. ROSENTHAL:  And so everyone has the performance

6     goals, and we regard this as an incentive plan.  And we think

7     the facts and circumstances of the case, which is the

8     applicable test, justify this.

9          Now is that the same as the business judgment rule?  I

10    don't know.  There's case law that suggests facts and

11    circumstances may be similar to the business judgment rule.

12    But regardless of the standard, we think that, under the facts

13    and circumstances of our case, we need this to achieve our

14    goals.

15         Your Honor, we've submitted the declaration of the

16    debtors' Chief Restructuring Officer Kevin Carmody; he's in the

17    courtroom.  And I'd ask to put him on the stand for a couple of

18    questions, and then move his declaration into evidence and ask

19    if anyone has -- wants to cross-examine him.

20         THE COURT:  Any objections?

21         UNIDENTIFIED:  No, Your Honor.

22         THE COURT:  Very well.  Mr. Carmody, come on up.

23    Please remain standing.  We'll swear the witness, please.

24    KEVIN CARMODY, WITNESS FOR THE DEBTORS, SWORN.

25         THE CLERK:  Please state and spell your name for the

1    record.

2            THE WITNESS:  Kevin Michael Carmody, C-a-r-m-o-d-y.

3            THE COURT:  Welcome, sir.

4            THE WITNESS:  Thanks.

5                          **DIRECT EXAMINATION**

6    **BY MR. ROSENTHAL:**

7    Q    Mr. Carmody.

8    A    Good morning.

9    Q    Good morning.

10        Did you submit a declaration in support of the debtors'

11   motion to approve a key incentive plan and to seal certain

12   confidential business information?

13   A    Yes, I did.

14   Q    So I want to ask you a couple of questions about that

15   declaration, to explore some concepts there.

16        In the declaration, you describe the performance targets as

17   "not being lay-ups."  Do you recall that sports analogy?

18   A    I do, yes.

19   Q    Mr. Carmody, what performance targets -- without disclosing

20   the targets themselves, what performance targets do we have in

21   the KEIP?

22   A    There are two performance targets:  One is based on full-

23   year revenue for 2015, and the second metric is based on

24   EBITDARP for the full year, as well.

25   Q    And what is "EBITDARP"?

1    A    It's, effectively, a measurement of earnings, EBITDA, with

2    a couple of other add-backs that you would typically see.

3    Q    I want to focus on --

4              THE COURT:  I just want to make sure because actually,

5    "EBITDARP" is a new one on me.  The R is "restructuring costs"?

6              THE WITNESS:  Right.

7              MR. ROSENTHAL:  Restructuring and --

8              THE WITNESS:  And the P is "pension."

9              THE COURT:  Pension obligations.  Okay.

10   BY MR. ROSENTHAL:

11   Q    I want to focus on the revenue side.  On a year-to-year

12   basis, Mr. Carmody, has Standard Register experienced revenue

13   declines?

14   A    It has, yes.

15   Q    And what do you attribute those to?

16   A    A large part of it has to do with the industry itself.  So

17   Standard Register works in the -- operates in the printing

18   business, which is going from print to digital, so there's been

19   an overall decline or shift in revenue, which means that there

20   are head winds the company is facing.  So the company is right

21   in the middle of transitioning from print to digital.

22        And in the nearer term -- by that, we mean this year and

23   hopefully next year -- you'll see an industry decline which

24   will impact the top line.

25   Q    And in your experience as a CRO, do you -- would you expect

1    that a Chapter 11 filing would impact revenue, and how?

2    A    Yes, I -- the feedback we've gotten -- this is typical for

3    many Chapter 11 cases.  But there is a high degree of

4    sensitivity with the customers when a company goes through

5    Chapter 11.  So you would expect, for example, that the sales

6    pipeline would decrease substantially as the company is in

7    Chapter 11, until we at least get certainty that the company

8    will be reorganized or sold.  And Standard Register is clearly

9    facing those head winds, as it goes through its Chapter 11

10   Trustee case.

11   Q    In your view, does the KEIP revenue target have any impact

12   on the Chapter 11 reduction?

13   A    The revenue target, by design, takes into -- well it

14   assumes that we will lose some of our revenue.  What it doesn't

15   assume is that we would lose the revenue associated with the

16   broader industry decline and the Chapter 11 cases itself.

17        And the reason we out that metric in place was to

18   incentivize our folks to be in front of our customers, to

19   basically say that we have a well-thought-out and planned

20   bankruptcy, with adequate -- adequate liquidity, we're serving

21   our customers properly, let's get that message to our

22   customers, so we don't have an incremental decline in revenue.

23            THE COURT:  Can I make sure that I understood your --

24   the answer that you just gave?  So your point was, you

25   described the nature of the debtors' industry, and there is a

1    downward trend, and your projections or your benchmarks would

2    capture that trend as being a fact of life, but that you did

3    not capture in the further downward trend that you would

4    expect, associated with a bankruptcy and the disruption

5    associated with it.  Is that it?

6              THE WITNESS:  Correct.

7              THE COURT:  And so the idea is to tell the employees

8    that this plan is structured in a way that, if you can

9    eliminate or avoid the anticipated or pretty easily,

10   experience-wise, projected downward trend, just because people

11   don't like doing business with a company in bankruptcy, then

12   you'll get your nut.

13             THE WITNESS:  That's --

14             THE COURT:  Is that right?

15             THE WITNESS:  Fair enough.  I would say, even to put a

16   finer point on it, that we assume there was a decrease in

17   revenue.  It wasn't acceptable to experience an industry

18   decline, any significant further decline associated with the

19   Chapter 11 case.

20             THE COURT:  Fair point.  Okay.  Thank you.  I

21   appreciate the clarification.  Sorry for the interruption.

22   BY MR. ROSENTHAL:

23   Q    Okay.  Now I want to talk -- I want to shift to the

24   EBITDARP component.  Based on the current trending of the

25   company's financials, can we meet the EBITDARP annual target?

1    A   Based on the current trends, we would not meet the EBITDARP

2    target for 2015.

3    Q   And what -- Mr. Carmody, again, without disclosing the

4    number, what would have to happen for us to meet that EBITDARP

5    target?

6    A   So this was a point of, I would say "spirited debate" at

7    the company, probably mostly between myself and the CFO.  What

8    we said is we will have an EBITDARP target for the full year,

9    but we're not going to assume that our cost structure will stay

10   the same, if our revenue declines.

11       So, for order -- in order for the company to meet its

12   EBITDARP target, there has to be meaningful performance

13   improvements that will take place in 2015.  Over 10 percent of

14   EBITDA would come from some form of cost reductions or other

15   measures that would increase overall performance.

16   Q   Did you engage in discussions with Silver Point about the

17   EBITDARP target?

18   A   I did, yes.

19   Q   And is the EBITDARP target one that you arrived at, in

20   part, as a result of those discussions?

21   A   In part.  I would say in part.  But also, a lot of

22   discussion with the management team, including the CEO and the

23   CFO, Joe Morgan and Ben Cutting, and the board, for that

24   matter.

25           MR. ROSENTHAL:  Your Honor, I have no further

1    questions for Mr. Carmody.

2         THE COURT:  Are you moving the admission of his

3    declaration?

4         MR. ROSENTHAL:  I do; I would move the admission of

5    Mr. Carmody's declaration.

6         THE COURT:  Mr. Kenney, any objection to the admission

7    of the declaration?

8         MR. KENNEY:  No.

9         THE COURT:  You'll certainly have an opportunity to

10   cross on it.

11        Very well, the declaration is admitted.

12      (Carmody Declaration Received into Evidence)

13        THE COURT:  Mr. Kenney, good morning.

14        MR. KENNEY:  Good morning, Your Honor.  For the

15   record, Mark Kenney for the United States Trustee.

16                   **CROSS-EXAMINATION**

17   **BY MR. KENNEY:**

18   Q   Mr. Carmody, just a couple of brief questions.

19        If I understand your discussion, you're saying that,

20   basically -- there's a downward -- there's one downward slope

21   on revenue, simply because of industry trends, and then there

22   is a further downward deflection of that curve, based on the

23   Chapter 11 filing.  And you're saying that the purpose of the

24   revenue portion of the KEIP is to induce certain personnel to

25   basically force that revenue curve back to where it would have

1  been without the Chapter 11 filing.

2  A   Right.  We -- so what I would say, again, we expect that

3  revenue will drop, but we want to incentivize our sales force,

4  and also the people that execute customer orders and fulfill

5  customer orders, that it's not acceptable to let that second

6  curve, slope of the line, go down further, and they have to

7  find a way to fill that pipeline.

8  Q   Okay.  Mr. Carmody, I understand how that kind of an

9  incentive would work with respect to the company personnel who

10  actually interface with customers.  How does that -- how does

11  that revenue incentive -- how do employees who do not deal with

12  the customer base, how are they incentivized by that; what can

13  they do that's going to shift that revenue curve?

14  A   So you have a number of different categories, so I'll

15  explain three:

16      You have your sales personnel, that's self-evident, talking

17  to our largest customers, explaining the Standard Register

18  story, to preserve the top line, and hopefully get new

19  business.  Pretty easy.

20      Then you have your customer service reps that deal with

21  customer issues and complaints, all focusing on the top line.

22      But even if you go into our facilities, where they're

23  producing goods for customers, they're measured on customer

24  fulfillment.  If they don't hit their customer fulfillment

25  rates, if they are not -- if they're missing orders, the top

line falls. So, even at the plant level, they're focused on the revenue line item, and also the EBITDARP line item.

Q All right. You know, I'm a little bit handicapped by not being able to reference, you know, specific personnel.

But Mr. Carmody, do you believe that every employee who is slated to receive a payment under the KEIP is actually somebody in a position to influence the revenue stream?

A Yes, I do. And it's one of the core messages that Joe Morgan broadcasts to his team, the leadership team and the line management team, about driving revenue growth, driving EBIDTA, driving cash; so, yes.

THE COURT: Mr. Kenney, let me ask you. I have the exhibit that's been filed under seal that identifies both the targets and the individuals and their compensation. If you'd like, I'm happy to take a five-minute break, and we can mark that document up in a way that will allow you to examine; we can number some of the lines or something else.

We've all done this before. But the last thing I want to do is handicap you, irrespective of the merits of the sealing issue. You filed an objection, you're entitled to test the issues with the witness. My goal would be to be pretty flexible and give you a fair amount -- I'm not going to clear the courtroom, I'm not going to seal the transcript or anything else. But if we need to take a moment and figure out how we'll navigate this, I'm happy to give you that time and opportunity.

1          MR. KENNEY:  I appreciate that, Your Honor.

2          THE COURT:  All right.  Let me make a couple of

3     suggestions.  We'll take a five-minute break.

4          But, you know, for example, I see the list, and as I

5     understand the point that you're getting to with Mr. Carmody,

6     the issue is some of these folks clearly can have an impact on

7     the bottom line, even people that aren't, you know, sort of in

8     the beautiful-person executive suite.  And Mr. Carmody's

9     comment is going to be different people in different capacities

10    contribute in different ways, I think that's kind of where I

11    see you going.

12         We can either number, or you can identify individuals

13    at this stage with a number or a star.  If you want to mark up

14    my copy, you're welcome to do so, and then I can follow along.

15    But hopefully, that can take, you know, just a few minutes.

16    And I'll be able to follow along, and I expect that other

17    parties will be.

18         But you know, being sensitive to the debtors' wish to

19    keep certain information private, at least at a minimum until I

20    rule on the sealing issue, I think I can respect that and still

21    allow us to have a productive and functional hearing.

22         So we're going to take a five-minute break.  Mr.

23    Carmody, you're not to discuss your testimony with anyone

24    during the beak.  And you just let us know or let the court

25    reporter know when you're ready to go.  Okay?

1        MR. KENNEY:  Thank you, Your Honor.

2        THE COURT:  All right.  We'll stand in recess.  Thank

3   you.

4        (Recess taken at 10:38 a.m.)

5        (Call to order of the Court.)

6        (Witness resumes stand.)

7        THE COURT:  Please be seated.

8        Mr. Kenney.

9        MR. KENNEY:  Thank you, Your Honor.  We've used the

10   break productively.

11        THE COURT:  Terrific.

12        MR. KENNEY:  Your Honor has a marked-up copy.  I think

13   we've numbered five lines.

14        THE COURT:  Great.  Thank you.

15   BY MR. KENNEY:

16   Q   Mr. Carmody, my understanding under the incentive plan is,

17   as you testified before, there's a revenue component and

18   there's an EBITDARP component, and they're equally weighted.

19   And the revenue component is basically designed to, basically,

20   wipe out whatever effect the Chapter 11 itself had, so that you

21   recover the company to its normal sales trajectory.

22        And if you would take a look at the person I've marked as

23   number one.

24   A   (Witness reviews exhibit.)

25   Q   Not a customer-facing person, how does that person affect

1   the revenue of the company?

2   A   Yeah.  Well, he -- his primary role is in finance, but he

3   is customer-facing, so he is dealing with customers on a weekly

4   basis.

