# EXHIBIT A

Master Services Agreement

This Master Services Agreement ("Agreement") is dated and effective March, 2014 between The Standard Register Company ("SRC"), an Ohio corporation, with its principal place of business at 600 Albany Street, Dayton, Ohio 45417, and Chaotic Moon, LLC, a Delaware limited liability company with its principal place of business at 319 North Congress Avenue #200, Austin, Texas, 78701, USA ("Service Provider"), each individually referred to as a "Party" and collectively referred to as the "Parties".

BACKGROUND

Service Provider provides professional services and related work. SRC desires to obtain such Services from Service Provider and Service Provider is willing to provide the same to SRC pursuant to the following terms. The Parties, therefore, agree as follows:

1. **DEFINITIONS**
    1.1 "Affiliate" means any entity which controls, is controlled by, or is under common control with, the applicable Party.
    1.2 "Confidential Information" means non-public information that each Party obtains from the other Party or on its behalf in anticipation of or in connection with this Agreement relating to the disclosing Party's business that the disclosing Party designates as being confidential or proprietary or which, under the circumstances surrounding disclosure, ought to be treated as confidential. Confidential Information includes, without limitation, current and prospective marketing models, plans or strategies, vendor/supplier lists, customer or consumer lists or information, Nonpublic Personal Information, Personally Identifiable Information, former or current employee lists or information, passwords and security practices and procedures, advertising and pricing plans or strategies, databases and data processing methodologies, algorithms, software code (in any form including source code and executable or object code), margins and expense levels, distribution and reseller arrangements, strategies and plans for the development and implementation of future products and services, refinements and additions to current products or services, trade secrets, any other proprietary, confidential or secret aspects of the Parties' business.
        1.2.1 Information is not Confidential Information if it: (a) was already in the possession of the recipient prior to its receipt from an entity other than a Party or someone acting on its behalf, as shown by the recipient's books and records; (b) is, or becomes, public knowledge through no fault, or wrongful act or omission of the recipient; (c) is, or becomes, available to the recipient from a source other than the disclosing Party, if such source has rightfully obtained such information without an obligation of confidentiality to the disclosing Party; or (d) is independently developed by the recipient without reference to the Confidential Information of the disclosing Party.
    1.1 "Deliverable(s)" means (i) all documentation, materials and tangible items embodying the Services, including, without limitation, research results and summaries, images, designs, slides, text, artwork, portraits, graphics, photographs, pictures, illustrations, works of authorship and all other copyrightable forms of expression, and (ii) any invention, discovery, enhancement, improvement, know-how, design, layout, practice, process or method made, developed or first reduced to practice by Service Provider, either solely or in collaboration with SRC, subcontractors or others, during the course of providing the Service, in each instance whether protected by any Proprietary Right or not, but in any event specifically relating to the Services performed or to be performed by Service Provider. Deliverables do not include Service Provider Materials or Third Party Materials.
    1.2 "SRC Materials" means all content, artwork, images, designs, photos, and all other copyrightable works, and any derivatives thereof, that SRC or its representatives provide Service Provider (in whatever form or medium) in connection with this Agreement.

1.3 "**Intellectual Property**" means all algorithms, application programming interfaces, apparatus, circuit designs and assemblies, concepts, Confidential Information, data, databases and data collections, designs, diagrams, documentation, drawings, flow charts, formulae, ideas and inventions (whether or not patentable or reduced to practice), know-how, materials, marketing and development plans, marks (including brand names, product names, logos, and slogans), methods, models, configurations and architectures, procedures, processes, protocols, schematics, software code (in any form including source code and executable or object code), specifications, techniques, tools, uniform resource identifiers including uniform resource locators (URLs), user interfaces, web sites, works of authorship, and other forms of technology.

1.4 "**Nonpublic Personal Information**" means Personally Identifiable Information and any list, description or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Personally Identifiable Information that is not publicly available.

