# EXHIBIT C

CAUSE NO. D-1-GN-14-005362

| | | |
|---|---|---|
| CHAOTIC MOON, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| THE STANDARD REGISTER | § | |
| COMPANY, | § | |
| | § | 126TH JUDICIAL DISTRICT |
| DEFENDANT. | § | |
| | § | |

## MOTION TO DISMISS BASED UPON FORUM SELECTION CLAUSE, AND, SUBJECT THERETO, ORIGINAL ANSWER AND COUNTERCLAIM OF DEFENDANT THE STANDARD REGISTER COMPANY

COMES NOW The Standard Register Company (hereinafter, "Standard Register"), Defendant in the above-captioned matter, and files its Motion to Dismiss, and, subject thereto, Original Answer and Counterclaim to the Plaintiff's Original Petition, and respectfully submits the following:

## I. FACTUAL BACKGROUND

1.     Plaintiff, Chaotic Moon, LLC, a Delaware limited liability company, filed its Original Petition against Defendant alleging breach of contract and, in the alternative, quantum meruit, along with a claim for attorneys' fees. As set forth in Plaintiff's Original Petition, the parties' relationship is governed by the Master Services Agreement (hereinafter, "MSA") and separately negotiated Statements of Work (hereinafter, "SOW") #1, #2 and #3. A copy of the MSA, which form the basis of Plaintiff's claims, is attached to Exhibit A, the Affidavit of Priya Serai ("Serai Aff."), as **Exhibit 1** and incorporated herein by reference. The parties executed the MSA in

March 2014, and subsequently executed each SOW in April and June 2014. *See* Ex. 1, attached hereto.

2.   As set forth in the MSA and the subsequently entered SOW #1, #2 and #3, each SOW is incorporated into and governed by the terms of the MSA. *See* MSA, § 2.1.

3.   Pursuant to the MSA, the parties specifically and exclusively designated the state of Delaware as the jurisdiction and venue for any dispute regarding the agreements forming the basis of Plaintiff's claims.    Moreover, the parties agreed that the MSA would likewise be governed by the laws of Delaware.  As set forth in § 15.6 of the MSA:

> 15.6   This Agreement shall be governed by and construed under the laws of the State of Delaware.  The Parties hereby submit and agree to be subject to the **exclusive jurisdiction of the federal and state courts in the State of Delaware** in any suit or proceeding arising out of or relating to this Agreement or the Services.  In any suit or proceeding to enforce rights under this Agreement, the prevailing Party shall be entitled to recover reasonable costs and attorneys' fees.

(Emphasis added).

4.   Because Delaware is the proper venue and jurisdiction for this matter, this Court should dismiss this Texas case and require Plaintiff to refile its action in Delaware.

## II.  ARGUMENT AND AUTHORITIES

**A.    The Forum Selection Clause must be upheld and enforced**.

5.   Standard Register and Chaotic Moon entered into the MSA, and, as set forth above, expressly agreed that the exclusive jurisdiction for all disputes arising out of or relating to the agreement shall lie in the state and federal courts of Delaware. MSA, § 15.6.  Plaintiff violated that forum selection clause by commencing this action in Texas. Therefore, this Motion to Dismiss is the appropriate mechanism to remedy Plaintiff's violation.

6.    The United States Supreme Court has held that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 32 L. Ed. 2d 513, 92 S. Ct. 1907, 1913 (1972), *superseded in part by statute,* 28 U.S.C. § 1404(a), *as recognized by Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988); *see also Atl. Marine Constr. Co. v. United States Dist. Court,* 134 S. Ct. 568, 582, 187 L. Ed. 2d 487, 502 (2013) (following *Bremen* and *Stewart Org.* and holding, in part, that " . . . forum-selection clauses should control except in unusual cases.").

7.    It is also well-established Texas law that forum selection clauses are presumptively valid and generally enforceable. *See, e.g., In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 680 (Tex. 2009); *In re Laibe Corp.,* 307 S.W.3d 314, 316 (Tex. 2010) (per curiam); *Stokes Interest, G.P. v. Santo-Pietro,* 343 S.W.3d 441, 444 (Tex. App. -- El Paso 2010, no pet.).

8.    The Texas Supreme Court has held that the enforcement of forum selection clauses is *mandatory* unless the opposing party clearly demonstrates that: "(1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial." *In re Lyon Fin. Servs., Inc.,* 257 S.W.3d 228, 231-32 (Tex. 2008) (per curiam) (citing *In re AUI Ins. Co.,* 148 S.W.3d 109, 112 (Tex. 2004)). Alleged "inconvenience" of the selected forum must be so extreme as to "deny the party [challenging enforcement] its day in court." *In re Laibe Corp.,* 307 S.W.3d at 317 (citing *In re Lyon Fin. Servs., Inc.,* 257 S.W.3d at 234). The burden of proof on a party challenging the enforcement of such a clause is heavy. *In re Lyon Fin. Servs., Inc.,* 257 S.W.3d at 231-32.

9.    As an initial matter, there can be no dispute that this case is governed by a valid and enforceable forum selection clause designating Delaware as both the appropriate choice of law *and* the <u>exclusive</u> forum for any dispute "arising out of or relating to" the MSA or Statements of Works incorporated therein.  MSA, §§ 2.1, 15.6.  The language of the MSA is clear and unambiguous in this regard.  *See id.*  Moreover, although Plaintiff has ignored the forum selection clause set forth in § 15.6 of the MSA by filing this suit in Texas, Plaintiff seeks an award of attorneys' fees pursuant to that very same section of the parties' agreement.  *See* Original Petition at ¶ 15; MSA, § 15.6.  Thus, Plaintiff cannot deny the validity of § 15.6 of the MSA.

10.    Moreover, as set forth in both the MSA and in Plaintiff's Original Petition, Plaintiff is a Delaware limited liability company and, furthermore, was the party who drafted the forum selection provision contained in the MSA, designating Delaware as the proper forum for this dispute.  Thus, Plaintiff cannot show that enforcement of the clause would be unreasonable or unjust, nor could it legitimately argue that the clause is the result of fraud or overreaching.

