## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 524 & 526** |

## OBJECTION OF BANK OF AMERICA, N.A., TO COMMITTEE'S MOTION FOR STANDING TO COMMENCE AND PROSECUTE CLAIMS ON BEHALF OF DEBTORS' ESTATES

Bank of America, N.A., in its capacity as administrative and collateral agent for the Pre-Petition ABL Lenders and the ABL DIP Lenders (collectively, in such capacities, "ABL Agent"),[2] objects to the Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates (the "Motion") [Docket Nos. 524 & 526] filed on May 18, 2015, by the Official Committee of Unsecured Creditors (the "Committee"). Through the Motion, the Committee seeks the entry of an order granting the Committee standing

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).

[2] Capitalized terms used but not defined in this objection shall have the meanings ascribed to them in the Final Order (I) Authorizing Debtors in Possession to obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; and (III) Providing Adequate Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (Docket No. 290) (the "Final DIP Financing Order").

to prosecute certain alleged claims on behalf of the Debtors' estates against the ABL Agent and the Pre-Petition ABL Lenders (collectively, the "Pre-Petition ABL Credit Parties").[3]

For the reasons hereinafter set forth, the Motion fails to satisfy the strict standards that must be met for the grant of derivative standing to pursue claims that the Debtors and their professional advisors have rightly determined are non-existent or otherwise would not enhance recovery for the benefit of the Debtors' estates. The correctness of the Debtors' election not to challenge the liens and claims of the Pre-Petition ABL Credit Parties is readily confirmed by a reading of the counts in the Committee's proposed Complaint involving the Pre-Petition ABL Credit Parties and applying well-settled derivative standing law to those counts.

**Preliminary Statement**

A.    **Overview**

1.      Prior to the date of the commencement of the Debtors' Chapter 11 cases (the "Petition Date"), the Pre-Petition ABL Credit Parties established in favor of certain of the Debtors (the "Debtor Borrowers") an asset-based, revolving credit facility pursuant to which the Pre-Petition ABL Credit Parties made loans, issued letters of credit, and made other extensions of credit available to the Debtor Borrowers, secured by security interests in and liens upon substantially all of each Debtor Borrower's property (real and personal).  The loans and other

---

[3] Through the Motion, the Committee also seeks Court approval to commence and prosecute certain claims on behalf of the Debtors' estates against the Pre-Petition Term Credit Parties.

In this Objection, ABL Agent specifically addresses only the relief requested by the Committee with respect to the Pre-Petition ABL Credit Parties. ABL Agent, however, also objects to the relief requested by the Committee with respect to the Pre-Petition Term Credit Parties, as ABL Agent does not believe that the Committee has stated, or can state, plausible claims against the Pre-Petition Term Credit Parties, the Committee through its actions threatens the proposed sale of the Debtors' assets, and the Motion appears to be little more than a litigation tactic to coerce the Pre-Petition Term Credit Parties into funding a recovery for unsecured creditors.

By not addressing its objections to the relief the Committee is seeking as to the Pre-Petition Term Credit Parties (they are preparing their own objections to the Motion), ABL Agent is not waiving its objections to such requested relief and expressly reserves the right to assert those objections at the hearing on the Motion.

extensions of credit made by the Pre-Petition ABL Credit Parties were based upon the reported values of eligible accounts and eligible inventory, as is typical in an asset-based lending arrangement.  As of the Petition Date, the aggregate amount owed to the Pre-Petition ABL Credit Parties for revolving credit loans and undrawn letters of credit totaled approximately $96,775,000.  (Final DIP Financing Order ¶ 6.F., at 10).  The reported values of the Debtor Borrowers' accounts and inventory on that date exceeded $171,950,000 (Schedules B, Docket Nos. 477 & 485), leaving a collateral cushion of some $75,000,000.

2.       The Pre-Petition Term Credit Parties (the so-called Silver Point parties) made term loans to some or all of the Debtor Borrowers, secured by security interests in and liens upon substantially all of each Debtor Borrower's property (real and personal).

3.       An intercreditor agreement entered into by the Pre-Petition ABL Credit Parties and the Pre-Petition Term Credit Parties established the relative priorities of their respective liens upon the assets of the Debtor Borrowers, with the Pre-Petition ABL Credit Parties having first priority with respect to all assets (including accounts receivable, general intangibles and inventory), except for fixed assets consisting of real estate and equipment and certain general intangibles in which the Pre-Petition Term Credit Parties were afforded first priority.

**B.       Summary of Proposed Committee Claims**

4.       The Committee's alleged claims against the Pre-Petition ABL Credit Parties fall into four categories:

- First, the Committee asserts in the Eleventh Count of the proposed Complaint that the Pre-Petition ABL Credit Parties never obtained a lien upon certain assets of the Debtors (an assertion which, for the most part, is not presently disputed by the Pre-Petition ABL Credit Parties) and that they did not perfect their liens with respect to other assets

(excluding accounts receivable, general intangibles and inventory, as to which no assertion of a lack of a perfected lien is made).

- Second, the Committee maintains in the Twelfth Count of the proposed Complaint that, if the Pre-Petition ABL Credit Parties' claims against the Debtors were undersecured on the date of bankruptcy, amounts applied post-petition to accrued interest and fees should be re-characterized as payments to principal and offset against the principal balance of the pre-petition loans.

- Third, the Committee posits in the Thirteenth Count of the proposed Complaint that, to the extent any of the Debtors' obligations to any of the Pre-Petition ABL Credit Parties are voidable under Chapter 5 of the Bankruptcy Code (and no avoidable obligations under Chapter 5 are identified by the Committee), the claims of the Pre-Petition ABL Credit Parties should be disallowed to that extent under Section 502(d) of the Bankruptcy Code.

- Fourth, the Committee contends in the Fourteenth Count of the proposed Complaint that the Pre-Petition ABL Credit Parties improved their position within the meaning of Section 547(c)(5) of the Bankruptcy Code by virtue of the attachment of their security interest to tax refunds and other tax attributes of the Debtors (a contention that is disputed on multiple bases, as discussed below).

5.     It is noteworthy that derivative standing for all claims sought to be asserted against the Pre-Petition ABL Credit Parties is dependent upon allegations and proof that the claims of the Pre-Petition ABL Credit Parties were undersecured as of the Petition Date and each earlier date on which an alleged avoidable transfer occurred. Nowhere in the proposed Complaint is any such allegation made, which is not surprising given the overwhelming evidence to the

contrary.   Indeed, the Committee has not even attempted to explain what new facts it has uncovered during its due diligence before filing the Motion that would prompt it to abandon the earlier position articulated in its objection to the Debtors' DIP financing motion that the claims of the Pre-Petition ABL Credit Parties were "massively oversecured."  (*See* Paragraph 26, *infra*.)

