## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No.  15-10541 (BLS)<br><br>(Jointly Administered)<br><br>Re: D.I. 23, 286, 559<br><br>Hearing Date: June 17, 2015 at 10:00 a.m. ET |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

The Official Committee of Unsecured Creditors (the "Committee"), appointed in the chapter 11 cases (the "Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), submits this objection (the "Objection") to the relief sought in the Debtors' motion [D.I. 23] and supplement [D.I. 559] (together, the "Sale Motion")[2] for the sale of substantially all of their assets.  In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Committee objects to the proposed sale (the "Sale") of the Debtors' business as a going concern to Standard Acquisition Holdings, LLC (the "Stalking Horse Bidder"), an

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the *Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [D.I. 524] (the "Standing Motion").

affiliate of Silver Point Capital, L.P. (together with its affiliates, "Silver Point"), as the stalking horse bidder (or any other bidder).

2.      Silver Point and the other lenders should not be permitted to use Chapter 11 in place of a state court foreclosure action without a commitment to fund a confirmable and feasible Chapter 11 plan that provides for the payment of all administrative expenses and a distribution to unsecured creditors.

3.      At a minimum, any sale of the Debtors' assets should result in the payment of all administrative expenses and a distribution to unsecured creditors, to which they are entitled. This is especially true where, as here, over $50 million of the Debtors' assets were not subject to properly perfected liens of the Debtors' prepetition lenders, and certain of the Debtors' assets, such as substantial equity in the Debtors' foreign subsidiaries, were expressly excluded from the lenders' prepetition collateral.  Permitting the Stalking Horse Bidder to acquire the Debtors' assets, and especially the Unencumbered Assets (as defined below), via credit bid or otherwise, without at least allocating an appropriate portion of the sale price to Unencumbered Assets (including Avoidance Actions, as defined below) will impermissibly prejudice and impair the rights of the Debtors' estates and unsecured creditors.

4.      Furthermore, under the circumstances of this case, the Stalking Horse Bidder should not be permitted to credit bid Silver Point's alleged secured claims.  As set forth in detail in the Standing Motion and the Complaint (each as defined below), the Committee asserts substantial and colorable claims against Silver Point and other prepetition lenders seeking, among other things, to avoid, as fraudulent transfers, $210 million of obligations incurred by the Debtors and the liens granted by Standard Register in favor of Silver Point as part of Standard Register's August 1, 2013 acquisition (the "WorkflowOne Acquisition") of WorkflowOne, LLC

("<u>WorkflowOne</u>").  Unless and until Silver Point's alleged claims, liens and security interests are determined valid and enforceable, Silver Point, through the Stalking Horse Bidder, should not be permitted to credit bid.  Allowing a credit bid under these circumstances will not only chill the bidding process, but will be inequitable.

5.      For the same reason, even if the Court overrules the Committee's other objections and a Sale is consummated to a party other than the Stalking Horse Bidder, the proceeds of the Sale should not be applied against any outstanding obligations under the Prepetition Term Loans, except pursuant to a confirmed Chapter 11 plan or upon final adjudication or settlement of the Committee's Complaint.  Further, to the extent the Court authorizes a sale to the Stalking Horse Bidder, the Committee's right to pursue the claims asserted in the Standing Motion and Complaint should be fully preserved for the Debtors' estates.

6.      The Committee further objects to any Sale that includes the purchase of avoidance power actions under Chapter 5 of the Bankruptcy Code or other similar laws (the "<u>Avoidance Actions</u>").  These Avoidance Actions, the face amount of which is in excess of $245 million, were not subject to prepetition liens and are excluded from the lenders' DIP Collateral by operation of the DIP Order.  Therefore, unless the value of the avoidance actions (or, alternatively, the actions themselves) is left for the benefit of the Debtors' estates, the Sale should not be approved.

7.      Moreover, the proposed asset purchase agreement contains ambiguities that require clarification to avoid the transfer of certain assets (particularly potentially unencumbered causes of action) not intended to be sold.  The Committee requests clarification and assurance that the Committee's rights, including the claims asserted in the Standing Motion and the

Complaint, will be fully preserved and will not be impaired in the event the Court approves the proposed Sale to any party.

8.      Finally, the relief sought in the Supplement should also be denied.  Through the Supplement, the Debtors seek to allow the successful bidder up to 90 days after closing to determine which contracts and leases the buyer will assume.  This relief is contradictory to the requirements of the Stalking Horse APA (as defined below) which mandate that a prospective buyer identify prior to closing which contracts and leases it will acquire, and acquire such contracts and leases at closing.[3]  It also unduly prejudices the estates, as well as counterparties to executory contracts and unexpired leases.  The delay will make it difficult, if not impossible, to assess the value of competing bids, which is necessary to select the winning bidder prior to the sale hearing.

9.      By way of example, if the cash consideration offered by two bidders is equal or nearly equal, the number of executory contracts and unexpired leases assumed and assigned and the cure costs paid could be the determinative factor in assessing the highest and best bid.  Given that the Debtors and the Stalking Horse Bidder were confident that the proposed timeline for the Sale was appropriate at the start of the process, there is no legitimate reason to extend the deadline to decide which agreements to assume.

10.     The Committee urges the Court to condition approval of the proposed Sale or any other sale of substantially all of the Debtors' assets in these Cases (as defined herein) to the filing of a confirmable and feasible Chapter plan pursuant to which the successful sale bid (a) pays or provides cash sufficient to satisfy all administrative expenses and priority claims as part of a Chapter 11 plan, (b) provides sufficient funding for the plan process and the expenses that will

---

[3]    Through the Supplement the Debtors do not seek to modify the Stalking Horse APA in this regard.  *See* Stalking Horse APA, §§2.6(d), 2.6(f), and 2.9(a).

accrue during the post confirmation wind-down period, and (c) provides for a distribution to unsecured creditors to which they are entitled.

11.    Accordingly, the Committee respectfully requests that, unless and until the objections raised herein are adequately resolved, the Sale Motion should be denied.

## JURISDICTION

12.    The Court has jurisdiction to consider the Sale Motion and this Objection under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

13.    On March 12, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code").  These Cases are being jointly administered and no trustee or examiner has been appointed.  *See* D.I. 46.

14.    On the Petition Date, the Debtors filed the Sale Motion through which, *inter alia*, the Debtors sought authority to enter into a stalking horse purchase agreement with Standard Acquisition Holdings, LLC, a Silver Point affiliate (the "Stalking Horse APA").  *See* D.I. 23.

15.    On March 24, 2015, the Office of the United States Trustee for Region 3 appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  *See* D.I. 99.

16.    On April 6, 2015, the Committee filed the *Objection of the Official Committee of Unsecured Creditors to the Relief Sought in the Debtors' Sale Motion. See* D.I. 200.

17.    On April 15, 2015, the Court entered the *Order (I) Establishing Sale Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (II) Approving the Maximum Reimbursement Amount; (III) Establishing Procedures Relating to the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of all Procedures, Protections, Schedules, and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale; and (VI) Granting Certain Related Relief* (the "Bid Procedures Order"). *See* D.I. 286. The Bid Procedures Order, together with the bidding procedures annexed thereto, established the following sale-related deadlines:

- o June 1, 2015 at 4:00 p.m. (ET) – Objection to Sale to the Stalking Horse Bidder;
- o June 11, 2015 at 5:00 p.m. (ET) - Bid Deadline;
- o June 15, 2015 at 10:00 a.m. (ET) – Auction;
- o June 16, 2015 at 4:00 p.m. (ET) – Objection to Successful Bidder;
- o June 17, 2015 at 10:00 a.m. (ET) – Sale Hearing; and
- o August 16, 2015 – Closing Deadline.

18.    On May 27, 2015, the Debtors filed a supplement (the "Supplement") to the Sale Motion seeking to establish certain procedures governing the Debtors' post-closing assumption and assignment (or rejection, as applicable) of executory contracts and unexpired leases to the buyer. Through the Supplement, the Debtors seek (among other relief) to establish procedures pursuant to which the buyer would have ninety (90) days after closing to decide which executory contracts/unexpired leases it will assume and which executory contracts/unexpired leases the Debtors will be required to reject.

