**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| THE STANDARD REGISTER COMPANY, | : | Case No. 15-10541 (BLS) |
| *et al.*, | : | |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Re: Docket No. 524, 526 and 557.** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OBJECTION OF SILVER POINT FINANCE, LLC TO MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING THE
COMMITTEE STANDING TO COMMENCE AND PROSECUTE CERTAIN ACTIONS
<u>ON BEHALF OF THE DEBTORS' ESTATES</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... i

PRELIMINARY STATEMENT...........................................................................................1

BACKGROUND ...................................................................................................................5

    I.      WorkflowOne's Bankruptcy ................................................................................5

    II.     The WorkflowOne Acquisition ...........................................................................7

    III.    Standard Register's Stock Price Increases Following the WorkflowOne
            Acquisition............................................................................................................10

    IV.    Standard Register's Pension Payments ................................................................12

    V.      Standard Register's Bankruptcy..........................................................................13

    VI.    The DIP Financing ...............................................................................................13

    VII.   The Committee's Standing Motion.......................................................................15

OBJECTION...........................................................................................................................16

    A.    The Committee's Proposed Complaint Does Not Allege Colorable Claims .........17

    B.    A Cost/Benefit Analysis Demonstrates that the Prosecution of the
           Proposed Complaint Will Not Benefit the Debtors' Estates .................................31

    C.    The Debtors Did Not Abuse Their Discretion In Releasing and Refusing
           To Pursue the Claims Set Forth in the Proposed Complaint.................................33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ passim

*In re Baltimore Emergency Services II, Corp.*,
    432 F.3d 557 (4th Cir. 2005) ...........................................................................................32

*Benjamin v. Diamond (In re Mobile Steel, Co.)*,
    563 F.2d 692 (5th Cir. 1997) ...........................................................................................28

*Carr v. New Century TRS Holdings (In re New Century TRS Holdings, Inc.)*,
    No. 07-10416, 2012 Bankr. LEXIS 9 (Bankr. D. Del. Jan. 9, 2012) ...............................22

*In re Centaur, LLC*,
    No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ..............16, 17, 31

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998) .......................................................................................28, 29

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.)*,
    432 F.3d 448 (3d Cir. 2006) .......................................................................................23, 27

*DHP Holdings II Corp. v. Peter Skop Industries,, Inc. (In re DHP Holdings II Corp.)*,
    435 B.R. 220 (Bankr. D. Del. 2010) ...............................................................................25

*FCC v. Airadigm Communications, Inc. (In re Airadigm Commc'ns, Inc.)*,
    616 F.3d 642 (7th Cir. 2010) ...........................................................................................23

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006) .............................................................................................1

*In re GenTek Inc.*,
    328 B.R. 423 (Bankr. D. Del. 2005) ..........................................................................31, 32

*In re G-I Holdings, Inc.*,
    313 B.R. 612 (Bankr. D. N.J. 2004) .....................................................................17, 20, 21

*Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*,
    316 B.R. 141 (D. Del. 2004) .......................................................................................16, 17

*Iridium Operating LLC v. Motorola, Inc.*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ..........................................................................3, 19

*In re Kendrick & King Lumber, Inc.,*
  14 B.R. 764 (W.D. Okla. 1981) ..................................................................29

*Le Café Creme v. Le Roux (In re Le Café Creme),*
  244 B.R. 221 (Bankr. S.D.N.Y. 2000)........................................................27

*In re Lightsquared Inc.,*
  504 B.R. 321 (Bankr. S.D.N.Y. 2013).........................................................28

*Metro Communications Corp. BVI v. Advanced Mobilecomm Technologies Inc.,*
  854 A.2d 121 (Del. Ch. 2004).....................................................................30

*In re Mid-American Waste Systems, Inc.,*
  284 B.R. 53 (Bankr. D. Del. 2002) .............................................................28

*In re MIG, Inc.,*
  No. 09-12118 (KG), 2009 WL 8662897 (Bankr. D. Del. Dec. 18, 2009)..................21, 32

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
  330 F.3d 548 (3d Cir. 2003) ...............................................................16, 31

*Official Committee of Unsecured Creditors of National Forge Co. v. Clark
  (In re National Forge Co.),* 326 B.R. 532 (W.D. Pa. 2005)..............................31

*Official Committee of Unsecured Creditors of Fedders North America, Inc. v. Goldman
  Sachs Credit Partners, L.P. (In re Fedders North America Inc.),*
  405 B.R. 527 (Bankr. D. Del. 2009) ...........................................................24

*Official Committee of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum
  Capital Partners, LLC (In re Radnor Holdings Corp.),*
  353 B.R. 820 (Bankr. D. Del. 2006) ...........................................................27

*Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp North America,
  Inc. (In re TOUSA, Inc.),*
  406 B.R. 421 (S.D. Fla. 2009) ..................................................................29

*In re Optim Energy, LLC,*
  No. 14-10262 (BLS),2014 WL 1924908 (Bankr. D. Del. May 13, 2014),
  *aff'd,* 527 B.R. 169 (D. Del. 2015) ..........................................................16

*In re PWS Holding Corp.,*
  303 F.3d 308 (3d Cir. 2002) .....................................................................31

*Rosenbaum & Co. v. H.J. Myers & Co.,*
  No. CIV.A., 97-824, 1997 WL 689288 (E.D. Pa. 1997) .................................26

*SB Liquidation Trust v. Preferred Bank (In re Syntax-Brillian Corp.),*
    No. 08-11407, 2013 Bankr. LEXIS 194 (Bankr. D. Del. Jan. 15, 2013),
    *aff'd in part*, 573 F. App'x 154 (3d Cir. 2014) ................................................22

*In re Take-Two Interactive Securities Litigation,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) .............................................................26

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,*
    549 U.S. 443 (2007)...........................................................................................28

*Unsecured Creditors' Committee of STN Enterprises Inc. v. Noyes (In re STN*
    *Enterprises)*, 779 F.2d 901 (2d Cir. 1985) .......................................................33

*VFB LLC v. Campbell Soup Co.,*
    482 F.3d 624 (3d Cir. 2007) ...................................................................... <u>passim</u>

*VFB LLC v. Campbell Soup Co.,*
    No. Civ. A. 02-137 KAJ, 2005 WL 2234606 (D. Del. Sept. 13, 2005),
    *aff'd*, 482 F.3d 624 (3d Cir. 2007) .............................................................2, 19

*In re Washington Mutual, Inc.,*
    461 B.R. 200 (Bankr. D. Del. 2011) .................................................................28

*Weyandt v. Federal Home Loan Mortgage Corp. (In re Weyandt),*
    544 F. App'x 107 (3d Cir. 2013)...................................................................32, 33

*Zazzali v. AFA Financial Group, LLC (In re DBSI, Inc.),*
    477 B.R. 504 (Bankr. D. Del. 2012) .................................................................25

## STATUTES AND RULES

15 U.S.C. § 78u-4(b)(2) .............................................................................................26

Fed. R. Civ. P. 9(b)....................................................................................................26

## OTHER AUTHORITIES

Ralph C. Ferrara et al., Gerrara on Insider Trading and the Wall ¶ 3.02[6] (2015) ......................26

Silver Point Capital, L.P.; Silver Point Finance, LLC; SPCP Group III, LLC; Silver Point Capital Fund, L.P.; SPF CDO I, Ltd.; and SPCP Group, LLC (collectively, "**Silver Point**") hereby objects (the "**Objection**") to the *Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* (Docket No. 256) (the "**Standing Motion**," which attaches the "**Proposed Complaint**"). With respect to the Objection, Silver Point respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

1.      The centerpiece of the Proposed Complaint is the Committee's assertion that Standard Register received "less than reasonably equivalent value" in connection with its assumption of $210 million of secured debt related to the WorkflowOne Acquisition.  But the Committee's theory of value suffers at least two fatal flaws that demonstrate why its claims are not colorable.  First, the Committee makes no mention of the fact that the WorkflowOne Acquisition was fully disclosed to the public equity markets and that those markets viewed the WorkflowOne Acquisition as conveying reasonably equivalent value to Standard Register.  In fact, the value of Standard Register's common stock increased 380%, from $3 per share to $14.40 per share, in the week following the announcement of the WorkflowOne Acquisition.  Reasonably equivalent value "is not an esoteric concept": a party receives reasonably equivalent value for obligations it assumes if it gets "roughly the value" of those assumed obligations.[2]

---

[1]    Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms herein.

