REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | Re: Docket No. 524 |

## DEBTORS' OBJECTION TO COMMITTEE'S MOTION FOR STANDING TO PROSECUTE ESTATE CAUSES OF ACTION

---

[1] The Debtors and the last four digits of their respective U.S. federal taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (n/a); Standard Register de México, S. de R.L. de C.V. (n/a); Standard Register Servicios, S. de R.L. de C.V. (n/a); and Standard Register Technologies Canada ULC (n/a). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

## TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

I.     Standard Register's Historical Business ............................................................. 3

       A.   Healthcare Unit .................................................................................. 4

       B.   Business Solutions Unit ..................................................................... 4

II.    The Shift From Print to Digital: Standard Register's Restructuring Efforts and Search for the Right Strategic Partner ................................................................ 4

       A.   Standard Register's Reinvestment and Restructuring Efforts ................... 4

       B.   Standard Register's Search for the Right Strategic Partner ..................... 6

III.   The WorkflowOne Transaction ......................................................................... 7

       A.   Financial Analysis of the Transaction.................................................. 8

       B.   The Board's Evaluation of the Transaction ......................................... 11

       C.   The Market Reacts to the Transaction ................................................ 13

IV.   The Board's Consideration of Pursuing Claims Against Silver Point .............. 14

OBJECTION ........................................................................................................................ 15

I.     The Claims Are Not Colorable ......................................................................... 15

       A.   Fraudulent Transfer (Counts 1-4, 8, 13, 16-19)................................... 17

       B.   Breach of Fiduciary Duty (Count 15) ................................................ 32

       C.   Recharacterization (Count 7) ............................................................ 38

       D.   Equitable Subordination, Equitable Disallowance (Counts 9-10) ............ 42

       E.   Validity of Liens (Counts 5-6, 11-12)................................................. 46

       F.   Improvement in Lien Position (Count 14) ........................................... 47

**TABLE OF CONTENTS**
**(continued)**

Page

II.    The Decision Not to Sue was Reasonable ........................................................................ 49

   A.    The Debtors' Decision Not to Sue Was Reasonable Because the Claims Are
   Not Valuable ........................................................................................................................ 51

   B.    The Debtors' Decision Not to Sue Was Reasonable Because They Needed
   Access to DIP Financing and A Stalking Horse ............................................................. 53

   C.    The Debtors' Decision Not to Sue Was Reasonable Because Creditors Had
   Standing to Bring Many of the Claims Asserted in the Complaint (and Chose Not
   to)   55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antioch C. Litig. Trust v. Morgan,*
    2012 WL 6738676 (S.D. Ohio 2012) .................................................................. 32

*AP Servs., LLC v. McKesson Corp. (In re CRC Parent Corp.),*
    Adv. No. 12-50701 (MFW), 2013 WL 2149492 (Bankr. D. Del. May 16, 2013) ................... 47

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................... 16, 44

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ................................................................................... 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................... 16

*Burtch v. Opus, LLC (In re Opus East, LLC),*
    528 B.R. 30 (Bankr. D. Del. 2015) ................................................................... 23

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,*
    160 F.3d 982 (3d Cir. 1998) .......................................................................... 45

*City of Edinburg Council v. Pfizer, Inc.,*
    754 F.3d 159 (3d Cir. 2014) .......................................................................... 43

*Cohen v. MB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),*
    432 F.3d 448 (3d Cir. 2006) .............................................................. 38, 39, 42, 44

*Creditors' Comm. of Jumer's, Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.),*
    338 B.R. 344 (C.D. Ill. 2006) ........................................................................ 26

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.),*
    380 B.R. 348 (Bankr. D. Del. 2008) ........................................................ 20, 23, 24

*Elway Co. LLP v. Miller (In re Elrod Holdings Corp.),*
    392 B.R. 110 (Bankr. D. Del. 2008) .................................................................. 55

*G.I. Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.),*
    313 B.R. 612 (Bankr, D.N.J. 2004) ................................................................... 16

*Gries Sports Enters., Inc. v. Cleveland Browns Football Co., Inc.,*
    496 N.E.2d 959 (Ohio 1986) ......................................................................... 33

*Harbinger Cap. Partners LLC v. Ergen (In re LightSquared Inc.),*
    504 B.R. 321 (Bankr. S.D.N.Y. 2013) ................................................................ 45

*Hinsley v. Boudloche (In re Hinsley),*
    201 F.3d 638 (5th Cir. 2000) ......................................................................... 17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Adelphia Commc'ns Corp.,*
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ........................................................................ 45

*In re Amcast Indus. Corp.,*
    365 B.R. 91 (Bankr. S.D. Ohio 2007) .................................................................. 33, 37

*In re Answers Corp. Shareholder Litig.,*
    C.A. No. 6170-VCN, 2012 WL 1253072 (Del. Ch. Apr. 11, 2012) ........................ 36

*In re Antioch Co.*, 456 B.R. 791 (Bankr. S.D. Ohio 2011), *report and recommendation*
    *adopted*, 2011 WL 3664564 (S.D. Ohio 2011) ........................................ 32, 33, 36, 37

*In re Archdiocese of Milwaukee,*
    483 B.R. 855 (Bankr. E.D. Wisc. 2012) ................................................................ 51

*In re Centaur, LLC,*
    No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ................ 15

*In re DVI, Inc.,*
    Adv. No. 08-50248 (MFW), 2008 WL 4239120 .................................................... 48

*In re Foxmeyer Corp.,*
    286 B.R. 546 (Bankr. D. Del. 2002) ...................................................................... 49

*In re Fruehauf Trailer Corp.,*
    444 F.3d 203 (3d Cir. 2006) .................................................................................. 26

*In re M&S Grading, Inc.,*
    541 F.3d 859 (8th Cir. 2008) ................................................................................ 50

*In re Mid–Am. Waste Sys., Inc.,*
    284 B.R. 53 (Bankr. D. Del. 2002) ........................................................................ 42

*In re Mid-American Waste Systems, Inc.,*
    284 B.R. 53 (Bankr. D. Del. 2002) ........................................................................ 44

*In re Nat'l Century Fin. Enterprises, Inc.,*
    504 F. Supp. 2d 287 (S.D. Ohio 2007) .............................................................. 32, 34

*In re Optim Energy, LLC,*
    527 B.R. 169 (D. Del. 2015) .................................................................................. 42

*In re Prince,*
    85 F.3d 314 (7th Cir. 1996) .................................................................................... 3

*In re SI Restructuring,*
    532 F.3d 355 (5th Cir. 2008) .............................................................................. 42, 44

*In re Tower Air, Inc.,*
    416 F.3d 229 (3d Cir. 2005) .................................................................................. 36

## TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Washington Mut., Inc.,*
461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, No. 08-12229 MFW, 2012 WL
1563880 (Bankr. D. Del. Feb. 24, 2012) ................................................................... 45

*In re Winstar Commc'ns, Inc.,*
554 F.3d 382 (3d Cir. 2009) .................................................................................... 44

*Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.),*
316 B.R. 141 (D. Del. 2004) .................................................................................. 15

*Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re
Hechinger Inv. Co. of Del., Inc.),*
327 B.R. 537 (D. Del. 2005) .................................................................................. 18

*Matter of Century Glove, Inc.,*
151 B.R. 327 (Bankr. D. Del. 1993) ....................................................................... 48

*Mellon Bank, N.A. v. Metro Communications, Inc.,*
945 F.2d 635 (3d Cir. 1991) .................................................................... 21, 26, 27, 29

*Metlyn Realty Corp. v. Esmark, Inc.,*
763 F.2d 826 (7th Cir. 1985) .................................................................................. 26

*Moody v. Sec. Pac. Bus. Credit,*
971 F.2d 1056 (3d Cir. 1992) ...................................................................... 20, 21, 23

*MRWind Down Co. v. Rock-Tenn Converting Co. (In re Markson Rosenthal & Co.),*
No. 06-13163 (DHS), Adv. No. 06-01899, 2009 WL 3763048 (Bankr. D.N.J. Oct. 27,
2009) ................................................................................................................ 18

*NCS Healthcare, Inc. v. Candlewood Partners, LLC,*
827 N.E.2d 797 (Ohio Ct. App. 2005) ............................................................... 33, 36

*Official Comm. Of Unsecured Creditors of Am.'s Hobby Ctr., Inc. v. Hudson United
Bank (In re Am.'s Hobby Ctr., Inc.),*
223 B.R. 275 (Bankr. S.D.N.Y. 1998) ............................................................ 50, 51, 55

*Official Comm. Of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit
Partners L.P. (In re Fedders N. Am., Inc.),*
405 B.R. 527 (Bankr. D. Del. 2009) .................................................................. 16, 42

*Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum
Capital Partners, LLC (In re Radnor Holdings Corp.),*
353 B.R. 820 (Bankr. D. Del. 2006) .................................................................. 38, 42

*Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M.
Fabrikant & Sons, Inc.),*
394 B.R. 721 (Bankr. S.D.N.Y. 2008) ....................................................................... 26

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Official Employment-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*,
    Bankr. No. 01-16034-AJG, Adv. Nos. 03-3522, 03-3721, 2005 WL 6237551 (Bankr.
    S.D. Tex. Dec. 9, 2005) ...................................................................................................... 17

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002)................................................... 21, 22, 23, 25, 26, 27, 29

*PW Enters., Inc. v. N. Dakota Racing Comm'n (In re Racing Servs., Inc.)*,
    540 F.3d 892 (8th Cir. 2008) ............................................................................. 16, 50, 51

*Radol v. Thomas*,
    772 F.2d 244 (6th Cir. 1985) .................................................................................... 33, 34

*Samson v. Alton Banking & Trust Co. (In re Ebbler Furniture and Appliances, Inc.)*,
    804 F.2d 87 (7th Cir. 1986) ....................................................................................... 48, 49

*Slone v. Lassiter (In re Grove-Merritt)*,
    406 B.R. 778 (Bankr. S.D. Ohio 2009)......................................................................... 17

*Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) .......................................................................... 27

*Strock v. Pressnell*,
    527 N.E.2d 1235 (Ohio 1988) ....................................................................................... 32

*Travelers Cas. & Surety Co. of Am. v. Pac.Gas & Electric Co.*,
    549 U.S. 443 (2007)....................................................................................................... 45

*Unsecured Creditors Comm. Of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*,
    779 F.2d 901 (2d Cir. 1985) .......................................................................................... 51

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) .................................................................. 3, 17, 22, 25, 26

*Webster v. Senyi De Nagy- Unyom (In re Yelverton)*,
    Bankr. No. 09-00414, Adv. No. 09-10048, 2012 WL 1229752 (Bankr. D.D.C. Apr. 12,
    2012) .............................................................................................................................. 50

**Statutes**

11 U.S.C. § 547(b) ............................................................................................................. 47

11 U.S.C. § 547(c)(5).......................................................................................................... 48

11 U.S.C. § 548 .................................................................................................................. 17

15 U.S.C. § 78t-1(a) ........................................................................................................... 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

15 U.S.C. § 78u-4(b)(2) (1995) ................................................................................ 43

O.R.C. § 1336.04-05 ................................................................................................ 17

O.R.C. § 1701.59(B) ........................................................................................... 32, 35

O.R.C. § 1701.59(E) ...................................................................................... 32, 35, 37

O.R.C. § 1701.60(A)(1)(a)&(c) ............................................................................... 37

**Other Authorities**

Chris Farrell, Forbes, *Smart Money Moves, Now That Interest Rates Are Rising*, *available
    at* http://www.forbes.com/sites/nextavenue/2013/06/24/smart-money-moves-now-that-
    interest-rates-are-rising ....................................................................................... 21

The Standard Register Company ("Standard Register") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submit this objection (the "Objection") to the *Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [Docket. No. 524] (the "Motion")[2] filed by the official committee of unsecured creditors (the "Committee").  In support of this Objection, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Market participants voted with their wallets upon the announcement of the WorkflowOne Transaction.  The following chart shows the market price of Standard Register's common stock before and after the WorkflowOne Transaction, announced on August 1, 2013:



Standard Register's equity value skyrocketed by 360% on the public announcement, as investors pumped an additional $56.4 million into the stock of the company.  The stock continued to trade at levels above the pre-announcement price for more than a year thereafter.  This contemporaneous market-based evidence conclusively demonstrates not only that Standard Register received "reasonably equivalent value" for its acquisition of WorkflowOne (since market participants were willing to pay 4.6 times the price for Standard Register's equity after the transaction than they were before the transaction), but also that Standard Register was not

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

insolvent at any relevant time and, in fact, became much more solvent as a result of the transaction.

