IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15- 10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 524. |

**DECLARATION OF KEVIN CARMODY IN SUPPORT OF DEBTORS' OBJECTION TO THE COMMITTEE'S MOTION FOR AN ORDER GRANTING STANDING**

I, Kevin M. Carmody, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") with an office at 55 East 52nd Street, New York, NY 10055.  Since March 2, 2015, I have served as Chief Restructuring Officer of the Debtors.

2.      I submit this declaration (the "Declaration") in opposition to the *Motion of the Official Committee of Unsecured Creditors For An Order Granting the Committee Standing And Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [Docket No. 524] (the "Standing Motion") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the matters set forth herein. I am over eighteen (18) years of age and I am authorized to submit the Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated.

4. On March 12, 2015, I submitted a declaration [Docket No. 2] (the "First Day Declaration") providing, among other things, a summary overview of the Debtors and the Chapter 11 Cases. On April 10, 2015, I submitted a declaration [Docket No. 240] (the "DIP Reply Declaration")[2] regarding, among other things, the decision of the Board of Directors of Standard Register to enter into bankruptcy, the financial pressure the Company faced prior to and following the Petition Date, and the role of the DIP Loans in the Company's stability. My statements in the First Day Declaration and the DIP Motion Declaration are hereby incorporated by reference as though fully set forth herein.

A.   **Pressure on the Debtors' Post-Petition Operations**

5. The Debtors' operations rely in large part on the stability of the Debtors' vendor base and customer base, who have expressed serious concerns about the length of the Chapter 11 Cases and any resultant business interruption. The DIP Loan was a key factor in the Company's ability to respond to the concerns of its vendors and customers after the Petition Date, as it provided assurance regarding the ability of the Debtors to maintain liquidity during the pendency of the bankruptcy proceedings.

---

[2] Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Standing Motion, First Day Declaration, or DIP Reply Declaration, as applicable.

6. The Company's clients and vendors are highly sensitive to a risk of disruption in the Company's business, and in some circumstances have imposed more restrictive terms on the Company as a condition to continue doing business with the Company while the bankruptcy proceedings are ongoing. However, the DIP Loan is a key factor in allowing the Company to preserve these relationships pending conclusion of the ongoing sale process.

C. **The Board's Determination to Approve the Terms of the DIP Loans and APA**

7. As an advisor to the Company prepetition, and as CRO of the Company since shortly before the Petition Date, I have discussed the terms of the DIP Loan with the Strategy Committee of the Standard Register Board of Directors as well as the full Board. The Board was fully informed of all developments leading up to the bankruptcy filing and was informed as to the material terms of the DIP Loan and APA.

8. Despite efforts by the Debtors to obtain DIP financing from lenders other than the prepetition lenders, Silver Point and Bank of America, no alternatives were available. The negotiations over the DIP Financing and APA with the prepetition lenders were contentious and fully at arms-length. The Debtors pushed back on all material terms in an effort to obtain the best possible terms from the pre-petition lenders. Despite these efforts, the Debtors were unable to reach an agreement on the DIP Financing terms that did not include a waiver by the Company of its ability to pursue claims against Silver Point and Bank of America in the bankruptcy proceeding. Because the prepetition lenders insisted on this provision, the Debtors, as a practical matter, would not have been able to secure the DIP Loan and APA without the provision that required the waiver of the Company's rights to pursue claims against Silver Point and Bank of America.

9.     The Debtors' decision to agree to the DIP Loan and APA was in the best interests of the Company, and was a far better value maximizing alternative than liquidating the Company, which would likely have been necessary absent entering into the DIP Loan and APA. This decision allowed the Debtors to preserve the Company's enterprise value as an ongoing operation, maintain important customer and vendor relationships, and position the Company to sell its business as a going concern.  I firmly believe that the financing obtained by the Debtors from the prepetition lenders was the best (in fact, the only) financing available to us at the time and was absolutely essential to enable the Company to operate during bankruptcy.  Similarly, I believe that entry into the stalking horse agreement with Silver Point was in the best interests of the Debtors' estate as it enabled the Debtors to enter chapter 11 other than in a freefall mode and provided the opportunity for a value maximizing auction process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

    */s/ Kevin Carmody*
Kevin Carmody

Executed this 1st day of June 2015