## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15- 10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 524. |

### DECLARATION OF JOSEPH P. MORGAN, JR. IN SUPPORT OF DEBTORS' OBJECTION TO THE COMMITTEE'S MOTION FOR AN ORDER GRANTING STANDING

I, Joseph P. Morgan, Jr., hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the President and Chief Executive Officer of The Standard Register Company ("Standard Register" or the "Company"), and have served in this role since my appointment in January 2009, prior to which I was Executive Vice President and Chief Operating Officer of the Company.  I also serve on the Company's Board of Directors (the "Board"), and have done so since January 2009.

2.      I submit this declaration (the "Declaration") in support of the Debtors' objection to the *Motion of the Official Committee of Unsecured Creditors For An Order Granting the Committee Standing And Authorizing the Committee to Commence and Prosecute*

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

*Certain Actions on Behalf of the Debtors' Estates* [Docket No. 524] (the "Standing Motion")[2] in the above-captioned chapter 11 cases.

       3.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the matters set forth herein. I am over eighteen (18) years of age and I am authorized to submit the Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated.

**A.**     **The Company's Pursuit of Increased Shareholder Value**

       4.     In late 2011, the Company faced challenges to its business and financial performance. In light of these challenges, the Company retained Bank of America Merrill Lynch ("BAML") in early January 2012 to advise the Board in connection with various potential strategic alternatives for enhancing shareholder value.

       5.     At this time, the Board and Company also were advised by Gibson, Dunn & Crutcher LLP ("Gibson Dunn").

       6.     On January 6, 2012, BAML presented the Board with its initial evaluation of the Company's performance, and identified several potential strategic alternatives that the Company could pursue in order to increase shareholder value and improve the Company's financial position, including a potential sale or acquisition, refinancing, or restructuring. At this meeting, the Board, in consultation with its advisors, determined that the Company should pursue a number of strategic alternatives going forward, and that the Board should have a

---

[2]   Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Standing Motion.

standing weekly call in order to update the Board as necessary and ensure that the Board was kept apprised of any developments.

7.    Throughout 2012 and 2013, BAML and I regularly updated the Board and the Company's management, and participated in Board meetings, regarding the Company's financial performance, the Company's valuation and sensitivities, BAML's efforts to identify strategic partners and financial sponsors, and analysis of the strategic alternatives available to the Company. Prior to Board meetings, the Board members typically received "pre-read" materials (information and presentations relevant to the agenda for the meeting) from the Company and its advisors in order to make the Board meetings more productive. The Board and the Company's management actively engaged with BAML in these discussions.

**B.    The Company's Pursuit of a Strategic Transaction with WorkflowOne**

8.    One of the strategic paths that the Board concluded should be pursued was a potential sale to or business combination with another company. Thus, in 2012, the Board enlisted BAML to approach third party companies and financial sponsors that may be interested in a strategic transaction with the Company. Through these efforts, the Company engaged in discussions with two separate companies about a potential sale of the Company, one of which conducted extensive diligence in connection with a possible acquisition of the Company. Although negotiations concerning a potential sale of the Company reached an advanced stage, ultimately this third party was not willing to finalize the terms of an acquisition of the Company.

9.    At the same time, the Company also pursued a potential business combination with WorkflowOne, LLC ("WorkflowOne"). WorkflowOne, which like the Company also was based in Dayton, Ohio, offered managed services for print, print-related, and promotional marketing services and was a competitor of the Company.

3

10.    The Board had previously considered a potential business combination with WorkflowOne in July 2010.  The Board, in consultation with its advisors, determined it would not pursue a transaction with WorkflowOne at that time.  Attached as Exhibit A is a true and correct copy of the Minutes from this Board of Directors meeting.

11.    In late June 2012, with the knowledge and consent of the Board, I had a preliminary meeting with Tim Tatman, the CEO of WorkflowOne in order to explore a potential business combination between the Company and WorkflowOne.  By that time, WorkflowOne had already been through and emerged from its own chapter 11 case.  The Company executed a confidentiality agreement with WorkflowOne on the same day.

12.    In mid-October 2012, with the knowledge and consent of the Board, representatives from the Company and I met with a principal of Silver Point, the agent for the secured debt of WorkflowOne and a significant owner of WorkflowOne, in New York City to discuss the Company's potential business combination with WorkflowOne in greater detail.  At that meeting, the Company received an initial detailed proposal regarding a potential business combination.

