# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15- 10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 524. |

## DECLARATION OF ROBERT GINNAN IN SUPPORT OF DEBTORS' OBJECTION TO THE COMMITTEE'S MOTION FOR AN ORDER GRANTING STANDING

I, Robert Ginnan, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I served as the Executive Vice President, Treasurer, and Chief Financial Officer of The Standard Register Company ("Standard Register" or the "Company"), from August 2013 until March 6, 2015, prior to which I was Vice President, Treasurer, and Chief Financial Officer of the Company beginning in February 2009. I served as the Corporate Controller of the Company from June 2000 to February 2009, and was employed by the Company starting in February 1992. I currently serve as the Senior Vice President and Chief Financial Officer of Everyware Global, Inc.

2. I received my Masters of Business Administration from Ashland University, and my Bachelor of Science in Business Administration degree in Accounting and IT

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

from The Ohio State University. I am a Certified Management Accountant. I have served in treasury and financial roles at major corporations for nearly 30 years.

3. I submit this declaration (the "Declaration") in support of the Debtors' objection to the *Motion of the Official Committee of Unsecured Creditors For An Order Granting the Committee Standing And Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [Docket No. 524] (the "Standing Motion")[2] in the above-captioned chapter 11 cases.

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the matters set forth herein. I am over eighteen (18) years of age and I am authorized to submit the Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein from my own personal knowledge, except as otherwise stated.

A. **The Company's Decision to Enter Into the WorkflowOne Acquisition**

5. As a result of my long history with the Company, I am familiar with the Company's business and financial performance, as well as the printing and marketing industry as a whole. During my tenure at Standard Register, I oversaw a team of employees who regularly evaluated the Company's business and financial planning, budgeting, and performance according to the Company's long-term and near-term plan. In my role as CFO of the Company, I oversaw the Company's annual financial plan, which included planning, modeling, and compiling financial projections that were provided to and approved by the Company's Board as part of the annual financial planning process.

---

[2] Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Standing Motion.

6. In the years leading up to the WorkflowOne Acquisition, the Company suffered from declining revenue and a mounting pension obligation. Although the industry had generally suffered from similar revenue declines, the Company was taking steps to transform its business and reverse the downward trend. For example, the Company was actively attempting to move its business from print to digital in response to customer demand. Although in early 2013, revenue trends suggested that the Company's revenue would be flat through 2015, I and Company management believed that the Company was poised to enter a period of revenue growth in the longer-term.

7. Immediately prior to the WorkflowOne Acquisition, the Company had limited availability under its Prepetition ABL, which put stress on the Company's business operations. At the same time, the Company projected that its pension obligations would remain large and peak in 2014, and that the Company would have difficulty fulfilling this commitment absent a change in the Company's financial position.

8. I was intimately involved in the Company's consideration of various strategic alternatives in 2012 and 2013, including the WorkflowOne Acquisition. My responsibilities included discussing the Company's financial performance and projections with interested third parties when appropriate, and working with the Company's financial advisor, Bank of America Merrill Lynch ("BAML"), and valuation advisor, Capstone Valuation Services LLC ("Capstone"), in connection with the WorkflowOne Acquisition.

9. I also attended Board meetings regularly in order to update the Board regarding the Company's financial performance, projections, and the expected synergies from any transaction. The Board was fully engaged in its consideration of these topics, and I believe they were appropriately informed by the Company's management and advisors.

10. I firmly believed at the time—and continue to believe so today—that the WorkflowOne Acquisition was in the best interests of the Company. WorkflowOne was an attractive strategic partner for the Company. Although WorkflowOne was a direct competitor of the Company and also based in Dayton, Ohio, there was very little overlap in the customer base of the two companies, which created significant opportunities for revenue growth post-acquisition. The acquisition also was attractive because there were significant synergies that could be realized from a combination of the two companies—through a consolidation of manufacturing facilities and IT functions, for example. WorkflowOne was also an attractive acquisition target for the Company given that WorkflowOne had eliminated its pension obligation through its 2010 bankruptcy filing.

11. At the same time, although the Company still had a significant pension obligation, we believed that interest rates would increase over the long-term, which would have the effect of decreasing the Company's funding obligation on that debt. For example, for every 100 basis point increase in interest rates, the Company's unfunded pension liability would be reduced by approximately $40 million. Such a reduction in aggregate unfunded pension liability would have reduced the Company's annual cash funding obligations by an amount that exceeded any concomitant rise in the Company's interest expense by a substantial margin. In addition, the Company's obligations on the Prepetition Term Loans included concessions structured to align the Company's available cash with the required payment obligations, including a one-year amortization payment holiday on the first lien term loan and an election to pay interest in kind for a number of years on the second lien term loan. We believed that these terms would provide the Company sufficient liquidity to bridge to rising interest rates which would effectively reduce

not only the present value of the Company's obligations on its pension obligations but reduce any annual cash contributions required to be paid.

