# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  15-10541 (BLS)<br><br>(Jointly Administered)<br><br>Hearing Date: June 8, 2015 at 9:30 a.m. (ET)<br><br>RE:  Docket Nos. 524, 526 |

## OMNIBUS REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN FURTHER SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING THE COMMITTEE STANDING AND AUTHORIZING THE COMMITTEE TO COMMENCE AND PROSECUTE CERTAIN ACTIONS ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") appointed in the bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this omnibus reply (the "Reply") to the objections filed by the Debtors (the "Debtors' Objection") [D.I. 583], Silver Point Finance, LLC (the "Silver Point Objection") [D.I. 581], and Bank of America, N.A. (the "BofA Objection" and collectively with the Debtors' Objection and the Silver Point Objection, the "Objections") [D.I. 579] to the Committee's motion (the "Standing Motion") [D.I. 524, 526] for an order granting the Committee standing and authority to commence, prosecute, and, if appropriate, settle an action or actions based upon the allegations set forth in the proposed complaint substantially in the form annexed to the Standing Motion as

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

Exhibit 1 (the "Complaint").[2]    As and for this Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    Stilted rhetoric and literary quotes aside, the Objections must be viewed for what they are: futile efforts by putative defendants to avoid further investigation and adjudication on the merits of the substantial and highly colorable claims and causes of action (the "Claims") the Committee – the only party not a putative defendant and capable of doing so – asserts in the proposed Complaint.  Notwithstanding requests by Silver Point and the Debtors that the Court adjudicate the merits of the Complaint now, the numerous factual issues surrounding the WorkflowOne Acquisition are complex and fact-specific, require further discovery, and present issues for trial, not for summary decision in connection with the Standing Motion.

2.    In an effort to defeat the Standing Motion, Silver Point and the Debtors mischaracterize the allegations in the Complaint, creating their own alternate, disputed version of the facts.  However, as set forth in the Standing Motion and as discussed further below, the Court's role in assessing whether the Complaint asserts colorable claims is not to weigh and decide factual disputes.  There is no doubt that factual disputes exist.  The appropriate inquiry is whether the Complaint contains sufficient factual allegations that, taken as true and construed in favor of the Committee, state plausible claims for relief.  The Complaint more than meets this standard.

3.    Virtually all of the putative defendants' alleged reasons for denial of the Standing Motion involve the resolution of disputed facts.  For example, with respect to the Committee's fraudulent conveyance Claims, the putative defendants' central argument is that the Debtors' market capitalization after the WorkflowOne Acquisition conclusively demonstrates that the

_____

[2]    Capitalized terms used but not defined herein have the meanings ascribed thereto in the Standing Motion.

Debtors received reasonably equivalent value in exchange for incurring an additional $210 million of debt and granting liens to Silver Point.  Relying on <u>VFB, LLC v. Campbell Soup Co.</u>, 482 F.3d 624, 633 (3d Cir. 2007), Silver Point and the Debtors assert that the Debtors' stock price immediately following the WorkflowOne Acquisition "conclusively demonstrates" and the "public market reaction is conclusive" that the Debtors received reasonably equivalent value in, and did not become insolvent as a result of, the WorkflowOne Acquisition. However, these arguments mischaracterize the <u>VFB</u> court's holding.  In finding market capitalization was an appropriate valuation benchmark, the <u>VFB</u> court, <u>after lengthy trial and analysis of valuation reports and expert opinions</u>, first determined, based on the facts of that case, that an efficient market existed for the stock price and that there was no "reason to distrust it."  The <u>VFB</u> court expressly recognized that an assessment of market capitalization must take into account the factual context in which it is raised and not occur in a vacuum.  Courts have uniformly ruled that whether a debtor received reasonably equivalent value is a fact-intensive inquiry and typically not ripe for adjudication on a motion to dismiss.  While the putative defendants may try to raise the market capitalization issue at trial after a full record is developed, the Standing Motion and the discussion below demonstrate that the allegations in the Complaint assert more than sufficient factual allegations with respect to each element of the fraudulent conveyance Claims to withstand a motion to dismiss.

4.     Here, trading in the Debtors' stock was light prior to the WorkflowOne Acquisition, meaning that small increases in trading volume had the ability to cause significant price changes.  Moreover, the market did not have access to material information immediately after the transaction and, when more information trickled into the market more than two months after the closing of the WorkflowOne Acquisition, the stock price plummeted.  In addition,

Silver Point itself believed that the value of the acquired assets was substantially less than the amount of debt assumed by the Debtors and began selling off the Debtors' common stock in the Debtors as early as May 2014.

5.      The Complaint contains sufficient facts to support the Claims.  As discussed more fully below, the Committee asserts colorable Claims that the Debtors have unjustifiably (but unsurprisingly, given Silver Point's influence over the Debtors) refused to pursue.  Accordingly, the Court should overrule the Objections and grant the Standing Motion.

## REPLY

6.      The Court should grant the Standing Motion because (1) the Claims are colorable and (2) the Debtors unjustifiably refused to pursue the Claims.  See In re Centaur, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010); see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548 (3d Cir. 2003); In re Yes! Entertainment Corp., 316 B.R. 141, 145 (D. Del. 2004).

## I.      THE COMPLAINT ASSERTS COLORABLE CLAIMS.

### A.      Standard for determining whether claims are colorable

7.      When deciding whether a proposed complaint asserts colorable claims and causes of action, "the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim" pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Centaur, 2010 WL 4624910, at *4.  The "threshold for stating a colorable claim is low[,]" see In re Washington Mutual, Inc., 461 B.R. 200, 255 (Bankr. D. Del. 2011), and a "relatively easy one" to meet.  In re Adelphia Commc'ns Corp., 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).  As part of this analysis, courts do not conduct a "de facto mini-trial" on the merits of the proposed complaint.  See id. at 369, 375.

8.      A plaintiff "gets the benefit of the doubt" with respect to the factual allegations in its complaint in connection with a motion to dismiss. In re Pitt Penn Holding Co., 484 B.R. 25, 34 (Bankr. D. Del. 2012) (BLS); In re Jevic Holding Corp., 2011 WL 4345204, at *3 (Bankr. D. Del. Sept. 15, 2011) (BLS) (denying motion to dismiss fraudulent transfer claim and holding that "credibility of the facts alleged by the plaintiff *are not at issue in a motion to dismiss* because 'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'") (citations omitted).  The standard is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Pitt Penn, 484 B.R. at 35 (citation omitted).

9.      Rather, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.2d 203, 210 (3d Cir. 2009) (citation omitted).  A plaintiff adequately pleads a claim for relief so long as "[t]he factual allegations in [the] complaint are more than labels and conclusions or a formulaic recitation of the elements of a cause of action." Fowler, 578 F.2d at 212 (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 564 (2007)) (internal quotation marks omitted).

