FILED UNDER SEAL[1]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al*,[2]<br><br>               Debtors. | Chapter 11<br><br>Case No. 15-10541 (BLS)<br><br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE STANDARD REGISTER COMPANY, *et al.*, ON BEHALF OF THE DEBTORS' ESTATES,<br><br>               Plaintiff,<br><br>     v.<br><br>SILVER POINT CAPITAL, L.P.; SILVER POINT FINANCE, LLC; SPCP GROUP III LLC; SILVER POINT CAPITAL FUND, L.P.; SPF CDO I, LTD.; SPCP GROUP, LLC; DLJ INVESTMENT PARTNERS, L.P.; DLJ INVESTMENT PARTNERS II, L.P.; DLJIP II HOLDINGS, L.P.; CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH; CREDIT SUISSE LOAN FUNDING LLC; SARGAS CLO II LTD.; WG HORIZONS CLO I; JOSEPH P. MORGAN, JR.; ROY W. BEGLEY, JR.; F. DAVID CLARKE, III; JOHN Q. SHERMAN, II; JULIE D. KLAPSTEIN; JOHN J. SCHIFF, JR.; ROBERT M. GINNAN; WFSR HOLDINGS, LLC, F/K/A WORKFLOW HOLDINGS, LLC; AND JOHN DOES 1-10; AND XYZ COMPANIES 1-10,<br><br>               Defendants. | Adv. Pro. No. 15-_____ (BLS)<br><br>**ADVERSARY COMPLAINT** |

---

[1]   The Committee filed this Complaint under seal, and a redacted copy of this Complaint on the public docket, pursuant to the *Order Authorizing the Committee to File Under Seal the Motion (Including Any Exhibits Attached Thereto) of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [D.I. 612].

[2]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

The Official Committee of Unsecured Creditors (the "Committee") of The Standard Register Company ("SRC") and the other debtors and debtors-in-possession (collectively with SRC, the "Debtors")[3] in the above-captioned chapter 11 bankruptcy cases (the "Chapter 11 Cases"), on behalf of the Debtors' chapter 11 estates, as and for its adversary complaint (the "Complaint") against the above-captioned defendants (collectively, the "Defendants") pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and §§ 105, 502, 506, 510, 544, 547, 548, 550, and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), hereby respectfully alleges as follows:

## PRELIMINARY STATEMENT[4]

1.      These Chapter 11 Cases are the final act in a strategy orchestrated by Silver Point to obtain ownership of the Debtors' business, eviscerate hundreds of millions of dollars of unsecured claims, offload liability for the Debtors' underfunded defined benefit pension plan onto the PBGC, and reap the resulting cash flow benefits entirely for itself at the expense of the Debtors' other creditors and stakeholders.

2.      Through this adversary proceeding, the Committee, on behalf of the Debtors' estates, seeks to (among other things):

- avoid and unwind, pursuant to sections 544 and 548 of the Bankruptcy Code and applicable state law, the fraudulent transfers made and obligations incurred by certain Debtors, in their largest acquisition ever, in exchange for ownership of their deeply insolvent competitor WorkflowOne in a lopsided transaction in which the Debtors received less than reasonably equivalent value and were left insolvent, undercapitalized, and unable to pay their debts as they came due;

---

[3]    As used herein, "Standard Register" refers to the Debtors and their business as they existed prior to the WorkflowOne Acquisition (as defined below).

[4]    Capitalized terms in the Preliminary Statement have the meanings ascribed thereto in subsequent sections of the Complaint.

- recover damages from the Debtors' board of directors and certain key officers for the breach of their fiduciary duties in approving the wasteful acquisition of WorkflowOne;

- recover fees and transaction bonuses paid in connection with the WorkflowOne acquisition;

- avoid liens on certain of the Debtors' assets that were not properly perfected prior to the commencement of the Chapter 11 Cases; and

- obtain a judgment declaring that certain of the Debtors' assets were unencumbered prior to the commencement of the Chapter 11 Cases.

3.      The relief the Committee seeks through this adversary proceeding will, among other things, substantially reduce the Debtors' obligations, preserve the value of the Debtors' unencumbered assets for the benefit of unsecured creditors, provide meaningful financial recoveries for the Debtors' estates, and prevent Silver Point from obtaining all of the value of the Debtors' business at the expense of the Debtors' other stakeholders, including unsecured creditors.

## JURISDICTION, VENUE, AND STANDING

4.      On March 12, 2015 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Chapter 11 Cases are jointly administered under the case styled as In re The Standard Register Company, Lead Case No. 15-10541 (BLS), pursuant to an order of the Court dated March 13, 2015 [D.I. 46].

5.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334(b) and the Standing Order of the United States District Court for the District of Delaware referring all cases and proceedings arising under the Bankruptcy Code to the Bankruptcy Judges of this District.

6.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). In the event any part of this adversary proceeding is found to be non-core, the Committee consents to the entry of final orders and judgments by this Court pursuant to Bankruptcy Rule 7008.

7.    Venue is proper in this Court and this District pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with the Chapter 11 Cases currently pending before the Court.

8.    The Committee has standing to bring this Complaint pursuant to the Court's ruling on the record at the hearing held on June 8, 2015.

## THE PARTIES

9.    Plaintiff is the Official Committee of Unsecured Creditors duly appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the Office of the United States Trustee for Region 3 on March 24, 2015.

### Term Loan Defendants

10.    Defendant Silver Point Capital, L.P. ("SPC")[5] is a Delaware corporation with executive offices located at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06830. SPC is the representative of the lenders under the Prepetition Term Loans (as defined below).

11.    Defendant Silver Point Finance, LLC ("Silver Point Finance") is a Delaware limited liability company with executive offices located at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06830.   Silver Point Finance is the administrative agent under the Prepetition Term Loans.

---

[5]    The term "Silver Point" used throughout this Complaint refers to SPC and/or its affiliates and is used in the interest of brevity where direct references to specific SPC-affiliated entities are not necessary.

12.     Defendant SPCP Group III LLC ("SPCP GIII") is a Delaware limited liability company with executive offices located at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06830.  SPCP GIII was a lender under both Prepetition Term Loans at the closing of the Debtors' acquisition of WorkflowOne, LLC and its direct and indirect subsidiaries (as described more fully below, the "WorkflowOne Acquisition").

13.     Defendant Silver Point Capital Fund, L.P. ("SPCF") is a Delaware limited partnership with executive offices located at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06830.  SPCF was a lender under the Second-Lien Term Loan (as defined below) at the closing of the WorkflowOne Acquisition.

14.     Defendant SPF CDO I, Ltd. ("SPF CDO") is an exempted limited liability company organized under the laws of the Cayman Islands.  SPCP GIII, through SPC as agent, is the collateral manager of SPF CDO.  Upon information and belief, SPF CDO has executive offices located at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06830.  SPF CDO was a lender under both Prepetition Term Loans at the closing of the WorkflowOne Acquisition.

15.     Defendant SPCP Group, LLC ("SPCP" and collectively with SPC, Silver Point Finance, SPCP GIII, SPCF, and SPF CDO, the "Silver Point Defendants") is a Delaware corporation with executive offices located at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06830.  SPCP was a lender under both Prepetition Term Loans at the closing of the WorkflowOne Acquisition.

