1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3   IN RE:                        )  Case No. 15-10541 (BLS)
                                  )  Chapter 11
4   THE STANDARD REGISTER COMPANY, )
    INC., *et al.*,                )
5                                 )
                  Debtors.        )  Courtroom No. 1
6                                 )  824 Market Street
                                  )  Wilmington, Delaware 19801
7                                 )
                                  )  June 8, 2015
8                                 )  9:30 A.M.

9                      TRANSCRIPT OF HEARING
                 BEFORE HONORABLE BRENDAN L. SHANNON
10                  UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12
    For the Debtors:          Gibson, Dunn & Crutcher LLP
13                            By:  MICHAEL ROSENTHAL, ESQUIRE
                              333 South Grand Avenue
14                            Los Angeles, California 90071

15  For Bank of America:      Parker Hudson Rainer & Dobbs
                              By:  ED DOBBS, ESQUIRE
16                            1500 Marquis Two Tower
                              Atlanta, Georgia 30303
17
    ECRO:                     DANA MOORE
18
    Transcription Service:    Reliable
19                            1007 N. Orange Street
                              Wilmington, Delaware 19801
20                            Telephone:  (302) 654-8080
                              E-Mail:  gmatthews@reliable-co.com
21

22  Proceedings recorded by electronic sound recording:
    transcript produced by transcription service.
23

24

25

```
1   For Silverpoint:          Skadden Arps Slate Meagher & Flom
                              By:  ALBERT HOGAN, ESQUIRE
2                             155 North Wacker Drive
                              Chicago, Illinois 60606
3
    For the Committee:        Lowenstein Sandler
4                             By:  SHARON LEVINE, ESQUIRE
                              65 Livingston Avenue & 6 Becker
5                             Farm Road
                              Roseland, New Jersey 07068
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                   INDEX

2                                                                    Page

3    NOTICE OF AGENDA MATTERS:
For the Debtors, by Mr. Rosenthal                              4,23
4    For the Committee, by Ms. Levine                                 5
For Silverpoint, by Mr. Hogan                                   43
5    For Bank of America, by Mr. Dobbs                               52

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Please be seated.  Mr. Rosenthal, good

2  morning.

3      MR. ROSENTHAL:  Good morning, Your Honor, Michael

4  Rosenthal on behalf of the Debtors.  In the Courtroom with me

5  today, Your Honor, I'd like to introduce a number of people.

6  First is Joe Morgan who's the Debtors' CEO.  They're sitting

7  in the back row here.  Kevin Carmody who you know is the

8  Debtors' CRO; Bob Ginnan who's the Debtors' former CFO; Andy

9  Torgove who you know from Lazard is the investment banker for

10  the Debtors; and my colleagues Brian Lutz, Jeremy Graves, and

11  Kyle Kolb.

12      As is my custom I'll give the Court just a brief

13  overview of where we are in the case.  When we were last

14  before you, you approved the employee incentive plan.  And

15  since then, the company has focused on continuing their

16  business, maximizing profits and marketing the business for

17  sale.

18      As you know, the bids are due on Thursday.  The due

19  diligence process is in its final stages.  And we are

20  optimistic that we will receive multiple qualified bids and

21  then we'll have a robust auction which is to occur on June

22  15th, next Monday.  The sale hearing is scheduled before Your

23  Honor for the 17th.  But, obviously, Your Honor, before we get

24  to the auction we have to address the Committee's motion for

25  standing.  And so I will cede the podium to Ms. Levine.

1         THE COURT:  Let me ask you a question before we get

2    to that.  We have agenda item number one which is the

3    Jefferies retention.  And I do have the competing forms of

4    order that were submitted.  I just didn't have a chance with

5    the matters that I had last week to turn to it, but that's on

6    the front burner and I will study the competing forms of the

7    order and the submissions.  I don't think I need anything

8    further from the parties.  I understand the issues, as well

9    as the bid and the ask.  But I see that that's listed on the

10   agenda and, again, I do try to turn to these promptly when

11   they come in.  I think I know where we are on that.  I don't

12   believe that I need anything further, but I at least wanted

13   to touch on that as an agenda matter.

14         MR. ROSENTHAL:  Thank you.  We'd rather get to the

15   motion for standing.

16         THE COURT:  Sure.  Ms. Levine.

17         MS. LEVINE:  Good morning, Your Honor, Sharon Levin,

18   Lowenstein Sandler here with my colleagues Paul Kizel,

19   Wojciech Jung, Andrew Belman and our Delaware co-counsel --

20         THE COURT:  Right behind you, yes.

21         MS. LEVINE:  We want to thank you for hearing the

22   Committee's motion for standing.  We respectfully submit that

23   the Committee meets the standard of asserting a colorful

24   claim within the four corners of the complaint which is the

25   standard that the Court needs to look at in order to make

1  this determination.  In our [indiscernible] this morning,

2  we're going to address the fact that we believe that we've

3  asserted colorable claims within the complaint itself.  We're

4  going to address the fact that the Debtors we believe

5  unjustifiably refuse to bring the claims, but probably not

6  unexpectedly.

7          And we're going to address the fact that we believe

8  that the declarations should be inadmissible as not probative

9  with regard to whether or not the complaint itself asserts

10  colorable claims and [indiscernible] not probative with

11  regard to whether or not the Debtor unjustifiably failed to

12  assert the claims itself.  But regardless particularly with

13  regard to the Danello [*phonetic*] declaration which we just

14  received this morning as we were walking in here at 9:30.

15  It's apparently dated June 4th.  It's about this thick.  And

16  the idea that it wasn't provided to us in advance of the

17  hearing we find a little bit troubling, Your Honor.

18          THE COURT:  Let me ask you a question.  Is this an

19  evidentiary hearing?

20          MS. LEVINE:  We don't believe so, Your Honor.

21          THE COURT:  The reason it would be that as to

22  colorable claim since case law teaches that it's a 12(b)(6)

23  standard and we deal with your proposed claim or your propose

24  complaint on a Rule 12(b)(6) approach, at least.  And that's

25  clearly not an evidentiary hearing.  As a matter of fact the

1  Court is not obliged to make findings of fact or conclusions

2  of law under Rule 12(b)(6), right?

3          MS. LEVINE:  Correct.

4          THE COURT:  But the question of whether or not the

5  Debtors' refusal has been unjustified would seem to me to be

6  evidentiary, whether or not we need, you know, a lot of

7  testimony or something.  It doesn't seem like there's a lot

8  of -- well wouldn't that be an evidentiary issue?

9          MS. LEVINE:  Your Honor, we respectfully submit that

10  it's not, and it's not because under the Debtor in possession

11  financing order, the Debtors have admitted that they are not

12  allowed to bring these claims. So the only party who can

13  bring them is the Committee.  So to the extent --

14          THE COURT:  Well the question of refusal is not in

15  doubt, but the case law talks about unjustified refusal.  And

16  so the question of justification and thought process and

17  deference, perhaps, to business judgment seems to be part of

18  the analysis.

19          MS. LEVINE:  Your Honor, we do respectfully submit

20  that regardless of what's contained in the declarations and

21  here it's really just independent that we have disputed

22  issues of fact.  The declarations are submitted by the

23  purported target defendants.  So there is really no, it's a

24  creditability issue.

25          THE COURT:  Isn't that an evidentiary issue, then?

1       MS. LEVINE:  But further, Your Honor, there would be

2 no witness here who can come forward and say that there was

3 an accurate justifiable reason because we are seeking to

4 bring suit against the very parties who were seeking to have

5 us found not to be justifiably bringing that suit.  So it

6 becomes circular.  To the extent that Your Honor disagrees,

7 obviously, we're prepared to address it.  But we don't think

8 that there would be any way that, for example, Silver Point

9 could come forward and say that this is unjustifiable when

10 they are the purported defendant if we've met the burden of

11 asserting colorable claims.

12       Likewise, we believe that the Debtor who is

13 beholding to Silver Point in this case and who has submitted

14 declarations of the two target officers and directors

15 similarly cannot be found to have been putting forth credible

16 evidence with regard to whether or not these are, this is a

17 justifiable decision.  Your Honor, respectfully submitted the

18 --

19       THE COURT:  Hang on.  So then your analysis it may

20 be correct, but it would boil the Court's analysis primarily

21 down to one of colorable claim.  If there's a colorable claim

22 then refusal is by definition unjustified, am I right?

23       MS. LEVINE:  Your Honor, we would respectfully

24 submit that that's correct.  And we in researching the issue

25 --

1          THE COURT:  So why do I have a two prong test, three

2    prong test?

3          MS. LEVINE:  Your Honor, in the event that the Court

4    is in a situation where the Debtor, for example, has not

5    waived the right to bring these claims.

6          THE COURT:  Sure.

7          MS. LEVINE:  Or there are other parties out there

8    who are asserting competing claims, but historically we've

9    researched the issue.  We've not come across any case where

10   the Court has held a plenary hearing on justifiable denial

11   and then the circumstances where the Courts have considered a

12   Committee's request.  Once the Court finds a colorable claim,

13   we haven't found a case where the Court said but the Debtor

14   researched this.  And, therefore, made an informed decision

15   that it shouldn't be brought.  We're the only fiduciary here,

16   Your Honor, that's not self-interested on this issue.

17         THE COURT:  I understand.  Let me ask you for, back

18   to your outline.  It's a little bit of a chicken and egg in

19   both in your analysis and the Debtors' analysis when we talk

20   about refusal.  We'll get to colorable claim.  That's really

21   where the meat of the analysis and the meat of the case law

22   about these issues is.  But I, at least, want to circle back

23   to this because your point would be where are we today.

24         The Debtors entered into a DIP financing order that

25   says they can't bring these claims.  So the fact of the

1  matter is that they're refused and that's where we are.  The

2  Debtors' analysis says no, no, no.  You need to go back to

3  the question of why we're not pursuing these claims.  The

4  Debtor was faced with two options, right, or at least this is

5  their analysis.  If we're living in a binary world.

6          The Debtor said we could articulate and pursue

7  claims and causes of action against Silver Point at a point

8  where we're in the measure of financial distress.  And we

9  could pursue them.  They're not simple causes of action.

