# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: June 17, 2015 at 10 a.m. (ET)<br>Re: Docket Nos. 23 & 559 |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING SALE PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS; (E) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; AND (F) GRANTING CERTAIN RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED <u>LEASES IN CONNECTION WITH THE SALE</u>**

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

    **A.**    The Sale Motion and Sale Procedures Order ........................................................ 2

    **B.**    The Marketing Process and Sale ......................................................................... 3

    **C.**    Objections to the Sale Motion ............................................................................ 4

OMNIBUS REPLY ................................................................................................................. 4

    **A.**    Most Sale Objections Have Been Resolved, and the Remaining Objections Should be Overruled ......................................................................................... 5

        **(i)**    The Committee's Objection .................................................................... 6

            (a)    The Sale is the Result of a Robust, Court-Approved Auction Process ...................................................................... 6

            (b)    The Sale is Not a *Sub Rosa* Plan ...................................................... 8

            (c)    The Additional Assumption and Assignment Procedures are Beneficial and Have Value to the Estates .............................. 13

            (d)    The Sale of Avoidance Actions Against Trade Creditors Is Ordinary and Appropriate ............................................. 15

        **(ii)**    AMS's Objection ................................................................................ 16

            (a)    The Debtors Can Sell Free and Clear of AMS's Lien Pursuant to Section 363(f)(3) & (f)(5) ......................................... 16

            (b)    The Value of AMS's Lien is Adequately Protected .................... 18

            (c)    The Successful Bidder is Entitled to a Finding of Good Faith Under Section 363(m) ......................................................... 19

            (d)    A Waiver of the 14-day Stay is Warranted .................................. 20

    **B.**    The Contract Objections Either Have Been Resolved or Will Likely be Resolved Prior to the Sale Hearing ...................................................................... 21

        **(i)**    Contract Counterparties Have Received Adequate Assurance of Future Performance ............................................................................. 21

        **(ii)**    Ongoing and Future Fees and Costs Associated with a Transferred Contract will be Paid by the Successful Bidder ...................................... 24

        **(iii)**    Paragon's Request for Attorneys' Fees is Unreasonable and Should be Denied ........................................................................................... 24

**TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Carlisle Homes, Inc. v. Azzari*,
103 B.R. 524 (Bankr. D.N.J. 1988) ........................................................... 22

*Cinicola v. Scharffenberger*,
248 F.3d 110 (3d Cir. 2001)........................................................................ 22

*Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*,
600 F.3d 231 (2d Cir. 2010)........................................................................ 19

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986)........................................................................ 20

*In re Alipat, Inc.*,
36 B.R. 274 (Bankr. E.D. Mo. 1984)........................................................... 23

*In re Allen Family Foods, Inc.*,
Case No. 11-11764 (KJC) (Bankr. D. Del. July 29, 2011) ........................ 16

*In re Am. Home Mortgage Holdings, Inc.*,
Case No. 07-11047 (Bankr. D. Del. Oct. 30, 2007)................................... 11

*In re AmCad Holdings*,
Case No. 14-12168 (MFW) (Bankr. D. Del. Oct. 31, 2014) ...................... 7

*In re ANC Rental Corp.*,
277 B.R. 226 (Bankr. D. Del. 2002) ......................................................... 22

*In re Barzel Indus.*,
2009 Bankr. LEXIS 4568 (Bankr. D. Del. Nov. 12, 2009) ........................ 9

*In re Beker Industries Corp.*,
63 B.R. 474 (Bankr. S.D.N.Y. 1986).......................................................... 17

*In re Boston Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010)................................................... 17, 18

*In re Bridgeport Hldgs., Inc.*,
388 B.R. 548 (Bankr. D. Del. 2008) ........................................................... 6

*In re BT Tires Group Holding, LLC*,
Case No. 0911173 (Bankr. D. Del. June 26, 2009) ................................... 11

*In re Carlisle Homes, Inc.*,
103 B.R. 524 (Bankr. D.N.J. 1988) ........................................................... 22

*In re Constar Int'l Holdings*,
Case No. 13-13281 (CSS) (Bankr. D. Del. Feb. 10, 2014)........................ 8

*In re Crown Books Corp.*,
269 B.R. 12 (Bankr. D. Del. 2001) ........................................................... 25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re CyberDefender Corp.*,
  Case No. 12-10633 (Bankr. D. Del. May 7, 2012) .......................................................... 17, 18

*In re Decora Industries, Inc.*,
  2002 WL 32332749 (D. Del. May 20, 2002)................................................................... 11, 13

*In re Diamond Glass, Inc.*,
  Case No. 08-10601 (Bankr. D. Del. June 20, 2008) ............................................................. 11

*In re EWGS Intermediary*,
  Case No. 13-12876 (MFW) (Bankr. D. Del. Dec. 5, 2013)..................................................... 8

*In re F & H Acquisition Corp*
  Case No. 13-13220 (KG) (Bankr. D. Del. Feb. 28, 2014). ................................................... 15

*In re FCC Holdings*,
  Case No. 14-11987 (CSS) (Bankr. D. Del. Sept. 22, 2014)..................................................... 7

*In re Fluid Routing Solutions Intermediate Holding Corp.*,
  Case No. 09-10384 (Bankr. D. Del. Mar. 26, 2009).............................................................. 11

*In re GMC*,
  407 B.R. 463 (2d Cir. 2009) ................................................................................................... 9

*In re GSC, Inc.*,
  453 B.R. 132 (Bankr. S.D.N.Y. 2011)..................................................................................... 9

*In re Hayes Lemmerz Int'l. Inc.*,
  2009 Bankr. LEXIS 4756 (Bankr. D. Del. Oct. 29, 2009)....................................................... 9

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012)............................................................................................ 17, 18

*In re HSS Holding*,
  Case No. 13-12740 (BLS) (Bankr. D. Del. Dec. 13, 2013)..................................................... 8

*In re Integrated Res., Inc.*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992)..................................................................................... 6

*In re Landauer Healthcare Holdings, Inc.*,
  Case No. 13-12098 (CSS) (Bankr. D. Del. Jan. 6, 2014) ...................................................... 16

*In re Los Angeles Dodgers LLC*,
  468 B.R. 652 (Bankr. D. Del. 2011) ...................................................................................... 20

*In re Natco Indus., Inc.*,
  54 B.R. 436 (Bankr. S.D.N.Y. 1985)..................................................................................... 22

*In re Nellson Nutraceutical, Inc.*,
  Case No. 06-10072 (Bankr. D. Del. Aug. 24, 2007)............................................................. 11

*In re Nortel Networks, Inc.*,
  2011 Bankr. LEXIS 3971 (Bankr. D. Del. July 11, 2011)....................................................... 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re OCZ Tech. Grp., Inc.*,
  Case No. 13-13126 (PJW) (Bankr. Del. Jan. 16, 2014) ........................................... 15

