# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-10541 (BLS)<br><br>(Jointly Administered)<br><br>Re: D.I. 23, 286, 559, 580<br><br>Hearing Date: June 17, 2015 at 10:00 a.m. ET<br>Objection Deadline: June 16, 2015 at 4:00 p.m. ET[2] |

## SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors") submits this supplemental objection (the "Supplemental Objection") to the relief sought in the Debtors' motion [D.I. 23] and supplemental motion [D.I. 559] (together, the "Sale Motion")[3] for approval of the sale of substantially all of their assets (the "Sale"). In support of this Supplemental Objection, the Committee respectfully states as follows:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] The objection deadline to the Sale with respect to any purchaser other than the Stalking Horse Bidder was today, June 16, 2015, at 4:00 AM (ET). However, as set forth in detail below, the issues in this Supplemental Objection did not arise until shortly before the objection deadline. Accordingly, the Committee respectfully requests leave to submit this Supplemental Objection after the objection deadline.

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Sale Objection [D.I. 580].

30954/2
06/16/2015 37663641.5

## BACKGROUND

1.      On June 1, 2015, consistent with the provisions of the Bid Procedures Order, the Committee filed its objection to the Sale to the Stalking Horse Bidder [Docket No. 580] (the "Sale Objection"). The Committee incorporates the Sale Objection herein by reference.

2.      On June 15, 2015, the Debtors conducted an auction (the "Auction") of substantially all of their assets. The Stalking Horse Bidder and Taylor Corporation ("Taylor") were the only bidders. At the conclusion of the Auction at approximately 11:15 PM (ET), the Debtor selected the Stalking Horse Bidder as the winning bidder, subject to approval by the Debtors' board of directors. Taylor expressly stated at the conclusion of the Auction that it would not submit a further bid.

3.      Notwithstanding the conclusion of the Auction, and without any prior notice to the Committee, the Debtors informed the Committee shortly before Noon on Tuesday, April 16, 2015 that Silver Point and Taylor engaged in discussions after the Auction. The Debtors have advised the Committee that as a result of those discussions, Taylor increased its bid by $2 million and Silver Point agreed to allow Taylor to be the winning bidder.

4.      Thus, at this point, the Committee understands that the Debtors intend to move forward with Taylor as the winning bidder.

5.      On June 15, 2015, the same day that the Auction took place, the Committee, the Debtors, and Silver Point reached an agreement in principle to resolve (among other issues) the issues set forth in the Sale Objection and this Supplemental Objection and the claims and causes of action the Committee asserts against a number of Silver Point-affiliated parties in the Committee Complaint (as defined below). However, the parties have not yet memorialized the terms of that agreement in writing and it is not certain that the tentative settlement will come to

fruition. Accordingly, the Committee submits this Supplemental Objection out of an abundance of caution.

6. Among other things, the Sale Objection raises the following serious issues, all of which apply to the proposed Sale to Taylor:

- The Sale Motion fails the applicable strict scrutiny review due to Silver Point's insider status and undue control over the Debtors.

- The Sale may leave the Debtors' estates administratively insolvent.

- Silver Point should not be permitted to credit bid[4] its prepetition claims because its liens and claims are subject to a significant challenge (the "Challenge")[5] by virtue of the Committee's motion for standing to pursue, among other things, fraudulent conveyance and equitable subordination claims against Silver Point in connection with the Debtors' ill-conceived purchase of WorklowOne in August 1, 2013 (the "Standing Motion") [D.I. 524]. Subsequent to the filing of the Sale Objection, the Court granted the Standing Motion by order dated June 10, 2015 [D.I. 648] and the Committee filed its adversary complaint asserting the Challenge (the "Committee Complaint") [Adv. Pro. No. 15-50771].

- If permitted to credit bid, Silver Point should be required to post a bond or a letter of credit in the full amount of its bid to protect the estates' interests in the event the Challenge is successful. Such relief is more than appropriate where, as here, Silver Point has orchestrated a truncated sale process through the imposition of self-created and self-serving sale and DIP financing milestones.

