1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
2

3  IN RE:                        )  Case No. 15-10541 (BLS)
                                 )  Chapter 11
4  THE STANDARD REGISTER COMPANY, )
   INC., *et al.*,               )
5                                )
                  Debtors.       )  Courtroom No. 1
6                                )  824 Market Street
                                 )  Wilmington, Delaware 19801
7                                )
                                 )  June 17, 2015
8                                )  10:00 A.M.

9                   TRANSCRIPT OF HEARING
           BEFORE HONORABLE BRENDAN L. SHANNON
10              UNITED STATES BANKRUPTCY JUDGE

11 APPEARANCES:

12

   For the Debtors:       Young Conaway Stargatt & Taylor, LLP
13                         By:  DREW MAGAZINER, ESQUIRE
                           1000 North King Street
14                         Wilmington, Delaware 19801

15                         Gibson, Dunn & Crutcher LLP
                           By:  MICHAEL ROSENTHAL, ESQUIRE
16                              JEREMY GRAVES, EQUIRE
                               MATTHEW BOUSLOG, ESQUIRE
17                         333 South Grand Avenue
                           Los Angeles, California 90071
18
   ECRO:                  DANA MOORE
19
   Transcription Service:  Reliable
20                         1007 N. Orange Street
                           Wilmington, Delaware 19801
21                         Telephone:  (302) 654-8080
                           E-Mail:  gmatthews@reliable-co.com
22

23 Proceedings recorded by electronic sound recording:
   transcript produced by transcription service.
24

25

```
 1   For Leeswood, Inc.
     Bullet Line, LLC
 2   Time Planner Calendars
     The Reynolds Company:      Morris James
 3                              By:  CHUCK KUNZ, ESQUIRE
                                     BRETT FALLON, ESQUIRE
 4                              500 Delaware Avenue, Suite 1500
                                Wilmington, Delaware 19801-1494
 5
     For the Committee:         Lowenstein Sandler
 6                              By:  SHARON LEVINE, ESQUIRE
                                     ANDREW BELLMANN, ESQUIRE
 7                              65 Livingston Avenue & 6 Becker
                                Roseland, New Jersey 07068
 8
     For Applied Mechanical
 9   Systems, Inc:              The Rosner Law Group
                                SCOTT J. LEONHARDT, ESQ.
10                              824 North Market Street, Suite 810
                                Wilmington, Delaware 19801
11
     For CareSource Mgmt.:      Cross & Simon, LLC
12                              By:  CHRISTOPHER SIMON, ESQUIRE
                                1105 N. Market Street, Suite 901
13                              Wilmington, Delaware 19801
14
     For Morgan Adhesives:      Potter Anderson & Coroon
15                              By:  ETTA MAYERS, ESQUIRE
                                1313 North Market Street
16                              Wilmington, Delaware 19801

17   For Healthcare
     Purchasing Alliance:       Blank Rome
18                              By:  ALAN ROOT, ESQUIRE
                                1201 Market Street
19                              Wilmington, Delaware 19801

20   For Hewlett Packard:       Cole Schotz P.C.
                                By:  KATE STICKLES, ESQUIRE
21                              500 Delaware Avenue
                                Wilmington, Delaware 19801
22
     For CDK Global, LLC:       Barnes & Thornburg, LLP
23                              By:  KEVIN COLLINS, ESQUIRE
                                1000 N. West Street
24                              Wilmington, Delaware 19801

25
```

```
1   For Cisco Systems
    Capital Corp.:          Ashby & Geddes
2                           By:  RICARDO PALACIO, ESQUIRE
                            500 Delaware Avenue
3                           Wilmington, Delaware 19801

4   For Creditor, New York
    Presbyterian Hospital:  Epstein Becker & Green, P.C.
5                           By:  WENDY MARCARI, ESQUIRE
                            250 Park Avenue
6                           New York, New York 10177
    For Silver Point:       Skadden Arps Slate Meagher & Flom
7                           By:  RON MEISLER, ESQUIRE
                            155 North Wacker Drive
8                           Chicago, Illinois 60606

9   TELEPHONIC APPEARANCE:

10  For Vocalink, Inc.:     Cole Schotz P.C.
                            By:  JILL BIENSTOCK, ESQUIRE
11                          500 Delaware Avenue
                            Wilmington, Delaware 19801
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

                                                              Page

NOTICE OF AGENDA MATTERS:
For the Debtors, by Mr. Rosenthal                        5,15,22
For the Debtors, by Mr. Graves                                13
For Leeswood, Inc., by Mr. Kunz                               14
For Creditors Committee, by Ms. Levine                        16
For Applied Mechanical Systems Inc., by Mr. Leonhardt         20
For CareSource Mgmt., by Mr. Simon                            21
For Morgan Adhesives, by Ms. Mayers                           21
For HealthCare Purchasing, by Mr. Root                        21
For the Debtors, by Mr. Bouslog                               31
For the Debtors, by Mr. Magaziner                             44
For Hewlett Packard, by Ms. Stickles                          45
For Vocalink, by Ms. Bienstock                                45
For CDK Global, by Mr. Collins  46
For Cisco Systems Capital, by Mr. Palacio                     47
For N.Y. Presbyterian Hospital, by Ms. Marcari               48
For Silverpoint, by Mr. Meisler                               52

EXHIBITS:
Declaration:
    Andrew Torgove                                            24
    Greg Jackson                                              26
    Andrew Torgove                                            26

1            THE CLERK:  All rise.

2            THE COURT:  Please be seated.  Mr. Rosenthal, you've

3    been busy.

4            MR. ROSENTHAL:  We have.  Good morning, Your Honor,

5    Michael Rosenthal with Jeremy Graves and Matt Bouslog from

6    Gibson Dunn.  Also with us are Mike Nestor and Drew Magaziner

7    from Young Conaway and Andy Torgove from Lazard.  Your Honor,

8    as my bloodshot eyes will attest the past five days have been

9    quite a whirlwind. And the whirlwind is still not quite over.

10   There are several items on the agenda today, but I'd like to

11   address the main event the sale hearing first.

12           As Your Honor knows, we filed a motion seeking

13   approval to sell substantially all of our assets to the

14   stalking horse bidder.

15           THE COURT:  Let me ask you a question just for

16   context because I had a hearing and there was some back and

17   forth, I think, from Mr. Nestor and Ms. Bellam in my

18   Chambers.  Is this a status report or is this hearing?

19           MR. ROSENTHAL:  This is just a status report.

20           THE COURT:  All right I appreciate it; you may

21   proceed.  Sorry for the interruption.

22           MR. ROSENTHAL:  It's going to take about 10 minutes.

23           THE COURT:  I got time.

24           MR. ROSENTHAL:   Your Honor, the Court entered a

25   sales procedure order approving buyer protections and sale

1   procedures. And then with the assistance of the Debtors'

2   investment banker Lazard the Debtors engaged in an exhausted

3   process to identify perspective bidders for the assets.  They

4   sent confidential information, memorandum to numerous parties

5   who had contacted them, who Lazard contacted, and who we were

6   put in touch with through the Committee.

7          On the bid deadline, the Debtors received a

8   competing proposal from Taylor Corporation which is a company

9   in substantially the same industry as the Debtors.  The

10  Debtors reviewed the initial bid which came in on June 11th

11  and engaged in some further discussions with Taylor over the

12  next 12 to 18 hours regarding certain provisions of that

13  proposal.  As a result of those discussions Taylor on the

14  afternoon of the 12th improved its bid and Taylor accepted;

15  I'm sorry and the Debtors accepted the improved bid.  And

16  based on the improved bid, Your Honor, the Debtors qualified

17  Taylor as a qualified bidder and as the initial bidder at the

18  auction.

19         While the Taylor bid, just for the sake of the

20  record, Your Honor, while the Taylor bid contains some

21  elements that did not conform strictly to the sale

22  procedures, the Debtors after consultation with the lenders

23  and the UCC decided that these inconsistencies did not

24  disqualify the Taylor bid from being a qualified bid.

25         THE COURT:  Okay.

1       MR. ROSENTHAL:  And we announced that at the auction
2   on the morning of the 15th.
3       On Monday, the Debtors conducted an all-day auction
4   at Gibson Dunn.  The participants included Taylor and the
5   second lien holders who were qualified under the sale
6   procedures order, and we're going to call them the second
7   lien bidders.  We opened the auction by recounting the
8   background of the auction and by announcing some basic rules
9   of the auction.  And after my initial remarks the second lien
10  bidders submitted an overbid in the form of a markup of the
11  Taylor APA.
12      The parties then broke to evaluate the overbid.
13  And, thus, began a lengthy break during which two things were
14  happening simultaneously.  The parties were reviewing the
15  overbid submitted by the second lien bidders and at the same
16  time discussions were ongoing between the UCC and Silver
17  Point to resolve the UCC's objection to the sale and to
18  resolve the pending litigation brought on behalf of the
19  estate against Silver Point.
20      We took four or five hour break.  We wanted to see
21  if those negotiations could be concluded successfully before
22  we began the auction process again because a number of the
23  items that had been in the original Taylor bid we received
24  were impacted by whether there was a challenge to the second
25  lien bidders right to credit bid.

