```
 1                     UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                        )  Case No. 15-10541 (BLS)
                                   )  Chapter 11
 4   THE STANDARD REGISTER COMPANY,)
     et al.,                       )
 5                                 )
                                   )
                    Debtors.       )
 6   _____)
                                   )
     THE STANDARD REGISTER COMPANY,)  Adv. Pro. No. 15-50883(BLS)
 7                                 )
                    Plaintiff,     )
 8        vs.                      )
                                   )
 9   CRAIG H. STOCKMAL;LYNN D. SMITH)  Courtroom No. 1
     FOCUSED IMPRESSIONS, INC.; AND )  824 Market Street
10   FOCUSED IMPRESSIONS TECHNOLOGY )  Wilmington, Delaware 19801
     LLC,                          )
11                                 )  July 1, 2015
                    Defendants.    )  1:30 P.M.
12   _____)

                         TRANSCRIPT OF HEARING
13             BEFORE HONORABLE BRENDAN L. SHANNON
                  UNITED STATES BANKRUPTCY JUDGE
14

15   APPEARANCES:

16   For the Debtors:        Gibson, Dunn & Crutcher LLP
                             By:  MICHAEL ROSENTHAL, ESQUIRE
17                                KYLE KOLB, ESQUIRE
                             333 South Grand Avenue
18                           Los Angeles, California 90071

19   Young Conaway Stargatt & Taylor, LLP
                             By:  ANDREW MAGAZINER, ESQUIRE
20                                MIKE NESTOR, ESQUIRE
                             1000 North King Street
21                           Wilmington, Delaware 19801

22   ECRO:                   DANA MOORE

23   Transcription Service:  Reliable
                             1007 N. Orange Street
24                           Wilmington, Delaware 19801
                             Telephone:  (302) 654-8080
25                           E-Mail:  gmatthews@reliable-co.com

     Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

```
 1   For the Committee:       Lowenstein Sandler
                              By:  PAUL KIZEL, ESQUIRE
 2                            65 Livingston Avenue & 6 Becker
                              Roseland, New Jersey 07068
 3
     For Craig Stockmal
 4   Lynn Smith:              Sullivan Hazeltine & Allinson
                              By:  WILLIAM SULLIVAN, ESQUIRE
 5                            901 N. Market Street
                              Wilmington, Delaware 19801
 6
     TELEPHONIC APPEARANCE:
 7
     For Craig Stockmal
 8   Lynn Smith:              Todd & Weld
                              By:  DAVID RICH, ESQUIRE
 9                            One Federal Street
                              Boston, Massachusetts 02110
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                   INDEX

2                                                                        Page

3    NOTICE OF AGENDA MATTERS:
     For the Debtors, by Mr. Rosenthal                          4,23
4    For Creditors Committee, by Mr. Kizel                       15
     For Craig Stockmal/Lynn Smith, by Mr. Sullivan              16
5    For Craig Stockmal/Lynn Smith, by Mr. Rich                  17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  All rise.

2        THE COURT:  Please be seated.  Mr. Rosenthal.

3        MR. ROSENTHAL:  Your Honor, Michael Rosenthal and

4   Kyle Kolb along with Mike Nestor and Andrew Magaziner from

5   Young Conaway on behalf of the Debtors.  Also Kevin Carmody

6   is on the phone with us and then Jerry Sauer [*phonetic*], the

7   general counsel is here in person.

8        THE COURT:  Okay.

9        MR. ROSENTHAL:  Your Honor, thanks for accommodating

10  us on such short notice.  I know it's the middle of a holiday

11  week.  We're all trying to come in or get out; I can't tell

12  which.

13       THE COURT:  Well and I want to say I scheduled it

14  because I wasn't confident that I would be able to schedule

15  it if we didn't do it today, that I'd be able to get to it

16  for more than or in less than a couple of weeks.  So I am

17  aware that it was, frankly, burdensome on the Defendants in

18  the litigation to be basically stuck with a TRO hearing on 24

19  hours' notice.  I'm sensitive to that, but I am, as a general

20  proposition, reluctant to try to hand these matters over to

21  my colleague where I've got a measure of familiarity with the

22  matter.  And so I deemed it appropriate to schedule it, but I

23  am aware of the burden that's placed on the Defendants.  And

24  I did see and I carefully read the preliminary response

25  that's been filed.  Where are we going?

1      MR. ROSENTHAL:  Your Honor, we need to go forward.

2 This is a very important matter for the company and we're

3 concerned about the implications for our Taylor sale, and

4 we're also concerned about the implications on our customer

5 base.

6      Your Honor, Craig Stockmal and Lynn Smith were

7 longtime employees of Standard Register.  Mr. Stockmal was,

8 in fact, one of the most highly compensated employees of

9 Standard Register.  Both Stockmal and Smith were bound by

10 Standard Register's code of ethics and an executed salesman

11 agreement which requires them to maintain in confidence all

12 of Standard Register's trade secrets and confidential and

13 proprietary information.

14      THE COURT:  Those were the sales agreement with

15 Uarco from the late 80s.

16      MR. ROSENTHAL:  From the late 80s.  Uarco was

17 acquired and then subsequently fully merged into Standard

18 Register, so those agreements became binding and enforceable

19 by Standard Register and have, in fact, been enforced by

20 Standard Register in the past.  They're binding because of

21 operational law, merger by operational law.

22      In the salesman agreements Stockmal and Smith agreed

23 that they occupied a position of trust and confidence.  They

24 agree to keep all information about Standard Register's

25 customers confidential and agree the company will suffer

1  irreparable harm if they engage in prohibitive conduct.

