# EXHIBIT A

## PREFERRED CERTIFIED SUPPLIER AGREEMENT

This PREFERRED CERTIFIED SUPPLIER AGREEMENT ("Agreement") is made this 06 day of November, 2007, by and between THE STANDARD REGISTER COMPANY, an Ohio corporation ("Standard") with its principal place of business located at 600 Albany Street, Dayton, Ohio 45408-1442 and Harmony Press, Inc. d/b/a/ Harmony Marketing Group ("Supplier") with its principal place of business located at 115 N. Main St., Bourbon, IN 46504. Standard and Supplier shall sometimes be referred to individually as a "Party", and collectively as the "Parties".

---

## RECITALS

A.  Standard desires to either (i) subcontract, from time to time, with Supplier for services (the "Sourced Services") and/or products or product components (the "Sourced Products") which Standard will then furnish to its customers (the "Customers") or (ii) have Supplier provide the Sourced Services and Sourced Products directly to the Customers.

B.  Supplier desires to receive Requests for Quote (an "RFQ") for the sale of the Sourced Services and Sourced Products under the terms and conditions set forth in this Agreement.

C.  The Sourced Services and/or Sourced Products (hereinafter referred to collectively as the "Sourced Work") shall be either (i) purchased from time to time by Standard from the Supplier pursuant to and in accordance with the terms and conditions contained in purchase orders previously or hereafter issued by Standard to the Supplier or subcontract agreements previously or hereafter entered into between Standard and the Supplier, or (ii) purchased from time to time by the Customers from the Supplier pursuant to and in accordance with the terms and conditions contained in purchase orders issued by the Customers.

D.  The Parties anticipate that a purchase order will be issued by Standard or directly by a Customer for each project. Each purchase order shall hereinafter be referred to as an "Order".

E.  Standard, Customers and Supplier desire to provide an improved and transparent process to issue Orders and to monitor and report on the Parties' obligations under this Agreement and Standard has deployed certain software capabilities to facilitate the issuance and execution of Orders.

F.  Standard and Supplier desire to provide for the confidentiality of certain information which the Supplier has or will receive from Standard and the Customers in connection with the Supplier's performance of its obligations under the Orders.

G.  Standard and Supplier also desire to provide for certain contractual indemnification by the Supplier to Standard in connection with the Sourced Work.

H.  Standard and Supplier also desire to provide that the Supplier will not compete, directly or indirectly, with Standard in providing the Sourced Work to the Customers.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and other good and valuable consideration, the receipt of which is hereby acknowledged, Standard and Supplier hereby agree as follows:

1.    SOURCING PROCESS AND TECHNOLOGY

1.1 CPX Website Access And Use.  In order to enhance Customers' sourcing of printed products and services, Standard hereby grants to Supplier, during the term of this Agreement, a non-exclusive, nontransferable right to access and use the SMARTworks Commercial Print Exchange website (the "CPX Website"), located at www.smartworks.com/cpx including, but not limited to, the ability to accept RFQ's, provide quotes, request change orders and receive Orders directly from the CPX Website.

1.2 CPX Quote Receipt And Response. Standard will from time to time during the term of this Agreement issue RFQ's for particular print projects ("Projects") on the CPX Website. Standard will determine, in its sole discretion, which suppliers will be eligible to bid on any particular Project. If Supplier is eligible to receive an RFQ for a particular Project, Supplier will receive notice of such RFQ by e-mail, the web or other form of notice as determined by Standard in its sole discretion. Supplier agrees to monitor its e-mail and the CPX website and to provide quotes within the timeframe requested for the Project or to respond that at the Supplier's discretion, the Supplier chooses not to provide a quote on the Project. Upon receipt of a quote, Standard will disclose that quote information to the Customer, but such information will not be disclosed to any other supplier.

1.3 Supplier Responsibility. Supplier solely shall be responsible for completing all Orders received by Supplier from Customers or Standard for the Sourced Products and/or Sourced Services including, but not limited to, shipping the Sourced Products ordered by the Customers or Standard and submitting billing through the CPX Website to the Customers or Standard for all Sourced Products and Sourced Services ordered by Customers or Standard

1.4 Project Terms. In the event that Supplier is awarded a Project under this Agreement pursuant to which the Sourced Products and/or Sourced Services are sold and/or provided by Supplier directly to Standard, Standard will issue an Order via the CPX Website to Supplier with respect to such Sourced Products and/or Sourced Services. All purchases of Sourced Products or Sourced Services by Standard shall be subject to the terms and conditions set forth in this Agreement and any additional purchase order terms and conditions. The terms and conditions of this Agreement may be modified or supplemented but only to the extent as set forth on Exhibit A attached hereto. The purchase order terms and conditions attached hereto as Exhibit B are provided for reference only, and the most current version is available at www.standardregister.com/partners/suppliers/potermsconditions.html (the "Terms and Conditions"). In the event that the Terms and Conditions are modified by Standard for a particular Project, Standard shall notify Supplier of such proposed modifications clearly in writing, which shall include an RFQ or purchase order. Supplier's acceptance of a purchase order with respect to a Project, or submission of a quote for, and award by Standard of, such Project shall bind Supplier to the modified Terms and Conditions for that particular Project only. In the event that Supplier is awarded a Project under this Agreement pursuant to which the Sourced Products and/or Sourced Services are sold and/or provided by Supplier directly to Standard's Customer, such Customer will issue an Order via the CPX Website to Supplier with respect to such Sourced Products and/or Sourced Services.

1.5 CPX Website Limitations. Although Supplier generally will be able to access the CPX Website and Related Software twenty-four (24) hours a day, Standard may restrict Supplier's access to the CPX Website and Related Software during non-business hours. Standard may also establish reasonable limitations regarding the CPX Website and Related Software support it will render to Supplier.

1.6 Security. Supplier shall receive an account ID username and password to gain access to and use of the CPX Website. Supplier shall maintain the confidentiality of its username and password. Supplier shall be fully responsible for all activities that occur under its username and password. Supplier shall (i) not allow any unauthorized person to use its account, username or password at any time, and (ii) notify Standard of any actual or suspected unauthorized use of its username or password. STANDARD SHALL NOT BE LIABLE TO SUPPLIER FOR ANY LOSS OR DAMAGE ARISING FROM ANY UNAUTHORIZED USE OF SUPPLIER'S USERNAME OR PASSWORD.

1.7 Unlawful or Prohibited Acts. Supplier shall not use the CPX Website for any purpose that is unlawful or prohibited by law or the terms or conditions contained in this Agreement. Supplier shall not (i) reverse engineer, decompile or disassemble any portion of the CPX Website or tamper in any way with the operation of the CPX Website, or (ii) insert or make use of any type of disabling device including, but not limited to, viruses, worms, Trojan horses, time bombs, cancelbots or any similar device that may impair, damage or interfere with the proper working order of the CPX Website.

1.8 Additional Supplier Duties. Supplier shall have the sole responsibility (i) to maintain all hardware including, but not limited to, operating procedures, audit controls, accuracy and security of input and output data, restart and recovery routines and other procedures which are required in order for Supplier to use the CPX Website, (ii) to maintain back-up data necessary to replace critical Supplier data in the event of the loss or damage to such data from any cause, and (iii) to ensure that the Supplier personnel are trained in the proper use and operation of the CPX Website and that the Supplier personnel use the CPX Website in accordance with all applicable manuals, documentations and instructions.

1.9 Links To Third-Person Sites. The CPX Website may contain hyperlinks to web sites operated by persons other than Standard (the "Additional Web Sites"). These hyperlinks are provided for Supplier's reference only. Standard does not control the Additional Web Sites and is not responsible for their contents. The inclusion of the hyperlinks to the Additional Web Sites does not imply any endorsement of the material on the Additional Web Sites or any association with their operators. Standard shall not be responsible for damages or losses caused by any delays, defects or omission that may exist in the services, information or other content provided in the Additional Web Sites, whether actual, special, consequential or punitive. Standard does not make any guarantees or representations to Supplier as to, and shall have no liability for, any electronic content delivered to Supplier by any third Person including, without limitation, the accuracy, subject matter, equality or timelines of any electronic content.

1.10 Disclaimer. Neither this Agreement nor any documentation furnished by Standard to Supplier in connection with the CPX Website is intended to express or imply any warranty that the CPX Website will at all times be timely or error-free.

2.      WARRANTIES

2.1 Sourced Work Warranty. Supplier warrants to Standard that all Sourced Work shall (i) conform to the specifications, drawings, samples or other descriptions specified by Standard or, if none are specified, to Supplier's standard specifications for the Sourced Work, (ii) be prepared in a professional manner, consistent with the standard of skill and care exercised within Supplier's industry on projects of comparable scope and complexity, in a similar location, and in conformance with the requirements of this Agreement; (iii) be fit and sufficient for the purpose intended, merchantable, of good material and workmanship and free from defect (collectively, the "Sourced Work Warranty"). Standard's inspection, test, acceptance or use of the Sourced Work shall not affect Supplier's obligations under the Sourced Work Warranty. Supplier shall re-perform, replace or correct, at Standard's option and at Supplier's cost, any Sourced Work that does not conform to the Sourced Work Warranty. If Supplier fails to correct defects in or replace nonconforming Sourced Work within ten (10) days from the date Standard notifies Supplier of the defect or defects, Standard may, upon ten (10) days' prior written notice to Supplier, either (a) make such corrections or replace such Sourced Work and charge Supplier for all costs incurred by Standard, or (b) revoke its acceptance of the Sourced Work, in which event Supplier shall be obligated to refund the purchase price and make all necessary arrangements, at Supplier's cost, for the return of the Sourced Products to Supplier.

