## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| SRC LIQUIDATION COMPANY, | : | Case No. 15-10541 (BLS) |
| *et al.*, | : | |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Re: Docket Nos. 945, 990.** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SILVER POINT FINANCE, LLC'S LIMITED OBJECTION TO (A) DEBTORS' MOTION TO ESTABLISH PROCEDURES TO TRANSFER, ABANDON, OR SELL DE MINIMIS ASSETS AND (B) DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) AMEND INSURANCE AGREEMENT AND (II) <u>ASSUME INSURANCE AGREEMENT AS AMENDED</u>

Silver Point Finance, LLC, as administrative agent under the Pre-Petition Second Lien Term Loan Agreement (in such capacity, the "**Agent**"),[1] respectfully submits this limited objection to (a) the Debtors' Motion to Establish Procedures to Transfer, Abandon, or Sell De Minimis Assets (Docket No. 990) (the "**Abandonment Motion**") and (b) the Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Amend Insurance Agreement and (II) Assume Insurance Agreement as Amended (Docket No. 945) (the "**Anthem Motion**"). In support of its objections, the Agent respectfully states as follows:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in, as context dictates, (a) the Abandonment Motion, (b) the Anthem Motion, (c) the Final Order (I) Authorizing Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; and (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (Docket No. 290) (the "**DIP Financing Order**"), or (d) the asset purchase agreement submitted by Taylor Corporation at the auction held June 15, 2015 (the "**Taylor APA**"), as applicable.

## PRELIMINARY STATEMENT

1.      The Abandonment and Sale Procedures are grossly unfair to the Agent and the Second Lien Term Lenders; inconsistent with the Settlement Agreement between the Debtors, the Agent, and the Creditors Committee dated as of June 19, 2015 (Docket No. 696) (the "**Committee Settlement**"); and contrary to the Debtors' fiduciary duties to creditors, including the Second Lien Term Lenders. Although the Committee Settlement provided the Debtors with $3.5 million in life insurance proceeds and another $15 million in wind-down funds to wind down the chapter 11 cases, the Abandonment and Sale Procedures seek to shift responsibility for administering the Debtors' remaining assets (real or personal) entirely onto the Second Lien Term Lenders. In particular, the procedures would force the Agent, on behalf of the Second Lien Term Lenders, either to take possession of and title to the Excluded Assets or permit the Debtors to abandon or sell such assets at their discretion—all with only two business days' prior notice. Notably, the Debtors have not performed any meaningful due diligence concerning the Excluded Assets and, despite repeated requests, have not facilitated the Agent's attempts to conduct its own due diligence.[2] In effect, the Debtors seek to wash their hands of the burden of administering the Excluded Assets by forcing the Agent either to take full responsibility for the administration of such assets or to acquiesce to their abandonment.

2.      The Agent is dismayed by the Debtors' approach to the wind-down process because the Agent (on behalf of the Second Lien Term Lenders) agreed in the Committee Settlement to release its claim to the Wind-Down Amount, other than an amount specifically

---

[2]    The term "De Minimis Assets," as the Debtors use it, is a misnomer. "De Minimis Assets" are, as defined in the Abandonment Motion, any Excluded Assets regardless of their value. *See* Abandonment Motion ¶ 8. As explained in more detail below, the Debtors' conclusion that the Excluded Assets "have little or no value to the Debtors' estates" is pure conjecture. *Id.*

allocated for its professional fees and expenses, on the understanding (consistent with common practice in a liquidating chapter 11 case) that the Wind-Down Amount would be used to facilitate an orderly and thoughtful resolution of the Chapter 11 Cases. More particularly, the Agent assumed that the Debtors would use the Wind-Down Amount and life insurance proceeds to conduct diligence, market, and sell the remaining assets, thereby enhancing recoveries for creditors, including the Second Lien Term Lenders. Because the Abandonment and Sale Procedures, far from enhancing their recoveries, are in fact affirmatively harmful to the Second Lien Term Lenders, it is unclear that the ongoing wind-down and plan process confers any value even roughly proportional to the Agent's and Second Lien Term Lenders' concessions with respect to the Wind-Down Amount. In this regard, the Debtors' proposed procedures, if implemented, would violate the Debtors' fiduciary duties and are inconsistent with the Committee Settlement.[3]

