## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 945, 990 & 1047** |

## DEBTORS' REPLY TO SILVER POINT FINANCE, LLC'S LIMITED OBJECTION TO (A) DEBTORS' MOTION TO ESTABLISH PROCEDURES TO TRANSFER, ABANDON, OR SELL DE MINIMIS ASSETS AND (B) DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) AMEND INSURANCE AGREEMENT AND (II) ASSUME INSURANCE AGREEMENT AS AMENDED

SRC Liquidation Company and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby submit this reply (this "Reply") to the limited objection [Docket No. 1047] (the "Objection") of Silver Point Finance, LLC ("Silver Point") to (a) the *Debtors' Motion to Establish Procedures to Transfer, Abandon, or Sell De Minimis Assets* [Docket No. 990] (the "Abandonment Motion") and (b) the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (i) Amend Insurance Agreement and (ii) Assume Insurance Agreement as Amended* [Docket No. 945] (the "Assumption Motion" and together with the Abandonment Motion, the "Motions"),[2] and respectfully represent as follows:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in, as context dictates, the Motions.

## PRELIMINARY STATEMENT

1.      Each week, the Debtors receive a notice from Taylor, the Court-approved purchaser of substantially all of the Debtors' assets, that it will not take sundry items in far-flung locations where the underlying lease is being rejected. The cost of collecting, storing, and disposing of these items exceeds their value—if that were not so, Taylor, which is entitled under the APA to retain these items at no additional cost, would not leave them with the estates. The Debtors' proposed Sale and Abandonment Procedures are designed to give the Debtors a practical way of dealing with these worthless items. Absent the Sale and Abandonment Procedures, the Debtors would be forced to file seriatim abandonment motions on a weekly basis and to spend money collecting and storing junk while the notice periods on these motions run.

2.      Turning a blind eye to practicality and economic reality, Silver Point complains that the proposed Sale and Abandonment Procedures are "grossly unfair to the Agent" and are "contrary to the Debtors' fiduciary duties" to "administer" these assets. Silver Point's position ignores the simple truth that there is no economic benefit to "administering" these assets. But, if Silver Point believes the Debtors are wrong about that for some reason, the Sale and Abandonment Procedures give Silver Point the opportunity to itself take title to these items and to keep 100% of the proceeds, if any, it realizes from "administering" the items Taylor wouldn't take for free, and that the Debtors have determined, in the sound exercise of their business judgment, have no value.

3.      The Sale and Abandonment Procedures are imminently reasonable and Silver Point's Objection should be seen for what it is—a naked attempt to re-trade its deal with the estates and the Debtors' unsecured creditors to grab for itself another $1.1 million "settlement" of manufactured issues.

01:17690367.3

## BACKGROUND

**A.    The Taylor Sale, the Committee Settlement, and the Excluded Assets**

4.    Pursuant to the APA, Taylor provided the Debtors with approximately $15 million (the "Wind-Down Amount") to enable the Debtors to pay (a) pre-closing professional fees and expenses, (b) sale-related fees and expenses, (c) insurance costs, (d) certain benefits and employee-related expenses, and (e) the estates' post-closing professional fees and other administrative expenses.  *See* APA § 1.1 (definition of "Wind-Down Amount").

5.    In the settlement agreement entered into in conjunction with the Sale by the Debtors, the Committee, and Silver Point (the "Settlement Agreement"), Silver Point expressly agreed to "waive, release, and relinquish any right, title, interest, or claim, of any type or nature whatsoever, in the Wind-Down Amount funded under the APA, and agree[d] that such amount can be used and distributed by the Debtors, in their sole discretion, as provided by the APA . . . ." Settlement Agreement at 7.

6.    However, with respect to Silver Point and the other prepetition and postpetition lenders, the Wind-Down Amount creates a narrow carveout for payment of:

> [A]ll allowed and unpaid professional fees, expenses and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) **incurred or accrued** by the professionals for the DIP Agents or DIP Credit Parties, or for the pre-petition secured lenders under the ABL Credit Facility, First Lien Term Loan or Second Lien Term Loan **on or prior to the Closing** [*i.e.*, July 31, 2015], to the extent required to be paid by the Debtors.

*Id*. (emphasis added).

7.    To provide for the pre-closing fees and expenses of the Debtors' lenders, the parties to the Settlement Agreement agreed that:

> [T]he Wind-Down Amount includes $1,850,000 on account of professional fees and expenses of the professional advisors to the DIP Agents (as defined in the DIP Financing Order), the First Lien Agent, the Second Lien Agent, and the Pre-Petition ABL Agent (as defined in the DIP Financing Order), **assuming a Closing**

01:17690367.3

**Date no later than July 19, 2015** and that all obligations herein of the Parties are honored in their entirety.

Settlement Agreement at 6 (emphasis added).

