## EXHIBIT 4

## COMMITTEE SETTLEMENT

*EXECUTION VERSION*

# THE STANDARD REGISTER COMPANY

## SETTLEMENT AGREEMENT AMONG DEBTORS, SILVER POINT FINANCE, LLC & OFFICIAL COMMITTEE OF UNSECURED CREDITORS

### *June 19, 2015*

This settlement agreement (the **"Settlement Agreement"**) memorializes the terms of a settlement (the "**Settlement**") among The Standard Register Company and its affiliated debtors and debtors in possession (the "**Debtors**"), Silver Point Finance, LLC, in its own capacity and in its capacity as administrative agent (the "**Term DIP Agent**") under the Term DIP Credit Agreement, the First Lien Term Loan Facility,[1] and Second Lien Term Loan Facility, and the duly appointed Official Committee of Unsecured Creditors of the Debtors (the "**Committee**" and, together with the Debtors and Silver Point Finance, LLC (in the capacities set forth above), the "**Parties**") in connection with the Debtors' chapter 11 cases (the **"Chapter 11 Cases"**) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

This Settlement Agreement shall be binding, and obligations shall arise hereunder, only upon the execution and delivery of counterpart signatures among the Parties; *provided*, *however*, that the Debtors' obligations hereunder shall be subject to approval of this Settlement by the Bankruptcy Court. The Parties shall use best efforts to obtain Bankruptcy Court approval of the Settlement Agreement pursuant to the order approving the Sale (as defined below) on an expedited basis. This Settlement Agreement does not constitute an offer with respect to any securities or a solicitation of acceptances or rejections of any plan of reorganization or liquidation, it being understood that such solicitation, if any, shall be made only in compliance with applicable provisions of securities, bankruptcy, and/or other applicable laws. This Settlement Agreement is subject to Rule 408 of the Federal Rules of Evidence and any analogous rule of any applicable state or other jurisdiction. This Settlement Agreement shall not be admissible into evidence in any proceeding by a person who is not a Party hereto or a Released Party other than (a) a proceeding to enforce its terms and (b) to establish any of the covenants, provisions, or undertakings set forth herein.

Each Party to this Settlement is entering into this agreement for the purpose of settling and resolving the claims and/or disputes between the parties discussed herein and this settlement is not intended to, and does not constitute, nor shall it be deemed to constitute, an admission by any Party hereto of any liability, culpability, or fault; and any and all such admission of liability, culpability, and/or fault is hereby expressly denied.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable best efforts with respect to, the pursuit,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement by and among Taylor Corporation, as Buyer, and the Debtors, as Sellers (the "**APA**"), dated June 19, 2015.

approval, implementation, and consummation of the transactions that are the subject of this Settlement Agreement, and each Party shall take such action as may be reasonably necessary and requested to carry out the purposes and intent of this Settlement Agreement and shall refrain from taking any action that would frustrate the purposes and intent of this Settlement Agreement.

*Summary*

The Settlement is intended to resolve all claims of the Debtors' estates that can be asserted by the Debtors or any estate representative of the Debtors, including the Committee, against the Released Parties (as defined below), including, without limitation, the Silver Point Entities[2] and each of the lenders party to either or both of the First Lien Term Loan Facility and Second Lien Term Loan Facility. Without limiting the generality of the foregoing, the Settlement shall include a general release of all claims (as defined in the Bankruptcy Code) and causes of action of the Committee (the "**Committee's Claims**") against the Released Parties, whether or not asserted and regardless of whether such claims and causes of action are asserted by the Committee directly in its own right or derivatively on behalf of the Debtors and regardless of whether asserted in the form of an adversary proceeding, contested matter, objection, or otherwise. Moreover, the Committee shall irrevocably admit, stipulate, and agree to the stipulations set forth in the DIP Financing Order (as defined below), including, without limitation, paragraph 6 thereof.

