THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.
ACCEPTANCES OR REJECTIONS TO THE PLAN ARE BEING SOLICITED SUBJECT TO
APPROVAL OF THIS DISCLOSURE STATEMENT
BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

Dated: Wilmington, Delaware
      September 22, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Michael A. Rosenthal (NY No. 4697561)
Jeremy L. Graves (CO No. 45522)
Matthew G. Bouslog (CA No. 280978)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
mrosenthal@gibsondunn.com
jgraves@gibsondunn.com
mbouslog@gibsondunn.com

*Counsel to the Debtors and Debtors in Possession*

**PLEASE REVIEW THIS DOCUMENT FOR IMPORTANT INFORMATION REGARDING:**
- **\* Description of the Debtors, their Estates, and Background of the Chapter 11 Cases**
- **\* Classification and Treatment of Claims and Equity Interests**
- **\* Distributions to Holders of Allowed Claims**
- **\* Implementation and Execution of the Plan**
- **\* Treatment of Contracts and Leases and Procedures to Assert Rejection Claims**

**AND IMPORTANT DATES:**
- **\* Date to Determine Record Holders of Claims and Equity Interests: September 21, 2015**
- **\* Deadline to Submit Ballots and Third Party Opt-Out Election: November 2, 2015 at 5:00 p.m. (ET)**
- **\* Deadline to Object to Disclosure Statement and Plan Confirmation: November 2, 2015 at 5:00 p.m. (ET)**
- **\* Hearing on Disclosure Statement Approval and Plan Confirmation: November 19, 2015 at 9:30 a.m. (ET)**
- **\* Administrative Expense Claim Bar Date:  Thirty (30) days after the Effective Date of the Plan**
- **\* Deadline to Submit Rejection Claims arising from the entry of the Confirmation Order: Thirty (30) days after the Confirmation Date**

## 1.    <u>INTRODUCTION</u>

    **1.1    <u>Purpose of the Disclosure Statement.</u>** This disclosure statement (including all exhibits thereto, as may be amended, supplemented, or modified, the "<u>Disclosure Statement</u>") is being provided by the Debtors to the U.S. Trustee and to Holders of Claims pursuant to section 1125(b) of title 11 of the United States Code for the purpose of soliciting acceptances of the *First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and Its Affiliates*, dated as of September 22, 2015 (including all exhibits thereto, as may be amended, supplemented, or modified, the "<u>Plan</u>").  The Plan has been Filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), and the summaries of the Plan contained herein shall not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan.  A copy of the Plan is attached hereto as **<u>Exhibit 1</u>**.  <u>All capitalized terms used within this Disclosure Statement which are not defined herein shall have the meanings set forth in the Plan.</u>

    THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(c) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), NOR HAS THE SEC PASSED UPON ITS ACCURACY.

    NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER

THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER
DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.   THE
DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION, OR
INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR
INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS
DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN DETERMINING
WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.   NO LEGAL OR TAX
ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.   YOU ARE
STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL, AND TAX
ADVISORS TO UNDERSTAND FULLY THE PLAN AND DISCLOSURE STATEMENT.
THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS
GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.  THE DELIVERY
OF THIS DISCLOSURE STATEMENT DOES NOT, UNDER ANY CIRCUMSTANCE,
IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN
SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER
THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH
THE PLAN AND ITS EXHIBITS, IF ANY.  IF ANY CONFLICTS EXIST BETWEEN THE
PLAN AND DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL
VOTING CLASSES VOTE TO ACCEPT THE PLAN.**

### 1.2    Disclosure Statement Approval and Confirmation of the Plan.

1.2.1    **Requirements.**  This Disclosure Statement describes the Debtors
and the Plan that the Debtors, with the support of the Committee, will present to the
Bankruptcy Court for Confirmation.  The requirements for Confirmation of the Plan are set
forth in section 1129 of the Bankruptcy Code.

1.2.2    **Combined DS/Confirmation Hearing.**    Pursuant to the
Solicitation Order and in accordance with section 105(d)(2)(B)(vi) of the Bankruptcy Code,
the Bankruptcy Court has scheduled a combined hearing on **November 19, 2015, at 9:30
a.m. (prevailing Eastern Time)** to determine: (a) whether the Disclosure Statement
provides adequate information for Holders of Claims entitled to vote on the Plan to make
an informed judgment regarding their vote on the Plan, as required by section 1125 of the
Bankruptcy Code, and (b) whether the Plan meets the confirmation requirements of section
1129 of the Bankruptcy Code (the "Combined Approval Hearing").

1.2.3    **Deadline to Object to Confirmation of the Plan.**    The
Bankruptcy Court has set **November 2, 2015, at 5:00 p.m. (prevailing Eastern Time)**, as
the deadline for Filing and serving objections to approval of the Disclosure Statement and
Confirmation of the Plan.  Objections to the Disclosure Statement and Confirmation must
be electronically Filed with the Bankruptcy Court and served on (i) the Office of the United
States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn:
Mark Kenney); (ii)  counsel to the Debtors, (A) Gibson, Dunn & Crutcher LLP, 200 Park
Avenue, New York, NY 10166 (Attn: Michael A. Rosenthal ) and (B) Young Conaway

Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801 (Attn: Michael R. Nestor); (iii) counsel to the Committee, (A) Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, NY 10020 (Attn: Sharon L. Levine) and (B) Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward); and (iv) counsel to the Second Lien Agent, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606-1720 (Attn: Ron E. Meisler and Christopher M. Dressel).

    **1.2.4**  **Effect of Confirmation.**  Confirmation of the Plan will authorize the Distribution of the Assets of the Debtors to Holders of Allowed Claims and the dissolution of the Debtors, as provided in the Plan and the Confirmation Order. Confirmation of the Plan serves to make the Plan binding upon the Debtors, all Creditors, Holders of Equity Interests, and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

  **1.3**  **Voting on the Plan and Third Party Opt-Out Election.**

    **1.3.1**  **Impaired Claims or Equity Interests.**  Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims and Equity Interests in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests may be Impaired if the Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.  The Holders of Claims in Classes I and II are Unimpaired by the Plan, are deemed to accept the Plan, and do not have the right to vote on the Plan.  The Holders of Claims in Class V and Equity Interests in Class VI will not receive any payment or Distribution or retain any property pursuant to the Plan, are deemed to reject the Plan, and do not have the right to vote.

    **1.3.2**  **Eligibility to Vote on the Plan.**  Unless otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes III and IV as of the Record Date may vote on the Plan, unless expressly prohibited from voting under the terms of the Solicitation Order or any other Order of the Bankruptcy Court.

    **1.3.3**  **Third Party Opt-Out Election.**  Each Holder of a Claim who is presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code (*i.e.*, Holders of Claims in Classes I and II), and each Holder of a Class III and/or Class IV Claim, should also note that the Plan provides for Third Party Releases of the Released Parties.

  **IF YOU ARE THE HOLDER OF A CLASS III SECOND LIEN SECURED CLAIM OR A CLASS IV GENERAL UNSECURED CLAIM AND YOU DO NOT OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN SECTION 7.4 OF THE PLAN BY BOTH (I) VOTING TO REJECT THE PLAN OR ABSTAINING FROM VOTING ON THE PLAN, AND (II) MAKING THE THIRD PARTY OUT-OPT ELECTION IN ITEM 2 OF YOUR PROPERLY COMPLETED AND TIMELY RETURNED BALLOT, YOU WILL BE DEEMED ON BEHALF OF YOURSELF AND YOUR ESTATE, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, BUSINESS MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY AND ALL OTHER**

PERSONS OR PARTIES CLAIMING UNDER OR THROUGH YOU, TO HAVE GRANTED THE THIRD PARTY RELEASE TO THE RELEASED PARTIES.

IF YOU ARE THE HOLDER OF A CLAIM WHO IS PRESUMED TO HAVE ACCEPTED THE PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE (I.E., A HOLDER OF A CLAIM IN CLASS I OR CLASS II), YOU WILL NOT HAVE A RIGHT TO MAKE A THIRD PARTY OPT-OUT ELECTION AND YOU WILL BE DEEMED ON BEHALF OF YOURSELF AND YOUR ESTATE, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, BUSINESS MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY AND ALL OTHER PERSONS OR PARTIES CLAIMING UNDER OR THROUGH YOU, TO HAVE GRANTED THE THIRD PARTY RELEASE TO THE RELEASED PARTIES.

      1.3.4    <u>Voting and Third Party Opt-Out Procedure; Ballot Deadline</u>. To ensure your vote is counted and any Third Party Opt Out Election is effective, you must, by the Voting Deadline (as defined below), (i) complete the Ballot in accordance with the instructions set forth therein, (ii) indicate your decision either to accept or reject the Plan in the boxes indicated in the Ballot, (iii) make a Third Party Opt Out Election, if desired, and (iii) sign and return the Ballot to the address set forth on the Ballot.  If you fail to complete the foregoing by the Voting Deadline and in accordance with the instructions set forth in your Ballot, your vote will be disregarded and you will be deemed to have granted the Third Party Release to the Released Parties.  <u>ABSENT PRIOR CONSENT OF THE DEBTORS, BALLOTS SENT BY FACSIMILE OR ELECTRONIC TRANSMISSION WILL NOT BE ALLOWED OR COUNTED</u>.

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan <u>must actually be received by the Balloting/Claims Agent on or before</u> **November 2, 2015 at 5:00 p.m. (prevailing Eastern Time) (the "Voting Deadline")**. **Holders of Claims in Class III or Class IV desiring to make the Third Party Opt-Out Election must, by the Voting Deadline, both (i) vote to reject the Plan or abstain from voting on the Plan, and (ii) check the box in Item 2 of the Ballot.**

      1.3.5    <u>Acceptance of the Plan</u>.  For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Impaired Class of Claims must vote to accept the Plan, excluding the votes of insiders.  For the Plan to be confirmed, at least one Impaired Class of Claims must actually vote to accept the Plan.  <u>YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN THE BALLOT TO THE BALLOTING/CLAIMS AGENT, PRIME CLERK, AT THE APPLICABLE ADDRESS:  SRC LIQUIDATION COMPANY BALLOT PROCESSING, C/O PRIME CLERK LLC, 830 THIRD AVENUE, 3RD FLOOR, NEW YORK, NY 10022.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND ENSURE THAT THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF CREDITOR IS CORRECTLY IDENTIFIED IN THE BALLOT</u>.  THE BALLOT WILL NOT BE COUNTED AND ANY THIRD PARTY OPT OUT ELECTION MADE BY YOU IN THE BALLOT WILL NOT BE EFFECTIVE UNLESS THE BALLOT IS ACTUALLY RECEIVED BY PRIME CLERK BY THE VOTING DEADLINE.

