UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| | . Chapter 11 |
| IN RE: | . |
| | . Case No. 15-10541 (BLS) |
| SRC LIQUIDATION COMPANY, | . |
| et al, | . |
| | . Courtroom No. 1 |
| | . 824 Market Street |
| Debtors. | . Wilmington, Delaware 19801 |
| | . |
| . . . . . . . . . . . . . . . . | . Monday, September 21, 2015 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Andrew L. Magaziner, Esq.
                            YOUNG, CONAWAY, STARGATT
                             & TAYLOR, LLP
                            Rodney Square
                            1000 North King Street
                            Wilmington, Delaware 19801

                            Jeremy L. Graves, Esq.
                            Matthew G. Bouslog, Esq.
                            GIBSON, DUNN & CRUTCHER, LLP
                            200 Park Avenue
                            New York, New York 10166

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Dana Moore, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:   (Continued)

For the U.S. Trustee:          Mark Kenney, Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               844 King Street, Suite 2207
                               Lockbox 35
                               Wilmington, Delaware 19801

For the Official Committee
of Unsecured Creditors:        Justin K. Edelson, Esq.
                               POLSINELLI, LLP
                               222 Delaware Avenue, Suite 1101
                               Wilmington, Delaware 19801

                               Wojciech F. Jung, Esq.
                               LOWENSTEIN SANDLER, LLP
                               1251 Avenue of the Americas
                               New York, New York 10020

For Silver Point
Finance, LLC, et al:           Christopher M. Dressel, Esq.
                               SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP
                               155 North Wacker Drive
                               Chicago, Illinois 60606

                               Dain A. De Souza, Esq.
                               SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP
                               One Rodney Square
                               920 North King Street
                               Wilmington, Delaware 19801

For Taylor Corporation:        Matthew P. Austria, Esq.
                               WERB & SULLIVAN
                               300 Delaware Avenue, Suite 1300
                               Wilmington, Delaware 19801

For Xerox Corporation:         John D. McLaughlin, Jr., Esq.
                               CIARDI, CIARDI & ASTIN
                               1204 North King Street
                               Wilmington, Delaware 19801

(Appearances Continued)

```
APPEARANCES VIA TELEPHONE:

For the Debtors:              Michael A. Rosenthal, Esq.
                             GIBSON DUNN & CRUTCHER, LLP

For Silver Point
Finance, LLC, et al:          Ron Meisler, Esq.
                             SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM, LLP

For the Pension Benefit

Guarantee Corporation:        Courtney Morgan, Esq.
                             PENSION BENEFIT GUARANTEE
                              CORPORATION
For Anthem:                   Tiffany S. Cobb, Esq.
                             VORYS, SATER, SEYMOUR & PEASE

For TLF Graphics, Inc.:       Kelly C. Griffith, Esq.
                             HARRIS BEACH, PLLC
```

INDEX

Page

MOTION RE:  SCHEDULING COMBINED CONFIRMATION AND            6
DISCLOSURE STATEMENT HEARING, ESTABLISHING
SOLICITATION PROCEDURES, ET CETERA

MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS          19

THIRD OMNIBUS OBJECTIONS TO CLAIMS                         21

MOTION TO AMEND/ASSUME INSURANCE AGREEMENT                 22

SALE PROCEDURES MOTION RE:  *DE MINIMIS* ASSETS            23

1          (Proceedings commence at 10:38 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Please be seated.  Good morning.

4                COUNSEL:  Good morning.  Good morning.

5                MR. GRAVES:  Good morning, Your Honor.  Sorry for the

6     brief delay.

7                THE COURT:  That's just fine.

8                MR. GRAVES:  For the record, Jeremy Graves of Gibson

9     Dunn, on behalf of the debtors.

10               THE COURT:  Welcome.

11               MR. GRAVES:  Thank you.

12               With me in the courtroom today are Matt Bouslog, also

13    of Gibson Dunn, and Mr. Magaziner from Young Conaway.

14               THE COURT:  Great.

15               MR. GRAVES:  When we were last before Your Honor, it

16    was a teleconference, in which we were requesting some dates

17    for our proposed combined hearing on our disclosure statement

18    and our plan.  Following that teleconference, at which you gave

19    us some dates, we did, in fact, file that motion, seeking

20    approval of some solicitation procedures related to the

21    combined hearing process, and I'll turn to that motion in just

22    a second.

23               THE COURT:  Sure.

24               MR. GRAVES:  By way of status update in the case, the

1    debtors did file their plan and disclosure statement --

2              THE COURT:  I saw.

3              MR. GRAVES:  -- this past Friday.  And we've continued

4    our efforts to monetize and administer the remaining assets and

5    wind up the affairs of the estates, following the sale to

6    Taylor, which closed on July 31st.

7              In that regard, we've also sold some insurance

8    policies, recently, for net consideration of approximately $3.5

9    million.

10             THE COURT:  Okay.

11             MR. GRAVES:  We've also been working to tie off

12   miscellaneous loose ends and administer some claims, so that we

13   will be in a position to confirm our plan come November.  And

14   the items on today's agenda reflect those efforts to tie off

15   those loose ends.

16             THE COURT:  Very good.

17             MR. GRAVES:  If it's okay with Your Honor, at the

18   request of Mr. Kenney, we're going to take the last agenda item

19   first --

20             THE COURT:  That's fine.

21             MR. GRAVES:  -- and that is our solicitations

22   procedures motion.

