# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 15-10541-BLS |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | **Re: Docket No. 1086** |
| | : | |

### LIMITED OBJECTION OF CARESOURCE AND CARESOURCE MANAGEMENT GROUP CO. TO FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES

CareSource and CareSource Management Group Co. (collectively "CareSource"), by and through undersigned counsel, hereby files this limited objection to the First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates (the "Plan").  In support of this Objection, CareSource respectfully represents as follows:

### Preliminary Statement

1.       By the Plan, the Debtors seek, among other things, to transfer -- free and clear of liens, claims, encumbrances – insurance policies which cover claims of CareSource.  The Debtors seek to transfer these policies to a trust solely for the benefit of the Debtors' secured lenders.  CareSource objects to the Plan to the extent it purports to deny CareSource access to proceeds from the liability insurance policies.  These liability insurance proceeds are not property of the estate because, unlike insurance proceeds for casualty and fire insurance policies, the Debtors never had a right to receive and keep these liability insurance proceeds when the insurer paid a

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

claim.  Rather, these insurance proceeds were and are only payable to those entities harmed by the Debtors and with a valid claim under the insurance policy, such as CareSource.  CareSource has significant claims against the Debtors arising from the Debtors' breach of their agreements with CareSource.  These breaches have exposed CareSource to significant potential civil liability and regulatory oversight.  At all times prior to the filing the Plan, the Debtors consistently maintained that proceeds from their liability insurance policies were intended to cover the claims of CareSource.  The language of the Plan now directly contradicts this.  For this reason, and other reasons set forth herein, CareSource objects to the Plan.

## Background and Relevant Facts

2.      On March 12, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtors' pre-petition business activities included providing printing services and printed materials.

4.      CareSource, headquartered in Dayton, Ohio, is a managed care company servicing the needs of its more than 1.4 million health care members.  CareSource regularly and frequently uses printed materials to communicate with its members regarding their health care policies, benefits, coverage, and cost of health insurance coverage.  If CareSource fails to timely or accurately communicate with its members, this can lead to potential liability

5.      To meet its printing needs, CareSource entered into a Master Services Agreement with the Debtors, effective on July 22, 2014 (the "Effective Date").  CareSource and the Debtors executed Amendment No. 1 to the Master Services Agreement effective on October 15, 2014. CareSource and the Debtors executed Amendment No. 2 to the Master Services Agreement

effective on December 30, 2014.  These documents are collectively referred to as the "Master Services Agreement".

6.      CareSource and the Debtors executed a Delegated Services Agreement effective on January 14, 2015 (the "Delegated Services Agreement").  The Delegated Services Agreement contains certain information that is the same as or similar to information contained in the Master Services Agreement.  However, the Delegated Services Agreement also contains additional information that is necessary for CareSource and the Debtors to comply with applicable health care laws and regulations, including certain privacy requirements.

7.      CareSource and the Debtors also executed a Business Associate Agreement (the "BAA").

8.      The Master Services Agreement, the Delegated Services Agreement, and the BAA are collectively referred to herein as the "Contracts".  Given the sensitive nature of the printing work done by the Debtors, Section 2.4 of the Master Services Agreement and Section 2.5 of the Delegated Services Agreement required the Debtors to purchase insurance to protect CareSource from liability arising from the Debtors' printing errors.

9.      The Debtors failed to perform in accordance with the Contracts in many ways (the "Performance Defaults").  The Performance Defaults are well documented in detail by sealed pleadings filed by CareSource in this case; in sum, the Debtors made errors in certain printed materials, exposing CareSource to possible liability.  CareSource timely filed a proof of claim for damages arising from the Performance Defaults.

10.     On June 19, 2015, the Court entered the Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases; and (III) Granting Certain Related Relief [Docket No. 698] (the "Sale Order"), authorizing the Debtors to sell substantially all of their assets to Taylor Corporation ("Taylor") pursuant to that certain Asset Purchase Agreement entered into by and between the Debtors and Taylor, dated as of June 19, 2015 (the "APA").

