## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| SRC LIQUIDATION COMPANY, | : | Case No. 15-10541 (BLS) |
| *et al.*, | : | |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Re: Docket Nos. 1086, 1243, 1253, 1256.** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**STATEMENT OF SILVER POINT FINANCE, LLC IN SUPPORT OF CONFIRMATION OF FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES**

Silver Point Finance, LLC, as administrative agent under the Pre-Petition Second Lien Term Loan Agreement (in such capacity, the "**Agent**"),[1] respectfully submits this statement (the "**Statement**") in support of confirmation of the *First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* [ECF No. 1086] (the "**Plan**") and in response to certain objections thereto. In support thereof, the Agent respectfully states as follows:

### PRELIMINARY STATEMENT

1.      Like many sale cases, these chapter 11 cases could have concluded with a conversion to chapter 7 or a structured dismissal, leaving administrative and priority claims

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in, as context dictates, (a) the Plan, (b) that certain Settlement Agreement Among Debtors, Silver Point Finance, LLC & Official Committee of Unsecured Creditors dated as of June 19, 2015 [ECF No. 696] (the "**Committee Settlement**"); or (c) the Final Order (I) Authorizing Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. § 364; and (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 (Docket No. 290) (the "**DIP Financing Order**").

1

unpaid and yielding no recovery for general unsecured creditors. *See, e.g., Official Comm. of Unsecured Creditors v. CIT Group/Bus. Credit Inc.* (In re Jevic Holding Corp.), 787 F.3d 173, 181-82 (3d Cir. 2015). At the outset of the case, however, the Court urged the parties to pursue a chapter 11 plan at the conclusion of the sale process. *See* Hr'g Tr. at 119:20-121:1, *In re SRC Liquidation Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Apr. 13, 2015). Consistent with the Court's admonition, the Agent, the Debtors, and the Committee entered into the Committee Settlement, which memorializes numerous compromises necessary to confirm a chapter 11 plan. For its part, the Agent agreed (a) that $5 million in cash proceeds of the Taylor Sale that would have otherwise been allocable to the Second Lien Lenders as proceeds of second lien collateral would instead be assigned to the GUC Trust and distributed to general unsecured creditors and (b) to release its liens on the Wind-Down Amount, certain life insurance proceeds, and other assets. These agreements permit a meaningful distribution to general unsecured creditors and ensure that there are sufficient unencumbered assets to satisfy administrative and priority claims in full.

2.      In exchange, the Debtors and the Committee granted a full release of all claims of the Debtors' estates against the Silver Point Entities and other Released Parties. The Debtors and the Committee also agreed to support a plan containing an "opt out" third-party release in favor of the Released Parties and a disgorgement provision providing that any unsecured creditor that initiates a lawsuit against any of the Released Parties waives its distribution under the Plan.[2]

---

[2]    The disgorgement provision and third-party release are set forth in sections 1.6 and 7.4 of the Plan, respectively.

3.      Several parties have objected to the third-party release and disgorgement provisions.[3] But none of the objecting parties acknowledges that these provisions are fundamental elements of the global resolution embodied in the Committee Settlement. The objecting parties effectively argue that general unsecured creditors should receive all of the benefits of the Committee Settlement but that the Silver Point Entities should not receive the *quid pro quo* they negotiated for. As discussed below, these objections are unfounded. Both the third-party release and the disgorgement provision are fair and equitable to unsecured creditors and other parties-in-interest, appropriate under the circumstances, and consistent with the Bankruptcy Code. The objections should be overruled and the Plan confirmed.

## STATEMENT IN SUPPORT OF THE PLAN

I.      **The Third-Party Release Is Proper.**

A.      **The Third-Party Release Is Consensual and Appropriately Tailored.**

4.      PBGC and the Texas Comptroller assert that the third-party release is improper because it is non-consensual. *See* PBGC Obj. ¶¶ 18-29; Texas Comptroller Obj. ¶¶ 30-34. They are mistaken. Case law in this district clearly establishes that a *consensual* third-party release is appropriate even where the prerequisites for non-consensual third-party releases are not satisfied. *See In re Indianapolis Downs, LLC, 486 B.R. 286, 305 (Bankr. D. Del. 2013)* ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."); *In re Exide Techs.*, 303 B.R. 48, 74

---

[3]      The Pension Benefit Guaranty Corporation ("**PBGC**") filed an objection to the third-party release, among other provisions [ECF No. 1256] (the "**PBGC Objection**"). The Comptroller of Public Accounts of the State of Texas (the "**Texas Comptroller**") also objected to the third-party release [ECF No. 1253] (the "**Texas Comptroller Objection**"). CareSource and CareSource Management Group Co. (collectively, "**CareSource**") filed a limited objection to the disgorgement provision, among other elements of the Plan [ECF No. 1243] (the "**CareSource Objection**").

