**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | Ref. Docket No. 1286 |

**DECLARATION OF LANDEN C. WILLIAMS IN SUPPORT OF CONFIRMATION
OF THE SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR
SRC LIQUIDATION COMPANY AND ITS AFFILIATES**

I, Landen C. Williams, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a partner at WilliamsMarston LLC ("WilliamsMarston") and, and as of the date hereof, I am serving as the Chief Restructuring Officer and Treasurer of SRC Liquidation Company f/k/a The Standard Register Company ("SRC")[2] and its affiliated debtors and debtors in possession (collectively, the "Debtors"). I am authorized to make this Declaration on behalf of the Debtors and in support of the *Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates*, dated as of November 11, 2015 [Docket No. 1286] (the "Plan").[3] Unless otherwise stated, all matters set forth in this Declaration are based on (a) my

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] On October 29, 2015, the Debtors filed a motion to modify WilliamsMarston's engagement to appoint me as the Debtors' interim President and Chief Executive Officer, and to continue service as the Debtors' Treasurer. *See* Docket No. 1236.

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan [Docket No. 1286], the *Disclosure Statement for First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* [Docket No. 1087] (the "Disclosure Statement"), and the *Debtors'*

01:17958490.1

personal knowledge, (b) my review of relevant documents, (c) information supplied to me by the Debtors' Professionals, and (d) my views, based upon my experience and knowledge of the Debtors' financial condition.  If I were called to testify I could, and would, testify competently to the facts discussed herein.

## QUALIFICATIONS

2. I have almost twenty years of relevant management consulting experience, and in that capacity I have previously served as an interim corporate controller of two publicly traded companies and have advised many other clients on financial modeling, liquidity and cash management, wind-down initiatives, claims reconciliation and financial reporting.  Throughout my career, I have also advised debtors and creditors regarding the design and implementation of corporate restructuring strategies both in and out of court.

3. I have been serving as the Debtors' Chief Restructuring Officer and Treasurer since August 26, 2015.  In this capacity, I have gained a thorough understanding of the Debtors' Assets and liabilities.

## THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE

4. <u>Compliance with Chapter 11 Requirements</u>.  Based on my understanding of the Plan, the events that have occurred throughout these Chapter 11 Cases, the obligations imposed upon the Debtors as a result of various orders entered during these Chapter 11 Cases, and the requirements of the Bankruptcy Code, and upon the advice of counsel, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code for confirmation of a plan of liquidation.

---

*Memorandum of Law in Support of (i) Approval of the Disclosure Statement and (ii) Confirmation of the Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates*, filed concurrently herewith, as applicable.

01:17958490.1

5. On the basis of conversations with counsel, I believe that the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126, as well as the Solicitation Order [Docket No. 1073].

6. <u>Injunction</u>.  The injunction provisions contained in Sections 1.8 and 7.2 of the Plan are necessary and appropriate to prevent Holders of Claims against and Equity Interests in the Debtors from dissipating the value of the Assets and to protect the Debtors and the Trusts from the costs, professional fees, and time delay associated with any potential litigation from prepetition Creditors and equity holders after the Effective Date.  Any such litigation would hinder the efforts of the Debtors and the Trusts to fulfill their responsibilities under the Plan and undermine their efforts to maximize value for Holders of Allowed General Unsecured Claims.  The injunction provisions are narrowly tailored to achieve that critical objective.

7. <u>Good Faith of the Debtors in Proposing the Plan</u>.  The Plan has been proposed by the Debtors in good faith, with the legitimate and honest purpose of allowing Creditors to realize the highest possible recoveries under the circumstances of these Chapter 11 Cases.  The Plan is the culmination of significant arm's-length, good faith negotiations among the Debtors, the Committee, the Silver Point Entities, Taylor, and others.  I believe that the Plan is fundamentally fair to all stakeholders and has been proposed with the legitimate purpose of liquidating and winding down the affairs of the Debtors and expeditiously distributing value to Creditors.  Accordingly, I believe that the Plan and the related documents have been filed in good faith.

8. <u>Payments to Retained Professionals</u>.  I understand that all payments made or to be made by the Debtors to their retained advisors or to the Committee's advisors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan

01:17958490.1

3

and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Bankruptcy Court.

