**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

FILED

2015 DEC -4  AM 11: 04

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                                          Case No. 15-10541 (BLS)

SRC LIQUIDATION COMPANY, *et al.*,                              Chapter 11

                                                               Judge Shannon
                         Debtors.                              Jointly Administered

**CREDITOR RECOVERY SITE LOGISTICS' NOTICES OF**
**ADMINISTRATIVE DAMAGES CLAIM**
**AND REJECTION DAMAGES CLAIM**

**PLEASE TAKE NOTICE** that on November 4, 2015, the United States Bankruptcy Court for the District of Delaware (the "Court") entered that certain *Notice Regarding Contract Deemed Rejected* [Docket No. 698] (the "Contract Rejection Notice").

**PLEASE TAKE FURTHER NOTICE** that in accordance with the terms of the Notice, and with paragraph 37 of the Sale as defined in the Contract Rejection Notice, NetGain Information Systems Company DBA Recovery Site Logistics ("RSL" or "Creditor") objects to the removal of its executory contract or unexpired lease, for the reasons set forth herein.

**PLEASE TAKE FURTHER NOTICE** that Debtors have incorrectly listed RSL's contract as a purchase order expiring on December 31. 2015; when in fact the contract expires December 31, 2016; as shown on: (i) attached Appendix 1, a true and accurate copy of the Master Services Agreement, with Schedules, Exhibits and Appendices 1 and 2 between Debtors and Creditor (the "Contract"); and (ii) attached Appendix 2, Debtor's Purchase Order 259666 dated 12-2-2014, which states in pertinent part *"Business Recovery Center (A) and Drop Ship Equipment Service (D) Retainer Amendment 2: Year 4 of 5 (Billed Monthly). January 1, 2015 – December 31, 2015."* ***emphasis added***. (the "Purchase Order")

**PLEASE TAKE FURTHER NOTICE** that Debtors have continued using the services described in the Contract (the "Services") post-Petition; and discussed extending the term of the Services into 2016, despite this case; until on or about December 1, 2015, when Debtor informed Creditor to the contrary.

**PLEASE TAKE FURTHER NOTICE** that the Services are all founded upon the use of RSL's disaster recovery and business recovery real estate, and therefore, act as an unexpired lease of real property.

**PLEASE TAKE FURTHER NOTICE** that, as a result of the above, RSL asserts a claim for administrative expense in the amount of $22,199.00, for Services rendered to Debtor under the Contract, but unpaid, from November 1, 2015 through November 30, 2015.

1

**PLEASE TAKE FURTHER NOTICE** that, as a result of the above, RSL asserts a claim for rejection damages in the amount of $266,388.00, computed as one year of the rent (Services) reserved by the lease or Contract, following the earlier of the date of the filing of the Petition in this case, pursuant to statutory damages set forth in 11 USC 502(b)(6).

**PLEASE TAKE FURTHER NOTICE** that the above claims are in addition to the $29,454 pre-Petition claim previously allowed in this case.

Dated:    December 3, 2015
          Bellefontaine, OH

Michael G. Minnich, CEO of Creditor
NETGAIN INFORMATION SYSTEMS CO. dba
RECOVERY SITE LOGISTICS, *Pro Se*
220 Reynolds Avenue
P.O. Box 490
Bellefontaine, Ohio   43311-0490
Telephone:    (937) 593-7177
Facsimile:    (937) 593-4282
E-mail:       michael.minnich@netgainis.com

2

# **APPENDIX 1**

# Recovery Site Logistics
## Disaster Recovery Master Agreement

This Disaster Recovery Master Agreement ("Master Agreement") is between The Standard Register Company, an Ohio corporation, 600 Albany Street, Dayton, Ohio 45417-3405, hereinafter referred to as "Client" and Recovery Site Logistics, LLC, an Ohio limited liability company, 6475 Perimeter Dr. #102 , Dublin, Ohio 43016 , hereinafter referred to as "RSL" dated as of January 1, 2011 (the "Agreement Date") to be effective as of January 1, 2011 (the "Effective Date").  Client and RSL shall sometimes be referred to individually as a "Party" or collectively as the "Parties" in this Master Agreement.

**PURPOSE:**  This Master Agreement sets forth the general terms and conditions regarding the Business Recovery Services to be provided by RSL to Client. Terms and conditions specific to the various services to be performed hereunder are set forth on Attachments, Schedules and Exhibits attached hereto and incorporated by reference herein. RSL and Client will enter into additional Schedules, Attachments, Exhibits and Addendums  which will set forth which services Client is contracting for, as well as any additional terms and conditions.

### SECTION 1. Definitions.

**Authorized Representative** - in the case of Client, the person authorized to give RSL notice of a Declared Disaster; and, in the case of RSL, the person authorized to accept Client's notice of a Declared Disaster as more fully described in Section 6 of this Master Agreement.

**Business Recovery Services** - a general term used to describe the service(s) as defined below offered by RSL, one or more of which Client may elect to contract for hereunder, including, Drop Ship Equipment, Mobile Recovery Center, Business Recovery Center, Hosting Recovery Center, and FLEXDATA™ Services.

**Drop Ship (Cold Tier) Equipment** – Term used to designate the shipment of computer equipment as defined and described on Attachment D and Schedule D to a Client's designated location within the continental United States at time of disaster. Delivery times and general terms are defined on said Schedule D.

**Mobile Recovery Center** – Term used to define a mobile computing environment including pre-defined computer systems and peripherals. The environment will be based in a mobile computer center unit with onboard generator, air conditioning, and pre-wired for LAN and telephone connectivity. Delivery times and general terms are defined and described on Attachment C and on said Attachment.

**Business Recovery Center** – Term used to define a fully equipped ready-to-use office facility as defined and described on Attachment A and Schedule A on a temporary basis following a Declared Disaster at the Client's covered location. The number of Client seats and test terms are defined on Schedule A.

**Hosting Recovery Center** – Term used to define Technology and Communications functions as defined and described on Attachment B and Schedule B where RSL maintains computer equipment for purposes of testing and disaster recovery and Clients can install customer owned equipment for purposes of testing and disaster recovery. Client access to the Hosting Recovery Center and its obligations are defined and described under  Schedule B.

**FLEXDATA™** - Term used to define an automated method of data backup to a Virtural Tape Device (VTL) where data is stored and de-duplicated and if Client chooses, can have the data replicated to a second VTL device installed at a second location.  Services options, support and other obligations are defined and described on Attachment E and on Schedule E.

**Declared Disaster** - any unplanned interruption of Client's normal computer operations that Client reasonably believes is an emergency situation.

**Declared Disaster Test** - any planned and scheduled disaster event test performed by Client with  RSL.

**Equipment** - all of the computer equipment listed in the Schedules.

**Hot Tier Equipment** - any Equipment which has been solely designated by Client only as Hot Tier Equipment will be installed, configured and functioning at all times in the Hosting Recovery Center. The Hot Tier Equipment shall be dedicated to this Master Agreement and shall be imaged and functioning at all times at Client's sole discretion. Unless otherwise noted in this Master Agreement, image control, software configuration, etc. will be the sole responsibility and authority of Client.

**Person** - any natural person, corporation, limited liability company, partnership, joint venture, trust, association, political entity or political subdivision thereof.

**Recovery Support Team** – RSL will assist Client in the coordination and management of the disaster recovery operation.

**RSL Equipment** - any Equipment that is either owned by or leased to RSL.

**Client Equipment** – any Equipment that is either owned by or leased to Client.

**Service(s)** - means individually or collectively as appropriate, the Business Recovery Services that RSL is furnishing Client.

**Software** - a general term used to describe all programs used inside the computer and peripheral devices to make them perform any function, including, but not limited to, the operating system and all application programs.

**Software Image** - software owned by Client to be provided to RSL and stored by RSL to be installed on RSL Equipment prior to shipment or setup of Equipment for Declared Disaster or Declared Disaster Test.

**Warm Tier Equipment** - any Equipment which has been solely designated by Client only as Warm Tier Equipment will be installed and  configured in the Hosting Recovery Center but will be powered down when not in use. Client shall have the sole responsibility to activate the Equipment. The Warm Tier Equipment shall be dedicated to this Master Agreement and shall be available for activation at the sole discretion and authority of the Client.

## SECTION 2.  Selection of Services.
The Business Recovery Service(s) to be provided hereunder are indicated by a "Yes" in the blank next to the name of the Service.  Client acknowledges and agrees that if a "Yes" is not in the blank next to the name of the Service, then Client is NOT contracting for said Service hereunder, and RSL will not be obligated to provide said Service to Client in the event of a Declared Disaster.  Only those Services indicated with a "Yes" will be provided when requested in accordance with this Master Agreement by Client in the event of a Declared Disaster.

| | | | | |
|---|---|---|---|---|
| Yes | Business Recovery Center (Schedule A) | | Yes | Drop Ship Equipment Services (Schedule D) |
| Yes | Hosting Recovery Center (Schedule B) | | Yes | FLEXDATA™ Services (Schedule E) |
| ____ | Mobile Recovery Center (Schedule C) | | | |

## SECTION 3. Nature of Services to be Performed.
A.      During the term of this Master Agreement, RSL will provide to Client the Services selected by Client above, and more fully described in the attached Attachments and  Schedules, within the time period(s) specified in said Schedules.

B.      Notification to RSL of a Declared Disaster may either be verbal or written but will not be considered effectively given until Client's Authorized Representative provides an Authorized Representative of RSL with authorization for the activation of one or more of the Business Recovery Services contracted for by Client hereunder.

C.      Subject to the exceptions in Section 12, RSL will be available to receive notification of a Declared Disaster, 24 hours per day, 7 days per week, every day of the year.

D.     In order for both Parties to discover any logistical or other problems in the performance of the Business Recovery Services to be provided under this Master Agreement in the event of an actual Declared Disaster, the Parties agree that a Declared Disaster Test will be conducted at least once every twelve months. This Declared Disaster Test will be handled in the same manner as an actual notification by Client to RSL of an actual Declared Disaster. However, Client agrees to schedule such Declared Disaster Test with RSL at least 90 days in advance of the actual Declared Disaster Test date. Further, at the time of notifying RSL of the Declared Disaster Test, Client agrees to advise the RSL Authorized Representative that the Declared Disaster Test declaration is only a test, and not an actual Declared Disaster. As this Declared Disaster Test is designed to discover any problems in the performance of the Services to be provided under this Master Agreement, Client acknowledges and agrees that any failure of RSL to perform within the time set forth in the Schedules, or any other performance problem during a Declared Disaster Test shall not be deemed a breach of this Master Agreement. In the event of a Declared Disaster Test, Client agrees to pay RSL for all food services, usage rates, office supplies, long distance calls, shipping and other charges incurred by Client during the Declared Disaster Test.

