UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 15-10541 (BLS) |
| | ) | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.,* | ) | |
| | ) | |
| _____Debtors._____ | ) | |
| EISNERAMPER LLP, NOT IN ITS | ) | |
| INDIVIDUAL CAPACITY BUT AS | ) | |
| TRUSTEE OF THE SRC | ) | |
| LIQUIDATING GUC TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 15-50771 |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH P. MORGAN, JR., ROY W. | ) | Courtroom No. 1 |
| BEGLEY, JR., F. DAVID CLARKE, | ) | 824 Market Street |
| III, JOHN Q. SHERMAN, II, | ) | |
| JULIE D. KLAPSTEIN, JOHN J. | ) | February 8, 2016 |
| SCHIFF, JR., ROBERT M. GINNAN, | ) | 10:00 A.M. |
| R. ERIC MCCARTHEY, JOHN DOES | ) | |
| 1-10, AND XYZ COMPANIES 1-10, | ) | |
| | ) | |
| _____Defendants._____ | ) | |

TRANSCRIPT OF HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

ECRO:                    DANA MOORE

Transcription Service:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         Telephone:  (302) 654-8080
                         E-Mail:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording:
transcript produced by transcription service.

```
 1   APPEARANCES:

 2   For the Debtors:          Lowenstein Sandler LLP
                               By:  SHARON LEVINE, ESQUIRE
 3                             65 Livingston Avenue
                               Roseland, New Jersey 07068
 4
     For Robert Ginnan:        Jones Day LLP
 5                             By:  MARJORIE DUFFY, ESQUIRE
                               325 John H. McConnell Boulevard
 6                             Suite 600
                               Columbus, Ohio 43215
 7
     For the Six Independent Director Defendants:
 8                             Morrison & Foerster
                               By:  JAMES KOUKIOS, ESQUIRE
 9                             2000 Pennsylvania Avenue, NW
                               Suite 6000
10                             Washington, D.C. 20006-1888

11   For Joseph Morgan:        Squire Patton Boggs
                               By:  JOSEPH WEINSTEIN, ESQUIRE
12                             4900 Key Tower 127 Public Square
                               Cleveland, Ohio 44114
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                          <u>Page</u>

3  <u>NOTICE OF AGENDA MATTERS:</u>
For the Independent Director Officers, by Mr. Koukios        4
4  For Robert Ginnan, by Ms. Duffy                            29
   For Joseph Morgan, by Mr. Weinstein                        43
5  For the Debtors, by Ms. Levine

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  All rise.

2        THE COURT:  Please be seated.  Good morning.

3        Argument scheduled for today.  Ready to proceed?

4        MR. KOUKIOS:  Yes, Your Honor.

5        THE COURT:  Welcome.

6        MR. KOUKIOS:  Thank you.

7        Good morning, Your Honor.  My name is James Koukios

8   from the law firm of Morrison Foerster.  We represent the six

9   independent director Defendants.  And also here from Morrison

10  Foerster are Carl Loewenson Jr., and Jim Peck.

11       THE COURT:  Welcome.

12       MR. KOUKIOS:  So along with counsel for Mr. Morgan

13  and Mr. Ginnan.

14       As you know, we filed a joint motion to dismiss the

15  breach of fiduciary duty and fraudulent transfer claims

16  alleged in the amended complaint.  Although it's a joint

17  motion, and although the parties on this side agree that the

18  claims are insufficiently plead and, ultimately, meritless,

19  we believe that there are a handful of discreet issues that

20  applied differently to the directors.

21       THE COURT:  They're a different priority.

22       MR. KOUKIOS:  Exactly.

23       THE COURT:  That's appeared in the briefing, but I'm

24  happy to allow parties to walk through that.

25       MR. KOUKIOS:  Thank you, Judge.

1    So if it pleases the Court, I'm going to start out

2  by addressing the breach of fiduciary duty claim as it

3  applies to the directors.  Then, Ms. Duffy is going to

4  address those claims as they apply to the officers.  Then,

5  Mr. Weinstein is going to address the fraudulent transfer

6  claims.

7    THE COURT:  I think that makes sense.

8    Ms. Levine, does that make sense to, basically, hear

9  from everybody and then you can respond comprehensively.

10    MS. LEVINE:  Yes.  Thank you.

11    THE COURT:  Very well.  All right, you may proceed.

12    MR. KOUKIOS:  Thank you, Your Honor.

13    The crux of our argument today, as to why the breach

14  of fiduciary duty claims should be dismissed against the

15  independent directors is, 1) the Trustee has failed to plead

16  sufficient facts to overcome the presumption under Ohio Law

17  that the directors acted reasonably, in good faith and with

18  the requisite care in approving the WorkflowOne acquisition

19  and 2) that the Trustee has, likewise, failed to plead

20  sufficient facts to establish that the directors approved the

21  WorkflowOne acquisition with the deliberate intent to injure

22  Standard Register or with reckless for Standard Register's

23  best interests.

24    Rather than alleging these sufficient factual

25  matter, as required under *Iqbal and Twombly,* to show that the

1  decision to acquire WorkflowOne was beyond the protection of

2  the Business Judgment Rule at the time it was made.  The

3  Trustee relies on labels and hindsight based conclusions.  So

4  our motion builds on the mutually re-enforcing legal

5  standards of the Ohio Business Judgment Law and the 12(b)(6)

6  standards set forth by the Supreme Court in *Twombly and*

7  *Iqbal.*

8          THE COURT:  There may be distinctions around the

9  edges, but am I correct, in my review of your briefing as

10  well as, obviously, the responses, that in broad brush the

11  Ohio Business Judgment Rule has similar function and,

12  basically, the same contours as this Court would be familiar

13  with under Delaware Law.  Is that a fair statement?

14          MR. KOUKIOS:  It is very similar, Your Honor.  They,

15  actually, have codified it in the statute and it has a couple

16  unique aspects to it that have to be addressed.  I think,

17  some are different.  I think they are very similar and Ohio

18  Law says, you know, where there is not Case Law in Ohio or

19  where similar in Ohio to Delaware, you should apply similar

20  standards.  I think it's a little bit different.  And I did

21  want to walk through some of those specific Ohio issues with

22  Your Honor today.

23          THE COURT:  Sure.

24          MR. KOUKIOS:  We think that the Ohio Business

25  Judgement Statute, given its protective nature of directors

1  and officers, combined with the *Twombly and Iqbal* Standard,

2  are mutually re-enforcing in that both favor the dismissal of

3  inadequately pled claims in order to avoid the expense of

4  discovery and reduce litigation costs.

5        In this case, in particular, Your Honor, the

6  failings of the amended complaint are particularly glaring

7  and inexcusable when one considers the extensive discovery

8  into the projections, into the board meetings and things like

9  that, that the Trustee already had when it had already

10 received and reviewed before the filing.

11       THE COURT:  How much does that factor into my

12 analysis?  I saw it touched on in the pleadings.  And your

13 familiar, I'm sure, with Case Law that suggests that when we

14 are dealing with true Trustees, you know, a Chapter 7 Trustee

15 or somebody else that comes into, often, a mess of a

16 situation, Case Law supports the proposition that there is a

17 lower threshold for that Trustee to meet, recognizing that

18 they don't' necessarily have all the institutional knowledge.

19       I have wondered whether or not you're, sort of,

20 imposing the flip side of that coin where you've got a

21 Liquidating Trustee that is the successor, effectively, to a

22 Committee that had all the benefits of Discovery Rule 2004

23 and whatever else they would get during the bankruptcy case.

24 Is there, as a practical matter, a more rigorous standard

25 because of that?

1    MR. KOUKIOS:  I think so, Your Honor.  I think it

2  makes sense in this case, especially when you consider the

3  policies underlying the Business Judgment Rule in Ohio and

4  *Iqbal and Twombly,* which is to avoid extensive discovery and

5  litigation costs.

6    The fact of the matter here is the complaint is not

7  going to get any better.  You know, the "linchpin", as they

8  call it in their argument, of the fiduciary duty claims, for

9  the breach of the duty of care is the projections.  It had

10  the projections.  It had the projections for months, and

11  months and months.  Now, they have, presumably, even more

12  documents as a result of the factors that Your Honor just

13  mentioned.

14    The best they can say, that was wrong with those

15  projections, is that the revenue growth was too high.  If you

16  look at page 12 to 13, they have a bullet point list in their

17  opposition brief.  Every single bullet point, except for one,

18  mentions, and the other one mentioned is just an introductory

19  bullet point, revenue growth.  The "linchpin" of this claim

20  is that their projections were unreasonable because it

21  projected revenue growth.  That is the best they could, Your

22  Honor.

23    The cases, for example, *Miramar Firefighters and*

24  *Solessa* (ph), I probably pronounced that one wrong, but those

25  cases both say, you know, in order to allege this type of

1  claim, you really have to point out the errors in the

2  projections.  What was wrong with the methodology?  What was

3  wrong with the input?  I think one of the cases uses that

4  word, inputs that went into it.  Here, all they say is the

5  projected revenue to be too high.

6          THE COURT:  Well, I think I'd ask -- this is

7  softball, so it's coming.  But, revenues are always rosy.

8          MR. KOUKIOS:  Yes.

9          THE COURT:  If they weren't, I wouldn't have a job.

10          But beyond that, the fact that they are incorrect or

11  they relied on, maybe, ones that could have withstood some

12  rigorous scrutiny, even if you acknowledge that -- if you

13  were to stand there today and say, you know something, these

14  numbers presented to the board suggested returns, suggested a

15  growth in the paper and printing business that anybody with a

16  pulse would not really have -- that's probably too strong.

17  That would not certainly be consistent with what industry

18  trends have been.  Maybe they had their reasons or not.

19          The Business Judgment Rule is not just about -- the

20  Business Judgment Rule at a standard in Ohio, as I understand

21  it, is sufficiently broad that I don't even know that you

22  need to defend the projections as much as you do.  I know

23  that you do and the methodology.  Even if you said somebody

24  that really knows what they are doing with these projections

25  would have probably put greater weight on X, Y or Z where a

1    multiple was really, really not supportable.  Again, we

2    conduct valuation trials all the time.  We get very

3    experienced people.

4            MR. KOUKIOS:  Right.

5            THE COURT:  You know, coming in and testifying that

6    the multiple is 5.7 or 8.1 and you get somebody, again,

7    qualified, cleared that says the company is worth a billion

8    one and he went to Wharton and the other guy from Dartmouth

9    says that its worth $6 billion dollars.  So either of those

10   analysis, right, fall within the scope of the business

11   judgment protections so long as they exercise a modicum of

12   diligence, is that fair?

13           MR. KOUKIOS:  I agree with Your Honor.  Instead of a

14   softball, I'll call it a chip shot field goal since we are on

15   Super Bowl Monday now.  But, absolutely right, Your Honor.

16           That is the biggest problem in this complaint, on

17   the projection side, from our perspective is that it says the

18   revenue growth was too optimistic.  And that's all it says,

19   as a result.  It doesn't get into any of the problems that

20   went into that, which could, arguably, take it outside of the

21   Business Judgment Rule.  You are absolutely right, Your

22   Honor.

23           I think one, particularly, glaring problem here as

24   well is they say, in the complaint, outside analysist said

25   that, you know, that this wasn't going to do so well.  Well,

1  that's all well and good, but the directors here have inside

2  information.  They were able to look at their own business.

3  They were able to look at WorkflowOne's business.  They were

4  able to put it together and see, from their perspective, what

5  the revenue growth should be.

6          They may have been wrong.  They may have been wildly

7  wrong, but they had internal information that they used and

8  relied on that the Trustee does not point out any problems

9  with that information that they used.  So we think this is a

10  Heartland Business Judgment question that the Committee and

11  the Trustee have failed to allege any of those specific

12  methodological errors, calculation errors; specific errors

13  that made those predictions unreasonable.

14          I think Your Honor, in one case, said that

15  projections tend to be optimistic by nature.  Certainly one

16  that's going to support an acquisition is going to be

17  optimistic.  If they weren't, the acquisition wouldn't have

18  gone forward.  That doesn't take it outside of the Business

19  Judgment Rule.

20          THE COURT:  Well, yeah, lots of investment banker

21  fees have been built on the word Synergy.  And whether or not

22  they are accurate or not really only plays out in time.

23          If I were to boil down your -- and we have had a lot

24  of briefing on this.  If I were to boil down your argument,

25  is it across the board for all of the Defendants?  Is it

1   their position that this is simply a hindsight attack?

2          MR. KOUKIOS:  Absolutely, 100%, Your Honor.  This is

3   a Monday morning quarterbacking.  It's just hindsight based.

