## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Case No. 15-10541 (BLS) |
| SRC LIQUIDATION, LLC, | Chapter 11 |
| Debtor. | **Objection Deadline:  June 9, 2016 at 4:00 p.m. (ET)**<br>**Hearing date:  June 29, 2016 at 10:30 a.m. (ET)** |
| | [Ref. D.I. 1984] |

## AMERICAN REPROGRAPHICS COMPANY'S RESPONSE IN OPPOSITION TO STANDARD REGISTER INC.'S FOURTH (4TH) OMNIBUS OBJECTION TO SECTION 503(b)(9) CLAIMS

American Reprographics Company ("ARC") by this pleading responds to Standard Register Inc.'s Fourth (4th) Omnibus (Substantive) Objection To Section 503(b)(9) Claims [Docket No. 1984]("Objection") and requests that an evidentiary hearing be set on the Objection or that the Objection be treated in accordance with Part VII of the Federal Rules of Bankruptcy Procedure.

By and through the Objection, Taylor Corporation and its Designated Buyer Standard Register ("Taylor"), seek entry of an order pursuant to 11 U.S.C. § 502(b) to reclassify ARC's 11 U.S.C. § 503(b)(9) claim in the amount of $35,144.32 to a general unsecured claim.  ARC opposes the Objection on the grounds that it delivered goods to The Standard Register Company ("Debtor") with a value of $35,144.32 within twenty (20) days of the commencement of the Debtor's bankruptcy case on March 12, 2015 ("Petition Date") and therefore no basis exists to reclassify its Section 503(b)(9) claim in the amount of $35,144.32 ("Administrative Claim").

1578019

## BRIEF SUMMARY OF FACTS

Since August 9, 2012, ARC has acted as a vendor to Debtor, producing managed print and promotional products which are then shipped directly to the Debtor's customers. The terms of the relationship between the Debtor and ARC are set forth in the Supply Agreement dated August 9, 2012, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by this reference. ARC provided goods to the Debtor before the Debtor filed for bankruptcy relief and after the Debtor's filing pursuant to the Supply Agreement.

The business relationship between ARC and the Debtor provided for and required control by the Debtor. *See* Exhibit 1. When Debtor received an order for the product from a customer, it would issue a purchase order to ARC and ARC would commence production of the goods ordered. *Id*. The Debtor mandated what method and carrier ARC had to use to ship the goods to Debtor's customer. *See* Exhibit 1 and Proof of Claim No. 1734. ARC was required to use a mailing label on all orders prior to shipment which expressly memorialized that Debtor, not ARC, was shipping the goods. *See* Exhibit 1. ARC was instructed to use Debtor's own account with the carrier, meaning that Debtor, not ARC, had the ability to adjust or stop shipment. *Id.*

Once ARC places the goods with the carrier it has no control over the shipment. ARC does not hire, direct, or control the carrier, which receives its instructions solely from Debtor. The Supply Agreement provides that "Delivery" means:

> Seller shall deliver the items to Debtor the date(s) indicated in the purchase order, in accordance with any other requirements of [Debtor] and, in addition, as set forth in any other documents agreed to in writing by the parties.

*Id.* ¶ 7. Thus, pursuant to the terms of the Supply Agreement, the Debtor received the goods (i.e. they were delivered) on the dates indicated in the purchase orders. *See* Supply Agreement, Exhibit 1. Each of the purchase orders supporting ARC's Administrative Claim demonstrate that the goods

2

were indeed received under the terms of the Supply Agreement by the Debtor within twenty days of the Petition Date. *See* Proof of Claim No. 1734.

## ARGUMENT

ARC's Administrative Claim should not be reclassified because: (1) ARC provided goods to the Debtor within 20 days of the Petition Date and the Debtor pursuant to the terms of the Supply Agreement received such goods within 20 days of the Petition Date; and, (2) it is appropriate for ARC, a drop-shipment creditor, to rely upon 11 U.S.C. § 503(b)(9) to make an administrative claim. To the extent that this Court is inclined to sustain the Objection, ARC requests the opportunity to provide evidence through an evidentiary hearing or Title VII of the Federal Rules of Bankruptcy Procedure so that that issues of fact (i.e. receipt of goods by the Debtor) may be resolved.

