```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2


 3                                      .  Chapter 11
        IN RE:                          .
 4                                      .  Case No. 15-10541 (BLS)
        SRC LIQUIDATION, LLC,           .
 5                                      .
                                        .  Courtroom No. 1
 6                                      .  824 Market Street
                                        .  Wilmington, Delaware 19801
 7                                      .
                         Debtor.        .  June 14, 2017
 8      . . . . . . . . . . . . . . . .    9:00 A.M.

 9
                             TRANSCRIPT OF HEARING
10              BEFORE HONORABLE BRENDAN L. SHANNON
                     UNITED STATES BANKRUPTCY JUDGE
11
        APPEARANCES:
12
        For the Debtors:         Justin Edelson, Esquire
13                                POLSINELLI PC
                                  222 Delaware Avenue, Suite 1101
14                                Wilmington, Delaware 19801

15                                - and -

16                                Matthew Austria, Esquire
                                  WERB & SULLIVAN
17                                300 Delaware Avenue, Suite 1300
                                  Wilmington, Delaware 19801
18

19

20      Audio Operator:          Dana Moore

21      Transcription Service:   Reliable
                                 1007 N. Orange Street
22                               Wilmington, Delaware 19801
                                 Telephone:  (302) 654-8080
23                               E-Mail:  gmatthews@reliable-co.com

24      Proceedings recorded by electronic sound recording:
        transcript produced by transcription service.
25
```

1  APPEARANCES (Continued):

2  For International
   Imaging Materials,
3  Inc.:                      Henry Baer, Jr., Esquire
                              FINN DIXON & HERLING LLP
4                             6 Landmark Square
                              Stamford, Connecticut 06901-2704
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2
                                                                    Page

3

<u>AGENDA MATTERS</u>:   (MATTER GOING FORWARD)

4

5
     Standard Register Inc.'s Seventh (7th) Omnibus
     (Substantive) Objection to Section 503(b)(9) Claims
6    Pursuant to Section 502 of the Bankruptcy Code,
     Bankruptcy Rule 3007 and Local Rule 3007-1          **4**
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 9:00 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning.  Apologies for the late

4     start.

5               Counsel.

6               MR. EDELSON:  Good morning, Your Honor.  Justin

7     Edelson from Polsinelli on behalf of SRC Liquidation.

8               We have a pretty quick agenda this morning for

9     you, Your Honor.  The only matter going forward is Standard

10    Register Incorporated's seventh omnibus objection with

11    respect to the International Imaging Materials claim.

12              With that I will hand the podium over to Mr.

13    Austria to handle that objection.

14              THE COURT:  Great.

15              MR. EDELSON:  Mr. Austria, good morning.

16              MR. AUSTRIA:  Good morning, Your Honor.

17              THE COURT:  I have some recollection.  Did I

18    already have a hearing on this a while ago?

19              MR. AUSTRIA:  A while ago.  The first omnibus

20    objection back in October 2015 on a drop ship delivery issue.

21              THE COURT:  Okay.

22              MR. AUSTRIA:  That may be what you're recalling,

23    and I'll refer to it in my presentation.

24              THE COURT:  Great.

25              MR. AUSTRIA:  For the record Matthew Austria of

1    Werb & Sullivan on behalf of Standard Register, Inc.

2          On February 6th Standard Register, Inc., filed its

3    seventh omnibus objection to 503(b)(9) claims.  The objection

4    included an objection to International Imaging Materials

5    claim No. 1737 on the basis that the goods in question were

6    drop shipped to the debtors' customers and not actually

7    delivered to the debtors as required under Section 503(b)(9).

8          As set forth in SRI's reply, it appears that the

9    parties are largely in agreement on the relevant facts.

10          THE COURT:  It does.

11          MR. AUSTRIA:  Yes.  The sole remaining issue for

12    determination by the Court, we believe, is whether IIMAK's

13    practice of delivering goods to the debtors' customers, via

14    UPS, using Standard Register's shipping account constituted

15    delivery for the purposes of 503(b)(9).

16          IIMAK's total asserted 503(b)(9) claim is

17    $57,164.89 dollars.  The parties agree that $8,750.46 dollars

18    was paid to IIMAK after the proof of claim was filed and that

19    satisfied a corresponding portion.

20          THE COURT:  Hang on a second.

21          Andrew, can you tell the jokers that are in the

22    conference room right next door that they should move to a

23    different conference room?

24          That's the 9:30 hearing.  I'm loathed to get in

25    the way of whatever they're, hopefully, resolving.

1        (Laughter)

2             THE COURT:  I do want to give you my full

3   attention.

4             MR. AUSTRIA:  I'll go slowly and give them time.

5             THE COURT:  You take your time.

6        (Laughter)

7             MR. AUSTRIA:  The parties agree that $8,750.46

8   dollars was paid to IIMAK after the proof of claim was filed

9   and that satisfied a corresponding portion of the asserted

10  claim.  The parties agree that the originally asserted claim

11  amount should be reduced by that amount.

12            THE COURT:  Okay.

13            MR. AUSTRIA:  The parties further agree that

14  $2,096.27 dollars in goods were shipped and actually

15  delivered to the debtor and satisfied Section 503(b)(9)

16  delivery requirement.  SRI does not contest that that portion

17  of IIMAK's asserted 503(b)(9) claim is valid.

