## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SRC LIQUIDATION, LLC,[1] | ) | Case No. 15-10541 (BLS) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:  May 15, 2019 at 10:00 a.m. (ET)** |
| | ) | **Obj. Deadline: March 20, 2019 at 4:00 p.m. (ET)** |
| | ) | |

## MOTION OF MAR-BOW VALUE PARTNERS, LLC, A CREDITOR, FOR RELIEF FROM ORDERS UNDER BANKRUPTCY RULE 9024 AND CIVIL RULE 60(d)(3)

Pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure and Rule 60(d)(3) of the Federal Rules of Civil Procedure, Mar-Bow Value Partners, LLC ("Mar-Bow"), a creditor,[2] files this motion (the "Motion") to seek relief from (1) the Order Authorizing the Debtors to (I) Employ and Retain McKinsey Recovery & Transformation Services U.S., LLC to Provide Interim Management Services Pursuant to 11 U.S.C. § 363, and (II) Designate Kevin Carmody as Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Date (Dkt. 257, entered April 13, 2015); and (2) the Order Modifying That Certain Order Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC, to Authorize the Appointment of Kevin Carmody as Interim President and Chief Executive Officer (Dkt. 823, entered July 13, 2015).  In support of the Motion, Mar-Bow respectfully states as follows:

---

[1] The last four digits of the Debtor's taxpayer identification number are 5540.  Inquiries regarding the Debtor should be directed to the GUC Trustee, c/o EisnerAmper LLP, 111 Wood Avenue South, Iselin, NJ 08830-2700 (Attn: Anthony R. Calascibetta).

[2] As indicated in the Notice of Transfer of Claim Other Than for Security (Dkt. 1507, filed March 21, 2016), Mar-Bow acquired a claim against the Debtor SRC Liquidation LLC.

## INTRODUCTION AND RELIEF REQUESTED

1.      On March 12, 2015 (the "Petition Date"), The Standard Register Company (n/k/a SRC Liquidation, LLC) and its affiliates (collectively, the "Debtors")[3] each filed a voluntary petition for relief under chapter 11 in this Court.

2.      On March 23, 2015, the Debtors filed a Motion for Order Authorizing the Debtors to (I) Employ and Retain McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") to Provide Interim Management Services Pursuant to 11 U.S.C. § 363, and (II) Designate Kevin Carmody as Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Date (the "Application").  (Dkt. 87)

3.      In support of their Application, the Debtors filed a Declaration of Kevin Carmody (the "Declaration").  (Dkt 87-3)  Kevin Carmody is a practice leader of McKinsey RTS and a partner of McKinsey and Company, Inc. ("McKinsey"), the indirect parent of McKinsey RTS.

4.      Both the Debtors and McKinsey RTS's Declaration recognized and accepted the necessity that the Application[4] and Declaration[5] comply with the Protocol established by the Office of the United States Trustee for its retention under 11 U.S.C. § 363.[6]  Part I.E. of the Protocol requires:

---

[3] In addition to The Standard Register Company, the Debtors are (a) SR Liquidation Holding Company (f/k/a Standard Register Holding Company), (b) SR Liquidation Technologies, Inc. (f/k/a Standard Register Technologies, Inc.), (c) SR Liquidation International, Inc. (f/k/a Standard Register International, Inc.), (d) iMLiquidation, LLC (f/k/a iMedConsent, LLC), (e) SR Liquidation of Puerto Rico Inc. (f/k/a Standard Register of Puerto Rico Inc.), (f) SR Liquidation Mexico Holdings Company (f/k/a tandard Register Mexico Holdings Company), (g) SR Liquidation Holdings, S. de R.L. de C.V. (f/k/a Standard Register Holdings, S. de R.L. de C.V.), (h) SR Liquidation de Mexico, S. de R.L. de C.V. (f/k/a Standard Register de México, S de R.L. de C.V.), (i) SR Liquidation Servicios, S. de R.L. de C.V. (f/k/a Standard Register Servicios, S. de R.L. de C.V., and (j) SR Liquidation Technologies Canada ULC (f/k/a Standard Register Technologies Canada ULC).

[4] Application, p. 7, ¶ 15.

[5] Declaration, p. 8, ¶ 16

[6] This Protocol is sometimes called the "J. Alix Protocol."  The history of the Protocol is:

all appropriate disclosures of any and all facts that may have a bearing on whether JAS, its affiliates, and/or the individuals working on the engagement have any conflict of interest or material adverse interest, including but not necessarily limited to the following:

1. Connection, relationship or affiliation with secured creditors, postpetition lenders, significant unsecured lenders, equity holders, current or former officers and directors, prospective buyers, or investors.

5.      As stated by Clifford J. White III, the Director of the Executive Office for United

States Trustees:[7]

> • *The J. Alix Protocol incorporates § 327(a)'s conflict-of-interest rules to bar those with an actual conflict of interest from being retained.* The protocol also avoids conflicts of interest by preventing the CRO from managing the engagement to the financial benefit of the CRO's firm. It does so by establishing the so-called "one hat rule: allowing the professional to serve in only one capacity, such as CRO, crisis manager, financial advisor, claims agent or investor. Similarly, it also bans the CRO's firm from investing in the DIP for two years after the engagement concludes.
>
> • *The J. Alix Protocol incorporates the disclosure requirements governing a § 327(a) application by requiring an affidavit setting forth connections with parties and professionals. These disclosures are analogous to those required under Fed. R. Bankr. P. 2014.* Disclosure and transparency are key to evaluating potential conflicts

---

Seventeen years ago, the U.S. Trustee Program (USTP) entered into settlement agreements regarding the terms for the retention of firms providing chief restructuring officers (CROs) and other staff to assist debtors in possession (DIPs) with their chapter 11 duties. These settlements, which have come to be known as the "J. Alix Protocol" after the firm involved, apply the conflict-of-interest provisions of the Bankruptcy Code to the hiring of CROs, who are charged with mixed professional and business-management duties. Courts have approved hundreds of these settlements, which allow employment under § 363(b) (the use of estate property outside the ordinary course of business) while applying the relevant conflict protections of § 327(a) (the employment of professionals).

Clifford J. White III, *et. al.*, Future of USTP's CRO "Protocol", Am. Bankr. Inst. J., September 2018, at 24.

[7] *Id.* (emphasis added).

of interest and enhancing public confidence in the integrity of the
system.

6.      On April 13, 2015, the Court entered an order granting the Application (the
"Order").  (Dkt. 257)  Consistent with the Protocol, the Order stated: "McKinsey RTS shall
disclose any and all facts that may have a bearing on whether the firm, its subsidiaries, certain of
its affiliates, and/or any individuals working on the engagement hold or represent any interest
adverse to the Debtor, its creditors, or other parties in interest.  The obligation to disclose identified
in this subparagraph is a continuing obligation."[8]  (Order, ¶ 2(h))

7.      *In violation of the Order and the Protocol, McKinsey RTS's Declaration did not
disclose the identity of any of its investment or client connections in this case and McKinsey RTS
has never disclosed the identities of **any** of its connections in this case.*

8.      Mar-Bow requests relief from the Order under Rule 60(d)(3) of the Federal Rules
of Civil Procedure because in its Declaration, McKinsey committed substantial and multiple frauds
on the Court as follows:

> **a.  McKinsey RTS intentionally violated the Order and the Protocol;**
>
> **b.  McKinsey RTS fraudulently concealed the investments that its partners
> and employees had in Interested Parties, including *Bank of America* and
> *Credit Suisse*, who were secured creditors and DIP lenders;**
>
> **c.  McKinsey RTS fraudulently concealed dozens of its own client
> relationships with Interested Parties;**
>
> **d.  McKinsey RTS fraudulently concealed that it was reviewing the proofs of
> claims that its own clients had filed (to which it then filed *no* objections);**
>
> **e.  McKinsey RTS fraudulently concealed that it held an interest adverse to
> the estate due to its liability for preference payments totaling
> $1,477,299.53; and**

---

[8] On motion of the Debtors (Dkt. 729, filed June 24, 2015), the Court an order authorizing Mr.
Carmody to serve as the Debtors' President and Chief Executive Officer.  (Dkt. 823, entered July 13, 2015).

     **f.**  **McKinsey RTS falsely stated in its Declaration, "McKinsey RTS does not hold an adverse interest to the Debtors' estates, and McKinsey RTS is a 'disinterested person,' as that term is defined in section 101(14) of the Bankruptcy Code."[9]**

9.     McKinsey RTS knew that if it had disclosed its actual conflicts of interest as required, the Debtors' Application to approve its retention would have been denied. McKinsey RTS committed these frauds on the Court in order to evade that result and to unlawfully obtain and then retain its employment in these cases. McKinsey RTS's conduct was either intentional, willfully blind to the truth, or in reckless disregard of the truth, any of which is sufficient for the Court to find that McKinsey RTS committed a fraud on the court and to impose the relief that Mar-Bow seeks.

10.    Accordingly, to preserve and promote the integrity of the Court's process, Mar-Bow respectfully requests that the Court: (1) vacate the Order approving McKinsey RTS's employment; (2) order McKinsey RTS to disgorge the fees and expenses that the Debtors paid to it; (3) order McKinsey to disgorge all illegal profits that it realized from its investments in Interested Parties; (4) order McKinsey RTS to disgorge the preference of $1,477,299.53; (5) order McKinsey RTS to file a declaration that truthfully and completely discloses all of its relationships with the Debtors and Interested Parties, including all client and investment relationships; (6) permit Mar-Bow full discovery on this Motion; and (7) impose any additional remedies that the Court deems appropriate.

---

[9] Dkt 87-3, p. 16, ¶ 35.

## JURISDICTION, VENUE, AND STANDING

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference from the United States District Court for the*

*District of Delaware* dated February 29, 2012.

12.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

14.     The statutory and legal predicates for the relief requested herein are Rule 9024 of

the Federal Rules of Bankruptcy Procedure and Rule 60(d)(3) of the Federal Rules of Civil

Procedure.

