**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION, LLC,[1] | Case No. 15-10541 (BLS) |
| Debtor. | (Jointly Administered) |
| | **Hearing Date: May 15, 2019 at 10:00 am (ET)** |

## OBJECTION OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC TO MAR-BOW VALUE PARTNERS, LLC'S MOTION FOR RELIEF FROM ORDERS UNDER BANKRUPTCY RULE 9024 AND CIVIL RULE 60(d)(3) [DKT. 2392]

---

[1] The last four digits of the Debtor's taxpayer identification number are 5540. Inquiries regarding the Debtor should be directed to the GUC Trustee, c/o EisnerAmper LLP, 111 Wood Avenue South, Iselin, NJ 08830-2700 (Attn: Anthony R. Calascibetta).

## TABLE OF CONTENTS

Pages

BACKGROUND ........................................................................................................1

ARGUMENT ...........................................................................................................6

I.     MAR-BOW LACKS STANDING TO OBTAIN RELIEF ...............................6

     A.     Standing Is A Threshold Constitutional And Statutory Requirement ....................7

     B.     Mar-Bow Does Not Hold An Interest That Provides A Right To Be Heard ..........9

          1.     Mar-Bow Does Not Have A Viable Interest As A General Unsecured Creditor .......................................................................................9

          2.     The Plan Transferred Mar-Bow's Cause of Action To The Secured Creditor Trust ...........................................................................................12

     C.     There is No Fraud on the Court Exception to Standing Requirements.................14

     D.     Mar-Bow's Allegations Do Not Warrant An Exercise Of This Court's Inherent Authority.......................................................................................16

II.     RTS DID NOT COMMIT FRAUD ON THE COURT AND MAR-BOW'S CLAIMS TO THE CONTRARY DO NOT AMOUNT TO A CLAIM OF FRAUD ...........................................................................................................17

     A.     RTS Has Not Committed Fraud On The Court ...................................................18

     B.     RTS Met Its Disclosure Obligations And Did Not Hold An Adverse Interest...................................................................................................22

          1.     RTS Complied With Its Disclosure Requirements ...................................22

               a.     Rule 2014 Does Not Require Disclosure Of Affiliates' Connections...............................................................................24

               b.     RTS's Use Of A Lookback Period Was Proper...........................25

               c.     Disclosing Client Connections "By Category" Was Not Fraud On The Court .......................................................................26

          2.     RTS Was Not Required To Disclose MIO Connections Because MIO Is Legally, Functionally, And Operationally Separate From RTS ............................................................................................................27

          3.     RTS Did Not Conceal Its Connections ....................................................31

    4.  RTS Complied With The Employment Order In This Case ......................35

    5.  RTS Is Not *Per Se* Disqualified ..................................................................36

  C.  RTS Was Not Conflicted In Claims Review .........................................................36

  D.  RTS Did Not Conceal Preferences From The Debtors ..........................................37

  E.  RTS Did Not Violate Any Fiduciary Duties To The Estate .................................39

III.  Mar-Bow's Motion Is Barred By The Doctrine Of Laches ...............................................39

CONCLUSION ......................................................................................................................................41

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Begier v. IRS*,
496 U.S. 53 (1990) ........................................................................................ 37

*Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*,
415 F. Supp. 133 (D.N.J. 1976) ..................................................................... 18

*Bulloch v. United States*,
763 F.2d 1115 (10th Cir. 1985) ..................................................................... 18

*Burton v. Horn*,
No. 09 Civ 2435, 2018 WL 5264336 (E.D. Pa. Oct. 22, 2018) ...................... 18

*Cantor v. Perelman*,
414 F.3d 430 (3d Cir. 2005) ........................................................................... 40

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ................................................................................. 14, 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................................................................................... 16

*Davis v. Federal Election Comm'n*,
554 U.S. 724 (2008) ......................................................................................... 7

*Denison v. Marina Mile Shipyard, Inc.*,
Nos. 10 Civ. 62522, 11 Civ. 61398, 2012 WL 75768 (S.D. Fla. Jan. 10, 2012) ........ 15, 21

*Gache v. Hill Realty Associates, LLC*,
No. 13-CV-1650 (CS), 2014 WL 5048336 (S.D.N.Y. Sept 22, 2014) ............. 15

*Gibson v. Gillespie*,
34 Del. 331, 152 A. 589 (Del. Super. Ct. 1928) ............................................. 11

*Hall v. State*,
655 A.2d 827 (Del. Super. Ct. 1994) ............................................................. 11

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
322 U.S. 238 (1944) ....................................................................................... 14

*Helms v. Arboleda*,
224 B.R. 640 (Bankr. N.D. Ill. 1998) ............................................................ 39

*Herring v. FDIC*,
82 F.3d 282 (9th Cir. 1995) .................................................................... 14, 16

*Herring v. United States*,
    424 F.3d 384 (3d Cir. 2005)................................................................... 17, 18

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013)................................................................................ 14

*In re AbitibiBowater Inc.*,
    No. 09-11296 (KJC), 2010 WL 4823839 (Bankr. D. Del. Nov. 22, 2010) ...................... 7

*In re Am. Bus. Fin. Servs., Inc.*,
    361 B.R. 747 (Bankr. D. Del. 2007) ................................................ 18

*In re Am. Bus. Fin. Servs., Inc.*,
    471 B.R. 354 (Bankr. D. Del. 2012) ................................................ 18

*In re Am. Home. Mortg. Holdings, Inc.*,
    476 B.R. 124 (Bankr. D. Del. 2012) ................................................ 38

*In re Am. Int'l Refinery, Inc.*,
    676 F.3d 455 (5th Cir. 2012) ........................................................ 36

*In re Am. Remanufacturers*, Inc.,
    439 B.R. 633 (Bankr. D. Del. 2010) ................................................ 39

*In re AroChem Corp.*,
    176 F.3d 610 (2d Cir. 1999)..................................................... 33, 36

*In re Baron's Stores, Inc.*,
    No. 97-25645, 2007 WL 1120296 (Bankr. S.D. Fla. Apr. 12, 2007) ..................... 20, 21

*In re Conex Holdings, LLC*,
    522 B.R. 480 (Bankr. D. Del. 2014) ................................................ 38

*In re Emoral, Inc.*,
    740 F.3d 875 (3d Cir. 2014)......................................................... 12

*In re Energy Future Holdings Corp.*,
    561 B.R. 630 (Bankr. D. Del. 2016) ................................................ 40

*In re eToys, Inc.*,
    331 B.R. 176 (Bankr. D. Del. 2005) ................................................ 21

*In re G-I Holdings, Inc.*,
    295 B.R. 502 (D.N.J. 2003) ........................................................ 18

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011)......................................................... 7

*In re Grabill Corp.*,
    983 F.2d 773 (7th Cir. 1993) ....................................................................... 25

*In re Leslie Fay Cos.*,
    175 B.R. 525 (Bankr. S.D.N.Y. 1994) ......................................................... 36

*In re M.T.G., Inc.*,
    366 B.R. 730 (Bankr. E.D. Mich. 2007), *aff'd*, 400 B.R. 558 (E.D. Mich. 2009) ........... 21

*In re Martin*,
    817 F.2d 175 (1st Cir. 1987) ....................................................................... 36

*In re McIntyre*,
    328 B.R. 356 (Bankr. D. Mass. 2005) ......................................................... 10

*In re MGL Corp.*,
    No.00-10804 (DWS), 2003 WL 22996974  (Bankr. E.D. Pa. Dec. 16, 2003) ................ 15

*In re Molded Acoustical Prods., Inc.*,
    18 F.3d 217 (3d Cir. 1994)........................................................................... 38

*In re Molten Metal Tech., Inc.*,
    289 B.R. 505 (Bankr. D. Mass. 2003) ......................................................... 25

*In re Morris Publishing Grp., LLP*,
    No. 10-10134, 2010 WL 599393 (Bankr. S.D. Ga. Feb. 10, 2010).................................... 8

*In re MPM Silicones, LLC*,
    No. 14-22503, Dkt. 99 (S.D.N.Y. filed April 28, 2014).................................... 39

*In re Mushroom Transp. Co.*,
    382 F.3d 325 (3d Cir. 2004)........................................................................ 40

*In re Network Access Solutions, Corp.*,
    330 B.R. 67 (Bankr. D. Del. 2005) .............................................................. 40

*In re New Century TRS Holdings, Inc.*,
    No. 07-10416 (KJC), 2013 WL 5460029 (Bankr. D. Del. Sept. 30, 2013) ....................... 7

*In re Nine W. Holdings, Inc.*,
    588 B.R. 678 (Bankr. S.D.N.Y. 2018)........................................................... 23

*In re Patriot Coal Co.*,
    No. 12-12900, Dkt. 141 (S.D.N.Y. filed July 19, 2012).................................... 39

*In re Pillowtex Corp.*,
    427 B.R. 301 (Bankr. D. Del. 2010) ............................................................. 38

*In re Pillowtex, Inc.*,
    304 F.3d 246 (3d Cir. 2002) ............................................................................ 37

*In re R&R Assocs. of Hampton*,
    248 B.R. 1 (Bankr. D.N.H. 2000) ................................................................... 21

*In re Relativity Media, LLC*,
    No. 18-11358 (MEW), 2018 WL 3769967 (Bankr. S.D.N.Y. July 6, 2018) ................... 19

*In re Rupari Holding Corp.*,
    573 B.R. 111 (Bankr. D. Del. 2017) ............................................................... 11

*In re Rusty Jones, Inc.*,
    134 B.R. 321 (Bankr. N.D. Ill. 1991) ............................................................. 25

*In re Stone & Webster*,
    373 B.R. 353 (Bankr. D. Del. 2007) ................................................................. 8

*In re Tolona Pizza Prods. Corp.*,
    3 F.3d 1029 (7th Cir. 1993) ......................................................................... 38

*In re Tower Park Properties, LLC*,
    803 F.3d 450 (9th Cir. 2015) ....................................................................... 13

*In re Tribeca Mkt., LLC*,
    516 B.R. 254 (Bankr. S.D.N.Y. 2014) ............................................................ 25

*In re Trigee Foundation, Inc.*,
    No. 12-00624, 2017 WL 562425 (Bankr. D.D.C. Feb. 10, 2017) ........................... 21

*In re W.R. Grace & Co.*,
    532 F. App'x 264 (3d Cir. 2013) .................................................................... 7

*In re Woodbridge Grp. of Cos., LLC*,
    590 B.R. 99 (Bankr. D. Del. 2018) ................................................................ 11

*Kem Mfg. Corp. v. Wilder*,
    817 F.2d 1517 (11th Cir. 1987) .................................................................... 15

*Long v. Tommy Hilfiger U.S.A., Inc.*,
    671 F.3d 371 (3d Cir. 2012) ......................................................................... 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 7

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S.,*
    *LLC*,
    578 B.R. 325 (E.D. Va. 2017) ................................................................ 24, 26

*Marshall v. Gurley*,
    No. 4:17-cv-405, 2018 WL 4762858 (E.D. Tex. Sept. 30, 2018)...................................15

*McDonald's Corp. v. Roga Enterprises, Inc.*,
    No. 10-21706-CIV, 2010 WL 4281868 (S.D. Fla. Oct. 25, 2010) ..................................15

*Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*,
    No. 09 Civ. 5612, 2010 WL 11508022 (C.D. Cal. Feb. 26, 2010)..................................24

*N. Emerson-West v. Redman*,
    630 F. Supp. 2d 373 (D. Del. 2009)...................................................................................19

*Pearson v. First NH Mortg. Corp.*,
    200 F.3d 30 (1st Cir. 1999)................................................................................................21

*Skouras v. Admiralty Enters., Inc.*,
    386 A.2d 674 (Del. Ch. 1978)...........................................................................................39

*Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.*,
    No. 12507, 1993 WL 294847 (Del. 1993) .......................................................................11

*Sutherland v. Irons*,
    628 F.2d 978 (6th Cir. 1980*)* ...........................................................................................15

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017)........................................................................................................7

*U.S. ex rel. Ketroser v. Mayo Found.*,
    729 F.3d 825 (8th Cir. 2013) ............................................................................................20