5       And he's also responsible for developing the financial plan

6   or financial reporting that goes -- on a monthly basis, it goes

7   back to many people throughout the organization, including the

8   sales reps, to figure are they behind, are they ahead of plan.

9   So he's instrumental from that perspective, as well.

10  Q   Okay.  Now I'll note that the spreadsheet does not show

11  that individual as customer-facing.  Are you saying that he --

12  but he still affects revenue?

13  A   Yeah, absolutely.  He has an active role in dealing with

14  our customer base.

15  Q   Okay.  And what about the person identified with the number

16  three, who's also not customer-facing; how does he impact

17  revenue?

18  A   Well, he deals with -- he's a legal -- a legal person, he

19  deals with customer disputes, one in particular that's a

20  critical customer.  So he, too, has a fair degree of

21  interaction with our customer base.

22  Q   And the individual identified with number four?

23  A   Limited customer involvement, but heavily involved in

24  managing cash, heavily involved in the vendor community, which

25  is critical to our customer base.  As we've talked about, with

1    our sub-con line item, how fragile our supply chain is.  This

2    person is directly responsible for resolving disputes, making

3    sure that they get escalated, so that we hit our customer

4    fulfillment rates.

5        And before we took a break, I was saying that the -- if you

6    think about the revenue targets, it's easy to see where a sales

7    rep would be incentivized to generate revenue.  But customer

8    service has a critical role, and also operations has a critical

9    role, to make sure that we're serving our customers and giving

10   them product on time that meets the quality standards.

11       This person falls more so in the third bucket than the

12   first or second bucket.  It's still very important to our

13   customer base and to our top line.

14   Q    Okay.  And so, if I'm to understand it, even personnel who

15   are more, shall we say "vendor-facing" than customer-facing,

16   still have some, at least, indirect role in revenue?

17   A    Absolutely.  Especially in a Chapter 11 case, where we've

18   heard from almost every one of our top customers, saying, how

19   is my vendor community, are they protected, are they still

20   going to be able to deliver product.  That's where this person

21   gets heavily involved.

22           THE COURT:  Let me ask you a question.  Would this

23   person -- when you're describing vendor-side discussions, at

24   least as a general proposition, the significance on the revenue

25   side --

1          THE WITNESS:  Uh-huh.

2          THE COURT:  -- that that person might be able to bring

3    to bear would be when you've got vendors that are putting you

4    on different terms, or putting you on CIA or COD, all those

5    are, obviously, going to affect a cash position on a going-

6    forward basis.  Do I have that right?

7          THE WITNESS:  That's fair.  And I'd also say that she

8    is instrumental in management supply chain, so that her

9    customers are less of a flight risk.

10          So there could be a scenario, which we heard very

11    early on, where our customers were very nervous about our

12    ability to interact and pay our vendors.  We've been able to do

13    that.  If that wasn't the case and we missed orders, the risk

14    that these customers would resource would be higher.

15          THE COURT:  So noted.  Thank you.  Sorry for the

16    interruption.

17    BY MR. KENNEY:

18    Q   Now, Mr. Carmody, are the incentive payments that are

19    covered by the proposed incentive plan in lieu of other

20    incentive payments that these employees qualify for?

21    A   Well, there is not -- most of these employees don't have an

22    incentive plan in place.

23    Q   Okay.

24    A   With the --

25    Q   Do any of them have employment contracts?

1    A    I'm -- I'm sure they do, yes.

2    Q    Now do you know if their -- the employment agreements

3    include a bonus component?

4    A    Well, I don't know on an individual basis.  I just know,

5    last year, that the bonuses that were paid out were just to a

6    few people.

7        The only deviation there would be for sales reps, where

8    there is a sales commission schedule, so they're basically on a

9    base salary or a draw; and, if they sell, they get additional

10   compensation.  But that would be part of their standard pay --

11   pay package, and not necessarily over and above.

12   Q    I understand.

13       MR. KENNEY:  All right.  I have no further questions.

14   Thank you.

15       THE COURT:  Let me ask a question before Mr. Carmody

16   goes anywhere, and it may require, Mr. Rosenthal, you to

17   resume.

18       We kind of collapsed the sealing issues, as well as

19   the substance, and I know we've covered the substance, and I

20   follow the arguments in both directions, as well as the

21   testimony.  But it seems to me that Mr. Carmody's testimony

22   might be relevant to the sealing issues, if those remain -- if

23   all of those objections and concerns remain live.  Is that a

24   fair guess?

25       MR. KENNEY:  I think some of the issues are still

1    live, Your Honor.  It's a question -- I mean, right now, what

2    they're doing is they've sealed the entire exhibit, and I guess

3    there's a question of are there any portions of that that can

4    be disclosed.

5         I will say that the disclosure that the CEO Is not

6    part of the incentive plan anymore really does help a lot --

7         THE COURT:  Sure.

8         MR. KENNEY:  -- with the public perception.  But

9    obviously, it's a public case.  The public has the right to

10   know certain information about what's going on in the case.

11        THE COURT:  Okay.

12        MR. KENNEY:  And obviously, one of the -- it's

13   difficult when the public sees that there is a bonus plan in

14   place, and they really can't understand any of the facts about

15   that plan.

16        THE COURT:  Okay.  I think the most sensible way to

17   proceed would be, Mr. Rosenthal, if you want to get up and

18   elicit some testimony from Mr. Carmody with respect to the

19   debtors' concerns about disclosure of this information,

20   generally.  And then, Mr. Kenney, I'll give you an opportunity

21   to cross on that.  I think that's probably the most productive

22   way.  I realize this is a little bit unorthodox, but I think

23   we've taken this in two bites, and that's fine with me.  Does

24   that make sense?

25        MR. KENNEY:  Yes, it does, Your Honor.

1          THE COURT:  All right.  Mr. Rosenthal.

2                   **FURTHER DIRECT EXAMINATION**

3    **BY MR. ROSENTHAL:**

4    Q    Mr. Carmody, do you -- you're aware that we -- the debtors

5    filed a motion to seal the information related to the employees

6    who were subject to the KEIP plan, and to seal the information

7    related to the debtors' business plan.

8    A    Yes, I am.

9    Q    So let's address each of those separately.

10        Do you know whether, prior to the filing of the case, the

11   debtor disclosed projections of its future performance in its

12   securities filings?

13   A    No, they did not.

14   Q    So would it be a deviation from a normal course to disclose

15   its projected 2015 business plan to the -- publicly?

16   A    Yes, it would.

17   Q    Is the debtor involved in a competitive sales process at

18   the moment?

19   A    Yes, we are.

20   Q    Do you have a view whether disclosure of the 2015 business

21   plan would be harmful to the debtors' competitive position or

22   the sale process?

23   A    We believe it would put us at a significant competitive

24   disadvantage, yes.

25   Q    Have the -- has the 2015 business plan been disclosed to

1   the bidders?

2   A   The plan has been disclosed under the terms of individual

3   NDAs.

4   Q   And do those NDAs permit the bidders to disclose that

5   information publicly in any form or fashion?

6   A   No, they do not.

7   Q   Do you know whether the bidders -- whether the NDAs address

8   the situation about information the bidders receive from public

9   disclosures, and whether that has to be kept confidential?

10  A   My understanding is that it does not.

11  Q   Do you have a -- we -- do you have a view whether the

12  disclosure of the key employees covered by the plan or their

13  compensation would be helpful or harmful to the debtors?

14  A   Well, I think it would be harmful, if you -- just as one

15  example, if we released the names on this list, and there were

16  key sales personnel, there would be nothing that necessarily

17  would prevent a potential buyer from soliciting the employment

18  of those individuals, which would harm our business.

19  Q   Do the -- some of the employees on that list have specific

20  important customer relationships that the company relies on?

21  A   Yes, absolutely.

22  Q   Would -- is it conceivable to you that the potential buyer

23  or competitor would simply hire those employees and not go

24  through the sale process at all?

25  A   That was one of the alternatives we considered for sure,

1   yes.

2   Q   Do you think that disclosure of the names of the

3   participants and their salary levels would create any morale

4   issues among other employees not covered by the plan?

5   A   I think it would, absolutely, yes.  It's confidential

6   information within the company.

7   Q   Is it generally the case that employees' compensation is

8   interchanged between the employees of the company, among

9   employees of the company?

10  A   No.  Again, that information is held confidential.

11          MR. ROSENTHAL:  I have nothing further, Your Honor.

12          THE COURT:  Okay.  Mr. Kenney.

13                       **CROSS-EXAMINATION**

14  **BY MR. KENNEY:**

15  Q   Mr. Carmody, you participated in the first-day hearing in

16  this case?

17  A   I did.

18  Q   And you remember that there was an interim, and

19  subsequently, a final order approving debtor-in-possession

20  financing?

21  A   I do.

22  Q   And was there a budget filed in connection with that order?

23  A   Yes.

24  Q   Okay.  And does that budget not set forth some projected

25  revenues for the first 13 weeks of the bankruptcy case?

1    A    Well, it sets forth receipts, which is -- it's a little

2    tough to get back to a revenue number because the first several

3    weeks of the DIP budget are based on accounts receivable, not a

4    pure revenue number.  And then, as you go further out into the

5    DIP budget, then we layer in the same revenue projections that

6    we have for the KEIP into the DIP budget.

7    Q    So that there's already been some limited disclosure of,

8    say, collections for a portion of that 13 weeks, and then,

9    subsequently, revenues?

10   A    Yes.  So it's two -- I mean, two pieces:  One is, how

11   quickly would we collect existing accounts receivable at the

12   time of the filing, which would be based on revenue that was

13   already generated; and then, as we burned off that accounts

14   receivable aging schedule, how would we collect -- or forecast

15   receipts, rather, for the last several weeks of the forecast,

16   which would be based on revenue, yes.  But we didn't disclose

17   the revenue line item.

18   Q    How are specific revenue targets useful to the debtors'

19   competitors?

20   A    Well, any of the financial information, whether it be

21   revenue targets or EBITDA, will give them an idea of how big

22   they are or where they play in the marketplace, so I think it's

23   extremely useful to them.

24        THE COURT:  Isn't it true, though, the company -- this

25   is a publicly reporting company.

1          THE WITNESS:  Yeah.

2          THE COURT:  So the business plan shows where you think

3    you're going, but the fact of the matter is I presume that

4    you've got 10-K's and 10-Q's that have robust financial

5    disclosure --

6          THE WITNESS:  Yeah.

7          THE COURT:  -- that I presume, just as this company

8    probably combs through the filings of its competitors, they're

9    combing through yours.

10          THE WITNESS:  On a historic basis, they would, but

11    they wouldn't see -- so, for example, the ten -- the year-end

12    filings, which show what we did in 2014, it wouldn't layer in

13    what we're doing for the full year of '15.  So, in our example,

14    the competitors wouldn't know today, based on the thirteen-week

15    DIP budget, whether we were forecasting a decline just based on

16    industry trends, but also, a degradation due to the Chapter 11

17    process, because we're only going out for the next three months

18    in our DIP budget, and the targets for the KEIP are for the

19    full year.

20          THE COURT:  Okay.  I understand.  Sorry.

21    BY MR. KENNEY:

22    Q   Well, you just said you were -- Mr. Carmody, you just said

23    you were talking about the 10-K's would show it on an annual

24    basis.  But doesn't the company also file 10-Q's?

25    A   They, historically, have; they don't file those now.

1   Q   So you're saying somebody couldn't take the company's 10-

2   K's and 10-Q's that were filed through, I think September of

3   2014, and basically do some kind of analysis to assess where

4   the company is going, sales-wise?

5   A   They -- they could definitely do that.  They could take a

6   look at the last several quarters or the last several years,

7   and make a projection as to what Standard Register would look

8   like in 2015, 2016.

9       But again, it -- our business plan takes into account where

10  we think we're headed.  Customer degradation, customer losses,

11  industry trends.  That would be our view, and that view is not

12  public.  So they would -- any potential -- well, any third

13  party that's relying on publicly available information would do

14  an outside-in analysis [sic].  And I'm saying that the plan

15  that we have, if released to the public, would put us at a

16  competitive disadvantage.

17  Q   What is the competitive disadvantage if a competitor knows

18  what your projected revenue is for the quarter?

19  A   Well, I think it's financially sensitive information.  And

20  I look at it from revenue, and I look at it from an EBITDARP

21  perspective.  So there could be a world where they look at our

22  projections, and they say, the business is in worse shape than

23  we thought; that could be a conclusion.  They wouldn't have

24  visibility into that today.  Or it could be that we're

25  projected to be performing better than otherwise thought.

1   Q    I can understand if you're projecting -- were to, say, go

2   to your customers and say, look Standard Register is circling

3   the drain, maybe you better give all your business to us now,

4   before they go under.  But if your revenue projections are

5   higher than they assumed, how is that competitively useful?

6   A    You could make an -- you could -- for example, there have

7   been companies that have been in the print business that have

8   gone to digital that have experienced 20 to 25 percent declines

9   in revenue.  There could be a case, if we published our

10  forecast, where -- just hypothetically, where you could look at

11  our projections relative to other industry benchmarks over

12  time, and a competitor could say, listen, they're going to drop

13  15 percent more revenue, you're an at-risk customer; they could

14  use that against us, for example.