1.5 "**Personally Identifiable Information**" includes but is not limited to: (i) information a consumer or customer provides to SRC or SRC's clients to obtain a product or service from SRC or SRC's clients; (ii) information about a consumer or customer resulting from any transaction involving a product or service provided by SRC or SRC's clients; (iii) information SRC otherwise obtains about a consumer or customer in connection with providing a product or service to that consumer or customer directly or on behalf of its clients; (iv) the fact that a person is or has been a SRC consumer or customer or has obtained a product or service from SRC or SRC's clients; (v) information about a SRC consumer or customer if it is disclosed in a manner that indicates that the individual is or has been a SRC consumer or customer; (vi) information about a consumer or customer that SRC collects through web analytics or internet "cookies" (an information collecting device from a web server); or (vii) information about a consumer or customer from a consumer report.

1.6 "**Proprietary Right**" means all copyrights, trademarks, product or service marks, trade dress, patents, trade secrets, moral rights, author's rights, privacy rights, publicity rights and all other forms of intellectual property protection, or rights arising under common law, by statute and/or by contract.

1.7 "**Representative(s)**" means Service Provider's directors, officers, employees, agents, affiliates and subcontractors.

1.8 "**Service(s)**" means the Deliverables and the service to be performed by the Service Provider and the obligations and responsibilities of the Service Provider as set forth in this Agreement or any related SOW.

1.9 "**Service Provider Materials**" means all Intellectual Property and other materials developed, acquired, or otherwise obtained by Service Provider prior to this Agreement or modified, improved, enhanced, extended or created but not specifically related to the services to be performed and Deliverables to be delivered to SRC.

1.10 "**Statement of Work**" and "**SOW**" includes, but is not limited to, a statement of work, purchase order, work order or other similar document attached to this Agreement and/or referencing this Agreement and executed and delivered by each of the Parties hereto specifying the applicable Services and Deliverables to be performed and/or delivered by Service Provider, as well as such other details and terms and conditions relating thereto as may be agreed to by the Parties.

1.11 "**Third Party Materials**" means all Intellectual Property and other materials licensed or obtained by Service Provider from third parties used by Service Provider in the performance of Services or incorporated in or provided as a Deliverable.

2. **SERVICES / CONSULTATION**

2.1 *Statements of Work.* Each SOW shall be deemed incorporated into and governed by the terms and conditions of this Agreement. If any term or condition of a SOW conflicts with (or is inconsistent with) any term or condition of the body of this Agreement, then the term or condition contained in the SOW will prevail with respect to the applicable SOW.

2.2 *Acceptance.* Except as otherwise set forth in an applicable SOW and subject to the external dependencies and obligations of SRC set forth in the applicable SOW ("Dependencies"), Deliverables must meet material deadlines, specifications and acceptance criteria set forth in each SOW ("Acceptance Criteria"). SRC, with Service Provider's cooperation and assistance, will conduct acceptance tests to verify whether the Deliverables meet Acceptance Criteria. SRC shall have such specific period as may be mutually agreed upon as

set forth in the applicable SOW to conduct acceptance testing (the "Acceptance Period"). Unless SRC rejects a Deliverable prior to the expiration of the Acceptance Period by giving written notice to Service Provider specifying the Acceptance Criteria that are not met by such Deliverable and documenting the details of the acceptance testing so that Service Provider can recreate the alleged nonconformance, then such Deliverable shall be deemed accepted by SRC. SRC may reject any Deliverable that does not conform materially to the applicable Acceptance Criteria, and SRC shall accept each Deliverable that conforms materially to the applicable Acceptance Criteria. Service Provider will promptly remedy any actual nonconformance at no additional charge to SRC.

2.3 *Change Orders*. If a material change to Service Provider's scope of work, resource allocations, schedule or Fees results from (i) a modification to the SOW as requested by SRC; (ii) a failure by either Party or its Representatives to timely perform its responsibilities with respect to the Services, including without limitation, a failure to timely provide approvals, materials, or feedback, as required by the SOW; or (iii) an extension of any milestone completion schedule under the SOW due to causes outside of Service Provider's reasonable control or complications unanticipated by the Parties, then Service Provider and SRC shall negotiate in good faith to detail the changes to the applicable SOW including additional fees in a writing signed by both Parties ("Change Order").