11.    Further, in recognizing that forum selection clauses are presumptively enforceable, Texas courts have also noted that "[b]y entering into an agreement with a forum-selection clause, the parties effectively represent to each other that the agreed forum is not so inconvenient that enforcing the clause will deprive either party of its day in court, whether for cost or other reasons." *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (quoting *Lyon Fin. Servs.*, 257 S.W.3d at 233).  "Absent proof of 'special and unusual circumstances,' trial in another forum is not 'so gravely difficult and inconvenient' as to warrant disregarding the contractually-specified forum." *Id.* (quoting *AIU Ins. Co.*, 148 S.W.3d at 113).  A level of "extreme inconvenience[,]" encompassing more than conclusory statements regarding financial and logistical difficulties in

4

the chosen forum, must be established in order for a court to disregard the forum selection clause. *Id.* at 318.

12.    Accordingly, because Plaintiff cannot meet its heavy burden to invalidate the forum selection clause or demonstrate that extreme circumstances exist in this case such that the clause should not be enforced, there is no question that Delaware is the appropriate forum to resolve the claims set forth in Plaintiff's Original Petition and Plaintiff's complaint should therefore be dismissed.

**B.    A motion to dismiss is the proper procedural mechanism to enforce the parties' forum selection clause.**

13.    Where an action is filed in violation of a forum selection clause, a motion to dismiss is the appropriate procedural mechanism to remedy same. See *In re AIU Ins. Co.*, 148 S.W.3d at 111-21 (Tex. 2004); *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 610 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *My Café-CCC, Ltd. v. Lunchstop, Inc.*, 107 S.W. 3d 860, 865 (Tex. App. -- Dallas 2003, no pet.); *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687 (Tex. App. – Houston [14th Dist.] 2007, pet. denied).

14.    Texas Courts have also concluded that a motion to dismiss is a proper mechanism to enforce a forum selection clause that selects another state as the proper forum for litigation. *See id.; see also, Accelerated Christian Education, Inc. v. Oracle Corporation*, 925 S.W.2d 66, 70 (Tex. App.–Dallas 1996, no writ) (citing as authority *Busse v. Pacific Cattle Feeding Fund #1, Ltd.*, 896 S.W.2d 807, 812-13 (Tex. App.–Texarkana 1995, writ denied); *Greenwood v. Tillamook Country Smoker, Inc.*, 857 S.W.2d 654, 657 (Tex. App.–Houston [1st Dist.] 1993, no writ); and *Pozero v. Alfa Travel, Inc.*, 856 S.W.2d 243, 244 (Tex. App.–San Antonio 1993, no writ)).

5

15. If a trial court denies a motion to enforce a valid, enforceable, forum selection clause that specifically designates another state or country as the chosen forum, "the trial court's final judgment is subject to automatic reversal at the request of the party seeking enforcement of the clause." *In re AIU Ins. Co.*, 148 S.W.3d 109, 118 (Tex. 2004). According to the Texas Supreme Court, a trial in any forum other than the one contractually agreed upon "will be a meaningless waste of judicial resources." *Id.* Subjecting a party to trial in a forum other than that agreed upon is clear harassment and does not benefit the individual or the judicial system. *Id.*

16. And although the current legal standard under Texas law no longer requires the Court to look to the controlling law of the forum that the parties have designated in their agreement, and determine whether the other state would recognize the forum selection clause, Delaware does in fact recognize the validity of and enforce such clauses. *Nat'l Indus. Group v. Carlyle Investment Mgmt,* 67 A.3d 373, 383 (Del. 2013); *compare In re Tyco Electronics Power Sys.,* No. 05-04-01808-CV, 2005 Tex. App. LEXIS 819, *11-12 (Tex. App. – Houston [5th Dist.] Feb. 2, 2005, orig. proceeding).

## III.    CONCLUSION

17. Defendant and Plaintiff contractually consented to submit any dispute arising under or related to the MSA to the jurisdiction and venue of Delaware's courts. Plaintiff, a Delaware limited liability company, will be unable to bear its heavy burden of showing that trial in Delaware is unfair, unjust or unreasonable, or that such extreme circumstances exist in this case to warrant disregarding the contractually agreed upon forum. Therefore, Plaintiff must be held to its contractual mandate that it litigate its disputes with Defendant in Delaware and this action must be dismissed in accordance with Texas law.

## ORIGINAL ANSWER AND COUNTERCLAIM
## SUBJECT TO MOTION TO DISMISS

### IV.    GENERAL DENIAL

18.    Subject to and without waiving the Motion to Dismiss, Defendant, The Standard Register Company, hereby files this its Answer to Plaintiff's Original Petition and denies each and every claim and allegation as set forth in Plaintiff's Original Petition, as permitted by Rule 92 of the Texas Rules of Civil Procedure, and demands that Plaintiff prove the truth of the allegations by a preponderance of the credible evidence.

### V.    AFFIRMATIVE DEFENSES

19.    Plaintiff's Original Petition fails to state a claim upon which relief can be granted.

20.    Plaintiff's Original Petition should be dismissed for lack of jurisdiction.

21.    Plaintiff's claims are barred by Plaintiff's prior breach of the agreements between the parties.

### VI.    COUNTERCLAIM

Comes now Defendant, Standard Register, and subject to and without waiving its Motion to Dismiss, for its counterclaim against Plaintiff, Chaotic Moon, states the following:

**Breach of Contract**

22.    Defendant repeats and reincorporates the preceding paragraphs as if fully written herein.

23.    In March 2014, Plaintiff and Defendant entered into a Master Services Agreement ("MSA"), attached to Serai Aff. as **Exhibit 1**, whereby Plaintiff was to provide Defendant with professional services and certain specified Deliverables pursuant the MSA and separately negotiated Statements of Work ("SOW"), in order to ultimately develop a custom software application for use by Defendant's customers.

7

24.    Pursuant to the parties' contract, and the overall purpose and structure of the project, the work completed under each separate SOW would be the foundation for the work to be completed in subsequent SOWs, intended to culminate in the final custom software product to be delivered to Defendant.