6.       In addition, nowhere in the Motion or the proposed Complaint does the Committee challenge (i) the validity or enforceability of any of the Pre-Petition ABL Loan Documents, (ii) the validity, perfection or enforceability of the Pre-Petition ABL Credit Parties' liens on accounts, inventory, equipment, instruments, documents, chattel paper, general intangibles or books and records of the Debtor Borrowers (collectively, the "Unchallenged Collateral"), or (iii) the priority of the Pre-Petition ABL Credit Parties' liens on the Unchallenged Collateral.[4]

7.       The grant of derivative standing initially requires the moving party to demonstrate, by specific factual allegations, the existence of a colorable claim against the putative defendant.   Here, the claims sought to be asserted by the Committee against the Pre-Petition ABL Credit Parties fail to pass that test.   Moreover, even if derivative standing were granted, the proposed Complaint would be subject to dismissal under the *Twombly/Iqbal* guidelines articulated by the Supreme Court, as more fully discussed below.

8.       Derivative standing should not be granted to enable the Committee to pursue claims, at likely significant expense to the Debtors' estates, when there is no demonstration that the estates can reasonably be expected to benefit from such pursuit.   Absent a credible basis for alleging that the claims of the Pre-Petition ABL Credit Parties were undersecured on any of the

---

[4] In the Final DIP Financing Order, the Debtors stipulated that the Pre-Petition ABL Credit Parties had fully perfected, first-priority liens on the ABL Priority Collateral, which includes, among other types of assets, all of the accounts and inventory of the Debtor Borrowers, and fully perfected, second-priority liens on the Term Loan Priority Collateral. (Final DIP Financing Order ¶ 6.B., at 7).

relevant dates, the exclusion from the collateral base of those few items identified by the Committee as not being subject to a lien in favor of the Pre-Petition ABL Credit Parties and the lack of perfection on those items specified by the Committee in its proposed Complaint are of no consequence. The Pre-Petition ABL Credit Parties were entitled to full payment of their claims pursuant to the roll-up under the Final DIP Financing Order. (Final DIP Financing Order ¶ 12.A., at 27.)

## Grounds for Objecting to Committee's Motion

### A.    Standard for Derivative Standing

9.    The Bankruptcy Code does not specifically authorize a creditors' committee to initiate derivative adversary proceedings. However, courts have construed Sections 503(b), 1103(c) and 1109(b) of the Bankruptcy Code to authorize granting a committee an implied, qualified right to do so if certain conditions are met and court approval is obtained. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003).

10.    A committee seeking derivative standing to prosecute estate claims must, at a minimum, affirmatively establish that (i) a demand has been made upon the statutorily authorized party to take action, (ii) the demand has been declined, (iii) a colorable claim exists, and (iv) the inaction is an abuse of discretion (*i.e.*, unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case. *See G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004), *aff'd in part, rev'd in part on other grounds*, 2006 WL 1751793 (D.N.J. June 21, 2006). Although this standard has been articulated in a variety of different ways – for example, some courts collapse the first, second, and fourth elements into one requirement that the debtor has "unjustifiably refused" to bring a certain adversary proceeding – it has been widely accepted by courts in this Circuit. *See*,

*e.g.*, *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entertainment Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *Official Committee of Unsecured Creditors v. Cablevision Systems Corp. (In re Valley Media, Inc.)*, No. 02-04553 (PJW), 2003 WL 21956410, at *2-3 (Bankr. D. Del. Aug. 14, 2003).

11.     A committee seeking derivative standing has the burden to show that the debtor has unjustifiably refused to pursue colorable claims. *See In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citing *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003)).

### (a)     Alleged Claim Must Be Colorable

12.     Generally speaking, a claim is "colorable" if, when asserted with appropriate proof, it would entitle the party asserting the claim to a recovery. *See In re LTV Steel Co.*, 333 B.R. 397, 406 (Bankr. N.D. Ohio 2005).   Although a court is not required to conduct an evidentiary hearing in determining whether a claim is colorable, there must be some evidentiary basis for the allegation beyond the mere presence of a complaint so as to "ensure that the claims do not lack any merit whatsoever." *Id.* (citing *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 248 (5th Cir. 1988)).   A court is not bound to accept as true "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).   The proposed complaint must state more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

13.     In deciding whether a claim is colorable for purposes of derivative standing, courts employ a standard tantamount to that used in evaluating a motion to dismiss for failure to state a claim. *See, e.g., In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at *6

(Bankr. D. Del. May 13, 2014) (determining if any of the claims are even colorable undertakes the "same analysis as when a defendant moves to dismiss a complaint for failure to state a claim") (quoting *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010)); *In re Washington Mutual, Inc.*, 461 B.R. 200, 255-56 (Bankr. D. Del. 2011) (denying standing to assert equitable subordination claim because committee "failed to state a colorable claim"); *Official Committee of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson United Bank (In re America's Hobby Center, Inc.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); *Official Committee of Unsecured Creditors of the Debtors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999); *LTV Steel*, 333 B.R. at 406. It would be illogical to find a claim set forth in a proposed complaint to be colorable if that claim would be subject to dismissal for failure to state a claim.

14.      As this Court has recognized, the Supreme Court's seminal decisions in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), revolutionized federal pleading standards by clarifying that "all civil complaints must now set out sufficient *factual matter* to show that the claim is facially *plausible*." *Walker v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 86 (Bankr. D. Del. 2010) (emphasis added) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).  To establish the facial plausibility of a claim, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id*. (quoting *Iqbal*, 556 U.S. at 678). The motion to dismiss standard is well-known:  "[to] survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Optim Energy*, 2014 WL 1924908, at *6 (quoting *Iqbal*, 556 U.S. at 678); *see Clear Thinking Group LLC v. Brightstar US, Inc. (In re KCMVNO, Inc.)*, No. 10-50730 (BLS), 2010 WL

4064832, at *2 (Bankr. D. Del. Oct. 15, 2010) (first "separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions" and then "determine whether the remaining well-pled facts sufficiently show that the plaintiff has a plausible claim for relief"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. S*ee also Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) ("[A] complaint must do more than allege the plaintiff's entitled to relief.  A complaint has to 'show' such an entitlement with its facts.").  Critically, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint should be dismissed. *Id*. S*ee also Crowe v. Moran (In re Moran)*, 413 B.R. 168, 176 (Bankr. D. Del. 2009).  Plausibility depends on a host of considerations -- "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

15.      In the absence of a colorable claim alleging specific facts that satisfy the plausibility standard, defendants should not be subjected to the burdens of continued discovery and the worry of overhanging litigation.  *Twombly,* 550 U.S. at 556.