19.    On May 18, 2015, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estate* (the "Standing Motion") [D.I. 524], with a proposed adversary complaint (the "Complaint") attached thereto. Through the Complaint, as further outlined below, the Committee asserts highly colorable claims against third parties, including (a) fraudulent conveyance claims seeking to

avoid $210 million of alleged secured obligations assumed by the Debtors and liens granted in connection with the August 1, 2013 acquisition of WorkflowOne by Standard Register, (b) claims against certain of the Debtors' directors and officers, (c) a determination that, as of the Petition Date, certain of the Debtors' assets were not subject to properly perfected liens asserted by the Debtors' secured lenders, (d) equitable disallowance or subordination of Silver Point's claims, (e) recharacterization of the Second-Lien Term Loans as equity interests, and (f) damages from certain of the Debtors' current and former officers and directors and other defendants.

20.     Pursuant to the Scheduling Order entered on May 26, 2015 [D.I. 557], a hearing on the Standing Motion is scheduled for June 8, 2015 at 9:30 a.m.

**The Debtors' Business**

21.     The Debtors operate on a large scale and internationally.  According to the Debtors, they are one of the leading providers in the United States of communications services and communications workflow, content and analytics solutions through multiple communication channels, including print, electronic, and internet-based communications, to clients in the healthcare, financial services, manufacturing, retail, and transportation industries.  *Declaration Of Kevin Carmody In Support Of The Debtors' Chapter 11 Petitions And Requests For First Day Relief* ("Carmody Declaration") [D.I. 2], ¶12.  The Debtors have a total of fifty-three (53) production and warehouse facilities in North America.  *Id.*

22.     The Debtors' operations are divided between two main business units: (i) healthcare, which accounts for almost one-third of the Debtors' revenues, and (ii) integrated communications (*f/k/a* business solutions), which accounts for the remainder of the Debtors' revenues.  *Id.*

**Prepetition Capital Structure**

23.    As of the Petition Date, five of the Debtors were obligors under a first-lien prepetition term loan (the "First-Lien Term Loan") and a second-lien prepetition term loan (the "Second-Lien Term Loan" and collectively with the First-Lien Term Loan, the "Prepetition Term Loans") with Silver Point Finance as agent and various lenders (collectively, the "Prepetition Term Lenders").  As of the Petition Date, approximately $115.4 million and $98.6 million remained outstanding under the First-Lien Term Loan and the Second-Lien Term Loan, respectively.

24.    The same five Debtors were also the obligors under a prepetition asset-backed revolving facility (the "Prepetition ABL Facility") provided by Bank of America, N.A. and Wells Fargo Bank, N.A. as lenders (collectively the "Prepetition ABL Lenders" and collectively with the Prepetition Term Lenders, the "Prepetition Lenders").  As of the Petition Date, approximately $96.3 million remained outstanding under the Prepetition ABL Facility.  As set forth below, pursuant to the DIP Order, the obligations under the Prepetition ABL Facility were rolled up into a postpetition ABL facility.

25.    None of the assets of the following six entities were pledged as collateral for the Prepetition Term Loans or the Prepetition ABL Facility:

- Standard Register Holding Company, which is wholly owned by The Standard Register Company;
- Standard Register Mexico Holding Company, which is wholly owned by The Standard Register Company;
- Standard Register Holding, S. de R.L. de C.V., which is 90% owned by Standard Register Mexico Holding Company and 10% owned by Standard Register Holding Company;
- Standard Register Servicios, S. de R.L. de C.V., which is 99.97% owned by Standard Register Holding, S. de R.L. de C.V. and .03% owned by Standard Register Mexico Holding Company;

- Standard Register de Mexico, S. de R.L de C.V., which is 99.97% owned by Standard Register Holding, S. de R.L. de C.V. and .03% owned by Standard Register Mexico Holding Company; and
- Standard Register Technologies Canada ULC, which is wholly owned by Standard Register Technologies, Inc.

26.     The Debtors' unsecured liabilities, including underfunded pension obligations and excluding potential rejection damage claims, exceed $350 million.

27.     As set forth in detail in the Standing Motion and the Complaint (including in Exhibits B and C thereto), pursuant to applicable Pledge and Security Agreements governing the Prepetition Term Loans and the Prepetition ABL Facility (including sections 1(c), 2(a) and 2(a)(xv)), certain of the Debtors' equity interest in their foreign subsidiaries are expressly excluded from the lenders' collateral, including:

- Any and all equity interest in Standard Register Technologies Canada ULC; and
- 35% of the equity of the following companies:
  - o Standard Register Holding, S. de R.L. de C.V., which is 90% owned by Standard Register Mexico Holding Company and 10% owned by Standard Register Holding Company;
  - o Standard Register Servicios, S. de R.L. de C.V., which is 99.97% owned by Standard Register Holding, S. de R.L. de C.V. and .03% owned by Standard Register Mexico Holding Company;
  - o Standard Register de Mexico, S. de R.L. de C.V., which is 99.97% owned by Standard Register Holding, S. de R.L. de C.V. and .03% owned by Standard Register Mexico Holding Company;
  - o Standard Register Holding Company, which is wholly owned by The Standard Register Company; and
  - o Standard Register Mexico Holding Company, which is wholly owned by The Standard Register Company

28.     In addition, as detailed in the Standing Motion and the Complaint, certain of the liens asserted by the Debtors' prepetition lenders were not properly perfected as of the Petition Date.  Those Unencumbered Assets are set forth as Exhibit A to this Objection.  The value of the Unencumbered Assets, as set forth in the exhibit, is in excess of $50 million, exclusive of the Avoidance Actions and the Debtors' equity interests in their foreign subsidiaries.

**Debtor-in-Possession Financing**

29.     By order dated April 16, 2015 (the "DIP Order") [D.I. 290], the Court approved the Debtors' request (as modified) for postpetition financing.  Through the DIP Order, among other things, and subject to the right to assert challenges provided in paragraph 28(B) of the DIP Order (and as made in the Complaint), the Debtors were permitted to (i) completely roll-up their obligations under the Prepetition ABL Facility into a postpetition ABL facility and (ii) borrow up to $30 million under a delayed-draw term loan from Silver Point and related lenders (the "DIP Term Loan").

30.     Upon information and belief, as of May 31, 2015, Debtors owed approximately $1.05 million under the DIP Term Loan and approximately $81 million under the rolled-up ABL facility.  The balance outstanding under the DIP Term Loan was used solely to pay an origination fee to Silver Point on account of the DIP Term Loan.  As such, the only new money the Debtors have drawn under their DIP financing was to cover Silver Point's financing related fees.

**The Prepetition Lenders' Involvement and Control**

31.     As detailed in the Standing Motion and Complaint Standard Register acquired 100% of the outstanding equity interests of WorkflowOne on August 1, 2013.  In connection with this ill-conceived acquisition of a heavily indebted competitor, Standard Register and certain of its subsidiaries assumed and incurred WorkflowOne's secured debt (owed primarily to Silver Point) in the principal amount of approximately $210 million, and pledged certain of its assets to secure that debt.[4]  Additionally, Standard Register issued warrants to the lenders under the Second-Lien Term Loan convertible into 2,645,952 shares of common stock

---

[4]     As outlined in the Standing Motion and Complaint, prior to the WorkflowOne Acquisition, Standard Register's secured Debt was a manageable $50 million.

32.     The enormous debt incurred and liens granted in the WorkFlowOne Acquisition were made for less than reasonably equivalent value and left the Debtors insolvent and with unreasonably small capital.  Silver Point was well aware of the potential consequences of the WorkflowOne Acquisition, and that the excessive debt burden imposed on the Debtors was likely to lead to the situation the Debtors now face.

33.     As a result of the WorkflowOne Acquisition and the exercise of the warrants issued in connection with that transaction, Silver Point controlled 29.6% of the common stock of the lead Debtor.  *See* Schedule 13D filed by Silver Point Capital, L.P. on Aug. 12, 2013.