[2]    *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)).

Third Circuit law on this point establishes that market prices are the primary and, in most cases, dispositive indicia of value for fraudulent transfer purposes.  Fraudulent transfer law "cannot rationally be invoked" to undermine the function of public equity markets.[3]  The value established on the open market "is the fair market value for purposes of determining reasonably equivalent value," in the absence of any evidence of manipulation or bad faith.[4] The Committee's failure to even acknowledge, let alone address meaningfully, this fundamental point dooms its fraudulent transfer claims.

2.     Second, the Committee completely ignores the projected $40 million in annual savings, *i.e.*, "merger synergies," associated with the WorkflowOne Acquisition, instead choosing to focus myopically on how Silver Point marked its WorkflowOne loans to market on a standalone basis before the WorkflowOne Acquisition.  When merger synergies are properly taken into account, even the Committee's assertion as to WorkflowOne's standalone value demonstrates Standard Register received reasonably equivalent value in connection with the WorkflowOne Acquisition.  Added to even the $134 million figure the Committee's professionals assert is the "midpoint of the enterprise valuation implied by traditional valuation methodologies" for WorkflowOne's assets on a standalone basis, *see* Proposed Compl. ¶ 78, the projected $40 million in annual merger synergies results in a value greater than the $210 million in secured debt assumed in connection with the WorkflowOne Acquisition when those synergies are valued using even a modest 3x multiple.  Indeed, the market capitalization of Standard

---

[3]     *VFB LLC v. Campbell Soup Co.*, 482 F.3d at 631.

[4]     *VFB LLC v. Campbell Soup Co.*, No. Civ. A. 02-137 KAJ, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007).

Register increased by more than $90 million[5] in the week following the WorkflowOne Acquisition, demonstrating both the "verdict of solvency and capital adequacy already given []by the public markets"[6] and that Standard Register's shareholders recognized the value of the projected merger synergies created by the WorkflowOne Acquisition.[7]  Standard Register easily received reasonably equivalent value when it engaged in a transaction designed to combine two companies into an enterprise that could capture significant cost savings and be better positioned to deal with a challenging business environment.  A seasoned board of directors, their advisors, and the public equity markets all saw it this way.  The Committee's re-write of history does not pass muster.

        3.       The Committee also seeks derivative standing to pursue a variety of other baseless claims against Silver Point and the Prepetition Term Lenders (among others), including claims

---

[5]    The calculation for the market capitalization increase is that Standard Register had (a) a market capitalization of over $110 million as of August 5, 2013, less than one week after the WorkflowOne Acquisition was announced (*i.e.*, 5,229,793 shares of Common Stock issued and outstanding, plus the 2.6 million of cashless warrants issued for Common Stock, resulting in a 7,875,745 shares of Common Stock on a diluted basis, trading at $14 per share), <u>less</u> (b) a market capitalization of approximately  $15 million on July 31, 2013, just prior to the WorkflowOne Acquisition (*i.e.,* 5,229,793 shares of Common Stock issued and outstanding, trading at approximately $3 per share), which <u>equals</u> (c) a more than $94 million increase in market capitalization in the week following the announcement of the WorkflowOne Acquisition. Even if calculated on a non-diluted basis for the imminent exercise of the 2.6 million cashless penny warrants, Standard Register's market capitalization in August 2013 would be over $73 million (*i.e.*, 5,229,793 shares of Common Stock, at $14 per share), resulting in a market capitalization increase of over $57 million over the same period.

[6]    *Iridium Operating LLC v. Motorola, Inc.*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) (discussing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007)).

[7]    As explained below, Silver Point's internal mark-to-market valuations of its pre-acquisition debt has virtually no bearing on the value received by Standard Register in the transaction, whereas the projected and realized merger synergies are essential to evaluating the transaction.  By focusing on the former and entirely ignoring the latter, the Proposed Complaint badly misunderstands the economic substance of the transaction and embraces a theory of fraudulent transfer law contradicted by Third Circuit case law.  The Committee's theory, if followed to its logical conclusion, would lead to the absurd result that any acquisition occurring at a premium to a target's current standalone enterprise value would, by itself, require finding that the acquirer failed to obtain reasonably equivalent value.

that the Prepetition Term Loans should now be recharacterized as equity, subordinated or otherwise set aside, despite the contracting parties' clear intent that the Prepetition Term Loans constitute secured debt. Having gone fishing for deficiencies in Silver Point's liens on the Debtors' assets, the Committee has come up empty-handed and for its examples of improper perfection largely points to the banal fact that certain assets were "expressly excluded" from the Prepetition Term Lenders' collateral package, *see* Proposed Compl. ¶ 172. But this simply confirms the fact that the Prepetition Term Loans were purposefully intended to be secured debt. The Committee has not and cannot satisfy its burden of justifying that it should be granted standing to derivatively pursue any of the proposed claims against Silver Point or the Prepetition Term Lenders on behalf of the Debtors' estates.

4.      ***First***, the Committee cannot demonstrate that there are "colorable" claims against Silver Point or the Prepetition Term Lenders. The conclusory allegations and mischaracterizations asserted in the Proposed Complaint do not establish any grounds for the purported recharacterization, equitable subordination, and avoidance of liens claims. The proposed recharacterization and equitable subordination claims are both implausible and unsubstantiated, ignoring the clear intent of the parties.

5.      ***Second***, the Standing Motion lacks the cost-benefit analysis required of a creditor's request for derivative standing. Given that there is virtually no likelihood of success on the proposed claims, the Committee cannot show that the prosecution of the Proposed Complaint will afford any concrete benefit to the Debtors' estates above the substantial costs, burdens, and delay that pursuit of the purported claims would entail.

6.      ***Finally***, the Committee cannot show what is perhaps the most important prerequisite to derivative standing, namely that the Debtors abused their discretion in releasing

4

avoidance claims against Silver Point—a new money DIP lender and the Debtors' stalking horse bidder—or that their refusal to consent to or otherwise pursue the claims set forth in the Proposed Complaint is unjustified. As explained below, the Committee's claims are not colorable. But even if the Committee could find some modicum of merit buried in its thicket of allegations, it cannot show that the Debtors acted unreasonably in foregoing such marginal claims in light of the benefits provided by Silver Point as stalking horse buyer and DIP lender. For these reasons, the Standing Motion should be denied.

## BACKGROUND

### I.    WorkflowOne's Bankruptcy

7.    Silver Point's involvement with WorkflowOne dates back to 2005, when Silver Point provided both first and second lien debt financing to support Workflow's acquisition of the Relizon Company. In 2010—approximately 5 years after Silver Point's initial loans to Workflow were made and approximately 12 months before the maturity of Workflow's first lien term loan facility—Workflow filed for bankruptcy, citing the fallout from the 2008 economic crisis and declining demand throughout the industry. *See* Disclosure Statement at 26, *In re Workflow Mgmt. Inc.*, No. 10-74617 (SCS) (Bankr. E.D. Va. Jan. 21, 2011), Docket No. 718. Under WorkflowOne's plan of reorganization, WorkflowOne's assets were sold pursuant to an asset purchase agreement executed on January 21, 2011, with WorkflowOne Holdings, LLC, an entity controlled in part by prepetition second lien lenders and in part by its equity sponsor.[8] *See*

---

[8]    Pursuant to the asset purchase agreement, WorkflowOne Holdings, LLC purchased all of the WorkflowOne-debtors' assets, but did not assume the obligations under The Relizon Company Retirement Plan, a defined benefit pension plan that had been maintained by one of the WorkflowOne debtors. *See* Disclosure Statement at 25, 38, *In re Workflow Mgmt. Inc.*, No. 10-74617 (SCS) (Bankr. E.D. Va. Jan. 21, 2011), Docket No. 718. The
                                                                                                              *(cont'd)*

Confirmation Order at 18, *In re Workflow Mgmt. Inc.*, No. 10-74617 (SCS) (Bankr. E.D. Va. Feb. 25, 2011), Docket No. 874.