2.     Content to pursue a strategy that ignores the single most important factor that courts in the Third Circuit are directed to consider in assessing whether an avoidable fraudulent conveyance has occurred, the Committee never tells the Court about the performance of the Company's stock after the announcement of the WorkflowOne Transaction—because it eviscerates the Committee's arguments for standing.  The market reaction was hardly a case of irrational exuberance.  Rather, sophisticated investors recognized that the transaction constituted a sensible marriage of two significant market players which improved Standard Register's competitive posture, combined largely non-overlapping customer bases, paved the way for synergies and economies of scale (almost all of which were, in fact, realized) that increased the value of the combined company far beyond the mere sum of the two companies' standalone values, and provided liquidity, among other things, to bridge to widely anticipated higher interest rates that, for actuarial reasons, was expected to resolve Standard Register's legacy unfunded pension liability.[3]

3.     The WorkflowOne Transaction resulted from a prudent strategic initiative by Standard Register's Board and management to enhance the Company's competitive footprint, generate increased cash flow and revenue, eliminate excess and duplicative overhead, and position the combined company for sustained growth.  Standard Register's financial advisor, Bank of America Merrill Lynch ("BAML"), issued a fairness opinion as to the consideration paid by Standard Register for WorkflowOne, and another independent financial advisor,

---

[3]  At base, Standard Register's unfunded pension liability is the discounted present value of an actuarially determined payment stream to Standard Register's pension participants.  As interest rates rise from an unprecedented low interest rate environment, the discount rate applied to a future payment stream rises as well, resulting in a reduced present value of the payment stream—in Standard Register's case to the tune of approximately $40 million per 100 basis points.

Capstone Valuation Services, LLC ("Capstone"), ███████████████████████████
███████████████████████.

4.      The Committee has not even alleged, let alone shown, as it must, that there was some fraud on the market or other reason to ignore the decisions that sophisticated economic stakeholders made using the best information available at the time.  *Cf. VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'") (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)).  Instead, the Committee wants the Court to indulge the Committee's Monday morning quarterbacking that ignores the most essential facts and justifications for the acquisition.  At bottom, the Committee wants the Court to do precisely what the Third Circuit has admonished courts not to do—use fraudulent transfer law to "undermine" the "function" of equity markets in "allow[ing] participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate." *Id.* at 631.  The Committee's baseless standing motion must be rejected.

## BACKGROUND

I.      **Standard Register's Historical Business**

5.      Standard Register was founded in 1912 to introduce a simple improvement to the autographic register into the marketplace.  In its first century of existence, the company grew and expanded from its humble origins in Dayton, Ohio into one of the largest and most diversified providers of print products in the United States.

6.      By 2012, Standard Register's vast operations were divided between two business units:  (i) healthcare, and (ii) business solutions.

3

A.    **Healthcare Unit**

7.    Standard Register offered the following services to its healthcare clients: (i) targeted, personalized marketing and educational materials, admission kits, patient communication boards and overnight stay hospitality kits, and promotional items to support wellness programs to attract new patients and professionals and educate consumers; (ii) patient identification and safety solutions, including wristbands, laboratory and pharmacy labels, documentation with barcodes, patient photos, and data to help assure the right tests, treatments, and medications are matched with the right patient; and (iii) document management and printing services, such clinical documents, operational forms, secure prescriptions, and supplies.

B.    **Business Solutions Unit**

8.    Standard Register offered the following services to its business solutions clients: (i) marketing materials, including the management, production, sourcing, kitting, warehousing, and distribution of a complete range of branded materials to improve sales efforts through various sales and media channels; (ii) customer onboarding, regulatory notices, letters, sales and transactional communications that require secure, accurate and efficient handling and delivery using print media; (iii) product marking and labeling solutions for products; and (iv) document management and printing services, such as traditional business forms, preprinted documents, and secure documents (using specialized inks, unique constructions, and other proprietary security features to defeat attempts to create fraudulent copies or alterations).

II.    **The Shift From Print to Digital: Standard Register's Restructuring Efforts and Search for the Right Strategic Partner**

A.    **Standard Register's Reinvestment and Restructuring Efforts**

9.    Print products are not buggy whips.  However, demand for traditional printing services has been declining as a result of advances in technology and the proliferation of digital,

4

electronic, and internet-based communication and marketing options.   As a result, Standard

Register experienced sluggish financial performance near the end of 2011.

10.    At this time, Standard Register's Board directed management to implement

aggressive restructuring steps to recapture lost revenue.  Standard Register retained the services

of AlixPartners to assist the company in restructuring its cost structure and stabilizing its

revenue.

11.    Standard Register invested heavily in an effort to position its business to take

advantage of the transformation taking place in the industry in response to customer demand for

more digital products.  Its healthcare unit developed patient information management solutions

that include software modules for patient identity authentication and registration, documentation

management, and medication history to enable hospitals to effectively manage their paper and

electronic records and provide patients with access to discharge instructions and educational

materials.  Its business solutions unit transformed itself by adding integrated communications

capabilities, including mobile and digital media, to better meet customer demand, broaden the

customer base, and boost revenue.  Standard Register's new digital services allowed clients to

customize and personalize their documents, including critical communications to their

customers.  Standard Register also developed analytics tools to help its customers track the

efficacy of such materials.

12.    Moreover, in 2013 Standard Register introduced two "Centers of Excellence" to

improve performance levels in key operational and service areas:  (a) a new marketing, kitting,

and logistics center in Jeffersonville, Indiana—which is now the company's flagship facility—to

implement best practices in printing, kitting, and distribution and (b) a center in Atlanta, Georgia

to develop communications solutions and services for the healthcare industry.

13.    All of these reinvestment and restructuring actions were important steps undertaken to enable the company to continue growing in the face of industry-wide revenue headwinds.

**B.    Standard Register's Search for the Right Strategic Partner**

14.    In late 2011, Standard Register's Board, with the assistance of BAML, determined that it would be desirable to explore the possibility of a strategic combination with another company. The print products industry is highly fragmented. Given that many small suppliers did not weather the downturn and had gone out of business, customers were becoming increasingly concerned with the size and financial stability of their print suppliers. Thus, Standard Register concluded that it would have greater success securing new business by being a larger provider with a national footprint and supply capability. A larger footprint with a more diverse customer base would also present other strategic advantages such as the ability to expand its product lines and to cross-sell new products.

15.    Besides the strategic advantages of a merger, Standard Register focused on the financial benefits the right merger might provide. One of these benefits included the potential for improved liquidity. Although Standard Register then had a $100 million revolving credit facility, the company had access to far less than the full amount of the facility due to Standard Register's collateral base. Similarly, historically low interest rates had caused Standard Register's underfunded pension liability, and consequent statutorily-required minimum annual contributions, to be artificially inflated. The right merger partner would increase Standard Register's liquidity not only through generation of operating cash flow but through an increase to Standard Register's borrowing base, which in turn would facilitate greater availability under the Standard Register revolver. This additional liquidity would, among other things, provide a

bridge to a higher interest rate environment where Standard Register's underfunded pension liability, and the required minimum annual pension contributions, would be reduced.

16.     Thus, at the instruction of the Board, BAML canvassed the market for possible merger candidates.  Three potential candidates surfaced, and Standard Register engaged in discussions with all three.

III.     **The WorkflowOne Transaction**

17.     In June 2012 WorkflowOne emerged as the leading merger candidate.  There were many similarities between the two companies.  Like Standard Register, WorkflowOne also was headquartered in Dayton.  It provided products and services similar to those provided by Standard Register from locations that were often in proximity with Standard Register's locations.  However, the two companies had few overlapping customers.  Standard Register had historically serviced larger companies whereas WorkflowOne's focus had historically been on mid-market customers.

18.     The potential combination of these two companies into one larger enterprise presented an opportunity to realize enormous transaction synergies.  On the expense side, the reduction in the manufacturing footprint and administrative personnel would allow the combined company to reduce costs as a percentage of revenue.  As a revenue driver, the merger would allow a larger Standard Register to (a) broaden its overall customer base, (b) expand its array of services and products (by adding document management and kitting services as well as promotional and branded merchandise to its portfolio), and (c) extend its business relationships with existing customers while deepening its position in existing markets through opportunities to cross-sell combined products and services.

19.     As summarized in the accompanying declaration of Standard Register's Chief

Executive Officer, Joseph P. Morgan, Jr., the WorkflowOne acquisition culminated an extensive

due diligence process and negotiations that extended for over a year with active involvement of

Standard Register's Board, senior management, and outside advisors though all stages of the

potential transaction.

**A.      Financial Analysis of the Transaction**

**(i)      Revenue and Synergy Projections**

20.     Standard Register used the information collected during the due diligence process

to conduct a bottom-up analysis of WorkflowOne and the potential synergies of the transaction.

As part of this analysis, Standard Register looked at WorkflowOne's actual revenue performance

in 2011, 2012, and 2013, and also compared this revenue performance to WorkflowOne's

projections generated after WorkflowOne had emerged from bankruptcy protection.[4]

WorkflowOne had projected revenues in 2011 of ███████ (only marginally more than the

actual revenues of ███████) and in 2012 of ███████ (again only marginally more than

the actual revenues of ███████). In 2013, WorkflowOne had projected revenues of ███████

███████ through July, and had actual revenues of ███████ in that period—again, only

marginally less than plan. Using this data, WorkflowOne's future projections, and Standard

Register's own analysis of the WorkflowOne business, Standard Register developed its own

projections for WorkflowOne's future performance.

---

[4] In an attempt to discredit the due diligence process, the Committee references what it believes to be a ███
███████ revenue discrepancy between WorkflowOne's chapter 11 disclosure statement projections and
WorkflowOne's performance in the 29-month period following its chapter 11 case. However, in assessing the
merits of the proposed transaction, Standard Register did not rely on the disclosure statement projections, but
rather (and more predictably) relied on a comparison of reorganized WorkflowOne's actual business plan, as
approved by the Board of reorganized WorkflowOne, versus actual performance. Using this measure,
WorkflowOne's performance during the 29-month period missed plan by ███████, or approximately
3.02%.

21.     Standard Register did not generate or rely on pie-in-the-sky revenue projections to justify the acquisition. To the contrary, in estimating the revenues of the combined company, Standard Register utilized its own ordinary course projections of revenue. Although Standard Register had been experiencing annual revenue declines prior to 2013, the company's substantial investments in technology and integrated communications offerings were reasonably expected to begin paying dividends to offset any further revenue deterioration related to traditional print products. Thus, the company projected moderate revenue deterioration in the near term, with revenues returning to 2012 levels by 2017.

22.     The following chart shows the revenue numbers and projections Standard Register utilized in evaluating the transaction (in millions):

| | 2011 (actual) | 2012 (actual) | 2013 (estimate) | 2014 (estimate) | 2015 (estimate) | 2016 (estimate) | 2017 (estimate) |
|---|---|---|---|---|---|---|---|
| WorkflowOne | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Standard Register | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Combined | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

23.     As the chart demonstrates, Standard Register anticipated further declines in revenue that would eventually be offset by increased revenue from its restructuring efforts and its ability to grow the business as a larger, more financially stable company.

24.     Standard Register also performed a comprehensive review of the anticipated synergies arising from the transaction. That analysis demonstrated that the combined companies could achieve ▮▮▮▮▮ per year in annual cost savings as a result of the merger. *See* Morgan Declaration, Ex. B. Those synergies have been realized—in fact, the company is on track to realize ▮▮▮▮▮ in annual cost savings as a result of the merger. *See* Ginnan Declaration ¶ 21.