13.    The Board received a further presentation regarding WorkflowOne's business from the Company's advisors at a Board meeting in late October 2012.  The Board also received an overview of materials from WorkflowOne's management regarding WorkflowOne's revenue, financial structure, and balance sheet.  At the Board meeting, the Board discussed the synergies projected to be realized from a potential business combination with WorkflowOne, as projected by each company. The Company's advisors also provided the Board with an analysis of WorkflowOne's proposal for a business combination, including the ownership sensitivities,

valuation and leverage considerations, and financial projections for the combined company. The Board engaged in active discussion with its financial and legal advisors regarding the proposal.

14.    The Board presentation in late October 2012 also noted that WorkflowOne had entered into a Chapter 11 case on September 29, 2010, and that as a result of confirmation of a chapter 11 plan in that case, WorkflowOne had reduced its total debt by approximately $149 million and its cash debt service by approximately $50 million annually. In the Board's view, WorkflowOne was a better acquisition target in 2012 than it had been in 2010, as a result of WorkflowOne's restructuring and significant debt reduction.

15.    Over the next several months, the Company and its advisors continued to engage in active negotiations with WorkflowOne and its advisors regarding the details of a potential transaction. Throughout these efforts, the Board received detailed updates regarding the state of the negotiations, pricing, the various assumptions underlying the financial analyses of the proposed business combination (including the anticipated amount of synergies and revenue shock after the combination), the level and nature of the debt proposed to be assumed (which represented a further reduction from the debt level of WorkflowOne after its emergence from chapter 11), and the recommendations of the Company's advisors. As a result of these discussions, and after careful consideration, the Board determined that it was in the best interests of the Company's shareholders to continue to move forward with negotiations with WorkflowOne towards a potential business combination.

16.    In early November 2012, the Company and WorkflowOne reached a high-level agreement regarding the path forward for the negotiation and due diligence process necessary for a potential transaction, including the establishment of an electronic data room for the collection and review of information relating to a potential transaction.

17.     Representatives from the Company and its advisors met with representatives from WorkflowOne and its advisors in early December 2012.

18.     The Company and WorkflowOne continued to exchange detailed proposals and undertook due diligence efforts into early 2013, and the Board was kept apprised of all relevant developments.  This included many in-person meetings between representatives of the Company, WorkflowOne, and Silver Point, some of which I attended.

19.     In March 2013, intensive due diligence began between the Company and WorkflowOne.  In connection with the Company's due diligence efforts, the Company retained additional advisors in order to advise on all aspects of the transaction.

20.     In particular, the Company retained Capstone Valuation Services, LLC ("Capstone") on June 11, 2013, in order to provide the Company with an opinion regarding whether the Company, on a pro forma basis, would remain solvent after the Company's anticipated acquisition of WorkflowOne.  The Board determined that it was prudent to obtain this advice from Capstone given that, as part of the potential transaction, the Company would be incurring an increased debt load.

21.     On July 25, 2013, the Board held a meeting to discuss the final and terms of the acquisition of WorkflowOne, which was expected to close on July 31, 2013 (the "WorkflowOne Acquisition").  At this meeting, the Board received detailed presentations from its advisors.  BAML presented regarding its analysis with respect to the transaction, including on the structure of the transaction, the purchase price, the financing terms, projected financials, projected synergies and their rationales, and the enterprise value of WorkflowOne.  BAML also advised the Board that it was working on a fairness opinion regarding the proposed transaction,

████████████████████████████████. Gibson Dunn advised the Board regarding the structure and terms of the transaction and all relevant agreements necessary to complete the transaction, as well as the Board's fiduciary duties in connection with the transaction. Capstone advised the Board that it was working on its solvency opinion, ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. The Board engaged in active discussion with each of its advisors regarding these presentations and recommendations.

      22.     On July 31, 2013, the Board held a final meeting for the purpose of consideration and approving the WorkflowOne Acquisition. BAML provided its final analysis regarding the strategic rationale of the transaction, valuation of WorkflowOne, potential synergies, and its final fairness opinion, ████████████████████████████

████████████████████████████████████████████████████████

████. Attached as Exhibit B is a true and correct copy of the presentation delivered by BAML to the Board. Attached as Exhibit C is a true and correct copy of the fairness opinion delivered by BAML to the Board. Capstone also provided its final solvency opinion, ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Attached as Exhibit D is a true and correct copy of the final solvency opinion provided by Capstone to the Board.

**C.**     **The Board's Reasonable and Diligent Evaluation of the WorkflowOne Acquisition**

      23.     Based on the work, investigation, advice and diligence described above, the Board was fully and appropriately informed regarding WorkflowOne's business, the terms of the WorkflowOne Acquisition, and the compelling strategic rationale for the WorkflowOne

Acquisition. I believed then, as I continue to believe to this day, that the WorkflowOne Acquisition was the right move and a good deal for the Company and its stockholders.