12. As part of our analysis of WorkflowOne, neither we nor, to the best of my knowledge, BAML, analyzed WorkflowOne's projections as contained in its Chapter 11 disclosure statement, and we did not think such a review was relevant. Instead, our consideration of WorkflowOne's performance focused on WorkflowOne's actual performance as compared to its post-bankruptcy business plan (as approved by the Board of reorganized WorkflowOne) (the "WorkflowOne Business Plan"), as well as the projections going forward. WorkflowOne's actual post-bankruptcy performance compared to the WorkflowOne Business Plan reflected only a modest revenue shortfall in 2012 and 2013.

13. Thus, WorkflowOne was a highly attractive acquisition candidate for the Company because the acquisition was expected to provide cash flow through access to WorkflowOne's revenue base, incremental EBITDA, and anticipated synergies, and at the same time, the Company was expected to be able to effectively manage its pension obligations over time.

14. I received additional compensation that was connected to the successful execution of a strategic combination. The bonus that I ultimately received in connection with my work in connection with the Company's pursuit of various strategic alternatives, including the WorkflowOne Acquisition, had absolutely no role whatsoever in my decision ultimately to support the transaction with WorkflowOne. I received a $162,500 cash payment upon the closing of the WorkflowOne Acquisition, and a $162,500 performance-related cash payment six months following the closing of the transaction that was contingent on, and awarded on the basis

of, the performance of the overall business after the WorkflowOne Acquisition. The remainder of my compensation was not related to the WorkflowOne Acquisition.

B.      **Expected Synergies from the WorkflowOne Acquisition**

15.     With the assistance of my team and Company management, I oversaw the calculation of potential synergies that we expected to result from the proposed acquisition of WorkflowOne. We took a conservative and deliberate approach in doing so, and believed the projected synergies were reasonable and achievable.

16.     The process to determine the potential synergies was months-long, and involved extensive diligence of WorkflowOne's business, which included several in-person meetings with WorkflowOne personnel to discuss WorkflowOne's capabilities and expenses on a line-item basis. The synergies that the Company anticipated were primarily in the areas of facilities, paper purchasing, outsourcing enhancement, freight, marketing and sales, IT, and operations. In sum, we anticipated ████████ per year in total run-rate synergies by the end of fiscal year 2015.

17.     Standard Register used the information collected during the due diligence process to conduct a bottoms-up analysis of WorkflowOne and the potential synergies of the transaction. As part of this analysis, Standard Register looked at WorkflowOne's actual revenue performance in 2011, 2012, and 2013, and also compared this revenue performance to WorkflowOne's projections. WorkflowOne had projected revenues of ████████████████ ████████████████████████████. WorkflowOne had actual revenues in 2011 and 2012 only marginally less than plan—████████████████████████████ In 2013, WorkflowOne had projected revenues of $262.2 million through July, and had actual revenues of ████████ in that period—again, only marginally less than plan. Using this data,

WorkflowOne's future projections, and Standard Register's own analysis of the WorkflowOne business, Standard Register developed its own projections for WorkflowOne's future performance.

18.  To estimate the revenues of the combined company, Standard Register also utilized its own ordinary course projections of revenue. The Company reasonably believed that the negative revenue impact of the switch from print to digital had largely been realized, and that revenue lines for traditional print products would begin to flatten out. At the same time, the Company's substantial investments in technology and integrated communications offerings were expected to begin paying dividends to offset any further revenue deterioration related to traditional print products. Thus, the Company projected moderate revenue deterioration in the near term, with revenues coming back to 2012 levels by 2017.

19.  The following chart shows the revenue numbers and projections Standard Register utilized in evaluating the transaction (in millions):

|  | 2011 (actual) | 2012 (actual) | 2013 (estimate) | 2014 (estimate) | 2015 (estimate) | 2016 (estimate) | 2017 (estimate) |
|---|---|---|---|---|---|---|---|
| WorkflowOne | | | | | | | |
| Standard Register | | | | | | | |
| Combined | | | | | | | |

20.  As the chart demonstrates, Standard Register anticipated further declines in revenue that would eventually be offset by increased revenue from its restructuring efforts and its ability to take a larger piece of the shrinking print products pie as an outgrowth of its status as a larger, more financially stable company.