10.      A court deciding a motion to dismiss under Rule 12(b)(6) cannot look to documents or declarations outside of the complaint or any attachments thereto, but rather, "looks only to the facts alleged in the complaint and its attachments *without reference to other parts of the record*." Jordan, Inc. v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994) (emphasis added); see West Penn Allegheny Health System, Inc. v. UPMC; Highmark, Inc., 627 F.3d 85, 97 n.6 (3d Cir. 2010) ("The general rule . . . is that 'a district court ruling on a

motion to dismiss may not consider matters extraneous to the pleadings.'") (citation omitted); <u>see also</u> <u>Wellness Pub. v. Barefoot</u>, 2008 WL 108889, at *18 n.11 (D.N.J. Jan. 9, 2008) ("The Court did not consider this affidavit as it is outside of the pleading and, therefore, not properly considered on a motion to dismiss under Rule 12(b)(6)); <u>In re Ames Dept. Stores, Inc.</u>, 322 B.R. 238, 241 (Bankr. S.D.N.Y. 2005) ("[A] court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda, in ruling on a motion to dismiss.").

11.     Thus, Rule 12(b)(6) requires denial of a motion to dismiss where, as here, a complaint – based upon a review of <u>only</u> the complaint and any documents intrinsic thereto – "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570); <u>see also</u> <u>In re Gibson Group, Inc.</u>, 66 F.3d 1436, 1439 (6th Cir. 1995) (holding that for purposes of a standing motion and in determining whether a claim is colorable, the "Court must look to the face of the complaint . . . without requiring or considering whether evidence supported the claims stated in the complaint"); <u>see also</u> <u>In re Dzierzawski</u>, 518 B.R. 415, 419-20 (Bankr. E.D. Mich. 2014) (granting standing and declining to consider defendants' facts that "would defeat [plaintiff's] proposed avoidance action claims.").

**B.     The Claims are colorable because the Committee has pleaded them with sufficient specificity to satisfy the Rule 12(b)(6) standard.**

12.     To ascertain whether the claims set forth in the Complaint are colorable, the Court must determine whether the Committee states "a plausible, and not merely speculative, claim for relief." <u>Pitt Penn</u>, 484 B.R. at 36; <u>see also</u> <u>Jevic</u>, 2011 WL 4345204, at *2-*3 (applying the same standard); <u>In re Charys Holding Co., Inc.</u>, 2010 WL 2774852, at *2-*3 (Bankr. D. Del. July 14, 2010) (BLS) (same).  As discussed above, this assessment considers only the allegations in the

Complaint itself, not the legal arguments and allegations set forth in the Silver Point Objection, the Debtors' Objection, the allegations raised in the declarations of Kevin Carmody (the "Carmody Declaration"), Joseph Morgan (the "Morgan Declaration"), and Robert Ginnan (the "Ginnan Declaration") submitted by the Debtors in opposition to the Standing Motion (collectively, the "Debtors' Declarations") [D.I. 584, 586, 588], or any other documents or evidence.  See Pitt Penn, 484 B.R. at 34 (holding that even though the allegations in a complaint may be "vigorously disputed, *that is not part of the inquiry*" on a Rule 12(b)(6) motion to dismiss) (emphasis added).

13.    A fundamental flaw pervades the Objections: the repeated assertion that the Committee must *prove* all of the Claims in order to prevail on the Standing Motion.  See, e.g., Debtors' Objection, ¶ 45 ("To state a claim for constructively fraudulent transfer the Committee *must demonstrate that . . .*") (emphasis added).  However, notwithstanding that assertion and the alternative version of the facts put forth by Silver Point and the Debtors, the Court should not conduct a "mini-trial" on the merits of the Complaint or entertain any evidence or factual allegations outside of the four corners of the Complaint when assessing whether the Claims are colorable.  The Claims, and especially those Claims that seek to avoid fraudulent transfers and obligations, are fact-intensive and require resolution at trial following fulsome discovery.  See, e.g., Charys, 433 B.R. 628, 638 (Bankr. D. Del. 2010) (BLS) (denying motion to dismiss and holding that "reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process"); Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP Inc.), 332 B.R. 129, 133 (Bankr. D. Del. 2005) (denying defendants' motion for summary judgment on actions brought under section 1336.04(A)(2) of the Ohio Uniform Fraudulent Transfer Act and section 548 of the Bankruptcy Code); In re Artha Management,

Inc., 174 B.R. 671, 679 (Bankr. S.D.N.Y. 1994) (holding that "[p]roving valuation for purposes of insolvency at the time of a transfer is a fact-specific inquiry such that summary judgment is inappropriate"). The Standing Motion should be granted.

**C.     The Debtors' stock price is not conclusive evidence of value or solvency.**

*HOW DID YOU GO BANKRUPT?*
*TWO WAYS. GRADUALLY, THEN SUDDENLY.*[3]

14.     Contrary to the self-serving statements in the Objections, the Debtors' stock price as of the time of the WorkflowOne Acquisition is far from "conclusive" evidence of whether the Debtors received reasonably equivalent value in the WorkflowOne Acquisition or whether the WorkflowOne Acquisition rendered the Debtors insolvent. In re WR Grace & Co., 446 B.R. 96, 106 n. 11 (Bankr. D. Del. 2011) (holding, in the context of plan confirmation, that "while market valuation of a company was strong evidence of its solvency," lenders "have not backed up their contention that Debtors' market capitalization is conclusively one of solvency" and that "arguments for presumption of solvency are not supported in the record or by operation of law. . . ."), aff'd, 468 B.R. 81 (D. Del. 2012) (as amended by 475 B.R. 34), aff'd, 2013 U.S. App. LEXIS 18346 (3d Cir. Sept. 4, 2013); see also Kerr McGee Corp. v. Tronox, Inc. (In re Tronox Inc.), 503 B.R. 239, 298, 300 (Bankr. S.D.N.Y. 2013) (holding, after denial of multiple motions to dismiss and a lengthy trial, that "[p]laintiffs have clearly overcome the assumption of market efficiency" and that "[d]efendants' reliance on the 'market' . . . is unavailing").

*i.     Stock price is not talismanic with respect to value or solvency.*

15.     The Debtors' stock price does not constitute a conclusive indication of value for fraudulent conveyance purposes at the standing stage of the litigation. As in VFB, fulsome discovery and trial on the merits is required. Silver Point and the Debtors rely heavily on VFB

---

[3]     HEMINGWAY, E., THE SUN ALSO RISES (Scribner 1954).

for the proposition that the Debtors must have received reasonably equivalent value in, and been solvent after, the WorkflowOne Acquisition because their stock price increased immediately post-closing. The <u>VFB</u> court did not so hold. Rather, the <u>VFB</u> court affirmed the district court's conclusion reached following a lengthy trial that the market for VFB's stock several months after the challenged transfer was an efficient market and, therefore, that the price of VFB's stock on the public market several months after the transaction was a reasonable indicator of VFB's value. As soon as the market ceases to be efficient, the market price becomes suspect.