16.     Defendant DLJ Investment Partners, L.P. ("DLJIP") is a Delaware limited partnership with executive offices located at 9 Old Kings Highway South, Darien, Connecticut 06820.  DLJIP was a lender under the Second-Lien Term Loan at the closing of the WorkflowOne Acquisition.

17.     Defendant DLJ Investment Partners II, L.P. ("DLJIP2") is a Delaware limited partnership with executive offices located at 9 Old Kings Highway South, Darien, Connecticut 06820.   DLJIP2 was a lender under the Second-Lien Term Loan at the closing of the WorkflowOne Acquisition.

18.     Defendant DLJIP II Holdings, L.P. ("DLJIP2 Holdings") is a Delaware limited partnership with executive offices located at 9 Old Kings Highway South, Darien, Connecticut 06820.   DLJIP2 Holdings was a lender under the Second-Lien Term Loan at the closing of the WorkflowOne Acquisition.

19.     Defendant Credit Suisse AG, Cayman Islands Branch ("CS") is the Cayman Islands branch of a Swiss banking institution based in Zurich, Switzerland.   CS has executive offices in the United States located at Eleven Madison Avenue, New York, New York 10010. CS was a lender under the First-Lien Term Loan at the closing of the WorkflowOne Acquisition.

20.     Defendant Credit Suisse Loan Funding LLC ("CSLF") is a Delaware limited liability company with executive offices located at 7033 Louis Stephens Drive, Research Triangle Park, North Carolina 27709.   CSLF was a lender under the First-Lien Term Loan at the closing of the WorkflowOne Acquisition.

21.     Defendant Sargas CLO II Ltd., f/k/a DeMeer Middle Market CLO 2006-1, Ltd. ("SCLO"), is an exempted limited liability company organized under the laws of the Cayman Islands.   Upon information and belief, SCLO's collateral manager in the United States is Fortress Investment Group LLC, with executive offices located at 1345 Avenue of the Americas, 23rd Floor, New York, New York 10105.   SCLO was a lender under the First-Lien Term Loan at the closing of the WorkflowOne Acquisition.

22.     Defendant WG Horizons CLO I ("WG CLO" and collectively with the Silver Point Defendants, DLJIP, DLJIP2, DLJIP2 Holdings, CS, CSLF, and SCLO, the "Term Loan Defendants") is a company incorporated under the laws of the Cayman Islands. Upon information and belief, WG CLO has executive offices located at c/o West Gate Horizons Advisors LLC, 633 West 5th Street Suite # 6600, Los Angeles, California 90071. WG CLO was a lender under the First-Lien Term Loan at the closing of the WorkflowOne Acquisition.

**Director and Officer Defendants**

23.     Joseph P. Morgan, Jr. ("Morgan") is, and was at all times relevant to this Complaint, the Debtors' President and Chief Executive Officer and a member of the Debtors' Board of Directors (the "Board"). Morgan has been a member of the Board since 2009 and is a member of the Executive Committee.

24.     Roy W. Begley, Jr. ("Begley") was, at all times relevant to this Complaint, a member of the Board. Begley resigned from the Board on March 10, 2015, two days before the Petition Date, immediately after the Board discussed its intent to commence these Chapter 11 Cases but before the Board voted to approve a resolution authorizing the Debtors' bankruptcy filing.

25.     F. David Clarke, III ("Clarke") is, and was at all times relevant to this Complaint, a member of the Board. Clarke has been a member of the Board since 1992 and Chairman of the Board since 2006. Clarke is also the Chair of the Executive Committee and a member of the Compensation Committee and the Audit Committee.

26.     John Q. Sherman, II ("Sherman") is, and was at all times relevant to this Complaint, a member of the Board. Sherman has been a member of the Board since 1994 and is

the Chair of the Corporate Governance and Nominating Committee, a member of the Compensation Committee, and the Presiding Director of the Non-Management Director Meeting.

27.    Julie D. Klapstein ("Klapstein") was, at all times relevant to this Complaint, a member of the Board. Klapstein was elected to the Board in April 2011. The minutes of the November 5, 2014 Board meeting indicate that Klapstein resigned from the Board on November 3, 2014 because she was "in disagreement with the Company and the Board on topics discussed."

28.    John J. Schiff, Jr. ("Schiff") is, and was at all times relevant to this Complaint, a member of the Board. Schiff has been a member of the Board since 1982 and is a member of the Audit Committee.

29.    R. Eric McCarthey (collectively with Morgan, Begley, Clarke, Sherman, Klapstein, and Schiff, the "Director Defendants") has been a member of the Board since 2008 and is the Chair of the Audit Committee and a member of the Executive and Corporate Governance Committee and the Nominating Committee.

30.    Robert M. Ginnan ("Ginnan" and together with the Director Defendants, the "Director and Officer Defendants") was the Debtors' chief financial officer prior to the WorkflowOne Acquisition and provided financial projections and other information related to the WorkflowOne Acquisition. Ginnan resigned on February 24, 2015, effective as of March 6, 2015.

**Other Defendants**

31.    WFSR Holdings, LLC, f/k/a Workflow Holdings, LLC ("WF Holdings") is a Delaware limited liability company. Corporation Service Company is the Delaware registered agent for WF Holdings, with an address of 2711 Centerville Road, Suite 400, Wilmington,

Delaware 19808. WF Holdings, the parent of WorkflowOne, LLC and its direct and indirect subsidiaries (collectively, "WorkflowOne"), sold 100% of the membership interests in WorkflowOne to SRC in the WorkflowOne Acquisition.

32.     John Does 1-10 and XYZ Companies 1-10 (the "Additional Parties") are persons and legal entities – including without limitation consultants, law firms, accounting firms, financial advisory firms, and other funds and/or discretionary accounts affiliated with the Term Loan Defendants or represented by the Silver Point Defendants – that aided and abetted, benefitted from, or otherwise participated in the wrongful acts alleged in this Complaint. The identity of the Additional Parties will be determined through discovery in this adversary proceeding.

## BACKGROUND

### A.    History of the Debtors' Businesses

33.     The Standard Register Company was founded in 1912 in Dayton, Ohio. Standard Register's first product, the pin-feed autographic register, revolutionized business forms by using a wooden sprocket to feed rolled, pre-punched forms through the hand-cranked machine, thereby keeping the layers of paper and carbon from slipping.

34.     Standard Register went public in 1956. In 1986, Standard Register acquired Burroughs Corporation, becoming the second-largest business forms manufacturer in the world.

35.     In 1996, Standard Register's stock moved from the NASDAQ and began trading on the New York Stock Exchange, where it was traded until the Debtors filed for bankruptcy protection on the Petition Date.

36.     According to the Debtors, they are one of the leading providers in the United States of communications services and communications workflow, content and analytics

solutions through multiple communication channels, including print, electronic, and internet-based communications, to clients in the healthcare, financial services, manufacturing, retail, and transportation industries.

37.    The Debtors' operations are divided between two main business units: (a) healthcare, which accounts for almost one-third of the Debtors' revenues, and (b) integrated communications (f/k/a business solutions), which accounts for the remainder of the Debtors' revenues.