10 They may have merit.  We'll get to colorability, etcetera.

11 But the Debtor said but our management, our board, our

12 counsel all said we got two options.  You can go to war with

13 Silver Point or we can file a bankruptcy proceeding that has,

14 to use Mr. Rosenthal's worlds, you know, a structure and a

15 format so that we've got financing.  We have a stalking

16 horse. We're going to move the process forward.  In the

17 absence of that we'd be in World War III.

18         So when you evaluate the justifiability of our

19 decision it really has to be not today after we've

20 effectively waived it under the DIP order, but as of the

21 commencement of these bankruptcy proceedings or otherwise.

22 How do you respond?

23         MS. LEVINE:  Your Honor, if that is really the test

24 then we may as well do away with the provision and the DIP

25 order that reserves this right for the Committee, because

1  there's never going to be a circumstance where you have the

2  secured lender providing rescue financing and being the

3  stalking horse bidder, where the Debtors not going to feel

4  compelled to waive those claims.  It just can't happen.

5       We've got the DIP.  We've got the stalking horse

6  bid.  The Debtors expecting a robust auction with this

7  standing motion pending.  And, frankly, Your Honor, in other

8  cases where the Debtor has been concerned about the press or

9  the fan press around our standing motion, we've not been able

10  to streamline the process by consenting to standing with

11  regard to profession type issues and reserving for another

12  day the comments that relate solely to damage claims; for

13  example, to avoid the [indiscernible] concern and, otherwise,

14  stipulate to things like where we see encumbered assets vs.

15  unencumbered assets.  None of that has happened in this case.

16       It's been [indiscernible] up against the Committee,

17  Your Honor.  So we are here not solely because we truly,

18  truly want to be here in this kind of an environment, but

19  because we've been forced to take it to this level.  That

20  said if, in fact, any time that you have a situation where

21  the prepetition lender is the stalking horse bidder and the

22  Debtor-in-possession financing source.  If you find that that

23  necessarily means that the Debtor justifiably waived the

24  right to bring the claims, there's never going to be a

25  circumstance where proper claims are going to be brought.

1        THE COURT:  Fair point.

2        MS. LEVINE:  Colorable claims?

3        THE COURT:  Yes.

4        MS. LEVINE:  Your Honor, we respectfully submit that

5   the standard for bringing, for granting standing is similar

6   to a 12(b)(6) motion.  If you take a look at <u>Pitt Penn</u> and

7   <u>Jevic</u> the Committee gets the benefit of the doubt on the

8   claims.  It's based upon the assumption that all of the

9   allegations contained in the complaint are true and the Court

10  should not be looking at declarations or extraneous

11  documents.

12        With regard to fraudulent conveyance jumping perhaps

13  a little bit out of order than where we originally were going

14  to go but since Your Honor seems to be presented with a stock

15  price chart we respectfully submit that that's a question of

16  fact for trial.  It's not one of the issues we pled within

17  the complaint.  But to the extent that Your Honor is

18  addressing it either here or in connection with whether or

19  not the Debtors justifiably didn't bring the cause of action

20  we respectfully submit that the stock value here was $3.00 a

21  share with an 8 million share market cap or $13.8 million

22  with a $30 million share mortgage cap.

23        This is a small company, post-closing.  There was

24  likely a bump on the closing itself as the information with

25  regard to the actual --

1       THE COURT:  It almost quadrupled and then it --

2       MS. LEVINE:  But as the information with regard to

3  the actual fundamentals of the company leaked out into the

4  market the stock dropped.  In addition to that the stock very

5  quickly settled at a price of $5.00.  If you take a look at

6  that percentage to the total debt which was $500 million

7  dollars we would offer testimony at the time that we got to

8  trial assuming we reach that point that that's nothing more

9  than an option value.  In addition to that, it doesn't take

10  into account whether or not the stock was shorted and why it

11  was being traded.

12       We're not saying, Your Honor, that Campbell and

13  Asarco [*phonetic*] prevent looking at the stock for valuation.

14  But we are --

15       THE COURT:  Campbell was at the summary judgment

16  stage, right?

17       MS. LEVINE:  Yeah, Your Honor, both of these -- well

18  yes.  Campbell was at the summary judgment stage after --

19       THE COURT:  After discovery.

20       MS. LEVINE:  After, in fact, there had been evidence

21  and discovery.  But also talked about the fact that it was a

22  factual inquiry and relied upon the fact that there was

23  extensive evidence.

24       THE COURT:  Okay.

25       MS. LEVINE:  Your Honor, we respectfully submit that

1   that complaint deserves colorable claims, that the

2   transaction that we're dealing with here is a transaction

3   with regard to Standard Register's acquisition of Workflow.

4   The target defendants are the Silver Point entities, the

5   offices and directors, the asset base lender with regard to

6   [indiscernible] issues not necessarily with regard to the

7   fraudulent conveyance issues, and Workflow Holdings who is

8   the counterparty to the Workflow transaction.

9          Prior to the time of transaction as pled in the

10  complaint, and by the way, Your Honor, I'm going to reference

11  general allegations, but not numbers. We filed the complaint

12  under seal because all that was information was provided to

13  us pursuant to confidentiality agreement and protective order

14  --

15          THE COURT:  I'm aware.

16          MS. LEVINE:  The notice that Silver Point included

17  some numbers in their reply but since they provided us with

18  some of the documents we don't feel comfortable guessing

19  which is right and which is wrong.

20          THE COURT:  Better they do it than you.

21          MS. LEVINE:  Your Honor, prior to the -- as alleged

22  in the complaint prior to the transaction Standard Register

23  was meeting its obligations as it came due.  It was making

24  payments including to its pension and certain legacy

25  liabilities.  It was actually reinvesting in making capital

1   improvements.  And it was on a trajectory to grow its

2   customer base.  Conversely, Workflow was in a Chapter 11,

3   then out of a Chapter 11, and following the Chapter 11 highly

4   levered and losing money.  So at the time of the transaction,

5   we respectfully submit, that we have adequately pled that

6   Standard Register acquired less than recently equivalent

7   value.

8         We would invite the Court to take a look at the

9   allegations in paragraphs 95 through a 103, but we don't

10  really want; again, we don't really want to go through all of

11  those numbers.

12        In addition to that, Your Honor, inviting the Court

13  to take a look at 104 through a 108 we respectfully submit

14  that the transaction actually rendered Standard Register who

15  was previously operating insolvent.  That the projections

16  that were relied on in terms of making the transaction, at

17  the time of the transaction were flawed, that it was left

18  with, not only that was it rendered insolvent 104 to 108, but

19  it was also, even though it's an or, we think we have and.

20  It was actually rendered with less than reasonably small

21  capital.

22        Your Honor, when you take a look at the transaction,

23  you have as indicated in the complaint Silver Point writing

24  down its Workflow debt and writing off its equity prior to

25  the transaction.  We also have internal emails which we gave

1  in the complaint so we're not going outside the complaint

2  where the Silver Point director is talking to other directors

3  about the fact that even if this doesn't work, we can put a

4  363 sale and get rid of the pension obligation.

5        We would respectfully submit that, therefore, this

6  transaction was not done with the intent that it be a better

7  deal for everybody, but that it was done with the catch all

8  that the board and Silver Point decided they could put it

9  together and if didn't work no problem.  It would get rid of

10  the obligations which were being paid at the time of the

11  transaction.

12        And, Your Honor, that's an important fact here.  At

13  the time that Standard Register was looking at the Workflow

14  transaction, a lot of the unsecured creditors who are getting

15  wiped out in this bankruptcy case if they do get wiped out

16  existed.  And they were paid in the ordinary course.  It

17  includes not only the defined benefit plan which is obviously

18  a larger number, but also the serp payments to the senior

19  executive under the senior executive retirement plans.  Those

20  are not PBGC protected plans.  Those are guys who are already

21  retired and with no ability to make up the difference and

22  who, otherwise, just getting wiped out through this

23  transaction.

24        Your Honor, taking a brief stop just to go in order

25  of the complaint talk a little bit about the asset baseline.

1        THE COURT:  Okay.

2        MS. LEVINE:  That's not really as focused on the

3  fraudulent conveyance and the Workflow transaction.  We have

4  three buckets of assets there.  One's where we looked at the

5  asset baseline [indiscernible]; one where we think everybody

6  gets if they don't have a lien, and a middle ground where we

7  are all admitting that perhaps there's a dispute.

8        It appears that the only opposition to standing on

9  the facts out of the complaint is the asset base lenders

10  contend that they are fully collateralized in terms of value

11  on the assets in which they have a lien.  And we respectfully

12  --

13        THE COURT:  So this is an academic issue?

14        MS. LEVINE:  Yeah but we respectfully submit that's

15  great for them and we're not looking for them not to get

16  paid.  All that means is we don't have to deal with a

17  deficiency claim. But if there are truly unencumbered assets

18  we would like to make sure that they are preserved and

19  segregated to the unsecured creditors.  So this goes back to

20  making sure that the lender is paid on account of its pre and

21  post-petition liens.

22        THE COURT:  So the issue from your point of view on

23  a prospective basis with the ABL lender would be one of

24  whether it's marshalling or reverse marshalling, whether or

25  not there are assets that are, which assets are being

1   liquidated and used to pay off.

2          MS. LEVINE:  Correct.

3          THE COURT:  And your concern would be that if they

4   liquidate undisputed collateral then great and pay themselves

5   off then great.  We don't care.  But if disputed collateral

6   is liquidated and undisputed collateral is liquidated your

7   point would be that that money, some of that should be

8   attributable to the unsecureds.  I understand the argument.

9          MS. LEVINE:  That's correct, Your Honor.

10          Your Honor, with regard to the officers and

11   directors, it's basically the same set of facts that we were

12   looking at with regard to the Workflow transaction plus some

13   additional evidence like the Court's attention to the

14   allegations in 118, 119 and then 213 forward with regard to

15   those causes of action.