*In re Perry Hollow Management Co., Inc.*,
  297 F.3d 34 (1st Cir. 2002) ..................................................................................... 20

*In re Premium Papers Holdco*, LLC,
  Case No. 06-10269 (Bankr. D. Del. July 13, 2006 and Oct. 26, 2006) .................... 11

*In re Questex Media Group, Inc.*,
  2009 Bankr. 4724 (Bankr. D. Del. Nov. 24, 2009) .................................................... 9

*In re Real Mex Restaurants Inc*
  Case No. 11-13122 (BLS) (Bankr. D. Del. Feb. 10, 2012). .............................. 15,16

*In re Summit Global Logistics, Inc.*,
  2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) ............................................ 9

*In re Tactical Intermediate Holdings*,
  Case No. 14-11659 (KG) (Bankr. D. Del. Aug. 22, 2014) .......................................... 7

*In re Taylor-Wharton Intern., LLC*,
  2010 WL 2906763 (Bankr. D. Del. June 8, 2010) .................................................... 19

*In re THQ Inc.*,
  2013 Bankr. LEXIS 770 (Bankr. D. Del. Jan. 24, 2013) ............................................ 9

*In re Trans World Airlines, Inc.*,
  No. 01-00056, 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) ............................ 11

*In re TriDimension Energy, L.P.*,
  2010 Bankr. LEXIS 4838 (Bankr. N.D. Tex. Nov. 19, 2010) .................................. 10

*In re VeraSun Energy Corp.*,
  2009 Bankr. LEXIS 4713 (Bankr. D. Del. Nov. 10, 2009) ........................................ 9

*In re Victor Oolitic Stone Co.*,
  Case No. 14-10311 (CSS) (Bankr. D. Del. Apr. 16, 2014) ........................................ 7

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc.*,
  209 F.3d 291 (3d Cir. 2000) ..................................................................................... 22

*Lexington Ridge Homeowners' Assn. v. Schlueter*,
  2013 WL 1707833 (Ohio Ct. App. Apr. 22, 2013) .................................................. 18

*Pension Benefit Guaranty Com. v. Braniff Airways*,
  700 F.2d 935 (5th Cir.1983) ..................................................................................... 12

*Smith v. Van Gorkom*,
  488 A.2d 858 (Del. 1985) ........................................................................................... 6

**Statutes**

11 U.S.C. § 363(f)(2) ................................................................................................ 22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

11 U.S.C. § 363(f)(3) ................................................................................................. 16

11 U.S.C. § 365(b)(1)(A) ............................................................................................ 24

Ohio Rev. Code § 2323.07........................................................................................... 18

**Treatises**

Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* (16th ed.) ................................... 24

The Standard Register Company and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby submit this omnibus reply (this "Reply") in support of the *Debtors' Motion for (i) an Order (a) Establishing Sale Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (b) Approving Bid Protections; (c) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (d) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (e) Scheduling a Hearing to Consider the Proposed Sale; and (f) Granting Certain Related Relief; and (ii) an Order (a) Approving the Sale of Substantially All of the Debtors' Assets and (b) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale* [Docket No. 23] (the "Initial Sale Motion") and the supplement to the Sale Motion [Docket No. 559] (the "Sale Motion Supplement" and together with the Initial Sale Motion, the "Sale Motion")[2] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.       Since before entering into the Stalking Horse APA, the Debtors and their professionals have worked tirelessly to obtain the best possible price for the Transferred Assets through the Sale, while preserving the value of the Debtors' estates during the administration of the Chapter 11 Cases.  Although the Debtors received over 100 formal and informal objections to the Sale, the Debtors have been proactive and diligent in seeking to resolve objections where

---

[2]      Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Sale Motion, the Sale Procedures, or the Stalking Horse APA, as applicable.

01:17256438.1

possible.[3]  There are only a relatively small number of remaining objections that the Court may

be asked to resolve.

2.      Approval of the Sale will enable the Debtors' businesses to be sold as a going

concern, which is in the best interest of the Debtors' estates and their stakeholders.  Simply put,

there is no better path forward for the Debtors' estates than approval of the Sale.  Therefore, for

the reasons set forth herein, the Debtors' respectfully request that the Court overrule any

unresolved objections and approve the Sale.

## BACKGROUND

### A.      The Sale Motion and Sale Procedures Order

3.      On March 12, 2015, the Debtors entered into the Asset Purchase Agreement (the

"Stalking Horse APA") with a group led by an affiliate of Silver Point Capital, L.P. ("Silver

Point"), as the buyer and stalking horse bidder (the "Stalking Horse").

4.      Also on March 12, 2015, the Debtors filed the Initial Sale Motion seeking

(a) approval of certain sale procedures with respect to the sale of substantially all of the Debtors'

assets (the "Sale") and (b) approval of the Sale.  On April 15, 2015, the Court approved the sale

procedures (the "Sale Procedures") proposed in the Initial Sale Motion and entered the *Order*

*(i) Establishing Sale Procedures Relating to the Sale of Substantially All of the Debtors' Assets;*

*(ii) Approving the Maximum Reimbursement Amount; (iii) Establishing Procedures Relating to*

*the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,*

*Including Notice of Proposed Cure Amounts; (iv) Approving Form and Manner of Notice of All*

*Procedures, Protections, Schedules, and Agreements; (v) Scheduling a Hearing to Consider the*

---

[3]    Many objections have been resolved by revising the proposed Sale Order, which the Debtors intend to submit prior to the Sale Hearing.

*Proposed Sale; and (vi) Granting Certain Related Relief* [Docket No. 286] (the "Sale Procedures Order").

5.      On May 27, 2015, the Debtors filed the Sale Motion Supplement, seeking to implement additional procedures (the "Additional Assumption and Assignment Procedures") with respect to the assumption and assignment of executory contracts and leases (collectively, the "Contracts and Leases").  Specifically, the Additional Assumption and Assignment Procedures will provide the Successful Bidder with 90 days following the closing of the Sale (the "Closing") to evaluate Contracts and Leases to determine whether such Contracts or Leases should be assumed and assigned.

**B.      The Marketing Process and Sale**

6.      As explained in the Initial Sale Motion, the Debtors, with the help of Lazard and the Debtors' other advisors, have been working diligently to market the Debtors' assets to a broad base of potential buyers to maximize recovery for the Debtors' estates.  The Debtors' investment bankers at Lazard reached out to approximately 115 possible strategic and financial buyers.  Apr. 10 Torgove Decl. ¶ 30.  The Committee's investment bankers provided a list of approximately 40 additional potential purchasers and each of these parties was contacted.  Apr. 10 Torgove Decl. ¶ 30.  As a result of this extensive marketing campaign, 19 parties demonstrated enough interest to execute non-disclosure agreements and the Debtors engaged in protracted, in-depth due diligence with 5 parties.