- Consistent with fundamental credit bid principles, Silver Point should not be permitted to credit bid on unencumbered assets, such as avoidance actions and the assets described in the Committee Complaint, and the value of unencumbered assets, once determined, should remain with the Debtors' estates for the benefit of unsecured creditors.

- Silver Point (and the other prepetition term loan lenders) should not receive any sale proceeds absent prior resolution of the claims and causes of action the Committee has asserted against Silver Point in the Committee Complaint, or a settlement thereof. To the extent the Court determines that Silver Point and the other term loan lenders have valid claims and liens, such claims and liens can attach to the sale proceeds, thereby protecting their alleged interests.

---

[4] Assuming Taylor (as defined below) is indeed the winning bidder, the Committee's objections with respect to limiting Silver Point's ability to credit bid nevertheless apply to Silver Point as back-up bidder.

[5] Pursuant to the Bid Procedures Order, nothing in the Court-approved procedures governing the Sale "is intended or shall be construed to amend, modify or otherwise alter the third-party challenge rights pursuant to paragraph 27 of the Interim DIP Order and paragraph 28 of the Final DIP Order."

- All chapter 5 causes of action and all claims asserted in the Committee Complaint should be excluded from the sale and left for the benefit of the Debtors' estates (although the Sale Motion and Taylor's original asset purchase agreement (the "Taylor APA") provided that certain chapter 5 causes of action are transferred assets under the Taylor APA, they do not provide any description whatsoever regarding the identity or value of such claims, thereby making it impossible to determine whether sufficient value is being provided for those claims, to the extent such claims can be transferred solely for the benefit of the buyer as a matter of law).

- The Sale Motion is a *sub rosa* plan because it seeks approval of a sale of substantially all of the Debtors' assets and dictates the outcome of this case without the significant protections afforded by a plan confirmation process under the Bankruptcy Code including, but not limited to, the requirement that all administrative claims be paid in full and that unsecured creditors receive a distribution to which they are entitled.

**SUPPLEMENTAL OBJECTION**

7.  The Court should deny the Sale Motion unless the issues raised in the Sale Objection and this Supplemental Objection are resolved. While the Taylor APA and the resulting auction provided incremental value over the Stalking Horse APA, the reality remains that the Sale process remains suspect and these estates may be administratively insolvent post-closing with no clear path forward.

    **A.**    **Silver Point Chilled the Sale Process**

8.  The theoretical purpose of allowing a credit bid under section 363(k) of the Bankruptcy Code is to ensure that a debtor does not sell its secured creditor's collateral for less than fair value. RadLAX Gateway Hotel, LLC, et al. v. Amalgamated Bank, 132 S. Ct. 2065, 2070 n. 2 (2012) ("ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price"). Significantly, however, section 363(k) provides an exception to the allowance of credit-bidding if "the court for cause orders otherwise." Id. at 2070 n.3.

9.  The "for cause" exception, which the Bankruptcy Code does not define, allows a court wide discretion to "deny a lender the right to credit bid in the interest of any policy

advanced by the Code." In re Philadelphia Newspaers, LLC, 599 F.3d 298, 316 (3d Cir. 2010); see also In re RML Development, Inc., 528 B.R. 150, 156 (Bankr. W.D. Tenn. 2014) (limiting Silver Point's ability to credit bid to solely the undisputed portion of its secured claim where a challenge was pending with respect to the secured amount).

10. Given the purpose of credit bidding – to assure that a debtor obtains maximum value for its secured creditor's collateral – courts should utilize the "for cause" exception where, as here, (a) there is a significant and *bona fide* dispute as to the extent, validity, and priority of the secured lender's alleged claims and liens or (b) credit-bidding poses a risk that it will inhibit a robust sale process. See, e.g., In re Fisker Automotive Holdings, Inc., 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien" and because unlimited credit bidding would chill participation in the sale process), leave to appeal denied, 2014 U.S. Dist. LEXIS 15497, at *16 (D. Del. 2014) ("[T]he right to credit bid is not absolute."). Both of these circumstances exist here.