1        After a lengthy break and a lot of angst the UCC and

2   Silver Point and the Debtors were able to come up with the

3   outline of a deal to resolve both the sale objection and the

4   pending litigation against Silver Point; at which point we

5   reconvened the auction, announced the outline of the deal.

6   And then, of course, it was subject to definitive

7   documentation.

8        The agreement resolved, as I said, the sale, will

9   resolve the sale objections and the litigation.  And based on

10  that is allowing Taylor to submit an overbid to the second

11  lien bid which was more favorable to the estate both in terms

12  of price and in terms of the terms.

13       We had a number of successful rounds of bidding and

14  we concluded late Monday night with the bid by Silver Point

15  that at the time represented the highest, and when I say

16  Silver Point, Silver Point is agent for the second lien --

17       THE COURT:  Yeah I get it.

18       MR. ROSENTHAL:  That at the time represented the

19  highest bid on a purely dollar basis and this was 10:30,

20  11:00 Monday night.  Because the auction and indicated to the

21  parties that we would recommend the Silver Point bid to the

22  board, we were not making a definitive decision at that time

23  and that we would notify the parties of the decision within

24  24 hours.

25       The next morning before our board call Lazard acting

1  as an intermediary essentially facilitated further

2  discussions between the second lien bidders and Taylor.  And

3  as a result of those negotiations, Taylor agreed to increase

4  its bid by $2 million dollars.  And the second lien bidders

5  agreed that they would not top that.  So we concluded those

6  discussions around noon yesterday.

7        The Standard Register board met thereafter and

8  determined that subject to definitive documentation the

9  Taylor bid should be presented to the Court as the highest

10  and otherwise best bid.  Now comes the sort of the difficult

11  part of --

12        THE COURT:  Thus far, it's been pretty good.

13        MR. ROSENTHAL:  There was a great deal of drama

14  involved.  So thereafter the Debtors met with Taylor to try

15  to iron out the revisions to the APA and negotiate you know

16  resulting from the auction process.  At the same time Silver

17  Point and the UCC was preparing a definitive settlement

18  agreement to resolve the UCC's sale and litigation issues.

19  These are all somewhat intertwined because the Taylor's

20  decision to make a better bid was conditioned on the release

21  of the challenge to the liens.

22        We received a draft of the settlement agreement late

23  yesterday afternoon.  In the meantime we were continuing to

24  work on the definitive successful agreement with the

25  successful buyer and we were trying to negotiate and revise

1  the second lien holder's bid which is now the backup, which

2  would be the backup bid.

3          THE COURT:  Sure.

4          MR. ROSENTHAL:  And, unfortunately, the hearing and

5  night came too quickly; morning came too quickly this morning

6  and the hearing came too quickly so those discussions are not

7  yet concluded.

8          We do, Your Honor, have a declaration of Andy

9  Torgove of Lazard as to the results of the auction and the

10 like, but I'd like to defer that until we actually present

11 the agreement.  We would request the Court's indulgence for

12 an adjournment of this hearing so that discussions can

13 continue and we can come back to the Court with a complete

14 package that includes the successful bid, the backup bid, the

15 settlement of the UCC objections to the sale and the

16 litigation.

17         I want the Court to understand all the parties here

18 everyone that's been in these negotiations is interested in

19 finalizing this as soon as possible.  And we're aware that

20 there's great interest among Standard Register customers and

21 employees and vendors and the public to know the final

22 outcome of this auction with certainty.  But we you know, we

23 want to make sure that all the t's are crossed and the I's re

24 dotted.

25         THE COURT:  I don't disagree with any of that.  Let

1  me ask you a question and then I will hear from other

2  parties.  I think the original request from Mr. Nestor was to

3  come back around 3:00.  The concern that I had was one I

4  didn't have the benefit of any context from you so I didn't

5  know.  But I have a basically a hard stop at 4:30, so I

6  suggested that you return at 1:30. But I'll be, I'd ask that

7  parties that are on the phone place their phones on mute

8  right now. There's a little bit of feedback in the Courtroom.

9         But I guess I'll be guided by your [indiscernible].

10  I understand precisely the dynamic and the process that

11  you're describing.  And every instinct I have is to allow

12  that to play itself out and I recognize that it requires a

13  bunch of moving parts and a period of time. So I'm not trying

14  to jam you into a 1:30 time period.  My concern was if this

15  was coming back with a significant contested matter at 3:00

16  there's not much I can do for you and we would roll

17  presumably into the next day.

18         What do you think?

19         MR. ROSENTHAL:  I do not believe that it will roll

20  into a significant contested matter.  I cannot assure the

21  Court that at 1:30 we will be in a position to present the

22  agreement.  But I can tell the Court as I was in a hearing

23  years ago and a Fifth Circuit Judge was sitting as a

24  Bankruptcy Judge and I heard two lawyers arguing about how

25  they should --

1        THE COURT:  We don't get that a lot in the Fifth

2   Circuit.

3        MR. ROSENTHAL:  Yes, you're right.  How they should

4   have more time to prepare a brief.  And she looked at them

5   and she said you know I know that lawyers time expands to

6   bill the hours allotted.  You'll do it in the short period of

7   time I'm giving you.  So we do think that keeping the parties

8   on a short rope is actually helpful to the settlement

9   process.

10       THE COURT:  Right.  Well we'll talk about timing

11  then at the conclusion.  I didn't mean to cut you off.  I

12  just wanted to make sure that I understood that the game plan

13  was going forward.  But I think I understand where the

14  parties are and I'd hear from anybody that wishes to be

15  heard.

16       MR. ROSENTHAL:  No my only conclusion, Your Honor,

17  is that we're, I think the parties that are in these

18  negotiations are united in their efforts to bring this to a

19  resolution, to present the Taylor bid as the successful bid

20  and to close that sale as quickly as possible.

21       THE COURT:  Okay, all right let me hear from anybody

22  that wishes to be heard.  Good.  Okay then here's what I'd

23  like to do.  Recognizing I think the wisdom of your

24  observation I think the best way to proceed would be to plan

25  to reconvene here at 2:00.  And my hope would be that the

1  parties would be able to close the loop on the different

2  processes that are going on right now.   And, again, my issue

3  with the timing was I wasn't certain what you were going to

4  be bringing over to me.  But if you need additional time then

5  I would ask that you just confer.  I wouldn't want to go

6  later than 3:00 just because even this sort of thing putting

7  it on the record does take a period of time. And I'm

8  sensitive to the issue of, frankly, getting the message out

9  there and closure to this process.

10       So why don't we plan to reconvene at 2:00 P.M.  If

11  there is a need for additional we could go as late as 3:00.

12  Debtors could advise Chambers and advise parties in interest

13  about the timing. But let's presume and work toward 2:00 and

14  I will look forward to seeing the parties then. We'll stand

15  in recess.  Thank you.  Mr. Nestor.

16       MR. NESTOR:  We have one motion that we would like

17  to go forward.  It's uncontested.

18       MR. GRAVES:  I will try to be brief.  For the record

19  Jeremy Graves, Gibson Dunn on behalf of the Debtors. This is

20  agenda item number five.

21       THE COURT:  Okay.

22       MR. GRAVES:  Which is the Debtors' motion for entry

23  of an order establishing procedures to settle and satisfy

24  claims against critical vendors, effectuate setoff agreements

25  with Creditors and establish procedures related to 503(b)(9)

1 claims.  We received some informal comments from the

2 Committee who asked for consultation rights and a variety of

3 matters.  We've agreed to grant those consultation rights to

4 the Committee.

5        We also received one informal objection and four

6 formal objections to the motion.  We've resolved each of the

7 objections with revised language in the proposed order.  And

8 I do have a blackline compared.  May I approach?

9        THE COURT:  Very good; Sure.

10        MR. GRAVES:  I've presented the Court with the

11 blackline.  Would you like me to walk you through it or --

12        THE COURT:  No I'll take a look at it.  I'm looking

13 at it right now.  I see specific provisions for Georgia

14 Pacific, as well as other players in paragraph nine.  I see

15 the consultation rights.  Okay I think I understand.  I don't

16 have any questions.  I'd like if anyone else wishes to be

17 heard with respect to the Debtors' request to establish

18 certain procedures.  Mr. Kunz.

19        MR. KUNZ:  I represent a number of the parties to

20 this order sort of by way of Mr. Waxman.

21        THE COURT:  Okay.

22        MR. KUNZ:  I haven't seen the blackline.  I

23 understand that we're resolved, but I know that there was

24 some language that was bandied about last night.  I don't

25 know if it's urgent that it be entered before 2:00, but if I

1  could have a couple minutes just to kind of look it over.