2  Prohibitive conduct is defined as using or divulging for the

3  benefit of the employee the company's trade secrets or

4  confidential information.  And it's also defined prohibited

5  conduct includes competing with the company for two years

6  following termination by soliciting anybody that the company

7  has sold to or any party that these employees were involved

8  in the solicitation of business.

9       In addition, Your Honor, Mr. Stockmal had signed an

10 additional confidentiality agreement that we actually found

11 after we filed the complaint.  It was signed in January of

12 2005.  It's called an Enterprise Data Warehouse

13 Confidentiality Agreement which allowed him access to all of

14 the information stored in Standard Register's enterprise data

15 warehouse including inventions, trade secrets, software,

16 firmware, customer and product information.  This required

17 Mr. Stockmal to agree that he has a confidential relationship

18 with the company, and he did and agreed to receive and retain

19 this information only for the company's business purposes and

20 to make no other use of the information or disclose it to any

21 third parties.

22      The customer lists, customer relationships are

23 clearly property of the estate.  Unquestionably in this case,

24 Your Honor, our business is dependent on our list of

25 customers and maintaining those lists in confidence, as you

1  know, we spent a lot of time in this Court and with the

2  bidders talking about non-disclosure agreements because we do

3  not want our customer list out in the public.  We do not want

4  our customers to be poached by people who know that we are a

5  company that's in Chapter 11 and our customers would be

6  susceptible to being picked off.

7        We have a right, Your Honor, to protect the

8  company's assets through the enforcement of the

9  confidentiality agreements.  We think we have a right to

10  protect the company's assets from being taken away through

11  violations of the automatic stay under Section 362(a)(3) of

12  the Bankruptcy Code.

13        THE COURT:  Do you have a copy of the

14  confidentiality agreement that Mr. Stockmal signed in 2005

15  and have you shared a copy with Mr. Sullivan?

16        MR. ROSENTHAL:  I will, Your Honor.  May I approach?

17        THE COURT:  Sure.  Thank you.

18        MR. ROSENTHAL:  This one was not attached to Mr.

19  Carmody's declaration.  We located it, we were under the gun

20  as well to file these pleadings.  We located it after we had

21  filed the pleadings.

22        THE COURT:  Let me as you a question, I have the

23  salesman agreement from June of '83 attached to the back of

24  it.  Was this attached in the company's records?

25        MR. ROSENTHAL:  Yes.  Which one?

1    THE COURT:  I have the company agreements dated

2  January 10, 2005 and stapled to the back of it is one page it

3  looks like of the Uarco agreement.  So the question I have

4  and I don't want to get too far into the details of it,

5  there's some issues about the continuing effectiveness of the

6  Uarco agreement and I've seen that in the preliminary

7  response and then Mr. Stockmal's declaration.  But here's

8  what you handed me.  Was this attached?  Was the salesman

9  agreement attached?

10    MR. ROSENTHAL:  I don't believe so, but I don't,

11  Your Honor.

12    THE COURT:  I'll return this to you.  I have the --

13    MR. ROSENTHAL:  I don't believe so, Your Honor.

14    THE COURT:  Okay, all right, so it's just a copying

15  issue.

16    MR. ROSENTHAL:  But let me be clear, Your Honor, we

17  believe that not only is confidentiality required under the

18  salesman agreement or the Enterprise Data Warehouse Agreement

19  but also under the company's code of ethics.  It is a well-

20  known that employment by Standard Register is subject to code

21  of ethics.  And, in fact, every employee receives training on

22  that every year and Mr. Stockmal and Ms. Smith were trained

23  in the code of ethics last in August of 2014.

24    THE COURT:  Let me ask if that's the case and that

25  the code of ethics that was the subject of training and

1   presumably executed or signed off on by Ms. Smith and by Mr.

2   Stockmal I think I'm going to hear from the other side.  If

3   that were so effective and the Debtor was sure that they had

4   a binding and effective confidentiality and non-compete

5   arrangement, then why was the Debtor working so hard to get

6   Mr. Stockmal to sign the non-compete which he apparently

7   assiduously avoided doing?

8           MR. ROSENTHAL:  The Debtors had some issues with Mr.

9   Stockmal a couple of years ago.  And as part of the

10  resolution of those issues one of the things they wanted to

11  do was to expand the scope of the confidentiality agreement

12  to include non-poaching of employees.  The existing

13  confidentiality agreement did not include non-poaching of

14  employees.  And the board wanted to try to expand the breadth

15  of the confidentiality agreements to include the poaching of

16  employees.

17          THE COURT:  Okay.

18          MR. ROSENTHAL:  All right Mr. Stockmal and Ms. Smith

19  were the company's principal contacts with some of the

20  company's most important customers including one of its

21  largest customers.  Now we have not named the customer.

22  We've named it as a key customer, but I believe just because

23  it will probably slip during this hearing --

24          THE COURT:  Certainly the email correspondence

25  touches on it.

1    MR. ROSENTHAL:  Yes.  The customer is Liberty Mutual

2  and its affiliates and it's a very large customer of the

3  company that generates approximately $23 million dollars in

4  annual revenue.

5    The facts as we note them, Your Honor, April 3, 2015

6  Smith abruptly and without notice resigns from the company.

7  Before leaving our offices she deletes substantially all of

8  her email files.  Mr. Stockmal explained that she had left

9  work for a division of Liberty. Actually, we now know that

10  she apparently went to work for Mr. Stockmal's company

11  Focused Impressions, a competitor.

12    After Ms. Smith left, Stockmal emailed her about the

13  Liberty Mutual account; strange that Mr. Stockmal would email

14  Ms. Smith, no longer an employee, about the Liberty Mutual

15  account.  On June 19th, just 10 days ago, 12 days ago now, Mr.