2.2 Delivery Warranty. Time is of the essence. Supplier is sufficiently experienced, qualified, equipped, organized, staffed and financed to perform the Sourced Work within the deadlines set by Standard and its Customers. If delivery of the Sourced Products is not made in the quantities and on the delivery date or dates specified or the rendering of the Sourced Services is not completed by the date or dates specified, Standard shall have the right, in addition to its other rights and remedies, to take either one or all of the following actions: (i) cancel the delivery by written notice effective when received by Supplier as to Sourced Products not yet shipped or Sourced Services not yet rendered and to purchase substitute Sourced Products or Services elsewhere and charge the Supplier with any loss incurred, or (ii) terminate this Agreement and any Orders between Standard and the Supplier.

2.3 Additional Performance Measures. In addition to any other performance requirements contained herein, Supplier agrees to perform the Sourced Work within the Scorecard Guidelines attached hereto and made a part hereof as Exhibit C. Supplier agrees to cooperate with any performance evaluations performed by Standard or its Customers that are based upon the Scorecard Guidelines.

3.      CONFIDENTIALITY

3.1      Confidential Information. Supplier shall keep all Standard and Customer trade secret, proprietary and such other information, including, but not limited to, software programs, technical data, methodologies, know-how, processes, developmental work, artwork, content, marketing requirements, marketing plans, pricing and cost data, quotations and quotation methodologies, customer information (including, but not limited to, any personal information related to any identified or identifiable natural person or legal person, such as Standard's or Customer's employees, customers, subcontractors, partners or any third party) and financial and business information (collectively, the "Confidential Information"), in the strictest confidence. Supplier shall only disclose the Confidential Information to its employees who have a need to know the Confidential Information in order for Supplier to perform this Agreement. Supplier shall only use the Confidential Information for the performance of this Agreement.

3.2      Exclusions. Confidential Information will not include information that (i) is or becomes a part of the public domain through no act or omission of the Supplier, (ii) was in the Supplier's lawful possession prior to the disclosure and had not been obtained by the Supplier either directly or indirectly from Standard or its Customers, (iii) is lawfully disclosed to the Supplier by a third party without restriction on disclosure, or (iv) is independently developed by the Supplier as proven by dated written records. In addition, nothing contained in this Agreement will be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required by law or valid order of a court or other governmental authority; provided, however, the Supplier will first have given notice to Standard or its Customer, if applicable, and will have made a reasonable effort to restrict the scope of disclosure to the greatest extent reasonably possible and to obtain a protective order requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued.

3.3      Confidentiality Covenant. The Supplier shall hold, by using the same degree of care that it takes for its own information of a similar nature, the Confidential Information in confidence perpetually (the "Confidentiality Covenant"). In no event shall Supplier disclose the Confidential Information in any form to any of its officers, employees or agents or use the Confidential Information for any purpose other than in the performance of its obligations under the Orders.

3.4    Return or Destruction of Confidential Information. Within three (3) business days from receipt of a written request from either Standard or its Customer, the Supplier shall either (i) return all copies of any Confidential Information in its possession to Standard or its Customers or (ii) if so directed by Standard or its Customer, destroy all Confidential Information in its possession and provide Standard and its Customer with written certification signed by a duly authorized officer of Supplier that the Confidential Information has been destroyed. The Supplier's confidentiality obligations under this Agreement shall continue in full force and effect notwithstanding the return or destruction of the Confidential Information.

4.    INTELLECTUAL PROPERTY AND PREPARATORY MATERIALS

4.1    Intellectual Property and Preparatory Materials. Standard shall retain title and ownership to all SRC Intellectual Property and SRC Preparatory Materials furnished by Standard to Supplier in order to assist Supplier in performing the Sourced Work. The term "SRC Intellectual Property" shall mean any Intellectual Property now or hereafter owned by or licensed to Standard. The term "Intellectual Property" shall mean all of a Person's right, title and interest in and to the following: fictitious names, trade names, trademarks, trademark registrations, trademark applications, service marks, service mark registrations, service mark applications, copyrights, copyright registrations, copyright applications, patent rights, licenses with respect to any of the foregoing, trade secrets, proprietary information and know-how inventions, inventor's notes, drawings and designs, customer and vendor lists and the goodwill associated with any of the foregoing now owned or hereafter acquired by a Person. The term "Person" shall mean any natural person, corporation, association, general or special partnership, limited liability company, joint venture or governmental agency. The term "SRC Preparatory Materials" shall include, but is not limited to, any plates, negatives, mats and electronic data or files now owned or hereafter acquired by Standard in connection with the Sourced Work. All rights of ownership to data, applications, plates, negatives, mats and electronic data or files, documentation, drawings, samples, prototypes, modifications to commercial products, whether in magnetic or physical form, first produced under this Agreement, and not merely an enhancement or modification of Supplier's work product or Background Technology (as defined below) shall vest solely in Standard. Supplier shall assist Standard in the application of any copyright or patent right associated with such intellectual property. For purposes of this Agreement, "Background Technology" shall mean all procedures, designs, drawings, models, trade secrets, know-how, source codes, software and other documentation, information and technology proprietary to Supplier, which Supplier (i) has acquired or acquires from third parties, (ii) creates outside of its performance of its services under this Agreement, or (iii) relates to skills and knowledge of a general nature acquired by the Supplier in the course of performance of services under this Agreement. Supplier retains all rights, including, but not limited to, intellectual property rights in any and all of the Background Technology provided to Standard under this Agreement.

4.2    Customer Intellectual Property and Preparatory Materials. Each Customer shall retain title and ownership to all Customer Intellectual Property and Customer Preparatory Materials furnished by Customer or Standard to Supplier in order to assist Supplier in performing the Sourced Work. The term "Customer Intellectual Property" shall mean any Intellectual Property now owned or licensed to Customer. The term "Customer Preparatory Materials" shall include, but is not limited to, any plates, negatives, mats and electronic data or files now owned or hereafter acquired or developed by a Customer in connection with the Sourced Work.

4.3    Supplier Covenants. Supplier hereby covenants to Standard that (i) Supplier shall only use the SRC Intellectual Property, SRC Preparatory Materials, Customer Intellectual Property and Customer Preparatory Materials to perform the Sourced Work in accordance with and subject to any additional limitations as set forth in the Orders, and (ii) to return to Standard or Customer, upon Standard's demand, the SRC Intellectual Property, SRC Preparatory Materials, Customer Intellectual Property and Customer Preparatory Materials (the "Intellectual Property and Preparatory Materials Covenant"). This includes any changes and/or alterations of the data requested by Standard or Customer to be performed by the Supplier.

4.4    Intellectual Property Warranty. In the event that any Sourced Work, deliverables or any other intellectual property provided by Supplier under this Agreement is held to constitute an infringement and its use is enjoined, Supplier will, at its own expense and at its option, (i) procure for Standard or its Customers, the right to continue to receive the Sourced Work, deliverables or other intellectual property provided in connection herewith, or (ii) if applicable, replace the same with non-infringing Sourced Work, deliverables or any other intellectual property of equivalent function and performance, or (iii) modify the Sourced Work, deliverables or any other intellectual property so they become non-infringing without detracting from function or performance, or (iv) if alternatives (i), (ii) and (iii) are not reasonably available, refund to Standard all fees paid to Supplier for the infringing Sourced Work, deliverables or any other intellectual property and reimburse Standard for any costs incurred by Standard or its Customers as a result of such infringement. This intellectual property warranty is in addition to any other warranty provided under this

Agreement. This intellectual property warranty shall not apply to the specific content of the intellectual property that was provided by Customer to Standard and/or Supplier.

5.    ELECTRONIC DATA

5.1 Definition. "Electronic Data" shall mean all information regardless of form that Customers or Suppliers have entered or transferred or provided to Standard though the CPX Website. Electronic Data shall include, but is not limited to, information such as price, quantity, quality, delivery, invoice, change order, specification, shipping, payment, due date, storage, purchase order and other like data and all information that has been provided electronically by Supplier or Customer in connection with its response to RFQ's issued on the CPX Website. Standard shall not be responsible for the loss or destruction of any Electronic Data owned by Supplier. Standard is not liable for any application whatsoever that might result in down time or non-usability of the licensed CPX Website. Standard recommends Supplier routinely back up its Electronic Data and Standard will not be held responsible for any lost data accordingly.

5.2 Ownership. Standard will own, and have the right to use in accordance with this Agreement, all Electronic Data generated by use of the CPX Website that it collects on its servers and databases. Except as expressly permitted under this Agreement, Standard will not share with any third party any Electronic Data obtained through this Agreement that in any way identifies Supplier individually without Supplier's express written consent. However, notwithstanding anything herein to the contrary, nothing shall restrict Standard from (i) in any way including Electronic Data relating to Supplier's bids as a part of aggregated Electronic Data used by Standard or others for analyzing market and business trends or any other purpose so long as Standard does not attribute any such information to Supplier individually; (ii) providing Supplier contact and identification information (such as contact name, address, etc.) and pricing and other product terms to Customers to enable transactions over the CPX Website; (iii) using Electronic Data to generate reports and fulfilling its duties and obligations under this Agreement and any licenses or other agreements that Standard has with Customers and Suppliers; (iv) using Electronic Data to enhance the CPX Website; (v) disclosing information if Standard believes in good faith that the disclosure is necessary to comply with law or to enforce its rights under the Agreement; or (vi) transferring any Electronic Data relating to a Customer's transactions with Supplier to the Customer.