3.       Nonetheless, the Agent supports reasonable abandonment procedures and has proposed modifications to the Abandonment and Sale Procedures that are fair to both the Second

---

[3]     The Agent has agreed to support (and continues to support) a chapter 11 plan consistent with the Committee Settlement. Considering the Debtors' facially unreasonable Abandonment and Sale Procedures, however, the Agent is now seriously concerned that Debtors are not fulfilling their obligations under the Committee Settlement. The draft chapter 11 plan that the Debtors recently circulated has only heightened the Agent's concerns. That plan seeks to deprive the Agent of the $1.85 million portion of the Wind-Down Amount specifically allocated to the Agent's fees and costs under the Settlement Agreement. Nor, contrary to the Agent's expectation, is there any indication that the Debtors intend to use any portion of the Wind-Down Amount to monetize their remaining assets for the benefit of creditors. Because unused wind-down funds must be refunded to Taylor, the Debtors are effectively proposing to return value to Taylor ahead of their secured creditors. Given that the Debtors neither intend to make any significant efforts to maximize the value of the Excluded Assets themselves nor to compensate the Agent or the Secured Creditor Trust for their fees and costs in doing so, the Agent has doubts about the viability of the chapter 11 plan under consideration. Not only is the plan inconsistent with the Committee Settlement, it likely would not satisfy the best-interests-of-creditors test. To the extent the Debtors persist in advocating a non-conforming chapter 11 plan, the Agent reserves its right to oppose such plan and to seek conversion to chapter 7. These are issues for another day, however.

Lien Term Lenders and the Debtors. The Agent's proposals improve upon the Abandonment and

Sale Procedures, including in the following respects:

(a)    The Agent would not take title to or possession of any Excluded Assets in its own name; rather, to the extent the Agent determines such assets have value, they would, on the effective date of the plan, be contributed to a secured creditor trust (the "**Secured Creditor Trust**") for the benefit of the Second Lien Term Lenders;[4]

(b)    The Agent would be permitted a reasonable time after Taylor's designation of assets as Excluded Assets to conduct due diligence before determining whether such assets have value or should be abandoned.

The Agent's proposed modifications strike an appropriate balance between the Debtors' interest

in efficiently administering the estates' remaining assets and achieving a confirmable chapter 11

plan and the Agent's interest in maximizing the value of the Excluded Assets for the benefit of

the Second Lien Term Lenders.

4.    The Debtors' procedures, in contrast, render many of the Debtors' commitments

in the Committee Settlement illusory. Under the Debtors' proposal, the Agent has no meaningful

ability to maximize the value of the Excluded Assets. Indeed, given the plainly inadequate

diligence period the Debtors have proposed, the Agent is left with two equally unenviable

alternatives: either agree to abandon *all* Excluded Assets or blindly take title to assets which may

have net negative value. Moreover, the Debtors have consistently rebuffed the Agent's request to

conduct due diligence on the potential Excluded Assets.[5]

---

[4]    Another possibility is for the Excluded Assets to vest in the reorganized Debtors, subject to the liens and claims of the Agent and the Second Lien Term Lenders, to be wound down following the plan effective date.

[5]    Indeed, although the Committee Settlement allocates $1.85 million of the Wind-Down Amount to the Agent for the payment of its professional fees and costs, the Debtors have asserted that the Agent is not entitled to access that amount for post-closing fees and expenses, despite the Second Lien Term Lenders' adequate protection rights under the DIP Financing Order. No such limitation appears in the Committee Settlement, however.