8.      Despite these clear limitations to the pre-closing period (and having been paid its pre-closing fees in connection with the sale closing), Silver Point now claims that this language gives it an entitlement to an additional $1.85 million for post-closing professional fees.  To the contrary, however, neither the APA nor the Settlement Agreement reserved any funds exclusively for Silver Point.  Moreover, the Settlement Agreement did not create an entitlement for Silver Point to postpetition interest, professional fees, or expenses on account of its remaining undersecured claim.

9.      As explained in the Abandonment Motion, the APA's definition of "Excluded Assets" includes the Debtors' interest in certain life insurance policies and in the trusts that hold them.  At no time did Silver Point have a lien against or interest in the insurance policies.  *See Objection of Silver Point Finance, LLC to Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [Docket No. 581] at Exhibit A page 9 (Silver Point "claim[s] no security interest in these policies").  Silver Point confirmed this fact in the Settlement Agreement.  *See* Settlement Agreement at 7.  The Debtors subsequently liquidated the insurance policies and recovered approximately $3.5 million in proceeds.

10.      After having paid a substantial number of post-closing administrative expenses, the Debtors only have approximately $8 million remaining to fund all remaining administrative expenses, priority claims, and a chapter 11 plan.

B.      **Insurance Amendment**

11.      In connection with closing the Taylor Sale, the Debtors entered into the Amendment with Anthem.  Following the closing of the Taylor Sale, on August 4, 2015, the Debtors used $500,000 from the Wind-Down Amount to fund the "Initial Prepayment" for the Anthem Services under the Amendment.  Anthem is currently processing and paying claims incurred by covered employees pre-closing.  To the extent that any portion of the Initial Prepayment remains after Anthem's payment of claims, it will be returned to the Debtors and redeposited in the special account established upon the closing of the Taylor Sale to hold the Wind-Down Amount.

## REPLY

A.      **The Abandonment and Sale Procedures are Appropriate and Should be Approved**

12.      Silver Point's objection is predicated entirely on the false premise that the Debtors will be abdicating their fiduciary duties by selling or abandoning De Minimis Assets that have little or no value.  This position is puzzling given that the Bankruptcy Code expressly authorizes debtors to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a) (emphasis added).  To abandon property under section 554, a debtor "need only demonstrate that [it] has exercised sound business judgment in making the determination to abandon."  *In re Contract Research Solutions, Inc.*, 2013 WL 1910286, at *4 (Bankr. D. Del. May 1, 2013) (citation omitted).

13.      Here, Taylor has the right to take title to all of the Excluded Assets for no additional consideration.  Taylor is a sophisticated, for profit enterprise that has conducted extensive diligence on all of the Debtors' assets.  The Debtors firmly believe that Taylor will, in fact, take title to any assets that are worth more than the costs of disposition—and Taylor has confirmed to the Debtors that it intends to do just that.  The only exception is a parcel of real

property located in Terre Haute, Indiana that has known environmental issues. Because Taylor

has the right to take the De Minimis Assets for free, Taylor's decision not to take any such

Assets constitutes a de facto market test that such De Minimis Assets have no net value. As if

that weren't enough, the Debtors will offer all De Minimis Assets to Silver Point for it to take,

for free, before such De Minimis Assets are abandoned. The Debtors respectfully submit that it

is a safe bet that assets which two different sophisticated parties will not even take for free are

just the kind of assets that are "burdensome to the estate or that is of inconsequential value and

benefit to the estate." 11 U.S.C. § 554(a).

14.    Silver Point's complaints that two business days is insufficient time for it to

determine whether the assets in question have value are likewise misplaced. The lists of assets

that Taylor does not want are easily reviewed for potential value. For example, set out below is

one such list of assets related to the Debtors' former facility located in Tolland, Connecticut:

- (8) Office Chairs
- (1) large metal desk
- (8) free standing filing cabinets
- (1) rolling rack shelf
- (1) wood credenza
- (1) folding table (approx. 8x3)
- (4) cafeteria tables
- (2) conference tables
- (8) conference chairs
- (1) refrigerator cabinet
- (2) large dry erase boards
- (1) credit card scanning device and (1) card impression device
- (1) ID photo taking device
- (1) large metal and wood work bench
- (1) tall metal cabinet
- (2) Liebert NFinity industrial UPS units
- (1) switch rack with 6 48-port and 2 24-port switches
- (1) large table with rack/shelves from prep
- (10) push carts of various shapes and sizes
- (1) mechanical push sweeper
- (1) tape machine