In addition, the Committee shall (a) withdraw with prejudice its (i) *Objection of the Official Committee of Unsecured Creditors to the Proposed Sale of Substantially all of the Debtors' Assets* [ECF No. 580] and (ii) Supplemental Objection of the Official Committee of Unsecured Creditors to the Proposed Sale of Substantially All of the Debtors' Assets [ECF No. 682] (the objections described in clauses (i) and (ii), collectively, the "**Committee Sale Objections**"), (b) affirmatively support the sale (the "**Sale**") of substantially all of the Debtors' assets to the Taylor Corporation (the "**Buyer**") pursuant to the APA, as amended from time to time, and, in the alternative, to the Back-Up Bidder, and (c) not object to the distribution of proceeds of the Sale to the Debtors' estates in conformance with the terms of this Settlement.

In exchange for the foregoing, the Second Lien Agent (on behalf of the

---

[2]    As used herein, "**Silver Point Entities**" means: Silver Point Capital Fund, L.P.; Silver Point Finance, LLC; SPCP Group III LLC; Silver Point Capital Fund, L.P.; SPF CDO I, Ltd.; SPCP Group, LLC; Silver Point Capital Offshore Fund, Ltd.; Silver Point Capital Master Fund, L.P.; Standard Acquisition Holdings, LLC, in its own capacity and in its capacity as Back-Up Bidder (as defined in the APA) and as sub-agent to Silver Point Finance, LLC, as administrative agent under the First Lien Term Loan Facility (in such capacity, the "**First Lien Agent**") and Second Lien Term Loan Facility (in such capacity, the "**Second Lien Agent**"); and each of their general partners, directors, and managers.

lenders under the Second Lien Term Loan Facility (the "**Second Lien Lenders**") and the Debtors shall provide Settlement Consideration (as defined below), in addition to any other commitments and agreements contained herein.

*Settlement Consideration*

The Committee's agreements and commitments hereunder shall be in exchange for the following (collectively, the "**Settlement Consideration**"):

(a)    $5,000,000 (the "**GUC Cash Payment**") of the Additional Cash Component of the Sale that would otherwise be allocable to the Second Lien Lenders under the APA (which the Parties agree, in light of the resolution of the Committee's Claims and the Committee Sale Objections as provided herein, represent proceeds of the collateral of the Second Lien Lenders and shall not constitute property of the Debtors' estates) shall be designated for a distribution solely to holders of allowed general unsecured claims against the Debtors (collectively, the "**General Unsecured Creditors**"). Contemporaneously with the payment of the Additional Cash Component to the Second Lien Agent, the Second Lien Agent, on behalf of the Second Lien Lenders, shall consent that the GUC Cash Payment be paid to a trust established by the Committee, and authorized by the order of the Bankruptcy Court approving this Settlement, for the benefit of General Unsecured Creditors (the "**GUC Trust**"). The GUC Trust shall be formed, among other things, to hold and distribute the GUC Cash Payment to General Unsecured Creditors. From and after the Closing Date, the costs and expenses of the GUC Trust shall be funded exclusively from the GUC Trust's assets and proceeds thereof, exclusive of the GUC Cash Payment.

With respect to the GUC Trust, the Committee shall designate an individual or entity (the "**GUC Trustee**") to serve as trustee of the GUC Trust. The GUC Trustee shall receive and deposit the GUC Cash Payment in a separate account (the "**GUC Trust Account**") with a financial institution designated by the GUC Trustee. The GUC Trustee shall hold the GUC Cash Payment in the GUC Trust Account.

(b)    A percentage of the aggregate recovery from the estate

3

(the "**Second Lien Recovery**") to Second Lien Lenders as set forth in the table attached as __Exhibit A__ hereto (the "**Sharing Payment**"). The Second Lien Recovery shall be equal to the ratio, expressed as a percentage, of (i)(A) the amount of Additional Cash Component actually received by the Second Lien Lenders (or the Second Lien Credit Bid Amount, to the extent the Buyer terminates the APA and Standard Acquisition Holdings, LLC as the Back-Up Bidder consummates the sale) after deduction of the GUC Cash Payment, less (B) the sum of (1) any portion of the Maximum Reimbursement Amount actually received by the First Lien Agent (or the Back-Up Bidder, as its sub-agent), and (2) the fees and expenses of the Second Lien Agent, over (ii) the amount necessary for Full Payment (as defined in the DIP Financing Order) of the obligations under the Second Lien Term Loan Facility. The Sharing Payment, if and when triggered, shall be funded into the GUC Trust. For the avoidance of doubt, if the Back-Up Bidder is the buyer, no recovery on equity or acquired assets shall be considered in determining the Second Lien Recovery.