2.      **THE DEBTORS AND KEY EVENTS LEADING**
        **TO THE FILING OF THE CHAPTER 11 CASES**

        2.1      **Description of Debtors.**  As of the Petition Date, the Debtors were one of the
leading providers in the United States of communications services and communications
workflow, content and analytics solutions through multiple communication channels, including
print, electronic and internet-based communications, to clients in the healthcare, financial
services, manufacturing, retail and transportation industries.  The Debtors had operations in all
50 U.S. states, Mexico, Canada and Puerto Rico, and employed approximately 3,500 full-time
employees and 16 part-time employees.  At any given time, the Debtors also had approximately
500 contract workers engaged to provide a variety of manufacturing, sales, operations and other
daily business services.  The Debtors had a total of fifty-three (53) production and warehouse
facilities in North America, the majority of which were located in the United States.  The
Debtors' operations were divided between two business units:  (i) healthcare, which accounted
for almost one-third of the Debtors' revenues, and (ii) integrated communications (f/k/a business
solutions), which accounted for the remainder of the Debtors' revenues.[2]

        Although separate legal Entities, the Debtors operated as a consolidated Entity.  The
parent company, SRC Liquidation Company, f/k/a The Standard Register Company, is a publicly
traded company that is incorporated in Ohio and is headquartered in Dayton, Ohio.  SRC
Liquidation Company has ten wholly-owned direct and indirect subsidiaries, six of which are
U.S. Entities, three of which are Mexican Entities and one of which is a Canadian Entity.  SRC
Liquidation Company and all of its wholly-owned direct and indirect subsidiaries are Debtors in
the above administratively consolidated Chapter 11 Cases.

        2.2      **Sale to Taylor.**  The Debtors filed the Chapter 11 Cases for the principal purpose
of effectuating a sale of their operating business and Assets as a going concern.  On the Petition
Date, the Debtors Filed a motion to sell substantially all of their Assets and business to an
acquisition Entity formed by the administrative agent under the Debtors' First Lien Term Facility
(defined below).  In connection with this motion, the Bankruptcy Court approved the bid of this
Entity (the "Stalking Horse") as the "stalking horse" bid, and the Court approved a sale and
marketing process that culminated in an auction held on June 15, 2015.  As a result of the
marketing process and auction, Taylor, a privately held company in the same business as the
Debtors, emerged as the winning bidder for the Debtor's Assets and business and, on June 19,
2015, the Bankruptcy Court approved the sale to Taylor (the "Taylor Sale").  The Taylor Sale
closed on July 31, 2015.  The proceeds from the Taylor Sale were used to (i) repay the Debtors'
Postpetition DIP Financing (defined below), (ii) pay the Claims of the First Lien Term Lenders
(defined below), (iii) pay a portion of the Claims of the Second Lien Term Lenders (defined
below), and (iv) fund the $5 million GUC Cash Payment.  Taylor also assumed certain limited
obligations of the Debtors and advanced approximately $15.076 million to the Debtors (the
"Wind-Down Amount") to be used by the Debtors for the payment of claims related to the wind-
down of the Debtors and their Chapter 11 Cases.  The Debtors used a portion of the Wind-Down
Amount to loan $600,000 to the GUC Trust as the GUC Trust Seed Funding Amount.  Any
portion of the Wind-Down Amount that is not used to pay claims related to the wind-down of the

---

[2]      The healthcare unit accounted for approximately 29% of the Debtors' consolidated revenues in 2014 and 2013,
        while the integrated communications unit accounted for approximately 71% of the Debtors' consolidated
        revenues in 2014 and 2013.

Debtors and to wind down the Chapter 11 Cases will be returned to Taylor, although it is not currently anticipated that there will be any excess Wind-Down Amount to return to Taylor.

While Taylor purchased substantially all of the Debtors' Assets, certain Assets were excluded from the Taylor Sale (collectively, the "Excluded Assets"). The Excluded Assets are available for Distribution to the Creditors of the Debtors. As part of the negotiations leading to the approval of the Taylor Sale, the Debtors, the First Lien Term Lenders, the Second Lien Term Lenders, and the Committee, with Bankruptcy Court approval, entered an agreement that provided the basis for the Plan's allocation of the Excluded Assets between the Second Lien Term Lenders and the Debtors' other Creditors.

### 2.3 Key Prepetition Indebtedness.

2.3.1  **Secured Debt.**  On the Petition Date, the Debtors were obligated on a certain Amended and Restated Loan and Security Agreement, dated as of August 1, 2013 (the "ABL Loan") by and among The Standard Register Company and certain of its subsidiaries, Bank of America, N.A. ("BofA"), as administrative agent, and the lenders named therein (the "ABL Lenders"), which provided up to $125 million in aggregate loans and other financing accommodations in the form of an Asset-based revolving credit facility that was set to mature on August 1, 2018. The ABL Loan was secured by a first-priority security interest in, and lien on, the borrowers' cash, accounts, deposit accounts, securities accounts, security entitlements, securities, financial Assets, inventory, certain tax refunds, related Assets, and all proceeds from such property and Assets (collectively, the "ABL Collateral") and by a third-priority security interest in, and lien on, substantially all of the borrowers' other Assets. As of the Petition Date, the Debtors owed approximately $96.3 million in principal, plus accrued interest, on the ABL Loan.

On the Petition Date, the Debtors were also obligated on the Term Loans (defined below), in the aggregate amount of approximately $214 million, that had been assumed by the Debtors in connection with their 2013 acquisition of WorkflowOne, LLC.[3] First, the Debtors were obligated under that certain First Lien Credit Agreement, dated as of August 1, 2013 (as amended, the "First Lien Term Loan Facility"), by and among The Standard Register Company, WorkflowOne, LLC, the subsidiary guarantors named therein, Silver Point Finance, LLC ("Silver Point"), as administrative agent, and the lenders named therein (the "First Lien Term Lenders"). The First Lien Term Loan was a term loan in the original principal amount of approximately $124 million that was set to mature on August 1, 2018 (the "First Lien Term Debt"). The First Lien Term Loan Facility was secured by a first-priority security interest in, and lien on, substantially all of the borrowers' and guarantors' Assets that did not constitute ABL Collateral, including intercompany debt, owned real property (including all improvements thereon), equipment and fixtures, certain equity interests, and all proceeds from such property and Assets (collectively, the "Term Loan Collateral") and by a second-priority security interest and lien on the ABL Collateral. As of the Petition Date, the Debtors owed approximately $115.3 million in principal, plus accrued interest, on the First Lien Term Debt.

---

[3]  WorkflowOne, LLC subsequently merged with and into The Standard Register Company as part of an internal corporate reorganization transaction.

The Debtors were also obligated on that certain Second Lien Credit Agreement, dated as of August 1, 2013, (as amended, the "Second Lien Term Loan Facility," and, together with the First Lien Term Loan Facility, the "Term Loans") by and among The Standard Register Company, WorkflowOne, LLC the subsidiary guarantors named therein, Silver Point, as administrative agent, and the lenders named therein (the "Second Lien Term Lenders" and, together with the First Lien Term Lenders, the "Term Loan Lenders").  The Second Lien Term Loan Facility is a term loan with an original principal amount of approximately $96 million that matures on February 1, 2020 (the "Second Lien Term Debt").  The Second Lien Term Loan is secured by a second-priority security interest in, and lien on, the Term Loan Collateral and by a third-priority security interest in, and lien on, the ABL Collateral.  As of the Petition Date, the Debtors owed approximately $98.6 million in principal, plus accrued interest, on the Second Lien Term Debt.

In addition to the foregoing indebtedness, the Debtors are obligated under certain capital leases related to equipment.  In connection with the Taylor Sale, Taylor has the option, until 90 days after the closing of the Taylor Sale, to assume such capital leases.

**2.3.2  Pension Plan Liabilities.**  The Debtors administered a qualified[4] pension plan that covers certain U.S. employees but is frozen and no longer available to new participants (the "Qualified Pension Plan" and the obligations thereunder, the "Pension Obligations").  The Qualified Pension Plan is currently underfunded in the approximate amount of $193.6 million.[5]  The Debtors made contributions to the Qualified Pension Plan of approximately $24.7 million in 2013 and $37.2 in 2014, respectively.  Pursuant to its authority under applicable Federal law, on August 31, 2015, the PBGC terminated the Qualified Pension Plan and became statutory trustee of such Plan.  The Debtors do not have any additional funding obligations thereunder.  The PBGC has Filed Claims against the Debtors in connection with the Qualified Pension Plan, but participants in the Qualified Pension Plan do not have individual Claims against the Debtors' Estates that are separate and apart from the Claims asserted by the PBGC.

**2.3.3  Trade Debt.**  Prior to the Taylor Sale, the Debtors produced approximately half of their products at their production facilities, while the remaining products were primarily sourced from the Debtors' preferred suppliers on credit.  For example, the Debtors purchased raw paper in a wide variety of weights, grades, and colors from various paper mills located in the United States and Canada.  Pressure-sensitive materials, carbonless paper, inks, and printing supplies were purchased from leading vendors.  As of the Petition Date, the Debtors owed approximately $72.7 million[6] in unsecured trade debt.

---

[4]    The Debtors also have non-qualified pension plans, which are unfunded and have no plan assets.  The Debtors have also established a 401(k) plan that is fully funded and, prior to the Petition Date, was administered by The Standard Register Employee Savings Plan (Plan #015) Benefits Committee.  That plan has been terminated, and Shepherd Kaplan LLC has been appointed as the new administrator of the 401(k) plan and is working with the plan participants to transition their Assets to new accounts.

[5]    As reflected in the Debtors' books and records as of February 28, 2015.

[6]    As reflected in the Debtors' books and records as of February 28, 2015.

**2.4**     <u>Events Leading to the Filing of the Chapter 11 Cases.</u>  For over a century, the Debtors' printing services and printed goods had made up a significant part of their business. However, the demand for many of the printed forms, training and enrollment materials that the Debtors produced and sold declined as new mobile and web-based communications were integrated with printed materials.  Over the past few years, the Debtors took affirmative steps to navigate the challenging evolution of the printing industry to transform their operations and achieve success in this new media landscape.  The Debtors' management managed their finances and worked to increase their revenue and EBITDA, meet their large legacy pension funding obligations, achieve performance measures required by financial covenants in their loan documents, and aggressively cut costs.  In 2013, the Debtors consummated a strategic acquisition of WorkflowOne, LLC to consolidate operations and decrease overall costs.  In so doing, the Debtors diversified their services by adding integrated communications capabilities, including mobile and digital media, to better meet their customers' needs, and broadened their customer base to boost revenue.