23             The solicitation motion does not seek substantive

24   approval of the disclosure statement, but merely seeks approval

25   of the debtors' solicitation procedures, time line, and the

1    form of ballots.  Nonetheless, you may have seen Mr. Kenney's

2    reservation of rights --

3        THE COURT:  Of course.

4        MR. GRAVES:  -- in which he indicated he hasn't seen

5    the plan and disclosure statement, which was fair, because we

6    were still drafting it.  But we did, at his request, share

7    advanced drafts of both the plan and the disclosure statement.

8    He provided helpful comments, and the filed versions that we

9    filed on Friday incorporated his comments.  He also had one

10   comment to the proposed solicitation procedures order that I

11   will address in a moment.

12       But first, if you'll give me a second, I'd just like

13   to give you a sense of the high-level overview of the plan

14   structure.

15       THE COURT:  Great.

16       MR. GRAVES:  In a nutshell, the debtors' plan is what

17   I would call a "pool plan."  I call it a "pool plan" because,

18   following the debtors' settlement with the committee and Silver

19   Point, we essentially have two pools of assets:  We have the

20   assets that are reserved for the unsecured creditors, and we

21   have the assets that are reserved for the second lien lenders.

22   And the plan's structure implements these two pools by

23   providing the assets of each respective pool to a trust, to be

24   administered for the benefit of those claimants in each of

25   those different pools and classes.

1          It also contemplates that ownership of the reorganized

2    entities would vest in the general unsecured creditors trust,

3    so they would be able to administer claims, et cetera, by

4    virtue of their ownership of the reorganized entity.

5          The other notable feature of the plan is it does

6    contemplate substantive consolidation for purposes of

7    distribution.

8          THE COURT:  Uh-huh.

9          MR. GRAVES:  We think, quite frankly, that given the

10   way the debtors operated prepetition, that's the only practical

11   way forward in this case.

12         THE COURT:  I understand.

13         MR. GRAVES:  Moving to the solicitation procedures, we

14   have proposed a time line, which is set out in the motion.  I'm

15   happy to walk through it now or take any amendments to it you

16   might have.

17         THE COURT:  No.  Why don't we walk through that

18   quickly.  And I just want to make sure that I've got the dates

19   that you're looking for.  I saw the dates; I just want to make

20   sure they're on my calendar.  I recall.

21         MR. GRAVES:  Okay.  We have today as the record date

22   for determining who has the claims.  We propose to complete our

23   solicitation by September 28th, that's a week from today.

24   We've proposed November 2nd to be the voting deadline, the

25   deadline for filing objections to the -- both the plan and the

1   disclosure statement, and the deadline to file motions under

2   Rule 3018 for estimation.

3           THE COURT:  Okay.

4           MR. GRAVES:  We've got November 6th as a deadline for

5   our tabulation agent to file the declaration related to the

6   results of voting.  And we've got November 11th as the deadline

7   for the debtors to file their brief in support, reply to any

8   objections, and reply to any 3018 motions.  And we have down, I

9   believe, from your chambers --

10          THE COURT:  16th?

11          MR. GRAVES:  -- November 19th.  We have the nine --

12  the 16th came out of the conference.  And then my understanding

13  was that --

14          THE COURT:  I have the 19th at 9:30?

15          MR. GRAVES:  Yes, that's what I have.

16          THE COURT:  That's fine.

17          Let me ask you a question.  Do you anticipate, at this

18  point, that the debtor will be filing objections to claims that

19  would give rise to 3018 issues?

20          MR. GRAVES:  I don't.

21          THE COURT:  Okay.  And obviously, if that changes --

22          MR. GRAVES:  It's always --

23          THE COURT:  -- that's fine, but ...

24          MR. GRAVES:  It's certainly possible, but I do not

25  anticipate that --

1          THE COURT:  Okay.

2          MR. GRAVES:  -- Your Honor.

3          THE COURT:  Okay.

4          MR. GRAVES:  In terms of the procedures that we've

5    proposed, we think they're fairly straightforward.  Although I

6    would highlight two particular aspects of the solicitation

7    procedures:

8          First, in the settlement with Silver Point and the

9    committee, we did agree that we would seek opt-out third-party

10   releases --

11         THE COURT:  Uh-huh.

12         MR. GRAVES:  -- of the Silver Point Entities, and the

13   forms of ballots that were attached to the motion do reflect

14   that opt-out procedure.

15         And second, Mr. Kenney raised an issue related to

16   Section 1125 of the Bankruptcy Code.  As you know, Section 105

17   does clearly authorize the debtors to go forward with a

18   combined disclosure statement and plan process.

19         THE COURT:  Uh-huh.

20         MR. GRAVES:  1125(b) also could be read to suggest

21   that you can't solicit votes unless the Court has approved the

22   disclosure statement.  And so Mr. Kenney's creative suggestion

23   was to have the Court conditionally approve the disclosure

24   statement, to the extent required by Section 1125(b), but

25   subject to final approval at the combined hearing.  And so we

1    have made some changes to the order that -- I have a black-line

2    here, if you'd like to see it.

3          THE COURT:  That sounds fine.  I'd like to hear from

4    Mr. Kenney.

5          MR. GRAVES:  Oh, sure.

6          THE COURT:  I'll take your black-line.

7          Mr. Kenney, can I ask you a question?  The -- and

8    these are institutional things, so I'm kind of putting you on

9    the spot, and you're welcome to duck the question, if you want.

10   But I think I've asked this of your colleagues at different

11   points.