11.     The sale to Taylor, pursuant to the provisions of the APA, closed on July 31, 2015 (the "Closing Date").  *See* Docket No. 889.

12.     On September 24, 2015, the Debtors served their *Fourth Notice Regarding Designation as Removed Contract and Rejection Thereof* [D.I. No. 1097] (the "Rejection Notice"), formally rejecting the Contracts.

13.     Pursuant to the requirements in the Contracts to do so, the Debtors had insurance policies to cover claims, such as those arising because of the Performance Defaults.  Both before and after the Petition Date, and prior to the Rejection Notice, the Debtors repeatedly stated to CareSource that proceeds from the Debtors' insurance policies would cover claims of CareSource for the Performance Defaults.  The Debtors even provided CareSource with a copy of the insurance policies, and stated numerous times that CareSource would have access to proceeds from the insurance policies to the extent the Performance Defaults resulted in civil liability and damages for CareSource.  The Plan now states precisely the opposite.

14.     The Debtors' sale to Taylor and subsequent events have left CareSource, Taylor, and the Debtors in an unusual posture with respect to the Contracts and the inter-party claims arising from the Contracts.  First, by the APA, the Debtors transferred to Taylor accounts receivable purportedly owed by CareSource to the Debtors, which are subject to defenses, counterclaims and setoff rights by CareSource for claims arising from the Performance Defaults.  Those rights were expressly preserved by the Sale Order.  The APA, however, did not transfer the

Debtors' insurance policies, the proceeds from which cover the claims of CareSource for the Performance Defaults, to Taylor.  Instead, the APA expressly retained the insurance policies for the Debtors

15.     Additionally, the Debtors no longer apparently believe that CareSource is entitled to pursue claims against the Debtors' liability insurance policies or to obtain proceeds from those policies to cover those claims.  Following the Rejection Notice, the Debtors did an about-face and informed CareSource **for the first time** that the Debtors' insurance policies and associated proceeds belonged to their secured creditors and would be transferred under the Plan to a trust benefitting the Debtors' secured lenders.  As a result of this turn of events and simultaneously with filing this Objection, CareSource has initiated an adversary proceeding seeking a determination by this Court that the Debtors' liability insurance proceeds therefrom are not property of the estate, and not subject to liens of the Debtors' secured lenders.

16.     CareSource objects to the Plan on several grounds.  First, Section 1.6 of the Plan provides for disgorgement and waiver of any amounts paid, or distributions to any general unsecured claimant who initiates a lawsuit against any of the "Released Parties."  CareSource has filed, or will file, an adversary proceeding against the Debtors and the Debtors' secured lenders to determine the validity, extent and priority of any claim or lien of the Debtors or the Debtors' secured lenders in proceeds from insurance policies intended to cover claims of arising from the Performance Defaults.  Each of the Debtors' secured lenders is a "Released Party" under the Plan. CareSource is aware of no precedent or authority in the Bankruptcy Code for disgorgement or waiver of distribution rights simply because CareSource exercised its rights under the Bankruptcy Rules to seek a determination of claims, liens and rights relating to insurance proceeds.  This is particularly egregious in light of the fact that CareSource's rights under the Contracts are expressly

preserved in the Sale Order, and the Debtors and the Debtors' secured lenders now apparently take the position that insurance proceeds are property of the estate. The Plan should not bar recovery or distribution simply because a general unsecured creditor seeks a determination of the validity or extent of claims and liens asserted by the Debtors' secured creditors.

17.    Second, CareSource objects to section 1.8 of the Plan to the extent it extends any injunction or stay pursuant to sections 105 and 362 until such time as the Debtors' Bankruptcy Cases **_are closed_**. CareSource may need to assert claims against the Debtors in state court to preserve its right to pursue its insurance claims regarding the Performance Defaults. The Plan should not create such a procedural roadblock by preventing CareSource from taking necessary actions to protect its rights.