(Bankr. D. Del. 2003) (because third-party release was consensual, "there [was] no need to consider" whether factors governing non-consensual releases were satisfied). The third-party release here is consensual because it only binds creditors who either accepted the plan or elected not to "opt out" on their ballots. *See Indianapolis Downs*, 486 B.R. at 304-06 (concluding that opt-out release similar to that at issue here was consensual and proper).

5.      The third-party release was highly negotiated and is integral to the Committee Settlement. Its contours were carefully tailored to comply with this Court's case law. To that end, the Committee Settlement parties agreed that the releases would bind the following holders:

(a)     Holders in unimpaired, deemed accepting classes;

(b)     Holders in voting classes that actually voted to accept the Plan;

(c)     Holders in voting classes that voted to reject the Plan and did not opt out of the release on their ballots; and

(d)     Holders in voting classes that abstained from voting on the Plan and did not to opt out of the release on their ballots.

The release does not bind rejecting or abstaining holders in voting classes who checked the "opt-out" box on their ballots. Nor does it bind any holders in deemed rejecting classes.

6.      The third-party release falls comfortably within the bounds established by applicable case law. The release is consensual as to creditors in unimpaired classes, as they are "deemed to accept the Plan" and, insofar as they "are being paid in full," they "have received consideration for the releases." *Indianapolis Downs*, 486 B.R. at 306; *see also U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (*In re Spansion), 426 B.R. 114, 144 (Bankr. D. Del. 2010) (third-

party release was appropriate as to "those parties who are 'deemed' to have accepted the Plan"). [4] Accepting creditors in voting classes have likewise, by their accepting votes, consented to the third-party release. *See Exide Techs.*, 303 B.R. at 74 (third-party release was appropriate because it bound "only those creditors and equity holders who accept[ed] the terms of the Plan").

7.    The third-party release is also consensual as to rejecting creditors and equity holders. Creditors and equity holders in deemed rejecting classes are not subject to the third-party release at all. And rejecting (or abstaining) creditors in voting classes are bound by the third-party release only if they did not opt out on their ballots. The third-party release was conspicuously noted in the Disclosure Statement and on the ballots themselves, which clearly highlighted the import of the opt-out election. *Cf. In re Lower Bucks Hosp.*, 571 F. App'x 139, 144 (3rd Cir. 2014) (affirming bankruptcy court's decision not to approve non-consensual release that was not disclosed in "a clear and conspicuous manner"). Because rejecting and abstaining creditors had ample opportunity to opt out of the third-party release, the release is consensual as to those creditors. *See Indianapolis Downs*, 486 B.R. at 305 (noting that release at issue "does not apply to any party that is deemed to reject the Plan or any party who opts out of granting the releases by checking the appropriate box on the Ballots").

**B.    The Plan's Injunction Provision Does Not Render the Opt-Out Election Illusory.**

---

[4]    The Agent is uncertain how, if at all, the Texas Comptroller's claims are classified. To the extent its claims belong to one or more unimpaired, non-voting classes, the Texas Comptroller is deemed to have consented to the third-party release. To the extent the Texas Comptroller holds unsecured claims and either voted in favor of the Plan or did not make a proper opt-out election on its ballot, it is deemed to have consented to the release. The Texas Comptroller's statement in its objection, *see* Texas Comptroller Obj. ¶ 34, that it does not consent to the third-party release is improper and should be disregarded.

8.    PBGC erroneously contends that section 7.5 of the Plan obviates the opt-out election. PBGC notes that section 7.5 provides for "'a permanent injunction against any party seeking to enforce any claim or Cause of Action against the Released Parties that has been released pursuant to the Committee Settlement or Section 7.4 of the [Liquidating] Plan,'" and complains that this provision "effectively negates [PBGC's] ability to opt out of Section 7.4." PBGC Obj. ¶ 26 (quoting Plan § 7.5). It does no such thing. A claim is enjoined pursuant to section 7.5 only if it is released under section 7.4 or the Committee Settlement. The claim of a creditor that properly opted out on its ballot is not released under section 7.4 and therefore not enjoined under section 7.5. Likewise, PBGC is not party to the Committee Settlement and, therefore, the incorporation of the Committee Settlement release in section 7.5 of the Plan does not negate PBGC's opt-out election.