9. <u>Offices and Directors</u>.  The GUC Trust Oversight Committee selected Jane W. Mitnick as the post-Effective Date director of the Liquidating Debtors, other than the Mexico Debtors, as set forth in the October 26, 2015 filing [Docket No. 1223].  Pursuant to the Plan, the managers, officers, directors, and other similar agents of the Mexico Debtors will retain their positions on and after the Effective Date, unless removed and/or replaced in accordance with the constituent documents and law applicable to such Mexico Debtors.  As of the Effective Date, the officers of the Mexico Debtors will be Gerard D. Sowar as sole administrator and Javier Lizardi as secretary, and each will be compensated pursuant to the agreements in place as of the Effective Date.  Mr. Sowar is currently paid $7,500 per month for his services, and Mr. Lizardi is paid $390 per hour for his services.  I understand that the parties with requisite authority to select, appoint, remove, replace, and establish the compensation (if any) of the manager(s), officer(s) and director(s) of the Mexico Debtors under the Mexico Debtors' constituent documents shall continue to have such authority.  EisnerAmper LLP has been appointed as the GUC Trustee.  *See* Docket No. 888.  Wilmington Trust Company has been appointed as the Secured Creditor Trustee.  I believe that the proposed Trustees and the management of the Mexico Debtors and the other Liquidating Debtors are consistent with the interests of Holders of Claims and Equity Interests and with public policy.

10. <u>Best Interest Test</u>.  I oversaw and assisted in the preparation of, and have reviewed and analyzed, the liquidation analysis of the Debtors attached as Exhibit 2 to the Disclosure Statement (the "<u>Liquidation Analysis</u>").  Additionally, I oversaw and assisted in the preparation of, and have reviewed and analyzed, an updated version of the Liquidation Analysis

for General Unsecured Claims (the "Updated Liquidation Analysis") attached hereto as Exhibit A, which primarily reflects additional financial information and updated projections since the Disclosure Statement was Filed on September 22, 2015.

11. The Liquidation Analysis and the Updated Liquidation Analysis are subject to all the assumptions, qualifications, and limitations set forth therein and in the Debtors' Disclosure Statement. The Liquidation Analysis and the Updated Liquidation Analysis assume a chapter 7 liquidation in which a trustee appointed by the Court would liquidate the assets of the Debtors' estates, as compared to the orderly liquidation of the Debtors' estates contained in the Plan. Underlying the Liquidation Analysis and the Updated Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' Professionals, including myself, are inherently subject to significant economic uncertainties and contingencies beyond the control of the Debtors, and are also based upon assumptions with respect to certain liquidation decisions that could be subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis and the Updated Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation, and actual results could vary significantly from those shown therein.

12. The Liquidation Analysis and the Updated Liquidation Analysis assume that there is no reasonable scenario where Holders of Subordinated Claims or Equity Interests would be entitled to receive any Distribution from the Debtors' estates. As set forth in the Disclosure Statement, the Debtors estimate that, after a complete reconciliation, General Unsecured Claims will equal approximately $550-650 million.[4] As set forth in the Updated Liquidation Analysis estimated Distributions to Holders of General Unsecured Claims will be between approximately

---

[4] General Unsecured Claims in the amount of approximately $9.4 billion were Filed against the Debtors by the Bar Date.

01:17958490.1

$1.3 million to $3.5 million plus the net value of any Avoidance Action recoveries. In addition, General Unsecured Creditors will receive the $5 million GUC Cash Payment and net recoveries from the GUC Trust Adversary Proceeding. Litigation recoveries are notoriously speculative and, although it is likely that some net value will be realized from the Avoidance Actions and the GUC Trust Adversary Proceeding, based on my review of the of the Avoidance Actions and the GUC Trust Adversary Proceeding, I do not believe there is any reasonable chapter 7 or chapter 11 scenario where Holders of General Unsecured Claims will receive sufficient value from the sources described above to be paid in full. Accordingly, no Distribution would be available to Holders of Class V (Subordinated Claims) or Class VI (Equity Interests) in a hypothetical chapter 7, and the Plan proposes the same result for these Classes.

13. In considering the impact that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in these Chapter 11 Cases, I have considered the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee. Moreover, I believe that conversion of these Chapter 11 Cases to chapter 7 would likely prolong these proceedings and delay distributions to Creditors.

14. As set forth in the Liquidation Analysis and the Updated Liquidation Analysis, I believe that Creditors will recover at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

15. <u>Impaired Classes</u>. Holders of Claims in Class I and Class II are Unimpaired under the Plan. Classes III and IV are Impaired Classes of Claims eligible to vote on the Plan. Class III voted to accept the Plan, and Class IV voted to reject the Plan. *See* Voting Declaration. Classes V and VI are Impaired and were deemed to reject the Plan.