E.     Client acknowledges and agrees that if during a Declared Disaster Test, RSL receives a disaster declaration from another customer which requires some or all of the Business Recovery Services being used by Client during the Declared Disaster Test that Client will allow RSL to terminate the Declared Disaster Test and take possession of said Business Recovery Services.

F.     The Parties further agree that during each annual Declared Disaster Test, RSL shall provide a trained on site disaster test monitoring resource to observe and document the Declared Disaster Test. This resource shall issue to Client within thirty (30) days after the Declared Disaster Test a written unabridged and an executive summary report of the Declared Disaster Test results. These reports will document the observations of the test procedures and performance of Client's personnel who participated in the Declared Disaster Test along with the resource's recommendations, if any, for improvements which Client could implement in connection with the Business / Hosting Recovery Services.

**SECTION 4. Term of Master Agreement.** This Master Agreement and Attachments and the Schedules attached hereto shall have a term of five (5) years commencing on the Effective Date of this Master Agreement (the "Original Term"). The Parties further agree that this Master Agreement will not automatically renew at the expiration of the Original Term. During the term of this Master Agreement, Client and RSL shall have the right, upon 90 day written notice by Client to RSL, to mutually agree to renegotiate and restructure any or all Attachments and Schedules attached to this Master Agreement in the event of a significant change in business by Client which could include loss of major customer reducing need for service or the sale of some or all of the Client's business to a third party. Client acknowledges that the term of any third party vendor leases for Technology Equipment provided by RSL/Lessor to Client will be governed by the terms and conditions of the third party vendor lease.

**SECTION 5. Client Equipment Installation and Maintenance Responsibilities.**
In addition to the terms and conditions contained in the attached Attachments, Exhibits and Schedules, Client further acknowledges and agrees to accept the following responsibilities:

A.     Client shall report to RSL all trouble with Equipment, Software, Software Images, or Business Recovery Services on a timely basis.

B.     In the event that replacement of a failed device is determined necessary by Client and/or RSL, Client shall unplug the failed device and ship it to RSL, cost of shipment paid by RSL, and RSL will provide Client with a replacement device. When the replacement device arrives, Client shall unpack it and plug it in.

C.     Client shall designate one person(s) and one alternate person in Client's employ as coordinator of all Equipment and Software covered under this Master Agreement. All Equipment and Software problems and their resolution will be coordinated by and through this person.

D.     Client shall use supplies conforming to approved specifications reasonably established by RSL where performance, maintenance, and servicing of the Equipment may be affected.

E.    Client shall provide RSL reasonable access to the Equipment and Software and shall cause its employees to cooperate with RSL in the maintenance of the Equipment.

F.    Client shall continuously maintain a suitable computer-operating environment when using RSL Equipment.

**SECTION 6. Authorized Representative.**

Client shall designate one or more Authorized Representatives who will be responsible for providing notification to RSL of a Declared Disaster, requesting the necessary Business Recovery Service(s), and providing any other notification or authorization required of Client under the terms of this Master Agreement.  Notification and authorization performed under the terms of this Master Agreement will not be valid unless made by an Authorized Representative of Client, and will only be valid if an Authorized Representative of Client provides the required notification or authorization to an Authorized Representative of RSL.  In the event that none of Client's Authorized Representatives are available to notify RSL of a Declared Disaster, an officer of Client may declare a disaster or may designate, in writing, a replacement Authorized Representative, who will assume all duties and responsibilities of the Authorized Representative.

**SECTION 7. Invoicing and Payment.**

A.    RSL will invoice Client as defined on a Schedule for all charges due RSL pursuant to this Master Agreement.  Payment of the fees and charges listed on a Schedule does not entitle Client to any Business Recovery Services other than those listed in that Schedule and its corresponding Attachment.  Any usage fees, rental fees, shipping fees, handling fees, installation fees, maintenance fees, or support fees which are in addition to the fees and charges as set forth in the Schedules shall be mutually agreed upon in writing by the Parties.

B.    All invoices will be sent to Client via normal mail, email, or overnight carrier.  Payment terms are 2% 20, Net 55 days. Late charges, calculated at the rate of 1.5% per month or the maximum rate currently permitted by law, whichever is less, will be charged to Client on all invoices unpaid after forty-five (45) days from the date of the invoice.

C.    Anything in this Master Agreement to the contrary notwithstanding, Client acknowledges and agrees that the performance of RSL' obligations under this Master Agreement is conditioned upon the timely payment by Client of the fees and charges listed in the Schedules.

**SECTION 8. Default.**

A.    If Client is in default of this Master Agreement, RSL shall provide Client with written notice of the default which shall specify the event or events of default and the action necessary to cure the default and provide Client with at least ten (10) days to cure the default.  If Client fails to cure the default in the cure period, RSL may pursue any one or more of the following remedies:
    1.    Take immediate possession of the RSL Equipment and Software; and/or
    2.    Deny access to RSL facilities either fixed or mobile; and/or
    3.    Not provide one or more Business Recovery Services in the event of a Declared Disaster; and/or
    4.    Terminate this Master Agreement; and/or
    5.    Pursue any additional or alternative remedies available at law or in equity.

B.    If RSL, during a period in which Client has not declared a disaster, is in default of this Master Agreement, Client shall provide RSL with written notice of the default which shall specify the event or events of default and the action necessary to cure the default and provide RSL with at least ten (10) days to cure the default.  If RSL fails to cure the default in the cure period, Client may pursue any one or more of the following remedies:
    1.    Terminate this Master Agreement; and/or
    2.    Pursue any additional or alternative remedies available at law or in equity.
    If RSL, during a Client Declared Disaster is in default of this Master Agreement, Client shall provide RSL with written notice of the default which shall specify the event or events of default and the action necessary to cure the default and provide RSL with forty-eight (48) hours  from receipt of written notification to RSL to cure the default.  RSL will not be in default for any Client provided equipment or Client directed third

party/vendor support services, software, or telecommunications. . If RSL fails to cure the default in the cure period, Client may pursue any one or more of the following remedies:

1.    Terminate this Master Agreement; and/or
2.    Pursue any additional or alternative remedies available at law or in equity.

## SECTION 9. Taxes.

In addition to the amounts otherwise specified in this Master Agreement, Client agrees to pay all taxes in connection with transactions covered by this Master Agreement which RSL is at any time obligated to pay or collect according to the laws of the state in which Client is domiciled if applicable.  Such taxes may include, but are not limited to, state and local sales and use taxes, including penalties and interest and assessments, but excluding any taxes based on the net income of RSL.  If RSL is obligated by state law to pay or collect such taxes, then Client shall either pay such taxes through RSL, or Client shall provide to RSL proof of direct payment of such taxes to the taxing authority.

## SECTION 10.  Disclaimer of Warranties and Limitation of Liability.

As Client has selected the Business Recovery Services covered under this Master Agreement, RSL specifically does not warrant that the Business Recovery Services covered herein will be suitable for Client's needs, or that such will achieve any specific level of performance.  Client relieves RSL of any liability resulting from any outage or failure other than a failure caused by RSL's negligence,  failure to provide the Equipment or Service as selected in the Schedules and Attachments attached to this Master Agreement, or to diligently perform remedial maintenance on the RSL Equipment.

Client represents and warrants that it has all appropriate licenses with respect to the Software Image which may be provided by Client to RSL in connection with the Services being provided hereunder, and that RSL's use of the Software Image in connection therewith will not infringe upon or otherwise be impaired by any patent, trademark, or other proprietary right in and to such Software Image.  Client agrees to indemnify and hold RSL harmless from and against any such claims of infringement or impairment of RSL's right to use the Software Image in accordance with the terms of this Master Agreement. During Client's period of use, Client shall be solely responsible for any security issues related to Client's use of any Equipment, including any wireless device, or Software provided by RSL under this Master Agreement (including performing their own backups, virus protection, data security, etc.)

**EXCEPT AS SPECIFICALLY PROVIDED IN THIS MASTER AGREEMENT, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE MADE BY RSL WITH RESPECT TO THE BUSINESS RECOVERY SERVICES PROVIDED HEREUNDER, THE MAINTENANCE SERVICES, OR OTHER TRANSACTIONS CONTEMPLATED HEREIN.**

**EXCEPT FOR CLAIMS UNDER SECTION 14 AND SECTION 15 OF THIS MASTER AGREEMENT, NEITHER PARTY SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, EVEN IF THE PARTY HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.  IN NO EVENT SHALL RSL' LIABILITY TO CLIENT ARISING OUT OF THIS MASTER AGREEMENT EXCEED THE AMOUNT REPRESENTED BY THAT PORTION OF THE ANNUAL SERVICE CHARGE CONTAINED HEREIN FOR THE BUSINESS RECOVERY SERVICE(S) AND THE RENTAL FEES PAID BY CLIENT FOR SUCH SERVICES.**

## SECTION 11. Sublicensee License.

Client hereby acknowledges that its use of the Microsoft Products accompanying the computer Equipment is governed by the applicable Microsoft End User License Agreement.

## SECTION 12. Excuse for Nonperformance / Multiple Disasters/Force Majeure.

A.    Client acknowledges and agrees that RSL and/or any of its subcontractors may be affected by the same or other Declared Disaster(s) affecting Client or other clients, and that such disaster(s) may render RSL and/or its subcontractors unable to perform or to delay performance under the terms and conditions herein.  RSL agrees to make reasonable efforts to perform under the terms and conditions herein, despite such disaster(s).