4          THE COURT:  The sporting analysis.

5          MR. KOUKIOS:  Exactly, Your Honor.  Thank you for

6   catching that.  Yes, Your Honor, completely a hindsight based

7   attack.  The important thing about the Business Judgment

8   Rule, as Your Honor knows, is that it has to evaluate the

9   decision at the time it was made with the information that

10  was available.  I mean, projections are that.  They are

11  projections.  We don't have Nostradamus out there to tell us

12  this is how it's going to end up.  This is our best educated

13  guess as to how it's going to happen, especially when we

14  combine these two companies that we think have synergy's and

15  have an ability to have different customer bases where you

16  can cross-sell, where you have significant savings that are

17  in the same city so they can consolidate headquarters, things

18  like that.

19         So, absolutely.  I think the point is that the

20  reasonableness of the projections have to be viewed at the

21  time they were made and they don't have to be, ultimately,

22  correct.  In order to survive 12(b)(6) the Trustee has to

23  point out specific problems, methodological problems,

24  calculation errors, things like that.  Those still don't,

25  necessarily, get you across the goal line, but they certainly

1    need to be alleged to be in the complaint.

2         Your Honor, if I may, because we have a higher

3    business judgment statute, there are a few other things they

4    have to show.  The reasonableness of the projections is just

5    the beginning; that's just the starting point.  Under the

6    Ohio Statute, 1701.59, the directors were entitled to rely on

7    those projections as a matter of law, as a matter of Ohio

8    Business Law, unless there was some reason for them to doubt

9    the reliability and competence of the people who prepared

10   them.

11        Again, there is not a single allegation, not a shred

12   of suggestion that there is any reason that the directors

13   should have doubted management.  You know, these managers, as

14   alleged in the complaint, were they had been there for a long

15   time.  They were the people who did the company's ordinary

16   projections.  Even setting aside acquisition, they are the

17   ones who did the financial reporting's and projections.  They

18   know the industry.  They know the players down the street.

19   There is not a shred, there is not a single allegation that

20   if you read it, factual context to support a finding that the

21   directors had reason to doubt Mr. Ginnan's or Mr. Morgan's

22   competence/reliability.  That is under the Ohio Statute and

23   that is one of the things that we wanted to point out to Your

24   Honor, that that may be the case in Delaware as well, but

25   it's actually in the statute in Ohio that's extremely

1  important.

2        Then, Your Honor, it goes beyond that because then

3  there is also the part of the Ohio Statute that says the

4  reliance, the director can't avail himself or herself of the

5  reliance unless there is something that would make it

6  unwarranted.  Again, there is not a single allegation in the

7  complaint that would suggest that it was unwarranted for the

8  directors to rely on these projections produced by the CFO

9  and the CEO.

10        The same is true, Your Honor, for the fairness

11  opinion and the solvency opinion.  So all the arguments we

12  make about this apply to that as well.

13        Then, Your Honor, to go one step further in Ohio, in

14  order to get damages, the Trustee would have to prove, by

15  clear and convincing evidence, that the directors acted with

16  the deliberate intent to injure Standard Register or with

17  reckless disregard.  So, that is another hurdle that needs to

18  be plead and the Case Law says that.

19        THE COURT:  I saw that in the Case Law.  I think I

20  wanted to understand how that applies at this stage.

21        MR. KOUKIOS:  Sure.

22        THE COURT:  Because, as I'm sure your familiar --

23  again, I hate to keep bringing this back to Delaware Law, but

24  that's the prism through which I view these discussions and

25  that's at least by way of my experience.

1        MR. KOUKIOS:  Sure.

2        THE COURT:  So under Delaware Law, as a general

3   rule, we see the exculpation provision in Section 102(b)(7)

4   that says you're not going to be monetarily liable, absent

5   some higher standard.  That seemed to me to be functionally

6   equivalent.  But the ability to recover, being dependent upon

7   a more robust showing, is that a Rule 12 consideration for me

8   or is that something that is fairly articulated as yet

9   another hurdle?

10        If I were to find, for example, that perhaps they

11   shouldn't have been entitled to rely upon the projections

12   because of any number of things, something in an e-mail.  All

13   right, we don't have this, but something in an e-mail that

14   says, you know, the accountants didn't seem to actually look

15   at our books and records before they cranked these out; they

16   just hit print or something like that.

17        If you were to find, as I think the Plaintiff

18   alleges, that the exercise of entering into WorkflowOne and

19   the diligence that was associated with it was reflected, an

20   insufficient review or insufficient rigor in evaluating the

21   projections, which is really why we are doing this.  All

22   right, we are going to do this, so we're going to combine, we

23   are going to get the synergy's and we are also going to,

24   perhaps, position ourselves in a challenged industry right

25   now with maybe some more pricing power, broader footprint,

1  yada, yada.  All of those are elements that, I understood,

2  are alleged for why they entered into the agreement, but

3  anyway.

4       My question would be, if I were to find, in the

5  context of the complaint for Rule 12, that they made

6  obligations sufficient to take you out of the protections of

7  the Business Judgment Rule, but that there are not

8  allegations that would support, you know, the higher standard

9  for actual monetary recovery, is it that one/two punch?

10      MR. KOUKIOS:  I think so, Your Honor.  If you look

11 at the *Goodyear* case at Star 9, that actually says in Ohio

12 you must prove not only the breach, but also recklessness or

13 intentional harm.  It actually says that that's the intent of

14 the Ohio Statute, is to require that and it's a requirement

15 that carries over into the pleadings.

16      So, actually, Your Honor, its multi-part.  There is

17 the unreasonableness of the projections, plus the unreliable

18 and incompetence of the people preparing them, that the

19 directors knew, plus knowing some fact that made reliance

20 unwarranted, plus recklessness and intentionality.  All those

21 things need to be alleged under Ohio Law.

22      THE COURT:  Can we circle back a little bit to the

23 discussion that we started on a few minutes ago about the

24 projections. Can we circle back a little bit to the

25 discussion that we started on a few minutes ago about the

1   projections?

2          MR. KOUKIOS:  Yes.

3          THE COURT:  We had a colloquia about the

4   significance of the projections in the complaint.  To me,

5   that is an awful lot of the predicate for any claim for

6   relief.

7          The Plaintiff contends that the reliance on the

8   projections that are coming exclusively from management were;

9   first, not reasonable, second, not tested and third, because

10  they are the basis for the independent steps.  There is a

11  solvency opinion and a fairness opinion.  Both of those are

12  based on the projections.  It's the Plaintiff's position that

13  the significance or the value of those, as a defense, is

14  compromised because of the source of the projections.  I

15  would like your response.

16         MR. KOUKIOS:  And you're talking about the fairness

17  and solvency, in particular?

18         THE COURT:  In particular.

19         MR. KOUKIOS:  They are, Your Honor.

20         The first thing I was going to point out is they

21  didn't even address the solvency or the fairness opinion in

22  the complaint.  There is nothing in the complaint about the.

23  We think that's a problem because under Ohio Law, the same

24  statute, the directors are entitled to rely on the fairness

25  opinion and the solvency opinion.  We think their failure to

1  allege anything about that in the complaint, knocks them out

2  of the box right there.  They completely failed.  Not only

3  did they not overcome the burden of pleading, they didn't

4  plead it at all.  So that's number one.

5       THE COURT:  Now I am going to test you because I

6  don't want you to forget my question.

7       MR. KOUKIOS:  Yes, I will not.

8       THE COURT:  Well, we'll see.

9       When we talk about fairness opinions, this type of

10  litigation is precisely why the practice is developed.  I

11  mean, there is not a legal requirement that I'm aware of,

12  that you go and get a fairness opinion.  You do it because

13  you want to insulate the transaction and be able to

14  demonstrate that it's either -- if you're down the street at

15  the Chancery Court, and again looking at Delaware, you are

16  trying to protect or implement the transaction prospectively.

17  If you are here in our Court, you are trying to defend

18  against challenges to the sufficiency of the process.  In the

19  fairness opinion, that third party participation is critical.

20       Are those two steps, the solvency and the fairness

21  opinions -- if they're present, is it your position that

22  their existence is merely always fatal or always fatal to a

23  claim along these lines?

24       MR. KOUKIOS:  I wouldn't say always fatal, Your

25  Honor.  I would say it was fatal, absent an allegation that

1   there is something wrong with them. I think it goes into the

2   Business Judgement presumption in Ohio where the Ohio

3   Legislature made a point of saying directors are entitled to

4   rely on expert analysis.  If you wanted to overcome the

5   Business Judgment presumption by clear and convincing

6   evidence in Ohio, you need to show that there was some reason

7   for them to doubt the reliability and the competence of those

8   expert reports.

9        So it's not always fatal, but it certainly sets a

10  very high bar here.  And there needs to be an allegation that

11  you're going to be able to meet that bar.  There is nothing

12  here.

13       Judge, the idea that the -- first of all, there is a

14  reductionism in the allegations about the projections.  The

15  projections have a lot more than just revenue growth.  The

16  projections had a lot more.  The Committee knows the Trustee

17  knows that because they have had them for, at least, half a

18  year.  But they know that those projections were not just

19  based on revenue growth.

20       So to begin with, I think there is a lot of

21  reductionism and cherry picking going on there to even talk

22  about revenue growth.  The same is true for the fairness and

23  solvency opinions.  It is true that projections were provided

24  to Bank of America, Merrill Lynch and to Capstone and that

25  those were used in the mix.  But also, if you read those

1  solvency opinions and fairness opinions, it's about three

2  pages of disclaimers and one sentence of an opinion.  But it

3  says that we looked at the market, we looked at comparables;

4  we looked at other things as well to reach our conclusions.

5        So it's not just that they said, all right, revenue

6  growth, check, go forth and conquer.  That is patently

7  ridiculous.  I mean that would not happen.  In the opinions,

8  themselves, they actually say we looked at comparables on

9  market, we did some other research as well.  So to say we

10 just regurgitated the revenue growth productions is really

11 reductionist on many different levels that, we think, is not

12 fair, to say the least, but, perhaps, more importantly, not

13 even plead.

14       So, Your Honor, really under 12(b)(6), shouldn't

15 even be considering their arguments in their brief about

16 what's wrong with the solvency opinion and fairness opinion

17 because they didn't even address it in their allegations.

18       THE COURT:  Okay.  Let's get back to my earlier

19 question.

20       MR. KOUKIOS:  Sure.  Based on projections.

21       THE COURT:  Very good.

22       MR. KOUKIOS:  You know, Your Honor, I had tried to

23 answer it in what I just said.

24       THE COURT:  I think you, largely, did.

25       MR. KOUKIOS:  If it was just regurgitation, there

1  are cases that say, you know, the AlixPartners opinion where

2  AlixPartners is going to need a contingency fee and so they

3  agreed to everything management said, and just really wrapped

4  up managements opinion.  I forget the name of the case, but

5  AlixPartners was the opinion-maker on that one.

6          You know, if you throw out an allegation like that,

7  you know, maybe where there were specific things that went

8  wrong -- there are a lot of allegations in that case about

9  exactly what AlixPartners did wrong in reaching their

10 opinion.  Maybe you would have a case where an opinion based

11 only on projections is not enough.  We certainly don't have

12 that situation here and there are not allegations about it

13 here.

14         THE COURT:  Okay.

15         MR. KOUKIOS:  And, Your Honor, just to emphasize the

16 point, it's not just the fairness and solvency opinions were

17 unreasonable, you have to have all those other things as well

18 that Ohio Law composes, which is a reason to believe that

19 they were improper and relies is unwarranted, plus

20 recklessness and intentional harm.  So none of that is

21 alleged in the complaint.

22         Your Honor, I'm sure there's more I have to say

23 about the projections, but I think we covered that fairly

24 well.  I would like to touch upon the breach of loyalty

25 claim, if we can.

1      THE COURT:  Yeah.

2      MR. KOUKIOS:  I think this one is, it's a little

3  more straight forward then the projections in that there are

4  two conclusory allegations in the entire complaint about the

5  loyalty claims against the directors.

6      THE COURT:  Which is entrenchment, right?

7      MR. KOUKIOS:  Entrenchment, yes.

8      So, if you look at paragraphs 51 and 115 of the

9  amended complaint, the Trustee alleges that the independent

10 directors authorized the WorkflowOne acquisition in order to

11 "retain their equity holders" and "maintain their positions

12 of control."  That's it.  That is all they allege.  That is

13 plainly insufficient under Delaware Law, as Your Honor has

14 found in other cases, or under Ohio Law.

15     In Ohio, a Plaintiff cannot establish a breach of

16 loyalty claim merely by alleging that as a result of a

17 business decision, the directors maintain their positions and

18 continue to receive compensation.  So if you look at the

19 1701.59(d)(1)(a) -- and that's completely consistent with

20 Your Honor's finding in *Fedders,* that under Delaware Law

21 simple allegations of entrenchment motives, such as pursuing

22 a transaction or to remain in office and continue collecting

23 director fees without more are insufficient to state a claim

24 that directors are financially interested.  So those two are,

25 I think, if not exact, they are closely aligned.

1       So to properly plead an entrenchment claim, the

2   Trustee must plead factual matter, under *Iqbal and Twombly,*

3   that suggests not only that the WorkflowOne acquisition had

4   an entrenchment effect on the Standard Register directors,

5   but also that the directors approved the acquisition solely

6   or primarily in order to achieve that effect.