Taylor objects to the ARC Administrative Claim and seeks to have it reclassified as a general unsecured claim on the grounds that drop-shipments are not entitled to reclamation rights and Debtor never received the goods. This is simply not the case. Not only did the Debtor receive the goods within 20 days of the Petition Date as is required but there is demonstrably no requirement that before an administrative claim may be asserted the goods which constitute the basis of the claim must have been subject to the creditor's reclamation claim. Lost reclamation claim creditors and drop-shipment creditors stand in the same position relative to the assertion of an 11 U.S.C. § 503(b)(9) claim, and there is no reasonable justification for treating the two types of creditors differently. "Receipt of the goods" expressly includes receipt of the goods by the sub-purchaser. *See* Exhibit 1 and *In re Momenta, Inc.*, 455 B.R. 353, 360 (Bankr. D.N.H. 2011). Moreover, the Supply Agreement provides that goods are deemed delivered to the Debtor upon receipt of the purchase order by ARC, thereby providing for "constructive receipt" of the goods by the Debtor. Therefore, at least when the Debtor's customer received the goods drop-shipped by ARC, but arguably when the goods were placed with the carrier within the 20 days before the filing

3

of the Petition Date, ARC held a valid administrative claim. Thus, this Court should overrule the Objection.

**A.      Being Able To File a Reclamation Claim is Not A Requirement For Being Entitled to A Claim Under 11 U.S.C. §503(b)(9).**

The argument against allowing drop-shipment creditors to assert an administrative claim under § 503(b)(9) is that 11 U.S.C. § 503(b)(9) allows for a creditor to assert an administrative claim only if the underlying shipment of goods was eligible for reclamation under 11 U.S.C. § 546 and under UCC §§2-702 and 2-705 UCC and because, drop-shipments may never be stopped in transit by the creditor/seller they are never eligible for reclamation and therefore by the drop-shipment creditor/seller may never assert a reclamation claim on goods that were drop-shipped. This argument is based on false premises.

The Objection suggests a "bright line" rule that every drop-shipment relationship automatically excludes a creditor from administrative claim status, as the goods are not received by the Debtor, but by the end-user. The New Hampshire Bankruptcy Court, affirmed by the New Hampshire District Court (*Ningbo Chenglu Paper Products Mfg. Co. v. Momenta, Inc.,* No. 11-CV-479-SM, 2012 WL 3765171, at *7 (D.N.H. Aug. 29, 2012), declined to follow those cases which defined receipt as exclusively requiring physical possession, and established that a debtor is considered to have received goods under § 503(b)(9) when it has <u>either</u> physical possession or constructive possession:

> A seller must be entitled to an administrative expense claim where a Debtor received goods, by having either physical possession or constructive possession as specified in UCC § 2-705(2), within twenty days of the commencement of the bankruptcy case. Consequently, a seller may have an administrative expense claim in a drop shipment situation, so long as the Debtor at some point had constructive possession of the goods.

*In re Momenta, Inc.*, 455 B.R. 353, 360 (Bankr. D.N.H. 2011). Thus, no such bright-line test exists.

4

The facts of this case provide not only that the Debtor constructively received the goods but that pursuant to the terms of the Supply Agreement the goods were received by the Debtor when shipped. The Debtor also had constructive possession of the goods once the Debtor issued the purchase orders. *See* Exhibit 1.

Taylor argues that the provisions of 11 U.S.C. § 503(b)(9) must be read in conjunction with 11 U.S.C. § 546 because 11 U.S.C. § 503(b)(9) was passed by Congress in the same law which added the provisions of 11 U.S.C. § 546 and was included in the "Reclamation" section of the Bankruptcy Abuse Prevention and Consumer Protection Act. Taylor argues that because these provisions of the Bankruptcy Code were enacted together, they must be read together. This premise has been incorrectly interpreted to mean that § 503(b)(9) only applies to creditors who had reclamation rights under § 546(c)(1), but whose rights were extinguished because the creditor did not timely assert those rights. The argument goes on to state that because drop-shipments do not qualify for reclamation rights (or the right to stop goods in transit, for that matter), no such shipments qualify for administrative claim treatment under §503(b)(9).

The Bankruptcy Code, however, does not specifically require that a creditor must be able to file a reclamation claim (and failed to do so) to hold an allowed § 503(b)(9) claim. At least one court has held that a reclamation claim has nothing to do with a claim under 11 U.S.C. §503(b)(9), stating as follows:

> Likewise, there is no basis to import a requirement that the goods be reclaimable, as argued by the Debtor. Congress added § 503(b)(9) to the Bankruptcy Code as part of § 1227 of BAPCPA, entitled "Reclamation." Most of BAPCPA § 1227 is devoted to amending § 546 of the Bankruptcy Code, which provides relief to sellers of goods who failed to give an effective notice for reclamation. The Debtor reads this scant legislative history as an indication that § 503(b)(9) is a reclamation concept, and suggests that goods must be reclaimable in order for a seller to have a §503(b)(9) claim. **However, there is nothing in § 503(b)(9) that requires a claimant to also be entitled to a reclamation right under § 546. Section § 546 does not limit or control in any way the rights that a claimant has under § 503(b)(9).**

5

*In re Plastech Engineered Products, Inc.*, 397 B.R. 828, 838, (Bankr. E.D. Mich. 2008) (emphasis added).