18            THE COURT:  Okay.

19            MR. AUSTRIA:  The parties also agree that the

20  remaining goods in question were shipped to the debtors'

21  customers by IIMAK, via UPS, using a Standard Register

22  shipping account.  When added together with the $2,096.27

23  dollars in goods shipped directly to the debtor and after

24  accounting for the $8,750.46 dollar payment to IIMAK after

25  the proof of claim is filed.  The total amount of goods

1  delivered in the 20 day period is $46,806.06 dollars.

2         SRI contends that the goods shipped to the

3  customers of the debtors by IIMAK, via UPS, using Standard

4  Register's shipping account were not received by the debtors

5  for purposes of satisfying Section 503(b)(9).  SRI further

6  contends that the shipping charges of $1,878.38 dollars,

7  appearing on the relevant invoices, were not goods that were

8  delivered to the debtor and should not be included in the

9  claim amount.

10        The Court previously considered the delivery issue

11 and sustained the first omnibus objection to drop ship

12 administrative claims.  As Your Honor may recall, the Court

13 incorporated UCC Article 2 considerations into the

14 determination of what constitutes delivery for purposes of

15 Section 503(b)(9).

16        The UCC defines receipt of goods as:

17        "Taking physical possession of them."

18        The Court ultimately determined that within the

19 Uniform Commercial Code goods that were delivered to the

20 customer of the debtors were not "received by the debtor,"

21 per Section 503(b)(9).

22        THE COURT:  Can I ask if there is significance in

23 the Case Law or in construing the statute in Article 2?  Can

24 I ask if there is significance to the fact that IIMAK was

25 using the debtors' UPS account and, therefore, it was the

1  debtors' relationship with the shipping company?

2          MR. AUSTRIA:  Certainly.  In the Case Law, no, I

3  don't think there is significance.

4          THE COURT:  Because I think about it this way.

5          MR. AUSTRIA:  Okay.

6          THE COURT:  All right.  And we'll play this string

7  out a little bit, but let's suppose that Standard Register

8  turns to IIMAK and says I've got a customer that wants the

9  product, I'd like you to deliver directly to them; I will pay

10  you, you bill me.  Standard drop ship arrangement.  IIMAK

11  then is free within its own assessment to say, okay, we're

12  going to take a look and, you know something, we're going to

13  use FedEx because we've got a good deal with FedEx.

14          Then the question is was this ever delivered to or

15  received by the debtor.  All right.

16          MR. AUSTRIA:  Correct.

17          THE COURT:  And on that fact pattern IIMAK makes

18  it, it's in the factor.  IIMAK contracts with a shipping

19  company that only knows IIMAK and that, presumably, doesn't

20  have any idea who Standard Register is, that delivers it then

21  to the customer.  At that point it's difficult to square how

22  Standard Register could be perceived to have received it.

23  They would have absolutely no power of control.

24          For example, if for whatever reason you say, you

25  know something, this client's not a good payer; don't deliver

1  it.  And if it's in transit and you call Federal Express, I

2  think Federal Express is going to say who are you?  So it's

3  not received by you because you don't have any control, or

4  possession or dominion over it, right?

5          MR. AUSTRIA:  Right.

6          THE COURT:  In this instance -- and I guess I'm

7  asking about the significance.

8          MR. AUSTRIA:  Okay.

9          THE COURT:  In this instance we have the same fact

10  pattern except that the shipping company is, essentially,

11  under contract with Standard Register.  So do we -- does that

12  weigh on the analysis.  I mean I understand the prior ruling

13  that I had.

14          MR. AUSTRIA:  Yes.

15          THE COURT:  And I guess I'd like your thoughts on

16  that analysis.

17          MR. AUSTRIA:  Sure.  SRC -- if there is a factual

18  distinction it's a minor one.  We don't think it changes the

19  outcome in this case.

20          The Third Circuit case of Marin Oil -- although it

21  was not dealing with 503(b)(9), it was dealing with

22  reclamation; 503(b)(9) wasn't enacted at the time.

23          THE COURT:  Right.

24          MR. AUSTRIA:  I believe it was a 1984 case.

25          THE COURT:  Right, but 503(b)(9) sort of grew out

1  of issues of the inefficiencies in cumbersome processes.

2          MR. AUSTRIA:  Correct.  Yes.

3          THE COURT:  I mean, I think I understand.

4          MR. AUSTRIA:  Yeah, and I believe that case is

5  properly considered within this framework where we say we

6  should look at UCC considerations and most certainly that

7  case dealt with receipt of goods under the UCC.

8          So in that case it makes a distinction between

9  having a passage of title and transfer of risk of loss, and

10 says --

11         THE COURT:  I'm going to cancel their hearing.

12      (Laughter)

13         THE COURT:  You may proceed.

14         MR. AUSTRIA:  Sure.  It makes a distinction

15 between having title and the risk of loss being transferred

16 to the buyer.  And it says in that instance, in that case,

17 the fact that the carrier have the goods was just that.  We

18 don't perceive that to mean that the buyer had physical

19 possession of the goods; the carrier did.