15.     Pursuant to Local Rule 9013-1(f), Mar-Bow consents to the entry of a final

judgment or order with respect to this Motion if it is determined that this Court would lack Article

III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND & DISCUSSION

### A.     MCKINSEY RTS FRAUDULENTLY CONCEALED ITS INVESTMENTS IN INTERESTED PARTIES

16.     McKinsey RTS's Declaration fraudulently concealed at least nine investment

relationships that McKinsey and its partners and employees had with Interested Parties through its

wholly-owned, managed and controlled in-house investment operation called the McKinsey

Investment Office ("MIO"):

| Row | Name from IP List | Debtor Relationship(s) | McKinsey Relationship(s) |
|---|---|---|---|
| 1 | Allianz SE | Insurance companies | MIO Investment |
| 2 | Bank of America | 50 largest unsecured creditors | MIO Investment; MIO Prime Broker; MIO Fund Custodian |
| 3 | Bank of America Corp. | Largest customers | MIO Investment; MIO Prime Broker; MIO Fund Custodian |

| Row | Name from IP List | Debtor Relationship(s) | McKinsey Relationship(s) |
|---|---|---|---|
| 4 | Bank of America, N.A. | Secured creditors | MIO Investment; MIO Prime Broker; MIO Fund Custodian |
| 5 | Citibank | Largest customers | MIO Investment; MIO Fund Custodian |
| 6 | Credit Suisse | Secured creditors | MIO Investment; MIO Fund Custodian |
| 7 | Credit Suisse AG, Cayman Island Branch | Secured creditors | MIO Investment; MIO Fund Custodian |
| 8 | Credit Suisse Loan Funding LLC | Secured creditors | MIO Investment; MIO Fund Custodian |
| 9 | Deutsche Bank Mexico SA | Landlords | MIO Investment |

17.     As required by law, MIO publicly files annual reports of its investments, called "Forms 5500," on behalf of the McKinsey Master Retirement Trust ("MMRT") on a website maintained by the United States Department of Labor.[10]  The list of MIO administered investments in Interested Parties above includes only investments of retirement assets, which total about $6.7 billion.  MIO administered holdings in its additional $18.7 billion in investment assets are not publicly accessible, but likely include additional investments in Interested Parties.  Mar-Bow will seek discovery to determine the full extent of MIO's investments in Interested Parties.

18.     Paragraph 2(h) of the Order required McKinsey RTS to disclose "all facts that may have a bearing on whether the firm, its subsidiaries, certain of its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtor, its creditors, or other parties in interest."  This Order reflects the Court's commitment to the principle that to

---

[10] *See* 26 U.S.C. § 6058; 29 U.S.C. §§ 1024, 1365.  To access these MMRT Forms 5500, go to the Labor Department search page:
https://www.efast.dol.gov/portal/app/disseminate?execution=e1s1
Type "McKinsey" into the "Plan Name" search box and then click on the "Search" button.  A list of MIO's annual Master Retirement Trust Forms 5500 then appears.  The forms can then be readily downloaded.

protect the integrity of its processes and to enhance public confidence in the integrity of the system, McKinsey must not hold or represent any interest adverse to the Debtors.

19.     Despite the clear command of the Order, McKinsey RTS concealed that McKinsey and its partners and employees, through its affiliate, MIO, did hold investment interests in creditors on the Interested Parties list – interests that were adverse to the estate.

20.     McKinsey RTS concealed those investments because it knew that if it had disclosed them, as the Order required, the Court would have denied the Debtors' Application for authority to retain it.

21.     McKinsey RTS's concealment of these investments in Interested Parties was, therefore, a fraud on the Court.

**B.     MCKINSEY RTS'S CONCEALMENT OF ITS INVESTMENT RELATIONSHIP WITH BANK OF AMERICA WAS PARTICULARLY EGREGIOUS**

22.     Bank of America was a secured creditor and provided postpetition financing for the Debtors.[11]

23.     During the time of the discussions and negotiations that resulted in the agreement of Bank of America to provide postpetition financing, Mr. Carmody served as the Debtors' Chief Restructuring Officer.   He was responsible for Standard Register's restructuring efforts and reported to the Board of Standard Register.[12]   In addition, McKinsey RTS was retained prepetition to assist "the Debtors' senior management with the development of a strategic business plan and strategic considerations including cash forecasting, financial reporting and SG&A opportunities.

---

[11] *See* Declaration of Kevin Carmody in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief (Dkt. 2, filed March 12, 2015, p. 10, ¶ 26) and Debtors' motion to approve postpetition financing (Dkt. 15, filed March 12, 2015, p. 2).

[12] Application, Dkt. 87, p. 3, ¶ 5.

Simultaneously, McKinsey RTS was tasked with contingency planning, including preparation for a chapter 11 filing, and/or a potential sale of the business."[13]

24.     Both during those negotiations and while the Debtors' Application to approve the postpetition financing was pending, no one knew that McKinsey, its partners and its employees held an equity investment position in Bank of America.  McKinsey concealed this crucial, disqualifying fact from the Court, the United States Trustee and the creditors, in violation of paragraph 2(h) of the Order and part I.E. of the Protocol.

25.     McKinsey RTS concealed this investment in Bank of America because it knew that if it had disclosed that investment, as the Order and the Protocol required, the Court would have denied the Debtors' Application for authority to retain it.

26.     McKinsey RTS's concealment of the investment in Bank of America was, therefore, a fraud on the Court.

C.     **MCKINSEY RTS'S FRAUDULENT CONCEALMENT OF MIO'S INVESTMENTS IN INTERESTED PARTIES WAS WRONGFUL**

27.     McKinsey's refusal to disclose its investment relationships with Interested Parties was without justification in law or in fact.  It was therefore wrongful and fraudulent.

28.     On its website, McKinsey publicly represents: "We are a global management consulting firm."[14]

29.     However, McKinsey operates through numerous subsidiaries.  One subsidiary is McKinsey RTS, which is a direct wholly-owned subsidiary of McKinsey & Company, Inc. United States, which, in turn, is a direct wholly-owned subsidiary of McKinsey Holdings, Inc., which, in turn, is a direct wholly-owned subsidiary of McKinsey.  McKinsey established McKinsey RTS in

---

[13] *Id.*, p. 4-5, ¶ 8.

[14] McKinsey Website - About Us.  www.mckinsey.com/about-us/overview.

2010 for only one discernable but improper purpose—to continue to pursue the lucrative bankruptcy consulting market without having to disclose McKinsey's connections, including MIO's investment connections.

30.    Another subsidiary of McKinsey is MIO.  MIO encompasses MIO Partners, Inc. and its sister company, MIO Partners (EU) Limited.  Like McKinsey RTS, they are wholly-owned indirect subsidiaries of McKinsey.  MIO creates value for the McKinsey organization by generating client referrals, promoting employee retention, and creating valuable partner and alumni rewards.  MIO does that by providing highly profitable private and proprietary investment and retirement opportunities to the partners, employees and alumni of the McKinsey organization. MIO manages assets for (i) certain pension plans sponsored by McKinsey in which certain current and former McKinsey employees participate, and (ii) privately offered investment vehicles in which McKinsey partners, former partners and their immediate family members can invest.

31.    McKinsey RTS's concealment of MIO-managed investments in Interested Parties in this case was wrongful because:

- Functionally, McKinsey operates as one firm and it holds itself out to the world as one firm.

- The partners that own and manage McKinsey own and manage all of its affiliates, including both MIO and McKinsey RTS.

- McKinsey RTS can only perform its consulting services by "borrowing" the employees of its affiliates in the McKinsey organization.

- MIO can only perform its investment services for McKinsey by "borrowing" McKinsey partners for its board and key management positions.

- MIO invests in McKinsey RTS clients and in Interested Parties in McKinsey RTS's bankruptcy cases.

- The MIO Board and staff have full access to everything that McKinsey RTS does in its bankruptcy cases and to the results of its activities.

- McKinsey RTS's partners and employees have access to substantial information about MIO's investments.

- McKinsey RTS partners and employees discuss their own investments with MIO staff, including their investments in clients of McKinsey RTS and in the Interested Parties in its bankruptcy cases.

- Because McKinsey also owns McKinsey RTS, the net profit that McKinsey RTS makes from its engagements is *McKinsey's* profit.

- MIO regularly invests in the very market that McKinsey RTS serves – the distressed business market.

32.    McKinsey now admits that although MIO loses money on operations, McKinsey subsidizes that loss.  This demonstrates the importance of MIO to McKinsey, its partners and employees.  The subsidy artificially enhances the returns of MIO investors compared to the market, and thereby incentivizes McKinsey alumni to refer work to McKinsey.  The result is a massive conflict of interest—one that may have impacted this and other bankruptcy cases in which McKinsey served.  This subsidy also demonstrates that MIO is unlike any truly independent investment firm or hedge fund.  Rather, it is a substantial part of McKinsey's client referral engine.

33.    Although McKinsey, MIO and McKinsey RTS may be separate legal entities, many factors demonstrate that *functionally* and *operationally* McKinsey RTS is not separate from McKinsey and MIO:

- Client service: McKinsey RTS performed the services that the Debtors engaged it to perform by "borrowing" the employees of its affiliates in the McKinsey organization.  That is how McKinsey RTS works its bankruptcy cases.

- Management: McKinsey RTS is managed by the same managing partner and Shareholders Council as McKinsey and its affiliates.  Moreover, at the same time McKinsey RTS was serving the Debtors, its president was on the board of MIO.

- Legal support: Both Alison Proshan and Laurie Basch are Associate General Counsel at McKinsey and perform conflict checks for McKinsey RTS's chapter 11 engagements and provide other substantial legal services for McKinsey RTS.  Casey Lipscomb is the Secretary and General Counsel of MIO and an Associate General Counsel of McKinsey.