*U.S. ex rel. Miller v. Weston Educ., Inc.*,
    840 F.3d 494 (8th Cir. 2016) ............................................................................................19

*United States v. Allergan, Inc.*,
    746 F. App'x 101 (3d Cir. 2018) ...............................................................................20, 24

*United States v. Burke*,
    193 F. App'x 143 (3d Cir. 2006) ......................................................................................18

*Universal Oil Products Co. v. Root Refining Co.*,
    328 U.S. 55 (1946)............................................................................................................14

*Whittington v. Dragon Grp., L.L.C.*,
    991 A.2d 1 (Del. 2009) .....................................................................................................40

## **Statutes**

11 U.S.C. § 101.....................................................................................................................9, 24

11 U.S.C. § 1109 ........................................................................................... 7, 8, 13

11 U.S.C. § 327 ..................................................................................... 4, 19, 20, 33

11 U.S.C. § 362 ................................................................................................... 13

11 U.S.C. § 363 ......................................................................................... 4, 22, 26

11 U.S.C. § 546 ......................................................................................... 3, 13, 37

11 U.S.C. § 547 ............................................................................................ 37, 38, 39

11 U.S.C. § 549 ................................................................................................... 13

## Other Authorities

Black's Law Dictionary (10th ed. 2014) ............................................................... 10

## Rules

Fed. R. Bankr. P. 2014 ............................................................................... passim

Fed. R. Civ. P. 60 ......................................................................................... 6, 12, 17

McKinsey Recovery & Transformation Services U.S., LLC ("RTS") respectfully submits this objection to the Motion of Mar-Bow Value Partners, LLC ("Mar-Bow") for Relief from Orders Under Bankruptcy Rule 9024 and Civil Rule 60(d)(3) (the "Motion") (Dkt. 2392).  Mar-Bow's Motion asks this Court to vacate the April 13, 2015 order approving RTS's employment in this case (the "Order") and order (1) disgorgement of the fees and expenses paid to RTS by the Debtors, "profits" purportedly realized on investments in Interested Parties by RTS's parent company McKinsey & Co., Inc. ("McKinsey"), and a purported preference of $1,477,299.53; (2) RTS to file a new declaration disclosing all client and investment connections; and (3) discovery on the Motion.  Mar-Bow's Motion should be denied in its entirety.

## BACKGROUND

This Motion claiming fraud on the court is the latest salvo in an anticompetitive campaign by Jay Alix ("Alix") to force RTS out of the bankruptcy advisory business by challenging RTS's disclosures years after they were approved by bankruptcy courts, without objection by any economic stakeholder to those bankruptcy cases.  In 2016, using an alter-ego named "Mar-Bow"—an entity named after iconic McKinsey leader Marvin Bower that Alix created solely for the purpose of buying claims to harass RTS[2]—Alix purchased a general unsecured claim in the amount of $7,219.  Mar-Bow then waited over three years to bring this Motion in which it asserts that RTS did not satisfy the disclosure requirements of Bankruptcy Rule 2014 and that it secured employment in this case only by engaging in a fraud on this Court.  These assertions are demonstrably false.

---

[2] Alix admitted under oath that he formed Mar-Bow solely to object to RTS's retentions in bankruptcy cases.  (Ex. 1 to the Transmittal Affidavit of Maria Ginzburg (hereinafter "Ex. 1") (Alix *Westmoreland* Dep. Tr.) 25:14-26:10.)

This is the fourth bankruptcy court, and fifth case, in which Alix falsely has accused RTS of fraud.  In each of these cases, Alix has adopted an extreme legal position regarding what Rule 2014 requires and has weaponized his idiosyncratic stance—including that RTS is *per se* disqualified from serving any debtor—to lodge inflammatory accusations against RTS.  And in many of these cases (including this one) Alix has asserted that McKinsey's disagreement with his interpretation of Rule 2014 means *ipso facto* that McKinsey engaged in fraud on the court, which is a claim reserved for egregious acts of misconduct such as jury tampering or bribery.  Earlier this year, the judges presiding over three other bankruptcies in which Mar-Bow has raised the same attacks on RTS—the *Westmoreland*, *Alpha Natural Resources*, and *SunEdison* cases—jointly referred RTS, Mar-Bow, and the U.S. Trustee to mediation before Judge Marvin Isgur.  The mediation resulted in a settlement between RTS and the U.S. Trustee, including a release of claims regarding RTS's prior disclosures in all cases, including this one.[3]  In presenting that settlement to the referring courts, Judge Isgur found that the parties' disagreement arose out of a "good faith dispute concerning the application of Rule 2014"[4]—not out of fraud, much less fraud *on the court.*  A hearing concerning that settlement before the three courts is scheduled for April 16.  Mar-Bow and RTS, however, did not settle.  Since then, the court in *SunEdison* on April 2, 2019 heard arguments on Mar-Bow's lack of standing, and the court in *ANR* on April 23, 2019 will hear argument on standing, with both deferring consideration of the merits of Mar-Bow's allegations.

The Motion fails for several independent reasons.  As an initial matter, Mar-Bow lacks standing to assert its claims because it does not have an economic interest in the relief it seeks.

---

[3] As part of that settlement, RTS agreed to pay $15 million to the three debtors' estates in exchange for the U.S. Trustee's release of non-fraud claims related to RTS's disclosures in all of RTS's prior chapter 11 engagements about which Alix complains in a civil RICO suit he filed in the District Court for the Southern District of New York.

[4] Ex. 21, Mediator's Notice, *Westmoreland*, Dkt. 1406.

Mar-Bow purchased a general unsecured claim after the chapter 11 plan went effective.  The chapter 11 plan extinguished general unsecured claims like the one Mar-Bow allegedly purchased and, in exchange, granted claimholders interests in the General Unsecured Creditor Trust ("GUC Trust").  The GUC Trust Agreement prohibits the contractual transfer of any beneficial interests in the Trust.  Thus, Mar-Bow could not have acquired any viable interests in the GUC Trust.  And even if it had such interests, Mar-Bow still would lack standing because the fraud on the court claim that Mar-Bow asserts belongs to the Secured Creditor Trust, not the GUC Trust, and only the Trustee of the Secured Creditor Trust can pursue that claim.[5]

Moreover, Alix has conceded that Mar-Bow has no economic interest in this dispute.  In his RICO action (which asserts the same baseless claims about *Standard Register* presented here), Alix argued that AlixPartners suffered a direct injury and that "***there is no proof that any debtor or Interested Party suffered a financial loss because of Defendants' scheme***." (Ex. 2 (*Alix v. McKinsey & Co.*, No. 1:18-cv-04141 (JMF) (S.D.N.Y. November 28, 2018), Dkt. 93) at 30 (emphasis added).)  He also argued that AlixPartners is the "***only party directly injured*** by Defendants' concealment of disqualifying connections."  (Ex. 3 (*Id*. at Dkt. 100) at 5 (emphasis added).)  Alix's concession confirms his obvious and indisputable motivation here.  He is the founder, thirty-five percent owner, and board member of AlixPartners.  RTS competes successfully with AlixPartners by providing valuable services to debtors like Standard Register.  Alix should not be permitted to pursue his strategy of pushing RTS out of the business with unfounded allegations of fraud on the

---

[5]  As discussed herein, the Motion is not premised on Chapter 5 of the Bankruptcy Code and is therefore not an "Avoidance Action" that was retained by the liquidating debtors.  To the extent Mar-Bow is seeking relief pursuant to Chapter 5, it still lacks standing and would be precluded by the applicable statute of limitations imposed by Section 546 of the Bankruptcy Code in any event.

court through his specially-created claims acquisition and litigation vehicle before confirming whether that vehicle even has standing to assert such claims.

Regardless of standing, there is no reason for this Court to consider Mar-Bow's claim because his inflammatory rhetoric does not demonstrate or even state a claim of fraud and, thus, fails on the merits.  RTS did not commit fraud in connection with its Rule 2014 disclosures and at all times complied in good faith with Rule 2014's requirements.  At most, and as established by its filings and the testimony of its principal, Jay Alix, Mar-Bow has exploited a legal disagreement about the scope of Rule 2014 to fuel baseless and damaging accusations of fraud.  Mar-Bow's theory is derived wholly from its extreme (and legally unsound) view of Rule 2014, which is that Rule 2014 requires RTS to disclose the connections of all of its affiliates—although the rule on its face calls only for the disclosure of connections of the "person" engaged by the Debtors—and that RTS cannot apply any limit on how far back it retrospectively searches (a "lookback period").  Mar-Bow then applies that uniquely-held interpretation to RTS's disclosures and concludes that any discrepancies amount to fraud.  There is no basis for Mar-Bow's interpretation and, in any case, such a legal disagreement is not fraud.

Holding RTS's disclosures to a false standard does not establish fraud, much less fraud on the Court—which is a higher burden yet.  In this case, as in all bankruptcy cases in which it participates, RTS filed a declaration expressly laying out how it made its disclosures.  Despite being retained pursuant to section 363 and not section 327, RTS disclosed the connections of members of RTS and connections of any consultants employed by an affiliate who worked on the RTS team. It also made disclosures of connections where the client service provided by a consulting affiliate focused on a direct commercial relationship to the Debtor.  RTS made these disclosures by de-

scriptive category—for example, by identifying the existence of connections to creditors or vendors, and the number of those connections—rather than by identifying its other client connections by name.  RTS used this method in order to reconcile its obligations under Rule 2014 with its commitment to maintaining its client confidentiality.  In *Alpha Natural Resources* and afterwards, RTS changed its "by category" approach to disclosure by name after the U.S. Trustee filed a motion to compel.  The change demonstrates the opposite of fraud: RTS changed its approach when the U.S. Trustee so requested and, like it always had done, disclosed its approach.

Mar-Bow's disagreement with RTS about the form and scope of disclosure is not fraud on the court.  Mar-Bow has pleaded no facts to show that RTS acted other than in accordance with its good faith interpretation of the Bankruptcy Code.  In fact, as noted earlier, Judge Isgur in his mediation report specifically noted that RTS's settlement with the U.S. Trustee resolved a "good faith dispute concerning the application of Bankruptcy Rule 2014."[6]  RTS publicly described its search process and disclosure framework in detail for creditors, the U.S. Trustee, and other interested parties to review and scrutinize.  For four years, no party here raised any challenge.

Mar-Bow's other claims also fail because RTS did not have any disqualifying connections or conceal any preferential payments—and such allegations do not state a claim of fraud on the Court regardless.  Accordingly, the Motion should be denied in its entirety.[7]

---

[6] *See* Ex. 21, Mediator's Notice, *Westmoreland* Dkt. 1406.

[7] Mar-Bow notified RTS yesterday, on the eve of the filing of this brief, that it intended to file a new declaration next week in support of its Motion, which was filed on March 6, 2019.  Mar-Bow reserves the right to respond to any motion filed by Mar-Bow to file a supporting untimely declaration including the right to object to any such filing.

## **ARGUMENT**

## I.    **MAR-BOW LACKS STANDING TO OBTAIN RELIEF**

Mar-Bow asserts that it "acquired a claim against the Debtor SRC Liquidation LLC" on

March 21, 2016—after the *Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation*

*Company And Its Affiliates (With Technical Modifications)* ("the Plan") was confirmed on No-

vember 19, 2015 (Dkt. 1331) and became effective on December 18, 2015, (Dkt. 1412).[8]  The

Transfer Notice filed by AAA Flag & Banner Mfg. Co. Inc. ("AAA Flag") on March 31, 2016

states that Mar-Bow entered into an Assignment of Claim agreement with AAA Flag to acquire

"all of [AAA Flag's] right, title and interest in, to and under the Claim of Assignor . . . representing

all claims of Assignor pending against the Debtor . . . ."  (Ex. 4 (Transfer Notice at 2).)  Before

confirmation of the Plan, AAA Flag had filed a general unsecured claim for "goods sold" for

$7,219.92.  (Ex. 5 (AAA Flag Proof of Claim(.)

Three years later, Mar-Bow filed its Motion for fraud on the court pursuant to Federal Rule

of Civil Procedure 60(d)(3) seeking, in part, that RTS: (1) "disgorge the fees and expenses that the

Debtors paid [to RTS]," (2) "disgorge all illegal profits that it realized from its investments in

Interested Parties," and (3) "disgorge the preference of $1,477,299.53."  (Mot. ¶ 10.)