15  Q    And that's not something that you can counter through your

16  sales force?

17  A    It's difficult because we know that our competitors in the

18  marketplace -- we've heard this third-hand; I haven't heard it

19  directly -- are -- are marketing against Standard Register.  I

20  think they have a very difficult job as sales reps in the

21  marketplace today.

22      Two things I've learned:  One is the customers have been

23  very loyal to Standard Register, but it's very difficult to

24  confirm new work.  So our sales pipeline, as we've gone through

25  this Chapter 11 bankruptcy, has, effectively, slowed down

1   significantly.  It hasn't dried up entirely, but it's slowed

2   down significantly.

3      So I think it's very difficult for these sales reps to

4   continue, day by day, to try to market Standard Register's

5   products, even in an environment where the customers have been

6   highly supportive of the company.

7          MR. KENNEY:  I have no further questions.

8          THE COURT:  I do.  And whether this triggers another

9   question -- part of it is really just a marketplace question,

10  and it may not be directly related or different from the points

11  that you've described.

12                        **EXAMINATION**

13  **BY THE COURT:**

14  Q   It is apparent to me that any competitor looking for your

15  business or looking for your customers might study any

16  financial information that they could get, any additional

17  financial information that they get, associated with a

18  bankruptcy.  I think you've covered that.

19     Given that -- given the size of this debtors' business, and

20  frankly, the size and sophistication of what I understand to be

21  your customer base, is it reasonable to expect that the

22  customers are devoting resources, as well, to determine your

23  financial health?

24  A   I think they are, for -- yeah, absolutely.

25          THE COURT:  Okay.  I understand.  I don't know if that

1    triggers anything else --

2              MR. KENNEY:  No, it does not, Your Honor.

3              THE COURT:  All right, great.

4              MR. KENNEY:  Thank you.

5              THE COURT:  Thank you.

6              Mr. Rosenthal, redirect?

7              MR. ROSENTHAL:  Just a couple of questions, Your

8    Honor.

9                    **REDIRECT EXAMINATION**

10   **BY MR. ROSENTHAL:**

11   Q   Mr. Carmody, we talked about 10-K's not disclosing

12   projections of revenues.  Do ten -- do the company's pre-filing

13   10-Q's disclose projections of revenue?

14   A   No.  The 10-Q would have even more limited information than

15   the annual reporting.

16   Q   And does the DIP budget reflect -- it reflects collections

17   or revenue?

18   A   Pure collections.

19   Q   All right.

20   A   It's 100 percent cash; cash receipts, cash disbursements.

21   Q   And there's not a direct correlation between collections

22   and revenue.

23   A   There is not a direct correlation, correct.

24   Q   Have you had circumstances where customers have raised

25   questions about the financial performance and wherewithal of

1    the company?

2    A    Yes.

3            MR. ROSENTHAL:  No further questions.

4            THE COURT:  Okay.  Any redirect [sic]?

5            MR. KENNEY:  No, Your Honor.

6            THE COURT:  All right.  Very well.  Mr. Carmody, thank

7    you, sir.  You may step down.

8        (Witness excused.)

9            THE COURT:  All right.  Before I hear from the debtor

10   and the U.S. Trustee with respect to the substance, I'd hear

11   from either the -- either and/or the committee and the lenders,

12   in connection with the relief requested.

13           MR. JUNG:  Good morning, Your Honor.  Wojciech Jung,

14   Lowenstein Sandler, proposed counsel to the committee.

15           THE COURT:  Welcome.

16           MR. JUNG:  Your Honor, as Mr. Rosenthal has stated

17   from the outset, following the filing of the motion, we have

18   had a number of substantive discussions regarding various

19   components of the proposed KEIP.   The committee has made a

20   number of requests.  The committee has served a discovery

21   request -- requests upon the debtors.

22           Your Honor, based upon negotiations over the last

23   couple of weeks, we have come to terms on the proposed KEIP,

24   and with the modifications that have been discussed on the

25   record, the committee does not oppose the KEIP as currently

1    proposed.

2              THE COURT:  Very good.

3              MR. JUNG:  Thank you.

4              THE COURT:  Thank you very much.

5              MR. DRESSEL:  Good morning, Your Honor.  Christopher

6    Dressel of Skadden Arps on behalf of Silver Point Finance, LLC,

7    and Standard Acquisition Holdings, LLC.

8              Mr. Rosenthal is correct that the debtors have

9    consulted with Silver Point with respect to the KEIP, and

10   Silver Point has no objection to entry of the relief requested

11   in the form attached to the motion.

12             THE COURT:  Very good.

13             Mr. Collins.

14             MR. COLLINS:  Good morning, Your Honor.  For the

15   record, Mark Collins on Richards, Layton & Finger, on behalf of

16   Bank of America as ABL Agent.  We also have no objection to

17   this motion, Your Honor.

18             THE COURT:  Very good.  Thank you.

19             Okay.  Mr. Rosenthal, briefly.

20             MR. ROSENTHAL:  Your Honor, I think the record is

21   clear.  All of the economic constituencies who have an interest

22   in this case support --

23             THE COURT:  He hates it when you say that.

24        (Laughter.)

25             MR. ROSENTHAL:  I know, I know.  I know.  And I know

1  the United States Trustee does a -- you know, has a -- does a

2  yeoman's job of protecting, you know, and presenting the

3  positions it thinks are important.  But we believe that, under

4  the facts and circumstances of this case, this KEIP is an

5  appropriate incentive plan, under the applicable Bankruptcy

6  Code standards.

7          First, the cost of the KEIP is minimal, given the

8  value of -- the value to be received from the achievement of

9  the revenue and EBITDARP goals.  It's minimal compared to the

10 potential for receiving higher and better offers for the

11 transferred assets.  And it's minimal, particularly in light of

12 the fact that, in all but the most extreme cases that we could

13 think of, the buyers will be picking up the cost of this KEIP.

14          Secondly, we think that the revenue and EBITDARP

15 targets serve to focus the employees of this company to

16 maximize the performance of the debtors' operations and

17 maximize the value of this business.  So we do think that the

18 KEIP, as presented, with the modifications that we have agreed

19 to propose, brings significant benefits to the debtors' estate

20 and all stakeholders.

21          In terms of the ceiling, you've heard, both in the

22 declaration and from Mr. Carmody, that we believe that both the

23 business plan information and the employee-related information

24 is critical, confidential information, which can be protected

25 under Section 107 of the Bankruptcy Code.

1          The debtors did not normally disclose their

2    projections.  The did disclose, historically, as do public --

3    as public companies are required to do, they did disclose their

4    historical results.  And of course, it's possible for anyone to

5    go look at the historical results, compare them to the prior

6    quarter or the prior year or whatever, and make projections of

7    their own, for a third party to make projections of its own on

8    what likely would be the company's performance in the future.

9          But those projections wouldn't take into consideration

10    what measures the company might be implementing in the future,

11    to change revenue, to reduce expenses, all of those things that

12    competitors might very well like to know, but they don't know.

13    Because they don't know and the never know, in the case of

14    Standard Register, or with any major company, frankly, what the

15    business plan of that company is on an annual basis.

16          As to the key employees, we're very concerned.  These

17    key employees -- this company is about its employees and the

18    customer relationships that these employees have.  It doesn't -

19    - it's not necessarily only customer-facing; it's in terms of

20    people who deal with the vendor community, to ensure that the

21    products are delivered to the customer.  So all of these

22    employees are vital to our business.

23          We've got bidders in the data room, looking at the

24    information.  They do know who these employees are, but they

25    are bound by confidentiality agreements not to disclose the

1   names of them and not to hire these employees.

2          If we publicly disclose the names of these employees,

3   we are very concerned that bidders already in the data room or

4   competitors not in the data room will just reach out to the

5   employees and hire them.  After all, if they can give them a

6   slightly higher compensation package, why do they need to buy

7   the debtors' assets through a 363 sale?  They can buy the

8   debtors' business opportunities and customer relationships

9   through the very key employees that we have identified as being

10  key employees of our business.

11         For these reasons, Your Honor, we believe there's

12  nothing to be gained and everything to be lost by forcing the

13  debtors to disclose their sensitive, confidential business

14  information.

15         THE COURT:  Very good.

16         Mr. Kenney.

17         MR. KENNEY:  Good morning, Your Honor.  Again, Mark

18  Kenney for the record.

19         Your Honor, I'm not asking the debtors to disclose

20  their deepest secrets.  It's largely a question of probing just

21  what can be disclosed.  And if information is truly subject to

22  misuse by creditors, you know, (indiscernible) says that the

23  Court can ordered it sealed.

24         But you know, part of it is I have to raise the issue.

25  Your Honor can determine the issue, just like with the KEIP.  I

1    have to raise the issue.  It's up to Your Honor to determine

2    whether there's a sufficient degree of difficulty.  One of the

3    -- one of the issues is that, where it's not being publicly

4    disclosed, how do you really accurately assess that?  And --

5            THE COURT:  Let me ask you a question.  When we

6    started doing this a long time ago, there was a lot of effort.

7    This is different from -- well, actually, I guess it applies to

8    the financial information.  But let's focus our attention for a

9    second on the area that I think is probably not terribly

10   controversial, and that is the names and amounts of most of the

11   employees on this list.

12           People that are the most senior employees, especially

13   with an SEC-reporting company, I mean, usually, they've sort of

14   signed on for a measure of disclosure.  I get it.  But

15   generally, it's not controversial.

16           And we would have this discussion -- and I'm talking

17   15, 20 years ago.  We would have this discussion about the need

18   for disclosure in a context where it was very difficult to find

19   this information, if you weren't on the service list, if you

20   weren't totally engaged in the case.

21           Is there a different thought process -- the statute

22   remains precisely the same; I assume the case law is equally

23   relevant from 1980 to today.  But is there a different thought

24   process that both you and I should consider, given that, in a

25   case of any size, my guess is that there's a Facebook page that

1    puts -- I'm not kidding -- that puts -- well, and you know I'm

2    not kidding.  There's a Facebook page that loads all this stuff

3    up, and that, you know, you've got 1,000 employees, and 800 of

4    them know by eleven o'clock this morning, you know, what's on

5    the docket.  Does that change, or should we be cognizant of

6    that for purposes of Section 107?

7            MR. KENNEY:  I think we need to be cognizant of it,

8    Your Honor.  I don't know that that really changes the

9    analysis.  Obviously, information, even without a Facebook,

10   travels a lot faster today than it ever has before.  And let's

11   face it, in a few years, we're going to look back on today and

12   say, boy, those were the dinosaur days, we were really slow

13   back then.

14       (Laughter.)

15           MR. KENNEY:  And I think, in some respects, because of

16   social media and the rapid flow of information, there's

17   probably actually more information out there about everybody

18   today than there ever was before.

19           THE COURT:  Yeah.

20           MR. KENNEY:  I mean, the only way that doesn't happen

21   is if people make an extreme, concerted effort, you know, to

22   avoid publicly disclosing their personal information.

23           Now I don't know how many people actually publish

24   their salaries, other than you and I, since we're federal

25   employees.

1           THE COURT:  You got to tell everybody, don't you?

2      (Laughter.)

3           MR. KENNEY:  Well, Your Honor, I think -- I can

4      understand, to some degree, protecting the personal income

5      information of some of the employees.  And Your Honor pointed

6      out the distinction between the high-level executives of a

7      company, who look, they've signed on for the public ride,

8      versus the rank-and-file employees.  And I don't want to -- I

9      don't want to insult people on the list of participants and say

10     that they're rank-and-file people.  I think they are middle

11     management and senior management.

12          THE COURT:  Uh-huh.

13          MR. KENNEY:  And I think, as to some of the people,

14     especially the executives, the people who we would look at and

15     say, that person is clearly a statutory insider, I think, as to

16     them, there's no reason to conceal that information.

17          As to the other people, Your Honor, I think there's

18     some continuum between sealing up all the information tightly,

19     and not letting it out to anybody, and at the other end, having

20     everything open and public.  And when they seal the entire

21     exhibit, what they've done is they've basically sealed it off

22     completely.  And I think there is some level of disclosure that

23     should be made.  You can certainly always code a list.

24          Right now, you have no idea what the bonus amounts

25     payable to anybody are, what they are as a percentage of

1   salary, even without naming particular individuals.  I mean, if

2   there's somebody whose salary is $700,000 a year, and he's

3   getting a bonus of $200,000, you know, you could certainly have

4   something that says that, you know, a certain employee is

5   getting a bonus of -- is eligible for a bonus of $200,000,

6   which constitutes 40 percent of his -- 40 percent of this

7   person's base salary.  I don't think that really gives anything

8   away.

9           But it does, I think, give the public a little more

10  confidence in a system that puts forth some information, where

11  somebody can look at it and they can say, well, gee, it's a

12  small -- a small number of people are getting the lion's share

13  of that bonus money, and maybe that's not an appropriate plan,

14  versus a plan where they can look at it and they can say, well,

15  okay, it seems like it's pretty linear, people are getting --

16  you know, people who have lower salary levels are getting lower

17  bonuses, but maybe it's the same percentage of their salary.