2.4 *Subcontractors*. Service Provider shall not delegate or otherwise subcontract any part of the Services or Deliverables to any affiliate or third Party unless: (a) SRC consents in writing in advance (excluding individual contractors engaged by Service Provider, for whom SRC's consent is not required); and (b) such affiliate or third Party agrees in writing to be bound by (i) the terms and conditions of this Agreement, including, without limitation Sections 5, 6, 9, and 15.4 herein, or (ii) terms and conditions at least as favorable to SRC than those contained herein. Service Provider shall be responsible for enforcing the requirements of this Agreement with respect to its Representatives and shall be responsible for Services performed or Deliverables provided by its Representatives hereunder to the same extent as if performed by Service Provider itself. Service Provider is responsible and liable to SRC for any breach of such terms and conditions, subject to the terms of this Agreement.

2.5 *No Minimum Quantity*. By entering into this Agreement, neither Party makes any promise or commitment to engage in any minimum quantity of Services or to execute and deliver any particular SOW.

3. COMPENSATION

3.1 Service Provider shall be compensated for the Services as expressly set out in an applicable SOW or as otherwise agreed to by the Parties in writing.

3.2 To the extent provided for expressly in a SOW or other written agreement between SRC and Service Provider and subject to the terms and conditions of such SOW or agreement and payment for all applicable items to Service Provider (or any applicable third Party) by SRC, all equipment (personal computers, lap top computers, modems, etc.) or other items of personal property procured by Service Provider and paid for by SRC is SRC's property and will be delivered to SRC by Service Provider in accordance with the terms of the applicable SOW.

3.3 Service Provider will be reimbursed for reasonable expenses pursuant to the terms of the applicable SOW or as otherwise agreed by the Parties in writing.

3.4 SRC has no obligation to deduct from any compensation due to Service Provider hereunder any payments required by any taxing authorities, including income tax and social security payments. Payment of all such taxes is the Service Provider's responsibility. Service Provider agrees to indemnify and hold SRC harmless for any claims made by any taxing authorities resulting from Service Provider's compensation or Services hereunder; provided, however, that unless SRC provides Service Provider with a valid tax exemption number or as otherwise provided herein, SRC shall pay directly or reimburse Service Provider for all taxes, assessments, permits and fees, however designated, which are levied upon this Agreement, each SOW or the Services and/or Deliverables, or their use, excluding franchise taxes and taxes based upon Service Provider's income.

3.5 Invoices will be delivered to SRC by Service Provider as provided in the applicable SOW. Undisputed

portions of such invoices shall be paid within forty-five (45) days of the date SRC receives Service Provider's invoice, unless a different period is specified in the SOW. In order to dispute any amount, SRC must submit a written notice detailing the grounds for such dispute within such payment period. Disputed amounts will be paid within fifteen (15) days after any resolution of the dispute.

4. **TERMINATION**

4.1 SRC shall have the right to terminate this Agreement or any outstanding SOW by giving thirty (30) days prior written notice to Service Provider, accompanied by all undisputed amounts due and payable to Service Provider pursuant to this Agreement as of the date of such notice (and disputed amounts are subject to the requirements of Section 3.5 above for detailed notice and payment upon resolution of the dispute); additionally, SRC shall remain obligated to pay Service Provider for any Deliverables completed during such thirty (30) day notice period. Unless provided otherwise in an applicable SOW, each SOW shall terminate simultaneously with the termination of the Agreement, provided that the terms of the Agreement shall continue to apply to SOWs and/or Deliverables that are already complete.

4.2 Notwithstanding the termination of this Agreement or any SOW, the following Sections of this Agreement shall be deemed to survive: 2.4, 3.2, 4 through 10, 12, 13, and 15.4 (and any other provision of this Agreement or a SOW which expressly extends beyond the term hereof or, under the circumstances, ought to survive) and, to the extent applicable to the foregoing Sections or provisions, Sections 1 and 15 herein.