25.    Pursuant to the terms of the MSA and each SOW subsequently entered by the parties, the SOWs were incorporated into, and governed by the terms of the MSA.

26.    On or about April 15, 2014, the parties entered into and executed SOW #1. Pursuant to the terms of SOW #1, Defendant was required to, and did pay Plaintiff $50,000 for the consulting services specified therein.

27.    On or about April 22, 2014, the parties entered into and executed SOW #2. Pursuant to the terms of SOW #2, in exchange for the services and Deliverables described thereunder, Defendant was required to, and did pay Plaintiff $85,000 upon execution of the SOW.  Thereafter, upon completion of the work described in SOW #2 and acceptance of the same by Defendant, a final payment of $85,000 was due to Plaintiff.

28.    On or about June 17, 2014, although work under SOW #2 was not yet completed, the parties entered into and executed SOW #3.  Pursuant to the terms of SOW #3, in exchange for the services and Deliverables described thereunder, Defendant was required to, and did pay Plaintiff $388,400 upon execution of the SOW.  Thereafter, pursuant to the terms of SOW #3, once the parties mutually agreed upon a written amendment to SOW #3 setting forth the specific features and payment schedule for this work order, additional milestone payments were to be made in accordance with the written amendment.

29.    Ultimately, although Plaintiff purported to finish the work described under SOW #2, nine of the Deliverables described in the contract were never delivered to Defendant.

8

Consequently, there was no final acceptance of all Deliverables under SOW #2, as the work was never completed.

30.    With respect to SOW #3, Plaintiff never proposed, and Defendant never entered into, a written amendment setting forth the specific milestones under the project and related payment schedule. Moreover, Plaintiff failed to staff the project in accordance with the terms set forth in ¶ 2 of SOW #3. Plaintiff delegated or otherwise subcontracted parts of the Services and/or Deliverable to affiliates and/or third parties without Defendant's approval in violation of the MSA. Plaintiff actively hid and intentionally failed to disclose such subcontractors to Defendant. In addition, Plaintiff never completed the specified work or Deliverables described under SOW # 3, as the Deliverables described in the contract were either not delivered to Defendant or delivered with such poor quality that Defendant could not use them.

31.    Pursuant to § 4 of the MSA and ¶ 8 of SOW #3, Defendant could terminate the contract for any reason by providing written notice to Plaintiff. As a result of Plaintiff's breaches of SOW #2 and #3, as set forth above in ¶¶ 29- 30, Defendant terminated the MSA and SOW #3 by providing written notice to Plaintiff on September 17, 2014, in accordance with the terms of the MSA and SOW #3.

32.    As a result of Plaintiff's breaches of SOW #2 and #3, as set forth above in ¶¶ 29-30, in addition to not receiving all of the individual services and Deliverables set forth in SOW #2 and SOW #3, Defendant never received the final product contemplated by the MSA, that is, a custom software application that could be used by its customers.

33.    As a further result of Plaintiff's breaches of SOW #2 and #3, as set forth above in ¶¶ 29-30, Defendant ultimately paid Plaintiff over $500,000 for services and Deliverables that were sub-standard, incomplete, or never delivered to Defendant. Moreover, as a result of

Plaintiff's breach, Defendant had to spend additional time and over $200,000 to correct Plaintiff's sub-standard work and complete the project on its own.

34.     Accordingly, as a direct and proximate result of Plaintiff's breach of the MSA and SOW #2 and #3, Defendant has been damaged in excess of $200,000 and is entitled to recover actual damages. Pursuant to Rule 47, Defendant/Counter-Plaintiff asserts that it is seeking monetary relief over $200,000 but not more than $1,000,000.

35.     Pursuant to § 15.6 of the MSA, and the prevailing party provision therein, Defendant is entitled to and seeks its costs and attorneys' fees incurred herein.

## VII.    REQUEST FOR DISCLOSURE

36.     Pursuant to the provisions of Tex. R. Civ. P. 194, Chaotic Moon is requested to disclose, within thirty (30) days of service of  this request, the information and material described in Tex. R. Civ. P. 194.2(a)-(l).

## VIII.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant The Standard Register Company prays that:

(a) Plaintiff take nothing by reason of this suit;

(b) This suit be dismissed based upon the parties' mandatory contractual forum selection clause and that Defendant be discharged and released accordingly;

(c) In the alternative, Standard Register recover judgment on its counterclaim for breach of contract against Chaotic Moon, to include: (i) an award of damages for Chaotic Moon's breach; (ii) an award of its attorneys' fees and reasonable costs as the prevailing party pursuant to § 15.6 of the MSA; and (iii) an award of pre- and post-judgment interest; and

(d) That Defendant be awarded all such other and further relief, both general and special, at law and in equity, to which Defendant may show itself justly entitled.

Respectfully submitted,

/s/ Derek Quick
Derek Quick [SBN 24072471]
**STRASBURGER & PRICE, LLP**
720 Brazos Street, Suite 700
Austin, Texas 78701-2974
512.499.3600
512.499.3660 (Facsimile)
derek.quick@strasburger.com

**ATTORNEYS FOR DEFENDANT THE
STANDARD REGISTER COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served on all counsel of record via certified mail, return receipt requested, on this the 23rd day of January, 2015:

Daniel H. Byrne
Lessie Gilstrap Fitzpatrick
Fritz, Byrne, Head & Harrison, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, Texas 78701

/s/ Derek Quick
Derek Quick

11

# EXHIBIT A

CAUSE NO. D-1-GN-14-005362

| | | |
|---|---|---|
| CHAOTIC MOON, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| THE STANDARD REGISTER | § | |
| COMPANY, | § | |
| | § | 126TH JUDICIAL DISTRICT |
| DEFENDANT. | § | |
| | § | |

**<u>AFFIDAVIT OF PRIYA SERAI IN SUPPORT OF DEFENDANT THE STANDARD REGISTER COMPANY'S MOTION TO DISMISS BASED UPON FORUM SELECTION CLAUSE</u>**

STATE OF OHIO                          )
                                       )SS:
COUNTY OF Montgomery                   )

I, Priya Serai, being first duly cautioned and sworn, state as follows:

1.      I am Director of Business Operations for The Standard Register Company ("Standard Register") and have personal knowledge of the information contained in this affidavit, and am duly authorized to make this Affidavit in support of Standard Register's Motion to Dismiss Based Upon Forum Selection Clause.