### (b)      Debtors' Refusal to Pursue Claim Must be Unjustifiable

16.      A second element for derivative standing is a demonstration that the estate fiduciary has unjustifiably refused to pursue a claim.

17.      To determine whether a debtor has unjustifiably refused to pursue a claim, courts engage in an analysis aimed at determining whether prosecution of that claim is likely to benefit the estate.  *In re STN Enterprises*, 779 F.2d 901, 905 (2d Cir. 1985). S*ee also Official Committee of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 548 (W.D. Pa. 2005);

*Official Committee of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, 2006 WL 1751793, at *11-12 (D.N.J. June 21, 2006); *Official Committee of Unsecured Creditors v. CIBC Wood Gundy Ventures, Inc. (In re Temtechco, Inc.)*, 1998 WL 887256, at *7 (Bankr. D. Del. Dec. 18, 1998). Courts consider a cost/benefit analysis, weighing the probability of the committee's success and the size of any expected financial recovery against the estimated cost of litigation. *See, e.g., Centaur,* 2010 WL 4624910, at *7 (granting standing to prosecute claims, but limiting recovery of professional fees to any cash proceeds or other quantifiable value received by the estate as a result of the litigation, where benefit to estate could not be quantified with reasonable certainty); *America's Hobby Center,* 223 B.R. at 282 ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery…. [A] sufficient likelihood of success must be found to justify the anticipated delay and expense to the bankruptcy estate") (internal quotation marks omitted); *Adelphia Communications Corp. v. Bank of America, N.A.* (*In re Adelphia Communications Corp.)*, 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005) (pursuing colorable claims must be a "sensible expenditure" of estate resources). Thus, courts generally assess the merits of a committee's proposed claim and "whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued." *Nat'l Forge*, 326 B.R. at 548 (citing *In re America's Hobby Center, Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998).[5]

---

[5] In analyzing the "probability of success and the potential costs of litigation, including attorneys' fees," some courts consider "whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee." *Nat'l Forge*, 326 B.R. at 548; *G-I Holdings,* 2006 WL 1751793, at *11-12.

The elements of the derivative standing test, then, go hand in hand. If the committee does not allege sufficient facts to state a plausible claim, the Court cannot conduct the cost/benefit analysis to assess whether pursuit of the proposed claims is likely to benefit the debtor's estate, and derivative standing then should be denied.

18.        Assessing an estate fiduciary's justification for declining to pursue a claim requires consideration of whether the proposed litigation would needlessly risk depletion of the estate. *See, e.g.*, *In re Nat'l Forge Co.*, 326 B.R. 532, 548 (W.D. Penn. 2005); *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 219, 253 (5th Cir. 1988); *Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.)*, 183 B.R. 795, 806 (Bankr. E.D. Tenn. 1995). "[U]nduly expos[ing] the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery" ought to be avoided. *In re Capmark Financial Group Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010). *See also In re Ambac Financial Group, Inc.*, 457 B.R. 299, 305 (Bankr. S.D.N.Y. 2011), *aff'd*, 10-B-15973 (SCC), 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 Fed. Appx. 663 (2d Cir. 2012) ("Nothing in . . . applicable case law requires a debtor to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice."); *Geltzer v. The Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*, 506 B.R. 29, 43 (Bankr. E.D.N.Y. 2014) ("[T]he desire of shareholders or guarantors . . . to pursue litigation, from which they have little to lose, in preference to the benefits offered by the Settlement, cannot be given substantial weight.").

19.        In passing upon a derivative standing motion, a court must separately evaluate the viability of *each* claim for which standing is sought, *see G-I Holdings*, 313 B.R. at 628., and examine "*on affidavit and other submission, by evidentiary hearing or otherwise*, whether an action asserting such claims is likely to benefit the reorganization estate." *STN Enterprises*, 779 F.2d at 905 (emphasis added).

B.        **Derivative Standing Should be Denied**.

20.       As noted earlier, the Committee seeks derivative standing to assert four categories of claims against the Pre-Petition ABL Credit Parties.  The viability of each claim sought to be asserted hinges upon allegation and proof that the Pre-Petition ABL Credit Parties were undersecured on the two relevant dates alleged by the Committee—(i) the Petition Date and (ii) for purposes of the improvement in position test under Section 547(c)(5), the 90th day prior to the Petition Date.  Conspicuously absent from the Committee's proposed Complaint is any allegation to that effect.

21.       As for the Committee's assertion that the Pre-Petition ABL Credit Parties' liens did not extend to certain assets of the Debtors, that allegation (which, for the most part, is not presently disputed by the Pre-Petition ABL Credit Parties), even if true, is of no moment unless the absence of such collateral rendered the claims of the Pre-Petition ABL Credit Parties undersecured.

22.       As for the Committee's assertion that the Pre-Petition ABL Credit Parties' liens with respect to certain assets were unperfected (notably excluding accounts receivable, general intangibles, inventory and the other Unchallenged Collateral), that allegation, even if true, would be of no significance since the lack of perfection would not result in the Pre-Petition ABL Credit Parties' claims being undersecured (and the Committee makes no averment in its proposed Complaint to the contrary).

23.       As for the Committee's assertion that the Pre-Petition ABL Credit Parties improved their position under Section 547(c)(5) by virtue of the attachment of their security interest to the Debtors' tax refund claims and other tax attributes, the Pre-Petition ABL Credit Parties note that Section 547(c)(5) focuses solely upon floating liens on accounts and inventory (not general intangibles, under which tax refund claims and other tax attributes would be

subsumed) and requires a showing that, on the 90th day before the Petition Date, the claims of the Pre-Petition ABL Credit Parties (taking into account all collateral items subject to their perfected liens) were undersecured (an averment never made in the proposed Complaint and one that would not have been credible in light of the overwhelming evidence to the contrary, as detailed in Paragraph 26 below).

24.    As for the Committee's assertion that the post-petition application of collateral proceeds to the Pre-Petition ABL Credit Parties' claims for interest and fees should be reapplied to principal, the Committee merely alleges in its proposed Complaint that such relief should be granted "if" the Pre-Petition ABL Credit Parties' claims were undersecured on the Petition Date (with no allegation that they were).