34.     Silver Point's acquisition of a substantial equity position in the Debtors entitled Silver Point to appoint two members of the Debtors' board of directors (the "Board").  Promptly after exercising its warrants, Silver Point appointed two members (one of whom was a Silver Point employee) to the Board, who in turn sat on various committees.[5]  Subsequent to the WorkflowOne Acquisition and at a time it was aware of the Debtors' financial and operational challenges, Silver Point actively traded (through multiple sales) in the Debtors' equity. Commencing in May 2014, with two of Silver Point's appointees on the Board (including Anthony DiNello, a Silver Point employee), and amid its serious concerns of a potential covenant breach under the Prepetition Term Loans (only months after the closing of the WorkflowOne Acquisition), Silver Point began selling its shares in the Debtors.  In total, between May 5, 2014 and December 5, 2014, Silver Point sold 556,800 shares of the Debtors' common stock, comprising nearly 20% of all of the Debtors' shares traded during that period. Silver Point's sales of stock were among the largest sales involving the Debtors' stock during

---

[5]     In October 2013 two designees of Silver Point were appointed to the Debtors' board of directors: Anthony J. DiNello and Robert A. Peiser.  *See* NOTICE OF ANNUAL MEETING OF SHAREHOLDERS OF THE STANDARD REGISTER COMPANY, dated March 14, 2014.

that period.  As of the Petition Date, although it had sold a significant amount of shares, Silver Point still held 20% of the Debtors' common stock.  *See* Schedule 13D filed by Silver Point Capital, L.P. on March 12, 2015.

35.     The burden of the prepetition credit facilities placed "severe liquidity constraints" on the Debtors.  *See* Sale Motion, ¶ 9.  Once Silver Point decided to force the Debtors into a chapter 11 proceeding, Mr. Dinello resigned from the Board in early December 2014 and Silver Point agreed to short-term covenant relief in January 2015 in order to allow the Debtors to retain professionals (McKinnsey & Co., Lazard, and Gibson Dunn) to prepare for the filing.

36.     Although the Debtors requested Silver Point to extend the covenant relief, it refused.  Instead, in January, 2015, Silver Point placed the Debtors on a clear course toward a liquidating Chapter 11 by proposing DIP financing and to serve as the stalking horse bidder for substantially all of the Debtors' assets pursuant to a partial credit bid under section 363 of the Bankruptcy Code.

37.     The selection of a Silver Point affiliate as the stalking horse bidder was made with absolutely no prior marketing of the Debtors' assets, thereby impairing the Debtors' prepetition ability to maximize the value of their assets for the benefit of all stakeholders (as opposed to Silver Point's interests).  Although the Debtors did engage in discussions with one or two other potential interested parties shortly before the Petition Date, those discussions did not result from any solicitation efforts by the Debtors or their professionals.

38.     On March 12, 2015, as it had done with the Workflow Debtors, Silver Point caused the Debtors to commence these Cases to effectuate an acquisition of the Debtors' assets free and clear of liens and claims (including but not limited to the Debtors' underfunded pension

liability) pursuant to section 363 of the Bankruptcy Code, with a Silver Point affiliate credit bidding a substantial portion of the Prepetition Term Loans as the stalking horse purchaser.

39.     As it had contemplated since before the WorkflowOne Acquisition, Silver Point is using the chapter 11 process to obtain all of the cash flow of the combined businesses while jettisoning the pension plan liabilities and other unsecured claims.  Approximately two weeks prior to the scheduled Auction and Bid Deadline, Silver Point requested that the Debtors file the Supplement seeking to enlarge, by 90 days from closing, the period during which a buyer will have to decide which executory contracts/unexpired leases it will acquire.[6]

**The Committee Investigation and Adversary Proceeding**

40.     Immediately after being appointed, the Committee served formal discovery requests on the Debtors and Silver Point Capital, L.P. seeking documents related to, among other things, the WorkflowOne Acquisition and the Prepetition Term Loans.  Through its investigation and analysis, the Committee identified numerous causes of action against several groups of defendants, including Silver Point and the other lenders under the Prepetition Term Loans (the "Term Loan Defendants").  The claims alleged against the Term Loan Defendants in the Complaint include the following:

41.     **Fraudulent Transfers and Obligations**  The Committee has determined that the Debtors (a) did not receive reasonably equivalent value in the WorkflowOne Acquisition and (b) were insolvent at the time of or were rendered insolvent by the WorkflowOne Acquisition, (c) were left with unreasonably small capital following the WorkflowOne Acquisition, and/or (d) intended to incur, knew they would incur, or should have known they would incur debts beyond their ability to pay as such debts matured.  Accordingly, through the Complaint, the Committee

---

[6]    The Committee understands that no other potential bidder has requested the relief sought in the Supplement, which relief is contrary to the Stalking Horse APA.

seeks to avoid (a) the obligations the Debtors incurred by becoming borrowers or guarantors under the Prepetition Term Loans, as avoidable fraudulent obligations, and (b) the alleged liens securing the Prepetition Term Loans, as avoidable fraudulent obligations, each under section 548(a)(1)(B) of the Bankruptcy Code, section 1336.04(A)(2) of the Ohio Revised Code (made applicable under section 544 of the Bankruptcy Code), or both.

42. **Equitable Disallowance or Subordination** The Committee's investigation further revealed that affiliates of Silver Point Finance, LLC, the agent under the Prepetition Term Loans, traded extensively in the Debtors' securities in the months leading up to the Debtors' bankruptcy filing. During that time, Silver Point had two appointees, including a Silver Point employee, on the Board, and thus was in possession of material nonpublic information regarding the Debtors' business and financial condition. Accordingly, in the Complaint, the Committee seeks entry of a judgment equitably disallowing and/or subordinating all of Silver Point's claims against the Debtors.

43. **Recharacterization** The Second-Lien Term Loans bear several hallmarks of a speculative equity investment, rather than an extension of credit. For instance, the Second-Lien Term Loans bear "paid-in-kind" interest and do not require ongoing amortization of principal. Accordingly, through the Complaint, the Committee seeks a judgment recharacterizing the Second-Lien Term Loans as equity interests, reflecting the real economic nature of the Second-Lien Term Loans.

44. **Avoidance of Unenforceable Liens** The Committee's investigation revealed that the alleged liens securing the Prepetition Term Loans were not properly perfected in a number of the Debtors' significant assets prior to the Petition Date. Accordingly, through the Complaint,

the Committee seeks a judgment declaring that those assets are unencumbered and available for general unsecured creditors.

45.    **Disgorgement or Recharacterization of Payments**    To the extent the Committee prevails on the various causes of action avoiding the alleged liens securing the Prepetition Term Loans or disallowing or subordinating the claims related to the Prepetition Term Loans, the Committee seeks disgorgement of amounts paid (pre and postpetition) on account thereof or, if appropriate, recharacterization of such payments as repayments of principal.

**The Stalking Horse APA**

46.    The proposed Sale to the Stalking Horse Bidder includes, among others, the following material terms:

- Purchase Price - $275 million, including an estimated $130 million to repay the DIP obligations (including the rolled-up Prepetition ABL Facility and certain Assumed Liabilities set forth below), and a $113 million credit bid; [*See* Stalking Horse APA § 2.7(a)];

- Purchased Assets – Substantially all of the Debtors' assets including, but not limited to [*See* Stalking Horse APA § 2.1, *et seq.*]:

    o Avoidance actions with respect to trade obligations paid prior to the Petition Date (the identity of, and the potential value of which, have not been disclosed);

    o All cash, excluding the Wind-Down Amount; and

    o Substantially all of the Unencumbered Assets identified by the Committee in the Complaint.

- Excluded Assets – Assets not being sold include, but are not limited to, the following [*See* Stalking Horse APA § 2.2, *et seq.*]:

    o Avoidance actions and claims other than those related to trade obligations paid prior to the Petition Date; and

    o Insurance policies;

- Assumed Liabilities – Liabilities being assumed include, but are not limited to, the following [*See* Stalking Horse APA § 2.3, *et seq.*]:

    o All Liabilities of sellers under the "Transferred Contracts" to be assigned to the Stalking Horse Bidder;

- o Cure Claims up to the Cure Claims Cap of $12,200,000 [*See* Stalking Horse APA § 2.6];

- o Postpetition trade payables and obligations granted administrative expense status under 503(b)(9) of the Bankruptcy Code;

- o All liabilities arising under the Employee Incentive Plan and related employee matters;

- o All liabilities for certain customer programs to extent buyer chooses to assume in its discretion;

- Excluded Liabilities – Liabilities not being assumed include, but are not limited to, the following [*See* Stalking Horse APA § 2.4, *et seq.*]:

  - o Tax liabilities arising prior to or on the Closing Date;

  - o Liabilities arising under contracts that are not a Transferred Contract and arising prior to, at, or after the closing date;

  - o Pension or retirement liabilities of Standard Register to its current and former employees; and

  - o Liabilities arising under any collective bargaining law, agreements, or arrangements;