8.     In exchange for their prepetition secured claims, WorkflowOne's first lien lenders received new notes in the same principal amount as the prepetition first lien debt and its second-lien lenders received a combination of new second lien notes and preferred equity interest. *See* Disclosure Statement at 4-5, *In re Workflow Mgmt. Inc.*, No. 10-74617 (SCS) (Bankr. E.D. Va. Jan. 21, 2011), Docket No. 718.   The notes were issued by WorkflowOne Holdings, LLC, the purchaser of substantially all of WorkflowOne's assets.   WorkflowOne emerged from bankruptcy with approximately $140 million of first lien debt, and $140 million of second lien debt.   *Id.* at 37.   Silver Point held a majority of both exit facilities.[9]

9.     The Committee asserts that Silver Point "valued its equity investment in WorkflowOne as zero and the Workflow Secured Loans at just $146.4 million, or less than half of their par value of $314.1 million."   Standing Mot. at ¶ 79.   Setting aside the irrelevance of how Silver Point valued the equity of WorkflowOne, these valuations represent Silver Point's mark-to-market valuations of its debt holdings in WorkflowOne on a standalone basis as of September 17, 2012, and did not account for the value of synergies projected to be realized if

_____

*(cont'd from previous page)*

WorkflowOne pension plan was underfunded in the approximate amount of $32 million based on actuarial calculations as of December 31, 2009.  *See id.* at 38.

[9]   From time to time between WorkflowOne's emergence from bankruptcy and the date of the WorkflowOne Acquisition, Silver Point bought interests in WorkflowOne's first lien debt obligations on the secondary market. Additionally, Silver Point purchased additional second lien obligations from a lender that was liquidating its investment portfolio in 2012, and closed a second purchase of second lien obligations from another lender in 2013, prior to the sale of WorkflowOne to Standard Register.

WorkflowOne were to be acquired by a complementary company such as Standard Register.[10] Silver Point's mark-to-market valuations account for numerous factors that are not relevant in assessing the fair value of WorkflowOne's assets.  These factors include a discount for the illiquidity of the loans, the fact that the debt was marked on a yield-to-maturity basis, and the comparatively low interest rate on the WorkflowOne secured debt relative to prevailing market rates—each useful to Silver Point in monitoring and evaluating its debt but which have no bearing on the value of WorkflowOne's assets.  This "below market" character of the debt remained true even for the debt assumed by Standard Register as a result of the WorkflowOne Acquisition (defined below).

## II.    The WorkflowOne Acquisition

10.    On August 1, 2013, Standard Register announced its acquisition of WorkflowOne, LLC ("**WorkflowOne**") through a transaction "valued at $218 million, financed by assuming $210 million of long-term debt and the issuance of warrants with an estimated value of $8 million."  The Standard Register Company, Current Report (Form 8-K), at Ex. 99-2 (Aug. 1, 2013).  The acquisition (the "**WorkflowOne Acquisition**") was completed that same day, immediately following execution of the Membership Interest Purchase Agreement (the "**Purchase Agreement**") between Standard Register, WorkflowOne Holdings, LLC (the "**Seller**") and WorkflowOne.  *Id.* at 2.

---

[10]    Indeed, even a modest 3x multiple to the projected $40 million in annual cost savings associated with the WorkflowOne Acquisition, when added to the $134 million figure the Committee alleges was the "midpoint enterprise valuation" for WorkflowOne on a standalone basis, Standing Mot. ¶ 38, results in a valuation significantly higher than the $210 million of secured debt assumed in connection with the WorkflowOne Acquisition.

11.     WorkflowOne generated "approximately $460,000,000 of revenue for the 2012 fiscal year." *Id.* Standard Register announced to the public that it expected to achieve "$1 billion in annual revenue and $40 million in annual savings when the integration is complete." The Standard Register Company, Current Report (Form 8-K), at Ex. 99-2 (Aug. 1, 2013).[11] Standard Register also stated that even before the expected merger synergies were fully realized, the acquisition was "expected to deliver value creation benefits immediately from combined sales and operating capabilities and to improve 2013 EBITDA." *Id.*

12.     Also on August 1, 2013, in connection with the execution of the Purchase Agreement, Standard Register entered into an Amendment and Restatement Agreement (the "**Amendment and Restatement Agreement**") with WorkflowOne, Seller, WorkflowOne's first and second lien lenders, Silver Point Capital, L.P. (as the lenders' representative), and Silver Point Finance, LLC, as the administrative agent. *Id.* at 2.

13.     Pursuant to the Amendment and Restatement Agreement, the parties agreed that the principal amount of all indebtedness of WorkflowOne then outstanding under the WorkflowOne first lien credit agreement—$123,753,259.62—would "remain outstanding as first lien term loans of equal principal amount of WorkflowOne" and would be assumed by Standard Register "as co-obligor thereunder." The Standard Register Company, Current Report (Form 8-K), at Ex. 10.1 (Aug. 1, 2013). This was accomplished through Standard Register's entry into

---

[11]  Standard Register reiterated these projections in their 2013 Annual Report. *See* The Standard Register Company, Annual Report (Form 10-K), at 11 (Mar. 3, 2014) ("In total, we expect to realize annual savings of $40 million from these plans when the integration is complete. We are still early in the process of integration, so the synergy savings we expect to realize are not yet visible in our results. However, we anticipate realizing approximately 50% of the projected savings in 2014. The remaining savings will be realized as we complete our restructuring plans in 2015.").

the First Lien Credit Agreement, dated August 1, 2013 (the "**Prepetition First Lien Term Loan Agreement**"), a copy of which was attached to Standard Register's SEC filing announcing the WorkflowOne Acquisition.   The Standard Register Company, Current Report (Form 8-K), at Ex. 10.2 (Aug. 1, 2013).   Under the Prepetition First Lien Term Loan Agreement, Standard Register was required to make quarterly amortization payments in the amount of $2,500,000 "commencing on September 30, 2014"—more than a year after the WorkflowOne Acquisition closed.   The Standard Register Company, Current Report (Form 8-K), at 3 (Aug. 1, 2013).

14.    The Amendment and Restatement Agreement also provided for the assumption of indebtedness under the WorkflowOne second lien credit agreement in an aggregate principal amount of $86,246,740.38.   *Id.* at 4.   As with the Prepetition First Lien Term Loan Agreement, this was accomplished through Standard Register's August 1, 2013 entry into the Second Lien Credit Agreement (the "**Prepetition Second Lien Term Loan Agreement**," and together with the Prepetition First Lien Term Loan Agreement, the "**Prepetition Term Loan Agreements**," and the loans thereunder the "**Prepetition Term Loans**"),[12] a copy of which was also attached to Standard Register's SEC filing announcing the WorkflowOne Acquisition.   *Id.* at Ex. 10.3.   Upon the termination of the Prepetition First Lien Term Loan Agreement, mandatory payments were due under the Prepetition Second Lien Term Loan Agreement "based on a percentage of excess cash flow and certain other events."   *Id.* at 4.[13]   The full unpaid principal amount was due on February 1, 2020, and carried an interest rate of an adjusted LIBOR plus 8.65%, with an option

---

[12]    The lenders under the Prepetition Term Loan Agreements are referred to herein as the "**Prepetition Term Lenders**."

[13]    The "certain other events" included customary payment provisions triggered by certain events of default.

to capitalize (*i.e.*, pay in kind or "PIK") interest payments due "on or before the third anniversary of the Closing Date."  *Id.* at Ex. 10.3 (Prepetition Second Lien Term Loan Agreement, § 3.2.4).

15.    In addition to the $210 million in assumed debt, Standard Register also issued warrants to WorkflowOne's second lien lenders that were subsequently converted into 2.6 million shares of Standard Register's common stock in October 2013.  *See* The Standard Register Company, Current Report (Form 8-K), at 1 (Aug. 1, 2013); The Standard Register Company, Annual Report (Form 10-K), at 16 (Mar. 3, 2014).