9

### (ii)    WorkflowOne Valuation Analysis

25.    In addition to Standard Register's bottom-up analysis of WorkflowOne and the potential synergies of the transaction, Standard Register's Board engaged BAML to conduct a valuation analysis of WorkflowOne and to issue a fairness opinion with respect to the transaction. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

26.    BAML concluded that WorkflowOne was worth between ████████████ ██████ using a comparable companies analysis, between ████████████████████ using a comparable transactions analysis, and between ████████████████ using a discounted cash flow analysis, inclusive of synergies. *See* Morgan Declaration, Ex. B.  Against this backdrop, Standard Register's negotiated arms-length purchase price of $218 million (payable in a combination of debt and equity) represents reasonably equivalent value for the WorkflowOne business. *See* Section I.A below.

### (iii)    Cash Flow Projections

27.    The consideration for Standard Register's acquisition of WorkflowOne was largely assumption of debt.  However, Standard Register did not simply assume WorkflowOne's debt obligations in whole cloth.  First, Standard Register's purchase price for WorkflowOne required WorkflowOne's lenders to write-off approximately $125.6 million of debt.  Second, to ensure that Standard Register would have the ability to make required principal and interest payments, have time and money to implement the anticipated cost savings and satisfy its annual pension obligations until interest rate increases could provide relief, Standard Register structured the transaction so that it (a) freed up availability under its revolving credit facility, (b) included a one-year amortization payment holiday on the first lien debt, and (c) priced the debt reasonably

10

and with provisions for Standard Register to PIK all of the interest on the second lien debt for at least two years (and a portion of that interest thereafter).

28.    BAML conducted a comprehensive review of the proposed capital structure and Standard Register's ability to remain in compliance with the proposed covenants on the new debt. BAML's analysis ███████████████████████████████████████



(iv)    **Solvency Analysis**

29.    Standard Register also retained Capstone to provide a solvency opinion with respect to the transaction. ███████████████████████████████████

**B.    The Board's Evaluation of the Transaction**

30.    Throughout 2012 and 2013, BAML and management regularly updated the Board regarding the company's financial performance, the company's valuation and sensitivities, BAML's efforts to identify strategic partners and financial sponsors, and analysis of the strategic

alternatives available to the company, and in particular the potential WorkflowOne Transaction. Prior to Board meetings, the Board members typically received a packet of materials from the company and its advisors to ensure the Board was well informed and make the Board meetings more productive. The Board and the company's management actively engaged with BAML in these discussions.

31.     Between regular Board meetings, the Board scheduled weekly status update calls to keep the Board members apprised of developments related to the potential WorkflowOne transaction and other restructuring initiatives.

32.     On July 25, 2013, the Board held a meeting to discuss the final and terms of the acquisition of WorkflowOne, which was expected to close on July 31, 2013. At this meeting, the Board received detailed presentations from the company's advisors. BAML presented regarding its analysis with respect to the transaction, including on ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████ Gibson Dunn advised the Board regarding the structure and terms of the transaction and all relevant agreements necessary to complete the transaction, as well as the Board's fiduciary duties in connection with the transaction. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ The Board engaged in active discussion with each of its advisors regarding these presentations and recommendations.

33.     On July 31, 2013, the Board held a final meeting for the purpose of considering the WorkflowOne Transaction.  BAML provided its final analysis regarding ██████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████

34.     After considering all available information, the Board unanimously approved the acquisition of WorkflowOne in exchange for $1 in cash, the assumption of $210 million in amended and restated debt, and the issuance of warrants. The WorkflowOne Transaction closed on August 1, 2013.

C.     **The Market Reacts to the Transaction**

35.     On July 30, 2013, the last business day before the WorkflowOne Transaction was announced, Standard Register's stock price closed at $3.00 per share.

36.     On the day that the WorkflowOne transaction was announced, Standard Register's stock price closed at $13.80 per share—a five-year high reflecting a 360% increase above the previous business day's closing price.

37.     The following chart shows the stock's price performance and the company's market capitalization for the succeeding 12-month period:



## IV.    The Board's Consideration of Pursuing Claims Against Silver Point

38.    In the months leading up to the Petition Date, the Board considered, and received legal advice, concerning the possibility that the company could pursue claims against Silver Point (as the agent under the first and second lien term loans), including fraudulent conveyance claims. After careful evaluation of various considerations, the Board, in consultation with its advisors, determined that it was not in the best interest of the company and its stakeholders to pursue possible claims against Silver Point in connection with the WorkflowOne Transaction or otherwise. Among other considerations, the Board's decision not to pursue claims against Silver Point was based on the Board's conclusions—drawn in part in reliance on the fairness opinion provided by BAML and the valuation opinion provided by Capstone—that the company was not insolvent at the time of the WorkflowOne Transaction from a going concern perspective, and that the company had received reasonably equivalent value for the consideration it paid.

39.    The Board's determination not to bring claims against Silver Point prior to the chapter 11 petition also was based on the view that even if litigation against Silver Point were to

14

be successful—which would involve a significant dedication of time and resources by the Company and its advisors at a time when the Company was on the brink of failure—the Company's business might not have sufficient access to funding to survive the litigation (thereby destroying going concern value), and the best possible result would be a minimal decrease in the size of Silver Point's secured position.[5] Moreover, pursuing litigation would necessarily have meant giving up the only available DIP financing leading into chapter 11, which was essential to the Company as it entered into an orderly—rather than free-fall—chapter 11 proceeding. Therefore, the benefits of a successful litigation did not outweigh the anticipated costs.

## OBJECTION

40.    In order for the Court to grant derivative standing, the Committee must (1) establish a colorable claim; (2) demonstrate that the Debtors unjustifiably refused to pursue the claim; and (3) obtain permission from the bankruptcy court to initiate the action. *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citing *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004)).

41.    Here, the Committee has failed to establish that any of its proposed claims are colorable or that the Debtors unjustifiably refused to pursue those claims.

## I.    The Claims Are Not Colorable

42.    "In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." *In re Centaur*, 2010 WL 4624910 at *4 (citations omitted); *see also PW Enters., Inc. v. N. Dakota*

---

[5]    Under any rational analysis, the company received significant value from the WorkflowOne Transaction even if the Court were to determine that a fraudulent transfer had occurred and, under section 548(c) of the Bankruptcy Code, Silver Point would be entitled to enforce the obligations of the company, and Silver Point's liens, to the extent of that value.

*Racking Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008) ("[A] creditor's claims are colorable if they would survive a motion to dismiss."). "Further, in ascertaining whether a plaintiff has stated a cognizable claim, the court also examines the facts as alleged by the plaintiff for any dispositive affirmative defenses." *G.I. Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004).

43.    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed factual allegations are not required, a plaintiff must provide the grounds of his entitlement to relief beyond mere "'labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *see also Official Comm. Of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 537 (Bankr. D. Del. 2009) (quoting *Twombly*). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). "Courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted). Therefore, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief," and dismissal is required. *Iqbal*, 556 U.S. at 679 (internal quotation marks omitted). Here, the Complaint consists of bare and conclusory allegations, which altogether ignore critical facts that demonstrate the absence of liability, that are insufficient to state a claim.

44.     Nonetheless, even if the Court concludes that the allegations contained in the

Complaint sufficiently *allege* misconduct that can overcome a motion to dismiss, those

allegations are not supported by the actual facts.  As a result, the claims alleged in the Complaint

are not viable and therefore the Debtors' decision not to pursue those claims was reasonable.

### A.      Fraudulent Transfer (Counts 1-4, 8, 13, 16-19)

#### (i)      Applicable Standard

45.     The Committee's complaint does not allege actual fraud.  To state a claim for a

constructively fraudulent transfer the Committee must demonstrate that (i) the Debtors did not

receive reasonably equivalent value in exchange for the consideration paid to acquire

WorkflowOne <u>and</u> (ii) were insolvent at the time of the transaction or became insolvent as a

result of the transaction, were engaged or were about to engage in a business or a transaction for

which the remaining assets of the Debtors were unreasonably small in relation to the business or

transaction, or intended to incur, or believed or reasonably should have believed that the Debtors

would incur, debts beyond their ability to pay as they became due.  *See* 11 U.S.C. § 548; Ohio

Rev. Code § 1336.04-05.[6]

#### (ii)     The Debtors Were Solvent at All Relevant Times

##### a)      The Debtors Were Not Insolvent On the Date of the WorkflowOne Transaction Nor Rendered Insolvent Thereby

46.     The most reliable measure of solvency is market capitalization.  *See, e.g.,*

*Campbell Soup*, 482 F.3d at 631 ("Market capitalization . . . reflects all the information that is

---

[6]  Ohio has enacted the Uniform Fraudulent Transfer Act (the "<u>UFTA</u>").  "States that have adopted the UFTA interpret it similarly to § 548(a)(1)(B)(i)" of the Bankruptcy Code, so precedents from bankruptcy courts interpreting that section are relevant even in suits brought under state law. *Official Employment-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*, Bankr. No. 01-16034-AJG, Adv. Nos. 03-3522, 03-3721, 2005 WL 6237551, at *43 (Bankr. S.D. Tex. Dec. 9, 2005) (citing *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 643 (5th Cir. 2000)); *see also, e.g., Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 804-05 (Bankr. S.D. Ohio 2009) (stating that "relevant provisions of the Ohio UFTA are nearly identical to the [Bankruptcy] Code provision").

publicly available about a company at the relevant time of valuation." (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) (plurality))); *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 548 (D. Del. 2005) ("[B]ecause valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to prevailing marketplace values, rather than to values created with the benefit of hindsight for the purpose of litigation.") (internal citations and quotation marks omitted); *MRWind Down Co. v. Rock-Tenn Converting Co. (In re Markson Rosenthal & Co.)*, No. 06-13163 (DHS), Adv. No. 06-01899, 2009 WL 3763048, at *9 (Bankr. D.N.J. Oct. 27, 2009) ("[C]ourts now find valuation based on the public markets to be most beneficial and accurate in determining insolvency as of a transfer date . . . .").

47.    Here, the Debtors had a market capitalization of at least $13.9 million[7] at all points in time in the one-year period prior to the WorkflowOne Transaction. Immediately following the WorkflowOne Transaction, the Debtors had a market capitalization of $85.1 million. At all points in time during the one-year period following the WorkflowOne Transaction the Debtors had a market capitalization of at least $43.7 million. Thus, applying the method "most beneficial and accurate in determining insolvency as of a transfer date," the Debtors were unquestionably solvent on all relevant dates. *MRWind Down Co. v. Rock-Tenn Converting Co. (In re Markson Rosenthal & Co.)*, No. 06-13163 (DHS), Adv. No. 06-01899, 2009 WL 3763048, at *9 (Bankr. D.N.J. Oct. 27, 2009).

---

[7]    The market capitalization figures cited herein reflect the implied market capitalization of Standard Register's common stock and preferred stock, combined. Standard Register's preferred shares are not traded on a liquid market. These shares have superior voting rights, but have economic rights that are identical to those of the common shares. Thus, the preferred shares likely have a market value that exceeds the value of the common shares. However, for purposes of determining the implied market capitalization of Standard Register, these shares were assumed to have a value that is equal to the value of the publicly-traded common shares.