        24.    One of the principal strategic rationales for pursuing the WorkflowOne Acquisition was the significant synergies that we reasonably believed would be achieved through the transaction. These synergies included a significant consolidation of each company's manufacturing footprint, optimizing IT infrastructure and adopting in-class customer-facing technology, reducing operating expenses, and the realignment and combination of certain functions by reducing duplicative overhead (such as marketing and finance), leading to reduced operating expenses. The Company engaged in significant work in modeling and calculating the anticipated synergies that would result from the transaction, and senior management and the Board believed that the anticipated synergies were reasonable and achievable. The Company has estimated that it actually realized synergies of ███████████ in 2014, and is on track to realize synergies of ██████████ in 2015.

        25.    Another of the principal strategic rationales for the WorkflowOne Acquisition was the Board's belief that the transaction would increase revenue and cash flow of the combined entity. The Board and its advisors anticipated that the combined company would lead to a broader customer base, because there was very little overlap between the customers of the two companies. We also believed that a combined company would lead to additional cross-selling opportunities, all leading to increased value for the shareholders.

        26.    The Board's belief in the value of the transaction also was based on our view that the Company was on the cusp of emerging from a period of declining revenue. By 2013—around the time of the transaction—the Company had made a series of significant investments in its business, and secured important and significant customer relationships, that we

believed helped position the Company for sustained future growth, as reflected in the Company's financial projections. For example, we had made investments in our business in Mexico, invested in high speed inkjet and labeling equipment, improved our software capabilities, and stabilized a number of our larger customer accounts. These efforts helped stabilize the business, provided an enhanced degree of predictability for the Company's performance, and gave the Company and the Board confidence that the Company would emerge from a period of declining revenue and underperformance.

27.    At the same time, the Company was facing stiff competition, the negotiations of the Company's credit facility were challenged, there was unexpected employee turnover, and the New York Stock Exchange indicated the Company was at risk of being de-listed. Thus, although the Company's outlook was not yet ideal, it embarked on combining with WorkflowOne in order to further improve the Company's long-term position.

28.    When evaluating the combination with WorkflowOne, the Board, in consultation with its advisors, also believed that the financial covenants contained in the first and second term lien agreements entered into with Silver Point in connection with the WorkflowOne Acquisition were reasonable, and that the Company would be able to comply with their requirements. In fact, the WorkflowOne Acquisition allowed for the Company to expand its ABL credit facility, which provided greater liquidity for the Company to realize the opportunities the WorkflowOne Acquisition presented. By creating a new transformative business opportunity for the Company through the investments made, the Company would have a larger customer base to increase capacity utilization and profitability. The Board reasonably believed that the Company's capital structure would be manageable going forward if the Company executed on its business plan, which we believed was reasonable and achievable.

29.    At no time did the Board believe that the Company was receiving less than reasonably equivalent value for its acquisition of WorkflowOne, or that the transaction would leave the Company insolvent or with unreasonably small capital. This belief was both supported and confirmed by the BAML fairness opinion and the Capstone solvency opinion provided in connection with the transaction.

30.    The Board also agreed to award transaction bonuses to myself and Chief Financial Officer Robert Ginnan, based in part on the recommendation of its compensation advisor, Semler Brossy Consulting Group, Inc. I understood that these bonuses were intended to award the Mr. Ginnan and me for (i) contributing to the successful completion of a transaction, to which Mr. Ginnan and I had devoted significant time and energy, and (ii) to align the longer-term interests of Mr. Ginnan and me with the Company by tying a portion of the bonus to the continued performance of the Company. The Board had discussed awarding transaction-related bonuses in connection with the completion of any transaction or other strategic alternatives that were being considered by the Board, separate and apart from the WorkflowOne Acquisition. Although I was not a member of the Compensation Committee of the Board, it is my understanding that this Committee had similar discussions and recommended this course of action to the Board.

31.    The bonus that I ultimately received in connection with my work in connection with the Company's pursuit of various strategic alternatives, including the WorkflowOne Acquisition, had absolutely no role whatsoever in my decision ultimately to support a transaction with WorkflowOne. As part of my Execution Bonus awarded in August 2013, I received a $450,000 cash payment upon the closing of the WorkflowOne Acquisition, and a $450,000 performance-related cash payment six months following the closing of the

transaction that was contingent on, and awarded on the basis of, the performance of the overall business after the WorkflowOne Acquisition. The remainder of my compensation was not related to the WorkflowOne Acquisition. I did not sell any stock when the trading window opened after the WorkflowOne Acquisition, and I have remained with the Company to this day in order to transform the Company and help execute the integration plan.