21. The Company was largely on track to achieve these synergies at the time I left the Company in March 2015, which confirms my firm belief that the targeted synergies were reasonable and fully supported the Company's decision to enter into the WorkflowOne Acquisition. By the end of 2014, it was my understanding that the Company had implemented projects in connection with the integration of WorkflowOne that achieved ▮▮▮▮ in savings per year for the Company on an annualized basis, based on the Company's internal tracking of its synergy realization. As of February 2015, the Company was on track to realize ▮▮▮▮ in annual cost savings as a result of the merger. Attached as Exhibit A is a true and correct copy of the Integration Synergy Savings worksheet maintained by the Company, as of February 12, 2015.

C. **The Company's Financial Projections**

22. With the assistance of my team and Company management, I also oversaw the creation of the forward-looking financial projections used by BAML, Capstone, and WorkflowOne in connection with the WorkflowOne Acquisition. The projections were developed as part of the Company's annual financial planning process, and were not developed specifically in connection with a potential acquisition of WorkflowOne or any other third party.

23. The projections were created and refined through multiple rounds of comprehensive and deliberate determinations about the Company's future at a business-unit level, and were based off our reasonable estimation of the likely growth or decline of each of the Company's product lines.

24. The debt assumed in connection with the WorkflowOne Acquisition was necessary and neither excessive nor otherwise burdensome or inappropriate. First, it was the principal consideration paid by the Company for the WorkflowOne business. Second, the

payment terms and covenants, including the interest rate (including a PIK component), and amortization schedule, made imminent sense in the context of the Company's future business plan and the synergies that would be generated from the WorkflowOne Acquisition. No covenant ratio can be viewed in isolation, and that is clearly the case with the Company's debt to EBITDAP leverage ratio cited by the Committee, which wholly disregards the synergies associated with the transaction. The critical issue is not the leverage ratio *per se* but whether there was a reasonable prospect that the Company could pay the debt, when and as it became due. Given the amortization holiday, the ability to PIK interest for a significant period of time and the Company's projected cash position, the Company and its advisors at BAML reasonably believed that the Company could timely pay the amounts due on such debt.

25. In connection with the WorkflowOne Acquisition, my team and I also developed an estimate of revenue of the combined companies that would be lost as a result of the transaction, which we called a "shock loss." We believed these estimates were reasonable.

D. **The Performance of the Combined Company Post-Acquisition**

26. The WorkflowOne Acquisition was announced on August 1, 2013. The day before the announcement, the Company's stock price closed at $3.00. The Company's stock price closed at $13.80 the day of the announcement, a 360% increase, reflecting the market's overwhelmingly favorable reaction to a combination of the two companies. The Company's stock price continued its strong performance for an extended period as the Company executed its integration plan and began to realize the synergies that had been anticipated in connection with the transaction.

27. As of August 31, 2013, 5,546,511 shares of common stock were outstanding, and 944,966 shares of Class A stock were outstanding. As of October 27, 2013,

8,188,406 shares of common stock were outstanding, and 944,966 shares of Class A stock were outstanding.

28. The most significant challenge facing the combined company in the two years following the transaction was continued revenue decline. At the time of the WorkflowOne Acquisition, we anticipated that the Company and the industry as a whole were emerging from a period of negative growth. We firmly believed the Company would begin to experience a leveling off of revenue decline, leading to revenue growth in the years following the acquisition, as reflected in the Company's five-year financial projections. Following the acquisition, however, the expected growth failed to materialize as quickly as we had anticipated, and it became clear that the downturn from which we believed we were emerging would continue. This stagnated growth outpaced the revenue synergies realized from the transaction and prevented the Company from realizing the kind of top-line growth that was necessary to fund the Company's operations and manage its debt obligations.

29. To reiterate, the Company's struggles following the WorkflowOne Acquisition were not the result of a failure to realize anticipated synergies from that transaction. In fact, the Company's access to capital was increased as a result of the WorkflowOne Acquisition's terms, as the size of the Company's ABL was increased by 25% to $125 million, which was significant because at the time of the transaction the Company had far less than the full borrowing capacity under the existing $100 million facility. As a result of prior borrowings and borrowing base limitations, Standard Register only had access to ██████████ in additional liquidity prior to the WorkflowOne Acquisition. As a result of the WorkflowOne Acquisition, Standard Register's liquidity under the revolver increased to ██████████ on August 1, 2013 and its borrowing base essentially doubled. In my view, it was the combination of continued low

interest rates and the unanticipated continuation of industry-wide challenges that led to the Company's ultimate chapter 11 filing. Low interest rates inhibited reduction of the Company's unfunded pension liability and maintained annual pension contributions at an unsustainable level, and the continuation of industry-wide challenges prevented the combined company from realizing the revenue growth that we reasonably anticipated and, after extensive diligence, projected would be achieved by the Company as the industry emerged from its downturn.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

                                                                                                        */s/ Robert Ginnan*  
                                                                                                        Robert Ginnan

    Executed this 1st day of June, 2015