16.    Moreover, while the <u>VFB</u> court expressly recognized that a plaintiff can demonstrate that a public company's market price is flawed, the plaintiff in that case did not meaningfully attempt to do so. <u>See</u> <u>VFB</u>, 482 F.3d at 634. The Third Circuit stated that market efficiency and adequate public disclosure of material information are the cornerstones of market capitalization theory. <u>Id</u>. at 632. The court further recognized that "[a]ll agree that if the market capitalization was inflated by Campbell's manipulations it was not good evidence of value; the question is whether it was so inflated[.]" <u>Id</u>. at 632.

17.    <u>VFB</u> involved a fraudulent conveyance claim challenging a March 1998 "leveraged spin" transaction pursuant to which a newly formed subsidiary acquired a line of business by assuming approximately $500 million in bank debt, resulting in a bankruptcy filing approximately three years later. <u>Id</u>. at 626. A brief comparison of the material facts (among others) that gave rise to the <u>VFB</u> court's reliance on market capitalization theory to the current posture and facts of the Committee's proposed litigation is as follows:

| VFB | Standard Register |
|---|---|
| Lengthy trial on the merits, including expert reports and testimony | No trial, limited pre-suit discovery |
| Market capitalization was continuously double the purchase price for more than a | Market capitalization was less than half of the purchase price for WorkflowOne |

| VFB | Standard Register |
|---|---|
| year after the challenged transaction | immediately after closing and less than 28% of the purchase price approximately three months later |
| Public disclosure of previously inflated sales and earnings figures promptly after the challenged transaction closed | Disclosure of historical financial data for WorkflowOne delayed by more than two months |
| Court considered stock price and stability several months *after* the challenged transaction | Objections consider only the stock price immediately after the WorkflowOne Acquisition |
| Steady stock price following public disclosures of corrected financial information and after the truth about the subsidiary's prospects had been "fully exposed" | Stock price declined significantly following public disclosure of historical financial data for WorkflowOne and data regarding projected integration and restructuring costs |
| Heavy trading volume by sophisticated investors | Light trading volume, no significant institutional ownership |
| No indication of significant changes in short interest post-closing | 800% increase in short interest immediately after closing |
| Outperformance of industry index (the S&P mid-cap food index) for approximately one year after the spinoff transaction, after fulsome disclosure of true financial condition | Stock price plummeted within weeks after after fulsome disclosure of true financial condition; began preparing for a bankruptcy filing approximately 13 months later |
| Ability to raise $200 million in unsecured debt from institutional investors more than a year after the spinoff transaction | Inability to obtain additional or replacement financing or alternative DIP financing |

18.     The <u>VFB</u> court, in reviewing the district court's decision rendered after a lengthy

trial and under the rigid "clear error" standard, stressed that, based on the facts of that case, the

question of valuation was "not even close" given that market capitalization never dropped below

$1.1 billion – more than double the purchase price – until approximately a year later.  <u>Id.</u> at 629,

633.  The court further stressed that "[v]aluing an asset is a difficult task that depends upon detail

factual determinations, which may be overturned only if they are 'completely devoid of a

credible evidentiary basis or bear[] no rational relationship to supporting data."  <u>Id</u>. at 633

(citations omitted).

19.     The VFB court cautioned that the factual context underlying the market's valuation of a stock is key to determining whether market capitalization is a reliable measure of a company's value in the context of a fraudulent conveyance claim.  The court stressed that "the factual context is, naturally enough, a question of fact, and it is the context that the parties dispute in the present case."  Id. at 632.

20.     That factual questions cannot be resolved at this early stage of litigation was emphasized in ASARCO LLC and Southern Peru Holdings LLC v. Americas Mining Corporation, 396 B.R. 278, 343 (S.D. Tex. 2008).  The ASARCO court, applying Delaware law to a fraudulent conveyance claim, held that the "weight a court should give the stock price in determining reasonably equivalent value necessarily depends on the reliability of that stock price as a reflection of the value of the company at the relevant time.  Thus, market efficiency is an important consideration in determining what weight to give the market value of the stock," but market pricing is not per se determinative.  The ASARCO court found that certain factors, including "[i]nformation and insight not communicated to the market" (quoting Cede & Co. v. Technicolor, Inc., 684 A.2d 289, 301 (Del. 1996) (quoting Paramount Commc'ns, Inc. v. Time Inc., 571 A.2d 1140, 1150 n. 12 (Del.1989)) (quotation marks omitted), low weekly trading volume, and low public float cut against the argument that a stock's market capitalization reflects its value.

21.     Thus, at this early stage of the litigation, the Court cannot make factual determinations but instead, must accept all facts asserted in the Complaint as true and draw all reasonable inferences in the Committee's favor.  The significance of the Debtors' post-acquisition stock price is a fact-intensive issue to be decided at trial, not in the context of the Standing Motion.

ii.     ***Even if it were relevant to the Standing Motion, the Debtors' post-closing stock price was flawed.***

22.     Even if the Court were to consider Silver Point's and the Debtors' arguments regarding the market value of the Debtors' common stock, both objections fail to mention one critical fact:  Because the market did not have material information about WorkflowOne or the WorkflowOne Acquisition, the immediate post-closing increase in the Debtors' stock price reflects nothing more than irrational exuberance.

23.     Because WorkflowOne was a private company prior to the WorkflowOne Acquisition, none of its historical financial data were publicly available.  After the Debtors announced the closing of the WorkflowOne Acquisition, they withheld WorkflowOne's historical financial information from the public.  See Form 8-K filed by The Standard Register Company on August 1, 2013, Item 9.01(a) ("The financial information required by this item is not being filed herewith.").  Although the WorkflowOne Acquisition closed on August 1, 2013, the Debtors did not release this crucial financial information until October 15, 2013 – *two and a half months* after closing.  See Form 8-K/A filed by The Standard Register Company on October 15, 2013.  The Debtors' stock price following the WorkflowOne Acquisition is set forth in the following chart:



### Stock Price Performance

### Disclosures Filed by the Company

| | Filed On | Disclosures Related to WorkflowOne Acquisition |
|---|---|---|
| 1 | 08/02/13 | • Press release disclosing annual savings of $40.0 million upon completion of integration of WorkflowOne; no mention of cost to achieve savings |
| 2 | 10/02/13 | • 8-K filed (no press release) disclosing $40.0 million in annual savings upon completion of integration with WorkflowOne, cost of restructuring initiative of $29.8 million until end of 2015 and $8.5 million in integration-related charges to achieve potential cost savings<br>• Stock price was $10.47, a 24.2% decline from 08/01/13 |
| 3 | 10/15/13 | • 8-K/A filed disclosing WorkflowOne's historical financials |
| 4 | 10/25/13 | • Press release disclosing Q3 '13 earnings announcement<br>• Stock price closed at $9.39 at day of announcement; two weeks later, price declined by 46.0% to $6.43 |
| 5 | 11/12/13 | • Filed 10-Q disclosing earnings and purchase price allocation<br>• Total assets acquired of $260.0 million of which $130.0 million were intangibles<br>• Total liabilities acquired of $253.0 million including Long-term Debt of $211.0 million and $42.6 million of Other Liabilities<br>• Net assets acquired of $6.5 million and net tangibles of ($123.0) million |

24.    Without any financial data regarding WorkflowOne, investors buying the Debtors' common stock immediately after the WorkflowOne Acquisition had barely more information upon which to base their trading decisions than the proverbial blindfolded monkey

throwing darts at the stock pages.[4]    The only meaningful information available to guide investors' decisions immediately after the closing of the WorkflowOne Acquisition was the mere fact that the Debtors had purchased a similarly sized competitor and anticipated eventually realizing $40 million of cost synergies (with no mention of how much it would cost to achieve the projected synergies).

25.    Unsurprisingly, after the Debtors began to reveal the reality of the financial quagmire they got themselves into, the price of their common stock plummeted.  On October 2, 2013, more than two months after closing, the Debtors filed a Form 8-K indicating that they expected to realize $40 million of annual savings once the integration with WorkflowOne was complete, but that they anticipated incurring restructuring costs of $29.8 million through the end of 2015 and $8.5 million of integration-related costs in order to achieve those savings.  See Form 8-K filed by The Standard Register Company on Oct. 3, 2013.  On October 15, 2013, the Debtors filed an amendment to their August 1, 2013 Form 8-K, finally disclosing WorkflowOne's historical financial data.  See Form 8-K/A filed by The Standard Register Company on Oct. 15, 2013.  On October 25, 2013, the Debtors released their earnings for the third quarter of 2013 (which included two full months post-closing).  By November 8, 2013, approximately three weeks after the Debtors finally provided financial data for WorkflowOne, the Debtors' stock price had plummeted to $6.43, less than half of its post-closing peak, for a market capitalization of less than $60 million – less than 30% of amount of secured debt incurred by the Debtors in the WorkflowOne Acquisition.  Because of the rapid decline in the Debtors' stock price once the Debtors finally released WorkflowOne's financial data two months after the WorkflowOne

---

[4]    See Burton Malkiel, A RANDOM WALK DOWN WALL STREET ("A blindfolded monkey throwing darts at a newspaper's financial pages could select a portfolio that would do just as well as one carefully selected by experts.")

Acquisition, the Debtors' stock price immediately after closing is not a meaningful indicator of the value the Debtors received in the transaction or their solvency.

**D.      The Complaint asserts colorable constructive fraudulent transfer Claims.**

26.      Counts one through four and sixteen through nineteen of the Complaint seek to avoid the SR Term Loan Obligations, the SR Term Loan Liens, and various other transfers the Debtors made in connection with the WorkflowOne Acquisition as constructive fraudulent obligations or transfers, as applicable.  See Complaint, ¶¶ 143-167, 217-246.  These Claims are colorable because the Committee adequately alleges (it need not "demonstrate," as the Debtors suggest) that the Debtors (a) received less than reasonably equivalent value for the obligations and transfers the Committee seeks to avoid and (b) were insolvent at the time of, or became insolvent as a result of, the transaction, (c) were left with unreasonably small capital for the business in which they were engaged or were about to engage, or (d) believed or reasonably should have believed that they would incur debts beyond their ability to pay when due.  See 11 U.S.C. § 548(a)(1)(B); Ohio Rev. Code § 1336.04(a)(2).

> *i.      The Complaint adequately alleges that the Debtors received less than reasonably equivalent value in the WorkflowOne Acquisition and for the various other related transfers the Committee seeks to avoid.*

27.      The Complaint sets forth specific reasons why the Debtors received less than reasonably equivalent value in the WorkflowOne Acquisition.  The Committee's allegations with respect to reasonably equivalent value flow primarily from its review and analysis of the limited pre-suit discovery materials produced by Silver Point and the Debtors.

28.      First, the Committee alleges, based upon a review of the Debtors' board minutes and WorkflowOne's financial statements, that the Debtors rejected transaction overtures for WorkflowOne three years prior to the WorkflowOne Acquisition (when WorkflowOne's

revenues and EBITDA were significantly greater than in 2013) and noted that the price would need to be "significantly less than $200 million" for a deal to make sense. See Complaint, ¶¶ 94-95.

29.    Second, the Committee alleges, based upon a review of internal analyses produced by Silver Point in the limited discovery produced to date, that Silver Point itself (a) valued its equity investment in WorkflowOne at zero, (b) valued $314 million of WorkflowOne's secured debt at less than half of par value, and (c) viewed the aggregate price it received for WorkflowOne as a 39% premium to an alternative cash sale of WorkflowOne, which Silver Point believed had a fair value of approximately $140 million. See Complaint, ¶¶ 96-100. Contrary to the attempts in the Silver Point Objection to explain this fact away, a seller's own view of the value of an asset provides highly relevant evidence to assess whether a transaction lacked reasonably equivalent value. See Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. Inc. (In re MDIP Inc.), 332 B.R. 129, 134-35 (Bankr. D. Del. 2005) (finding that a defendant's internal valuation documents, though disputed by defendants, "cannot be ignored by the Court" and required denial of defendant's motion for summary judgment).

30.    Third, the Committee alleges, based upon preliminary analyses prepared to date by the Committee's professionals, that as of the date of the WorkflowOne Acquisition, (a) WorkflowOne had a going concern value of no more than $66-79 million on a standalone basis, and (b) WorkflowOne had a midpoint fair value of approximately $134 million. See Complaint, ¶¶ 101-102. The Committee bases this analysis on the Debtors' financial statements, publicly available data for comparable companies and comparable transactions, and the Debtors' financial projections, revised to correct a number of material flaws in BAML's valuation analysis. Most notably, the Committee's analysis does not rely on hindsight or the fact that the

Debtors eventually filed bankruptcy as evidence of insolvency. Rather, the Committee bases its analysis entirely on information available at the time of the WorkflowOne Acquisition.