**B.    History of WorkflowOne**

38.    Prior to the WorkflowOne Acquisition, WorkflowOne was a commercial printer and a competitor of Standard Register.

39.    Prior to 2009, twenty of the Workflow Debtors (as defined below) were borrowers and/or guarantors under two secured credit facilities (in addition to other indebtedness): (a) a first-lien credit facility with approximately $111.5 million of term loan principal and $35 million of revolving credit advances (including $4.8 million of letters of credit) outstanding (the "Workflow First-Lien Facility") and (b) a $140 million second-lien term loan (of which Silver Point affiliates held approximately $111 million) bearing interest at 18% per annum, with approximately $56.5 million of accrued paid-in-kind interest outstanding  (the "Workflow Second-Lien Loan" and together with the Workflow First-Lien Facility, the "Workflow Secured Loans").

40.    During the fourth quarter of 2008, the Workflow Debtors were unable to make the substantial interest payments due under the Workflow First-Lien Facility.

41.    In January 2009, the Workflow Debtors entered into forbearance agreements with respect to the Workflow Secured Loans.

42.     Under the terms of the forbearance agreements, interest on the Workflow Second-Lien Loan was capitalized.

43.     Shortly thereafter, Silver Point Finance replaced Credit Suisse as agent under the Workflow Second-Lien Loan.

44.     In the second quarter of 2009, the Workflow Debtors entered into amendments to the Workflow Secured Loans, obtaining short-term covenant relief.

45.     In late 2009, the Workflow Debtors sought to undertake a high-yield bond issuance to pay off the Workflow First-Lien Facility and a portion of the Workflow Second-Lien Loan.

46.     The Workflow Debtors could not obtain the consent of certain Silver Point affiliates, whose consent was necessary to undertake the transaction due to their controlling position.

47.     During the period prior to September 2010, Silver Point affiliates began acquiring portions of the Workflow First-Lien Facility.

48.     In the spring of 2010, the Workflow Debtors sought and reached an agreement with certain of their first-lien lenders to extend the maturity date of the first tranche of their first-lien revolver, but the sole lender under the other, $6.8 million tranche – a Silver Point affiliate that also held a controlling position in the Workflow Second-Lien Loan – refused to extend the maturity of the second tranche.

49.     As a result of Silver Point's refusal to consent to either a refinancing transaction or extend the maturity of the second revolver tranche of the Workflow First-Lien Facility, the Workflow Debtors were forced into bankruptcy to avoid a default and foreclosure.

50.     On September 29, 2010, Workflow Management Inc. and twenty (20) of its direct and indirect subsidiaries (collectively, the "Workflow Debtors") filed chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Virginia.

51.     In the affidavit in support of their bankruptcy petitions and first-day pleadings, the Workflow Debtors alleged that Silver Point "ha[d] frustrated the [Workflow Debtors'] refinancing efforts" and that "no deal could be reached with" Silver Point.

52.     The Workflow Debtors' chapter 11 plan of reorganization (the "Workflow Plan") was confirmed by order dated February 25, 2011.

53.     Through the Workflow Plan, WF Holdings, a defendant in this adversary proceeding and an entity affiliated with Silver Point, purchased all of the assets of the Workflow Debtors pursuant to section 363 of the Bankruptcy Code.

54.     Through the Workflow Plan, the Workflow Secured Loans were converted into first- and second-lien notes issued by WF Holdings (the "New Workflow First-Lien Loan" and "New Workflow Second-Lien Loan", respectively, and collectively, the "New Workflow Loans") and secured by first and second liens on the acquired assets.

55.     Pursuant to the Workflow Plan, Silver Point obtained approximately 33% of the membership interests in WF Holdings.

56.     WF Holdings did not assume the Workflow Debtors' underfunded defined-benefit pension plan, which was left with the Workflow Debtors and terminated by the Pension Benefit Guaranty Corporation (the "PBGC") –

57.   ███████████████████████████████████

███████████████████████████████████ the bulk of the New Workflow Loans and Silver Point Finance became the agent under the New Workflow First-Lien Loan. As noted earlier, Silver Point Finance was already the agent under the New Workflow Second-Lien Loan.

## C.   Standard Register's Pre-Acquisition Capital Structure and Operations

58.   Prior to the WorkflowOne Acquisition, Standard Register had very little interest-bearing debt. Although its defined benefit pension plan was underfunded, its capital structure was manageable.

59.   Immediately before the WorkflowOne Acquisition closed on August 1, 2013, Standard Register's only funded long-term debt consisted of outstanding borrowings of approximately $50 million under a $100 million asset-backed revolving credit facility (the "Prepetition ABL Facility") with Bank of America, N.A. as agent and lender and Wells Fargo Bank, N.A. as lender.

60.   SRC was the borrower and four of its subsidiaries, Standard Register International, Inc., Standard Register Technologies, Inc., iMedconsent, LLC, and Standard Register of Puerto Rico Inc.[6] (collectively with SRC, the "Prepetition Obligor Debtors"), were guarantors under the Prepetition ABL Facility.

61.   Prior to the WorkflowOne Acquisition, the Prepetition ABL Facility was secured by a lien on the Prepetition Obligor Debtors' accounts receivable, inventories, fixed assets, and certain other assets (as later modified in connection with the WorkflowOne Acquisition, the "Prepetition ABL Liens").

---

[6]   On June 10, 2014, WorkflowOne of Puerto Rico Inc. changed its name to Standard Register of Puerto Rico Inc. WorkflowOne, LLC was also a guarantor under the Prepetition ABL Facility until it merged into SRC on December 31, 2014.

62.    Other than the Prepetition Obligor Debtors, no other Debtors or affiliates of the Debtors were borrowers or obligors under the Prepetition ABL Facility.[7]

63.    According to Standard Register's Form 10-Q for the first quarter of 2013, Standard Register had negative shareholders' equity of approximately ($121 million) as of the end of the first quarter of 2013, shortly before the closing of the WorkflowOne Acquisition.

64.    In the first half of 2013 (the two quarters preceding the WorkflowOne Acquisition), Standard Register generated approximately $8.8 million of cash flow from operations (even after paying $11.9 million of pension contributions), used $6.3 million of cash to make capital improvements, and made $1.2 million of net principal repayments on the Prepetition ABL Facility.

65.    Before making pension and other post-employment benefits contributions, Standard Register generated over $148 million of net cash flow from operations from 2010 through the first half of 2013. In total, from 2010 through the first half of 2013, Standard Register's operations generated approximately $52.4 million of cash, even after paying $95.7 million of pension and postretirement benefit contributions, and Standard Register used $39.7 million of cash generated by operations to fund capital expenditures over the same period, as set forth below:

| ($ millions) | 2010 | 2011 | 2012 | 1H2013 | Total |
|---|---|---|---|---|---|
| Net Cash Provided By Operating Activities | $ 11.8 | $ 13.3 | $ 18.5 | $ 8.8 | $ 52.4 |
| Net Cash Used in Investing Activities | (10.5) | (17.2) | (5.8) | (6.2) | (39.7) |
| Net Cash (Used In) Provided by Financing Activities | (3.1) | 5.1 | (13.4) | (3.1) | (14.5) |
| *Effect of Exchange Rate Changes* | (0.1) | (0.2) | 0.1 | 0.0 | (0.2) |
| **Net Change in Cash** | **$ (1.9)** | **$ 1.0** | **$ (0.6)** | **$ (0.5)** | **$ (2.0)** |
| *Memo: Pension and OPEB Contributions* | *27.8* | *28.7* | *27.3* | *11.9* | *95.7* |

---

[7]    Six of the Debtors are not parties (either as borrowers or guarantors) to the Prepetition Term Loans or the Prepetition ABL Facility: Standard Register Holding Company, Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., Standard Register Technologies Canada ULC.