16          THE COURT:  Okay.

17          MS. LEVINE:  In addition to paragraph 72 through 77.

18   Your Honor, the basis there is that the board looked at, the

19   Standard Register board looked at the Workflow transaction

20   several times over a period of time deciding it was a bad

21   idea until suddenly you have a situation where Silver Point

22   is all about it.  And the officers and directors and the

23   officers who prepared the projections are getting bonus for

24   getting the deal done.

25          We think that based upon all projections and based

1  upon the failure to adequately provide liquidity to the

2  extent that there was going to be a transaction regardless

3  that we have disputed questions of fact and adequately pled

4  breach of fiduciary duty by both the directors and the

5  individual officers.

6          Your Honor, to the extent there's extraneous

7  evidence that's been offered to the Court with regard to the

8  fact that there were valuation reports at the time of the

9  transaction, we would respectfully submit that both the

10 Capstone report and the Bank of America Merrill Lynch report

11 rely on the company's and management's numbers and,

12 particularly, the numbers that were prepared by the two

13 officers and directors who provided declarations in

14 opposition to the standing motion.  And that both the revenue

15 projections there were [indiscernible] as were the

16 projections with regard to interest rates.

17         And, interestingly, Your Honor, and, again, in

18 declaration in paragraph 6 and 7 they talk about the fact

19 that the company is stable, but that it might have problems

20 honoring its patient obligations.  Then suddenly as we jump

21 down to paragraph 11 where we're post acquisition, it's not

22 that the merger has solved the pension issue.  It's that

23 suddenly we're going to rely on an increase in extraneous

24 interest rates to fund those expenses.  So we had a situation

25 where Standard Register might have had flat revenues that

1  were projected to start growing in 2015 but was honoring its

2  obligation to a place where we were immediately following the

3  Workflow transaction, they're not honoring those obligations.

4        Your Honor, with regard to Workflow Holding it's

5  just a counterparty to the transaction.  But to the extent

6  that it received consideration as part of the transaction we

7  would respectfully submit that we should get that

8  consideration back.

9        THE COURT:  Okay; I understand.

10       MS. LEVINE:  Your Honor, that's basically our

11  argument with regard to standing and having colorable claims.

12  With regard to the fact that the Debtor did not justifiably

13  decline to bring the claims, we would not the following.

14  That the three declarations that are being submitted into

15  Court as that proposition are being submitted by proposed

16  defendants.

17       THE COURT:  Well that's always the case, though.  I

18  meant that's not remarkable.

19       MS. LEVINE:  But it's a, yes and no, Your Honor.

20  It's, in fact, some of the reasons for not having standing

21  were broader.  There have been situations where we've been

22  opposed by other parties in interest and not just the

23  proposed defendants.

24       We would note with regard to the Carmody declaration

25  admits that he was involved in the case about ten minutes

1   before it filed.  That his primary focus was to get the DIP

2   and the stalking horse bid in place.  With regard to the DIP

3   from Silver Point, Your Honor, again we would note that the

4   only draw on that DIP has been to pay Silver Point fees with

5   regard to the stalking horse bid.  Today is not the day, but

6   we intend to present a connection with objections to the

7   sale; issue with regard to whether or not that actually

8   helped or hurt the sale process.

9         In terms of a credit bid without an upset price

10  chilling some of the potential alternate bidders, Your Honor,

11  we would also note that regardless of whether or not that was

12  the intent at the time that the case was filed under the DIP

13  order we got a period of time within which to bring these

14  challenges at the point in time we met that deadline.  And at

15  this point in time, the DIP is in place.  The stalking horse

16  bid is in place.  The bids are due Monday and the auction is

17  scheduled for Wednesday so that alleged concern has past.

18        Three we would note that the apparent reliance on

19  Gibson Dunn with regard to an analysis of whether or not this

20  was appropriate, Gibson Dunn was the attorneys who advised

21  Standard Register in connection with the Workflow transaction

22  back in 2013.  So there's an appearance here of potentials

23  for conflict of interest or seeing things through glasses

24  that it might be better to let a third party look through.

25  And we would respectfully submit that the Committee is the

1  proper fiduciary to make those claims.

2         Similarly, Your Honor, in reliance on the <u>Capstone</u>

3  report and on the Bank of America report as we indicated a

4  little bit earlier number one it's flawed because they relied

5  on the very management projections that we're challenging.

6  Number two, we would note that particularly with regard to

7  the Bank of America report that the report relies on

8  comparables which didn't close; at least in one instance.

9  And we think there may be other issues with the report, but

10 we would respectfully submit that regardless that's a

11 question of fact for trial once the parties have a chance to

12 work through discovery.

13         THE COURT:  Okay.

14         MS. LEVINE:  Your Honor, we already addressed

15 previously the stock price.  To the extent that Your Honor

16 admits the declarations, again we would need a break and some

17 time to look at the Danello declaration.

18         THE COURT:  Okay, I understand.

19         MS. LEVINE:  With regard to [indiscernible] we

20 discussed the inconsistency with regard to the pensions and

21 the fact that it was showing that Standard Register's

22 standalone entity was making money and that suddenly it was

23 post-closing when they started having the problems.

24         With regard to the Morgan declaration, there's an

25 admission which is included in the allegation in the

1  complaint in paragraph 26 that Standard Register was working

2  a new customer relationships that should have dropped benefit

3  to the revenue line prior to the time of the Workflow

4  transaction.

5          THE COURT:  Okay.

6          MS. LEVINE:  Your Honor, reserving the time to rebut

7  we would respectfully submit that the Committee has met its

8  burden of providing a colorable claim and to show that the

9  Debtors' decision not to bring the action was not

10 justifiable. Thank you.

11         THE COURT:  Mr. Rosenthal.

12         MR. ROSENTHAL:  I try to bring just a little levity

13 in before at the risk of wasting your time.  We cleverly

14 cited to John Steinbeck's of mice and men for the proposition

15 that sometimes the best laid plans of mice and men often go

16 awry.

17         Unfortunately, Steinbeck while he took the title of

18 his famous book --

19         THE COURT:  Didn't actually write that.

20         MR. ROSENTHAL:  Didn't actually write that.

21         THE COURT:  Oh really.

22         MR. ROSENTHAL:  It was actually written, it's in

23 ultimate stands of a poem called To a Mouse by Robert Burns,

24 a Scottish poet.

25         THE COURT:  A Scottish poet.  He's the poet laureate

1  of Scotland.

2        MR. ROSENTHAL:  Who said the best land schemes of

3  mice and men gang aft-a-gley which means often go awry, so I

4  apologize for not crediting Mr. Burns.

5        THE COURT:  There's got to be enough some English

6  major in this room pointed that out to you.

7        MR. ROSENTHAL:  We're trying to increase the

8  literary --

9        THE COURT:  From your lips to God's ears/

10        MR. ROSENTHAL:  Your Honor, I want to start where

11  Ms. Levin started about the declarations.  We believe that

12  these declarations are admissible.  In fact, they're

13  absolutely required.  We believe that the Committee has an

14  obligation to present evidence in support of the Committee's

15  motion for standing.  And that the failure to do so means

16  that the Committee's motion should not be granted.

17        The Cybergenics test as the Court says is a three

18  part test.  The two parts that are relevant; one, obviously,

19  the third part as the Court makes.

20        THE COURT:  Sure.

21        MR. ROSENTHAL:  But the two parts are colorable

22  claim.  I tend to agree with the Court that if the Court

23  wants to make the decision about a colorable claim under

24  standards similar to 12(b)(6), the Court need not consider

25  evidence.  Of course not just every allegation will do when

1  we have all of the Twombly and Iqbal --

2          THE COURT:  Twombly and Iqbal analysis --

3          MR. ROSENTHAL:  Overviews.  But that the second one

4  is that demonstration that the Debtors' decision not to bring

5  the claim was unjustified. That is a distinctly evidentiary

6  matter.  If you look and, Your Honor, to say it does not

7  reach the second prong out of the Cybergenics test.

8          THE COURT:  I agree.  So, at least, until somebody

9  tells me otherwise I do not believe that the Court's inquiry

10  into whether there's a colorable claim is an evidentiary

11  exercise.  And I'll give you a couple of reasons.

12          The first is most obviously I think case law teaches

13  the 12(b)(6) analysis and Courts are familiar with it,

14  counsel are familiar with it.  That's how we do it.  The

15  second thing is that in the overwhelming majority of cases

16  where we would see this would be on this fact pattern.  We've

17  got a case that is a few months old, a Committee that's been

18  at it for several months and, again, to impose upon a

19  Committee an evidentiary burden in identifying and

20  articulating those claims.

21          An affirmative evidentiary burden would be to

22  conduct a mini trial, right.  The consequences of that I

23  think are troubling and would be particularly troubling to

24  the Debtor.  Because if I were to have a Committee come in

25  two weeks into a case and say we're going to look for

1  standing, so saddle up guys.  I need depositions in three

2  weeks.  I want all of the documents delivered within a week.

3  And we'd have that, that mini trial.

4         Now in some ways that may be helpful or not, but I

5  don't think that that's what's contemplated. So I will

6  observe that the issue of colorability is not an evidentiary

7  inquiry. I haven't seen the Danello declaration.  I have seen

8  the other two declarations and I would be inclined to admit

9  them.  We can talk about Danello and if you need time that's

10 fine.  But to me your point that the issue of justifiable

11 refusal I think that that is an evidentiary inquiry.

12        I can easily imagine a situation where I wouldn't

13 need a lot of live testimony about it where the circumstances

14 and the analysis are what they are.  But it does seem to me

15 that that's different than the 12(b)(6) analysis where I'm

16 granting or accepting well pled allegations is true for

17 purposes of whether or not to determine whether there's a

18 cause of action.

19        So we can talk about Danello at an appropriate time.

20 But it seems to me that the other affidavits are appropriate.

21 So let's circle back then.  And, again, by way of -- so by

22 way of where we're going today it would seem to me that I do

23 want to hear argument from the parties with respect to the

24 colorable claims.  I think also that to further complicate

25 this matter it would seem to me that while I apply a Rule

1  12(b)(6) standard, I think the colorability analysis is

2  perhaps a little bit less rigorous in terms of what I am

3  permitted to consider.