7.      As a result of those efforts, the Debtors received one Qualified Bid on the Bid Deadline, June 11, 2015.  Having received a Qualified Bid, the Debtors will proceed with the Auction on June 15, 2015 consistent with the Sale Procedures.

01:17256438.1

C.    **Objections to the Sale Motion**

8.    Pursuant to the Sale Procedures Order, the Debtors provided sufficient notice to all parties implicated by the Sale, which included, among other things, providing notice regarding the Sale, the Sale Procedures, and the list of Contracts and Leases that may be assumed and assigned (the "Cure List") with associated Cure Amounts.  [*See* Docket Nos. 322, 350-52, 387, 508, 523, 527 & 533].  Additionally, pursuant to the Sale Procedures Order, the Debtors published notice of the Sale in (i) the *New York Times* on April 20, 2015, (ii) the *Dayton Business Journal* on April 24, 2015, and (iii) the *Dayton Business Journal Morning Edition email newsletter* in five (5) consecutive daily issues dated April 20, 2015 through April 24, 2015.  [*See* Docket Nos. 338 & 406].

9.    A number of counterparties to the Debtors' Contracts and Leases, as well as a few other parties, have filed objections or responses to the Sale Motion.  These objections and the Debtors' responses thereto are detailed in the charts attached hereto as Exhibit A and Exhibit B, respectively.  Specifically, Exhibit A addresses the objections that challenge one or more aspects of the Sale itself (collectively, the "Sale Objections").  Exhibit B addresses the objections relating to the assumption and assignment of Contracts and Leases (collectively, the "Contract Objections").

## OMNIBUS REPLY

10.    The Debtors respectfully submit that the Sale resulting from the Auction will satisfy applicable legal requirements for approval under section 363(b)(1) of the Bankruptcy Code.  Moreover, the Sale is further supported by the record in these Chapter 11 Cases.

11.    The Stalking Horse APA was the product of extensive good-faith and arms-length negotiations with Silver Point and, in the Debtors' business judgment, contained the best available terms and conditions for the Sale at the time it was executed.  To the extent that the

01:17256438.1

Debtors are successful in obtaining a higher or otherwise better offer for the Transferred Assets through the Auction, the Debtors anticipate an elevated recovery for the Debtors' estates. Accordingly, the fairness and reasonableness of the consideration to be paid in connection with the Sale has been demonstrated by extensive market exposure and an open and fair marketing process—the best means for establishing a fair and reasonable price for the Transferred Assets.

12.     Moreover, the Debtors and their professionals have worked diligently to respond to, and resolve where possible, the numerous formal and informal responses and objections received in response to the Sale Motion.  Only a relatively small number of objections remain unresolved as of the filing hereof, and the Debtors are continuing to work towards reaching a resolution with relevant parties prior to the hearing scheduled on June 17, 2015 (the "Sale Hearing").

**A.     Most Sale Objections Have Been Resolved, and the Remaining Objections Should be Overruled**

13.     Most Sale Objections either have been, or are expected to be, resolved prior to the Sale Hearing.  Notwithstanding this progress, the following parties have filed Sale Objections that the Debtors address herein, and will, absent a resolution in the interim, need to be resolved by the Court at the Sale Hearing: (i) Applied Mechanical Systems, Inc. ("AMS"); (ii) Avery Dennison Corporation ("Avery Dennison"); (iii) CDK Global, LLC ("CDK"); (iv) ColFin Cobalt I-II Owner, LLC and ColFin Cobalt III Owner, LLC (together, "ColFin"); (v) the Official Committee of Unsecured Creditors (the "Committee"); and (vi) the United States (the "U.S."). The objections filed by the Committee and AMS are addressed below; with respect to the balance, the Debtors' proposed resolutions are set forth on Exhibit A.

    **(i)**       **The Committee's Objection**

14.      The Committee's objection is largely dedicated to explaining the Committee's

view as to why a sale to Silver Point is not appropriate or why certain provisions of the Stalking

Horse APA should not be approved.  These arguments may be rendered moot by the upcoming

Auction, and therefore the Debtors have elected not to expend estate resources to formulate a

reply to those objections at this time.  To the extent these arguments remain relevant following

the Auction, the Debtors reserve their right to file a reply to the Committee's objections at that

time to respond to any arguments not addressed herein.

    **(a)**       **The Sale is the Result of a Robust, Court-Approved Auction Process**

15.      Much of the Committee's objection to the Sale revolves around the theme that the

Sale requires "strict scrutiny."  Contrary to the Committee's assertions, it is well-established that

a debtor's decision to sell property outside of the ordinary course of business enjoys the strong

presumption "that in making a business decision the directors . . . acted on an informed basis, in

good faith and in an honest belief that the action taken was in the best interests of the company."

*In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van*

*Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Hldgs., Inc.*, 388 B.R. 548,

567 (Bankr. D. Del. 2008) (holding that directors enjoy a presumption of honesty and good faith

with respect to negotiating and approving a transaction involving a sale of assets).

16.      In any event, regardless of the standard that is applied, the Debtors' sale process

was robust and resulted in an auction that will maximize the value that the Debtors receive for

the Transferred Assets.  In light of the Debtors' revenues, expenses, and substantial liabilities,

including a significant underfunded pension liability, a reorganization that does not include a

value-maximizing sale is not a viable alternative.  Under the circumstances, a section 363 sale is

the only option for preserving the Debtors' going concern value for the benefit of all

01:17256438.1

constituents.  For this reason, the Court approved the Debtors' sale process and entered the Sale Procedures Order.

17.     The Debtors' investment bankers at Lazard reached out to approximately 115 possible strategic and financial buyers.  The Committee's investment bankers provided a list of approximately 40 additional potential purchasers and each of these parties was contacted.  As a result of this extensive marketing campaign, 19 parties demonstrated enough interest to execute non-disclosure agreements and the Debtors engaged in protracted, in-depth due diligence with 5 parties.  At the conclusion of this process, a strategic buyer placed a qualified topping bid that exceeded the purchase price under the Stalking Horse APA.

18.     Given the limited pool of possible purchasers of the Debtors' assets, a longer sale process was not likely, in the Debtors' business judgment, to produce any additional Bidders or raise the prospects for receiving a higher price for the Debtors' assets.  Nonetheless, the Committee makes vague references to an "expeditious process."  Comm. Obj. ¶ 53.