11. First, as noted above, at a hearing conducted on June 8, 2015, and as memorialized in the Standing Order entered on June 10, 2015, the Court granted the Standing Motion and authorized the Committee to assert (among other claims against other defendants) claims against Silver Point and the other prepetition term lenders for avoidance of fraudulent transfers and obligations under sections 544 and 548 of the Bankruptcy Code and for equitable subordination of Silver Point's claims (the "Claim and Lien Challenge"). If the Claim and Lien Challenge is successful, the Committee will avoid alleged secured claims of up to $210 million and the liens securing those claims or, alternatively, Silver Point's claims will be subordinated to all general unsecured claims. Under these circumstances, denial of Silver Point's right to credit

bid for cause is appropriate because there is a substantial risk that Silver Point and the other prepetition term loan lenders are, in fact, not entitled to credit bid. Where, as here, a court has already determined that potential claims may exist that are not subject to quick or easy resolution and that would invalidate alleged claims and liens, the risk of allowing an alleged secured creditor to credit bid should lie not with the estate but with the lender asserting the right to credit bid in the face of a substantial, bona fide challenge to its alleged liens and claims.

12. This should be the case especially in circumstances where the party asserting the right to credit bid insists, as a prerequisite to providing DIP financing, on an expedited sale process and on provisions forcing the Committee to conduct an expedited investigation and seek standing to assert the Challenge prior to the sale approval hearing. Allowing Silver Point to credit bid after the Court has granted the Committee standing to assert significant challenges to Silver Point's alleged liens and claims would defeat the very purpose of requiring the Committee to obtain standing prior to the sale hearing. Given that Silver Point is the party that insisted on the expedited sale and investigation process, it is fair and equitable for Silver Point to bear the risks associated with credit bidding.

13. In addition to the pending Claim and Lien Challenge, the Court should not approve the Sale because Silver Point's failure to establish a cap on its ability to credit bid prior to the Auction likely impaired, rather than promoted, the fundamental bankruptcy goal of value maximization by discouraging other bidders from participating.

14. As set forth in the Sale Objection, the Stalking Horse APA provides for the repayment of the Prepetition ABL Facility (which was converted into postpetition DIP ABL facility pursuant to a final financing order entered in the case), assumption of certain limited liabilities, and a credit bid of Silver Point's alleged First-Lien Term Loan claim of $113.6

million. Importantly, through the Stalking Horse APA, Silver Point reserved the right to credit bid up to the full amount of the outstanding Second-Lien Term Loans, in the approximate amount of $96.7 million.

15. Multiple parties conducted due diligence and expressed interest in the Debtors' assets during the postpetition marketing period. Virtually all of these parties, however, expressed concern over Silver Point's ability to continue credit bidding at the Auction without paying cash – the type of currency required of all other bidders. Silver Point's refusal to establish a cap on its potential credit bid discouraged potential bidders, who – unlike Silver Point – did not have the protection of expense reimbursement if they did not win the auction.

16. Ultimately, not wanting to engage in skewed competition with Silver Point's unlimited (for all practical purposes) power to bid in virtual currency, only one party, Taylor, submitted a competing bid. Silver Point's ability to credit bid $210 million on account of its alleged prepetition claims chilled bidding and, unfortunately, the Committee's concerns expressed in the Sale Objection over Silver Point's unlimited credit bid rights came true.

17. Silver Point's refusal to inform parties of its likely maximum credit bid amount under the Second-Lien Term Loan was unjustified for several reasons. First, all parties, including Silver Point, knew at the outset of these Chapter 11 Cases that a failure to cap Silver Point's ability to credit bid would significantly chill bidding. Second, by granting the Committee standing to challenge all of Silver Point's asserted liens and claims, the Court found that the estate held potential claims that, if successful, would substantially limit or eliminate Silver Point's alleged secured claims and liens. Third, on June 8, 2015, the Committee filed the Committee Complaint, thereby initiating the Claim and Lien Challenge. As such, by the June

11, 2015 bid deadline, Silver Point's alleged secured claims and liens – much like the claims and liens at issue in <u>Fisker</u> – were the subject of a substantial and bona fide dispute.