2          THE COURT:  I think that sounds fine.  If it's

3  satisfactory you can hand it to the Court Reporter and I'll

4  sign it.  And if there's an issue with the language and we

5  need to talk about it, we can talk about it at 2:00.  Does

6  that work?

7          MR. KUNZ:  Absolutely fine, Your Honor.

8          THE COURT:  Okay.  All right that sounds fine.  I'll

9  look forward to see the order.  Stand in recess.  Thank you.

10     [Recess 10:22:28 - 3:09:01]

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.  Mr. Rosenthal.

13          MR. ROSENTHAL:  Thank you, Your Honor, Michael

14  Rosenthal, Jeremy Graves, Matt Bouslog from Gibson Dunn and

15  Mike Nestor from Young Conaway.

16          THE COURT:  You don't look any better than you did

17  this morning.

18          MR. ROSENTHAL:  I don't; I don't.  You know we, well

19  every minute is a little surprise here.  Let me tell you how

20  we would like to proceed.  We have resolved all of the issues

21  with respect to the Taylor asset purchase agreement.  The

22  Silver Point backup asset purchase agreement is trailing a

23  little bit behind.  There are no material issues that I know

24  of.

25          There have been constant negotiations and

1  discussions about the settlement agreement that's part of

2  this approval process.  Everything seemed to be agreed until

3  I walked into Court five minutes ago.  And there's one

4  remaining issue that there's still some discussions about but

5  I think the parties are optimistic that they will be worked

6  out.

7          THE COURT:  Okay.

8          MR. ROSENTHAL:  Silver Point is on the line right

9  now.  Skadden's on the line right now.  What we would like to

10 do, Your Honor, is go forward with the hearing, present our

11 evidence in our case.  Ms. Levine will, I believe, unless

12 it's resolved in the next 30, 40 minutes we'll reserve her

13 rights.

14         THE COURT:  Sure.

15         MR. ROSENTHAL:  In the event that we do reach an

16 agreement, we will submit an order under certification of

17 counsel.  If not, we'll have to be back here.

18         THE COURT:  Okay.  I think that sounds fine.  Ms.

19 Levine, do you wish to be heard?

20         MS. LEVINE:  Just briefly, Your Honor.

21         THE COURT:  Sure.

22         MS. LEVINE:   Sharon Levine, Lowenstein Sandler for

23 the Committee.  Your Honor, we're reserving our rights with

24 regard to all of our objections, evidence, etcetera.  And to

25 the extent we are able to resolve these issues, I would

1  respectfully request that to the extent we don't wind up

2  doing any cross examination that whatever findings Your Honor

3  makes because there will be other pending different

4  litigation that may come before Your Honor on other different

5  days that the findings you make for this purpose are just for

6  the purpose of the sale hearing.

7          THE COURT:  Okay.  All right so I think I know where

8  we are.  I think I'm the only one here who's operating on

9  full sleep.   And I would like to repeat it in slow and small

10  words and make sure we're all on the same page.

11          So my understanding is that the settlement process

12  is still being documented and finalized.  I understand that a

13  Silver Point backup APA is still being finalized.  You're

14  telling me the Taylor APA you can close the loop on.  What

15  you want to do is basically make your case if everything gets

16  resolved then I'll see the order and I'll enter the order.

17          If everything is not resolved then I think and this

18  is the particular point.  We'll talk about your comment in a

19  second.  But if everything is not resolved then we reconvene

20  and we have a hearing.  And neither the Committee nor any

21  other parties are bound by what has happened here and the

22  proffers that I've accepted there would be an opportunity for

23  cross and to put on a case, do I have that right?

24          MR. ROSENTHAL:  That's correct, Your Honor.

25          THE COURT:  Okay yeah I think that makes abundant

1  sense.  With respect to the scope of the findings that I'm

2  being asked to make in the context of the sale hearing, I

3  don't think I have an issue with that, but the devil will be

4  in the details because --

5  　　　　　MS. LEVINE:  Your Honor, just to speak with a little

6  bit more clarity and a little bit more coffee.  The bottom-

7  line is if we're able to reach an agreement and I'm not sure

8  we will, then the Committee would be giving up claims against

9  certain of the Defendants in the proposed litigation, but not

10 against other Defendants.  And then to the extent that there

11 are certain findings that are made here today that

12 potentially impact that litigation, we don't want to have to

13 cross examine these witnesses or prolong or make this

14 litigation more expensive.  On the other hand if, in fact,

15 those issues come before Your Honor again at a different

16 time, we would like to reserve the right to not have this

17 become the rule of the case.

18 　　　　　THE COURT:  All right I don't want to get overly

19 hung up on this.  I understand the proposition that you're

20 raising and I think I'm largely okay with it, but there is

21 again the issue is going to be in the details, because I

22 believe I'm obliged to make certain findings if I'm going to

23 approve a sale.  The significance of those findings for

24 purposes of either *race judicata*, issue preclusion, or law of

25 the case will be what it is.  And I can make them consistent

1  with, I think, the parties expectations.

2         I'm not trying to, but I want neither the Committee

3  nor, frankly a litigant to get whipsawed or blindsided weeks

4  or months from now by finding out that claims have either

5  been preserved secretly or have been waived. So I understand

6  the proposition.  I don't think we need to answer this

7  question right now.  But this is one of those situations

8  where sort of bells are starting to go off.

9         Look people stand there all the time and reserve

10  their rights.  And I generally say great. But this is one of

11  those situations where or what rights are being reserved

12  might need to be defined.  Whether we need to do that right

13  now I don't think so.  And I believe that the issue can be

14  addressed perhaps if, again, if consensus breaks out by the

15  terms of the order.  But, again, I don't want a Committee to

16  assume that a reservation of rights has an effect broader

17  than or is in derogation of whatever findings I'm making

18  pursuant to the sale order.

19         MS. LEVINE:  Your Honor is going to make findings

20  pursuant to the sale order pursuant to evidence that's going

21  to be presented here today.

22         THE COURT:  Right.

23         MS. LEVINE:  And we're not going to and assuming if

24  things work out we're not going to cross examine or take a

25  lot of the Court's time or put on a robust big hearing

1       THE COURT:  Right.

2       MS. LEVINE:  If similar issues arise at a later

3  date, we just want the opportunity to have the big robust

4  hearing that if it's necessary we didn't have this go around.

5  That's what we're doing.

6       THE COURT:  That I understand.  I think that

7  clarifies it a little bit.

8       MS. LEVINE:  No surprises; sorry if I was unclear.

9       THE COURT:  No and that lent some clarity to it and

10  I think that's helpful.  Okay I think I understand.  Mr.

11  Leonhardt.

12       MR. LEONHARDT:  Good afternoon, Your Honor, for the

13  record Scott Leonhardt from the Rosner Law Group appearing on

14  behalf of Applied Mechanical Systems, Inc.  Your Honor, just

15  to be clear we do have a live objection.  It's really a

16  353(f) objection as our client has a secured claim and an

17  adequate protection objection.  And I do have a few questions

18  I'd like to raise on cross, so I just didn't want anyone

19  being surprised.

20       THE COURT:  Okay.

21       MR. LEONHARDT:  I will wait then for the Debtors to

22  put on their evidence.

23       THE COURT:  All right.  Mr. Simon.

24       MR. SIMON:   Thank you, Your Honor.  Good afternoon,

25  Chris Simon for CareSource Management Company.  Your Honor,

1   we have positions or informal objections to the sale.  But I

2   believe it's been resolved.  We have not seen a file APA or

3   an order so I rise with the same concerns Ms. Levine raises

4   and I want to make that point for the record that our issues

5   relate to litigation that may happen down the road and we

6   want those issues preserved.  Thank you.

7          THE COURT:  Very good.  All right.  We got more

8   people coming up.

9          MS. MAYERS:  Your Honor, Etta Mayers with Potter

10  Anderson & Coroon on behalf of Morgan Adhesive.  I would like

11  to me too Mr. Simon's comments that we have objection on file

12  that we believe have been resolved but having not seen the

13  language, we reserve our rights too.

14         THE COURT:  And that's fine.  Those rights are

15  certainly reserved and I expect again that that loop will get

16  closed.

17         MS. MAYERS:  Thank you.

18         THE COURT:  Mr. Root.

19         MR. ROOT:  Good afternoon, Your Honor, Alan Root of

20  Blank Rome on behalf of HealthCare Purchasing Alliance.  Your

21  Honor, we likewise have sale objections that have been

22  resolved in a form of the sale order.  And although I'm

23  standing up and saying me too, I just want to make it clear

24  that before Your Honor enters any order we need to see the

25  sale order and me saying it's not just a reservation of

1  rights.  But to the extent that any of the language is

2  changed it needs to be worked out before it can be entered

3  under COC.

4       THE COURT:  Of course; that's fine.  I'm confident

5  that you'll have an opportunity to see any order before its

6  entered.