16  Stockmal also without warning or explanation resigned.  He

17  also deleted a significant portion of his email before

18  leaving and promptly went to work as CEO of Focused

19  Impressions.

20    Through investigation over the last several days,

21  we've discovered that Focused Impressions maintains a website

22  and email addresses for Stockmal and Smith that's been

23  maintained for over a year before their departure.  We had

24  been informed and believe that they have contacted or been in

25  touch with Liberty Mutual.  And we know that Focused

1  Impressions or we believe that Focused Impressions offers

2  products and services substantially similar to those offered

3  by Standard Register.  One of the sources of this

4  information, Your Honor, is Taylor.  Some of the senior

5  executives at Taylor actually have contacts at Liberty Mutual

6  and were advised that they had been contacted.

7          Your Honor, we believe that Focused Impressions

8  offers a technology platform similar to the one offered by

9  Standard Register --

10          THE COURT:  Take a step back; you mentioned Taylor.

11  Let me take a step back.  You mentioned Taylor just a moment

12  ago.  I approved and entered a sale order a little over a

13  week ago, right?

14          MR. ROSENTHAL:  19th.

15          THE COURT:  19th; week and a half.  My recollection

16  was that the closing was anticipated be no later than mid-

17  July, is that correct?

18          MR. ROSENTHAL:  The closing was scheduled, is

19  scheduled to be somewhere between July 21st and July 31st.

20          THE COURT:  Okay.

21          MR. ROSENTHAL:  No earlier than the 16th but given

22  the way the finality of the order and 10 days business

23  expiring before closing could be required, the earliest it

24  could occur is the 21st.  Taylor has spoken to us about

25  whether that could be delayed until the 31st of July to have a

1  month in closing and we are considering that request.

2          THE COURT:  Okay.

3          MR. ROSENTHAL:  We believe, Your Honor, that

4  [indiscernible] joined the Defendant's actions will cause

5  irreparable harm to Standard Register's business by diverting

6  customers including potentially Liberty Mutual by eroding

7  customer confidence and by potentially threatening the Taylor

8  sale.

9          We offered the declaration of Mr. Carmody into

10  evidence.  He is on the phone as he could not physically get

11  here.  To the extent that the Court desires to hear evidence,

12  Mr. Sauer in the Courtroom --

13          THE COURT:  I think the practice in this

14  jurisdiction and I think everybody should, hopefully is on

15  the same page; the practice in this jurisdiction as to a

16  temporary restraining order is that the hearing is done on

17  the papers and so I would not expect to hear live testimony

18  today.  So I will hear argument of counsel, and I've had an

19  opportunity, again, to see everyone's papers.

20          MR. ROSENTHAL:  That's fine, Your Honor.

21          THE COURT:  Okay.

22          MR. ROSENTHAL:  Your Honor, we believe that there is

23  ample justification for the issuance of this TRO.  The TRO

24  motion was served on the Defendants as soon as practical

25  after filing.  We had trouble actually serving Mr. Stockmal

1  originally.  We left it, I believe, at his place of business,

2  his residence, but, ultimately, we emailed it to him.  The

3  standard as the Court knows or issuance of a TRO are there a

4  reasonable likelihood of success on the merits; will Standard

5  Register be irreparably harmed without such relief; will the

6  harm outweigh the potential harm to the non-moving party and

7  is granting the relief in the public interest?  We believe

8  all of these standards are met.

9         In fact, Your Honor, I thought it was interesting

10 when we looked at the response.  The Defendants apparently

11 are arguing that they are not doing anything in violation of

12 either their agreements or in to disclose confidential and

13 proprietary information.  We suggested that perhaps that's

14 the reason they shouldn't oppose the TRO.  But, nonetheless,

15 we're going forward here.

16        Reasonable likelihood of success, first element.  We

17 think that we have demonstrated an ability to succeed on

18 claims of breach of contract; these various agreements,

19 misappropriation of trade secrets, tortious interference with

20 our agreements with Liberty Mutual and others, and violation

21 of the automatic stay.  We do not believe that actual entry

22 at this point is required as an injunction is appropriate to

23 the extent that it prevents the occurrence of injuries with a

24 threat of injuries under Third Circuit case law.  And even

25 without entry I think violation of the automatic stay and

1  must be enforced to preserve the integrity of the bankruptcy

2  process.

3          We think that Standard Register will be irreparably

4  harmed absent an injunctive relief.  These actions have the

5  potential to injure Standard Register's business and the

6  value of its estate, and harm its economic relationships and

7  goodwill.  We think the misappropriated information is a

8  trade secret.  And that misappropriation of trade secrets in

9  and of itself will cause irreparable injury, and we direct

10 the Court's attention to our cases cited at pages 16 through

11 18.

12         We do not think the Defendants will suffer harm if

13 the Court grants the TRO.  First, they argue that they are

14 not violating the provisions, that they are not using

15 confidential and proprietary information. But even beyond

16 that, Your Honor, they can continue to operate Focused

17 Impressions.  And Mr. Stockmal and Ms. Smith can continue to

18 do business so long as they do not violate their agreements

19 with Standard Register or use trade secret confidential or

20 proprietary information misappropriated from Standard

21 Register.

22         You're not entitled to steal Standard Register's

23 business and then claim that you will suffer harm if your

24 theft is discovered and the items you stole are taken away or

25 you can't use them. We think there's a strong public interest

1   in this case in favor of granting an injunction.  We think

2   that the enforcement of the salesman agreements and the code

3   of ethics will serve the public interest. We believe that

4   enjoining violations of the automatic stay promotes the goals

5   of the Bankruptcy Code and preserves the integrity of the

6   bankruptcy process.  And we believe that the public interest

7   discourages practices aimed at secretly acquiring trade

8   secrets, misappropriating trade secrets and stealing customer

9   information through unfair competition.