5.3 Disclosure. Supplier acknowledges that Standard may, from time to time, make known generally that a particular party is a registered user of the CPX Website and Supplier consents to such disclosure. Standard's rights hereunder shall expressly survive the termination or expiration of this Agreement for any reason. Supplier agrees that it will use Customer information provided by Customer or Standard hereunder in accordance with its obligations to such Customer, and Supplier shall not sell, rent, transfer or otherwise provide to any third party any information provided by Standard without each affected Customer's prior written consent.

5.4 Liability. STANDARD SHALL NOT BE LIABLE TO SUPPLIER FOR ANY LOSS OF THE ELECTRONIC DATA.

5.5 Data Backup. Any Electronic Data delivered to Standard by Supplier shall be backed up by duplicate material retained by Supplier. Standard shall have the right to copy and retain for its files all Electronic Data owned by Supplier.

5.6 Supplier Responsibility. Supplier accepts sole responsibility for the accuracy and adequacy of all Electronic Data, and subsequent changes to recorded Electronic Data provided by Supplier to Standard. Standard shall not be responsible for errors or omissions resulting from the inaccuracy or defect in any Electronic Data supplied by Supplier. If Supplier fails to provide Standard with accurate and adequate Electronic Data in accordance with any applicable time schedules as contained in any RFQ issued by Standard or Customer on the CPX Website for the Sourced Products and/or Sourced Services or otherwise, Supplier will reschedule and render the Services as promptly as possible. The time for the delivery of the Sourced Products and Sourced Services is of the essence. Supplier will pay Standard, at its standard rates in effect at the time, for processing any reruns or any additional work performed by Standard due to the Supplier submitting improper Electronic Data which are incorrect or incomplete.

6.    NON-COMPETITION AND REQUEST FOR QUOTE COVENANTS

6.1 Non-Competition Covenant. During the term of this Agreement and for a period of one (1) year from the expiration or termination of this Agreement for any reason, Supplier shall not, directly or indirectly, sell, lease or otherwise provide any Sourced Work to any Customer that Supplier has furnished any Sourced Services or Sourced Products through this Agreement with Standard (whether ordered via the CPX Website or otherwise) during the term of this Agreement (the "Non-Competition Covenant").

6.2 <u>Permitted Product Sales and Services</u>. Nothing contained in this Agreement shall be construed as prohibiting Supplier from selling, leasing or otherwise providing the Sourced Products or rendering the Sourced Services to any Person that is not disqualified by the terms in 6.1.

6.3 <u>Supplier Acceptance of Non-Competition Covenant</u>. The Non-Competition Covenant will become effective with respect to a Customer when Supplier accepts an RFQ or Order from Standard or such Customer through the CPX Website or otherwise. Supplier is responsible for not accepting and promptly returning all RFQ's and Orders from Customers the Supplier does not want the Non-Competition Covenant to apply to. Notwithstanding anything to the contrary contained in this Agreement, Supplier shall not use any information provided by Standard or by a Customer, through an RFQ, an Order or the CPX Website, or otherwise obtained by Supplier in connection with providing Sourced Work, to directly or indirectly sell or otherwise provide any services, products or product components, including, but not limited to, the Sourced Work, to such Customer.

6.4 <u>Guaranteed Price Covenant</u>. If at any time during the term of this Agreement Supplier sells any of the Sourced Products or renders any of the Sourced Services of the same kind, quality and quantity as provided for in any of the Orders to any Person at a price that is lower than the price then in effect under any of the Orders for substantially similar Sourced Products or Sourced Services, that lower price shall apply for all substantially similar Sourced Products and Sourced Services purchased by Standard from Supplier so long as the lower prices remain in effect (the "Guaranteed Price Covenant").

6.5 <u>Fee Covenant</u>. Not later than thirty (30) days after the end of each calendar quarter, Supplier shall pay Standard a program maintenance fee in an amount equal to three percent (3%) of the aggregate amount paid Supplier by Standard and/or Standard's Customers in the previous calendar quarter for all Sourced Work (the "Fee Covenant"). The Fee Covenant will not apply until Supplier has received at least $10,000 in Sourced Work from Standard and/or Standard's Customers.

6.6 <u>Change Orders</u>. Supplier shall not provide any Sourced Work in excess of that which is specifically set forth in an Order unless authorized in writing by a change order signed by Standard or its Customer.

6.7 <u>Supplier Audit</u>. Upon reasonable notice from Standard, Supplier shall grant Standard, and a third-party, or other auditors reasonable access to Supplier's records, systems, controls, processes and procedures related to Supplier's performance of the Sourced Work for the purpose of performing audits or examinations to determine Supplier's compliance with the terms and conditions contained in this Agreement and the Orders including, but not limited to, the Non-Competition Covenant. The audit information provided hereunder shall remain in the strictest confidence. Standard's audit rights granted hereunder shall continue for a period of four (4) years following the termination or expiration of any agreement that Standard has with its Customers to provide the Sourced Work (the "Audit Covenant").

7.    INDEMNIFICATION

7.1 <u>Indemnification</u>. Supplier shall indemnify, defend and hold harmless Standard and its Customers and their respective directors, officers and employees of (the "Indemnified Parties"), from and against any and all liabilities, losses, suits, claims, demands, judgments, fines, damages, costs and expenses (including all costs for investigation and defense thereof, including, but not limited to, court costs, paralegal and expert fees and reasonable attorneys' fees) which may be incurred by, charged to or recovered from any of the foregoing ("Indemnified Loss") (i) by reason or on account of damage to or destruction of any property of Standard or its Customers, or any property of, injury to or death of any person resulting from or arising out of or in connection with Supplier's performance of its obligations under the Orders, or the acts or omissions of the Supplier's directors, officers, agents, employees, Suppliers, licensees or invitees, regardless of where the damage, destruction, injury or death occurred, unless such liability, loss, suit, claim, demand, judgment, fine, damage, cost or expense was proximately caused solely by the Indemnified Parties' negligence or by the joint negligence of the Indemnified Parties and any Person other than Supplier's directors, officers, agents, employees, Suppliers, licensees, or invitees, (ii) arising out of or in connection with the failure of Supplier to keep, observe or perform any of the covenants or agreements in the Orders which are required to be kept, observed or performed by Supplier including, but not limited to, the Confidentiality Covenant, Intellectual Property and Preparatory Materials Covenant and Non-Competition Covenant, (iii) resulting from any claim or action alleging that Standard's or its Customers' possession or use of any software, firmware, programming or other item provided by the Supplier pursuant to the Orders infringes any Person's Intellectual Property right; or (iv) arising out of the breach of this Agreement by Supplier (collectively, the "Indemnification Covenant"). Standard shall provide Supplier reasonable notice of any Indemnified Loss for which indemnification will be sought hereunder, allow Supplier or its insurer to compromise and defend the Indemnified Loss to the extent of its interests, and reasonably cooperate with the defense of any Indemnified Loss.

7.2 Violations of Law. Supplier shall assume all responsibility for any loss which is caused by its violation of any state, federal, municipal or agency law, rule, regulation or order pertaining to performance of its obligations under the Orders. The Supplier shall give to the proper authorities all required notices relating to its performance, obtain all official permits and licenses, and pay all proper fees and taxes.

7.3 Term of Indemnification Covenants. The Indemnification Covenant contained in this Agreement shall survive the expiration or termination of this Agreement for any reason. No provision contained in this Agreement shall be construed to negate, abridge or otherwise reduce any other right of indemnity that Standard or its Customers may have as to any Person including, but not limited to, Supplier.

8. NON-DISCRIMINATION AND MINORITY BUSINESS DEVELOPMENT.

8.1 Equal Opportunity Employers. Standard and Supplier are equal opportunity employers and do not discriminate in employment of Persons or awarding of Orders because of a Person's race, sex, age, religion, national origin, veteran or handicap status.

8.2 Compliance. Supplier is aware of and fully informed of Supplier's responsibilities and agrees to the provisions under the following: (i) Executive Order 11246, as amended or superseded, in whole or in part, and as contained in Section 202 of said Executive Order as found at 41 C.F.R. § 60-1.4(a) (1-7); (ii) Section 503 of the Rehabilitation Act of 1973 as contained in 41 C.F.R. § 60-741.4; and (iii) The Vietnam Era Veterans' Readjustment Assistance Act of 1974 as contained in 41 C.F.R. § 60-250.4.

8.3 Minority Business Development. Standard is committed to serving the diverse needs of its communities by identifying qualified Minority and Women Owned Businesses ("MWBE"), Disadvantaged Business Enterprises ("DBE") and Small Business Enterprises ("SBE"), each certified by appropriate state or local organizations (collectively, "Historically Underutilized Businesses" or "HUBs") that add value to the procurement process.

Supplier shall use its reasonable best efforts to support Standard's utilization of HUBs including, but not limited to, identifying and notifying Standard of procurement opportunities that may exist relating to the Orders that include, or may include, HUBs' participation in the production of the Sourced Products and the rendering of the Sourced Services. Supplier shall also assist Standard in the continued development of its HUB program including, but not limited to, participating in trade shows, developing seminars and participating in discussions with local councils.