5.      Like the Abandonment Motion, the Anthem Motion inappropriately deprives the Agent of the value of the Excluded Assets. Through the Anthem Motion, the Debtors seek authorization to contract with Anthem to administer self-insured health insurance claims for former employees during a one-year Claims Runout Period. As explained below, at the conclusion of the Claims Runout Period, Anthem may owe the Debtors a significant refund on account of certain IBNR Overpayments. Any such refund rightfully should be paid to the Agent or the Secured Creditor Trust. The Anthem Plans are Excluded Assets under the Taylor APA, and the Taylor APA further provides that any refunds on account of Excluded Assets are themselves Excluded Assets. *See* Taylor APA §§ 1.1, 2.2(e). The Agent has proposed language clarifying its entitlement to any such IBNR Overpayment, but the Debtors have refused to incorporate that language into the proposed form of order.

## FACTUAL BACKGROUND

**I.      The Taylor Sale, the Committee Settlement, and the Excluded Assets**

6.      The Taylor APA affords Taylor a 90-day post-Closing Asset Review Period, during which Taylor may, with limited exceptions, designate any contracts and assets it chooses as Removed Contracts and Excluded Assets, respectively. *See* Taylor APA § 2.13. The Debtors and the Committee have agreed in the Committee Settlement, that, with certain specifically enumerated exceptions, the Agent is "entitled to the proceeds of any Excluded Assets or, *at [the Agent's] sole election*, to recover title to and possession of any Excluded Assets." Committee Settlement at 6 (emphasis added).

7.      Pursuant to the Taylor APA, Taylor funded a Wind-Down Amount of approximately $15 million. *See* Taylor APA § 1.1 (definition of "Wind-Down Amount"). The Committee Settlement provides that $1.85 million of the Wind-Down Amount is specifically

allocable to professional fees and expenses of the Agent. *Id.* at 6. The remainder of the Wind-Down Amount is generally available to fund "the cost of the payment of professional fees, disbursements and other administrative expenses in connection with the wind down and conclusion of the Cases," including various categories of expenses and liabilities specifically enumerated in the definition thereof. *See id.* In addition, under the Committee Settlement, the Agent agreed that $3.5 million in proceeds of certain life insurance policies will be available free and clear to fund the wind-down process.

## II.    The Abandonment and Sale Procedures

8.      Shortly after the Taylor Sale closed, the Agent and the Debtors began negotiating procedures to implement the Committee Settlement, wind-down the Excluded Assets, and ultimately formulate a consensual liquidating plan. During these discussions, the Agent articulated its principal objectives with respect to the Excluded Assets—to conduct reasonable diligence concerning the Excluded Assets and formulate a strategy for the Debtors to promptly liquidate any remaining assets to enhance recoveries for the Second Lien Term Lenders.

9.      On September 3, 2015, following several weeks of discussions, the Agent presented the Debtors with its proposed modifications to the Abandonment and Sale Procedures. The Agent carefully formulated its proposal to accommodate the interests of both the Debtors and the Second Lien Term Lenders. In brief, the key elements of the Agent's proposed modifications are as follows:

(a)      All Excluded Assets acceptable to the Agent would vest in the Secured Creditor Trust on the plan effective date;[6]

---

[6]    Thus, the Agent would not hold or possess such assets in its own right.

(b)    The Secured Creditor Trust would agree to accept any owned real property designated as an Excluded Asset, other than the Debtors' Terre Haute, Indiana facility; the Debtors or the reorganized Debtors would retain title to the Terre Haute facility and retain a portion of the proceeds of the sale of the Terre Haute property, subject to the payment of certain costs;

(c)    (i) The Secured Creditor Trust would accept all personal property located at any owned facility designated as an Excluded Asset (subject to Taylor's right to designate such personal property as Transferred Assets) and, (ii) with respect to personal property at leased facilities, the Agent would be permitted a reasonable due diligence period before determining whether to consent to the abandonment of such assets or accept them as a contribution to the Secured Creditor Trust; the length of the diligence period would correspond to the Debtors' rent payment schedule, such that the Agent would have ample time possible to evaluate the Excluded Assets without imposing any incremental costs upon the Debtors (which costs, if any, would be borne by the Agent if not paid by Taylor); and

(d)    The Agent would release its $1.85 million Wind-Down Amount allocation in exchange for a $1.1 million settlement payment to be applied at the discretion of the Agent and/or the Secured Creditor Trust.