- A large abundance of small parts, including sundry spare parts
- A number of work benches and tool chests
- (1) small metal desk
- (1) HP Compaq dc6700 PC
- (1) HP L1706 monitor
- Various supplies from lighting/bathroom/woodworking/painting/cleaning

The Debtors do not believe that it takes two whole days to conduct due diligence on such a list. Nonetheless, as reflected in the revised proposed order approving the Abandonment Motion attached hereto as Exhibit A (the "Revised Abandonment Order"), the Debtors have extended the time period for Silver Point to identify any assets that it wants from two business days to five business days.[3]  The Debtors believe that this modification will provide Silver Point sufficient time to determine whether or not it wants any particular Excluded Asset while avoiding the incurrence of unnecessary expenses by the Debtors' estates in collecting and storing such worthless assets while Silver Point conducts "due diligence" on them.[4]

15.     What's more, the Debtors will not, as Silver Point suggests, blindly abandon assets that have substantial value.  For example, the Debtors have located a purchaser for the Terre Haute property notwithstanding the underlying environmental concerns related thereto. The proceeds of that sale, which are anticipated to be approximately $150,000, will be turned over to Silver Point in their entirety.  Similarly, the Debtors sold another property earlier in the Chapter 11 Cases for $2.2 million, where 100% the proceeds were turned over to Silver Point. See Docket No. 450.  As these examples demonstrate, if the Debtors do believe that a particular

---

[3]     In addition to the modification noted above, the Debtors have incorporated language into the Revised Abandonment Order which resolves informal comments received from the Committee and the Environmental Protection Agency, respectively, regarding the Abandonment Motion, as well as the issues raised in the formal objection filed by Xerox Corporation [D.I. 1037].  A cumulative blackline is attached hereto as Exhibit B.

[4]     Despite Silver Point's claims to the contrary, the Abandonment and Sale Procedures do not require Silver Point to "agree to abandon *all* Excluded Assets or blindly take title to assets . . . ."  Obj. ¶ 4 (emphasis in original). Taylor is providing a list of Excluded Assets on a weekly basis, and Silver Point will likewise have the weekly ability to pick and choose which Excluded Assets it wants, and which Excluded Assets it does not want.

asset has value that can be efficiently realized, they are happy to do so for Silver Point's sole benefit.

16.    But, while a trustee or debtor in possession has a "duty to maximize the value of the estate," *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985), that duty runs to the creditor body as a whole and not to any one creditor at the expense of others. For this reason, courts consistently recognize that abandonment of assets is appropriate where, as here, the assets in question are overencumbered. *See, e.g.*, *In re KVN Corp., Inc.*, 514 B.R. 1, 8-9 (9th Cir. BAP 2014) ("overencumbered property generally should be abandoned, not administered, because there is no benefit to unsecured creditors"); *In re HSF Holding, Inc.*, 421 B.R. 716 (Bankr. D. Del. 2010) (granting motion to abandon where "any value obtained by the estate would not be distributed to the general unsecured creditors but instead would inure to the benefit of [secured creditor]"); *McGahren v. First Citizens Bank & Trust Co. (In re Weiss)*, 111 F.3d 1159, 1168 (4th Cir. 1997) (affirming authority to abandon where "property's liens exceeded its value and that the property therefore was of inconsequential value to the estate").

17.    Given this clear authority to abandon overencumbered assets, it is not surprising that Silver Point does not even attempt to challenge the Debtors' authority to abandon the De Minimis Assets under section 554.  Silver Point instead relies on its "expectations" and "assumptions" made in connection with the Taylor Sale.  Despite these newly-revealed expectations and assumptions, two things are clear:  (1) at no time have the Debtors waived their right to abandon assets pursuant to section 554, and (2) at no time have the Debtors agreed (including in connection with the APA and the Settlement Agreement) to use estate resources to market and sell property for the sole benefit of Silver Point instead of making those resources available for distribution to the Debtors' general unsecured creditors.