(c)     If the APA between the Buyer and the Debtors is terminated and the Debtors alternatively close a sale transaction with Standard Acquisition Holdings, LLC, as the Back-Up Bidder, and the Back-Up Bidder is subsequently sold to a third party (including by merger, stock sale, or sale of substantially all assets, whether in one or a series of related transactions) (a "**Subsequent Transaction**") before the fourth anniversary of the closing date of the sale by the Debtors to the Back-Up Bidder (the "**Subsequent Transaction Period**"), a cash payment in an aggregate amount equal to the following (the "**Subsequent Transaction Payment**"): 10% of the excess, if any, of (x) the net proceeds (after customary transaction fees and expenses) of the Subsequent Transaction over (y) $337,400,000 (it being understood that the amount referenced in clause (y) shall be updated within 105 days of the Closing Date of the sale with the Back-Up Bidder to reflect an amount equal to the sum of: (i) the Cash Component, (ii) Capitalized Lease obligations that are assumed, (iii) assumed Cure Claims, and 503(b)(9) claims, and (iv) the obligations under the First Lien Term Loan Facility and the Second Lien Term Loan Facility, including accrued and unpaid interest thereon through the Closing Date of the sale to

the Back-Up Bidder (such terms as defined in the asset purchase agreement with the Back-Up Bidder (the "**Back-Up APA**"))). For the avoidance of doubt, to the extent the Back-Up Bidder transfers all or substantially all of the assets to an entity under the control of the Back-Up Bidder, if such related transferee engages in a Subsequent Transaction during the Subsequent Transaction Period, the foregoing provision shall apply to such related transferee as it applied to the Back-Up Bidder. [3]

In addition, the Parties agree that the Wind-Down Amount (as defined in the APA) paid by the Buyer pursuant to the APA shall be used to fund the Committee's professional advisors (the "**Committee Professionals**"),[4] up to $2,000,000 of the currently or subsequently allowed and unpaid fees and expenses of the Committee Professionals. To the extent they are not paid from the foregoing Wind-Down Amount, an additional $1 million of the currently or subsequently allowed and unpaid fees and expenses of the Committee Professionals, to the extent that such fees and expenses do not relate to work performed for the GUC Trust from and after the Closing Date, shall be paid from the proceeds of the Life Insurance Policies that are listed on **Exhibit B** hereto (the "**Life Insurance Policies**"). In addition, on the Closing Date, the Debtors shall advance $600,000 to fund the GUC Trust (the "**GUC Trust Seed Funding Amount**"). For the avoidance of doubt, nothing herein shall limit the right of the Committee Professionals to seek the payment of all fees and expenses allowed in these Chapter 11 Cases from the Debtors' estates, *provided*, *however*, that such fees and expenses shall not include fees and expenses for work performed for the GUC Trust from and after the Closing Date. The GUC Trust shall repay the GUC Trust Seed Funding Amount from the first net proceeds recovered by the GUC Trust from the liquidation of its assets, but in no event from the GUC Cash Payment.

The Debtors agree that they shall cause the agreements in the preceding paragraph to be satisfied, and the Committee agrees that the Released Parties shall have no separate liability therefor. The Debtors further

---

[3]   The foregoing rights with respect to the Subsequent Transaction will be issued in a way that complies with law and where no prior registration under securities laws is required and so that the Back-Up Bidder (Standard Acquisition Holdings, LLC) is not subject to public reporting requirements under any securities laws on a post-issuance basis or is not treated as a publicly traded partnership for tax or other purposes. Any transfers of such right would be subject to a Right of First Offer and to other customary restrictions including no transfers to competitors.

[4]   If the APA with the Buyer is terminated and the Debtors subsequently close a sale to the Back-Up Bidder, the Back-Up APA shall provide for the $2,000,000 referenced in this paragraph to be contributed by the Back-Up Bidder as part of the Wind-Down Amount (as defined in the Back-Up APA).

covenant and agree that, unless the APA is terminated, they shall not draw the "Wind Down Funding Loan," as defined in the Super-Priority Priming Debtor In Possession Delayed Draw Term Loan Credit Agreement, dated as of March 12, 2015 (the "**Term DIP Credit Agreement**"), or any loan for the "Wind Down Amount" as defined in the Term DIP Credit Agreement.