Because of declining demand in the printing space, the Debtors struggled to achieve their revenue and EBITDA targets. At the same time, as revenue and EBITDA were declining, the Debtors still needed to maintain relatively large fixed costs on account of the required interests payments on their secured debt, together with the required Qualified Pension Plan contributions, and the necessary capital expenditures and investments that the Debtors had to make to finance their operations while continuing to integrate WorkflowOne.  Consequently, the Debtors evaluated all of their strategic options to maximize the value of their business for the benefit of all stakeholders.  Ultimately, the Debtors determined that the best alternative to maximize value required a sale of their business operations as a going concern.  During the months preceding the Petition Date, the Debtors negotiated with various potential purchasers.  Despite diligent effort, the Debtors were unable to find any party willing to purchase the Debtors' business operations and Assets, except within the confines of a bankruptcy proceeding.  Accordingly, immediately prior to the Petition Date, the Debtors entered into a "stalking horse" agreement to sell substantially all of their business operations and Assets to the Stalking Horse.  After executing the agreement with the Stalking Horse, the Debtors filed the Chapter 11 Cases and sought approval of the sale of their business operations and Assets, free and clear of liens, claims and encumbrances, pursuant to section 363 of the Bankruptcy Code.

As part of the agreement with the Stalking Horse, the Debtors were able to secure debtor in possession financing from their ABL Lender and the Term Loan Lenders that facilitated the Debtors' ability to file and pursue the required Chapter 11 Cases and section 363 sale.

**3.**     **THE CHAPTER 11 CASES**

**3.1**     <u>Commencement of the Chapter 11 Cases.</u>  On March 12, 2015, the Debtors each Filed a voluntary petition under chapter 11 of the Bankruptcy Code and continued in the management and possession of their business and property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**3.2**     <u>First Day Relief.</u>  Concurrent with the filing of their chapter 11 petitions, the Debtors Filed several "first-day" applications and motions (collectively, the "<u>First Day Pleadings</u>") with the Bankruptcy Court.  The First Day Pleadings, as set forth more fully therein,

were intended to minimize the adverse effects of the Chapter 11 Cases on the Debtors and were necessary to enable them to operate effectively as chapter 11 debtors in possession.  Pursuant to the First Day Pleadings, the Debtors sought and obtained the approval of the Bankruptcy Court to, among other things, (i) jointly administer the Chapter 11 Cases for procedural purposes only; (ii) establish adequate assurance procedures with respect to their utility providers; (iii) pay certain prepetition taxes, including trust fund and personal liability taxes; (iv) maintain prepetition insurance policies and pay or honor prepetition obligations related thereto; (v) pay, honor, or otherwise satisfy certain prepetition customer programs and practices in the ordinary course of their business; (vi) pay certain prepetition wages, salaries, commissions, and other accrued compensation and continue certain employee benefits and programs; (vii) pay prepetition obligations to certain critical vendors and service providers; and (viii) continue using their prepetition centralized cash management system and bank accounts and business forms. For additional information with respect to the First Day Pleadings and related relief sought by the Debtors at the beginning of the Chapter 11 Cases, please consult the *Declaration of Kevin M. Carmody in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 2].

   **3.3**  **DIP Financing and Use of Cash Collateral.**  On the Petition Date, the Debtors Filed, along with the other First Day Pleadings, the *Debtors' Motion: (A) for Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtors' Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection to Prepetition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (B) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001* [Docket No. 15] (the "DIP Motion").  The Bankruptcy Court approved the relief requested in the DIP Motion initially on an interim basis and thereafter on a final basis [Docket No. 124] (the "Final DIP Order").  Pursuant to the Final DIP Order, the Debtors were authorized to enter into a $125 million post-petition ABL secured credit facility with the ABL Lenders, which also resulted in a roll-up of the ABL Loan (the "Postpetition ABL Facility"), and enter into a $30 million post-petition term loan secured credit facility with certain of the Term Loan Lenders (the "Postpetition Term Loan Facility" and, together with the Postpetition ABL Facility, the "Postpetition DIP Financing").  The Final DIP Order also provided for adequate protection liens and payments with respect to the ABL Loan and the Term Loans.  Claims for amounts due and owing under the Postpetition DIP Financing were paid in full from proceeds of the Taylor Sale.

   **3.4**  **Retention of Professionals.**  The Debtors retained the following professionals in the Chapter 11 Cases:  (i) Gibson, Dunn & Crutcher LLP, as bankruptcy co-counsel; (ii) Young Conaway Stargatt & Taylor, LLP as Delaware bankruptcy co-counsel; (iii) McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey") as restructuring advisor and, particularly, Kevin M. Carmody of McKinsey, initially as Chief Restructuring Officer,[7] and subsequently as President and Chief Executive Officer; (iv) WilliamsMarston, LLC as restructuring advisor and, particularly, Landen C. Williams as Chief Restructuring Officer and Treasurer; (v) Dinsmore & Shohl LLP, as special counsel and conflicts counsel; (vi) Prime Clerk LLC, as claims and noticing agent; and (vii) Lazard Middle Market LLC, as investment banker.  In addition, the Debtors obtained authority to employ and retain certain professionals utilized in the ordinary course of their business operations.

---

[7] Mr. Carmody was subsequently replaced with Landen Williams as the Debtors' Chief Restructuring Officer.

**3.5**    **Appointment of Committee and Retention of Committee Professionals.**    On March 24, 2015, the U.S. Trustee appointed the Committee. The members of the Committee are the Pension Benefit Guaranty Corporation, Georgia-Pacific Consumer Products LP, Veritiv Corporation, The Flesh Company, Timothy V. Webb, Gary Becker, and Mark A. Platt. The Committee retained Lowenstein Sandler LLP and Polsinelli PC as bankruptcy counsel, Zolfo Cooper, LLC, as financial and forensic advisor, and Jefferies LLC, as investment banker.

**3.6**    **Schedules, Bar Date Order, and Claim Objections.**    On May 11, 2015, the Debtors Filed their Schedules. Upon the motion of the Debtors, the Bankruptcy Court entered an order on May 8, 2015 (the "Bar Date Order") setting a bar date for non-governmental Claims of July 8, 2015 (the "Bar Date"),[8] and a governmental Claims bar date of September 8, 2015. Approximately 2,335 proofs of Claim were timely Filed by the Bar Date asserting over $9.4 billion in liquidated Claims against the Debtors. While the reconciliation Claims objection process is ongoing, it appears that many Creditors Filed duplicative Claims against each of the Debtors. The Debtors will continue to review and reconcile the Claims and may File objections to Claims to ensure that Claims are afforded the proper treatment under the Plan. After Confirmation of the Plan, responsibility for objections, if any, to Other Secured Claims and Second Lien Secured Claims will reside in the Secured Creditor Trust and responsibility for objection to all other Claims will reside in Liquidating SRC, which will be owned by the GUC Trust.

**3.7**    **Sale of Assets.**    As indicated in Section 2.2 above, on June 19 2015, the Bankruptcy Court approved the Taylor Sale, which closed on July 31, 2015. In addition to repayment in full of the Postpetition DIP Financing, the Cash proceeds of the Taylor Sale fully repaid the First Lien Term Loan and a portion of the Second Lien Term Loan, funded the $5 million GUC Cash Payment to the GUC Trust, and the Debtors retained approximately $15.076 million for the wind-down of the Chapter 11 Cases, including the funding of the $600,000 GUC Trust Seed Funding Amount. Pursuant to the Taylor Sale, Taylor also assumed certain of the Debtors' obligations, including, without limitation, obligations to Creditors holding Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, certain obligations to post-petition trade vendors, obligations for cure-related Claims, and certain obligations for employee Claims.

The Excluded Assets were not sold to Taylor pursuant to the Taylor Sale. These Excluded Assets are available for Distribution to the Creditors of the Debtors. For more information regarding the Taylor Sale, please consult, as applicable, the sale motion [Docket No. 23] and the sale order approving the Taylor Sale [Docket No. 698] (the "Sale Order").

**3.8**    **Committee Adversary Action.**    Pursuant to the Final DIP Order, the Committee preserved the right to investigate potential claims and Causes of Action against the Debtors' prepetition secured Creditors and other parties. The Committee timely Filed a motion with the Bankruptcy Court for standing to pursue claims and Causes of Action against certain of the Released Parties and the Debtors' current and former directors and officers. On June 10, 2015, the Bankruptcy Court granted the Committee standing to bring such claims and Causes of Action [Docket No. 648] and, on June 8, 2015, the Committee commenced adversary proceeding Case

---

[8]    The Bar Date did not apply to certain Claims for Pension Benefits (as defined in the Bar Date Order). The Debtors expect that a bar date for Pension Benefits Claims will be set in the near future.

No. 15-50771 (the "Committee Adversary Action").  The Committee Settlement resolved the claims and Causes of Action against the Released Parties that were asserted in the Committee Adversary Action, but the Committee Adversary Action is still pending against certain of the Debtors' current and former officers and directors.

      **3.9**    **Committee Settlement.**    The Sale Order also approved the Committee Settlement, which resolved the claims asserted by the Committee against the First Lien Term Lenders and the Second Lien Term Lenders and certain other Released Parties in the Committee Adversary Action.  The Committee Settlement resulted in (a) the establishment of the GUC Trust for the benefit of unsecured Creditors of the Debtors; (b) the funding of the GUC Trust with the $5 million GUC Cash Payment from the Distribution that otherwise would have been available to the Second Lien Term Lenders as a result of the Taylor Sale; (c) the agreement of the Debtors to provide the $600,000 GUC Trust Seed Funding Amount to the GUC Trust as a loan; (d) the transfer of the Committee Adversary Action (other than claims and Causes of Action against the Released Parties (as defined in the Committee Settlement) that were settled pursuant to the Committee Settlement), and any recoveries therefrom, including, without limitation, any recoveries from the Debtors' directors' and officers' insurance policies (the "D&O Insurance") to the GUC Trust; (e) the agreement that certain Excluded Assets were not subject to any liens (the "Free and Clear Assets")[9] and could be used, free and clear, to fund the wind-down of the Chapter 11 Cases and Distributions to Creditors, other than the Released Parties; (f) the release by the Debtors and the Committee of the Released Parties from any and all claims, including those which were or could have been asserted in connection with the Committee Adversary Action; and (g) the Committee's agreement to support the Plan.  The Committee Settlement generally forms the basis of the allocation of the Excluded Assets under the Plan.  A copy of the Committee Settlement is attached hereto as Exhibit 4.

**4.**        **SUMMARY OF THE PLAN**[10]

      **4.1**    **Classification of Claims and Equity Interests under the Plan.**  All Claims and Equity Interests, except the Unclassified Claims, are placed in the Classes set forth in Article 1 of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, including Professional Fee Claims, have not been classified.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes.