12         Over the past few years, I have at least offered the

13   combined hearing approach in different cases where it seemed,

14   to me, appropriate.  Some cases, it's clearly not, and there's

15   going to be a lot of legwork to get to a plan.  But a fair

16   number of these cases, as you know, have a pattern similar to

17   this one, where there's early proceedings that are,

18   essentially, successfully resolved, and we have basically a

19   pretty straightforward exercise.  And to me, and often to the

20   litigants, the idea of saving, you know, 45 or 60 days is

21   actually, in many of these cases, it's real money.

22         So I've been supportive of it, and I've actually

23   recommended it at times.  But I've been certainly sensitive to

24   the concerns that your office might have about sufficiency of

25   disclosure and balancing those issues.  And so -- and I've seen

1    this issue before in other cases, and I think your office,

2    maybe Mr. Buchbinder, raised it, as well.

3           Are you aware -- and again, I'm kind of putting you on

4    the spot -- and does your office have a particular position

5    with respect to the combined --

6           MR. KENNEY:  Your Honor --

7           THE COURT:  -- versus segregated one?

8           MR. KENNEY:  -- they have not taken a firm position;

9    it's something that we're looking at on a case-by-case basis.

10   And we have raised it in certain cases, where we just think

11   it's inappropriate, or where the -- there are issues with the

12   time line involved.

13          This is one where we looked at it, and once I had the

14   plan and disclosure statement in my hands, we were able to

15   resolve some issues.  I mean, it compressed our ability to

16   review it, initially, before it got solicited.  My concern was

17   the risk that there would be some fatal defect in what was sent

18   out --

19          THE COURT:  Yeah.

20          MR. KENNEY:  -- that would require a re-solicitation.

21          THE COURT:  Well, the one thing that I've generally

22   accepted, and I think that counsel goes into it with their eyes

23   open, is that you take a risk.  And if it's -- if there's a

24   basic problem, then, you know, you haven't saved the time that

25   you were hoping to.  But I think experience teaches us that, at

1    least as it relates to disclosure issues, that's usually pretty

2    rare.

3            If there's a confirmation problem, then we're all --

4    but often, those would be fleshed out in the lead-up, in the

5    traditional line, where somebody would stand up and say, I just

6    want to be clear, I've read your disclosure statement and your

7    plan, we're at the disclosure statement, and I don't want to

8    make anybody unhappy, but your plan is not confirmable.  And

9    often, we'll see modifications.  And that opportunity is

10   basically foregone when you combine the two.

11           MR. KENNEY:  Yeah, and that is a big part of the

12   concern, Your Honor.  I mean, I think, as far as the second --

13   I mean, because we did have the opportunity, I mean, we really

14   -- I think we were talking about it on Thursday or Friday, and

15   I received updated drafts over the weekend, which I got to see

16   first thing this morning; black-lines, of course.

17           This is a situation where we looked at it and said, it

18   can be made to work.  There were a couple of kinks to be worked

19   out, one of which was, you know -- and I don't think it's such

20   a creative solution, as -- but the idea that 1125(b) says it

21   has to be approved.  And 1125(d), in a small business case,

22   permits it to be conditionally approved.

23           THE COURT:  Right.  And this is, emphatically --

24           MR. KENNEY:  This is not --

25           THE COURT:  -- not a small business.

1          MR. KENNEY:  -- a small business case.

2          THE COURT:  No.

3          MR. KENNEY:  And I looked at and I said, my -- there

4     was a real concern that we don't want to have it solicited out

5     and have somebody come in --

6          THE COURT:  Come up with --

7          MR. KENNEY:  -- at confirmation --

8          THE COURT:  -- (indiscernible) opposition --

9          MR. KENNEY:  -- and blow it up then.

10         THE COURT:  Yep.

11         MR. KENNEY:  And it seemed like -- it's not creative;

12    it's an idea I stole from somebody else.

13         THE COURT:  I think I heard that --

14         MR. KENNEY:  If it conditionally approved -- huh?

15         THE COURT:  I think I heard that idea, previously, so

16    it was --

17         MR. KENNEY:  Yeah.

18         THE COURT:  -- from somebody.

19         MR. KENNEY:  Yeah, but if it at least conditionally

20    approved or, you know, provisionally approved, you have the

21    ability to solicit it.  Obviously, if there turns out to be

22    some fatal defect that all of us missed, you know, we then have

23    to deal with it.  But we -- it's better to try to address

24    whatever we can now --

25         THE COURT:  Uh-huh.

1          MR. KENNEY:  -- rather than find it -- you know, find

2     everybody at confirmation, you know, that either you have

3     something that's fatally defective and has to be re-solicited,

4     or you're backed into a corner that the economics of the case

5     just won't allow re-solicitation.

6          THE COURT:  Right.

7          MR. KENNEY:  And ...

8          THE COURT:  And often, these kind of cases are the

9     thin ones, where you're trying to save $150,000 to distribute

10    it to creditors.

11         MR. KENNEY:  That's correct, Your Honor.  And where,

12    if you had to --

13         THE COURT:  Do it all over again.

14         MR. KENNEY:  If you needed a do-over, it costs you

15    that $150,000.  And we've seen that, where it's like, if you

16    want money to distribute to creditors, you need to have a new

17    process.

18         THE COURT:  Right.

19         MR. KENNEY:  And I don't know if -- I think, given the

20    pool of money they have here, it's not as much an economic

21    issue as one of, you know, making sure the right I's are dotted

22    and the right T's are crossed.

23         THE COURT:  Sure.

24         MR. KENNEY:  You know?  Before it goes out.

25         THE COURT:  That's -- I appreciate the context.

1          On a longer-term basis, obviously not relating to this

2     particular case, but if there's a process that would be

3     acceptable and sort of more standardized for purposes of

4     dealing with these context of cases, which actually are not

5     uncommon, I'd invite your office to raise them through, you

6     know, either the Inns of Court or the -- or a bench-and-bar.