18.    Finally, Section 2.3.4 of the Plan provides that, on the Effective Date of the Plan, "all Assets of the Debtors not otherwise transferred either to the GUC Trust or the Secured Creditor Trust shall vest in Liquidating SRC free and clear of all Claims, Equity Interests, liens, charges or other encumbrances…." (Plan § 2.3.4). The Plan further provides that "on the Effective Date, the Debtors shall transfer all their right, title, and interest in and to all of the Secured Creditor Trust Assets not already transferred to the Secured Creditor Trust pursuant to the Wind-Down Settlement, if any. In accordance with section 1141 of the Bankruptcy Code, all Secured Creditor Trust Assets shall automatically vest in the Secured Creditor Trust free and clear of all Claims and Liens other than Permitted Claims and Liens under the Second Lien Term Loan Facility and the Claims and Liens of the Second Lien Agent, Holders of Class II Claims and Bank of America, N.A." (Plan § 2.3.7). The Plan defines "Secured Creditor Trust Assets" as "all of the Debtors' Assets other than (i) the Rabbi Trust Proceeds, (ii) the Wind-Down Amount, (iii) the Wind-Down Funds proceeds thereof, (vi) the D&O Insurance and the D&O Policies, (vii) the Taylor Utility

6

Deposits, (viii) those GUC Trust Assets transferred to the GUC Trust in connection with closing of the Taylor Sale in accordance with the Committee Settlement, (ix) the obligation of Taylor to pay the Taylor Payment Receivable, and (x) the obligation of the GU Trust to repay the GUC Trust Seed Funding Amount."

Ownership of an insurance policy does not "inexorably lead to ownership of the proceeds." In re Louisiana World Exposition, 832 F.2d 1391, 1401 (5th Cir. 1987). CareSource submits that the proceeds of the applicable liability insurance policies covering the Performance Defaults are not part of the Debtors' estate because the Debtors never had a right to receive or keep those proceeds when the insurer paid on a claim. See Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51 (5th Cir. 1993) ("When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate."). Thus, the Plan cannot purport to transfer any interest in those proceeds free and clear of liens, claims or encumbrances, nor are the proceeds encumbered by the Debtors' secured lenders. See First Fidelity Bank v. McAteer, 985 F.2d 114 (3d Cir. 1993); see also, In re Louisiana World Exposition, 832 F.2d at 1399; Baez v. Medical Liab. Mut. Ins. Co., 136 B.R. 65 (Bankr. S.D.N.Y. 1992).

Moreover, the Debtors have always maintained that proceeds from those insurance policies cover claims of CareSource, until their recent and sudden about-face in which they reversed their position. The Plan adopts this newfound position, which lacks any basis under the law. For the reasons set forth in more detail in CareSource's adversary proceeding seeking a determination of the validity, extent and priority of liens or claims of the Debtors' secured lenders to proceeds from policies of the Debtors' insurance, CareSource respectfully submits that the Plan should not be

approved to the extent it purports to grant the Debtors an interest in liability insurance proceeds that are not property of the estate, transfers an interest in such proceeds to a trust solely for the benefit of the Debtors' secured creditors, or cuts off the rights of CareSource to those proceeds. Absent and prior to a final determination by this Court in an adversary proceeding to the contrary, the Plan should not abridge rights of CareSource.

WHEREFORE, for the reasons set forth herein, CareSource respectfully requests that the Court deny entry of an Order approving the Plan.

Dated:  October 30, 2015
           Wilmington, Delaware

CROSS & SIMON, LLC

*/s/ Christopher P. Simon*
Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
1105 North Market Street, Suite 901
Wilmington, DE  19801
Telephone:  (302) 777-4200
Facsimile:  (302) 777-4224
Email:  csimon@crosslaw.com
           kmann@crosslaw.com

-and-

David M. Whittaker, Esq. (0019307)
(*admitted pro hac vice*)
BRICKER & ECKLER LLP
100 South Third Street
Columbus, OH  43215
Telephone:  (614) 227-2355
Facsimile:  (614) 227-2390
Email:  dwhittaker@bricker.com

*Attorneys for CareSource and CareSource Management Group Co.*