### C.    The Third-Party Release Would Be Appropriate Even on a Non-Consensual Basis.

9.    Because the third-party release is consensual, PBGC's argument that the Released Parties did not "provide[] a critical financial contribution to creditors or the Estate," PBGC Obj. ¶ 27, is a moot point. *See In re Exide Techs.*, 303 B.R. at 75. But, as PBGC well knows,[5] the Agent's contributions did not consist solely of "'formulat[ing] and negotiate[ing]'" the Plan. PBGC Obj. ¶ 27 (quoting *Spansion*, 426 B.R. at 145). To the contrary, the Agent provided material financial consideration in the form of a $5 million settlement payment, which is the *only* source of distributions to general unsecured creditors in this case. In addition, the Agent's

---

[5]    Considering its position as the Debtors' largest unsecured creditor and its membership on the Committee, PBGC's objection to the releases negotiated in the Committee Settlement, and to the Plan generally, should be viewed with appropriate skepticism, as an opportunistic effort to retain all of the benefits of the Committee Settlement while denying the Released Parties the benefit of their bargain.

agreement to release its liens on the Wind-Down Amount has enabled the payment in full of administrative and priority creditors, a prerequisite to the confirmation of chapter 11 plan. In light of these circumstances, the Agent has made a substantial contribution to these chapter 11 cases sufficient to justify the third-party release even on a non-consensual basis.

10.     "The hallmarks of permissible non-consensual releases," according to the Third Circuit's decision in *Continental Airlines*, are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Gillman v. Cont'l Airlines* (In re Cont'l Airlines), 203 F.3d 203, 214 (3d Cir. 2000). Subsequent case law has refined this test and elaborated that released parties provide "a critical financial contribution to the debtors' plan that is necessary to make the plan feasible" and that the non-consenting releasors have received reasonable consideration in exchange for their releases. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001). The *Spansion* court summarized the test as follows:

> (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release.

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co.* (In re Spansion, Inc.), 426 B.R. 114, 144 (Bankr. D. Del. 2010).

11.     The third-party release meets these standards. The concessions made by the Agent and the other Released Parties in the Committee settlement are the "lynch-pin" of the Debtors' Plan. Hr'g Tr. at 115:13-117:23, *In re Freedom Rings LLC*, No. 05-14268 (CSS) (Bankr. D. Del. Apr. 20, 2006), ECF No. 385 (granting non-consensual release where released parties provided "material, specific consideration" necessary for the debtors to confirm any plan). Absent the Agent's agreement to release its liens on a portion of the Taylor Sale proceeds, the Debtors likely

would have insufficient unencumbered assets to pay administrative and priority claims in full, let alone provide a distribution to general unsecured creditors. These considerations satisfy the first three *Spansion* factors.

12.    As to the fourth factor, the Agent submits that the third-party release is fair consideration for the Agent's agreements in the Committee Settlement. The Committee Settlement was highly negotiated at arm's length between the Agent, the Debtors, and the Committee. The Committee's prospects of recovering greater value from the Released Parties by litigating its fraudulent transfer and lien-perfection claims to judgment were speculative at best. And, even had it ultimately prevailed on the merits, the Committee would have incurred substantial professional fees and expenses in the process. As such, the Committee Settlement, including the third-party release, represents a fair exchange of value, satisfying the fourth *Spansion* factor.

## II.    The Disgorgement Provision Is Appropriate.

13.    Like the third-party release, the disgorgement provision of section 1.6 of the Plan is an essential component of the Committee Settlement. Section 1.6 provides that a general unsecured creditor that sues a Released Party forfeits any distribution under the Plan. The logic of section 1.6 is simple. In exchange for dismissing its adversary complaint against the Released Parties, the Committee demanded a substantial contribution toward general unsecured creditor recoveries. Accordingly, the Agent agreed, among other things, to carve out $5 million of its proceeds for distribution to general unsecured creditors. But this settlement would be meaningless to the Agent and the Second Lien Lenders if the beneficiaries of the settlement payment could immediately reassert some or all of the claims that had purportedly been settled. To that end, the Committee Settlement parties agreed that general unsecured creditors who assert claims against the Released Parties will receive no distribution. Thus, while section 1.6 does not

absolutely bar further claims against the Released Parties, it appropriately ensures that general unsecured creditors cannot accept their pro rata share of the settlement consideration while simultaneously suing the settling defendants on account of the settled claims.