16. <u>Allowed Priority Claims</u>.  Section 3.3.1 of the Plan requires the Debtors to pay (or reserve and promptly pay) in Cash on the later of (a) the Effective Date or (b) the date on which such Claims become due and payable the Allowed amount of all Unclassified Claims (other than Professional Fee Claims) and Priority Claims to the extent such Claims are Allowed as of the Effective Date.

17. With respect to Unclassified Claims (other than Professional Fee Claims) that are not Allowed as of the Effective Date, they will be paid within thirty (30) days of becoming Allowed Claims.  With respect to Priority Claims that are not Allowed as of the Effective Date, they will be reserved for in the Disputed Claims Reserve and paid upon the resolution of all Disputed Priority Claims.  Any shortfall in the Disputed Claims Reserve will be funded by Liquidating SRC.

18. With respect to Professional Fee Claims, Section 9.1 of the Plan provides that any unpaid portion of such Claims will be paid, unless otherwise agreed, from the Professional Fee Escrow Account before the later of (a) the Effective Date or (b) three Business Days after the order approving such Person's final fee application.  Any shortfall in the Professional Fee Escrow Account will be funded by Liquidating SRC.

19. <u>Acceptance of the Plan by at Least One Impaired Class</u>.  Class III is not comprised of insiders and voted to accept the Plan.  *See* Voting Declaration.

20. <u>Feasibility of the Plan</u>.  Based on my knowledge of the Debtors' records, projections, Filed proofs of Claim, requests for payment of Administrative Expense Claims submitted to date, and post-confirmation Assets and liabilities, and as set forth in the Updated Liquidation Analysis, I believe that the Liquidating Debtors will have sufficient Assets to

administer and consummate the Plan, satisfy post-Confirmation Date obligations, and close the Chapter 11 Cases.

21.     Statutory Fees.  It is my understanding that the Debtors have paid all chapter 11 filing and operating fees required to be paid during these Chapter 11 Cases and filed all fee statements required to be filed.  Section 8.8 of the Plan provides that U.S. Trustee Fees incurred by the U.S. Trustee prior to the Effective Date shall be paid on or before the Effective Date.

22.     Inapplicability of Sections 1129(a)(13)-(16).  I have been advised by counsel that sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129 (a)(16) of the Bankruptcy Code are inapplicable to the Debtors.

23.     Tax Returns.  The Debtors will file tax returns with applicable governmental units as and when such tax returns are required to be filed pursuant to applicable non-bankruptcy law.

I declare under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.


Dated:  November 11, 2015
       Boston, Massachusetts        */s/ Landen C. Williams*
                                            Landen C. Williams

# Exhibit A

## Updated Liquidation Analysis

**SRC Liquidation Company et al.**
**Updated Liquidation Analysis[1]**

Pursuant to section 1129(a)(7) of the Bankruptcy Code (the "Best Interests Test"), each holder of an Impaired Claim or Equity Interest must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

In determining whether the Best Interests Test has been met, the first step is to determine the projected recovery that each Class of Creditors would receive in a hypothetical liquidation of the assets of the Debtors in a chapter 7 proceeding. That amount is then compared to the projected recovery that each Class of Creditors is expected to receive under the Plan.

The Debtors, with the assistance of their restructuring advisors, prepared this hypothetical liquidation analysis (the "Updated Liquidation Analysis") in connection with the Disclosure Statement. The Updated Liquidation Analysis indicates the estimated amounts available to make Distributions to Holders of General Unsecured Claims as part of a hypothetical chapter 7 liquidation, as an alternative to the Plan. This Updated Liquidation Analysis does not compare alternative recoveries to (a) Holders of Other Secured Claims, Priority Claims, and Second Lien Claims, as they either voted to, or were deemed to, accept the Plan; or (b) Holders of Subordinated Claims and Equity Interests, as these Holders, for reasons set forth in the Williams Declaration, would not receive recoveries in a chapter 7 liquidation and are not receiving recoveries under the Plan. The Updated Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement.