B.     **Multiple Disasters.**  Except as otherwise provided for in Section 12(D) of this Master Agreement, Client acknowledges and agrees that the nature of the Services provided under this Master Agreement constitute an arrangement by which multiple clients may rely on the same set of RSL physical equipment and facilities for Business Recovery Services.  As such, more than one client could declare a disaster and require use of the Business Recovery Services at the same time as Client.  As a result, RSL will implement a process of a first come, first serve basis, whereby RSL will provide Business Recovery Services to its clients on the basis of the order in which clients declare a disaster.  Notwithstanding anything to the contrary, RSL shall not be obligated to provide Business Recovery Services in this manner if by doing so it shall cause a breach of a pre-existing RSL obligation to perform Business Recovery Services on a shared basis amongst all of its clients, including Client.  Further, Client acknowledges and agrees that it may be necessary for RSL to substitute comparable equipment or provide substituted alternative locations for the Business Recovery Centers.  Client agrees to cooperate with RSL as reasonably necessary in the event of multiple disaster declarations, to allow RSL to efficiently and effectively manage this process.  Client acknowledges and agrees that RSL shall not be held responsible for any delay or failure to perform hereunder for which delay or failure is due to multiple disaster declarations, unless RSL is deemed to have acted in a gross negligent manner or with willful misconduct.

C.     **Force Majeure**.  Neither Party shall be held responsible for any delay or failure to perform hereunder for which delay or failure is due to directives of the government or governmental agency, acts of God, acts of terrorism, strikes or other labor dispute, riot, or any other causes, contingencies, or circumstances not subject to the reasonable control of the non-performing Party which prevents or hinders performance hereunder, or makes such  performance impractical.  RSL agrees to make commercially reasonable efforts to perform under the terms and conditions herein, despite such force majeure event; however, Client agrees that RSL is not responsible for any delay or failure to perform under these circumstances.

D.     **Hosting Recovery Center**.  The Parties hereby agree and acknowledge that Client shall at all times during the term of this Master Agreement have the exclusive use of the Hosting Recovery Center  secured caged space dedicated to Client together with the Hot Tier Equipment and Warm Tier Equipment to be located in the Hosting Recovery Center.  The provisions as contained in Section 12(B) of this Master Agreement regarding multiple disasters shall not apply to the Hosting Recovery Center or to the Hot Tier or Warm Tier Equipment specified for Client.

## SECTION 13.  Dispute Resolution.

Except as provided otherwise in this Master Agreement, all claims, disputes, controversies, and other matters in question between the Parties to this Master Agreement, including any affiliates, subsidiaries, or parent companies of Client or RSL, as well as any officers or employees of Client, RSL, or any affiliates, subsidiaries, or parent companies of Client or RSL, arising out of, or relating to, this Master Agreement, or to the breach thereof, or any other matter, including any claim in which either Party is demanding monetary damages of any nature including negligence, strict liability or intentional acts or omissions by either Party, and which cannot be resolved by the Parties, shall be settled by arbitration in accordance with the Arbitration Procedure described below.

**Arbitration Procedure:**

Except as provided otherwise in this Section, the arbitration shall be administered in accordance with the commercial arbitration rules of the American Arbitration Association.  There shall be three (3) neutral arbitrators, unless otherwise agreed to by the Parties.  Each Party shall name, in writing, one arbitrator, and the third arbitrator shall be chosen by the two arbitrators so selected.  If the two arbitrators fail to select a third arbitrator or should either Party fail to select an arbitrator, then that arbitrator shall be chosen by a Common Pleas Court Judge serving in the Common Pleas Court of Hamilton County, Ohio.  In any case, all arbitrators must be attorneys with experience in contract law.  Additionally, all arbitrators must sign an oath of neutrality prior to their assumption of duties as an arbitrator.  The Parties hereby agree that the arbitration proceeding shall be held in Columbus, Ohio.  In no event shall the demand for arbitration be made more than two (2) years after the claim or cause of action arises.  The award of the arbitrator or arbitration panel shall be final and binding, and there shall be no appeal therefrom.  Judgment upon the award rendered by the arbitrator or arbitration panel may be entered in any court having jurisdiction.  The U.S. Arbitration Act shall govern the interpretation and application of this Section.  The Dispute Resolution Provisions as contained in this Section 13 shall not be applicable to any dispute between the Parties

arising under Sections 14 of this Master Agreement or any claims for indemnification arising under Section 15 of this Master Agreement.

**SECTION 14.    Confidential Information And Trademarks.**

A.    **Confidential Information.**  The Parties shall take reasonable steps not to disclose, publish, release, transfer or otherwise make available any Confidential Information of the other Party to any Person other than their respective affiliates, employees and agents without the prior written consent of the other Party or as otherwise authorized by the terms of this Master Agreement.  The term "Confidential Information" as used in this Master Agreement shall mean (i) all information clearly identified in writing by a Party at the time of disclosure as confidential, (ii) all information disclosed orally that either is identified as confidential or that a reasonable Person at the term of disclosure would assume, under the circumstances, to be confidential including, but not limited to, any trade secrets, developments, systems, inventions, software, firmware, formulas, devices, know-how, pricing strategies, development plans and product information that derives independent value from not being generally known to the public or other Persons who could obtain economic value for its disclosure, and (iii) the Attachments, Schedules and Exhibits to this Master Agreement.

B.    **Non-Confidential Information.**  Confidential Information shall not include information which (i) was known by the receiving Party at the time of disclosure; (ii) is or becomes, through no fault of the receiving Party, available to the public; (iii) is obtained by the receiving Party from a third party without breach of any agreement with, or obligation of confidentiality to, the disclosing Party; (iv) is independently developed by the receiving Party without use of proprietary information received from the disclosing Party; (v) is publicly disclosed by the disclosing Party in writing without restrictions similar to those contained in this Master Agreement; or (vi) is required by law or a court of a government entity to be disclosed.

C.    **Injunctive Relief.**  The Parties acknowledge that a violation of the confidentiality obligations as contained in this Master Agreement will cause irreparable loss and harm to the Disclosing Party which cannot be reasonably or adequately compensated by damages in an action at law, and, accordingly, the Disclosing Party will be entitled to a reasonable injunctive and other equitable relief to enforce the confidentiality obligations contained in this Master Agreement and to prevent or cure any breach or threatened breach thereof.

D.    **Return of Confidential Information.**  The Confidential Information, including copies thereof, shall at all times remain the property of the Disclosing Party.  Upon termination of this Master Agreement, all Confidential Information shall be returned to the Disclosing Party, or, if requested by the Disclosing Party, destroyed by the Receiving Party with satisfactory proof of destruction provided by the Receiving Party to the Disclosing Party.

**SECTION 15. Insurance.**

A.    **General Indemnification.**  Each Party (the "Indemnifying Party") will indemnify and hold harmless the other Party (the "Indemnified Party") from and against any loss, liability, damage, and expense (including reasonable attorneys' fees) relating to or arising out of the performance of this Master Agreement, insofar as such claims (the "Indemnified Claims") arise from:

(1)    The negligent or willful actions, omissions or misconduct of the Indemnifying Party, its employees, agents, or contractors in the performance of this Master Agreement, except to the extent that the loss, claim, liability, damage or expense is proximately caused by the negligent or willful actions, omissions or misconduct of the Party seeking indemnification; and

(2)    The breach or default by the Indemnifying Party of any of its representations, warranties or agreements as contained in this Master Agreement or any other agreement between the Parties.

B.      **Indemnification Procedure for Third Person Claims.** The Indemnifying Party shall defend any action or suit brought by a third Person against the Indemnified Party for any Indemnified Claim. The Indemnified Party will notify the Indemnifying Party promptly in writing of any written claims, lawsuits or demands by third Persons for which the Indemnified Party alleges that the Indemnifying Party is responsible to indemnify under the terms of this Master Agreement, and, if requested by the Indemnifying Party, will tender to the Indemnifying Party the settlement, defense of such claim, lawsuit or demand. The Parties will cooperate in every reasonable manner with the defense or settlement of such claim, demand, or lawsuit. The Indemnifying Party will not be liable for settlements by the Indemnified Party or any claim, demand or lawsuit unless the Indemnifying Party has approved the settlement in advance or unless the defense of the claim, demand or lawsuit has been tendered to the Indemnifying Party in writing and the Indemnifying Party has failed promptly to undertake the settlement or defense.

### SECTION 16. Insurance.
Both Parties agree to maintain the following types of insurance coverage during the term of this Master Agreement with insurers with an A.M. Best's Rating of not less than A-: VII or its equivalent: Workers' Compensation, Employer's Liability Insurance, Commercial General Liability Insurance (with limits of not less than US$1,000,000 per occurrence and US$2,000,000 general aggregate), Automobile Liability, and Excess Liability (with limits not less than US$1,000,000 per occurrence and US$1,000,000 in the aggregate). Either Party may request of the other Party a certificate of insurance demonstrating that such party has obtained the above described insurance. All policies providing coverage shall contain provisions that no cancellation, non-renewal or material changes in the policy shall become effective, except on thirty (30) days written notice to the other Party.

### SECTION 17. Miscellaneous Provisions.
A.      This Master Agreement will be effective and binding only when executed by an authorized representative of RSL and an authorized representative of Client denoting its acceptance.

B.      This Master Agreement contains the entire understanding between the Parties. This Master Agreement supersedes all prior agreements and understandings, written or oral, between the Parties regarding this subject matter, and may not be changed or terminated except by a written amendment signed by both Parties. No change, termination, or attempt to waive any of the provisions hereof shall be binding unless in writing and signed by an authorized representative of RSL and an authorized representative of Client. No prior representations or statements, written or oral, shall be deemed to be a part of this Master Agreement unless specifically set forth herein. Forbearance or indulgence by either Party in any regard shall not constitute a waiver of the terms or conditions to be performed under this Master Agreement and until the performance of the terms or conditions is complete, the other Party may invoke any remedy available under this Master Agreement or by law, despite the forbearance or indulgence. Client hereby acknowledges that any and all representations made by RSL and its employees or agents, either orally or in writing, which are not specifically included in the terms and conditions of this Master Agreement or in a written addendum signed by an authorized officer of RSL, are not material to this Master Agreement and are not binding upon RSL. Client further acknowledges that Client has read and understood this Master Agreement and that Client has had the opportunity to consult with legal counsel.