7       THE COURT:  It seemed to me, though, that your

8   briefing suggests that the Plaintiff is obliged to identify a

9   different path.

10      MR. KOUKIOS:  Yes.

11      THE COURT:  That would put their positions at risk.

12      MR. KOUKIOS:  Absolutely.

13      THE COURT:  Is that an affirmative obligation?

14      MR. KOUKIOS:  I think so, Your Honor, because

15  without it, it doesn't advance the ball to say that because

16  of this transaction, you stayed in office. That would be the

17  case.

18      THE COURT:  Every case.

19      MR. KOUKIOS:  Every case, right.  I mean if they

20  decided just to try to get different funding, if they tried

21  to acquire a smaller company and looking short of selling

22  out, could be alleged to have been in order to stay in

23  office.  So that can't be enough because, virtually,

24  everything other than selling out would get you there.

25      There are cases that say this; *Benihana and Bodkin*

1  talk about the fact that you really need to allege facts that
2  would show a loss of control as a result of a rejected
3  transaction and that that was the sole or primary purpose of
4  pursuing that.  There is just nothing, there is nothing at
5  all in the complaint about that.

6        I think particularly telling, Your Honor, is there
7  was a slight suggestion in one of the earlier paragraphs that
8  Standard Register was in talks with another company to sell-
9  out, to be acquired, instead of being the acquirer.  Very
10 tellingly, you know, we think the complaint stretches things,
11 but not beyond breaking.  I think this is particularly
12 important, they know from the papers they have that that
13 other company walked away.  The directors didn't reject it;
14 the other company walked away and said too rich for our
15 blood, we don't want to acquire you.  There is a hint that an
16 acquisition being acquired was considered, but even a Trustee
17 doesn't go so far as to say that it was rejected because it
18 wasn't.

19       So, Your Honor, with that there is nothing left at
20 all in the complaint that would show a primary or sole
21 motivation to entrench themselves.

22       THE COURT:  Let me ask you a question.  Speaking of
23 loyalty, and I want to make sure I got my dance card right,
24 you represent a number of directors, but non-officer
25 directors?

1         MR. KOUKIOS:  Correct.

2         THE COURT:  Okay.  And the officer directors, Mr.

3   Ginnan and Mr. Morgan?

4         MR. KOUKIOS:  Yes.

5         THE COURT:  Are both targets of, I think, Count II,

6   which is the fraudulent conveyance count.

7         MR. KOUKIOS:  That's correct.  The independent

8   directors are not.

9         THE COURT:  I want to make sure that I understand,

10  and I realize that I'm asking you to characterize the

11  Plaintiff's complaint, but the Plaintiff will have an

12  opportunity to respond.  As I understand it that claims that

13  appear in Count II on fraudulent conveyance, don't also sound

14  in a breach of loyalty.  They are fraudulent conveyance, not

15  an argument.

16        Normally when you see a CEO or a senior officer

17  getting substantial bonuses or money's coming into them, for

18  better or worse, you'll see a loyalty claim.  You are self-

19  dealing.  You are taking actions to benefit yourself,

20  potentially, at the expense of the corporation, right?

21        MR. KOUKIOS:  Yes.

22        THE COURT:  But do I accurately understand that, to

23  the extent there is a loyalty claim against all of the

24  directors, it is for entrenchment and for being motivated to

25  keep their jobs, but there is not a loyalty claim against

1  those two individuals; who I recognize are not your clients,

2  but there is not a loyalty claim against those two folks.

3  There is a fraudulent transfer claim, which is, as a

4  practical matter perhaps, a lower or different burden.  Do I

5  have that right?

6         MR. KOUKIOS:  So Ms. Duffy is going to address that

7  issue, specifically, on the loyalty issue.

8         Our directors, independent directors did not receive

9  a transaction bonus.

10         THE COURT:  Right.

11         MR. KOUKIOS:  So there is no allegation against our

12  clients that they were motivated by a transaction bonus.

13  There is the transaction bonus allegation against Morgan and

14  Ginnan, I believe.  So Ms. Duffy will be in a better position

15  to deal with that.

16         THE COURT:  All right, we'll deal with that.

17         MR. KOUKIOS:  But it's a very important point and

18  it's one of the reasons we divided it up this way, Your

19  Honor.  We, obviously, don't think that Mr. Morgan and Mr.

20  Ginnan were motivated improperly by a transaction bonus, but

21  it's important to point out that our clients, the independent

22  directors, did not receive a transaction bonus.  So it's

23  solely an entrenchment claim against them.

24         Your Honor, I think we've touched on most of the

25  things that I wanted to touch on.  I did want to point out,

1  getting back to the projections, I think one of our best

2  cases is the *Miramar Firefighters* case.

3          THE COURT:  I've seen it.

4          MR. KOUKIOS:  Yeah, so I just wanted to emphasize

5  that, I think, similar language in there that's particularly

6  useful, in our opinion, Your Honor, is that the Plaintiff

7  must explain adequately, in the amended complaint, why any of

8  the inputs used in the financial projections were, *per say,*

9  unreasonable.  I think, again, focus on inputs, not just the

10 fact that they projected growth is important.

11         Then, another quote from that case, Your Honor, "to

12 state a non-exculpated breach of fiduciary duty claim, based

13 on errors in the financial advisors analysis, requires that

14 the board relied upon what it knew was an inaccurate

15 analysis."  So just to underline that, Judge, there is just

16 no allegations whatsoever in the duty of care claim that our

17 clients knew that there were any problems with the

18 projections prepared by management and, certainly, no

19 allegations at all about the Bank of America, Merrill Lynch

20 or Capstone opinions.

21         THE COURT:  Okay.

22         MR. KOUKIOS:  And then, Your Honor, we already

23 touched on this a little bit, but, I think that Your Honor

24 started with this.  I think the discoveries are particularly

25 important in this case to consider.  Earlier in these

1  proceedings, the Standard Register Company produced,

2  approximately, 48,000 pages of documents.  Included in those

3  were all of the board minutes from 2010 through 2014, all the

4  projections that were used, the fairness opinion, the

5  solvency opinion, e-mails from four senior managers,

6  additional documents talking about the acquisition and all

7  the strategy that went into pursuing multiple possible

8  combinations.

9       This is not a case where the Plaintiffs, as you

10  eluded to earlier, Your Honor, were shooting in the dark and

11  hoping discovery would later shed light on the allegations.

12  They had everything at their disposal to make this an

13  adequate complaint.  If there really was an error in the

14  projections or something in the methodology, they had all the

15  documents, they could have plead it, they didn't.  So this is

16  not a case that makes sense.

17       This is really a case where exercising or applying

18  the Ohio Business Judgment Statute, and *Iqbal and Twombly,*

19  would result in exactly what they are designed to do, which

20  is to try to cut-off expensive and unnecessary litigation

21  when the Plaintiffs can't even make a showing in the amended

22  complaint.  There is no excuse for it in this case and it

23  makes sense to end this now, especially as to the

24  entrenchment and breach of fiduciary duty of care claim as

25  well.

1       We believe that the amendment complaint's breach of
2   fiduciary duty claim should be dismissed as to all
3   Defendants, but, for my part, for the independent directors
4   particularly.  Thank you, Your Honor.

5       THE COURT:  Sure thing.  Ms. Duffy, welcome.

6       MS. DUFFY:  Thank you, Your Honor.  Good morning,
7   Your Honor.

8       THE COURT:  Good morning.

9       MS. DUFFY:  May I please the Court, Marjorie Duffy
10  from Jones Day on behalf of Mr. Robert Ginnan.

11      As Mr. Koukios indicated, I will be addressing the
12  fiduciary duty claims as to the officer Defendants, Mr.
13  Morgan and Mr. Ginnan, which is Count I of the amended
14  adversary complaint.

15      Your Honor, you hit the nail on the head when you
16  said that projections fall within the protections of the
17  Business Judgment Rule.  Courts recognize that projections
18  are exactly the kind of decision the Business Judgement Rule
19  respects.

20      The duty of care claim, Your Honor, should be
21  dismissed for four reasons.  To begin with, it amends to
22  nothing more than second guessing the business judgment of
23  fiduciaries.  In addition, Ohio Law requires that we presume
24  that Mr. Morgan and Mr. Ginnan acted loyally, carefully and
25  in good faith.  As such, we defer to them for the preparation

1    of projections for a company with which they are intimately

2    familiar.  That deference stems from the Ohio Supreme Court's

3    recognition that fiduciaries are far better equipped to rate

4    business judgments on a company's behalf.

5         That brings me to my next point, Your Honor.  The

6    Sixth Circuit applying Ohio Law cautions that Courts must

7    refrain from imposing liability on the basis of ex-post

8    judicial hindsight.  But that is what the Trustee asks this

9    Court to do.  The Trustee contends that projections prepared

10   for a 2013 deal were flawed because the combined company,

11   ultimately, filed for bankruptcy in 2015.  Fiduciaries,

12   however, are not required to be clairvoyant.

13        Rather, as stated by the Sixth Circuit, the Business

14   Judgment Rule recognizes that many important corporate

15   decisions are made under conditions of certainly;

16   furthermore, the Trustees' claim ignores the very nature and

17   essence of projections.  Projections are inherently forward

18   looking predictions.  They take into account a variety of

19   factors, some of which go to the future and they are, at

20   bottom and at best, as Court's recognize, educated guesses.

21        THE COURT:  Speaking of educated guesses, I asked

22   your colleague, a few moments ago, when we talk about

23   projections, and, again, I'm looking at the briefing by the

24   Plaintiff that talks about the projections.  I think can be

25   fairly read to suggest that there is a higher standard of

1  review or, perhaps, less deference if the projections are not

2  prepared by third parties or scrubbed by independent

3  professionals.  Again, they have cited *Talsa* and a couple

4  other decisions that I recall.  I apologize, I don't have it

5  in front of me, but I'm sure you saw it.

6          In order to have the benefit of the Business

7  Judgment Rule, I don't debate any of the propositions that

8  you make.  Again, at the risk of being flip, if projections

9  were that easy or hitting them were that easy, I would not

10  have a job.  But is there, in fact, either under Ohio Law or

11  as a general proposition, a two tiered reviewed.  If you got

12  company projections, probably, you may not be fully

13  protected.  If you get projections that are scrubbed or

14  reviewed by professionals, then you are thoroughly entitled

15  to rely on them.

16          That is implicate, I think, in the Plaintiff's

17  argument, that everything falls from flood projections

18  exclusively from the company, and a garbage in/garbage out

19  kind of theory, and a criticism of the board for relying upon

20  them unjustly.  I think that is a fair characterization and I

21  would like your response.

22          MS. DUFFY:  Your Honor, I think there are three

23  responses.  One, I think Court's recognize that, contrary to

24  the motion that independent third parties, whether

25  contemporaneously or, in this case, after the fact, are

1  coming in and second guessing projections.

2         I think that it is not the case that Court's look

3  askance at projections prepared by management.  Management,

4  in this case, knew the company better than anyone.  They know

5  the company.  They know the industry.  They know the trends,

6  historically and what they foresee the future to be.  They

7  know all of the inputs, not just one component, such as

8  revenue, all of the inputs that go into the projections, Your

9  Honor.

10        I think that Court's actually view projections

11  prepared in ordinary course as being reliable.  They aren't

12  generated in support of litigation.  They aren't expert

13  driven.  They aren't after the fact hindsight guessing.  They

14  were prepared by fiduciaries, based on what they knew at the

15  time, doing the best job that they could and brining their

16  own experience, to bear, to prepare those projections.  I

17  don't think it's true, Your Honor, and I don't think the Case

18  Law suggests that management prepared projections are somehow

19  deficient if they are prepared by, you know, insiders of the

20  company.

21        THE COURT:  Still then on projections.  There is an

22  interesting disconnect, at least from where I sit.  I see

23  projections, really, in two contexts.

24        The first is this context, which means that the

25  company was, an allegation that the company was ill-managed,

1   that its projections were unreasonable and it has tumbled off

2   the cliff and into my Court because of those projections.

3   There, we generally don't have an issue about whether the

4   projections were, in fact, accurate because we know.   All

5   right, you can look.   These are projections from 2013 and we

6   are in 2016.   So we know.

7           The other side of it is an evaluation context, which

8   is not today.   I usually get a projection, business

9   projections made by the Debtor, stretching out five years, to

10  support or undercut a particular analysis, a particular

11  guess.   I have this discussion all the time in the context of

12  valuation where we test, not only the inputs and the

13  accuracy, but, frankly, the *bonafides* of the process in a

14  valuation context.