The primary argument advanced in support of the reclamation claim requirement focuses on the wrongfully perceived undeserved "benefit" afforded to a drop-shipment creditor if it is permitted to make an administrative claim. This "benefit" is wrongfully perceived because it is premised on the idea that drop-shipments are not eligible for § 503(b)(9) treatment and are only general unsecured claims. Thus, to allow § 503(b)(9) treatment for drop-shipments gives the creditor/seller a "windfall" by elevating the status of a general unsecured claim to an administrative claim. Drop-shipment creditors are not provided a windfall at all. Rather, they are receiving priority treatment provided to those creditors under the 11 U.S.C. §503(b)(9) that continued to do business with the Debtor when it was in financial distress and provided an actual and necessary benefit to he Debtor − goods.

This argument against giving a drop-shipment creditor a "windfall" fails to acknowledge the status of the failed reclamation claim. If a creditor fails to demand reclamation through the required §546(c) notice, the creditor has lost its reclamation right and has only a general unsecured claim. Thus, in that situation the creditor with the lost reclamation claim is in the same position as the drop-shipment creditor − both hold general unsecured claims. However, § 546(c)(2) gives guidance to the lost reclamation claim creditor by alerting such creditor that it may still assert an administrative claim under § 503(b)(9). Importantly, § 546(c)(2) does not give the lost reclamation claim creditor the **right** to file a § 503(b)(9) claim but only alerts such a creditor to the option of obtaining some relief under that section: "If a seller of goods fails to provide notice in the manner described in paragraph (1), the seller still may assert the rights contained in section 503(b)(9)." 11 U.S.C. § 546(c)(2).

1578019

Accordingly, the drop-shipment creditor and the lost reclamation claim creditor are in exactly the same situation when each asserts an administrative claim under § 503(b)(9).   Both would have general unsecured claims but for the possibility of asserting an administrative claim. If the use of § 503(b)(9) by the drop-shipment creditor is characterized as providing a "windfall," the use of that section by the lost reclamation claim creditor should also be characterized as providing that creditor with a "windfall."   Yet, the latter use is favored while the former use is disparaged.   At the point when each of these creditor types would assert an administrative claim, they are in exactly the same situation.   Both have general unsecured claims, and both would use § 503(b)(9) to convert at least part of the unsecured claim into an administrative claim.   Nowhere in the text of § 503(b)(9) is the use of that section tied to, or dependent upon, a creditor failing to satisfy the reclamation provision of § 546(c)(1) – a condition which Congress could easily have added if that was the intention.   Rather, Congress' deliberate omission of such a requirement demonstrates that § 503(b)(9) is not intended to, nor designed to, be limited to only failed reclamation claim creditors, but instead is available to any creditor who satisfied the conditions therein.

## B.    The Debtor Received Goods Within 20 Days of the Petition Date.

Taylor argues that UCC § 2-103(A)(3)[1] requires actual physical possession of the goods. However, with respect to drop-shipment creditors, a debtor's "constructive" receipt of the goods  is sufficient.   *See In re Momenta*, 455 B.R. at 360.   This is true because in a drop-shipment situation the goods are not delivered to the debtor/buyer but, instead, to the buyer's customer (i.e., the sub-purchaser).   Taylor argues that even if "constructive" receipt of the goods would suffice, the goods were not constructively received by the debtor because none of the situations described in

---

[1]  "'Receipt' of goods means taking physical possession of them."

UCC § 2-705(2)(b)-(d)[2] occurred.  This reasoning is misguided.

Official Comment 2 to UCC § 2-705(2)(b)-(d) provides that "receipt by the buyer" includes "receipt by the buyer's representative, the sub-purchaser" when the goods are drop-shipped.  To the extent that Taylor argues that the language of the Comment only applies when determining whether a creditor/seller has the right to stop goods in transit, then the three constructive receipt options set forth in UCC § 2-705(2)(b)-(d) only apply in that context as well.   Either UCC § 2-705(2)(b)-(d) and the Comment are applicable only to determine whether a seller has the right to stop goods in transit (in which case they are arguably completely irrelevant to this discussion) or they may be more universally applied, in which case it is clear that drop-shipped goods, at least when they are received by the sub-purchaser (if not before), are "received" by the debtor/buyer.

Having established the right to a § 503(b)(9) claim upon the goods being delivered to the sub-purchaser within the applicable time period, with regard to ARC the right has its genesis when the goods were delivered to the carrier for transit to the sub-purchaser.  It must be reemphasized that Debtor instructed ARC to drop-ship the orders and use Debtor's account with the carrier (as explicitly set forth in the Supply Agreement). *See* Exhibit 1.  Accordingly, once the goods were delivered to the carrier, ARC had no control over the goods – Debtor possessed sole control.  The common element of the constructive receipt situations described in UCC  §  2-705  is  the acquisition of control over the goods obtained by the debtor/buyer. Similarly, here Debtor required ARC to ship the goods in such a fashion that Debtor, not ARC,  had  control  over  the goods once they were delivered to the carrier. *See* Exhibit 1.  These deliberate actions create the same common element – control – as the UCC § 2-705 situations, and there is no logical basis for treating the situations differently.