20         So when we look at this -- when Standard Register,

21 Inc., looks at this situation -- if we agree, and we believe

22 this Court does agree from the previous decision, that a drop

23 ship customer that receives the goods does not satisfy the

24 delivery requirement to the debtor why would we then say that

25 goods that for a very brief moment in time are possessed by a

1  shipper give the buyer, in that instance, you know, the right

2  to a 503(b)(9) claim.

3         When we look at the supply agreement that was in

4  place and we look at, in particular, Schedule 2 we don't see

5  any indication that an agency relationship was contemplated

6  between the shipper and between Standard Register, Inc.  Just

7  reading the contents of that Schedule 2 it appears that

8  Standard Register wanted the end customer to believe that

9  Standard Register was the party shipping the goods.  There

10  does not appear to be any intention that Standard Register

11  would ever possess the goods.

12         So considering that IIMAK and the debtors never

13  intended, at least with regard to these particular goods, for

14  the debtor to have physical possession of them.  It would

15  seem almost illogical to say, okay, well we're going to give

16  them -- we're going to allow them to satisfy this delivery

17  requirement just because the shipper happened to have

18  possession of them briefly and just because there were some

19  provisions that said title transfer.

20         The other thing I should point out in that supply

21  agreement when they talk about the transfer of title and the

22  transfer of risk of loss, I'm not sure that those particular

23  provisions apply to this situation because there were other

24  instances, as we know, where goods were going directly to the

25  debtor.  Schedule 2 seems to present a different fact pattern

1  and, you know, I think we would look to that as, really,

2  what's relevant here.

3         So, you know, with that we do think properly that

4  if we set the allowed claim it should be at the $2,096

5  dollars; just the amount that was actually delivered to the

6  debtor.

7         THE COURT:  Very good.

8         MR. AUSTRIA:  Thank you, Your Honor.

9         THE COURT:  Sure.  Thank you.

10         Counsel, good morning.

11         MR. BAER:  Good morning, Your Honor.  For the

12  record, Your Honor, Hank Baer from Finn Dixon on behalf of

13  International Imaging Materials, Inc., whom we refer to as

14  IIMAK.

15         THE COURT:  Welcome.

16         MR. BAER:  Thank you.

17         Very quickly, the factual recitation by counsel, I

18  think, is largely correct.  Just two quick clarifications.

19         For the $8,750 dollar amount that has been paid we

20  both agree that that's, essentially, a setoff.  Just to be

21  clear for the record, though, we're, sort of, agreeing to

22  that for purposes of today's hearing; for the calculation of

23  the claim.

24         THE COURT:  Right.

25         MR. BAER:  My client never actually went through

1 and reconciled which invoices were paid and which weren't.

2 So we're agreeing that to the extent it's allowable to be a

3 setoff --

4          THE COURT:  I think that makes abundant sense.

5 We're just trying to figure out what the number is.

6          MR. BAER:  That's exactly right.

7          THE COURT:  Okay.  I appreciate that.  Thank you.

8          MR. BAER:  The second thing, if I can, Your Honor,

9 is to hand up one exhibit.

10          THE COURT:  Sure.

11          MR. BAER:  I've given it to counsel.  He's taken a

12 look at it.

13          THE COURT:  Great.  Thank you.

14          MR. BAER:  Your Honor, that exhibit is -- that's

15 an email from UPS to Standard Register simply clarifying, in

16 case there's any question, exactly who owns the account.  I

17 think Your Honor touched on one of the most critical portions

18 here which is the ownership of that account.

19          THE COURT:  Yes.

20          MR. BAER:  I think the issue here -- one of the

21 issues and the main disagreements often focus on terminology.

22 I think I can summarize the debtors' position that this is a

23 drop ship claim, drop ship claims are not received by the

24 debtor; therefore, they're not entitled to 503(b)(9)

25 recognition.

1            I think all of those, you know -- to use the

2    phrase "put the rabbit in the hat," because it's not entirely

3    clear what a drop ship claim is.  There's no definitive

4    definition of it.

5            I think that the Court has recognized before there

6    are differences between goods that are shipped to third

7    parties to continue work on it before they get sent as

8    opposed to sent to customers, etc.  I think there are also

9    distinctions that are necessary between ownership of the

10   goods, when title passes, etc.  I think there are various

11   ways to look at the relationships between the parties.  And I

12   think that as Your Honor has already done one of the best

13   ways to do it is to consider hypotheticals.

14            THE COURT:  Sure.

15            MR. BAER:  One of the issues aside from

16   considering what is actually a drop ship claim you think

17   about what is received by the debtor.  You think about what

18   is received, which is what a lot of the cases have talked

19   about.  Most of the cases, I think, the debtors and this

20   Court in previous decisions have talked about the

21   applicability of Section 2705.

22            THE COURT:  Right.

23            MR. BAER:  Now, 2705 deals with the seller

24   stoppage rights.  It doesn't deal with --

25            THE COURT:  It's usually a two party arrangement.

1   It's not being delivered to a third party if it is transit.

2   If I can stop it then its mine.  If you can stop it then it's

3   yours.

4           MR. BAER:  I think that's probably generally

5   right, Your Honor.  I think the issue is the definition of

6   the UCC of receipt is not just physical possession.

7           THE COURT:  Right.

8           MR. BAER:  Its physical possession unless the

9   contract requires otherwise.  So with that carve-out Courts

10  have looked at 2705, but that's not a definitive answer.  I

11  don't think by any stretch we can say that 2705(b), (c) and

12  (d), which the debtors have termed constructive delivery

13  provisions, are the full universe of constructive delivery.