- <u>Office space</u>: McKinsey RTS shares office locations with McKinsey and its affiliates.

- <u>Marketing support</u>: McKinsey RTS is fully dependent on the McKinsey brand and on McKinsey marketing support for business generation.

- <u>Information technology support</u>: McKinsey RTS utilizes McKinsey's information technology systems.

- <u>Human resources support</u>: McKinsey RTS utilizes McKinsey's human resources and employee recruitment capabilities.

- <u>Accounting and tax support</u>: McKinsey RTS has no independent financial accounting system.

- <u>MIO</u>: Partners and employees of McKinsey RTS have the opportunity to invest their assets in MIO.

34.    Beyond all of that, the financial returns that the MIO brings to McKinsey partners and employees are part of their incentive and compensation.  Indeed, the New York Times recently reported that "from 2000 to 2010, MIO's flagship fund, the Compass Special Situations Fund, had an average annual return above 9 percent, compared with a 1.6 percent loss in the S&P 500 Index. In 2008, when the broader United States stock market fell more than 36 percent, the Special Situations Fund lost about half that amount."[15]

35.    McKinsey RTS has, therefore, wide-ranging and significant *functional* connections to its affiliates, including MIO, that are well beyond a mere legal connection through common McKinsey ownership.  McKinsey RTS cannot carry out its business on its own.  The same is true of MIO.

36.    Jon Garcia has been the President of McKinsey RTS since its founding in 2010.  He also served on the MIO Board from December 8, 2006 through June 9, 2017 and was on its Audit Committee and Investment Committee.  ***Thus, Mr. Garcia was on the MIO Board at all crucial***

---

[15] Michael Forsythe, Walt Bogdanich and Bridget Hickey, "As McKinsey Sells Advice, Its Hedge Fund May Have a Stake in the Outcome", New York Times, February 19, 2019, p. 1.

*times during this case.*  This means that while he was overseeing McKinsey RTS and its work in this case, he was also overseeing MIO investments, including its investments in key Interested Parties in this case.  This blatant conflict of interest alone is abhorrent to values that Section 327 represents—the crucial necessity of maintaining the integrity of the process and the public's confidence in it.

37.     The MIO Board oversees MIO's investments.  This included Mr. Garcia and its other members who are McKinsey partners.  *MIO investments include investments in McKinsey clients and in Interested Parties in these cases.*  At the same time, the MIO Board has a fiduciary duty to maximize the value of MIO *for the benefit of McKinsey partners* because McKinsey partners are the beneficial owners of MIO.

38.     MIO has no policy prohibiting investments in McKinsey clients or in the Interested Parties in McKinsey RTS's bankruptcy cases, including the debtors and their creditors, competitors, customers and suppliers.  As a result, MIO does invest in those parties.

39.     *McKinsey RTS has unlawfully concealed MIO investments in Interested Parties in this case and in its other bankruptcy cases—investments overseen by the McKinsey partners and the McKinsey RTS partners on the MIO Board.*

40.     On the MMRT's publicly available Forms 5500, substantial information about its investments is available to all 27,000 McKinsey partners and employees, including the partners and employees of McKinsey RTS and those of its affiliates who work on McKinsey RTS bankruptcy matters.  *This includes information about MIO direct and indirect investments in large numbers of Interested Parties in McKinsey RTS's bankruptcy cases, including this case.*

41.     Functionally, the operations of McKinsey, McKinsey RTS and MIO are fully intertwined and linked.  Paragraph 2(h) of the Order, therefore, required McKinsey RTS to disclose all of the investments of its partners and employees in the Debtors and in Interested Parties.

42.     McKinsey's partners own and manage McKinsey and all of its affiliates.  McKinsey has no outside owners or managers.  The mission of the McKinsey partners who manage MIO is to maximize the value of MIO *for the benefit of McKinsey's partners* because McKinsey is functionally one firm.

43.     Nothing prevents people associated with McKinsey RTS from accessing the substantial information about MIO's investments that MIO makes available to them.  And nothing prevents MIO staff and management from accessing the substantial information available to them about McKinsey RTS.

44.     Whether any of that happens may be challenging to prove.  But, no one—not the parties, not the United States Trustee and certainly not this Court—should have to investigate it. *See* Part VI.A., below.  That is why the Court ordered McKinsey to disclose all of investments interests that are "adverse to the Debtor, its creditors, or other parties in interest."  (Order, ¶ 2(h)

45.     McKinsey RTS's engagement agreement with the Debtors also proves beyond doubt that McKinsey and its affiliates function as one firm.  The indemnification paragraph of this agreement (Dkt. 87-4, p. 7, ¶ 6(a)) applies to *all of McKinsey and everyone associated with it*:

> The Company and its affiliates hereby agree (i) to indemnify, hold harmless and defend McKinsey RTS, and its past, present and future affiliates, and each of their respective directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons . . . .

46.     One further point destroys McKinsey's claim that MIO and McKinsey RTS are separate: *MIO regularly invests in the very markets that McKinsey RTS serves – the distressed company and distressed debt investment markets.*

14

47.    MIO's most recent SEC Form ADV, filed in December 2018, states that part of MIO's investment strategy is: "Distressed Investing. This strategy typically involves purchasing securities of companies in or near bankruptcy, liquidation or reorganization and sometimes selling stock of the same companies short."[16]

48.    MIO has made investments, often through its "Compass" family of direct investment funds, in many bankruptcy cases.  In the following six bankruptcy cases, MIO had a direct investment in either the Interested Parties, the debtor, or both:

1)  *In re Seadrill Ltd.*, No. 17-60079 (S.D. Tex., filed Sept. 21, 2017) – MIO's Compass TSMA and Compass ESMA funds appear as 5% or more shareholders in Seadrill's SEC filings.  They also appear on a service list in the case.  Aristeia, another MIO fund, appears on the Interested Parties lists as a bondholder.[17]

2)  *In re Magnum Hunter Resources*, No. 15-12533 (D. Del., filed Dec. 15, 2015) – MIO's Compass ESMA and Compass TSMA, along with Aristeia, appear in a supplement to the debtor's plan.[18]

3)  *In re Caesars Entertainment Operating Co.*, No. 15-01145 (N.D. Ill., filed Jan. 15, 2015) – MIO's Compass ESMA, Compass TSMA, and Compass Offshore HTV PCC LTD appear on Interested Party Lists.[19]

4)  *In re Endeavour Operating Corp.*, No. 14-121308 (D. Del., filed Oct. 10, 2014) – An SEC EX-99 Settlement Agreement shows MIO's Compass Offshore HTV PCC and Compass HTV LLC as term loan lenders and identifies Aristeia and Whitebox as lenders.[20]

5)  *In re MPM Silicones LLC*, No. 14-22503 (S.D.N.Y., filed April 13, 2014) – The chapter 11 plan identified MIO's Compass TSMA, Compass ESMA and Aristeia

[16] The quoted entry is on page 12 of the brochure, available at: https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VR SN_*ID*=494983

[17] Seadrill's SEC F-1/A, filed July 18, 2018, p. 31; *Seadrill* Dkt. 1168, pp. 108-9; *Seadrill* Dkt. 192-3, Application to Employ Kirkland & Ellis, p. 37.

[18] *Magnum Hunter* Dkt. 1231, Fourth Amended Supplement to the Third Amended Joint Plan of Reorganization, pp. 76 and 96.

[19] *Caesars* Dkt. 2528-5, Application to Employ Jones Day, p. 6.

[20] Endeavour Operating Corp. SEC 8-K, ex 99.2, exhibit 2, Aug. 3, 2015.

as lenders. Compass TSMA, Compass ESMA and Aristeia then became a 3.51% shareholder of MPM Holdings, the successor to MPM Silicones.[21]

6) *In re New Stream Secured Capital, Inc.*, No. 11-10753 (D. Del., filed Mar. 13, 2011) – MIO and its private funds were the DIP Lenders and parties to the Plan Support Agreement. They also purchased estate assets. The MIO funds were SSALT Fund Limited; Compass Special Situations Fund LLC; Compass COSS Master Limited; and Special Situations Fund LP.[22]

49.     In addition, in the following eight cases, MIO had an investment in a third-party fund called Whitebox, which was invested in either the Interested Parties, the debtor, or both, *while McKinsey RTS served as a professional and fiduciary in the case*:

1) *In re Commonwealth of Puerto Rico*, No. 17-03283, (D.P.R., filed July 3, 2017).[23]

2) *In re Westmoreland Coal Co.*, No. 18-35672 (S.D. Tex., filed Oct. 9, 2018).

3) *In re SunEdison, Inc.*, No. 16-10992 (S.D.N.Y., filed April 21, 2016).

4) *In re Alpha Natural Resources, Inc*, No. 15-33896. (E.D. Va., filed Aug. 3, 2015).

5) *In re NII Holdings, Inc.*, No. 14-12611 (S.D.N.Y., filed Sept. 15, 2014).

6) *In re Edison Mission Energy*, No. 12-49219 (N.D. Ill., filed Dec. 17, 2012).

7) *In re AMR Corp.*, No. 11-15463 (S.D.N.Y., filed Nov. 29, 2011).

8) *In re UAL Corp.*, No. 02-48191 (N.D. Ill., filed Dec. 9, 2002).

50.     MIO's fiduciary obligations to its investors are similar to McKinsey RTS's fiduciary duties to the bankruptcy estates that employ it. Each must place its clients' interests

---

[21] *MPM* Dkt. 943, Amended Plan, p. 72; MPM Holdings SEC S-1, Amendment No. 2, filed Oct. 31, 2017.

[22] *New Stream* Dkt. 4, Disclosure Statement, pp. 45, 73-77, 137, 191, 227 and 698 of 836.