Mar-Bow lacks standing to assert its Motion because it has no economic interest in the

relief it seeks.  Months before Mar-Bow contends it purchased its claim from AAA Flag, the Plan

extinguished all general unsecured claims, converting them into beneficial interests in the GUC

Trust.  Additionally, the GUC Trust Agreement expressly prohibits transfers of beneficial interests

except by "laws of descent and distribution" or "operation of law" and thus, any purported con-

tractual assignment of Trust interests to Mar-Bow is not valid.  (Ex. 6 (GUC Trust Agreement)

---

[8] *See* Mot. n.2.; Ex. 4, Dkt. 1507 (the "Transfer Notice")).

§ 5.4 (emphasis added).)  But even if Mar-Bow somehow were to hold a valid interest in the GUC Trust (which it could not), it still would lack standing because the purported fraud on the court it asserts is a claim of the Debtors assigned to the Secured Creditor Trust, and only the Trustee of that Trust has a direct interest in it.  (Ex. 7 (Plan) § 2.3.7, Ex. A at § 105.)

### A.    Standing Is A Threshold Constitutional And Statutory Requirement

Standing is a threshold question that the movant "must demonstrate." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650-51 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief sought.") (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 WL 5460029, at *1 (Bankr. D. Del. Sept. 30, 2013) ("[t]o appear and be heard in a bankruptcy case, a party must establish standing").

The Third Circuit has held that "Article III standing and standing under the Bankruptcy Code are effectively coextensive." *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 211 (3d Cir. 2011); *In re W.R. Grace & Co.*, 532 F. App'x 264, 266 (3d Cir. 2013).  To meet Article III requirements, a party must demonstrate that (1) it has suffered an injury, (2) there is a causal connection between the alleged injury and the challenged conduct, and (3) a favorable decision would likely redress the injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury to the movant must be "concrete," "distinct and palpable," and "actual or imminent;" in other words, the movant must have a "personal stake in the outcome of [the] litigation."  *Global Indus.*, 645 F.3d at 210 (internal quotations omitted).  And the movant must "establish that the injury fairly can be traced to the challenged action" such that it "is likely to be redressed by a favorable decision."  *Id.* (internal quotations omitted).

The Bankruptcy Code provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder,

or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).  To have standing, a party in interest must be "directly or adversely affect[ed]" by the court order.  *In re AbitibiBowater Inc.*, No. 09-11296 (KJC), 2010 WL 4823839, at *9 (Bankr. D. Del. Nov. 22, 2010) (holding that the movant lacked standing to object because "there [was] no plan provision that directly or adversely affect[ed] [its] pecuniary interests . . . .") (citing *In re Morris Publishing Grp., LLP*, No. 10-10134 (JSD), 2010 WL 599393 (Bankr. S.D. Ga. Feb. 10, 2010) (a party in interest under § 1109 must have a "pecuniary interest that is directly or adversely affected by the outcome of the proceeding, such that it requires representation")).  In *In re Stone & Webster*, for example, a movant sought to intervene in an adversary proceeding between the plaintiff (a trust) and the defendant (a Saudi oil company) claiming that the defendant was liable for, among other things, breach of contract.  373 B.R. 353, 356, 359-60 (Bankr. D. Del. 2007).  Having entered into an asset purchase agreement with the chapter 11 debtors, and having purchased "substantially all of the Debtors' assets[,]" (*id.* at 357), the proposed intervenor sought to "obtain from [defendant] that which otherwise would go to the Trust if the Trust [was] successful in its breach of contract cause of action."  *Id.* at 360.  The court held that the proposed intervenor lacked an interest in the contract in dispute because the proposed intervenor "ha[d] no right to the proceeds of the Trust's breach of contract claim," it "lack[ed] standing to participate in the . . . [p]roceeding."  *Id.* at 362.

As detailed below, Mar-Bow has no interest, much less a direct, distinct, palpable, and imminent interest in the fraud on the court claim it asserts.  Even if its claim had merit—and it does not—Mar-Bow would recover nothing because (a) it has not received a viable assignment of any interests in the bankruptcy, and (b) even if it did have an interest as a general unsecured creditor in the GUC Trust, the claim it asserts belongs to the Secured Creditor Trust and not to any

individual trust beneficiary.  As such, Mar-Bow has suffered no injury for which its claim could possibly provide redress and has no pecuniary interest in the outcome of its claim.

**B.      Mar-Bow Does Not Hold An Interest That Provides A Right To Be Heard**

**1.      Mar-Bow Does Not Have A Viable Interest As A General Unsecured Creditor**

Additionally, Mar-Bow has no financial stake in the claim it asserts.  Mar-Bow only pleads that it purchased a claim, which according to the docket is a general unsecured claim.  (*See* Mot. n.2; Dkt. 1507 (Notice of Transfer of Claim Other Than for Security (the "Transfer Notice")).) Under the Plan, General Unsecured Creditors received beneficial interests in the GUC Trust on the effective date, and as a result, all General Unsecured Claims were "cancelled" as of that time. Pursuant to the Cancellation of Claims and Equity Interests section of the Plan: "*all* notes, stock, instruments, certificates, and other documents evidencing *any Claims* or Equity Interests shall be cancelled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged."  (Ex. 7 (Plan) § 1.7 (emphasis added).)  A Claim "means a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors or the Estates whether or not asserted or Allowed"—and this plainly includes AAA Flag's claim.  (*Id*. at Ex. A at 3.)[9]  In exchange for their cancelled claims, General Unsecured Creditors like AAA Flag were "entitled to receive [their] Pro Rata Share of the beneficial interests in the GUC Trust as set forth in Section 3.2 of the Plan . . . ."  (*Id*. at § 1.)  Section 3.2.3 confirms that "Each Holder of Allowed Claims in Class IV," which are the General Unsecured Claims, "shall receive a beneficial interest reflecting that Holder's Pro Rata

---

[9] Under the Bankruptcy Code, "[t]he term 'claim' means—(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C. § 101(5).

Share of total beneficial interests in the GUC Trust." Thus, when the Plan became effective on December 18, 2015, AAA Flag's General Unsecured Claim was cancelled, and it received a beneficial interest in the GUC Trust. This occurred months before Mar-Bow purports to have received an assignment of AAA Flag's claim. Therefore, there was no claim against the Debtors that could have been transferred to Mar-Bow.

Mar-Bow has failed to plead that that it owns an interest in the GUC Trust. Instead, it only states only that "[a]s indicated in the Notice of Transfer of Claim Other Than for Security (Dkt. 1507, filed March 21, 2016), Mar-Bow acquired a claim against the Debtor SRC Liquidation LLC"—long after the Plan went effective on December 18, 2015. (Mot. at 1 n.2.) Mar-Bow's assignment was through contract: the Notice of Transfer purportedly transferred a claim to Mar-Bow "pursuant to the terms of an ASSIGNMENT OF CLAIM . . . ." (Ex. 4 (Transfer Notice).)

Any purported assignment of AAA Flag's trust interests violated the terms of the GUC Trust Agreement, which prohibits contractual transfers of beneficial interests in the GUC Trust: "[t]he interests of Beneficiaries are not negotiable and *not transferable* except (a) pursuant to applicable laws of descent and distribution or (b) by operation of law." (Ex. 6 (GUC Trust Agreement) § 5.4. (emphasis added).) A contractual assignment is not one made "pursuant to applicable laws of descent and distribution,"[10] nor is it "by operation of law."[11] A right created by operation of law is separate and distinct from one created through voluntary contract. *See, e.g.*, *In re McIntyre*, 328 B.R. 356, 361 (Bankr. D. Mass. 2005) (distinguishing between assignments that occur through "contract, and therefore require[] offer, acceptance and consideration" and others that

---

[10] "Descent and distribution" refers to "the rules by which a decedent's property is passed, whether by intestate succession or by will." Black's Law Dictionary (10th ed. 2014).

[11] "By operation of law" means a "right or liability is created for a party *regardless of the party's actual intent*." *Id*. (emphasis added).

"happen by operation of law"); *see also Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.*, No. 12507, 1993 WL 294847, at \*5-6 (Del. Ch. 1993) ("The distinction between an express transfer by sale or gift and transfer by operation of law is significant in the realm of corporate law.").

A transfer through voluntary contract is invalid under the GUC Trust Agreement and, therefore, any such assignment is void and unenforceable. *See, e.g.*, *In re Woodbridge Grp. of Cos., LLC*, 590 B.R. 99, 109 (Bankr. D. Del. 2018) (sustaining debtor's objection to a proof of claim where, as here, the purchaser acquired the claim in violation of an anti-assignment clause); *see also In re Rupari Holding Corp.*, 573 B.R. 111, 119 (Bankr. D. Del. 2017) (holding that where an assignment provision provided that an agreement could be assigned only (1) "by operation of law" or (2) "as part of a sale of substantially all of the Debtors' assets," and it "would []be impossible for an assignment to occur under either condition" that "there can be no proposed assignment").  Without a valid assignment, Mar-Bow has no interest in this bankruptcy case and lacks standing to pursue this Motion for that reason alone.

But even if the GUC Trust Agreement did permit Mar-Bow to purchase this claim, the law of champerty independently bars Mar-Bow's claim.  Delaware courts prohibit champertous assignments "based upon the ground that no encouragement should be given to litigation by the introduction of a party to enforce those rights which the owners are not disposed to prosecute." *Gibson v. Gillespie*, 152 A. 589, 593 (Del. Super. Ct. 1928); *see also Hall v. State*, 655 A.2d 827, 830 (Del. Super. Ct. 1994) (same).  Prior to its purchase of an unsecured creditor claim in this matter, Mar-Bow had no legal or equitable interest in AAA Flag, the Debtors, or the subject matter of this litigation.  Mar-Bow's express purpose, which Alix has admitted in sworn testimony, is

simply to bring further litigation against RTS by enforcing rights which AAA Flag was not disposed to (and did not) prosecute. (Ex. 1 (Alix Dep. Tr.) 467:3-16.)  Thus, Mar-Bow's attempt to assert a claim against RTS is barred by Delaware champerty law.

**2.      The Plan Transferred Mar-Bow's Cause of Action To The Secured Creditor Trust**

Mar-Bow's Motion fails for an independent reason.  Here, Mar-Bow asserts fraud on the court under Federal Rule of Civil Procedure 60(d)(3) and seeks disgorgement of fees and profits based on supposed non-disclosures in RTS's application for professional employment.  As it seeks disgorgement of fees paid by the Debtors for RTS's employment as a professional (and supposed trading profits made thereupon), the claim belonged to the Debtor's estates pre-confirmation.[12] Thereafter, the Plan assigned these fraud-based claims to the Secured Creditor Trust.  Even if Mar-Bow had an interest in the GUC Trust, it has none in the Secured Creditor Trust and, thus, it would receive no recovery even if its allegations were meritorious—which they are not.

Mar-Bow's lack of a financial interest in the cause of action it seeks to assert is fatal to its standing on this Motion.  Under the Plan, the Debtors transferred all their assets[13] to two trusts: (1) the Secured Creditor Trust and (2) the GUC Trust (together, the "Trusts").  The Plan granted to the trustees of the Trusts the right to pursue any "Causes of Action" that were transferred to the respective trusts: "the responsibilities of the Trustees of each Trust . . . shall include, but shall not

---

[12] Nor can Mar-Bow claim it has a personal injury here—it purports to stand in the shoes of AAA Flag and alleges no particularized injury on account of the Debtors' payments of fees.  It is black letter law that a cause of action for such allegations of generalized harm belongs to the estate, not individual creditors.  *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).

[13] Assets is defined as "any and all right, title, and interest in and to property *of whatever type or nature*." (Ex. 7 (Plan) Ex. A at 2 (emphasis added).)

be limited to . . . [i]nvestigating, pursuing, litigating, settling, or abandoning any Causes of Action transferred to the Trust."[14]  (Ex. 7 (Plan) § 2.5.1.)