18  But at least there's some information in the record about what

19  people are getting.

20          THE COURT:  Okay.

21          MR. KENNEY:  Okay.  And I think, when everything is

22  under seal, it also does make it a lot more difficult for

23  people to assess the propriety of the bonus plan in the first

24  place.  I know Your Honor likes to avoid sports analogies, but

25  the idea is:  Is this something that creates, you know, a

1   genuine level of difficulty that requires people to perform at

2   a higher level --

3            THE COURT:  Are you --

4            MR. KENNEY:  -- than they would in the absence of --

5            THE COURT:  Are you avoiding the "slam dunk" phrase?

6        (Laughter.)

7            MR. KENNEY:  Your Honor, and I understand that Your

8   Honor doesn't like the sports analogies.

9            THE COURT:  I don't have a problem with sports

10  analogies.  My problem is they're usually botched.

11       (Laughter.)

12           MR. KENNEY:  Well, you know, I think --

13           THE COURT:  Say it's catching a ball that's, you know,

14  somewhat deflated.

15           UNIDENTIFIED:  Deflated.

16       (Laughter.)

17           THE COURT:  How would that get you in trouble?

18           MR. KENNEY:  Or throwing a ball that's somewhat

19  deflated.  You know --

20           THE COURT:  Let's move on, we're both going to get in

21  trouble.

22           MR. KENNEY:  (Indiscernible) Your Honor, I think that

23  -- you know, it's two things, obviously.  The more that is kept

24  under wraps, I think the more public -- the more the public is

25  suspicious of it.  And bankruptcy is supposed to be a public

1    process.  Judge Walrath says -- and I think she probably

2    cribbed it from somebody else -- you know, a debtor is in a

3    fishbowl.

4            THE COURT:  Uh-huh.

5            MR. KENNEY:  You know, and I understand, to the extent

6    that things are going to cause competitive disadvantage, you

7    don't put that information out there.  But I think there is

8    some -- there is something that can be done beyond sealing

9    every -- you know, beyond sealing all the information tightly,

10   so that the public can see that, you know, maybe this is an

11   appropriate bonus plan.

12           And I think, you know, in terms of the degree of

13   difficulty, Your Honor, it's their burden.  I mean, I

14   understand that -- I understand what they're saying is, in

15   terms of the revenue targets is trying to -- it's just --

16   they're trying to basically stem further losses that kind of

17   arise naturally out of the Chapter 11.  And you know, so I

18   think, you know, that's the level or degree of difficulty

19   they're talking about, and that's for Your Honor to decide,

20   whether it's an appropriate performance standard.

21           With respect to the EBITDARP targets, I mean, Mr.

22   Carmody is able to give us specific performance figures, and it

23   says, you know, it's going to require significant improvement

24   over where they were in the past.  So I think, really, they've

25   much more clearly established a target, you know, a bona fide

 1   target than with respect to the revenue figures.  And it seemed

 2   like it's basically -- it's a standard of we shouldn't be any

 3   worse than we already are.  And I don't know if that's really

 4   an appropriate standard for incentive payments, especially when

 5   we're talking about the upper-level personnel.

 6        THE COURT:  Well, I'm not certain that I necessarily

 7   disagree with it.  I certainly have seen that as a discussion.

 8   I mean, I don't think I've seen it put it into such sharp

 9   relief as here.  But the fact is that I think Mr. Carmody's

10   testimony was pretty clear that, given the nature of this

11   business -- and it's not a secret to anybody.  I mean, the

12   transition from print to digital is just a fact of life.

13   Managing that process is the responsibility of the company, and

14   certainly the responsibility of senior management.

15        And the fact is, as a general proposition, there's

16   usually some sort of bankruptcy penalty associated because

17   you've got people that stopped paying you, or people that

18   stretched you out, et cetera.

19        But I think the -- I mean, we focused on that in his

20   testimony, but I'm not certain that that's entirely the focus

21   of the debtors' metrics and milestones and goals.  But it's

22   probably a coherent proposition to anticipate head winds and

23   compensate people for successfully besting them.  I think I

24   understand that proposition.  But I don't think that that is

25   the be all and end all.  And I agree, if that were the -- if

1   that were the substance of it, sort of minimize the cost

2   associated with the hit we'd take, that's probably not, in and

3   of itself, a heck of a metric.  But I understand.  Okay.

4          MR. KENNEY:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          All right.  Does anyone else wish to be heard?

7      (No verbal response.)

8          THE COURT:  Okay.  I'm going to approve and authorize

9   the relief requested in the key employee incentive plan.  And I

10  would note that the U.S. Trustee's objection, frankly, helped

11  develop the record in a way that clarifies it for me, and

12  certainly gets it to a point where I'm comfortable approving

13  it.

14         As I've said on many occasions, I attribute

15  significant weight to the position of stakeholders in the

16  process, particularly the official committee, but as well, the

17  lenders in this case.  And Mr. Rosenthal ticked off the terms

18  of the plan, and then I think what are the -- acknowledged to

19  be the significant, either clarifications or improvements.

20         I start from the proposition that this is under

21  Section 503(c)(3), and I don't think I need to address or

22  dispose of the question of whether or not it's a business

23  judgment or some higher standard.  That's actually a lengthy

24  academic discussion of how business judgment operates in a

25  bankruptcy case, versus in a chancery proceeding, and that's

1   really beyond the scope of this.  Under whatever the analysis

2   is, I'm satisfied that the debtor has demonstrated that the

3   facts and circumstances of this case warrant the relief that is

4   requested.

5        Removal of the CEO from the process addressed, I

6   think, a good deal of a concern with respect to sufficiency of

7   disclosure.

8        I'll deal with sealing in just a moment.

9        But let me first note that I don't believe, from Mr.

10  Carmody's declaration and from his testimony and from the

11  testimony elicited on cross, that these are a slam dunk, in

12  terms of an achievable metric.  And in addition, in a sale

13  context, we have a measure of -- as a practical matter, a

14  measure of disruption and uncertainty in the lives of all of

15  the employees.  And the purpose of the incentive program is to

16  keep them focused.

17       I believe that the interests of all stakeholders are

18  served best by minimizing disruption to operations, maintaining

19  performance on a go-forward basis, in order to maximize and

20  maintain value as we head toward an auction process.  And I'm

21  satisfied that this program is carefully and properly

22  calculated to achieve that goal.

23       With respect to sealing, I will grant the sealing

24  motion.  And I am a little bit more reluctant -- I would -- I

25  guess I'd express some measure of reluctance to approve it as

1    broadly as I have.  I have little heartburn about sealing the

2    individual employee information.  The issues, as we get up to

3    senior executives who are already disclosed on an SEC reporting

4    basis, obviously, they raise their own issues.  But I'm not

5    going to parse through it, especially with the CEO being

6    removed.

7          But you know, it's an interesting colloquy.  I don't

8    think that the statute has changed, Section 107.  But the fact

9    of the matter is that Mr. Carmody testified to the concern and

10   risk of disruption.  And I see internal and external risks to -

11   - of disruption from the disclosure of all this information

12   because I know from experience that this will be in the hands

13   of rank and file and employees, and frankly, competitors,

14   within minutes of being filed here.

15         And even with a withholding of names, but if we listed

16   the amounts and the percentages, I -- I was an associate in a

17   law firm.  I knew how to back in, how to reverse-engineer a

18   compensation report to figure out where I fit in, and where I

19   thought other people did, as well.  And I have little doubt

20   that that would occur, and that that would be, frankly,

21   disruptive to the debtors' goals in this process.

22         And I do, again, attribute significant weight to the

23   support of the creditors' committee, and what I expect is their

24   consensus with the debtor that it is important to maintain and

25   manage the flow of information.  It's a tension between the

1    interests of a debtor of a commercial enterprise, to try to

2    manage information, and the fishbowl that I acknowledge the

3    debtor lives in.  But under the circumstances of this case, I'm

4    satisfied.

5         I would observe that I think this runs right up

6    against the edge of what I am comfortable approving.  And I

7    mean no disparagement.  But the sealing of the structure of the

8    plan and the metrics and the milestones makes it, I think --

9    and Mr. Kenney noted this -- difficult for parties that are not

10   currently in possession of the sealed document to really make

11   sense of it.

12        I think the outlines of the plan and the context of

13   the plan are certainly susceptible to being understood.  But

14   the range of it is usually a little bit more disclosed.  But I

15   accept Mr. Carmody's testimony and the debtors' proposition for

16   why they've structured it this way.  But I would observe that

17   this is probably at the edge of what I'd be prepared to seal,

18   under the circumstances.

19        So, based upon the record before me, I will approve

20   and authorize the relief requested.  Mr. Rosenthal, do you have

21   a clean form of order?

22        MR. ROSENTHAL:  Yes, Your Honor.

23        THE COURT:  Or I guess two orders.

24        MR. ROSENTHAL:  I have three orders.  I have an order

25   permitting us to file the reply yesterday.

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  An order on the seal motion, and an

3    order on the KEIP.

4          THE COURT:  Great.

5          MR. ROSENTHAL:  May I approach?

6          THE COURT:  Sure.  All right.  We have -- and then the

7    other items are all related before we get to the status

8    conference, right?  They are the committee retention issues.

9    Is that right?

10          MR. ROSENTHAL:  Yes, Your Honor.

11          THE COURT:  Why don't we take -- I'll sign these in

12    chambers.  Why don't we take just a five-minute break, and then

13    we'll return for the committee retention.  Stand in recess.

14      (Recess taken at 11:26 a.m.)

15      (Proceedings resume at 11:40 a.m.)

16      (Call to order of the Court.)

17          THE COURT:  Please be seated.  Counsel?

18          MR. JUNG:  Good morning, Your Honor.  For the record,

19    Wojciech Jung, Lowenstein Sandler, proposed counsel to the

20    committee.

21          Your Honor, I will address the four retention

22    applications that have been filed by committee professionals;

23    two on the legal side, and two financial advisors.  I'm not

24    sure if Your Honor has a preference as to which way I proceed,

25    but I will begin with addressing objections that relate to all

1    retentions, and then go into specifics.

2            THE COURT:  That sounds fine.

3            MR. JUNG:  Your Honor, a little bit of background.  On

4    March 24th, 2015, the Office of the United States Trustee

5    formed the Official Committee of Unsecured Creditors.  On the

6    same day, Your Honor, the committee retained Lowenstein as its

7    primary legal counsel and the Polsinelli firm as local and

8    Delaware and conflicts counsel.  The committee also retained

9    Jefferies as its investment banker, as well as Zolfo Cooper as

10   its financial advisor.

11           Your Honor, the debtor, Silver Point, and Bank of

12   America filed objections; some of them are limited in scope.

13   Your Honor, the main issue that resonates in all three

14   objections is references to the budget.

15           THE COURT:  Uh-huh.

16           MR. JUNG:  The Court, early on, approved the debtor-

17   in-possession financing.  That financing references a budget,

18   and includes line items for various professionals.

19   (Indiscernible) argue that retentions should not be approved

20   because parties first (indiscernible) the budget, and second,

21   they may exceed the budgeted amounts.

22           Your Honor, we submit that budgetary issues, quite

23   frankly, have very little to do with retentions.  None of the

24   parties have yet sought the approval and allowance of any fees

25   and expenses in this case.

1          Your Honor, the debtor, on behalf of the lenders, have

2     filed this case, and seek significant relief from the Court;

3     relief around the imposition of the automatic stay.  And more

4     importantly, Your Honor, with respect to a 363 sale that is

5     very much ongoing.

6          So, Your Honor, the lenders have chosen to request

7     specific relief from the Court, and arguably the Bankruptcy

8     Codes to that effect.  However, Your Honor, through their

9     request, the debtors are and the lenders are excluding other

10    provisions of the Bankruptcy Code that are equally applicable

11    here.  Some of them, Your Honor, referenced are the

12    (indiscernible) with respect to budget issues.  I believe that

13    Your Honor said that the budget issues the Court has the

14    discretion to modify as it sees fit, depending, obviously, how

15    the case progresses.

16         Your Honor, the committee is not asking today to

17    modify the budget.  The Court reserved the parties' 506(c)

18    rights at the time of the financing.  Those rights are not

19    being affected by any of the retentions.

20         Your Honor, the same way the debtors were free to

21    retain their advisors, the code permits the committee to retain

22    its advisors, and that should carry considerable weight with

23    respect to the committee's selection.

24         Your Honor, with respect to all the parties' request

25    that committee's financial professionals be subject to 330

1    review with respect to their fees.  Your Honor, we have

2    submitted our reply, and I will not repeat what is in there.

3    But suffice it to say, Your Honor --

4        THE COURT:  I've read your reply.

5        MR. JUNG:  Thank you.  That 330 review for parties

6    other than the Office of the United States Trustee is simply

7    not (indiscernible) and is not common.  Your Honor, the

8    debtors' professionals -- the debtors' financial professionals

9    were approved or retained under similar provisions, including

10   Section 328 review.  Your Honor, the importance of that --

11       THE COURT:  How do I deal with the question -- we're

12   talking about the 328 issue now, right?