5. **OWNERSHIP OF DELIVERABLES AND MATERIALS**

5.1 Service Provider acknowledges that all Deliverables (other than Service Provider Materials and Third Party Materials) are the sole and exclusive property of SRC and, except as stated below, agrees to assign and hereby does assign, to SRC, all of Service Provider's right, title and interest in and to all Deliverables and Proprietary Rights (other than Service Provider Materials and Third Party Materials) upon payment in full of all amounts owed to Service Provider under this Agreement. Accordingly, Service Provider shall require each of its employees and Representatives performing any Service to assign in writing all their right, title and interest in and to Deliverables to Service Provider.

5.2 To the extent that any Service Provider Materials are embedded or incorporated into any Deliverable, upon payment in full of all amounts owed to Service Provider under this Agreement Service Provider hereby grants to SRC a non-exclusive, perpetual, irrevocable, worldwide, unrestricted license for SRC to use, copy, modify, improve and display, the Service Provider Materials as they exist in the Deliverable to the extent required for the use of the Deliverable in accordance with this Agreement and any applicable SOW. Service Provider shall obtain SRC's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, prior to incorporating any Service Provider Materials or third party software into any Deliverable. SRC understands and agrees that the use, duplication, distribution and creation of derivative works of any works embodying Third Party Materials (including without limitation Deliverables), may require SRC to obtain a license from each applicable third party with respect to such Third Party Materials, and Service Provider agrees to cooperate with SRC in good faith by identifying such Third Party Materials and providing reasonable assistance to SRC in obtaining such licenses.

5.3 Service Provider shall, upon request and at no cost to SRC (except as noted below), do all lawful acts, including, but not limited to, executing documents, making lawful oaths, giving testimony and cooperating in all related proceedings and matters as may be reasonably necessary for SRC to obtain, sustain, reissue and enforce Proprietary Rights related to any Deliverable and to perfect, affirm and record its complete ownership and title thereto. To the extent that giving testimony and cooperating with proceedings under this Section 5.3 requires Service Provider to expend a material level of time and/or resources, SRC shall pay Service Provider's reasonable fees and expenses related thereto.

5.4 Service Provider will keep reasonably complete, accurate and authentic accounts, notes, data and records of all Deliverables in accordance with Service Provider's business practices and in material conformance with any manner and form, and any obligation to deliver such materials to SRC, described in the applicable SOW.

5.5 SRC Materials shall remain the sole and exclusive property of SRC and, other than as set forth herein,

Service Provider Materials shall remain the sole and exclusive property of Service Provider or third Parties who have granted rights to Service Provider. Service Provider agrees to (a) access and use SRC Materials solely in connection with this Agreement; (b) use commercially reasonable efforts to protect and safeguard SRC Materials from misuse, loss and destruction; and (c) not use or disclose SRC Materials other than in connection with the performance of Services or as otherwise necessary or appropriate for Service Provider to fulfill its obligations under the applicable SOW, without the prior written consent of SRC. SRC agrees to (a) access and use Service Provider Materials only pursuant to the license granted under the applicable SOW; (b) use commercially reasonable efforts to protect and safeguard Service Provider Materials from misuse, loss and destruction; and (c) not use or disclose Service Provider Materials other than in connection with the intended use of the applicable Deliverables, without the prior written consent of Service Provider. Regardless of any such consent, except as otherwise stated herein, neither Party is conferred or granted, by estoppel, implication or otherwise, any Proprietary Right, license, interest or title in, to or under SRC Materials or Service Provider Materials.

6. **CONFIDENTIAL INFORMATION**

6.1 Except as necessary in the performance of the Services or as otherwise stated herein, neither Party will access, use or retain Confidential Information of the other Party without specific written authorization from that Party.

6.2 Notwithstanding the provisions of this Section 6, the recipient Party may disclose the other Party's Confidential Information if, in the view of its counsel, such disclosure is required by law or legal process; provided, however, that recipient Party shall give reasonable notice to the other Party of such requirement and shall cooperate with such other Party in legal efforts to limit or mitigate any such disclosure so as to preserve, to the extent practicable, the confidential and proprietary nature of any such information.

6.3 Immediately upon the expiration or termination of this Agreement or applicable SOW or earlier, upon SRC's request, Service Provider shall deliver to SRC or provide written confirmation of secure destruction of all SRC Materials and Confidential Information, in whatever form and on whatever media recorded, electronic or physical, or items containing or referring, in whole or in part, to any SRC Materials or Confidential Information.