2.      As Director of Business Operations, among other duties, I have overall responsibility for managing the company's contracts with outside vendors as it relates to Customer-Facing Technology Solutions.

3.      In March 2014, Standard Register entered into a Master Services Agreement ("MSA") with Chaotic Moon, LLC, for the purpose of developing a specific Customer-Facing Technology Solution in the creation of a custom software application for use by Standard Register's customers.



EXHIBIT

A

4.    The MSA was executed by authorized representatives of both Standard Register and Chaotic Moon in March 2014.

5.    Under the terms of the MSA, the work to be completed thereunder would be broken down into separate Statements of Work ("SOW"), all of which would be incorporated into the MSA and ultimately culminate in the final custom software product to be delivered to Standard Register.

6.    On or about April 15, 2014, the parties entered into and executed SOW #1.

7.    On or about April 22, 2014, the parties entered into and executed SOW #2.

8.    On or about June 17, 2014, the parties entered into and executed SOW #3.

9.    I oversaw the engagement of Chaotic Moon to perform the services described in the MSA and above-mentioned SOWs and tracked progress with respect to the specific deliverables and services identified in each SOW.

10.    True and accurate copies of the MSA entered into and executed by Standard Register and Chaotic Moon, are attached hereto as **EXHIBIT 1.**

FURTHER AFFIANT SAYETH NAUGHT.

_____
Priya Serai

Sworn to and subscribed in my presence this 23rd day of January, 2015.

_____
NOTARY PUBLIC

My Commission Expires:

TERESA L. MYERS, Notary Public
In and for the State of Ohio
My Commission Expires April 20, 2019

# EXHIBIT 1

## Master Services Agreement

This Master Services Agreement ("Agreement") is dated and effective March, 2014 between The Standard Register Company ("SRC"), an Ohio corporation, with its principal place of business at 600 Albany Street, Dayton, Ohio 45417, and Chaotic Moon, LLC, a Delaware limited liability company with its principal place of business at 319 North Congress Avenue #200, Austin, Texas, 78701, USA ("Service Provider"), each individually referred to as a "Party" and collectively referred to as the "Parties".

### BACKGROUND

Service Provider provides professional services and related work. SRC desires to obtain such Services from Service Provider and Service Provider is willing to provide the same to SRC pursuant to the following terms. The Parties, therefore, agree as follows:

1. **DEFINITIONS**

    1.1 **"Affiliate"** means any entity which controls, is controlled by, or is under common control with, the applicable Party.

    1.2 **"Confidential Information"** means non-public information that each Party obtains from the other Party or on its behalf in anticipation of or in connection with this Agreement relating to the disclosing Party's business that the disclosing Party designates as being confidential or proprietary or which, under the circumstances surrounding disclosure, ought to be treated as confidential. Confidential Information includes, without limitation, current and prospective marketing models, plans or strategies, vendor/supplier lists, customer or consumer lists or information, Nonpublic Personal Information, Personally Identifiable Information, former or current employee lists or information, passwords and security practices and procedures, advertising and pricing plans or strategies, databases and data processing methodologies, algorithms, software code (in any form including source code and executable or object code), margins and expense levels, distribution and reseller arrangements, strategies and plans for the development and implementation of future products and services, refinements and additions to current products or services, trade secrets, any other proprietary, confidential or secret aspects of the Parties' business.

    1.2.1 Information is not Confidential Information if it: (a) was already in the possession of the recipient prior to its receipt from an entity other than a Party or someone acting on its behalf, as shown by the recipient's books and records; (b) is, or becomes, public knowledge through no fault, or wrongful act or omission of the recipient; (c) is, or becomes, available to the recipient from a source other than the disclosing Party, if such source has rightfully obtained such information without an obligation of confidentiality to the disclosing Party; or (d) is independently developed by the recipient without reference to the Confidential Information of the disclosing Party.

    1.1 **"Deliverable(s)"** means (i) all documentation, materials and tangible items embodying the Services, including, without limitation, research results and summaries, images, designs, slides, text, artwork, portraits, graphics, photographs, pictures, illustrations, works of authorship and all other copyrightable forms of expression, and (ii) any invention, discovery, enhancement, improvement, know-how, design, layout, practice, process or method made, developed or first reduced to practice by Service Provider, either solely or in collaboration with SRC, subcontractors or others, during the course of providing the Service, in each instance whether protected by any Proprietary Right or not, but in any event specifically relating to the Services performed or to be performed by Service Provider. Deliverables do not include Service Provider Materials or Third Party Materials.

    1.2 **"SRC Materials"** means all content, artwork, images, designs, photos, and all other copyrightable works, and any derivatives thereof, that SRC or its representatives provide Service Provider (in whatever form or medium) in connection with this Agreement.

EXHIBIT

1

tabbies

1.3 **"Intellectual Property"** means all algorithms, application programming interfaces, apparatus, circuit designs and assemblies, concepts, Confidential Information, data, databases and data collections, designs, diagrams, documentation, drawings, flow charts, formulae, ideas and inventions (whether or not patentable or reduced to practice), know-how, materials, marketing and development plans, marks (including brand names, product names, logos, and slogans), methods, models, configurations and architectures, procedures, processes, protocols, schematics, software code (in any form including source code and executable or object code), specifications, techniques, tools, uniform resource identifiers including uniform resource locators (URLs), user interfaces, web sites, works of authorship, and other forms of technology.

1.4 **"Nonpublic Personal Information"** means Personally Identifiable Information and any list, description or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Personally Identifiable Information that is not publicly available.