25.    As for the Committee's count praying for disallowance of the Pre-Petition ABL Credit Parties' claims under Section 502(d) if and to the extent that those claims are voidable under Chapter 5 of the Bankruptcy Code, the count fails to allege that any of the claims are voidable and mistakenly relies upon a section of the Bankruptcy Code applicable solely to claimants who have failed to disgorge voidable or otherwise recoverable pre-petition property transfers.

26.    It is understandable that the Committee has not identified any documents or offered any affidavits or analysis that would reasonably call into question whether the claims of the Pre-Petition ABL Credit Parties were ever undersecured in light of:

- Stipulations by the Debtors in the interim and final DIP financing orders (Interim DIP Financing Order ¶ 5.I., at 12; Final DIP Financing Order ¶ 6.I, at 13) and the acknowledgments in the Debtors' Schedules (Schedules B, Docket Nos. 477 & 485) that the claims of the Pre-Petition ABL Credit Parties were oversecured on the Petition Date

(the Debtors scheduled total accounts and inventory as of the Petition Date of $113,754,750 and $57,136,625.97, respectively).

- The monthly liquidity certificates prepared by the Debtor for the twelve months prior to the Petition Date (each of which shows that eligible accounts and inventory collateral, after application of advance rates, substantially exceeded the outstanding claims of the Pre-Petition ABL Credit Parties).[6]

- The post-petition reduction of the outstanding loan balance owed to the Pre-Petition ABL Credit Parties through accounts receivable collections during the first 30 days of the cases (most, if not all, of which consisted of pre-petition accounts) from approximately $93,204,000 to approximately $20,000,000 before the ultimate roll-up of the balance of those loans in accordance with the Final DIP Financing Order (with approximately $57,136,000 of pre-petition inventory at cost, and a substantial balance of pre-petition accounts receivable, remaining as security for the balance of the loans).[7]

---

[6] Copies of these certificates were provided to the Committee prior to the filing of the Motion. The most recent liquidity certificate received by the Pre-Petition ABL Credit Parties prior the Petition Date (which is incorrectly dated February 1, 2014 rather than February 1, 2015) is annexed hereto as Exhibit A and shows a substantial collateral cushion above the outstanding loan balances.  For example, as shown on the Exhibit A entry for February 1, 2015, the gross loan availability for borrowing purposes (calculated by applying the applicable advance rates against eligible accounts and eligible inventory) totaled $120,296,334, which after deducting $3,570,510 of letters of credit and $84,207,019 of outstanding loans, left the Debtor Borrowers with borrowing capacity of an additional $32,518,805.  Note that eligible accounts and eligible inventory are in aggregate less than total accounts receivable and total inventory values without taking into account elegibility criteria.

[7] The Committee never alleges that the Pre-Petition ABL Credit Parties were at any time undersecured. The valuation of a debtor's assets is on a "going concern" value basis when the debtor is not on its "death bed." *See, e.g.*, *American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.)*, 367 B.R. 500 (Bankr. D. Del. 2007) (before going concern valuation is abandoned, debtor must be wholly inoperative, defunct or dead on its feet), *aff'd*, 384 B.R. 62 (D. Del. 2008); *Total Technical Services, Inc. v. Whitworth (Matter of Total Technical Services, Inc.)*, 150 B.R. 893 (Bankr. D. Del. 1993) (when debtor was conducting business at relevant times, use going concern value); *Fryman v. Century Factors (In re Art Shirt Ltd.)*, 93 B.R. 333 (E.D. Pa. 1988) (going concern value not used only when debtor's business is wholly inoperative, defunct or dead on its feet).

- The fact that the stalking-horse bid and bid procedures require payment in full of the Pre-Petition ABL Credit Parties' claims (Asset Purchase Agreement dated March 12, 2013, at § 2.7(a) [Exhibit A, Docket No. 23]; Sale Procedures at 10 [Docket No. 286].

- The following assertions by the Committee in its objection to the Debtors' motion for DIP financing approval [Docket No. 202 (the "<u>DIP Objection</u>")]: (i) the "collateral package" offered to the ABL DIP Lenders was "unnecessary because adequate protection is again abundant in the form of a *substantial equity cushion*" (DIP Objection, p. 3) (emphasis added), (ii) the ABL DIP Lenders' "alleged liens cover the Debtors' most liquid collateral and their claims are *massively oversecured*," (DIP Objection, p. 3) (emphasis added), (iii) the existence of "a substantial equity cushion coupled with the value preservation enabled by the mere continuation of the Debtors' business," are sufficient as adequate protection of the Pre-Petition ABL Credit Parties' liens (DIP Objection, ¶ 39), (iv) the ABL DIP Lenders were adequately protected by an "equity cushion of more than $100 million," which "alone is adequate protection of" their interests (DIP Objection, ¶ 40), and (v) the ABL DIP Lenders security interests were adequately protected by the equity cushion and from continued operation of the Debtors' business, with the result that "[n]othing more is necessary."[8] (DIP Objection, ¶ 41.)

---

[8] In Paragraph 65 of the DIP Objection, the Committee states that nothing in the DIP Objection is an admission or stipulation with respect to the liens or claims of the Pre-Petition ABL Credit Parties. Despite that purported reservation, the main focus of the Committee's arguments regarding the absence of any need for the Pre-Petition ABL Credit Parties to have as adequate protection any additional collateral was the existence of a substantial equity cushion over and above the claims of the Pre-Petition ABL Credit Parties. More importantly, the Committee has not sought in either the Motion or the proposed Complaint to retract or qualify any of the positions taken in the DIP Objection regarding the Pre-Petition ABL Credit Parties being oversecured and none of the allegations contained in the proposed Complaint assert a different position than that taken in the DIP Objection.

- The absence of any dispute by the Committee in its DIP Objection to the roll-up of the claims of the Pre-Petition ABL Credit Parties into the DIP financing provided by them as DIP lenders.

27.     The Committee does not offer any evaluation in its Motion of the likelihood that any of its proposed claims against the Pre-Petition ABL Credit Parties will succeed on the merits. Indeed, the Committee does not offer enough factual or legal support for any of these proposed claims to survive a motion to dismiss. Nor does the Committee provide any documentary evidence in support of its proposed claims, despite having asked for – and received[9] – extensive discovery from the Pre-Petition ABL Credit Parties, and despite the fact that courts "must [] examine, *on affidavit and other submission, by evidentiary hearing or otherwise*, whether an action asserting such claims is likely to benefit the reorganization estate." *STN Enterprises,* 779 F.2d at 905 (emphasis added).