- Assumption and Assignment of Contracts - the assumption of the Assumed Liabilities will take place at Closing [*See* Stalking Horse APA § 2.9(a)].  On or prior to the third Business Day before Closing, Buyers may designate in writing any Executory Contract as a Transferred Contract to be assumed by it pursuant to the Stalking Horse APA or remove any Executory Contract previously designated as a Transferred Contract  [*See* Stalking Horse APA § 2.6(d)].  Further, buyers are obligated to pay at Closing any undisputed cure claims associated with the assumption of a Transferred Contract that is an Executory Contract or such other amount as agreed to between the applicable Buyer and the counterparty. *Id*.  At any time at least two (2) Business Days prior to Closing, buyers may exclude from being assigned any Contracts or Leases previously designated for assignment [*See* Stalking Horse APA § 2.6(f)];

- Wind-Down Amount – The amount reserved for post-sale administration of the estate as contemplated in the Wind-Down Budget [*See* Stalking Horse APA § 1.1].  The Committee has not been consulted regarding any aspect of the Wind-down Budget, including the aggregate amount of or line items within the Wind-down Budget;

- Conditions Precedent – the following limitations, among others, must be satisfied prior to closing [*See* Stalking Horse APA § 7.3, *et seq.*]:

  - o Cure Claims shall not exceed $14 million;

  - o Cash Component (to satisfy the DIP Obligations and the Prepetition ABL Debt) shall not exceed $140 million; and

  - o Assumed Liabilities shall not exceed $18 million.

47.     Significantly, the Stalking Horse APA provides no assurance that the estate will be left administratively solvent after the closing of the sale.

## OBJECTION

### A.     The Sale Requires Strict Scrutiny

#### i.     Insider Transaction

48.     The proposed Sale requires special scrutiny due to the insider status of Silver Point and does not pass muster under the heightened scrutiny applicable to transactions involving insiders.  That transactions among debtors and insiders are subject to a heightened standard of scrutiny is not novel.  The United States Supreme Court and a majority of Circuit Courts of Appeal have so held.  *See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939); *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) ("Insider's dealings with debtor-corporation are ordinarily subject to rigorous or strict scrutiny."); *In re Auto Style Plastics, Inc.*, 269 F.3d 726, 745 (6th Cir. 2001) (same); *In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 1991) (same); *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991) (same); *Brewer v. Erwin & Erwin, P.C.*, 942 F.2d 1462, 1465 (9th Cir. 1991) (same); *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 393 (10th Cir. 1979) (same); *United Hotels Co. of America v. Mealey*, 147 F.2d 816, 819 (2d Cir.1945) (same); *In re Nugelt*, 142 B.R. 661, 667 (Bankr. D. Del. 1992) (same).

49.     "[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein." *In re Papercraft Corp.*, 211 B.R. 813, 823 (W.D. Pa. 1997) (explaining how insider transactions are subjected to rigorous scrutiny, requiring a showing of inherent fairness), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *In re Ultimate Escapes Holdings, LLC*, 2014 WL 5861765, at *9 (Bankr. D. Del.

Nov. 12, 2014)(BLS) (entire fairness must be proven where independence of decision making is at risk due to "extraneous considerations or influences"); *In re Enron Corp.*, 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b)."); *In re Biderman Indus., U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (insider transactions under § 363(b) "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse"). This demanding approach is far from novel.

50.    Here, despite Silver Point's self-serving declaration (and request for a finding of the Court) that it is a non-insider of the Debtors, Silver Point is an insider of the Debtors.  *See In re Washington Mut., Inc.*, 461 B.R. 200, 263 (Bankr. D. Del. 2011) ("Insiders of a corporation are not limited to officers and directors, but may include 'temporary insiders' who have 'entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.'") (*citing Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983)); *cf. N.J. Carpenters Pension Fund v. info GRP., Inc.*, No. Civ. A. 5334-VCN, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011) (*de facto* control can be found to exist through contact with board of directors sufficient to give rise to fiduciary duties); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 399 (3d Cir. 2009) (determining that major creditor was non-statutory insider based on findings that creditor had "the ability to coerce [debtor] into a series of transactions that were not in [debtor's] best interests).

51.    Hallmarks of Silver Point's status as an insider of the Debtors include, among other things:

- Silver Point's designation of three parties (one of whom was its employee) to the Board, including to various sub-committees thereof;

- Silver Point's significant equity position in the Debtors (as much as 29.6% of the Debtors' common stock prior to the Petition Date and approximately 20% as of the Petition Date);

- Silver Point's status as a secured creditor holding a purported $210 million of secured debt which was incurred as part of the WorkflowOne Acquisition within 18 months of the Petition Date, which debt Silver Point knew or should have known was not reasonable and would eventually allow Silver Point to take control of the Debtor by virtue of its secured creditor status and influence;

- Silver Point's substantial sale of equity in the Debtors during the months leading up to the Petition Date (*see* Exhibit A to the Complaint).

52.    As such, Silver Point is an insider of the Debtors and the Sale requires rigorous scrutiny.

### ii.    Sale of Substantially all Assets

53.    Because the Debtors seek to sell substantially all of their assets in an expeditious process pursuant to Bankruptcy Code § 363, and thereby avoid the safeguards afforded by a plan confirmation process under the Bankruptcy Code, the Sale requires closer scrutiny than a typical sale of assets outside the ordinary course of business. *In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004) (stating that a sale of all, or substantially all, of the assets of a Chapter 11 estate in the absence of a confirmed plan, while not forbidden, is subject to close scrutiny by creditors and the court); *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003).

54.    Approval of a sale of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code requires that the debtor a valid business justification for the sale, that the price represents fair value, and that the parties negotiated and entered into the sale transaction in good faith. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D. Del. 1999).

55.     Here, the proposed purchase price of $275 million falls far short of the amount of the lenders' asserted secured claims.  At the proposed price, the Sale will yield no benefit to the estates.  Whether the proposed Sale price represents fair value cannot be determined at this time, especially because the Auction (scheduled for June 15, 2015) has not yet occurred.  Accordingly, the Committee reserves its right to further object to the proposed Sale price at the time of the Sale Hearing.

56.     It is also a fundamental policy of bankruptcy law that a debtor-in-possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few. *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (*citing NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)).

57.     Where, as here, there is a proposed sale in Chapter 11 of substantially all of a debtor's property in exchange for retirement of secured debt, without the protections of the disclosure statement and plan process, the transaction must be closely scrutinized and the transaction proponent bears a heightened burden. *See In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (cit*ing In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 11 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); s*ee also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

58.     The proposed Sale fails to meet this heightened burden and must be denied.

**B.     The Stalking Horse APA is an impermissible *sub rosa* plan and was not proposed in good faith.**

59.     A transaction is an impermissible *sub rosa* plan if it disposes of all or substantially all of the debtor's assets without following the Bankruptcy Code's procedural protections in connection with the development and approval of a plan of reorganization, such

that the sale itself is a *de facto* plan.  The procedural protections provided in the Bankruptcy Code include, among other things, the right to receive a detailed disclosure statement from a debtor and the right to vote on the proposed plan.

60.     Because of the importance of these protections to ensure that creditors are treated fairly, courts have rejected proposed postpetition agreements between debtors and select creditors that have the effect of dictating material terms of a plan of reorganization without complying with the Bankruptcy Code's procedural requirements for plan confirmation.  *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets"); *see also In re Swallen's, Inc.*, 269 B.R. 634, 638 (BAP 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.").

61.     Section 363 asset sales should not be used to circumvent the protections for unsecured creditors mandated in the Bankruptcy Code.  *In re Westpoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding chapter 11's plan confirmation procedures") *aff'd in part, rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010), *citing In re The Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.")).

62.     The United States Court of Appeals for the Third Circuit expressed that section 363 sales should not be used to short circuit the plan confirmation process and section 1129 of the Bankruptcy Code. *Abbotts Dairies*, 788 F.2d 143, *supra*.  In *Abbotts Dairies*, the court held that the "good faith" requirement of a Section 363 sale is to be used to assure that by means of an asset sale, a debtor does not abrogate the protections afforded to creditors under section 1129 and the plan confirmation process. *Id*. at 150.  Because the proposed Sale (and the entire Chapter 11 case) was and is designed to benefit only Silver Point, will potentially leave the estate administratively insolvent and does not provide general unsecured creditors with consideration to which they are entitled, it is not proposed in good faith.