16.    The WorkflowOne Acquisition was viewed by Standard Register as one with "near−term and long−term value creation benefits" that was being pursued "at the right time with the right financial structure."  The Standard Register Company, Current Report (Form 8-K), at Ex. 99-1 (Aug. 1, 2013).  The WorkflowOne Acquisition also made Standard Register's "pension obligation more manageable, and [provided] additional resources to execute within [Standard Register's] strategy."  The Standard Register Company, Current Report (Form 8-K), at Ex. 99-1 (Aug. 1, 2013).[14]

III.    **Standard Register's Stock Price Increases Following The WorkflowOne Acquisition**

17.    Standard Register was a publicly traded company, with its common stock "traded on the New York Stock Exchange (NYSE) under the symbol SR."  The Standard Register Company, Annual Report (Form 10-K), at 1 (Mar. 3, 2014).  In the months preceding the

---

[14]    On the pension side, Standard Register noted that it was "encouraged by the recent rise in long−term interest rates" because higher interest rates would mean a higher discount rate, meaning that "Company's pension liability would be reduced at the end of 2013 by an actuarial gain."  The Standard Register Company, Current Report (Form 8-K), at Ex. 99-1 (Aug. 1, 2013).  By the same token, this statement sheds light on why Standard Register, and the public equity markets, viewed the assumption of WorkflowOne's below-market, i.e., lower-interest-rate, debt as "the right financial structure" through which to accomplish the WorkflowOne Acquisition.

WorkflowOne Acquisition, Standard Register's shareholders had approved a 1-for-5 reverse split of its outstanding shares of common stock and class A stock. *Id.* at 41. Standard Register's shares had experienced a steady and pronounced decline leading up the approval of the reverse split on April 25, 2013—from around $12 per share in early January 2012, to under $3.50 per share at the time the reverse split was announced, a decline of over 70%. Standard Register's share price traded within a band of $2.50 to $4.20 per share during the 12 months preceding the closing of the WorkflowOne Acquisition.

18.    In the days following the announcement of the WorkflowOne Acquisition, by contrast, Standard Register's common stock traded up significantly on heavy volume. From a July 31 close of $2.99 immediately before the WorkflowOne Acquisition, Standard Register's stock price increased to an all-time closing high of $14.40 on August 5, 2013—an increase of over 380%.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

And, as reflected by the following chart, following its acquisition of WorkflowOne, Standard Register's common stock remained above the pre-acquisition price for more than a year, into 2015:



## IV.    Standard Register's Pension Payments

19.    Following the WorkflowOne Acquisition, Standard Register continued to make substantial pension contributions. The Company contributed $15 million in 2013 post-closing and $39.6 million in 2014.

20.    Indeed, the acquisition of the WorkflowOne assets essentially doubled the Company's borrowing base, thereby permitting significantly greater access to working capital under Standard Register's ABL facility. The ABL facility was expanded to $125 million to provide "additional liquidity and the ability to capitalize on opportunities for growth" and

"financial stability and flexibility" aligned with Standard Register's strategic objectives.    The Standard Register Company, Current Report (Form 8-K), at Ex. 99-1 (Aug. 1, 2013); *see also* The Standard Register Company, Annual Report (Form 10-K), at 25 (Mar. 3, 2014); The Standard Register Company, Q2 2013 Earnings Call (Aug. 1, 2013).[15]  A significant portion of these borrowings were used to make contributions to Standard Register's pension plans.

## V.    Standard Register's Bankruptcy

21.    On March 12, 2015, each of the Debtors filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "**Bankruptcy Code**").    The Debtors continue to operate their businesses and manage their properties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in these chapter 11 cases.

22.    On March 24, 2015, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.

## VI.    The DIP Financing

23.    On March 12, 2015, the Debtors filed their *Motion of Debtors for Order (A) Authorizing Debtors to (I) Provide Adequate Protection to the Debtors' Secured Lenders, (II) to Obtain Interim Postpetition Financing on a Superpriority, Secured and Priming Basis in*

---

[15]    In connection with the WorkflowOne Acquisition, the Prepetition Term Lenders subordinated their liens to the ABL lenders with respect to approximately $80 million of accounts receivable and inventory.  *Cf.*  The Standard Register Company, Current Report (Form 8-K), at Ex. 10.2 (Aug. 1, 2013) (§ 9.11(b), each first lien lender "consents to the subordination of Liens provided for in the ABL/Term Intercreditor Agreement"); *id.* at Ex. 10.3 (§ 9.11(b), each second lien lender "consents to the subordination of Liens provided for in the ABL/Term Intercreditor Agreement").

*Favor of Silver Point Finance, LLC, as Administrative Agent for Proposed DIP Term Lenders,*
*and Bank of America, N.A., as Administrative Agent for Proposed DIP ABL Lenders, and (III) to*
*Modify the Automatic Stay; and (B) Scheduling, and Establishing Deadlines Relating to a Final*
*Hearing and Entry of a Final Order on Postpetition Financing* (Docket No. 15) (the "**DIP**
**Motion**").  The DIP Motion sought approval of, among other things, a $30 million new money
DIP term loan from Silver Point.  On March 13, 2015, this Court entered the *Interim Order (I)*
*Authorizing Debtors in Possession to Obtain Financing Pursuant to 11 U.S.C. §§ 105, 362, 363,*
*and 364, (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11*
*U.S.C. § 364, (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying*
*Automatic Stay Pursuant to 11 U.S.C.  §§ 361, 362, 363, and 364; and (IV) Scheduling Final*
*Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2*
(Docket No. 15) (the "**Interim DIP Order**").

24.     On April 7, 2015, the Committee filed its objection (Docket No. 202) to the DIP
Motion.  Following a contested hearing, on April 13, 2015, the Committee's objection to the DIP
Motion was overruled and the order granting the DIP Motion was entered (Docket No. 290) (the
"**Final DIP Order**").

25.     The DIP Motion and the Final DIP Order made clear that Silver Point's new-
money DIP loan was extended on the express condition that the Debtors (i) stipulate to the
validity and enforceability of the DIP lenders prepetition debt (including the Prepetition Term
Loans) and (ii) "absolutely and unconditionally forever waive, discharge and release" the "Pre-
Petition Credit Parties" (*e.g.*, Silver Point and the Prepetition Term Lenders) from:

> any and all "claims" (as defined in the Bankruptcy Code),
> counterclaims, actions, debts, accounts, causes of action [. . .] it
> may have against any Pre-Petition Credit Party [] that arise out of

or relate to any of the Pre-Petition Loan Documents or any acts, inaction, or transactions thereunder, whether disputed or undisputed, at law or in equity, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to Section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law [(the "**Debtor Release**") .]

Final DIP Order ¶ 6.H.

26.     The Final DIP Order approved the Debtor Release. The Debtors' stipulations, waivers and releases are binding on each Debtor and any successor "under all circumstances and for all purposes," unless a chapter 7 or 11 trustee is appointed before the Challenge Deadline or the cases convert to chapter 7 before the Challenge Deadline.  Final DIP Order ¶¶ 28.A., 28.E. The Debtors' stipulations, agreements and releases are binding on the Committee, unless the Committee "having requisite standing has timely and properly filed an adversary proceeding or contested matter by no later than the [May 26, 2015] Challenge Deadline." Final DIP Order ¶ 28.B.

27.     By agreement of the parties, the Committee's Challenge Deadline was extended to June 8, 2015, provided that the Committee file its Standing Motion by May 18, 2015.  *See* Scheduling Order, Docket No. 557.