48.     What's more, the fairness opinion that the Debtors received from BAML also demonstrates solvency.  ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

49.     Capstone agrees.  █████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████

50.     The Committee completely ignores the market view of the Debtors' solvency and the opinions of both Capstone and BAML.  Instead, the Committee first asserts that the Debtors were insolvent because Standard Register no longer had a statutory surplus.  This argument is frivolous.  The Committee is speaking out of both sides of its mouth.  It argues both that Standard Register was insolvent prior to the WorkflowOne Transaction and that Standard Register's pre-acquisition "capital structure was manageable."  Mot. ¶ 15.  The Committee's argument is wrong.  A corporation's statutory surplus is the amount by which the company's balance sheet assets exceed its liabilities plus its stated capital.  Ohio Rev. Code § 1701.32. However, the Third Circuit has held that "[w]here bankruptcy is not 'clearly imminent' on the date of the challenged conveyance . . . assets should be valued on a going concern basis" rather

---

8  ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████.

than on a balance sheet basis. *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1067 (3d Cir. 1992); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 355 (Bankr. D. Del. 2008) ("A business does not have to be thriving in order to receive a going concern valuation. Before the going concern valuation is to be abandoned, the business must be wholly inoperative, defunct or dead on its feet.") (citations and internal quotation marks omitted).  That was not the case with Standard Register at the time of the WorkflowOne Transaction, and the Committee has not alleged that bankruptcy was "clearly imminent" on the date of such Transaction.  Nor could the Committee reasonably make such an allegation: in fact, Standard Register survived outside of chapter 11 for 19 months after the WorkflowOne Transaction and even today is a viable, cash generating entity, far from "wholly inoperative, defunct or dead on its feet." *Id.*  As a result, the Committee's statutory surplus argument, which ignores the going concern value of Standard Register and, instead, improperly focuses on Standard Register's balance sheet, is a red herring.

51.    The Committee next asserts that Standard Register was insolvent immediately following the transaction because "the Debtors' total debt and non-operating liabilities of $511 million exceeded the midpoint fair value of their assets (based on a comparable companies analysis, comparable transactions analysis, discounted cash flow analysis including synergies, and including net operating losses) by approximately $170 million." Compl. ¶ 107.  This argument is equally baseless.  The Committee has provided no support for its suggestion that the combined company was only worth $341 million.[9]  As noted above, BAML valued the combined company, without including the full value of the synergies from the transaction, to be approximately ███████████.  And the $511 million liabilities figure cited by the Committee does not take into consideration that the Company's pension liability is an actuarial calculation

---

[9] The Debtors asked the Committee to provide support for this proposition on May 25, 2015 and as of the date hereof the Committee has not responded to the Debtors' request.

only that is subject to significant downward adjustment when interest rates rise.  *See Mellon*

*Bank, N.A. v. Metro Commc'n's, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) ("The debtor's assets <u>and</u>

<u>liabilities</u> are tallied <u>at fair valuation</u> to determine whether the corporation's debts exceed its

assets.") (emphasis added).  For example, the Committee's analysis lists the unfunded pension

liability as $235 million.  However, the company (and many other market participants)

reasonably believed in 2013 that interest rates would rise from historic lows, which would have

reduced the Debtors' unfunded pension liabilities by more than $80 million in the two years

following the transaction.[10]  *See, e.g.*, Chris Farrell, *Smart Money Moves, Now That Interest*

*Rates Are Rising* (June 6, 2013), *available at* http://www.forbes.com/sites/nextavenue/2013

/06/24/smart-money-moves-now-that-interest-rates-are-rising ("Moody's Analytics predicts 10-

year Treasury yields will go from today's 2.44% to 3.5% in 2014 and to 4.5% by the end of

2015.").

52.    In short, ███████████████████████████, and the company's market

capitalization each demonstrates that Standard Register was solvent both before and after the

WorkflowOne Transaction.

**b)    The Debtors Were Sufficiently Capitalized**

53.    The Committee argues that the Debtors were inadequately capitalized after the

WorkflowOne Transaction.  "In *Moody*, the Third Circuit held that the test for 'unreasonably

small capital' is 'reasonable foreseeability.'  That is, was it reasonably foreseeable on the date of

Closing . . . that [the debtor] would have unreasonably small capital to carry out its business?"

*Peltz v. Hatten*, 279 B.R. 710, 744 (D. Del. 2002) (internal citations omitted).

---

[10]  A company's unfunded pension liability is an actuarial calculation that bears an inverse relationship to interest
rates.  In Standard Register's case, its unfunded pension liability was expected to decrease by approximately
$40 million for each 100 basis point rise in interest rates.

54.    Standard Register was not undercapitalized on the date of the closing of the

WorkflowOne Transaction, nor was it reasonably foreseeable Standard Register would become

undercapitalized.  At the time of the closing, BAML projected that the combined company would

have levered free cash flow ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ *See* Morgan Declaration, Ex. D at 5.

55.    No credible argument can be made that it was reasonably foreseeable on the date

of the WorkflowOne Transaction that Standard Register was undercapitalized.  The market

clearly did not think so.  Market participants reacted to the announcement of the WorkflowOne

Transaction by investing $56.4 million in Standard Register's common stock in a 24-hour

period—an undisputed fact that demolishes the Committee's position.  If it was reasonably

foreseeable that Standard Register was or would be undercapitalized as a result of the

transaction, Standard Register's stock price would have declined, not skyrocketed.  It is not the

function of fraudulent transfer law to second-guess the informed decisions of investors about

what was foreseeable at the time through the lens of hindsight.  *See, e.g., Campbell Soup* at 631

("Equity markets allow participants to voluntarily take on or transfer among themselves the risk

that their projections will be inaccurate; fraudulent transfer law cannot rationally be invoked to

undermine that function."); *Peltz v. Hatten*, 279 B.R. at 738 ("When sophisticated parties make

reasoned judgments . . . that are supported by then prevailing marketplace values and by the

reasonable perceptions about growth, risks, and the market at the time, it is not the place of

fraudulent transfer law to reevaluate or question those transactions with the benefit of

hindsight.") (citations omitted).

56.     The Committee's argument that the Debtors were inadequately capitalized turns on repackaged assertions that Standard Register's liabilities exceeded its assets and vague allegations related to the Debtors' "financial flexibility," their "cash needs," and their then-anticipated pension funding obligations.  Yet, determining whether Standard Register had sufficient capital to carry out its business requires much more than the mere assessment of assets and liabilities and of cash requirements alone.  As the Delaware Bankruptcy Court has recently recognized "[i]n determining whether a company has adequate capital, the Court must consider its assets, access to borrowing (both third party and affiliate), and equity." *Burtch v. Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30, 55 (Bankr. D. Del. 2015); *see also Peltz*, 279 B.R. at 745 ("the test for unreasonably small 'capital' should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period"); *Moody*, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital."); *EBC I*, 380 B.R. at 359 (holding debtor was solvent where it was able to obtain a $40 million line of credit).

57.     In addition to the sizeable free cash flow reasonably projected by BAML to be available from operations after the WorkflowOne acquisition, the acquisition also enabled Standard Register to increase the face amount of its revolving credit facility from $100 million to $125 million and the ability to make further draws on that facility by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.  Confirming the perception of market participants, these sources provided adequate liquidity for Standard Register to operate its business long after the closing of the WorkflowOne Transaction.

c)    **The Debtors Had the Ability to Pay Their Debts As They Came Due**

58.    Under the "ability to pay debts" prong of the insolvency test, a company is solvent if it "was able to pay, intended to pay, and in fact was paying its debts as they came due" as of the relevant date. *In re EBC I*, 380 B.R. at 359.

59.    Standard Register was able to pay, intended to pay, and in fact was paying its debts as they came due on the date of the WorkflowOne Transaction. As noted above, BAML projected ████████████████████████████████████████████████████ ████████████████████████████████████████████. In addition, at closing, the company had access to $65.7 million in additional revolver availability. And, Capstone concluded ███████████████████████████████████████ ████████████████████████████████████. Moreover, it is undisputed that Standard Register continued paying its debts as they came due for more than a year-and-a-half following the WorkflowOne Transaction.

60.    The best the Committee can muster is an unsupported, conclusory allegation that the Debtors "should have known" that they would be rendered unable to pay their debts as they came due. *See* Compl. ¶ 119. Here again, the Committee regurgitates its arguments that the Debtors were over-leveraged. These arguments are misplaced for the reasons stated previously. In particular, the company had leeway in the financial covenants in the post-acquisition debt (*see supra*, ¶ 27) and the terms of that debt included limited amortization and provisions to allow the interest to be paid in kind (*see id.*). In addition, the six-and-a-half year maturity of the second lien portion of the debt allowed ample time for Standard Register, aided by business growth and reduced pension exposure resulting from increased interest rates, to access the capital markets for a replacement facility if it decided not to pay the balloon due at maturity on that debt.

61.     The Committee also places great weight on the supposed "significant risks inherent in [Standard Register's] financial projections." *See* Compl. ¶¶ 118-19.  The Committee does not identify what these alleged risks were, nor why they were "significant."  Standard Register's projections, generated as part of the company's annual budgeting process and not for purposes of the transaction, were compiled through a careful and reasonable analysis of the company's position and business plan.  Although Standard Register had been experiencing annual revenue declines prior to 2013, the company's substantial investments in technology and integrated communications offerings were expected to begin paying dividends to offset any further revenue deterioration related to traditional print products.  Thus, the company reasonably projected moderate revenue deterioration in the near term, very modest growth in later years, and revenues coming back to 2012 levels by 2017.  These were far from the pie-in-the-sky revenue projections the Committee suggests.

62.     Participants in the market evaluated the "risk that [the] projections [would] be inaccurate."  *Campbell Soup*, 482 F.3d at 631.  The result of that evaluation was a decision by sophisticated market participants to invest $56.4 million in Standard Register's common stock in a 24-hour period.  "When sophisticated parties make reasoned judgments . . . that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."  *Peltz v. Hatten*, 279 B.R. at 738.

### (iii)    The Debtors Received Reasonably Equivalent Value In the WorkflowOne Transaction

63.     "[R]easonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"  *VFB LLC*

*v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)).

64.     In valuing the benefits received in a transaction, it is appropriate to consider both the direct and the indirect benefits of the transaction, such as synergies. *See, e.g., Mellon Bank*, 945 F.2d at 646-47 (observing that the creation of synergy between two affiliated companies can constitute "value" within the meaning of section 548 of the Bankruptcy Code); *Creditors' Comm. of Jumer's, Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.)*, 338 B.R. 344, 354 (C.D. Ill. 2006) ("[I]ndirect benefits constitute 'value' and can include a wide range of intangibles such as: corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or 'synergy' within a corporate group as a whole; and a corporation's ability to retain an important source of supply or an important customer.") (citation omitted); *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 738 (Bankr. S.D.N.Y. 2008) ("[T]ransfers . . . are supported by fair consideration when the debtor benefits indirectly.  Indirect benefits may include synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships.").

65.     The Delaware district court has recognized the relevance of marketplace values to an assessment of reasonably equivalent value. *Peltz v. Hatten*, 279 B.R. at 738 ("[I]n determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values.") (citations omitted); *see also Campbell Soup*, 482 F.3d at 633 ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (citation and internal quotations omitted); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985) ("The price of

26

an actively traded stock . . . is . . . an unusually reliable source of information when the essential conditions (liquid markets, public information, and a following by professional investors) are met.  The price at which people actually buy and sell, putting their money where their mouths are, is apt to be more accurate than the conclusions of any one analyst."); *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007) ("[A] powerful indication of contemporary, informed opinion as to value comes from private investors who with their finances and time at stake, and with access to substantial professional expertise, concluded at the time that the business was indeed one that could be profitably pursued.") (citations and internal quotations omitted).

66.    How do these cases impact the reasonably equivalent value received by Standard Register in the WorkflowOne Transaction?  Investors on the New York Stock Exchange concluded that Standard Register's equity was 360% more valuable as a result of the WorkflowOne Transaction, easily satisfying the test for reasonably equivalent value endorsed by the Third Circuit: whether the going concern value after the transaction equals or exceeds its going concern value before the transaction.  *Mellon Bank*, 945 F.2d at 647 ("[W]hen the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received."). In so doing, these investors made "reasoned judgments about the value of assets that [were] supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time." *Peltz v. Hatten*, 279 B.R. at 738.  "[I]t is not the place of fraudulent transfer law to reevaluate or question th[at] transaction[] with the benefit of hindsight." *Id.*

27

67.    The reality, confirmed by the huge and sustained rise in the stock price, is that Standard Register received in the WorkflowOne Transaction far more than it paid.  In the transaction, Standard Register not only acquired the hard assets and business of WorkflowOne, but it also obtained the opportunity to realize enormous synergies relative to the size of the combined business.  The combination of these direct and indirect benefits improved Standard Register's competitive posture, combined largely non-overlapping customer bases, paved the way for synergies and economies of scale that increased the value of the combined company far beyond the mere sum of the two companies' standalone values, and provided liquidity to, among other things, bridge to widely anticipated higher interest rates that, for actuarial reasons, would have resolved Standard Register's legacy unfunded pension liability.