### D.    The Company's Performance Following the WorkflowOne Acquisition

32.    The WorkflowOne Acquisition was very favorably received by the marketplace, which confirmed my and the Board's view that this was a highly compelling strategic combination of two complementary companies. In particular, on the day the transaction was publicly announced, the Company's stock price closed 360% higher than the previous day's closing price.

33.    Immediately after the transaction was announced, we also began executing on our plan of combining and integrating the two companies. Up through February 2015, the Company was generally on track to achieve, if not exceed, the level of synergies that we had projected in connection with the transaction.

34.    The challenge for the Company in the period following the WorkflowOne Acquisition was revenue generation. Despite our best efforts, the Company was not able to meet revenue expectations in the first two quarters of 2014. Although the Company's performance stabilized in the second half of 2014 and was poised to be relatively strong in 2015, we came to understand that the business challenges that had been plaguing the industry for the preceding years were continuing, and the Company could not in the limited period of time before the chapter 11 filing take advantage of the investments it had made in its business to generate sufficient revenue to overcome these industry-wide challenges. Another factor that presented

challenges to the Company was the continuing low interest rate environment, which the Company had anticipated would recede in 2014 and 2015, and which negatively impacted the Company's ability to manage its pension liability obligations.  Ultimately, these factors drove the Company to seek bankruptcy protection.

**E.**     **The Board's Consideration of Pursuing Claims Against Silver Point**

35.     In the months leading up to the Petition Date, the Company and Board were advised by Lazard Middle Market LLC, McKinsey Recovery & Transformation Service U.S., LLC, and Gibson Dunn.  During this period, the Board considered, and received legal advice, concerning the possibility that the Company could pursue claims against Silver Point. After careful evaluation of various considerations, the Board, in consultation with its advisors, determined that it was not in the best interest of the Company and its stakeholders to pursue possible claims against Silver Point in connection with the WorkflowOne Acquisition or otherwise.  Among other considerations, the Board's decision not to pursue claims against Silver Point, including fraudulent transfer claims, was based on the Board's assessment that there was little prospect of a successful fraudulent conveyance claim against Silver Point because the Company was not insolvent at the time of the WorkflowOne Acquisition from a going concern perspective, and the Company had received reasonably equivalent value for the consideration it paid.

36.     This view also was supported by my belief, both at the time of the Workflow One Acquisition and to this day, that the transaction was the right move for the Company and presented the Company with the best opportunity to realize sustained growth in a challenged industry.  Indeed, this view was confirmed by the very positive stock price movement following the announcement of the deal, which reflected the market's view that the combination

was accretive to the value of the company and would spur continued growth. That reaction also reflected the market's view that our projected synergies and revenue growth through the acquisition were achievable—which further undercuts any suggestion that the Company did not receive reasonably equivalent value in the Workflow One transaction or that the Company was rendered insolvent as a result of the transaction.

37.     The Board's determination not to bring claims against Silver Point prior to the bankruptcy petition also was based on the view that even if litigation against Silver Point were to be successful—which would involve a significant dedication of time and resources by the Company and its advisors at a time when the Company was on the brink of failure—the best possible result would be a minimal decrease in the size of Silver Point's secured position. Therefore, the benefit of a successful litigation did not outweigh the anticipated costs.

38.     This was particularly true because the Board determined that a chapter 11 filing was imminent and that the Company should pursue a sale under section 363 of the Bankruptcy Code. Desiring to avoid a freefall chapter 11 case which might significantly undermine value, the Company explored options for DIP financing and to identify a stalking horse bidder. At the same time that the Board was making a cost-benefit analysis regarding litigation against Silver Point, it became apparent that the only available source of DIP financing was Silver Point and the Debtors' existing asset based lender, and that the only party willing to provide an acceptable stalking horse bid was Silver Point.

39.     These pieces of information, combined with the Board's assessment of the costs and benefits of proposed litigation against Silver Point led the Board to determine that it was in the best interest of the Company, its stockholders, and its creditors to agree to the terms of the DIP Financing, which was being provided by the prepetition lenders, and the Silver Point

APA, even though by doing so the Company would have to waive its right to pursue any claims against Silver Point and Bank of America. The benefit to the Company of doing so was significant and far outweighed the projected benefits of electing to assert claims against one or both of the Company's lenders. With these agreements with Silver Point and Bank of America, the Company was assured (i) a stalking horse bidder, and (ii) debtor-in-possession financing, without which a bankruptcy filing was likely to lead to significant difficulties for the Company going forward and probable liquidation. The Board made this determination in close consultation with its advisors and after careful consideration of all alternatives.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_/s/ Joseph P. Morgan, Jr._
Joseph P. Morgan, Jr.

Executed this 1st day of June, 2015