31.     Silver Point erroneously characterizes the Committee's assessment of WorkflowOne's value as flawed because it does not take transaction synergies into account. <u>See</u> Silver Point Objection, ¶ 2. This assertion is incorrect. The Committee determined – again, on a preliminary basis, based upon the limited discovery materials received to date – and the Complaint alleges that the adjusted midpoint value of WorkflowOne at the time of the WorkflowOne Transaction, *inclusive of transaction synergies and related expenses projected in connection with the WorkflowOne Acquisition*, was approximately $134 million. <u>See</u> Complaint, ¶ 102. Notwithstanding Silver Point's mischaracterization, the inclusion of cost synergies in the Committee's value allegation clearly indicates that the Committee arrived at this value not on a standalone basis, but on the basis of WorkflowOne as acquired. Silver Point and the Debtors may disagree with the adjustments the Committee applied to reach this assessment, but that is a factual issue for decision at trial. <u>See</u> <u>Jevic</u>, 2011 WL 4345204, at *9 (holding that, notwithstanding a lender's counterarguments and factual allegations, the committee seeking standing "has adequately alleged the absence of [reasonably equivalent value] at this stage and is entitled to further pursue its claims"); <u>Pitt Penn</u>, 484 B.R. at 50 ("All that is needed at this stage is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.") (quoting <u>Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)</u>, 2008 WL 4239120, at *9 (Bankr. D. Del. Sept. 16, 2008) and collecting cases).

32.     The other payments the Committee seeks to avoid as fraudulent transfers include payments of WorkflowOne's professional fees, payment of fees to BAML for its services as investment banker, and bonuses paid to two of the Debtors' key executives (insiders) in

connection with the WorkflowOne Acquisition.  See Complaint, ¶¶ 217-246.  If the Debtors

failed to receive reasonably equivalent value for the purchase of WorkflowOne itself, it logically

follows that they failed to receive reasonably equivalent value for (a) incremental amounts they

paid to or on behalf of WorkflowOne's parent on top of the purchase price, (b) to the Debtors'

investment banker that provided flawed advice, or (c) to the Debtors' executives for executing

the doomed WorkflowOne Acquisition.  The Complaint adequately alleges this logical link.  See

Complaint, ¶ 123.

> **ii.    *The Complaint adequately alleges that the WorkflowOne Acquisition
> rendered the Debtors insolvent.***

33.    The Committee alleges that, following the WorkflowOne Acquisition, the Debtors

carried total debt and non-operating liabilities of approximately $511 million, comprised of the

Prepetition Term Loans, the Prepetition ABL Facility, underfunded pension liability, capital

lease obligations, deferred compensation obligations, and environmental liabilities.    See

Complaint, ¶ 106.  The Committee based this factual allegation on the Debtors' own financial

statements.

34.    The Debtors attempt to rebut the Committee's allegation that the Debtors carried

$511 million of total debt and non-operating liabilities following the WorkflowOne Acquisition

by asserting that an increase in interest rates would have reduced their underfunded pension

liability.  See Debtors' Objection, ¶ 51.  The Debtors' assertion is of no moment in connection

with the Standing Motion.  First, as set forth above, only the factual allegations contained in the

Complaint, not the Debtors' assertions and conclusions or the allegations in the Declarations, are

relevant in determining whether the Claims are colorable.  See Gibson Group, 66 F.3d at 1439

(for purposes of a standing motion and in determining whether a claim is colorable, the "Court

must look to the face of the complaint . . . without requiring or considering whether evidence

supported the claims stated in the complaint"); see also Dzierzawski, 518 B.R. at 419-20 (granting standing and declining to consider defendants' facts that "would defeat [plaintiff's] proposed avoidance action claims."). Second, the supposed increase in interest rates never occurred, and there was certainly no meaningful consensus among contemporaneous experts as to what was likely to happen to interest rates in mid-2013.

35.    The Committee further alleges that the Debtors' $511 million of combined total debt and non-operating liabilities following the WorkflowOne Acquisition exceeded the midpoint fair value of the combined company by approximately $170 million. See Complaint, ¶ 107. The Committee's assessment of the fair value of the combined company followed the exact same trio of valuation methodologies used by the Debtors' investment banker, BAML – a comparable companies analysis, a comparable transactions analysis, and a discounted cash flow analysis including transaction synergies – with adjustments to correct certain errors underlying BAML's analysis. The Committee more than adequately alleges that the WorkflowOne Acquisition rendered the Debtors insolvent, and is entitled to present evidence at trial in support of that allegation. Cf. Jevic, 2011 WL 4345204, at *9 (holding that an allegation that the debtor "was 'insolvent or would be rendered insolvent by the [challenged] transactions'" was sufficient to survive a motion to dismiss) (citing Joseph v. Frank (In re Troll Commc'ns, LLC), 385 B.R. 110, 123-24 (Bankr. D. Del. 2008) (finding a plaintiff adequately pleaded insolvency where complaint alleged facts showing that the debtors' liabilities exceeded their assets prior to bankruptcy)).

### iii.    The Complaint adequately alleges that the WorkflowOne Acquisition left the Debtors with unreasonably small capital.

36.    The Committee alleges five specific reasons why the WorkflowOne Acquisition left the Debtors with unreasonably small capital for their business.

37.    First, the Complaint alleges that the Debtors' total adjusted debt and non-operating liabilities, as a multiple of their earnings before interest, taxes, depreciation, amortization, and pension expense (EBITDAP), exceeded the fair value of their assets under any valuation methodology after the WorkflowOne Acquisition.  See Complaint, ¶ 109.  The Committee bases this allegation on the Debtors' financial statements and on the Committee's assessment of the Debtors' value, as discussed above.  The Complaint further alleges that the ratio of total adjusted debt to EBITDAP for comparable companies was 1.9 times, far smaller than the Debtors' debt-to-EBITDAP ratio.  See Complaint, ¶ 110.  The Committee bases these allegations on publicly available financial information for six comparable publicly traded companies.

38.    Second, the Committee alleges that the Debtors' ratio of liabilities to capitalization was 147%, a far larger figure than comparable companies' average of 29%.  See Complaint, ¶ 111.  The Committee bases this allegation on the Debtors' financial statements, the Committee's analysis of the Debtors' fair value discussed above, and publicly available financial information for comparable companies.

39.    Third, the Committee alleges that the debt the Debtors incurred in the WorkflowOne Acquisition constrained their financial flexibility in the face of significant external risks.  See Complaint, ¶ 112.  The Committee bases this allegation on a review of the Debtors' financial statements and industry data available at the time of the WorkflowOne Acquisition.

40.    Fourth, the Committee alleges that the Debtors projected pension funding obligations of approximately $40 million in each of 2014 and 2015 and cumulative costs to achieve merger synergies with WorkflowOne of approximately $34 million over the same

period.  See Complaint, ¶ 114.  The Committee bases this allegation on the Debtors' financial statements.

41.     Fifth, the Committee alleges that the Debtors' post-closing total debt represented approximately 10.7 times its estimated 2014 unlevered cash flow.  The Committee bases this allegation on a review of the Debtors' financial statements.