D.    **The WorkflowOne Acquisition (the Fraudulent Conveyance Transaction)**

66.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

67.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

68.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

69.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

70.    In deciding to move forward with the WorkflowOne Acquisition, the Board and the Director and Officer Defendants ensured that Standard Register's senior management and the Board (some of whom were descendants of Standard Register's founders) would remain in place and retain their equity holdings, and that certain members of senior management, including Morgan and Ginnan, would receive significant transaction bonuses and other incentive compensation.

71.    Morgan and Ginnan had a significant personal interest in pursuing the WorkflowOne Acquisition by virtue of their interest in maintaining their senior officer positions and receiving significant bonuses and other compensation upon consummation of the acquisition. And, in connection with the WorkflowOne Acquisition, Morgan and Ginnan, although well aware of, among other factors, the deteriorating state of the industry, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

72.    Due in large part to the WorkflowOne Acquisition, Morgan and Ginnan saw their total compensation more than double in 2013 as compared to 2012.

73.    Morgan's total compensation for 2013 was $4.14 million (including a $900,000 transaction bonus related to the WorkflowOne Acquisition), a 120.8% increase from his 2012 compensation of $1.87 million.

74.    Ginnan's total compensation for 2013 was $1.48 million (including a $325,000 transaction bonus related to the WorkflowOne Acquisition), a 103.4% increase from his 2012 compensation of $725,000.

75.    ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

76.    The Board and the Director and Officer Defendants nevertheless agreed to pay $218 million, including incurring $210 million of assumed debt secured by new liens on

Standard Register's assets, for WorkflowOne, notwithstanding WorkflowOne's deteriorating revenues and the fact that the value of WorkflowOne was significantly and materially less than $218 million. The midpoint of the enterprise valuation implied by applying traditional valuation methodologies to WorkflowOne is just ███████████████████████████████

███████████████████████

77.    As consideration for the WorkflowOne Acquisition:

• SRC paid $1.00 to WF Holdings in exchange for 100% of the equity interests in WorkflowOne,

• SRC became an additional borrower under the New Workflow First-Lien Loan, which was converted into a term loan at the closing of the WorkflowOne Acquisition (as modified, the "First-Lien Term Loan"),

• SRC became an additional borrower under the New Workflow Second-Lien Loan, which was reduced in principal amount to $86,246,740.38 (as modified, the "Second-Lien Term Loan" and together with the First-Lien Term Loan, the "Prepetition Term Loans"),

• the maturity date of the Prepetition Term Loans was amended to August 1, 2018.

• the other Prepetition Obligor Debtors became guarantors of the Prepetition Term Loans,

• Standard Register issued equity and warrants to Silver Point valued at approximately $8 million,

• SRC agreed to assume all of WorkflowOne's other liabilities, and

• all of the Prepetition Obligor Debtors granted first and second liens (the "SR Term Loan Liens" and together with the liens previously granted by WorkflowOne, the "Term Loan Liens") on certain of their assets in support of their newly assumed obligations under the Prepetition Term Loans (the "SR Term Loan Obligations").

78.    By assuming the First-Lien Term Loan, the Prepetition Obligor Debtors incurred principal obligations of $123,753,259.62 at the closing of the WorkflowOne Acquisition.

79.    By assuming the Second-Lien Term Loan, the Prepetition Obligor Debtors incurred principal obligations of $86,246,740.38 at the closing of the WorkflowOne Acquisition.

80.    In total, the Prepetition Obligor Debtors incurred $210,000,000 of new SR Term Loan Obligations to the Term Loan Defendants as of the closing of the WorkflowOne Acquisition.

81.    Through the assumption of the Prepetition Term Loans, Standard Register approximately quintupled its long-term funded debt overnight.

82.    In addition to the exorbitant principal obligations Standard Register incurred, the Prepetition Term Loans significantly limited Standard Register's financial flexibility in the face of secular headwinds and meaningful risk in implementing a financial turnaround:

- the First-Lien Term Loan required the Debtors to make principal amortization payments of $2,500,000 per quarter (prior to the WorkflowOne Acquisition, Standard Register had no ongoing principal amortization requirements because its only long-term debt was a revolving credit facility),

- the First-Lien Term Loan required the Debtors to make mandatory repayments of between 50% and 75% of their excess cash flow and the proceeds of asset sales,

- the First-Lien Term Loan bears interest at adjusted LIBOR plus 7.00%, and

- the Second-Lien Term Loan bears interest at adjusted LIBOR plus 8.65%.

83.    Due to the massive amount of debt the Debtors incurred through the WorkflowOne Acquisition, the Debtors' interest expense skyrocketed. During the first three quarters of 2014, the Debtors' interest expense was approximately $15 million, or approximately $20 million on an annualized basis, as compared to $1.2 million in the first half of 2013 (prior to the WorkflowOne Acquisition).

84.    Based on ongoing secular headwinds, significant risks to the financial projections for the combined company, and the burdens imposed by the Prepetition Term Loans, the Director and Officer Defendants should have realized that the WorkflowOne Acquisition would leave the Debtors overleveraged and posed a material risk that the Debtors would be unable to satisfy their debts as they came due.



85.

86.

87.

88.    From 2010 through the first half of 2013 (immediately before the WorkflowOne Acquisition), the Debtors paid approximately $96 million of pension contributions.  As of June 30, 2013, Standard Register's pension benefit liability was approximately $239 million.

89.

90.    Because Silver Point knew that the WorkflowOne Acquisition would leave the Debtors overleveraged, that the Debtors faced a significant risk that they would be unable to repay their debts, and that the Debtors would thereafter need to use a chapter 11 proceeding to eliminate their pension liability (in addition to other liabilities), Silver Point did not act in good faith in extending the Prepetition Term Loans to the Prepetition Obligor Debtors through the WorkflowOne Acquisition.

91.    By seizing on the Board's and the Director and Officer Defendants' desire to do any deal so long as Standard Register was the acquirer, Silver Point positioned itself to seize control of Standard Register, offload Standard Register's underfunded pension liability onto the PBGC, and obtain the full benefit of Standard Register's operating cash flow for itself.

*i.*    ***Standard Register did not receive reasonably equivalent value in the WorkflowOne Acquisition.***

92.    ███████████████████████████████████████████████████
███████████████████████████████████████████

93.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████

94.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████

95. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████



96. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

97. ███████████████████████████████████████

████████████████████████████████████████████

██████████████

98. ███████████████████████████████████████

█████████████████████████

99. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████

100.    The midpoint fair value of WorkflowOne at the time of the WorkflowOne

Acquisition (based on traditional valuation methodologies ████████████████████

████████████████████ and cost synergies and related expenses) was approximately ████

████, significantly and materially less than the $218 million purchase price.

101.    Because the value of WorkflowOne was significantly and materially less than (a) the amount of the SR Term Loan Obligations incurred by the Prepetition Obligor Debtors and (b) the value of the SR Term Loan Liens granted by the Prepetition Obligor Debtors, the Prepetition Obligor Debtors did not receive reasonably equivalent value for the incurrence of the SR Term Loan Obligations or the granting of the SR Term Loan Liens.

ii.    *Standard Register was rendered insolvent by the WorkflowOne Acquisition*

102.    On January 23, 2012, Standard Register announced that it was suspending quarterly dividends pursuant to Ohio law, which requires that cash dividends be paid only out of a corporation's statutory surplus. Because Standard Register's shareholders' equity had turned negative, there was no longer a surplus from which to pay dividends.