4       And so I can take sort of a flexible, I think a more

5  flexible approach because Rule 12(b) doesn't talk about

6  colorability.  Colorability almost implies a smell test.  And

7  I ought to be able to look perhaps at maybe something broader

8  than just the four corners of the complaint as articulated.

9  So I think that there's -- I don't know if that's helpful to

10 understand but I think that there's a slightly more flexible

11 approach, but I don't regard this as an evidentiary inquiry

12 in that respect.

13      I read your papers carefully.  I didn't catch the

14 Robert Burns bit, though.  I always thought it was of mice

15 and men.  How do you respond, though, to what was my first

16 reaction and Ms. Levine's immediate reaction that if you're

17 right on how you've articulated this that we would never see

18 a successful Committee standing motion; or, at least, under

19 most circumstances?

20      I think I laid out in pretty favorable terms the

21 thought process that the Debtor would likely have gone

22 through.  I got two options.  You probably sat at the table

23 and said you have two options, guys.  You can go to war with

24 a senior secured creditor and pursue causes of action that

25 are not simple or easy, but pursue them, or you can commence

1    a bankruptcy proceeding.  And, again, I didn't handle the

2    first days, but I read the transcript a couple of times and

3    you walked the Court through how the Court go to today and

4    why having a DIP and having a stalking horse is better than a

5    free fall and all the other words we would have for what a

6    free fall is.

7            How do you respond to if that is sufficient to

8    justify the non-prosecution than every Debtor can meet that

9    standard.

10           MR. ROSENTHAL:  Actually I don't think that's

11   sufficient.  I think the real inquiry on the second prong is

12   are there really claims worth bringing in that the Court

13   needs to think about what analysis the Debtor did and how

14   these facts would like come out in terms of making that

15   decision about whether the refusal is justified or not

16   justified.

17           The fact that we got a DIP, the fact that we got a

18   stalking horse is helpful to the estate.  But the underlying

19   question, Your Honor, I think is not whether you can stay the

20   cause of action.  I don't think as a practical matter that's

21   what companies do.  They don't sit around in board room and

22   listen to their lawyers and say can we survive a motion to

23   dismiss on this claim.

24           THE COURT:  Agreed.

25           MR. ROSENTHAL:  They sit around a board room and say

1  what claims can we bring.  What's the likelihood that will

2  win?  If we win what's the amount of damages we're likely to

3  get?  How much will it cost us to bring the case?  How

4  harmful would it be to the business while we're litigating

5  against this party?  How harmful will it be to our business?

6  And is there another path that's better for us.  So that I

7  think is what we did in this case.

8           THE COURT:  Okay.

9           MR. ROSENTHAL:  And that's where I think the whole

10  concept of the justifiable refusal comes in.  So let me take

11  an example because I, you know, I hoped you would ask this

12  question actually because my, we read your Optim transcript.

13  And I know in Optim you decided on colorable claim. But I was

14  going to try to direct you to the second prong, because I

15  think the second prong because these things merge.  I think

16  colorable claim is relatively easy to justify.  And I think

17  that if you only had to look at colorable claim the result

18  that you said would be the case before that you never give

19  standing.  If you only had to look at colorable claims most

20  of the times the Committee would get standing.

21           So let's look at the fraudulent transfer claim.  In

22  reality, there are lots of claims asserted here.  I think

23  that there are real claims.  I mean we see the Committee

24  throwing things against the wall I think, recharacterization.

25  We didn't see any evidence of those kinds of inequitable

1  evil, bad, bad acts.  So let's look at the two that sort of I

2  think are the most likely: fraudulent conveyance and lien and

3  validity.

4        We'll focus on fraudulent conveyance. Was there a

5  transfer?  No question there was a transfer.  And I think

6  this is an analysis.  I can't tell you, you know, the real

7  attorney/client privileges and everything, but this is an

8  analysis that the company, that it was their transfer.  What

9  do we need to show?  We need to show there was insolvent.

10 And we need to show that they did not receive recent

11 equivalent [indiscernible].

12       Let's talk about insolvency.  How would we show

13 that?  So the first thing we see about showing insolvency is

14 that chart right there.  Now at first I wasn't going to use

15 that chart.  Mr. Graves put it together and I was like nay I

16 don't want to use that.  The Judge won't really appreciate

17 that.  But that chart doesn't indicate solvency.  But what it

18 does indicate absolutely.  But what it does indicate it's the

19 best evidence, according to the Third Circuit, it's the best

20 evidence of whether a company is solvent and whether the

21 transaction was added to have credence.

22       So you see in that chart that before the transaction

23 the market cap of the company was about $20 million dollars.

24 The company was trading about $3.00 a share.  After the

25 transaction the price of the stock goes up to $13 something

1  80, market cap goes to $60 or 70 million dollars.  And it

2  doesn't as the Committee would have you believe promptly go

3  back down to $5.00.

4          You see a dip in October as Silver Point was able to

5  exercise their warrant.  [indiscernible] in selling, but as

6  they were able to exercise their warrant.  Then you see the

7  tree line.  But you see the market cap still saying around

8  that, what is that $60 million dollar level.  You see an

9  uptick.  This is almost a year after the transaction.  You

10  see an uptick for the earnings.  You see another uptick for

11  the earnings.  So that's the first thing I'm looking at.

12          I have a chart; the market evidence which is one of

13  the factors that the Third Circuit considers to be most

14  indicative is against me.  What else do I have?  I have a

15  Bank of America analysis which demonstrates that the

16  enterprise value of the company before the transaction is

17  $319 million dollars.  And that Workflow itself had a value

18  of roughly what we paid for it $239 million if you sort of

19  take the mean of the various analysis that they put together.

20  And then I have a Capstone opinion that demonstrates the

21  Debtors were insolvent after the transaction.  That's the

22  evidence that I would have to overcome in order to win the

23  insolvency prong.

24          Now let's talk about what's on the other side of

25  that evidence.  We've got the possibility that we could have

1  some Monday morning quarterback expert testify that all of

2  those don't make any sense and the market didn't have any

3  idea what it was doing.  And that unlike every other stock on

4  the New York Stock Exchange the investors in this stock just

5  didn't get it.  They didn't get it.  We informed the market

6  of everything we're required to under the SCC Rules, but they

7  just didn't get it for this stock.  They might get it for

8  every other stock.  So I got a Monday morning quarterback who

9  might try to say that.

10        The Committee says now well I should have looked at

11 insolvency not on a going concern basis but on a liquidation

12 basis.  But the Third Circuit says I'm not supposed to do

13 that.  If liquidation is not imminent then there's no reason

14 that liquidation value is the appropriate value for solvency,

15 it's going concern value.  Liquidation clearly wasn't

16 imminent in this situation, so from my perspective, that

17 insolvency prong pretty difficult prong to satisfy.  Maybe

18 not impossible, but pretty good prong.

19        I had the same kind of analysis for recently

20 equivalent value.  Again Campbell says that delta and market

21 capitalization is the strongest indicator of recently

22 equivalent value.  That delta is $60 million dollars.  So

23 that market is telling you that it added $60 million dollars.

24 Then I have the Bank of America fairness opinion that says

25 that Workflow including synergies was worth somewhere in the

1  depending on the analysis you use, but the mean we got to was

2  about $230, $240.  I paid $218.  It's roughly what it's

3  worth; a little less perhaps.

4       And what do we know on the other side of that?  We

5  know that Silver Point valued -- no Silver Point marked down

6  Workflows debt to a $140 million dollars. But they did that

7  on a standalone basis because they didn't know they were

8  going -- when they did that, they didn't know that they were

9  going to merge with Standard Register.  That's just what they

10  were carrying this debt at.  That didn't reflect any

11  synergies.

12       We know the Third Circuit says you have to take into

13  consideration synergies.  We know that Bamble said there were

14  synergies.  We know there were synergies.  So I mean I just

15  from that recently equivalent value perspective it appears

16  that the best facts are that it would be difficult to

17  demonstrate recently equivalent value.  So I put that in the

18  calculation.  And I've got a litigation result that's

19  somewhat uncertain and difficult and hard to win.

20       And then I say what's my prize?  What's the best

21  case that I can think of?  Now there's a possibility that I

22  could win on the Committee's theory that Silver Point acted

23  in bad faith and that it doesn't get any claim, even though

24  Workflow clearly had some value that they don't get any claim

25  what so ever.  And the company gets a total windfall.

1  Standard Register acquires Workflow and there are no claims

2  that result in that transaction.

3          I don't have any facts to back that up.  These were

4  arm's length third party negotiations.  They had Perella

5  Weinberg.  We had Bank of America.  We had Capstone.  We had

6  Gibson Dunn.   I mean these were arm's length, tough

7  negotiations.  I don't see any basis for that bad faith

8  argument.  The more likely result I see even if I manage to

9  win is that their claim is reduced from what we paid to 18 to

10  a lesser value.

11          Now the evidence that I know about is that Silver

12  Point marked it down to a $140, didn't include synergies so

13  it's hard to see how it would go below a $140.  And that's

14  the best case.  So on top of all of that, you know our case,

15  best case unlikely I'm going to win it.  How much will it

16  cost me?  We know litigation is expensive.  It's going to

17  cost me out of pocket a ton of money.  And that money is

18  spent whether I win or lose.  So now I'm engaged in

19  litigation and I don't have a good business plan to keep my

20  business alive and viable while I'm litigating and attacking

21  my secured creditor.

22          So I've got a claim that's of marginal value.  It's

23  going to cost me a lot to pursue.  I threaten my entire going

24  concern value.  And on top of all of that I'm thinking is

25  there another alternative that avoids these and gets me where

1 I want to be.

2 　　　　THE COURT:  Let me ask then, certainly back to where

3 we started on this point.  Part of this may boil down to a

4 question that you touched on which was either with competing

5 constructions of the analysis either these motions should be

6 granted all the time or they should be denied all the time;

7 depending on who's correct about this analysis.  But I

8 listened carefully to the walkthrough that you just gave me,

9 and I get it.  And I want you to leave aside for a moment the

10 concrete issues that we just covered with respect to

11 insolvency, etcetera; reasonably equivalent value and the

12 market reaction.