19.     Here, the sale timeline provided for almost three months between the Petition Date (March 12, 2015) and the Auction date (June 15, 2015), a total of 95 days—more than enough for a fair and robust sales process.  Added to this time period, however, are the weeks of marketing, negotiating, and diligence during which the Debtors and their advisors engaged prior to the Petition Date.  Indeed, this Court has approved sales with much shorter marketing periods. *See, e.g., In re AmCad Holdings*, Case No. 14-12168 (MFW) (Bankr. D. Del. Oct. 31, 2014) [D.I. 222] (43 days between petition date and sale hearing); *In re FCC Holdings*, Case No. 14-11987 (CSS) (Bankr. D. Del. Sept. 22, 2014) [D.I. 166] (29 days between petition date and sale hearing); *In re Tactical Intermediate Holdings*, Case No. 14-11659 (KG) (Bankr. D. Del. Aug. 22, 2014) (46 days between petition date and sale hearing) [D.I. 225]; *In re Victor Oolitic Stone*

*Co.*, Case No. 14-10311 (CSS) (Bankr. D. Del. Apr. 16, 2014) [D.I. 158] (58 days between

petition date and sale hearing); *In re Constar Int'l Holdings*, Case No. 13-13281 (CSS) (Bankr.

D. Del. Feb. 10, 2014) [D.I. 350, 354 & 357] (54 days between petition date and sale hearing); *In

re HSS Holding*, Case No. 13-12740 (BLS) (Bankr. D. Del. Dec. 13, 2013) [D.I. 209] (51 days

between petition date and sale hearing); *In re EWGS Intermediary*, Case No. 13-12876 (MFW)

(Bankr. D. Del. Dec. 5, 2013) [D.I. 181] (32 days between petition date and sale hearing).

20.     Indeed, the Debtors believe that a longer process may have resulted in a lower

purchase price.  The Debtors' CRO has explained that "[w]hile the Company is in bankruptcy,

numerous new business proposals outstanding with customers have been placed on hold

indefinitely, and the pipeline of such business opportunities is effectively dried up."  Apr. 10

Carmody Decl. ¶ 17.  The CRO further noted about the Debtors' condition:   "[T]he enterprise

value of the business is like a melting ice cube: the longer the Company is in bankruptcy, the

greater the risk to the Company's survival."  Apr. 10 Carmody Decl. ¶ 17.  There is simply no

evidence that the longer sale process proposed by the Committee would have resulted in

additional, let alone higher bids for the Debtors' assets.

21.     The Debtors could not have done any more to secure a better or higher bid for

their assets.  Simply put:  the Court-approved process will result in the maximum possible value

for the Debtors' assets.  Thus, even if the Court were to ignore established law and the business

judgment standard (which it should not), the Debtors can still demonstrate that the Sale satisfies

the Committee's "strict scrutiny" standard and should be approved.

**(b)     The Sale is Not a *Sub Rosa* Plan**

22.     Ignoring all relevant facts and a wealth of case law, the Committee objects to the

Sale on the grounds that the Stalking Horse APA is an improper *sub rosa* plan "because it

constitutes a complete disposition of substantially all of the Debtors' valuable assets and

effectively dictates the outcome of these Cases." Comm. Obj. ¶ 65. Nothing could be further from the truth. Neither the Stalking Horse APA, nor any other asset purchase agreement under consideration, purports to dictate the terms of any plan provisions whatsoever.

23.    It is well-established in this jurisdiction that a 363 sale that does not dictate terms of distribution and, accordingly, is not a *sub rosa* plan. *See, e.g., In re THQ Inc.*, 2013 Bankr. LEXIS 770, at *22-23 (Bankr. D. Del. Jan. 24, 2013) (finding that a § 363 sale was not a *sub rosa* plan because the sale "neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors."); *In re Nortel Networks, Inc.*, 2011 Bankr. LEXIS 3971, at *24 (Bankr. D. Del. July 11, 2011) (same); *In re Questex Media Group, Inc.*, 2009 Bankr. 4724, at *21 (Bankr. D. Del. Nov. 24, 2009) (same); *In re Barzel Indus.*, 2009 Bankr. LEXIS 4568, at *11-12 (Bankr. D. Del. Nov. 12, 2009) (same); *In re VeraSun Energy Corp.*, 2009 Bankr. LEXIS 4713 (Bankr. D. Del. Nov. 10, 2009) (same); *In re Hayes Lemmerz Int'l. Inc.*, 2009 Bankr. LEXIS 4756, at *14 (Bankr. D. Del. Oct. 29, 2009) (same); *see also In re GMC*, 407 B.R. 463, 495 (2d Cir. 2009) (finding a sale under § 363 did not constitute a *sub rosa* plan because the sale's purpose was to bring in value that creditors could share in pursuant to a subsequent plan); *In re GSC, Inc.,* 453 B.R. 132, 175-80 (Bankr. S.D.N.Y. 2011) (finding that a sale under § 363 did not constitute a *sub rosa* plan because there was nothing in the transactions or sale order to suggest that the proceeds would be distributed inconsistent with the absolute priority rule); *In re Summit Global Logistics, Inc.,* 2008 Bankr. LEXIS 896, at *40-43 (Bankr. D.N.J. Mar. 26, 2008) (finding that a sale under § 363(f) was not a *sub rosa* plan because it was made in good faith and in the sound business judgment of the debtor facing a liquidity crisis, plus the unsecured creditor-objector could not clearly articulate the rights and benefits they were being deprived of under the sale); *In re TriDimension*

*Energy, L.P.*, 2010 Bankr. LEXIS 4838, at *15 (Bankr. N.D. Tex. Nov. 19, 2010) (finding a sale

of assets was not a *sub rosa* plan because the sale was reasonable and appropriate under the

circumstances and did not dictate the terms of any liquidation).

24.     Based on the facts of these Chapter 11 Cases, it is evident that the Debtors are not

trying to implement a plan through the proposed Sale.  The Debtors are merely satisfying their

fiduciary duties by preserving and, indeed, maximizing value for the benefit of all stakeholders.