18.     Indeed, the competing bidder, Taylor, recognized the weakness of Silver Point's alleged secured claims and liens – to the detriment of the estates. For example, the original Taylor APA provided for a significant reduction in consideration if Taylor was the back-up bidder but ultimately closed. In pertinent part, the original Taylor APA provided:

> If [Taylor is] designated as the Back-Up Bidder and [is] requested to proceed with the Closing for any reason pursuant to the Sale Procedures Order, (i) the amount of the Additional Cash Component shall be adjusted dollar for dollar to the extent that the calculation of the Aggregate Consideration as of the actual date of Closing differs from the calculation of the Aggregate Consideration as of July 19, 2015, excluding the amount by which the Pre-Closing Professional Fee Amount incurred as of the actual date of Closing exceeds the Pre-Closing Professional Fee Amount incurred as of July 19, 2015, (ii) **the Additional Cash Component as adjusted pursuant to the foregoing clause (i) shall be reduced by $20,000,000**, and (iii) [Tayor] shall receive a credit against the Additional Cash Component in an amount equal to all deposits recovered from the initial Successful Bidder by any of the Sellers relating to the initial Successful Bidder's failure to close.

Taylor APA, § 2.7(b) (emphasis added). Furthermore, the Taylor APA also reduced the consideration provided to the extent the Committee is successful in challenging Silver Point's secured liens and claims (or settles those challenges):

> If and to the extent that (i) any Encumbrance relied upon by either the Stalking Horse (as defined in the Sale Procedures Order) or any Second Lien Bidder (as defined in the Sale Procedures Order) to credit bid is at any time avoided, recovered or preserved for the benefit of any Seller's bankruptcy estate for any reason, or (ii) any credit bid submitted by the either the Stalking Horse or any Second Lien Bidder is voided or disallowed for any reason, or (iii) either the Stalking Horse Bidder or any Second Lien Bidder at any time pays or relinquishes for the benefit of any Seller's bankruptcy estate any amount that has the effect of protecting or preserving the right to credit bid ((i) – (iii) collectively, the "Avoided Credit Bid Amount"), then an amount equal to fifty percent (50%) of the Avoided Credit Bid Amount shall be paid to [Taylor] if the Avoided Credit Bid Amount arises under the foregoing clauses (i) and

> (ii), and an amount equal to forty percent (40%) of the Avoided Credit Bid Amount shall be paid to [Taylor] if the Avoided Credit Bid Amount arises under the foregoing clause (iii), provided, however, that for the avoidance of doubt, the Avoided Credit Bid Amount shall be $0 if, after taking into consideration the value of any Encumbrance avoided, recovered or preserved or any credit bid voided or disallowed, the Stalking Horse or, if applicable, any Second Lien Bidder would still have been entitled to credit bid an amount equal to or greater than the amount such entity credit bid at the Auction.

Taylor APA, § 2.7(c).

19.     Silver Point's refusal to limit its credit bid to an amount less than par under the Second-Lien Term Loan discouraged bidding and ultimately deprived the estates of significant potential value. The Court should not reward Silver Point's bid-chilling behavior by permitting Silver Point to collect substantially all of the sale proceeds at closing (or, if the Sale closes to Silver Point as the back-up bidder, allowing Silver Point to credit bid), prior to the resolution of the Claim and Lien Challenge.

### B.    Administrative Insolvency

20.     Under the current proposal, there is a high likelihood that the Debtors' estates will be administratively insolvent post-closing. As set forth in the Sale Objection (pages 23-27), the Sale strips the estates of all valuable assets and leaves the estates with millions of dollars of incurred but unpaid administrative obligations.