7       MR. ROOT:  That's all right, Your Honor, but I just

8  want to make sure it's clear on the record.  Thank you, Your

9  Honor.

10       THE COURT:  Thank you.  Mr. Rosenthal, I think

11  you're clear.

12       MR. ROSENTHAL:  Your Honor, we're here today on the

13  Debtors' motion to sell substantially all of the assets.  As

14  you know, it came up on our motion where we had a stalking

15  horse bidder.  As a result of the auction, we are now pleased

16  to tell the Court that we would like the Court to approve the

17  sale to one of the bidders at auction.  I advised the Court

18  earlier this morning, we'd like to approve the sale to Taylor

19  Corporation pursuant to the Taylor asset purchase agreement

20  and to approve the offer form the second lien bidder as the

21  backup bid.

22       In support of approval of the sale to Taylor

23  Corporation the Debtors submit to the Court that we've

24  conducted an exhausted post-petition marketing and auction

25  process.  That as a result of that process there was an

1  active auction which commenced on June 11th and continued

2  during the day of June 12th.

3        The auction resulted in an agreement with Taylor

4  Corporation that is a higher and otherwise better offer than

5  either the agreement with the stalking horse or the offer

6  presented at the auction by the second lien bidder.  The

7  board of Standard Register in a meeting yesterday concluded

8  after presentations by its advisors that the offer of Taylor

9  Corporation represented a higher and better offer than either

10  the agreement with the stalking horse or the offer presented

11  by the second lien bidders.

12        We would like to tender, Your Honor, the declaration

13  of Andrew Torgove regarding the results of the auction.  Mr.

14  Torgove is present in the Courtroom for cross examination.

15  Does your Honor have a copy?

16        THE COURT:  No I have a copy but I'll take a clean

17  copy up for admission.

18        MR. ROSENTHAL:  While I am not going to go over that

19  declaration in detail, I would like to highlight some of the

20  points.

21        THE COURT:  Okay I have read the declaration, so I

22  will admit that.

23     [Declaration of Andrew Torgove received into evidence]

24        MR. ROSENTHAL:  Thank you, Your Honor.  The

25  declaration confirms that the aggregate consideration of

1   approximately $307 million dollars offered by Taylor

2   Corporation is $24.6 million dollars higher than the

3   aggregate consideration offered by the stalking horse APA and

4   higher than the last bid offered by the second lien bidders.

5   It also clarifies and confirms that the terms of the Taylor

6   offer are otherwise better for the Debtors' estate.

7          The declaration of Mr. Torgove is offered not only

8   in support of the finding that the highest and best offer has

9   been obtained and that additional value has been created as a

10  result of the auction process before this Court.  But that

11  the Taylor Corporation and the sellers acted at arm's length

12  in a good faith throughout the sale process.  And did not

13  engage in any activity that would deprive either Taylor

14  Corporation or the sellers of the benefits of a finding under

15  363(m) or 363(n).  Same goes true, Your Honor, for the

16  efforts with respect to the second lien bidders.

17         As adequate assurance of its ability to consummate

18  the purchase including adequate assurance of future

19  performance Taylor Corporation submitted certain financial

20  information to the Debtors which the Debtors in consultation

21  with their advisors determined to be adequate.  Initially,

22  Taylor Corporation submitted details of availability of cash

23  and marketable securities that would be sufficient to satisfy

24  their obligations.

25         I do not believe, Your Honor, and that it's

1 appropriate now to disclose the amount of those, other than

2 to say that Lazard and the other financial advisors and the

3 business people for the Debtors and the Committee received

4 that information.  Everyone who was on the notice list

5 received that information.  No one questioned the credit

6 worthiness of Taylor Corporation to close this acquisition.

7           THE COURT:  My instinct is you all wouldn't have

8 spent 60 hours awake if you didn't think they could do the

9 deal.

10          MR. ROSENTHAL:  That's true, Your Honor.  In

11 addition, Your Honor, I would like to submit the declaration

12 of Greg Jackson who is the executive vice president of Taylor

13 Corporation.

14          THE COURT:  Okay I have that.

15          MR. ROSENTHAL:  To further support of adequate

16 assurance of performance.

17          THE COURT:  All right let me ask there is a request

18 for the, at least one request for an opportunity to cross

19 examine and I will afford that opportunity at the appropriate

20 time.  But I would ask if there is any opposition to the

21 admission of Mr. Torgove's declaration or Mr. Jackson's

22 declaration?  Very well, they're both admitted subject to the

23 stricture identified by counsel for the Committee.

24     [Andrew Torgove and Greg Jackson Declarations received

25 into evidence]

1           MR. ROSENTHAL:  Your Honor, there were several

2   objections raised to the sale.  I will allow Mr. Bouslog to

3   handle most of them, the three or four that were raised by

4   the parties that came to the podium.  I do have or want to

5   address the Committee objections not in terms of the

6   substance at this point, but in terms of the fact that we

7   believe we resolved those in connection with the settlement.

8           THE COURT:  Yes.

9           MS. LEVINE:  Is that just settlement that's fine.

10  But my understanding is we don't have a settlement so what's

11  leave the Committee objections to the side for now if we

12  could, Your Honor.

13          THE COURT:  Well here's the thing.  What I

14  understand the stated goal of this exercise right now is to

15  permit the Debtor to make a sufficient record that I can

16  enter an order without requiring a further hearing.  I

17  believe that I can do that if I am advised subsequent to this

18  hearing if the Committee objection is withdrawn.  If the

19  Committee objection is not withdrawn we're back here and

20  we'll have a substantive hearing as we've discussed.

21          I'm happy to take for purposes of context however

22  you want to present this to me.  But to me if the focus of

23  the analysis is narrow and that is whether or not this Debtor

24  has carried its burden under Abbotts Dairies in 363(b) to

25  demonstrate that the proposed sale is representative of the

1    Debtors' best business judgment and return in a good faith to

2    a non-insider.  And also that, again, consistent with Mr.

3    Torgove's declaration that the marketing and sale process and

4    the auction itself was conducted professionally,

5    appropriately, and with full integrity I don't know that we

6    need to get into a lot of the details about the Committee

7    objection.

8         There are, I think, some other objections that are

9    still out there that we'll deal with, but I'm really at your

10   pleasure.  I don't know that we need to walk through them or

11   the resolution of those concerns.  What I do believe is

12   material and I believe Mr. Torgove's declaration does speak

13   to this but you can as well is that I believe the record does

14   need to reflect the extent to which the Committee was

15   involved and engaged in the auction process and the process

16   of evaluating competing bids and the ultimate decision.

17        And if we close the loop on that and, again,

18   presuming that the matter is resolved and I think we're okay

19   and, if not, then again we're back to a substantive hearing.

20   Does that make sense?

21        MR. ROSENTHAL:  Yes, it does, Your Honor.  So, Your

22   Honor, the Debtors clearly believe that the sale of Taylor

23   Corporation is in the best interest of the Debtors and is an

24   appropriate exercise of the fiduciary duties and business

25   judgment of the board Standard Register and should be

1  approved by this Court.

2       Taylor Corporation is not an insider, is not related

3  in any way to Standard Register.  It's a large privately

4  owned company, but it is a very large company which, as you

5  know, or as you may have suspected has been involved in

6  discussions for some time with Standard Register.

7       In terms of the Committee's involvement, the

8  committee was involved in the auction and in the marketing

9  process.  Leon Schlesinger from Jefferies was and the

10  professionals from Zolfo were involved extensively with the

11  Lazard folks and the McKenzie folks in the marketing process.

12  They were brought into the loop on the data room and kept

13  apprised of the status of negotiations.

14       The auction itself was as open a process as I could

15  imagine.  The Committee was given information by me before

16  the auction as to what we expected to occur.  The things that

17  were, the rules that we were intending to impose on the

18  bidding, how we intended to structure the auction when we got

19  to the auction.  The Committee was involved from minute one.

20  They were involved in virtually every negotiation that took

21  place the day of the auction.  And subsequently they were

22  kept advised.

23       Their insight was frequently requested. We consulted

24  with them when we needed to which was often to get their

25  impressions about these competing bidders and how best to

1  maximize the value of the estate, both in terms of maximizing

2  the overall aggregate value of the estate and in terms of

3  ensuring that the estate had adequate resources on an ongoing

4  basis to propose a plan of reorganization and exit the case

5  in a reasonable timeframe and fashion.

6         So I think there's no question about their

7  involvement and I hope there's no question in the Court's

8  mind about the integrity of the process and the good faith of

9  the participants in this process.  But I'm happy to answer

10  specific questions.

11         THE COURT:  No I don't have any specific questions.

12  I think we can talk about, I believe we've got; I believe

13  that Mr. Torgove's declaration and the other one Mr. Jackson,

14  right.