10          For those reasons, Your Honor, we believe a TRO

11  should issue, that the Court should schedule preliminary

12  injunction hearing within 14 days so that we can explore this

13  matter further.

14          THE COURT:  Very good.  I'd ask that the Committee

15  has any position before I hear; obviously, then, Mr.

16  Sullivan, you would have an opportunity to respond to every

17  body.  Welcome.

18          MR. KIZEL:  Good afternoon, Paul Kizel from

19  Lowenstein Sandler on behalf of the Committee. Your Honor,

20  we're here today to support the Debtors' request.  Everything

21  Mr. Rosenthal said we're in agreement with and we would, you

22  know, pay particular attention that we want to avoid anything

23  to avoid threats to the pending sale and to avoid any

24  violations of the automatic stay which we believe would occur

25  if, in fact, these agreements are violated.  So bottom-line

1  is, Your Honor, we strongly support the request made by the

2  Debtor.  We don't believe a short interim order pending

3  discovery or further actions would provide material harm to

4  the Defendants.  So we would support the Debtors' request.

5           THE COURT:  Very good.  Mr. Sullivan, good

6  afternoon.  You had a busy night.

7           MR. SULLIVAN:   Good afternoon, Your Honor, actually

8  for the record Bill Sullivan, Sullivan Hazeltine & Allison on

9  behalf of the Defendants in the adversary who are Craig

10 Stockmal, Lynn Smith and Focused Impressions Inc. and Focused

11 Impressions Technology LLC.  I'll have to confess to Your

12 Honor that it was not a busy night for me.  I did not get

13 involved until this morning.  But on the phone with me is

14 David Rich from the Todd & Weld LLP firm in Boston.

15          THE COURT:  Okay.

16          MR. SULLIVAN:  Mr. Rich --

17          THE COURT:  I'm happy to hear from him.  I'm

18 certainly not going to stand on ceremony about *pro hac*.

19 We'll worry about all that stuff later.  I certainly

20 appreciate him making himself available this afternoon.

21          MR. SULLIVAN:  Very well, Your Honor, we have

22 submitted the *pro hac*.

23          THE COURT:  Okay I'll sign that when I see it, but

24 while I don't believe I've had the pleasure of meeting Mr.

25 Rich, I'm certainly familiar with the Todd & Weld firm.  And,

1   again, as I said at the outset it would not typically be my

2   practice to schedule this absent you know a true full on

3   clear emergency.  And, honestly, while I've looked at this I

4   probably, if I had my druthers and if my schedule permitted,

5   I probably would have given it a day or two to get to a TRO

6   on a more civilized pace. But, frankly, as I said at the

7   outset my schedule didn't permit it, and I didn't believe I

8   would be able to afford the parties a hearing in a timeline

9   consistent with what the Debtors were asking.  So, Mr. Rich,

10  to the extent that you've had a heck of a night and a

11  difficult morning I apologize for that, and I appreciate you

12  participating today by phone.  You may proceed, sir.

13          MR. RICH:  Thank you, Your Honor; can you hear me?

14          THE COURT:  I can hear you just fine.

15          MR. RICH:  Hello?  Thank you.   First of all thank

16  you for hearing from me this afternoon.  I appreciate the

17  Court's consideration under the circumstances.

18          As a preliminary matter, my goal in responding was

19  to provide you with some factual foundational information.

20  Obviously, we didn't have a chance to respond to the legal

21  arguments that are set out.  I think there are some

22  significant legal issues involved here.  So to the extent the

23  Court has a particular interest in any or all of these legal

24  issues, we can certainly get a brief to the Court in the

25  short term, but like I said given that your analysis in the

1  first instance would be on the facts that was my charge.

2        Let me start with the presentation made by the

3  Plaintiffs.  We heard in counsel's presentation a lot of

4  language concerning, I took some notes, stealing business,

5  stealing customer information, and similar language.

6  However, if you look at the actual record of the evidence

7  that is actually before the Court which is what really

8  matters, obviously in this context, there's no evidence to

9  support any of it.  In fact, the only evidence before the

10 Court is the evidence which has been submitted in my client's

11 papers which denies completely the notion that anything has

12 been stolen or any customer information or any business has

13 been stolen.

14        If you look at the Plaintiff's affidavit of Mr.

15 Carmody, the closest that he comes to alleging wrongdoing is

16 in paragraph 26 in his affidavit where he says since Stockmal

17 and Smith's resignation Standard Register's management, now

18 represented [indiscernible] have a reason to believe that

19 Stockmal and Smith and so forth have done these terrible

20 things.  Well that's not a factual foundation from which I

21 would respectfully submit the Court can issue an order.

22        On a couple of factual issues that were raised and I

23 apologize these aren't in our papers, but the affidavits, but

24 we could certainly get this information to you.  I'm not sure

25 of the particular material that's in [indiscernible] but I

1  think it's worth addressing.  There was a reference in their

2  papers to Ms. Smith departing and somehow a misrepresentation

3  being made to the company with regard to where she was going

4  and what she was doing.  In fact, Your Honor, I can represent

5  to you that after she left Standard Register she actually

6  went to go work as a consultant for a couple of months for

7  Liberty Mutual.  She actually was employed by the consulting

8  on of Liberty Mutual.