9. GENERAL

9.1 Effective Date and Termination. This Agreement shall become effective as of the date Supplier has begun its performance of its duties under any of the Orders or the date this Agreement has been fully executed by both Parties, whichever shall occur first. This Agreement shall remain in full force and effect for an initial period of three (3) years with automatic renewal for successive one (1) year periods unless either Party shall furnish the other Party with a written notice not less than sixty (60) days prior to the renewal date that this Agreement shall not be renewed. Standard may, at its sole option, terminate this Agreement at any time for its convenience and without cause upon thirty (30) days' prior written notice to Supplier. The provisions of this Agreement shall continue to be applicable to all Sourced Work which had been ordered by Standard and accepted by Supplier prior to the date this Agreement is terminated.

9.2 Integration and Amendments. This Agreement (and the Terms and Conditions integrated herein) and the Orders shall constitute the entire agreement between the Parties with respect to the Sourced Work and shall supersede all prior or simultaneous representations, discussions, negotiations, letters, proposals, agreements and understandings between the Parties with respect to the Sourced Work, whether written or oral. In the event of any conflict between any provision contained in this Agreement and any Order, the provisions contained in this Agreement shall be controlling. This Agreement may not be amended except by a written agreement executed by both Parties.

9.3 Binding Effect and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and the respective successors and assigns including, without limitation, any successor in interest to either Party by merger or otherwise; provided, however, Supplier may not assign or delegate the performance of its obligations under this Agreement or the Orders to any Person except with Standard's prior written consent. In the event Supplier is merged into another Person or its assets are acquired by another Person, Standard may terminate this Agreement and all Orders upon ten (10) days' prior written notice to Supplier or its successor in interest.

9.4 Third-Party Beneficiary. Standard's Customers shall be considered to be a third-party beneficiary of the Confidentiality Covenant, the Indemnification Covenant, and the Audit Covenant contained in this Agreement.

9.5 <u>Waiver</u>. Either Party's waiver of any term or condition of this Agreement or any Order must be in writing and shall not be construed to be a waiver of any other term or condition thereof. Either Party's waiver of any term or condition of this Agreement or any Order shall not be deemed a waiver of a subsequent breach of the same term or condition contained in this Agreement or any Order. The failure or delay of either Party to enforce any of its rights under this Agreement or any Order shall not constitute a waiver of such rights or any future rights under this Agreement or any Order.

9.6 <u>Independent Contractors</u>. Standard and Suppliers are independent contractors. Each Party shall have sole responsibility for the payment of all employee taxes, compensation, wages, benefits, contributions, insurance and like expenses, if any, of its employees. Nothing contained in this Agreement or the Orders shall be construed as (i) either creating a partnership or joint venture between the Parties, or (ii) authorizing the other Party from acting as an agent or representative of the other Party. Neither Party shall make any contract, agreement, warranty or representation on behalf of the other Party.

9.7 <u>Injunctive Relief</u>. Supplier acknowledges that violation of any of the provisions of the Confidentiality Covenant or the Non-Competition Covenant as contained in this Agreement will cause irreparable loss and harm to Standard which cannot be reasonably or adequately compensated by damages in an action at law. Accordingly, in the event of a breach or threatened breach by Supplier of either the Confidentiality Covenant or Non-Competition Covenant, Standard shall be entitled, without posting bond or other security, to injunctive and other equitable relief to prevent or cure any breach or threatened breach thereof, and Supplier agrees that it will not be a defense to any request for such relief that Standard has an adequate remedy at law. Notwithstanding the foregoing, Standard shall have all other legal remedies as may be appropriate under the circumstances including, inter alia, recovery of damages occasioned by such breach.

9.8 <u>Jury Trial Waiver</u>. The Parties hereby waive trial by jury in any action, proceeding, claim or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Agreement or the Orders.

9.9 <u>Choice of Law and Venue</u>. This Agreement and the Orders shall be governed and construed in accordance with the laws of the State of Ohio without regard to the conflict of law principles. The Parties hereby submit to the jurisdiction of the courts of the State of Ohio and of the United States located in Montgomery County, Ohio, and each Party agrees not to raise and waive any objections to, or defense based on the venue of, any such court or forum non convenience.

9.10 <u>Survival</u>. The Confidentiality Covenant, Indemnification Covenant, Intellectual Property and Preparatory Materials Covenant, Non-Competition Covenant and Fee Covenant shall survive the termination of this Agreement for the periods set forth in this Agreement.

9.11 <u>Notices</u>. All notices, consents, waivers and other communications required or permitted to be given pursuant to this Agreement or any Order, shall be in writing and shall be deemed to have been delivered either (i) on the delivery date, if personally delivered, or if delivered by confirmed facsimile or e-mail, (ii) one (1) business day after delivery to any national overnight courier directing delivery on the next business day, receipt requested, or (iii) three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, with adequate postage affixed thereto. All notices to Standard shall be sent to Standard at 600 Albany Street, Dayton, Ohio 45408-1442, to the attention of Contract Services, and to Supplier at its address as set forth in this Agreement, or at such other address as either Party may designate in writing to the other Party.

9.12 <u>Section Titles</u>. The section titles are solely for convenience of reference and shall not affect the meaning or construction of any provision of this Agreement.

9.13 <u>Severability</u>. If any term or provision of this Agreement or the Orders shall be held or deemed to be, or shall in fact be illegal, inoperative or unenforceable, this provision shall not affect any other provision or provisions contained in this Agreement or the Orders.

9.14 <u>Publicity</u>. Supplier shall not use the name(s), trademark(s), or trade name(s) of Standard, Customers or each of their subsidiaries or affiliates, except as follows: (i) with the prior written consent of Standard or the Customer; or (ii) as may be necessary for Supplier to perform its obligations under this Agreement; or (iii) as may otherwise be required by law. Supplier shall provide ten (10) days written notice to Standard prior to disclosure under subsections (ii) or (iii) above.

8

9.15 Permits, Licenses and Inspections. Supplier will secure and pay for all licenses, permits and inspections necessary for prosecution and completion of the Sourced Services. Upon Standard's request, Supplier will deliver to Standard copies of all permits, written approvals, licenses and inspections promptly after their receipt by Supplier.

9.16 Insurance. Supplier shall maintain in full force and effect, at Supplier's own expense, workers' compensation insurance as required under the laws or regulations having jurisdiction over Supplier's employees; general liability insurance with policy limits not less than a combined single limit for bodily injury and property damage of $1,000,000 per occurrence and $2,000,000 in the general aggregate; and all-risk property insurance with an endorsement to include property of others with a sublimit on the property of others coverage of no less than $1,000,000 per occurrence. The foregoing insurance shall have coverage for Supplier's operations and contractual liabilities and shall provide that Standard shall receive sixty (60) days prior written notification before any such insurance is canceled. Any general liability and all-risk property insurance will name Standard as an additional insured.

9.17 Security and Safety. Supplier shall comply with all applicable security and safety policies and procedures of Standard and its Customers that are now in effect or hereafter implemented by Standard or its Customers.

9.18 Invoices and Payment. Notwithstanding anything else contained herein, Section 8 (Invoices and Payment) to the Terms and Conditions is deleted in its entirety and replaced with the following:

"8. Invoices and Payment. Invoices shall be rendered through the CPX Website or acceptable alternative and shall contain the PURCHASE ORDER NUMBER, item number, description of goods or services, quantities, unit prices, and total purchase price. All taxes shall be stated separately. All payments shall be made net fifty-five (55) days from receipt of Seller's invoice; provided, however, if Buyer makes a payment within twenty (20) days receipt of such invoice, Buyer shall receive a two percent (2%) discount for the amount of such invoice unless other cash discount incentives are offered and accepted in writing. Cash discount periods shall be computed from either the date of actual delivery of the goods or the date an acceptable invoice is received, whichever is later. All claims for money due or to become due from Buyer shall be subject to deduction by Buyer for any setoff or counterclaim arising out of this or any other of Buyer's Orders with Seller."

9.19 Buy Paper Program. Standard may identify preferred paper suppliers that Supplier must select from to acquire the paper to perform the Sourced Work. The prices for such paper are established by Standard and the preferred paper suppliers. Supplier shall be made aware of the prices for such paper prior to the submission of Supplier's quote to Standard. The prices for the paper may not include all rebates received by Standard. All payments to the preferred paper suppliers for such paper shall be made within twenty (20) days receipt of the corresponding invoice, and Supplier shall receive a one percent (1%) discount for the amount of such invoice unless other cash discount incentives are offered and accepted in writing. Supplier shall provide the preferred paper suppliers with all reasonably requested information for billing purposes and to evaluate the credit worthiness of Supplier.

IN WITNESS WHEREOF, Standard and Supplier have executed this Preferred Certified Supplier Agreement by their duly authorized officers or representatives as of the day and year first above written.

"STANDARD REGISTER"

THE STANDARD REGISTER COMPANY,
an Ohio corporation

By _____
Signature

_Director of Procurement_____
Title

_11/8/07_____
Date

"SUPPLIER" _Harmony Press, Inc._
_d/b/a Harmony Marketing Group_
a(n) _Indiana Corporation____

By _____
Signature

_C.O.O._____
Title

_11/06/07_____
Date

EXHIBIT A

MODIFICATIONS AND SUPPLEMENTS TO PREFERRED CERTIFIED SUPPLIER AGREEMENT

First Modification to Agreement

When Supplier is providing Standard with Sourced Work for Standard's non-Hewlett-Packard Company or non-Fifth Third Bank Customers, Section 6.5 (Fee Covenant) to the Agreement shall remain unchanged.