While the Agent's negotiations with the Debtors continue, the Debtors have so far not agreed to modify the Abandonment and Sale Procedures.

## III.    The Anthem Motion

10.    Prior to the Taylor Sale, the Debtors maintained self-insured health insurance plans and contracted with Anthem to administer these plans. Anthem Motion ¶ 6. Taylor has not assumed these plans. *See* Taylor APA § 1.1 (definition of "Rejected Health Plans"). Pursuant to the Anthem Motion, the Debtors seek to amend the Anthem Insurance Agreement to terminate most services thereunder, while ensuring that, during the one-year Claims Runout Period, Anthem will continue to process claims that were accrued but not yet reported when the Taylor Sale closed. *Id.* ¶¶ 7-9. The Amendment, among other things, requires that the Debtors make a $500,000 Initial Prepayment and Weekly Payments based on the aggregate amount of claims paid by Anthem during the preceding week. *Id.* at Ex. B. At the end of the Claims Runout Period,

Anthem will reconcile claims it has paid on the Debtors' behalf against payments received by the Debtors and refund any overpayment to the Debtors. *Id.*

## OBJECTION

I.      **The Abandonment and Sale Procedures Are Unreasonable and Inconsistent with the Debtors' Fiduciary Duties and Obligations under the Committee Settlement.**

11.     The Committee Settlement reflects a carefully balanced and highly negotiated compromise between the Debtors, the Agent, and the Committee concerning the allocation of the Excluded Assets. Under the Committee Settlement, the Agent agreed to release its claims and liens on certain specifically enumerated assets; conversely, the Debtors and the Committee agreed that the Agent has liens on all other Excluded Assets. Committee Settlement at 6. The Agent is entitled either to the proceeds of these Excluded Assets or, "at [the Agent's] sole election, to recover title to and possession of any Excluded Assets." *Id.*

12.     The Committee Settlement contemplates that the Debtors will wind-down their estates in an orderly fashion, endeavoring to maximize the value of the Excluded Assets. The costs associated with administering and monetizing the Excluded Assets are undoubtedly "administrative expenses in connection with the wind down and conclusion of the Cases." Taylor APA § 1.1 (definition of "Wind-Down Amount"). More generally, the Debtors have a fiduciary obligation to manage the wind-down process with due care and appropriate regard of the interests of their stakeholders, including their secured lenders. *See United States v. State St. Bank and Trust Co. (In re Scott Cable Commc'ns, Inc.)*, No. ADV. A-01-04605, 2002 WL 417013, at *4 (Bankr. D. Del. Mar. 4, 2002) ("Although the United States disputes that the Debtor has an interest in protecting the PIK Note Holders because they are secured creditors, I disagree. As a

debtor-in-possession in a bankruptcy case proceeding under Chapter 11, Debtor has a duty to act on behalf of the Estate for the benefit for *all* creditors.").[7] Absent its expectation that the Debtors would administer the wind-down process in the interests of all creditors, including the Second Lien Term Lenders, the Agent never would have agreed to relinquish its claim to the Wind-Down Amount or the life insurance proceeds.[8]

13.    Through the Abandonment and Sale Procedures, the Debtors seek to abdicate responsibility for their remaining assets. The procedures evince no effort to maximize the value of—or, indeed, realize any value from—the Excluded Assets and in some respects are actively hostile to the interests of the Debtors' secured creditors. The deficiencies of the Abandonment and Sale Procedures include the following:

(a)    The Debtors presume that the Excluded Assets have little or no value but, to the extent of the Agent's knowledge, this conclusion is purely conjectural; the Debtors have performed little or no due diligence and have rebuffed the Agent's efforts to perform their own diligence;

---

[7]    The Debtors implicitly admit in the Abandonment Motion that they have largely disregarded the interests of the Second Lien Term Lenders and the Agent in formulating the Abandonment and Sale Procedures. The Debtors' argument that the Excluded Assets "have little or no value to the Debtors' estates" is predicated on the assumption that "the aggregate value of the Excluded Assets that are subject to the liens of the Second Lien Lenders . . . is far less than the outstanding principal amount still owed to the Second Lien Lenders." Abandonment Motion ¶ 4. In other words, the Debtors may treat the Excluded Assets as nearly worthless precisely because they are unlikely to generate any value for stakeholders *other than the Agent and the Second Lien Term Lenders*.