18.     While the Settlement Agreement does not obligate the Debtors to use estate resources to maximize a recovery for Silver Point at the expense of general unsecured creditors, the Settlement Agreement does create a right for Silver Point to recover title to and possession of any Excluded Assets—precisely so that it can realize the value, if any, from those Assets. Almost three months after the Settlement Agreement was negotiated, Silver Point now wants to change the terms of the Settlement Agreement.  Silver Point states that it "does not intend to take title to any Excluded Assets in its own right," but instead demands that the Debtors bear the burden of marketing and/or preserving its collateral until a plan is confirmed where the assets can be transferred to a creditors' trust.  Obj. ¶ 13.  Simply put, that is not the deal Silver Point struck.

19.     Instead, the Abandonment and Sale Procedures balance the interests of the Debtors' various creditors by providing Silver Point with the option to take title to and possession of any De Minimis Asset, in accordance with the terms of the Settlement Agreement, and in the event that Silver Point does not want any particular De Minims Asset, the Debtors have the ability, but not the obligation, to dispose of it without incurring unnecessary costs. These procedures are fully consistent with section 554 of the Bankruptcy Code and should be approved.

**B.     Silver Point is Not Entitled to Any Payment of the Wind-Down Amount on Account of Fees Incurred After the Closing of the Taylor Sale**

20.     While not necessarily pertinent to the Motions, in its Objection, Silver Point asserts that it is entitled to $1.85 million of the Wind-Down Amount in order to leverage the Debtors into paying Silver Point $1.1 million for the privilege of collecting its own collateral. However, as explained above, the APA and Settlement Agreement only provide for payment of fees and expenses of Silver Point and other lenders on account of <u>pre-closing activity</u>.  Indeed,

the Settlement Agreement itself references an assumed closing date of the Taylor Sale as the basis for the calculation of the $1.85 million.

21.    For the avoidance of doubt, the Debtors dispute any alleged entitlement asserted by Silver Point to the Wind-Down Amount on account of fees incurred following the closing of the Taylor Sale.  As an undersecured creditor, pursuant to section 506(b) of the Bankruptcy Code, Silver Point is not entitled to postpetition interest or fees.  *See Joubert v. ABN AMRO Mortgage Grp. (In re Joubert)*, 411 F. 3d 452, 454 (3rd Cir. 2005) (only an oversecured creditor is entitled to add reasonable interest and fees to its secured claim).

**C.    Silver Point is Not Entitled to any Funds Returned from Anthem**

22.    In addition to opposing the Abandonment Motion, Silver Point has manufactured a dispute relating to the return of any funds from Anthem on account of the $500,000 Initial Payment.  Silver Point alleges that the Anthem Health Plans are Excluded Assets and that any future refund from Anthem must therefore be on account of the Anthem Health Plans and subject to Silver Point's liens.  Silver Point's argument is fundamentally flawed.

23.    Any refund owed by Anthem to the Debtors would be on account of payments made under the Amendment, not the Anthem Health Plans.  The Anthem Health Plans were terminated as of July 31, 2015, pursuant to the Amendment and that certain *Order Authorizing Debtors to (a) Terminate Severance Plan and (b) Modify and/or Terminate Other Employee Benefit Plans* [Docket No. 825].  Therefore, the Initial Payment, which was made on August 4, 2015, could not possibly have been on account of or "related to the excluded Anthem Health Plans" as Silver Point suggests.  *See* Obj. ¶ 16.

24.    Moreover, Silver Point disclaimed "any right, title, interest, or claim, of any type or nature whatsoever, in the Wind-Down Amount funded under the APA . . . ."  Settlement Agreement at 7.  The Initial Payment was made, after the closing of the Taylor Sale, entirely

from the free and clear Wind-Down Amount.  The funds did not somehow become subject to a non-existent Silver Point lien merely because the Debtors provided them to Anthem to hold as a security deposit.  It is disingenuous (at best) for Silver Point to now assert a contingent interest in the return of the Initial Payment or any other funds received from Anthem, on account of the Amendment.

25.    Accordingly, Silver Point has failed to articulate any legal or factual basis for any interest in funds returned from Anthem.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court overrule the Objection

and enter the Revised Abandonment Order and the proposed form of order approving the

Assumption Motion.

Dated: September 17, 2015
Wilmington, Delaware

             */s/ Andrew L. Magaziner*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
mnestor@ycst.com
kcoyle@ycst.com
mkandestin@ycst.com
amagaziner@ycst.com

-and-

Michael A. Rosenthal (NY No. 4697561)
Jeremy L. Graves (CO No. 45522)
Matthew G. Bouslog (CA No. 280978)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
mrosenthal@gibsondunn.com
jgraves@gibsondunn.com
mbouslog@gibsondunn.com

*Counsel to the Debtors and Debtors in Possession*