For the avoidance of doubt, the Parties agree that the Wind-Down Amount includes $1,850,000 on account of professional fees and expenses of the professional advisors to the DIP Agents (as defined in the DIP Financing Order), the First Lien Agent, the Second Lien Agent, and the Pre-Petition ABL Agent (as defined in the DIP Financing Order), assuming a Closing Date no later than July 19, 2015 and that all obligations herein of the Parties are honored in their entirety.

For the avoidance of doubt, to the extent the APA is terminated and the Debtors alternatively close a sale transaction with the Back-Up Bidder, the GUC Cash Payment, the $2,000,000 Wind-Down Amount allocation for the Committee Professionals set forth above, the Sharing Payment, and the Subsequent Transaction Payment shall be paid, at the closing of such transaction, by the Back-Up Bidder.

*Unencumbered Assets*

The Committee hereby agrees that all Transferred Assets constitute collateral securing the First Lien Term Loan Facility and Second Lien Term Loan Facility (the "**Term Loan Facilities**") and that the proceeds of such collateral constitute cash collateral securing the obligations under such Term Loan Facilities. For the avoidance of doubt, the Committee irrevocably waives any claim that all or any portion of the Transferred Assets constitute unencumbered assets and/or that the proceeds of the sale of such Transferred Assets do not constitute collateral securing the DIP Obligations, the obligations under the Term Loan Facilities, and/or adequate protection replacement liens granted with respect to the Term Loan Facilities.  The Parties further agree that, except as provided below, Excluded Assets constitute collateral securing the DIP Obligations, the obligations under the Term Loan Facilities, and/or adequate protection replacement liens granted with respect to the Term Loan Facilities.  Accordingly, the Parties further agree that, except as provided below, the lenders under the Term Loan Facilities (or the First Lien Agent and/or Second Lien Agent on their behalf) shall be entitled to the proceeds of any Excluded Assets or, at their sole election, to recover title to and possession of any Excluded Assets.

Notwithstanding anything herein to the contrary, the Parties agree as follows:

(a)  The Silver Point Entities, on their own behalf and as the First Lien Agent and Second Lien Agent (and the "Required Lenders" under each of the Term Loan Facilities (as defined thereunder) direct the First Lien Agent or Second Lien Agent, as applicable, as an exercise of remedies, to) waive, release, and relinquish any right, title, interest, or claim, of any type or nature whatsoever, in the Wind-Down Amount funded under the APA, and agree that such amount can be used and distributed by the Debtors, in their sole discretion, as provided by the APA; *provided*, *however*, that a portion of the Wind-Down Amount is allocated and shall be paid to the professional advisors of the DIP Agents (as defined in the DIP Financing Order), the First Lien Agent, the Second Lien Agent, and the Pre-Petition ABL Agent (as defined in the DIP Financing Order).

(b)  The Silver Point Entities, on their own behalf and as First Lien Agent and Second Lien Agent (and the "Required Lenders" under each of the Term Loan Facilities (as defined thereunder) direct the First Lien Agent or Second Lien Agent, as applicable, as an exercise of remedies, to), waive, release, and relinquish any right, title, interest, or claim, of any type or nature whatsoever, in the Life Insurance Policies (and the Debtors' interest in that certain trust, effective as of January 1, 1998, between The Standard Register Company and Key Trust Company of Ohio, National Association , that holds only such Life Insurance Policies (as such trust may have been or may subsequently be amended, supplemented, or modified, the "**Standard Register Deferred Compensation Plan Trust**")), and agree that such assets and their proceeds shall be available to the Debtors' estates, free and clear of any liens, encumbrances, or claims, administrative or otherwise, of the Silver Point Entities, including the First Lien Agent and Second Lien Agent; *provided*, *however*, that, to the extent the Standard Register Deferred Compensation Plan Trust holds any assets other than the Life Insurance Policies, the Parties agree that the proceeds of such additional assets constitute the cash collateral of the Second Lien Lenders.