---

[9]    The Free and Clear Assets consist of (i) the Rabbi Trust Proceeds, (ii) the Wind-Down Amount, (iii) the Wind-Down Funds Account, (iv) the Committee Adversary Action (including the D&O Claims asserted therein and related D&O Insurance), (v) the Avoidance Actions, (vi) the obligation of Taylor to pay the Taylor Payment Receivable, and (vii) the obligation of the GUC Trust to repay the GUC Trust Seed Funding Loan.

[10]    The descriptions of the Plan and its provisions set forth herein are summaries only and the Plan contains additional provisions that may affect your rights.  You are urged to read the Plan in its entirety before deciding whether to vote to accept or reject the Plan.  The summary of the Plan set forth herein is qualified in its entirety by reference to the Plan that is attached hereto as Exhibit 1.

**4.2**     **Treatment of Allowed Claims and Equity Interests Under the Plan.**

The Plan is a plan of liquidation, whereby the Debtors are treated as substantively consolidated Entities for purposes of Distributions under the Plan, and the Debtors' remaining Assets are pooled and distributed to Persons holding Allowed Claims in accordance with the priorities of the Bankruptcy Code and the treatment of Claims and Equity Interests set forth below.  The number and amount of Allowed Claims will not affect Distributions for Holders of Allowed Administrative Expense Claims, Allowed Priority Claims, or Allowed Secured Claims.  Actual Distributions on account of Allowed Unsecured Claims and Allowed Second Lien Claims may differ from the estimates set forth in the table below.  Distributions under the Plan to Holders of Allowed Class III Claims (Second Lien Secured Claims) will depend entirely on the amount realized from the liquidation of the Secured Creditor Trust Assets, and the costs and expenses incurred by the Secured Creditor Trust in connection with such liquidation.  Similarly, other than the GUC Cash Payment, further Distributions under the Plan to Creditors holding Allowed Class IV Claims (General Unsecured Claims) will depend significantly, among other things, on the amount of the recoveries, if any, from the Committee Adversary Action, the proceeds from the disposition of the Free and Clear Assets, the amount of Allowed Administrative Expense Claims and Allowed Priority Claims, and the costs and expenses incurred by the GUC Trust and Liquidating SRC in connection with the liquidation of the Free and Clear Assets, the Claims reconciliation process, and the other costs associated with the wind-down of the Liquidating Debtors.

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN.  THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY.  REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS.  THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE.  THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|-------|------|------------------|-----------|----------------------------------------|--------------------------------|
| I | Other Secured Claims | Unimpaired and Deemed to Accept | Subject to Section 3.3 of the Plan, except to the extent that a Holder of an Allowed Other Secured Claim has been paid by or on behalf of the Debtors prior to the Effective Date or agrees to a different treatment, with respect to Other Secured Claims that are Allowed as of the Effective Date the Debtors shall, (a) satisfy such Claims in whole or in part by the transfer of all or any portion of the Assets securing such Claims or (b) at the election of the Second Lien Agent made on or before the Effective Date and with the consent of the Debtors (i) reinstate such Claims in full, leaving unaffected the Holder's legal, equitable and contractual rights; *provided* that the Committee's consent shall be required for such reinstatement if the Creditor has any Secured Claim against Liquidating SRC or the GUC Trust, (ii) pay such Claims in Cash up to the Allowed amount of such Claims, (iii) begin to make deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of such Claims, or (iv) treat such Claims in a manner that would provide the "indubitable equivalent" of such Claims; and, with respect to Other Secured Claims that are not Allowed as of the Effective Date, the collateral securing such Other Secured Claim, or the proceeds thereof, will be set aside on the Effective Date and Distributed in accordance with Section 3.3.2 of the Plan upon Allowance of such Claim. | $0.00 | 100% |
| II | Priority Claims | Unimpaired and Deemed to Accept | Subject to Section 3.3 of the Plan, except to the extent that a Holder of an Allowed Priority Claim has been | $2.5 million | 100% |

| | | | paid by or on behalf of the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Claim shall be paid Cash in the Allowed amount of their Priority Claim on the Effective Date or on the date such Allowed Priority Claim becomes due and payable pursuant to Section 3.3.2 of the Plan if such Priority Claim is not Allowed on the Effective Date; *provided, however*, that, at the election of the Debtors exercised prior to the Confirmation Hearing and in consultation with the Committee, Holders of Priority Tax Claims shall be paid the Allowed Amount of their Priority Tax Claim plus interest at the applicable rate in Cash in regular quarterly installments, of a value as of the Effective Date of the Plan, equal to such Allowed Amount, over a period ending no later than March 11, 2020. | | |
|---|---|---|---|---|---|
| III | Second Lien Secured Claim | Impaired and Entitled to Vote | Each Holder of the Allowed Second Lien Secured Claim shall be entitled to receive its Pro Rata Share, as reflected in the books and records of the Second Lien Agent, of the beneficial interests in the Secured Creditor Trust as set forth in Section 3.2 of the Plan. | $87.3 million[11] | 11%[12] |
| IV | General Unsecured Claims | Impaired and Entitled to Vote | Each Holder of an Allowed General Unsecured Claim shall be entitled to receive its Pro Rata Share of the beneficial interests in the GUC Trust as set forth in Section 3.2 of the Plan, subject to Section 1.6 of the Plan and the GUC Trust Agreement; *provided, however*, that the Second Lien Deficiency Claims shall be deemed | $550-650 million | 1%[13] |

---

[11]   According to Debtors' books and records, without giving effect to the impact on such Claim of the $5 million GUC Cash Payment made by the Second Lien Term Lenders to settle the Committee Adversary Action.

[12]   Amount includes distributions already made to the Holders of Second Lien Secured Claims.

[13]   Amount includes the GUC Cash Payment that was already made to the GUC Trust.

| | | | allowed for voting purposes only, but the Holders thereof shall not be entitled to any Distribution on account of such Claims under the Plan, including from the GUC Trust. | | |
|---|---|---|---|---|---|
| V | Subordinated Claims | Impaired and Deemed to Reject | Holders of Subordinated Claims will not receive any Distributions on account of such Claims under the Plan. | $0 | 0% |
| VI | Equity Interests | Impaired and Deemed to Reject | On the Effective Date, all Equity Interests in the Debtors shall be cancelled, annulled, and voided, and Holders thereof shall be entitled to no Distribution or recovery on account of such Equity Interests, *provided*, *however*, that Equity Interests in any subsidiary of SRC Liquidation Company which is wholly owned, directly or indirectly, by SRC Liquidation Company shall be preserved solely for the benefit of the Holders of Allowed Claims as provided in the Plan. | N/A | 0% |

Underlying the estimated percentage recovery identified in the above chart are a number of assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic and other uncertainties and contingencies beyond the control of the Debtors. There is no assurance that the stated estimated percentage recovery will be realized, and the actual recovery percentage for Holders of Claims in Class III and Class IV could vary materially from those shown here depending on the outcome of a number of variables.

        **4.2.1**    **Unclassified Claims.** Subject to Section 3.3 of the Plan, except to the extent otherwise agreed to by the Holder of an Allowed Unclassified Claim, each Holder of an Allowed Unclassified Claim (other than Professional Fee Claims) shall be paid in Cash the full amount of such Allowed Unclassified Claim. Allowed Unclassified Claims (other than Professional Fee Claims) shall be paid (i) by the Debtors or Liquidating SRC on the later of the Effective Date or the date such Claim becomes due and payable (or as soon as reasonably practicable after) if such Claim is Allowed as of the Effective Date; and (ii) by Liquidating SRC in accordance with Section 3.3 of the Plan on the later of Allowance of such Claim or the date such Claim becomes due and payable (or as soon as reasonably practicable after) if such Claim is not Allowed as of the Effective Date; *provided*, *however*, that with respect to (i) and (ii), neither the Debtors nor the Liquidating Debtors shall be responsible to pay Unclassified Claims that are to be paid by Taylor in connection with the Taylor Payment Receivable and, instead, Taylor shall be responsible for such payments. Professional Fee Claims will be Allowed and paid in accordance with Article 9 of the Plan, which provides for the estimated amount of Professional Fee Claims to be funded into the Professional Fee Claims Escrow on the Effective Date.

**4.2.2**    **Sources of Payment of Other Secured Claims**.  With respect to Other Secured Claims other than the Other Secured Claim of Bank of America, N.A. that are Allowed as of the Effective Date, the Debtors shall (a) satisfy such Claims in whole or in part by the transfer of all or any portion of the Assets securing such Claims  or (b) at the election of the Second Lien Agent made on or before the Effective Date and with the consent of the Debtors (i) reinstate such Claims in full, leaving unaffected the Holder's legal, equitable and contractual rights; provided that the Committee's consent shall be required for such reinstatement if the Creditor has any Secured Claim against Liquidating SRC or the GUC Trust, (ii) pay such Claims in Cash up to the Allowed amount of such Claims, (iii) begin to make deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of such Claims, or (iv) treat such Claims in a manner that would provide the "indubitable equivalent" of such Claims.  Collateral, or the proceeds thereof, with respect to any Other Secured Claim that is not Allowed as of the Effective Date will be set aside on the Effective Date and Distributed in accordance with Section 3.3.2 of the Plan upon Allowance of such Claim.  The Other Secured Claims of Bank of America, N.A. pursuant to the BofA Cash Collateral Agreement shall be treated as set forth in Section 2.6 of the Plan.  Specifically, the Debtors shall assume and assign the BofA Cash Collateral Agreement and shall transfer the BofA Cash Collateral Account to the Secured Creditor Trust, and Bank of America, N.A. shall be entitled to payment of its Claims, if any, from the BofA Cash Collateral Account in accordance with the terms and conditions of the BofA Cash Collateral Agreement.  Collateral, or the proceeds of such collateral, set aside for any Disputed Other Secured Claim that is not required to pay such Disputed Other Secured Claim shall be paid to the Secured Creditor Trust, and any such Assets that are transferred to the Secured Creditor Trust shall be used and distributed in accordance with the terms of the Plan and the Secured Creditor Trust Agreement.

**4.2.3**    **Sources of Payment of Unclassified Claims and Priority Claims.**  The Cash being used to fund the payments under the Plan to the Holders of Unclassified Claims and Priority Claims comes from the Wind-Down Amount, the Rabbi Trust Proceeds, any recoveries from the Avoidance Actions and, as applicable, the Taylor Payment Receivable.  The Taylor Payment Receivable is the obligation of Taylor, pursuant to the Asset Purchase Agreement, to pay certain categories of Claims, including, without limitation, cure Claims related to Executory Contracts and Unexpired Leases assumed by Taylor, post-petition Claims of trade vendors, post-petition Claims related to Potential Contracts and Potential Assets (as defined in the Asset Purchase Agreement), Allowed Claims with priority pursuant to section 503(b)(9) of the Bankruptcy Code, and certain other               tax               and               employee               obligations.