7          MR. KENNEY:  Right, right.

8          THE COURT:  Because I think, if we can -- each one of

9     these is kind of bespoke, and that's kind of an expensive way

10    to do a cost-saving process.

11         MR. KENNEY:  It is, Your Honor.  I mean, and the

12    decision on, you know, any kind of an agreed process from my

13    office would come from way above my pay grade.

14         THE COURT:  Yeah, I don't know if I'm looking to get

15    that elaborate.

16         MR. KENNEY:  But I think one thing that really does

17    help is if we have an opportunity -- you know, if that motion

18    is filed at the same time as the plan and disclosure statement,

19    that gives us a little bit more time to work with it.  But I

20    know that --

21         THE COURT:  That's (indiscernible)

22         MR. KENNEY:  I mean, part of the idea was that this

23    also truncated the amount of time they had available to do the

24    drafting.

25         THE COURT:  Right.

1          MR. KENNEY:  They had negotiated everything, but

2    sometimes there's a huge delta between negotiation and having

3    it reduced to paper.

4          THE COURT:  Okay.

5          MR. KENNEY:  You know, we were able to make it work

6    here, but I think it was because, you know, in that --

7    basically, just last week is when things really started to come

8    together.

9          THE COURT:  Well, as always, I certainly appreciate

10   your turning to these items to sort of smooth the tracks.  All

11   right.

12         So you may proceed.

13         MR. GRAVES:  Well, so, Your Honor, with that, we would

14   ask that the Court enter the solicitation procedures order.

15         THE COURT:  Okay.  Does anyone else wish to be heard

16   with respect to the debtors' request for approval of

17   solicitation procedures?  That would include a provisional

18   approval of the disclosure statement today.

19    (No verbal response)

20         THE COURT:  Okay.  All right.  I am prepared to

21   approve and authorize the relief.  As we have discussed

22   previously in this case, on the record, there are circumstances

23   where the combined hearing process is appropriate, and it

24   appeared to me that this could be one of those; the debtor,

25   apparently, concurs and has coordinated with and received good

1    input from the Office of the United States Trustee.

2         I have reviewed the submissions and the proposed time

3    line and the mechanics of the solicitation process that the

4    debtors have proposed, and I'm satisfied that they're compliant

5    with both our local rules, as well as the applicable rules and

6    statute.  So I will approve and authorize the motion.

7         Do you have a clean form of order?

8         MR. GRAVES:  Thank you, Your Honor.  May I approach?

9         THE COURT:  Sure.  Great.  Thank you.  Okay.  We'll

10   have this on the docket today.

11        MR. GRAVES:  Appreciate it.

12        THE COURT:  Mr. Kenney, did you have other matters you

13   needed to get to?  I think we put your stuff up front.

14        MR. KENNEY:  Your Honor, I don't, but I do have a

15   formation meeting at eleven o'clock, and I would request that I

16   be excused.

17        THE COURT:  Is that my problem?

18   (Laughter)

19        THE COURT:  It is my problem, isn't it?

20        MR. KENNEY:  It's your case.

21        THE COURT:  It is my problem.

22   (Laughter)

23        THE COURT:  Form away.

24        MR. KENNEY:  Thank you, Your Honor.

25        MR. GRAVES:  Thank you, Your Honor.  I believe the

1    rest of the items on today's agenda, we believe, are your

2    problems, as well.  We apologize for that.

3         (Laughter)

4         MR. GRAVES:  The agenda -- we'd like to go back to the

5    beginning of the agenda --

6         THE COURT:  Okay.

7         MR. GRAVES:  -- if that would be okay, and then I'll

8    turn it over to Mr. Bouslog for the remainder of the hearing.

9         So we'll be at Agenda Item Number 5, and that item is

10   the debtors' motion to reject our collective bargaining

11   agreements with the unions at their former Fayetteville,

12   Arkansas and York, Pennsylvania facilities.

13        Because we sold all of our business operations to

14   Taylor, we actually terminated all of our employees, except for

15   one, and that included all of the union employees.  These

16   folks, though, were generally taken care of because Taylor

17   offered them employment, basically as soon as they were

18   terminated from the debtors, and they've continued working in

19   their old positions.  But the estates were left with collective

20   bargaining agreements that governed terms and conditions of

21   employment, but had no employees.

22        THE COURT:  Okay.

23        MR. GRAVES:  And although we didn't think that there

24   are any continuing administrative expenses accruing under these

25   collective bargaining agreements, we thought it would be

1    prudent to move to formally reject them as part of the

2    administration of the estates, which brought us headlong into

3    the requirements of Section 1113 of the Bankruptcy Code.

4         We do think we've satisfied those requirements, which

5    oblige the debtors to, among other things, engage in good faith

6    negotiations with the union regarding the rejection.  We've

7    done that, and I think we've done that successfully.  We're

8    reached a tentative agreement with the unions regarding the

9    rejection.

10        THE COURT:  Okay.

11        MR. GRAVES:  The agreement we've reached in principle

12   is that we'll agree to a voluntary termination of the

13   collective bargaining agreements; and, at the same time, we

14   will agree to the amount of their administrative expense claims

15   and their priority claims that arose under the agreements while

16   they were in force.

17        And I think we've reached an agreement on the amount

18   of claims and the form of stipulation and an order that we'd

19   like to present, but we're not quite ready to present that to

20   Your Honor.  So, if it's okay with you, from a procedural

21   standpoint, we'd prefer to submit that to you under

22   certification of counsel.