14.    Notably, just one of the thousands of general unsecured creditors in these cases challenges the disgorgement provision. That lone exception is CareSource, which recently sued the Silver Point Entities, seeking a declaratory judgment that the Agent lacks a valid lien on certain insurance proceeds. Implicitly acknowledging that the Challenge period established by the DIP Financing Order has long since elapsed, CareSource also seeks a judgment that it is not bound by the stipulations in the DIP Financing Order. This is precisely the type of conduct the Agent sought to avoid when it negotiated the disgorgement provision as part of the Committee Settlement. Whether or not CareSource ultimately prevails on the merits, if it succeeds in prosecuting its claims against the Silver Point Entities without forfeiting its distribution under the Plan, other general unsecured creditors may conclude that they, too, can assert claims against the Released Parties without consequence.

15.    Contrary to CareSource's position, *see* CareSource Obj. ¶ 16, case law establishes that a plan can impose conditions on plan distributions provided the plan complies with the absolute priority rule. Indeed, bankruptcy courts have approved conditional distribution mechanisms, including so-called "death traps," that are significantly harsher than the disgorgement provision at issue here. *See In re MPM Silicones, LLC*, No. 14-22503-rdd, 2014 WL 4637175, at *3 (Bankr. S.D.N.Y. Sept. 17, 2014) (noting that "fish-or-cut bait, death-trap, or toggle provisions have long been customary in Chapter 11 plans"). Examples abound. In *Zenith Electronics*, the court confirmed a plan that provided a significant distribution to a class of bondholders if it voted to accept the plan, but no distribution if it voted to reject. *In re Zenith*

*Elecs.*, 241 B.R. 92, 105-06 (Bankr. D. Del. 1999). In *Momentive*, the court confirmed a plan that proposed to pay senior secured claims in full in cash, excluding any make-whole premium, if the class accepted, but to "cram-up" the class with replacement notes if it rejected. *MPM Silicones*, 2014 WL 4637175, at \*4-5. In *Adelphia Communications*, the court approved a plan that gave old equity holders new equity interests only if the class voted to accept the plan. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275-76 (Bankr. S.D.N.Y. 2007).

16.    The disgorgement provision differs from these "death traps" only in that it is significantly *less* punitive. Distributions to unsecured creditors under the proposed Plan are not conditioned on the unsecured class voting to accept or on individual creditors granting the third-party release. Notably, as an alternative to the disgorgement provision, the Silver Point Entities could have protected themselves against future litigation risk by insisting that the unsecured class receive no distribution unless it accepted the Plan.[6] As it stands, however, unsecured creditors will receive a distribution under the Plan even though the unsecured class rejected the Plan and irrespective of whether any individual unsecured creditor voted to reject and/or opted out of the third-party release.

17.    Although the disgorgement provision is more moderate than the death trap provisions that have been approved in many other cases, it is justified by the same underlying logic. As the *Adelphia Communications* court explained, a "'carrot and stick' provision" is appropriate where the plan provides holders "*more* than their legal entitlement." *Id.* at 275 (emphasis in original). Such is the case here. The Taylor Sale yielded far less in proceeds than

---

[6]    In that scenario, there would be no distribution to unsecured creditors unless half in number and more than two-thirds in amount granted the third-party release.

the total amount of secured and priority unsecured claims. Thus, under the absolute priority rule, unsecured creditors would be entitled to no distribution. *Cf. id.* at 275 & n.331. General unsecured creditors will receive a distribution here only because the Agent agreed, in consideration for the Committee's obligations under the Committee Settlement, to allocate $5 million in proceeds of its collateral for distributions to unsecured creditors. Because the Agent is funding a distribution to which unsecured creditors would otherwise not be entitled, it is both fair and consistent with the Bankruptcy Code that such distributions be conditioned on the disgorgement provision.

WHEREFORE, the Agent respectfully requests that the Court confirm the Plan, overrule any objections thereto, and grant such other and further relief as may be just and proper.

DATED:      Wilmington, Delaware
November 11, 2015

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:    */s/ Jason M. Liberi*
Sarah E. Pierce (I.D. No. 4648)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Ron E. Meisler
Christopher M. Dressel
155 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Attorneys for Silver Point Finance, LLC*