The Updated Liquidation Analysis has been prepared to reflect the hypothetical situation that the Chapter 11 Cases convert to chapter 7 cases on or about December 1, 2015 (the "Liquidation Date") with a chapter 7 trustee (the "Chapter 7 Trustee") appointed by the Bankruptcy Court. It also assumes that the Effective Date would occur on the Liquidation Date. The Debtors believe that the Plan provides for the liquidation of the Debtors in a manner that is more time and cost effective than liquidation under chapter 7 of the Bankruptcy Code. The Debtors believe that a conversion to chapter 7 would likely result in a delay of Distributions to Creditors and a reduction in recoveries compared to those available under the Plan. The Debtors believe that conversion of the Chapter 11 Cases to chapter 7 would increase administrative expenses as a result of (a) the fees payable to the Chapter 7 Trustee under section 326 of the Bankruptcy Code, and (b) the fees and costs incurred by professionals engaged to represent the Chapter 7 Trustee. In addition, conversion would delay distributions to creditors because the Chapter 7 Trustee and his/her professionals would require additional time and effort to evaluate the Debtors' books and records, Creditors' Claims, and Assets. Accordingly, the Debtors believe the value of property to be received under the Plan by each Holder of an Allowed General Unsecured Claim would be equal to or greater than the value such Holders would receive in a liquidation under chapter 7 of

---

[1] Unless separately defined herein, all capitalized terms have the meanings ascribed to them in the *Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* (the "Plan") or the *Disclosure Statement for First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* (the "Disclosure Statement").

the Bankruptcy Code. To arrive at this conclusion, the Debtors estimated and compared the likely returns under the Plan and under chapter 7.

The determination of the hypothetical chapter 7 liquidation to wind down the Debtors' estates is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors and their advisors, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS UNDER THE PLAN OR A CHAPTER 7 LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTION REPRESENTED HEREIN. ACTUAL RESULTS COULD VARY MATERIALLY. THE CLAIMS REFLECTED IN THE UPDATED LIQUIDATION ANALYSIS ARE SET FORTH SOLELY FOR THE PURPOSES OF SUCH ANALYSIS AND ARE NOT INTENDED AND SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE DEBTORS' LIABILITY OF ANY SUCH CLAIMS FOR ANY PURPOSE.

*Amounts in $1,000's* **UNAUDITED**

## Liquidation Analysis for General Unsecured Claims

|  | High Distribution | | Low Distribution | |
|---|---|---|---|---|
| **Sources of Funds**[1] | **Chapter 11** | **Chapter 7** | **Chapter 11** | **Chapter 7** |
| Cash[2] | $8,083 | $8,083 | $8,083 | $8,083 |
| Return of GUC Trust Seed Funding Amount | 600 | 600 | - | - |
| Taylor Funding for Section 503(b)(9) Claims[3] | 7,648 | 7,648 | 36,566 | 36,566 |
| Taylor Funding for Priority Tax Claims[4] | 575 | 575 | 575 | 575 |
| Taylor Funding for Severance and Vacation Claims | 75 | 75 | 75 | 75 |
| Other Funding from Taylor Payment Receivable[5] | Unknown | Unknown | Unknown | Unknown |
| Avoidance Actions[6] | Unknown | Unknown | Unknown | Unknown |
| Subtotal: | 16,981 | 16,981 | 45,300 | 45,300 |
| **Uses of Funds:** | | | | |
| Administrative Expense Claims | | | | |
| Severance and Vacation (Funded by Taylor) | (75) | (75) | (75) | (75) |
| Professional Fees[7] | (1,922) | (2,172) | (2,412) | (2,662) |
| Section 503(b)(9) Claims (Funded by Taylor)[8] | (7,648) | (7,648) | (36,566) | (36,566) |
| Wind-Down Settlement Payment to Silver Point | (750) | (750) | (750) | (750) |

[1] Both the Sources of Funds and the Uses of Funds set forth herein take into account the payment obligations of Taylor under the Asset Purchase Agreement, including payment of the Taylor Payment Receivable.

[2] All amounts set forth herein are as of the assumed Liquidation Date of 12/1/2015. Additionally, cash balances are inclusive of Professionals' retainers and prepayments.

[3] Under the Asset Purchase Agreement, Taylor has assumed payment of Claims arising under section 503(b)(9) of the Bankruptcy Code, and these Source of Funds are exactly offset in Uses of Funds. The Low Distribution scenario represents all current Filed section 503(b)(9) Claims, including Claims related to drop shipments. However, based on an initial reconciliation of such Claims, and the Court's recent ruling on drop-ship Claims, a lower estimate is presented in the High Distribution scenario. Actual Allowed section 503(b)(9) Claim amounts may vary.

[4] Amounts represent Source of Funds related to approximately $454,000 of Priority Tax Claims and approximately $121,000 of Other Secured Claims, which Taylor is obligated to pay under the Asset Purchase Agreement.