C.      This Master Agreement shall be governed by the laws of the State of Ohio. If any of the provisions or portions thereof are determined to be invalid or unenforceable, such invalid provisions or invalid portions shall be severed from this Master Agreement, and all other provisions hereof shall remain in full force and effect, however, it is expressly understood and agreed that each and every provision of this Master Agreement which provides for a limitation of liability, disclaimer of warranties, or exclusion of damages is intended by the Parties to be severable and independent of any other provisions and to be enforced as such. Further, it is expressly understood and agreed that in the event any remedy hereunder is determined to have failed of its essential purpose, all limitations of liability and exclusions of damages set forth herein shall remain in effect.

D.      No action, regardless of form, arising out of transactions under this Master Agreement may be brought by either Party more than two (2) years after cause of action has occurred. This limitation shall not apply to collection of any amounts owed by Client to RSL.

E.  This Master Agreement may not be assigned by either Party without the prior written consent of the other Party which consent shall not be unreasonably withheld, and any attempt to do so shall be void and of no effect.

F.  This Master Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns as permitted hereunder.

G.  All notices, consents, waivers and other communications required or permitted to be given pursuant to this Master Agreement shall be in writing and shall be deemed to have been delivered either (i) on the delivery date, if personally delivered, or, if delivered by confirmed facsimile or e-mail, (ii) one (1) business day after delivery to any national overnight courier directing delivery on the next business day, receipt requested, or (iii) three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, with adequate postage affixed thereto.  All notices to the Parties shall be addressed to the Parties as follows, or at such other address as either Party may designate in writing to the other Party:

<div style="margin-left:2em;">

Client:        The Standard Register Company
600 Albany Street
Dayton, Ohio 45417-3405
Attention:  Richard Ball
           Director of Procurement

With a copy to:   The Standard Register Company
600 Albany Street
Dayton, Ohio  45417-3405
Attention:  Gerard D. Sowar, Esq.
           Vice President, General Counsel and Secretary

RSL:        Recovery Site Logistics, LLC
6475 Perimeter Dr. #102
Dublin, Ohio 43016

</div>

H.  THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS MASTER AGREEMENT.

I.  All media releases by either Party or its employees or agents relating to this Master Agreement or its subject matter, excluding any announcement intended solely for internal distribution at either Party or any disclosure required by legal, accounting, or regulatory requirements beyond the reasonable control of either Party shall be coordinated with and approved by either Party in writing prior to the release thereof.  Either Party acknowledges that the either Party's name, logo, slogans, and trademarks (collectively "Marks") are the valuable property of either Party, and that either Party has the right to control the use and display of the Marks.

J.  Either Party agrees that all information communicated by either Party whether before or after the date hereof, shall be received in strict confidence, including, but not limited to, the pricing terms of any proposal or of this Master Agreement, and shall not be disclosed by either Party, its agents, or employees to any third Party without the prior written consent of either Party, except as may be necessary by reason of legal, accounting, or regulatory requirements beyond the reasonable control of either Party.

K.  This Master Agreement may be executed in several counterparts, all of which taken together, shall constitute a single Master Agreement between the Parties.

L.  The section headings used herein are for reference and convenience only and shall not enter into the interpretation of this Master Agreement.

M.     This Master Agreement includes several Attachments, Schedules and Exhibits, which are attached hereto and incorporated by reference herein. In the event of a conflict between the terms and conditions of this Master Agreement and those of an Attachment, Schedule or Exhibit, the Master Agreement shall take precedence.

N.     RSL may suspend performance of its obligations herein, without further liability, as a result of conditions which RSL reasonably believes represents a safety or health hazard during the period such hazard persists and while reasonable efforts are being made to eliminate the hazard. Client acknowledges and agrees that Client shall be responsible to ensure the safety of RSL' staff while at the recovery location and to observe OSHA regulations.

O.     <u>Technology Equipment upgrade and/or exchange.</u>

1.     Adding or upgrading equipment – With ninety (90) days notice to RSL, Client may add or upgrade Technology Equipment to any Schedule at mutually agreed to monthly fees, which fees will be comparable to those monthly fees currently being paid by Client for comparable Technology Equipment on a Schedule.
2.     Removing or exchanging equipment – During the first nine (9) months of the Master Agreement or on the annual anniversary of the Effective Date thereafter, with at least ninety (90) days notice to RSL, Client can remove or exchange Technology Equipment on a Schedule and RSL will provide to Client a monthly fee credit, mutually agreed to, that can be applied to adding or upgrading Technology Equipment to a Schedule.
3.     Third Party Vendor Lease – any Technology Equipment provided by RSL/Lessor to Client under a third party lease will be subject to the following terms and conditions for Technology Upgrades/Exchange: .

**Technology Upgrade/Exchange:** If Lessee is not in default under the Lease at such time as Lessee desires to upgrade/exchange the Equipment ("Existing Equipment"), Lessee may notify RSL/Lessor of its desire to upgrade/exchange the Equipment with technologically more advanced Equipment ("Upgrade/Exchange Equipment"). In the event RSL/Lessor receives such notice, it agrees to negotiate in good faith to enter into a new lease or leases with RSL/Lessor for the Upgrade/Exchange Equipment upon mutually agreeable terms and conditions. Lessee agrees to satisfy the remaining obligation under the existing lease, and RSL/Lessor agrees to terminate the rental obligations of the returned Equipment upon the Commencement Date of the lease or leases for the Upgrade Equipment, provided that the termination of rental obligations shall not be effective unless the Secured Party and Assignee, if any, gives its written consent thereto. Lessee understands, however, that a breach by RSL/Lessor under this paragraph shall in no way release the Lessee from or affect the Lessee's obligations to continue making rental payments to any Secured Party or Assignee, if any. Lessee acknowledges that this Technology Upgrade/Exchange option is subordinate to and does not in any way modify the Lessee's absolute and unconditional obligation to pay all rentals and other amounts due under the Lease. The term "Lessee" as used in this Paragraph shall mean The Standard Register Company. The term "Secured Party" as used in this Paragraph shall mean any Person who has a purchase money security interest (as defined in the Ohio Uniform Commercial Code) in the Existing Equipment. The term "Assignee" as used in this Paragraph shall mean any Person to whom RSL/Lessor has assigned its interest as Lessor in the Lease for the Existing Equipment.

At the end of the original lease terms, Lessee has the option to purchase all or not less than all Equipment at fair market value, return the Equipment, or refresh the Equipment from original lease to a new agreed upon lease term.

**Client:**                      **RSL:**

**The Standard Register Company**       **Recovery Site Logistics, LLC**
**600 Albany Street**                   **6475 Perimeter Dr. #102**
**Dayton OH 45417-3405**          Dublin, Ohio 43016

By: _____

Name: _Joseph Morgan_

Title: _President + CEO_

Date: _12/21/10_

By: _____

Name: _D. Eric Venters_

Title: _President_

Date: _12/22/10_

**Attachment A**
**Business Recovery Center**

**Description of Services**
The Business Recovery Center ("BRC") provides a fully equipped ready-to-use office facility on a temporary basis following a Declared Disaster at the Client's covered location.   A predetermined number of fifty (50) seats and specified Equipment will be made available as described in Schedule A.

Client is entitled to use the BRC for up to forty-two (42) days following notification of a Declared Disaster.

**Charges**
(a)  Client agrees to pay the five (5) day minimum daily usage fee as described in Schedule A, for each activation of the BRC service, together with all sales and use taxes imposed thereon.  Each usage fee or other amount due hereunder shall be due in accordance with the invoicing and payment terms contained in Section 7 of the Master Agreement.  In the event that the usage period is less than the anticipated usage period indicated in Schedule A, Client shall forfeit and pay RSL all discounts granted upon the length of the anticipated usage period.
(b)  Client will pay to RSL a Daily Utilization Fee for each day or part thereof in excess of the minimum number of days that the service is provided to Client.

**Client Obligations**
Client agrees that the following are obligations of Client under this Master Agreement:
(a)  The development, testing, and implementation of all procedures to be adopted in the event of a Declared Disaster.
(b)  The security and protection of confidential information, the BRC, and the Equipment contained within.
(c)  The results of applications whether restored and run by RSL or by the Client.
(d)  Providing RSL staff adequate access to the area in which the BRC is to be located and ensure adequate office accommodations and facilities for RSL to perform its obligations under this Master Agreement, including access for maintenance.
(e)  Ensuring that the BRC is not connected with any Client supplied items (including hardware, software, and telecommunications) without RSL' prior consent.
(f)  Ensuring there is no modification of the BRC in any way.
(g)  The administration of the system(s), including loading of all tapes, disks, or files and establishing the operational procedures. RSL will provide startup operation as deemed appropriate by RSL.

**Declared Disaster Test**
Additional BRC test time is available at the rates listed on Schedule A.

If during a Declared Disaster Test another Client notifies RSL of a Declared Disaster, Client shall make the BRC available to RSL within six hours of being given notice.  The Declared Disaster Test will resume after the Declared Disaster is terminated.

**Attachment B**
**Hosting Recovery Center**

**Description of Services**
RSL will supply the Technology and Communications functions as described in Schedule B at the RSL Hosting Recovery Center ("HRC") described in Schedule B. Client may install certain items of Client equipment on or with the RSL supplied Technology or Communications services during the term of this Master Agreement. Client shall retain the ownership of all items of Client equipment stored at the HRC, and RSL shall retain the ownership of all items supplied by RSL in the performance of this Master Agreement.

Client will have access to the HRC Monday – Friday during normal business hours (currently 8:00 a.m. to 5:00 p.m. Eastern Time). After hour access will be provided to Client by RSL with prior approval and security clearance by RSL for Client.

At the request of Client, RSL may assist Client in performing light duties or correcting minor problems with Client-supplied equipment. RSL will provide such assistance for up to two events, not to exceed one hour each, per month, at no additional charge to Client, during normal business hours. Assistance beyond the two days per month described above will be billed to Client at the rate of $100.00 per hour for a minimum of one hour for each occurrence in which assistance is required during normal business hours, and $150.00 per hour if outside of normal business hours. This service is provided on an as available, first come, first serve, basis, with no guarantee that RSL will be able to remedy any problems with the equipment.

**Charges**
Client will pay the fees for the HRC services as set forth in Schedule B in accordance with the payment terms of this Master Agreement.