15          Here the analysis, I think, is much more focused.

16  It doesn't matter that the projections that the Debtors'

17  estimate of where the business would go was wrong.

18          MS. DUFFY:   That's exactly right, Your Honor.   That

19  is exactly right.

20          That is the point.   The Business Judgment Rule says

21  we are not doing hindsight second guessing.   We are looking

22  at what the officers knew and did at the time.   The fact that

23  subsequent events diverge from their predictions is

24  irrelevant for purposes of this, Your Honor.

25          I think that brings to mind two important points

1  here.  First, the Trustee concedes the qualifications of Mr.

2  Morgan and Mr. Ginnan to preparation of the projections.

3  Your Honor understands, in a state of the notion, that this

4  is a process by which the preparations are prepared.  One

5  side of the process is who prepared them.  We touched on that

6  a little bit before, Your Honor, with respect to the

7  management prepared projections, but a little bit of emphasis

8  here that this is not the case where uniformed individuals

9  were coming and pressing print, as Your Honor said before,

10 without any further consideration.  They were not unfamiliar

11 with the company.  They were not unfamiliar with the

12 industry.

13        Now, Mr. Morgan served as Standard Register's CEO.

14 Before that, he had been the company's chief operating

15 officer.  He spent over six years with the company.  Mr.

16 Ginnan served as CFO.  Before that had been corporate

17 controller, spending over 20 years of his career with the

18 company.

19        There is no dispute, in this case, that projections

20 were prepared by individuals with a deep understanding of the

21 company's business, extensive knowledge of the industry as a

22 whole and significant experience with the company's business

23 planning, including the preparation of projections.

24        Your Honor, I think the other side of the component

25 here is what did these experienced, qualified, careful

1   individuals do?  What did they look at?  The Trustee attacks

2   one aspect of the projections; the growth prediction.  But it

3   does not attack anything else about the projections.

4          If I could, Your Honor, before I get to the inputs,

5   talk about the process more generally and what the Trustees'

6   complaint fails to plead.  As Mr. Koukios indicated, and this

7   is firmly established in Ohio Law, they must plead specific

8   facts to rebut the presumption of the Business Judgment Rule.

9   It's not enough to merely disagree.  So there are not factual

10  allegations showing that the projections were prepared

11  recklessly.  There are no allegations that Mr. Morgan and Mr.

12  Ginnan prepared one set of projections hastily, without due

13  consideration and never updated them.  To the contrary, Mr.

14  Morgan and Mr. Ginnan prepared nearly a dozen set of

15  projections over the course of the year that Standard

16  Register was considering its strategic options.

17         There are no allegations that Mr. Morgan and Mr.

18  Ginnan ignored changing conditions or refused to contemplate

19  the impact those conditions would have on their projections.

20  In fact, even while the Trustee attacks the projections as

21  "overly optimistic," Mr. Morgan and Mr. Ginnan revised the

22  original projections downward to take into account Standard

23  Register's performance.  There is no dispute about that.

24         Again, Your Honor, while the Trustee takes issue

25  with the revenue of the combined company, it does not

1  meaningfully challenge any other aspect of the projections.

2  It does not challenge the expectation that the deal would

3  result in significant synergies, through consolidation of

4  manufacturing facilities, that synergies would also be

5  achieved through consolidation of IT functions, through

6  sales, marketing, paper purchasing, freight; there is no

7  challenge to the expectation that the interest rate would

8  increase over the long term or to the anticipated and related

9  reduction of the company's pension liability.

10        The Trustee takes no issue with estimating

11 WorkflowOne's future revenues, based on Standard Register's

12 comprehensive due diligence of WorkflowOne.  There is no

13 disagreement, importantly, Your Honor, about the expectation

14 for significant opportunities for revenue growth of the

15 combined company because there was very little overlap in the

16 customer basis of the two companies.

17        The Trustee does not take issue with the assumption

18 that the company in the industry, generally, were emerging

19 from a period of negative growth.  There is also no dispute

20 that the projections, first, reasonably anticipated a short-

21 term decline in revenue of the combined company or revenues

22 coming back to pre-deal levels by 2017.  In other words, Your

23 Honor, the Trustee concedes that every single aspect of the

24 preparation of the projections, who prepared them, how they

25 prepared them, the inputs that went into them, that every

1  single aspect of the projections were prepared in exactly the

2  manner they should.  They simply disagree with one aspect of

3  the projections.

4       Mr. Morgan and Mr. Ginnan exercised careful informed

5  business judgment as to that aspect of the projections.

6  Under Ohio Law, so long as the decision to make certain

7  assumptions about revenue growth can be attributed to "any

8  rational business purpose."  That decision, the assumptions

9  themselves, cannot be disturbed by hindsight based attacks.

10       Your Honor, the issue, as you know, is not whether

11  the Trustee can come in with the benefit of 20/20 hindsight

12  and find some reason to disagree with a single aspect of the

13  projections.  We all know that they were not born out by

14  future events, but that is not the issue.  The issue is not

15  whether even reasonable careful minds could differ, whether

16  an equally diligent fiduciary could have come up with a

17  different set of projections.

18       The discreet, narrow question here is whether there

19  are any factual allegations showing that the projections were

20  not prepared carefully, were not prepared loyally by informed

21  fiduciaries in good faith.  The answer is no, Your Honor.

22       The Court of Chancery has observed, it is only in

23  extraordinary circumstances that judicial judgment should be

24  substituted for the business judgment of fiduciaries.  There

25  are not such extraordinary circumstances here, Your Honor.

1      Under Ohio Law, the business judgment rule exists to

2 protect Mr. Morgan and Mr. Ginnan from the Trustees' attacks.

3 It should be enforced here and the duty of care claim should

4 be dismissed, Your Honor.

5      THE COURT:  I think I asked your colleague -- I

6 think your colleague covered loyalty.  I assume your position

7 on loyalty is, essentially, the same?

8      MS. DUFFY:  Yes, Your Honor.  The entrenchment claim

9 is to the officer Defendants.

10      THE COURT:  And am I correct, in my reading of the

11 complaint that the count relating to the fraudulent transfers

12 applies to your people?

13      MS. DUFFY:  That's correct, Your Honor.  Mr.

14 Weinstein will handle that aspect of the claim.

15      THE COURT:  Okay.

16      MS. DUFFY:  If I may, Your Honor, I think that your

17 reading of the complaint in the papers is accurate because, I

18 think, to the extent that the Trustee did assert a loyalty

19 claim as to Mr. Morgan and Mr. Ginnan in connection with the

20 receipt of the transaction bonuses, they have abandoned that

21 claim.

22      The Trustee argued the pair obtained these

23 comparatively small transaction bonuses.  Mr. Morgan and Mr.

24 Ginnan prepared projections in pursuit of a transaction that

25 they knew or should have known would bankrupt the company,

1  that they thought would destroy the value of their substantia

2  shareholdings in the company, would result in a forfeiture of

3  their significant holdings and  the retirement plans and

4  would, potentially, eliminate their jobs and livelihoods.

5       We pointed that out, Your Honor, in our opening

6  brief and the Trustee has no response.  It simply asserts, in

7  conclusory fashion, in one line, that the trade action

8  bonuses were "outsized."  Even if that single reference could

9  preserve the argument, the Trustee has conceded the point.

10  The Trustee expressly disavowed any challenge to the board's

11  decision to award the bonuses or compensation, generally.

12  That means that they do not challenge the amount or size of

13  the bonus.

14       In other words, Your Honor, to the extent anything

15  remained of the loyalty claim, as to Mr. Morgan and Mr.

16  Ginnan, they have conceded it.  Even if they didn't concede

17  it, it's implausible, Your Honor.  In every regard, the

18  transaction bonuses aligned the interest of Mr. Morgan and

19  Mr. Ginnan with the shorter term and long term interests of a

20  successful combined company post-closing.

21       THE COURT:  Let me ask a mechanical question.

22       MS. DUFFY:  Yes.

23       THE COURT:  Again, in the event that they are not

24  abandoned, I would like to make sure I understand the

25  Defendants position with respect to approval or the mechanics

1  of the transaction bonuses, themselves.  I touched on this,

2  obviously, with your colleague.  The transaction bonuses were

3  part of the overall transaction and slightly different from a

4  typical comp arrangement for a senior officer.

5      Is it the Defendants positon that these were not

6  self-dealing and that the appropriate -- I realize we're at

7  the pleading stage.  You know what I'm talking about.  Here,

8  loyalty claims, to the extent that they get any traction, are

9  always I sat in a room with myself and I voted myself a big

10 bonus because I am a terrific guy; recognizing that it would

11 steal from the company valuable money that they needed, but I

12 wanted it because I wanted it and I recognized that it would

13 harm the shareholders.  That's the loyalty claim.  That is

14 the one everybody wants because that's the one you get to

15 recover on.

16      I would like your understanding on that issue.  I

17 would like your response.

18      MS. DUFFY:  Well, I think, first, Your Honor, your

19 comment indicates exactly what's missing from this complaint.

20 There are no allegations of self-dealing.  So the board

21 approved the transaction bonuses on July 31st, which was a day

22 before the WorkflowOne transaction closed.  The board

23 approved those, Your Honor.

24      Mr. Morgan is a director.  He is also an officer.

25 Mr. Ginnan is an officer.  There are no allegations that they

1  voted on their own compensation.  There are no allegations

2  that they participated in an only fashion, Your Honor.  The

3  board, as the Trustee knows from documents it has in its

4  possession, was assisted by compensation counsel.  Your

5  Honor, the notion that Mr. Morgan and Mr. Ginnan engaged in

6  self-dealing, one, is that allegation simply doesn't fit the

7  facts here.  They are not sitting on two sides of the same

8  deal.  And, I think, Your Honor, that goes to show the

9  implausibility of the arguments here where, in your example,

10  it was the I'm voting myself a great big bonus because I'm a

11  terrific guy, even though I know it's going to harm the

12  company.  There is nothing about these transactions that show

13  any divergence between interest of the combined company, and

14  Mr. Morgan and Mr. Ginnan.

15        To the contrary, they even further aligned the

16  interest of those individuals which were already aligned by

17  virtue of their significant stock holdings in the company,

18  Your Honor.  They each, before the bonuses, held significant

19  stock in the company; that means it was in their interest for

20  the combined company to do well.

21        By virtue of the transaction bonuses, Your Honor,

22  which the Trustee ignores, kind of, the multi-faceted arrange

23  of them.  There's an equity component and there is a cash

24  component.  The equity component consisted of grants of time

25  restricted stock and performance restricted stock.  So the

1    notion would be that Mr. Ginnan and Mr. Morgan, their

2    personal interests would be advanced by a successful long-

3    term company.

4         The notion that they would somehow prepare

5    projections of a deal that they thought would drive the

6    company into the ground is implausible.  The performance

7    related grants would vest over the course of three years.

8    The time vested, also three years; 2016.  Even the cash side,

9    Your Honor, again, further aligns their interest for the

10   successful company.

11        The cash component consisted of half of a bonus that

12   was paid upon closing of the transaction and half that was

13   paid six months out, but only a certain performance

14   thresholds were achieved; that is, if the combined company

15   did, in fact, do well.  And it did, Your Honor.  Those

16   bonuses were paid.

17        The Trustees' argument ignores all of those

18   significant incentives that aligned Mr. Morgan and Mr. Ginnan

19   with the company.  They allege, at bottom, that Mr. Morgan

20   and Mr. Ginnan missed nearly $3 million dollars in collective

21   equity; not even counting these restricted stock grants I

22   just mentioned, not even counting stock options, forfeited

23   hundreds of thousands of dollars in their retirement plans

24   and case aside over 25 years of collective service to the

25   company.  For what?  For half of a onetime cash bonus that

1  was no more than a fraction of their interest in the company

2  and, importantly, where there is no dispute that the other

3  aspects of the bonus, the other cash component, the equity

4  component aligned the shorter term and longer term interests

5  of Mr. Morgan and Mr. Ginnan with the combined company.

6       Your Honor, the implausible claim, to the extent it

7  has not been abandoned, should be dismissed.

8       THE COURT:  Welcome.

9       MR. WEINSTEIN:  Good morning, Your Honor.  May I

10 please the Court, my name is Joe Weinstein, I'm with Squire

11 Patton & Boggs.  I too am an Ohio lawyer.  I am here on

12 behalf of my client, Mr. Morgan, but also speaking on behalf

13 of the CFO, Mr. Ginnan, with respect to these claimed

14 fraudulent transfers.

15      THE COURT:  Okay.

16      MR. WEINSTEIN:  We believe that the claim,

17 fraudulent transfers, should be dismissed for a number of

18 reasons.  Plaintiff fails to plead plausible fraudulent

19 transfer with respect to the performance bonuses.  The

20 bonuses were awarded by the board of directors under

21 recommendation of their compensation committee which, itself,

22 relied on an outside advisor on compensation.  These bonuses

23 were directed to these officers, first for the work that they

24 did with respect to all transactions, including the one that,

25 ultimately, was accepted and the acquisition went forward,

1  and for future performance following that transaction.