---

[2] (b)  acknowledgment  to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer; or (c)  such acknowledgment to the buyer by a carrier by reshipment or as a warehouse; or (d)  negotiation to the buyer of any negotiable document of title covering the goods.

1578019

## CONCLUSION

For the reasons set forth above, ARC requests that the Objection to the § 503(b)(9) claim of ARC be overruled in its entirety.   In the alternative, ARC requests that the Objection be set for an evidentiary hearing.

## RESERVATION OF RIGHTS

ARC reserves the right to amend, modify, or supplement this response.

Dated:  June 17, 2016                    BRUTZKUS GUBNER

                                         */s/ Robyn B. Sokol*
                                         _____
                                         Robyn B. Sokol (California Bar No. 159506)
                                         Reed Bernet (California Bar No. 281020)
                                         BRUTZKUS GUBNER
                                         21650 Oxnard Street, Suite 500
                                         Woodland Hills, CA 91367
                                         Telephone:    (818) 827-9000
                                         Facsimile:    (818) 827-9099
                                         Email: rsokol@brutzkusgubner.com

                                         Attorneys for ARC Document Solutions, LLC

## SUPPLY AGREEMENT

This Supply Agreement ("Agreement") is made and entered into as of the 9th day of August, 2012 between WorkflowOne LLC, with its primary offices located at 220 East Monument Avenue, Dayton, OH 45402 (referred to as "WorkflowOne") and American Reprographics Company (referred to as "Seller") with its primary offices located at 945 Bryant Street, San Francisco, California 94103. In this Agreement, "Seller" also includes subsidiaries and any other entity controlled by or under common control of the Seller entity referred to above.

**WHEREAS**, WorkflowOne is in the business of managed print and promotional products;

**WHEREAS**, it is the intent of WorkflowOne to develop a high level of communication with key sellers in order to promote the objectives of this Agreement;

**WHEREAS**, WorkflowOne and Seller desire to enter into this Agreement to state how the organizations will work together;

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the parties agree as follows:

**1.    Product/Service Deliverables**
This Agreement pertains to all purchase transactions between WorkflowOne and Seller for products and/or services rendered. Seller shall design, manufacture, or purchase to make available for sale to WorkflowOne, and WorkflowOne shall purchase from Seller, the merchandise as described in the purchase order. All products and/or services covered by this Agreement regardless of the time will be referred to as "Items" or "Products." WorkflowOne shall purchase Products by issuing a written purchase order signed by an authorized agent of WorkflowOne indicating the specific products, specifications related thereto, quantity, price, shipping instructions, requested delivery dates, "bill to" and "ship to" addresses and any other special instructions ("Product Specifications"). Seller will be notified in writing of any changes to the specifications. Seller must acknowledge, in writing those changes. Before Seller changes its production location or discontinues the manufacture of any products or services available at the time of this Agreement, Seller must give WorkflowOne at least sixty (60) days prior written notice.

**2.    Acceptance/Title to Goods**
WorkflowOne and Seller agree to be bound by the terms and conditions set forth herein for the purchase of Items and Products as described in WorkflowOne's purchase orders to Seller. Any terms or conditions in any purchase order, acknowledgement, invoice or other paper or electronic document, that are contrary to the terms of this Agreement, issued by either Seller or WorkflowOne are superseded by the terms and conditions of this Agreement. By shipping goods or performing services after receipt of a purchase order,

Seller shall be deemed to be bound by the terms and conditions of this Agreement. WorkflowOne will take title to the Products upon risk of loss transferring to WorkflowOne under the applicable shipping terms.

**3.    Price**
Seller agrees that the prices, payment terms, credit terms and volume discounts given to WorkflowOne will be equal to the lowest prices, payment terms, credit terms and volume discounts offered to any other customer of Seller for like volumes of products purchased over the same period of time.

**4.    Property Ownership Rights**
Except as otherwise set forth in this Agreement, all materials (including any Items and/or Products), dyes, molds, documents, data, information, deliverables and suggestions of every kind, and descriptions supplied to Seller or any Seller employee, subcontractor, agent or authorized representative, or prepared or developed by Seller or any Seller employee, subcontractor, agent or authorized representative, exclusively pursuant to this Agreement, or resulting from the services provided hereunder, shall be the sole and exclusive property of WorkflowOne and shall be deemed confidential information. WorkflowOne shall have the right to make whatever use it deems desirable of any such materials, documents, data and information; provided that Seller may retain copies of such materials as required by applicable laws, rules and regulations. Should Seller provide any design services associated with the items, WorkflowOne will own this design work as well, whether performed by Seller for payment or performed by Seller for WorkflowOne without cost. Seller will deliver to WorkflowOne, at WorkflowOne's request, all camera ready and other