14  There are thousands of scenarios we can come up with where

15  its constructive or deemed delivery, but they don't

16  necessarily fit within (b), (c) or (d).

17          THE COURT:  Sure.

18          MR. BAER:  The other problem, of course, with

19  looking at 2705 is that 2705(a) actually says receipt by the

20  buyer.  So it's a little bit circular in the sense that if

21  2705(a) is received by the buyer that means (b), (c) and (d)

22  are not received by the buyer and that would satisfy the

23  requirements of stoppage, which even the debtor has taken the

24  position that qualifies for 503(b)(9) treatment.

25          THE COURT:  Let me ask -- you touched on my

1  hypothetical and I'd like your thoughts on it.  I got

2  counsel's response.

3           On the hypothetical that I just gave starting with

4  the first, which is IIMAK, please make your product and

5  deliver it to my client; do it however you would.  All right.

6           MR. BAER:  Right.

7           THE COURT:  You just need to get it there by the

8  30th.  IIMAK says fine.  I say, you know, bill me.  IIMAK

9  says fine.  IIMAK makes the product, IIMAK contracts with a

10 company to deliver it, IIMAK is in control of that

11 relationship, IIMAK delivers the product to that customer;

12 let me ask you, under those circumstances, which are not our

13 circumstances here, do you think you'd still have a receipt

14 argument?

15          MR. BAER:  I'll answer that in two ways, Your

16 Honor.

17          First of all, I think answer is actually yes.

18          THE COURT:  Okay.

19          MR. BAER:  And to be -- it's worth looking at.

20 Again, 2705 is what most people look at.

21          THE COURT:  Right.

22          MR. BAER:  2705(a), the official comment to

23 2705(a) says:

24          "Receipt by the buyer includes receipt by the

25          buyers designated representative, the sub-

1           purchaser, when shipment is made direct to him and

2           the buyer, himself, never receives the goods."

3           That explicitly states that pursuant to 2705(a)

4   that's considered to be receipt.  Now the reason I want to

5   answer that twice is because, as you said, that's not

6   necessarily on for today and I'm not asking the Court to make

7   that determination.  That's probably more global

8   consideration of our drop ship goods in general.  I don't

9   think that applies to us.

10          Your Honor's earlier hypothetical about to the

11  extent that it's not IIMAK's shipper, but it's the debtors, I

12  think that clearly is considered receipt.  And I thought

13  about it the same way.  I think it sounds like that Your

14  Honor was, which is walking through hypotheticals; trying to

15  figure out that conceptual point at which there is receipt by

16  the debtor even if just for a moment.

17          And one of the ways that I was looking at it is,

18  and I'll try not to go too far into the hypothetical, but

19  let's say, purely a hypothetical, this Court were to

20  determine that the 503(b)(9) claim asserted by IIMAK was not

21  actually entitled to administrative priority.  Obviously,

22  that's a hypothetical.

23          THE COURT:  Never happens.

24          MR. BAER:  Never happen.

25          But to the extent it was, and I go back and tell

1   my client, and my client says fine.  We're here on this

2   claim.  They, obviously, want to know for business purposes.

3   They say going forward I guess we can't do that for

4   financially troubled companies.  Now, that's, obviously,

5   unfortunate.  It might even be ironic because that's actually

6   the exact opposite impact of what 503(b)(9) is supposed to

7   intend, but they go back and say, fine, we can't ship this

8   way anymore.

9        The next, Standard Register calls up and says we're in

10  a little bit of difficult, we need 45 days instead of 30.  My

11  client says fine, but to protect myself I'm not going to be

12  able to ship under the current terms.  Now, we're going to

13  ship directly to you.  So it was directly to the debtor --

14              THE COURT:  Who incurs then a further cost?

15              MR. BAER:  Further cost for the delay of waiting,

16  but let's consider for a second it comes in, it gets dropped

17  on their desk, it's not getting done anything for the debtors

18  so the debtors slap some new shipping on it and sends it off.

19  It's been on the debtors' desk for one second.  It's a little

20  bit incongruous to suggest that that satisfies it, but

21  another might not.  And the best way to consider it is to

22  continue.

23              Let's continue that hypothetical out. It may

24  answer what the distinction would be.  Let's take it one step

25  further.  UPS is the shipper in both cases.  The UPS agent

1  walks in and says I've got this here and the debtor says hold

2  on, don't do it, let me put a shipping on it and send it out.

3  It's never actually been received; it never touched the desk.

4          THE COURT:  I guess my point would be -- I

5  understand the hypothetical.  I guess I'd argue with you, I

6  don't know that that's nearly as incongruous as you think

7  because I think 503(b)(9) contemplates precisely that

8  situation.  I am running a -- we'll leave PACA out of it, but

9  I am running a vegetable stand.  You show up at 5:30 in the

10 morning and you deliver tomatoes, and a restaurant owner

11 shows up at quarter to six and says I'll take them all.  I

12 have received -- I have absolutely received them and they are

13 off of my shelf 10 minutes later.  I mean that's not a

14 difficult situation to perceive and I think that that will

15 fall squarely within 503(b)(9).