[23] MIO also has investments in Puerto Rico bonds through Compass and Aristeia. At the same time, McKinsey's fee application states that it is serving as a consultant and debt restructuring advisor to the PROMESA Oversight Board.

above its own.  And each owes its clients a duty of loyalty, a duty of care, a duty of honest and candor, and a duty to act in the best interest of its clients.[24]

51.    McKinsey's insurmountable problem is that it owns, manages and profits from both MIO and McKinsey RTS, and McKinsey's fiduciary obligations to its investors clash directly and repeatedly with its fiduciary obligations to its bankruptcy clients.  When MIO is directly or indirectly invested in or managing an equity or debt investment in a chapter 11 debtor that employs McKinsey RTS, or in an interested party, the interests of MIO investors (who are McKinsey partners and employees) directly conflict with the interests of McKinsey RTS's bankruptcy estate client.

52.    McKinsey RTS's Declaration boldly stated that "McKinsey RTS does not hold an adverse interest to the Debtors' estates, and that McKinsey RTS is a 'disinterested person,' as that term is defined in section 101(14) of the Bankruptcy Code."  Dkt. 87-3, p. 16, ¶ 35.  *But that statement is a false statement.*

53.    McKinsey RTS has intentionally concealed the investment interests of its partners and employees in creditors of these estates.  *McKinsey's concealment of those investments is a fraud on this Court that threatens the integrity of the Court's process and that demands this Court's remedy.*

### D.    MCKINSEY RTS ALSO FRAUDULENTLY CONCEALED DOZENS OF CLIENT RELATIONSHIPS WITH INTERESTED PARTIES

54.    McKinsey RTS also concealed dozens of McKinsey client relationships with Interested Parties in this case:

---

[24] For an investment advisor's duties, *see, e.g.*, 15 U.S.C. § 80b-6; *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 187-89 (1963) (describing in detail an investment adviser's fiduciary duties under the Investment Advisers Act).

| Row | McKinsey Undisclosed Clients on IP List | Debtor Relationship |
|---|---|---|
| 1 | Allianz | Insurance companies |
| 2 | Bank of America | 50 largest unsecured creditors |
| 3 | Bank of America Corp. | Largest customers |
| 4 | Bank of America, N.A. | Secured creditors |
| 5 | Citibank | Largest customers |
| 6 | Credit Suisse | Secured creditors |
| 7 | Credit Suisse AG, Cayman Island Branch | Secured creditors |
| 8 | Credit Suisse Loan Funding LLC | Secured creditors |
| 9 | Deutsche Bank Mexico SA | Landlords |
| 10 | Wells Fargo | Secured creditors |
| 11 | AIG | Insurance companies |
| 12 | American Electric Power Co. | Utility providers |
| 13 | Anheuser Busch LLC | Parties relating to significant litigation involving the Debtors |
| 14 | AT&T | Utility providers |
| 15 | AT&T Corp | Parties relating to significant litigation involving the Debtors |
| 16 | BMO Harris Bank N.A. | Landlords |
| 17 | BW /IP International Inc | Parties relating to significant litigation involving the Debtors |
| 18 | CBRE, Inc. | Landlords |
| 19 | Century Link | Utility providers |
| 20 | Century Telephone | Utility providers |
| 21 | Chartis | Insurance companies |
| 22 | Chubb | Insurance companies |
| 23 | CNA Financial Corp. | Insurance companies |
| 24 | Columbia Casualty Company | Insurance companies |
| 25 | Columbia Gas of Massachusetts | Utility providers |
| 26 | Columbia Gas of Ohio | Utility providers |
| 27 | Columbia Gas of Pennsylvania | Utility providers |
| 28 | Continental Casualty | Insurance companies |
| 29 | Dominion East Ohio | Utility providers |
| 30 | Dow Chemical Co | Parties relating to significant litigation involving the Debtors |
| 31 | Duke Energy | Utility providers |
| 32 | Duke Energy Progress | Utility providers |
| 33 | Duke Energy-Charlotte | Utility providers |
| 34 | Duke Energy-Louisville | Utility providers |
| 35 | Duriron Corporation | Parties relating to significant litigation involving the Debtors |
| 36 | E. I. Dupont De Nemours And Company | Secured creditors |

| Row | McKinsey Undisclosed Clients on IP List | Debtor Relationship |
|---|---|---|
| 37 | Emerson Electric Co | Parties relating to significant litigation involving the Debtors |
| 38 | Ernst & Young LLP | Ordinary course professionals |
| 39 | Federal Insurance Company | Insurance companies |
| 40 | Flowserve Corporation | Parties relating to significant litigation involving the Debtors |
| 41 | Flowserve US Inc | Parties relating to significant litigation involving the Debtors |
| 42 | General Electric Co | Parties relating to significant litigation involving the Debtors |
| 43 | IBM | Other "significant" vendors as identified by Debtors |
| 44 | Illinois National Ins Co | Insurance companies |
| 45 | International Business Machine Corp | Parties relating to significant litigation involving the Debtors |
| 46 | L.M. Berry and Company LLC | Parties relating to significant litigation involving the Debtors |
| 47 | Lazard Freres & Co. LLC | Chapter 11 case professionals for Debtors |
| 48 | Liberty Mutual | Insurance companies |
| 49 | Liberty Mutual Insurance | Debtor's largest customers |
| 50 | National Union Fire Insurance Company of Pittsburgh | Insurance companies |
| 51 | Pacific Gas & Electric Co. | Utility providers |
| 53 | Piedmont Natural Gas | Utility providers |
| 54 | Southern California Edison | Utility providers |
| 55 | Thomson Reuters | Ordinary course professionals |
| 56 | Travelers | Insurance companies |
| 57 | United States Department of Defense | Parties relating to significant litigation involving the Debtors |
| 58 | United States Steel Corpora | Parties relating to significant litigation involving the Debtors |
| 59 | Verizon | Debtor's largest customers |
| 60 | Verizon | Utility providers |
| 61 | Verizon New York Inc | Parties relating to significant litigation involving the Debtors |
| 62 | Verizon North LLC | Parties relating to significant litigation involving the Debtors |
| 63 | Verizon Wireless | Utility providers |
| 64 | Windstream | Utility providers |
| 65 | Xcel Energy | Utility providers |
| 66 | XL | Insurance companies |
| 67 | Zurich | Insurance companies |

55.     McKinsey served in key leadership roles for the Debtors and provided "a broad range of services" for the Debtors.  McKinsey's services for the Debtors, therefore, impacted every Interested Party, including those who were its clients, some favorably and some adversely.  But throughout the case, no one knew the identities of any of the Interested Parties who were McKinsey clients.

56.     In the Application, this is the description of McKinsey RTS's "broad range of services":[25]

(a)     Developing a strategic business plan with the Company's CFO and other key functional leaders that can be used to facilitate discussions with the Debtors' lenders and certain other stakeholders;

(b)     Developing a short-term cash flow forecasting process and implementing cash management strategies;

(c)     Establishing a weekly financial reporting package that provides additional transparency into the Debtors' near term cash position, including a forecast to actual variance analysis;

(d)     Supporting Counsel with the development of various strategic and restructuring alternatives;

(e)     Providing strategic advice to support the overall restructuring process;

(f)     Participating in stakeholder discussions, negotiations and diligence meetings along with the Debtors' Counsel and the Debtors' financial advisor;

(g)     Evaluating certain near term operational cost reduction and value enhancement opportunities (e.g., SG&A and procurement);

(h)     Working with Counsel on supporting data in order for Counsel to prepare first day motions, the petitions for relief

---

[25] Application, p. 6, ¶ 12.

and other documents and evidence needed to implement the
Debtors' Chapter 11 Cases;

(i)     Providing testimony and other litigation support as requested
by Counsel in connection with matters upon which
McKinsey RTS is providing services; and

(j)     Assisting with all such other restructuring matters as may be
requested by Counsel that fall within McKinsey RTS's
expertise and that are mutually agreed upon between the
Debtors and McKinsey RTS.

57.     In addition, as of June 26, 2015, Mr. Carmody committed to serve as "the Debtors'
interim President, Chief Executive Officer, and Director, in addition to his current role as Chief
Restructuring Officer."[26]

58.     As noted, the Order obligated McKinsey RTS to "disclose any and all facts that
may have a bearing on whether the firm, its subsidiaries, certain of its affiliates, and/or any
individuals working on the engagement . . . represent any interest adverse to the Debtor, its
creditors, or other parties in interest."[27]  Because McKinsey's work impacted every one of the
Interested Parties in these cases, including those who were McKinsey clients, the Order required
McKinsey to disclose the identities of all of its clients who were Interested Parties.

59.     Instead of complying with the Order and disclosing these client relationships,
McKinsey RTS intentionally concealed them from the Court and falsely declared that it was
disinterested.  McKinsey did that because it knew that disclosing them would result in the Court's
denial of the Debtors' Application to authorize its employment.

60.     McKinsey's concealment of its client relationships with Interested Parties was
therefore a fraud on the Court.

---

[26] Dkt. 729, p. 6, ¶ 14.

[27] Order, ¶ 2(h).

E.   **MｃKɪɴsᴇʏ Cᴏᴍᴍɪᴛᴛᴇᴅ ᴀ Fʀᴀᴜᴅ ᴏɴ ᴛʜᴇ Cᴏᴜʀᴛ Wʜᴇɴ Iᴛ Rᴇᴠɪᴇᴡᴇᴅ ᴛʜᴇ Cʟᴀɪᴍs ᴏꜰ Iᴛs Oᴡɴ Cʟɪᴇɴᴛs, Nᴏɴᴇ ᴏꜰ Wʜᴏᴍ Iᴛ Hᴀᴅ Dɪsᴄʟᴏsᴇᴅ**

61.     McKinsey RTS submitted five declarations in support of the Debtors' first five Omnibus Objection to Claims.[28]   In each of those declarations, Mr. Carmody stated, "I am the Chief Executive Officer of SRC Liquidation Company, one of the above captioned affiliated debtors and debtors in possession.   In this capacity, I am one of the persons responsible for overseeing the claims reconciliation and objection process in these Chapter 11 Cases."[29]

62.     McKinsey clients filed numerous proofs of claim in the case.  Nothing in the record states or suggests that McKinsey RTS recused itself from reviewing these claims filed by McKinsey's own clients.