The Debtors transferred to the Secured Creditor Trust "all of their right, title, and interest in and to all of the Secured Creditor Trust Assets not already transferred to the Secured Creditor Trust . . . ."  (*Id.* § 2.3.7.)  The Secured Creditor Trust Assets are defined as "*all of the Debtors Assets*" except twelve enumerated assets that were not transferred.[15]  Because Mar-Bow's alleged cause of action does not fit within any of these exceptions, it "automatically vest[ed] in the Secured Creditor Trust free and clear of all Claims and Liens, other than Permitted Claims and Liens under the Second Lien Term Facility and the Claims and Liens of the Second Lien Agent, Holders of Class III Claims [Second Lien Secured Claims] and Bank of America, N.A."  (Ex. 7) Plan § 2.3.7.) Mar-Bow has no interest in the Secured Creditor Trust.[16]  Indeed, it has no interest here at all.

---

[14] "Cause of Action" is defined broadly to include "any action, class action, claim, cause of action, contro-versy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, ac-count, defense, offset, power, privilege, license, and franchise *of any kind or character whatsoever*, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liqui-dated or unliquidated, disputed or undisputed, secured or unsecured, assertible directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include: (a) any right of setoff, counterclaim, or recoup-ment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim or cause of action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code or similar state law; and (d) *any claim or defense, including fraud, mistake, duress and usury* and any other defenses set forth in section 558 of the Bankruptcy Code." (Ex. 7 (Plan) Ex. A at 3.)

[15] Those twelve assets are the Rabbi Trust Proceeds, the Wind Down Amount, the Wind-Down Funds Ac-count, the Avoidance Actions, the GUC Trust Assets, the GUC Trust Causes of Action, D&O Insurance, Taylor Utility Deposits, GUC Trustee Seed Funding, Taylor Payment Receivables, Terre Haute, and Equity Interests in the Debtors. (Ex. 7 (Plan), Ex. A at 10.)  The Motion does not rely on Chapter 5 of the Code and its baseless allegation that RTS committed fraud on the court by purportedly "fraudulently con-ceal[ing]" that it had received avoidable payments for services is therefore not a claim for avoidance under Chapter 5. (Mot. ¶ 8.)  Even if the claims were "Avoidance Actions," any such claim would be an enumer-ated Avoidance Action that belongs to the Liquidating SRC—not Mar-Bow (*see* Ex. 7 (Plan) § 2.3.4, Ex. A §§ 58, 60, 105)—and would also be barred by the two-year statute of limitations.  11 U.S.C. §§ 546(a), 549.

[16] Even if it did, it would not have the right to assert the claims it brings here.  Under the Secured Creditor Trust Agreement only the Trustee can pursue Trust claims: "[a] Beneficiary shall have no title to, right to, possession of management of, or control of, the Trust Assets . . . The whole title to all the Trust Assets shall

### C.      There is No Fraud on the Court Exception to Standing Requirements

This is the third bankruptcy case in which Mar-Bow has asserted a fraud on the court claim

against RTS without having standing to do so.   In both *ANR* and *SunEdison*, Mar-Bow has argued

that it enjoys an exception from the clear standing requirements that apply to every litigant in every

federal case because it has asserted a claim for fraud on the court.[17]   But even assuming arguendo

that Mar-Bow has advanced any valid claim of fraud, Mar-Bow confuses the court's inherent

power to adjudicate fraud on the court with Mar-Bow's purported right to pursue and litigate a

claim.   In other courts, Mar-Bow erroneously has relied on cases such as *Hazel-Atlas Glass Co. v.*

*Hartford-Empire Co.*, 322 U.S. 238 (1944), *Universal Oil Products Co. v. Root Refining Co.*, 328

U.S. 55 (1946), and *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), which unremarkably hold that

courts possess inherent power to address fraud on the court.   These cases do not aid Mar-Bow

because they do not even discuss a litigant's standing, much less hold that there is an exception to

fundamental standing requirements. *Cf. Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013) ("[I]t is

not enough that the party invoking the power of the court have a keen interest in the issue.   That

party must also have 'standing'. . . .").

Indeed, courts have expressly rejected similar arguments that fraud on the court claims

somehow create an exemption to constitutional standing requirements.   In *Herring v. FDIC*, 82

F.3d 282 (9th Cir. 1995), for example, shareholders of a bank in receivership argued that because

---

be vested in the Trustee and the sole interest of the beneficiaries shall be the rights and benefits given to such Beneficiaries under the Agreement."   (Ex. 22, Dkt. 1304-3 (Secured Creditor Trust Agreement) § 3.1).)   The Trustee, not beneficiaries, has the power to bring suit.   (*Id.* at § 6.2(h); § 11.2.); *In re Tower Park Prop., LLC*, 803 F.3d 450, 463 (9th Cir. 2015) ("[A] trust beneficiary[] does not possess party-in-interest status under § 1109(b), at least where his interests are adequately represented by a party-in-interest trustee.").

[17] Mar-Bow's briefs can be found at: *In re Old ANR, LLC*, 19-00302 (KRH) (Bankr. E.D. Va. filed Mar. 6, 2019), Dkt. 26; *In re SunEdison*, 16-10992 (SMB) (Bankr. S.D.N.Y. filed Mar. 25, 2019), Dkt. 5862. RTS's briefs in *In re Old ANR* can be found at Dkts. 19, 31; and in *In re SunEdison* at Dkt. 5815.

the FDIC had committed fraud on the court by, among other things, submitting false statements and perjured testimony, the shareholders had standing to set aside a judgment on account of the court's inherent power.  The Ninth Circuit rejected that argument and held "Rule 60(b) *does not grant* anyone standing to bring an independent action: it merely does not restrict any standing a party may otherwise have" and that "[t]he shareholders cannot come to court just to hold the FDIC accountable for its alleged fraud."  *Id.* at 285-86 (emphasis added); *see also Kem Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1521 (11th Cir. 1987) (rejecting an exception to the standing rule and holding that "a nonparty only has standing to raise a challenge of fraud on the court if the non-party's interests are directly affected by the final judgment."); *In re MGL Corp.*, No.00-10804 (DWS), 2003 WL 22996974, at *3-4 (Bankr. E.D. Pa. Dec. 16, 2003) (rejecting fraud on the court claim that affected no interest of the movants "nor placed any restriction on their rights and reme-dies" for lack of standing); *Gache v. Hill Realty Assocs., LLC*, No. 13-CV-1650 (CS), 2014 WL 5048336 (S.D.N.Y. Sept 22, 2014) (fraud on the court claim belonged to the bankruptcy estate and the individual debtor lacked standing).[18]

Nor can Mar-Bow rely on the Court's inherent authority to *create* standing where it oth-erwise does not exist.  In *SunEdison* and *ANR*, Mar-Bow has speculated that the courts could fash-ion a payment for Mar-Bow *if* it succeeded on its claims against RTS, *if* the courts sanctioned RTS,

---

[18] Mar-Bow also has mischaracterized cases that address whether *a non-party has standing* to vacate a judgment with the issue of whether *standing is required at all.*  In these cases the non-party had a financial stake in the controversy and, thus, standing.  *See Sutherland v. Irons*, 628 F.2d 978, 978-80 (6th Cir. 1980) (non-party government agency subrogated to plaintiff asserted it was deprived of its share of a court settle-ment and had standing); *Marshall v. Gurley*, No. 4:17-CV-405, 2018 WL 4762858 (E.D. Tex. Sept. 30, 2018) (movant with a non-dischargeable judgment against the debtor had a financial interest in the alleg-edly fraudulent sale of debtor's property); *cf. Denison v. Marina Mile Shipyard, Inc.*, No. 10-62522, 2012 WL 75768, at *5 (S.D. Fla. Jan. 10, 2012) (administrator brought issue of disgorging commissions of a real estate broker to court's attention; bankruptcy court then issued *sua sponte* order to show cause why the commissions should be disgorged).  Where a non-party lacks a stake in the case, courts dismiss its claims.  *See, e.g., McDonald's Corp. v. Roga Enter., Inc.*, No. 10-21706-CIV, 2010 WL 4281868, at *1 (S.D. Fla. Oct. 25, 2010) (dismissing motion of a creditor of a non-party principal of the estate).

*if* Mar-Bow then moved to have the hypothetical sanctions distributed to itself and other general unsecured creditors, and *if* the courts then distributed the hypothetical sanctions—not through the Plan—but directly to creditors in some other unknown fashion.  That kind of conjecture is inadequate to confer standing.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (A "theory of standing [that] relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending."); *Herring*, 82 F.3d at 286.[19]

### D.   Mar-Bow's Allegations Do Not Warrant An Exercise Of This Court's Inherent Authority

Finally, while the Court has inherent authority to address fraud on the court, there is no good reason to do so here for the simple reason that no fraud on the court has occurred.  As explained in detail below, Mar-Bow has manufactured an inflammatory fraud on the court claim for the purpose of harming a competitor.  Despite Mar-Bow's rhetoric of fraud, it is clear that what Mar-Bow calls fraud is really a dispute over the scope and meaning of Rule 2014.  Mar-Bow's claim of "fraud on the court" therefore should be seen for what it is: a business competitor's attempt to malign RTS publicly and push it out of the market.  Mar-Bow filed this Motion not to seek financial redress for itself or even creditors of the Debtors' estates, but rather to pursue its scorched-earth litigation campaign to damage RTS's bankruptcy advisory business.

Mar-Bow's true motives are further revealed by Alix's own admission that no debtor or creditor was harmed by RTS's alleged conduct here or elsewhere.  In the RICO case Alix filed in the District Court for the Southern District of New York, he avers that creditors and debtors, including those in this case, have suffered no harm from RTS's alleged behavior.  There, Alix—as

---

[19] The shareholders in *Herring* lacked standing because creditors and the FDIC would receive any proceeds from the claim.  The court rejected the request, much like Mar-Bow's, to create standing by eliminating the FDIC's interests in the receivership on the basis of its alleged fraud.  *Herring*, 82 F.3d at 286.

purported assignee of AlixPartners, one of RTS's direct competitors—brought claims against RTS, McKinsey, and a number of its professionals, alleging that RTS's purportedly deficient Rule 2014 disclosures amounted to RICO predicate acts and a pattern of racketeering activity that allegedly deprived AlixPartners of professional retentions in RTS's place.   Defendants moved to dismiss because, among other things, AlixPartners was not proximately harmed by any purportedly insuf-ficient Rule 2014 disclosure.  *Id.* at Dkt. 89.  In opposing that motion, Alix argued that "***there is no proof that any debtor or Interested Party suffered a financial loss because of Defendants' scheme***."  (Ex. 2 (RICO Dkt. 93) at 30 (emphasis added).)  He was "not alleg[ing] that any debtor or Interested Party was in fact injured, nor have Defendants argued otherwise."  (Ex. 3 (RICO Dkt. 100) at 5.)  He argued that ***no one*** was harmed but AlixPartners: "AlixPartners, therefore, may be (and, according to the Amended Complaint, is) the ***only party directly injured*** by Defendants' concealment of disqualifying connections."  (*Id.* (emphasis added).)

Now wearing his creditor hat, Alix (through Mar-Bow) argues the opposite: that RTS harmed the Debtors' estates and (derivatively) creditors.  (*See* Motion ¶ 124 (noting that the alleged conduct was "at the expense of the Debtors creditors").)  This Court should not let Alix argue out of both sides of his mouth—first, that only ***competitors*** (specifically AlixPartners) have been harmed by RTS and, now, that Mar-Bow as an unsecured creditor was somehow harmed.  Alix cannot have it both ways, and this Court should not ignore his earlier admissions.

## II.    RTS DID NOT COMMIT FRAUD ON THE COURT AND MAR-BOW'S CLAIMS TO THE CONTRARY DO NOT AMOUNT TO A CLAIM OF FRAUD

Beyond Mar-Bow's lack of standing, its arguments also fail on the merits.  The standards for a motion for relief based on fraud on the court under Federal Rule of Civil Procedure 60(d)(3) are exceedingly stringent, requiring "clear, unequivocal, and convincing" evidence of "egregious"

misconduct. *Herring v. United States*, 424 F.3d 384, 390 (3d Cir. 2005) (internal quotations omit-

ted). Mar-Bow has not alleged anything constituting fraud at all, much less egregious misconduct.