13       MR. JUNG:  Correct.

14       THE COURT:  How do I deal with the example brought up

15   by, I believe, the agent that, with a success or transaction

16   fee proposed for your investment banker, for example, the

17   committee could vigorously oppose a transaction, a witness from

18   that investment banker could testify in opposition to that

19   transaction.  I could overrule that, grant the debtors' motion,

20   and that transaction, having been opposed by the committee,

21   would trigger a financial advisor or a transaction fee.  Is

22   there an anomaly there; is that an issue?

23       MR. JUNG:  Your Honor, two thoughts in that regard.

24   In the objection, the debtor said Jefferies should not get a

25   sale transaction fee, at least not for the portion of the

1   consideration that is being offered by the stalking horse.

2   Jefferies listened to the response and, as noted in our reply,

3   modified the proposed sale transaction fee.  As currently

4   proposed, Your Honor, the transaction -- the sale transaction

5   fee will be two and a half percent over an amount that is in

6   excess of what is currently proposed by the stalking horse bid.

7           Your Honor, with respect to -- and I should I

8   reference any monthly fees in excess of the first two months,

9   half of it will be credited against any sale transaction fee or

10  a back-end fee, as may be applicable, with respect to a plan.

11  And I should also note that Jefferies will be entitled to only

12  one fee, meaning a sale fee or a plan fee, not both.

13          Your Honor, with respect to -- with respect to those

14  fees, in particular, Jefferies' retention in this case is very

15  important.  Your Honor may recall that Jefferies testified in

16  connection with the bid procedures.

17          THE COURT:  I recall.

18          MR. JUNG:  And many of the issues, Your Honor, that

19  were raised were very important, and a lot of them was the

20  scope of the breakup fee that has been requested.  The amount

21  of the breakup fee and express reimbursement, if I recall, that

22  has been requested was close to $10 million.  Your Honor heard

23  testimony from Jefferies on that issue, and ultimately, their

24  request for a breakup fee was denied, and the expense

25  reimbursement was reduced or capped at $1.5 million.  Your

1    Honor, that is already significant input that has been

2    provided.

3           Your Honor, there will be much more that Jefferies

4    will be called upon to do in this case.  The debtors are

5    engaged in the sale process, the process is very much ongoing,

6    and Jefferies is very involved in many aspects of that

7    transaction; not only dealing with or speaking with potential

8    bidders and answering some of their questions, but also keeping

9    the committee informed with respect to the process and the

10   potential values that the transaction may realize.

11          Your Honor, Jefferies may be called upon to testify on

12   valuation issues later on in the case, when it comes to plan

13   confirmation.  Your Honor, as in any other bankruptcy,

14   valuation testimony may be important, and it may be important

15   here.

16          Your Honor, Jefferies is also -- has already been

17   called upon by the committee to evaluate the significant

18   prepetition transactions that the debtor was involved in, in I

19   believe, mid-2013.  Your Honor, obviously, a

20   financial/investment-banking-type analysis is required to that

21   effect.

22          And Your Honor, we will address the standing motion

23   and the related matters when we come to the status --

24          THE COURT:  At the conclusion.

25          MR. JUNG:  -- portion of the discussion.

1          Your Honor, so we believe that 328 retention is

2     appropriate.  Financial advisors usually take a high risk for

3     payment at the end.  They often lower their up-front requests.

4     And that is, Your Honor, very much included in their

5     consideration and scope of the fee.

6          Your Honor, Mr. Szlezinger, who is in court today,

7     would testify -- and if I might proffer his testimony, he would

8     testify that Jefferies' retention in this case is normal,

9     Jefferies has been retained under similar fee arrangements in

10    other cases, meaning both a flat fee and a transaction fee.

11         Your Honor, through over Mr. Szlezinger's over 25

12    years of experience in the restructuring industry, he has seen

13    other investment bankers retained under Section 328, in cases

14    similar to the case here, and those transactions, likewise,

15    involved not only 328 retention, but a fee structure, including

16    both a monthly fee, as well as a transaction fee.

17         Your Honor, the same 328 analysis obviously applies to

18    the Zolfo retention.  We have supplied, both in the body of the

19    reply, as well as an exhibit, a number of cases where both

20    Zolfo, Jefferies, and frankly, the debtors' professionals have

21    been retained under the 328 standard, in cases where only the

22    Office of the U.S. Trustee was given Section 330 review.

23         Your Honor, Jefferies' engagement letter was, not only

24    modified post-filing, but it was negotiated with the committee.

25    The committee did ask specific questions, not only with respect

1    -- with regards to the scope of the fees, but with respect to

2    the services provided.  And I believe both the retention

3    applications of Jefferies, as well as Zolfo, make clear, Your

4    Honor, that the services that each will be -- is called upon to

5    provide are services that are distinct, which, again, brings

6    back -- brings me back to the DIP financing and sale procedures

7    hearing.

8         Your Honor, at that time, heard testimony from both

9    Jefferies, with respect to sale issues, as well as from Zolfo,

10   with respect to debtor-in-possession issues and budget issues.

11   Your Honor, in cases of this type, especially where a sale or

12   transaction is being brought, it is rather common for a

13   committee to have the services of both an investment banker, as

14   well as Zolfo, as well as -- as well as a financial advisor.

15        Your Honor, no party questioned the capabilities of

16   any of the professionals sought to be retained.  Your Honor, it

17   appears, as I said --

18        THE COURT:  There's no issue --

19        MR. JUNG:  -- at the --

20        THE COURT:  There's no issue with respect to

21   qualifications, experience, or competence.

22        MR. JUNG:  Right, right.  Your Honor, in sum, we

23   submit that budget issues are not an issue to be addressed

24   today.  Your Honor, we have added language to all forms of

25   proposed orders, reserving everyone's rights with respect to --

1          THE COURT:  Okay.  Do you know if that language is

2    satisfactory?  I think it was proposed by Silver Point and it

3    looked -- I didn't do a black-line of one against the other,

4    but it looked like --

5          MR. JUNG:  Your Honor, it was substantially similar to

6    the one proposed by Silver Point and of -- and Bank of America,

7    and it was virtually identical to the language included in the

8    retention orders of the debtors' professionals.

9          THE COURT:  Al right.  I understand.

10          MR. JUNG:  Your Honor, as I mentioned, Mr. Szlezinger

11    is in court today, and I would offer his short proffer with

12    respect to the fee issues and retentions I discussed, and he is

13    available for cross-examination, to the extent parties wish to

14    proceed in that fashion.

15          THE COURT:  Okay.  You may proffer.

16          MR. JUNG:  Your Honor, Leon Szlezinger, who is the

17    managing director and joint global head of restructuring and

18    recapitalization of Jefferies, who would testify as follows:

19          Mr. Szlezinger has over 25 years of experience in the

20    restructuring industry.  He has been involved in over 30 M&A

21    transactions, both in distressed situation, Chapter 11

22    situations, as well as outside of Chapter 11.

23          He would also testify that Jefferies is routinely

24    retained and engaged by both debtors, as well as committees,

25    pursuant to fee structures that include a set component or set

1   flat monthly fees, as well as transaction fees.

2          He would also testify that, during his 25 years of

3   experience in the industry, he has seen other investment

4   banking firms being engaged in Chapter 11 proceedings on terms

5   similar to the retention of -- proposed retention of Jefferies

6   here; meaning, a flat fee and a restructuring fee.

7          Mr. Szlezinger would also testify that Section 330

8   review, in his view, is very uncommon for parties other than

9   the Office of the United States Trustee.

10         He would also testify that the amounts -- that the

11  compensation amounts, as modified are market, and are

12  comparable to fees charged by other investment banking firms in

13  similarly situated cases.

14         Lastly, he would testify that the retention has been

15  negotiated -- that the terms of the retention have been

16  negotiated with the committee.  The committee has scrutinized

17  the terms of that retention, and ultimately, the parties agreed

18  on the structure that has been presented to Your Honor.  And

19  Your Honor, that would be his testimony.

20         THE COURT:  Okay.  Does anyone wish to cross on that

21  testimony?

22      (No verbal response.)

23         THE COURT:  Okay.  I'll accept that testimony.

24         MR. JUNG:  Thank you.

25         THE COURT:  All right.  Objections?  I'll start with

1    the debtor.  Mr. Rosenthal.

2         MR. ROSENTHAL:  Your Honor, this is a tough one for

3    me.  I'll tell you what we don't object to.

4         We don't object to the concept of the committee having

5    professionals, and professionals of their own choosing.  But we

6    simply -- and we raised it in our objection, we just don't have

7    the authority under our DIP to pay the amounts requested on a

8    monthly or overall basis under the DIP budget.  Now why is that

9    important?  I mean, I think that's it's important -- as estate

10   fiduciaries, we're concerned that the estate not incur

11   obligations that it cannot pay.

12        This is a familiar refrain that you may hear from me

13   more, as the case goes on.  But you know, we have to be

14   cognizant.  We are an operating business, we're incurring

15   expenses all the time.  We have to make sure that I -- that

16   everyone that has an administrative expense claim is actually

17   going to get paid because they're providing goods and services

18   to us, and the debtor is taking advantage of them to preserve

19   this business.

20        So we are cognizant of your statement that you're not

21   bound by the budget, in terms of allocation of fees among

22   professionals.  But the professionals are only one aspect of

23   expenses that need to get paid in a Chapter 11 case.  There are

24   other administrative expenses that are of equal priority.  So

25   that's the essence of our budget objection.

1          We do have a couple of specific objections that I --

2     that, you know, I just want to refer to.

3          We appreciate the raise, and we appreciate the

4     Jefferies modification that says that, if the stalking horse is

5     -- wins, based just solely on the stalking horse fee, that they

6     will get no fee, and it will only be based on an overbid.

7          We continue to believe that -- we don't know how much

8     they've really been involved, and how much they will continue

9     to be involved in that sale process.  We know that they have

10    made some -- given us some suggestions about potential over-

11    bidders.  We're not -- clearly, if one of their over-bidders

12    comes to the table and makes a bid, we think that would add

13    value.

14         But we just don't know at this point how much value

15    they will or have added to the process, which is one of the

16    reasons that we have also raised the 330 issue with respect to

17    their employment.  You know, and the situation that you

18    mentioned is one of those situations, where it may actually be

19    relevant to be able to go back and evaluate the reasonableness.

20         On the Zolfo side, I -- and I think we have no issue

21    with the -- with Jefferies, other than the budget issue, with

22    Jefferies receiving the monthly fee.  We do think that they --

23    part of their role is to keep the committee informed here, and

24    we appreciate the value that they bring -- that they bring with

25    respect to that.

1          On the Zolfo side, again, we work with Zolfo

2    frequently, we work with Jefferies frequently.  No question

3    about any of their competence or ability.  Apart from the

4    budget issue, I do have an issue about why 330 wouldn't apply

5    to Zolfo.  They bill hourly, as all the other professionals

6    here.  They are not an investment bank.  We can call them a

7    "financial advisor," but they're not an investment bank;

8    they're a turnaround firm.  They provide valuable services, but

9    they provide them the same way that an Alix would or an A&M.

10          And if you look at the list that's attached to the

11    committee objection, there are a number of investment bankers

12    who have received orders exempting them from 330, but I don't

13    see any Alix and A&M and Zolfo, FTI, Conway MacKenzie folks on

14    that list.

15          So, Your Honor, I -- you know, that's our objection.

16    We appreciate the committee's need to have professionals, but

17    we at least, at a minimum, want the Court to be cognizant of

18    these other issues that we're grappling with.

19          THE COURT:  Okay.  I understand.

20          Yes, sir.

21          MR. DRESSEL:  Good morning, Your Honor.  Christopher

22    Dressel of Skadden on behalf of Silver Point Finance, LLC, as

23    the post-petition agent.  We also filed a limited objection and

24    reservation of rights with respect to the committee's retention

25    applications.

1          I'd echo Mr. Rosenthal's point that our objection is

2     not grounded on an assessment of the qualifications of the

3     committee's advisors; rather, it's based, I think, on two kind

4     of fundamental points that I want to clarify.

5          One is with respect to the budget.  There is, I think,

6     a suggestion that the objection is grounded on the budget.

7     It's more or a reservation of rights on that point, and a

8     clarification that, while we've had discussion at previous

9     hearings about the amounts allocated to the committee's

10    advisors in the budget, Your Honor has made a ruling and has

11    identified, you know, two discrete mechanisms through which

12    those disputes may be resolved in the future; those being

13    506(c) relief and reallocation.  And we accept Your Honor's

14    findings in that regard.

15         Nonetheless, the fact remains that Silver Point

16    reserves its rights with respect to the budget, and by not

17    objecting either to the retentions of the committee

18    professionals, or to any individual fee applications as an

19    acquiescence to the payment of amounts through DIP proceeds in

20    excess of the budget.