7. **RELATIONSHIP OF THE PARTIES**

7.1 Service Provider is an independent contractor and nothing herein creates a partnership, joint enterprise, or any form of employment relationship between the Parties. Neither Party has the right, power, or authority to bind the other to any third Party or to act in any way as the representative or agent of the other, unless otherwise expressly agreed to in writing signed by both Parties.

8. **NOTICES**

8.1 All notices contemplated under this Agreement shall be in writing and shall be deemed received as reasonably evidenced via receipted mail (including e-mail, facsimile, overnight delivery, or certified mail), postage prepaid as applicable and addressed as set forth below. A Party may from time to time change its address or designee for notification purposes by giving the other Party prior notice of the new address or designee and the date upon which the change will become effective.

For notices to SRC:

The Standard Register Company
600 Albany Street
Dayton, Ohio 45417
Attention: Legal Department

For notices to Service Provider:

Chaotic Moon, LLC
3571 Far West Blvd., #36
Austin, TX 78731 USA

Attention: Legal Department

With a copy to:

Wm. A. Broussard, Esq.
General Counsel, Chaotic Moon, LLC
P.O. Box 162926
Austin, TX 78716-2926 USA
Re: SRC MSA

### 9. PRIVACY & SECURITY REQUIREMENTS

9.1 Service Provider shall comply with the laws and regulations applicable to its obligations hereunder; provided, however, Service Provider makes no warranty or representation that the Services or Deliverables will comply with any laws and regulations applicable to their end use by SRC, its customers, and/or consumer end users.

9.2 If requested by SRC, Service Provider facilities and or systems where the Services are being undertaken, developed or performed will undergo a security audit in accordance with generally accepted industry practices, at the expense of SRC.

9.3 Service Provider shall implement and maintain appropriate policies and procedures to safeguard the confidentiality of SRC Confidential Information.

9.4 Service Provider shall promptly advise SRC in writing when any unauthorized access to SRC Confidential Information has occurred or is suspected to have occurred or when any of the requirements of this Section have been or may have been violated whether by accident or by intent.

### 10. LIMITATION OF LIABILITY

10.1 EXCEPT FOR (I) A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (II) A PARTY'S INDEMNIFICATION OBLIGATION UNDER SECTION 13, OR (III) A BREACH OF THE CONFIDENTIALITY OBLIGATIONS OF SECTIONS 5.5, 6, OR 9, (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR PAYMENT OF ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES AND/OR LOST PROFITS (OTHER THAN WHERE LOST PROFITS WOULD BE INCLUDED IN THE MEASURE OF SERVICE PROVIDER'S DIRECT DAMAGES FOR A BREACH OF THIS AGREEMENT BY SRC) ARISING FROM THE SUBJECT MATTER OF THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) IN NO EVENT SHALL SERVICE PROVIDER'S LIABILITY UNDER THIS AGREEMENT EXCEED THE AMOUNT OF TOTAL PAYMENTS PAID TO SERVICE PROVIDER UNDER THIS AGREEMENT RELATING TO THE DELIVERABLES OR SERVICES GIVING RISE TO SUCH LIABILITY. THE PROVISIONS OF THIS SECTION 10 SHALL APPLY REGARDLESS OF THE FORM OF ACTION, DAMAGE, CLAIM, LIABILITY, COST, EXPENSE, OR LOSS, WHETHER IN CONTRACT, STATUTE, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE.

### 11. PUBLICITY

11.1 Service Provider may publicly refer to SRC as a client and use SRC's logo on Service Provider's website and printed material, subject to SRC's prior written approval of any accompanying text.

### 12. WARRANTIES

12.1 Service Provider warrants that it is fully qualified to perform the Services and, except as expressly set forth in the applicable SOW, has, and will be responsible for providing, at its sole costs and expense, all the expertise, undertakings, resources, equipment, materials, supplies and other items of expense necessary to perform and complete the Services according to the terms herein.