1.5 **"Personally Identifiable Information"** includes but is not limited to: (i) information a consumer or customer provides to SRC or SRC's clients to obtain a product or service from SRC or SRC's clients; (ii) information about a consumer or customer resulting from any transaction involving a product or service provided by SRC or SRC's clients; (iii) information SRC otherwise obtains about a consumer or customer in connection with providing a product or service to that consumer or customer directly or on behalf of its clients; (iv) the fact that a person is or has been a SRC consumer or customer or has obtained a product or service from SRC or SRC's clients; (v) information about a SRC consumer or customer if it is disclosed in a manner that indicates that the individual is or has been a SRC consumer or customer; (vi) information about a consumer or customer that SRC collects through web analytics or internet "cookies" (an information collecting device from a web server); or (vii) information about a consumer or customer from a consumer report.

1.6 **"Proprietary Right"** means all copyrights, trademarks, product or service marks, trade dress, patents, trade secrets, moral rights, author's rights, privacy rights, publicity rights and all other forms of intellectual property protection, or rights arising under common law, by statute and/or by contract.

1.7 **"Representative(s)"** means Service Provider's directors, officers, employees, agents, affiliates and subcontractors.

1.8 **"Service(s)"** means the Deliverables and the service to be performed by the Service Provider and the obligations and responsibilities of the Service Provider as set forth in this Agreement or any related SOW.

1.9 **"Service Provider Materials"** means all Intellectual Property and other materials developed, acquired, or otherwise obtained by Service Provider prior to this Agreement or modified, improved, enhanced, extended or created but not specifically related to the services to be performed and Deliverables to be delivered to SRC.

1.10 **"Statement of Work"** and **"SOW"** includes, but is not limited to, a statement of work, purchase order, work order or other similar document attached to this Agreement and/or referencing this Agreement and executed and delivered by each of the Parties hereto specifying the applicable Services and Deliverables to be performed and/or delivered by Service Provider, as well as such other details and terms and conditions relating thereto as may be agreed to by the Parties.

1.11 **"Third Party Materials"** means all Intellectual Property and other materials licensed or obtained by Service Provider from third parties used by Service Provider in the performance of Services or incorporated in or provided as a Deliverable.

**2.    SERVICES / CONSULTATION**

2.1 *Statements of Work.* Each SOW shall be deemed incorporated into and governed by the terms and conditions of this Agreement. If any term or condition of a SOW conflicts with (or is inconsistent with) any term or condition of the body of this Agreement, then the term or condition contained in the SOW will prevail with respect to the applicable SOW.

2.2 *Acceptance.* Except as otherwise set forth in an applicable SOW and subject to the external dependencies and obligations of SRC set forth in the applicable SOW ("**Dependencies**"), Deliverables must meet material deadlines, specifications and acceptance criteria set forth in each SOW ("**Acceptance Criteria**"). SRC, with Service Provider's cooperation and assistance, will conduct acceptance tests to verify whether the Deliverables meet Acceptance Criteria. SRC shall have such specific period as may be mutually agreed upon as

set forth in the applicable SOW to conduct acceptance testing (the "Acceptance Period"). Unless SRC rejects a Deliverable prior to the expiration of the Acceptance Period by giving written notice to Service Provider specifying the Acceptance Criteria that are not met by such Deliverable and documenting the details of the acceptance testing so that Service Provider can recreate the alleged nonconformance, then such Deliverable shall be deemed accepted by SRC. SRC may reject any Deliverable that does not conform materially to the applicable Acceptance Criteria, and SRC shall accept each Deliverable that conforms materially to the applicable Acceptance Criteria. Service Provider will promptly remedy any actual nonconformance at no additional charge to SRC.

2.3 *Change Orders.* If a material change to Service Provider's scope of work, resource allocations, schedule or Fees results from (i) a modification to the SOW as requested by SRC; (ii) a failure by either Party or its Representatives to timely perform its responsibilities with respect to the Services, including without limitation, a failure to timely provide approvals, materials, or feedback, as required by the SOW; or (iii) an extension of any milestone completion schedule under the SOW due to causes outside of Service Provider's reasonable control or complications unanticipated by the Parties, then Service Provider and SRC shall negotiate in good faith to detail the changes to the applicable SOW including additional fees in a writing signed by both Parties ("Change Order").

2.4 *Subcontractors.* Service Provider shall not delegate or otherwise subcontract any part of the Services or Deliverables to any affiliate or third Party unless: (a) SRC consents in writing in advance (excluding individual contractors engaged by Service Provider, for whom SRC's consent is not required); and (b) such affiliate or third Party agrees in writing to be bound by (i) the terms and conditions of this Agreement, including, without limitation Sections 5, 6, 9, and 15.4 herein, or (ii) terms and conditions at least as favorable to SRC than those contained herein. Service Provider shall be responsible for enforcing the requirements of this Agreement with respect to its Representatives and shall be responsible for Services performed or Deliverables provided by its Representatives hereunder to the same extent as if performed by Service Provider itself. Service Provider is responsible and liable to SRC for any breach of such terms and conditions, subject to the terms of this Agreement.

2.5 *No Minimum Quantity.* By entering into this Agreement, neither Party makes any promise or commitment to engage in any minimum quantity of Services or to execute and deliver any particular SOW.

3.     COMPENSATION

3.1 Service Provider shall be compensated for the Services as expressly set out in an applicable SOW or as otherwise agreed to by the Parties in writing.

3.2 To the extent provided for expressly in a SOW or other written agreement between SRC and Service Provider and subject to the terms and conditions of such SOW or agreement and payment for all applicable items to Service Provider (or any applicable third Party) by SRC, all equipment (personal computers, lap top computers, modems, etc.) or other items of personal property procured by Service Provider and paid for by SRC is SRC's property and will be delivered to SRC by Service Provider in accordance with the terms of the applicable SOW.

3.3 Service Provider will be reimbursed for reasonable expenses pursuant to the terms of the applicable SOW or as otherwise agreed by the Parties in writing.

3.4 SRC has no obligation to deduct from any compensation due to Service Provider hereunder any payments required by any taxing authorities, including income tax and social security payments. Payment of all such taxes is the Service Provider's responsibility. Service Provider agrees to indemnify and hold SRC harmless for any claims made by any taxing authorities resulting from Service Provider's compensation or Services hereunder; provided, however, that unless SRC provides Service Provider with a valid tax exemption number or as otherwise provided herein, SRC shall pay directly or reimburse Service Provider for all taxes, assessments, permits and fees, however designated, which are levied upon this Agreement, each SOW or the Services and/or Deliverables, or their use, excluding franchise taxes and taxes based upon Service Provider's income.