28.     The Motion is silent on the net amount of any recovery the Debtors' estates likely would realize if the Committee were to succeed on its proposed claims against the Pre-Petition ABL Credit Parties. In fact, the Debtors' estates are unlikely to realize any net benefit since the Pre-Petition ABL Credit Parties' claims were substantially oversecured and were paid pursuant to the Final DIP Financing Order's authorized roll-up and not from unencumbered funds.

---

[9] The Pre-Petition ABL Credit Parties produced to the Committee substantial documents relating to the Pre-Petition ABL Credit Facility and their security interests and liens. The Committee was appointed on March 24, 2015, and retained counsel that same day. On March 31, 2015, the Committee's counsel forwarded a document request to counsel for ABL Agent setting forth 32 separate categories of documents requested, including loan documents, security and perfection documents, appraisals, collateral inspections and loan reports. As requested by the Committee's counsel, beginning on April 6, and continuing on April 7, 9 and 10, ABL Agent produced documents in response to the Committee's requests. By e-mail on April 20 to counsel for ABL Agent, the Committee's counsel indicated that they had reviewed the documents produced by ABL Agent and requested certain additional documents and information. On April 27, counsel for ABL Agent responded to the Committee, providing the additional documents and information requested. In total, ABL Agent produced approximately 1,960 pages of documents in response to the Committee's requests.

RLF1 12072391v.1

29.     Finally, the Committee does not provide any inkling as to how much the proposed litigation is expected to cost and how these litigation costs will be paid. Should the Committee be granted derivative standing to pursue its claims, the Committee and the Pre-Petition ABL Credit Parties would almost certainly become embroiled in protracted and expensive litigation. The Committee does not offer to fund any of this litigation. Presumably, the Committee is expecting the costs of this litigation to be absorbed by the Debtors' estates.[10]

30.     The substantial costs of litigating will outweigh any recovery realized by the Debtors' estates because there is a very low probability that any of the Committee's proposed claims will succeed and, even if the Committee succeeds on any of these claims, it is doubtful that the Debtors' estates would realize any net benefit. Simply put, the Committee has failed to show that the proposed litigation will yield a net recovery to unsecured creditors greater than what they will otherwise receive absent litigation.

31.     Accordingly, with respect to each claim asserted against the Pre-Petition ABL Credit Parties, the Committee either cannot demonstrate that the claim is colorable or that litigating the claim would benefit the Debtors' estates.

(a)     **Claim to Determine Validity and Perfection of Pre-Petition Liens (Eleventh Count) is Either not Plausible or Would not Benefit Debtors' Estates**

32.     In the Eleventh Count, the Committee seeks a determination as to the validity, perfection and enforceability of the liens of the Pre-Petition ABL Credit Parties as to certain

---

[10] These litigation costs are likely to be substantial. For just one week, March 24 to March 31, Lowenstein Sandler LLP ("Lowenstein Sandler"), Committee counsel, billed $209,616.75 in fees, more than double the amount budgeted for Committee counsel for an entire month. [Docket No. 529]. As of June 1, 2015, aside from this one fee application for a week's worth of services and the fee application filed on May 28, 2015, by Polsinelli PC ("Polsinelli"), the Committee's Delaware and conflicts counsel, for that same week of March seeking some $14,604 in fees and expenses [Docket No. 561], neither Lowenstein Sandler, Polsinelli, nor Zolfo Cooper, LLC, the Committee's financial and forensic advisors, has filed a fee application for its services in these cases.

specified assets of the Debtors. Attached to the proposed Complaint as <u>Exhibit C</u> is a list of the Debtors' assets as to which the Committee contends the Pre-Petition ABL Credit Parties either never obtained, or failed to perfect, a lien. The Committee further seeks to recover for the benefit of the Debtors' estates the value of any proceeds from these allegedly unencumbered assets received by the Pre-Petition ABL Credit Parties.

33.     The Committee should not be granted standing to litigate claims asserted in the Eleventh Count because litigating this proposed claim is unnecessary and wasteful.  With respect to some of the assets characterized by the Committee as "unencumbered," the Pre-Petition ABL Credit Parties do not contend that, as of the Petition Date, they had a lien on or security interest in these assets.  In some instances, the asset was expressly excluded from the Pre-Petition ABL Collateral under the Pre-Petition ABL Loan Documents, and in other instances the Pre-Petition ABL Credit Parties, although granted a lien on the asset, elected not to perfect that lien.

34.     Subject to the completion of appropriate due diligence, the Pre-Petition ABL Credit Parties would be willing to stipulate with the Debtors and the Committee that, with respect to each of the following assets identified in <u>Exhibit C</u> to the proposed Complaint (with values ascribed by the Committee and accepted herein solely for purposes of this Objection), the Pre-Petition ABL Credit Parties either do not have a lien or, if they do, their lien is unperfected:

- Standard Register's equity interest in Standard Register Technologies Canada ULC (no value assigned)

- Standard Register's equity interests in foreign subsidiaries, beyond 65% of such interests (no value assigned to remaining 35%)

- Deposit Account No. 2581 of Standard Register at Fifth Third Bank (value assigned $0)

- Deposit Account No. 2304 of Standard Register at Santander Bank (value assigned $0)

- Deposit Account No. 4086 of Standard Register at TD Bank (value assigned $25,530.97)

RLF1 12072391v.1

- Deposit Account No. 6912 of Standard Register Technologies at Royal Bank of Canada (value assigned $4,000)

- Deposit Account Nos. 9201, 3101 and 4201 of iMedConsent at First Citizens Bank (values assigned $90,000, $0 and $0, respectively)

- Deposit Account Nos. 1815 and 6637 of Standard Register Holding S. de R.L. de C.V. at Banamex  (values assigned $874.42 and $540.05, respectively)

- Deposit Account Nos. 3370, 7856 and 6661 of Standard Register Holding de Mexico S. de R.L. de C.V. at Banamex (values assigned $13,296.95, $32,784.22 and $61,339.18, respectively)

- Real property located at 325 Butler Drive, Murfreesboro, Rutherford County, Tennessee (value assigned of $846,043.82)

- Real property located at 1750 Miller Avenue, Shelbyville, Shelby County, Indiana (value assigned $493,698.33)

- Real property located at 3655 S. School Avenue, Fayetteville, Washington County, Arizona (value assigned $529,347.28)

- Real property located at 1251 N. Fruitridge Avenue, Terre Haute, Virgo County, Indiana (value undetermined)

- Motor vehicles with title certificates (aggregate value assigned of $382,067 based on original cost as new, but Debtors' Schedules reflect aggregate value of $6,481 without any per vehicle breakdown)

- Commercial tort claims (claims unspecified and value unknown)