63.     In *Braniff*, the seminal case prohibiting sales as *sub rosa* plans*,* the debtor sought approval of a settlement with certain of its secured and unsecured creditors that called for the debtor to sell aircraft, equipment, landing slots and airport terminal leases to a buyer in exchange for travel scrip, secured notes, and a profit participation in the buyer's future operation.  700 F.2d at 939.  The travel scrip could only be used by employees, shareholders, and designated unsecured creditors. *Id.*  The Fifth Circuit held that such a sale could not be approved under section 363(b) because it would dictate the terms of any future plan of reorganization without providing creditors with the procedural protections of a plan. *Id.*

64.     Any sale transaction that dictates essential terms of a future reorganization plan and seeks to short circuit creditors' rights must occur through a plan approval process, which includes disclosure requirements under section 1125 of the Bankruptcy Code, voting requirements under section 1126 of the Bankruptcy Code, the best interest of creditors test under section 1129(a)(7) of the Bankruptcy Code, the payment of all administrative priority claims

under section 1129(a)(9)(A) of the Bankruptcy Code, and the absolute priority rule of section 1129(b)(2)(B) of the Bankruptcy Code.

65.     The Stalking Horse APA is a *sub rosa* plan because it constitutes a complete disposition of substantially all of the Debtors' valuable assets and effectively dictates the outcome of these Cases.  Absent, at a minimum, an agreement to fund all administrative claims (including all claims under section 503(b)(9) of the Bankruptcy Code) and providing a distribution to unsecured creditors on account of (at least) the Avoidance Actions and unencumbered assets, Silver Point should not be permitted to utilize the Bankruptcy Code to effectuate the equivalent of a state law foreclosure action.  Permitting the Debtors and Silver Point to circumvent the requirements of the Bankruptcy Code for plan confirmation, by initiating these Cases and intentionally not providing the necessary consideration for the Debtors to confirm a plan, evidences a lack of good faith on the part of the Debtors and Silver Point.  Such conduct should not be rewarded by entry of a sale order transferring the Debtors' assets to Silver Point free and clear of all liens, claims, and encumbrances.

66.     Such an attempt to short circuit the plan confirmation process is fundamentally inconsistent with the Bankruptcy Code and is itself sufficient reason to deny the Sale Motion.

**C.     The Sale Proceeds Must be Sufficient to Pay Administrative and Other Expenses Related to Confirmation of a Plan**

**i.     Administrative Expenses**

67.     The sale process must be structured in such a way to ensure that the estates will have sufficient cash to administer the Debtors' remaining assets (including funding to pursue causes of action against, among others, the defendants named in the Complaint), wind down the Debtors' estates, and pay all administrative expense and priority claims in cash on the effective date of a plan.

68.     First, it is well-settled that a plan cannot be confirmed unless all administrative expense claims are paid in full, in cash, on the plan's effective date.  *See* 11 U.S.C. §1129(a)(9)(A); *In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002).  The same is generally true for other priority claims under section 507(a).  *See* 11 U.S.C. §1129(a)(9)(B); *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 166 (D. Del. 2006). Unless sufficient funds are set aside as part of the sale process, it is a near certainty that the Debtors will be unable to pay all of these claims or to confirm a plan after the Sale closes.  The inability to confirm a plan generally constitutes cause to dismiss a chapter 11 case.  11 U.S.C. § 1112(b).   Accordingly, in order to allow a sale transaction outside of the plan process, the proposed purchase price must be an amount of cash sufficient to pay all allowed administrative expense and priority claims in full on the effective date of the plan.

69.     It has been clear from the Petition Date that neither the Debtors nor Silver Point propose to provide sufficient funding to satisfy all administrative expense and priority claims. While the Stalking Horse APA provides for the assumption of certain liabilities and obligations, not all obligations are assumed by the purchaser.  For example, as set forth above, the amount of cure claims and assumed liabilities are artificially capped at amounts that are below the outstanding amounts, and the Stalking Horse APA does not provide for the payment of other (non-trade) administrative expense obligations of the estates.  The Debtors have not made any showing that the stalking-horse bid is sufficient to satisfy all of those claims.

## ii.     Wind-Down Budget

70.     The Debtors' estates will also require cash in order to fund a budget to ensure that the Chapter 11 plan can be finalized, proposed, confirmed, and implemented.  To that end, the successful bid should, as part of the purchase price, provide an adequate amount of cash to fund a wind-down budget as agreed upon by the Debtors and the Committee for the administration of

the Debtors' remaining assets and the wind-down of the Debtors' estates (the "<u>Wind-Down Budget</u>").

71.     While the Stalking Horse APA contemplates payment of certain (non-trade) administrative expenses, it has been clear from the Petition Date that a substantial amount of administrative expense claims (including professional expense claims) will remain unpaid.  The proposed Sale does not currently provide any details regarding an adequate Wind-Down Budget and the Committee has serious concerns that the purchase price will not be sufficient to satisfy all of the costs necessary to wind down the Chapter 11 proceeding.

72.     Any sale should be conditioned upon the satisfaction of all administrative expense claims and a meaningful distribution to unsecured creditors.  This is especially true in these Cases as the Committee, through the Standing Motion and Complaint, (i) has identified over $50 million in unencumbered assets, (ii) seeks to avoid over $210 million in secured obligations, and (iii) seeks to pursue other affirmative claims on behalf of the Debtors' estates.

**D.     The Proposed Sale to Silver Point Will Leave the Debtors' Estates Administratively Insolvent and Trigger Substantial Unsecured Liabilities**

73.     The proposed Sale to the Stalking-Horse Bidder would leave little, if any, cash for the estates to cover administrative expenses of the Debtors' Chapter 11 proceedings, let alone provide any source of recovery for the Debtors' general unsecured creditors.   A section 363 sale of substantially all of a debtor's assets in Chapter 11 is appropriate only when it is a step toward confirmation of a Chapter 11 plan. *See In re Prime Succession, Inc., et al,* Case No. 03-25063-BKC-PGH (Bankr. S.D. Fla. 2003).  In other words, the proceeds from the sale must be adequate to pay all administrative and priority claims in full, in cash, on the plan's effective date. *See* 11 U.S.C. § 1129(a)(9).

74.      Courts have declined to allow section 363 sales of substantially all of a debtor's assets where such sales would leave the debtor's estate with such scant value as to frustrate reorganization.  In *Braniff*, for example, the court reasoned, "were this transaction approved, and considering the properties proposed to be transferred, little would remain save fixed based equipment and little prospect or occasion for further reorganization." 700 F.2d at 940.  *See also In re Feinstein Family P'ship*, 247 B.R. 502 (Bankr. M.D. Fla. 2000) (denying trustee's motion to sell fully encumbered property to a credit bidder and holding that a trustee should not act as the lender's liquidating agent).

75.      Acquirers in section 363 sales must also be prepared to provide some basic consideration to unsecured creditors.  As the Supreme Court has affirmed, "[a] principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by *all* creditors." *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363, 373 (5th Cir. 1987), *aff'd,* 484 U.S. 365 (1988) (emphasis added).  Were the Debtors and any successful bidder to seek to effect a Sale that benefits secured creditors to the exclusion of unsecured creditors, they would violate the good-faith requirement inherent in all Chapter 11 cases. *See, e.g., In re Brown,* 951 F.2d 564 (3d Cir. 1991).  Because the proposed purchase price is not even sufficient to satisfy the claims of prepetition secured lenders, the sale benefits only Silver Point.

76.      Courts have declined to approve section 363 sales that only benefit a secured creditor.  *See, e.g., In re Fremont Battery Co.*, 73 B.R. 277, 279 (Bankr. N.D. Ohio 1987) (sustaining objection to proposed sale of assets which would benefit only secured creditor); *In re Encore Health Assocs.*, 312 B.R. 52 (Bankr W.D.Pa. 2004) (finding no business justification as sole purpose of section 363 sale was to liquidate assets for benefit of secured creditors).  This

Court should not permit the Debtors to abuse the Chapter 11 process as no business reason, other than satisfying the outstanding indebtedness to Silver Point, presently exists to justify the Sale.

77.    Clearly, the proposed Sale does not maximize value to the estates.  Because the consummation of the Stalking Horse APA will likely leave the estate administratively insolvent and will trigger significant unsecured liabilities, this Court should deny the Sale Motion.