**VII.    The Committee's Standing Motion**

28.     On May 18, 2015, the Committee filed the Standing Motion, which attached the Proposed Complaint.  By the Standing Motion, the Committee seeks authority to prosecute the following causes of action against Silver Point and certain other Prepetition Term Lenders, which are set forth in the Proposed Complaint: (i) the avoidance of the obligations and liens under the Prepetition Term Loan Agreements as constructively fraudulent transfers pursuant to sections

15

548, 550, and 551 of the Bankruptcy Code; (ii) the avoidance of the obligations and liens under the Prepetition Term Loan Agreements as constructively fraudulent transfers pursuant to sections 554, 550, and 551 of the Bankruptcy Code and section 1336.01(A)(2) of the Ohio Revised Code; (iii) avoidance of certain purportedly unperfected liens and security interests of the Prepetition Term Lenders; (iv) the recharacterization or disallowance of postpetition interest and expenses on the Prepetition Term Loans; (v) the recharacterization of the Prepetition Second Lien Term Loans as equity; (vi) disallowance of certain claims under section 502(d) of the Bankruptcy Code; (vii) equitable subordination and equitable disallowance of Silver Point's claims; (viii) avoiding certain transfers as improper improvements in position under section 547 of the Bankruptcy Code; and (ix) certain avoidance claims against WorkflowOne Holdings, LLC. The Standing Motion has been noticed for hearing on June 8, 2015.

## OBJECTION

29.    To obtain derivative standing to assert the claims set forth in the Proposed Complaint, the Committee must demonstrate that (i) they have alleged colorable claims; (ii) that the Debtors have unjustifiably refused to pursue (or refused to consent to the Committee's pursuit on behalf of the Debtors); and (iii) the Committee has received leave to sue from the bankruptcy court. *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003)), *aff'd*, 527 B.R. 169 (D. Del. 2015); *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citing *Infinity Inv'rs Ltd. v. Kingsborough* (In re Yes! Entm't Corp.), 316 B.R. 141, 145 (D. Del.

2004)).[16]  Derivative standing should be granted only where the likelihood and magnitude of success in prosecuting the claims outweighs the likely cost, disruption and delay associated with the litigation. *See Centaur*, 2010 WL 4624910, at *5.

30.     The party seeking standing bears the burden of demonstrating that it has satisfied all of the prerequisites for derivative standing. *See Infinity Investors Ltd. v. Kingsborough* (In re Yes! Entm't Corp.), 316 B.R. 141, 145 (D. Del. 2004).  If a proposed claim lacks "any merit whatsoever, allowing another party to pursue the claims at the expense of the bankruptcy estate would neither be in the best interest of the estate nor necessary and beneficial to the efficient resolution of the bankruptcy proceedings."  *In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D. N.J. 2004) (quoting *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003)).

31.     The Standing Motion fails to satisfy any of these requirements, and therefore should be denied.

### A.     The Committee's Proposed Complaint Does Not Allege Colorable Claims

32.     The inquiry into whether claims are colorable focuses on whether the claims would survive a defendant's motion to dismiss.  *In re Centaur*, 2010 WL 4624910 at *4.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of

---

[16]   Other lower courts within the Third Circuit have employed the following four-part test: "A committee may have derivative standing to initiate an avoidance action on behalf of the debtor where: 1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and 4) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case." *In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D. N.J. 2004) (citing *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd.* ( In re Gibson Group, Inc.), 66 F.3d 1436, 1446 (6th Cir. 1995)).

17

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.    Instead, facts must be pleaded "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

       1.     *The Proposed Complaint Fails To State a Colorable Claim for Avoidance of Allegedly Constructively Fraudulent Transfers Under Either Federal Bankruptcy or State Law (Counts One through Four)*

33.    Although Third Circuit law provides that "fraudulent transfer law cannot rationally be invoked to undermine" the function of public equity markets, *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (citing *In re R.M.L., Inc.,* 92 F.3d 139, 151 (3d Cir. 1996)), the Committee's Proposed Complaint seeks to do just that.[17]  The Proposed Complaint alleges that Standard Register received "less than reasonably equivalent value" in connection with its assumption of $210 million of secured debt related to the WorkflowOne Acquisition. But Standard Register's shareholders enthusiastically received news of the transaction, as reflected by the 380% increase in the value of Standard Register's common stock in the week following the announcement of the WorkflowOne Acquisition.

34.    For all of the allegations in the Proposed Complaint, it is telling that neither the Standing Motion nor the Proposed Complaint make any mention of the performance of Standard Register's common stock in the many months following the WorkflowOne Acquisition. Nor does the Proposed Complaint contain any allegation of "manipulation or bad faith" with respect to the trading in Standard Register's common stock or the disclosures of the WorkflowOne Acquisition to the public through Standard Register's SEC filings.

---

[17]    As noted by the Committee in the Standing Motion, the Ohio Uniform Fraudulent Transfer Act "substantially tracks section 548 of the Bankruptcy Code."  Standing Mot. ¶ 75.

35.    The public market reaction is conclusive on whether Standard Register received "reasonably equivalent value" when it acquired WorkflowOne. "[T]he value established on the open market is the fair market value for purposes of determining reasonably equivalent value, '[i]n the absence of any evidence of manipulation or bad faith.'"  *VFB LLC v. Campbell Soup Co.*, No. Civ. A. 02-137 KAJ, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005) (quoting *PHP Liquidating, LLC v. Robbins* (In re PHP Healthcare Corp.), 128 Fed. App'x. 839, 848 (3d Cir. 2005)), *aff'd*, 482 F.3d 624 (3d Cir. 2007).  This is particularly true "with respect to stock traded on 'the New York Stock Exchange, one of the most efficient capital markets in the world[.]'" *Id.* (quoting *In re PHP Healthcare Corp.*, 128 Fed. App'x. at 848).

36.    In light of:

- the Third Circuit's validation in *VFB* of the use of "market data for purposes of valuing a public company for fraudulent conveyance purposes," *Iridium Operating LLC v. Motorola, Inc.*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) (discussing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007));
- the Third Circuit's common-sense reminder that "the public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view," *id.*;
- the Committee's failure to acknowledge—much less meaningfully address—such market data; and
- the Committee's failure to allege or adduce any evidence of manipulation or bad faith with respect to Standard Register's publicly traded common stock,

the Proposed Complaint fails to articulate any colorable claims with respect to its allegation that Standard Register did not receive reasonably equivalent value.  The claims alleged in the Proposed Complaint with respect to both the prepetition term loan obligations incurred by the Debtors in connection with the WorkflowOne Acquisition (Counts One and Three) and the liens

associated with the term loan obligations (Counts Two and Four) suffer from this infirmity, among others.

2.    *The Committee Fails To State a Colorable Claim for Lien Disallowance (Count Five)*

37.    The Committee asserts that it "seeks a determination as to the validity, perfection, and enforceability of the Term Loan Liens" with respect to certain assets.  *See* Proposed Compl. ¶¶ 171, 174.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Committee's challenge to the validity of the Prepetition Term Lenders' liens is without factual or legal basis, for the reasons set forth on <u>Exhibit A</u> attached hereto.  Indeed, with the singular exception of the allegation that the UCC-1 Financing Statement against WorkflowOne of Puerto Rico Inc. was not amended after that entity changed its name, Proposed Compl. ¶ 173, the Committee does not allege any facts about any purported lien perfection issues with respect to liens against any of the Prepetition Term Lenders' collateral.  Instead, the Committee lists a variety of assets that were "expressly excluded" from the Prepetition Term Lenders' collateral.  *Id.* at ¶ 172. With respect to "expressly excluded" assets, there is of course no basis whatsoever for the Committee's professionals to be granted derivative standing to litigate factual issues not in dispute.

38.    Moreover, with respect to the single lien perfection issue plead by the Committee, because the Committee is seeking to pursue its lien disallowance claim derivatively, "it is the committee's burden in the first instance to demonstrate that it has satisfied the test for derivative standing." *In re G-I Holdings, Inc.*, 313 B.R. 612, 629 (Bankr. D. N.J. 2004) (citing *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd.* (In re Gibson Grp., Inc.), 66 F.3d 1436, 1446 (6th Cir.

20

1995).  The Committee has not met its burden here because the Committee has not demonstrated that it is more likely than not that the estate will benefit if the Committee is granted standing—based on the proposed claim's probability of success, the expense and other detriments of the litigation, and the value that the estate would obtain if the claims were successfully litigated. *In re G-I Holdings, Inc.*, 313 B.R. at 628 ("[A] colorable claim [is one] that would benefit the estate if successful[], based on a cost-benefit analysis performed by the court"); *In re MIG, Inc.,* No. 09-12118 (KG), 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009) ("A court must also determine . . . the likely benefit to the estate which encompasses the likelihood of success of the proposed litigation.").  Accordingly, the Committee's claim for lien disallowance is not colorable and, even if colorable, would produce no material benefit for the estate.