68.    In its report to the Board, BAML valued WorkflowOne at between ███████ ████████ using a comparable companies analysis, between ███████████ ██████ using a comparable transactions analysis, and between ████████████ using a discounted cash flow analysis.  While the comparable companies and comparable transactions analyses did not expressly include the impact of synergies, the discounted cash flow analysis assumed that the combined entity would, with time, realize approximately ██████ of annual synergies.  The anticipated synergies were substantially realized.  By management's calculations, ████████████ of annual synergies—across a broad range of activities—had been realized by the end of 2014 and Standard Register remains on pace to realize ██████ in annual synergies from the transaction by the end of 2015—*which in fact exceeds the level of synergies projected in the merger.*

69.    To paraphrase John Steinbeck, the best laid plans sometimes go awry.  *See* John Steinbeck, *Of Mice and Men* (1937).  Unfortunately, despite the impact of the synergies, the

company has been unable to turn the revenue train around quickly enough to reach its revenue goals. In particular, the company's bankruptcy filing was precipitated in large part by two headwinds that were stronger than expected. First, as a result of delicate worldwide economic conditions and the Federal Reserve's conservative stance, interest rates stayed at or below historical lows for much longer than most market participants believed they would, providing no relief to Standard Register for its aggregate unfunded pension liability or its required minimum annual contribution. As previously noted, each 100 basis point increase in interest rates would have reduced the company's unfunded pension liability by approximately $40 million. Second, although the company forecast revenue deterioration in each of 2013 and 2014 before an ultimate revenue turnaround, revenues declined more than anticipated in 2013 and 2014. The risk that Standard Register might not realize its revenue targets was of course known by market participants, who nonetheless firmly believed in the success of the merger. The Court should not now second guess these "reasonable perceptions about growth, risks, and the market at the time." *Peltz v. Hatten*, 279 B.R. at 738 (citations omitted).

70.    But the Committee would have the Court do just that. Worse, the Committee would have the Court reevaluate the WorkflowOne Transaction by improperly focusing not on what Standard Register received—as is required for a reasonably equivalent value analysis under section 548 of the Bankruptcy Code—but rather on the value Silver Point placed on its WorkflowOne debt on a standalone basis.

71.    The Committee has not colorably shown, as it must, that the value Standard Register actually received was not reasonably equivalent to the $218 million it paid. What Standard Register received includes the expected synergies and other indirect benefits of the transaction. *See Mellon Bank*, 945 F.2d at 647 ("[I]ndirect economic benefits <u>must</u> be measured

29

and then compared to the obligations that the bankrupt incurred . . . . [T]he[se] indirect benefits [include] the synergy expected to result from the combination of these corporations.") (emphasis added).

72.    The Committee asserts that WorkflowOne was only worth $66-79 million "[o]n a discounted cash flow basis, exclusive of projected transaction synergies." Compl. ¶ 101. The Committee next argues, again without considering synergies or even explaining how the Committee calculates the number, that the midpoint enterprise valuation was only $134 million. *Cf.* Mot. ¶ 38. These arguments have no legal consequence for the simple reason that they fail to consider a key aspect of the legally cognizable value that Standard Register received from the WorkflowOne Transaction:  the value of the synergies (*which were in fact realized*) and other indirect benefits of the transaction. According to BAML, when those synergies are included, the discounted cash flow analysis values WorkflowOne between ██████████ and ██████████, a range that includes the $218 million paid by Standard Register. *See* Morgan Declaration, Ex. B. The $218 million purchase price also fell within the ranges of the other valuation methodologies employed by BAML. *Id.*

73.    In a last ditch effort to demonstrate the Company overpaid, the Committee refers to minutes of a 2010 Board meeting at which the Company had been considering whether to make a proposal to buy Workflow One.  At the time, WorkflowOne had a significant amount of pension liability, which it had not yet eliminated through its later confirmed chapter 11 reorganization plan.  The minutes do not say, as the Committee alleges, that the Board valued WorkflowOne in 2010 at less than $200 million.  The minutes say that to open negotiations with WorkflowOne regarding a possible transaction, Standard Register's CEO should tell WorkflowOne that its "financial model presented would have to be significantly less than $200

million to make financial sense for the Company." These minutes are totally irrelevant to the question of whether a transaction three years later with a new, post-bankruptcy entity constituted a fraudulent transfer. Morgan Declaration Ex. A.

       (iv)    **The Debtors Received Reasonably Equivalent Value for the Executive Bonuses**

74.     The Committee also attacks the bonuses earned by the Debtors' CEO and CFO in connection with the WorkflowOne Transaction. This entire attack is based on the Committee's conclusion that the WorkflowOne Transaction was a fraudulent conveyance. The Debtors vigorously deny such conclusion. And, as noted above, the WorkflowOne Transaction increased the value of the shareholders' investment by 360% and in the process increased Standard Register's market capitalization by more than $66.6 million. The CEO's and CFO's leadership in putting together a deal that resulted in this significant value to the company more than justified the payment of the bonuses. The transaction bonuses were put in place precisely because the Board wanted to incentivize a transaction that would generate such value.

75.     What's more, 50% of the bonus award was tied to the performance of the overall business after the WorkflowOne Transaction. This portion of the bonuses was not earned or paid until six months after closing. The CEO and CFO provided reasonably equivalent value for these payments by leading the company through the critical first phase of the integration process.

76.     Finally, it is unclear why the Committee complains that, after inclusion of the transaction bonuses, the CEO's and CFO's total compensation packages were on par with those of one of the Debtors' competitors. With the bonuses, the Debtors were able to retain executive talent on par with their competitors. In any event, there are no facts alleged that these standard transaction bonuses, recommended by the Debtors' outside compensation advisor and approved

by the Debtors' Compensation Committee (which did not include either the CEO or the CFO) and full Board were out of line with bonuses paid in similar transactions.

77.     In short, the Debtors received more than reasonably equivalent value for the bonuses.

**B.     Breach of Fiduciary Duty (Count 15)**

     (i)     **Applicable Standard**

78.     In order to prevail on a claim of breach of fiduciary duty under Ohio law, a plaintiff must show "(1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe such duty, and (3) an injury proximately resulting therefrom." *In re Nat'l Century Fin. Enterprises, Inc.*, 504 F. Supp. 2d 287, 310-11 (S.D. Ohio 2007) (citing *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988)).

79.     Section 1701.59(B) of the Ohio Revised Code requires directors to perform their duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." Ohio Rev. Code § 1701.59(B).  A breach of these duties "must be demonstrated[] by 'clear and convincing evidence.'"  *In re Antioch Co.*, 456 B.R. 791, 861 (Bankr. S.D. Ohio 2011), *report and recommendation adopted*, 2011 WL 3664564 (S.D. Ohio 2011), *on reconsideration sub nom. Antioch C. Litig. Trust v. Morgan*, 2012 WL 6738676 (S.D. Ohio 2012) (quoting Ohio Rev. Code § 1701.59(D)).  Further, for a "director to be liable for damages in any action that he takes or fails to take, it must be proven by 'clear and convincing evidence . . . that the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation.'"  *Id.* (quoting Ohio Rev. Code §

1701.59(E)).  Officers are subject to similar duties.  *Koos v. Cent. Ohio Cellular, Inc.*, 641

N.E.2d 265, 272 (Ohio Ct. App. 1994).

80.    "[I]n evaluating a director's compliance with the duty of care, Ohio courts adhere

to the 'business judgment rule,' and will not inquire into the wisdom of actions taken by the

directors in the absence of fraud, bad faith or abuse of discretion." *Radol v. Thomas*, 772 F.2d

244, 256 (6th Cir. 1985); *see also In re Amcast Indus. Corp.*, 365 B.R. 91, 103 (Bankr. S.D. Ohio

2007) ("[Ohio Rev. Code § 1701.59(C)] is essentially a codification of the 'business judgment

rule,' a common law rule pursuant to which courts defer to the business judgment of directors

who are making corporate decisions within their broad discretion.").  "The business judgment

rule recognizes that many important corporate decisions are made under conditions of

uncertainty, and it prevents courts from imposing liability on the basis of ex post judicial

hindsight and lowers the volume of costly litigation challenging directorial actions." *Radol*, 772

F.2d at 257; *see also In re Antioch*, 456 B.R. at 860-61 (same).  "A party challenging a board of

directors' decision bears the burden of rebutting the presumption that the decision was a proper

exercise of the business judgment of the board." *Gries Sports Enters., Inc. v. Cleveland Browns

Football Co., Inc.*, 496 N.E.2d 959, 964 (Ohio 1986).

      (ii)    **The Debtors' Directors and Officers Did Not Breach Any Applicable
Duty.**

          a)    **The Board's Decisions Are Entitled to Deference Under the
Business Judgment Rule**

81.    The Committee offers no allegations that would overcome the protection of the

business judgment rule.  Indeed, they ignore altogether the presumption of the business judgment

rule.  This alone is fatal to their breach of fiduciary duty claims. *See NCS Healthcare, Inc. v.*

*Candlewood Partners, LLC*, 827 N.E.2d 797, 803 (Ohio Ct. App. 2005) (dismissing complaint against directors for failing to allege that an exception to business judgment rule applied).

82.     Further, the Committee's complaint is bereft of *any* factual allegations involving director defendants Roy W. Begley, F. David Clarke, III, John Q. Sherman, II, Julie D. Klapstein, John J. Schiff, and R. Eric McCarthey—that is, all members of the Board at the time the WorkflowOne Transaction was approved other than Joseph Morgan. This complete lack of factual allegations highlights a critical deficiency in the Committee's complaint: even if it is assumed that Morgan was not disinterested (though, in fact, he was disinterested), all six of the company's other directors, exercising their fiduciary duties in good faith, without any conflicts and with the requisite due care, approved every material decision relating to the WorkflowOne Transaction.[11] There is no allegation that Morgan or Ginnan controlled or exercised any undue influence over the Board. Accordingly, the Board's decisions are entitled to deference under Ohio's business judgment rule, and the Committee's attempt to "impos[e] liability on the basis of ex post . . . hindsight" is misguided and must be rejected. *Radol*, 772 F.2d at 257. There are simply no allegations that the Director and Officer Defendants "engage[d] in self-dealing," "act[ed] in bad faith," or "fail[ed] to attempt to prevent waste or self-dealing" by other directors of which they were aware. *Nat'l Century Fin. Enter. Inc.*, 504 F. Supp. 2d at 313.

83.     The Committee's allegations as to the decisions of the Director and Officer Defendants are precisely the type of hindsight criticism that the business judgment rule is intended to preclude. In any event, the Committee's allegations disregard the fairness of the WorkflowOne Transaction to the company and the substantial due diligence conducted by the Board (with appropriate input from management) in evaluating and eventually approving the

---

[11]   Ginnan, the CFO, was not a member of the Board.

WorkflowOne Transaction. Morgan Declaration ¶¶ 9-29; Ginnan Declaration ¶¶ 8-9. Among other steps, the Board (with assistance and input from management, including the Officer Defendants) (1) considered and evaluated alternative strategic options, Morgan Declaration ¶ 8; (2) met repeatedly with executives at WorkflowOne and Silver Point to exchange information and conduct due diligence, *id.* ¶¶ 10, 12-13, 15-19; (3) retained Capstone to deliver a solvency opinion, ¶ 20; (4) obtained a fairness opinion from Bank of America, *id.* ¶ 22; and (5) held regular Board meetings to keep Board members apprised and enable them to make an informed decision about the WorkflowOne Transaction, *id.* ¶¶ 11, 13-15, 18, 21-22. On an informed basis, the Director and Officer Defendants believed, reasonably and in good faith, that the WorkflowOne Transaction was in the best interests of the Company for numerous strategic reasons, including the opportunity to expand the Company's customer base, the synergies that could be realized, and the potential for revenue growth. Ginnan Declaration ¶ 10.