42.     The Complaint adequately alleges that the Debtors were overleveraged – and thus had unreasonably small capital – following the WorkflowOne Acquisition.   See Jevic, 2011 WL 4345204, at *10 (holding that a committee's allegations that (a) a challenged transaction reduced the debtors' equity and increased their debts and (b) the projections underlying the challenged transaction "were highly unrealistic and highly unreasonable" were sufficient to satisfy this element).

> ***iv.     The Complaint adequately alleges that the Debtors believed, or reasonably should have believed, that they would incur debts beyond their ability to pay as they came due following the WorkflowOne Acquisition.***

43.     The Committee alleges that the Debtors knew, or should have known, that they incurred debts beyond their ability to pay through the WorkflowOne Acquisition because (a) the interest, amortization, and excess cash flow payments under the Prepetition Term Loans were substantial and were far larger than the Debtors' pre-acquisition debt service and (b) the Debtors' financial projections prepared in connection with the WorkflowOne Acquisition contained unreasonable assumptions about post-acquisition revenue growth, contrary to historical declines and readily available analyst projections for comparable companies and the Debtors' industry as a whole.  See Complaint, ¶¶ 116-118.  The Committee bases these allegations on the Debtors' financial statements, the transaction documents for the WorkflowOne Acquisition, the credit

agreements for the Prepetition Term Loans, the Debtors' financial projections, and analyst projections for several comparable companies and for the Debtors' industry as a whole.

44.    The Debtors' allegations that the Board relied on fairness and solvency opinions by outside advisors, see Debtors' Objection, ¶¶ 3, 25, 29, 38, 83, do not affect the Court's assessment of whether the fraudulent transfer claims are colorable because, as discussed above, arguments and allegations outside of the Complaint are irrelevant to the Court's assessment of whether any of the Claims are colorable.

45.    Even if the fairness and solvency opinions the Board relied on were relevant to the assessment of whether the Claims are colorable (which they are not), those opinions were materially flawed and any reliance on them by the Board was patently unreasonable.

46.    First, the solvency and fairness opinions the Debtors rely on, relied in turn on the Debtors' own flawed and unreasonable financial projections (and, in particular, their revenue projections, which were excessively optimistic compared to historical performance and contemporaneous analyst reports for comparable companies and the Debtors' industry as a whole).  See Jevic, 2011 WL 4345204, at *9 (holding that financial projections made at the time of a challenged transaction "must in fact be reasonable" and noting that the Third Circuit has held that the reasonableness of such projections "must be tested by an objective standard anchored in the company's actual performance") (quoting Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992)); see also Tronox, 503 B.R. at 298-99 (holding that "projections were unrealistic when compared to . . . historical performance").  In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006) (holding that the reasonableness of financial projections requires an analysis of whether they were prudent when made).  Such an analysis is necessarily a fact-specific inquiry that is inappropriate at this stage of the litigation.

47.     Second, BAML's fairness opinion used improper comparable public companies (including specialized businesses and companies with vastly different margin profiles) and precedent transactions in its valuation of WorkflowOne (including transactions that occurred years before the WorkflowOne Acquisition and transactions that never closed).    Most importantly, the Board's reliance on outside solvency and fairness opinions does not insulate the WorkflowOne Acquisition from challenge.  See Tronox, 503 B.R. at 291 (solvency opinion that relied on defendant's own estimates could not defeat claim for fraudulent conveyance); Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp North America, Inc. (In re TOUSA, Inc.), 422 B.R. 783, 839 (Bankr. S.D. Fla. 2009) (solvency opinion was not credible, in part, because it relied on projections provided entirely by debtors' management); Calpine Corp. v. Rosetta Resources Inc. (In re Calpine Corp.), 377 B.R. 808, (Bankr. S.D.N.Y. 2007) (motion to dismiss fraudulent transfer action denied despite existence of fairness opinion).

48.     All of the Committee's allegations with respect to the elements of the constructive fraudulent conveyance Claims satisfy the Rule 12(b)(6) motion to dismiss standard because the Committee pleaded them in great detail, in good faith, and with a solid evidentiary basis.  None of the arguments, unsupported conclusory statements, and misstated factual allegations proffered by Silver Point and the Debtors in their respective Objections and the Declarations are relevant to the Court's consideration of whether the Claims are colorable.  Accordingly, the fraudulent conveyance Claims are colorable.

**E.     The Complaint asserts colorable Claims for breach of fiduciary duty by the Director and Officer Defendants.**

49.     The fifteenth count of the Complaint alleges that the Director and Officer Defendants breached their fiduciary duties to the Debtors by approving the WorkflowOne Acquisition.  This count is based upon two primary allegations.

50.    <u>First</u>, the Committee alleges that the Board failed to fully and adequately inform itself as to the propriety of the WorkflowOne Acquisition, as evidenced by (among other things) the observation by one of Silver Point's initial appointees to the Board post-closing that the Board was unaware of an entire line of business comprising 8% of WorkflowOne's revenues and "knew very little about [WorkflowOne]."  <u>See</u> Complaint, ¶¶ 213-214.  Of note, the Committee has not yet had an opportunity to depose any of the Debtors' directors or officers from the time of the WorkflowOne Acquisition or take other post-suit discovery to further develop the breach of fiduciary duty Claims before trial.

51.    <u>Second</u>, the Committee alleges that Morgan and Ginnan (the Debtors' Chief Executive Officer and former Chief Financial Officer) provided unrealistic, overly optimistic financial projections to the Board and that the Board's reliance on those projections was unreasonable.  <u>See</u> Complaint, ¶ 213, 215.  The Complaint alleges in detail some of the reasons the Debtors' financial projections were faulty.  <u>See</u> Complaint, ¶ 118 (discussing the flaws in the Debtors' revenue projections, including the assumptions that the combined companies' revenue would grow substantially following the WorkflowOne Acquisition despite historical revenue declines at both Standard Register and WorkflowOne and contrary to analysts' projections for comparable companies and the Debtors' industry).

52.    The Debtors' assertions that the Director and Officer Defendants are absolved of liability because they relied on an analysis prepared by BAML are misguided for the same reason the BAML analysis does not automatically preclude the fraudulent conveyance Claims. <u>See</u> ¶ 39 above.

F.     **The Complaint asserts colorable Claim for recharacterization of the Second-Lien Term Loans as equity interests. (Count 7)**

53.     The seventh count of the Complaint seeks recharacterization of the Second-Lien Term Loans as equity.  See Complaint, ¶¶ 178-181.  Silver Point argues that the Committee has failed "to show that the Petition [sic] Second Lien Term Loans were actually an equity contribution."  See Silver Point Objection, ¶ 44.  However, at this stage, the Committee need only plead, rather than prove, a colorable claim that the economic substance of the Second-Lien Term Loan was an equity contribution.