103.    Immediately following the WorkflowOne Acquisition, the Debtors' liabilities exceeded the fair value of their assets.

104.    At the time of the WorkflowOne Acquisition, the pro forma combined company had approximately $261 million of funded debt obligations, $7 million of capital lease obligations, $235 million of unfunded pension liability, $3 million of deferred compensation obligations, and $4 million of reported environmental liabilities, for combined total debt and non-operating liabilities of $511 million.

105.    Following the WorkflowOne Acquisition, the Debtors' total debt and non-operating liabilities of $511 million exceeded the midpoint fair value of their assets (based on a comparable companies analysis, comparable transactions analysis, discounted cash flow analysis including synergies, and including net operating losses) by approximately $170 million.

106.    Therefore, the Debtors were left insolvent as a result of the WorkflowOne Acquisition.

### iii.    *The WorkflowOne Acquisition left the Debtors with unreasonably small capital.*

107.    Following the WorkflowOne Acquisition, the Debtors had total adjusted debt and non-operating liabilities of 6.6 times projected pro forma combined 2013 EBITDAP[8] and 6.4 times projected 2014 EBITDAP.  Under any of the traditional valuation methodologies, this exceeds the implied valuation range for the Debtors.

108.    In contrast, comparable companies[9] had a median total adjusted debt of just 1.9 times estimated 2013 EBITDAP.

109.    The Debtors' severe undercapitalization was reflected in their leverage ratio and in comparison to their peers.  Following the WorkflowOne Acquisition, the ratio of Standard Register's total liabilities-to-capitalization was 147%.[10]  By contrast, the median of the total liabilities-to-capitalization ratio for comparable companies at the time of the WorkflowOne Acquisition was approximately 29%.

110.    The excessive debt and other obligations the Debtors incurred through the WorkflowOne Acquisition severely constrained their financial flexibility despite significant risks in their financial projections, including secular declines in print products and related services, the erosion of healthcare service offerings as a result of the widespread implementation of electronic health records, and merger-related risks.

111.    Compounding this issue, the Debtors' cash needs following the WorkflowOne Acquisition were substantial.

---

[8]    EBITDAP stands for Earnings Before Interest, Taxes, Depreciation, Amortization, and Pension income or expense, a non-GAAP earnings metric commonly used by companies with significant pension obligations.

[9]    For purposes of this analysis, comparable companies include Avery Dennison, Consolidated Graphics, Deluxe, Quad/Graphics, RR Donnelley, and Transcontinental.

[10]    Total Liabilities includes funded debt, capital leases and underfunded pension obligations.  The calculation of the total liabilities-to-capitalization ratio is based on the midpoint valuation under the traditional valuation methodologies.

112.   At the time of the WorkflowOne Acquisition, in addition to debt service on the Prepetition Term Loans, the Debtors projected that they would incur pension funding obligations of approximately $40 million in each of 2014 and 2015 and cumulative costs to achieve synergies of approximately $34 million over the same period.

113.   At the time of the WorkflowOne Acquisition, the combined company's total debt represented approximately 10.7 times its estimated 2014 unlevered free cash flow.

*iv.*      ***Through the WorkflowOne Acquisition, Standard Register incurred debts beyond its ability to pay.***

114.   The Prepetition Term Loans saddled the Debtors with substantial additional expenses, including $10 million of amortization payments per year under the First-Lien Term Loan, mandatory principal payments consuming as much as 75% of the Debtors' excess cash flow, and annual interest expense of approximately $20 million (nearly ten times their annual interest expense before the WorkflowOne Acquisition).

115.   Essentially, the Debtors' capital structure after closing on the WorkflowOne Acquisition was excessively leveraged and severely limited the Debtors' financial flexibility.

116.   

117.   The Director and Officer Defendants, with due care and appropriate inquiry, and in the absence of any personal interest, should have known that the WorkflowOne Acquisition had a high potential to render the Debtors unable to pay their debts as they became due, given the

significant risks inherent in their financial projections (and in particular, their revenue projections).

## E.    WorkflowOne Acquisition Executive Bonuses

118.    In connection with the closing of the WorkflowOne Acquisition, Morgan and Ginnan were awarded bonuses (the "Transaction Bonuses") of up to $900,000 and $325,000, respectively, with half paid at closing and the remainder to be paid in the first quarter of 2014 based on certain performance-related thresholds.

119.    In total, due in large part to the WorkflowOne Acquisition, Morgan's and Ginnan's total 2013 compensation (including the Transaction Bonuses) each more than doubled as compared to 2012.

120.    Morgan's and Ginnan's total 2013 compensation packages were on par with those of the CEO and CFO of Cenveo, a competitor with nearly double the Debtors' revenues.

121.    Because, among other things, the Debtors did not receive reasonably equivalent value in and were left insolvent by the WorkflowOne Acquisition, the Debtors did not receive reasonably equivalent value for the Transaction Bonuses and other increased compensation paid to Morgan and Ginnan.

## H.    Silver Point's Ownership and Influence

122.    In addition to assuming WorkflowOne's obligations under the Prepetition Term Loans, the Debtors also issued warrants to the lenders under the Second-Lien Term Loan (primarily Silver Point affiliates) convertible into 2,645,952 shares of common stock in SRC.

123.    As a result of the WorkflowOne Acquisition, Silver Point obtained control of approximately 29.6% of the common stock of SRC.

124.    Silver Point also obtained the right to appoint, and did appoint, two directors to the Board.

125.    Silver Point's initial appointees to the Board were Anthony DiNello (a Silver Point employee) and Robert Peiser, an outside director.

126.    ████████████████████████████████████████████

████████████████████████████████████████████

127.    Peiser is a member of the corporate governance and nominating committee of the Board and the chair of the compensation committee.

128.    DiNello was a member of the audit committee.

129.    Peiser (and later, Frederic Brace, who succeeded DiNello on the Board based ██ ███████████████████) are members of the Board's three-member strategy committee formed in January 2015 to evaluate the Debtors' strategic alternatives, which eventually led to the commencement of these Chapter 11 Cases.

130.    During his tenure on the Board, DiNello was a member of the audit committee

████████████████████████████████████████████

████████████████████

131.    Commencing in May 2014, with two of its appointees (including DiNello, a Silver Point employee) on the Board, ███████████████████████ ████████████████, Silver Point began selling its shares in SRC, reducing its holdings of SRC's common stock from 29.6% to 20.0% as of the Petition Date.

132.    Between June 11, 2014 and December 5, 2014, Silver Point sold 364,200 shares of SRC's common stock, as reflected on the chart annexed hereto as **Exhibit A**.  In total, between May 5, 2014 and December 5, 2014, Silver Point sold 556,800 shares of SRC's common stock, comprising nearly 20% of all of the Debtors' shares traded during that period.

133.    ███████████████████████████████████████

██████████████████████████████████████████████

134.    On December 24, 2014, DiNello resigned from the Board. Upon information and belief, DiNello resigned in an attempt to isolate Silver Point from the Debtors' management.

135.    On December 27, 2014, the Debtors retained Lazard Middle Market LLC to, among other things, identify and evaluate potential candidates for a sale transaction.