13 　　　　But when I'd ask you to give me an answer; or not an

14 answer, but a response on my observation that the analysis

15 you just descried is hardly remarkable.  Okay this is not

16 unusual whether we're dealing with a company that is a

17 product of a recent merger acquisition or a company that is

18 just struggling and in distress and ultimately chooses to

19 move forward with a bankruptcy proceeding.

20 　　　　The idea of evaluating the difficulty of litigation,

21 the assessment of the difficulty of litigation versus trying

22 to reach some sort of accommodation sometimes however

23 distasteful or however burdensome.  When Debtors are often

24 faced, we'll go back to more English literary comments.

25 Debtors often face a Hopson's choice, okay.  And I can give

1  you a thousand fact patterns and you'd probably give me more

2  where you've got a Debtor that is difficult circumstances and

3  is left with very few alternatives.

4        Often their stark; their do what the lender says or

5  face foreclosure.  Do what the lender says or face a

6  liquidation.  What's the difference here that would mean that

7  this is not a rule for all cases where the circumstance

8  automatically means or by simple application means that a

9  Committee would not be accorded the opportunity to pursue

10 this?

11       MR. ROSENTHAL:  Well first I think that the ability

12 of the Committee to have standing should be narrowly

13 construed.  And I think that whether it's the STN Court or

14 the Eighth Circuit or whatever that by and large it's

15 difficult, should be difficult to obtain standing.  Because

16 the Debtor is the fiduciary for the estate and it's looking

17 out not just for unsecured creditors but for maximizing the

18 value of the estate.  And that's why the Debtor has the

19 ability to pursue these claims without coming to the Court or

20 whereas the Committee has to come to the Court.

21       In terms of a further response, though, Your Honor,

22 I think the answer is in this case we came up with and I

23 don't want to say that it's absolutely unique.  It's not.  I

24 mean you see this all the time.  But we came up with a value

25 maximizing strategy for the estate where we had financing,

1 but we had a stalking horse which is going to lead to, we

2 believe, an auction which will generate value for that

3 secured creditor but will also generate value for the estate.

4      So let me tell you how I see that.  The price that

5 Silver Point is willing to pay or the price that any

6 competing bidder is willing to pay is comprised generally of

7 two components.  One component is paying off the ABL.  The

8 second component is paying off the first lien term debt which

9 is about a $113 million I think right now.  That's not the

10 only consideration, though.

11      The consideration also includes assuming all of our

12 post-petition trade payables.  Assuming all of our 503(b)(9)

13 claims.  Those were all administrative claims.  Those are all

14 amounts that are received by the estate or, at least, a

15 significant portion of our deferred revenues, sales rebate, a

16 number of claims which would be administrative claims, paying

17 our, having a wind down budget that includes payment of other

18 administrative claims of the estate.  So the estate is

19 actually receiving value from this transaction separate and

20 apart from the unsecured creditors.

21      So that's my response is.  Are there other cases

22 where a Debtor has done that?  Absolutely.  And in those case

23 if the facts are as I've described them I don't think the

24 Court should grant the Committee's standing.  And you know

25 it's particularly I think what the Court has to do is,

1   frankly, evaluate whether these are real causes of actions,

2   whether these are nuisance causes of action.

3           And we've all been in situations where Committees

4   out of the money, do whatever they can to try to generate

5   value.  And some of that value, quite frankly, might come

6   from raising these claims and settling them.  I mean I think

7   you ask in the Optim hearing you asked should I take into

8   consideration that most lawsuits settle.  And I think my

9   answer to that is no because that's not the test.  The test

10  is --

11          THE COURT:  I agree.

12          MR. ROSENTHAL:  The test is do you, has the Debtor

13  justifiably refused to pursue the claims.  So I don't think

14  you should allow nuisance type claims to go forward just

15  because it's likely to impose settlement, pressure on the

16  parties.

17          THE COURT:  I haven't looked at that transcript, but

18  my recollection of that colloquia, though, was that counsel

19  was raising this parade of horribles of what would happen

20  that, you know, the case, itself, would head off a cliff and

21  the power plant would cease to operate, the lights would go

22  out in the state of Texas and all kinds of things like that.

23  That was predicated upon and the millions and millions

24  associated with trying it.

25          I asked the question, well, that's not the only

1  possibility, that is one, and shouldn't I factor in whether

2  or not, indeed, litigation settles.  I think that may be a

3  consideration in that particular context, but I agree with

4  you that the prospect that litigation can be commenced and

5  settled doesn't lower the bar for somebody to say all right,

6  glob it in there and see if you can get your attorneys' fees

7  paid.  That seems to me to be a fair assessment, so I do

8  agree with you there.

9         MR. ROSENTHAL:  I think, Your Honor, that on all of

10  these claims, that the Committee has one, they may not have

11  stated a colorable claim, but even if they did, it's not a

12  claim that the estate should be pursuing, you know, on the

13  estates nickel with the disadvantage that it potentially

14  threatens the auction process, that it embroils the estate in

15  needless litigation.  We can go over the rest of these claims

16  if you want to, re-characterization.  I mean, this looks,

17  smells, talks like debt.

18         The only facts that the Committee demonstrates is

19  that there was PIK interest, but second lien debt frequently

20  has PIK interest.  That there was a limited amortization of

21  an amortization holiday on the; I'm sorry, that the second

22  lien didn't get paid until maturity, but if you think about

23  that, we see that all the time to.  This is a first

24  lien/second lien facility.

25         The first lien got paid mandatory excess cash flow

1    of 75 percent of our excess cash flow.  The first and second

2    lien decided we're going to take 75 percent of the cash flow

3    under the intercreditor agreement, it would go to the first

4    lien anyway.  We're going to leave 25 percent at home, at the

5    company so the company has some additional working capital to

6    do its business.  So I don't think that that is indicative.

7    The company knew how to give equity to Silver Point.  It gave

8    them warrants that were worth $8 million dollars.

9          So the re-characterization claim, I don't see.  I

10   don't see the equitable subordination claim. I think if this

11   Court were to say or suggest that merely because a counter

12   party in an acquisition transaction receives more than they

13   have marked the debt to, you would send shutters down the M&A

14   transaction market.  I mean that is really, the sort of, the

15   fact that the Committee relies on about why we overpaid.

16         I don't see any bad faith in these negotiations.  I

17   don't see that we were misled.  There is no allegation that

18   we were misled about WorkFlowOne about their business, about

19   what we were buying, that they didn't inform us of what we

20   were buying.  We saw a company that was a strategic

21   combination to us.  We use the word marriage.  We saw a

22   marriage.  We saw a marriage between two companies.  They

23   were based in the same city. They had overlapping customer

24   bases, but not totally overlapping businesses.  They had

25   promised synergies, which we actually realized.

1       THE COURT:  The Committee points out when you talk

2  about synergies; first of all, synergies are like the band at

3  a wedding.  It's the subject of all of the discussion leading

4  in and some cases present synergies and some cases don't.  As

5  the Committee pointed out in their rely, okay, so we had a

6  company that was in bankruptcy, came out of bankruptcy,

7  merged with, married another and promptly we are all back in

8  bankruptcy.  The enthusiasm for synergies, in that context,

9  seems to be a little bit questionable.  Am I mistaken?

10      MR. ROSENTHAL:  No, I think it was Standard Register

11 that saw the synergies.  Let's talk about Workflow.  Workflow

12 had projections that came from their reorganized board verses

13 actuals that weren't $170 million dollars short of disclosure

14 statement projections.  The boards projections versus their

15 actuals were down about two or three percent.  So they were

16 relatively on target.  We saw an ability, through this

17 acquisition, to create SG&A synergies, but we also saw an

18 ability to increase our customer base.  We saw an ability to

19 combine some of the excess cash flow that Workflow generated,

20 to give us extra working capital, to enable us to make

21 pension payments.  Ms. Levine says we didn't make any pension

22 payments.  We did make pension payments.

23      What we were hoping was that we would be able, over

24 time, interest rates would help us on our pension obligation,

25 even though we were going to be able to make the pension

1  payments.  So it is a combination of being able to use that

2  liquidity and getting some interest relief.  So, I think that

3  you have to consider the impact of synergies in the

4  calculation and the cases say that, but I don't think that it

5  supports anything remotely like an equitable subordination

6  claim or an equitable disallowance claim.  I mean, I don't

7  think that there was any effort by the, and I don't think

8  there is any evidence that there was any effort by the

9  Workflow management team to, you know, force Standard

10  Register to buy them.  Standard Register made a reasoned

11  business judgment about whether they would make that

12  acquisition.

13          THE COURT:  Okay.

14          MR. ROSENTHAL:  Your Honor, we would ask that, we do

15  believe that the Debtors made the very justifiable decision,

16  that it was in the best interest to waive these claims in

17  order to make our way to this value maximizing sale.  We

18  don't think these claims had meaningful value and we don't

19  think the Committee should be given standing.  As evidence of

20  that, we would ask that the declarations of Mr. Morgan, Mr.

21  Ginnan, Mr. Carmody that were submitted in connection with

22  our objection, be admitted into evidence.

23          THE COURT:  Okay.  I understand.  Counsel.

24          MR. HOGAN:  Good morning, Judge, Al Hogan of Skadden

25  Arps on behalf of Silver Point.

1        THE COURT:  Welcome.

2        MR. HOGAN:  Very nice to be here this morning,

3   Judge.  I thought the discussion that Your Honor was having

4   with counsel on the standard was interesting.  Not

5   surprisingly, I agree with what Mr. Rosenthal said.  I think

6   he got the standard, just about, exactly correct.  One thing

7   I would point out is that the Third Circuit has actually

8   spoken to this issue in a general sense.  The Third Circuit

9   has said that "even if permitted under the Bankruptcy Code,

10  derivative standing is the exception, rather than the rule."