25.     Furthermore, in arguing that the Sale was not proposed in good faith because it

may benefit Silver Point over other creditors, the Committee ignores the fact that a sale of all or

substantially all of a debtor's assets under section 363(b) of the Bankruptcy Code is not improper

simply because some creditors may benefit disproportionately to others.  Indeed, as Judge Walsh

has previously noted:

> (a) First, nothing in § 363 suggests that disparate treatment of creditors, such as is
> likely to occur here, disqualifies a transaction from court approval. The purpose of
> a § 363(b) sale is to transform assets—and in TWA's case, volatile assets—into
> cash in an effort to maximize value. Distribution of the value generated in
> accordance with § 1129 and other priority provisions occurs and is intended to
> occur subsequent to the sale.
>
> (b) Many § 363(b) sale transactions have the effect of causing disparate treatment
> of similarly situated creditors. For example, when a debtor sells off a significant
> division of its business as part of a chapter 11 reorganization to reorient the
> debtor's business, the creditors of the sold division, including its employees,
> typically benefit disproportionately to other similarly situated creditors. Likewise,
> where there is a § 363 sale of substantially all of the debtor's business as a going
> concern, there is bound to be disparate treatment of similarly situated creditors.
>
> (c) The treatment of creditors in a § 363(b) context is dictated by the fair market
> value of those assets of the debtor that the purchaser in its business judgment
> elects to purchase. A purchaser cannot be told to assume liabilities that do not
> benefit its purchase objective. Thus, the disparate treatment of creditors occurs as
> a consequence of the sale transaction itself and is not an attempt by the debtor to
> circumvent the distribution scheme of the Code.
>
> (d) The purpose of a § 363(b) sale is to maximize the benefit to the debtor's entire
> estate. Where a sale results in disparate treatment of similarly situated creditors
> the sale may appear to be at the expense of individual creditor constituencies.
> However, if the sale is in the best interests of the estate it follows that the entire

> estate suffers in the absence of the sale. In other words, a sale under § 363(b) is intended to benefit the estate by minimizing loss of value to the estate. There is nothing in the statute that requires a § 363(b) sale to provide a pro rata distribution to all unsecured creditors or even any distribution to all unsecured creditors.

*In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *26-27 (Bankr. D. Del. Apr. 2, 2001) (PJW); *see also In re Decora Indus., Inc.*, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) (Farnan, J.) (finding that because the bankruptcy court would oversee the distribution of the proceeds of the asset sale, and given the debtor's precarious financial position, the proposed sale of substantially all of the debtor's assets was not an improper *sub rosa* plan).

26.     Moreover, it is not uncommon for a debtor to sell assets outside of the plan process. *See In re BT Tires Grp. Holding, LLC*, Case No. 09-11173 (Bankr. D. Del. June 26, 2009) (order authorizing sale of substantially all of the debtors' assets to insider pursuant to a credit bid); *In re Fluid Routing Solutions Intermediate Holding Corp.*, Case No. 09-10384 (Bankr. D. Del. Mar. 26, 2009) (order authorizing sale of substantially all of the assets associated with the debtors' fuel systems business to an insider); *In re Diamond Glass, Inc.*, Case No. 08-10601 (Bankr. D. Del. June 20, 2008) (order authorizing sale of substantially all of the debtors' assets); *In re Am. Home Mortgage Holdings, Inc.*, Case No. 07-11047 (Bankr. D. Del. Oct. 30, 2007) (order authorizing sale of debtors' loan servicing business); *In re Nellson Nutraceutical, Inc.*, Case No. 06-10072 (Bankr. D. Del. Aug. 24, 2007) (order authorizing sale of substantially all of the debtors' assets); *In re Premium Papers Holdco*, LLC, Case No. 06-10269 (Bankr. D. Del. July 13, 2006 and Oct. 26, 2006) (orders authorizing sale of substantially all of the debtors' assets). This well-settled practice reflects the practical reality that many debtors do not have sufficient liquidity or capital to maintain the going-concern value of their businesses over the duration necessary to prosecute, confirm, and consummate a chapter 11 plan, as is the case with the Debtors under the instant facts.

27.     The Committee cites to *Pension Benefit Guaranty Com. v. Braniff Airways (In re Braniff Airways)*, 700 F.2d 935 (5th Cir.1983), for the proposition that a debtor and the Court cannot short circuit the requirements of chapter 11 for confirmation of a plan by establishing the terms of the plan *sub rosa* in connection with the sale of assets.  But the facts before the Court demonstrate that the terms of the proposed Sale are materially distinguishable from those the Fifth Circuit found objectionable in *Braniff Airways*.  In that case, the debtor sought to transfer the debtor's cash, airplanes and equipment, terminal leases and landing slots to the buyer in return for travel scrip, unsecured notes and a profit participation in the buyer's proposed operation.  *In re Braniff Airways*, 700 F.2d at 939.  Under the agreement between the debtor and buyer, the scrip only could be used in a future reorganization of the debtor and could be issued only to the debtor's former employees, shareholders, and certain unsecured creditors.  *Id*.  The Fifth Circuit found this provision of the transaction "not only changed the composition of [the debtor's] assets, the contemplated result under § 363(b), it also had the practical effect of dictating some of the terms of any future reorganization plan."  *Id.* at 939-40.

28.     The Fifth Circuit also found objectionable an agreement between the debtor and its creditors whereby the secured creditors were required to vote a portion of their deficiency claim in favor of any future reorganization plan approved by the majority of the unsecured creditors' committee.  *Id.* at 940.  The Court found that "such an action is not comprised by the term 'use, sell, or lease,' and it thwarts the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned."  *Id*.

29.     Finally, the Fifth Circuit found objectionable a provision in the *Braniff Airways* sale which provided for the release of claims by all parties against the debtor, its secured creditors, and its officers and directors.  *Id*.

01:17256438.1

12

30.     The Committee does not, and cannot, point to any provision in the Stalking Horse APA that is similar to the troublesome provisions at issue in *Braniff Airways*.  Neither the Stalking Horse APA nor the proposed Sale Order contain any provision that dictates the terms of the Debtors' future chapter 11 plan, describes creditor voting rights, or provides for releases of claims against the Debtors, Silver Point or officers and directors.

31.     Rather, as described above, sound business reasons exist for the timely consummation of the proposed Sale.  The proposed Sale preserves the value of the Debtors' estates.  And timing is critical.  *See In re Decora Indus., Inc.*, 2002 WL 323.32749 at *8-9 (D. Del. May 20, 2002) (recognizing the precarious financial and business position of Debtors as a factor in determining that Debtors' proposed sale of substantial all of their assets did not constitute an improper *sub rosa* plan).

32.     Accordingly, the proposed Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization for the Debtors.  Thus, the Sale does not constitute a *sub rosa* chapter 11 plan.

(c)     **The Additional Assumption and Assignment Procedures are Beneficial and Have Value to the Estates**

33.     In this case, the Debtors have determined, in an exercise of their sound business judgment, that their estates will be best served through the implementation of the Additional Assumption and Assignment Procedures.  The Committee raises several reasons why the Court should listen to its business judgment, and not that of the Debtors.  Each of the Committee's arguments is misplaced for the reasons stated below.