21.     The caps the Taylor APA places on the types of administrative claims Taylor will assume, and the $16 million limitation on the Wind-Down Amount potentially renders the estates administratively insolvent and thus incapable of confirming a plan in these Chapter 11 Cases. The Court should not approve a Sale that does not provide sufficient funds to pay all administrative expenses.

### C. All Proceeds on Account of Silver Point's Disputed Liens and Claims Should be placed in Escrow

22. In the Sale Objection the Committee argued that the Court should direct that the Sale proceeds be held in escrow pending resolution of the claims against Silver Point (and related entities) in the Committee Complaint. This request is even more important today. Since the filing of the Sale Objection the Court considered the relief sought in the Committee in the Standing Motion. The Court found that the Committee's asserted claims are colorable and granted the Committee standing to pursue claims on behalf of the Debtors' estates. See standing order dated June 10, 2015 [D.I. 648].

23. Through its complaint filed on June 8, 2015, the Committee asserted multiple highly colorable claims against Silver Point (and other parties) which would, when successful, severely limit or eliminate Silver Point's asserted secured claims and liens.

24. Courts have ordered the placement of sale proceeds in escrow when faced with disputed claims. See Sale Objection, ¶¶ 99-103; RML Development, 528 B.R. at 156-57 (ordering escrow of sale proceeds, if any, above the undisputed portion of Silver Point's secured claim while challenge was pending); see also In re Orion Refining Corp., 341 B.R. 476, 479 (Bankr. D. Del. 2006) (holding sale proceeds in escrow pending resolution of lien dispute); In re Nersinger, 361 B.R. 32, 34-35 (Bankr. W.D.N.Y. 2007) (same); Culver, LCC v. Chiu (In re Chiu), 266 B.R. 743, 748 (9th Cir. B.A.P. 2001) (same"); In re Wiford, 105 B.R. 992, 996 (Bankr. N.D. Okla. 1989) (same); In re Lincolnshire Campus, LLC, 2010 WL 5209300 at *8 (Bankr. N.D. Tex. Sep. 24, 2010) (same); In re Golf Links Recreation, L.L.C., 2008 WL 2705561 at *2 (Bankr. D. Ariz. Jul. 10, 2008) (same).

25. Similarly here, until the Committee's claims set forth in the Complaint are adjudicated or settled, all sale proceeds otherwise attributable to the Prepetition Term Loan should be placed and held in escrow.

**D.   Approval of the Sale Should Preserve the Committee's Rights with Respect to the Complaint**

26. As set forth in the Sale Objection, ¶¶ 104-110, the Committee objects to the sale of Chapter 5 causes of action, including any claims asserted by the Committee in its Complaint. Absent such relief, the purchaser will get windfall and the estates will be deprived significant value. In addition, the Committee's efforts to augment these estates will be for not.

27. Similarly, the Committee and any other estate representative must be granted access to the Debtors' books, record and employees, to the extent such books, records and employees are transferred to the purchaser at closing. See e.g., Stalking Horse APA, Section 2.1(h).

28. The Committee is concerned that the Taylor APA does not clearly specify that the Committee and the successor to the Debtors under a plan of liquidation will have sufficient access to records and information needed to wind down the Debtors' estates and prosecute the Complaint. The Transition Services Agreement, Exhibit 15 to the Taylor APA, likewise does not provide the Committee or any successor of these estates with the right to access the Debtors' records and information (including the Transferred Records and Transferred Systems as defined in the Transition Services Agreement) may be necessary for further prosecution of the Complaint and related discovery.

29. Because the Committee's (or the estate successor's) prosecution of the Complaint would be severely prejudiced if access to the Debtors' books and information is limited post-closing, the Committee respectfully requests that the sale order specifically preserves those rights

and require the purchaser to preserve those assets and cooperate with the Committee in with respect to any request for documents or information.