15         MR. ROSENTHAL:  Jackson.

16         THE COURT:  Both of those have been admitted.  And I

17  think their responsive to the Debtors' evidentiary burden on

18  their case in chief.  Unless there are other issues, I think

19  we probably should address the issue that was raised by

20  Applied Mechanics and any other pending objector with the

21  following caveat.  And, again, anybody that wants to come up

22  to the podium is welcome to do so.

23         But my approach to this kind of unusual but

24  certainly not unique process is that the party powder is dry

25  and will remain dry if a settlement and consensus is not

1   achieved.  And, again, I'll conduct a hearing on the merits

2   of whatever issues I need to deal with.  What I understand

3   the Debtor to be doing in large measure is to be making its

4   case in anticipation of what we would typically expect to be

5   a consensual hearing.

6        And so we're sort of having a consensual hearing in

7   the hope that it becomes a consensual hearing.  I get it.

8   But I think I'd like the Debtors' position with respect to

9   the Applied Mechanical issue which I think my recollection is

10  that's a mechanic's lien question for I think a $100 grand;

11  $125?

12        MR. ROSENTHAL:  $120,000.

13        UNIDENTIFIED SPEAKER:  $124, Your Honor.

14        MR. ROSENTHAL:  Your Honor, before I put Mr. Bouslog

15  up here, you're absolutely right this is all going forward

16  under the assumption that if the Committee objection will be

17  withdrawn if we reach a settlement.  And if we don't reach a

18  settlement we'll have to be back before the Court.

19        With respect to the parties that came to the podium

20  and said that we had agreed to order, to language we did.  We

21  agreed to it --

22        THE COURT:  Right they have to --

23        MR. ROSENTHAL:  They have to see the order.

24        THE COURT:  Exactly and I'm okay with that.

25        MR. ROSENTHAL:  And let me let Mr. Bouslog stand up

1 here and talk to you about the mechanics lien.

2          THE COURT:  Good.

3          MR. BOUSLOG:  Good afternoon, Your Honor, Matt

4 Bouslog from Gibson Dunn on behalf of the Debtors.  The

5 Debtors' position with respect to the mechanics lien is that

6 the Debtors are permitted under Section 363(f)(3) and (f)(5)

7 to sell free and clear the lien.  Our view is that and we've

8 attached in our reply and we have here certified copies of

9 the first, second, and third mortgages that are all senior to

10 the applied the MAS lien.

11          Under Third Circuit law the Debtors or the parties

12 seeking to sell free and clear of a party's lien -- well let

13 me back up just for a second.  Under 363(f)(3) in our reply

14 brief we cited CyberDefender defender which is a case that

15 this Court had where it held that (f)(3) allows the sale free

16 and clear of all liens if there, if a price is in excess of

17 the value of the liens.  Here that's the case that the value

18 of the liens are not the face value of the liens.  But that

19 the value of the liens are limited by the value of the

20 property.

21          In this case, the first and second lien mortgages

22 from Silver Point the first is being satisfied, but the

23 second would not be.  The MAS lien is junior to those and,

24 therefore, the value of that lien is nothing.  We've also

25 cited under 363(f)(5) this Court's same decision in

1  CyberDefender referencing that if there's other alternative

2  proceedings whether it be in State Court or another equitable

3  proceeding to compel a party to receive the money

4  satisfaction in discharge of its lien that it's been allowed.

5       And that's the case where we cited an Ohio statute

6  in a case where Ohio law certainly does allow for foreclosure

7  of liens and disbursements of proceeds and the priority of

8  those liens.  The Debtors' position is that we are authorized

9  to sell free and clear of the liens.

10      With respect to MAS's request for adequate

11  protection for its lien value they're entitled to adequate

12  protection for the value of the lien.  But in this case the

13  value is zero.  Going back to what I was saying before the

14  Third Circuit case which we cited is In re Heritage Highgate

15  679 F.3d --

16      THE COURT:  I'm familiar with the case.

17      MR. BOUSLOG:  That says that the party seeking to

18  sell free and clear or seeking to reduce or challenge the

19  secured status of a claim has the initial burden.  We have

20  here in Court the certified copies of those mortgages.  And

21  given that the sale price does not satisfy all those senior

22  mortgages, Debtor submit that if we've met that burden and

23  that its, therefore, on the Creditor who bears or the

24  alternate burden of persuasion to demonstrate by a

25  preponderance of the evidence both the extent of its lien and

1  the value of the collateral securing its claim.

2          THE COURT:  Let me ask you a question then.  How

3  does this square with the point raised in the objection that

4  the determination of the extent to limit your priority of

5  lien is a subject for an adversary proceeding under Rule 7001

6  and that, at least, at this point I'm obliged to acknowledge

7  or provide some measure of protection until I can determine

8  that they are as you've described, in fact, out of the money?

9          MR. BOUSLOG:  To challenge the secured status of a

10  lien or of a claim and whether or not a lien has any value

11  that doesn't require a separate adversary proceeding.  The

12  Third Circuit case was simply a determination under 506.  And

13  that's what we're seeking here.  We're not challenging

14  whether the lien attached, but the secured status and whether

15  that lien has any value is what we're arguing.  In this case

16  it doesn't have any value.  And, therefore, the adequate

17  protection is zero because the lien value is valued at zero.

18          THE COURT:   Mr. Leonhardt.  Let me ask you a

19  question.  Again state mechanic lien law is peculiar to state

20  to state.  Is it your position that by virtue of whatever

21  applicable mechanic's lien laws there is that you are senior

22  to all other secured claims as to the assets?

23          MR. LEONHARDT:  It's our position that the Ohio laws

24  nuance and it does, in fact, require an adversary proceeding

25  to adjudicate and for this Court to enter declaratory relief

1 with respect to the relative priority of liens.  And that it

2 can't be done on two days' notice in a reply that the due

3 process and the United States Constitution requires more

4 notice and more opportunity to be heard.  And more briefing

5 on the nuance Ohio mechanics law and Ohio priority schemes

6 generally.

7         THE COURT:  Well, right, but my question was is it

8 your position that the mechanics lien that your client

9 asserts and which I've read the history of the perfection

10 that as a matter of law that is, in fact, senior to a prior

11 perfected security interest?

12         MR. LEONHARDT:  I can't take a position on that at

13 this time.  Again, I would say the burden is on them.  And if

14 this Court's going to adjudicate the priority we'd like it

15 done in an adversary proceeding and we'd like due process.

16 It's my understanding the Ohio mechanic statute is very

17 nuanced and there are concepts of marshaling.  And let me see

18 if I have a cite to the statute.

19         THE COURT:  I'm not certain that marshaling would

20 necessarily enter into this, at least at this stage although

21 that's not necessarily your burden to demonstrate where we've

22 got a sale of substantially all assets.  Let me ask a

23 question, Mr. Bouslog.

24         MR. BOUSLOG:  Yes.

25         THE COURT:  In the interest of getting past today

1  look I have held and I did it I think in a bench ruling in

2  CyberDefender but I get written in the ABI of Journals.  I

3  have held that I rejected the proposition that I think was

4  from another Circuit that, in fact, the sale couldn't be

5  approved without the consent of even out of the money

6  interest holders.

7          In that case, there was no issue about the relative

8  priority and the positions of the two.  I think there were

9  first and seconds and everybody agreed that they were out of

10 the money.  The question was whether or not I needed to

11 provide for respect for their nominal or notional amounts

12 versus their actual.  And my conclusion was as you described

13 that 363(f) contemplates that I can authorize that sale.

14         In this instance here's the issue that I've got and

15 I touched on it with counsel and, at least, as of right now

16 there's not an answer.  My instincts tell me that as a

17 general proposition a mechanics lien is likely junior to

18 prior perfected liens, but I've seen a lot of squirrely

19 mechanics lien laws and similar laws relating to oil and gas

20 and those sorts of things that may affect prior perfected

21 liens.

22         Again, I'll tell you that my instincts are telling

23 me that you're probably right.  And if, indeed, the thirds

24 are duly perfected and out of the money and if the mechanics

25 lien is, in fact, behind them then that's the end of the

1    inquiry.  I'm not certain that I can close the loop no that

2    today, though.  I understand the argument and I'm not

3    satisfied that it requires an adversary proceeding, but I

4    think that it may require further proceedings for a measure

5    of confidence from me that I say that, in fact, we've got

6    one, two, three and four and Mr. Leonhardt's client is four

7    and they're out of the money.

8           I have made that ruling.  I don't have any

9    reservations about that ruling.  I'm not sure I can get to

10   that without understanding the scope of Ohio law.  Again,

11   with a $125,000 at issue here I don't know whether or not we

12   adequately protect or we set it up for some modest escrow.

13   And I'll deal with this as quickly as you want me to deal

14   with it.  But, again, I'm reluctant to just say you know

15   something you're out of luck.  I think that's probably where

16   it winds up.