9          So, again, it's not a falsehood.  In fact, she did

10  and when my client sent, Mr. Stockmal sent an email that was

11  exactly what he was referring to.  There was no evidence in

12  the record or stealing business or revealing confidential

13  information or proprietary information or trade secrets

14  because it hasn't happened.  My clients startup software

15  company is a software technology company that hope someday,

16  has not yet developed a product that it can market or sell to

17  the public, is a quasi-software program that doesn't do any

18  of the things, and there was no record and there's no

19  evidence, any of the same things that they were doing or that

20  Standard Register does.  Standard Register sells forms.

21  That's what my clients did.  My clients are not selling

22  forms. They're not selling anything of the sort.  They're

23  selling a software product; some day when they hope to have a

24  product which is ready to be marketed.

25          On the issue of the agreements, you know I think

1  that the record belies the fact that these agreements are

2  enforceable.  Counsel made reference to the fact that this

3  non-compete, the negotiations in 2014 were designed and

4  intended to broaden the existing agreement.  That's belied by

5  the very documents if you look at Exhibit B to Mr. Stockmal's

6  affidavit the president of Standard Register is saying we

7  need a document saying you won't compete with us at Liberty.

8  And it goes on to say and you won't raid our employees if you

9  leave.

10      It's a [indiscernible] enforceable non-compete which

11  precludes my client from somehow soliciting Liberty if they

12  were utilizing the same or similar services.  They wouldn't

13  need a new agreement that said that.  Respectfully and I will

14  also add, Your Honor, that this comment that we heard at the

15  argument about what the Board of Directors wanted in the

16  nature of the negotiation is nowhere before the Court in any

17  admissible form.  The only admissible evidence is the

18  testimony from my client in his affidavit which speaks very

19  precisely and very specifically supported by documents with

20  regard to the nature and extent of the interactions.

21      As it relates to this 2005 agreement, this is the

22  first I heard of it.  And I honestly haven't had a chance to

23  talk to my client about an agreement that he signed 10 years

24  ago that I've never seen.  So I would, again, respectfully

25  submit that it would not necessarily be appropriate for the

1 Court to rely upon a document that wasn't provided to us

2 until the hearing.  But that being said,; again, even if

3 there is a confidentiality agreement, there's no evidence in

4 the record, therefore, no likelihood of success on the merits

5 that my clients are violating the agreement.  And that's the

6 standard here.

7       On the issue of, on one other issue, you know the

8 real issue here that they are seeking to suggest my clients

9 had -- no one has heard from Liberty Mutual on this issue.

10 And I think there are a lot of reasons why Liberty Mutual may

11 or may not be making decisions as it relates to how it is

12 that they intend to proceed in the future.  But I can

13 represent to the Court and I think that the papers bear this

14 out that any decision that Liberty Mutual is making relative

15 to whom it wishes to do business with in the future has

16 absolutely nothing with what my clients are or are not doing

17 because, of course, they're not competing.  They're not

18 selling a similar technology.

19       And I would also add, Your honor, if you look at the

20 pleadings that were filed in the bankruptcy case Liberty

21 Mutual claims that it's owed $11 million dollars from The

22 Standard Register.  So I'm simply speculating at this point,

23 of course, but that might in some way be a reason for

24 whatever it is they feel or perceive to be impacting their

25 ability to continue on at this $25 million dollar a year

1  pace.

2        Your Honor, there is no irreparable harm.  In fact,

3  if you look to the very agreement that we say is

4  unenforceable but they say is enforceable with regard to

5  taking business, there's actually a provision in that

6  agreement which sets forth the monetary amount that the

7  breaching salesman in that case would be obligated to pay in

8  the event there's an adjudicated breach of contract.  And it

9  speaks to a penalty of 30% to the aggregate sales price of

10 any sale of the competitive product.

11       So the very contract upon which they are relying

12 contains the very remedy for which they would be entitled in

13 the event that they were successful in demonstrating

14 ultimately, and they haven't done it yet, that there was a

15 material breach of the agreement which caused them harm.  And

16 that's their remedy.  And where they haven't had what remedy

17 at loss here money damages, an injunction isn't appropriate.

18       You know, I think that I hit the main points, Your

19 Honor, so unless you have any other follow-up questions or

20 concerns, I would respectfully submit rely on the affidavits.

21 And, again, to the extent you're looking for any legal

22 briefing on any issue we can turn that around very quickly.

23       THE COURT:  Very good.  Thank you very much, Mr.

24 Rich, I don't have any questions at this point.  Mr.

25 Rosenthal, brief reply.

1        MR. ROSENTHAL:  Just a brief reply, Your Honor. With

2    respect to the last point, taking the last point first, that

3    provision is paragraph 10 which has the remedy of an

4    injunction and it has the remedy --

5        THE COURT:  And it specifically also provides that

6    the remedies are not limited, although we're listing

7    different categories of remedy.  I have paragraph 10 in front

8    of me.

9        MR. ROSENTHAL:  Correct.  Let's see what are the

10    other points.  Your Honor, we have received information from

11    our buyer that they had been, that Liberty Mutual has been

12    contacted.  We are very concerned and the reason we brought

13    this is we are very concerned that this account is being

14    solicited regardless of what Mr. Stockmal will say now and

15    Ms. Smith will say now.  If, in fact, they are not doing what

16    they have said they are not doing, then this temporary

17    restraining will not enjoin them from doing anything.  But we

18    do not believe that is the case.

19        And we do not think we have the luxury of waiting 14

20    days to figure out what they've been doing. Because by the

21    time that 14 days is up, so much damage can be done to the

22    company that cannot be undone.  It is true that Liberty

23    Mutual has filed an unsecured claim against the estate.  But,

24    nonetheless, they're continuing to do business with us.  And

25    they are doing it, you know they have been doing it for years

1  and years and this is a key customer relationship.

2         I do not know, frankly, whether Ms. Smith went to

3  work for Liberty Mutual.  What I do know is I have an email

4  from Mr. Stockmal after Ms. Smith left to a personal email

5  address of Ms. Smith saying we're trying to get this paid.