When Supplier is providing Standard with Sourced Work for Hewlett-Packard Company and/or its affiliates or Fifth Third Bank and/or its affiliates, Section 6.5 (Fee Covenant) of the Agreement is deleted in its entirety and replaced with the following:

"6.5    Reserved."

Second Modification to Agreement

Notwithstanding anything else contained in the Agreement, if Supplier is providing Standard with Sourced Work for Hewlett-Packard Company or one of its affiliates, Section 6 (Risk of Loss) to the Terms and Conditions is deleted in its entirety and replaced with the following:

"6.    Risk of Loss.  When performing Sourced Services under the Agreement, title to the products shall be with Buyer or its Customers at all times.  Risk of loss to the products shall immediately transfer to Buyer upon delivery of the products to the carrier at Seller's facilities."

When Supplier is providing Standard with Sourced Work for its non-Hewlett-Packard Company Customers, Section 6 to the Terms and Conditions shall remain unchanged and in full force and effect.

Third Modification to Agreement

Notwithstanding Section 9.19 of the Agreement, Supplier agrees to participate in the HP Buy Paper Program set forth below when Supplier is providing Standard with Sourced Work for Hewlett-Packard Company and/or its affiliates.  As used in the HP Buy Paper Program, the term "printer" shall mean "Supplier" and the terms "Hewlett-Packard Company" and "HP" shall mean "Customer" as those terms are defined in the Agreement.

HP BUY PAPER PROGRAM

Paper Program

Printers will place orders with xpedx, the paper supplier identified for the HP Buy Paper Program, for all paper required for HP projects.

1.    Paper Brands for the HP Buy Paper Program

Hewlett-Packard Company and xpedx have established preferred paper mill partners that are included in a comprehensive HP Buy Paper Program.  The products offered by these mills provide HP with many choices in terms of paper price, quality, finishes and breadth of product line. The updated list of negotiated paper grades will be provided to you separately.

Printers will, on occasion, be required to order paper that is not on the negotiated list, e.g., synthetic substrates, unique text and cover grades, etc. In these cases, the xpedx Program Coordinators and Account Managers will be available to assist in the selection of the right paper to satisfy HP's needs.

2.    Order Placement

When you are asked to bid or estimate print jobs by HP print buyers and agencies, your bid should reflect manufacturing costs only and amount of paper required to complete the job.  Paper orders will be placed by you with xpedx as usual; however, you will not be invoiced for paper.  Paper invoices will be sent directly to HP.

3.    Printer Handling Fees - HP will not pay a handling fee for paper.

11

4.    **General Information:**

a.    **HP Printer Claims for Paper**

If HP printers encounter a problem that is believed to be paper or freight damage related, xpedx must be notified immediately by telephone or email and industry standards pertaining to the filing of a claim must be followed.

~~xpedx will facilitate and monitor the claim process between the printer and the paper mill. HP printers will~~ have 24/7 coverage for claims information and may contact Adam Weisbacker, xpedx HP Program Coordinator, at 513-981-2564 (office direct) or 513-317-5971 (cell) or by emailing adam.weisbacker@xpedx.com. If you do not receive an immediate reply from Adam, please contact Pam Mantor at 520-260-6541 (cell) or by emailing pkmantor@aol.com , or Helen Hawekotte 626-584-9900 (office) or 626-318-4825 (cell) or by emailing helen.hawekotte@xpedx.com.

If HP printers encounter a paper problem while on press, the paper mill technical staff must be notified immediately. The paper mill alone is authorized to admit fault, or to commit the mill to charges or settlement. Further, if the printer decides to continue to run the paper when a known paper problem has been observed, any press time in excess of two hours will not be considered reimbursable.

HP printers must gather adequate evidence and samples to support a valid paper claim. This includes a specific description of the problem, where it is occurring, when it began, and whether it is an intermittent or continuous problem.

Important: All label or stenciled information contained on the roll, carton or skid must be collected and/or noted by written documentation.

b.    **Damaged Blankets or Plates**

The mill will accept a claim for the actual value of damaged blankets or plates, once the mill has determined their paper is defective. Supporting evidence of the paper defect and subsequent press sheets showing the result of the damage must be submitted. Damaged blankets and plates must be retained and kept available pending settlement of the claim.

c.    **Transit Damage Claims**

It is imperative that you carefully and thoroughly inspect all paper shipments, confirming any transit damage by making sure the truck driver countersigns the delivery papers, noting all damaged goods. Please collect all wrappers and labels for inspection when discovery of concealed damage occurs, immediately notifying xpedx. xpedx will make every effort to facilitate a credit for concealed transit damage for the paper.

5.    **Training**

HP expects all printer employees, including estimators, buyers, and sales representatives to be fully knowledgeable of the cost savings efforts and processes of the HP Print Program. All printers are expected to adequately train their employees to successfully implement this program.

6.    **Contact Information for HP Buy Program**

Customer Service Center
Hours:  8 AM EST to 4 PM PST
(After 4 PM PST, please contact your local xpedx rep with emergency requests.)

Contact:             Adam Weisbacker
Phone:              513-981-2564
                    800-305-2905

| | |
|---|---|
| Email: | adam.weisbacker@xpedx.com or HP.Paper@xpedx.com |
| Fax: | 1-800-792-9173 |
| Manager: | john.suto@xpedx.com |
| HP CSR Manager: | stephanie.varley@xpedx.com |
| Call/email HP CSR Center to: | Check stock or place orders |
| xpedx will contact you to: | Review job specifics<br>Coordinate delivery requirements |

7.  **Complaint Handling**

Twenty-four hour a day, seven day a week coverage by printers' local xpedx rep, xpedx Program Coordinators or Account Managers.  Information and assistance will be provided for paper claims and replacement stock.

Email claim information to:     adam.weisbacker@xpedx.com
513-981-2564 or 513-317-5971
pkmantor@aol.com
520-260-6541
helen.hawekotte@xpedx.com
626-318-4825

**EXHIBIT B**
**PURCHASE ORDER**
**TERMS AND CONDITIONS**

1. Agreement. This Purchase Order ("Order") is The Standard Register Company's ("Buyer") offer to purchase from Seller the goods and/or services which are described on the face of this Order. This Order is issued pursuant to the Preferred Supplier Agreement (the "Agreement") by and between Buyer and Seller and the terms and conditions contained in the Agreement are incorporated herein by reference. By acknowledging receipt of this Order or by shipping the goods or by beginning to perform the services, Seller agrees to the terms and conditions of sale contained in this Order. Any terms proposed in Seller's acceptance of this Order which add to, vary from, or conflict with the terms in this Order, are hereby objected to. Any such proposed terms shall be void and the terms in this Order shall constitute the complete and exclusive statement of the terms and conditions of the contract between the Seller and Buyer. If this Order has been issued by Buyer in response to an offer to sell by Seller and if any of the terms herein are additional to or different from any terms of the Seller's offer, then the issuance of this Order by Buyer shall constitute an acceptance of Seller's offer subject to Seller assenting to such additional and different terms and acknowledging that this Order constitutes the entire agreement between Seller and Buyer. Seller shall be deemed to have assented to these terms and conditions and acknowledged that this Order constitutes the entire agreement between Seller and Buyer unless Seller notifies Buyer to the contrary in writing within five (5) days of receipt of this Order.

2. Prices. This Order must not be filled at a price higher than shown on the face of this Order. Any change to the purchase price or any other term or condition of this Order must be authorized in writing or electronically through the CPX website by Buyer. All prices are FOB Buyer's designated delivery location and include all custom duties and sales, use, excise and property taxes and similar charges.

3. Price Warranty. Seller warrants to Buyer that the prices for the goods sold to Buyer under this Order are not less favorable than those currently extended to any other customer for the same or like goods in equal or less quantities. If Seller reduces its price for such goods during the term of this Order, Seller shall correspondingly reduce the price of the goods sold thereafter to Buyer under this Order.

4. Delivery. Time is of the essence. If delivery of the goods is not made in the quantities and on the delivery date or dates specified or the rendering of the services is not completed by the date or dates specified, Buyer shall have the right, in addition to its other rights and remedies, to take either or both of the following actions: (i) direct expedited routings of the goods with the Seller paying the difference in cost between the expedited routing and the Order routing cost; (ii) cancel this Order by written or electronic notice effective when received by Seller as to goods not yet shipped or services not yet rendered and to purchase substitute goods or services elsewhere and charge Seller with any loss incurred.

5. Packaging. All goods must be packaged in the manner as specified by Buyer and shipped in the manner and by the route and carrier designated by Buyer. If Buyer does not specify the manner in which the goods must be packaged, Seller shall package the goods so as to avoid any damage in transit. If Buyer does not specify the manner of shipment, route or carrier, Seller shall ship the goods at the lowest possible transportation rates, consistent with Seller's obligation to meet the delivery schedule set forth in this Order.

6. Risk of Loss. Title and risk of loss in transit shall not pass to Buyer until delivery of the goods to the location designated on the face of this Order.

7. Inspection. Buyer's payment for the goods shall not constitute its acceptance of the goods. Buyer shall have the right, but not the obligation, to inspect the goods and to reject any of the goods which are in Buyer's judgment defective. Goods so rejected and goods supplied in excess of quantities ordered may be returned to the Seller at its expense. The fact that Buyer failed to inspect or test any goods shall not affect any of the Buyer's rights.