[8]    Absent its voluntary agreement to waive and release its liens on the Wind-Down Amount, the Wind-Down Amount would undoubtedly be subject to the Agent's liens and claims. The Second Lien Security and Pledge Agreement, dated as of August 1, 2013, expressly grants the Pre-Petition Term Credit Parties a security interest in proceeds of Collateral (as defined therein). *See* Second Lien Security and Pledge Agreement § 2(a)(xiv). The term "proceeds," as used therein, has the meaning given to it in the UCC. *Id.* § 1(b). The UCC defines "proceeds" as including "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." UCC § 9-102(64)(A). Because the Wind-Down Amount was acquired by the Debtors "upon the sale" of Transferred Assets constituting Term Priority Collateral or ABL Priority Collateral, the Wind-Down Amount would be collateral of the Pre-Petition Term Credit Parties had the Agent not released its liens under the Committee Settlement.

(b)    The Debtors would afford the Agent a mere two business days to review the Excluded Assets, determine whether to take title, and actually take possession; otherwise, the Debtors would be free to abandon, sell, or otherwise dispose of such assets;[9]

(c)    Although the Agent has repeatedly informed the Debtors that it does not intend to take title to any Excluded Assets in its own right, but instead would prefer that any Excluded Assets it elects to accept vest in a creditors' trust, the Abandonment and Sale Procedures make no allowance for this possibility.

Abandonment Motion ¶ 9. Considering these factors, the Agent submits that the Abandonment and Sale Procedures are not merely flawed, but are—most glaringly, in limiting the Agent to two business days' of diligence—facially unreasonable.

14.    Put simply, the Debtors should not be permitted to avail themselves of a $15 million wind-down fund and $3.5 million in life insurance proceeds while making only half-hearted efforts to administer their remaining assets. The Debtors' position is premised on the view that the remaining assets are of obviously inconsequential value and, more generally, appears to be animated by the view that they have no fiduciary responsibility to enhance the Second Lien Term Lenders' recovery. As to the first point, the Agent submits that the Debtors have no informed basis to conclude that the Excluded Assets are of de minimis value, as (a) they cannot possibly value the Excluded Assets when they have not yet been identified by Taylor and

---

[9]    The two business day deadline is so thoroughly impractical that it evidences sheer thoughtlessness, if not outright bad faith. The assets that Taylor has already designated as Excluded Assets consist of a wide assortment of office furnishings and miscellaneous equipment, which the Agent could not reasonably recover in two business days. Taking possession of real property in two business days is even more impractical given the formalities associated with real property transfers. The two business day deadline effectively turns the Committee Settlement on its head. As noted above, the Committee Settlement provides that the Agent and the Second Lien Term Lenders are entitled to proceeds of these Excludes Assets or, "at [the Agent's] sole election, to recover title to and possession of any Excluded Assets." Committee Settlement at 6. In other words the Committee Settlement presumes that the Debtors will monetize the Excluded Assets and remit the proceeds to the Agent unless the Agent—in its sole discretion—elects to take possession of the Excluded Assets and monetize them itself. Under the Debtors' procedures, in contrast, the Agent must either take possession of the Excluded Assets on just two business days' notice or acquiesce to their likely abandonment.

(b) they have conducted little or no due diligence, as evidenced by the Debtors' inability to provide the Agent a schedule of personal property assets acquired by Taylor.[10] As to the second point, the Debtors' obligations as estate fiduciaries extend to all creditors, including the Second Lien Term Lenders. Again, it was on the assumption that the Debtors would faithfully execute these duties during the wind-down process that the Agent agreed to relinquish its liens on the Wind-Down Amount and the life insurance proceeds.