(c) The Silver Point Entities, on their own behalf and as First Lien Agent and Second Lien Agent (and the "Required Lenders" under each of the Term Loan Facilities (as defined thereunder) direct the First Lien Agent or Second Lien Agent, as applicable, as an exercise of remedies, to), waive, release, and relinquish any right, title, interest, or claim, of any type or nature whatsoever, in any claim or cause of action of the

Debtors under chapter 5 of the Bankruptcy Code that is an Excluded Asset (the "**Avoidance Actions**"), and agree that such Avoidance Actions shall be available to the Debtors' estates, free and clear of any liens, encumbrances, or claims, administrative or otherwise, including but not limited to those of the Silver Point Entities, including the First Lien Agent and Second Lien Agent.

(d) Subject to the Disgorgement Right (as defined below), the GUC Cash Payment constitutes proceeds of the Term Loan Facilities, and shall be transferred to the GUC Trust as provided above. The Silver Point Entities, on their own behalf and as First Lien Agent and Second Lien Agent, waive, release, and relinquish any right, title, interest or claim, of any type or nature whatsoever, in the GUC Cash Payment and shall not be entitled to any distribution therefrom.

(e) The D&O Claims (as defined below) and the Debtors' right to proceeds from the D&O Insurance (as defined below) secure the Term Loan Facilities, and, in exchange for the consideration provided hereunder, shall be transferred to the GUC Trust on the Closing Date, free and clear of any liens, claims, or encumbrances, including but not limited to those of the Silver Point Entities, including the First Lien Agent and Second Lien Agent.  The Silver Point Entities, on their own behalf and as First Lien Agent and Second Lien Agent (and the "Required Lenders" under each of the Term Loan Facilities (as defined thereunder) direct the First Lien Agent or Second Lien Agent, as applicable, as an exercise of remedies, to), waive, release, and relinquish any right, title, interest or claim, of any type or nature whatsoever, in the Debtors' director and officer insurance (the "**D&O Insurance**") and those certain claims and causes of action (together with any proceeds thereof, including any proceeds of the D&O Insurance) against any parties other than the Released Parties (as defined below), including but not limited to any such claims that are not currently asserted in, but could be added to, the Committee Adversary Proceeding by way of amendment, joinder, or otherwise, including claims against any additional party (the "**D&O Claims**"); *provided*, *however*, that nothing herein shall prejudice the right of any director of the Debtors or WorkflowOne nominated by the Silver Point Entities (including, without limitation, Anthony DiNello, Frederic Brace, and Robert Peiser) (x) to obtain or be protected by the coverage to which he is entitled under the Debtors' D&O Insurance (including advancement of fees and expenses) or (y) to seek indemnification from the Debtors.

8

For the avoidance of doubt, all GUC Trust assets and proceeds thereof shall, subject to the repayment claim of the Debtors related to the GUC Trust Seed Funding Amount, be free and clear of any liens, encumbrances, or claims, administrative or otherwise, including but not limited to those of the Silver Point Entities, including the Term DIP Agent, the First Lien Agent, and the Second Lien Agent.

In furtherance of the foregoing, upon the Closing Date, the Committee hereby admits and stipulates to, and agrees to be bound by, each of the stipulations set forth in the DIP financing order entered in the Chapter 11 Cases [ECF No. 290] (the "**DIP Financing Order**"), including, without limitation, paragraph 6 thereof. The Committee further admits, stipulates, and agrees that the "Challenge Period" pursuant to the DIP Financing Order has expired and all claims thereunder have been released.