4.2.3.1  **General**.  To implement the Plan, the Debtors or Taylor (from the Taylor Payment Receivable), as applicable, will pay all Unclassified Claims (other than Professional Fee Claims) and Priority Claims that are Allowed on the Effective Date as provided in Section 3.3.1 of the Plan.  Unclassified Claims (other than Professional Fee Claims) and Priority Claims that are not Allowed as of the Effective Date will be paid from amounts deposited into the Disputed Claims Reserve or by Taylor (from the Taylor Payment Receivable), in accordance with Section 3.3.2 of the Plan.  The Disputed Claims Reserve shall be funded first by any portion of the Wind-Down Amount not needed to pay Professional Fee Claims in accordance with Article 9 of the Plan or Allowed

Unclassified Claims and Allowed Priority Claims in accordance with Section 3.3.1 of the Plan. Notwithstanding the foregoing, the Debtors shall not be required to pay (or reserve for), any Unclassified Claims, Priority Claims, Other Secured Claims or other Claims that are to be paid by Taylor in connection with the Taylor Payment Receivable, provided that, at Confirmation, the Court may require Taylor to confirm its financial capability timely to pay the Taylor Payment Receivable. It is possible that the amounts ultimately Allowed for the Claims identified in the prior sentence and to be paid by the Debtors, as opposed to Taylor, will exceed the funds deposited in the Disputed Claims Reserve and, if that happens, the Holders of such Claims will receive only their Pro Rata Share of the funds in the Disputed Claims Reserve, and the Holders of such Claims shall have no recourse to any Assets of the GUC Trust or Secured Creditor Trust, nor shall such Holders have any recourse or Cause of Action against the Secured Creditor Trust, the GUC Trust or the Trustees for the failure to receive the full amount of their Allowed Claims. Nothing in the Plan, however, shall relieve Taylor of the obligation to pay any portion of the Taylor Payment Receivable. Other than any amounts set aside for Disputed Other Secured Claims, the excess amount, if any, remaining in the Disputed Claims Reserve after payment in full of all Unclassified Claims (other than Professional Fee Claims) and Priority Claims shall be paid to Taylor, as Surplus Wind-Down Funds, to the extent that such remaining funds in the Disputed Claims Reserve were funded from the Wind-Down Amount and were not used to pay Unclassified Claims or Priority Claims in accordance with Section 3.3.2. Subject to payment of Surplus Wind-Down Funds to Taylor as provided in the preceding sentence, the excess amount, if any, remaining in the Disputed Claims Reserve (other than amounts set aside for Disputed Other Secured Claims) shall be used to satisfy the costs and expenses of Liquidating SRC, with the remaining funds being transferred to the GUC Trust, and any such funds that are transferred to the GUC Trust shall be used and distributed in accordance with the terms of the Plan and the GUC Trust Agreement. No funds shall be paid to either Taylor or the GUC Trust out of the Disputed Claims Reserve until such time as all Disputed Unclassified Claims (other than Professional Fee Claims) and all Priority Claims have been resolved in accordance with Section 3.3.2 of the Plan.

4.2.3.2 **Taylor Liability for Unclassified Claims and Priority Claims Through Taylor Payment Receivable**. Pursuant to the Asset Purchase Agreement, Taylor is responsible for many, but not all of the Debtors' Allowed Unclassified Claims and some of the Priority Claims. Thus, while there will be a significant amount of additional Allowed Unclassified Claims and Priority Claims owed for post-petition goods and services delivered, the pre-petition delivery of goods that give rise to post-petition Allowed Unclassified Claims with priority pursuant to section 503(b)(9) of the Bankruptcy Code, cure Claims related to the assumption by the Debtors and assignment to Taylor of Executory Contracts and Unexpired Leases, Claims related to Potential Contracts and Potential Assets from the closing of the Taylor Sale until such Potential Contracts and/or Potential Assets are designated as Transferred Assets or Removed Assets (each as defined in the Asset Purchase Agreement) by Taylor, post-petition employee severance and vacation pay Claims, pre and post-petition real estate tax Claims for real

estate, owned and leased, transferred to Taylor as Transferred Assets, and post-petition sales and use taxes and taxes, transfer and otherwise, related to the closing of the Taylor Sale, all of these Allowed Unclassified Claims are Assumed Liabilities under the Asset Purchase Agreement and will be paid by Taylor through the Taylor Payment Receivable.

4.2.3.3 **Debtors' Liability for Allowed Unclassified Claims**.    The Debtors believe that the total amount of unpaid Allowed Unclassified Claims not covered by the Taylor Payment Receivable will be approximately $4.2 million as of the Effective Date.    Generally, the composition of Allowed Unclassified Claims to be paid by the Debtors on or after the Effective Date is anticipated to be as follows:  (a) Professional Fee Claims - $1.2 million; (b) wind-down costs of the Estates - $150,000; (c) payment of post-petition obligations related to incurred but not reported health insurance Claims related to the Debtors' self-insured health plan; (d) real property taxes owed on owned real estate not transferred to Taylor as Transferred Assets (as defined in the Asset Purchase Agreement), and (e) post-petition Claims for short term disability Claims, flexible spending account Claims, and transition of the Debtors' employee benefit programs - $300,000.

4.2.3.4 **Debtors' Liability for Priority Claims**.  The Debtors believe that the total amount of Priority Claims not covered by the Taylor Payment Receivable will be approximately $2.5 million.  Generally, the composition of Priority Claims to be paid by the Debtors is anticipated to be as follows:  (a) priority employee Claims not to exceed $608,000; (b) Priority Claims of Governmental Units – approximately $1.8 million.  While there have been many more Priority Claims Filed than are reflected in the foregoing numbers, the Debtors believe that such excess Filed Priority Claims will, as a result of the reconciliation and objection process, be Disallowed and/or treated as an Allowed General Unsecured Claim or, in the case of Claims that have priority pursuant to section 503(b)(9) of the Bankruptcy Code that were improperly Filed as Priority Claims, recharacterized as section 503(b)(9) Claims properly payable by Taylor from the Taylor Payment Receivable.  The principal bases for this result is as follows:  (i) many of the Claims Filed as Priority Claims are, in fact, not Priority Claims at all; for example, many trade vendors Filed Priority Claims, but there is no priority Claim category under the Bankruptcy Code for trade vendor Claims; (ii) many of the Debtors' employees Filed Priority Claims for the full amount that they might be owed, including under various retirement programs; however, even if these Claims were Priority Claims, the total amount of the Priority Claim of any one employee is, under the Bankruptcy Code, capped at $12,475 less amounts, if any, that such employee was paid during the Chapter 11 Cases on account of his or her pre-petition Claims.

4.2.3.5 **Debtors' Sources to Pay Allowed Unclassified Claims and Priority Claims that Will Not Be Satisfied By the Taylor Payment Receivable**.  As discussed previously, Taylor, through the Taylor Payment Receivable, is obligated to pay a significant portion of the Debtors' Allowed Unclassified Claims and Priority Claims.  Those Allowed Unclassified Claims and Priority Claims not paid by Taylor will be paid through the Wind-Down

Amount, the Rabbi Trust Proceeds, and recoveries from the Avoidance Actions. As the Liquidation Analysis demonstrates, the Debtors believe that the amount available from these sources will be sufficient to pay these Claims in full, as provided in the Plan and as required to confirm the Plan under the provisions of the Bankruptcy Code.

**4.3**     **Sources of Payment of Class III and Class IV Claims**.

### 4.3.1     Secured Creditor Trust.

4.3.1.1 **General**.  On the Effective Date of the Plan, the Secured Creditor Trust Assets will be transferred to the Secured Creditor Trust.  The Secured Creditor Trust Assets are all of the Debtors' Assets other than (i) the Rabbi Trust Proceeds, (ii) the Wind-Down Amount, (iii) the Wind-Down Funds Account, (iv) the Avoidance Actions (v) the GUC Trust Causes of Action and proceeds thereof, (vi) the D&O Insurance and D&O Policies, (vii) the Taylor Utility Deposits, (viii) those GUC Trust Assets transferred to the GUC Trust in connection with closing of the Taylor Sale in accordance with the Committee Settlement, (ix) the obligation of Taylor to pay the Taylor Payment Receivable, and (x) the obligation of the GUC Trust to repay the GUC Trust Seed Funding Loan. The proceeds from the liquidation of the Secured Creditor Trust Assets, net of costs and expenses of the Secured Creditor Trust, will be distributed by the Secured Creditor Trust, and Holders of Second Lien Secured Claims, who are the beneficiaries of the Secured Creditor Trust, will receive their Pro Rata Share of such Distributions.

4.3.1.2 **Estimated Amount of Claims of Beneficiaries of Secured Creditor Trust**.  The Taylor Sale resulted in the repayment of the Debtors' debtor-in-possession financing obligations, together all amounts owed to the Debtors' ABL lenders and First Lien Lenders and $11,270,000 of the amount owed to the Second Lien Lenders.  The beneficiaries of the Secured Creditor Trust are the Second Lien Lenders.  The principal balance owed to the Second Lien Lenders, after the payment from the Taylor Sale, is approximately $87.3 million.

4.3.1.3 **Estimated Value of Secured Creditor Trust Assets**. Substantially all of the Assets securing the Second Lien Debt were sold to Taylor in the Taylor Sale.  However, some Assets were specifically excluded from the Taylor Sale.  In addition, Taylor has the right until October 29, 2015, to determine that certain Assets which it is entitled, for no additional consideration, to transfer to it as Transferred Assets (as defined in the Asset Purchase Agreement) will, in fact, remain with the Debtors (the "Removed Assets/Contracts").  Collectively, these Assets are the Excluded Assets.  As part of the Committee Settlement, the Debtors, the Committee and the Second Lien Agent reached an agreement that, other than the Free and Clear Assets, all of the Excluded Assets would be subject to the lien of the Second Lien Lenders, and that the Free and Clear Assets would be free and clear of such lien and the Second Lien Lenders would not assert any claim to or lien against those Assets or the proceeds of those Assets.  The

Excluded Assets, other than the Free and Clear Assets, are the Secured Creditor Trust Assets. The value of the Secured Creditor Trust Assets is uncertain, in part because it is currently unclear what Assets Taylor will allow to remain with the Debtors as Removed Assets/Contracts. However, the Debtors have assumed that substantially all of the valuable Assets securing the Second Lien Secured Claims were sold in the Taylor Sale, resulting in a distribution to the Second Lien Lenders during the Chapter 11 Cases, and that Assets returned by Taylor as Removed Assets/Contracts will have minimal value.