23        THE COURT:  Okay.  I'll look for it.  I don't have any

24   problem with that.  I have seen the motion, and I looked at it

25   quickly, and I did see that the agenda reflects that there's a

1    resolution and process between the parties.  I don't expect

2    that I'd have any issue with it, and so I'll look for it under

3    certification.

4          MR. GRAVES:  I appreciate that.

5          THE COURT:  If issues arise, you're welcome to get me

6    on the phone; and, obviously, if I have questions when I get

7    it, I would certainly reserve the opportunity to get you all on

8    the phone.

9          MR. GRAVES:  Absolutely.  And we'll --

10         THE COURT:  But it seems to me like it should be

11   pretty routine.

12         MR. GRAVES:  We'd be available for that.

13         THE COURT:  Sure.

14         MR. GRAVES:  Thank you, Your Honor.

15         MR. BOUSLOG:  Good morning, Your Honor.  Matt Bouslog

16   from Gibson Dunn on behalf of the debtors.

17         If it's all right with you, I'd like to start with

18   Agenda Number -- Item Number 7, which is the third omnibus

19   objection to claims.

20         THE COURT:  Okay.

21         MR. BOUSLOG:  We received comments from a couple of

22   claimants and have discussed with them the meaning and purpose

23   of the objection.  We don't believe that they have any further

24   objection to the claim objection itself, and so we would ask

25   that the Court approve that motion.

1          THE COURT:  Okay.  Let me ask if anyone else wishes to

2    be heard with respect to Agenda Item Number 7, which is the

3    debtors' third omnibus substantive objection.

4          (No verbal response)

5          THE COURT:  Okay.  I did see the responses of Ms.

6    Rattie (phonetic) and Mr. O'Donnell -- or mister -- yeah, Mr.

7    O'Donnell.  And based upon the record before me and on

8    counsel's representations, I'm satisfied the debtors have

9    carried their burden, and the objection will be sustained on

10   the terms described.

11         MR. BOUSLOG:  Thank you, Your Honor.  May I approach?

12         THE COURT:  You may.  Thank you.

13         MR. BOUSLOG:  Okay.

14         THE COURT:  Next matter?

15         MR. BOUSLOG:  Sorry?

16         THE COURT:  Next matter.

17         MR. BOUSLOG:  Yes, the next matter.  Let me jump back

18   to Number 6, if that's okay.

19         THE COURT:  Sure.

20         MR. BOUSLOG:  That's the insurance motion.

21         We've discussed with counsel for Silver Point this

22   morning, and we have written in to the order a reservation of

23   rights by the agent for the second lien lenders, with respect

24   to any return of funds.  And so, if it's all right with Your

25   Honor, we've got an amended order here that we'd like to

1   submit.

2          THE COURT:  That would be great.

3          MR. BOUSLOG:  Thank you.

4          THE COURT:  And this is acceptable to the lender?  Mr.

5   De Souza, good to see you this morning.

6          MR. DE SOUZA:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. DE SOUZA:  Yes, Your Honor.  That's acceptable.

9          THE COURT:  Very good.  Okay.

10          MR. BOUSLOG:  Okay.

11          THE COURT:  And I see the reservation handwritten in.

12   That sounds fine.

13          MR. BOUSLOG:  Thank you, Your Honor.

14          So the last item that we have here is the abandonment

15   motion.  We have had ongoing discussions with Silver Point with

16   respect to the relief that we sought there.  We've had some

17   additional revisions going back and forth over the weekend, and

18   even this morning.  And we've come to a point where we have

19   part of a disagreement as to the time period in which the --

20   Silver Point should be entitled to conduct its diligence.

21          The debtors believe that they have a right to abandon

22   these assets, that they are burdensome to the estate and of

23   inconsequential value.  We don't believe that anything we're

24   going to get back is worth over $80 million, which is the

25   amount of their claim, and we're entitled to abandonment.  But

1    we -- consistent with the terms of the settlement agreement, we

2    will provide them an opportunity to take them.

3         THE COURT:  Yep.

4         MR. BOUSLOG:  We have agreed them to form a secured

5    creditor trust and to take those assets in the secured creditor

6    trust.

7         And what we're asking for, in a revised order that

8    I'll submit -- and I'll wait for counsel to speak, as well,

9    because he may have some comments with respect to the current

10   revised version of the order -- is that, upon five business

11   days after receiving the notice from Taylor with respect to

12   whether assets are excluded, that we -- if we don't receive

13   notice from them, that we're entitled to abandonment.

14        They want five business days to be able to conduct

15   their own diligence.  We can't guarantee that.  We have certain

16   access rights from Taylor.  But we're concerned from an estate

17   perspective, that, if, by no fault of our own, perhaps maybe a

18   delay in getting the keys or something from Taylor, that we or

19   Silver Point is not able to actually access the facilities to

20   go in and look at assets, that perhaps we trigger another

21   month's worth of rent under a lease, and then we incur

22   additional administrative expenses.

23        And whereas, we're -- we understand the request from

24   Silver Point, that they want to be able to go look at these

25   assets, the lists that we've seen we believe are sufficiently

1   detailed.  And as a practical matter -- or better said, as a

2   principal matter, we don't think that anybody is really

3   entitled to go look at these assets as a precondition to use

4   being able to abandon them; that, once we get these in our --

5   in an exercise of our reasonable business judgment, that we

6   should be able to abandon it upon the expiration of those five

7   days, when the leases are deemed rejected and these assets come

8   back to us.