[5] Under the Asset Purchase Agreement, Taylor is obligated to satisfy various obligations, including certain Administrative Expense Claims and other Priority Claims. This Source of Funds is a placeholder for obligations arising under the Taylor Payment Receivable other than those obligations covered in the preceding categories "Taylor Funding for Priority Tax Claims" and "Taylor Funding for Severance and Vacation Claims." Any amount is this category would be exactly offset in Uses of Funds.

[6] The ultimate recovery on the Avoidance Actions is subject to a number of factors that are outside the control of the Debtors and, therefore, it is difficult, if not impossible, to estimate with any degree of certainty the ultimate outcome of any of the Avoidance Actions. However, it is assumed that a Chapter 7 trustee would take the same steps and incur the same expense to prosecute the Avoidance Actions as contemplated under the Plan. Therefore, the inability to predict the outcome of the Avoidance Actions or other litigation, and hence the net projected recovery, is the same in a liquidation of the Debtors under chapter 7 as compared to the liquidation of the Debtors pursuant to the Plan. Thus, these estimates do not include costs to pursue Avoidance Actions or reflect any potential recoveries.

[7] Professionals fees do not reflect any offset of retainers, include holdbacks for applicable Professionals as of the Liquidation Date, and project future Professional fees through the Effective Date based on historical run rates. Professional fees incurred by Professionals engaged by a Chapter 7 Trustee are reflected in the category "Chapter 7 Statutory and Professional Fees."

[8] Amounts represent payment by Taylor of the section 503(b)(9) Claims that are the responsibility of Taylor. These amounts are exactly offset in Sources of Funds. The Low Distribution scenario represents payment of all current Filed section 503(b)(9) Claims, including Claims related to drop shipments. However, based on an initial reconciliation of such Claims, and the Court's recent ruling on drop-ship Claims, a lower payment estimate is presented in the High Distribution scenario. Actual Allowed section 503(b)(9) Claim amounts may vary.

01:17958491.1

*Amounts in $1,000's* **UNAUDITED**

| | | | | |
|---|---:|---:|---:|---:|
| Chapter 7 Statutory and Professional Fees[9] | - | (562) | - | (544) |
| Other Administrative Expense Claims[10] | (1,467) | (1,467) | (2,211) | (2,211) |
| Priority Claims | | | | |
| 2015 Tax Liabilities[11] | (159) | (159) | (159) | (159) |
| Priority Tax Claims (Funded by Taylor)[12] | (575) | (575) | (575) | (575) |
| Funding for Other Taylor Payment Receivables | Unknown | Unknown | Unknown | Unknown |
| Other Priority Claims[13] | (849) | (849) | (1,199) | (1,199) |
| Subtotal: | (13,444) | (14,257) | (43,947) | (44,742) |
| **Amount Available for Distribution to Holders of General Unsecured Claims**[14] | $3,537 | $2,725 | $1,352 | $558 |

---

[9] Chapter 7 Trustee fees are calculated as set forth in the fee schedule included in section 326 of the Bankruptcy Code. A Chapter 7 Trustee may argue that the statutory fees should be assessed on payments covered by the Taylor Payment Receivable; however, these amounts are not included in the Debtors' estimates. This line item also includes an estimate of fees and expenses that would be incurred by Professionals engaged by the Chapter 7 Trustee for initial start-up and evaluation costs only. The Debtors did not estimate potential Professional fees related Claims reconciliation or costs related to Avoidance Actions for either the chapter 7 or the Plan scenarios because the Debtors have assumed that such costs would be similar in all scenarios. Additionally, it is anticipated that if the Chapter 11 Cases are converted to chapter 7, distributions to Holders of Allowed General Unsecured Claims would be delayed.

[10] Amounts represent other Administrative Expense Claims and estimated Administrative Expense Claims not listed in another category.

[11] Amounts include estimated postpetition 2015 taxes, including certain state income and franchise taxes.

[12] Amounts represent payment by Taylor of approximately $454,000 of Priority Tax Claims and approximately $121,000 of Other Secured Claims, which Taylor is obligated to pay under the Asset Purchase Agreement. These amounts are exactly offset in Sources of Funds.

[13] The Low Distribution scenario includes all current Filed Priority Claims, excluding Priority Claims that have been disallowed pursuant to a Court order otherwise deemed satisfied, but including all Disputed Priority Claims at the amount asserted by the Creditor.

[14] Amounts represent potential Distribution Holders of General Unsecured Claims before taking into account costs of Claims reconciliation, costs related to prosecuting the Avoidance Actions, or Avoidance Action recoveries.

01:17958491.1