If requested, Client acknowledges and agrees that there is a $150 per hour charge for access to the HRC outside of normal business hours (including holidays) if RSL support must accompany Client for this access.

**Client Obligations**
Client agrees that the following are obligations of Client under this Attachment B:

(a) Client is responsible for any and all actions of Client representatives at the HRC. Client acknowledges that all Client representatives must be escorted by a RSL representative at the HRC at all times.
(b) The security and protection of Client's confidential information.
(c) The administration of the Client's system(s), including loading of all tapes, disks or files and establishing the operational procedures of Client's hardware and software, including any backup requirements.

**Disclaimers**
Client acknowledges and agrees that RSL does not control any third party services, including, but not limited to, internet access services, internet bandwidth, telephone lines, and data circuits, and the performance of any Client equipment or software, and as such, Client agrees that RSL is not responsible for the performance of any such third party services or Client equipment or software. Further, Client acknowledges that RSL shall not be responsible for any down-time caused by a third party service or any actions by Client or Client's representatives.

**Attachment C**
**Mobile Recovery Center**

**Description of Services**
A Mobile Recovery Center ("MRC") will be delivered to the agreed Client location, as described in Schedule C, upon notification of a Declared Disaster and subject to site access availability, within the time frame described in Schedule C.

An MRC is a complete mobile computing environment including pre-defined computer systems and peripherals. The environment will be based in a mobile computer center unit with onboard generator, air conditioning, and pre-wired for LAN and telephone connectivity.

**Charges**
(a) The Client agrees to pay the minimum daily usage fee as described in Schedule C for each activation of this service, together with all sales and use taxes imposed thereon. Each usage fee or other amount due hereunder shall be due in accordance with the invoicing and payment terms contained in Section 7 of the Master Agreement.
(b) Client will pay to RSL a daily utilization fee for each day or part thereof in excess of the minimum number of days that the MRC service is provided to Client.

**Client Obligations**
Client agrees that the following are obligations of Client under this Master Agreement:
(a) The development, testing, and implementation of all procedures to be adopted in the event of a Declared Disaster
(b) The security and protection of confidential information, the MRC, and the Equipment contained within.
(c) The results of applications whether restored and run by RSL or by Client.
(d) All necessary permits, consents, and permissions (i.e., landlord's consent, planning permission, etc.).
(e) Ensuring that the location, operation, and running of the MRC do not contravene any law, rule, or regulation.
(f) Providing RSL staff adequate access to the area in which the MRC is to be located and to ensure adequate office accommodations and facilities for RSL to perform its obligations under this Master Agreement, including access for maintenance.
(g) Ensuring that the MRC is not connected with any Client supplied items (including hardware, software, and telecommunications) without RSL' prior written consent.
(h) Ensuring that there is no relocation of the MRC or modification of it in any way.
(i) The administration of the system(s), including loading of all tapes, disks, or files and establishing the operational procedures. RSL will provide startup operation as deemed appropriate by RSL.

**Declared Disaster Test**
MRC test time is available at contracted rates.

If during a Declared Disaster Test another Client notifies RSL of a Declared Disaster, then Client shall make the MRC available to RSL within six hours of being given notice. The Declared Disaster Test will resume after the Declared Disaster is terminated.

**Safekeeping**
Client is responsible for the safekeeping of the MRC and all RSL Equipment therein, and shall bear the risk of any loss, damage, theft, or destruction of the MRC and related Equipment upon shipment to Client by RSL. Client shall insure the MRC and related equipment against such risk of loss for no less than replacement cost, and if requested by RSL, shall provide evidence of such insurance. At RSL' option, Client shall either replace or pay the replacement cost of the MRC or any related equipment, which is lost, stolen, destroyed, or damaged beyond repair. Until the MRC or related equipment has been repaired, replaced, or the replacement cost thereof has been paid by the Client, the usage period shall continue and Client shall continue to pay the usage fee with respect hereto. Any items or non-expendable materials not returned to RSL will be charged to Client at full replacement cost (minimum charge of $10). All Equipment will be delivered to Client with ownership labels affixed, none of which Client shall permit to be removed or defaced.

**Consumables**
Client acknowledges and agrees that Client shall be solely responsible for the costs of all consumables used in conjunction with any Equipment provided by RSL hereunder. Such consumables shall include, but not be limited to, diesel or other fuel, toner cartridges, paper, etc.

Client Initials: _[signature]_                    Page 1 of 2                    Rev. 38812

**No 911 Service**
**CLIENT ACKNOWLEDGES THAT THE TELEPHONE SERVICES PROVIDED IN THE MRCs USE VOICE IP TECHNOLOGY. AS SUCH, CLIENT ACKNOWLEDGES AND AGREES THAT 911 EMERGENCY SERVICE WILL NOT BE AVAILABLE FROM ANY PHONE IN THE MOBILE RECOVERY CENTER.**

THE REMAINDER OF ATTACHMENT C IS INTENTIONALLY LEFT BLANK

**Attachment D**
**Drop Ship Equipment Service**

**Description of Services**
In the event of a Declared Disaster, RSL agrees to deliver to Client's designated location, within the timeframe specified in Schedule D, the Equipment as listed in Schedule D. At the time of notification of the Declared Disaster, Client shall designate the location to which Client desires the Equipment be delivered. Any changes to such shipping address after such address has been given to RSL shall excuse and relieve RSL from any and all obligations and/or liability for failure to deliver within the time period specified in Schedule D. Subject to the exceptions in Section 12 of the Master Agreement, delivery will be complete when the Equipment is received at Client's designated shipping address.

**Proprietary Software Installation**
If provided to RSL by Client, and requested by Client at the time of a Declared Disaster, the Client's specific Software Image can be loaded onto each system before it leaves the RSL distribution center. RSL does not guarantee usability or functionality of the Software Image.

**Quantities of Equipment**
At the time of notification of a Declared Disaster, Client shall designate the quantity of each Equipment product that is required to meet Client's needs. RSL will, within the time period specified in Schedule D of such notification and subject to the exceptions in Section 12, deliver the Equipment requested by Client up to the quantities for each Equipment and Software product listed in Schedule D. If Client requests a greater quantity of any Equipment or Software product than is listed in Schedule D, such Equipment in excess of the quantity listed in Schedule D may be provided by RSL on an "as available" basis.

**Charges**
(a) Client agrees to pay RSL monthly, during the usage period, the usage fees indicated on Schedule D, for each item of Equipment and Software, together with all sales and use taxes imposed thereon if applicable. Each usage fee or other amount due hereunder shall be due in accordance with the invoicing and payment terms contained in Section 7 of the Master Agreement. In the event that the usage period for an item of Equipment or Software is less than the anticipated usage period indicated in Schedule D, Client shall forfeit and pay RSL all discounts granted upon the length of the anticipated usage period.
(b) Client shall pay to RSL a prorated usage fee for each day or part thereof in excess of the minimum number of days that the service is provided to Client.
(c) The usage period shall commence on the date RSL ships the Equipment to Client and shall be automatically extended upon all of the terms and conditions hereof until the date that the Equipment is returned to the possession of RSL.

**Client Obligations**
(a) Client represents and warrants that Client has taken all reasonable precautions to protect the Client supplied Software and Equipment from infection by any computer virus. RSL represents and warrants that it has taken all reasonable precautions to protect the RSL supplied Software and Equipment from infection by any computer virus.
(b) Client agrees not to install Equipment of any type or modify in any way the products without prior written consent from RSL.
(c) Client agrees to permit RSL and its agents all reasonable access to the site where the Equipment is located for any lawful purpose.

**Declared Disaster Testing**
Client may test the full or partial scheduled hardware listed in Schedule D. Equipment Declared Disaster Testing rates are based on a daily usage. All or a selection of contracted Equipment is configured to meet requested configurations and shipped to a designated site for a Declared Disaster Test. Just as in an actual Declared Disaster, this site can be at any location in the continental United States.

**Delivery and Return**
All Equipment is shipped F.O.B. from the designated RSL inventory center. Equipment may not be shipped via mail. Unless Client notifies RSL to the contrary in writing (facsimile transmission acceptable) within 72 hours after receipt of the delivery invoice, it shall be conclusively presumed that the Equipment was delivered to Client in good operating

condition. Equipment shall be returned to RSL by prepaid insured shipment to the nearest RSL inventory center. Client shall pay RSL for all shipping and handling charges. Client shall return Equipment to RSL in good operating condition, normal wear and tear excepted.

## Ownership and Use

The Equipment shall remain the property of RSL without any option to purchase unless such an option is granted prior to commencement of the usage period and explicitly set forth in writing or in some other document signed by the parties. Client shall use the Equipment only at the Equipment location specified at the time of a Declared Disaster or Declared Disaster Test and shall not remove, sublease, rent, transfer, assign, sell, alter, modify, or encumber any item of Equipment without the prior written consent of an officer of RSL.

## Exchange Service

Under the exchange service option, RSL will replace any item of Equipment which is found to be defective during the usage period, provided that Client, at its cost, has shipped the defective item back to RSL. In the event that an item of Equipment does not operate properly, Client shall notify RSL before taking any remedial action or returning it to RSL. In the event that an item of Equipment requires repair or recalibration as a result of an accident or Client's unauthorized tampering or repair or negligence, misuse, or abuse of such item, Client shall bear the entire cost thereof, including any shipping costs.

## Safekeeping

Client is responsible for the safekeeping of all RSL Equipment therein, and shall bear the risk of any loss, damage, theft, or destruction of the Equipment upon shipment to Client by RSL. Client shall insure each item of Equipment against such risk of loss for no less than replacement cost, and if requested by RSL, shall provide evidence of such insurance. At RSL' option, Client shall either replace or pay the replacement cost of any item, which is lost, stolen, destroyed, or damaged beyond repair. Until an item has been repaired, replaced, or the replacement cost thereof has been paid by the Client, the usage period shall continue and Client shall continue to pay the usage fee with respect hereto. Any items or non-expendable materials not returned to RSL will be charged to Client at full replacement cost (minimum charge of $10). All Equipment will be delivered to Client with ownership labels affixed none of which Client shall permit to be removed or defaced.