2          The bonuses and, frankly, the board's decision in

3  awarding these bonuses have not been challenged by Plaintiff

4  here.  In fact, the Plaintiff is emphatic in their briefing

5  and they say that this is not a challenge to the board's

6  actions in approving the bonuses or awarding compensation,

7  generally.  While that may be and eluded to this, Your Honor,

8  may be they are going after a lower standard in just looking

9  at a structural constructive fraudulent transfer.

10          THE COURT:  Sure.  You have to agree, it has a much

11  different proof burden and as a practical matter, presumably,

12  a lower one.  I mean you can imagine where it would be harder

13  or easier.  But loyalty claims are hard.

14          MR. WEINSTEIN:  Loyalty claims are, indeed, hard,

15  Your Honor.

16          I submit that there is an overlap here.  You can't

17  get away from this as part of the proof because, in fact,

18  there is a collateral admission here by not attacking the

19  board, that the board implicitly decided the correct number

20  that you had reasonably equivalent value.

21          After all, if the board had decided to over award

22  these officers, certainly there would be a breach of

23  fiduciary duty claim there.  This goes to, ultimately, the

24  plausibility of a fraudulent transfer claim.  It may not be

25

1  dispositive in and of itself, but it certainly goes to the

2  overall plausibility of that claim.

3          THE COURT:  Cold you confirm for me, these are

4  structured as constructive fraudulent transfers.

5          MR. WEINSTEIN:  That is correct, Your Honor.  They

6  are constructive fraudulent transfer claims under 11 U.S.C.

7  548(a)(1)(b) and Ohio Revised Code 1336.4; the elements of

8  which are, essentially, the same.

9          THE COURT:  Pretty much the same.

10         MR. WEINSTEIN:  Right.

11         So the Trustee can't avoid the transfers unless it

12  pleads and shows that the company received less then

13  reasonably equivalent value and that the company was either

14  insolvent at the time a transaction was made, or became

15  insolvent as a result of it or that the company had

16  unreasonably small capital.  The fact is that the complaint

17  here fails on both counts.

18         Plaintiff is absolutely wrong when it tries to argue

19  that fraudulent transfer claims are not subject to motions to

20  dismiss because they are fact intensive.  Well, they need to

21  be fact intensive to prove.  They are certainly not fact

22  intensive to allege plausibly, so long as you have a claim.

23  But here, Plaintiffs don't.

24         Contrary to Plaintiffs' argument is, well, Court's

25  dismiss these cases when they are not plead correctly and

1  they are not plead correctly if Plaintiff's simply parrot the

2  language of the statute and allege general conclusory facts

3  that mirror that language.  Here, we have no facts that show

4  that these were, indeed, fraudulent transfers.

5        Just breaking down the elements of the claim, there

6  is no plausible allegation here that CEO and CFO didn't earn

7  the bonuses by providing reasonably equivalent value; that's

8  for several reasons.  First, because Plaintiff alleges that

9  the date of the insolvency came at some point after the

10  August 1st WorkflowOne acquisition and because the bonuses

11  were awarded on July 31st, the bonuses are a pre-existing debt

12  that sheltered from avoidance as a matter of law.  The

13  payments were deemed reasonably equivalent value as they're

14  paid.

15        Second point.  Even if that weren't the case,

16  Plaintiff doesn't challenge the board's award of the bonuses,

17  including their amount, which was within the board's business

18  judgment to do.  And Your Honor indicated earlier that this

19  compensation may have been a little out of the ordinary.  In

20  fact, Your Honor, I would submit that compensational

21  arrangements like this are often made to --

22        THE COURT:  No, I don't think I said it was out of

23  the ordinary.  I think that it was different from, because it

24  was tied to a transaction.  Again, I'm just comparing this to

25  the sorts of things that I see, where you see just

1  performance bonuses all the time and people go after them.

2  It's relatively low hanging fruit in many, many cases.

3         So the fact that this is tied to a particular

4  transaction is just a little bit different then, you know,

5  what I saw last week or what I will see next week about the

6  two, or three or four years of bonuses for senior management

7  in another case.

8         MR. WEINSTEIN:  Well, in fact, the award is the

9  first half of the cash component.  It wasn't really tied to

10  this particular transaction, but rather was tied to the work

11  done by these officers in pursuing any and all transactions.

12  It did, of course, obviously end with this one, but this was

13  to award these officers, who were doing their day to day

14  work, and discharging their day to day responsibilities while

15  also doing the extra work that it took to ready the company

16  for a transaction.

17         THE COURT:  I think I'd like -- I expect that the

18  Plaintiff will say that you're kind of putting the rabbit in

19  the hat when you're tying the reasonable equivalent value

20  with the fact that the board process hasn't been challenged.

21  So we got a board process that was, I guess, adequately

22  alleged to be appropriate and, therefore, it must be

23  reasonably equivalent value.  How do we determine that it was

24  reasonably equivalent value?  Because we had a good board

25  process at the outset.  There has got to be a disconnect

1   there.

2        MR. WEINSTEIN:  Well, I'm not suggesting that there

3   is, necessarily, (indiscernible).  What I am saying is, these

4   are factors to be considered to determine whether under

5   *Twombly and Iqbal* there is a plausibly alleged claim here.

6   We are not challenging the loyalty of the individual

7   officers.  We are not challenging the process of the award.

8   We just don't like the award.

9        Under what standard are we going to measure

10  reasonably equivalent value?  Well, normally you look at it

11  from the creditor standard; however, here, because these

12  awards were for pre-existing debt.  They are normally not

13  avoidable and to the extent that we had the forward looking

14  awards, which were awarded in a pre-existing way, contingent

15  upon performance, those performance criteria were met.

16       Along that line, there is no allegation that the

17  officers didn't meet the post-performance criteria.  There is

18  no challenge to those criteria or the implicit determination

19  by the board.  I think in the exercise of their business

20  judgment, that there was a delivery of value to the company

21  as a result of that work.

22       In looking at reasonably equivalent value, just

23  generally, in this Circuit, the Courts, of course, look to

24  whether the transaction was at arm's length, whether the

25  transferee acted in good faith and whether there was a degree

1  of difference between the fair market value of the services

2  and the price paid.

3          Here, there is no allegation that the transaction

4  wasn't at arm's length.  Indeed, this was an award made by

5  the board to these officers, based on the board's judgment as

6  to what should be awarded.  There is no allegation that the

7  officers did not act in good faith in doing the work both

8  pre-acquisition and post-acquisition.  And there is no

9  plausible, non-conclusory, allegation that the bonuses were

10 relatively equivalent in value, given the fact that there has

11 been no challenge that we have discussed and that the

12 criteria were met.  Taken together, taking all of these

13 factors together, there really is no basis to conclude, under

14 *Twombly and Iqbal,* that there is a plausible claim that the

15 settlement, for reasonably equivalent value, wasn't received.

16         Similarly, Plaintiffs also fail to plausibly plead

17 that the company was insolvent; again, for several reasons.

18 The amended complaint asserts insolvency.

19         THE COURT:  But it does start or address a point

20 that, again, we covered a little bit at the outset of the

21 discussion and that is the standard or the prism through

22 which I should review these allegations -- because I will

23 confess, I struggle with it a little bit.  It is a well

24 settled proposition that a Bankruptcy Trustee, typically,

25 receives more deference at the Rule 12 stage for the reasons

1  that we discussed.

2        Insolvency is a good example of a context where

3  Courts would generally say, and I think I have permitted it,

4  just put a little meat on the bone, we will worry about

5  solvency later and it's not really necessarily fair to take a

6  Trustee and impose this burden.  You've got to show either of

7  the two statutory definitions.  You got to do that with

8  records that may be in disarray, without having the

9  institutional knowledge and memory, yada, yada, yada.

10        So, I think your point would be that, consistent

11  with the comments earlier, that the Court's analysis should

12  be, frankly, pretty strict where we have players that have,

13  frankly, all of the financial records of the company or had

14  access to much more than we would see in a Chapter 7 case.

15        MR. WEINSTEIN:  I agree, Your Honor.

16        This is a very different circumstance.  When all of

17  the information is, effectively, in the Trustees' hands, they

18  have had the ability to analyze that information and, yet,

19  still can't plead any better than they have plead.  That is

20  correct, they haven't met the standard.

21        In fact, the Trustee admits, in the complaint, that

22  the company was not insolvent at relevant times.  At

23  paragraph 99 of the complaint, and we note this in our

24  briefing as well, the Plaintiff states that within months

25  after closing of the WorkflowOne acquisition, it became

1    apparent that the Debtors would breach covenants in certain

2    term loans.  Note that these are unspecified covenants that

3    would be breached sometime even farther in the future and

4    that these covenants don't, in and of themselves, suggest an

5    inability to pay creditors.

6           But even assuming that this allegation is an initial

7    indicator of some future insolvency, this doesn't happen

8    until months after the closing and the bonus payments.  We

9    submit that this admission, in and of itself, is dispositive.

10   But even if it weren't, it goes into that mix of factors that

11   the Court needs to consider to see whether the claim has been

12   plausibly alleged.  That also is informed by the fact that

13   the board obtained a solvency opinion; that the solvency

14   opinion addressed not only the solvency of the company, but

15   also the adequacy of the company's capital.  There is nothing

16   in the complaint that goes to the capital of the company,

17   other than simply parroting the statutory language that it

18   was small.

19          The company show price also, as we have noted,

20   soared 360% when the acquisition was announced and continued

21   to trade above pre-merger levels for more than a year.  Now,

22   show price is a data point for determining value.  Contrary

23   to the argument that the Trustee made in response, what I'm

24   saying is fully dispositive and conclusive.  But what we are

25   saying is that when you take it in conjunction with the fact

1  that there is no allegation of failure to pay debts when due,

2  the solvency opinion, Plaintiffs own admission regarding the

3  future of when the insolvency might take place.  Plaintiff

4  has implausibly plead that the company was insolvent at the

5  time of the bonuses.

6          For those reasons, we think Counts II and III should

7  be dismissed.

8          THE COURT:  All right, why don't we do this?

9  Anything else from the Defendants side?

10          MR. KOUKIOS:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Why don't we just take a two

12  minute break and then we will hear from the Plaintiff.  Stand

13  in recess.  Thank you.

14     (Recess 11:13:48 to 11:25:39)

15          THE CLERK:  All rise.

16          THE COURT: Please be seated.  Ms. Levine.

17          MS. LEVINE:  Thank you, Your Honor.  Good morning,

18  Sharon Levine, Andrew Behlmann, Wojciech Jung, Lowenstein

19  Sandler, along with from Polsinelli Justin Edelson.

20          THE COURT:  Great.

21          MS. LEVINE:  Thank you.  Your Honor, we respectfully

22  submit that the allegations in the complaint presume true and

23  given reasonable deference to the Plaintiff are sufficient.

24  And we would also respectfully submit that Your Honor

25  consider this in connection with the standing motion.  But

1   even if it's not the appropriate recovery under the case --

2   the appropriate result under the case law, it's to have us

3   re-plea and not to dismiss and deprive the Creditors of the

4   causes of action.

5          And then just to deal with a couple of preliminary

6   matters before we actually start talking about the complaint.

7   There's been a lot made in the brief about the fact that we

8   settled with Silver Point and that, therefore, they were our

9   primary consideration.  Your Honor, what the Committee did

10  here was look to the fact that we were pressed against a very

11  short time table with regard to an emergent sale process, and

12  we focused on Silver Point because we needed to resolve in

13  order to stabilize the assets.

14         THE COURT:  I think you need to go much further with

15  that.  I understand that it was -- it was pled.  And had I

16  been in their shoes, I probably would have made that same

17  point.  I don't think that that really gets them very far.

18  And, again, I mean no criticism making the point.  As I said,

19  I would have made it.

20         But, you know, I was here.  I remember the context.

21  And, again, it was not a remarkable fact pattern.  This was a

22  transaction that was being challenged by a Committee with a

23  significant lender that had been a Legacy lender, a

24  historical lender to the company, and a desire to make the

25  best of a difficult situation.  And, ultimately, I think the

1  Committee did, and it was a correct consensual plan here,

2  right?

3        MS. LEVINE:  Consensual -- well everybody withdrew

4  their objections to the sale.  And then there was --

5        THE COURT:  And I call that a consensual

6  transaction.

7        MS. LEVINE:  Just to finish the point slightly, Your

8  Honor, we did make a -- not to go into settlement

9  concessions, but we did make a proposal -- not surprising the

10  insurance carriers wanted their day in Court here today.

11        THE COURT:  Sure.

12        MS. LEVINE:  But we're not sitting by just dragging

13  our feet trying to make life difficult for people here.