**EXHIBIT "1"**

artwork, including digital files, pertaining to such WorkflowOne's customer(s) requested by WorkflowOne (collectively "Artwork"). Contractor hereby assigns to WorkflowOne, its successors and assigns, any and all inventions, creations, improvements, know-how, deliverables or other developments, and all patents, copyrights or applications therefore, related to such Artwork or otherwise related to the Products or Items provided hereunder and hereby agrees to do, and to cause its employees to do, any and all acts, and to execute any and all instruments, which WorkflowOne may reasonably request to secure for itself, its successors and assigns, any such rights. WorkflowOne may sell the Products or Items to any of its customers anywhere in the world for any use or purpose.

**5.    Trademarks**
The parties hereto agree that all Products supplied may be required to bear trademarks to be selected by WorkflowOne. WorkflowOne shall authorize Seller in writing of any trademarks that Seller is authorized to apply to the Products.

**6.    Representations and Warranties of Seller**
Seller expressly represents and warrants the following with respect to the Items and/or Products delivered under this Agreement: all Items and Products will be of high quality and free from defects or workmanship issues, fit for WorkflowOne's particular purposes and of merchantable quality; Seller will comply with all applicable international, federal, state, and local laws, rules, and regulations and ordinances in the performance of its obligations under this Agreement; the discoveries, inventions, products, services or processes used in the business of Seller do not infringe upon or conflict with any right or patent of any third party, or any discovery, invention, product or process which is the subject of a patent application filed by any third party; Products or Items delivered to WorkflowOne pursuant to this Agreement shall comply with the most stringent of WorkflowOne's or Seller's specifications, performance guarantees and requirements as amended from time to time; and all items shall be sold to WorkflowOne free and clear of any encumbrances.

Seller's warranties and guarantees shall survive inspection, delivery and acceptance of the items and/or payment by WorkflowOne. If the items do not conform to any of these representations or warranties, then, at WorkflowOne's option, Seller shall replace defective items, DDU (as defined in Incoterms–2000 Edition) WorkflowOne's designated site at Seller's expense, or in the case of services, re-perform the services at Seller's expense. WorkflowOne has the right to withhold payment for all items that do not meet the specification until such

time that Seller replaces said items. In the event that, in the reasonable opinion of WorkflowOne, Seller cannot replace the items, or re-perform the services, within a reasonable period of time, then WorkflowOne may take all steps necessary to have the breach of warranty cured and/or may terminate the purchase order and/or this Agreement, at its sole option. In any event, Seller shall be responsible for all expenses and damages which WorkflowOne incurs because of the breach of warranty or representation. The foregoing warranties, representations and obligations shall also apply to the items supplied by Seller in such repair, replacement or re-performance. Seller shall pass on to WorkflowOne the benefit of any manufacturer's warranties.

**7.    Delivery**
Seller shall deliver the items to WorkflowOne on the date(s) indicated in the purchase order, in accordance with any other requirements of WorkflowOne and, in addition, as set forth in any other documents agreed to in writing by the parties. If Seller fails to make delivery of any part of the items on the date(s) indicated WorkflowOne may, but shall not be required to, terminate the purchase order and/or this Agreement and pursue other remedies.

**8.    Payment Terms**
WorkflowOne shall pay Seller in accordance with the terms and any incentives specified on Schedule 1. Payment for any Item or Product under this Agreement will not constitute acceptance thereof.

**9.    Inspection of Goods and Facilities**
WorkflowOne may inspect any items ordered hereunder during their manufacture, construction or preparation at reasonable times and shall have the right to inspect such items at the time of their delivery and/or completion. Items furnished hereunder may at any time be rejected for defects revealed by inspection or analysis even though such items may have previously been inspected and accepted. Such rejected items may, at WorkflowOne's option, be returned to Seller for full refund to WorkflowOne, including removal, shipping and transportation charges or credited towards future deliveries. Seller also grants WorkflowOne, or third parties representing WorkflowOne, the right to inspect facilities of subcontractors at any time in order to assess working conditions.

**10.    Covenant of Cooperation**
Seller agrees that it will comply with WorkflowOne's instructions for shipment and delivery to its warehouses and customers, instructions for proper invoicing, and any other reasonable request by WorkflowOne related to order processing. Subject to the terms and conditions herein provided, each of the

11

parties hereto shall use its best effort to take, or cause to be taken, all action, or do, or cause to be done, all things reasonably necessary, proper or advisable to minimize the cost and loss to the other caused by elimination of items that are currently being provided by Seller or termination of this Agreement on expiration or because of fault of the other party. With respect to termination or the expiration of the term of this Agreement, the parties shall cooperate to minimize at termination the amount of finished goods, work in process and raw materials.