16         MR. BAER:  I agree completely with that.

17         THE COURT:  Okay.

18         MR. BAER:  But I think if we continue the

19 hypothetical to the next step, let's say the UPS deliverer

20 walks in and doesn't actually drop it.  Let's take the next

21 step and say that the UPS agent says, you know what, I'm

22 tired of bringing them --

23         THE COURT:  No, I'm taking that --

24         MR. BAER:  -- take them back out.  So I'm going to

25 walk in and say where do you want me to deliver this.

1      THE COURT:  -- off the truck.

2      MR. BAER:  Yeah.  Let's say -- then the next step

3  is the UPS agent says I'm not going to even bother driving

4  there because I'm wasting gas and time.  So he calls them up

5  and says where do you want me to deliver this.  All of this

6  is considered to be delivery, but it's never actually step

7  foot on the debtors and that's where we are here.

8      THE COURT:  Okay.

9      MR. BAER:  UPS actually is controlling it and

10  going where the debtors are instructing them to go.

11      THE COURT:  Let me ask you a question.  I follow

12  your hypo.

13      Let me ask you a question that takes us a step

14  away from the UCC because in my prior comments, and I don't

15  think it's a controversial proposition, Case Law teaches that

16  we are obliged to strictly construe all administrative

17  priorities for bankruptcy lawyers and, particularly, those

18  that represent debtors.  I mean, they've been aggrieved about

19  503(b)(9) forever because all these different changes have

20  made it much more expensive to get yourself out of

21  bankruptcy.  There are more cash claims you have to pay.

22      You know, as a Judge, I think 503(b)(9) is

23  actually helpful because it definitely addresses a lot of the

24  hurt feelings that we used to have about people swearing on

25  their mother's soul.  The wimpy burger.

1              So let me ask you, does that then -- assuming that

2    your analysis under 503(b)(9) and the UCC is correct, is

3    there a further gloss from the bankruptcy code about as I

4    construe 503(b)(9), which talks about all kinds of -- sorry,

5    UCC 2705 which talks about all sorts of different scenarios,

6    right.  The UCC is all about this.  It's about there's a

7    million different business out there and we're not going to

8    prescribe exactly how it; we're giving general rules from the

9    road and sometimes you ought to drive slowly and sometimes

10   you ought to put the top up if it's raining, but we're not

11   making those decisions.

12             So how much of a gloss does the bankruptcy code

13   then put on that analysis?

14             MR. BAER:  I apologize, Your Honor.  I'm not sure

15   I follow what you're asking.

16             THE COURT:  Well, the question is the UCC gives me

17   a methodology to look and to construe, right.  And we've got

18   a whole range of hypotheticals.  One is it lands on the desk,

19   right, and then its sold or moved on immediately, right.  And

20   I think in that situation you are pushing an open door.

21   Receipt has occurred.

22             MR. BAER:  Agreed.

23             THE COURT:  But now we have, in 2075, more nuance

24   circumstances that reflect business realities; is it really

25   received.  And there's discretion that's built into this.  We

1  have definitions and the Court will determine under the

2  specific relationship whether or not receipt has occurred and

3  there consequences to that.

4        Obviously, under UCC 2705 just generally and under

5  the bankruptcy code, obviously, there are consequences.  You

6  will have either an admin claim that gets paid, I assume, in

7  full or you'll have an unsecured claim that gets paid in

8  bankruptcy dollars.

9        So the question is if I were sitting across the

10  street in the Superior Court, and this was a straight up

11  commercial dispute and I were construing 2705 I'd just figure

12  out who wins.  In this situation I look at 2705 and should I,

13  frankly, take a more strained or constrained view of your

14  argument in order to make it difficult for you or, sort of,

15  increase the hurdle that you have to get over.

16        Am I making myself a little bit clear?

17        MR. BAER:  I understand, Your Honor.

18        I think the answer is, no, this Court should not

19  be applying additional hurdle over the UCC.  I don't think

20  that this Court should be considering UCC 2705 as the

21  universe of the UCC with which it should refer.  I think, you

22  know, other relevant provisions include UCC 2503 which talks

23  about the manner of seller's delivery.  UCC 2504 which says

24  the shipment by the seller to the buyer is considered to be

25  completed at the time it goes into -- if agreed by the

1  parties at the time it gets given to the shipper.

2            THE COURT:  To the agent.

3            MR. BAER:  To the agent.

4            THE COURT:  Yeah.

5            MR. BAER:  I think Section 2401 deals with passing

6  of title.  I think all of these things together create what's

7  the necessary framework by which this Court can consider.  I

8  think it's a similar framework to how across the street would

9  be considering a UCC claim.  I think it's probably a similar

10 analysis, whether it be based on a court of equity or simply

11 the understanding that business relationships have nuance and

12 each one is a little bit different.

13           THE COURT:  Can I ask you then -- and I think

14 we've covered this, but I want to understand it.  I will

15 start by acknowledging this is a fact pattern.  I guess I'd

16 like you to walk me through it.  It does seem to me a

17 challenging concept to view the goods as received.

18           I understand there's concepts of legal fictions,

19 etc., but on the first hypothetical that I gave where

20 Standard Register, other than a phone call to you, never

21 touches, never sees, never has any sort of control,

22 ownership, dominion and no documented relationship to this

23 other than simply just to these guys.  Do you think that

24 falls with -- I mean, is there an argument that that falls

25 within the receipt category?  I'm trying to figure out -- I

1  understand the legal fiction.