63.     *Throughout the time that McKinsey RTS was reviewing creditors' claims, no one associated with the case knew that McKinsey was reviewing its own clients' claims.  The single reason that no one knew of this blatant conflict of interest was that McKinsey RTS had not disclosed the identities of any of its clients.*

64.     By itself, McKinsey RTS's concealment of the fact that it was reviewing the claims of its own clients (all undisclosed) constituted a fraud on the court.

65.     But McKinsey RTS may well have compounded its fraud on the court in reviewing claims.  Mar-Bow has commenced an analysis of McKinsey RTS's work in reviewing claims. That analysis is ongoing.  *Preliminarily, that analysis suggests that McKinsey RTS did not object to any of the proofs of claims that McKinsey clients filed.*

---

[28] Dkt. 964-2, filed Aug. 21, 2015; Dkt 965-2, filed Aug. 21, 2015; Dkt. 966-2, filed Aug. 21, 2015; Dkt. 1039-2, filed Oct. 13, 2105; Dkt. 1040-2, filed Sept. 14, 2015.

[29] Dkt. 964-2, p. 2, ¶ 1; Dkt 965-2, p. 2, ¶ 1; Dkt. 966-2, p. 2, ¶ 1; Dkt. 1039-2, p. 2, ¶ 1; Dkt. 1040-2, p. 2, ¶ 1.

66.     It may be impossible to determine whether McKinsey's failure to object to its own clients' proofs of claim was a matter of coincidence, unconscious influence, intent or worse.  But in this bankruptcy process, no one should have to harbor any concern about it, let alone ask the question.

67.     McKinsey RTS therefore committed a fraud on the court in concealing of its client connections while reviewing their claims.  Had McKinsey RTS disclosed those client connections as required, the Court surely would not have permitted McKinsey RTS to review its own clients' claims.  To evade that result, McKinsey RTS concealed its client connections.

**F.     MCKINSEY RTS'S DECLARATION VIOLATED THE ORDER AND THE CASELAW ON THE DISCLOSURE OBLIGATIONS UNDER RULE 2014**

68.     As noted, McKinsey RTS's Disclosure did not identify any connections.  Rather, the Disclosure provided a count of the number of connections in certain categories on the Interested Parties list.[30]  Then, McKinsey RTS merely asserted, "Based upon the research described above, McKinsey RTS has ascertained that members of McKinsey RTS and its affiliates have served and/or currently serve various parties on the Interested Parties List, but on matters unrelated to the Debtors and their chapter 11 cases."[31]

69.     McKinsey RTS's Disclosure did not comply with the requirements of the Order, the Protocol, Rule 2014 or the caselaw interpreting Rule 2014.

70.     As noted, the Protocol "incorporates the disclosure requirements governing a § 327(a) application by requiring an affidavit setting forth connections with parties and

---

[30] Declaration, pp. 11-12, ¶ 24.

[31] Declaration, p. 11, ¶ 24.  See also, p. 24, ¶ 29 ("Based upon the responses to these inquiries, McKinsey RTS and its affiliates serve or have served in the last three years various parties included on the Interested Parties List, but other than as may be described herein, such client service has not focused on a direct commercial relationship or transaction with the Debtors.").

professionals. These disclosures are analogous to those required under Fed. R. Bankr. P. 2014. Disclosure and transparency are key to evaluating potential conflicts of interest and enhancing public confidence in the integrity of the system."[32]

71.    Therefore, both the Order and the extensive and uniform caselaw on the disclosure requirements of Rule 2014 were applicable to McKinsey RTS's Disclosure in this case.

### 1.    The Order and Rule 2014 Obligated McKinsey RTS to Self-Report Its Connections and Conflicts

72.    The Order recognized that in fulfilling the Court's important responsibilities under Bankruptcy Code § 327,[33] the Court must rely on McKinsey RTS to self-report its connections and its conflicts. "Bankruptcy courts have neither the resources nor the time to investigate the veracity of the information submitted … and to root out the existence of undisclosed conflicts of interest." *Kravit, Gass & Weber, S.C. v. Michel* (*In re Crivello*), 134 F.3d 831, 839 (7th Cir. 1998); *see also In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (the court should not have to "rummage through files or conduct independent fact finding investigations" to determine whether a professional should be disqualified). "Bankruptcy courts are not obligated to hunt around and ferret through thousands of pages in search of the basic disclosures required by Rule

---

[32] Clifford J. White III, et. al., Future of USTP's CRO "Protocol", Am. Bankr. Inst. J., September 2018, at 24, 60.

[33] *See Interwest Bus. Equip., Inc. v. U.S. Trustee* (*In re Interwest Bus. Equip., Inc.*), 23 F.3d 311, 317 (10th Cir. 1994) ("A bankruptcy court has the authority and the responsibility to only approve employment of professionals who meet the minimum requirements set forth in § 327(a), independent of objections."); *see also In re HML Enterprises, LLC*, 2016 WL 5939737, at *6 (Bankr. E.D. Tex. Oct. 12, 2016) ("Notwithstanding the lack of any objection, the Court has an independent duty to inquire into the qualifications of counsel for debtor in possession under § 327(a); *In re Boot Hill Biofuels, LLC*, 2009 WL 982192, at *2 (Bankr. D. Kan. Mar. 27, 2009); *In re Git-N-Go, Inc.*, 321 B.R. 54, 59 (Bankr. N.D. Okla. 2004); *In re Marion Carefree Ltd. P'ship*, 171 B.R. 584, 589 (Bankr. N.D. Ohio 1994).

2014." *Quarles and Brady LLP v. U.S. Trustee* (*In re Jennings*), 199 F. App'x 845, 848 (11th Cir.

2006).[34]

73.    As the court stated in *In re Matco Elec. Grp, Inc.*, 383 B.R. 848, 853 (Bankr.

N.D.N.Y. 2008):

> Fed. R. Bankr. P. 2014 is not intended to condone a game of cat and
> mouse where the professional seeking appointment provides only
> enough disclosure to whet the appetite of the UST, the court or other
> parties in interest, and the burden shifts to those entities to make
> inquiry in an effort to expand the disclosure.[35]

74.    Similarly, in *In re Marine Outlet, Inc.*, 135 B.R. 154, 156 (Bankr. M.D. Fla. 1991),

the court stated:

> There is no duty placed on the United States Trustee or on creditors
> to search the record for the existence, vel non, of a conflict of interest
> of a professional sought to be employed. On the contrary, there is a
> definite affirmative duty placed on a professional to disclose his or
> her connection with parties whose interest is or may be antagonistic
> or opposite to the interest of the general estate[.]

### 2.    Strict Enforcement of the Order, Bankruptcy Rule 2014 and 11 U.S.C. § 327 Is Critical to Maintain the Integrity of the Bankruptcy Process and the Public's Confidence in It

75.    The Seventh Circuit made this essential point in *United States v. Gellene*, 182 F.3d

578, 588 (7th Cir. 1999) (emphasis added):

> [T]his procedure is designed to ensure that a "disinterested person"
> is chosen to represent the debtor. This requirement goes to the heart
> of the integrity of the administration of the bankruptcy estate. The
> Code reflects Congress' concern that any person who might possess
> or assert an interest or have a predisposition that would reduce the

---

[34] *See also In re Hutch Holdings, Inc.*, 532 B.R. 866, 880 (Bankr. S.D. Ga. 2015); *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) (courts have no obligation to "seek out conflicts of interest not disclosed" by debtors and professionals); *In re BH & P, Inc.*, 119 B.R. 35, 44 (Bankr. D.N.J. 1990) ("It is not ... the obligation of the bankruptcy court to search the record for possible conflicts of interest.").

[35] *See also In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999) ("[C]oy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient.") (quoting *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991)).

> value of the estate or delay its administration ought not have a professional relationship with the estate.

76.    In that same vein, the court in *In re Watson*, 94 B.R. 111, 117 (Bankr. S.D. Ohio 1988), concisely explained the reasons why the court has an independent duty to ensure compliance with Rule 2014 and Bankruptcy Code § 327: "The courts are absolutely uniform as to one command: the bankruptcy court must —no matter how unpleasant a task it may be—ensure the integrity of the bankruptcy process.  The interests of maintaining public confidence in the bankruptcy system must prevail."  But, as stated above, this independent duty to ensure compliance does not require the Court to investigate all possible avenues for evidence of a conflict.

77.    In *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987), the court stated that the bankruptcy court has a "fundamental responsibility to monitor the integrity of the proceedings before it.  In light of the duty explicitly imposed on the bankruptcy court by § 327—a duty which demands that the court root out impermissible conflicts of interest between attorney and client."[36]

78.    Finally, the requirement to disclose connections is also designed to ensure public confidence in the integrity of the bankruptcy process.  *In re Sundance Self Storage-El Dorado LP*, 482 B.R. 613, 625 (Bankr. E.D. Cal. 2012); *In re Michigan General Corp.*, 78 B.R. 479, 484 (Bankr. N.D. Tex. 1987).

### 3.    The Order, Rule 2014 and the Caselaw Interpreting It Were the Tools That Enabled the Court to Enforce Section 327

79.    "The verified statement required by Rule 2014 and the statement concerning conflicts in the application for employment pursuant to § 327 are intended to fully inform the court

---

[36] *See also* COLLIER ON BANKRUPTCY, § 327.03 at 327–20 (15th ed. 1988) ("As a general principle, professional persons employed by the [debtor in possession] should be free of any conflicting interest which might in the view of the trustee or the bankruptcy court impair the high degree of impartiality and detached judgment expected of them during the administration of a case.").

of the qualification of the proposed professional and maintain the integrity of the bankruptcy court." *In re Plaza Hotel Corp.*, 123 B.R. 466 (B.A.P. 9th Cir. 1990).