Mar-Bow merely has staked out an extreme interpretation of Rule 2014, shared by no one, and

calls disagreement with that view "fraud." Even assuming Mar-Bow had standing, the Motion

provides no basis for this Court to revisit its four-year-old Order approving RTS's retention.

### A.    RTS Has Not Committed Fraud On The Court

Fraud on the court requires "clear, unequivocal and convincing evidence," *Herring*, 424

F.3d at 386-87, that is "evidence so clear, direct and weighty and convincing as to enable [the

factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in

issue." *In re G-I Holdings, Inc.*, 295 B.R. 502, 508 (D.N.J. 2003) (internal quotations omitted);

*accord In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 754 (Bankr. D. Del. 2007) (describing the

fraud upon the court standard in the Third Circuit as "very demanding"). Fraud on the court is

"extraordinarily rare relief," *United States v. Burke*, 193 F. App'x 143, 144 (3d Cir. 2006), because

it strikes at the heart of the judicial system: "the finality of a judgment." *Herring*, 424 F.3d at 386.

As distinguished from fraud on an opposing party, fraud on the court is "directed to the judicial

machinery itself and is not fraud between the parties or fraudulent documents, false statements or

perjury." *Burton v. Horn*, No. 09-2435, 2018 WL 5264336, at \*7 (E.D. Pa. Oct. 22, 2018) , quoting

*Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985). The standard is satisfied "only by

'the most egregious misconduct directed to the court itself'"—conduct that "seriously affects the

integrity of the normal process of adjudication"—for example, the "bribery of a judge or jury or

fabrication of evidence by counsel." *Herring*, 424 F.3d at 386-87, 386 n.1, 390 (internal quotations

omitted).[20] A motion for fraud on the court also "must be commenced within a reasonable time of

---

[20] Nondisclosure of pertinent facts does *not* rise to the level of fraud on the court. *In re Am. Bus. Fin. Servs., Inc.*, 471 B.R. 354, 365 (Bankr. D. Del. 2012) (finding lender's alleged nondisclosure of valuation of

the discovery of the fraud." *N. Emerson-West v. Redman*, 630 F. Supp. 2d 373, 376 (D. Del. 2009) (internal quotes omitted).

The Motion falls far short of stating that any fraud occurred, much less egregious fraudulent conduct.   In place of evidence—let alone "clear, unequivocal, and convincing" evidence—of any fraud by RTS, Mar-Bow points only to a disagreement with RTS's interpretation of the Rule.  To take the most prominent example, Mar-Bow's claims that RTS engaged in "fraud" primarily on the basis of RTS's non-disclosure of connections of MIO Partners ("MIO"), an investment affiliate of RTS.   (Motion § A.)  But the plain language of Rule 2014 requires only the "person" seeking to be retained by the Debtors to disclose its connections, Fed. R. Bankr. P. 2014(a), not an affiliate of the entity seeking to be retained, and Mar-Bow cites no caselaw precedents supporting its favored interpretation.[21]  A survey of the disclosures of twenty bankruptcy professionals shows that disclosure practices regarding investment affiliates varies widely.[22]

---

debtor's beneficial interests in mortgage loan trusts insufficient to establish fraud on the court absent "affirmative misrepresentation"); *accord Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 n.15 (D.N.J. 1976) ("Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court."). Nor does perjury "constitute fraud upon the court." *Herring*, 424 F.3d at 390.

[21] Courts have acknowledged that the caselaw regarding retentions and conflict issues are not entirely consistent. *In re Relativity Media, LLC*, No. 18-11358 (MEW), 2018 WL 3769967 (Bankr. S.D.N.Y. July 6, 2018) ("The case law that has attempted to define the standards set forth in Sections 327(a) and 327(c), frankly, is not necessarily all that consistent.")

[22] *See* Ex. 8 (providing a summary of how the industry discloses affiliates and investments); *see also, e.g.*, *id.* at 52 (Lazard Frères & Co. LLC) (disclosing that "Lazard also has asset management affiliates, Lazard Asset Management LLC ('LAM') and Lazard Frères Gestion SAS ('LFG'), and an affiliate, Edgewater HoldCo LLC" and that "[s]ome of these LAM or LFG accounts and funds may have held, may now hold or may in the future hold debt or equity securities of the Debtors or the Debtors' creditors, equity holders, or other parties in interest in these cases, and LAM or LFG may have relationships with such parties"); *id.* at 55 (Guggenheim Securities LLC) ("as Guggenheim Securities is the only entity being retained in these cases, the Client Match List described in Paragraph 7 above reflects solely such Potential Parties in Interest that are or were current or former investment banking clients of Guggenheim Securities, and not of all of its affiliate and related entities"); *id.* at 65 (Jefferies LLC) ("as Jefferies is the only entity being retained in these cases, we have researched only the electronic client files and records of Jefferies, not all of its affiliates, to determine connections with any Potential Parties in Interest").

Disclosures based on a reasonable interpretation of the law are not fraudulent. *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 500 (8th Cir. 2016) ("A defendant's 'reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud.'" (quoting *U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013)); *see also Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 376 (3d Cir. 2012) (stating that a violation of a law is not willful "just because a defendant's interpretation is erroneous; it must instead be 'objectively unreasonable'") (internal citation omitted). This is so even if RTS's interpretation turns out to be mistaken. *See United States v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (observing that "an innocent, good-faith mistake about the meaning of an applicable rule or regulation" and statements "based on reasonable but erroneous interpretations of a defendant's legal obligations" do not amount to intentional falsehoods). As already noted, Judge Isgur, who presided over an intensive mediation during which the parties made voluminous submissions, explicitly described RTS's position as a "good faith dispute[] [with the U.S. Trustee] concerning the application of Bankruptcy Rule 2014" in various chapter 11 cases, including this specific case.[23] A good faith dispute is not fraud.

Mar-Bow takes an even more extreme view of Section 327, again calling RTS's disagreement with Mar-Bow's interpretation fraud. Mar-Bow argues that even if RTS followed Mar-Bow's interpretation of Rule 2014, and disclosed all the connections of itself and all its affiliates, the end result would be RTS's disqualification because any investment connection of MIO, and any client connection of RTS or any of its affiliates' to the Debtors or their competitors, are automatically disqualifying. (Mot. ¶ 20). Again, this interpretation is unsupported by either the statutory language or the case law. Disagreement with Mar-Bow's uniquely held interpretation, which

---

[23] *See* Ex. 21, Mediator's Notice, *Westmoreland* Dkt. 1406 ¶ 3.

if correct would result in RTS never being qualified to serve in bankruptcy, is not fraud.  Mar-Bow's insistence that it is only reveals its anticompetitive objective.[24]

The cases upon which Mar-Bow relies are readily distinguishable because they involve lies—intentional concealment of material conflicts.  For example, in *In re eToys, Inc.*, the debtors' counsel knowingly failed to disclose that it previously represented the debtors' general partners and helped to establish limited partnerships that had benefitted from fraudulent transfers from the debtors.  331 B.R. 176, 188 (Bankr. D. Del. 2005) (holding that the non-disclosure was "knowing" because the court found counsel had actual knowledge of the connection and did not disclose it for four months).  Mar-Bow's other cited cases are similarly inapposite.  *See Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 37-38, 41 (1st Cir. 1999) (attorney made "deliberate efforts to mislead the court through inaccurate representations" about having represented both the debtor and a se-cured party against whom the debtor was litigating); *Denison*, 2012 WL 75768, at *5-6 (holding that broker's clear "self dealing" and "interest adverse to the estate" warranted disgorgement); *In re M.T.G., Inc.*, 366 B.R. 730, 751 (Bankr. E.D. Mich. 2007), *aff'd*, 400 B.R. 558 (E.D. Mich.

---

[24] Two cases involving disputes over the non-disclosure of connections are instructive.  In *In re Baron's Stores, Inc.*, No. 97-25645, 2007 WL 1120296, at *1 (Bankr. S.D. Fla. Apr. 12, 2007), a special counsel was retained by the debtor to prosecute an action against the debtor's prepetition auditor.  The retention application contained an affidavit stating that the special counsel was disinterested.  Later, after plan con-firmation and the close of the case, it was discovered that the affidavit omitted several connections to inter-ested parties, including the fact that the special counsel itself held prepetition claims against the debtor and that it had agreed before the bankruptcy to represent the debtor's prepetition shareholders against the audi-tor.  The prepetition shareholders sued to reopen several orders, claiming that the special counsel had com-mitted fraud on the court.  *Id.* at *1-2.  The court rejected the claims, holding that "fraud upon the court requires more than a mistake, it requires *subjective intent*."  *Id.* at *8 (emphasis added).  The court found no "intentional omission or misstatement in the . . . retention affidavits and motions."  *Id.*  Rather, it found that "at all relevant times the Attorneys believed in good faith" that they did not have an interest adverse to the estate.  *Id.* at *10, *12.  The court also rejected claims based on non-disclosure of tenuous connections: "[t]here was no evidence that [the special counsel] understood that they were required to disclose these attenuated relationships or connections as part of their retention."  *Id.* at *13.  Likewise, the court in *In re Trigee Foundation, Inc.* rejected a fraud on the court claim against the debtor's attorneys, who had failed to disclose that they had represented a creditor of the debtor.  No. 12-00624, 2017 WL 562425, at *5-6 (Bankr. D.D.C. Feb. 10, 2017).  The court found no "deliberate attempt to mislead the court;" it "was at most negligence."  *Id.* at *5.

2009) (chapter 7 trustee and his law firm simultaneously were being paid to review the creditor's claim against the estate); *In re R&R Assocs. of Hampton*, 248 B.R. 1, 6-7 (Bankr. D.N.H. 2000) (debtors' counsel knowingly failed to disclose that they represented the debtors' general partners before the bankruptcy and had established limited partnerships that were the beneficiaries of fraudulent transfers from debtors). There are no similar facts here. What Mar-Bow calls fraud is not RTS's intentional concealment of conflicts; it is RTS's disclosure of conflicts in accordance with a view of the law that it held in good faith even if it was not the view that Mar-Bow now espouses.

RTS also fully disclosed the search process and disclosure framework it employed including the limitations of that process and the types of connections that it was not disclosing, as detailed below. The fact that RTS made fully apparent to any reader of its Rule 2014 disclosures the view of the law it held also negates any claim of fraud.

### B.    RTS Met Its Disclosure Obligations And Did Not Hold An Adverse Interest

Mar-Bow's theory of fraud on the court requires this Court to, among other things, (1) accept Mar-Bow's extreme view that a retention governed by 11 U.S.C. § 363 requires disclosure of all connections of *all* affiliates, without regard for any lookback period; (2) find that RTS's good-faith—and disclosed—interpretation of its disclosure obligations constitutes fraud; and (3) conclude that any disclosure of such connections would have been *per se* disqualifying for retention under section 363 of the Bankruptcy Code. (Mot. §§ A-F.) Mar-Bow is incorrect on each of these points; its outlier theory has no support.

### 1.    RTS Complied With Its Disclosure Requirements

Mar-Bow asserts that RTS failed to comply with Rule 2014—and that such failure amounts to a fraud on the court. (Mot. § F.) It did not and it does not. RTS was retained to provide interim management services, and Kevin Carmody was retained as Chief Restructuring Officer ("CRO")

and (for a time) interim CEO pursuant to 11 U.S.C. § 363. RTS undertook its customary connection check process and voluntarily made disclosures that would otherwise satisfy its disclosure obligations arising under Rule 2014 in order to provide the Court full transparency to its retention. *See In re Nine W. Holdings, Inc.*, 588 B.R. 678, 687–88 (Bankr. S.D.N.Y. 2018).