21         On that score, to address Your Honor's question about

22    the language that's in --

23         THE COURT:  Let me ask you a question.  And I don't

24    want to go too far into the DIP financing issue, but this is, I

25    think, one of the concerns Mr. Rosenthal was hinting at.

```
 1                  If I were to approve the retention applications,

 2      particularly with the monthly obligations that are not

 3      necessarily provided for under the budget, is the debtor not at

 4      risk that the debtor is in default of its -- at least of its --

 5      I guess of its financial covenants, in the context of the DIP

 6      financing?

 7                  MR. DRESSEL:  The --

 8                  THE COURT:  From day one.

 9                  MR. DRESSEL:  The short answer is that the payment of

10      professional fees in amounts in excess of the budget would be

11      an event of default --

12                  THE COURT:  So payment would be --

13                  MR. DRESSEL:  -- with (indiscernible) --

14                  THE COURT:  -- an EOD, but the incurrence is not an

15      EOD and wouldn't --

16                  MR. DRESSEL:  Yes.  I think we've laid out in our

17      objection that --

18                  THE COURT:  I saw it.

19                  MR. DRESSEL:  -- we're distinguishing between Your

20      Honor's right to allow fees as administrative expenses and the

21      payment of those fees --

22                  THE COURT:  Okay.

23                  MR. DRESSEL:  -- under the DIP.

24                  THE COURT:  I think you've answered my question.

25                  MR. DRESSEL:  Great.
```

1        To briefly address your question in the context of the

2   previous argument about the language in the reservation of

3   rights, there is a slight difference.

4        THE COURT:  Okay.

5        MR. DRESSEL:  I, frankly, don't feel that it would be

6   productive to argue this here.  So I would simply say, in

7   clarification, that the change is really the deletion of the

8   reservation of rights with respect to monthly fee applications.

9   So I'll just state for the record that, if we elect to object

10  or to not object to a monthly fee application of a committee

11  advisor, that that's not a signal that we have acquiesced to

12  the payment of those fees under the DIP.

13       With respect to the committee financial advisors, our

14  concerns are similar to those raised by the debtors, and are

15  really twofold.  And I think it's important to distinguish

16  between the financial advisor and the investment banker.

17       Our concern with respect to the financial advisor is

18  that, while they're seeking relief under 328(a), they propose

19  to bill on an hourly basis, just like an attorney would.  And

20  so there is a disconnect between the rationale for 328(a)

21  relief, which was identified by counsel for the committee as to

22  insulate the professional from kind of hindsight bias and

23  reassessing this flat fee arrangement, and a situation where,

24  despite seeking relief under 328(a), the professional is

25  actually seeking to be retained on an hourly basis.

1          I think a professional seeking retention on an hourly

2     basis should submit itself to review based on the same factors

3     that underlie a review of any other professional seeking review

4     in an -- on an hourly basis.  And I think the responses

5     identified in the committee's argument today and in their reply

6     really go to more of an investment banker type relationship,

7     where there is a fee structure outside of a traditional hourly

8     billing arrangement.

9          With respect to the investment banker, our concern is

10    that there is no link between the terms under which it would

11    earn a success fee and the contributions it would make to the

12    estate.  As the committee notes in its reply, the retention of

13    a professional under 328(a) must be in connection with a

14    demonstration of benefit to the estate.

15         I note that, on that score, the reply, in Paragraph 50

16    of the reply, which is the only instance in which the committee

17    actually directly addresses that standard, the single fact that

18    they muster in their defense is the mere fact that Jefferies

19    has been engaged -- has been working with the committee for two

20    months now.  But there is no showing, and indeed, I do not

21    think that they can make a showing that Jefferies would only

22    earn a success fee in circumstances where it actually

23    contributed to the success of the sale process.

24         As we note, under the original structure, Jefferies

25    would have earned a success fee in connection with the

1    consummation of the stalking horse bid.  While we do appreciate

2    the committee's and the investment banker's movement in that

3    regard.  Unfortunately, they have not moved to the point where

4    it sufficiently addresses the concern.  Indeed, it continues to

5    raise the same fundamental concern, which is that the

6    investment banker could continue to earn a success fee, even

7    though it was not responsible for the cultivation of the

8    winning bidder.

9            I would also point out, similarly, that --

10           THE COURT:  Let me ask you a question.

11           MR. DRESSEL:  Yes.

12           THE COURT:  Because counsel has pointed me to a number

13    of examples, and I'll acknowledge that examples in prior orders

14    are of limited utility.  In the absence of opposition, where

15    stakeholders are on board, I'm not necessarily likely to raise

16    the issue on my own.

17           But if your analysis is accurate, is there a

18    circumstance under which a committee investment banker would be

19    entitled to be engaged under 328(a)?  We never know, exactly.

20    I think the debtors' professional or the debtors' investment

21    banker gets the benefit of the doubt that they are running the

22    process and looking to bring in a buyer.  We've seen cases

23    where committees have accomplished and achieved that, or

24    otherwise actively engaged in that solicitation process, but

25    it's not as presumptive.  So is this a change to practice?

1          MR. DRESSEL:  I don't think so, and let me address

2     that --

3          THE COURT:  Sure.

4          MR. DRESSEL:  -- in a few different ways.

5          THE COURT:  Okay.

6          MR. DRESSEL:  So, first of all, think it's conceivable

7     that there is a situation in which the committee's investment

8     banker could add real value to the sale process.  It's just

9     that's impossible to quantify right now, to give the Court

10    enough confidence, I believe, that retention under 328 is

11    appropriate.  And that's why I believe the relief requested

12    should, at the bare minimum, be limited by 330 review at the

13    end of the process.

14         Second, I acknowledge that retention of an investment

15    banker and similar type of professional advisors under 328 is

16    common practice.  I think, in a plan case, where there's issues

17    around structuring complex securities and --

18         THE COURT:  Exit financing.

19         MR. DRESSEL:  -- resolving valuation issues, there is

20    more of a -- I think, an interactive role between the

21    committee's professional advisors, including its investment

22    banker, and the debtors' advisors, which may justify a

23    transaction fee under 328(a).

24         And then, third and finally, I would simply note that

25    I think each case has to be judged on its own merits.  I think

1   the case law speaks to that and, in particular, requires that a

2   retention under 328 be accompanied by a demonstration of

3   benefit to the estate.  And so I simply argue here, not for a

4   general change in practice, of course, but that, under the

5   facts and circumstances of these cases, there have -- has been

6   no demonstration of such a benefit to the estate.

7           And with respect to the particularly services that

8   counsel to the committee identified in his presentation today

9   that have been and will be continued to be performed by

10  Jefferies, our position isn't that those should be inherently

11  incompensible, but rather, that there's no logical link between

12  those services and the compensation of those services through a

13  success fee that is tied to a sale that the committee, right

14  now, is opposing.

15          Unless Your Honor has any questions --

16          THE COURT:  No, I don't have any questions.  Thank

17  you, Mr. Dressel.

18          Mr. Collins.

19          MR. COLLINS:  Good afternoon again, Your Honor.  Mark

20  Collins of Richards, Layton & Finger on behalf of Bank of

21  America.

22          Your Honor, I'll be very brief because I think the

23  points have been very well covered by counsel to the company,

24  as well as counsel --

25          THE COURT:  Let me ask you a broad question.

1          MR. COLLINS:  Yes.

2          THE COURT:  Beyond the particulars of this case, but

3     I'm interested in your thoughts.  The issue of the budget, I

4     hear you.  You know?  And I've said in many, many cases -- and

5     you've been here for it --

6          MR. COLLINS:  Yeah.

7          THE COURT:  -- that, in the context of an interim or a

8     final DIP, I'm not, generally, going to try to plug in a budget

9     number.  I can't do that any better than the professionals.

10    And the expectation is that it will be negotiated consensually,

11    and people will abide by it; or, if they can't get to that

12    point, again, I'm not going to plug in a number, but rather, I

13    will advise the parties that I'll deal with it at the

14    appropriate time, and I expect the committee to perform its

15    statutory function.  And usually it works out, so ...

16         (Laughter.)

17         THE COURT:  So it doesn't completely blow up on me.

18         But play this string out.  And I don't know that --

19    I'm sure it's happened before, because this isn't the first

20    time I've encountered this issue.  But you know, I -- I'm

21    focused on Mr. Rosenthal's comments.  He's looking at me

22    saying, Judge, how do you approve people that aren't even

23    remotely covered -- amounts that aren't covered in the budget.

24    And again, no question with respect to experience.  I've dealt

25    with both of these firms many, many times.  You know, are --

1   what we're doing is we're creating a crisis; you know, starting

2   a land war in Asia or something like that.

3          How do I respond to that, and how does that -- how do

4   I deal with that today or at a DIP financing?

5          MR. COLLINS:  I understand the concern, Your Honor.  I

6   guess I take it from maybe a different perspective, being on

7   the professional's side.

8          THE COURT:  That's why I asked.

9          MR. COLLINS:  Right.  And this is a -- this is a case

10  that -- in all honestly, that I would not typically see a

11  Jefferies, and maybe a Zolfo, involved in.  This is a -- more

12  of a medium-sized case.  It has a significant amount of debt on

13  it, doing a credit bid.  And there is a budget for committee

14  professionals, but it's limited, given the nature of the case.

15         Given that, I think it's up to the professional to

16  decide if they want to pitch for the work, and take it on the

17  risk of not getting paid fees that they typically get paid in

18  different types of cases.  So I think the risk is really on the

19  professional.  If they want to do this assignment, they are

20  volunteering taking it on.  They understand the limitations in

21  the budget.  They also understand Your Honor's comments about

22  reservation of rights on reallocating.  But this is not a

23  guarantee of payment if you --

24         THE COURT:  It's not.  It's not.

25         MR. COLLINS:  -- if you get retained.

1          THE COURT:  And it's not intended as one.

2          MR. COLLINS:  Right.

3          THE COURT:  But the fact of the matter is that I have

4    to get past that hearing, and my -- I have two choices.

5          MR. COLLINS:  Right.

6          THE COURT:  I can turn to the lender and say, here's

7    the number, plug it in and move forward, which I'm -- I simply

8    have no context to do.

9          MR. COLLINS:  Right.  And I don't think -- and I don't

10   think you need to do that today.  I think that a payment -- as

11   was explained by counsel for Silver Point, a payment above the

12   budget line items would cause a default.  Having professional

13   fees allowed above the budget is -- would not be an event of

14   default.  And they would take it on -- the risk of are there

15   unencumbered funds that are going to come out later in the

16   case, is a sale so successful that there, are in fact,

17   recoveries to go to parties, other administrative expense

18   claims that are not covered by the budget.  You know, those are

19   the things that would play out in the case.  But I think the

20   professionals for the committee have to go into it with eyes

21   wide open, about how limited this case is on the funding side.

22         THE COURT:  Okay.  Let's start with 328.

23         MR. COLLINS:  So, Your Honor, let's -- 328, I -- with

24   respect to Zolfo, because I think that is the easier one.  I

25   have not seen a financial advisor get approved under 328 for

1    hourly fees.  And in fact, I looked at Paragraph 31 of the

2    Zolfo retention application, where they cited a number of cases

3    that said, and I'll quote it:

4             "Courts in this circuit have approved similar fee

5             arrangements for financial advisors that contain

6             reasonable terms and conditions under 328."

7             And there's about six cases cited.  We went and looked

8    through those cases.  Everywhere, where the professional was

9    charging by the hour, there was 330 review.  In the cases where

10   there were flat fee or percentage-based success fees, those

11   were 328 approval.  And so I think, with respect to Zolfo, they

12   should be 330 review.

13            THE COURT:  Let's talk about Jefferies.

14            MR. COLLINS:  Your Honor, with respect to Jefferies, I

15   think we have to look at the language of 328.  328 talks about

16   approval of payment arrangements under 328, where there are

17   reasonable terms and conditions.  And if Your Honor determines

18   the reasonableness at the outset, then you can only really

19   review it, if -- in light of developments not capable of being

20   anticipated -- reasonably anticipated at the time of approval.

21            Here, we have a situation where we are arguing that

22   the terms themselves are not reasonable because they are

23   earning a seven-hundred-and-fifty-thousand-dollar success fee,

24   plus percentage amounts above that, I believe, when they may

25   have brought no value to the table because the debtors'

1    investment bank is fully running the process.

2            If, however, their retention application was tied to a

3    percentage off of recovery to unsecured creditors, a recovery

4    off of a buyer that they located and developed and brought to

5    the table, then Your Honor might determine that to be

6    reasonable under 328.

7            THE COURT:  Let me ask you, because I think counsel

8    for the committee touched on this.  It's not particular about

9    the agent; you're just --

10           MR. COLLINS:  Right.

11           THE COURT:  -- standing there.

12           MR. COLLINS:  Right.

13           THE COURT:  Counsel touched on the point that

14   Jefferies testified in the context of the bid procedures and

15   supported certain objections that yielded real value.  While

16   that's not typically the context in which we see a transaction

17   fee approved, is that a predicate for doing so?