12.2 Service Provider warrants that the Services will be performed by experienced and well-qualified personnel in a professional and workmanlike manner, all in accordance with the terms herein and applicable law. In addition to the foregoing and not in limitation thereof, the Services will conform to generally accepted standards for the type of work involved (unless otherwise specified in the applicable SOW) and will materially conform to all specifications set forth in the applicable SOW. Service Provider agrees to use industry standard efforts to render the Services required in a timely and diligent manner.

12.3  Service Provider warrants that any defect or error in the Services or Deliverables provided by or on behalf of Service Provider that does not materially conform with the applicable SOW shall be remedied by Service Provider in a timely fashion and at no additional cost to SRC for a period of thirty (30) days from final approval of such Service or Deliverable ("Warranty Period").

12.4  Additional warranties and specifications may be set forth in the applicable SOW.

## 13. INDEMNITY

13.1  Service Provider will, at its sole cost and expense, indemnify, hold harmless and defend SRC and its officers, directors, employees, agents, and other representatives against any and all suits, claims, losses, liabilities, damages and expenses, including attorneys' fees and court costs, ("Losses") asserted against SRC in the United States to the extent such Losses relate to or arise from any part of the Service infringing a Proprietary Right of any third Party (a "Claim").

13.1.1  Notwithstanding the foregoing, Service Provider is not required to indemnify SRC in the case of (a) any matter arising out of or relating to any materials provided or specified by SRC, (b) compliance by Service Provider with detailed specifications prescribed by and originating with SRC, (c) any use, modification, or combination of Services, Deliverables, Service Provider Materials and/or Third Party Materials in a manner inconsistent with, or outside the scope of, the applicable SOW, to the extent that such provision, specification, compliance, use, modification or combination constitutes the basis of the infringement or alleged infringement of Proprietary Rights and/or Losses, or (d) where the use of the Services or Deliverables (in a manner consistent with and inside the scope of the applicable SOW) by SRC, its customers, or consumer end-users violates any law, regulation, or applicable standard.

13.1.2  If any of the Services or Deliverables are found, or in Service Provider's reasonable opinion are likely to be found, to infringe on an Intellectual Property Right, then in lieu of its indemnity obligation Service Provider may within a reasonable time, at its option and sole expense, (a) secure for SRC the right to continue the use of such infringing item; (b) replace such item with a substantially equivalent non-infringing item or modify such item, with no material change in functionality, so that it becomes non-infringing; or (c) if neither of the preceding two options is feasible, Service Provider may elect to refund to SRC all fees and expenses paid by SRC for the Services and/or Deliverables that gave rise to the applicable Claim, in which case the applicable SOWs, and the provisions of this Agreement relating thereto shall be deemed terminated without further liability to either Party.

13.2  SRC will, at its sole cost and expense, indemnify, hold harmless and defend Service Provider and its officers, directors, employees, agents, and other representatives against any and all Losses relating to or arising from (a) materials provided or specified by SRC, (b) compliance by Service Provider with detailed specifications prescribed by and originating with SRC, (c) any use, modification, or combination of Services, Deliverables, Service Provider Materials and/or Third Party Materials in a manner inconsistent with, or outside the scope of, the applicable SOW, to the extent that such provision, specification, compliance, use, modification or combination constitutes the basis of infringement or alleged infringement of Proprietary Rights and/or Losses, or (d) where the use of the Services or Deliverables (in a manner consistent with and inside the scope of the applicable SOW) by SRC, its customers, or consumer end-users violates any law, regulation, or applicable standard.

13.3  The foregoing indemnity will be provided, subject to the Party to be indemnified: (i) promptly notifying the indemnifying Party in writing of the claim (in any event in a manner to allow the Party against whom indemnity is sought to evaluate the applicable claim, engage counsel of its choosing, and file a timely response to such claim); and (ii) allowing the indemnifying Party to control, and reasonably cooperating with the indemnifying Party in the defense and any related settlement negotiations, with the Party to be indemnified having the right to approve any such settlement to the extent that such Party's rights or liabilities are affected thereby. The Party being indemnified reserves the right (at its expense) to have its counsel participate in the defense of any Claim.