3.5 Invoices will be delivered to SRC by Service Provider as provided in the applicable SOW. Undisputed

portions of such invoices shall be paid within forty-five (45) days of the date SRC receives Service Provider's invoice, unless a different period is specified in the SOW. In order to dispute any amount, SRC must submit a written notice detailing the grounds for such dispute within such payment period. Disputed amounts will be paid within fifteen (15) days after any resolution of the dispute.

4.    **TERMINATION**

4.1 SRC shall have the right to terminate this Agreement or any outstanding SOW by giving thirty (30) days prior written notice to Service Provider, accompanied by all undisputed amounts due and payable to Service Provider pursuant to this Agreement as of the date of such notice (and disputed amounts are subject to the requirements of Section 3.5 above for detailed notice and payment upon resolution of the dispute); additionally, SRC shall remain obligated to pay Service Provider for any Deliverables completed during such thirty (30) day notice period. Unless provided otherwise in an applicable SOW, each SOW shall terminate simultaneously with the termination of the Agreement, provided that the terms of the Agreement shall continue to apply to SOWs and/or Deliverables that are already complete.

4.2 Notwithstanding the termination of this Agreement or any SOW, the following Sections of this Agreement shall be deemed to survive: 2.4, 3.2, 4 through 10, 12, 13, and 15.4 (and any other provision of this Agreement or a SOW which expressly extends beyond the term hereof or, under the circumstances, ought to survive) and, to the extent applicable to the foregoing Sections or provisions, Sections 1 and 15 herein.

5.    **OWNERSHIP OF DELIVERABLES AND MATERIALS**

5.1 Service Provider acknowledges that all Deliverables (other than Service Provider Materials and Third Party Materials) are the sole and exclusive property of SRC and, except as stated below, agrees to assign and hereby does assign, to SRC, all of Service Provider's right, title and interest in and to all Deliverables and Proprietary Rights (other than Service Provider Materials and Third Party Materials) upon payment in full of all amounts owed to Service Provider under this Agreement. Accordingly, Service Provider shall require each of its employees and Representatives performing any Service to assign in writing all their right, title and interest in and to Deliverables to Service Provider.

5.2 To the extent that any Service Provider Materials are embedded or incorporated into any Deliverable, upon payment in full of all amounts owed to Service Provider under this Agreement Service Provider hereby grants to SRC a non-exclusive, perpetual, irrevocable, worldwide, unrestricted license for SRC to use, copy, modify, improve and display, the Service Provider Materials as they exist in the Deliverable to the extent required for the use of the Deliverable in accordance with this Agreement and any applicable SOW. Service Provider shall obtain SRC's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, prior to incorporating any Service Provider Materials or third Party software into any Deliverable. SRC understands and agrees that the use, duplication, distribution and creation of derivative works of any works embodying Third Party Materials (including without limitation Deliverables), may require SRC to obtain a license from each applicable third Party with respect to such Third Party Materials, and Service Provider agrees to cooperate with SRC in good faith by identifying such Third Party Materials and providing reasonable assistance to SRC in obtaining such licenses.

5.3 Service Provider shall, upon request and at no cost to SRC (except as noted below), do all lawful acts, including, but not limited to, executing documents, making lawful oaths, giving testimony and cooperating in all related proceedings and matters as may be reasonably necessary for SRC to obtain, sustain, reissue and enforce Proprietary Rights related to any Deliverable and to perfect, affirm and record its complete ownership and title thereto. To the extent that giving testimony and cooperating with proceedings under this Section 5.3 requires Service Provider to expend a material level of time and/or resources, SRC shall pay Service Provider's reasonable fees and expenses related thereto.

5.4 Service Provider will keep reasonably complete, accurate and authentic accounts, notes, data and records of all Deliverables in accordance with Service Provider's business practices and in material conformance with any manner and form, and any obligation to deliver such materials to SRC, described in the applicable SOW.

5.5 SRC Materials shall remain the sole and exclusive property of SRC and, other than as set forth herein,

Service Provider Materials shall remain the sole and exclusive property of Service Provider or third Parties who have granted rights to Service Provider. Service Provider agrees to (a) access and use SRC Materials solely in connection with this Agreement; (b) use commercially reasonable efforts to protect and safeguard SRC Materials from misuse, loss and destruction; and (c) not use or disclose SRC Materials other than in connection with the performance of Services or as otherwise necessary or appropriate for Service Provider to fulfill its obligations under the applicable SOW, without the prior written consent of SRC. SRC agrees to (a) access and use Service Provider Materials only pursuant to the license granted under the applicable SOW; (b) use commercially reasonable efforts to protect and safeguard Service Provider Materials from misuse, loss and destruction; and (c) not use or disclose Service Provider Materials other than in connection with the intended use of the applicable Deliverables, without the prior written consent of Service Provider.  Regardless of any such consent, except as otherwise stated herein, neither Party is conferred or granted, by estoppel, implication or otherwise, any Proprietary Right, license, interest or title in, to or under SRC Materials or Service Provider Materials.

6.      CONFIDENTIAL INFORMATION

6.1 Except as necessary in the performance of the Services or as otherwise stated herein, neither Party will access, use or retain Confidential Information of the other Party without specific written authorization from that Party.

6.2 Notwithstanding the provisions of this Section 6, the recipient Party may disclose the other Party's Confidential Information if, in the view of its counsel, such disclosure is required by law or legal process; provided, however, that recipient Party shall give reasonable notice to the other Party of such requirement and shall cooperate with such other Party in legal efforts to limit or mitigate any such disclosure so as to preserve, to the extent practicable, the confidential and proprietary nature of any such information.

6.3 Immediately upon the expiration or termination of this Agreement or applicable SOW or earlier, upon SRC's request, Service Provider shall deliver to SRC or provide written confirmation of secure destruction of all SRC Materials and Confidential Information, in whatever form and on whatever media recorded, electronic or physical, or items containing or referring, in whole or in part, to any SRC Materials or Confidential Information.