- Assets of foreign subsidiaries in foreign jurisdictions (aggregate value assigned approximately $1,984,684)

- Certain life insurance policies (value assigned equals approximately $3,651,900)

- Assets of Standard Register Holding Company and Standard Register Mexico Holding Company (value undetermined)

35.      Litigation with respect to these assets is unnecessary and will only cause the Debtors' estates to incur additional costs with no corresponding benefit.  It bears repeating that, even if the Pre-Petition ABL Credit Parties held no lien (or no perfected lien) on any of the described assets, the value of the Unchallenged Collateral (including accounts receivable,

general intangibles and inventory) more than covers the entirety of the outstanding indebtedness owed on the Petition Date to the Pre-Petition ABL Credit Parties.  The values assigned by the Committee to the above assets total approximately $8,110,000 (adjusted downward to slightly more than $7,740,000 if the Debtors' value for the motor vehicles is used), a negligible amount given the overall amount of claims, uncontested items of perfected collateral, and the excess of Unchallenged Collateral values over the Pre-Petition ABL Credit Parties' claims (that excess, as shown on the Debtors' Schedules and as admitted by the Committee in the DIP Objection, totaling at least $75,000,000, based upon Petition Date accounts and inventory of approximately $114,300,000 and $57,650,000, respectively, against total debt of approximately $96,775,000). Hence, the existence of unperfected liens on other assets of the Debtors does not affect in any way the right of the Pre-Petition ABL Credit Parties to a full and complete recovery based upon the Unchallenged Collateral.  Even if the Pre-Petition ABL Credit Parties received after the Petition Date proceeds of assets on which they either did not have a lien or had an unperfected lien, such proceeds would have reduced the amount of their oversecured claims, thereby reducing recourse to the Unchallenged Collateral.[11]

36.     In addition, with reference to the deposit accounts on which the Pre-Petition ABL Credit Parties may not have obtained a deposit account control agreement to perfect their liens, the contents of those accounts likely consisted of proceeds of accounts receivable or other Unchallenged Collateral in which the Pre-Petition ABL Credit Parties indisputably held a perfected lien; and the Committee has made no assertion to the contrary (apparently assuming, without averment, that that is not the case).  Moreover, to the extent that the real property items

---

[11] The proposed Complaint does not seek recovery of any payments (including any proceeds that may have been received from assets of a Debtor other than Unchallenged Collateral), and any such attempted recovery would have been unavailing in light of the oversecured position of the Pre-Petition ABL Credit Parties.

listed above are subject to the liens of the term lenders (the Silver Point parties), the Pre-Petition ABL Credit Parties do not believe that there is any equity over and above the claims of the term lenders.  Finally, even as to those items of property of the Debtors that may be unencumbered or encumbered by a lien that was unperfected as of the Petition Date, all of these assets are secured by unassailable, judicially approved liens pursuant to the Court's DIP financing orders. Accordingly, until all of the DIP financing obligations to the ABL and term lenders are paid in full, there are no unencumbered assets available for the Committee or its constituents.

37.       As to the remaining assets identified by the Committee on <u>Exhibit C</u> to the proposed Complaint, the Pre-Petition ABL Credit Parties dispute the Committee's contention that the Pre-Petition ABL Credit Parties' liens are unperfected. In its proposed Complaint, the Committee alleges no facts to support its claim, much less enough facts to state a "plausible" claim as required by such decisions as *Cybergenics*. For that reason alone, the Motion should be denied as to those assets.

38.       Moreover, the Committee is simply in error as to those assets as a matter of undisputed fact and law. In the Pre-Petition ABL Loan Documents, the Pre-Petition ABL Credit Parties were granted security interests in and liens upon substantially all of the assets of each Debtor Borrower, including Standard Register and Standard Register of Puerto Rico. The Pre-Petition ABL Credit Parties perfected these security interests and liens by filing UCC financing statements describing such collateral in the appropriate jurisdictions and by filings in local real property records.[12] For the reasons set forth in the chart below, the Pre-Petition ABL Credit Parties have a valid, perfected and enforceable lien on each of these assets:

---

[12] In neither its Motion nor its proposed Complaint does the Committee allege that any of the UCC or mortgage filings made by the Pre-Petition ABL Credit Parties were in any way defective.

| Asset in Question | Evidence of Lien and Perfection |
|---|---|
| Certain unspecified computer programs and related computer agreements and materials | The Pre-Petition ABL Credit Parties have a perfected lien on the general intangibles and books and records of Standard Register. A copy of the UCC financing statement is attached to this Objection as Exhibit B. Section 2(a)(xv) of the Security and Pledge Agreement states that the security interest granted as to books and records (including computer programs and computer materials and records) shall not apply to computer programs and related computer agreements and materials if the granting of such a lien would constitute a default under the agreement relating to such computer programs and related computer agreements and materials. But the Committee does not even allege that any such agreements exist. |
| Real property of Standard Register located at 325 Busser Road, Manchester Township, York County, Pennsylvania | ABL Agent was granted a third lien mortgage by Standard Register which was recorded on August 13, 2013, in the York County, Pennsylvania records. A copy of this mortgage is attached to this Objection as Exhibit C. ABL Agent's lien is third behind the liens of the Pre-Petition Term Credit Parties. By Order entered May 8, 2015 [Docket No. 450], the Court authorized Standard Register to sell this property for $2.2 million. |
| Tax refunds and tax credits of Standard Register | In the Motion and proposed Complaint, the Committee does not explain the basis for its contention that lien of the Pre-Petition ABL Credit Parties did not attach to these tax refunds and tax credits (including refunds due to the use of net operating losses). Generally speaking, a tax refund is deemed to be a general intangible, *see, e.g.*, *BancorpSouth Bank v. Hazelwood Logistics Center, LLC*, 706 F.3d 888 (8th Cir. 2013); *In re Castle Ventures, Ltd.*, 167 B.R. 758 (Bankr. E.D.N.Y. 1994); *Sterling National Bank & Trust Co. of New York v. Bornstein (In re Metric Metals International, Inc.)*, 20 B.R. 633 (S.D.N.Y. 1981), and the Pre-Petition ABL Credit Parties are perfected as to Standard Register's pre-petition general intangibles. (*See* Exhibit B). If the Committee is taking the position that these tax refunds and tax credits constitute post-petition property, such tax refunds and tax credits clearly are subject to the perfected lien of the ABL DIP Credit Parties by virtue of the grant of liens under the Final DIP Financing Order. |