**E.    Silver Point Should Not Be Allowed to Credit Bid at the Auction or Receive Proceeds of the Sale on Account of Its Alleged Liens**

**i.    Silver Point Inappropriately Seeks to Credit Bid on Unencumbered Assets**

78.    As set forth in the Standing Motion and Complaint, even before counting the over $245 million face amount of the Avoidance Actions, the Committee identified more than $50 million of Unencumbered Assets (as set forth in <u>Exhibit A</u> attached hereto), plus other assets (mainly equity interests in and assets of the Debtors' foreign subsidiaries), in which the prepetition lenders do not have properly perfected liens.[7]    Accordingly, the Committee has determined that a portion of the Debtors' prepetition assets are unencumbered.  As a result, Silver Point has no right to assert a credit bid on all of the Debtors' prepetition assets as the Unencumbered Assets do not "secure" its claims.  *See In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806, 807-808 (Bankr. E.D.Va. 2014) (a "credit bid amount must be configured to prevent [the secured lender] from credit bidding its claim against assets . . . that are not within the scope of its collateral pool."); *see also In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55,

---

[7]    The Committee asserts that Silver Point and other lenders do not have a valid unavoidable lien on certain of the Debtors' Deposit Accounts, Real Estate, Motor Vehicles, Intellectual Property, Commercial Tort Claims, Tax Refunds, Foreign Equity, Inventory and Equipment, Life Insurance Policies, Deposits and Leasehold and Improvement Interests.  Permitting a credit bid on all of the Debtors' unencumbered assets, including the assets of the non-Debtors' foreign subsidiaries and affiliates would provide a windfall to Silver Point at the expense of the Debtors' other creditors. *See In re Package Design & Supply Co.*, 217 B.R. 422, 427 (Bankr. W.D.N.Y. 1998) (recognizing lienor should not capitalize "where the lender's lien did not encumber all prepetition assets and the unencumbered assets added significant value to what the lienor is claiming").

59 (Bankr. D. Del. 2014) (363(k) provides the right to credit bid on assets subject to the bidder's lien).

79.    Permitting a credit bid on all of the Debtors' assets, including the Unencumbered Assets, would provide a windfall to Silver Point at the expense of the Debtors' other creditors. *See In re Package Design & Supply Co.*, 217 B.R. 422, 427 (Bankr. W.D.N.Y. 1998) (recognizing that a lienor should not capitalize "where the lender's lien did not encumber all prepetition assets and the unencumbered assets added significant value to what the lienor is claiming").

### ii.    Silver Point Should not be Permitted to Credit Bid due to Existing Challenges to its Asserted Claims and Liens

80.    Section 363(k) allows the holder of a lien securing an allowed claim to bid in a non-ordinary course of business sale, and if successful, to offset its claim against the purchase price of the property (a "credit bid").  Specifically, section 363(k) states:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court *for cause* orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added)*; see also In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010) (Bankruptcy Code section 363(k) allows "[a] court [to] deny a lender the right to credit bid in the interest of any policy advanced by the Code").

81.    Section 363(k) provides an obvious advantage to a lender over other bidders because the lender is allowed to bid with its debt, rather than new cash.  Courts thus must protect a debtor's estate from loss of value caused by credit bidding in those rare instances where courts allow credit bidding based on disputed claims.

82.     Section 363(k) also, however, expressly grants the court discretion to deny a creditor's ability to credit bid "for cause."  Although cause is not defined within section 363, cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, Case No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006).  The language of section 363(k) permits the Court to specifically restrict the ability to credit bid.  *Id.*

**i.      Silver Point's Alleged Claims and Liens Are Disputed
and Have Not Been Allowed.**

83.     The Court has the statutory authority to grant the relief requested by virtue of sections 105(a) and 502(d) of the Bankruptcy Code.  In addition, the Court has the authority to grant the relief requested herein because (i) the Court has the power to enforce its own previously entered orders, and (ii) a failure to grant the relief requested will (a) prejudice the Committee's pending litigation and (b) cause other harm to the bankruptcy estates and the unsecured creditor body.

84.     As set forth above, the Committee has initiated a challenge to Silver Point's alleged liens and security interests in these Cases.  The Committee should be allowed ample opportunity to pursue that challenge without the concern that sale proceeds will be disbursed to Silver Point before such challenge is finally adjudicated.  The Committee thus requests that to the extent that the proposed credit bid by Silver Point is permitted to proceed, there should be some form of protection to the rest of the creditor body in the event that the Committee is successful in prosecuting the causes of action set forth in the Complaint.

85.     The Committee therefore seeks for the sale proceeds to be deposited into a segregated, interest-bearing escrow account pending the resolution and/or final adjudication of the Committee's lien challenge.

86.      Section 502(d) of the Bankruptcy Code empowers the Court to "disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title . . ." 11 U.S.C. § 502(d).

87.      Section 502(d) applies not only to transfers that are avoided, but also to transfers that are avoidable. *In re America West Airlines, Inc.*, 217 F.3d 1161 (9th Cir. 2000). The *America West* court held that, under section 502(a) of the Bankruptcy Code, a claim is allowed "unless a party in interest objects". *Id*. at 1163. It further held that "§ 502(d) disallows the claims of creditors who have received avoidable transfers, unless the creditor relinquishes the transfer." *Id*. at 1164 (emphasis supplied). Further, liability of the transferee of the avoidable transfer need not be established for disallowance under section 502(d) of the Bankruptcy Code. *Id*. at 1165-67. Moreover, disallowance under section 502(d) is mandated "even if the underlying avoidance action would be barred by the statute of limitations." *Id*. (*citing Committee of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.*), 143 B.R. 734, 737 (9th Cir. BAP 1992)); *see also In re Sierra-Cal*, 210 B.R. 168, 173 (Bankr. E.D. Cal. 1997) (holding that "'the court shall disallow' leaves no latitude for the court once the predicate rights are determined" and "the mere assertion of a prima facie § 502(d) defense is sufficient to place the claim in a status in which it is neither allowed nor disallowed").

88.      The Committee's request that Silver Point not be permitted to credit bid is also supported by the holding of *In re Microage, Inc*., 291 B.R. 503 (B.A.P. 9th Cir. 2002), where the Bankruptcy Appellate Panel held that a creditor's claim cannot be allowed if such creditor faces a challenge under chapter 5 of the Bankruptcy Code. Here, Silver Point's prepetition claims

based on the WorkflowOne Acquisition are no different than the *Microage* claim for purposes of determining whether the claim can be allowed in light of a pending (or contemplated) challenge.

89.    In *Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232 (1st Cir. 1997), the First Circuit stated that the legislative intent behind § 502(d) is "to encourage the collection of the largest amount possible to provide a dividend or a better dividend to the unsecured creditors." *Id*. at 1238.  Granting the relief requested herein will further the legislative intent behind § 502(d) by ensuring that the Court is able to consider and rule upon the challenge asserted with respect to the liens held by Silver Point before all of the Sale proceeds are disbursed.  It would be detrimental the estate and to the entire creditor body if the Sale proceeds would be distributed to Silver Point, only for the Committee to have to subsequently claw the proceeds back pursuant to a judgment on the Complaint. Thus, until resolution of the Committee's challenge to Silver Point's liens, the Sale proceeds must either remain in escrow or provide sufficient funding for the plan process and administrative expenses.

90.    In addition to the powers granted to the Court pursuant to section 502(d), a bankruptcy court has broad powers under section 105(a) to judicially administer the cases before it.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . . ." 11 U.S.C. § 105(a); *see also In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005) ("Section 105(a) empowers bankruptcy courts and district courts sitting in bankruptcy to fashion orders in furtherance of Bankruptcy Code provisions."); *In re International Fibercom, Inc*., 503 F.3d 933, 940 (9th Cir. 2007) ("That equitable power is established by § 105(a) of the Bankruptcy Code, which provides that a bankruptcy court may, 'sua sponte, tak[e] any action or mak[e] any

determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.'").