> 3.   *The Committee Fails To State a Colorable Claim for Recharacterization or Disallowance of Interest and Expenses (Count Six)*

39.    The Committee requests that this Court "determine the extent to which the Prepetition Term Loans were undersecured as of the Petition Date," Proposed Compl. at 35, and that, to the extent the Prepetition Term Loans were undersecured, any "postpetition payments of interest, fees, costs, and expenses" should be disallowed, recharacterized, or disgorged. *Id.*   As a separate count, this claim is not colorable.  If the Committee is granted standing and succeeds on its separate proposed fraudulent conveyance or lien avoidance claims, as set forth below, the Final DIP Order contains a mechanism to address excess adequate protection payments.

40.     As a preliminary matter, the Committee has not sought reconsideration of this Court's Final DIP Order,[18] under which this Court authorized the Debtors to "make adequate protection and other payments to Pre-Petition Credit Parties to the extent authorized or required [therein]."  Final DIP Order ¶ 8.B.

41.     Paragraph 15 of the Final DIP Order approved an adequate protection package for the Prepetition Term Agents.  The adequate protection package granted to the Prepetition Term Agents was "subject to the rights of third parties preserved under Paragraph 28 [the Challenge Deadline]."  Importantly, Paragraph 28.D of the Final DIP Order provides that:

> if an adversary proceeding or contested matter is timely and properly filed as of the applicable Challenge Deadline against a Pre-Petition Credit Party, *the entity prosecuting that timely adversary proceeding or motion can, if successful, challenge the adequate protection provided with respect to any lien avoided and payments made* to any Pre-Petition Credit Party and all of the provisions regarding Adequate Protection Claims and Adequate Protection Liens in this Final Order are qualified by this reservation of the rights of third parties. *If the Adequate Protection payments made exceed the amount of adequate protection to which any Pre-Petition Credit Party is entitled, that excess shall be applied to that Pre-Petition Credit Party's allowed secured claim*.

Final DIP Order ¶ 28.D (emphasis added).     Accordingly, the Committee's claim for recharacterization or disallowance of the adequate protection package approved by this Court is not colorable because it is both (1) premature (as no successful challenge has yet been made) and (2) moot (as the Final DIP Order contains a mechanism for adjusting a Prepetition Term

---

[18]  "[A] Rule 60(b) motion is an extraordinary remedy only appropriate where 'rare circumstances' are present," and accordingly "the movant 'bears a heavy burden'" in establishing grounds for relief. *SB Liquidation Trust v. Preferred Bank* (In re Syntax-Brillian Corp.), No. 08-11407, 2013 Bankr. LEXIS 194, at *19 (Bankr. D. Del. Jan. 15, 2013) (quoting *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991)), *aff'd in relevant part*, 573 F. App'x 154 (3d Cir. 2014); *accord Carr v. New Century TRS Holdings* (In re New Century TRS Holdings, Inc.), No. 07-10416, 2012 Bankr. LEXIS 9, at *6 (Bankr. D. Del. Jan. 9, 2012) ("Parties seeking review of an order or judgment under Rule 60(b) have a high hurdle to overcome in obtaining relief.") (citation omitted).

Lender's claim in the event Adequate Protection payments made exceeded the amount of adequate protection to which such party is entitled).

> 4. *The Committee Fails To State a Colorable Claim for Recharacterization of the Prepetition Second Lien Term Loans (Count Seven)*

42.    The Committee's proposed claim seeking to recharacterize the Prepetition Second Lien Term Loans is both legally and factually deficient.  The Committee's legal theory is that recharacterization is an equitable power of the Court to "prevent the injustice that would result from treating the Second-Lien Term Loan as indebtedness."  Proposed Compl. ¶ 181.  But in contrast to the remedy of equitable subordination, in the Third Circuit, the focus of the recharacterization inquiry "is whether 'a debt actually exists,' or, put another way, we ask what is the proper characterization in the first instance of an investment." *Cohen v. KB Mezzanine Fund II, LP* (In re SubMicron Sys. Corp.), 432 F.3d 448, 454 (3d Cir. 2006) (citation omitted).   In rejecting the concept of a "mechanistic scorecard" of factors to examine, courts generally consider: (1) what the parties say in their contracts; (2) what they do through their actions; and (3) the economic reality of the surrounding circumstances. *Id.* at 456.

43.    While not explicitly set forth in the Bankruptcy Code, recharacterization "is a theory, adopted by the overwhelming majority of courts to have considered the question, that bankruptcy courts may place the proper label of 'claim' (generally, debt) or 'interest' (equity) on an advance of funds, regardless of what the parties call it." *FCC v. Airadigm Commc'ns, Inc.* (In re Airadigm Commc'ns, Inc.), 616 F.3d 642, 653 (7th Cir. 2010). Accordingly, the Committee's notion that recharacterization is an appropriate mechanism to prevent a perceived "injustice" that would result from treating debt as debt—rather than an inquiry into "the advance's true character," *SubMicron*, 432 F.3d at 454 n.7 (quoting *Citicorp Real Estate, Inc. v. PWA, Inc.* (In

re Georgetown Bldg. Assocs., Ltd. P'ship), 240 B.R. 124, 137 (Bankr. D.D.C. 1999))—is misplaced.

44.     The Committee makes two factual allegations in support of its claim that the Prepetition Second Lien Term Loans should be recharacterized as equity, both of which are insufficient to show that the Petition Second Lien Term Loans were actually an equity contribution.  First, the Committee notes that the terms of the loans permitted "the accrual of in-kind interest."  Proposed Compl. ¶ 180.  Second, the Committee states that the Prepetition Second Lien Term Loans lack "any mandatory amortization payments."  *Id.*  As this Court is undoubtedly aware, these are common features of funded debt.  Simply noting these two features of the Prepetition Second Lien Term Loans is facially insufficient to support the Committee's contention that the 100-plus page Second Lien Credit Agreement was intended to be an equity investment in Standard Register.

45.     To support a claim for recharacterization, a party must allege specific facts supporting the inference that the parties intended the transfers to be disguised capital contributions. *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P.* (In re Fedders N. Am., Inc.), 405 B.R. 527, 554 (Bankr. D. Del. 2009).  The Committee has failed to do so here.

> 5.     *The Committee Fails To State a Colorable Claim for Disallowance Under Section 502(d) (Count Eight)*

46.     The Proposed Complaint seeks to assert claims against Silver Point and other Prepetition Term Lenders to avoid certain obligations incurred in connection with the WorkflowOne Acquisition.  *See* Proposed Compl. ¶¶ 143-67.  Count eight of the Proposed Complaint requests disallowance of these parties' claims against the Debtors pursuant to section

502(d) of the Bankruptcy Code.  Proposed Compl. ¶¶ 182-83.  Count eight is premature.  Before section 502(d) can be invoked, a party must obtain a judgment for the avoidance of a transfer. A cause of action under section 502(d) to disallow proofs of claim is premature if, as here, the proposed plaintiff "has not yet obtained a judgment" on its avoidance claims. *Zazzali v. AFA Fin. Grp., LLC* (In re DBSI, Inc.), 477 B.R. 504, 517 (Bankr. D. Del. 2012) (Walsh, J.) (dismissing section 502(d) disallowance claim because trustee "has not [yet] obtained a judgment on his avoidance claims"); *accord DHP Holdings II Corp. v. Peter Skop Indus., Inc.* (In re DHP Holdings II Corp.), 435 B.R. 220, 226 (Bankr. D. Del. 2010) (debtors' count to disallow claims under section 502(d) premature because debtors did not yet have a judgment against defendant on turnover count and defendant had not yet filed proof of claim).  The Committee has not yet objected to Silver Point's claims, let alone obtained any judgment to avoid any obligations in connection with the WorkflowOne Acquisition, and do not allege otherwise.  Accordingly, the Committee has failed to state a colorable claim for disallowance under section 502(d).