84.     Taken together, these circumstances demonstrate that in approving and supporting the WorkflowOne Transaction, the Director and Officer Defendants acted "in good faith, in a manner [they] reasonably believe[d] to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." Ohio Rev. Code § 1701.59(B). Further, since the Committee is challenging only actions taken by the Director and Officer Defendants in their capacities as directors and officers, in order to maintain a claim for damages the Committee must prove that each defendant's "action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation." *Id.* § 1701.59(E). The complaint does not allege even reckless disregard by any Director or Officer Defendant, much less any action taken with intent to cause

35

injury to the corporation. Accordingly, the Committee fails to state a colorable claim for breach of fiduciary duty even assuming that the business judgment rule would not apply.[12]

85.    The Committee alleges in a conclusory fashion that each of the Director and Officer Defendants had a personal interest in pursuing the WorkflowOne Transaction in order to maintain their senior officer positions. Compl. ¶ 72. There is not a single fact offered to back up this bare conclusion, and thus there is no basis to plausibly infer any such influence. *See Iqbal*, 556 U.S. at 663 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see also In re Antioch*, 456 B.R. at 867 ("The inference that the [plaintiff] would have this court draw, that one can be liable per se by association with [the debtor] as a fiduciary, without more—is untenable.").

86.    Nor is the Board's approval of transaction bonuses for Morgan and Ginnan a basis to plead a plausible breach of fiduciary duty claim. *See In re Answers Corp. Shareholder Litig.*, C.A. No. 6170-VCN, 2012 WL 1253072, at *8 (Del. Ch. Apr. 11, 2012) ("[I]t is not inherently unreasonable for a board to . . . provide an executive with a bonus for his role in negotiating a transaction."). Upon full consideration, the Board agreed to award these bonuses to Morgan and Ginnan, based in part on the recommendation of its disinterested compensation advisor, Semler Brossy Consulting Group, Inc. Morgan Declaration ¶ 30. Further, the Board's Compensation Committee, of which neither Morgan nor Ginnan was a member, discussed this course of action and recommended it to the Board. *Id.* The bonuses included an incentive-based component

---

[12]    In arguing that the Director and Officer Defendants breached their applicable fiduciary duties, the Committee relies principally on *In re Antioch*, 456 B.R. 791. In contrast to the plaintiff in *Antioch*, the Committee has not alleged any facts to overcome the applicability of the business judgment rule and its corresponding presumptions of good faith and fair dealing. *See, e.g., In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (federal procedural law requires a plaintiff to "plead around the business judgment rule" when the complaint brings the rule directly into issue); *NCS Healthcare, Inc.*, 827 N.E.2d at 803 (dismissing complaint against directors for failing to allege that an exception to business judgment rule applied).

intended to further align the longer-term interests of Morgan and Ginnan with the continued performance of the Debtors. *Id.* The decision, by a majority of the undeniably non-conflicted members of a seven person board, to award these transaction bonuses was itself a reasonable exercise of the Board's business judgment, and no facts are alleged that would overcome the protection of the business judgment rule. *See In re Antioch*, 456 B.R. at 868 ("[T]ransactions between a corporation and its officers and directors are permitted, as long as a disinterested majority of the board of directors approves the transaction after full disclosure by the interested directors or, if the transaction is fair.") (citing Ohio Rev. Code § 1701.60(A)(1)(a) & (c)).

### b) The Directors and Officers Fulfilled Their Fiduciary Duties

87.    Even if the Director and Officer Defendants were deemed to be interested—which they were not—and the business judgment rule did not apply, the Committee's allegations would still not support claims for breach of fiduciary duty. Where directors are deemed not to be disinterested, their decisions are "closely scrutinized." *In re Amcast Indus. Corp.*, 365 B.R. at 104 (citing *Koos*, 641 N.E.2d at 273). In such circumstances, the director will be required to show that the transaction was fair and reasonable to the corporation notwithstanding his or her personal interest. *Id.* (citing Ohio Rev. Code § 1701.59(E)); *Koos*, 641 N.E.2d at 273).

88.    Here, the WorkflowOne Transaction satisfies even this more exacting standard of review. For all of the reasons stated above, the Transaction was fair and reasonable for the company. This reasonableness was reflected in the performance of the company's stock price, the analysis provided by BAML, and the opinion provided by Capstone.

89.    Moreover, the full Board—including six directors other than Morgan—approved the transaction after conducting substantial due diligence and thorough informed consideration over an extended period. Morgan Declaration ¶¶ 9-29; Ginnan Declaration ¶¶ 8-9. Morgan and

Ginnan both have averred that their bonuses played no role whatsoever in their decision to support the transaction. Morgan Declaration ¶¶ 30-31; Ginnan Declaration ¶ 15. Because the Committee has not alleged facts to the contrary and has not alleged that Morgan or Ginnan exercised any undue influence or control over the Board, the Committee has failed to show that any potential breach by Morgan or Ginnan proximately caused the harm complained of—namely, the approval of the WorkflowOne Transaction.[13]

### C.   Recharacterization (Count 7)

#### (i)   Applicable Standard

90.     As the Third Circuit has held, "the determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction." *Cohen v. MB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 457 (3d Cir. 2006). "That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id.* at 456; *see also In re Fedders*, 405 B.R. at 554 ("The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution.") (citing *In re SubMicron*, 432 F.3d at 455-56); *Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838-39 (Bankr. D. Del. 2006) (similar).

91.     The Third Circuit also clarified that "[n]o mechanistic scorecard suffices. And none should . . . . Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter

---

[13] Indeed, Ginnan was not a member of the Board and did not personally approve the WorkflowOne Transaction. For this reason alone, Ginnan is not required to prove the reasonableness of the transaction.

the borrower's fortunes; therefore, the funds are debt) or an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *In re SubMicron*, 432 F.3d at 456 (parentheticals in original).

92.     The Committee cites a 7-factor test that it asserts the Court should consider in determining whether the second lien portion of the debt (the "Second Lien Term Loan") should be recharacterized as equity: "(1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation." Mot. ¶ 115 (citing *In re SubMicron Sys.*, 432 F.3d at 455 n.8).

> **(ii)     There Is No Evidence That the Parties Intended the Second Lien Term Loan to Be an Equity Contribution**

93.     There is no evidence that the parties intended the Second Lien Term Loan to be an equity contribution and not a true loan.  Borrowing the Committee's preferred factors:  (1) the name given to the instrument was a "Second Lien Credit Agreement"; (2) the intent of the parties as reflected in Standard Register's SEC filings was for the instrument to be a debt instrument; (3) the Second Lien Term Loan has debt-like covenants and provisions, including an established interest rate and a fixed maturity date of February 1, 2020; (4) Silver Point, as agent, has the right to enforce payment of principal and interest; (5) the Second Lien Term Loan does not come with any voting rights; (6) the Second Lien Term Loan was assumed as debt as part of the WorkflowOne Transaction whereas equity investments in the Debtors were made through the purchase of stock (or, in the case of the equity portion of the consideration paid in the WorkflowOne Transaction, through the issuance of warrants); and (7) the Second Lien Term

Loan has the right to be paid a fixed amount before equity holders are paid in a liquidation. None of these factors supports a finding that the parties intended the Second Lien Term Loan to be an equity contribution.

94.    The full history of the Second Lien Term Loan only serves to bolster this conclusion. The loan was first extended to WorkflowOne in 2005. When WorkflowOne emerged from bankruptcy in 2011, the loan was converted into second lien debt issued by WorkflowOne's new corporate parent. At the time of the WorkflowOne Transaction, the outstanding balance on the debt was $211,818,083. Because Standard Register was unwilling to assume that amount of debt, it was written down to $86.2 million before the debt was assumed by Standard Register. Silver Point received equity in Standard Register in exchange for its agreement to write down the debt (demonstrating that when the Debtors intended to grant an equity stake, they knew how to do it). As part of that transaction, the Debtors executed a Pledge and Security Agreement in favor of the Second Lien lenders. And, those lenders also entered into an intercreditor agreement with the First Lien lenders and an Intercreditor agreement with the ABL lenders. All of these facts evince an intent that the Second Lien Term Loan be treated as debt not equity.

95.    Although the facts overwhelmingly demonstrate that the parties intended the Second Lien Term Loan to be a loan, the Committee argues that two facts support finding that the loan was actually a disguised equity contribution. First, the Committee asserts that "the Second-Lien Term Loan was out of the money at the time of the transaction." Mot. ¶ 117. This assertion is not supported by the Committee's own math. In paragraph 87 of the Motion, the Committee asserts that "[a]t the time of the WorkflowOne Acquisition, the pro forma combined company had approximately $261 million of funded debt obligations [and] $7 million of capital

lease obligations . . . ." In paragraph 88 of the Motion, the Committee asserts that the midpoint fair value of the Debtors' assets on the date WorkflowOne Transaction was $341 million. Thus, the Committee's own math (which grossly understates the true value of the combined company for the reasons stated previously) conclusively demonstrates that the company was worth more than the amount of its secured debt such that the Second Lien Term Loan was <u>not</u> out of the money at the time of the transaction.

96.      The Committee next argues that the Court should find that the Second Lien Term Loan was a disguised equity contribution because "the Second-Lien Term Loan accrued PIK interest and did not require any mandatory amortization payments." Mot. ¶ 117. As this Court is well aware, it is quite common for loans to call for the payment of interest in kind rather than in cash. In any event, and contrary to the Committee's assertion, the Second Lien Term Loan requires both payment of interest in cash and mandatory amortization payments. Section 3.2.4 of the Second Lien Term Loan Agreement provides: "Accrued interest on each Loan shall be payable in cash on the dates provided for in Sections 3.2.3(c), (d) and (e)." Sections 3.2.3(c), (d), and (e) provide that interest is payable "on each Quarterly Payment Date," "on the last day of each applicable Interest Period," or "on the date [that] any Base Rate Loans [are] converted into LIBO Rate Loans," as applicable. Section 3.2.4 of the Second Lien Term Loan Agreement then provides that during the first three years of the loan only, the Debtors have the right to capitalize the interest and to add it to the principal balance of the loan. With respect to loans "other than Term C Loans," the Debtors' right to capitalize interest is limited to 50% of the interest due following the second anniversary of the closing date, and is unavailable if the Debtors' liquidity exceeds $50 million on any payment date. Far from indicating an intent to

infuse equity, these carefully negotiated interest payment provisions demonstrate that the Second

Lien Term Loan was just that—a loan.

**D.      Equitable Subordination, Equitable Disallowance (Counts 9-10)**

      (i)      **Applicable Standard**

97.      Equitable subordination under section 510(c) of the Bankruptcy Code is a

"drastic" and "unusual" remedy, *In re SubMicron Sys. Corp.*, 291 B.R. 314, 327, 329 (D. Del.

2003) *aff'd*, 432 F.3d 448 (3d Cir. 2006), that should be applied only with "great caution" in

"limited circumstances," even in cases involving insiders of the debtor, *In re AutoStyle Plastics,*

*Inc.*, 269 F.3d 726, 745 (6th Cir. 2001).  *See also In re Fedders*, 405 B.R. at 554 (citing *In re*

*Radnor*, 353 B.R. at 841).  It requires the plaintiff to show that (1) the defendant engaged in

inequitable conduct, (2) the misconduct caused injury to creditors of the bankrupt or conferred an

unfair advantage on the defendant, and (3) equitable subordination of the defendant's claim

would not be inconsistent with the provisions of the Bankruptcy Code.  *In re Radnor*, 353 B.R. at

841; *see also In re SubMicron*, 432 F.3d at 462; *In re SI Restructuring, Inc.*, 532 F.3d 355, 360

(5th Cir. 2008).