54.     As Silver Point itself recognizes, the inquiry for recharacterization requires the Court to consider various factors to determine a party's intent, which necessitates a fact intensive inquiry.  See SubMicron Sys. Corp., 432 F.3d 448, 456 (3d Cir. 2006).  As hallmark indicators that the economic substance of the Second-Lien Term Loan was equity, not debt (and notwithstanding Silver Point's self-serving assertion that loan terms that do not require payment of interest or principal are "common features of funded debt"), the Committee alleges that the terms of the Second-Lien Term Loan did not require cash interest payments and lacked any mandatory amortization payments.  See Complaint, ¶ 180.  These specific factual allegations, among others, are sufficient to allege that the Second-Lien Term Loan was, in substance, an equity contribution and must be evaluated by the Court as part of its multi-factor inquiry at trial.

G.     **Equitable Subordination or Disallowance (Counts 9-10)**

55.     The ninth and tenth counts of the Complaint seek entry of a judgment equitably disallowing Silver Point's claims, or subordinating Silver Point's claims to all allowed general unsecured claims against the Debtors.  See Complaint, ¶¶ 184-191.  In support of these counts, the Committee specifically alleges that Silver Point traded in the Debtors' common stock while in possession of material nonpublic information Silver Point acquired as a fiduciary of the

Debtors.  See Complaint, ¶¶ 186, 190.  Insider trading can constitute inequitable conduct warranting equitable disallowance or subordination of an insider's claims.  See, e.g., In re Washington Mutual, Inc., 461 B.R. 200, 254-67 (Bankr. D. Del. 2011).  In addition, the Committee specifically alleges that Silver Point inequitably took advantage of the Board's urgent desire to do a deal in order to position itself to obtain control of the Debtors.  See Complaint, ¶ 93.  The Committee's allegations are specific and flow from the Committee's review of pre-suit discovery materials produced by Silver Point and the Debtors.  The Committee is entitled to develop these claims through discovery and prove them at trial.

**H.**     **The Committee has pleaded colorable Claims in the remaining counts of the Complaint. (Counts 5, 6, 8, 11-14)**

56.     The Committee asserts colorable claims in the fifth, sixth, eighth, and eleventh through fourteenth counts of the Complaint.  These counts seek a determination of the extent, validity, priority, and perfection of the Term Loan Defendants' and Prepetition ABL Defendants' asserted liens and security interests in the Debtors' assets as of the Petition Date, as well as ancillary relief that may flow from the avoidance of certain liens and claims pursuant to other counts of the Complaint.

57.     The Complaint identifies various categories of assets (as specifically identified in Exhibits B and C to the Complaint) that, despite the lenders' assertions that they have valid liens on substantially all of the Debtors' assets, were unencumbered or not subject to properly perfected liens and security interests.  See Complaint, ¶ 100.  In their Objections, the lenders appear to concede that certain of those assets were indeed unencumbered, but dispute others.  Exhibits A and B hereto identify the assets that are clearly unencumbered (and all parties agree) and the assets with respect to which liens and security interests remain disputed.  As such,

a legitimate dispute remains with respect to the extent, validity, priority, and perfection of the lenders' asserted liens and security interests.

58.     The Prepetition ABL Agent argues that no colorable claims exist with respect to the Prepetition ABL Lenders because, even if the Prepetition ABL Lenders' liens challenged in the Complaint were held invalid, the Prepetition ABL Lenders were nonetheless oversecured. The Prepetition ABL Lender argues that the value ascribed to the contested collateral is a "negligible amount" of $8.1 million.

59.     In reality, the value of the Debtors' unencumbered assets is significantly more than the $8.1 million identified by the Prepetition ABL Lenders when collateral for which value is presently undetermined (such as the Debtors' substantial and valuable equity interests in foreign affiliates) is included. Moreover, assuming, *arguendo*, that the value of the Debtors' unencumbered assets is $8.1 million, neither the Debtors nor the lenders have offered those funds as a means of recovery for unsecured creditors. Instead, the lenders seek to keep the value of those assets exclusively for themselves.

60.     In addition, the value of the lenders' collateral has not been established under section 506 of the Bankruptcy Code to conclude that they are oversecured. The lenders' reliance on the DIP Order and the Debtors' assertions in their financing motion that they are oversecured is of no moment. First, the lenders' liens and the valuation of their collateral remain subject to a challenge raised in the Standing Motion and Complaint. Second, the lenders' own position shown by their demand, and the Debtors' agreement, with respect to various "adequate protection" provisions in the DIP Order (such as payment of interest, legal and other fees, replacement liens, etc.) belie their current position with respect to the value of their prepetition collateral. See DIP Order, ¶¶ 14-15. If the lenders truly believed that a significant equity

cushion existed in the value of their prepetition collateral (in excess of $50 million) as of the Petition Date, there would be no need for additional "adequate protection." See Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.), 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection."); see also In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.") (internal quotations omitted).

61.     The sixth and twelfth counts of the Complaint seek disgorgement or recharacterization of payments made on account of the Prepetition Term Loans and the Prepetition ABL Facility, to the extent those loans were undersecured.  As a matter of law, an undersecured creditor is not entitled to postpetition payment of interest, fees, costs, and expenses.  These Claims necessarily turn on a determination (under other counts of the Complaint) that the applicable lenders were undersecured.  No further factual pleading is necessary to adequately assert these Claims.

62.     Similarly, the eighth and thirteenth counts of the Complaint seek disallowance of the Term Loan Defendants' and the Prepetition ABL Defendants' claims to the extent they are voidable under chapter 5 of the Bankruptcy Code.  As a matter of law, disallowance of claims of entities that owe avoidable transfers to a bankruptcy estate is mandatory.  See 11 U.S.C. § 502(d).  Accordingly, no further factual pleading is necessary to adequately assert these Claims, which necessarily turn on a finding (under other counts of the Complaint) that certain transfers or obligations are avoidable.

63.    As such, the fifth, sixth, eighth, and eleventh through fourteenth counts of the Complaint contain colorable claims.

## II.    THE DEBTORS UNJUSTIFIABLY REFUSED TO PURSUE, OR TO PERMIT THE COMMITTEE TO PURSUE, THE CLAIMS SET FORTH IN THE COMPLAINT.

64.    In addition to the Debtors' stipulations in the DIP Order precluding them from challenging Silver Point's and the Prepetition ABL Lenders' alleged liens and claims, the Debtors raise two supposed justifications for their refusal to bring the Claims: (a) that the Claims are not valuable and (b) that the Debtors could not sue Silver Point because they needed access to DIP financing and a stalking-horse bidder.  Both are baseless.