136.    On January 21, 2015, the Debtors, Silver Point Finance, and certain of the Term Loan Defendants entered into amendments to the loan agreements governing the Prepetition Term Loans (the "Term Loan Amendments"), pursuant to which, among other things, (a) the testing date for certain covenants under the Prepetition Term Loans was extended from December 31, 2014 to February 27, 2015 and (b) the Debtors' right to reinvest the proceeds of asset dispositions were further restricted.

137.    ███████████████████████████████████████

██████████████████████

138.    Instead, on January 27, 2015, Silver Point provided the Debtors with a term sheet for debtor-in-possession financing and a proposed stalking horse bid for substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, as it had contemplated prior to entering into the WorkflowOne Acquisition.

139.    Due to Silver Point's refusal to provide longer-term covenant relief, the selection of a Silver Point affiliate as the stalking horse bidder was made with absolutely no prior marketing of the Debtors' assets.

140.    As it had done with the Workflow Debtors (████████████████████████ ████████████████████████████), Silver Point caused the Debtors to commence

these Chapter 11 Cases on March 12, 2015 to effectuate an acquisition of the Debtors' assets free and clear of liens and claims (including but not limited to the Debtors' underfunded pension liability) pursuant to section 363 of the Bankruptcy Code, with a Silver Point affiliate credit bidding a substantial portion of the Prepetition Term Loans as the stalking horse purchaser.

## COUNTS AGAINST THE TERM LOAN DEFENDANTS

### FIRST COUNT
#### Against the Term Loan Defendants
#### Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B)
#### (SR Term Loan Obligations)

141.   The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

142.   Standard Register incurred the SR Term Loan Obligations within two years before the Petition Date.

143.   Standard Register received less than reasonably equivalent value in exchange for the SR Term Loan Obligations.

144.   Standard Register became insolvent as a result of incurring the SR Term Loan Obligations.

145.   After incurring the SR Term Loan Obligations, Standard Register was left with unreasonably small capital for the business in which it was engaged.

146.   By reason of the foregoing, the SR Term Loan Obligations constitute avoidable fraudulent obligations pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants pursuant to sections 548, 550 and 551 of the Bankruptcy Code, (a) avoiding the SR Term Loan Obligations, (b) directing that any payments (including but not limited to payments of principal, interest, fees, costs, and expenses) received

by any of the Term Loan Defendants on account of the SR Term Loan Obligations be disgorged to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

### SECOND COUNT
*Against the Term Loan Defendants*
**Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B)**
**(SR Term Loan Liens)**

147.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

148.    The grant of the SR Term Loan Liens was a transfer of an interest of the Debtors in property, as the term "transfer" is defined in section 101(54) of the Bankruptcy Code.

149.    Standard Register granted the SR Term Loan Liens within two years before the Petition Date.

150.    Standard Register received less than reasonably equivalent value in exchange for the SR Term Loan Liens.

151.    Standard Register became insolvent as a result of granting the SR Term Loan Liens.

152.    After granting the SR Term Loan Liens, Standard Register was left with unreasonably small capital for the business in which it was engaged.

153.    By reason of the foregoing, the SR Term Loan Liens constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants pursuant to sections 548, 550 and 551 of the Bankruptcy Code, (a) avoiding the SR Term Loan Liens and preserving the SR Term Loan Liens for the benefit of the Debtors' estates, (b) directing that any assets subject to the SR Term Loan

Liens, or any proceeds thereof (including but not limited to payments of principal, interest, fees, costs, and expenses), received by any of the Term Loan Defendants in satisfaction of the SR Term Loan Liens be disgorged by the recipients thereof or the value thereof returned to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

**THIRD COUNT**
*Against the Term Loan Defendants*
**Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Ohio Rev. Code § 1336.04(A)(2)**
**(SR Term Loan Obligations)**

154.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

155.    Standard Register incurred the SR Term Loan Obligations within four years prior to the date of this Complaint.

156.    Standard Register did not receive reasonably equivalent value in exchange for the SR Term Loan Obligations.

157.    After incurring the SR Term Loan Obligations, Standard Register was left with unreasonably small capital for the business in which it was engaged.

158.    When the SR Term Loan Obligations were incurred, Standard Register intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond its ability to pay as such debts came due.

159.    The SR Term Loan Obligations are avoidable fraudulent obligations within the meaning of applicable state laws, including but not limited to the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code. §§ 1336.01 *et seq.*

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants, pursuant to sections 544, 550 and 551 of the

Bankruptcy Code and the Ohio Uniform Fraudulent Transfer Act, (a) avoiding the SR Term Loan Obligations and (b) directing that any payments (including but not limited to payments of principal, interest, fees, costs, and expenses) received by any of the Term Loan Defendants on account of the SR Term Loan Obligations be disgorged by the recipients thereof, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

**FOURTH COUNT**
*Against the Term Loan Defendants*
**Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Ohio Rev. Code § 1336.04(A)(2)**
**(SR Term Loan Liens)**

160.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

161.    Standard Register granted the SR Term Loan Liens within four years prior to the date of this Complaint.

162.    Standard Register did not receive reasonably equivalent value in exchange for the SR Term Loan Liens.

163.    After granting the SR Term Loan Liens, Standard Register was left with unreasonably small capital for the business in which it was engaged.

164.    When the SR Term Loan Liens were granted, Standard Register intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond its ability to pay as such debts came due.

165.    The granting of the SR Term Loan Liens was an avoidable fraudulent transfer to or for the benefit of the Term Loan Defendants within the meaning of applicable state laws, including but not limited to the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code §§ 1336.01 *et seq.*

**WHEREFORE,** the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants, pursuant to sections 544, 550 and 551 of the Bankruptcy Code and the Ohio Uniform Fraudulent Transfer Act, (a) avoiding the SR Term Loan Liens and preserving the SR Term Loan Liens for the benefit of the Debtors' estates and (b) directing that any assets subject to the SR Term Loan Liens, or any proceeds thereof (including but not limited to payments of principal, interest, fees, costs, and expenses), received by any of the Term Loan Defendants in satisfaction of the SR Term Loan Liens be disgorged by the recipients thereof or the value thereof returned to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

**FIFTH COUNT**
*Against the Term Loan Defendants*
**Objection to Extent and Validity of Term Loan Liens**

166.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

167.    The Debtors have stipulated that Silver Point Finance, as agent under the First-Lien Term Loan and the Second-Lien Term Loans, holds perfected liens on and security interests in substantially all of the Prepetition Obligor Debtors' assets.

168.    The Committee requested documents from the Term Loan Defendants to demonstrate the existence and perfection of the Term Loan Defendants' alleged liens on the Debtors' assets.

169.    The Term Loan Defendants have not provided the Committee with documentation demonstrating that the Term Loan Liens are perfected in accordance with applicable law with respect to the assets identified on **Exhibit B** annexed hereto (the "Term Unencumbered Assets").

170.    Pursuant to the terms of the Prepetition Term Loans, as set forth in sections 1(c) [with respect to Pledged Equity in foreign subsidiaries], 2(a) [with respect to Standard Register Technologies Canada ULC], and 2(a)(xv) [with respect to computer programs and related computer agreements and materials] of the applicable Pledge and Security Agreement, certain of the Term Unencumbered Assets were expressly excluded from the Term Loan Defendants' collateral (the "Term Excluded Assets").