11  We site to that in our opposition, Judge.

12       It strikes me that, in the circumstance of this

13  case, where you have a Debtor that has waived these causes of

14  action in a DIP order, approved by the Court, it seems that

15  it would be extraordinary, then, to read the standard in a

16  way that a Committee --

17       THE COURT:  That's what the standard is for.

18       MR. HOGAN:  I'm sorry, Judge.

19       THE COURT:  That is what the standard is for.  I

20  mean, I don't sign DIP orders.  DIP lenders don't lend if you

21  say look, I would really like your money.  Yes, it is highly

22  likely that I will sue you at some point very soon.  People

23  don't lend under those circumstances.

24       MR. HOGAN:  Agreed.  My point, Judge, is that it

25  would be very odd then to take that fact pattern and say

1  because of the waiver, now that --

2        THE COURT:  Yeah, I don't think that the waiver; I

3  will say this, I don't think that the waiver built into a DIP

4  is the predicate for an unjustified refusal.  That is the

5  fact of the refusal.

6        MR. HOGAN:  Great.

7        THE COURT:  So, you know, because I don't think that

8  that gets anywhere.  That was part of the colloquia I had

9  with Ms. Levine is that this is every case and, frankly, with

10  Mr. Rosenthal.  So the issue is there has been refusal, all

11  right. That refusal is, at a minimum, embodied in the DIP, at

12  least as it relates to Silver Point and the ABL.  So we can

13  go from there.

14        MR. HOGAN:  That's right, Judge.  So very good.  So

15  from there, you know, the majority of the discussion gets

16  away from colorable claim.  I actually would stop and say the

17  stock price chart in this case, really raises a serious

18  question about whether or not there is a colorable claim and

19  we don't think there is.  In light of the Third Circuit's Law

20  in Campbell Soup, we heard the Committee come up on the reply

21  papers and today suggest that there are all sorts of reasons

22  that might exist for why this stock price chart shouldn't be

23  trusted, but that's nowhere in their complaint, Judge.

24        Even in a 12(b)(6) standard, the company stock

25  prices something that the Court can absolutely take judicial

1  notice of.  The complete absence of any explanation in the

2  Committees' complaint about how they are going to overcome

3  the fact that a publicly traded stock on the New York Stock

4  Exchange reacted to this transaction and said it was of

5  significant value to Standard Register, and how the stock

6  price remained at pre-transaction levels for a year and a

7  half after that.  Now they are going to come in and refute

8  that.  That is a significant colorability issue, Judge.  I

9  don't think they get over the colorability hurdle.

10       Then we get to the unjustifiable reliance prong,

11  keeping in mind the standard that, I think, we all agree with

12  now.  The Debtors here aren't simply saying that, you know,

13  we made a choice.  The Debtors are saying that if they were

14  looking at this litigation, they wouldn't spend the money to

15  pursue it.  That judgement makes a lot of sense.  If you look

16  at the Iridium case and the other cases where these kinds of

17  cases are actually litigated.  When you read those opinions,

18  and the Committee is absolutely right, they are not in a

19  motion to dismiss standard.

20       You read those opinions and the subtext running in

21  my mind is $10 million dollars, $15 million dollars, that's

22  how much those cases cost to litigate.  They are wildly

23  expensive when you look at the number of documents, number of

24  experts, number of trial days that go into those; these are

25  expensive cases to litigate.  They are hard cases to

1   litigate.  Given that stock price chart, the fact that the

2   Committee hasn't explained it all in their pleading, not only

3   is it not colorable, but it would not be anywhere close to

4   the resources to chase those kinds of claims down.

5          Judge, pivoting for a moment to the declaration of

6   Mr. Danello, the binder, does Your Honor not have that?

7          THE COURT:  I got your binder.

8          MR. HOGAN:  So, Judge, we talked to the Committee

9   last Friday.  We asked for a meet and confer.  The Committee

10  informed us that they were not going to have evidence; that

11  surprised us a little bit.  We did advise them that we were

12  intending to introduce the declaration of Mr. Danello.  We

13  did provide it to them this morning.  The binder is thick,

14  but that's because it's got some SEC filed public documents

15  related to Standard Register.  The declaration, itself, is

16  much shorter.  It's a few pages long.

17         The other thing that I would note is that the

18  documents that we attached to the declaration at the back,

19  the things that are not the publicly filed documents.

20         THE COURT:  The internal memoranda?

21         MR. HOGAN:  Yes, Judge.

22         THE COURT:  Okay.

23         MR. HOGAN:  Judge, those are documents that were

24  produced to the Committee in this case.  One other thing that

25  hasn't been mentioned, but I want to just mention; Your Honor

1    said it would be a bad thing within every circumstance the

2    Committee were to come in and say okay, now we got a

3    challenge period and here is all our discovery, we want all

4    the documents and we want all the depositions.  Judge that is

5    what the Committee actually did here.

6           After the challenge period was established, there

7    were massive discovery requests.  Silver Point produced

8    almost 50,000 pages of documents and the Debtors did the

9    same.  Mr. Danello sat for a deposition in connection with

10   the DIP financing motion and we made him available, tried to

11   schedule a deposition.  We tried to say come and talk to Mr.

12   Danello, take his deposition and the Committee declined that.

13   The Debtors, I believe, also made their witnesses available

14   and the Committee declined that as well.

15          So I think Your Honor touched on it, the idea that

16   the yes, it's a 12(b)(6) standard, but, Judge, the reason why

17   we put in Mr. Danello's declaration, and we're going to urge

18   its admission into evidence, is that I get it, on a 12(b)(6)

19   standard the Committee shouldn't have to come in and prove

20   their case; I understand that.  But certainly, in the Court's

21   role as gatekeeper in assessing the overall propriety of

22   proceeding on derivative standing, some attention should be

23   paid to what the Committee does know and what they've got

24   access to.

25          I thought Mr. Rosenthal's comments were spot on when

1  given this challenge period, and given the discovery that was

2  available to them that they did take, and that they could

3  have taken, there is no hint anywhere in the record that

4  Workflow somehow fooled Standard Register or vice versa in

5  connection with entering this transaction.  Judge, Mr.

6  Danello's declaration goes into what Silver Point and the

7  Workflow were thinking about and assessing, and attaches the

8  documents that, I think, the Committee tries to sell as

9  somehow suggesting that Silver Point planned this bankruptcy.

10  If you look at Mr. Danello's declaration, that is false.

11  They have had the opportunity to test that and the documents

12  don't back it up and the deposition testimony, they took,

13  doesn't back it up.  Mr. Danello is here today and it doesn't

14  back it up.

15       Silver Point entered into this transaction for the

16  same reason the Workflow did, for the same reason that the

17  Debtors did.  They saw significant synergies.  Judge, you

18  asked about synergies.  This looks to me like one of those

19  circumstances where you have a fragmented industry, you have

20  companies that happen to be in the same city; that's nice,

21  but, apparently, they have no-overlapping --

22       THE COURT:  Different segments.

23       MR. HOGAN:  Different segments.  This transaction

24  really does look like one where it's a win/win.  Mr. Danello

25  explains that in his declaration as well.  So, I think with

1  having taken that peak, I don't think the Committee can come

2  here and say we are going to ignore those facts and we are

3  going to try to sell the Court on something that really just

4  does not bear out, given all of the evidence that the parties

5  have looked at to this point.  The Debtors recognize this and

6  they have recognized it all along.  They engaged in the

7  transaction.  That is why they wouldn't proceed with this

8  cause of action, if they were spending their own money to do

9  it.

10       Judge, the two other things that Mr. Danello's

11  declaration does is that it explains this concept of mark to

12  market and it is true that Silver Point had marked its debt

13  to approximately $137 million dollars.  Now, that's somewhat

14  happenstance because Silver Point marking its debt to market

15  takes other things into account; hits the interest on the

16  debt.  How does this look like in the hands of somebody

17  buying debt.  I think, frankly, that one sort of missed the

18  mark a little bit, but it's absolutely true that the internal

19  documents, and that's why I wanted Your Honor to have them,

20  reflect that Silver Point looking at Workflow prior to the

21  transaction on a standalone basis thought that the company

22  would generate about $140 million dollars in a cash sale; no

23  doubt about it.

24       Interestingly enough, when you look at what the

25  Debtors internal advisors are looking at for Bank of America,

1  they sort of thought the same thing; nothing was hidden here

2  in terms of what the value of these companies might be on a

3  standalone basis.  It all comes down to what Silver Point was

4  saying internally, internally was Workflow by itself, cash

5  only sale, yeah, about $140 million.  But then they go onto

6  say this transaction makes sense because of the synergies,

7  about what this company can accomplish together and the

8  documents, internal Silver Point documents going to say we

9  think there is an upside case here where these synergies get

10  realized and we actually realize a return on the debt, the

11  warrants that are granted to the second lien noteholders.

12       So there absolutely is nothing and the Committee has

13  had access to this stuff, there is nothing in these documents

14  that support the theory that somehow in the middle of the

15  night, WorkflowOne and Silver Point were able to foist a

16  bunch of bad assets onto Standard Register.  The record

17  simply doesn't support it and in light of that stock price

18  chart, it would be a fool's errand to spend the $10 million

19  dollars to litigate that case, to try and win.

20       Judge, the last thing that Mr. Danello's declaration

21  delivers, you know, counsel talked about scorched earth

22  against the Committee.  I'm not sure where that is coming

23  from, but I can tell you that we looked at a complaint that

24  sued Silver Point, sued the Debtors directors and officers,

25  sued, I think, the Debtors advisors, sue John Doe's and John

1  Doe companies.  So, you know, scorched earth, I'm not sure

2  where that is coming from.