34.     First, the Committee asserts that allowing the buyer to decide which contracts to assume or reject "interjects uncertainty into the sale process and may chill bidding.  The delay resulting from the Asset review Period will make it difficult, if not impossible, for the Debtors

and the Committee to assess the value of competing bids . . . . [B]y way of example, if the cash

consideration offered by two bidders is equal or nearly equal, the number of executory

contracts/unexpired leases assumed and assigned and the resulting cure costs paid could be the

determinative factor in assessing the highest and best bid." Comm. Obj. ¶ 113.  The

Committee's objection is predicated on the mistaken belief that under the original Sale

Procedures the Debtors would have known which contracts were being assumed/rejected as of

the date of the Auction.  That is not the case.  Under section 2.6(d) of the Stalking Horse APA, as

originally proposed, the buyer would have had until the third business day prior to closing to

designate which contracts it would assume or reject.  Thus, the Debtors were never going to

know with any accuracy, at the time of the Auction, the number of Contracts and Leases that

would be assumed and assigned to the buyer.  The Assumption and Assignment Procedures

merely extend this post-Auction review period.  Far from chilling bidding, as the Committee

suggests, the Debtors believe this provision encouraged bidding because potential buyers knew

they would have additional time to review Contracts and Leases to ensure that only the most

advantageous agreements were assumed.

   35. From a contract counterparty perspective, the Debtors believe that the additional

review period may actually increase the likelihood that more Contracts and Leases will be

assumed.  With the benefit of additional time to conduct diligence, a buyer will be able to better

understand the value of each Contract and Lease and will be better positioned to justify paying

cure claims associated with a larger number of Contracts and Leases.  To the extent more

Contracts and Leases are assumed and assigned to a buyer, the Debtors' estates will, of course,

benefit through a reduction in overall rejection claims.

36.     Second, the Committee states that allowing the buyer to decide which contracts to assume or reject "leaves the estates exposed to potential large rejection damage claims long after the Closing Date."  Comm. Obj. ¶ 112.  As noted above, section 2.6(d) of the Stalking Horse APA gave the buyer the right to designate Transferred Contracts after the Auction.  Accordingly, the length of time that transpires before the rejection damages claims are asserted has no significance.

37.     Third, the Committee observes that the proposed procedures are not yet incorporated into the Stalking Horse APA.  The Debtors expect that the purchase agreement with the Successful Bidder will address this concern.

38.     In short, the Debtors believe that the Additional Assumption and Assignment Procedures are appropriate and are supported by the Debtors' sound business judgement.

> ### (d)     The Sale of Avoidance Actions Against Trade Creditors Is Ordinary and Appropriate

39.     The Committee also objects to the sale of avoidance actions against trade creditors.  However, buyers often purchase the estate's right to pursue such causes of action because it doesn't make good business sense to sue your customers and vendors.  For this reason, ensuring that the Debtors' trade creditors are not subject to suit is an essential component of the Sale.

40.     As the Court noted in the *Real Mex* case, "the sale or release of these types of claims is not unusual as it relates to general Chapter 5 causes of action and including fraudulent conveyance claims for business reasons.  *In re Real Mex Restaurants Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Feb. 10, 2012) (Hr'g Tr.); *see also, e.g.*, *In re F & H Acquisition Corp.*, Case No. 13-13220 (KG) (Bankr. D. Del. Feb. 28, 2014) [Docket No. 447]; *In re OCZ Tech. Grp., Inc.*, Case No. 13-13126 (PJW) (Bankr. D. Del. Jan. 16, 2014) [Docket No. 241]; *In re*

*Landauer Healthcare Holdings, Inc.*, Case No. 13-12098 (CSS) (Bankr. D. Del. Jan. 6, 2014)

[Docket No. 477]; *In re Real Mex Rests., Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Feb.

22, 2012) [Docket No. 923]; *In re Allen Family Foods, Inc.*, Case No. 11-11764 (KJC) (Bankr.

D. Del. July 29, 2011) [Docket No. 220].  There is nothing extraordinary about the sale of

avoidance actions, and there is no reason to disapprove the sale of such actions here.

> **(ii)     AMS's Objection**

41.     AMS asserts that it has a perfected mechanic's lien (the "Lien") on certain real

property located at 600 Albany Street, Dayton, OH 45417 (the "Building").  AMS Obj. ¶ 1.

According to AMS, it perfected its Lien effective as of December 11, 2014.  *Id.*  In its objection,

AMS essentially makes four arguments: (1) the Debtors cannot sell the Building free and clear of

AMS's Lien, (2) the proposed Sale structure does not adequately protect AMS's Lien, (3) a

buyer is not entitled to a finding of good faith under section 363(m) of the Bankruptcy Code, and

(4) the Sale Order should not include waivers of Bankruptcy Rule 6004 and 6006.[4]

> **(a)     The Debtors Can Sell Free and Clear of AMS's Lien Pursuant to
> Section 363(f)(3) & (f)(5)**

42.     Section 363(f)(3) provides that property may be sold under section 363(b) free

and clear of liens if "such interest is a lien and the price at which the property is to be sold is

greater than the aggregate value of all liens on such property."  11 U.S.C. § 363(f)(3).  AMS

argues that section 363(f)(3) does not apply because "the aggregate face amount of all liens is far

*greater* than the [cash proceeds from the Sale]."  AMS Obj. ¶ 10.  As an initial matter, to the

extent that the proceeds from the Sale would be insufficient to fully satisfy the first, second, and

third priority liens that are all senior to AMS's lien, section 506(a) of the Bankruptcy Code

---

[4]     The U.S. makes a similar argument in its objection.

renders AMS's Lien worthless, and AMS should be treated as an unsecured creditor.[5]  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 146 (3d Cir. 2012) (valuing lien "at zero" and designating creditor as unsecured where value of senior liens exceeded value of collateral)the Debtors submit that AMS does not hold a secured claim

43.     To the extent AMS's Lien has any value (it does not), the Court specifically considered and rejected the same argument advanced by AMS in *In re CyberDefender Corp.*, Case No. 12-10633 (Bankr.  D. Del. May 7, 2012) (BLS) [D.I. 191] (Hr'g Tr.).  Citing *In re Beker Industries Corp.*, 63 B.R. 474 (Bankr. S.D.N.Y. 1986), the Court approved the sale of collateral free and clear of a junior lien, holding that "[a]s it relates to [section] 363(f)(3), the Code is clear, I think, that the Court can approve and authorize a sale free and clear of liens where the property is sold for greater than the value of the liens.  And I think that the courts that have construed and followed the *Beker* analysis have it right and . . . it's consistent with our practice that the value of those liens is determined by reference to section 506, and that it is in fact the value of the collateral, not the face value of the asserted lien."  *Id.* at 67.  *See also In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010) ("The 'value' of a lien is to be determined by reference to section 506(a) —that is, it is the amount by which the lienholder's claim is actually secured.").

44.     In this instance, AMS concedes that the value of senior liens exceed the value of the Building (AMS Obj. ¶ 10) and implicitly recognizes the value of its Lien is $0.00.  Hence, the cash proceeds from the Sale will exceed the value of AMS' Lien, and the Sale is therefore permissible under section 363(f)(3).