### E. The Sale Should not Prejudice Creditors' Setoff and Recoupment Rights

30. The Committee objects to the Sale to the extent it eliminates creditors' setoff and recoupment rights, and the right to assert other defenses related to the Chapter 11 Cases.[6] For example, pursuant to section 2.1(p) of the Taylor APA, the purchaser acquires the following assets:

> all of the rights and claims of the Sellers available under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code solely with respect to trade obligations paid prior to the Petition Date, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing, (such rights and claims not to be prosecuted by the Buyers or any other entity);

31. Likewise, section 5.12 of the Taylor APA states that:

> The Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances, against or created by the Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and (b) the Buyers are not successors to any Seller or the bankruptcy estate by reason of any theory of law or equity, and the Buyers shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets shall be transferred to the Buyers free and clear of all obligations, Liabilities and Encumbrances (other than Lease Encumbrances) to

---

[6] Certain creditors of the Debtors have raised similar issues in their objections to the Sale. See, e.g., Docket Nos. 567, 606, 646.

the fullest extent permitted by Section 363 of the Bankruptcy Code.

Stalking Horse APA § 5.12.

32. The terms "Liabilities"[7] and "Encumbrances"[8] are broadly defined in the Stalking Horse APA, and may operate to the prejudice of creditors' by jeopardizing their rights to assert claims of setoff, recoupment and to assert other defenses and claims against the Debtors post-closing. Accordingly, any order approving the Sale should make clear that creditors' rights to setoff, recoupment and other defenses are preserved post-closing.

### F. Cause Exists to Surcharge Silver Point's Collateral

33. To the extent the Sale would otherwise leave the Debtors' estates administratively insolvent post-closing (and assuming, *arguendo*, that the Court ultimately determines that Silver Point's alleged liens and claims are valid, enforceable, and not subject to subordination), the Court should surcharge Silver Point's collateral under section 506(c) of the Bankruptcy Code.

34. Section 506(c) of the Bankruptcy Code provides an exception to the general rule that the payment of expenses associated with administering a bankruptcy estate, including the administration of assets pledged as collateral, must be consensual or from the proceeds of unencumbered assets. Under section 506(c), the debtor's estate "may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

---

[7] "Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

[8] "Encumbrance" means any charge, claim, mortgage, lien, encumbrance, option, pledge, security interest or other restriction of any kind.

35. The purpose Section 506(c) is to prevent secured creditors from obtaining a financial windfall at the expense of the bankruptcy estate and unsecured creditors by ensuring that the secured creditors are responsible for the collateral disposition and preservation costs during a bankruptcy case. See Loudoun Leasing Dev. Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.), 128 F.3d 203 (4th Cir. 1997); In re TIC Memphis RI 13, LLC, 498 B.R. 831 (Bankr. W.D. Tenn. 2013).

36. To surcharge a lender's collateral on account of an administrative expense under Section 506(c) of the Bankruptcy Code: (i) the expenditure must be necessary; (ii) the amounts expended must be reasonable; and (iii) the secured creditor must benefit from the expense. The inquiry into what costs are reasonable and necessary, and the extent to which they benefit the secured party, is factual. See 4 COLLIER ON BANKRUPTCY ¶ 506.05[9] (16th ed. 2014). If an administrative expense satisfies the requirements of section 506(c), the proceeds from the sale or other disposition of the collateral must be used first to pay the surcharged expense, with any excess applied to payment of the claims secured by the property.

37. Here, it is beyond dispute that the Debtors filed these Chapter 11 Cases at the request of and on behalf of Silver Point to liquidate Silver Point's collateral. It is also beyond dispute that the bankruptcy process provides certain benefits and protections to the buyer not available in an alternative state court foreclosure proceeding. The chapter 11 process comes with costs, such as operating and non-operating expenses. Lastly, there is no dispute that the Debtors' estates have incurred significant administrative expenses intended to maximize the value of the Debtors' assets for the benefit of Silver Point.

38. Shortly after its appointment, the Committee recognized the potential for administrative insolvency and argued against a waiver of the estates' rights under section 506(c)

in connection with the Debtors' postpetition financing. The Court refused to approve Silver Point's demand for a waiver of the estates' rights under Section 506(c) of the Bankruptcy Code and specifically preserved those rights. See Final DIP Order, ¶¶ 16, 18 [D.I. 290].