17          But, again, I have just had passing experience with

18   different states.  And I think that it is within a state's

19   power to identify certain liens that may be clearly tax liens

20   come up in that category.  I make no comment about whether

21   Ohio mechanics lien law provides for that.  But I think I'd

22   like to see if we can find a way to get us past this.  I'm

23   happy to address this issue and I'm not looking to tie

24   anybody up.  But with the amount in controversy I think we

25   ought to be able to find a way to deal with this issue.  And,

1  again, if you need me to rule on it, I'll rule on it.

2          MR. BOUSLOG:  Your Honor, so long as the, is the

3  Committee and the other stakeholders on board including the

4  buyer and Silver Point.  It may make the most sense to

5  perhaps escrow the amount and then seek a quick ruling as to

6  this.

7          The motions been on file since the beginning of this

8  case.  This didn't come out of nowhere.  The party's papers

9  citing Ohio law state that it's effective as of a particular

10 date.  We have the evidence here.  This is an evidentiary

11 hearing.  And we're prepared to submit the mortgages

12 providing our evidence which I believe satisfies our burden.

13         THE COURT:  Yeah I'd like to; again, I think I'd

14 tell you that I would want to take it under advisement and

15 know with confidence that, in fact, the Ohio law does not get

16 superior rates.  I told you what my instincts are, but you

17 know at this point and I'm not necessarily going all over the

18 due process issue.  The motions been filed.  The objection

19 was filed. The lien has been asserted.  And you know we could

20 deal with this issue today.  I'm not satisfied that it

21 requires an adversary proceeding.  What it requires is a

22 sufficient record for me to be confident.  Not necessarily on

23 the sufficiency of the mortgages.  I'm pretty confident of

24 where your mortgages are.

25         My question is where exactly these guys fall.  And

1   if you're right then I don't think it's going to be a very

2   big issue.  And if you're not then in economic terms it's not

3   insignificant, certainly to the Claimant.  But it's one that

4   I would be able to address, I am confident, before you would

5   get to a closing.

6          MR. BOUSLOG:  If you allow us a moment to confer

7   with the parties.

8          UNIDENTIFIED SPEAKER:  Your Honor, what I was going

9   to suggest is the anticipated closing date is mid-July.

10  That's not a firm day but there's a provision that says it

11  can be required, cannot be required to be earlier than July

12  6th.  It might be, but I doubt it.  It could be a little

13  later.  If we could set up a schedule that would have this

14  heard before the anticipated closing we may never have to get

15  to the escrow amount.

16         THE COURT:  Here's what I like I'd like you to

17  confer.  I'd like letter submissions, not briefs from the

18  parties.  Letters not to exceed three pages apiece.

19         UNIDENTIFIED SPEAKER:  I'm sorry how much?

20         THE COURT:  Three.

21         UNIDENTIFIED SPEAKER:  Three pages.

22         THE COURT:  Single spaced.  And I'll take the letter

23  submissions at the party's convenience.  I don't believe that

24  I need argument on it.  If I do I would get you on the phone

25  and I would be prepared to rule on this by the end of next

1  week if that's needed.  And looking at my schedule I would

2  prefer that we do it in that timeframe, because I've got some

3  issues that include Boy Scout Camp in the first week of July.

4  So I don't want to brush up against this and I want to,

5  frankly, give due attention.

6          The issues are pretty narrow.  And so I would take

7  those letter submissions.  You can confer with Mr. Leonhardt.

8  If you want to get letters to me you know end of this week,

9  beginning of next week I will rule on them before the end of

10  next week.  Okay.  And hopefully that will keep everybody on

11  board.  I don't believe then I need to address questions of

12  adequate protection because adequate protection would come in

13  the context of a closing.  And I'll be able to make that

14  determination.

15          And, again, I don't think that this issue having

16  been addressed separately would impair the Debtors' ability

17  to obtain entry of an order approving the sale with those

18  rights subject to further disposition after the letter

19  briefing.  Does that make sense?

20          MR. LEONHARDT:  It does, Your Honor.  And I

21  appreciate Your Honor's ruling.  I would like to present just

22  some very quick argument on 363(f)(3).  I appreciate Your

23  Honor did make a transcript ruling.

24          THE COURT:  I'll look forward to it in the letter.

25  And my comments on the transcript ruling are not dispositive

1    for purposes of today.  I'm just telling you what I've done

2    in the past.  And I recognize that it wasn't in an opinion.

3    And I recognize that it's not universally held, although I am

4    right.

5        [Laughter]

6            MR. LEONHARDT:  And I want to take the difficult job

7    of trying to persuade you otherwise.

8            THE COURT:  And you're welcome to do so in your

9    letter and I'll look for it then.  And I don't regard my

10   comments today as having disposed of that issue in advance.

11           MR. LEONHARDT:  Okay and on the adequate protection

12   the one thing I was going to get out on cross was that

13   whether or not there was any allocation of the sales proceeds

14   to the real property to which our mechanic lien is attached.

15           THE COURT:  I'm not certain that that is -- why

16   don't we hold that in abeyance.  And here's the bottom-line

17   is this.  If you're superior I believe your rights will be

18   protected.  If you're not then the consequences will be

19   whatever the code requires.  And an issue about, again in a

20   sale of this size and no one's trying to minimize the

21   significance of your client's claim and I commend you for

22   defending it, but we'll be able to deal with it.  But I don't

23   believe that we need to deal with that on cross examination.

24   Those rights are reserved today.

25           And I would not leave you in a position where I

1  would determine that, in fact, you are superior and then

2  you've got kind of a gotcha from or a bait-and-switch from

3  the other side that says well the asset that you had to lien

4  on we decided didn't have any value.  I don't think that's

5  going to get very far.

6          MR. LEONHARDT:  Okay.  Yeah I'm just thinking of the

7  scenario let's say we're second or third what portion of the

8  sale, what value are we ascribing to the building for

9  purposes of valuating the collateral in which my client has a

10 security interest for determining if they should be in the

11 money or, for whatever reason, if they become a general

12 unsecured creditor by virtue of that collateral.

13         THE COURT:  And I guess my point is I understand the

14 argument and my point is that those rights are fully

15 reserved.

16         MR. LEONHARDT:  Understood.

17         THE COURT:  And so if we do need to have that

18 hearing on the valuation of a variety of collections of

19 pieces of real property and a variety of states in order to

20 determine a $125,000 mechanics lien claim, I'll conduct that

21 trial.

22         MR. LEONHARDT:  Understood.  Thank you very much,

23 Your Honor.  Mr. Bouslog.

24         MR. BOUSLOG:  Your Honor, I got just a few more

25 items.  Let me just privy that we had discussed with the

1  other parties, we anticipated having potential resolution and

2  agreed upon language in our proposed order with those parties

3  that have spoken today and with some of the other parties

4  that raised objections.  There's a few items that we agreed

5  to read into the record, if I may.

6           THE COURT:  Sure.

7           MR. BOUSLOG:  With respect to Chaotic Moon's

8  objection nothing in the sale order shall act to approve or

9  be deemed to be an approval of 1) any sale of the Debtors of

10 any assets or property provided by Chaotic Moon LLC "Chaotic

11 Moon" pursuant to that certain master services agreement with

12 The Standard Register Company dated effective March 2014, the

13 MSA, including without limitations any deliverables,

14 intellectual property, or confidential information as such

15 terms are defined in the MSA or; 2) any assumption and/or

16 assignment of any contract of Chaotic Moon including without

17 limitation the MSA.

18          We've also agreed to read into the record one of the

19 statements with respect to International Paper Company.  The

20 Debtors agreed there are two agreements on our potential

21 assumption and assignment schedule and that those agreements

22 are integrated and that must either be rejected or assumed

23 and assigned together.

24          There are a handful of other objections that I don't

25 know if those parties are continuing to press those

Case 15-10541-BLS   Doc 735   Filed 06/25/15   Page 43 of 57

43

1  objections.  If they are, we can address them; otherwise --

2       THE COURT:  I think what you can do is call them out

3  and ask if you've got objections that are identified.  But I

4  would afford parties an opportunity at this point right now

5  if anyone else has objections to the sale in the context in

6  which we've identified the process right now.  I would hear

7  from those parties at this point.

8       MR. BOUSLOG:  If helpful, I can run through those

9  sale objections that we believe we will be resolving that

10  perhaps save us a little bit of time.

11       THE COURT:  Sure.

12       MR. BOUSLOG:  Avery Dennison was one of the sale

13  objections that we've since resolved.  Chaotic Moon we read

14  into the record there.  Custom Graphics is one that the

15  Debtors would continue to respond to and I don't know if

16  Custom Graphics is here.  Maybe we can just keep this

17  separate this of those parties where we would continue to

18  respond if they pressed their objections.