6  And Ms. Smith says, it was a vendor paid that relates to the

7  Liberty account.  And Ms. Smith says well you need to do

8  that.  If not, we're in trouble.  Who is we're in trouble if

9  it's not Mr. Stockmal and Ms. Smith and their plans to divert

10 this business.

11         THE COURT:  All right a couple of things.  First the

12 last colloquy there's really nothing in the record before me,

13 and I'm not faulting anybody for what is and what is on the

14 record in 24 hours.  But that's obviously not going to drive

15 my analysis one way or the other.  I am going to grant the

16 request for a temporary restraining order on more restricted

17 terms that have been requested or proposed by the Debtor, and

18 I will give you my reasons.

19         First, the parties are in agreement as to what the

20 applicable standard are.  There are four elements a party

21 must show to obtain a temporary restraining order and that is

22 a reasonable likelihood of success on the merits;

23 demonstration of irreparable harm in the absence of that

24 relief; the outweighing of harm to the non-moving party; and

25 that the granting of relief is in the public interest.  And I

1  will roll through these pretty quickly.

2          But before I do, I would note that I have Standard

3  Register on my calendar already for another matter for 11:00

4  a.m. on the 15th of July.  And I would propose that we

5  calendar this subject to the party's request for any further

6  scheduling. But I believe that the code authorizes me to

7  enter a temporary restraining order on no notice which is

8  what I would certainly call this for no more than 14 days,

9  and I believe that that will then carry us to a hearing on

10 the 15th.  If the parties are engaged in discovery or briefing

11 in which further time, they are welcome to so stipulate, but

12 in the absence of any sort of arrangement I would expect to

13 hear, to conduct the hearing on a preliminary injunction on

14 the 15th of July.

15          But as I said the elements are not in dispute here

16 and the question, we start with a reasonable likelihood of

17 success on the merits.  And what the Debtor has alleged is

18 essentially a raid on the Debtor by former employees.  I will

19 observe on the very limited record that's before me that I

20 have significant reservations about the strength of the

21 Debtors' argument based upon the limited documents that have

22 been submitted to me.

23          But when the Debtor moves forward, and this is not

24 the first time that we've seen this kind of an issue in a

25 bankruptcy case particularly relating to one that is in a

1    sale context.  Often a Debtor will show up and will

2    demonstrate that it's got a clear pretty iron-clad non-

3    compete.  I have reservations about the sufficiency of the

4    Uarco non-compete.  And, again, all I'm doing is sharing with

5    you my observations.  But these date to 25, 30 years ago for

6    predecessor entities.  The record would need to make it

7    abundantly clear that the parties continue to remain bound by

8    these provisions and that's not abundantly clear to me at

9    this stage.

10        In addition, I looked very quickly at the

11    confidentiality agreement and consistent with Mr. Rich's

12    observations, I am somewhat reluctant to base my ruling on

13    that specifically given that it was just discovered by the

14    Debtor and then handed to opposing counsel and, of course, at

15    the hearing.  And so you know while I will observe that the

16    Debtor has, at least, significantly alleged that there are

17    binding non-compete and confidentiality obligations, I'm

18    simply sharing for purposes of the hearing coming up that the

19    Debtor will need I think put some meat on the bone on that

20    allegation or, at least, demonstrate that the documents that

21    they've identified are, indeed, effective and binding.

22        But, nevertheless, the Debtors' allegations relate

23    to contentions that parties, sales people in particular, who

24    have spent many, many years with the company have left the

25    company.  The Debtor alleges that those individuals, the

1  Defendants, are in possession of material confidential and

2  valuable business information.  And that seems entirely

3  plausible from Mr. Carmody's declaration, as well as,

4  frankly, from the Court's long experience with these matters.

5       And so while I have reservations about the

6  effectiveness of the non-compete arrangements that have been,

7  at least, to date identified to the Court, I am satisfied

8  that the Debtor has demonstrated a likelihood of success on

9  the merits as to its intention to protect its confidential

10 business information and, therefore, I'm satisfied the Debtor

11 has met that prong.

12      More importantly, though, is the prospect of

13 irreparable harm and this is driven particularly, again, as I

14 said, by the context in which this adversary proceeding is

15 filed.  This has been a relatively contentious case filed

16 just a few months ago with a sale of a very substantial

17 business, through an auction that went, if memory serves, for

18 more than 40 hours, and a sale order that was substantial but

19 required I think many, many subsequent hours to negotiate and

20 finalize and move forward.

21      The record that I recall and the record that upon

22 which I based my approval of the sale made it clear that the

23 Court had concluded and the Debtors had established that the

24 transaction with the Taylor entity is in the estate's best

25 interest, represents the exercise of its reasonable best

Case 15-10541-BLS    Doc 772    Filed 07/02/15    Page 28 of 37

1  business judgment, and that it is the best alternative for

2  the many employees and other stakeholders and creditors of

3  the Debtor.

4         And when I look at this case and risk proposed or,

5  at least, identified by the Debtor the Debtor is in a very,

6  very vulnerable position.  We have not yet closed the

7  transaction that's already been approved by the Bankruptcy

8  Court.  That will close presumably at some point in the next

9  30 days.  It does not take a lot of imagination to anticipate

10  that there is a risk of material disruption to that process

11  that can harm the interest of all stakeholders.  And I note

12  that the Official Committee of Unsecured Creditors has

13  weighed in its support of the injunctive relief today.