8. Invoices and Payment. Invoices shall be rendered through the CPX Website or acceptable alternative and shall contain the PURCHASE ORDER NUMBER, item number, description of goods or services, quantities, unit prices, and total purchase price. All taxes shall be stated separately. Payment shall be made net fifty-five (55) days from receipt of Seller's invoice unless cash discount incentives are offered and accepted. Cash discount periods shall be computed from either the date of actual delivery of the goods or the date an acceptable invoice is received, whichever is later. All claims for money due or to become due from Buyer shall be subject to deduction by Buyer for any setoff or counterclaim arising out of this or any other of Buyer's Orders with Seller.

9. Changes. No modification of this Order shall be effective without Buyer's prior written or electronically provided consent. Buyer reserves the right to change (i) specifications and drawings where the goods are being specifically manufactured for Buyer, (ii) the place of delivery, (iii) the time of delivery, or (iv) the quantity purchased.

10. Cancellation. Buyer may cancel this Order or any part thereof if Seller breaches any provision of this Order. This Order will terminate automatically, without notice, if Seller becomes insolvent or the subject of any proceeding under the law relating to bankruptcy or the relief of debtors. Buyer may also terminate this Order or any part thereof for the sole convenience of Buyer.

11. Warranty. Seller warrants to Buyer that all goods covered by this Order shall conform to the specifications, drawings, samples or other descriptions specified by Buyer or if none are specified, to Seller's standard specifications for such goods. Seller also warrants to Buyer that all goods shall be fit and sufficient for the purpose intended, merchantable, of good material and workmanship and free from defect. Buyer's inspection, test, acceptance or use of the goods shall not affect Seller's obligations under these warranties. Seller shall replace or correct, at Buyer's option and at Seller's cost, defects of any goods not conforming to these warranties. If Seller fails to correct defects in or replace nonconforming goods within ten(10) days from the date the Buyer notifies Seller of the defect or defects, Buyer may, upon ten (10) days prior written notice to Seller, either (i) make such corrections or replace such goods and charge Seller for all costs incurred by Buyer, or (ii) revoke its acceptance of the goods in which event Seller shall be obligated to refund the purchase price and make all necessary arrangements, at Seller's costs, for the return of the goods to Seller.

12. Patent Indemnification. Seller shall defend, at its own expense with counsel reasonably satisfactory to Buyer, any action against Buyer for any alleged infringement of patent, invention or copyright rights arising from the sales or use of the goods. Seller shall indemnify Buyer from any damages, liabilities, claims, losses and expenses (including attorney's fees) paid or incurred by Buyer in connection with any such action. Buyer, at its expense, may participate in the defense of any such action, but shall not be obligated to so participate.

13. Confidentiality. All specifications, documents, and prototype goods delivered by Buyer to Seller are the property of Buyer. They are delivered solely for the purpose of Seller's performance of this Order and on the express conditions that the information contained therein shall not be disclosed to others nor used for any purpose other than in connection with this Order except with Buyer's prior written consent. Seller shall promptly return to Buyer all such specifications, documents and prototype goods upon Buyer's written or electronic request. Seller's obligations under this Paragraph shall survive the cancellation, termination or completion of this Order.

14. Force Majeure. Buyer may delay delivery and/or acceptance occasioned by causes beyond its control.

15. Remedies. Each of the rights and remedies reserved to Buyer in this Order shall be cumulative and additional to any other remedies provided in law or equity. No delay or failure by Buyer in the exercise of any right or remedy shall affect any such right or remedy and no action taken or omitted by Buyer shall be deemed to be a waiver of any such right or remedy.

16. Assignment. This Order may not be assigned except with Buyer's prior written approval.

17. Compliance with Laws. Seller warrants to Buyer that all goods supplied hereunder will have been produced in compliance with all applicable federal, state and local laws, orders, rules and regulations, including, but not limited to, the Fair Labor Standards Act of 1938, the Civil Rights Act of 1964, the Occupational Safety and Health Act of 1970, the Noise Control Act of 1972 and the Toxic Substance Control Act of 1976. Seller shall furnish Buyer, no later than the date the goods are delivered, with a Material Safety Data Sheet for any goods which are covered by the Occupational Safety and Health Act Hazard Communications Standard as contained in 29 C.F.R. § 1910.1200. Seller also warrants to Buyer that it is an affirmative action/equal opportunity employer and hereby certifies it is in compliance with the requirements of Executive Order 11246, as amended, and Part 60-1 and 60-2 of Title 41 Code of Federal Regulations (CFR), relating to federal equal employment opportunity requirements and certification of non-segregated facilities; Executive Order 11625 relating to minority and women business enterprises; Executive Order 11701 (41 CFR 60-250) and the Vietnam Veterans Readjustment Act of 1974 relating to the employment of veterans; and Section 503 of the Rehabilitation Act of 1973 and (41 CFR 60-741) relating to the employment of handicapped persons. Further, the Seller agrees to comply, as appropriate, with 45 CFR 31028 and 45 CFR 31033 (Small Business/Socially and Economically Disadvantaged Small Business Utilization). Seller shall indemnify Buyer from any damages, liabilities, claims, losses and expenses (including attorneys' fees) paid or incurred by Buyer as a result of any breach by Seller of these warranties.

18. Government Contracts. If this Order bears a government contract number on the face of this Order, Seller shall comply with all pertinent provisions of said government contract and pertinent executive orders and directives to the extent that they apply to the subject matter of this Order and all such pertinent contract provisions, orders and directives are hereby incorporated by reference into this Order. A copy of the government contract's terms and conditions will be given to Seller upon request.

19. Notices. All notices, consents, waivers and other communications required or permitted to be given pursuant to this Order, shall be in writing and shall be deemed to have been delivered either (i) on the delivery date, if personally delivered, or if

15

delivered by confirmed facsimile or e-mail, (ii) one (1) business day after delivery to any national overnight courier directing delivery on the next business day, receipt requested, or (iii) three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, with adequate postage affixed thereto.  All notices to Buyer Register shall be sent to Standard Register at 600 Albany Street, Dayton, Ohio 45408-1442, to the attention of Contract Services, and to Seller at its address as set forth in this Order, or at such other address as either party may designate in writing to the other party.

20. Severability.  If any provision of this Order shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, this provision shall not affect any other provision or provisions contained in this Order.

21. Paragraph Titles.  The paragraph titles are solely for convenience of reference and shall not affect the meaning or construction of any provision of this Order.

22. Jury Trial Waiver.  The Seller and Buyer hereby waive trial by jury in any action, proceeding, claim or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Order.

23. Applicable Law.  This Order shall be governed and construed in accordance with the laws of the State of Ohio without regard to its conflict of law principles.

**EXHIBIT C**
**SCORECARD GUIDELINES**


**Standard Register®**
ADVANCING YOUR REPUTATION

1/22/2012

Dear Standard Register Commercial Print Partner:

Standard Register is very appreciative of the support we get from your company in serving our customers. We know we have high expectations and that you do a very nice job in meeting our quality and service needs. We like all companies must constantly be reviewing what we do and how we do it to stay ahead of the competition to always be the preferred supplier to our customers.

As part of our approach to meet this objective, we have once again been reviewing our subcontractor programs. We are looking at further consolidating our supply base to best leverage our material costs, minimize freight costs and time for both ourselves and our customers, and insure we are dealing with the companies that consistently provide the best quality and service. We feel your organization meets these requirements and can continue to help us improve at what we do.

As such, we would like to reconfirm your status as a preferred supplier within our subcontracting program and at the same time, advise we need a change in our agreements. This change is to increase the fees (rebates) you pay to SRC by 5%. None of us like rebates, however, we need to do this due to a system issue at SRC.

Effective on all new purchase orders placed with your company as of 2/01/2012 and thereafter, the new rebate percentage will be 8% (eight percent).As an acknowledgement and acceptance of this contract modification , we would ask you to sign this letter in the space below agreeing to the new rebate percentage and return this either by scanning and e-mailing after you sign or mailing a signed copy to the attention of :

Paula Carpenter
600 Albany St.
Dayton, Ohio 45417
Paula.carpenter@standardregister.com

Additionally, for all future rebate payments, please note the change of address below. Please ensure all rebate checks reference "Subcon Rebate" and the fiscal period directly on the remittance. The new address for checks is: Standard Register
PO Box 840655
Dallas, TX 75284

There are no other changes to the terms of your contract with Standard Register. We would appreciate your signed agreement acknowledging this change returned NO LATER than 1/30/2012.

Failure to return an executed copy of this letter may result in our choosing to utilize other suppliers.

Please feel free to contact myself or Rick Ball to discuss any concerns or issues you may have at your convenience.

Scott Finberg
Director, Print Management
The Standard Register Company
651-365-1034
Scott.finberg@standardregister.com

Richard L. Ball
Director, Supply Chain
The Standard Register Company
937-221-1765
Rick.ball@standardregister.com

Change in increase in rebate percentage change is hereby accepted by:

_____

Company Name

_____

Printed Name

Signature_____          Date:_____

**Gary Price**

| | |
|---|---|
| **From:** | Kevin Heller [kevin.heller@hmktgroup.com] |
| **Sent:** | Monday, January 23, 2012 7:07 AM |
| **To:** | tim.harman@hmktgroup.com; 'Jim Pattison'; 'Gary Price' |
| **Subject:** | FW: New Rebate Structure |
| **Attachments:** | Rebate Revision Agreement .doc; _Certification_.htm |

Looks like we're getting a significant "BUMP" on the SRC rebate. If I'm reading this right, it says 8%. Seems pretty steep.