## II.     The Agent's Proposed Modifications Appropriately Balance the Debtors' and the Second Lien Term Lenders' Competing Interests.

15.     As noted above, the Agent has proposed reasonable changes to the Abandonment and Sale Procedures. Under the Agent's proposal, the Agent would assume most of the responsibility and costs of administering the Excluded Assets. In exchange for assuming the largely unquantified burden and expense of administering these assets, and in lieu of its $1.85 million professional fee allocation, the Agent would receive a lower, flat amount from the Wind-Down Amount. The Agent's proposed revisions are fair to the Agent and Second Lien Term Lenders, while acknowledging the Debtors' concerns about managing the costs of the wind-down process.

## III.    The Order Granting the Anthem Motion Should Provide that the Agent or the Secured Creditor Trust Is Entitled to any IBNR Overpayment.

16.     The Agent does not oppose the Anthem Motion; however, any order granting the motion must clarify that the Agent or the Secured Creditor Trust is entitled to any IBNR Overpayment. Under the Taylor APA, "all . . . credits, security deposits, other deposits, refunds, prepaid assets or charges, rebates, and setoffs, relating to any Excluded Asset" are themselves

---

[10]    Similarly, although the Debtors' complain about the costs to the estate of maintaining the Excluded Assets, *see* Abandonment Motion ¶ 12, the Debtors have been unable to supply even a rudimentary analysis of these costs.

Excluded Assets. *See* Taylor APA § 2.2(e). The Anthem Health Plans are Excluded Assets. *See* Taylor APA § 1.1 (definition of "Rejected Health Plans"). Accordingly, any IBNR Overpayment—which is a refund due to the Debtors related to the excluded Anthem Health Plans—is an Excluded Asset, to which the Agent or the Secured Creditor Trust is entitled. The Agent has proposed the following language to clarify its right to any IBNR Overpayment:

> Any IBNR Overpayment refunded to the Debtors pursuant to the Amendment shall be deposited in a deposit account designated by the Second Lien Lender Agent and subject to the Term Adequate Protection Liens and Term Security Interests in favor of the applicable Pre-Petition Term Credit Parties. The Debtors shall not be permitted to use the IBNR Overpayment except with the prior consent of the Second Lien Lender Agent, and the Second Lien Lender Agent may apply such IBNR Overpayment to the payment of the Pre-Petition Term Debt under the Pre-Petition Second Lien Term Loan Agreement without further order or consent of the Debtors or Anthem. Capitalized terms used but not defined in this paragraph [•] shall have the meanings ascribed to such terms in the final DIP financing order.

The Debtors have not agreed to incorporate the requested language.

17.    The Debtors assert that the Agent has no right to any IBNR Overpayment because the Debtors have funded their obligations under the Amendment from the Wind-Down Amount. And, because the Agent renounced its claim to the Wind-Down Amount (excepting the $1.85 million specifically allocated to its professional fees and costs), the Debtors claim that the Agent likewise has forfeited its right to any IBNR Overpayment. The Agent submits, however, that the Debtors' source of funds is irrelevant. Once the Debtors' payment obligations to Anthem are funded, a contingent refund right arises. It is this asset—and not the Wind-Down Amount itself—in which the Agent claims an interest.

WHEREFORE, the Agent respectfully requests that the Court deny the Abandonment Motion and grant the Anthem Motion with the changes proposed herein and grant such other and further relief as may be just and proper.

DATED:      Wilmington, Delaware
              September 15, 2015

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


By:    */s/ Jason M. Liberi*
       Sarah E. Pierce (I.D. No. 4648)
       Jason M. Liberi (I.D. No. 4425)
       One Rodney Square
       P.O. Box 636
       Wilmington, Delaware 19899-0636
       Telephone: (302) 651-3000
       Fax: (302) 651-3001

       - and -

       Ron E. Meisler
       Christopher M. Dressel
       155 North Wacker Drive
       Chicago, Illinois 60606
       Telephone: (312) 407-0700
       Fax: (312) 407-041

       *Attorneys for Silver Point Finance, LLC*