*General Release*          In exchange for the Settlement Consideration and other promises and agreements set forth in this Settlement, the Committee and the Debtors, on behalf of themselves and their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, business managers, accountants, attorneys, representatives, consultants, agents, and any and all other person, party, or entity claiming under or through them, hereby release, discharge, and acquit the Silver Point Entities (including, without, limitation, Silver Point Finance, LLC, in its own capacity and in its capacity as administrative agent under the Term DIP Credit Agreement and the Term Loan Facilities); DLJ Investment Partners, L.P.; DLJ Investment Partners II, L.P., DLJIP II Holdings, L.P.; Credit Suisse AG, Cayman Islands Brand; Credit Suisse Loan Funding LLC; Sargas CLO II Ltd.; WG Horizons CLO I; any other lender under either or both of the Term Loan Facilities; any person who has served as a director of Workflow Holdings, LLC, WorkflowOne, LLC, or their subsidiaries (collectively, "**WorkflowOne**"); Anthony DiNello, Frederic Brace, and Robert Peiser; and each of their respective current and former heirs, executors, administrators, predecessors, successors, assigns, subsidiaries, parents, affiliates, divisions, partners, members, interest holders (direct and indirect), officers, directors, employees (including, for the avoidance of doubt, any current or former employee of the Silver Point Entities in his or her capacity as a board member of the Debtors or WorkflowOne), agents, shareholders, managers, accountants, attorneys, representatives, consultants, other professionals, insurers, and any and all other persons, corporations, or other entities acting under the direction, control, or on behalf of any of the foregoing, in each case solely in their capacity as such (each of the foregoing, a "**Released Party**") from any and all claims, counterclaims, disputes, liabilities, suits, demands, defenses,

liens, actions, administrative proceedings, and causes of action of every kind and nature, or for any type or form of relief, and from all damages, injuries, losses, contributions, indemnities, compensation, obligations, costs, attorneys' fees, and expenses, of whatever kind and character, whether past or present, known or unknown, suspected or unsuspected, fixed or contingent, asserted or unasserted, accrued or unaccrued, liquidated or unliquidated, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, or requirement, and claims of every kind, nature, and character whatsoever, including avoidance claims, causes of actions, and rights of recovery arising under chapter 5 of the Bankruptcy Code and any and all claims based on avoidance powers under any applicable non-bankruptcy law that any such releasing Party ever had or claimed to have, or has or claims to have presently or at any future date, against any Released Party arising from or related in any way whatsoever to the Debtors or Workflow One; *provided*, *however*, that this release shall not apply to any obligations under this Settlement Agreement or, to the extent the Back-Up Bidder is the buyer, any obligations under the Back-Up APA.  Each Released Party not a Party hereto is an intended third-party beneficiary of this Settlement Agreement and shall be entitled to enforce the same. The general release set forth in this paragraph shall be effective on the Closing Date.

Without limiting the foregoing, the Committee hereby agrees that it shall:

(a)     Within two (2) business days following the Closing Date, file an amended complaint in that certain adversary proceeding styled *Official Committee of Unsecured Creditors of The Standard Register Company*, et al., *v. Silver Point Capital, L.P.* et al., Adv. Proc. No. 15-50771 (BLS) (Bankr. D. Del.) (the "**Committee Adversary Proceeding**") and shall dismiss with prejudice, and forbear from ever prosecuting, any and all claims against the Released Parties in the Committee Adversary Proceeding, including any such claims that are not currently asserted in, but could be added to, the Committee Adversary Proceeding by way of amendment, joinder, or otherwise;

(b)     Subject to the Closing, to the extent not already released, dismiss with prejudice and forbear from prosecuting claims against persons to the extent a

judgment or settlement against such person could reasonably be expected to result in a post-petition administrative expense claim against the Debtors' estates or any claims against the Released Parties (absent written consent from such Released Parties and full indemnification from the GUC Trust); *provided*, *however*, the Committee shall not be precluded from asserting claims against any director or officer currently named in the Committee's Adversary Proceeding so long as, to the extent any Released Party is joined to or named in any such litigation, the Committee, its successor, and/or the GUC Trust or the GUC Trustee agrees to reduce its recovery, solely for the benefit of such Released Party, by the full amount of any judgment entered against the Released Party with respect to any claim of contribution, indemnification, or otherwise.

(c)     Withdraw the Committee Sale Objections and forbear from objecting to or opposing the Sale, or any relief sought by the Debtors, the Buyer, or the Silver Point Entities in furtherance of the same, including, without limitation, any objection to the payment of the obligations under the Term Loan Facilities directly to the agents or lenders thereunder, and affirmatively support the Sale and the Settlement; and

(d)     Admit, or be deemed to have admitted, that none of the Silver Point Entities is an "insider" of the Debtors, as defined in section 101(31) of the Bankruptcy Code or applicable case law.