The Second Lien Agent also claims an entitlement to $1.85 million from the Wind-Down Amount, which it argues should be allocated to the fees and expenses incurred by the Second Lien Agent following the closing of the Taylor Sale. The Debtors dispute any entitlement by the Second Lien Agent to any portion of the Wind-Down Amount. Pursuant to the terms of the Asset Purchase Agreement and the Committee Settlement, the Debtors believe the Second Lien Agent, along with the Debtors' other lenders, was entitled to payment from the Wind-Down Amount only on account of fees and expenses incurred prior to the closing of the Taylor Sale. For the avoidance of doubt, the Debtors do not believe that the Second Lien Agent is entitled to payment of interest, fees, or expenses in addition to what the Debtors have already paid the Second Lien Lender.

> **4.3.2   GUC Trust.** The GUC Trust, either directly or through its ownership of the Liquidating SRC Membership Interests, will own all of the Free and Clear Assets. The GUC Trust was established, pursuant to the Bankruptcy Court's order approving the Taylor Sale, to implement the terms of the Committee Settlement, which was approved as part of the Taylor Sale. In connection with the closing of the Taylor Sale, the GUC Trust received a portion of the Free and Clear Assets, namely: the $5 million GUC Cash Payment, the $600,000 GUC Trust Seed Funding Amount, and the Committee Adversary Action, including the right to any proceeds of the D&O Insurance. On the Effective Date of the Plan, the GUC Trust, through its receipt of 100% of the Liquidating SRC Membership Interests, will receive the balance of the Free and Clear Assets, subject to the payment of Allowed Unclassified Claims, Other Secured Claims, and Priority Claims, as provided in the Plan. After the funding of the Secured Creditor Trust on the Effective Date, Liquidating SRC will own the Free and Clear Assets not transferred to the GUC Trust on the closing of the Taylor Sale. The Free and Clear Assets owned by Liquidating SRC will first be used to pay Allowed Administrative Expense Claims, Allowed Priority Claims, Other Secured Claims, and any other costs and expenses incurred by Liquidating SRC (whether in connection with the Claims resolution process and/or pursuit of the Avoidance Actions, or otherwise). Following the payment of all Allowed Unclassified Claims and Priority Claims, including those Disputed Unclassified Claims and Disputed Priority Claims resolved and Allowed through the provisions of Section 3.3.2 of the Plan, the Surplus Wind-Down Funds, if any, shall be paid to Taylor. Any then remaining Assets of Liquidating SRC will be available, to the extent determined to be appropriate by the board of directors of Liquidating SRC (which will be appointed by the GUC Trust Oversight Committee), to be distributed to the GUC Trust. In turn, Holders of Allowed General Unsecured Claims, who are the beneficiaries of the GUC Trust, will receive their Pro Rata Share of the Distributions from the GUC Trust, net of costs and expenses of the

GUC Trust, which costs and expenses include repayment of the GUC Trust Seed Funding Amount to Liquidating SRC.

### 4.3.2.1 **Estimated Amount of Claims of Beneficiaries of GUC Trust.**

The beneficiaries of the GUC Trust are the Holders of General Unsecured Claims in Class III.   As of the Petition Date, the Debtors' books and records reflect that the Debtors had three general categories of General Unsecured Creditors.   First, amounts owed to Creditors whose Claims arose from goods and services delivered to or on behalf of the Debtors prior to the Petition Date.   The Debtors believe the amount of such Claims is approximately $66 million. Second, amounts owed with respect to the Debtors' obligations under their Qualified Pension Plan.   The Debtors believe that they owe approximately $373 million under the Qualified Pension Plan.   Third, amounts owed to the Debtors' former employees for contributions or payments due to such employees under various non-qualified retirement plans in the amount of approximately $5.5 million.

Notwithstanding the amounts reflected in the Debtors' books and records, unsecured Claims in the amount of approximately $9.4 billion were Filed against the Debtors by the Bar Date.   Some of these Claims relate to the Claims of the Debtors' secured lenders that were paid in connection with the Taylor Sale.   Other Claims appear to be duplicative Claims Filed against each of the Debtors.   And, a number of the Claims appear to be Claims that have either been paid as critical vendor Claims, or will be paid by Taylor, through the Taylor Payment Receivable, because they are cure Claims related to assumed Executory Contracts and Unexpired Leases or because they are Claims entitled to status as Administrative Expense Claims under section 503(b)(9) of the Bankruptcy Code. After reconciliation of the Filed Claims, consideration of the impact of substantive consolidation of the Debtors for Distribution purposes proposed in the Plan, and completion of the Claims objection process contemplated by the Plan, the Debtors believe that total Allowed General Unsecured Claims against the Debtors will be approximately $550 million to $650 million.

### 4.3.2.2 **Estimated Value of GUC Trust Assets**.   The GUC Trust Assets available to pay Allowed General Unsecured Claims break down into two categories.   Those already owned directly by the GUC Trust and those owned indirectly by the GUC Trust, as a result of the Plan, through the GUC Trust's ownership of Liquidating SRC.   The GUC Trust's direct Assets are the Committee Adversary Action, the $5 million GUC Cash Payment and the GUC Trust Seed Funding Amount.  The $5 million GUC Cash Payment is available for Distribution to the beneficiaries of the GUC Trust and cannot be used for any other purpose.   Pursuant to the Committee Settlement, the GUC Trust Seed Funding Amount is to be used to pay the costs and expenses to prosecute the Committee Adversary Action, but it is to be repaid to the Debtors from net proceeds of the Committee Adversary Action before any further Distributions are made to the beneficiaries of the GUC Trust.   The value of the Committee Adversary Action is uncertain and is subject to numerous inherent risks associated

with litigation.  The GUC Trust Assets owned indirectly through ownership of Liquidating SRC are the Rabbi Trust Proceeds, the Avoidance Actions and any amounts in the Wind-Down Funds Account after repayment to Taylor of the Surplus Wind-Down Amount, if any.  Whether these Assets, ultimately, generate recoveries for the GUC Trust depend on a number of factors.  First, the Assets of Liquidating SRC must first be used to pay Allowed Unclassified Claims, Priority Claims and Other Secured Claims of the Debtors.  The Debtors anticipate that this will consume a significant portion of the Rabbi Trust Proceeds.  See further discussion at Section 4.2.3 above.  Second, the value of the Avoidance Actions is also uncertain for several reasons, including without limitation:  (a) it is presently unclear which Avoidance Actions will actually be retained by the Debtors; Taylor has the right to designate certain Avoidance Actions as Transferred Assets (as defined in the Asset Purchase Agreement); (b) those Avoidance Actions which remain with the Debtors are litigation claims which, as with all litigation, are subject to litigation risk and will be offset by the costs of litigation; and (c) the Avoidance Actions will be subject to the defenses available to defendants under section 5 of the Bankruptcy Code, including without limitation, the defenses of new value and contemporaneous exchange for value.

**4.4**    **No Distributions to Holders of Equity Interests.** The value of the Debtors' remaining Assets is far less than the amount necessary to pay in full the Allowed Claims of the Debtors' Creditors.  Therefore, the Plan provides for the cancellation of the existing Equity Interests of in Debtors (other than Equity Interests in a subsidiary of SRC Liquidation Company which is wholly-owned, directly or indirectly, by SRC Liquidation Company, which Equity Interests are preserved solely for the benefit of the Holders of Allowed Claims as provided in the Plan).  Holders of cancelled Equity Interests in the Debtors will receive no Distribution under the Plan.

**4.5**    **Implementation and Execution of the Plan.**

**4.5.1**    **Effective Date.**  As set forth in Article 3 of the Plan, the Plan shall become effective on the date which is the first Business Day on which each condition set forth in Article 6 of the Plan has been satisfied or waived as set forth therein.  Upon the occurrence of the Effective Date, Liquidating SRC shall File and serve a notice of confirmation and occurrence of the Effective Date.  On the Effective Date, or as soon as practicable thereafter, Liquidating SRC, the GUC Trustee, and the Secured Creditor Trustee, as applicable, shall consummate, pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, those transactions and sales of property, if any, set forth in the Plan or the Plan Supplement.

**4.5.2**    **Summary of Means of Implementation and Execution of the Plan.**  Articles 2 and 3 of the Plan set forth the means by which the Plan shall be implemented and executed, including the substantive consolidation of the Debtors, the establishment of the Trusts, the appointments and responsibilities of the Trustees of the respective Trusts, the funding of accounts and reserves, the issuance of Liquidating SRC Membership Interests, the liquidation and monetization or abandonment of any remaining non-Cash Assets, the Distribution of Assets, the treatment of any unclaimed or *de minimis* Distributions, and the dissolution of the Liquidating Debtors.  Additionally, the terms and

conditions of the Trusts and the rights, duties, and obligations of the Trustees of the respective Trusts are set forth in the GUC Trust Agreement and the Secured Creditor Trust Agreement, which shall be Filed in substantially final form with the Plan Supplement.

Subject to the following sentence, the Debtors' rights, claims, and Causes of Action, including Avoidance Actions, with respect to trade obligations (including obligations to customers) were sold in the Taylor Sale. However, such right, claim, or Cause of Action against any customer or trade vendor only constitutes a Transferred Asset (as defined in the Asset Purchase Agreement) to the extent that the following two conditions are satisfied:  (a) it is listed on a schedule provided to the Debtors and the Committee no later than 90 days after the Closing, and (b) Taylor determines that the customer or trade vendor against whom such right or claim can be asserted is (i) a current customer of the Business (as defined in the Asset Purchase Agreement), (ii) a trade vendor of the Business that is deemed by Taylor in good faith to be material to the Business, or (iii) is an affiliate of Taylor. The balance of the Debtors' rights, claims, and Causes of Action, including without limitation the unresolved claims asserted in the Committee Adversary Action and remaining Avoidance Actions, will not be transferred to Taylor and will be pursued in the sole discretion of Liquidating SRC or, in the case of the Committee Adversary Action, the GUC Trust.  <u>The Debtors specifically do not waive any Avoidance Actions against any party, including without limitation, any supplier or customer of the Debtors, and reserve the right to bring such actions after the Effective Date.</u>

### 4.5.3    <u>Substantive Consolidation of the Debtors</u>.    Entry of the Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates of the Debtors for the purposes of confirming and consummating the Plan, including, but not limited to, voting, confirmation and Distribution. On and after the Effective Date, (i) all Assets and liabilities of the Debtors shall be deemed to be the Assets and liabilities of a single, consolidated entity, (ii) each Claim Filed or to be Filed against any Debtor shall be deemed Filed as a single Claim against and a single obligation of the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, *provided*, *however*, that the Claims set forth in the Mexico Consideration Tax Treatment Agreement shall be preserved solely for the purposes of implementing that Agreement, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) the existing Equity Interests in SRC Liquidation Company shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any existing Equity Interest held by a Debtor in any other Debtor, except as and to the extent required in the Mexico Consideration Tax Treatment Agreement, (vii) all guarantees of any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor shall be one obligation of the substantively consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors.