9        And I think that's where the principal disagree now

10   lays, is they want that period tolled, so that they have a

11   guaranteed right of those five business days to be able to go

12   look at those assets.

13        THE COURT:  And the issue is that, if there's a delay

14   in the exercise of, say, that right, and we tumble them to the

15   next month, then you get hit with another month's of rent.  Is

16   that -- is the assumption there that, under the existing

17   protocol, that it's not going to be a Silver Point obligation;

18   that will be a debtors' side obligation or an estate

19   obligation?

20        MR. BOUSLOG:  That's right, that's right.  For assets

21   that, frankly, we don't -- we don't think that the estate is

22   every going to receive a dollar from the monetization of these

23   assets, and so we don't think the estate should bear that risk.

24        THE COURT:  Okay.  I'll hear from the -- I assume the

25   committee wants to be heard, and then I'll hear from Silver

1    Point.

2           MR. BOUSLOG:  And let me just mention that any

3    addition revisions to the order we have not had the opportunity

4    to preview with the committee.

5           THE COURT:  Sure.

6           MR. BOUSLOG:  We would still need to do that.

7           THE COURT:  Okay.  Mr. Jung.

8           MR. JUNG:  Good morning, Your Honor.

9           Your Honor, we share the debtors' concerns.  We

10   believe that five days for due diligence is enough, especially

11   because, Your Honor, Silver Point was the stalking horse.  That

12   they --

13          THE COURT:  Yes, and they --

14          MR. JUNG:  They --

15          THE COURT:  -- know the assets.

16          MR. JUNG:  They've done due diligence, they got paid

17   for it through the breakup fee.  Your Honor, we believe five

18   days is more than enough.

19          THE COURT:  Okay.

20          MR. JUNG:  Thank you.

21          THE COURT:  I understand.

22          Mr. Dressel, good morning, sir.

23          MR. DRESSEL:  Good morning, Your Honor.  Good morning,

24   Your Honor.  Christopher Dressel, Skadden, Arps, Slate, Meagher

25   & Flom, on behalf of Silver Point Finance, LLC, in its capacity

1    as administrative agent for the debtors' second -- prepetition

2    second lien term loan facility.

3         Your Honor, we have been engaged in discussions with

4    the debtors for several weeks, probably approaching a month, on

5    a number of practical difficulties associated with --

6         THE COURT:  It's a practical issue, more than anything

7    else.

8         MR. DRESSEL:  Yeah.  And I think there are some

9    theoretical disputes between us on certain issues, including,

10   you know, with respect to the wind-down amount.  But I think

11   the issues that are most relevant here relate to practical

12   concerns.

13        In the committee's settlement agreement, Your Honor,

14   there's a provision that provides that, with respect to the

15   assets that Silver Point was agreed to have liens on, Silver

16   Point is either entitled to the proceeds of those assets; or,

17   at its sole election, to take title and possession of those

18   assets.  And in certain cases, we believe that there is real

19   value to be had from some of these assets.

20        We agree with the debtors that certain of the assets

21   probably are not valuable.  We're not looking to take card

22   table chairs, leaky refrigerators, and some of the other assets

23   that have appeared on some of the lists.  But we believe, based

24   on our engagement with the debtors and Taylor, that at least

25   some of the assets may have a real value.  And we want the

1  opportunity, consistent with the settlement agreement, to be

2  able to monetize value for the benefit of our lenders.

3        The problem that we have, principally, with the

4  debtors' procedures is that it gives us virtually no

5  opportunity to actually ascertain which of those assets has

6  value and ought to be monetized, and which are appropriately

7  abandoned by the debtors.

8        The debtors, in their revised form of order that was

9  attached to their reply, have extended the period for Silver

10  Point to make a decision from two business days to five

11  business days.  But that does not address our fundamental

12  problem, which is that we don't have enough information,

13  currently, to make an intelligent decision, whether it's a two-

14  business-day period or a five-business-day period, about which

15  --

16        THE COURT:  Because you don't know what's coming.

17        MR. DRESSEL:  Because we don't know what's coming.

18  And we don't agree --

19        THE COURT:  Well, right --

20        MR. DRESSEL:  And --

21        THE COURT:  -- you won't know.

22        MR. DRESSEL:  We won't -- we --

23        THE COURT:  Until decisions are made or Taylor says,

24  all right, everything that's in this warehouse, we don't want.

25        MR. DRESSEL:  We'll -- yeah, we'll know substantially

1    concurrently with the debtors what types of assets are coming

2    back.

3          THE COURT:  Okay.

4          MR. DRESSEL:  But the information we've received in

5    consultation with Silver Point's professionals, and consulting

6    with financial advisors and liquidators on these issues, is

7    that the information we're receiving so far from the buyer and

8    from the debtors isn't sufficient to make a reasonable

9    determination --

10          THE COURT:  Quickly.

11          MR. DRESSEL:  -- quickly.  And so we don't think it's

12    something --

13          THE COURT:  So can I ask a mechanical question?

14          MR. DRESSEL:  Yes.

15          THE COURT:  And again, if this is -- if you don't know

16    the answer to this, that's fine.  Again, this -- I don't view

17    this, really, as a legal issue; this is a transactional and a

18    mechanical issue, to me.  And I'm sensitive to the debtor's

19    concerns.  But when you say that the information you're not

20    getting is sufficient, is it your expectation that superior

21    information could put together, if people were doing it?