## Software

The Equipment may include Software. The Software shall remain the property of its licensor. The terms and conditions of any Software license agreement covering the Software are incorporated herein by reference and supersede anything to the contrary herein, and Client agrees to be bound by such terms and conditions, particularly those limiting the use and transfer of the Software. Except as otherwise permitted therein, Client shall use the Software only with the Equipment and shall not copy, remove, sublicense, rent, transfer, assign, alter, sell, modify, or encumber the software without RSL's prior written consent. The Software is warranted only to the extent provided directly by its licensor. RSL makes no independent warranty as to the performance of the Software.

## Consumables

Client acknowledges and agrees that Client shall be solely responsible for the costs of all consumables used in conjunction with any Equipment provided by RSL hereunder. Such consumables shall include, but not be limited to, toner cartridges, paper, etc.

**Attachment E**
**FLEXDATA™ Services**

## SECTION 1.  Definitions.

All terms defined otherwise in the Master Agreement shall have the same meaning in this Attachment E ascribed to them in the Agreement.

**FLEXDATA™** *Services* - a general term used to describe the services set forth and described in this Attachment E.

## SECTION 2.  Selection of Services.

The FLEXDATA™ Service(s) to be provided hereunder shall be indicated on one or more schedules to the Master Agreement executed by the Parties.

## SECTION 3.  FLEXDATA™  Services.

### A.  FLEXDATA™ Services

**1.  Description of Services.**
The FLEXDATA™ Service is a data vaulting service utilizing a virtual tape library (VTL) to provide offsite backup data storage and recovery capabilities.

**2.  Charges.**
Client agrees to pay the fees as set forth on an applicable  Schedule E  for the FLEXDATA™ Services.

### B.  FLEXDATA™ Quickship Services

**1.  Description of Services**
The FLEXDATA™ Quickship Service is where a Client uses the FLEXDATA™ Service described above, and in the event of a Declared Disaster, RSL will load the Client's Data onto a server and ship the server to Client s designated recovery site.

**2.  Charges**
 **a)   Usage Fee.**
 Client agrees to pay the daily usage fee as described in the  Schedule E , for each test/declaration of a Flex Recovery Service.

 **b) Disaster Declaration**
 All of the terms and conditions provided for in the Master Agreement and any Attachments, Schedules and Exhibits thereto regarding disaster declarations and declared disaster testing shall be applicable hereto in the performance of the Flex Recovery Services.

## SECTION 4.  Client Obligations.

Client agrees to accept the following responsibilities with regard to the FLEXDATA™ Services:

**A.** **Data**.  Client acknowledges and agrees that RSL shall require Client to take all steps necessary to protect and ensure the security of all data sent to RSL for backup services ("Data").  This includes, but is not limited to, encrypting all Data to prevent RSL or any third party from accessing, viewing or otherwise using such Data. Client acknowledges and agrees that RSL shall have no liability whatsoever for the Data, including, but not limited to, corrupted data, missing data, data damaged in shipment, or data security.  RSL shall only be liable for negligence and intentional misconduct regarding the storage of the Data.  RSL must make it's BEST efforts to protect all Client data stored on RSL's network or equipment from breaches of security by any third party.

**B.** Client warrants that its Data will not violate any law, statute or regulation (including any obscenity or indecency laws), and shall indemnify RSL and hold RSL harmless against any third party claims regarding any breach of this warranty.

Client Initials _[signature]_    Page 1 of 3    Rev. 38812

C.    The security and protection of Client's confidential information (including all of Client's Data).

D.    Unless otherwise set forth on an Attachment, Schedule or Exhibit, Client acknowledges they are responsible for acquiring, paying for and maintaining the network infrastructure between the equipment located at the Client's site and the equipment located at the RSL facility for the FLEXDATA™ Service and FLEXDATA™ Quickship Service.

E.    Client shall be responsible for provisioning sufficient power to support all FLEXDATA™ Service and FLEXDATA™ Quickship Service equipment at their site.

F.    Client will take reasonable precautions to protect all Software, Data and Equipment from infection by any computer virus.

G.    Ensuring that the RSL supplied equipment is not connected with any Client-supplied items, including hardware and telecommunications equipment, without notifying RSL and receiving RSL's consent, which consent will not be unreasonably withheld.

H.    Client shall report to RSL all trouble with the Flex Services on a timely basis.

I.    Client shall designate one person and one alternate person in Client's employ as coordinator of the FLEXDATA™ Services covered under this Master Agreement.  All problems and their resolution will be coordinated by and through this person.

J.    Client shall provide to RSL reasonable access to the Equipment and shall cause their employees to cooperate with RSL in the maintenance of the Equipment, and to ensure adequate accommodations and facilities for RSL to perform its obligations under the Master Agreement.

K.    All fees shall be due in accordance with the invoicing and payment terms contained in the Master Agreement.

## SECTION 5. RSL Obligations
RSL agrees to accept the following responsibilities with regard to the FLEXDATA™ Services:

A.    **Installation of FLEXDATA ™ Service.**
1) RSL will procure and test hardware and software prior to deployment to Client's location
2) RSL will coordinate with Client's IT personnel to install VTL appliance into Client's network.
3) RSL will assist Client to integrate VTL Appliance within Client's existing backup architecture.
4) Once installation and integration are complete RSL will confirm that all "back up" jobs are properly functioning with VTL device.
5) RSL will transfer a copy of the Client's site VTL Appliance locally to the remote site VTL appliance.
6) RSL will verify that the FLEXDATA™ process can be completed locally prior to leaving Client's site.
7) The remote VTL appliance with Client's data will be taken to the remote location and installed into a rack and connected to the Client provisioned circuit.
8) The final test will be preformed to test circuit connectivity and the functionality of the FLEXDATA™ Service

B.    **Monitoring.**
RSL will monitor basic appliance and circuit functionality; Errors and issues will be reported to Client in a timely manner.

C.    **Technical Support**
RSL will assist the Client to troubleshoot , isolate and identify any issues within the FLEXDATA™ Service and take corrective action to repair.
RSL will provide remote phone assistance. On-site support is also available upon request for $1500 technical plus all reasonable travel expenses.

### SECTION 6. Safekeeping.

Client acknowledges and agrees that all Equipment and software, including, but not limited to, the servers, racks and any peripheral equipment, provided in the provision of the FLEXDATA™ Services shall remain the property of RSL at all times. Client is responsible for the safekeeping of all Equipment, and shall bear the risk of any loss, damage, theft, or destruction thereto, upon shipment to Client by RSL. At RSL' option, Client shall either replace or pay the replacement cost of the item that is lost, stolen, destroyed, or damaged beyond repair. Until the item has been repaired, replaced, or the replacement cost thereof has been paid by Client, the usage period shall continue and Client shall continue to pay the usage fee with respect thereto. Any items or non-expendable materials not returned to RSL will be charged to Client at full replacement cost (minimum charge of $10). All Equipment made available to Client will have ownership labels affixed, none of which Client shall permit to be removed or defaced.

### SECTION 7. Exchange Service.

Within twenty-four (24) hours of RSL' determination of a failed device supplied by RSL in the performance of the FLEXDATA™ Service including Software provided by RSL there under (a "Failed Device"), RSL will repair or replace such Failed Device which is found to be defective at any time after its receipt by Client, provided that Client has shipped the Failed Device back to RSL (unless advised by an RSL representative that the Failed Device will be repaired onsite instead). RSL shall be responsible for all shipping charges. Client must notify RSL before taking any remedial action or returning it to RSL. In the event that a device provided by RSL requires repair or recalibration as a result of an accident caused by Client or Client's unauthorized tampering or repair or negligence, misuse, or abuse of such item, Client shall bear the entire cost of repair or replacement, including any shipping costs.

### SECTION 8. FLEXDATA™ Support

Client acknowledges and agrees that technical support does not include deployment support after the installation of the **FLEXDATA™ Service, as defined in Section 5.A. of this Attachment E. This includes,** but is not limited to, installation/reinstallation/deployment of Client owned hardware, troubleshooting SAN or IP network environments, installing Linux or Linux kernels, SAN switching zone preparation and configuration, SAN connection preparation and troubleshooting, IP connection and troubleshooting, storage connection preparation and troubleshooting, or installing software not supplied by RSL (such as backup package or SNMP package). **Additional support after the installation of the FLEXDATA™ Service is available at RSL's current professional service rates.** RSL does not provide technical support for third-party software or hardware not provided by RSL, but RSL will help identify the issue. The Client may be requested to log the outstanding case with the relevant third-party vendor.

### SECTION 9. Miscellaneous

A. **Client may not:**
   1) Alter, modify, or adapt any Software provided with the FLEXDATA™ Services ("FLEXDATA™ Software"), or portions thereof including, but not limited to, reverse engineering, translation, decompiling, disassembling, or creating derivative works.
   2) Other than as provided in the Master Agreement, make copies of the documentation, the FLEXDATA™ Software, or portions thereof.
   3) Remove any proprietary notices or labels on the FLEXDATA™ Software or Equipment.
   4) Export or use the FLEXDATA™ Software or Equipment, or use the FLEXDATA™ Software, Equipment or Services to provide services, in violation of any United States export laws, rules or regulations.

B. **High Risk Activities:** The FLEXDATA™ Service is not fault tolerant. FLEXDATA™ Service is not designed, manufactured or intended for use or resale on equipment used in hazardous environments requiring fail-safe performance, such as in the operation of nuclear facilities, aircraft navigation or communication systems, air-traffic control, direct life support machines, or weapons systems, in which the failure of the FLEXDATA™ Service could lead directly to death, personal injury, or severe physical or environmental damage ("High Risk Activities"). **RSL AND ITS SUPPLIERS SPECIFICALLY DISCLAIM ANY EXPRESS OR IMPLIED WARRANTY OF FITNESS FOR HIGH RISK ACTIVITIES.**



**Exhibit A**
**Authorized Representative**

Client may amend their Authorized Representative list by notifying their Account Executive by fax or e-mail. RSL may amend their Authorized Representative list by notifying Client's authorized contact by fax or e-mail. Changes will be accepted upon execution of an amendment by both Client and RSL.