14        THE COURT:  I knew that.

15        MS. LEVINE:  Your Honor, they've also made a lot

16  about the 4- to 5,000 documents that were produced.  We

17  haven't had new discovery against these Defendants with

18  regard to these issues.  We also haven't had discovery, and I

19  want to be careful with all these pronouns because we did

20  sign an NDA.  I know Your Honor hasn't dealt with the under

21  seal motion, but there may be some -- even though it was

22  probably not a problem anymore, we did sign the NDA.

23        But there was a pre-petition strategic potential

24  purchaser who did not get the opportunity that they thought

25  they should have gotten with regard to the prepetition sale

1    process.  They did show up in connection with the post-
2    petition sale process with counsel, with financial advisors,
3    and actively participating in that process.  And we have not
4    had the opportunity to have discovery against them with
5    regard to whether and what extent -- what happened
6    prepetition didn't necessarily have to have in prepetition if
7    they had been given a more robust opportunity to the sale
8    process.

9         Your Honor has heard -- and there's been a lot in
10   the briefs about the Ohio Standard versus the Delaware
11   Standard.  We believe that regardless, Your Honor, that the
12   facts that we pled in this complaint will meet the standard.
13   And we're not bringing this cause of action frivolously or
14   based upon what we believe are insignificant facts.

15        We would respectfully submit that if you take a look
16   at the facts -- and we're cognizant of debt.  If we're
17   looking at the projections at the time that they were made,
18   not with 20/20 hindsight, those projections were made by a
19   management team that had never met their projections
20   previously.

21             THE COURT:  Jevic or?  Jevic?

22             MS. LEVINE:  Fetters may have said it to Your Honor.

23             THE COURT:  Okay.

24             MS. LEVINE:  But --

25             THE COURT:  Anyway, it's in Jevic too.

1        MS. LEVINE:  <u>Jevic</u> is the Committee's counsel

2   favorite case, Your Honor.

3        THE COURT:  My understanding is it's fully briefed

4   on the petition for cert.  And just to editorialize.  To the

5   extent that I have one in my career that goes all the way up,

6   it has to be a bench ruling -- come on.

7        You may proceed.

8        (Laughter)

9        MS. LEVINE:  I'll cite <u>Fetters</u> next time.

10       But regardless, Your Honor, what -- you know,

11  there's been a lot of pun made that, you know, we should be

12  on this relying on this management team, and people make

13  mistakes with regard to projections all the time, and that's

14  not unusual for why you wind up in bankruptcy.  And we

15  understand that.  We agree with that.  And we're not standing

16  here with a standing motion in every single one of the cases

17  where we show up as Committee counsel.

18       But what's different here, Your Honor, and it is

19  different here is this management team never met their

20  projections.  And when they did put these projections

21  together, they put them together in a way that should have

22  been obvious to them and obvious to the board that they were

23  not appropriate.  And it wasn't just the revenue.

24       They took -- they took the - the low credit combined

25  entities and they increased the debt by five times.  They

1   took $50 million and they took it up to $250.  They increased

2   revenues to a point where under their projections they were

3   going to have to be the best performer in the industry.

4          They did not include in those projections anything

5   for the post-closing, post-merger integration thrust which

6   turned out to be $30 million dollars.  They did not take into

7   account that while historically they have been able to shrink

8   SG&A, they have never both shrunk SG&A and ground revenue;

9   ever.  And the management team knew this and the board, if

10   they didn't know it, Your Honor, they should have been aware

11   of it.

12          And we also respectfully submit that prior to the

13   merger while we understand that the industry was struggling,

14   this company Standard Register was paying their debts as they

15   came due.  They were paying their pension.  They were paying

16   the retiree.  They were paying their trade, and they were

17   making their debt service payments.

18          So it's only after the merger that their suddenly

19   was liquidity crunch and the need for a very, very fast

20   filing in a Chapter 11.  And the interesting thing there,

21   Your Honor, is also they projected that they weren't going to

22   get the benefit of the synergies for 18 months.  So they

23   understood that they were going to be major costs which they

24   never accounted for and other things that happened post-

25   closing.  But that they weren't actually going to kick in and

1  get the benefits for 18 months.

2          THE COURT:  Well my recollection is that this was an

3  old line company.  I mean not seeing the benefits of a merger

4  for 18 months doesn't strike me as a remarkable proposition.

5          MS. LEVINE:  No, but the point -- the -- but the

6  point of that is slightly different, Your Honor.  What they

7  said they were't going to kick in and get the -- they already

8  admitted they weren't going to get the benefits of the

9  synergies.

10         THE COURT:  Right.

11         MS. LEVINE:  But they were admit -- they were

12 immediately summarily able to handle five times debt service.

13 They were suddenly going to have better performance with

14 regard to their EBITDA.  They were suddenly not going to have

15 to pay the $30 million dollars that they actually had to pay

16 in terms of post-merger costs.  So there was a disconnect

17 even under their own projections sitting in the board room at

18 the time that they -- at the time that they did the closing.

19         THE COURT:  Well, again, if they get the benefit of

20 the business check rule, those objections reflect, frankly, a

21 post-merger period that would be, to use a neutral term,

22 challenging.  Okay.  That -- pardon me.  We're going to

23 combine two businesses.  Everybody knows that that's not a

24 simple exercise.  We're not going to see the synergy benefits

25 immediately, and they projected for that.  And, frankly, it

1  went sour.  It didn't work.

2          MS. LEVINE:  Your Honor, that's not what we're

3  saying, though, and that's not what pled in the complaint.

4          In other words, this isn't a situation where their

5  projections were "x" prior to the merger and maybe even a

6  little bit more conservative post-merger.  And then when the

7  synergies kicked in, they got much better.  These were

8  projections where suddenly they were going from a place where

9  they were paying their -- their -- they were paying their

10 debts as they came due.  The projected price closing they

11 should be able to continue to pay their debts as they come

12 due.  They should not pay five times debt service.  They're

13 not -- and that they should be able to survive post-merger

14 without paying any merger costs, Your Honor.

15         That's -- that's very -- that's like saying or, you

16 know, we have a projection in our projections for health

17 benefits.  But we're going to use as an assumption aspirins

18 cure cancer and, therefore, we're going to have very low --

19         THE COURT:  Nobody's going to get sick.

20         MS. LEVINE:  Nobody's going to get sick.  And,

21 therefore, post-closing we're going to have -- we're going to

22 do much better than we ever did before with regard to our

23 health benefits.  It's not reasonable in a company that has

24 never been able to shrink SG&A and grow revenue, which

25 actually makes sense.

1        If you're not focusing on your corporate overhead

2   and your sales and your marketing to suddenly think that

3   you're going to be able to grow revenue while you're

4   shrinking SG&A when you have historically never done that is

5   just not reasonable as you're sitting in the boardroom at

6   that time.  And those allegations are pled.

7        And it's also interesting to us that even though the

8   discovery that we did which was a 60 hour marathon race

9   before the sale hearing did produce email which is mainly

10  we're here because Silver Point.  We haven't done the

11  discovery we would like to do here.  But as pled in the -- as

12  pled 1/12, the Silver Point third member was surprised that

13  the board members didn't really understand workflow's

14  business.  That was a gratuitous email by Silver Point to

15  somebody else in Silver Point.

16       THE COURT:  And, but we do know, right, emphatically

17  that they are always the smartest guys in the room.  And,

18  generally, they don't have -- I should stop.  Go on.

19       MS. LEVINE:  That's a point for discovery, Your

20  Honor.

21       THE COURT:  It is; it is.  I'm being a little flip,

22  but --

23       MS. LEVINE:  That's the -- I mean that's the --

24  that's the -- you know, we're at the pleading stage.  And

25  that's the -- you know, that's the point we're trying to

1   make.

2       With regard to the point about the stock price is,

3   you know, there was a lot of discussion --

4       THE COURT:  Well that goes to the fraudulent

5   conveyance issue, I think, and -- and -- well and it also

6   goes to --

7       MS. LEVINE:  It also goes to the -- it would also go

8   to the valuation/whether or not the projections are making

9   sense point, as well, Your Honor.

10      We would respectfully submit that we dress this a

11  little bit of a standing motion, but we'll address it again.

12  We don't believe that Campbell or any of the cases that were

13  cited dealt with a motion to dismiss.  They dealt with the

14  fact that this was after you went through the entire

15  discovery process as one of the facts that you considered.

16      You considered the fact of the stock price and

17  whether the stock price actually supported the other facts

18  that you had already established.  But even if Your Honor

19  believes it's relevant here, we would respectfully submit

20  that this caused them to place on August 1.  On August 1, the

21  company issued an 8-K that basically said we've done this

22  merger.  It was more like a press release then a true bid

23  disclosure.

24      And on October 15th for the first time, they made

25  public disclosure of the financials.  And what the -- what

1   actually was going to be entailed in this combination and the

2   stock price tanked.  So when the stock market had actual

3   visibility into what the board had visibility into right

4   before the closing, the stock price tanked.

5        THE COURT:  Let's take a step back.  I think if I

6   were to characterize the argument as it relates to count one,

7   a breach of fiduciary duties, starting with the care, how is

8   it that this would not give a cause of action for every

9   failed deal?  We have lots of companies that do deals or that

10   take steps that fail.  I mean and they wind up here.

11        And the presumption is that the failure -- you know

12   that the risk of default or the risk of failure in commercial

13   enterprise is always there, and that the directors are not

14   guarantors of the success of their strategy.  And if you look

15   at like -- and then, I guess, Chancellor Strine's opinion in

16   Trenwick.

17        And he spent a 100 pages or so on that proposition

18   as it related particularly to the business judgment issue.

19   And I recognize we're talking about Ohio law and not Delaware

20   law.  But many of the propositions are analogous.  So, I

21   think, they're going to ask we got a deal.  We had a merger.

22   We used the projections.  We put the companies together, and

23   we wound up in bankruptcy.  It didn't work.

24        I don't know whether it's empty head/clean hands

25   defense or something.  But, you know, why there -- why is it

1  that not every failed transaction that winds up in this Court

2  gives rise to a cause of action if this doesn't?

3        MS. LEVINE:  Your Honor, there are a lot of cases

4  where the projections simply with reasonable assumptions and

5  with everybody showing up and really paying attention just

6  don't pan out, because of a -- because of business trends.

7  You see it industry after industry.

8        THE COURT:  Sure.

9        MS. LEVINE:  Okay.  There were also transactions

10  where you have unforeseen consequences.  You have Sandy or

11  Katrina, or your major customer goes out of business, or GM

12  files and there are first or second's here auto supplier.

13      But those are very different circumstances than showing

14  up in a boardroom with a set of projections that five times

15  your debt and --

16        THE COURT:  Went into a different business, though.

17  It's not -- it's not as if you just quadrupled or quintupled

18  the debt of Standard Register.  You added to it workflow,

19  right?

20        MS. LEVINE:  You did, Your Honor, but they were

21  operating under assumptions that had never proven valid in

22  this context before.

23        I know I'm harping on the shrinking the SG&A and

24  growing revenues.

25        THE COURT:  Right.

1          MS. LEVINE:   But five times debt where they're only

2    looking at two times EBITDA is not necessarily an appropriate

3    way for the board to act even if the board is protected by

4    whatever the standard is in Ohio versus the standard in

5    Delaware.

6          This is not a case where there were reasonable

7    projections, but the business just continued to deteriorate.

8    This is a situation where prior to the closing, they were

9    meeting debts as they came due.  And after the closing aced

10   upon, we would respectfully submit, unreasonable assumptions.

11   The transaction failed and it failed quickly.

12         I would like to -- and, frankly, as part of the

13   discovery we'd like to understand why the strategic left and

14   was so excited to get back in post-bankruptcy.  And it could

15   possibly be, and we think it's like that we're going to see,

16   that there was some disconnect with regard to what they

17   thought people were valuing things at and the way people were

18   viewing things that was incorrect that got a lot more correct

19   once there was the transparency of the Bankruptcy Court.

20         Your Honor, and it's the same thing with the Advisor

21   opinions.  In other words if you have a management team that

22   has never met its projections historically that doesn't mean

23   they're not working hard or trying hard necessarily.  But it

24   was a good idea in those situations to get a solvency opinion

25   or a fairness opinion that's based upon an independent

1  analysis of the projections that they're relying on as

2  opposed to simply relying on management projections and then

3  just tying it up in a pretty slideshow.

4          That's not the type of independent board analysis --

5          THE COURT:  Well how do you respond to the argument

6  from Ms. Duffy that, in fact, that's not what happened?  And

7  it's not just a fairness opinion that says the number showed

8  the company will succeed -- the projections -- the revenue

9  projections show the company will succeed, so here you go.

10         MS. LEVINE:  Your Honor, looking under the fairness

11  opinion, Page 3.