**11.    Assignment**
Neither party may assign this Agreement, or any right thereunder, without prior written consent of the other except that WorkflowOne shall have the right to assign it to any entity into which it shall be merged, with which it shall be consolidated, or by which it or all or substantially all of its assets shall be acquired.

**12.    Taxes and Other Charges**
In addition to the price of the items sold hereunder, unless otherwise agreed, Seller will pay all foreign charges including, by way of example but without limitation, excise taxes, value added taxes, and export taxes.

**13.    Packing and Marking Requirements**
No charges for packing, containers or transportation will be allowed unless specified in instructions received on the face of any purchase order.  Seller shall be responsible for any damage to merchandise caused by improper boxing, crating, or packing.

**14.    Insurance**
Seller agrees to maintain, throughout the term of this Agreement, Products Liability and Comprehensive General Liability Insurance coverage of no less than two million U.S. dollars (US $2,000,000) per occurrence. Such insurance shall (a) be with a U.S. insurance company acceptable to WorkflowOne and shall name WorkflowOne as an Additional Insured for liability arising out of this Agreement, (b) acknowledge that Seller's insurance is primary and that any insurance carried by WorkflowOne is excess or secondary insurance, and (c) contain a provision requiring Seller's insurers to provide WorkflowOne with written notice of any cancellation or adverse material change in such insurance shall not be effective as to the benefit and/or Interest of the Additional Insureds for thirty (30) days after written notice of such cancellation or adverse material change is received by WorkflowOne.  Prior to execution of this Agreement, Seller shall furnish WorkflowOne with certificates of insurance evidencing the above insurance.

**15.    Indemnification**

Seller shall indemnify and hold harmless WorkflowOne, its assigns and customers, against all losses, expenses (including reasonable attorneys' fees), fines, penalties, damages, claims and liabilities of any nature for any violation of the Agreement by Seller or allegation relating to a potential violation of law, or injuries to persons or damage to property occurring due to or arising out of (a) the sale, recall or use of the Products, if such injury or damage is caused by defective Products or if the Products fail to perform as warranted or represented by Seller; (b) any Product characteristic, failure to provide warnings or other suitable labels, or any manufacturing defect or failure to meet Product Specifications; (c) any breach or violation of any representation, warranty or other obligation of Seller under this Agreement.

**16.    Subcontracting**
Seller shall identify to WorkflowOne upon request any and all third parties ("Subcontractors") from whom Seller obtains the merchandise supplied to WorkflowOne by Seller pursuant to this Agreement. Seller shall obtain assurances from each Subcontractor that (a) the merchandise conforms to and has been tested in accordance with WorkflowOne's specifications, (b) the Subcontractor shall comply with the provisions of this Agreement and of any other agreements between the parties with respect to trademarks and treatment of confidential information.

**17.    Audits**
Seller shall immediately notify WorkflowOne of, and provide WorkflowOne copies of, any inquiries, correspondence or communications to or from any governmental or regulatory authority relating to this Agreement, including, but not limited to, requests for inspection of the Seller's facilities, and Seller shall permit WorkflowOne to attend any such inspections. Seller will make reasonable efforts to separate, and not disclose, confidential materials that are not required to be disclosed during such inspections.

**18.    Freight Terms**
All freight terms shall be as described on Schedule 2 to this Agreement, but if there is no Schedule 2, the freight terms shall be as agreed to by the parties in writing.

**19.    Termination of Purchase Order**
WorkflowOne may terminate work under an order in whole or in part at any time by providing   written notice to Seller that states the extent and effective date of such termination. On receipt of such notice, Seller shall, to the extent directed by WorkflowOne, stop work under such order, and take any necessary action to protect property in Seller's possession that belongs to WorkflowOne or in which WorkflowOne

has an interest. WorkflowOne shall only pay for the work completed prior to the written notice and WorkflowOne shall be entitled to any and all partial Items or Products as a result of such completed work.

#### 20. Duration and Breach of Agreement

This Agreement will be for a period of one year starting on the date at the top of this Agreement, and will automatically renew from year-to-year, unless a party notifies the other that this Agreement will not be renewed or will be renegotiated at least thirty (30) days prior to the expiration of any term. Each party will perform its respective obligations under this Agreement through the effective date of the termination. The occurrence of any of the following shall constitute an event of breach hereunder:

a) The failure of Seller to keep, perform or observe any term, covenant or condition of this Agreement which failure is not remedied within thirty (30) days after receipt of written notice thereof from WorkflowOne.

b) Any insolvency, receivership, general assignment for the benefit of creditors; any voluntary bankruptcy or other proceeding for relief of debtors, protection of creditors, or termination of the corporate existence by Seller; or any involuntary bankruptcy or similar proceeding against Seller which is not dismissed within thirty (30) days after its initiation.