2          MR. BAER:  Again, I think -- and, again,

3  recognizing that's not the facts that we're faced with --

4          THE COURT:  I'll grant you that.

5          MR. BAER:  I do think there's an argument that

6  that falls within the definition of receipt.  I think it's,

7  obviously, much more attenuated and extended then --

8          THE COURT:  Then what you have today.

9          MR. BAER:  Yes, but I think the concept of receipt

10 includes, necessarily, the concept of deemed receipt and of

11 constructive receipt.  I think there are circumstances,

12 especially looking at 2705, comment 2, that says that

13 includes receipt by a third party and your designee, right.

14 I think there's a good argument that that still contemplates

15 receipt.  I think our argument today or the issue that we're

16 dealing with today is much more straight forward.

17         THE COURT:  Because of the UPS relationship?

18         MR. BAER:  It's not just the UPS relationship,

19 it's also the terms of the contract.

20         THE COURT:  Sure.

21         MR. BAER:  I think in this case, Your Honor, we

22 went through a thousand hypotheticals, right.  We started

23 with the one -- okay, one is UPS with SRC's UPS service and

24 the other is Federal Express.  That's somewhat straight

25 forward.  Then if you extend that out and you say, okay, the

1  UPS guy picks it up and calls up the debtor and says where do

2  you want me to take this.  That's still deemed in

3  constructive receipt, notwithstanding that it never actually

4  stepped foot there.

5         You can also look at it another way from when you

6  talk about delivery to the debtor, right.  That's sort of a

7  concept that we've never talked about because we all sort of

8  know what that is, but the bottom line is the debtor,

9  Standard Register, that's not a thing.  It's a collective of

10  legal rights and obligations and that's really it.  So you

11  can't actually hand it to Standard Register.

12         THE COURT:  You're kind of philosophical on me.

13     (Laughter)

14         MR. BAER:  So, you know, conceptually I think we

15  all agree, if they walk over and put it down on the debtors,

16  you know, desk that's delivery, notwithstanding that the --

17         THE COURT:  But that's not the only flavor of

18  delivery.

19         MR. BAER:  That's exactly right.  And you can

20  extend that out again.  You can say, okay, how about if you

21  hand it to the CEO.  Okay.  How about if the CEO says I need

22  it now and he drives up and picks it up, right.  The CEO is

23  not the debtor.  How about the CEO says my cousin is coming

24  to get it from you.  How about if the debtor says my shipper

25  is coming to get it from you.

1          There is, at this point, a critical difference.

2 And I think where you draw the line is -- and I think this is

3 where Your Honor was going earlier -- its ownership of the

4 goods, right.  At what point does the title pass.  What point

5 does risk of loss pass.  What point does control pass.  I

6 think if we ignore that distinction it becomes a very

7 slippery slope where all of a sudden we're putting ourselves

8 in positions that nobody actually agrees with, but it's

9 consistent with the last one so we kind of have to say that

10 that's not really delivery even though we all know it is.

11          The distinction -- and I think this is a critical

12 distinction for this case.  I think we've all agreed that the

13 contracts in this case say risk of loss and title pass in

14 this case when it's delivered to the debtors' shipper and the

15 debtors' shipper is UPS.  At that point IIMAK is out.  It

16 would be unreasonable to say at that point IIMAK is still in

17 control and is not to be deemed receipt, notwithstanding that

18 the UCC, 503, 504, 401 and 705 all say that they've delivered

19 it and the debtor has received it.  That distinction is

20 actually a critical distinction, but to my knowledge no Court

21 has ever found for a 503(b)(9) claim.

22          Now, counsel talked before about Marin Oil, which

23 a 1983 case.  Putting aside the fact that that's a 34 year

24 old case, more critically that deals with reclamation claims.

25 Now, we've all understood and I think it's obvious that

1  503(b)(9) and reclamation are related.

2          THE COURT:  But they're not the same.

3          MR. BAER:  They're not the same.  And one of the

4  most critical differences between the two is the concept of

5  delivery because reclamation has the additional requirement

6  that they have to keep the goods within.  A reclamation claim

7  is only good to the extent that the debtors still possess the

8  goods and they are subject to the superior rights of a good

9  faith purchaser which does not apply to 503(b)(9), which, of

10 course, is why Marin Oil never even discussed the fact that

11 the official comment 2 says delivery to somebody else counts

12 because that wasn't applicable there.

13         So Marin Oil not only was it 34 years ago, not

14 only did it deal with reclamation claims, but it was, what,

15 two decades before 503(b)(9) was even drafted.  So I don't

16 think that that's biding or, frankly, even relevant to this

17 case.

18         THE COURT:  Okay.

19         MR. BAER:  And I don't think any of the decisions

20 that other Courts have considered, much less this Court, deal

21 with this critical distinction.  The other claims that this

22 Court have considered, the debtor brought up, one is TLF

23 Graphics.  TLF Graphics said only this is -- you know, by

24 equity, Your Honor, you need to -- notwithstanding the claim

25 doesn't actually fit, equity mandates.