80.    "Bankruptcy Rule 2014 provides the mechanism for enforcing the provisions of section 327(a) by requiring disclosure of the attorney's relationships with parties in interest in the case." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005).[37]

81.    Rule 2014(a) enables the Court and interested parties to determine whether a professional (1) possesses or asserts for a client any economic interest that would tend to lessen the value of the bankruptcy estate or create either an actual or potential dispute in which the estate would be a rival claimant, or (2) possesses or has a predisposition under the circumstances to be biased against the estate. *In re Lewis Road*, 2011 WL 6140747, at *7 (Bankr. E.D. Va. 2011).

82.    The disclosure requirements of Rule 2014 are therefore the cornerstone of the professional retention process. *In re Enron Corp.*, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. 2002).

> **4.    The Order and Rule 2014 Required McKinsey to Disclose Not Just Interests That "Are Adverse" or Even "Might Be Adverse" to the Estate; It Mandates Disclosure of "All Facts That May Have a Bearing"**

83.    In *In re Gulf Coast Orthopedic Center*, 265 B.R. 318, 323 (Bankr. M.D. Fla. 2001), the court emphasized the requirement to disclose all connections:

> Under [Rule 2014] the applicant and the professional must disclose all connections, not merely those which rise to the level of conflict. *Halbert v. Yousif*, 225 B.R. 336 (E.D. Mich. 1998); *In re Keller Financial Services of Florida, Inc.*, 243 B.R. 806 (Bankr. M.D. Fla.

---

[37] *See also In re Hutch Holdings, Inc.*, 532 B.R. 866, 880 (Bankr. S.D. Ga. 2015) ("Bankruptcy Rule 2014 is exceptionally broad and implements the appointment of professionals under § 327 of the Bankruptcy Code by 'provid[ing] a mechanism for ensuring the disinterestedness of such professionals.'") (quoting *In re Fibermark, Inc.*, 2006 WL 723495, at *8 (Bankr. D. Vt. Mar. 11, 2006)); *In re Fresh Choice, LLC*, 2014 WL 929018, at *5 (Bankr. N.D. Cal. March 10, 2014) ("The purpose of Rule 2014 is to '[assist] the court in ensuring that [a professional] has no conflicts of interest and is disinterested, as required by 11 U.S.C. § 327(a).'") (quoting *Neben & Starrett Inc. v. Chartwell Fin. Corp.* (*In re Park-Helena Corp.*), 63 F.3d 877, 881 (9th Cir. 1995)).

1999); *In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998). These disclosure requirements are not discretionary and the duty of the professional to disclose all connections with the Debtor, Debtor–in–Possession, insiders, creditors or parties of interest is a must[.]

84.    A professional seeking employment by a bankruptcy estate and the resulting benefits "has a responsibility to leave no reasonable stone unturned" when investigating and disclosing potential connections under Rule 2014.  *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987).  Any "close or debatable issue ought to be resolved in favor of disclosure."  *In re Miners Oil Co.*, 502 B.R. 285, 302 (Bankr. W.D. Va. 2013) (quotation marks and citation omitted).

85.    Contrary to McKinsey RTS's apparent belief based upon its actions, Rule 2014 deliberately takes the decision-making authority about what constitutes an adverse interest away from self-screening professionals and places it squarely on the courts, with the assistance of the U.S. Trustee and interested parties.  In *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012), the Court of Appeals for the Fifth Circuit stated, "The disclosure requirements of Rule 2014(a) are broader than the rules governing disqualification, and an applicant must disclose all connections regardless of whether they are sufficient to rise to the level of a disqualifying interest under Section 327(a)."  (Emphasis added.)  *See also In re Knight-Celotex*, *LLC*, 695 F.3d 714, 722 (7th Cir. 2012) (noting that "connections" that must be disclosed pursuant to Rule 2014(a) as "considerably broader" than the disclosures required for section 327(a)) (citing *In re Gluth Brothers Construction, Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011)).

86.    In *Lewis Road*, the court stated:

The duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of *its duty to assure the attorney's eligibility for employment under section 327(a)* and to make an informed decision on whether the engagement is in the best interest of the estate.

2011 WL 6140747, at *8, (quoting *In re eToys, Inc.,* 331 B.R. 176, 189 (Bankr. N.D. Del. 2005)) (emphasis added).

87.     Essentially, McKinsey RTS's position is, "trust me, I know what is relevant." McKinsey RTS has thus impermissibly arrogated to itself the determination that its connections are permissible.   McKinsey RTS's behavior is contrary to the extensive and uniform case law interpreting the mandatory requirements of Rule 2014.   *See, e.g.*, *Park-Helena*, 63 F.3d at 881-82 ("General Order 44 [the precursor to Rule 2014] does not give the attorney the right to withhold information because it is not apparent to him that there is a conflict.") (citing *In re Haldeman Pipe & Supply Co.*, 417 F.2d 1302, 1304 (9th Cir. 1969)); *Rome v. Braunstein*, 19 F.3d at 59 ("decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment").

### 5.     McKinsey RTS Did Not Identify All of Its Connections with All Interested Parties in Sufficient Detail for the Court to Fulfill Its Responsibility

88.     In *Lewis Road*, the court analyzed disclosures that did not identify all connections by name and then held them "woefully inadequate." *Id.* at *9, 12.  The debtor's application stated only that proposed counsel had "connections with a creditor" and that the "potential conflict of interest has been waived," but it did not provide any other detail.  *Id*. at *1-2.  The court held that this disclosure was insufficient to satisfy the requirements of Rule 2014 due to its lack of detail. *Id*. at *12.

89.     Other bankruptcy courts have also noted the duty of a professional seeking employment in a chapter 11 case to disclose sufficient detail concerning its pre-filing connections with interested parties, so that the court and the United States Trustee are fully informed of the relevant circumstances surrounding such connections.  In *In re Mitchell*, 497 B.R. 788 (Bankr.

E.D.N.C. 2013), the court denied all compensation to a firm representing a chapter 11 debtor due

to its failure to disclose that it also represented the 50% owner of a limited partnership to which

the chapter 11 debtor client had transferred property of significant value shortly before filing.  The

court noted:

> [E]ven if the firm was unsure about whether the joint representation
> was permissible, at a minimum [it] certainly had an obligation to
> disclose the potential conflict and to bring the issue to the court's
> attention.  [Its] failure to make that required disclosure meant that
> the court reviewed the employment application on incomplete
> information and the misleading statement that the firm did not have
> a conflict and was disinterested.

*Id*. at 793.

90.     A court must have sufficient information to understand the magnitude of all of a

professional's connections and potential conflicts.  *See, e.g.*, *Am. Int'l Refinery*, 676 F.3d at 465-

66 (retainer source and attorney's role in prepetition debtor transactions); *KLG Gates LLP v.

Brown*, 506 B.R. 177, 195 (E.D.N.Y. 2014) (application listed numerous creditor clients but did

not disclose that lead counsel personally represented large creditors in recent bankruptcy cases or

that creditor waivers were limited); *Miners Oil Co.*, 502 B.R. at 307-08 (disclosure about

connection to debtor's principal was insufficient to disclose intertwined business affairs, impact

of corporate filing on individual's divorce, extent of debt owed to principal and his other

companies).

91.     McKinsey RTS's disclosures of its connections should have been detailed and

explicit enough for the Court and the other parties to "gauge whether [McKinsey RTS] is not

disinterested or holds an adverse interest [to the Debtors' estates]."  In *In re Midway Indus.

Contractors, Inc.*, 272 B.R. 651, 662 (N.D. Ill. 2001), the court held:

> The disclosure in the Rule 2014 Affidavit must be explicit enough
> for the court and other parties to gauge whether the person to be
> employed is not disinterested or holds an adverse interest. See *In re*

*Granite Partners, L.P.*, 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998).
Persons to be employed "must disclose all facts that bear on ...
disinterestedness, and cannot usurp the court's function by
choosing, ipse dixit, which connections impact disinterestedness
and which do not. The existence of an arguable conflict must be
disclosed if only to be explained away." *Id.* at 35 (internal citations
omitted). Disqualification is justified for lack of adequate disclosure
in the Rule 2014 Affidavit, even if it turns out that the professional
is in fact disinterested. *In re Filene's Basement, Inc.*, 239 B.R. 845,
848 (Bankr. D. Mass. 1999).

92.     Bankruptcy case precedent is uniform and unequivocal: Disclosure declarations

like the Declarations that McKinsey RTS filed in this case is insufficient under Rule 2014.  *See,*

*e.g.*, *Leslie Fay Cos.*, 175 B.R. at 530 (affidavit that "disclosed generally that Weil Gotshal

represented entities that were 'claimants of the Debtors in matters totally unrelated to the Debtors'

cases but failed to identify current client that was a large creditor, was insufficient); *In re Granite*

*Partners, L.P.*, 219 B.R. 22, 28 (Bankr. S.D.N.Y. 1998) (firm sanctioned for disclosures that did

not identify client relationships).  "[T]he professional must disclose to the court and the parties in

interest all facts which might bear on the professional's qualification for retention[.]"  *In re Rusty*

*Jones*, 134 B.R. 321, 342 (Bankr. N.D. Ill. 1991); *In re Churchfield Mgmt. & Inv. Corp.*, 100 B.R.