The relevant question here is whether RTS disclosed connections that have a bearing on its "disinterestedness." RTS did so, thus fully complying with Rule 2014. First, RTS disclosed the connections of all "members of McKinsey RTS," which included all individuals employed or affiliated with RTS—the retained professional "person" in this case. (Dkt. 87-3 ¶¶ 21 at n.5, 22, 24.) Second, RTS disclosed the connections of each individual—including any consulting employees borrowed from RTS's consulting affiliates at McKinsey who worked on the Standard Register engagement. (*Id.* at ¶ 22, 24.) Further, and as disclosed, RTS searched for any client service connections of its consulting affiliates where the client service involved a "direct commercial relationship"[25] with the Debtors. (*Id.* at ¶¶ 28(a)-(b), (e).) These disclosures satisfied RTS's obligation to disclose connections bearing on RTS's disinterestedness. They were also consistent with RTS's disclosures in its prior bankruptcy engagements dating back to 2011, cases in which no creditor ever objected to RTS's retention.

Through its extreme interpretation of Rule 2014, Mar-Bow contends that the Rule requires RTS to disclose: (1) connections by name of *all* affiliates including its investment affiliate MIO; and (2) *all* client connections, without any lookback period—that is, all connections whether currently existing or a decade old. Mar-Bow is wrong. Nowhere does Rule 2014 contain a definition

---

[25] Examples would include advising on an M&A transaction involving the Debtors or advising on commercial purchasing work directed at the Debtors. (*See* Ex. 9 (*Westmoreland*, Deposition Transcript of Mark Hojnacki, dated December 31, 2018 ("Hojnacki Dep. Tr") 154:4-14 (describing examples of "direct commercial relationship or transaction" given to partners in the survey).)

of "connections," nor does the Rule "explain . . . the level of detail required in a professional's Rule 2014 disclosures." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S., LLC*, 578 B.R. 325, 333 (E.D. Va. 2017). Moreover, as noted above (*supra* at n. 22), there is wide variation in disclosure practice among bankruptcy professionals, many of whom similarly do not disclose affiliate connections or employ a lookback period. But even if Mar-Bow's implausible interpretation were correct, RTS's differing interpretation does not support a claim for fraud on the court. *See Allergan, Inc.*, 746 F. App'x at 106 (the False Claims Act—which prohibits a person from knowingly submitting a false claim—"does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations") (quotations and citations omitted); *accord Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*, No. 09 Civ. 5612, 2010 WL 11508022, at *12 (C.D. Cal. Feb. 26, 2010) ("[T]o the extent [the case] can be viewed as a dispute over the parties' respective rights, duties and obligations under governing statutes and regulations, it would not appear to provide any basis for asserting a claim of fraud.").

### a.    Rule 2014 Does Not Require Disclosure Of Affiliates' Connections

The plain language of Rule 2014 requires only the disclosure of the professional "*person's* connections." Fed. R. Bankr. P. 2014(a). "Person" is defined in the Bankruptcy Code as an "individual, partnership, and corporation." 11 U.S.C. § 101(14). This definition does not include "affiliates," a term separately defined in the Bankruptcy Code. *See id.* at § 101(2) (defining "affiliates"). "Disinterested person" also is defined in the Bankruptcy Code and notably excludes

mention of "affiliates."  *Id.*  The drafters of Rule 2014 could have required disclosure of all con-

nections of *all* affiliates of the professional person.  They did not.[26]

    **b.**  **RTS's Use Of A Lookback Period Was Proper**

   The same is true of RTS's use of a three-year lookback period.  Mar-Bow's position that

RTS cannot use a lookback period, and instead must disclose all client connections regardless of

how long ago RTS actually served the client, is both extreme and inconsistent with industry prac-

tice including with the practices of other professionals in the industry *and in this very case*.[27]  RTS,

like most professional advisors, uses a lookback period to identify only those connections that are

recent or presently existing.  The use of a lookback period also is consistent with the caselaw

interpreting Rule 2014, which does not require "disclos[ure] of every past or remote connection

with every party in interest," but rather only those that "could reasonably have an effect on the

[professional's] judgment in the case."  *In re Molten Metal Tech., Inc.*, 289 B.R. 505, 511 (Bankr.

D. Mass. 2003); *accord In re Rusty Jones, Inc.*, 134 B.R. 321, 346 (Bankr. N.D. Ill. 1991), *abro-*

*gated on other grounds by In re Grabill Corp.*, 983 F.2d 773, 777 (7th Cir. 1993) ("Rule 2014

does not require an attorney to dredge up every past connection, however remote, that he or she

ever had with the parties in interest in the case."); *In re Tribeca Mkt., LLC*, 516 B.R. 254, 278-79

(Bankr. S.D.N.Y. 2014) (same).

---

[26] Moreover, as discussed *infra* § II.B.4, RTS did in fact disclose connections of affiliates despite not being required to do so under the plain terms of Rule 2014.

[27] *See* Application to Employ Gibson Dunn & Crutcher LLP, Dkt. 85, ¶¶ 28(c), 30 (describing three-year "lookback" period); Application to Employ Lazard Frères & Co. LLC, Dkt. 89-4 ¶ 5 (same); Application to Employ Jefferies LLC, Dkt. 318-4 ¶ 9 (same); *see also* Ex. 8 (providing a summary of how the industry consistently uses a lookback period).

### c.    Disclosing Client Connections "By Category" Was Not Fraud On The Court

Mar-Bow's claim that "RTS's Disclosure did not identify any connections" is similarly misplaced.  (Mot. ¶ 68.)  To the contrary, RTS identified connections by descriptive category, as clearly stated in its declaration.  For example, the following paragraph discloses connections, each one linked to a particular category on the Interested Parties list:

> Certain members of the Retained Staff serving the Debtors currently serve or in the past three years have served one of the Parties relating to significant litigation involving the Debtors, one of the Debtors' 50 largest unsecured creditors on a consolidated basis as identified in their chapter 11 petitions, one of the Debtors' largest customers, and have engaged in proposal discussions with an affiliate which is both one of the Debtors' 50 largest unsecured creditors on a consolidated basis as identified in their chapter 11 petitions and one of the Largest vendors and subcontracting vendors, but in each case on matters unrelated to the Debtors and these Chapter 11 Cases.

(Dkt. 87-3 ¶ 24(a).)  RTS's declaration further makes clear that the client service performed for each client disclosed by category was "unrelated" to the Debtors.  (*Id.*)

RTS submitted seventeen declarations in six prior bankruptcy cases as well as in this case using this form of disclosure—no creditor objected and no court denied RTS's engagement.  Mar-Bow disagrees with RTS that this form of disclosure is adequate, but such a disagreement, particularly in light of RTS's disclosures detailing what it was and was not disclosing, is not fraud, *much less fraud on the court*.  (*See* Dkt. 257 (Order Authorizing the Debtors to (I) Employ and Retain McKinsey Recovery and Transformation Services U.S., LLC to Provide Interim Management Services Pursuant to 11 U.S.C. § 363, and (II) Designate Kevin Carmody as Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Date) ¶ 2(h) (outlining RTS's disclosure requirements but not stating the form that disclosures must take)); *ANR*, 578 B.R. at 333 (Judge Huennekens explaining in *ANR* that "Rule 2014 contains no definition of 'connections,' nor does it explain further the

level of detail required in a professional's Rule 2014 disclosures.").  AlixPartners has itself disclosed "confidential clients" by category in certain circumstances.[28]

### 2.      RTS Was Not Required To Disclose MIO Connections Because MIO Is Legally, Functionally, And Operationally Separate From RTS

Mar-Bow asserts that RTS should have disclosed investments of the McKinsey Investment Office ("MIO"), the investment affiliate that manages assets for the McKinsey pension plan (the "MMRT") and privately offered investment vehicles.  (Mot. §§ A-C; *see also* Ex. 12 (*ANR*, Declaration of Casey Lipscomb, dated Sept. 12, 2018); Ex. 13 (*ANR*, Supplemental Declaration of Casey Lipscomb, dated Nov. 9, 2018).)   This assertion is wrong.  But, once again, a dispute over the interpretation of the rules over which all professionals must make reasonable judgments *does not constitute fraud on the court.*

Mar-Bow bases its argument on rank assertions that MIO is not operated separately and distinctly from RTS's consulting affiliates and that information is freely shared between the two entities.  (Mot. ¶¶ 33, 43.)  Alix, however, has admitted that Mar-Bow has no good-faith basis for its claims that MIO is not separate from the rest of McKinsey.  In his deposition in *Westmoreland*, Alix admitted that he:

- never has spoken with an MIO investor or plan participant other than about the barest outline of what MIO does;

- "never [has] seen an [MIO] employee policy;"

- never has seen "MIO's financial statements" and does not know whether MIO turns a profit;

---

[28] *See* Ex. 10, *In re Altegrity, Inc.*, No. 15-10226 (Bankr. D. Del. filed Feb. 17, 2015), Declaration of Kevin McShea (AlixPartners), ¶ 16 ("There are *five confidential clients* of AlixPartners that are vendors and landlords to the Debtors as well as professionals in interest in the bankruptcy matter.") (emphasis added.).  AlixPartners also tailors its disclosures to work "related" to the debtors.  *See, e.g.*, Ex. 11, *In re Basic Energy Servs., Inc.*, No. 16-12320 (Bankr. D. Del. filed Oct. 25, 2016) (Declaration of David C. Johnston, dated Oct. 25, 2016) ¶ 26 (disclosing "confidential clients" and representing that the "clients are current and former AlixPartners clients in matters *unrelated* to the Debtors").

- never has seen "any MIO policies" that might affect whether MIO can own shares in a chapter 11 debtor;

- does not know "how it works inside MIO;"

- never has been to MIO's office;

- never has witnessed any meeting between an MIO investment advisor and a McKinsey employee; and

- has no idea "about the level of information or the type of information that is provided to investors in [MIO reportings]."[29]

Mar-Bow's claims instead are based on a fundamental misapprehension of how MIO operates; of how it and McKinsey consulting affiliates (like RTS) are separated; and of the extent to which information flow between MIO and the rest of McKinsey is restricted.

MIO is its own corporation, as Mar-Bow admits.  (Mot. ¶ 30.)  It is an indirect subsidiary of McKinsey.  (Ex. 12 (*ANR*, Lipscomb Decl.) ¶ 3.)  Also, "[b]y design, MIO Partners is operated separately and distinctly from McKinsey's consulting services including for the purpose of ensuring McKinsey's disinterested service to its consulting clients."  (Ex. 14 (*Westmoreland*, Declaration of Mark Hojnacki, dated November 8, 2018 ("Hojnacki Decl.")) ¶ 37.)  MIO, unlike the rest of McKinsey, is registered as an investment advisor with the SEC.  (Ex. 12 (*ANR*, Lipscomb Decl.) ¶ 4.)  MIO also has its own directors and officers.  (*Id.* at ¶ 8.)  It maintains electronic information on MIO-controlled servers, which can be accessed only by MIO employees, (Ex. 13 (*ANR*, Lipscomb Supp. Decl.) ¶ 5), and MIO employees cannot access client information that is stored electronically on McKinsey's databases.  (*Id.*)  MIO also has its own professional staff, its investment professionals sit in MIO's own office space, and MIO performs functions entirely unrelated to the consulting functions that McKinsey and its consulting affiliates perform.  (Ex. 14 (*Westmoreland*,

---

[29] Ex. 1 (Alix Dep. Tr.) 187:17-20; *id.* at 174:15-175:11; *id.* at 368:08-09; *id.* at 395:03-07, 396:23-397:04; *id.* at 402:04-09; *id.* at 388:11-14; *id.* at 171:12-22; *id.* at 379:23-380:3.

Hojnacki Decl.) ¶ 37.)  The employees at McKinsey's consulting affiliates, thus, have little or no insight even into how MIO functions, much less what its underlying investments are.

A recent independent investigation by the Special Counsel for the Financial Oversight and Management Board for Puerto Rico, which confirmed that McKinsey's consulting affiliates are operated separately from MIO, demonstrates how baseless Mar-Bow's allegations are.  (Ex. 15 (*In re The Financial Oversight and Mgmt. Bd. for P.R.*, 17-03283 (LTS) ("*In re FOMB*") (D.P.R. filed Feb. 18, 2019) (Dkt. 5154)) at 1-2.)  Mar-Bow ignores this report.  After interviewing MIO professionals and McKinsey witnesses and reviewing MIO and McKinsey policies, the Special Counsel concluded that McKinsey's and MIO's policies and practices "ensured and continue to ensure that McKinsey's consulting work and MIO's investment management work were and are separate and that there is no information sharing between them."  (*Id.* at 1-2.)  It found that McKinsey and MIO had effective policies to ensure separateness and that "McKinsey employees are not provided with information related to MIO's underlying investments *and have no ability to influence MIO's investment decisions*."  (*Id.* at 3 (emphasis added).)  In sum, "[t]he McKinsey consulting arm is effectively walled off from its investment arm, and there is no sharing of confidential information . . . except in limited circumstances" between MIO and consulting affiliates.  (*Id.* at 81.)