18           MR. COLLINS:  I -- no, Your Honor.

19           THE COURT:  Because we're talking about value.

20           MR. COLLINS:  Right, you're talking about value.  But

21   they are also seeking to obtain a monthly fee for providing

22   general advice and services, right?  And then you have a

23   transaction fee for what I would view as a success.

24           THE COURT:  The deal.

25           MR. COLLINS:  A deal.  Simply coming into court and

1    testifying for 15 minutes on the stand about chilling effect of

2    bid protections, in my view, would not equal a seven-hundred-

3    and-fifty-thousand-dollar success fee for work done by Lazard.

4            THE COURT:  I understand.  Okay.

5            MR. COLLINS:  Let me just see if there's anything I

6    need to cover.

7            THE COURT:  Sure.  Take your time.

8            MR. COLLINS:  No, I think that was everything, Your

9    Honor.

10           THE COURT:  Very good.

11           MR. COLLINS:  Thank you.

12           THE COURT:  Yes, sir.

13           MR. LABUDA:  Good afternoon, Your Honor.  Tom Labuda

14   of Sidley Austin, on behalf of Jefferies.  And if I may just

15   respond to a couple of the questions Your Honor had.

16           THE COURT:  Sure.

17           MR. LABUDA:  And a *pro hac vice* was filed yesterday.

18   I don't know if --

19           THE COURT:  I'm happy to hear you.

20           MR. LABUDA:  Great.  Really, just two points.  One is

21   the point about the potential anomaly that Your Honor posed,

22   and it sort of coincides the points counsel for Silver Point

23   made, as well.  It's a good question, and we would submit that

24   the answer is in Congress' intent in enacting 328 and 330,

25   which was that professionals should be paid on the same basis,

1   both in and outside of bankruptcy.

2          And if you do look at those cases that were cited, or

3   even the Lazard engagement letter in this case, it's pretty

4   clear that the structure includes these both monthly fees and

5   flat fees, and they typically do not have any sort of condition

6   that they had so many conversations, that they identified the

7   buyer, et cetera.  And I would point as an example --

8          THE COURT:  Let me ask you a question.

9          MR. LABUDA:  Sure.

10          THE COURT:  And I'm not -- I'm very familiar with the

11   Third Circuit case law, and I don't disagree with you at all

12   that going back to fixing the Chandler Act from the '30s --

13          MR. LABUDA:  Uh-huh.

14          THE COURT:  -- to 1978, and bringing the varsity on to

15   the field of all of that.  And then the Third Circuit has told

16   us it's market price.  It's an interesting question, though.

17   And I've not thought of it in this context, but your point a

18   moment ago raises it.  There is not a market for creditors'

19   committees outside of bankruptcy.

20          MR. LABUDA:  That's correct.  There are ad hoc

21   committees, certainly.

22          THE COURT:  There are ad hoc committees.  But as a

23   general proposition -- and perhaps -- and it may be that

24   there's a simple answer to this.  I wouldn't get too hung up on

25   it for the purposes of the merits of this, but as we think

1    through this.

2          Clearly, a part of the thrust of the 328 issue,

3    especially as it relates to your client Jefferies is an issue

4    of nobody has got heartburn about the debtor retaining an

5    investment banker under 328(a), with a transaction fee, et

6    cetera.  If you look, take us out of bankruptcy, take us four

7    blocks down the street to the Chancery Court, you would see

8    precisely the same engagement, on the same terms, and that

9    would be what the market provides.

10         Their issue here is that, in the debtors' context;

11   that is, the entities' professional, that is the professional

12   that is expected to run the sale process, obviously, you don't

13   need to tell me what the statutory and standing and fiduciary

14   responsibilities are, but it's a different analysis.  And I

15   think what I'm hearing from this side is, in the context of a

16   committee, the principles that apply to a company retaining its

17   own professional don't necessarily apply.  And so is that a

18   distinguishing consideration?  I hadn't thought about it, so

19   I'm just kind of raising it.

20         MR. LABUDA:  I would think that it is a legitimate

21   question, and a legitimate inquiry to look, and which is why

22   the size of the fees may differ dramatically.  I haven't done

23   the calculation here, but I'm assuming the Lazard fee is going

24   to be a multi-million-dollar fee, if the sale is successful and

25   it closes.  And I think a committee fee would take that into

1    account by providing for a much lesser fee.

2         Now I do think that there are cases outside of

3    bankruptcy.  You have ad hoc committees --

4         THE COURT:  You do.

5         MR. LABUDA:  -- lender groups that certainly employ

6    bankers.  And the debtor often signs engagement letters for

7    them.  And I think, if Mr. Szlezinger had testified, he could

8    talk about some of those cases; including one, <u>Dendreon</u>, when

9    he was involved with an ad hoc group outside of bankruptcy that

10   did have a transaction fee for those creditors.  But you are

11   right.  I think there is a distinction, and it would result in

12   a lower fee.

13        But I would note, as well, here that the key fee, I

14   think from the committee's perspective in Jefferies, is really

15   more the plan fee or restructuring fee, as opposed to the sale

16   fee.  Because unless the committee is going to be excluded from

17   the plan process, which I know the debtor will not do, they're

18   going to be a critical component of any plan negotiation that

19   goes on.

20        And in fact, under the Lazard retention order,

21   Lazard's engagement ends at the closing at the sale.  So they

22   will be banker involved in that, and the committee will need

23   their services.  It will be critical that they have the advice

24   and an analysis of their own banker to advise them, hopefully,

25   on some plan that would be consensual among the parties.

1        So to sort of just wrap up this point, I would say

2    that the cases that have been cited to Your Honor do not have

3    this sort of touch rule or sort of requirement that they're

4    responsible for it.  It's not in the Lazard order, or not, as

5    far as I'm aware, in any of the orders that have been cited in

6    the objections, as opposed to bankers.

7        I'll note, as well, notwithstanding that, Jefferies

8    did concede to reduce the restructuring fee if the committee is

9    not on board with it.  That's not something Jefferies wanted;

10   that's a byproduct of the arm's length negotiation that went

11   on.  They'd obviously prefer not to have it, but they have

12   agreed to dramatically reduce it in that scenario.

13       THE COURT:  Did I not track this?  I have a little

14   chart that I've made of this.  But I have the transaction fee.

15   Is there a separate plan fee?

16       MR. LABUDA:  It's called a "transaction fee," but it

17   was broken down because it would be calculated differently if

18   it were a sale or a plan of reorganization that would not have

19   a sale price.  So, given that there would be two formulas, as

20   originally envisioned, it's encompassed under that transaction

21   fee.

22       But again, I do think that they've made a significant

23   reduction in any fee arising from the sale.  But I will say

24   again to Your Honor, that I think, from our perspective, you

25   know, a fee arising from any plan is much more important and

1    applicable here, from Jefferies', and perhaps even the

2    committee's perspective.

3              THE COURT:  Okay.

4              MR. LABUDA:  The other point is the 330 point.  Your

5    Honor can make a determination of reasonableness now.  There

6    are cases out there that say, what do you look at.  You look at

7    their qualifications and need for the banker.

8              THE COURT:  And the market terms.

9              MR. LABUDA:  What -- is it market -- exactly.

10             And the reason why 328 was enacted was because

11   contingency fee arrangements or flat fee arrangements are very

12   different from hourly, where an hourly professional can file

13   monthly fee statements, interim applications, and get a feel,

14   are these fees being objected to, are they being disallowed,

15   and if they're disallowed, they can make the decision that I'm

16   no longer going to work in this case.

17             A flat fee professional or a contingency arrangement,

18   you're asking the professional to do all of the work; hundreds,

19   maybe thousands of hours, and then, at the end of the case,

20   examine what that work was worth, or in a case, bankruptcy,

21   where it's an adversarial process to begin with, and we've

22   already been told there are objections to it, people are

23   saying, do all the work, and then we'll litigate with you

24   whether you should get any fee.  And that's just too much risk

25   and too much uncertainty under those scenarios.  And that's

1    exactly, we would submit, why 328 was enacted.

2           THE COURT:  Okay.  Thank you.

3           MR. LABUDA:  Thank you.

4           THE COURT:  All right.

5           MR. JUNG:  Your Honor, I will be brief.

6           Your Honor, the committee has a goal and a job to do

7    in this case, a job that a debtor or the lenders will not do.

8    As already illustrated in connection with the financing and the

9    sale, the debtor will not take positions or many positions that

10   are, frankly, adverse to the lender.

11          Your Honor, a number of parties emphasized the need

12   for a linkage between a fee and a 328 approval.  However, Your

13   Honor, looking through the payment provisions for both the

14   debtor and, in fact, the lender's own professional, there is no

15   linkage.  Your Honor, it is not common; and in fact, we have

16   not seen a linkage that had been put in place by courts with

17   respect to a result specifically achieved by a committee

18   professional.

19          Your Honor, a lot has been said with respect to 328

20   and three twenty -- or 330 review for a financial advisor, and

21   the parties have suggested that 328 approval is not common.

22   Your Honor, we -- there are plenty of cases, frankly, to the

23   contrary, and I will only reference three.

24          Your Honor, in the Allied Nevada case, Zolfo was

25   retained as a committee financial advisor in May of this year,

1    just a couple of weeks ago, Your Honor, under 328 review, under

2    the same fee structure.  Your Honor, in the (indiscernible)

3    case, likewise, Zolfo was engaged under 328 in January of this

4    year.  And two years ago, Your Honor, in Exide, the same thing,

5    Zolfo was retained under 328.

6          Your Honor, also parties referenced that -- the size

7    of this case, as I believe the reference was made that these

8    cases are medium-sized, and the committee may not need both

9    sets of financial professionals.  Your Honor, it's interesting

10   to see the deference made, given when you got professionals

11   retained by other constituents, Your Honor, it begs to differ

12   what size of a case, and this --

13         THE COURT:  My guess is, they talked about in

14   advanced, and the guys from Skadden probably told Mr. Collins

15   to make that argument.

16      (Laughter.)

17         MR. JUNG:  Your Honor, in sum, we don't believe that

18   the budget should control retentions.  The parties and the

19   committee should have a level playing field here.  And we

20   believe that the proposed retentions, as revised for Jefferies

21   and by the inclusion of the reservation of rights in the

22   orders, under those terms, Your Honor, we believe the retention

23   should be approved.

24         THE COURT:  Very well.

25         MR. JUNG:  Thank you.

1          THE COURT:  Okay.  Here's what we're going to do.  I'm

2    going to approve the retention applications with the following

3    provisions:

4          First, I note that I think counsel has assiduously

5    noted that there are no issues and no challenges to the

6    qualifications, experience, and abilities of all four

7    professionals at issue here.

8          The retentions of debtors' counsel [sic] are,

9    effectively, unopposed, other than a budget issue that I'll

10   deal with in a moment.  I will approve the Lowenstein and

11   Polsinelli retention applications, as provided.

12         With respect to the budget issue, I agree with counsel

13   that I will not address issues with respect to the budget and

14   budgetary restrictions, in the context of a retention.  I think

15   case law teaches that a committee is entitled to interview and

16   retain counsel of its choice, subject, of course, to this

17   Court's review.  And again, there's no challenge to the

18   abilities and qualifications.

19         I make no comment with respect to the size of this

20   case.  I think that that's a separate consideration.  It

21   sometimes comes into play.  But this is not what I would call a

22   small little case or anything else that would catch my

23   attention, to see such a major player showing up.  There are

24   significant amounts at issue here.  This is not a simple case.

25         And so, be that as it may, I have no concerns with

1   respect to the engagement and qualifications of the

2   professionals at issue.  So I'm not going to touch on the

3   budget issue.

4         I share, frankly, Mr. Rosenthal's concern, and that's

5   why I expressly asked the question.  And I did see it in your

6   papers, but I appreciate, Mr. Dressel, you walking me through

7   the issue.  The last thing I would want to do is put the debtor

8   in a functional default situation at the outset.  We may have

9   issues that we'll need to deal with, and it may be that the

10  issues resolve as the case plays itself out.  I will be here,

11  one way or the other.

12        With respect to the 328 retentions, as to Zolfo, I

13  will not approve a 328 retention; I will approve a 330

14  retention.  I find that, again, the retention of Zolfo is

15  consistent.  I understand the work that they're going to do.

16  And again, on an hourly basis, it seems to me that that 328(a)

17  retention is not either typical or appropriate.

18        I would make the following observation, and it applies

19  both to Jefferies and to Zolfo, and that is that I certainly am

20  not criticizing counsel for raising prior instances of

21  retentions that had particular provisions.  If I were sitting

22  where you are, I would do precisely the same thing.

23        But I find it of extremely limited utility.  The fact

24  that an order has been entered that provides for certain

25  protections for a professional in another case doesn't give me

1    any context on whether it was opposed, what the circumstances

2    of that were, what the amounts were, and what the judge was

3    considering.

4         And as you might expect, in many, many instances, I

5    rely upon the able and experience counsel and other

6    professionals that are in the case in front of me and the

7    oversight of the Office of the United States Trustee.  And if

8    there were no opposition to these retentions, I would likely

9    have approved them without comment.  But -- so I don't find

10   that the fact that these professionals have been retained in

11   other cases, in this jurisdiction or in others, under the terms

12   that they're requesting today is of any significance to me.