## 14. INSURANCE

14.1  During the term of this Agreement, Service Provider will carry and maintain at its own cost,

Chaotic Moon-Standard Register                                                                                      Page 7 of 9
Master Services Agreement

with companies that are rated a minimum of "A-" by A.M. Best, or are otherwise reasonably acceptable to SRC, the following insurance:

(a) Commercial General Liability Insurance, including bodily injury, property damage, blanket contractual and products/completed operations coverage in an amount not less than $1,000,000 per occurrence, $1,000,000 annual aggregate. SRC shall be named as an Additional Insured on this policy;

(b) Automobile Liability Insurance covering any vehicle used in performing the Services under this Agreement in an amount not less than $1,000,000 per occurrence, $1,000,000 annual aggregate. SRC shall be named as an Additional Insured on this policy;

(c) Professional Liability (Errors and Omissions) Insurance in an amount not less than $1,000,000 per claim/aggregate;

(d) Statutory Worker's Compensation Insurance in accordance with applicable laws;

(e) Employer's Liability subject to a limit of an amount not less than $100,000 per occurrence; and

(f) Umbrella Liability in an amount not less than $1,000,000.

14.2   Service Provider shall provide SRC with certificates of insurance reflecting the coverages and amounts set forth in this Section 14 within ten (10) days after execution of this Agreement and within thirty (30) days of all subsequent renewals. Service Provider agrees to notify SRC in writing with thirty (30) days advance notice should any of these coverages be canceled or materially changed.

## 15. MISCELLANEOUS

15.1   This Agreement, including each SOW and any materials incorporated herein by reference, represent the complete and entire agreement between the Parties regarding the subject matter hereof, and supersedes all prior agreements and understandings between the Parties. This Agreement may not be amended except through a writing signed by each of the Parties hereto, which specifically references the Sections of this Agreement sought to be amended.

15.2   No waiver of any right, obligation or default shall be effective unless it is in writing, and signed by the Party against whom the waiver is sought to be enforced. One or more waivers of any right, obligation or default shall not be construed as a waiver of any subsequent right, obligation or default.

15.3   Any provision or provisions of this Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any of the other provisions, and shall be modified or excised to the minimum extent possible so that this Agreement otherwise remains enforceable and in full force and effect. No ambiguity herein shall be construed against either Party as the drafter, as each Party has reviewed this Agreement with its counsel.

15.4   Service Provider acknowledges and agrees that SRC Confidential Information and SRC Materials constitute valuable trade secrets and/or property of SRC and that any unauthorized disclosure or use of such information or materials by Service Provider or any of its Representatives would cause SRC irreparable harm for which its remedies at law would be inadequate. Accordingly, Service Provider agrees that, during the term hereof and thereafter, SRC shall have the right, in addition to any other remedies available to it, to the issuance of immediate injunctive relief enjoining any breach by Service Provider of its obligations under Sections 5.5, 6, and 9 herein.

15.5   The Parties will comply with all known applicable laws, whether foreign, federal, state or local. Notwithstanding anything to the contrary set forth in this Agreement or any SOW, it is understood that it is the intention of Supplier to perform all Services and deliver all Deliverables entirely within the boundaries of the United States of America, and compliance with any and all laws, rules and regulations of any work product of Services or Deliverable arising from any export or deemed export by SRC outside of the United States of America shall be solely and exclusively the responsibility of SRC.

15.6   This Agreement shall be governed by and construed under the laws of the State of Delaware. The Parties hereby submit and agree to be subject to the exclusive jurisdiction of the federal and state courts

in the State of Delaware in any suit or proceeding arising out of or relating to this Agreement or the Services. In any suit or proceeding to enforce rights under this Agreement, the prevailing Party shall be entitled to recover reasonable costs and attorneys' fees.

15.7    This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all of which, taken together, will constitute one and the same instrument.

Accepted and Agreed:

The Standard Register Company

Signature: _____
Name: Thomas J Farnbacher
Title: VP Global Strategic Sourcing

Chaotic Moon, LLC

Signature: _____
Name: John Fremont
Title: EVP