7.      RELATIONSHIP OF THE PARTIES

7.1 Service Provider is an independent contractor and nothing herein creates a partnership, joint enterprise, or any form of employment relationship between the Parties. Neither Party has the right, power, or authority to bind the other to any third Party or to act in any way as the representative or agent of the other, unless otherwise expressly agreed to in writing signed by both Parties.

8.      NOTICES

8.1 All notices contemplated under this Agreement shall be in writing and shall be deemed received as reasonably evidenced via receipted mail (including e-mail, facsimile, overnight delivery, or certified mail), postage prepaid as applicable and addressed as set forth below.  A Party may from time to time change its address or designee for notification purposes by giving the other Party prior notice of the new address or designee and the date upon which the change will become effective.

For notices to SRC:

The Standard Register Company
600 Albany Street
Dayton, Ohio  45417
Attention: Legal Department

For notices to Service Provider:

Chaotic Moon, LLC
3571 Far West Blvd., #36
Austin, TX  78731 USA

Attention: Legal Department

With a copy to:

Wm. A. Broussard, Esq.
General Counsel, Chaotic Moon, LLC
P.O. Box 162926
Austin, TX 78716-2926 USA
Re: SRC MSA

**9.    PRIVACY & SECURITY REQUIREMENTS**

9.1 Service Provider shall comply with the laws and regulations applicable to its obligations hereunder; provided, however, Service Provider makes no warranty or representation that the Services or Deliverables will comply with any laws and regulations applicable to their end use by SRC, its customers, and/or consumer end users.

9.2 If requested by SRC, Service Provider facilities and or systems where the Services are being undertaken, developed or performed will undergo a security audit in accordance with generally accepted industry practices, at the expense of SRC.

9.3 Service Provider shall implement and maintain appropriate policies and procedures to safeguard the confidentiality of SRC Confidential Information.

9.4 Service Provider shall promptly advise SRC in writing when any unauthorized access to SRC Confidential Information has occurred or is suspected to have occurred or when any of the requirements of this Section have been or may have been violated whether by accident or by intent.

**10.    LIMITATION OF LIABILITY**

10.1    EXCEPT FOR (i) A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (ii) A PARTY'S INDEMNIFICATION OBLIGATION UNDER SECTION 13, OR (iii) A BREACH OF THE CONFIDENTIALITY OBLIGATIONS OF SECTIONS 5.5, 6, OR 9, (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR PAYMENT OF ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES AND/OR LOST PROFITS (OTHER THAN WHERE LOST PROFITS WOULD BE INCLUDED IN THE MEASURE OF SERVICE PROVIDER'S DIRECT DAMAGES FOR A BREACH OF THIS AGREEMENT BY SRC) ARISING FROM THE SUBJECT MATTER OF THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) IN NO EVENT SHALL SERVICE PROVIDER'S LIABILITY UNDER THIS AGREEMENT EXCEED THE AMOUNT OF TOTAL PAYMENTS PAID TO SERVICE PROVIDER UNDER THIS AGREEMENT RELATING TO THE DELIVERABLES OR SERVICES GIVING RISE TO SUCH LIABILITY. THE PROVISIONS OF THIS SECTION 10 SHALL APPLY REGARDLESS OF THE FORM OF ACTION, DAMAGE, CLAIM, LIABILITY, COST, EXPENSE, OR LOSS, WHETHER IN CONTRACT, STATUTE, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE.

**11.    PUBLICITY**

11.1    Service Provider may publicly refer to SRC as a client and use SRC's logo on Service Provider's website and printed material, subject to SRC's prior written approval of any accompanying text.

**12.    WARRANTIES**

12.1    Service Provider warrants that it is fully qualified to perform the Services and, except as expressly set forth in the applicable SOW, has, and will be responsible for providing, at its sole costs and expense, all the expertise, undertakings, resources, equipment, materials, supplies and other items of expense necessary to perform and complete the Services according to the terms herein.

12.2    Service Provider warrants that the Services will be performed by experienced and well-qualified personnel in a professional and workmanlike manner, all in accordance with the terms herein and applicable law. In addition to the foregoing and not in limitation thereof, the Services will conform to generally accepted standards for the type of work involved (unless otherwise specified in the applicable SOW) and will materially conform to all specifications set forth in the applicable SOW. Service Provider agrees to use industry standard efforts to render the Services required in a timely and diligent manner.

12.3      Service Provider warrants that any defect or error in the Services or Deliverables provided by or on behalf of Service Provider that does not materially conform with the applicable SOW shall be remedied by Service Provider in a timely fashion and at no additional cost to SRC for a period of thirty (30) days from final approval of such Service or Deliverable ("**Warranty Period**").

12.4      Additional warranties and specifications may be set forth in the applicable SOW.

**13.    INDEMNITY**

13.1      Service Provider will, at its sole cost and expense, indemnify, hold harmless and defend SRC and its officers, directors, employees, agents, and other representatives against any and all suits, claims, losses, liabilities, damages and expenses, including attorneys' fees and court costs, ("**Losses**") asserted against SRC in the United States to the extent such Losses relate to or arise from any part of the Service infringing a Proprietary Right of any third Party (a "**Claim**").

13.1.1  Notwithstanding the foregoing, Service Provider is not required to indemnify SRC in the case of (a) any matter arising out of or relating to any materials provided or specified by SRC, (b) compliance by Service Provider with detailed specifications prescribed by and originating with SRC, (c) any use, modification, or combination of Services, Deliverables, Service Provider Materials and/or Third Party Materials in a manner inconsistent with, or outside the scope of, the applicable SOW, to the extent that such provision, specification, compliance, use, modification or combination constitutes the basis of the infringement or alleged infringement of Proprietary Rights and/or Losses, or (d) where the use of the Services or Deliverables (in a manner consistent with and inside the scope of the applicable SOW) by SRC, its customers, or consumer end-users violates any law, regulation, or applicable standard.