| | |
|---|---|
| Finished goods of Standard Register of Puerto Rico (a Delaware corporation) | The Pre-Petition ABL Credit Parties were granted a lien on the inventory of Standard Register of Puerto Rico (a Delaware corporation), and that lien was perfected by an "all assets" UCC filing with the Delaware Secretary of State. A copy of that UCC financing statement is attached to this Objection as <u>Exhibit D</u>. The Committee does not aver to the contrary in the proposed Complaint, nor does it explain in the proposed Complaint any basis for contending that these finished goods are not subject to the perfected liens of the Pre-Petition ABL Credit Parties.[13] |
| Assets of Standard Register of Puerto Rico | The Committee includes on the list of alleged unencumbered assets the assets of Standard Register of Puerto Rico "with respect to liens under the Second-Lien Term Loan." The Committee does not explain in the Motion or in the proposed Complaint the basis for asserting that these assets, as to which the Pre-Petition ABL Credit Parties have perfected liens, are unencumbered. (*See* <u>Exhibit D</u>). |
| Security deposits, pre-paid rent, and pre-paid maintenance contracts of Standard Register | The Committee does not explain in the Motion or in the proposed Complaint the basis for contending that the Pre-Petition ABL Credit Parties are unperfected as to these assets. To the extent that Standard Register is entitled to the return or refund of any of these deposits, pre-paid rent or pre-paid maintenance contracts under the applicable agreement, that right is a general intangible subject to the perfected lien of the Pre-Petition ABL Credit Parties. *See, e.g.*, *Vienna Park Properties v. United Postal Savings Ass'n (In re Vienna Park Properties)*, 976 F.2d 106 (2d Cir. 1992); *First National Bank of Litchfield v. O'Neil (In re Litchfield Construction Management, Inc.)*, 137 B.R. 98 (Bankr. D. Conn. 1992). |
| Leasehold improvements of Standard Register | The Committee does not identify which "leasehold improvements" it is referring to. To the extent that these leasehold improvements consist of items of equipment, the Pre-Petition ABL Credit Parties have a perfected lien on these assets, even if these items of equipment are deemed to be fixtures (but there is no allegation in the proposed Complaint that any of those items constitute fixtures). |

---

[13] Pre-Petition ABL Agent filed a UCC financing statement naming Standard Register of Puerto Rico as debtor and describing the collateral as all of the personal property of Standard Register of Puerto Rico. (*See* <u>Exhibit D</u>). This financing statement was filed with the Delaware Secretary of State, the jurisdiction in which Standard Register was incorporated, in accordance with the Uniform Commercial Code as adopted by the Commonwealth of Puerto Rico.

| Construction in Process/Various Capital Projects of Standard Register | In its Motion and proposed Complaint, the Committee provides no information as what "construction in process/various capital projects" it is referring to. The Pre-Petition ABL Credit Parties have perfected liens upon substantially all of the assets of Standard Register, except for the assets described in Paragraph 34 above, and these "construction in process/various capital projects" do not fall within any of those excluded asset categories and would constitute general intangibles as to which the Pre-Petition ABL Credit Parties hold perfected liens. |
|---|---|

39.       In short, litigating the claims asserted in the Eleventh Count is unnecessary and would be a waste of limited resources.

> **(b)     Claim for Recharacterization/Disallowance of Interest and Expense (Twelfth Count) Lacks a Colorable Basis**

40.       The Twelfth Count in the proposed Complaint asserts that post-petition payments of interest, fees and expenses to the Pre-Petition ABL Credit Parties should be disallowed and treated as repayments of principal "[t]o the extent the Pre-Petition ABL Liens were undersecured." (Compl. ¶ 200, at 41).

41.       Nowhere in the proposed Complaint is there any allegation that the Pre-Petition ABL Credit Parties were ever undersecured.  Indeed, all evidence in the record to date firmly supports a contrary position.

42.       At a minimum, for the claim to be well pled, the Committee would have to allege and prove that the Pre-Petition ABL Credit Parties were undersecured. *See, e.g.*, *Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008). The Committee merely alleges that, "*to the extent the Prepetition ABL Liens were undersecured, the Debtors' post-petition payment of interest, fees, costs, and expenses to or for the benefit of the Prepetition ABL Lenders*" should be disallowed or recharacterized as repayments of

principal. (Compl. ¶ 200, at 41) (emphasis supplied). This allegation does not state a "plausible" claim and is not sufficient to satisfy the standard for derivative standing under *Cybergenics*.

43.     Having omitted an allegation essential for the viability of the claim, the claim lacks a colorable basis, and derivative standing to assert it should therefore be denied.

> ### (c)     Claim for Disallowance of Pre-Petition ABL Credit Parties' Claims Pursuant to Section 502(d) (Thirteenth Count) Lacks a Colorable Basis

44.     In the Thirteenth Count, the Committee states without embellishment that the Pre-Petition ABL Credit Parties' claims against the Debtors should be disallowed under Section 502(d) "[t]o the extent the Debtors' obligations to any of the Prepetition ABL Defendants are voidable under Chapter 5 of the Bankruptcy Code." (Compl. ¶ 202, at 41).

45.     The Thirteenth Count does not identify any obligations owed to the Pre-Petition ABL Credit Parties that are (or might be) avoidable under Chapter 5 of the Bankruptcy Code. More importantly, Section 502(d) does not authorize the disallowance of a claim because an obligation to the holder of the claim is avoidable.   Rather, Section 502(d) by its own terms applies only to claims of entities from which property is recoverable and transferees of voidable transfers to the extent that the entity or transferee has not repaid the amount or turned over the property for which the entity or transferee is liable.[14]

---

[14] In addition, even if a Section 502(d) claim were cognizable under the facts alleged, the claim would be premature. *See, e.g.*, *Zazzali v. AFA Financial Group, LLC (In re DBSI, Inc.)*, 477 B.R. 504, 517 (Bankr. D. Del. 2012) (Section 502(d) claim is premature and must be dismissed "where the trustee does not yet have a judgment against the transferee"); *Joseph v. Feit (In re Liberty Brands, LLC)*, 476 B.R. 443 (Bankr. D. Del. 2012) (Section 502(d) claim was premature when no judgment had been entered against defendants and defendants had not filed any claims in case); *Cohen v. TIC Financial Systems (In re Ampace Corp.)*, 279 B.R. 145 (Bankr. D. Del. 2002) (Section 502(d) not operative until judicial order requiring turnover of property has been entered). *See also Logan v. Credit General Insurance Co. (In re PRS Insurance Group, Inc.)*, 331 B.R. 580, 587 (Bankr. D. Del. 2005) (purpose of Section 502(d) is "to ensure compliance with judicial orders"). Hence, that count is insufficient on its face to state a legally cognizable claim against the Pre-Petition ABL Credit Parties.