91.     The Court also has the power, pursuant to § 105(a), to enforce its own orders. "The plain language of § 105(a) grants to a bankruptcy court broad authority, including *sua sponte* authority, to impose sanctions to enforce and implement its own orders or rules, or to prevent abusive litigation tactics, so as to achieve the orderly and expeditious disposition of the cases before it." *In re Icenhower*, 406 B.R.42, 67 (Bankr. S.D.Cal. 2009). *See also Dunmore v. U.S.*, 358 F.3d 1107, 1114-15 (9th Cir. 2004); *Brown v. Ramsay (In re Ragar)*, 3 F.3d 1174, 1179 (8th Cir.1993) ("If a bankruptcy court can decide the qualification of attorneys to represent parties before it . . . and if such decisions are necessary or appropriate in the execution of the court's duties under Title 11 . . . it is likewise necessary or appropriate for the court to enforce its own orders."); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966) (stating that there is "no question that courts have inherent power to enforce compliance with their lawful orders").

92.     In these Cases, it is appropriate for the Court to exercise its equitable powers to ensure that the provisions of the DIP Order and Bid Procedures Order that only allow Silver Point to credit bid in accordance with section 363(k) are enforced. Pursuant to section 363(k), a secured creditor may only credit bid to the extent its lien secures an allowed claim. See 11 U.S.C. §363(k) ("At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, … such holder may offset such claim against the purchase price of such property."). In order to interpret and enforce the credit bidding aspect of the DIP Order or the Bid Procedures Order, the Court must first use its equitable powers under section 105(a) to determine if Silver Point has in fact an allowed claim to be entitled to credit bid. "Without a valid interest, the property would be transferred to a putative secured creditor using a credit bid

as part of the consideration, only to have that creditor's lien subsequently deemed invalid." *Merit Group*, 464 B.R. at 252.  Thus, resolution of the causes of action set forth in the Complaint is a prerequisite to Silver Point's ability to credit bid in the Sale.

> ii.    **Denial of the Right to Credit Bid Is Appropriate Where Silver Point's Alleged Liens and Claims Have Not Been Proven Valid.**

93.     Because Silver Point's claims and its alleged liens and security interests in the Debtors' assets have not been proven valid and are subject to a pending challenge,[8] the exercise of the Court's discretion under section 363(k), denying Silver Point the ability to credit bid, is appropriate.   The Committee has identified highly colorable claims that, if successful, would eviscerate Silver Point's liens placed on the Debtors' assets as a result of the WorkflowOne Acquisition. Permitting Silver Point to credit bid those disputed liens will chill bidding and potentially prejudice the Committee's challenges set forth in the Complaint.   Thus, until such time as the Committee is satisfied with, or when Silver Point establishes, the validity of Silver Point's alleged liens and security interests, the privilege of a credit bid should not be afforded.

94.     The concept of preventing a lender from credit bidding based on the questionable status of its asserted liens is hardly novel.  *See e.g., In re RML Development, Inc.,* No. 13-29244, 2014 WL 3378578, at *5 (Bankr. W.D. Tenn. July 10, 2014) (finding cause to limit credit bid to uncontested portion of claim); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 64 (Bankr. D. S.C. 2010) (refusing credit bid where claim is disputed); *In re Akard St. Fuels, L.P.*, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (denying lender's ability to credit bid and allowing sale free and clear of all liens under section 363(f)(4) where lender's liens were subject to a challenge and lender was "capable of bidding cash at the auction and later recovering the cash if it proved its liens"); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that "[a]t any such

---

[8]     As previously stated, a hearing on the Standing Motion is scheduled for June 8, 2015.

sale, NBC shall not be entitled to offset bid any of its claimed liens or security interest under [§ 363(k)] because the validity of its liens and security interests are unresolved.").  Here, the Committee has identified certain Unencumbered Assets, some of which are not subject to dispute based on their exclusion from Silver Point's collateral package.  It would be inequitable and improper to permit Silver Point to credit bid on the Unencumbered Assets.

> ### iii.    If Silver Point is Permitted to Credit Bid, Such Bid Should be Conditioned Upon a Bond.

95.    The Committee has determined that the Debtors' obligations under the Prepetition Term Loans, and the alleged liens securing such obligations, may be avoidable in their entirety, for the reasons set forth in the Complaint.  If the Court is inclined to permit Silver Point to credit bid using its challenged claims, such bid should be conditioned to assure that unsecured creditors are not prejudiced if Silver Point's asserted claims and liens are avoided, disallowed, or subordinated.

96.    Courts have placed conditions on lender's ability to credit bid in various forms. For example, in *In re River Road Hotel Partners, LLC*, 2010 WL 6634603 at *2 (Bankr. N.D.Ill. Oct. 5, 2010), the court held that "courts have required secured creditors to put cash in escrow, pay a portion of the bid in cash, or furnish a letter of credit when the amount and validity of an alleged senior lien is in dispute."  In *In re Chiu,* 304 F.3d 905 (9th Cir. 2002), the court required that sale proceeds be placed in escrow pending judicial determination of a disputed lien.  In *In re Octagon Roofing*, 125 B.R. 583, 592 (Bankr. N.D. Ill. 1991), the court permitted a lender's credit bid so long as lender posted an irrevocable letter of credit drawn on another bank in order to protect the trustee if the lien was later set aside.  *See also In re Miami General Hospital, Inc*., 81 B.R. 682 (S.D. Fla. 1988) (permitting lender's credit bid but preserving the right of the trustee to

file an adversary proceeding or otherwise object to the extent, validity and priority of the lender's liens).

97.     Here, the Committee has challenged all of Silver Point's alleged claims and liens. As such, at minimum, to preserve the rights of unsecured creditors, Silver Point should be required post a letter of credit for the full amount of its bid.

**F.      In the Event of a Successful Credit Bid, the Committee Should not be Bound by any Order that Purports to Allow Silver Point's Claims Prior to the Final Resolution of the Committee's Lien Challenge and Other Claims Asserted in the Complaint.**

98.     In the event the Court is inclined to allow Silver Point to credit bid, the credit bid and any order entered in response thereto must state that their purported claims, liens, and security interests will not be deemed valid by virtue of their credit bid.  As held in *In re Radnor Holdings Corp.,* 353 B.R. 820 (Bankr. D. Del. 2006), the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent, and validity of the underlying lien claim and may preclude litigation against the lender for avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshaling, or other litigation claims, unless those rights are expressly reserved. *Id*. at 846.  Therefore, to the extent that any order entered in response to the Sale Motion has the legal effect of allowing the alleged secured claims of Silver Points and its affiliates against the Debtors' estates, such order should not be binding on the Committee until the Committee's challenges are finally resolved.  Thus, the Committee requests that if Silver Point, or any other alleged secured lender of the Debtors, are allowed to credit bid, the sale related orders include the following language:

> The failure of the Committee to object to a bid put forth by the DIP Lenders, the ABL Lenders, the First Lien Term Lenders or the Second Lien Term Lenders[9] (collectively, the "Lenders") or the Court's approval of any such credit bid shall not (a) prejudice or impair the rights of the

---

[9]     As each term is defined in the DIP Motion [D.I. 15].

Official Committee of Unsecured Creditors (the "Committee") to challenge the nature, extent, validity, priority, perfection or amount of the Lenders' alleged liens, security interests and claims or (b) release the Lenders from any causes of action which can be brought by or on behalf of the Debtors' estates, including but not limited to those asserted in the Complaint.

**G.      The Proceeds of the Proposed Sale Should not be Distributed to any Secured Lender Prior to Final Resolution of any Filed Lien Challenge.**

99.      For the same reason that Silver Point should not be permitted to credit bid, no sale proceeds should be distributed to Silver Point at closing.  All Sale proceeds should be placed in escrow until such time as the Committee's challenge of Silver Point's purported liens and security interests is fully resolved.  Any distribution of the sale proceeds should depend on the outcome of the Committee's pending challenges and upon further order of the Court or agreement of the Committee.  Failure to delay the distribution of the proceeds to Silver Point and the others Prepetition Term Lenders may result in an additional layer of expense to recover the funds for the estate in the event the Court grants the relief sought against Silver Point in the Complaint.

100.      Courts have granted similar relief when there are disputes regarding the extent and validity of claims and liens that it would be prudent to resolve prior to distributing the sale proceeds.  *In re Scimeca Foundation, Inc.*, 497 B.R. 753, 771, 774 (Bankr. E.D. Pa. 2013) (escrowing sale proceeds related to disputed claims pending resolution of adversary proceeding). In *In re Hussey Copper Corp.*, Case No. 11-13010 (BLS) (Bankr. D. Del. Sept. 27, 2011), the creditors' committee objected to the proposed sale and the distribution of the sale proceeds until after it investigated and brought potential causes of action against recipients of the sale proceeds. The court granted the debtors' sale motion but specifically required (in paragraph 9 of the sale order) the debtors to deposit the disputed funds into a separate escrow account.  The court noted

that the distribution of the escrowed funds should be subject to the allowance of the challenged claims.