> 6. *The Committee Fails To State a Colorable Claim for Equitable Subordination (Count Nine)*

47.     The Committee alleges that Silver Point generally "engaged in inequitable conduct that has harmed the Debtors' general unsecured creditors[.]"  Proposed Compl. ¶ 185. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.   The only specific conduct that the Committee alleges was inequitable—"trading in the Debtors' common stock while in possession of material nonpublic information acquired as a fiduciary of the Debtors," Proposed Compl. ¶ 190—is at once factually incorrect and legally insufficient.

25

48.     It is simply not the case that Silver Point engaged in insider trading.  Silver Point maintains a strict ethical wall between its public trading desk and its private investment analysts. Silver Point never traded Standard Register stock on the basis of material non-public information available to its private side.

49.     Moreover, a private litigant asserting fraud claims under the Exchange Act must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also* Fed. R. Civ. P. 9(b). Numerous courts have applied this heightened pleading standard to insider trading claims brought by private parties. *See, e.g.*, *Rosenbaum & Co. v. H.J. Myers & Co.*, No. CIV. A. 97-824, 1997 WL 689288, at *3 (E.D. Pa. 1997) (plaintiff did not plead insider trading allegations "with the specificity and detail required under Rule 9(b) and [the PLSRA]"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 310 n.50 (S.D.N.Y. 2008) (applying heightened pleading standards to insider trading claims). *See generally* Ralph C. Ferrara et al., *Ferrara on Insider Trading and the Wall* ¶ 3.02[6] (2015) (noting that "courts have dismissed insider trading allegations due to a failure by the plaintiff to plead particularized facts sufficient to establish that the defendant acted with scienter"). Because the Committee's equitable subordination claims are grounded exclusively on insider trading allegations, the Committee cannot show a colorable claim for subordination or disallowance without satisfying the pleading requirements attendant to insider trading claims, which it has wholly failed to do. In fact, the Committee's insider trading allegations are so perfunctory, *see, e.g.*, Proposed Compl. ¶¶ 185-86, that they do not satisfy even the more lenient pleading requirements under *Iqbal*, *Twombly*—or even the now-defunct *Conley v. Gibson* standard.

50.     Finally, even if the Committee were to properly plead insider trading claims, as a legal matter, the Committee nonetheless fails to state a colorable claim for the "'drastic' and 'unusual' remedy" of equitable subordination. *See Official Comm. of Unsecured Creditors of Radnor Holdings Corp., v. Tennenbaum Capital Partners, LLC* (In re Radnor Holdings Corp.), 353 B.R. 820, 840 (Bankr. D. Del. 2006) (quoting *Cohen v. KB Mezzanine Fund II, LP* (In re SubMicron Sys. Corp.), 291 B.R. 314, 327–29 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006)).  As the cases cited by the Committee make clear, "[t]he general rule is that claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered as a result of the inequitable conduct." *Le Café Creme v. Le Roux* (In re Le Café Creme), 244 B.R. 221, 236 (Bankr. S.D.N.Y. 2000) (quoting *Fabricators, Inc. v. Technical Fabricators, Inc.* (In re Fabricators, Inc.), 926 F.2d 1458, 1470 (5th Cir. 1991)).

51.     The alleged insider trading allegation is inequitable conduct of a type that, even if true, would harm only the party who purchased such shares from Silver Point, not the Debtors or their creditors.   As the Third Circuit explained in *SubMicron*, the doctrine of equitable subordination "'is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct.'" *SubMicron*, 432 F.3d at 462 (quoting *In re SubMicron Sys. Corp.*, 291 B.R. at 327). The Committee does not even attempt to explain how Silver Point's allegedly improper trading in the Debtors' equity interests harmed *creditors*.  Moreover, the Complaint does not allege—nor could it be the case—that the sale of Standard Register's common stock conferred an unfair advantage on Silver Point in its capacity as a secured creditor.

52.     As such, the Committee's claim for equitable subordination is not colorable because the Committee fails to allege inequitable conduct that, even if true, resulted in harm to

the Debtors or their creditors or otherwise conferred an unfair advantage on Silver Point in its

capacity as a secured creditor.    *See generally Citicorp Venture Capital, Ltd. v. Comm. of*

*Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) (alleged misconduct

"must have resulted in injury to the creditors [of the bankrupt] or conferred an unfair advantage

on the claimant"); *Benjamin v. Diamond* (In re Mobile Steel Co.), 563 F.2d 692, 703 (5th Cir.

1997) (same).

> 7.    *The Committee Fails To State a Colorable Claim for Equitable*
>        *Disallowance (Count Ten)*

53.    The Tenth Count of the Proposed Complaint seeks "equitable disallowance" of all

of Silver Point's Claims. Proposed Compl. at 38. This claim is not colorable for the reasons set

forth above, and because there is no such cause of action. *In re Mid-American Waste Sys., Inc.*,

284 B.R. 53, 68 (Bankr. D. Del. 2002) (Walsh, J.) ("Equitable considerations can justify only the

subordination of claims, not their disallowance."). *See also Harbinger Cap. Partners LLC v.*

*Ergen* (In re Lightsquared Inc.), 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("With enormous

respect to those courts who have held to the contrary, this Court holds that the Bankruptcy Code,

pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are

otherwise allowable under section 502(b) of the Bankruptcy Code."). *Cf. Travelers Cas. & Sur.*

*Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 449 (2007) (Bankruptcy Code directs that

court "'shall allow' [a] claim 'except to the extent that' the claim implicates any of the nine

exceptions enumerated in § 502(b)."); *but see In re Washington Mut., Inc.*, 461 B.R. 200, 257

(Bankr. D. Del. 2011) (Walrath, J.) (concluding court does have the authority to disallow a claim

on equitable grounds in extreme instances), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del.

2012).[19]

> 8.    *The Committee Fails To State a Colorable Claim for Improvement In Position (Count Fourteen)*

54.    The Committee's fourteenth count, challenging the attachment of the lenders'

floating liens to after acquired property, consists largely of a formulaic recitation of the legal

standards governing "improvement in position" under section 547 of the Bankruptcy Code, *see*

Proposed Compl. ¶¶ 206-209, and lacks the minimum factual specificity necessary to establish a

colorable claim. *See Iqbal*, 556 U.S. at 678.

55.    The only category of "Floating Lien Transfers" (as defined in the Proposed

Complaint) the Committee identifies with any specificity are certain tax credits, tax refunds, and

net operating losses for tax year 2014, as identified in the Debtors' schedules and statements.

First, as it has previously explained, "Silver Point does not purport to have a prepetition lien on

the Debtors' NOLs." Sale Reply ¶ 28. Second, case law concerning the application of preference

law to tax refunds and credits is sparse and uncertain. While some courts have held that the

debtor does not acquire rights in its tax refunds until the end of the applicable tax year, *see, e.g.*,

*Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am, Inc.* (In re TOUSA,

Inc.), 406 B.R. 421, 432 (S.D. Fla. 2009) (under federal and New York law, tax refunds do not

attach until the end of the tax year), others have rejected the this position, *see, e.g.*, *In re*

*Kendrick & King Lumber, Inc.*, 14 B.R. 764, 767 (W.D. Okla. 1981). Thus, the Committee's

---

[19]    The Third Circuit has declined to address the question. *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n.7 (3d Cir. 1998) ("We find it unnecessary here to resolve the issue as to whether equitable 'disallowance' remains an available remedy.").

conclusory statement that "[t]he Floating Lien Transfers were made . . . on or about January 1, 2015," Proposed Compl. ¶ 207, is, at best, subject to dispute. Given the uncertain prospects of recovery, and the relatively small value of the tax credits and refunds at issue,[20] the Debtors' decision to release and not pursue such claims was reasonable.

> 9.    *The Committee's Claims Against WF Holdings Fail Because the WF Holdings No Longer Exists (Counts Eighteen and Nineteen)*

56.    The Committee's eighteenth and nineteenth counts attack approximately $5.5 million in professional fees paid to the seller, WorkflowOne Holdings, LLC, in connection with the WorkflowOne Acquisition.  WFSR Holdings, LLC (f/k/a WorkflowOne Holdings, LLC) was a Delaware LLC that dissolved and was wound up last year.  The certificate of cancellation for WorkflowOne Holdings, LLC was filed on December 30, 2014, and was effective on December 31, 2014.  *See* Certificate of Cancellation, attached as <u>Exhibit B</u>.