98.      "Courts recognize three general categories of behavior that may constitute

inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and

3) claimant's use of the debtors as a mere instrumentality or alter ego." *In re Optim Energy,*

*LLC*, 527 B.R. 169, 176 (D. Del. 2015); *see also In re Radnor*, 353 B.R. at 841.  "To qualify as

inequitable conduct, the insider or fiduciary creditor must have actually used its power to control

the debtor or its position of trust with the debtor to its own advantage or to the other creditors'

detriment." *In re Optim Energy*, 527 B.R. at 177 (citing *In re Mid–Am. Waste Sys., Inc.*, 284

B.R. 53, 70 (Bankr. D. Del. 2002)).

### (ii)   The Committee Fails to State a Colorable Claim for Equitable Subordination.

99.    Because the Committee has not adequately alleged either inequitable conduct or any actual harm to creditors, it has failed to allege facts sufficient to state a colorable equitable subordination claim.

100.    The Committee's sole specific attempt to assert inequitable conduct to justify subordination and disallowance is its assertion that Silver Point traded in the Debtors' common stock while in possession of material nonpublic information. Compl. ¶ 190. But the Committee falls well short of alleging the facts required to state an insider trading claim—particularly given that claims for insider trading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In fact, the Committee fails to include *any* allegations that Silver Point acted with scienter.

101.    Further, in order to state a claim for insider trading liability, a private litigant must demonstrate that it traded in the relevant securities contemporaneously with the defendant. 15 U.S.C. § 78t-1(a) ("Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class."); *see also City of Edinburg Council v. Pfizer, Inc.*, 754 F.3d 159, 175 (3d Cir. 2014) ("Section 20A [of the Exchange Act] . . . provides an express private cause of action for insider trading against contemporaneous traders . . . ."). The Committee ignores this intractable standing problem to any insider trading claim.

102.    Nor has the Committee adequately alleged any actual harm to the Debtors' unsecured creditors. The doctrine of "equitable subordination is remedial, not penal, and in the

43

absence of actual harm, equitable subordination is inappropriate." *In re SI Restructuring*, 532

F.3d at 361; *see also In re SubMicron*, 432 F.3d at 462 (equitable subordination "should be

applied only to the extent necessary to offset specific harm that creditors have suffered on

account of the inequitable conduct"); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir.

2009) (equitable subordination is a "remedial rather than penal doctrine designed to undo or

offset any inequality in the claim position of a creditor that will produce injustice or unfairness to

other creditors in terms of the bankruptcy results." (internal quotations omitted)).  Here, the

Committee "has failed to show that [] the unsecured creditors suffered any harm as a result of

defendants' actions." *In re SubMicron*, 432 F.3d at 462 (internal quotation marks omitted).  The

Committee's threadbare allegation that Silver Point's inequitable conduct has harmed the

Debtors' general unsecured creditors is unsupported by any alleged facts.  "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Iqbal*, 556 U.S. at 678.  Because insider trading by Silver Point is the only inequitable conduct

alleged, the Complaint fails to demonstrate harm to creditors: as is reflected by the

contemporaneous trading requirement in the Securities Exchange Act of 1934 that would be the

basis for any insider trading cause of action, only those entities that purchased Silver Point's

stock at the time of the relevant transactions could have been harmed by Silver Point's trading.

     (iii)    **The Committee Has Not Stated a Colorable Claim for Equitable Disallowance.**

103.    The Committee also seeks the equitable disallowance of Silver Point's claims.

This claim must fail not only because no inequitable conduct justifying disallowance has been

alleged, but more importantly because equitable disallowance, even if it remains a viable remedy

after the enactment of the Bankruptcy Code (which is highly suspect), is one that should be used

incredibly sparingly. *See, e.g., In re Mid-American Waste Systems, Inc.*, 284 B.R. 53, 69 (Bankr.

D. Del. 2002) (Walsh, J.) ("Equitable considerations can justify only the subordination of claims, not their disallowance."); *Harbinger Cap. Partners LLC v. Ergen (In re LightSquared Inc.)*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("[T]his Court holds that the Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b) of the Bankruptcy Code."); *cf. Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Electric Co.*, 549 U.S. 443, 449 (2007) (Bankruptcy Code directs that court "'shall allow' [a] claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b).").[14]

104.    Even if it is assumed that equitable disallowance is a viable remedy, the Committee falls far short of alleging any colorable claim for its application much less the very rare circumstances where a claim would be equitably disallowed.  Thus, while Judge Walrath has concluded that bankruptcy courts do "have the authority to disallow a claim on equitable grounds," she qualifies her view by disallowing a claim only 'in those extreme instances— perhaps very rare—where it is necessary as a remedy." *In re Washington Mut., Inc.*, 461 B.R. 200, 257 (Bankr. D. Del. 2011), *vacated in part*, No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (quoting *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007).  But the claimants in *Washington Mutual* set forth detailed allegations to establish the basis for invoking the extreme remedy of equitable disallowance.  The Committee's threadbare allegations here fail to establish such a basis.

---

[14]    The Third Circuit has declined "to resolve the issue as to whether equitable 'disallowance' remains an available remedy."  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n.7 (3d Cir. 1998).

105.    There is no basis to allow the Committee to seek equitable disallowance of Silver Point's claims, and allowing the Committee to go down this path under the Standard Register facts would just promote a fishing expedition and nuisance litigation.

**E.      Validity of Liens (Counts 5-6, 11-12)**

106.    A party seeking to avoid a purported security interest in a bankruptcy proceeding bears the burden of demonstrating that the alleged security interest is unperfected or invalid. *See, e.g.*, *In re Burnham*, 231 B.R. 270, 272 (Bankr. N.D. Ohio 1999); *In re Bowling*, 314 B.R. 127, 135 (Bankr. S.D. Ohio 2004).

107.    The Committee has provided lists of assets that it claims are unencumbered based on the lenders' alleged failure to perfect their liens.  The Debtors granted security interests in the assets identified in the documents governing the Prepetition Term Loans and the Prepetition ABL Facility.  With the exception of the Committee's allegation in paragraph 173 of the Complaint involving the UCC-1 financing statement with respect to WorkflowOne of Puerto Rico Inc., the Debtors are unaware of any lien perfection issues with respect to this collateral.  Because this is the sole specific instance of a lien perfection issue alleged by the Committee, the Committee has not carried its burden of demonstrating that the remaining liens it challenges were not validly perfected, and thus their Complaint fails to state a colorable claim on these counts.

108.    The Committee further argues that it should be granted a declaration that assets not included in the collateral package are unencumbered.  This declaration is not necessary.  To the extent the Debtors did not grant a security interest in an asset, the lenders do not have a security interest in that asset.  The estates do not need to spend money in litigation to get an order that merely restates what the loan and security documents already provide on their face.

F.      **Improvement in Lien Position (Count 14)**

(i)      **Applicable Standard**

109.    The Committee alleges that, to the extent the Prepetition ABL and Term Loans

were undersecured, the Debtors' granting of additional collateral to these lenders on or about

January 1, 2015, was an improvement of the lenders' positions during the applicable preference

period and thus subject to avoidance under section 547 of the Bankruptcy Code.

110.    A trustee may avoid a preferential transfer of an interest of the debtor in property

if such interest is

> (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by
> the debtor before such transfer was made; (3) made while the debtor was insolvent; (4)
> made [] on or within 90 days before the date of the filing of the petition . . . ; and (5) that
> enables such creditor to receive more than such creditor would receive if—(A) the case
> were a case under chapter 7 of this title; (B) the transfer had not been made, and (C) such
> creditor received payment of such debt to the extent provided by the provisions of this
> title.

11 U.S.C. § 547(b).  Unless the party challenging the transaction at issue proves every element, a

transfer is not avoidable as a preference under section 547(b).  *AP Servs., LLC v. McKesson*

*Corp. (In re CRC Parent Corp.)*, Adv. No. 12-50701 (MFW), 2013 WL 2149492, at *2 (Bankr.

D. Del. May 16, 2013).

111.    Section 547(c)(5) sets forth an exception to transfers that may be avoided as

preferential.  It provides that a trustee may not avoid a transfer

> (5) that creates a perfected security interest in inventory or a receivable or the proceeds of
> either, except to the extent that the aggregate of all such transfers to the transferee caused
> a reduction, as of the date of the filing of the petition and to the prejudice of other
> creditors holding unsecured claims, of any amount by which the debt secured by such
> security interest exceeded the value of all security interests for such debt on the later of--
>    (A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section
>    applies, 90 days before the date of the filing of the petition; or
>    (ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies,
>    one year before the date of the filing of the petition; or

(B) the date on which new value was first given under the security agreement creating such security interest;

11 U.S.C. § 547(c)(5).

       (ii)     **The Committee Has Failed to State a Colorable Preferential Transfer Claim**

112.    In *In re DVI, Inc.*, Adv. No. 08-50248 (MFW), 2008 WL 4239120, at *5-6, the bankruptcy court considered a so-called "improvement in position claim" under section 547(c)(5). The court held that while it was not necessary for a claimant to allege or prove each and every transfer that occurred during the preference period, the claimant must "allege the aggregate effect of those transfers." *Id.* at *6. In so holding, the court agreed with the Seventh Circuit's analysis in *Samson v. Alton Banking & Trust Co. (In re Ebbler Furniture and Appliances, Inc.),* 804 F.2d 87, 89-90 (7th Cir. 1986), which requires a court to compare the value of the secured creditor's collateral and its secured claim 90 days before the petition and on the petition date, and to determine whether the secured creditor's position improved between those two dates. *See also Matter of Century Glove, Inc.*, 151 B.R. 327, 340 (Bankr. D. Del. 1993) ("The *Ebbler* case states the correct test for determining the existence of a § 547(c)(5) preference.).

113.    Despite citing section 547(c)(5) of the Bankruptcy Code, the Committee has failed to state a claim for an avoidable preference. While the Committee's complaint parrots the general elements of a fraudulent transfer, it fails to allege "the aggregate effect" of the allegedly preferential transfers with any specificity. The complaint states only that the alleged transfers reduced the amounts by which the prepetition secured lenders were undersecured. Unlike the complaint in *In re DVI*, the Committee's complaint fails "to assert the aggregate of the transfers." 2008 WL 4239120 at *5. Absent the comparison of collateral and amounts

outstanding required under *Ebbler*, 804 F.2d at 89, as endorsed by the bankruptcy courts of this District, the Committee's boilerplate allegations do not state any colorable claim for relief.

114.    Further, the Committee only states generically that the alleged transfers reduced the amounts by which the prepetition lenders were undersecured, without providing any allegations as to the extent to which the loans were undersecured.  If these loans were fully secured or oversecured at the time of the transfers, "as a matter of law, [the secured lenders] could not have improved their secured (*i.e.*, lien) position between the date upon which they received the Security Interests . . . and the [Petition Date]." *In re Foxmeyer Corp.*, 286 B.R. 546, 567 (Bankr. D. Del. 2002).  In fact, the upcoming auction of Standard Register may yield proceeds that would render irrelevant the question whether the prepetition secured lenders improved their position or not.

115.    In any event, as is demonstrated in the next section, the amount of any alleged improvement in position is nominal compared to the costs to pursue a preference claim related to such improvement and certainly to the benefits that were obtained by the Debtors from entering the chapter 11 case with agreed debtor in possession financing from the prepetition secured lenders and Silver Point as the stalking horse bidder.

116.    For the foregoing reasons, the Committee has not stated a colorable claim that should be pursued for the avoidance of any transfers as a preference under section 547(b) of the Bankruptcy Code.

## II.    The Decision Not to Sue was Reasonable

117.    To be awarded derivative standing, the Committee must demonstrate that Standard Register has unjustifiably refused to pursue the proposed actions.  As the Eighth Circuit has explained, "to prevent derivative adversary proceedings from becoming the norm in

49

bankruptcy, we agree with our sister circuits that the critical inquiry is whether the trustee (or

debtor-in-possession) abused its discretion by *unjustifiably* refusing to pursue the creditor's

proposed claims." *In re Racing Servs., Inc.*, 540 F.3d at 900 (citations omitted, emphasis in

original). The court further held:

> To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy
> court with *specific* reasons why it believes the trustee's refusal is unjustified. A
> creditor thus does not meet its burden with a naked assertion that 'the trustee's
> refusal is unjustified.' If presented with nothing more than this, the bankruptcy
> court may properly deny a creditor's motion without explanation. The creditor,
> *not the bankruptcy court,* has the onus of establishing the trustee unjustifiably
> refuses to bring the creditor's claim.