65.    The Debtors appear to base their conclusory allegation that the claims set forth in the Complaint are not valuable on the Debtors' own speculation as to the Committee's likelihood of success on the merits of the Complaint.  It is not entirely clear why the Debtors care (and expend considerable and scarce resources opposing the relief the Committee seeks in the Standing Motion), other than to appease Silver Point, but the Debtors' allegations in this regard are misguided.

66.    The Debtors allege that if the liens granted in connection with the WorkflowOne Acquisition are avoided as fraudulent transfers, Silver Point will retain a lien on the Debtors' assets to the extent Silver Point gave value in the WorkflowOne Acquisition.  First, the extent to which Silver Point might retain any of its liens and claims is highly speculative.  The recipient of an avoidable fraudulent transfer is only entitled to a lien under section 548(c) to the extent it gave value, and only if it was a transferee in good faith.  See Le Café Crème v. Le Roux (In re Le Café Crème), 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000) (noting that under constructive fraudulent law "[g]ood faith is required of both the transferor and the transferee"); In re

Checkmate Stereo & Elecs., Ltd., 9 B.R. 585, 617 (Bankr. E.D.N.Y. 1981) (stating that good faith may also be lacking "because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer. . . .").

67.     The value of a lien under section 548(c) depends upon the actual value given by the transferee. See, e.g., Matter of Positive Health Mgmt., 769 F.3d 899, 905-07 (5th Cir. 2014) (holding that "value" under section 548(c) of the Bankruptcy Code is not the same as "reasonably equivalent value" under section 548(a)). Silver Point has not proven the value it gave to the Debtors in the WorkflowOne Acquisition, which is the relevant value for purposes of section 548(c), or that it was a transferee in good faith with respect to the SR Term Loan Liens or the SR Term Loan Obligations.

68.     The Debtors also disingenuously mischaracterize the Committee's allegation in the Complaint regarding the midpoint value of WorkflowOne, stating that "the Committee admits that WorkflowOne was worth at least $134 million on the date of the WorkflowOne [Acquisition], *excluding synergies*." See Debtors' Objection, ¶ 124 (emphasis added).  This assertion is patently false.  The Committee's allegation regarding the $134 million value of WorkflowOne was based on the midpoint, not the minimum, of a preliminary range of values calculated based upon information available at the time of the WorkflowOne Acquisition, including a rationalized forecast of the combined company's revenues instead of the outlandish projections used by the Debtors and BAML.  Moreover, the Committee's valuation includes the Debtors' projected transaction synergies, adjusted to correct material errors in the assumptions made by BAML in its fairness opinion and by the Debtors in their financial projections.  These are highly fact-sensitive issues properly decided at trial, following fulsome discovery.  However, based upon the Committee's investigation and the incomplete discovery materials received to

date, the Committee has determined that the Claims are meritorious, have substantial value, and are far from speculative.

69.     The Debtors further argue that their decision not to sue Silver Point was reasonable because the Debtors needed access to DIP financing and a stalking horse bidder.  The truth underlying this assertion is simple: the Debtors are beholden to Silver Point, which holds 20% of the Debtors' common equity, controls two seats on the Debtors' board of directors, and is the Debtors' primary prepetition secured lender (and now a DIP lender).  The Debtors could not have sued Silver Point even if they wanted to, as they likely would have faced an immediate foreclosure.

70.     Despite the Debtors' assertions that they desperately needed DIP financing from Silver Point, and Silver Point's assertions that it is a "new money DIP lender," the Debtors have not yet used and likely never will use any of the liquidity available under the DIP term loan provided by Silver Point other than to pay more than $1 million in fees to Silver Point itself.

71.     The Committee has serious doubts as to the veracity of the Debtors' assertion that their board of directors, which includes two Silver Point designees and included a Silver Point employee until late December 2014, made a "careful evaluation" and determined not to sue Silver Point.  Suing Silver Point on account of the WorkflowOne Acquisition would constitute a tacit acknowledgment by the Board of its own breach of fiduciary duty in approving that transaction.  Moreover, the Debtors' counsel, Gibson Dunn, was and is unable to give the Debtors unbiased advice with respect to the Claims because Gibson Dunn advised the Board in connection with the WorkflowOne Acquisition.  See Debtors' Objection, ¶ 32.  In addition, in its pre-suit discovery, the Committee specifically requested documents from the Debtors concerning "causes of action, and the value thereof . . . including actions Concerning or arising out of the

WorkflowOne Acquisition."    Despite now alleging that they have undertaken a "careful evaluation" of potential claims related to the WorkflowOne Acquisition, see Debtors' Objection, ¶ 38, the Debtors produced no documents responsive to this request.

72.    The simple reality is that the Debtors' estates likely hold immensely valuable Claims against Silver Point and other potential defendants.  The Debtors' unwillingness to sue their controlling secured lender or implicate their own officers and directors (and counsel) may explain the Debtors' refusal to bring the Claims, but does not justify such refusal.  The Claims are meritorious and warrant prosecution for the benefit of the Debtors' estates and creditors.  The Committee is the only conflict-free party capable of doing so.

73.    The Debtors' assertion that individual creditors' failure to bring claims for recharacterization, equitable subordination, and equitable disallowance demonstrates that the Debtors' refusal to do so was reasonable, see Debtors' Objection at ¶ 133, borders on frivolous. In light of the fact that the Debtors concealed their alleged impending covenant breach from the general public while preparing a bankruptcy filing at Silver Point's direction, most of the Debtors' creditors were likely unaware of the severity of the Debtors' financial straits until the Petition Date.  Moreover, individual creditors have two compelling disincentives to bring such a suit either pre- or post-petition: (a) the costs of suit relative to the size of their individual claims and (b) the desire to continue doing business with the Debtors.

74.    Through the Objections, all Silver Point and the Debtors have done is demonstrate that significant issues of fact exist.  Factual disputes are not resolved in connection with a motion to dismiss, and thus need not be addressed in connection with the Standing Motion.

75.    As set forth in the Standing Motion, the Complaint, and this Reply, the Complaint asserts valuable Claims on which the Committee has demonstrated a high likelihood of success.

The recovery on those Claims will far outweigh any incremental costs incurred by the Debtors' estates in the prosecution thereof.  In sum, the Committee has amply demonstrated that the Claims are colorable and that the Debtors' refusal to pursue the Claims was unreasonable in light of the merits and value thereof.  Nothing more is necessary.  The Standing Motion should be granted.

**[ *signature page follows* ]**

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court overrule the Objections, grant the relief requested in the Standing Motion, and grant the Committee such other and further relief as the Court deems appropriate.

Dated: June 4, 2015

Respectfully Submitted,

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973-597-2500
Facsimile:  (973) 597-2400

*-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Counsel to the Committee*

*-and-*

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (DE Bar No. 3877)
Justin K. Edelson (DE Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

*Delaware Co-Counsel to the Committee*

-34-