171.    In addition, Silver Point Finance, in its capacity as agent under the Second-Lien Term Loan, filed a UCC-1 Financing Statement against WorkflowOne of Puerto Rico Inc. on March 3, 2011.  That UCC-1 was never amended after WorkflowOne of Puerto Rico Inc. changed its name to Standard Register of Puerto Rico Inc.  Accordingly, the Term Loan Liens securing the Second-Lien Term Loan were not properly perfected against the assets of Standard Register of Puerto Rico Inc. as of the Petition Date, which also constitute Term Unencumbered Assets.

172.    Accordingly, the Committee seeks a determination as to the validity, perfection, and enforceability of the Term Loan Liens asserted by Silver Point Finance, in its capacity as agent under the Prepetition Term Loans, against the Term Unencumbered Assets.

173.    To the extent any Term Unencumbered Assets, or proceeds thereof, have been applied to the First-Lien Term Loans or the Second-Lien Term Loans, the Committee seeks to recoup the value thereof for the benefit of the Debtors' estates.

WHEREFORE, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants pursuant to, *inter alia*, sections 506(b), 506(d), 544, 550, and 551 of the Bankruptcy Code, (a) declaring that the Term Loan Liens were not duly perfected as of the Petition Date with respect to, and thus are invalid and unenforceable against,

the Term Unencumbered Assets, (b) declaring that any other lien or security interest granted to

the Term Loan Defendants that was not duly perfected as of the Petition Date or that is voidable

under applicable law is null and void and/or avoided, (c) declaring that the Term Excluded

Assets are not subject to the Term Loan Liens, (d) directing that any Term Unencumbered Assets

or Term Excluded Assets or proceeds thereof that have been applied to the Prepetition Term

Loans be disgorged by the recipients thereof or the value thereof returned to the Debtors' estates,

and (e) awarding such other relief as the Court deems just and proper.

**SIXTH COUNT**
*Against the Term Loan Defendants*
**Recharacterization or Disallowance of Payment of Interest and Expenses**

174.   The Committee restates the allegations set forth in the preceding paragraphs of

this Complaint as though fully set forth herein.

175.   Pursuant to sections 105(a) and 506(b) of the Bankruptcy Code, to the extent the

Prepetition Term Loans were undersecured, the Debtors' postpetition payment of interest, fees,

costs, and expenses to or for the benefit of the Term Loan Defendants should be disallowed or

treated as repayments of principal.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in

its favor and against the Term Loan Defendants, (a) determining the extent to which the

Prepetition Term Loans were undersecured as of the Petition Date, (b) declaring that, to the

extent the Prepetition Term Loans were undersecured, the Debtors' postpetition payment of

interest, fees, costs, and expenses to or for the benefit of the Term Loan Defendants on account

of the Prepetition Term Loans are either disallowed or recharacterized as repayments of

principal, (c) to the extent any postpetition payment of interest, fees, costs, and expenses is

disallowed, directing the Term Loan Defendants to disgorge such amounts, and (d) awarding such other relief as the Court deems just and proper.

**SEVENTH COUNT**
*Against the Term Loan Defendants*
**Recharacterization of the Second-Lien Term Loan Claims as Equity**

176.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

177.    Under the equitable powers conferred upon the Court by section 105 of the Bankruptcy Code, the Court can look to the substance of a transaction and determine, notwithstanding the fact that the parties have described the transaction as an extension of credit, the transaction nevertheless should be treated as an equity investment.

178.    The terms of the Second-Lien Term Loan, including but not limited to the accrual of in-kind interest and the absence of any mandatory amortization payments, are indicative of an equity investment in SRC, rather than an extension of credit.

179.    In order to prevent the injustice that would result from treating the Second-Lien Term Loan as indebtedness, any claims asserted against the Debtors by the Term Loan Defendants on account of the Second-Lien Term Loan should be recharacterized as equity interests.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants (a) declaring that the Second-Lien Term Loan constitutes an equity interest in SRC, rather than indebtedness and (b) and awarding such other relief as the Court deems just and proper.

### EIGHTH COUNT
### *Against the Term Loan Defendants*
### Disallowance of the Term Loan Defendants' Claims

180.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

181.    To the extent the Debtors' obligations to any of the Term Loan Defendants are voidable under chapter 5 of the Bankruptcy Code, the Term Loan Defendants' claims against the Debtors should be disallowed pursuant to section 502(d) of the Bankruptcy Code.

WHEREFORE, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants (a) disallowing the Term Loan Defendants' claims against the Debtors pursuant to section 502(d) of the Bankruptcy Code and (b) awarding such other relief as the Court deems just and proper.

### COUNT AGAINST THE SILVER POINT DEFENDANTS

### NINTH COUNT
### *Against the Silver Point Defendants*
### Equitable Subordination of the Silver Point Claims

182.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

183.    The Silver Point Defendants have engaged in inequitable conduct that has harmed the Debtors' general unsecured creditors and has given the Silver Point Defendants unjust advantages over them.

184.    The Silver Point Defendants' inequitable conduct included, without limitation, trading in the Debtors' common stock while in possession of material nonpublic information acquired as a fiduciary of the Debtors.

185.    Subordination of the Silver Point Defendants' claims to all general unsecured claims against the Debtors would not be inconsistent with any provisions of the Bankruptcy Code.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Silver Point Defendants, (a) equitably subordinating all claims asserted by the Silver Point Defendants against the Debtors (the "Silver Point Claims"), including but not limited to any claims related to or arising under the Prepetition Term Loans, to all general unsecured claims against the Debtors, and (b) awarding such other relief as the Court deems just and proper.

## COUNT AGAINST THE TERM LOAN DEFENDANTS

### TENTH COUNT
### *Against the Term Loan Defendants*
### Avoidance of Liens – Improvement In Position - 11 U.S.C. § 547(c)(5)

186.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

187.    The attachment of certain security interests or other liens upon the Debtors' property or any proceeds thereof, including, but not limited to, attachment to the Debtors' tax credits and tax refunds for the year 2014 identified on Schedules B18 and B21 to the Schedules of Assets and Liabilities filed by The Standard Register Company on May 11, 2015 [D.I. 477], and the Debtors' net operating losses for the year 2014, represent one or more transfers (collectively, the "Floating Lien Transfers") that were made by one or more of the Debtors to or for the benefit of one or more of the Term Loan Defendants, each Term Loan Defendant being an alleged creditor of the Debtors.

188.    The Floating Lien Transfers were made from property of one or more Debtors for or on account of an antecedent debt allegedly owed by one or more of the Debtors to one or more of the Term Loan Defendants before the Floating Lien Transfers were made (the "Antecedent Debt").

189.    The Floating Lien Transfers were made while the Debtors were insolvent.

190.    The Floating Lien Transfers were made by the Debtors to one or more of the Term Loan Defendants on or about January 1, 2015, which is less than 90 days before the Petition Date.

191.    Upon information and belief, the Floating Lien Transfers enabled one of more of the Term Loan Defendants to receive more than they would have received if (a) these Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy Code; (b) the Floating Lien Transfers had not been made; and (c) such Term Loan Defendants received payment on the Antecedent Debt to the extent provided by the provisions of the Bankruptcy Code.

192.    The Floating Lien Transfers reduced the amounts by which the Prepetition Term Loans were undersecured and were made on the later of (a) 90 days before the Petition Date and (b) the date on which new value was first given under the security agreement creating such security interest, to the prejudice of other creditors holding unsecured claims (the "Reduced Insufficiency").