3         The one thing they said about Silver Point that,

4  frankly, is reckless, is that Silver Point engaged in insider

5  trading.  That is absolutely false and Mr. Danello's

6  declaration deals with that.  We think it's important for the

7  Court to hear that.  That is, by the way, the only

8  inequitable conduct that the Committee alleges, even if it

9  were true, and it's patently false, even if it were true, we

10 wouldn't support an equitable subordination claim.  The idea

11 of equitable disallowance is a very questionable theory.

12        Judge, we thought it was important, Mr. Danello

13 thought it was important to advise the Court that not

14 surprisingly, as most people understand, when you are dealing

15 with an entity like Silver Point, a sophisticated investment

16 firm, that has a public side and a private side, guess what,

17 there's a wall and everybody knows that.  So the Committees'

18 allegations here that because Silver Point [indiscernible]

19 was selling equity, somehow that leads to an allegation that

20 there was insider trading going on.  It's false.  We think

21 it's reckless and we wanted Your Honor to know it.

22        So, Judge, unless you have any other questions of

23 me, I guess the last thing would be, you know, all of the

24 other causes of action here, all of the various lien

25 disallowance issues, again, we don't think that the Committee

1  has met its burden at all of showing that pursuing those

2  causes of action result in any benefit to the estate.  We

3  think the Debtors' judgment here makes imminent sense in

4  light of the economics of this transaction.  So we think the

5  motion should be denied in its entirety.

6          THE COURT:  Very well.  Thank you.  Yes, sir.

7          MR. DOBBS:  May I please the Court, may name is Ed

8  Dobbs from Atlanta, Georgia.  I am representing Bank of

9  America in its capacity as administrative and collateral

10 agent for itself and Wells Fargo Bank.

11         THE COURT:  Welcome.

12         MR. DOBBS:  Thank you, Your Honor.  Your Honor,

13 there are four counts that were filed against the banks.  All

14 of those counts revolve around one fact and that is whether

15 or not the banks were over secured on the date of bankruptcy.

16 Your Honor, I can see counsel and board wrestling over the

17 questions, whether to bring a fraudulent conveyance action

18 against Silver Point.  I can see them weighing the pros and

19 cons.

20         THE COURT:  You're okay with that?

21         MR. DOBBS:  I'm okay with that.

22         THE COURT:  I like your clarity and focus.

23         MR. DOBBS:  There wasn't any weighing of what to do

24 with respect to our liens and claims.  Nobody forced the

25 Debtor in the DIP financing order to cede the fact that the

1  banks were over secured.  Nobody compelled the Debtor or even

2  asked the Debtor to schedule, in its assets, an equity

3  cushion on the date of bankruptcy of $75 million dollars of

4  collateral, unchallenged collateral, Your Honor, accounts,

5  inventory, documents, instruments, the primary collateral of

6  the banks.

7       Nobody asked the Debtor to show that we were $75

8  million dollars over secured.  Nobody asked the Committee, on

9  the opposition that they raised to the DIP financing adequate

10 protection, to say in their papers that the banks were

11 "massively over secured."  Massively over secured has a nice

12 ring to it, but they put a number to massively over secured;

13 that number was $100 million dollars of equity cushion of the

14 banks claims.

15      Now, Your Honor, before I, with the Court's

16 permission, address the four separate counts, and we believe

17 they hang on threads so gossamer as a spider web, I would

18 like to get a little bit of clarity from counsel for the

19 Committee whether or not in light of the presentation, all

20 they are asking is that we marshal our collateral to those

21 items that are unchallenged and that we not first seek

22 recourse against the items on which we do not have a lien,

23 because if that is now their request, then we have much less

24 to say.

25      MS. LEVINE:  Your Honor, two responses.  Yes, but

1    there are three buckets; ones we agree on, one where there is

2    secured, one where there is not a security interest and ones

3    where they are disputed.  We are still looking for clarity

4    through this Court on the disputed claims to the extent we

5    can't work that out.

6              MR. DOBBS:  Excuse me, Your Honor.

7              THE COURT:  Go on.

8              MR. DOBBS:  With the understanding that there is no

9    longer an effort to seek recovery of damages or money from us

10   on a fraudulent, an avoidance theory, and all that is being

11   sought is a marshalling and a determination of those items on

12   which we are not perfected or we did not ever get a lien in

13   the first instance.  I will say this, there is no need for

14   that because Your Honor, in the final DIP financing order,

15   authorized, because we were so substantially over secured and

16   no one challenged that, no one challenged that, the Committee

17   did not challenge that, we had a rollup of our prepetition

18   debt.

19        So there are no liens prepetition to marshal, to

20   avoid, to discuss.  We have rolled up, into the DIP, all of

21   our prepetition loans.  Why?  Because, using the words the

22   Committee, we were massively over secured.  So there is no

23   need for marshalling.  There is no need for a determination

24   of whether we had a lien on a particular item of collateral

25   because the unchallenged collateral that we did have was $75

1 million dollars above the amount of our debt, according to

2 the Debtor, and $100 million according to the Committee.

3          So, Your Honor, I would suggest that if we are

4 talking about a colorable claim, that does not rise to the

5 level of plausibility.  If we are talking about justification

6 by the Debtor in not brining such a claim, the Debtor clearly

7 was warranted in passing on suing any of the ABL lenders.

8 Your Honor, I am prepared to answer any questions the Court

9 may have.

10          THE COURT:  No, I don't have any questions right

11 now.

12          MR. DOBBS:  Thank you, Your Honor.

13          THE COURT:  All right, Ms. Levine, I think I want to

14 know, from the Committees' point of view, I think I have

15 ruled with respect to three of the affidavits.  The Danello

16 affidavit, I actually had seen and I realize you just, I

17 think it came into me on Friday afternoon as well.  I didn't

18 realize that it was included --

19          MS. LEVINE:  Your Honor, it came to us this morning

20 as we walked into Court.

21          THE COURT:  Okay.  I think I want to know where we

22 go from here.  This is, you all have been here before, this

23 is a lot more opening argument then I typically contemplate.

24 I think I would like to know where we go from here.  You have

25 heard my colloquia with Mr. Rosenthal.  I don't believe that

1 the colorable claim issue is susceptible to an evidentiary

2 presentation. I think it's a Rule 12 analysis.  I think we

3 had a back and I think I, frankly, understand in full candor

4 what both sides are arguing with respect to the managements

5 thought process, the Debtors' thought process as to how it

6 evaluated these claims and elected not to pursue them.  Where

7 do we go from here?

8        MS. LEVINE:  Your Honor, procedurally, starting

9 first with the ABL lenders and going backwards.  We

10 understood, and if we're wrong Your Honor will correct us,

11 that the challenge covered the ability to unravel, to the

12 extent appropriate, the rollup and Your Honor will rule on

13 that or not.  We believe that to the extent they are secured

14 or over secured on collateral that nobody disputes, we should

15 have the benefit of unencumbered assets for the unsecured

16 creditors.  So that may be an easy one.

17        With regard to the Danello declaration, it seems to

18 deal with a lot of issues of fact, but not with the Debtors'

19 deliberation.  So we would respectfully submit that it's not

20 probative with regard to whether or not the Debtor was

21 justified in not bringing these claims.  We would also note

22 that the Debtors' declarations, Ginnan's declaration deals

23 with factual disputes.

24        THE COURT:  You have raised and, I think, made the

25 legitimate point that these are declarations by parties that

1  are either targets of the investigation or associated with

2  targets of the --

3        MS. LEVINE:  I'm just talking about if Your Honor is

4  going to take testimony and we're going to cross.  We don't

5  think the Danello declaration should come in on the point

6  that Your Honor is suggesting there should be a trial on or a

7  mini-trial on.  We don't think the Ginnan declaration should

8  come in on the point that Your Honor is suggesting there

9  should be a mini-trial on because that is disputing facts in

10 the complaint with regard to the allegations.  With regard to

11 the Morgan declaration, it only purports to address the issue

12 of whether or not this is justifiable in paragraphs 35 to 39.

13 We would note that the Debtors, Silver Point as well, but the

14 Debtors specifically refuse to provide us with a privilege

15 log.

16        So to the extent that there were alleged

17 conversations with counsel, with regard to whether or not

18 they considered these claims, that there were no documents

19 produced in that regard and there is no indication to us that

20 there were documents that were being withheld, that could

21 have been produced in that regard, subject to a claim of

22 privilege.  So we would respectfully submit that any

23 documents that address that issue, that are being offered

24 here today, are inappropriate.  That type of a request was

25 included in the request that we made in connection with the

1  general discovery that we sought.

2       THE COURT:  Okay.  I would like your brief reply on,

3  particularly, the point that Mr. Rosenthal made about the

4  issue about refusal, unjustifiable refusal.  I think he was

5  responding directly to your point and to my questions.  How

6  do I deal with the issue of refusal because I think Mr. Hogan

7  also touched on this and said look, this is expensive, hairy

8  litigation and the Debtor made the decision not to pursue it

9  beforehand.   How can I conclude that that was either

10  unreasonable or unjustified?  And then, acknowledge that I am

11  struggling, and I think I threw back at Mr. Hogan and I

12  definitely threw it at Mr. Rosenthal, every case presents

13  precisely that fact pattern.  So how do I deal with this?

14       MS. LEVINE:  Your Honor, first of all, starting with

15  the premise that every case presents this, it's more than

16  even every case presents this because sitting on both sides

17  of the table, doing company side work in addition to

18  Committee work, it's not only that the Debtors are beholding

19  to the lenders in these kinds of situations and trying to, in

20  essence, built a bridge that they can get through their

21  Chapter 11 case, but often times they rely on the fact that a

22  Committee is going to come in and kick the tires and,

23  perhaps, make things better for everybody, loosen up the DIP,

24  make sure administrative claims get paid, move forward along

25  those lines.

1              If you will note, Debtors' counsel actually parsed

2    his words very carefully because when he was talking about

3    the fact that there were going to be claims that were going

4    to be assumed as part of the asset purchase agreements,

5    nobody ever came out and said, specifically, this case was

6    going to be administratively solvent or even administratively

7    solvent, except for not paying the Committees' professionals.