---

[5]   The Debtors have attached as Exhibits C, Exhibit D, and Exhibit E, respectively, copies of the senior liens securing approximately $300 million in debt.  Moreover, according to the Debtors' books and records, the Building has a value of no more than $7,091,000.90.  *See* Schedules and Statements [Docket No. 477].

45.     Additionally, in *CyberDefender*, the Court also held that section 363(f)(5) authorizes the sale free and clear of junior liens where the junior lienholder "could be compelled in a foreclosure sale to accept a money satisfaction of [its] interest . . . ." *In re CyberDefender Corp.* Hr'g Tr. at 68; *see also In re Boston Generating, LLC*, 440 B.R. at 333 ("the existence of judicial and nonjudicial foreclosure and enforcement actions under state law can satisfy section 363(f)(5)").

46.     Under Ohio law, which governs, a foreclosure sale could extinguish AMS's junior Lien, and AMS could be compelled to accept a money satisfaction for its Lien to the extent excess funds were available. *See* Ohio Rev. Code § 2323.07; *Lexington Ridge Homeowners' Assn. v. Schlueter*, 2013 WL 1707833, at *4 (Ohio Ct. App. Apr. 22, 2013) (recognizing foreclosure results in extinsguishment of liens and disbursement to lienholders in order of lien priority).

47.     Thus, the Court has ample basis, under section 363(f)(3) and (f)(5), to authorize the sale of the Building free and clear of AMS's Lien.

            **(b)     The Value of AMS's Lien is Adequately Protected**

48.     AMS argues that the proposed Sale "provides no adequate protection to AMS" because there would be no surplus cash proceeds available to pay AMS.  AMS Obj. ¶ 14. However, as AMS acknowledges, a debtor is only required under sections 361 and 363(e) to protect the *value* of a party's interest in property.  AMS Obj. ¶ 12.  In this case, as stated above, if the Sale proceeds do not satisfy all senior liens—meaning that the combined value of all other senior liens exceeds the value of the Building—AMS does not hold a secured claim.  *See  In re Heritage Highgate*, 679 F.3d at 146.  To the extent AMS's Lien has any value, the value of AMS's Lien is protected through a provision in the proposed Sale Order that the liens of existing

01:17256438.1

lienholders will attach to the sale proceeds "in the order of their priority, with the same validity, force, and effect" that existed prior to the Sale.  Proposed Sale Order [Docket No. 559] ¶ 6.

49.     Courts frequently recognize that a lienholder is adequately protected by granting replacement liens that attach to the proceeds of a sale transaction in "the same order of priority and with the same validity, force and effect" that existed prior to the sale.  *See In re Taylor-Wharton Intern., LLC*, 2010 WL 2906763, at *5 (Bankr. D. Del. June 8, 2010) (order approving sale); *see also Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 257 (2d Cir. 2010) ("permitting the sale of the Debtor's assets free and clear of encumbrances but attaching replacement liens on the proceeds of such sale to the same extent, validity, and priority as the original liens [is] squarely within the letter and purpose of [adequate protection]") (citation omitted).

50.     Here, the fact that the cash sale proceeds may not be sufficient to satisfy all senior liens—leaving no recoverable value on account of AMS's Lien—is of no moment.  Neither section 361 nor section 363(e) guarantee junior lienholders a cash recovery on account of its underwater lien.  Instead, those provisions simply require the preservation of the *value* of each lien.  Thus, to the extent AMS has a secured claim, the replacement lien provided in the proposed Sale Order satisfies the requirements under section 361 and 363(e).

### (c)     The Successful Bidder is Entitled to a Finding of Good Faith Under Section 363(m)

51.     AMS argues that any buyer should not be entitled to a finding of good faith under section 363(m) of the Bankruptcy Code because the buyer is aware of AMS's Lien, and the cash proceeds from the Sale may not be sufficient to pay AMS's claim in full.  AMS Obj. ¶ 15.

52.     AMS has failed to cite a single case where a buyer's simple awareness of an underwater junior lien could constitute "bad faith" such that the buyer would forfeit the

protections of section 363(m).  Instead, to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

53.     As the Debtors have demonstrated throughout these Chapter 11 Cases, the Debtors have been working diligently to market their assets to a broad base of potential buyers to maximize recovery for the Debtors' estates.  The Debtors have negotiated with the Stalking Horse and other interested parties in good faith and at arm's length, and the Successful Bidder should therefore be entitled a finding of good faith under section 363(m) of the Bankruptcy Code.

### (d)     A Waiver of the 14-day Stay is Warranted

54.     Finally, AMS argues that the Court should not waive the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d).

55.     A court has discretion to waive the 14-day stay of its order under Bankruptcy Rules 6004 and 6006, and waivers are routinely granted even when a party objects to the underlying motion.  *See, e.g.*, *In re Los Angeles Dodgers LLC*, 468 B.R. 652, 662 (Bankr. D. Del. 2011) (granting waiver where debtors operating within a small time frame to proceed with sale); *In re Perry Hollow Management Co., Inc.*, 297 F.3d 34, 41 (1st Cir. 2002) (waiver of stay not abuse of discretion where bankruptcy court found sale price was reasonable, the buyer was ready to complete the sale, and waiver would reduce administrative expenses).

56.     Here, the Debtors believe, and anticipate the Court will conclude, the Sale price will be reasonable.  Additionally, as the Debtors have emphasized since the beginning of the Chapter 11 Cases, time is of the essence with respect to the Sale.  Secured debt obligations and other administrative expenses continue to accrue, and the Debtors lack sufficient funding to

operate their businesses on a prolonged basis.  Granting the waiver will enable the Successful

Bidder to proceed to the Closing Date more quickly, which will allow the Debtors to satisfy

secured debt obligations sooner and reduce accruing administrative expenses, which ultimately

benefits the estates.

57.     Therefore, the Debtors request that the Sale Order be effective immediately by

providing that the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

**B.     The Contract Objections Either Have Been Resolved or Will Likely be Resolved Prior to the Sale Hearing**

58.     The Contract Objections do not challenge the Sale itself, but rather, among other

things, (a) contest the Debtors' proposed cure amount ("Cure Amount") with respect to specific

Contracts and Leases, (b) request adequate assurance of future performance with respect to

specific Contracts and Leases, or (c) seek other relief specific to such Contracts and Leases.