39. The Third Circuit has expressly stated that a section 506(c) surcharge is appropriate where there is a direct benefit to the secured creditors. In re C.S. Associates, 29 F.3d 903, 906 (3d Cir. 1994); see also In re Flagstaff Foodservice Corp., 762 F.2d 10, 12 (2d Cir. 1985) (it is appropriate to surcharge collateral where "funds were expended primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure"). Courts have surcharged lenders' collateral in liquidating bankruptcy cases. The sale of secured creditors' collateral warrants a surcharge of such collateral for sale-related costs. See, e.g., In re McKeesport Steel Castings Co., 799 F.2d 91 (3d Cir. 1986) (allowing recovery under section 506(c) for the costs of utility service supplied postpetition where the service "benefited [the lenders] in that it preserved the Debtor's business and permitted the sale of the assets as a going concern which provided a greater return to the secured parties than they would have received in other circumstances"); I.R.S. v. Boatmen's First Nat'l Bank of Kansas City, 5 F.3d 1157 (8th Cir. 1993) (permitting recovery of unpaid postpetition employment taxes from a secured lender's collateral because the debtor incurred the taxes in furtherance of "the ambition of the [secured] creditor to preserve and improve its secured collateral and the opportunity to realize that ambition" through the debtor's postpetition operation of its business); In re Guterl Special Steel Corp., 316 B.R. 843 (Bankr. W.D. Pa. 2004) (allowing recovery of postpetition fees and expenses of trustee and attorneys from escrowed proceeds of lender's collateral, including fees incurred unsuccessfully seeking funding for environmental cleanup of remaining parcel even though it remained unsold); In re Sharon Steel Corp., 206 B.R. 776, 783 (Bankr. W.D. Pa. 1997)

(allowing recovery of postpetition wages and benefits under section 506(c) where the "[m]ovants all contributed to the postpetition preservation and liquidation of the collateral for the direct benefit of" the secured lender); In re Erie Hilton Joint Venture, 125 B.R. 140 (Bankr. W.D. Pa. 1991) (permitting recovery under section 506(c) of real estate taxes and utility charges incurred in the postpetition operation of the debtor's business); In re Loop Hosp. P'Ship, 50 B.R. 565, 571-72 (Bankr. N.D. Ill. 1985) (allowing recovery of estate professionals' fees under section 506(c) and the court's equitable powers where lender recovered more than it would have in a foreclosure action)

40.    Trade vendors' extension of postpetition credit enabled the Debtors to continue operating their business as a going concern, thereby helping to maintain the value of the Debtors' assets as compared to a liquidation sale. Estate professionals conducted a sale process for the sole purpose of liquidating Silver Point's alleged collateral. Silver Point realized far greater value from the Sale as a result of these contributions. Accordingly, the corresponding administrative expenses were reasonable and necessary and benefitted Siler Point. As a result, it is appropriate to surcharge Silver Point's alleged collateral under section 506(c) to ensure payment of all administrative expenses.

## RESERVATION OF RIGHTS

41.    The Committee reserves the right to supplement this Supplemental Objection at any time prior to the Hearing. The Committee expressly reserves its rights to raise additional or further objections to the Sale Motion, the Stalking Horse APA and the Taylor APA at or prior to the Hearing on any subsequent hearing.

[ *signature page follows* ]

## **CONCLUSION**

For the foregoing reasons, the Committee respectfully requests that the Court deny the

relief sought in the Sale Motion.


Dated: June 16, 2015                    Respectfully Submitted,

                                          **LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973-597-2500
Facsimile:  (973) 597-2400

*-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Counsel to the Official Committee of Unsecured Creditors*

*-and-*

**POLSINELLI PC**

/s/ *Justin K. Edelson*
Christopher A. Ward (DE Bar No. 3877)
Justin K. Edelson (DE Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921

*Delaware Counsel to the Official Committee of Unsecured Creditors*