19       We believe Liberty Mutual is resolved so far as I

20  understand.  Multnoma County we believe that the sale order

21  as it will be amended will provide the permitted encumbrances

22  will include senior ad valorem and tax liens.  We were not

23  able to get confirmation from them that that resolved their

24  objection, but we believe that would be just a handful of

25  others.

1       And with respect to the Paragon LP that is the one

2  contract objection regarding cure amounts seeking attorney's

3  fees where no amount was in default and the cure amount is

4  zero.  The Debtors would press our reply if they continue

5  with their objections.

6            THE COURT:  Okay.

7            MR. MAGAZINER:  Good afternoon, Your Honor, one

8  clarifying point; Drew Magaziner from Young Conaway on behalf

9  of the Debtors.

10           THE COURT:  Welcome.

11           MR. MAGAZINER:  Mr. Bouslog made reference to

12  Liberty and I just wanted to clarify to note that I would

13  make reference that we are not seeking to assume and assign

14  any insurance policies without their consent.

15           THE COURT:  Okay that should resolve that; very

16  good.

17           MR. MAGAZINER:  In fact, the insurance policies are

18  excluded assets.

19           THE COURT:  Okay, Ms. Stickles, good to see you.

20           MS. STICKLES:  Good to see you, Your Honor; Kate

21  Stickles on behalf of Hewlett Packard Company and certain

22  related entities.  There is actually discrepancy in cure

23  amount that was filed with respect to Hewlett Packard and it

24  does not accurately reflect an agreement of the parties.

25  I've spoke briefly to Debtors' counsel prior to this and

1   we'll attempt to work this out this evening.  My colleague

2   Jill Bienstock is on the phone and I don't know if she has

3   anything further to add.

4          THE COURT:  Counsel.

5          MS. BIENSTOCK:  Hi, good afternoon, Your Honor,

6   thank you so much for allowing me to appear by phone and

7   thank you, Kata.   What Kate had mentioned, we had actually

8   struck an agreement, at least in principle, to the total list

9   of contracts that were to be assumed.  And ultimately the

10  documents that were recently filed with the Court over the

11  course of the last 48 hours do not reflect that agreement.

12  And we're happy to work with Mr. Magaziner and his firm to

13  resolve it rather than waste the Court's time right now.  But

14  we'd obviously like to reserve our rights because the cure

15  amount for the prepetition amounts is inaccurate.  And

16  there's also a sizable post-petition receivable that remains

17  due and unpaid that has still not been accounted for either

18  in the cure amount or remedied.

19         THE COURT:  Okay, Mr. Magaziner?

20         MR. MAGAZINER:  That's correct, Your Honor.  I just

21  want to clarify we will work with parties; that was the

22  intent of filing it yesterday.

23         THE COURT:  Okay.  I think those rights are

24  certainly reserved.  It's not unusual to leave contract

25  assumption and cure issues for a later hearing.  And, again,

1   I think experience teaches that those are almost uniformly

2   resolved as a business matter between the parties.  But if

3   the issue remains live, I'll be here and I don't see that as

4   being an impediment to the sale process.

5           MS. BIENSTOCK:  Thank you, Your Honor.

6           THE COURT:  Very good; thank you.  Mr. Collins.

7           MR. COLLINS:  Your Honor, Kevin Collins, Barnes &

8   Thornburg just rise briefly here.  We represent CDK Global

9   LLC.  We're working with the Debtors and the buyer on

10  language in the sale order, so just like other folks we would

11  reserve our objections until we've seen the final language in

12  the sale order, but we expect to be resolving that.

13          THE COURT:  Okay that sounds fine.  Mr. Palacio.

14          MR. PALACIO:  Your Honor, may I please the Court

15  Ricardo Palacio of Ashby & Geddes on behalf of Cisco Systems

16  as well as Salesforce.com Inc.  Your Honor, again I don't

17  know where you're handling things.  I know you're pressed for

18  time and the Debtor is the only one here.

19     Very briefly reservation of rights, again, with respect

20  to Cisco we're fine with the zero cure with the understanding

21  that there's going to be an amendment and payments made, if

22  you will, in the ordinary course.  There's a discrepancy in

23  terms of whether the payments had actually been transferred

24  or made to us at this point and there's about a $2,000

25  [indiscernible] we'll address.  It's not worth the Court's

1  time at this point to address those rights --

2          THE COURT:  That's a business issue.

3          MR. PALACIO:  Exactly.  And, again, all of this has

4  been vetted with Mr. Magaziner and Ms. Coyle at Young

5  Conaway.

6          With respect to Salesforce.com we do have a

7  significant amount in the $100,000 realm, six figure realm.

8  We received a stub payment. We're anticipating another one to

9  be made, but again we're just reserving our rights today.

10          THE COURT:  Well those rights are reserved and,

11  again --

12          MR. PALACIO:  To the receipt of those funds in due

13  course.

14          THE COURT:  Yeah and, again, I think experience

15  teaches that these issues with respect to cures I think

16  you're wise to stand up and reserve your rights, but as a

17  practical matter, you know, we're often dealing with moving

18  targets.

19          MR. PALACIO:  Absolutely.

20          THE COURT:  And we've dealt with these on a post-

21  sale basis.

22          MR. PALACIO:  Thank you so much.

23          THE COURT:  Thank you.  Mr. Kunz.

24          Mr. KUNZ:  Thank you, Your Honor, didn't want to be

25  left behind.  It's just a we need to see the order again.  I

1  think we're resolved with respect to the objection by the

2  Reynolds Company.  Also Leeswood, Bullet Line and Time

3  Planner, but again we just need to see the order.

4         THE COURT:  Okay and I'm confident that the order

5  will be circulated before it's submitted.

6         MR. KUNZ:  Thank you.

7         THE COURT:  Okay.  All right does anyone else wish

8  to be heard with respect to the Debtors' request for approval

9  of the sale and related relief?

10        MS. MARCARI:  Yes, Your Honor, this is Wendy Marcari

11 of Epstein Becker & Green on behalf of the New York

12 Presbyterian Hospital.  We filed an objection. Your Honor, we

13 are a customer of Standard Register.  One aspect of the

14 objection is expected to be resolved by language to be

15 included in the order.

16        What I wanted to question that remains is the

17 adequate assurance question.  The declarations that have been

18 referenced of Andrew Torgove and Greg Jackson are not filed

19 on the docket and they haven't been served on the contract

20 counterparties.  And so I'm not satisfied on behalf of New

21 York Presbyterian Hospital that the Debtors being satisfied

22 by Taylor Corporation's financial wherewithal it's

23 sufficient.  And so I'm not sure how we can pass on the

24 adequate assurance of future performance by Taylor

25 Corporation without having been provided any evidence of that

1  affect.

2         THE COURT:  Mr. Rosenthal.

3         MR. ROSENTHAL:  Your Honor, we're happy to speak

4  directly to counsel for New York Presbyterian and provide

5  more detailed information and try to get her comfortable.

6         THE COURT:  All right and I think in the absence of

7  that, again those rights are reserved and the Court would

8  return for a further hearing probably tomorrow or later this

9  week.

10        MR. ROSENTHAL:  That's fine, Your Honor.

11        THE COURT:  Okay I understand.

12        MS. MARCARI:  Okay thank you, Your Honor.

13        THE COURT:  Certainly.  Mr. Leonhardt.

14        MR. LEONHARDT:  Thank you, Your Honor, just to

15 clarify to the extent that sale orders enter before Your

16 Honor's had the opportunity to rule on the letter briefing

17 should there just be a paragraph or a sentence in there

18 reserving my client's right or do you want to just so order

19 the record.

20        THE COURT:  I think I'd so order the record.

21        MR. LEONHARDT:  Okay.

22        THE COURT:  I don't think anybody's under mistakes

23 or illusions.  The Debtors hoping to resolve this matter and

24 promptly submit a form of order.  Your issues are reserved

25 and preserved pending disposition by the Court.  Parties that

1  have said I want to see the form of order will have the

2  opportunity to see the form of the order.  If it's not

3  satisfactory I will conduct a further hearing or you can get

4  on the phone.

5         Again, if there are issues with respect to

6  sufficiency of the process I will expect and I'm confident

7  that Debtors' counsel will communicate to the Court that

8  issues remain and that you need to get on the phone with me

9  or we need to have a further live hearing tomorrow or Friday

10  or Monday or whatever.  And I will make myself available for

11  that process.  So we're in a, and I think your concerns are

12  noted.  Your rights are reserved on the record.  The entry of

13  an order would not have an effect on the treatment of your

14  mechanic's lien.  Those issues are reserved for disposition

15  by the Court.