14         And so based upon that I am satisfied, frankly, that

15  there is a risk of irreparable harm to the Debtor in the

16  absence of the relief to the extent that it could materially

17  threaten the Taylor sale.  I'm also satisfied based upon the

18  record and, again, the narrow record thus developed that the

19  harm to the Debtors and, particularly, to the proposed

20  transaction upon which all parties are relying outweighs the

21  risk of harm to the non-moving party being the Defendants.

22         And in this instance, I place significant weight on,

23  frankly, the Defendant's own allegations that it is their

24  firm belief that they are not directly competing, that they

25  are not stealing or using company information, that they did

1  not even at this point have a product to bring to market, and

2  that it is, I think to use Mr. Rich's term, a startup

3  software company with the anticipate will be a cloud based

4  product or service.  And that may all be fine.  But it seems

5  to me that over the course of the next two weeks there will

6  be very, very limited harm to Mr. Smith, Mr. Stockmal and the

7  corporate Defendants with the need to abide by the temporary

8  restraining order on a going forward basis.

9          And, finally, as I have observed in other instances

10 most request for a temporary restraining order that are

11 brought to this Court do not materially implicate the public

12 interest.  And to the extent that the public interest needs

13 to be addressed, I would observe that facilitating and

14 encouraging the reorganization process is in and of itself a

15 public interest embodied in Chapter 11 and so I am satisfied

16 that the Debtors have carried their burden.

17          I am prepared to enter an order but I will not

18 require the inclusion of paragraph three in that order which

19 was a specific turnover order.  And paragraph two, I will

20 allow.  Yeah paragraph two is the injunction provision which

21 precludes the use of trade secrets, using or disclosing

22 Standard Register's confidential and proprietary information,

23 contacting or soliciting actual potential customers in

24 violation of the agreements alleged by the Debtors, and

25 tortuously interfering with ongoing contractual and business

1  relationships of Standard Register.

2         Paragraph three relates to prompt turnover of trade

3  secrets, confidential and proprietary information, etcetera.

4  I'm not going to require at this stage turnover. That is not

5  an unusual request. But, again, until such time as the Debtor

6  demonstrates contractual or legal obligations that would

7  require affirmative action on behalf of the Defendants to

8  turn over delivered material that seems to me to be more

9  properly reserved for purposes of a preliminary injunction.

10         As I said the order itself would expire in 14 days

11  unless extended by the Court or by agreement of the parties.

12  And I'd be prepared, again, to conduct a preliminary

13  injunction hearing on the 15th at 11:00 a.m.  In addition, I

14  think I'd like, just to make sure that I've got some sense of

15  what's coming.

16         Mr. Rich, I had an opportunity, as I said, to review

17  the preliminary response which you submitted, and I

18  appreciate you getting that in and getting the declarations

19  in.  It seems to me that in, at least, one or two places in

20  your submissions you've indicated an expectation to seek

21  transfer of venue, is that correct?

22         MR. RICH:  Yes.

23         THE COURT:  Okay.  I make no comment obviously on

24  the merits of a venue issue at this point.  But I would

25  encourage the parties to confer.  If a venue is going to get

1  filed, it probably ought to be filed promptly so that it

2  could be heard contemporaneously with the TRO, with the PI on

3  the 15th; does that make sense, Mr. Rich?

4          MR. RICH:  It does.

5          THE COURT:  Okay.  Yeah I just don't -- and so in

6  fairness to the Debtors so now you know it's coming, that

7  certainly, there may be other motion practice.  I don't know.

8  A couple other things.

9          This is expedited litigation.  It is my expectation

10  that further preliminary injunction there will be discovery

11  that occurs in anticipation of that.  And so my practice as

12  I've generally provided is that I expect counsel to work

13  productively together to move forward.  The Debtor obviously

14  has commenced this process and I'm confident will abide by

15  and participate in discovery.

16          But if there are issues with discovery, I don't want

17  motion practice.  And, Mr. Rich, I'm not sure if you've been

18  in my Court but your able local counsel certainly has.  My

19  practice is that motion practice as it relates to discovery

20  and scheduling these issues is not worth the time nor the

21  paper.  So if you got issues, I would encourage you to get me

22  on the phone.  I will not be the easiest guy to reach.  And

23  it may be that I will address issues by phone or at least you

24  got to tell me by email that you got a problem.  But my hope

25  is that the parties can focus their issues on the matters

1 that are before us.  I've expressed my observations with

2 respect to, again, what is the admittedly expedited record

3 that's been developed by the Debtors and we'll go from there

4 for the 15th.

5        But I would be prepared to enter that order.  I

6 would ask that the Debtors submit a revised order under

7 certification or if you want to mark it up, that would be

8 fine with me. Are there any questions?

9        MR. RICH:  Your Honor, oh I'm sorry, Your Honor.

10 Your Honor, this is David Rich again.  Could I raise one

11 issue with the proposed form that you just went over?

12        THE COURT:  Yes.

13        MR. RICH:  Okay so under number two subsection

14 (iii), it would prohibit my clients from contacting or

15 soliciting Standard Register's actual or potential customers

16 in violation of the salesman agreement and the code of

17 ethics.  Neither the salesman agreement nor the code of

18 ethics prohibits anybody from contacting anybody.  And it

19 doesn't pertain to potential customers either.

20        And my practical concern, aside from the legal

21 concern, obviously, that obtaining an injunction which is

22 beyond the scope of even the contracts they're seeking to

23 enforce.  Again, as I mentioned earlier, is that my client

24 was for a period of time, Ms. Smith, was working as a

25 consultant or an employee, depending on how you to Liberty

1  Mutual.  And it's my understanding that from time to time

2  they will reach out to her with questions with regard to the

3  sorts of things that she did, again, for the couple of months

4  that she was working over there.