**From:** Finberg, Scott [mailto:Scott.Finberg@standardregister.com]
**Sent:** Sunday, January 22, 2012 11:29 PM
**To:** Smith - Allen, Ronda
**Subject:** New Rebate Structure

Good Evening:

Standard Register is very appreciative of the support we get from your company in serving our customers. We know we have high expectations and that you do a very nice job in meeting our quality and service needs.  We like all companies must constantly be reviewing what we do and how we do it to stay ahead of the competition to always be the preferred supplier to our customers.
As part of our approach to meet this objective, we have once again been reviewing our subcontractor programs.  We are looking at further consolidating our supply base to best leverage our material costs, minimize freight costs and time for both ourselves and our customers, and insure we are dealing with the companies that consistently provide the best quality and service.

We feel your organization meets these requirements and can continue to help us improve at what we do.


If you have any questions please feel free to contact me to answer and questions

**SCOTT FINBERG**
*DIRECTOR PRINT MANAGEMENT*
**Standard Register (Supply Chain Services)**
Office: 651-365-1034  |  Mobile: 651-206-2760
standardregister.com
**Advancing Your Reputation**

Confidentiality Notice: This email message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

ADDENDUM
TO
PREFERRED SUBCONTRACTOR
AGREEMENT

THIS ADDENDUM ("Addendum") is made effective as of April 1st, 2014 ("Effective Date"), by and between THE STANDARD REGISTER COMPANY, an Ohio corporation, having its principal place of business at 600 Albany Street, Dayton, Ohio 45417, ("Standard Register"), *Hofmann Press*, a *C* corporation, on its own behalf and on behalf of its Affiliates, with its principal place of business located at *Bourbon, IN* , ("Subcontractor") and augments the Preferred Subcontractor Agreement dated _____("Agreement") entered into by and between Standard Register and/or WorkflowOne – a Standard Register Company and Subcontractor.

WHEREAS, Standard Register and Subcontractor now desire to modify the Agreement to reflect certain changes in the terms or conditions of the Agreement;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and intending to be legally bound by the terms of this Addendum, Standard Register and Subcontractor agree that;

1. Standard Register shall now be defined to include its subsidiary WorkflowOne. So that either Standard Register or WorkflowOne may utilize this Agreement for the purchase of Goods or Services from Subcontractor.

2. A new section shall be added as follows: Taxes and Other Charges

   In addition to the price of the items sold hereunder, unless otherwise agreed, Seller will pay all foreign charges including, by way of example but without limitation, excise taxes, value added taxes, and export taxes.

3. The Rebate Covenant shall be deleted and replaced with the following: Rebate : Subcontractor shall pay Standard Register a rebate in the amount of 5% of the sale price of all Products( less taxes, freight and postage ) and Services in the previous month for all Subcontracted Work ("Rebate"). Standard Register shall deduct the Rebate amount from each invoice received from Subcontractor. Standard Register intends to auto deduct the Rebate from invoices at the time they are presented for payment as soon as payments are being made from Oracle.

**For Legacy Standard Register purchase orders:** Monthly accruals and monthly payments will still have to be accounted for and made for those transactions until Oracle has been adopted as the company-wide A/P platform.

**For Legacy WorkflowOne purchase orders:** Auto deduct incentive (rebate) at time of invoice payment

4.  The Payment Terms shall be revised to read as follows" Payment Terms : All payments due hereunder shall be made based on 2% 30 days, Net 60 days terms. Risk of loss shall transfer to Standard Register at the point of shipment provided that Standard Register's carrier is being used. If the Subcontractor uses a carrier not approved by Standard Register, risk of loss shall transfer at point of delivery.

5.  Packaging and Shipping Requirements shall be deleted and replaced with the following: Freight and Packing Terms : All freight terms shall be as described on Schedule 2 to this Agreement as well as the supplemental Order Fulfillment Guidelines (OFIs). Seller shall be responsible for any damage to merchandise caused by improper boxing, crating, or packing

6.  In the event of a conflict between the terms and conditions of this Addendum and the Agreement, the terms and conditions of this Addendum shall control.

7.  This Addendum is limited precisely as written and shall not constitute a waiver or modification of any other term or condition of the Agreement.  Except as expressly modified by this Addendum, the Agreement shall remain in full force and effect.

8.  Standard Register and Subcontractor represent and warrant to each other that the execution, delivery and performance of this Addendum have been duly authorized by all requisite corporate action.

IN WITNESS WHEREOF, Standard Register and Subcontractor, by their duly authorized officers or representatives, have executed this Addendum as of the Effective Date.

THE STANDARD REGISTER COMPANY                                    [Subcontractor]

By: _____          By: _____

Name: _____          Name: _James W. Pattison_

Title: _____          Title: _C. O. O._

Date: _____          Date: _4/19/14_

# Certificate of Compliance

Unless otherwise exempt by applicable provisions of the Federal laws, regulations and Executive Orders referred to herein, the undersigned supplier certifies as follows:

1. **Equal Opportunity Clause** – That it shall comply with the provisions of Executive Order 11246, Section 202, paragraph (1) through (7), which provisions are incorporated herein by reference.
2. **Certification of Non-segregated Facilities** – That it does not and will not maintain segregated facilities as described in Executive Order 11246 and in 41 CFR 60-1.8, which provisions are incorporated herein by reference.
3. **Affirmative Action for Disabled Veterans & Veterans of the Vietnam Era** – That it shall comply with the provisions of Executive Order 11701, Section 402 of the Vietnam Era Veterans Readjustment Act of 1974 and 41 CFR 60-250, which provisions are incorporated herein by reference.
4. **Affirmative Action for Disabled Workers** – That it shall comply with the provision of Executive Order 11758, Section 503 of the Rehabilitation Act of 1973 and 41 CFR 60-741, which provisions are incorporated herein by reference.
5. **Employer Information report and Affirmative Action Program** – That it shall file the Standard Form 100 (EEO-1) in compliance with Executive Order 11246 and 41 CFR 60-1.7 and shall file a written affirmative action program as required by 41 CFR 60-1.40.
6. **Small Business, Small Disadvantaged Business, Woman-owned Business and Subcontracting Programs** – that it shall use its best efforts to carry out the provisions of Executive Order 11625 and FAR 52.219-9 (d)(9) and 52.219-13, which provides that these businesses be considered fairly as subcontractors and the provisions of which are incorporated herein by reference.
7. **Fair Labor Standards** – That it shall comply with all provisions of the Fair labor Standards Act (29 U.S.C. Sections 201-219) and implementing regulations (29 C.F.R. parts 510-794), which establish minimum wages, overtime pay, record keeping, and child labor use standards for employees.

CHECK ALL THAT APPLY:

_____ Large Business – Generally over 500 employees

___✓___ Small Business – Generally fewer than 500 employees (refer to 13 CFR part 121 or Small Business Administration for exceptions).

_____ Disabled Veteran Owned – At least 51% owned by a disabled veteran(s), and who daily control and operate the business.

_____ Minority Owned – At least 51% owned by Black Americans, Hispanic American, Native American, Asian-Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the Small Business Act.
**Definition of Minority - Please check all that apply:**
_____ The phrase "Black American" means persons having origins in any of the black racial groups of Africa.
_____ "Hispanic American" includes persons of Mexican, Cuban, Puerto Rican, Central or South American, or other Spanish culture.
_____ The phrase "Native American" means American Indians, Eskimos, Aleuts, and native Hawaiians.
_____ The term "Asian-Pacific American" means U.S. citizens whose origins are Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the U.S. Trust Territories of the Pacific, Northern Marinas, Laos, Cambodia and Taiwan.

_____ American Female Owned – At least 51% owned by a woman/women who are United States citizens and who daily control and operate the business.

_____ Certified by what organization (include copy of certification)? _____

Name of the Company  _Harmony Press, Inc. d/b/a Harmony Marketing Group_

Parent Company Name _____

Address  _115 N. Main St., Bourbon, IN 46504_

Authorized Signature  _[signature]_　　　　　　　　Date  _4/17/14_

Type of Authorized Representative  _C.O.O._

Form No 3410 Revised: March 10, 2014

Form **W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

### Request for Taxpayer
### Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)
*HARMONN Press, Inc.*

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☐ Individual/sole proprietor  ☑ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
*115 N. Main St.*

Requester's name and address (optional)

City, state, and ZIP code
*Bourbon IN 46504*

List account number(s) here (optional)

Print or type
See Specific Instructions on page 2

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line
to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a
resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other
entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a
TIN* on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose
number to enter.

Social security number

| | | | – | | | – | | | | |

Employer identification number

| 3 | 5 | – | 1 | 3 | 3 | 1 | 7 | 8 |

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign
Here

Signature of
U.S. person ▶

Date ▶ *4/17/14*

## General Instructions

Section references are to the Internal Revenue Code unless otherwise
noted.