*Payment of Term Loan Facilities*

The Parties hereby agree that, on the Closing Date (a) the Maximum Reimbursement Amount shall be paid directly from the proceeds of the Sale to the First Lien Agent or the Back-Up Bidder (as sub-agent to the First Lien Agent), as directed by the First Lien Agent, (b) the cash consideration described in Section 2.7(a)(ii)(x) of the APA shall be paid directly to the First Lien Agent in accordance with Section 2.9(c) of the APA, and (c) an amount equal to the amounts listed in Section 2.7(a)(ii)(z) of the APA less the GUC Cash Payment shall be paid directly to the Second Lien Agent, (d) the GUC Cash Payment shall be paid to the GUC Trust, and (e) the Wind-Down Amount shall be paid to the Debtors.

*Plan Support*

The Parties covenant that they will make all reasonable efforts to confirm a Plan consistent with this Settlement Agreement, and will not propose and/or support any plan of liquidation that deviates materially

11

from the terms of this Settlement; *provided*, *however*, that this provision shall not be construed to prevent the Committee from reviewing, commenting on, or otherwise negotiating the terms of the Plan in a manner customary for an official committee of unsecured creditors and consistent with this Settlement.

The Parties agree to support a Plan containing customary release and exculpation provisions for the Debtors and the Committee, and their respective professionals, subject to an appropriate carve-out to fully preserve the claims set forth in the Committee Adversary Proceeding (other than claims released and settled pursuant to this Settlement Agreement) and "opt-out" third-party releases in favor of the Released Parties (including, without limitation, Anthony DiNello, Frederic Brace, and Robert Peiser) (the "**Third-Party Releases**"). The Plan shall, among other things, provide that:

(a)    Parties voting in favor of the Plan shall be deemed to have granted the Third-Party Release and shall have no option to opt-out of such Third-Party Release;

(b)    Parties who vote to reject the Plan, or abstain from voting on the Plan, and who do not affirmatively opt-out of the Third-Party Release, shall be deemed to have granted the Third Party Release.

The Parties further agree to support a Plan containing a provision that would require any General Unsecured Creditor who receives a distribution from the GUC Cash Payment, and if such creditor initiates a lawsuit in its individual capacity against any of the Released Parties, to (a) refund any such distribution to the Second Lien Agent (the "**Disgorgement Right**"), and (b) waive its right to any further distributions.

The Committee agrees that it shall affirmatively support acceptance and confirmation of a Plan consistent with this Settlement Agreement and, in furtherance thereof, shall transmit to general unsecured creditors a customary committee letter urging General Unsecured Creditors to accept the Plan.

No Committee Professional shall represent any party in connection with any claim, action, or proceeding against the any Released Party arising from or related in any manner to the transactions and occurrences underlying the Committee's Claims and/or the Committee Sale Objection or the claims released pursuant to this Settlement Agreement; the Released Party's business dealing with the Debtors, WorkflowOne, Workflow Management, Inc., or any of their respective affiliates, predecessors, or successors; or the Chapter 11 Cases.

*Professional Fee Matters*   The Parties agree to the following with respect to professional fee and retention matters:

(a)   The Silver Point Entities shall promptly file a notice withdrawing any outstanding objections to fee statements or applications of the Committee Professionals or the Debtors. The Silver Point Entities shall further refrain from objecting to any now pending or subsequently filed fee statements or applications of the Committee Professionals or the Debtors.

(b)   Notwithstanding anything to the contrary in the DIP Financing Order, the Parties waive any right to seek section 506(c) relief in these Chapter 11 Cases.

(c)   The Silver Point Entities shall not oppose a motion for reconsideration filed by Jefferies LLC seeking approval of a transaction fee not in excess of $1 million pursuant to section 328(a) of the Bankruptcy Code.

(d)   The engagement of Jefferies LLC shall terminate on the Closing Date.

(e)   Zolfo Cooper agrees that its fees and expenses from and after June 30, 2015 shall be limited to $50,000 per month; *provided*, *however*, that Zolfo Cooper shall be permitted to carry forward the unused portion of any month's $50,000 allocation to the next month.