The substantive consolidation of the Debtors under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Trusts on or after the Effective Date

(including any agreements entered into by the GUC Trust or the Secured Creditor Trust prior to the Effective Date, all of which are deemed to be ratified as of the Effective Date), (iv) the Debtors' or the GUC Trust's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, and (v) distributions to the Debtors or the Trusts from any insurance policies or the proceeds thereof.  Notwithstanding the substantive consolidation called for herein, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed, dismissed or converted.

The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation provided for in the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any Creditor purportedly affected by such substantive consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation proposed by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing.  In the event any such objections are timely Filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

The Debtors believe that substantive consolidation is warranted here because, among other reasons, the Debtors historically operated on a consolidated basis. Debtors had essentially the same officers and directors. Customers and others identified the Debtors by their trade names as opposed to their corporate identities. The Debtors believe that most or all of their unsecured Creditors viewed the Debtors as a single entity when extending credit terms. Further, all accounts payable functions were performed from one centralized location at SRC Liquidation Company's main corporate headquarters, by the same administrative staff working on behalf of all Debtors, and substantially all debts were centralized and paid by SRC Liquidation Company. Additionally, while the Debtors' financial systems did track intercompany transactions and debts in the aggregate, such amounts customarily were not reconciled in detail by the Debtors as a matter of administrative and accounting convenience. Determining the sources of the Debtors' pre-petition Assets and liabilities on a per-Entity basis would involve the nearly impossible task of reviewing and categorizing thousands of records to trace such transactions back to the proper Entity. Indeed, given the Assets held by the Debtors, and the expense of generating separate lists of Assets and liabilities as well as plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to Creditors and will allow for greater efficiencies and simplification in administering the Plan. Accordingly, the Debtors believe that substantive consolidation of the Debtors' Estates under the terms of the Plan will not adversely impact the treatment of any of the Debtors' Creditors, but rather will reduce administrative expenses by automatically eliminating duplicative Claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of eleven (11) separate Debtor's estates separately, as well as eliminating the need to determine Professional fees on a case-by-case basis and streamlining the administration of the Plan.

**4.5.4    Records.**  After the Effective Date, all of the Debtors' books and records in their possession relating to the conduct of the Debtors' business prior to the

Effective Date shall vest in the Liquidating Debtors. The GUC Trustee shall have equal access to all such books and records, and Liquidating SRC shall make such books and records reasonably available to the Secured Creditor Trust at the sole expense of the Secured Creditor Trust. The Debtors' right access to its former books and records that were sold to Taylor shall continue to be governed by the terms and conditions related to such access as set forth in the MTSA.

> **4.5.5      Third Party Releases and Disgorgement Provision.**  An integral component of the agreement of the Second Lien Term Lenders to the Committee Settlement was that neither they, nor their affiliates, would be subject to lawsuits from any Holders of General Unsecured Claims. The Second Lien Term Lenders were unwilling to settle with the Committee and make the GUC Cash Payment available for Distribution to general unsecured Creditors if those same Creditors could, in their individual capacity, subsequently sue the Second Lien Term Lenders for actions arising from or related to the Debtors. To address this concern and obtain the benefit of the Committee Settlement for General Unsecured Creditors, the Committee and the Debtors agreed that the Plan would provide for the Third Party Releases and that any Holder of a General Unsecured Claim that receives a Distribution from the GUC Cash Payment shall, if such Holder initiates a lawsuit in its individual capacity against any of the Released Parties, (a) refund any such Distribution to the Second Lien Agent, and (b) waive its right to any further Distributions. For a description of the Third Party Releases, see Section 7.3 below.

**4.6      Administrative Expense Claim Bar Date.**   Other than with respect to Professional Fee Claims, any Person asserting an Administrative Expense Claim must submit a proof of claim with respect to such Administrative Expense Claim to the Balloting and Claims Agent **so that it is actually received** on or before the Administrative Expense Claims Bar Date.

**4.7      Objections to Claims.**  The Plan provides Liquidating SRC or the GUC Trustee (and, with respect to Class I Claims other than the Other Secured Claim of Bank of America, N.A., and Class III Claims other than the Second Lien Claim Filed by the Second Lien Agent, the Secured Creditor Trustee) with up to 365 days from the Effective Date to object to Claims, which deadline may be extended upon a motion Filed with the Bankruptcy Court by the Liquidating SRC, the GUC Trustee or the Secured Creditor Trustee, as applicable, prior to the expiration of the Claim Objection Deadline. The Claim Objection Deadline shall be automatically extended upon the Filing of a motion requesting an extension of the Claim Objection Deadline until such time as the motion is granted or denied by the Bankruptcy Court.

**4.8      Executory Contracts and Unexpired Leases.**  Subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors that have not been assumed and assigned, or rejected, prior to the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order, as of the Confirmation Date, provided that to the extent the D&O Policies, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor are executory, the D&O Policies, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor shall not be deemed rejected but shall be deemed assumed by the Liquidating Debtors as of the Effective Date and shall remain in full force and effect following the occurrence of the Effective Date. From and after the Effective Date, the Liquidating Debtors shall take no action that would cancel, modify, or otherwise impair the "Extended Reporting Period Elected (Pre-Paid)" or other similar

endorsements or provisions of the D&O Policies, all of which shall remain in full force and effect in accordance with their terms. Any Creditor asserting a Claim for monetary damages as a result of the rejection of an Executory Contract or Unexpired Lease, and/or the abandonment of Assets, pursuant to the Confirmation Order, shall File a proof of Claim (each a "Rejection Claim") within thirty (30) days of the Confirmation Date.

**4.9** **Conditions Precedent to the Effective Date.** Article 6 of the Plan sets forth the conditions that must occur prior to the occurrence of the Effective Date. This Article also describes the Debtors' ability to waive such conditions, as well as the effect of non-occurrence of the conditions to the Effective Date, including the vacation of the Confirmation Order. If the Confirmation Order is vacated pursuant to Section 6.3 of the Plan, (i) the Plan shall be null and void in all respects, and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interest in, the Debtors and the Estates or (b) prejudice in any manner the rights of the Debtors, the Estates, the GUC Trust, the Secured Creditor Trust, or any other party in interest.

**4.10** **Pension Benefit Guranty Corporation Matters**. Subject to Article 7 of the Plan and any corollary provisions of the Confirmation Order, no other provision in the Confirmation Order or the Plan shall in any way be construed to discharge, release, limit, or relieve any Person other than the Debtors, and, as set forth in Article 7 of the Plan and any corollary provisions of the Confirmation Order, the Exculpated Parties and the Released Parties, in any capacity, from any liability or responsibility with respect to The Stanreco Retirement Plan under any law, governmental policy, or regulatory provision. Subject to Article 7 of the Plan, The Pension Benefit Guaranty Corporation and The Stanreco Retirement Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. Notwithstanding the foregoing, the Pension Benefit Guaranty Corporation and The Stanreco Retirement Plan shall continue to be subject to the provisions of Sections 1.5 and 1.6 of this Plan.

**4.11** **Miscellaneous Provisions.** Article 8 of the Plan contains several miscellaneous provisions, including (i) the retention of jurisdiction by the Bankruptcy Court over certain matters following the Confirmation Date and the Effective Date; (ii) the Liquidating Debtors' payment of statutory fees pursuant to 28 U.S.C. § 1930; (iii) the termination of the Balloting/Claims Agent in its capacity as claims, noticing and balloting agent, at Liquidating SRC's discretion; and (iv) the issuance of a final decree and the closing of the Chapter 11 Cases.

**4.12** **Final Approval and Payment of Professional Fees.** Article 9 of the Plan describes the procedures for payment of Professional Fee Claims, including the funding of the Professional Fee Claims Escrow Account. On the Effective Date, the Debtors shall establish and fund the Professional Fee Claims Escrow Account in an amount sufficient to pay, in full, any then unpaid fees and expenses (including, without limitation, any estimated, accrued but unbilled fees and expenses through the Confirmation Date) owed to any Person asserting a Professional Fee Claim. Amounts held in the Professional Fee Claims Escrow Account shall not constitute property of the Debtors or the Liquidating Debtors and shall only be distributed in accordance with Section 9.2 of the Plan. Each Person asserting a Professional Fee Claim shall be entitled to a maximum amount from the Professional Fee Claims Escrow Amount equal to the amount of the Professional Fee Summary submitted by such Person less all interim compensation paid to such Person during the Chapter 11 Cases. In the event there is a remaining balance in the

Professional Fee Claims Escrow Account following payment of all Allowed Professional Fee Claims in accordance with Section 9.1 of the Plan, such remaining amount, if any, shall be paid into the Wind-Down Funds Account.  In the event that there are insufficient funds in the Professional Fee Claims Escrow Account to pay any Allowed Professional Fee Claims in accordance with the terms of the Professional Fee Claims Escrow Account, the unpaid portion of such Allowed Professional Fee Claims shall be paid by Liquidating SRC.

## 5.    FEASIBILITY

### 5.1    Financial Feasibility Analysis.

**5.1.1    Bankruptcy Code Standard.**  The Bankruptcy Code requires that, in order to confirm a plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

**5.1.2    Liquidating Plan.**  The Plan is a plan of liquidation and therefore satisfies the feasibility standard.  Exhibit 2 attached hereto demonstrates that the Debtors have sufficient funds to pay in full Unclassified Claims and Priority Creditors, as required by section 1129 of the Bankruptcy Code.

## 6.    BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN

### 6.1    Chapter 7 Liquidation.

**6.1.1    Bankruptcy Code Standard.**  Notwithstanding acceptance of a plan by the requisite number of Creditors in an impaired class, the Bankruptcy Court must still independently determine that such plan provides each member of each impaired class of claims and interests that does not individually accept the plan with a recovery that has a value at least equal to the value of the recovery that each such member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date of such plan.

**6.1.2    Plan is in the Best Interests of Creditors.**  The Debtors believe that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, and Distributions under the Plan will commence at an earlier point in time than they would if a chapter 7 trustee were put in place.

Substantially all of the Debtors' tangible Assets have already been liquidated during the Chapter 11 Cases.  The Debtors have diligently proceeded with monetizing or attempting to monetize all Assets of their Estates other than Assets with a *de minimis* value and certain remaining Causes of Action, if any.

Although the Plan effects a liquidation of the Estates' remaining Assets and a chapter 7 liquidation would have the same goal, the Debtors believe that the Plan provides the best source of recovery to Holders of Allowed Claims.  Liquidating the Assets under chapter 7 would require the appointment of a chapter 7 trustee.  Such an appointment would delay Distributions to

Holders of Claims and would likely provide a smaller Distribution to Holders of Allowed Claims because of the additional fees and expenses which would be incurred during a chapter 7 liquidation, including potential added time and expense incurred by a chapter 7 trustee and any of its retained professionals who would need to familiarize themselves with the Chapter 11 Cases.