22          MR. DRESSEL:  Our -- we are in discussions with a

23    liquidator, who's prepared, on short order, to conduct the

24    reasonable diligence at these facilities, that we believe that

25    we may receive back this week, if the liquidator has sufficient

1    access to the facilities from the debtor, once they're

2    designated as excluded assets by Taylor.

3         And so I think the crux of the matter is:  How do we

4    ensure that we're about to get access to do that due diligence.

5    And the debtors have said that they're not in total control

6    because there may be logistical issues that prevent --

7         THE COURT:  Well, I assume some of these sites are

8    Taylor-controlled right now, right?

9         MR. BOUSLOG:  All of them.

10        THE COURT:  Yeah.

11        MR. DRESSEL:  Our position is that, once Taylor

12   designates an asset as an excluded asset, the debtors are then

13   in control of that facility.  And in fact, even while it's a

14   so-called "potential asset," meaning it's --

15        THE COURT:  Am I mixing apples and oranges?  When you

16   say a -- it seems to me like there's a difference between if

17   there's a site, say, a leased site, and Taylor says, you know,

18   we want the site, we don't want the refrigerator.  And I may be

19   grossly oversimplifying this, but frankly, those are some of

20   the details that will determine whether or not five days or ten

21   days is sufficient.

22        Is it your expectation the debtors -- that Taylor is

23   going to turn to the debtor and say, not that we don't want the

24   refrigerator or this stack of chairs, but Taylor is going to

25   say, we do not want the site located at 51 Sycamore Avenue in

1    LA?  And if that's the case, then you need to know everything

2    that's in 51 Sycamore Avenue because the debtor is going to

3    basically walk away from it in five days.

4            MR. DRESSEL:  It's our understanding --

5            THE COURT:  Is that --

6            MR. DRESSEL:  -- that Taylor may designate certain

7    real property facilities as excluded, but -- owned real

8    property facilities.  What we're mainly concerned about now,

9    based on the information we've received from Taylor, is that

10   Taylor is going to designate certain leasehold facilities as

11   rejected contracts --

12           THE COURT:  Okay.

13           MR. DRESSEL:  -- and it's going to leave the personal

14   property.

15           THE COURT:  There's a lot of stuff in there.

16           MR. DRESSEL:  And some of that is going to be, to put

17   bluntly, garbage, and some of it may be machinery or equipment

18   that has value, you know, not that it's going to satisfy Silver

19   Point's claims, but it has real value.

20           THE COURT:  Okay.  I -- so I think I understand the

21   bid and the ask.

22           Mr. Bouslog, come on up.  Don't go anywhere, Mr.

23   Dressel.  Don't go anywhere.

24           I guess I need to know, what's the bid and the ask

25   right now, because I understand precisely each side's concerns.

1    I'm not sure that this is sufficiently baked for me to say five

2    days is sufficient.  I get it, from the debtors' point of view,

3    you got to get out of these properties and it needs to happen.

4    But some of this, again, is not a legal -- I can't look at a

5    rule and say the rule requires that, you know, five days is

6    sufficient.

7           Is this fully baked right now?  Is there -- you know,

8    you guys are talking about the -- I'm sorry, when I say "you

9    guys," I'm speaking of Silver Point -- are concerned about the

10   sufficiency of the information, the time line, and what your

11   expectations are.  You've got a liquidator that's kind of in

12   the mix now.  Do I need to answer this question today?

13          MR. BOUSLOG:  I think so because we're getting these

14   assets on a weekly basis -- or these lists --

15          THE COURT:  Yeah.

16          MR. BOUSLOG:  -- on a weekly basis, on a Monday, and

17   it's been Monday's.  Taylor will send us a list, and they're

18   saying, here's our list of rejected contracts, and here's a

19   list of removed assets.  And they are itemizing on those lists.

20   We're handing those lists over to Silver Point on a weekly

21   basis.  The type of lists that we included in our reply is what

22   they're receiving.  We think that it is sufficient.  And we're

23   willing to give them whatever access rights that we have to

24   facilitate their ability to get in and look at these sites and

25   determine.

1     But Silver -- or Taylor is specifically identifying

2  the assets.  Occasionally, they'll say, you know,

3  "miscellaneous office furniture."  But they have itemized it as

4  detailed as, you know, "two paper cutters," "one shredder."

5  The lists are sufficient.  And they're sufficient from a

6  debtor's perspective to look at say, we should be able to

7  abandon this; or, if you guys want it, go get it, you've got

8  your five days.

9     THE COURT:  Here's what I want to do.  I'm satisfied

10  that you need an answer and you need it promptly.  What I --

11  here's what I'd like to do.  I would like the parties to confer

12  for the next 48 hours, and I will get on the phone with you at

13  your convenience on Wednesday, and the reason is this.  It's --

14  uh-oh, that's Yom Kippur.

15     Mr. Dressel, let me ask you a question.  Is there any

16  more information that I'm going to get?  Because I really kind

17  of feel like I'm just sort of picking a number or a day right

18  now.  And not that I'm criticizing the information in the

19  briefing, but again, this is not really a legal issue.

20     This is the sort of thing that is typically resolved -

21  - and again, there's been, obviously, from the Court's point of

22  view, a very productive and consensual and professional working

23  relationship between the debtor and Silver Point, presumably

24  Taylor, as well, because I haven't heard anything about it, so

25  I'm assuming everybody is playing nicely in the sandbox.

1          My -- again, my instinct would be that I would give

2     you a little bit of time to sort of boil this down to a finer

3     point, figure out where your liquidator fits into this mix.

4     And if you want to get on the phone and say, it's got to be ten

5     days or it's got to be five days, and the exposure is this, and

6     the lists are sufficient or not sufficient, I think I just want

7     that boiled down.