The following persons are designated as the Authorized Representative of Client:

Name: _STEVE BRASWELL_   Title: _INFRASTRUCTURE ARCHITECT_

Name: _TODD SUCHLAND_   Title: _DR SPECIALIST_

Name: _PHIL WOODS_   Title: _DIRECTOR IT_

The following persons are designated as the Authorized Representative of RSL:

Name: Fred Schwanke   Title: Director Operations

Name: D. Eric Venters   Title: President

Name: Matthew Smith   Title: Vice President, Sales

**Exhibit B**
**RSL Recovery Support Team Charges**

Basic Recovery Support Team – up to 3 members:      $1500.00 each person per day
Each additional member:      $  750.00 each person per day

Client shall additionally pay all reasonable travel, lodging, meals, and all other expenses related to the Recovery Support Team's support at Client's disaster recovery operation.

**Exhibit C**
**Microsoft License Agreement for End Users using a Microsoft Product on a Rental Computer**

This computer system contains one or more Microsoft Products which are licensed to Recovery Site Logistics as a sublicensee of Recovery Site Logistics, Client is bound by the terms of this Rental Sublicensee License Agreement.

Microsoft Corporation has licensed the software to Recovery Site Logistics and Recovery Site Logistics has sublicensed the use of this software to Client on the terms below.  Client will not be able to use this Microsoft software unless Client agrees to the following terms:

MICROSOFT SOFTWARE LICENSE
1. GRANT OF LICENSE.  This Microsoft License Agreement ("License") permits Client to use one copy of the specified version of the Microsoft software product(s) identified above ("SOFTWARE") on the equipment, provided the SOFTWARE is in use on only one computer at any time during the period Client is a customer.  The SOFTWARE is "in use" on equipment when it is loaded into the temporary memory (i.e., RAM) or installed into the permanent memory (e.g., hard disk, CD ROM, or other storage device) of the equipment.
2. COPYRIGHT.  The SOFTWARE is owned by Microsoft or its suppliers and is protected by United States copyright laws and international treaty provisions.  Therefore, Client must treat the SOFTWARE like any other copyrighted material (e.g., a book or musical recording).  Client may not copy the SOFTWARE or written materials accompanying the SOFTWARE.
3. OTHER RESTRICTIONS.  This Microsoft License Agreement is Client's proof of license to exercise the rights granted herein.  Client may not rent or lease the SOFTWARE or otherwise transfer your rights hereunder.  Client may not reverse engineer, decompile, or disassemble the SOFTWARE.

**WARRANTY**
**SOFTWARE PROVIDED "AS IS".**  **THE PRODUCTS, PRODUCT MATERIALS AND ANY OTHER SERVICES, MATERIAL AND SOFTWARE PROVIDED BY MICROSOFT AND/OR SUBLICENSED TO CLIENT ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND.  NO OTHER WARRANTIES.**  **Microsoft disclaims all warranties, either expressed or implied, including but not limited to implied warranties of merchantability and fitness for a particular purpose, with respect to the SOFTWARE, the accompanying written materials, and any accompanying hardware.**

**NO LIABILITY FOR CONSEQUENTIAL DAMAGES.**  **In no event shall Microsoft or its suppliers be liable for any damages whatsoever (including, without limitation, damages for loss of business profits, business interruption, loss of business information, or other pecuniary loss) arising out of the use or inability to use the SOFTWARE, even if Microsoft has been advised of the possibility of such damages.  Because some states do not allow the exclusion or limitation of liability for consequential or incidental damages, the above limitation may not apply to Client.**

This Agreement is governed by the laws of the State of Washington.



# RSL

## D I S A S T E R   R E C O V E R Y

### No Downtime. No Worries.

**SCHEDULE A DATED JANUARY 1, 2011**
**BETWEEN RECOVERY SITE LOGISTICS, LLC ("RSL")**
**AND THE STANDARD REGISTER COMPANY ("CLIENT")**

**I.  The Standard Register Company**

600 Albany Street
Dayton Ohio 45408

Contact: Steven Braswell
Phone:  (937) 221-1118
Email:  steven.braswell@standardregister.com

**II.  Recovery Site Logistics, LLC**

6475 Perimiter Dr. #102
Dublin, Ohoi 43016

Sales:  Matt Smith
Phone: (614) 526-1127
Email:  msmith@rsldr.com

Operations: Fred Schwanke
Phone: (614) 526-1120
Email: fschwanke@rsldr.com

**III.  TECHNOLOGY**

| Hardware Configurations | Qty | Subscription Fees Per Month | Declaration Usage Fee Per Unit Per Day | Testing Usage Fee Per Unit Per Day |
|---|---|---|---|---|
| **BUSINESS RECOVERY CENTER (BRC)**<br><br>*Location:*<br>  Recovery Site Logistics<br>  8235 Estates Parkway<br>  Plain City, OH 43064<br>*BRC Includes:*<br>  24-Hour Controlled Security Access<br>  Climate-Controlled Environment<br>  Smoke And Fire Protection<br>  Availability of Backup Generator/UPS<br>  Conference Room, Break Room and Parking | 1 | Included | N/A | N/A |
| *Client Recovery Seats*<br><br>*Client Work Group Positions*<br>  Includes work space/cube, chair and phone<br>  Includes minimum Desktop PC Configuration:<br>    2.8 GHz Processor<br>    512 MB RAM<br>    40 GB Hard Drive<br>    10/100/1000 Ethernet Card<br>    CD-ROM<br>    Keyboard/Mouse/Monitor<br>  Includes Voice Connectivity<br>    (50) Phone Extensions with Voice Mail<br>    Hunt Group and Call Re-Routing | 50 | Included | $10.00 | $5.00 |
| *Business Recovery Infrastructure*<br>  Local Network Connectivity<br>  Network Office Printer (2)<br>  Fax Machine and Copier | 1 | Included | N/A | N/A |

Client Initials _____

Rev 58812

| | | | | |
|---|---|---|---|---|
| **HOSTING RECOVERY CENTER** | 1 | Included | N/A | N/A |
| *Burstable Internet Connectivity*<br>1MB Dedicated with up 15 MB burstable<br>with Client provided router | 1 | Included | $100 per burstable Mbps used | $100 per burstable Mbps used |

## IV. CONTRACT TERMS

| | |
|---|---|
| **MONTHLY RETAINER FEE:** | Included |
| **ONE TIME SET UP FEE** | Included |
| **TERM OF SCHEDULE:** | 60 Months from the effective date of the Master Agreement |

## V. DISASTER DECLARATION TERMS

Client may declare the full or partial scheduled hardware listed above.  Declaration rates are based on a minimum five (5) day usage at the rates provided above.

## VI. DISASTER TESTING TERMS

BRC Equipment Test Time - one (48) hour test slot per year included at no charge.

Beyond the BRC Test Time listed above, Client may test the full or partial hardware listed on the Schedule A.
Testing rates above the annual 48 hour test slot are based on a minimum five (5) day usage at the rates provided above.
Burstable Internet usage is based on a rate of $100 per Mbps used and billed monthly.

## VII. GENERAL TERMS

A.  Price valid with signature on or before December 30, 2010.

**THE STANDARD REGISTER COMPANY**

NAME: Joseph Morgan

TITLE: President - CEO

SIGNATURE: N-RA

DATE: 12/21/10

**RECOVERY SITE LOGISTICS, LLC**

NAME: D. Eric Vesta

TITLE: PRESIDENT

SIGNATURE:

DATE: 12/22/10



**RSL**
DISASTER RECOVERY
No Downtime. No Worries.

**SCHEDULE D (Phase I) DATED JANUARY 1, 2011**
**BETWEEN RECOVERY SITE LOGISTICS, LLC ("RSL")**
**AND THE STANDARD REGISTER COMPANY ("CLIENT")**

**I. The Standard Register Company**

600 Albany Street
Dayton, Ohio 45408

Contact:   Steve Braswell
Phone:     (937) 221-1118
Email:     steven.braswell@standardregister.com

Client Number:

Reference Number:  RRS10121010-RSL-SR03

**II. Recovery Site Logistics, LLC**

6475 Perimiter DR. #102
Dublin, Ohio 43016

Sales:    Matt Smith
Phone:   (614) 526-1127
Email:   msmith@rsldr.com

Operations: Fred Schwanke
Phone:    (614) 526-1120
Email:    fschwanke@rsldr.com

**III. TECHNOLOGY**

**DROPSHIP EQUIPMENT**

| Hardware Configurations | | Qty | | Declaration / Usage Fee Per Unit Per Day | Notes | |
|---|---|---|---|---|---|---|
| **HP BL 480c Blade Server**<br>Dual 2.33 GHz Quad-core Xeon Processors<br>64 GB RAM<br>Smart Array P400i Controller (On-Board)<br>146 GB Physical Hard Drive Space (73 x 2)<br>(2) 10/100/1000 Ethernet Ports (On-board)<br>(2) 10/100/1000 Multifunction Ethernet Ports (On-board)<br>(2) Emulex 4Gbps Fibre Channel Ports (Mezzanine) | | 32 | | $193 | C-Class Blades | |
| **HP BladeSystem C7000 Enclosure**<br>(2) Onboard Administrator Modules<br>Single Phase Power Module<br>(6) Hot-Plug Power Supplies<br>(10) Active Cool Fans<br>(2) HP 1/10Gb Virtual Connect Ethernet Modules<br>(2) HP 4Gb Virtual Connect Fibre Channel Modules | | 4 | | $60 | C-Class Chassis | |
| **Dell Power Edge 2950 Server**<br>Dual 2.33 GHz Quad Core Xeon Processors<br>48 GB RAM<br>PERC 5 Array Controller (On-Board)<br>584 GB Physical Hard Drive Space (146 x 4)<br>DVD/CD-RW<br>(4) USB 2.0 Ports (On-Board)<br>(2) 10/100/1000 Ethernet Ports (On-Board)<br>Rail Kit<br>Keyboard, Mouse, Monitor | | 14 | | $200 | Dedicated | |