12         THE COURT:  Okay.

13         MS. LEVINE:  In light of the opinion, we have

14  assumed and we know -- and we relied upon, without

15  independent verification, for accuracy and completeness, and

16  then move on to talk about what management has done.

17         THE COURT:  No, I've seen -- but here's what I'm

18  talking about.  I've seen the cases that you refer to about

19  simply taking management -- I cannot recall, either on the

20  bench or in practice, seeing a fairness opinion that said

21  what we did is we went in and made a set of projections

22  because I -- I just haven't seen that.

23         MS. LEVINE:  And I'm not saying that you necessary

24  would or you should, Your Honor.  What we're saying is you

25  can't then say we've dressed up these projections, which the

1  board should have known better.  And just because we've

2  dumped it in a fairness opinion, now suddenly --

3          THE COURT:  That's a good image.

4          MS. LEVINE:  -- they're --

5          THE COURT:  I like it.

6          MS. LEVINE:  -- they're worthy.  Okay?  I mean, you

7  know, yes, you get good projections, either through a third

8  party or through a management team, where they've relied on

9  appropriate assumptions --

10          THE COURT:  Well, then --

11          MS. LEVINE:  -- then you have the fairness opinion

12  and the solvency opinion, and that helps buttress the board,

13  who hasn't done the projections themselves.  But if the board

14  is --

15          THE COURT:  Well, what's the upside to getting a

16  fairness and a solvency opinion?  If the company is going to

17  prepare the projections, which they do, okay, and I would

18  have limited confidence, frankly, if -- and again, I mean no

19  -- and I'm not going to name anybody.  But if any one of the

20  outfits that you and I both know came in and said, we're

21  going to do projections for this company -- or if a committee

22  came in and said, we're going to do projections for the

23  company, I mean, like that's a nice hobby, but you don't know

24  anything about that company, you can look at what their

25  historical action is, but you don't know the -- you know, you

1  don't know the purchasing agent at your largest customer,

2  where you went to the kid's baptism.

3      You know, those are the -- and I'm being a little

4  bit extreme.  But really, you know, a lot of these things

5  about projections or what the company will do, we are

6  confident of our relationship with our customer, we are

7  confident of our management team.  Why?  Because Larry has

8  been with the company for 33 years.

9      MS. LEVINE:  But that, Your Honor, is exactly why

10  these projections fail.  In other words, if they came into

11  the board room and said, look, we have to be conservative on

12  our revenue, or we have bake into these projections that

13  we're going to grow SG&A if we plan to grow revenue, then

14  that would make more sense.

15      But what opinion -- but what this management team

16  did, and what was blessed by this board, was creating

17  assumptions here, like the we're not going to have healthcare

18  anymore because we're only going to hire healthy people.

19  That can't possibly be what you protect by dunking it into a

20  solvency opinion.  It has to -- the whole process has to be

21  reasonable for the end game to be reasonable.

22      And what we're saying here is we see a lot of cases

23  where we've reviewed the -- you know, the activity of the

24  board and the board minutes and the management, and you don't

25  see this here, with these kinds of standing motions or

1   pursuing, after we get through a settlement of the sale,

2   anything above and beyond.  That is not this case.

3           THE COURT:  Okay.  Let me ask you a point -- and I

4   don't want to take you out of order, but we've talked a

5   little bit about the -- that final hurdle, I guess, to

6   recovery, was the way that we talked about it; that, if,

7   indeed, you show, for example, a breach of a fiduciary duty,

8   all right, that they should have known, that this was garbage

9   in, garbage out, numbers that had never been met and -- and a

10  flawed analysis, and they should have known.

11          Do you agree with, I think, the characterization

12  that then, in order to get an affirmative recovery, you would

13  need to then show the higher standard, in order to recover on

14  a breach of a duty of care?  We'll get to loyalty in a

15  moment.  But I think that that's the question, as I

16  understood it, and as it's been briefed; that you can allege

17  duty of care, but simple negligence is not going to get you

18  dollars.

19          MS. LEVINE:  Your Honor, we believe that the

20  conduct here meets the standard under the Ohio statute.

21  Wordsmithing is wordsmithing.

22          THE COURT:  Uh-huh.

23          MS. LEVINE:  But we're not just saying, with 20/20

24  hindsight, there should have been better projections.  We're

25  not showing up here and just saying, you know, they did the

1  WorkflowOne transaction, and then they would up in

2  bankruptcy.  We're exploring why, sitting in the board room,

3  before they did the WorkflowOne transaction, and then they

4  wound up in bankruptcy.  We're explaining why, sitting in the

5  board room, before they did the WorkflowOne transaction,

6  there were mistakes made; that we concede today that they

7  should have seen then, that don't involve 20/20 hindsight.

8          So I want to be careful about using exactly what

9  this -- the level of care is, Your Honor.  One of the things

10 that we're concerned about is we haven't -- you know, I don't

11 want the insurance carrier to suddenly say they're denying

12 coverage because of something I'm saying at the podium today.

13 But we believe that we're meeting the appropriate standard

14 that's required under the Ohio statute.

15         THE COURT:  I understand.  Can we talk about

16 loyalty, and the loyalty claims?

17         MS. LEVINE:  Your Honor, we have legacy directors

18 with regard -- who have been here for a substantial period of

19 time, who have equity, who have trusts who have equity.  We

20 have an entrenched management team that got bonuses and

21 salaries of $40 million in one instance, and a little bit

22 less, but that not much less, in another, to do not certain

23 performance or not a certain result, but this transaction

24 because this transaction kept the capital structure above the

25 debt the same.

1       And I would respectfully submit that it's hard, at

2   this point in time, without getting the discovery that we

3   need, both from the officers and directors and from other

4   folks who were in the pre-bankruptcy process, to understand

5   exactly how it was they were discouraged from continuing to

6   participate in that practice.  But we do believe that we've

7   met the pleading burden here, given the amount of facts that

8   we can physically have at this point in time.

9       THE COURT:  I'd like your specific response to the

10   colloquy that I had with counsel a few moments ago, about

11   what the appropriate standard or rigor should I apply to your

12   factual allegations.  And you've touched on a it a couple of

13   times, that you got discovery from Silver Point, but we

14   didn't -- I understand we haven't gotten to discovery in this

15   adversary proceeding.

16       MS. LEVINE:  Your --

17       THE COURT:  But you are different.  You've

18   represented Chapter 7 Trustees, I know.  But you're different

19   from a trustee who comes into, you know, something that's

20   just in disarray, and you've got empty file cabinets and the

21   sort of image that, you know --

22       MS. LEVINE:  Your Honor, we understand.  I

23   understand what you're getting at.

24       THE COURT:  Yeah.

25       MS. LEVINE:  But I mean, what you're saying is, you

1    are the committee, you got some discovery in the Chapter 11

2    process, now the trustee is sort of a successor to that cause

3    of action.

4         The bottom line is this, Your Honor:  We had 60

5    days [sic] of turmoil leading up to the sale process, and

6    fighting over the DIP and focusing on the issues that needed

7    to get resolved, in order to preserve the hard assets and the

8    jobs and the transaction.  And coupled in with that were some

9    very vigorous negotiations, as you can imagine, with Silver

10   Point and with the debtor, to get through to that process.

11        And then, following that sale process, there was --

12   there was sort of a hiatus where we needed to get through the

13   plan confirmation, and that we had some discussions with the

14   defendants here.  Basically, the process was sort of stayed,

15   in terms of discovery or moving forward, pending where we are

16   today.

17        As I indicated earlier, we made a settlement

18   proposal, but the parties sort of tacitly agreed that we

19   would get through the -- that we would get through this

20   motion to dismiss, and then we would see if there was an

21   opportunity for discussions without incurring a lot of costs

22   associated with discovery; and then, if not, coming back to

23   either discovery or perhaps us coming back to Your Honor to

24   seek help through mediation.

25        But what we don't have is a situation where we're

1  churning away at looking and reading documents and

2  investigating and interviewing witnesses.  It was a brief,

3  sixty-day window, where all we did was get through the sale

4  process.  And then it sort of went a little bit into a lull,

5  getting through today's hearing.

6          And so we'd respectfully submit that it would be a

7  little bit unfair -- I guess it would be a lesson learned

8  because, you know, we'd be -- we'd have -- we'd know next

9  time that we have to be churning away through this whole

10 process, as opposed to parsing it out in a measured -- in a

11 more measured approach.

12     (Participants confer)

13          THE COURT:  Should we turn to fraudulent

14 conveyances?  Or I'm happy to address anything further that

15 we need to cover for the fiduciary duties.

16          MS. LEVINE:  I'm sorry, Your Honor.  I missed that,

17 I was --

18          THE COURT:  Do you want to talk about fraudulent

19 conveyances, or are there areas that we still need to cover

20 on fiduciary duties?

21          MS. LEVINE:  I think that's good.

22          One point my colleague was making to me is that we

23 also had a challenge deadline with regard to Silver Point.

24          THE COURT:  I recall.

25          MS. LEVINE:  That was part of that.

1          THE COURT:  Oh, yeah.

2          MS. LEVINE:  That was part of it.

3          THE COURT:  And let me be clear.  It's not lost

4   upon me that the circumstances in which this process started,

5   I think I've said already that the fact that you've reached a

6   resolution with Silver Point, to me, doesn't weigh really on

7   this analysis at all, and it doesn't -- I guess the hope

8   would be that it would color the Court's view of this, and it

9   doesn't -- I guess the hope would be that it would color the

10  Court's view of this, and it doesn't.  All right?

11         I was there.  I am sufficiently, I think, alert to

12  what was happening in front of me, to welcome the resolution

13  that you touched on, that allowed for the case to move

14  forward on an ultimately consensual basis.  So I don't

15  believe -- it's not that I'm endeavoring to penalize the

16  committee for settling, or that these guys get an inference

17  or something against your complaint because of the lead-up.

18         The issue is a more discrete one about, frankly, as

19  a practical matter, the standard that I ought to impose, in

20  looking at these allegations, and whether or not, given that

21  some discovery and some information has been made available

22  to you because of the process.

23         I'm under no illusions that complete discovery has

24  been provided or that you've got a boat-load of depositions

25  of the folks that you're suing now or anything like that.

1  But your position is, again, at least somewhat different from

2  the typical context of a plaintiff in Rule 12.

3         MS. LEVINE:  We understand that, Your Honor.

4         THE COURT:  Yeah.

5         MS. LEVINE:  And we think that, actually, the

6  allegations in this complaint already reflect some of what we

7  were able to learn through that process.

8         With regard to fraudulent conveyance, Your Honor,

9  we do believe that there are some detailed insolvency

10  pleadings in the complaint.  We look at 84 through 96;

11  particularly, 84, 85, 86, and 87.  We also -- and I would

12  also cite, I guess, 122.

13         But the bottom line is, you know, there was some

14  colloquy with regard to whether or not this was a breach of

15  fiduciary duty, whether this was breach of loyalty, or

16  whether it's fraudulent conveyance.  We made the informed

17  decision, maybe, or maybe the uninformed decision that

18  fraudulent conveyance was the easiest standard and involved

19  the least amount of adjectives, and -- but that that was a

20  path of better, and perhaps least resistance, to getting to a

21  resolution.

22         I'll go back to what we said earlier, if you think

23  that -- if the Court thinks that we improperly pled the

24  complaint, we'd ask for leave to replead, as opposed to

25  walking away --

1          THE COURT:  I understand that.

2          MS. LEVINE:  -- from the causes of action.

3          THE COURT:  Yeah.  The purpose of my questioning

4 was to -- just to make sure.  Because I start with the

5 complaint, and then I go through all the briefing.  And I, in

6 this case, did not, necessarily, go back, generally, through

7 the complaint.  So I wanted to make sure that I understood

8 what was being pled.

9          And I don't necessarily disagree with the thought

10 process.  I think that loyalty is a hard and a high standard.

11 And I also think the discussion with Mr. Weinstein -- the

12 more specific question is whether or not there are sufficient

13 allegations to support a fraudulent conveyance claim under

14 548.

15          MS. LEVINE:  Your Honor, we believe that there is.

16          THE COURT:  Okay.

17          MS. LEVINE:  I've cited the particular paragraphs

18 which we'd ask Your Honor to review at your leisure.

19          THE COURT:  Uh-huh.

20          MS. LEVINE:  But just basically, these particular

21 defendants were given a substantial sum of money to achieve a

22 particular result that didn't really achieve the result it

23 was designed to, arguably, achieve.  In other words, they got

24 paid a lot of money to do a transaction that seems to have

25 benefitted them more than anybody else.

1    And we're going to back to, in the real time, not

2  looking at it with 20/20 hindsight, at the time they were

3  entering into it.  It seems like the fact that it was ill-

4  fated should have been more fully apparent to everybody who

5  was involved in the transaction.