Upon the occurrence of an event of default as set forth above, WorkflowOne shall have the right to immediately terminate this Agreement upon written notice thereof to Seller. Such right shall be cumulative with all other rights provided for hereby and at law. In addition to its other remedies, WorkflowOne may withhold and retain from time to time out of any money due Seller hereunder amounts sufficient fully to reimburse and compensate itself for any loss or damage which it sustains, or may sustain, as the result of any liens, suits, actions, legal proceedings, claims, demands, damages or costs, or as a result of any damage it incurs, or may incur, due to delays or default or breaches on the part of Seller in the performance of this Agreement.

#### 21. Independent Contractor

Seller will provide the services to WorkflowOne as an independent contractor and not as an employee or agent of WorkflowOne. Seller will not have any right or authority to represent, commit or bind WorkflowOne in any way without the prior written consent of an authorized representative of WorkflowOne. Seller will not be entitled to any employee benefits offered to executives or employees of WorkflowOne and Seller will be responsible for all taxes on amounts paid by WorkflowOne for any services.

#### 22. Confidential Information, Non-Solicitation

In the process of Seller filling orders from WorkflowOne under this Agreement, Seller will obtain valuable proprietary information concerning many aspects and details of the Products, Items and trade relationship between WorkflowOne and its customers ("Customers"). In exchange for the placement by WorkflowOne of product orders with Seller anticipated by this Agreement, Seller agrees that Seller will not and will not permit any of its officers, directors, employees, agents or independent contractors to, disclose to any third party or use for Seller's or such person's own benefit, at any time, either directly or indirectly any of the proprietary information to which it has access as a result of its relationship with WorkflowOne. During the term of this Agreement and for a period of two (2) years after the date of the last order (the "Termination Period"), Seller will not: (i) directly or indirectly, solicit or attempt to solicit the sale of any product or service to any Customer of Seller; or during the Termination Period accept, fulfill, knowingly sell or agree to fulfill Customer orders for products or services which are substantially similar to orders Seller previously fulfilled for such Customers on behalf of WorkflowOne unless such orders are submitted by WorkflowOne, or (ii) knowingly allow a current or former WorkflowOne employee to (other than expressly on WorkflowOne's behalf), directly or indirectly, acquire products or services from Seller on behalf of a Customer. In the event WorkflowOne submits a purchase order for a Customer that is also an existing Customer of Seller, then Seller shall immediately notify WorkflowOne, in writing, of that fact and describe the scope of Seller's existing work for that Customer ("Notice"). Upon receipt of that Notice, provided it is not inaccurate, the obligations of subparagraphs (i) and (ii) above shall not apply, only to the Customer and only to the scope of the existing work, identified and described in the Notice. Seller acknowledges and agrees that any violation of the covenants contained in this paragraph may cause irreparable damage to WorkflowOne. Therefore, in the event Seller breaches any of its obligations in this paragraph, WorkflowOne will have the right to (a) equitable relief including but not limited to having the foregoing specifically enforced by any court; and (b) require Seller to account for and to pay over to WorkflowOne all damages, lost profits and costs (including attorneys' fees) incurred by WorkflowOne as a result of such breach. WorkflowOne's rights as set forth above shall be in addition to and independent of all other rights and remedies available to WorkflowOne.

#### 23. Representations

The representations, warranties, indemnities, ownership, confidentiality, nondisclosure, and non-solicitation provisions contained herein shall survive the termination or expiration of this Agreement.

## 24.    Entire Agreement

This Agreement constitutes the entire understanding of the parties with respect to the provision of Items and Products and no representation or statement not included herein shall be binding unless signed by both parties; provided, however, additional information in any purchase order, which is not contradictory to the terms of this Agreement, shall also apply.

## 25.    Waiver

No waiver by either party at anytime of any of the terms, conditions or covenants of this Agreement, or non-compliance therewith, shall be treated at anytime thereafter as a waiver of the same or of any other term, condition or covenant herein contained, nor of the strict and prompt performance thereof.

## 26.    Governing Law\Jurisdiction

The rights and obligations of the parties under this Agreement shall not be governed by the provisions of the 1980 United Nations Convention on Contracts for the International Sale of Goods; rather, these rights and obligations shall be governed by the laws of the State of Ohio, USA, excluding its conflicts of laws provisions. Seller agrees that the U.S., Ohio and/or Montgomery County courts shall have exclusive jurisdiction regarding any disputes between the parties, and Seller consents to such jurisdiction.

## 27.    Governing Language

The governing language of this Agreement shall be English, and this Agreement has been executed in English. If either party prepares a translation of this Agreement, such translation shall not have any authority and the English version of this Agreement shall at all times prevail.