1          For <u>TLF Graphics</u>, Your Honor, the entire argument

2   is titled equities mandate that the 503(b)(9) claim be

3   allowed.  That has nothing to do with these circumstances.

4   We're not saying the equity committee.  We're saying this --

5          THE COURT:  Your contract and --

6          MR. BAER:  This is a specific contract provision

7   that's unique.  The Envelope Printery that we talked about,

8   that the debtor raised.  The Envelope Printery says, and this

9   is in Paragraph 9:

10          "These orders were shipped directly to the

11          designees using a carrier selected by the

12          designees."

13          Again, they do not say the title pass, they do not

14   say the risk of loss pass, they do not say that this is a

15   shipper belonging to the debtors.  At no point do they say

16   that the debtors received those goods.  And I think that's

17   the same thing for every other claim that this case has dealt

18   with.  There has yet to be one case where there's an actual

19   connection that the debtor, at that point, owned the goods

20   and controlled the goods.

21          And I think as this Court has already said, all

22   you need it one moment.  All it has to do is touch down on

23   the desk.  All you have to have is one minute where the

24   debtors owned, possessed or controlled the goods and that

25   makes it receipt.  And I think that that clear distinction is

1   satisfied in this case.

2          THE COURT:  Okay.  I understand.

3          Brief response.

4          I think I'd like to start with a comment mentioned

5   a moment ago which is, sort of, the broader inquiry.  We'll

6   start high and get granular in a moment.

7          Part of the comment from counsel was what kind of

8   behavior do we want to encourage.  And I realize that I've

9   got two parties before me on a particular claim, but one of

10  the things that drives this analysis, particularly as a

11  business court, is that, you know, we deal with this not just

12  in terms of claims, but, obviously, in terms of financing

13  arrangements, *et cetera*; what sort of conduct do we want to

14  reward, or encourage, *et cetera.*

15         I think counsel's argument was, you know,

16  something if you draw such a pinched construction of

17  503(b)(9) people will not deliver.  And 503(b)(9) says in its

18  legislative history you get an admin claim so that you will

19  continue to deliver when a company is in distress, but not

20  yet in bankruptcy.  So I'd like that, sort of, broader

21  thought.  Is the world going to come to a crashing end or --

22         MR. AUSTRIA:  I think the easy answer to that,

23  Your Honor, is no.  And the reason being, I think if Your

24  Honor was to rule in Standard Register, Inc.'s favor and say

25  there is no delivery here for purposes of 503(b)(9) I think

1  savvy businesses could contract and put provisions in a

2  supply agreement that says, for purposes of interpreting

3  bankruptcy code provisions, at the point we deliver goods to

4  your shipper you are deemed to have received them.

5          THE COURT:  But in fairness, rather than needing

6  to be a savvy drafter, you'd say, you know something, I want

7  cash on delivery.  I realize you're in a jam, I realize you

8  can't keep the lights on, I realize you can't make payroll,

9  but I'm not delivering anything unless you give me cash.

10  That's the more likely result.

11          MR. AUSTRIA:  Sure.

12          THE COURT:  That's actually not a remarkable

13  proposition with a struggling company one way or the other.

14  We're just, sort of, putting it under the lens of 503(b)(9)

15  and whether it fits.

16          MR. AUSTRIA:  I agree.

17          THE COURT:  Okay.

18          MR. AUSTRIA:  I think the bigger concern there

19  would be if there's a ruling in favor of IIMAK.  When debtors

20  are attempting to confirm a plan it will be difficult to try

21  to estimate the value of outstanding 503(b)(9) claims.

22  Presumably, the debtor has record of goods that were

23  delivered to the debtor.  When goods are being shipped to a

24  third party that might not be readily apparent.  I think the

25  decision will, essentially, create a new class of 503(b)(9)

1  claimants that wasn't contemplated by those who enacted

2  503(b)(9).

3        Just looking at the plain language of 503(b)(9) it

4  says delivered to the debtor.  Mr. Baer suggests there are

5  other hypothetical situations where there might be

6  constructive receipt beyond those UCC provisions.  I believe

7  that's a fair comment, but when we're looking at 503(b)(9) I

8  agree with Your Honor's assessment that there should probably

9  be a more constrained interpretation.

10        THE COURT:  But is 503(b)(9) exclusive of

11  constructive receipt?  Do you actually have to hold the stuff

12  even for the second that we described or --

13        MR. AUSTRIA:  I think the situation would be

14  different if the end party to receive delivery was the actual

15  debtor.  In this case nobody disputes that the ultimate

16  delivery was going to go to the customer and not the debtor.

17  So with that in mind is there a situation where there should

18  be constructive receipt where there's no intention that the

19  debtor is ultimately going to receive the goods?  I don't

20  think so.  I don't think that's what 503(b)(9) intended.

21        Once you open that door it's a slippery slope.

22  Where do you draw the line as to what constitutes delivery.

23  I think we should correctly look at the plan language of

24  503(b)(9).  It says delivery to the debtor and that is not

25  what we have here.

1          THE COURT:  Okay.  I understand.

2          MR. AUSTRIA:  Thank you, Your Honor.

3          THE COURT:  Can I ask you one last question?  Back

4   to slippery slope, edge of the abyss, whichever metaphor

5   you're looking for.