389, 393 (Bankr. N.D. Ill. 1989).[38]

93.     In *Granite Partners*, 219 B.R. at 28-29, the court sanctioned the Willkie Farr law

firm because its Rule 2014 disclosures said that the firm "had 'client relationships' with various

---

[38] *See also In re LPN Healthcare Facility Inc.*, 498 B.R. 196, 200 (Bankr. S.D. Ohio 2013)
(vacating an order approving employment of accounting firm due to the firm's failure to disclose as a
"connection" the fact that it also was providing accounting services to individuals and entities involved
with the debtor-in-possession); *In re Miners Oil Co., Inc.*, 502 B.R. 285, 304-5 (Bankr. W.D. Va. 2013)
(Fees reduced for violation of Rule 2014; noting that published bankruptcy court decisions are quite
consistent in requiring that debtors-in-possession and their professionals, whose employment is sought to
be approved, be meticulous in disclosing "all connections" with the debtor and other parties in interest, the
failure to do so justifying a court's taking significant punitive or corrective action; because the objective of
requiring disclosure is not so much to protect against prejudice to a debtor's bankruptcy estate, but to ensure
undivided loyalty and untainted advice from professionals, lack of disclosure in and of itself is sufficient to
warrant disqualification, even if in the end there was no prejudice).

(unidentified) creditors and broker-dealers, but the affidavit did not disclose what this meant." In fact, when the affidavit was filed, Willkie Farr had five open matters for one of the primary litigation targets, Merrill Lynch, and in the next 2½ years, opened some 400 more, generating millions of dollars of fees. *Id.*

94.     In *In re Southmark Corp.*, 181 B.R. 291, 293 (Bankr. N.D. Tex. 1995), Coopers & Lybrand's Rule 2014 affidavit disclosed that it had provided accounting and consulting services for Drexel on unrelated matters. But Coopers did not disclose that auditing work or that Drexel paid Coopers $18.5 million in fees during the past 2½ years. *Id.* Nor did Coopers disclose that Drexel had been the debtor's investment banker and advisor, that the debtor owed $1 billion on high risk bond claims, and that prepetition, Drexel had pled guilty and entered a consent decree with the SEC for securities claims. *Id*. at 295-96.

G.     **MCKINSEY RTS'S STATEMENT IN ITS DECLARATION THAT IT WAS DISINTERESTED WAS FALSE BECAUSE IT HELD AN INTEREST ADVERSE TO THE ESTATE ARISING FROM THE DEBTORS' PREFERENCE CLAIM OF $1,477,299.53 AGAINST IT**

95.     As noted, the Debtors filed these cases on March 12, 2015. Within 90 days before that, McKinsey RTS received $1,477,299.53 from the Standard Register on account of antecedent debts:[39]

| Billing Period | Invoice Date | Payment Date | Days | Payment Amount |
|---|---|---|---|---|
| 1/14/15 to 1/31/15 | 2/4/15 | 2/19/15 | 15 | $223,531.25 |
| 2/2/15 to 2/27/15 | 3/3/15 | 3/6/15 | 3 | $905,202.38 |
| 3/1/15 to 3/10/15 | 3/9/15 | 3/10/15 | 1 | $299,972.90 |
| 3/11/15 | 3/11/15 | 3/11/15 | 0 | $48,593.00 |
| **TOTAL** | | | | $1,477,299.53 |

96.     Because the Debtors made these payments within a few days after invoicing, they were not in the ordinary course of business under 11 U.S.C. § 547(c)(2). Indeed, the last payment

---

[39] Declaration, p. 9, ¶ 19.

was made the day before the Debtors filed their bankruptcy cases and on the same date as the invoice.

97.     As a result, on the petition date, the Debtors held a claim against McKinsey in the amount of $1,477,299.53 under 11 U.S.C. § 547(b).

98.     McKinsey RTS therefore held an interest adverse to the estate.  In *In re First Jersey Securities, Inc.*, 180 F.3d 504 (3d Cir. 1999), the United States Trustee objected to the retention of the attorney proposed by the debtor on the ground that counsel had received a preferential payment, constituting an interest adverse to the estate.  The Third Circuit reversed the approval of counsel's retention by both the bankruptcy court and the district court, stating, "Where there is an actual conflict of interest ... disqualification is mandatory."  *Id*. at 509 (citing *In re Marvel Entertainment*, 140 F.3d 463, 476 (3d Cir. 1998).  The court then held, "A preferential transfer to [debtor's counsel] would constitute an actual conflict of interest between counsel and the debtor, and would require the firm's disqualification."  *Id*. (emphasis in original).

99.     McKinsey RTS's statement in its Declaration that it was disinterested is therefore false on this additional ground.

---

The Declaration also states that the Debtors paid an initial retainer of $275, 000 on January 20, 2015, and a second retainer of $475,000 on February 12, 2015.  *Id*.  However, the Declaration makes contradictory and confusing statements about its use of these retainers.  The Declaration states, "Pursuant to the Prepetition Engagement Letters, McKinsey RTS has applied its Initial Retainer to prepetition fees incurred."  *Id*.  And the Declaration repeats, "The Initial Retainer has been applied to outstanding balances existing as of the Petition Date."  *Id*., p. 9, ¶ 20.

However, immediately following, the Declaration states, "A balance of $275,000 remains on the Initial Retainer."  The Declaration then adds, "In addition to the Initial Retainer, McKinsey RTS also received a $475,000 retainer (the "Second Retainer" and together with the Initial Retainer, the "Retainers") on February 12, 2015.  A balance of $475,000 remains on the Second Retainer.  As contemplated by the CRO Engagement Letter, the Retainers are being held as security for postpetition services and expenses incurred in connection with, and during the pendency of, these Chapter 11 Cases."  *Id*., pp. 9-10, ¶ 20.

Those statements simply cannot be reconciled.  This preference analysis assumes that the latter statements more accurately reflects the true facts.

**H.     MCKINSEY RTS COMMITTED MULTIPLE FRAUDS ON THE COURT**

100.    In *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), the Supreme Court discussed the fraud on the court doctrine: "[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."[40]

101.    A false statement or concealment concerning a conflict of interest constitutes a fraud on the court.  For example, in *Pearson v. First NH Mortgage Corp.*, 200 F.3d 30 (1st Cir. 1999), the Court of Appeals for the First Circuit held that the debtor stated a colorable claim for fraud on the court in alleging that his attorney concealed a disqualifying conflict of interest.

102.    In *Denison v. Marina Mile Shipyard, Inc.*, 2012 WL 75768 (S.D. Fla. Jan. 10, 2012), *aff'd sub nom. In re New River Dry Dock, Inc.*, 497 F. App'x 882 (11th Cir. 2012), the court found that the concealment of a conflict of interest by two real estate brokers that the debtor had employed was a fraud on the court.

103.    In *In re M.T.G., Inc.*, 366 B.R. 730, 748 (Bankr. E.D. Mich. 2007), *aff'd*, 400 B.R. 558 (E.D. Mich. 2009), the bankruptcy court found a fraud on the court when the trustee entered into an undisclosed fee arrangement with a secured creditor and then subsequently obtained the entry of three orders that benefited that creditor.

---

[40] *See also*, *Cresswell v. Sullivan Ft Cromwell*, 922 F.2d 60, 70 (2d Cir. 1990); *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 130 (4th Cir. 2000) (Fraud on the court involves "corruption of the judicial process itself."); *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987); *In re Whitney-Forbes*, 770 F.2d 692, 698 (7th Cir. 1985); *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999) holding that any time an original judgment or order was obtained through fraud on the court, the bankruptcy court may amend that judgment or order under its inherent power).

104.    On similar facts, in *In re R & R Associates of Hampton*, 248 B.R. 1, 7 (Bankr.

D.N.H. 2000), the court denied a professional's motion to dismiss a claim of fraud on the court,

finding that the trustee had stated a valid claim and stating:

> In this case, the Trustee principally argues that the Law Firm
> Defendants' failure to disclose their prepetition connections with the
> Debtor, the general partners, and the limited partnerships in
> violation of § 327 [of the] Bankruptcy Code and Rule 2014 of the
> Federal Rules of Bankruptcy Procedure set in motion a scheme to
> defraud the Court.

105.    As in *Hazel-Atlas*, McKinsey RTS's conduct in these cases was "a wrong against

the institutions set up to protect and safeguard the public, institutions in which fraud cannot

complacently be tolerated consistently with the good order of society."  64 U.S. at 246,

106.    And as in *M.T.G.*, "[i]t seems inconceivable that" this Court would have entered

the orders approving the Debtors' employment of McKinsey RTS and approving McKinsey's fees

in full if it had known the true extent of McKinsey RTS's own stake in the Debtors' reorganization.

366 B.R. at 752-53

107.    By failing to make adequate disclosures, a coy (or worse, conflicted) professional

puts the bankruptcy court in the position of having to make important retention decisions without

the benefit of the information it needs to act in the best interest of the estate.[41]  Thus, such a fraud

on the court justifies granting a Rule 60(d)(3) motion seeking relief from a judgment or order.

108.    Federal Rule of Civil Procedure 60(d)(3) recognizes a federal court's power to "set

aside a judgment for fraud on the court," and that power is not subject to the one-year bar for

---

[41] *M.T.G.*, 400 B.R. at 568 ("Judge Graves stated that 'the court can determine disinterestedness only if all potential conflicts are fully disclosed.'  Hence, based on that alone, this court can conclude that the Bankruptcy court was deceived, since it made rulings on motions and rendered Orders without full knowledge of [the fiduciary's] actual conflicts of interests.").

requests to set aside the judgment for fraud as between the parties. *Fox*, 739 F.3d at 136. Rule 60 applies to bankruptcy cases as a result of Bankruptcy Rule 9024.[42]

109.    Courts are empowered to vacate judgments for fraud upon the court without procedural limitations because a fraud on the court seriously affects the integrity of the normal process of adjudication. *Genesys Data*, 204 F.3d at 130 (internal quotations omitted). In *Hazel-Atlas*, 64 U.S. at 246, the Supreme Court held that a litigant could raise fraud on the court even if it "should have been expected to do more than it did to uncover the fraud" when the case was initially tried many years before; the Court reasoned:

> Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

110.    Similarly, in *In re eToys, Inc.*, 331 B.R. 176, 188 (Bankr. D. Del. 2005), the court held that the passage of time does not foreclose a finding that a professional's employment should have been denied when a fraud has been committed upon the court:

> In this case it is alleged that the professionals did not disclose conflicts of interest that would have barred their retention. If this is true, it would constitute a fraud on the Court warranting relief even though more than a year has passed since the professionals were retained and their fees approved.