Mar-Bow ignores these facts and instead contends that simply because Jon Garcia, RTS's president, sat on the MIO Board during the *Standard Register* bankruptcy, RTS had a "blatant conflict of interest."  (Mot. ¶ 36.)  But not only did Mr. Garcia have no role in the *Standard Register* bankruptcy, neither he nor any other McKinsey partner, even those serving on the MIO Board, could have directed any MIO investment activity in connection with any Interested Party (or otherwise).  (Ex. 12 (*ANR*, Lipscomb Decl.) ¶ 9 ("The MIO Board is not responsible for making

investment decisions on behalf of the Plans or Funds.").)[30]  And MIO policy precludes MIO employees and Board members from discussing investments outside of MIO.  (Ex. 16 (*ANR*, Declaration of Jon Garcia ("Garcia Decl.")) ¶ 6.)  Mr. Garcia adhered strictly to that policy.  (*Id.*)

The "evidence" Mar-Bow marshals in support of its allegations that RTS concealed MIO connections is the publicly disclosed information that MIO makes to the SEC and that the MMRT makes to the Department of Labor on Forms ADV and 5500, respectively.  Forms 5500 and ADV disclose allocations made by the MMRT on a retrospective basis—the Form 5500 listing investments in 2015, the year RTS filed its declaration in this case, was not filed until September of 2016 (about 10 months *after* the Debtors' plan was confirmed).  The belated public disclosure of some investments overseen by MIO cannot impact RTS's disinterestedness because "the age of the information contained in the Forms 5500 makes it impossible to confirm, based upon publicly-available information, whether and to what extent those investments still existed at the time [the forms were filed] or at any time afterward (including now)." (Ex. 15 (*In re FOMB*, at 71.)

Moreover, Mar-Bow does not allege that any RTS employee actually accessed these regulatory filings. In fact, in *ANR*, RTS—at the request of the U.S. Trustee—surveyed its employees and the team serving the debtors to ask whether any individual had accessed the Forms 5500 for this purpose; no one had.  (Ex. 17 (*ANR*, Declaration of Selembe Chambers, dated November 9, 2018 ("Chambers Decl.")), ¶ 8.)  Put otherwise, none of these regulatory filings provide any contemporaneous information about any particular investment held by any RTS individual, and Mar-Bow has not shown that any RTS individual had knowledge of any MIO investments in Interested

---

[30] Before September 1, 2017, the MIO Board ratified allocations and redemptions to third-party funds *that already had been made* by MIO professional staff in the previous quarter.  (Ex. 15 (*In re FOMB*, at 52) ¶ 8.)

Parties.[31]  Moreover, since this information is not provided in real time, any information provided was stale and only available 10 months after the plan was confirmed when RTS was no longer providing any services to the Debtors.  Thus, any information cited by Mar-Bow in connection with the Motion is irrelevant for RTS's connections at the time it was retained in March 2015.

Mar-Bow also makes the extraordinary and unprecedented demand in the Motion that McKinsey "disgorge" the profits that McKinsey realized on its purported investments in Interested Parties.  This request for relief goes well beyond any cognizable legal theory—and Mar-Bow asserts none.  First, neither McKinsey nor MIO—the RTS affiliate that made these investments—are a party to this proceeding.  Therefore, any causes of action against those entities cannot be brought in this Court.  Second, Mar-Bow has presented no allegation—let alone proof—that MIO's investments were illegal.  Rather, Mar-Bow challenges RTS's disclosures and retention, which cannot possibly serve as a basis for disgorgement against MIO.  Third, while the Court has the power to grant equitable relief, its "inherent powers must be exercised with restraint and discretion," and such unmoored relief is inimical to the concept of restraint.  *Chambers*, 501 U.S. at 44.

### 3.    RTS Did Not Conceal Its Connections

Mar-Bow also alleges—without citation—that RTS failed to disclose 67 "client relationships with Interested Parties in this case."  (Mot. ¶ 54.)  Again, Mar-Bow is  manufacturing concealment from disagreement with an extreme view that only Mar-Bow holds.  The process by

---

[31] Mar-Bow's allegation about a Bank of America investment is particularly perplexing.  Without citation, Mar-Bow claims that "McKinsey, its partners and its employees held an equity investment position in Bank of America."  (Mot. ¶ 24.)  This allegation suffers from the same fatal defect as its other MIO-based allegations:  RTS consultants lack information about specific underlying investments made by MIO third-party managed funds.  Any purported "connections" of RTS's investment affiliates cannot and do not impact RTS's disinterestedness.  Moreover, RTS is not actually invested in Bank of America stock; Bank of America appears on Schedule 3 of the *ANR* disclosures because it held CDS protection on Bank of America because Bank of America was a counterparty to a swap.

which Mar-Bow identified supposedly "concealed" connections ignores the reasonable—and dis-closed—boundaries on RTS's connections search.  These allegations do not identify any fraud.

In his deposition in *Westmoreland*, Alix explained his methodology for compiling RTS's purported connections.  He admitted that to identify the connections that Mar-Bow claims were "concealed," he built up and maintains a so-called "database" of McKinsey connections, created by compiling client names disclosed in prior RTS Rule 2014 declarations and, in some instances, client names gleaned from media or other public sources.[32]  (Ex. 1 (Alix Dep. Tr.) 70:21-71:3, 80:4-8.)  When RTS submits a new Rule 2014 declaration, Mar-Bow consults its "database" and compares it to the list of Interested Parties filed in the bankruptcy—here, the list of Interested Parties in *Standard Register*.  (*See, e.g.*, *id.* at 71:8-14 (discussing application of "database" to Interested Parties list in *Westmoreland*)); (*see also* Dkt. 87-3 (Declaration of Kevin Carmody ("Carmody Declaration") Schedule 1, at 19-27).)  If an entity name appears on the Interested Par-ties list and in the "database," but not in RTS's declaration, then Mar-Bow declares the connection to have been "concealed" by RTS regardless of *when* the connection appeared in a prior RTS filing or whether the connection was an RTS connection or that of another McKinsey consulting affiliate.  Thus, Mar-Bow ignores that a connection might have been disclosed in one bankruptcy but not another bankruptcy for perfectly valid reasons—and, notably, for the precise reasons stated in the Carmody Declaration.

---

[32] Counsel for Alix and Mar-Bow admitted during meet and confer sessions that this "database" of client connections is in reality an Excel spreadsheet—*i.e.*, a list.  Moreover, none of the "social media" sources that Alix relies upon—namely, five LinkedIn profiles that he produced to RTS in advance of his deposi-tion—provide evidence of McKinsey "connections" because they show only that McKinsey alumni later worked for entities that may appear on the Interested Parties list.  These profiles do not show, as Alix alleged (*See* Ex. 1 (Alix Dep. Tr.) at 75:14-76:14), that McKinsey employees discuss their clients publicly, and McKinsey policy prohibits them from doing so in any event.

Mar-Bow never addresses the fact that RTS disclosed its conflict-checking process to the Court, a disclosure in which RTS expressly explained that it was not searching for all connections no matter how tenuous.[33]  As stated in the Carmody Declaration, RTS searched for the connections of the "Retained Staff," *i.e.*, the team members serving the debtors, as well as the connections of members of "McKinsey RTS," a defined term that "include[s] personnel from affiliates of McKinsey RTS who provide recovery and transformation services worldwide." (Dkt. 87-3 (Carmody Decl.) ¶ 22 & n.5.)  The specific individuals staffed on the *Standard Register* team serving the Debtors are not the same as those staffed in other bankruptcies, and, thus, the connections of some members of the Retained Staff in *Standard Register* were different than the connections in other bankruptcies.  Mar-Bow's database also ignores that RTS limited its search to a three-year period despite the fact that—as described *supra*, the Order required RTS to disclose only connections that are *currently* held or represented.  *In re AroChem Corp.*, 176 F.3d 610, 623 (2d Cir. 1999) (concluding that because the phrase "hold or represent" in 11 U.S.C. § 327(a) is "phrased in the present tense . . . counsel will be disqualified . . . only if it presently 'hold[s] or represent[s] an interest adverse to the estate,' notwithstanding any interests it may have held or represented in the past.'").  Similarly, the "database" fails to account for newer clients or connections that did not exist in 2015 at the time of RTS's engagement, and thus could not have been "concealed."

Alix admits that Mar-Bow's "database" fails to take RTS's search parameters into account, (*see* Ex. 1 (Alix Dep. Tr.) 85:24-86:2), and RTS's preliminary analysis of Mar-Bow's chart of connections confirms it.  RTS recreated Mar-Bow's approach here by reviewing the Rule 2014 declarations in other bankruptcies in which RTS participated, as well as the disclosures initially

---

[33] *See also* Ex. 8 (*Westmoreland* Dkt. 1686-1 (noting that most professionals impose certain limitations on their conflict search, such as only searching for connections recorded in the prior to years or limiting disclosure of affiliate connections).

made *in camera* in July 2016 and docketed on January 16, 2019 in the *Alpha Natural Resources* bankruptcy.  Twenty of the connections that Mar-Bow alleges were "concealed" in *Standard Register* previously were disclosed *in camera* in *ANR* as RTS clients, affiliates of RTS clients, or connections of RTS's affiliates.  These recently publicized disclosures, however, include client and affiliate connections that would not have been included in *Standard Register* because such MIO connections only were disclosed *in camera* in connection with the *ANR* court's specific order directing RTS to do so.  RTS never was required to search for or disclose these MIO connections, absent the *ANR* court's specific request in that case.  Because there was (and is) no legal obligation to search for or disclose them, such MIO connections were never concealed from the Court.

Of the remaining connections on Mar-Bow's chart, all but three were connections of disclosed McKinsey clients or affiliates of disclosed McKinsey clients named in Rule 2014 declarations submitted in subsequent bankruptcies. (*See* Ex. 18 (*ANR*, Third Supp. Declaration of Kevin Carmody, dated May 19, 2016); Ex. 19 (*ANR*, Declaration of Kevin Carmody, dated August 5, 2016).)  But the periods covered by the disclosed lookback periods for these bankruptcies were different, so many connections disclosed in one bankruptcy were outside of the lookback period applied in *Standard Register*.  Similarly, Mar-Bow improperly assumed that a disclosed current client in 2018 means that such client should have been disclosed in *all* prior retentions, even if it was a new client.  Also, Mar-Bow assumes that the composition of RTS itself did not change.  And given the fact that the non-RTS team members were drawn from different practice groups, connections of borrowed team members disclosed in one bankruptcy would not be the same as those of borrowed team members in *Standard Register*.  Therefore, Mar-Bow's baseless analysis of RTS's disclosures fails to demonstrate that RTS concealed any connection.

**4.    RTS Complied With The Employment Order In This Case**

Mar-Bow's contention that RTS failed to comply with the terms of this Court's Order regarding disclosure of connections equally lacks merit—and would not give rise to a fraud on the court in any event.  (*See* Mot. ¶¶ 6-7.)  The Order approving RTS's employment in this case required RTS to "disclose any and all facts that may have a bearing on whether the firm, its subsidiaries, *certain* of its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtor, its creditors, or other parties in interest."  (Dkt. 257 ¶ 2(h) (emphasis added).)  The Order expressly authorized RTS to exercise discretion in its disclosure by stating that RTS needed only to "disclose any and all facts that *may have a bearing" on disinterestedness.*  (Dkt. 257 ¶ 2(h) (emphasis added).)  RTS complied with the Order and made clear its understanding by specifying in detail the searches it conducted and disclosing the results.  No party objected.