13        With respect to Jefferies, it's a more complicated

14   issue, but I will not approve a 328(a) retention, as it relates

15   to a sale or transaction fee for Jefferies.  And I agree that I

16   have seen it on many occasions.  I agree that it is customary

17   for debtors' counsel.  But I'm not satisfied that I know, at

18   this context, sufficient information that would allow me to

19   make a determination of whether or not the 328(a) transaction

20   fee is reasonable or appropriate.

21        I have certainly read it carefully, I understand, and

22   I have seen amounts like that that I have approved in other

23   cases.  But again, there is a -- there's a function difference

24   between the financial advisor and -- I'm sorry -- the

25   investment banker for a professional and the investment banker

1   for the debtor, at least as the Court typically presumes a sale

2   process will move forward.  And so, at least in consideration

3   of the objections that have been raised, I will not approve the

4   328(a) retention, as it relates to the transaction fee for

5   Jefferies.

6           I would make the following observation, though.  And I

7   think that this is important.  And Mr. Labuda, I appreciate you

8   clarifying this for me.

9           While I have concerns with respect to the 328(a)

10  retention terms, as it would relate to a transaction fee, I

11  would be prepared to revisit that issue in the context of if

12  there were a plan or an exit or a restructuring arrangement

13  that were to be negotiated or obtained between the parties.

14          I'm looking at this case as a sale case.  I make no

15  prediction about how the auction itself may play out.  But I

16  have concerns with respect to approving on a 328 basis a

17  transaction fee for committee counsel at this stage.  It seems

18  to me that, if this case were to play out with a sale that was

19  then looking, shortly thereafter, at a plan to be developed and

20  confirmed, it may be that committee counsel would be deeply

21  involved, and the committee professionals would be deeply

22  involved in that exercise.  And I would be prepared to revisit

23  the terms of the engagement or amend and expand the terms of

24  the engagement, if circumstances warrant.  That would seem, to

25  me, to be a more typical arrangement.

1          I've taken a very quick look at this while we were --

2    while you were speaking and while I was preparing to rule, and

3    I don't necessarily see it broken out in a way that would allow

4    me to intelligently approve it under 328, for purposes of a

5    restructuring or plan fee, versus the sale.  It seems to me

6    that there's kind of a toggle there.

7          And so, based upon the application, as it's presented

8    before me, the focus of our discussion today and of the

9    retention has been on the context of a sale, and so I will not

10   approve a 328(a) retention, as it relates to a sale for

11   Jefferies.

12         Are there any questions?  Mr. Labuda.

13         MR. LABUDA:  Your Honor, I would just ask if that's

14   the concern.  I think Jefferies would be willing to strike any

15   fee whatsoever arising from any sale, so it truly would be a

16   plan that the committee had been negotiating on --

17         THE COURT:  Well, let's do this.

18         MR. LABUDA:  -- and seeking confirmation of that

19   wasn't a mere distribution of proceeds of an asset sale.

20         THE COURT:  Let's do this.  I think I've made my

21   observations.  I'm certainly open to the issue.  But at least

22   at the beginning, you don't negotiate it with me.

23     (Laughter.)

24         THE COURT:  But I would if I were you.  The -- so I

25   would invite you to confer.  I think I've made my observations.

1    I don't know as much about the dynamics about this case, and so

2    I'm reluctant to -- I'm reluctant to go much further than I

3    have.

4         The idea of a plan and the terms of a plan and a

5    restructuring are much less -- present much less concern than,

6    frankly, the very simple issue of how do we know -- to be

7    blunt, and again, with no disrespect to Jefferies, how do we

8    know whether or not they are going to actually contribute

9    anything to the sale process?

10        You know, at this stage, I -- again, I make no comment

11   about their involvement and contribution to the bid procedures,

12   et cetera.  But I've heard and I am supportive of the

13   objections and the concerns at this stage relating to a sale.

14   You're welcome to confer.  And if you can come to terms, I'm

15   confident I'll be supportive.  If that becomes an issue, then I

16   don't want more motion practice or anything else.  You can get

17   me on the phone, and show me what the bid and the ask are, and

18   we can talk about that.

19        MR. LABUDA:  I will just disclose to the Court, we

20   have discussed this possibility with the committee, who is

21   certainly on board of just striking that provision of the

22   engagement letter, if it would solve the problem for the Court.

23        THE COURT:  I'd like to know -- I'd like the objectors

24   to have a chance to understand that --

25        MR. LABUDA:  Okay.

1        THE COURT:  -- and get their head around it.  But

2   again, it's not my intention to leave Jefferies hanging out

3   there.  And so, if there is consensus, you can expect I'd be

4   likely on board.  If there's an issue, then what I would

5   encourage you to do is get me on the phone --

6        MR. LABUDA:  Okay.

7        THE COURT:  -- and we can sort through it.  Okay?

8        MR. LABUDA:  Thank you, Your Honor.

9        THE COURT:  All right.  All right.  So I will look for

10   orders with respect to the four retentions.  And I don't know

11   if we need to tinker with them a little bit, but I'll take them

12   under certification; that seems as easy as anything.

13        MR. JUNG:  Your Honor, we have copies of Lowenstein's

14   and Polsinelli's retentions --

15        THE COURT:  Okay.

16        MR. JUNG:  -- that were filed with the reply.

17        THE COURT:  Great.

18        MR. JUNG:  If I may approach.

19        THE COURT:  I'll take them.  And I'll take the other

20   two under certification, after the process plays out.

21        I think we have a status conference at this point.

22        MR. JUNG:  Yes, Your Honor.  As Your Honor may recall,

23   the final financing order establishes May 26th as the challenge

24   deadline for the committee to review and challenge any claims

25   or liens with respect to prepetition lenders.

1      Your Honor, the committee contemplates filing a

2  standing motion by end of business on Monday, which is next

3  Monday, May 18th, which would be about eight days or so prior

4  to the challenge period.  Your Honor, I know that because the

5  language of the financing order provides that the committee

6  must be granted standing prior to the expiration of the

7  challenge deadline, which brings a question that we would

8  likely need a hearing between the 18th and the 26th.

9      THE COURT:  Okay.  Thoughts?

10  (No verbal response.)

11      THE COURT:  Well, let's do this.  Do you want a

12  minute?

13      UNIDENTIFIED:  I do, Your Honor.

14      THE COURT:  Yeah.  I think I mentioned, I will deal

15  with all -- any and all of this on the merits.  My goal is to

16  not burden the parties with the emergency practice.  But

17  there's a deadline, and the committee needs to abide by it.

18  But there ought to be a way that we can rationally deal with

19  these issues.

20      I will -- we'll give you five minutes, and then we'll

21  reconvene.  And I think I'll look to be guided by the parties.

22  Stand in recess.

23  (Recess taken at 12:40 p.m.)

24  (Proceedings resume at 1:02 p.m.)

25      THE COURT:  Please be seated.

1          MR. JUNG:  Wojciech Jung for the record.

2          Your Honor, we were able to confer with the debtors

3     and the lenders, and we have some dates to propose to Your

4     Honor.

5          THE COURT:  Great.  Okay.

6          MR. JUNG:  As mentioned earlier, the committee will

7     file its standing motion on the 18th, together with attached

8     proposed complaint.  Parties-in-interest would have until June

9     1 to file responses.  The committee would have until June 4 to

10    file a reply.  And depending on Your Honor's availability, the

11    parties would request a hearing on June 8th.

12         THE COURT:  I can do that.

13         MR. JUNG:  And Your Honor, with respect to the

14    challenge deadline, parties are in agreement that the deadline

15    will be tolled until such time as Your Honor rules on the

16    motion.

17         THE COURT:  Okay.  Mr. Meisler?

18         MR. MEISLER:  Your Honor, that's not quite right.  We

19    agreed that the challenge period would be extended until the

20    end of business on June 8th.

21         THE COURT:  So would you like me to rule from the

22    bench?

23         MR. MEISLER:  That -- Your Honor, that's what we were

24    hoping.  We --

25         THE COURT:  Would you like me to order lunch in for

1   you guys, too?

2        (Laughter.)

3        THE COURT:  Is there anything else I can do for you?

4        We'll -- I'm fine with that.  One of two things will

5   happen.  At the conclusion of the hearing on the 8th, I will

6   either be prepared to rule from the bench; or, if I'm not, I'm

7   aware of the parties' timing, and I would rule promptly.  And I

8   think that that's -- I don't need -- if I were Silver Point --

9   and Mr. Meisler, I would not want to be in the situation where

10  you're just left out there hanging with me.  I will deal with

11  this issue on the 8th, and you ought to, and are welcome to

12  remind me on the 8th.  I'm not guaranteeing that I rule from

13  the bench.

14       In this situation -- well, you've been here before.

15  But in this situation, if I have a fair amount of testimony and

16  a bunch of issues, I may say, I'm going to take this under

17  advisement; I'll get you on the phone tomorrow or the next day

18  and I'll rule.  But it's not my -- but I understand the

19  certainty you're looking for.  I'm okay with that structure.

20  And if I need to, I will deal with it at the end of the day on

21  the 8th.  If I'm not in a position to rule, I will deal with it

22  in a way that is cognizant of your concerns and respect to all

23  of your interests.  Okay?

24       MR. MEISLER:  Thank you, Your Honor.

25       MR. JUNG:  Your Honor, with the agreement on the

1  dates, I will presume that we no longer have to file a motion

2  to shorten time --

3          THE COURT:  You don't need --

4          MR. JUNG:  -- that has been dispensed with?

5          THE COURT:  -- a motion to file -- to shorten time.

6  As a matter of fact, I don't think you need to shorten time,

7  anyway.  The 18th to the 8th is probably pretty close.  So you

8  don't need to file a motion to shorten time, I'm okay with the

9  scheduling; you can just notice it.  And we would convene at

10  9:30 a.m. on the 8th.

11          Let me make a couple of observations.  I'm not sure

12  how much live testimony the parties are expecting.  I've done

13  this -- I've seen this play out a couple of different ways.

14  I've seen it largely by affidavit and document, I've seen it by

15  live testimony, as well.  So the only thing I'd ask is that you

16  do what you've done in the past, and that's confer and make

17  sure that everybody is on the same page.

18          I have time for you on the 8th.  If we're talking

19  about witnesses and a number of them, then I would encourage

20  the parties to consider proceeding with direct by way of

21  declaration.  I'm not going to order that.  But I'll tell you

22  that I often prefer it, especially when I know it's coming,

23  because I think it -- I can read it faster than you can elicit

24  it.  And also, I think that it certainly makes the cross-

25  examination more focused and more brisk.

1              If there are issues with respect to the mechanics of

2    the process, if there are discovery issues or anything else, or

3    scheduling issues, I don't like motion practice in that

4    context, and I would invite you to get me on the phone, if we

5    have problems with this.

6              But Mr. Rosenthal, would you remind me -- or actually,

7    Counsel, you may know.  But what's the -- what's our sale

8    hearing?

9              MR. ROSENTHAL:  The sale hearing is the 17th, Your

10   Honor.

11             MR. JUNG:  The 17th.

12             THE COURT:  It's, I'm sorry, the 7th of?

13             MR. JUNG:  17th.

14             MR. ROSENTHAL:  17th.

15             THE COURT:  17th.

16             MR. ROSENTHAL:  The 11th is the auction deadline, and

17   the 15th is the auction, if we have one, and the 17th is the

18   sale hearing.

19             THE COURT:  Great.  I see it here.  Okay.

20             All right.  Well, that sounds fine.  Then the timing

21   the parties have proposed is okay.  As I said, you don't need

22   to file a motion to shorten.  I'll look for that motion to be

23   filed on Monday.  And again, issues related to process,

24   briefing, et cetera, would be the subject of teleconference.

25             And as well -- especially if this is documentary, then

1   I would expect the parties to confer in advance and, to the

2   extent possible, come up with an agreed list of stipulated

3   exhibits.  That means -- that doesn't mean you all have to

4   agree, but the majority of them, I expect, are not going to be

5   controversial.  If there are ones that are controversial, we'll

6   deal with them.  They'd be in your own separate package.

7          But anything else that we need to cover for purposes

8   of this issue?

9          UNIDENTIFIED:  No.

10         MR. JUNG:  That's all from us, Your Honor.

11         THE COURT:  Okay.  Thank you very much.  And we'll

12   stand in recess.  Thank you very much, Counsel, I appreciate

13   it.

14         UNIDENTIFIED:  Thank you, Your Honor.

15    (Proceedings concluded at 1:07 p.m.)

16                         *****

1                        CERTIFICATION

2              I certify that the foregoing is a correct transcript

3         from the electronic sound recording of the proceedings in the

4         above-entitled matter to the best of my knowledge and ability.

5

6

7

8         /s/ Coleen Rand                     May 19, 2015

9         Coleen Rand

10        Certified Court Transcriptionist

11        For Reliable