13.1.2  If any of the Services or Deliverables are found, or in Service Provider's reasonable opinion are likely to be found, to infringe on an Intellectual Property Right, then in lieu of its indemnity obligation Service Provider may within a reasonable time, at its option and sole expense, (a) secure for SRC the right to continue the use of such infringing item; (b) replace such item with a substantially equivalent non-infringing item or modify such item, with no material change in functionality, so that it becomes non-infringing; or (c) if neither of the preceding two options is feasible, Service Provider may elect to refund to SRC all fees and expenses paid by SRC for the Services and/or Deliverables that gave rise to the applicable Claim, in which case the applicable SOWs, and the provisions of this Agreement relating thereto shall be deemed terminated without further liability to either Party.

13.2      SRC will, at its sole cost and expense, indemnify, hold harmless and defend Service Provider and its officers, directors, employees, agents, and other representatives against any and all Losses relating to or arising from (a) materials provided or specified by SRC, (b) compliance by Service Provider with detailed specifications prescribed by and originating with SRC, (c) any use, modification, or combination of Services, Deliverables, Service Provider Materials and/or Third Party Materials in a manner inconsistent with, or outside the scope of, the applicable SOW, to the extent that such provision, specification, compliance, use, modification or combination constitutes the basis of infringement or alleged infringement of Proprietary Rights and/or Losses, or (d) where the use of the Services or Deliverables (in a manner consistent with and inside the scope of the applicable SOW) by SRC, its customers, or consumer end-users violates any law, regulation, or applicable standard.

13.3      The foregoing indemnity will be provided, subject to the Party to be indemnified: (i) promptly notifying the indemnifying Party in writing of the claim (in any event in a manner to allow the Party against whom indemnity is sought to evaluate the applicable claim, engage counsel of its choosing, and file a timely response to such claim); and (ii) allowing the indemnifying Party to control, and reasonably cooperating with the indemnifying Party in the defense and any related settlement negotiations, with the Party to be indemnified having the right to approve any such settlement to the extent that such Party's rights or liabilities are affected thereby.  The Party being indemnified reserves the right (at its expense) to have its counsel participate in the defense of any Claim.

**14.    INSURANCE**

14.1      During the term of this Agreement, Service Provider will carry and maintain at its own cost,

with companies that are rated a minimum of "A-" by A.M. Best, or are otherwise reasonably acceptable to SRC, the following insurance:

    (a) Commercial General Liability Insurance, including bodily injury, property damage, blanket contractual and products/completed operations coverage in an amount not less than $1,000,000 per occurrence, $1,000,000 annual aggregate. SRC shall be named as an Additional Insured on this policy;

    (b) Automobile Liability insurance covering any vehicle used in performing the Services under this Agreement in an amount not less than $1,000,000 per occurrence, $1,000,000 annual aggregate. SRC shall be named as an Additional Insured on this policy;

    (c) Professional Liability (Errors and Omissions) insurance in an amount not less than $1,000,000 per claim/aggregate;

    (d) Statutory Worker's Compensation insurance in accordance with applicable laws;

    (e) Employer's Liability subject to a limit of an amount not less than $100,000 per occurrence; and

    (f) Umbrella Liability in an amount not less than $1,000,000.

    14.2    Service Provider shall provide SRC with certificates of insurance reflecting the coverages and amounts set forth in this Section 14 within ten (10) days after execution of this Agreement and within thirty (30) days of all subsequent renewals. Service Provider agrees to notify SRC in writing with thirty (30) days advance notice should any of these coverages be canceled or materially changed.

**15.**    **MISCELLANEOUS**

    15.1    This Agreement, including each SOW and any materials incorporated herein by reference, represent the complete and entire agreement between the Parties regarding the subject matter hereof, and supersedes all prior agreements and understandings between the Parties. This Agreement may not be amended except through a writing signed by each of the Parties hereto, which specifically references the Sections of this Agreement sought to be amended.

    15.2    No waiver of any right, obligation or default shall be effective unless it is in writing, and signed by the Party against whom the waiver is sought to be enforced. One or more waivers of any right, obligation or default shall not be construed as a waiver of any subsequent right, obligation or default.

    15.3    Any provision or provisions of this Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any of the other provisions, and shall be modified or excised to the minimum extent possible so that this Agreement otherwise remains enforceable and in full force and effect. No ambiguity herein shall be construed against either Party as the drafter, as each Party has reviewed this Agreement with its counsel.

    15.4    Service Provider acknowledges and agrees that SRC Confidential Information and SRC Materials constitute valuable trade secrets and/or property of SRC and that any unauthorized disclosure or use of such information or materials by Service Provider or any of its Representatives would cause SRC irreparable harm for which its remedies at law would be inadequate. Accordingly, Service Provider agrees that, during the term hereof and thereafter, SRC shall have the right, in addition to any other remedies available to it, to the issuance of immediate injunctive relief enjoining any breach by Service Provider of its obligations under Sections 5.5, 6, and 9 herein.

    15.5    The Parties will comply with all known applicable laws, whether foreign, federal, state or local. Notwithstanding anything to the contrary set forth in this Agreement or any SOW, it is understood that it is the intention of Supplier to perform all Services and deliver all Deliverables entirely within the boundaries of the United States of America, and compliance with any and all laws, rules and regulations of any work product of Services or Deliverable arising from any export or deemed export by SRC outside of the United States of America shall be solely and exclusively the responsibility of SRC.

    15.6    This Agreement shall be governed by and construed under the laws of the State of Delaware. The Parties hereby submit and agree to be subject to the exclusive jurisdiction of the federal and state courts

in the State of Delaware in any suit or proceeding arising out of or relating to this Agreement or the Services. In any suit or proceeding to enforce rights under this Agreement, the prevailing Party shall be entitled to recover reasonable costs and attorneys' fees.

15.7        This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all of which, taken together, will constitute one and the same instrument.

Accepted and Agreed:

The Standard Register Company                    Chaotic Moon, LLC

Signature: _____    Signature: _____

Name: _Thomas S Farnbacher_                Name: _John Fremont_

Title: _VP Global Strategic Sourcing_         Title: _EVP_