RLF1 12072391v.1

46.      Because no avoidance cause of action is identified in the Thirteenth Count, no colorable claim is stated by the Committee and derivative standing with respect to the Thirteenth Count should be denied.

#### (d)    Claim for Avoidance of Under Section 547(c)(5) (Fourteenth Count) Lacks a Colorable Basis

47.      The Fourteenth Count seeks to set aside the liens of the Pre-Petition ABL Credit Parties pursuant to Section 547(c)(5) of the Bankruptcy Code to the extent of their alleged improvement in position.

48.      Section 547(b)(5) exempts from preference attack so-called "floating liens" on accounts and inventory (or the proceeds of either), except to the extent that the attachment of the floating lien to accounts and inventory during the 90-day period prior to bankruptcy enabled the secured creditor to improve its position "to the prejudice of" holders of unsecured claims.  11 U.S.C. § 547(b)(5).  The improvement, if any, is determined by comparison of the loan-to-collateral ratio on the 90th day before bankruptcy to the same ratio on the date of bankruptcy. *See, e.g.*, *In re Qualia Clinical Service, Inc.*, 652 F.3d 933, 937 (8th Cir. 2011). No improvement is deemed to exist if, on the 90th day pre-bankruptcy date, the secured creditor was oversecured (taking into account liens on all of the debtor's assets).  *E.g.*, *In re Smith's Home Furnishings, Inc.*, 265 F.3d 959 (9th Cir. 2001) (Section 547(c)(5) applies only to creditor who is undersecured 90 days before bankruptcy); *In re Foxmeyer Corp.*, 286 B.R. 546 (Bankr. D. Del. 2002) (secured creditor must be undersecured on 90th day preceding bankruptcy for Section 547(b)(5) to apply).

49.      While the Committee refers to the "attachment of certain security interests or other liens upon the Debtors' property or any proceeds thereof" (Compl. ¶ 204, at 42), it does not identify any property or proceeds of the Debtors that are the cause of the alleged improvement in

position of the Pre-Petition ABL Credit Parties other than "the Debtors' tax credits and tax refunds for the year 2014 identified on Schedules B18 and B21 to the Schedules of Assets and Liabilities filed by The Standard Register Company on May 11, 2015 [D.I. 477], and the Debtors' net operating losses for the year 2014 . . . . " (the "Tax Refunds") (Compl. ¶ 204, at 42).

50.        The Fourteenth Count does not assert that the claims of the Pre-Petition ABL Credit Parties were undersecured on the 90th day prior to the Petition Date, that the alleged improvement resulted from changes in the composition of accounts receivable and inventory (rather than solely from the Tax Refunds), or that unsecured creditors were prejudiced by the alleged improvement.  Further, the Fourteenth Count does not specify the amount of the alleged improvement.   In addition, because the Tax Refunds constitute general intangibles and not accounts, *see, e.g.*, *BancorpSouth Bank v. Hazelwood Logistics Center, LLC*, 706 F.3d 888 (8th Cir. 2013), Section 547(b)(5) is inapplicable as it does not apply to floating liens on tax refund claims. *See, e.g.*, *Markowitz v. Heritage Bank, N.A. (Matter of Jefferson Mortgage Co.)*, 25 B.R. 963, 967 (Bankr. D.N.J. 1982) (tax refund is general intangible and Section 547(c)(5) does not apply).[15]

51.        Having failed to set forth any of the basic elements for application of the improvement-in-position test under Section 547(b)(5), the Committee's request for standing with respect to the Fourteenth Count should be denied.

**Conclusion**

---

[15] Although Section 547(a)(3) defines the term "receivable," as used in the improvement-in-position test in Section 547(c)(5), to mean "right of payment," the legislative history makes clear that Section 547(c)(5) was intended to overrule pre-Bankruptcy Code cases holding that the floating liens on inventory or accounts receivable could be vulnerable to preference attack. *See* Senate Report No. 95-989 ("A creditor with a security interest in a floating mass, such as inventory or *accounts receivable*, is subject to a preference attack to the extent he improves his position during the 90-day period before bankruptcy. The test is a two-point test, and requires determination of the secured creditor's position 90 days before the petition and on the date of the petition.  If new value was first given after 90 days before the case, the date on which it was first given substitutes for the 90-day point.").

It is unclear what motivated the Committee to seek standing to assert avoidance claims against creditors holding oversecured pre-petition claims.  Perhaps it was motivated by counsel's concern that it leave "no stone unturned" and not permit the challenge deadline to pass without preserving any potential claim, if a claim was later determined to exist.

Whatever the motivation, the proposed Complaint fails to state a colorable claim against the Pre-Petition ABL Credit Parties warranting derivative standing.  The Debtors, as fiduciaries guided by experienced and sophisticated professionals, have not lightly stipulated to the validity, perfection and enforceability of the liens and claims of the Pre-Petition ABL Credit Parties. Their judgment should be respected, as no evidence or arguments mustered by the Committee call that judgment into question.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

RLF1 12072391v.1

For all of the foregoing reasons, ABL Agent respectfully requests that the Court (i) deny

the Committee's Motion and (ii) grant such other and further relief as is just and proper.

Dated:  June 1, 2015                            Respectfully submitted,
        Wilmington, Delaware

                                         */s/ Joseph C. Barsalona II*
                                         Mark D. Collins (No. 2981)
                                         Tyler D. Semmelman (No. 5386)
                                         Joseph C. Barsalona II (No. 6102)
                                         RICHARDS, LAYTON & FINGER, P.A.
                                         One Rodney Square
                                         920 North King Street
                                         Wilmington, DE 19801
                                         Telephone:  (302) 651-7700
                                         Facsimile:  (302) 651-7701
                                         Email:  collins@rlf.com
                                                   semmelman@rlf.com
                                                   barsalona@rlf.com

                                         -and-

                                         C. Edward Dobbs
                                         James S. Rankin, Jr.
                                         PARKER HUDSON RAINER
                                           & DOBBS LLP
                                         1500 Marquis Two Tower
                                         285 Peachtree Center Avenue NE
                                         Atlanta, GA 30303
                                         Telephone:  (404) 523-5300
                                         Facsimile:  (404) 522-8409
                                         Email:  edobbs@phrd.com
                                                   jrankin@phrd.com

                                         *Counsel for Bank of America, N.A., as*
                                          *Pre-Petition ABL Agent and ABL DIP*
                                         *Agent*

RLF1 12072391v.1