101.    Similarly, in *In re Chem Rx Corporation,* Case No. 10-11567 (MFW) (Bankr. D. Del. Nov. 4, 2010), the creditors' committee objected to the distribution of the proceeds from the sale of the debtors' assets until after, *inter alia*, resolution of the committee's adversary proceeding challenging the purported claims and liens of the first lien lenders.  In response to the committee's objection, the Court, in paragraph 40 of the sale order, provided for the cash portion of the sale proceeds, minus the deposit, to be placed into an escrow account pending further order of the Court.

102.    Also instructive is *In re IT Group, Inc.,* Case No. 02-10118 (MFW) (Bankr. D. Del. Apr. 25, 2002), in which the Court entered a sale order pursuant to which certain proceeds from the sale of the debtors' assets were placed in three separate interest-bearing escrow accounts, equal to the amount of claims and liens asserted by three entities, respectively, pending allowance or disallowance by the Court of certain asserted claims and liens.

103.    In this case, it is appropriate for the Court to ensure that, in order to preserve the Committee's lien challenge rights, the Court should direct that the proceeds of sale be escrowed pending resolution of the Complaint.

### H.    Chapter 5 Causes Of Action and Estate Causes Of Action Should Be Excluded From the Acquired Assets.

104.    The APA includes several items in the list of Acquired Assets to be sold to the Buyer which should be removed, including certain Chapter 5 causes of action, and estate causes of action.  *See* Stalking Horse APA § 2.1 (definition of Transferred Assets).

105.    With respect to certain Chapter 5 Causes of Action, the Committee objects to any transfer of causes of action belonging to the estates.  To the extent that Chapter 5 causes of

action are included in assets to be purchased, neither the Sale Motion nor the Stalking Horse APA provides any detail regarding either the number or value of such claims.  The Committee understands, from the Debtors' schedules of assets and liabilities filed on May 11, 2015, that the face value of preference claims alone exceeds $245 million.  As such, the Committee objects to the sale of Chapter 5 Avoidance Actions.

106.    The estates' Chapter 5 Avoidance Actions belong to the estates and should be preserved for the benefit of all creditors.  *See In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors.  To fulfill this duty, trustees and debtors in possession have a variety of statutorily created powers, known as avoidance powers, which enable them to recover property on behalf of the bankruptcy estate."); *In re Vogel Van & Storage, Inc.*, 210 B.R. 27, 32 (N.D.N.Y. 1997) *aff'd*, 142 F.3d 571 (2d Cir. 1998) (explaining that it is a "well-settled principle that neither a trustee in bankruptcy, nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid a preference.").

107.    For the same reasons, the Committee objects to the sale of any assets, including the causes of action asserted in the Complaint (and proceeds thereof), as well as the Debtors' insurance policies and rights thereunder.

108.    The Stalking Horse APA is unclear with respect to whether the causes of action included in the Complaint are part of the proposed Sale and whether any of the defendants named in the Complaint would be entitled to a release upon consummation of the Sale.   Section 2.1(l) provides that the Transferred Assets include:

> to the extent related to the Transferred Assets or Business and except as set forth in Section 2.2(c), all rights, claims or causes of action of the Sellers against third parties arising out of events occurring prior to the Closing, including and, for the avoidance of

doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to the Sellers;

109.    Further, Section 2.1(p) provides that the Transferred Assets include:

(p) all of the rights and claims of the Sellers available under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code solely with respect to trade obligations paid prior to the Petition Date, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing, (such rights and claims not to be prosecuted by the Buyers or any other entity); and

110.    To the extent any claims asserted in the Complaint, or proceeds thereof, constitute a component of the Transferred Assets, the Committee objects to the Sale thereof.

**I.      The Belated Relief Sought Through the Supplement is not Warranted.**

111.    By the Supplement, the Debtors propose additional procedures (collectively, the "Additional Procedures") for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Potential Contracts") in connection with the Sale. Among other things, the Debtors propose that a buyer be afforded ninety (90) days after the Closing Date to evaluate the Potential Contracts in order to determine which contracts to assume (the "Asset Review Period").

112.    The Committee objects to the inclusion of the Asset Review Period because allowing the buyer up to 90 days (post-closing) to determine which contracts and leases the buyer will assume unduly prejudices the Debtors' estates and their creditors, and leaves the estates exposed to potential large rejection damage claims long after the Closing Date.

113.    In addition, the Asset Review Period injects uncertainty into the Sale process and may chill bidding.  The delay resulting from the Asset Review Period will make it difficult, if not impossible, for the Debtors and the Committee to assess the value of competing bids, which is necessary to select the winning bidder prior to the Sale hearing.  By way of example, if the cash consideration offered by two bidders is equal or nearly equal, the number of executory contracts/unexpired leases assumed and assigned and the resulting cure costs paid could be the determinative factor in assessing the highest and best bid.

114.    Indeed, the Committee understands that no bidder, other than Silver Point, requested approval of the Asset Review Period sought in the Supplement, and such request is contrary to the Stalking Horse APA[10] that the Court approved by Order dated April 15, 2015 [D.I. 286].   Given Silver Point's prior involvement with the Debtors (including Board membership and stock ownership), Silver Point cannot reasonably assert that it needs additional time to evaluate the Potential Contracts.  As the Supplement contradicts the court-approved Stalking Horse APA, and the Supplement does not seek to amend or otherwise modify the Stalking Horse APA, the Court should deny the relief sought in the Supplement, which conflict with a prior Order of the Court.

115.    Finally, the Debtors fail to cite any precedent to support a 90 day Asset Review Period.  For example, the Debtors cite to the sale order in *In re OSH 1 Liquidating Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. Oct. 22, 2013) [D.I. 670], which provides for a thirty (30) day designation period.  The remaining cases cited by the Debtors provide no indication as to the terms of the respective designation periods.  Thus, based on the authorities cited in the Supplement, the Debtors' assertion that "[c]ontract assumption procedures similar to [those

---

[10]    The Stalking Horse APA provides that that the assumption of the Assumed Liabilities (as defined in the Stalking Horse APA) will take place on the Closing Date.  *See* Stalking Horse APA at §§ 2.6(d), (f) and 2.9(a).

requested by Debtors in the Supplement] are routinely approved by courts" (Supplement at ¶ 18) is dubious at best.

116.    Accordingly, for the foregoing reasons, the Additional Procedures, specifically, the Asset Review Period, should not be approved.

## **<u>RESERVATION OF RIGHTS</u>**

117.    The Committee reserves the right to supplement this Objection at any time prior to the Hearing.  The Committee expressly reserves its rights to raise additional or further objections to the Sale Motion, Silver Point, or the Stalking Horse APA at or prior to the Hearing on any subsequent hearing.

*[ signature page follows ]*

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court deny the relief sought in the Sale Motion.

Dated: June 1, 2015                    Respectfully Submitted,

                                       **LOWENSTEIN SANDLER LLP**
                                       Kenneth A. Rosen, Esq.
                                       Sharon L. Levine, Esq.
                                       Paul Kizel, Esq.
                                       Wojciech F. Jung, Esq.
                                       65 Livingston Avenue
                                       Roseland, NJ  07068
                                       Telephone:  (973-597-2500
                                       Facsimile:  (973) 597-2400

                                       *-and -*

                                       Gerald C. Bender, Esq.
                                       1251 Avenue of the Americas
                                       New York, NY 10020
                                       Telephone:  (212) 262-6700
                                       Facsimile:  (212) 262-7402

                                       *Counsel to the Official Committee of Unsecured Creditors*

                                       *-and-*

                                       **POLSINELLI PC**

                                       /s/ *Christopher A. Ward*
                                       Christopher A. Ward (Del. Bar No. 3877)
                                       Justin K. Edelson (Del. Bar No. 5002)
                                       222 Delaware Avenue
                                       Suite 1101
                                       Wilmington, DE 19801
                                       Telephone:  (302) 252-0920
                                       Facsimile:  (302) 252-0921

                                       *Delaware Counsel to the Official Committee of Unsecured Creditors*