57.    After the certificate of cancellation has been filed, suits generally may not be brought by or against an LLC.  *Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004) ("§ 18–803(b) of the LLC Act provides that [a] suit generally may be brought by or against a limited liability company only until the certificate of cancellation is filed.").  Accordingly, the Committee may not bring claims against WorkflowOne Holdings, LLC.

---

[20]    The tax refunds and credits listed in schedule B18, excluding refunds attributable to tax years prior to 2014, total $418,725.54. Those listed in schedule B21—which are described as "contingent and unliquidated"—are largely undetermined, but those listed in a sum certain amount total $215,000.  In the context of the millions of dollars that would be spent on litigation if the Standing Motion were granted, the Debtors' judgment to waive and release these theoretical and uncertain allegations is beyond reproach.

B.     **A Cost/Benefit Analysis Demonstrates that the Prosecution of the Proposed Complaint Will Not Benefit the Debtors' Estates**

58.     Putting to one side the fact that in the Final DIP Order the Debtors waived and released any chapter 5 avoidance actions they may have had against Silver Point,[21] it is not sufficient for the Committee to simply state that the Proposed Complaint asserts "colorable" claims—which this Proposed Complaint demonstrably does not—rather, the determination of whether the Committee should be allowed to prosecute those claims in the shoes of the Debtors "turns on the outcome of a cost/benefit analysis." *Centaur*, 2010 WL 4624910, at *5; *see also In re Cybergenics Corp.*, 330 F.3d 548, 568-69 (3d Cir. 2003) (reasoning that the court acts as gatekeeper in assessing whether pursuit of derivative claims will directly benefit the estate).

59.     Accordingly, the Court should assess "whether, in light of the probable costs of the litigation, the claims would likely benefit the estate if pursued." *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark* (In re Nat'l Forge Co.), 326 B.R. 532, 548 (W.D. Pa. 2005). This means that "'at least some consideration of the possibilities of success' should be considered before granting or denying a standing motion." *Centaur*, 2010 WL 4624910, at *6 (quoting *Adelphia Commc'ns Corp. v. Bank of America, N.A.* (In re Adelphia Commc'ns Corp.), 330 B.R. 364, 375-76 (Bankr. S.D.N.Y. 2005)). At a minimum, a court, "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the

---

[21]     Once avoidance actions are released by a debtor in possession, who stands "in the overshoes" of creditors, such actions may not be pursued derivatively by creditors. *See, e.g.*, *In re PWS Holding Corp.*, 303 F.3d 308, 314-15 (3d Cir. 2002) (plan release by debtor precluded creditor from pursuing state law fraudulent transfer claim); *In re GenTek Inc.*, 328 B.R. 423, 429 (Bankr. D. Del. 2005) ("Because the Debtors released those claims in the Plan, the Plan and Confirmation Order enjoin [plaintiffs] from now prosecuting those claims.").

bankruptcy estate that the initiation and continuation of litigation will produce." *In re MIG, Inc.*, No. 09-12118 (KG), 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009) (citation omitted).

60.     The Committee's Standing Motion contains scant analysis of the costs or benefits associated with the proposed claims against Silver Point.  Instead, the Committee's view appears to be that this Court should permit the prosecution of the derivative claims set forth in the Proposed Complaint because of "what the unsecured creditors are being offered in the absence of such litigation."  Standing Mot. ¶ 136.  But this type of analysis turns the benefit-to-the-estate analysis on its head and displaces the debtor in possession's role as the fiduciary for the entire bankruptcy estate—not just the interests of general unsecured creditors.

61.     This is why, "[e]ven if permitted under the Bankruptcy Code, derivative standing is the exception rather than the rule." *Weyandt v. Fed. Home Loan Mortg. Corp.* (In re Weyandt), 544 F. App'x. 107, 110 (3d Cir. 2013) (quoting *In re Baltimore Emergency Servs. II, Corp.*, 432 F.3d 557, 562 (4th Cir. 2005)).  It is a "fundamental bankruptcy principle that the right to pursue fraudulent transfer claims shifts to the debtor in possession upon the filing of a chapter 11 petition notwithstanding that, outside of bankruptcy, such claims belong solely to creditors." *In re GenTek Inc.*, 328 B.R. 423, 429 (Bankr. D. Del. 2005).

62.     Not only are the Committee's proposed claims without merit, but the cost of such litigation and the attendant disruptive effects on the sale process and these chapter 11 cases would be tremendous.  Litigating the claims alleged in the Proposed Complaint would embroil the Debtors and other parties in interest in a protracted and expensive litigation that would undoubtedly cost these estates millions of dollars in professional fees.  Significantly, the Committee is expecting the estates to bear its litigation fees, a factor which this Court must "carefully examine[]" as part of its cost-benefit analysis and which weighs against a grant of

derivative standing. *Unsecured Creditors' Comm. of STN Enters. Inc. v. Noyes* (In re STN Enters.), 779 F.2d 901, 905 (2d Cir. 1985).

63.     While the Debtors ably make these arguments in their objection, as the stalking horse bidder and largest secured creditor, Silver Point similarly has an interest in preserving the going concern value of the Debtors, running an efficient and value maximizing sale process, and moving these cases forward.

64.     The Committee's professionals simply do not have the same fiduciary duties as the Debtors to maximize the value of the estate for all stakeholders.   Nor, given the capital structure, does the Committee share the priorities of the Debtors or Silver Point to run a value maximizing sale process.   The Committee's fiduciary duty is solely to general unsecured creditors, and while their attempt to employ abusive and cumbersome litigation tactics in the hope of obtaining a larger share of a smaller pie for its constituents may be understandable, such actions are not in the best interest of all creditors or of the estates generally.

**C.     The Debtors Did Not Abuse Their Discretion In Releasing and Refusing To Pursue the Claims Set Forth in the Proposed Complaint**

65.     In the chapter 11 context, "perhaps the most important prerequisite to derivative standing is that [the party with authority to act under the Bankruptcy Code] has abused its discretion in failing to avoid a preferential or fraudulent transfer." *In re Weyandt*, 544 F. App'x. at 110 (alteration in original) (quoting *In re Gibson Grp., Inc.*, 66 F.3d at 1442).   The record in these chapter 11 cases, including the good faith finding contained in the Final DIP Order, demonstrates that the Debtors agreed to the stipulations, waivers and releases contained in the Final DIP Order only after their own analysis of potential claims against the Prepetition Term Lenders and after multiple rounds of good faith, arm's-length negotiations.   *See* Final DIP Order

¶ 7.F.  The Committee has not and cannot show that Standard Register abused its discretion in declining to pursue the various claims set forth in the Proposed Complaint.

66.     As previously discussed, the Committee's purported claims against Silver Point and the Prepetition Term Lenders are not "colorable claims." And any benefit obtainable through prosecuting the Proposed Complaint would be far outweighed by the costs and delay that would be associated with such litigation.   Accordingly, the Committee cannot show that the Debtors unjustifiably refused to grant derivative standing to the Committee.

WHEREFORE, Silver Point respectfully requests that the Court (i) deny the Standing Motion and (ii) grant such other and further relief as may be just and proper.

DATED:        Wilmington, Delaware
              June 1, 2015

                              SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP


                      By:    _/s/ Sarah E. Pierce_____
                              Sarah E. Pierce (I.D. No. 4648)
                              One Rodney Square
                              P.O. Box 636
                              Wilmington, Delaware 19899-0636
                              Telephone: (302) 651-3000
                              Fax: (302) 651-3001


                              - and -

                              Ron E. Meisler
                              Albert L. Hogan III
                              Christopher M. Dressel
                              Carl T. Tullson
                              155 North Wacker Drive
                              Chicago, Illinois 60606
                              Telephone: (312) 407-0700
                              Fax: (312) 407-041

                              *Attorneys for Silver Point Finance, LLC*

35