*Id.* (emphases in original). The Committee has made no such showing.

118.    Where a debtor-in-possession decides not to pursue a claim after good faith

consideration because it concludes that doing so would not be in the best interest of the estate,

the debtor-in-possession's failure to assert the claim is justified and derivative standing should be

denied. *See In re M&S Grading, Inc.*, 541 F.3d 859, 866 (8th Cir. 2008); *see also Webster v.

Senyi De Nagy- Unyom (In re Yelverton)*, Bankr. No. 09-00414, Adv. No. 09-10048, 2012 WL

1229752, at *2 (Bankr. D.D.C. Apr. 12, 2012) ("If the trustee is acting in the best interest of the

estate, it is unclear why the court would exercise its equitable powers to grant another party

derivative standing to pursue these claims.").

119.    Contrary to the Committee's suggestion, a debtor's decision not to pursue claims

against a creditor due to waiver in connection with securing post-petition financing is not a per se

unjustified refusal for purposes of derivative standing. *Cf. Official Comm. Of Unsecured

Creditors of Am.'s Hobby Ctr., Inc. v. Hudson United Bank (In re Am.'s Hobby Ctr., Inc.)*, 223

B.R. 275, 283 (Bankr. S.D.N.Y. 1998). "Where the debtor actively opposes the creditors'

committee's request for leave to sue, the court must look at whether, beyond the fact that the

50

debtor had no meaningful choice but to forego litigation, there is a substantial reason why interposition of the proposed suit would be harmful to the estate." *Id.*

### A. The Debtors' Decision Not to Sue Was Reasonable Because the Claims Are Not Valuable

120.    In determining whether the debtor-in-possession's refusal is justified, the court should perform a "cost-benefit analysis," weighing the probability of legal success and financial recovery if successful, the creditor's fee arrangement, and anticipated delay and expense to the bankruptcy estate that the litigation will cause. *In re Racing Servs.*, 540 F.3d at 901.

121.    "The first element of a cost-benefit analysis is cost." *In re Archdiocese of Milwaukee*, 483 B.R. 855, 869 (Bankr. E.D. Wisc. 2012). The Committee ignores altogether the significant cost the company would incur by bringing the claims set forth in the complaint, and provides no estimate whatsoever as to that cost or who would pay the Committee's fees. The Complaint suggests the Committee will pursue additional and costly discovery against Defendants, the Debtors, and other third-parties. Thereafter, motion practice, and possibly a trial, will follow. Such proceedings would take at least several months, if not longer, and require substantial expenditures.

122.    Where, as here, there will be substantial costs to the estate, "a sufficient likelihood of success must be found to 'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'" *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. at 282 (quoting *Unsecured Creditors Comm. Of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 906 (2d Cir. 1985)).

123.    The Committee has already received tens of thousands of pages of documents in discovery from the Debtors, Silver Point and Bank of America, yet, as set forth above, the Complaint consists of little more than conclusory theories and threadbare accusations. *See In re*

51

*Archdiocese of Milwaukee*, 483 B.R. at 869-71 (finding cost-benefit analysis weighed against granting derivative standing where already-conducted discovery had led to little evidence of liability and more fulsome discovery leading to trial would incur substantial time and resources). Indeed, the facts that have been discovered demonstrate that the claims are not viable and therefore there is no justification for spending additional estate money to pursue these baseless claims.

124.    What's more, these baseless claims have limited upside potential for the estates. Putting aside the highly unlikely recharacterization, disallowance and equitable subordination theories of the Committee, the grand prize of the Committee's game is avoidance of the WorkflowOne Transaction as a fraudulent transfer.  However, if the WorkflowOne Transaction is avoided as a fraudulent transfer, it is not as if the estates will be left without secured claims. Under section 548(c), the First and Second Lien lenders will retain a lien on the Debtors' assets to the extent that they gave value to the Debtors in the WorkflowOne Transaction.  Even the Committee admits that WorkflowOne was worth at least $134 million on the date of the WorkflowOne Transaction, excluding synergies.  *Cf.* Compl. ¶ 102.  And, the facts demonstrate that WorkflowOne was actually worth much more than that.  Thus, the Debtors' estates likely would not realize a substantial benefit from the fraudulent transfer action even if it were wildly successful.

125.    And, the likelihood of success on the Committee's other claims, which are essentially nuisance claims, compared to the disruption those claims would cause the company strongly supports denying the Committee standing to pursue them.

126.    The Debtors do not believe that the costs and highly speculative benefits of litigation justify bringing the claims asserted in the Complaint.

**B.      The Debtors' Decision Not to Sue Was Reasonable Because They Needed Access to DIP Financing and A Stalking Horse**

127.    The Debtors had an urgent and immediate need for DIP financing when these Chapter 11 Cases were filed.  Absent such financing, the Debtors could not continue their operations and maximize the value of their estates.  *See Final Order (I) Authorizing Debtors In Possession To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims To Postpetition Lenders Pursuant To 11 U.S.C. §§ 364; and (III) Providing Adequate Protection To Prepetition Credit Parties And Modifying Automatic Stay Pursuant To 11 U.S.C. §§ 361, 362, 363, and 364* [Docket No. 290] (the "Final DIP Order") at ¶ 7; First Day Declaration at ¶ 105; *Declaration of Kevin Carmody in Support of Debtors' Sale Motion and Motion to Approve Postpetition Financing* [Docket No. 240] (the "Carmody Financing Declaration") at ¶ 7.

128.    The Debtors did not have any available options for DIP financing other than the financing provided pursuant to the Final DIP Order.  *See* First Day Declaration ¶ 107; Carmody Financing Declaration ¶ 14; Carmody Standing Motion Declaration ¶ 8; *Declaration of Andrew Torgove in Support of Debtors' Sale Motion and Postpetition Financing Motion* [Docket No. 246] (the "Torgove Declaration") at ¶ 15.  That financing was on the best terms the Debtors could negotiate, and the Debtors' lenders required that they waive certain of the estate claims that the Committee now seeks to pursue.  *See* Carmody Financing Declaration ¶ 14-15; Torgove Declaration ¶ 34.

129.    The Board considered, and received legal advice, concerning the possibility that the company could pursue claims against Silver Point.  Morgan Declaration ¶¶ 35-39.  After careful evaluation of various considerations, the Board, in consultation with its advisors, determined that it was not in the best interest of the company and its stakeholders to pursue

possible claims against Silver Point in connection with the WorkflowOne Transaction or

otherwise. *Id.* The Board's determination not to bring claims against Silver Point prior to the

bankruptcy petition also was based on the view that even if litigation against Silver Point were to

be successful—which would involve a significant dedication of time and resources by the

company and its advisors at a time when the company was on the brink of failure—the best

possible result would be a minimal decrease in the size of Silver Point's secured position.

Therefore, the benefit of a successful litigation did not outweigh the anticipated costs. *Id.* Thus,

the Debtors determined, in the sound exercise of their business judgment, that it was better to

waive certain estate claims and secure DIP financing than to allow their estates to be forced into

immediate liquidation. *Id.*; *see also* First Day Declaration ¶ 115; Carmody Financing

Declaration ¶ 15; Carmody Standing Motion Declaration ¶ 8.

130.    The Debtors also determined that obtaining a stalking horse bid, even if from

Silver Point, was far preferable than entering chapter 11 in a freefall with no stalking horse, and

that such stalking horse bid would provide substantial benefits, including, among other things,

the possibility of a value maximizing auction, certainty of closing, timing, and consideration, and

would provide comfort to customers, vendors, and employees. Torgove Declaration ¶ 28. The

stalking horse Asset Purchase Agreement contains the best possible terms the Debtors could

obtain from Silver Point under the circumstances. *Id.* The stalking horse Asset Purchase

Agreement was a package deal with Silver Point's DIP financing offer.

131.    The Committee contends that the Debtors' decision to waive certain estate claims

excuses their failure to demand that the Debtors prosecute these causes of action. Mot. ¶ 127.

The Committee's argument is a red herring. The relevant inquiry is not whether a demand on the

Debtors was necessary; the relevant inquiry is whether the Committee can "demonstrate that the

Debtors unjustifiably failed or refused to pursue the causes of action set forth in the Complaint . . . ." Mot. ¶ 124; *Cf. In re Am.'s Hobby Ctr., Inc.*, 223 B.R. at 283 ("Where the debtor actively opposes the creditors' committee's request for leave to sue, the court must look at whether, beyond the fact that the debtor had no meaningful choice but to forego litigation, there is a substantial reason why interposition of the proposed suit would be harmful to the estate."). The Committee cannot meet this significant burden, particularly given the unassailable benefit that has accrued to the Debtors by lining up DIP financing and a stalking horse bid heading into bankruptcy.

132.    The Committee does not address the Debtors' need for financing nor evaluate whether the Debtors' decision to waive certain claims as a condition to obtaining that financing was reasonable. And for good reason. Given the highly speculative (at best) nature of the claims that the Committee seeks to prosecute, the Debtors' decision to waive those claims in order to obtain a stalking horse bid and the financing needed to continue in operation for the benefit of their creditors, employees, vendors, and other parties in interest was imminently justified.

### C.    The Debtors' Decision Not to Sue Was Reasonable Because Creditors Had Standing to Bring Many of the Claims Asserted in the Complaint (and Chose Not to)

133.    Many of the claims set forth in the complaint are properly characterized as inter-creditor disputes. These include the claims for recharacterization (Count 7), equitable subordination (Count 9), and equitable disallowance (Count 10). Creditors have standing to bring these claims without a special order of the Court. *See, e.g.*, *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 731, 753 (6th Cir. 2001) (in an adversary proceeding, junior creditor sought recharacterization and equitable subordination of senior creditors' participation interest; the bankruptcy court ruled on the merits, and the district and circuit courts affirmed); *Elway Co. LLP*

*v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr. D. Del. 2008) (equitable subordination is not a cause of action specific to a debtor in possession or trustee; a secured creditor may seek equitable subordination of another creditor's claim). And the Final DIP Order preserved for creditors the right to prosecute these claims for a period of 75 days. *See* Final DIP Order ¶ 28.

134.    The Debtors do not believe that these claims are viable for the reasons stated previously. However, in the Final DIP Order, the Debtors preserved the right for any creditors that thought they might have these claims to directly prosecute them. No creditors thought that prosecution of such claims was worth the expense. In these circumstances, the Debtors' decision to allow creditors to prosecute the claims but to refrain from spending estate funds to do so was justified.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court deny the Standing

Motion.


Dated:    June 1, 2015
          Wilmington, Delaware          /s/ Andrew L. Magaziner                              
                                        Michael R. Nestor (No. 3526)
                                        Kara Hammond Coyle (No. 4410)
                                        Maris J. Kandestin (No. 5294)
                                        Andrew L. Magaziner (No. 5426)
                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253
                                        mnestor@ycst.com
                                        kcoyle@ycst.com
                                        mkandestin@ycst.com
                                        amagaziner@ycst.com

                                        -and-

                                        Michael Rosenthal (NY No. 4697561)
                                        Brian M. Lutz (NY No. 4164208)
                                        Jeremy L. Graves (CO No. 45522)
                                        Matthew G. Bouslog (CA No. 280978)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        333 South Grand Avenue
                                        Los Angeles, CA 90071-1512
                                        Telephone: (213) 229-7000
                                        Facsimile: (213) 229-7520
                                        mrosenthal@gibsondunn.com
                                        blutz@gibsondunn.com
                                        jgraves@gibsondunn.com
                                        mbouslog@gibsondunn.com

                                        *Counsel to the Debtors and Debtors in Possession*