193.    The Debtors' estates are entitled to avoid the Floating Lien Transfers, and any other transfers that caused the Reduced Insufficiency pursuant to sections 547(b) and (c)(5) of the Bankruptcy Code.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Term Loan Defendants pursuant to, *inter alia*, sections 547(b) and

(c)(5), 550 and 551 of the Bankruptcy Code, (a) avoiding the Floating Lien Transfers, and any other transfers that caused the Reduced Insufficiency, as preferential transfers, and preserving the liens created by the Floating Lien Transfers for the benefit of the Debtors' estates, and (b) awarding such other relief as the Court deems just and proper.

## COUNTS AGAINST THE DIRECTOR AND OFFICER DEFENDANTS

### ELEVENTH COUNT
*Against the Director and Officer Defendants*
**Breach of Fiduciary Duty**

194.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

195.    The Director and Officer Defendants owed fiduciary duties including, among other things, duties of care and loyalty, to the Debtors.

196.    The Director and Officer Defendants breached their fiduciary duties by, among other things, approving the WorkflowOne Acquisition without fully and adequately informing themselves as to the propriety thereof, including but not limited to relying on unrealistic and overly optimistic projections which they knew or should have known the business would not achieve after the WorkflowOne Acquisition was consummated.

197.    DiNello, one of Silver Point's initial appointees to the Board, ███████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

198.    Morgan and Ginnan breached their fiduciary duties by, among other things,

████████████████████████████████████████████

████████ which they knew or should have known the business would not achieve after the WorkflowOne Acquisition was consummated.

199.    The Director and Officer Defendants' breaches of their fiduciary duties caused the waste and dissipation of the Debtors' assets to the detriment of the Debtors and their creditors.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against the Director and Officer Defendants, awarding (a) actual, compensatory damages, (b) punitive damages, (c) interest, (d) reasonable attorneys' fees and costs, and (e) such other relief as the Court deems just and proper.

**TWELFTH COUNT**
***Against Defendants Morgan and Ginnan***
**Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) (Bonuses)**

200.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

201.    Morgan and Ginnan received Transaction Bonuses in the amount of up to $900,000 and $325,000, respectively, in connection with the WorkflowOne Acquisition.

202.    Payment of the Transaction Bonuses was a transfer of an interest of the Debtors in property, as the term "transfer" is defined in section 101(54) of the Bankruptcy Code.

203.    The Debtors paid the Transaction Bonuses within two years before the Petition Date.

204.    The Debtors received less than reasonably equivalent value in exchange for the Transaction Bonuses.

205.    The Debtors became insolvent as a result of the WorkflowOne Acquisition and payment of the Transaction Bonuses.

206.    After paying the Transaction Bonuses, the Debtors were left with unreasonably small capital for the business in which they were engaged.

207.    When they paid the Transaction Bonuses, the Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts came due.

208.    By reason of the foregoing, the Transaction Bonuses constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, pursuant to sections 548, 550 and 551 of the Bankruptcy, demands judgment in its favor and against Morgan and Ginnan, (a) avoiding the payment of the Transaction Bonuses, (b) directing Morgan and Ginnan to disgorge the Transaction Bonuses to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

<u>**THIRTEENTH COUNT**</u>
*Against Morgan and Ginnan*
**Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Ohio Rev. Code § 1336.04(A)(2)
(Bonuses)**

209.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

210.    Standard Register paid the Transaction Bonuses within four years prior to the date of this Complaint.

211.    Standard Register did not receive reasonably equivalent value in exchange for the Transaction Bonuses.

212.    After paying the Transaction Bonuses, Standard Register was left with unreasonably small capital for the business in which it was engaged.

213.   When the Transaction Bonuses were paid, Standard Register intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond its ability to pay as such debts came due.

214.   The Transaction Bonuses were avoidable fraudulent transfers to or for the benefit of Morgan and Ginnan within the meaning of applicable state laws, including but not limited to the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code. §§ 1336.01 *et seq.*

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against Morgan and Ginnan, pursuant to sections 544, 550 and 551 of the Bankruptcy Code and the Ohio Uniform Fraudulent Transfer Act, (a) avoiding the payment of the Transaction Bonuses, (b) directing Morgan and Ginnan to disgorge the Transaction Bonuses to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

## COUNTS AGAINST OTHER DEFENDANTS

### FOURTEENTH COUNT
*Against WF Holdings*
**Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) (Fees)**

215.   The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

216.   SRC paid, for the benefit of WF Holdings, approximately $5,575,000 of professional fees incurred by WF Holdings in connection with the WorkflowOne Acquisition (the "Reimbursed Fees").

217.   Payment of the Reimbursed Fees was a transfer of an interest of the Debtors in property, as the term "transfer" is defined in section 101(54) of the Bankruptcy Code.

218.   The Debtors paid the Reimbursed Fees within two years before the Petition Date.

219.    The Debtors received less than reasonably equivalent value in exchange for the Reimbursed Fees.

220.    The Debtors became insolvent as a result of the WorkflowOne Acquisition and payment of the Reimbursed Fees.

221.    After paying the Reimbursed Fees, the Debtors were left with unreasonably small capital for the business in which they were engaged.

222.    When they paid the Reimbursed Fees, the Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts came due.

223.    By reason of the foregoing, the Reimbursed Fees constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**WHEREFORE,** the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against WF Holdings, pursuant to sections 548, 550 and 551 of the Bankruptcy Code, (a) avoiding the payment of the Reimbursed Fees, (b) directing that the Reimbursed Fees be disgorged to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

## FIFTEENTH COUNT
### Against WF Holdings
**Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Ohio Rev. Code § 1336.04(A)(2)
(Fees)**

224.    The Committee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

225.    Standard Register paid the Reimbursed Fees within four years prior to the date of this Complaint.

226.    Standard Register did not receive reasonably equivalent value in exchange for the Reimbursed Fees.

227.    After paying the Reimbursed Fees, Standard Register was left with unreasonably small capital for the business in which it was engaged.

228.    When the Reimbursed Fees were paid, Standard Register intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond its ability to pay as such debts came due.

229.    The Reimbursed Fees were avoidable fraudulent transfers to or for the benefit of WF Holdings within the meaning of applicable state laws, including but not limited to the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code. §§ 1336.01 *et seq.*

**WHEREFORE**, the Committee, on behalf of the Debtors' estates, demands judgment in its favor and against WF Holdings, pursuant to sections 544, 550 and 551 of the Bankruptcy Code and the Ohio Uniform Fraudulent Transfer Act, (a) avoiding the payment of the Reimbursed Fees, (b) directing that the Reimbursed Fees be disgorged to the Debtors' estates, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

## RESERVATION OF RIGHTS

230.    The causes of action set forth in this Complaint are based upon the information provided to date by the Debtors in connection with the filing of their Chapter 11 Cases and by the Debtors and certain of the Silver Point Defendants in response to the Committee's formal and informal discovery requests. Because discovery is ongoing, the Committee may become aware of additional causes of action not set forth in this Complaint. Accordingly, the Committee reserves the right to (a) amend this Complaint, including but not limited to adding additional claims, Additional Parties, and modifying claims asserted herein, and (b) commence additional

adversary proceedings or other proceedings or contested matters in the future to allege other and

further claims against the Defendants or any other parties.


Dated: June 8, 2015                    **LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, NJ 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400

  *-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Counsel to the Committee*

  *-and-*

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward
Justin K. Edelson
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

*Delaware Counsel to the Committee*