8    They are very careful about what their assuming and we would

9    respectfully submit, for the benefit here of Silver Point,

10   the everything that is important in this case, Your Honor, is

11   that Standard Register, as we have alleged in the case, as a

12   standalone company, had a baseline revenue stream which it

13   admitted was flat, but was going to increase by its own

14   projections 2015 and it was paying the very obligations that

15   it's looking to now jettison post-merger.  So we have a

16   situation where there were a group of creditors who were not

17   prejudiced, we have a merger and now an insolvent company,

18   Silver Point is the beneficiary and those creditors are not.

19             We have internal e-mails, which we allege in the

20   complaint, which indicate that Silver Point fully understood

21   that even if this was a hope and a prayer, they could do what

22   they did in Workflow, jettison the pensions and the other

23   Legacy liabilities and keep the benefit of the combined

24   entities for themselves.  If you take a look at what happened

25   post-merger, Your Honor, it's not unusual that even if you

1  have a merger of two wildly successful companies, there is a

2  period of time where you just have to make them one.  You

3  have to shut the lights in some places, you know, reduce

4  duplication and things like that, but that's different then

5  the synergies that they were talking about getting here,

6  which synergies they acknowledge themselves were going to

7  take two years for them to kick in.

8        So what they did here was they starved the liquidity

9  of a company, which is what we talk about in the complaint as

10  well, coming up to this filing. Now that we are in

11  bankruptcy, to the extent that we permit Silver Point to

12  jettison all of these liabilities, they will get the benefit

13  of the synergies and nobody else will.  That is part of what

14  is already included in the four corners of the complaint.  I

15  am not sure how much you want us to address the trading and

16  the stock.  We have our investment banker with us in Court

17  today.  We have been a little bit hamstrung because is not

18  retained.

19        THE COURT:  I mean, I think I understand the

20  Committees' position with I don't think there is any dispute

21  about the record and the conclusions that I should draw

22  either, based upon my perception of the market place or the

23  Committees' position that, in a lightly traded stock that's

24  soaring up and trending down that it's a factual inquiry and

25  the Campbell Soup decision, actually, supports that analysis.

1  I understand the parties' respective positions.

2          MS. LEVINE:  Just to run through some of the facts

3  that were referenced by counsel, SG&A is a percentage of

4  sales increased.  Your Honor, it didn't decrease, which is

5  something that you would normally expect.

6          THE COURT:  With synergies.

7          MS. LEVINE:  Post-closing long term debt and

8  accounts payable increased, but gross margins did not.  Net

9  income declined.  The value of the intangible sword, but that

10 the synergy issue.  And the AR from the days of sale, you

11 know, the amount the receivables turned, actually, increased

12 as well and cash flow eroded.  All of that, Your Honor, is in

13 the complaint.

14         THE COURT:  All right, here is what I think I want

15 to do.  I want to take a break, briefly.  The argument has

16 certainly been helpful to me.  I will return and rule with

17 respect to issues of the discovery and the substance of the

18 request as well, to the extent that we are procedurally

19 complete. We'll stand in recess.

20   [Recess 11:08:59 to 11:56:55]

21         THE CLERK:  All rise.

22         THE COURT:  Please be seated.  The matter before the

23 Court is the Official Committees' motion for standing, to

24 file, and pursue and settle, if appropriate, estate claims

25 and causes of action.  The motion is opposed by the Debtor,

1    Silver Point and by B of A, as agent for the ABL lenders.

2    For the reasons I will provide, I will grant the motion and

3    accord the Committee standing to pursue claims and causes of

4    action identified in the motion and the draft complaint

5    attached to the motion.

6           The objections to the motion are overruled and as a

7    threshold matter, I would observe that it is difficult for

8    the Court to dispose of this matter from the bench versus

9    through a more formal opinion, but the parties have certainly

10   explained to the Court the urgency of the matter and I will

11   do my best to provide you with a full explanation of my

12   reasoning.  As I said, the parties have fully briefed the

13   issues and are in agreement as the applicable standard, to

14   obtain standing the Third Circuit Cybergenics decision

15   teaches that the Committee must demonstrate a colorable

16   claim, that the Debtors have unjustifiable refused to bring

17   these claims and that they have obtained leave of Court.

18          The Debtors and Silver Point have filed

19   declarations, each of which I have reviewed and each of which

20   are admitted for purposes of this hearing and this motion.

21   The applicable standard for assessing whether a colorable

22   claim has been asserted is comparable to the Rule 12(b)(6)

23   standard.  That standard is a familiar with one, starting

24   with Twombly and Iqbal and their progeny.  As I stated during

25   argument, I apply the standard with a measure of flexibility

1  in the context of a colorability determination and in

2  connection with that, I have admitted the declarations that

3  otherwise, typically would not be considered in the context

4  of a true 12(b)(6) argument.

5       I am satisfied that the Committee has carried its

6  burden to identify colorable claims, with the exception that

7  I do not believe that colorable claims have been identified

8  or articulated against B of A and the ABL lenders.  I will

9  return to B of A momentarily.  But as to colorable claims

10  against the remaining potential Defendants, I first note that

11  it is not incumbent upon the Committee to prove its claims,

12  but rather to adequately state them.  If not adequately

13  stated, standing will be denied, the Debtors' stipulations

14  will be given preclusive effect and the doors to the Court

15  house will be closed to these claims.

16       The undisputed record here is that this Debtor is

17  the product of a merger with another formerly bankrupt

18  entity, WorkforceOne.  Debtors and objectors focus

19  substantial attention on market prices of the Debtors, market

20  prices for stock and the Debtors' related market

21  capitalization on a post-merger basis to demonstrate solvency

22  and reasonable value obtained in connection with the

23  transaction.

24       The record reflects that the stock soared and then

25  declined following the merger.  Case Law teaches that market

1  capitalization and share prices are, indeed, and may be

2  robust evidence of solvency and of value, but in this case

3  the Committee has adequately demonstrated that it should be

4  afforded an opportunity to test the significance of that

5  evidence and to test the reliability of that evidence.  I

6  note that the Campbell's VFB decision, which endorses

7  consideration of market action as evidence, was presented to

8  that Court in the context of a motion for summary judgment,

9  presumably after substantial discovery and investigation.  In

10  this instance, the Committee seeks to investigate and pursue

11  claims and causes of action relating to a July 2013 merger

12  and events leading up to a bankruptcy filing by this Debtor

13  in the winter of 2015.

14         While I don't begin to suggest that these claims are

15  easy to prove or to recover upon, the Committee has

16  adequately stated them for the Court to determine that they

17  are colorable claims within the meaning of the Cybergenics

18  decision.  Accordingly, I will grant the Committee standing

19  to pursue claims identified in their complaint with the

20  further proviso that I will not permit standing to pursue a

21  claim for equitable disallowance, as I don't believe that the

22  Code or applicable Case Law contemplates that as a cause of

23  action.

24         Having identified colorable claims, I must address

25  the issue of the "unjustifiable refusal prong," articulated,

1  again, in Cybergenics decision. The question here is the

2  Debtors' unjustified refusal to pursue these claims. It

3  cannot be that a Debtors' rational decision to reach an

4  accommodation with its secured lender before a filing, with

5  all the obvious benefits associated with that accommodation,

6  is sufficient to insulate potential claims from review by a

7  Committee.  If so, then a challenge period and a right to ask

8  for standing would be, indeed a hollow remedy for a

9  Committee.

10       In the present circumstances, the Debtor entered

11 into a DIP financing agreement and to a stalking horse

12 agreement with Silver Point to provide structure for this

13 bankruptcy proceeding.  The litigation alternative was,

14 likely, unpalatable for reasons amply stated by Mr. Rosenthal

15 at argument, but Case Law teaches that creditors have the

16 right to look back at transfers and prepetition conduct, and

17 in the present circumstances the Debtor cannot be expected to

18 vigorously consider and pursue these matters given the

19 relative bargaining positions of the parties on a pre-

20 bankruptcy basis.

21       Accordingly, I am satisfied that the Committee has

22 carried its burden and the motion will be granted as I have

23 stated above.  As it relates to the ABL lenders and Bank of

24 America, I find that the Committee has not articulated

25 colorable claims.  The colloquia and the argument this

1  morning indicates to me that if there is an issue with B of

2  A, it is an issue of allocation and distribution of potential

3  sale proceeds.  I have confidence that the Court and the

4  parties can deal with that issue directly, if and when it

5  arises, but I don't believe that colorable claims have been

6  articulated for purposes of the relief requested by the

7  Committee.

8          For the reasons I have stated, the motion is granted

9  and I will look to the parties to submit an order under

10  certification so providing.  Are there any questions?  Ms.

11  Levine.

12          MS. LEVINE:  Your Honor, procedurally, today is the

13  deadline to file the complaint.  Either we can deem the

14  complaint attached, file or if the Court wants to give us 24

15  hours to clean up and file a clean, we are happy to do that

16  as well.

17          THE COURT:  I will leave that to the parties.  The

18  motion is granted.  I understand the point, but as a

19  practical matter, it is a practical impossibility for the

20  period to expire with me having ruled.  So either you file

21  what you got or you coordinate and, frankly, file a complaint

22  that's more compliant with the scope of my ruling.  So I will

23  either extend it briefly, or I will deem the period extended

24  or I will deem this filed, but I don't think that that's

25  appropriate because --

1        MS. LEVINE:  We just want to get rid of the B of A

2   claims.  Thank you.

3        THE COURT:  Yeah.  I would extend the period for, I

4   don't know, three business days and if that's an issue, then

5   we can cross that bridge.  All right, are there any

6   questions?  Very well, we will stand in recess.  Thank you

7   very much counsel.

8     (Court Adjourned).

9

10

11                          CERTIFICATE

12

13   I certify that the foregoing is a correct transcript from the

14   electronic sound recording of the proceedings in the above-

15   entitled matter.

16   /s/Mary Zajaczkowski                  June 8, 2015
17   Mary Zajaczkowski, CET**D-531                  Date

18

19

20

21

22

23

24

25