Moreover, as detailed in Exhibit B, the Debtors also propose that certain discrete Contract and

Lease issues be adjourned to a future date for later resolution or adjudication by the Court;

however, such adjournment would be limited to those issues that do not prejudice the Debtors'

ability consummate the Sale as quickly as possible after entry of the Sale Order, such as

challenges to particular Cure Amounts.  The Debtors address certain Contract Objections below,

including adequate assurance of future performance, and the remaining objections are addressed

in Exhibit B.[6]

**(i)     Contract Counterparties Have Received Adequate Assurance of Future Performance**

59.     Several parties asserting Contract Objections have requested adequate assurance

of future performance with respect to Contracts or Leases that will be assumed and assigned

---

[6]     Exhibit B-1 includes all Contract Objections that the Debtors believe are resolved; Exhibit B-2 includes Contract Objections that are unresolved, partially unresolved, or partially adjourned; and Exhibit B-3 only includes the Contract Objections that the Debtors seek to adjourn.

through the Sale. As explained below, the Debtors submit that they have established adequate

assurance of future performance. Moreover, the Successful Bidder will provide additional

adequate assurances prior to or in connection with the Sale Hearing.

60.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an

executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of

future performance by the assignee . . . is provided." 11 U.S.C. § 363(f)(2). The meaning of

"adequate assurance of future performance" depends on the facts and circumstances of each case,

but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In*

*re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also L.R.S.C. Co. v. Rickel*

*Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code

generally favors free assignability as a means to maximize the value of the debtor's estate."); *In*

*re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean adequate assurance that the debtor will thrive and pay rent).

61.     The Third Circuit has declared that the requirement of "adequate assurance" of

future performance was "not intended" to give any non-debtor contract party "greater rights in a

case under the [Bankruptcy Code] that he has outside" of the Bankruptcy Code. *Cinicola v.*

*Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (citation omitted). In addition, although

there is no single solution for adequate assurance in every case, "'the required assurance will fall

considerably short of an absolute guarantee of performance.'" *Id.* (quoting *In re Carlisle Homes,*

*Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988)); *see also In re ANC Rental Corp.,* 277 B.R. 226,

238 (Bankr. D. Del. 2002) (non-debtor parties had adequate assurance of future performance

even though assignee was a holding company that had never operated a rental concession

business because holding company projected annual savings of $4.5 million thereby rendering it

much more financially secure than the debtor); *In re Alipat, Inc.,* 36 B.R. 274, 278 (Bankr. E.D. Mo. 1984) (stating "there is no requirement at law that a proposed assignee must furnish a letter of credit or other absolute guaranty of payment" to satisfy the "adequate assurance" requirement and concluding that "adequate assurance" existed where party had the "financial resources . . . available to meet the rental payments").

62.     Here, in addition to what the Successful Bidder provides, the counterparties to the Contracts and Leases have received more than sufficient adequate assurance of future performance.  By virtue of the Sale, the Successful Bidder will operate the Transferred Assets only after having expunged material amounts of debt that burdened the estates.  In fact, following the Closing, the new operations will have reduced secured debt materially, shed all of the Debtors' pension liabilities (including an underfunding obligation of approximately $200 million), and eliminated virtually all prepetition trade debt (estimated at over $70 million).

63.     The Debtors submit that a business with a market value of over $275 million that has shed such a large amount of debt provides more than sufficient value to ensure the adequate assurance of future performance for the Contracts and Leases to be assumed and assigned.

64.     Accordingly, the Debtors request that the Court find that the Debtors and the Successful Bidder have provided adequate assurance of future performance for all potential counterparties within the meaning of sections 365(b)(l)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code with respect to counterparties.  The Contract Objections requesting adequate assurance of future performance should therefore be overruled.

**(ii)      Ongoing and Future Fees and Costs Associated with a Transferred Contract will be Paid by the Successful Bidder**

65.      Several parties asserting Contract Objections have requested that amounts coming due postpetition be included as part of the Cure Amount under section 365(b)(1)(A) of the Bankruptcy Code.

66.      Section 365(b)(1)(A), however, only requires an amount to be cured where "there has been a default."  *See also* Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 365.06[1]-[2] (16th ed.) ("section 365(b) applies only when there has been a default . . . either before or after the commencement of the case").

67.      Hence, if the Debtors are not in default with respect to postpetition amounts coming due on Contracts and Leases, such amounts need not be "cured" upon the assumption and assignment to the Successful Bidder.  In designating a Contract or Lease as a Transferred Contract, the Successful Bidder will necessarily assume the ongoing payment obligations associated with such Contract or Lease.  To the extent any postpetition amounts are in default and must be cured upon assumption and assignment, the Debtors submit that the proposed Sale Order, which states that a buyer must pay all postpetition defaults and obligations, provides adequate assurance that such amounts will be cure.  *See* 11 U.S.C. § 365(b)(1)(A) (trustee may provide adequate assurance that the trustee will promptly cure defaults).

68.      For these reasons, the Debtors believe that any Contract Objections seeking to include non-defaulted, postpetition amounts in the respective Cure Amount for any Contract or Lease should be overruled.

**(iii)      Paragon's Request for Attorneys' Fees is Unreasonable and Should be Denied**

69.      The Paragon, LP ("Paragon") filed a Contract Objection [Docket No. 451] admitting that "no amounts are owing under the Lease other than fees incurred by Landlord in

connection with the proposed sale and assumption and assignment of its Lease."  Paragon Obj.

¶ 3 (emphasis added).  Despite admitting that there was no existing default under Paragon's

Lease, Paragon filed its objection seeking "costs and attorneys' fees under the Lease."  *Id.*

Paragon fails to specify the amount of costs and fees owed.

70.      As explained in by the court in *In re Crown Books Corp.*, "[a]ttorneys' fees are

recoverable under section 365(b)(1) only if they are reasonable."  269 B.R. 12, 18 (Bankr. D.

Del. 2001) (emphasis added).  In *Crown Books*, the court awarded attorneys' fees related to a

meritorious cure objection but judged the reasonableness, in part, against the disputed amount in

default.  *Id.* at 19.  The court, however, denied an award of fees related to "general services by

the attorney for . . . advising its client of the effect of the bankruptcy filing on its rights."

71.      Because Paragon concedes that there is no amount in default, and therefore

nothing to cure, its objection was unnecessary and the Debtors submit that any request for

attorneys' fees is unreasonable.


*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request the Court to grant the relief requested in

the Sale Motion and overrule any unresolved objections that the Debtors have not previously

agreed to adjourn.

Dated: June 15, 2015
Wilmington, Delaware

                    */s/ Andrew L. Magaziner*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Michael A. Rosenthal (NY No. 4697561)
Samuel A. Newman (CA No. 217042)
Jeremy L. Graves (CO No. 45522)
Matthew G. Bouslog (CA No. 280978)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
mrosenthal@gibsondunn.com
snewman@gibsondunn.com
jgraves@gibsondunn.com
mbouslog@gibsondunn.com

*Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Chart of Sale Objections**

01:17256438.1

# EXHIBIT B

## Chart of Contract Objections

## **EXHIBIT C**

**First Lien Mortgage**

# **EXHIBIT D**

## **Second Lien Mortgage**

## **EXHIBIT E**

### **Third Lien Mortgage**

01:17256438.1