16         MR. LEONHARDT:  Thank you so much, Your Honor.

17         THE COURT:  Sure.  Ms. Levine.

18         MS. LEVINE:  Your Honor, just on scheduling.  To the

19  extent that we're unable to resolve our issues I may have a

20  witness issue tomorrow and we were hoping Your Honor might

21  reserve some time for us on Friday or whatever other day the

22  Court finds appropriate.

23         THE COURT:  If I give it to you, you'll use it.

24         MS. LEVINE:  We don't have to do scheduling now,

25  Your Honor, just alerting the Court to the conflict on

1  Thursday.

2          THE COURT:  Yeah the answer is yes.  If this thing

3  goes off the rails I'll hear you.

4          MS. LEVINE:  Thank you.

5          THE COURT:  And there be a bunch of moving parts so

6  I don't think it's productive to anticipate that and say I'll

7  see you Friday or I'll see you Monday.  I'll be guided by

8  parties and what I would expect and, frankly, direct if we

9  start heading in that direction you need to get me on the

10 phone.

11         MS. LEVINE:  Thank you.

12         THE COURT:  And I know you would.  Mr. Meisler,

13 welcome.

14         MR. MEISLER:  Thank you, Your Honor.  I'm here on

15 behalf of Silver Point Finance LL.  Your Honor, we just want

16 to be clear and articulate that we are reserving our rights

17 to object to certain --

18         THE COURT:  There's a lot of that going on today.

19         MR. MEISLER: True.  We are supportive, of course, of

20 the sale process and of the sale.  There is an aspect of the

21 asset purchase agreement that was heavily negotiated.  There

22 was part and parcel of the resolution with the UCC that we

23 hope will still come together.  In particular, there is a

24 wind down amount that's part of the asset purchase agreement.

25 And it's sizeable.  It's $15.1 million.

1    Your Honor, we did hear you in a prior hearing where

2 you encouraged the parties to sort out a way so that there

3 could be a confirmable Chapter 11 plan.  The construct of the

4 wind down is that in our view we are making concessions

5 because we view the $15.1 million dollars as proceeds of

6 collateral.  And so we would be taking a -- this is, I'm not

7 meaning to run over other people's right to argue to the

8 contrary.  I'm just articulating in a way we view it.

9    And we view that concession as part and parcel of

10 this resolution.  And so what we think would happen is we

11 think the $15.1 million dollar wind down would have to be

12 addressed if we're not consenting to use of proceeds or our

13 collateral.  And so that would be the sticky issue that we

14 would have to get through.

15    THE COURT:  Oh I understand.  Look, in some ways

16 this is -- the easiest way for me to deal with this process

17 right now would to be bounce all of you and say I'll see you

18 tomorrow with final documents.  I don't believe that that's

19 productive for the estate or the parties and I'm confident

20 you don't want to spend another night in Wilmington,

21 Delaware.

22    So I am proceeding today on the assumption that the

23 Debtor has made its case sufficient for entry of a large

24 consensual order that's predicated upon the anticipated

25 resolution of the significant Committee objection and the

1   assertion of significant rights by Senior Secured Creditors,

2   namely your clients.  If that doesn't happen we're in a

3   different hearing and I'll be here.

4          And while I haven't seen the nuts and bolts of this

5   settlement and the resolution that you crafted, I've seen it

6   before and I've got a pretty good idea of what it would look

7   like.  But, again, if it's not consensual then it's not a

8   settlement and we have a different hearing and I'll conduct

9   that hearing.  If it's consensual, which I strongly

10  recommend, then I'll take the order subject to the points

11  that I've made previously and party's rights to look at that

12  order.

13         So I appreciate getting the heads up about that

14  issue and I'm under no illusions that if there's not an

15  agreement that the elements of the settlement continue in the

16  absence of a settlement.  So I think I understand the

17  dynamics.  I guess I want to make sure I'm not missing

18  anything.  You know my hope would be that I see an order

19  under certification sometime tomorrow that reflects

20  satisfaction by the stakeholders.  And if not, then I

21  probably expect a phone call that says we'll see you on

22  Friday or we'll see you on Monday and we'll be there with our

23  witnesses and we got a hearing; the hearing that I was kind

24  of expecting and sort of dreading it 9:00 this morning.

25         MR. MEISLER:  Thank you, Your Honor, I think we see

1   it the same way.  One minor detail and I'm going to surprise

2   my friend and colleague Mr. Dobbs there is in the ABL DIP

3   agreement, as well as in the term loan agreement a milestone

4   that the sale order must be ordered on June 19th and I believe

5   that's this Friday.  To the extent that we need to wait until

6   Monday or someday shortly thereafter to have a sale order

7   entered, Your Honor, we are comfortable pushing out that

8   milestone date and we would ask that the ABL DIP lenders do

9   some early.

10          THE COURT:  You've been placed on the spot, Mr.

11  Dobbs.

12          MR. DOBBS:  Not the first time, Mr. Meisler.  Your

13  Honor that will be fine.

14          THE COURT:  Okay yeah again I hope that it doesn't

15  come to that, but if it does the representation that I'm

16  making to the parties is that I will give you the hearing

17  that you need to move the matter forward.  But, again, it's

18  my hope that settlement that's been hammered out and in

19  concept is out there between the parties can get finalized

20  and memorialized.  And if not then we'll deal with it with a

21  full and appropriate hearing.

22          MR. MEISLER:  Terrific.  Thank you, Your Honor.

23          THE COURT:  Thank you.  All right, Mr. Rosenthal.

24          MR. ROSENTHAL:  Your Honor, I'm aware of your time

25  constraints.  We appreciate your time to get today.  I will

1  just close, Your Honor, by saying that we're working very

2  hard to bring this to final closure.  These are two very

3  significant companies, both strategic players seeking to

4  merge.  There's a lot of attention on this merger in the

5  press and elsewhere, so the sooner we can get an order, move

6  this process forward the better for these companies and their

7  business operations.  And I know the Debtor, at least, is

8  very sensitive to that.

9         THE COURT:  Okay.  Well let me, does anyone else

10  wish to be heard?  Here's what I believe that I'm obliged to

11  do at this point.  First, I'm obliged to hear from Mr.

12  Fallon.

13         MR. FALLON:  Your Honor, I just didn't want the time

14  to pass Avery Dennison and I believe we're resolved.  But we

15  just need to see how its papered.

16         THE COURT:  Okay I expect you will.  All right again

17  we're in an unusual, but I think a practical position right

18  now where the Debtor is expecting the matters that objections

19  will be resolved and documented through resolution that will

20  allow the submission of a consensual form of order.  And with

21  that understand the Court will find subject to the provisos

22  that I've made now a number of times and in recognition of

23  the reservation of rights of parties, as well as applied

24  mechanical; that I am satisfied that the Debtors carried

25  their burden with respect to Bankruptcy Code Section 363(b)

1  as it relates to the request to sell assets of the estates.

2       Specifically, I will rely upon the declarations of

3  Mr. Jackson and Mr. Torgove.  And I am satisfied that the

4  Debtors have conducted a robust and professional sale and

5  marketing effort, that the auction itself was conducted

6  consistent with bid procedures previously approved by this

7  Court.  That the result of that auction was a number of

8  robust spirited rounds of bidding that have substantially

9  improved the economic prospects of the transaction that

10  Taylor Corporation was declared to be and found to be the

11  winning bidder with the second lien noteholders represented

12  by Silver Point as the backup bidder.  That the transaction

13  represents as proposed by the Debtors the exercise of the

14  Debtors' best business judgment and that the transaction

15  itself, again, is expected to proceed in good faith

16  consistent with the provisions of the Abbotts Dairies case

17  and its progeny.  And, therefore, I would be prepared to

18  entertain that order under certification of counsel in the

19  expectation that all material objections have been resolved

20  or, otherwise, addressed.

21       I note again the applied mechanical issue will be

22  the subject of letter briefing and I'll look from guidance of

23  the parties as to the timing of that and my anticipation

24  would be that I would be able to dispose of that issue before

25  next week, depending on when you get me your letters.  But

1  with that, again, I think the record is sufficient for the

2  Court to approve and authorize the transaction in the absence

3  of continued material objection.

4        If objections arise, I would, again, ask that the

5  parties get me on the phone and we will deal with substance

6  and scheduling at the appropriate time.  But I commend the

7  parties for what has clearly been a successful and productive

8  exercise to this point and certainly has been a long and

9  challenging one.  So, again, I would look for and hope for a

10  consensual form of order promptly and I would expect to be

11  advised by the parties in the absence of that.  All right,

12  we'll stand in recess.  Thank you very much, counsel.

13      (Court Adjourned)

14

15

16                        CERTIFICATE

17

18  I certify that the foregoing is a correct transcript from the

19  electronic sound recording of the proceedings in the above-

20  entitled matter.

21
    /s/Mary Zajaczkowski                    June 19, 2015
22  Mary Zajaczkowski, CET**D-531                  Date

23

24

25