5      And I would, I don't want to find my client in a

6  position where they're being accused of being in contempt of

7  an order where, again, the language that they have proposed

8  is so far beyond the actual language of the agreements

9  they're seeking to enforce.  So as a practical matter would

10 prohibit my clients again from contacting people over at

11 Liberty Mutual whom my clients have worked with, have social

12 relationships with for 30, 35 years.  And I would just ask

13 the Court to, at least, give that some consideration even if

14 just for the next two weeks.

15     THE COURT:  Okay.  I'll hear from the Debtor in

16 response in one moment.  But at a minimum your suggestion in

17 romanette (iii) as it relates to or potential customers I

18 will strike the words or potential for the period of two

19 weeks.  That seems to me to be a little bit too fuzzy for

20 purposes of the scope of a temporary restraining order which

21 I think case law teaches should be narrowly tailored to the

22 harm identified.

23     The issue, again, seems to me to be the relationship

24 and, frankly, long relationship that both Mr. Stockmal and

25 Ms. Smith have had with Liberty Mutual.  I would like to hear

1 from the Debtor in response.

2        MR. ROSENTHAL:  Your Honor, we believe, well first

3 place paragraph nine of the salesman agreement provides that

4 the salesman agrees he will not contact these parties.  So,

5 you know, I think it is drawing too fine a line to say they

6 are able to contact but they're not able to solicit. We don't

7 know what's going to happen during the course of that

8 contact.  This is only a 14 day provision.  I do not think

9 that we should limit it just to soliciting what I think we're

10 causing more trouble than we're gaining.

11        THE COURT:  I've heard enough.  I'm going to leave

12 it as --

13        MR. RICH:  Your Honor, just to --

14        THE COURT:  Yeah go on.

15        MR. RICH:  Your Honor, just for the record paragraph

16 nine says that the salesman agreement will not contact with a

17 view towards selling a product competitive to the product

18 served or proposed.  It doesn't say they won't contact.

19 That's what the language says.  And, you know, I'll leave it

20 at that, Your Honor, and I apologize for interrupting.

21        THE COURT:  No that's fine.  I am going to leave the

22 language in there from contacting and soliciting, and I will

23 preclude that over the period of the two weeks.  I'm, again,

24 sensitive to the bind that your client is going to be in.  My

25 hope and expectation would be that over the two weeks that

1  has an intervening July 4th holiday, which I apparently have

2  just ruined for all of you, hopefully there will not be a

3  material burden.

4          I would leave it open, though, that, Mr. Rich, if

5  Ms. Smith and it seems that's the most likely prospect, if

6  Ms. Smith is contacted by Liberty Mutual with a request for

7  information you're welcome to confer with the Debtors to

8  advise them of that request by Liberty Mutual.  But I would

9  deem it inappropriate for Ms. Smith to introduce

10 communications.  And if they're looking for information from

11 her and she's got it and if it's okay with the Debtors for

12 her to respond then so be it.  If it becomes an emergency

13 then you can get me on the phone and we can deal with it.

14          But the concern articulated by the Debtors, I

15 understand and so while I think it's too broad to include the

16 concept of potential customers here, I think we know largely

17 who we're talking about.  And, again, I don't want to

18 necessarily get into a situation about having to parse what

19 is a solicitation and what is contacting.  So under other

20 circumstances we might be able to draw that line but I'm not

21 comfortable with it here and so I'm satisfied that the

22 language with the words or potential stricken are

23 appropriate, and I would enter that order.

24          MR. ROSENTHAL:  Your Honor, I have marked up the

25 order to make the following changes.  I added in paragraph

1  one as of 2:45, we went a little bit longer, but at 2:45

2  P.M., I deleted or potential customers in paragraph two.  I

3  deleted paragraph three.  I renumbered the remaining

4  paragraphs three, four and five, and I added in the blank on

5  the date of the preliminary injunction July 15, 2015 at 11:00

6  A.M. Eastern.

7          THE COURT:  Very good.

8          MR. ROSENTHAL:  May I approach?

9          THE COURT:  Sure.  Thank you.  Okay as I said I will

10 expect to see the parties on the 15th of July.  If there is a

11 venue motion that will travel with and be scheduled for the

12 same date.  And I would ask, gentlemen, if you would confer

13 to just make sure everybody is on the same page about when

14 that motion would be filed.  And, again, I would encourage

15 the parties to confer with respect to a proper briefing

16 schedule.

17         I will tell you that, I don't know if I'm doing

18 anybody any favors, but if what we're, the last pleading

19 typically is a reply of some sort.  And if it's okay with the

20 parties the last deadline, the last time to file anything

21 would be noon on the 14th.  If there's a sense that that's not

22 fair we could go earlier.  But I wouldn't go earlier than the

23 13th for that final submission.  But often there's a, you all

24 are trying to figure out what the last time you can get

25 something into me is.

1       It is difficult, obviously, to deal with staffing

2   and getting this kind of litigation up and done in two weeks.

3   And so, again, if the parties need additional time then they

4   can consent and I would, you can expect that I would be able

5   to accommodate your requests.  But with that information, I

6   would look forward to seeing the parties on the 15th.

7           Anything further today?

8           MR. ROSENTHAL:  No; thank you, Your Honor.

9           THE COURT:  Very well, we'll stand in recess.  Thank

10  you very much.

11          MR. RICH:  Thank you.

12          THE COURT:  Thank you, counsel.

13      (Court Adjourned)

14

15

16                          CERTIFICATE

17

18  I certify that the foregoing is a correct transcript from the

19  electronic sound recording of the proceedings in the above-

20  entitled matter.

21  /s/Mary Zajaczkowski                    July 2, 2015

22  Mary Zajaczkowski, CET**D-531                   Date

23

24

25