### Purpose of Form

A person who is required to file an information return with the IRS must
obtain your correct taxpayer identification number (TIN) to report, for
example, income paid to you, real estate transactions, mortgage interest
you paid, acquisition or abandonment of secured property, cancellation
of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident
alien), to provide your correct TIN to the person requesting it (the
requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a
number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt
payee. If applicable, you are also certifying that as a U.S. person, your
allocable share of any partnership income from a U.S. trade or business
is not subject to the withholding tax on foreign partners' share of
effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request
your TIN, you must use the requester's form if it is substantially similar
to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are
considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or
organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or
business in the United States are generally required to pay a withholding
tax on any foreign partners' share of income from such business.
Further, in certain cases where a Form W-9 has not been received, a
partnership is required to presume that a partner is a foreign person,
and pay the withholding tax. Therefore, if you are a U.S. person that is a
partner in a partnership conducting a trade or business in the United
States, provide Form W-9 to the partnership to establish your U.S.
status and avoid withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 12-2011)

## Standard Register Supplier Request Document

### *This information to be filled out by Supplier*

Supplier Name _Harmony Press, Inc. d/b/a Harmony Marketing Group_

Physical Address _115 N. Main St._

City _Bourbon_ State _IN_ Country _USA_ Zip Code _46504_

Remit-To Site Address (Invoice Payments) _Same_

City _____ State _____ Country _____ Zip Code _____

Contact Name _Nicole Tunis_

Supplier Phone Number _(008) 354-7683_     Supplier Fax Number _(574) 342-0409_

Federal Tax ID _35-1333178_     DUNS Number _____

Do you have Limited Liability Insurance?  Yes _____  No _✓_
(Required for all Service & Food Suppliers*)

If Yes, Please Include a Copy of Your Current Insurance Certificate

*Please Note: Minimum requirements for Limited Liability Insurance are $1mil per occurrence, $2mil aggregate*

For Resale Suppliers:

Supplier e-mail address (to which orders can be sent): _Lynn.Williams@Hmktgroup.com_

Preferred Method of Delivery for Purchase Orders:  Fax _____     Email _✓_

Form No 3410 Revised: March 10, 2014

# Passport Update Form

Use this form to keep our information up-to-date. Please complete our quarterly update sheet (one form for each location) and return by email to: Joann Edwards (JoAnn.Edwards@StandardRegister.com). You may add additional pages if needed.

☐ Place an X in the box if no change has occurred since last update

| Submitted by<br>James W. Pattison | | Date<br>4/17/14 |
|---|---|---|
| Company Name<br>Harmony Press, Inc. | Location<br>Bourbon, IN | |
| Owner / President<br>Timothy J. Harman | | |
| Address<br>115 N. Main St. | | |
| City<br>Bourbon | State<br>IN | Zip<br>46504 |
| Phone<br>800-525-3742 | Fax<br>574-342-0409 | |
| Contact for Quotes Name<br>Kevin Heller | | |
| Email<br>Kevin.Heller@hmktgroup.com | | |
| General Email<br>Estimating@hmktgroup.com | | |
| Website<br>HMKTGROUP.com | | |
| New Products | | |
| Capability / Equipment Changes<br>Design, Print (offset & digital), Finishing, Fulfillment | | |
| Changes in certifications (ISO, TS 16949, FSC/SFI, etc.)<br>Gracol 7; FSC; SFI | | |
| International Manufacturing Locations | ☐ Yes     xx☐ No | |
| If  yes, List Countries and Capabilities | | |
| DBE (Diverse Business Status) - No<br>☐ WBE-Women Owned        ☐ MBE-Minority Owned        ☐DVBE-Disable Veteran Owned | | |

Preferred method of Purchase Order receipt

☐ Fax number:                              xx☐ Email address:
Lynn.Williams@hmktgroup.com
(please include fax number or email address)

# Strategic Trade Partner Confirmation

2014 Order Fulfillment Instructions Receipt Confirmation

Company Name: _____Harmony Press, Inc. _____

Location: ___Bourbon, IN_____

1.  Does your company currently hold inventory or provide warehousing for Standard Register?

    Please circle one    Yes            No  xx - NO
    If Yes, please explain:

2.  Please list any and all reasons your company would be unable to comply with 2014 Order Fulfillment Instructions.  If none, please list – "Not Applicable".

    Not Applicable

3.  Any additional updates to your company information or comments you would like to include?  If none, please list – "Not Applicable".

    Not Applicable

I, _James W. Pattison, C.O.O._____, of the company ___Harmony Press, Inc. d/b/a Harmony Marketing Group_____, acknowledge receipt of the SR's 2014 Order Fulfillment Instructions. Any

request for an exception to the OFI should be submitted to StrategicSourcing@StandardRegister.com for prior approval.

Signature                                                              Date    4/17/14

Please return to: TradeAgreements@StandardRegister.com.

# SUPPLIER INFO

## STANDARD REGISTER PARTNER PROFILE

**General Information**

| | |
|---|---|
| Firm Name: | Harmony Press, Inc. d/b/a Harmony Marketing Group |
| [ xx ] Corporation | [  ] Partnership    [  ] Sole Proprietorship    Duns #: |
| Street Address: | 115 N Main St |
| City: | Bourbon    State:    IN    Zip Code:    46504 |
| Mail address if different: | |
| Phone: | 800 -525-3742    Phone:    Fax:    574-342-0409 |
| Web Site: | www. HMKTGroup.com |
| Name of Company President: | Timothy J. Harman    Phone:    800-525-3742    Ext. |
| Presidents E-Mail Address: | tim.harman@hmktgroup.com |
| Name of Sales VP/Manager: | Kevin Heller    Phone:    260-249-3115    Ext. |
| VP/Manager E-Mail Address: | kevin.heller@hmktgroup.com |
| Name of Customer Service Manager: | James Pattison    Phone:    800-525-3742    Ext. |

Person to Contact for:

| | | | |
|---|---|---|---|
| Price Quotation (name) | Lynn Williams | Deliver Commitments: | same |
| E-Mail Address for Quotes | lynn.williams@hmktgroup.com | Order Expediting: | same |
| E-Mail Address for Design Files | same | | |
| Order Entry: | same | Billing Inquiries: | Nicole Tunis |
| Complaints: | jim.pattison@hmktgroup.com | E-Mail for Address Billing | nicole.tunis@hmktgroup.com |
| Other Contacts: | | | |

Provide names and phone numbers of at least 3 customers (other than Standard Register) for reference.

**Sales and Delivery Policies:**

| | |
|---|---|
| Standard Delivery Schedule: | In Days |

Rush Delivery Schedule and Charges (specify amount and when applied):

| | |
|---|---|
| 24 Hours: | |
| 48 Hours: | |
| 72 Hours: | |
| Do you accept electronic Files? What Formats? | Yes - all |

[ x ] X if you have a Direct Sales Force - Calls directly on the end user.  May be calling on same customers as SRC.

| Number of Sales Reps  that Sell Direct | % of Business from    Direct Sales. | % of Sales that are sold Direct - but not in Competition |
|---|---|---|
| 7 | 85 | 85 |

# SUPPLIER INFO

| Location of Reps: | Midwest & National |
| --- | --- |

Paula M. Carpenter

Form # 1971
Revised 11/12

# SUPPLIER INFO

| | | | | | | |
|---|---|---|---|---|---|---|
| **Corporate Information:** | | | | | | |
| Year Firm Established: | 1975 | | Annual Sales Volume: | | $10MM - $15MM | |
| What % of your total sales is to Standard Register Company: | | | | 8% | | |
| Union Affiliation [ ] Yes [ xx ] No - If yes which Union: | | | | | Exp. Date: | |

Do you qualify as a minority business [ ] Yes [ xx ] No;  a woman owned business [ ] Yes [ xx ] No -  If yes to either fill in below:

| Type of minority: | AA - African-American [ ] | AP - Asian-American [ ] | AI - Asian-Indian [ ] | DVBE - Disabled Vet Bus. Ent. [ ] |
|---|---|---|---|---|
| HA - Hispanic-American [ ] | HUB - Historically Underutilized Business [ ] | | NA - Native-American [ ] | NH - Native-Hawaiian [ ] |
| W - Non-Ethnic Female [ ] | SBA - Small Disadvantaged Business [ ] | | VET - Veteran Owned [ ] | Other - [ ] _____ |
| Certification No. | | State: | | Exp. Date: |

Please provide Minority Certificate to: Standard Register, 600 Albany Street, Dayton, OH 45408 - ATTN:  Paula Carpenter (paula.carpenter@stdreg.com)

| Number of Employees:  Total | | 50 | Production | | 25 | Office: | | 25 |
|---|---|---|---|---|---|---|---|---|

Plant locations and size of facility in square feet:

Do you have warehousing space available in your facility [ xx ] Yes [ ] No.  How much space is available: 15,000 sf

Do you comply with the Federal Regulations of HIPPA or GLB? No

| Major Paper Suppliers: | Carbonless: | | % | Bond: | | % | |
|---|---|---|---|---|---|---|---|
| Other Material | Supplier: Xpedex | | % | Supplier: | | | % |

Please complete attached Product / Features worksheet along with a complete listing of equipment and copy of certificates and return all pages via email to:

tradeagreements@standardregister.com

| *Certifications* | *xx* | Gracol 7 (G7) | Green Partner |
|---|---|---|---|
| | Minority | Union | Wind Energy Powered |
| *XX* | FSC | American Institute of Baking (AIB) | ISO certified (specify) _____ |
| xx | SFI | FDA | |
| Information Provided by: | James W. Pattison | | Date: | 4/17/2014 |

Paula M. Carpenter

Form # 1971
Revised 11/12