(f)   From and after the Closing, any fees and expenses of Committee Professionals shall, to the extent such fees and expenses relate to work performed for the GUC Trust, including without limitation work performed to pursue the Committee Adversary Proceeding, be the responsibility of the GUC Trust, but not payable from the GUC Cash Payment, and not of the Debtors.

(g)   The Committee shall promptly file a notice withdrawing any outstanding objections to the fee statements or applications of the Debtors' Professionals.

(h)   The Committee and the Debtors shall not object to any reimbursement of fees and expenses of the professional advisors of Term DIP Agent, First Lien Agent, and Second Lien Agent.

(i)   The Committee Professionals agree that they shall not

Case 15-10541-BLS   Doc 696-1   Filed 06/19/15   Page 15 of 22

represent any person or entity in prosecuting any claim against any Released Party relating in any manner to the transactions and occurrences underlying the Committee's Claims and/or the Committee Sale Objection or the claims released pursuant to this Settlement Agreement, the Released Party's business dealing with the Debtors or the Chapter 11 Cases.

*Deficiency Claims*     The Silver Point Entities, including the Second Lien Agent, hereby waive any right to receive a distribution or payment of any kind on account of any unsecured deficiency claim arising under or related to the Second Lien Term Loan Facility; *provided*, *however*, that this waiver shall not waive the Silver Point Entities' right to vote on a Plan.

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized, where applicable.

THE STANDARD REGISTER
COMPANY

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President & CEO

STANDARD REGISTER
INTERNATIONAL, INC.

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President

STANDARD REGISTER
TECHNOLOGIES, INC.

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President

STANDARD REGISTER HOLDING
COMPANY

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President

STANDARD REGISTER
TECHNOLOGIES CANADA ULC

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President

[Signature Page to Settlement Agreement]

Case 15-10541-BLS    Doc 696-1    Filed 06/19/15    Page 17 of 22

**STANDARD REGISTER MEXICO
HOLDING COMPANY**

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President

**STANDARD REGISTER HOLDING, S.
DE R.L. DE C.V.**

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  Sole Manager

**STANDARD REGISTER SERVICIOS,
S. DE R.L. DE C.V.**

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  Sole Manager

**STANDARD REGISTER DE MEXICO,
S. DE R.L. DE C.V.**

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  Sole Manager

**IMEDCONSENT, LLC**

By: _____
    Name:  Joseph P. Morgan, Jr.
    Title:  President

**STANDARD REGISTER OF PUERTO
RICO INC.**

By: _____

    Name:  Joseph P. Morgan, Jr.
    Title:  President

Case 15-10541-BLS    Doc 696-1    Filed 06/19/15    Page 19 of 22

SILVER POINT FINANCE, LLC

By: _____

    Name:   Michael A. Gatto
    Title:   Authorized Signatory

**OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS**

By: _____

Sharon L. Levine
Lowenstein Sandler LLP, solely in its
capacity as counsel to the Official
Committee of Unsecured Creditors and
not in its individual capacity

**EXHIBIT A**
**SHARING PAYMENTS**

| Tranche | Second Lien Recovery | Distribution to Second Lien Lenders[5] | Sharing Payment as Percent of Second Lien Recovery Within Such Tranche |
|:---:|:---:|:---:|:---:|
| A | 0%-19.9% | 100% | 0% |
| B | 20%-49.9% | 95% | 5% |
| C | 50%-69.9% | 70% | 30% |
| D | 70%-89.9% | 60% | 40% |
| E | 90%-par plus accrued interest | 50% | 50% |

For illustrative purposes only, if the Second Lien Lenders were to receive a Second Lien Recovery of 40%, the total Sharing Payment would be 1.01% of the distributions to the Second Lien Lenders (19.9% x 0% + 20.1% x 5% = 1.01%).

---

[5]    Net of Sharing Payments.

**EXHIBIT B**
**LIFE INSURANCE POLICIES**

| |
|---|
| Corporate Owned Life Insurance Policy (Case No. CVL106) |
| Corporate Owned Life Insurance Policy (Case No. CFL175) |
| Life Insurance Policy with Grupo Nacional Provincial, owned by Standard Register Servicios S. de R.L. de C.V. |