Accordingly, the Debtors believe that the Plan is in the best interests of Creditors.

**6.1.3    Liquidation Analysis.**  The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of the effect that a chapter 7 liquidation would have on the recoveries of the Holders of Claims is set forth in the hypothetical liquidation analysis (the "Liquidation Analysis") annexed hereto as **Exhibit 2**.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors.  Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated.  In particular, the Liquidation Analysis assumes that $1.1 million is paid to the Second Lien Agent to settle the Debtors' dispute with the Second Lien Agent related to its claim that it is entitled to $1.85 million of the Wind-Down Amount.  Although the Debtors dispute the Second Lien Agent's claim to any portion of the Wind-Down Amount, the Second Lien Agent may be successful in securing $1.85 million of the Wind-Down Amount for the benefit of the Holders of Second Lien Secured Claims.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

**6.2    Continuation of the Chapter 11 Cases.**  The Debtors are not a going concern and thus there is no benefit to remaining in chapter 11.

**6.3    Alternative Plan(s).**  The Debtors do not believe that any feasible alternative plan structures exist, and that the only alternatives to the Plan are the conversion of the Chapter 11 Cases to chapter 7 and liquidation of the Debtors pursuant to chapter 7 and a structured dismissal of the Chapter 11 Cases.  The Debtors do not believe that either of these alternatives is preferable to the Plan, and that the Plan, as described herein, enables Holders of Claims to realize the greatest possible value under the circumstances.

# 7.    INJUNCTION, EXCULPATION, AND RELEASES

**7.1**    Plan Injunction.  Confirmation of the Plan shall operate as an injunction against the commencement or continuation of any act or action to collect, recover, or offset from the Estates (unless such offset rights were asserted in writing prior to the Confirmation Date), the GUC Trust, the Secured Creditor Trust, or any of their property, any Claim or Equity Interest treated in the Plan or any actions to interfere with the implementation and consummation of the Plan, except as otherwise expressly permitted by the Plan, the Confirmation Order or by Final Order enforcing the terms of the Plan.  The Bankruptcy Court shall have jurisdiction to determine and award damages for any violation of such injunction, including compensatory

damages, professional fees and expenses, and exemplary damages for any willful violation of said injunction.

**7.2    Exculpation and Limitation of Liability.** None of the Debtors, the Committee or the Second Lien Agent, or any of their respective current members, partners, officers, directors, employees, advisors, professionals, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Entities) but solely in their capacities as such (collectively, the "**Exculpated Parties**") shall have or incur any liability to any Holder of any Claim or Equity Interest for any act or omission on or before the Effective Date in connection with, related to, or arising out of the Chapter 11 Cases, the negotiation and execution of the purchase agreements for the sale of the Debtors' Assets to Taylor during the Chapter 11 Cases, the negotiation and execution of the Committee Settlement, the negotiation and execution of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, and the property to be distributed under the Plan on or before the Effective Date, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except in case of fraud, willful misconduct, intentional misconduct, or gross negligence by such Exculpated Party as determined by a Final Order.

The Confirmation Order shall serve as a permanent injunction against any party seeking to enforce any claim or Cause of Action against the Exculpated Parties that has been exculpated pursuant to Section 7.3 of the Plan. Upon information and belief, the U.S. Trustee does not believe that the Second Lien Agent and its current members, partners, officers, directors, employees, advisors, professionals, agents and advisors are properly included in the definition of Exculpated Parties.

**7.3    Third Party Releases.** On the Effective Date, (a) each Holder of a Claim who is presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code (i.e., Holders of Claims in Classes I and II), and (b) each Holder of a Class III and/or Class IV Claim who is entitled to vote on the Plan and does not, by the Voting Deadline, both (i) vote to reject the Plan or abstain from voting on the Plan and (ii) make the Third Party Opt-Out Election on its properly completed and returned Ballot, shall be deemed on behalf of itself and its estate, affiliates, heirs, executors, administrators, successors, assigns, managers, business managers, accountants, attorneys, representatives, consultants, agents, and any and all other Persons or parties claiming under or through them, to release, discharge, and acquit the Silver Point Entities; DLJ Investment Partners, L.P.; DLJ Investment Partners II, L.P., DLJIP II Holdings, L.P.; Credit Suisse AG, Cayman Islands Branch; Credit Suisse Loan Funding LLC; Sargas CLO II Ltd.; WG Horizons CLO I; any other lender under either or both of the First Lien Term Loan Facility or the Second Lien Term Loan Facility; any Person who has served as a director of Workflow Holdings, LLC, WorkflowOne, LLC, or their subsidiaries (collectively, "**WorkflowOne**"); Anthony DiNello, Frederic Brace, and Robert Peiser; and each of their respective current and former heirs, executors, administrators, predecessors, successors, assigns, subsidiaries, affiliates, divisions, partners, members, interest holders (direct and indirect), officers, directors, employees (including, for the avoidance of doubt, any current or former employee of the Silver Point Entities in his or her capacity as a board member of the Debtors or

WorkflowOne), **agents, shareholders, managers, accountants, attorneys, representatives, consultants, other professionals, insurers, and any and all other Persons acting under the direction, control, or on behalf of any of the foregoing, in each case solely in their capacity as such (each of the foregoing, a "Released Party") from any and all claims, counterclaims, disputes, liabilities, suits, demands, defenses, liens, actions, administrative proceedings, and Causes of Action of every kind and nature, or for any type or form of relief, and from all damages, injuries, losses, contributions, indemnities, compensation, obligations, costs, attorneys' fees, and expenses, of whatever kind and character, whether past or present, known or unknown, suspected or unsuspected, fixed or contingent, asserted or unasserted, accrued or unaccrued, liquidated or unliquidated, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, or requirement, and claims of every kind, nature, and character whatsoever, including avoidance claims, Causes of Action, and rights of recovery arising under chapter 5 of the Bankruptcy Code and any and all claims based on avoidance powers under any applicable non-bankruptcy law that any such releasing party ever had or claimed to have, or has or claims to have presently or at any future date, against any Released Party arising from or related in any way whatsoever to the Debtors or WorkflowOne. For the avoidance of doubt, the failure to make the Third Party Opt Out Election shall not prevent any Holder of a Claim from receiving a Distribution under the Plan. Nothing in Section 7.4 of the Plan shall be deemed to release, waive, or otherwise impact any of the GUC Trust Causes of Action or any other Causes of Action against the defendants named in the GUC Trust Adversary Complaint or any other defendants that are not Released Parties for claims related to or based on the facts and circumstances alleged in the GUC Trust Adversary Complaint.**

Upon information and belief, the U.S. Trustee does not believe that rights of recoupment are properly released by the Third Party Release.

> **7.4** <u>**Releases Contained in Committee Settlement**</u>. For the avoidance of doubt, nothing in the Plan shall limit the scope or timing of the releases approved through the Committee Settlement.

> **The Confirmation Order shall serve as a permanent injunction against any party seeking to enforce any claim or Cause of Action against the Released Parties that has been released pursuant to the Committee Settlement or Section 7.4 of the Plan.**

## 8. <u>RISK FACTORS</u>

Holders of Claims who are entitled to vote on the Plan should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.

> **8.1** <u>**Certain Bankruptcy Considerations.**</u> Even if an Impaired Class votes to accept the Plan, and with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court may exercise substantial discretion and may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of Distributions to dissenting Holders of Claims or Equity Interests

may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

     **8.2**    **Claims and Asset Value Estimation.**  There can be no assurance that the estimated amount of Claims set forth in the Plan is correct.  Additionally, there can be no assurance that the Debtors' estimate of the value of the Assets is correct.  Any increase in the amount of Claims or decrease in the value of the Assets versus the Debtors' estimates of each could result in decreased recoveries to Creditors.  The actual allowed amounts of Claims may differ from the Debtors' estimates.  Any value given as to the Claims against and the Assets of the Debtors and the Estates is based upon an estimation of such value only and no formal appraisal of either has been done in connection with this Disclosure Statement.

     Distributions under the Plan to Holders of Allowed Class III Claims will depend entirely on the amount realized from the liquidation of the Secured Creditor Trust Assets, and the costs and expenses incurred by the Secured Creditor Trust in connection with such liquidation.  Similarly, other than the GUC Cash Payment, further Distributions under the Plan to Creditors holding Allowed Class IV Claims will depend entirely, among other things, on the amount of the recoveries, if any, with respect to the Committee Adversary Action, the proceeds from the disposition of the Free and Clear Assets, the Amount of Allowed Administrative Expense Claims and Allowed Priority Claims, and the costs and expenses incurred by the GUC Trust and Liquidating SRC in connection with the liquidation of the Free and Clear Assets, the claims reconciliation process, and the post-Effective Date wind-down of the Liquidating Debtors.

     Actual Distributions to Allowed Unsecured Claims and Allowed Second Lien Claims may differ from those projected in this Disclosure Statement, and the Debtors make no warranties or representation about the actual amount of any such Distributions.  The practical and legal reality is that, except as described herein, there is no other source of payment for Distributions to such Creditors.  Under the Plan, Allowed Administrative Expense Claims and Priority Claims are payable before any further Distributions to the GUC Trust.  Under the Secured Creditor Trust Agreement, the fees and expenses of the Secured Creditor Trustees and its professionals and advisors, are payable before any Distributions to Holders of Allowed Class III Claims, and under the GUC Trust Agreement, except for the GUC Payment, the fees and expenses of the GUC Trustee, and its professionals and advisors, and repayment of the GUC Trust Seed Funding Amount are payable before any Distributions to Holders of Allowed Class IV Claims.

**9.**     **TAX CONSEQUENCES OF THE PLAN**

     A detailed discussion of potential U.S. federal income tax consequences of the Plan can be found in the *Analysis of Certain U.S. Federal Income Tax Consequences of the Plan* annexed hereto as **Exhibit 3**.

10.    **CONCLUSION**

It is important that you exercise your right to vote on the Plan.  The Debtors and the Committee believe that the Plan fairly and equitably provides for the treatment of all Claims against and Equity Interests in the Debtors and recommend that you cast your Ballot in favor of the Plan.

IN WITNESS WHEREOF, the Debtors have executed this Disclosure Statement this 22nd day of September, 2015.

> SRC LIQUIDATION COMPANY, ON ITS
> OWN BEHALF AND ON BEHALF OF
> ITS DEBTOR AFFILIATES, AS DEBTORS AND
> DEBTORS IN POSSESSION
>
>
> By:      */s/ Landen C. Williams*
> Name:   Landen C. Williams
>
>  Title:   Chief Restructuring Officer