8          I mean, I'm prepared to rule, and to rule promptly.

9     But I think I'd like one last try, to see if you can figure out

10    a path forward.  And I'd be prepared, again, to rule on this

11    issue, you know, on -- I think probably the 23rd is a problem

12    for getting anybody on the phone.  But I would do it tomorrow,

13    late in the day, or I would do it on Thursday, in the morning,

14    if you'd like.  I'm really at your pleasure.

15         MR. DRESSEL:  So, from our perspective, I guess I

16    would say two things.  First of all, we've been engaged on kind

17    of a more comprehensive --

18         THE COURT:  Yeah.

19         MR. DRESSEL:  -- resolution of kind of all of the --

20         THE COURT:  Yeah.

21         MR. DRESSEL:  We hope to hopefully resolve that as

22    soon as possible.  But then we have this narrower issue that

23    relates -- that's pressing because we think we're going to get

24    assets back today, or at least in the near-term future.  And to

25    --

1          THE COURT:  Well, but here's the question.  Let me ask

2     you a question.  Today is an excellent example.  Okay?  So you

3     want five business days, which would take us to the 28th,

4     right?  That's the debtors' bid.  Silver Point's ask would be

5     eight, ten business days, right?

6          MR. DRESSEL:  Our ask is that the period be tolled if

7     we don't have reasonable access to the facility.  And we

8     believe that the debtors are in a position to -- it's their

9     decision whether we have access.

10          THE COURT:  That gets kind of complicated.  I'm not

11     sure how I answer that question because, if I say five days or

12     it's tolled, what do I get, a notice of tolling, or a "we don't

13     agree"?  If the debtor says, you know, look, I said I'd be

14     there at 10:30, I'm standing there with the keys, and you're

15     not there; or you get a guy that says, look, we got to fly into

16     Wisconsin or Boston or someplace else, I can't be there until

17     noon, I mean, the mechanics -- here's the thing.

18          I would like you to see if you can sort this out.  I

19     would be -- I am prepared to rule, one way or the other,

20     because I agree with the debtor that you need an answer on

21     this, and frankly, just an answer on one side or the other may

22     be sufficient.  But I don't want to just pick a number because

23     I'm not the guy that's doing it.

24          But again, if we take -- if we take the extended

25     period, right?  So the debtor sends the information today,

1    right?  Today is a Monday.  Five days expires on the 28th, so

2    you have your answer, and it's either it is or it isn't.

3         If a notice of tolling comes in on the 28th, say we

4    follow your idea.  Okay, Mr. Dressel?  So you send a notice of

5    tolling, or whatever you mechanically agree on, right?  At that

6    point, either you get together, or maybe you get me on the

7    phone.  But it's probably not going to happen before Thursday

8    or Friday, and we're into another month.

9         Now it may be a small facility, but it's probably not.

10   So are we talking about, you know, a month's rent at 5,000,

11   35,000, something like that?  Who's paying that?  And we start

12   raising a whole bunch of questions that are much more

13   complicated than figuring out who gets the -- you know, the

14   paper cutters, the presses, and everything else.

15        So I would like to see whether or not the parties can

16   boil down with one last effort.  If you want to get together

17   with me tomorrow, we can get on the phone tomorrow.  If it's

18   Thursday, it's Thursday.  If you can make Yom Kippur, I'll be

19   here, but I'm -- but generally, we don't schedule a lot of

20   hearings on Yom Kippur in the Bankruptcy Court.

21        So why don't -- I would like to leave it there.  I'm

22   not really ducking the question, but you know, from my point of

23   view, it's a coin-toss.  Your position sounds pretty

24   reasonable, and the debtors' position sounds eminently

25   reasonable, as well.  And I'm prepared to decide, and I can

1    provide the parties with guidance going forward.  But I'd ask

2    for one last try, to see if there's a protocol.

3         MR. DRESSEL:  We're happy to continue (indiscernible)

4         THE COURT:  Okay, okay.  And you can give us a call

5    end of day today; give Ms. Bello a call, and she'll tell you --

6    and she'll give you time either tomorrow, Wednesday if you want

7    it, or Thursday, and we'll go from there.  Okay?

8         MR. BOUSLOG:  Thank you, Your Honor.

9         THE COURT:  All right.  Thanks guys.

10        MR. BOUSLOG:  If possible, we would maybe request

11   tomorrow, just to avoid pushing it into the next month.

12        THE COURT:  Well, and I -- that certainly sounds fine.

13   Then you guys need to go back to someplace and eat doughnuts in

14   a conference room and sort this out.

15        MR. BOUSLOG:  Thank you, Your Honor.

16        THE COURT:  All right.  Mr. Bouslog or ...

17        MR. GRAVES:  Mr. Graves.

18        THE COURT:  Mr. Graves, I'm sorry.

19        MR. GRAVES:  I believe that completes the agenda for

20   today.

21        THE COURT:  All right.  Anything further?

22      (No verbal response)

23        THE COURT:  Very well.  Thank you for your time.  I

24   will look forward to speaking with the parties tomorrow.

25        MR. GRAVES:  Thank you, Your Honor.

1           THE COURT:  We stand in recess.  Thank you, Mr.

2      Graves.

3           (Proceedings concluded at 10:55 a.m.)

4                              *****

1                        <u>CERTIFICATION</u>

2            I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and ability.

5

6

7

8    <u>/s/ Coleen Rand                </u>        September 27, 2015

9    Coleen Rand

10   Certified Court Transcriptionist

11   For Reliable