| | | | | | |
|---|---|---|---|---|---|
| **Dell Power Edge 2950 Server**<br>   Dual 2.66 GHz Quad Core Xeon Processors<br>   16 GB RAM<br>   PERC 5 Array Controller (On-Board)<br>   730 GB Physical Hard Drive Space (146 x 5)<br>   DVD/CD-RW<br>   (4) USB 2.0 Ports (On-Board)<br>   (2) 10/100/1000 Ethernet Ports (On-Board)<br>   Rail Kit<br>   Keyboard, Mouse, Monitor<br>   4-port Gigabit Ethernet Adapter | | 3 | | $60 | **Firewall<br>Mgmt Station** | |
| **IBM pSeries 550 9133-55A**<br>   Dual 1.65GHz PowerS+ Processor<br>   32 GB RAM<br>   292 GB Physical Disk Drive Space (73 x 4)<br>   DVD-ROM<br>   36/72GB 4mm Tape Drive<br>   (2) 10/100/1000 Ethernet Ports (On-Board)<br>   4-Port Gigabit Ethernet Adapter | | 1 | | $298 | **HA** | |
| **Sun Enterprise M4000**<br>   Quad x 2.53 GHz Quad-Core SPARC64 Processors<br>   64 GB RAM<br>   146 GB Physical Disk Drive Space (73 x 2)<br>   DVD-ROM<br>   (2) 10/100/1000 Ethernet ports (On-Board)<br>   (2) Dual-Port 4Gbps Fibre Channel HBA | | 1 | | $1,596 | **SUN Environment** | |
| **HP DL 380 G5 Server**<br>   Dual 2.33 GHz Quad-Core Xeon Processor<br>   8 GB RAM<br>   Smart Array P400 RAID Controller<br>   438 GB Physical Hard Drive Space (146 x 3)<br>   DVD-ROM<br>   (4) USB 2.0 Ports (On-Board)<br>   (2) 10/100/1000 Ethernet Ports (On-Board)<br>   Rail Kit<br>   Keyboard, Mouse, Monitor | | 1 | | $39 | **Cisco Unity VM Server** | |
| **Cisco ASA5520 Firewall Edition**<br>   512 MB RAM, 64 MB Flash<br>   750 IPsec VPN Peers<br>   (4) Gigabit Ethernet Ports<br>   10/100 Fast Ethernet Port | | 1 | | $53 | **VPN 3030<br>Concentrator** | |
| **Cisco 11506 Content Services Switch**<br>   Switch Control Module<br>   (2) SFP-based Gigabit Ethernet Ports<br>   SSL Termination and HTTP Compression | | 3 | | $67 | **Content Switch** | |
| **Cisco 2821 Router**<br>   512 MB RAM, 256 MB Flash<br>   SP Services IOS<br>   SRST Feature License - 48 Users<br>   (2) 10/100/1000 Ethernet Ports<br>   (1) PVDM2-64 Voice DSP Module | | 1 | | $46 | **PDN router** | |

Client Initials _JADEV_               Page 2 of 4               Rev. 39510

| | | | | | |
|---|---|---|---|---|---|
| Cisco 3825 Router<br>   256 MB RAM, 64 MB Flash<br>   Advanced IP Services IOS<br>   VPN Module (EPII-PLUS)<br>   (2) 10/100/1000 Ethernet Ports | | 1 | | $56 | Internet router |
| Cisco 6509 Switch<br>   Supervisor Engine 720-3B<br>      512 MB RAM, 128 MB Flash<br>   (1) 48-Port 10/100/1000 Ethernet Module (WS-X6748-GE-TX)<br>   (1) 3000W Power Supply | | 1 | | $60 | Core |
| Cisco 6509 Switch<br>   Supervisor Engine 720-3B<br>      512 MB RAM, 128 MB Flash<br>   (3) 48-Port 10/100/1000 Ethernet Module (WS-X6748-GE-TX)<br>   (1) 3000W Power Supply | | 1 | | $60 | DMZ 6509 |
| Cisco 6509 Switch<br>   Supervisor Engine 720-3B<br>      512 MB RAM, 128 MB Flash<br>   (8) 48-Port 10/100/1000 Ethernet Module (WS-X6748-GE-TX)<br>   (2) 3000W Power Supply | | 2 | | $630 | Access 6509 |

## IV.  CONTRACT TERMS

| | |
|---|---|
| MONTHLY RETAINER FEE: | $26,408.00 |
| CLIENT DISCOUNT: | ($6,227.00) |
| NET MONTHLY RETAINER FEE: | $20,181.00 |
| TERM OF SCHEDULE: | 60 Months from the effective date of the Master Agreement |
| SHORT TERM FEE: | $22,199.00  Three (3) Month Increments |

Drop Ship price will change accordingly when the initial Hosting Recovery Schedule will be executed on or before June 30, 2011

## V.  DISASTER DECLARATION TERMS

Client may declare the full or partial scheduled hardware listed above.  Declaration rates are based
on a minimum five (5) day usage at the rates provided above.

## VI.  DISASTER TESTING TERMS

Client may test the full or partial hardware listed above.  Testing rates are based on a minimum
five (5) day usage at the rates provided above. Client responsible for all shipping and installation
charges with Drop Ship equipment.

## VII.  GENERAL TERMS

A. Should Client declare a disaster under the terms and  conditions set forth in the Master Agreement, RSL
agrees to provide adequate floor space and Internet access to Client for Disaster Recovery.

B. Price Valid with signature on or before December 30, 2010

THE STANDARD REGISTER COMPANY

NAME: Joseph Morgan

TITLE: President/CEO

SIGNATURE:

DATE: 12/21/10

Client Initials

RECOVERY SITE LOGISTICS, LLC

NAME: D. Eric Weiner

TITLE: President

SIGNATURE:

DATE: 12/22/10

# Disaster Recovery Master Agreement

## Contract Addendum 1

In accordance with the Disaster Recovery Master Agreement between The Standard Register Company, an Ohio corporation (Client) and Recovery Site Logistics, LLC, an Ohio limited liability company, (RSL), executed by RSL on December 22, 2010, both Parties hereby agree to amend the provisions of the Agreement dated January 1, 2011 as follows:

1. Schedule D ( Phase-I) dated January 1, 2011

   Extend the three (3) month increment beyond June 30, 2011 at the same monthly rate of $22,199.00 to December 31, 2011. Schedule D (Phase-I) will be modified and or expire once Schedule B and Schedule D (Phase-II) are signed and executed.

2. Schedule B dated January 1, 2011

   Change item E text under VII. GENERAL TERMS from
   E. Price valid with signature on or before June 30, 2011

   To the following statement:
   E. Price valid with signature on or before September 1, 2011.

3. Schedule D (Phase-II) dated January 1, 2011

   Change item A. text under VII. GENERAL TERMS from
   A. Price valid with signature on or before June 30, 2011

   To the following statement:
   A. Price valid with signature on or before September 1, 2011

This Amendment does not change, terminate, or waive any other provisions of the Disaster Recovery Master Agreement. The persons signing below on behalf of each Party represent and warrant that they are duly authorized agents of respective companies to execute this Amendment and bind their respective Parties to the terms and conditions of this Amendment.

THE STANDARD REGISTER COMPANY

NAME:

TITLE:

SINGNAURE:

DATE: 6/23/11

RECOVERY SITE LOGISTIS, LLC

NAME: L. Fred Schwanke

TITLE: COO

SINGATURE:

DATE: 6/29/11

# Disaster Recovery Master Agreement

## Contract Addendum 2

In accordance with the Disaster Recovery Master Agreement between The Standard Register Company, an Ohio corporation (Client) and Recovery Site Logistics, LLC, an Ohio limited liability company, (RSL), executed by RSL on December 22, 2010, both Parties hereby agree to amend the provisions of the Agreement dated January 1, 2011 as follows:

1. Schedule D ( Phase-I) dated January 1, 2011

   Extend the Schedule at the same monthly rate of $22,199.00 through the end of term as stated in the Master Agreement. Schedule D (Phase-I) will be modified and or expire once Schedule B and Schedule D (Phase-II) are signed and executed.

2. Schedule B dated January 1, 2011

   Remove item F text under VII. GENERAL TERMS as stated on Contract Addendum 1.

3. Schedule D (Phase-II) dated January 1, 2011

   Remove item A. text under VII. GENERAL TERMS as stated on Contract Addendum 1.

This Amendment does not change, terminate, or waive any other provisions of the Disaster Recovery Master Agreement.  The persons signing below on behalf of each Party represent and warrant that they are duly authorized agents of respective companies to execute this Amendment and bind their respective Parties to the terms and conditions of this Amendment.

THE STANDARD REGISTER COMPANY

NAME:_____

TITLE:_____

SINGNAURE:_____

DATE:_____

RECOVERY SITE LOGISTIS, LLC

NAME:_____

TITLE:_____COO_____

SINGATURE:_____

DATE:_____11/21/11_____

## **APPENDIX 2**



**Standard Register®**
ADVANCING YOUR REPUTATION

| P.O. Number must be on all Invoices, Packing Slips, & Correspondence. | | **Purchase Order** | |
|---|---|---|---|
| | | **259666** | Rev. 0 |

**Billing Address: Attention Accounts Payable**
Standard Register
P.O. Box 2245
Dayton, OH 45401–2245

**Vendor Name:**
RECOVERY SITE LOGISTICS
6475 PERIMETER DRIVE
#102
DUBLIN, OH 43016

**Correspondence and Acknowledgments: Attention Purchasing**
Standard Register
600 Albany Street
Dayton, OH 45417–3405

| Date: | Payment Terms: | Purchasing Contact: | Phone No: |
|---|---|---|---|
| 12/02/2014 | 2% 20 DAYS NET 30 | Matthew Blockberger | (937) 221-1747 |
| Freight: | FOB: | Carrier: | Fax No: |

| Line # | Quantity | Unit of Measure | Description | Required Delivery Date | Unit Price | Taxable |
|---|---|---|---|---|---|---|
| 1 | 12 | MTH | Business Recovery Center (A) & Drop Ship Equipment Service (D) Retainer Amendment 2: Year 4 of 5 (Billed Monthly).  January 1, 2015 – December 31, 2015 SHIP TO: 600 Albany Street Dayton,OH 45417–3405 DELIVER TO: Carrier, Erin Elizabeth (12) | 11/26/2014 | 22,199.00000 | Y |

Standard Register

| | | Total: | **266,388.00** |
|---|---|---|---|
| | | Currency: | USD |

**Purchase Order Terms & Conditions can be accessed electronically at http://standardregister.com/company/partners-suppliers/po-terms**

Electronically signed by
**Matthew Blockberger**

Page 1 of 1