6    And we actually think that that goes back, and

7  without reiterating it, it goes back to the inconsistent --

8  the internal inconsistencies we see in the projections; the

9  fact that they were paying their debts as they came due,

10  before they filed; and even looking at the stock price, once

11  the market actually saw what the financials looked like, as

12  opposed to just getting the 8-K sort of press release on

13  August 1, but actually saw what the financials looked like,

14  on October 15 -- which, by the way, was after some of the

15  preferred stock vested, was the first time the financials

16  came out -- the stock price tanked.

17    So, Your Honor, we'd respectfully submit that all

18  of the motion to dismiss should be denied; that we've met the

19  standard; that, if you look at the allegations more favorable

20  to the committee, at least at this -- the trustee, at least

21  at this point in time, that we have properly pled a cause of

22  action.

23    We would ask Your Honor to consider the fact that,

24  perhaps inappropriately, but we tried to be responsible, in

25  terms of spiking the administrative expenses, and then going

1  quiet during certain periods of time.  So to say we have this

2  extended period of time with vast amounts of discovery would

3  not actually be what happened here.  And we would

4  respectfully submit that, to the extent --

5          THE COURT:  And I think I -- I don't disagree with

6  that.  It's still -- it's a qualitative question.  Again, I

7  don't think these -- while they've identified, the folks on

8  the other side, what they believe is substantial information

9  that you've obtained, again, I'm not under any illusions that

10  somebody has had complete pre-filing discovery and should be

11  held almost to summary judgment standard or something like

12  that.

13          You have more than a trustee would typically have,

14  and I don't think you can really dispute that.  But again, I

15  -- the inquiry, from my point of view, was:  How do I value

16  that for purposes of analyzing your complaint?  And I think

17  I've heard from you clearly, and I understand it, and I've

18  heard from the other side, as well.

19          MS. LEVINE:  Thank you.

20          THE COURT:  Okay.  Brief reply?  Rock, scissors,

21  paper.

22          MR. KOUKIOS:  Thank you, Your Honor.

23  *        So, Your Honor, I just want to begin with the

24  entrenchment claim.  I don't think Ms. Levine really focused

25  on that argument against the directors.  I think the only

1 reply was that they had equity interests.  For the reasons we

2 stated before, that's not enough to get -- to establish an

3 entrenchment claim.

4          Regarding the issue of revenue growth versus SG&A,

5 I mean, it sure sounds like this is an attempt to substitute

6 the trustee's judgment for the directors and management's

7 judgments at the time.  There were reasons for that that were

8 outlined in the projections and the documents that the

9 trustee has, for why that was believed to be the case at the

10 time; that the combination of the companies would allow for

11 SG&A costs to go down and revenue to go -- to grow up.

12          It may have been wrong.  It wasn't necessarily

13 wrong in all regards, but it may have been wrong in some

14 regards.  But that's really -- it sure sounds like they made

15 an attempt to, after the fact, substitute judgment for what

16 it should have been at the time.  There really isn't any

17 specific error or methodology that's been identified that

18 went wrong.

19          And again, Your Honor, fully understanding your

20 points about the amount discovery that's been had, I think

21 the important point here is that the projections and the

22 board minutes have all been produced.  So could there be some

23 deposition that -- where somebody says something that might

24 be slightly off?  I suppose.  But the projections are right

25 there.

1          And I think, under the Ohio law, which specifically

2     entitles directors to rely on what management prepares and

3     what -- and what expert advisors produce, there has to be

4     more in the complaint to get to that point.  I think this was

5     really -- in a lot of ways, it's turning the process

6     backwards.  You're supposed to allege enough to get to

7     discovery; you're not supposed to get discovery because you

8     haven't alleged enough.  It's kind of backwards.

9          And again, Your Honor, the thoroughness in the

10    solvency opinions were produced and not referenced in the

11    complaint at all, which we believe is fatal.  And just to

12    give you -- Your Honor a sense of what was in -- I know

13    you've seen -- and as you mentioned, you've seen many of

14    these opinions.

15         But for example, for the fairness opinion, Bank of

16    America said that they had reviewed publicly available

17    business and financial information on both companies, they

18    reviewed internal financial and operating information and

19    forecasts from management of both companies.

20         They reviewed and discussed alternate versions of

21    the forecasts from WorkflowOne, Incorporated, and adjustments

22    by Standard Register's management.  They discussed

23    operations, financial conditions, and prospects with

24    WorkflowOne and Standard Register management.

25         They compared Standard Register's stock trading

1   history with companies that Bank of America deemed relevant.

2   Bank of America compared Standard Register and WorkflowOne's

3   financial information to companies that, again, Bank of

4   America deemed relevant.  And they compared the terms of the

5   acquisition to other deals that they deemed relevant.  So

6   this was not a fairness opinion that was just -- far from

7   just based on projections.  It incorporated all of that.

8           And then, for Capstone's solvency opinion, there

9   was -- I won't go through all the details, but very similar

10  type of independent analysis that was conducted, as well,

11  including looking at comparable companies and performance of

12  comparable companies.

13          But I think the bottom line here is, Your Honor,

14  that the projections are what they are, and the committee has

15  them.  The board minutes are what they are, and the committee

16  has them.  It's hard to think that the complaint is going to

17  get any better on those, on those aspects, because they have

18  what they need for that part.

19          And Your Honor, you hit the nail on the head when

20  you said that this is -- this was a troubled industry.  This

21  would be like, right now, with the oil and gas industry, that

22  -- should just every oil and gas company close shop because

23  they don't know what the price of a barrel is going to be in

24  a year because it's a volatile time?  So they can't do any

25  mergers, or they can't do any acquisitions, they can't do any

1  investments?

2          Standard Register's directors and managers here

3  were in a troubled industry.  They thought that they had

4  taken steps to reverse the course, and they thought this was

5  going to help, as well.  And that was protected by the Ohio

6  business judgment rule.

7          THE COURT:  Thank you.

8          MR. KOUKIOS:  Thank you, Your Honor.

9          THE COURT:  Very good.  Okay.  I have heard enough.

10 *        I'm going to dismiss the first count of the

11 complaint, with prejudice.  I find that there are not

12 sufficient allegations in the complaint that would support

13 either a breach of the duty of care or a breach of the duty

14 of loyalty.  And I'll give you my reasons in a moment.

15         I will dismiss, without prejudice, the second and

16 third counts that relate to potential fraudulent transfers.

17 And I will dismiss, without prejudice, Count 4, which is

18 basically the follow-on count that goes with 2 and 3.

19         The primary concern and the focus of my attention

20 is primarily on Count 1, which relates a breach of fiduciary

21 duty.  And I will note that I would typically address this

22 through a written opinion, and that would likely be

23 preferable.  But I would conclude from my review, frankly, of

24 the full briefing, as well as the argument that I've received

25 today, that I have little reservation with respect to the

1  breach of fiduciary duty counts.

2          As a threshold matter, I see this kind of

3  litigation and this kind of attack on a prior transaction

4  that was previously approved by a board of directors as being

5  the reason why there is the business judgment rule; codified

6  into statute in Ohio, and by analogy, as we discussed during

7  the argument, well-developed in the -- in Delaware state law,

8  which is not governing in this instance, but, frankly, I will

9  confess helps to inform the Court's judgment, and is not

10 sufficiently dissimilar from the Ohio approach that I think

11 my analysis is still well-founded.

12         The case law teaches that the business judgment

13 rule is designed to insulate officers and directors of a

14 corporation from liability for their decision-making process

15 in determining the course and activities of a business

16 operation.  And the fact of the matter is that, as I said

17 during the argument, the risk of failure and the risk of

18 default is always there.

19         But the fact is that officers and directors are not

20 guarantors of the success of the enterprise.  They are

21 expected to exercise reasonable diligence to act in good

22 faith and to act with utmost fair dealing and good faith to

23 the company.  And as I look at the claim for a breach of a

24 duty of care, I simply don't see it.  I have looked at the

25 allegations.

1        I am satisfied that, on the allegations set forth,

2  the directors were entitled to rely upon the projections that

3  were developed.  And I find that there are no meaningful

4  allegations that would undercut the integrity of the

5  projections sufficient to render the directors' decision to

6  rely upon those projections as wrong or a sufficient

7  predicate to assert liability against them.

8        This is a transaction made by a company that was in

9  a challenged industry, that was looking to reformat its

10 business through a merger.  It expected that the results of

11 that transaction would be favorable, as is typically the

12 case.  And the facts, circumstances -- the facts and

13 circumstances reflect, in hindsight, that it did not work

14 out.

15       But we're not permitted to use a hindsight

16 analysis.  It would be very easy to establish a cause of

17 action in this court against officers and directors if,

18 indeed, hindsight were permitted.  The question is at the

19 time of the transaction.  And I'm satisfied that, even on the

20 allegations taken in the light most favorable to the

21 plaintiff, the facts do not support a breach of a duty of

22 care, as articulated under the Ohio business judgment law.

23       As to a loyalty claim, again, I find that the

24 allegations are conclusory, relating to an entrenchment and a

25 desire to keep jobs and compensation.  These are elements, as

1   I've written before, applying Delaware law, that are present

2   in every case.  We have people that are working for the

3   company, they're compensated, and that are, as a practical

4   matter, presumed to want to continue on with the company.

5           The simple fact that a particular transaction

6   permits them to remain in place and to continue to get

7   compensated, that allegation is not sufficient to allege a

8   loyalty claim against the company; the standard is, as a

9   practical matter, much, much higher.

10          And again, in this case, I see nothing that would

11  support an entrenchment claim and an allegation that the

12  debtors were acting adversely to the -- to what they knew to

13  be the company's best interests, in order to benefit

14  themselves.  That simply is not contained in this complaint.

15          With respect to the fraudulent transfers, and

16  again, because I'm giving leave to replead, I will be brief.

17  We're talking about performance bonuses that, at least in

18  amounts, do not shock the Court, from experience in other

19  transactions.  And again, I believe that I can look to the

20  amounts in the complaint in the context of the overall

21  transaction, and use, at least, my own assessment of the

22  relative amounts, to determine whether or not there is

23  sufficient allegations that would justify moving forward on

24  the claims that are articulated in article -- in Counts 1 and

25  2.

1    I don't find that there are sufficient allegations

2 to support these.  And specifically, I'm not satisfied that

3 the plaintiff has articulated that the debtor failed -- that

4 the company failed to obtain reasonably equivalent value

5 associated with the transactions.

6    The parties have spent a good deal of time briefing

7 and addressing this issue, and I'm not going to belabor the

8 record this afternoon.  But I will simply conclude, based

9 upon the record thus developed, and specifically, again, the

10 allegations that are set forth, that I don't believe that

11 there are sufficient allegations to support a fraudulent

12 transfer claim, as it relates to the prong of reasonably

13 equivalent value.

14    In addition, I was guided by counsel to the various

15 sections of the complaint dealing with insolvency.  And

16 again, I struggle to see, under these circumstances, as

17 alleged, that the debtor was insolvent at the time of the

18 transaction, or that it was rendered insolvent.

19    I make no comment about the significance of the

20 stock price.  It went up; it went down.  I think, as a

21 practical matter, case law teaches that we look at that

22 afterwards.  But it is, nevertheless, significant evidence,

23 perhaps not appropriate for a Rule 12 motion.  But when

24 courts look to see what people with skin in the game, with

25 actual market-based information do, we can look to that as an

1  indicator of value.

2          Again, not dispositive.  There's -- that would

3  probably place too much confidence in the thought process of

4  the marketplace.  But it is, I would acknowledge,

5  significant, and I think case law supports that the trading

6  price of a security or a debt instrument is, indeed,

7  meaningful evidence of value and relevant to the solvency

8  analysis.

9          So I will permit the plaintiff to replead, if it

10 wishes, on Counts 2, 3, and 4.  But as to Count 1, I will

11 dismiss that count with prejudice, as I find no allegations

12 that would support it.  And I don't believe that there is a

13 meaningful purpose to be served.

14         I would ask that the parties confer, in order to

15 formulate an order that is consistent with the Court's

16 ruling, and I would enter it promptly.

17         Are there any questions?

18         COUNSEL:  No.  No, Your Honor.

19         THE COURT:  All right.  I appreciate everyone's

20 time today.  We stand in recess.

21    (Proceedings concluded at 12:14 p.m.)

22

23

24

25

1                          CERTIFICATE

2

3   I certify that the foregoing is a correct transcript from the

4   electronic sound recording of the proceedings in the above-

5   entitled matter.

6
    /s/Mary Zajaczkowski                    February 10, 2016
7   Mary Zajaczkowski, CET**D-531                   Date

8   /s/ Coleen Rand                      February 10, 2016
9   Coleen Rand, AAERT Cert. No. 341

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25