## 28.    Force Majeure

Neither party will be responsible for any delays or failures in performance caused by acts of God, war, terrorism, riots, fire, explosion, flood, strike, governmental laws or regulations; provided that the party who is affected or threatened by such event immediately notifies the other party of the nature and estimated effect upon its performance. Seller will use its best efforts to remove any force majeure event to the extent possible. At WorkflowOne's discretion, the period specified for delivery of goods or services and any warranties will be extended by the period of delay occasioned by any such cause and deliveries omitted will be made during such extension, or the total quantity will be reduced by the deliveries affected by the suspension of such performance, but the balance of a purchase order will remain unaffected. WorkflowOne will have the option to terminate this Agreement or any then open purchase order without liability to Seller in the event of a force majeure situation. In the event of allocation by Seller as a result of a force majeure condition, Seller will allocate its total available supply of production and goods among WorkflowOne's and Seller's most favored customers on a fair and equitable basis.

## 29.    Notice

Notices under this Agreement shall be sufficient if sent by United States certified mail, postage prepaid or by an air courier service, prepaid as follows:

If to WorkflowOne:

WorkflowOne
Attention: Contract Administration
220 East Monument Avenue
Dayton, OH  45402

If to Seller:

_____
_____
_____

## 30.    Enforceability

Should any provision of this Agreement become invalid or unenforceable, the remaining provisions shall remain unaffected, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**(signature page follows)**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first mentioned above.

SELLER

By: *Richard Ferry*

Printed Name: RICHARD FERRY

Title: 11/6/2012   VICE PRESIDENT OPERATIONS

WORKFLOWONE LLC:

By: *Thomas Koenig*

Printed Name:  Thomas Koenig

Title:  Vice President / Chief Financial Officer

*[WORKFLOWONE LEGAL DEPT. APPROVED AS TO FORM stamp: M-154  11-26-12]*

## SCHEDULE 1

American Reprographics Company

The terms and conditions stated herein apply to all accumulated sales to WorkflowOne and its subsidiaries from all Seller subsidiaries.

INCENTIVE STRUCTURE

5% of the sale price of all Products, less taxes, freight and postage

PAYMENT TERMS

2% 30 days, Net 60 days

## SCHEDULE 2

American Reprographics Company

### PARCEL TRADE PARTNER PROGRAM:

United Parcel Service (UPS): WorkflowOne will assist Seller in establishing a separate UPS, or other parcel carrier as designated by WorkflowOne, account number, in the name of Seller as a WorkflowOne Trade Partner, for each of Seller's applicable distribution points. It will be the Seller's responsibility to ensure that all WorkflowOne parcel ground shipments weighing 350 pounds or less, or WorkflowOne parcel air shipments weighing 100 pounds or less, or any other designated air shipment requested by WorkflowOne Sales, be shipped using the account number(s) established. Additionally, the Seller will be responsible for payment to UPS, or other parcel carrier as designated by WorkflowOne, for all charges incurred on the account(s). To be reimbursed for all UPS, or other parcel carrier as designated by WorkflowOne, charges, the Seller will add all UPS, or other parcel carrier as designated by WorkflowOne, shipping charges to the applicable product invoice.

### ALL OTHER FREIGHT:

All other freight charges payable by WorkflowOne for product shipments will be as outlined in the WorkflowOne "Order Fulfillment Instructions" which may be updated from time-to-time and may include mutually agreed upon customer requests.

17

**WorkflowOne**
**Strategic Sourcing**
**Shipping Location(s) Information for the Establishment of UPS Accounts**

Dear Trade Partner:

In an effort to ensure that our Customers are given the utmost in service and value, WorkflowOne has developed a core carrier program with a select number of transportation providers. A detailed listing of these providers can be found in your current edition of the Order Fulfillment Instructions. A segment of this program requires packages weighing 350 pounds or less for Ground, and 100 pounds or less for Air, be delivered via UPS, or such other carrier designated by WorkflowOne.

UPS, or other carrier, will work with each trade partner to establish a separate UPS, or other carrier, account number, in the name of WorkflowOne, for each of your applicable distribution points used for WorkflowOne orders. All packages weighing 350 pounds or less for Ground and 100 pounds for Air, delivered for WorkflowOne must be shipped using the established WorkflowOne UPS, or other carrier, account number. This procedure will require each trade partner to pay for all UPS, or other carrier, charges incurred. To be reimbursed for all UPS, or other carrier, costs, all charges must be added to the product invoice.

A manifesting system is not required for UPS, or other carrier, package pickup. Their system involves "peel and stick" labeling of packages with a uniquely-coded barcode. A listing of all packages picked up from your distribution points will be delivered to you by the next business morning.

To implement the UPS, or other carrier, program, the enclosed "Shipping Locations Information" form must be completed and returned, no later than fifteen (15) days after receipt of this letter. A UPS, or other carrier, representative will then contact you with your account number. Please implement this program immediately after receiving your account number.
Thank you in advance for your cooperation in this matter. If you should have any questions, please contact Amber Hawks at 937-630-8211, or Mike Mahan at 937-630-8096.