6          I agree with you that the UCC is informative.  I

7   agree with you that we also look to the terms of the

8   contract, *et cetera,* but there is also a, I guess, reality

9   check.  We could easily draft a contract that while your

10  client is preparing or building this stuff its mine.  So it's

11  in your factory, it's in process, but nevertheless as you are

12  bolting the thing together or whatever product we're doing,

13  as your printing product its mine.

14         All right.  That's an arrangement, for example --

15  I don't know if you've done the auto parts cases, but if you

16  have an auto parts factory in Mexico it belongs to GM.

17  Acknowledging again those aren't our facts, I do have this

18  issue.  You're both sort of making the argument, you know.

19  His point is -- counsel's point is, you know, you're going to

20  open the door and 503(b)(9) is going to be an even bigger

21  burden.  Your point is going to be its going to reflect

22  business realities of what people are doing and what they

23  expect.

24         I guess I'd like your thoughts about whether or

25  not are there limits to how much I need to respect or

1  acknowledge a contract that we could all easily identify

2  where it never leaves; you know, it never leaves your

3  property, but nevertheless it's deemed the debtors' property.

4  You know what I mean?

5          MR. BAEER:  I do, Your Honor.

6          THE COURT:  It's kind of the squirrely fact

7  pattern.

8          MR. BAER:  Right.  And I understand the issue.

9  That's in so many different circumstances, right, where you

10 actually deem something to be financing, but it's not and

11 when you deem something to be a lease, but it's not.  There

12 are ways that you can contractually provide for something

13 that everybody looks at and says, okay, we know that's not.

14         So at the end of the day I think the Court needs

15 to look not only what the contract says, but what the reality

16 is.  And I don't think there is any question in this

17 circumstance what the reality is.  I also don't think -- I

18 mean, I think we can always find hypotheticals that would

19 theoretically stretch the bounds of any bright line, but I

20 think probably the bright line of once they control it and

21 once the risk of lost ships, that's the point at which we

22 deliver.

23         I mean, unfortunately, one way or the other the

24 Court is going to have to make a determination about receipt,

25 right.  It's going to have to be one place or the other.

1              THE COURT:  Sure.

2              MR. BAER:  So I don't think it's -- I think it's

3    important that we do it in a way that's logical and legal.  I

4    think it's a way that's going to apply to the most

5    circumstances possible.  I think simply saying physical

6    possession doesn't work because I think we've already

7    identified multiple circumstances in which physical

8    possession is not actually the rule.  I also don't think

9    physical possession is drafted in either the UCC or under the

10   bankruptcy code.  So I don't think that we should read it in.

11   All right.

12             A couple of quick distinctions.  And I don't want

13   to belabor the point, but I think counsel talked about how

14   the bankruptcy code said deliver to the debtors.  It actually

15   says receipt by the debtors and that's what we're talking

16   about.  There were many circumstances of receipt by the

17   debtors.

18             We talked about -- counsel talked about that savvy

19   business parties could contract.  That's what they did,

20   right.  This circumstance is --

21             THE COURT:  And these are the rights that --

22             MR. BAER:  Specifically set forth; it's exactly

23   what's there.

24             I think the debtors' concern about value in

25   503(b)(9) claims is a bit of a straw man because, in fact, in

1  this case they did.  We're talking about a plan that was

2  confirmed a year or two ago.  They knew exactly what these

3  claims were.  They knew exactly what the dollar amount was

4  and they could satisfy them.

5          We're not talking about claims that get sent out

6  with the debtor not knowing about them, right.  They get the

7  invoices.  They know exactly what gets shipped to whom and

8  when.  There's (indiscernible) that they can evaluate.  And I

9  don't think there's any concern about this Court creating a

10  new class. I think 503(b)(9) was created by Congress. I don't

11  think its incumbent upon this Court -- I don't think we

12  should be asking this Court to make a determination about who

13  should or should not.  I think the language is clear.

14          THE COURT:  Okay.

15          MR. BAER:  I think receipt is satisfied.

16          THE COURT:  I'm going to take the matter under

17  advisement.  I would observe that this argument was a lot

18  more entertaining than I expected when we started.

19          I expect to rule probably by memorandum order and

20  depending on how the case law evolves it may turn into an

21  opinion, but I do expect to rule promptly.  I really do

22  appreciate the submissions.

23          The other thing that I think was particularly

24  helpful -- and I've had this challenge in many, many claim

25  disputes involving business relationships. It was really

1   helpful for the parties to confer and to, essentially, agree

2   on what the facts and the timeline were because often that's

3   not in dispute, but it is hard for the Court to sift through

4   and figure that out and make sure that you've got it right.

5   So I do appreciate the coordination.

6           Again, I think the argument was particularly

7   helpful.  I'll take the matter under advisement and I'll rule

8   promptly.

9           Anything further today?

10          UNIDENTIFIED SPEAKER:  No, Your Honor.

11          THE COURT:  All right.  Thanks very much.  Have a

12  great day.

13          ALL:  Thank you, Your Honor.

14      (Proceedings concluded at 9:48 a.m.)

15

16

17

18                          CERTIFICATE

19

20  We certify that the foregoing is a correct transcript from

21  the electronic sound recording of the proceedings in the

22  above-entitled matter.

23  /s/Mary Zajaczkowski                    June 27, 2017
    Mary Zajaczkowski, CET**D-531                    Date
24

25