111.    The Court of Appeals for the First Circuit has aptly noted that it is inappropriate to hold a litigant alleging fraud on the court to a "smoking gun" standard for allowing discovery. *Pearson*, 200 F.3d at 35. Rather, it held that "once the record evidence demonstrates a 'colorable' claim of fraud, the court may exercise its discretion to permit preliminary discovery and

---

[42] Fed. R. Bankr. P. 9024 (providing that, subject to exceptions not relevant here, "Rule 60, F.R.Civ.P., applies in cases under the Code").

evidentiary proceedings." *Id*. Mar-Bow has presented at least a "colorable claim" from reliable, publicly available sources that McKinsey RTS engaged in fraud on the Court. It should, therefore, be permitted additional discovery.

112.    McKinsey RTS's Declaration was *intentionally* false. McKinsey RTS clearly acted intentionally in choosing to conceal all of its connections, the connections of MIO and the connections of its other affiliates. Nevertheless, Mar-Bow is not required to show that McKinsey RTS's declarations were intentionally false. It is sufficient that McKinsey RTS acted in a manner that "is intentionally false, willfully blind to the truth, *or* is in reckless disregard of the truth." *Esposito v. New York*, 2012 WL 5499882, at *2 (S.D.N.Y. Nov. 13, 2012) (emphasis added).[43] Nor is Mar-Bow required to show that McKinsey acted with malevolence. *In re Ocon*, 2009 WL 405370, at *1 (11th Cir. Feb. 19, 2009). At a minimum, McKinsey RTS certainly acted with intent to deceive the Court and in a manner that was willfully blind to the truth and was in reckless disregard of the truth. Its conduct was much more culpable than mere negligence or even gross negligence.

**I.    AT THE CORE OF MCKINSEY RTS'S FRAUD ON THE COURT IS ITS UTTER REFUSAL TO ACCEPT THAT UNDER BANKRUPTCY LAW, IT IS A FIDUCIARY**

113.    At the heart of McKinsey RTS's frauds on the court is its stubborn and arrogant refusal to accept that it is a fiduciary and that it has fiduciary obligations.

114.    The Fifth Circuit has held, "A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession

---

[43] *See also Herring v. United States*, 424 F.3d 384, 387 n.1 (3d Cir. 2005); *Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010); *United States v. Brown*, 2016 WL 8731397, at *2 (E.D. Cal. May 13, 2016); *Bowie v. Maddox*, 677 F. Supp. 2d 276, 279 (D.D.C. 2010); *James v. United States*, 603 F. Supp. 2d 472, 487 (E.D.N.Y. 2009); *M.T.G., Inc.*, 400 B.R. at 565; *In re Michelson*, 141 B.R. 715, 726 (Bankr. E.D. Cal. 1992) ("The officer of the court must have fraudulent intent, which connotes either knowledge, including reckless disregard, of falsity or intentional omission of material information.").

and other court-appointed professionals, who are responsible for managing the debtor's estate in the best interest of creditors." *In re Southmark Corp.*, 163 F.3d 925, 931 (5th Cir. 1999).

115.    McKinsey RTS was a fiduciary in this case.  As a fiduciary, McKinsey RTS owed its full loyalty to the Debtors' estates.  *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994).

116.    As the New York Court of Appeals profoundly stated in *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, J.):

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer*, 243 N. Y. 439, 444, 154 N. E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.[44]

117.    Accordingly, although when working outside of bankruptcy, McKinsey RTS's conduct in simultaneously serving clients with competing interests—competitors, suppliers, customers, creditors—may be permitted, that conduct is forbidden here.  In these chapter 11 cases, McKinsey RTS was "bound by fiduciary ties."  It was "held to something stricter than the morals of the market place."  *Id.*  Its standard of behavior was "[n]ot honesty alone, but the punctilio of an honor the most sensitive[.]"  *Id.*  And this Court's attitude should be one of "uncompromising rigidity . . . when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions."  *Id.*

---

[44] The United States Supreme Court has quoted and cited this *Meinhard* holding with approval. *See SEC v. Chenery Corp.*, 318 U.S. 80, 97 (1943); *Woods v. City Nat. Bank & Tr. Co. of Chicago*, 312 U.S. 262, 269 (1941); *Seminole Nation v. United States*, 316 U.S. 286, 297, n. 12 (1942).

118.     McKinsey RTS's engagement agreement unlawfully states that it is not a fiduciary. "Nothing in this Agreement is intended to create, nor shall be deemed or construed to create, a fiduciary or agency relationship between McKinsey RTS and the Company, or its Board of Directors."[45]  By this agreement, McKinsey RTS utterly disavows and rejects its legal status as a fiduciary for the Debtors' bankruptcy estates.  Under the uniform case law, this disavowal and rejection was unlawful.

119.     Because as a matter of law, McKinsey RTS was a fiduciary, it could not evade the responsibilities of a fiduciary by disavowing them in its engagement agreement.  Therefore, this provision in McKinsey RTS's agreement with the Debtors violated its fiduciary duties.

120.     Indeed, on June 28, 2016, Judge Huennekens outright rejected McKinsey RTS's vigorous argument in the *Alpha Natural Resources* bankruptcy case that it was not a fiduciary, holding, "Section 327 talks about professionals.  McKinsey's a professional. . . .  They're a fiduciary."[46]  Yet McKinsey RTS did nothing to correct its engagement letter in any of its cases.

---

[45] Dkt. 87-4, p. 11, ¶ 11.

[46] *ANR* Dkt. 2839, Hearing Transcript, June 28, 2016 (Attached as Exhibit 1) at 158:11-13.

## NO PRIOR REQUEST

121.    No prior request for relief sought in this Motion has been made by Mar-Bow to this Court.

## NOTICE

122.    Notice of this Motion has been given to the following parties, or, in lieu thereof, to their counsel, if known: (i) the GUC Trustee; (ii) the Debtor; (iii) the Office of the United States Trustee for the District of Delaware; (iv) McKinsey RTS; and (v) any party who has filed a formal requests for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  Mar-Bow submits that, in light of the nature of the relief requested and the circumstances, no other or further notice is required or necessary.

## CONCLUSION

123.    McKinsey RTS committed numerous frauds on this Court.  It violated the Court's Order.  It violated the United States Trustee's Protocol.  Its Declaration fraudulently concealed its investment interests in Interested Parties and its client relationships across virtually all significant classes of creditors.

124.    McKinsey RTS's improper conduct in this case was much more extreme, unconscionable and deplorable than mere nondisclosure or even perjury.  McKinsey RTS tampered with the administration of justice in these cases at the expense of the Debtors' creditors.  *Hazel-Atlas*, 322 U.S. at 246.  McKinsey RTS's conduct was "an intentional plot to deceive the judiciary" that touched on "the public interest in a way that fraud between individual parties generally does not."  *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 136 (4th Cir. 2014).  And it was a fraud by which "the integrity of the court and its ability to function impartially is directly impinged."  *Great Coastal Express, Inc. v. Int'l Bhd. Of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982).

125.    McKinsey RTS was a fiduciary in these cases.  It was required to act with unbounded and unconditional loyalty to this bankruptcy estate, the Interested Parties, and to this Court.  It was required to leave "no stone unturned," *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987), in an enthusiastic and energetic search for and disclosure of every fact that this Court needed to assure itself, the Interested Parties, the United States Trustee, and the public that it was safe to trust it with the integrity of the Court's process.  McKinsey RTS did none of that.

126.    Mar-Bow petitions the Court to heed Justice Cardozo's sage advice: "As to this there has developed a tradition that is unbending and inveterate.  Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions." *Meinhard*, 249 N.Y. at 464, 164 N.E. at 546.

127.    McKinsey RTS's fraud on the Court compels the relief that Mar-Bow seeks.

WHEREFORE, Mar-Bow requests that the Court: (1) vacate the Order approving McKinsey RTS's employment; (2) order McKinsey RTS to disgorge the fees and expenses that the Debtors paid to it; (3) order McKinsey to disgorge all illegal profits that it realized from its investments in Interested Parties; (4) order McKinsey RTS to disgorge the preference of $1,477,299.53; (5) order McKinsey RTS to file a declaration that truthfully and completely discloses all of its relationships with the Debtors and Interested Parties, including all client and investment relationships; (6) permit Mar-Bow full discovery on this Motion; and (7) impose any additional remedies that the Court deems appropriate.

Dated: March 6, 2019
      Wilmington, Delaware

Respectfully submitted,

Steven Rhodes, Esq.
STEVEN RHODES CONSULTING, LLC
1610 Arborview
Ann Arbor, Michigan 48103
Telephone:    (734) 646-7406
Facsimile:    (734) 665-6915
Email:    rhodessw@comcast.net

  - and -

Sheldon S. Toll, Esq.
LAW OFFICES OF SHELDON S. TOLL, PLLC
29580 Northwest Highway
Suite 1000
Southfield, Michigan 48034
Telephone:    (248) 351-5480
Facsimile:    (248) 358-2740
Email:    sst@lawtoll.com

  - and -

Sean O'Shea, Esq.
Michael Petrella, Esq.
Amanda Devereux, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
Telephone:    (212) 504-5700
Facsimile:    (212) 504-6666
Email:    sean.oshea@cwt.com
        michael.petrella@cwt.com
        amanda.devereux@cwt.com

*Lead Counsel for Mar-Bow Value Partners, LLC*

  - and -

*/s/ Marc R. Abrams*
Marc R. Abrams (No. 955)
Aaron H. Stulman (No. 5807)
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone:     (302) 357-3267
Facsimile:     (302) 357-3270
Email:         mabrams@wtplaw.com
               astulman@wtplaw.com

*Local Counsel for Mar-Bow Value Partners, LLC*