As discussed above, RTS disclosed connections of individuals working at consulting affiliates who were on the RTS team.  It also searched for connections of any consulting affiliate where there was a direct commercial relationship to the debtor—searching across all employees, not just the Standard Register team.  RTS then expressly disclosed its approach.  (Dkt. 87-3 ¶ 28.)  Connections of affiliates unrelated to the debtor or connections of MIO that sit behind an information barrier do not rise to the level of "facts that may have a bearing" on RTS's disinterestedness, and there is no basis for such connections to fall within the scope of the Order.  As described above, MIO connections are not known to RTS consultants.  MIO investments are not directed by RTS consultants, and any contemporaneous investments by MIO or its third-party managers in Interested Parties that were unknown cannot create an adverse interest.  RTS's approach was consistent with that of many other financial professionals in the industry.

### 5.    RTS Is Not *Per Se* Disqualified

Finally, Mar-Bow broadly asserts, without any support, that "[b]ecause McKinsey's work impacted every one of the Interested Parties in these cases," any further disclosures per se "would [have] result[ed] in the Court's denial of the Debtors' Application to authorize [RTS's] employment." (Mot. ¶¶ 25-59.)  Mar-Bow's automatic theory of disqualification rings hollow: the case law does not contain any such "bright line" rules of disqualification.  Instead, when considering whether to approve a retention application, courts "favor . . . an approach which evaluates the facts and circumstances of each particular case."  *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (quoting *In re Martin*, 817 F.2d 175, 180-81 (1st Cir. 1987)); *see also In re AroChem Corp.*, 176 F.3d 610, 626 (2d Cir. 1999) ("The statutory scheme does not dictate such a [per se] rule, however.  Rather, given 'the fact-specific nature of parties' interests and their alignments . . . no general rule of simple application . . . can be gleaned.'").  Any question about whether RTS's connections might have been disqualifying must be tethered to the "adverse interest" standard—a "determination [that] must be made with an eye to the specific facts of each case."  *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461-62 (5th Cir. 2012) (internal quotes omitted); (Ex. 20, *In re Synergy Pharms. Inc.*, Case No. 18-14010 (JLG) (S.D.N.Y. Bankr.), Transcript of Hearing, dated Feb. 6, 2019, 24:20-22 ("[T]he Court notes that a professional's representation of a creditor [or] a debtor is not a per se bar to the retention of that professional . . . .").)  But in any case, Mar-Bow cannot predicate a *fraud* claim on the non-disclosure of all clients of RTS's affiliates when the disclosure at issue expressly states that it does not disclose those connections, nor did the Order require such disclosures.

### C.    RTS Was Not Conflicted In Claims Review

Without pleading any facts or citing to any law, Mar-Bow baldly asserts that RTS reviewed proofs of claims filed by McKinsey clients and (1) failed to disclose that it was undertaking that

review, and (2) failed to object to any of its clients' proofs of claims.  (*See* Mot. § E.)  Mar-Bow has not cited any law requiring a CRO to recuse itself from reviewing claims filed by companies that are clients of the consultant's affiliates on separate and unrelated matters.  As RTS disclosed, its consulting affiliates did not have connections with a direct commercial relationship to the debtors—so any work McKinsey affiliates might have done for an Interested Party would have been unrelated to claims in this bankruptcy.  Mar-Bow's conclusory allegations about conflicts of interest cannot rise to the level of egregious misconduct necessary to plead fraud on the court.

### D.    RTS Did Not Conceal Preferences From The Debtors

Mar-Bow also alleges that RTS committed fraud on the court by concealing that it held an adverse interest to the estate arising from supposed preference payments of $1,477,299.53 that McKinsey received for consulting services from Debtors within 90 days before the Petition Date.  (Mot. § G.)  Mar-Bow does not style this claim as a preference claim, which would long be time-barred under Section 546(a)(1) of the Bankruptcy Code.   But recasting the claim as one for fraud on the court does not save it from dismissal because the payments were ***disclosed*** in the Carmody Declaration and, thus, cannot be fraud.  (*See* Dkt. 87-3, Carmody Decl. ¶ 19; *see also* Mot. ¶ 95 (acknowledging and citing to RTS's disclosure of payments).)

The Court need go no further.  But in any event, RTS's pre-petition payments from the Debtors were also not preferences.[34]  Section 547(b) "prevents a debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy."  *Begier v. IRS*, 496 U.S. 53, 58 (1990); *see also* 11 U.S.C. § 547(b).  However, by the statute's plain terms, only those payments that were on account of antecedent debt constitute a preferential transfer.  *Id.* at

---

[34] As discussed, *supra* note 15, Mar-Bow's claim for avoidance of a preference is time-barred under 11 U.S.C. § 546.

§ 547(b)(2).  As was disclosed in the Carmody Declaration, certain of the alleged preferential payments were in fact paid when RTS held a retainer for future invoices and thus the subsequent payments were not on account of antecedent debt.  *See In re Pillowtex, Inc.*, 304 F.3d 246, 255 (3d Cir. 2002) (noting that U.S. Trustee suggests that professionals protect themselves from the preference risk by obtaining a retainer).  Similarly, had the payments not been made, RTS would have been a secured creditor to the extent of the retainer.  Mar-Bow accordingly is unable to satisfy section 547(b)(5), which requires a debtor to show that payment of a preference enabled the creditor to receive more than it would have received in a chapter 7 liquidation.

Moreover, Section 547(c)(2) offers the defense of "ordinary course," which provides that "payment of a debt incurred by the debtor in the ordinary course of business" is not an avoidable preference when it is subjectively "made in the ordinary course of business between the parties" or objectively "made according to ordinary business terms."  *See In re Pillowtex Corp.*, 427 B.R. 301, 307 (Bankr. D. Del. 2010) (explaining the court must "perform a 'subjective test' to determine the consistency of transactions between the parties before and during the preference period"); *In re Am. Home. Mortg. Holdings, Inc.*, 476 B.R. 124, 140 (Bankr. D. Del. 2012) ("'Ordinary business terms' looks to general norms within the creditor's industry.").

The subjective inquiry requires the court to consider myriad factors, including the length of time the parties engaged in the type of dealing at issue, the amount of and manner of tendering payments, whether there appears to be an unusual action by the debtor or creditor, and whether the creditor did anything to gain an advantage in light of the debtor's compromised financial condition. *See In re Conex Holdings, LLC*, 522 B.R. 480, 486-87 (Bankr. D. Del. 2014).  The Third Circuit has cautioned that transfers made "according to ordinary business terms" may be avoided only if they are "so idiosyncratic as to fall outside that broad range of" practices customary in creditor's

industry. *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 220 (3d Cir. 1994) (internal quotation marks omitted) (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993)).

The only support Mar-Bow provides for its assertion that the payments were outside the ordinary course pertains to the timing of the payments: "[b]ecause the Debtors made these payments within a few days after invoicing, they were not in the ordinary course of business under 11 U.S.C. § 547(c)(2)." (Mot. ¶ 96.) That is insufficient to plead fraud on the court.[35] And in any case, these payments were *disclosed* and thus cannot constitute fraud on the court.

### E.  RTS Did Not Violate Any Fiduciary Duties To The Estate

Mar-Bow's throwaway assertion at the end of its Motion (see Mot. § I) that RTS violated fiduciary obligations to the Debtors and harmed the estate not only is frivolous, but also contradict Alix's prior stated positions that none of the debtors served by RTS—including the Debtors here— have suffered any injury. (*See supra* at I.D.) Indeed, RTS consistently has provided value to its clients and has faced no objection from any debtor or creditor with a pecuniary interest in any of the estates that RTS has served. Mar-Bow has identified no disqualifying conflict. The only party that has raised issues about RTS is Mar-Bow, who was not even a creditor at the time RTS was providing services to the Debtors. Given this, Mar-Bow's baseless assertion that RTS harmed the Standard Register estate (or any other debtor) rings hollow.

### III.  Mar-Bow's Motion Is Barred By The Doctrine Of Laches

Finally, the doctrine of laches bars Mar-Bow from bringing this Motion. The equitable defense of laches "may justify the [court's] refusal to reopen a bankruptcy matter." *In re Am. Remanufacturers*, Inc., 439 B.R. 633, 636 (Bankr. D. Del. 2010) (citing *Helms v. Arboleda*, 224

---

[35] AlixPartners itself discloses pre-petition payments made within days of invoicing. *See, e.g.*, *In re Patriot Coal Co.*, 12-12900, Dkt. 141 (S.D.N.Y. filed July 19, 2012) (invoices dated June 26, 2012 and July 6, 2012 and paid on the same dates); *In re MPM Silicones, LLC*, 14-22503, Dkt. 99 (S.D.N.Y. filed April 28, 2014) (showing invoice dated April 8, 2014 and paid April 9, 2014).

B.R. 640, 644 (Bankr. N.D. Ill. 1998)). The defense "is based on the theory that upon a person's acquiring knowledge of a wrong affecting his rights, any unreasonable delay in asserting an equitable remedy will bar such form of relief." *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del. Ch. 1978) (citation omitted). "The equitable defense of laches is available when a party has knowledge of a claim, there is an inexcusable delay in bringing the action, and the delay is prejudicial to the defendants." *In re Network Access Solutions, Corp.*, 330 B.R. 67, 79 (Bankr. D. Del. 2005) (citing *Cantor v. Perelman*, 414 F.3d 430, 439-40 (3d Cir. 2005)); *In re Mushroom Transp. Co.*, 382 F.3d 325, 337 (3d Cir. 2004)). All three elements are satisfied here.

Mar-Bow purchased its alleged claim in this case on March 21, 2016. (Mot. at n.2.) Kevin Carmody had filed his declaration detailing RTS's entire search procedure and openly described RTS's disclosures prior to its retention on April 13, 2015. (Dkt. 87-3 ¶¶ 22-23.) Mar-Bow chose not to intervene in these cases when it intervened in *ANR*, even though it was simultaneously pursuing the same claims it complains of here in *ANR*. "An unreasonable delay can range from as long as several years to as little as one month. The temporal aspect of the delay is less critical than the reasons for it." *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 7-8 (Del. 2009). Mar-Bow's delay is both lengthy—totaling nearly three years—and entirely unexplained. Thus, the delay is unreasonable and inexcusable. *In re Energy Future Holdings Corp.*, 561 B.R. 630, 646 (Bankr. D. Del. 2016) (delay inexcusable where movants waited "31 months into extremely complex cases to assert" a motion to dismiss). Mar-Bow's delay prejudices RTS. Had Mar-Bow promptly raised its concerns regarding RTS's disclosures, the Court could have considered those concerns and, if the Court deemed appropriate, asked RTS to modify its disclosures or otherwise address any concerns based on the information then readily available. Instead, Mar-Bow waited for three years—

asserting its claim now only because it sees a tactical advantage to expanding the number of venues in which it is asserting inflammatory and baseless fraud claims against RTS.

## <u>CONCLUSION</u>

Mar-Bow lacks standing to bring the claims it asserts.  On the merits, its Motion raised three years after Mar-Bow purchased its claim does not support a claim of fraud on the court and is barred by laches.  The Court should deny Mar-Bow's Motion in full.

Dated:    April 11, 2019

ASHBY & GEDDES, P.A.

By: */s/ William P. Bowden*
William P. Bowden (No. 2553)
Michael D. DeBaecke (No. 3186)
David F. Cook (No. 6352)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone:    (302) 654-1888
Facsimile:    (302) 654-2067
Email: wbowden@ashbygeddes.com
         mdebaecke@ashbygeddes.com
         dcook@ashbygeddes.com


Faith E. Gay, *pro hac vice to be filed*
Maria Ginzburg, *pro hac vice to be filed*
David S. Flugman, *pro hac vice to be filed*
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 390-9000
Email: fgay@selendygay.com
         mginzburg@selendygay.com
         dflugman@selendygay.com


M. Natasha Labovitz, *pro hac vice to be filed*
Erica Weisgerber, *pro hac vice to be filed*
Elie J. Worenklein, *pro hac vice to be filed*
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:    (212) 909-6000
Email: nlabovitz@debevoise.com
         eweisgerber@debevoise.com
         eworenklein@debevoise.com


*Attorneys for McKinsey Recovery & Transformation*
*Services U.S., LLC*