# Exhibit 1

Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF TEXAS

4  HOUSTON DIVISION

5  ----------------------------------x

6  In re:

7

8  WESTMORELAND COAL COMPANY, et al.,

9

10                     Chapter 11

11       Debtors.   Case No: 18-35672(DRJ)

12                   (Jointly Administered)

13  ----------------------------------x

14

15

16              December 31, 2018

17           **  REVISED  **

18       Videotaped Deposition of Jay Alix

19

20

21

22

23  Reported By:

24  Mark Richman, CSR, RPR, CM

25  Job No: 153327

1
2       December 31, 2018
3           8:38 a.m.
4
5
6       Videotaped Deposition of JAY ALIX, held
7   at the offices of Boies Schiller & Flexner
8   LLP, 575 Lexington Avenue, New York, New
9   York, before Mark Richman, a Certified
10  Shorthand Reporter, Registered
11  Professional Reporter and Notary Public
12  within and for the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2   A P P E A R A N C E S:
3   BOIES SCHILLER & FLEXNER
4   Attorneys for the Witness
        575 Lexington Avenue
5       New York, NY 10022
6   BY:  SEAN O'SHEA, ESQ.
        MICHAEL PETRELLA, ESQ.
7       CHRISTOPHER ZONA, ESQ.
8
9
10  DIAMOND McCARTHY
    Attorneys for Mar-Bow Value Partners
11      990 Fanin, Suite 3700
        Houston, TX 77010
12
13  BY:  CHRISTOPHER MURRAY, ESQ.
14
15  LAW OFFICE OF SHELDON S. TOLL
    Attorneys for Mar-Bow Value Partners
        29580 Northwestern Highway
16      Southfield, MI 48034
17  BY:  SHELDON TOLL, ESQ.
        (Pro hac vice)
18
19  DANIEL L. LEMISCH, ESQ. (Pro hac vice)
    Attorneys for Mar-Bow Value Partners, LLC
20      Lakeview Capital, Inc.
        151 South Old Woodward Avenue
21      Birmingham, MI 48009
22  BY:  DANIEL LEMISCH, ESQ.
23
24
25  ///

1
2   A P P E A R A N C E S (Continued):
    ZACK A. CLEMENT
3   Attorneys for McKinsey
        3753 Drummond Street
4       Houston, TX 77025
5   BY:  ZACK CLEMENT, ESQ.
6       (Via teleconference)
7
    SELENDY & GAY
8   Attorneys for McKinsey Recovery and Transformation Services
        1290 Avenue of the Americas
9       New York NY 10104
10  BY:  CHRISTINE CHUNG, ESQ.
        ERICA IVERSON, ESQ.
11      NICHOLAS KLENOW, ESQ.
12
13
14
15  KIRKLAND & ELLIS
    Co-Counsel to the Debtors and Debtors in
16  Possession
        300 North LaSalle
17      Chicago, IL 60654
18  BY:  GREGORY PESCE, ESQ.
19      (Via teleconference)
20
21  ALSO PRESENT:
22  MATTHEW SMITH, Videographer
23
24
25

1       JAY ALIX
2       THE VIDEOGRAPHER:  This begins
3   media label number 1 of the video
4   recorded deposition of Jay Alix in
5   the matter of In re:  Westmoreland
6   Coal Company, et al., in the United
7   States Bankruptcy Court, Southern
8   District of Texas, Houston Division.
9   This deposition is being held at 575
10  Lexington Avenue in New York, New
11  York, on December 31st, 2018 at
12  approximately 8:38 a.m.
13      My name is Matthew Smith for TSG
14  Reporting Incorporated, I'm the legal
15  video specialist.  The court reporter
16  is Mark Richman in association with
17  TSG Reporting.
18      Will counsel please introduce
19  yourself for the record.
20      MS. CHUNG:  Christine Chung from
21  Selendy & Gay representing McKinsey
22  Recovery and Transformation Services.
23      MS. IVERSON:  Erica Iverson,
24  Selendy & Gay, also representing
25  McKinsey Recovery and Transformation

1    JAY ALIX
2  Services.
3        MR. KLENOW:  Nick Klenow from Selendy
4  & Gay also representing McKinsey.
5        MR. O'SHEA:  Sean O'Shea for the
6  witness and Mar-Bow, Boies Schiller &
7  Flexner.
8        MR. ZONA:  Chris Zona for the
9  witness and Mar-Bow, Boies Schiller &
10  Flexner.
11        MR. RHODES:  Steve Rhodes for
12  Mar-Bow.
13        MR. LEMISCH:  Daniel Lemisch for
14  Mar-Bow.
15        MR TOLL:  Sheldon Toll for
16  Mar-Bow.
17        THE VIDEOGRAPHER:  Counsel on the
18  phone.
19        THE REPORTER:  I have the
20  appearances of counsel on the phone.
21        THE VIDEOGRAPHER:  Would the
22  court reporter please swear the
23  witness.
24        JAY ALIX, Having been called as
25  a witness, having been first duly

1    JAY ALIX
2  sworn by the Notary Public (Mark
3  Richman), was examined and testified
4  as follows:
5        EXAMINATION BY MS. CHUNG:
6    Q.   Good morning, Mr. Alix.
7    A.   Good morning, Ms. Chung.
8    Q.   So we met a couple of weeks ago
9  on the 18th of December in Houston.  Do
10  you recall that?
11    A.   In the hallway, in the courtroom,
12  yes.
13    Q.   And in the courtroom your lawyer,
14  Mr. Rhodes, who is here today,
15  represented in the court that you
16  participated in the drafting of the
17  objection that's the subject of our
18  proceeding today.  Do you recall him
19  saying that?
20    A.   Yes.
21    Q.   And was that statement true?
22    A.   Yes.
23    Q.   You addressed the court yourself
24  that day, didn't you?
25    A.   The court asked me to stand and

1    JAY ALIX
2  asked me questions and I answered the
3  court's questions.
4    Q.   And one of the things that you
5  said when you responded to the court was
6  that you've read everything in the
7  objection and that you agree with it and
8  you support it; is that correct?
9    A.   That's correct.
10    Q.   And it's correct because what you
11  said is the truth?
12    A.   Correct.
13    Q.   Did you review the December 20th
14  filing that your lawyers made that
15  related to the taking of these
16  depositions?
17    A.   I don't know which filing that
18  is.
19    Q.   One of the representations in
20  there was that Mar-Bow and yourself, Jay
21  Alix, look forward to demonstrating the
22  good-faith basis for each and every one
23  of its allegations?
24    A.   I haven't --
25    Q.   Do --

1    JAY ALIX
2    A.   I haven't read that document.
3    Q.   I'm sorry?
4    A.   I haven't read that document that
5  you're referring to.
6    Q.   Whether you've read the document
7  or not, is it a statement that you agree
8  with?
9    A.   Can you read the statement again?
10    Q.   That you --
11    A.   Can I see it?
12    Q.   That you look forward -- that you
13  look forward to demonstrating a
14  good-faith basis for each and every one
15  of Mar-Bow's allegations?
16    A.   Yes.
17    Q.   Is there anything in the amended
18  objection that Mar-Bow filed in this
19  case that you no longer agree with?
20    A.   No.
21    Q.   Is there anything in that
22  objection that you no longer support?
23    A.   I know of a couple of
24  typographical errors in the objection,
25  but other than that, I don't believe

JAY ALIX

there's any word choices or sentences or
phrases that I'm not supportive.
   Q.   Now the court's order that
brought us all together today, have you
reviewed that?
   A.   Yes.
   Q.   The order that said we should all
get together before the 31st?
   A.   Yes, yes.
   Q.   So here we are?
   A.   Very familiar with that court
order.
   Q.   Okay.  Now let me use a word used
in that order.  It asked -- I had asked
-- it directed that these depositions
explore the basis and authorization for
the allegations in your original
objection, in Mar-Bow's original
objection and Mar-Bow's amended
objection.  Do you recall the order
using those words?
   A.   Not specifically but I know
that's the intention of the order.
   Q.   So let me ask you, do you agree

JAY ALIX

that you authorized the filing of the
original objection in this case?
   A.   I did authorize that filing, yes.
   Q.   And you did so after you read it;
is that right?
   A.   That's correct.
   Q.   And do you agree that you
authorized the filing of the amended
objection in this case?
   A.   I did.
   Q.   And you did so after reviewing
it; is that right?
   A.   Yes, I did.
   Q.   It might help a little bit for
the court reporter if you waited until,
I trail off a little bit but you might
want to wait until my question is
finished before you answer.
   A.   I'm glad to wait.
   Q.   I'm sure Mr. O'Shea will tell you
that that's a good practice as well.
      So you are someone who's given
testimony many times, right?
   A.   I have.

JAY ALIX

   Q.   And you understand the oath that
you just took?
   A.   I do.
   Q.   You testified in depositions or
in court at least a dozen times?  How
many times?
   A.   More than a dozen times.
   Q.   Okay.  So I'll skip --
approximately how many times would you
say?
   A.   Well, I worked for 35 years in
the restructuring business and doing
litigation support, fraud investigations
and providing expert testimony, and in
most of those situations I either gave a
deposition or expert testimony or both.
So it would be maybe dozens of times.
   Q.   Okay.  Thanks for that.  So I'm
going to skip the preliminaries on
instructions, etc.  I think you're
familiar.  I'll just ask you is there
anything that you think prevents you
from giving truthful and honest
testimony today?

JAY ALIX

   A.   No.
   Q.   So AlixPartners is a company that
you started in 1981, at least the
predecessor company you started in 1981;
is that right?
   A.   Yes.
   Q.   And at the time you were the only
employee, do I have that right?
   A.   I started by myself in my
apartment, that's right.
   Q.   And through various iterations of
what was the original company to what is
AlixPartners today, the company has
grown from 1 to 2,000 employees,
correct?
   A.   There's approximately 2,000
employees at AlixPartners today, yes.
   Q.   So you're the founder of
AlixPartners?
   A.   I am.
   Q.   You're a former 100 percent
owner?
   A.   That's correct.
   Q.   And you were the hundred percent

JAY ALIX

1
2  owner as recently as when, some time in
3  the 2000s?
4      A.    The firm had, we had a capital
5  transaction where I sold control of the
6  firm in October of 2006, and at the time
7  --
8          MS. CHUNG:  We have a little
9  interruption because of the audio
10  hookup.  We've been going for a
11  little while.  We've moved the phone
12  closer to the witness so you can let
13  us know if you have further problems,
14  all right?  Can you hear me?  I'm not
15  sure that it's working.
16         Can we go off the record and
17  figure it out.
18         THE VIDEOGRAPHER:  Time is 8:47
19  a.m., we're off the record.
20         (A recess was had.)
21         THE VIDEOGRAPHER:  Time is 8:51
22  a.m., we're on the record.
23      Q.    So, Mr. Alix, when we dropped off
24  to fix the technical issue, the question
25  was when were you last -- when were

JAY ALIX

1
2  you last 100 percent owner of
3  AlixPartners, 2006, was it 2006?
4      A.    It was in 2006.
5      Q.    Okay.  And you own what
6  percentage of the company now?
7      A.    Now I own approximately 35
8  percent of the company.
9      Q.    And do you own that directly or
10  through other entities or people?
11      A.    I owned it through my holding
12  companies and my -- generally through an
13  entity called Lakeview Capital and there
14  are small minor pieces of the ownership
15  that are in my estate plans for my
16  children, but the combination of all
17  that adds up to the 35 percent.
18      Q.    When you say Lakeview Capital,
19  there's more than one Lakeview Capital
20  entity, right?
21      A.    There's Lakeview Capital, kind of
22  the parent company, and then there are
23  other subsidiary companies below it.
24      Q.    That are also called Lakeview?
25      A.    They have Lakeview name.  I have

JAY ALIX

1
2  a film company called Lakeview
3  productions that makes documentary films
4  and Broadway musicals and plays.  I have
5  some Lakeview property companies that
6  own that I own.  So Lakeview is a name
7  that covers some other entities.
8      Q.    The party in this case is
9  Lakeview Capital Inc.; is that right?
10     A.    The party in this case is
11 Mar-Bow.
12     Q.    Well --
13     A.    Mar-Bow Value Partners Inc.
14     Q.    You're not aware that Lakeview
15 Capital Inc. signed on to papers that
16 Mar-Bow has been filing?
17     A.    I see.  Lakeview Capital Inc.
18 being my, my family office, my holding
19 company, my family office, has an
20 employee who is the general counsel of
21 Lakeview and advises Lakeview and its
22 affiliates.  So Mr. Lemisch signed on as
23 general counsel of Lakeview Capital and
24 its related entities.
25     Q.    Is Lakeview Capital the company

JAY ALIX

1
2  that you mentioned before through which
3  you own -- you own a part of
4  AlixPartners?
5      A.    Through that company, yes.
6      Q.    And what is Lakeview Capital
7  Holdings?
8      A.    Lakeview Capital Holdings would
9  be one of the companies in this family
10 of companies that are in my family
11 office.
12     Q.    So if you can, by the precise
13 name, what -- which Lakeview entities
14 are the entities through which you own
15 your shares in AlixPartners?
16     A.    Sitting here today I don't know
17 that.  I haven't looked at that in many
18 years and so I don't really know how
19 that's set up right now.
20     Q.    Do you have an idea of which
21 entities are the ones through which you
22 own most of your ownership of
23 AlixPartners?
24     A.    I just -- that structure has been
25 set up by other people primarily for tax

JAY ALIX

1
2  planning purposes and for ownership
3  purposes and investment purposes and I
4  was not involved directly in the setting
5  up of that.  So I don't -- I think of it
6  all as just Lakeview.
7    Q.  Okay.
8    A.  Not as a legal matter but as a,
9  you know, a conversational matter.  And
10  I don't probe very deeply past that in
11  my day-to-day life.
12    Q.  So in a conversational manner, is
13  it through Lakeview, this cluster let's
14  call it, that you own 35 percent or is
15  it a smaller percentage with the other
16  percentages being through these estate
17  things that you mentioned for your
18  children?
19    A.  My total holdings in
20  AlixPartners, whatever entity it would
21  be in within my group of entities, would
22  be about 35 percent.  It's not 35 plus 5
23  somewhere else, plus 10 somewhere else.
24  It's 35 plus or minus a couple of points
25  depending on dilution through all these

JAY ALIX

1
2  entities.
3    Q.  When you say my group of
4  companies, are you referring to any
5  group of companies other than this
6  Lakeview group that you've talked about?
7    A.  No, there's no other group of
8  companies.
9    Q.  And you're a current member of
10  the board of directors of AlixPartners,
11  do I have that right?
12    A.  I am a member of the board of
13  directors of AlixPartners.
14    Q.  How long have you been a member
15  of the board of AlixPartners?
16    A.  Well, I went on the board in 1981
17  when I started the firm, and I came off
18  the board in 2006 -- 2007 when I sold
19  control of the firm.  And then when CVC
20  Capital Partners bought back into the
21  firm, when they bought into the firm and
22  bought control from Hellman & Friedman
23  in about 2012, somewhere 2012, 2013, CVC
24  bought control of the firm from Hellman
25  & Friedman who bought it from me.  So it

JAY ALIX

1
2  went from my control to Hellman &
3  Friedman's control to CVC's control.
4  When CVC bought the control in 2012 I
5  rejoined the board of directors at that
6  time.
7    Q.  So you've been continuously a
8  board member since 2012; is that
9  correct?
10    A.  I believe that's right, yes.
11    Q.  And Mar-Bow which you've brought
12  up, the objector here, you've described
13  yourself as the beneficial owner of
14  Mar-Bow in court filings; is that right?
15    A.  Yes.
16    Q.  Okay.  And what does that mean to
17  you?
18    A.  Well it's my -- it's my
19  disclosure that I control Mar-Bow.
20  Regardless of what entity is held in or
21  how the stock runs or who the officers
22  or directors are, I am the beneficial
23  owner and the controller of Mar-Bow
24  effectively, just to cut throughout the
25  corporate structure.

JAY ALIX

1
2    Q.  Who are the officers and
3  directors of Mar-Bow?
4    A.  I'm not really sure.
5    Q.  Are there any?
6    A.  Well at one time an attorney
7  named Donald Lifton was involved as the
8  incorporator because he helped set it
9  up.  Mr. Lifton has since passed away
10  about two months ago, a good friend.  So
11  I don't know what's happened inside
12  Mar-Bow as far as who's taken his place
13  and which role and who's in which
14  position as a corporate governance
15  matter.
16    Q.  So sitting here today you don't
17  know who any of the directors or
18  officers of Mar-Bow are?
19    A.  Well I believe I'm an officer and
20  director of Mar-Bow.  But I don't know
21  which title I have today.  I have
22  another associate named Robert Shields
23  who is a corporate attorney and has been
24  working on managing my corporate affairs
25  for many years and so Mr. Shields would

Page 22

JAY ALIX

1  have set all that up and we can get
2  probably an affidavit from him as to who
3  the actual officers and directors are
4  and the owners are of each entity, but I
5  don't have that information myself. I
6  don't work in that area of running
7  Mar-Bow or Lakeview.
8    Q.  So appreciate that.  Let me
9  revise my question a little bit.
10  Sitting here today, other than yourself,
11  you don't know who any of the directors
12  or officers of Mar-Bow are?
13    A.  I could check the files.  Right
14  now I don't recall.  I've seen it in the
15  past, I just don't recall right now.
16    Q.  So sitting here now you don't
17  know other than yourself?
18    A.  Fair enough.
19    Q.  How many employees does Mar-Bow
20  have?
21    A.  I'm not aware of any employees
22  that Mar-Bow has.
23    Q.  Does Mar-Bow conduct any business
24  other than filing objections in
25

Page 23

JAY ALIX

1  bankruptcy cases in which RTS is seeking
2  to be employed as a professional?
3    A.  Yes.
4    Q.  What business does it do other
5  than that?
6    A.  Mar-Bow invests in claims in
7  bankrupt companies.
8    Q.  And when you say it invests in
9  claims in bankrupt companies, you mean
10  in bankruptcy cases in which RTS is
11  applying to be a professional; is that
12  correct?
13    A.  So far that's what's happened.
14  It's been primarily to create an
15  opportunity for me to help the
16  bankruptcy system become aware that
17  there's not a level playing field going
18  on in the bankruptcy restructuring
19  industry and I'm trying to help create a
20  level playing field.
21    Q.  And by that you mean by making
22  allegations about -- of misconduct by
23  McKinsey RTS; is that right?
24       MR. O'SHEA:  Objection, form.
25

Page 24

JAY ALIX

1  You can answer.
2    A.  I believe that McKinsey has been
3  engaged in misconduct in the bankruptcy
4  system and I have made allegations about
5  McKinsey's misconduct in the bankruptcy
6  system in a number of forums, yes.
7    Q.  And that's been through Mar-Bow?
8    A.  Yes, done through Mar-Bow.
9    Q.  And when you said --
10    A.  Well it's also been done in other
11  ways but through Mar-Bow.  I've done it
12  in my own name as well.
13    Q.  That's right, you're referring to
14  the civil RICO suit?
15    A.  RICO suit.  I've pursued the RICO
16  suit in my own name personally and in
17  the Alpha Natural Resources bankruptcy
18  case.  And in the Westmoreland
19  bankruptcy case, I have pursued my
20  claims as a creditor of Alpha, as a
21  creditor of Westmoreland through
22  Mar-Bow.
23    Q.  In the bankruptcy cases though
24  that's been done through Mar-Bow, right?
25

Page 25

JAY ALIX

1    A.  Correct.
2    Q.  So when you said that Mar-Bow was
3  created primarily to help create this
4  opportunity for you to raise awareness
5  in the bankruptcy system of what you
6  maintain are McKinsey's -- is McKinsey's
7  misconduct, was that the primary aim or
8  the sole aim?
9       MR. O'SHEA:  Objection, misstates
10    the testimony.  You can go ahead and
11    answer.
12    A.  Can you repeat the question.
13    Q.  Isn't it the case that it's the
14  sole aim of Mar-Bow to, as you put it,
15  create the opportunity for you to help
16  the bankruptcy system become aware of
17  the lack of a playing field because of
18  McKinsey's purported misconduct?
19    A.  I established Mar-Bow to buy a
20  claim in Alpha Natural Resources.  That
21  claim would then allow me to have
22  standing like any other creditor in that
23  bankruptcy case.  And then I used that
24  standing to bring about a motion to
25

Page 26

JAY ALIX

1 Excel McKinsey to comply with the
2 bankruptcy code.
3    Q.   So other than buying claims in
4 bankruptcy cases in which RTS is
5 applying to be retained as a
6 professional and pursuing claims in
7 those cases, does Mar-Bow have any
8 business?
9    A.   Not at this time.
10    Q.   Okay.  Now one of the footnotes
11 in the objection, the amended objection
12 that Mar-Bow filed, and I think you've
13 got it in front of you, it's been marked
14 as exhibit 1.
15       (Exhibit 1, Amended Objection of
16    Mar-Bow was marked for
17    identification.)
18       MR. O'SHEA:  May I see it?  Thank
19 you.
20    Q.   If you turn to footnote 2.
21    A.   Do you know what page that's on?
22    Q.   It's on page 1.
23    A.   Yes.  Footnote 1 or footnote 2?
24    Q.   Footnote 2.  Do you have the

Page 27

JAY ALIX

1 place?
2    A.   Yes.  Yes.
3    Q.   Okay, so I can see you're reading
4 it.  It says Mar-Bow is a creditor and
5 therefore has standing to assert this
6 objection under 11 USC 1109 B.  Mar-Bow
7 owns 1.5 million face value of
8 Westmoreland Coal Company 144A bonds.
9 Let me stop there.  So is that a true
10 statement?
11    A.   That's my understanding, yes.
12    Q.   From whom did Mar-Bow buy those
13 144A bonds?
14    A.   Who did we buy them from?
15    Q.   Mm-hmm.
16    A.   I don't know who we bought them
17 from.  I asked my CFO, Mr. Art Kubert --
18 excuse me.  I asked my CFO, Mr. Art
19 Kubert to purchase some bonds in
20 Westmoreland.  He contacted the brokers
21 he works with.  He contacted attorney
22 Toll to advise and I was told that we
23 acquired these bonds.  I don't know who
24 the intermediaries were, who the owners

Page 28

JAY ALIX

1 were.
2    Q.   Do you know what price was paid
3 for the bonds?
4    A.   I don't know exactly the price
5 but I think it was about 40 cents on the
6 dollar.
7    Q.   The next sentence says "Mar-Bow
8 is also an equity security holder in
9 13,500 shares of Westmoreland's MLP
10 affiliate."  Do you see that?
11    A.   Yes.
12    Q.   From where did Mar-Bow obtain
13 those equity shares?
14    A.   Same process that I just
15 described for the bonds was used to buy
16 the shares.
17    Q.   So you don't know the identity of
18 the seller?
19    A.   I do not.
20    Q.   And who does?
21    A.   I don't know.
22    Q.   Well you said --
23    A.   I don't know who -- I don't know
24 if anyone knows who the seller is.

Page 29

JAY ALIX

1 Typically when you're buying securities
2 on the open market there's sellers in
3 the world and there's buyers in the
4 world and intermediaries and brokers
5 match them together.  So I'm not sure if
6 the sellers are known to anyone other
7 than they were purchased.
8    Q.   Do you know if that's the process
9 through which these shares were brought
10 -- bought?
11    A.   I believe that's what happened.
12 I believe they were bought in the open
13 market.
14    Q.   What was the price paid for the
15 shares?
16    A.   Boy, that's a good question.  I
17 think the shares were purchased -- I
18 don't know the price per share.  But I
19 have a recollection that the purchase,
20 the total value was somewhere between a
21 hundred and $200,000.  But I could be
22 wrong about that.  I'd have to go back
23 and check.
24    Q.   The total value of the shares was

JAY ALIX

1
2  somewhere between a hundred and
3  $200,000?
4     A.   I think so.
5     Q.   For the 13,500 shares that are
6  referenced in the footnote?
7     A.   I'm not clear on that.  I'm not
8  clear on that.  I didn't process the
9  transaction myself.
10    Q.   Who knows what the price was that
11 was paid?
12    A.   It would be Mr. Kubert.
13    Q.   And Mar-Bow was formed when?
14    A.   Mar-Bow was formed in the spring
15 of 2016.
16    Q.   And you've already mentioned that
17 Mar-Bow has purchased claims in ANR, the
18 ANR proceeding?
19    A.   Yes.
20    Q.   Also here obviously?
21    A.   Yes.
22    Q.   Did Mar-Bow also purchase claims
23 in the Gen On and Sun Ed proceedings?
24    A.   Mar-Bow purchased a claim in Gen
25 On proceeding, Mar-Bow did not purchase

JAY ALIX

1
2  a claim in the Sun Ed proceeding.
3     Q.   And what claim did Mar-Bow buy in
4  the Gen On proceeding?
5     A.   In Gen On Mar-Bow purchased
6  approximately $150,000 of present value
7  I think bonds in Gen On.
8        MR. O'SHEA:  I think we're going
9     beyond the four corners of the
10    judge's order.  I'll allow you to go
11    on a little longer but I just want to
12    admonish you that I think you're
13    running afoul of the judge's order.
14    Q.   You can answer the question.
15    A.   What was the question again?
16    Q.   The question --
17       MR. O'SHEA:  He already answered
18    the question.
19    Q.   The question was, the question
20 was what claim did Mar-Bow buy in the
21 Gen On proceeding?
22       MR. O'SHEA:  Asked and answered.
23    Go ahead and answer it again.
24    A.   I recall that Mar-Bow purchased
25 about $150,000 of present value debt

JAY ALIX

1
2  securities in Gen On.
3     Q.   Okay.  And do you know from where
4  Mar-Bow purchased those bonds?
5     A.   I do not.  It would have been the
6  same process as I described with the
7  Westmoreland purchase.
8     Q.   And does Mar-Bow still hold that
9  claim?
10    A.   No.  What happened is, I learned
11 of the Gen On bankruptcy filing in about
12 August of 2017, and so I undertook a
13 process to see if I would have any
14 conflict of interest in acting in Gen On
15 as a board member of AlixPartners.  And
16 I asked the general counsel of
17 AlixPartners if she had ever heard of
18 Gen On, she said no.  I asked the CEO of
19 AlixPartners if he ever heard of Gen On,
20 he said no.  I asked -- I checked the
21 docket.  I had Mr. Toll check the docket
22 and he said AlixPartners is not on the
23 docket as a professional.
24       So I concluded at that time that
25 the case was going forward, McKinsey had

JAY ALIX

1
2  been hired, and that AlixPartners was
3  not working at the company.
4        And so I think it was a Tuesday
5  morning in August I think, I purchased
6  with Mr. Kubert's help about $150,000
7  worth of securities in Gen On, and then
8  about an hour later I received a call
9  from Attorney Rhodes and I learned that
10 -- I became aware that AlixPartners'
11 name was in another place in the docket
12 under a disclosure made by the CEO of
13 Gen On.  So the CEO of Gen On had made a
14 disclosure that he as CEO had hired both
15 McKinsey and AlixPartners through
16 Kirkland & Ellis a year earlier.  Which
17 I had no awareness of.
18       So I was trying to figure out what
19 had happened there.  And what happened,
20 which is ordinary -- ordinarily the
21 case, it happens often, Kirkland & Ellis
22 who was pursuing litigation on behalf of
23 Gen On, I guess, had hired AlixPartners
24 directly to work for Kirkland & Ellis.
25 So when I called AlixPartners about Gen

JAY ALIX

1 On, they wouldn't have had Gen On as a
2 top-of-the-mind name, they would have
3 had Kirkland & Ellis as a matter because
4 the firm AlixPartners does a lot of work
5 where law firms retain the firm.
6    Q.   Mr. Alix, the question was do you
7 still own a claim in Gen On?  The answer
8 is no?
9    A.   I was trying to answer your
10 question.  I think the question you
11 asked me, you asked me how.
12    Q.   I think it's a yes or no
13 question.  Is it yes or no?
14    A.   Do I own a claim in Gen On?  No.
15 So the end of the story is, within three
16 hours of buying the claim I donated the
17 claim to the Mayo Clinic.
18    Q.   And when did you do that?
19    A.   About three hours after I bought
20 it that morning.  So I found out by 9
21 o'clock in the morning and by noon I
22 called Mayo Clinic and said I have to
23 make a donation to you.  I gave it to
24 them at no cost to them.  I just made it
25

JAY ALIX

1 as a donation.  Made no profit and
2 walked away.
3    Q.   How much is the donation worth?
4    A.   The donation would have been the
5 value of the bonds that I gave them.
6    Q.   And what was the value of the
7 bonds when you gave it to them?
8    A.   Probably close to what I paid for
9 it, $150,000.
10    Q.   What's the basis for your saying
11 that that's the value?
12    A.   Because I don't remember the
13 price of the bonds, I just remember what
14 we had about $150,000 involved in the
15 transaction.
16    Q.   Okay.  So in terms of preparing
17 for this deposition, did you meet with
18 your lawyers?
19    A.   I have met with my lawyers, yes.
20    Q.   And since the order came out
21 ordering these depositions, how many
22 times have you met with your lawyers?
23    A.   Since the order came out, what
24 day did the order come out?
25

JAY ALIX

1    Q.   The 20th.
2    A.   What day was that last week?  Was
3 that -- what day of the week is that?
4    Q.   Thursday.
5    A.   Thursday last week?  The order
6 came out on Thursday last week.  So I
7 arrived here in New York and came to
8 this office at 2 o'clock in the
9 afternoon on Thursday last week, and I
10 met with my attorneys on Thursday
11 afternoon into Thursday evening, Friday
12 during the day into early evening,
13 Saturday during the day and into early
14 evening, and then Sunday, yesterday, and
15 during the day to late afternoon.
16    Q.   Who was present for those
17 sessions?
18    A.   People are coming and going so
19 not everyone is in every meeting.  But
20 generally, you know, over that span of
21 time, I had meetings with Mr. O'Shea,
22 with Chris -- sorry, I don't know your
23 last name.
24        MR. ZONA:  Zona.
25

JAY ALIX

1    A.   Chris Zona.
2        MS. CHUNG:  You can say it on the
3 record, it's okay.
4    A.   Attorney Rhodes, attorney
5 Lemisch, attorney Toll, attorney
6 Petrillo, Chris Murray, I think Allan
7 Diamond was on some phone calls, and
8 then there have been other attorneys
9 coming and going who I'm not as familiar
10 with, who I don't know as well but I
11 know they're working on it.
12    Q.   So before the judge ordered the
13 depositions in this case, when is the
14 last time that you met with your
15 attorneys for four days in a row?
16    A.   These attorneys on this matter?
17 I don't think I've ever met with these
18 attorneys on this matter for four days
19 in a row.
20    Q.   How about any of the attorneys
21 for four days in a row, any of the
22 attorneys you named?
23    A.   Oh, in the last four and a half
24 years, five years, probably there have
25

JAY ALIX

1  been many times I've met with attorneys
2  for many days.
3     Q.   On these matters, the RICO case,
4  the ANR proceeding?
5     A.   RICO, ANR.
6        MR. O'SHEA:  The RICO case don't
7     answer, it's not within the four
8     corners of this order.  Anything else
9     you can answer.
10        (Instruction not to answer.)
11     A.   On ANR, on Gen On, on Sun Edison,
12  on -- I've investigated all of
13  McKinsey's bankruptcy cases.  I've
14  looked at all 4 cases and I've studied
15  them extensively and I've talked to my
16  attorneys about all 4 of those
17  bankruptcy cases as well as other
18  experts.
19     Q.   So you've said that also in the
20  media, right, that you personally have
21  investigated what you view to be
22  McKinsey's misconduct?
23     A.   You have to show me the media
24  quote you're referring to.

JAY ALIX

1     Q.   Well, for example, in -- there
2  was a podcast that you gave in South
3  Africa, do you recall that, in May?
4     A.   I didn't give it -- I did not
5  give a podcast in South Africa, no.  I
6  was in Barcelona, Spain and the
7  journalist was from South Africa and I
8  gave a telephonic interview to that
9  journalist which he then posted a
10  podcast.
11     Q.   Is it controversial to you to say
12  that you personally, you previously have
13  said that you personally investigated
14  your claims of misconduct against
15  McKinsey?
16        MR. O'SHEA:  Objection, form.
17     A.   You have to tell me --
18        MR. O'SHEA:  You can go ahead and
19     answer.
20     A.   You have to tell me the context
21  and the place.  I've been thoughtful
22  about what I say and where I say it and
23  how I say it.  So if you'd like to go
24  over anything I've said to the media, in

JAY ALIX

1  the media at any time I'm glad to talk
2  about it.
3     Q.   Okay.  So let's make it simpler.
4  Have you personally, do you regard
5  yourself personally to have investigated
6  the claims of misconduct against
7  McKinsey?
8     A.   I have personally been
9  investigating the claims of misconduct
10  against McKinsey, that is true, and it's
11  been a very extensive and detailed
12  investigation.
13     Q.   And you told the judge that you
14  have spent four and a half years
15  investigating the claims that you've
16  raised in the objection, right, in this
17  case?
18     A.   I have.
19     Q.   Okay.  So at what point did you
20  hire others -- your filing of last week
21  refers to a team of professionals who's
22  been working with you, a substantial
23  team of professionals.  Who are the
24  members of that team?

JAY ALIX

1        MR. O'SHEA:  You want to show him
2     the document you're referring to?
3     A.   I heard two questions.
4        MR. O'SHEA:  Hold on a second.
5     You want to show him the document
6     you're referring to?
7        MS. CHUNG:  Sure.
8        MR. O'SHEA:  We.
9        (Exhibit 2, Objection of Mar-Bow
10     was marked for identification.)
11        MS. CHUNG:  We will mark this as
12     3.
13        MR. O'SHEA:  What is 2?
14        MS. CHUNG:  We've marked the
15     objection and the amended objection
16     just to make those the top ones.
17        (Exhibit 3, Mar-Bow's emergency
18     motion was marked for
19     identification.)
20        MS. CHUNG:  I'll say for the
21     record that the amended objection is
22     exhibit 1 and the original objection
23     that Mar-Bow filed is exhibit 2.  So
24     we are making this exhibit 3 and this

11  (Pages 38 to 41)

JAY ALIX

1
2   is the December 20th filing by
3   Mar-Bow Value Partners.
4       Q.    Mr. Alix, we are looking at
5   paragraph 4.
6       A.    Paragraph 4 on page 3?
7       Q.    That's right.
8       A.    Okay.
9       Q.    And in particular I'm going to
10  read from the second sentence.  It says
11  "Moreover preparing a witness to
12  coherently and effectively present his
13  investigative work and that of a
14  substantial team of professionals,
15  cannot and should not be required to be
16  done in an unreasonably abbreviated time
17  frame."
18       Do you see that sentence?
19       A.    Yes.
20       Q.    And that was in the context of
21  requesting this deposition not take
22  place until at the earliest the week in
23  January, right?
24       A.    I'm not sure what's in the
25  motion, what does it plead.

JAY ALIX

1
2       Q.    So the substantial team of
3   professionals that's referred to here,
4   who is that team of professionals?
5       A.    Well, it's the people I just
6   mentioned who are here in the room today
7   with us.  I think that's primarily who
8   they are referring to.
9       Q.    And are there any consultants who
10  has worked on the team of professionals?
11      A.    In over the four and a half
12  years?
13      Q.    Mm-hmm.
14      A.    Yes.
15      Q.    Okay, who are they?
16      A.    I have been advised by, for
17  expert opinion, by bankruptcy law
18  professor John Pottow at the University
19  of Michigan Law School.  I've been
20  advised by bankruptcy law professor Lois
21  Lupica at the University of Maine Law
22  School.  I have been advised by
23  professor, bankruptcy law professor
24  Nancy Rappaport at the University of Las
25  Vegas Nevada Law School.  I have been

JAY ALIX

1
2   advised by former chief bankruptcy Judge
3   Judith Fitzgerald from the Pittsburgh
4   bench and the Delaware bench.  I have
5   been advised by former U.S. Attorney
6   Steven Biskupic, who is the U.S.
7   Attorney who prosecuted as a U.S.
8   Attorney John Gellene in the Gellene
9   Rule 2014 conviction felony.   I have
10  been advised by bankruptcy practitioner
11  Matthew Feldman at the Willkie Farr law
12  firm who was the governance leader on
13  the Tarp bailout for the bankrupt auto
14  companies.
15       I've been advised by attorney --
16  bankruptcy practitioner Donald Lifton
17  who recently passed away.  I've been
18  advised by bankruptcy practitioner John
19  Green from the Miller Canfield law firm.
20  I've been advised by corporate attorney
21  Michael Cokely from the Miller Canfield
22  law firm.  I've been advised by Mr.
23  James Stuart, a senior attorney at the
24  Honigman Miller law firm.  I've been
25  advised by an attorney in London who I

JAY ALIX

1
2   don't recall his name right now.
3       I feel like I might be leaving
4   some people out.  That's all I can
5   recall right now.  If I think of others
6   I'll bring them to your attention.
7       Q.    Have you now named, as far as you
8   can remember sitting here, all the
9   lawyers and consultants that are -- that
10  are people who have advised you on your
11  claims of misconduct against McKinsey
12  RTS?
13      A.    Your question is have I named all
14  of them?
15      Q.    The ones that you remember?
16      A.    The answer is I have not named
17  all of them because there could be
18  others.  I'm just telling you the ones I
19  recall today.  And they've been advising
20  me on and off for the last four years.
21      Q.    So that was -- you're
22  anticipating my question.  Was there a
23  period of time when you worked on what
24  you've called your investigation on your
25  own and then you hired consultants, or

JAY ALIX

1 did you hire people at the very
2 beginning?
3 A.   No.  I discovered McKinsey's lack
4 of compliance with Rule 2014 about four
5 and a half, five years ago on my own by
6 reading McKinsey's disclosure documents
7 on my own, and I had no one hired or
8 thought about or investigated into this
9 situation.
10    I was surprised by what I read in
11 them.  And once I read that they were
12 not in compliance with Rule 2014, I
13 asked for some others to look at them
14 and I got more of them and I looked at
15 them, they weren't in compliance.  And
16 so I finally called up attorney Toll and
17 I sought his advice just to make sure I
18 was reading them correctly because I had
19 been involved in the business of
20 AlixPartners for many years and I hadn't
21 been involved in the bankruptcy business
22 for many years so I thought something
23 had changed while I was away raising my
24 children.  And it turns out apparently
25

JAY ALIX

1 nothing had changed around Rule 2014 and
2 the same standards applied and so I was
3 quite surprised at what I found.
4 Q.   So in the period of time when you
5 say -- the first part of your answer
6 said about four and a half or five years
7 ago on my own by reading McKinsey's
8 disclosure documents, you concluded that
9 they were not in compliance with Rule
10 2014.  What documents did you review to
11 come to that conclusion?
12 A.   I reviewed McKinsey's Rule 2014
13 declaration in the -- in the Harry &
14 David bankruptcy case.  Actually,
15 there's a document I'd like to look at.
16 Can I review -- I'd like to review this
17 document that I see on the pile here of
18 documents if I could?
19    MR. O'SHEA:  This thing?  You
20 know what, we will provide this to
21 you.  It's just a --
22    MS. CHUNG:  Well if he's going to
23 refer to it, yes.
24    MR. O'SHEA:  I'll give it to you.
25

JAY ALIX

1 Do you have an extra copy of this?
2 You can use mine.  Well, you know
3 what, I'll get you another one.  And
4 for the record, we will mark this if
5 you like.  What do you want to mark
6 it as, 4?
7    MS. CHUNG:  It's 4.
8    (Exhibit 4, list of bankruptcies
9 and dates and related datapoints was
10 marked for identification.)
11    MR. O'SHEA:  This is just a list
12 of bankruptcies and dates and related
13 datapoints.
14 A.   Can you repeat the question
15 again, please?
16 Q.   Well the question was what
17 documents had you reviewed to reach your
18 conclusion that McKinsey's -- McKinsey
19 RTS's bankruptcy disclosures were not in
20 compliance with Rule 2014?  And I think
21 you mentioned reading the Harry & David
22 disclosure and then you asked to see
23 this document.
24 A.   Right.  So I guess to clarify
25

JAY ALIX

1 your question, at what point in time are
2 you referring to as far as documents I
3 reviewed?  Is it --
4 Q.   Before you hired other people --
5 A.   Yes.
6 Q.   You said you reached the
7 conclusion --
8 A.   Yes.
9 Q.   That McKinsey was out of
10 compliance with Rule 2014.  So the
11 question is just a list of the documents
12 that you reviewed to reach that
13 conclusion?
14 A.   Right.  Okay, so based on my
15 recollection which is four and a half
16 years ago and a lot has passed since
17 then, but I believe I reviewed the
18 American Airlines disclosure document
19 that McKinsey filed in the American
20 Airlines bankruptcy case in the Southern
21 District of New York.  I believe I
22 reviewed the -- and there was seven of
23 those disclosure documents at that time.
24 There are seven total in that case but I

JAY ALIX

1  know I reviewed at least the first two
2  or three of them.  I reviewed the Harry
3  & David documents at that time.  And I
4  might have reviewed one of the other,
5  one of the other four above that.  So I
6  reviewed, I think I reviewed three cases
7  and I reviewed more than one disclosure
8  document per case.
9   Q.   And have you listed now all the
10  documents that you remember reviewing
11  before you reached your conclusion that
12  McKinsey RTS was out of compliance with
13  Rule 2014?
14   A.   No.  I have not listed all of
15  them.  I don't recall all of them right
16  now.  I'm sure once I started looking at
17  this I might have asked for more
18  documents.  I might have read other
19  files.  I might have gotten other
20  research done so that's not all the
21  documents I reviewed.
22   Q.   Do you remember reviewing
23  anything other than Rule 2014
24  disclosures by RTS to reach that

JAY ALIX

1  conclusion?
2   A.   I remember reading about some of
3  the bankruptcy cases in the media and
4  what was happening in the cases.  I
5  remember learning more about McKinsey's
6  involvement in the bankruptcy
7  restructuring business in Chapter 11
8  cases.  I started learning more about
9  McKinsey's RTS business at that time.
10  And I started learning more about
11  McKinsey's hiring of people from
12  AlixPartners to build their RTS
13  business.  And I started learning more
14  about just what was going on in the
15  bankruptcy industry because I had been
16  out of it for a long time.
17   Q.   Were the things that you just
18  listed in your last answer, are those
19  things that helped you to conclude that
20  McKinsey RTS was filing bankruptcy
21  disclosures out of compliance with Rule
22  2014?
23   A.   Those were part of helping me
24  form my conclusion, but that was not

JAY ALIX

1  what I -- that was not only what I
2  relied on.
3   Q.   All right.  So what else did you
4  -- what else did you rely on in forming
5  the conclusion that McKinsey RTS was out
6  of compliance with Rule 2014 at this
7  time when you were investigating it on
8  your own?
9   A.   So at that time that I -- I
10  sought the advice of counsel.
11   Q.   Okay.
12   A.   Starting with Mr. Toll who is a
13  40-year bankruptcy practitioner and
14  litigator and someone I've worked with
15  for 30 years.
16     MS. CHUNG:  I'm going to object
17  and move to strike as being
18  nonresponsive.
19   Q.   The question is just what else
20  did you rely on in forming the
21  conclusion that McKinsey RTS was out of
22  compliance with Rule 2014?
23     MR. O'SHEA:  That answer is
24  absolutely responsive, but go ahead.

JAY ALIX

1   A.   I'm letting you know that I
2  relied on the advice of experts and I'm
3  just about to tell you who they are.
4   Q.   Again, let's limit ourselves to
5  the time period before you hired other
6  people.  Have you now named everything
7  that you relied on in forming the
8  conclusion on your own that McKinsey RTS
9  was out of compliance with Rule 2014?
10   A.   I didn't form a conclusion on my
11  own.  I was questioning my own
12  conclusion.  I was challenging my own
13  conclusion.  I wanted to make sure I was
14  right about my conclusion before I
15  asserted a conclusion.  So I didn't form
16  a conclusion that was definitive.  I had
17  questions.  I had concerns.  I had deep
18  concerns about what I was reading.
19   Q.   Well five minutes ago you
20  testified that you concluded the
21  McKinsey RTS was out of compliance with
22  Rule 2014.  Was that definitive or not?
23   A.   As I sit here today --
24     MR. O'SHEA:  Objection, misstates

JAY ALIX

the testimony.  Go ahead and answer.
A.   As I sit here today I can make
the statement that based on what I
learned at that time I came to that
conclusion but I didn't come to it in
one minute or one day.  I spent months
and months and months trying to think
about what I was reading, what I was
seeing.  I was asking other people to
read these things.  Do you see what I
see?  And it was an extensive and far
reaching due diligence process on my
part.  And I was surprised by what I was
reading almost to the point that I
didn't believe what I was reading and I
was doubting myself.  And therefore in
doubting myself, I started asking other
people do you read -- what do you read
when you read this?  How do you see it
and what's your conclusion?  So I
was getting the advice and counsel of
experts.
Q.   When you say read these, what's
the these?

JAY ALIX

A.   These would be McKinsey's Rule
2014 disclosures.
Q.   Okay.  All right.  So another
thing that's in exhibit 3, if you just
turn back to that, in paragraph 11.  It
says "To be sure, Mar-Bow has carefully
gathered thousands of documents and
spent hundreds of professional hours
analyzing and developing each and every
one of its allegations."
Do you see that?  It's on page 5.
A.   Right, I'm trying to understand
the context of that sentence, what's it
being in regard to.  Yes, I see it.
Q.   So are you aware that over the
weekend, boxes of documents were
produced to RTS from your lawyers?
A.   I'm aware that documents were
produced over the weekend, yes.
Q.   If I represent to you that there
are about 290 documents there, do you
have any reason to doubt that
representation?
A.   I have not counted the documents

JAY ALIX

in the binders.
Q.   Do you know what -- what is the
organizing principle of those binders,
what do they represent?
A.   The binders were compiled by my
attorneys and I did not review or
supervise the compilation of the
documents nor I have reviewed the
binders directly.  I know generally the
contents that are in them.  I've seen
the outline of the contents.  I've seen
the titles of the documents.  But I
haven't turned every page.  But I'm
generally familiar with the types of
documents that are there and generally
those contents.
Q.   Okay.  And do you have an
understanding about why those were
produced to RTS?
MR. O'SHEA:  Without reference to
any communications with counsel,
please.
A.   When I was in court in Texas with
Judge Jones, I forget, was it two weeks

JAY ALIX

ago?
Q.   The 18th.
A.   18th?  He asked me to stand up in
court and he asked me to explain to him,
affirm that I knew where I was and what
I was doing and why I was here and did I
stand behind my statements, and I said I
did.  And he said, well, he needed me to
establish a reasonable basis for my, for
my allegations.  And he needed McKinsey
to establish a reasonable basis for
their Rule 2014 disclosures.
And he gave us that task.  And my
understanding is that this deposition
and everything around it is connected to
that.  And he also said, well, documents
weren't necessary.  They could be
changed between the parties.  And he let
us know that he was going to make his
decision based on the deposition and
that we had a reasonable basis.
So my attorneys and I had a
conference and I concluded that in order
to establish my reasonable basis for

JAY ALIX

1
2 Judge Jones who wants to know how he
3 should view this situation, I wanted him
4 to know that I established my reasonable
5 basis for my allegations based on
6 extensive research, extensive
7 documentations and expertise that took
8 years to compile and years to assemble.
9 And we were trying to give him a sense
10 of that along with my deposition so that
11 he would understand that I have a
12 reasonable basis for my allegations.
13    Q.   So let me make sure that I've
14 understood properly.
15    You -- the documents were produced
16 to provide, together with your
17 deposition today, the reasonable basis
18 for the allegations in the objection
19 that Mar-Bow filed; is that fair?
20    A.   You said that fast.  Let me make
21 sure I understand your words.  Say it
22 again.
23    Q.   Sure.
24    A.   Or he can read it back to me.
25    Q.   The documents that were produced

JAY ALIX

1
2 over the weekend, together with your
3 deposition today, are intended by you
4 and Mar-Bow to be the reasonable basis
5 for the allegation in the objection that
6 Mar-Bow filed?
7    A.   They would be a part of or a
8 subset of the -- of my basis.  They are
9 a part of and included in my, all my
10 other work, yes.
11    Q.   So when you say --
12    A.   This is not, this is not all my
13 documents and it's not everything I've
14 relied on to form my basis.  This is
15 just a good-faith attempt to show that I
16 had a good-faith basis to allege what
17 I've alleged.
18    Q.   Okay.  So do you have an
19 intention to produce the rest of the
20 documents that you regard as part of
21 being the reasonable basis for the
22 allegations in your objection?
23    MR. O'SHEA:  I'm going to object.
24 The court's order does not require
25 the production of any documents.  I

JAY ALIX

1
2 might note that McKinsey has not
3 produced any documents.  There are 13
4 binders, excuse me, 13 binders of
5 documents produced to you over the
6 weekend in advance of this
7 deposition.  Our transmittal letter
8 explicitly said that they did not
9 form the basis, the entire basis of
10 the objection but they were meant as
11 a good-faith basis and were provided
12 to you in that spirit.
13    I think you're trying to misstate
14 and misrepresent what was done.  With
15 that, you can go ahead.
16    Q.   The question was do you have an
17 intention to produce the rest of the
18 documents that you regard as being the
19 reasonable basis for the allegations in
20 your objection?  It's a yes or no
21 question.
22    A.   I can't answer yes or no.
23    Q.   Okay, that's fine.  So let's turn
24 to --
25    A.   I'd like to answer it though if I

JAY ALIX

1
2 could.
3    Q.   Pardon me?
4    A.   I'd like to answer it to provide
5 the information to the court.
6    Q.   It's fine, there's no pending
7 question.  Why don't we turn to exhibit
8 1.  Paragraph 166.
9    MS. CHUNG:  And while we are
10 turning to it I will say we offered
11 to produce documents to Mar-Bow over
12 the weekend under a confidentiality
13 stipulation and that offer was
14 refused.
15    MR. O'SHEA:  Well, well, as long
16 as you are bringing that up, our
17 documents were produced without
18 precondition and without any sort of
19 requirement that they be subject to
20 any sort of confidentiality order.
21 We asked for the production of the
22 confidentiality order and discussion
23 of exactly what you wanted and were
24 met with, we're not going to tell
25 you.  Look, we're happy to receive

JAY ALIX

1
2 any documents you want to produce.
3 The judge didn't require any.  And
4 the gamesmanship involved required us
5 to refuse your offer because it was
6 based on preconditions of
7 confidentiality.
8     I think the judge's order said
9 that the documents and the
10 depositions would be produced without
11 redaction and we were concerned that
12 what you were seeking was in
13 violation of the Court's order.
14     Q.  Mr. Alix, before we move from
15 exhibit 4 which was the chart you asked
16 to see that was provided by your
17 counsel, who prepared that chart?
18     A.  This chart was prepared by one of
19 my associates on my archive staff, my
20 research staff.  Her name is Lisa
21 Philips.
22     Q.  And it says on it updated
23 December 28, 2018.  Do you see that at
24 the top?
25     A.  I do see that.

JAY ALIX

1
2     Q.  Is that the last time that this
3 chart was updated?
4     A.  I don't know if it's been updated
5 since then.  This version that's here
6 was updated on that date according to
7 this document.
8     Q.  So I've asked you to -- sorry,
9 when you mentioned research staff, whose
10 research staff do you mean, Mar-Bow's or
11 Lakeview's?
12     A.  At Lakeview I have an archive
13 staff for my personal archives.  I've
14 been archiving in my personal business
15 career and writing and documenting in my
16 career and the building of AlixPartners,
17 spent a lot of time on that last many
18 years.  And as I started doing more of
19 this research about McKinsey --
20     MS. CHUNG:  I'm going to object
21 and move to strike again.  The answer
22 was it Mar-Bow's or Lakeview's,
23 that's the question.
24     A.  They're employed by --
25     MR. O'SHEA:  I'm going to object.

JAY ALIX

1
2 Look, you ask a question and you
3 don't like an answer and then you
4 interrupt and cut off the witness.
5 I'm going to let that go for now.
6 But if it continues we're going to
7 seek an order from the court.  You
8 ask a question, you're going to have
9 to live with the answer.  Go ahead.
10     Q.  Question is and was, whose
11 research staff do you mean, Mar-Bow's or
12 Lakeview's?
13     A.  Mar-Bow does not have research
14 staff.  These would be people employed
15 by me at Lakeview.
16     Q.  Thank you.  So now let's turn to
17 paragraph 166 of the amended objection.
18 The header there, do you have it?  Do
19 you have it in front of you?  It's
20 exhibit 1.
21     A.  Exhibit 1.  Which paragraph?
22     Q.  Paragraph 166.
23     A.  Thank you.  Okay.
24     Q.  There's a header there that says
25 "McKinsey's RTS's declaration unlawfully

JAY ALIX

1
2 conceals a total of at least 205
3 connections."
4     Do you see that?
5     A.  Yes.
6     Q.  And then 166 reads "McKinsey
7 RTS's declaration concealed at least 205
8 connections.  This is a shockingly high
9 number of concealed connections, even
10 for McKinsey RTS."
11     Do you see that?
12     A.  Yes.
13     Q.  So in your view, this chart which
14 goes on for nine pages, goes on to page
15 65, missed connections that in your view
16 McKinsey RTS should have disclosed in
17 the Westmoreland case, right?
18     A.  I'd like to reflect on the
19 document for a minute if I could.  I'm
20 sorry, what's the question?
21     Q.  The question was in your view
22 this chart, it lists 205 connections
23 that you believe should have been
24 disclosed in the Westmoreland case by
25 McKinsey RTS?

17 (Pages 62 to 65)

JAY ALIX

1
2   A.   That's correct.
3   Q.   Okay.  And this kind of concealed
4   connections conclusion that McKinsey RTS
5   was concealing connections, is this a
6   conclusion that you also reached as part
7   of your personal investigations back
8   when you were looking at disclosure
9   statements that you specified earlier?
10      MR. O'SHEA:  Objection, form.
11   You can answer.
12   A.   I'm not sure if I understand the
13   time frame of the question and the
14   conclusion as to when it applies in the
15   time frame.
16   Q.   Okay.  So before you testified
17   that when you were doing your personal
18   investigations of McKinsey RTS including
19   investigation of its Rule 2014
20   declarations, you concluded that
21   McKinsey was out of compliance with Rule
22   2014, right?
23   A.   Yes.
24   Q.   And was part of what you regarded
25   as the noncompliance the failure to

JAY ALIX

1
2   disclose connections like the ones that
3   are listed in this chart for the
4   Westmoreland case?
5   A.   Well these connections are
6   specific to Westmoreland.  I can't say
7   that the ones there were like these
8   here.  There were connections not
9   disclosed there, and these are the
10   connections that I can determine are not
11   disclosed here.
12   Q.   Okay.  So why don't we discuss
13   these first, maybe that's more concrete.
14   The chart --
15      MR. O'SHEA:  When you get a
16   chance, Chris, I'd like a break.  You
17   can continue.  When you see a good
18   breaking point.
19      MS. CHUNG:  No, that's fine,
20   that's fine.
21   Q.   So in this chart, this nine-page
22   chart, the columns are row, entity,
23   category, known McKinsey connection
24   name, and type of connection, right?
25   A.   Correct.

JAY ALIX

1
2   Q.   Okay.  And the chart does not
3   identify, for any of these rows, 205
4   entries why you think the connection was
5   concealed, does it?
6   A.   Does not?  Well the chart itself
7   does not but I think the paragraphs at
8   the end do.  Paragraph 167, 168 and 169
9   do identify why I think they were
10   concealed.
11   Q.   Okay.  So let's take 167.  These
12   entities are known by McKinsey -- known
13   to be -- sorry.  Let me start again.
14   "These entities are known to be McKinsey
15   RTS connections from the declarations
16   that McKinsey RTS submitted in its
17   previous Chapter 11 cases and from other
18   publicly available sources."
19      Do you see that?
20   A.   Yes.
21   Q.   And that sentence is accurate?
22   A.   Yes.
23   Q.   Okay.  So every missing
24   connection, every concealed connection,
25   let me say concealed because that's the

JAY ALIX

1
2   words of the objection, every concealed
3   connection that you've listed in this
4   chart is one that was found through
5   publicly available sources?
6   A.   Correct.
7   Q.   Okay.  And those publicly
8   available sources include declarations
9   that were submitted by McKinsey RTS in
10   other bankruptcy cases?
11   A.   That's correct.
12   Q.   Okay.  And which bankruptcy
13   cases, which declarations from which
14   bankruptcy cases did you rely on?
15   A.   I'm going to refer to this chart
16   again, exhibit 4.  These are the
17   Westmoreland -- these are the
18   Westmoreland concealed undisclosed
19   connections.  They would have been
20   derived from the list of connections
21   that McKinsey submitted in Gen On
22   Energy.  So there's connections here
23   that were connections in Gen On.  They
24   were disclosed by McKinsey in Gen On and
25   yet they were not disclosed by McKinsie

JAY ALIX

1
2  in Westmoreland.  This list includes
3  connections from Sun Edison, whereby
4  connections were disclosed by McKinsey
5  in Sun Edison and yet they were not
6  disclosed by McKinsey in Westmoreland.
7      This list includes connections
8  disclosed by McKinsey in Alpha Natural
9  Resources.  There were connections
10  McKinsey disclosed after court order and
11  being compelled to comply with Rule 2014
12  in Alpha, and those connections they
13  disclosed in Alpha were not disclosed in
14  Westmoreland, and yet all those
15  connections appear, all of these
16  companies -- I have to stop.  There's
17  someone on the phone making a lot of
18  noise.
19      MS. CHUNG:  Can people on the
20  phone mute, please.  Thank you.
21   A.   There's -- so in each of these
22  bankruptcy cases of Alpha Natural
23  Resources, Sun Edison, Gen On, McKinsey
24  disclosed certain connections to those
25  cases.  So we were able to extract the

JAY ALIX

1
2  list of all the names they disclosed in
3  those cases and start to build a
4  database of known McKinsey connections
5  because McKinsey said they don't have a
6  database of their connections.  So I
7  built a database of McKinsey's
8  connections.  And applying that
9  information to the parties in interest
10  list in Westmoreland, I could tell
11  pretty quickly, once McKinsey filed
12  their Westmoreland declaration, that
13  they had disclosed about 150 names in
14  Westmoreland.  But my database shows
15  that from McKinsey's own public
16  disclosures in other cases, that there
17  were another 202 connections -- 205
18  connections that McKinsey did not
19  disclose in Westmoreland.
20      So we -- and those undisclosed or
21  concealed connections of McKinsey are
22  all backed up by verified documents that
23  McKinsey itself supplied under the
24  penalty of perjury in other cases.
25      So I know that, as an example,

JAY ALIX

1
2  BlackRock Inc. is a connection of
3  McKinsey because it appears in other
4  cases.  I'll also point out that the MIO
5  investments on the type of connection,
6  those documents through the MIO
7  investments would have all come from
8  McKinsey's either form 5500s that they
9  filed with the Department of Labor, or
10  McKinsey's form ADV which they filed
11  with the Securities and Exchange
12  Commission and those two publicly
13  available forms are supplied by McKinsey
14  from McKinsey's own records.
15      So this list of connections is
16  built from McKinsey's court filed 2014
17  disclosures, McKinsey's years of form
18  5500s filed with the Department of Labor
19  and McKinsey's form ADV, SEC ADV filed
20  with the SEC every year for many years.
21      And so that's primarily the
22  source, those publicly available sources
23  all supplied by McKinsey for this list
24  of connections.
25      Those names are in the database

JAY ALIX

1
2  that I've created and then that database
3  is compared against the parties in
4  interest list of this bankruptcy case
5  which yields at least 350 known
6  connections of McKinsey of which
7  McKinsey only revealed about 150 in its
8  initial declaration.
9      And we do that within a few hours
10  of the filing of this case off of a
11  small database that my archive staff
12  created.
13   Q.   Okay.  So let's separate the
14  world into when you were talking about
15  looking at the bankruptcy Rule 2014
16  declarations from ANR, Gen On, Sun Ed,
17  the connections that you took from those
18  declarations, those appear as the client
19  connections in this chart, right, if you
20  look at the last column?  You're talking
21  about --
22   A.   No, not always.  No, not always.
23   Q.   Well it's your contention that
24  MIO investments are never disclosed by
25  McKinsey, right?

JAY ALIX

1
2  A.   No, that's not my contention.
3  That's McKinsey's contention.
4  Q.   Okay.  So --
5  A.   McKinsey said they are never
6  going to disclose those MIO connections.
7  I'm trying to find out what those MIO
8  connections are.
9  Q.   Right, right.  And you know that
10 -- so the client connections that are --
11 let's ask it this way.  Where it says
12 type of connection in the last column
13 and it says client, the source for those
14 entries are the bankruptcy declarations
15 that McKinsey filed, McKinsey RTS filed
16 in the prior bankruptcies, the ones that
17 you mentioned.  What else?
18 A.   Well there's also internet
19 research, you know, searching on public,
20 publicly available databases on the
21 internet and there are many references
22 to McKinsey having clients across a
23 broad spectrum of companies, a broad
24 spectrum of government agencies, you
25 know, here and around the world.

JAY ALIX

1
2  I mean this morning in the New
3  York Times there were marked McKinsey
4  clients revealed in the story in the New
5  York Times.
6  So McKinsey's clients are often
7  mentioned in media.  And those become
8  additions to the database.  And the
9  source that we found it at is put into
10 the database.  So if it's from the New
11 York Times article the database will say
12 it's from the New York Times article or
13 from a Wall Street Journal article or
14 from Bloomberg or from LinkedIn.  It
15 could be McKinsey employees all post
16 quite a bit of information about
17 themselves on social media.  And so by
18 just going to LinkedIn I can see many
19 McKinsey employees' profiles where they
20 list what they do, who they work for and
21 what they've done, where their careers
22 are.
23 Q.   So these two --
24 A.   And also McKinsey alumni do that
25 as well.  McKinsey alumni talk about the

JAY ALIX

1
2  things they worked on while they were at
3  McKinsey.  So when you start getting
4  into the world of the internet,
5  McKinsey's secrecy is like Swiss cheese
6  a little bit because they've got alumni,
7  25,000, 30,000 alumni who are all
8  posting on social media.  You've got
9  30,000 employees who are all posting on
10 social media.  Their clients are posting
11 all the time.  So there's lots of
12 information available to everybody about
13 McKinsey's connections, especially to
14 McKinsey, so.
15 Q.   Mr. Alix, isn't it the case of
16 the client connections listed in this
17 chart that's at paragraph 16, the vast,
18 vast majority of them come from
19 McKinsey's RTS prior bankruptcy filings?
20 A.   I don't know if I could testify
21 it's the vast, vast majority of them.  I
22 think it's surely the majority of them.
23 It may be a significant majority of
24 them.
25 Q.   So like, for example, there's

JAY ALIX

1
2  media articles that you turned over to
3  us about Safety-Kleen Systems which is
4  entry 139, right?
5  A.   Entry 139 is Safety-Kleen,
6  utilities, yes, mm-hmm, I see that.
7  Q.   So do you remember whether that
8  came from a prior McKinsey RTS Rule 2014
9  filing or from a media article?
10 A.   I would have to look into the
11 binders to see where that came from.
12 Q.   And sitting here today, do you
13 know how many of the client connections
14 listed in the chart at paragraph 166
15 came from McKinsey RTS's prior
16 bankruptcy filings as opposed to media
17 reports, media reports of client
18 service?
19 A.   I don't know that today but I
20 think it's in the documents that were
21 turned over to you.
22 Q.   All right.  So the documents that
23 you turned over to us would show --
24 those include any of the sources for why
25 an entry is on this chart; is that

JAY ALIX

1
2  right?
3      A.   The documents are best
4  information about how we put things on
5  the chart.
6      Q.   And when you put the client
7  connections from McKinsey's RTS prior
8  bankruptcy declarations into your
9  database which then became the basis for
10  the chart, you put in every client
11  connection that McKinsey RTS has ever
12  disclosed back to ANR?
13      A.   That was the intent, the
14  intention of the database is to collect
15  as many connections from the public
16  domain as possible.
17      Q.   So your contention is that if
18  McKinsey RTS disclosed a client in the
19  ANR bankruptcy which could be as long as
20  three years ago, that it should have
21  been disclosed in the Westmoreland
22  declaration that was filed in November
23  of this year?
24      A.   No, that's not my contention.
25      Q.   Well that's the method you used,

JAY ALIX

1
2  right, all the ANR client names that
3  were in McKinsey RTS Rule 2014
4  declarations were put into your
5  database, and then as you say you
6  compared that database to the interested
7  parties list in Westmoreland, right?
8      MR. O'SHEA:  Objection, misstates
9  the testimony.  You can answer.
10      A.   I think what I've testified to is
11  that I have gathered thousands of
12  corporate names, individual names across
13  many years now in attempt to build a
14  database of McKinsey connections that
15  could be used and searchable against
16  parties' interest list for debtor
17  companies which is what all law firms do
18  and all consulting firms do in this
19  case, only McKinsey doesn't do that so
20  I've done it for them.
21      Q.   So let me ask you about that.  So
22  McKinsey disclosed --
23      A.   I didn't answer, I didn't finish
24  answering the question.
25      Q.   I believe you did.

JAY ALIX

1
2      MR. O'SHEA:  Let's not argue
3  about that.  Finish the answer.
4      A.   So you said it's my contention
5  that if it was there it's here.  My
6  contention is that the database is just
7  built to be a complete list of possible
8  connections, and then from there, you
9  know, there has to be a screening and
10  some research and some judgment used and
11  some analysis used as to whether or not
12  a connection is likely, and that
13  judgment should be done by McKinsey when
14  it makes its Rule 2014 disclosures, not
15  by me but by McKinsey.
16      Q.   So I'm asking you about your
17  analysis.  In this chart at paragraph
18  166?
19      A.   Yes.
20      Q.   There are connections, client
21  connections that are drawn from the ANR
22  bankruptcy declarations?
23      A.   Yes.
24      Q.   Okay.  So you know that in
25  Westmoreland McKinsey applied --

JAY ALIX

1
2  McKinsey RTS applied a two year lookback
3  period, correct?
4      A.   They have stated --
5      MR. O'SHEA:  Objection, form.
6  You can form.
7      A.   They stated they applied a two
8  year lookback period but I don't think
9  that's accurate.
10      Q.   Well your contention of the
11  missing connections disregards the two
12  year lookback period, right?
13      MR. O'SHEA:  Objection, form, you
14  can answer.
15      A.   I'm applying Rule 2014 as written
16  in the bankruptcy code and Rule 2014 as
17  written in the bankruptcy code and all
18  the case law supporting it says a
19  professional in a bankruptcy case has to
20  disclose all connections.  The
21  bankruptcy code doesn't talk about a two
22  year lookback or a three year lookback
23  or any lookback.  It talks about all
24  connections.  And other than de minimis
25  connections, it's all connections.

JAY ALIX

1
2    So if McKinsey represented a large
3    bank in 2016 which they disclosed after
4    the bankruptcy case was over, that meant
5    that two years ago before the
6    Westmoreland case started they were
7    representing a large bank.  So even by
8    their own two year lookback period,
9    McKinsey probably didn't include all of
10   its own connections and the two year
11   lookback period is an invention that
12   McKinsey has chosen to self decide how
13   it's going to adjudicate its own
14   connections.
15   Q.   Okay.  So to be clear, your view
16   of the law is what Mr. Rhodes in your
17   presence told me in a meet and confer on
18   the 17th of December before our court
19   appearance which is your view of Rule
20   2014 is that it does not permit a look
21   -- the use of a lookback period?
22   A.   I don't know.
23        MR. O'SHEA:  Objection.  You can
24   answer.
25   A.   I don't know what Mr. Rhodes told

JAY ALIX

1
2    you in your meeting with him.
3    Q.   You were on the phone, weren't
4    you?
5    A.   I don't know what you said and
6    what he said and what you're trying to
7    get to.  I know what Rule 2014 says and
8    Rule 2014 says disclose all connections.
9    That's what the code says.  The rule has
10   the force of law, that's what the law
11   says.
12   Q.   Okay.  And so just to be clear,
13   when you say all connections, you mean
14   all connections back in time, even for
15   the Westmoreland case from 2014, 2015?
16   A.   No, I don't mean that.  No.  I
17   mean Rule 2014 is the, is the
18   established standard.  And then it's
19   backed up by decades of case law.  And
20   the case law is law.  And the case law
21   clearly articulates and clearly lays out
22   all of the nuances around Rule 2014 and
23   all the interpretation on 2014.  And one
24   of the key nuances in the case law is
25   that de minimis connections do not have

JAY ALIX

1
2    to be disclosed, as an example.  That's
3    one example.  So it wouldn't have to be
4    disclosed.
5    Q.   But you don't regard --
6    A.   Or something.
7        MR. O'SHEA:  Objection.  Let him
8    finish the answer.
9    A.   Or something that is so far
10   remote and so far away that it couldn't
11   possibly be there.  But the case law
12   also says when in doubt disclose.  When
13   in doubt disclose.  Make the judgment in
14   favor of disclosure.  Don't make it in
15   favor of not disclosure.
16        Don't make the decision to find
17   how little you can disclose which is
18   what I believe McKinsey has done here.
19   I think the case law all says make the
20   judgment to disclose as much as possible
21   so the court can rely on the disclosure
22   to determine if the company, the
23   professional is qualified to serve the
24   debtor as a fiduciary.
25   Q.   Your chart at paragraph 166

JAY ALIX

1
2    includes about 130 client connections.
3    A.   I'm sorry.
4    Q.   Can I make that representation to
5    you?
6    A.   Where is that?
7    Q.   166, the same chart, the 9 page
8    chart?
9        MR. O'SHEA:  Can we have that
10   break now, Chris, it's been a while?
11       MS. CHUNG:  Let me finish the
12   question.
13   Q.   This chart at paragraph 166
14   includes about 130 client connections.
15   And it includes, does it not, client
16   connections that predate August --
17   sorry, October 1, 2016 which was the
18   lookback period used by McKinsey RTS and
19   disclosed by McKinsey RTS?
20   A.   No, it also includes things that
21   are within that two-year period.
22   Q.   But it also includes things
23   outside the two-year period, right?
24   A.   There are connections inside the
25   two year, outside.  The two-year period

JAY ALIX

1
2  is not relevant to this analysis.
3      MS. CHUNG:  Thank you.  Let's
4  take the break now.
5      MR. O'SHEA:  Can we have a
6  running time, Matthew?
7      THE VIDEOGRAPHER:  Time is 9:57
8  a.m., we are off the record.
9      (A recess was had.)
10     THE VIDEOGRAPHER:  Time is 10:16
11 a.m., we're on the record.
12     Q.  So, Mr. Alix, your last answer
13 before the break was that the two year
14 lookback period was not relevant to this
15 analysis, meaning the analysis that led
16 to the chart at paragraph 166.  Let me
17 just make sure that I understand.  You
18 did not exclude a client connection from
19 this chart solely on the basis that it
20 was outside of the lookback period that
21 McKinsey RTS was applying?
22     A.  I need to go back to that page.
23 Which page is it on?
24     Q.  It's para 166.  And that's on
25 page 57.

JAY ALIX

1
2      A.  All right.  Can you repeat your
3  question, please.
4      Q.  If there was a connection in your
5  database drawn from the declarations
6  that you identified earlier, you did not
7  exclude that connection from this chart
8  at paragraph 166 if it was outside the
9  lookback period that McKinsey RTS
10 applied?
11     A.  Right, I would not have excluded
12 a connection that I found using
13 McKinsey's documents comparing it to the
14 parties in interest list.  I wasn't
15 doing a two year lookback period.  I was
16 looking for connections, all
17 connections.
18     Q.  And including connections as you
19 mention in the ANR case, right?
20     A.  All the known connections that we
21 know about McKinsey are in the database.
22 So and then it tells us where it came
23 from.  So there could be ANR
24 connections, Sun Edison connections, Gen
25 On connections, they're all in the

JAY ALIX

1
2  database.
3      Q.  How about as far back as Harry &
4  David?  Aren't there entries in your
5  chart that go back to Harry & David?
6      A.  As it turns out, McKinsey did not
7  make any disclosure of Harry & David.
8  As you can see in this document on line
9  item 5, McKinsey filed three disclosure
10 documents in Harry & David all signed by
11 Mr. Seth Goldstrum and in all three of
12 those disclosure statements McKinsey
13 disclosed no names.  So it can't go back
14 as far as Harry & David because McKinsey
15 didn't disclose any connections in Harry
16 & David.  They completely violated Rule
17 2014.
18     Q.  Didn't McKinsey disclose the
19 connection listed at line 138 of your
20 chart, the Pension Benefit Guarantee
21 Corp. in the Harry & David case?
22     A.  I don't know.  As I sit here now
23 I don't know, I'd have to go back and
24 check the database and check the files.
25     Q.  And Harry & David --

JAY ALIX

1
2      A.  I believe there were very few
3  connections disclosed in Harry & David.
4  If not it was probably not more than 20.
5      Q.  If I represent to you that PBGC
6  was not disclosed in any McKinsey RTS
7  Rule 2014 declaration after Harry &
8  David, that the first time that PBGC was
9  disclosed as a client in a bankruptcy in
10 which RTS was retained was Harry & David
11 in 2011, you don't have any reason to
12 dispute that?
13     A.  I'd have to check the files.
14     Q.  And your testimony that it's an
15 invention of McKinsey RTS's to apply a
16 lookback period, did anybody, yourself,
17 anyone on your team, investigate whether
18 the other professionals who are being
19 retained or have applied to be retained
20 in this bankruptcy, applied a lookback
21 period?
22     MR. O'SHEA:  Objection to form.
23 You can answer.
24     A.  I think many professionals in the
25 bankruptcy advising and restructuring

23  (Pages 86 to 89)

JAY ALIX

1
2  business utilize a lookback period.
3  McKinsey itself has used many lookback
4  periods.  And that's one of the problems
5  with lookback periods, the problem is
6  that sometimes they're two years,
7  sometimes they're one year, sometimes
8  they're three years.
9      MS. CHUNG:  I'm going to object
10  and move to strike.  The question was
11  --
12      MR. O'SHEA:  I'm going to object
13  that you're not letting the witness
14  answer the question before
15  interposing your objection.
16      MS. CHUNG:  Well the entire
17  answer so far is nonresponsive.
18  Q.   So the question was, have you or
19  anyone else on your team investigated
20  whether the other professionals who
21  sought to be retained in this case have
22  applied a lookback period?  It's a yes
23  or no question.
24  A.   I have reviewed the disclosures
25  of some of the other professionals in

JAY ALIX

1
2  this case, not all of them, and I know
3  it's generally the practice that many of
4  them use lookback periods.
5  Q.   So in this case are you aware
6  that AlixPartners, the firm that you are
7  minority owner of, used a lookback
8  period of five years?
9  A.   In this case I'm not aware of
10  that.
11  Q.   If I represent to you that it
12  did, you don't have any reason to
13  disbelieve that?
14  A.   What do you mean by this case?
15  Q.   In the Westmoreland case?  No,
16  I'm sorry, not in Westmoreland.  That
17  AlixPartners -- let me withdraw that.
18  That AlixPartners currently and when it
19  applies to be a bankruptcy professional
20  not in this case but in other cases uses
21  a lookback period of five years?
22  A.   That's incorrect.
23  Q.   What do you --
24  A.   AlixPartners has a database, a
25  conflicts database which all law firms

JAY ALIX

1
2  use that keeps track of all connections
3  for all time.  It doesn't stop at five
4  years.  And when the, when the conflict
5  search is done, it scans the whole
6  database and it produces a report of
7  anything that's within five years and
8  with the theory that everything past
9  five years is likely de minimis.  If the
10  firm discovers that something past five
11  years is not de minimis, it then
12  includes it in the disclosure document.
13      In addition, after it does that,
14  the firm then sends an email to all
15  employees of the firm, not just the
16  partners, not just the affiliates
17  working on the assignment, not slicing
18  and dicing away all the divisions as
19  McKinsey has done here, the firm sends
20  it to all 2000 employees and then they
21  add on top of what the database showed
22  to supplement it with personal
23  knowledge, personal experience, personal
24  history, and then those are also added
25  which could go back, you know, many

JAY ALIX

1
2  years.  My own disclosures go back many
3  years when I find things.
4      So the five year report to the
5  court is based on a look back over all
6  time and anything that is material or
7  significant would be reported past the
8  five years.  So it's not correct to say
9  AlixPartners itself only uses a five
10  year lookback.  That would be an
11  understatement and a mischaracterization
12  of what happens in the process.
13  Q.   Well one of the things that you
14  describe was that AlixPartners produces
15  a report that's everything within five
16  years with the theory that everything
17  past five years is likely de minimis,
18  right?
19  A.   No.
20  Q.   Isn't that exactly what you said?
21  A.   No.
22  Q.   It produces a report of anything
23  that's within five years and with the
24  theory that everything past five years
25  is likely de minimis?

JAY ALIX

1
2  A.   No.
3  Q.   That's the report that's
4  produced?
5  A.   The things past five years are
6  looked at to see if they are de minimis.
7  There's not a presumption they are de
8  minimis.  It's to see if they are de
9  minimis.
10 Q.   Well you just testified that the
11 report that's produced in the first
12 instance assumes that anything that's
13 within five years, anything past five
14 years is likely de minimis.  That's what
15 you said, right?
16 A.   No, it assumes that everything
17 within five years need to be reported.
18 Q.   Right.
19 A.   And then anything past five years
20 because of such a large lapse of time is
21 likely de minimis but it's still
22 reviewed and checked.
23 Q.   Okay. But for McKinsey RTS, your
24 chart does not make any presumption like
25 Alix does that anything past five years

JAY ALIX

1
2  is likely de minimis, correct?
3  A.   Well I don't have any information
4  from McKinsey past five years because
5  McKinsey didn't start reporting any
6  disclosure, any connections until we
7  filed a motion to compel and the court
8  granted it in June of 2016.  So McKinsey
9  has only got two and a half years of
10 public disclosure except for a couple of
11 small exceptions in United Airlines
12 where the US Trustee called them out
13 there and perhaps in Harry & David if
14 you've got a PBGC connection.  But
15 basically out of 41 declarations,
16 McKinsey was generally, generally, for
17 the most part, not disclosing any
18 connections in the first 20, 22, 6, 11,
19 3, 14, in the first 26 disclosure
20 documents that they filed they had
21 almost a negligible amount of
22 disclosures of anything.  So I can't
23 look back five years for McKinsey
24 because McKinsey didn't disclose
25 anything that I could look to to see

JAY ALIX

1
2  their disclosures.
3  Q.   You have looked back five years
4  for McKinsey.  If you used ANR
5  declarations, right, you know that that
6  bankruptcy was confirmed in 2016?
7  A.   The bankruptcy was confirmed in
8  July of 2016 in ANR.
9  Q.   Right.  And so --
10 A.   So --
11 Q.   In that case --
12 A.   I'm agreeing 2016 in July but I
13 don't know about the rest of the
14 sentence.
15 Q.   So if you put into your database
16 client connections from the ANR
17 disclosures that RTS made, you are
18 putting into your database client
19 connections that predate the date that
20 you just gave?
21 A.   Those disclosures --
22 Q.   June of 2016?
23 A.   That's, that's not correct.
24 That's a misstatement.
25 Q.   How could McKinsey RTS have

JAY ALIX

1
2  disclosed connections that it didn't
3  have, that it had after June of 2016 if
4  it was made, if it was making
5  disclosures before then?
6  A.   Well I'm not arguing that point.
7  I'm suggesting that the way you phrase
8  your question isn't supported by the
9  facts of the logic or the story here.
10 Q.   The question is simply if
11 McKinsey was making disclosures in ANR
12 in June of 2016 and you put those
13 connections into your database, those
14 are all connections outside of the
15 lookback period of Westmoreland, right?
16     MR. O'SHEA:  Objection to form.
17 A.   No.  That's not the case.
18 Because those connections, first of all
19 -- first of all, McKinsey didn't make
20 any disclosures in its first declaration
21 in ANR, it didn't make any in its second
22 declaration in ANR, it didn't make any
23 in its third declaration of ANR.  Its
24 fourth declaration which was compelled
25 by a motion to compel from the US

JAY ALIX

1  Trustee where the US Trustee said their
2  disclosures appear to comply but don't
3  comply with 2014, they disclosed 18
4  connections to the US Trustee.
5      And I believe there was a
6  deception of the US Trustee because they
7  represented to the US Trustee who filed
8  a motion in the court.
9      I think he was deceived to remove
10  his motion and stop his action by
11  McKinsey disclosing 18 connections in
12  ANR.  And I have no belief or basis to
13  think that those 18 went back two years
14  before that.  They might have been
15  immediate connections going on right
16  then, which are still going on today.
17      So the idea that the two year
18  lookback somehow cuts off in the past
19  completely ignores the idea that the
20  client is an ongoing client and still is
21  today.
22  Q.   But you --
23  A.   So your statement about what was
24  disclosed in ANR is out of bounds is

JAY ALIX

1  illogical and unsupported by the story
2  and the facts and the situation.
3  Q.   When you say there wasn't
4  disclosure in ANR you mean there wasn't
5  disclosure by name, the kind of
6  disclosure that would have enabled you
7  to put a name into your database?
8  A.   There was no disclosure in
9  compliance with Rule 2014 in the first
10  three declarations in ANR.
11  Q.   You mean no disclosure by name?
12  There were no names in those
13  disclosures, that's what you mean?
14  A.   No.  No.  That's not what I mean.
15  Q.   So you think there were client
16  names disclosed in those disclosures?
17  A.   No, I don't think that either.  I
18  think those declarations were not in
19  compliance with Rule 2014.  They were
20  missing the names, they were missing the
21  descriptions, they were missing
22  investments, they were missing alumni
23  connections, they were missing vendors
24  of McKinsey, they were missing MIO

JAY ALIX

1  connections, they were -- it was
2  incomplete and it wasn't a full list of
3  all their connections.
4  Q.   To the extent --
5  A.   So it wasn't in compliance with
6  Rule 2014.
7  Q.   To the extent that McKinsey
8  disclosed names in ANR and you know that
9  they did, right?
10  A.   They were compelled by the US
11  Trustee and then compelled by me.  They
12  did not disclose those voluntarily.
13  They did not step -- I want to finish my
14  answers if I can.  They were dragged to
15  the disclosure process by the US Trustee
16  first and by me second.  McKinsey
17  disclosed nothing voluntarily and had no
18  spirit of disclosure in ANR.
19  Q.   In ANR by your own testimony
20  McKinsey made disclosures by name and
21  those disclosures went into your
22  database, right?
23  A.   In ANR McKinsey did make
24  disclosures by name after being

JAY ALIX

1  compelled twice and those names are in
2  our database.
3  Q.   And those names to the extent
4  they were disclosed were names of
5  clients as of the dates of the filing of
6  the declaration, that's all it could be,
7  right?
8  A.   There are names of clients in the
9  declaration and they could be names of
10  clients that are running and going still
11  today.
12  Q.   And when you say could be, that's
13  your guess, you don't have -- there's no
14  information in that declaration that
15  says that they were a client past 2016
16  if the declaration was filed in 2016,
17  right, Mr. Alix?
18  A.   No, Ms. Chung.  I have been in
19  the consulting business for 40 years and
20  there's a part of the consulting
21  business called flywheel accounts.  A
22  flywheel account is part of a business
23  model which McKinsey has mastered more
24  than any other consulting firm in the

JAY ALIX

world.  The theory is that once you get
the client you never let go of the
client if you can, you never move out.
No one is more famous for that than
McKinsey.  So if McKinsey is advising
Chase Bank in June of 2016 and it's
going on and then I see a connection
between McKinsey and that company later,
it's fair to say, it's a fair and
reasonable assumption and probably
highly likely that a large corporation
which is a McKinsey client in June 2016,
is going on past 2016 into the future.
I don't know exactly what date that
particular assignment stopped and the
new one started.  But McKinsey engages a
business model.  Its business model is
to start work and then move from one
assignment to the next to the next to
the next in the company.
     So the assumption that you're
making or the presumption you'd like me
to agree to which I can't, is that just
because they disclosed something in June

JAY ALIX

of 2016 that connection has to be more
than two years old and therefore outside
the lookback that they want to use,
which is not appropriate and in fact
that connection may be existing today
and it's highly likely it's existing
today based on what I've seen in
McKinsey's disclosures.
     Because I can see in their
disclosures many of them are
connections, the ones they did disclose
are still connections in another
disclosure and then in another
disclosure.  So it proves the point
that, yes, they may go back two years
but they also roll forward two or three
or four years because of the flywheel
nature of McKinsey's business.
     Q.   So you're assuming when you make
your chart that once McKinsey RTS --
McKinsey generally had a client, it's
the client forever?
     A.   I didn't say it's the client
forever.  I just said there's a

JAY ALIX

connection at that date, A, B, it's on
the interested parties list and C,
McKinsey has a relationship with it
sometime by -- sometime within the last
few years.  I mean the two year standard
isn't the bankruptcy code, that's just
what McKinsey has chosen.  The fact is
somewhere in the last one, two, three,
four, five years right up to today
McKinsey may have an active client
connection with that company and if they
haven't disclosed that or explained it,
then they are leaving it up to the
parties, to the trustee and to the court
to have to figure that out.  And my
understanding and the case law we're not
supposed to leave it up to the court and
the parties and the trustee to figure it
out.  McKinsey is supposed to be
forthcoming with that information which
they have not been.
     Q.   So for any of the 130 client
connections you list in the chart at
paragraph 166, tell me from when to when

JAY ALIX

McKinsey RTS or McKinsey served the
client?
     A.   I could interpolate some of that
by using the binders and I have to go
connection by connection.  Many of them
I would not be able to do that for but I
would know it was a connection of
McKinsey some time in the last three
years because all of it was gathered in
the last three years from public
information.
     Q.   But if it was gathered from the
ANR declaration from 2016, it would list
client connections back to 2014, right?
     A.   Which could still be connections
today.  Which would still be connections
today --
     Q.   But you can't name me --
     A.   They would still be connections
today if it's still a client of McKinsey
today.
     Q.   Are you saying it is a client of
McKinsey today or it could be in your
view?

Page 106

JAY ALIX

1
2    A.   I'm saying within Rule 2014
3  McKinsey has to disclose all
4  connections.  That company is a
5  connection of McKinsey's within the
6  meaning and the structure of Rule 2014
7  and all the case law that supports Rule
8  2014.
9    Q.   Even if it was a client back in
10  2014?
11    A.   Well this is 2018.  2014 is four
12  years ago.  And it's a connection of
13  McKinsey.  So, yes, under Rule 2014 they
14  would have to disclose that.
15    Q.   Okay.  And even if McKinsey has
16  consistently disclosed what lookback
17  period it is using?
18    A.   McKinsey disclosing its lookback
19  period does not relieve it of the law.
20  I can't say to you I'm going to --
21  here's -- my tax return requires me to
22  file -- to report all my income and pay
23  taxes on my income.  I can't write a
24  note to the IRS and say, listen, I've
25  decided not to report all my income for

Page 107

JAY ALIX

1
2  the first three months of the year and
3  now that I've told you that I'm going to
4  sign my return and send it in and I'm
5  not guilty of tax evasion just because I
6  told you I was going to do it.
7    Q.   You also --
8    A.   I can't tell you I'm going to --
9  I can't tell that I'm going to break a
10  law and then be relieved of my
11  responsibilities for breaking the law
12  just because I told you.  This theory of
13  I told you I did this and therefore I am
14  relieved from my duty under the law is a
15  ridiculous assumption.
16    Q.   So you have a disagreement with
17  McKinsey RTS about what Rule 2014
18  requires in terms of a lookback period?
19    A.   No, I don't.  I have a
20  disagreement -- McKinsey has a
21  disagreement with Rule 2014 and all the
22  case law supporting it.  Their
23  disagreement is with the case law and
24  with the rule, not with me.
25    Q.   And McKinsey in applying a

Page 108

JAY ALIX

1
2  lookback period is doing something that
3  every other professional in this case,
4  the Westmoreland case is doing, right?
5    A.   I don't know what every other
6  professional in this case is doing.  I
7  don't have an opinion about every other
8  professional in this case.  I do know
9  that in the ANR case McKinsey chose to
10  throw all the other professionals under
11  the bus as soon as they got challenged.
12  And I see them doing it again in this
13  case.  My review of all the other
14  professionals' documents seem to have a
15  spirit of disclosure, a desire to
16  disclose, an intention to disclose, a
17  willingness to disclose and a
18  predisposition to disclose.  When I look
19  at McKinsey's documents I see a
20  predisposition to not disclose.  I see
21  an unwillingness to disclose.  I see a
22  fight not to disclose.  And that is
23  inconsistent with the spirit and the
24  underlying rules and case law of Rule
25  2014.

Page 109

JAY ALIX

1
2    Q.   So let me ask you, if Alvarez,
3  Jones Day, PwC applies a lookback period
4  of two years, Centerview applies a
5  lookback period of three years, Kirkland
6  applies a lookback period of three
7  years, Morrison Foerster applies a
8  lookback period of three years, you
9  don't have an opinion that those
10  professionals are also violating Rule
11  2014?
12    A.   I'm going to leave it up to the
13  judge as to who violates Rule 2014 and
14  who doesn't.  I know that I've studied
15  McKinsey's disclosures and McKinsey's
16  disclosures are not in compliance with
17  Rule 2014 and never have been.
18    Q.   But in the aspect of applying a
19  lookback period, you don't have an
20  opinion one way or another about any of
21  these other professionals who are
22  applying a lookback period exactly the
23  same way that RTS is?
24    A.   There is no lookback period in
25  Rule 2014.

28 (Pages 106 to 109)

JAY ALIX

1
2   Q.   Okay.  And who -- which
3   bankruptcy professional agrees with your
4   view that no lookback period is
5   permitted by Rule 2014?
6   A.   Well, all of the experts I
7   mentioned earlier, professor of law John
8   Pottow, professor of law Lois Lupica,
9   professor of law Nancy Rappaport, former
10  bankruptcy judge Judith Fitzgerald,
11  former bankruptcy judge Steven Rhodes,
12  former assistant U.S. Attorney -- I have
13  two more I didn't mention earlier by the
14  way, I recalled them at the break.
15      Former assistant U.S. Attorney
16  Andy Fish, former assistant U.S.
17  Attorney Guy Petrillo, former assistant
18  U.S. Attorney John O'Shea.  You know,
19  bankruptcy attorney Sheldon Toll.
20  Former acting U.S. Attorney Daniel
21  Lemisch.  Bankruptcy practitioner Matt
22  Feldman.  And I suspect all of
23  McKinsey's law firms, other than Hogan &
24  Lovells because I thought as part of my
25  research I thought maybe McKinsey is

JAY ALIX

1
2   getting advice from its lawyers to not
3   do this.  Then I went back and read the
4   disclosure documents of Debevoise &
5   Plimpton, of Proskauer Rose, Mr.
6   Bienenstock, of Dewey Lebouf when Mr.
7   Bienenstock was at Dewey, I've read
8   Jones days, I read Skadden, Arps, I read
9   Kirkland & Ellis, and all of those
10  firms, all of those firms appear to be
11  making full disclosure and all those
12  firms I don't think would ever say that
13  Rule 2014 says there's a lookback period
14  here.
15      Q.   Are you representing that all
16  those firms that you named don't apply a
17  lookback period?
18      A.   I'm not representing what they do
19  or they don't do.  I just know that none
20  of them would ever say that the law says
21  there's a lookback period in the law.
22      Q.   Are they using a lookback period
23  in their disclosure statements?
24      A.   I don't have those disclosure
25  statements here.  I know that generally

JAY ALIX

1
2   people do that.  But I, you know, I'm
3   not here to advocate for that.  I'm here
4   to advocate for full disclosure and
5   transparency in the bankruptcy system.
6   Q.   And you acknowledge that the view
7   you are advocating for is something
8   that, as you just put it, generally
9   people don't do?
10  A.   I don't know when they report
11  their disclosures.  If they've also
12  scanned their all time databases to see
13  if there's anything else that needs to
14  be disclosed.  In other words they might
15  be looking within two years and because
16  they have a spirit to disclose and a
17  desire to disclose they may be looking
18  for other material connections that they
19  would also add to their disclosure
20  because they don't think they are de
21  minimis.  They may also conclude that
22  there are connections before that period
23  are de minimis and therefore they need
24  not be disclosed.
25  Q.   You don't --

JAY ALIX

1
2   A.   Therefore, I think that -- I
3   think that it's hard for me sitting here
4   to say how they think about those
5   lookback periods.  I know in our case
6   our database goes back all the way at
7   AlixPartners and therefore if something
8   were to pop out that's not de minimis it
9   would probably have to be disclosed.  So
10  I don't know how other people -- even
11  the idea of what is a lookback period,
12  how to apply it, what's in it, what's
13  not in it, is something we'd have to
14  study and go deeply on.  I think the
15  industry probably needs to think about
16  this and probably Congress has to maybe
17  address this at some point or the rules
18  committee I guess has to address it.
19  But the rules committee when it did
20  address this in the last couple of years
21  the bankruptcy rules committee decided
22  after careful review that it wanted to
23  have more disclosure not less.  It did
24  not want to limit the disclosure.  That
25  was in the last two and a half years.

JAY ALIX

1
2  So there's the practitioners,
3  there's the lawyers, there's the
4  consultants, there's the accounting
5  firms, there's the investment banks,
6  there's the judges, there's the US
7  trustees, there's the code, there's the
8  case law, there's Congress and there's
9  the rules committee.  There are a lot of
10 people involved in this discussion and
11 to suggest that somehow the
12 practitioners who have a self interest
13 in how this works out are the arbiter
14 and the final decision on how this is to
15 be thought about, I think is an
16 oversimplification of a very complicated
17 process.
18 Q.   So one of the names you left out
19 when you named the people that support
20 your view that a lookback period is not
21 permitted by Rule 2014 was Mr. Rhodes.
22 Does he agree with that view?
23 A.   Well, Mr. Rhodes as a judge will,
24 I'm going to guess, interpret the law as
25 it's written and apply the law as it's

JAY ALIX

1  written.
2
3  Q.   As a judge did he approve the
4  retention of professionals who applied a
5  lookback period in their Rule 2014
6  declarations?
7  A.   I don't know what he approved and
8  didn't approve in his court.  I suspect
9  it's all in the public record and I
10 suspect you could find that easily in
11 the docket if you wanted to.  I don't
12 know.  I've never looked at that.
13 Q.   Okay.  In the Congress, all the
14 people you mentioned, have any of them
15 ever said, to your knowledge, that it's
16 illegal under Rule 2014 to apply a
17 lookback period and disclose that you're
18 applying a lookback period?
19 A.   Has anyone ever said that about
20 applying a lookback period?  Well what
21 the case law says it's illegal not to
22 disclose all your connections.  They
23 don't really -- the laws don't deal with
24 McKinsey's lookback period.  It deals
25 with did you disclose all your

JAY ALIX

1
2  connections?  And there is a legion
3  amount of case law that says if you
4  haven't disclosed all your connections,
5  then you're not in compliance with the
6  law.
7  Q.   Is there any --
8  A.   I have evidence that says
9  McKinsey hasn't disclosed all of its
10 connections even within its two year
11 lookback period.  So if McKinsey is
12 saying it's using a two year lookback
13 period and then it doesn't even use that
14 two year lookback period to disclose all
15 of its connections, which is what I've
16 seen here, then it doesn't matter
17 whether they use a two year lookback, a
18 two year lookback or a ten year
19 lookback.  McKinsey is not disclosing
20 all of its connections even in the two
21 year lookback that's been established.
22 Q.   We'll get to that.  Tell me any
23 law that you're aware of, you talk about
24 all this law, any law that gets applied
25 to say it's illegal to use a lookback

JAY ALIX

1
2  period?
3  A.   I haven't looked at all the case
4  law.  I suspect if -- I suspect there's
5  case law that would say if someone used
6  a lookback period to not comply with
7  Rule 2014 they'd probably be found to be
8  not in compliance with the law.  That's
9  a device to get around making
10 disclosures.  And if parties have a
11 spirit to disclose.  The court has to
12 decide ultimately what's in the best
13 interest of the estate.  And if the
14 court decides that hiring a professional
15 who's used a lookback period is in the
16 best interests of the estate because the
17 court knows the professional to have
18 integrity.  The court knows the
19 professional to be honest, the court
20 trusts the professional to bring things
21 to the Court's attention, then the court
22 can decide what standard it needs to use
23 at that time on that disclosure.  That's
24 the court's discretion.  Because the
25 court has the ability to apply what's in

JAY ALIX

1
2 the best interests of the estate.  But
3 if the court becomes aware that a
4 professional is consistently withholding
5 connections, reducing the scope of
6 disclosure, reducing the field of
7 possibilities, using lookback periods
8 and limited definitions to not disclose
9 anything, then that violates the spirit
10 of 2014, it violates the intention of
11 2014 and it violates what the courts are
12 trying to find which is professionals
13 who can act as fiduciaries for the
14 debtor fiduciary which is the trustee.
15   Q.   Isn't it true that courts approve
16 every day in this country professionals
17 to be retained who apply lookback
18 periods?
19   A.   I suspect it happens.
20   Q.   Okay.  So when you talk about de
21 minimis connections you've actually
22 said that de minimis don't need to be
23 disclosed, you don't have for any of
24 these clients that are listed in the
25 chart on paragraph 166, you don't know

JAY ALIX

1
2 the service that McKinsey RTS or
3 McKinsey performed for these clients,
4 right?
5   A.   Well in some cases if the
6 information came from public domain
7 sources, then it might be a part of a
8 story where it actually explained what
9 McKinsey was doing and the work it was
10 doing and the impact of the work.  And
11 you can see in a newspaper article or on
12 the Internet that perhaps the work is
13 significant.  If someone described their
14 work on the Internet, you can see the
15 work was significant.  And just the
16 titles of the companies, the nature of
17 the work and the nature of McKinsey.
18 McKinsey doesn't do unserious work.  It
19 doesn't do frivolous work.  It doesn't
20 do de minimis work.  No one hires
21 McKinsey to pay them $10 million to do
22 de minimis work.  They hire McKinsey to
23 do big important work.
24   Q.   Wait.  By de minimis you mean
25 connection to the debtor, not whether

JAY ALIX

1
2 the work was de minimis, right?
3   A.   No, I think you were rephrasing
4 -- sorry, I understood your question to
5 mean I don't know the nature of the work
6 that McKinsey did to imply that perhaps
7 it wouldn't have been required to be
8 disclosed even if it was three years
9 old.  And what I'm suggesting is whether
10 it was one years old, two years old or
11 three years old, four years old, five
12 years old, ten years old, I can't
13 imagine any assignment that McKinsey
14 would be doing that wouldn't be an
15 important assignment to their firm, an
16 important assignment to that company,
17 and important to the parties involved.
18 And when something is important to the
19 parties involved that could affect their
20 judgment or their attitude about a
21 situation, then it's no longer de
22 minimis.  It may not -- the professional
23 making the decision who has a self
24 interest in the outcome might want to
25 justify and rationalize it's de minimis

JAY ALIX

1
2 and they may want to justify or
3 rationalize they don't have to disclose
4 it, but if that was important and big
5 work for McKinsey and that party is also
6 important and big in this debtor case as
7 a party in interest, I think we've moved
8 out of the zone of de minimis into the
9 zone of important connections that need
10 to be disclosed or if you're not sure,
11 err on the side of disclosure.
12   Q.   But you don't know?
13   A.   Disclose, disclose, disclose is
14 the standard.
15   Q.   You don't know one way or another
16 whether any of the work that was
17 performed by any of the clients listed
18 in paragraph 166 was related to the
19 debtor?
20   A.   Sitting here I don't.  But I do
21 think if the judge orders discovery and
22 these clients are all asked directly as
23 to what the work was that McKinsey did
24 for them and McKinsey has to provide its
25 records to show the proper explanation

JAY ALIX

1  as to what its work was, that that work
2  wasn't impacting this debtor, well then
3  that would work out fine.  But what we
4  have right now is we have a list, a
5  large list of 205 connections in
6  paragraph 166 of significant, big
7  companies with big activities, with a
8  big consulting firm, with a big
9  investing firm and there's nothing
10 explained about it anywhere.  That is
11 completely outside the bounds of Rule
12 2014.
13     MS. CHUNG:  I'm going to object
14 and move to strike everything after
15 "sitting here I don't."
16 Q.   I'm just going to ask you do you
17 think the standard of disclosure in
18 bankruptcy is whether the engagement is
19 important to the professional?  Is that
20 the position you're staking out?
21 A.   I think --
22     MR. O'SHEA:  Objection to the
23 form of the question and the
24 argumentative nature of it.  And in

JAY ALIX

1  fact the argumentative nature of much
2  of this.  But I'll let you answer the
3  question.
4  A.   I think all the factors around
5  the connection have to be evaluated
6  before anybody can conclude anything.
7  And it's incumbent upon the professional
8  applying to the court for employment as
9  a fiduciary to establish to the court
10 and all the parties and the US Trustee
11 that they have the requisite
12 independence, qualifications, freedom of
13 conflict, and the ability to carry out
14 the affairs of that court and that
15 estate in a way that doesn't bias their
16 advice or harm the estate of the debtor
17 in any way or the court's process in any
18 way.
19     When I stare at these 160 -- 205
20 undisclosed connections in Westmoreland
21 in paragraph 166, I have serious doubts
22 that anybody could come to that
23 conclusion without a lot more
24 information about these connections.

JAY ALIX

1      I don't, you're correct, I don't
2  have all the information on them.  But I
3  have more than a reasonable basis to
4  raise concerns and raise flags that
5  McKinsey's $25 billion investment fund
6  at least has an indirect investment in
7  the debtor and if McKinsey has indirect
8  investments in the debtor that's a
9  violation of section 101.14 of the code.
10     So how can we sit here and say two
11 years matters or one year matters or
12 four years matters?  It's more serious
13 than that.
14     We're looking at investments by
15 McKinsey in its wholly-owned subsidiary,
16 as a part of a one firm-firm, that has
17 direct or indirect investments in this
18 debtor and its creditors and its
19 competitors and its customers.
20     There's something terribly wrong
21 with that.  There's something terribly
22 wrong with that.
23 Q.   Now you're shifting to
24 investments.  We haven't been talking

JAY ALIX

1  about investments?
2  A.   You asked me to look on this page
3  and investments are right on this page.
4  They are right here in the column you
5  asked me to look at.
6  Q.   Let me ask you before we leave
7  clients, when you say you have serious
8  doubts that anybody could come to the
9  conclusion without a lot more
10 information that these connections were
11 adequately disclosed, that anybody
12 includes you?
13 A.   No.  That's not what I'm saying.
14 That's a false conclusion.  What I was
15 saying is these are known connections of
16 McKinsey and they're on the parties in
17 interest list for this debtor.  And
18 McKinsey did not bring them up
19 voluntarily, McKinsey didn't offer
20 anything.  And many of them are within
21 the last two years for McKinsey.
22     Therefore, if there's so many
23 companies that are connected to McKinsey
24 within the last two years and by its own

JAY ALIX

1     
2  standard it didn't include them, then
3  how can it be that we're supposed to
4  rely on McKinsey's judgment about
5  connections that are within the last two
6  years that are not a problem?
7    Q.   How many of the 130 client
8  connections listed in this chart were
9  within the last two years?
10    A.   I would have to take out the
11  document and look at the database and
12  answer it connection by connection.  But
13  it's not just clients.  It's also
14  investment positions in the debtor, the
15  debtor's vendors, the debtor's customers
16  and the debtor's competitors.
17    Q.   We will get to the investments in
18  a second.  So you can't tell me sitting
19  here how many of the 130 client
20  connections were within the past two
21  years or outside the two year lookback
22  period that McKinsey RTS applied?
23    A.   Many of them were within the two
24  years, many of them are outside the two
25  years, but the two years is not a factor

JAY ALIX

1  I'm using to do my analysis.
2    Q.   Right, you've made very clear
3  regardless whether it's in the lookback
4  period that McKinsey RTS disclosed,
5  you've put those connections on your
6  chart, right?
7    A.   These are all connections of
8  McKinsey & Company.
9    Q.   Your view is that if McKinsey &
10  Company had the connection at any point
11  in time, it's obligated to disclose that
12  connection in perpetuity?
13    A.   My view is that McKinsey &
14  Company has to comply with Rule 2014 to
15  be a fiduciary and a court-appointed
16  professional in this bankruptcy case and
17  any bankruptcy case and it is not doing
18  that.  And these connections demonstrate
19  that clearly and unequivocally, and I
20  have a reasonable basis for bringing
21  this forward because of that.
22    Q.   The way that your chart was built
23  up it assumes that if McKinsey RTS
24  disclosed any client connection from any

JAY ALIX

1  prior bankruptcy declaration, it should
2  have been disclosed in Westmoreland?
3    A.   Can you repeat the question.
4    Q.   The way that your chart was
5  compiled, it assumes that if McKinsey
6  RTS disclosed a client at any point in
7  time, that client should appear in the
8  Westmoreland Rule 2014 declaration of
9  RTS?
10    A.   No.
11    Q.   Well you haven't excluded any of
12  the connections that you drew off of
13  prior bankruptcy declarations, right?
14    A.   That's because McKinsey is
15  playing a game of cat and mouse here,
16  and the game of cat and mouse is
17  completely disallowed under all the case
18  law.  And what they're doing is they've
19  held back some information which is
20  clearly available in the public domain
21  and they're making the parties, the
22  court, the US Trustee, creditors, have
23  to figure out is it a connection or
24  isn't it a connection?

JAY ALIX

1  Is it material or isn't it
2  material?  We shouldn't even have to ask
3  those questions.  We shouldn't even have
4  to be put in that position.  The
5  creditors of this estate, the employees
6  of this company who are sitting in court
7  hoping to keep their healthcare, the
8  judge who is trying to run a docket
9  that's got thousands of cases on it
10  shouldn't be spending any time having to
11  figure out how it is that McKinsey has
12  dozens of investment positions in
13  parties who may be owners in this
14  company and they haven't explained it to
15  anyone.
16    Q.   So the answer to my --
17    A.   That's just not acceptable.  So
18  the answer to your question is, all I
19  can do is say there's 202 undisclosed
20  known connections of McKinsey that
21  impact this company and it's a complete
22  black box and McKinsey is fighting
23  viciously to try and hold the court and
24  the parties away from that knowledge.

33  (Pages 126 to 129)

JAY ALIX

1  
2      I would rather we spend our time
3  getting to the bottom of it and finding
4  out if McKinsey is qualified to serve.
5  If they're qualified to serve then let
6  them serve.  If they want to do the work
7  let them do the work.  But they've got
8  to disclose.  And if they disclose they
9  can do all the bankruptcy work they want
10 as far as I'm concerned.
11     But it's not fair to the court,
12 it's not fair to the parties, it's
13 certainly not fair to the US Trustee who
14 is trying to figure this out and can't
15 because McKinsey won't let them do their
16 job and it's certainly not fair to
17 competitors on the playing field.  This
18 makes an unlevel playing field for the
19 industry which directly affects and
20 hurts AlixPartners and by default hurts
21 me for sure.  But on top of that, it
22 pollutes and ruins the system that I've
23 spent 40 years working in and I don't
24 like it.  I'm not going to sit back and
25 allow a large international, the largest

JAY ALIX

1  
2  consulting firm in the world, who puts
3  data systems in companies and clients
4  for fees, to say they don't have a data
5  system and they can't look past two
6  years and oh, by the way we don't have
7  access to it because this is a blind
8  trust or that's not a direct
9  relationship.  That's all fabrication by
10 McKinsey.  That's not in the law.
11 That's not in the case law.  This is,
12 this is, this is quite a, quite a
13 travesty that they've done here.
14    Q.   Mr. Alix, do you remember the
15 question?
16    A.   You know, I'm glad to have you
17 read it back to me.
18    Q.   You haven't excluded any of the
19 connections that you drew off the
20 private -- off the prior bankruptcy
21 declarations, any of the client
22 connections, you haven't excluded any of
23 the prior client connections that you
24 drew off the prior bankruptcy
25 declarations in making the chart that's

JAY ALIX

1  
2  at paragraph 166?
3    A.   That's not correct.
4    Q.   Name me one that you excluded?
5    A.   I can't name it here but I do
6  know when we screened this before we
7  filed this document with the court, we
8  were very careful to be sure that we had
9  a good source for every connection, that
10 we had a good belief as to why it was a
11 connection.  So as an example, if
12 McKinsey's name appeared in an article
13 about a company but -- and even if it
14 was a credible publication like the Wall
15 Street Journal or one of McKinsey's own
16 publications that they put out, they put
17 a lot of publications out, just because
18 they named a company in the article it
19 doesn't mean it was a client.  So we
20 would not have taken that situation
21 knowingly and put it up as a connection.
22    Q.   I'm sorry, that's not what I'm
23 asking.  I asked you --
24    A.   I'm not finished yet.
25    Q.   If the name --

JAY ALIX

1  
2    A.   I'm not finished yet.
3    Q.   The question was --
4    A.   I'm going to answer it right now.
5       MR. O'SHEA:  Let's not argue.
6  Let's let him finish the question.
7  You can put another, Chris.
8    A.   I think -- I think the point is
9  that we would go through a process to
10 see if any connection, which might have
11 been flagged to be on this parties in
12 interest lists, might not be as strong a
13 connection in our database to feel good
14 about filing a document with court.
15    Therefore, if we had to make a
16 choice we would have erred on the side
17 of dropping it versus putting it in.  So
18 your statement that I didn't take
19 anything off of this list as a part of
20 the review is incorrect.  That was done
21 and it was done connection by connection
22 as best we could knowing that we don't
23 have enough data from McKinsey to know
24 what the truth is.  I'm interpolating
25 from data which McKinsey's published

JAY ALIX

1  which is incomplete.
2  Q.   You can't name me any single
3  connection that was named in a prior RTS
4  declaration that you exclude from your
5  chart?
6      MR. O'SHEA:  Asked and answered.
7  You can answer again.
8  A.   I'll be glad to go through all of
9  the prior declarations, all the prior
10  cases, compare to the notebooks and we
11  will come up with the names.
12  Q.   And you haven't, you haven't done
13  that exercise until now?
14  A.   No.  I just said to you we did it
15  often as we -- as we prepared for this
16  litigation and other litigation to make
17  sure we felt solid about the connection.
18  So there are companies that have been
19  left off this list and probably other
20  lists because we weren't sure about how
21  solid the connection was.
22      These connections we feel very
23  comfortable that they're solid
24  connections and they're backed up by

JAY ALIX

1  publicly available documents, many of
2  them filed by McKinsey in the public
3  domain.
4  Q.   What can you mean by solid
5  connection if you don't know what the
6  service was?
7  A.   The bankruptcy code doesn't
8  require us to define the service.  The
9  bankruptcy code just says if you have a
10  connection, any connection, all
11  connections, disclose the connection.  I
12  don't have to know the service to
13  identify something that's a connection.
14  The code doesn't define that these
15  services are included in connections and
16  these services are left out.  Or these
17  investments are connections but these
18  kinds of investments are not
19  connections.  Or that indirect
20  investment over there is different than
21  this client over here.
22      Matter of fact, all the case law
23  says do not do that.  The case law says
24  you have to include it all and leave it

JAY ALIX

1  up to the court to adjudicate that.
2      When a company, when a
3  professional takes that power to its own
4  hands to decide well this service
5  doesn't apply and this investment
6  doesn't apply, what they've done is
7  usurped the court's power to adjudicate
8  whether or not something is a
9  disqualifying connection.
10      The professional's job under the
11  law and under all the case law is to
12  disclose all connections, period, full
13  stop, no limitations.
14      The court's job is then to decide
15  how to adjudicate those connections.
16  McKinsey has usurped the court's power
17  to adjudicate whether these are
18  disqualifying connections or not and I'm
19  just pointing that out as a messenger, a
20  as whistleblower to say that's what's
21  going on here and I wanted this court to
22  know about it.
23  Q.   So any --
24  A.   What the court does with it will

JAY ALIX

1  be up to the court.  But I'm bringing to
2  the Court's attention the data, the data
3  that supports that I believe McKinsey is
4  not complying with Rule 2014 and the
5  spirit underlying it in doing what's in
6  the best interests of this estate.
7  Q.   So by what you just said, any
8  professional who takes into account the
9  type of service that they performed for
10  their prior clients in making
11  disclosures under Rule 2014 is usurping
12  the power of the court?
13  A.   No.  It's what Mr. Bienenstock
14  argued in ANR.  Mr. Bienenstock,
15  McKinsey's lawyer, all of these issues
16  in the ANR case who is now not involved,
17  I guess, he represented to the court in
18  the ANR court record that context
19  matters.  He kept saying context
20  matters, context matters.  And I respect
21  Mr. Bienenstock, I've known him for a
22  long time.  And he said context matters.
23      So if this is a connection, if,
24  say, BlackRock is a connection, what's

JAY ALIX

1   the context.  Well if McKinsey doesn't
2   disclose the nature of the connection,
3   the court and the trustee is left to
4   guess the context.  If McKinsey says
5   well I disclosed it for these two years
6   but not for the month before that, so
7   now do I have to think as a court or a
8   trustee was there something that
9   happened 25 months ago?  But because it
10  was outside the 24-month period it
11  doesn't matter?  That's not the spirit
12  of the code.  It's not the spirit of the
13  rule.
14     Q.   But your logic is not limited to
15  McKinsey, right?  You're saying that any
16  professional needs to disclose context
17  in your view?
18     A.   If any professional reads the
19  case law around Rule 2014 they would see
20  all of what I'm saying presented in all
21  the case law and it's been going on for
22  decades and going back to general rule,
23  you know, 40, I think it was 40 or 44 in
24  the old, in the old act.  So this is not

JAY ALIX

1   new stuff.  This is around.  McKinsey
2   has got top lawyers inside the firm,
3   they have 60 lawyers on their corporate
4   legal staff.  They've got people with
5   bankruptcy experience who claim great
6   bankruptcy knowledge.  They got the best
7   law firms in the world advising them.
8   This is not rocket science.  This is
9   pretty simple stuff.
10     Q.   You think it's simple to say, you
11  think it's simple to say that Rule 2014
12  disallows a professional from applying a
13  lookback period, even though you are
14  unable to name a single case that holds
15  that?
16     A.   Rule 2014 --
17        MR. O'SHEA:  Objection.  That
18     misstates the testimony.  You can go
19     ahead and answer.
20     A.   Rule 2014 doesn't say that, it
21  doesn't not say that.  It says what it
22  says on the page.  It's black letter
23  law.  I'm just saying there's black
24  letter law and if I read it literally as

JAY ALIX

1   it's written that would be the standard
2   that could be applied to any
3   professional by any court of competent
4   jurisdiction and by any trustee acting
5   on behalf of the US Trustee program.
6        These disclosures do not comport
7   with the law.  I can't come into this
8   case and say, well, I want to argue two
9   years was almost good enough but maybe
10  they should have done two years and
11  three months or two years and six
12  months.  That's why the rule says just
13  disclose all connections.  Because the
14  court, the trustee and all the parties
15  can't figure out whether two years is
16  right, one year is right, five years is
17  right, ten years is right or forever is
18  right.
19        What they figured out is just
20  disclose all connections that are
21  material, that are not de minimis in the
22  context of this case and be prepared to
23  defend it.  And when in doubt, disclose
24  it.  Disclose it.

JAY ALIX

1     Q.   Did --
2     A.   And I'm saying they're not --
3   when they're in doubt they have a
4   predisposition to not disclose.  That's
5   a bad predisposition for a court to rely
6   on, for a fiduciary who is going to
7   execute the affairs of a debtor.  It's
8   not a good starting point in a one
9   billion or $10 billion case.  And these
10  are big cases with big money, lots of
11  people, lots of employees.  This
12  Westmoreland case has 2,900 employees
13  and it's like this judge, you know, has
14  them showing up in his courtroom.  He's
15  got to make sure that McKinsey is a good
16  fiduciary for everybody and not just
17  good for its friends who are
18  undisclosed.
19     Q.   Did anybody, yourself, or anyone
20  on your professional team, check to see
21  whether any of the entities listed in
22  your chart of 205 were disclosed in
23  Westmoreland?
24     A.   Well this is a chart of

JAY ALIX

1
2 disclosure -- this is a chart of
3 connections.  Disclosing connections is
4 different than disclosing entities.
5 Some of these entities are disclosed but
6 they were disclosed as client
7 connections, not as investment
8 connections.  So that was a little
9 quick, I think, a little bit of a -- a
10 little bit of wordsmithing by McKinsey
11 and probably some bifurcation.  Because
12 most of the investment connections,
13 which might have a dual connection to
14 the debtor are being clients of
15 McKinsey.
16     So McKinsey did disclose some of
17 them as clients.  But it did not
18 disclose them as investments of McKinsey
19 into the debtor directly or indirectly.
20     That to me speaks volumes about
21 what I consider to be the concealment of
22 this or the deceptive nature of this.
23 That wasn't a forthright deception.
24 That wasn't a forthcoming description.
25 So when you said, oh, the entity was

JAY ALIX

1
2 disclosed, well, that's not what the
3 code says.  You have to disclose all
4 your connections.  It didn't say
5 disclose all the entities, it said
6 disclose all the connections.
7     So we can count these by entities
8 and that's one way to look at it, and
9 that would give you a much lower number.
10 Or you can count them by connections
11 which is what the code does and which is
12 how the parties in interest list
13 specifies it.  It puts it under
14 different categories of connection
15 possibilities.
16     So you have to disclose all your
17 connections by name, under the
18 categories, with enough information so
19 the court can exercise its power over
20 the appointment of a professional who
21 needs to carry out fiduciary
22 responsibility for the debtor.
23 Q.   So you --
24 A.   And that's not happening here.
25 Q.   So the answer is you do know that

JAY ALIX

1
2 entities that are in your chart of 205
3 shockingly concealed connections were
4 disclosed in McKinsey RTS Rule 2014
5 declarations?
6     MR. O'SHEA:  Objection to form.
7 A.   Some of the entities were
8 disclosed as clients but not as
9 investments in the debtor.
10 Q.   How many?
11 A.   I have to look at the chart and
12 count them.
13 Q.   Okay.
14 A.   You can open -- I mean I can do
15 that if you want with the notebooks.
16 Q.   Isn't it the case -- it's fine.
17 Isn't it the case in terms of the
18 categories you discussed, client
19 connections that are named in your chart
20 as client connections and the category
21 of client connections, were disclosed as
22 client connections in McKinsey RTS's
23 Rule 2014 declarations?
24 A.   That's a broad and sweeping
25 statement that I'd have to go case by

JAY ALIX

1
2 case and client by client with.
3 Q.   Is that something that anybody on
4 your team did before they filed the
5 Mar-Bow objection?
6 A.   All, every one of these
7 connections that are here, every entity
8 was looked at and it was compared to the
9 parties in interest list as to whether
10 it was a client connection, an MIO
11 connection or a fund advisor.  That's
12 how this information was created.  The
13 information and the type of connection
14 comes out of these public documents.
15 And then we can compare that to what
16 they filed in the parties -- what they
17 filed in disclosure and compare that to
18 the parties in interest list.
19     So it was this long and
20 painstaking process to recreate
21 effectively the database that McKinsey
22 probably should have created that says
23 here's McKinsey's client connection with
24 this entity.  Here's McKinsey's
25 investment connection with this entity.

JAY ALIX

1  
2  Here's McKinsey's fund advisor
3  connection.  Here's a service provider
4  to McKinsey.  And it turns out that
5  connection is in many different places
6  in the parties in interest list and
7  therefore those different relationships
8  have to be matched up to the parties in
9  interest list.  McKinsey did not do that
10  in their disclosure.  They did not take
11  the time to go do that.
12       MR. O'SHEA:  Excuse me a second.
13  I'm getting, Mark, a low battery
14  notification.  Sorry for the
15  interruption.
16   Q.   Mr. Alix, I wasn't asking you
17  about any painstaking process.  I was
18  asking you about the simple process of
19  taking the client connections in your
20  chart, in paragraph 166, and comparing
21  it to the disclosures made by McKinsey
22  RTS in the Hojnacki declarations for
23  client connections.  Did anybody on your
24  team do that?  It's a yes or no
25  question.

JAY ALIX

1  
2   A.   Well you said it's a simple
3  process.  It's not a simple process and
4  therefore, it's not easily a yes or no
5  question.  It's a complex process and a
6  complex analysis.  So I can answer it
7  with complex, accurate descriptions
8  because yes or no doesn't work the way
9  you framed the question and the way you
10  understand the information.
11   Q.   So are you aware, for example,
12  that Bank of America, which is in your
13  chart as a client connection, was
14  disclosed as a client connection in the
15  Hojnacki declaration?
16   A.   Where is that?  Where do you see
17  that?
18   Q.   We're getting a line number for
19  you.
20   A.   I can probably cut through it.  I
21  can --
22   Q.   71.  Bank of America Corporation.
23   A.   If you want we can just stipulate
24  that McKinsey did disclose 150
25  connections in the Westmoreland case.

JAY ALIX

1  
2  I'm not saying they didn't make any
3  disclosure.  They made 150 disclosures.
4   Q.   Sorry, that's not the question.
5  The question is something that you put
6  in your chart as a concealed connection,
7  as a concealed client connection,
8  appears in the Hojnacki declaration as a
9  client connection, a disclosed client
10  connection?
11   A.   Which one, Bank of America?
12   Q.   Yes.
13   A.   71?  It's here as a five percent
14  or more shareholder, right?  Is that the
15  heading it's under?  It's a category in
16  the five percent or more shareholders,
17  Bank of America, client.  So it's here
18  as a client.  But I don't know what's
19  behind the categorization or how it got
20  put in.  I have to see it.
21   Q.   Did anybody ever check to see if
22  Bank of America was -- Bank of America
23  was disclosed as a client connection in
24  Mr. Hojnacki's declaration before you
25  filed this objection?

JAY ALIX

1  
2   A.   I would have to check his
3  declaration, the parties in interest
4  lists, compare it to this and go to the
5  database.
6   Q.   And if you did that would you be
7  the first person on your team who ever
8  did that?
9   A.   I don't think so.  I think the
10  team has worked diligently.  They worked
11  hard for four years building this
12  database.  Everybody is careful.  This
13  is double checked by other people.  Is
14  it perfect?  No, it's not perfect.
15  There are mistakes in it?  There might
16  be a couple of mistakes in it.  But out
17  of 205 connections that are identified,
18  my guess is in anything, law of large
19  numbers, you could have three or four or
20  five mistakes it in, but you're not
21  going to have a hundred mistakes in it
22  or 200 mistakes in it.
23   Q.   So if I told you there are 102 of
24  the connections listed in your chart
25  that are disclosed in Hojnacki's

JAY ALIX

1
2   deposition, one or the other of them,
3   what do you have to dispute that?
4     A.   What I would say is you have to
5   go through which type of connection was
6   disclosed, which category in the parties
7   in interest list, whether it was
8   disclosed timely in the first
9   disclosure, why did it come in the
10  second disclosure?  Did McKinsey know
11  about it when they filed the first
12  disclosure?  How did they disclose it in
13  the first disclosure?  Was it disclosed
14  as a client?  Was it disclosed as an
15  investment?  Was it disclosed as a fund
16  advisor?
17     My understanding is that none of
18  the investments have been disclosed and
19  none of the MIO connections have been
20  disclosed, and I also know that many of
21  the client connections were not
22  disclosed.
23     Do I think that this chart is
24  perfect, that a hundred and 80 -- the
25  205?  I believe it's about as perfect as

JAY ALIX

1
2   it can be.  Do I think that you and your
3   staff and a team of accountants could
4   find a mistake in it?  Sure I think you
5   could.  There's mistakes in everything
6   everyone does.
7     Q.   How about finding 57 client names
8   that were disclosed as client names in
9   the Hojnacki declarations that are still
10  listed in your chart of concealed
11  connections?
12     A.   You'd have to show me that.
13     Q.   So you haven't done that
14  exercise?
15     A.   You'd have to show me that.
16     Q.   I'm asking you have you ever done
17  that exercise?
18     A.   I haven't looked for 57 client
19  connections.  Mr. Hojnacki's
20  declarations were compared to the
21  parties in interest list of this
22  company.  Mr. Hojnacki's declarations
23  were compared to our database.  They
24  were compared to the MIO database that
25  we have.  And that result was this work

JAY ALIX

1
2   product.
3     If there's a problem with this
4   work product, I would be glad to fix it.
5   But I don't think that you're going to
6   find the 205 connections were all listed
7   in Mr. Hojnacki's database compared to
8   this list.
9     Q.   Are we going to find -- you don't
10  have any basis to dispute that we found
11  more than a few connections in your
12  chart, client connections that were
13  disclosed as client connections in the
14  Hojnacki declaration?
15     A.   I have no reason to dispute what
16  you're saying because I don't know what
17  you've done.  But I'd be glad to look at
18  your work and compare it to my chart and
19  reconcile it.
20     Q.   And my question is about your
21  work, and you seem to have answered my
22  question that the comparison was done
23  and that the Mar-Bow objection was still
24  filed?
25     MR. O'SHEA:  I'm going to object.

JAY ALIX

1
2   One, it is argumentative, misstates
3   the testimony.  But if you can, go
4   ahead and answer.
5     A.   I'm not sure if I understand the
6   conclusion that she's asking me to agree
7   with.  But I think --
8     Q.   I'm asking --
9     A.   -- there's a good-faith basis of
10  putting these names here off a database
11  that was built using McKinsey's records
12  and the parties in interest in this case
13  and his declarations in this case.  And
14  there's something close to 205
15  connections, connections, not just
16  client names, connections that were not
17  disclosed in this case.
18     Q.   I'm going to give you one more
19  time to answer, one more chance to
20  answer the question.
21     Did someone on your team check to
22  see if the client connections in your
23  chart at paragraph 166 were also
24  disclosed as client connections in
25  either the Hojnacki declarations before

JAY ALIX

1    you filed the objection?
2    A.   I believe it was reviewed.
3    Q.   And the objection was still
4    filed?
5    A.   It's here, it's filed.
6    Q.   All right.  Thank you.  All
7    right.  So let's talk about these MIO
8    connections that are listed on the
9    chart.  And you've already testified
10   that the source for the MIO, what you've
11   identified in the last column of your
12   chart as MIO investments, the sources
13   for those entries were the forms 5500
14   that are filed with the Department of
15   Labor by MIO and the SEC forms ADV.  Do
16   I have that testimony correct?
17   A.   Generally that's correct.
18   Q.   When you say generally, is there
19   some other source that went into
20   identifying what are the MIO connections
21   listed in your chart?
22   A.   There is publicly available
23   information about the MIO and on the
24   Internet.  And there was also some MIO

JAY ALIX

1    -- McKinsey was ordered by Judge
2    Huennekens to disclose MIO connections,
3    and so there was some collection of
4    information through the disclosures in
5    ANR, and there were seven affidavits
6    filed I think in the ANR case I think to
7    the US Trustee regarding MIO and its
8    activities.
9         So there's information.  We've
10   tried to gather information from many
11   sources about the MIO.  So I think most
12   of the names here do come from the 5500s
13   and the form ADV, but there could be
14   other exceptions to that.
15   Q.   Okay, but none of the names here
16   came from MIO disclosures made to Judge
17   Huennekens, right, because those
18   disclosures were made in camera?
19   A.   Well that's, that's a bit of a
20   question mark.  There were disclosures
21   made to Judge Huennekens in camera after
22   the motion to compel was granted.  Our
23   motion to compel was granted by Judge
24   Huennekens.  And McKinsey was ordered to

JAY ALIX

1    disclose MIO connections but they were
2    allowed to do it in camera to
3    accommodate their desires for privacy,
4    which we've objected to.
5         And then the US Trustee filed a
6    document to compel McKinsey to release
7    all of the information in the public
8    domain.  The Judge Huennekens asked
9    McKinsey for a recommendation -- asked
10   the US Trustee for a recommendation of
11   what McKinsey should disclose in the
12   public domain, and the US Trustee filed
13   a recommendation in the ANR case in
14   August of 2016.  And McKinsey
15   simultaneous with that filing of the
16   recommendation by the US Trustee
17   released I think about 85 names, new
18   names that had never been disclosed in
19   the case and the case was over at that
20   point.  So they released 85 names in the
21   case supposedly including MIO
22   connections to the case which is what
23   the judge had ordered.
24        I just learned a month ago that

JAY ALIX

1    the US Trustee believes, a month ago
2    today or yesterday, that McKinsey has
3    not been forthright with its MIO
4    connections in that case.
5         The US Trustee has been
6    investigating that for two years and has
7    now determined that McKinsey did not
8    disclose or turn over all of its
9    connections in MIO as ordered by the
10   court and as required by the US Trustee.
11   It has now filed a motion to reopen the
12   ANR case and to -- and they want the
13   judge to make McKinsey disgorge its fees
14   because it did not disclose all of the
15   MIO connections it was supposed to
16   disclose under that order.
17        So there's information about MIO
18   connections from the ANR case and that
19   litigation which may have influenced how
20   we presented MIO connections in this
21   filing.  But I have to go connection by
22   connection and document by document to
23   do that which is how this was compiled.
24   Q.   Are you saying --

JAY ALIX

1
2    MS. CHUNG: First of all, I
3    object and move to strike the entire
4    answer. The question was --
5    MR. O'SHEA: We've been going
6    about an hour, when you have a good
7    breaking point I'd like a break.
8    Q.   None of the names here in your
9    chart that are MIO investments came from
10   disclosures made to Judge Huennekens in
11   camera because you never learned those
12   disclosures; isn't that right, Mr. Alix?
13   A.   I've never seen the disclosures
14   in camera.  But McKinsey was ordered by
15   the US Trustee and the judge to then
16   disclose them in August, and on that
17   list in August there's a presumption
18   that MIO connections are disclosed in
19   that list.
20   Q.   Did McKinsey RTS ever disclose to
21   the public any MIO investment
22   connections in the ANR case?
23   A.   They did not do it in ANR cases
24   as far as I know.  But they were ordered
25   to do that by the US Trustee and by the

JAY ALIX

1
2    judge, so if they didn't do that they
3    would be violating the court's order.
4    Q.   Is there any connection to MIO
5    that you are aware of that went into
6    your database from the ANR case?
7    A.   Yes.
8    Q.   Which ones?
9    A.   White Box, Compass Funds, there's
10   three or four of them listed in this
11   objection that are connections to ANR,
12   connections to McKinsey that are in our
13   database.  So we've probably got, we've
14   probably got six or seven MIO
15   connections that are connected to ANR
16   that are in our database from McKinsey
17   investments in ANR prepetition and
18   McKinsey investments in ANR during the
19   process of the case and McKinsey
20   investments in ANR and its reorganized
21   companies postpetition, including
22   Contura and White Box.  So those are ANR
23   related connections that relate to
24   McKinsey, that relate to the MIO, that
25   are in this database.

JAY ALIX

1
2    Q.   That don't come from any McKinsey
3    RTS declaration; isn't that right?
4    A.   Well the affidavits that were
5    filed, the seven affidavits that were
6    filed including from Mr. Garcia, Mr.
7    Lipscomb in the ANR case within the last
8    90 days clearly discuss White Box. They
9    clearly discuss the Compass Funds and
10   they clearly discuss I think a couple of
11   the other funds that are in the ANR
12   case.  So I do have information in the
13   database about MIO's investments in ANR
14   that was provided by McKinsey in sworn
15   affidavits.
16   Q.   So in the case of White Box,
17   let's take that as an example, White Box
18   was not something that was disclosed in
19   the McKinsey RTS declaration, that's
20   your whole beef about White Box, right?
21   A.   I don't know what you mean by
22   whole beef about White Box.
23   Q.   Well it wasn't disclosed in a
24   McKinsey RTS declaration, that was a
25   connection that you called to the

JAY ALIX

1
2    attention of the court, right?
3    A.   No.  That's not what happened.
4    That's not what happened at all.  That's
5    a mischaracterization of the whole
6    thing.
7    Q.   Have you ever been able to prove
8    that McKinsey RTS received an interested
9    parties list with the name White Box on
10   it?
11   A.   I haven't tried to prove or
12   disprove whether they received a list or
13   not.  White Box is a connection that
14   McKinsey had had needed to be disclosed
15   in ANR and they did not disclose it.
16   Q.   So you can't say one way or the
17   other whether McKinsey RTS ever received
18   an interested parties list with White
19   Box on it?
20   A.   There was an interested parties
21   list in the ANR case attached to the
22   Alvarez & Marsal disclosure that had
23   White Box on it and Alvarez & Marsal's
24   disclosure document was filed within two
25   hours, according to the court record,

Page 162

JAY ALIX

1  within two hours of the McKinsey
2  disclosure. So it's clear that Alvarez
3  had a parties in interest list with
4  White Box on it and it's clear that
5  McKinsey's parties in interest list was
6  missing White Box on it with what they
7  filed, which is also an entity that they
8  have an investment in ANR.
9      So those are the facts. I don't
10  know how that arose. I don't know who
11  did it. I don't know who made the list.
12  I don't know if anybody tampered with
13  the list. But I do know that there was
14  parties in interest list with White Box
15  on it at the beginning of that case and
16  they were available to the professionals
17  and White Box was there.
18  Q.   And you haven't tried to prove or
19  disprove that McKinsey ever got --
20  McKinsey RTS ever got an interested
21  parties list with White Box on it?
22  A.   No, I haven't tried. Well
23  actually I'm trying that because I filed
24  the motion to reopen the ANR bankruptcy
25

Page 163

JAY ALIX

1  case for fraud on the court. And if
2  that motion is granted then I will seek
3  discovery around the idea of how it came
4  to pass that somehow some professionals
5  at White Box on their parties in
6  interest list and others didn't and yet
7  the professional that had it, who didn't
8  have it on the list also had an
9  investment in White Box at the same
10  time.
11     So and it's clear that McKinsey
12  knows about White Box because Mr.
13  Carmody testified under oath within 20
14  days after plan consummation, the plan
15  was consummated on July 26th, 2016 and
16  on August 16 of 2016, so 20 days later,
17  those dates may be off a little bit but
18  it's close, he testified that he knew of
19  White Box. So he knows at the time when
20  he's testifying probably about the
21  feasibility of the plan of
22  reorganization.
23     He's testifying about a plan which
24  is going to benefit White Box which
25

Page 164

JAY ALIX

1  McKinsey has a financial interest in.
2  And he never brought it to Judge
3  Huennekens' attention that he was
4  testifying about the feasibility of a
5  plan when he has a financial interest in
6  the outcome of that plan.
7      And then it turns out that White
8  Box was known to some of the debtor's
9  professionals at the beginning of the
10  case.
11     And when I looked at the form
12  5500s that McKinsey has filed with the
13  Department of Labor, it's clear that
14  McKinsey has been involved with White
15  Box for years and years and years before
16  the ANR bankruptcy case.
17     So I have datapoints that say
18  McKinsey itself knows that it's involved
19  with White Box for many, many years
20  before ANR bankruptcy case. McKinsey
21  itself knows under Mr. Carmody's
22  testimony at the time of confirmation
23  and consummation of the plan that White
24  Box is involved in the case. Other
25

Page 165

JAY ALIX

1  professionals in the case know that
2  White Box is involved in the case. And
3  when the case is over White Box ends up
4  with a significant financial interest
5  and investment in the successor entity
6  to the debtor called Contura which then
7  becomes very profitable, which means
8  that McKinsey has profited greatly,
9  directly or indirectly in a financial
10  interest from the debtor.
11  Q.   So --
12  A.   So those are the things I know.
13  Q.   I'm going to --
14  A.   I know those things. Other
15  things I'll have to learn by discovery.
16  But I have a high degree of confidence
17  that I know those things.
18     MS. CHUNG: So I'm going to
19  object and move to strike everything
20  after "no, I haven't tried."
21  A.   Well, I have tried. I'm
22  explaining to you what I have tried.
23  And there are more things I would try if
24  granted discovery.
25

JAY ALIX

1
2    Q.   You have never been able to
3  establish that Mr. Carmody, who I
4  mentioned, when you say that he was
5  aware of White Box, what he testified
6  was that he was aware that White Box was
7  a, was a lender, right?
8    A.   He testified that White Box was a
9  creditor in the ANR case at the time of
10  confirmation.
11    Q.   And you filed your motion to
12  reopen in ANR without ever coming
13  forward with proof that Mr. Carmody was
14  aware that MIO held any kind of
15  investment in White Box?
16    A.   Without any proof that Mr.
17  Carmody held an investment in White Box?
18    Q.   That Mr. Carmody knew that MIO
19  held any investment in White Box?
20    A.   Well, I don't know what Mr.
21  Carmody knows or doesn't know other than
22  what he discloses.  But Mr. Carmody also
23  did not disclose whether or not he
24  personally, through his MIO investment
25  account, personally has an investment in

JAY ALIX

1
2  White Box.  And if Mr. Carmody has an
3  investment in White Box, then Mr.
4  Carmody knows about White Box.
5    Q.   And when you say if you don't
6  know one way or the other --
7    A.   I don't know whether he has a
8  personal investment in White Box or not
9  but it's available to him through his
10  MIO investment options which would have
11  been offered to him as a partner in
12  McKinsey.  So it's reasonable to think
13  that he would know that White Box was an
14  option.  He would have been presented
15  White Box on a menu of investment
16  options by the financial planners of MIO
17  who meet with and advise the partners of
18  McKinsey and talk about what the
19  investment options are.
20    So Mr. Carmody clearly is in a
21  position to know that White Box could
22  have been there and maybe was there.
23    Q.   What's your basis for saying that
24  any McKinsey consultant has ever
25  discussed with any MIO investment

JAY ALIX

1
2  advisor the third-party managers who MIO
3  might hire?
4    A.   Because the -- because the MIO
5  White Box says that the MIO has
6  employees who meet with McKinsey
7  partners to help them do all their
8  financial planning and they do it on a
9  regular basis and McKinsey partners are
10  encouraged to invest their money with
11  MIO and use all of MIO's options.
12    And so if I'm going to invest with
13  White Box or invest with MIO, I want to
14  know what my options are and I want to
15  know what is offered.
16    And the MIO SEC filing, when I
17  read the SEC filing by the MIO it said
18  that McKinsey's MIO activity includes an
19  active interest in distressed investing.
20  Investing in troubled companies, in the
21  creditors of troubled companies, in the
22  debt of troubled companies and also
23  taking short positions on the stock of
24  troubled companies.
25    So if that's what the MIO is

JAY ALIX

1
2  advertised and told, told the SEC that,
3  and then they've also therefore
4  advertised it and told McKinsey partners
5  that that's available to them in one of
6  those offerings would have to be the
7  White Box offering because it took a
8  position in this company which is
9  distressed debt, it just seems logical
10  to me that Mr. Carmody may have known
11  about that and in fact may have even
12  made a personal decision to invest in
13  that.
14    And Mr. Carmody works for Mr.
15  Garcia and Mr. Garcia is on the
16  investment board of MIO.  He's on the
17  board of directors of MIO and he runs
18  RTS.  Which the US Trustee has said was
19  misrepresented to him in a pleading last
20  month.
21    Therefore, there's just so much
22  information available to McKinsey's own
23  partners and its own staff about White
24  Box, about distressed investing, about
25  positions it's taken, that when you step

Page 170

JAY ALIX

1  back at it you say, wow,
2  there's a lot here.  And those are all
3  facts.
4
5      I don't have what's in Mr.
6  Carmody's personal investment account,
7  admitted.  I don't have what's in Mr.
8  Garcia's personal investment account,
9  admitted.
10     But everybody's hovering around
11 the situation and all this data is
12 available, and I'm gathering it being an
13 outsider in the public domain.  So if I
14 can get this much in the public domain
15 they probably have ten times as much
16 inside to draw from.
17 Q.   Probably --
18 A.   That's all you can conclude.
19 Well probably is right.
20 Q.   Probably?
21 A.   That's probably.  Because I know
22 how businesses work.  I have a 40-year
23 career and I know how much data gets put
24 out by investors and by companies and by
25 funds and by investment funds and how

Page 171

JAY ALIX

1  this world works.  I'm a CPA.  I've got
2  a lot of financial experience.  I've
3  raised investment funds, I've managed
4  investments and I have my own
5  investments.  I know how the world
6  works.
7      This is not some secret thing
8  where somebody says here is all my money
9  and don't tell me what it's about.
10 That's not how it works.
11 Q.   You have no idea whether what's
12 being discussed with the investment
13 advisors is at the level of, here is an
14 investment strategy, passive US
15 equities, or whether it's third-party
16 managers or whether it's the underlying
17 investments bought by the third-party
18 managers; you've never been in one of
19 these meetings, right?
20 A.   Not with MIO, no.  I've never
21 been in an MIO meeting.
22 Q.   You've never talked to anyone at
23 McKinsey about what they discussed with
24 their MIO advisors, right?

Page 172

JAY ALIX

1  A.   Not anyone currently at McKinsey,
2  no.  But I've talked to alumni about it.
3  Q.   And you've never gone to the --
4  you say you've looked at the website for
5  MIO.  You don't have access, maybe
6  you'll tell me you have gained access to
7  MIO's website that's available to their,
8  their -- the McKinsey consultants who
9  invest with MIO?
10 A.   I'll leave the hacking to
11 McKinsey, thank you.
12 Q.   So the answer is no?
13     MR. O'SHEA:  Can we have the
14 break?  We've been waiting.
15     MS. CHUNG:  We're waiting because
16 your client is talking.
17     MR. O'SHEA:  Let's not get into
18 that.  You ask questions and he
19 answers them as fully and completely
20 as he can.
21 Q.   Let me get an answer to this last
22 question.  Now that you interrupted me I
23 need to look back at what it was.  So
24 the answer is, no, you've never been in

Page 173

JAY ALIX

1  to see what information is available to
2  McKinsey consultants, employees,
3  partners who invest their assets through
4  MIO?
5  A.   That's correct.  I'm using my
6  business judgment, my experience in 40
7  years of business to know how to form my
8  answer.
9      MS. CHUNG:  Okay.
10     MR. O'SHEA:  Thanks.
11     THE VIDEOGRAPHER:  Time is 11:30
12 a.m., we're off the record.
13     (A recess was had.)
14     THE VIDEOGRAPHER:  Time is 11:43
15 a.m., we are on the record.
16 Q.   So, Mr. Alix, if I have it right,
17 before the break when you were saying
18 what the sources were for the MIO
19 connections that you've listed in
20 paragraph 166.
21 A.   That's exhibit --
22 Q.   One.
23 A.   One.  166?
24 Q.   Mm-hmm.

JAY ALIX

1
2    A.   Yes.  What's the question?
3    Q.   So when you had the type of
4    connection and the type of connection is
5    MIO related, so in that first column --
6    in the last column MIO fund advisor, MIO
7    investments, the source of your saying
8    that that's the type of connection is a
9    public source, it's either the form
10    5500s or the ADVs or in some instances,
11    as you were putting it, filings in the
12    ANR case?
13    A.   Yes, they would be public
14    sources, that's right.
15    Q.   All right.  And you mentioned
16    before the break that there -- you have
17    spoken to alumni of McKinsey about MIO.
18    What information have you gotten about
19    MIO from McKinsey alumni?
20    A.   I learned from alumni that they
21    can leave their money with McKinsey, or
22    invest their money with McKinsey with
23    the MIO and that they are -- they have
24    financial products and investments
25    available to them that have excellent

JAY ALIX

1
2    returns and excellent results, and that
3    McKinsey's MIO has been profitable 24,
4    last 25 years and that they're very
5    happy to have that type of investment
6    return and track record.  And then that
7    led into -- I'm not trying to -- trying
8    to cut myself off here.  That led into a
9    lot of other discussions about McKinsey,
10    about alumni and about MIO.  But that's
11    the answer to the MIO part.
12    Q.   And are the McKinsey alumni that
13    you spoke to either current or former
14    members of AlixPartners?
15    A.   I think today of our 2,000
16    employees, AlixPartners has about 125 to
17    150 people who have worked at McKinsey
18    at some time in their career.  Most of
19    them did not come from McKinsey to
20    AlixPartners.
21    Q.   The question is just were any of
22    the people that you spoke to about MIO,
23    who were McKinsey alumni, also current
24    or former members of AlixPartners?  It's
25    a yes or no question.

JAY ALIX

1
2    A.   Some were current -- some are
3    current board members, some are former
4    board members, some are current
5    employees and some are former employees.
6    Q.   And when you say current board
7    members or former board members, you
8    mean of which entity?
9    A.   Of AlixPartners.
10    Q.   Okay.  All right.  And did any of
11    those people allow you access to their
12    MIO website where they can -- they get
13    information about MIO and that would
14    show what the information is that they
15    get about their MIO investments?
16    A.   About their private website?
17    I've seen the public website of MIO,
18    I've never seen the private website of
19    MIO.
20    Q.   So there are MIO connections
21    listed in this chart of the 205 in
22    addition to the client connections, and
23    I'll represent to you that there are
24    about maybe over 60 here who are listed
25    as, that are listed as MIO connections,

JAY ALIX

1
2    either as investments, fund prime
3    brokers, fund custodians.
4        From your objection you think it's
5    appropriate to list these as MIO
6    connections, as concealed connections
7    because in your view RTS is not separate
8    from MIO, right?
9    A.   My view is that McKinsey is a one
10    firm-firm, it's one firm and it includes
11    RTS, it includes MIO and includes all
12    the McKinsey affiliates, all affiliates,
13    because MIO is a wholly-owned 100
14    percent controlled subsidiary of
15    McKinsey as is RTS, under common
16    control, with common board members and
17    common activities.
18        So the answer is, I think that all
19    of McKinsey & Co.'s connections need to
20    be disclosed under Rule 2014.
21    Q.   Okay.  So can we look at 84,
22    paragraph 84 of your objection.
23    A.   Which page is that?
24    Q.   Page 29?
25    A.   29?

JAY ALIX

1
2 Q.   29.
3 A.   Right.
4 Q.   Paragraph 84 says "Because MIO
5 and McKinsey RTS are not separate, every
6 MIO connection to the debtors and to the
7 debtor's creditors, customers,
8 competitors or suppliers means that
9 McKinsey, its partners and its employees
10 hold an interest that is adverse to the
11 estate that is disqualifying under 11
12 USC Section 327."
13    See where I've read that from?
14 A.   Yes.
15 Q.   So the logic here is, your
16 contention is McKinsey and RTS are not
17 separate and that as a result every MIO
18 connection must be disclosed, and more
19 than that, that every MIO connection is
20 disqualifying, right?
21 A.   That's right, that's what it
22 says, yes.
23 Q.   Okay.  So your claim that MIO has
24 no -- let's look at paragraph 12 for a
25 second.

JAY ALIX

1
2 A.   That's on page?
3 Q.   7.
4 A.   Paragraph 12, yes.
5 Q.   So the second bullet -- the first
6 bullet is what you just said, McKinsey
7 is one firm.  That's your view, right?
8 A.   Mm-hmm.
9 Q.   And then it says, "Neither
10 McKinsey RTS nor MIO has any identity or
11 existence separate from McKinsey."
12    Have I read that properly?
13 A.   That's what it says.
14 Q.   Okay.  That's your view, you
15 support that view, you agree with it?
16 A.   Yes.
17 Q.   So you acknowledge that MIO is
18 its own corporate affiliate, right, you
19 identify it as a wholly-owned indirect
20 subsidiary?
21 A.   It's a wholly-owned subsidiary of
22 McKinsey & Company.
23 Q.   But it has a corporate identity
24 just like Mar-Bow has a corporate
25 identity, right?

JAY ALIX

1
2 A.   I haven't looked at its
3 incorporation papers so I don't really
4 know the corporate form of its entity or
5 its corporate governance directly.  I
6 know it's presented as being a
7 corporation and a hundred percent owned
8 by McKinsey & Company.
9 Q.   So if you look at paragraph 17 of
10 your objection, just on the facing page,
11 on page 8 it says "Another subsidiary is
12 MIO Partners Inc., (MIO) it is also
13 wholly-owned subsidiary of McKinsey &
14 Company Inc.," right?
15 A.   I just said that, yes.
16 Q.   And you agree with that?
17 A.   I agree with that.
18 Q.   And you also state in your
19 objection that MIO has its own
20 employees, more than 150 of them,
21 correct?
22 A.   Correct.  Well, show me where I
23 said that.
24 Q.   32, paragraph 32 on page 12.
25 Sorry, paragraph 35.

JAY ALIX

1
2 A.   MIO employs more than 150
3 personnel.  That's what it says, employs
4 more than 150 personnel.
5 Q.   And that's information you got
6 from public filings that RTS made,
7 right?
8 A.   Public filings, public
9 statements, yes.
10 Q.   Part of the public statement that
11 you don't quote here is that MIO has --
12 employs its own people,  that MIO staff
13 do not work for any other part of
14 McKinsey?
15 A.   I'm sorry, what's the question?
16 Q.   Do you remember that another part
17 of this -- of the declaration from which
18 you drew this statement about MIO having
19 more than 150 personnel, was that those
20 personnel work only for MIO, not for any
21 other part of McKinsey?
22    MR. O'SHEA:  What declaration are
23 we talking about?
24    MS. CHUNG:  I'm asking about the
25 same declaration that this

JAY ALIX

1
2 representation came from.
3   A.   I don't recall anything more than
4 this statement.
5   Q.   Okay.  So -- and you concede the
6 whole reason we're here, MIO's
7 operations are investing, not
8 consulting, right?
9   A.   I'm not conceding -- what's your
10 question?
11   Q.   MIO's activities are managing
12 pension plans and investment plans, not
13 giving consulting services, right?
14   A.   Based on publicly available
15 information, that's what's been
16 presented to the public and that's what
17 I'm relying on.  It's been presented
18 that way to me by McKinsey.  That's how
19 McKinsey presents it.
20   Q.   Right.  And you're not including
21 in your objection here any information
22 other than that?  You don't have
23 information from some other source that
24 MIO engages in anything other than
25 managing pension plans and investment

JAY ALIX

1
2 funds, right?
3   A.   No, I do.  I do.
4   Q.   Are you maintaining that MIO
5 engages in consulting, providing
6 consulting services?
7   A.   I think MIO has a part of its
8 business which is more than straight
9 investing and less than consulting.  So
10 it's not -- there's a -- there's a, you
11 know, here's straight consulting, here's
12 straight investing and then there's
13 stuff in the middle and I think the
14 stuff in the middle is going on based on
15 publicly available information in the
16 disclosures which makes it a bleeding
17 together, a blending of these two kinds
18 of activities.
19   Q.   And this thing that's going on in
20 the middle, what is that stuff?
21   A.   It would fall into the category
22 of direct investing and distressed
23 investing and operating in and around
24 troubled companies which the MIO admits
25 on its website that it does, or excuse

JAY ALIX

1
2 me its SEC document that it does.
3     So when you characterize it as
4 pension investing which sounds like,
5 sounds like it could be characterized as
6 passive, inactive kind of investing,
7 there is certainly that kind of
8 investing going on in MIO from what I
9 can tell and what I've read.  But I've
10 also been able to see and read that
11 there's a whole another kind of what I
12 call active investing, hands-on
13 investing, and kind of what we normally
14 call in the investment world merchant
15 banking activity which is very much a
16 hands-on information-based,
17 experience-based and capital-based
18 investment activity and the MIO is
19 clearly and fully engaged in that.
20   Q.   This SEC document you keep
21 referring, to you think that that SEC
22 document says that MIO engages directly
23 in distressed debt investing?
24   A.   I can get it.  It's in the -- I
25 think we've got it in the files.  I mean

JAY ALIX

1
2 let's read it.  I know that they -- I
3 know that they invest, engaged directly
4 in distressed debt investing.  I know
5 that.  That's something I know.
6   Q.   I know that they invest, engage
7 directly in distressed debt investing.
8 You mean that MIO directly engaged in
9 that?  That's what you think the SEC
10 document says?
11     MR. O'SHEA:  Objection, misstates
12 the testimony.
13   A.   The SEC document that I referred
14 to that I saw has a generalized
15 statement describing the kinds of
16 distressed investing, distressed
17 securities that MIO is invested in, and
18 it talks about distressed investing, and
19 I believe it said including direct
20 investing and I believe it said
21 including short positions.  It didn't,
22 it didn't list and specify how it did it
23 in every situation, how it did it in
24 every investment and there are so many
25 ways and formulas and flavors to

JAY ALIX

1  distressed investing and the statement
2  was broad enough to cover the whole
3  landscape. So I'm relying on McKinsey's
4  own presentation that it invests heavily
5  and regularly in the distressed debt
6  space and distressed company space.
7      Q.   What do you mean by heavily and
8  regularly?
9      A.   Well if somebody takes the time
10 to disclose it to the SEC and offer
11 products like that to their employees,
12 then that's regularly. And if -- you
13 wouldn't disclose something unless it
14 was significant or material. So heavily
15 means it's material. It's a material
16 activity of the enterprise, enough that
17 it has to be disclosed to the SEC.
18     Q.   Okay. So far everything you've
19 described about MIO, even according to
20 your belief of this middle stuff is all
21 investment activity, right?
22     A.   No. I'm saying there's
23 investment activity, there's consulting
24 activity, and there's what I call

JAY ALIX

1  merchant banking activity and there's a
2  certain amount of merchant banking
3  activity going on in here which is
4  different than just straight investing,
5  passive investing or straight consulting
6  with no capital. This is services using
7  expertise, this is capital being
8  employed just for capital with no real
9  hands-on activity or control, and then
10 there's this middle ground called
11 merchant banking activity which the MIO
12 and McKinsey are engaged in.
13     Q.   You've never been to MIO, right?
14     A.   What do you mean I've never been
15 to MIO, what does that mean?
16     Q.   Do you know that there's an
17 office that is an MIO office?
18     A.   Oh, no I've never been to their
19 offices, no.
20     Q.   Are you aware that MIO has a
21 separate office from the rest of
22 McKinsey?
23     A.   I'm told that but I don't know
24 what that means. I don't know if MIO

JAY ALIX

1  has one office and no one is anywhere
2  else, if they have offices around the
3  world, if they share office space with
4  McKinsey in other parts of the world, if
5  they invest in other parts of the world
6  through McKinsey offices. So I think
7  the statement that they have one office
8  and it's not part of McKinsey would be
9  questionable because McKinsey is a one
10 firm-firm, it has people share offices,
11 share space, share activities and share
12 personnel.
13     Q.   Until I asked you a question,
14 until two minutes ago you had no idea
15 whether MIO had a separate office or had
16 offices with the rest of McKinsey; isn't
17 that correct?
18     A.   I think what I was saying was --
19 I'm answering the question I think you
20 just asked me. I answered that question
21 I thought you asked me. I'll answer the
22 questions you want to give me. But MIO,
23 I know there's an office for MIO in New
24 York City. I've seen that on the

JAY ALIX

1  website. The question is, how many
2  other offices does MIO operate out of?
3  How many other places does it work and
4  how many of those are McKinsey offices
5  around the world?
6      If McKinsey is investing in Latin
7  America and the MIO is being run out of
8  the McKinsey office in Latin America or
9  in, you know, South America or in
10 Europe, then MIO doesn't have separate
11 offices, it has offices with McKinsey &
12 Company and I suspect from what I've
13 been told from alumni that that's the
14 case.
15     Q.   Okay, but you say if McKinsey is
16 investing in Latin America, you have
17 zero idea whether even that condition is
18 satisfied?
19     A.   No, that's not true. I saw that
20 McKinsey actually was invested in
21 BlackRock's --
22     Q.   You're going to tell me that
23 McKinsey --
24     MR. O'SHEA: Whoa, whoa, let him

JAY ALIX

1
2    finish the answer, please.
3       A.   I saw that McKinsey is invested
4    in a BlackRock, I think it's a BlackRock
5    South American fund.  And in fact the
6    BlackRock South American fund ended up
7    buying stock in Contura before the
8    bankruptcy case of ANR and Contura was
9    completed.  And in doing that it meant
10   that BlackRock, McKinsey's client and
11   McKinsey's invest -- who invests
12   hundreds of millions or billions of
13   McKinsey's money shows up as an early
14   shareholder in Contura while the company
15   is still in bankruptcy and the plan
16   hasn't been consummated.  And that could
17   only happen if somebody brought
18   BlackRock into the ANR bankruptcy case
19   and into the position of getting early
20   issue stock of Contura which doesn't
21   make any sense if you think about a plan
22   of reorganization and how it gets done.
23   It also raises the issue of how
24   BlackRock and the McKinsey connection
25   get into that position.  It also raises

JAY ALIX

1
2    the question why Mr. Carmody didn't
3    disclose that in confirmation which
4    happened after that transaction.  And it
5    also raises the question why it wasn't
6    disclosed at all that a McKinsey
7    investment vehicle has an interest in
8    the debtors -- in the stock of the
9    debtor company which is going to get the
10   debtors' best assets before the
11   reorganization is completed.
12      That to me is concern.  But the
13   other concern was, how is it that a
14   South America investment fund is
15   invested in an Appalachian coal company?
16      So I do know that McKinsey, MIO
17   invests in South America activities
18   because there's a fund targeted at South
19   America.  And I do know that McKinsey as
20   a $25 billion investment fund is not
21   just investing domestically within the
22   borders of the United States, they're
23   investing globally which means the MIO
24   activities have to occur globally and
25   they have to be people with investment

JAY ALIX

1
2    activity globally.
3       So I don't know if all the offices
4    all around the world of the MIO are
5    separate from McKinsey or they're in
6    shared space or they share cubicles or
7    it's a hoteling office.  But generally
8    big companies that are one firm-firms
9    like McKinsey try and consolidate office
10   space wherever they can, often with
11   hoteling situations.  And I believe
12   that's a real possibility here.  Have I
13   gone and checked it, no?  I have looked
14   at the offices?  No.  But that's how the
15   world works.
16      Q.   Okay.  And the allegations that
17   you just said about somebody owning
18   something in BlackRock, I think you mean
19   Latin America, those are the allegations
20   that are at paragraphs 379 and 378 of
21   this same objection, right?
22      A.   Are we on 379?  I'll check that.
23   I've read that section.
24      Q.   Okay.  And that's what you were
25   just talking about and what those

JAY ALIX

1
2    paragraphs talk about, it's intended to
3    be the same thing, right?
4       A.   I didn't intend it to be the same
5    thing.  I was describing from recall
6    some of the aspects of it.  There are
7    more details about this situation that I
8    know about that are not all described
9    here.  This is -- these are the -- these
10   are the highlights of that situation
11   that I was describing.
12      Q.   Okay.  And the highlights include
13   that, as you put it in the objection
14   itself, it is unclear how BlackRock
15   Latin America Investment Trust obtained
16   this valuable original issue stock or
17   how it became the first or among the
18   first to obtain this position.  It is
19   also unclear whether BlackRock's good
20   fortune in acquiring the Contura stock
21   had anything to do with MIO's $600
22   million investment in BlackRock or
23   BlackRock's status of McKinsey, right,
24   that's what 379 says, right?
25      A.   I think you've read it correctly,

JAY ALIX

1
2  yes.
3      Q.    And the $600 million investment
4  in BlackRock that you're talking about
5  in that paragraph, the MIO investment,
6  is not in BlackRock Latin America Trust.
7  You say three paragraphs earlier that
8  it's in something called BlackRock
9  Russell 3000 nonlending fund and
10  BlackRock Tips, right, paragraph 375?
11     A.    I think the page speaks for
12  itself.
13     Q.    Okay, great.  So you do know from
14  reading the public information that MIO
15  uses third-party managers, that it
16  employs third-party managers?
17     A.    I've read that.
18     Q.    Okay.  And that in the cases
19  where MIO uses third-party managers, as
20  is usually the case with third-party
21  managers, they exercise their own
22  discretion in terms of investment
23  decisions?
24     A.    I would not agree with that as a
25  universal statement in this situation.

JAY ALIX

1
2      Q.    Do you remember reading some of
3  the same declarations that you are
4  quoting from and citing from in your
5  objection, that MIO employs third-party
6  managers who exercise their own
7  investment discretion?
8      A.    The declarations have said that,
9  but I have found the declarations to be
10  not credible and I've discounted many of
11  the representations in them because they
12  are conflicted and they are
13  contradictory.  The declarations are
14  contradictory to each other and they are
15  contradictory to prior statements made
16  by McKinsey.  So the declarations are
17  of, in my opinion, of suspect value.
18     Q.    What percentage of MIO's
19  investments are made through third-party
20  managers, do you have any idea?
21     A.    Well I think the answer is I
22  don't have the exact percentage to be
23  responsive.  But the MIO is a $25
24  billion assets under management fund,
25  AUM, assets under management.  And the

JAY ALIX

1
2  pension fund with the 5500s only cover
3  the pension fund portion of that.  So to
4  describe the MIO as just a pension fund
5  really minimizes and somewhat is a
6  little bit of a wordsmithing game.
7  Because what the MIO really is, is $25
8  billion of assets under management, and
9  about one third of those assets, a
10  minority portion, are in the pension
11  fund.  Two third of those assets are
12  unrestricted and free to go anywhere
13  they want, not controlled by ERISA or
14  the Department of Labor regulations.
15     So what we don't have any insight
16  into and what this paragraph is saying,
17  I think, in the -- in one part of it
18  here in paragraph 376, it says that we
19  have insight into the 5500s which
20  clearly show that BlackRock has hundreds
21  of millions of dollars of McKinsey money
22  that its working with McKinsey.  We also
23  know that BlackRock is a client of
24  McKinsey and we still have a big dark
25  hole, a big black hole here of

JAY ALIX

1
2  information about what the other $17
3  billion of money is doing.  And it's a
4  more than fair statement to conclude, or
5  fair statement to say that if BlackRock
6  is a good investment vehicle for the
7  pension fund where they have a very high
8  fiduciary standard for hundreds of
9  millions of dollars, then there is
10  likely other BlackRock investment funds
11  inside the $17 billion.
12     So this is only raising a
13  question.  It doesn't come to a
14  conclusion, it raises the question which
15  is why full disclosure is so important.
16  So we don't have to ask these questions.
17  And it's not my burden to answer all
18  these questions or have the information
19  or to go inside McKinsey and figure it
20  out.
21     It's McKinsey's burden to
22  establish the answers to all these
23  questions.  But there's enough
24  information here that says these are
25  questions that need to be answered.

JAY ALIX

1  They need to be answered.
2  Q.   Do you understand that it's your
3  obligation and the obligation of your
4  team of professionals to have a
5  good-faith basis to make allegations in
6  a court pleading?
7  A.   My team of professionals and I
8  have more than a good-faith basis for
9  what we have filed here.  The facts in
10  paragraph 374 to 381 are all based on
11  information which McKinsey has supplied
12  under the penalty of perjury in other
13  bankruptcy cases, to the SEC, and to the
14  Department of Labor in their own forms.
15  It's publicly available.  We've
16  read it.  We've explained it.  We've
17  expressed where we have uncertainty.
18  379 says it is unclear, or it says how
19  can this name fit that.
20  It's very simple.  It's unclear.
21  But McKinsey has an obligation under the
22  law to disclose all this and it's not.
23  And what I've identified here in
24  this section 4 is that a McKinsey client

JAY ALIX

1  and a McKinsey investment fund
2  enterprise and a huge target of all
3  their investment dollars, has somewhat
4  of an insider position inside an ongoing
5  bankruptcy case which is not explained
6  anywhere but has been reported by
7  another public entity called Standard &
8  Poor's.
9  So not only is that a reasonable
10  basis for what we put in this claim,
11  that alone is probably reason enough
12  that McKinsey was not qualified to serve
13  this debtor and it was never disclosed
14  by McKinsey at any time ever until I
15  revealed it in this pleading.
16  Q.   Mr. Alix, you don't have any
17  information that McKinsey MIO was ever
18  invested in BlackRock Latin America,
19  none?
20  MR. O'SHEA:  Is that a question?
21  MS. CHUNG:  It's a question.
22  MR. O'SHEA:  Really?  I move to
23  strike.  It's argumentative and I
24  don't think it's a question.

JAY ALIX

1  Q.   Let me ask it a different way.
2  You don't have any information that
3  McKinsey MIO was ever invested in
4  BlackRock Latin America, do you?
5  A.   I have information that says
6  McKinsey has invested a lot of money
7  with BlackRock and BlackRock has an
8  unexplained position as debtor which
9  McKinsey never disclosed their
10  connection to BlackRock.
11  Q.   How many BlackRock --
12  A.   That raises the question for me
13  to have a reasonable basis to put it in
14  this pleading as to a question that
15  needs to be answered.
16  Q.   How many BlackRock funds are
17  there?
18  A.   Dozens.  BlackRock has trillions
19  of dollars under management.
20  Q.   So let's go back to the question
21  I originally asked you.  You don't have
22  any idea what percentage of MIO's
23  investments are made through third-party
24  managers.  You just said there's a

JAY ALIX

1  two-third chunk of the investment plans
2  where you have no idea because 5500s
3  don't apply there?
4  A.   I don't have a calculation of
5  what percentage.  In large investment
6  funds you have asset allocations.  We
7  have $25 billion of assets under
8  management.  And there would be an asset
9  allocation process to allocate how much
10  is going to go to alternative
11  investments, how much would go to fixed
12  income, how much would go to equities,
13  how much would go to distressed, how
14  much would go to proprietary trading,
15  how much would go to merchant banking
16  activities, how much goes into real
17  estate, how much goes into natural
18  resources, how much goes into coal
19  mines, how much goes into other client
20  companies.
21  I don't have that analysis.  But I
22  know from significant long experience
23  that when you have $25 billion of money,
24  you have many, many pockets to invest

JAY ALIX

1
2  money through.  And I do not have the
3  transparency from the disclosures
4  McKinsey has made to make sure that that
5  BlackRock investment is not in any way
6  connected to McKinsey.  And because it
7  wasn't disclosed, it raises the
8  question, it raises the valid question
9  as to how did it get there and is it
10  connected to McKinsey?
11      And McKinsey, as a good fiduciary
12  in a federal bankruptcy case, would have
13  wanted to bring that forward voluntarily
14  and say, your Honor, just want you to
15  know that BlackRock who we invest a lot
16  of money with turns out owns part of
17  this company that the debtor has just
18  formed to come out of bankruptcy.  By
19  the way, we were involved in forming the
20  company because we were the advisor to
21  the debtor.  And on top of that, this is
22  a transaction which could connect to us
23  or could appear to, but we want to
24  assure the court it doesn't connect to
25  us.

JAY ALIX

1
2      That's all they would have to do
3  and that's what a good fiduciary in a
4  bankruptcy would do.  They would want to
5  eliminate the need for a party to ask
6  the question.
7      And so if I'm a party in ANR with
8  standing which I am and I'm also a
9  concerned bankruptcy professional who
10  wants to help protect the bankruptcy
11  system that I've lived in for 40 years,
12  that question needs to be asked and
13  answered in good faith by McKinsey, not
14  proven by me.
15  Q.   You don't know whether BlackRock
16  was disclosed in the ANR case because
17  you weren't part of the in camera
18  procedure, right?
19  A.   This investment wasn't disclosed
20  in the ANR case.
21  Q.   Well this investment, you haven't
22  proved there is any this investment.
23  I'm asking you a different question.
24  A.   This investment --
25  Q.   Was BlackRock disclosed in camera

JAY ALIX

1
2  in the ANR proceeding, do you know one
3  way or the other?
4  A.   I don't know.
5      MR. O'SHEA:  I would ask --
6  excuse me.  I would ask that you not
7  step on the witness's answers,
8  please.
9      MS. CHUNG:  I will also lower my
10  voice.
11      MR. O'SHEA:  I appreciate that.
12  Q.   I'm just asking you, Mr. Alix,
13  you weren't a part of in camera
14  procedure in ANR and therefore, you
15  can't say that McKinsey RTS failed to
16  disclose BlackRock to the court in the
17  ANR proceeding?
18  A.   I was not in the in camera
19  proceedings.  I was blocked from the in
20  camera disclosures.  McKinsey supposedly
21  disclosed connections later at the
22  requirement of the US Trustee.  And in
23  none of the disclosures was anything
24  explained about the BlackRock connection
25  in this detail.

JAY ALIX

1
2  Q.   Can you answer my question?
3  A.   I think I did.  I said I wasn't
4  in the --
5  Q.   No, the question is --
6  A.   I said I wasn't in the in camera
7  proceeding.
8  Q.   And therefore, second part of it
9  was, and therefore, you can't know, you
10  don't know whether McKinsey RTS
11  disclosed BlackRock to Judge Huennekens
12  in the Eastern District of Virginia?
13  A.   I do not know what they disclosed
14  to Judge Huennekens in camera.  I do
15  know that the US Trustee said a month
16  ago that information that was disclosed
17  in camera had been held back, was not
18  disclosed and the US Trustee wants the
19  ANR case back opened for fraud on the
20  court and they want McKinsey's fees
21  disgorged because the US Trustee feels,
22  independent of me, that after a two-year
23  investigation, they were misled and the
24  court was misled in those in camera
25  disclosures.

Page 206

```
 1          JAY ALIX
 2      Therefore, I don't know.  But I do
 3  have a valid basis for raising this
 4  question because I believe that
 5  McKinsey, based on the US Trustee's
 6  filed statement, withheld important
 7  information from Judge Huennekens in
 8  those in camera discussions.  And I
 9  objected to them being in camera because
10  I thought that was wrong.  I thought the
11  information should be on the public
12  record.  And I thought as the moving
13  party I had the right to see the
14  information.
15      Judge Huennekens gave McKinsey an
16  accommodation when he did that.  And in
17  return, and in thanking him for his
18  accommodation, they deceived him, they
19  lied to him and they burned him.
20      And so I just want to make sure
21  that in this situation that doesn't
22  happen again.
23  Q.   You think that a federal judge
24  gave an accommodation to McKinsey RTS?
25  A.   McKinsey asked and pleaded with
```

Page 207

```
 1          JAY ALIX
 2  the judge to have these disclosures done
 3  in camera.  They did not want them on
 4  the public record.  Normally all
 5  professionals disclosures under Rule
 6  2014 are done in the public record and
 7  filed with the court in the public
 8  record.  The fact that Judge Huennekens
 9  allowed that at McKinsey's request was
10  in a sense granting their request.  It
11  wasn't his idea.  It wasn't the US
12  Trustee's idea.
13      In fact the US Trustee filed a
14  pleading in August saying they wanted it
15  all in the public record and they don't
16  want it in camera.
17      So therefore I think that Judge
18  Huennekens granted their request
19  probably in an act of good faith to
20  trust and believe McKinsey.  And I
21  believe that McKinsey has abused his
22  trust and his good faith because of what
23  the US Trustee has now filed and
24  reported in the case.
25      MS. CHUNG:  I'm going to object
```

Page 208

```
 1          JAY ALIX
 2  and move to strike everything in the
 3  prior answer after I do not know what
 4  they disclosed to Judge Huennekens in
 5  camera.
 6  Q.   And also as to your statement
 7  that the trustee felt independently of
 8  you that they were misled, Mar-Bow made
 9  submissions to the US Trustee, right,
10  those are the exact letters and emails
11  from October 2018 that were attached by
12  Hector Duran in this case to his last
13  filing to the court?
14  A.   I don't understand the question.
15  Q.   The question is, the things that
16  were attached to Hector Duran's last
17  filing in this court, the letters and
18  email from Mar-Bow from October of 2018,
19  those were indeed sent by Mar-Bow to the
20  US Trustee; is that correct?
21  A.   I did not see the attachments to
22  Mr. Duran's filing so I don't know what
23  you're referring to.
24  Q.   Do you know that Mar-Bow made
25  letter submissions to the US Trustee in
```

Page 209

```
 1          JAY ALIX
 2  connection with the ANR case in October
 3  of 2018?
 4  A.   I do, I'm aware of that.
 5  Q.   And do you know that they went to
 6  meet with the US Trustee in Washington
 7  in October of 2018?
 8  A.   Who they?
 9  Q.   Anyone on your team?
10  A.   You said do you know that.  You
11  are assuming -- are you stating they did
12  or are you asking me if they did?
13  Q.   I'm asking you whether you know
14  whether anyone on your team went to see
15  the US Trustee in October of 2018?
16  A.   I don't believe that anybody went
17  to see the US Trustee in October of
18  2018.
19  Q.   Did you review the letters and
20  the emails before they went to the US
21  Trustee?
22  A.   Yes.
23  Q.   And did you approve and support
24  everything that's in those emails and
25  the letter?
```

JAY ALIX

1
2   A.   Yes.
3   Q.   Including the, the expression
4   that if the US Trustee did not fix its
5   own house then Congress would intervene?
6   Did you approve and support that
7   statement?
8        MR. O'SHEA:  Objection.  You want
9   to show him that statement that
10  you're quoting and representing is
11  from the letter?
12       MS. CHUNG:  You can do that in
13  your exam.  I'll take the answer to
14  my question.
15       MR. O'SHEA:  Well then I object
16  because you're asking him to guess
17  about something you're not showing
18  him a document.  So I object.  You
19  can try to answer the question if you
20  can.
21  A.   I'd like to read the document
22  because I think it's out of context and
23  I think the answer needs to be put in
24  the context of the letter.
25  Q.   Let me make it more general.  Do

JAY ALIX

1
2   you remember that those letters made a
3   reference to Congress fixing the house
4   of the US Trustee if the US Trustee did
5   not fix its own house?
6   A.   I don't think I would
7   characterize it that way and I don't
8   think that's what was -- I don't think
9   that was the intention of the statement
10  as you're -- as you're characterizing
11  it.
12  Q.   Had anybody, either yourself or
13  any representative of yourself been to
14  representatives of Congress before this
15  letter was written to the US Trustee?
16  A.   I have not met with any
17  representatives of Congress.
18  Q.   What about people that you've
19  hired?
20  A.   People I have hired have met with
21  representatives of Congress.
22  Q.   And does that include Andy Biggs
23  who also is referenced in letters to the
24  trustee?
25  A.   I believe that representatives on

JAY ALIX

1
2   my behalf have met with Congressman
3   Biggs or his staff, I'm not sure which,
4   in the past.
5   Q.   Did any of those visits predate
6   October of 2018?
7   A.   There were visits with members of
8   Congress, with the house judiciary
9   committee and the members of the senate
10  judiciary committee as well as their
11  staffers starting some time in 2018,
12  probably in the -- probably -- probably
13  in the first half of '18, like in the
14  springtime, maybe in the summer.  I'm
15  not sure when exactly.  Those meetings
16  on my behalf would have been conducted
17  by attorney Daniel Lemisch who is here
18  today, former acting U.S. Attorney in
19  Detroit, and he was assisted in those
20  meetings by two lobbying firms, one
21  called Cornerstone and one called Cogent
22  Partners, I think.
23       And Mr. Lemisch, along with those
24  firms, have met with and discussed full
25  disclosure transparency and compliance

JAY ALIX

1
2   with the intention of Rule 2014 of the
3   bankruptcy code with members of the
4   house judiciary committee and the senate
5   judiciary committee on both the
6   republican side of the aisle and the
7   democratic side of the aisle to try to
8   bring about more transparency to this
9   problem, that it's going on and it needs
10  to be corrected.
11  Q.   So you reported to members of the
12  judiciary committees, as you've
13  described it, what you believe to be
14  McKinsey's misconduct in filing Rule
15  2014 declarations?
16  A.   People working for me have done
17  that.
18  Q.   And did they characterize
19  McKinsey's conduct as unlawful
20  concealment of connections, as your
21  objection does here?
22  A.   I wasn't in the meeting so I
23  don't know exactly what they said.  But
24  I'm sure they were presenting our view
25  that these disclosure documents, 41

JAY ALIX

1  
2  disclosures -- well at the time probably
3  30 -- 39 disclosure declarations filed
4  by McKinsey were not compliant with Rule
5  2014 of the bankruptcy code and that it
6  was very concerning because it happened
7  across 13 bankruptcy cases involving,
8  you know, six courts and ten judges who
9  were being, in my opinion, misled by
10  McKinsey's disclosure process.
11     Q.   And did you --
12     A.   And I thought since the house
13  judiciary committee and the senate
14  judiciary committee are charged by
15  Congress to oversee the bankruptcy court
16  system and the federal court system,
17  that I believed that this was an offense
18  against the system.  I believed that
19  this was in some ways an attack on the
20  system.
21        And so I thought that the people
22  who oversee the system and regulate the
23  system needed to be aware of it and
24  needed to take appropriate action to
25  correct it.  And that was the purpose

JAY ALIX

1  
2  and the intention in making sure that
3  full disclosure and transparency in the
4  bankruptcy court system is maintained
5  and that this type of practice, which I
6  think is insidious, needs to be
7  corrected and asking the House and the
8  senate committees to look into it and to
9  make sure that they protect the federal
10  court system and protect the rule of
11  law.
12     Q.   And did you present these members
13  of Congress the results of analysis from
14  this database that you've described?
15     A.   I don't know exactly what was
16  presented.  Mr. Lemisch could answer
17  those questions.
18     Q.   And you took the same view that
19  you're taking in this proceeding that
20  Rule 2014 requires disclosure of all
21  connections, even connections outside
22  lookback periods that were truthfully
23  disclosed in bankruptcy declarations?
24     A.   Can you say that question again
25  or rephrase it?

JAY ALIX

1  
2     Q.   When you or people who you hired
3  were going around to members of
4  Congress, were they saying that McKinsey
5  was failing to make disclosures, was
6  unlawfully concealing connections based
7  on your view that Rule 2014 requires
8  disclosures of all connections,
9  irrespective of lookback period?
10     A.   Well you said you or your people.
11  I was never there.  So let's get rid of
12  the you.  And then as far as what they
13  said or what they did, I wasn't there.
14  So I would recommend that you ask Mr.
15  Lemisch these questions.
16     Q.   Okay.  And do you know whether
17  they left any documents with
18  congressional staffers?
19     A.   I do not.
20     Q.   Did they discuss with the
21  congressional staffers the conduct of
22  the US Trustee or what they wanted --
23  anything they wanted the US Trustee to
24  do?
25     A.   I do not know.

JAY ALIX

1  
2     Q.   Okay.  And who has that
3  information?
4     A.   Mr. Lemisch.
5     Q.   All right.  Did you make
6  contributions to any of these members of
7  Congress that you either -- that you --
8  your representatives met with?
9     A.   I did.  I made political
10  contributions to members of the house
11  judiciary committee and the senate
12  judiciary committee within the election
13  laws as a citizen that I'm allowed to
14  do, and I made contributions to both
15  sides of the political spectrum with any
16  member who believes in protecting the
17  bankruptcy court system, full disclosure
18  and transparency in the bankruptcy
19  system.
20     Q.   And does that mean that you made
21  contributions to people -- did you make
22  contributions to each of the members of
23  Congress that you met with?
24     A.   I don't know sitting here --
25        MR. O'SHEA:  Objection, misstates

JAY ALIX

1
2    the testimony, but you can answer.
3        A.   I don't know sitting here today
4    who was met with, which staffers, which
5    members, and who got a donation.  I
6    don't know that.  Mr. Lemisch has that
7    information.
8        Q.   I guess what I'm asking is of the
9    members of Congress that your
10   representatives met with, were there
11   some that you gave contributions to and
12   others that you didn't based on your
13   view that they were supportive or not
14   supportive?
15       A.   I think there were people who
16   were met with that did not receive a
17   contribution and I think there were
18   people who were met with who also had
19   gotten a contribution.  And they met
20   with staff people and not the member and
21   some people met with multiple members.
22   I wasn't involved in the thought process
23   and in the planning of that.
24       Q.   The contributions --
25       A.   Those meetings were done with

JAY ALIX

1
2    people without my involvement in the
3    planning of those meetings or the
4    execution of those meetings.
5        Q.   Well presumably those meetings
6    happened with your authorization; is
7    that correct?
8        A.   Oh, no doubt about that.
9        Q.   Okay.
10       A.   I mean I own the activity, I'm
11   saying that.  But to answer your
12   specific questions, I wasn't in any
13   meeting, I didn't talk to any member and
14   I didn't talk to any staff person.
15       Q.   Did you give any direction to any
16   of the people who went out with --
17       A.   Excuse me one second.  I did talk
18   to one member, United States Senator
19   Debbie Stabenow, she's my senator from
20   Michigan and I have had a long
21   political, you know, citizen
22   relationship with her and donor to her
23   over the years.  And I did speak with
24   her and discussed these issues with her
25   on two occasions in the last four years.

JAY ALIX

1
2    But other than her, in the ordinary
3    course of my conversations with her,
4    I've not solicited or talked to or
5    discussed this with any other member.
6        Q.   Have you given directions to
7    people who have gone to meet with these
8    members of Congress?
9        A.   I've given Mr. Lemisch the
10   freedom to plan these meetings, to think
11   about the issues we're facing, to
12   discuss these issues that we're facing
13   and to ask him to bring about a full
14   transparency and awareness that there's
15   something going on in the bankruptcy
16   system and it needs to be corrected, and
17   if legislation is needed to fix the
18   problem then we would encourage that.
19   And if -- and if the people who oversee
20   the bankruptcy court system, the house
21   judiciary and senate judiciary committee
22   need to get involved to make sure that
23   the isn't compromised, the integrity of
24   the court and the integrity of the
25   system cannot be compromised.

JAY ALIX

1
2    And I saw this as a systemic
3    compromise of the system because of its
4    repetitive nature, the repeating
5    activity here and the fact that I
6    thought what was going on was improper
7    and lacked any basis in the law from
8    what I know.
9        Q.   And to be clear, because nowhere
10   in your last answer did you mention RTS,
11   you're talking about what you view to be
12   RTS's conduct; that was what you were
13   going to see Congress about, right?
14       A.   I was going to see Congress -- I
15   didn't go see Congress.  I asked my
16   associates to go see Congress, explain
17   the situation and ask them what they
18   would like to do about it, how could
19   they help with it and make them aware of
20   it, just make them aware of it.
21       Q.   But, Mr. Alix, the situation, all
22   of a sudden you're shy about talking
23   about McKinsey RTS?
24       A.   No, I --
25           MR. O'SHEA:  Objection,

JAY ALIX

1
2  argumentative.  Chris, confine your
3  comment to question and answer
4  please.
5      Q.   So let me ask you, I've asked you
6  twice now, what you sent your people to
7  talk about with members of Congress was
8  what you viewed to be RTS's misconduct,
9  right?
10     A.   I sent them to bring to the
11  attention of the members who oversee
12  this bankruptcy court system what I
13  believe to be an illegal ongoing scheme
14  inside the federal court system in the
15  bankruptcy courts being run by McKinsey
16  RTS and being overseen by Robert
17  Sternfels and Mr. John Garcia.  That's
18  what I think has happened here.  And I
19  think that McKinsey needs to correct
20  this problem.  And I have tried
21  valiantly to correct this problem.
22  McKinsey did not listen to me.
23      I approached McKinsey about it in
24  2014.  I spent 4 months meeting with
25  McKinsey's CEO, Mr. Dominick Barton.  I

JAY ALIX

1
2  brought all of this to his attention on
3  eleven occasions.  I brought him
4  documents.  I met with Robert Sternfels
5  who oversees RTS business.  Mr. Garcia
6  works for him.
7      I've seen emails to Kevin Sneader
8  who runs McKinsey today and I've even
9  sent an email eight months -- in
10  February, nine months ago, ten months
11  ago, to Mr. Gary Pincus who appeared in
12  court two weeks ago explaining this all
13  to him and asking him if he wanted to
14  try to find a way to get a resolution.
15      So I've tried to get a resolution
16  to this with Mr. Pincus who is in court
17  now on this, with Mr. Sneader who runs
18  McKinsey today, with Dominick Barton who
19  ran McKinsey for nine years, and with
20  Robert Sternfels who oversees the RTS
21  business and all this reports up to him.
22  And he's involved in these bankruptcy
23  cases because his name appears in the
24  timesheets of these Chapter 11
25  companies.

JAY ALIX

1
2      And with all those contacts, no
3  one at McKinsey has wanted to address
4  these issues, solve these problems or
5  stop them.
6      And so in a attempt to try to
7  figure out where to go next, I went from
8  Mr. Barton who I went to with no
9  lawyers, with no demands, with no
10  requirements, just comply with the law.
11     Mr. Barton told me these weren't
12  serious laws.  He told me McKinsey
13  didn't like these laws.  He also
14  admitted they were breaking the laws but
15  he didn't think they were serious.  Mr.
16  Sternfels told me they were not going to
17  comply with the laws, he wasn't going to
18  change anything.
19     Mr. Sneader who runs the firm
20  today never answered my email.  Mr.
21  Pincus who runs North America which this
22  all reports into because it happens in
23  North America, he never answered my
24  email.
25     So I went from talking to McKinsey

JAY ALIX

1
2  with no lawyers and with no requests
3  other than to comply with the law, to
4  becoming frustrated with that.
5      Once I got frustrated with that
6  and realized that they were not ever
7  going to listen to me about this law, I
8  said well if they're not going to listen
9  to me, okay, they don't want to trust
10  me, fine, I then brought in six outside
11  bankruptcy experts who I have no prior
12  relationship professionally with and I
13  asked them to independently review these
14  disclosures and then to report their
15  findings to the US Trustee.  And nothing
16  they would do would be influenced by me
17  and their compensation would not depend
18  on -- their findings -- their
19  compensation would not depend on their
20  findings.  They are all independent of
21  me.  I had no history with them.
22      And independently of each other
23  and me, they came to the same conclusion
24  that these violations are of historic
25  proportions; that they've never seen

Page 226

JAY ALIX

1  like this in the bankruptcy system; that
2  it is unprecedented.  And they are all
3  legal scholars so they know what
4  unprecedented means to use that word and
5  they concurred on that as a group.
6      That group's information was then
7  brought to the US Trustee.  The US
8  Trustee in Washington met with former
9  bankruptcy judge Steven Rhodes and
10  former bankruptcy judge Judy Fitzgerald
11  who presented the information along with
12  all the other expert opinions.
13      The US Trustee reviewed all that
14  independently.  The US Trustee's legal
15  staff reviewed it.  They spent quite a
16  bit of time.  They studied it, they
17  followed up with it.
18      And the US Trustee, on its own,
19  then moved to file two objections
20  against McKinsey, one a motion to compel
21  in the ANR case and the second one an
22  objection to McKinsey's appointment in
23  the Sun Edison case.
24      Within a few weeks after that the

Page 227

JAY ALIX

1  US Trustee withdrew his objection in
2  both cases and McKinsey filed --
3      Q.   Mr. Alix, do you remember what
4  the question was?
5      A.   Well you asked me how I got to
6  Congress.  I'm trying to give you the
7  background.
8      Q.   No, that was not the question.
9      A.   The judge asked me to establish
10  my reasonable basis for what I've done
11  here.  And I think the issue is how did
12  I get to Congress and what am I telling
13  them and why am I telling them that.
14      And I'm telling you that it
15  happened in phases, where I first
16  attempted to help McKinsey correct this
17  problem.  Then I asked the US Trustee to
18  help correct the problem.  Then I asked
19  Judge Huennekens to help correct the
20  problem and now I've asked the Southern
21  District of New York to help correct the
22  problem.  And I've asked -- I'm now
23  bringing it to the attention of Judge
24  Jones because the problem continues and

Page 228

JAY ALIX

1  its being brought to his court by
2  McKinsey, not once but twice.
3      Q.   So what do you mean you brought
4  this to the attention of the Southern
5  District of New York?
6      A.   I filed a RICO suit in the
7  Southern District of New York alleging
8  RICO activity and the predicate acts of
9  a RICO claim for what McKinsey has done
10  in the bankruptcy court system.
11      Q.   So far when you talk about the
12  illegal scheme to use your words, what
13  we've talked about is you have a view of
14  what Rule 2014 requires, and you also
15  know that McKinsey RTS disagrees with
16  you; that's part of why you're
17  frustrated, right?
18          MR. O'SHEA:  Objection, form.
19      You can answer.
20          MS. CHUNG:  I think I used
21      exactly the word he did.
22      Q.   You think, for example, we spent
23  a lot of time on it this morning --
24          MR. O'SHEA:  Do you want an

Page 229

JAY ALIX

1  answer to the last one or do you want
2  to just put another one over the last
3  one?
4      A.   What was the question?
5          MR. O'SHEA:  Well I'll try and
6  read it back.  So when you talk about
7  the illegal scheme, to use your
8  words, we've talked about, is you
9  have a view of what Rule 2014
10  requires, and you also know that
11  McKinsey RTS disagrees with you;
12  that's part of why you're frustrated,
13  right?
14      A.   I have a view of what the
15  bankruptcy code requires.  I have a view
16  of what the case law requires.  I have a
17  review of what decades of litigation on
18  these issues requires.  And McKinsey
19  disagrees with that view.  And it's that
20  view that I brought to the attention of
21  McKinsey's leaders and it's that view
22  that I brought to the attention of the
23  US Trustee and it's that view that I
24  brought to the attention of Judge

JAY ALIX

1
2 Huennekens and it's that view that I'm
3 bringing to the attention of judge
4 Jones.
5    Q.   Perfect.  So when you say in your
6 objection that McKinsey RTS unlawfully
7 concealed connections, concealment means
8 hiding something, right?
9    A.   We can check the definition.  But
10 generally if you're concealing you're
11 hiding, you're misleading, you're not
12 presenting, you're engaged in some kind
13 of a deception.
14    Q.   Okay.  But not presenting is
15 different from concealing, right?
16 You're a fraud, you're a fraud, you're a
17 certified fraud examiner?
18    A.   I am a certified fraud examiner
19 and you can parse those words any way
20 you want.  But as a certified fraud
21 examiner, I've been trained and
22 experienced for 40 years in looking for
23 the badges of fraud.  Because it's very
24 pardon to improve -- it's very hard to
25 prove intent in fraud.  It's very hard

JAY ALIX

1
2 to know what someone did when they did
3 it.
4       But all we can do in retrospect is
5 go back and see with the information we
6 have are the badges of fraud available
7 in the situation, the badges of
8 deception available in the situation?
9       Is the party who made the
10 representation in possession of the
11 knowledge they needed to comply with the
12 law or to comply with the rule, to
13 comply with the regulation?
14       And we investigate financial
15 frauds and financial transactions.  We
16 get to see whether or not with
17 hindsight, if they had enough
18 information to do it right.  And somehow
19 smart, intelligent, well-advised people
20 with good lawyers did it wrong.
21       That starts to look like badges of
22 deception, starts to look like badges of
23 fraud.  And I have based my analysis on
24 all my experience in investigating
25 frauds, all my experience in the

JAY ALIX

1
2 bankruptcy court system, understanding
3 what Rule 2014 requires, and being in
4 this position myself, along with all the
5 expert advisors I've had who have looked
6 at this, and it appears that McKinsey,
7 who well knows what Rule 2014 says and
8 well knows what all the case law is, has
9 somehow created a McKinsey exception to
10 these laws.
11       And that seems very odd to me and
12 it seems very suspect to me, as to how
13 they can keep intentionally doing that
14 when they've been called out by the US
15 Trustee six times, by Judge Huennekens
16 twice and by the bankruptcy code itself
17 and by all the case law and by me and
18 I'm sure by many of their attorneys.
19 Because I know those law firms are all
20 pretty credible people.  And I can't
21 imagine any of them would be advising
22 McKinsey to not comply with the law.
23    Q.   But --
24    A.   So therefore I suspect that the
25 badges of deception are everywhere here.

JAY ALIX

1
2    Q.   So you authorized the use of the
3 word fraud in this Mar-Bow objection?
4    A.   Oh, I did.  In my RICO complaint
5 I'm alleging crimes.  I've already
6 alleged crimes.  I'm on record thinking,
7 saying McKinsey has broken federal laws
8 in my RICO suit.  The RICO suit can only
9 award civil damages.  But, you know, I
10 am of the belief that McKinsey has
11 broken serious and important federal
12 laws under Title 18.
13    Q.   Based on your interpretation of
14 what the rule and the law requires?
15    A.   No, no, no, no, no. That would be
16 an oversimplification of how I got here.
17    Q.   You answered earlier you couldn't
18 name a single professional other than
19 ones you hired that agree with you that
20 Rule 2014 requires disclosures of all
21 connections no matter how far back?
22    A.   I don't think I said it that way.
23 All the professionals I hired are I
24 think -- I'm trying to not step into a
25 privilege problem here.  But, you know,

JAY ALIX

1  
2 I've consulted with, you know, I think
3 close to ten former US attorneys or
4 assistant US attorneys, I've consulted
5 with the former U.S. Attorney who
6 actually ran the prosecution of the most
7 famous case around this, the Gellene
8 case where John Gellene, a bankruptcy
9 attorney who didn't disclose one
10 connection in one bankruptcy case, went
11 to federal prison for a year and a half.
12      So one bankruptcy lawyer who
13 doesn't disclose one connection when
14 given a chance to correct it goes to
15 federal prison for a year and a half.
16 And I know for a fact that in these 14
17 bankruptcy cases McKinsey has withheld,
18 they have omitted at least 2,300
19 connections that they were obligated to
20 file and obligated to report.
21      And I know for a fact that they
22 have indirect financial investments in
23 at least three or four of these debtors
24 that I can see from their own public
25 documents.  I have more than a

JAY ALIX

1  
2 reasonable basis to conclude that
3 there's something very wrong with these
4 disclosures and with this activity that
5 they've been engaged in and I'm very
6 concerned about it both for the
7 bankruptcy system.  I'm concerned abut
8 it for the process of how cases are
9 done.  I'm concerned about it for the
10 benefit of the other parties in the case
11 who don't have the knowledge that this
12 is happening and they're settling their
13 claims and they're taking financial
14 settlements that are being engineered by
15 McKinsey in a case without knowing that
16 McKinsey has a financial interest in the
17 outcome of the case.
18      And I think whenever I explain to
19 anybody if we step back from the law and
20 the rules and say hey how would you like
21 to have a fiduciary who is managing your
22 assets and, by the way, they have a
23 financial stake in the outcome of how it
24 comes out which they don't tell you
25 about, and, by the way, everybody around

JAY ALIX

1  
2 that situation are all friends and
3 clients of theirs who they could
4 possibly perhaps prejudice one or the
5 other in favor of them or themselves or
6 the others, or that fiduciary and that
7 estate is going to engage in some
8 self-dealing transactions using their
9 fiduciary role and their inside
10 knowledge to create financial gain for
11 themselves, I'm sure if I asked any
12 bankruptcy judge in the country would
13 they like to appoint that professional
14 in a bankruptcy case so they can self
15 deal, traffic in the assets, not
16 disclose their investments, withhold
17 hundreds if not thousands of
18 connections, that wouldn't be just my
19 view, that would be any lay person's
20 view with common sense.
21 Q.   Do you think that --
22 A.   And it turns out the
23 professionals all around me generally
24 agree with that view.
25 Q.   The professionals around you

JAY ALIX

1  
2 disagree with the professionals around
3 McKinsey RTS about what the rule
4 requires?
5 A.   As it turns out --
6      MR. O'SHEA:  Objection, you can
7 answer.
8 A.   As it turns out, that's not true
9 because I thought about that.  I really
10 thought about that.  And I thought, God,
11 could they be getting this advice to do
12 this?
13      So I went through all the
14 professionals that McKinsey has worked
15 with.  I've looked at the disclosures of
16 45 professionals in all these cases.
17 And as it turns out, when I look at
18 Jones Day's disclosures, they disclose
19 all their connections, and there's a
20 sense and they look adequate to me.
21      When I look at Kirkland & Ellis's
22 disclosures, they are probably the most
23 comprehensive and complete of any of the
24 firms in the business.  They are in the
25 top of the group as far as the quality

Page 238

JAY ALIX

1  of their disclosures.
2  Q.   Both of those, both of those
3  advisors --
4      MR. O'SHEA:  Come on, you're
5  really interrupting his answer
6  please.
7      MS. CHUNG:  He's not answering
8  anything responsive to the question.
9      MR. O'SHEA:  That's your opinion,
10  Chris, and I respect your opinion but
11  you really have to honor the process
12  here.  Finish your answer.
13      MS. CHUNG:  He's repeating
14  himself and filibustering.
15  Q.   We've established you can't
16  dispute that Kirkland and Jones Day both
17  use lookback periods, right?
18      MR. O'SHEA:  Chris, please, let
19  him answer the question.
20      MS. CHUNG:  He's not answering
21  the question.
22      MR. O'SHEA:  We can argue about
23  that and you can have your view.  But
24  you're interrupting right in the

Page 239

JAY ALIX

1  middle of his answer and that's
2  really not fair.  And I think the
3  judge will take a dim view of that,
4  please.
5      MS. CHUNG:  I don't.
6  Q.   Listen, Mr. Alix, you know --
7      MR. O'SHEA:  I'd like to go back
8  to the last question and let him
9  finish the answer, please.
10  A.   As part of my due diligence, I
11  was wondering whether McKinsey's view of
12  Rule 2014 is supported by its advisors
13  as you positioned it.
14      So I went back and I reviewed the
15  disclosures of K & E, of Jones Day, of
16  Kirkland & Ellis, of Hogan & Lovells, of
17  Debevoise & Plimpton, of Proskauer Rose
18  and of your old law firm Quinn Emanuel
19  because I thought since your firm mostly
20  came from there then their disclosures
21  in bankruptcy would be instructive to
22  me.
23      I was trying to see if any of
24  those firms for their own benefit who

Page 240

JAY ALIX

1  all have to comply with this rule would
2  advocate, one, for a position that you
3  disclose no names in the first eleven
4  bankruptcy cases other than a couple,
5  and none of those firms take that
6  position.
7      So it's clear that the whole
8  scheme or routine or whatever you want
9  to call it, the whole protocol around
10  not disclosing any names for eleven
11  bankruptcy cases in 26 disclosures would
12  have not been supported by any of those
13  law firms because they don't do that
14  themselves and they would never in good
15  conscious as good attorneys say don't
16  disclose the names.  I've got to think
17  those firms would say you've got to
18  disclose the names.
19      Then I thought how could this be
20  happening?  Because I know in Alpha it
21  wasn't until the US Trustee filed the
22  motion to compel that McKinsey gave up
23  18 or 20 names, and then I filed a
24  motion to get 80 names.

Page 241

JAY ALIX

1  Q.   That's really enough.
2  A.   I want to finish my answer.
3  Q.   Then let's finish it.
4  A.   I want the judge to understand
5  how I got here.  Because you're
6  mischaracterizing my testimony and my
7  motives and they're not right.
8      So what happened is, once I saw
9  that and I realized McKinsey was in a
10  sense had to be forced into it, I
11  started studying what happened.  How
12  could they be getting to this analysis?
13  Who is giving this legal analysis?
14      So when I met with Dominick Barton
15  he told me he met with Skadden Arps.  He
16  told me he met with Eric Friedman, the
17  managing partner of Skadden Arps.  And
18  he told me that Skadden advised him to
19  stop this practice in the fall of 2014.
20  And yet he didn't do it and he told me
21  these laws weren't important, that
22  nobody cares about them.
23      So I came to the conclusion that
24  McKinsey corporately has been given

61  (Pages 238 to 241)

JAY ALIX

1
2 advice by credible, important,
3 knowledgeable law firms and yet has
4 chosen to ignore the advice of those law
5 firms and those lawyers.
6      And then on top of that I've come
7 to see that the US Trustee has asked
8 them six times in pleadings to comply
9 with these laws and they still don't do
10 it.
11      So it's not my view only that
12 McKinsey doesn't agree with.  They may
13 have other advisors.  McKinsey is being
14 told by judges, they're being told by
15 the US Trustee repeatedly, they're being
16 told by their own law firms, I suspect,
17 and they're not complying.  It's not
18 just my view, it's a lot of view.
19      The US Trustee said in court
20 filings that only McKinsey, as far as
21 they know, they're the only professional
22 in the country that does this and the US
23 Trustee disagrees with it and they
24 disagree with it adamantly.
25      So it's not me versus McKinsey.

JAY ALIX

1
2 It's not me versus their lawyers.
3      The only lawyer I could find who
4 does disclosures this way in two
5 bankruptcy cases is Mr. Peter Ivanick
6 from Hogan & Lovells who in two recent
7 bankruptcy case was disclosing by
8 category.
9      And I heard you say in court the
10 other day that Mr. Peter Ivanick was
11 there, although I didn't see who he was
12 and he's there advising McKinsey on the
13 disclosures.
14      So now I see that what you're
15 saying is correct.  McKinsey has an
16 advisor, Mr. Peter Ivanick, from Hogan &
17 Lovells, who is advising McKinsey not to
18 comply with Rule 2014 and to not comply
19 with case law.
20      So that was a very important
21 reveal that you gave to me and to the
22 court.  Because I've checked all the
23 other law firms and they comply.  That's
24 how I got to this conclusion.
25   Q.   You think that the other law

JAY ALIX

1
2 firms don't apply lookback periods?
3   A.   I wasn't talking about lookback
4 periods.  The code doesn't talk about
5 lookback periods.  I'm talking about the
6 bankruptcy code, Rule 2014 and having
7 the intention and the predisposition to
8 comply with the code.
9   Q.   So let's talk about intention and
10 predisposition to comply with the code.
11 Intent to deceive is an element of
12 alleging any kind of bankruptcy fraud,
13 right?  You know that as a fraud
14 examiner?
15   A.   I don't know the strict
16 definition of bankruptcy fraud.  But I
17 know what fraud it and I know what fraud
18 with a small "f" is as a financial
19 person.  I think I understand what fraud
20 is with a capital "F," you know, as a
21 legal matter.  But I'm not rendering a
22 legal opinion and I'm not suggesting a
23 legal outcome on a conclusion.
24      I do think I have observed
25 hundreds of acts of omission, thousands

JAY ALIX

1
2 of acts of omission and hundreds of acts
3 of commission of false or misleading or
4 incomplete or deceptive statements in
5 these court filed documents, and the
6 advisors I have who are expert on this
7 say it's historic and it's
8 unprecedented.
9   Q.   And it's based on your
10 interpretation of what Rule 2014
11 requires?
12      MR. O'SHEA:  Objection, misstates
13   the testimony.  You can answer.
14   A.   No, no, no, no, no, no.  I'm
15 relying on opinions from many experts
16 and it turns out my own experience
17 around the bankruptcy court system for
18 the last 40 years, plus, plus expert
19 opinion, plus detailed financial
20 analysis, plus thousands of hours of
21 study and research and documents
22 supplied by McKinsey and analyzed by
23 people who know these things that are
24 all independent of me and McKinsey, have
25 came -- come to the same conclusion.

JAY ALIX

Q.   But these people sitting at the table, these people on your team of professionals, they all agree with this view that Rule 2014 requires disclosures of all connections, right?  That's what your objection says?

A.   You'll have to take their deposition and ask them what their view is.  I can't speak for them on all their view.  I know that I have relied on their expert advice and credentials and I'm comfortable that my position filed in these documents is supported by the people who advised me.

Q.   For intent to deceive, for concealing, you would have to --

A.   Well I would have to tell you that --

Q.   Sorry, there's no question pending yet.

A.   Oh, okay, fine.  Please tell me, explain.

Q.   Okay.  So you, that means bad faith, it means that McKinsey RTS agreed

JAY ALIX

with you secretly and then concealed the connections.  So what's your proof that McKinsey RTS ever agreed with your interpretation of Rule 2014?

MR. O'SHEA:  I'm going to object.  I don't think that that question goes to the four corners of the two dockets numbers, two docket entries that Judge Jones asked us -- asked you to limit your inquiry to.  That said, you can answer the question if you can.

Q.   Well you're the one --

A.   Can you read me back the question?

Q.   Let me withdraw the question and set a predicate for it.  You're the one who says in your objection that McKinsey RTS is engaged in a history of frauds, right?

A.   A history of filing false documents in the federal court.

Q.   Okay.  But filing false documents, because in your view the

JAY ALIX

falsity is it's not complying with your idea of what Rule 2014 requires?

A.   It's not complying with the code, it's not complying with the US Trustee's view of the rules, it's not complying with US Bankruptcy Judge Huennekens' view of the rule, and it's not complying with the experts who I've engaged and who have rendered their expert opinions on the case.

Q.   Judge Huennekens found McKinsey RTS was disinterested after the in camera proceeding that you were not a part of, right?

A.   That's a big leap from what happened to that case.  That is not what happened.  That is not what happened at all.  You are mischaracterizing what happened.

Q.   You think that it's a mischaracterization to say that Judge Huennekens found McKinsey RTS to be disinterested after an in camera hearing?

JAY ALIX

A.   I think that's a mischaracterization of what happened there.

Q.   Okay.  Let's go back to the original question.  What -- your contention, your frustration is that McKinsey RTS has never agreed with you about your interpretation of Rule 2014.  Where's your evidence that McKinsey RTS ever agreed with you?

A.   So in -- my evidence is this:  In September of 2014 I had a two-hour meeting with Mr. Dominick Barton in person, the CEO of McKinsey, and participating in that meeting by telephone was Robert Sternfels who arguably today is the number two person at McKinsey today.

So four and a half years ago I met with these two senior leaders of McKinsey, the CEO and the number two.  In that meeting in those two hours I presented to them examples of McKinsey's -- examples of disclosure documents from

Page 250

JAY ALIX

1 other bankruptcy cases by other
2 professionals and explained to them what
3 the rule required, and then I also
4 presented to them their own disclosure
5 documents and showed them how they were
6 deficient.
7 And I went to them as a
8 professional to professional. I went to
9 them as a person in the industry who is
10 trying to help someone else in the
11 industry and saying, look, you've got to
12 comply with these laws. And you need to
13 work on this.
14 I also reported to them other what
15 I thought were improper and maybe
16 illegal activities I thought their firm
17 was doing, and they took it all to
18 heart, they listened. Dominick Barton
19 took extensive notes in his notebook for
20 two hours and thanked me profusely
21 for bringing it to his attention. He
22 really expressed great gratitude.
23 He promised me he would look into
24 it. He promised me he would get some

*(Note: line numbers 1-25 as printed)*

Page 251

JAY ALIX

1 opinions about it and he asked me if I
2 would speak with him the next day.
3 So the next day I had another
4 phone call with Mr. Barton and Mr.
5 Sternfels and we discussed this all
6 again and Mr. Barton asked me to be
7 patient while he looked into it. He
8 asked me for my patience and he asked me
9 not to do anything with my concerns
10 until he had a chance to look into it
11 and so I agreed to be patient.
12 The next day he called me again
13 and he wanted to talk to me, this time
14 without Mr. Sternfels and he told me he
15 did not want to have Mr. Sternfels on
16 the phone because he did not agree with
17 Mr. Sternfels' view of the situation,
18 that Mr. Sternfels wanted to go ahead
19 and keep competing the way McKinsey had
20 been competing and not making these
21 disclosures and that Mr. Barton felt
22 that McKinsey should be complying with
23 the law or he said if we can't comply
24 with the law then we just shouldn't do

Page 252

JAY ALIX

1 the business. That was his idea.
2 So Mr. Barton suggested that he
3 never liked the bankruptcy business. He
4 never wanted McKinsey to be in the
5 bankruptcy business. And he told me
6 that he thought it was a low business.
7 He said I don't want us to work down
8 there with those people.
9 So I said, well, whatever you
10 think about it, there's laws here and
11 these laws are important laws. And he
12 said they're not important laws. He
13 said the laws don't matter. He says
14 nobody cares about these laws. I said
15 these laws do matter. They matter to
16 the US Trustee, they matter to the
17 bankruptcy court and they matter to the
18 parties who are honest players on this,
19 on the platform.
20 So he said he would look into it.
21 He pleaded with me to be careful, be
22 patient and be careful, don't say
23 anything, just let him look into it. He
24 said McKinsey is a big place, it's

Page 253

JAY ALIX

1 complicated, he needed time.
2 I said, fine, how much time do you
3 need? He told me he would need about a
4 month and a half.
5 In October of 2014 he contacted
6 me, asked me if I wanted to meet, if I
7 would meet him in Paris -- in London at
8 his office.
9 I happened to be in Europe at that
10 time so I met with him in London. And
11 in that meeting, in October of 2014, he
12 acknowledged to me, he admitted to me,
13 he made the admission that he had called
14 Skadden Arps, that he had spoken with
15 Eric Friedman who is the managing
16 partner of Skadden Arps who I do not
17 know, I learned his name that day for
18 the first time, he told me that Eric
19 Friedman had told him that what McKinsey
20 was doing was wrong, that it was
21 improper, that they shouldn't be doing
22 it and it was probably illegal. And he
23 told me that he was very upset with John
24 Garcia for having put McKinsey in this

JAY ALIX

1
2  position and that he was talking with
3  Bob Sternfels about changing this
4  practice.
5      He told me that he spoke with
6  Virginia Molino, the general counsel of
7  McKinsey, about this and she agreed with
8  the assessment from Skadden and he told
9  me that he was going to correct the
10  problem immediately.
11      I asked him what he would do to
12  correct the problem.  He said it was his
13  plan to just have McKinsey come out of
14  the bankruptcy restructuring business.
15      I said that's not necessary if you
16  comply with the law.  I said you have to
17  comply with the law.
18      He said I don't like the business,
19  I don't want to be in this business.  I
20  never wanted to be in this business.  He
21  said he didn't know why they even set up
22  RTS.
23      It's my belief they set up RTS to
24  avoid the disclosure law for the rest of
25  McKinsey which is why it was set up.

JAY ALIX

1
2  But he wanted to get McKinsey out of it.
3      I said when did he do that.  He
4  said comply or get out.
5      He said that he would, he would
6  fix it once he was reelected as CEO.
7      And he said there may be a few
8  more cases until then.  I said how long
9  until you're -- I said how are you
10  reelected to CEO?
11      This was October.  He said he
12  would be reelected in January he hoped.
13  I said what if you're not reelected?  He
14  said well I should be.
15      I said you cannot have any more
16  bankruptcy cases, you can't keep doing
17  this if you're not going to comply with
18  the law.  You're on notice now.
19      He said well maybe one will slip
20  through.  I said no, none can slip
21  through.  You either comply with the law
22  or you're not complying with the law.
23  You can't do that as a CEO of this
24  company.
25      He then told me that he would

JAY ALIX

1
2  comply with the law or they wouldn't do
3  the work.  So I left that meeting with
4  his agreement.  We had an agreement and
5  a full understanding and we agreed that,
6  in return for me not taking any action
7  at that time, that he would work to get
8  reelected, he would have McKinsey comply
9  with the law from that point forward,
10  and he would, once reelected, he would
11  move to, A, remove Mr. Garcia from
12  running the RTS business, B, remove Mr.
13  Seth Goldstrum from leading the RTS
14  business, and C, merge RTS back into big
15  McKinsey ex-bankruptcy work.
16      I asked him how can he do that.
17  He told me he spoke with Mr. Gordon Orr,
18  the former CEO of McKinsey and Gordon
19  told him that he needed -- was it
20  Gordon?  My recall on that name may be
21  incorrect.  I put a mark on that recall.
22      But he consulted with his
23  predecessor.  No, was it Ian Davis?  I
24  think it was Ian Davis, his predecessor.
25  It was either Gordon or Ian.  I got

JAY ALIX

1
2  those two names confused right now.  He
3  consulted with Ian Davis, his
4  predecessor, who told him when you have
5  to change something inside McKinsey, you
6  change the leaders, you don't
7  restructure the company.
8      So he consulted with Ian Davis who
9  told him he had to change out the
10  leaders of this business and that's what
11  he was going to do.
12      So I said we have an agreement
13  then?  He said we have an agreement, no
14  more bankruptcies.  You get reelected,
15  and then you work to stop this business
16  from doing this thing, or if you're
17  going to stay in it, which was okay, you
18  got to comply with the law.  He said
19  fine.
20      So I have his admission.  I have
21  his admission.  I have a series of long
22  discussions with him.  And then after
23  that, he and I talked and met a number
24  of times more where we kept talking
25  about this.

JAY ALIX

1
2       So I know that McKinsey, at the
3  very top of the firm, knows this issue.
4  He's admitted the issue to me
5  repeatedly. He's gotten legal advice
6  about it.  He was advised by counsel to
7  stop doing it.  And yet within two weeks
8  after that meeting McKinsey files the
9  NII bankruptcy which is on this sheet at
10 number 9. I called him. I said you
11 filed these disclosures, they're not
12 complete.  He said that one slipped
13 through.  I said you can't have things
14 slip through as a CEO.  You told me you
15 were going to monitor it.  He said well
16 next time.
17      And then when he got reelected he
18 didn't take any action to get RTS
19 changed he told me.  And then he filed
20 -- they got involved with Standard
21 Register.  And again those disclosures
22 are completely missing all the Rule 2014
23 requirements.
24      So I called him again.  I said
25 what's up, Dom?  You told me you're

JAY ALIX

1
2  going to fix this. He goes, oh, I was
3  unaware of that.  Let me get back to you
4  on that.   And then nothing came of
5  that.
6       And then by August, I was busy
7  that summer in August because my
8  daughter was getting married and I was
9  running her wedding, so I learned about
10 the Alpha Natural Resources case after
11 August.
12      And so I called him again and I
13 went to see him in October of 2015 and I
14 told him, listen, this is the third one.
15 We've been meeting for a year, we've
16 been talking for a year, you were going
17 to fix this.  He said well it's hard,
18 it's difficult.  I said well what are
19 you going to do about the commitments
20 you made to me to fix these other
21 problems?  He said haven't done them,
22 can't do them.  He told me he had
23 prostate cancer at that time.  We talked
24 about his children, we talked about a
25 lot of things, his marriage.

JAY ALIX

1
2       And then in the middle of that
3  meeting he said, you know, why don't you
4  let us refer some work to you?  We're
5  going to refer some consulting work to
6  your firm.  He said we're going to refer
7  Fortisku a mining company in Australia
8  for you.  I said we don't, I can't do
9  mining work in Australia.  I don't have
10 any work there.  I said I can't take
11 that.
12      He said, oh.  He said well how
13 about if we refer Volvo to you, a
14 company in Europe, they need to be
15 restructured?  You can do that, right?
16      I said Dom, I said I can't accept
17 any of this.  You need to comply with
18 the law and until you comply with the
19 law we're not going to do any business
20 together on anything.  That's what you
21 promised me.  That's what you said you
22 would do.  You've got to do that.
23      And so I have Mr. Barton's
24 admission and repeated admission and
25 repeated affirmation that they weren't

JAY ALIX

1
2  complying with the law. He knew it. He
3  got legal advice about it.  It kept
4  happening.  I kept warning him.  And
5  finally when I spent 14 months I
6  realized I have been deceived.  I have
7  been deceived.  I have been led along
8  and I took the bait and I feel foolish
9  about it.
10      But I realize I can't stop trying
11 to get the system protected. I've got
12 to try and protect the system.
13      So I therefore went ahead and
14 taken all other steps since then in a
15 graduating series of incremental steps.
16      But my first instinct was to go to
17 McKinsey and help McKinsey.  And I
18 didn't go with lawyers and I didn't go
19 with any proposals other than you've got
20 to comply with this law.
21      And since then, it's been a
22 journey, none of which I planned, none
23 of which I thought that far about.  It's
24 just been taking the next incremental
25 step until I can help fix this problem

JAY ALIX

1  
2  in the bankruptcy system.
3     Q.   Who was a witness to these
4  conversations with Dominick Barton where
5  you allege that he agreed with your view
6  that something McKinsey was doing,
7  McKinsey RTS was doing something wrong
8  in its bankruptcy filings?
9     A.   There was no person there.  Mr.
10  Barton took extensive notes in his
11  notebook so his notebooks are I'm sure
12  there.  I took some notes in those
13  meetings.  And then when I left --
14  before I went to the meeting, after I
15  left, after I left the meeting I called
16  my attorneys who I told I was going to
17  have these meetings and I reported the
18  findings of the meetings to my attorneys
19  and then I made contemporaneous notes
20  immediately after those meetings to
21  record my understanding of what was said
22  and what the agreements were.
23     Q.   So the witnesses to those
24  meetings are yourself and Mr. Barton?
25     A.   There's other witnesses around

JAY ALIX

1  
2  because Mr. Barton's secretaries,
3  Charlotte, Claire Tarantino and
4  Catherine were exchanging emails with me
5  and with my assistant Deborah Darisi.
6  And Mr. Barton was writing a number of
7  emails which I have and I think I've
8  actually sent them to Mr. Gary Pincus
9  who has them who was in court last week.
10     And you can see in the emails he's
11  thanking me for meeting with him.  He's
12  greatly appreciative.  He's expressing
13  gratitude.  He wasn't writing to me
14  saying your views are wrong, we
15  disagree.  You know we're not going to
16  do it.  Our lawyers say something
17  different.
18     Q.   He also --
19     A.   He was basically agreeing with me
20  and letting me talk here today.  I told
21  him the kind of things I'm telling you
22  here today.  He agreed.  He got advice
23  on it and he led me down the path.  And
24  I feel, I feel like this is such bad
25  behavior for the leader of a big -- of

JAY ALIX

1  
2  the world's largest consulting firm to
3  somehow have someone come to him
4  voluntarily and say, listen, I know you
5  don't know this but your company is
6  breaking federal laws and I think you
7  should do something about it.  And I
8  thought he would do something about it
9  right away.  I thought he would just get
10  at it.  I couldn't believe he wasn't
11  getting at it.  That he wanted to wait
12  to get elected, that he wasn't going to
13  stop it and he just kept going.
14     So I realized at that point
15  McKinsey as an enterprise has something
16  wrong with its culture when it becomes
17  aware that these important federal laws
18  are, one, not important, two, not going
19  to be followed, and three, even after
20  being put on notice they're going to
21  keep violating those federal laws.
22     To me that's a serious problem
23  that the bankruptcy court system cannot
24  tolerate.  And as a 40-year participant
25  in that system, I can't tolerate it.

JAY ALIX

1  
2  I'm not going to tolerate it.
3     This is not a vendetta as you all
4  said to the media.  There's no motive
5  here.  I won't make any money from this.
6  God knows, I'll probably lose a lot of
7  money from doing it.  I'm not making any
8  friends from doing it.
9     The only thing going on here is
10  I'm trying to protect the bankruptcy
11  court system from what I consider to be
12  a rogue player on the playing field and
13  they've tilted the playing field which
14  is hurting my firm and all the firms in
15  the industry, and it's hurting the court
16  and it's hurting the system and it's
17  hurting all the parties and they're
18  lying to the US Trustee and they're
19  lying to the judges and it needs to
20  stop.
21     Q.   You're not claiming that you have
22  any email from Mr. Barton acknowledging
23  that McKinsey was engaging in any kind
24  of violation of law?
25     A.   I have emails from Mr. Barton

JAY ALIX

1  
2  acknowledging our meetings.  I have
3  emails from Mr. Barton thanking me for
4  our meetings.  I have emails from Mr.
5  Barton giving me his whole schedule for
6  three months, trying to meet with me
7  because he's trying to appease me and
8  play me along so that I'll be patient
9  with him.
10      I don't know any CEO who sends a
11  competitor their calendar for three
12  months in an email, which what is he
13  did, and said he would meet with me
14  anywhere around the world if I would
15  show up there.
16      So he clearly has a real interest
17  and attitude meeting with me, appeasing
18  me and keeping me patient because he
19  needs to get reelected.
20      MS. CHUNG:  Objection and move to
21  strike.
22    Q.   You don't have an email from Mr.
23  Barton acknowledging any kind of
24  misconduct on the part of McKinsey RTS?
25    A.   No.  But I think it's in his

JAY ALIX

1  
2  notebooks that he took at every meeting.
3  He wrote notes at every meeting in his
4  notebook.
5    Q.   But you don't know what's his
6  notebooks?
7    A.   He was writing as I was speaking
8  and he was writing as he was speaking.
9  So I don't think he was writing about
10  the weather, about the clothes I was
11  wearing, I think he was writing about
12  the content of the conversations.
13      MR. O'SHEA:  We've been going for
14  some time, Chris, lunch is ready when
15  you're ready.
16    Q.   You don't have any idea what Mr.
17  Barton wrote in his notebooks?
18    A.   Well, he was writing --
19      MR. O'SHEA:  Asked and answered.
20    A.   He was nodding his head when he
21  wrote.  He was looking at me and writing
22  more and looking at me.  You know, it's
23  one on one, two people working together,
24  so.
25    Q.   You've never seen the contents of

JAY ALIX

1  
2  the notebooks?
3    A.   I've never seen the notebooks,
4  well I've seen the handwriting in the
5  notebooks and I've seen the size of
6  them.  They're about, they're not a full
7  eight and a half by eleven nobody.  They
8  are very distinctive.  They've got kind
9  of a leather cover, they're colored.
10  It's got one of those tassels you put in
11  I think.  And he opened them up and he
12  would write in the notebooks and he
13  wrote at every meeting.
14    Q.   You don't know the content of the
15  notebooks?
16    A.   Sitting here today, I do not know
17  the content of the notebooks.  But I
18  have reason to believe that it's the
19  contents of our meetings.
20    Q.   Not just sitting here today.
21  You've never seen the contents of the
22  notebooks?
23    A.   I've never seen the contents of
24  the notebooks.  I've seen the writing
25  being put into the notebooks.

JAY ALIX

1  
2      MS. CHUNG:  All right, thanks,
3  let's take a break here.
4      THE VIDEOGRAPHER:  Time is 1:05
5  p.m.  We're off.
6      (Luncheon recess.)
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25

Page 270

JAY ALIX

1
2       A F T E R N O O N  S E S S I O N
3            (1:44 p.m.)
4       THE VIDEOGRAPHER:  Time is 1:44
5    p.m., we are on the record.
6       JAY ALIX, resumed, having been
7    previously duly sworn, was examined
8    and testified further as follows:
9       CONTINUED EXAMINATION
10      BY MS. CHUNG:
11      Q.   So, Mr. Alix, before the break
12   you were describing a series of meetings
13   that you had with Mr. Barton in 2014 and
14   2015, right?
15      A.   Before I answer the question,
16   there are a few things, upon reflection,
17   that I want to add to the record about
18   people I'd met with or I gave you a list
19   of people I'd spoken to.  There were a
20   few more people I recall as I was eating
21   lunch so I just want you to know that,
22   that I want to either add to the record
23   now or I can do it upon reflection
24   later.  But I want to add some more
25   names of people I've spoken with.

Page 271

JAY ALIX

1
2       Q.   You mean in connection with what,
3    Congress or?
4       A.   No, you asked me about people I'd
5    spoken with to get advice or to test my
6    theory or my interpretation of rules
7    2014.
8       Q.   So that's fine.  We can pick that
9    up later.
10      So in terms of these meetings
11   with Mr. Barton that you described in
12   late 2014, early 2014, is that the right
13   time frame?
14      A.   The meetings, the first meeting
15   was in September of 2014.  The last
16   meeting was in October of 2015, and then
17   there was an email that I sent him I
18   think in 20 --  I can't remember if it
19   was summer of '16 or summer of '17 but
20   there was one email I sent then.
21      But the meetings and the phone
22   calls started in September.  The phone
23   calls -- my attempts to contact him
24   started in August of 2014 and the last
25   meeting in person in his New York office

Page 272

JAY ALIX

1
2    was in October of 2015.
3       Q.   Okay.  And you've had
4    opportunities to describe these meetings
5    with Mr. Barton before in court
6    pleadings, right?
7       A.   I have described them in court
8    pleadings.  I filed two affidavits in
9    the ANR case.  In ANR I filed two sworn
10   affidavits about these meetings and the
11   content of these meetings with Judge
12   Huennekens in the ANR case.
13      Q.   And you also filed a civil RICO
14   complaint in which you described
15   these meetings with Mr. Barton, right?
16      A.   The meetings are summarized in
17   the civil RICO complaint.  They're not
18   really detailed but the substance of
19   them was there.
20      Q.   Okay.  And the substance of them,
21   you had an opportunity to compile the
22   substance of them twice because the RICO
23   complaint was filed originally in May
24   and then filed again in October in an
25   amendment, right?

Page 273

JAY ALIX

1
2       A.   I think my attorneys can speak to
3    that, but they amended the RICO
4    complaint I think at the suggestion of
5    the judge in that case.
6       Q.   And you reviewed the amendment
7    and the original, right?
8       A.   I did, yes, I did.
9       Q.   And you've also given public
10   statements about these meetings that you
11   had with Mr. Barton?
12      A.   I don't know what you mean by
13   public statements.  What do you mean?
14   Can you list or tell me what you mean?
15      Q.   Well you described them, for
16   example, in the Biz News interview you
17   did from Barcelona, the one we talked
18   about earlier?
19      A.   I don't recall exactly what I
20   said there so I would listen to that
21   transcript, read it if you'd like and we
22   can talk about it.
23      Q.   Okay.  So in any of the court
24   filings or in the Biz News interview,
25   you've never previously said that Mr.

JAY ALIX

1
2 Barton agreed with you that McKinsey RTS
3 was violating bankruptcy rules with its
4 bankruptcy disclosures?
5     MR. O'SHEA:  Object.  I think it
6 misstates the documents.  You can
7 answer.
8     A.   In my -- is the question in my
9 previous statements I've never said he
10 agreed with me; is that right?  Is that
11 the question?
12     MR. O'SHEA:  I'll read it to you.
13 So in any of the court filings or Biz
14 News interview, you never -- you've
15 never previously said that Mr. Barton
16 agreed with you that McKinsey RTS was
17 violating bankruptcy rules with its
18 bankruptcy disclosures?
19     A.   Well, I think I used the phrase
20 admission in the ANR affidavits that I
21 signed to the federal court in the ANR
22 case twice.  So and I don't know the
23 exact wording in the RICO suit.  But Mr.
24 Barton made the admission to me and
25 admission is another phrase for

JAY ALIX

1
2 agreement.
3     Q.   So what admission are you
4 claiming that Mr. Barton made to you,
5 the one that you described earlier where
6 he said that the Skadden lawyer told him
7 that their bankruptcy disclosures were
8 not in compliance with the law?
9     A.   That's one admission he made,
10 yes.  Skadden advised him -- he violated
11 his attorney-client privilege and he
12 told me that Skadden, he told me the
13 advice that Eric Friedman had given him,
14 that Skadden believed that McKinsey
15 wasn't complying with the proper
16 disclosure requirements.  Certainly
17 Skadden's disclosures don't look like
18 McKinsey's.  And number two, that I had
19 alleged to Mr. Barton, I had alleged in
20 a sworn deposition in August of 2014 and
21 again to Mr. Barton and Mr. Sternfels
22 that I was made aware that McKinsey may
23 be engaged in a pay for play activity
24 involving certain members of McKinsey
25 RTS offering McKinsey, exclusive

JAY ALIX

1
2 McKinsey referrals from McKinsey's
3 exclusive client base in return for
4 those bankruptcy attorneys or investment
5 bankers making exclusive referrals to
6 McKinsey RTS for bankruptcy work, which
7 I explained to Mr. Barton if that was
8 happening, that was illegal and he
9 should stop it.  And he said he wanted
10 to look into that.
11     So he was looking into the
12 disclosure issues and he was looking
13 into the pay for play allegations.
14     At the lunch in October 2014 he
15 made the admission to me that in fact
16 the offers, McKinsey was making offers
17 to professionals in bankruptcy to get
18 exclusive referrals from them.
19     I don't know if anyone ever
20 accepted any offer.  I have no knowledge
21 that anyone ever accepted an offer.  But
22 I know the offers were made.  That was
23 told to me and Mr. Barton admitted that
24 they were being done and he expressed
25 great rage and upset that Mr. Garcia and

JAY ALIX

1
2 Mr. Goldstrum had orchestrated that and
3 he used both of their names in the
4 conversation.
5     So and he told me he reviewed that
6 with Bob Sternfels and he told me he
7 reviewed that with Jean Molino, the
8 general counsel of McKinsey, and that
9 they were, quote, all on board with
10 fixing the problem.
11     Q.   The question is did you say in
12 the RICO complaint that you filed twice,
13 did you make any claim that Dominick
14 Barton agreed with you that McKinsey RTS
15 was violating bankruptcy laws with its
16 bankruptcy disclosures?
17     MR. O'SHEA:  I would request that
18 you show him the document rather than
19 have him guess at what was said.
20     MS. CHUNG:  I can ask him his
21 recollection. I'm ready to show him
22 the document too.
23     MR. O'SHEA:  You can, Chris, but
24 I think it's unfair.
25     A.   I may be confused.  Are you

JAY ALIX

1
2 asking me about the document or are you
3 asking me about the conversation I had
4 with him?
5    Q.   I'm asking you about the
6 documents.  You had an opportunity twice
7 in the RICO case to come forward with
8 any allegation that Dominick Barton
9 agreed, one, that McKinsey RTS's
10 disclosures violated bankruptcy laws or
11 rules, and you didn't do so, did you?
12    A.    Well I think I just testified
13 that in the ANR case I swore out --
14    Q.   No, that's not the question.
15    A.   You said any document.
16    Q.   I said in your civil RICO
17 complaint.
18    A.   Oh, I see.
19    Q.   You did not come forward with any
20 allegation that Dominick Barton agreed
21 with you that McKinsey RTS's Rule 2014
22 disclosures violated the bankruptcy laws
23 or rules.
24    A.   I have to see the complaint.  I
25 don't -- I can't recall what it says in

JAY ALIX

1
2 the complaint about that topic.
3        MS. CHUNG:  Let's mark this.
4    A.   Now we're going into the RICO
5 complaint, so, okay.
6        MS. CHUNG:  5.
7        MR. O'SHEA:  Yes, we are, it's
8 beyond the four corners of the
9 judge's order.
10        MS. CHUNG:  No, it's --
11        MR. O'SHEA:  I'm just alerting
12 you to it.  I'm going to allow the
13 question and answer.  I'm not saying
14 I'm going to instruct him not to
15 answer.  But I'm just alerting you.
16        (Exhibit 5, Amended RICO
17 Complaint 18-cv-04141 was marked for
18 identification.)
19    A.   Which page do you want me at?
20    Q.   Paragraph 129.
21        MR. O'SHEA:  Actually I think it
22 begins on 119, doesn't it?
23        MS. CHUNG:  I'm asking about
24 paragraph 129.
25        MR. O'SHEA:  Well you're asking

JAY ALIX

1
2 about the whole document.  I mean
3 let's be fair.
4        MS. CHUNG:  If he can find me a
5 place where he says that he ever
6 claimed that Dominick Barton admitted
7 that McKinsey RTS was violating
8 bankruptcy laws and rules with its
9 bankruptcy disclosures, he's welcome
10 to do it.
11        MR. O'SHEA:  If you think that's
12 impeachment that he has to say it,
13 that I have to say it in a complaint,
14 fine, go to it, Chris, use your time
15 as you see fit.
16        MS. CHUNG:  I think that's very
17 much impeachment.
18        MR. O'SHEA:  Well, use your time
19 as you see fit.
20    Q.   So going to paragraph 129.
21    A.   Paragraph 129 or page?
22    Q.   Yes, on page 45.  This is
23 addressing the October 2014 meeting that
24 you gave testimony about before the
25 lunch break, right?

JAY ALIX

1
2    A.   Let me just get familiar with the
3 document for a second, please.
4    Q.   Sure.
5        MS. CHUNG:  I'm just realizing I
6 should say for the record that the
7 amended RICO complaint has been
8 marked as 5.
9    Q.   Mr. Alix, we've all been waiting
10 now for about five minutes.  Have you
11 found any place where you made the
12 allegation that I specified?
13    A.   I haven't finished reading yet.
14    Q.   So, so far you haven't found one?
15    A.   I haven't said that.
16        So what's the question?
17    Q.   The question is there's no
18 allegation in your amended RICO
19 complaint that Dominick Barton agreed
20 with you that McKinsey RTS's Rule 2014
21 disclosures violated the law?  It's a
22 yes or no question.
23    A.   Well I'm disagreeing with the
24 question then because I think it's
25 evident by reading the transcript -- by

JAY ALIX

1
2 reading the pages that there are many
3 places that are evidence here that I
4 discuss the violations of 2014 and the
5 pay for play scheme with Mr. Barton.  We
6 were talking about both of them all the
7 time and they were all subject to our
8 agreement and they were all subject to
9 the understanding, and he was
10 acknowledging to me he knew they were
11 improper and that's why he was agreeing
12 to make these changes because of it.
13   Q.   So point me to the place where
14 you think there's an acknowledgment, or
15 even an allegation by you, that Mr.
16 Barton agreed with you that RTS's
17 disclosures were violating Rule 2014 or
18 any bankruptcy law?
19   A.   So I would say it's built up in
20 sentences but the first one is on 119.
21 "On multiple occasions beginning
22 September I confronted Barton and
23 Sternfels with evidence of McKinsey's
24 repeated violations of bankruptcy law
25 including the disclosures."

JAY ALIX

1
2       And so that was the beginning of
3 it and our very first conversation.
4   Q.   You think that that sentence says
5 that Barton agreed with you?
6       MR. O'SHEA:  I don't think he was
7 finished with his answer.
8       MS. CHUNG:  I think he was, he
9 finished answering the question.
10   A.   No, I said many sentences here.
11 I'd like to go through all the sentences
12 to create the complete record of the
13 conversation --
14   Q.   That's not the question.  Here is
15 the question for you.  Give me your best
16 sentence?
17   A.   I don't have a best sentence.
18       MR. O'SHEA:  I object to this.
19 Is this really what you think
20 impeachment is in your vast
21 experience, Chris?
22       MS. CHUNG:  I want to hear what
23 his best shot is that somebody's ever
24 said this before.
25   A.   I don't understand what the

JAY ALIX

1
2 question is.
3   Q.   So why don't we do it a different
4 way.  I'll take that back because that
5 speaks for itself.  And I'm going to
6 give you the ANR declaration.  Why don't
7 we mark this as number 6.
8   A.   Well I just want to say there are
9 five or six sentences in here that
10 clearly talk about the fact I was
11 talking to Barton about the pay for
12 play, the lack of disclosures, he
13 acknowledged it and he agreed they
14 weren't complying and he was going to
15 fix it.
16       So whether or not it's framed the
17 way you want to read it I don't know.
18 But this clearly lays out many
19 references to the disclosures,
20 McKinsey's disclosures in 123.  I mean
21 it goes on and on through many
22 paragraphs and Barton and I and
23 Sternfels -- not Sternfels, Barton and I
24 came to the understanding there was a
25 problem and that he was going to fix it

JAY ALIX

1
2 so that's his admission.
3   Q.   Show me what is your best
4 sentence in there that Barton ever
5 agreed with you that McKinsey RTS's
6 disclosures violated Rule 2014?
7   A.   The best sentence is that he
8 agreed with me to go fix it in return
9 for me holding back on reporting it and
10 then he went and got advice from counsel
11 at Skadden and he gave me the admission
12 that Skadden agreed with it.
13   Q.   No, what this says about Skadden
14 is in paragraph 128.
15   A.   He went to Skadden with all the
16 information, he got advice about it and
17 he came back and said they've agreed.
18   Q.   Let's look at 128 if you want to
19 bring up Skadden.
20   A.   Well, look.
21   Q.   You actually talk about the
22 Skadden meeting in the RICO complaint,
23 right, and it doesn't say anything about
24 McKinsey's --
25   A.   Why are you yelling at me?

72 (Pages 282 to 285)

JAY ALIX

1
2    Q.   Does it say anything about
3  McKinsey RTS's Rule 2014 disclosures
4  violating the law and Barton telling you
5  that it did, 128, where you describe the
6  Skadden advice?
7    A.   So let me just -- I'm on page 47.
8  On page 48.  Alix dropping the issues he
9  had raised concerning McKinsey's
10  acknowledged pay to play scheme and its
11  illegal disclosure declarations.  That
12  was the conversation.  It was always in
13  the conversation.
14    Q.   Where are you reading from?
15    A.   I'm at the top of page 48.
16  That's throughout this section, we were
17  always talking about the disclosures and
18  always talk about the pay for play.  It
19  was part of the understanding.  It was
20  part of the admission, it was part of
21  the conversation.  It was part of the
22  admission.  It was part of the
23  understanding in the agreement we
24  reached.  And it was part of all the
25  subsequent phone calls that we had where

JAY ALIX

1
2  he admitted to me that they had not
3  completed the disclosures as they should
4  have and he asked me to be patient and
5  not report it in NII and Standard
6  Register and Alpha, acknowledging that
7  they weren't in compliance but asking me
8  to be patient and not report it.
9    Q.   Okay, so --
10    A.   So it's clear, in the totality of
11  it, it's a clear understanding of the
12  agreement and his admission.
13    Q.   So let's look at the very
14  sentence you've pointed to on 47 and 48.
15  Barton's offers were blatant attempts at
16  payoffs and bribes offered in return for
17  Alix dropping the issues he had raised
18  concerning McKinsey's acknowledged pay
19  to play scheme and its illegal
20  disclosure declarations.  You think that
21  that sentence is Dominick Barton's
22  admission that anything that RTS was
23  doing with its bankruptcy disclosures
24  violated law?
25    A.   Yes.

JAY ALIX

1
2    Q.   Okay.  Why don't we take a look
3  at your ANR declaration.
4    A.   He wouldn't be making me that
5  offer if he wasn't trying to deal with
6  that problem.
7    Q.   Let's look at your ANR
8  declaration which we've marked as 6.
9    (Exhibit 6, declaration of Mr.
10  Alix in ANR was marked for
11  identification.)
12    Q.   This is a much shorter document,
13  it's easier to absorb and it's dated
14  June 4, 2016.  So much closer in time to
15  the actual conversations, right?
16    A.   The file date is June 6, 2016.
17  The document in the body of the document
18  is June 4.  I signed it on June 4 but it
19  was filed on June 6.
20    Q.   Right, June 4th you yourself
21  marked out and put your initials next to
22  the date June 4, 2016, right?
23    A.   Right.
24    Q.   So this was much closer in time
25  to the actual conversations with Mr.

JAY ALIX

1
2  Barton, right?
3    A.   No.
4    Q.   2016 is closer to 2014 than 2018
5  is, right?
6    A.   I didn't know what you were
7  referring to much closer.  The
8  conversations with Barton started in
9  September of 2014 and ended in October
10  of 2015, and then this is June of 2016.
11  I don't know about the characterization
12  of much closer or not.
13    Q.   So in the second page of this
14  declaration you say "In the process,
15  however" reading from about eight lines
16  up from the bottom, "In the process
17  however, I believe Mr. Barton came to
18  recognize the merit of my concern about
19  the conflict between the confidentiality
20  requirements of McKinsey's business
21  model and the disclosure requirements of
22  a bankruptcy practice."
23    See that sentence?
24    A.   Yes.
25    Q.   Okay.  So there's nothing here.

JAY ALIX

1
2  Here you say I believe that Mr. Barton
3  came to recognize the merit of your
4  concern.  This is not a statement that
5  Mr. Barton acknowledged the merit of
6  your concern.
7    A.   If you want to wordsmith it that
8  way that's fine.
9    Q.   Well their your words, right, you
10 signed it and you swore to it?
11   A.   I certainly signed it.  I'm not
12 backing away from it.  But that's my way
13 of saying he made the admission, we had
14 an understanding and it was mutual.
15   Q.   Okay.  Now none of these
16 allegations about -- so let's look at
17 this, this is -- we will mark this as 7.
18 This is the transcript of the Biz News
19 podcast that you gave earlier this year.
20     (Exhibit 7, transcript of the Biz
21 News was marked for identification.)
22   A.   Can I consult with my attorney
23 for a second?
24   Q.   Sure.
25     MR. O'SHEA:  Go off the record.

JAY ALIX

1
2    THE VIDEOGRAPHER:  Time is 2:10
3  p.m., we're off the record.
4     (Pause in the proceedings.)
5    THE VIDEOGRAPHER:  Time is 2:11
6  p.m., we're on the record.
7    A.   Thank you for the break, I
8  appreciate it.
9    Q.   No problem.  So if you can take a
10 look at what we've marked as exhibit 7.
11 So this is a transcript of the podcast
12 that was broadcast of your interview,
13 the one you referred to earlier as
14 having taken from Barcelona.  It was
15 done in May of 2018, do I have that
16 right?
17   A.   I don't recall the exact date.
18 It's in that time frame somewhere I
19 think.
20   Q.   Okay.  So in this -- the podcast,
21 I've listened to the podcast, it's about
22 40 minutes.  Does that comport with your
23 recollection?
24   A.   I haven't timed it, but let's
25 keep going.

JAY ALIX

1
2    Q.   Okay.  So in this interview --
3  and what is Biz News?  Maybe you can
4  explain it for people that are not --
5  this is a South African media outlet,
6  right?
7    A.   I think it's a South African
8  media outlet that has both print
9  publications and they put out podcasts,
10 I think.  They do interviews and then
11 they print it and publicize it and I
12 think as you can see, he said they're
13 connected somehow to the Wall Street
14 Journal.  So I don't know what all of
15 that is.  But it's South Africa, it's
16 podcast, it's print and it's the Wall
17 Street Journal all in one.
18   Q.   So if you turn to page 4 in the
19 course of this interview you also laid
20 out this long and what you described as
21 a frustrating process of bringing to
22 McKinsey's attention what you believed
23 were RTS's bankruptcy rule
24 noncompliance, right?
25   A.   What are you referring to

JAY ALIX

1
2  specifically?
3    Q.   The entire litany of things that
4  you've described now multiple times.
5    A.   Well I think the document, if
6  this is an accurate transcription of
7  what I said, then the document speaks
8  for itself.
9    Q.   Okay.  So let me ask you --
10   A.   But I don't know if this is an
11 accurate transcription of what I said or
12 not.
13   Q.   That can be compared, the tape
14 exists.  But let me direct you to the
15 top of page 4, and actually it starts on
16 page 3, the bottom of page 3 you start
17 describing what happened when you took
18 your complaints to Dominick Barton,
19 right?  So I went to Dominick Barton.
20   A.   I have to read the paragraph.
21     MR. O'SHEA:  Well, in order to be
22 -- we haven't seen this document
23 before today.  In order to be fair to
24 the witness I think he should have
25 the opportunity to read the entire

Page 294

JAY ALIX

1    thing.
2    Q.  The question is going to be the
3  same question.  In describing this
4  course of meetings that you had with Mr.
5  Barton, Mr. Alix, you never claimed that
6  Mr. Barton agreed with you that McKinsey
7  RTS was violating Rule 2014 with its
8  bankruptcy disclosures?
9    A.  I'm having trouble focusing in on
10  it because it is single spaced and many
11  pages.  Dominick Barton admitted to me
12  that he knew they were violating the
13  bankruptcy disclosure rules and the pay
14  for play was improper and he said he
15  would fix it.  And I've said that every
16  which way I can within trying to be
17  careful with my words.
18    Q.  But so far we haven't identified
19  any place in any prior court pleading,
20  though you've had multiple
21  opportunities, where you said the same
22  thing that you've tried to say today,
23  which is that Dominick Barton agreed
24  with you that McKinsey RTS's bankruptcy

Page 295

JAY ALIX

1  disclosures violated Rule 2014?
2    MR. O'SHEA:  I'm going to object,
3  I think that's incorrect.  I think it
4  misreads the documents.  I think
5  you've isolated various portions of
6  these documents without reading them
7  as a whole as the witness has
8  testified, so in that sense it
9  misstates his testimony.
10    And this is also, I would add, as
11  I've stated before, outside the four
12  corners of this judge's order and
13  improper.
14    MS. CHUNG:  It's not outside the
15  four corners.
16    MR. O'SHEA:  Excuse me, I'm not
17  finished.  With that, you can answer
18  the question if you can.
19    A.  I'm not sure what the question is
20  anymore.
21    Q.  I think the question is, I'm
22  giving you the opportunity to identify
23  any place, you've filed many court
24  proceedings, you've filed complaints,

Page 296

JAY ALIX

1  you've filed objections through Mar-Bow,
2  tell me any place before today you said
3  that Dominick Barton agreed with you
4  that McKinsey RTS's Rule 2014
5  declarations violated bankruptcy law?
6    A.  Without reviewing all the court
7  documents in all those cases, ANR,
8  Westmoreland, the RICO suit and if you
9  want to pull up media commentary, it's
10  going to be hard to answer that question
11  yes or no.
12    Q.  Okay.  So in looking at this one
13  that we're looking at --
14    A.  I think I've made it pretty clear
15  that's what he and I were talking about
16  for 4 months and he was talking with me
17  and agreeing with me he had to fix that
18  problem.  So I think he's admitted it to
19  me many times.  But whether or not it's
20  written the way you are characterizing a
21  document, I'd have to look at all the
22  documents.
23    Q.  And you understand, for example,
24  in the RICO case, you said earlier the

Page 297

JAY ALIX

1  RICO complaint was amended because the
2  judge gave an order, right?
3    A.  You'll have to interview Mr.
4  O'Shea about why it was amended.
5    Q.  All right.  So in this document
6  that we're looking at, I'm just going to
7  direct your attention to one sentence.
8    A.  Which one?
9    Q.  Which says, on page 4, it's the
10  second complete paragraph.  Where you
11  make a representation about --
12    A.  Where?
13    Q.  Where it says "And at that
14  point," okay?
15    A.  And at that point I came to see
16  that, you know, they just weren't
17  listening, they were not interested in
18  hearing what I had to say, they weren't
19  interested in complying with the law.
20  They didn't feel it applied to them and,
21  in fact, Mr. Barton told me that he did
22  not think that these were important
23  laws, he thought that these laws were
24  not that important.  I told them that

Page 298

JAY ALIX

1  they were very important, they're very
2  serious, they're federal laws.  And in
3  fact, there's a case where professionals
4  in the United States -- in the US
5  professionals are going to federal
6  prison if they're not compliant with
7  these laws.
8  Q.   Okay, so Mr. Alix.
9  A.   Where intentionally -- I want to
10  finish.
11  Q.   There's no pending question.
12  A.   You asked me to look at the
13  paragraph and I'm reading it to make
14  sure I'm clear.  You said there's a
15  question in this paragraph.
16  Q.   Here is the question.  The
17  question is the paragraph does not say,
18  when you're describing what your
19  reaction was, what the reaction was from
20  McKinsey in this set of allegations
21  you're making, you don't say that Mr.
22  Barton agreed with you that McKinsey was
23  violating Rule 2014, that McKinsey RTS
24  was violating Rule 2014?

*Note: Line numbers 1-25 per page.*

Page 299

JAY ALIX

1  A.   I haven't finished reading the
2  document so I can't answer your
3  question.
4  Q.   In any part of what you've read
5  up until now is there any such
6  admission?
7  A.   Well Mr. Barton told me he did
8  not think that these were important
9  laws.
10  Q.   Okay, but that's --
11  A.   That's his admission, there are
12  laws and he doesn't think they're
13  important and they're not going to
14  comply with it.
15  Q.   And you regard that as the same
16  thing as --
17  A.   That's at least a tacit admission
18  if not outright admission.  He did that
19  over and over again.
20  Q.   You think saying they're --
21  A.   He said to me they're not
22  important laws, implying to me they're
23  not going to comply with them and then
24  after the fact they didn't comply with

Page 300

JAY ALIX

1  them.  I know he knows they're laws.  I
2  know he knows I thought they were laws.
3  I have his admission that there are
4  laws.  If he says to me they're not
5  important laws, inside of that sentence
6  is the admission that they're laws.  And
7  he knows that they're not important laws
8  because he's not going to comply with
9  them.
10  Q.   Mr. Alix --
11  A.   That's what he led me to believe.
12  That's my testimony.  That's what my
13  affidavit is saying.  That's what the
14  RICO suit is saying and that's what
15  happened.
16  Q.   As a fraud examiner, as someone
17  who has testified as an expert in
18  bankruptcy court, you know that in order
19  for there to be a fraud there has to be
20  bad faith.  McKinsey RTS has to believe
21  that it's violating the law.  And now
22  you're back to discussing differences in
23  interpretations of the rule.  Right?
24  A.   No.  I'm not.

Page 301

JAY ALIX

1  MR. O'SHEA:  I'm going to object
2  and move to strike the question.
3  Look, you can argue all day long
4  about the law here, Chris.  But the
5  judge's order says the body of these
6  two pleadings at their respective
7  docket numbers, and you're going far
8  afield and you're arguing with the
9  witness.  At times today you've
10  raised your voice to this witness.
11  I've tried to be patient.  But I
12  think you're running really afoul of
13  the judge's order.
14  MS. CHUNG:  I don't think I am
15  because the witness has testified
16  that he authorized and supports the
17  allegations of the history of fraud
18  that's alleged in the objection.  So
19  the question about where he believes
20  that McKinsey ever -- McKinsey RTS
21  ever had bad faith, and what he's
22  testified about is an alleged
23  admission by Mr. Barton that thus far
24  he hasn't been able to say where he's

JAY ALIX

1    ever said this before.
2    Q.    And my question about this
3    document, Mr. Alix, is nowhere in this
4    podcast that lasted 40 minutes did you
5    ever allege that McKinsey RTS or anybody
6    else at McKinsey committed fraud, did
7    you?
8    A.    Well I wasn't using the podcast
9    to establish my legal position on a lot
10   of this.  As you can see it's a four and
11   a half year old journey.  I've gone to
12   the ANR court.  I've submitted sworn
13   affidavits.  I've submitted a
14   significant pleading in the Westmoreland
15   case.  And I've filed a complaint in the
16   Southern District of New York alleging
17   criminal activity with RICO predicates
18   clearly established.
19         Therefore, whether or not the
20   words that you're looking for in these
21   documents, I can't speak to it.  All I
22   can tell you is the documents speak for
23   themselves and if lawyers want to argue
24   the law or the basis for bad faith, you

JAY ALIX

1    know, you're welcome to do that.
2         But I know that when I meet with
3    the CEO of another company, business
4    person to business person, and I tell
5    them that I think their company is
6    violating federal laws repeatedly and
7    they ask me to be patient and not report
8    it so they can fix it, to me that's the
9    admission.
10        And when he then calls a lawyer
11   and the lawyer says, yeah, you're
12   breaking the law, you better fix it and
13   he tells me that and he tells me what
14   the lawyer said, that's his admission.
15        And then when I call him again and
16   tell him that you did it again in the
17   NII case he says, yeah, it happened and
18   I can't fix that one.
19   Q.    You're just repeating yourself
20   and you're not responding to the
21   question.
22        MR. O'SHEA:  And you're
23   interrupting the witness.
24        MS. CHUNG:  Yes, because he's not

JAY ALIX

1    being responsive to anything that's
2    being asked.
3         MR. O'SHEA:  Boy, I think you
4    know better than this, Chris.  You're
5    really way out of bounds.
6    Q.    We can cut this short.  Let's
7    look at page 5.  Let's look at your own
8    characterizations of what the conduct
9    is?
10   A.    At what?
11   Q.    Page 5 of the podcast?
12   A.    Exhibit 7, page 5?
13   Q.    Mm-hmm.
14   A.    Page 5.
15   Q.    So I'm just going to ask you yes
16   or no, have I read this correctly, these
17   are in your words?  Very top of the
18   page, "There are recent cases that
19   they've been involved in where I know
20   for a fact that they have withheld
21   dozens and dozens of important
22   disclosures, basically false disclosure
23   by omission, omitting important
24   conflicts of interests and connections

JAY ALIX

1    that are required to be disclosed."
2         Have I read that sentence
3    properly?
4    A.    You have read that properly.
5    Q.    Okay.  And that's what you said
6    to the Biz News?
7    A.    Well we'd have to check the
8    transcript against the recording, but
9    yeah.
10   Q.    So assuming that the recording is
11   accurate, the way that you describe the
12   misconduct here is false disclosure by
13   omission, right?
14   A.    Yes.
15   Q.    And so let's turn to the page,
16   page 8.  The first reference where it
17   says Alix, there's a reference to you
18   speaking.
19   A.    On the top or the bottom?
20   Q.    At the very top.
21   A.    Uh-huh.
22   Q.    So page 8 I'm going to read
23   again, I'm just going to ask you whether
24   I've read this properly which is a

JAY ALIX

1  transcript of your interview.
2  "Absolutely.  The Wall Street Journal
3  story opened up even more really
4  violations than I was aware of.  I
5  stumbled into the lack of
6  disclosure-intentional lack of
7  disclosure-across multiple federal
8  bankruptcy cases, which in itself is a
9  very serious set of violations."
10     See that?  I've read that
11  properly?
12  A.  I see that.  I think you've read
13  it properly.
14  Q.  So you're saying that McKinsey
15  RTS intentionally did not disclose --
16  A.  Yes.
17  Q.  That's your view?
18  A.  I believe McKinsey intentionally
19  did not disclose and I've pled that in
20  the ANR case and I've pled that in the
21  Westmoreland case and I've pled that in
22  the RICO case.
23  Q.  Okay.  And when you say which in
24  itself is a very serious set of

JAY ALIX

1  violations, you're saying a violation of
2  Rule 2014 according to your
3  interpretation of Rule 2014?
4  A.  According to the rule and
5  according to all the case law for
6  decades and decades, it's a very serious
7  violation of Rule 2014, according to all
8  the case law.
9  Q.  Okay.  And that's the same case
10  law, when you refer to the case law and
11  all the case law, you're referring to
12  the same case law that you referred to
13  earlier in this deposition, and that you
14  admitted you can't cite a single case
15  that says, for example, that Rule 2014
16  disallows lookback period use?
17  A.  All the case law around Rule 2014
18  disclosure violations, section 101.14
19  and section 327 of the bankruptcy code
20  is well documented, well known and well
21  available to everyone to read.  And so I
22  don't have to provide an overview or
23  term paper on it.  I've read quite a bit
24  of case law.  I know it well.  I can't

JAY ALIX

1  cite it like a lawyer does off the top
2  of my head, but I know pretty good.  And
3  it's pretty clear that everything I've
4  seen in the McKinsey disclosures are all
5  serious violations of Rule 2014 and
6  section 101.14.
7  Q.  You know there's a difference
8  though between a violation and an
9  intentional violation, right?  You're
10  nodding?
11  A.  That a question.
12  Q.  So --
13  A.  Are you asking me a question or
14  are you asking me for agreement?
15  Q.  I am but you nodded.
16  A.  No, I'm nodding because I'm
17  hearing you.  I'm acknowledging that I'm
18  hearing you.  And I'm wondering if you
19  want me to answer that question or if
20  you want to ask me another question?
21  Q.  I'm asking you if you understand
22  there's a difference between alleging
23  that someone didn't comply with the law,
24  violated the law, and intentionally

JAY ALIX

1  violated the law?
2  A.  My understanding --
3  Q.  It's just a yes or no question.
4  Is there a difference?
5  A.  No, you asked me if I understand.
6  I'm trying to explain my understanding
7  so I can answer your question.
8  Q.  Why don't we do it in order.  Yes
9  or no, is there a difference?  And then
10  I'll let you give your understanding.
11  A.  Ask me the question again.
12  Q.  Do you understand, yes or no,
13  that there is a difference between
14  saying there's a violation of law and
15  there is an intentional violation of
16  law?
17  A.  There is a difference.
18  Q.  Okay.  And your understanding of
19  that difference is what?
20  A.  My understanding of that
21  difference is based on my years of
22  training as a certified fraud examiner
23  and as a person who has investigated
24  many frauds as well as a practitioner in

78  (Pages 306 to 309)

Page 310

JAY ALIX

1  the bankruptcy space having filled out
2  these Rule 2014 violations, having
3  taught numerous courses to federal
4  bankruptcy judges and US district judges
5  and attorneys about these issues and
6  many other issues on bankruptcy.
7  And my understanding is this:
8  That if someone inadvertently does not
9  disclose a connection, a connection, two
10  connections, five connections, it's
11  probably what we call a foot fault.
12  They are probably inadvertent and it was
13  probably just a violation as you say.
14  And in those situations, there are still
15  pretty stiff penalties for firms who
16  make those violations even when they
17  didn't intend it, even when there was no
18  intention, it was just error.  But the
19  courts have consistently found in those
20  situations, with just one violation or
21  two of an undisclosed connection, that
22  they still found it, saw fit, and I know
23  that, you know, hundreds of thousands
24  and millions of dollars of fees can be

Page 311

JAY ALIX

1  at stake.
2  But when the court starts finding
3  multiple connections undisclosed, it
4  rises above that.  It rises above the
5  idea that how can a firm that knows all
6  of its own connections repeatedly not
7  disclose its connections and then after
8  it's been ordered to disclose the
9  connections by a judge in a bankruptcy
10  case not disclose all its connections,
11  then it's been ordered by the US Trustee
12  in six different pleadings to do it and
13  it still hasn't done it, in my world as
14  a fraud examiner that starts to rise to
15  intentionality if not crossing
16  completely over.
17  So I think that you're right,
18  there are violations and then there's
19  intentionality.  And I have pled in this
20  case starting back at the ANR case with
21  the advice of all the experts I
22  mentioned earlier that everyone who's
23  advised me believes that this is
24  intentional.  It appears intentional.

Page 312

JAY ALIX

1  And therefore I have a good faith
2  basis relying on a dozen experts and my
3  own research and my own history and
4  knowledge that these violations that I'm
5  seeing repetitively in 41 disclosure
6  documents filed under the penalty of
7  perjury, that are missing collectively
8  something missing 2,000 connections,
9  that to me appears intentional.
10  Q.   You would agree with me that if
11  there's nondisclosure that's good faith,
12  to say there's a policy of not
13  disclosing, it's done in good faith and
14  that results in 10,000 nondisclosures,
15  that's not fraud?
16  MR. O'SHEA:  Objection, calls for
17  a conclusion of law which is outside
18  this witness's expertise.  And it's
19  also a misleading question because
20  built into it is if there's a policy
21  of violating the law, then if you
22  follow that policy that somehow it's
23  not a violation of law, which we both
24  know, Chris, you from your long

Page 313

JAY ALIX

1  experience and as well as me in my
2  experience, that that is not true.
3  MS. CHUNG:  So I can adjust the
4  question slightly.
5  Q.   You agree with me there's a
6  disclosure -- actually the question is
7  fine.  If it's a good faith
8  nondisclosure, no matter how many
9  nondisclosures there are, there's no
10  intentional fraud; do you know that as a
11  fraud examiner?
12  A.   I think the assumption it's a
13  good faith filing in serious doubt
14  because.  Because a good faith filing
15  would require the petitioner, the
16  applicant, to have a basis for
17  expressing their sworn statement under
18  the penalty of perjury.
19  Q.   Okay, so you've answered the
20  question.
21  A.   No, I'm not done yet.
22  Q.   I'm sorry, you have answered the
23  question.
24  MR. O'SHEA:  Chris, please,

JAY ALIX

1  please, you can't do this.
2       MS. CHUNG:  Yes, I can because
3  he's not answering the question.
4     Q.   The question was you agree with
5  me that if there's a good faith
6  disclosure no matter how many
7  disclosures there are, then he says the
8  assumption is of a good faith filing is
9  in serious doubt.  So you agree with me
10  that good faith is a dividing line,
11  you're just quibbling about whether the
12  assumption is met?
13     A.   Read the question again.
14     Q.   You agree with me that if there's
15  a good faith disclosure, no matter how
16  many of them there are, good faith
17  nondisclosure let's make it -- good
18  faith nondisclosure, no matter how many
19  of them there are, that's not a fraud?
20     A.   I do not agree with you.
21     Q.   You don't agree with that?
22     A.   I don't agree with you.
23     Q.   Okay.  And you --
24     A.   Do you want me to --

JAY ALIX

1     Q.   You don't have any reason to
2  think, for example, you've talked about
3  your advisors, you don't have any
4  firsthand knowledge of what McKinsey's
5  advisors are telling McKinsey RTS,
6  McKinsey RTS's advisors are telling
7  McKinsey RTS?
8     A.   Well, if you're saying that
9  McKinsey has done all this on the advice
10  of counsel, then I suspect they may have
11  a claim against their law firms.  If
12  McKinsey's done this all of its own
13  decision, then McKinsey has to look to
14  itself.
15       But somebody has to take
16  responsibility at McKinsey, one person
17  has to take responsibility at McKinsey
18  for how these things get filed.  And
19  there's a pattern to all of them and yet
20  there are many different law firms
21  involved.  But the documents have a
22  pattern.
23     Q.   The question was just --
24       MR. O'SHEA:  No, no, we're going

JAY ALIX

1  to stop this, Chris.  You're going to
2  let this witness answer the question.
3  This has got to stop.
4       MS. CHUNG:  He's not answering
5  the question.
6       MR. O'SHEA:  You don't think he's
7  answering the question.  You don't
8  like the answer, and that's
9  different.
10       MS. CHUNG:  He's skipping the
11  answer to the question.
12       MR. O'SHEA:  With respect, this
13  has got to stop.  You go ahead and
14  answer the question, Mr. Alix.
15     Q.   And try to answer whether there's
16  any good faith, whether you have any
17  firsthand knowledge of what advice
18  McKinsey RTS is getting?  It's a yes or
19  no question.  Do you, Mr. Alix, or don't
20  you?
21     A.   I do, I do have knowledge of what
22  advice McKinsey is getting.
23     Q.   Firsthand knowledge?
24     A.   Well, you stood up in court the

JAY ALIX

1  other day and said Mr. Ivanick from
2  Hogan & Lovells is giving advice on
3  disclosure of connections.  I read Mr.
4  Ivanick's disclosures and they don't
5  comply with Rule 2014, so I imagine he's
6  giving them bad advice and that's my
7  good faith basis for that statement.
8       I also have read Mr. Carmody's
9  declarations in both the ANR case and
10  more importantly this situation the
11  GenOn case and when Mr. Carmody looked
12  -- worked at AlixPartners he filled out
13  and signed Rule 2014 disclosures and
14  they had the names and descriptions in
15  them of all connections off the database
16  process I described to you.  And yet he
17  goes over to McKinsey and somehow
18  McKinsey he switches over immediately to
19  not disclosing names, in disclosing any
20  descriptions and representing to the
21  court that they are disinterested when
22  the MIO has financial interests in the
23  debtor.
24       So I have firsthand knowledge that

Page 318

JAY ALIX

1
2 there's something wrong with that.
3     So I can't say to you that there's
4 a good faith basis for these
5 declarations because I don't think a
6 good faith basis underlies the
7 declarations.
8     Q.    Well you're saying that you
9 disagree with the advice that you
10 believe these people have gotten.  Isn't
11 that what you're saying?
12    A.    No, no.
13    Q.    You disagree with it?
14    A.    The bankruptcy code and the
15 bankruptcy law and the case law
16 disagrees with the advice McKinsey is
17 getting.  They are just choosing to
18 ignore the code and the law and they're
19 going to dive under some blanket that's
20 privileged because I got it based on
21 advice of counsel.  Well if McKinsey is
22 going to claim they got this based on
23 the advice of counsel, then their
24 counsel is going to have to testify in
25 this court and show the legal opinion

Page 319

JAY ALIX

1
2 that they gave McKinsey that this was
3 good disclosure.  Because you can't rely
4 on the advice of counsel as a shield and
5 then say I did it and not be held
6 accountable for it.
7     So either all of McKinsey's
8 lawyers are going to have to testify in
9 this case, without attorney-client
10 privilege, that they advised McKinsey
11 with written opinions to make these
12 disclosures this way, or McKinsey is
13 going to have to accept the consequences
14 that the bankruptcy code doesn't allow
15 for this and they did it knowingly and
16 intentionally which they've done
17 repeatedly in 41 signed disclosures.
18    Q.    You're --
19    A.    So that's good faith to me.
20    Q.    My question was not limited to
21 counsel.  It was not.
22    A.    Well you said their advisors are
23 getting it.  So I don't know.  Maybe
24 there's other advisors.
25    Q.    Your advisors aren't limited to

Page 320

JAY ALIX

1
2 counsel?
3    A.    I'm not saying they have to limit
4 advice to lawyers.  They can get it from
5 anyone they want.  I think whoever that
6 is giving them this advice is going to
7 have to prove it on the record with the
8 court in this case that they gave
9 McKinsey expert opinion advice, that
10 these disclosures withholding 200
11 connections, withholding indirect
12 financial interest in this debtor and
13 maybe direct and having a black box of
14 all things we don't even know about,
15 that that was really good law compliance
16 with this, with this code in good faith.
17    Q.    When you say --
18    A.    That's not a good faith basis.
19    Q.    When you say withholding, you
20 mean according to the rule as you
21 interpret it?
22    A.    As the case law interprets it.
23    Q.    Right.  You --
24    A.    The case law.
25    Q.    Your interpretation of the case

Page 321

JAY ALIX

1
2 law?
3    A.    The case law, hundreds of cases.
4    Q.    Which nobody, you can't name a
5 single person other than people you
6 hired agree with?
7    A.    Oh, that's not true.  That's not
8 true at all.  I can name a lot of people
9 who agree with it.  I can probably name
10 500 bankruptcy lawyers who agree with
11 it.  There's 350 bankruptcy judges in
12 this country that rely on that rule.
13 There's 94 U.S. Trustee's in this
14 country that rely on that rule.  The
15 federal court districts rely on that
16 rule.  The Supreme Court relies on that
17 rule.  The rules committee of the
18 federal court system in bankruptcy
19 relies on that rule.
20     The US Trustee said it right.
21 Only McKinsey, only McKinsey is the only
22 professional they've ever heard who has
23 this interpretation of this view of it.
24    Q.    This interpretation --
25    A.    If McKinsey wants to limit that,

81 (Pages 318 to 321)

JAY ALIX

1
2 have at it. I'm not saying they have to
3 adopt my advice. But I am saying this
4 judge needs to be aware that they've
5 presented themselves on the sworn
6 affidavit saying we are in compliance
7 with the Rule 2014. That statement,
8 we're in compliance with 2014, under the
9 penalty of perjury, in good faith is
10 missing in these declarations.
11      If they want to convince this
12 judge of that, have at it. I've done my
13 job. I brought it to his attention. I
14 don't think McKinsey could or should do
15 that. And I went to Dominick Barton
16 four and a half years ago to explain to
17 him he should not do that.
18 Q.   Now you're just repeating.
19 A.   That's good faith. My good faith
20 is I've explained what I believe to be
21 true and if McKinsey has a different
22 view bring it to the court.
23 Q.   McKinsey's view in applying a
24 lookback period is the same as every
25 other professional's view in the case,

JAY ALIX

1
2 right, you have no basis to dispute
3 that?
4 A.   Listen, you can fight on the
5 lookback period all day long. But
6 whether you are on this side of the wall
7 by one day or that side of the wall the
8 code is clear, disclose all your
9 connections, and the code doesn't say
10 and limited to a lookback period.
11 Q.   And your view that McKinsey is
12 one firm that has to disclose all
13 affiliate connections, also other
14 professionals in the case are not
15 disclosing affiliate connections?
16 A.   Listen, that's between you,
17 McKinsey and the court. I'm not here
18 with any opinion about the other
19 professionals. As far as I know their
20 disclosures are adequate and the court
21 has accepted them as they are. If
22 McKinsey wants to start a case against
23 the other professionals McKinsey should
24 go do that. That's not my interest.
25      My interest and my only purpose

JAY ALIX

1
2 of being here is to make sure that this
3 court knows that this firm McKinsey has
4 been a repeat offender of this rule and
5 the court before they approve them in
6 this case as a creditor with an interest
7 in the case as well as a person
8 concerned with the system and wanting a
9 level playing field, I want to make sure
10 the court is aware of the facts. What
11 the court does with that is up to the
12 judge.
13 Q.   So you've made very clear that
14 your interest is McKinsey RTS. But the
15 logic of what you are arguing, the logic
16 of saying you can't apply a lookback
17 period applies to every other
18 professional in this case, right?
19 A.   I'm not saying you can't.
20      MR. O'SHEA: Objection, that
21 misstates his testimony. It's not an
22 issue about a lookback period. He
23 never said that.
24      MS. CHUNG: He's testified --
25 A.   I don't care about the lookback

JAY ALIX

1
2 period. I'm not interested in lookback
3 period. What I'm interested in is
4 disclosing all connections that would be
5 in the best interests of this estate and
6 creditors to have disclosed on the
7 record an for the court to adjudicate
8 under his own discretion and judgment
9 about what's conflicting and what's not.
10 And McKinsey has taken a position that
11 it will decide for itself in secret
12 whether it thinks it is worthwhile to
13 show to the judge or not. That violates
14 the spirit, the law and the case law and
15 everything around this process and it
16 corrupts the bankruptcy system.
17 Q.   Don't other -- don't other
18 professionals as well, for example, make
19 -- they make representations about
20 relatedness to the debtor, happens every
21 day in bankruptcy court?
22 A.   All kinds of people make all
23 kinds of disclosures in bankruptcy court
24 and each one stands on its own and each
25 judge decides for him or herself who

JAY ALIX

1  they trust and who they don't, who has a
2  history in the court and who doesn't.
3  Who do they want to rely on and who not.
4  Who they think is a good fiduciary and
5  who they think won't be well suited as a
6  fiduciary.  Who they think will work in
7  the best interest of the estate and who
8  not.
9
10      But that judge needs to rely on
11  the history and the credibility and the
12  integrity of those professionals.
13      And all I've brought forward here
14  is the fact that this professional is
15  not using forthright disclosure
16  practices, high integrity, and a desire
17  to help this court get to the bottom of
18  what's going on here.
19  Q.  So let's talk about this
20  bankruptcy.  In Westmoreland you think,
21  as we looked at in paragraph 84 of the
22  objection, your view is MIO and RTS are
23  not separate and that's why you think
24  all those connections have to be
25  disclosed?

JAY ALIX

1
2  A.   My view is that McKinsey is a one
3  firm-firm, as promoted by professor
4  David Maister who they copied from the
5  Harvard Business School.  And David
6  Maister advised them and they present
7  themself to the world as a global one
8  firm-firm and in fact their fee
9  applications in this case and in every
10  case start off with the first few pages
11  explaining that they are a one
12  firm-firm.
13      And then I find evidence in many
14  places throughout a lot of research that
15  the presentation that you've made that
16  they're separate, that the MIO is some
17  kind of a blind trust, is a, is a false
18  statement and in fact it's been called
19  out by the US Trustee in the pleading a
20  month ago that it was represented to the
21  US Trustee four times the MIO is a blind
22  trust and the US Trustee has determined
23  and said out loud in public that that is
24  a false statement four times to them on
25  the record in the ANR case and it was

JAY ALIX

1
2  uttered by McKinsey's attorney.  And
3  they have since had to pull back from
4  that statement.
5      And then they went from it is a
6  blind trust to it's essentially a blind
7  trust to it's like a blind trust to it's
8  run independently to its mostly
9  independent to nobody crosses over.
10      Okay, some people cross over but
11  not that many.
12      Uh-oh, a lot of people cross over.
13  They don't get information.
14      Well they get some information.
15      Well they get it about this, this
16  and this.
17      This is an evolving story that
18  doesn't end.  It's a never ending story.
19  So I don't know which one is right.  I
20  don't know which one was the true one.
21  Was this one true, was this one true?  I
22  don't know.  All I know is the story
23  keeps evolving and none of it holds up
24  when it's scrutinized.
25  Q.   And you don't know, for example

JAY ALIX

1
2  -- you've already described many of the
3  things that you don't know about MIO,
4  right?  You know --
5  A.   MIO is a huge business.  I don't
6  know a lot about the business.
7  Q.   The reason --
8  A.   I know about the things I've
9  talked about.
10  Q.   The reason that MIO investments
11  appear on your chart at paragraph 166 is
12  because of your view that MIO is not
13  separate, and you know that McKinsey
14  disagrees with you?
15  A.   No, it's the bankruptcy code's
16  view that McKinsey is not separate.
17  It's an affiliate.  Look, you talked
18  about corporate forum in the courtroom.
19  But I think you meant corporate form
20  when you said it.  I'm not sure about
21  that, but you said in the transcript.
22  It's not about corporate form.
23      Bankruptcy court is a court of
24  equity.  The court has the ability to
25  look through corporate form to look at

JAY ALIX

1  the substance of a transaction and to
2  look at the equitable nature of the
3  situation.
4      And in this situation, when you
5  look through the corporate form, you
6  have to also look at not just corporate
7  form, you have to look at corporate
8  control, corporate governance, corporate
9  board members, corporate employees,
10 corporate activities, corporate business
11 models.
12     And so claiming that there's a
13 corporation that wraps around this thing
14 to a bankruptcy process is of no
15 consequence.  Because in bankruptcy we
16 look through corporations all the time
17 to see how transactions were done.  We
18 substantively consolidate companies.  We
19 treat them as one company for a
20 bankruptcy proceeding.
21     And so arguing corporate form as a
22 separation, having a conflicts wall, is
23 not really effective or appropriate in
24 this setting, especially when there's

JAY ALIX

1  case law that says big companies that
2  are bigger than McKinsey, companies like
3  Coopers & Lybrand, companies like
4  Pricewaterhouse, big companies have to
5  disclose all their connections for their
6  affiliates and not just the office
7  working on the case, not just the people
8  working on the case and not just the
9  group working on the case.
10     And Ernst & Young, yeah, Ernst &
11 Young had this for their restructuring
12 firm as well.  These are firms much
13 bigger than McKinsey that comply with
14 these laws and report for their
15 affiliates.  McKinsey is an outlier here
16 and it's violating all the case law.
17 Q.   It's an outlier, AlixPartners
18 itself doesn't disclose the affiliations
19 of its -- the connections of all its
20 affiliates, does it?
21 A.   You want to back that one up?
22 You want to back it up?
23 Q.   Yeah.
24 A.   Back it up.  Find me the

JAY ALIX

1  affiliate that wasn't disclosed for
2  AlixPartners.
3  Q.   How about the connections of
4  Lakeview?
5  A.   Try it.
6  Q.   Your view would be that if a
7  board member of AlixPartners had a
8  connection to the debtor in some way or
9  an equity interest in the debtor in some
10 way, directly or indirectly, that's a
11 disqualifying interest?
12 A.   No, it's a connection that has to
13 be reported and disclosed.
14 Q.   No, it's more than that.  You say
15 in here that any MIO connection is not
16 only something that has to be disclosed
17 but has to be, is disqualifying?
18 A.   The professional's obligation is
19 to disclose.  It's the court's job to decide
20 to adjudicate whether it's disqualifying
21 or not.  The professional doesn't get to
22 make that decision.  The court gets to
23 make that decision.
24 Q.   So it's --

JAY ALIX

1  A.   McKinsey has abrogated that's
2  decision to itself, but that's an
3  improper usurpation of the court's power
4  that McKinsey has given to itself on
5  thousands of decisions they never should
6  have done.
7      But when I get my 2014 disclosure
8  request from AlixPartners on every
9  single Chapter 11 case they do, I read
10 it.  I'm not an employee of the firm.  I
11 don't work there and I'm not an officer
12 there and I'm not working on the case.
13 But I read it, and I try and figure out
14 if I'm connected in any way, other than
15 a de minimis way, to everybody in that
16 list and I report my connections to the
17 firm and they report them.
18     So, if you've got a board member
19 at AlixPartners who is not filling out
20 the form properly, I'd like to know it
21 because I would go tell them immediately
22 and I would fix it immediately.  I would
23 not tolerate anybody connected to my
24 company not making full disclosures of

JAY ALIX

1  any material connection that's not de
2  minimis, especially if they are in
3  control of the enterprise.
4     Q.   Any material connections that's
5  not de minimis, that's what you just
6  said?
7     A.   You don't report de minimis
8  connections.  If I have a MasterCard in
9  my wallet and the firm is helping
10  MasterCard, I don't have to report that
11  connection.
12     Q.   You testified you don't know
13  anything about McKinsey's service and
14  you are assuming they are all not de
15  minimis, right?
16     A.   These are big clients of
17  McKinsey.  It's a big consulting firm.
18  McKinsey doesn't do small stuff.
19  McKinsey isn't helping people pay their
20  bills.
21     Q.   But McKinsey doesn't do small
22  stuff but AlixPartners does, is that
23  what it boils down to?
24     A.   No, we do the same work but we

JAY ALIX

1  disclose all of our connections.
2  McKinsey doesn't.
3     MR. O'SHEA:  You're a little over
4  an hour, Chris.  At an appropriate
5  time can we take a break?
6     MS. CHUNG:  Sure.  So this is
7  going to be 8.
8     (Exhibit 8, declaration filed in
9  the Ultrapetrol Bahamas limited case
10  in 2017 by AlixPartners was marked
11  for identification.)
12     MS. CHUNG:  This is a declaration
13  filed in the Ultrapetrol Bahamas
14  limited case in 2017 by AlixPartners.
15     MR. O'SHEA:  Can I have an offer
16  of proof about how this is consistent
17  with the judge's order of December
18  20th that the subject party of the
19  deposition is limited to the basis
20  and authorization for the allegations
21  contained in docket number 629 and
22  669, please?
23     MS. CHUNG:  Sure.  So the basis
24  of the -- the apparent basis of the

JAY ALIX

1  allegations is that McKinsey is
2  violating the law and that it is
3  doing so in a way that is
4  intentional.
5     Mr. Alix has not backed away from
6  that at all.  And so what it is that
7  other professionals are doing goes to
8  good faith and to the common
9  practice.
10     MR. O'SHEA:  It's obviously
11  irrelevant, Chris.  I think you know
12  better.  I'm going to allow it but I
13  think the court will probably read
14  this deposition if not view this
15  videotape and I think you're running
16  afoul of the Court's order and you're
17  on notice.
18     Q.   So, Mr. Alix, I'm going to direct
19  your attention to page 9.  Well first of
20  all let's go to page 7.  Paragraph 17,
21  the last sentence, I'm just going to
22  read it.  This relates to your testimony
23  earlier about AlixPartners and whether
24  or not it uses a lookback period.  "A

JAY ALIX

1  search was performed for connections to
2  the potential parties in interest within
3  the past five years."
4     A.   Where are you reading from?
5     Q.   The last sentence of paragraph
6  17.
7     A.   You said page 7.
8     MR. O'SHEA:  It's not on page 7.
9     A.   You mean page 7 of the Court --
10  well, no, they're the same.
11     MR. O'SHEA:  We're in the wrong
12  place here, Chris.
13     Q.   It's page 7 at the bottom of the
14  page.
15     MR. O'SHEA:  Paragraph 17.
16     MS. CHUNG:  Paragraph 17.  It
17  starts on page 53 of the filing.
18     A.   This is page 7 and page 7.
19     MR. O'SHEA:  Page 53 of the
20  docket.  Just give us a moment
21  please.
22     A.   Page 53 of 70 on the docket, Jay.
23     MS. CHUNG:  We're using the pages
24  at the top.

JAY ALIX

1
2    MR. O'SHEA: I think we have it.
3    Q.   I'm just going to read the last
4  sentence of paragraph 17. "A search was
5  performed for connections to the
6  potential parties in interest within the
7  past five years and results were
8  disclosed to AlixPartners Holdings LLP,
9  AP Holdings, AlixPartners Parent Company
10  and HofAP Holdings US and non-US
11  subsidiary affiliates."
12    Do you see that?
13    A.   I do see that.
14    Q.   And now I'd like to direct your
15  attention to paragraph 9 -- sorry, page
16  9 which is page 55 of 70 if you're doing
17  that.
18    A.   Page 55 of 70.
19    Q.   So second paragraph there says,
20  at the top of the page, the first full
21  paragraph, "In addition, AlixPartners
22  may have had, may currently have or may
23  in the future have business
24  relationships with, among other
25  entities, portfolio companies of the

JAY ALIX

1
2  investors and portfolio companies of
3  private equity funds in which they are
4  limited partners, in matters unrelated
5  to the debtors or their affiliates in
6  these Chapter 11 cases. Based on, among
7  other things, the business separation
8  between each of the investor parties and
9  AlixPartners and the contractual client
10  confidentiality obligations of
11  AlixPartners, AlixPartners believes that
12  it does not hold or represent an
13  interest adverse to the estate with
14  respect to the engagement."
15    So does that last sentence that I
16  read, beginning "Based on, among other
17  things, the business separation," this
18  is AlixPartners relying on the
19  separation between it and investor
20  parties not to disclose connections of
21  the investor parties?
22    A.   Can you define investor parties
23  to me? It's a defined term.
24    Q.   Yes, it's on the prior page, page
25  54 of 70.

JAY ALIX

1
2    A.   Where do I find that?
3    Q.   It's at the very top of the page.
4  It says the equity capital of AP
5  Holdings is now owned by, one, the
6  managing directors of AlixPartners, two,
7  Lakeview Capital Holdings Inc. and other
8  affiliates of Jay Alix, collectively
9  Lakeview, affiliates of, and this is in
10  French, Caisse de depot et placement du
11  Quebec and then in paren CDPQ, (iv),
12  affiliates of Investcorp Group, (IVC)
13  five, affiliates of Public Sector
14  Pensions Investment Board, (PSP
15  Investments), end of paren, and 6, other
16  individuals and trusts.
17    So investor parties is defined to
18  include all those in the next sentence?
19    A.   Right.
20    Q.   Right?
21    A.   So what's the question?
22    Q.   Lakeview Capital is identified
23  there as an affiliate of Jay Alix and
24  because it's an investor party it's one
25  for which AlixPartners is relying on

JAY ALIX

1
2  business separation not to make
3  disclosures about those investor
4  parties, right?
5    A.   No. Because Lakeview Capital I
6  get -- I personally get a Rule 2014
7  request and I fill it out with all my
8  knowledge about anything that I'm
9  connected to.
10    Q.   That's not what this is saying
11  though, is it?
12    A.   Well sure it is. It's defining
13  the investor parties and then it's
14  saying that based on, among other
15  things, the business separation between
16  each investor parties, AlixPartners and
17  the -- I see what it's saying here. But
18  I'm telling you the way the disclosure
19  process works it's all netted in it.
20    Q.   But it's relying on the
21  separation, not on what the disclosure
22  process?
23    A.   Oh, you're talking about the
24  separation.
25    Q.   Yes.

JAY ALIX

1
2   A.   So let's talk about separation
3   then.  You want --
4   Q.   No --
5   A.   If you're going to use this, then
6   you need to understand the separation
7   which is very different than the MIO.
8   The MIO is 100 percent owned and
9   controlled subsidiary of the consulting
10  firm that's doing the work.
11      None of these investors are a 100
12  percent owned and controlled subsidiary
13  of AlixPartners doing the consulting
14  work.
15  Q.   It's a parent.
16  A.   Not even a parent.  None of them
17  are a parent.  These are, these are
18  small minority holders in AlixPartners.
19  There's no seconding of employees,
20  there's no sharing of IT, there's no
21  sharing of systems, there's no sharing
22  of finances.  There's no sharing of
23  offices.  The people at Caisse de depot
24  are up in Canada, and they don't work at
25  AlixPartners, they don't get the client

JAY ALIX

1
2   information, they don't see the client's
3   work, they don't get the engagement
4   letters.
5      Therefore, to compare this group
6   of affiliates which are minor and not in
7   control by AlixPartners versus a fund, a
8   $25 billion hedge fund which is
9   completely under the control of McKinsey
10  and its consulting partners who comprise
11  its board and have their money in the
12  fund themselves and then invest it in
13  companies that are debtors for the
14  consulting firm, you're comparing, you
15  know, watermelons and lug nuts.  It's
16  crazy.
17  Q.   Let's see if we can agree.
18  Separation, if separation exists and
19  this is what paragraph 84 of your own
20  objection says --
21  A.   That's just the last stop in a
22  belt and suspenders and bolt and screws
23  and nuts program to disclose all
24  connections.
25  Q.   But this is not relying on belts

JAY ALIX

1
2   and suspenders?
3   A.   It's relying on what I told you.
4   And this is in addition to that.  This
5   is a statement that says in addition to
6   all of the things I've just told you, we
7   do that too.
8   Q.   This is a statement that based on
9   separation alone, they don't hold or
10  represent an adverse interest and you
11  are saying that you disagree with the
12  degree of separation, but this sentence
13  does say that based on separation alone
14  they feel that they do not need -- they
15  do not have an interest -- adverse
16  interest to the estate; isn't that what
17  this interest says?
18  A.   This is going to be a long class
19  on Rule 2014 disclosure, case law.
20  Q.   No.
21  A.   Corporate form as you pointed
22  out, corporate control, corporate
23  governance, ownership percentages,
24  access to information, transparency of
25  information and how people conduct

JAY ALIX

1
2   business every day.  And when the
3   general counsel of the MIO who writes an
4   affidavit, swears on an affidavit, the
5   ANR case, and says I'm the general
6   counsel of the MIO and you can believe
7   my affidavit, and what he doesn't say in
8   that affidavit is he's also a general
9   counsel for McKinsey & Company and he
10  also has his own money in the MIO and
11  that's missing from the affidavit, that
12  affidavit is not in good faith and the
13  separation that you're talking about and
14  trying to compare it to this minority
15  investors who are not connected to
16  AlixPartners in any way shape or form
17  day to day is completely irrelevant and
18  doesn't begin to do it.
19      But if you want to go through all
20  of the AlixPartners' disclosures and
21  somehow imply because you did a few
22  minutes ago that a board member, me,
23  didn't make full disclosures, we can
24  spend a lot of time on that.  We can
25  spend the rest of the time on that.

JAY ALIX

1  
2 Because you're not going to walk out of  
3 here making any statement about me or my  
4 disclosures under Rule 2014. Otherwise  
5 we're going to have to have a much  
6 longer deposition and I'm going to want  
7 my lawyers to go on direct and spend  
8 another seven hours on it. If you want  
9 to cross we can keep doing it.  
10      But I'm going to get AlixPartners'  
11 lawyers in here because I don't  
12 represent them here today and I'm not  
13 their counsel. I didn't sign this  
14 declaration. I didn't file it and it's  
15 not the way you characterized it.  
16      So you're going to have to decide  
17 what it's going to be. But we're not  
18 going to leave here with me having you  
19 imply that about me or my board role or  
20 my disclosures for AlixPartners.  
21   Q.   We can look at that immediately  
22 after the break. But my only question  
23 to you was this sentence that I read is  
24 not relying on anything but separation  
25 to say there is no interest adverse to

JAY ALIX

1  
2 the estate?  
3   A.   I disagree with you.  
4      MR. O'SHEA:  Well it says among  
5 other things, right?  That implies  
6 not just separation, just to be clear  
7 on the record, Chris.  But go ahead,  
8 dig yourself another hole.  
9   Q.   It says based on, among other  
10 things, the business separation between  
11 each of the investor parties.  So the  
12 other things here?  
13   A.   Other things is three big words.  
14   Q.   What are they?  
15   A.   I think I just explained some of  
16 them.  Do you want me to go over them  
17 again?  
18   Q.   Are there any disclosures in here  
19 about the affiliates, the investor  
20 parties as that's defined?  Are there  
21 any disclosures of connections of the  
22 investor parties as that's defined here?  
23   A.   So let's go back to what I said.  
24 All the board members get a Rule 2014  
25 disclosure as do the investors.  They

JAY ALIX

1  
2 also post their investments that connect  
3 to AlixPartners entities in many ways.  
4 Those are all reviewed in the firm's  
5 database and then they're put into  
6 disclosure.  
7      So our database would have any  
8 corporate entity that the investors own  
9 that then could connect to our clients.  
10 And it's updated quarterly.  Therefore,  
11 unlike the MIO, we are actually taking  
12 the portfolio companies of our investors  
13 that connect to our enterprise in any  
14 way and our people, putting them in the  
15 database and then they get reported as a  
16 part of our connections.  We don't  
17 distinguish where it came from.  We are  
18 just saying that all of them in our  
19 database for all time are there and  
20 available to be reviewed.  
21      That's very different than what  
22 you're explaining about the MIO or what  
23 is done in these bankruptcy cases.  It's  
24 a real, real stretch.  
25   Q.   Okay.  So we will examine what

JAY ALIX

1  
2 you understand that difference to be or  
3 whether you have a basis to make that  
4 allegation after the break.  
5      MR. O'SHEA:  Great.  Can we get  
6 running time, Matthew?  
7      THE VIDEOGRAPHER:  Do you want to  
8 go off?  
9      MS. CHUNG:  Yes.  
10      THE VIDEOGRAPHER:  Time is 3  
11 p.m., we're off the record.  
12      (A recess was had.)  
13      THE VIDEOGRAPHER:  Time is 3:20  
14 p.m., we're on the record.  
15      THE WITNESS:  So, Ms. Chung, I  
16 want to just say on the record that I  
17 know I got a little heated there in  
18 the last session.  I thought you were  
19 going to impugn my integrity and that  
20 always gets me a little anxious and I  
21 want to defend it.  So you didn't do  
22 that and I appreciate it.  I think my  
23 composure will be fine as long as we  
24 don't leave me cut and bleeding with  
25 my integrity on the table here.

JAY ALIX

1
2  Because I'm told my lawyers won't
3  have a chance to have direct
4  examination with me, so I don't want
5  to leave anything in this record that
6  would leave my integrity questioned
7  and if it is then I would have to
8  defend it.  I want you to know that's
9  what was borne of that.
10      I also said I have a few other
11  names I wanted to give you.  I also
12  realize I didn't fully answer the
13  question about the claims.
14      So I have some witness questions,
15  advisor names and some claims
16  information that I want to supplement
17  the record with.
18  Q.   Okay.  So here's what I'm going
19  to do.  It is just a situation where and
20  I appreciate your statement and it's not
21  a problem at all.
22  A.   Thank you.
23  Q.   Because it's a time deposition we
24  sort of have to figure out what the
25  priorities are.  So I don't want to give

JAY ALIX

1
2  the impression -- I'm going to come back
3  around and hopefully and ask you for the
4  supplementations of your answers but I'd
5  like to keep going for now if that's
6  okay with you?
7  A.   No problem.  I just want to make
8  sure I've made a record I have more to
9  tell you and we can add it to the record
10  tomorrow if you want.  I just want to
11  make sure I've put it on the record that
12  there's more.
13  Q.   Our view is there's not a
14  tomorrow but we can get to that if we,
15  if that becomes an issue.
16      Okay.  So I'd like to go back to
17  exhibit 8 which is the Ultrapetrol
18  AlixPartners disclosure.  I'm going to
19  ask you about paragraph 22?
20  A.   On which docket page?
21  Q.   Docket page 64.  Sorry.  I'm
22  looking at a subset document which is
23  all dangerous.
24  A.   Docket page?
25  Q.   64.  And this is a paragraph

JAY ALIX

1
2  about whether AlixPartners or any of its
3  professionals holds debtor securities.
4  And it starts by saying "To the best of
5  my knowledge, neither AlixPartners nor
6  any of its professionals is a direct
7  holder of any of the debtors'
8  securities."  And then in the next
9  sentence is where there's a reference to
10  board members.  It says "It is possible
11  that certain of AlixPartners' employees,
12  managing directors, board members,
13  equityholders, or an affiliate of any of
14  the foregoing, may own investment
15  interests in mutual funds or other
16  investment vehicles (including various
17  types of private funds) that own the
18  debtors' or other parties in interests'
19  debt or equity securities, or other
20  financial instruments, including bank
21  loans or other obligations.  Typically,
22  the holders of such interests have no
23  control over investment decisions
24  related to such investment funds or
25  financial instruments."

JAY ALIX

1
2  Have I read that properly?
3  A.   Well there's another sentence.
4  Q.   The next sentence says
5  "AlixPartners' policy prohibits its
6  employees from personally trading in the
7  debtors' securities."  Right?  So that's
8  the paragraph?
9  A.   That's the paragraph.
10  Q.   Okay.  And in terms of control
11  over investment decisions, do you have
12  -- what information do you have, if any,
13  that any RTS consultant has control over
14  the investment decisions of MIO?
15  A.   Can you read the question again.
16  Q.   The question is, as I understand
17  it, you don't have any information that
18  RTS consultants can control the
19  investment decisions of MIO.
20  A.   That's, that's not my
21  understanding.
22  Q.   So tell me what the basis of your
23  view that there is such control, what is
24  the basis?
25  A.   It's a multipart answer so I'd

JAY ALIX

1
2  like to give the whole answer if I
3  could.  Because I have a number of
4  datapoints that lead me to my
5  conclusion.
6      The MIO is a 100 percent
7  controlled subsidiary of McKinsey &
8  Company, McKinsey & Company senior
9  partners and its board of directors
10 control all of the affiliates.  So this
11 board of shareholders at McKinsey &
12 Company, which I think was 31
13 shareholders, the top -- we have 460
14 voting partners at McKinsey, I
15 understand, of which 31 or 32 sit on the
16 board of shareholders which then have
17 the management team working for them and
18 then they have all the consulting groups
19 working for them.
20     Leaders and members of the
21 consulting group and the composite
22 McKinsey collectively control the board
23 of directors of the MIO.  And the
24 holding company McKinsey, where everyone
25 is a shareholder of McKinsey,

JAY ALIX

1
2  collectively own a hundred percent of
3  the MIO.
4      So therefore this investment fund
5  of $25 billion is under the direct
6  control and governance and oversight of
7  McKinsey's senior consulting leaders.
8      So while there is a corporation to
9  one side called MIO, I guess, and maybe
10 RTS is a corporation and maybe McKinsey
11 North America is a corporation and maybe
12 McKinsey Washington, D.C. is a
13 corporation and McKinsey, you know,
14 South Africa is a corporation and
15 McKinsey Puerto Rico is a corporation,
16 the fact is, is that all of these
17 corporations, including MIO, feed up
18 into McKinsey parent company where the
19 500 shareholders own their stock.
20     So all the profit from RTS goes
21 up, all the losses.  All the profit from
22 MIO goes up and all the losses.  And so
23 there's a control.  Corporate form may
24 be in place, but control is clearly
25 under the same consolidated group of

JAY ALIX

1
2  people.
3      So if these same consolidated
4  group of people have control, they have
5  transparency into all these different
6  enterprises and they are in a position
7  to see the entire picture.
8      Number two, the board members of
9  the MIO are people who run RTS.  So RTS,
10 it's well known that RTS was founded and
11 built by Mr. John Garcia and it's
12 overseen by Robert Sternfels, the number
13 two person at McKinsey today.
14     So if Mr. Garcia is starting and
15 building RTS and he's also on the board
16 of directors of the MIO, that's a direct
17 link between RTS, its leadership and all
18 of its client information and the MIO
19 and its leadership and all of its
20 investment information.
21     Beyond that we can also see that
22 the RTS -- the MIO business has a number
23 of investment pockets, including
24 distressed debt investing, merchant
25 banking activities, direct investing, of

JAY ALIX

1
2  which Mr. Garcia sees as a board member
3  of MIO, he sees it as an investment
4  committee member of MIO, and he sees it
5  as an audit committee member of MIO, and
6  he sits on the RTS board and he sits up
7  on parent company McKinsey's shareholder
8  group.  And Mr. Garcia would personally
9  have his own personal funds invested in
10 the MIO.  So he himself would have his
11 pension money and his other nonpension
12 investment money invested in the MIO,
13 as would be true for all McKinsey
14 partners including those sitting on the
15 board of the MIO who also work in the
16 consulting side.
17     So the idea that somehow the MIO
18 is separate, is just -- it's not
19 constructed that way.  It's not built
20 that way.  If it were to be separate it
21 would have majority of the shares of the
22 MIO owned by an outside shareholder like
23 Fidelity or Templeton funds.  It would
24 have a majority of its board members
25 coming from outside the company who have

Page 358

JAY ALIX

1
2  never been affiliated with McKinsey &
3  Company.  And it would be gathering
4  assets, you know, assets under
5  management, AUM, from a large group of
6  outside investors and not have McKinsey
7  employees and their alumnis and their
8  families.
9      So there is probably a
10  corporation, as you've argued, there's a
11  corporate form, but corporate form
12  doesn't dictate governance.  It doesn't
13  dictate control.  And, most importantly,
14  it doesn't dictate behavior.
15      The MIO, as a $25 billion
16  investment vehicle, is central to the
17  business model of McKinsey & Company.
18  It's central to the referral model for
19  referrals for client work from the
20  alumni.
21      So if we see past the corporate
22  organization and we look into the
23  business model, the economic business
24  model of McKinsey & Company, what we see
25  a person is hired as a young person, a

Page 359

JAY ALIX

1
2  middle or career person, how ever they
3  get them, they get to work on clients of
4  McKinsey in all these different
5  corporations, a lot of corporations, but
6  they treat them as if they are seamless
7  as if they are one for marketing
8  purposes they are all called McKinsey.
9      Those people make money.  The
10  money they make is then invested in the
11  MIO.  And the firm sets aside pension
12  money and that's invested in the MIO.
13      And then those people go on and
14  they keep doing more work, more clients'
15  work and they build up money in the MIO.
16      And then one day they leave
17  McKinsey, many people, that's why they
18  have such a big alumni base and
19  McKinsey's alumni network which is
20  controlled by the firm, it's a full time
21  function of the firm, places these
22  people in high positions and important
23  positions in corporations all over the
24  world and in government positions all
25  over the world.

Page 360

JAY ALIX

1
2      And the articles that have been
3  published clearly say that and McKinsey
4  is proud of that.  It's boasted more
5  Fortune 500 CEOs than any other company.
6  So the alumni are now in client
7  companies who got placed there after
8  they left McKinsey.  But when they went
9  to the client company they were allowed
10  to leave their money with the MIO so
11  they are still connected with McKinsey
12  through the MIO.  And then they are in a
13  position to refer new business, new
14  client work to McKinsey which they do.
15  McKinsey is managing that person's
16  money.
17      The new young people coming up to
18  McKinsey because they have an upper
19  policy are coming through and they are
20  meeting those alumni and those companies
21  to themselves get a job some day when
22  they are alumni.  And around and around
23  and around that business model goes.
24  It's like a virtuous circle.  And it's a
25  perpetual motion machine that creates,

Page 361

JAY ALIX

1
2  it creates flywheel accounts in
3  consulting and it creates outsized
4  valuable investment opportunities for
5  the alumni who are referring the
6  business and who are the executives of
7  the companies that McKinsey services,
8  including the vendors, the creditors,
9  the suppliers and the customers of their
10  clients.
11      And all that's fine.  It's a
12  beautiful thing when it works.
13      The problem is that when you take
14  that model and you lift it out of we'll
15  call the workaday commercial world and
16  you move it inside the bankruptcy court
17  system where the advisor for the debtor
18  has got to be a fiduciary and free of
19  all conflict and all perception of
20  conflict, no hint of conflict, and no
21  interest in the company, and if you're
22  not sure you have to disclose it.  And
23  the rule of the court is just disclose
24  it all and let the court figure it out.
25      So we have a situation where the

JAY ALIX

1 actual economic model of McKinsey, the
2 business model for referrals, for
3 employees, for promotion, for training
4 and for investment is all connected
5 together. And that's evidenced by the
6 fact that many people have McKinsey
7 titles and MIO titles so they're not all
8 separate people.
9 Casey Lipscomb who subscribed, who
10 swore out an affidavit as the general
11 counsel of the MIO, failed to disclose
12 in that affidavit that he's also on the
13 general counsel staff of McKinsey &
14 Company and he failed to disclose that
15 he also has his own personal funds
16 invested in the MIO.
17 Mr. Garcia who swore out an
18 affidavit that he's, you know, the
19 founder of --
20 Q. Okay, I think this is long enough
21 on this answer. Let me just ask you
22 something about Mr. Garcia. Mr. Garcia
23 is not a member of the MIO board any
24 more, right?

JAY ALIX

1 A. Mr. Garcia went off the board
2 after McKinsey started working on GenOn.
3 In the runup to GenOn and during the
4 filing of its affidavits, Mr. Garcia was
5 a member of the MIO board while McKinsey
6 was servicing GenOn and while McKinsey
7 was also servicing GenOn's parent NRG
8 which it did not disclose at that time.
9 Q. This case is Westmoreland.
10 There's a representation in Mr.
11 Hojnacki's declaration that there's no
12 member of the service team, and you know
13 that service team is defined to include
14 RTS, all of RTS, serves on the board of
15 MIO. Do you have any information that
16 impugns that statement?
17 A. Yes.
18 Q. Which is what?
19 A. The bankruptcy code doesn't limit
20 the connections to the service team or
21 to the affiliate. It's for the entire
22 enterprise. When the code says the
23 person, definition under the code is,
24 the person is the corporation, it's the

JAY ALIX

1 whole entity. It doesn't matter whether
2 Mr. Hojnacki is on the board or somebody
3 else on the team who did the work is on
4 the board.
5 The firm McKinsey is the
6 professional providing the work to the
7 debtor and all of its affiliates and all
8 of its connections.
9 And therefore, the representation
10 that somehow someone would work on the
11 debtor's client, on the debtor matter,
12 that person didn't have insight into a
13 boardroom, that doesn't remove or
14 relieve the corporation from its
15 connections and its obligations to
16 disclose and the fact that it's an
17 actual conflict of interest if there's
18 an investment and it's even worse if
19 it's undisclosed.
20 Q. Let's go to paragraph --
21 A. And that's the situation we have
22 here.
23 Q. Let's go to paragraph 19 of your
24 objection.

JAY ALIX

1 A. This is the document I have.
2 Q. It's exhibit 1. I'd like to talk
3 about some of the particulars of what
4 you've alleged about MIO.
5 A. Which page?
6 Q. Page 9, paragraph 19.
7 A. Court stamp page 9?
8 Q. No, it's page 9 on the bottom of
9 the document.
10 A. What's the question?
11 Q. The very beginning of your long
12 answer was about because the
13 shareholders' counsel of McKinsey &
14 Company runs McKinsey & Company, in your
15 view that means that it directs MIO,
16 among other affiliates. So this
17 paragraph says, in the last sentence --
18 A. Which one?
19 Q. Paragraph 19, the last sentence.
20 "Because McKinsey owns all" -- I think
21 it's supposed to say of its affiliates,
22 "including both MIO and McKinsey RTS,
23 the shareholders council presumably has
24 the power and responsibility to set

Page 366

JAY ALIX

1
2  policy for all of its affiliates in its
3  global operations, including both MIO
4  and McKinsey RTS."
5      Have I read that properly?
6   A.   That's what the sentence says.
7   Q.   Okay.  So presumably has the
8  power and the responsibility.  You don't
9  know that the shareholders council is
10  exercising power and responsibility over
11  MIO?
12   A.   Well, I mean my basis, my basis
13  for making this statement and agreeing
14  with it as printed is that as a CPA, as
15  a person who spent his life for 40 years
16  around corporations, I know that when
17  there's a parent company and it has a
18  lot of subsidiaries, that the ultimate
19  authority, the last stop on the train of
20  authority and responsibility and where
21  the buck stops, as this judge says, who
22  is he going to hold accountable, in a
23  corporate structure it stops with the
24  board of directors of the parent
25  company.  And the board of directors of

Page 367

JAY ALIX

1
2  the parent company then may delegate
3  some authority or some responsibility to
4  certain people and subsidiaries or
5  managers or officers or employees.
6      But there is no doubt, under
7  proper corporate governance, that all of
8  the policies, all of the
9  responsibilities and all of the
10  authority stems from, and is derived
11  from, the board of directors and the
12  shareholders of the parent company that
13  owns all the companies.
14      The board of directors and the
15  shareholders of the parent company
16  oversees all of the, you know,
17  enterprise -- entities in the corporate
18  tree.
19      So this sentence as stated is
20  correct and, you know, I'm 95 percent
21  sure it's accurate.  Maybe 99 percent
22  sure it's accurate, because that's how
23  corporate governance works.
24   Q.   Even though you've never seen
25  MIO's policies?

Page 368

JAY ALIX

1
2   A.   MIO's policies are just internal
3  decisions that people make to execute
4  business on a day-to-day basis.
5   Q.   Sorry, the question is a yes or
6  no answer, you've never seen MIO's
7  internal policies?
8   A.   Oh, no, I've never seen an
9  employee policy, that's right.
10   Q.   And nothing in this paragraph is
11  talking about the power, the
12  responsibility to set power for
13  investment decisionmaking, right?  The
14  paragraph doesn't say that?
15   A.   The paragraph says that all of
16  that would ultimately be the
17  responsibility of the parent company
18  board.
19   Q.   And the Lipscomb declaration
20  which you quote in here, you cite in
21  many places, so you in fact rely on it,
22  don't you?
23   A.   Well there are some things that I
24  agree with and there are some things in
25  it that I greatly disagree with, and I

Page 369

JAY ALIX

1
2  think it's a document that has to be
3  looked at with some skepticism.
4   Q.   Okay.  So that declaration says
5  that third-party managers use their own
6  discretion to make investments, doesn't
7  it?
8   A.   It does but then it contradicts
9  it in another paragraph.  So he says it
10  in one paragraph that it does and then
11  in another one he says it doesn't.  And
12  he says and that's true maybe in the
13  pension fund but it may not be true for
14  the other $17 billion of money and it's
15  certainly not true when it comes to the
16  direct investments which could be four
17  or $5 billion and it's certainly not
18  true for the Compass Funds.
19      So I have lots of examples where
20  his statement, if we would slice a thin
21  slice of the MIO, of the 17 billion,
22  that might be true for 1 billion or 5
23  billion, maybe even 10 billion, but he
24  also testified in his declaration as did
25  the others that there are many

JAY ALIX

1   exceptions to that.  So therefore it's
2   not an absolute statement that anyone
3   would rely on as far as being absolute.
4   And because he himself wears both hats,
5   he's in the MIO side and he's on the
6   McKinsey company side and he's investor,
7   his statements have to be viewed with,
8   you know, some, some skepticism.
9      Q.   So let's look at the things that
10  you accepted and didn't accept from Mr.
11  Lipscomb's declaration in terms of
12  whether there is separation between MIO
13  and the consultants.  Let's go to
14  paragraph 53 of your declaration.  Or
15  your objection.
16     A.   That's on page?
17     Q.   Page 17.
18        MS. CHUNG:  And why don't we mark
19  Mr. Lipscomb's supplemental
20  declaration which is what's being
21  cited here.
22     A.   Do we have his declaration?
23     Q.   We're about to give it to you.
24        (Exhibit 9, declaration of

*(Note: line numbering as shown in image)*

JAY ALIX

1   Lipscomb was marked for
2   identification.)
3      MS. CHUNG:  This is exhibit 9.
4      Q.   So paragraph 53 of your objection
5   says, Mr. Lipscomb has -- Mr. Lipscomb
6   also identified a broad and impressive
7   range of information that MIO makes
8   available to its investors including
9   investors on the service team.
10     And then you list bullets and
11  subbullets, so we're just going to go
12  through those systematically.  You say
13  "MIO provides historical performance of
14  investment options available in the
15  plans."
16     And then your objection cites to
17  paragraph 16 of Mr. Lipscomb's
18  declaration.
19     A.   I'm sorry, where do you see that?
20     Q.   It's paragraph 53 of your
21  objection, the first bullet.
22     A.   Yes, and you said 16?  Where is
23  16?
24     Q.   At the bottom.  If you trace the

JAY ALIX

1   footnote 21.
2      A.   I saw the 21, you're saying take
3   footnote, down to footnote 21 and then
4   it refers to id at page 7, paragraph 16.
5   So you want to go there?
6      Q.   Yep.  So the bullet in your
7   objection said MIO provides historical
8   performance of the investment options
9   available in the plans, so these are the
10  pension plans.  And indeed the first
11  sentence of paragraph 16 in Mr.
12  Lipscomb's declaration, exhibit 9,
13  "Participants are provided with
14  historical performance of the investment
15  options available in the plans and
16  information regarding the appreciation
17  or depreciation of their account
18  balances based on the performance of the
19  investment options they have selected."
20  Right, I've read that properly?
21     A.   That's what the paragraph 16 says
22  and that's the first two bullet points
23  on page 30 of 163 in document 669.
24     Q.   Good point.  We're making good

JAY ALIX

1   progress.  So investment options in Mr.
2   Lipscomb's declaration refers back to
3   the prior paragraph in his declaration,
4   right, 15.  "Some examples of investment
5   options available for selection by
6   participants are passive US equities
7   portfolio, passive US bonds portfolio,
8   and passive inflation-linked bonds
9   portfolio.  You see that?
10     A.   I do see that.
11     Q.   So investment options in Mr.
12  Lipscomb's declaration isn't referring
13  to knowing third-party manager
14  identities or specific investments that
15  are made by MIO or any of its
16  third-party managers?
17     A.   Right.  But that's contradicted
18  in paragraph 23 of his declaration.
19     Q.   Okay.  We're going to get to
20  that.
21     So third bullet in your -- third
22  bullet in your objection says SSGA,
23  State Street Global Advisors, an MIO
24  investment option, provides information

JAY ALIX

1  to participants that identifies top ten
2  holdings in its funds.  And then it
3  refers through footnote 23 to paragraph
4  16 again and that's the next -- that's
5  the third sentence of paragraph 16 in
6  the Lipscomb declaration.  "State Street
7  operates SEC registered investment funds
8  that I understand are widely used by
9  US-based retirement plans.  State Street
10 provides information to participants
11 that identifies the top ten holdings in
12 its funds."
13        Right, that's what you're citing
14 to in your objection?
15   A.   Right.
16   Q.   Those top ten holdings of State
17 Street Global Advisors, did you do any
18 investigation to see what those are
19 reported as?
20   A.   I have not looked at that, no.
21   Q.   So you can't say sitting here now
22 whether those are always third-party
23 managers, mutual funds?
24   A.   I haven't focused on what's below

JAY ALIX

1  State Street at this point.  That's for
2  the next round of due diligence.
3    Q.   And State Street is a huge
4  investment firm, probably the biggest?
5    A.   I don't know about that.  It's a
6  well-known brand name in investment
7  management.
8    Q.   Okay.  But sitting here you can't
9  say whether the top ten holdings of
10 State Street as they're reported are
11 anything other than mutual funds?
12   A.   It's not specific here and I
13 don't know.
14   Q.   Okay.  So your fourth bullet,
15 "Investors may request offering and
16 subscription materials for the
17 investable Compass Funds, another MIO
18 investment option, in which they wish to
19 invest."
20       And footnote 24 refers us to
21 paragraph 17 of the Lipscomb
22 declaration.
23       Now first of all, you've never
24 reviewed offering or subscription

JAY ALIX

1  materials for the investable Compass
2  Funds, have you?
3    A.   I've not seen those, no.
4    Q.   Okay.
5    A.   They're not available to me.  As
6  far as I know, as far as I know they're
7  not in the public domain.  I've seen
8  information about the Compass Funds in
9  the public domain but I haven't seen the
10 offering memorandums of the Compass
11 Funds.
12   Q.   Okay.  So the first paragraph of
13 17 -- the first sentence of paragraph 17
14 in Mr. Lipscomb's declaration indeed
15 says "The investable Compass Funds are
16 available to investors for investment at
17 different offering periods during the
18 year, and investors may request offering
19 and subscription materials for the funds
20 in which they wish to invest."  Right?
21   A.   Excuse me.  I have to get my
22 glasses on, sorry.  That's what it says.
23 That's the statement in this document,
24 in the declaration.

JAY ALIX

1    Q.   And the very next sentence which
2  you don't cite in your objection says,
3  "These offering materials do not
4  identify third-party managers to whom
5  the investable Compass Funds allocate
6  monies for investment, or the underlying
7  investments made by such managers."
8    A.   That's the statement.  I don't
9  know if it's a true statement or not and
10 I don't know if there's any support for
11 it but that's the statement.
12   Q.   Okay.  So what you did was you
13 decided the first sentence was true and
14 the second sentence wasn't true?
15   A.   I haven't decided anything is
16 true or not.  I'm raising the question
17 about whether or not any of this is true
18 and whether McKinsey in light of its
19 lack of disclosure about any of this,
20 and they've forced us to go find it,
21 McKinsey is going to need to take on the
22 burden, its normal and actual burden to
23 verify this information.
24   Q.   Let me put it a different way.

JAY ALIX

1
2  You refer to and quote the first
3  sentence of 17 -- of paragraph 17 in
4  Lipscomb declaration in your objection
5  but not the second sentence?
6     A.  I'm not sure what your question
7  is.
8     Q.   There's no place in paragraph 53
9  of the objection where you quote or cite
10  the second sentence of paragraph 17 of
11  the Lipscomb declaration, the one that
12  says that offering materials do not
13  identify third-party managers to whom
14  the investable Compass Funds allocate
15  monies for investment, or the underlying
16  investments made by such managers?
17     A.   I have to compare the documents.
18  I don't see it here on this page.  But I
19  don't know what else.  This is a big
20  section.  It's a big document.  I'll
21  take your word for it.  I'm not agreeing
22  that it is, I'm not agreeing that it
23  isn't.
24     Q.   Okay.  So we will let the
25  declaration -- sorry, the objection

JAY ALIX

1
2  speak for itself.
3     The next bullet that you have
4  says, has to do with MIO employees, an
5  investor in an investable compass fund
6  with several categories of
7  performance-related information, right?
8  So that's the black bullet at the top of
9  page 18.
10     And then of those several
11  categories, the subbullets say "Periodic
12  reports regarding the performance of the
13  funds, as well as the appreciation or
14  diminution of their personal investment
15  balances."
16     So now we're in the investment
17  plans.  And you've put in your objection
18  that investors receive periodic reports
19  about performance.  You've never seen
20  any of those periodic reports, right?
21     A.   I've never seen any of the MIO
22  reports, no.
23     Q.   So you don't have any idea about
24  the level of information or the type of
25  information that is provided to

JAY ALIX

1
2  investors in those plans, right?
3     A.   I have never seen those reports.
4     Q.   Okay.  And you cite in your
5  objection to, if you look at note 26,
6  paragraph 19.
7     A.   I'm getting confused with the
8  paragraphs and pages and documents.
9     Q.   This is paragraph 19 of the
10  Lipscomb declaration which is exhibit 9.
11     A.   Okay, got it.
12     Q.   So again the first sentence of
13  paragraph 19 says "First, investors
14  receive (or have access to) periodic
15  reports regarding the performance of the
16  funds, as well as the appreciation or
17  diminution of their personal investment
18  balances."
19     That's the part that correlates to
20  the bullet in your objection, right?
21     A.   I'm not sure where you are now.
22  I've gotten lost between the pages.
23     Q.   It's on page 18 of your
24  objection.
25     A.   Yes.

JAY ALIX

1
2     Q.   At the top of the page.
3     A.   Yes.
4     Q.   The second paragraph that has the
5  subbullet that says periodic reports
6  regarding the performance of the funds,
7  as well as the appreciation or
8  diminution of their personal investment
9  balances.
10     So your objection characterizes
11  that as some of the several categories
12  of performance-related information that
13  are available to investors?
14     A.   Right.
15     Q.   Okay.  So that's the first
16  sentence of paragraph 19 in Lipscomb
17  declaration.
18     A.   Is that a question?  Paragraph
19  19, first sentence.  Receive or have
20  access to periodic reports regarding the
21  performance of the funds, as well as the
22  appreciation or diminution of their
23  personal investment balances.  That's
24  what it says, yes.  Those sentences
25  match.

JAY ALIX

1
2    Q.   Okay.  But the second sentence of
3    paragraph 19 in Mr. Lipscomb's
4    declaration is not in your objection,
5    and that says "These performance reports
6    do not disclose the identities of
7    third-party managers, specific
8    investments made by those third-party
9    managers or specific MIO direct
10   investments."  Right?
11       A.   That sentence from page 8 of
12   document 4160, that specific second
13   sentence of paragraph 19 is not on this
14   page.
15       Q.   Okay.  And the next bullet that
16   you have is annual, in your objection,
17   is "Annual financial statements,
18   identifying any MIO direct developments
19   or allocations to third-party managers
20   that exceed 5 percent of the assets of
21   the investable compass fund."
22       Again, this is a category of
23   information that you are claiming is
24   available to investors?
25       A.   Where did you find that?

JAY ALIX

1
2    Q.   I'm reading now from the same
3    part of the objection that we were
4    looking at, the top of page 18.
5        A.   Oh, I see it here.  It's in
6    paragraph 20, right?
7        Q.   Is that right?
8        A.   Yes.
9        Q.   And then you're citing to
10   paragraph 20.  And the part that's not
11   in your objection is the rest of
12   paragraph 20 which says "The financial
13   statements identify any MIO direct
14   investments or allocations to
15   third-party managers that exceed 5
16   percent of the assets of the investable
17   company fund.  The financial statements
18   do not disclose underlying investments
19   made by third-party managers."
20       A.   That's what it says.
21       Q.   And in the last bullet in your
22   objection refers to "Periodic
23   newsletters, prepared by the MIO staff,
24   about each fund and its performance,
25   which occasionally identified portfolio

JAY ALIX

1
2    companies that were already sold by a
3    private equity fund in which the compass
4    Private Investment Fund had invested."
5        So that refers to paragraph 22 of
6    the Lipscomb declaration.
7        These periodic newsletters, by the
8    way, that are referenced in your
9    objection, you've never seen any period
10   newsletter of MIO, right?
11       A.   No.
12       Q.   So you don't have any idea what
13   level of information about investment
14   strategies or investment options or
15   investments are contained in those
16   newsletters?
17       A.   No.  I know what those
18   newsletters are like for almost all
19   money managers I've ever been associated
20   with so I have a general familiarity
21   especially as a CPA, but I haven't seen
22   these newsletters.  I've written these
23   kind of newsletters myself so I know
24   what's needed in them to report to
25   investors.

JAY ALIX

1
2    Q.   So here when you go to paragraph
3    22 in Lipscomb's declaration, the first
4    sentence again makes reference to the
5    periodic newsletter so it matches your
6    objection.  But the rest of that
7    paragraph is not cited to in your
8    objection, right?
9        A.   Where are you now?
10       Q.   22 of the Lipscomb declaration.
11       A.   22?
12       Q.   Yes.
13       A.   Didn't we just do 22?
14       Q.   I don't think so.
15       A.   Oh, okay.
16       Q.   So paragraph 22 says "Third,
17   investors in the investable compass fund
18   receive (or have access to) periodic
19   newsletters, prepared by the MIO staff,
20   about each fund and its performance."
21   But it goes on to say, "In connection
22   with preparing this declaration, I
23   caused the newsletters for the
24   investable Compass Funds for 2015 and
25   2016 to be reviewed.  That review did

JAY ALIX

1
2  not identify any instance in which
3  Whitebox advisors was identified in the
4  newsletters.  Indeed, the newsletters do
5  not identify MIO direct investments, the
6  third-party managers to whom allocations
7  have been made, or the underlying
8  investments made by those third-party
9  managers, with one exception described
10  in paragraph 23 that has no relation to
11  Whitebox or Alpha Natural Resources."
12      So none of that information is
13  conveyed in your paragraph 53.
14   A.   I see it's here and it's not
15  here.
16   Q.   Okay.  All right, thanks.  So
17  let's examine also you have said --
18   A.   I think paragraph 23 then goes on
19  to contradict everything you just said.
20   Q.   Well paragraph 23 is about a
21  private equity fund, right?
22   A.   Well we can read paragraph 23
23  like we did the others.
24   Q.   So "As of 2015, certain of the
25  investable Compass Funds invest in

JAY ALIX

1
2  private equity funds managed by
3  third-party managers (the Compass
4  Private Investment Fund).  Those
5  externally managed private equity funds
6  generally purchase portfolio companies,
7  attempt to increase the value of those
8  companies through active management, and
9  then sell those companies at a profit.
10  The newsletters for the Compass Private
11  Investment Funds have occasionally
12  identified portfolio companies that were
13  already sold by a private equity fund in
14  which the Compass Private Investment
15  Fund had" investment -- "had invested."
16  Have I read that properly?
17   A.   You've read it.  But I think it's
18  an incomplete statement.
19   Q.   You think that what's in here is
20  an incomplete statement?
21   A.   Yes.
22   Q.   So this is another part of Mr.
23  Lipscomb's declaration that you choose
24  not to accept even though you question
25  or quote other parts of it?

JAY ALIX

1
2   A.   No, I question it.  I question
3  it.  I don't think that's a forthright
4  description of how reporting of private
5  equity funds and how they work and how
6  investors find out about them.  I've run
7  private equity funds, I've raised
8  private equity funds.  This description,
9  which is kind of close but quite, not
10  quite how it works, that's not how it
11  works.  I don't know how it works.  I'm
12  going to admit I don't know how it works
13  inside MIO but that's not how the
14  industry works.
15   Q.   Again you're referring to your
16  experience or industry experience but
17  you concede that you don't know what the
18  MIO operation is?
19   A.   Well I didn't write this
20  declaration and I didn't refer to this
21  paragraph in this section.  I'm just
22  telling you that when I read that
23  paragraph, based on my own experience,
24  my own training and my own acumen, I
25  know that when he says the newsletters

JAY ALIX

1
2  for the compass private equity funds
3  have occasionally identified portfolio
4  companies, well occasionally is not a
5  good word to be used when we're talking
6  about, you know, this kind of situation,
7  that were already sold.  Well, what
8  about if it was about to be sold?  What
9  about if we have a contract?  What if
10  it's under contract by a private equity
11  fund?
12      I know private equity funds, they
13  boast about their deals, they boast when
14  they buy stuff, they boast when they
15  refinance stuff, they boast when they
16  sell it and they try to sell it when
17  they've got a problem.  And they're
18  saying when the private fund has
19  invested.
20      So these are third-party managers.
21  So he just spent five paragraphs telling
22  how there's no access to third-party
23  managers and then he says but there's
24  access to third-party managers.  So it
25  just feels to me like it's that kind of

JAY ALIX

1 third-party manager but not that kind of
2 third-party manager. And we don't show
3 it except we do show it. And we do it
4 sometimes but not at other times.
5     And in a disclosure environment
6 like this, it shouldn't be left up for
7 all of us to ask those questions.
8    Q.   What about in an objection
9 environment putting some things in but
10 some things not in, that's okay?
11    A.   Absolutely. Because lawyers are
12 paid to be advocates and they are
13 advocating a position. But he's giving
14 -- but he's giving an affidavit that
15 supposedly as an independent objective,
16 signed under penalty of perjury,
17 statement to help a court make a
18 decision. And he starts off by saying,
19 he says, look, I'm the general counsel
20 and secretary of MIO partners and I've
21 held that position for 4 years. We're
22 supposed to take from that, we're
23 supposed to take from that that he's a
24 reliable witness for us. The next

*(Line numbers 1-25 shown in margin)*

JAY ALIX

1 sentence should have said I'm also a
2 general counsel for McKinsey & Company
3 because that's what his LinkedIn profile
4 says.
5    Q.   So you've said this several
6 times.
7    A.   I haven't actually addressed it
8 here. And the third thing he doesn't
9 say is I'm going to give you a sworn
10 declaration about what you should trust
11 me on, your Honor, about the MIO. And
12 what he doesn't say in the third
13 sentence is, and by the way, I have
14 500,000, a million, 2 million, $3
15 million invested in the MIO and I have a
16 real vested interest in making sure this
17 story comes out right.
18    Q.   You have no idea what Mr.
19 Lipscomb has invested in MIO?
20    A.   I have no idea but he's been
21 there for 4 years according to his own
22 declaration, 4 years, and so he's
23 probably made some money at McKinsey I
24 would think.

JAY ALIX

1    Q.   Let me just make sure I have it
2 straight. You think because it's an
3 advocacy document it's okay for you to
4 cite parts of Mr. Lipscomb's declaration
5 and not cite other parts that expressly
6 limit the parts that you cite?
7    A.   It's not my attorney's job to
8 advocate for Mr. Lipscomb's position,
9 it's my attorney's job to advocate for
10 what we see in these declarations that's
11 wrong with them and what are the, all
12 the badges that may support our view
13 that more disclosure is needed. And we
14 have supported that beyond a reasonable
15 doubt.
16    Q.   I don't think I got an answer to
17 my question. Yes or no, do you think
18 what I described is okay for you and
19 your attorneys to do?
20      MR. O'SHEA: I disagree. I think
21 he has answered the question. You
22 can answer it again if you like. My
23 objection is asked and answered in
24 any event, but go ahead.

JAY ALIX

1    A.   I think our objection speaks for
2 itself on the surface. Competent
3 attorneys prepared it. I reviewed it.
4 I agree with it. I stand behind it.
5 Mr. Lipscomb has written his
6 declaration. His attorneys reviewed it.
7 They agree with it, they stand behind
8 it. I'm sure that McKinsey will file
9 things that quote what we've written in
10 parts that McKinsey likes and we'll
11 quote things that they've written and we
12 will take the parts that support the
13 case that we're bringing to the court,
14 and the court will have to decide who
15 the court wants to believe, who the
16 court believes is giving the court the
17 full story and making full disclosure
18 with full transparency of all the facts.
19 I feel very good about what we've
20 supplied and I have concerns that this
21 declaration has got a lot more advocacy
22 than it has objectivity.
23    Q.   And I will note again you've been
24 given the opportunity to give a yes or

JAY ALIX

1  
2  no answer and you evaded that
3  opportunity.
4      So let's go to paragraph 58 in
5  your objection.
6   A.   Paragraph 59.
7   Q.   Yes, page 19.
8   A.   Page 19, 58. I'm going to --
9  I'll answer but I'm going to need a
10 break soon; I need to use the restroom.
11  Q.   Okay. So this is a paragraph
12 about the profit that MIO makes. It's
13 not the only paragraph that makes
14 reference to profit from MIO being
15 rolled up into the parent company. It
16 says "The profit that MIO makes from its
17 fees on its operations is McKinsey's
18 profit. MIO's precise annual fees are
19 unknown but the standard in the industry
20 is between 1 percent and 2 percent of
21 the value of assets under management
22 plus between 10 percent and 20 percent
23 of the gain in value. Because MIO's
24 assets under management are $25 billion,
25 its annual fees for that would likely be

JAY ALIX

1  
2  between $250 million and $500 million."
3      So let me just stop there and say
4  you don't know what MIO's annual fees
5  are?
6   A.   I have not seen their financial
7  statements, no.
8   Q.   And as you say you haven't seen
9  any financial statements from MIO. You
10 don't know if MIO generates a profit?
11  A.   Well, if they don't generate a
12 profit then maybe the people should pull
13 their money out.
14  Q.   Well, there's a difference, isn't
15 there, or maybe --
16  A.   Assets under management are
17 growing so they must be making money for
18 somebody because you don't get $25
19 billion of assets under management and
20 not make a profit.
21  Q.   What you're saying here though is
22 that the annual fees, let's keep
23 reading, "If MIO's returns on investment
24 are a conservative 10 percent per year,
25 its return on investment is $2.5 billion

JAY ALIX

1  
2  per year. Its annual fees on that would
3  be between $250 million and $500
4  million."
5      So you're saying that MIO makes a
6  profit in fees of $250 to $500 million
7  in this paragraph, right?
8   A.   I'm saying that's an estimate of
9  what the profit and the fees could be.
10      MR. O'SHEA: It doesn't say
11 anything about profit. Just for the
12 record.
13  Q.   Well the first paragraph says the
14 profit that MIO makes from its fees,
15 right?
16      MR. O'SHEA: You were reading
17 MIO's total annual fees. It's annual
18 fees that would be 250 and 500. Now
19 you're changing up. I'm just for the
20 sake of the record making the clear
21 there's a difference between annual
22 fees and profits.
23  Q.   One or the other, you don't know
24 either, Mr. Alix, do you?
25  A.   Well I don't have MIO's financial

JAY ALIX

1  
2  statements, but I have my own experience
3  with money management. I am again a
4  CPA. I've been around the private
5  equity industry and the asset management
6  industry all my career. And these are
7  well-known, well established industry
8  standards. In fact Steven Schwarzman,
9  who is the CEO of Blackstone, said the
10 greatest invention in history was the 2
11 in 20 model, mean the 2 percent fee and
12 20 percent of gain. Because he said
13 it's a beautiful thing.
14      So the whole industry of money
15 management, assets under management
16 operates in this range of 1 to 2 percent
17 of management fees and 10 to 20 percent
18 of the gains on the assets, and there
19 are some situations where there's a
20 little less gain, there are some more
21 gain over the 20.
22      So I was making a statement here
23 based on my extensive experience that
24 this is not an unreasonable range of
25 information to talk about the fact that

JAY ALIX

1
2  the MIO, as a money manager, is a very
3  valuable and profitable asset of
4  McKinsey & Company, which is owned by
5  the people who own the consulting firm
6  and run by them, because if it wasn't a
7  valuable asset they would have sold it
8  by now, got rid of it.  So therefore it
9  must be very valuable and this is one
10  way to express the magnitude of that
11  value.
12    Q.   You don't think that McKinsey can
13  regard MIO as being valuable if it
14  doesn't turn a profit?  It's being run
15  for its employees and its partners,
16  right?
17    A.   That's right.  You're kind of
18  making my point.  They think it's so
19  valuable because it creates referrals,
20  it creates ways for them to give
21  business out to professionals, it
22  creates a way for them to bring alumni
23  into it and it creates a way to make
24  investments in client companies
25  including companies in Chapter 11 that

JAY ALIX

1
2  they're not supposed to do.  So it turns
3  out it's very profitable to make
4  investments in companies that are your
5  clients.  But it's not appropriate in
6  Chapter 11 which it's done in ANR, it's
7  done in Sun Edison and it's doing it
8  in Westmoreland Coal and that's
9  inappropriate.
10    Q.   Do you --
11    A.   So it's making profit out of its
12  fiduciary role with clients in Chapter
13  11 companies and anybody in the
14  bankruptcy restructuring business who
15  hears that usually expresses alarm and
16  disbelief because they can't belief it's
17  happening.
18    Q.   Name for me any, any debtor
19  equity that MIO has ever purchased in a
20  direct investment, not through a mutual
21  fund, not through a third-party manager?
22    A.   Well, I mean section 101.14 says
23  direct or indirect.  So it doesn't
24  matter whether it's direct or indirect
25  for the purposes of this discussion and

JAY ALIX

1
2  this objection.
3    Q.   Separation matters?
4    A.   This objection is talking about
5  all of MIO's indirect investments which
6  we have transparency into already and we
7  have a $17 billion hole of money which
8  does billions in direct investments and
9  we can't see it.  And it's likely to
10  think that McKinsey since it has no
11  policy against investing in its client,
12  it has no policy against investing into
13  suppliers of its clients or investing in
14  the competitors of its clients, and they
15  clearly treat their bankruptcy clients
16  as if they're not in bankruptcy for
17  fiduciary purposes, it stands to reason
18  that this is something that has to be
19  looked at and thought about and just
20  disclose it, disclose it to the court,
21  disclose it to the parties.  It just
22  needs to be disclosed.  I'm not the
23  judge or jury whether these interests
24  are disqualifying or not.  I think
25  they're disqualifying.  But so what,

JAY ALIX

1
2  let's forget what I think.  The court
3  needs to get a full disclosure under
4  Rule 2014 and the court can decide it.
5    Q.   How do you know MIO or McKinsey
6  doesn't have a policy against investing
7  in debtors?
8    A.   Well then it's violating its
9  policy.  If it has a policy it's
10  violating it, if it doesn't have a
11  policy it probably should.
12    Q.   Do you know?
13    A.   The information indicates that
14  there is no policy and it indicates that
15  if there is one they're violating it.
16    Q.   The publicly available
17  information that you're talking about
18  that you relied on?
19    A.   The information that McKinsey
20  disclosed to the world is what we're
21  relying on.
22    Q.   Do --
23    A.   I don't have McKinsey's
24  information, that's clear, I have my
25  information which they put out and that

JAY ALIX

1
2  draws this conclusion and it draws it
3  beyond a reasonable doubt.
4     Q.  Do you know the scope of any MIO
5  policy that might or might not affect
6  whether or not it can own shares in a
7  debtor?  Didn't you testify earlier
8  you've never seen any MIO policy?
9     A.  I don't have any MIO policies.
10 But the policies aren't included in the
11 bankruptcy code.  The policies aren't in
12 any of the case law.  The policies
13 aren't in any of the rules.
14    McKinsey's policies are set up
15 for its own commercial purposes and for
16 its own profit making purposes.  They
17 have a policy they can invest in their
18 clients that's so they can make money.
19 They have a policy not to disclose their
20 clients.  That's so they can make money.
21    They have a policy not to comply
22 with Rule 2014 so they can make money.
23    So McKinsey likes to make money
24 that way, I get that.  And that's fine
25 outside of bankruptcy.

JAY ALIX

1
2     But once you, as Judge Huennekens
3  said in his court order and the US
4  trustees has said six times to McKinsey,
5  once you enter the bankruptcy arena you
6  become a fiduciary with one obligation
7  and only one, to protect the interests
8  of that estate, have no adverse
9  interest, have no direct or indirect
10 interest, and be forthright and make
11 good disclosures and act in the best
12 interests of the estate.
13    And there is no creditor or no
14 court that would ever agree that having
15 the debtors' primary financial
16 restructuring advisor having a financial
17 interest, let alone a concealed
18 financial interest in the estate, direct
19 or indirect, is in the best interests of
20 the estate.  No one would ever come to
21 that conclusion.
22    Q.  But it matters, under your own
23 objection, separation matters in that
24 equation?
25    A.  No, no.  I was saying --

JAY ALIX

1
2     Q.  That's --
3     A.  I explained to you in that answer
4  the corporate control matters, corporate
5  governance matters, board control
6  matters and who has access and how do
7  they work and who's crossing over
8  corporate barriers.  And what I can see
9  here is there's complete control,
10 complete dominance and control by
11 McKinsey of this MIO, complete dominance
12 over the board and its governance and
13 people crossing over corporate barriers
14 all throughout this business.  That is
15 the context you have to look at the MIO
16 in.  The context of MIO stands on its
17 own and it's just not a word this is
18 separation or corporate form.  Those are
19 nice words.  The substance of the
20 transaction says that's not what's going
21 on.  What's going on is this business
22 model that requires all this stuff to
23 work together and everybody to work
24 together to create this economic outcome
25 that makes McKinsey a lot of money.

JAY ALIX

1
2     Q.  You keep saying it makes McKinsey
3  a lot of money.  You have no idea
4  sitting here whether MIO makes or loses
5  money for McKinsey, do you?
6     A.  Well if it loses money for
7  McKinsey that's McKinsey's problem.  It
8  appears like it makes money for
9  McKinsey, based on everything I've ever
10 learned in business and I've experienced
11 as a professional, as a CPA who's sees
12 -- I've seen financial statements of
13 thousands of companies.
14    This looks like a very profitable
15 enterprise to me.  And being in the
16 consulting business and having been in
17 the investment business and the private
18 equity business, this looks like an
19 extremely profitable business model to
20 me.
21    Q.  You're assuming that MIO is run
22 like a 220 hedge fund?
23    A.  If it wasn't, they'd shut it
24 down.
25    Q.  Well, you don't have any --

JAY ALIX

1    A.   McKinsey partners aren't giving
2  away money all day long.  They are
3  working as hard as they can to find any
4  way to make money from what I read in
5  newspapers anywhere in the world.  So
6  therefore, if this wasn't making money,
7  they'd shut it down.
8    Q.   What about RTS making money, you
9  said it's fees are $140 million right?
10   A.   You and I will never know how
11 exactly how much RTS makes or MIO makes
12 because in a large corporation there's
13 something known as transfer pricing.
14 And what happens is somebody from this
15 division provides services to that
16 division, they may have an internal
17 accounting charge that says we will show
18 this one as a loss because we don't get
19 any tax deduction here and we will
20 transfer the profit over here because
21 the tax rates are lower.
22      That's called tax planning and big
23 companies do it all over the world all
24 day long.

JAY ALIX

1      If you want to represent the MIO
2  doesn't make money, I would suggest to
3  you that you need to look at McKinsey's
4  tax strategy for where does it move
5  profits, where does it move costs, where
6  does it move investments, what capital
7  gains structure does it want to be under
8  and how is that designed?
9      Corporate form has more to do with
10 tax strategy than it has to do with
11 conflict walls and protecting
12 disclosures.
13   Q.   I'm just going to go to paragraph
14 21 of your objection.
15   A.   Which page is that?
16   Q.   Page 9.
17   A.   Okay, paragraph 21 on page 9.
18 Can I get a break soon?
19   Q.   I was just going to ask you.  Why
20 don't we do that?  You want to do that?
21   A.   Yes.
22      THE VIDEOGRAPHER:  Time is 4:12
23 p.m., we are off the record.
24      (A recess was had.)

JAY ALIX

1      THE VIDEOGRAPHER:  Time is 4:34
2  p.m., we're on the record.
3    Q.   So before the break, Mr. Alix, we
4  were going to look at paragraph 21 on
5  page 9 of the amended Mar-Bow objection.
6    A.   Yes.
7    Q.   It says McKinsey established
8  McKinsey RTS in 2010 for only one
9  discernible purpose to continue to
10 pursue the lucrative bankruptcy
11 consulting market without having to
12 disclose McKinsey's connections."  And
13 I'd like to read that in conjunction
14 with paragraph 59.
15   A.   In the same document?
16   Q.   Yes.
17   A.   Paragraph 59, which page is that?
18   Q.   It's page 20.  So this is your
19 own allegation about how much McKinsey
20 RTS has made from bankruptcy debtor
21 clients since 2001, McKinsey and
22 McKinsey RTS have been paid $140,809,985
23 in fees from its bankruptcy debtor
24 clients, including pre-petition and

JAY ALIX

1  post-petition fees.  The profit that
2  McKinsey RTS makes from its bankruptcy
3  engagements and its other engagements is
4  McKinsey's profit.
5      So that's $140 million, $141
6  million in the last 17 years?  Right?
7    A.   You're asking me to conclude
8  about the time or the money?
9    Q.   Well the time and the money.  It
10 says "Since 2001, McKinsey and McKinsey
11 RTS have been paid --
12      MR. O'SHEA:  In fees or profit
13 too.
14   Q.   In fees.
15   A.   Document shows on page 20 docket
16 number 669, paragraph 59, that our
17 understanding is that McKinsey entered
18 the bankruptcy business in 2001 and then
19 their activity was taken over by
20 McKinsey RTS I believe in around 2010.
21 And that when you look at the court
22 records of the 14 cases that are on this
23 sheet, it shows 140 million 809, this
24 shows 140 million 809 so this ties into

JAY ALIX

1  that.
2  Q.  So this is your calculation based
3  on fee petitions court records?
4  A.  So I gathered all the fee
5  applications from all these cases.  I
6  and my staff reviewed all the
7  applications and all the time entries
8  and then we analyzed all the fee
9  disclosures that McKinsey has made in
10  all those cases in all those courts and
11  we made this entry and this document.
12  Q.  Okay.  So I can make it easy.
13  Let's assume that that's an accurate
14  number and let's go to paragraph 15.
15  A.  Paragraph 15, page 15?
16  Q.  Paragraph 15, page 8.  And it
17  says that McKinsey has 3,000 employees
18  working in more than 126 cities and 65
19  countries worldwide.  It has revenues of
20  $10 billion per year.  And then you cite
21  to Forbes, right?
22  A.  Right.
23  Q.  Okay.  So if we do the math on
24  that, you can do it with me if you want

JAY ALIX

1  or you can let me represent it.  But if
2  it's $140 million from fees in
3  bankruptcy business in 17 years, that's
4  a little over $8.2 million a year.
5  A.  140 divided by 17?
6  Q.  Yes.
7  A.  You're saying is 8.2?  2 times 17
8  is 34.  8 times 7 is 56.  1 is 8 and 5
9  is 13.  Zero.
10  Q.  By the way, have you ever done
11  this calculation before?
12  A.  Which one?  The one I'm doing
13  right now?
14  Q.  Yes.
15  A.  To divide it by year?  I don't
16  recall if I divided it by year.  I spent
17  more time dealing with the individual
18  fee amounts in exhibit 4.  I don't know
19  if I've done this calculation.  But
20  you're representing it's 8 times 17,
21  right?  8 times 7 is 56.  Divide by 8.
22  That's about right.
23  Q.  If we do $10 billion, if McKinsey
24  does $10 billion in revenues a year I

JAY ALIX

1  realize we have to make a bit of an
2  assumption because we're not sure it's
3  been $10 billion for 17 years?
4  A.  No, it hasn't been.  It's been
5  rising based on publicly available data,
6  it's been rising from five to seven to
7  eight to nine to ten.
8  Q.  So if we just use ten as a
9  benchmark, that works out --
10  A.  You'd be better off to use an
11  average between the starting point and
12  the endpoint, use the average, which
13  would probably be like five or six.
14  Q.  Use whatever you want.
15  A.  Well I'm just saying if you want
16  to do a calculation which is a better
17  representation of what their -- what
18  percentage this is of their total which
19  I think --
20  Q.  So I did 10 billion a year.
21  A.  Okay.
22  Q.  And I think it works out to .08
23  percent of its revenues on a per year
24  basis, comes from bankruptcy advisory

JAY ALIX

1  business?
2  A.  It's amazing, isn't it?
3  Q.  Right.  So it's a small amount,
4  right?
5  A.  No, it's not a small amount.
6  It's $140 million.  It's real money to
7  the creditors and employees and the
8  environmental claimants in all these
9  statements.
10  Q.  It's a small percentage of
11  McKinsey's revenues?
12  A.  McKinsey may think it's a small
13  percentage of their revenue and
14  mathematically without knowing actual
15  year we won't know.  But what we don't
16  know is how much postpetition work there
17  was as a result of representing these
18  debtors which was represented improperly
19  because of the conflicts.
20  And what we don't know is how
21  much prepetition revenue there was
22  because they don't disclose past 90 days
23  for all their previous work in these
24  companies.

JAY ALIX

1
2    And what we don't know is how
3    much profit they made by investing in
4    the securities of these companies while
5    they were representing the debtors.
6        So $140 million I would say,
7    based on what I've seen so far, might
8    just be the tip of an iceberg.
9    Q.   So let's add this to the list of
10   things you didn't know before you filed
11   your objection, right?
12   A.   I don't know it. I only have
13   publicly available information. But
14   what I have in the public domain tells
15   me that where I come from and I think in
16   Texas, $140 million is real money to
17   real people. It's not a small amount of
18   money. This is real money. That's at
19   least one good size Texas ranch right
20   there.
21   Q.   On a percentage basis, if you
22   make my assumption it's .08 percent of
23   McKinsey's revenues, if you make your
24   assumption, it's 1.6 percent?
25   A.   Call it -- call it --  call it

JAY ALIX

1
2    less than that. It's dollars. It's
3    real money. People don't get paid in
4    percentages, don't get percentages on
5    their credit card. Maybe Bitcoin is in
6    percentages. But the last time I went
7    to the store a gallon of gas was three
8    bucks and a gallon of milk was three
9    bucks and a new Chevy pickup truck is
10   $50,000. That's a lot of Chevy pickup
11   trucks.
12   Q.   You think that people at McKinsey
13   would commit a massive illegal scheme, a
14   fraud scheme for less than one percent
15   of its revenues?
16       MR. O'SHEA: Objection,
17   relevance. Really, Chris? This is
18   within the four corners of what the
19   judge ordered you to question on?
20       MS. CHUNG: This is what he's
21   alleged, that we have done this
22   because it's a lucrative.
23       MR. O'SHEA: This is the best you
24   can do?
25       MS. CHUNG: This is what he's

JAY ALIX

1
2    alleged.
3        MR. O'SHEA: Okay, go to it.
4    Q.   It's a lucrative bankruptcy
5    business that McKinsey is so desperate
6    to be in that it will commit a massive
7    illegal fraud scheme?
8    A.   Here's the problem. The way
9    consulting firms work and the way
10   McKinsey works is people get credit for
11   bringing in business. And so McKinsey
12   writ large, the whole holding company, I
13   suspect this is a minor amount of money
14   for the whole company. I suspect this
15   is a major amount of money for the two
16   or three or four people that engineered
17   this scheme and get credit for it.
18       So if I think about Mr. Sternfels
19   who gets credit for the business he
20   brings in and Mr. Garcia who gets the
21   credit for the business he brings in and
22   Mr. Carmody who signed more than a dozen
23   of these declarations that are false and
24   Mr. Hojnacki and Mr. Seth Goldstrum and
25   for all the people who work on this like

JAY ALIX

1
2    Alison Proshan and Virginia Molino, they
3    are getting compensation in their credit
4    account for this revenue. And they may
5    not have a piece of credit for the other
6    people because other people are getting
7    credit for.
8    Q.   Is this another thing --
9    A.   I'm not done yet.
10       MR. O'SHEA: Don't interrupt his
11   answer.
12   A.   You said you wanted this answer.
13   I'm going to answer for you. You said
14   you wanted it. This is not a lot of
15   money for a big company with $10
16   billion. It's a huge amount of money
17   for the individuals that do the work
18   that get credit into their annual
19   compensation.
20       This business was designed and set
21   up by Mr. Garcia, by his own admission
22   and websites and in publications, he
23   gets credit off all this. And Mr.
24   Garcia is the person who appears to be
25   running this business. Therefore, I

JAY ALIX

1 believe that this is a big deal for Mr.
2 Garcia and Mr. Sternfels under the way
3 consulting firms compensate their
4 partners and give credit for who brings
5 in business.
6    So it's a lot of money for the
7 creditors of every one of these estates.
8 And even if it wasn't, it's a lot of
9 money for the judge and for the
10 employees and it's a lot of money for
11 the US Trustee and it's a lot of money
12 for Mr. Garcia and Mr. Sternfels and Mr.
13 Carmody and it's a lot of money for me.
14    Q.   You have no idea how Mr.
15 Sternfels, Mr. Carmody, whoever else you
16 named, Alice Proshan, who is a member of
17 the legal department, get compensated at
18 McKinsey, do you?
19    A.   I do, I do.  I've talked to a lot
20 of McKinsey alumni.  Remember I have 125
21 in my firm, and I have three of them on
22 my board of directors and I know them in
23 real life.  I've asked them all about
24 how much and I've read another book

JAY ALIX

1 called The Firm and I've read another
2 book about McKinsey.
3    So I actually have a very deep
4 understanding about how compensation
5 works.  Including Mr. Barton told me at
6 our lunch how compensation works at
7 McKinsey.  And he told me how the voting
8 for the managing partner works.  And he
9 told me how much money people have to
10 bring in to be a partner at McKinsey.
11    Q.   You don't know --
12    A.   I know a lot about compensation
13 at McKinsey and I think this is a lot of
14 money for people who put this scheme
15 together.
16    Q.   You don't know what, what credit
17 Mr. Garcia or anybody else you named got
18 for any -- working in any of these
19 bankruptcies or --
20    A.   I know --
21    Q.   Please let me finish my question.
22 Or what percentage it was of his total
23 compensation for example, you have zero
24 idea of that?

JAY ALIX

1    A.   If he's running these kind of
2 schemes he's making a lot of money.
3    Q.   That's your testimony?
4    A.   He's making a lot of money.  Well
5 I know he gets credit off of any
6 consulting business that runs through
7 his franchise and I know that he lost
8 his franchise when McKinsey was in the
9 hedge fund consulting business.  But
10 after this former chairman went to
11 prison for insider trading, Garcia's
12 consulting business was shut down and he
13 lost that franchise and he had to go
14 build another business and this is the
15 business he built and he pursued it in
16 three inappropriate and deceitful and
17 maybe illegal ways.  And he's making a
18 lot of money for doing it.
19    Q.   Let's go to where you claim that
20 you actually have numbers.  So why don't
21 we take a look at --
22    A.   I want to be clear though.  I
23 don't think 30,000 people at McKinsey
24 are involved in this scheme.  I don't

JAY ALIX

1 think McKinsey & Company is a bad
2 company.  I think McKinsey RTS and the
3 leaders of RTS have created a scheme and
4 they're profiting heavily from it and
5 that's a lot of money for a few people
6 who are running the scheme and nobody
7 else in this firm seems to be able to
8 stop them.  Mr. Barton couldn't stop
9 them.  Mr. Sneader is not stopping it.
10 I called Mr. Pincus, he didn't stop it.
11 I didn't call, I sent him an email.  So
12 no one in the company is stopping it and
13 the people who are getting to run this
14 are making more than a hundred million
15 dollars a year in terms of the fees to
16 the firm.
17    A compensation and consulting firm
18 of this size can be up to 40 or 50
19 percent of the billings.
20    Q.   So again we're going to your
21 industry knowledge and your general
22 experience, right?
23    A.   My industry knowledge is pretty
24 good.

JAY ALIX

1
2    Q.   You have no -- you don't know,
3    you don't know what money John Garcia
4    made or how much of it came from this
5    business, you don't even know what
6    percentage of RTS's business is
7    bankruptcy advisory business, do you?
8    A.   I can tell you if I had the list
9    of the people working these assignments,
10   I could actually within five or 10
11   percent tell you how much money those
12   people made as a group and based on
13   their billings I might get very close to
14   their own income on that.
15   Q.   And you don't have that list?
16   A.   I don't have that list, but I
17   have the industry experience to know how
18   that list works, how credit works and
19   how people from McKinsey told me it
20   works inside McKinsey.  McKinsey is very
21   big on giving credit to each business to
22   the people who create it and run it and
23   this money is going right into the
24   pockets of those people and they are
25   making it because they're not complying

JAY ALIX

1
2    with federal laws.
3    Q.   Let's go to paragraph 10 g.
4    A.   Which page is that?
5    MR. O'SHEA:  6.
6    Q.   So you've made reference a couple
7    of times to McKinsey RTS making money
8    off of an investment in some entity that
9    was debtor related.  And this is an
10   allegation that you've made in this and
11   other proceedings that McKinsey RTS also
12   fraudulently concealed its disqualifying
13   conflicts of interest in the ANR case.
14   One of those equity concealed
15   investments netted McKinsey an illegal
16   $50 million profit.  You see that?
17   A.   I have to look at this index for
18   a second to see, to place myself.  Hold
19   on.  10 g is?
20   Q.   You have it, right?
21   A.   I'm reading the prelude to it to
22   make sure I understand the context of
23   it.
24   Q.   Well the other place where it is
25   is in paras 363, it's in the back again,

JAY ALIX

1
2    if you want to look there.
3    A.   I'm looking at the prelude to it
4    first.
5    Q.   So we've already talked about
6    whether Whitebox was on the interested
7    party list that was given to McKinsey
8    RTS.  The $50 million gain that you're
9    talking about here, according to you
10   this was a gain in the shares of Contura
11   Energy, right, which started trading in
12   August 2016?  Your claim is that
13   McKinsey MIO directly or indirectly
14   held, actually indirectly held shares of
15   Contura, right?
16   A.   Yes.
17   Q.   Okay.  And the $50 million
18   figure, you got that from looking at the
19   form 5500 for MIO from 2016, right?
20   A.   Yes.  And 2015.
21   Q.   All right.  So let's take a look
22   at that.  We'll mark this as 10.
23        (Exhibit 10, McKinsey Master
24   Retirement Trust Form 5500 2016.  Was
25   marked for identification.)

JAY ALIX

1
2    A.   This is for the 2016 year end?
3    Q.   That's right.
4    A.   Do you have the 2015 year end?
5    Q.   Well let's look at this one
6    first.
7    A.   This will present an incomplete
8    picture.
9    Q.   Well let's see.  So if you look
10   at 361, paragraph 361 of your objection.
11   Says "The McKinsey Master Retirement
12   Trust administered by MIO owned 110
13   million interest in Whitebox which owned
14   an 11.1 percent interest in Contura.
15   McKinsey's investment in Whitebox
16   increased in value by $50,488,357 as a
17   result of its interest in Contura
18   between its first trading date in mid
19   2016 and the end of 2016."
20        Right?  Have I read that
21   properly?
22   A.   I think you read the document
23   correctly.
24   Q.   And Whitebox is a third-party
25   manager which owned this interest in

JAY ALIX

1
2  Contura, that's the allegation that
3  you're making here?
4    A.  I believe that's correct.
5    Q.  Okay.  So if you go to the 5500
6  that we handed you and you look at the
7  last page.
8    A.  Yes.
9    Q.  The $50 million figure that's in
10  paragraph 361 on the very last page of
11  the exhibit, right, so this is schedule
12  H, there are five Whitebox entities
13  listed there?
14    A.  Yes.
15    Q.  And what you did to get the
16  50,488,357 is you summed the last
17  column, the entries for each of the five
18  Whitebox entities, which is the current
19  value column, right?
20    A.  I believe so.  I mean I have to
21  do the math.  You want me to sum those
22  columns?
23    Q.  You can if you want.  I mean I
24  can represent to you that this is the
25  method it comes out to the number but if

JAY ALIX

1
2  you want to double-check it that's your
3  prerogative.
4    A.  I'm not in the business of
5  letting other people represent numbers
6  or facts to me unless I really know
7  where they come from.  45, 53, 54, 55.
8  So what was your number for the second
9  column?
10    Q.  I have only the total number.  So
11  I think what you did, Mr. Alix, is you
12  took the five numbers there, you added
13  them up and then you subtracted the
14  corresponding five entries for current
15  cost.  And I think that number will tie
16  out to the $50 million figure that I
17  mentioned before.
18    A.  You're using tie out, that's
19  pretty good, that's accountant talk.
20  Okay.  So you got 147 plus 10 is 247
21  plus 8 is 327 plus 10 is 427 plus 37, 38
22  would make it $80 million.  Right.  So
23  it's 80 -- yes, to beginning current
24  cost is 80 and the ending current value
25  is 130 in those two columns.

JAY ALIX

1
2    Q.  Okay.
3    A.  The first column of the Whitebox
4  entries on docket 4124 adds up to 80
5  million and the Whitebox entries on that
6  same page 47 of docket 4124 adds up to
7  130 million.
8    Q.  Okay.  So in order to conclude,
9  as you do in the objection, that there
10  was $50 million increase in value, that
11  McKinsey's investment in Whitebox
12  increased in value by $50 million as a
13  result of its interest in Contura,
14  you're assuming that every dollar of
15  gain that you calculated in each of
16  these five Whitebox funds was
17  attributable to Contura?
18    A.  That's not correct.
19    Q.  Well it's the same number, it's
20  $50 million?
21    A.  It's the same number on all these
22  pages.  That doesn't mean your
23  assumptions are correct.  Numbers are
24  always the same in a lot of places.
25  That's not correct.

JAY ALIX

1
2    Q.  Well you're not disagreeing with
3  me that if you do the math that we
4  talked about --
5    A.  Oh, yeah if we do the math --
6    Q.  That's the number?
7    A.  You can see they had a gain of
8  $50 million related to Whitebox.  As I
9  said earlier, if we took the 2015 form
10  where there was another, I think it was
11  another like 30 or $35 million gain in
12  2015 on the same Whitebox activities and
13  since Whitebox was a known creditor and
14  they were under the parties in interest
15  list in the beginning of the case, it
16  appears they may have been accumulating
17  their position in the debtor either
18  prepetition or during the bankruptcy.
19  But if they're on the parties in
20  interest list they have to be there
21  prepetition.  So McKinsey's invested in
22  Whitebox in 2016, 2015, 2014, and the
23  2015 5500 plus the 2016 5500 add up to
24  $80 million of profit.  And the stock in
25  Contura went from like 15, $16 on

JAY ALIX

1  confirmation I think up to the 70s.
2      So there was kind of a three and a
3  half to four times gain in the stock for
4  just a short period before even this
5  form starts picking up their cost basis
6  on it.
7      So it's reasonable to think that
8  perhaps some of the gain was actually
9  recorded in 2015 as well as in 2016.
10  And since together there's $80 million,
11  I was more conservative and I just took
12  this number knowing that there was high
13  probability that the cost basis was even
14  less than what was presented here.
15      So there's room in the number for
16  it to be another number.
17      I can see the 50 here so I've used
18  this 50 as a reasonable basis for my
19  pleading. But until McKinsey discloses
20  all of its investments in Whitebox in
21  2016, 2015 and 2014, we're not going to
22  know exactly how much profit they made.
23  But I think 50 million is a fair
24  estimate because they made a lot more

JAY ALIX

1  than that. And they didn't make less
2  than that. So --
3      Q.  So let me just ask you. The
4  50,488,357 is exactly the number looking
5  at derived from just this 2016 formula,
6  you agree with that?
7      A.  That's convenient for you. But
8  I'm telling you I had a broader basis
9  than that for using that number besides
10  just calculating those two columns.
11      Q.  So I'll get to that. But the
12  number that you put in the Mar-Bow
13  objection is the number that comes just
14  out of doing the calculation that I
15  described from this one 2016 form 5500?
16      A.  It doesn't come just from that.
17  That is an oversimplification of an
18  attempt to estimate something that
19  McKinsey should have disclosed and
20  didn't.
21      Q.  You agree with me that saying
22  that there's $50,488,357 in gain
23  reflected in this 5500 solely due to
24  Contura is not a reasonable assumption?

JAY ALIX

1      A.  It is a reasonable assumption.
2      Q.  You would be assuming that the
3  only thing owned by Whitebox, any of
4  these five Whitebox funds, is Contura
5  shares?
6      A.  I can't tell the original cost
7  basis of the Contura shares and when
8  Whitebox first entered the situation.
9      Q.  So let's talk about that. Even
10  if you went to a different 5500, you
11  would never know when the shares were
12  purchased, right? You wouldn't know
13  when the cost basis was incurred?
14      A.  What I know is that I've got part
15  of a pension fund with one third of $25
16  billion disclosed, 17 billion
17  undisclosed, a large appetite by the MIO
18  to be in Whitebox funds. My guess is
19  these are not all the Whitebox funds
20  that McKinsey is in and my guess is that
21  somewhere in these funds or in this
22  family of funds over many years is the
23  Contura holding maybe spread across many
24  funds and maybe in the rest of the MIO.

JAY ALIX

1      What I do know is that the debtor
2  disclosed that Whitebox is a party in
3  interest, I don't know which party in
4  interest. And maybe Whitebox purchased
5  the debt and the equity of Contura in
6  all these funds. Therefore, for now,
7  it's a safe assumption to say it appears
8  that McKinsey's made $50 million on
9  their Whitebox relationship which
10  includes their investment in Contura.
11      Until they disclose more, I can't
12  go further than that other than it looks
13  like they made $50 million with Whitebox
14  connected to Contura.
15      Q.  So this is another place where
16  you'd have to get discovery from RTS to
17  substantiate an assumption that you made
18  about Whitebox holding only Contura?
19      A.  What I would I get the discovery
20  from RTS or from MIO? Who is going to
21  control that information?
22      Q.  Either one. You're saying
23  without discovery from either one?
24      A.  Either one.

Page 434

JAY ALIX

1
2    Q.   You can't substantiate what you
3    put here?
4    A.   If RTS can disclose what's going
5    on in MIO which I think is the case, I'd
6    be glad to get it because I think that's
7    what you just said.  But I think you'll
8    need to get the discovery from MIO to
9    get that answer.
10   Q.   But in terms of the basis for
11   what you put in your objection, the
12   $50,488,357, you're now saying even
13   though the number matches exactly the
14   number in this 5500, that it's other
15   investments in other years that make
16   this number a fair number?
17   A.   No, no.  I'm saying that Whitebox
18   is investing in ANR over many years
19   because they're on the parties in
20   interest form at the start of the
21   bankruptcy.  Therefore, we can't tell
22   when they first entered the ownership
23   position into ANR.  They could be a
24   prepetition equityholder and debtholder
25   of ANR which would mean that McKinsey

Page 435

JAY ALIX

1
2    had an indirect or direct financial
3    interest in ANR when they got hired to
4    be a fiduciary which they did not
5    disclose to Judge Huennekens or the US
6    Trustee.
7    So I suggest to you that maybe
8    McKinsey should spend its time figuring
9    out when it first became an investor, a
10   creditor in ANR prepetition and then do
11   the calculation itself and disclose it
12   to Judge Huennekens and disclose it to
13   the US Trustee.  Because the US Trustee
14   said in its filing a month ago that he's
15   not getting this disclosure from
16   McKinsey even though he's been asking
17   for it for two years.  He's been asking
18   and he's finally decided that he's been
19   lied to and a fraud was committed and he
20   wants this information, and he's not
21   getting it.
22   And I'm limited to just what
23   McKinsey has filed publicly.
24   Q.   So, Mr. Alix, I'm just asking you
25   without the information you described,

Page 436

JAY ALIX

1
2    why do you think it was reasonable for
3    you to put $50,488,357 as a gain in
4    McKinsey's interest in Whitebox between
5    mid 2016 and the end of 2016?
6    A.   It's reasonable because that's
7    all the information that McKinsey
8    provided publicly about this position
9    they had in ANR.  So I used the best
10   information that McKinsey provided.  The
11   burden is on McKinsey to put more
12   information out.
13   Q.   Okay.  So in terms of referring
14   to an earlier form 5500, another thing
15   that you don't know is whether McKinsey
16   put more, MIO put more or took money out
17   of Whitebox, you have zero idea about
18   that, right?
19   A.   McKinsey has to tell us that.
20   That's their obligation to tell us that.
21   Q.   Is there anything you think that
22   McKinsey doesn't have an obligation to
23   tell you?
24   A.   McKinsey has an obligation to
25   comply with Rule 2014 to disclose all

Page 437

JAY ALIX

1
2    their connections and all their
3    investments direct and indirect in the
4    debtor ANR, in the debtor Sun Edison, in
5    the debtor GenOn and in the debtor
6    Westmoreland, and they have not met that
7    obligation or met that burden at all
8    ever.
9    MS. CHUNG:  Let me ask how much
10   time I have left?
11   A.   McKinsey has other investments in
12   ANR too that we haven't talked about,
13   including prepetition equity.  I believe
14   they are an equity owner in ANR
15   prepetition and they did not disclose
16   that which was also disqualifying.
17   MS. CHUNG:  Can I take a two
18   minute break and just figure out what
19   I have left?
20   MR. O'SHEA:  Sure.
21   MS. CHUNG:  Great.  Let's go off
22   the record.
23   THE VIDEOGRAPHER:  Time is 5:03
24   p.m., we're off the record.
25   (A recess was had.)

JAY ALIX

1  (Exhibit 11, Mar-Bow Value
2  Partners, LLC's motion for relief
3  from adjustments and for indicative
4  ruling was marked for
5  identification.)
6       THE VIDEOGRAPHER:  Time is 5:12
7  p.m., we're on the record.
8    A.   How much more time is there?
9    Q.   There's about 29 more minutes
10 according to Sean.  According to my time
11 there's 30.
12      MR. O'SHEA:  I'll give you the
13 30, Chris.  Go on, knock yourself
14 out.
15   A.   And leave time for my, my
16 additional comments to the record,
17 please.
18      MS. CHUNG:  Maybe Sean will give
19 you that minute.  It's just about the
20 time, Mr. Alix.
21   Q.   So before the break you were
22 saying you consulted, you may have
23 consulted the 2015 5500 in order to make
24 the calculation that appears in the

JAY ALIX

1  objection about the $50 million gain in
2  Whitebox, right?
3    A.   I did consult with the 2015 5500
4  to help me determine that the 50 million
5  was not an unreasonable estimate of the
6  gain that McKinsey had made.
7    Q.   Okay.  Can you take a look at
8  exhibit 11 which we've put in front of
9  you which is Mar-Bow Value Partners
10 motion for relief from judgments and for
11 an indicative ruling in the ANR
12 bankruptcy case.
13   A.   I have exhibit 11.
14   Q.   And if you go to page 9.
15   A.   Not confusing the page number.
16 We're finally working this thing out.
17 There's no paragraph numbers, that's the
18 problem.
19   Q.   Right in the middle of the page
20 right after the footnote marker that
21 says 29 it says "The MIO form 5500 for
22 2016, the most recent available, shows
23 that McKinsey's investment in Whitebox
24 increased in value by $50,488,357 as a

JAY ALIX

1  result of its interest in Contura
2  between the first Contura trading date
3  and year-end 2016."
4       Have I read that properly?
5    A.   I read that.
6    Q.   Okay.  So let me ask you now, I
7  want to just back up for a second to
8  paragraph 166.
9    A.   Of which document?
10   Q.   Of the objection which is the
11 nine page chart.
12   A.   Which page?
13   Q.   Gibbs on page 57.
14   A.   Yes.
15   Q.   So you testified earlier that the
16 MIO investments and other MIO
17 connections on these pages -- I take it
18 they primarily came from the 5500's and
19 the form ADVs is that right?
20   A.   I would say primarily is correct.
21   Q.   And for the form ADVs if we're
22 understanding what you produced
23 yesterday correctly, the most recent one
24 -- sorry.  For the 5500s, the most

JAY ALIX

1  recent one that you looked at was for
2  2017?
3    A.   I believe the form ADV filed in
4  2018 for the year end 2017 has been
5  filed.
6    Q.   Okay.  So you're switching to the
7  other one.  So that's also helpful.  So
8  for the form ADV, the last one that you
9  looked at was dated 2018 but you
10 understand that it's reflecting activity
11 holdings, advisors as of year end 2017,
12 right?
13   A.   As of December 31, 2017 as the
14 cutoff for the information and then the
15 form is filed in 2018.
16   Q.   Okay.
17   A.   And I've looked at that form is
18 the most recent one available back many
19 years before that.
20   Q.   Okay.  And so you understand that
21 the declaration filed by Mr. Hojnacki in
22 November of this year, for the purposes
23 of that declaration, you did not consult
24 anything that would show MIO's holdings

JAY ALIX

1  as of that date?
2  A.  Okay.  Let's go slow because
3  we're in accounting language land.
4    So as of that date is a balance
5  sheet term and balance sheet accounts
6  are recorded as of a date.  Income
7  statement terms are recorded for a
8  period.
9    What's your question you're
10  asking me about that form?
11  Q.  The question is just given the
12  nature of the form ADV, the last
13  available information that you had from
14  which -- from a form ADV would have been
15  MIO's holdings at the end of 2017?
16  A.  As of December 31st, 2017 as
17  reported on the ADV or on the 5500.
18  Q.  Okay.
19  A.  Because 2018 hasn't ended yet.
20  Q.  Okay.  So on the 5500 as well you
21  understand that those forms typically
22  lag by nine or ten months.  For 2017
23  you're not going to see the 5500 until
24  September or October of 2018?

JAY ALIX

1  A.  Right, I think the 2017, the year
2  end 2017, if that's the cutoff for the
3  holdings, that's the balance sheet date.
4  The balance sheet date is the assets and
5  liabilities as of December 31, 2017 and
6  we get that information on a form that's
7  filed in 2018.
8  Q.  '18, okay.  And you understand
9  that the Hojnacki declaration was filed
10  in November of 2018?
11  A.  There was two declarations filed
12  and they were both, one was filed 30
13  days after the case was filed and one
14  was filed two weeks ago, the night
15  before the court hearing.
16  Q.  Okay.  So can I turn your
17  attention to paragraph 248 of your, the
18  objection, the Mar-Bow objection.
19  A.  248?
20  Q.  Yes.
21  A.  You got a page number?
22  Q.  I'm sorry, it's page number 89.
23  A.  I'm on page 89.  Paragraph 248.
24  Q.  So these are now allegations not

JAY ALIX

1  about Westmoreland but about the GenOn
2  bankruptcy case.  And in paragraph 247
3  let's start there at the top of the
4  page, you've characterized as McKinsey
5  RTS's frauds on the court, four things
6  listed in subsections A through D,
7  right?
8  A.  I need to see the preview to the
9  paragraph, hold on.  I'm familiar with
10  247 in docket 669, paragraph 247.  I've
11  now looked at that.
12  Q.  Okay.  So I'm going to ask you
13  about, because of the press of time,
14  what you've characterized as the first
15  fraud which appears at the subheader 1.
16  "McKinsey fraudulently concealed that
17  NRG Energy was a McKinsey client while
18  it was investigating GenOn's substantial
19  claims against NRG Energy."
20    Have I read that header
21  correctly?
22  MR. O'SHEA:  I'm sorry, Chris,
23  where are you?
24  MS. CHUNG:  On page 89 in the

JAY ALIX

1  middle of the page.
2  A.  I'm in paragraph 247.
3  MR. O'SHEA:  I'm in paragraph 247
4  too.
5  MS. CHUNG:  The header.
6  A.  The header.  "McKinsey
7  fraudulently concealed that NRG Energy
8  was a McKinsey client while it was
9  investigating GenOn's substantial claims
10  against NRG Energy."  That's the
11  headline.
12  Q.  So the headline says that
13  McKinsey was simultaneously serving NRG
14  Energy and GenOn?
15  A.  Correct.
16  Q.  Okay.  And in paragraph 252 on
17  page 90 the next page.
18  A.  Yes.
19  Q.  You say "In the same month (June
20  of 2016) that GenOn retained McKinsey
21  RTS to investigate NRG Energy, McKinsey
22  filed an amended declaration, not in the
23  GenOn case, but in the Sun Edison case,
24  disclosing that NRG Energy was a

JAY ALIX

1  McKinsey client.  McKinsey RTS,
2  therefore, fraudulently concealed that
3  very same connection throughout the
4  course of the GenOn case."
5      Have I read that correctly?
6  A.   That's what it says on the page.
7  Q.   Okay.  So your source for
8  believing that McKinsey represented or
9  served, sorry, GenOn and NRG
10  simultaneously, is the declaration that
11  was filed in the Sun Ed case disclosing
12  NRG Energy as a McKinsey client?
13  A.   The Sun Edison case declaration
14  signed by McKinsey disclosed NRG as its
15  client at the same time that McKinsey
16  was working on GenOn.
17  Q.   And the first GenOn declaration
18  is dated in June of 2017, do you recall
19  that?
20  A.   I saw it.  One second.  I think
21  it's on the page before here.  The first
22  declaration is June 23rd, 2017.
23  Q.   Okay.  In that declaration
24  McKinsey applied, McKinsey RTS applied

JAY ALIX

1  and it disclosed that it was applying a
2  two year lookback period, right?
3  A.   I don't know if it said it was a
4  two year lookback period or not.  I can
5  look at the declaration.
6  Q.   In reviewing paragraph 252 and
7  authorizing paragraph 252, did you
8  consider that the GenOn and Sun Edison
9  cases have different -- when you apply
10  the lookback periods, they cover
11  different periods of time?
12  A.   Well the companies start, the
13  bankruptcies start, you know, at
14  different dates.  And so on a timeline,
15  if this is, from your perspective, you
16  know, earlier dates and this is later
17  dates going this way, the GenOn case is
18  occurring -- Sun Edison is occurring
19  here and then GenOn overlaps the Sun
20  Edison while it's open, and then
21  Westmoreland overlaps with GenOn.
22      So we can see in the disclosures
23  throughout the case what's being
24  disclosed, how they run into or over the

JAY ALIX

1  other case and how they run into it.
2      So if I know this company filed
3  bankruptcy here, I can look back two
4  years and see whether or not the
5  disclosures in this case have parties in
6  interest that are on this list.
7      So when I did my analysis, I took
8  the filing date here, I went back 90
9  days because that's the prepetition
10  preference period and it's a clean
11  cutoff before bankruptcy.
12      And then I looked back the two
13  years with both points to see what was
14  disclosed at any time in those two years
15  as supplied by McKinsey in its own sworn
16  statements, and then found those
17  companies, put them in the database and
18  then compared them to the parties in
19  interest list at each case along the
20  way.  And since the cases overlap, you
21  know, one, two, three, it's fair to
22  think that with flywheel accounts
23  consulting and a regular involvement
24  with these companies, that these

JAY ALIX

1  disclosures here overlap to here and
2  properly overlap to here.  That's how it
3  gets done.
4  Q.   So lookback periods in Sun Ed and
5  GenOn, if you did the analysis you
6  described, you notice that they don't
7  overlap for at least a period of a year.
8  Sun Ed, the first Sun Ed declaration was
9  June 5th of 2016?
10  A.   But Sun Ed ended, Sun Ed ended --
11  Sun Ed ended on July 25, 2017 and GenOn
12  filed bankruptcy on June 14th, 2017.  So
13  there's a period of overlap.  And I have
14  reason to believe that a lot of these
15  big flywheel accounts of McKinsey run on
16  and on and on.  So it's more reasonable
17  than not to think that these disclosures
18  overlap with each other.
19      In addition, if we're going to use
20  the two year lookback period, I have a
21  number of examples in GenOn where
22  McKinsey didn't even disclose everything
23  in its own two year lookback period.
24      So a number of our disclosures

JAY ALIX

1
2 that we found that are undisclosed are
3 within the two year lookback period from
4 McKinsey's own disclosures.
5      So the idea that you say they
6 apply a two year lookback period, they
7 don't apply that religiously or
8 consistently or completely.  There are
9 things missing in their own two year
10 lookback period you can see in the
11 overlaps that should have been disclosed
12 and weren't.  So whether it's two years
13 before or two years after or all
14 connections as the code requires,
15 there's holes in that process by
16 McKinsey on all sides of these time
17 periods they're establishing.
18 Q.   Your own objection says that it's
19 in June of 2016 that McKinsey filed an
20 amended declaration in GenOn, not in
21 GenOn but in Sun Ed.  So that
22 declaration was filed in June of 2016.
23 There's a two year lookback period.
24 McKinsey RTS could have been disclosing
25 a client connection as early as 2014,

JAY ALIX

1
2 right?
3 A.   About NRG?
4 Q.   Yes.
5 A.   Well they -- look, you can create
6 any scenario you want.  I'm not here to
7 try and argue how many different
8 scenarios of disclosure we can come up
9 with.  I have validated information
10 supplied by McKinsey that says they're
11 connected to this company, it's a big
12 company.  And in fact I have information
13 that says McKinsey has been connected to
14 NRG for the last eight or nine years.  I
15 mean NRG and McKinsey go way back to
16 Mirant, they go back to Edison Mission.
17 I mean in this case, Edison Mission,
18 number 8, McKinsey advised as a
19 fiduciary they filed three disclosure
20 documents, they disclosed zero
21 connections in Edison Mission, no names
22 and when the case was done McKinsey
23 transferred all the assets, the key
24 assets of Edison Mission to NRG.
25 Q.   Mr. Alix.

JAY ALIX

1
2 A.   And they never disclosed whether
3 they were connected to NRG or not.
4 Q.   I'm just asking you --
5      MR. O'SHEA:  Whoa, enough of
6 this.  Let him finish.  You asked a
7 question and he's answering it.
8 A.   You gave me a hypothetical.
9      MR. O'SHEA:  You're not
10 questioner and judge here, please.
11      MS. CHUNG:  I am the questioner
12 here.
13      MR. O'SHEA:  But you're not the
14 judge.
15      MS. CHUNG:  And this isn't
16 responsive to my question.  I'm going
17 to move to strike that answer.
18 Q.   The question is just McKinsey
19 RTS, if it disclosed in the Sun Ed case
20 as you're saying here in June of '16
21 that NRG was a client and it applied a
22 two year lookback period faithfully,
23 accurately, truthfully, it could have
24 been disclosing NRG as a client as early
25 as 2014, you understand the logic of

JAY ALIX

1
2 that, right, Mr. Alix?
3 A.   I can't work with logic.  I'm at
4 assumptions.
5 Q.   And if it was disclosing a
6 client, this is the only -- you have no
7 other information that NRG was being
8 served simultaneously with GenOn?
9 A.   Well, let's see.  McKinsey
10 disclosed in the GenOn, in the initial
11 disclosure document, if we can get the
12 GenOn first disclosure document I can
13 answer that question.  Because in the
14 GenOn disclosure document McKinsey made
15 a cryptic footnote in GenOn that
16 McKinsey has represented some NRG
17 affiliates in the past, and then that
18 document listed I think hundreds of
19 affiliates.
20      So that's a tacit admission that
21 McKinsey has a connection to the parent
22 company but they haven't really
23 explained the disclosure.  And in fact
24 it appears in retrospect that they were
25 advising the parent company on its

JAY ALIX

1  
2  separation from NRG while they were also
3  investigating the claims of GenOn
4  against the parent company.
5     Q.   So now you're saying that
6  McKinsey RTS simultaneously disclosed
7  its connection to NRG in the GenOn case
8  but did not disclose its connection in
9  the GenOn case only in the Sun Ed case?
10    A.   No, no.  What I'm saying is they
11 made a full disclosure in Sun Edison
12 that they represent NRG.  And I can see
13 from the prior bankruptcy cases they've
14 had a continuous relationship with NRG.
15 And I can see in Sun Ed that they sold
16 assets to NRG without disclosing to the
17 Sun Edison Corp that NRG was their
18 client, when it was at that time.
19       They sold Edison Mission assets to
20 NRG.  They merged the Mirant assets into
21 Reliant to create GenOn which was sold
22 to NRG.  And then they come along and do
23 GenOn which was created out of those
24 bankruptcies and they make a tacit
25 admission that they may have some

JAY ALIX

1  
2  connection to the affiliates of NRG when
3  in fact they're investigating the claims
4  of GenOn against NRG for fraudulent
5  conveyance for hundreds of millions of
6  dollars.  And all that history was left
7  out.  None of that is in the disclosure.
8       So if the parent company of the
9  debtor has been a continuing and ongoing
10 client of McKinsey and their work for
11 that parent company helped create the
12 debtor and then McKinsey advises the
13 debtor with banks that are McKinsey
14 clients on the other side of it,
15 McKinsey is on all sides of that
16 transaction and they didn't explain any
17 of that to this judge.  They never
18 explained to this judge that they were
19 on all sides of the transaction in NRG
20 -- excuse me, in GenOn, and the
21 disclosure is completely deceiving and
22 deceptive.
23    Q.   Mr. Alix, if the GenOn case as
24 you say began in June of 2017, you know
25 that McKinsey RTS discloses it used a

JAY ALIX

1  
2  two year lookback period.  So the
3  furthest back the connections would go
4  that were reported are 2015.  You don't
5  have any information.  If you looked at
6  only public information as you say, you
7  have no information that NRG was ever
8  served by McKinsey RTS past 2014?
9     A.   I have, I have a résumé I
10 received from a McKinsey employee who
11 listed on his résumé working on NRG as a
12 client.
13       So I have that information where
14 an employee of McKinsey said they were
15 working on NRG for McKinsey during that
16 time period.
17    Q.   During what time period?
18    A.   During the time period that would
19 be covered in the two year lookback
20 period.
21    Q.   So how early or how late?
22    A.   I got the résumé a year ago, so.
23 So, you know --
24    Q.   You're representing that you have
25 a résumé that establishes that there was

JAY ALIX

1  
2  -- that backs your allegation here that
3  there was fraudulent concealment because
4  McKinsey simultaneously served NRG
5  Energy and GenOn?
6       MR. O'SHEA:  Is that a question?
7       MS. CHUNG:  Yes.
8     A.   All I can tell you --
9       MR. O'SHEA:  Object to the form.
10 You can try and answer.
11    A.   All the badges of deception are
12 in this situation.  I just think
13 McKinsey should disclose its whole
14 relationship with NRG, all the time
15 period, all the work as it should have
16 in its Rule 2014 procedure and the let
17 the judge decide.
18    Q.   But you're not --
19    A.   The judge can decide.  I don't
20 have to decide that and I don't have to
21 prove it.
22       I can just tell you the facts I
23 know, I've picked them up from
24 McKinsey's documents, I've reported them
25 as I know them and they need to be

JAY ALIX

1    disclosed.
2    Q.   I'm not hearing you say that any
3    part of McKinsey's GenOn disclosure was
4    false.
5    A.   The GenOn disclosure is false
6    because it's missing all kinds of --
7    it's got dozens of undisclosed
8    connections, it's got dozens of
9    undisclosed investments in GenOn, it's
10   missing other relationships of the MIO
11   and clients, and it completely is
12   missing the entire history of what
13   McKinsey writ large has been doing with
14   GenOn for the last eight years.
15        It just files a disclosure that
16   says in the last 90 days we started
17   working on this company and by the way,
18   we got a preference here which we're not
19   really going to call it either.
20        And so that disclosure is false
21   in dozens of ways.  But this thing about
22   NRG is the elephant in the room because
23   NRG has been a huge client of McKinsey
24   from everything I've read in these

JAY ALIX

1    documents, in the previous bankruptcy
2    cases, McKinsey has been selling assets
3    of these other companies where it is a
4    fiduciary, they are selling them to NRG
5    in four or five occasions and they've
6    never disclosed that NRG was their
7    client at any of that time period.
8    Q.   You don't have any information
9    other than a résumé that you haven't
10   produced and you haven't been specific
11   about that NRG was ever served by
12   McKinsey after 2014?
13   A.   I have information.
14   Q.   Right --
15        MR. O'SHEA:  Objection.  That is
16   argumentative in the extreme.  There
17   is no obligation to provide discovery
18   as I know it.  There's no discovery
19   period open, although we have
20   provided you 13 binders and you
21   provided us nothing for the
22   deposition of Hojnacki, although
23   albeit you had no obligation.  But we
24   provided that voluntarily to be

JAY ALIX

1    transparent.
2        And, finally, I object to the form
3    of the nonquestion that you just put.
4    Q.   Tell me what you have other than
5    this résumé that is not mentioned in
6    your objection, that has not been
7    produced, not that there's any
8    obligation, that says that NRG was ever
9    served by McKinsey RTS after 2014?  And
10   even that concedes too much because you
11   haven't really said that the résumé says
12   there was service at that time?
13   A.   In the GenOn disclosure documents
14   there are indirect references to NRG
15   affiliates.
16   Q.   Well that could mean that
17   McKinsey RTS is serving GenOn because as
18   you point out it's a parent-sub, right?
19   A.   No, no.  It mentioned NRG
20   affiliates, not GenOn affiliates.
21   Q.   And GenOn is an NRG affiliate?
22   A.   But they listed hundreds of NRG
23   affiliates that we could have worked for
24   any one of these but we can't tell you

JAY ALIX

1    which ones.
2    Q.   There are 900 affiliates in that
3    case?
4    A.   NRG affiliates and McKinsey said
5    we might have worked for all of them
6    which means they are working for NRG,
7    doesn't it?
8    Q.   Your contention is that
9    disclosure failed?  Your contention is
10   that that disclosure failed to disclose
11   the NRG connection?
12   A.   It failed.
13   Q.   That's what the paragraph which
14   read says?
15   A.   It failed to properly disclose
16   that so the judge could form and
17   adjudicate whether or not there was an
18   irreconcilable conflict between the
19   parent company and the debtor GenOn
20   which McKinsey is integral for
21   separating those companies and forming
22   the basis of the plan of reorganization
23   and providing all the information to the
24   creditors on.

JAY ALIX

1
2    Q.   Okay.  So your contention is that
3    what you've testified to today and
4    what's in the objection is a basis for
5    saying that McKinsey RTS committed fraud
6    with respect to the GenOn nondisclosure
7    of NRG as a client simultaneous with NRG
8    -- simultaneous with GenOn?
9    A.   Well as a fraud investigator I
10   was trained to look for the badges of
11   fraud.  It's hard to prove the intent of
12   fraud after the fact when you weren't
13   there.  So what we start doing as an
14   investigator is we start looking for all
15   the badges and every time we find a
16   badge, a small one, a medium one or big
17   one we pin it on that part of the body
18   and eventually if there's no fraud maybe
19   if there's one or two badges you say
20   that's a mistake or oversight.  Five
21   badges you start seeing a trend and
22   pretty soon it's a pattern.
23        In all of these bankruptcy cases
24   I'm seeing lots of badges, all of which
25   raise issues of deception, of misleading

JAY ALIX

1
2    statements, of withheld connections,
3    unexplained relationships, undisclosed
4    client activity, undisclosed investment
5    activity, the transfer of debtor assets
6    to affiliates of McKinsey to its own
7    affiliates that were not disclosed, the
8    transfer of assets to McKinsey's other
9    assets that were not disclosed.
10        From what I can see, McKinsey is
11   trafficking in these assets of these
12   companies and it looks like a
13   reorganization trafficking scheme to me
14   and not a help to the bankruptcy court
15   to me.
16   Q.   When you talk about undisclosed
17   connections in other cases, you're
18   talking about the same methodology that
19   you've described for doing the
20   undisclosed connections in Westmoreland,
21   right?
22   A.   Say that again?
23   Q.   When you talk about their
24   undisclosed connections in other
25   bankruptcies, like GenOn, you did the

JAY ALIX

1
2    same thing, you took names out of your
3    database, put them into a chart and you
4    took MIO investments from 5500s and ADVs
5    that report retrospectively?
6    A.   That's not correct.  What
7    happened is McKinsey in 14 -- in 26
8    sworn disclosure documents disclosed
9    minimal names for 26 sworn declarations.
10   And then in the last 15 they disclosed
11   names but they dribbled them out a
12   little at a time.
13   Q.   I'm not asking about that.  I'm
14   asking when you, your allegation in this
15   objection, there are other missing
16   connections in GenOn, ANR, Westmoreland,
17   including Westmoreland, Sun Ed, those
18   charts that you created were created
19   using the same methodology that you've
20   described for the chart that you did for
21   Westmoreland?
22   A.   Each chart was created on its own
23   based on the parties in interest list in
24   that case, the time frame of that case,
25   the information we had available at that

JAY ALIX

1
2    time from publicly available information
3    before.
4        We don't have all the information.
5    We don't have McKinsey's records.  I
6    don't have their client lists.  I don't
7    know what all their investments are.
8    But what I do know is this information
9    is all in the public domain.  I spent a
10   lot of time and energy trying to develop
11   it and bring it to light.  And the first
12   thing I did is I brought it to McKinsey
13   for about a year and a half.
14   Q.   Now you're just repeating
15   yourself.
16   A.   And I brought it to the Trustee.
17        MR. O'SHEA:  Please, please.
18        MS. CHUNG:  He's repeating
19   himself and it's not responsive.
20        MR. O'SHEA:  Chris, you know the
21   procedure as well as I do.
22   Throughout this deposition all day
23   long you've been interrupting and
24   stepping on the witness's answer.
25        MS. CHUNG:  Because all he's

JAY ALIX

1  JAY ALIX
2  doing is repeating himself and not
3  being responsive.
4      MR. O'SHEA:  It may upset you but
5  really you're trained better than
6  this, come on.
7  Q.   So let's talk about you concede,
8  you've said a couple of times today,
9  that you have a self interest in whether
10 or not you succeed in defending
11 Mar-Bow's objection because you are
12 interested in AlixPartners, you're an
13 owner of AlixPartners?
14 A.   I'm a 35 percent shareholder of
15 AlixPartners.
16 Q.   And also a board member?
17 A.   And I'm a board member of
18 AlixPartners.
19 Q.   And so you understand that
20 whether you win or lose, this objection
21 does have to do with your own financial
22 interests?
23 A.   Well you know how you were saying
24 earlier that this is so small for
25 McKinsey, it's like a percent they would

1  JAY ALIX
2  never risk their firm for it?  It turns
3  out that I've been fortunate enough the
4  financial rewards here other than losing
5  money for four years doing this is not
6  going to really -- I'd probably be
7  farther ahead if I stopped than if I
8  kept on going with this.  I'm losing
9  friends, I'm losing relationships.
10 McKinsey has been pressuring all my,
11 all my investors on top of it and I'm
12 spending a lot of money.
13     So I suspect that when this is
14 done I won't feel like I've gotten
15 financially ahead.  I'll feel like I've
16 gotten financially down.
17     But I will have sort of have
18 sorted out a big problem in the
19 bankruptcy system which is going to be
20 very satisfying to me at this time in my
21 life as a philanthropist and a person
22 who is retired from the bankruptcy
23 business.
24 Q.   You also have, I think you're
25 right to say, you have interest in

1  JAY ALIX
2  AlixPartners other than financial ones,
3  it's the firm you founded?
4  A.   Right, I'm proud of the firm, I
5  want it to succeed and it should be
6  competing on a level playing field and
7  McKinsey should be competing on a level
8  playing field and McKinsey is not.
9  Q.   Does it matter --
10 A.   So therefore McKinsey who has
11 been working in an anticompetitive way
12 by breaking federal laws to compete,
13 they need to stop their anticompetitive
14 way and get on a level playing field and
15 make full disclosures in the bankruptcy
16 court system.
17 Q.   Do you feel that the way you go
18 about as you put it creating the level
19 playing field matters?
20 A.   That's what -- yes.  I went to
21 Dominick Barton and talked to him for a
22 year and a half and tried to get him to
23 see this.
24 Q.   Do you think that making
25 selective disclosures to the court,

1  JAY ALIX
2  making misleading representations to the
3  court is a fair way or a level playing
4  field?
5      MR. O'SHEA:  Objection to the
6  form of the question, argumentative.
7  If you can answer it, go ahead.
8  A.   I believe that all of our
9  presentations that I've made to the
10 court are made in good faith.  I've done
11 as much due diligence as I can with the
12 information available to me.  I've spent
13 four years working on this with teams of
14 experts who support these conclusions.
15 And I've reported it all to the courts.
16 But I first reported to McKinsey who
17 didn't do anything about it.  I reported
18 it to the US Trustee.  So the way I'm
19 going about it is carefully,
20 thoughtfully and conservatively and I
21 didn't escalate to this level until
22 McKinsey kept ignoring me.  Then they
23 ignored the US Trustee.  Then they
24 ignored Judge Huennekens.  And so we're
25 here today.

JAY ALIX

1   
2    I didn't plan to go here, I
3    didn't want to go here.  My life would
4    be better off if I wasn't here.  I'm not
5    here for any competitive reason other
6    than I want to get the system
7    straightened out.  I've retired over 20
8    years ago from my firm after my wife
9    died.  I raised my kids.  I came back in
10   the business as a board member and I
11   find this situation.
12        And as a philanthropist and a
13   person who is engaged in only
14   philanthropic activities at this time of
15   my life, other than sitting on the board
16   of AlixPartners, I find the damage to
17   the system to be very important to me.
18   I spent years helping this system.  I've
19   been an instructor in the system.  I've
20   been on the national bankruptcy review
21   commission.  Seeing this going on in
22   this system is a real problem for me and
23   I feel like I have to do it.
24   Q.    This is a yes or no question.  Do
25   you agree that your side and our side

JAY ALIX

1   
2    have an equal duty, that every
3    participant in a bankruptcy proceeding
4    has an equal duty not to mischaracterize
5    connections and conflicts to the court?
6    A.    I agree that everybody working in
7    the court has a duty to not
8    mischaracterize anything to the court.
9    And I think that my analysis shows me
10   that McKinsey has not disclosed over
11   2,300 connections and rising and in this
12   case they're short at least a couple of
13   hundred.
14        I think that I'm comfortable with
15   my representations to the court and I
16   hope McKinsey is too.
17        MR. O'SHEA:  I'm told your time
18   is up, Chris.
19        MS. CHUNG:  That's fine, we will
20   leave it there.
21        MR. O'SHEA:  Well I would like my
22   client to have the opportunity to
23   supplement his answers as we talked
24   about.
25   Q.    So one was the claims.  You

JAY ALIX

1   
2    wanted to say more about the claims.
3    A.    So we talked about claims and so
4    I did not purchase -- I thought when you
5    asked me before if I purchased the claim
6    in Sun Edison back when I was buying
7    claims 2016.  I did not buy claim in Sun
8    Edison at that time.  However, I believe
9    I purchased a claim in Sun Edison within
10   the last ten days.  So and I'd forgotten
11   about that.  So I do have a claim that I
12   purchased in Sun Edison in last ten days
13   and Mar-Bow has purchased that claim.
14        With regard to --
15   Q.    What kind of a claim is it?
16   A.    Probably a trade claim of some
17   kind.  I'm not sure.  Again, I didn't do
18   the purchase so same process, same
19   people.
20   Q.    Same question.  Do you know how
21   much you paid for the claim?
22   A.    I haven't seen the answer yet.
23   Probably, probably somewhere between, I
24   don't know, 50 and $200,000, I don't
25   know.

JAY ALIX

1   
2    Number 2, you had asked me were
3    there any witnesses between my
4    conversation between me and Mr.
5    Sternfels.
6    Q.    No, you and Mr. Barton.
7    A.    I mean Mr. Barton.  And it turns
8    out yes, Mr. Sternfels was a witness to
9    our very first conversation.  He was on
10   the telephone while Mr. Barton and I
11   were in person in New York in September
12   of 2014.
13   Q.    I think you said that but that's
14   fine.
15   A.    I didn't answer in response to
16   your question a witness.
17   Q.    And the last is who your advisors
18   and professional team are?
19   A.    Right.  So I'm going to try and
20   speak slowly on names here.  So Mr. Andy
21   Fish, former assistant U.S. Attorney in
22   New York.  Mr. Guy Petrillo, a former
23   assistant U.S. Attorney in New York.
24   Jason Schwartz, representing Alix
25   partners.  I had these discussions about

JAY ALIX

1
2   these topics with him when he was
3   representing AlixPartners in the
4   Delaware litigation.  Alexander
5   Southwell, a former assistant U.S.
6   Attorney, Gibson Dunn, involving the
7   Delaware litigation.
8       Mr. Reed Brodsky, former assistant
9   U.S. Attorney, Gibson Dunn, these
10  conversations in the Delaware
11  litigation.  Mr. Jack Butler, a former
12  partner at Skadden Arps and long
13  acquaintance of mine, we've discussed
14  it.
15      Former bankruptcy judge Jim Peck,
16  James Peck in New York, the bankruptcy
17  judge on the Lehman case, he and I
18  discussed it.  I'll come back to that
19  one.  I'm not sure. I don't now who I
20  wrote down.
21      Mr. Al Togut.  Mr. Al Togut a
22  bankruptcy attorney in New York, well
23  known for his conflicts work and an
24  expert in his field.  And I discussed it
25  with him.

JAY ALIX

1
2       Mr. David Ruby, other local
3   counsel in Virginia and his partner Mr.
4   Will Prince in Virginia.
5       Professor Laurence Tribe from the
6   Harvard Law School.  Professor Tribe is
7   a Supreme Court specialist and his
8   associate Jonathan Massi.  Lawrence
9   Tribe, professor Tribe has taken on the
10  appeal for Mar-Bow to apply for cert at
11  the Supreme Court.
12      I said William Prince.
13      Attorney Susan Freeman, a
14  bankruptcy appellate expert based in
15  Arizona.  Her partner Daniel Ariello who
16  has now left her firm.  And Justin I
17  think it's Henderson who is now her
18  current partner on this.
19      In addition, both McKinsey and I
20  have had lobbyists in Washington.  I
21  mentioned I think Cornerstone and Cogent
22  Strategies.  McKinsey has been using
23  Bracewell as a lobbyist in Washington
24  and they've run into each other in many
25  meetings.

JAY ALIX

1
2       And then media advisors, McKinsie
3   is using Brunswick Media Advisors in
4   this matter, and then I've been using
5   primarily SKDK in Washington DC and
6   their affiliates and Robert Marston
7   Company in New York.
8       So we've all this media advisors,
9   lobbyists, lawyers, specialists in
10  bankruptcy and local counsel all the way
11  through the process.
12  Q.   I just want to make sure what
13  criteria you're applying.  Because are
14  you saying that every one of those
15  people that you named is your advisors,
16  are people that you've retained or
17  hired?  Are you including people that
18  you had conversations with?
19  A.   Some of them are conversations.
20  But they are extensive -- extended
21  conversations that they all wanted to
22  have with me about this topic.  Some of
23  them were sent to see me by McKinsey.
24  Q.   Can you just tick off which ones
25  are people that you retained and paid?

JAY ALIX

1
2   A.   It might be easier for me to pick
3   off the ones I didn't retain and pay.
4   Q.   That's fine.
5   A.   Reed Brodsky, Alexander Southwell
6   and Jason Schwartz are from Gibson Dunn
7   and they represented AlixPartners in the
8   Delaware litigation.  They were not
9   representing me personally.
10      Jack Butler approached me and
11  James Peck approached me to talk to me
12  and probably carry a message on behalf
13  of McKinsey to me.
14  Q.   This isn't an exercise about your
15  identifying McKinsey's consultants or
16  whoever talked, it's about yours?
17  A.   Well they came to see me and I
18  could tell by the conversation they were
19  sent to see me by McKinsey.
20  Q.   The question was who is on your
21  professional team of advisors?
22  A.   Well, okay, Al Togut is not on my
23  team, David ruby is on my team, Will
24  Prince is on my team.  Andy Fish and Guy
25  Petrillo are on my team.  Laurence Tribe

Page 478

```
1            JAY ALIX
2   is on my team.  Jonathan Massi is on my
3   team.  Daniel Ariello, justice Henderson
4   and Susan Freeman along with the few I
5   mentioned earlier and the people from
6   the lobbying firms and the media firms.
7       Q.   Okay.  All right.
8          MR. O'SHEA:  Thank you.
9          MS. CHUNG:  Thanks.
10      A.   Thank you.  Thank you.  I'm sorry
11  I talked so fast.
12          THE VIDEOGRAPHER:  This concludes
13  today's deposition, time is 5:49 p.m.
14      (Time noted:5:49 p.m.)
15
16   _____
17      JAY ALIX
18
19   Subscribed and sworn to before me
20   this      day of      2019.
21   _____
22
23
24
25
```

Page 479

```
1
2           C E R T I F I C A T E
3
4   STATE OF NEW YORK  )
5                      ):
6   COUNTY OF NEW YORK )
7
8           I, Mark Richman, a Certified
9   Shorthand Reporter, Registered Professional
10  Reporter and Notary Public within and for
11  the State of New York, do hereby certify:
12          THAT JAY ALIX, the witness whose
13  deposition is hereinbefore set forth, was
14  duly sworn by me and that such deposition is
15  a true record of the testimony given by such
16  witness.
17          I further certify that I am not
18  related to any of the parties to this action
19  by blood or marriage; and that I am in no
20  way interested in the outcome of this
21  matter.
22          IN WITNESS WHEREOF, I have
23  hereunto set my hand this 31ST day of
24  DECEMBER, 2019.
25                      _____
                        Mark Richman, CSR, RPR, CM
```

Page 480

```
1
2
3              E X H I B I T S
    NUMBER     DESCRIPTION        PAGE
4   EXHIBIT 1   Amended Objection of    26
       Mar-Bow
5   EXHIBIT 2   Objection of Mar-Bow    41
    EXHIBIT 3   Mar-Bow's emergency     41
       motion
6   EXHIBIT 4   List of bankruptcies    48
       and dates and related
7      datapoints
    EXHIBIT 5   Amended RICO Complaint  279
8      18-cv-04141
    EXHIBIT 6   Declaration of Mr. Alix  288
9      in ANR
    EXHIBIT 7   Transcript of the Biz   290
10     News
    EXHIBIT 8   Declaration filed in    335
11     the Ultrapetrol Bahamas
       limited case in 2017 by
12     AlixPartners
    EXHIBIT 9   Declaration of Lipscomb  370
13  EXHIBIT 10  McKinsey Master         424
       Retirement Trust Form
14     5500 2016.
    EXHIBIT 11  Mar-Bow Value Partners,  438
15     LLC's motion for relief
       from adjustments and
16     for indicative ruling
17
           INSTRUCTION
18  (Instruction not to          38
    answer.)
19
20
21
22
23
24
25
```

Page 481

```
1
2           ERRATA SHEET
3   CASE NAME: In re: Westmoreland Coal
    DATE OF DEPOSITION: December 31, 2018
4   WITNESS' NAME: JAY ALIX
5   PAGE/LINE(S)/  CHANGE       REASON
6      ___/___/_____
       ___/___/_____
7      ___/___/_____
       ___/___/_____
8      ___/___/_____
       ___/___/_____
9      ___/___/_____
       ___/___/_____
10     ___/___/_____
       ___/___/_____
11     ___/___/_____
       ___/___/_____
12     ___/___/_____
       ___/___/_____
13     ___/___/_____
       ___/___/_____
14     ___/___/_____
       ___/___/_____
15     ___/___/_____
       ___/___/_____
16     ___/___/_____
       ___/___/_____
17     ___/___/_____
       ___/___/_____
18     ___/___/_____
       ___/___/_____
19     ___/___/_____
20   _____
21      JAY ALIX
    SUBSCRIBED AND SWORN TO
22  BEFORE ME THIS_____DAY
    OF_____, 2018.
23
24   _____
    NOTARY PUBLIC
25  MY COMMISSION EXPIRES_____
```

**A**

**a.m (8)**
2:3 5:12 14:19,22
86:8,11 173:13,16
**abbreviated (1)**
42:16
**ability (3)**
117:25 123:14 329:24
**able (7)**
70:25 105:7 161:7
166:2 184:10
301:25 421:8
**abrogated (1)**
333:2
**absolute (2)**
370:3,4
**absolutely (3)**
52:25 306:3 390:12
**absorb (1)**
288:13
**abused (1)**
207:21
**abut (1)**
235:7
**accept (4)**
260:16 319:13 370:11
387:24
**acceptable (1)**
129:18
**accepted (4)**
276:20,21 323:21
370:11
**access (11)**
131:7 172:6,7 176:11
344:24 380:14
381:20 385:18
389:22,24 404:6
**accommodate (1)**
156:4
**accommodation (3)**
206:16,18,24
**account (7)**
101:23 137:9 166:25
170:6,8 372:18
417:4
**accountable (2)**
319:6 366:22
**accountant (1)**
427:19
**accountants (1)**
151:3
**accounting (3)**
114:4 406:18 442:4
**accounts (5)**
101:22 361:2 442:6
448:23 449:16

**accumulating (1)**
429:16
**accurate (9)**
68:21 81:9 147:7
293:6,11 305:12
367:21,22 410:14
**accurately (1)**
452:23
**acknowledge (2)**
112:6 179:17
**acknowledged (5)**
253:13 284:13 286:10
287:18 290:5
**acknowledging (6)**
265:22 266:2,23
282:10 287:6
308:18
**acknowledgment (1)**
282:14
**acquaintance (1)**
474:13
**acquired (1)**
27:24
**acquiring (1)**
193:20
**act (4)**
118:13 138:25 207:19
403:11
**acting (4)**
32:14 110:20 140:5
212:18
**action (5)**
98:11 214:24 256:6
258:18 479:18
**active (4)**
104:11 168:19 184:12
387:8
**activities (14)**
122:8 155:9 177:17
182:11 183:18
188:12 191:17,24
201:17 250:17
330:11 356:25
429:12 470:14
**activity (22)**
168:18 184:15,18
186:17,22,24,25
187:2,4,10,12 192:2
219:10 221:5 228:9
235:4 275:23
302:18 409:20
441:11 463:4,5
**acts (4)**
228:9 244:25 245:2,2
**actual (7)**
22:4 288:15,25 362:2

364:18 377:23
413:15
**acumen (1)**
388:24
**adamantly (1)**
242:24
**add (9)**
92:21 112:19 270:17
270:22,24 295:11
351:9 414:9 429:23
**added (2)**
92:24 427:12
**addition (7)**
92:13 176:22 338:21
344:4,5 449:20
475:19
**additional (1)**
438:17
**additions (1)**
75:8
**address (4)**
113:17,18,20 224:3
**addressed (2)**
7:23 391:8
**addressing (1)**
280:23
**adds (3)**
15:17 428:4,6
**adequate (2)**
237:20 323:20
**adequately (1)**
125:12
**adjudicate (8)**
82:13 136:2,8,16,18
325:7 332:21
461:18
**adjust (1)**
313:4
**adjustments (2)**
438:4 480:15
**administered (2)**
1:12 425:12
**admission (30)**
253:14 257:20,21
260:24,24 274:20
274:24,25 275:3,9
276:15 285:2,11
286:20,22 287:12
287:22 290:13
299:7,12,18,19
300:4,7 301:24
303:10,15 417:21
453:20 454:25
**admit (1)**
388:12
**admits (1)**

183:24
**admitted (11)**
170:7,9 224:14
253:13 258:4
276:23 280:6 287:2
294:12 296:19
307:15
**admonish (1)**
31:12
**adopt (1)**
322:3
**ADV (10)**
72:10,19,19 154:16
155:14 441:4,9
442:13,15,18
**advance (1)**
60:6
**adverse (6)**
178:10 339:13 344:10
344:15 346:25
403:8
**advertised (2)**
169:2,4
**advice (33)**
46:18 52:11 53:3
54:22 111:2 123:17
237:11 242:2,4
246:12 258:5 261:3
263:22 271:5
275:13 285:10,16
286:6 311:22
315:10 316:18,23
317:3,7 318:9,16,21
318:23 319:4 320:4
320:6,9 322:3
**advise (2)**
27:23 167:17
**advised (20)**
43:16,20,22 44:2,5,10
44:15,18,20,22,25
45:10 241:19
246:15 258:6
275:10 311:24
319:10 327:6
451:18
**advises (2)**
16:21 455:12
**advising (8)**
45:19 89:25 102:6
139:8 232:21
243:12,17 453:25
**advisor (10)**
145:11 146:2 150:16
168:2 174:6 202:20
243:16 350:15
361:17 403:16

**advisors (23)**
171:14,25 232:5
238:4 239:13
242:13 245:6 315:4
315:6,7 319:22,24
319:25 373:24
374:18 386:3
441:12 473:17
476:2,3,8,15 477:21
**advisory (2)**
412:25 422:7
**advocacy (2)**
392:4 393:22
**advocate (5)**
112:3,4 240:3 392:9
392:10
**advocates (1)**
390:13
**advocating (2)**
112:7 390:14
**ADVs (2)**
174:10 440:20,22
464:4
**affairs (3)**
21:24 123:15 141:8
**affect (2)**
120:19 402:5
**affidavit (11)**
22:3 300:14 322:6
345:4,4,7,8,11,12
362:11,13,19
390:15
**affidavits (9)**
155:6 160:4,5,15
272:8,10 274:20
302:14 363:5
**affiliate (10)**
28:11 179:18 323:13
323:15 329:17
332:2 340:23
352:13 363:22
460:22
**affiliated (1)**
358:2
**affiliates (32)**
16:22 92:16 177:12
177:12 331:7,16,21
338:11 339:5 340:8
340:9,12,13 343:6
347:19 354:10
364:8 365:17,22
366:2 453:17,19
455:2 460:16,21,21
460:24 461:3,5
463:6,7 476:6
**affiliations (1)**

331:19
**affirm (1)**
57:6
**affirmation (1)**
260:25
**afield (1)**
301:9
**afoul (3)**
31:13 301:13 336:17
**Africa (5)**
39:4,6,8 292:15
355:14
**African (2)**
292:5,7
**afternoon (3)**
36:10,12,16
**agencies (1)**
74:24
**ago (26)**
7:8 21:10 46:6 47:8
49:17 53:20 57:2
78:20 82:5 106:12
138:10 156:25
157:2 188:15
205:16 223:10,11
223:12 249:20
322:16 327:20
345:22 435:14
443:15 456:22
470:8
**agree (37)**
8:7 9:7,19 10:25 11:8
102:24 114:22
153:6 179:15
180:16,17 194:24
233:19 236:24
242:12 246:4
251:17 312:11
313:6 314:5,10,15
314:21,22,23 321:6
321:9,10 343:17
368:24 393:5,8
403:14 431:7,22
470:25 471:6
**agreed (27)**
246:25 247:4 249:8
249:11 251:12
254:7 256:5 262:5
263:22 274:2,10,16
277:14 278:9,20
281:19 282:16
283:5 284:13 285:5
285:8,12,17 294:7
294:24 296:4
298:23
**agreeing (7)**

96:12 263:19 282:11
296:18 366:13
378:21,22
**agreement (9)**
256:4,4 257:12,13
275:2 282:8 286:23
287:12 308:15
**agreements (1)**
262:22
**agrees (1)**
110:3
**ahead (17)**
25:11 31:23 39:19
52:25 54:2 60:15
64:9 139:20 153:4
251:19 261:13
316:14 347:7
392:25 467:7,15
469:7
**aim (3)**
25:8,9,15
**Airlines (3)**
49:19,21 95:11
**aisle (2)**
213:6,7
**al (5)**
1:8 5:6 474:21,21
477:22
**alarm (1)**
399:15
**albeit (1)**
459:24
**alerting (2)**
279:11,15
**Alexander (2)**
474:4 477:5
**Alice (1)**
418:17
**Alison (1)**
417:2
**Alix (528)**
1:18 2:6 5:1,4 6:1,24
7:1,6 8:1,21 9:1
10:1 11:1 12:1 13:1
14:1,23 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1,7 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1,4
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1

59:1 60:1 61:1 62:1
62:14 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
76:15 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
86:12 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1,25 95:1
96:1 97:1 98:1 99:1
100:1 101:1,18
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
131:14 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1,16 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1,12
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
173:17 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
199:17 200:1 201:1
202:1 203:1 204:1
204:12 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
221:21 222:1 223:1

224:1 225:1 226:1
227:1,4 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1,7 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1,6,11
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1,9 282:1
283:1 284:1 285:1
286:1,8 287:1,17
288:1,10 289:1
290:1 291:1 292:1
293:1 294:1,6 295:1
296:1 297:1 298:1,9
299:1 300:1,11
301:1 302:1,4 303:1
304:1 305:1,18
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1,15,20
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1,6,19
337:1 338:1 339:1
340:1,8,23 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1

384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1
396:1,24 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1,4 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
427:11 428:1 429:1
430:1 431:1 432:1
433:1 434:1 435:1
435:24 436:1 437:1
438:1,21 439:1
440:1 441:1 442:1
443:1 444:1 445:1
446:1 447:1 448:1
449:1 450:1 451:1
451:25 452:1 453:1
453:2 454:1 455:1
455:23 456:1 457:1
458:1 459:1 460:1
461:1 462:1 463:1
464:1 465:1 466:1
467:1 468:1 469:1
470:1 471:1 472:1
473:1,24 474:1
475:1 476:1 477:1
478:1,17 479:12
480:8 481:4,20
**AlixPartners (76)**
13:3,14,18,20 15:3
17:4,15,23 18:20
19:10,13,15 32:15
32:17,19,22 33:2,15
33:23,25 34:5 46:21
51:13 63:16 91:6,17
91:18,24 93:9,14
113:7 130:20
175:14,16,20,24
176:9 317:13
331:18 332:3,8
333:9,20 334:23
335:11,15 336:24
338:8,9,21 339:9,11
339:11,18 340:6,25
341:16 342:13,18
342:25 343:7
345:16 346:20
348:3 351:18 352:2

352:5 466:12,13,15
466:18 468:2
470:16 474:3 477:7
480:12
**AlixPartners' (5)**
33:10 345:20 346:10
352:11 353:5
**Allan (1)**
37:7
**allegation (12)**
59:5 278:8,20 281:12
281:18 282:15
349:4 408:20
423:10 426:2 457:2
464:14
**allegations (22)**
8:23 9:15 10:18 23:23
24:5 55:11 57:11
58:5,12,18 59:22
60:19 192:16,19
198:6 276:13
290:16 298:21
301:18 335:21
336:2 443:25
**allege (3)**
59:16 262:5 302:6
**alleged (9)**
59:17 233:6 275:19
275:19 301:19,23
365:5 415:21 416:2
**alleging (5)**
228:8 233:5 244:12
302:17 308:23
**allocate (3)**
201:10 377:6 378:14
**allocation (1)**
201:10
**allocations (4)**
201:7 382:19 383:14
386:6
**allow (7)**
25:22 31:10 130:25
176:11 279:12
319:14 336:13
**allowed (4)**
156:3 207:9 217:13
360:9
**Alpha (11)**
24:18,21 25:21 70:8
70:12,13,22 240:21
259:10 287:6
386:11
**alternative (1)**
201:11
**alumni (22)**
75:24,25 76:6,7 99:23

172:3 174:17,19,20
175:10,12,23
189:14 358:20
359:18,19 360:6,20
360:22 361:5
398:22 418:21
**alumnis (1)**
358:7
**Alvarez (4)**
109:2 161:22,23
162:3
**amazing (1)**
413:3
**amended (19)**
9:17 10:20 11:9 26:12
26:16 41:16,22
64:17 273:3 279:16
281:7,18 297:2,5
408:6 445:23
450:20 480:3,7
**amendment (2)**
272:25 273:6
**America (21)**
147:12,22 148:11,17
148:22,22 189:8,9
189:10,17 191:14
191:17,19 192:19
193:15 194:6
199:19 200:5
224:21,23 355:11
**American (4)**
49:19,20 190:5,6
**Americas (1)**
4:8
**amount (9)**
95:21 116:3 187:3
413:4,6 414:17
416:13,15 417:16
**amounts (1)**
411:19
**analysis (16)**
80:11,17 86:2,15,15
127:2 147:6 201:22
215:13 231:23
241:13,14 245:20
448:8 449:6 471:9
**analyzed (2)**
245:22 410:9
**analyzing (1)**
55:10
**Andy (4)**
110:16 211:22 473:20
477:24
**annual (11)**
382:16,17 394:18,25
395:4,22 396:2,17

396:17,21 417:18
**ANR (100)**
30:17,18 38:5,6,12
73:16 78:12,19 79:2
80:21 87:19,23 96:4
96:8,16 97:11,21,22
97:23 98:13,25 99:5
99:11 100:9,19,20
100:24 105:14
108:9 137:15,17,19
155:6,7 156:14
157:13,19 158:22
158:23 159:6,11,15
159:17,18,20,22
160:7,11,13 161:15
161:21 162:9,25
164:17,21 166:9,12
174:12 190:8,18
203:7,16,20 204:2
204:14,17 205:19
209:2 226:22 272:9
272:9,12 274:20,21
278:13 284:6 288:3
288:7,10 296:8
302:13 306:21
311:21 317:10
327:25 345:5 399:6
423:13 434:18,23
434:25 435:3,10
436:9 437:4,12,14
439:12 464:16
480:9
**answer (115)**
11:19 24:2 25:12
31:14,23 34:8,10
38:8,10,11 39:20
45:16 47:6 51:19
52:24 54:2 60:22,25
61:4 63:21 64:3,9
66:11 79:9,23 80:3
81:14 82:24 84:8
86:12 89:23 90:14
90:17 123:3 126:12
129:17,19 133:4
134:8 139:20
143:25 147:6 153:4
153:19,20 158:4
172:13,22,25 173:9
175:11 177:18
188:22 190:2
195:21 197:17
205:2 208:3 210:13
210:19,23 215:16
218:2 219:11
221:10 222:3
228:20 229:2 237:7

238:6,13,20 239:2
239:10 241:3
245:13 247:12
270:15 274:7
279:13,15 283:7
295:18 296:11
299:3 308:20 309:8
316:3,9,12,15,16
350:12 353:25
354:2 362:22
365:13 368:6
392:17,23 394:2,9
404:3 417:11,12,13
434:9 452:17
453:13 457:10
465:24 469:7
472:22 473:15
480:18
**answered (18)**
8:2 31:17,22 134:7
152:21 188:21
197:25 198:2
200:16 203:13
224:20,23 233:17
267:19 313:20,23
392:22,24
**answering (9)**
79:24 188:20 238:8
238:21 283:9 314:4
316:5,8 452:7
**answers (6)**
100:15 172:20 197:22
204:7 351:4 471:23
**anticipating (1)**
45:22
**anticompetitive (2)**
468:11,13
**anxious (1)**
349:20
**anybody (17)**
89:16 123:7,23 125:9
125:12 141:20
145:3 146:23
148:21 162:13
209:16 211:12
235:19 302:6
333:24 399:13
419:18
**anymore (1)**
295:21
**AP (2)**
338:9 340:4
**apartment (1)**
13:11
**Appalachian (1)**
191:15

**apparent (1)**
335:25
**apparently (1)**
46:25
**appeal (1)**
475:10
**appear (7)**
70:15 73:18 98:3
111:10 128:8
202:23 329:11
**appearance (1)**
82:19
**appearances (1)**
6:20
**appeared (2)**
132:12 223:11
**appears (13)**
72:3 148:8 223:23
232:6 311:25
312:10 405:8
417:24 429:16
433:8 438:25
444:16 453:24
**appease (1)**
266:7
**appeasing (1)**
266:17
**appellate (1)**
475:14
**appetite (1)**
432:18
**applicant (1)**
313:17
**applications (3)**
327:9 410:6,8
**applied (16)**
47:3 80:25 81:2,7
87:10 89:19,20
90:22 115:4 116:24
126:22 140:3
297:21 446:25,25
452:21
**applies (7)**
66:14 91:19 109:3,4,6
109:7 324:17
**apply (16)**
89:15 111:16 113:12
114:25 115:16
117:25 118:17
136:6,7 201:4 244:2
324:16 447:10
450:6,7 475:10
**applying (15)**
23:12 26:6 71:8 81:15
86:21 107:25
109:18,22 115:18

115:20 123:9
  139:13 322:23
  447:2 476:13
**appoint (1)**
  236:13
**appointment (2)**
  143:20 226:23
**appreciate (5)**
  22:9 204:11 291:8
  349:22 350:20
**appreciation (5)**
  372:17 379:13 380:16
  381:7,22
**appreciative (1)**
  263:12
**approached (3)**
  222:23 477:10,11
**appropriate (6)**
  103:5 177:5 214:24
  330:24 335:5 399:5
**approve (6)**
  115:3,8 118:15
  209:23 210:6 324:5
**approved (1)**
  115:7
**approximately (5)**
  5:12 12:10 13:17 15:7
  31:6
**arbiter (1)**
  114:13
**archive (3)**
  62:19 63:12 73:11
**archives (1)**
  63:13
**archiving (1)**
  63:14
**area (1)**
  22:7
**arena (1)**
  403:5
**arguably (1)**
  249:18
**argue (7)**
  80:2 133:5 140:9
  238:23 301:4
  302:24 451:7
**argued (2)**
  137:15 358:10
**arguing (4)**
  97:6 301:9 324:15
  330:22
**argumentative (7)**
  122:25 123:2 153:2
  199:24 222:2
  459:17 469:6
**Ariello (2)**

475:15 478:3
**Arizona (1)**
  475:15
**arose (1)**
  162:11
**Arps (6)**
  111:8 241:16,18
  253:15,17 474:12
**arrived (1)**
  36:8
**Art (2)**
  27:18,19
**article (7)**
  75:11,12,13 77:9
  119:11 132:12,18
**articles (2)**
  77:2 360:2
**articulates (1)**
  83:21
**aside (1)**
  359:11
**asked (64)**
  7:25 8:2 10:15,15
  27:18,19 31:22
  32:16,18,20 34:12
  34:12 46:14 48:23
  50:18 57:4,5 61:21
  62:15 63:8 121:22
  125:3,6 132:23
  134:7 156:9,10
  188:14,21,22
  200:22 203:12
  206:25 221:15
  222:5 225:13 227:6
  227:10,18,19,21,23
  236:11 242:7
  247:10,10 251:2,7,9
  251:9 253:7 254:11
  256:16 267:19
  271:4 287:4 298:13
  304:3 309:6 392:24
  418:24 452:6 472:5
  473:2
**asking (35)**
  54:10,18 80:16
  132:23 146:16,18
  151:16 153:6,8
  181:24 203:23
  204:12 209:12,13
  210:16 215:7 218:8
  223:13 278:2,3,5
  279:23,25 287:7
  308:14,15,22 409:8
  435:16,17,24
  442:11 452:4
  464:13,14

**aspect (1)**
  109:18
**aspects (1)**
  193:6
**assemble (1)**
  58:8
**assert (1)**
  27:6
**asserted (1)**
  53:16
**assessment (1)**
  254:8
**asset (5)**
  201:7,9 397:5 398:3,7
**assets (31)**
  173:4 191:10 195:24
  195:25 196:8,9,11
  201:8 235:22
  236:15 358:4,4
  382:20 383:16
  394:21,24 395:16
  395:19 397:15,18
  443:5 451:23,24
  454:16,19,20 459:3
  463:5,8,9,11
**assignment (6)**
  92:17 102:16,20
  120:13,15,16
**assignments (1)**
  422:9
**assistant (10)**
  110:12,15,16,17
  234:4 263:5 473:21
  473:23 474:5,8
**assisted (1)**
  212:19
**associate (2)**
  21:22 475:8
**associated (1)**
  384:19
**associates (2)**
  62:19 221:16
**association (1)**
  5:16
**assume (1)**
  410:14
**assumes (4)**
  94:12,16 127:24
  128:6
**assuming (7)**
  103:20 209:11 305:11
  334:15 405:21
  428:14 432:3
**assumption (13)**
  102:11,22 107:15
  313:13 314:9,13

412:3 414:22,24
  431:25 432:2 433:8
  433:18
**assumptions (2)**
  428:23 453:4
**assure (1)**
  202:24
**attached (3)**
  161:21 208:11,16
**attachments (1)**
  208:21
**attack (1)**
  214:19
**attempt (5)**
  59:15 79:13 224:6
  387:7 431:19
**attempted (1)**
  227:17
**attempts (2)**
  271:23 287:15
**attention (20)**
  45:6 117:21 137:3
  161:2 164:4 222:11
  223:2 227:24 228:5
  229:21,23,25 230:3
  250:22 292:22
  297:8 322:13
  336:20 338:15
  443:18
**attitude (2)**
  120:20 266:17
**attorney (34)**
  21:6,23 27:22 33:9
  37:5,5,6,6 44:5,7,8
  44:15,20,23,25
  46:17 110:12,15,17
  110:18,19,20
  212:17,18 234:5,9
  290:22 328:2
  473:21,23 474:6,9
  474:22 475:13
**attorney's (2)**
  392:8,10
**attorney-client (2)**
  275:11 319:9
**attorneys (29)**
  3:4,10,15,19 4:3,8
  36:11 37:9,16,17,19
  37:21,23 38:2,17
  56:7 57:23 232:18
  234:3,4 240:16
  262:16,18 273:2
  276:4 310:6 392:20
  393:4,7
**attributable (1)**
  428:17

**audio (1)**
  14:9
**audit (1)**
  357:5
**August (14)**
  32:12 33:5 85:16
  156:15 158:16,17
  163:17 207:14
  259:6,7,11 271:24
  275:20 424:12
**AUM (2)**
  195:25 358:5
**Australia (2)**
  260:7,9
**authority (4)**
  366:19,20 367:3,10
**authorization (3)**
  10:17 219:6 335:21
**authorize (1)**
  11:4
**authorized (4)**
  11:2,9 233:2 301:17
**authorizing (1)**
  447:8
**auto (1)**
  44:13
**available (43)**
  68:18 69:5,8 72:13,22
  74:20 76:12 128:21
  135:2 154:23
  162:17 167:9 169:5
  169:22 170:12
  172:8 173:2 174:25
  182:14 183:15
  198:16 231:6,8
  307:22 348:20
  371:9,15 372:10,16
  373:6 376:6,17
  381:13 382:24
  401:16 412:6
  414:13 439:23
  441:19 442:14
  464:25 465:2
  469:12
**Avenue (5)**
  2:8 3:4,20 4:8 5:10
**average (2)**
  412:12,13
**avoid (1)**
  254:24
**award (1)**
  233:9
**aware (26)**
  16:14 22:22 23:17
  25:17 33:10 55:16
  55:19 91:5,9 116:23

118:3 147:11 159:5
166:5,6,14 187:21
209:4 214:23
221:19,20 264:17
275:22 306:5 322:4
324:10
**awareness (3)**
25:5 33:17 220:14

**B**

**B (4)**
27:7 104:2 256:12
480:2
**back (67)**
19:20 29:23 55:6
58:24 66:7 78:12
83:14 86:22 88:3,5
88:13,23 92:25 93:2
93:5 95:23 96:3
98:14 103:16
105:15 106:9 111:3
113:6 128:20
130:24 131:17
138:23 170:2
172:24 200:21
205:17,19 229:7
231:5 233:21
235:19 239:8,15
247:15 249:5
256:14 259:3 284:4
285:9,17 300:23
311:21 328:3
331:22,23,25
347:23 351:2,16
373:3 423:25 440:8
441:19 448:4,9,13
451:15,16 456:3
470:9 472:6 474:18
**backed (4)**
71:22 83:19 134:25
336:6
**background (1)**
227:8
**backing (1)**
290:12
**backs (1)**
457:2
**bad (8)**
141:6 246:24 263:24
300:21 301:22
302:25 317:7 421:2
**badge (1)**
462:16
**badges (13)**
230:23 231:6,7,21,22
232:25 392:13

457:11 462:10,15
462:19,21,24
**Bahamas (3)**
335:10,14 480:11
**bailout (1)**
44:13
**bait (1)**
261:8
**balance (4)**
442:5,6 443:4,5
**balances (5)**
372:19 379:15 380:18
381:9,23
**bank (10)**
82:3,7 102:7 147:12
147:22 148:11,17
148:22,22 352:20
**bankers (1)**
276:5
**banking (6)**
184:15 187:2,3,12
201:16 356:25
**bankrupt (3)**
23:8,10 44:13
**bankruptcies (9)**
48:9,13 74:16 257:14
419:20 447:14
454:24 463:25
480:6
**bankruptcy (224)**
1:2 5:7 23:2,11,17,19
24:4,6,18,20,24
25:6,17,24 26:3,5
32:11 38:14,18
43:17,20,23 44:2,10
44:16,18 46:22
47:15 48:20 49:21
51:4,7,16,21 52:14
69:10,12,14 70:22
73:4,15 74:14 76:19
77:16 78:8,19 80:22
81:16,17,19,21 82:4
89:9,20,25 91:19
96:6,7 104:7 110:3
110:10,11,19,21
112:5 113:21
122:19 127:17,18
128:2,14 130:9
131:20,24 135:8,10
139:6,7 162:25
164:17,21 190:8,15
190:18 198:14
199:6 202:12,18
203:4,9,10 213:3
214:5,7,15 215:4,23
217:17,18 220:15

220:20 222:12,15
223:22 225:11
226:2,10,11 228:11
229:16 232:2,16
234:8,10,12,17
235:7 236:12,14
239:22 240:5,12
243:5,7 244:6,12,16
245:17 248:7 250:2
252:4,6,18 254:14
255:16 258:9 262:2
262:8 264:23
265:10 274:3,4,17
274:18 275:7 276:4
276:6,17 277:15,16
278:10,22 280:8,9
282:18,24 287:23
289:22 292:23
294:9,14,25 296:6
300:19 306:9
307:20 310:2,5,7
311:10 318:14,15
319:14 321:10,11
321:18 325:16,21
325:23 326:20
329:15,23 330:15
330:16,21 348:23
361:16 363:20
399:14 400:15,16
402:11,25 403:5
408:11,21,24 409:3
409:19 411:4
412:25 416:4 422:7
429:18 434:21
439:13 444:3 448:4
448:12 449:13
454:13 459:2
462:23 463:14
467:19,22 468:15
470:20 471:3
474:15,16,22
475:14 476:10
**banks (2)**
114:5 455:13
**Barcelona (3)**
39:7 273:17 291:14
**barriers (2)**
404:8,13
**Barton (71)**
222:25 223:18 224:8
224:11 241:15
249:15 250:19
251:5,7,22 252:3
262:4,10,24 263:6
265:22,25 266:3,5
266:23 267:17

270:13 271:11
272:5,15 273:11
274:2,15,24 275:4
275:19,21 276:7,23
277:14 278:8,20
280:6 281:19 282:5
282:16,22 283:5
284:11,22,23 285:4
286:4 289:2,8,17
290:2,5 293:18,19
294:6,7,12,24 296:4
297:22 298:23
299:8 301:24
322:15 419:6 421:9
468:21 473:6,7,10
**Barton's (4)**
260:23 263:2 287:15
287:21
**base (2)**
276:3 359:18
**based (35)**
49:15 54:4 57:21 58:5
62:6 93:5 103:8
182:14 183:14
198:11 206:5 216:6
218:12 231:23
233:13 245:9
309:22 318:20,22
339:6,16 341:14
344:8,13 347:9
372:19 388:23
397:23 405:9 410:3
412:6 414:7 422:12
464:23 475:14
**basically (3)**
95:15 263:19 304:23
**basis (65)**
8:22 9:14 10:17 35:11
57:10,12,22,25 58:5
58:12,17 59:4,8,14
59:16,21 60:9,9,11
60:19 78:9 86:19
98:13 124:4 127:21
152:10 153:9
167:23 168:9 198:6
198:9 199:11
200:14 206:3 221:7
227:11 235:2
302:25 312:3
313:17 317:8 318:4
318:6 320:18 323:2
335:20,24,25 349:3
353:22,24 366:12
366:12 368:4
412:25 414:21
430:6,14,19 431:9

432:8,14 434:10
461:23 462:4
**battery (1)**
146:13
**beautiful (2)**
361:12 397:13
**becoming (1)**
225:4
**beef (2)**
160:20,22
**began (1)**
455:24
**beginning (9)**
46:3 162:16 164:10
282:21 283:2
339:16 365:12
427:23 429:15
**begins (2)**
5:2 279:22
**behalf (5)**
33:22 140:6 212:2,16
477:12
**behavior (2)**
263:25 358:14
**belief (6)**
98:13 132:10 186:21
233:10 254:23
399:16
**believe (47)**
9:25 20:10 21:19 24:3
29:12,13 49:18,22
54:16 65:23 79:25
84:18 89:2 98:6
137:4 150:25 154:3
185:19,20 192:11
206:4 207:20,21
209:16 211:25
213:13 222:13
264:10 268:18
289:17 290:2
300:12,21 306:19
318:10 322:20
345:6 393:16
409:21 418:2 426:4
426:20 437:13
441:4 449:15 469:8
472:8
**believed (4)**
214:17,18 275:14
292:22
**believes (6)**
157:2 217:16 301:20
311:24 339:11
393:17
**believing (1)**
446:9

belt (1)
343:22
belts (1)
343:25
bench (2)
44:4,4
benchmark (1)
412:10
beneficial (2)
20:13,22
benefit (4)
88:20 163:25 235:10
239:25
best (20)
78:3 117:12,16 118:2
133:22 137:7 139:7
191:10 283:15,17
283:23 285:3,7
325:5 326:8 352:4
403:11,19 415:23
436:9
better (7)
303:13 304:5 336:13
412:11,17 466:5
470:4
beyond (5)
31:9 279:8 356:21
392:15 402:3
bias (1)
123:16
Bienenstock (5)
111:6,7 137:14,15,22
bifurcation (1)
142:11
big (32)
119:23 121:4,6 122:7
122:8,9,9 141:11,11
192:8 196:24,25
248:16 252:25
256:14 263:25
331:2,5 334:17,18
347:13 359:18
378:19,20 406:23
417:15 418:2
422:21 449:16
451:11 462:16
467:18
bigger (2)
331:3,14
biggest (1)
375:5
Biggs (2)
211:22 212:3
billings (2)
421:20 422:13
billion (31)

124:6 141:10,10
191:20 195:24
196:8 197:3,11
201:8,24 343:8
355:5 358:15
369:14,17,21,22,23
369:23 394:24
395:19,25 400:7
410:21 411:24,25
412:4,21 417:16
432:17,17
billions (2)
190:12 400:8
bills (1)
334:21
binders (9)
56:2,4,6,10 60:4,4
77:11 105:5 459:21
Birmingham (1)
3:21
Biskupic (1)
44:6
bit (13)
11:15,17 22:10 75:16
76:6 142:9,10
155:20 163:18
196:6 226:17
307:24 412:2
Bitcoin (1)
415:5
Biz (8)
273:16,24 274:13
290:18,20 292:3
305:7 480:9
black (6)
129:23 139:23,24
196:25 320:13
379:8
BlackRock (34)
72:2 137:25 190:4,4,6
190:10,18,24
192:18 193:14,22
194:4,6,8,10 196:20
196:23 197:5,10
199:19 200:5,8,8,11
200:12,17,19 202:5
202:15 203:15,25
204:16,24 205:11
BlackRock's (3)
189:22 193:19,23
Blackstone (1)
397:9
blanket (1)
318:19
blatant (1)
287:15

bleeding (2)
183:16 349:24
blending (1)
183:17
blind (6)
131:7 327:17,21
328:6,6,7
blocked (1)
204:19
blood (1)
479:19
Bloomberg (1)
75:14
board (54)
19:10,12,15,16,18
20:5,8 32:15 169:16
169:17 176:3,4,6,7
177:16 277:9
330:10 332:8
333:19 340:14
343:11 345:22
346:19 347:24
352:10,12 354:9,11
354:16,22 356:8,15
357:2,6,15,24
362:24 363:2,6,15
364:3,5 366:24,25
367:11,14 368:18
404:5,12 418:23
466:16,17 470:10
470:15
boardroom (1)
364:14
boast (4)
389:13,13,14,15
boasted (1)
360:4
Bob (2)
254:3 277:6
body (3)
288:17 301:6 462:17
Boies (4)
2:7 3:3 6:6,9
boils (1)
334:24
bolt (1)
343:22
bonds (13)
27:9,14,20,24 28:4,16
31:7 32:4 35:6,8,14
373:8,9
book (2)
418:25 419:3
borders (1)
191:22
borne (1)

350:9
bottom (8)
130:3 289:16 293:16
305:20 326:17
337:14 365:9
371:25
bought (11)
19:20,21,22,24,25
20:4 27:17 29:11,13
34:20 171:18
bounds (3)
98:25 122:12 304:6
box (46)
129:23 159:9,22
160:8,16,17,20,22
161:9,13,19,23
162:5,7,15,18,22
163:6,10,13,20,25
164:9,16,20,25
165:3,4 166:5,6,8
166:15,17,19 167:2
167:3,4,8,13,15,21
168:5,13 169:7,24
320:13
boxes (1)
55:17
Boy (2)
29:17 304:4
Bracewell (1)
475:23
brand (1)
375:7
break (22)
67:16 85:10 86:4,13
107:9 110:14 158:7
172:15 173:18
174:16 269:3
270:11 280:25
291:7 335:6 346:22
349:4 394:10
407:19 408:4
437:18 438:22
breaking (7)
67:18 107:11 158:7
224:14 264:6
303:13 468:12
bribes (1)
287:16
bring (13)
25:25 45:6 117:20
125:19 202:13
213:8 220:13
222:10 285:19
322:22 398:22
419:11 465:11
bringing (9)

61:16 127:21 137:2
227:24 230:3
250:22 292:21
393:14 416:11
brings (3)
416:20,21 418:5
broad (5)
74:23,23 144:24
186:3 371:7
broadcast (1)
291:12
broader (1)
431:9
Broadway (1)
16:4
Brodsky (2)
474:8 477:5
broken (2)
233:7,11
brokers (3)
27:21 29:5 177:3
brought (18)
10:5 20:11 29:10
164:3 190:17 223:2
223:3 225:10 226:8
228:2,4 229:21,23
229:25 322:13
326:13 465:12,16
Brunswick (1)
476:3
buck (1)
366:21
bucks (2)
415:8,9
build (5)
51:13 71:3 79:13
359:15 420:15
building (3)
63:16 149:11 356:15
built (10)
71:7 72:16 80:7
127:23 153:11
282:19 312:21
356:11 357:19
420:16
bullet (13)
179:5,6 371:22 372:7
372:23 373:22,23
375:15 379:3,8
380:20 382:15
383:21
bullets (1)
371:11
burden (6)
197:17,21 377:23,23
436:11 437:7

**burned (1)**
206:19
**bus (1)**
108:11
**business (90)**
12:13 22:24 23:5 26:9
46:20,22 51:8,10,14
63:14 90:2 101:20
101:22,23 102:18
102:18 103:19
173:7,8 183:8 223:5
223:21 237:24
252:2,4,6,7 254:14
254:18,19,20
256:12,14 257:10
257:15 260:19
289:20 303:4,5
327:5 329:5,6
330:11 338:23
339:7,17 341:2,15
345:2 347:10
356:22 358:17,23
358:23 360:13,23
361:6 362:3 368:4
398:21 399:14
404:14,21 405:10
405:16,17,18,19
409:19 411:4 413:2
416:5,11,19,21
417:20,25 418:6
420:7,10,13,15,16
422:5,6,7,21 427:4
467:23 470:10
**businesses (1)**
170:22
**busy (1)**
259:6
**Butler (2)**
474:11 477:10
**buy (8)**
25:20 27:13,15 28:16
31:3,20 389:14
472:7
**buyers (1)**
29:4
**buying (5)**
26:4 29:2 34:17 190:7
472:6

C

**C (6)**
3:2 4:2 104:3 256:14
479:2,2
**Caisse (2)**
340:10 342:23
**calculated (1)**

428:15
**calculating (1)**
431:11
**calculation (8)**
201:5 410:3 411:12
411:20 412:17
431:15 435:11
438:25
**calendar (1)**
266:11
**call (15)**
18:14 33:8 184:12,14
186:25 240:10
251:5 303:16
310:12 361:15
414:25,25,25
421:12 458:20
**called (30)**
6:24 15:13,24 16:2
33:25 34:23 45:24
46:17 95:12 101:22
160:25 165:7
187:11 194:8 199:8
212:21,21 232:14
251:13 253:14
258:10,24 259:12
262:15 327:18
355:9 359:8 406:23
419:2 421:11
**calls (6)**
37:8 271:22,23
286:25 303:11
312:17
**camera (21)**
155:19,22 156:3
158:11,14 203:17
203:25 204:13,18
204:20 205:6,14,17
205:24 206:8,9
207:3,16 208:5
248:14,24
**Canada (1)**
342:24
**cancer (1)**
259:23
**Canfield (2)**
44:19,21
**capital (23)**
3:20 14:4 15:13,18,19
15:21 16:9,15,17,23
16:25 17:6,8 19:20
187:7,8,9 244:20
340:4,7,22 341:5
407:7
**capital-based (1)**
184:17

**card (1)**
415:5
**care (1)**
324:25
**career (6)**
63:15,16 170:23
175:18 359:2 397:6
**careers (1)**
75:21
**careful (6)**
113:22 132:8 149:12
252:22,23 294:18
**carefully (2)**
55:7 469:19
**cares (2)**
241:23 252:15
**Carmody (17)**
163:14 166:3,13,17
166:18,21,22 167:2
167:4,20 169:10,14
191:2 317:12
416:22 418:14,16
**Carmody's (3)**
164:22 170:6 317:9
**carry (3)**
123:14 143:21 477:12
**case (234)**
1:11 9:19 11:3,10
16:8,10 24:19,20
25:14,24 32:25
33:21 37:14 38:4,7
40:18 47:15 49:21
49:25 50:9 65:17,24
67:4 73:4,10 76:15
79:19 81:18,19 82:4
82:6 83:15,19,20,20
83:24 84:11,19
87:19 88:21 90:21
91:2,5,9,14,15,20
96:11 97:17 104:17
106:7 107:22,23
108:3,4,6,8,9,13,24
113:5 114:8 115:21
116:3 117:3,5 121:6
127:17,18 128:18
131:11 135:23,24
136:12 137:17
138:20,22 139:15
140:9,23 141:10,13
144:16,17,25 145:2
147:25 153:12,13
153:17 155:7
156:14,20,20,22,23
157:5,13,19 158:22
159:6,19 160:7,12
160:16 161:21

162:16 163:2
164:11,17,21,25
165:2,3,4 166:9
174:12 189:15
190:8,18 194:20
199:6 202:12
203:16,20 205:19
207:24 208:12
209:2 226:22,24
229:17 232:8,17
234:7,8,10 235:10
235:15,17 236:14
243:7,19 248:11,17
259:10 272:9,12
273:5 274:22 278:7
278:13 296:25
298:4 302:16
303:18 306:21,22
306:23 307:6,9,10
307:11,12,13,15,18
307:25 311:11,21
311:21 317:10,12
318:15 319:9 320:8
320:22,24,25 321:3
322:25 323:14,22
324:6,7,18 325:14
327:9,10,25 331:2,8
331:9,10,17 333:10
333:13 335:10,15
344:19 345:5
363:10 393:14
402:12 423:13
429:15 434:5
439:13 443:14
444:3 445:24,24
446:5,12,14 447:18
447:24 448:2,6,20
451:17,22 452:19
454:7,9,9 455:23
461:4 464:24,24
471:12 474:17
480:11 481:3
**cases (57)**
23:2,11 24:24 26:5,8
38:14,15,18 50:7
51:4,5,9 68:17
69:10,13,14 70:22
70:25 71:3,16,24
72:4 91:20 119:5
129:10 134:11
141:11 158:23
194:18 198:14
214:7 223:23 227:3
234:17 235:8
237:16 240:5,12
243:5 250:2 255:8

255:16 296:8
304:19 306:9 321:3
339:6 348:23
409:23 410:6,11
447:10 448:21
454:13 459:3
462:23 463:17
**Casey (1)**
362:10
**cat (2)**
128:16,17
**categories (6)**
143:14,18 144:18
379:6,11 381:11
**categorization (1)**
148:19
**category (7)**
67:23 144:20 148:15
150:6 183:21 243:8
382:22
**Catherine (1)**
263:4
**caused (1)**
385:23
**CDPQ (1)**
340:11
**Centerview (1)**
109:4
**central (2)**
358:16,18
**cents (1)**
28:6
**CEO (15)**
32:18 33:12,13,14
222:25 249:15,22
255:6,10,23 256:18
258:14 266:10
303:4 397:9
**CEOs (1)**
360:5
**cert (1)**
475:10
**certain (6)**
70:24 187:3 275:24
352:11 367:4
386:24
**certainly (7)**
130:13,16 184:7
275:16 290:11
369:15,17
**certified (6)**
2:9 230:17,18,20
309:23 479:8
**certify (2)**
479:11,17
**CFO (2)**

27:18,19
**chairman (1)**
420:11
**challenged (1)**
108:11
**challenging (1)**
53:13
**chance (5)**
67:16 153:19 234:14
251:11 350:3
**change (5)**
224:18 257:5,6,9
481:5
**changed (4)**
46:24 47:2 57:19
258:19
**changes (1)**
282:12
**changing (2)**
254:3 396:19
**Chapter (9)**
1:10 51:8 68:17
223:24 333:10
339:6 398:25 399:6
399:12
**characterization (1)**
289:11
**characterizations (1)**
304:9
**characterize (3)**
184:3 211:7 213:18
**characterized (4)**
184:5 346:15 444:5
444:15
**characterizes (1)**
381:10
**characterizing (2)**
211:10 296:21
**charge (1)**
406:18
**charged (1)**
214:14
**Charlotte (1)**
263:3
**chart (65)**
62:15,17,18 63:3
65:13,22 67:3,14,21
67:22 68:2,6 69:4
69:15 73:19 76:17
77:14,25 78:5,10
80:17 84:25 85:7,8
85:13 86:16,19 87:7
88:5,20 94:24
103:21 104:24
118:25 126:8 127:7
127:23 128:5

131:25 134:6
141:23,25 142:2
144:2,11,19 146:20
147:13 148:6
149:24 150:23
151:10 152:12,18
153:23 154:10,13
154:22 158:9
176:21 329:11
440:12 464:3,20,22
**charts (1)**
464:18
**Chase (1)**
102:7
**check (13)**
22:14 29:24 32:21
88:24,24 89:13
141:21 148:21
149:2 153:21
192:22 230:9 305:8
**checked (5)**
32:20 94:22 149:13
192:13 243:22
**cheese (1)**
76:5
**Chevy (2)**
415:9,10
**Chicago (1)**
4:17
**chief (1)**
44:2
**children (4)**
15:16 18:18 46:25
259:24
**choice (1)**
133:16
**choices (1)**
10:2
**choose (1)**
387:23
**choosing (1)**
318:17
**chose (1)**
108:9
**chosen (3)**
82:12 104:8 242:4
**Chris (28)**
6:8 36:23 37:2,7
67:16 85:10 133:7
222:2 238:11,19
267:14 277:23
280:14 283:21
301:5 304:5 312:25
313:25 316:2 335:5
336:12 337:13
347:7 415:17

438:14 444:23
465:20 471:18
**Christine (2)**
4:10 5:20
**CHRISTOPHER (2)**
3:7,12
**Chung (83)**
4:10 5:20,20 7:5,7
14:8 37:3 41:8,12
41:15,21 47:23 48:8
52:17 61:9 63:20
67:19 70:19 85:11
86:3 90:9,16 101:19
122:14 158:2
165:19 172:16
173:10 181:24
199:22 204:9
207:25 210:12
228:21 238:8,14,21
239:6 266:20 269:2
270:10 277:20
279:3,6,10,23 280:4
280:16 281:5 283:8
283:22 295:15
301:15 303:25
313:4 314:3 316:5
316:11 324:24
335:7,13,24 337:17
337:24 349:9,15
370:19 371:4
415:20,25 437:9,17
437:21 438:19
444:25 445:6
452:11,15 457:7
465:18,25 471:19
478:9
**chunk (1)**
201:2
**circle (1)**
360:24
**cite (10)**
307:15 308:2 368:20
377:3 378:9 380:4
392:5,6,7 410:21
**cited (2)**
370:22 385:7
**cites (1)**
371:17
**cities (1)**
410:19
**citing (3)**
195:4 374:14 383:9
**citizen (2)**
217:13 219:21
**City (1)**
188:25

**civil (5)**
24:15 233:9 272:13
272:17 278:16
**claim (28)**
25:21,22 30:24 31:2,3
31:20 32:9 34:8,15
34:17,18 139:6
178:23 199:11
228:10 277:13
315:12 318:22
420:20 424:12
472:5,7,9,11,13,15
472:16,21
**claimants (1)**
413:9
**claimed (2)**
280:6 294:6
**claiming (4)**
265:21 275:4 330:13
382:23
**claims (23)**
23:7,10 24:21 26:4,7
30:17,22 39:15 40:7
40:10,16 45:11
235:13 350:13,15
444:20 445:10
454:3 455:3 471:25
472:2,3,7
**Claire (1)**
263:3
**clarify (1)**
48:25
**class (1)**
344:18
**clean (1)**
448:11
**clear (22)**
30:7,8 82:15 83:12
127:3 162:3,5
163:12 164:14
221:9 240:8 287:10
287:11 296:15
298:15 308:4 323:8
324:13 347:6
396:20 401:24
420:23
**clearly (17)**
83:21,21 127:20
128:21 160:8,9,10
167:20 184:19
196:20 266:16
284:10,18 302:19
355:24 360:3
400:15
**CLEMENT (2)**
4:2,5

**client (108)**
73:18 74:10,13 76:16
77:13,17 78:6,10,18
79:2 80:20 85:2,14
85:15 86:18 89:9
96:16,18 98:21,21
99:16 101:16 102:3
102:4,13 103:22,23
103:24 104:11,23
105:3,15,21,23
106:9 126:7,19
127:25 128:7,8
131:21,23 132:19
135:22 142:6
144:18,20,21,22
145:2,2,10,23
146:19,23 147:13
147:14 148:7,9,9,17
148:18,23 150:14
150:21 151:7,8,18
152:12,13 153:16
153:22,24 172:17
176:22 190:10
196:23 198:25
201:20 276:3 339:9
342:25 356:18
358:19 360:6,9,14
364:12 398:24
400:11 444:18
445:9 446:2,13,16
450:25 452:21,24
453:6 454:18
455:10 456:12
458:24 459:8 462:7
463:4 465:6 471:22
**client's (1)**
343:2
**clients (34)**
74:22 75:4,6 76:10
101:6,9,11 118:24
119:3 121:17,22
125:8 126:13 131:3
137:11 142:14,17
144:8 236:3 334:17
348:9 359:3 361:10
399:5,12 400:13,14
400:15 402:18,20
408:22,25 455:14
458:12
**clients' (1)**
359:14
**Clinic (2)**
34:18,23
**close (6)**
35:9 153:14 163:19
234:3 388:9 422:13

**closer (6)**
14:12 288:14,24
289:4,7,12
**clothes (1)**
267:10
**cluster (1)**
18:13
**CM (2)**
1:24 479:25
**Co-Counsel (1)**
4:15
**Co.'s (1)**
177:19
**coal (7)**
1:8 5:6 27:9 191:15
201:19 399:8 481:3
**code (35)**
26:3 81:16,17,21 83:9
104:7 114:7 124:10
135:8,10,15 138:13
143:3,11 213:3
214:5 229:16
232:16 244:4,6,8,10
248:4 307:20
318:14,18 319:14
320:16 323:8,9
363:20,23,24
402:11 450:14
**code's (1)**
329:15
**Cogent (2)**
212:21 475:21
**coherently (1)**
42:12
**Cokely (1)**
44:21
**collect (1)**
78:14
**collection (1)**
155:4
**collectively (4)**
312:8 340:8 354:22
355:2
**colored (1)**
268:9
**column (10)**
73:20 74:12 125:5
154:12 174:5,6
426:17,19 427:9
428:3
**columns (4)**
67:22 426:22 427:25
431:11
**combination (1)**
15:16
**come (31)**

35:25 47:12 54:6 72:7
76:18 123:23 125:9
134:12 140:8 150:9
155:13 160:2
175:19 197:13
202:18 238:5 242:6
245:25 254:13
264:3 278:7,19
351:2 403:20
414:15 427:7
431:17 451:8
454:22 466:6
474:18
**comes (7)**
145:14 235:24 369:15
391:18 412:25
426:25 431:14
**comfortable (3)**
134:24 246:13 471:14
**coming (6)**
36:19 37:10 166:12
357:25 360:17,19
**comment (1)**
222:3
**commentary (1)**
296:10
**comments (1)**
438:17
**commercial (2)**
361:15 402:15
**commission (4)**
72:12 245:3 470:21
481:25
**commit (2)**
415:13 416:6
**commitments (1)**
259:19
**committed (3)**
302:7 435:19 462:5
**committee (16)**
113:18,19,21 114:9
212:9,10 213:4,5
214:13,14 217:11
217:12 220:21
321:17 357:4,5
**committees (2)**
213:12 215:8
**common (5)**
177:15,16,17 236:20
336:9
**communications (1)**
56:22
**companies (62)**
15:12,23 16:5 17:9,10
19:4,5,8 23:8,10
44:14 70:16 74:23

79:17 119:16 122:8
125:24 131:3
134:19 159:21
168:20,21,22,24
170:24 183:24
192:8 201:21
223:25 330:19
331:2,3,4,5 338:25
339:2 343:13
348:12 360:7,20
361:7 367:13 384:2
387:6,8,9,12 389:4
398:24,25 399:4,13
405:13 406:24
413:25 414:4
447:13 448:18,25
459:4 461:22
463:12
**company (97)**
1:8 5:6 13:3,5,13,14
15:6,8,22 16:2,19
16:25 17:5 27:9
33:3 84:22 102:9,21
104:12 106:4
120:16 127:9,11,15
129:7,15,22 132:13
132:18 136:3
151:22 169:8
179:22 180:8,14
186:7 189:13
190:14 191:9,15
202:17,20 255:24
257:7 260:7,14
264:5 303:4,6
330:20 333:25
338:9 345:9 354:8,8
354:12,24 355:18
357:7,25 358:3,17
358:24 360:5,9
361:21 362:15
365:15,15 366:17
366:25 367:2,12,15
368:17 370:7
383:17 391:3
394:15 398:4
416:12,14 417:15
421:2,3,13 448:3
451:11,12 453:22
453:25 454:4 455:8
455:11 458:18
461:20 476:7
**compare (8)**
134:11 145:15,17
149:4 152:18 343:5
345:14 378:17
**compared (9)**

73:3 79:6 145:8
151:20,23,24 152:7
293:13 448:19
**comparing (3)**
87:13 146:20 343:14
**comparison (1)**
152:22
**compass (20)**
159:9 160:9 369:18
375:18 376:2,9,11
376:16 377:6
378:14 379:5
382:21 384:3
385:17,24 386:25
387:3,10,14 389:2
**compel (7)**
95:7 97:25 155:23,24
156:7 226:21
240:23
**compelled (5)**
70:11 97:24 100:11
100:12 101:2
**compensate (1)**
418:4
**compensated (1)**
418:18
**compensation (9)**
225:17,19 417:3,19
419:5,7,13,24
421:18
**compete (1)**
468:12
**competent (2)**
140:4 393:3
**competing (4)**
251:20,21 468:6,7
**competitive (1)**
470:5
**competitor (1)**
266:11
**competitors (5)**
124:20 126:16 130:17
178:8 400:14
**compilation (1)**
56:8
**compile (2)**
58:8 272:21
**compiled (3)**
56:6 128:6 157:24
**complaint (18)**
233:4 272:14,17,23
273:4 277:12
278:17,24 279:2,5
279:17 280:13
281:7,19 285:22
297:2 302:16 480:7

**complaints (2)**
293:18 295:25
**complete (9)**
80:7 129:22 237:23
258:12 283:12
297:11 404:9,10,11
**completed (3)**
190:9 191:11 287:3
**completely (12)**
88:16 98:20 122:12
128:18 172:20
258:22 311:17
343:9 345:17 450:8
455:21 458:12
**complex (3)**
147:5,6,7
**compliance (25)**
46:5,13,16 47:10
48:21 49:11 50:13
51:22 52:7,23 53:10
53:22 66:21 99:10
99:20 100:6 109:16
116:5 117:8 212:25
275:8 287:7 320:15
322:6,8
**compliant (2)**
214:4 298:7
**complicated (2)**
114:16 253:2
**comply (42)**
26:2 70:11 98:3,4
117:6 127:15
224:10,17 225:3
231:11,12,13
232:22 240:2 242:8
243:18,18,23 244:8
244:10 250:13
251:24 254:16,17
255:4,17,21 256:2,8
257:18 260:17,18
261:20 299:15,24
299:25 300:9
308:24 317:6
331:14 402:21
436:25
**complying (14)**
137:5 242:17 248:2,4
248:5,6,8 251:23
255:22 261:2
275:15 284:14
297:20 422:25
**comport (2)**
140:7 291:22
**composite (1)**
354:21
**composure (1)**

349:23
comprehensive (1)
237:23
comprise (1)
343:10
compromise (1)
221:3
compromised (2)
220:23,25
concealed (23)
65:7,9 66:3 68:5,10
68:24,25 69:2,18
71:21 144:3 148:6,7
151:10 177:6 230:7
247:2 403:17
423:12,14 444:17
445:8 446:3
concealing (5)
66:5 216:6 230:10,15
246:17
concealment (4)
142:21 213:20 230:7
457:3
conceals (1)
65:2
concede (3)
182:5 388:17 466:7
concedes (1)
460:11
conceding (1)
182:9
concern (5)
191:12,13 289:18
290:4,6
concerned (7)
62:11 130:10 203:9
235:6,7,9 324:8
concerning (3)
214:6 286:9 287:18
concerns (5)
53:18,19 124:5
251:10 393:21
conclude (8)
51:20 112:21 123:7
170:18 197:4 235:2
409:8 428:8
concluded (5)
32:24 47:9 53:21
57:24 66:20
concludes (1)
478:12
conclusion (35)
47:12 48:19 49:8,14
50:12 51:2,25 52:6
52:22 53:9,11,13,14
53:15,16,17 54:6,21

66:4,6,14 123:24
125:10,15 153:6
197:14 225:23
241:24 243:24
244:23 245:25
312:18 354:5 402:2
403:21
conclusions (1)
469:14
concrete (1)
67:13
concurred (1)
226:6
condition (1)
189:18
conduct (6)
22:24 213:19 216:21
221:12 304:9
344:25
conducted (1)
212:16
confer (1)
82:17
conference (1)
57:24
confidence (1)
165:17
confidentiality (6)
61:12,20,22 62:7
289:19 339:10
confine (1)
222:2
confirmation (4)
164:23 166:10 191:3
430:2
confirmed (2)
96:6,7
conflict (10)
32:14 92:4 123:14
289:19 361:19,20
361:20 364:18
407:12 461:19
conflicted (1)
195:12
conflicting (1)
325:9
conflicts (7)
91:25 304:25 330:23
413:20 423:13
471:5 474:23
confronted (1)
282:22
confused (3)
257:2 277:25 380:7
confusing (1)
439:16

Congress (24)
113:16 114:8 115:13
210:5 211:3,14,17
211:21 212:8
214:15 215:13
216:4 217:7,23
218:9 220:8 221:13
221:14,15,16 222:7
227:7,13 271:3
congressional (2)
216:18,21
Congressman (1)
212:2
conjunction (1)
408:14
connect (5)
202:22,24 348:2,9,13
connected (16)
57:16 125:24 159:15
202:6,10 292:13
333:15,24 341:9
345:15 360:11
362:5 433:15
451:11,13 452:3
connection (106)
67:23,24 68:4,24,24
69:3 72:2,5 74:12
78:11 80:12 86:18
87:4,7,12 88:19
95:14 102:8 103:2,6
104:2,12 105:6,6,8
106:5,12 119:25
123:6 126:12,12
127:11,13,25
128:24,25 132:9,11
132:21 133:10,13
133:21,21 134:4,18
134:22 135:6,11,11
135:12,14 136:10
137:24,25 138:3
142:13 143:14
145:10,11,13,23,25
146:3,5 147:13,14
148:6,7,9,10,23
150:5 157:22,23
159:4 160:25
161:13 174:4,4,8
178:6,18,19 190:24
200:11 204:24
209:2 234:10,13
271:2 310:10,10,22
332:9,13,16 334:2
334:12 385:21
446:4 450:25
453:21 454:7,8
455:2 461:12

connections (247)
65:3,8,9,15,22 66:4,5
67:2,5,8,10 68:15
69:19,20,22,23 70:3
70:4,7,9,12,15,24
71:4,6,8,17,18,21
72:15,24 73:6,17,19
74:6,8,10 76:13,16
77:13 78:7,15 79:14
80:8,20,21 81:11,20
81:24,25,25 82:10
82:14 83:8,13,14,25
85:2,14,16,24 87:16
87:17,18,20,24,24
87:25 88:15 89:3
92:2 95:6,18 96:16
96:19 97:2,13,14,18
98:5,12,16 99:24
100:2,4 103:12,13
104:24 105:15,16
105:17,20 106:4
112:18,22 115:22
116:2,4,10,15,20
118:5,21 121:9
122:6 123:21,25
125:11,16 126:5,8
126:20 127:6,8,19
128:13 129:21
131:19,22,23
134:23,25 135:12
135:16,18,20
136:13,16,19
140:14,21 142:3,3,7
142:8,12 143:4,6,10
143:17 144:3,19,20
144:21,22 145:7
146:19,23 147:25
149:17,24 150:19
150:21 151:11,19
152:6,11,12,13
153:15,15,16,22,24
154:9,21 155:3
156:2,23 157:5,10
157:16,19,21
158:18,22 159:11
159:12,15,23
173:20 176:20,22
176:25 177:6,6,19
204:21 213:20
215:21,21 216:6,8
230:7 233:21
234:19 236:18
237:19 246:6 247:3
304:25 310:11,11
311:4,7,8,10,11
312:9 317:4,16

320:11 323:9,13,15
325:4 326:24 331:6
331:20 332:4
333:17 334:5,9
335:2 337:2 338:5
339:20 343:24
347:21 348:16
363:21 364:9,16
408:13 437:2
440:18 450:14
451:21 456:3 458:9
463:2,17,20,24
464:16 471:5,11
conscious (1)
240:16
consequence (1)
330:16
consequences (1)
319:13
conservative (2)
395:24 430:12
conservatively (1)
469:20
consider (3)
142:21 265:11 447:9
consistent (1)
335:17
consistently (4)
106:16 118:4 310:20
450:8
consolidate (2)
192:9 330:19
consolidated (2)
355:25 356:3
constructed (1)
357:19
consult (3)
290:22 439:4 441:24
consultant (2)
167:24 353:13
consultants (9)
43:9 45:9,25 114:4
172:9 173:3 353:18
370:14 477:15
consulted (7)
234:2,4 256:22 257:3
257:8 438:23,24
consulting (36)
79:18 101:20,21,25
122:9 131:2 182:8
182:13 183:5,6,9,11
186:24 187:6 260:5
264:2 334:18 342:9
342:13 343:10,14
354:18,21 355:7
357:16 361:3 398:5

405:16 408:12
416:9 418:4 420:7
420:10,13 421:18
448:24
**consummated (2)**
163:16 190:16
**consummation (2)**
163:15 164:24
**contact (1)**
271:23
**contacted (3)**
27:21,22 253:6
**contacts (1)**
224:2
**contained (2)**
335:22 384:15
**contemporaneous (1)**
262:19
**content (4)**
267:12 268:14,17
272:11
**contention (13)**
73:23 74:2,3 78:17,24
80:4,6 81:10 178:16
249:7 461:9,10
462:2
**contents (7)**
56:11,12,17 267:25
268:19,21,23
**context (16)**
39:21 42:20 55:14
137:19,20,21,23
138:2,5,17 140:23
210:22,24 404:15
404:16 423:22
**continue (2)**
67:17 408:10
**Continued (2)**
4:2 270:9
**continues (2)**
64:6 227:25
**continuing (1)**
455:9
**continuous (1)**
454:14
**continuously (1)**
20:7
**contract (2)**
389:9,10
**contractual (1)**
339:9
**contradict (1)**
386:19
**contradicted (1)**
373:18
**contradictory (3)**

195:13,14,15
**contradicts (1)**
369:8
**contribution (2)**
218:17,19
**contributions (7)**
217:6,10,14,21,22
218:11,24
**control (33)**
14:5 19:19,22,24 20:2
20:3,3,4,19 177:16
187:10 330:9 334:4
343:7,9 344:22
352:23 353:10,13
353:18,23 354:10
354:22 355:6,23,24
356:4 358:13 404:4
404:5,9,10 433:22
**controlled (6)**
177:14 196:13 342:9
342:12 354:7
359:20
**controller (1)**
20:23
**controversial (1)**
39:12
**Contura (25)**
159:22 165:7 190:7,8
190:14,20 193:20
424:10,15 425:14
425:17 426:2
428:13,17 429:25
431:25 432:5,8,24
433:6,11,15,19
440:2,3
**convenient (1)**
431:8
**conversation (10)**
277:4 278:3 283:3,13
286:12,13,21 473:4
473:9 477:18
**conversational (2)**
18:9,12
**conversations (10)**
220:3 262:4 267:12
288:15,25 289:8
474:10 476:18,19
476:21
**conveyance (1)**
455:5
**conveyed (1)**
386:13
**conviction (1)**
44:9
**convince (1)**
322:11

**Coopers (1)**
331:4
**copied (1)**
327:4
**copy (1)**
48:2
**corners (7)**
31:9 38:9 247:8 279:8
295:13,16 415:18
**Cornerstone (2)**
212:21 475:21
**Corp (2)**
88:21 454:17
**corporate (43)**
20:25 21:14,23,24
44:20 79:12 139:4
179:18,23,24 180:4
180:5 329:18,19,22
329:25 330:6,7,8,9
330:9,10,11,11,22
344:21,22,22 348:8
355:23 358:11,11
358:21 366:23
367:7,17,23 404:4,4
404:8,13,18 407:10
**corporately (1)**
241:25
**corporation (14)**
102:12 147:22 180:7
330:14 355:8,10,11
355:13,14,15
358:10 363:25
364:15 406:13
**corporations (6)**
330:17 355:17 359:5
359:5,23 366:16
**correct (47)**
8:8,9,10,12 11:7
13:16,24 20:9 23:13
25:2 66:2 67:25
69:6,11 81:3 93:8
95:2 96:23 124:2
132:3 154:17,18
173:6 180:21,22
188:18 208:20
214:25 219:7
222:19,21 227:17
227:19,20,22
234:14 243:15
254:9,12 367:20
426:4 428:18,23,25
440:21 445:16
464:6
**corrected (3)**
213:10 215:7 220:16
**correctly (7)**

46:19 193:25 304:17
425:23 440:24
444:22 446:6
**correlates (1)**
380:19
**corresponding (1)**
427:14
**corrupts (1)**
325:16
**cost (7)**
34:25 427:15,24
430:6,14 432:7,14
**costs (1)**
407:6
**council (2)**
365:24 366:9
**counsel (32)**
5:18 6:17,20 16:20,23
32:16 52:11 54:22
56:22 62:17 254:6
258:6 277:8 285:10
315:11 318:21,23
318:24 319:4,21
320:2 345:3,6,9
346:13 362:12,14
365:14 390:20
391:3 475:3 476:10
**count (3)**
143:7,10 144:12
**counted (1)**
55:25
**countries (1)**
410:20
**country (5)**
118:16 236:12 242:22
321:12,14
**COUNTY (1)**
479:6
**couple (11)**
7:8 9:23 18:24 95:10
113:20 149:16
160:10 240:5 423:6
466:8 471:12
**course (4)**
220:3 292:19 294:5
446:5
**courses (1)**
310:4
**court (159)**
1:2 5:7,15 6:22 7:15
7:23,25 8:5 10:12
11:16 12:6 20:14
56:24 57:5 61:5
64:7 70:10 72:16
82:18 84:21 93:5
95:7 98:9 104:15,18

115:8 117:11,14,17
117:18,19,21,25
118:3 123:9,10,15
128:23 129:7,24
130:11 132:7
133:14 136:2,22,25
137:2,13,18,19
138:4,8 140:4,15
141:6 143:19
157:11 161:2,25
163:2 198:7 202:24
204:16 205:20,24
207:7 208:13,17
214:15,16 215:4,10
217:17 220:20,24
222:12,14 223:12
223:16 228:2,11
232:2 242:19 243:9
243:22 245:5,17
247:23 252:18
263:9 264:23
265:11,15 272:5,7
273:23 274:13,21
294:20 295:24
296:7 300:19
302:13 311:3
316:25 317:22
318:25 320:8
321:15,16,18
322:22 323:17,20
324:3,5,10,11 325:7
325:21,23 326:3,17
329:23,23,24
332:23 336:14
337:10 361:16,23
361:24 365:8
390:18 393:14,15
393:16,17,17
400:20 401:2,4
403:3,14 409:22
410:4 443:16 444:6
463:14 468:16,25
469:3,10 471:5,7,8
471:15 475:7,11
**court's (15)**
8:3 10:4 59:24 62:13
117:21,24 123:18
136:8,15,17 137:3
159:3 332:20 333:4
336:17
**court-appointed (1)**
127:16
**courtroom (4)**
7:11,13 141:15
329:18
**courts (7)**

118:11,15 214:8
222:15 310:20
410:11 469:15
**cover (4)**
186:3 196:2 268:9
447:11
**covered (1)**
456:19
**covers (1)**
16:7
**CPA (5)**
171:2 366:14 384:21
397:4 405:11
**crazy (1)**
343:16
**create (11)**
23:15,20 25:4,16
236:10 283:12
404:24 422:22
451:5 454:21
455:11
**created (11)**
25:4 73:2,12 145:12
145:22 232:9 421:4
454:23 464:18,18
464:22
**creates (7)**
360:25 361:2,3
398:19,20,22,23
**creating (1)**
468:18
**credentials (1)**
246:12
**credibility (1)**
326:11
**credible (4)**
132:14 195:10 232:20
242:2
**credit (15)**
415:5 416:10,17,19
416:21 417:3,5,7,18
417:23 418:5
419:17 420:6
422:18,21
**creditor (9)**
24:21,22 25:23 27:5
166:9 324:6 403:13
429:13 435:10
**creditors (10)**
124:19 128:23 129:6
168:21 178:7 325:6
361:8 413:8 418:8
461:25
**crimes (2)**
233:5,6
**criminal (1)**

302:18
**criteria (1)**
476:13
**cross (3)**
328:10,12 346:9
**crosses (1)**
328:9
**crossing (3)**
311:16 404:7,13
**cryptic (1)**
453:15
**CSR (2)**
1:24 479:25
**cubicles (1)**
192:6
**culture (1)**
264:16
**current (12)**
19:9 175:13,23 176:2
176:3,4,6 426:18
427:14,23,24
475:18
**currently (3)**
91:18 172:2 338:22
**custodians (1)**
177:3
**customers (4)**
124:20 126:15 178:7
361:9
**cut (6)**
20:24 64:4 147:20
175:8 304:7 349:24
**cutoff (3)**
441:15 443:3 448:12
**cuts (1)**
98:19
**CVC (3)**
19:19,23 20:4
**CVC's (1)**
20:3

─────────────
D
─────────────

**D (1)**
444:7
**D.C (1)**
355:12
**damage (1)**
470:16
**damages (1)**
233:9
**dangerous (1)**
351:23
**Daniel (7)**
3:19,22 6:13 110:20
212:17 475:15
478:3

**Darisi (1)**
263:5
**dark (1)**
196:24
**data (9)**
131:3,4 133:23,25
137:3,3 170:11,23
412:6
**database (53)**
71:4,6,7,14 72:25
73:2,11 75:8,10,11
78:9,14 79:5,6,14
80:6 87:5,21 88:2
88:24 91:24,25 92:6
92:21 96:15,18
97:13 99:8 100:23
101:3 113:6 126:11
133:13 145:21
149:5,12 151:23,24
152:7 153:10 159:6
159:13,16,25
160:13 215:14
317:16 348:5,7,15
348:19 448:18
464:3
**databases (2)**
74:20 112:12
**datapoints (5)**
48:10,14 164:18
354:4 480:7
**date (16)**
63:6 96:19 102:15
104:2 288:16,22
291:17 425:18
440:3 442:2,5,7
443:4,5 448:9 481:3
**dated (3)**
288:13 441:10 446:19
**dates (8)**
48:10,13 101:6
163:18 447:15,17
447:18 480:6
**daughter (1)**
259:8
**David (19)**
47:15 48:22 50:4 88:4
88:5,7,10,14,16,21
88:25 89:3,8,10
95:13 327:4,5 475:2
477:23
**Davis (4)**
256:23,24 257:3,8
**day (33)**
7:24 35:25 36:3,4,13
36:14,16 54:7 109:3
118:16 238:17

239:16 243:10
251:3,4,13 253:18
301:4 317:2 323:5,7
325:21 345:2,17,17
359:16 360:21
406:3,25 465:22
478:20 479:23
481:22
**Day's (1)**
237:18
**day-to-day (2)**
18:11 368:4
**days (14)**
37:16,19,22 38:3
111:8 160:8 163:15
163:17 413:23
443:14 448:10
458:17 472:10,12
**DC (1)**
476:5
**de (32)**
81:24 83:25 92:9,11
93:17,25 94:6,7,8
94:14,21 95:2
112:20,23 113:8
118:20,22 119:20
119:22,24 120:2,21
120:25 121:8
140:22 333:16
334:2,6,8,15 340:10
342:23
**deal (4)**
115:23 236:15 288:5
418:2
**dealing (1)**
411:18
**deals (2)**
115:24 389:13
**Debbie (1)**
219:19
**Debevoise (2)**
111:4 239:18
**Deborah (1)**
263:5
**debt (10)**
31:25 168:22 169:9
184:23 185:4,7
186:6 352:19
356:24 433:6
**debtholder (1)**
434:24
**debtor (50)**
79:16 84:24 118:14
119:25 121:6,19
122:3 123:17 124:8
124:9,19 125:18

126:14 141:8
142:14,19 143:22
144:9 165:7,11
191:9 199:14 200:9
202:17,21 317:24
320:12 325:20
332:9,10 352:3
361:17 364:8,12
399:18 402:7
408:21,24 423:9
429:17 433:2 437:4
437:4,5,5 455:9,12
455:13 461:20
463:5
**debtor's (6)**
126:15,15,16 164:9
178:7 364:12
**debtors (11)**
1:11 4:15,15 178:6
191:8 234:23 339:5
343:13 401:7
413:19 414:5
**debtors' (5)**
191:10 352:7,18
353:7 403:15
**decades (5)**
83:19 138:23 229:18
307:7,7
**deceitful (1)**
420:17
**deceive (2)**
244:11 246:16
**deceived (4)**
98:10 206:18 261:6,7
**deceiving (1)**
455:21
**December (14)**
1:16 2:2 5:11 7:9 8:13
42:2 62:23 82:18
335:18 441:14
442:17 443:6
479:24 481:3
**deception (8)**
98:7 142:23 230:13
231:8,22 232:25
457:11 462:25
**deceptive (3)**
142:22 245:4 455:22
**decide (13)**
82:12 117:12,22
136:5,15 325:11
332:20 346:16
393:15 401:4
457:17,19,20
**decided (5)**
106:25 113:21 377:14

377:16 435:18
**decides (2)**
117:14 325:25
**decision (10)**
57:21 84:16 114:14
120:23 169:12
315:14 332:23,24
333:3 390:19
**decisionmaking (1)**
368:13
**decisions (7)**
194:23 333:6 352:23
353:11,14,19 368:3
**declaration (90)**
47:14 64:25 65:7
71:12 73:8 78:22
89:7 97:20,22,23,24
101:7,10,15,17
105:14 128:2,9
134:5 147:15 148:8
148:24 149:3
152:14 160:3,19,24
181:17,22,25 284:6
288:3,8,9 289:14
335:9,13 346:14
363:12 368:19
369:4,24 370:12,15
370:21,23,25
371:19 372:13
373:3,4,13,19 374:7
375:23 376:15,25
378:4,11,25 380:10
381:17 382:4 384:6
385:3,10,22 387:23
388:20 391:11,23
392:5 393:7,22
441:22,24 443:10
445:23 446:11,14
446:18,23,24 447:6
449:9 450:20,22
480:8,10,12
**declarations (47)**
66:20 68:15 69:8,13
73:16,18 74:14 78:8
79:4 80:22 87:5
95:15 96:5 99:11,19
115:6 128:14
131:21,25 134:10
144:5,23 146:22
151:9,20,22 153:13
153:25 195:3,8,9,13
195:16 213:15
214:3 215:23
286:11 287:20
296:6 317:10 318:5
318:7 322:10

392:11 416:23
443:12 464:9
**deduction (1)**
406:20
**deep (2)**
53:18 419:4
**deeply (2)**
18:10 113:14
**default (1)**
130:20
**defend (3)**
140:24 349:21 350:8
**defending (1)**
466:10
**deficient (1)**
250:7
**define (3)**
135:9,15 339:22
**defined (5)**
339:23 340:17 347:20
347:22 363:14
**defining (1)**
341:12
**definition (3)**
230:9 244:16 363:24
**definitions (1)**
118:8
**definitive (2)**
53:17,23
**degree (2)**
165:17 344:12
**Delaware (5)**
44:4 474:4,7,10 477:8
**delegate (1)**
367:2
**demands (1)**
224:9
**democratic (1)**
213:7
**demonstrate (1)**
127:19
**demonstrating (2)**
8:21 9:13
**department (7)**
72:9,18 154:15
164:14 196:14
198:15 418:18
**depend (2)**
225:17,19
**depending (1)**
18:25
**deposition (27)**
1:18 2:6 5:4,9 12:17
35:18 42:21 57:15
57:21 58:10,17 59:3
60:7 150:2 246:9

275:20 307:14
335:20 336:15
346:6 350:23
459:23 465:22
478:13 479:13,14
481:3
**depositions (6)**
8:16 10:16 12:5 35:22
37:14 62:10
**depot (2)**
340:10 342:23
**depreciation (1)**
372:18
**derived (3)**
69:20 367:10 431:6
**describe (5)**
93:14 196:4 272:4
286:5 305:12
**described (24)**
20:12 28:16 32:6
119:13 186:20
193:8 213:13
215:14 271:11
272:7,14 273:15
275:5 292:20 293:4
317:17 329:2 386:9
392:19 431:16
435:25 449:7
463:19 464:20
**describing (7)**
185:15 193:5,11
270:12 293:17
294:4 298:19
**description (4)**
142:24 388:4,8 480:3
**descriptions (4)**
99:22 147:7 317:15
317:21
**designed (2)**
407:9 417:20
**desire (3)**
108:15 112:17 326:16
**desires (1)**
156:4
**desperate (1)**
416:5
**detail (1)**
204:25
**detailed (3)**
40:12 245:19 272:18
**details (1)**
193:7
**determine (3)**
67:10 84:22 439:5
**determined (2)**
157:8 327:22

**Detroit (1)**
212:19
**develop (1)**
465:10
**developing (1)**
55:10
**developments (1)**
382:18
**device (1)**
117:9
**Dewey (2)**
111:6,7
**Diamond (2)**
3:10 37:8
**dicing (1)**
92:18
**dictate (3)**
358:12,13,14
**died (1)**
470:9
**difference (11)**
308:8,23 309:5,10,14
309:18,20,22 349:2
395:14 396:21
**differences (1)**
300:23
**different (26)**
135:21 142:4 143:14
146:5,7 187:5 200:2
203:23 230:15
263:17 284:3
311:13 315:21
316:10 322:21
342:7 348:21 356:5
359:4 376:18
377:25 432:11
447:10,12,15 451:7
**difficult (1)**
259:18
**dig (1)**
347:8
**diligence (4)**
54:13 239:11 375:3
469:11
**diligently (1)**
149:10
**dilution (1)**
18:25
**dim (1)**
239:4
**diminution (4)**
379:14 380:17 381:8
381:22
**direct (28)**
124:18 131:8 183:22
185:19 293:14

297:8 320:13
336:19 338:14
346:7 350:3 352:6
355:5 356:16,25
369:16 382:9,18
383:13 386:5
399:20,23,24 400:8
403:9,18 435:2
437:3
**directed (1)**
10:16
**direction (1)**
219:15
**directions (1)**
220:6
**directly (15)**
15:9 18:4 33:24 56:10
121:22 130:19
142:19 165:10
180:5 184:22 185:3
185:7,8 332:11
424:13
**director (1)**
21:20
**directors (19)**
19:10,13 20:5,22 21:3
21:17 22:4,12
169:17 340:6
352:12 354:9,23
356:16 366:24,25
367:11,14 418:23
**directs (1)**
365:16
**disagree (9)**
237:2 242:24 263:15
318:9,13 344:11
347:3 368:25
392:21
**disagreeing (2)**
281:23 429:2
**disagreement (4)**
107:16,20,21,23
**disagrees (6)**
228:16 229:12,20
242:23 318:16
329:14
**disallowed (1)**
128:18
**disallows (2)**
139:13 307:17
**disbelief (1)**
399:16
**disbelieve (1)**
91:13
**discernible (1)**
408:10

**disclose (117)**
67:2 71:19 74:6 81:20
83:8 84:12,13,17,20
88:15,18 95:24
100:13 103:12
106:3,14 108:16,16
108:17,18,20,21,22
112:16,17 115:17
115:22,25 116:14
117:11 118:8 121:3
121:13,13,13
127:12 130:8,8
135:12 136:13
138:3,17 140:14,21
140:24,25 141:5
142:16,18 143:3,5,6
143:16 147:24
150:12 155:3 156:2
156:12 157:9,15,17
158:16,20 161:15
166:23 186:11,14
191:3 198:23
204:16 234:9,13
236:16 237:18
240:4,17,19 306:16
306:20 310:10
311:8,9,11 323:8,12
331:6,19 332:20
335:2 339:20
343:23 361:22,23
362:12,15 363:9
364:17 382:6
383:18 400:20,20
400:21 402:19
408:13 413:23
433:12 434:4 435:5
435:11,12 436:25
437:15 449:23
454:8 457:13
461:11,16

**disclosed (126)**
65:16,24 67:9,11
69:24,25 70:4,6,8
70:10,13,13,24 71:2
71:13 73:24 78:12
78:18,21 79:22 82:3
84:2,4 85:19 88:13
89:3,6,9 97:2 98:4
98:25 99:17 100:9
100:18 101:5
102:25 104:13
106:16 112:14,24
113:9 116:4,9
118:23 120:8
121:10 125:12
127:5,25 128:3,7

138:6 141:23 142:5
142:6 143:2 144:4,8
144:21 147:14
148:9,23 149:25
150:6,8,13,14,15,18
150:20,22 151:8
152:13 153:17,24
156:19 158:18
160:18,23 161:14
177:20 178:18
186:18 191:6
199:14 200:10
202:7 203:16,19,25
204:21 205:11,13
205:16,18 208:4
215:23 305:2 325:6
326:25 332:2,14,17
338:8 400:22
401:20 431:20
432:17 433:3
446:15 447:2,25
448:15 450:11
451:20 452:2,19
453:10 454:6 458:2
459:7 463:7,9 464:8
464:10 471:10

**discloses (3)**
166:22 430:20 455:25

**disclosing (19)**
95:17 98:12 106:18
116:19 142:3,4
240:11 243:7
312:14 317:20,20
323:15 325:4
445:25 446:12
450:24 452:24
453:5 454:16

**disclosure (110)**
20:19 33:12,14 46:7
47:9 48:23 49:19,24
50:8 66:8 84:14,15
84:21 88:7,9,12
92:12 95:6,10,19
99:5,6,7,9,12
100:16,19 103:14
103:15 108:15
111:4,11,23,24
112:4,19 113:23,24
117:23 118:6
121:11 122:18
142:2 145:17
146:10 148:3 150:9
150:10,12,13
161:22,24 162:3
197:15 212:25
213:25 214:3,10

215:3,20 217:17
249:25 250:5
254:24 275:16
276:12 286:11
287:20 289:21
294:14 304:23
305:13 307:19
312:6 313:7 314:7
314:16 317:4 319:3
326:15 333:8
341:18,21 344:19
347:25 348:6
351:18 377:20
390:6 392:14
393:18 401:3
435:15 451:8,19
453:11,12,14,23
454:11 455:7,21
458:4,6,16,21
460:14 461:10,11
464:8

**disclosure-across (1)**
306:8

**disclosure-intentio...**
306:7

**disclosures (116)**
48:20 50:25 51:22
55:3 57:13 71:16
72:17 80:14 90:24
93:2 95:22 96:2,17
96:21 97:5,11,20
98:3 99:14,17
100:21,22,25 103:9
103:11 109:15,16
112:11 117:10
137:12 140:7
146:21 148:3 155:5
155:17,19,21
158:10,12,13
183:16 202:3
204:20,23 205:25
207:2,5 214:2 216:5
216:8 225:14
233:20 235:4
237:15,18,22 238:2
239:16,21 240:12
243:4,13 246:5
251:22 258:11,21
274:4,18 275:7,17
277:16 278:10,22
280:9 281:21
282:17,25 284:12
284:19,20 285:6
286:3,17 287:3,23
294:9 295:2 304:23
308:5 314:8 317:5

317:14 319:12,17
320:10 323:20
325:23 333:25
341:3 345:20,23
346:4,20 347:18,21
403:11 407:13
410:10 447:23
448:6 449:2,18,25
450:4 468:15,25

**discounted (1)**
195:10

**discovered (1)**
46:4

**discovers (1)**
92:10

**discovery (10)**
121:21 163:4 165:16
165:25 433:17,20
433:24 434:8
459:18,19

**discretion (5)**
117:24 194:22 195:7
325:8 369:6

**discuss (7)**
67:12 160:8,9,10
216:20 220:12
282:4

**discussed (11)**
144:18 167:25 171:13
171:24 212:24
219:24 220:5 251:6
474:13,18,24

**discussing (1)**
300:23

**discussion (3)**
61:22 114:10 399:25

**discussions (4)**
175:9 206:8 257:22
473:25

**disgorge (1)**
157:14

**disgorged (1)**
205:21

**disinterested (3)**
248:13,24 317:22

**disprove (2)**
161:12 162:20

**dispute (6)**
89:12 150:3 152:10
152:15 238:17
323:2

**disqualifying (11)**
136:10,19 178:11,20
332:12,18,21
400:24,25 423:12
437:16

**disregards (1)**
81:11

**distinctive (1)**
268:8

**distinguish (1)**
348:17

**distressed (15)**
168:19 169:9,24
183:22 184:23
185:4,7,16,16,18
186:2,6,7 201:14
356:24

**district (9)**
1:3 5:8 49:22 205:12
227:22 228:6,8
302:17 310:5

**districts (1)**
321:15

**dive (1)**
318:19

**divide (2)**
411:16,22

**divided (2)**
411:6,17

**dividing (1)**
314:11

**division (4)**
1:4 5:8 406:16,17

**divisions (1)**
92:18

**docket (18)**
32:21,21,23 33:11
115:11 129:9 247:9
301:8 335:22
337:21,23 351:20
351:21,24 409:16
428:4,6 444:11

**dockets (1)**
247:9

**document (62)**
9:2,4,6 41:3,6 47:16
47:18 48:24 49:19
50:9 63:7 65:19
88:8 92:12 126:11
132:7 133:14 156:7
157:23,23 161:24
184:2,20,22 185:10
185:13 210:18,21
277:18,22 278:2,15
280:2 281:3 288:12
288:17,17 293:5,7
293:22 296:22
297:6 299:3 302:4
351:22 365:2,10
369:2 372:24
376:24 378:20

382:12 392:4
408:16 409:16
410:12 425:22
440:10 453:11,12
453:14,18
**documentary (1)**
16:3
**documentations (1)**
58:7
**documented (1)**
307:21
**documenting (1)**
63:15
**documents (74)**
46:7 47:9,11,19 48:18
49:3,12,24 50:4,11
50:19,22 55:8,17,19
55:22,25 56:9,13,16
57:17 58:15,25
59:13,20,25 60:3,5
60:18 61:11,17 62:2
62:9 71:22 72:6
77:20,22 78:3 87:13
88:10 95:20 108:14
108:19 111:4 135:2
145:14 213:25
216:17 223:4
234:25 245:5,21
246:14 247:23,25
249:25 250:6 274:6
278:6 295:5,7 296:8
296:23 302:22,23
312:7 315:22
378:17 380:8
451:20 457:24
459:2 460:14 464:8
**doing (45)**
12:13 57:7 63:18
66:17 87:15 108:2,4
108:6,12 119:9,10
120:14 127:18
128:19 137:6 190:9
197:3 232:13
250:18 253:21,22
255:16 257:16
258:7 262:6,7 265:7
265:8 287:23 336:4
336:8 338:16
342:10,13 346:9
359:14 399:7
411:13 420:19
431:15 458:14
462:13 463:19
466:2 467:5
**dollar (2)**
28:7 428:14

**dollars (8)**
196:21 197:9 199:4
200:20 310:25
415:2 421:16 455:6
**Dom (2)**
258:25 260:16
**domain (1)**
78:16 119:6 128:21
135:4 156:9,13
170:13,14 376:8,10
414:14 465:9
**domestically (1)**
191:21
**dominance (2)**
404:10,11
**Dominick (19)**
222:25 223:18 241:15
249:14 250:19
262:4 277:13 278:8
278:20 280:6
281:19 287:21
293:18,19 294:12
294:24 296:4
322:15 468:21
**Donald (2)**
21:7 44:16
**donated (1)**
34:17
**donation (5)**
34:24 35:2,4,5 218:5
**donor (1)**
219:22
**double (1)**
149:13
**double-check (1)**
427:2
**doubt (11)**
55:23 84:12,13
140:24 141:4 219:8
313:14 314:10
367:6 392:16 402:3
**doubting (2)**
54:17,18
**doubts (2)**
123:22 125:9
**dozen (4)**
12:6,8 312:3 416:22
**dozens (8)**
12:18 129:13 200:19
304:22,22 458:8,9
458:22
**drafting (1)**
7:16
**dragged (1)**
100:15
**draw (1)**

170:16
**drawn (2)**
80:21 87:5
**draws (2)**
402:2,2
**drew (4)**
128:13 131:19,24
181:18
**dribbled (1)**
464:11
**dropped (1)**
14:23
**dropping (3)**
133:17 286:8 287:17
**Drummond (1)**
4:3
**du (1)**
340:10
**dual (1)**
142:13
**due (5)**
54:13 239:11 375:3
431:24 469:11
**duly (3)**
6:25 270:7 479:14
**Dunn (3)**
474:6,9 477:6
**Duran (1)**
208:12
**Duran's (2)**
208:16,22
**duty (4)**
107:14 471:2,4,7

─────────
**E**
**E (10)**
3:2,2 4:2,2 239:16
270:2,2 479:2,2
480:2
**earlier (22)**
33:16 66:9 87:6 110:7
110:13 194:7
233:17 273:18
275:5 290:19
291:13 296:25
307:14 311:23
336:24 402:7 429:9
436:14 440:16
447:17 466:24
478:5
**earliest (1)**
42:22
**early (8)**
36:13,14 190:13,19
271:12 450:25
452:24 456:21

**easier (2)**
288:13 477:2
**easily (2)**
115:10 147:4
**Eastern (1)**
205:12
**easy (1)**
410:13
**eating (1)**
270:20
**economic (3)**
358:23 362:2 404:24
**Ed (15)**
30:23 31:2 73:16
446:12 449:5,9,9,11
449:11,12 450:21
452:19 454:9,15
464:17
**Edison (24)**
38:12 70:3,5,23 87:24
226:24 399:7 437:4
445:24 446:14
447:9,19,21 451:16
451:17,21,24
454:11,17,19 472:6
472:8,9,12
**effective (1)**
330:24
**effectively (3)**
20:24 42:12 145:21
**eight (6)**
223:9 268:7 289:15
412:8 451:14
458:15
**either (19)**
12:16 72:8 99:18
153:25 174:9
175:13 177:2
211:12 217:7
255:21 256:25
270:22 319:7
396:24 429:17
433:23,24,25
458:20
**elected (1)**
264:12
**election (1)**
217:12
**element (1)**
244:11
**elephant (1)**
458:23
**eleven (4)**
223:3 240:4,11 268:7
**eliminate (1)**
203:5

**Ellis (7)**
4:15 33:16,21,24 34:4
111:9 239:17
**Ellis's (1)**
237:21
**email (11)**
92:14 208:18 223:9
224:20,24 265:22
266:12,22 271:17
271:20 421:12
**emails (10)**
208:10 209:20,24
223:7 263:4,7,10
265:25 266:3,4
**Emanuel (1)**
239:19
**emergency (2)**
41:18 480:5
**employed (4)**
23:3 63:24 64:14
187:9
**employee (6)**
13:9 16:20 333:11
368:9 456:10,14
**employees (31)**
13:15,18 22:20,22
75:15 76:9 92:15,20
129:6 141:12,13
168:6 173:3 175:16
176:5,5 178:9
180:20 186:12
330:10 342:19
352:11 353:6 358:7
362:4 367:5 379:4
398:15 410:18
413:8 418:11
**employees' (1)**
75:19
**employment (1)**
123:9
**employs (5)**
181:2,3,12 194:16
195:5
**enabled (1)**
99:7
**encourage (1)**
220:18
**encouraged (1)**
168:10
**ended (6)**
190:6 289:9 442:20
449:11,11,12
**endpoint (1)**
412:13
**ends (1)**
165:4

**energy (12)**
69:22 424:11 444:18
444:20 445:8,11,15
445:22,25 446:13
457:5 465:10
**engage (2)**
185:6 236:7
**engaged (11)**
24:4 184:19 185:3,8
187:13 230:12
235:5 247:20 248:9
275:23 470:13
**engagement (3)**
122:19 339:14 343:3
**engagements (2)**
409:4,4
**engages (4)**
102:17 182:24 183:5
184:22
**engaging (1)**
265:23
**engineered (2)**
235:14 416:16
**enter (1)**
403:5
**entered (3)**
409:18 432:9 434:22
**enterprise (8)**
186:17 199:3 264:15
334:4 348:13
363:23 367:17
405:15
**enterprises (1)**
356:6
**entire (8)**
60:9 90:16 158:3
293:3,25 356:7
363:22 458:13
**entities (22)**
15:10 16:7,24 17:13
17:14,21 18:21 19:2
68:12,14 141:22
142:4,5 143:5,7
144:2,7 338:25
348:3 367:17
426:12,18
**entity (18)**
15:13,20 18:20 20:20
22:5 67:22 142:25
145:7,24,25 162:8
165:6 176:8 180:4
199:8 348:8 364:2
423:8
**entries (10)**
68:4 74:14 88:4
154:14 247:9 410:8

426:17 427:14
428:4,5
**entry (4)**
77:4,5,25 410:12
**environment (2)**
390:6,10
**environmental (1)**
413:9
**equal (2)**
471:2,4
**equation (1)**
403:24
**equitable (1)**
330:3
**equities (3)**
171:16 201:13 373:7
**equity (25)**
28:9,14 329:24
332:10 339:3 340:4
352:19 384:3
386:21 387:2,5,13
388:5,7,8 389:2,10
389:12 397:5
399:19 405:18
423:14 433:6
437:13,14
**equityholder (1)**
434:24
**equityholders (1)**
352:13
**Eric (4)**
241:17 253:16,19
275:13
**Erica (2)**
4:10 5:23
**ERISA (1)**
196:13
**Ernst (2)**
331:11,11
**err (1)**
121:11
**ERRATA (1)**
481:2
**erred (1)**
133:16
**error (1)**
310:19
**errors (1)**
9:24
**escalate (1)**
469:21
**especially (4)**
76:13 330:25 334:3
384:21
**ESQ (12)**
3:6,6,7,12,17,19,22

4:5,10,10,11,18
**essentially (1)**
328:6
**establish (8)**
57:10,12,25 123:10
166:3 197:22
227:10 302:10
**established (8)**
25:20 58:4 83:18
116:21 238:16
302:19 397:7 408:8
**establishes (1)**
456:25
**establishing (1)**
450:17
**estate (21)**
15:15 18:16 117:13
117:16 118:2
123:16,17 129:6
137:7 178:11
201:18 236:7 325:5
326:8 339:13
344:16 347:2 403:8
403:12,18,20
**estates (1)**
418:8
**estimate (4)**
396:8 430:25 431:19
439:6
**et (3)**
1:8 5:6 340:10
**Europe (3)**
189:11 253:10 260:14
**evaded (1)**
394:2
**evaluated (1)**
123:6
**evasion (1)**
107:5
**evening (3)**
36:12,13,15
**event (1)**
392:25
**eventually (1)**
462:18
**everybody (7)**
76:12 141:17 149:12
235:25 333:16
404:23 471:6
**everybody's (1)**
170:10
**evidence (6)**
116:8 249:10,12
282:3,23 327:13
**evidenced (1)**
362:6

**evident (1)**
281:25
**evolving (2)**
328:17,23
**ex-bankruptcy (1)**
256:15
**exact (4)**
195:22 208:10 274:23
291:17
**exactly (14)**
28:5 61:23 93:20
102:15 109:22
212:15 213:23
215:15 228:22
273:19 406:12
430:23 431:5
434:13
**exam (1)**
210:13
**examination (3)**
7:5 270:9 350:4
**examine (2)**
348:25 386:17
**examined (2)**
7:3 270:7
**examiner (8)**
230:17,18,21 244:14
300:17 309:23
311:15 313:12
**example (16)**
39:2 71:25 76:25 84:2
84:3 132:11 147:11
160:17 228:23
273:16 296:24
307:16 315:3
325:18 328:25
419:24
**examples (5)**
249:24,25 369:19
373:5 449:22
**exceed (2)**
382:20 383:15
**Excel (1)**
26:2
**excellent (2)**
174:25 175:2
**exception (2)**
232:9 386:9
**exceptions (3)**
95:11 155:15 370:2
**Exchange (1)**
72:11
**exchanging (1)**
263:4
**exclude (3)**
86:18 87:7 134:5

**excluded (5)**
87:11 128:12 131:18
131:22 132:4
**exclusive (4)**
275:25 276:3,5,18
**excuse (9)**
27:19 60:4 146:12
183:25 204:6
219:17 295:17
376:22 455:20
**execute (2)**
141:8 368:3
**execution (1)**
219:4
**executives (1)**
361:6
**exercise (7)**
134:14 143:19 151:14
151:17 194:21
195:6 477:14
**exercising (1)**
366:10
**exhibit (44)**
26:15,16 41:10,18,23
41:24,25 48:9 55:5
61:7 62:15 64:20,21
69:16 173:22
279:16 288:9
290:20 291:10
304:13 335:9
351:17 365:3
370:25 371:4
372:13 380:10
411:19 424:23
426:11 438:2 439:9
439:14 480:3,4,5,6
480:7,8,9,10,12,13
480:14
**existence (1)**
179:11
**existing (2)**
103:6,7
**exists (2)**
293:14 343:18
**experience (18)**
92:23 139:6 171:3
173:7 201:23
231:24,25 245:16
283:21 313:2,3
388:16,16,23 397:2
397:23 421:23
422:17
**experience-based (1)**
184:17
**experienced (2)**
230:22 405:10

**expert (13)**
12:15,17 43:17
226:13 232:5 245:6
245:18 246:12
248:10 300:18
320:9 474:24
475:14
**expertise (3)**
58:7 187:8 312:19
**experts (10)**
38:19 53:3 54:23
110:6 225:11
245:15 248:9
311:22 312:3
469:14
**EXPIRES (1)**
481:25
**explain (8)**
57:5 221:16 235:18
246:23 292:4 309:7
322:16 455:16
**explained (14)**
104:13 119:8 122:11
129:15 198:17
199:6 204:24 250:3
276:7 322:20
347:15 404:3
453:23 455:18
**explaining (4)**
165:23 223:12 327:11
348:22
**explanation (1)**
121:25
**explicitly (1)**
60:8
**explore (1)**
10:17
**express (1)**
398:10
**expressed (3)**
198:18 250:23 276:24
**expresses (1)**
399:15
**expressing (2)**
263:12 313:18
**expression (1)**
210:3
**expressly (1)**
392:6
**extended (1)**
476:20
**extensive (8)**
40:12 54:12 58:6,6
250:20 262:10
397:23 476:20
**extensively (1)**

38:16
**extent (3)**
100:5,8 101:4
**externally (1)**
387:5
**extra (1)**
48:2
**extract (1)**
70:25
**extreme (1)**
459:17
**extremely (1)**
405:19

_____

**F**

**f (4)**
244:18,20 270:2
479:2
**fabrication (1)**
131:9
**face (1)**
27:8
**facing (3)**
180:10 220:11,12
**fact (30)**
103:5 104:8 123:2
135:23 169:11
190:5 207:8,13
221:5 234:16,21
276:15 284:10
297:22 298:4
299:25 304:21
326:14 327:8,18
355:16 362:7
364:17 368:21
397:8,25 451:12
453:23 455:3
462:12
**factor (1)**
126:25
**factors (1)**
123:5
**facts (9)**
97:9 99:3 162:10
170:4 198:10
324:10 393:19
427:6 457:22
**failed (7)**
204:15 362:12,15
461:10,11,13,16
**failing (1)**
216:5
**failure (1)**
66:25
**fair (17)**
22:19 58:19 102:10

102:10 130:11,12
130:13,16 197:4,5
239:3 280:3 293:23
430:24 434:16
448:22 469:3
**faith (32)**
203:13 207:19,22
246:25 300:21
301:22 302:25
312:2,12,14 313:8
313:14,15 314:6,9
314:11,16,17,19
316:17 317:8 318:4
318:6 319:19
320:16,18 322:9,19
322:19 336:9
345:12 469:10
**faithfully (1)**
452:22
**fall (2)**
183:21 241:20
**false (12)**
125:15 245:3 247:22
247:24 304:23
305:13 327:17,24
416:23 458:5,6,21
**falsity (1)**
248:2
**familiar (6)**
10:12 12:22 37:10
56:15 281:2 444:10
**familiarity (1)**
384:20
**families (1)**
358:8
**family (5)**
16:18,19 17:9,10
432:23
**famous (2)**
102:5 234:7
**Fanin (1)**
3:11
**far (28)**
21:12 23:14 45:7 49:3
54:12 84:9,10 88:3
88:14 90:17 130:10
158:24 186:19
216:12 228:12
233:21 237:25
242:20 261:23
281:14 294:19
301:8,24 323:19
370:4 376:7,7 414:7
**Farr (1)**
44:11
**farther (1)**

467:7
**fast (2)**
58:20 478:11
**fault (1)**
310:12
**favor (3)**
84:14,15 236:5
**feasibility (2)**
163:22 164:5
**February (1)**
223:10
**federal (23)**
202:12 206:23 214:16
215:9 222:14 233:7
233:11 234:11,15
247:23 264:6,17,21
274:21 298:3,6
303:7 306:8 310:4
321:15,18 423:2
468:12
**fee (6)**
327:8 397:11 410:4,5
410:9 411:19
**feed (1)**
355:17
**feel (13)**
45:3 133:13 134:23
261:8 263:24,24
297:21 344:14
393:20 467:14,15
468:17 470:23
**feels (2)**
205:21 389:25
**fees (24)**
131:4 157:14 205:20
310:25 394:17,18
394:25 395:4,22
396:2,6,9,14,17,18
396:22 397:17
406:10 408:24
409:2,13,15 411:3
421:16
**Feldman (2)**
44:11 110:22
**felony (1)**
44:9
**felt (3)**
134:18 208:7 251:22
**Fidelity (1)**
357:23
**fiduciaries (1)**
118:13
**fiduciary (22)**
84:24 118:14 123:10
127:16 141:7,17
143:21 197:8

202:11 203:3
235:21 236:6,9
326:5,7 361:18
399:12 400:17
403:6 435:4 451:19
459:5
**field (15)**
23:18,21 25:18 118:6
130:17,18 265:12
265:13 324:9 468:6
468:8,14,19 469:4
474:24
**fight (2)**
108:22 323:4
**fighting (1)**
129:23
**figure (17)**
14:17 33:18 104:16
104:19 128:24
129:12 130:14
140:16 197:19
224:7 333:14
350:24 361:24
424:18 426:9
427:16 437:18
**figured (1)**
140:20
**figuring (1)**
435:8
**file (6)**
106:22 226:20 234:20
288:16 346:14
393:9
**filed (92)**
9:18 26:13 41:24
49:20 58:19 59:6
71:11 72:9,10,16,18
72:19 74:15,15
78:22 88:9 95:7,20
98:8 101:17 132:7
135:3 145:4,16,17
148:25 150:11
152:24 154:2,5,6,15
155:7 156:6,13
157:12 160:5,6
161:24 162:8,24
164:13 166:11
198:10 206:6 207:7
207:13,23 214:3
227:3 228:7 240:22
240:24 245:5
246:13 258:11,19
272:8,9,13,23,24
277:12 288:19
295:24,25 296:2
302:16 312:7

315:19 335:9,14
414:10 435:23
441:4,6,16,22 443:8
443:10,12,13,14,15
445:23 446:12
448:3 449:13
450:19,22 451:19
480:10
**files (7)**
22:14 50:20 88:24
89:13 184:25 258:8
458:16
**filibustering (1)**
238:15
**filing (32)**
8:14,17 11:2,4,9
16:16 22:25 32:11
40:21 42:2 51:21
73:10 77:9 101:6
133:14 156:16
157:22 168:16,17
208:13,17,22
213:14 247:22,24
313:14,15 314:9
337:18 363:5
435:14 448:9
**filings (10)**
20:14 76:19 77:16
174:11 181:6,8
242:20 262:8
273:24 274:13
**fill (1)**
341:7
**filled (2)**
310:2 317:13
**filling (1)**
333:20
**film (1)**
16:2
**films (1)**
16:3
**final (1)**
114:14
**finally (5)**
46:17 261:5 435:18
439:17 460:3
**finances (1)**
342:22
**financial (35)**
164:2,6 165:5,10
167:16 168:8 171:3
174:24 231:14,15
234:22 235:13,16
235:23 236:10
244:18 245:19
317:23 320:12

352:20,25 382:17
383:12,17 395:6,9
396:25 403:15,16
403:18 405:12
435:2 466:21 467:4
468:2
**financially (2)**
467:15,16
**find (21)**
74:7 84:16 93:3
115:10 118:12
151:4 152:6,9
223:14 243:3 280:4
327:13 331:25
340:2 377:21
382:25 388:6 406:4
462:15 470:11,16
**finding (3)**
130:3 151:7 311:3
**findings (4)**
225:15,18,20 262:18
**fine (20)**
60:23 61:6 67:19,20
122:4 144:16
225:10 246:22
253:3 257:19 271:8
280:14 290:8 313:8
349:23 361:11
402:24 471:19
473:14 477:4
**finish (14)**
79:23 80:3 84:8 85:11
100:14 133:6 190:2
238:13 239:10
241:3,4 298:11
419:22 452:6
**finished (8)**
11:19 132:24 133:2
281:13 283:7,9
295:18 299:2
**firm (60)**
14:4,6 19:17,19,21,21
19:24 34:5,6 44:12
44:19,22,24 91:6
92:10,14,15,19
101:25 120:15
122:9,10 131:2
139:3 177:10 179:7
224:19 239:19,20
250:17 258:3 260:6
264:2 265:14 311:6
323:12 324:3
331:13 333:11,18
334:10,18 342:10
343:14 359:11,20
359:21 364:6 375:5

398:5 418:22 419:2
421:8,17,18 467:2
468:3,4 470:8
475:16
**firm's (1)**
348:4
**firm-firm (6)**
124:17 177:10 188:11
327:3,8,12
**firm-firms (1)**
192:8
**firms (33)**
34:6 79:17,18 91:25
110:23 111:10,10
111:12,16 114:5
139:8 212:20,24
232:19 237:24
239:25 240:6,14,18
242:3,5,16 243:23
244:2 265:14
310:16 315:12,21
331:13 416:9 418:4
478:6,6
**first (65)**
6:25 47:6 50:2 67:13
89:8 94:11 95:18,19
97:18,19,20 99:10
100:17 107:2 149:7
150:8,11,13 158:2
174:5 179:5 193:17
193:18 212:13
227:16 240:4
253:19 261:16
271:14 282:20
283:3 305:17
327:10 336:20
338:20 371:22
372:11,23 375:24
376:13,14 377:14
378:2 380:12,13
381:15,19 385:3
396:13 424:4 425:6
425:18 428:3 432:9
434:22 435:9 440:3
444:15 446:18,22
449:9 453:12
465:11 469:16
473:9
**firsthand (4)**
315:5 316:18,24
317:25
**Fish (3)**
110:16 473:21 477:24
**fit (4)**
198:20 280:15,19
310:23

**Fitzgerald (3)**
44:3 110:10 226:11
**five (50)**
37:25 46:6 47:7 53:20
91:8,21 92:3,7,9,10
93:4,8,9,15,17,23
93:24 94:5,13,13,17
94:19,25 95:4,23
96:3 104:10 120:11
140:17 148:13,16
149:20 281:10
284:9 310:11 337:4
338:7 340:13
389:21 412:7,14
422:10 426:12,17
427:12,14 428:16
432:5 459:6 462:20
**fix (19)**
14:24 152:4 210:4
211:5 220:17 255:6
259:2,17,20 261:25
284:15,25 285:8
294:16 296:18
303:9,13,19 333:23
**fixed (1)**
201:12
**fixing (2)**
211:3 277:10
**flagged (1)**
133:11
**flags (1)**
124:5
**flavors (1)**
185:25
**Flexner (4)**
2:7 3:3 6:7,10
**flywheel (6)**
101:22,23 103:18
361:2 448:23
449:16
**focused (1)**
374:25
**focusing (1)**
294:10
**Foerster (1)**
109:7
**follow (1)**
312:23
**followed (2)**
226:18 264:19
**follows (2)**
7:4 270:8
**foolish (1)**
261:8
**foot (1)**
310:12

**footnote (12)**
26:21,24,24,25 30:6
372:2,4,4 374:4
375:21 439:21
453:15
**footnotes (1)**
26:11
**Forbes (1)**
410:22
**force (1)**
83:10
**forced (2)**
241:11 377:21
**foregoing (1)**
352:14
**forever (3)**
103:23,25 140:18
**forget (2)**
56:25 401:2
**forgotten (1)**
472:10
**form (62)**
23:25 39:17 51:25
53:11,16 59:14 60:9
66:10 72:8,10,17,19
81:5,6,13 89:22
97:16 122:24 144:6
155:14 164:12
173:8 174:9 180:4
228:19 329:19,22
329:25 330:6,8,22
333:21 344:21
345:16 355:23
358:11,11 404:18
407:10 424:19,24
429:9 430:6 431:16
434:20 436:14
439:22 440:20,22
441:4,9,16,18
442:11,13,15 443:7
457:9 460:3 461:17
469:6 480:13
**formed (3)**
30:13,14 202:18
**former (28)**
13:22 44:2,5 110:9,11
110:12,15,16,17,20
175:13,24 176:3,5,7
212:18 226:9,11
234:3,5 256:18
420:11 473:21,22
474:5,8,11,15
**forming (5)**
52:5,21 53:8 202:19
461:22
**forms (5)**

72:13 154:14,16
198:15 442:22
**formula (1)**
431:6
**formulas (1)**
185:25
**forth (1)**
479:13
**forthcoming (2)**
104:21 142:24
**forthright (5)**
142:23 157:4 326:15
388:3 403:10
**Fortisku (1)**
260:7
**fortunate (1)**
467:3
**fortune (2)**
193:20 360:5
**forum (1)**
329:18
**forums (1)**
24:7
**forward (12)**
8:21 9:12,13 32:25
103:17 127:22
166:13 202:13
256:9 278:7,19
326:13
**found (16)**
34:21 47:4 69:4 75:9
87:12 117:7 152:10
195:9 248:12,23
281:11,14 310:20
310:23 448:17
450:2
**founded (2)**
356:10 468:3
**founder (2)**
13:19 362:20
**four (40)**
31:9 37:16,19,22,24
38:8 40:15 43:11
45:20 46:5 47:7
49:16 50:6 103:18
104:10 106:11
120:11 124:13
149:11,19 159:10
219:25 234:23
247:8 249:20 279:8
295:12,16 302:11
322:16 327:21,24
369:16 415:18
416:16 430:4 444:6
459:6 467:5 469:13
**fourth (2)**

**frame (6)**
42:17 66:13,15
271:13 291:18
464:24
**framed (2)**
147:9 284:16
**franchise (3)**
420:8,9,14
**fraud (38)**
12:14 163:2 205:19
230:16,16,17,18,20
230:23,25 231:6,23
233:3 244:12,13,16
244:17,17,19
300:17,20 301:18
302:7 309:23
311:15 312:16
313:11,12 314:20
415:14 416:7
435:19 444:16
462:5,9,11,12,18
**frauds (5)**
231:15,25 247:20
309:25 444:6
**fraudulent (2)**
455:4 457:3
**fraudulently (4)**
423:12 444:17 445:8
446:3
**free (2)**
196:12 361:18
**freedom (2)**
123:13 220:10
**Freeman (2)**
475:13 478:4
**French (1)**
340:10
**Friday (1)**
36:12
**Friedman (6)**
19:22,25 241:17
253:16,20 275:13
**Friedman's (1)**
20:3
**friend (1)**
21:10
**friends (4)**
141:18 236:2 265:8
467:9
**frivolous (1)**
119:19
**front (3)**
26:14 64:19 439:9
**frustrated (4)**
225:4,5 228:18

97:24 375:15
229:13
**frustrating (1)**
292:21
**frustration (1)**
249:7
**full (21)**
100:3 111:11 112:4
136:13 197:15
212:24 215:3
217:17 220:13
256:5 268:6 333:25
338:20 345:23
359:20 393:18,18
393:19 401:3
454:11 468:15
**fully (3)**
172:20 184:19 350:12
**function (1)**
359:21
**fund (43)**
124:6 145:11 146:2
150:15 174:6 177:2
177:3 190:5,6
191:14,18,20 194:9
195:24 196:2,3,4,11
197:7 199:2 343:7,8
343:12 355:4
369:13 379:5
382:21 383:17,24
384:3,4 385:17,20
386:21 387:4,13,15
389:11,18 399:21
405:22 420:10
432:16
**funds (53)**
159:9 160:9,11
170:25,25 171:4
183:22 197:10
200:17 201:7 339:3
352:15,17,24 357:9
357:23 362:16
369:18 374:3,8,13
374:24 375:12,18
376:3,9,12,16,20
377:6 378:14
379:13 380:16
381:6,21 385:24
386:25 387:2,5,11
388:5,7,8 389:2,12
428:16 432:5,19,20
432:22,23,25 433:7
**further (4)**
14:13 270:8 433:13
479:17
**furthest (1)**
456:3

**future (2)**
102:14 338:23

_____
**G**
_____

**g (2)**
423:3,19
**gain (5)**
236:10 394:23 397:12
397:20,21 424:8,10
428:15 429:7,11
430:4,9 431:23
436:3 439:2,7
**gained (1)**
172:7
**gains (2)**
397:18 407:8
**gallon (2)**
415:7,8
**game (3)**
128:16,17 196:6
**gamesmanship (1)**
62:4
**Garcia (24)**
160:6 169:15,15
222:17 223:5
253:25 256:11
276:25 356:11,14
357:2,8 362:18,23
362:23 363:2,5
416:20 417:21,24
418:3,13 419:18
422:3
**Garcia's (2)**
170:8 420:12
**Gary (2)**
223:11 263:8
**gas (1)**
415:7
**gather (1)**
155:11
**gathered (5)**
55:8 79:11 105:10,13
410:5
**gathering (2)**
170:12 358:3
**Gay (4)**
4:7 5:21,24 6:4
**Gellene (4)**
44:8,8 234:7,8
**Gen (26)**
30:23,24 31:4,5,7,21
32:2,11,14,18,19
33:7,13,13,23,25
34:2,8,15 38:12
69:21,23,24 70:23
73:16 87:24

**general (16)**
16:20,23 32:16
138:23 210:25
254:6 277:8 345:3,5
345:8 362:11,14
384:20 390:20
391:3 421:22
**generalized (1)**
185:14
**generally (17)**
15:12 36:21 56:10,15
56:16 91:3 95:16,16
103:22 111:25
112:8 154:18,19
192:7 230:10
236:23 387:6
**generate (1)**
395:11
**generates (1)**
395:10
**GenOn (49)**
317:12 363:3,4,7
437:5 444:2 445:15
445:21,24 446:5,10
446:17,18 447:9,18
447:20,22 449:6,12
449:22 450:20,21
453:8,10,12,14,15
454:3,7,9,21,23
455:4,20,23 457:5
458:4,6,10,15
460:14,18,21,22
461:20 462:6,8
463:25 464:16
**GenOn's (3)**
363:8 444:19 445:10
**getting (21)**
54:22 76:3 111:2
130:3 146:13
147:18 190:19
237:11 241:13
259:8 264:11
316:19,23 318:17
319:23 380:7 417:3
417:6 421:14
435:15,21
**Gibbs (1)**
440:14
**Gibson (3)**
474:6,9 477:6
**give (23)**
39:5,6 47:25 58:9
143:9 153:18
188:23 219:15
227:7 283:15 284:6
309:11 337:21

350:11,25 354:2
370:24 391:10
393:25 398:20
418:5 438:13,19
**given (12)**
11:23 220:6,9 234:14
241:25 273:9
275:13 333:5
393:25 424:7
442:12 479:15
**giving (13)**
12:24 182:13 241:14
266:5 295:23 317:3
317:7 320:6 390:14
390:15 393:17
406:2 422:21
**glad (7)**
11:20 40:2 131:16
134:9 152:4,17
434:6
**glasses (1)**
376:23
**global (4)**
327:7 366:3 373:24
374:18
**globally (3)**
191:23,24 192:2
**go (94)**
14:16 25:11 29:23
31:10,23 39:19,24
52:25 54:2 60:15
64:5,9 86:22 88:5
88:13,23 92:25 93:2
102:3 103:16 105:5
113:14 133:9 134:9
139:19 144:25
146:11 149:4 150:5
153:3 157:22
196:12 197:19
200:21 201:11,12
201:13,14,15,16
221:15,16 224:7
231:5 239:8 249:5
251:19 261:16,18
261:18 280:14
283:11 285:8
290:25 316:14
323:24 333:22
336:21 345:19
346:7 347:7,16,23
349:8 351:16
359:13 364:21,24
370:14 371:12
372:6 377:21 385:2
392:25 394:4
407:14 410:15

416:3 420:14,20
423:3 426:5 433:13
437:21 438:14
439:15 442:3
451:15,16 456:3
468:17 469:7 470:2
470:3
**God (2)**
237:10 265:6
**goes (18)**
65:14,14 113:6
201:17,18,19,20
234:14 247:7 259:2
284:21 317:18
336:8 355:20,22
360:23 385:21
386:18
**going (175)**
12:20 14:10 23:18
31:8 32:25 36:19
37:10 42:9 47:23
51:15 52:17 57:20
59:23 61:24 63:20
63:25 64:5,6,8
69:15 74:6 75:18
82:13 90:9,12 98:16
98:17 101:11 102:8
102:14 106:20
107:3,6,8,9 109:12
114:24 122:14,17
130:24 133:4
136:22 138:22,23
141:7 149:21 152:5
152:9,25 153:18
158:5 163:25
165:14,19 168:12
183:14,19 184:8
187:4 189:23 191:9
201:11 207:25
213:9 216:3 220:15
221:6,13,14 224:16
224:17 225:7,8
236:7 247:6 254:9
255:17 257:11,17
258:15 259:2,16,19
260:5,6,19 262:16
263:15 264:12,13
264:18,20 265:2,9
267:13 279:4,12,14
280:20 284:5,14,25
291:25 294:3 295:3
296:11 297:7 298:6
299:14,24 300:9
301:2,8 304:16
305:23,24 315:25
316:2 318:19,22,24

319:8,13 320:6
326:18 335:8
336:13,19,22 338:3
342:5 344:18 346:2
346:5,6,10,16,17,18
349:19 350:18
351:2,5,18 366:22
371:12 373:20
377:22 388:12
391:10 394:8,9
404:20,21 407:14
407:20 408:5
417:13 421:21
422:23 430:22
433:21 434:4
442:24 444:13
447:18 449:20
452:16 458:20
467:6,8,19 469:19
470:21 473:19
**Goldstrum (4)**
88:11 256:13 277:2
416:24
**good (61)**
7:6,7 11:22 21:10
29:17 67:17 132:9
132:10 133:13
140:10 141:9,16,18
158:6 193:19 197:6
202:11 203:3,13
207:19,22 231:20
240:15,16 308:3
312:2,12,14 313:8
313:14,15 314:6,9
314:11,16,17,18
316:17 317:8 318:4
318:6 319:3,19
320:15,16,18 322:9
322:19,19 326:5
336:9 345:12
372:25,25 389:5
393:20 403:11
414:19 421:25
427:19 469:10
**good-faith (8)**
8:22 9:14 59:15,16
60:11 153:9 198:6,9
**Gordon (4)**
256:17,18,20,25
**gotten (8)**
50:20 174:18 218:19
258:5 318:10
380:22 467:14,16
**governance (11)**
21:14 44:12 180:5
330:9 344:23 355:6

358:12 367:7,23
404:5,12
**government (2)**
74:24 359:24
**graduating (1)**
261:15
**granted (6)**
95:8 155:23,24 163:3
165:25 207:18
**granting (1)**
207:10
**gratitude (2)**
250:23 263:13
**great (6)**
139:6 194:13 250:23
276:25 349:5
437:21
**greatest (1)**
397:10
**greatly (3)**
165:9 263:12 368:25
**Green (1)**
44:19
**GREGORY (1)**
4:18
**ground (1)**
187:11
**group (16)**
18:21 19:3,5,6,7
226:6 237:25
331:10 340:12
343:5 354:21
355:25 356:4 357:8
358:5 422:12
**group's (1)**
226:7
**groups (1)**
354:18
**growing (1)**
395:17
**grown (1)**
13:15
**Guarantee (1)**
88:20
**guess (14)**
33:23 48:25 101:14
113:18 114:24
137:18 138:5
149:18 210:16
218:8 277:19 355:9
432:19,21
**guilty (1)**
107:5
**Guy (3)**
110:17 473:22 477:24

| **H** |
| --- |

**H (2)**
426:12 480:2
**hac (2)**
3:17,19
**hacking (1)**
172:11
**half (19)**
37:24 40:15 43:11
46:6 47:7 49:16
95:9 113:25 212:13
234:11,15 249:20
253:5 268:7 302:12
322:16 430:4
465:13 468:22
**hallway (1)**
7:11
**hand (1)**
479:23
**handed (1)**
426:6
**hands (1)**
136:5
**hands-on (3)**
184:12,16 187:10
**handwriting (1)**
268:4
**happen (2)**
190:17 206:22
**happened (26)**
21:11 23:14 29:12
32:10 33:19,19
138:10 161:3,4
191:4 214:6 219:6
222:18 227:16
241:9,12 248:17,18
248:18,20 249:3
253:10 293:17
300:16 303:18
464:7
**happening (7)**
51:5 143:24 235:12
240:21 261:4 276:8
399:17
**happens (6)**
33:21 93:12 118:19
224:22 325:20
406:15
**happy (2)**
61:25 175:5
**hard (8)**
113:3 149:11 230:24
230:25 259:17
296:11 406:4
462:11
**harm (1)**

123:17
**Harry (15)**
47:14 48:22 50:3 88:3
88:5,7,10,14,15,21
88:25 89:3,7,10
95:13
**Harvard (2)**
327:5 475:6
**hats (1)**
370:5
**head (2)**
267:20 308:3
**header (5)**
64:18,24 444:21
445:6,7
**heading (1)**
148:15
**headline (2)**
445:12,13
**healthcare (1)**
129:8
**hear (2)**
14:14 283:22
**heard (5)**
32:17,19 41:4 243:9
321:22
**hearing (6)**
248:25 297:19 308:18
308:19 443:16
458:3
**hears (1)**
399:15
**heart (1)**
250:19
**heated (1)**
349:17
**heavily (4)**
186:5,8,15 421:5
**Hector (2)**
208:12,16
**hedge (3)**
343:8 405:22 420:10
**held (12)**
2:6 5:9 20:20 128:20
166:14,17,19
205:17 319:5
390:22 424:14,14
**Hellman (3)**
19:22,24 20:2
**help (20)**
11:15 23:16,20 25:4
25:16 33:6 168:7
203:10 221:19
227:17,19,20,22
250:11 261:17,25
326:17 390:18

439:5 463:14
**helped (3)**
21:8 51:20 455:11
**helpful (1)**
441:8
**helping (4)**
51:24 334:10,20
470:18
**Henderson (2)**
475:17 478:3
**hereinbefore (1)**
479:13
**hereunto (1)**
479:23
**hey (1)**
235:20
**hiding (2)**
230:8,11
**high (6)**
65:8 165:17 197:7
326:16 359:22
430:13
**highlights (2)**
193:10,12
**highly (2)**
102:12 103:7
**Highway (1)**
3:15
**hindsight (1)**
231:17
**hint (1)**
361:20
**hire (4)**
40:21 46:2 119:22
168:3
**hired (16)**
33:2,14,23 45:25 46:8
49:5 53:6 211:19,20
216:2 233:19,23
321:6 358:25 435:3
476:17
**hires (1)**
119:20
**hiring (2)**
51:12 117:14
**historic (2)**
225:24 245:7
**historical (3)**
371:14 372:8,15
**history (11)**
92:24 225:21 247:20
247:22 301:18
312:4 326:3,11
397:10 455:6
458:13
**HofAP (1)**

338:10
**Hogan (5)**
110:23 239:17 243:6
243:16 317:3
**Hojnacki (11)**
146:22 147:15 148:8
151:9 152:14
153:25 364:3
416:24 441:22
443:10 459:23
**Hojnacki's (6)**
148:24 149:25 151:19
151:22 152:7
363:12
**hold (9)**
32:8 41:5 129:24
178:10 339:12
344:9 366:22
423:18 444:10
**holder (2)**
28:9 352:7
**holders (2)**
342:18 352:22
**holding (7)**
15:11 16:18 285:9
354:24 416:12
432:24 433:19
**holdings (16)**
17:7,8 18:19 338:8,9
338:10 340:5,7
374:3,12,17 375:10
441:12,25 442:16
443:4
**holds (3)**
139:15 328:23 352:3
**hole (4)**
196:25,25 347:8
400:7
**holes (1)**
450:15
**honest (3)**
12:24 117:19 252:19
**Honigman (1)**
44:24
**honor (3)**
202:14 238:12 391:12
**hookup (1)**
14:10
**hope (1)**
471:16
**hoped (1)**
255:12
**hopefully (1)**
351:3
**hoping (1)**
129:8

**hoteling (2)**
192:7,11
**hour (3)**
33:8 158:6 335:5
**hours (10)**
34:17,20 55:9 73:9
161:25 162:2
245:20 249:23
250:21 346:8
**house (9)**
210:5 211:3,5 212:8
213:4 214:12 215:7
217:10 220:20
**Houston (5)**
1:4 3:11 4:4 5:8 7:9
**hovering (1)**
170:10
**Huennekens (23)**
155:3,18,22,25 156:9
158:10 205:11,14
206:7,15 207:8,18
208:4 227:20 230:2
232:15 248:12,23
272:12 403:2 435:5
435:12 469:24
**Huennekens' (2)**
164:4 248:7
**huge (5)**
199:3 329:5 375:4
417:16 458:24
**hundred (9)**
13:25 29:22 30:2
149:21 150:24
180:7 355:2 421:15
471:13
**hundreds (12)**
55:9 190:12 196:20
197:8 236:17
244:25 245:2
310:24 321:3
453:18 455:5
460:23
**hurting (4)**
265:14,15,16,17
**hurts (2)**
130:20,20
**hypothetical (1)**
452:8

---

**I**

**Ian (5)**
256:23,24,25 257:3,8
**iceberg (1)**
414:8
**id (1)**
372:5

**idea (27)**
17:20 98:18,20
113:11 163:4
171:12 188:15
189:18 195:20
200:23 201:3
207:11,12 248:3
252:2 267:16 311:6
357:17 379:23
384:12 391:19,21
405:3 418:15
419:25 436:17
450:5
**identification (11)**
26:18 41:11,20 48:11
279:18 288:11
290:21 335:12
371:3 424:25 438:6
**identified (11)**
87:6 149:17 154:12
198:24 294:19
340:22 371:7
383:25 386:3
387:12 389:3
**identifies (2)**
374:2,12
**identify (10)**
68:3,9 135:14 179:19
295:23 377:5
378:13 383:13
386:2,5
**identifying (3)**
154:21 382:18 477:15
**identities (2)**
373:15 382:6
**identity (4)**
28:18 179:10,23,25
**ignore (2)**
242:4 318:18
**ignored (2)**
469:23,24
**ignores (1)**
98:20
**ignoring (1)**
469:22
**IL (1)**
4:17
**illegal (15)**
115:16,21 116:25
222:13 228:13
229:8 250:17
253:23 276:8
286:11 287:19
415:13 416:7
420:18 423:15
**illogical (1)**

99:2
**imagine (3)**
120:13 232:21 317:6
**immediate (1)**
98:16
**immediately (6)**
254:10 262:20 317:19
333:22,23 346:21
**impact (2)**
119:10 129:22
**impacting (1)**
122:3
**impeachment (3)**
280:12,17 283:20
**implies (1)**
347:5
**imply (3)**
120:6 345:21 346:19
**implying (1)**
299:23
**important (31)**
119:23 120:15,16,17
120:18 121:4,6,9
122:20 197:15
206:6 233:11
241:22 242:2
243:20 252:12,13
264:17,18 297:23
297:25 298:2 299:9
299:14,23 300:6,8
304:22,24 359:22
470:17
**importantly (2)**
317:11 358:13
**impression (1)**
351:2
**impressive (1)**
371:7
**improper (7)**
221:6 250:16 253:22
282:11 294:15
295:14 333:4
**improperly (1)**
413:19
**improve (1)**
230:24
**impugn (1)**
349:19
**impugns (1)**
363:17
**inactive (1)**
184:6
**inadvertent (1)**
310:13
**inadvertently (1)**
310:9

**inappropriate (2)**
399:9 420:17
**include (9)**
69:8 77:24 82:9 126:2
135:25 193:12
211:22 340:18
363:14
**included (3)**
59:9 135:16 402:10
**includes (14)**
70:2,7 85:2,14,15,20
85:22 92:12 125:13
168:18 177:10,11
177:11 433:11
**including (25)**
66:18 87:18 156:22
159:21 160:6
182:20 185:19,21
210:3 282:25
352:16,20 355:17
356:23 357:14
361:8 365:23 366:3
371:9 398:25
408:25 419:6
437:13 464:17
476:17
**income (6)**
106:22,23,25 201:13
422:14 442:7
**incomplete (6)**
100:3 134:2 245:4
387:18,20 425:7
**inconsistent (1)**
108:23
**Incorporated (1)**
5:14
**incorporation (1)**
180:3
**incorporator (1)**
21:8
**incorrect (4)**
91:22 133:20 256:21
295:4
**increase (2)**
387:7 428:10
**increased (3)**
425:16 428:12 439:25
**incremental (2)**
261:15,24
**incumbent (1)**
123:8
**incurred (1)**
432:14
**independence (1)**
123:13
**independent (5)**

205:22 225:20 245:24
328:9 390:16
**independently (5)**
208:7 225:13,22
226:15 328:8
**index (1)**
423:17
**indicates (2)**
401:13,14
**indicative (3)**
438:4 439:12 480:16
**indirect (15)**
124:7,8,18 135:20
179:19 234:22
320:11 399:23,24
400:5 403:9,19
435:2 437:3 460:15
**indirectly (5)**
142:19 165:10 332:11
424:13,14
**individual (2)**
79:12 411:18
**individuals (2)**
340:16 417:17
**industry (17)**
23:20 51:16 113:15
130:19 250:10,12
265:15 388:14,16
394:19 397:5,6,7,14
421:22,24 422:17
**inflation-linked (1)**
373:9
**influenced (2)**
157:20 225:16
**information (110)**
22:6 61:5 71:9 75:16
76:12 78:4 95:3
101:15 104:21
105:12 119:6
123:25 124:3
125:11 128:20
143:18 145:12,13
147:10 154:24
155:5,10,11 156:8
157:18 160:12
169:22 173:2
174:18 176:13,14
181:5 182:15,21,23
183:15 194:14
197:2,18,24 198:12
199:18 200:3,6
205:16 206:7,11,14
217:3 218:7 226:7
226:12 231:5,18
285:16 328:13,14
343:2 344:24,25

350:16 353:12,17
356:18,20 363:16
371:8 372:17
373:25 374:11
376:9 377:24 379:7
379:24,25 381:12
382:23 384:13
386:12 397:25
401:13,17,19,24,25
414:13 433:22
435:20,25 436:7,10
436:12 441:15
442:14 443:7 451:9
451:12 453:7 456:5
456:6,7,13 459:9,14
461:24 464:25
465:2,4,8 469:12
**information-based ...**
184:16
**initial (2)**
73:8 453:10
**initials (1)**
288:21
**inquiry (1)**
247:11
**inside (14)**
21:11 85:24 139:3
170:16 197:11,19
199:5 222:14 236:9
257:5 300:6 361:16
388:13 422:20
**insider (2)**
199:5 420:12
**insidious (1)**
215:6
**insight (3)**
196:15,19 364:13
**instance (2)**
94:12 386:2
**instances (2)**
174:10
**instinct (1)**
261:16
**instruct (1)**
279:14
**Instruction (3)**
38:11 480:17,18
**instructions (1)**
12:21
**instructive (1)**
239:22
**instructor (1)**
470:19
**instruments (2)**
352:20,25
**integral (1)**

461:21
**integrity (8)**
117:18 220:23,24
326:12,16 349:19
349:25 350:6
**intelligent (1)**
231:19
**intend (2)**
193:4 310:18
**intended (2)**
59:3 193:2
**intent (5)**
78:13 230:25 244:11
246:16 462:11
**intention (12)**
10:24 59:19 60:17
78:14 108:16
118:10 211:9 213:2
215:2 244:7,9
310:19
**intentional (7)**
308:10 309:16 311:25
311:25 312:10
313:11 336:5
**intentionality (2)**
311:16,20
**intentionally (6)**
232:13 298:10 306:16
306:19 308:25
319:16
**interest (75)**
32:14 71:9 73:4 79:16
87:14 114:12
117:13 120:24
121:7 125:18
133:12 143:12
145:9,18 146:6,9
149:3 150:7 151:21
153:12 162:4,6,15
163:7 164:2,6 165:5
165:11 168:19
178:10 191:7
235:16 266:16
320:12 323:24,25
324:6,14 326:8
332:10,12 337:3
338:6 339:13
344:10,15,16,17
346:25 361:21
364:18 391:17
403:9,10,17,18
423:13 425:13,14
425:17,25 428:13
429:14,20 433:4,5
434:20 435:3 436:4
440:2 448:7,20

440:2 448:7,20
464:23 466:9
467:25
**interested (13)**
79:6 104:3 161:8,18
161:20 162:21
297:18,20 325:2,3
424:6 466:12
479:20
**interests (13)**
117:16 118:2 137:7
304:25 317:23
325:5 352:15,22
400:23 403:7,12,19
466:22
**interests' (1)**
352:18
**intermediaries (2)**
27:25 29:5
**internal (3)**
368:2,7 406:17
**international (1)**
130:25
**internet (6)**
74:18,21 76:4 119:12
119:14 154:25
**interpolate (1)**
105:4
**interpolating (1)**
133:24
**interposing (1)**
90:15
**interpret (2)**
114:24 320:21
**interpretation (10)**
83:23 233:13 245:10
247:5 249:9 271:6
307:4 320:25
321:23,24
**interpretations (1)**
300:24
**interprets (1)**
320:22
**interrupt (2)**
64:4 417:10
**interrupted (1)**
172:23
**interrupting (4)**
238:6,25 303:24
465:23
**interruption (2)**
14:9 146:15
**intervene (1)**
210:5
**interview (9)**
39:9 273:16,24

274:14 291:12
292:2,19 297:4
306:2
**interviews (1)**
292:10
**introduce (1)**
5:18
**invention (3)**
82:11 89:15 397:10
**invest (18)**
168:10,12,13 169:12
172:10 173:4
174:22 185:3,6
188:6 190:11
201:25 202:15
343:12 375:20
376:21 386:25
402:17
**investable (11)**
375:18 376:2,16
377:6 378:14 379:5
382:21 383:16
385:17,24 386:25
**Investcorp (1)**
340:12
**invested (18)**
185:17 189:21 190:3
191:15 199:19
200:4,7 357:9,12
359:10,12 362:17
384:4 387:15
389:19 391:16,20
429:21
**investigate (3)**
89:17 231:14 445:22
**investigated (7)**
38:13,22 39:14 40:6
46:9 90:19 309:24
**investigating (9)**
40:10,16 52:8 157:7
231:24 444:19
445:10 454:3 455:3
**investigation (5)**
40:13 45:24 66:19
205:23 374:19
**investigations (3)**
12:14 66:7,18
**investigative (1)**
42:13
**investigator (2)**
462:9,14
**investing (35)**
122:10 168:19,20
169:24 182:7 183:9
183:12,22,23 184:4
184:6,8,12,13,23

185:4,7,16,18,20
186:2 187:5,6 189:7
189:17 191:21,23
356:24,25 400:11
400:12,13 401:6
414:3 434:18
**investment (119)**
18:3 114:5 124:6,7
126:14 129:13
135:21 136:6 142:7
142:12 145:25
150:15 158:21
162:9 163:10 165:6
166:15,17,19,24,25
167:3,8,10,15,19,25
169:16 170:6,8,25
171:4,13,15 175:5
182:12,25 184:14
184:18 185:24
186:22,24 191:7,14
191:20,25 193:15
193:22 194:3,5,22
195:7 197:6,10
199:2,4 201:2,6
202:5 203:19,21,22
203:24 276:4
340:14 352:14,16
352:23,24 353:11
353:14,19 355:4
356:20,23 357:3,12
358:16 361:4 362:5
364:19 368:13
371:15 372:9,15,20
373:2,5,12,25 374:8
375:5,7,19 376:17
377:7 378:15
379:14,16 380:17
381:8,23 384:4,13
384:14 387:4,11,14
387:15 395:23,25
399:20 405:17
423:8 425:15
428:11 433:11
439:24 463:4
**investments (63)**
72:5,7 73:24 99:23
124:9,15,18,25
125:2,4 126:17
135:18,19 142:18
144:9 150:18
154:13 158:9
159:17,18,20
160:13 171:5,6,18
174:7,24 176:15
177:2 195:19
200:24 201:12

234:22 236:16
329:10 340:15
348:2 369:6,16
373:15 377:8
378:16 382:8,10
383:14,18 384:15
386:5,8 398:24
399:4 400:5,8 407:7
423:15 430:21
434:15 437:3,11
440:17 458:10
464:4 465:7
**investor (15)**
339:8,19,21,22
340:17,24 341:3,13
341:16 347:11,19
347:22 370:7 379:5
435:9
**investors (22)**
170:24 339:2 342:11
345:15 347:25
348:8,12 358:6
371:9,10 375:16
376:17,19 379:18
380:2,13 381:13
382:24 384:25
385:17 388:6
467:11
**invests (5)**
23:7,9 186:5 190:11
191:17
**involved (22)**
18:4 21:7 35:15 46:20
46:22 62:4 114:10
120:17,19 137:17
164:15,19,25 165:3
202:19 218:22
220:22 223:22
258:20 304:20
315:22 420:25
**involvement (3)**
51:7 219:2 448:24
**involving (3)**
214:7 275:24 474:6
**irreconcilable (1)**
461:19
**irrelevant (2)**
336:12 345:17
**irrespective (1)**
216:9
**IRS (1)**
106:24
**isolated (1)**
295:6
**issue (9)**
14:24 190:20,23

193:16 227:12
258:3,4 324:22
351:15
**issues (12)**
137:16 219:24 220:11
220:12 224:4
229:19 276:12
286:8 287:17 310:6
310:7 462:25
**item (1)**
88:9
**iterations (1)**
13:12
**iv (1)**
340:11
**Ivanick (4)**
243:5,10,16 317:2
**Ivanick's (1)**
317:5
**IVC (1)**
340:12
**Iverson (3)**
4:10 5:23,23

———————

**J**

**Jack (2)**
474:11 477:10
**James (3)**
44:23 474:16 477:11
**January (2)**
42:23 255:12
**Jason (2)**
473:24 477:6
**Jay (487)**
1:18 2:6 5:1,4 6:1,24
7:1 8:1,20 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1

91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1

261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1,6 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1,23
338:1 339:1 340:1,8
340:23 341:1 342:1
343:1 344:1 345:1
346:1 347:1 348:1
349:1 350:1 351:1
352:1 353:1 354:1
355:1 356:1 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1 365:1 366:1
367:1 368:1 369:1
370:1 371:1 372:1
373:1 374:1 375:1
376:1 377:1 378:1
379:1 380:1 381:1
382:1 383:1 384:1
385:1 386:1 387:1
388:1 389:1 390:1
391:1 392:1 393:1
394:1 395:1 396:1
397:1 398:1 399:1
400:1 401:1 402:1
403:1 404:1 405:1
406:1 407:1 408:1
409:1 410:1 411:1
412:1 413:1 414:1
415:1 416:1 417:1
418:1 419:1 420:1
421:1 422:1 423:1
424:1 425:1 426:1

427:1 428:1 429:1
430:1 431:1 432:1
433:1 434:1 435:1
436:1 437:1 438:1
439:1 440:1 441:1
442:1 443:1 444:1
445:1 446:1 447:1
448:1 449:1 450:1
451:1 452:1 453:1
454:1 455:1 456:1
457:1 458:1 459:1
460:1 461:1 462:1
463:1 464:1 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1
475:1 476:1 477:1
478:1,17 479:12
481:4,20

Jean (1)
  277:7
Jim (1)
  474:15
job (8)
  1:25 130:16 136:11
  136:15 322:13
  360:21 392:8,10
John (10)
  43:18 44:8,18 110:7
  110:18 222:17
  234:8 253:24
  356:11 422:3
Jointly (1)
  1:12
Jonathan (2)
  475:8 478:2
Jones (10)
  56:25 58:2 109:3
  111:8 227:25 230:4
  237:18 238:17
  239:16 247:10
Journal (5)
  75:13 132:15 292:14
  292:17 306:3
journalist (2)
  39:8,10
journey (2)
  261:22 302:12
judge (76)
  37:13 40:14 44:2
  56:25 58:2 62:3
  109:13 110:10,11
  114:23 115:3
  121:21 129:9
  141:14 155:2,17,22
  155:24 156:9,24

157:14 158:10,15
159:2 164:3 205:11
205:14 206:7,15,23
207:2,8,17 208:4
226:10,11 227:10
227:20,24 229:25
230:3 232:15
236:12 239:4 241:5
247:10 248:7,12,22
272:11 273:5 297:3
311:10 322:4,12
324:12 325:13,25
326:10 366:21
400:23 403:2
415:19 418:10
435:5,12 452:10,14
455:17,18 457:17
457:19 461:17
469:24 474:15,17
judge's (8)
  31:10,13 62:8 279:9
  295:13 301:6,14
  335:18
judges (7)
  114:6 214:8 242:14
  265:19 310:5,5
  321:11
judgment (8)
  80:10,13 84:13,20
  120:20 126:4 173:7
  325:8
judgments (1)
  439:11
judiciary (11)
  212:8,10 213:4,5,12
  214:13,14 217:11
  217:12 220:21,21
Judith (2)
  44:3 110:10
Judy (1)
  226:11
July (4)
  96:8,12 163:16
  449:12
June (24)
  95:8 96:22 97:3,12
  102:7,13,25 288:14
  288:16,18,18,19,20
  288:22 289:10
  445:20 446:19,23
  449:10,13 450:19
  450:22 452:20
  455:24
jurisdiction (1)
  140:5
jury (1)

400:23
justice (1)
  478:3
justify (2)
  120:25 121:2
Justin (1)
  475:16

_____

**K**

K (1)
  239:16
keep (12)
  129:8 184:20 232:13
  251:20 255:16
  264:21 291:25
  346:9 351:5 359:14
  395:22 405:2
keeping (1)
  266:18
keeps (2)
  92:2 328:23
kept (7)
  137:20 257:24 261:3
  261:4 264:13 467:8
  469:22
Kevin (1)
  223:7
key (2)
  83:24 451:23
kids (1)
  470:9
kind (25)
  15:21 66:3 99:6
  166:14 184:6,7,11
  184:13 230:12
  244:12 263:21
  265:23 266:23
  268:8 327:17
  384:23 388:9 389:6
  389:25 390:2
  398:17 420:2 430:3
  472:15,17
kinds (6)
  135:19 183:17 185:15
  325:22,23 458:7
Kirkland (10)
  4:15 33:16,21,24 34:4
  109:5 111:9 237:21
  238:17 239:17
Klenow (3)
  4:11 6:3,3
knew (6)
  57:6 163:19 166:18
  261:2 282:10
  294:13
knock (1)

438:14
**know (308)**
8:17 9:23 10:23 14:13
  17:16,18 18:9 21:11
  21:17,20 22:12,18
  26:22 27:17,24 28:3
  28:5,18,22,24,24
  29:9,19 32:3 36:21
  36:23 37:11,12
  47:21 48:3 50:2
  53:2 56:3,10 57:20
  58:2,4 63:4 71:25
  74:9,19,25 76:20
  77:13,19 80:9,24
  82:22,25 83:5,7
  87:21 88:22,23 91:2
  92:25 96:5,13 100:9
  102:15 105:8 108:5
  108:8 109:14
  110:18 111:19,25
  112:2,10 113:5,10
  115:7,12 118:25
  120:5 121:12,15
  131:16 132:6
  133:23 135:6,13
  136:23 138:24
  141:14 143:25
  148:18 150:10,20
  152:16 158:24
  160:21 162:11,11
  162:12,13,14 165:2
  165:13,15,18
  166:20,21 167:6,7
  167:13,21 168:14
  168:15 170:21,23
  171:6 173:8 180:4,6
  183:11 185:2,3,4,5
  185:6 187:17,24,25
  188:24 189:10
  191:16,19 192:3
  193:8 194:13
  196:23 201:23
  202:15 203:15
  204:2,4 205:9,10,13
  205:15 206:2 208:3
  208:22,24 209:5,10
  209:13 213:23
  214:8 215:15
  216:16,25 217:24
  218:3,6 219:21
  221:8 226:4 228:16
  229:11 231:2
  232:19 233:9,25
  234:2,16,21 239:7
  240:21 242:21
  244:13,15,17,17,20

245:23 246:11
253:18 254:21
258:2 260:3 263:15
264:4,5 266:10
267:5,22 268:14,16
270:21 273:12
274:22 276:19,22
284:17 289:6,11
292:14 293:10
297:17 300:2,3,19
303:2,3 304:5,20
307:25 308:3,8
310:23,24 312:25
313:11 319:23
320:14 323:19
328:19,20,22,22,25
329:3,4,6,8,13
333:21 334:13
336:12 343:15
349:17 350:8
355:13 358:4
362:19 363:13
366:9,16 367:16,20
370:9 375:6,14
376:7,7 377:10,11
378:19 384:17,23
388:11,12,17,25
389:6,12 395:4,10
396:23 401:5,12
402:4 406:11
411:19 413:16,17
413:21 414:2,10,12
418:23 419:12,13
419:17,21 420:6,8
422:2,3,5,17 427:6
430:23 432:12,13
432:15 433:2,4
436:15 447:4,14,17
448:3,22 455:24
456:23 457:23,25
459:19 465:7,8,20
466:23 472:20,24
472:25
**knowing (5)**
133:22 235:15 373:14
  413:15 430:13
**knowingly (2)**
132:21 319:15
**knowledge (18)**
92:23 115:15 129:25
  139:7 231:11
  235:11 236:10
  276:20 312:5 315:5
  316:18,22,24
  317:25 341:8 352:5
  421:22,24

**knowledgeable (1)**
242:3
**known (18)**
29:7 67:23 68:12,12
  68:14 71:4 73:5
  87:20 125:16
  129:21 137:22
  164:9 169:10
  307:21 356:10
  406:14 429:13
  474:23
**knows (19)**
28:25 30:10 117:17
  117:18 163:13,20
  164:19,22 166:21
  167:4 232:7,8 258:3
  265:6 300:2,3,8
  311:6 324:3
**Kubert (3)**
27:18,20 30:12
**Kubert's (1)**
33:6

---

## L

**L (1)**
3:19
**label (1)**
5:3
**Labor (6)**
72:9,18 154:16
  164:14 196:14
  198:15
**lack (6)**
25:18 46:4 284:12
  306:6,7 377:20
**lacked (1)**
221:7
**lag (1)**
442:23
**laid (1)**
292:19
**Lakeview (31)**
3:20 15:13,18,19,21
  15:24,25 16:2,5,6,9
  16:14,17,21,21,23
  16:25 17:6,8,13
  18:6,13 19:6 22:8
  63:12 64:15 332:5
  340:7,9,22 341:5
**Lakeview's (3)**
63:11,22 64:12
**land (1)**
442:4
**landscape (1)**
186:4
**language (1)**

442:4
**lapse (1)**
94:20
**large (13)**
82:2,7 94:20 102:12
  122:6 130:25
  149:18 201:6 358:5
  406:13 416:12
  432:18 458:14
**largest (2)**
130:25 264:2
**Las (1)**
43:24
**LaSalle (1)**
4:16
**lasted (1)**
302:5
**late (3)**
36:16 271:12 456:21
**Latin (8)**
189:7,9,17 192:19
  193:15 194:6
  199:19 200:5
**Laurence (2)**
475:5 477:25
**law (150)**
3:14 34:6 43:17,19,20
  43:21,23,25 44:11
  44:19,22,24 79:17
  81:18 82:16 83:10
  83:10,19,20,20,20
  83:24 84:11,19
  91:25 104:17 106:7
  106:19 107:10,11
  107:14,22,23
  108:24 110:7,8,9,23
  111:20,21 114:8,24
  114:25 115:21
  116:3,6,23,24,24
  117:4,5,8 128:19
  131:10,11 135:23
  135:24 136:12,12
  138:20,22 139:8,24
  139:25 140:8
  149:18 198:23
  215:11 221:7
  224:10 225:3,7
  229:17 231:12
  232:8,17,19,22
  233:14 235:19
  239:19 240:14
  242:3,4,16 243:19
  243:23,25 251:24
  251:25 254:16,17
  254:24 255:18,21
  255:22 256:2,9

257:18 260:18,19
261:2,20 265:24
275:8 281:21
282:18,24 286:4
287:24 296:6
297:20 300:22
301:5 302:25
303:13 307:6,9,11
307:11,12,13,18,25
308:24,25 309:2,15
309:17 312:18,22
312:24 315:12,21
318:15,15,18
320:15,22,24 321:2
321:3 325:14,14
331:2,17 336:3
344:19 402:12
475:6
**Lawrence (1)**
475:8
**laws (43)**
115:23 217:13 224:12
  224:13,14,17
  232:10 233:7,12
  241:22 242:9
  250:13 252:11,12
  252:12,13,14,15,16
  264:6,17,21 277:15
  278:10,22 280:8
  297:24,24 298:3,8
  299:10,13,23 300:2
  300:3,5,6,7,8 303:7
  331:15 423:2
  468:12
**lawyer (9)**
7:13 137:16 234:12
  243:3 275:6 303:11
  303:12,15 308:2
**lawyers (26)**
8:14 35:19,20,23 45:9
  55:18 111:2 114:3
  139:3,4 224:9 225:2
  231:20 242:5 243:2
  261:18 263:16
  302:24 319:8 320:4
  321:10 346:7,11
  350:2 390:12 476:9
**lay (1)**
236:19
**lays (2)**
83:21 284:18
**lead (1)**
354:4
**leader (2)**
44:12 263:25
**leaders (7)**

229:22 249:21
257:6,10 354:20
355:7 421:4
**leadership (2)**
356:17,19
**leading (1)**
256:13
**leap (1)**
248:16
**learn (1)**
165:16
**learned (9)**
32:10 33:9 54:5
156:25 158:11
174:20 253:18
259:9 405:10
**learning (4)**
51:6,9,11,14
**leather (1)**
268:9
**leave (14)**
104:18 109:12 125:7
135:25 172:11
174:21 346:18
349:24 350:5,6
359:16 360:10
438:16 471:20
**leaving (2)**
45:3 104:14
**Lebouf (1)**
111:6
**led (6)**
86:15 175:7,8 261:7
263:23 300:12
**left (15)**
114:18 134:20 135:17
138:4 216:17 256:3
262:13,15,15 360:8
390:7 437:10,19
455:6 475:16
**legal (14)**
5:14 18:8 139:5 226:4
226:15 241:14
244:21,22,23 258:5
261:3 302:10
318:25 418:18
**legion (1)**
116:2
**legislation (1)**
220:17
**Lehman (1)**
474:17
**Lemisch (14)**
3:19,22 6:13,13 16:22
37:6 110:21 212:17
212:23 215:16

216:15 217:4 218:6
220:9
**lender (1)**
166:7
**let's (61)**
18:13 40:4 53:5 60:23
64:16 68:11 73:13
74:11 80:2 86:3
133:5,6 154:8
160:17 172:18
178:24 185:2
200:21 216:11
241:4 244:9 249:5
269:3 279:3 280:3
285:18 287:13
288:7 290:16
291:24 304:7,8
305:16 314:18
326:19 336:21
342:2 343:17
347:23 364:21,24
370:10,14 386:17
394:4 395:22 401:2
410:14,15 414:9
420:20 423:3
424:21 425:5,9
432:10 437:21
442:3 444:4 453:9
466:7
**letter (8)**
60:7 139:23,25
208:25 209:25
210:11,24 211:15
**letters (6)**
208:10,17 209:19
211:2,23 343:4
**letting (4)**
53:2 90:13 263:20
427:5
**level (12)**
23:18,21 171:14
324:9 379:24
384:13 468:6,7,14
468:18 469:3,21
**Lexington (3)**
2:8 3:4 5:10
**liabilities (1)**
443:6
**lied (2)**
206:19 435:19
**life (6)**
18:11 366:15 418:24
467:21 470:3,15
**lift (1)**
361:14
**Lifton (3)**

21:7,9 44:16
**light (2)**
377:19 465:11
**liked (1)**
252:4
**likes (2)**
393:11 402:23
**limit (7)**
53:5 113:24 247:11
320:3 321:25
363:20 392:7
**limitations (1)**
136:14
**limited (11)**
118:8 138:15 319:20
319:25 323:10
335:10,15,20 339:4
435:22 480:11
**line (4)**
88:8,19 147:18
314:11
**lines (1)**
289:15
**link (1)**
356:17
**LinkedIn (3)**
75:14,18 391:4
**Lipscomb (17)**
160:7 362:10 368:19
371:2,6,6 374:7
375:22 378:4,11
380:10 381:16
384:6 385:10
391:20 393:6
480:12
**Lipscomb's (12)**
370:12,20 371:18
372:13 373:3,13
376:15 382:3 385:3
387:23 392:5,9
**Lisa (1)**
62:20
**list (65)**
48:9,12 49:12 69:20
70:2,7 71:2,10
72:15,23 73:4 75:20
79:7,16 80:7 87:14
100:3 104:3,24
105:14 122:5,6
125:18 133:19
134:20 143:12
145:9,18 146:6,9
150:7 151:21 152:8
158:17,19 161:9,12
161:18,21 162:4,6
162:12,14,15,22

163:7,9 177:5
185:22 270:18
273:14 333:17
371:11 414:9 422:8
422:15,16,18 424:7
429:15,20 448:7,20
464:23 480:6
**listed (27)**
50:10,15 51:19 67:3
69:3 76:16 77:14
88:19 118:24
121:17 126:8
141:22 149:24
151:10 152:6 154:9
154:22 159:10
173:20 176:21,24
176:25 426:13
444:7 453:18
456:11 460:23
**listen (10)**
106:24 222:22 225:7
225:8 239:7 259:14
264:4 273:20 323:4
323:19
**listened (2)**
250:19 291:21
**listening (1)**
297:18
**lists (5)**
65:22 133:12 134:21
149:4 465:6
**litany (1)**
293:3
**literally (1)**
139:25
**litigation (10)**
12:14 33:22 134:17
134:17 157:20
229:18 474:4,7,11
477:8
**litigator (1)**
52:15
**little (19)**
11:15,17 14:8,11
22:10 31:11 76:6
84:17 142:8,9,10
163:18 196:6 335:4
349:17,20 397:20
411:5 464:12
**live (1)**
64:9
**lived (1)**
203:11
**LLC (1)**
3:19
**LLC's (2)**

438:3 480:15
**LLP (2)**
2:8 338:8
**loans (1)**
352:21
**lobbying (2)**
212:20 478:6
**lobbyist (1)**
475:23
**lobbyists (2)**
475:20 476:9
**local (2)**
475:2 476:10
**logic (7)**
97:9 138:15 178:15
324:15,15 452:25
453:3
**logical (1)**
169:9
**Lois (2)**
43:20 110:8
**London (3)**
44:25 253:8,11
**long (22)**
19:14 51:17 61:15
78:19 137:23
145:19 201:23
219:20 255:8
257:21 292:20
301:4 312:25 323:5
344:18 349:23
362:21 365:12
406:3,25 465:23
474:12
**longer (5)**
9:19,22 31:11 120:21
346:6
**look (81)**
8:21 9:12,13 46:14
47:16 61:25 64:2
73:20 77:10 82:20
93:5 95:23,25
108:18 125:3,6
126:11 131:5 143:8
144:11 152:17
170:2 172:24
177:21 178:24
180:9 215:8 231:21
231:22 237:17,20
237:21 250:12,24
251:11 252:21,24
275:17 276:10
285:18,20 287:13
288:2,7 290:16
291:10 296:22
298:13 301:4 304:8

304:8 315:14
329:17,25,25 330:3
330:6,7,8,17 346:21
358:22 370:10
380:5 390:20
404:15 407:4 408:5
409:22 420:22
423:17 424:2,21
425:5,9 426:6 439:8
447:6 448:4 451:5
462:10
**lookback (94)**
81:2,8,12,22,22,23
82:8,11,21 85:18
86:14,20 87:9,15
89:16,20 90:2,3,5
90:22 91:4,7,21
93:10 97:15 98:19
103:4 106:16,18
107:18 108:2 109:3
109:5,6,8,19,22,24
110:4 111:13,17,21
111:22 113:5,11
114:20 115:5,17,18
115:20,24 116:11
116:12,14,17,18,19
116:21,25 117:6,15
118:7,17 126:21
127:4 139:14
215:22 216:9
238:18 244:2,3,5
307:17 322:24
323:5,10 324:16,22
324:25 325:2
336:25 447:3,5,11
449:5,21,24 450:3,6
450:10,23 452:22
456:2,19
**looked (27)**
17:17 38:15 46:15
94:6 96:3 115:12
117:3 145:8 151:18
164:12 172:5 180:2
192:13 232:5
237:15 251:8
317:12 326:21
369:3 374:21
400:19 441:2,10,18
444:12 448:13
456:5
**looking (23)**
42:4 50:17 66:8 73:15
87:16 112:15,17
124:15 230:22
267:21,22 276:11
276:12 296:13,14

297:7 302:21
351:22 383:4 424:3
424:18 431:5
462:14
**looks (4)**
405:14,18 433:13
463:12
**lose (2)**
265:6 466:20
**loses (2)**
405:4,6
**losing (3)**
467:4,8,9
**loss (1)**
406:19
**losses (2)**
355:21,22
**lost (3)**
380:22 420:8,14
**lot (47)**
34:5 49:17 63:17
70:17 114:9 123:24
125:10 132:17
170:3 171:3 175:9
200:7 202:15
228:24 242:18
259:25 265:6
302:10 321:8
327:14 328:12
329:6 345:24 359:5
366:18 393:22
404:25 405:3
415:10 417:14
418:7,9,11,12,14,20
419:13,14 420:3,5
420:19 421:6
428:24 430:25
449:15 465:10
467:12
**lots (5)**
76:11 141:11,12
369:19 462:24
**loud (1)**
327:23
**Lovells (5)**
110:24 239:17 243:6
243:17 317:3
**low (2)**
146:13 252:7
**lower (3)**
143:9 204:9 406:22
**lucrative (3)**
408:11 415:22 416:4
**lug (1)**
343:15
**lunch (5)**

267:14 270:21 276:14
280:25 419:7
**Luncheon (1)**
269:6
**Lupica (2)**
43:21 110:8
**Lybrand (1)**
331:4
**lying (2)**
265:18,19

———————————

**M**

———————————

**machine (1)**
360:25
**magnitude (1)**
398:10
**Maine (1)**
43:21
**maintain (1)**
25:7
**maintained (1)**
215:4
**maintaining (1)**
183:4
**Maister (2)**
327:4,6
**major (1)**
416:15
**majority (6)**
76:18,21,22,23
357:21,24
**making (42)**
23:22 41:25 70:17
97:4,11 102:23
111:11 117:9
120:23 128:22
131:25 137:11
215:2 251:21 265:7
276:5,16 288:4
298:22 333:25
346:3 366:13
372:25 391:17
393:18 395:17
396:20 397:22
398:18 399:11
402:16 406:7,9
420:3,5,18 421:15
422:25 423:7 426:3
468:24 469:2
**managed (3)**
171:4 387:2,5
**management (18)**
195:24,25 196:8
200:20 201:9
354:17 358:5 375:8
387:8 394:21,24

395:16,19 397:3,5
397:15,15,17
**manager (6)**
373:14 390:2,3 398:2
399:21 425:25
**managers (30)**
168:2 171:17,19
194:15,16,19,21
195:6,20 200:25
367:5 369:5 373:17
374:24 377:5,8
378:13,16 382:7,9
382:19 383:15,19
384:19 386:6,9
387:3 389:20,23,24
**managing (10)**
21:24 182:11,25
235:21 241:18
253:16 340:6
352:12 360:15
419:9
**manner (1)**
18:12
**Mar-Bow (83)**
3:10,15,19 6:6,9,12
6:14,16 8:20 9:18
16:11,13,16 20:11
20:14,19,23 21:3,12
21:18,20 22:8,13,20
22:23,24 23:7 24:8
24:9,12,23,25 25:3
25:15,20 26:8,13,17
27:5,7,13 28:8,13
30:13,14,17,22,24
30:25 31:3,5,20,24
32:4,8 41:10,24
42:3 55:7 58:19
59:4,6 61:11 64:13
145:5 152:23
179:24 208:8,18,19
208:24 233:3 296:2
408:6 431:13 438:2
439:10 443:19
472:13 475:10
480:4,4,14
**Mar-Bow's (9)**
9:15 10:19,20 41:18
63:10,22 64:11
466:11 480:5
**mark (17)**
1:24 2:9 5:16 7:2
41:12 48:5,6 146:13
155:21 256:21
279:3 284:7 290:17
370:19 424:22
479:8,25

**marked (18)**
26:14,17 41:11,15,19
48:11 75:3 279:17
281:8 288:8,10,21
290:21 291:10
335:11 371:2
424:25 438:5
**marker (1)**
439:21
**market (3)**
29:3,14 408:12
**marketing (1)**
359:7
**marriage (2)**
259:25 479:19
**married (1)**
259:8
**Marsal (1)**
161:22
**Marsal's (1)**
161:23
**Marston (1)**
476:6
**Massi (2)**
475:8 478:2
**massive (2)**
415:13 416:6
**Master (3)**
424:23 425:11 480:13
**MasterCard (2)**
334:9,11
**mastered (1)**
101:24
**match (2)**
29:6 381:25
**matched (1)**
146:8
**matches (2)**
385:5 434:13
**material (10)**
93:6 112:18 129:2,3
140:22 186:15,16
186:16 334:2,5
**materials (5)**
375:17 376:2,20
377:4 378:12
**math (4)**
410:24 426:21 429:3
429:5
**mathematically (1)**
413:15
**Matt (1)**
110:21
**matter (27)**
5:5 18:8,9 21:15 34:4
37:17,19 116:16

135:23 138:12
233:21 244:21
252:14,16,16,17,18
313:9 314:7,16,19
364:2,12 399:24
468:9 476:4 479:21
**matters (16)**
38:4 124:12,12,13
137:20,21,21,23
339:4 400:3 403:22
403:23 404:4,5,6
468:19
**Matthew (5)**
4:22 5:13 44:11 86:6
349:6
**Mayo (2)**
34:18,23
**McCARTHY (1)**
3:10
**McKinsey (659)**
4:3,8 5:21,25 6:4
23:24 24:3 26:2
32:25 33:15 39:16
40:8,11 45:11 48:19
49:10,20 50:13
51:21 52:6,22 53:9
53:22 57:11 60:2
63:19 65:6,10,16,25
66:4,18,21 67:23
68:12,14,16 69:9,21
69:24 70:4,6,8,10
70:23 71:4,5,11,18
71:21,23 72:3,13,23
73:6,7,25 74:5,15
74:15,22 75:3,15,19
75:24,25 76:3,14
77:8,15 78:11,18
79:3,14,19,22 80:13
80:15,25 81:2 82:2
82:9,12 84:18 85:18
85:19 86:21 87:9,21
88:6,9,12,14,18
89:6,15 90:3 92:19
94:23 95:4,5,8,16
95:23,24 96:4,25
97:11,19 98:12
99:25 100:8,17,21
100:24 101:24
102:6,6,9,13,17
103:21,22 104:4,8
104:11,20 105:2,2,9
105:21,24 106:3,13
106:15,18 107:17
107:20,25 108:9
110:25 116:9,11,19
119:2,3,9,17,18,21

119:22 120:6,13
121:5,23,24 124:8
124:16 125:17,19
125:20,22,24
126:22 127:5,9,10
127:14,24 128:6,15
129:12,21,23 130:4
130:15 131:10
133:23 135:3
136:17 137:4 138:2
138:5,16 139:2
141:16 142:10,15
142:16,18 144:4,22
145:21 146:4,9,21
147:24 150:10
155:2,25 156:7,10
156:12,15 157:3,8
157:14 158:14,20
159:12,16,18,19,24
160:2,14,19,24
161:8,14,17 162:2
162:20,21 163:12
164:2,13,15,19,21
165:9 167:12,18,24
168:6,9 169:4
171:24 172:2,9,12
173:3 174:17,19,21
174:22 175:9,12,17
175:19,23 177:9,12
177:15,19 178:5,9
178:16 179:6,10,11
179:22 180:8,13
181:14,21 182:18
182:19 187:13,23
188:5,7,9,10,17
189:5,7,9,12,16,21
189:24 190:3,24
191:6,16,19 192:5,9
193:23 195:16
196:21,22,24
197:19 198:12,22
198:25 199:2,13,15
199:18 200:4,7,10
202:4,6,10,11
203:13 204:15,20
205:10 206:5,15,24
206:25 207:20,21
214:4 216:4 221:23
222:15,19,22,23
223:8,18,19 224:3
224:12,25 226:21
227:3,17 228:3,10
228:16 229:12,19
230:6 232:6,9,22
233:7,10 234:17
235:15,16 237:3,14

240:23 241:10,25
242:12,13,20,25
243:12,15,17
245:22,24 246:25
247:4,19 248:12,23
249:8,11,15,19,22
251:20,23 252:5,25
253:20,25 254:7,13
254:25 255:2 256:8
256:15,18 257:5
258:2,8 261:17,17
262:6,7 264:15
265:23 266:24
274:2,16 275:14,22
275:24,25 276:2,6
276:16 277:8,14
278:9,21 280:7
281:20 285:5 286:3
294:7,25 296:5
298:21,23,24
300:21 301:21,21
302:6,7 306:15,19
308:5 315:6,7,8,10
315:14,17,18
316:19,23 317:18
317:19 318:16,21
319:2,10,12 320:9
321:21,21,25
322:14,21 323:11
323:17,22,23 324:3
324:14 325:10
327:2 329:13,16
331:3,14,16 333:2,5
334:18,19,20,22
335:3 336:2 343:9
345:9 354:7,8,11,14
354:22,24,25
355:10,12,13,15,18
356:13 357:13
358:2,6,17,24 359:4
359:8,17 360:3,8,11
360:14,15,18 361:7
362:2,7,14 363:3,6
363:7 364:6 365:14
365:15,21,23 366:4
370:7 377:19,22
391:3,24 393:9,11
398:4,12 400:10
401:5,19 402:23
403:4 404:11,25
405:2,5,7,9 406:2
408:8,9,20,22,23
409:3,11,11,18,21
410:10,18 411:24
413:13 415:12
416:5,10,11 418:19

418:21 419:3,8,11
419:14 420:9,24
421:2,3 422:19,20
422:20 423:7,11,15
424:7,13,23 425:11
430:20 431:20
432:21 434:25
435:8,16,23 436:7
436:10,11,15,19,22
436:24 437:11
439:7 444:5,17,18
445:7,9,14,21,22
446:2,2,9,13,15,16
446:25,25 448:16
449:16,23 450:16
450:19,24 451:10
451:13,15,18,22
452:18 453:9,14,16
453:21 454:6
455:10,12,13,15,25
456:8,10,14,15
457:4,13 458:14,24
459:3,13 460:10,18
461:5,21 462:5
463:6,10 464:7
465:12 466:25
467:10 468:7,8,10
469:16,22 471:10
471:16 475:19,22
476:23 477:13,19
480:13
**McKinsey's (107)**
24:6 25:7,7,19 38:14
38:23 46:4,7 47:8
47:13 48:19 51:6,10
51:12 55:2 64:25
71:7,15 72:8,10,14
72:16,17,19 74:3
75:6 76:5,13,19
78:7 87:13 103:9,19
106:5 108:19
109:15,15 110:23
115:24 124:6 126:4
132:12,15 133:25
137:16 145:23,24
146:2 153:11 162:6
168:18 169:22
175:3 186:4 190:10
190:11,13 197:21
205:20 207:9
213:14,19 214:10
222:25 226:23
229:22 239:12
249:24 275:18
276:2 282:23
284:20 285:24

286:9 287:18
289:20 292:22
315:5,13 319:7
322:23 328:2
334:14 355:7 357:7
359:19 394:17
401:23 402:14
405:7 407:4 408:13
409:5 413:12
414:23 425:15
428:11 429:21
433:9 436:4 439:24
450:4 457:24 458:4
463:8 465:5 477:15
**McKinsie (2)**
69:25 476:2
**mean (50)**
20:16 23:10,22 63:10
64:11 75:2 83:13,16
83:17 91:14 99:5,12
99:14,15 104:6
119:24 120:5
132:19 135:5
144:14 160:21
176:8 184:25 185:8
186:8 187:15,16
192:18 217:20
219:10 228:4 271:2
273:12,13,14 280:2
284:20 320:20
337:10 366:12
397:11 399:22
426:20,23 428:22
434:25 451:15,17
460:17 473:7
**meaning (2)**
86:15 106:6
**means (11)**
165:8 178:8 186:16
187:25 191:23
226:5 230:7 246:24
246:25 365:16
461:7
**meant (4)**
60:10 82:4 190:9
329:19
**media (22)**
5:3 38:21,24 39:25
40:2 51:4 75:7,17
76:8,10 77:2,9,16
77:17 265:4 292:5,8
296:10 476:2,3,8
478:6
**medium (1)**
462:16
**meet (11)**

35:18 82:17 167:17
168:6 209:6 220:7
253:7,8 266:6,13
303:3
**meeting (27)**
36:20 83:2 171:22
213:22 219:13
222:24 249:14,16
249:23 253:12
256:3 258:8 259:15
260:3 262:14,15
263:11 266:17
267:2,3 268:13
271:14,16,25
280:23 285:22
360:20
**meetings (29)**
36:22 171:20 212:15
212:20 218:25
219:3,4,5 220:10
262:13,17,18,20,24
266:2,4 268:19
270:12 271:10,14
271:21 272:4,10,11
272:15,16 273:10
294:5 475:25
**member (23)**
19:9,12,14 20:8 32:15
217:16 218:20
219:13,18 220:5
332:8 333:19
345:22 357:2,4,5
362:24 363:6,13
418:17 466:16,17
470:10
**members (31)**
40:25 175:14,24
176:3,4,7,7 177:16
212:7,9 213:3,11
215:12 216:3 217:6
217:10,22 218:5,9
218:21 220:8 222:7
222:11 275:24
330:10 347:24
352:10,12 354:20
356:8 357:24
**memorandums (1)**
376:11
**mention (3)**
87:19 110:13 221:10
**mentioned (18)**
17:2 18:17 30:16 43:6
48:22 63:9 74:17
75:7 110:7 115:14
166:4 174:15
311:23 427:17

460:6,20 475:21
478:5
**menu (1)**
167:15
**merchant (6)**
184:14 187:2,3,12
201:16 356:24
**merge (1)**
256:14
**merged (1)**
454:20
**merit (3)**
289:18 290:3,5
**message (1)**
477:12
**messenger (1)**
136:20
**met (32)**
7:8 35:20,23 36:11
37:15,18 38:2 61:24
211:16,20 212:2,24
217:8,23 218:4,10
218:16,18,19,21
223:4 226:9 241:15
241:16,17 249:20
253:11 257:23
270:18 314:13
437:6,7
**method (2)**
78:25 426:25
**methodology (2)**
463:18 464:19
**MI (2)**
3:16,21
**Michael (2)**
3:6 44:21
**Michigan (2)**
43:19 219:20
**mid (2)**
425:18 436:5
**middle (10)**
183:13,14,20 186:21
187:11 239:2 260:2
359:2 439:20 445:2
**milk (1)**
415:8
**Miller (3)**
44:19,21,24
**million (44)**
27:8 119:21 193:22
194:3 391:15,15,16
395:2,2 396:3,4,6
406:10 409:6,7,24
409:25 411:3,5
413:7 414:6,16
421:15 423:16

424:8,17 425:13
426:9 427:16,22
428:5,7,10,12,20
429:8,11,24 430:11
430:24 433:9,14
439:2,5
**millions (5)**
190:12 196:21 197:9
310:25 455:5
**mine (2)**
48:3 474:13
**mines (1)**
201:20
**minimal (1)**
464:9
**minimis (30)**
81:24 83:25 92:9,11
93:17,25 94:6,8,9
94:14,21 95:2
112:21,23 113:8
118:21,22 119:20
119:22,24 120:2,22
120:25 121:8
140:22 333:16
334:3,6,8,16
**minimizes (1)**
196:5
**mining (2)**
260:7,9
**minor (3)**
15:14 343:6 416:13
**minority (4)**
91:7 196:10 342:18
345:14
**minus (1)**
18:24
**minute (4)**
54:7 65:19 437:18
438:20
**minutes (7)**
53:20 188:15 281:10
291:22 302:5
345:22 438:10
**MIO (239)**
72:4,6 73:24 74:6,7
99:25 145:10
150:19 151:24
154:8,11,13,16,21
154:24,25 155:3,8
155:12,17 156:2,22
157:4,10,16,18,21
158:9,18,21 159:4
159:14,24 166:14
166:18,24 167:10
167:16,25 168:2,4,5
168:11,13,16,17,18

168:25 169:16,17
171:21,22,25 172:6
172:10 173:5,19
174:5,6,6,17,19,23
175:3,10,11,22
176:12,13,15,17,19
176:20,25 177:5,8
177:11,13 178:4,6
178:17,19,23
179:10,17 180:12
180:12,19 181:2,11
181:12,18,20
182:24 183:4,7,24
184:8,18,22 185:8
185:17 186:20
187:12,14,16,18,21
187:25 188:16,23
188:24 189:3,8,11
191:16,23 192:4
194:5,14,19 195:5
195:23 196:4,7
199:18 200:4
317:23 326:22
327:16,21 329:3,5
329:10,12 332:16
342:7,8 345:3,6,10
348:11,22 353:14
353:19 354:6,23
355:3,9,17,22 356:9
356:16,18,22 357:3
357:4,5,10,12,15,17
357:22 358:15
359:11,12,15
360:10,12 362:8,12
362:17,24 363:6,16
365:5,16,23 366:3
366:11 369:21
370:6,13 371:8,14
372:8 373:16,24
375:18 379:4,21
382:9,18 383:13,23
384:10 385:19
386:5 388:13,18
390:21 391:12,16
391:20 394:12,14
394:16 395:9,10
396:5,14 398:2,13
399:19 401:5 402:4
402:8,9 404:11,15
404:16 405:4,21
406:12 407:2
424:13,19 425:12
432:18,25 433:21
434:5,8 436:16
439:22 440:17,17
458:11 464:4

**MIO's (20)**
160:13 168:11 172:8
182:6,11 193:21
195:18 200:23
367:25 368:2,6
394:18,23 395:4,23
396:17,25 400:5
441:25 442:16
**Mirant (2)**
451:16 454:20
**mischaracterizatio...**
93:11 161:5 248:22
249:3
**mischaracterize (2)**
471:4,8
**mischaracterizing (2)**
241:7 248:19
**misconduct (14)**
23:23 24:4,6 25:8,19
38:23 39:15 40:7,10
45:11 213:14 222:8
266:24 305:13
**misleading (5)**
230:11 245:3 312:20
462:25 469:2
**misled (4)**
205:23,24 208:8
214:9
**misreads (1)**
295:5
**misrepresent (1)**
60:14
**misrepresented (1)**
169:19
**missed (1)**
65:15
**missing (19)**
68:23 81:11 99:21,21
99:22,23,24,25
162:7 258:22 312:8
312:9 322:10
345:11 450:9 458:7
458:11,13 464:15
**Mission (5)**
451:16,17,21,24
454:19
**misstate (1)**
60:13
**misstatement (1)**
96:24
**misstates (11)**
25:10 53:25 79:8
139:19 153:2
185:11 217:25
245:12 274:6
295:10 324:21

**mistake (2)**
151:4 462:20
**mistakes (6)**
149:15,16,20,21,22
151:5
**MLP (1)**
28:10
**mm-hmm (6)**
27:16 43:13 77:6
173:25 179:8
304:14
**model (15)**
101:24 102:18,18
289:21 358:17,18
358:23,24 360:23
361:14 362:2,3
397:11 404:22
405:19
**models (1)**
330:12
**Molino (3)**
254:6 277:7 417:2
**moment (1)**
337:21
**money (76)**
141:11 168:10 171:9
174:21,22 190:13
196:21 197:3 200:7
201:24 202:2,16
265:5,7 343:11
345:10 357:11,12
359:9,10,12,15
360:10,16 369:14
384:19 391:24
395:13,17 397:3,14
398:2 400:7 402:18
402:20,22,23
404:25 405:3,5,6,8
406:3,5,7,9 407:3
409:9,10 413:7
414:16,18,18 415:3
416:13,15 417:15
417:16 418:7,10,11
418:12,14 419:10
419:15 420:3,5,19
421:6 422:3,11,23
423:7 436:16 467:5
467:12
**monies (2)**
377:7 378:15
**monitor (1)**
258:15
**month (9)**
138:7 156:25 157:2
169:20 205:15
253:5 327:20

**435:14 445:20**
**months (17)**
21:10 54:7,8,8 107:2
138:10 140:12,13
222:24 223:9,10,10
261:5 266:6,12
296:17 442:23
**morning (7)**
7:6,7 33:5 34:21,22
75:2 228:24
**Morrison (1)**
109:7
**motion (21)**
25:25 41:19 42:25
95:7 97:25 98:9,11
155:23,24 157:12
162:25 163:3
166:11 226:21
240:23,25 360:25
438:3 439:11 480:5
480:15
**motive (1)**
265:4
**motives (1)**
241:8
**mouse (2)**
128:16,17
**move (19)**
52:18 62:14 63:21
90:10 102:4,19
122:15 158:3
165:20 199:23
208:2 256:11
266:20 301:3
361:16 407:5,6,7
452:17
**moved (3)**
14:11 121:7 226:20
**moving (1)**
206:12
**multipart (1)**
353:25
**multiple (6)**
218:21 282:21 293:4
294:21 306:8 311:4
**Murray (2)**
3:12 37:7
**musicals (1)**
16:4
**mute (1)**
70:20
**mutual (5)**
290:14 352:15 374:24
375:12 399:20

——————————
**N**

**N (5)**
3:2 4:2 270:2,2,2
**name (38)**
5:13 15:25 16:6 17:13
24:13,17 33:11 34:3
36:24 45:2 62:20
67:24 99:6,8,12
100:21,25 105:19
132:4,5,12,25 134:3
139:15 143:17
161:9 198:20
223:23 233:18
253:18 256:20
321:4,8,9 375:7
399:18 481:3,4
**named (15)**
21:7,22 37:23 45:7,13
45:16 53:7 111:16
114:19 132:18
134:4 144:19
418:17 419:18
476:15
**names (46)**
71:2,13 72:25 79:2,12
79:12 88:13 99:13
99:17,21 100:9
101:2,4,5,9,10
114:18 134:12
151:7,8 153:10,16
155:13,16 156:18
156:19,21 158:8
240:4,11,17,19,24
240:25 257:2
270:25 277:3
317:15,20 350:11
350:15 451:21
464:2,9,11 473:20
**Nancy (2)**
43:24 110:9
**national (1)**
470:20
**natural (7)**
24:18 25:21 70:8,22
201:18 259:10
386:11
**nature (11)**
103:19 119:16,17
120:5 122:25 123:2
138:3 142:22 221:4
330:3 442:13
**necessary (2)**
57:18 254:15
**need (26)**
86:22 94:17 112:23
118:22 121:9
172:24 177:19

**197:25 198:2 203:5**
220:22 250:13
253:4,4 260:14,17
342:6 344:14
377:22 394:9,10
407:4 434:8 444:9
457:25 468:13
**needed (11)**
57:9,11 161:14
214:23,24 220:17
231:11 253:2
256:19 384:24
392:14
**needs (18)**
112:13 113:15 117:22
138:17 143:21
200:16 203:12
210:23 213:9 215:6
220:16 222:19
265:19 266:19
322:4 326:10
400:22 401:3
**negligible (1)**
95:21
**neither (2)**
179:9 352:5
**netted (2)**
341:19 423:15
**network (1)**
359:19
**Nevada (1)**
43:25
**never (59)**
73:24 74:5 102:3,4
109:17 115:12
156:19 158:11,13
164:3 166:2 171:19
171:21,23 172:4,25
176:18 187:14,15
187:19 199:14
200:10 216:11
224:20,23 225:25
240:15 249:8 252:4
252:5 254:20
267:25 268:3,21,23
273:25 274:9,14,15
294:6 324:23
328:18 333:6 358:2
367:24 368:6,8
375:24 379:19,21
380:3 384:9 402:8
406:11 432:12
452:2 455:17 459:7
467:2
**new (35)**
2:8,8,12 3:5 4:9 5:10

**5:10 36:8 49:22**
75:2,4,10,12 102:17
139:2 156:18
188:24 227:22
228:6,8 271:25
302:17 360:13,13
360:17 415:9
473:11,22,23
474:16,22 476:7
479:4,6,11
**News (8)**
273:16,24 274:14
290:18,21 292:3
305:7 480:10
**newsletter (2)**
384:10 385:5
**newsletters (12)**
383:23 384:7,16,18
384:22,23 385:19
385:23 386:4,4
387:10 388:25
**newspaper (1)**
119:11
**newspapers (1)**
406:6
**nice (1)**
404:19
**NICHOLAS (1)**
4:11
**Nick (1)**
6:3
**night (1)**
443:15
**NII (3)**
258:9 287:5 303:18
**nine (7)**
65:14 223:10,19
412:8 440:12
442:23 451:14
**nine-page (1)**
67:21
**nodded (1)**
308:16
**nodding (3)**
267:20 308:11,17
**noise (1)**
70:18
**non-US (1)**
338:10
**noncompliance (2)**
66:25 292:24
**nondisclosure (5)**
312:12 313:9 314:18
314:19 462:6
**nondisclosures (2)**
312:15 313:10

**nonlending (1)**
194:9
**nonpension (1)**
357:11
**nonquestion (1)**
460:4
**nonresponsive (2)**
52:19 90:17
**noon (1)**
34:22
**normal (1)**
377:23
**normally (2)**
184:13 207:4
**North (4)**
4:16 224:21,23
355:11
**Northwestern (1)**
3:15
**Notary (4)**
2:11 7:2 479:10
481:24
**note (4)**
60:2 106:24 380:5
393:24
**notebook (3)**
250:20 262:11 267:4
**notebooks (15)**
134:11 144:15 262:11
267:2,6,17 268:2,3
268:5,12,15,17,22
268:24,25
**noted:5:49 (1)**
478:14
**notes (5)**
250:20 262:10,12,19
267:3
**notice (4)**
255:18 264:20 336:18
449:7
**notification (1)**
146:14
**November (3)**
78:22 441:23 443:11
**NRG (51)**
363:8 444:18,20
445:8,11,14,22,25
446:10,13,15 451:3
451:14,15,24 452:3
452:21,24 453:7,16
454:2,7,12,14,16,17
454:20,22 455:2,4
455:19 456:7,11,15
457:4,14 458:23,24
459:5,7,12 460:9,15
460:20,22,23 461:5

461:7,12 462:7,7
**nuances (2)**
83:22,24
**number (45)**
5:3 24:7 65:9 143:9
147:18 249:18,22
257:23 258:10
263:6 275:18 284:7
335:22 354:3 356:8
356:12,22 409:17
410:15 426:25
427:8,10,15 428:19
428:21 429:6
430:13,16,17 431:5
431:10,13,14
434:13,14,16,16
439:16 443:22,23
449:22,25 451:18
473:2 480:3
**numbers (8)**
149:19 247:9 301:8
420:21 427:5,12
428:23 439:18
**numerous (1)**
310:4
**nuts (2)**
343:15,23
**NY (2)**
3:5 4:9

_____

**O**

**O (3)**
270:2,2,2
**o'clock (2)**
34:22 36:9
**O'Shea (138)**
3:6 6:5,5 11:21 23:25
25:10 26:19 31:8,17
31:22 36:22 38:7
39:17,19 41:2,5,9
41:14 47:20,25
48:12 52:24 53:25
56:21 59:23 61:15
63:25 66:10 67:15
79:8 80:2 81:5,13
82:23 84:7 85:9
86:5 89:22 90:12
97:16 110:18
122:23 133:5 134:7
139:18 144:6
146:12 152:25
158:5 172:14,18
173:11 181:22
185:11 189:25
199:21,23 204:5,11
210:8,15 217:25

221:25 228:19,25
229:6 237:6 238:5
238:10,19,23 239:8
245:12 247:6
267:13,19 274:5,12
277:17,23 279:7,11
279:21,25 280:11
280:18 283:6,18
290:25 293:21
295:3,17 297:5
301:2 303:23 304:4
312:17 313:25
315:25 316:7,13
324:20 335:4,16
336:11 337:9,12,16
337:20 338:2 347:4
349:5 392:21
396:10,16 409:13
415:16,23 416:3
417:10 423:7
437:20 438:13
444:23 445:4 452:5
452:9,13 457:6,9
459:16 465:17,20
466:4 469:5 471:17
471:21 478:8
**oath (2)**
12:2 163:14
**object (20)**
52:17 59:23 63:20,25
90:9,12 122:14
152:25 158:3
165:20 207:25
210:15,18 247:6
274:5 283:18 295:3
301:2 457:9 460:3
**objected (2)**
156:5 206:9
**objection (131)**
7:17 8:7 9:18,22,24
10:19,20,21 11:3,10
23:25 25:10 26:12
26:12,16 27:7 39:17
40:17 41:10,16,16
41:22,23 53:25
58:18 59:5,22 60:10
60:20 64:17 66:10
69:2 79:8 81:5,13
82:23 84:7 89:22
90:15 97:16 122:23
139:18 144:6 145:5
148:25 152:23
154:2,4 159:11
177:4,22 180:10,19
182:21 185:11
192:21 193:13

195:5 210:8 213:21
217:25 221:25
226:23 227:2
228:19 230:6 233:3
237:6 245:12 246:7
247:19 266:20
301:19 312:17
324:20 326:22
343:20 364:25
370:16 371:5,17,22
372:8 373:23
374:15 377:3 378:4
378:9,25 379:17
380:5,20,24 381:10
382:4,16 383:3,11
383:22 384:9 385:6
385:8 390:9 392:24
393:2 394:5 400:2,4
403:23 407:15
408:6 414:11
415:16 425:10
428:9 431:14
434:11 439:2
440:11 443:19,19
450:18 459:16
460:7 462:4 464:15
466:11,20 469:5
480:3,4
**objections (3)**
22:25 226:20 296:2
**objective (1)**
390:16
**objectivity (1)**
393:23
**objector (1)**
20:12
**obligated (3)**
127:12 234:19,20
**obligation (12)**
198:4,4,22 332:19
403:6 436:20,22,24
437:7 459:18,24
460:9
**obligations (3)**
339:10 352:21 364:16
**observed (1)**
244:24
**obtain (2)**
28:13 193:18
**obtained (1)**
193:15
**obviously (2)**
30:20 336:11
**occasionally (4)**
383:25 387:11 389:3
389:4

**occasions (4)**
219:25 223:3 282:21
459:6
**occur (1)**
191:24
**occurring (2)**
447:19,19
**October (20)**
14:6 85:17 208:11,18
209:2,7,15,17 212:6
253:6,12 255:11
259:13 271:16
272:2,24 276:14
280:23 289:9
442:25
**odd (1)**
232:11
**offender (1)**
324:4
**offense (1)**
214:17
**offer (8)**
61:13 62:5 125:20
186:11 276:20,21
288:5 335:16
**offered (4)**
61:10 167:11 168:15
287:16
**offering (9)**
169:7 275:25 375:16
375:25 376:11,18
376:19 377:4
378:12
**offerings (1)**
169:6
**offers (4)**
276:16,16,22 287:15
**office (19)**
3:14 16:18,19 17:11
36:9 187:18,18,22
188:2,4,8,16,24
189:9 192:7,9 253:9
271:25 331:7
**officer (2)**
21:19 333:12
**officers (6)**
20:21 21:2,18 22:4,13
367:5
**offices (13)**
2:7 187:20 188:3,7,11
188:17 189:3,5,12
189:12 192:3,14
342:23
**oh (16)**
37:24 131:6 142:25
187:19 219:8 233:4

246:22 259:2
260:12 278:18
321:7 341:23 368:8
383:5 385:15 429:5
**okay (141)**
10:14 12:9,19 15:5
18:7 20:16 26:11
27:4 32:3 35:17
37:4 40:4,20 42:8
43:15 49:15 52:12
55:4 56:18 59:18
60:23 64:23 66:3,16
67:12 68:2,11,23
69:7,12 73:13 74:4
80:24 82:15 83:12
94:23 106:15 110:2
115:13 118:20
144:13 155:16
173:10 176:10
177:21 178:23
179:14 182:5
186:19 189:16
192:16,24 193:12
194:13,18 216:16
217:2 219:9 225:9
230:14 246:22,24
247:24 249:5
257:17 272:3,20
273:23 279:5 287:9
288:2 289:25
290:15 291:20
292:2 293:9 296:13
297:15 298:9
299:11 305:6
306:24 307:10
309:19 313:20
314:24 328:10
348:25 350:18
351:6,16 353:10
362:21 366:7 369:4
373:20 375:9,15
376:5,13 377:13
378:24 380:4,11
381:15 382:2,15
385:15 386:16
390:11 392:4,19
394:11 407:18
410:13,24 412:22
416:3 424:17 426:5
427:20 428:2,8
436:13 439:8 440:7
441:7,17,21 442:3
442:19,21 443:9,17
444:13 445:17
446:8,24 462:2
477:22 478:7

**old (13)**
3:20 103:3 120:9,10
120:10,11,11,12,12
138:25,25 239:19
302:12
**omission (4)**
244:25 245:2 304:24
305:14
**omitted (1)**
234:18
**omitting (1)**
304:24
**once (12)**
46:12 50:17 71:11
102:2 103:21 225:5
228:3 241:9 255:6
256:10 403:2,5
**ones (14)**
17:21 41:17 45:15,18
67:2,7 74:16 103:12
159:8 233:19 461:2
468:2 476:24 477:3
**ongoing (4)**
98:21 199:5 222:13
455:9
**open (5)**
29:3,13 144:14
447:21 459:20
**opened (3)**
205:19 268:11 306:4
**operate (1)**
189:3
**operates (2)**
374:8 397:16
**operating (1)**
183:23
**operation (1)**
388:18
**operations (3)**
182:7 366:3 394:17
**opinion (13)**
43:17 108:7 109:9,20
195:17 214:9
238:10,11 244:22
245:19 318:25
320:9 323:18
**opinions (4)**
226:13 245:15 248:10
251:2 319:11
**opportunities (3)**
272:4 294:22 361:4
**opportunity (10)**
23:16 25:5,16 272:21
278:6 293:25
295:23 393:25
394:3 471:22

**opposed (1)**
77:16
**option (3)**
167:14 373:25 375:19
**options (13)**
167:10,16,19 168:11
168:14 371:15
372:9,16,20 373:2,6
373:12 384:14
**orchestrated (1)**
277:2
**order (37)**
10:4,8,13,15,21,24
31:10,13 35:21,24
35:25 36:6 38:9
57:24 59:24 61:20
61:22 62:8,13 64:7
70:10 157:17 159:3
279:9 293:21,23
295:13 297:3
300:19 301:6,14
309:9 335:18
336:17 403:3 428:8
438:24
**ordered (10)**
37:13 155:2,25
156:24 157:10
158:14,24 311:9,12
415:19
**ordering (1)**
35:22
**orders (1)**
121:21
**ordinarily (1)**
33:20
**ordinary (2)**
33:20 220:2
**organization (1)**
358:22
**organizing (1)**
56:4
**original (9)**
10:18,19 11:3 13:13
41:23 193:16 249:6
273:7 432:7
**originally (2)**
200:22 272:23
**Orr (1)**
256:17
**outcome (7)**
120:24 164:7 235:17
235:23 244:23
404:24 479:20
**outlet (2)**
292:5,8
**outlier (2)**

331:16,18
**outline (1)**
56:12
**outright (1)**
299:19
**outside (19)**
85:23,25 86:20 87:8
97:14 103:3 122:12
126:21,24 138:11
215:21 225:10
295:12,15 312:18
357:22,25 358:6
402:25
**outsider (1)**
170:13
**outsized (1)**
361:3
**overlap (6)**
448:21 449:2,3,8,14
449:19
**overlaps (3)**
447:20,22 450:11
**oversee (4)**
214:15,22 220:19
222:11
**overseen (2)**
222:16 356:12
**oversees (3)**
223:5,20 367:16
**oversight (2)**
355:6 462:20
**oversimplification (3)**
114:16 233:16 431:18
**overview (1)**
307:23
**owned (11)**
15:11 180:7 340:5
342:8,12 357:22
398:4 425:12,13,25
432:4
**owner (8)**
13:23 14:2 15:2 20:13
20:23 91:7 437:14
466:13
**owners (3)**
22:5 27:25 129:14
**ownership (5)**
15:14 17:22 18:2
344:23 434:22
**owning (1)**
192:17
**owns (4)**
27:8 202:16 365:21
367:13

_____

**P**

**P (4)**
3:2,2 4:2,2
**p.m (13)**
269:5 270:3,5 291:3,6
349:11,14 407:24
408:3 437:24 438:8
478:13,14
**page (109)**
26:22,23 42:6 55:12
56:14 65:14 85:7
86:22,23,25 125:3,4
139:23 177:23,24
179:2 180:10,11,24
194:11 279:19
280:21,22 286:7,8
286:15 289:13
292:18 293:15,16
293:16 297:10
304:8,12,13,15,19
305:16,17,23
336:20,21 337:8,9
337:10,14,15,18,19
337:19,20,23
338:15,16,18,20
339:24,24 340:3
351:20,21,24 365:6
365:7,8,9 370:17,18
372:5,24 378:18
379:9 380:23 381:2
382:11,14 383:4
394:7,8 407:16,17
407:18 408:6,18,19
409:16 410:16,17
423:4 426:7,10
428:6 439:15,16,20
440:12,13,14
443:22,23,24 444:5
444:25 445:2,18,18
446:7,22 480:3
**PAGE/LINE(S)/ (1)**
481:5
**pages (10)**
65:14 282:2 294:12
327:10 337:24
380:8,22 428:22
440:18
**paid (10)**
28:3 29:15 30:11 35:9
390:13 408:23
409:12 415:3
472:21 476:25
**painstaking (2)**
145:20 146:17
**paper (1)**
307:24
**papers (2)**

16:15 180:3
**para (1)**
86:24
**paragraph (141)**
42:5,6 55:6 61:8
64:17,21,22 68:8
76:17 77:14 80:17
84:25 85:13 86:16
87:8 104:25 118:25
121:18 122:7
123:22 132:2
146:20 153:23
173:21 177:22
178:4,24 179:4
180:9,24,25 194:5
194:10 196:16,18
198:11 279:20,24
280:20,21 285:14
293:20 297:11
298:14,16,18
326:21 329:11
336:21 337:6,16,17
338:4,15,19,21
343:19 351:19,25
353:8,9 364:21,24
365:7,18,20 368:10
368:14,15 369:9,10
370:15 371:5,18,21
372:5,12,22 373:4
373:19 374:4,6
375:22 376:13,14
378:3,8,10 380:6,9
380:13 381:4,16,18
382:3,13 383:6,10
383:12 384:5 385:2
385:7,16 386:10,13
386:18,20,22
388:21,23 394:4,6
394:11,13 396:7,13
407:14,18 408:5,15
408:18 409:17
410:15,16,17 423:3
425:10 426:10
439:18 440:9
443:18,24 444:3,10
444:11 445:3,4,17
447:7,8 461:14
**paragraphs (7)**
68:7 192:20 193:2
194:7 284:22 380:8
389:21
**paras (1)**
423:25
**pardon (2)**
61:3 230:24
**paren (2)**

340:11,15
**parent (21)**
15:22 338:9 342:15
342:16,17 355:18
357:7 363:8 366:17
366:24 367:2,12,15
368:17 394:15
453:21,25 454:4
455:8,11 461:20
**parent-sub (1)**
460:19
**Paris (1)**
253:8
**parse (1)**
230:19
**part (48)**
17:3 47:6 51:24 54:14
59:7,9,20 66:6,24
95:17 101:21,23
110:24 119:7
124:17 133:19
175:11 181:10,13
181:16,21 183:7
188:9 196:17
202:16 203:17
204:13 205:8
228:17 229:13
239:11 248:15
266:24 286:19,20
286:20,21,22,24
299:5 348:16
380:19 383:3,10
387:22 432:15
458:4 462:17
**participant (2)**
264:24 471:3
**participants (4)**
372:14 373:7 374:2
374:11
**participated (1)**
7:16
**participating (1)**
249:16
**particular (2)**
42:9 102:16
**particulars (1)**
365:4
**parties (62)**
57:19 71:9 73:3 79:7
87:14 104:3,15,19
117:10 120:17,19
123:11 125:17
128:22 129:14,25
130:12 133:11
140:15 143:12
145:9,16,18 146:6,8

149:3 150:6 151:21
153:12 161:9,18,20
162:4,6,15,22 163:6
235:10 252:19
265:17 337:3 338:6
339:8,20,21,22
340:17 341:4,13,16
347:11,20,22
352:18 400:21
429:14,19 434:19
448:6,19 464:23
479:18
**parties' (1)**
79:16
**partner (9)**
167:11 241:18 253:17
419:9,11 474:12
475:3,15,18
**partners (29)**
3:10,15,19 16:13
19:20 42:3 92:16
167:17 168:7,9
169:4,23 173:4
178:9 180:12
212:22 339:4
343:10 354:9,14
357:14 390:21
398:15 406:2 418:5
438:3 439:10
473:25 480:14
**parts (8)**
188:5,6 387:25 392:5
392:6,7 393:11,13
**party (13)**
16:8,10 121:5,7 203:5
203:7 206:13 231:9
335:19 340:24
424:7 433:3,4
**pass (1)**
163:5
**passed (3)**
21:9 44:17 49:17
**passive (6)**
171:15 184:6 187:6
373:7,8,9
**path (1)**
263:23
**patience (1)**
251:9
**patient (9)**
251:8,12 252:23
266:8,18 287:4,8
301:12 303:8
**pattern (3)**
315:20,23 462:22
**Pause (1)**

291:4
**pay (12)**
106:22 119:21 275:23
276:13 282:5
284:11 286:10,18
287:18 294:14
334:20 477:3
**payoffs (1)**
287:16
**PBGC (3)**
89:5,8 95:14
**Peck (3)**
474:15,16 477:11
**penalties (1)**
310:16
**penalty (6)**
71:24 198:13 312:7
313:19 322:9
390:17
**pending (3)**
61:6 246:21 298:12
**pension (14)**
88:20 182:12,25
184:4 196:2,3,4,10
197:7 357:11
359:11 369:13
372:11 432:16
**Pensions (1)**
340:14
**people (110)**
15:10 17:25 36:19
43:5 45:4,10 46:2
49:5 51:12 53:7
54:10,19 64:14
70:19 112:2,9
113:10 114:10,19
115:14 139:5
141:12 149:13
175:17,22 176:11
181:12 188:11
191:25 211:18,20
213:16 214:21
216:2,10 217:21
218:15,18,20,21
219:2,16 220:7,19
222:6 231:19
232:20 245:23
246:2,3,15 252:9
267:23 270:18,19
270:20,25 271:4
292:4 318:10 321:5
321:8 325:22
328:10,12 331:8
334:20 342:23
344:25 348:14
356:2,4,9 359:9,13

359:17,22 360:17
362:7,9 367:4 368:3
395:12 398:5
404:13 414:17
415:3,12 416:10,16
416:25 417:6,6
419:10,15 420:24
421:6,14 422:9,12
422:19,22,24 427:5
472:19 476:15,16
476:17,25 478:5
**percent (37)**
13:22,25 15:2,8,17
18:14,22 148:13,16
177:14 180:7 342:8
342:12 354:6 355:2
367:20,21 382:20
383:16 394:20,20
394:22,22 395:24
397:11,12,16,17
412:24 414:22,24
415:14 421:20
422:11 425:14
466:14,25
**percentage (12)**
15:6 18:15 195:18,22
200:23 201:6
412:19 413:11,14
414:21 419:23
422:6
**percentages (5)**
18:16 344:23 415:4,4
415:6
**perception (1)**
361:19
**perfect (5)**
149:14,14 150:24,25
230:5
**performance (12)**
371:14 372:9,15,19
379:12,19 380:15
381:6,21 382:5
383:24 385:20
**performance-relate...**
379:7 381:12
**performed (5)**
119:3 121:17 137:10
337:2 338:5
**period (92)**
45:23 47:5 53:6 81:3
81:8,12 82:8,11,21
85:18,21,23,25
86:14,20 87:9,15
89:16,21 90:2,22
91:8,21 97:15
106:17,19 107:18

108:2 109:3,5,6,8
109:19,22,24 110:4
111:13,17,21,22
112:22 113:11
114:20 115:5,17,18
115:20,24 116:11
116:13,14 117:2,6
117:15 126:22
127:5 136:13
138:11 139:14
216:9 307:17
322:24 323:5,10
324:17,22 325:2,3
336:25 384:9 430:5
442:9 447:3,5
448:11 449:8,14,21
449:24 450:3,6,10
450:23 452:22
456:2,16,17,18,20
457:15 459:8,20
**periodic (10)**
379:11,18,20 380:14
381:5,20 383:22
384:7 385:5,18
**periods (16)**
90:4,5 91:4 113:5
118:7,18 215:22
238:18 244:2,4,5
376:18 447:11,12
449:5 450:17
**perjury (6)**
71:24 198:13 312:8
313:19 322:9
390:17
**permit (1)**
82:20
**permitted (2)**
110:5 114:21
**perpetual (1)**
360:25
**perpetuity (1)**
127:13
**person (26)**
149:7 219:14 244:19
249:15,18 250:10
262:9 271:25 303:5
303:5 309:24
315:17 321:5 324:7
356:13 358:25,25
359:2 363:24,25
364:13 366:15
417:24 467:21
470:13 473:11
**person's (2)**
236:19 360:15
**personal (17)**

63:13,14 66:7,17
92:22,23,23 167:8
169:12 170:6,8
357:9 362:16
379:14 380:17
381:8,23
**personally (13)**
24:17 38:21 39:13,14
40:5,6,9 166:24,25
341:6 353:6 357:8
477:9
**personnel (5)**
181:3,4,19,20 188:13
**perspective (1)**
447:16
**PESCE (1)**
4:18
**Peter (3)**
243:5,10,16
**petitioner (1)**
313:16
**petitions (1)**
410:4
**PETRELLA (1)**
3:6
**Petrillo (4)**
37:7 110:17 473:22
477:25
**phases (1)**
227:16
**philanthropic (1)**
470:14
**philanthropist (2)**
467:21 470:12
**Philips (1)**
62:21
**phone (12)**
6:18,20 14:11 37:8
70:17,20 83:3 251:5
251:17 271:21,22
286:25
**phrase (3)**
97:7 274:19,25
**phrases (1)**
10:3
**pick (2)**
271:8 477:2
**picked (1)**
457:23
**picking (1)**
430:6
**pickup (2)**
415:9,10
**picture (2)**
356:7 425:8
**piece (1)**

417:5
**pieces (1)**
15:14
**pile (1)**
47:18
**pin (1)**
462:17
**Pincus (5)**
223:11,16 224:21
263:8 421:11
**Pittsburgh (1)**
44:3
**place (18)**
21:12 27:2 33:11
39:22 42:22 252:25
280:5 281:11
282:13 294:20
295:24 296:3
337:13 355:24
378:8 423:18,24
433:16
**placed (1)**
360:7
**placement (1)**
340:10
**places (7)**
146:5 189:4 282:3
327:14 359:21
368:21 428:24
**plan (13)**
163:15,15,22,24
164:6,7,24 190:15
190:21 220:10
254:13 461:23
470:2
**planned (1)**
261:22
**planners (1)**
167:16
**planning (5)**
18:2 168:8 218:23
219:3 406:23
**plans (12)**
15:15 182:12,12,25
201:2 371:16
372:10,11,16
374:10 379:17
380:2
**platform (1)**
252:20
**play (9)**
266:8 275:23 276:13
282:5 284:12
286:10,18 287:19
294:15
**player (1)**

265:12
**players (1)**
252:19
**playing (14)**
23:18,21 25:18
128:16 130:17,18
265:12,13 324:9
468:6,8,14,19 469:3
**plays (1)**
16:4
**plead (1)**
42:25
**pleaded (2)**
206:25 252:22
**pleading (9)**
169:19 198:7 199:16
200:15 207:14
294:20 302:15
327:19 430:20
**pleadings (5)**
242:8 272:6,8 301:7
311:13
**please (24)**
5:18 6:22 48:16 56:23
70:20 87:3 190:2
204:8 222:4 238:7
238:19 239:5,10
246:22 281:3
313:25 314:2
335:23 337:22
419:22 438:18
452:10 465:17,17
**pled (4)**
306:20,21,22 311:20
**Plimpton (2)**
111:5 239:18
**plus (13)**
18:22,23,24 245:18
245:18,19,20
394:22 427:20,21
427:21,21 429:23
**pockets (3)**
201:25 356:23 422:24
**podcast (11)**
39:3,6,11 290:19
291:11,20,21
292:16 302:5,9
304:12
**podcasts (1)**
292:9
**point (24)**
40:20 49:2 54:15
67:18 72:4 97:6
103:15 113:17
127:11 128:7 133:8
141:9 156:21 158:7

256:9 264:14
282:13 297:15,16
372:25 375:2
398:18 412:12
460:19
**pointed (2)**
287:14 344:21
**pointing (1)**
136:20
**points (3)**
18:24 372:23 448:14
**policies (9)**
367:8,25 368:2,7
402:9,10,11,12,14
**policy (9)**
312:13,21,23 353:5
360:19 366:2 368:9
400:11,12 401:6,9,9
401:11,14 402:5,8
402:17,19,21
**political (3)**
217:9,15 219:21
**pollutes (1)**
130:22
**Poor's (1)**
199:9
**pop (1)**
113:8
**portfolio (10)**
338:25 339:2 348:12
373:8,8,10 383:25
387:6,12 389:3
**portion (2)**
196:3,10
**portions (1)**
295:6
**position (25)**
21:14 122:21 129:5
167:21 169:8
190:19,25 193:18
195:5 200:9 232:4
240:3,7 246:13
254:2 302:10
325:10 356:6
360:13 390:14,22
392:9 429:17
434:23 436:8
**positioned (1)**
239:14
**positions (8)**
126:14 129:13 168:23
169:25 185:21
359:22,23,24
**possession (2)**
4:16 231:10
**possibilities (2)**

118:7 143:15
**possibility (1)**
192:12
**possible (4)**
78:16 80:7 84:20
352:10
**possibly (2)**
84:11 236:4
**post (2)**
75:15 348:2
**post-petition (1)**
409:2
**posted (1)**
39:10
**posting (3)**
76:8,9,10
**postpetition (2)**
159:21 411:17
**potential (2)**
337:3 338:6
**Pottow (2)**
43:18 110:8
**power (11)**
136:4,8,17 137:13
143:19 333:4
365:25 366:8,10
368:11,12
**practice (7)**
11:22 91:3 215:5
241:20 254:4
289:22 336:10
**practices (1)**
326:16
**practitioner (6)**
44:10,16,18 52:14
110:21 309:25
**practitioners (2)**
114:2,12
**pre-petition (1)**
408:25
**precise (2)**
17:12 394:18
**precondition (1)**
61:18
**preconditions (1)**
62:6
**predate (3)**
85:16 96:19 212:5
**predecessor (4)**
13:5 256:23,24 257:4
**predicate (2)**
228:9 247:18
**predicates (1)**
302:18
**predisposition (6)**
108:18,20 141:5,6

244:7,10
**preference (2)**
448:11 458:19
**prejudice (1)**
236:4
**preliminaries (1)**
12:20
**prelude (2)**
423:21 424:3
**prepared (7)**
62:17,18 134:16
140:23 383:23
385:19 393:4
**preparing (3)**
35:17 42:11 385:22
**prepetition (9)**
159:17 413:22 429:18
429:21 434:24
435:10 437:13,15
448:10
**prerogative (1)**
427:3
**presence (1)**
82:17
**present (8)**
4:21 31:6,25 36:17
42:12 215:12 327:6
425:7
**presentation (2)**
186:5 327:15
**presentations (1)**
469:9
**presented (12)**
138:21 157:21 167:14
180:6 182:16,17
215:16 226:12
249:24 250:5 322:5
430:15
**presenting (3)**
213:24 230:12,14
**presents (1)**
182:19
**press (1)**
444:14
**pressuring (1)**
467:10
**presumably (3)**
219:5 365:24 366:7
**presumption (4)**
94:7,24 102:23
158:17
**pretty (10)**
71:11 139:10 232:20
296:15 308:3,4
310:16 421:24
427:19 462:22

**prevents (1)**
12:23
**preview (1)**
444:9
**previous (4)**
68:17 274:9 413:24
459:2
**previously (4)**
39:13 270:7 273:25
274:15
**price (6)**
28:3,5 29:15,19 30:10
35:14
**Pricewaterhouse (1)**
331:5
**pricing (1)**
406:14
**primarily (8)**
17:25 23:15 25:4 43:7
72:21 440:19,21
476:5
**primary (2)**
25:8 403:15
**prime (1)**
177:2
**Prince (3)**
475:4,12 477:24
**principle (1)**
56:4
**print (3)**
292:8,11,16
**printed (1)**
366:14
**prior (21)**
74:16 76:19 77:8,15
78:7 128:2,14
131:20,23,24 134:4
134:10,10 137:11
195:15 208:3
225:11 294:20
339:24 373:4
454:13
**priorities (1)**
350:25
**prison (4)**
234:11,15 298:7
420:12
**privacy (1)**
156:4
**private (23)**
131:20 176:16,18
339:3 352:17 384:3
384:4 386:21 387:2
387:4,5,10,13,14
388:4,7,8 389:2,10
389:12,18 397:4

405:17
**privilege (3)**
233:25 275:11 319:10
**privileged (1)**
318:20
**Pro (2)**
3:17,19
**probability (1)**
430:14
**probably (46)**
22:3 35:9 37:25 82:9
89:4 102:11 113:9
113:15,16 117:7
134:20 142:11
145:22 147:20
159:13,14 163:21
170:15,17,19,20,21
199:12 207:19
212:12,12,12 214:2
237:22 253:23
265:6 310:12,13,14
321:9 336:14 358:9
375:5 391:24
401:11 412:14
467:6 472:16,23,23
477:12
**probe (1)**
18:10
**problem (31)**
90:5 126:6 152:3
213:9 220:18
222:20,21 227:18
227:19,21,23,25
233:25 254:10,12
261:25 264:22
277:10 284:25
288:6 291:9 296:19
350:21 351:7
361:13 389:17
405:7 416:8 439:19
467:18 470:22
**problems (4)**
14:13 90:4 224:4
259:21
**procedure (4)**
203:18 204:14 457:16
465:21
**proceeding (14)**
7:18 30:18,25 31:2,4
31:21 38:5 204:2,17
205:7 215:19
248:14 330:21
471:3
**proceedings (5)**
30:23 204:19 291:4
295:25 423:11

**process (34)**
28:15 29:9 30:8 32:6
32:13 54:13 93:12
100:16 114:17
123:18 133:9
145:20 146:17,18
147:3,3,5 159:19
201:10 214:10
218:22 235:8
238:12 289:14,16
292:21 317:17
325:15 330:15
341:19,22 450:15
472:18 476:11
**produce (2)**
59:19 60:17 61:11
62:2
**produced (14)**
55:18,20 56:20 58:15
58:25 60:3,5 61:17
62:10 94:4,11
440:23 459:11
460:8
**produces (3)**
92:6 93:14,22
**product (2)**
152:2,4
**production (2)**
59:25 61:21
**productions (1)**
16:3
**products (2)**
174:24 186:12
**professional (46)**
2:11 23:3,12 26:7
32:23 55:9 81:19
84:23 91:19 108:3,6
108:8 110:3 117:14
117:17,19,20 118:4
120:22 122:20
123:8 127:17 136:4
137:9 138:17,19
139:13 140:4
141:21 143:20
163:8 203:9 233:18
236:13 242:21
250:9,9 321:22
324:18 326:14
332:22 364:7
405:11 473:18
477:21 479:9
**professional's (3)**
136:11 322:25 332:19
**professionally (1)**
225:12
**professionals (43)**

40:22,24 42:14 43:3
43:4,10 89:18,24
90:20,25 108:10
109:10,21 115:4
118:12,16 162:17
163:5 164:10 165:2
198:5,8 207:5
233:23 236:23,25
237:2,14,16 246:4
250:3 276:17 298:4
298:6 323:14,19,23
325:18 326:12
336:8 352:3,6
398:21
**professionals' (1)**
108:14
**professor (11)**
43:18,20,23,23 110:7
110:8,9 327:3 475:5
475:6,9
**profile (1)**
391:4
**profiles (1)**
75:19
**profit (26)**
35:2 355:20,21 387:9
394:12,14,16,18
395:10,12,20 396:6
396:9,11,14 398:14
399:11 402:16
406:21 409:2,5,13
414:3 423:16
429:24 430:23
**profitable (6)**
165:8 175:3 398:3
399:3 405:14,19
**profited (1)**
165:9
**profiting (1)**
421:5
**profits (2)**
396:22 407:6
**profusely (1)**
250:21
**program (2)**
140:6 343:23
**progress (1)**
373:2
**prohibits (1)**
353:5
**promised (3)**
250:24,25 260:21
**promoted (1)**
327:3
**promotion (1)**
362:4

**proof (4)**
166:13,16 247:3
335:17
**proper (3)**
121:25 275:15 367:7
**properly (16)**
58:14 179:12 305:4,5
305:25 306:12,14
333:21 353:2 366:5
372:21 387:16
425:21 440:5 449:3
461:16
**property (1)**
16:5
**proportions (1)**
225:25
**proposals (1)**
261:19
**proprietary (1)**
201:15
**prosecuted (1)**
44:7
**prosecution (1)**
234:6
**Proshan (2)**
417:2 418:17
**Proskauer (2)**
111:5 239:18
**prostate (1)**
259:23
**protect (6)**
203:10 215:9,10
261:12 265:10
403:7
**protected (1)**
261:11
**protecting (2)**
217:16 407:12
**protocol (1)**
240:10
**proud (2)**
360:4 468:4
**prove (7)**
161:7,11 162:19
230:25 320:7
457:21 462:11
**proved (1)**
203:22
**proven (1)**
203:14
**proves (1)**
103:15
**provide (6)**
47:21 58:16 61:4
121:24 307:23
459:18

**provided (10)**
60:11 62:16 160:14
372:14 379:25
436:8,10 459:21,22
459:25
**provider (1)**
146:3
**provides (5)**
371:14 372:8 373:25
374:11 406:16
**providing (4)**
12:15 183:5 364:7
461:24
**PSP (1)**
340:14
**public (44)**
2:11 7:2 71:15 74:19
78:15 95:10 105:11
115:9 119:6 128:21
135:3 145:14 156:8
156:13 158:21
170:13,14 174:9,13
176:17 181:6,8,8,10
182:16 194:14
199:8 206:11 207:4
207:6,7,15 234:24
273:9,13 327:23
340:13 376:8,10
414:14 456:6 465:9
479:10 481:24
**publication (1)**
132:14
**publications (4)**
132:16,17 292:9
417:22
**publicize (1)**
292:11
**publicly (17)**
68:18 69:5,7 72:12,22
74:20 135:2 154:23
182:14 183:15
198:16 401:16
412:6 414:13
435:23 436:8 465:2
**published (2)**
133:25 360:3
**Puerto (1)**
355:15
**pull (3)**
296:10 328:3 395:12
**purchase (8)**
27:20 29:20 30:22,25
32:7 387:6 472:4,18
**purchased (15)**
29:8,18 30:17,24 31:5
31:24 32:4 33:5

399:19 432:13
433:5 472:5,9,12,13
**purported (1)**
25:19
**purpose (3)**
214:25 323:25 408:10
**purposes (9)**
18:2,3,3 359:8 399:25
400:17 402:15,16
441:23
**pursue (1)**
408:11
**pursued (3)**
24:16,20 420:16
**pursuing (2)**
26:7 33:22
**put (49)**
25:15 75:9 78:4,6,10
79:4 96:15 97:12
99:8 112:8 127:6
129:5 132:16,16,21
133:7 148:5,20
170:23 193:13
199:11 200:14
210:23 229:3
253:25 256:21
264:20 268:10,25
288:21 292:9 348:5
351:11 377:25
379:17 401:25
419:15 431:13
434:3,11 436:3,11
436:16,16 439:9
448:18 460:4 464:3
468:18
**puts (2)**
131:2 143:13
**putting (6)**
96:18 133:17 153:10
174:11 348:14
390:10
**PwC (1)**
109:3

_____
**Q**

**qualifications (1)**
123:13
**qualified (4)**
84:23 130:4,5 199:13
**quality (1)**
237:25
**quarterly (1)**
348:10
**Quebec (1)**
340:11
**question (187)**

11:18 14:24 22:10
25:13 29:17 31:14
31:15,16,18,19,19
34:7,11,11,14 45:13
45:22 48:15,17 49:2
49:12 52:20 60:16
60:21 61:7 63:23
64:2,8,10 65:20,21
66:13 79:24 85:12
87:3 90:10,14,18,23
97:8,10 120:4
122:24 123:4 128:4
129:19 131:15
133:3,6 146:25
147:5,9 148:4,5
152:20,22 153:20
155:21 158:4
172:23 174:2
175:21,25 181:15
182:10 188:14,20
188:21 189:2 191:2
191:5 197:13,14
199:21,22,25
200:13,15,21 202:8
202:8 203:6,12,23
205:2,5 206:4
208:14,15 210:14
210:19 215:24
222:3 227:5,9 229:5
238:9,20,22 239:9
246:20 247:7,12,16
247:17 249:6
270:15 274:8,11
277:11 278:14
279:13 281:16,17
281:22,24 283:9,14
283:15 284:2 294:3
294:4 295:19,20,22
296:11 298:12,16
298:17,18 299:4
301:3,20 302:3
303:22 308:12,14
308:20,21 309:4,8
309:12 312:20
313:5,7,21,24 314:4
314:5,14 315:24
316:3,6,8,12,15,20
319:20 340:21
346:22 350:13
353:15,16 365:11
368:5 377:17 378:6
381:18 387:24
388:2,2 392:18,22
415:19 419:22
442:10,12 452:7,16
452:18 453:13

457:6 469:6 470:24
472:20 473:16
477:20
**questionable (1)**
188:10
**questioned (1)**
350:6
**questioner (2)**
452:10,11
**questioning (1)**
53:12
**questions (16)**
8:2,3 41:4 53:18
129:4 172:19
188:23 197:16,18
197:23,25 215:17
216:15 219:12
350:14 390:8
**quibbling (1)**
314:12
**quick (1)**
142:9
**quickly (1)**
71:11
**Quinn (1)**
239:19
**quite (8)**
47:4 75:16 131:12,12
226:16 307:24
388:9,10
**quote (9)**
38:25 181:11 277:9
368:20 378:2,9
387:25 393:10,12
**quoting (2)**
195:4 210:10

**R**

**R (4)**
3:2 4:2 270:2 479:2
**rage (1)**
276:25
**raise (4)**
25:5 124:5,5 462:25
**raised (7)**
40:17 171:4 286:9
287:17 301:11
388:7 470:9
**raises (7)**
190:23,25 191:5
197:14 200:13
202:7,8
**raising (4)**
46:24 197:12 206:3
377:17
**ran (2)**

223:19 234:6
**ranch (1)**
414:19
**range (3)**
371:8 397:16,24
**Rappaport (2)**
43:24 110:9
**rates (1)**
406:22
**rationalize (2)**
120:25 121:3
**reach (3)**
48:18 49:13 50:25
**reached (4)**
49:7 50:12 66:6
286:24
**reaching (1)**
54:13
**reaction (2)**
298:20,20
**read (80)**
8:6 9:2,4,6,9 11:5
42:10 46:11,12
50:19 54:11,19,19
54:20,24 58:24
111:3,7,8,8 131:17
139:25 168:17
178:13 179:12
184:9,10 185:2
192:23 193:25
194:17 198:17
210:21 229:7
247:15 273:21
274:12 284:17
293:20,25 299:5
304:17 305:3,5,23
305:25 306:11,13
307:22,24 314:14
317:4,9 333:10,14
336:14,23 338:3
339:16 346:23
353:2,15 366:5
372:21 386:22
387:16,17 388:22
406:5 408:14
418:25 419:2
425:20,22 440:5,6
444:21 446:6
458:25 461:15
**reading (25)**
27:4 46:7,19 47:8
48:22 51:3 53:19
54:9,15,16 194:14
195:2 281:13,25
282:2 286:14
289:15 295:7

298:14 299:2 337:5
383:2 395:23
396:16 423:21
**reads (2)**
65:6 138:19
**ready (3)**
267:14,15 277:21
**real (14)**
187:9 192:12 201:17
266:16 348:24,24
391:17 413:7
414:16,17,18 415:3
418:24 470:22
**realize (3)**
261:10 350:12 412:2
**realized (4)**
225:6 241:10 261:6
264:14
**realizing (1)**
281:5
**really (27)**
17:18 21:4 115:23
180:3 196:5,7
199:23 237:9 238:6
238:12 239:3 241:2
250:23 272:18
283:19 301:13
304:6 306:4 320:15
330:24 415:17
427:6 453:22
458:20 460:12
466:5 467:6
**reason (14)**
55:23 89:11 91:12
152:15 182:6
199:12 268:18
315:2 329:7,10
400:17 449:15
470:5 481:5
**reasonable (27)**
57:10,12,22,25 58:4
58:12,17 59:4,21
60:19 102:11 124:4
127:21 167:12
199:10 200:14
227:11 235:2
392:15 402:3 430:8
430:19 431:25
432:2 436:2,6
449:17
**recall (21)**
7:10,18 10:21 22:15
22:16 31:24 39:4
45:2,5,19 50:16
182:3 193:5 256:20
256:21 270:20

273:19 278:25
291:17 411:17
446:19
**recalled (1)**
110:14
**receive (6)**
61:25 218:16 379:18
380:14 381:19
385:18
**received (5)**
33:8 161:8,12,17
456:10
**recess (7)**
14:20 86:9 173:14
269:6 349:12
407:25 437:25
**recognize (2)**
289:18 290:3
**recollection (4)**
29:20 49:16 277:21
291:23
**recommend (1)**
216:14
**recommendation (4)**
156:10,11,14,17
**reconcile (1)**
152:19
**record (51)**
5:19 14:16,19,22 37:4
41:22 48:5 86:8,11
115:9 137:19
161:25 173:13,16
175:6 206:12 207:4
207:6,8,15 233:6
262:21 270:5,17,22
281:6 283:12
290:25 291:3,6
320:7 325:7 327:25
347:7 349:11,14,16
350:5,17 351:8,9,11
396:12,20 407:24
408:3 437:22,24
438:8,17 479:15
**recorded (4)**
5:4 430:10 442:7,8
**recording (2)**
305:9,11
**records (6)**
72:14 121:25 153:11
409:23 410:4 465:5
**Recovery (3)**
4:8 5:22,25
**recreate (1)**
145:20
**redaction (1)**
62:11

**reducing (2)**
118:5,6
**Reed (2)**
474:8 477:5
**reelected (9)**
255:6,10,12,13 256:8
256:10 257:14
258:17 266:19
**refer (10)**
47:24 69:15 260:4,5,6
260:13 307:11
360:13 378:2
388:20
**reference (8)**
56:21 211:3 305:17
305:18 352:9 385:4
394:14 423:6
**referenced (3)**
30:6 211:23 384:8
**references (3)**
74:21 284:19 460:15
**referral (1)**
358:18
**referrals (6)**
276:2,5,18 358:19
362:3 398:19
**referred (4)**
43:3 185:13 291:13
307:13
**referring (17)**
9:5 19:4 24:14 38:25
41:3,7 43:8 49:3
184:21 208:23
289:7 292:25
307:12 361:5
373:13 388:15
436:13
**refers (7)**
40:22 372:5 373:3
374:4 375:21
383:22 384:5
**refinance (1)**
389:15
**reflect (1)**
65:18
**reflected (1)**
431:24
**reflecting (1)**
441:11
**reflection (2)**
270:16,23
**refuse (1)**
62:5
**refused (1)**
61:14
**regard (8)**

40:5 55:15 59:20
60:18 84:5 299:16
398:13 472:14
**regarded (1)**
66:24
**regarding (6)**
155:8 372:17 379:12
380:15 381:6,20
**regardless (2)**
20:20 127:4
**Register (2)**
258:21 287:6
**registered (3)**
2:10 374:8 479:9
**regular (2)**
168:9 448:24
**regularly (3)**
186:6,9,13
**regulate (1)**
214:22
**regulation (1)**
231:13
**regulations (1)**
196:14
**rejoined (1)**
20:5
**relate (2)**
159:23,24
**related (12)**
8:15 16:24 48:10,13
121:18 159:23
174:5 352:24 423:9
429:8 479:18 480:6
**relatedness (1)**
325:20
**relates (1)**
336:23
**relation (1)**
386:10
**relationship (7)**
104:4 131:9 219:22
225:12 433:10
454:14 457:14
**relationships (5)**
146:7 338:24 458:11
463:3 467:9
**release (1)**
156:7
**released (2)**
156:18,21
**relevance (1)**
415:17
**relevant (2)**
86:2,14
**reliable (1)**
390:25

**Reliant (1)**
454:21
**relied (6)**
52:3 53:3,8 59:14
246:11 401:18
**relief (3)**
438:3 439:11 480:15
**relies (2)**
321:16,19
**relieve (2)**
106:19 364:15
**relieved (2)**
107:10,14
**religiously (1)**
450:7
**rely (14)**
52:5,21 69:14 84:21
126:4 141:6 319:3
321:12,14,15 326:4
326:10 368:21
370:4
**relying (11)**
182:17 186:4 245:15
312:3 339:18
340:25 341:20
343:25 344:3
346:24 401:21
**remember (16)**
35:13,14 45:8,15
50:11,23 51:3,6
77:7 131:14 181:16
195:2 211:2 227:4
271:18 418:21
**remote (1)**
84:10
**remove (4)**
98:10 256:11,12
364:14
**rendered (1)**
248:10
**rendering (1)**
244:21
**reopen (3)**
157:12 162:25 166:12
**reorganization (5)**
163:23 190:22 191:11
461:23 463:13
**reorganized (1)**
159:20
**repeat (5)**
25:13 48:15 87:2
128:4 324:4
**repeated (3)**
260:24,25 282:24
**repeatedly (5)**
242:15 258:5 303:7

311:7 319:17
**repeating (7)**
221:4 238:14 303:20
322:18 465:14,18
466:2
**repetitive (1)**
221:4
**repetitively (1)**
312:6
**rephrase (1)**
215:25
**rephrasing (1)**
120:3
**report (21)**
92:6 93:4,15,22 94:3
94:11 106:22,25
112:10 225:14
234:20 287:5,8
303:8 331:15
333:17,18 334:8,11
384:24 464:5
**reported (18)**
1:23 93:7 94:17 199:7
207:24 213:11
250:15 262:17
332:14 348:15
374:20 375:11
442:18 456:4
457:24 469:15,16
469:17
**reporter (8)**
2:10,11 5:15 6:19,22
11:16 479:9,10
**reporting (5)**
5:14,17 95:5 285:9
388:4
**reports (13)**
77:17,17 223:21
224:22 379:12,18
379:20,22 380:3,15
381:5,20 382:5
**represent (13)**
55:21 56:5 89:5 91:11
176:23 339:12
344:10 346:12
407:2 411:2 426:24
427:5 454:12
**representation (8)**
55:24 85:4 182:2
231:10 297:12
363:11 364:10
412:18
**representations (5)**
8:19 195:11 325:19
469:2 471:15
**representative (1)**

211:13
**representatives (6)**
211:14,17,21,25
217:8 218:10
**represented (9)**
7:15 82:2 98:8 137:18
327:20 413:19
446:9 453:16 477:7
**representing (15)**
5:21,24 6:4 82:7
111:15,18 210:10
317:21 411:21
413:18 414:5
456:24 473:24
474:3 477:9
**republican (1)**
213:6
**request (8)**
207:9,10,18 277:17
333:9 341:7 375:16
376:19
**requesting (1)**
42:21
**requests (1)**
225:2
**require (4)**
59:24 62:3 135:9
313:16
**required (6)**
42:15 62:4 120:7
157:11 250:4 305:2
**requirement (2)**
61:19 204:22
**requirements (5)**
224:10 258:23 275:16
289:20,21
**requires (18)**
106:21 107:18 215:20
216:7 228:15
229:11,16,17,19
232:3 233:14,20
237:4 245:11 246:5
248:3 404:22
450:14
**requisite (1)**
123:12
**research (14)**
50:21 58:6 62:20 63:9
63:10,19 64:11,13
74:19 80:10 110:25
245:21 312:4
327:14
**resolution (2)**
223:14,15
**resources (7)**
24:18 25:21 70:9,23

201:19 259:10
386:11
**respect (5)**
137:21 238:11 316:13
339:14 462:6
**respective (1)**
301:7
**responded (1)**
8:5
**responding (1)**
303:21
**response (1)**
473:15
**responsibilities (2)**
107:11 367:9
**responsibility (10)**
143:22 315:17,18
365:25 366:8,10,20
367:3 368:12,17
**responsive (7)**
52:25 195:23 238:9
304:2 452:16
465:19 466:3
**rest (10)**
59:19 60:17 96:13
187:22 188:17
254:24 345:25
383:11 385:6
432:25
**restroom (1)**
394:10
**restructure (1)**
257:7
**restructured (1)**
260:15
**restructuring (8)**
12:13 23:19 51:8
89:25 254:14
331:12 399:14
403:16
**result (6)**
151:25 178:17 413:18
425:17 428:13
440:2
**results (4)**
175:2 215:13 312:15
338:7
**résumé (7)**
456:9,11,22,25
459:10 460:6,12
**resumed (1)**
270:6
**retain (2)**
34:6 477:3
**retained (9)**
26:6 89:10,19,19

90:21 118:17
445:21 476:16,25
**retention (1)**
115:4
**retired (2)**
467:22 470:7
**retirement (4)**
374:10 424:24 425:11
480:13
**retrospect (2)**
231:4 453:24
**retrospectively (1)**
464:5
**return (9)**
106:21 107:4 175:6
206:17 256:6 276:3
285:8 287:16
395:25
**returns (2)**
175:2 395:23
**reveal (1)**
243:21
**revealed (3)**
73:7 75:4 199:16
**revenue (3)**
413:14,22 417:4
**revenues (6)**
410:20 411:25 412:24
413:12 414:23
415:15
**review (13)**
8:13 47:11,17,17 56:7
108:13 113:22
133:20 209:19
225:13 229:18
385:25 470:20
**reviewed (31)**
10:6 47:13 48:18 49:4
49:13,18,23 50:2,3
50:5,7,7,8,22 56:9
90:24 94:22 154:3
226:14,16 239:15
273:6 277:5,7 348:4
348:20 375:25
385:25 393:4,7
410:7
**reviewing (5)**
11:12 50:11,23 296:7
447:7
**revise (1)**
22:10
**REVISED (1)**
1:17
**rewards (1)**
467:4
**Rhodes (11)**

6:11,11 7:14 33:9
37:5 82:16,25
110:11 114:21,23
226:10
**Richman (6)**
1:24 2:9 5:16 7:3
479:8,25
**Rico (33)**
24:15,16,16 38:4,6,7
228:7,9,10 233:4,8
233:8 272:13,17,22
273:3 274:23
277:12 278:7,16
279:4,16 281:7,18
285:22 296:9,25
297:2 300:15
302:18 306:23
355:15 480:7
**rid (2)**
216:11 398:8
**ridiculous (1)**
107:15
**right (241)**
11:6,13,24 13:6,9,11
14:14 15:20 16:9
17:19 19:11 20:10
20:14 22:14,16
23:24 24:14,25
38:21 40:17 42:7,23
45:2,5 48:25 49:15
50:16 52:4 53:15
55:4,13 65:17 66:22
67:24 73:19,25 74:9
74:9 77:4,22 78:2
79:2,7 81:12 85:23
87:2,11,19 93:18
94:15,18 96:5,9
97:15 98:16 100:10
100:23 101:8,18
104:10 105:15
108:4 119:4 120:2
122:5 125:4,5 127:3
127:7 128:14 133:4
138:16 140:17,17
140:18,18,19
148:14 154:7,8
155:18 158:12
160:3,20 161:2
166:7 170:19
171:20,25 173:17
174:14,15 176:10
177:8 178:3,20,21
179:7,18,25 180:14
181:7 182:8,13,20
183:2 186:22
187:14 192:21

193:3,23,24 194:10
203:18 206:13
208:9 217:5 221:13
222:9 228:18
229:14 230:8,15
231:18 238:18,25
241:8 244:13 246:6
247:21 248:15
257:2 260:15 264:9
269:2 270:14
271:12 272:6,15,25
273:7 274:10
280:25 285:23
288:15,20,22,23
289:2,5 290:9
291:16 292:6,24
293:19 297:3,6
300:24 305:14
308:10 311:18
320:23 321:20
323:2 324:18
328:19 329:4
334:16 340:19,20
341:4 347:5 353:7
362:25 368:9,13
372:21 373:5,18
374:14,16 376:21
379:7,20 380:2,20
381:14 382:10
383:6,7 384:10
385:8 386:16,21
391:18 396:7,15
398:16,17 406:10
409:7 410:22,23
411:14,22,23 413:4
413:5 414:11,19
421:23 422:23
423:20 424:11,15
424:19,21 425:3,20
426:11,19 427:22
432:13 436:18
439:3,20,21 440:20
441:13 443:2 444:8
447:3 451:2 453:2
459:15 460:19
463:21 467:25
468:4 473:19 478:7
**rise (1)**
311:15
**rises (2)**
311:5,5
**rising (3)**
412:6,7 471:11
**risk (1)**
467:2
**Robert (7)**

21:22 222:16 223:4
223:20 249:17
356:12 476:6
**rocket (1)**
139:9
**rogue (1)**
265:12
**role (4)**
21:13 236:9 346:19
399:12
**roll (1)**
103:17
**rolled (1)**
394:15
**room (3)**
43:6 430:16 458:23
**Rose (2)**
111:5 239:18
**round (1)**
375:3
**routine (1)**
240:9
**row (4)**
37:16,20,22 67:22
**rows (1)**
68:3
**RPR (2)**
1:24 479:25
**RTS (156)**
23:2,11,24 26:5 45:12
50:13,25 51:10,13
51:21 52:6,22 53:9
53:22 55:18 56:20
65:10,16,25 66:4,18
68:15,16 69:9 74:15
76:19 77:8 78:7,11
78:18 79:3 81:2
85:18,19 86:21 87:9
89:6,10 94:23 96:17
96:25 103:21 105:2
107:17 109:23
119:2 126:22 127:5
127:24 128:7,10
134:4 144:4 146:22
158:20 160:3,19,24
161:8,17 162:21
169:18 177:7,11,15
178:5,16 179:10
181:6 204:15
205:10 206:24
221:10,23 222:16
223:5,20 228:16
229:12 230:6 237:3
246:25 247:4,20
248:13,23 249:8,11
254:22,23 256:12

256:13,14 258:18
262:7 266:24 274:2
274:16 275:25
276:6 277:14 280:7
287:22 294:8
298:24 300:21
301:21 302:6
306:16 315:6,8
316:19 324:14
326:22 353:13,18
355:10,20 356:9,9
356:10,15,17,22
357:6 363:15,15
365:23 366:4 406:9
406:12 408:9,21,23
409:3,12,21 421:3,4
423:7,11 424:8
433:17,21 434:4
445:22 446:2,25
450:24 452:19
454:6 455:25 456:8
460:10,18 462:5
**RTS's (20)**
48:20 64:25 65:7
77:15 89:15 144:22
221:12 222:8 278:9
278:21 281:20
282:16 285:5 286:3
292:23 294:25
296:5 315:7 422:6
444:6
**ruby (2)**
475:2 477:23
**ruins (1)**
130:22
**rule (136)**
44:9 46:5,13 47:2,10
47:13 48:21 49:11
50:14,24 51:22 52:7
52:23 53:10,23 55:2
57:13 66:19,21
70:11 73:15 77:8
79:3 80:14 81:15,16
82:19 83:7,8,9,17
83:22 88:16 89:7
99:10,20 100:7
106:2,6,7,13 107:17
107:21,24 108:24
109:10,13,17,25
110:5 111:13
114:21 115:5,16
117:7 122:12
127:15 128:9 137:5
137:12 138:14,20
138:23 139:12,17
139:21 140:13

144:4,23 177:20
207:5 213:2,14
214:4 215:10,20
216:7 228:15
229:10 231:12
232:3,7 233:14,20
237:3 239:13 240:2
243:18 244:6
245:10 246:5 247:5
248:3,8 249:9 250:4
258:22 278:21
281:20 282:17
285:6 286:3 292:23
294:8 295:2 296:5
298:24,25 300:24
307:3,4,5,8,16,18
308:6 310:3 317:6
317:14 320:20
321:12,14,16,17,19
322:7 324:4 341:6
344:19 346:4
347:24 361:23
401:4 402:22
436:25 457:16
**rules (16)**
108:24 113:17,19,21
114:9 235:20 248:6
271:6 274:3,17
278:11,23 280:8
294:14 321:17
402:13
**ruling (3)**
438:5 439:12 480:16
**run (15)**
129:9 189:8 222:15
328:8 356:9 388:6
398:6,14 405:21
421:14 422:22
447:25 448:2
449:16 475:24
**running (12)**
22:7 31:13 86:6
101:11 256:12
259:9 301:13
336:16 349:6
417:25 420:2 421:7
**runs (8)**
20:21 169:17 223:8
223:17 224:19,21
365:15 420:7
**runup (1)**
363:4
**Russell (1)**
194:9

_____
        **S**

**S (7)**
3:2,14 4:2 270:2,2,2
480:2
**safe (1)**
433:8
**Safety-Kleen (2)**
77:3,5
**sake (1)**
396:20
**satisfied (1)**
189:19
**satisfying (1)**
467:20
**Saturday (1)**
36:14
**saw (8)**
185:14 189:20 190:3
221:2 241:9 310:23
372:3 446:21
**saying (72)**
7:19 35:11 105:23
106:2 116:12
125:14,16 137:20
138:16,21 139:24
141:3 148:2 152:16
157:25 167:23
173:18 174:7
186:23 188:19
196:16 207:14
216:4 219:11 233:7
243:15 250:12
263:14 279:13
290:13 299:21
300:14,15 306:15
307:2 309:15 315:9
318:8,11 320:3
322:2,3,6 324:16,19
341:10,14,17
344:11 348:18
352:4 372:3 389:18
390:19 395:21
396:5,8 403:25
405:2 411:8 412:16
431:22 433:23
434:12,17 438:23
452:20 454:5,10
462:5 466:23
476:14
**says (122)**
27:5 28:8 42:10 55:7
62:22 64:24 74:11
74:13 81:18 83:7,8
83:9,11 84:12,19
101:16 111:13,20
115:21 116:3,8
135:10,24,24 138:5

139:22,23 140:13
143:3 145:22 168:5
171:9 178:4,22
179:9,13 180:11
181:3 184:22
185:10 193:24
196:18 197:24
198:19,19 200:6
232:7 246:7 247:19
252:14 278:25
280:5 283:4 285:13
297:10,14 300:5
301:6 303:12,18
305:18 307:16
314:8 331:2 338:19
340:4 343:20 344:5
344:17 345:5 347:4
347:9 352:10 353:4
363:23 365:18
366:6,21 368:15
369:4,9,11,12 371:6
372:22 373:23
376:16,23 377:3
378:12 379:4
380:13 381:5,24
382:5 383:12,20
385:16 388:25
389:23 390:20
391:5 394:16
396:13 399:22
404:20 406:18
408:8 409:11
410:18 425:11
439:22,22 445:13
446:7 450:18
451:10,13 458:17
460:9,12 461:15
**scanned (1)**
112:12
**scans (1)**
92:5
**scenario (1)**
451:6
**scenarios (1)**
451:8
**schedule (2)**
266:5 426:11
**scheme (16)**
222:13 228:13 229:8
240:9 282:5 286:10
287:19 415:13,14
416:7,17 419:15
420:25 421:4,7
463:13
**schemes (1)**
420:3

**Schiller (4)**
2:7 3:3 6:6,9
**scholars (1)**
226:4
**School (5)**
43:19,22,25 327:5
475:6
**Schwartz (2)**
473:24 477:6
**Schwarzman (1)**
397:8
**science (1)**
139:9
**scope (2)**
118:5 402:4
**screened (1)**
132:6
**screening (1)**
80:9
**screws (1)**
343:22
**scrutinized (1)**
328:24
**seamless (1)**
359:6
**Sean (4)**
3:6 6:5 438:11,19
**search (3)**
92:5 337:2 338:4
**searchable (1)**
79:15
**searching (1)**
74:19
**SEC (15)**
72:19,20 154:16
168:16,17 169:2
184:2,20,21 185:9
185:13 186:11,18
198:14 374:8
**second (27)**
41:5 42:10 97:21
100:17 126:18
146:12 150:10
178:25 179:5 205:8
219:17 226:22
281:3 289:13
290:23 297:11
338:19 377:15
378:5,10 381:4
382:2,12 423:18
427:8 440:8 446:21
**seconding (1)**
342:19
**secrecy (1)**
76:5
**secret (2)**

171:8 325:11
**secretaries (1)**
263:2
**secretary (1)**
390:21
**secretly (1)**
247:2
**section (11)**
124:10 178:12 192:23
198:25 286:16
307:19,20 308:7
378:20 388:21
399:22
**Sector (1)**
340:13
**securities (10)**
29:2 32:2 33:7 72:11
185:17 352:3,8,19
353:7 414:4
**security (1)**
28:9
**see (113)**
9:11 16:17 26:19 27:4
28:11 32:13 42:18
47:18 48:23 54:11
54:12,20 55:12,15
62:16,23,25 65:4,11
67:17 68:19 75:18
77:6,11 88:8 94:6,8
95:25 102:8 103:10
108:12,19,20,21
112:12 119:11,14
133:10 138:20
141:21 147:16
148:20,21 153:22
173:2 178:13
184:10 206:13
208:21 209:14,17
221:13,14,15,16
231:5,16 234:24
239:24 242:7
243:11,14 259:13
263:10 278:18,24
280:15,19 289:23
292:12 297:16
302:11 306:11,13
330:18 338:12,13
341:17 343:2,17
356:7,21 358:21,24
371:20 373:10,11
374:19 378:18
383:5 386:14
392:11 400:9 404:8
423:16,18 425:9
429:7 430:18
442:24 444:9

447:23 448:5,14
450:10 453:9
454:12,15 463:10
468:23 476:23
477:17,19
**seeing (5)**
54:10 312:6 462:21
462:24 470:21
**seek (2)**
64:7 163:3
**seeking (2)**
23:2 62:12
**seen (37)**
22:15 56:11,12 103:8
116:16 158:13
176:17,18 188:25
223:7 225:25
267:25 268:3,4,5,21
268:23,24 293:22
308:5 367:24 368:6
368:8 376:4,8,10
379:19,21 380:3
384:9,21 395:6,8
402:8 405:12 414:7
472:22
**sees (4)**
357:2,3,4 405:11
**selected (1)**
372:20
**selection (1)**
373:6
**selective (1)**
468:25
**Selendy (4)**
4:7 5:21,24 6:3
**self (5)**
82:12 114:12 120:23
236:14 466:9
**self-dealing (1)**
236:8
**sell (3)**
387:9 389:16,16
**seller (2)**
28:19,25
**sellers (2)**
29:3,7
**selling (2)**
459:3,5
**senate (6)**
212:9 213:4 214:13
215:8 217:11
220:21
**senator (2)**
219:18,19
**send (1)**
107:4

**sends (3)**
92:14,19 266:10
**senior (4)**
44:23 249:21 354:8
355:7
**sense (7)**
58:9 190:21 207:10
236:20 237:20
241:11 295:9
**sent (10)**
208:19 222:6,10
223:9 263:8 271:17
271:20 421:12
476:23 477:19
**sentence (49)**
28:8 42:10,18 55:14
68:21 96:14 283:4
283:16,17 285:4,7
287:14,21 289:23
297:8 300:6 305:3
336:22 337:6 338:4
339:15 340:18
344:12 346:23
352:9 353:3,4
365:18,20 366:6
367:19 372:12
374:6 376:14 377:2
377:14,15 378:3,5
378:10 380:12
381:16,19 382:2,11
382:13 385:4 391:2
391:14
**sentences (6)**
10:2 282:20 283:10
283:11 284:9
381:24
**separate (16)**
73:13 177:7 178:5,17
179:11 187:22
188:16 189:11
192:5 326:23
327:16 329:13,16
357:18,20 362:9
**separating (1)**
461:22
**separation (24)**
330:23 339:7,17,19
341:2,15,21,24
342:2,6 343:18,18
344:9,12,13 345:13
346:24 347:6,10
370:13 400:3
403:23 404:18
454:2
**September (7)**
249:13 271:15,22

282:22 289:9
442:25 473:11
**series (3)**
257:21 261:15 270:12
**serious (14)**
123:22 124:13 125:8
224:12,15 233:11
264:22 298:3
306:10,25 307:7
308:6 313:14
314:10
**serve (5)**
84:23 130:4,5,6
199:13
**served (2)**
105:2 446:10 453:8
456:8 457:4 459:12
460:10
**serves (1)**
363:15
**service (14)**
77:18 119:2 135:7,9
135:13 136:5
137:10 146:3
334:14 363:13,14
363:21 371:10
460:13
**services (10)**
4:8 5:22 6:2 135:16
135:17 182:13
183:6 187:7 361:7
406:16
**servicing (2)**
363:7,8
**serving (2)**
445:14 460:18
**session (1)**
349:18
**sessions (1)**
36:18
**set (17)**
17:19,25 21:8 22:2
247:18 254:21,23
254:25 298:21
306:10,25 365:25
368:12 402:14
417:20 479:13,23
**Seth (3)**
88:11 256:13 416:24
**sets (1)**
359:11
**setting (2)**
18:4 330:25
**settlements (1)**
235:14
**settling (1)**

235:12
**seven (7)**
49:23,25 155:6
159:14 160:5 346:8
412:7
**shape (1)**
345:16
**share (7)**
29:19 188:4,11,12,12
188:12 192:6
**shared (1)**
192:6
**shareholder (6)**
148:14 190:14 354:25
357:7,22 466:14
**shareholders (9)**
148:16 354:11,13,16
355:19 365:24
366:9 367:12,15
**shareholders' (1)**
365:14
**shares (16)**
17:15 28:10,14,17
29:10,16,18,25 30:5
357:21 402:6
424:10,14 432:6,8
432:12
**sharing (7)**
342:20,21,21,22
**sheet (7)**
258:9 409:24 442:6,6
443:4,5 481:2
**Sheldon (4)**
3:14,17 6:15 110:19
**shield (1)**
319:4
**Shields (2)**
21:22,25
**shifting (1)**
124:24
**shockingly (2)**
65:8 144:3
**short (5)**
168:23 185:21 304:7
430:5 471:12
**shorter (1)**
288:12
**Shorthand (2)**
2:10 479:9
**shot (1)**
283:23
**show (22)**
38:24 41:2,6 59:15
77:23 121:25
151:12,15 176:14
180:22 196:20

210:9 266:15
277:18,21 285:3
318:25 325:13
390:3,4 406:18
441:25
**showed (2)**
92:21 250:6
**showing (2)**
141:15 210:17
**shows (7)**
71:14 190:13 409:16
409:24,25 439:23
471:9
**shut (3)**
405:23 406:8 420:13
**shy (1)**
221:22
**side (13)**
121:11 133:16 213:6
213:7 323:6,7 355:9
357:16 370:6,7
455:14 470:25,25
**sides (4)**
217:15 450:16 455:15
455:19
**sign (2)**
107:4 346:13
**signed (12)**
16:15,22 88:10
274:21 288:18
290:10,11 317:14
319:17 390:17
416:22 446:15
**significant (9)**
76:23 93:7 119:13,15
122:7 165:5 186:15
201:23 302:15
**simple (7)**
139:10,11,12 146:18
147:2,3 198:21
**simpler (1)**
40:4
**simply (1)**
97:10
**simultaneous (3)**
156:16 462:7,8
**simultaneously (5)**
445:14 446:11 453:8
454:6 457:4
**single (7)**
134:3 139:15 233:18
294:11 307:15
321:5 333:10
**sit (6)**
53:24 54:3 88:22
124:11 130:24

354:15
**sits (2)**
357:6,6
**sitting (21)**
17:16 21:16 22:11,17
45:8 77:12 113:3
121:20 122:16
126:18 129:7
217:24 218:3 246:2
268:16,20 357:14
374:22 375:9 405:4
470:15
**situation (27)**
46:10 58:3 99:3
120:21 132:20
170:11 185:23
193:7,10 194:25
206:21 221:17,21
231:7,8 236:2
251:18 317:11
330:4,5 350:19
361:25 364:22
389:6 432:9 457:12
470:11
**situations (5)**
12:16 192:11 310:15
310:21 397:19
**six (10)**
140:12 159:14 214:8
225:10 232:15
242:8 284:9 311:13
403:4 412:14
**size (3)**
268:5 414:19 421:19
**Skadden (19)**
111:8 241:16,18,19
253:15,17 254:8
275:6,10,12,14
285:11,12,13,15,19
285:22 286:6
474:12
**Skadden's (1)**
275:17
**SKDK (1)**
476:5
**skepticism (2)**
369:3 370:9
**skip (2)**
12:9,20
**skipping (1)**
316:11
**slice (2)**
369:20,21
**slicing (1)**
92:17
**slightly (1)**

313:5
**slip (3)**
255:19,20 258:14
**slipped (1)**
258:12
**slow (1)**
442:3
**slowly (1)**
473:20
**small (14)**
15:14 73:11 95:11
244:18 334:19,22
342:18 413:4,6,11
413:13 414:17
462:16 466:24
**smaller (1)**
18:15
**smart (1)**
231:19
**Smith (2)**
4:22 5:13
**Sneader (4)**
223:7,17 224:19
421:10
**social (3)**
75:17 76:8,10
**sold (10)**
14:5 19:18 384:2
387:13 389:7,8
398:7 454:15,19,21
**sole (2)**
25:9,15
**solely (2)**
86:19 431:24
**solicited (1)**
220:4
**solid (4)**
134:18,22,24 135:5
**solve (1)**
224:4
**somebody (8)**
171:9 186:10 190:17
192:17 315:16
364:3 395:18
406:15
**somebody's (1)**
283:23
**somewhat (2)**
196:5 199:4
**soon (4)**
108:11 394:10 407:19
462:22
**sorry (27)**
9:3 36:23 63:8 65:20
68:13 85:3,17 91:16
120:4 132:22

146:14 148:4
180:25 181:15
246:20 313:23
338:15 351:21
368:5 371:20
376:23 378:25
440:25 443:23
444:23 446:10
478:10
**sort (4)**
61:18,20 350:24
467:17
**sorted (1)**
467:18
**sought (3)**
46:18 52:11 90:21
**sounds (2)**
184:4,5
**source (10)**
72:22 74:13 75:9
132:9 154:11,20
174:7,9 182:23
446:8
**sources (10)**
68:18 69:5,8 72:22
77:24 119:7 154:13
155:12 173:19
174:14
**South (14)**
3:20 39:3,6,8 189:10
190:5,6 191:14,17
191:18 292:5,7,15
355:14
**Southern (7)**
1:3 5:7 49:21 227:21
228:5,8 302:17
**Southfield (1)**
3:16
**Southwell (2)**
474:5 477:5
**space (7)**
186:7,7 188:4,12
192:6,10 310:2
**spaced (1)**
294:11
**Spain (1)**
39:7
**span (1)**
36:21
**speak (8)**
219:23 246:10 251:3
273:2 302:22,23
379:2 473:20
**speaking (3)**
267:7,8 305:19
**speaks (5)**

142:20 194:11 284:5
293:7 393:2
**specialist (2)**
5:15 475:7
**specialists (1)**
476:9
**specific (8)**
67:6 219:12 373:15
375:13 382:7,9,12
459:11
**specifically (2)**
10:23 293:2
**specified (2)**
66:9 281:12
**specifies (1)**
143:13
**specify (1)**
185:22
**spectrum (3)**
74:23,24 217:15
**spend (5)**
130:2 345:24,25
346:7 435:8
**spending (2)**
129:11 467:12
**spent (15)**
40:15 54:7 55:9 63:17
130:23 222:24
226:16 228:23
261:5 366:15
389:21 411:17
465:9 469:12
470:18
**spirit (11)**
60:12 100:19 108:15
108:23 112:16
117:11 118:9 137:6
138:12,13 325:14
**spoke (4)**
175:13,22 254:5
256:17
**spoken (5)**
174:17 253:15 270:19
270:25 271:5
**spread (1)**
432:24
**spring (1)**
30:14
**springtime (1)**
212:14
**SSGA (1)**
373:23
**Stabenow (1)**
219:19
**staff (20)**
62:19,20 63:9,10,13

64:11,14 73:11
139:5 151:3 169:23
181:12 212:3
218:20 219:14
226:16 362:14
383:23 385:19
410:7
**staffers (4)**
212:11 216:18,21
218:4
**stake (2)**
235:23 311:2
**staking (1)**
122:21
**stamp (1)**
365:8
**stand (5)**
7:25 57:4,8 393:5,8
**standard (12)**
83:18 104:6 117:22
121:14 122:18
126:2 140:2 197:8
199:8 258:20 287:5
394:19
**standards (2)**
47:3 397:8
**standing (4)**
25:23,25 27:6 203:8
**stands (3)**
325:24 400:17 404:16
**stare (1)**
123:20
**start (15)**
68:13 71:3 76:3 95:5
102:19 293:16
323:22 327:10
434:20 444:4
447:13,14 462:13
462:14,21
**started (19)**
13:4,5,10 19:17 50:17
51:9,11,14 54:18
63:18 82:6 102:17
241:12 271:22,24
289:8 363:3 424:11
458:17
**starting (6)**
52:13 141:9 212:11
311:21 356:14
412:12
**starts (9)**
231:21,22 293:15
311:3,15 337:18
352:4 390:19 430:6
**state (11)**
2:12 180:18 373:24

374:7,10,17 375:2,4
375:11 479:4,11
**stated (4)**
81:4,7 295:12 367:19
**statement (46)**
7:21 9:7,9 27:11 54:4
98:24 133:18
144:25 181:10,18
182:4 185:15 186:2
188:8 194:25 197:4
197:5 206:6 208:6
210:7,9 211:9 290:4
313:18 317:8 322:7
327:18,24 328:4
344:5,8 346:3
350:20 363:17
366:13 369:20
370:3 376:24 377:9
377:10,12 387:18
387:20 390:18
397:22 442:8
**statements (22)**
57:8 66:9 88:12
111:23,25 181:9
195:15 245:4
273:10,13 274:9
370:8 382:17
383:13,17 395:7,9
397:2 405:12
413:10 448:17
463:2
**States (5)**
1:2 5:7 191:22 219:18
298:5
**stating (1)**
209:11
**status (1)**
193:23
**stay (1)**
257:17
**stems (1)**
367:10
**step (6)**
100:14 169:25 204:7
233:24 235:19
261:25
**stepping (1)**
465:24
**steps (2)**
261:14,15
**Sternfels (22)**
222:17 223:4,20
224:16 249:17
251:6,15,16,19
254:3 275:21 277:6
282:23 284:23,23

356:12 416:18
418:3,13,16 473:5,8
**Sternfels' (1)**
251:18
**Steve (1)**
6:11
**Steven (4)**
44:6 110:11 226:10
397:8
**stiff (1)**
310:16
**stipulate (1)**
147:23
**stipulation (1)**
61:13
**stock (10)**
20:21 168:23 190:7
190:20 191:8
193:16,20 355:19
429:24 430:4
**stood (1)**
316:25
**stop (23)**
27:10 70:16 92:3
98:11 136:14 224:5
241:20 257:15
258:7 261:10
264:13 265:20
276:9 316:2,4,14
343:21 366:19
395:3 421:9,9,11
468:13
**stopped (2)**
102:16 467:7
**stopping (2)**
421:10,13
**stops (2)**
366:21,23
**store (1)**
415:7
**story (11)**
34:16 75:4 97:9 99:2
119:8 306:4 328:17
328:18,22 391:18
393:18
**straight (6)**
183:8,11,12 187:5,6
392:3
**straightened (1)**
470:7
**strategies (2)**
384:14 475:22
**strategy (3)**
171:15 407:5,11
**Street (13)**
4:3 75:13 132:15

292:13,17 306:3
373:24 374:7,10,18
375:2,4,11
**stretch (1)**
348:24
**strict (1)**
244:15
**strike (11)**
52:18 63:21 90:10
122:15 158:3
165:20 199:24
208:2 266:21 301:3
452:17
**strong (1)**
133:12
**structure (5)**
17:24 20:25 106:6
366:23 407:8
**Stuart (1)**
44:23
**studied (3)**
38:15 109:14 226:17
**study (2)**
113:14 245:21
**studying (1)**
241:12
**stuff (11)**
139:2,10 183:13,14
183:20 186:21
334:19,23 389:14
389:15 404:22
**stumbled (1)**
306:6
**subbullet (1)**
381:5
**subbullets (2)**
371:12 379:11
**subheader (1)**
444:16
**subject (5)**
7:17 61:19 282:7,8
335:19
**submissions (2)**
208:9,25
**submitted (5)**
68:16 69:9,21 302:13
302:14
**subscribed (3)**
362:10 478:19 481:21
**subscription (3)**
375:17,25 376:20
**subsections (1)**
444:7
**subsequent (1)**
286:25
**subset (2)**

59:8 351:22
**subsidiaries (2)**
366:18 367:4
**subsidiary (11)**
15:23 124:16 177:14
179:20,21 180:11
180:13 338:11
342:9,12 354:7
**substance (5)**
272:18,20,22 330:2
404:19
**substantial (5)**
40:23 42:14 43:2
444:19 445:10
**substantiate (2)**
433:18 434:2
**substantively (1)**
330:19
**subtracted (1)**
427:13
**succeed (2)**
466:10 468:5
**successor (1)**
165:6
**sudden (1)**
221:22
**suggest (3)**
114:11 407:3 435:7
**suggested (1)**
252:3
**suggesting (3)**
97:7 120:9 244:22
**suggestion (1)**
273:4
**suit (9)**
24:15,16,17 228:7
233:8,8 274:23
296:9 300:15
**Suite (1)**
3:11
**suited (1)**
326:6
**sum (1)**
426:21
**summarized (1)**
272:16
**summed (1)**
426:16
**summer (4)**
212:14 259:7 271:19
271:19
**Sun (34)**
30:23 31:2 38:12 70:3
70:5,23 73:16 87:24
226:24 399:7 437:4
445:24 446:12,14

447:9,19,20 449:5,9
449:9,11,11,12
450:21 452:19
454:9,11,15,17
464:17 472:6,7,9,12
**Sunday (1)**
36:15
**supervise (1)**
56:8
**supplement (3)**
92:22 350:16 471:23
**supplemental (1)**
370:20
**supplementations (1)**
351:4
**supplied (8)**
71:23 72:13,23
198:12 245:22
393:21 448:16
451:10
**suppliers (3)**
178:8 361:9 400:13
**support (11)**
8:8 9:22 12:14 114:19
179:15 209:23
210:6 377:11
392:13 393:13
469:14
**supported (5)**
97:8 239:13 240:13
246:14 392:15
**supporting (2)**
81:18 107:22
**supportive (3)**
10:3 218:13,14
**supports (3)**
106:7 137:4 301:17
**supposed (8)**
104:18,20 126:3
157:16 365:22
390:23,24 399:2
**supposedly (3)**
156:22 204:20 390:16
**Supreme (3)**
321:16 475:7,11
**sure (60)**
11:21 14:15 21:4 29:6
41:8 42:24 46:18
50:17 53:14 55:7
58:13,21,23 66:12
86:17 121:10
130:21 132:8
134:18,21 141:16
151:4 153:5 202:4
206:20 212:3,15
213:24 215:2,9

220:22 232:18
236:11 262:11
281:4 290:24
295:20 298:15
324:2,9 329:20
335:7,24 341:12
351:8,11 361:22
367:21,22 378:6
380:21 391:17
392:2 393:9 412:3
423:22 437:20
472:17 474:19
476:12
**surely (1)**
76:22
**surface (1)**
393:3
**surprised (3)**
46:11 47:4 54:14
**Susan (2)**
475:13 478:4
**suspect (15)**
110:22 115:8,10
117:4,4 118:19
189:13 195:17
232:12,24 242:16
315:11 416:13,14
467:13
**suspenders (2)**
343:22 344:2
**swear (1)**
6:22
**swears (1)**
345:4
**sweeping (1)**
144:24
**Swiss (1)**
76:5
**switches (1)**
317:19
**switching (1)**
441:7
**swore (4)**
278:13 290:10 362:11
362:18
**sworn (15)**
7:2 160:14 270:7
272:9 275:20
302:13 313:18
322:5 391:10
448:16 464:8,9
478:19 479:14
481:21
**system (48)**
23:17 24:5,7 25:6,17
112:5 130:22 131:5

203:11 214:16,16
214:18,20,22,23
215:4,10 217:17,19
220:16,20,25 221:3
222:12,14 226:2
228:11 232:2 235:7
245:17 261:11,12
262:2 264:23,25
265:11,16 321:18
324:8 325:16
361:17 467:19
468:16 470:6,17,18
470:19,22
**systematically (1)**
371:13
**systemic (1)**
221:2
**systems (3)**
77:3 131:3 342:21

——————
T
**T (4)**
270:2 479:2,2 480:2
**table (2)**
246:3 349:25
**tacit (3)**
299:18 453:20 454:24
**take (33)**
42:21 68:11 86:4
126:10 133:18
146:10 160:17
210:13 214:24
239:4 240:6 246:8
258:18 260:10
269:3 284:4 288:2
291:9 315:16,18
335:6 361:13 372:3
377:22 378:21
390:23,24 393:13
420:22 424:21
437:17 439:8
440:18
**taken (8)**
21:12 132:20 169:25
261:14 291:14
325:10 409:20
475:9
**takes (3)**
136:4 137:9 186:10
**talk (32)**
40:2 75:25 81:21
116:23 118:20
154:8 167:18 193:2
219:13,14,17 222:7
228:12 229:7 244:4
244:9 251:14

263:20 273:22
284:10 285:21
286:18 326:19
342:2 365:3 397:25
427:19 432:10
463:16,23 466:7
477:11
**talked (23)**
19:6 38:16 171:23
172:3 220:4 228:14
229:9 257:23
259:23,24 273:17
315:3 329:9,17
418:20 424:5 429:4
437:12 468:21
471:23 472:3
477:16 478:11
**talking (28)**
73:14,20 124:25
172:17 181:23
192:25 194:4
221:11,22 224:25
244:3,5 254:2
257:24 259:16
282:6 284:11
286:17 296:16,17
341:23 345:13
368:11 389:5 400:4
401:17 424:9
463:18
**talks (2)**
81:23 185:18
**tampered (1)**
162:13
**tape (1)**
293:13
**Tarantino (1)**
263:3
**target (1)**
199:3
**targeted (1)**
191:18
**Tarp (1)**
44:13
**task (1)**
57:14
**tassels (1)**
268:10
**taught (1)**
310:4
**tax (8)**
17:25 106:21 107:5
406:20,22,23 407:5
407:11
**taxes (1)**
106:23

**team (35)**
40:22,24,25 42:14
43:2,4,10 89:17
90:19 141:21 145:4
146:24 149:7,10
151:3 153:21 198:5
198:8 209:9,14
246:3 354:17
363:13,14,21 364:4
371:10 473:18
477:21,23,23,24,25
478:2,3
**teams (1)**
469:13
**technical (1)**
14:24
**teleconference (2)**
4:6,19
**telephone (2)**
249:17 473:10
**telephonic (1)**
39:9
**tell (38)**
11:21 39:18,21 53:4
61:24 71:10 104:25
107:8,9 116:22
126:18 171:10
172:7 184:9 189:23
235:24 246:18,22
273:14 296:3
302:23 303:5,17
333:22 351:9
353:22 422:8,11
432:7 434:21
436:19,20,23 457:8
457:22 460:5,25
477:18
**telling (12)**
45:18 227:13,14,15
263:21 286:4 315:6
315:7 341:18
388:22 389:21
431:9
**tells (4)**
87:22 303:14,14
414:14
**Templeton (1)**
357:23
**ten (16)**
116:18 120:12 140:18
170:15 214:8
223:10 234:3 374:2
374:12,17 375:10
412:8,9 442:23
472:10,12
**term (3)**

307:24 339:23 442:6
**terms (11)**
35:17 107:18 144:17
194:22 271:10
353:10 370:12
421:16 434:10
436:13 442:8
**terribly (2)**
124:21,22
**test (1)**
271:5
**testified (22)**
7:3 12:5 53:21 66:16
79:10 94:10 154:10
163:14,19 166:5,8
270:8 278:12 295:9
300:18 301:16,23
324:24 334:13
369:24 440:16
462:3
**testify (4)**
76:20 318:24 319:8
402:7
**testifying (3)**
163:21,24 164:5
**testimony (24)**
11:24 12:15,17,25
25:11 54:2 79:9
89:14 100:20
139:19 153:3
154:17 164:23
185:12 218:2 241:7
245:13 280:24
295:10 300:13
324:21 336:23
420:4 479:15
**Texas (5)**
1:3 5:8 56:24 414:16
414:19
**thank (12)**
26:19 64:16,23 70:20
86:3 154:7 172:12
291:7 350:22 478:8
478:10,10
**thanked (1)**
250:21
**thanking (3)**
206:17 263:11 266:3
**thanks (5)**
12:19 173:11 269:2
386:16 478:9
**theirs (1)**
236:3
**themself (1)**
327:7
**theory (6)**

92:8 93:16,24 102:2
107:12 271:6
**they'd (3)**
117:7 405:23 406:8
**thin (1)**
369:20
**thing (23)**
47:20 55:5 161:6
171:8 183:19 193:3
193:5 257:16 265:9
294:2,23 299:17
330:14 361:12
391:9 397:13 417:8
432:4 436:14
439:17 458:22
464:2 465:12
**things (47)**
8:4 18:17 51:18,20
54:11 76:2 78:4
85:20,22 93:3,13
94:5 117:20 165:13
165:15,16,18,24
208:15 245:23
258:13 259:25
263:21 270:16
293:3 315:19
320:14 329:3,8
339:7,17 341:15
344:6 347:5,10,12
347:13 368:23,24
370:10 390:10,11
393:10,12 414:10
444:6 450:9
**think (242)**
12:21,23 18:5 26:13
28:6 29:18 30:4
31:7,8,12 33:4,5
34:11,13 37:7,18
43:7 45:5 48:21
50:7 54:8 60:13
62:8 68:4,7,9 76:22
77:20 79:10 81:8
84:19 89:24 98:10
98:14 99:16,18,19
111:12 112:20
113:2,3,4,14,15
114:15 120:3 121:7
121:21 122:18,22
123:5 133:8,8 138:8
138:24 139:11,12
142:9 149:9,9
150:23 151:2,4
152:5 153:7 155:7,7
155:12 156:18
160:10 167:12
175:15 177:4,18

183:7,13 184:21,25
185:9 188:7,19,20
190:4,21 192:18
193:25 194:11
195:21 196:17
199:25 205:3
206:23 207:17
210:22,23 211:6,8,8
212:22 215:6
218:15,17 220:10
222:18,19 224:15
227:12 228:21,23
233:22,24 234:2
235:18 236:21
239:3 240:17
243:25 244:19,24
247:7 248:21 249:2
252:11 256:24
263:7 264:6 266:25
267:9,11 268:11
271:18 273:2,4
274:5,19 277:24
278:12 279:21
280:11,16 281:24
282:14 283:4,6,8,19
287:20 291:19
292:7,10,12 293:5
293:24 295:4,4,5,22
296:15,19 297:23
299:9,13,21 301:13
301:15 303:6 304:4
306:13 311:18
313:13 315:3 316:7
318:5 320:5 322:14
326:5,6,7,20,23
329:19 336:12,14
336:16 338:2
347:15 349:22
354:12 362:21
365:21 369:2
385:14 386:18
387:17,19 388:3
391:25 392:3,17,18
392:21 393:2
398:12,18 400:10
400:24 401:2
412:20,23 413:13
414:15 415:12
416:18 419:14
420:24 421:2,3
425:22 427:11,15
429:10 430:2,8,24
434:5,6,7 436:2,21
443:2 446:21
448:23 449:18
453:18 457:12

467:24 468:24
471:9,14 473:13
475:17,21
**thinking (1)**
233:6
**thinks (1)**
325:12
**third (11)**
97:23 196:9,11
259:14 373:22,22
374:6 385:16 391:9
391:13 432:16
**third-party (31)**
168:2 171:16,18
194:15,16,19,20
195:5,19 200:24
369:5 373:14,17
374:23 377:5
378:13 382:7,8,19
383:15,19 386:6,8
387:3 389:20,22,24
390:2,3 399:21
425:24
**thought (29)**
46:9,23 110:24,25
114:15 188:22
206:10,10,12
214:12,21 218:22
221:6 237:9,10,10
239:20 240:20
250:16,17 252:7
261:23 264:8,9
297:24 300:3
349:18 400:19
472:4
**thoughtful (1)**
39:22
**thoughtfully (1)**
469:20
**thousands (9)**
55:8 79:11 129:10
236:17 244:25
245:20 310:24
333:6 405:13
**three (37)**
34:16,20 50:3,7 78:20
81:22 88:9,11 90:8
99:11 103:17 104:9
105:9,11 107:2
109:5,6,8 120:8,11
140:12 149:19
159:10 194:7
234:23 264:19
266:6,11 347:13
415:7,8 416:16
418:22 420:17

430:3 448:22
451:19
**throw (1)**
108:10
**Thursday (6)**
36:5,6,7,10,11,12
**tick (1)**
476:24
**tie (2)**
427:15,18
**ties (1)**
409:25
**tilted (1)**
265:13
**time (129)**
13:8 14:2,6,18,21
20:6 21:6 26:10
32:24 36:22 37:15
40:2 42:16 45:23
47:5 49:2,24 50:4
51:10,17 52:8,10
53:6 54:5 63:2,17
66:13,15 76:11
83:14 86:6,7,10
89:8 92:3 93:6
94:20 105:9 112:12
117:23 127:12
128:8 129:11 130:2
137:23 146:11
153:19 163:11,20
164:23 166:9
173:12,15 175:18
186:10 199:15
212:11 214:2
226:17 228:24
251:14 253:2,3,11
253:19 256:7
258:16 259:23
267:14 269:4 270:4
271:13 280:14,18
282:7 288:14,24
291:2,5,18 330:17
335:6 345:24,25
348:19 349:6,10,13
350:23 359:20
363:9 407:23 408:2
409:9,10 410:8
411:18 415:6 435:8
437:10,23 438:7,9
438:11,16,21
444:14 446:16
447:12 448:15
450:16 454:18
456:16,17,18
457:14 459:8
460:13 462:15

464:12,24 465:2,10
467:20 470:14
471:17 472:8
478:13,14
**timed (1)**
291:24
**timeline (1)**
447:15
**timely (1)**
150:8
**times (31)**
11:24 12:6,7,8,10,18
35:23 38:2 75:3,5
75:11,12 170:15
232:15 242:8
257:24 293:4
296:20 301:10
327:21,24 390:5
391:7 403:4 411:8,9
411:21,22 423:7
430:4 466:8
**timesheets (1)**
223:24
**tip (1)**
414:8
**Tips (1)**
194:10
**title (2)**
21:21 233:12
**titles (4)**
56:13 119:16 362:8,8
**today (51)**
7:14,18 10:5 12:25
13:14,18 17:16
21:16,21 22:11 43:6
45:19 53:24 54:3
58:17 59:3 77:12,19
98:17,22 101:12
103:6,8 104:10
105:17,18,21,22,24
157:3 175:15
212:18 218:3 223:8
223:18 224:20
249:18,19 263:20
263:22 268:16,20
293:23 294:23
296:3 301:10
346:12 356:13
462:3 466:8 469:25
**today's (1)**
478:13
**Togut (3)**
474:21,21 477:22
**told (61)**
27:23 40:14 82:17,25
107:3,6,12,13

149:23 169:2,2,4
187:24 189:14
224:11,12,16
241:16,17,19,21
242:14,14,16
251:15 252:6 253:4
253:19,20,24 254:5
254:8 255:25
256:17,19 257:4,9
258:14,19,25
259:14,22 262:16
263:20 275:6,12,12
276:23 277:5,6
297:22,25 299:8
344:3,6 350:2 419:6
419:8,10 422:19
471:17
**tolerate (4)**
264:24,25 265:2
333:24
**Toll (10)**
3:14,17 6:15,15 27:23
32:21 37:6 46:17
52:13 110:19
**tomorrow (2)**
351:10,14
**top (28)**
41:17 62:24 92:21
130:21 139:3
202:21 237:25
242:6 258:3 286:15
293:15 304:18
305:20,21 308:2
337:25 338:20
340:3 354:13 374:2
374:12,17 375:10
379:8 381:2 383:4
444:4 467:11
**top-of-the-mind (1)**
34:3
**topic (2)**
279:2 476:22
**topics (1)**
474:2
**total (9)**
18:19 29:21,25 49:25
65:2 396:17 412:19
419:23 427:10
**totality (1)**
287:10
**trace (1)**
371:25
**track (2)**
92:2 175:6
**trade (1)**
472:16

**trading (6)**
201:15 353:6 420:12
424:11 425:18
440:3
**traffic (1)**
236:15
**trafficking (2)**
463:11,13
**trail (1)**
11:17
**train (1)**
366:19
**trained (3)**
230:21 462:10 466:5
**training (3)**
309:23 362:4 388:24
**transaction (9)**
14:5 30:9 35:16 191:4
202:22 330:2
404:20 455:16,19
**transactions (3)**
231:15 236:8 330:18
**transcript (9)**
273:21 281:25 290:18
290:20 291:11
305:9 306:2 329:21
480:9
**transcription (2)**
293:6,11
**transfer (4)**
406:14,21 463:5,8
**transferred (1)**
451:23
**Transformation (3)**
4:8 5:22,25
**transmittal (1)**
60:7
**transparency (11)**
112:5 202:3 212:25
213:8 215:3 217:18
220:14 344:24
356:5 393:19 400:6
**transparent (1)**
460:2
**travesty (1)**
131:13
**treat (3)**
330:20 359:6 400:15
**tree (1)**
367:18
**trend (1)**
462:21
**Tribe (5)**
475:5,6,9,9 477:25
**tried (12)**
155:11 161:11 162:19

162:23 165:21,22
165:23 222:20
223:15 294:23
301:12 468:22
**trillions (1)**
200:19
**trouble (1)**
294:10
**troubled (5)**
168:20,21,22,24
183:24
**truck (1)**
415:9
**trucks (1)**
415:11
**true (25)**
7:21 27:10 40:11
118:15 189:20
237:8 313:3 321:7,8
322:21 328:20,21
328:21 357:13
369:12,13,15,18,22
377:10,14,15,17,18
479:15
**trust (16)**
131:8 193:15 194:6
207:20,22 225:9
326:2 327:17,22
328:6,7,7 391:11
424:24 425:12
480:13
**trustee (79)**
95:12 98:2,2,5,7,8
100:12,16 104:15
104:19 118:14
123:11 128:23
130:13 138:4,9
140:5,6,15 155:8
156:6,11,13,17
157:2,6,11 158:15
158:25 169:18
204:22 205:15,18
205:21 207:13,23
208:7,9,20,25 209:6
209:15,17,21 210:4
211:4,4,15,24
216:22,23 225:15
226:8,9,14,19 227:2
227:18 229:24
232:15 240:22
242:7,15,19,23
252:17 265:18
311:12 321:20
327:19,21,22
418:12 435:6,13,13
465:16 469:18,23

**Trustee's (5)**
206:5 207:12 226:15
248:5 321:13
**trustees (2)**
114:7 403:4
**trusts (2)**
117:20 340:16
**truth (2)**
8:11 133:24
**truthful (1)**
12:24
**truthfully (2)**
215:22 452:23
**try (16)**
129:24 165:24 192:9
210:19 213:7
223:14 224:6 229:6
261:12 316:16
332:6 333:14
389:16 451:7
457:10 473:19
**trying (28)**
23:20 33:18 34:10
54:8 55:13 58:9
60:13 74:7 83:6
118:12 129:9
130:14 162:24
175:7,7 227:7
233:24 239:24
250:11 261:10
265:10 266:6,7
288:5 294:17 309:7
345:14 465:10
**TSG (2)**
5:13,17
**Tuesday (1)**
33:4
**turn (10)**
26:21 55:6 60:23 61:7
64:16 157:9 292:18
305:16 398:14
443:17
**turned (4)**
56:14 77:2,21,23
**turning (1)**
61:10
**turns (13)**
46:25 88:6 146:4
164:8 202:16
236:22 237:5,8,17
245:16 399:2 467:2
473:7
**twice (8)**
101:2 222:6 228:3
232:16 272:22
274:22 277:12

278:6
**two (110)**
21:10 41:4 50:2 56:25
72:12 75:23 81:2,7
81:11,21 82:5,8,10
85:25 86:13 87:15
90:6 95:9 98:14,18
103:3,16,17 104:6,9
109:4 110:13
112:15 113:25
116:10,12,14,17,18
116:20 120:10
124:11 125:22,25
126:5,9,20,21,23,24
126:25 131:5 138:6
140:9,11,12,16
157:7 161:24 162:2
183:17 188:15
196:11 212:20
219:25 223:12
226:20 243:4,6
247:8,9 249:18,21
249:22,23 250:21
257:2 258:7 264:18
267:23 272:8,9
275:18 301:7
310:10,22 340:6
356:8,13 372:23
416:15 427:25
431:11 435:17
437:17 443:12,15
447:3,5 448:4,13,15
448:22 449:21,24
450:3,6,9,12,13,23
452:22 456:2,19
462:19
**two-hour (1)**
249:14
**two-third (1)**
201:2
**two-year (4)**
85:21,23,25 205:22
**TX (2)**
3:11 4:4
**type (12)**
67:24 72:5 74:12
137:10 145:13
150:5 174:3,4,8
175:5 215:5 379:24
**types (2)**
56:15 352:17
**typically (3)**
29:2 352:21 442:22
**typographical (1)**
9:24

**U**

**U.S (15)**
44:5,6,7 110:12,15,16
110:18,20 212:18
234:5 321:13
473:21,23 474:5,9
**Uh-huh (1)**
305:22
**Uh-oh (1)**
328:12
**ultimate (1)**
366:18
**ultimately (2)**
117:12 368:16
**Ultrapetrol (4)**
335:10,14 351:17
480:11
**unable (1)**
139:15
**unaware (1)**
259:3
**uncertainty (1)**
198:18
**unclear (4)**
193:14,19 198:19,21
**underlies (1)**
318:6
**underlying (7)**
108:24 137:6 171:17
377:7 378:15
383:18 386:7
**understand (29)**
12:2 55:13 58:11,21
66:12 86:17 147:10
153:5 198:3 208:14
241:5 244:19
283:25 296:24
308:22 309:6,13
342:6 349:2 353:16
354:15 374:9
423:22 441:11,21
442:22 443:9
452:25 466:19
**understanding (24)**
27:12 56:19 57:15
104:17 150:17
232:2 256:5 262:21
282:9 284:24
286:19,23 287:11
290:14 309:3,7,11
309:19,21 310:8
353:21 409:18
419:5 440:23
**understatement (1)**
93:11
**understood (2)**

58:14 120:4
**undertook (1)**
32:12
**undisclosed (17)**
69:18 71:20 123:21
129:20 141:19
310:22 311:4
364:20 432:18
450:2 458:8,10
463:3,4,16,20,24
**unequivocally (1)**
127:20
**unexplained (2)**
200:9 463:3
**unfair (1)**
277:24
**United (6)**
1:2 5:6 95:11 191:22
219:18 298:5
**universal (1)**
194:25
**University (3)**
43:18,21,24
**unknown (1)**
394:19
**unlawful (1)**
213:19
**unlawfully (3)**
64:25 216:6 230:6
**unlevel (1)**
130:18
**unprecedented (3)**
226:3,5 245:8
**unreasonable (2)**
397:24 439:6
**unreasonably (1)**
42:16
**unrelated (1)**
339:4
**unrestricted (1)**
196:12
**unserious (1)**
119:18
**unsupported (1)**
99:2
**unwillingness (1)**
108:21
**updated (5)**
62:22 63:3,4,6 348:10
**upper (1)**
360:18
**upset (3)**
253:24 276:25 466:4
**US-based (1)**
374:10
**USC (2)**

27:7 178:12
**use (27)**
10:14 48:3 82:21 91:4
92:2 103:4 116:13
116:17,25 117:22
168:11 226:5
228:13 229:8 233:2
238:18 280:14,18
307:17 342:5 369:5
394:10 412:9,11,13
412:15 449:20
**uses (5)**
91:20 93:9 194:15,19
336:25
**usually (2)**
194:20 399:15
**usurpation (1)**
333:4
**usurped (2)**
136:8,17
**usurping (1)**
137:12
**utilities (1)**
77:6
**utilize (1)**
90:2
**uttered (1)**
328:2

**V**

**valiantly (1)**
222:21
**valid (2)**
202:8 206:3
**validated (1)**
451:9
**valuable (7)**
193:16 361:4 398:3,7
398:9,13,19
**value (27)**
3:10,15,19 16:13 27:8
29:21,25 31:6,25
35:6,7,12 42:3
195:17 387:7
394:21,23 398:11
425:16 426:19
427:24 428:10,12
438:2 439:10,25
480:14
**various (3)**
13:12 295:6 352:16
**vast (5)**
76:17,18,21,21
283:20
**Vegas (1)**
43:25

**vehicle (3)**
191:7 197:6 358:16
**vehicles (1)**
352:16
**vendetta (1)**
265:3
**vendors (3)**
99:24 126:15 361:8
**verified (1)**
71:22
**verify (1)**
377:24
**version (1)**
63:5
**versus (4)**
133:17 242:25 243:2
343:7
**vested (1)**
391:17
**vice (2)**
3:17,19
**viciously (1)**
129:24
**video (2)**
5:3,15
**Videographer (22)**
4:22 5:2 6:17,21
14:18,21 86:7,10
173:12,15 269:4
270:4 291:2,5 349:7
349:10,13 407:23
408:2 437:23 438:7
478:12
**videotape (1)**
336:16
**Videotaped (2)**
1:18 2:6
**view (67)**
38:22 58:3 65:13,15
65:21 82:15,19
105:25 110:4 112:6
114:20,22 127:10
127:14 138:18
177:7,9 179:7,14,15
213:24 215:18
216:7 218:13
221:11 228:14
229:10,15,16,20,21
229:22,24 230:2
236:19,20,24
238:24 239:4,12
242:11,18,18 246:5
246:9,11 247:25
248:6,8 251:18
262:5 306:18
321:23 322:22,23

322:25 323:11
326:22 327:2
329:12,16 332:7
336:15 351:13
353:23 365:16
392:13
**viewed (2)**
222:8 370:8
**views (1)**
263:14
**violated (11)**
88:16 275:10 278:10
278:22 281:21
285:6 287:24 295:2
296:6 308:25 309:2
**violates (5)**
109:13 118:9,10,11
325:13
**violating (21)**
109:10 159:3 264:21
274:3,17 277:15
280:7 282:17 286:4
294:8,13 298:24,25
300:22 303:7
312:22 331:17
336:3 401:8,10,15
**violation (12)**
62:13 124:10 265:24
307:2,8 308:9,10
309:15,16 310:14
310:21 312:24
**violations (12)**
225:24 282:4,24
306:5,10 307:2,19
308:6 310:3,17
311:19 312:5
**Virginia (5)**
205:12 254:6 417:2
475:3,4
**virtuous (1)**
360:24
**visits (2)**
212:5,7
**voice (2)**
204:10 301:11
**volumes (1)**
142:20
**voluntarily (6)**
100:13,18 125:20
202:13 264:4
459:25
**Volvo (1)**
260:13
**voting (2)**
354:14 419:8

**W**

**wait (4)**
11:18,20 119:24
264:11
**waited (1)**
11:16
**waiting (3)**
172:15,16 281:9
**walk (1)**
346:2
**walked (1)**
35:3
**wall (8)**
75:13 132:14 292:13
292:16 306:3 323:6
323:7 330:23
**wallet (1)**
334:10
**walls (1)**
407:12
**want (94)**
11:18 31:11 41:2,6
48:6 62:2 100:14
103:4 113:24
120:24 121:2 130:6
130:9 140:9 144:15
147:23 157:13
168:13,14 188:23
196:13 202:14,23
203:4 205:20
206:20 207:3,16
210:8 225:9 228:25
229:2 230:20 240:9
241:3,5 251:16
252:8 254:19
270:17,21,22,24
279:19 283:22
284:8,17 285:18
290:7 296:10
298:10 302:24
308:20,21 314:25
320:5 322:11 324:9
326:4 331:22,23
342:3 345:19 346:6
346:8 347:16 349:7
349:16,21 350:4,8
350:16,25 351:7,10
351:10 372:6 407:2
407:8,21 410:25
412:15,16 420:23
424:2 426:21,23
427:2 440:8 451:6
468:5 470:3,6
476:12
**wanted (25)**
53:14 58:3 61:23

113:22 115:11
136:22 202:13
207:14 216:22,23
223:13 224:3
251:14,19 252:5
253:7 254:20 255:2
264:11 276:9
350:11 417:12,14
472:2 476:21
**wanting (1)**
324:8
**wants (7)**
58:2 203:10 205:18
321:25 323:22
393:16 435:20
**warning (1)**
261:4
**Washington (6)**
209:6 226:9 355:12
475:20,23 476:5
**wasn't (37)**
87:14 99:4,5 100:3,6
122:3 142:23,24
146:16 160:23
191:5 202:7 203:19
205:3,6 207:11,11
213:22 216:13
218:22 219:12
224:17 240:22
244:3 263:13
264:10,12 275:15
288:5 302:9 332:2
377:15 398:6
405:23 406:7 418:9
470:4
**watermelons (1)**
343:15
**way (74)**
74:11 97:7 109:20,23
110:14 113:6
121:15 123:16,18
123:19 127:23
128:5 131:6 143:8
147:8,9 161:16
167:6 182:18 200:2
202:5,19 204:3
211:7 223:14
230:19 233:22
235:22,25 243:4
251:20 284:4,17
290:8,12 294:17
296:21 304:6
305:12 319:12
332:9,11 333:15,16
336:4 341:18
345:16 346:15

348:14 357:19,20
377:25 384:8
391:14 398:10,22
398:23 402:24
406:5 411:11 416:8
416:9 418:3 447:18
448:21 451:15
458:18 468:11,14
468:17 469:3,18
476:10 479:20
**ways (7)**
24:12 185:25 214:19
348:3 398:20
420:18 458:22
**we'll (4)**
116:22 361:14 393:11
424:22
**we're (56)**
14:19,22 31:8 61:24
61:25 64:6 86:11
104:17 124:15
126:3 147:18
172:16 173:13
182:6 220:11,12
260:4,6,19 263:15
269:5 279:4 291:3,6
296:14 297:7
315:25 322:8
337:12,24 346:5,17
349:11,14 370:24
371:12 372:25
373:20 379:16
389:5 390:22,23
393:14 401:20
408:3 412:3 421:21
430:22 437:24
438:8 439:17
440:22 442:4
449:20 458:19
469:24
**we've (29)**
14:10,11 41:15 121:7
155:10 156:5 158:5
159:13,13 172:15
184:25 198:16,17
198:17 228:14
229:9 238:16
259:15,15 267:13
281:9 288:8 291:10
393:10,20 424:5
439:9 474:13 476:8
**wearing (1)**
267:11
**wears (1)**
370:5
**weather (1)**

267:10
**website (8)**
172:5,8 176:12,16,17
176:18 183:25
189:2
**websites (1)**
417:22
**wedding (1)**
259:9
**week (8)**
36:3,4,6,7,10 40:21
42:22 263:9
**weekend (5)**
55:17,20 59:2 60:6
61:12
**weeks (6)**
7:8 56:25 223:12
226:25 258:7
443:15
**welcome (2)**
280:9 303:2
**well-advised (1)**
231:19
**well-known (2)**
375:7 397:7
**went (36)**
19:16 20:2 98:14
100:22 111:3
154:20 159:5 209:5
209:14,16,20
219:16 224:7,8,25
234:10 237:13
239:15 250:8,9
259:13 261:13
262:14 285:10,15
293:19 322:15
328:5 360:8 363:2
415:6 420:11
429:25 432:11
448:9 468:20
**weren't (15)**
46:16 57:18 83:3
134:21 203:17
204:13 224:11
241:22 260:25
284:14 287:7
297:17,19 450:12
462:12
**Westmoreland (49)**
1:8 5:5 24:19,22 27:9
27:21 32:7 65:17,24
67:4,6 69:17,18
70:2,6,14 71:10,12
71:14,19 78:21 79:7
80:25 82:6 83:15
91:15,16 97:15

108:4 123:21 128:3
128:9 141:13,24
147:25 296:9
302:15 306:22
326:20 363:10
399:8 437:6 444:2
447:22 463:20
464:16,17,21 481:3
**Westmoreland's (1)**
28:10
**WHEREOF (1)**
479:22
**whistleblower (1)**
136:21
**White (44)**
159:9,22 160:8,16,17
160:20,22 161:9,13
161:18,23 162:5,7
162:15,18,22 163:6
163:10,13,20,25
164:8,15,20,24
165:3,4 166:5,6,8
166:15,17,19 167:2
167:3,4,8,13,15,21
168:5,13 169:7,23
**Whitebox (32)**
386:3,11 424:6
425:13,15,24
426:12,18 428:3,5
428:11,16 429:8,12
429:13,22 430:21
432:4,5,9,19,20
433:3,5,10,14,19
434:17 436:4,17
439:3,24
**whoa (3)**
189:25,25 452:5
**wholly-owned (5)**
124:16 177:13 179:19
179:21 180:13
**widely (1)**
374:9
**wife (1)**
470:8
**William (1)**
475:12
**willingness (1)**
108:17
**Willkie (1)**
44:11
**win (1)**
466:20
**wish (2)**
375:19 376:21
**withdraw (2)**
91:17 247:17

**withdrew (1)**
227:2
**withheld (4)**
206:6 234:17 304:21
463:2
**withhold (1)**
236:16
**withholding (4)**
118:4 320:10,11,19
**witness (25)**
3:4 6:6,9,23,25 14:12
42:11 64:4 90:13
262:3 293:24 295:8
301:10,11,16
303:24 316:3
349:15 350:14
390:25 473:8,16
479:12,16,22
**WITNESS' (1)**
481:4
**witness's (3)**
204:7 312:19 465:24
**witnesses (3)**
262:23,25 473:3
**wondering (2)**
239:12 308:19
**Woodward (1)**
3:20
**word (8)**
10:2,14 226:5 228:22
233:3 378:21 389:5
404:17
**wording (1)**
274:23
**words (13)**
10:22 58:21 69:2
112:14 228:13
229:9 230:19 290:9
294:18 302:21
304:18 347:13
404:19
**wordsmith (1)**
290:7
**wordsmithing (2)**
142:10 196:6
**work (78)**
22:7 33:24 34:5 42:13
59:10 75:20 102:19
119:9,10,12,14,15
119:17,18,19,20,22
119:23 120:2,5
121:5,16,23 122:2,2
122:4 130:6,7,9
147:8 151:25 152:4
152:18,21 170:22
181:13,20 189:4

250:14 252:8 256:3
256:7,15 257:15
260:4,5,9,10 276:6
326:7 333:12
334:25 342:10,14
342:24 343:3
357:15 358:19
359:3,14,15 360:14
364:4,7,11 388:5
404:7,23,23 413:17
413:24 416:9,25
417:17 453:3
455:10 457:15
474:23
**workaday (1)**
361:15
**worked (12)**
12:12 43:10 45:23
52:15 76:2 149:10
149:10 175:17
237:14 317:13
460:24 461:6
**working (30)**
14:15 21:24 33:3
37:12 40:23 92:17
130:23 196:22
213:16 267:23
331:8,9,10 333:13
354:17,19 363:3
406:4 410:19
419:19 422:9
439:17 446:17
456:11,15 458:18
461:7 468:11
469:13 471:6
**works (25)**
27:22 114:13 169:14
171:2,7,11 192:15
223:6 341:19
361:12 367:23
388:10,11,11,12,14
412:10,23 416:10
419:6,7,9 422:18,18
422:20
**world (26)**
29:4,5 73:14 74:25
76:4 102:2 131:2
139:8 171:2,6
184:14 188:4,5,6
189:6 192:4,15
266:14 311:14
327:7 359:24,25
361:15 401:20
406:6,24
**world's (1)**
264:2

**worldwide (1)**
410:20
**worse (1)**
364:19
**worth (2)**
33:7 35:4
**worthwhile (1)**
325:12
**wouldn't (9)**
34:2 84:3 120:7,14
186:14 236:18
256:2 288:4 432:13
**wow (1)**
170:2
**wraps (1)**
330:14
**writ (2)**
416:12 458:14
**write (3)**
106:23 268:12 388:19
**writes (1)**
345:3
**writing (10)**
63:15 263:6,13 267:7
267:8,9,11,18,21
268:24
**written (12)**
81:15,17 114:25
115:2 140:2 211:15
296:21 319:11
384:22 393:6,10,12
**wrong (13)**
29:23 124:21,23
206:10 231:20
235:3 253:21 262:7
263:14 264:16
318:2 337:12
392:12
**wrote (5)**
267:3,17,21 268:13
474:20

_____

**X**

**x (3)**
1:5,13 480:2

_____

**Y**

**yeah (6)**
303:12,18 305:10
331:11,24 429:5
**year (68)**
33:16 72:20 78:23
81:2,8,12,22,22
82:8,10 85:25 86:13
87:15 90:7 93:4,10
98:18 104:6 107:2

116:10,12,14,17,18
116:18,21 124:12
126:21 140:17
234:11,15 259:15
259:16 290:19
302:12 376:19
395:24 396:2
410:21 411:5,16,17
411:25 412:21,24
413:16 421:16
425:2,4 441:5,12,23
443:2 447:3,5 449:8
449:21,24 450:3,6,9
450:23 452:22
456:2,19,22 465:13
468:22
**year-end (1)**
440:4
**years (132)**
12:12 17:18 21:25
37:25,25 40:15
43:12 45:20 46:6,21
46:23 47:7 49:17
52:16 58:8,8 63:18
72:17,20 78:20
79:13 82:5 90:6,8
91:8,21 92:4,7,9,11
93:2,3,8,16,17,23
93:24 94:5,13,14,17
94:19,25 95:4,9,23
96:3 98:14 101:20
103:3,16,18 104:6
104:10 105:10,11
106:12 109:4,5,7,8
112:15 113:20,25
120:8,10,10,11,11
120:12,12 124:12
124:13 125:22,25
126:6,9,21,24,25,25
130:23 131:6 138:6
140:10,11,12,16,17
140:18 149:11
157:7 164:16,16,16
164:20 173:8 175:4
203:11 219:23,25
223:19 230:22
245:18 249:20
309:22 322:16
337:4 338:7 366:15
390:22 391:22,23
409:7 411:4 412:4
432:23 434:15,18
435:17 441:20
448:5,14,15 450:12
450:13 451:14
458:15 467:5

469:13 470:8,18
**yelling (1)**
285:25
**Yep (1)**
372:7
**yesterday (3)**
36:15 157:3 440:24
**yields (1)**
73:5
**York (28)**
2:8,9,12 3:5 4:9 5:10
5:11 36:8 49:22
75:3,5,11,12 188:25
227:22 228:6,8
271:25 302:17
473:11,22,23
474:16,22 476:7
479:4,6,11
**young (4)**
331:11,12 358:25
360:17

_____

**Z**

**ZACK (2)**
4:2,5
**zero (5)**
189:18 411:10 419:24
436:17 451:20
**Zona (6)**
3:7 6:8,8 36:25,25
37:2
**zone (2)**
121:8,9

_____

**0**

**08 (2)**
412:23 414:22

_____

**1**

**1 (18)**
5:3 13:15 26:15,16,23
26:24 41:23 61:8
64:20,21 85:17
365:3 369:22
394:20 397:16
411:9 444:16 480:3
**1.5 (1)**
27:8
**1.6 (1)**
414:24
**1:05 (1)**
269:4
**1:44 (2)**
270:3,4
**10 (21)**
18:23 119:21 141:10

369:23 394:22
395:24 397:17
410:21 411:24,25
412:4,21 417:15
422:10 423:3,19
424:22,23 427:20
427:21 480:13
**10,000 (1)**
312:15
**10:16 (1)**
86:10
**100 (6)**
13:22 15:2 177:13
342:8,11 354:6
**10022 (1)**
3:5
**101.14 (4)**
124:10 307:19 308:7
399:22
**10104 (1)**
4:9
**102 (1)**
149:23
**11 (17)**
1:10 27:7 51:8 55:6
68:17 95:18 178:11
223:24 333:10
339:6 398:25 399:6
399:13 438:2 439:9
439:14 480:14
**11.1 (1)**
425:14
**11:30 (1)**
173:12
**11:43 (1)**
173:15
**110 (1)**
425:12
**1109 (1)**
27:7
**119 (2)**
279:22 282:20
**12 (3)**
178:24 179:4 180:24
**123 (1)**
284:20
**125 (2)**
175:16 418:21
**126 (1)**
410:19
**128 (3)**
285:14,18 286:5
**129 (4)**
279:20,24 280:20,21
**1290 (1)**
4:8

**13 (5)**
60:3,4 214:7 411:10
459:21
**13,500 (2)**
28:10 30:5
**130 (7)**
85:2,14 104:23 126:7
126:19 427:25
428:7
**138 (1)**
88:19
**139 (2)**
77:4,5
**14 (5)**
95:19 234:16 261:5
409:23 464:7
**140 (9)**
406:10 409:6,24,25
411:3,6 413:7 414:6
414:16
**140,809,985 (1)**
408:23
**141 (1)**
409:6
**144A (2)**
27:9,14
**147 (1)**
427:20
**14th (1)**
449:13
**15 (7)**
373:5 410:15,16,16
410:17 429:25
464:10
**150 (9)**
71:13 73:7 147:24
148:3 175:17
180:20 181:2,4,19
**150,000 (5)**
31:6,25 33:6 35:10,15
**151 (1)**
3:20
**153327 (1)**
1:25
**16 (13)**
76:17 163:17 271:19
371:18,23,24 372:5
372:12,22 374:5,6
429:25 452:20
**160 (1)**
123:20
**163 (1)**
372:24
**166 (24)**
61:8 64:17,22 65:6
77:14 80:18 84:25

85:7,13 86:16,24
87:8 104:25 118:25
121:18 122:7
123:22 132:2
146:20 153:23
173:21,24 329:11
440:9
**167 (2)**
68:8,11
**168 (1)**
68:8
**169 (1)**
68:8
**17 (26)**
180:9 197:2,11
271:19 336:21
337:7,16,17 338:4
369:14,21 370:18
375:22 376:14,14
378:3,3,10 400:7
409:7 411:4,6,8,21
412:4 432:17
**17th (1)**
82:18
**18 (10)**
98:4,12,14 212:13
233:12 240:24
379:9 380:23 383:4
443:9
**18-35672(DRJ) (1)**
1:11
**18-cv-04141 (2)**
279:17 480:8
**18th (3)**
7:9 57:3,4
**19 (12)**
364:24 365:7,20
380:6,9,13 381:16
381:19 382:3,13
394:7,8
**1981 (3)**
13:4,5 19:16

――――――――――――
          **2**
――――――――――――

**2 (15)**
26:21,24,25 36:9
41:10,14,24 391:15
394:20 397:10,11
397:16 411:8 473:2
480:4
**2,000 (4)**
13:15,17 175:15
312:9
**2,300 (2)**
234:18 471:11
**2,900 (1)**

141:13
**2.5 (1)**
395:25
**2:10 (1)**
291:2
**2:11 (1)**
291:5
**20 (17)**
89:4 95:18 163:14,17
240:24 271:18
383:6,10,12 394:22
397:11,12,17,21
408:19 409:16
470:7
**200 (2)**
149:22 320:10
**200,000 (3)**
29:22 30:3 472:24
**2000 (1)**
92:20
**2000s (1)**
14:3
**2001 (3)**
408:22 409:11,19
**2006 (5)**
14:6 15:3,3,4 19:18
**2007 (1)**
19:18
**2010 (2)**
408:9 409:21
**2011 (1)**
89:11
**2012 (4)**
19:23,23 20:4,8
**2013 (1)**
19:23
**2014 (149)**
44:9 46:5,13 47:2,11
47:13 48:21 49:11
50:14,24 51:23 52:7
52:23 53:10,23 55:3
57:13 66:19,22
70:11 72:16 73:15
77:8 79:3 80:14
81:15,16 82:20 83:7
83:8,15,17,22,23
88:17 89:7 98:4
99:10,20 100:7
105:15 106:2,6,8,10
106:11,13 107:17
107:21 108:25
109:11,13,17,25
110:5 111:13
114:21 115:5,16
117:7 118:10,11
122:13 127:15

128:9 137:5,12
138:20 139:12,17
139:21 144:4,23
177:20 207:6 213:2
213:15 214:5
215:20 216:7
222:24 228:15
229:10 232:3,7
233:20 239:13
241:20 243:18
244:6 245:10 246:5
247:5 248:3 249:9
249:13 253:6,12
258:22 270:13
271:7,12,12,15,24
275:20 276:14
278:21 280:23
281:20 282:4,17
285:6 286:3 289:4,9
294:8 295:2 296:5
298:24,25 307:3,4,8
307:16,18 308:6
310:3 317:6,14
322:7,8 333:8 341:6
344:19 346:4
347:24 401:4
402:22 429:22
430:22 436:25
450:25 452:25
456:8 457:16
459:13 460:10
473:12
**2015 (19)**
83:15 259:13 270:14
271:16 272:2
289:10 385:24
386:24 424:20
425:4 429:9,12,22
429:23 430:10,22
438:24 439:4 456:4
**2016 (48)**
30:15 82:3 85:17 95:8
96:6,8,12,22 97:3
97:12 101:16,17
102:7,13,14 103:2
105:14 156:15
163:16,17 288:14
288:16,22 289:4,10
385:25 424:12,19
424:24 425:2,19,19
429:22,23 430:10
430:22 431:6,16
436:5,5 439:23
440:4 445:21
449:10 450:19,22
472:7 480:14

**2017 (19)**
32:12 335:11,15
  441:3,5,12,14
  442:16,17,23 443:2
  443:3,6 446:19,23
  449:12,13 455:24
  480:11
**2018 (24)**
1:16 2:2 5:11 62:23
  106:11 208:11,18
  209:3,7,15,18 212:6
  212:11 289:4
  291:15 441:5,10,16
  442:20,25 443:8,11
  481:3,22
**2019 (2)**
478:20 479:24
**202 (2)**
71:17 129:20
**205 (14)**
65:2,7,22 68:3 71:17
  122:6 123:20
  141:23 144:2
  149:17 150:25
  152:6 153:14
  176:21
**20th (4)**
8:13 36:2 42:2 335:19
**21 (6)**
372:2,3,4 407:15,18
  408:5
**22 (8)**
95:18 351:19 384:5
  385:3,10,11,13,16
**220 (1)**
405:22
**23 (6)**
373:19 374:4 386:10
  386:18,20,22
**23rd (1)**
446:23
**24 (2)**
175:3 375:21
**24-month (1)**
138:11
**247 (6)**
427:20 444:3,11,11
  445:3,4
**248 (3)**
443:18,20,24
**25 (15)**
124:6 138:10 175:4
  191:20 195:23
  196:7 201:8,24
  343:8 355:5 358:15
  394:24 395:18

432:16 449:12
**25,000 (1)**
76:7
**250 (4)**
395:2 396:3,6,18
**252 (3)**
445:17 447:7,8
**26 (6)**
95:19 240:12 380:5
  464:7,9 480:3
**26th (1)**
163:16
**279 (1)**
480:7
**28 (1)**
62:23
**288 (1)**
480:8
**29 (5)**
177:24,25 178:2
  438:10 439:22
**290 (2)**
55:22 480:9
**29580 (1)**
3:15

_____
**3**

**3 (11)**
41:13,18,25 42:6 55:5
  95:19 293:16,16
  349:10 391:15
  480:5
**3,000 (1)**
410:18
**3:20 (1)**
349:13
**30 (7)**
52:16 214:3 372:24
  429:11 438:12,14
  443:13
**30,000 (3)**
76:7,9 420:24
**300 (1)**
4:16
**3000 (1)**
194:9
**31 (7)**
1:16 2:2 354:12,15
  441:14 443:6 481:3
**31st (4)**
5:11 10:9 442:17
  479:23
**32 (3)**
180:24,24 354:15
**327 (3)**
178:12 307:20 427:21

**335 (1)**
480:10
**34 (1)**
411:9
**35 (10)**
12:12 15:7,17 18:14
  18:22,22,24 180:25
  429:11 466:14
**350 (2)**
73:5 321:11
**361 (3)**
425:10,10 426:10
**363 (1)**
423:25
**37 (1)**
427:21
**370 (1)**
480:12
**3700 (1)**
3:11
**374 (1)**
198:11
**375 (1)**
194:10
**3753 (1)**
4:3
**376 (1)**
196:18
**378 (1)**
192:20
**379 (4)**
192:20,22 193:24
  198:19
**38 (2)**
427:21 480:18
**381 (1)**
198:11
**39 (1)**
214:3

_____
**4**

**4 (24)**
38:15,17 42:5,6 48:7
  48:8,9 62:15 69:16
  198:25 222:24
  288:14,18,18,22
  292:18 293:15
  296:17 297:10
  390:22 391:22,23
  411:19 480:6
**4:12 (1)**
407:23
**4:34 (1)**
408:2
**40 (13)**
28:6 101:20 130:23

138:24,24 173:7
  203:11 230:22
  245:18 291:22
  302:5 366:15
  421:19
**40-year (3)**
52:14 170:22 264:24
**41 (6)**
95:15 213:25 312:6
  319:17 480:4,5
**4124 (2)**
428:4,6
**4160 (1)**
382:12
**424 (1)**
480:13
**427 (1)**
427:21
**438 (1)**
480:14
**44 (1)**
138:24
**45 (3)**
237:16 280:22 427:7
**460 (1)**
354:13
**47 (3)**
286:7 287:14 428:6
**48 (4)**
286:8,15 287:14
  480:6
**48009 (1)**
3:21
**48034 (1)**
3:16
**4th (1)**
288:20

_____
**5**

**5 (16)**
18:22 55:12 88:9
  279:6,16 281:8
  304:8,12,13,15
  369:17,22 382:20
  383:15 411:9 480:7
**5:03 (1)**
437:23
**5:12 (1)**
438:7
**5:49 (1)**
478:13
**50 (18)**
421:19 423:16 424:8
  424:17 426:9
  427:16 428:10,12
  428:20 429:8

430:18,19,24 433:9
  433:14 439:2,5
  472:24
**50,000 (1)**
415:10
**50,488,357 (7)**
425:16 426:16 431:5
  431:23 434:12
  436:3 439:25
**500 (7)**
321:10 355:19 360:5
  395:2 396:3,6,18
**500,000 (1)**
391:15
**53 (9)**
337:18,20,23 370:15
  371:5,21 378:8
  386:13 427:7
**54 (2)**
339:25 427:7
**55 (3)**
338:16,18 427:7
**5500 (18)**
154:14 424:19,24
  426:5 429:23,23
  431:16,24 432:11
  434:14 436:14
  438:24 439:4,22
  442:18,21,24
  480:14
**5500's (1)**
440:19
**5500s (10)**
72:8,18 155:13
  164:13 174:10
  196:2,19 201:3
  440:25 464:4
**56 (2)**
411:9,22
**57 (4)**
86:25 151:7,18
  440:14
**575 (3)**
2:8 3:4 5:9
**58 (2)**
394:4,8
**59 (4)**
394:6 408:15,18
  409:17
**5th (1)**
449:10

_____
**6**

**6 (9)**
95:18 284:7 288:8,9
  288:16,19 340:15

423:5 480:8
**60 (2)**
139:4 176:24
**600 (2)**
193:21 194:3
**60654 (1)**
4:17
**629 (1)**
335:22
**64 (2)**
351:21,25
**65 (2)**
65:15 410:19
**669 (4)**
335:23 372:24 409:17
  444:11

_____
**7**

**7 (16)**
179:3 290:17,20
  291:10 304:13
  336:21 337:8,9,10
  337:14,19,19 372:5
  411:9,22 480:9
**70 (4)**
337:23 338:16,18
  339:25
**70s (1)**
430:2
**71 (2)**
147:22 148:13
**77010 (1)**
3:11
**77025 (1)**
4:4

_____
**8**

**8 (16)**
180:11 305:17,23
  335:8,9 351:17
  382:11 410:17
  411:9,9,21,22,22
  427:21 451:18
  480:10
**8.2 (2)**
411:5,8
**8:38 (2)**
2:3 5:12
**8:47 (1)**
14:18
**8:51 (1)**
14:21
**80 (8)**
150:24 240:25 427:22
  427:23,24 428:4
  429:24 430:11

**809 (2)**
409:24,25
**84 (5)**
177:21,22 178:4
  326:21 343:19
**85 (2)**
156:18,21
**89 (3)**
443:23,24 444:25

_____
**9**

**9 (18)**
34:21 85:7 258:10
  336:20 338:15,16
  365:7,8,9 370:25
  371:4 372:13
  380:10 407:17,18
  408:6 439:15
  480:12
**9:57 (1)**
86:7
**90 (5)**
160:8 413:23 445:18
  448:9 458:17
**900 (1)**
461:3
**94 (1)**
321:13
**95 (1)**
367:20
**99 (1)**
367:21
**990 (1)**
3:11

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAY ALIX,

               *Plaintiff*,

        -against-

MCKINSEY & CO., INC.; MCKINSEY
HOLDINGS, INC.; MCKINSEY &
COMPANY INC. UNITED STATES;
MCKINSEY RECOVERY &
TRANSFORMATION SERVICES U.S.,
LLC; DOMINIC BARTON; KEVIN
CARMODY; JON GARCIA; SETH
GOLDSTROM; ALISON PROSHAN;
ROBERT STERNFELS; and JARED
YERIAN,

               *Defendants*.

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Sean F. O'Shea
Michael E. Petrella
Amanda L. Devereux
**BOIES SCHILLER FLEXNER LLP**
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiff*

## Table of Contents

TABLE OF AUTHORITIES ..................................................................................... III

PRELIMINARY STATEMENT .................................................................................. 1

RELEVANT BACKGROUND ................................................................................... 2

ARGUMENT ............................................................................................................. 3

I.     ALIX ADEQUATELY ALLEGES PROXIMATE AND BUT-FOR CAUSATION. ............................................................................................... 3

      A.    The Supreme Court's Decision in *Bridge* Demonstrates That Alix Has Properly Pled Proximate Causation. ..................................... 3

      B.    *Anza* is Distinguishable Because the FAC Alleges a Direct Injury. ................. 6

      C.    Defendants' Purported Intervening and Superseding Causes Do Not Apply to the Entirety of Alix's Claims, and in Any Event Cannot Be Decided on a Rule 12(b)(6) Motion. .............................................. 11

      D.    The Court Can Determine Whether AP Would Have Likely Obtained Assignments Absent Defendants' Racketeering. .......................... 17

II.    ALIX ADEQUATELY PLEADS RICO PREDICATE ACTS BY EACH DEFENDANT. ......................................................................................... 19

      A.    The Fraud-Based Predicates Allege Both Affirmative Misrepresentations and Omissions. ................................................. 19

      B.    Bankruptcy Fraud in Violation of 18 U.S.C. §§ 152(2) and 152(3). .............. 22

      C.    Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343. ................ 33

      D.    Obstruction of Justice and Witness Tampering. ............................... 34

      E.    Violations of 18 U.S.C. § 2314. ........................................................ 37

      F.    Money Laundering in Violation of 18 U.S.C. § 1957(a). ................. 38

      G.    Violations of 18 U.S.C. § 152(6) and State Law Commercial Bribery. .......... 39

III.   ALIX ADEQUATELY PLEADS SCIENTER. .............................................. 41

      A.    The FAC Gives Rise to a Strong Inference of Fraudulent Intent. ................. 41

      B.    Defendants' Exculpatory Arguments Are Meritless. ........................ 44

IV.   THE COUNT 1 AND COUNT 3 RICO ENTERPISES ARE WELL-PLED. ............. 53

      A.    The Count 1 Enterprise Is Validly Pled. .......................................... 53

      B.    The Count 3 Enterprise Is Validly Pled. .......................................... 55

V.    ALIX ADEQUATELY PLEADS RICO ENTERPRISE PARTICIPATION BY THE INDIVIDUAL DEFENDANTS. ........................................................ 56

VI.   ALIX ADEQUATELY PLEADS AIDING AND ABETTING LIABILITY FOR RICO PREDICATE OFFENSES. .......................................................... 62

VII.  THE RICO CONSPIRACY CLAIM IS WELL-PLED. .................................. 65

VIII. ALIX'S RICO CLAIMS ARE TIMELY. ...................................................... 67

IX.   THE CONTRACT CLAIM IS WELL-PLED. ................................................ 69

|  | A. | The Contract Does Not Unreasonably Restrain Trade. ...................................69 |
|--|----|-------------------------------------------------------------------------------|
|  | B. | The *Winston* Factors Do Not Preclude Alix's Contract Claim. .......................70 |
|  | C. | Alix Pleads Facts that Unequivocally Demonstrate Barton's Actual or, at a Minimum, Apparent Authority to Enter into the Contract........................72 |
|  | D. | Alix Adequately Pleads Damages, and Defendants' Assertion of Failure to Mitigate is Premature and Baseless.................................................73 |
| X. | | THE TORTIOUS INTERFERENCE CLAIM IS WELL-PLED..................................73 |
|  | A. | The Bankruptcy Code Does Not Preempt Alix's State-Law Claims..............73 |
|  | B. | Alix's Claims Are Well-Pled under Virginia Law. .........................................74 |
| CONCLUSION | | ....................................................................................................................75 |

ii

# TABLE OF AUTHORITIES

**Cases**

*131 Main St. Assocs. v. Manko,*
  897 F. Supp. 1507 (S.D.N.Y. 1995)...................................................................62, 63

*4K&D Corp. v. Concierge Auctions, LLC,*
  2 F. Supp. 3d 525 (S.D.N.Y. 2014) ...................................................................11, 64

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,*
  *Nat'l Ass'n,* 731 F.2d 112 (2d Cir. 1984) ...............................................................22

*Ainsworth v. Owenby,*
  2018 WL 3964807 (D. Ore. Aug. 17, 2018) ............................................................11

*Air et Chaleur, S.A. v. Janeway,*
  757 F.2d 489 (2d Cir. 1985)....................................................................................72

*Am. Auto. Accessories, Inc. v. Fishman,*
  1996 WL 480369 (N.D. Ill. Aug. 22, 1996) ...........................................................64

*AMA Realty LLC v. 9440 Fairview Ave. LLC,*
  2014 WL 1783099 (D.N.J. May 2, 2014) ..................................................................6

*Amati v. City of Woodstock,*
  176 F.3d 952 (7th Cir. 1999) ..................................................................................25

*Amsterdam Tobacco Inc. v. Philip Morris Inc.,*
  107 F. Supp. 2d 210 (S.D.N.Y. 2000)......................................................................59

*Angermeir v. Cohen,* 14 F. Supp. 3d 134 (S.D.N.Y. 2014) ......................................65

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006).........................................................................................*passim*

*Ashcroft v. Iqbal,*
  556 U.S. 662, 678 (2009)....................................................................................49, 50

*Ashland Oil v. Arnett,*
  875 F.2d 1271 (7th Cir. 1989) .................................................................................66

*Astech-Marmon, Inc. v. Lenoci,*
  349 F. Supp. 2d 265, (D. Conn. 2004).................................................................13, 17

*Astor Holdings v. Roski,*
  325 F. Supp. 2d 251 (S.D.N.Y. 2003)......................................................................73

*Baisch v. Gallina,*
  346 F.3d 366 (2d Cir. 2003)..................................................................................8, 9

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,*
  2000 WL 1694322 (S.D.N.Y. Nov. 13, 2000)..........................................................62

*Baron v. Rabinovici*,
   2006 WL 1318426 (E.D.N.Y. May 12, 2006) ...................................................................30

*Baumer v. Pachl*,
   8 F.3d 1341 (9th Cir. 1993) ...............................................................................56, 61

*BCS Servs., Inc. v. Heartwood 88, LLC*,
   637 F.3d 750, (7th Cir. 2011) ......................................................................*passim*

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................47, 50

*Betulius v. Hanna*,
   1996 WL 900413 (W.D. Mich. 1996)...............................................................62

*Bigsby v. Barclays Capital Real Estate, Inc.*,
   170 F. Supp. 3d 568 (S.D.N.Y. 2016)...............................................................43

*Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*,
   832 F. Supp 585 (E.D.N.Y. 1993) .....................................................56, 57, 61

*Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*,
   2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ...................................................67

*Bradley v. Franklin Collection Serv., Inc.*,
   2011 WL 13134961 (N.D. Ala. Mar. 24, 2011) ...............................................62

*Bridge v. Phoenix Bond & Indem. Co.*,
   128 S. Ct. 2131 (2008)...............................................................................*passim*

*Brown v. Cassens Transp. Co.*,
   675 F.3d 946 (6th Cir. 2012) ...............................................................17

*Bulletin Displays, LLC v. Regency Outdoor Advert., Inc.*,
   518 F. Supp. 2d 1182 (C.D. Cal. 2007) ...............................................6, 7

*Burke v. Dowling*,
   944 F. Supp. 1036 (E.D.N.Y. 1995) ...............................................................30

*Cadle Co. v. Flanagan*,
   2006 WL 860063 (D. Conn. Mar. 31, 2006) ...................................................61

*Casey v. Odwalla, Inc.*,
   2018 WL 4500877 (S.D.N.Y. Sept. 19, 2018)...............................................2

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001)...............................................................52, 53, 55, 66

*Central Bank of Denver v. First Interstate Bank*,
   511 U.S. 164 (1994)...............................................................61, 62, 63, 64

*Chen v. Major League Baseball Props.*,
   798 F.3d 72 (2d Cir. 2015)...............................................................28

*Chevron Corp. v. Donziger,*
   974 F. Supp. 2d 362 (S.D.N.Y. 2014)....................................................................13, 16

*ChevronCorp. v. Donziger,*
   871 F. Supp. 2d 229 (S.D.N.Y. 2012).............................................................................33

*City of Cleveland v. Ameriquest Mortg. Secs., Inc.,*
   615 F.3d 496 (6th Cir. 2010) ..........................................................................................11

*City of Phila. v. Fleming Cos., Inc.,*
   264 F.2d 1245 (10th Cir. 2001) ......................................................................................48

*City of Roseville Emps. Ret. Sys. v. Nokia Corp.,*
   2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011)..................................................................22

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)...................................................................................................18, 19

*Clark v. Conahan,*
   737 F. Supp. 2d 239 (M.D. Pa. 2010) ..............................................................................6

*Cohen v. S.A.C. Trading Corp.,*
   711 F.3d 353 (2d Cir. 2013)............................................................................................67

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,*
   271 F.3d 374 (2d Cir. 2001).................................................................................9, 11, 14

*Congregacion de la Mision Provincia de Venez. v. Curi,*
   978 F. Supp. 435 (E.D.N.Y. 1997) .................................................................................66

*Cowen & Co. v. Fiserv, Inc.,*
   141 A.D.3d 18 (1st Dep't 2016) ......................................................................................70

*Cox v. Admin. U.S. Steel & Carnegie,*
   17 F.3d 1386 (11th Cir. 1994) ........................................................................................62

*Crab House of Douglaston Inc. v. Newsday, Inc.,*
   418 F. Supp. 2d 193 (E.D.N.Y. 2006) ............................................................................57

*Crab House of Douglaston Inc. v. Newsday Inc.,*
   801 F. Supp. 2d 64 (E.D.N.Y. 2011) ..............................................................................57

*D. Penguin Bros. Ltd. v. City Nat'l Bank,*
   587 F. App'x 663 (2d Cir. 2014) ......................................................................................3

*D'Addario v. Geller,*
   264 F. Supp. 2d 367 (E.D. Va. 2003) .............................................................................34

*Dalton v. Lee Publ'ns, Inc.,*
   2011 WL 1045107 (S.D. Cal. Mar. 22, 2011) ................................................................45

*Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
   1995 WL 43669 (S.D.N.Y. Feb. 2, 1995)........................................................................62

*De Sole v. Knoedler Gallery*,
 974 F. Supp. 2d 274 (S.D.N.Y. 2013)..................................................................................65

*Dep't of Econ. Dev. v. Arthur Andersen & Co.*,
 924 F. Supp. 449 (S.D.N.Y. 1996) ..............................................................56, 57, 62, 63

*DFG Mfg. Corp. v. Northrop Grumman Corp.*,
 1999 WL 33458384 (E.D.N.Y. Mar. 23, 1999)...................................................................70

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
 822 F.2d 1242 (2d Cir. 1987).............................................................................................48

*Doe v. Backpage.com, LLC*,
 817 F.3d 12 (1st Cir. 2016)................................................................................................14

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009).........................................................................................41, 42

*Elsevier, Inc. v. Grossman*,
 77 F. Supp.3d 331 (S.D.N.Y. 2015)..............................................................................66, 68

*Estate of Gottdiener v. Sater*,
 35 F. Supp. 3d 386 (S.D.N.Y. 2014).................................................................................63

*Faith Enters. Grp., Inc. v. Avis Budget Grp., Inc.*,
 2012 WL 1409403 (N.D. Ga. April 20, 2012).................................................................18

*Fed. Ins. Co. v. U.S.*,
 882 F.3d 348 (2d Cir. 2018)..............................................................................................65

*Feld Ent'mt Inc. v. ASPCA*,
 873 F. Supp. 2d 288 (D.D.C. 2012)..................................................................................34

*Ferri v. Berkowitz*,
 678 F. Supp. 2d 66 (E.D.N.Y. 2009) ................................................................................30

*Fezzani v. Bear, Stearns & Co., Inc.*,
 592 F. Supp. 2d 410 (S.D.N.Y. 2008)...............................................................................50

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
 458 U.S. 141 (1982)...........................................................................................................72

*Fielding v. Kupferman*,
 65 A.D.3d 437 (1st Dep't 2009) ........................................................................................72

*First Am. Corp. v. Al-Nahyan*,
 17 F. Supp. 2d 10 (D.D.C. 1998) ......................................................................................64

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
 385 F.3d 159 (2d Cir. 2004)...................................................................................30, 47, 65

*Foster v. Wintergreen Real Estate Co.*,
 81 Va. Cir. 353 (2010) .......................................................................................................74

*Franzone v. City of N.Y.*,
  2015 WL 2139121 (E.D.N.Y. May 4, 2015) ............................................. 64

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................... 44

*Friedman v. 24 Hour Fitness USA, Inc.*,
  580 F. Supp. 2d 985 (N.D. Cal. 2008) ................................................. 55

*Frydman v. Verschleiser*,
  172 F. Supp. 3d 653 (S.D.N.Y. 2016)................................................... 65

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
  640 F. Supp. 2d 300 (S.D.N.Y. 2013).................................................. 40

*Glenn v. Moss*,
  2017 WL 8950429, (N.D. Ill. Mar. 1, 2017)........................................... 17

*Goldston v. Bandwidth Tech. Corp.*,
  52 A.D.3d 360 (1st Dep't 2008) ........................................................ 71

*Gonzales v. Parks*,
  830 F.2d 1033 (9th Cir. 1987) .......................................................... 73

*Grauberger v. St. Francis Hosp.*,
  169 F. Supp. 2d 1172 (N.D. Cal. 2001) ............................................... 45

*Grewal v. Cuneo*,
  2015 WL 4103660 (S.D.N.Y. July 7, 2015) ........................................... 36

*Handeen v. Lamaire*,
  112 F.3d 1339 (8th Cir. 1997) .......................................................... 61

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*,
  955 F. Supp. 248 (S.D.N.Y. 1997) ............................................... 62, 63

*Hecht v. Commerce Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990)............................................................... 65

*Hemi Grp. LLC v. City of New York*,
  559 U.S. 1 (2010).................................................................. 1, 7, 8

*Highland Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n*,
  698 F.3d 202 (5th Cir. 2012) ........................................................... 69

*Holloway v. Household Auto. Fin. Corp.*,
  227 B.R. 501 (N.D. Ill. 1998) .......................................................... 73

*Holmes v. Secs. Inv. Protection Corp.*,
  503 U.S. 258 (1992)................................................................*passim*

*In re Advanta Corp. Secs. Litig.*,
  180 F.3d 525 (3d Cir 1999)............................................................. 48

*In re Agape Litig.*, 681 F. Supp. 2d 532 (E.D.N.Y. 2010)...................................... 59

*In re Am. Honda Motor Co.*,
  958 F. Supp. 1045 (D. Md. 1997) ................................................................62

*In re Balco Equities Ltd., Inc.*,
  345 B.R. 87 (Bankr. S.D.N.Y. 2006) .........................................................33

*In re BC Funding, LLC*, 519 B.R. 394 (E.D.N.Y. 2014) .......................................43

*In re Brennan*,
  187 B.R. 135 (Bankr. D.N.J. 1995) ............................................................25

*In re Byington*,
  454 B.R. 648 (Bankr. W.D. Va. 2011) .......................................................24

*In re ClassicStar Mare Lease Litig.*,
  727 F.3d 473 (6th Cir. 2013) ...............................................................53, 54

*In re Criimi Mae, Inc. Secs. Litig.*,
  94 F. Supp. 2d 652 (D. Md. 2000) .............................................................48

*In re E. Equip. & Servs. Corp.*,
  236 F.3d 117 (2d Cir. 2001) ......................................................................73

*In re Enron Corp.*,
  2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ...............................29

*In re Envirodyne Indus., Inc.*,
  150 B.R. 1008 (N.D. Ill. 1993) .......................................................25, 26, 32

*In re eToys, Inc.*,
  331 B.R. 176 (Bankr. D. Del. 2005) ...............................................29, 30, 35

*In re Express Scripts Holding Co. Secs. Litig.*,
  2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ..............................................22

*In re Farrington*,
  2007 WL 4365753 (Bankr. D. Ore. Dec. 11, 2007) ....................................21

*In re Fibermark*,
  2006 WL 723495 (D. Vt. Mar. 11, 2006) ...................................................29

*In re Filene's Basement, Inc.*,
  239 B.R. 850 (Bankr. D. Mass. 1999) ........................................................27

*In re First Jersey Secs., Inc.*,
  180 F.3d 504 (3d Cir. 1999) .......................................................................25

*In re Gen. Motors LLC Switch Litig.*,
  2016 WL 3920353 (S.D.N.Y. July 15, 2016) ...............................................5

*In re Gen. Wireless Operations Inc.*,
  2017 WL 5404534 (Bankr. D. Del. Apr. 6, 2017) ......................................28

*In re Granite Partners, L.P.*,
  219 B.R. 22 (Bankr. S.D.N.Y. 1998) ......................................24, 27, 32, 49

*In re Leslie Fay Cos., Inc.*,
  175 B.R. 525 (Bankr. S.D.N.Y. 1994)................................................................passim

*In re Lewis Rd., LLC*,
  2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011) .....................................25, 26

*In re Liebfried Aviation, Inc.*,
  445 B.R. 30 (Bankr. D. Mass. 2011) .............................................................32, 33

*In re Managed Care Litig.*,
  135 F. Supp. 2d 1253 (S.D. Fla. 2001) ...............................................................62

*In re Matco Elecs. Grp., Inc.*,
  383 B.R. 848, (Bankr. N.D.N.Y. 2008) .................................................21, 24, 26

*In re Mercury*,
  280 B.R. 35 (Bankr. S.D.N.Y. 2002)...................................................................24

*In re Mercury*,
  122 F. App'x 528 (2d Cir. 2004) .........................................................................24

*In re Merrill Lynch Auction Rate Secs. Litig.*,
  886 F. Supp. 2d 340 (S.D.N.Y. 2012)..................................................................70

*In re Merrill Lynch Ltd. P'ships Litig.*,
  154 F.3d 56 (2d Cir. 1998)...................................................................................66

*In re Midway Indus. Contractors, Inc.*,
  272 B.R. 651 (N.D. Ill. 2001) ..............................................................................27

*In re Miners Oil Co., Inc.*,
  502 B.R. 285 (Bankr. W.D. Va. 2013) ...........................................................26, 27

*In re Motel 6 Secs. Litig.*,
  161 F. Supp. 2d 227 (S.D.N.Y. 2001)...................................................................63

*In re One Commc'ns Corp.*,
  2009 WL 857535 (S.D.N.Y. Mar. 31 2009) ........................................................48

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014)......................................................................3

*In re Refco Inc. Secs. Litig.*,
  826 F. Supp. 2d 478 (S.D.N.Y. 2011)....................................................................9

*In re Refco Inc. Secs. Litig.*,
  2010 WL 6397586 (S.D.N.Y. July 19, 2010) ........................................................8

*In re Sealed Case*,
  162 F.3d 670 (D.C. Cir. 1998) .............................................................................34

*In re Sumitomo Copper Litig.*,
  104 F. Supp. 2d 314 (S.D.N.Y. 2000)...................................................................55

*In re Sumitomo Copper Litig.*,
   120 F. Supp. 2d 328 (S.D.N.Y. 2000)...................................................................67

*In re Sumitomo Copper*,
   995 F. Supp. 451 (S.D.N.Y. 1998). ......................................................................54

*In re Trust Am. Serv. Corp.*,
   175 B.R. 413 (Bankr. M.D. Fla. 1994) ...............................................................28

*Integrated Res. Real Estate Ltd. P'ships Secs. Litig.*,
   851 F. Supp. 556 (S.D.N.Y. 1994) ......................................................................68

*Internet Law Lib., Inc. v. Southridge Capital Mgmt.*,
   223 F. Supp. 2d 474 (S.D.N.Y. 2002)..................................................................70

*Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*,
   731 F.3d 556 (6th Cir. 2013) ...............................................................................17

*Jacobson v. Cooper*,
   882 F.2d 717 (2d Cir. 1989)................................................................................54

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)............................................................................................63

*Jenson v. Nat'l Air Traffic Controller's Ass'n*,
   2010 WL 1608678, (E.D. Wash. Apr. 15, 2010) .................................................68

*JSC Foreign Econ. Assoc. Technostroyexport*,
   2007 WL 1159637 (S.D.N.Y. Apr. 18, 2007).......................................................61

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ..........................................................43

*Kellogg Brown & Root Servs. v. U.S. ex rel. Carter*, 135 S. Ct. 1970 (2015).........................28

*Kerik v. Tacopina*,
   64 F. Supp. 3d 542 (S.D.N.Y. 2014)...................................................................64

*Khulumani v. Barclay Nat'l Bank Ltd.*,
   504 F.3d 254 (2d Cir. 2007) ...............................................................................64

*Kirwin v. Price Commc'ns Corp.*,
   391 F.3d 1323 (11th Cir. 2004) ..........................................................................66

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997) ...............................................68

*KLG Gates LLP v. Brown*,
   506 B.R. 177 (E.D.N.Y. 2014) ...........................................................................25

*Knight Secs. L.P. v. Fiduciary Tr. Co.*,
   5 A.D.3d 172 (1st Dep't 2004) ...........................................................................70

*Koch v. Christie's Int'l*, 699 F.3d 141 (2d Cir. 2012)......................................66, 68

*Kolchins v. Evolution Mkts.*,
   31 N.Y.3d 100 (2018)..........................................................................................70

*Kovach v. Access Midstream Partners, L.P.*,
  2016 WL 1162061 (N.D. Ohio Mar. 23, 2016) .................................................. 13

*Kravetz v. Brukenfeld*,
  1984 WL 2443 (S.D.N.Y. June 29, 1984) ......................................................... 41

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999) ............................................................................. 7

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp.2d 221, (S.D.N.Y. 2006) .............................................................. 67

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
  1995 WL 608323 (S.D.N.Y. Oct. 16, 1995) ..................................................... 40

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ............................................................................ 40

*Liberty Ins. Corp. v. Brenman*,
  2016 WL 880170 (E.D.N.Y. Mar. 1, 2016) ................................................. 67, 68

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL*,
  739 F.3d 45 (2d Cir. 2013) .............................................................................. 74

*Ling v. Deutsche Bank*, 2005 WL 1244689 (S.D.N.Y. May 26, 2005) .................................. 63

*Little v. City of N.Y.*,
  487 F. Supp. 2d 426 (S.D.N.Y. 2007) .............................................................. 65

*Loma Linda Univ. Med. Ctr., Inc. v. Farmers Grp., Inc.*,
  1995 WL 363441 (E.D. Cal. May 15, 1995) ..................................................... 55

*Maldonado v. Dominguez*,
  137 F.3d 1 (1st Cir. 1998) ............................................................................... 48

*Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*,
  2015 WL 5719801 (D.P.R. Sept. 29, 2015) ................................................. 62, 63

*Marshall & Ilsley Tr. Co. v. Pate*,
  819 F.2d 806 (7th Cir. 1987) ........................................................................... 13

*Matter of Atl. Sporting Club*,
  137 B.R. 550 (N.D. Ga. 1991) .................................................................... 26, 42

*Mattson v. Schultz*,
  145 F.3d 937 (7th Cir. 1998) ........................................................................... 17

*Mauriber v. Shearson/Am. Express*,
  567 F. Supp. 1231 (S.D.N.Y. 1983) ................................................................. 66

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992) ......................................................................... 3, 64

*Medgar Evers Houses Tenants Ass'n v.*
  *Medgar Evers Houses Assocs.*,
  25 F. Supp. 2d 116 (E.D.N.Y. 1998) ................................................................11

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ..........................................................................................73

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1172 (9th Cir. 2002) ..............................................................8, 14, 16

*Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*,
  2010 WL 11508022 (C.D. Cal. Feb. 26, 2010)................................................45

*Michael Coppel Promotions Pty. Ltd. v. Bolton*,
  982 F. Supp. 950 (S.D.N.Y. 1997) ...................................................................69

*Milam v. Dominick's Finer Foods, Inc.*,
  588 F.3d 955 (7th Cir. 2009) ..............................................................................5

*Milton Abeles, Inc. v. Farmers Pride, Inc.*,
  2007 2028069 (E.D.N.Y. July 11, 2007) .........................................................70

*Moon v. Harrison Piping Supply*,
  375 F. Supp. 2d 577 (E.D. Mich. 2005)............................................................62

*Morin v. Trupin*, 711 F. Supp. 97 (S.D.N.Y. 1989).............................................61

*Morning Star Packing Co. v. SK Foods, L.P.*,
  2011 WL 4591069 (E.D. Cal. Sept. 30, 2011)...............................................8, 9

*Napoli v. U.S.*, 45 F.3d 680 (2d Cir. 1995) .........................................................58

*Nikchemny v. Allstate Ins. Co.*,
  2016 WL 6082034, (E.D.N.Y. Oct. 17, 2016)..................................................68

*Niles v. Palmer*, 1999 WL 1419042 (S.D.N.Y. Oct. 22, 1999) ...........................63

*Nolte v. Pearson*, 994 F.2d 1311 (8th Cir. 1993)...........................................57, 61

NOW v. Scheidler,
  510 U.S. 249 (1994)....................................................................................12, 55

*Nurriddin v. Bolden*, 818 F.3d 751 (D.C. Cir. 2016).............................................14

*NYKCool A.B. v. Pac. Fruit, Inc.*,
  507 F. App'x 83 (2d Cir. 2013) ........................................................................71

*Ouaknine v. MacFarlane*,
  897 F.2d 75 (2d Cir. 1990)................................................................................40

*Padula v. Lilarn Props. Corp.*,
  84 N.Y.2d 519 (1994)........................................................................................73

*Pasquantino v. U.S.*,
  544 U.S. 349 (2005)...........................................................................................34

*Pearce v. Manhattan Ensemble Theater, Inc.*,
  528 F. Supp. 2d 175 (S.D.N.Y. 2007)............................................70

*Pension Comm. of Univ. of Montreal
  Pension Plan v. Banc of Am. Sec., LLC*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006)...........................................43

*Pers. Watercraft Prod. SARL v. Robinson*,
  2017 WL 4329790 (S.D.N.Y. Sept. 1, 2017).................................71

*Plumbers' & Pipefitters' Local No. 562 v.
  J.P. Morgan Acceptance Corp.*,
  2012 WL 601448 (E.D.N.Y. Feb. 23, 2012)..................................68

*Powers v. British Vita, P.L.C.*,
  57 F.3d 176 (2d Cir. 1995)...................................................47, 51

*Productores Asociados de Café Rio Claro, C.A. v. Barnett*,
  1999 WL 287389 (S.D.N.Y. May 7, 1999) ....................................49

*Rambarran v. Mount Sinai Hosp.*,
  2008 WL 850478 (S.D.N.Y. Mar. 28, 2008) .................................36

*Reading & Lang. Learning Ctr. v. Sturgill*,
  2016 WL 10880215 (Va. Cir. 2016)............................................74

*Reading Int'l, Inc. v. Oaktree Capital Mgmt.*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003).........................................69

*Redtail Leasing v. Bellezza*,
  1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)..................................57

*Republic of Colombia v. Diageo N. Am., Inc.*,
  531 F. Supp. 2d 365 (E.D.N.Y. 2007) ........................................14

*Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002) ..............................22

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)........................................................*passim*

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co., Inc.*,
  708 F. Supp. 2d 257 (E.D.N.Y. Mar. 3, 2010)...............................65

*Ritter v. Klisivitch*,
  2008 WL 2967627 (E.D.N.Y. July 30, 2008).................................30

*Roberto's Fruit Mkt., Inc. v. Schaffer*,
  13 F. Supp. 2d 390 (E.D.N.Y. 1998) .........................................40

*Robin Bay Assocs., LLC v. Merrill Lynch & Co.*,
  2008 WL 2275902 (S.D.N.Y. June 3, 2008) .................................72

*Rose v. Bartle*,
  871 F.2d 331 (3d Cir. 1989)...................................................65

*Rosenberg v. DVI Receivables,*
   835 F.3d 414 (3d Cir. 2016) ........................................................................... 73

*Rotella v. Wood,*
   528 U.S. 549 (2000) ................................................................................. 10, 67

*Rouse v. Rouse,*
   1990 WL 160194 (N.D.N.Y. 1990) ................................................................. 66

*RWB Servs., LLC v. Hartford Computer Grp., Inc.,*
   539 F.3d 681 (7th Cir. 2008) ..................................................................... 9, 10

*S.E.C. v. Invest Better 2001,*
   2005 WL 2385452 (S.D.N.Y. May 4, 2005) ................................................... 46

*S.E.C. v. Pentagon Capital Mgmt. PLC,*
   612 F. Supp. 2d 241 (S.D.N.Y. 2009) ...................................................... 41, 47

*S.E.C. v. Power,*
   525 F. Supp. 2d 415 (S.D.N.Y. 2007) ........................................................... 46

*Salinas v. U.S.,*
   522 U.S. 52 (1997) ........................................................................................ 57

*San Fran. Bay Area Rapid Transit Dist. v. Spencer,*
   2005 WL 2171906 (N.D. Cal. Sept. 6, 2005) ................................................. 61

*Sanchez v. ASA Coll., Inc.,*
   2015 WL 354083 (S.D.N.Y. June 15, 2015) ........................................ 3, 48, 64

*Schindler v. French,*
   232 F. App'x 17 (2d Cir. 2007) ..................................................................... 74

*Schmidt v. Fleet Bank,*
   16 F. Supp. 2d 340 (S.D.N.Y. 1998) ............................................................. 59

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ...................................... 63

*Silkwood v. Kerr-McGee Corp.,*
   464 U.S. 238 (1984) ...................................................................................... 73

*Simon v. Weaver,*
   327 F. Supp. 2d 258 (S.D.N.Y. 2004) ........................................................... 62

*Smith McDonnell Stone & Co. v. Delicato Vineyards,*
   1995 WL 375918 (S.D.N.Y. June 22, 1995) ................................................... 72

*Smith v. Cingular Wireless,*
   2006 WL 1272612 (D. Conn. Apr. 10, 2006) ................................................. 68

*Snellink v. Gulf Res., Inc.,*
   870 F. Supp. 2d 930 (C.D. Cal. 2012) ........................................................... 46

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG,*
   277 F. Supp. 2d 521 (S.D.N.Y. 2017) ........................................................... 64

*SourceOne Dental, Inc. v. Patterson Cos.*,
   310 F. Supp. 3d 346 (E.D.N.Y. 2018) ...................................................73

*Spinale v. U.S.*, 2004 WL 50873 (S.D.N.Y. Jan. 9, 2004).......................................63

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008)...................................................................66

*Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*,
   552 U.S. 148 (2008)...............................................................................63

*Sykes v. Mel Harris Assocs.*,
   757 F. Supp. 2d 413 (S.D.N.Y. 2010).....................................................44

*Targum v. Citrin Cooperman & Co.*,
   2013 WL 6087400 (S.D.N.Y. Nov. 19, 2013)....................................49, 50

*Tatung Co., Ltd. v. Hsu*,
   2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) .......................................61

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308 (2007).........................44

*Thai Airways Int'l v. United Aviation Leasing B.V.*,
   891 F. Supp. 113 (S.D.N.Y. 1994) .........................................................37

*Thompson v. Jasas Corp.*,
   212 F. Supp. 2d 21 (D.D.C. 2002) .........................................................68

*Tomar Elec., Inc. v. Watkins*,
   2009 WL 2222707 (D. Ariz. July 23, 2009) ...........................................17

*Turkmen v. Hasty*,
   789 F.3d 218 (2d Cir. 2015)...................................................................65

*Tymoshenko v. Firtash*,
   57 F. Supp. 3d 311 (S.D.N.Y. 2014).......................................................38

*U.S. ex rel. Banigan v. Organon USA, Inc.*,
   2013 WL 4786323 (S.D. Tex. Sept. 6, 2013) .........................................45

*U.S. ex rel. Miller v. Weston Educ., Inc.*,
   840 F.3d 494 (8th Cir. 2016) .................................................................45

*U.S. ex rel. Nevyas v. Allergan, Inc.*, 2015 WL 4064629 (E.D. Pa. July 2, 2015) .................44

*U.S. ex rel. Purcell v. MWI Corp.*,
   807 F.3d 281 (D.C. Cir. 2017)...............................................................45

*U.S. v. Abbell*,
   271 F.3d 1286 (11th Cir. 2001) .............................................................34

*U.S. v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)...................................................................20

*U.S. v. Baum*,
    32 F. Supp. 2d 642 (S.D.N.Y. 1999)...................................................................34

*U.S. v. Bonanno Organized Crime Family*,
    879 F.2d 20 (2d Cir. 1989)...........................................................................11

*U.S. v. Brown*,
    2012 WL 4103857 (W.D.N.Y. Sept. 17, 2012)..................................................36

*U.S. v. Cianci*,
    378 F.3d 71 (1st Cir. 2004)...........................................................................55

*U.S. v. Colton*,
    231 F.3d 890 (4th Cir. 2000) ........................................................................22

*U.S. v. Crispo*,
    306 F.3d 71 (2d Cir. 2002)...........................................................................35

*U.S. v. Crockett*,
    979 F.2d 1204 (7th Cir. 1992) ......................................................................66

*U.S. v. Dauray*,
    215 F.3d 257 (2d Cir. 2000)..........................................................................28

*U.S. v. Diaz*,
    176 F.3d 52 (2d Cir. 1999*)*.....................................................................57, 58

*U.S. v. Evans*,
    844 F.2d 36 (2d Cir. 1988)...........................................................................34

*U.S. v. Gellene*,
    182 F.3d 578 (7th Cir. 1999) ................................................................*passim*

*U.S. v. Genova*,
    333 F.3d 750 (7th Cir. 2003) ........................................................................63

*U.S. v. Gotti*, 459 F.3d 296 (2d Cir. 2006)..............................................................38

*U.S. v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016)..........................................................................33

*U.S. v. Henry*,.............................................................................................34

*U.S. v. Hoffman*,
    2015 WL 1608557 (E.D. La. Apr. 10, 2015)...................................................45

*U.S. v. Keplinger*,
    776 F.2d 678 (7th Cir. 1985) ........................................................................22

*U.S. v. Kumar*, 617 F.3d 612 (2d Cir. 2010).............................................................34

*U.S. v. Langella*,
    776 F.2d 1078 (2d Cir. 1985)........................................................................34

*U.S. v. Lundwall*,
  1 F. Supp. 2d 249 (S.D.N.Y. 1998) ........................................................34

*U.S. v. Markiewicz*,
  1996 WL 663894, (N.D.N.Y. Nov. 6, 1996) ...........................................22

*U.S. v. Maxwell*,
  920 F.2d 1028 (D.C. Cir. 1990) .............................................................47

*U.S. v. Moleski*,
  641 Fed. App'x 172 (3d Cir. 2016) .........................................................46

*U.S. v. Napoli*,
  2010 WL 1687669 (E.D.N.Y. Apr. 27, 2010) .........................................37

*U.S. v. Nekritin*,
  2011 WL 2462744 (E.D.N.Y. June 17, 2011) .........................................47

*U.S. v. O'Connor*,
  874 F.2d 483 (7th Cir. 1989) .................................................................37

*U.S. v. Payne*,
  591 F.3d 46 (2d Cir. 2010) ....................................................................55

*U.S. v. Pierce*,
  224 F.3d 158 (2d Cir. 2000) ..................................................................34

*U.S. v. Reich*,
  479 F.3d 179 (2d Cir. 2007) ..................................................................36

*U.S. v. Rodriguez*,
  2002 WL 31426211 (S.D.N.Y. Oct. 23, 2002) .......................................36

*U.S. v. Sabbeth*,
  125 F. Supp. 2d 33 (E.D.N.Y. 2000) ......................................................22

*U.S. v. SCRAP*,
  412 U.S. 669 (1973) ..............................................................................19

*U.S. v. Silver*,
  864 F.3d 102 (2d Cir. 2017) ..................................................................38

*U.S. v. Smith*,
  198 F.3d 377 (2d Cir. 1999) ..................................................................63

*U.S. v. Sokolow*,
  91 F.3d 396 (3d Cir. 1996) ....................................................................39

*U.S. v. Sun-Diamond Growers of Cal.*,
  138 F.3d 961 (D.C. Cir. 1998) ...............................................................47

*U.S. v. Thomas*,
  377 F.3d 232 (2d Cir. 2004) ..................................................................37

xvii

*U.S. v. Thompson*,
  76 F.3d 442 (2d Cir. 1996)........................................................................36

*U.S. v. Trapilo*,
  130 F.3d 547 (2d Cir. 1997).....................................................................21

*U.S. v. Turkette*,
  452 U.S. 576 (1981).................................................................................55

*U.S. v. Vilar*,
  729 F.3d 62 (2d Cir. 2013).......................................................................34

*U.S. v. Weisberg*,
  2011 WL 4345100 (E.D.N.Y. Sept. 15, 2011) .........................................38

*U.S. v. Weiss*,
  630 F.3d 1263 (10th Cir. 2010) ...............................................................36

*U.S. v. Zichettello*,
  208 F.3d 72 (2d Cir. 2000)........................................................................57

*U1it4less, Inc. v. FedEx Corp.*,
  871 F.3d 199 (2d Cir. 2017)................................................................53, 54

*U.S. v. Myerson*, 18 F.3d 153 (2d Cir. 1994).............................................38

*U.S. v. Viola*, 35 F.3d 37 (2d Cir. 1994)....................................................56

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
  395 B.R. 520 (Bankr. E.D.N.Y. 2008)......................................................30

*Vickers Stock Res. Corp. v. Quotron Sys., Inc.*,
  1997 WL 420265 (S.D.N.Y. July 25, 1997) ............................................56

*Walter v. Drayson*,
  538 F.3d 1244 (9th Cir. 2008) ............................................................56, 59

*Webster v. Omnitrition Int'l*,
  79 F.3d 776 (9th Cir. 1996) ......................................................................66

*Weir v. Cenlar FSB*,
  2018 WL 3443173 (S.D.N.Y. July 17, 2018) ..........................................53

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .............................................19

*Williams v. Ford Motor Co.*,
  11 F. Supp. 2d 983 (N.D. Ill. 1998) .........................................................55

*Willie McCormick & Assocs., Inc. v. Lakeshore Eng. Servs., Inc.*,
  2015 WL 5093785 (E.D. Mich. Aug. 28, 2015)....................................9, 13, 18

*Winston v. Mediafare Ent'mt Corp.*,
  777 F.2d 78 (2d Cir. 1985)..................................................................69, 71

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir. 2003) ...................................................................71

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
  328 F. App'x 695 (2d Cir. 2009) ...........................................................14

*World Wrestling Entm't, Inc.*, 5
  30 F. Supp. 3d 486 (S.D.N.Y. 2007) ......................................................14

*Worldwide Directories, S.A. de C.V. v. Yahoo! Inc.*,
  2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) .......................................48

*Zigman v. Giacobbe*,
  944 F. Supp. 147 (E.D.N.Y. 1997) ........................................................40

**Statutes**

11 U.S.C. § 107 ...............................................................................................31

11 U.S.C. § 303(i) ...........................................................................................73

11 U.S.C. § 327 ........................................................................................*passim*

11 U.S.C. § 328(c) ..........................................................................................73

11 U.S.C. § 541 ...............................................................................................72

11 U.S.C. § 1330(a) ........................................................................................73

15 U.S.C. 1 ......................................................................................................50

15 U.S.C. § 78j ...............................................................................................63

15 U.S.C. § 78n(e) ..........................................................................................63

18 U.S.C. § 2 .............................................................................................63, 64

18 U.S.C. § 101(14) .....................................................................20, 24, 28, 29

18 U.S.C. § 152(2) .....................................................................................21, 22

18 U.S.C. § 152(3) .....................................................................................21, 22

18 U.S.C. § 152(6) ..........................................................................................39

18 U.S.C. § 1341 .......................................................................................21, 33

18 U.S.C. § 1343 .......................................................................................21, 33

18 U.S.C. § 1503(a) ........................................................................................34

18 U.S.C. § 1512(b) ...................................................................................35, 36

18 U.S.C. § 1512(c) ...................................................................................35, 36

18 U.S.C. § 1515(a) .................................................................................................. 36

18 U.S.C. § 1952 ....................................................................................................... 37

18 U.S.C. § 1956 ....................................................................................................... 38

18 U.S.C. § 1957 .................................................................................................. 38, 39

18 U.S.C. § 1961(1) ............................................................................................. 63, 64

18 U.S.C. §§ 1961(3) ................................................................................................. 11

18 U.S.C. § 1961(4) ............................................................................................. 52, 54

18 U.S.C. § 1961(5) ..................................................................................................... 3

18 U.S.C. § 1962(c) .............................................................................................. passim

18 U.S.C. § 1962(d) .............................................................................................. passim

18 U.S.C. § 1964(c) .................................................................................... 3, 11, 63, 64

18 U.S.C. § 2314 ................................................................................................. 37, 50

18 U.S.C. §§ 1961(1) ........................................................................................... 3, 63

18 U.S.C. §1964(c) ........................................................................................ 3, 11, 63

N.Y. CPLR § 213 ....................................................................................................... 71

## Rules

17 C.F.R. 240.10b-5 .................................................................................................. 63

17 C.F.R. 240.14e-3 .................................................................................................. 63

Fed. R. Civ. P. 8(a) ............................................................................................. passim

Fed. R. Civ. P. 9(b) ............................................................................................. passim

Fed. R. Civ. P. 12(b)(6) ....................................................................................... passim

Fed. R. Civ. P. 56 ...................................................................................................... 13

Fed. R. Bankr. P. 2014 ........................................................................................ passim

Fed R. Bankr. P. 9011 ......................................................................................... 72, 73

N.Y. Prof. Rules Conduct 3.3(a)(2) ............................................................................ 1

N.Y. Rules Prof. Conduct 7.2(a) ............................................................................... 40

**Treatises**

*Restatement (Second) of Contracts* § 186, cmt. 1 (1981) .........................................................69

Ronald E. Mallen,
  *Legal Malpractice* § 37:1  (2018 ed.) ...............................................................................17

**Other Authorities**

U.S. Dep't of Justice, Justice Manual (Apr. 2018) § 1-1.200..................................................40

U.S. Dep't of Justice, Justice Manual (Apr. 2018) § 855 ......................................................40

## PRELIMINARY STATEMENT

The First Amended Complaint ("**FAC**") (ECF 73) exposes an almost two-decades-long pattern of racketeering activity by Defendants aimed at securing bankruptcy restructuring assignments for which Defendants McKinsey RTS ("**RTS**") and McKinsey & Co. were unqualified due to numerous undisclosed conflicts of interest. Plaintiff Jay Alix ("**Plaintiff**" or "**Alix**") by no means stands alone in asserting these allegations. They have been echoed and amplified by major media outlets (most notably the Wall Street Journal),[1] members of Congress,[2] and the U.S. Trustee's Office.[3]

In response to the FAC's avalanche of hard, documented facts, Defendants' rejoinder is, effectively, limited to a technical argument that Alix has not pled causation under RICO. In the course of advancing that contention, Defendants draw heavily from three of the four modern U.S. Supreme Court precedents explicating RICO causation. The fourth (and second most recent), *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), Defendants scarcely acknowledge with a fleeting "*Cf.*" cite in their brief.[4] *Bridge*, however, is controlling authority that dismantles Defendants' causation argument, hence Defendants' disingenuous attempt to close their eyes and wish it away.[5] The RICO injuries alleged in the

---

[1]     *See, e.g.*, Gretchen Morgenson and Tom Corrigan, *McKinsey is Big in Bankruptcy—and Highly Secretive*, Wall St. J., Apr. 27. 2018, available at https://www.wsj.com/articles/mckinsey-is-big-in-bankruptcyand-highly-secretive-1524847720; Gretchen Morgenson and Tom Corrigan, *McKinsey Investments Weren't Disclosed in Bankruptcy Cases*, Wall St. J., June 19, 2018, available at https://www.wsj.com/articles/mckinsey-investments-werent-disclosed-in-bankruptcy-cases-1529423138.

[2]     *See, e.g.*, Gretchen Morgenson and Tom Corrigan, *Lawmaker Questions U.S. Trustee Over McKinsey's Conflict Disclosures*, Wall St. J., July 18, 2018, available at https://www.wsj.com/articles/lawmaker-questions-u-s-trustee-over-mckinseys-conflict-disclosures-1531934727; *see also* Jordyn Holman, *Elizabeth Warren Asks McKinsey to Provide Information on Work for Saudis*, Bloomberg, Oct. 23, 2018, https://www.bloomberg.com/news/articles/2018-10-24/warren-asks-mckinsey-to-provide-information-on-work-for-saudis.

[3]     *See, e.g.*, Tom Corrigan and Gretchen Morgenson, *Justice Official Asks to Reopen Bankruptcy Case Advised by McKinsey & Co.*, Wall St. J., July 31, 2018, available at https://www.wsj.com/articles/justice-official-asks-to-reopen-bankruptcy-case-advised-by-mckinsey-co-1533077611.

[4]     The other three are *Holmes*, *Anza*, and *Hemi*, discussed *infra*. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("**MTD**") at 18-19.

[5]     *See* N.Y. Prof. Rules Conduct 3.3(a)(2).

FAC are direct under any reading of applicable Supreme Court authority, and Defendants' laundry list of factors that might have severed the chain of but-for causation are precisely of the sort that have been repeatedly held inappropriate for resolution on Rule 12(b)(6) motions. Similarly, overwhelming precedent confirms that this Court can indeed adjudicate the issue of whether AlixPartners ("**AP**") likely would have obtained one or more of the thirteen bankruptcy assignments at issue absent Defendants' illegal conduct.

To be sure, Defendants also advance every other conceivable attack on the FAC. But that blunderbuss array of perfunctory challenges does little more than declare, in a conclusory manner, that Plaintiff has failed to plead this, that, or another element of a claim, while conspicuously ignoring clear precedent and the meticulously detailed allegations of the 228-page, 588-paragraph FAC; its 146 pages of attachments itemizing Defendants' false statements and material omissions; and the 39-page, 95-paragraph declaration of four leading experts confirming the validity of Plaintiff's allegations.

The facts alleged in the FAC are amply supported and deeply concerning to Plaintiff, who proceeds as the assignee of a company (AP) that has suffered substantial economic harm from Defendants' illegal scheme. Plaintiff also seeks, as the civil RICO statute contemplates, to act as a private attorney general and thereby safeguard the integrity of the bankruptcy system to which he has dedicated his professional life. This case should proceed to discovery.

## **RELEVANT BACKGROUND**

Because the Court's evaluation of a motion pursuant to Fed. R. Civ. P. 12(b)(6) is limited to the allegations of the pleading, documents attached or "integral to the complaint," and judicially noticeable facts, *see Casey v. Odwalla, Inc.*, 2018 WL 4500877, at *4 (S.D.N.Y. Sept. 19, 2018), Plaintiff respectfully refers the Court to the FAC for the relevant facts.

## ARGUMENT

**I.    ALIX ADEQUATELY ALLEGES PROXIMATE AND BUT-FOR CAUSATION.**[6]

> **A.  The Supreme Court's Decision in *Bridge* Demonstrates That Alix Has Properly Pled Proximate Causation.**

The Supreme Court's decision in *Bridge* definitively disposes of Defendants' causation challenge.  In *Bridge*, the defendants allegedly engaged in a pattern of racketeering activity by violating a county law restricting bidders at tax lien auctions to one representative.  553 U.S. at 642-44.  By using straw bidders, the defendants gave themselves a larger presence at the auctions than they would have otherwise had, thereby increasing their odds of obtaining valuable liens at auction, allegedly at the plaintiffs' expense.  *Id.* at 643-44.  The Seventh Circuit reversed the district court's Rule 12(b)(6) dismissal of the complaint for lack of standing, and the Supreme Court affirmed.  *Id.* at 645, 660-61.

Notably, in *Bridge* it was not clear whether the defendants' conduct actually caused the plaintiffs to obtain fewer liens.  For example, one plaintiff acknowledged that the physical position of its bidder in the auction room was occasionally unconducive to drawing the auctioneer's attention; another conceded she may have been slow to raise her hand to bid at

---

[6]     To state a RICO claim under 18 U.S.C. § 1962(c), plaintiffs must allege: 1) defendant is a "person"; 2) "employed by or associated with"; 3) an "enterprise"; 4) engaged in or affecting interstate or foreign commerce; and 5) defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs"; 6) "through a pattern of racketeering activity[.]"  Private plaintiffs must also show an "injury" to their "business or property."  18 U.S.C. §1964(c).  "Racketeering activity" includes the criminal acts referenced in 18 U.S.C. § 1961(1).  A "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years.  18 U.S.C. § 1961(5).  "[I]n pleading a RICO claim against multiple defendants, the 'bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts.'"  *Sanchez*, 2015 WL 3540836, at *6 (Furman, J.) (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992)).  Alix need only meet Rule 9(b)'s heightened pleading requirement for RICO predicate acts sounding in fraud.  *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 666 (2d Cir. 2014) (citing *McLaughlin*, 962 F.2d at 194).  For other RICO predicates and elements, Alix "need satisfy only the 'short and plain statement' standard of Rule 8(a)."  *Id.*  "Even allegations of fraud can be made upon information and belief where the matters alleged are peculiarly within the opposing party's knowledge, as long as plaintiffs provide a statement of facts upon which the belief is founded."  *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014).  "Malice, intent, knowledge, and other conditions of mind may be averred generally."  Fed. R. Civ. P. 9(b).

3

times.[7]  For those reasons and others, the defendants complained that the Seventh Circuit erroneously described the bidding process in such a way as to falsely suggest "mathematical certainty" that the plaintiffs had lost tax liens because of defendants' misconduct.  *Id.* at 644 n.3.  Nevertheless, the court noted that, "[w]hile a precise understanding of the county's system may be necessary to calculate respondents' damages, nothing in our disposition turns on this issue.  For present purposes, it suffices that [plaintiffs] allege they 'suffered the loss of property related to the liens that they would have been able to acquire, and the profits flowing therefrom, had [defendants] not implemented their scheme and acquired liens in excess of their appropriate share through their violation of the County Rule.'"  *Id.*

After noting that "[p]roximate cause . . . is a flexible concept that does not lend itself to "'a black-letter rule that will dictate the result in every case,'" *id*. at 654, the court held that the plaintiffs sufficiently pled RICO standing and proximate cause: "[Plaintiffs'] alleged injury—the loss of valuable liens—is the direct result of [defendants'] fraud.  It was a foreseeable and natural consequence of [defendants'] scheme to obtain more liens for themselves that other bidders would obtain fewer liens[.]"  *Id*. at 658.  In short, the court recognized that the plaintiffs' allegation of lost liens from the defendants' racketeering was sufficient at the pleading stage, and thorny factual issues related to whether the plaintiffs in fact lost liens (and how many) were for subsequent proceedings.

On remand, the district court dismissed the *Bridge* complaint again, this time on proximate cause grounds.  On appeal, the Seventh Circuit again reversed, explaining that "[t]he defendants stole a ***business opportunity*** from the plaintiffs by flooding the auction room with raised hands that shouldn't have been there."  *BCS*, 637 F.3d at 756-57 (emphasis added).  Judge Posner further observed that causation need only be ***probable***, and thus the "statistical, probabilistic" loss alleged by the plaintiffs was valid.  *Id*. at 758-59.  The court

---

[7]     *See BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757-58 (7th Cir. 2011) (Posner, J.) (appeal in *Bridge* case following remand).

reinforced its conclusion by referencing an example of probabilistic injury it had previously

advanced in *Milam v. Dominick's Finer Foods, Inc.*, 588 F.3d 955, 958 (7th Cir. 2009):

> "Suppose you're playing roulette on a 37–number wheel (18 red, 18 black, and 1 green) at the Casino de Monte–Carlo, and after you have placed your $1,000 bet on red, which will pay you $2,000 if the ball lands on red, the casino collapses through the negligence of a building contractor, destroying not only the roulette wheel but also your chips, and you cannot get the money you paid for them back because all the casino's records were destroyed when it collapsed. You've suffered a loss equal to a 48.6 percent chance of winning $2,000. So $972.73 would be your damages." That is the type of probabilistic loss that the plaintiffs claim to have suffered in this case.

*BCS*, 637 F.3d at 758-59.[8]

Bridge—which Defendants ignore—is directly on point. Like the *Bridge* plaintiffs,

Alix alleges Defendants stole valuable consultancy opportunities from AP through

racketeering activity, including Defendants' failure to comply with Rule 2014. By violating

the law, Defendants secured assignments they otherwise would not have obtained, some

percentage of which would have gone to AP. The FAC is supported by the testimony of four

leading bankruptcy experts who confirm that Defendants' misconduct was wrongful and

disqualifying in each of the thirteen bankruptcies at issue, and that McKinsey should and

likely would have been disqualified in each of those cases. FAC, Ex. C ¶¶ 26, 36; *see also*

Point II.B, *infra*. In fact, McKinsey itself acknowledged that in three of its first four

bankruptcies, full compliance with Rule 2014 might well necessitate its withdrawal. Selendy

Aff. (ECF 90), Ex. 2-A at Ex. A ¶ 19; *id.*, Ex. 3 ¶ 16; *id.*, Ex. 4-A ¶ 17. Moreover, the FAC

expressly alleges that AP had a well-established 25% market share of the types of

assignments at issue. FAC ¶ 49. Although it cannot be determined with absolute certainty

that AP would have been hired for all thirteen assignments absent Defendants' fraud (just as

it could not be determined with absolute certainty that the roulette ball would have landed on

---

[8]    *See also In re Gen. Motors LLC Switch Litig.*, 2016 WL 3920353, at *17 (S.D.N.Y. July 15, 2016) (Furman, J.) (noting *BCS* and related cases "stand for the proposition that a RICO plaintiff can pursue a claim based on statistical harm to 'business' expectations").

red in the hypothetical posed in *BCS*, or that the *Bridge* plaintiffs would have won more

liens), at a minimum, Alix's allegations of "statistical, probabilistic" loss measured by AP's

25% market share are sufficient at the pleading stage.[9]  That conclusion is made even more

compelling by the FAC's allegations that, for many bankruptcies at issue, AP's chances of

being selected for the assignment following McKinsey's disqualification (voluntary or

otherwise) were effectively 100% given specific circumstances of those cases.[10]  FAC ¶ 383.

### B.  *Anza* is Distinguishable Because the FAC Alleges a Direct Injury.

Defendants rely heavily on the Supreme Court's readily distinguishable opinion in

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).  The *Anza* court stressed that the most

direct victim of the defendants' alleged scheme was the government, which had to first be

defrauded of tax revenue before the plaintiff could suffer loss, and that the plaintiff's injury

was indirect and derivative of the government's loss.  *Id.* at 459-60.  Here, in contrast, as in

*Bridge*, the government suffered no tangible, concrete injury from Defendants' scheme.[11]

Moreover, the injury AP incurred is neither dependent on nor derivative of any injury to any

other party; AP lost profits from Defendants' scheme ***regardless of whether any other class***

***of victims suffered a loss***.  In fact, as in *Bridge*, McKinsey competitors like AP may well be

---

[9]       *See also Bulletin Displays, LLC v. Regency Outdoor Advert., Inc.*, 518 F. Supp. 2d 1182, 1190-91 (C.D. Cal. 2007) (genuine issue of fact on proximate cause where RICO defendant bribed officials to obtain contracts even though "other factors . . . may have contributed to [plaintiff's] failure to achieve a City contract"; court noted, citing *Bridge*, that "when a defendant's pattern of racketeering activity shuts a plaintiff out of a bidding process, the competitor that was shortchanged may establish proximate cause," and if plaintiff's allegations were true it "clearly had a reduced, if not nil chance of receiving a contract . . . .").

[10]      Defendants argue that by providing specific examples of such cases, the FAC tacitly admits that no others exist.  MTD at 17.  That is false.  For example, in *SunEdison*, AP had a strong relationship with the debtor and was given a considerable role in the bankruptcy proceedings.  Moreover, SunEdison's Chief Restructuring Officer, who was hired on the day SunEdison filed for Chapter 11 protection, was a former AP managing director who in fact preferred AP for the assignment (but McKinsey was already entrenched from its prepetition work).  Had McKinsey been disqualified, AP was the clear and logical next choice.

[11]      *See AMA Realty LLC v. 9440 Fairview Ave. LLC*, 2014 WL 1783099, at *6 (D.N.J. May 2, 2014) ("That the NJ [Department of Environmental Protection] was the entity immediately duped [by defendants' racketeering] . . . does not disturb the clearly alleged causal link between the alleged scheme and the alleged harm suffered by Plaintiff."); *Clark v. Conahan*, 737 F. Supp. 2d 239, 268 (M.D. Pa. 2010) (direct intangible injury to government in form of loss of honest services of its employees did not render actual monetary loss to private RICO plaintiff indirect).

the *only* victims to suffer a concrete loss from Defendants' scheme. Such was not the case in *Anza*, where the government had to be defrauded of tax revenue before the defendant could allegedly lower prices and injure the plaintiff, or *Holmes* (which Defendants rely on), where broker-dealers had to be driven insolvent by the defendant's fraud before the plaintiff could be injured by its obligation to indemnify. In short, Alix does not seek to recover based on "the misfortunes visited upon a third person by the defendant's acts." *Holmes*, 503 U.S. at 268; *see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 238-39 (2d Cir. 1999) ("[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct.").

In *Anza*, the court further noted that the conduct that caused the plaintiff's alleged harm (lowering prices) was distinct from the defendant's alleged racketeering activity (defrauding the state of tax revenue). 547 U.S. at 457-58. The same dynamic existed in *Hemi*, which Defendants cite. 559 U.S. at 11. Here, however, the racketeering activity and the acts that caused AP's injury are identical: Defendants' filing of false Rule 2014 disclosures.[12] *See Bulletin Displays*, 518 F. Supp. 2d at 1190 n.7 (distinguishing *Anza* because defendants' racketeering activity—bribing city officials to avoid public bidding process and obtain billboard contracts—was same racketeering activity that injured plaintiff, who was a competing billboard operator deprived of an opportunity to obtain billboard contracts; there was "no factual or logical separation" between injury inflicted on plaintiff and fraudulent activity to manipulate city contracting).

Defendants announce, without support, that the only parties directly injured by their scheme were debtors, creditors, and other Interested Parties. MTD at 17. That analysis fails

---

[12] Defendants argue that the act causing injury is "not being selected by a debtor . . . ." MTD at 18. Leaving aside that lack of selection is the *absence* of an act, Defendants' position skirts the FAC's core allegation, that AP was not selected *because of McKinsey's racketeering activity*. FAC ¶ 4.

for three reasons. *First*, there is no proof that any debtor or Interested Party suffered a financial loss because of Defendants' scheme. *Second*, as noted above, AP's injury is direct; it is not derivative of, or dependent or contingent on, any injury to debtors, other Interested Parties, or anyone else.[13] That being the case, it is clear that different classes of victims can be directly injured by a pattern of racketeering. For example, in *Morning Star Packing Co. v. SK Foods, L.P.*, the plaintiffs, sellers of processed tomato products, alleged that their competitors bribed outside purchasing agents for potential customers (large buyers such as Kraft and Frito-Lay). 2011 WL 4591069, at *6 (E.D. Cal. Sept. 30, 2011). The plaintiffs claimed they suffered a RICO injury (like AP) in the form of lost contracts they otherwise would have obtained and lost opportunities to bid on contracts. *Id*. Like Defendants here, the *Morning Star* defendants argued that the plaintiffs could not establish standing or proximate cause because there were "more direct victims, namely, the companies who accepted defendants' rigged bids, who have filed suits stemming from the alleged RICO violations." *Id*. After surveying the Supreme Court's RICO proximate cause jurisprudence, including *Holmes*, *Anza*, *Bridge*, and *Hemi*, and relying heavily on Second Circuit authority, the court rejected that argument:

> "No precedent suggests that a racketeering enterprise may have only one 'target' or that only a primary target may have standing." *Baisch v. Gallina,* 346 F.3d 366, 375 (2d Cir. 2003); *In re Refco Inc. Securities Litigation,* 2010 WL 6397586, at *43 (S.D.N.Y. July 19, 2010) ("an injury can be direct even if the plaintiff is not the only target of the defendant's misconduct"). The existence of "different classes of plaintiffs, each of which suffered a different concrete injury proximately caused by the violation" does not defeat standing. *Mendoza* [*v. Zirkle Fruit Co.*], 301 F.3d [1163,] 1172 [(9th Cir. 2002)]. Plaintiffs have adequately alleged that they are direct, if not the only, victims of the RICO predicate acts.

---

[13]     Defendants suggest (without the benefit of supporting authority) that AP's injury is indirect because Rule 2014(a) was "designed" to protect Interested Parties. MTD at 17. That argument is essentially an attempt to invoke the "zone of interests" test that the Second Circuit has held cannot be applied independent of the proximate cause analysis—*i.e.*, if the proximate cause test is satisfied, courts are not to further consider whether the plaintiff falls within the zone of interests protected by the statutes governing the alleged predicate acts. *Baisch v. Gallina,* 346 F.3d 366, 373 (2d Cir. 2003).

*Morning Star*, 2011 WL 4591069, at *6; *see also Baisch*, 346 F.3d at 374 ("RICO standing extends to all directly injured parties, not just the most directly injured among them.").[14] The fact that debtors or other Interested Parties may (or may not) have *also* been directly injured by Defendants does not defeat Alix's standing or ability to plead proximate cause.[15]

*Third*, there is no risk of duplicative recovery here, a factor that militates in favor of finding proximate cause. *See Anza*, 547 U.S. at 459; *Holmes*, 503 U.S. at 269-70, 273. Any loss of estate value or incremental recovery suffered by a debtor or Interested Party because of Defendants' misconduct would be separate and distinct from the injury suffered by AP.[16]

Defendants cite *Anza*'s observation that RICO plaintiffs cannot establish proximate cause "simply by claiming that the defendant's aim was to increase market share at a competitor's expense." MTD at 17. The FAC, however, is not focused on Defendants' "aim" or intention, but on the direct injury to AP caused by their racketeering activity. To the extent Defendants suggest that RICO cannot redress a competitive injury (MTD at 1-2, 4, 17-18, 20-23 & n.16, 38), they are clearly wrong. *Bridge*, *Morning Star*, *Willie McCormick*, and countless other post-*Anza* decisions have found proximate cause properly pled in RICO cases between competitors alleging competitive injury.

---

[14]     *See also RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 688 (7th Cir. 2008) (camera distributor's RICO scheme directly injured plaintiff, distributor's lender, even though retailer that actually purchased cameras (Walmart) also suffered direct injury: "[Plaintiff] was a direct victim of the alleged scheme, even if Wal-Mart was one as well. The existence of multiple victims with different injuries does not foreclose a finding of proximate cause; in fact, one of the hallmarks of a RICO violation is 'the occurrence of distinct injuries' affecting several victims"); *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 384 (2d Cir. 2001) (noting *Holmes* court was concerned with overcompensation of a particular plaintiff, "not that a violator might be obligated to compensate two or more different classes of plaintiffs, each of which suffered a different [direct injury] . . . ."); *Willie McCormick & Assocs., Inc. v. Lakeshore Eng. Servs., Inc.*, 2015 WL 5093785, at *5 (E.D. Mich. Aug. 28, 2015) (fact that city suffered direct injury from bid-rigging conspiracy did not foreclose direct RICO injury to plaintiff contractor); *In re Refco Inc. Secs. Litig.*, 826 F. Supp. 2d 478, 536 (S.D.N.Y. 2011) ("An injury can be direct even if the plaintiff is not the only target of the defendant's misconduct.").

[15]     Defendants note that in *Bridge*, the plaintiffs were the only RICO victims. MTD at 18-19. But all of the foregoing cases (*RWB*, *Morning Star*, etc.) confirm that a plaintiff need not be a member of the only class of directly injured victims in order to plead proximate cause.

[16]     Contrary to Defendants' facile contention (MTD at 19), Mar-Bow's purchase of a claim in *Alpha* speaks to the standing rules in bankruptcy court, not whether AP suffered a direct RICO injury.

Defendants further argue that others are better situated than Alix to enforce Rule 2014(a).  MTD at 20-21.  Initially, "[t]he existence of a 'better' plaintiff is most relevant where the plaintiff alleges only an indirect injury.  It will not otherwise be grounds for denying a claim to a plaintiff directly injured by one predicate act in the hopes that a different one will emerge." *RWB*, 539 F.3d at 688.  As noted above, AP's injury is direct, not indirect.  Moreover, this Court need not speculate about who is best positioned to redress Defendants' illegal activity because actual events have supplied the answer.  But for Alix's efforts, Defendants' unlawful disclosures never would have come to light.  For example, the U.S. Trustee's initial challenge to McKinsey's disclosures in the *Alpha* bankruptcy was prompted by Mar-Bow Value Partners, LLC ("**Mar-Bow**"), an entity wholly owned and formed by Alix for the sole purpose of redressing McKinsey's illegal disclosure scheme.  Likewise, in July 2018, the U.S. Trustee supported Mar-Bow's application to re-open the *Alpha* bankruptcy based on new evidence of McKinsey's conflicts of interest discovered by Alix.  FAC ¶ 202; *Alpha*, Dkt. No. 4126 at 2-3 ¶¶ 3-8.  And it was, after all, Plaintiff (and only Plaintiff) that cared enough to intervene in *Alpha* and subsequently file this lawsuit.  In short, Plaintiff is best positioned to redress the racketeering activity alleged in the FAC because he alone has conducted extensive research on McKinsey's many undisclosed conflicts and sought to redress the racketeering activity alleged in the FAC.  In that sense, Alix has not only sought compensation for AP's private injury, but also has acted as a private attorney general using his own resources to advance the public's interest in an open and fair bankruptcy system, thereby serving one of the purposes of RICO.[17]

---

[17]     *See Rotella v. Wood*, 528 U.S. 549, 557-58 (2000) (RICO's civil enforcement provision is a "private attorney general" statute and reflects "congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices.  The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity. . . . The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better.").

Finally, even if there are others technically better situated than Alix to seek redress for Defendants' misconduct, that factor is not dispositive.[18] *See City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010) (*Anza* recognized that RICO plaintiffs need not satisfy all three *Holmes* proximate cause factors, one of which asks whether the plaintiff is best situated to sue); *Ainsworth v. Owenby*, 2018 WL 3964807, at **10 (D. Ore. Aug. 17, 2018) (holding none of *Holmes*'s proximate cause policy factors are dispositive).[19]

### C.  Defendants' Purported Intervening and Superseding Causes Do Not Apply to the Entirety of Alix's Claims, and in Any Event Cannot Be Decided on a Rule 12(b)(6) Motion.

Defendants argue that various events would purportedly need to occur before AP could have been retained and lost profits in the thirteen relevant bankruptcies.  MTD at 19,

---

[18]     Defendants' focus on bankruptcy courts and the U.S. Trustee as potential sources of vindication (MTD at 20-21) misses the point.  *Holmes* makes clear that an indirectly injured person should have no standing where a directly injured private RICO plaintiff can be expected to sue.  503 U.S. at 269-70, 273.  Initially, neither can bring private RICO actions under § 1964(c); the U.S. government is not a "person" capable of filing a § 1964(c) claim within the meaning of § 1961(3). *See, e.g., U.S. v. Bonanno Organized Crime Family*, 879 F.2d 20, 22-23 (2d Cir. 1989).  Nor could the courts or U.S. Trustee possibly have an injury to "money or property" here.  Moreover, while the government can always take action to rectify illegal conduct, the question is whether such action would redress lost profits suffered by AP; it would not.  *See Commercial Cleaning*, 271 F.3d at 385 ("If the existence of a public authority that could prosecute a claim against putative RICO defendants meant that the plaintiff is too remote . . . then no private cause of action could ever be maintained, for every RICO predicate offense, as well as the RICO enterprise itself, is separately prosecutable by the government. . . . Here . . . suits by governmental authorities . . . would do nothing to alleviate the plaintiffs' loss of profits.  There is no class of potential plaintiffs who have been more directly injured by the alleged RICO conspiracy than the defendant's business competitors, who have a greater incentive to ensure that a RICO violation does not go undetected or unremedied, and whose recovery would indirectly cure the loss suffered by these plaintiffs.").

[19]     Defendants' reliance on *4K&D* (MTD at 22) is obviously misplaced. The *4K&D* plaintiff conceded that its loss was indirect and derivative of the loss suffered by defrauded property sellers.  2 F. Supp. 2d at 541. Here, AP's loss is not dependent on or derivative of injury to anyone else. Similarly, *Medgar Evers* (MTD at 23 n.16) was decided before *Bridge* (and *Anza*) and clearly does not survive *Bridge*'s holdings that RICO plaintiffs need not plead reliance on defendants' misrepresentations and that fraud on a governmental entity that results in no tangible loss to the government does not preclude injured private plaintiffs from establishing RICO standing or causation. *Bridge*, 553 U.S. at 658-59.  Unlike Alix, the *Medgar Evers* plaintiffs had a problem with apportionment of damages.  *See* 25 F. Supp. 2d at 121.  Moreover, the court's curious reluctance to entertain the factual issue of whether the plaintiffs' losses were caused by the illegal conduct alleged (false statements to HUD regarding inspections, repairs, and improvements) or "poor management," when in fact they were essentially one and the same, is contrary to numerous cases holding that the need to resolve causation issues equally or more complex does not bar a RICO claim.  *See* Points I.C, I.D, *infra*.

24-25.  Defendants misapprehend the law.  Defendants correctly dub their litany of items that *could* break the causal chain (MTD at 24-25) as "intervening" and "superseding" causes. MTD at 19 n.14, 23.  As the court recognized in *BCS*, however, the impact of such causes is at best a matter for summary judgment, and certainly not for a motion to dismiss.  Like Defendants here, the *BCS*/*Bridge* defendants claimed various factors could have broken the causal chain of the plaintiffs' injury, such as poor positioning in the auction room or belated signaling to the auctioneer.  637 F.3d at 757-58.  On summary judgment, Judge Posner aptly explained the fallacy of their argument:

> The plaintiff doesn't have to prove a series of negatives; he doesn't have to "'offer evidence which positively exclude[s] every other possible cause of the accident.'"  In technical legal terms *the burden of proving an "intervening cause"— something which snaps the "causal chain" (that is, operates as a "superseding cause," wiping out the defendant's liability) that connects the wrongful act to the defendant's injury—is on the defendant*.  The district judge required the plaintiffs to prove the nonexistence of potential superseding causes rather than requiring the defendants to present evidence to support their conjectured superseding causes. . . .

*Id*. at 757-58 (citations omitted; emphasis added).

Citing specific facts and expert opinion, Alix plausibly alleges that, absent Defendants' illegal conduct, AP would have obtained one or more of the thirteen assignments at issue.[20]  Defendants raise various "intervening" and "superseding" events that might have occurred (or not occurred) that could break the causal chain.  The necessary implication of *BCS* is that a Rule 12(b)(6) motion is not the proper device to resolve the causal issues raised by Defendants; in *BCS*, the court found even summary judgment is inappropriate absent definitive evidence.  637 F.3d at 757-58.  *See also NOW v. Scheidler,* 510 U.S. 249, 256 (1994) ("At the pleading stage, general factual allegations of [RICO] injury resulting from the

---

[20]    FAC ¶¶ 47, 49, 75, 85, 92, 103, 111, 118, 140, 148, 154, 170, 175, 177, 218, 248, 383; *id.*, Ex. C ¶¶ 26, 36, 38-91.

defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.").[21]

Numerous cases have found RICO causation adequately pled despite multiple highly-compelling intervening causes that held the potential to sever the tie between the defendants' racketeering activity and the plaintiffs' alleged damages. *See Willie McCormick*, 2015 WL 5093785, at *5-*6 (RICO causation sufficiently pled despite numerous compelling reasons why defendants' bid-rigging scheme might not have caused competing plaintiff to receive less, more difficult, and lower quality work: "'[A] RICO case with a traditional proximate-cause problem (*e.g.*, a weak or insubstantial causal link, a lack of foreseeability, or a speculative or illogical theory of damages) . . . will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6).' . . . [I]t is not yet Plaintiff's burden to overcome those difficulties.") (citations omitted);[22] *Kovach v. Access Midstream Partners, L.P.*, 2016 WL 1162061, at *13-*14 (N.D. Ohio Mar. 23, 2016) (RICO causation sufficiently pled despite serious questions as to whether plaintiffs' injuries were caused by defendants' RICO scheme or pre-existing fraudulent scheme; court stated: "For now . . . plaintiffs have satisfactorily pled a RICO claim," causation problems were for summary judgment not a motion to dismiss, and "Defendants' argument that the [causation]

---

[21] Defendants wrongly contend that Alix cannot establish causation unless he proves that *thirteen* debtors would have selected AP following McKinsey's disqualification and *thirteen* bankruptcy courts would have approved it. MTD at 24. Alix can recover if he proves that McKinsey likely would have been disqualified (pre- or post-petition) and AP likely would have been retained as its replacement in at least *one* instance. *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 601 (S.D.N.Y. 2014) ("A 'plaintiff must prove only . . . an injury directly resulting from some or all of the activities comprising the violation,' however, and need not prove that every predicate act constituting the pattern injured the plaintiff in some way."); *see also Marshall & Ilsley Tr. Co. v. Pate*, 819 F.2d 806, 810 (7th Cir. 1987) (plaintiff need only prove injury from single predicate act in pattern).

[22] *See also Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 270-71 (D. Conn. 2004) (contractor that allegedly lost bidding opportunities to competitor engaged in bribe and kickback scheme entitled to "opportunity to discover evidence that it would have been awarded these contracts and reaped profits" had defendants not engaged in RICO activity, despite defendants' contention that it was "speculative to infer that the City would have necessarily hired [plaintiff], even if the Defendants had not corrupted the bidding process. In particular, they point out that [plaintiff] *never submitted an actual bid, produced work plans, or took any threshold step to secure the City work at issue*. Defendants also assert that [plaintiff's] damages claim is inherently unprovable because the award of a municipal contract hinges on several indeterminate factors.") (emphasis added).

allegation is conclusory is really an attempt to require plaintiffs to prove the extent of their

injury at the pleading stage."); *Republic of Colombia v. Diageo N. Am., Inc.*, 531 F. Supp. 2d

365, 436 (E.D.N.Y. 2007) (RICO claim based on money laundering sufficiently pled despite

"wide variety" of unrelated factors that might have caused plaintiffs' loss: "At this early stage

of the litigation, it is not possible to determine, as a matter of law, that Plaintiffs will not be

able to prove to a reasonable degree of certainty that Defendants' money laundering caused

Plaintiffs to lose revenues and profits.").[23]

Here, Plaintiff plausibly alleges a direct link between Defendants' racketeering and

AP's injury.  As the above authorities attest, any potential need to rebut various purported

"intervening" and "superseding" causes following discovery is not a basis to dismiss this case

on the pleadings.  *See also Mendoza*, 301 F.3d at 1170-71 (laborers successfully pled RICO

claim for purposes of Rule 12(b)(6) despite numerous intervening causes that could have

caused plaintiffs' depressed wages instead of defendants' hiring of illegal immigrants).[24]

---

[23]     *World Wrestling* (MTD at 25) is inapposite; it concerned a claim for honest-services fraud by an *offeror*—not a potential bidder like AP—who failed to allege that the bid facilitated by its corrupted employee was materially worse than the sidetracked bids.  That plaintiff's obstacles to proof are not present here.  *See Commercial Cleaning*, 271 F.3d at 382-83 (upholding RICO claim where competing bidder undercut plaintiff's bid through racketeering activities).  Moreover, the *World Wrestling* court did not find lack of causation.  Rather, it held that the plaintiff's allegations established that it *could not prove its alleged damages*.  Indeed, the plaintiff did not even attempt to quantify what its royalty rates would have been for the toy license deal.  530 F. Supp. 3d at 518 n.15, 522-23.  As to the videogame license deal, despite having full knowledge of what other existing licensees were paying and what other competing bidders had proposed to pay, the plaintiff refused to disclose those royalty rates.  *Id*. at 521-23.  In fact, the plaintiff alleged the corrupted deal it received was "comparable" to a competing bidder's initial proposal.  *Id*. at 522.  On appeal, the Second Circuit affirmed on statute of limitations grounds, without opining on damages.  328 F. App'x at 698 n.1.  Here, Defendants challenge causation, not Alix's methodology for calculating damages, and Alix's allegations do not contradict and defeat his own damages theory.  Further, as noted above, federal courts have repeatedly held that intervening causes (including in corrupted bidding cases) are a matter for discovery, not dismissal on the pleadings.

[24]     *Nurriddin* (MTD at 23) did not involve RICO or the concept of causation.  It merely held that the plaintiff's allegations that he was not fully disabled and that his employer did not view him as disabled fatally contradicted elements of his disability discrimination claim.  818 F.3d at 757.  *Backpage* (MTD at 24), also not a RICO case, involved a highly-attenuated causal theory involving sex-trafficking that is not even remotely analogous here.  The theory—that website operators' misrepresentations to law enforcement regarding the website's efforts to combat sex trafficking ads enabled the website to gain greater market share, thereby increasing the plaintiffs' risk of being

14

Defendants' nine potential "superseding" causes (MTD at 24-25) illustrate the wisdom of the foregoing decisions; each of those purported causes (which are addressed *seriatim* in corresponding numbered paragraphs below) is subject to reasonable proof through fact and expert discovery:

1. Defendants admit that the U.S. Trustee and the bankruptcy courts have independent obligations to evaluate disclosed conflicts. MTD at 21. Discovery will reveal what complete and truthful McKinsey Rule 2014 disclosures would have looked like, and the likely responses those disclosures would have prompted from the U.S. Trustee, bankruptcy courts, and Interested Parties. The U.S. Trustee has already made clear that the disclosure of McKinsey's financial interest in the outcome of *Alpha* would have at least prompted it to investigate further. FAC ¶¶ 20-21, 202.

2. Fact and expert discovery will demonstrate that "mitigation" efforts would not have been feasible in the thirteen cases at issue given the nature of McKinsey's conflicts. *See, e.g.*, FAC, Ex. C ¶ 37.

3. Four leading experts confirm that McKinsey's conflicts in each of the thirteen cases at issue were disqualifying and should and likely would have led to its disqualification if properly disclosed. FAC, Ex. C ¶¶ 26, 36. Fact and expert discovery will further buttress these conclusions.

4. Fact and expert discovery will demonstrate the absurdity of Defendants' speculative suggestion that the debtors, who invariably hire outside professionals for restructuring advice in bankruptcy proceedings, could or would have done the work themselves for a bankruptcy involving over $1 billion in assets rather than simply picking one of the other highly qualified consultancy firms.

5. The FAC pleads specific facts demonstrating AP was virtually certain to obtain at least several of the assignments that McKinsey wrongfully obtained. FAC ¶ 383. Discovery will confirm and expand upon those allegations.[25]

---

trafficked—ignored (*inter alia*) that the plaintiffs' victimization was directly caused by the persons committing sex trafficking (whether on- or off-line), not the website. 817 F.3d at 24-25.

[25] Defendants argue that in *Harry & David*, the debtor hired two restructuring advisors, and thus McKinsey's hiring did not preclude the hiring of AP. MTD at 20 n.15. But the fact remains that *Harry & David* had two restructuring consultant slots to fill. Had McKinsey been disqualified for one of those slots, AP was available, highly qualified, and likely would have been the replacement. Defendants also frivolously argue that because Count VII of the Amended Complaint (**tortious interference** under **Virginia** law) only claims that AP would have been hired in the *Alpha* case, Alix admits AP would not have been hired in the other twelve cases. MTD at 26 n.19. In reality, Count VII is limited to *Alpha* and *AMF Bowling* because that claim is brought under Virginia law and those are the only **Virginia** bankruptcies at issue. With respect to **RICO** (the actual subject of Defendants' causation argument), the FAC clearly pleads AP would have been hired in many if not all thirteen cases absent Defendants' racketeering. *See* FAC ¶¶ 4-5, 47, 49, 136, 383. Similarly, Defendants' apparent argument that a professional cannot serve multiple roles in a bankruptcy (MTD at 26 n.19), in addition to not being cognizable on a Rule 12(b)(6) motion, is flatly wrong. AP has, with court approval, served multiple functional and advisory professional roles in a single bankruptcy on many occasions.

6.  AP was qualified for all thirteen assignments, as discovery will show.

7.  AP was not conflicted out of any of the thirteen assignments, as discovery will show.

8.  Fact and expert discovery will show that AP's disclosures would have been unobjectionable as a matter of law.

9.  Fact and expert discovery will show that there would have been no legal basis to disapprove of AP's retention in any of the thirteen cases, as well as the reasonable amount of fees and profits on each of the assignments.

Moreover, as noted earlier, Defendants bear the burden of proving these superseding causes. *BCS*, 637 F.3d at 757-58. Alix does not bear the burden of pleading around them or addressing in his pleading every intervening cause Defendants dream up. *Cf. Mendoza*, 301 F.3d at 1171 ("It is inappropriate at this [pleading] stage to substitute speculation for the complaint's allegations of causation."). To the extent Alix must rebut them, he does not need to do so with respect to all thirteen cases to recover. Rather, he can prevail if he raises genuine factual issues concerning the foregoing superseding causes with respect to at least *one* of the thirteen cases. *See, e.g., Chevron*, 974 F. Supp. 2d at 601.

Defendants contend that Alix cannot prove but-for causation because he does not allege that AP "bid for the work in question" in each case. MTD at 24. That strawman argument misunderstands both the FAC and the industry. Debtors knew AP was, practically speaking, one of only four firms qualified to handle such assignments. *See* FAC ¶¶ 47, 49, 383. AP was available to compete for all of them, and did so in many cases (not just one, as Defendants falsely claim). *Id.* ¶¶ 4-5, 15, 47, 49, 66, 103, 135-36, 156, 178, 383. The only instances in which AP was "unable to compete" were when debtors handed the assignment to McKinsey without accepting any competition, likely because of McKinsey's illegal pay-to-play scheme admitted by Barton. *Id.* ¶¶ 15, 120, 128, 136, 359-365, 383. Had McKinsey been disqualified from any of the thirteen assignments (as it should have been), AP would have been ready, willing, and able to compete and take its place, and would have done so in

16

at least one instance, if not all.  FAC ¶¶ 47, 49, 136, 383.  *See Astech Marmon*, 349 F. Supp. 2d at 270-71.

### D.  The Court Can Determine Whether AP Would Have Likely Obtained Assignments Absent Defendants' Racketeering.

Defendants argue it is impossible for the Court to adjudicate what would have happened in the absence of their racketeering scheme.  MTD at 25-26.  They overlook that courts routinely make such determinations.  For example, legal malpractice cases frequently involve entire trials within a trial in which the court determines how a case likely would have turned out absent counsel's negligence.  *See, e.g.*, Ronald E. Mallen, *Legal Malpractice* § 37:1 ("Introduction – The case-within-a-case") (2018 ed.).[26]  Indeed, courts have employed this close analogy in the RICO context.  *See Brown v. Cassens Transp. Co.*, 675 F.3d 946, 965-66 (6th Cir. 2012) (en banc)[27] (holding plaintiffs would have achieved better outcome in workers' compensation proceedings absent defendants' scheme: "This is similar to legal malpractice cases, where the plaintiffs also allege . . . they could have prevailed or obtained a better outcome in the original lawsuit. . . . [P]laintiffs should be allowed to proceed on their RICO claim and put on evidence that they would have received a better result in the underlying state agency proceedings had the defendants not submitted fraudulent medical reports.").  Further, in many of the cases discussed above, RICO claims survived a Rule 12(b)(6) motion despite a need to determine how events would have unfolded in the absence

---

[26]     *See also Mattson v. Schultz*, 145 F.3d 937, 940 (7th Cir. 1998) ("If the jury in a malpractice case is charged with determining what a reasonable trier of fact would have decided if the malpractice plaintiff had been properly represented in the underlying suit . . . then the objective of the trial within the trial would be to simulate a trial between the plaintiff and the defendant in the underlying suit."); *Glenn v. Moss*, 2017 WL 8950429, at \*4 (N.D. Ill. Mar. 1, 2017) (in legal malpractice case, "[t]o prove proximate cause, the plaintiff must show that absent the attorney's negligence, the underlying suit would have been successful. . . . Plaintiff . . . must prove a case-within-a-case by showing that, but for the Defendants' negligence, Plaintiff would have won the underlying Agent Case") (footnote, internal quotations omitted); *Tomar Elec., Inc. v. Watkins*, 2009 WL 2222707, at \*2 (D. Ariz. July 23, 2009) (holding federal patent law issue existed warranting removal to federal court: "[J]udgment of legal malpractice must include a finding that  . . . the outcome of the underlying case would have differed absent the alleged negligence.  This common requirement that the 'but for' outcome of the underlying case be hypothetically litigated is dispositive of the jurisdictional issue.").

[27]     *Overruled on other grounds*, *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556 (6th Cir. 2013).

of defendants' wrongdoing.[28]  Four leading experts have confirmed that McKinsey's conflicts in each of the thirteen cases at issue were disqualifying, and should and likely would have led to its disqualification if properly disclosed.  FAC, Ex. C ¶¶ 26, 36.  And Alix pleads specific facts demonstrating why AP was likely to have been hired if McKinsey was disqualified. FAC ¶¶ 47, 49, 136, 383.  This is more than sufficient to survive the pleading stage.

The tenuousness of Defendants' argument is starkly illustrated by the sparse, highly distinguishable authority they attempt to muster for the proposition that the fact-finder cannot decide whether McKinsey likely would have been disqualified and AP retained in at least one of the thirteen bankruptcies.  MTD at 25-27.  *Clapper* is inapposite for myriad reasons, including because the claims at issue: 1) implicated national security concerns because the plaintiffs sought to invalidate a provision of **FISA**, jeopardizing the government's ability to prevent terrorist attacks, 133 U.S. at 1143-44; 2) largely pertained to *potential future injury*, not an existing injury, *see id.* at 1148; 3) required the court, with limited visibility into the inner workings of the national security apparatus, to determine how a FISA court would navigate a highly complex, multi-prong statutory analysis that in no way parallels the relatively straightforward disqualification inquiry at issue here, *id.* at 1149-50; 4) were decided on **summary judgment** motion and a full record, not on a 12(b)(6) motion, *id.* at 1147; and 5) the plaintiffs could not show they were at risk of surveillance under the

---

[28]     *See, e.g., BCS*, 637 F.3d at 758 ("The causal relation between a defendant's act and a plaintiff's injury . . . need only be **probable**.  Otherwise how could a person obtain a judgment for medical malpractice based on a failure to diagnose a disease that proved fatal but had it been diagnosed earlier *might* have been cured?  And how could four equally qualified employees who were discriminated against when a company made a single promotion obtain any relief?"); *Willie McCormick*, 2015 WL 5093785, at *6 (claim survived Rule 12(b)(6) motion despite requiring court to determine whether plaintiff would have received better contracting work from city absent defendants' racketeering); *see also Faith Enters. Grp., Inc. v. Avis Budget Grp., Inc.*, 2012 WL 1409403, at *4 (N.D. Ga. April 20, 2012) (RICO plaintiff alleging lost rental car sales sufficiently alleged proximate cause despite need to "show which customers *would have* booked rental cars from [them] had the Defendants not made the alleged misrepresentations," an analysis required "in every fraud claim.").

challenged FISA provision (as opposed to other statutory surveillance authority).[29]  *Id.* at

1149.  Here, in contrast, there is no doubt that the test for disqualification of professionals

under the Bankruptcy Code applies, or that McKinsey was required to pass that test and make

full disclosure under Rule 2014.  If *Clapper* is on a different planet than this case, *Whitmore*

(MTD at 26), another Article III standing case alleging future (not, as here, existing) injury,

inhabits another solar system.[30]

## II.      ALIX ADEQUATELY PLEADS RICO PREDICATE ACTS BY EACH DEFENDANT.

### A.   The Fraud-Based Predicates Allege Both Affirmative Misrepresentations and Omissions.

Contrary to Defendants' claims (MTD at 27-33), Alix does not allege mere silence in

the face of a duty to disclose; he alleges Defendants had a multifaceted fraudulent scheme to

---

[29]      *Clapper* also addressed Article III standing, not RICO proximate cause; the court noted that the standing inquiry is more rigorous when the constitutionality of an act of Congress or the Executive branch is at issue, particularly one involving intelligence gathering or foreign affairs.  133 U.S. at 1147.

[30]      *See Whitmore*, 495 U.S. at 156-57 ("Whitmore's principal claim of injury in fact is that Arkansas has established a system of comparative review in death penalty cases . . . . Although he has already been convicted of murder and sentenced to death, has exhausted his direct appellate review, and has been denied state postconviction relief, petitioner suggests that he might in the future obtain federal habeas corpus relief that would entitle him to a new trial.  If, in that new trial, Whitmore is again convicted and sentenced to death, he would once more seek review of the sentence by the Supreme Court of Arkansas; that court would compare Whitmore's case with other capital cases to insure that the death penalty is not freakishly or arbitrarily applied in Arkansas.  Petitioner asserts that he would ultimately be injured by the State Supreme Court's failure to review Simmons' death sentence, because the heinous crimes committed by Simmons would not be included in the data base employed for Whitmore's comparative review. . . . [E]ven if we were to follow Whitmore this far down the path, [i]t is nothing more than conjecture that the addition of Simmons' crimes to a comparative review "data base" would lead the Supreme Court of Arkansas to set aside a death sentence for Whitmore, whose victim died after he stabbed her 10 times, cut her throat, and carved an "X" on the side of her face.").

Notably, *Whitmore* cites *U.S. v. SCRAP*, 412 U.S. 669 (1973), in which the Supreme Court found standing sufficiently pled based on allegations requiring considerably more spectacular "causal gymnastics" (MTD at 21) than Alix's theory.  The *SCRAP* plaintiffs alleged: 1) a railroad freight surcharge approved by the ICC would result in increased use of non-recyclable goods, 2) resulting in use of more natural resources, 3) some of which might come from the Washington, D.C. area, 4) resulting in more trash deposited in Washington, D.C. area parks, 5) leading to economic, recreational, and aesthetic harm.  *See Whitmore*, 495 U.S. at 158-59.  If the Supreme Court afforded the *SCRAP* plaintiffs a chance to prove *those* allegations, it is hard to see why Alix should not be allowed the opportunity to prove the likelihood of McKinsey's disqualification in at least one of the thirteen cases had it made full disclosures under Rule 2014, and that AP would have been hired to replace McKinsey following disqualification.

conceal McKinsey's disqualifying connections through affirmative misrepresentations, obfuscations, and misleading half-truths, *as well as* omissions. Defendants made numerous affirmative misrepresentations to bankruptcy courts in furtherance of the scheme, such as:

- In each of the 13 bankruptcies, McKinsey US or RTS (and Goldstrom, Carmody, and Yerian in certain cases) falsely said they believed McKinsey to be a "disinterested person" within the meaning of § 101(14) (thus implying McKinsey was not disqualified under § 327(a)). RTS also falsely said it believed it did not hold or represent any interest adverse to the estate. FAC, Ex. B at 2, 4, 7, 9, 12, 14, 17, 18, 21, 23, 28, 30, 31, 48, 65, 70, 72, 78, 90, 98.

- In *Alpha*, RTS, Carmody, and Proshan induced the U.S. Trustee to withdraw a motion to compel by falsely representing that RTS's connections would be fully disclosed in a supplemental declaration. *Id.* ¶¶ 184-91.

- In *SunEdison*, Defendants never disclosed that McKinsey issued false invoices to SunEdison's non-debtor affiliates to fraudulently re-characterize work performed for debtors and thereby conceal a disqualifying voidable preference. *Id.* ¶¶ 221-36.

- In *GenOn*, RTS and Carmody falsely stated that RTS had no connections to a variety of categories of Interested Parties. *Id.* ¶¶ 276-81.

- McKinsey & Co. and Barton falsely assured Alix and AP that they would wind down RTS's bankruptcy consulting practice business and abstain from further bankruptcy consulting engagements (including illegal pay-to-play arrangements with one or more attorneys). *Id.* ¶¶ 128-35, 157.

- In *UAL*, *Mirant*, and *Lyondell*, McKinsey US falsely stated it could not identify clients or describe work performed for them due to an obligation to "maintain strict client confidentiality." *Id.* ¶¶ 9, 78, 84, 91, 477. In *Alpha*, RTS and Carmody cited this spurious confidentiality obligation as justification for identifying certain clients only as "confidential clients." *Id.*, Ex. C. ¶ 46(c). In fact, McKinsey's engagement agreements with clients permitted it to disclose such matters when "legally required." *Id.* ¶ 9; *id.*, Ex. C ¶ 49.

- In *Alpha* and *SunEdison*, RTS said MIO operates as a "blind trust," creating an impression that MIO's investment positions would not affect McKinsey professionals' judgment. *Id.* ¶ 21; *id.*, Ex. B at 60, 79. Some MIO holdings are publicly available, and Garcia was an MIO board member. *Id.*

Defendants also stated various misleading half-truths, from which there arose a duty to disclose the other half, *see U.S. v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (while "an omission can violate the [wire] fraud statute only in the context of a duty to disclose," such a duty may arise "where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading."):

- In *Harry & David*, after identifying no connections by name in two declarations, Goldstrom (on behalf of RTS) named a single client from years earlier, fostering the appearance of exacting compliance with Rule 2014—while concealing that connections included at least 13 current or recent McKinsey clients. FAC ¶ 95.

- Systematic use of "disclosure by category" was itself a misleading half-truth because without knowing the *identity* of a connection and details of the relationship, it is difficult to determine whether a connection is disqualifying.[31] In *Alpha*, by disclosing only that at some point in the preceding three years it advised a "Major Customer" of the debtor on "procurement in the coal sector generally but with no specific focus on the Debtors or these chapter 11 cases," RTS and Carmody made it difficult to determine that the "Major Customer" was U.S. Steel, a then-current McKinsey client whose lowered coal purchase costs would come at the debtor's expense. FAC ¶¶ 178-82. The same is true of RTS's vague description of its connections to SunEdison's then-CEO, Chatila. *Id.* ¶¶ 237-44.

- In *SunEdison*, RTS misleadingly described its confidentiality agreements with clients without disclosing that they permitted the disclosure of client information required by, *inter alia*, Rule 2014. FAC, Ex. C ¶ 4(d).

- Statements referring to "McKinsey RTS and its affiliates" gave the false impression that Defendants were, in fact, disclosing McKinsey's connections to Interested Parties through its "affiliates," as required by Rule 2014. *See* MTD at 36 & n. 30 (citing disclosures).

Thus, even if courts had some "flexib[ility]" in deciding the scope of information to require from a professional in assessing an application under § 327(a), as McKinsey *incorrectly* argues (*see* Point II.B, *infra*), plainly an applicant cannot induce such an accommodation by means of purposefully vague and misleading statements concerning, *e.g.*, a current McKinsey client that created a disqualifying conflict of interest. The foregoing affirmative misstatements and half-truths, therefore, operated as a fraud and violated 18 U.S.C. §§ 152(2), 152(3), 1341, and 1343, even if the information was not specifically called for by Rule 2014 as McKinsey (erroneously) contends. *See U.S. v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) ("term 'scheme to defraud' is measured by a nontechnical standard. It

---

[31] *See* FAC, Ex. C ¶¶ 26, 29-30, 33, 36, 41, 47, 55, 82-84, 93, 95; Supplemental Joint Declaration, Nov. 28, 2018 ("**Supp. Dec.**") ¶¶ 22-23; *In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 854-55 (Bankr. N.D.N.Y. 2008) (stating professional's vague description of relationship with significant creditor deprived court of opportunity to disqualify professional at outset of case); *In re Farrington*, 2007 WL 4365753, at *7 (Bankr. D. Ore. Dec. 11, 2007) (professional's failure to disclose details of connection with creditor "left the court without sufficient information to make an informed decision").

is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society.") (internal quotations omitted; alteration in original); *U.S. v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) (statutory or fiduciary duty of disclosure is not required under federal fraud statutes; rather, "[w]hat is essential is proof of a 'scheme or artifice to defraud,' which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter"); *U.S. v. Keplinger*, 776 F.2d 678, 697-98 (7th Cir. 1985) ("omissions or concealment of material information can constitute fraud . . . cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation"). Defendants' unsupported contentions about Rule 2014's scope (MTD at 28-33) are wrong. Defendants clearly had a duty to disclose all relevant facts, which they did not do. *See* Point II.B, *infra*; FAC, Ex. C ¶¶ 22-36, 38-73, 90-91; Supp. Dec. ¶¶ 6-36. *Aaron Ferer*, *Roseville*, *Express Scripts*, and *Resnik* (cited in MTD at 27-28) are inapposite. None involved RICO nor any of the RICO predicates at issue here. *Aaron Ferer* involved common law claims;[32] while *Resnik*, *Roseville*, and *Express Scripts* involved claims for securities fraud and the heightened pleading requirements of the PSLRA, which is not applicable here.[33]

## B. Bankruptcy Fraud in Violation of 18 U.S.C. §§ 152(2) and 152(3).[34]

---

[32]     *See Aaron Ferer*, 731 F.2d at 122-23 (stating duty of disclosure was required for claim against bank for *common law* misrepresentation and rescission based on omissions).

[33]     *Resnik*, 303 F.3d at 149 (holding, in shareholders' securities action, failure to provide grant-date present value for stock options did not render proxy statement materially false or misleading); *Express Scripts*, 2017 WL 3278930, at *8 (securities fraud claim under heightened standard of PSLRA); *Roseville*, 2011 WL 7158548, at *4 (same).

[34]     It is unlawful to "knowingly and fraudulently make[]" "a false oath or account in or in relation to any case under title 11," 18 U.S.C. § 152(2); or "a false declaration, certificate, verification or statement under penalty of perjury . . . in or in relation to any case under title 11[.]" 18 U.S.C. § 152(3). *See Sabbeth*, 125 F. Supp. 2d at 43-44 (MTD at 39) (conviction under § 152(2) for false testimony in bankruptcy matter); *Markiewicz*, 1996 WL 663894, at *2-*3 (MTD at 39) (conviction under § 152(3) for concealing source of income in bankruptcy petition).

The FAC adequately alleges that by knowingly and intentionally filing or causing to be filed numerous false and misleading disclosure declarations under penalty of perjury in one or more of McKinsey's Chapter 11 bankruptcies, each Defendant except for Barton and Garcia has committed, and all Defendants have aided and abetted, multiple acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3). *See* FAC ¶¶ 308-18, 408-18, 468-77; *id.*, Exs. A-B (describing specific false and misleading statements); *see also U.S. v. Gellene*, 182 F.3d 578, 589 (7th Cir. 1999) (affirming conviction under § 152(3) of attorney for omitting connections to clients in Rule 2014 disclosures); Point III, *infra*.

***Disclosure by category.*** Defendants claim they had "no duty" to actually **name** connections to Interested Parties, and thus they were at liberty to limit disclosures to those that they deemed relevant. MTD at 5, 27-33, 42. Defendants cannot cite a *single* authority condoning disclosure "by descriptive category rather than by name."[35] In addition to uniform precedent, Defendants know that their claims that Rule 2014's disclosure requirements are "flexible" and permit disclosure-by-category (MTD at 28-30) are false because the *Alpha* court told them so. FAC ¶¶ 187, 341. Defendants' assertion that *Alpha*'s ruling was unique to "the context of that case" (MTD at 31) is untrue. That court stated: "***Generally***, Bankruptcy Rule 2014 requires professional persons to disclose their connections **by name**." FAC ¶ 341 (quoting *Alpha*) (emphasis added); *see also* FAC, Ex. C ¶¶ 23, 40, 45-53; Supp. Dec. ¶¶ 16-17.[36]

Rule 2014 requires professionals to set forth, in "a verified statement," "***all*** of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of

---

[35]  *See* MTD at 3-4, 9, 11, 14, 27-29, 31, 36, 40, 52, 56 & n.54, 74.

[36]  Defendants' understanding that *Alpha*'s ruling was not case-specific is evident in *SunEdison* and *GenOn*, in which Defendants abruptly abandoned disclosure-by-category for a new *modus operandi*: belated disclosure. FAC ¶¶ 12-13, 207-17, 274-81.

23

the United States trustee."[37]  Fed. R. Bankr. P. 2014(a) (emphasis added); *see also* FAC, Ex.

C ¶¶ 24, 27, 29-32, 34, 40, 44-48, 68-73; Supp. Dec. ¶¶ 8, 10-27.  "Rule 2014 disclosure

requirements are to be strictly construed." *Leslie Fay*, 175 B.R. at 533 (citations omitted).[38]

"***All facts*** that may have any bearing on the disinterestedness of a professional ***must be***

***disclosed***."   *Id.* (emphasis added); *see also* FAC, Ex. C ¶¶ 29-32, 34.   "[I]t is the

responsibility of the professional, not of the court, to make sure that all relevant connections

have been brought to light." *Leslie Fay*, 175 B.R. at 533; *see also* FAC, Ex. C ¶¶ 29-30.

Failure to disclose connections is an independent basis for disqualification.  *Leslie Fay*, 175

B.R. at 533; *see also id.* at 537 (holding "known and significant creditors" must be explicitly

disclosed); FAC, Ex. C ¶¶ 29, 40, 45-48.   Professionals violate Rule 2014 where their

disclosures are "inadequate or worse, purposefully vague and misleading[.]"   *Matco*, 383

B.R. at 853 (internal citations omitted).[39]

---

[37]     Only professionals who "do not hold or represent an interest adverse to the estate" and who are "disinterested persons" may be retained by the debtor.  11 U.S.C. § 327(a).  A "disinterested person" "does not have an interest adverse to the interest of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.  11 U.S.C. § 101(14)(C).  This definition embraces "any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (quotations omitted).  Section 327 is implemented through Rule 2014(a).  "The scope of disclosure" under Rule 2014 "is much broader than the question of disqualification" under § 327.  *Matco*, 383 B.R. at 856 (citation omitted).

[38]     *See also In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011) ("Published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their attorneys . . . be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action.").

[39]     *See also Matco*, 383 B.R. at 852-53 ("obligation to disclose is not a subjective one, whereby the professional discloses only those 'connections' that he/she/it concludes are relevant . . . It is abundantly clear that Fed. R. Bankr. P. 2014(a) requires a significant level of disclosure of the proposed professionals' 'connections'"; "[i]t is equally clear that the level of disclosure outlined in the Rule is mandatory, whether or not that disclosure would unearth a conflict of interest."); *In re Mercury*, 280 B.R. 35, 56 (Bankr. S.D.N.Y. 2002) ("[P]rofessionals may not make unilateral determinations regarding the relevance of particular connections, or that certain connections to the debtor are too insignificant to disclose.") (citation omitted), *aff'd*, 122 F. App'x 528 (2d Cir. 2004); *Granite Partners*, 219 B.R. at 35 ("The professional must disclose ***all facts that bear on its disinterestedness***, and cannot usurp the court's function by choosing, *ipse dixit*, which connections impact disinterestedness and which do not.") (citations omitted; emphasis added).

Defendants' argument for disclosure-by-category contradicts the plain language of Rule 2014(a) and case law making clear, long before *Alpha*, that disclosure-by-category is not permitted.  Two decades before *Alpha* and six years before McKinsey's first bankruptcy, *Hayes*, a court stated:

> [C]ase law is abundantly clear that any relationship or fact which might create a disqualifying conflict of interest must be disclosed. . . . Such disclosure must, at a minimum, include the existence, nature and extent of any claims between related debtors. . . . [T]here must also be disclosure of the ***identities*** of any other parties in interest or related persons whom the professional also represents, the nature and extent of the relationship between that person and the debtor, and between that person and the professional, and any facts which might be construed as creating actual or potential conflicts of interest.

*In re Brennan*, 187 B.R. 135, 144 (Bankr. D.N.J. 1995) (emphasis added), *rev'd on other grounds*, *In re First Jersey Secs., Inc.*, 180 F.3d 504 (3d Cir. 1999).  As one court said in another context: "The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges."  *Amati v. City of Woodstock*, 176 F.3d 952, 956 (7th Cir. 1999).  Rule 2014 is so stringent that a law firm violated the Rule when it disclosed, ***by name, all 483*** current and former clients with potential connections to the debtor but failed to identify the attorneys who staffed the matters. *KLG Gates LLP v. Brown*, 506 B.R. 177, 193-94 (E.D.N.Y. 2014).  *See also* FAC, Ex. C ¶¶ 68-73; *Leslie Fay*, 175 B.R. at 537 ("boilerplate language . . . is not an adequate substitute").

"***[D]isclosures made pursuant to Rule 2014 must be explicit enough*** for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest."  *In re Lewis Rd., LLC*, 2011 WL 6140747, at *8-*9, *12 (Bankr. E.D. Va. Dec. 9, 2011) (emphasis added; quotations, citations omitted) (professionals violated Rule 2014 by "simply stat[ing] that 'proposed counsel has . . . [a] *connection with a creditor*" without "disclos[ing] with whom it held connections [or] describ[ing] what those connections were in its Application"; professional's statement "that it had 'connections with a creditor'

25

d[id] not contain the detail sufficient to comply with Rule 2014."); *see also In re Envirodyne Indus., Inc.*, 150 B.R. 1008, 1021 (N.D. Ill. 1993) (law firm Cleary, Gottlieb acted with "disregard of its obligation under [Rule] 2014(a)" where its initial disclosure affidavit "revealed merely that Cleary, Gottlieb had represented creditors in the past and would likely represent them in the future in matters unrelated to this case"; in reality, the firm represented a substantial creditor and equity holder of the debtor and was disqualified because of its "important economic interest in maintaining good relations with Salomon, a substantial client.").[40]  Like the professionals in *Lewis Road* and *Envirodyne*, Defendants violated Rule 2014 by providing boilerplate language and referring to connections to Interested Parties by "descriptive category."[41]   MTD at 3-4, 9, 11, 14, 52, 56 n.54; FAC, Ex. C ¶¶ 40-44. Moreover, even if disclosure by "descriptive category" *were* sufficient (and it is not), that would not explain 1) the many instances in which Defendants, like the defendant in *Gellene*, violated Rule 2014 by completely omitting connections that should have been disclosed, including current McKinsey clients;[42] 2) Defendants' failure to disclose the "round trip" payments in *SunEdison* or McKinsey's "pay-to-play" scheme; or 3) Defendants' failure to disclose numerous connections even by "category."  *See, e.g.*, FAC ¶¶ 276-81.

   ***Providing "sufficient information."***  Defendants' argument that McKinsey was "was fully transparent about what it was and was not disclosing" and that courts and Interested Parties had "sufficient information" and did not object (MTD at 4, 11, 33, 35, 43, 49, 52) is not only false but badly misapprehends the law.  It is the professional's responsibility to ***affirmatively*** supply all pertinent facts bearing on its disinterestedness, and one who fails to

---

[40]      *See also In re Miners Oil Co., Inc.*, 502 B.R. 285, 307-09 (Bankr. W.D. Va. 2013) (Rule 2014 disclosure inadequate where professional identified "connection" to debtor company's principal but not that principal was company's largest debtor or full extent of dealings between principal and professional); *Matter of Atl. Sporting Club*, 137 B.R. 550, 552-53 (N.D. Ga. 1991) (counsel failed to disclose extent of past representation of debtors' general partners, equity holder, and related entities).

[41]      Defendants admit that at least through 2016, their Rule 2014 disclosures were deficient; they purportedly changed their practices after an adverse ruling in *Alpha*.  MTD at 4 n.2, 9, 19, 31, 35-36.

[42]       *See* FAC ¶¶ 18, 24, 74, 79, 82, 101, 160, 162, 164, 166-67, 174, 178, 180-82, 191-92, 214, 217, 250, 260, 279; *id.*, Ex. B at 5, 8-9, 30-61, 66-67, 85.

do so cannot avoid punishment by claiming that its deficiencies were manifest. *See Matco*, 383 B.R. at 853-54 (rejecting argument); *Granite Partners, L.P.*, 219 B.R. at 35 (same). Rule 2014 "is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure." *Id.* at 852-53 (citations omitted). "The disclosures must be ***explicit and complete***." *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 662 (N.D. Ill. 2001) (emphasis added). "[A]ny close or debatable issue ought to be resolved in favor of disclosure." *Miners*, 502 B.R. at 302 (internal quotations omitted). "Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999) (quotations omitted). *See also* FAC, Ex. C ¶¶ 22-32; Supp. Dec. ¶¶ 22-24. Further, it is untrue that Defendants were transparent about what they were "not disclosing." MTD at 33. For example, none of their disclosure declarations affirmatively explained the deficiencies in their methodology for ascertaining disclosable connections, nor did they reveal that they were only partially disclosing connections. *See, e.g.*, FAC ¶¶ 59, 64-67; Point II.A, *supra*.

***Boilerplate language.*** Defendants' boilerplate language "stating that [McKinsey] and its affiliates may have in the past represented, may currently represent, or may in the future represent Interested Parties" (MTD at 33 (claiming Defendants made "extensive disclosures")) is grossly inadequate. Defendants also repeatedly violated Rule 2014 by submitting disclosures stating "McKinsey advises Interested Parties in matters unrelated to the bankruptcy" (MTD at 10, 36) without providing sufficient detail to reveal what were, in fact, significant connections to Interested Parties and disqualifying conflicts of interest. "Mere 'boilerplate' disclosure may cover an inadvertent failure to disclose an insignificant connection, but does not suffice for known connections with parties presenting a significant

risk of adversity." *Granite Partners*, 219 B.R. at 35 (citing *Leslie Fay*, 175 B.R. at 537). "A boilerplate statement that the professional may represent an unspecified creditor or party in interest in unrelated transactions in the future is insufficient disclosure of future connections." *Id.* at 36 (internal citations omitted). *See also* FAC, Ex. C ¶¶ 40-44; Supp. Dec. ¶ 15.

> ***Affiliates' connections.*** Professionals must disclose not only their own connections to the debtor and Interested Parties, but connections of their affiliates as well. *See In re Gen. Wireless Operations Inc.*, 2017 WL 5404534, at *2 (Bankr. D. Del. Apr. 6, 2017) ("A & G Realty shall disclose any and all facts that may have a bearing on whether A & G Realty, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest.").[43] *See also* FAC, Ex. C ¶¶ 31, 58, 64; Supp. Dec. ¶¶ 18-21. McKinsey US and RTS were obligated to disclose connections of their direct and indirect parent entities, as well as their corporate siblings (such as MIO)—in short, the whole McKinsey "organization."

Defendants cite no case law permitting them to disclose connections of their "affiliates" only where *they* deem them to be relevant.[44] Defendants' facile argument that Rule 2014 does not refer to "affiliates" (MTD at 29-30, 32), of course, ignores that Rule 2014 requires professionals to list all "connections," a term that is obviously broader than the term "affiliates."[45] Defendants' argument also fails because Rule 2014 is designed to ensure that

---

[43]     *Cf. In re Trust Am. Serv. Corp.*, 175 B.R. 413, 420 (Bankr. M.D. Fla. 1994) ("To ensure themselves no conflict existed with respect to related debtors, the duty was not solely limited to Coopers and Lybrand in Tampa, but was a duty of the whole organization . . . Coopers and Lybrand had a duty to ensure themselves of no conflict with all departments and locations of its partnership.").
[44]     *See* MTD at 11-12 (stating RTS's disclosures in *Alpha* were limited to disclosing "by descriptive category its own connections, those of its client service affiliates where the service focused on a direct commercial relationship with the debtors"); *see also id.* at 3-4, 8, 14, 27, 29-32.
[45]     *See, e.g.*, "Connection," def. noun 1, *Oxford Living Dictionary*, Oxford Univ. Press, https://en.oxforddictionaries.com/definition/connection (Nov. 28, 2018) ("A relationship in which a person or thing is linked or associated with something else."); *Chen v. Major League Baseball Props.*, 798 F.3d 72, 76 (2d Cir. 2015) ("When construing a statute, we begin with its language and proceed under the assumption that the statutory language, unless otherwise defined, carries its plain meaning; therefore, we 'consider the ordinary, common-sense meaning of the words' used in the statute.") (quoting *U.S. v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)); *see also Kellogg Brown & Root Servs. v.*

professionals are "disinterested persons" that have no adverse interests "by reason of any direct **or indirect** relationship to, connection with, or interest in, the debtor, **or for any other reason**." 11 U.S.C. § 101(14)(C) (emphasis added); *see also* FAC, Ex. C ¶ 31. This is not, as Defendants suggest (MTD at 29), a case testing the outer limits of "separateness from the applicant." At issue here are the connections of a parent entity, McKinsey & Co., and its wholly-owned subsidiaries, McKinsey Holdings, McKinsey US, RTS, and MIO. These relationships fit comfortably within the "indirect relationship" and "any other reason" language of § 101(14). Connections of any of these entities bears on the business and financial interests of the others and must be disclosed for a proper assessment under § 327(a). *See* Supp. Dec. ¶¶ 18-21.

Notably, Defendants cite only four cases mentioning Rule 2014, none of which support their position. *Enron* and *Fibermark* are easily distinguishable while *eToys* and *Leslie Fay* support Alix. *Enron* denied the creditors' motion to disqualify creditors' committee counsel, stating, without providing any detail, that "Milbank complied with its Rule 2014 disclosure obligations" and the creditors were seeking disclosure of "every conceivable interpretation of its connections and possible consequence resulting from the connections[.]" 2002 WL 32034346, at *5 (MTD at 17, 30). In *Fibermark*, the court declined, *on summary judgment*, to sanction a financial advisor that failed to disclose it had participated on various sides of other bankruptcies along with several other professionals in the case, in the absence of "any pecuniary or attorney-client or adversarial relationship" with the other professionals. 2006 WL 723495, at *7-*8, *11 (MTD at 30). Although Defendants cite *Fibermark* for the proposition that Rule 2014 is "flexible," the court acknowledged that

---

*U.S. ex rel. Carter*, 135 S. Ct. 1970, 1978 (2015) (referring to Black's Law Dictionary and Webster Dictionary for "ordinary meaning" of term in statute).

the disclosure obligation 'is very broad and strict[].'"[46]  *Id.* at \*8-\*9.  Unlike *Fibermark* and *Enron*, this case does not test the outer limits of Rule 2014 "connections."[47]  Rather, it concerns affirmative misrepresentations made to various courts and Defendants' *systematic* failure to disclose numerous disqualifying conflicts and connections, including current clients and McKinsey's fraudulent dealings with debtors.[48]

In *Leslie Fay*, the court disqualified Weil Gotshal from handling new matters for the debtor and imposed substantial sanctions because it violated Rule 2014 by failing to disclose connections to members of the debtor's Audit Committee and a large unsecured creditor.[49] 175 B.R. at 537 (MTD at 33).  Rejecting Defendants' proffered interpretation of Rule 2014(a), the court stated: "*[B]oilerplate language . . . is not an adequate substitute for disclosure of known and significant creditors.  To rule any other way would be to eviscerate the disclosure requirements of Rule 2014(a)*."  *Id.* (emphasis added).  Thus, *Leslie Fay* supports Alix and put Defendants on notice of their Rule 2014 obligations long before *Alpha* (and all of McKinsey's other bankruptcy matters).  In *eToys*, the court clarified that going forward, debtors' employees should disclose their relationships with debtors'

---

[46]    *Fibermark* further states: "There is no question that any connection that might reasonably be perceived to constitute a conflict of interest, or to support a determination that the applicant is not disinterested, must be disclosed.  A professional seeking to be employed in a bankruptcy case should disclose all arguable conflicts, even if it is only to explain them away."  *Id.* at \*10.

[47]    Defendants' appeal to their supposed compliance burden is particularly galling: other, much smaller, professional firms in the thirteen bankruptcies at issue disclosed vastly more connections than McKinsey without complaint.  *See* MTD at 30; FAC ¶¶ 11-12.

[48]    *See* Point II.A, *supra*; FAC ¶¶ 4, 9, 13, 15, 22-23, 75, 85, 92, 103, 111, 118, 120, 124, 128, 140, 148, 154, 170, 175, 177, 178-79, 192, 200, 218, 221-44, 248, 258, 266, 267-73, 280; *id.*, Ex. C ¶¶ 26, 36, 65, 78-94.

[49]    To the extent that Defendants assert that their Rule 2014 violations are more akin to those in *Leslie Fay*, which did not involve criminal charges, than *Gellene*, that is an issue that cannot be determined at the pleadings stage without fact discovery.  In *Leslie Fay*, the court concluded, following a six-month factual investigation by an independent examiner, that it did not believe Weil Gotshal's behavior in that case "to have been venal."  175 B.R. at 537.  In contrast, the defendant in *Gellene* was convicted for strikingly similar omissions.

professionals, 331 B.R. at 189-190, thus emphasizing the *breadth* of bankruptcy professionals' disclosure obligations under Rule 2014.[50]

**_Confidentiality concerns._**    Defendants admit their client agreements permit disclosure where "legally required to be disclosed." *Alpha*, Dkt. 212, Ex. A at 3; FAC ¶¶ 78-84; *id.*, Ex. C ¶¶ 49-50. Defendants cite no authority permitting them to omit connections' names due to purported concerns about client confidentiality.[51] That justification is belied by the facts that Defendants' failures to disclose were not limited to McKinsey clients; and Defendants could have (but never did prior to *Alpha*) submitted connections' names to the court *in camera* if they truly had confidentiality concerns.[52] *See* 11 U.S.C. § 107; FAC, Ex. C ¶¶ 45-53.

**_Reasonableness of interpretation._**    Defendants argue that even if their disclosures *were* grossly deficient, they were not fraudulent because "Defendants' interpretation of Rule

---

[50]    Defendants' remaining bankruptcy fraud cases, none of which address Rule 2014, are inapposite. *First Capital*, *Baron*, and *Burke* (MTD at 39 n.33) dismissed allegations of bankruptcy fraud under *§ 152(7)* where allegedly fraudulent transfers occurred years before the bankruptcy or, in *Burke*, where the plaintiff failed to allege defendants contemplated future bankruptcy proceedings while looting corporate assets. *First Capital*, 385 F.3d at 179; *Baron*, 2006 WL 1318426, at *2; *Burke*, 944 F. Supp. at 1066-67. *Ferri* and *Ritter* (MTD at 39 n.33) dismissed claims for failure to plead a pattern of racketeering activity. *Ferri*, 678 F. Supp. 2d at 75 (plaintiff merely alleged one fraudulent loan; bankruptcy fraud was unrelated to alleged RICO enterprise); *Ritter*, 2008 WL 2967627, at *11-*13 (no RICO pattern where alleged RICO scheme was solely intended to evade divorce judgment). *Vaughn* (MTD at 34-35) merely states, without detail, that allegations of bankruptcy fraud were conclusory and plaintiff failed "to explain how [defendant] committed the criminal act." 395 B.R. at 553.

[51]    *See* MTD at 2, 49, 57 n.55; FAC, Ex. C ¶¶ 45-53; Supp. Dec. ¶¶ 25-29.

[52]    While Defendants refer to a handful of Rule 2014 declarations submitted by other bankruptcy practitioners (including two by AP) purportedly invoking client confidentiality (MTD at 31 n.25), this "*tu quoque*" argument fails in three respects. *First*, each of the proffered declarations indisputably identifies the vast majority of connections by name (and AP's submissions also typically provide additional details concerning the connections). *Second*, Defendants do not contend that any other practitioners, *unlike McKinsey*, systematically withheld virtually all connection details through ten consecutive bankruptcy engagements. *Third*, Defendants do not claim that any other practitioners share McKinsey's business model, with conflicts of interest inherent in simultaneously serving competitors (*see, e.g.*, MTD at 31 n.24 ("RTS and its affiliates have a long-standing policy of serving competing companies")), which creates a unique and heightened probability that undisclosed connections will present a conflict with debtors or other Interested Parties. Additionally, Defendants' arguments highlight the problematic nature of submitting cherry-picked items of extrinsic evidence on a Rule 12(b)(6) motion. Were this a motion for summary judgment, for example, Plaintiff would submit evidence that AP's sparing invocation of client confidentiality was accompanied by a policy to reveal client identities in camera upon request by the U.S. Trustee or other stakeholders.

2014(a) was reasonable[.]"[53] MTD at 34. That argument was rejected in *Gellene*, which the FAC cites but Defendants ignore. *Gellene* affirmed the conviction of a partner of the law firm Milbank Tweed for bankruptcy fraud in violation of § 152(3) for failure to disclose his firm's connections to a senior secured creditor and related parties in his Rule 2014 disclosure declaration in support of his firm's retention as debtor's counsel. 182 F.3d 578 at 581. The court rejected the defendant's attempt to pass off his failures to disclose as "an error in legal judgment," *id.* at 584, and "stupid, but not criminal." *Id.* at 585. Refuting the defendant's argument that his failures to disclose were not material, the court stated:

> We have no doubt that *a misstatement in a Rule 2014 statement* by an attorney *about other affiliations constitutes a material misstatement.* Bankruptcy Rule 2014 requires the potential attorney for the debtor to set forth under oath any connections with the debtor, creditors, and any other party in interest. *The disclosure requirements apply to all professionals.* The professionals cannot pick and choose which connections are irrelevant or trivial.

*Id.* at 588 (quotations, citations omitted; emphasis added). "A court should view the professional's claim of confusion about disclosure skeptically[.]" *Granite Partners*, 219 B.R. at 39 (internal citation omitted) (rejecting argument by Willkie Farr law firm "that until *Leslie Fay* clarified the law, its disclosure of prospective connections was 'state of the art'").[54] Here, each Defendant is highly sophisticated and cannot plausibly claim they were simply confused about Rule 2014's requirements. *See also* FAC, Ex. C ¶¶ 22-37.

---

[53]     *See also* MTD at 2-3, 4-5, 7-8, 10-11, 14, 27-29, 35 n.28, 40.

[54]     Defendants repeatedly assert, without citing any authority, that they are not responsible for any deficiencies in the Rule 2014 disclosures because McKinsey had "sophisticated legal counsel." MTD at 35 n.28, 37, 46 n.41, 52-54, 57. *Leslie Fay*, *Granite Partners*, *Gellene*, and *Envirodyne* make clear that even sophisticated legal counsel can commit (and in the case of *Gellene*, be sent to prison for) Rule 2014 violations. *See also In re Liebfried Aviation, Inc.*, 445 B.R. 30, 32-34 (Bankr. D. Mass. 2011) (disqualifying accountant for failing to disclose connections to debtor affiliates in Rule 2014 disclosure where accountant claimed he "signed but did not read" affidavit prepared by debtor's attorney; "[h]is attempt to blame his lack of compliance on the debtor's attorney is unpersuasive, unprofessional and unavailing"). Defendants' (who are themselves experienced professionals) access to sophisticated legal counsel underscores that their Rule 2014 violations were knowing and intentional. Nor is there any merit to Defendants' assertion (for which they cite no authority, MTD at 52, 57) that they are absolved of responsibility because McKinsey's business relationships are "complex."

32

***Reliance on methodology.*** Nor are Defendants absolved by claims they relied on McKinsey's longstanding "methodology employed to identify connections to Interested Parties in each bankruptcy" as described in the Rule 2014 disclosures. MTD at 4, 49-50, 52, 56-57. Many undisclosed connections and conflicts were readily apparent to Defendants regardless of their conflicts checking system.[55] *See, e.g.*, FAC ¶¶ 24, 74, 79, 82, 95, 101, 164, 180-82, 191, 213-17, 249-60; Point III, *infra*. Moreover, as signatories of the Rule 2014 disclosures (as well as experienced and highly trained bankruptcy professionals), Goldstrom, Yerian, and Carmody had an affirmative obligation to inform themselves as to the content of any declarations that they signed.[56] *See also* FAC, Ex. C ¶¶ 54-67.

### C. Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.

The elements of mail and wire fraud are satisfied as to each Defendant because the FAC alleges that Defendants schemed to fraudulently obtain bankruptcy assignments for which McKinsey was disqualified (*see* Point I, *supra*), describes in detail how the mails and wires were used to further the scheme, and attributes specific instances to each Defendant, including numerous Rule 2014 disclosures.[57] FAC ¶¶ 319-30, 415-20, 478-84; *id.*, Exs. A-B.

---

[55] Defendants' offenses are far worse than those described in *Gellene*. In *Gellene*, the defendant omitted client connections from his Rule 2014 disclosures in just ***one*** bankruptcy. Defendants' unlawful scheme has continued over many years and at least ***thirteen*** bankruptcy engagements.

[56] *See In re Balco Equities Ltd., Inc.*, 345 B.R. 87, 117 (Bankr. S.D.N.Y. 2006) (supervising attorney could not "blame a subordinate for false statements contained in [Rule 2014 disclosure affidavits] signed by that same supervising attorney."); *Liebfried Aviation*, 445 B.R. at 32-34.

[57] The "essential elements" of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *U.S. v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (internal quotations and citations omitted). The gravamen of the offense is the scheme to defraud[.]" *Id.* (quoting *Bridge*, 553 U.S. at 647). *See also ChevronCorp. v. Donziger*, 871 F. Supp. 2d 229, 249-50 (S.D.N.Y. 2012) ("'Scheme to defraud' has been construed liberally to include any plan consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property. The scheme need not have succeeded to complete the offense. . . . There is no requirement that the defendant him—or herself use the mails. It suffices if the defendant caused them to be used by an agent, or sent in motion events which foreseeably would involve their use. . . . Each prohibited use of the mails . . . is a separate indictable offense even if all are made pursuant to a single corrupt scheme.") (citations, quotations omitted) (denying motion to dismiss RICO claims where defendant- attorney, allegedly committed fraud on Ecuadorean court).

Defendants' sole argument specific to mail and wire fraud, that AP had no "actual, protected property interest that McKinsey sought to misappropriate," MTD at 38, misconstrues the law and ignores the controlling precedent of *Bridge*.  Mail and wire fraud do *not* require that "the party whose money or property is the object of the scheme is the same party whom a fraudster seeks to deceive."  *Greenberg*, 835 F.3d at 305; *see also Bridge*, 553 U.S. at 649.  "***The [money or] property to which section 1341 refers need not be the plaintiffs'***, provided they are directly injured by the defendants' unlawful acquisition of the property."  *BSC*, 728 F.3d at 638 (emphasis added).  In *Bridge*, the tax liens were "property of Cook County," not the plaintiffs.  *Id.*  The plaintiffs could plead a RICO claim predicated on mail fraud because they "were deprived of the profit they would have made had the fraud not prevented them from being awarded as many tax liens as they would have been awarded otherwise."  *Id.*  It is irrelevant that the "money or property" obtained by Defendants, bankruptcy engagements and resulting fees, began as money or property of bankruptcy estates.  Because AP was "deprived of the profit [it] would have made had the fraud not prevented [it] from being awarded as many [bankruptcy engagements] as [it] would have been awarded otherwise," *id.*, Alix sufficiently pleads mail and wire fraud.[58]

### D.  Obstruction of Justice and Witness Tampering.

---

[58]   Defendants' remaining cases (MTD at 38), none of which involved RICO, are readily distinguishable.  *Henry* pre-dates *Bridge* by more than a decade, and to the extent that it can be construed as requiring a different outcome than *Bridge*, *Bridge* obviously controls.  *Henry* is also distinguishable because Alix specifically alleges that absent Defendants' fraud, McKinsey would have been disqualified, and that AP was virtually certain of obtaining at least some of the bankruptcy assignments in McKinsey's absence.  *See* Point I, *supra*; *Henry*, 29 F.3d at 114-15.  *See also Pasquantino*, 544 U.S. at 352-53, 355 (concluding "a plot to defraud a foreign government of tax revenue violates the federal wire fraud statute" and "Canada's right to uncollected excise taxes . . . is 'property' in its hands"); *Vilar*, 729 F.3d at 89 (rejecting argument that conviction for mail fraud required proof "mailing contained false or fraudulent material"); *Pierce*, 224 F.3d at 160 (reversing conviction under § 1956 where government failed to show "existence of such duties or taxes payable to the Canadian government" that smuggling evaded); *Evans*, 844 F.2d at 40-41 (rejecting government's argument that it has a "property" right in "prevent[ing] the resale or retransfer of U.S. military weaponry from foreign nations to other, unacceptable foreign powers.").

The FAC alleges that Defendants violated all elements of 18 U.S.C. §§ 1503(a),[59] 1512(b), and/or 1512(c) by filing or causing to be filed false and misleading disclosures[60] on behalf of McKinsey in all thirteen of McKinsey's Chapter 11 bankruptcies; impeding the *Alpha* bankruptcy by making false and misleading statements to the bankruptcy court and U.S. Trustee, resulting in the U.S. Trustee's withdrawal of its motion to compel; and by causing false testimony to be submitted by others in certain cases, including by misleading or influencing McKinsey employees so that they submitted declarations that were false and misleading.[61]  *Cf. U.S. v. Crispo*, 306 F.3d 71, 81-82 (2d Cir. 2002) (affirming conviction for

---

[59]    The "omnibus" clause of § 1503(a), which prohibits "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice[,]" is interpreted broadly and "embraces the widest variety of conduct that impedes the judicial process." *U.S. v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010).

[60]    It is well-established that false testimony made for an improper purpose may serve as the basis for a conviction under § 1503(a). *See U.S. v. Langella*, 776 F.2d 1078, 1081 (2d Cir. 1985); *U.S. v. Baum*, 32 F. Supp. 2d 642, 645, 651 (S.D.N.Y. 1999); *U.S. v. Abbell*, 271 F.3d 1286, 1301 (11th Cir. 2001) (attorneys' "involvement in trying to obtain a false exculpatory affidavit" for use in Colombian extradition proceedings supported conviction under RICO based on obstruction of justice); *U.S. v. Lundwall*, 1 F. Supp. 2d 249, 251 (S.D.N.Y. 1998) (defendants could be prosecuted under § 1503(a) for withholding and destroying documents during discovery in civil action); *Feld Ent'mt Inc. v. ASPCA*, 873 F. Supp. 2d 288, 319-20 (D.D.C. 2012) (plaintiff alleged "defendants provided knowingly false responses to interrogatories and knowingly false deposition testimony" in civil case). *In re Sealed Case*, 162 F.3d 670, 674 (D.C. Cir. 1998) (nonparty submitted false affidavit in civil case); *D'Addario v. Geller*, 264 F. Supp. 2d 367, 398-99 (E.D. Va. 2003) (denying motion to dismiss RICO claim; plaintiff alleged defendant violated § 1503(a) by "perjur[ing] himself by misrepresenting to this court [in shareholder derivative action] that RMST would not sell artifacts . . . and defendants filed "'false' periodic reports" and "failed to file required information with" SEC).

[61]    Specifically, **McKinsey & Co., McKinsey Holdings, and McKinsey US** each violated *§ 1503(a)* in all thirteen of McKinsey's Chapter 11 cases, *see* FAC ¶¶ 17-24, 72-118, 136-41, 143-55, 159-287, 299(d), 331-50, 492-97, violated *§ 1512(b)* in *Hayes, UAL, Mirant, Lyondell, Alpha* and *SunEdison, id.* ¶¶ 17-23, 72-93, 159-244, 352-56, 503, and violated *§ 1512(c)* in *Alpha, id.* ¶¶ 17-21, 159-202, 331-49, 357; **RTS** violated *1503(a)* in nine Chapter 11 cases, *Harry & David* through *GenOn, id.* ¶¶ 17-24, 94-111, 113-18, 136-41, 143-55, 159-287, 485; violated *§ 1512(b)* in *Alpha* and *SunEdison, id.* ¶¶ 17-23, 159-244, 498, and violated *§ 1512(c)* in *Alpha, id.* ¶¶ 17-21, 159-202, 505; **Barton** violated *§ 1503(a)* in *Harry & David* through *GenOn, id.* ¶¶ 299(e), 316, 331-51, violated *§ 1512(b)* in *Alpha* and *SunEdison, id.* ¶¶ 352-56, and violated *§ 1512(c)* in *Alpha, id.* ¶¶ 357-58; **Carmody** violated *§ 1503(a)* in *AMR* through *GenOn, id.* ¶¶ 17-24, 98-111, 113-18, 136-41, 147-55, 159-287, 299(j), 313, 331-50, violated *§ 1512(b)* in *Alpha* and *SunEdison, id.* ¶¶ 17-23, 159-244, 352-56, and violated *§ 1512(c)* in *Alpha, id.* ¶¶ 17-21, 159-202, 357-58; **Garcia** violated *§ 1503(a)* in *Harry & David* through *GenOn, id.* ¶¶ 299(g), 310, 331-51, violated *§ 1512(b)* in *Alpha* and *SunEdison, id.* ¶¶ 352-56, and violated *§ 1512(c)* in *Alpha, id.* ¶¶ 357-58; **Goldstrom** violated *§ 1503(a)* in *Harry & David* through *GenOn, id.* ¶¶ 94-106, 205-06, 299(h), 314, 331-50, violated *§ 1512(b)* in *Alpha* and *SunEdison, id.* ¶¶ 205-06, 352-56, and violated *§ 1512(c)* in *Alpha, id.* ¶¶ 357-58; **Proshan** violated *§ 1503(a)* in *AMR* through *GenOn, id.* ¶¶ 17-24, 98-111, 159-202, 299(i), 312, 331-51, violated *§ 1512(b)* in *Alpha* and *SunEdison, id.* ¶¶ 17-23, 159-202, 205-06, 352-56, and

obstruction of justice where defendant interfered with bankruptcy trustee's discharge of duties).

Defendants' *sole* response as to §§ 1503(a) and 1512(c) is a conclusory statement that they

had "no duty to disclose under Rule 2014(a)" and thus could not have violated those statutes.

MTD at 42 & n.36.[62]  That argument fails for the reasons stated in Point II.B, *supra*.[63]

Defendants' argument regarding § 1512(b) is limited to the conclusory statement that

"there is no allegation that any Defendant interfered with anyone's testimony, let alone did so

with a corrupt purpose."[64]  MTD at 41-42.  In fact, the FAC specifically alleges conduct by

Defendants meeting the criteria for witness tampering through both "corrupt persuasion"[65]

---

violated *§ 1512(c)* in *Alpha*, *id.* ¶¶ 17-21, 159-202, 357-58; **Sternfels** violated *§ 1503(a)* in *Harry & David* through *GenOn*, *id.* ¶¶ 205-44, 299(f), 315, 331-51, violated *§ 1512(b)* in *Alpha* and *SunEdison*, *id.* ¶¶ 352-56, and violated *§ 1512(c)* in *Alpha*, *id.* ¶¶ 357-58; and **Yerian** violated *§ 1503(a)* in *Edison Mission*, *id.* ¶¶ 299(k), 317, 350(d).

[62]  Defendants' reliance on *eToys* (MTD at 42) is misplaced.  That case cites neither § 1503(a) nor § 1512(c).  The court declined to make a criminal referral of a matter where a debtor's officer failed to disclose his relationship with the debtor's professionals because, prior to *eToys*, there was no requirement for debtors' employees to make such disclosures.  331 B.R. at 200.

[63]  Defendants' assertion that "even a false bankruptcy filing does not per se constitute an obstruction of justice" (MTD at 42) is unsupported.  In *Rodriguez*, which does not mention §§1503(a) or 1512(c), the court merely stated, in a *sentencing opinion*, that no upward departure for obstruction of justice was warranted because there was "no information to suggest that the defendant impeded or obstructed justice at the time of arrest, or during the investigation or prosecution of the offense." 2002 WL 31426211, at *14.  Defendants' other cases (MTD at 42 & n.36) are not to the contrary.  In Defendants' *sole* § 1503(a) case, the plaintiff alleged only that the defendant referred to non-equity law firm partners as "partners" in fee applications.  *Grewal*, 2015 WL 4103660, at *18-*19. Defendants' *sole* § 1512(c)(2) case likewise provides no support to Defendants.  *See Reich*, 479 F.3d at 185-87 (affirming § 1512(c)(2) conviction of attorney who faxed forged order to opponent).

[64]  Defendants' assertions that Alix fails to explain how Defendants misled the U.S. Trustee, and that Alix provides no support for the allegation that Defendants continued to omit connections in supplemental disclosures in *Alpha* (MTD at 42 n.35), ignore the FAC's plain language.  *See* FAC ¶ 346 ("In reliance on . . . RTS's fourth supplemental disclosure . . . the U.S. Trustee abandoned any further efforts . . . ."); *id.* ¶¶ 166-67, 174, 190-202; *id.*, Ex. B at 48-63 (identifying specific connections omitted from supplemental disclosures in *Alpha*).  Defendants' complaint that the FAC does not attach their voluminous disclosures (MTD at 42 n.35) ignores that the FAC describes the fraudulent disclosures in detail and attaches a 110-page chart.  *See* FAC, Ex. B.

[65]  "Corruptly persuades" means "the defendant's attempts to persuade were motivated by an improper purpose."  *U.S. v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).  "Corrupt persuasion" includes "non-coercive conduct."  *See id.*; *U.S. v. Weiss*, 630 F.3d 1263, 1273-74 (10th Cir. 2010) ("defendant's action was done voluntarily and intentionally to bring about false or misleading testimony or to prevent testimony with the hope or expectation of some benefit to the defendant or another person.")  (internal quotations omitted); *U.S. v. Brown*, 2012 WL 4103857, at *3 (W.D.N.Y. Sept. 17, 2012) ("To corruptly persuade means to act knowingly with a wrongful, immoral or evil purpose to convince or induce another person to engage in certain conduct.")  (internal quotations, citations omitted).

and "misleading conduct,"[66] within the meaning of 18 U.S.C. §§ 1512(b) and 1515(a)(3)(A), (B), and (E), including in *SunEdison*, in which McKinsey, Carmody, Proshan, Sternfels and Goldstrom intentionally caused a McKinsey employee, Hojnacki, to submit false and misleading declarations on behalf of RTS. *Id.* ¶¶ 350(g), 356, 498; *see also id.* ¶¶ 331-49; Point III, *infra*. The FAC further alleges that Defendants were motivated by an improper purpose of obtaining and keeping bankruptcy engagements which McKinsey would not have absent their deceit.[67] *Id.* ¶¶ 374-78, 525. Moreover, "the question whether a person acted with the intent to obstruct justice is almost always answered by resort to circumstantial evidence," *U.S. v. Napoli*, 2010 WL 1687669, at *3 (E.D.N.Y. Apr. 27, 2010) (citations omitted), and therefore the issue cannot be decided on a Rule 12(b)(6) motion.

### E. Violations of 18 U.S.C. § 2314.[68]

The FAC adequately pleads violations of 18 U.S.C. § 2314[69] because it alleges in detail how Defendants executed a scheme to fraudulently obtain bankruptcy consulting assignments worth millions in fees. It further describes how Barton and McKinsey & Co., aided and abetted by Sternfels and McKinsey, induced Alix to travel from Michigan to New York to meet with Barton on October 15, 2015 "to foster the false impression that McKinsey was pursuing corrective action" and "[b]y stringing Alix along in this fashion," they "sought

---

[66] "Misleading conduct" is defined broadly to include "(A) knowingly making a false statement; (B) intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby a false impression by such statement;" intentionally "submitting or inviting reliance on" false or misleading documents; and "(E) knowingly using a trick, scheme, or device with intent to mislead." 18 U.S.C. § 1515(a)(3).

[67] Defendants' *sole* §1512(b) case (MTD at 41) is readily distinguishable. *See Rambarran*, 2008 WL 850478, at *8 (no allegation false testimony "was the product of improper influence").

[68] Defendants incorrectly call § 2314 the "Travel Act," which is codified at 18 U.S.C. § 1952. MTD at 15, 40-41. Additionally, *Thai Airways* (MTD at 41) is inapposite; the plaintiff alleged a violation of the *first* paragraph of § 2314, concerning transfers of stolen or fraudulently obtained goods or funds. 891 F. Supp. at 118 (pleading "devoid of details as to other victims and other frauds" and thus 'fail[ed] to satisfy the continuity requirement necessary to form a RICO pattern") (citation omitted). Alix's allegations pertain to the *second* paragraph of § 2314 and are pled with sufficient particularity.

[69] To plead a claim under the second paragraph of 18 U.S.C. § 2314, plaintiffs must allege that 1) the defendant devised a scheme intending to defraud a victim of a minimum of $5,000; and 2) the victim was induced to travel in interstate commerce as a result of that scheme. *U.S. v. Thomas*, 377 F.3d 232, 236 (2d Cir. 2004).

to (and did) forestall legal action by AP, and thereby prolonged [Defendants'] scheme."[70]
FAC ¶¶ 134, 367-68.  *See U.S. v. O'Connor*, 874 F.2d 483, 487-88 (7th Cir. 1989) (affirming
§ 2314 conviction; defendant's "repeated promises to pay," made during telephone calls and
meetings for which creditor's agent travelled to Milwaukee, "were designed to postpone his
creditors' investigation and to prevent detection of his scheme").

Defendants' *only* argument, that "Alix admits that *he* requested the meeting with
Barton" (MTD at 41), fails because it is irrelevant whether the victim or the perpetrator of the
scheme initiated the meeting.  *See Thomas*, 377 F.3d at 234-35, 340 (rejecting argument "that
there was insufficient evidence of inducement" because the defendant "and his fraudulent
scheme were a 'motivating force' in" travel of victim's agent, where victim's agent initially
invited defendant to Memphis to explain investment scheme and travelled to New York only
after defendant said he could not travel to Memphis).  Here, Barton, and Defendants'
fraudulent scheme, were "motivating forces" in Alix's travel to New York.[71]

### F.  Money Laundering in Violation of 18 U.S.C. § 1957(a).

Alix pleads extensive facts regarding Defendants' receipt of proceeds from a wide
variety of RICO predicate acts, including, mail, wire, and bankruptcy fraud, all of which
constitute "specified unlawful activity" under 18 U.S.C. §§ 1956(c)(7) and 1957(f).[72]
Defendants' contention that Alix "has not satisfied the intent requirement" of the money
laundering statute because "[t]here is no suggestion that the purpose of these transactions was

---

[70]     During that meeting, in an unabashed display of fraudulent intent, Barton attempted to
prolong the scheme by offering bribes in the form of business referrals in exchange for silence
regarding McKinsey's unlawful pay-to-play scheme and disclosure practices. *Id.* ¶¶ 134, 367, 377.

[71]     *Myerson* (MTD at 41) is inapposite.  In *Myerson*, an attorney was convicted of tax fraud and
fraudulently overbilling clients.  18 F.3d at 155.  The court found insufficient evidence to find
Myerson induced clients to travel. *Id.* at 155 & n.1.  Because the clients would have travelled to meet
with their lawyers even if a different firm had represented them and even in the absence of Myerson's
overbilling scheme, their travel "was not in furtherance of the overbilling fraud, but was instead in
furtherance of their own legal business, and was only of peripheral importance to Myerson's fraud[.]"
*Id.*  In contrast, there was no reason for Alix's October 2015 meeting with Barton *except* for
Defendants' fraudulent scheme; Barton met Alix for the purpose of concealing and prolonging
Defendants' unlawful scheme.

[72]     *See* FAC ¶¶ 369-73, 439-42, 516-21.

38

to disguise or conceal the source of the funds" (MTD at 43) is irrelevant. Defendants refer to an element of money laundering under 18 U.S.C. § *1956(a)*.[73] But Alix pleads violations of 18 USC § *1957*. FAC ¶¶ 369-73, 439-42, 516-21. Unlike § 1956, § 1957 has no "intent" element, nor does it require that monetary transactions involving proceeds of specified unlawful activity be designed to disguise or conceal the source of those proceeds. *U.S. v. Weisberg*, 2011 WL 4345100, at *2-*3 (E.D.N.Y. Sept. 15, 2011).

To allege violations of § 1957, Alix need only plead facts indicating Defendants knowingly engaged in a monetary transaction involving proceeds of specified unlawful activity valued at more than $10,000. *U.S. v. Silver*, 864 F.3d 102, 114-15 (2d Cir. 2017). Section 1957 encompasses transactions involving unlawful proceeds commingled with "clean" funds. *Id.*; *U.S. v. Sokolow*, 91 F.3d 396, 411 (3d Cir. 1996) (court properly included funds received by defendant as salary in "value of funds" for purposes of calculating guidelines range as salary included proceeds of specified unlawful activity). Defendants' receipt and subsequent disbursement or reinvestment of fees obtained through a litany of specified unlawful activity, including mail fraud, wire fraud, and bankruptcy fraud (FAC ¶¶ 369-73, 439-42, 516-21, Points II.B-II.C, *supra*), which Defendants each knew were earned through their scheme, violated § 1957, regardless of whether the fees were disbursed as "ordinary course" salary payments.[74] *Silver*, 864 F.3d at 114-15.

### G. Violations of 18 U.S.C. § 152(6) and State Law Commercial Bribery.

A person violates 18 U.S.C. § 152(6) where he "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in a case under title

---

[73] Defendants' cases (MTD at 42) both concerned § 1956(a), not § 1957. *See Gotti*, 459 F.3d at 344; *Tymoshenko*, 57 F. Supp. 3d at 322.

[74] Defendants' argument that the FAC "negates the intent requirement" to plead money laundering for the "round trip" payments in *SunEdison* (MTD at 43 n.37) fails because there is no "intent" requirement in § 1957. As to Defendants' remaining arguments regarding the round trip payments, the FAC sets forth in detail the relevant criminal transactions. FAC ¶¶ 221-36.

11[.]"  In furtherance of the Count 1 and Count 3 Enterprises, McKinsey[75] offered exclusive, unlawful "'pay-to-play' arrangements to attorneys that handle high-stakes bankruptcy matters."[76]  FAC ¶ 15; *id.*, Ex. C ¶¶ 87-91.  Barton admitted the existence and illegality of McKinsey's pay-to-play scheme.  ¶ 128.  McKinsey characterizes its behavior as "everyday professional conduct."  MTD at 40.  The pay-to-play scheme, however, was clearly improper and disqualifying.  *See* FAC ¶ 120, Ex. C ¶¶ 87-91.  Section 327 requires that all professionals be "disinterested," and decisions to hire such professionals must be based on the estate's best interests, not on whether McKinsey paid debtors' attorneys for the engagement.  Further compounding the scheme, McKinsey failed to disclose it in its Rule 2014 disclosures.[77]  Additional information, including the specifics of the bribes, is peculiarly within Defendants' knowledge.  *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 310 (S.D.N.Y. 2013).  Defendants' *only* authority discussing § 152(6),[78] the Justice Manual ("**JM**") (MTD at 39-40), provides no support.[79]  The JM states that § 152(6) "is a very broad statute which covers all aspects of bribery . . . in bankruptcy cases" and "[t]here is no requirement that the act or forbearance from acting be unlawful itself."  JM § 855.  Finally, Defendants fail to address the FAC's allegation that the pay-to-play scheme was unlawful commercial bribery under New York, Texas, and Illinois law.  FAC ¶¶ 362, 509.

---

[75]     With respect to participants in the Count 1 Enterprise (which is RTS), "McKinsey" refers only to McKinsey & Co., McKinsey US, and McKinsey Holdings.

[76]     Defendants falsely state that the FAC accuses "all Defendants" of violating § 152(6) and state bribery laws.  MTD at 39.  The FAC clearly makes those allegations only as to "McKinsey," *i.e.*, the corporate Defendants.  *See* FAC ¶¶ 15, 120, 299, 359-65, 506-12; *id.*, pg. 1 (defining "McKinsey").

[77]     In addition to § 152(6) and Rule 2014, attorneys involved in the scheme would likely run afoul of Rule 2016 and applicable professional ethics rules.  *See* N.Y. Rules Prof. Conduct 7.2(a).

[78]     Neither *Zigman* nor *Roberto's* (MTD at 40) involved § 152(6) and both granted leave to replead.  *Zigman*, 944 F. Supp. at 158; *Roberto's*, 13 F. Supp. 2d at 394-97 (Rule 8(a) dismissal with leave to replead; pleading was "vague and incomprehensible," and "littered with unnecessary, vague and inflammatory language in the nature of trash-talking.").

[79]     Nor is the Justice Manual to be cited as precedent in any event.  *See* JM 1-1.200 (Apr. 2018), available at https://www.justice.gov/jm/jm-1-1000-introduction.

## III.   ALIX ADEQUATELY PLEADS SCIENTER.

"Allegations of scienter are sufficient if supported by facts giving rise to a strong inference of fraudulent intent." *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990) (quotations omitted). Such an inference arises from allegations (a) "show[ing] that defendants had both motive and opportunity to commit fraud, or (b) . . . constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quotations omitted). When facts underlying fraud are peculiarly within defendants' knowledge, Rule 9(b)'s requirements are relaxed. *Fuji*, 640 F. Supp. 2d at 310.[80]

### A.   The FAC Gives Rise to a Strong Inference of Fraudulent Intent.

Conscious misbehavior or recklessness may be alleged by showing, *inter alia*, that the defendants "engaged in deliberately illegal behavior." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quotations, citation omitted). Numerous allegations show Defendants' deliberately illegal behavior:

- Despite clear obligations under Rule 2014, *see* Point II.B, *supra*, Defendants disclosed virtually no McKinsey connections in the first 10 bankruptcies, over 15 years. This conduct is unprecedented. FAC, Ex. C. ¶ 22 & n.4.

- Despite its vast client base, McKinsey disclosed the fewest connections of any professional in every single bankruptcy but one. *Id.* ¶¶ 11-12.

- Defendants' illegal conduct continued even after Alix raised it with senior-most McKinsey management prior to RTS's appearance in *NII*. *Id.* ¶¶ 119-35.[81]

---

[80]     "Rule 9(b) is not intended to be an insurmountable hurdle for [claimants] to overcome, but was designed to afford defendants fair notice of the fraud alleged against them." *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 1995 WL 608323, at *3 (S.D.N.Y. Oct. 16, 1995) (quotations omitted) (failure to identify specific individuals responsible for each and every misrepresentation did not require dismissal, because counter-defendant would have relevant information and counter-plaintiff would not). Nor does Rule 9(b) "penalize a plaintiff merely because he was not privy to, and, therefore, cannot plead the details of, the inner workings of a group of defendants who allegedly acted in concert to defraud him." *Kravetz v. Brukenfeld*, 1984 WL 2443, at *3 n.9 (S.D.N.Y. June 29, 1984).

[81]     *See S.E.C. v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 264 (S.D.N.Y. 2009) (facts alleged "constitute[d] strong circumstantial evidence that Defendants were aware that late trading was illegal, including an email from a U.S. broker-dealer to Chester that directly informed him of the fact").

- After consulting with counsel, Barton admitted McKinsey's business model of client secrecy is inconsistent with the disclosures required of bankruptcy professionals, and promised to wind down RTS's bankruptcy practice. *Id.* ¶¶ 126-32.

- Despite notice from Alix, and Barton's promises, Defendants made illegally incomplete disclosures in *NII*, *Standard Register*, *Alpha*, *SunEdison*, and *GenOn*. *Id.* ¶¶ 136-58, 161-287.

- When, in the eleventh bankruptcy, *Alpha*, the U.S. Trustee demanded that RTS fully comply with Rule 2014, RTS promised to do so but did not. *Id.* ¶¶ 183-85.

- After Mar-Bow successfully moved the *Alpha* court to compel RTS to disclose all connections by name (the court's decision explicitly rejected McKinsey's disclosure-by-category ruse), RTS violated the order by delaying the disclosure of at least one egregious, disqualifying connection until after the case was effectively over, *id.* ¶¶ 186-90, and never disclosed others. *Id.* ¶¶ 193-202.

- In *SunEdison* and *GenOn*, Defendants abandoned disclosure-by-category, recognizing the *Alpha* ruling reflected well-established bankruptcy law. *Id.* ¶ 12; *id.*, Ex. C ¶ 22.

- For *SunEdison*, *GenOn*, and the balance of *Alpha*, Defendants adopted a new avoidance tactic: withholding some critical disclosures until after reorganization plans were confirmed. *Id.* ¶¶ 12, 164, 204, 274, 281. Other such connections they *never* disclosed. *Id.* ¶¶ 212-214.[82]

- RTS disclosed connections to Interested Parties in some bankruptcy cases while concealing its connections to the same Interested Parties in other cases. FAC ¶¶ 149-52, 169, 213.

- Carmody and Yerian would have known of the woefully incomplete nature of RTS's disclosures from their earlier employment at AP. *Id.* ¶¶ 63, 138, 299(j)-(k). Likewise, Defendants had access to sophisticated legal counsel, and several Individuals[83] had legal training.[84]

These facts show a concerted 17-year effort to evade the law, and eviscerate Defendants' assertion that they made "efforts to comply with Rule 2014(a), not to thwart it." MTD at 35.

Defendants argue incorrectly that allegations "McKinsey" 1) purposefully maintained an inadequate conflicts-checking system; and 2) formed RTS to thwart disclosure obligations,

---

[82]     McKinsey's habit of deriving investment profits from its restructuring engagements is evident in its recent work for the government of Puerto Rico. *See* Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome*, N.Y. Times, Sept. 26, 2018, http://https://www.nytimes.com/2018/09/26/business/mckinsey-puerto-rico.html.

[83]     As used herein, the term "**Individuals**" refers, collectively, to the individual Defendants (Barton, Carmody, Garcia, Goldstrom, Proshan, Sternfels, and Yerian).

[84]     *See, e.g.*, *Atl. Sporting Club*, 137 B.R. at 553 ("M & S is a firm with experienced bankruptcy counsel, fully aware of the extent of their representation of other related entities . . . The failure to disclose this information and other facts strongly indicates a deliberate attempt to circumvent the requirements of the Code.").

are not sufficiently particular. MTD at 37. Alix has provided facts inferentially supporting both points. For the first point, the FAC establishes that Defendants "knew facts or had access to information suggesting that their . . . statements were not accurate," or "failed to check information they had a duty to monitor," factors indicative of conscious misbehavior or recklessness. *JP Morgan*, 553 F.3d at 199. That Defendants were able to identify clients and disclose them by category rather than name in many Rule 2014 declarations (frustrating any attempt to discern whether connections were disqualifying) demonstrates Defendants had the relevant facts at hand. As an information technology leader, over 17 years of bankruptcy practice, McKinsey easily could have implemented a conflicts identification system of the kind used in medium-size and large law firms. FAC ¶ 63. The antiquated, woefully inadequate conflict-checking process described in many of McKinsey's Rule 2014 declarations was inconsistent with both McKinsey's information-technology expertise and with the robust systems employed by other professional firms, reflects, at best, a conscious indifference to its disclosure obligations and, more likely, a deliberate attempt to ensure that relevant conflicts were not reported. *Id.* ¶¶ 63, 377(b), 525(a); *id.*, Ex. C ¶¶ 23, 54-67. As for the second point, Defendants ignore pertinent allegations to the effect that RTS was formed to encapsulate McKinsey's bankruptcy practice in a remote entity that could then claim it was not required to disclose otherwise disqualifying connections of the broader McKinsey enterprise. *Compare* MTD at 37 *with* FAC ¶ 293.

The foregoing facts strongly support an inference that Defendants engaged in conscious misbehavior, or at least recklessness. Thus, Alix need not show Defendants' motive and opportunity to commit fraud, but the FAC does this as well.[85] It alleges McKinsey faced unique challenges motivating Defendants to employ fraud; Defendants

---

[85] Defendants' cases (MTD at 50) are readily distinguishable. *See Kalnit*, 264 F.3d at 139 (PSLRA case in which defendants allegedly sought to boost share price); *Bigsby*, 170 F. Supp. 3d at 578 ("no evidence of who specifically in Barclays stood to benefit from the alleged schemes.").

simply ignore these allegations.[86]  *See* FAC ¶¶ 126, 129, 374; MTD at 35-36, 49-50.  By inserting itself into the bankruptcy advisory domain, McKinsey cemented its grip on existing clients who previously would have had to seek restructuring advice elsewhere; it also obtained additional post-bankruptcy work from clients that otherwise might have defected. FAC ¶¶ 374(b)-(d).  Because McKinsey's business model, built on serving conflicting interests, is inconsistent with Rule 2014's disclosure obligations, McKinsey had to fraudulently evade disclosure requirements if it wished to pursue a bankruptcy practice.  *Id.* ¶¶ 126, 129, 374(a).[87]

### B.  Defendants' Exculpatory Arguments Are Meritless.

The guilty inference from the foregoing facts is at least as compelling as any of the supposedly innocent ones flowing from Defendants' various excuses.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."  *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007) (citation, quotations omitted).  Instead, "[a]n inference 'at least as likely as competing inferences' warrants recovery."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010) (quoting *Tellabs*, 551 U.S. at 324 n.5); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (the "tie . . . goes to the plaintiff").

*__No good faith dispute over interpretation of Rule 2014__*.  Defendants argue that the parties' dispute "boils down to a difference of opinion over statutory interpretation in which the Defendants' interpretation of Rule 2014(a) was reasonable," precluding their fraudulent

---

[86]     Defendants do not dispute that the FAC sufficiently alleges opportunity.  *See* MTD at 35-36.  "Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006).

[87]     *Cf. In re BC Funding, LLC*, 519 B.R. 394, 423 (E.D.N.Y. 2014) (motive sufficiently pled where RICO defendants allegedly stood to benefit from fees as a result of fraud); *Sykes v. Mel Harris Assocs.*, 757 F. Supp. 2d 413, 415 (S.D.N.Y. 2010) (motive sufficiently pled where RICO defendants allegedly made false court filings to secure default judgments).

intent.  MTD at 34.  Here, Defendants' proffered interpretation of the text of Rule 2014(a) is objectively **un**reasonable.  *See* Point II.B, *supra*; FAC, Ex. C ¶¶ 23, 27-77.  But even if that were not so, beginning no later than 1994, case law ***uniformly*** warned professionals that Rule 2014's disclosure obligations are construed broadly, and professionals who err on the side of nondisclosure do so at their peril.  *See Leslie Fay*, 175 B.R. at 533 ("'all connections' that are not so remote as to be *de minimis* must be disclosed"); Point II.B, *supra*.  The judicial consensus is evident from Defendants' failure to cite a ***single*** case supporting their position or to respond to the substance of the Joint Expert Declaration (FAC, Ex. C).  *Id.*

Moreover, Defendants' good-faith defense presents issues of fact that cannot be resolved on a motion to dismiss.[88]  This conclusion is apparent from Defendants' own authorities.  *See Purcell*, 807 F.3d at 284, 288 (MTD at 34) (MWI, which was charged with failing to reveal certain payments under regulatory requirement to disclose "regular commissions," argued that ambiguity of phrase "regular commissions" precluded showing of scienter as a matter of law; court found that *even if MWI could show that its interpretation was objectively reasonable*, a jury might conclude it acted with scienter "if there [wa]s interpretive guidance that might have warned [MWI] away from the view it took.") (internal quotations omitted); *Weston*, 840 F.3d at 503 (MTD at 34) (evidence that school falsified student attendance and grades to maintain federal aid eligibility created issue of fact as to defendant's fraudulent intent in violating obligation to maintain records "necessary to ensure the proper and efficient administration of [aid] funds," even though "no regulation establish[ed] specific attendance or grading policies"); *see also U.S. ex rel. Banigan v.*

---

[88]     *See, e.g., U.S. ex rel. Nevyas v. Allergan, Inc.*, 2015 WL 4064629, at *6 (E.D. Pa. July 2, 2015) ("Allergan's interpretation of the law focuses on its state of mind, and is properly addressed after full development of the factual record.  Allergan's reasonable interpretation of the law and applicable regulatory framework may well be a defense to liability, but it is not appropriate at the motion to dismiss stage when there are reasonable interpretations to the contrary"); *U.S. v. Hoffman*, 2015 WL 1608557, at *4 (E.D. La. Apr. 10, 2015) ("Insofar as the state tax credit regime and its clarity or lack thereof is a fact for the jury to consider when determining whether the government has proved beyond a reasonable doubt the scheme to defraud (and intent) elements of its case, the Court declines to review the sufficiency of the evidence supporting the grand jury indictments here.").

*Organon USA, Inc.*, 2013 WL 4786323, at *6 (S.D. Tex. Sept. 6, 2013) ("The majority of courts have held that it is inappropriate to decide a scienter issue, e.g. whether Organon had a 'good faith interpretation of the statute' that would negate the intent necessary for an F[alse] C[laims] A[ct] violation, at the pleading stage of the litigation.").[89]

**_Brazenness of scheme_**.  Next, Defendants say they could not have intended to defraud because their Rule 2014 declarations made clear what they were and were not disclosing. MTD at 33, 36-37.  Relatedly, Defendants argue that it is implausible that they intended to defraud, because the scheme was unlikely to succeed given the scrutiny their disclosures would have received from "experienced bankruptcy counsel, in addition to the U.S. Trustee and the bankruptcy courts."  *Id.* at 37.  These arguments ignore numerous allegations of affirmative misrepresentations and misleading half-truths that were not detectable on the face of the declarations.  *See* Point II.A, *supra*.  But even if Defendants' violations of Rule 2014 *were* facially discernible, that would not resolve scienter as a matter of law.  As the U.S. Trustee stated in *Alpha*, RTS's Rule 2014 declarations "g[a]ve the *appearance* of compliance without actually complying with Bankruptcy Rule 2014."  FAC ¶ 183.  Tens of thousands of filings were made in the massive bankruptcies at issue, and Defendants may simply have sought to capitalize on the rush of business and volume of filings.[90]  One can also reasonably

---

[89]    Defendants' other authorities (MTD at 34-35) do not call for a different outcome.  In *Dalton*, the court found **on summary judgment**, a good faith dispute existed as to whether the plaintiff was the defendant's employee, rather than an independent contractor, under California's fact-intensive test. 2011 WL 1045107, at *5.  Because the statutes under which the plaintiff sued provided that a colorable defense to employee status precluded employer liability, the plaintiff could not prevail on his claim that the defendant knowingly and intentionally failed to comply with the statutes at issue. *Id.*  In *Grauberger*, the statute at issue had conflicting interpretations by state and federal courts.  169 F. Supp. 2d at 1177.  In *Methodist Hospital*, the dispute concerned whether the plaintiff's charges were reasonable and customary, rather than being a true dispute over statutory interpretation.  2010 WL 11508022, at *12 ("Hospital's examples of fraud . . . amount to nothing more than a dispute over the proper amount of reimbursement for services rendered.").  Citing the distinguishable *Grauberger* case, the court said nothing about relevant case law being one-sided, as it is here.

[90]    *See, e.g.*, *U.S. v. Moleski*, 641 Fed. App'x 172, 175-76 (3d Cir. 2016) (rejecting mail fraud defendant's argument that fake financial instruments and letters sent to government and credit agencies in attempt to discharge tax and consumer debts were not materially false because attempt was too feeble to be believed: "Even if the demands in his documents were ultimately baseless, by

infer that the barebones declarations were part of a deliberate plan to put the onus on the U.S. Trustee and others to demand information, which demands McKinsey would strenuously resist until after plan confirmation, by which time it would be too late.  Indeed, that is what Defendants did.  *E.g.*, FAC ¶¶ 162, 164, 165, 172-175, 183-192, 204, 207-17, 237-44, 256-57, 281.  The fact that Defendants may have brazenly sought to hide their omissions "in plain sight" *supports*, rather than defeats, Alix's scienter allegations.[91]  Defendants' position is a variant of the discredited notion that one cannot be guilty of criminal fraud if the deception is too apparent.[92]  Even if Defendants' omissions were obvious, various stakeholders' failure to challenge them does not demonstrate the absence of a scheme to defraud.[93]

**_Defendants were responsible for truthful and complete disclosures_**.  Defendants' argument that there can be no inference of intent to defraud by the Individuals because McKinsey's purported methodology for conflicts-checking was in place before they joined the company (MTD at 49-50, 52, 54, 57) lacks any support.  Each Individual was a high-level McKinsey employee with responsibility for ensuring that McKinsey's conflicts-checking

---

obscuring them in obtuse legalese he could have confused the busy employees of financial institutions and the government who had to review them").

[91]     *See S.E.C. v. Power*, 525 F. Supp. 2d 415, 421 (S.D.N.Y. 2007) ("Complaint alleges scienter . . . circumstantially from facts such as . . . the sheer audacity of [] 'adjustments' to the balance sheets of acquired companies designed to improperly inflate Tyco's reported financial results."); *S.E.C. v. Invest Better 2001*, 2005 WL 2385452, at *4 (S.D.N.Y. May 4, 2005) ("the boldness of the fraud conclusively demonstrates the Defendant's high level of scienter"); *cf. Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 941 (C.D. Cal. 2012) (scienter adequately pled; "Gulf's high turnover rates, profit margin, and status as a top Chinese bromine producer are essential metrics that are known, and should be known by all executives and directors for their respective industries.  To blatantly overstate these metrics on a SEC filing amounts to either brazen defiance or reckless negligence.").

[92]     *See U.S. v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 971 (D.C. Cir. 1998) ("[W]hen an individual is swindled, the offender does not escape mail or wire fraud liability just because the victim was unwary, or even gullible.") (internal quotations omitted); *U.S. v. Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990) (rejecting argument that no fraud occurred because no reasonable person would have believed defendants' misrepresentations; under mail fraud statute, "monumental credulity of the victim is no shield for the accused") (internal quotations omitted); *U.S. v. Nekritin*, 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011) ("Even if . . . Medicare reviewed the allegedly false claims in 2009 and 'allowed' them to be paid . . . negligence in failing to discover the fraud at that time is not a defense"); *Pentagon*, 612 F. Supp. 2d at 264-65 (rejecting assertion that funds were not deceived by defendants' illegal late-trading because, having the relevant tax identification numbers, funds could have blocked the trading; reasonableness of victim's response is irrelevant).

[93]     The supineness of debtors' "highly-skilled bankruptcy counsel" (MTD at 37 n.31) is consistent with participation in the "pay-to-play" scheme.  FAC ¶¶ 15, 25-26, 120-21, 124, 128.

processes were adequate and its disclosures were complete and truthful.  Blaming unnamed

predecessors or McKinsey for faulty conflicts-checking processes does not absolve the

Individuals from responsibility for their own participation in submitting fraudulent and

misleading disclosures.   Nor does it explain Defendants' repeated failures to disclose

numerous connections and conflicts actually known to them.   *See* Point II.B, *supra*.

Defendants' cases do not support their argument.[94]   Nowhere do Defendants cite any

authority supporting their argument that their reliance on purportedly existing flawed

procedures precludes a finding of fraudulent intent, much less that such purported reliance

warrants dismissal at the pleadings stage.

**_Specific facts pled as to Individuals_**.  Defendants' argument that the FAC merely

relies on the Individuals' positions or titles, but does not allege any specific acts by them

(MTD at 46, 48, 50-51, 54-55), is flatly false.  The FAC alleges, in detail, numerous specific

predicate acts committed by each Individual, as well as additional predicate acts aided and

abetted by each.[95]  *Fleming*, *Criimi Mae*, *One Communications*, *Advanta*, and *Maldonado*

(MTD at 46 & n.42) are distinguishable because they were securities fraud cases under the

---

[94]    The passages cited by Defendants from *Twombly*, *First Capital*, and *Powers* (MTD at 49-50) and *Powers* are inapposite.  *See Twombly*, 550 U.S. at 566, 568 (referring to antitrust plaintiff's failure to allege more than parallel conduct by competitors); *Powers*, 57 F.3d at 184 (finding plaintiff alleged "fraudulent intent under the conscious behavior approach"); Point II.B, *supra* (discussing *First Capital*).

[95]    *See* Points II.A-II.F, *supra*; Point V, *infra*; FAC ¶¶ 24-27, 119-34, 142, 157-58, 299(e), 300-01, 310, 316, 320-26, 329-31, 334, 345, 350-52, 356-58, 367-68, 369-73, 374(d)-(e), 377(d)-(e), (**Barton**); *id.* ¶¶ 19, 65, 98-99, 102-06, 109, 137-56, 159-202, 205-07, 215, 231, 245-50, 256-58, 261, 264-65, 267, 270, 273-79, 281, 299(c), (j), 304, 310, 313, 321-25, 329, 331, 334-57, 369-76, 377(g), (**Carmody**); *id.* ¶¶ 65, 108, 115, 299(g), 310-11, 321-25, 329, 331, 344-45, 350-52, 356-58, 369-73 (**Garcia**); *id.* ¶¶ 65, 94-103, 105, 299(h), 310, 314, 321-25, 329, 331, 350, 352, 356-58, 369-73 (**Goldstrom**); *id.* ¶¶ 19, 65, 98-99, 102-03, 105-06, 108-09, 140-41, 148-49, 153, 155, 160-202, 205-07, 215, 231, 247, 249, 256, 261, 264, 299(i), 310, 312, 320-25, 329, 331, 334, 343,  345, 350(b)-(h), 352-57, 369-73 (**Proshan**); *id.* ¶¶ 205-44, 299(f), 310, 315, 319(b), 320-26, 329, 331, 334, 344-45, 350-52, 356-58, 367, 369-73 (**Sternfels**); *id.* ¶¶ 107-10, 299(k), 310, 317, 320-25, 329, 350(d), 369-73 (**Yerian**).    Defendants' assertion that the FAC "alleges only that Garcia engaged in aiding and abetting" (MTD at 50) is false.  The FAC clearly alleges that Garcia **committed** numerous acts of mail and wire fraud in nine McKinsey bankruptcy engagements (*Harry & David* through *GenOn*).  FAC ¶ 323.

PSLRA, which applies a heightened standard of scienter inapplicable here.[96]  In the passage

from *Sanchez* that Defendants cite repeatedly (MTD at 46, 51, 60 n.56), this Court stated

merely that "a plaintiff may not rely ***solely*** upon defendants' position of control in an

enterprise, and may not link individual defendants to fraudulent activities by stating ***only*** that

[d]efendants were officers and shareholders of the organization."[97]  2015 WL 3540836, at *6

(quoting *Productores*) (emphasis added).  That is not the case here, where Alix alleges

numerous fraudulent acts committed by each Defendant.  Defendants' assertion that "the fact

that 'Garcia, Goldstrom, and Proshan have legal training . . . is not a plausible allegation of

intent" (MTD at 46 n.43) likewise misses the point.  The FAC emphasizes the Individuals'

positions to underscore that they each had opportunity and motive.  Given the Individuals'

positions and expertise, the inexorable conclusion is that their fraudulent acts were committed

consciously and intentionally, and not unknowingly or inadvertently.  *See Gellene*, 182 F.3d

578 at 588; *Granite Partners*, 219 B.R. at 39; Point II.B, *supra*; Point V, *infra*.  Also without

merit are Defendants' assertions that the FAC contains no allegations that the Individuals

knew or even could have known that McKinsey's disclosures were false and misleading.

MTD at 49 & n.49, 51-53, 55, 57.  The FAC explains at length why and how each Defendant

---

[96]      *See Criimi Mae*, 94 F. Supp. 2d at 657 ("Most notably, the PSLRA has heightened the
requirements of Rule 9(b) for scienter.") (applying PSLRA; no scienter based on allegations officers
wished to retain current benefits or inflate stock price in absence of insider trading); *Fleming*, 264
F.3d at 1249 (PSLRA plaintiffs failed to allege executives committed securities fraud by failing to
specifically disclose lawsuit in SEC filings); *Advanta*, 180 F.3d at 537 (company's statements were
forward-looking, falling under PSLRA's safe harbor); *One Commc'ns Corp.*, 2009 WL 857535, at
*11 (dismissing Section 10(b) claim where plaintiff failed to allege why statements were misleading).
[97]      Defendants' other Rule 9(b) cases (MTD at 43) are readily distinguishable.  *See DiVittorio*,
822 F.2d at 1248-49 (securities fraud-based RICO claim against individuals not "tied to the [allegedly
fraudulent] Offering Memorandum in any specific way, or even alleged to have been an officer or
director of any" relevant corporate entity); *Worldwide Directories*, 2016 WL 1298987, at *4-*5
(plaintiffs failed to allege facts showing defendants participated in non-party co-conspirators' bribery
scheme in Mexico; plaintiffs plausibly alleged fraud against some defendants but did not "allege
sufficient domestic conduct"); *Targum*, 2013 WL 6087400, at *6-*7 (wire fraud claim failed because
communications were intrastate; mail fraud claim failed where no mailings contained fraudulent
statements or were connected to scheme; no alleged transfers of funds by corporate defendant).

knew or should have known of false and misleading nature of McKinsey's disclosures.[98]  For

the same reason, Defendants' assertion that the Individuals did not "personally research"

(MTD at 50 n.52, 56) McKinsey's connections fails.

**_Defendants' other purportedly plausible explanations_**.  Defendants' argument that

other plausible explanations may exist for the false and misleading disclosures and "Barton's

inaction" is irrelevant, particularly at the motion-to-dismiss stage, and misstates the legal

standard under both Rule 12(b)(6) and Rule 9(b).  *See* MTD at 40, 48, 52-53, 57.  *See, e.g.,*

*Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement").

Defendants' cases do not support their argument.  *Iqbal*, merely explains the holding in

*Twombly*, a Sherman Act case.  *See* MTD at 53 (arguing Goldstrom's actions are "more

likely explained by lawful, unchoreographed free-market behavior") (quoting *Iqbal*);

*Twombly*, 550 U.S. at 556-57 (explaining elements of claim for antitrust conspiracy under

Sherman Act).  The Sherman Act is irrelevant here; and Defendants do not cite any case law

indicating that a purported explanation "consistent with lawful conduct" (MTD at 53) will

defeat a RICO claim on a motion to dismiss.[99]  Further, the FAC alleges Defendants

knowingly and intentionally submitted dozens of false and misleading disclosures which

were carefully crafted to evade detection of their fraud.  Such behavior is not "consistent with

lawful conduct."[100]  Nor do Defendants describe any "plausible and wholly innocent reasons"

---

[98]  *See* FAC ¶¶ 25-27, 34, 65, 119-35, 142, 157, 299(e), 316, 320, 326, 330, 334, 344-45, 365, 367-68 (**Barton**); *id.* ¶¶ 35, 63, 65, 138, 163, 180, 183, 190, 198-200, 257-58, 277, 299(j), 313, 338, 345 (**Carmody**); *id.* ¶¶ 26, 63, 65, 108, 115-17, 125, 299(g), 311, 334, 344-45, 377(f) (**Garcia**); *id.* ¶¶ 37, 63, 65, 95, 99, 125, 205, 299(h), 314, 377(f) (**Goldstrom**); *id.* ¶¶ 38, 65, 105, 108, 163, 247, 299(i), 312, 345, 377(f) (**Proshan**); *id.* ¶¶ 25, 39, 119-26, 205, 237-41, 299(f), 315, 319(b), 326(g), (j), 334, 344-45, 377(d) (**Sternfels**); *id.* ¶¶ 40, 108-09, 299(k), 377(h) (**Yerian**).

[99]  Moreover, with respect to the "pattern of racketeering" element and claim for RICO conspiracy in this case, Defendants do not (and cannot plausibly) argue that they were merely engaged in "parallel conduct" given the Defendants' obvious and undisputed ties to each other.

[100]  Also without merit is Defendants' unsupported assertion that "Alix's own inaction in bringing his threatened 'remedial litigation' reinforces doubt about the plausibility of Alix's claims."  MTD at 48.  Alix brought this litigation in less than four years after he first spoke to Barton, and Mar-Bow moved to compel RTS in *Alpha* in 2016.

50

for Barton's purported "change of mind" to allow McKinsey to continue its illegal practices.[101]  MTD at 48.

**_Incriminating allegations against Barton_**.  Defendants wrongly assert that because Barton did not personally prepare or file the Rule 2014 disclosures or work on McKinsey's bankruptcy matters (MTD at 47 & n.45), the FAC's claims against Barton are impermissibly based on mere "inaction."  MTD at 48.  The FAC cites numerous actions taken by Barton in furtherance of Defendants' scheme, including that in connection with his separate communications with Alix, Barton committed multiple RICO predicate offenses, including violations of 18 U.S.C. § 2314 and mail and wire fraud.[102]  Defendants admit the FAC alleges "Barton 'foster[ed]' in Alix the false impression that McKinsey was pursuing corrective action,'" MTD at 48, *i.e.*, that Barton actively committed fraud to prolong Defendants' unlawful scheme and conceal that it was continuing.  *See Powers*, 57 F.3d at 184-85 (fraudulent "intent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident.").

Defendants' statement that the FAC says Barton did not know about McKinsey's unlawful scheme until 2014 (MTD at 47) is both false and irrelevant.  The FAC alleges that **_Barton told Alix_** that he was unaware of McKinsey's scheme until Alix raised it, not that Barton was telling the truth.  The FAC alleges in detail why there is, at a minimum, a strong inference Barton was lying, given his subsequent deceitful behavior, including numerous acts of committing and aiding and abetting RICO predicate offenses.  FAC ¶¶ 26-27, 119-36, 142, 157-58, 377(d)-(e).   But regardless of the exact point when Barton joined the scheme, the

---

[101]     *Fezzani* and *Targum* (MTD at 48) are inapposite.  *See Targum*, 2013 WL 6087400, at *4 (merely describing Rule 9(b)'s particularity requirement in passage cited by Defendants); *Fezzani*, 592 F. Supp. 2d at 423 (referring to standard for aiding and abetting *common law* fraud, which requires fiduciary duty for inaction to suffice; opinion did not specifically address RICO claim), *aff'd in part, vac'd in part*, 716 F.3d 18 (2d Cir. 2013) (*vacating* Rule 9(b) dismissal of claim for aiding and abetting fraud, finding sufficient involvement).

[102]     *See* FAC ¶¶ 26-27, 119-35, 142, 157-58, 299(e), 300, 323-26, 367-68; Points II.C, II.E, *supra*.

FAC makes clear that he joined no later than 2014 and committed at least two predicate acts after joining.

Similarly, Defendants wrongly assert that the FAC contains no allegations supporting an inference that Barton was seeking to forestall action by Alix and conceal McKinsey's continued wrongdoing and never intended to change RTS's unlawful bankruptcy practices. MTD at 48. Barton admitted that McKinsey's disclosure practices and pay-for-play scheme were unlawful; and Barton (and McKinsey & Co.) repeatedly made and broke promises to end the wrongful practices as he continued to meet and speak with Alix over the course of a year after Alix first raised the issue. FAC ¶¶ 26-27, 119-36, 142, 157-58, 377(d)-(e). Defendants ignore the obvious implications of these allegations. If McKinsey or Barton believed McKinsey's practices were lawful, Barton would not have admitted they were unlawful and should be remedied. If McKinsey and Barton believed Alix's assertions were baseless, Barton would have had no reason to continue to engage directly with Alix over the course of a year, much less to repeatedly promise to take action or to offer AP lucrative consulting assignments in an apparent bid for silence. Barton also had ultimate authority over McKinsey and the Individuals at all relevant times beginning in 2009, including during the formation of RTS (which was formed in an effort to evade disclosure requirements) and while McKinsey engaged in unlawful practices in multiple Chapter 11 bankruptcies before Alix confronted Barton in late 2014. *Id.* ¶¶ 24, 130-32, 299(e). These facts, along with the fact that none of RTS's practices changed after Barton made promises to Alix and AP, further bolster the inexorable conclusion that Barton not only had opportunity and motive, but he also knew about, authorized, and participated in the conduct of the RICO enterprise well before he was approached by Alix in 2014.

52

IV.     THE COUNT 1 AND COUNT 3 RICO ENTERPISES ARE WELL-PLED.

A.  The Count 1 Enterprise Is Validly Pled.[103]

RICO defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  In Count 1, Alix alleges that RTS is an "enterprise" within the meaning of § 1961(4) and each of the other Defendants are the racketeering "persons."  FAC ¶¶ 293, 298.  To state a claim under § 1962(c), the RICO violator, the "person," must be distinct from the enterprise.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  *King* held that an individual who conducted the affairs of his wholly-owned corporation through a pattern of racketeering activity was sufficiently distinct from the entity to be sued under § 1962(c), where the entity was not named as a defendant "person."  *Id.* ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.  And we can find nothing in the statute that requires more "separateness" than that.").

With *King* firmly in mind, the Second Circuit recently considered whether FedEx and one of its subsidiaries—the alleged RICO "persons"—were sufficiently distinct from another FedEx subsidiary—the purported RICO enterprise—to sustain a § 1962(c) claim, stating:

> Where, for example, a natural person controls two active corporations that operate independently in different lines of business, receive independent benefits from the illegal acts of the enterprise, and affirmatively <u>use</u> their separate corporate status to further the illegal goals of the enterprise, we will regard each of the three entities as distinct from their coordinated enterprise under Section 1962(c).

*U1IT4Less*, 871 F.3d at 205-06; *see also Weir v. Cenlar FSB*, 2018 WL 3443173, at *7 n.7 (S.D.N.Y. July 17, 2018) ("If [subsidiary] and [parent] were alleged to serve different roles

---

[103]     Defendants do not challenge the sufficiency of the Count 2 Enterprise.  *See* MTD at 57-60.

within the Cenlar Enterprise, Plaintiffs might have plausibly pleaded the distinctness requirement.") (citing *U1IT4Less*, 871 F.3d at 207).

The Second Circuit held "the mere fact of separate incorporation" of the subsidiary, "***without more***, does not satisfy RICO's distinctness requirement." *U1IT4Less*, 871 F.3d at 209 (emphasis added). The court emphasized that, in opposing the defendant's *summary judgment* motion, the plaintiff did not "present evidence that FedEx Corp.'s choice of corporate structure was in any way related to (let alone used to further) the racketeering activity alleged in the complaint." *Id.* at 207. The court did not specifically "explain[] what 'more' needs to be shown," *id.* at 208, but cited a Sixth Circuit case that surveys various Circuits' case law along with *King* and observes "the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature of its subsidiaries to perpetrate a fraudulent scheme." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492-93 (6th Cir. 2013). *ClassicStar* held that the ostensibly independent nature and ostensible expertise of one subsidiary, and investment opportunities offered by another subsidiary, facilitated a fraudulent scheme promoted by the parent and thus were sufficiently distinct from it. *Id.* at 493.

Unlike *U1IT4Less*, Alix does not rely on the fact of RTS's legal incorporation "without more." 871 F.3d at 209. Like the *ClassicStar* plaintiff, Alix alleges that McKinsey & Co. and McKinsey US formed RTS in 2010 ***specifically to facilitate a fraudulent scheme***:

> By encapsulating bankruptcy consulting activities in a separately incorporated legal entity—McKinsey RTS—McKinsey & Co., McKinsey Holdings, and McKinsey US purported to add a veneer of indirectness between them and bankruptcy debtors and other bankruptcy proceeding participants and used McKinsey RTS as a pretext to withhold their own multiplicity of connections to debtors and bankruptcy proceeding participants. Forming McKinsey RTS also allowed them to conduct the illegal scheme from a separate legal entity and thereby attempt to wall off its illegal activities from the larger McKinsey operation.

FAC ¶ 293; *id* ¶¶ 64, 522(b).  This critical allegation, which distinguishes *U1IT4Less* and their other authorities (MTD at 58-59), and which Defendants ignore, is both plausible and prescient.[104]  Defendants invoke RTS's separate incorporation to argue (without legal support) that they did not violate Rule 2014 because it did not require RTS to disclose the connections of its affiliates (such as McKinsey US, McKinsey & Co., McKinsey Holdings, or MIO).  MTD at 29-30, 32.

## B. The Count 3 Enterprise Is Validly Pled.

In Count 3, Alix alleges an association-in-fact enterprise, within the meaning of 18 U.S.C. § 1961(4), consisting of each Defendant together with McKinsey's bankruptcy clients. FAC ¶¶ 456-57.  Because the enterprise includes constituents other than Defendants, it is sufficiently distinct.  *E.g.*, *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) ("Where the overlap between the defendants and the alleged RICO enterprise is only partial, a RICO claim may be sustained.").  Confusing conspiracy with enterprise, Defendants say the allegations are insufficient absent allegations showing *why* McKinsey's bankruptcy clients would join with Defendants with the common purpose of victimizing AP.  MTD at 58.  However, "[t]he definition[] of an enterprise in the RICO statute . . .  in no way require[s] an enterprise to

---

[104]  Defendants plainly are aware of this allegation, because they argue elsewhere that it violates Rule 9(b).  MTD at 37.  That argument is unavailing because the "enterprise" element is governed by Rule 8(a).  *In re Sumitomo Copper*, 995 F. Supp. 451, 454 (S.D.N.Y. 1998).

include nothing but criminal actors." *U.S. v. Cianci*, 378 F.3d 71, 88 n.9 (1st Cir. 2004).[105]

Thus, it is immaterial whether McKinsey's clients shared Defendants' unlawful purpose.[106]

Defendants also argue, without legal support, that McKinsey's contractual agreements with its debtor clients are insufficient to plead the enterprise's structure because the specific terms of the engagement agreements are not pled. MTD at 59. These allegations are sufficient under Rule 8(a).[107] Likewise, Defendants' argument that it is insufficient to allege "that [McKinsey] personnel may work onsite while completing an assignment" (MTD at 59) is unsupported by authority and misstates the FAC's allegations. The FAC alleges, *inter alia*, McKinsey and its clients had an "interrelated management structure resulting from the assignment of McKinsey personnel to management positions in the bankruptcy consulting clients," FAC ¶ 457, giving the association a unified, quasi-corporate quality.

## V.     ALIX ADEQUATELY PLEADS RICO ENTERPRISE PARTICIPATION BY THE INDIVIDUAL DEFENDANTS.

As the Supreme Court explained in *Reves v. Ernst & Young*, 507 U.S. 170 (1993):

---

[105]     *See also King*, 533 U.S. at 164 ("RICO "protects the public from those who would unlawfully use an 'enterprise' (whether *legitimate* or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed[.]'") (quoting *Scheidler*, 510 U.S. at 259) (emphasis added); *U.S. v. Turkette*, 452 U.S. 576, 580-81 (1981) ("enterprise" includes legitimate enterprises); *id.* at 583 ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a *course of conduct*") (emphasis added); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 992-93 (N.D. Cal. 2008) (association-in-fact enterprise may include unwitting participants in defendants' scheme); *Rodriguez v. Banco Cent.*, 777 F. Supp. 1043, 1055 (D.P.R. 1991) ("Since the association-in-fact itself can be completely innocent, just like the corporation in the case of a single corporation identified as the enterprise, we see no reason to assume that it cannot be constituted of individuals, apart from one or a few RICO violators, who are totally innocent of wrongdoing.").

[106]     The fact that the composition of the Count 3 Enterprise may have shifted over time as particular bankruptcy clients came and went does not affect its legal sufficiency. *See, e.g., U.S. v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010) ("An 'individuals associated in fact' enterprise . . . may continue to exist even though it undergoes changes in membership.") (internal quotations omitted).

[107]     *See In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 318 (S.D.N.Y. 2000) (allegation that contract established "group of companies . . . for the purpose of carrying on, *inter alia*, the buying and selling of non-ferrous metals, the buying and selling of commodities in general, the buying and selling of foreign exchange whether in the spot or the futures market and introducing clients to [defendant] CLR" was sufficient to plead enterprise); *Williams v. Ford Motor Co.*, 11 F. Supp. 2d 983, 986 (N.D. Ill. 1998) (allegation that Ford and Ford dealership "operated through a structure formalized by contractual relationships that specified the manner in which the E[xtended] S[ervice] P[lan]s were sold and processed" adequately pled association-in-fact enterprise); *Loma Linda Univ. Med. Ctr., Inc. v. Farmers Grp., Inc.*, 1995 WL 363441, at *2 (E.D. Cal. May 15, 1995) ("It is clear that contractual relationships can establish a RICO enterprise").

> In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs.  Of course, the word 'participate' makes clear that ***RICO liability is not limited to those with primary responsibility for the enterprise's affairs***, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but ***some part in directing the enterprise's affairs is required***.

*Id.* at 179 (emphasis added; footnote omitted).  Here, each Individual had "some part in directing th[e] affairs" of the RICO enterprises alleged in the FAC.  Each Individual, as a McKinsey insider with knowledge or access to knowledge that would have enabled them to prepare and submit truthful disclosures, instead knowingly swore to, filed, caused to be filed, facilitated, and/or authorized numerous false and misleading disclosures submitted to obtain bankruptcy engagements for McKinsey on false pretenses.  *See* Points II.A-II.D, *supra*; FAC ¶¶ 299(e)-(k), 301-17, 319, 321-25, 329-31, 335-58.   Barton and Sternfels also made additional misrepresentations in furtherance of Defendants' scheme.  *See* Points II.C, II.E, *supra*; FAC ¶¶ 320, 326, 366-68.

Here, none of the Individuals are outside vendors or service providers, nor did they merely perform administrative or ancillary tasks for the enterprise.[108]   None of them can

---

[108]     These factors distinguish Defendants' authorities.  *See* MTD at 60-63.  In *Viola* (MTD at 60-61), the court held there was insufficient evidence to show that the defendant, who served as a ***janitor and handyman*** for a RICO enterprise's leader, participated in or had sufficient knowledge of the RICO scheme.  35 F.3d at 41.  *Vickers* (MTD at 61-63) is even further afield; it involved a claim that an ***outside vendor*** had operated or managed the affairs of the alleged RICO enterprise.  1997 WL 420265, at *4.  Similarly, *Reves*, *Arthur Andersen*, *Baumer*, *Biofeedtrac*, *Nolte*, and *Walter* all involved ***outside vendors or service providers***.  *See Reves*, 507 U.S. at 178-79 (MTD at 60-64) (***summary judgment*** dismissal of ***outside auditor***; merely reviewing debtor's books "did not rise to the level of participation in the management or operation of the Co-op."); *Baumer*, 8 F.3d at 1344 (MTD at 62) (no allegations ***outside attorney*** "play[ed] any part in directing the affairs of the enterprise."); *Walter*, 538 F.3d at 1247-48 (MTD at 61) (dismissing claims against ***outside counsel***, finding no evidence he participated in RICO enterprise); *Nolte*, 994 F.2d at 1317 (directed verdict dismissing claim against ***outside law firm*** that prepared tax opinion letters based on information from third party; "record [wa]s devoid evidence that the defendants participated, either directly or indirectly, in the conduct of the affairs of the enterprise"); *Arthur Andersen*, 924 F. Supp. at 465-66 (MTD at 66 n.58) (dismissing, on ***summary judgment***, RICO claim against ***outside accountants***); *Biofeedtrac*, 832 F. Supp. at 591 (MTD at 62-63) (dismissing, on ***summary judgment***, claims against ***outside counsel***; no evidence he participated in RICO enterprise).  *Redtail* (MTD at 62 n.58) likewise involved outsiders and is highly distinguishable.  1997 WL 603496, at *5 (granting leave to amend; pleading was "devoid of allegations suggesting that [moving defendants] had some part in directing

claim to be like the unwitting janitor in *Viola* or the new trainee or computer programmer in *Crab House*. Rather, each Individual is or was an ***insider*** with executive authority at McKinsey and significant expertise, and each participated in multiple RICO predicate acts such that they cannot plausibly argue that they did not participate in or have sufficient knowledge of the RICO scheme. *See supra*, n.95; Points II.A-II.F, III. Indeed, with the exception of Yerian, each Individual engaged in RICO predicate acts over *several* bankruptcy engagements. Accordingly, the FAC adequately pleads participation in a RICO enterprise by each Individual. Moreover, Alix's claims against the Individuals under § 1962(d) (*see* Point VII, *infra*) stand regardless of whether they have directed the enterprises' affairs.[109]

Defendants' argument that Plaintiff merely relies on the Individuals' positions at McKinsey entities (MTD at 60-63) fails because the FAC specifically alleges how each Individual intentionally participated in the direction of the RICO enterprises. *See supra*, n.95; Defendants' counterfactual assertions that Proshan merely followed orders with no managerial responsibilities whatsoever" (MTD at 61) and Carmody, Goldstrom, and Yerian did not "direct[] or manage[] any of the alleged RICO enterprises" (*id.* at 63; *see also id.* at 46 n.41, 54) ignore the FAC's allegations (and McKinsey's fee applications) and misconstrue

---

the enterprise's affairs"; pleading alleged defendants, corporate outsiders who received inside information through a chain of individuals, "pass[ed] on some inside information to others, trad[ed] on inside information and receiv[ed] some kickbacks for illegal trades"). The *Crab House* court ultimately only dismissed RICO claims against a trainee who started during the scheme's final months, and a person whose only involvement was creating a computer program that was later used in the scheme. The court *upheld* RICO claims against three individuals: Langer, a newspaper distributor's Chief Financial Officer who encouraged inflation of circulation figures; Pothoff, who told someone to "dump" newspapers as part of the scheme, with no indication that he was merely taking orders; and Brennan, who supervised a person who created a program to identify circulation volumes for the scheme. *See Crab House of Douglaston Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 207-09 (E.D.N.Y. 2006) ("***Crab House I***"); *Crab House of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 88-89 (E.D.N.Y. 2011) ("***Crab House II***"). (Defendants ignore *Crab House II* although they previously cited it. *See* ECF 63 at 53.) And in *Diaz* (MTD at 62), the Second Circuit *upheld* the RICO convictions. 176 F.3d at 92-93.

[109] *U.S. v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) ("*Reves* ruled only that for a defendant to be convicted of a substantive RICO violation under Section 1962(c), the defendant must have taken some part in directing the enterprise's affairs. No such requirement exists, under Section 1962(d)") (citations omitted); *see also Salinas v. U.S.*, 522 U.S. 52, 64 (1997) ("A person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense.") (citation omitted).

the law. Proshan, an experienced attorney and Senior Vice President at McKinsey & Co., played a primary role in overseeing, guiding, and drafting McKinsey's fraudulent disclosures beginning with *AMR*. FAC ¶¶ 38, 312. Carmody, Goldstrom, and Yerian each held managerial positions at RTS and personally committed bankruptcy fraud by signing and swearing to false and misleading Rule 2014 declarations. *Id.* ¶¶ 35, 37, 40, 313-14, 317. Carmody and Goldstrom also each advised on and were involved in the preparation of false disclosures in bankruptcies in which they were not the declarant, as evidenced by McKinsey fee applications, and both were executives at McKinsey; Goldstrom was also a member of RTS's board. *Id.* ¶¶ 35, 37, 313-14. Although the Individuals held relatively high-level positions, a role in "senior leadership" (MTD at 61) is not required for RICO liability. "'[*S*]*ignificant control* over or within an enterprise" *is not required*. *Reves*, 507 U.S. at 179 n.4 (emphasis added). "[L]iability under § 1962(c) is *not limited to upper management*" because "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184 (emphasis added).[110] By repeatedly preparing and submitting Rule 2014 disclosures which they knew to be false, misleading, and incomplete, the Individuals exercised "discretionary authority" and "played some part in directing the enterprise's affairs," namely by knowingly committing and facilitating the core frauds perpetrated by the enterprise.

Defendants' counterfactual assertion that Barton did not "*directly* manage[] the bankruptcy consulting practice" (MTD at 64 (emphasis added)) is irrelevant. It is unlawful to "participate, *directly or indirectly*, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c) (emphasis added). Alix does *not* allege Barton's participation was merely by virtue

---

[110] "Under the *Reves* operation-management test, even if a defendant is not acting in a managerial role," he "can still be liable for directing the enterprise's affairs if he exercised broad discretion in carrying out the instructions of his principal." *Diaz*, 176 F.3d at 92 (quotations omitted) (upholding RICO convictions where defendants' actions "demonstrate[d] that they had discretionary authority in carrying out the instructions of their principals."). *See also Napoli v. U.S.*, 45 F.3d 680, 683-84 (2d Cir. 1995) (upholding RICO convictions of private investigators who "carried out instructions from" attorneys to fabricate personal injury claims).

of his status as McKinsey's Managing Partner, or that his participation was limited to knowledge of the scheme. Defendants ignore overt acts taken by Barton as part of Defendants' scheme, including specific acts of mail and wire fraud and violations of § 2314. *See supra*, n.100.[111]

Defendants' contention that the FAC's allegations as to Carmody, Goldstrom, and Yerian (the "**Declarants**") "relate exclusively to signing certain Rule 2014(a) disclosures" (MTD at 62; *id.* at 48, 51, 56) ignores that their signing and swearing to those false and misleading disclosures constituted acts of bankruptcy fraud.[112] *See* Points II.B, III, *supra*. If anything, the Declarants are the most obviously culpable Defendants. Moreover, the FAC also alleges all three Declarants violated § 1957, Point II.F, *supra*; and Goldstrom and Carmody were involved in mail and wire fraud, bankruptcy fraud, obstruction of justice, and witness tampering in cases in which they were not declarants. *See* Points II.B-II.D, *supra*; FAC ¶¶ 98-103, 105-06, 205-06, 299(h), (j), 310, 313-14, 325, 329, 350(b)-(h), 356, 358. Goldstrom and Carmody accomplished these additional predicate offenses, in part, by "communicat[ing] with [their] colleagues about their work."[113] MTD at 51. The FAC cites McKinsey's fee applications in *AMR*, *AMF Bowling*, and *SunEdison* as evidence that Carmody and Goldstrom (and others) were involved in preparing fraudulent disclosures for

---

[111] Defendants' cases (MTD at 64) do not support Barton. In *Schmidt*, *Agape*, *Walter*, and *Reves*, the defendants were **outside service providers**; in *Amsterdam*, the defendant allegedly had knowledge of **outside third parties'** unlawful acts. *See Reves*, 507 U.S. at 178-79; *Walter*, 538 F.2d at 1248; *Agape*, 681 F. Supp. 2d at 369-70 (dismissing RICO claims against **outside bank and commodities trading company** whose services were used by stockbroker conducting Ponzi scheme); *Schmidt*, 16 F. Supp. 2d at 344, 347 (dismissing claims against **outside bank** that maintained accounts from which investment adviser stole money); *Amsterdam*, 107 F. Supp. 2d at 212, 218 (in case brought by cigarette wholesaler against cigarette manufacturer, defendant's salespersons' knowledge of third parties' smuggling of cigarettes from Virginia into New York did not, by itself, support a RICO claim).

[112] Defendants' argument that the Declarants submitted false disclosures "in only a handful of bankruptcy cases" (MTD at 63) is irrelevant. The FAC alleges that Defendants submitted false disclosures in every Chapter 11 bankruptcy for which McKinsey has been engaged, and that each separate Defendant has committed at least two RICO predicate acts, including through involvement in the submission of multiple false Rule 2014 disclosures.

[113] Defendants' statement that Goldstrom does not appear in McKinsey's *SunEdison* fee application is false. *See SunEdison*, Dkt. 1421-6 at 57 (5/11/2016 entry for Sternfels: "Participate in call with Seth Goldsrom [sic] (McKinsey) regarding disclosures and retention documents.").

bankruptcies in which they were not declarants.[114]  FAC ¶¶ 98, 105, 108, 205.  Defendants

also falsely assert that the FAC shows that Yerian accurately described McKinsey's "search

methods" and the number of types of McKinsey's connections.  MTD at 56.  The FAC

alleges that Yerian's declarations in *Edison Mission* were false and misleading and

purposefully vague because they failed to name a single connection and likely concealed

likely dozens of connections, just as they did in all of McKinsey's other Chapter 11 cases.

FAC ¶¶ 109-11.

Defendants' argument that the FAC fails to indicate that Garcia or Sternfels "exerted

direction or control" over the RICO enterprises (MTD at 63) ignores the FAC's detailed

allegations.  *See* FAC ¶¶ 36, 39, 65, 108, 115, 125, 128, 131-33, 157-58, 299(g), 311, 315,

334, 344-45, 351.[115]  Their claim that Proshan cannot be liable because she is an attorney

(MTD at 61-62) likewise fails because she is a McKinsey insider who used her authority and

position as in-house counsel to devise and carry out the unlawful scheme to file false and

misleading Rule 2014 disclosures; she was not merely providing ancillary services to a RICO

enterprise.[116]  Defendants' cases in which RICO claims against attorneys were dismissed

---

[114]     Defendants' conclusory footnote assertion that the FAC's references to the fee applications
fail to "state any claim" or suffice under Rule 9(b) (MTD at 51 n.49) misses the point.  The fee
applications support Alix's belief that certain Individuals were involved in submitting fraudulent
disclosures in matters for which they were not declarants.

[115]     Garcia was at all times CEO of RTS (the Count 1 Enterprise, which the FAC alleges was
formed to carry out Defendants' unlawful scheme) and thus clearly authorized and directed
Defendants' fraudulent scheme, at least beginning with the formation of RTS.  *See* FAC ¶¶ 36.
Garcia was also involved in creating the false Rule 2014 disclosures, as reflected by at least one
McKinsey fee application, *id.* ¶ 108, and Barton acknowledged Garcia was responsible for
McKinsey's unlawful scheme and went so far as to promise to remove him from his position at RTS.
¶¶ 131-32.  Similarly, the FAC alleges far more activity by Sternfels than "two telephone calls" (MTD
at 63) and involvement in the Chatila business arrangement.  Sternfels committed multiple RICO
predicate acts, including through direct and active involvement (as evidenced by McKinsey's fee
application) in multiple false and misleading disclosures submitted in *SunEdison*.  FAC ¶¶ 25, 119-26,
205, 237-41.

[116]     "*Reves* provides no blanket immunity for professionals regardless of their involvement in a
criminal enterprise, and other cases suggest that, where professionals are alleged to have exceeded the
mere rendering of legitimate professional services, the 'operation or management' requirement will be
pleaded adequately."  *JSC Foreign Econ. Assoc. Technostroyexport*, 2007 WL 1159637, at *2-*4, *8-
*9 (S.D.N.Y. Apr. 18, 2007) (*denying* motion to dismiss RICO claims against accountant and

involved only **outside** counsel.[117]  MTD at 61-62.  And numerous cases have upheld RICO

claims against both in-house and outside counsel.  *See, e.g., Cadle Co. v. Flanagan*, 2006 WL

860063, at *9, *11 (D. Conn. Mar. 31, 2006) (outside counsel liable under RICO for

"knowingly fil[ing] false documents with the court in an attempt to frustrate collection" of a

judgment; "*filing of false claim exemptions and compliance statements is conduct reaching*

*beyond the furnishing of advice, and constitutes decision making for the enterprise* or, at

the very least, the knowing implementation of decisions designed to defraud the plaintiffs.")

(emphasis added).[118]  Similarly, Proshan's drafting and submission of false and misleading

Rule 2014 disclosures "constitutes decision making for the enterprise" and knowing

participation in the unlawful scheme.

## VI.  ALIX ADEQUATELY PLEADS AIDING AND ABETTING LIABILITY FOR RICO PREDICATE OFFENSES.

Defendants ignore post-*Central Bank* decisions in this district and elsewhere finding

that civil RICO liability arises from aiding and abetting RICO predicate acts.  *See Bank*

*Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 1694322, at *5 (S.D.N.Y. Nov.

13, 2000) (upholding RICO claim based on aiding and abetting bank fraud; distinguishing

*Central Bank*, *Hayden*, and *Arthur Andersen*, stating: "[*T]he reasoning of those cases does*

*not apply to predicate violations of the statutes identified in § 1961(1)*.") (emphasis added);

*131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1529-30 & nn.17, 20 (S.D.N.Y. 1995)

---

accounting firm that filed false tax returns, facilitating bankruptcy fraud and laundering of stolen funds).

[117]  *See Baumer*, 8 F.3d at 1344; *Nolte*, 994 F.2d at 1317; *Biofeedtrac*; 832 F. Supp. at 591; *Morin*, 711 F. Supp. at 102 (plaintiff alleged attorney sought to collect on notes for client although plaintiff believed "the makers of such Investor Notes had full and complete defenses to the payment thereof.").

[118]  *See also, e.g., Napoli v. U.S.*, 45 F.3d 680, 681-82 (2d Cir. 1995) (RICO convictions of attorneys, office administrator, and private investigators in connection with fraudulent personal injury suits); *Handeen*, 112 F.3d at 1349-51; *Tatung Co., Ltd. v. Hsu*, 2015 WL 11072178, at *10-*11, *19-*20 (C.D. Cal. Apr. 23, 2015) (distinguishing *Baumer*; denying motion to dismiss by attorney, "a senior officer in various entities that part of the enterprises," who allegedly assisted in RICO scheme by creating false and misleading corporate documents); *San Fran. Bay Area Rapid Transit Dist. v. Spencer*, 2005 WL 2171906, at *5-*6 (N.D. Cal. Sept. 6, 2005) (distinguishing *Baumer*; denying motion to dismiss RICO claims against in-house counsel with responsibility for handling legal documentation of joint venture).

(plaintiffs alleged RICO claims predicated on aiding and abetting securities, mail, and wire fraud); *Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 1995 WL 43669, at \*4-\*5 (S.D.N.Y. Feb. 2, 1995) (rejecting argument that under *Central Bank*, "aiding and abetting the commission of a predicate act cannot constitute racketeering under RICO"); *see also Simon v. Weaver*, 327 F. Supp. 2d 258, 261-62 (S.D.N.Y. 2004) (setting forth elements of civil RICO claim for aiding and abetting).[119]

Consistent with these authorities, it would be inconsistent with plain statutory language and Congressional intent to conclude that RICO allows a private right of action for "commission" and conspiracy to commit predicate offenses, but not for aiding and abetting predicate offenses. Nowhere do §§ 1961 or 1962(c) require "commission" or delineate between indictable offenses involving "commission" and those involving "aiding and abetting." To the contrary, where a defendant is charged with violating RICO by committing two or more predicate acts, it "does not matter" whether they are culpable for the predicate acts because they aided and abetted the acts rather than committing them. *U.S. v. Genova*, 333 F.3d 750, 759-60 (7th Cir. 2003) (Easterbrook, J.). That is because aiding and abetting is not a separate offense, and therefore one who aids and abets a crime is charged as a principal. See 18 U.S.C. § 2; *U.S. v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999). And the RICO statute

---

[119]     *See also Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994) ("One who aids and abets two predicate acts can be civilly liable under RICO."), *mod. on other grounds*, 30 F.3d 1994 (post-*Central Bank*), *cert. denied*, 513 U.S. 1110 (1995); *Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, 2015 WL 5719801, at \*13 & n.36 (D.P.R. Sept. 29, 2015) (denying motion to dismiss RICO claim predicated on aiding and abetting mail and wire fraud); *Bradley v. Franklin Collection Serv., Inc.*, 2011 WL 13134961, at \*9-\*10 (N.D. Ala. Mar. 24, 2011) (denying motion to dismiss RICO claim based on aiding and abetting); *Moon v. Harrison Piping Supply*, 375 F. Supp. 2d 577, 595 (E.D. Mich. 2005) (allegations defendant aided and abetted mail fraud supported RICO claim), *aff'd in part, rev'd in part on other grounds*, 465 F.3d 719 (6th Cir. 2006); *In re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1267 (S.D. Fla. 2001) (holding "Plaintiffs can maintain a cause of action for aiding and abetting" under RICO); *In re Am. Honda Motor Co.*, 958 F. Supp. 1045, 1057-59 (D. Md. 1997) (upholding claims against individuals who allegedly participated in RICO scheme by aiding and abetting mail fraud); *Betulius v. Hanna*, 1996 WL 900413, at \*4 (W.D. Mich. 1996) ("One who aids and abets two predicate acts can be civilly liable under RICO.") (citations omitted).

(which is to be construed broadly[120]) provides a remedy for "**directly or indirectly**" participating in "**any act . . . involving**" bribery or "**any act**" which is indictable under" the predicate offenses at issue here. *See* 18 U.S.C. §§ 1961(1), 1962(c), 1964(c) (emphasis added). Defendants' approach ignores that aiding and abetting is indictable under the RICO predicate statutes listed in § 1961(1) and the plain meaning of 18 U.S.C. § 2 (which equates aiding and abetting with commission of a crime).[121]

Defendants' reliance on *Central Bank* fails. *Central Bank* did **not** involve RICO. It only addressed whether there is a private action for aiding and abetting **civil** violations of securities fraud **under Section 10(b) of the Securities and Exchange Act**. 511 U.S. at 178.[122] Therefore, nothing in *Central Bank* has any "bearing on the question of whether plaintiffs have adequately alleged **RICO** predicate acts of aiding and abetting [a predicate offense]." *Manko*, 897 F. Supp. at 1530 n.20.[123] Since *Central Bank,* neither the Supreme

---

[120] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985).

[121] In Defendants' *sole* case addressing predicate acts of aiding and abetting (MTD at 44-45), the court concluded that aiding and abetting *securities fraud* is not a RICO predicate because that would circumvent the PSLRA. *Sater*, 35 F. Supp. 3d at 393-94. *Motel 6* is inapposite because it dismissed "claims for aiding and abetting and conspiracy under §§ 10(b) and 14(e) and [SEC] Rules 10b-5 and 14e-3." 161 F. Supp. 2d at 234-35. Defendants' remaining cases address whether there is private claim for aiding and abetting *RICO violations themselves*, not whether aiding and abetting RICO predicates can violate RICO. *See Hayden*, 955 F. Supp. at 253-55 (finding "no private right of action for aiding and abetting *a RICO violation*") (emphasis added); *Arthur Andersen*, 924 F. Supp. at 475; *Ling*, 2005 WL 1244689, at *3; *Spinale*, 2004 WL 50873, at *6; *Niles*, 1999 WL 1419042, at *9-*10.

[122] The private cause of action for violations of § 10(b) was *judicially created*. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Because "'concerns with judicial creation of a private cause of action [under § 10(b)] caution against its expansion'" courts "must give 'narrow dimensions . . . to [that] right of action [which] Congress did not authorize[.]'" *Id.* (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*, 552 U.S. 148, 165, 167 (2008)).

[123] *See also Marrero-Rolon*, 2015 WL 5719801, at *1 ("*Central Bank* held that no civil aiding and abetting liability existed under § 10(b) of the Securities Exchange Act. The issue in *Central Bank* is thus more analogous to whether civil aiding-and-abetting a RICO violation exists than whether aiding and abetting mail fraud may be a predicate act. Moreover, following *Central Bank's* direction to look at the text, I noted that RICO defines 'racketeering activity' to include conduct 'indictable under' the mail or wire fraud statutes. Aiding and abetting mail or wire fraud is indictable under the substantive statute; thus it is a predicate under § 1961(1).") (internal citations omitted); *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 24 (D.D.C. 1998) ("I am persuaded that a civil RICO action is distinguishable from an action under § 10(b) of the Securities Exchange Act of 1934, and that with respect to RICO, Congress intended there to be aiding and abetting liability in civil actions."); *Am. Auto. Accessories, Inc. v. Fishman*, 1996 WL 480369, at *6 (N.D. Ill. Aug. 22, 1996) ("The Court finds Fishman's reliance on *Central Bank* unpersuasive. While the Securities Exchange Act was

Court nor the Second Circuit have addressed the **separate** issue of whether one can violate §
1962(c) by aiding and abetting, as opposed to committing, crimes enumerated as RICO
predicates. But all of the cases cited in the preceding paragraph hold that civil RICO aiding
and abetting liability survives *Central Bank*, and, as this Court has observed, the law in this
Circuit is that a RICO claim requires that the defendant "committed **or aided and abetted** the
commission of two predicate acts." *Sanchez*, 2015 WL 3540836, at *6 (quoting *McLaughlin*,
962 F.2d at 192) (emphasis added).[124] Because RICO provides a private right of action for
"[a]ny person injured in his business or property by reason of **a violation** of section 1962," 18
U.S.C. § 1964(c) (emphasis added), Alix can recover from Defendants who have **violated**
1962(c) by aiding and abetting at least two predicate acts.

## VII. THE RICO CONSPIRACY CLAIM IS WELL-PLED.

Defendants argue Alix has not alleged that any Defendant "agreed with at least one
other entity to commit a substantive RICO offense" by failing to allege "the circumstances—
time, date, place, etc.—under which Defendants allegedly formulated their conspiratorial
agreement." MTD at 65. However, Alix is only required to meet the notice pleading
standard of Rule 8(a).[125] Alix adequately alleges, in detail, the existence of an intricate

_____

found to provide no liability for aiding and abetting, it seems clear that Section 1962(c) does.
Specifically, Section 1962(c) prohibits "conducting or participation, directly or indirectly, in the
illegal activities." 18 U.S.C. § 1962(c). The language of Section 1962(c), especially that forbidding
"indirect participation," appears to permit aider and abettor liability.").

[124]    *See also, e.g.*, *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 2d
521, 577-78 (S.D.N.Y. 2017); *4K&D*, 2 F. Supp. 3d at 537; *Kerik v. Tacopina*, 64 F. Supp. 3d 542,
556 (S.D.N.Y. 2014); *Tymoshenko v. Firtash*, 2015 WL 5505841, at *4 (S.D.N.Y. Sept. 18, 2015);
*Franzone v. City of N.Y.*, 2015 WL 2139121, at *8 (E.D.N.Y. May 4, 2015). Moreover, in another
context, the Second Circuit rejected the argument that *Central Bank* precluded it from finding that
under the Alien Tort Claims Act ("**ATCA**"), individuals can bring private civil actions against people
who have aided and abetted violations of international criminal law. *Khulumani v. Barclay Nat'l
Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007). Like 18 U.S.C. § 2, customary international law
recognizes aiding and abetting liability. *Id.* at 270 (Katzan, J., concurrence stating majority opinion
on this point). Because the ATCA provides a private right of action for violations of international
criminal law, persons may be sued under the ATCA for aiding and abetting, as well as committing,
such violations.

[125]    *See Hecht*, 897 F.2d at 26 n.4 ("[P]leading of a [RICO] conspiracy, apart from the underlying
acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)"); *see
also Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 671 (S.D.N.Y. 2016) (rejecting argument that

criminal scheme involving each Defendant; the specific actions taken by each Defendant in furtherance thereof, including many acts of mail, wire, and bankruptcy fraud; and the benefits flowing to each Defendant thereby.[126]  *See* FAC ¶¶ 298-373, 398-442, 460, 521, 540-62. Alix alleges numerous communications by Defendants in furtherance of this scheme, and unlawful acts carried out by more than one Defendant in consultation with, and with assistance of, other Defendants.  *See id.* ¶¶ 550-53.  These allegations more than plausibly establish the existence of a conspiracy of which each Defendant was aware and in which they each participated.[127]

Defendants' attempt to invoke the intracorporate conspiracy doctrine (MTD at 66-67) likewise fails.  The Second Circuit recently stated that the doctrine's validity in the RICO context is, at best, undecided.[128]  *Fed. Ins. Co. v. U.S.*, 882 F.3d 348, 368 (2d Cir. 2018) ("In some civil contexts, the Supreme Court has adopted an 'intracorporate conspiracy doctrine' . . . [but] [w]e have not explicitly extended that reasoning to the criminal context") (citing *U.S. v. Crockett*, 979 F.2d 1204, 1218 n.12 (7th Cir. 1992) (rejecting doctrine in RICO

---

RICO claim must be dismissed because it "does not allege how, when, or why the members of the so-called Ring agreed to engage in the predicate wire fraud").

[126] Under § 1962(d), "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that she has adopted the goal of furthering or facilitating the criminal endeavor."  *First Capital*, 385 F.3d at 178 (quotations omitted).

[127] *See Frydman*, 172 F. Supp. 3d at 671 (dismissal not warranted where complaint "describe[d] in some detail the defendants' participation in the broader alleged criminal conspiracy and their respective roles in the RICO enterprise"); *Angermeir*, 14 F. Supp. 3d at 155 (declining to dismiss RICO conspiracy claim despite "somewhat conclusory" allegations of agreement where plaintiffs alleged "facts that support an inference that such an agreement did exist"); *De Sole v. Knoedler Gallery*, 974 F. Supp. 2d 274, 311 (S.D.N.Y. 2013) (declining to dismiss where allegations in complaint supported inference that "each of the individual defendants, by nature of their positions in the alleged racketeering enterprise, knew of the general nature of the conspiracy and facilitated the furtherance of the conspiracy"); *see also Rose v. Bartle*, 871 F.2d 331, 366-67 (3d Cir. 1989) (court may look "to any factual allegations of particular acts within the complaint as a whole" to infer RICO conspiracy).

[128] *Turkmen* and *Little* (MTD at 66-67) involved civil rights conspiracy claims under 42 U.S.C. § 1983, not RICO claims.  *Turkmen*, 789 F.3d 218 at 262; *Little*, 487 F. Supp. 2d at 437-38.  *Rite Aid* (MTD at 67) involved antitrust (not RICO) claims.  708 F. Supp. 2d at 263-64.

context)).[129]   Other Circuits have rejected the doctrine as inconsistent with RICO's

purposes.[130]

## VIII.    ALIX'S RICO CLAIMS ARE TIMELY.[131]

The four-year limitations period for civil RICO claims "begins to run when the

plaintiff discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd.*

*P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998). Inquiry notice "is judged under an objective

standard and requires an evaluation of the totality of the circumstances." *Staehr v. Hartford*

*Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).[132]  On a motion to dismiss, "***unless***

***Defendants can produce uncontroverted evidence that irrefutably demonstrates*** when

Plaintiff discovered or should have discovered the fraudulent scheme, ***they cannot satisfy the***

***heavy burden of establishing inquiry notice*** as a matter of law." *Elsevier,* 77 F. Supp. 3d at

348-49 (S.D.N.Y. 2015) (citation omitted; emphasis added). "Southern District courts have

variously described defendants' burden in this regard as '***extraordinary' and appropriate***

---

[129]     *See also Mauriber v. Shearson/Am.* Express, 567 F. Supp. 1231, 1241 (S.D.N.Y. 1983)
(declining to extend intracorporate conspiracy doctrine to RICO claims; holding that in RICO context,
"view of the corporation as a single legal actor becomes a fiction without a purpose"); *Rouse v. Rouse*,
1990 WL 160194, at *14 (N.D.N.Y. 1990) ("[T]he mere fact that an alleged RICO conspiracy is
intracorporate does not mean that the alleged RICO conspiracy fails as a matter of law.").

[130]     *See Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004) ("[T]he
intracorporate conspiracy doctrine cannot be invoked to defeat a § 1962(d) claim."); *Webster v.
Omnitrition Int'l*, 79 F.3d 776, 787 (9th Cir. 1996) ("Defendants argue that a corporation cannot
engage in a RICO conspiracy with its own officers and representatives. We disagree."); *Ashland Oil v.
Arnett*, 875 F.2d 1271, 1282 (7th Cir. 1989) (holding intracorporate conspiracy doctrine inapplicable
to RICO as distinguishable from antitrust context where an intracorporate conspiracy "poses no threat
to the goals of antitrust law – protecting competition. In contrast, intracorporate conspiracies do
threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and
separating racketeers from their profits"); *cf. King*, 533 U.S. at 166 ("antitrust law's intracorporate
conspiracy doctrine . . . turns on specific antitrust objectives.").

[131]     Defendants concede that Alix's claims are timely with respect to the *NII*, *Standard Register*,
*Alpha*, *SunEdison*, and *GenOn* matters.  *See* MTD at 67-70.

[132]     In addition, "the triggering information must relate directly to the misrepresentations and
omissions the Plaintiffs later allege in their action against the defendants." *Id.* (quotations, citations
omitted).  To trigger inquiry notice, "storm warnings" must reveal "the activities of the particular
defendants being sued." *Congregacion de la Mision Provincia de Venez. v. Curi*, 978 F. Supp. 435,
445 (E.D.N.Y. 1997).  Where a duty to inquire has been triggered and "a RICO plaintiff does begin or
has begun to inquire . . . the Court must determine whether a reasonably diligent investigation would
have revealed the injury to a person of reasonable intelligence[.]"  *Koch's*, 699 F.3d at 144 (citation
omitted). Determinations of inquiry notice are fact-intensive, particularly in the RICO context, and are
highly disfavored prior to discovery.  *See Elsevier, Inc. v. Grossman*, 77 F. Supp.3d 331, 348-49
(S.D.N.Y. 2015).

only in 'extreme circumstances.'" *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) (citation omitted; emphasis added).

Here, Defendants assert that all of its cases that concluded more than four years before the filing of this action are time-barred. MTD at 68. However, AP could not have known its *injury* until it learned of Defendants' fraudulent disclosure scheme.[133] And Defendants cite no evidence that AP was *actually* aware of that scheme more than four years before filing. To the extent Defendants imply that AP *should have been aware* of the scheme more than four years before filing, that argument absurdly requires AP to have read all of McKinsey's (and indeed, all professionals') voluminous disclosure statements beginning in 2001, despite having no reason to do so.[134] Defendants offer no such reason, and any reason it propounded would only raise a fact issue for discovery. Indeed, it is neither required nor customary for bankruptcy professionals such as AP, *even in matters for which they are engaged*, to review the Rule 2014 disclosures of *other* professionals, and such disclosures are not typically served on other professionals.[135] Because Defendants have not met their

---

[133] Contrary to Defendants' suggestion (MTD at 68), without knowing of Defendants' fraudulent scheme, awareness that McKinsey had earned fees was meaningless. Bankruptcy professionals earn fees legitimately every day.

[134] Clearly, the mere existence of a public filing does not necessarily give rise to inquiry notice. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) (no indication prior lawsuit received publicity; denying motion to dismiss RICO claim); *Liberty Ins. Corp. v. Brenman*, 2016 WL 880170, at *3 (E.D.N.Y. Mar. 1, 2016) (plaintiffs not put on inquiry notice by statement in complaint in action to which they were not parties); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp.2d 221, 234-35 (S.D.N.Y. 2006) (defendant failed to show inquiry notice by citing news articles and state court complaint referencing defendant's conflict of interest); *Sumitomo*, 120 F. Supp. 2d at 347 (denying motion to dismiss; RICO defendant failed to show inquiry notice based on "various news reports [] discussing manipulation of the copper market" and "public action" taken by London Metal Exchange); *see also Blue Cross Blue Shield Ass'n v. Glaxosmithkline* LLC, 2016 WL 6612804, at *8-*10 (E.D. Pa. Nov. 9, 2016) (denying motion to dismiss RICO claims; "[f]actual issues remain as to whether the public disclosures of [] issues between 2002 and 2005 constituted 'storm warnings' establishing inquiry notice"; defendant argued inquiry notice arose from public disclosures regarding FDA warning letter and recall; nationally publicized commencement of criminal investigation; widely publicized FDA seizure of all stocks of a drug; and related consent decree involving defendant).

[135] Defendants' cases in which RICO claims were dismissed on statute of limitations grounds (MTD at 67-68) are readily distinguishable. *See Rotella*, 528 U.S. at 556-57 (rejecting "injury and pattern discovery" rule; plaintiff discovered injury in 1986 but did not discover RICO predicate acts amounting to pattern until 1994); *Klehr*, 521 U.S. at 194-96 (rejecting "last predicate act rule"; affirming summary judgment; plaintiffs did not show reasonable diligence in discovering injury

"heavy" burden to "produce uncontroverted evidence that irrefutably demonstrates inquiry notice," *Elsevier*, 77 F. Supp. 3d at 348-49, their motion should be denied.[136]

Defendants' argument that all claims against Goldstrom and Garcia should be dismissed because Goldstrom only signed fraudulent disclosures in *Harry & David* and *AMR* while Garcia signed none (MTD at 68-70) fails for two reasons.[137] *First*, the FAC alleges that Goldstrom and Garcia have committed RICO predicate acts in the past four years, including mail and wire fraud and money laundering in connection with *Alpha*, *SunEdison*, and *GenOn*. FAC ¶¶ 209(g)-(h). *Second*, the FAC more than adequately pleads that Garcia and Goldstrom's participation in a RICO conspiracy continues through the present—an issue Defendants conspicuously fail to address.[138]

## IX. THE CONTRACT CLAIM IS WELL-PLED.

### A. The Contract Does Not Unreasonably Restrain Trade.[139]

---

nearly 20 years after purchasing faulty silo); *Koch*, 699 F.3d at 150 (undisputed that plaintiff was put on notice of counterfeit wine when he received testing results showing only 4.6% probability that wine was genuine and learned of lawsuit accusing seller of counterfeiting); *World Wrestling*, 328 F. App'x at 697-98 (multiple complaints made to plaintiff and suspicious bidding by defendant for contract with plaintiff); *Integrated Resources*, 851 F. Supp. at 568-59 (securities purchasers put on inquiry notice by written representations in offering memoranda).

[136] *See Liberty*, 2016 WL 880170, at *4 ("When Liberty Mutual became aware of the fraud, when their investigation commenced and concluded . . . are factual questions that cannot be determined from the face of the complaint and can only be ascertained through the discovery process"); *Plumbers' & Pipefitters' Local No. 562 v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012) (emphasizing "the wisdom of the observation that whether plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6), and that the more appropriate vehicle is a motion for summary judgment on a complete record.") (quotations, citation omitted).

[137] Defendants' remaining cases (MTD at 69-70), none of which are RICO or inquiry notice cases, are inapplicable. *See Nikchemny*, 2016 WL 6082034, at *1 (breach of contract claim); *Cingular Wireless*, 2006 WL 1272612, at *1 (summary order dismissing "various state law claims and a 42 U.S. § 1981 claim arising out of Plaintiff's employment"); *Jasas*, 212 F. Supp. 2d at 26 (dismissing defamation claim; plaintiff failed to supply dates of defamatory statements); *Jenson*, 2010 WL 1608678, at *1 (dismissing employment claims; plaintiff failed to allege dates of misconduct).

[138] *See* FAC ¶¶ 549, 551. Accordingly, even if Defendants *could* show inquiry notice four years prior to May 9, 2018, the date of filing (and they cannot), it would not result in the dismissal of Garcia or Goldstrom.

[139] Relying only on the *Restatement (Second) of Contracts*, Defendants argue that the contract is unenforceable because "an agreement for McKinsey not to compete with a competitor would be unreasonably in restraint of trade[.]" MTD at 71.

The *Restatement* provision on which Defendants rely (MTD at 71) prohibits only "unreasonable" restraints on trade, a highly fact-sensitive issue that cannot be resolved on a motion to dismiss.[140]  Moreover, the FAC alleges that the contract was designed to ***promote*** (not restrain) fair and lawful trade by ending Defendants' bankruptcy fraud, and that Barton accepted it because he disliked the restructuring business for McKinsey; understood that fully complying with Rule 2014 hurt McKinsey's business model; and he unequivocally sought to avoid a legal challenge.  *See* FAC ¶¶ 125-31.

## B. The *Winston* Factors Do Not Preclude Alix's Contract Claim.

Defendants invoke a four-factor test developed by the Second Circuit in *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir. 1985) to determine whether parties intended to be bound by an oral agreement.[141]  *See* MTD at 71.  However, that test is not amenable to resolution on a Rule 12(b)(6) motion.[142]  Moreover, all four *Winston* factors weigh in favor of finding an enforceable contract here.  *First*, there was no "express reservation not to be bound absent a writing."  Rather, the parties intended to be fully bound by their oral agreement.  FAC ¶ 131.  *Second*, Alix fully performed his obligations under the agreement by refraining from legal action during the agreed-upon period.  *Id.* ¶¶ 132-34.  *See,*

---

[140]    *See Restatement (Second) of Contracts* § 186, cmt. 1 (1981) ("Whether a restraint is reasonable is determined in the light of the circumstances of the transaction, including not only the particular facts but general social and economic conditions as well.  The promise is viewed in terms of the effects that it could have had and not merely what actually occurred.  Account is taken of such factors as the protection that it affords for the promisee's legitimate interests, the hardship that it imposes on the promisor, and the likely injury to the public. . . . A restraint that is reasonable in some circumstances may be unreasonable in others."); *see also Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 321-22 (S.D.N.Y. 2003) (denying motion to dismiss complaint alleging agreements unreasonably restrained trade because "essentially factual disputes . . . about the ultimate effects of these agreements on competition, cannot be resolved on a motion to dismiss").

[141]    The factors are 1) whether there is an express reservation not to be bound absent a writing; 2) partial performance; 3) agreement as to material terms; and 4) whether subject matter is of nature typically committed to writing.  *Winston*, 777 F.2d at 80.

[142]    *See Highland Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n*, 698 F.3d 202, 209 (5th Cir. 2012) ("[t]he [*Winston*] test is not overly useful in analyzing the parties' intent at the motion to dismiss stage because there is a lack of evidence to which the test can be applied. . . . [W]hether or not parties intend to be bound by an oral contract is usually a question of fact for the factfinder."); *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp. 950, 953-54 (S.D.N.Y. 1997) (plaintiff adequately pled breach of contract by pleading terms of oral contract in complaint; "issue of whether (and when) the parties intended to be bound is a factual issue that should [be] submitted to the jury.").

70

*e.g.*, *Pearce*, 528 F. Supp. 2d at 179 (MTD at 70) (denying motion to dismiss where complaint alleged plaintiff substantially performed obligations under alleged oral contract). Defendants' failure to fulfill *their* obligations is evidence of their breach, not the non-existence of the contract.[143]

*Third*, the parties agreed on all material terms.[144]  FAC ¶¶ 129-131.  Defendants' "missing" terms (MTD at 71) are ancillary to the core of the agreement and insufficient to warrant the drastic and disfavored remedy of dismissal for indefiniteness.[145]  However, the parties did agree to two of Defendants' three supposedly "missing" terms: the definition of the term "senior leadership" and "the length of time in [*sic*] which Alix supposedly agreed to be 'patient and refrain from acting[.]'"[146]  *See* FAC ¶ 131.  Defendants' final purportedly "missing" term, "how RTS would exit the market (including what would happen to its clients

---

[143]     *Abeles* (MTD at 71) is inapplicable because it involved *summary judgment* and an exception to the statute of frauds.  The court ruled against the plaintiff because he was unable to show actions taken by him (*not*, as Defendants assert, by the defendant) that were "only explainable by reference to the oral agreement."  2007 WL 2028069, at *4.

[144]     The contract at issue here is considerably more definite than, and bears little relationship to, the contracts in Defendants' cases.  *See, e.g.*, *Merrill Lynch*, 886 F. Supp. 2d at 346 (applying Mississippi law, declining to find independent contract based on bare oral promise to sell "very liquid" securities, separate and apart from transaction documents containing extensive disclaimers).

[145]     *See, e.g.*, *Kolchins v. Evolution Mkts.*, 31 N.Y.3d 100, 107 (2018) (affirming denial of motion to dismiss action on employment agreement where parties failed to agree on minimum compensation and length of non-compete because "[T]he terms of a contract do not need to be fixed with absolute certainty to give rise to an enforceable agreement.") (citation omitted) (internal quotations, alterations omitted); *Cowen & Co. v. Fiserv, Inc.*, 141 A.D.3d 18, 20-22 (1st Dep't 2016) (contract to provide financial advisory services to plaintiff investment bank in connection with planned buyout of non-party company providing for transaction fee "consistent with investment banking industry practice" was not indefinite because doctrine of definiteness "is to be sparingly used, as a last resort" particularly where "sophisticated parties intended to be bound by an agreement").

[146]     Defendants also argue that this purported indefiniteness renders Barton's promise too vague to support Alix's alternative claim for promissory estoppel.  *See* MTD at 71.  As noted above, there was nothing vague or ambiguous about Barton's unequivocal promise that RTS would be shuttered and its senior leadership removed.  Alix's reliance on that promise was reasonable and the precise result Barton intended.  FAC ¶ 135. Moreover, questions of definiteness, ambiguity, and reasonableness are fact-intensive and generally cannot be resolved on a motion to dismiss.  *See, e.g.*, *DFG Mfg. Corp. v. Northrop Grumman Corp.*, 1999 WL 33458384, at *9 (E.D.N.Y. Mar. 23, 1999) (denying motion to dismiss promissory estoppel claim because questions of "breadth and detail of the promises, or whether they were clear and unambiguous" are appropriate r esolved after discovery on summary judgment); *Knight Secs. L.P. v. Fiduciary Tr. Co.*, 5 A.D.3d 172, 174 (1st Dep't 2004) (on promissory estoppel claim, reasonableness of reliance "implicates factual issues whose resolution would be inappropriate" on motion to dismiss) (quoting *Internet Law Lib., Inc. v. Southridge Capital Mgmt.*, 223 F. Supp. 2d 474, 485 (S.D.N.Y. 2002)).

and employees),” MTD at 71, was of no concern to Alix.  He did not care about the details of *how* RTS exited the market, only that it *did*.[147]

*Fourth*, oral agreements are just as valid as written agreements, *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 109 (2d Cir. 2003), and commercial agreements between sophisticated parties are enforceable.  *See NYKCool A.B. v. Pac. Fruit, Inc.*, 507 F. App’x 83, 86 (2d Cir. 2013) (affirming arbitration award upholding oral agreement to “transport weekly shipments of Charterers’ bananas from Ecuador to California and Japan for the period between 2005 and 2008”).  Moreover, the agreement at issue here, involving (*inter alia*) cessation of a criminal business, FAC ¶ 128, is not the sort that parties would seek to formalize in writing; it was intended to permit Barton to dismantle RTS quietly after his re-election as McKinsey’s global managing partner.  *Id.* ¶ 131.  Thus, all four *Winston* factors favor Alix, and dismissal is inappropriate.  *See Pers. Watercraft Prod. SARL v. Robinson*, 2017 WL 4329790, at *9 (S.D.N.Y. Sept. 1, 2017) (“when courts have dismissed a Complaint under a *Winston* analysis under 12(b)(6), they have done so where . . . all four *Winston* factors weighed against the plaintiff.”).[148]

### C. Alix Pleads Facts that Unequivocally Demonstrate Barton’s Actual or, at a Minimum, Apparent Authority to Enter into the Contract.

Barton was the head of the entire McKinsey enterprise when the agreement was made, FAC ¶¶ 34, 129-31, and thus he had authority to bind McKinsey.  *See Goldston v. Bandwidth Tech. Corp.*, 52 A.D.3d 360, 362 (1st Dep’t 2008) (retainer agreement entered into by

---

[147]    Notably, Barton said RTS employees would be moved elsewhere at McKinsey.  FAC ¶¶ 131.

[148]    Defendants argue that “the actions of the parties belie the formation of a contract,” citing the three-year gap between their breach and this action.  MTD at 71.  Alix instituted this lawsuit well within the six-year statute of limitations for actions in contract.  *See* N.Y. CPLR § 213.  There is no requirement that an aggrieved party immediately bring suit, which would inundate courts with unnecessary filings regarding disputes that might otherwise be resolved by the parties.  Indeed, Alix made several such attempts as Barton repeatedly missed agreed-upon deadlines.  Barton and Alix not only reaffirmed that their agreement was valid and in force, but Barton asked for, and Alix agreed to provide, more time for Barton to take the promised actions.  FAC ¶¶ 129-34.  Moreover, Alix began to take remedial action shortly after it became clear that Barton and McKinsey had no real intent of fulfilling their end of the bargain.  *Id.* ¶¶ 183-91, 202, 207-11.

corporate president without approval of board of directors was binding; "[t]he president or other general officer of a corporation has power, prima facie, to do any act which the directors could authorize or ratify.").  But even if Barton had no actual authority, he had apparent authority to do so as McKinsey's Managing Partner.  *See id.* at 363 (when contract falls within scope of corporate executive's apparent authority, "his actual authority is immaterial, and internal procedures for review or ratification . . . are irrelevant.").

### D.  Alix Adequately Pleads Damages, and Defendants' Assertion of Failure to Mitigate is Premature and Baseless.

Questions of damages are typically not amenable to resolution on a motion to dismiss.[149]  *See* Points I.A, I.C, *supra*.  Moreover, Alix explicitly and specifically alleges the damages flowing from Defendants' breach, FAC ¶ 574, and AP has engaged in extensive mitigation efforts for which Alix seeks damages.  *Id.* ¶¶ 183-91, 202, 207-11.  Further, mitigation is a fact-sensitive issue inappropriate for a motion to dismiss, *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, 2008 WL 2275902, at *2 (S.D.N.Y. June 3, 2008), and an issue for which Defendants bear the burden of proof, *Air et Chaleur*, 757 F.2d at 494.

## X.  THE TORTIOUS INTERFERENCE CLAIM IS WELL-PLED.

### A.  The Bankruptcy Code Does Not Preempt Alix's State-Law Claims.[150]

There is a strong presumption that, in enacting federal statutes, Congress did not intend to supplant existing state law in fields historically regulated by states (*e.g.*, business

---

[149]  *See, e.g., Smith McDonnell Stone & Co. v. Delicato Vineyards*, 1995 WL 375918, at *3 (S.D.N.Y. June 22, 1995) (general allegations of damages sufficient to survive motion to dismiss); *Fielding v. Kupferman*, 65 A.D.3d 437, 442 (1st Dep't 2009) (assertion that damages were too speculative was inappropriate on motion to dismiss; "[a]t this early stage of the proceedings . . . plaintiffs is not obliged to show that he actually sustained damages") (citation, quotations omitted).

[150]  Defendants do not indicate which of recognized theory of preemption (express, conflict, or field) they are invoking, but they appear to rely on field preemption.  Express preemption is inapplicable because the provisions on which Defendants rely do not contain language expressly declaring Congressional intent to preempt state law.  *Compare, e.g.,* 11 U.S.C. § 541 ("notwithstanding any . . . applicable nonbankruptcy law") *with* 11 U.S.C. §§ 327, 328(c); Fed R. Bankr. P. 9011.  Conflict preemption is inapposite because Alix's tort claim would not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" reflected in §§ 327 and 328(c).  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 358 U.S. 141, 143 (1982).

torts) unless "that was [its] clear and manifest purpose." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotations omitted). The Bankruptcy Code provisions on which Defendants rely, §§ 327 and 328(c) and Rule 9011, and their legislative histories, do not address remedies for injuries to non-Interested Parties injured by a professional's false claims of disinterestedness; that silence indicates a lack of intent to override existing state law remedies.[151] Alix does not challenge any action taken by debtors or creditors, nor would resolution of his claims diminish the value of any debtor's estate. Nothing in Defendants' cases, in which *parties* to bankruptcies pursued state-law remedies premised on debtors' or creditors' actions for which the Bankruptcy Code provides a remedy, undermines this conclusion.[152]

## B.  Alix's Claims Are Well-Pled under Virginia Law.

Contrary to Defendants' assertions (MTD at 73), Virginia law[153] requires only that a business expectancy be specific and concrete, and that the expectation that it would be

---

[151]     *See Medtronic*, 518 U.S. at 490 (plurality) (state law products liability claims not preempted where legislative history was silent; "[i]f Congress intended such a result, its failure to even hint at it is spectacularly odd"); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984) ("silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct"); *Rosenberg v. DVI Receivables*, 835 F.3d 414, 420 (3d Cir. 2016) (rejecting argument that non-debtors' state law claims were pre-empted by 11 U.S.C. § 303(i), which permits bankruptcy courts to award damages to debtors where creditors initiate an involuntary filing in bad faith; § 303(i)'s silence "suggests that when Congress passed the provision it either did not intend to disturb the existing framework . . . or (more likely) was not thinking about non-debtor remedies at all"; it would be "inconsistent with the remedial purpose of § 303(i)" for Congress to create a system subject to abuse, provide no remedy in the Bankruptcy Code to non-parties, and yet, through silence, foreclose existing common law claims by injured non-parties).

[152]     *See Astor*, 325 F. Supp. 2d at 263 (claim premised on debtor allegedly filing bankruptcy petition solely to sever business relationship preempted; *E. Equip.*, 236 F.3d at 121 (state law claim premised on violations of automatic stay preempted by 11 U.S.C. § 362(h), which provides that any party may recover "damages for willful violations of the automatic stay"); *Gonzales*, 830 F.2d at 1035-36 (abuse of process claim against debtor preempted by Code provision authorizing sanctions for bad-faith petition filings); *Holloway*, 227 B.R. at 506-07 (debtor's claim against creditor for damages flowing from fraudulent proof of claim preempted by 11 U.S.C. § 1330(a)).

[153]     Where there is a conflict and where, as here, the substantive law at issue regulates conduct, New York courts apply the law of the jurisdiction where the tort has occurred. *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521-22 (1994); *SourceOne Dental, Inc. v. Patterson Cos.*, 310 F. Supp. 3d 346, 368 (E.D.N.Y. 2018) (claims for tortious interference with business expectancy are conduct-regulating in nature). Where tortious conduct occurred in a jurisdiction other than where the injury

realized was objectively reasonable. *See Foster v. Wintergreen Real Estate Co.*, 81 Va. Cir. 353, 364 (2010). Questions of whether an expectation was objectively reasonable are fact-intensive and cannot be decided on a motion to dismiss. *Reading & Lang. Learning Ctr. v. Sturgill*, 2016 WL 10880215, at \*15-\*16 (Va. Cir. 2016). Alix alleges McKinsey's conduct deprived AP of two Virginia assignments, *AMF Bowling* and *Alpha*, and provides specific, concrete reasons why AP reasonably expected to obtain those assignments absent McKinsey's misconduct. FAC ¶¶ 582-88.

## CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss should be denied.[154]

Respectfully submitted,

Dated: New York, New York
November 28, 2018

BOIES SCHILLER FLEXNER LLP

By: /s/ *Sean F. O'Shea*
Sean F. O'Shea (soshea@bsfllp.com)
Michael E. Petrella (mpetrella@bsfllp.com)
Amanda L. Devereux
(adevereux@bsfllp.com)
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Plaintiff*

---

was suffered, courts apply the law of the "place of conduct." *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 739 F.3d 45, 49-51 (2d Cir. 2013). Defendants' tortious conduct occurred in and was directed at Virginia and deprived AP of work to be performed in Virginia for companies headquartered or with significant operations in Virginia. FAC ¶¶ 294 & nn.34, 37; *id.* ¶¶ 582-88.

[154] In the alternative, any dismissal should be without prejudice and with leave to amend. *See, e.g., Schindler v. French*, 232 F. App'x 17, 19 (2d Cir. 2007) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citation and internal quotations omitted).

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAY ALIX,<br><br>    *Plaintiff*,<br><br>    -against-<br><br>MCKINSEY & CO., INC.; MCKINSEY HOLDINGS, INC.; MCKINSEY & COMPANY INC. UNITED STATES; MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC; DOMINIC BARTON; KEVIN CARMODY; JON GARCIA; SETH GOLDSTROM; ALISON PROSHAN; ROBERT STERNFELS; and JARED YERIAN,<br><br>    *Defendants*. | Case No. 18-cv-04141 (JMF) |

## PLAINTIFF'S SURREPLY IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Sean F. O'Shea
Michael E. Petrella
Amanda L. Devereux
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
(212) 446-2300

*Attorneys for Plaintiff*

Plaintiff Jay Alix respectfully submits this Surreply in further opposition to Defendants' motion to dismiss the Amended Complaint.[1]

## I.  ALIX HAS PLED PROXIMATE CAUSATION.

### A. *Bridge* Is the Controlling Precedent Here.

Defendants' insistence that *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) is distinguishable rests upon two insupportable assertions.  *First*, according to Defendants, the key to *Bridge's* holding is the fact that the "identically situated" bidder plaintiffs there were necessarily—as a matter of "mechanical, automatic" operation of the auction process at issue—injured by the defendants' fraud and no other factors could have caused the plaintiffs' losses.  Reply at 3-4.  This, they say, sets *Bridge* apart from the bankruptcy assignments at issue here.  *Id.*  But the Supreme Court specifically said that its decision did *not* turn on any "mathematical certainty" of injury and that "it suffice[d] that [plaintiffs] allege they suffered the loss of property related to the liens they would have been able to acquire, and the profits flowing therefrom, had [petitioners] not implemented their scheme."  554 U.S. at 644 n.3.  Worse, Defendants virtually ignore the crucial elaboration in the Seventh Circuit's post-remand decision in the *Bridge* lawsuit, *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011), which they wave off as an "out-of-circuit case."  Reply at 8.  In fact, the bidders were not "similarly situated" and the county auctioneers did not mechanically assign liens *pro rata* to attending bidders but, rather, called on the first bidder to raise his or her hand.  *BCS*, 637 F.3d at 752-53.  Like Defendants here, Motion at 24-25, the *Bridge* defendants offered a litany of purportedly intervening causes that could have accounted for plaintiffs' failure to win any particular auction:

---

[1]  Capitalized terms not defined herein have the meaning ascribed to them in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, dated November 28, 2018, ECF 93 ("**Opp.**").

- o The county might not have excluded the defendants from bidding even if it had learned of their violation of the single-bidder rule. *Id.* at 757.
- o "[C]ompetition from third-party bidders." *Id.* (internal quotation marks omitted).
- o "[A]uctioneers' subjective perceptions" in selecting winners. *Id.* (internal quotation marks omitted).
- o "[F]ailures of Plaintiffs' bidders to keep pace with the auction and to bid on liens they may have intended to bid on." *Id.* at 758 (internal quotation marks omitted).
- o Assignment of disadvantageous seating positions to plaintiffs' bidders. *Id.*
- o Some of plaintiff's bidders might have been slow to raise their hands. *Id.*

Notwithstanding these possibilities, Judge Posner observed that there was a strong statistical *probability* that each plaintiff lost at least one lien on account of the defendants' fraud and that this established *prima facie* causation so as to necessitate a trial. *BCS*, 637 F.3d at 758-759. This Court has itself recognized that *BCS* "stand[s] for the proposition that a RICO plaintiff can pursue a claim based on statistical harm to 'business' expectations." *In re Gen. Motors LLC Ignition Switch Litig.,* 2016 WL 3920353, at *17 (S.D.N.Y. July 15, 2016) (Furman, J.).

Here, there is also a strong likelihood that AlixPartners lost at least one bankruptcy engagement to McKinsey. AlixPartners enjoyed a 25 percent share of the market for high-end bankruptcy consulting engagements during the relevant period. FAC ¶ 49. Even disregarding Alix's allegations that AlixPartners had a much higher likelihood of retention in several of the thirteen bankruptcy engagements at issue were McKinsey disqualified, FAC ¶ 383 (and there is no legal basis to do so on a Rule 12(b)(6) motion), the probability that AlixPartners would have garnered at least one of those thirteen engagements, based on its market share, is approximately 97.4 percent.[2] Accordingly, it is highly unlikely that outside factors could account for all of AlixPartners' injuries here.

---

[2] Calculated by taking the likelihood of non-retention in a given engagement based on a 24.5 percent market share (0.755) multiplied by itself twelve times: $0.755^{13} = 0.0259$. Thus there is only a 2.6% probability that AlixPartners would not have been engaged in any of the bankruptcies and, conversely, a 97.4 % chance it would have been retained in one or more.

*Second*, Defendants erroneously claim that the bankruptcy assignments at issue here do not have the same "zero-sum" character as the auction system in *Bridge*. Reply at 3. The auctions in *Bridge* were not zero-sum in the sense that an auction lost by a defendant would necessarily have been won by any specific plaintiff in that case. Rather, an auction lost by defendant would have gone instead to one of any number of other bidders, including, on occasion, one of the plaintiffs. That is also true here: had McKinsey been disqualified in a given bankruptcy, the debtor would have selected a different advisor; in at least some instances, AlixPartners. Thus, the process here is zero-sum like *Bridge*; Defendants' argument to the contrary is based on their speculative and counterintuitive assertion that a debtor, having initially been inclined to proceed with an advisor, would have declined to retain an alternate advisor after McKinsey US or RTS was disqualified. *See* Motion at 24. On a motion to dismiss, the Court should resolve such inferences in Alix's favor.

## B. The Second Circuit's Decision in *Empire Merchants* Is Distinguishable.

The Second Circuit's recent decision in *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018), upon which the Reply places heavy reliance, Reply at 5-9, does not govern the outcome here.[3] The linchpin of the scheme was a tax-avoidance fraud perpetrated on New York City and State. *Id.* at 137, 144. As the Second Circuit correctly noted, the "case is thus just like *Anza*: the defendants did not pay taxes, and they 'us[ed] the proceeds from [this] fraud' to undercut the plaintiff's sales.") (quoting *Anza v. Ideal Steel Corp.*, 547 U.S. 451, 457-58 (2006). Unlike *Empire Merchants* or *Anza*, the instant case does not involve one competitor undercutting another through tax evasion. This is apparent from the fact that two of the three factors the Second Circuit found to undercut proximate cause in *Empire Merchants* are absent here.

---

[3]    Defendants correctly note that Alix's "counsel in this case successfully argued for the defendants" in the *Empire Merchants* case, which is why counsel can speak authoritatively on its holding.

3

*First*, the Second Circuit held that New York State "was a more direct victim of the smuggling operation" and therefore better situated to sue. *Empire Merchants*, 902 F.3d at 144. Here, there is no party more directly injured than AlixPartners. While the bankruptcy courts and U.S. Trustee were deceived by Defendants' scheme, neither is a "person injured in his business or property," 18 U.S.C. § 1964(c), and therefore cannot sue. *See* Opp. at 11 n.18. While Defendants argue that the debtors or Interested Parties are the more immediately-injured victims, Motion at 17; Reply at 9, they offer no support for this assertion. For one thing, Alix has not alleged that any debtor or Interested Party was in fact injured, nor have Defendants argued otherwise. For another, a professional may be disqualified where a connection merely creates ***the appearance*** of impropriety rather than an actual conflict of interest. *E.g.*, *In re Sauer*, 191 B.R. 402, 408 (Bankr. D. Neb. 1995). AlixPartners, therefore, may be (and, according to the Amended Complaint, is) the *only* party directly injured by Defendants' concealment of disqualifying connections. And even if there were other directly-injured parties, a racketeering scheme can have multiple classes of directly injured victims, Opp. at 8-9—a point ignored in the Reply.

*Second*, the *Empire Merchants* court highlighted the uncertain causal connection between the predicate acts of smuggling and the plaintiff's lost sales, which contrasted with the relatively "straightforward" adjudication attendant to New York's claim for lost taxes. 902 F.3d at 143-44. Defendants' arguments concerning the supposedly tenuous chain of causation for Alix's claims, Motion at 19-20; Reply at 9, rest on an unstated presupposition: that Alix's proof of causation is more fraught than that of the supposedly more-directly-injured debtors or Interested Parties. But the injury caused by a conflicted advisor can be difficult to prove. *United States v. Curcio*, 680 F.2d 881, 887 (2d Cir. 1982) ("dilemmas" faced by attorney representing multiple defendants "are insidious because it often is not clear that the conflict of interests, and not pure trial strategy, are the reasons for the tactics adopted-

4

or forgone-at trial.").  Defendants have not shown that the debtors in any of the thirteen bankruptcies at issue would have an easier time proving that McKinsey's conflicts of interest caused actionable RICO injury than Alix would in showing that AlixPartners would have obtained profitable engagements in one or more such bankruptcies in the absence of Defendants' fraudulent scheme.  In any event, the burden of proving such intervening causes lies with Defendants.  Opp. at 13-14.

## II.     DEFENDANTS FLATLY MISREPRESENT ONE OF PLAINTIFF'S KEY *SCIENTER* ALLEGATIONS.

Alix alleges that, *inter alia*, McKinsey's palpably deficient conflicts-checking methodology evidences Defendants' fraudulent intent in failing to disclose disqualifying connections.  FAC ¶¶ 63, 377(b), 525(a); *id.*, Ex. C ¶¶ 23, 54-67. Arguing that Alix has not adequately pled the corporate Defendants' scienter, the Reply makes a demonstrably false statement: "Alix does not allege that McKinsey intentionally decided to maintain an inadequate conflicts-check system."  In fact, Alix alleged, for example:

- "McKinsey's system of checking for conflicts by email is inadequate by design and intended to conceal rather than uncover adverse interests."  FAC ¶ 63);
- "The rudimentary nature of these [conflicts-checking] procedures, which is irreconcilable with McKinsey's claims to be a global information management leader, indicates that the system represented a deliberate attempt to conceal relevant connections by limiting internal inquiries in a manner ensuring that relevant connections would be missed."  *Id.* ¶ 377(b).

*See also* Opp. at 43 (citing foregoing allegations).

## III.    ALIX HAS PLED A SCHEME TO DEFRAUD ALIXPARTNERS OF MONEY OR PROPERTY WITHIN THE MEANING OF THE MAIL AND WIRE FRAUD STATUTES.

Defendants' opening brief argued that:

> [t]he Amended Complaint alleges only that McKinsey's Rule 2014(a) disclosures somehow *deprived AlixPartners of the ability to bid on (and secure) the bankruptcy assignments* in question. (AC ¶¶ 381, 445, 534.) A competitor's "*interest in a fair bidding opportunity*," however, is "not a property right."

(Emphasis added.)   That mischaracterizes the FAC (and ignores *Bridge*[4]), which did not

merely allege injury to intangible rights.[5]   Alix alleges a scheme to deprive him of money,

"that quintessential tangible form of property" under the federal fraud statutes.   *United States*

*v. Harris*, 805 F. Supp. 166, 176 (S.D.N.Y. 1992).   Accordingly, Alix's opposition brief

argued that the scheme deprived AlixPartners of "bankruptcy engagements *and the resulting*

*fees*" and that, under *Bridge*, it matters not that the money or property was in the hands of a

third party at the time the fraudulent statements were made.   Opp. at 34 (emphasis added).

Defendants' reply brief abandons the argument that Alix has pled only a deprivation

of a fair bidding process.   Reply at 15-16.   Instead, it argues that the "loss of a *future*

*business opportunity*" does not constitute "property" under the mail and wire fraud statutes.

Reply at 16 (emphasis added).   But each of the three cases Defendants cite (*College Savings*

*Bank*, *Asbestec*, *Chrebet*) concerns the meaning of "property" for purposes of a claim for

violation of due process; *not* the meaning of "property" in the mail or wire fraud statutes.

Alix has pled a scheme to deprive AlixPartners of money or property within the

meaning of the mail and wire fraud statutes.   Those terms are to be construed broadly.[6]   In

---

[4]   *See* 553 U.S. at 648 ("As a result, respondents *lost the opportunity* to acquire valuable liens.   Accordingly, respondents were injured in their business or property by reason of petitioners' violation of § 1962(c)") (emphasis added).

[5]   *E.g.*, FAC ¶ 5 ("Defendants' criminal enterprise has caused AP to lose considerable revenue that it otherwise would have earned had Defendants complied with the law and truthfully disclosed McKinsey's disqualifying conflicts of interest.") (emphasis added); *id.* ¶ 384 ("The damages to AP include, but are not limited to, fees from bankruptcy consulting engagements AP would have earned in the absence of the Count 1 Defendants' unlawful conduct; other lost business opportunities (including pre- and post-bankruptcy work); and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for the Count 1 Defendants' criminal activities.") (emphasis added.)

[6]   *E.g., McNally v. United States*, 483 U.S. 350, 356 (1987) (phrase "'any scheme or artifice to defraud' … is to be interpreted broadly insofar as property rights are concerned"); *United States v. Finazzo*, 2014 WL 184134, at *10 (E.D.N.Y. Jan. 14. 2014) ("Property rights protected by the fraud statutes are to be 'interpreted broadly.'") (quoting *McNally, id.*); *cf. United States v. Khashoggi*, 1990 WL 31874, at *13 (S.D.N.Y. Mar. 13, 1990) ("Decisions since *McNally* have broadly interpreted the property interests protected by the mail and wire fraud statutes to include not only the right to immediate possession of tangible property, but

6

*Reich v. Lopez*, 38 F. Supp. 3d 436, 450 (S.D.N.Y. 2014), for example, the court held that while generalized reputational harm to a plaintiff would not meet the statutory definition, where the defendants fraudulent misrepresentations to customers caused them to cease doing business with the plaintiff, the loss of future business revenue was sufficient to establish wire fraud. Here, Alix has pled that Defendants' scheme to defraud caused AlixPartners to lose the profits it would have earned from some or all of the thirteen bankruptcy engagements unlawfully secured by McKinsey US and RTS. *E.g.*, FAC ¶¶ 5, 384.

## IV.   ALIX HAS ADEQUATELY PLED HIS MONEY LAUNDERING CLAIMS UNDER 18 U.S.C. § 1957.

Defendants' opening brief mistakenly relied on the standards for a claim under 18 U.S.C. § 1956 when, in fact, Alix alleges that Defendants violated 18 U.S.C. § 1957. Opp. at 38-39. Belatedly addressing Section 1957, the Reply argues that Alix's allegations are too conclusory and, specifically, that he has not adequately pled any specific transaction involving $10,000 or more or the involvement of a "financial institution." These arguments are misguided. Money laundering allegations are subject only to the notice-pleading requirements of Rule 8(a).[7] The FAC adequately pleads the nature of the fraudulent scheme and associated money-laundering activities. Opp. at 38-39.

Defendants' reliance on *United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1 in the Name of Ishar Abdi & Barbara Abdi*, 255 F. Supp. 2d 56, 66 (E.D.N.Y. 2003) for the proposition that Alix "must plead 'that each monetary transaction alleged in the complaint involved more than $10,000,'" Reply at 18

---

also intangible rights created by contract, statute or even the employer-employee relationship.")

[7]   *E.g., Levine v. Torino Jewelers, Ltd.*, 2006 WL 709098, at *4 n.3 (S.D.N.Y. Mar. 22, 2006). Where the plaintiff alleges the general contours of the criminal scheme and money laundering activities, it need no plead specific transactions. *See Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 440 (E.D.N.Y. 2007) ("Defendants are correct that the Second Amended Complaint fails to provide significant specifics as to each Defendant's money-laundering acts. Because, however, Plaintiffs allege that each of the Defendants is engaged in the same enterprise and each of the Defendants utilizes identical tactics, this defect is not fatal.")

n.16, is twice misplaced. The *Abdi* court did not say that a complaint must identify specific transactions involving at least $10,000. It said that "the government must plead … that each monetary transaction alleged in the complaint involved more than $10,000." Here, Alix has pled that monies from McKinsey's unlawfully-obtained bankruptcy engagements were transferred amongst the defendants "in amounts exceeding $10,000," and that defendants made "deposit[s] or other financial transfers of such monies." *E.g.*, FAC ¶ 370. In any event, to the extent *Abdi* can be read to require pleading of specific transactions, it is distinguishable because the forfeiture claims at issue were governed by the heightened pleading requirements of Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims. 255 F. Supp. 2d at 67. Moreover, the multimillion-dollar engagement fees at issue here warrant the inference that intercorporate remittances met Section 1957's monetary threshold. Likewise, the assertion that Alix has not adequately pled the involvement of a "financial institution" as required by 18 U.S.C. § 1957(f)(1), Reply at 18 n. 16, is erroneous. These facts are fairly inferable given the near certainty that the funds transfers were accomplished by check or electronic transfer rather than cash or other non-banking means.[8]

## V.     ALIX HAS ADEQUATELY PLED A CONSPIRATORIAL AGREEMENT.

Defendants' Reply raises a new argument: that a conspiratorial agreement is not shown merely by the fact that the Defendants all participated in the same course of fraudulent conduct; instead, Alix must "assert allegations explaining how exactly the defendants went about entering into an agreement with each other." Reply at 26 (quoting *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068–69 (11th Cir. 2017)). *Almanza*, is inapposite, however.

---

[8]     See *Welch Foods Inc. v. Gilchrist*, 1996 WL 607059, at *5 (W.D.N.Y. Oct. 18, 1996) ("Gilchrist argues that Welch has failed to particularize any single transaction exceeding $10,000. … [L]iberally read the Complaint alleges that Gilchrist engaged in a number of prohibited transactions each of an amount greater than $10,000.… Furthermore, the acts pled strongly imply deposits, withdrawals or exchanges through financial institutions of funds or monetary instruments representing the proceeds derived from the bribery scheme; the precise details of every individual transaction are more accessible to Gilchrist. It is not relevant that Welch may not be able to sustain its burden at a later phase in these proceedings").

Adverting to the mere allegations of parallel conduct found insufficient to plead antitrust conspiracy in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), the *Almanza* court dismissed a claim that several airlines who charged passengers in Mexico for taxes from which they were exempt had in fact conspired together to do so. 851 F.3d at 1074. While parallel conduct by *unaffiliated* airlines may not warrant an inference of conspiracy, the present case involves allegations that closely affiliated business entities and their executives, operating within a single chain of command, participated and cooperated in the execution of a fraudulent scheme. *Almanza* therefore sheds no light on the sufficiency of Alix's conspiracy allegations.

Nor does the law of this Circuit impose on plaintiffs the typically-impossible burden to plead "how exactly the defendants went about entering into an agreement with each other." Reply at 26 (quoting *Almanza*, 851 F.3d at1060, 1068). Instead, "a defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 154 (S.D.N.Y. 2014) (internal quotation marks omitted). Here, Alix pleads that each of the individual defendants occupied executive positions at the corporate defendants and personally committed or aided and abetted at least two predicate acts in furtherance of a coherent, years-long scheme to defraud.

## VI. ALIX HAS PLED A CLAIM FOR BREACH OF CONTRACT.

Defendants argue that the contract between AlixPartners and McKinsey violates antitrust law in light of a purported "admi[ssion]" by Alix "that his purpose was to force McKinsey from the market." Reply at 29 (citing *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003)). Defendants distort Alix's allegations. The parties' purpose was not to eliminate lawful competition, but, rather, to foster fair and lawful competition. FAC ¶¶ 126, 129; Opp. at 70. It is self-evident that public policy favoring competition is not served

by unlawful business practices. Accordingly, *Visa*—which did not address anything remotely similar—is unavailing.

The Reply also argues that Alix's promise to refrain from suing was not valid consideration to support a contract. Reply at 29 n.31 (citing *Wood Realty Tr. v. N. Storonske Cooperage Co.*, 229 A.D.2d 821, 823 (N.Y. App. Div. 1996). *Wood* does not support Defendants' position. The court affirmed the denial of plaintiff's request to assert an express breach of contract claim, finding lack of consideration where the plaintiff temporarily and unilaterally refrained from bringing suit but never expressly promised to do so. 229 A.D.2d at 823 ("a promise to forego future litigation can constitute valid consideration[.] There are, however, no allegations … of any … promise to forego future litigation given by plaintiff in return for defendant's promise"). Here, Alix did expressly promise to forgo litigation. FAC ¶ 131. Moreover, *Wood* cites *Strong v. Sheffield*, 144 N.Y. 392, 395 (1895), which states that a promise to forbear from suing for a definite time or for a reasonable time will supply the requisite consideration, and that, "in the absence of a specified time, a reasonable time is held to be intended." Here, the parties agreed that Alix would refrain from suing until after March 2015, the date by which Barton promised that McKinsey would exit the bankruptcy business. FAC ¶ 131.

## CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss should be denied.[9]

Respectfully submitted,

Dated: New York, New York
February 15, 2019

BOIES SCHILLER FLEXNER LLP

By: /s/ *Sean F. O'Shea*
Sean F. O'Shea (soshea@bsfllp.com)

---

[9]    In the alternative, any dismissal should be without prejudice and with leave to amend. *See, e.g.*, *Schindler v. French*, 232 F. App'x 17, 19 (2d Cir. 2007) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citation and internal quotations omitted).

Michael E. Petrella (mpetrella@bsfllp.com)
Amanda L. Devereux
(adevereux@bsfllp.com)
55 Hudson Yards
New York, New York 10001
Tel: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Plaintiff*

# Exhibit 4

# United States Bankruptcy Court
## District of Delaware

**In Re:**    SRC Liquidation LLC et al. (f/k/a Standard Register Co)

**Case No:**    15-10541 (Jointly Administered)

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bank. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

Name of Transferee:                  Name of Transferor:
**Mar-Bow Value Partners, LLC**        **AAA Flag & Banner Mfg Co Inc**

Name and address where notices to transferee should be sent:

| | |
|---|---|
| Court Claim # (if known): | 2019 |
| Amount of Proof of Claim: | **$ 7,219.92** |
| Amount of Scheduled Claim: | **$ 6,715.35** |
| Date Claim Filed: | 06/29/15 |

Mar-Bow Value Partners, LLC
29580 Northwestern Hwy., Suite 100
Southfield, MI 48034

Name and Address of Transferor:
AAA Flag & Banner Mfg Co Inc
8955 National Blvd
Los Angeles, CA 90034

Phone:   212-616-7700
Last Four Digits of Acct #:   N/A

Phone:   310-836-3341
Last Four Digits of Acct. #:   N/A

Name and Address where transferee payments
Should be sent (if different from above):

Phone:      N/A
Last Four Digits of Acct. #:      N/A

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____        Date:   3/18/16
   Transferee / Transferee's Agent

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U.S.C. .152 & 3571*

---

### --DEADLINE TO OBJECT TO TRANSFER--

The transferor of claim named above is advised that this Notice of Transfer of Claim Other Than for Security has been filed in the clerk's office of this court as evidence of the transfer. Objections must be filed with the court within twenty (20) days of the mailing of this notice. If no objection is timely received by the court, the transferee will be substituted as the original claimant without further order of the court.

Date: _____         _____
                                       CLERK OF THE COURT

## TRANSFER NOTICE

AAA Flag & Banner Mfg Co Inc ("Assignor") transfers and assigns unto **Mar-Bow Value Partners, LLC** with an address at 29580 Northwestern Hwy., Ste. 100 Southfield, Michigan 48034, its successors and assigns ("Assignee"), pursuant to the terms of an ASSIGNMENT OF CLAIM between Assignor and Assignee (the "Agreement"), all of the Assignor's right, title and interest in, to and under the Claim of Assignor as set forth in the Agreement against SRC Liquidation LLC, et al., (the "Debtor"), in the aggregate amount of $ 7,219.92 representing all claims of Assignor pending against the Debtor in the United States Bankruptcy Court for the District of Delaware, administered as Case No. 15-10541, et al.

In Witness Whereof, Assignor and Assignee have signed below as of the 16th day of March, 2016.

Assignor:

**AAA Flag & Banner Mfg Co Inc.**

By: _____
Name: CRAIG FURST
Title: PRESIDENT

Assignee:

**Mar-Bow Value Partners, LLC**

By: _____
Name: _____
Title: Authorized Officer

# Exhibit 5

B 10 (Modified Official Form 10) (4/13)

MML ID # 888920

EPOC ID: 151054100113519

# UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE

## PROOF OF CLAIM

Indicate Debtor against which you assert a claim by checking the appropriate box below (**Check only one Debtor per claim form**):

- ☐ The Standard Register Company (Case No. 15-10541)
- ☐ Standard Register Holding Company (Case No. 15-10542)
- ☐ Standard Register Technologies, Inc. (Case No. 15-10543)
- ☐ Standard Register International, Inc. (Case No. 15-10544)
- ☐ iMedconsent, LLC (Case No. 15-10540)
- ☐ Standard Register of Puerto Rico Inc. (Case No. 15-10545)
- ☐ Standard Register Mexico Holding Company (Case No. 15-10546)
- ☐ Standard Register Hoiding, S. de R.L. de C.V. (Case No. 15-10547)
- ☐ Standard Register de Mexico, S. de R.L. de C.V. (Case No. 15-10548)
- ☐ Standard Register Servicios, S. de R.L. de C.V. (Case No. 15-10549)
- ☐ Standard Register Technologies **Canada** ULC (Case No. 15-10550)

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file requests for payment of an administrative expense according to 11 U.S.C. § 503.*

COURT USE ONLY

RECEIVED

JUN 29 2015

PRIME CLERK LLC

Name of Creditor (The person or other entity to whom the debtor owes money or property):

AAA FLAG & BANNER MFG CO INC

Name and address where notices should be sent:

AAA FLAG & BANNER MFG CO INC
8955 NATIONAL BLVD
LOS ANGELES CA 90034

*Debtor The Standard Register Company has listed your claim on Schedule F as a General Unsecured claim in the amount of $6,715.35. If you agree with the claim amount and characterization, you do not need to submit this claim form. If you disagree, you must timely file a proof of claim form or be forever barred from further recovery.*

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
(*If known*)

Filed on: _____

Telephone number: 310-836-3341 Email: cherise@aaaflag.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (**if different from above**):

- ☐ Date Stamped Copy Returned
- ☐ No Self-Addressed Stamped Envelope
- ☒ No Copy Provided

||||||||||||||  151054100113519

Telephone number: _____ email: _____

**1.** Amount of Claim as of Date Case Filed: $ 7,219.92 _____

If all or part of the claim is **secured**, complete **item 4**. If all or part of the claim is entitled to **priority**, complete **item 5**.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2.** Basis for Claim: GOODS SOLD _____
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: | 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): |
|---|---|---|
| | (See instruction #3a) | (See instruction #3b) |

**4.** Secured Claim (See instruction #4)
Check the appropriate box if the claim is **secured** by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐Real Estate ☐Motor Vehicle ☐Other
Describe:

Value of Property: $_____

Annual Interest Rate_____% ☐Fixed or ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____

Basis for perfection: _____

Amount of Secured Claim: $_____

Amount Unsecured: $ 7,219.92

**5.** Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

- ☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).
- ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).
- ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).
- ☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).
- ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

Claim Number: 2019

B 10 (Modified Official Form 10) (4/13)

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):** Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$ _____    **(See instruction #6)**

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, or security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9)

Check the appropriate box.

☐ I am the creditor.    ☒ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Cherise Gipson
Title:  ACCOUNTS RECEIVABLE
Company:  AAA FLAG & BANNER MFG. CO., INC.
Address and telephone number (if different from notice address above):

_____

(Signature)    6/23/15    (Date)

Telephone number: 310-836-3341  Email: cherise@aaaflag.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.



## AAA Flag & Banner Mfg. Co., Inc.

**Corporate Headquarters**
**8955 National Blvd**
**Los Angeles, CA 90034**
**(310) 836-3341**
**www.aaaflag.com**

# Invoice

| Invoice # | | Invoice Date |
|---|---|---|
| 6013103 | | 2/9/2015 |
| Reference | | Sales Team |
| Sales Order #194627 | | 320 YVONNE PANGRAMUYEN |

| Customer Name |
|---|
| Standard Register : LISA L SHREWSBURY |

| Bill To | Ship To |
|---|---|
| WORKFLOWONE - CORPORATE SALES OFFICE<br>PO BOX 3933<br>DAYTON OH 45401<br>United States | KRIS WRIGHT<br>WASTE MANAGEMENT<br>2900 WEST 68TH STREET<br>LITTLE ROCK AR 72209<br>United States |

| Project Title | | Ship Date | Tracking Number(s) | |
|---|---|---|---|---|
| WM LCRS OUTDOOR BANNERS | | 2/9/2015 | 1Z9207650343050805 | |
| Terms | P.O. # | F.O.B. | Insured? | Shipped Via |
| Net 30 Days | HS932414 | F.O.B. - AAA LA | | UPS-GROUND |

| Qty | Item Name | Description | Finishing Notes | Each | Amount | |
|---|---|---|---|---|---|---|
| 1 | LCR OUTDOOR BANNER - JOB# 4453988 | VUTEK - ROLL * Flexible * 9' H X 6' W * VINYL REGULAR 13 oz White * SF * 4 C/P * FL: * FM: Grommets Brass Reg, Webbing 2" * Portrait | ENCLOSED TWIST TIES FOR EVERY GROMMET ROLLED WITH THE BANNER | 197.50 | 197.50 | |

| | |
|---|---|
| Subtotal | 197.50 |
| Shipping Cost (UPS-GROUND) | 0.00 |
| Total | 197.50 |
| Amount Due | $197.50 |

| Amount Paid | 0.00 | Amount Due | 197.50 |
|---|---|---|---|

A FINANCE CHARGE OF 1 1/2% PER MONTH WHICH IS EQUIVALENT TO AN ANNUAL PERCENTAGE RATE OF 18% WILL BE APPLIED TO ACCOUNTS PAST DUE.
It is understood and agreed that in event it becomes necessary for AAA Flag & Banner, Mfg. Co to institute action to collect payment for merchandise sold herein, purchaser will pay all collection costs, including reasonable attorney's fees.
AAA Flag & Banner, Co. uses the highest quality materials and workmanship in production of its flags, signs, and banners, but cannot guarantee any damages due to weather and wind conditions.
Any Claims or Returns must be made within 5 days of receipt of goods. Upon approval, stock items will be issued a store credit. Customer products will either be repaired, replaced, or issued a credit upon approval.
Goods must be picked up within 15 days of completion, as AAA will not be responsible after this point. AAA cannot assume responsibility for shipping/freight delivery of lost or damaged goods if insurance is not requested

**Please remit all payments to: AAA Flag & Banner * 8955 National Blvd * Los Angeles * Ca * 90034**



## AAA Flag & Banner Mfg. Co., Inc.

**Corporate Headquarters**
8955 National Blvd
Los Angeles, CA 90034
(310) 836-3341
www.aaaflag.com

# Invoice

| Invoice # | Invoice Date |
|---|---|
| 6013371 | 2/13/2015 |
| Reference | Sales Team |
| Sales Order #194764 | 320 YVONNE PANGRAMUYEN |

| Customer Name |
|---|
| Standard Register : NORMA LANG |

| Bill To | Ship To |
|---|---|
| STANDARD REGISTER - CORPORATE SALES OFFICE<br>PO BOX 3933<br>DAYTON OH 45401<br>United States | WILDA WONG<br>PLANNED PARENTHOOD<br>1075 CAMINO DEL RIO SOUTH<br>SAN DIEGO CA 92108<br>United States |

| Project Title | Ship Date | Tracking Number(s) |
|---|---|---|
| PP LOGO BANNERS - PLANNED PARENTHO... | 2/13/2015 | 1Z8Y7R290341566395 |

| Terms | P.O. # | F.O.B. | Insured? | Shipped Via |
|---|---|---|---|---|
| NET 30 DAYS | EN236340 | F.O.B. - AAA LA | | UPS-GROUND |

| Qty | Item Name | Description | Finishing Notes | Each | Amount | |
|---|---|---|---|---|---|---|
| 9 | 72"WX36"H FUNDRAISING BANNERS - PROJECT#02-550 55 | VUTEK - ROLL * Flexible * 3' H X 6' W * VINYL REGULAR 13 oz White * SF * 4 C/P * FL: Sewing-Hem * FM: Grommets Brass Reg * Landscape | - HEM AND GROMMETS EVERY 2' - ENCLOSE TWIST TIES PER EVERY GROMMET | 59.50 | 535.50 | |

|  |  |
|---|---|
| Subtotal | 535.50 |
| Shipping Cost (UPS-GROUND) | 11.92 |
| Total | 547.42 |
| Amount Due | $547.42 |

| Amount Paid | 0.00 | Amount Due | 547.42 |
|---|---|---|---|

A FINANCE CHARGE OF 1 1/2% PER MONTH WHICH IS EQUIVALENT TO AN ANNUAL PERCENTAGE RATE OF 18% WILL BE APPLIED TO ACCOUNTS PAST DUE.
It is understood and agreed that in event it becomes necessary for AAA Flag & Banner, Mfg. Co to institute action to collect payment for merchandise sold herein, purchaser will pay all collection costs, including reasonable attorney's fees.
AAA Flag & Banner, Co. uses the highest quality materials and workmanship in production of its flags, signs, and banners, but cannot guarantee any damages due to weather and wind conditions.
Any Claims or Returns must be made within 5 days of receipt of goods. Upon approval, stock items will be issued a store credit. Customer products will either be repaired, replaced, or issued a credit upon approval.
Goods must be picked up within 15 days of completion, as AAA will not be responsible after this point. AAA cannot assume responsibility for shipping/freight delivery of lost or damaged goods if insurance is not requested.

**Please remit all payments to: AAA Flag & Banner * 8955 National Blvd * Los Angeles * Ca * 90034**



## AAA Flag & Banner Mfg. Co., Inc.

**Corporate Headquarters**
**8955 National Blvd**
**Los Angeles, CA 90034**
**(310) 836-3341**
**www.aaaflag.com**

# Invoice

| Invoice # | Invoice Date |
|---|---|
| 6014355 | 3/2/2015 |
| **Reference** | **Sales Team** |
| Sales Order #195419 | 320 YVONNE PANGRAMUYEN |

| Customer Name |
|---|
| Standard Register : SYDNEY I HUTIN |

| Bill To | Ship To |
|---|---|
| STANDARD REGISTER - CORPORATE SALES OFFICE<br>PO BOX 3933<br>DAYTON OH 45401<br>United States | ZOETIS<br>WORKFLOWONE<br>3125 LEWIS CENTER WAY<br>GROVE CITY OH 43123<br>United States |

| Project Title | Ship Date | Tracking Number(s) |
|---|---|---|
| ACT-00048 FEED ADDITIVES PULL UP BANN... | 3/2/2015 | 1Z9207650345025900 1Z9207650343100000 1Z920765... |

| Terms | P.O. # | F.O.B. | Insured? | Shipped Via |
|---|---|---|---|---|
| NET 30 DAYS | NY326480 | F.O.B. - AAA LA | | UPS-GROUND |

| Qty | Item Name | Description | Finishing Notes | Each | Amount | |
|---|---|---|---|---|---|---|
| 35 | REWIND RETRACTABLE BANNERS | VUTEK - ROLL * Flexible * 84" H X 36" W * VINYL SMOOTH White * SF * 4 C/P * FL: * FM: * Portrait | - ALLOW 6" EXTRA MATERIAL AT BOTTOM TO INSTALL IN REWIND BANNER STAND<br>- INSTALL IN NEW REWIND HARDWARE | 67.50 | 2,362.50 | |
| 35 | | HARDWARE * 36"WIDE REWIND RETRACTABLE STAND | | 117.50 | 4,112.50 | |

| | |
|---|---|
| Subtotal | 6,475.00 |
| Shipping Cost (UPS-GROUND) | 0.00 |
| Total | 6,475.00 |
| Amount Due | $6,475.00 |

| Amount Paid | 0.00 | Amount Due | 6,475.00 |
|---|---|---|---|

A FINANCE CHARGE OF 1 1/2% PER MONTH WHICH IS EQUIVALENT TO AN ANNUAL PERCENTAGE RATE OF 18% WILL BE APPLIED TO ACCOUNTS PAST DUE.
It is understood and agreed that in event it becomes necessary for AAA Flag & Banner, Mfg, Co to institute action to collect payment for merchandise sold herein, purchaser will pay all collection costs, including reasonable attorney's fees.
AAA Flag & Banner, Co. uses the highest quality materials and workmanship in production of its flags, signs, and banners, but cannot guarantee any damages due to weather and wind conditions.
Any Claims or Returns must be made within 5 days of receipt of goods. Upon approval, stock items will be issued a store credit. Customer products will either be repaired, replaced, or issued a credit upon approval.
Goods must be picked up within 15 days of completion, as AAA will not be responsible after this point. AAA cannot assume responsibility for shipping/freight delivery of lost or damaged goods if insurance is not requested.

**Please remit all payments to: AAA Flag & Banner * 8955 National Blvd * Los Angeles * Ca * 90034**

# Exhibit 6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>THE STANDARD REGISTER COMPANY, *et al*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-10541 (BLS)<br><br>(Jointly Administered) |

## NOTICE OF FILING OF GUC TRUST AGREEMENT

**PLEASE TAKE NOTICE** that attached hereto as **Exhibit A** is a copy of the *Standard Register Company General Unsecured Creditors' GUC Trust Agreement* filed with the Bankruptcy Court by the Official Committee of Unsecured Creditors appointed in the chapter 11 cases of the above-captioned debtors-in-possession.

**[*signature page follows*]**

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

Dated: August 3, 2015                    Respectfully Submitted,

                                         **LOWENSTEIN SANDLER LLP**
                                         Kenneth A. Rosen, Esq.
                                         Sharon L. Levine, Esq.
                                         Paul Kizel, Esq.
                                         Wojciech F. Jung, Esq.
                                         65 Livingston Avenue
                                         Roseland, NJ 07068
                                         Telephone: (973-597-2500
                                         Facsimile: (973) 597-2400

                                         *-and -*

                                         Gerald C. Bender, Esq.
                                         1251 Avenue of the Americas
                                         New York, NY 10020
                                         Telephone: (212) 262-6700
                                         Facsimile: (212) 262-7402

                                         *Counsel to the Official Committee of Unsecured Creditors*

                                         *-and-*

                                         **POLSINELLI PC**

                                         /s/ Justin K. Edelson
                                         Christopher A. Ward (DE Bar No. 3877)
                                         Justin K. Edelson (DE Bar No. 5002)
                                         222 Delaware Avenue, Suite 1101
                                         Wilmington, DE 19801
                                         Telephone: (302) 252-0920
                                         Facsimile: (302) 252-0921

                                         *Delaware Counsel to the Official Committee of Unsecured Creditors*

# EXHIBIT A

**Execution Version**

## STANDARD REGISTER COMPANY GENERAL
## UNSECURED CREDITORS' GUC TRUST AGREEMENT

This *Standard Register Company General Unsecured Creditors' GUC Trust Agreement* (the "GUC Trust Agreement") dated as of July 31, 2015, is entered into by and between The Standard Register Company, Standard Register Holding Company, Standard Register Technologies, Inc., Standard Register International, Inc., iMedConsent, LLC, Standard Register of Puerto Rico Inc., Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de México, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V. and Standard Register Technologies Canada ULC (collectively, the "Settlor" or Debtors"), on the one hand, and EisnerAmper LLP (the "GUC Trustee") and Anthony R. Calascibetta as the authorized representative of the GUC Trustee, on the other hand, for the benefit of the Beneficiaries (defined below) pursuant to the terms of the *Settlement Agreement Among Debtors, Silver Point Finance, LLC & Official Committee Of Unsecured Creditors* attached as Exhibit A to the *Notice of Filing of Settlement Agreement* [D.I. 696] (the "Settlement"), which Settlement was approved by the *Order (I) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests; (II) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (III) Granting Certain Related Relief* dated June 19, 2015 [D.I. 698] (the "Sale and Settlement Order") entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the jointly administered Chapter 11 cases captioned *In re The Standard Register Company, et al.*, Case No. 15-10541 (BLS) (collectively, the "Chapter 11 Cases").

## WITNESSETH

**WHEREAS**, the GUC Trust (defined below) is created pursuant to, and to effectuate, the Settlement and the Sale and Settlement Order; and

**WHEREAS**, the GUC Trust is created on behalf, and for the sole benefit, of the Beneficiaries pursuant to the Settlement and the Sale and Settlement Order; and

**WHEREAS**, the GUC Trust is established as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d) for the sole purpose of collecting, liquidating, and distributing the Net Proceeds in an expeditious and orderly manner for the benefit of the Beneficiaries in accordance with the terms of this GUC Trust Agreement and the Settlement with no objective to continue or engage in the conduct of a trade or business; and

**WHEREAS**, the GUC Trust is intended to qualify and be treated as a grantor trust for U.S. federal income tax purposes pursuant to Sections 671 through 677 of the Internal Revenue Code of 1986 (as amended, the "Tax Code");

**WHEREAS**, pursuant to the Settlement and this GUC Trust Agreement, the Settlor, the GUC Trustee and the Beneficiaries are required to treat the transfer of the Distributable Assets to the GUC Trust, for all U.S. federal income tax purposes, as a transfer of the Distributable Assets by the Settlor to the Beneficiaries in satisfaction of their Allowed Claims followed by a transfer of the Distributable Assets by the Beneficiaries to the GUC Trust in exchange for their beneficial interests herein, and to treat the Beneficiaries as the grantors and owners of the GUC Trust in accordance with Treasury Regulation section 301.7701-4; and

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein and in the Settlement, the Settlor and the GUC Trustee agree as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATIONS

1.1     Definitions.

1.1.1   "Allowed Claim"   means a General Unsecured Claim (or any portion thereof) (a) that has been allowed by a Final Order of the Bankruptcy Court (or such court as the Debtors (or successor estate representative), the GUC Trustee and the holder of any such claim agree may adjudicate such claim and any objections thereto), or (b) that either (x) has been scheduled as a liquidated, non-contingent, and undisputed claim in an amount greater than zero on the Debtors' schedules, or (y) is the subject of a timely filed proof of claim as to which either (i) no objection to its allowance has been filed (either by way of objection or amendment to the schedules) within the periods of limitation fixed by the Bankruptcy Code or by any Final Order of the Bankruptcy Court or (ii) any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order *provided, however*, that for purposes of determining the status of a particular claim, any such claim which has not been previously allowed or disallowed by a Final Order of the Bankruptcy Court shall be deemed a Disputed Claim unless such claim is specifically identified by the Debtors (or successor estate representative) and/or the GUC Trustee as being an Allowed Claim.

1.1.2   "Assets" means the Distributable Assets and the GUC Trust Seed Funding Amount.

1.1.3   "Available GUC Trust Cash" means the gross proceeds generated through the liquidation and monetization of Distributable Assets or any portion thereof, less (a) charges, costs and expenses that are rightly deducted and attributable to the liquidation and monetization of the Distributable Assets including, but not limited to, all costs, expenses, and obligations incurred by the GUC Trust and GUC Trustee (or professionals who may be employed by the

GUC Trustee in administering the GUC Trust) in carrying out the obligations and responsibilities under this GUC Trust Agreement and the Settlement; *provided*, *however*, no such fees shall be paid from the GUC Cash Payment; and (b) the Disputed Claims Reserve.

1.1.4   "Beneficiaries" means the General Unsecured Creditors whether their claims are Allowed before or after the Effective Date.

1.1.5   "Claims" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

1.1.6   "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

1.1.7   "D&O Claims" has the meaning ascribed to it in the Settlement.

1.1.8   "Disallowed Claim" means a General Unsecured Claim that is disallowed by Final Order or agreement between the Debtors and/or GUC Trustee and the applicable claimant.

1.1.9   "Disputed Claims Reserve" means cash in an amount equal to the Distributions which would have been made to Beneficiaries on account of Disputed Claims if such claims were Allowed or such other amount as may be ordered by the Bankruptcy Court.

1.1.10  "Disputed Claims" means the General Unsecured Claims that are not Allowed Claims or Disallowed Claims.

1.1.11  "Distributable Assets" means the assets (and proceeds thereof) transferred to and vested in the GUC Trust on the Effective Date (as defined below) or subsequent thereto that are available for Distribution, which assets are comprised of the GUC Cash Payment, the D&O Claims, the Sharing Payment (as defined in the Settlement), and any other funds or assets

-4-

that are available for the benefit of General Unsecured Creditors and are subsequently transferred to the GUC Trust by the Settlor.

1.1.12 "Distribution" means a distribution of property to a Beneficiary in accordance with this GUC Trust Agreement.

1.1.13 "Distribution Date" means any date on which Distributions are made in accordance with this GUC Trust Agreement.

1.1.14 "Encumbrances" means rights, Liens, Claims, liabilities, interests, or other encumbrances of any kind, whether direct, residual, contingent or otherwise.

1.1.15 "Entity" has the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

1.1.16 "Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed, such appeal has been resolved by a Final Order or agreement of all the parties to such appeal.

1.1.17 "General Unsecured Claim" means a general unsecured claim filed or scheduled against any of the Debtors.

1.1.18 "General Unsecured Creditor" means a holder of an Allowed Claim.

1.1.19 "GUC Cash Payment" has the meaning ascribed to it in the Settlement, which payment the GUC Trustee shall receive on the Effective Date and deposit into a separate and segregated account to be used solely and exclusively to make Distributions to the Beneficiaries.

1.1.20 "GUC Trust" means the liquidating trust established pursuant to the terms of this GUC Trust Agreement, the Settlement, and the Sale and Settlement Order.

1.1.21 "GUC Trustee" means (a) initially, the person or corporation defined as the "GUC Trustee" above, and (b) any successors or replacements duly appointed under the terms of this GUC Trust Agreement, and is the person referred to as the "GUC Trustee" in the Settlement.

1.1.22 "GUC Trust Oversight Committee" means those members of the Creditors' Committee who agree to serve as members of the GUC Trust Oversight Committee. The initial members of the GUC Trust Oversight Committee shall be all of the current members of the Creditors' Committee.

1.1.23 "GUC Trust Agreement" means this *The Standard Register Company General Unsecured Creditors' GUC Trust Agreement.*

1.1.24 "GUC Trust Seed Funding Amount" has the meaning ascribed to it in the Settlement.

1.1.25 "Lien" has the meaning ascribed to it in section 101(37) of the Bankruptcy Code.

1.1.26 "Net Proceeds" shall mean cash Distributable Assets of the GUC Trust net of all reserves, costs, fees, and expenses of the GUC Trust and GUC Trustee.

1.1.27 "Permitted Investments" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Bankruptcy Court may approve from time to time, or (d) demand deposits, money market account, or certificates of deposit at any bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000, *provided*, *however*, that

the scope of any Permitted Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, and to the investment guidelines of section 345 of the Bankruptcy Code, *provided*, *further*, *however*, the requirement of complying with the investment guidelines of section 345 of the Bankruptcy Code may be waived by the GUC Trustee with the approval of the GUC Trust Advisory Board.

      1.1.28 "Standing Order" means the Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates [D.I. 648].

      1.2    Use of Settlement Definitions.  All terms which are used in this GUC Trust Agreement but not defined herein shall have the meaning set forth in the Settlement or Sale and Settlement Order.

      1.3    Headings; Interpretation.  The headings in this GUC Trust Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this GUC Trust Agreement.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

      1.4    Particular Words.  Reference in this GUC Trust Agreement to any Section or Article is, unless otherwise specified, to that Section or Article under this GUC Trust Agreement. The words "hereof," "herein," "hereunder," and similar terms shall refer to this GUC Trust Agreement and not to any particular Section or Article of this GUC Trust Agreement.

## ARTICLE II

## DECLARATION OF TRUST

2.1     Creation and Name.  Pursuant to the Settlement and the Sale and Settlement Order, the Settlor hereby establishes and creates the GUC Trust, on behalf of, and for the benefit of the Beneficiaries as of the date hereof (the "Effective Date").  The GUC Trustee may conduct the affairs of the GUC Trust under the name "SRC Liquidating GUC Trust," and is the GUC Trust referred to as the "GUC Trust" in the Settlement.

2.2     Purpose of GUC Trust.  This GUC Trust Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a grantor trust.  The Settlor and the GUC Trustee, pursuant to the Settlement and Sale and Settlement Order hereby create the GUC Trust solely for the purpose of, liquidating and distribution the Distributable Assets in accordance with the terms of this GUC Trust Agreement, the Settlement and Sale and Settlement Order with no objective to continue or engage in the conduct of a trade or business.  The GUC Trustee shall engage only in activities reasonably necessary to, and consistent with the liquidating purpose of the GUC Trust including, but not limited to, (a) investigating and, if appropriate, pursuing, settling or abandoning causes of action, including but not limited to the D&O Claims not otherwise released under the Settlement, (b) administering and liquidating the Assets, (c) resolving all Disputed Claims and (d) making Distributions from the GUC Trust as provided for in the Settlement and this GUC Trust Agreement.  The activities of the GUC Trust shall be limited to those activities set forth in this GUC Trust Agreement.

2.3     Transfer of Distributable Assets.  Pursuant to the Settlement and the Sale and Settlement Order, the Settlor hereby grants, releases, assigns, conveys, transfers and delivers, on behalf of the Beneficiaries, all of the Settlor's rights, title and interest in the Distributable Assets

in trust for the benefit of the Beneficiaries, free and clear of all Encumbrances of all other Entities for the uses and purposes as specified in the Settlement and this GUC Trust Agreement, it being understood that the GUC Cash Payment shall only be used for Distributions to Beneficiaries.  For the avoidance of doubt, the costs and expenses of the GUC Trust shall be funded exclusively from the Assets, exclusive of the GUC Cash Payment.

2.4    Securities Law.  It is intended that the interests of the Beneficiaries in the GUC Trust and the entitlements hereunder (the "Beneficial Interests"), if any, of such Beneficiaries, shall not constitute "securities."  To the extent applicable and to the extent the Beneficial Interests or any entitlements of the Beneficiaries are deemed to be "securities," the issuance of the Beneficial Interests or the entitlements hereunder or under any Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code from Section 4(a)(2) of the Securities Act and any state and local laws requiring registration of securities.  If the GUC Trustee determines, with the advice of counsel, that the GUC Trust is required to comply with the registration and reporting requirements of the Securities Act of 1933, as amended, the Securities and Exchange Act of 1934, as amended (collectively, the "Securities Act), the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), or the Investment Company Act of 1940, as amended (the "Investment Company Act"), then the GUC Trustee shall take any and all actions to comply with such registration and reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.  Notwithstanding the foregoing, nothing contained herein shall be deemed to preclude the GUC Trustee from amending this GUC Trust Agreement to make such changes as are deemed necessary or appropriate by the GUC Trustee, with the advice of counsel, to ensure that the GUC Trust is not subject to registration and/or reporting requirement of the Securities Act, the Trust Indenture Act or the Investment Company Act,

provided that such amendments do not adversely affect the Distributions to be made under the terms of this GUC Trust Agreement.

2.5 <u>Appointment and Acceptance of GUC Trustee</u>. The GUC Trustee accepts the GUC Trust created by this GUC Trust Agreement and the grant, assignment, transfer, conveyance, and delivery to the GUC Trustee, on behalf, and for the benefit, of the Beneficiaries, by the Debtors of all of their respective right, title, and interest in the Distributable Assets, upon and subject to the terms and conditions set forth in this GUC Trust Agreement, the Settlement and the Settlement Order and any subsequent order of the Bankruptcy Court that is consistent with the terms and purpose of the Settlement.

2.6 <u>Transfer of D&O Claims</u>. The Debtors agree and authorize the GUC Trustee to (a) prosecute, settle, compromise and/or dismiss the claims authorized by the Standing Order, including the D&O Claims, on behalf of, and in the name of, the Debtors and their estates (b) be substituted as plaintiff for the Creditors' Committee in the adversary proceeding captioned *Official Committee of Unsecured Creditors of The Standard Register Company, et al. v. Silver Point Capital, L.P. et al.*, Adv. Proc. No. 15-50771 (BLS) (Bankr. D. Del.), as the same may be amended from time to time, including in accordance with the Settlement. To the extent that Debtors or their estates receive any recovery from the prosecution of the D&O Claims, including, without limitation, from any applicable insurance provider, the Debtors agree to promptly turn such recovery over to the GUC Trust.

2.7 <u>No Reversion to Debtors or Others</u>. The Distributable Assets shall be free and clear of all Encumbrances of the Debtors or any other Entity.

2.8 <u>Funding of the GUC Trust Seed Funding Amount</u>. On the Effective Date, the Debtors shall advance the GUC Trust Seed Funding Amount to the GUC Trust as a loan. The

GUC Trust shall repay the GUC Trust Seed Funding Amount without interest to the Debtors or their successors or assigns from either the GUC Trust Seed Funding Amount not used to pay costs and expenses of administering the GUC Trust and/or the Net Proceeds, if any, of the liquidation of the Distributable Assets (other than the GUC Cash Payment which shall be utilized exclusively for the payment of Distributions to Beneficiaries).  Except for the obligation of the GUC Trust to repay the GUC Trust Seed Funding Amount as set forth this Section 2.8, the GUC Trust Seed Funding Amount shall be free and clear of all Encumbrances of the Debtors or any other Entity.

## ARTICLE III

## ADMINISTRATION OF THE GUC TRUST

3.1     <u>Rights, Powers, and Privileges</u>.  The GUC Trustee shall have only the rights, powers and privileges expressly provided in this GUC Trust Agreement and in any order of the Bankruptcy Court that is not, absent the consent of the GUC Trustee, inconsistent with the terms and purpose of the Settlement and GUC Trust Agreement.  Subject to the terms of this GUC Trust Agreement, GUC Trustee shall have the power to take the actions specified in this Section 3.1 and any actions reasonably incidental thereto, which the GUC Trustee reasonably determines to be necessary or appropriate to fulfill the purpose of the GUC Trust, including but not limited to:

    A.    exercise all power and authority that may be necessary to implement the Settlement on behalf of the GUC Trust and enforce all provisions thereof;

    B.    open and maintain bank accounts, make Distributions and take other actions consistent with the Settlement and this GUC Trust Agreement, including the maintenance of appropriate reserves (including the Disputed Claim Reserve), in the name of the GUC Trust;

    C.    maintain the books and records of the GUC Trust, including any books and records of the Debtors transferred to the GUC Trust;

D.   incur and pay reasonable and necessary expenses in connection with the implementation and consummation of the Settlement;

E.   make decisions without court approval, regarding the retention or engagement of professionals or other Entities, and to pay, without court approval, all reasonable fees and expenses of the GUC Trust accruing from and after the Effective Date;

F.   collect and liquidate all Assets transferred or to be transferred to the GUC Trust;

G.   prepare and file tax returns and related forms and filings on behalf of the GUC Trust;

H.   investigate, prosecute and/or settle or abandon causes of action, including but not limited to the D&O Claims, not otherwise released pursuant to the Settlement and transferred to the GUC Trust;

I.   seek a determination of tax liability under section 505 of the Bankruptcy Code or otherwise and to pay, or cause to be paid, from the Assets any taxes incurred by the GUC Trustee on or after the Effective Date;

J.   invest, or cause to be invested, cash as deemed appropriate by the GUC Trustee, provided, however, such investments shall be Permitted Investments;

K.   enter, or cause to be entered, into any agreement or execute any document required by or consistent with this GUC Trust Agreement and the Settlement;

L.   abandon, or cause to be abandoned, in any commercially reasonable manner any Distributable Assets that the GUC Trustee reasonably concludes are burdensome or of inconsequential value and benefit to the GUC Trust without any need for Bankruptcy Court approval;

M.   prepare and file post-Effective Date operating reports as set forth in this GUC Trust Agreement;

N.   take all other actions not inconsistent with the provisions of this GUC Trust Agreement and the Settlement which the GUC Trustee deems reasonably necessary or desirable in connection with the administration and consummation of the GUC Trust and Settlement; and

O.   exercise such other powers as may be vested in the GUC Trustee, consistent with the intent and purpose of the GUC Trust Agreement and Settlement, by order of the Bankruptcy Court.

3.2    Transfer of Privileges.  On the Effective Date, the Debtors shall be deemed to transfer to the GUC Trustee the Debtors' evidentiary privileges, including the attorney/client privilege, that relate solely to the Distributable Assets transferred to the GUC Trust.  From and after such transfer, the Debtors and their Estates shall have no further rights or obligations with respect thereto.  Such privileged communications may be shared among the GUC Trustee, attorneys, financial advisors, accountants or other professionals and employees as the GUC Trustee and the GUC Trust Oversight Committee without compromising the privileged nature of such communications, in accordance with the "joint interest" doctrine.

3.3    Agents and Professionals.  The GUC Trustee may, but shall not be required to, consult with and retain Lowenstein Sandler LLP, Zolfo Cooper LLC and such other attorneys, disbursing agent, financial advisors, accountants or other professionals and employees as the GUC Trustee deems appropriate in the reasonable exercise of its discretion, and who the GUC Trustee reasonably determines to have qualifications necessary to assist the GUC Trustee in the proper administration of the GUC Trust after consultation with the GUC Trust Oversight Committee.  Subject to Section 7.9 of this GUC Trust Agreement, the GUC Trustee may pay the reasonable fees, costs and expenses of such persons out of the Assets (excluding the GUC Cash Payment) in the ordinary course of business and, except as set forth below, without any further notice to any party or action, order or approval of the Bankruptcy Court.  The GUC Trustee may retain professionals who previously were employed by the Creditors' Committee or the Debtors.  Professionals retained by the GUC Trustee shall receive compensation and reimbursement of expenses in a manner to be determined by the GUC Trustee, after consultation with the GUC Trust Oversight Committee, and in accordance with the payment procedures set forth in Section 7.9 of this GUC Trust Agreement.

3.4     Safekeeping of Distributable Assets.     All Distributable Assets shall, until distributed as provided herein, be held in trust for the benefit of the Beneficiaries in accordance with the Settlement and this GUC Trust Agreement.  The GUC Trustee shall be under no liability for interest or producing income on any Distributable Assets received by it hereunder and held for Distribution to the Beneficiaries, except as such interest or income shall actually be received by the GUC Trustee.

3.5     Fiduciary Duties of the GUC Trustee.  The GUC Trustee shall act in a fiduciary capacity on behalf of the interests of all Beneficiaries who are entitled to receive Distributions pursuant to the terms of the Settlement and this GUC Trust Agreement.

3.6     Limitations on GUC Trustee.  The GUC Trustee shall not at any time, on behalf of the GUC Trust or Beneficiaries, enter into or engage in any trade or business, and no part of the Assets, revenue, or income therefrom shall be used or disposed of by the GUC Trust in furtherance of any trade or business.  The GUC Trustee shall not pursue, commence or settle any cause of action, including but not limited to the D&O Claims not otherwise released pursuant to the Settlement without the prior consent of the GUC Trust Oversight Committee.

3.7     Other Activities.  Any individual serving as the GUC Trustee, other than in his or her individual capacity as such, shall be entitled to perform services for and be employed by third parties, *provided, however*, that such performance or employment affords such individual sufficient time to carry out his or her responsibilities as the GUC Trustee.  In addition, the GUC Trustee shall not be prohibited from engaging in any trade or business on its own account, provided that such activity does not interfere or conflict with the GUC Trustee's administration of the GUC Trust.

3.8     Investments.  The GUC Trustee may only invest funds held in the GUC Trust in Permitted Investments and, provided that the GUC Trustee does so, it shall have no liability in the event of insolvency of any institution in which the GUC Trustee has invested any of the Assets or any proceeds, revenue, or income therefrom.  The GUC Trustee may expend the cash of the GUC Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets during liquidation, (b) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the GUC Trust) and (c) to satisfy other liabilities incurred by the GUC Trust in accordance with the Settlement and this GUC Trust Agreement (including, without limitation, the payment of any taxes), provided, however, the GUC Cash Payment shall be used exclusively to make Distributions to Beneficiaries.

3.9     GUC Trustee Action.  The GUC Trustee shall hold, collect, conserve, protect and administer the GUC Trust in accordance with the provisions of this GUC Trust Agreement and the Settlement, and pay and distribute amounts as set forth herein for the purposes set forth in this GUC Trust Agreement.  The GUC Trustee shall exercise its business judgment for the benefit of the Beneficiaries in order to maximize the value of the Assets and Distributions, giving due regard to the cost, risk, and delay of any course of action.  Any good faith determination by the GUC Trustee as to what actions are in the best interests of the GUC Trust shall be determinative.

3.10    Bankruptcy Court Approval of GUC Trustee Actions.  Except as provided in this GUC Trust Agreement, the GUC Trustee need not seek or obtain an order or approval of the Bankruptcy Court or any other court in the exercise of any power, rights, or discretion conferred hereunder, or account to the Bankruptcy Court or any other court.  Notwithstanding the foregoing in this Section 3.10, the GUC Trustee may submit to the Bankruptcy Court any matter

regarding which the GUC Trustee may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the GUC Trustee with respect to the Assets, the GUC Trust, the GUC Trust Agreement, the Settlement, or the Debtors, including the administration and Distribution of the Assets.  The Bankruptcy Court shall retain jurisdiction for such purposes and shall approve or disapprove any such proposed action upon a motion filed by the GUC Trustee.  In addition, the GUC Trustee shall have the authority, but not the obligation, to seek Bankruptcy Court approval to sell any Asset free and clear of any and all Encumbrances (to the extent any Asset is not already free and clear of any all such Encumbrances).

3.11   GUC Trust Oversight Committee.   Members of the GUC Trust Oversight Committee shall serve without compensation, provided, however, members of the GUC Trust Oversight Committee shall be entitled to reimbursement from the GUC Trust for their reasonable and necessary out of pocket expenses incurred in connection with their service as members of the GUC Trust Oversight Committee.

3.12   GUC Trust Oversight Committee.   The GUC Trust Oversight Committee shall be established on the Effective Date and will remain and continue in full force and effect until the GUC Trust is dissolved in accordance with the terms of this GUC Trust Agreement.  The GUC Trust Oversight Committee shall have the rights and obligations set forth in this GUC Trust Agreement.  In all circumstances, the GUC Trust Oversight Committee shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the GUC Trust. Notwithstanding anything contained in this GUC Trust Agreement, the GUC Trust Oversight Committee shall not take any action which will cause the GUC Trust to fail to qualify as a "liquidating trust" for U.S. federal income tax purposes.

3.13   <u>GUC Trust Oversight Committee Tenure and Replacement.</u>  Each member of the GUC Trust Oversight Committee will serve until death, incapacitation or resignation.  A member of the GUC Trust Oversight Committee may resign at any time by providing a written notice of resignation to the GUC Trustee and remaining members of the GUC Trust Oversight Committee.  Upon the resignation, death or incapacity of a GUC Trust Oversight Committee member, a successor member may, but shall not be required to, be appointed by a majority of the remaining members of the GUC Trust Oversight Committee.

3.14   <u>GUC Trust Oversight Committee Action.</u>  Except as may otherwise be provided herein, a majority of the members of the GUC Trust Oversight Committee shall constitute a quorum for any action by the GUC Trust Oversight Committee, and the act of a majority of those present at any meeting at which a quorum is present, shall be the act of the GUC Trust Oversight Committee.  In the event of a tie vote, the GUC Trustee shall be deemed a voting member for the sole purpose of breaking any such tie vote of the GUC Trust Oversight Committee.  Any or all members of the GUC Trust Oversight Committee may participate in a regular or special meeting by use of telephone, or similar communications equipment by means of which all persons participating in the meeting may hear each other.  The GUC Trust Oversight Committee may adopt, by majority vote of all members, by-laws or other rules of procedure that are not inconsistent with the terms of this GUC Trust Agreement.  Notwithstanding anything contained in this section 3.14, a GUC Trust Oversight Committee member shall be recused from the GUC Trust Oversights Committee's deliberations and votes on any matters as to which such member has a conflicting interest as determined by both the GUC Trustee and the other members of the GUC Trust Oversight Committee.

3.15    GUC Trust Oversight Committee Action Without a Meeting.  Any action required or permitted to be taken by the GUC Trust Oversight Committee may be taken without a meeting if the action is taken by unanimous written consent, as evidenced by one or more written consents describing the action taken, signed by the members of the GUC Trust Oversight Committee or by such other procedures as may be agreed upon by a majority of the GUC Trust Oversight Committee, including negative notice procedures.

3.16    Periodic Consultation with GUC Trust Oversight Committee.  In addition to any other consultation and reporting requirements set forth in this GUC Trust Agreement, the GUC Trustee shall report and consult with the GUC Trust Oversight Committee at its discretion or as reasonably requested by the GUC Trust Oversight Committee or any member thereof concerning the status and administration of the GUC Trust and the Assets.

3.17    Insurance.  The GUC Trustee may use Assets (other than the GUC Cash Payment) in the GUC Trustee's reasonable business judgment to maintain customary insurance coverage, if available, for the protection of the Assets.  The GUC Trustee shall obtain insurance coverage with respect to the liabilities and obligations of the GUC Trustee and the GUC Trust Oversight Committee (in the form of an errors and omissions policy or otherwise) unless both the GUC Trustee and Liquidating GUC Trust Oversight Committee unanimously agree that such insurance shall not be required.

3.18    Confidentiality.  Any GUC Trustee and members of the GUC Trust Oversight Committee shall, during the period that they serve in such capacity under this GUC Trust Agreement, after removal, incapacitation or resignation, and after dissolution of the GUC Trust, hold strictly confidential and not use for personal gain any material, non-public information of or

pertaining to any Entity to which any of the Assets relates or which it has become aware of in its capacity as GUC Trustee or GUC Trust Oversight Committee member.

## ARTICLE IV

## DISTRIBUTIONS FROM THE GUC TRUST

4.1    Distributions.  Except as provided herein, Distributions of Available GUC Trust Cash shall be made to Beneficiaries on a *pro rata* basis, no less frequently than once annually, such period to be measured from the Effective Date *provided, however*, that the GUC Trustee may, after consultation with the GUC Trust Oversight Committee (i) defer a Distribution to the next Distribution Date if the GUC Trustee determines, in the reasonable exercise of the GUC Trustee's discretion, that the amount available for Distribution at such time is insufficient to justify the cost of effecting the Distribution (ii) make more frequent Distributions if the GUC Trustee determines that such interim distributions are warranted and economical; *provided, however*, that the GUC Trustee may, in the reasonable exercise of the GUC Trustee's discretion, cause the GUC Trust to retain an amount of Available GUC Trust Cash reasonably necessary to maintain the value of the Assets or to meet GUC Trust liabilities, including maintenance of the Disputed Claims Reserve, and withhold such cash from Distributions to Beneficiaries.  The GUC Trustee shall not make any Distributions of Assets to the Beneficiaries unless the GUC Trustee retains and reserves in the Disputed Claims Reserve such amounts as are reasonably necessary to satisfy amounts that would have been distributed in accordance with this Article IV in respect of Disputed Claims if the Disputed Claims were determined to be Allowed Claims immediately prior to such proposed Distribution to the Beneficiaries. The GUC Trustee shall not make any Distributions to Beneficiaries unless and until the GUC Trust Seed Funding Amount is repaid to the Debtors in accordance with Section 2.8 hereof, *provided, however*, the GUC Trustee may

-19-

distribute the GUC Cash Payment to the Beneficiaries prior to the repayment of the GUC Trust
Seed Funding Amount.

      4.2    <u>Location of Distributions</u>.  Distributions to the Beneficiaries shall be made (a) at
the addresses set forth on the claims register maintained in the Chapter 11 Cases or (b) at the
addresses set forth in any written notices of address changes delivered to the GUC Trustee after
the Effective Date.  The GUC Trustee shall have no obligation to make any effort to determine
the correct address of any Beneficiary.

      4.3    <u>No Interest on Claims</u>.  Interest shall not accrue on any claims held by the
Beneficiaries.

      4.4    <u>Fractional Dollars; De Minimis Distributions</u>.  The GUC Trustee shall (a) not be
required to make Distributions or payments of fractions of dollars, and whenever any
Distribution of a fraction of a dollar would otherwise be required, the actual Distribution made
shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with fractions
equal to or greater than half a dollar being rounded up, and fractions less than half a dollar
rounded down; and (b) have no duty to make a Distribution on account of any Allowed Claim on
a Distribution Date (i) if the aggregate amount of all Distributions authorized to be made on such
date is less than $1,000,000.00, in which case such Distributions shall be deferred to the next
Distribution Date or (ii) if the amount to be distributed to a Beneficiary on a particular
Distribution Date is less than $50.00, in which case such Distribution shall be deferred to the
next Distribution Date (unless such Distribution is the final Distribution to a Beneficiary, in
which case such Distribution shall revert to the GUC Trust to be reallocated and distributed to
the remaining Beneficiaries).  After final Distributions have been made in accordance with the
terms of this GUC Trust Agreement, if the amount held by the GUC Trust becomes, in the sole

discretion of the GUC Trustee, after consultation with the GUC Trust Advisory Committee, too small to cost-effectively make further distributions, the GUC Trustee may make a charitable donation of the funds to a charitable institution to be selected by the GUC Trustee.

4.5    Compliance with Tax Requirements.  The GUC Trustee shall be authorized to require each Beneficiary to provide it with a current executed Form W-9, W-8, or similar tax form as a condition precedent to being sent a Distribution.  The GUC Trustee shall provide advance written notice of any such requirement to each Beneficiary affected thereby.  The notice shall provide each Beneficiary with a minimum of 60 days after the date of mailing of such notice to provide a current executed Form W-9, W-8, or similar tax form to the GUC Trustee and shall expressly state that a failure to provide such form within the stated period shall result in a forfeiture of the right to receive any Distribution, that any such Distribution shall revert to the GUC Trust for distribution on account of other Allowed Claims and that the claim of the Beneficiary originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.  If a Beneficiary does not provide the GUC Trustee with a current executed Form W-9, W-8 or similar tax form within the time period specified in such notice, or such later time period agreed to by the GUC Trustee in writing in its discretion, such Beneficiary shall be deemed to have forfeited the right to receive any Distribution, any such Distribution shall revert to the GUC Trust for distribution to other Beneficiaries and the claim originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

4.6    Distributions After Allowance or Disallowance of a Disputed Claim.  At the GUC Trustee's reasonable discretion, within 30 days of a Disputed Claim becoming an Allowed Claim, or on the next Distribution Date after the Disputed Claim becomes an Allowed Claim, the

GUC Trustee shall distribute to the Beneficiary thereof, from the Disputed Claims Reserve, such amount of Available GUC Trust Cash as would have been distributed to such Beneficiary if its claim had been an Allowed Claim on the Effective Date.

      4.7    <u>Undeliverable Distributions and Unclaimed Property</u>.  If the Distribution to any Beneficiary is returned as undeliverable, no additional Distributions shall be made to such Beneficiary unless and until the GUC Trustee is notified in writing of such Beneficiaries' then-current address, at which time such Distribution shall be made without interest, *provided, however*, that unless a Beneficiary asserts a claim for an undeliverable Distribution within 120 days after such Distribution is returned undelivered such Distribution shall be deemed unclaimed property and all title to and beneficial interest in the Assets represented by any such undeliverable Distributions shall be cancelled and revert to and/or remain in the GUC Trust automatically and without need for further order by the Bankruptcy Court (notwithstanding any applicable federal, state or other escheat, abandoned or unclaimed property laws to the contrary), and such undeliverable Distributions shall be distributed to other Beneficiaries on account of their Allowed Claims.  Nothing contained in this GUC Trust Agreement shall require the GUC Trustee to attempt to locate any Beneficiary.  In the event any check sent to a Beneficiary respecting a Distribution has not been cashed within six (6) months after the Distribution Date, the GUC Trustee may cancel such check and such Distribution shall be deemed unclaimed property and all title to and beneficial interest in the Assets represented by any such undeliverable Distributions shall be cancelled and revert to and/or remain in the GUC Trust automatically and without need for further order by the Bankruptcy Court (notwithstanding any applicable federal, state or other escheat, abandoned or unclaimed property laws to the contrary).

4.8     Payments Limited to Distributable Assets.  Until such time as the GUC Trust Seed Funding Amount is repaid all Distributions to be made by the GUC Trustee to or for the benefit of any Beneficiary shall be made only from the Distributable Assets.

## ARTICLE V

## BENEFICIARIES

5.1     Incidents of Ownership.  The Beneficiaries shall be the sole beneficiaries of the GUC Trust and the Distributable Assets, and the GUC Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this GUC Trust Agreement and Settlement.

5.2     Interest Beneficial Only.  The ownership of a beneficial interest in the GUC Trust shall not entitle any Beneficiary or the Settlor to any title in or to the Assets or to any right to call for a partition or division of such Assets or to require an accounting, except as may specifically be provided herein or in any order of the Bankruptcy Court.

5.3     Evidence of Beneficial Interest.  Ownership of a beneficial interest in the Assets shall not be evidenced by any certificate, security, or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the GUC Trust by the GUC Trustee.  In maintaining the GUC Trustee's register of beneficial interest, the GUC Trustee may rely upon the Debtors' schedules and the official claims register maintained in the Chapter 11 Cases.

5.4     Limits on Transfers and Notice of Transfer of Beneficial Interest.  The interests of Beneficiaries are not negotiable and not transferable except (a) pursuant to applicable laws of descent and distribution or (b) by operation of law.  The GUC Trustee shall not be required to record any transfer which, in the GUC Trustee's sole discretion may be construed to create any uncertainty or ambiguity as to the identity of the holder of the interest in the GUC Trust.  Until

appropriate notification and proof thereof, in a form satisfactory to the GUC Trustee in the exercise of its reasonable discretion, is submitted to the GUC Trustee by registered or certified United States mail, return receipt requested, the GUC Trustee may continue to pay all amounts to or for the benefit of the original Beneficiary.  The GUC Trustee may rely without any further investigation upon any notification and proof of a transfer of a beneficial interest in the GUC Trust submitted in accordance with this Section 5.4 that the GUC Trustee reasonably believes to be genuine.

## ARTICLE VI

### THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

6.1    Reliance.  The GUC Trustee may absolutely and unconditionally rely, and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document that the GUC Trustee reasonably believes in good faith to be genuine.

6.2    Parties Dealing With the GUC Trustee.  In the absence of actual knowledge to the contrary, any Entity dealing with the GUC Trust or the GUC Trustee shall be entitled to rely on the authority of the GUC Trustee or any of the GUC Trustee's agents to act in connection with the Assets and this GUC Trust Agreement.  There shall be no obligation on any Entity dealing with the GUC Trustee to inquire into the validity, expediency or propriety of any transaction by the GUC Trustee or any agent of the GUC Trustee.

6.3    Limited Recourse.  Except as otherwise provided in this GUC Trust Agreement, Entities (including any professionals retained by the GUC Trustee in accordance with this GUC Trust Agreement) engaged in transactions with the GUC Trust or the GUC Trustee shall look only to the Assets (exclusive of the GUC Cash Payment) to satisfy any liability incurred in connection with carrying out the terms of this GUC Trust Agreement.

6.4    <u>Limitation of Liability</u>.  Except as expressly set forth in this GUC Trust Agreement, on and after the Effective Date, the GUC Trust shall have no liability on account of any claims.  Neither the GUC Trustee, the GUC Trust Oversight Committee, their respective members, designees or professionals, or any of their duly designated agents or representatives (collectively, the "<u>Covered Persons</u>"), shall be held personally liable for any claim asserted against them or the GUC Trust in connection with their duties and responsibilities relating to the Assets and GUC Trust.  Without limiting the generality of the foregoing, none of the Covered Persons shall be liable for any action taken or omitted to be taken in furtherance of their responsibilities hereunder, except to the extent that their conduct is determined by Final Order to be due to their own willful misconduct, gross negligence, self-dealing, or fraud.  The GUC Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  All Entities dealing with the GUC Trustee, GUC Trust or GUC Trust Oversight Committee shall only look to the Assets (other than the GUC Cash Payment), or any insurance that may cover such claim, to satisfy any liability incurred by the GUC Trustee or GUC Trust Oversight Committee.  Nothing contained in this GUC Trust Agreement or the Settlement shall be deemed to be an assumption by the GUC Trust or GUC Trustee of any of the liabilities, obligations or duties of the Debtors or the Beneficiaries.  The transfer of the Assets by the Debtors to the GUC Trust is made pursuant to a prior order of the Bankruptcy Court and the Debtors shall have no liability with respect to such transfer.

6.5    <u>Non-Liability for Acts of Others</u>.  The GUC Trustee and the GUC Trust Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with

advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the GUC Trustee nor the GUC Trust Oversight Committee shall be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the GUC Trustee or GUC Trust Oversight Committee or their respective members and/or designees. Any successor GUC Trustee may accept and rely upon any accounting made by or on behalf of any predecessor GUC Trustee hereunder, and any statement or representation made by a predecessor GUC Trustee or its agents as to the Assets or as to any other fact bearing upon the prior administration of the GUC Trust, so long as it has a good faith basis to do so. A successor GUC Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement, or representation if it is later proved to be incomplete, inaccurate, or untrue. A successor GUC Trustee shall not be liable for any act or omission of any predecessor GUC Trustee, nor have a duty to enforce any claims against any predecessor GUC Trustee on account of any such act or omission.

6.6     Indemnification. The GUC Trust shall indemnify and hold harmless, to the fullest extent permitted by law, the GUC Trustee, the GUC Trust Oversight Committee and their employees, members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such; each, an "Indemnified Party" and collectively, the "Indemnified Parties"), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such Indemnified Parties may incur or to which such Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such Indemnified Party arising out of or due to their acts or omissions, or

consequences of such acts or omissions, with respect to the implementation or administration of the GUC Trust or the Settlement or the discharge of their duties under this GUC Trust Agreement; *provided, however*, that no such indemnification will be made to such persons for actions or omissions that are determined by a Final Order to be a result of such persons' willful misconduct, gross negligence, self-dealing or fraud. Entities dealing with the GUC Trustee and GUC Trust Oversight Committee may only look to the Assets (other than the GUC Cash Payment) and any applicable insurance coverage to satisfy any liability incurred by the GUC Trustee or the GUC Trust Oversight Committee to such Entity in carrying out the terms of this GUC Trust Agreement, and neither the GUC Trustee nor the GUC Trust Oversight Committee shall have any personal obligation to satisfy any such liability. Notwithstanding any provision in this GUC Trust Agreement to the contrary, an Indemnified Party shall be entitled to request advances from the GUC Trust to cover reasonable fees and necessary expenses incurred in connection with defending itself in any action brought against it as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such; *provided, however*, that the GUC Trustee shall not be required to make any such advances; *provided further, however*, that any Indemnified Parties receiving such advances shall repay the amounts so advanced to the GUC Trust upon the entry of a Final Order of a court of competent jurisdiction finding that such Indemnified Parties were not entitled to such indemnity under the provisions of this Section 6.6. This indemnification shall survive the death, dissolution, resignation, or removal, as may be applicable, of the Indemnified Parties, or the termination of the GUC Trust, and shall inure to the benefit of the Indemnified Parties' heirs and assigns.

## ARTICLE VII

## SELECTION, REMOVAL AND COMPENSATION OF THE GUC TRUSTEE

7.1     Initial GUC Trustee.  Pursuant to the Settlement, the initial GUC Trustee was selected by the Creditors' Committee.

7.2     Term of Service.  The GUC Trustee shall serve until (a) the completion of all the GUC Trustee's duties, responsibilities and obligations under this GUC Trust Agreement (b) termination of the GUC Trust in accordance with this GUC Trust Agreement, or (c) the GUC Trustee's death or dissolution, incapacitation, resignation, or removal.

7.3     Removal of a GUC Trustee.  Any Entity serving as GUC Trustee may be removed at any time and for any reason by action of the GUC Trust Oversight Committee or upon the determination of the Bankruptcy Court on a motion for cause shown.  Any GUC Trustee so removed is entitled to payment of fees and expenses accrued prior to removal subject to the terms of this GUC Trust Agreement.  Any dispute regarding the compensation to be paid shall be determined by the Bankruptcy Court.

7.4     Resignation of GUC Trustee.  The GUC Trustee may resign at any time by giving the GUC Trust Oversight Committee at least 30 days' written notice of the GUC Trustee's intention to do so or such shorter time as agreed to by the GUC Trust Oversight Board.  Any resigning GUC Trustee is entitled to payment of fees and expenses accrued prior to resignation subject to the terms of this GUC Trust Agreement.  Any dispute regarding the compensation to be paid shall be determined by the Bankruptcy Court.

7.5     Accounting in the Event of Removal or Resignation.  In the event of removal or resignation, the removed or resigning GUC Trustee shall render to the GUC Trust Oversight Committee a full and complete accounting of monies and Assets received, disbursed, and held during the term of office of that GUC Trustee and such other information reasonably requested

-28-

by the GUC Trust Advisory Committee. Unless an earlier date is agreed to by the removed or resigning GUC Trustee, the removal or resignation shall be effective on the later of (a) the date specified in the notice; (b) the date that is 30 days after the date the notice is delivered; or (c) the date the accounting described in the preceding sentence is delivered.

7.6    Appointment of Successor GUC Trustee. Upon the resignation, death, incapacity, or removal of a GUC Trustee, the GUC Trust Oversight Committee shall appoint a successor GUC Trustee to fill the vacancy so created. Any successor GUC Trustee so appointed shall consent to and accept in writing the terms of this GUC Trust Agreement and agree that the provisions of this GUC Trust Agreement shall be binding upon and inure to the benefit of the successor GUC Trustee and all of the successor GUC Trustee's heirs and legal and personal representatives, successors or assigns. Notwithstanding anything in this GUC Trust Agreement, in the event that a successor GUC Trustee is not appointed within 60 days of the occurrence or effectiveness, as applicable, of the prior GUC Trustee's resignation, death, incapacity, or removal, the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the GUC Trust, shall approve a successor to serve as the GUC Trustee.

7.7    Powers and Duties of Successor GUC Trustee. A successor GUC Trustee shall have all the rights, privileges, powers, and duties of the predecessor GUC Trustee under this GUC Trust Agreement, the Settlement, or as provided in a further order of the Bankruptcy Court.

7.8    GUC Trust Continuance. The death, incapacity, resignation or removal of the GUC Trustee shall not terminate the GUC Trust or revoke any existing agency created pursuant to this GUC Trust Agreement or invalidate any action theretofore taken by the GUC Trustee.

7.9    Compensation and Costs of Administration. The GUC Trustee shall be compensated hourly with actual expenses reimbursed, or on such other reasonable terms as

determined initially by the Creditors' Committee and then by GUC Trust Oversight Committee, as appropriate; *provided, however*, that the GUC Trustee shall be compensated and reimbursed, as applicable, for services provided and expenses incurred in connection with the formation and implantation of the GUC Trust prior to the Effective Date, on such terms as previously agreed to by the GUC Trust Advisory Committee and the GUC Trustee.  Subsequent to the establishment of the initial compensation terms, the GUC Trustee, with the prior written approval of the GUC Trust Oversight Committee, may agree to modify the compensation structure.  The GUC Trustee may retain and compensate professionals as provided for in Section 3.3 of this GUC Trust Agreement.  The reasonable fees and actual and necessary expenses of such professionals, the GUC Trustee and any disbursing agent shall be paid by the GUC Trustee upon each monthly submission of a fee statement to the GUC Trustee and/or the GUC Trust Oversight Committee, as applicable, in accordance with the following procedures.  The GUC Trustee shall deliver his or her invoices or fee statements to the GUC Trust Oversight Committee before payment from the GUC Trust Assets therefor shall be allowed.  Any professionals retained by the GUC Trustee pursuant to this GUC Trust Agreement shall deliver their invoices or fee statements to the GUC Trustee and the GUC Trust Oversight Committee before payment from the GUC Trust Assets therefor shall be allowed.  Any Entity selected as disbursing agent by the GUC Trustee pursuant to this GUC Trust Agreement and the Settlement shall deliver their invoices or fee statements to the GUC Trustee and the GUC Trust Oversight Committee before payment from the GUC Trust Assets therefor shall be allowed.  The GUC Trustee and GUC Trust Oversight Committee, as applicable, shall have 15 days from the delivery of any invoice or fee statement to provide notice of an objection to the fee statement to the professional or Entity seeking compensation or reimbursement of expenses (including the GUC Trustee).  For an objection to be valid, it shall be

in writing and set forth in detail the specific fees objected to and the basis for the objection. The

uncontested portion of each invoice shall be paid within 25 days after its original delivery to the

GUC Trustee. Any objection that remains unresolved 15 days after it is made shall be submitted

to the Bankruptcy Court for resolution.

## ARTICLE VIII

## REPORTING AND TAX MATTERS

8.1     <u>Reporting and Filing Requirements</u>.  Within 60 days after December 31 of each

calendar year in which the GUC Trust shall remain in existence, the GUC Trustee shall file a

report with the Bankruptcy Court of all Assets received by the GUC Trust, all Available GUC

Trust Cash disbursed to Beneficiaries, all Assets held by the GUC Trust and all fees, income, and

expenses related to the GUC Trust during the preceding calendar year and such other information

as the GUC Trustee deems appropriate. The GUC Trustee's report shall be provided to the GUC

Trust Oversight Committee upon filing with the Bankruptcy Court and shall be available to any

Beneficiary upon written request.

8.2     <u>Filing of Tax Returns</u>.  The GUC Trustee shall file tax returns for the GUC Trust

as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other applicable

laws or regulations; *provided*, *however*, that the GUC Trustee may, in the GUC Trustee's

reasonable discretion, determine the best way to report for tax purposes with respect to the

Disputed Claims Reserve, including (i) filing a tax election to treat any and all reserves for

Disputed General Unsecured Claims as a disputed ownership fund ("<u>DOF</u>") within the meaning

of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather

than to tax such reserve as a part of the GUC Trust or (ii) electing to report as a separate trust or

sub-trust or other entity. If an election is made to report the Disputed Claims Reserve as a DOF,

the GUC Trust shall comply with all federal and state tax reporting and tax compliance

requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.

8.3     Preparation of Statements.   To the extent reasonably practicable and unless otherwise ordered by the Bankruptcy Court, the GUC Trustee shall, in conjunction with filing the GUC Trust's annual tax return, send to each Beneficiary a statement setting forth the Beneficiary's share of items of income, gain, loss, deduction, or credit and will instruct all such Beneficiaries to report such items on their federal income tax returns.  A final such statement shall also be sent to each Beneficiary within 75 days after the dissolution of the GUC Trust.  The GUC Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to provisions of the Settlement and any confirmation order entered by the Bankruptcy Court relating to Disputed Claims) to the Beneficiaries in accordance with their relative beneficial interests in the GUC Trust, as determined pursuant to this GUC Trust Agreement and the Settlement.

8.4     Valuation of Assets.  As soon as practicable after the Effective Date, the GUC Trustee, to the extent that it deems it necessary or appropriate in the reasonable exercise of its discretion, shall, in good faith, value the Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including the Debtors, the GUC Trustee and the Beneficiaries) for all federal income tax purposes.  The GUC Trustee shall be under no obligation to hire an expert to make such a valuation.

## ARTICLE IX

## MAINTENANCE OF RECORDS

9.1     Books and Records. The GUC Trustee shall maintain books and records containing a description of all property from time to time constituting the Assets and an accounting of all receipts and disbursements.  Said books and records shall be open to inspection

by any Beneficiary at any reasonable time during normal business hours and after reasonable advance notice.  The GUC Trustee shall furnish to any Beneficiary upon written request an annual statement of receipts and disbursements, including a summary of all income and expenses of the GUC Trust.

## ARTICLE X

### DURATION OF TRUST

10.1   <u>Duration</u>.  The GUC Trust shall become effective upon the Effective Date of the Settlement, and the GUC Trust and its provisions herein shall remain and continue in full force and effect until the GUC Trust is terminated.

10.2   <u>Termination</u>.  The GUC Trust shall terminate upon the occurrence of the earlier of (a) the final liquidation, administration, and Distribution of the Distributable Assets in accordance with this GUC Trust Agreement and the Settlement and the full performance of all other duties and functions of the GUC Trustee set forth in this GUC Trust Agreement and any further order of the Bankruptcy Court, (b) the fifth anniversary of the Effective Date. Notwithstanding the foregoing, the duration of the GUC Trust may be extended for multiple fixed terms upon motion of the GUC Trustee if approved by the Bankruptcy Court for cause shown prior to the termination of the GUC Trust.  Any such motion shall be filed no earlier than six months prior to the expiration of the term of the GUC Trust and each extended term.  The aggregate of all such extensions shall not exceed three years, unless the GUC Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the GUC Trust as a liquidating trust within the meaning of section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (i) the final Distributions pursuant to the Settlement, (ii) the filing by or on behalf of the GUC Trust of a certification of dissolution with the Bankruptcy Court and (iii) any other action deemed appropriate by the GUC Trustee, the

GUC Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

10.3    Continuance of GUC Trust for Winding Up.    After the termination of the GUC Trust and for the purpose of liquidating and winding up the affairs of the GUC Trust, the GUC Trustee shall continue to act as such until the GUC Trustee's duties have been fully performed, including, without limitation, such tasks as necessary to wind-up the affairs of the GUC Trust. After the termination of the GUC Trust, the GUC Trustee shall retain for a period of six months the books, records, Beneficiary lists, and certificates and other documents and files which shall have been delivered to or created by the GUC Trustee.    At the GUC Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after such six month period.    Except as otherwise specifically provided herein, upon the discharge of all liabilities of the GUC Trust and final Distributions pursuant to this GUC Trust Agreement, the GUC Trustee shall have no further duties or obligations hereunder.    For the avoidance of doubt, the limitations on liability contained in this GUC Trust Agreement shall apply to any actions taken by the GUC Trustee during the course of winding up the affairs of the GUC Trust.

## ARTICLE XI

## MISCELLANEOUS

11.1    Jurisdiction.    The Bankruptcy Court shall have exclusive jurisdiction over (a) the GUC Trust and the GUC Trustee with respect to the administration of and activities relating to the GUC Trust, and (b) any issues or disputes arising out of this GUC Trust Agreement; *provided*, *however*, that notwithstanding the foregoing, the GUC Trustee shall have the power and authority to bring any action in any court of competent jurisdiction to prosecute any cause of

action that constitutes an Asset, including but not limited to the D&O Clams not otherwise released pursuant to the Settlement.

  11.2 <u>Notices</u>. All notices to be given to Beneficiaries may be given by ordinary mail, or may be delivered personally, to the holders at the addresses appearing on the books kept by the GUC Trustee.  Any notice or other communication which may be or is required to be given, served, or sent to the GUC Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by email, telex, or facsimile (if receipt is confirmed) addressed as follows:

> If to the GUC Trust/GUC Trustee:
>
> EisnerAmper LLP
> Attn: Anthony R. Calascibetta
> 111 Wood Avenue South
> Iselin, NJ  08830-2700
> Telephone: 732.243.7389
> Fax: 732.951.7589
> E-mail: anthony.calascibetta@eisneramper.com
>
> With a copy to:
>
> LOWENSTEIN SANDLER LLP
> Attn: Sharon L. Levine & Wojciech F. Jung
> 65 Livingston Avenue
> Roseland, NJ 07068
> Telephone: 973.597.2500
> Fax: 973.597.2465 and 973.597.2375
> E-mail: slevine@lowenstein.com and wjung@lowenstein.com

or to such other address as may from time to time be provided in a written notice by the GUC Trustee.

  11.3 <u>Bond</u>. The GUC Trustee may serve with a bond, the terms of which shall be agreed to by the GUC Trust Oversight Committee, and the cost and expense of which shall be borne by the GUC Trust and paid for from the Assets (other than form the GUC Cash Payment).

11.4    Governing Law.  This GUC Trust Agreement shall be governed by and construed in accordance with the laws of the State of [New York], without giving effect to conflicts of law principles.

11.5    Successors and Assigns.  This GUC Trust Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

11.6    No Execution.  All funds in the GUC Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Entity can bind, pledge, encumber, execute upon, garnish, or attach the Assets in any manner or compel payment from the GUC Trust except by Final Order of the Bankruptcy Court.

11.7    Amendment.  The GUC Trustee, with the prior written approval of a majority of the existing members of the GUC Trust Oversight Committee and, until the effective date of a plan of reorganization/liquidation that may be confirmed in the Debtors' chapter 11 cases, the Debtors, may amend, supplement, or waive any provision of this GUC Trust Agreement, without notice to or the consent of any Beneficiary or the approval of the Bankruptcy Court, in order to: (i) cure any ambiguity, omission, defect, or inconsistency in this GUC Agreement; *provided*, *however*, that such amendments, supplements or waivers shall not be inconsistent with the terms of the Settlement Agreement or adversely affect the Distributions to any of the Beneficiaries or adversely affect the federal income tax status of the GUC Trust as a "liquidating trust"; (ii) comply with any requirements in connection with the  federal income tax status of the GUC Trust as a "liquidating trust"; and (iii) comply with any requirements in connection with maintaining that the GUC Trust is not subject to registration or reporting requirements of the Securities Act, the Trust Indenture Act, or the Investment Company Act.  Any substantive

provision of this GUC Trust Agreement may be amended or waived by the GUC Trustee, after consultation with the GUC Trust Oversight Committee and with the approval of the Bankruptcy Court (upon notice and an opportunity for a hearing); *provided, however*, that no change may be made to this Agreement that would (a) adversely affect the (i) Distributions to any of the Beneficiaries, or (ii) the federal income tax status of the Trust as a "liquidating trust" or (b) modify the stated purpose of the GUC Trust as described in this GUC Trust Agreement). Notwithstanding this Section 11.7, any amendments or modifications to this GUC Trust Agreement shall not be inconsistent with the purpose and intention of the GUC Trust to liquidate in an expeditious but orderly manner the Assets in accordance with Treasury Regulation Section 301.7701- 4(d).

11.8    Severability.    If any term, provision, covenant or restriction contained in this GUC Trust Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this GUC Trust Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

11.9    Counterparts.    This GUC Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and such counterparts shall together constitute but one and the same instrument. A facsimile or electronic mail signature of any party shall be considered to have the same binding effect as an original signature.

IN WITNESS WHEREOF, the parties have executed this GUC Trust Agreement (or are deemed to have so executed this GUC Trust Agreement) as of the day and year written above.

EisnerAmper LLP
GUC Trustee

The Standard Register Company, on behalf of itself and affiliated Debtors

By: _____

By: _____

Name: Anthony R. Calascibetta
Title: Its Representative

Name:  Gerard D. Sowar
Title:  Executive Vice President, General
        Counsel, and Secretary

# Exhibit 7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | **RE: Docket No. 1316** |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES (WITH TECHNICAL MODIFICATIONS)

Upon consideration of the *Debtors' Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates (with Technical Modifications)*, dated as of November 18, 2015 [Docket No. 1316], a conformed copy of which is attached hereto as Exhibit A (and together with all exhibits thereto and as amended, modified, or supplemented from time to time, the "Plan")[2] filed by SRC Liquidation Company (f/k/a The Standard Register Company) and its affiliated debtors and debtors in possession (each a "Debtor" and collectively the "Debtors"); and the Debtors having filed the *Disclosure Statement for First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* [Docket No. 1087] (including all exhibits thereto and as amended, modified, or supplemented from time to time, the "Disclosure Statement"); and the Court having entered the Solicitation Order [Docket

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement.

01:17987427.1

No. 1073] on September 21, 2015, thereby preliminarily approving the Disclosure Statement and authorizing the Debtors to solicit acceptances of the Plan; and upon the affidavits of service filed reflecting compliance with the notice and solicitation requirements of the Solicitation Order; and upon (a) the *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and Its Affiliates* [Docket No. 1271], filed on November 6, 2015, (b) the *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the First Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and Its Affiliates* [Docket No. 1313], filed on November 17, 2015 (the "Supplemental Voting Declaration"), (c) the *Debtors' Memorandum of Law in Support of (i) Approval of the Disclosure Statement and (ii) Confirmation of the Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* [Docket No. 1291] filed on November 11, 2015, (d) the *Omnibus Reply in Support of the Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* [Docket No. 1290] filed on November 11, 2015, and (e) the *Declaration of Landen C. Williams in Support of Confirmation of the Debtors' Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* [Docket No. 1289] filed on November 11, 2015; and all objections to the Plan having been resolved, withdrawn or overruled on the merits; and upon the evidence adduced and proffered and the arguments of counsel made in support of confirmation; and the Court having reviewed all documents in connection with confirmation and having heard all parties desiring to be heard; and upon the record of these Chapter 11 Cases; and after due deliberation and consideration of all of the foregoing; and sufficient cause appearing therefor; it is hereby FOUND AND DETERMINED THAT:[3]

---

[3]     The findings of the Court as set forth herein shall constitute findings of fact and conclusions of law pursuant to

01:17987427.1

2

A.    **Jurisdiction**.  The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 1334(a) and 157(1) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue of these proceedings and the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.    **Judicial Notice**.  The Court takes judicial notice of the docket in these Chapter 11 Cases maintained by the clerk of the Court and/or its duly appointed agent, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the Chapter 11 Cases, including, without limitation, the hearing to consider the Taylor Sale and the hearing to consider confirmation of the Plan (the "Confirmation Hearing").

C.    **Solicitation**.  The Solicitation Packages and the Confirmation Hearing Notice were transmitted and served in compliance with the Solicitation Order and the Bankruptcy Rules, and such transmittal and service was adequate and sufficient.  Adequate and sufficient notice of the Confirmation Hearing and the other dates described in the Solicitation Order was given in compliance with the Bankruptcy Rules and the Solicitation Order, and no other or further notice is or shall be required.  All parties in interest had a full and fair opportunity to appear and be heard at the Confirmation Hearing and no other or further notice is or shall be required.

---

Bankruptcy Rule 7052, which is applicable to this matter by virtue of Bankruptcy Rule 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

01:17987427.1

D.      **Disclosure Statement**. The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code. The Disclosure Statement was included in the Solicitation Packages and properly distributed to Holders in connection with solicitation of their acceptance or rejection of the Plan, in accordance with the provisions of the Bankruptcy Code.

E.      **Voting**. The procedures by which the ballots for acceptance or rejection of the Plan were distributed and tabulated were fair, properly conducted, and complied with the Bankruptcy Code, the Bankruptcy Rules, applicable non-bankruptcy law, and the Solicitation Order.

F.      **Plan Supplement**. Prior to the Confirmation Hearing, the Debtors filed the Plan Supplement [Docket No. 1304] (the "Plan Supplement"). The Plan Supplement complies with the terms of the Plan, and the Filing and notice of the Plan Supplement were appropriate and complied with the requirements of the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is or shall be required. The Debtors are authorized to modify the Plan Supplement documents following entry of this Confirmation Order.

G.      **Plan Confirmation Burden of Proof**. The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) of the Bankruptcy Code.

H.      **Bankruptcy Rule 3016(a)**. In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents of the Plan.

I.      **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))**. The Plan complies with all of the applicable provisions of the Bankruptcy Code.

(a)      **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))**. Classification of Claims and Equity Interests under the Plan is proper under section 1122 of the Bankruptcy Code.

(b)     **Specify Unimpaired Classes (11 U.S.C. § 1123(a)(2))**. Article 1 of the Plan specifies that Class I (Other Secured Claims) and Class II (Priority Claims) are Unimpaired under the Plan. Thus, the requirements of section 1123(a)(2) of the Bankruptcy Code are satisfied.

(c)     **Specify Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))**. Article 1 of the Plan designates Class III (Second Lien Secured Claims), Class IV (General Unsecured Claims), Class V (Subordinated Claims), and Class VI (Equity Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirements of section 1123(a)(3) of the Bankruptcy Code are satisfied.

(d)     **No Discrimination (11 U.S.C. § 1123(a)(4))**. The Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. Thus, the requirements of section 1123(a)(4) of the Bankruptcy Code are satisfied.

(e)     **Implementation of the Plan (11 U.S.C. § 1123(a)(5))**. The Plan provides for adequate means for its implementation including, among other things, the Taylor Receivable, which will used to satisfy certain Claims, and the ratification of the GUC Trust and the creation of the Secured Creditor Trust, which have been or which will be funded.

(f)     **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))**. Section 2.3.4 of the Plan provides that to the extent the Liquidating Debtors are not dissolved on the Effective Date, the applicable governing documents of the Liquidating Debtors shall be amended, if necessary, to prohibit the issuance of non-voting equity securities to the extent required by

01:17987427.1

5

section 1123(a) of the Bankruptcy Code. As such, the Plan does not provide for the issuance of non-voting securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

      (g)    **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** The Plan provides that from and after the Effective Date, the GUC Trust Oversight Committee shall have the authority to select, appoint, remove, replace, and establish the compensation (if any) of the member(s), manager(s), officer(s) and director(s) of the Liquidating Debtors, other than the Mexico Debtors. The GUC Trust Oversight Committee will be initially comprised of all members of the Committee, and it has selected the GUC Trust as the post-Effective Date member and/or authorized representative of the Liquidating Debtors, other than the Mexico Debtors. *See* Docket Nos. 888 & 1315. EisnerAmper LLP has been appointed as the GUC Trustee. *See* Docket No. 888. Wilmington Trust Company has been appointed as the Secured Creditor Trustee. The members, managers, officers, directors, and other similar agents of the Mexico Debtors shall retain their positions on and after the Effective Date, unless removed and/or replaced in accordance with the constituent documents and law applicable to such Mexico Debtors. The initial officers of the Mexico Debtors shall be Gerard D. Sowar as sole administrator and Javier Lizardi as secretary. Thus, the requirements of section 1123(a)(7) of the Bankruptcy Code are satisfied.

    J.    **Impairment/Unimpairment of Class of Claims and Equity Interests (11 U.S.C. § 1123(b)(1)).** As contemplated by section 1123(b)(1) of the Bankruptcy Code, Class I (Other Secured Claims) and Class II (Priority Claims) are Unimpaired under the Plan. Class III (Second Lien Secured Claim), Class IV (General Unsecured Claims), Class V (Subordinated Claims), and Class VI (Equity Interests) are Impaired under the Plan.

K.     **Additional Plan Provisions (11 U.S.C. § 1123(b))**. The Plan's provisions are appropriate, in the best interests of the Debtors and their Estates, and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (i) substantive consolidation of the Debtors, (ii) assumption and rejection of Executory Contracts and Unexpired Leases, (iii) establishment of the Trusts, (iv) the disgorgement provision, and (v) the vesting of Assets in Liquidating SRC and the Trusts, as applicable (including any and all Causes of Action, other than Causes of Action transferred to Taylor pursuant to the Asset Purchase Agreement or expressly released or waived pursuant to the Plan, whether arising before or after the Petition Date).

L.     **Releases, Exculpations, and Injunctions**. The Court has jurisdiction under 28 U.S.C. § 1334(a) and (b) to approve the releases, injunction, and exculpation provisions set forth in Article 7 of the Plan. In addition, section 105(a) of the Bankruptcy Code permits approval of the releases and the exculpation and issuance of the injunctions set forth in Article 7 of the Plan, when such provisions are essential to the formulation and implementation of the Plan as provided in section 1123 of the Bankruptcy Code, are not contrary to any provision of the Bankruptcy Code, confer material benefits on the Debtors' Estates, and are in the best interests of the Debtors, their Estates, their Creditors, and Holders of Equity Interests. The Released Parties provided a substantial contribution to the Chapter 11 Cases and the formulation and implementation of the Plan through, inter alia, the compromises made in the Committee Settlement. Further, the third party releases provided for in Section 7.4 of the Plan are consensual insofar as they apply only to (i) Holders of Claims who are presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and (ii) Holders of Claims who are entitled to vote on the Plan and either (x) voted in accept the Plan or (y) voted to reject the Plan, or

01:17987427.1

7

abstained from voting on the Plan, and did not make a proper and timely Third Party Opt-Out Election. Based upon the record of the Chapter 11 Cases and the evidence submitted, adduced or presented at or prior to, or in declarations filed in connection with, the Confirmation Hearing, the releases, injunctions, and exculpation set forth in Article 7 of the Plan are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code. All releases, exculpations, and injunctions embodied in the Plan are an integral part of the Plan. The releases, exculpations, and injunctions set forth in the Plan are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates, Creditors, and Holders of Equity Interests.

M. **Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** The Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.

N. **Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).** The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.

O. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).** Any payments made or promised by the Debtors for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to approval of this Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

01:17987427.1

P.    **Disclosure of Identity of Proposed Directors and Officers, Compensation of Insiders, and Consistency with the Interests of Creditors and Public Policy (11 U.S.C. § 1129(a)(5))**.  The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. The identity of (a) the members of the GUC Trust Oversight Committee; (b) the GUC Trustee; (c) the Secured Creditor Trustee; and (d) the member and/or authorized representative of the Liquidating Debtors has been disclosed, and, other than with respect to the Mexico Debtors, none of these parties is an insider as that term is defined in section 101(31) of the Bankruptcy Code.  The members, managers, officers, directors, and other similar agents of the Mexico Debtors shall retain their positions on and after the Effective Date, unless removed and/or replaced in accordance with the constituent documents and law applicable to such Mexico Debtors.  The initial officers of the Mexico Debtors shall be Gerard D. Sowar as sole administrator and Javier Lizardi as secretary, and the compensation arrangement is set forth in the Williams Declaration.  The proposed Trustees and the management of the Mexico Debtors and the other Liquidating Debtors is consistent with the interests of Holders of Claims and Equity Interests and with public policy.

Q.    **No Rate Changes (11 U.S.C. § 1129(a)(6))**.  The Debtors' Plan does not provide for any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

R.    **Best Interests of Creditors (11 U.S.C. § 1129(a)(7))**.  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The Supplemental Voting Declaration, the Williams Declaration, the Liquidation Analysis attached as Exhibit 2 to the Disclosure Statement, and other evidence submitted, adduced or presented at or prior to, or in declarations and other pleadings submitted in connection with the Confirmation Hearing (i) are reasonable, persuasive,

01:17987427.1

9

credible, and accurate as of the dates such analysis or evidence was presented, prepared, or submitted; (ii) have not been controverted by any other evidence; (iii) utilize reasonable and appropriate methodologies and assumptions; and (iv) establish that Holders of Claims in Impaired Classes have either accepted the Plan or will receive or retain under the Plan, on account of such Claims, property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

S.        **Acceptance or Rejection by Certain Classes (11 U.S.C. § 1129(a)(8))**. Classes I and II are Unimpaired under the Plan, and pursuant to section 1126(f) of the Bankruptcy Code are conclusively presumed to have accepted the Plan. Class III is Impaired and voted to accept the Plan. Class IV is Impaired and voted to reject the Plan. Classes V and VI are Impaired by the Plan and are presumed to have rejected the Plan.

T.        **Treatment of Administrative, Priority and Tax Claims (11 U.S.C. § 1129(a)(9))**. The treatment of Administrative Expense Claims, Priority Claims, and Professional Fee Claims pursuant to Article 3 of the Plan satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

U.        **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10))**. Class III is an Impaired Class of Claims that voted to accept the Plan, not including the votes of any insiders. Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code that at least one Class of Claims against the Debtors that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, has been satisfied.

V.        **Feasibility (11 U.S.C. § 1129(a)(11))**. The Williams Declaration, in addition to the Liquidation Analysis attached as Exhibit 2 to the Disclosure Statement, and other evidence

submitted, adduced, or presented by the Debtors at the Confirmation Hearing or in support of

confirmation of the Plan with respect to feasibility are persuasive and credible, and the Debtors

have established by a preponderance of the evidence that Confirmation of the Plan is not likely to

be followed by the need for further financial reorganization of the Debtors (other than the

liquidation contemplated by the Plan), thus satisfying the requirements of section 1129(a)(11) of

the Bankruptcy Code.

W. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C.

§ 1930, as determined by the Court, have been paid or will be paid on or before the Effective

Date pursuant to Article 8 of the Plan, thus satisfying the requirements of section 1129(a)(12) of

the Bankruptcy Code.

X. **Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).** The Debtors did

not provide "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code, prior to the

Petition Date. Accordingly, section 1129(a)(13) of the Bankruptcy Code does not apply.

Y. **Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).** The Debtors are not

required to pay any domestic support obligations. Accordingly, section 1129(a)(14) of the

Bankruptcy Code is not applicable to the Plan.

Z. **Individual Cases Subject to Objection by Unsecured Creditor (11 U.S.C.**

**§ 1129(a)(15)).** The Debtors are not individuals. Accordingly, section 1129(a)(15) of the

Bankruptcy Code is not applicable to the Plan.

AA. **Transfers of Property Pursuant to Non-Bankruptcy Law (11 U.S.C.**

**§ 1129(a)(16)).** Each Debtor is a moneyed, business or commercial corporation and accordingly,

section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Plan.

01:17987427.1

BB.     **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C.**

**§ 1129(b))**.  The classification and treatment of Claims and Equity Interests in Classes IV, V,

and VI, which have either rejected or are deemed to have rejected the Plan, is proper pursuant to

section 1122 of the Bankruptcy Code, and does not discriminate unfairly pursuant to section

1129(b)(1) of the Bankruptcy Code.  Pursuant to section 1129(b)(1) of the Bankruptcy Code, the

Plan may be confirmed notwithstanding the fact that not all Impaired Classes have voted to

accept the Plan, if all of the requirements of section 1129(a) of the Bankruptcy Code, other than

section 1129(a)(8) have been met.  Class III is an Impaired Class of Claims that voted to accept

the Plan.  With respect to Classes IV, V, and VI, which have not accepted the Plan, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code because the Plan does not

discriminate unfairly and is fair and equitable with respect to such Classes, including because

Holders of Allowed Claims in Class IV will receive their Pro Rata Share of the total beneficial

interests in the GUC Trust, and Holders of Claims or Equity Interests in each of the two Classes

junior to Class IV, Class V (Subordinated Claims) and Class VI (Equity Interests), will not

receive any Distribution on account such Claims or Equity Interests.

CC.     **Only One Plan (11 U.S.C. § 1129(c))**.  The Plan is the only chapter 11 plan

currently proposed in the Chapter 11 Cases, and the requirements of section 1129(c) of the

Bankruptcy Code are therefore satisfied.

DD.     **Principal Purpose (11 U.S.C. § 1129(d))**.  The principal purpose of the Plan is

neither the avoidance of taxes nor the avoidance of section 5 of the Securities Act, and no

governmental unit has objected to the Confirmation of the Plan on any such grounds.  The Plan

therefore satisfies the requirements of section 1129(d) of the Bankruptcy Code.

EE.    **Good Faith Solicitation (11 U.S.C. § 1125(e))**.  Based on the record before the

Court in the Chapter 11 Cases, the Debtors and their officers, directors, employees, advisors,

Professionals, and agents, and the other Exculpated Parties have acted in good faith within the

meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable

provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their

respective activities relating to the solicitation of acceptances of the Plan and their participation

in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the

protections afforded by section 1125(e) of the Bankruptcy Code and the injunction and

exculpation provisions set forth in Article 7 of the Plan.

FF.    **Assumption of Executory Contracts and Unexpired Leases (11 U.S.C.

§ 1123(b)(2))**.  Article 5 of the Plan governing the assumption and rejection of Executory

Contracts and Unexpired Leases meets the requirements of section 365(b) of the Bankruptcy

Code.  There have been no unresolved objections to the Debtors' assumption of certain

Executory Contracts and Unexpired Leases pursuant to the Plan.  The assumption of the Debtors'

Executory Contracts and Unexpired Leases pursuant to the Plan is in the Debtors' valid business

judgment, and the Debtors have provided adequate assurance of future performance (as that term

is used in section 365 of the Bankruptcy Code) under the Executory Contracts and Unexpired

Leases to be assumed.  No further adequate assurance of future performance is required.

GG.    **Satisfaction of Confirmation Requirements and Conditions to Confirmation**.

The Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy

Code.

HH.    **Retention of Jurisdiction**.  The Court may properly retain jurisdiction over the

matters set forth in Article 8 of the Plan and/or section 1142 of the Bankruptcy Code.

01:17987427.1

II.     **Substantive Consolidation**.  Based on the information contained in the Disclosure Statement and all evidence and arguments made, proffered, or adduced at the Confirmation Hearing, and in the absence of any objections to the request for substantive consolidation of the Debtors for all purposes, the substantive consolidation of the Debtors as provided in Section 2.2 of the Plan is justified and appropriate in these Chapter 11 Cases.

JJ.     **Plan Modifications**.  Modifications made to the Plan since the solicitation comply in all respects with Section 8.12 of the Plan and sections 1122 and 1123 of the Bankruptcy Code, as required under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The filing of the modified Plan with this Court and the disclosure of the modifications to the Plan on the record at the Confirmation Hearing constitutes due and sufficient notice of such modifications, and the Court hereby finds that such modifications are non-material, not adverse to any party-in-interest under the Plan and do not require the re-solicitation of any Class.

KK.    **PBGC Opt-Out Election**.  The PBGC made a proper and timely Third Party Opt-Out Election and shall not be subject to the Third Party Release in Section 7.4 of the Plan.

LL.     **PBGC Withdrawal of Vote**.  There is good cause for the PBGC to withdraw its vote rejecting the Plan and to abstain from voting.

Based upon the foregoing findings, and upon the record made before this Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby ORDERED, ADJUDGED, AND DECREED THAT:

**DISCLOSURE STATEMENT**

1.      The Disclosure Statement is approved on a final basis as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, and any objections to the Disclosure Statement not otherwise consensually resolved are overruled.

**CHAPTER 11 PLAN**

2.      **Confirmation**.  The Plan, as and to the extent modified by this Confirmation Order, is approved and confirmed under section 1129 of the Bankruptcy Code.  The Debtors are authorized to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and any documents contemplated to be executed therewith, prior to, on and after the Effective Date, including the Trust Agreements (along with any amendments, modifications, and supplements thereto and documents referred to in such papers consistent with the Plan), and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Court without the need for any further approval, act or action under any applicable law, order, rule, or regulation.  The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order.  The Plan complies with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules relating to and regarding confirmation.

3.      **General Settlement of Claims**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Subject to Article 4 of the Plan, all Distributions made to Holders of Allowed Claims in any Class shall be final.

4.      **Automatic Stay**.  The automatic stay under section 362 of the Bankruptcy Code is hereby modified to the extent necessary to implement the Plan.

5.      **Implementation Steps**.  All implementation steps set forth in the Plan are hereby approved, including, without limitation, the formation and/or ratification of the Trusts.  All other transactions contemplated by the Plan, including, without limitation, the dissolution of the

01:17987427.1

15

Liquidating Debtors, conversion of SRC Liquidation Company from a corporation into a limited

liability company and merger of the three (3) Mexico Debtors into one (1) Entity, may be

effected prior to, on, or subsequent to the Effective Date without any further action by Holders of

Equity Interests or the directors, managers, or other responsible persons of the Debtors.

6.      **Vesting of Assets.**  Except as expressly provided in the Plan, in this Confirmation

Order, or in the respective Trust Agreements, on the Effective Date (a)(i) all Secured Creditor

Trust Assets and (ii) the Wind-Down Settlement Payment (unless it has previously been paid by

the Debtors to the Secured Creditor Trust or to the Second Lien Agent) shall be transferred to

and vested in the Secured Creditor Trust free and clear of all Claims and Equity Interests;

*provided, however*, neither the Chubb Settlement Agreement (or proceeds thereof) nor any

employment practices liability insurance policies (or proceeds thereof) shall vest in the Secured

Creditor Trust; *provided further, however*, that the Secured Creditor Trust shall receive a

distribution with respect to the proceeds related to the real property located in Terre Haute,

Indiana (the "Terre Haute Property") to the extent that the expenses under Section 2(a)(ii) of the

Wind-Down Settlement (including, for the avoidance of doubt, all remediation expenses and/or

settlement costs, whether pre- or post-closing of any sale of the Terre Haute Property) are less

than the combined total of (x) sale proceeds from the sale of the Terre Haute Property and (y)

any Chubb Settlement Agreement proceeds, which distribution shall equal the amount of

proceeds from (x) and (y) in excess of the expenses; and (b) to the extent not previously

transferred and vested in the GUC Trust, the GUC Trust Assets shall be transferred to and vested

in the GUC Trust free and clear of all Claims and Equity Interests; *provided, however*, that under

no circumstances shall the Terre Haute Property be transferred to or vest in the GUC Trust

absent prior express consent by the GUC Trustee.  All Assets of the Debtors not otherwise

transferred either to the GUC Trust or the Secured Creditor Trust shall vest in Liquidating SRC free and clear of all Claims, Equity Interests, liens, charges or other encumbrances. The Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan.

7. **Substantive Consolidation**. Pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, the substantive consolidation of the Debtors is hereby approved, effective as of the Effective Date. As a result of such substantive consolidation, on and after the Effective Date (i) all Assets and liabilities of the Debtors shall be deemed to be the Assets and liabilities of a single, consolidated Entity; (ii) each Claim Filed or to be Filed against any Debtor shall be deemed Filed as a single Claim against and a single obligation of the Debtors; (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, *provided, however*, that the Claims set forth in the Mexico Consideration Tax Treatment Agreement shall be preserved solely for the purposes of implementing that Agreement; (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor; (v) the existing Equity Interests in SRC Liquidation Company shall be cancelled; (vi) no Distributions shall be made under the Plan on account of any existing Equity Interest held by a Debtor in any other Debtor, except as and to the extent required in the Mexico Consideration Tax Treatment Agreement; (vii) all guarantees of any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor shall be one obligation of the substantively consolidated Debtors; and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors. The substantive consolidation of the Debtors under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational

structure of the Debtors, (ii) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Trusts on or after the Effective Date (including any agreements entered into by the GUC Trust or the Secured Creditor Trust prior to the Effective Date, all of which are deemed to be ratified as of the Effective Date), (iv) the Debtors' or the GUC Trust's ability to subordinate or otherwise challenge Claims on an Entity-by-Entity basis, and (v) distributions to the Debtors or the Trusts from any insurance policies or the proceeds thereof. In particular, the substantive consolidation of the Debtors under the Plan shall not result in any Debtor that is not a named insured or additional insured under a general commercial liability insurance policy issued to one or more of the Debtors becoming an insured under such a policy, and the substantive consolidation of the Debtors under the Plan shall not render an insurance company that issued such a general commercial liability insurance policy liable on account of any Debtor that is not a named insured or additional insured under such a policy. Notwithstanding the substantive consolidation called for herein, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed, dismissed or converted.

8. **Post-Effective Date Corporate Existence**.

(a) Without any requirement to obtain approval of Holders of existing Equity Interests of SRC Liquidation Company, SRC Liquidation Company shall be converted from an Ohio corporation into an Ohio limited liability company. Liquidating SRC shall be prohibited from issuing any non-voting equity securities, and such prohibition shall be included in Liquidating SRC's organizational documents.

(b)     All of the existing Equity Interests in the Debtors (including all instruments evidencing such Equity Interests) shall be automatically deemed cancelled and extinguished without the requirement of any further action under any applicable agreement, law, regulation, or rule, *provided*, that Equity Interests in any subsidiary of SRC Liquidation Company which is wholly owned, directly or indirectly, by SRC Liquidation Company shall be preserved solely for the benefit of the Holders of Allowed Claims as provided in the Plan.

(c)     Liquidating SRC shall issue all of the Liquidating SRC Membership Interests to the GUC Trust.  The GUC Trust shall hold Liquidating SRC's Membership Interests for the benefit of the GUC Trust Beneficiaries, and such Liquidating SRC Membership Interests shall remain outstanding until Liquidating SRC is dissolved in accordance with the Plan.

(d)     On the Effective Date, without the need for any further order of the Court, action, or formality which might otherwise be required under applicable non-bankruptcy laws (a) the Debtors other than Liquidating SRC, the Mexico Holding Debtors, and the Mexico Debtors shall be dissolved without the need for any filings with the Secretary of State or other requisite governmental official in each Debtor's respective jurisdiction of formation and (b) the Mexico Holding Debtors and the Mexico Debtors may, in the sole discretion of Liquidating SRC, be (i) dissolved without the need for any filings with the Secretary of State or other requisite governmental official in each Debtor's respective jurisdiction of formation; (ii) merged into or with the GUC Trust, Liquidating SRC, or any other Debtor, or, with respect to the Mexico Debtors, into each other; or (iii) sold; *provided, however*, that no such dissolution, merger or sale shall occur with respect to the Mexico Debtors except in accordance with and pursuant to Mexico law (and after all obligations of such Mexico Debtors to be satisfied by Taylor have been determined and satisfied) or shall have the effect of altering implementation of

01:17987427.1

the Mexico Consideration Tax Treatment Agreement; *provided further, however*, that the proceeds of any sale of the Equity Interests of any Liquidating Debtor other than Liquidating SRC shall be remitted to the Secured Creditor Trust.

(e) After all Disputed Claims have been resolved in accordance with Section 4.2 of the Plan, all payments required to be made by Liquidating SRC or Taylor under this Plan, including without limitation Section 3.2.1 of the Plan, have been made, and all obligations of the Debtors under the Asset Purchase Agreement have been satisfied, and without the need for any further order of the Court, action, or formality which might otherwise be required under applicable non-bankruptcy laws, Liquidating SRC shall be dissolved without the need for any filings with the Secretary of State or other requisite governmental official in Liquidating SRC's jurisdiction of formation.

9. **Directors and Officers**. As of the Effective Date, the GUC Trust shall be the sole member and/or authorized representative of each of the Liquidating Debtors, other than the Mexico Debtors, and each individual who has previously served as a director shall be deemed to have resigned and shall have no further duties or responsibilities to any of the Debtors from and after the Effective Date. As of the Effective Date, the GUC Trustee individually, or through its authorized representatives or designees, shall have all requisite power and authority that may be or could have been exercised with respect to each Liquidating Debtor (whether or not dissolved as of the Effective Date) by any officer, director, shareholder, member, manager or other party acting in the name of such Liquidating Debtor or its respective estate with like effect as if duly authorized, exercised and taken by action of such officers, directors, members, managers, shareholders or other party. The GUC Trustee may also and shall be authorized, without further notice or other of the Court, select directors and officers of the Mexico Holding Debtors post-

Effective Date, and such directors and officers shall have the requisite authority to act on the

behalf of the Mexico Holding Debtors.  Notwithstanding any limitation in the GUC Trust

Agreement to the contrary, the GUC Trustee shall be and hereby is authorized to take any and all

action consistent with the Plan and this Confirmation Order.  The members, managers, officers,

directors, and other similar agents of the Mexico Debtors shall retain their positions on and after

the Effective Date, unless removed and/or replaced in accordance with the constituent documents

and law applicable to such Mexico Debtors.  The initial officers of the Mexico Debtors shall be

Gerard D. Sowar as sole administrator and Javier Lizardi as secretary.  The parties with requisite

authority to select, appoint, remove, replace, and establish the compensation (if any) of the

member(s) manager(s), officer(s) and director(s) of the Mexico Debtors under the Mexico

Debtors' constituent documents shall continue to have such authority.

      10.     **Entity Action.**  For purposes of clarity, any officer, director, manager or member

of the Liquidating Debtors and/or the GUC Trustee or its representative or designee, as

applicable, shall be authorized to take any action as may be necessary or appropriate to effectuate

and further evidence the terms and conditions of the Plan, whether or not specifically referred to

in the Plan or any exhibit thereto, without further order of the Court or further action by the

Liquidating Debtors or the GUC Trust (as applicable) or any other person.  For the avoidance of

doubt, the Debtors, the Liquidating Debtors and their respective officers, directors, mangers and

members and the GUC Trust and GUC Trustee are authorized and empowered pursuant to

section 1701.75 of Ohio Rev. Code, section 303 of the Delaware General Corporation Law and

other applicable law governing the Liquidating Debtors (the "Applicable Law") to take any and

all actions necessary or desirable to implement the transactions contemplated by the Plan and this

Confirmation Order, including executing, delivering and performing under all Plan-related

01:17987427.1

documents, in each case without any requirement of further vote, consent, approval, authorization or other action by the stockholders, officers or directors, or notice to, order of, or hearing before the Court. Any or all such documents shall be accepted upon presentment by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law. Furthermore, any member, manager, officer or director of the Liquidating Debtors is authorized, pursuant to Applicable Law, to dissolve the corporation under Delaware, Ohio and other applicable state law without any further vote, consent, approval, authorization or other action by the stockholders, members, officers or directors, or notice to, order of, or hearing before this Court.

11.   **Distributions**.  Liquidating SRC and the Trusts shall make, cause to be made, or facilitate, the Distributions required under the Plan to the applicable Holders of Allowed Claims.

12.   **Cash Payments**.  The sources of all Distributions and payments under the Plan are and will be Cash and Secured Creditors' collateral, to the extent applicable. Cash Distributions made pursuant to the Plan shall be in United States funds, by check drawn on a domestic bank, or by wire transfer from a domestic bank. Cash payments made pursuant to the Plan in the form of a check shall be null and void if not cashed within 180 days of the date of issuance thereof.

13.   **Delivery of Distributions**.  Except as otherwise provided in the Trust Agreements, Distributions shall be made to Record Holders of Allowed Claims: (a) first, at the address set forth on the Record Holder's last Filed proof of Claim or the address set forth in any later written notice of address change Filed by such Holder; (b) second, at the addresses reflected in the Schedules if neither a proof of Claim nor a written notice of address change has been

Filed; and (c) third, if the Record Holder's address is not listed in the Schedules, and such Record Holder has not Filed a proof of Claim or written notice of address change, at the last known address of such Record Holder according to the Debtors' books and records. Except for the preceding sentences, none of the Debtors, the GUC Trustee, or the Secured Creditor Trustee, as applicable, is required to make any additional inquiry into the address to which it must deliver a Distribution under the Plan. If, after complying with the foregoing procedures, a Distribution to any Holder of an Allowed Claim is returned as undeliverable or otherwise not accepted by the Holder, such Distribution shall be deemed forfeited and distributed to other Holders of Claims in the same Class pursuant to Section 3.7 of the Plan.

14. **Required Reporting Documents**. Unless otherwise set forth in the applicable Trust Agreement, prior to making any Distribution to the Holder of an Allowed Claim, Liquidating SRC (in connection with all Unclassified Claims (other than Professional Fee Claims) and Priority Claims, and Other Secured Claims), the GUC Trust (in connection with Class IV Claims), and the Secured Creditor Trust (in connection with Class III Claims) shall require that the Holder of such Claim furnish all Required Reporting Documents as a condition to the making of a Distribution. Failure to provide Required Reporting Documents shall result in a forfeiture of Distribution pursuant to Section 3.7 of the Plan.

15. **Disputed Claims**. Pursuant to Section 4.2 of the Plan, Disputed Claims may be settled or compromised without any further notice to or action, Order, or approval by the Court, as the case may be, under applicable law. Any Disputed Claim that is not resolved pursuant to Section 4.2 of the Plan shall be adjudicated by the Court (or, to the extent that the Court does not have jurisdiction, by any other court having jurisdiction over such dispute).

16. **Objections to Claims**. All objections to Claims shall be Filed within 180 days after the Effective Date (the "Claim Objection Deadline"). The Claim Objection Deadline may be extended upon a motion Filed with the Bankruptcy Court by Liquidating SRC or the GUC Trustee (or, in the case of Class I Claims (other than the Other Secured Claim of Bank of America, N.A.) and Class III Claims (other than the Second Lien Secured Claim filed by the Second Lien Agent), by the Secured Creditor Trust) prior to the expiration of the Claim Objection Deadline. The Claim Objection Deadline shall be automatically extended upon the Filing of a motion requesting an extension of the Claim Objection Deadline until such time as the Bankruptcy Court acts on such motion, without the necessity for the entry of a bridge order. From and after the Effective Date, the Liquidating Debtors shall take no action that would cancel, modify, or otherwise impair the "Extended Reporting Period Elected (Pre-Paid)" or other similar endorsements or provisions of the D&O Policies, all of which shall remain in full force and effect in accordance with their terms.

17. **Executory Contracts and Unexpired Leases**. Subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors that have not been assumed and assigned, or rejected, prior to the Confirmation Date, shall be deemed rejected as of the Confirmation Date, provided that to the extent the D&O Policies, the Chubb Settlement Agreement, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor are executory, the D&O Policies, the Chubb Settlement Agreement, all insurance agreements providing employment practices liability coverage, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor shall not be deemed rejected but shall be deemed assumed by the Liquidating Debtors, pursuant to section

365 of the Bankruptcy Code, as of the Effective Date and shall remain in full force and effect following the occurrence of the Effective Date.

18.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases and Abandoned Assets**.  Any Creditor asserting a Claim for monetary damages as a result of the rejection of an Executory Contract or Unexpired Lease, and/or the abandonment of Assets pursuant to the Plan shall file a proof of such Claim within thirty (30) days of the Confirmation Date.  The timeframe for asserting a Claim for money damages as a result of the rejection of an Executory Contract or Unexpired Lease, and/or the abandonment of Assets Pursuant to the Sale Order and/or the *Order Establishing Procedures for Debtors to Transfer, Abandon, or Sell De Minimis Assets* [Docket No. 1096] (the "Abandonment Procedures Order") shall continue to be as set forth in the Sale Order or the Abandonment Procedures Order, as applicable.  For the avoidance of doubt, the Abandonment Procedures Order shall continue to govern the abandonment of Assets by Liquidating SRC following the Confirmation Date and the Effective Date.

19.    **Debtors' Reservation of Rights Regarding Executory Contracts**.  Nothing in the Plan or this Order shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.

20.    **Unclassified Claims**.

(a)    Distributions to Holders of Allowed Unclassified Claims (other than Professional Fee Claims) and Allowed Claims in Classes I and II shall be made at such times as required by Article 1 and Section 3.3 of the Plan.

(b)    Other than with respect to Professional Fee Claims or Claims described in 11 U.S.C. § 503(b)(1)(B) and (C), any Person asserting an Administrative Expense Claim must

01:17987427.1

25

submit a proof of Claim with respect to such Administrative Expense Claim to the Balloting and

Claims Agent (in the manner set forth in the Notice of Confirmation and Effective Date (defined

below) attached hereto as Exhibit B) so that it is actually received on or before the

Administrative Expense Claims Bar Date (*i.e.*, 4:00 p.m. (prevailing U.S. Eastern time) on the

date that is 30 days after the Effective Date).

21.    **Professional Fee Claims**.

(a)    Notwithstanding any other provision of the Plan dealing with Unclassified

Claims, any Person asserting a Professional Fee Claim shall, no later than the Effective Date,

provide the Debtors with a summary of the compensation for services rendered and expense

reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee

Claim (which summary shall include, without limitation, a good faith estimate of accrued but

unbilled fees and expenses through the Confirmation Date) (for each Person, its "Professional

Fee Summary"), and shall, no later than 30 days after the Effective Date, File a final application

for allowance of compensation for services rendered and reimbursement of expenses incurred

through the Confirmation Date.  Objections to any final application for allowance of

compensation for services rendered and reimbursement of expenses incurred through the

Confirmation Date shall be due 30 days after such application is Filed.  All Allowed Professional

Fee Claims shall be paid in accordance with Section 9.1 of the Plan.

(b)    All Professional Fee Claims for services rendered after the Confirmation

Date shall be paid by the Debtors or Liquidating SRC, as applicable, upon receipt of an invoice

therefor, or on such other terms as Liquidating SRC and the Professional may agree, without the

requirement of any order of the Bankruptcy Court.

01:17987427.1

26

(c)     On the Effective Date, the Debtors shall establish and fund the

Professional Fee Claims Escrow Account in an amount sufficient to pay, in full, any then unpaid

fees and expenses (including, without limitation, any estimated, accrued but unbilled fees and

expenses through the Confirmation Date set forth on the Professional Fee Summary) owed to any

Person asserting a Professional Fee Claim. Amounts held in the Professional Fee Claims Escrow

Account shall not constitute property of the Debtors or the Liquidating Debtors and shall only be

distributed in accordance with Section 9.2 of the Plan and the Professional Fee Claims Escrow

Agreement.  In the event there is a remaining balance in the Professional Fee Claims Escrow

Account following payment of all Allowed Professional Fee Claims in accordance with Section

9.1 of the Plan, such remaining amount, if any, shall be paid to Liquidating SRC.  In the event

that there are insufficient funds in the Professional Fee Claims Escrow Account to pay any

Allowed Professional Fee Claims in accordance with the terms of the Professional Fee Claims

Escrow Account, the unpaid portion of such Allowed Professional Fee Claims shall be paid by

Liquidating SRC.

22.     **Releases, Injunction, and Exculpation**.  The releases, injunctions, and

exculpation set forth in Article 7 of the Plan are hereby approved and shall be effective and

binding on all Persons to the extent provided therein; *provided* that the releases, injunction, and

exculpation shall not release any post-Effective Date obligations of any party under the Plan or

any document, instrument, or agreement executed to implement the Plan.  For the avoidance of

doubt, and as provided in Section 8.14 of the Plan, nothing in this Order, the Plan, or the

Bankruptcy Code (and § 1141 thereof) shall in any way be construed to discharge, release, limit

or relieve any party, in any capacity, from any liability or responsibility with respect to the

Pension Plan or any other defined benefit pension plan under any law, governmental policy, or

01:17987427.1

27

regulatory provision. The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, or Bankruptcy Code. Notwithstanding the foregoing, the PBGC and the Pension Plan shall continue to be subject to the provisions of Section 1.6 of the Plan, and all Claims of the PBGC (including the amended Claims Filed by the PBGC for the Pension Plan's unfunded benefit liabilities, unpaid premiums, and unpaid minimum contributions) against the Debtors, to the extent Allowed, shall be fully satisfied by the treatment of such Allowed Claims as Unsecured Claims in Class IV of the Plan.

23. **Injunction Against Interference with Plan**. Upon the entry of this Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be permanently enjoined from the commencement or continuation of any act or action to collect, recover, or offset from the Estates (unless such offset rights were asserted in writing prior to the Confirmation Date), the GUC Trust, the Secured Creditor Trust, or any of their property, any Claim or Equity Interest treated in the Plan; act or actions to on account of or respecting any claim, demand, liability, debt, right, cause of action, or remedy released or to be released or exculpated or to be exculpated pursuant to the Plan or this Confirmation Order; or any actions to interfere with the implementation and consummation of the Plan, except as otherwise expressly permitted by the Plan or this Confirmation Order or by Final Order enforcing the terms of the Plan. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

01:17987427.1

24. **Term of Injunctions**. Except as otherwise provided in the Plan or this Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the applicable Chapter 11 Cases are closed.  In addition, on and after Confirmation Date, the Debtors may seek further Orders to preserve the status quo during the time between the Confirmation Date and the Effective Date or to enforce the provisions of the Plan.

25. **Rule 2004 Examinations**. The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 is expressly preserved following the Effective Date; *provided, however*, that the Liquidating Debtors shall not conduct any Rule 2004 examination relating to any Cause of Action that is expressly waived, relinquished, compromised, or settled in the Plan, the Committee Settlement, or any Final Order (including, without limitation, the Causes of Action against the Released Parties).

26. **Preservation of Causes of Action; Settlement**.

(a)     Except for Causes of Action against a Person or Entity that are have been transferred to Taylor pursuant to the Asset Purchase Agreement or Causes of Action against a Person or Entity that expressly waived, relinquished, released, compromised or settled in the Plan, the Committee Settlement, or any Final Order (including, without limitation, the Causes of Action against the Released Parties), the Debtors (before the Effective Date) and the Secured Creditor Trust, the GUC Trust, and the Liquidating Debtors (on and after the Effective Date) expressly reserve all Causes of Action for later adjudication (whether arising before or after the Petition Date, including any actions specifically enumerated in any supplemental documents) and, therefore, no preclusion doctrine or other rule of law, including, without limitation, the

01:17987427.1

doctrines of res judicata, collateral estoppels, issue preclusion, claim preclusion, estoppel

(judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as

a result of the confirmation or Effective Date of the Plan, or this Confirmation Order. All Causes

of Action held by the Debtors' Estates or the GUC Trust as of the Confirmation Date shall

survive Confirmation of the Plan and the commencement and prosecution of any Causes of

Action shall not be barred or limited by any estoppel (judicial, equitable or otherwise). No

defendant party to any Cause of Action (including Avoidance Actions) shall be permitted or

entitled to assert any defense based, in whole or in part, upon Confirmation of the Plan, and

Confirmation of the Plan shall not have any res judicata or collateral estoppel or preclusive effect

upon the commencement and prosecution of Causes of Action. The Debtors and the GUC

Trustee, on behalf of the GUC Trust and any successors in interest thereto, expressly reserve the

right to pursue or adopt any Causes of Action that are alleged in any lawsuit in which the

Debtors are a defendant or an interested party, against any Person or Entity, including, without

limitation, the plaintiffs and codefendants in such lawsuits. The Liquidating SRC and the GUC

Trustee shall, pursuant to section 1123 and all applicable law, have the requisite standing to

prosecute, pursue, administer, settle, litigate, enforce and liquidate any and all Causes of Action.

     (b)     No Entity may rely on the absence of a specific reference in the Plan or

the Disclosure Statement to any Cause of Action against them as any indication that the Debtors

or the GUC Trustee, as applicable, will not pursue any and all available Causes of Action against

them. Except with respect to Causes of Action as to which the Debtors have released any Entity

on or prior to the Effective Date, the Debtors or the GUC Trustee, as applicable, expressly

reserve all rights to prosecute any and all Causes of Action against any Entity, except as

otherwise expressly provided in the Plan or in this Confirmation Order. Unless any Causes of

01:17987427.1

Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the GUC Trustee expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan.

27.    **Dissolution of the Committee**.  On the Effective Date, the Committee shall be deemed dissolved, and its members shall be deemed released of all their duties, responsibilities, and obligations as members of the Committee in connection with the Bankruptcy Cases or the Plan and its implementation, and the retention or employment of the Committee's Professionals shall terminate; *provided*, *however*, that the Committee shall continue to exist after the Effective Date for the limited purpose of prosecution of any Professional Fee Claims pursuant to Article 9 of the Plan.

28.    **Section 1146 Exemption**.  Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with the Plan shall not be subject to any United States document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

01:17987427.1

29. **Objections**. All Objections to the Plan, confirmation of the Plan, and/or the Confirmation Order that have not been withdrawn, waived, settled or otherwise resolved are overruled in their entirety on the merits. Furthermore, all reservation of rights, responses to, and statements and comments, if any, in opposition to the Plan, other than those withdrawn with prejudice in their entirety prior to, or on the record at, the Confirmation Hearing, shall be, and hereby are, overruled in their entirety for the reasons stated on the record.

30. **Plan Supplement**. Each of the documents that comprise the Plan Supplement, are part of the Plan and are hereby approved in connection with confirmation of the Plan.

31. **Notice of Entry of Confirmation Order and Effective Date**. Pursuant to Bankruptcy Rules 2002 and 3020(c), the Debtors are hereby authorized and directed to serve a notice of entry of this Confirmation Order and the occurrence of the Effective Date, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Notice of Confirmation and Effective Date</u>") no later than five (5) Business Days after the Effective Date, on all Holders of Claims against or Equity Interests in the Debtors and all other Persons on whom the Confirmation Hearing Notice was served. The form of the Notice of Confirmation and Effective Date is hereby approved in all respects. The Notice of Confirmation and Effective Date shall constitute good and sufficient notice of the entry of this Confirmation Order and of the relief granted herein, and no other or further notice of entry of this Confirmation Order or the occurrence of the Effective Date need be given.

32. **Reference to Plan**. Any document related to the Plan that refers to a chapter 11 plan of the Debtors other than the Plan confirmed by this Confirmation Order shall be, and it hereby is, deemed to be modified such that the reference to a chapter 11 plan of the Debtors in such document shall mean the Plan confirmed by this Confirmation Order, if appropriate.

01:17987427.1

33.     **References to Plan Provisions**.  The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan (and all exhibits and schedules thereto) be confirmed in its entirety and incorporated herein by reference.

34.     **Rules Governing Conflicts Between Documents**.  In the event of a conflict between the terms or provisions of the Plan and any other Plan-related documents, the terms of the Plan shall control over such documents.  In the event of a conflict between the terms of the Plan or Plan-related documents, on the one hand, and the terms of this Confirmation Order, on the other hand, the terms of this Confirmation Order shall control.  This Confirmation Order shall supersede any orders of the Court issued prior to the Confirmation Date that may be inconsistent herewith.

35.     **Governmental Approvals Not Required**.  Except as set forth in the Plan, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to (i) the implementation or consummation of the Plan and (ii) any related documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, any related documents, instruments or agreements related thereto, and any amendments or modifications to any of the foregoing.

36.     **Binding Effect**.  The Plan shall be binding upon the Debtors, all Holders of Claims and Equity Interests (whether or not the Claims and Equity Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan), parties in interest, governmental units (to the fullest extent permitted by law), or other Persons, and their respective successors and assigns.

01:17987427.1

37.    **No Admissions**.  As to contested matters, adversary proceedings, and other

Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, or

the Disclosure Statement shall constitute or be construed as an admission of any fact or liability,

stipulation, or waiver, but rather as a statement made in settlement negotiations.  The Plan shall

not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan

as to Holders of Claims against, or Equity Interests in, the Debtors or any of their subsidiaries

and affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

38.    **Environmental Claims**.  Nothing in this Order or the Plan discharges, releases,

precludes or enjoins (i) any environmental liability to a governmental unit as defined in section

101(27) of the Bankruptcy Code ("Governmental Unit") that is not a Claim; (ii) any

environmental Claim of a Governmental Unit arising on or after the Effective Date; (iii) any

environmental liability to a Governmental Unit on the part of any entity as the owner or operator

of property after the Effective Date; or (iv) any environmental liability to a Governmental Unit

on the part of any Entity other than the Debtors or Reorganized Debtors.  Nothing in this Order

or Plan divests any tribunal of any jurisdiction it may have under environmental law to interpret

this Order or the Plan or to adjudicate any defense asserted under this Order or the Plan.

39.    **Liberty Mutual Insurance Agreements**.  Notwithstanding anything to the

contrary in the Plan, any exhibit to the Plan, the Plan Supplement, or this Confirmation Order,

nothing in the Plan, any exhibit to the Plan, the Plan Supplement, or this Confirmation Order

(including any provision that purports to be preemptory or supervening) shall in any way operate

to, or have the effect of, impairing the legal, equitable or contractual rights and defenses of the

insureds or insurers under the insurance policies or any related agreement issued by Liberty

Mutual Insurance Company, any of its affiliates, Fireman's Fund Insurance Company, or any co-

insurer insuring the same risk (collectively, the "Insurers") for the benefit of the Debtors or their affiliates (collectively, the "Insurance Agreements") or under any applicable non-bankruptcy law, including without limitation such Insurers' rights, if any, to draw on letters of credit issued for such Insurers' benefit or to apply escrowed amounts held by such Insurers, such Insurers' rights, if any, of setoff and recoupment, and such Insurers' rights, if any, to handle, control, direct and approve settlement of claims covered by the Insurance Agreements.

40. **Setoff Rights**. Notwithstanding anything in the Plan, the Plan Supplement or this Confirmation Order to the contrary, the rights of International Paper Company, Bullet Line, LLC, Leedsworld, Inc., Morgan Adhesives Company, LLC d/b/a MACtac, Pitney Bowes Presort Services, Inc. ("Presort"), and Timeplanner Calendars, Inc. to assert any defenses preserved by Section 16 of the Sale Order, including any right to setoff or recoupment, shall not be affected, impaired or otherwise modified. For the avoidance of doubt, notwithstanding that Presort is not listed in Section 16 of the Sale Order, Presort's rights to assert any defenses preserved by such provision (with respect to the designated parties identified therein), including any right to setoff or recoupment, shall not be affected, impaired or otherwise modified.

41. **CareSource Objection**. The objection of CareSource and CareSource Management Group Co. (together, "CareSource") is withdrawn. Any determination and the parties' rights as to whether any proceeds of that certain Professional and Technology Based Services, Technology Products, Information Security & Privacy, and Multimedia and Advertising Liability Insurance Policy and all endorsements thereto (Policy Number W147C2140201), and/or any other policy of insurance that may provide coverage for the printing error claims asserted by CareSource are property of the Debtors' estates is reserved and will be determined in the adversary proceeding filed by CareSource as Adv. Proc. No. 15-51775.

42.    **PBGC Vote**.  The PBGC's vote to reject the Plan is withdrawn, and the PBGC

shall be deemed to have abstained from voting; *provided*, *however*, that for the avoidance of

doubt, the PBGC's Third Party Opt-Out Election is not withdrawn, and the PBGC shall not be

subject to the Third Party Release in Section 7.4 of the Plan.

43.    **Section 502(h) Claims**.  Notwithstanding anything to the contrary in 11 U.S.C.

§1141(d) or the Plan, Plan Supplement, or this Confirmation Order (collectively, the "Plan

Documents"), nothing in the Plan Documents shall impair: (i) any General Unsecured Creditor's

right to assert a Claim under 11 U.S.C. § 502(h) (a "Section 502(h) Claim"), or (ii) the ability of

a Holder of an Allowed Section 502(h) Claim to become a beneficiary of the GUC Trust (or of

any other trust of which such Creditor is entitled to be or become a beneficiary) in respect of

such Section 502(h) Claim.  If any Creditor has a Section 502(h) Claim, then, to the extent that

such Claim is Allowed, the Creditor shall be entitled to share as a beneficiary of the GUC Trust

(and as a beneficiary of any other trust of which said creditor is entitled to be or become a

beneficiary) and all appropriate entries shall be made on the official register(s) maintained by the

GUC Trustee and/or any other trustee to reflect such beneficial interest in respect of the Section

502(h) Claim of such Creditor.  Any Section 502(h) Claim shall be Filed, if at all, no later than

thirty (30) days after such claim arises.  To the extent a Section 502(h) Claim is not timely Filed,

such Claim shall not constitute an Allowed Claim for any reason, including for Distribution

purposes.

44.    **Substantial Consummation**.  On the Effective Date, the Plan shall be deemed to

be substantially consummated under section 1101 of the Bankruptcy Code.

45.    **Case Closure**.  Pursuant to section 350 of the Bankruptcy Code, the closing of the

Chapter 11 Cases is hereby authorized.  Upon the Effective Date, the Court will enter one or

more order(s), in the form attached as <u>Exhibit C</u>, directing the Clerk of the Bankruptcy Court to

close such Chapter 11 Cases; *provided, however*, that the Chapter 11 Case of *SRC Liquidation*

*Company*, Case No. 15-10541 (BLS) (the "<u>Lead Case</u>") shall remain open until such time as the

Liquidating SRC or the GUC Trustee Files with the Court such documents required by the

Bankruptcy Rules and any applicable orders of the Court to close the Lead Case.  Upon entry of

this Confirmation Order, counsel for the Debtors shall submit proposed forms of orders to the

Court to enter on the docket of each individual Debtor's Chapter 11 Case to close such Chapter

11 Case effective on the Effective Date, except for Lead Case.  At any time prior to the closing

of the Lead Case, Liquidating SRC or the GUC Trustee may move to reopen a closed case.  All

U.S. Trustee fees payable under 28 U.S.C. § 1930 for the closed cases shall be paid on, or as

soon as reasonably practicable following the Effective Date.  The closing of the Chapter 11

Cases, other than the Lead Case, will in no way prejudice Liquidating SRC's or the GUC

Trustee's rights to object or otherwise contest a proof of Claim filed against any of the Debtors,

commence or prosecute any action to which any of the Debtors may be a party, or a claimant's

rights to receive Distributions under the Plan to the extent such claimant's Claim is ultimately

allowed, nor will the closing of such Chapter 11 Cases otherwise alter or modify the terms of the

Plan.

   46. **Retention of Jurisdiction**.  The Court hereby retains jurisdiction of the Debtors'

Chapter 11 Cases and all matters arising under, arising out of, or related to, the Chapter 11 Cases

and the Plan (i) as provided for in the Plan, (ii) as provided for in this Order, and (iii) for the

purposes set forth in sections 1127 and 1142 of the Bankruptcy Code.  Notwithstanding the entry

of this Order or the occurrence of the Effective Date, pursuant to Bankruptcy Code sections 105

and 1142, the Court, except as otherwise provided in the Plan or herein, shall retain exclusive

jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest

extent as is legally permissible.

47.    **Stay of Confirmation Order**.  The provisions of Federal Rule of Civil Procedure

62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not

apply to this Order, and the Debtors are authorized to consummate the Plan immediately upon

entry of this Order notwithstanding any stay otherwise imposed pursuant to Bankruptcy Rule

3020(e) or any other provision of the Bankruptcy Rules, including Bankruptcy Rule 6004(h),

7062, 9014, or otherwise.  The period in which an appeal with respect to this Order must be filed

shall commence immediately upon the entry of this Order.


Dated:    November 19, 2015
          Wilmington, Delaware

                                        _____
                                        Brendon L. Shannon
                                        Chief United States Bankruptcy Judge

## EXHIBIT A

### Plan

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |

## SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES (WITH TECHNICAL MODIFICATIONS)

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

Dated: Wilmington, Delaware
November 18, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Maris J. Kandestin (No. 5294)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Michael A. Rosenthal (NY No. 4697561)
Jeremy L. Graves (CO No. 45522)
Matthew G. Bouslog (CA No. 280978)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
mrosenthal@gibsondunn.com
jgraves@gibsondunn.com
mbouslog@gibsondunn.com

*Counsel to the Debtors and Debtors in Possession*

2

## INTRODUCTION

This consolidated Plan, proposed by and for the Debtors, contemplates the substantive consolidation of the Debtors for distribution purposes, the liquidation of the remaining Assets of the Debtors and the Distribution of such Assets to the Debtors' Creditors as provided herein. This Plan shall be interpreted as, and capitalized terms used, but not otherwise defined in the Plan shall have the meanings, set forth in Exhibit A attached hereto.

## 1. TREATMENT, CLASSIFICATION AND VOTING OF CLAIMS AND EQUITY INTERESTS; IMPAIRMENT

The categories listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class | Type | Status Under Plan | Treatment |
|-------|------|-------------------|-----------|
| I | Other Secured Claims | Unimpaired and Deemed to Accept | Subject to Section 3.3 of the Plan, except to the extent that a Holder of an Allowed Other Secured Claim has been paid by or on behalf of the Debtors prior to the Effective Date or agrees to a different treatment, with respect to Other Secured Claims that are Allowed as of the Effective Date the Debtors shall, (a) satisfy such Claims in whole or in part by the transfer of all or any portion of the Assets securing such Claims or (b) at the election of the Second Lien Agent made on or before the Effective Date and with the consent of the Debtors (i) reinstate such Claims in full, leaving unaffected the Holder's legal, equitable and contractual rights; *provided* that the Committee's consent shall be required for such reinstatement if the Creditor has any Secured Claim against Liquidating SRC or the GUC Trust, (ii) pay such Claims in Cash up to the Allowed amount of such Claims, (iii) begin to make deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of such Claims, or (iv) treat such Claims in a manner that would provide the "indubitable equivalent" of such Claims; and, with respect to Other Secured Claims that are not Allowed as of the Effective Date, the collateral securing such Other Secured Claim, or the proceeds thereof, will be set aside on the Effective Date and Distributed in accordance with Section 3.3.2 of the Plan upon Allowance of such Claim. |
| II | Priority Claims | Unimpaired and Deemed to | Subject to Section 3.3 of the Plan, except to the extent that a Holder of an Allowed Priority Claim has been paid by or on behalf of the Debtors prior to the Effective Date or |

| | | Accept | agrees to a different treatment, each Holder of an Allowed Priority Claim shall be paid Cash in the Allowed amount of their Priority Claim on the Effective Date or on the date such Allowed Priority Claim becomes due and payable pursuant to Section 3.3.2 of the Plan if such Priority Claim is not Allowed on the Effective Date. |
|------|-------------------------------|---------------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| III | Second Lien Secured Claim | Impaired and Entitled to Vote | Each Holder of the Allowed Second Lien Secured Claim shall be entitled to receive its Pro Rata Share, as reflected in the books and records of the Second Lien Agent, of the beneficial interests in the Secured Creditor Trust as set forth in Section 3.2 of the Plan. |
| IV | General Unsecured Claims | Impaired and Entitled to Vote | Each Holder of an Allowed General Unsecured Claim shall be entitled to receive its Pro Rata Share of the beneficial interests in the GUC Trust as set forth in Section 3.2 of the Plan, subject to Section 1.6 of the Plan and the GUC Trust Agreement; *provided, however,* that the Second Lien Deficiency Claims shall be deemed allowed for voting purposes only, but the Holders thereof shall not be entitled to any Distribution on account of such Claims under the Plan, including from the GUC Trust. |
| V | Subordinated Claims | Impaired and Deemed to Reject | Holders of Subordinated Claims will not receive any Distributions on account of such Claims under the Plan. |
| VI | Equity Interests | Impaired and Deemed to Reject | On the Effective Date, all Equity Interests in the Debtors shall be cancelled, annulled, and voided, and Holders thereof shall be entitled to no Distribution or recovery on account of such Equity Interests, provided, however, Equity Interests in any subsidiary of SRC Liquidation Company which is wholly owned, directly or indirectly, by SRC Liquidation Company shall be preserved solely for the benefit of the Holders of Allowed Claims as provided in the Plan. |

**1.1**  **Allowed Unclassified Claims**.  Subject to Section 3.3 of the Plan, except to the extent otherwise agreed to by the Holder of an Allowed Unclassified Claim, each Holder of an Allowed Unclassified Claim (other than Professional Fee Claims) shall be paid in Cash the full amount of such Allowed Unclassified Claim.  Allowed Unclassified Claims (other than Professional Fee Claims) shall be paid (a) by the Debtors or Liquidating SRC on the later of the Effective Date or the date such Claim becomes due and payable (or as soon as reasonably practicable after) if such Claim is Allowed as of the Effective Date; and (b) by Liquidating SRC in accordance with Section 3.3 of the Plan if such Claim is not Allowed as of the Effective Date.

Professional Fee Claims will be Allowed and paid in accordance with Article 9 of the Plan.

**1.2**     **Provisions Governing Allowance of and Defenses to Claims.**  Nothing in the Plan shall affect the rights, defenses, or remedies of the Debtors, the Estates, or the Trustees in respect of any Claim, including all rights, defenses, and remedies in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims.  The Trusts may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Estates or the Trusts may have against the Claim Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Trusts of any such Claim they may have against such Claim Holder.  The Trustee of either Trust may designate any Claim against such Trust as Allowed at any time from and after the Effective Date without further order of the Bankruptcy Court, subject to the provisions of the applicable Trust Agreement and Article 4 below.

**1.3**     **No Interest on Claims.**     Except as expressly required under sections 506 and 1129(a)(9)(C) of the Bankruptcy Code, the Holders of Claims shall not be entitled to any interest on such Claims that accrued on and after the Petition Date.

**1.4**     **Voting and Request to Confirm Under Section 1129(b).**  Claims in Classes III and IV are Impaired and the Holders thereof are entitled to vote to accept or reject the Plan.  Claims in Classes I and II are Unimpaired and the Holders thereof are deemed to accept the Plan and to grant the Third Party Releases.  Claims in Class V and Equity Interests in Class VI are Impaired, will not receive a Distribution under the Plan, and the Holders thereof are deemed to reject the Plan.  Any Class of Claims that does not have a Holder of a Claim as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting and determining acceptances and rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

In view of the deemed rejection by Classes V–VI, the Debtors request the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code as to such Classes and any other Class voting to reject the Plan.

**1.5**     **Third Party Releases.**  The Plan provides for the Third Party Releases.  Each Holder of a Claim who is presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code (*i.e.*, Holders of Claims in Classes I and II), shall be deemed to have granted the Third Party Releases.  Each Holder of a Class III or Class IV Claim entitled to vote shall be deemed to have granted the Third Party Releases unless such Holder, by the Voting Deadline, both (a) votes to reject the Plan or abstains from voting on the Plan and (b) executes and submits a Third Party Opt-Out Election.

**1.6**     **Disgorgement Provision.**  Any Holder of a Class IV Claim shall, if such Holder initiates a lawsuit in its individual capacity against any of the Released Parties, (a) pay an amount equal to any Distributions it has received from the GUC Cash Payment to the Second Lien Agent, and (b) be deemed to have automatically waived its right to any further Distributions under the Plan or from the GUC Trust.

**1.7**     **Cancellation of Claims and Equity Interests.**  Except as otherwise set forth in the Plan, and except for purposes of evidencing a timely asserted Claim, all notes, stock, instruments, certificates, and other documents evidencing any Claims or Equity Interests shall be cancelled,

shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or an any way related thereto shall be discharged.

**1.8** **Term of Injunctions or Stays.** **Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the applicable Chapter 11 Cases are closed.**

**1.9** **Corporate Action.** The Confirmation Order shall approve and authorize the Debtors to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and any documents contemplated to be executed therewith, prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without the need for any further approval, act or action under any applicable law, order, rule, or regulation.

**1.10** **Dissolution of Committee.** The Committee shall continue in existence through and including the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court, this Plan, or the Confirmation Order prior to the Effective Date. On the Effective Date, the Committee shall be deemed dissolved, and its members shall be deemed released of all their duties, responsibilities, and obligations as members of the Committee in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committee's Professionals shall terminate; *provided, however*, that the Committee shall continue to exist after the Effective Date for the limited purpose of prosecution of any Professional Fee Claims pursuant to Article 9 hereof.

**1.12** **Termination of Debtors' Professionals and Committee Professionals.** On the Effective Date, the Professionals for the Debtors and the Committee shall be deemed to have completed their services and their representation of the Debtors and the Committee, as applicable, shall be deemed to be terminated, provided that such Professionals shall be entitled to assert and prosecute Professional Fee Claims pursuant to Article 9 hereof.

**2.** **IMPLEMENTATION OF THE PLAN AND THE TRUSTS**

**2.1** **Implementation of the Plan.** The Plan will be implemented by the Debtors, the Secured Creditor Trust and the GUC Trust, as applicable, and funded from the Assets of the Estates, the Wind-Down Amount, and the Taylor Payment Receivable.

**2.2** **Substantive Consolidation.**

(a) Entry of the Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates of the Debtors for the purposes of confirming and consummating the Plan, including, but not limited to, voting, confirmation and Distribution. On and after the Effective Date, (i) all Assets and liabilities of the Debtors shall be deemed to be the Assets and liabilities of a single, consolidated Entity, (ii) each Claim Filed or to be Filed against any Debtor shall be deemed Filed as a single Claim against and a single obligation of the Debtors, (iii) all

4

Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, *provided*, *however*, that the Claims set forth in the Mexico Consideration Tax Treatment Agreement shall be preserved solely for the purposes of implementing that Agreement, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) the existing Equity Interests in SRC Liquidation Company shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any existing Equity Interest held by a Debtor in any other Debtor, except as and to the extent required in the Mexico Consideration Tax Treatment Agreement, (vii) all guarantees of any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor shall be one obligation of the substantively consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors.

(b) The substantive consolidation of the Debtors under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Trusts on or after the Effective Date (including any agreements entered into by the GUC Trust or the Secured Creditor Trust prior to the Effective Date, all of which are deemed to be ratified as of the Effective Date), (iv) the Debtors' or the GUC Trust's ability to subordinate or otherwise challenge Claims on an Entity-by-Entity basis, and (v) distributions to the Debtors or the Trusts from any insurance policies or the proceeds thereof. In particular, the substantive consolidation of the Debtors under the Plan shall not result in any Debtor that is not a named insured or additional insured under a general commercial liability insurance policy issued to one or more of the Debtors becoming an insured under such a policy, and the substantive consolidation of the Debtors under the Plan shall not render an insurance company that issued such a general commercial liability insurance policy liable on account of any Debtor that is not a named insured or additional insured under such a policy. Notwithstanding the substantive consolidation called for herein, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed, dismissed or converted.

(c) In the event the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Debtors' Estates: (i) the Plan shall be treated as a separate plan of liquidation for each Debtor not substantively consolidated, and (ii) the Debtors shall not be required to resolicit votes with respect to the Plan.

## 2.3    **The Debtors' Post-Effective Date Corporate Affairs**.

**2.3.1    Debtors' Managers, Directors, and Officers.**  On the Effective Date, other than with respect to the Mexico Debtors, each of the Debtors' managers, directors, and officers shall be deemed to resign, with such resignations to have immediate effect. Each Person serving in the capacity of director or officer of one or more of the Debtors other than the Mexico Debtors on or prior to the Effective Date shall have no continuing obligations to the Debtors or Liquidating Debtors following the occurrence of the Effective Date. The managers, officers, directors, and other similar agents of the Mexico Debtors shall retain their positions on and after the Effective Date.

**2.3.2** **Appointment of Member(s), Officer(s), Managers and Director(s) of Liquidating Debtors.** The initial member(s), manager(s), officer(s) and/or director(s) of the Liquidating Debtors other than the Debtors that will be dissolved on the Effective Date and the Mexico Debtors shall be selected by the GUC Trust Oversight Committee and identified to the GUC Trustee no later than ten (10) days prior to the Plan Voting Deadline. The GUC Trustee shall File a notice identifying the Person or Persons selected as post-Effective Date member(s), manager(s), officer(s) and/or director(s) of the Liquidating Debtors other than the Debtors that will be dissolved on the Effective Date and the Mexico Debtors and serve such notice on the Committee, the Second Lien Agent, the Debtors, and the U.S. Trustee no later than seven (7) days prior to the Plan Voting Deadline. The appointment of the initial member(s), manager(s), officer(s) and/or director(s) of the Liquidating Debtors other than the Debtors that will be dissolved on the Effective Date and the Mexico Debtors shall be approved in the Confirmation Order, and such appointment shall be effective on the Effective Date. Following the Effective Date, the GUC Trust Oversight Committee shall have the authority to select, appoint, remove, replace, and establish the compensation (if any) of the member(s), manager(s), officer(s) and/or director(s) of the Liquidating Debtors other than the Debtors that will be dissolved on the Effective Date and the Mexico Debtors as the GUC Trust Oversight Committee, in its sole discretion, deems appropriate, without further order of the Bankruptcy Court. The parties with requisite authority to select, appoint, remove, replace, and establish compensation (if any) of the member(s), manager(s), officer(s) and director(s) of the Mexico Debtors under the Mexico Debtors' constituent documents shall continue to have such authority.

**2.3.3** **Conversion of SRC Liquidation Company; Cancellation of Shares; GUC Trust as Sole Member.** In accordance with the Implementation Memorandum, the actions set forth in this Section 2.3.3 shall be taken on the Effective Date. Pursuant to the provisions of the Confirmation Order and without any requirement to obtain approval of Holders of existing Equity Interests of SRC Liquidation Company, SRC Liquidation Company shall be converted from an Ohio corporation into an Ohio limited liability company. All of the existing Equity Interests in the Debtors (including all instruments evidencing such Equity Interests) shall be automatically deemed cancelled and extinguished without the requirement of any further action under any applicable agreement, law, regulation, or rule, *provided*, that Equity Interests in any subsidiary of SRC Liquidation Company which is wholly owned, directly or indirectly, by SRC Liquidation Company shall be preserved solely for the benefit of the Holders of Allowed Claims as provided in the Plan. Liquidating SRC shall issue all of the Liquidating SRC Membership Interests to the GUC Trust. The GUC Trust shall hold such Liquidating SRC Membership Interests for the benefit of the GUC Trust Beneficiaries, and such Liquidating SRC Membership Interests shall remain outstanding until Liquidating SRC is dissolved in accordance with the Plan.

**2.3.4** **Vesting of Assets and Dissolution of the Debtors.** On the Effective Date, all Assets of the Debtors not otherwise transferred either to the GUC Trust or the Secured Creditor Trust shall vest in Liquidating SRC free and clear of all Claims, Equity Interests, liens, charges or other encumbrances other than the obligations set forth in the Wind-Down Settlement, if any. On the Effective Date or as soon thereafter as is reasonably practicable, and without the need for any further order of the Bankruptcy Court, action, or formality which might otherwise be required under applicable non-bankruptcy laws, (a) the Debtors other than Liquidating SRC, the Mexico Holding Debtors, and the Mexico Debtors shall be dissolved without the need for any filings with the Secretary of State or other requisite governmental official in each Debtor's

respective jurisdiction of formation and (b) the Mexico Holding Debtors and the Mexico Debtors may, in the sole discretion of Liquidating SRC, be (i) dissolved without the need for any filings with the Secretary of State or other requisite governmental official in each Debtor's respective jurisdiction of formation, (ii) merged into or with Liquidating SRC or the GUC Trust, or, with respect to the Mexico Debtors, into each other, or (iii) sold; *provided, however*, that no such dissolution, merger or sale shall occur with respect to the Mexico Debtors except in accordance with and pursuant to Mexico law (and after all obligations of such Mexico Debtors to be satisfied by Taylor have been determined and satisfied) or shall have the effect of altering implementation of the Mexico Consideration Tax Treatment Agreement; *provided further, however*, that the proceeds of any sale of the Equity Interests of any Liquidating Debtor other than Liquidating SRC shall be remitted to the Secured Creditor Trust; the Confirmation Order may provide for such dissolution, merger or sale of such other Debtors. Post Effective Date the GUC Trustee individually, or through its authorized representatives or designees, shall have all requisite power and authority that may be or could have been exercised with respect to each Liquidating Debtor (whether or not dissolved as of the Effective Date) by any officer, director, shareholder, member, manager or other party acting in the name of such Liquidating Debtor or its respective estate with like effect as if duly authorized, exercised and taken by action of such officers, directors, members, managers, shareholders or other party. The GUC Trustee may also and shall be authorized to, without further notice or other of the Court, select directors and officers of the Mexico Holding Debtors post Effective Date and such directors and officers shall have the requisite authority to act on the behalf of the Mexico Holding Debtors. To the extent they are not dissolved on the Effective Date, the applicable governing documents of the Liquidating Debtors shall be amended, if necessary, to prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After all Disputed Claims have been resolved in accordance with Section 4.2 hereof, all payments required to be made by Liquidating SRC or Taylor under this Plan, including without limitation Section 3.2.1, have been made, and all obligations of the Debtors under the Asset Purchase Agreement have been satisfied, and without the need for any further order of the Bankruptcy Court, action, or formality which might otherwise be required under applicable non-bankruptcy laws, Liquidating SRC shall be dissolved without the need for any filings with the Secretary of State or other requisite governmental official in Liquidating SRC's jurisdiction of formation. If desired by Liquidating SRC, the entry of a Final Decree in any of the Chapter 11 Cases shall effect the dissolution of the Liquidating Debtor in such case to the extent permissible under applicable law; *provided, however*, that no such dissolution shall occur with respect to the Mexico Debtors except in accordance with and pursuant to Mexico law (and after all obligations of such Mexico Debtors to be satisfied by Taylor have been determined and satisfied) or shall have the effect of altering implementation of the Mexico Consideration Tax Treatment Agreement. To the extent Liquidating SRC holds any Assets on the date of its dissolution that are not otherwise subject to Section 2.3.7 hereof, such Assets shall at the election of the GUC Trustee, either vest in the GUC Trust for the benefit of the GUC Trust Beneficiaries or may be sold or abandoned by Liquidating SRC pursuant to section 554 of the Bankruptcy Code and/or the *Order Establishing Procedures for Debtors to Transfer, Abandon, or Sell De Minimis Assets* [D.I. 1096].

**2.3.5   Trustees of Secured Creditor Trust.** The Secured Creditor Trust is and will be managed by the Secured Creditor Trustee. The Secured Creditor Trustee may be changed as provided in the Secured Creditor Trust Agreement. Any such changes prior to the Effective Date shall be noticed to the Committee, the Debtors and the U.S. Trustee.

**2.3.6  Establishment of Secured Creditor Trust.**  On the Effective Date, the Debtors and the Secured Creditor Trustee shall ratify the Secured Creditor Trust Agreement and shall confirm that the trust referred to in such Agreement is the Secured Creditor Trust pursuant to the Plan.  In the event of any conflict between the terms of the Plan and the terms of the Secured Creditor Trust Agreement, the terms of the Plan shall control.

**2.3.7  Secured Creditor Trust Assets.**  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date, except as provided in the Wind-Down Settlement, the Debtors shall transfer to the Secured Creditor Trust all of their right, title, and interest in and to all of the Secured Creditor Trust Assets not already transferred to the Secured Creditor Trust pursuant to the Wind-Down Settlement, if any. In accordance with section 1141 of the Bankruptcy Code, all Secured Creditor Trust Assets shall automatically vest in the Secured Creditor Trust free and clear of all Claims and Liens, other than Permitted Claims and Liens under the Second Lien Term Loan Facility and the Claims and Liens of the Second Lien Agent, Holders of Class III Claims and Bank of America, N.A.. The BofA Cash Collateral Agreement shall be deemed assigned, by virtue of this Plan and the Confirmation Order, to the Secured Creditor Trust on the Effective Date, and the Secured Creditor Trust shall be deemed the successor to the Debtors for the purposes of the BofA Cash Collateral Agreement and shall have the right to enforce any rights of the Debtors thereunder. In connection with the vesting and transfer of the Secured Creditor Trust Assets, including, without limitation, any Causes of Action that are Secured Creditor Trust Assets, any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Secured Creditor Trust shall vest in the Secured Creditor Trust.  The Debtors and the Secured Creditor Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. All Assets transferred to the Secured Creditor Trust shall be transferred free of any stamp or similar tax to the maximum extent permitted under section 1146(a) of the Bankruptcy Code.  All transfers of Secured Creditor Trust Assets to third parties in accordance with the Secured Creditor Trustee's duties and responsibilities under this Plan and the Secured Creditor Trust Agreement are transfers pursuant to this Plan and accordingly shall be free of any stamp or similar taxes.  To the extent any Secured Creditor Trust Assets are mistakenly transferred to the GUC Trust or vest in the Liquidating Debtors, the GUC Trust and/or the Liquidating Debtors, as applicable, shall, upon request, reasonably cooperate with the Secured Creditor Trust in causing such Secured Creditor Trust Assets to be transferred to the Secured Creditor Trust; and any such transfer shall be deemed made pursuant to the Plan, retroactive to the Effective Date.

**2.4  GUC Trust.**

**2.4.1  GUC Trust Trustees.**  The GUC Trust is and will be managed by the GUC Trustee.  The GUC Trustee may be changed as provided in the GUC Trust Agreement.  Any such changes prior to the Effective Date shall be noticed to the Second Lien Agent, the Committee, the Debtors and the U.S. Trustee.

**2.4.2  Establishment of the GUC Trust.**  On the Effective Date, the Debtors and the GUC Trustee shall ratify the GUC Trust Agreement and shall confirm that the trust referred to in such Agreement is the GUC Trust pursuant to the Plan.  In the event of any conflict between the terms of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall control.

**2.4.3   Transfer and Vesting of GUC Trust Assets.** On the Effective Date, notwithstanding any restriction on or prohibition of assignability under applicable non-bankruptcy law the Debtors shall transfer, to the extent not previously transferred pursuant to the Committee Settlement and the GUC Trust Agreement, all of their right, title, and interest in and to the GUC Trust Assets to the GUC Trust in trust for the benefit of the GUC Trust Beneficiaries and, in accordance with section 1141 of the Bankruptcy Code, all such Assets shall automatically vest in the GUC Trust, free and clear of all Claims and liens, subject only to repayment of the GUC Trust Seed Funding Amount and the expenses of the GUC Trust as set forth herein and in the GUC Trust Agreement. For the avoidance of doubt, to the extent the transfer, pursuant to the Committee Settlement, of any GUC Trust Assets to the GUC Trust prior to the Effective Date is ever deemed ineffective or otherwise invalid, such GUC Trust Assets shall be deemed transferred to the GUC Trust pursuant to this Plan, effective as of the Effective Date. On the Effective Date, to the extent that any GUC Trust Assets cannot be transferred to the GUC Trust for any reason, (a) the GUC Trustee is appointed as a representative of the Liquidating Debtors' estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to such Assets and (b) the Liquidating Debtors shall be deemed to have transferred and assigned to the GUC Trust, for the benefit of the GUC Trust Beneficiaries, all of their right, title, and interest in and to the proceeds of such Assets. All Assets transferred to the GUC Trust shall be transferred free of any stamp or similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code. All transfers of GUC Trust Assets to third parties in accordance with the GUC Trustee's duties and responsibilities under this Plan and the GUC Trust Agreement are transfers pursuant to this Plan and accordingly shall be free of any stamp or similar taxes.

In connection with the vesting and transfer of the GUC Trust Assets (including but not limited to the GUC Trust Causes of Action), any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the GUC Trust shall be transferred to and vest in the GUC Trust. Privileged communications may be shared among the GUC Trustee, the GUC Trust Oversight Committee, and the Liquidating Debtors without compromising the privileged nature of such communications, in accordance with the common interest doctrine. The Plan shall be considered a motion for such relief pursuant to sections 105, 363, and 365 of the Bankruptcy Code. The Debtors and the GUC Trustee are authorized to take all necessary actions to effectuate the transfer from the Debtors to the GUC Trust of such privileges, protections, and immunities held by the Debtors in connection with the GUC Trust Causes of Action. To the extent any GUC Trust Assets are mistakenly transferred to the Secured Creditor Trust, the Secured Creditor Trust shall, upon request, reasonably cooperate with the GUC Trust in causing such GUC Trust Assets to be transferred to the GUC Trust; and any such transfer shall be deemed made pursuant to the Plan, retroactive to the Effective Date.

**2.4.4   Repayment of GUC Trust Seed Funding Amount.** Prior to the Effective Date, the Debtors advanced the GUC Trust Seed Funding Amount to the GUC Trust from the Wind-Down Amount. The GUC Trust shall repay the GUC Trust Seed Funding Amount as provided in Section 2.8 of the GUC Trust Agreement before payment of any proceeds, other than the GUC Cash Payment, to beneficiaries of the GUC Trust.

**2.4.5   GUC Cash Payment.** Notwithstanding anything to the contrary herein, proceeds from the GUC Cash Payment shall be used solely as set forth in the Committee Settlement and the GUC Trust Agreement.

## 2.5   Treatment of GUC Trust and Secured Creditor Trust for Federal Income Tax Purposes; No Successor in-Interest.

The Trusts shall be established for the primary purpose of liquidating and distributing the Assets transferred to them, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trusts. Accordingly, the Trustee(s) of the GUC Trust and the Secured Creditor Trust shall, in an expeditious but orderly manner, liquidate and convert to Cash the Assets of the respective Trust, and make timely Distributions to the beneficiaries of each Trust, and not unduly prolong the duration of the Trusts. Neither the GUC Trust nor the Secured Creditor Trust shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the relevant Trust Agreement.

Each Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries of such Trust treated as grantors and owners of the Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Trustees, and the beneficiaries of the Trusts) shall treat the transfer of the Assets by the Debtors to the Trusts, as set forth in the Trust Agreements, as a transfer of such Assets by the Debtors to the Holders of Allowed Claims entitled to Distributions from the Assets of the relevant Trust, followed by a transfer by such Holders to the relevant Trust. Thus, the beneficiaries of each Trust shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as reasonably practicable after the Effective Date, the Trustees of each Trust (to the extent that the Trustees deem it necessary or appropriate in their sole discretion) shall make a good faith determination of the value of the Assets of such Trust. The valuation shall be used consistently by all parties (including the Debtors, the Trustees, and the beneficiaries of the Trusts) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Assets transferred either to the GUC Trust or the Secured Creditor Trust.

The right and power of the Trustees of each Trust to invest the Assets transferred to such Trust, the proceeds thereof, or any income earned by the Trust, shall be as set forth in the Trust Agreements.

**2.5.1   Responsibilities of Trustees.** The responsibilities of the Trustees of each Trust, which shall be discharged in accordance with the terms of this Plan and the relevant Trust Agreement, shall include, but shall not be limited to, the following:

(a)   Administering, liquidating, and monetizing the Assets of the Trust;

(b)   Objecting to and resolving Disputed Claims pursuant to Article 4 hereof;

(c)   Investigating, pursuing, litigating, settling, or abandoning any Causes of Action transferred to the Trust and, in the case of the GUC Trustee, administering the Assets of the Liquidating Debtors, in conjunction with the manager(s) and officer(s) of Liquidating SRC, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code;

(d)    Making Distributions in accordance with the terms of the Plan and the relevant Trust Agreement;

(e)    Preparing and Filing post-Effective Date operating reports;

(f)    Filing appropriate tax returns in the exercise of their fiduciary obligations;

(g)    Retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations; and

(h)    Taking such actions as are necessary and reasonable to carry out the purposes of the Trust.

As of the Effective Date, to the extent necessary or appropriate to effectuate the terms of the Plan and the relevant Trust Agreement, the Trustees of each Trust shall, as to any Assets transferred to such Trust pursuant to the Plan or the Committee Settlement, be deemed to be a representative of the Debtors' estates in the Chapter 11 Cases, under the Plan, or in any judicial proceeding or appeal to which a Debtor is a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

Subject to the terms of the relevant Trust Agreement, each Trust may hire and employ its own counsel, financial advisors, or other consultants, and the retention as a Professional during the Chapter 11 Cases shall not prohibit the Trust from hiring any particular Professional.

**2.5.2    Cost and Expenses of Trusts.**  All costs and expenses of each Trust shall be the responsibility of and paid by that Trust, as provided in the relevant Trust Agreement.

**2.5.3    Bonding of Trustees.**  The Trustee of each Trust shall not be obligated to obtain a bond but may do so, in his, her, or its sole discretion, in which case the expense incurred by such bonding shall be paid by the relevant Trust.

**2.5.4    Dissolution of the Trusts.**  Except as otherwise provided in the applicable Trust Agreement, the Trusts shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed on or before the fifth anniversary or the end of any extension period approved by the Bankruptcy Court (the Filing of which motion shall automatically extend the term of the Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of Assets of the relevant Trust.  Any such extension must be approved by the Bankruptcy Court within six (6) months of the beginning of the extended term.  As to each Trust, after (a) the final Distribution of the reserves and the balance of the Assets or proceeds of the Assets of such Trust pursuant to the Plan, (b) the Filing by or on behalf of the Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (c) any other action deemed appropriate by the Trustees of the Trust, the Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**2.5.5    Liability, Indemnification of the Trust Protected Parties.**  The Trust Protected Parties shall not be liable for any act or omission of any other Trust Protected Parties or the

member, designee, agent, or representative of such Trust Protected Parties, nor shall such Trust Protected Parties be liable for any act or omission taken or not taken (including, without limitation, any claim relating to or arising out of the implementation or administration of this Plan, the activities of the applicable Trust, the Assets or liabilities of the Debtors or the applicable Trust, or the responsibilities or obligations of the Trust Protected Parties with respect to the Plan, the applicable Trust, the Debtors, or the Liquidating Debtors (including, without limitation, claims under applicable environmental law)) other than for specific acts or omissions resulting from, and found by a court of competent jurisdiction to have been caused by, such Trust Protected Parties' willful misconduct, gross negligence or fraud. A Trustee of the Trusts may, in connection with the performance of his, her, or its functions, and in his, her, or its sole and absolute discretion, consult with his, her, or its attorneys, accountants, financial advisors, and agents. Notwithstanding such authority, no Trustee of any Trust shall be under any obligation to consult with his, her, or its attorneys, accountants, financial advisors, and agents, and his, her, or its determination not to do so shall not result in the imposition of liability on the Trustee, unless such determination is based on willful misconduct, gross negligence or fraud. Each Trust shall indemnify and hold harmless its own Trust Protected Parties, and not the Trust Protected Parties from any other Trust created pursuant to the Plan, from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related expenses) which such Trust Protected Parties may incur or to which such Trust Protected Parties may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Trust Protected Parties arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the applicable Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Trust Protected Parties for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

**2.5.6    Full and Final Satisfaction against Trusts.**  On and after the Effective Date, neither the GUC Trust nor the Secured Creditor Trust shall have any liability on account of any Claims or Equity Interests except as set forth in the Plan and in the relevant Trust Agreement. All payments and all Distributions made by each Trust under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against such Trust.

**2.6    Bank of America Claims.**  The Claims held by Bank of America, N.A. pursuant to the BofA Cash Collateral Agreement shall be Other Secured Claims and shall be treated as set forth in this Section 2.6.  The BofA Cash Collateral Agreement shall be assumed, affirmed and reinstated in full, and assigned to the Secured Creditor Trust along with the BofA Cash Collateral Account, leaving unaffected BofA's legal, equitable and contractual rights, including, without limitation, the lien of Bank of America, N.A. upon the LC Cash Collateral (as such term is defined in the BofA Cash Collateral Agreement). The Secured Creditor Trust, as assignee of the Debtors, shall maintain the BofA Cash Collateral Account and Bank of America, N.A. shall be entitled to payment of its Claims, if any, from the BofA Cash Collateral Account in accordance with the terms and conditions of the BofA Cash Collateral Agreement.  On and after the Effective Date, Bank of America, N.A. shall have no recourse against Liquidating SRC, the GUC Trustee, or the GUC Trust Assets for any Claims arising under the BofA Cash Collateral Agreement.  Notwithstanding any provision to the contrary in this Plan or in the Secured Creditor Trust Agreement, (i) the BofA Cash Collateral Account shall remain at Bank of

America, N.A., shall continue to be subject to the terms of the BofA Cash Collateral Agreement and any account agreement (the "BofA Account Agreement") entered into at any time with Bank of America, N.A. in connection with the opening of the BofA Cash Collateral Account, and shall remain open until all balances on deposit in the BofA Cash Collateral Account have been disbursed in accordance with the BofA Cash Collateral Agreement and the BofA Cash Collateral Agreement has been terminated; (ii) as of the Effective Date, the BofA Account Agreement shall be deemed assumed by the Debtors and assigned to the Secured Creditor Trust, and the Secured Creditor Trust shall be deemed the successor to the Debtors for the purposes of the BofA Account Agreement, shall continue to abide by and be subject to the terms of the BofA Account Agreement, and shall be entitled to all rights and benefits of the Debtors thereunder; (iii) no costs, expenses, taxes, or charges incurred by the Secured Creditor Trust or the Secured Creditor Trustee, the Advisor, any member of the Oversight Committee, any Agent or any officer or employee of the Secured Creditor Trust (as such terms are defined in the Secured Creditor Trust Agreement) including, without limitation, any professional fees and expenses, and no indemnification claim under the Secured Creditor Trust Agreement shall be payable from the deposit balances in the BofA Cash Collateral Account except from any Return Amount (as such term is defined in the BofA Cash Collateral Agreement) or other deposits returned to the Secured Creditor Trust (as successor to, and assignee of, the Debtors) pursuant to the terms of the BofA Cash Collateral Agreement; (iv) no Holder of a Claim in Classes I through VI shall have or be granted a lien upon the BofA Cash Collateral Account, the deposit balances in such account and its proceeds superior to or on par with the interest and lien of Bank of America, N.A. under the BofA Cash Collateral Agreement; (v) the Secured Creditor Trustee shall have no authority to liquidate, monetize or invest any part of the balances on deposit at any time in the BofA Cash Collateral Account, except in accordance with the terms of the BofA Cash Collateral Agreement, including, without limitation, with respect to any Return Amount; (vi) immediately upon the assignment of the BofA Cash Collateral Account to the Secured Creditor Trust, the lien and security interest of Bank of America, N.A. upon and in the BofA Cash Collateral Account and the LC Cash Collateral shall be deemed valid, binding and duly perfected, without Bank of America, N.A. being required to file any UCC-1 financing statement or similar document (but Bank of America, N.A. shall be authorized to make any such filings it deems appropriate in its discretion), and Bank of America, N.A. shall be deemed to have control over the BofA Cash Collateral Account for all purposes of perfection under the Uniform Commercial Code in effect under applicable law; and (vii) in connection with the assignment of the BofA Cash Collateral Account and BofA Cash Collateral Agreement to the Secured Creditor Trust, the Debtors, Liquidating SRC, and the Secured Creditor Trustee shall provide such information to, execute and deliver such documents to, and take such further actions as Bank of America, N.A. reasonably requests from time to time to evidence and give effect to such assignment and to perfect, and to continue and maintain perfection of, Bank of America, N.A.'s lien upon the BofA Cash Collateral Account and the LC Cash Collateral; *provided, however,* that such security interest shall terminate automatically pursuant to the terms and subject to the conditions set forth under the heading "Security Interests; Right of Setoff" in the BofA Cash Collateral Agreement.

**2.7    Continuation as Debtor in Possession Between the Confirmation Date and the Effective Date.** During the period from the Confirmation Date through the Effective Date, except as expressly provided herein, the Debtors shall continue to manage their Assets and resolve their liabilities, as debtors-in-possession, subject to the oversight of the Bankruptcy Court

as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

**3.   EXECUTION OF THE PLAN**

**3.1   Effective Date.** The Plan shall become effective on the date that is the first Business Day on which each condition set forth in Article 6 of the Plan has been satisfied or waived as set forth therein (the "Effective Date"). On the Effective Date, or as soon as practicable thereafter, Liquidating SRC, the GUC Trustee, and the Secured Creditor Trustee, as applicable, shall consummate, pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, those transactions and sales of property, if any, set forth in the Plan or the Plan Supplement.

**3.2   Funding, Distributions and Reserves for Class III and IV Claims.**

 **3.2.1   Transfers to Trusts.** On the Effective Date, or as soon thereafter as practicable, and to the extent not previously transferred pursuant to the Committee Settlement, the GUC Trust Agreement or the Wind-Down Settlement, the GUC Trust Assets will be transferred by the Debtors to the GUC Trust and the Secured Creditor Trust Assets will be transferred by the Debtors to the Secured Creditor Trust. The GUC Trust Assets and the Secured Creditor Trust Assets transferred by the Debtors shall be deemed vested in the respective Trust. The Liquidating Debtors shall not make any further transfers or contributions to the GUC Trust until all Unclassified Claims, Priority Claims, and Other Secured Claims are satisfied in accordance with the Plan; thereafter, subject to Section 2.3.7 hereof, all remaining Assets of Liquidating SRC may be transferred by Liquidating SRC to the GUC Trust.

 **3.2.2   No Waiver. The Debtors, the Liquidating Debtors, the GUC Trustee, and the Secured Creditor Trustee reserve the right to pursue any and all Causes of Action vested in them pursuant to the provisions of this Plan, the Trust Agreements, and/or the Committee Settlement, and all rights of the Liquidating Debtors, the Secured Creditor Trust, and the GUC Trust to pursue, administer, settle, litigate, enforce and liquidate any and all such Causes of Action consistent with the terms and conditions of the Plan, Secured Creditor Trust Agreement, the GUC Trust Agreement, and the Committee Settlement are hereby preserved. The Liquidating Debtors and the GUC Trustee shall, pursuant to Section 1123 and all applicable law, have the requisite standing to prosecute, pursue, administer, settle, litigate, enforce and liquidate the GUC Trust Causes of Action and Avoidance Actions. For the avoidance of doubt, (a) the GUC Trust Adversary Proceeding, the GUC Trust Causes of Action and Avoidance Actions are expressly preserved, and (b) all Causes of Action against the Released Parties are expressly released as set forth in the Committee Settlement, Article 7 hereof, and the corollary provisions of the Confirmation Order. The Secured Creditor Trust shall, pursuant to section 1123 of the Bankruptcy Code, have the requisite standing to prosecute, pursue, administer, settle, litigate, enforce, and liquidate any Causes of Action that constitute Secured Creditor Trust Assets.**

 **Except for Causes of Action against a Person or Entity that are expressly waived, relinquished, released, compromised or settled in this Plan, the Committee Settlement, the Wind-Down Settlement, or any Final Order (including, without limitation, the Causes of Action against the Released Parties), the Debtors (before the Effective Date) and the Secured Creditor Trust, the GUC Trust, and the Liquidating Debtors (on and after the**

Effective Date) expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine or other rule of law, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order. All Causes of Action held by the Debtors' Estates or the GUC Trust as of the Confirmation Date shall survive Confirmation of the Plan and the commencement and prosecution of any Causes of Action shall not be barred or limited by any estoppel (judicial, equitable or otherwise). Subject to the Committee Settlement, Article 7 hereof, and the corollary provisions of the Confirmation Order, the rights of the Secured Creditor Trust, the GUC Trust, and the Liquidating Debtors to commence and prosecute Causes of Action shall not be abridged, limited, or altered in any manner by reason of Confirmation of the Plan or the occurrence of the Effective Date. No defendant party to any Cause of Action (including Avoidance Actions) shall be permitted or entitled to assert any defense based, in whole or in part, upon Confirmation of the Plan, and Confirmation of the Plan shall not have any res judicata or collateral estoppel or preclusive effect upon the commencement and prosecution of Causes of Action. In addition, the Debtors, the Liquidating Debtors, the Secured Creditor Trust, and the GUC Trust, and any successors in interest thereto, expressly reserve the right to pursue or adopt any Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person, including, without limitation, the plaintiffs and co-defendants in such lawsuits.

### 3.2.3   Issuance of Beneficial Interests.

(a)     On the Effective Date, or as soon thereafter as practicable, (i) the GUC Trust will reaffirm the issuance of beneficial interests, as provided in this Plan and the GUC Trust Agreement, to Holders of Allowed Claims in Class IV, subject to any reserve for Disputed Class IV Claims, and (ii) the Secured Creditor Trust will reaffirm the issuance of beneficial interests, as provided in this Plan, to Holders of Allowed Claims in Class III. Each Holder of Allowed Claims in Class III shall receive its proportionate beneficial interest reflecting that Holder's Pro Rata Share, as reflected in the books and records of the Second Lien Agent, of the total beneficial interests in the Secured Creditor Trust. Each Holder of Allowed Claims in Class IV shall receive a beneficial interest reflecting that Holder's Pro Rata Share of the total beneficial interests in the GUC Trust. In calculating a Holder's Pro Rata Share, the Secured Creditor Trust shall be entitled to rely on the books and records of the Second Lien Agent and need not set aside and reserve for any Class III Disputed Claims, and the GUC Trust shall create a reserve of beneficial interests for Class IV Disputed Claims, and shall resolve and distribute such reserve as provided below.

(b)     The GUC Trust shall set aside and reserve a Pro Rata Share of beneficial interests in the GUC Trust (and payments and Distributions on account of such reserved beneficial interests) which would be distributable to the Holder of any Class IV Disputed Claim as if such Claim were an Allowed Claim. Liquidating SRC shall be responsible, at its cost, for the resolution of all Class IV Disputed Claims.

### 3.3   Distributions and Establishment of Reserves for Unclassified Claims, Other Secured Claims, and Priority Claims.

**3.3.1   Distributions on Account of Allowed Unclassified Claims, Other Secured Claims, and Priority Claims; Establishment of Reserves**.  On or before the Effective Date, the Debtors shall establish accounts and fund reserves necessary to effectuate the terms of the Plan. Except as provided in the last sentence of this Section 3.3.1, the Debtors or Liquidating SRC, as applicable, shall (a) pay (or reserve and promptly pay) in Cash on the later of the Effective Date and the date on which such Claims become due and payable the Allowed amount of all Unclassified Claims (other than Professional Fee Claims) and Priority Claims to the extent such Claims are Allowed as of the Effective Date, (b) with respect to Other Secured Claims other than the Other Secured Claim of Bank of America, N.A. that are Allowed as of the Effective Date, (i) satisfy such Claims in whole or in part by the transfer of all or any portion of the Assets securing such Claims  or (ii) at the election of the Second Lien Agent made on or before the Effective Date and with the consent of the Debtors (A) reinstate such Claims in full, leaving unaffected the Holder's legal, equitable and contractual rights; *provided* that the Committee's consent shall be required for such reinstatement if the Creditor has any Secured Claim against Liquidating SRC or the GUC Trust, (B) pay such Claims in Cash up to the Allowed amount of such Claims, (C) begin to make deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of such Claims, or (D) treat such Claims in a manner that would provide the "indubitable equivalent" of such Claims, (c) as to the Other Secured Claim of Bank of America, N.A., assume and assign the Debtors' right, title and interest in the BofA Cash Collateral Agreement to the Secured Creditor Trust, which shall continue to abide by the terms and conditions of the BofA Cash Collateral Agreement and be entitled to all benefits and proceeds related thereto as set forth in Section 2.6 hereof, (d) establish and fund an escrow account for payment in Cash of estimated Allowed Professional Fee Claims, (e) deposit or allocate funds in the Disputed Claims Reserve for each timely-Filed Priority Claim that is Disputed as of the Effective Date in the amount asserted for such Claim as of the Effective Date or in such other amount as may be ordered by the Bankruptcy Court, after notice and hearing, and (f) set aside the collateral, or the proceeds of such collateral, securing any Other Secured Claim that is Disputed as of the Effective Date.  The Disputed Claims Reserve shall be funded first by any portion of the Wind-Down Amount not needed to pay Professional Fee Claims in accordance with Article 9 of the Plan or Allowed Unclassified Claims and Allowed Priority Claims in accordance with this Section 3.3.1 of the Plan.  Notwithstanding the foregoing, the Debtors shall not be required to pay (or reserve for), any Unclassified Claims, Priority Claims, Other Secured Claims or other Claims that are to be paid, directly or indirectly, by Taylor in connection with the Taylor Payment Receivable, provided that, at Confirmation, the Court may require Taylor to confirm its financial capability timely to pay the Taylor Payment Receivable.

**3.3.2   Payment of Disputed Unclassified Claims, Other Secured Claims and Priority Claims**.  All Unclassified Claims (other than Professional Fee Claims) that are not Allowed as of the Effective Date shall be paid within thirty (30) days of the date they become Allowed Claims.  Priority Claims that are not Allowed as of the Effective Date shall be paid from the funds in the Disputed Claims Reserve or, as applicable, from the Taylor Payment Receivable.  Any Other Secured Claim that is not Allowed as of the Effective Date shall be paid solely from the collateral, or the proceeds thereof, set aside for the payment of such Disputed Other Secured Claim. After the Effective Date, Liquidating SRC shall manage and administer the Disputed Claims Reserve and the claims asserted against such Disputed Claims Reserve, and the Secured Creditor Trust shall manage and administer the resolution of any Disputed Other Secured Claim and the collateral, or proceeds thereof, set aside with respect to such Disputed Other Secured Claim.  Upon the resolution of all Priority Claims that are not to be paid by Taylor

from the Taylor Payment Receivable, the remaining funds in the Disputed Claims Reserve shall be distributed to the Holders of such Claims up to the full Allowed amount of such Claims. If the funds in the Disputed Claims Reserve are insufficient to satisfy the full Allowed amount of the Priority Claims that were not Allowed as of the Effective Date and that were not to be paid by Taylor from the Taylor Payment Receivable, the shortfall shall be funded into the Disputed Claims Reserve by Liquidating SRC and distributed to Holders of Allowed Priority Claims in accordance with the preceding sentence. The Holders of Unclassified Claims, Priority Claims and Other Secured Claims shall have no recourse to any Assets of the GUC Trust or Secured Creditor Trust, nor shall such Holders have any recourse or Cause of Action against the Secured Creditor Trust, the GUC Trust or the Trustees for the failure to receive payment (whether full or partial) on account of their Allowed Claims. The excess amount, if any, remaining in the Disputed Claims Reserve (other than amounts set aside for Disputed Other Secured Claims) shall be used to satisfy the costs and expenses of Liquidating SRC (including, without limitation, the costs of resolution of all Class IV Disputed Claims, with the remaining funds being transferred to the GUC Trust, and any such funds that are transferred to the GUC Trust shall be used and distributed in accordance with the terms of the Plan and the GUC Trust Agreement. No funds shall be paid to the GUC Trust out of the Disputed Claims Reserve until such time as all Disputed Unclassified Claims (other than Professional Fee Claims) and all Priority Claims have been resolved in accordance with this Subsection 3.3.2 of the Plan. Notwithstanding the foregoing, collateral, or the proceeds of such collateral, set aside for any Disputed Other Secured Claim that is not required to pay such Disputed Other Secured Claim shall be paid to the Secured Creditor Trust, and any such Assets that are transferred to the Secured Creditor Trust shall be used and distributed in accordance with the terms of the Plan and the Secured Creditor Trust Agreement. Nothing in the Plan, including without limitation this Section 3.3.2, shall relieve Taylor of the obligation to pay any portion of the Taylor Payment Receivable.

**3.4    Timing of Distribution.** Distributions to Holders of Allowed Unclassified Claims (other than Professional Fee Claims) and Allowed Claims in Classes I and II shall be made at such times as required by Article 1 and Section 3.3 of the Plan, and Distributions to Holders of Allowed Professional Fee Claims shall be made in accordance with Article 9 of the Plan. The timing of all other Distributions shall be made in accordance with the terms of the relevant Trust Agreement.

**3.5    Distributions on Account of Disputed Claims.** Notwithstanding any provision in the Plan to the contrary, except as otherwise ordered by the Bankruptcy Court, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until the resolution of such disputes by settlement in accordance with Section 4.2 of the Plan or Final Order. Notwithstanding the foregoing, any Person who holds both an Allowed Claim(s) and a Disputed Claim(s) shall receive the appropriate payment or Distribution on the Allowed Claim(s), although no payment or Distribution shall be made on the Disputed Claim(s) until such dispute is resolved by settlement or Final Order.

**3.6    Delivery of Distributions.** Except as otherwise provided in the Trust Agreements, Distributions shall be made to Record Holders of Allowed Claims: (a) first, at the address set forth on the Record Holder's last Filed proof of Claim or the address set forth in any later written notice of address change Filed by such Holder; (b) second, at the addresses reflected in the Schedules if neither a proof of Claim nor a written notice of address change has been Filed; and (c) third, if the Record Holder's address is not listed in the Schedules, and such Record Holder

has not Filed a proof of Claim or written notice of address change, at the last known address of such Record Holder according to the Debtors' books and records. Except for the preceding sentence, none of the Debtors, the GUC Trustee, or the Secured Creditor Trustee, as applicable, is required to make any additional inquiry into the address to which it must deliver a Distribution under the Plan.

**3.7    Requirements for Distributions; Unclaimed Distributions.**  Unless otherwise set forth in the applicable Trust Agreement, prior to making any Distribution to the Holder of an Allowed Claim, Liquidating SRC (in connection with all Unclassified Claims (other than Professional Fee Claims), Priority Claims, and Other Secured Claims), the GUC Trust (in connection with Class IV Claims, and the Secured Creditor Trust (in connection with Class III Claims) shall require that the Holder of such Claim furnish all documents required by applicable tax law or other government regulation as a condition to the making of a Distribution (the "Required Reporting Documents"). If (a) the Holder of an Allowed Claim fails to furnish the Required Reporting Documents within ninety (90) days, or such longer period agreed to by the requesting party, of a written request for the Required Reporting Documents, or (b) a Distribution made on account of an Allowed Claim is not accepted within ninety (90) days from the mailing of such Distribution, then (x) the Liquidating SRC, the GUC Trust, or the Secured Creditor Trust, as applicable, shall treat such Distribution (or Distribution to be made) as forfeited and the Distribution shall be distributed pro rata to other claimants in the same Class as the forfeiting Holder, provided that no claimant shall receive greater than payment in full, and (y) the forfeiting Holder shall receive no further Distributions and shall forfeit its rights to collect any amounts under the Plan.

**3.8    De Minimis Distributions.**  Unless otherwise set forth in the applicable Trust Agreement, neither Liquidating SRC, nor the Trusts shall be required to make any single Distribution to the Record Holder of an Allowed Claim or Equity Interest if such Distribution would be less than $25.00 (the "Threshold Amount"); *provided, however,* that Liquidating SRC and the Trusts shall make a Distribution to the Record Holder of an Allowed Claim if the aggregate Distributions to which such party would otherwise be entitled exceed $25.00. Unless otherwise set forth in the applicable Trust Agreement, after all the Assets of a Trust have been reduced to Cash or abandoned, the relevant Trust shall make the final Distribution. In the event that any final Distribution for an Allowed Claim is less than the Threshold Amount (each a "De Minimis Final Distribution"), the relevant Trust shall tender such De Minimis Final Distribution (together will all other De Minimis Final Distributions) to a charity selected by the Trustees of the Trust. In addition, either Trustee may donate any Assets of the applicable Trust that would be impractical to distribute to its beneficial interest holders to a charity selected by the applicable Trustee.

**3.9    Records.**  After the Effective Date, Liquidating SRC shall succeed to the Debtors' books and records relating to the conduct of the Debtors' business prior to the Effective Date, including all of the Debtors' rights with respect thereto. The GUC Trustee shall have equal access to all such books and records, and Liquidating SRC shall make such books and records reasonably available to the Secured Creditor Trust at the sole expense of the Secured Creditor Trust. The Debtors' right access to its former books and records that were sold to Taylor shall continue to be governed by the terms and conditions related to such access as set forth in the MTSA.

**3.10    Effectuating Documents.**  The Debtors and the Trustees, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, and releases and take

such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

**3.11**    **Administrative Expense Claim Bar Date.**  Other than with respect to Professional Fee Claims or Claims described in 11 U.S.C. § 503(b)(1)(B) and (C), any Person asserting an Administrative Expense Claim must submit a proof of Claim with respect to such Administrative Expense Claim to the Balloting and Claims Agent **so that it is actually received** on or before the Administrative Expense Claims Bar Date.

## 4.    CLAIM ALLOWANCE

**4.1**    **Claim Objections.**  All objections to Claims shall be Filed within 180 days after the Effective Date (the "Claim Objection Deadline").  The Claim Objection Deadline may be extended upon a motion Filed with the Bankruptcy Court by Liquidating SRC or the GUC Trustee (or, in the case of Class I Claims (other than the Other Secured Claim of Bank of America, N.A.) and Class III Claims (other than the Second Lien Secured Claim filed by the Second Lien Agent), by the Secured Creditor Trust) prior to the expiration of the Claim Objection Deadline.  The Claim Objection Deadline shall be automatically extended upon the Filing of a motion requesting an extension of the Claim Objection Deadline until such time as the Bankruptcy Court acts on such motion, without the necessity for the entry of a bridge order.

**4.2**    **Resolution of Disputed Claims.**  From and after the Effective Date, Liquidating SRC and the GUC Trustee shall have the exclusive authority to compromise, resolve and Allow any Disputed Claim other than Class I and Class III Disputed Claims and Disputed Taylor Claims without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by Liquidating SRC with respect to the Allowance of any Disputed Claim (other than Disputed Class I Claims, Class III Claims, and Taylor Claims) shall be conclusive evidence and a final determination of the Allowance of such Claim.  From and after the Effective Date, the Secured Creditor Trust shall have the exclusive authority to compromise, resolve and Allow any Class I Disputed Claims without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Secured Creditor Trust with respect to the Allowance of any Class I Disputed Claims shall be conclusive evidence and a final determination of the Allowance of such Claim.  Class III Claims other than the Class III Claim granted pursuant to the DIP Financing Order shall be disallowed on the Effective Date without the need for further order of the Bankruptcy Court or action by either the Second Lien Agent or the Secured Creditor Trust.  From and after the Effective Date, Taylor shall have the exclusive authority to compromise, resolve and Allow any Disputed Taylor Claims without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by Taylor with respect to the Allowance of any Taylor Claims shall be conclusive evidence and a final determination of the Allowance of such Claim.

**4.3**    **No Distribution Pending Allowance of Disputed Claims.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.  To the extent that all or a portion of a Disputed Claim becomes a Disallowed Claim, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is a Disallowed Claim and any property withheld pending the

resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same Class.

**4.4** **Distributions After Allowance of Disputed Claims.** To the extent that a Disputed Claim becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan, Confirmation Order, Asset Purchase Agreement, and/or the applicable Trust Agreement.

**4.5** **Distribution of Taylor Utility Deposits.** On the Effective Date the Debtors' obligations under the Utilities Order with respect to the Taylor Utility Deposits and the utility providers related thereto shall be deemed satisfied, the Debtors shall have no other obligations under the Utilities Order, and the Taylor Utility Deposits shall be deemed released from the Adequate Assurance Deposit Account to Liquidating SRC and shall be transferred to Taylor. As of the Effective Date, Liquidating SRC shall not have any obligations under the Utilities Order with respect to the Taylor Utility Deposits or the utility providers related thereto.

**4.6** **Other Utility Deposits.** On the Effective Date, the Debtors' obligations under the Utilities Order with respect to the Other Utility Deposits and the utility providers related thereto shall be deemed satisfied, the Debtors shall have no other obligations under the Utilities Order, and the Other Utility Deposits shall be deemed released from the Adequate Assurance Deposit Account to Liquidating SRC and shall be transferred to the Secured Creditor Trust.

**4.7** **Estimation of Claims.** Liquidating SRC (or the GUC Trustee, with respect to Class IV Claims) may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Liquidating SRC previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, Liquidating SRC (or the GUC Trustee, with respect to Class IV Claims) may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**5.** **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**5.1** **Executory Contracts and Unexpired Leases.** Subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors that have not been assumed and assigned, or rejected, prior to the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order, as of the Confirmation Date, provided that to the extent the D&O Policies, the Chubb Settlement Agreement, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor are executory, the D&O Policies, the Chubb Settlement Agreement, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor shall not be deemed rejected but shall be deemed assumed by the

Liquidating Debtors as of the Effective Date and shall remain in full force and effect following the occurrence of the Effective Date. From and after the Effective Date, the Liquidating Debtors shall take no action that would cancel, modify, or otherwise impair the "Extended Reporting Period Elected (Pre-Paid)" or other similar endorsements or provisions of the D&O Policies, all of which shall remain in full force and effect in accordance with their terms. Any Creditor asserting a Claim for monetary damages as a result of the rejection of an Executory Contract or Unexpired Lease, and/or the abandonment of Assets, pursuant to the Confirmation Order, shall File a proof of Claim (each a "Rejection Claim") within thirty (30) days of the Confirmation Date.

**5.2    Rejection Claims.**  Any Rejection Claims that are not timely Filed pursuant to Section 5.1 of the Plan, shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed pursuant to Section 5.1 of the Plan, Liquidating SRC may File an objection to any Rejection Claim on or prior to the Claim Objection Deadline.

## 6.    CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE

**6.1    Conditions to the Occurrence of the Effective Date.**  The occurrence of the Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 6.2 of the Plan: (a) the Bankruptcy Court shall have entered the Confirmation Order in a form satisfactory to the Debtors, the Committee, and the Second Lien Agent; (b) the Confirmation Order shall be effective and shall not be subject to any stay, whether or not such Confirmation Order shall have become a Final Order; (c) the Trust Agreements shall have been executed; (d) the Trusts shall have been established; (e) the Secured Creditor Trust Assets shall have been transferred to and vested in the Secured Creditor Trust free and clear of all Claims and Equity Interests, except as specifically provided in the Plan and the Secured Creditor Trust Agreement; (f) the GUC Trust Assets shall have been transferred to and vested in the GUC Trust free and clear of all Claims and Equity Interests, except as specifically provided in the Plan and the GUC Trust Agreement; (g) the existing Equity Interests in SRC Liquidation Company shall have been cancelled as provided in the Plan, and the Liquidating SRC Membership Interests shall have been issued to the GUC Trust in accordance with Section 2.3.3 of the Plan; and (h) the amounts to be paid and/or reserved for in accordance with Article 3 of the Plan, including the amounts to be funded into the Disputed Claims Reserve on the Effective Date, shall have been so paid and/or reserved, as applicable.

**6.2    Waiver of Conditions to Confirmation or the Effective Date.**  The conditions to the Effective Date set forth in Section 6.1 of the Plan may be waived in writing by the Debtors, the Second Lien Agent and the Committee at any time without further Order.

**6.3    Effect of Nonoccurrence of Conditions to the Effective Date.**  If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 6.1 and 6.2 of the Plan, then upon motion by the Debtors made after consultation with the Second Lien Agent and the Committee and before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties-in-interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; *provided, however,* that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of

the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section 6.3 of the Plan, (a) the Plan shall be null and void in all respects, and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interest in, the Debtors and the Estates or (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other party-in-interest.

## 7.   EFFECT OF THE PLAN ON CLAIMS AND EQUITY INTERESTS

**7.1    Binding Effect of the Plan.** The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

**7.2    Plan Injunction.  Confirmation of the Plan shall operate as an injunction against the commencement or continuation of any act or action to collect, recover, or offset from the Estates (unless such offset rights were asserted in writing prior to the Confirmation Date), the GUC Trust, the Secured Creditor Trust, or any of their property, any Claim or Equity Interest treated in the Plan or any actions to interfere with the implementation and consummation of the Plan, except as otherwise expressly permitted by the Plan or the Confirmation Order or by Final Order enforcing the terms of the Plan.  The Bankruptcy Court shall have jurisdiction to determine and award damages and/or other appropriate relief at law or in equity for any violation of such injunction, including compensatory damages, professional fees and expenses, and exemplary damages for any willful violation of said injunction.**

**7.3    Exculpation and Limitation of Liability.** None of the Debtors or the Committee, or any of their respective current members, partners, officers, directors, employees, advisors, professionals, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Entities) but solely in their capacities as such (collectively, the "Exculpated Parties") shall not have or incur any liability to any Holder of any Claim or Equity Interest for any act or omission on or before the Effective Date in connection with, related to, or arising out of the Chapter 11 Cases, the negotiation and execution of the purchase agreements for the sale of the Debtors' Assets to Taylor during the Chapter 11 Cases, the negotiation and execution of the Committee Settlement, the negotiation and execution of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, and the property to be distributed under the Plan on or before the Effective Date, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except in case of fraud, willful misconduct, intentional misconduct, or gross negligence by such Exculpated Party as determined by a Final Order.

**The Confirmation Order shall serve as a permanent injunction against any party seeking to enforce any claim or Cause of Action against the Exculpated Parties that has been exculpated pursuant to Section 7.3 of the Plan.**

**7.4    Third Party Releases.  On the Effective Date, (a) each Holder of a Claim who is presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code (i.e.,**

Holders of Claims in Classes I and II), and (b) each Holder of a Class III and/or Class IV Claim who is entitled to vote on the Plan and does not, by the Voting Deadline both (i) vote to reject the Plan or abstain from voting on the Plan and (ii) make the Third Party Opt-Out Election on its properly completed and returned Ballot, shall be deemed on behalf of itself and its estate, affiliates, heirs, executors, administrators, successors, assigns, managers, business managers, accountants, attorneys, representatives, consultants, agents, and any and all other Persons or parties claiming under or through them, to release, discharge, and acquit the Silver Point Entities; DLJ Investment Partners, L.P.; DLJ Investment Partners II, L.P., DLJIP II Holdings, L.P.; Credit Suisse AG, Cayman Islands Branch; Credit Suisse Loan Funding LLC; Sargas CLO II Ltd.; WG Horizons CLO I; any other lender under either or both of the First Lien Term Loan Facility or the Second Lien Term Loan Facility; any Person who has served as a director of Workflow Holdings, LLC, WorkflowOne, LLC, or their subsidiaries (collectively, "WorkflowOne"); Anthony DiNello, Frederic Brace, and Robert Peiser; and each of their respective current and former heirs, executors, administrators, predecessors, successors, assigns, subsidiaries, parents, affiliates, divisions, partners, members, interest holders (direct and indirect), officers, directors, employees (including, for the avoidance of doubt, any current or former employee of the Silver Point Entities in his or her capacity as a board member of the Debtors or WorkflowOne), agents, shareholders, managers, accountants, attorneys, representatives, consultants, other professionals, insurers, and any and all other Persons, corporations, or other Entities acting under the direction, control, or on behalf of any of the foregoing, in each case solely in their capacity as such (each of the foregoing, a "Released Party") from any and all claims, counterclaims, disputes, liabilities, suits, demands, defenses, liens, actions, administrative proceedings, and Causes of Action of every kind and nature, or for any type or form of relief, and from all damages, injuries, losses, contributions, indemnities, compensation, obligations, costs, attorneys' fees, and expenses, of whatever kind and character, whether past or present, known or unknown, suspected or unsuspected, fixed or contingent, asserted or unasserted, accrued or unaccrued, liquidated or unliquidated, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, or requirement, and claims of every kind, nature, and character whatsoever, including avoidance claims, Causes of Action, and rights of recovery arising under chapter 5 of the Bankruptcy Code and any and all claims based on avoidance powers under any applicable non-bankruptcy law that any such releasing party ever had or claimed to have, or has or claims to have presently or at any future date, against any Released Party arising from or related in any way whatsoever to the Debtors or WorkflowOne. For the avoidance of doubt, the failure to make the Third Party Opt Out Election shall not prevent any Holder of a Claim from receiving a Distribution under the Plan. Nothing in this Section 7.4 shall be deemed to release, waive, or otherwise impact any of the GUC Trust Causes of Action or any other Causes of Action against the defendants named in the GUC Trust Adversary Complaint or any other defendants that are not Released Parties for claims related to or based on the facts and circumstances alleged in the GUC Trust Adversary Complaint.

**7.5    Releases Contained in Committee Settlement**. For the avoidance of doubt, nothing in the Plan shall limit the scope or timing of the releases approved through the Committee Settlement, all of which shall be deemed incorporated by reference herein and shall remain in full force and effect.

**The Confirmation Order shall serve as a permanent injunction against any party seeking to enforce any claim or Cause of Action against the Released Parties that has been released pursuant to the Committee Settlement or Section 7.4 of the Plan.**

## 8.   MISCELLANEOUS PROVISIONS

**8.1     Retention of Jurisdiction.** Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases and the interpretation and implementation of this Plan and the Trust Agreements. Without limiting the foregoing, the Bankruptcy Court shall retain jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b)     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     Resolve any matters related to (i) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure obligations pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the applicable Trust Agreement;

(e)     Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)     Adjudicate, decide, or resolve any and all matters related to the Causes of Action, including any adversary proceeding pending as of the Effective Date to which the Debtors, the Committee, the Secured Creditor Trustee, or the GUC Trustee is a party, including but not limited to the GUC Trust Adversary Proceeding;

(g)     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the applicable Trust Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the applicable Trust Agreement;

(h)     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(i)     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or Trust Agreements, or any Entity's obligations incurred in connection with the Plan or Trust Agreements;

(j)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan or Trust Agreements;

(k)     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(l)     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Distributions;

(m)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Trust Agreements or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement or Trust Agreements;

(o)     Adjudicate any and all disputes arising from or relating to Distributions under the Plan, the Trust Agreements, or any transactions contemplated therein;

(p)     Consider any modifications of the Plan or the Trust Agreements, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(q)     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(r)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or the Trust Agreements, including disputes arising under agreements, documents, or instruments executed in connection with the Plan or the Trust Agreements;

(s)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(t)     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of

01:17982169.1

employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

  (u) Enforce the exculpation, release and injunction provision of the Committee Settlement, this Plan, and the Confirmation Order for the benefit of the Exculpated Parties and the Released Parties and hear and determine all disputes relating to the foregoing;

  (v) Enforce all orders previously entered by the Bankruptcy Court;

  (w) Hear any other matter not inconsistent with the Bankruptcy Code;

  (x) Enter an order or orders concluding or closing the Chapter 11 Cases; and

  (y) Enforce the injunction, release, and exculpation provisions set forth in the Plan.

**8.2** **Governing Law.** Except as mandated by the Bankruptcy Code or Bankruptcy Rules, as applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware.

**8.3** **Headings.** The headings of articles, paragraphs, and subparagraphs of the Plan are inserted for convenience only and shall not affect the interpretation of any provision of the Plan.

**8.4** **Time.** Time shall be calculated in accordance with Bankruptcy Rule 9006.

**8.5** **Severability.** Should any provision of the Plan be determined to be unenforceable after the Effective Date such determination shall in no way limit or affect the enforceability and operative effect of any and all of the other provisions of the Plan.

**8.6** **Revocation.** Subject to the Committee Settlement and upon consultation with the Second Lien Agent and the Committee, the Debtors reserve the right to revoke and withdraw the Plan prior to the entry of a Confirmation Order. If the Debtors revoke or withdraw the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, the Estates, the Committee, the Trustees, or any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors and the Estates.

**8.7** **Conflicts with the Plan.** In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement and any other Order in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; *provided, however*, that the Confirmation Order shall control and take precedence in the event of any inconsistency between any provision of the Plan and any of the foregoing documents.

**8.8** **Statutory Fees.** All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. After the Effective Date, Liquidating SRC shall pay, prior to the closing of the Chapter 11 Cases, in accordance with the Bankruptcy Code and the Bankruptcy Rules, all fees payable pursuant to 28 U.S.C. § 1930 that accrue before or after the Effective Date through and including the closing of any of the Chapter 11 Cases.

**8.9**    <u>Balloting/Claims Agent</u>.  Prime Clerk LLC ("<u>Prime Clerk</u>"), in its capacity as Balloting and Claims Agent shall continue to serve at the direction and discretion of Liquidating SRC. Prime Clerk shall be compensated in accordance with its Engagement Letter with the Debtors dated as of February 24, 2015, without the need for further Bankruptcy Court authorization or approval; provided, however, that the Bankruptcy Court shall retain jurisdiction over any disputes related to payment of any fees claimed by Prime Clerk.  Subsequent to the Effective Date, Liquidating SRC, in its sole discretion, may terminate Prime Clerk without need for further order of the Bankruptcy Court.

**8.10**    <u>Notices</u>.  Following the Effective Date, all pleadings and notices Filed in the Chapter 11 Cases shall be served on (a) Liquidating SRC and its counsel, (b) the Secured Creditor Trust, (c) counsel to the Secured Creditor Trust, (d) the GUC Trust, (e) counsel to the GUC Trust, (f) the U.S. Trustee, (g) any party whose rights are affected by the applicable pleading or notice, and (h) any party Filing a request for notices and papers on and after the Effective Date.

**8.11**    <u>Final Decree</u>.  The Confirmation Order shall constitute a Final Decree pursuant to section 350 of the Bankruptcy Code formally closing the Chapter 11 Cases of the Liquidating Debtors other than Liquidating SRC.  The Plan Supplement shall include a proposed form of order to be entered on the docket of the Chapter 11 Cases, other than the Chapter 11 Case of Liquidating SRC, closing such Chapter 11 Cases.  Upon Liquidating SRC's determination that all Claims have been Allowed, Disallowed, expunged or withdrawn, that all Causes of Action held by Liquidating SRC or the GUC Trustee, as applicable, have been finally resolved, transferred, or abandoned and that all payments required to be made by Liquidating SRC under this Plan, including without limitation Section 3.2.1, have been made, Liquidating SRC shall, after consultation with the GUC Trustee and the Secured Creditor Trustee, move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code.  Liquidating SRC may request the entry of the Final Decree notwithstanding the fact that not all Assets of Liquidating SRC have been monetized and distributed to the Holders of Allowed Claims.

**8.12**    <u>Modification Of The Plan</u>.  Subject to the limitations contained herein, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Trust Agreements or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and require prior consent of the Committee and the Second Lien Agent.

        <u>**Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.**</u>

**8.13**   **Section 1145 Exemption**.  Under section 1145 of the Bankruptcy Code, the issuance of the interests in the GUC Trust and the Secured Creditor Trust under the Plan or pursuant to the Committee Settlement and the GUC Trust Agreement and the issuance of the Liquidating SRC Membership Interests and equity interests in any Entities formed pursuant to the Secured Creditor Trust Agreement shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.

**8.14**   **Pension Benefit Guaranty Corporation Matters**.  Nothing in the Confirmation Order, the Plan, or the Bankruptcy Code (and § 1141 thereof) shall in any way be construed to discharge, release, limit, or relieve any party, in any capacity, from any liability or responsibility with respect to The Stanreco Retirement Plan ("Pension Plan") or any other defined benefit pension plan under any law, governmental policy, or regulatory provision. The Pension Benefit Guaranty Corporation ("PBGC") and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, or Bankruptcy Code.  Notwithstanding the foregoing, the PBGC and the Pension Plan shall continue to be subject to the provisions of Section 1.6 of this Plan, and all Claims of PBGC (including the amended claims filed by PBGC for the Pension Plan's unfunded benefit liabilities, unpaid premiums, and unpaid minimum contributions) against the Debtors, to the extent Allowed, shall be fully satisfied by the treatment of such Allowed Claims as Unsecured Claims in Class IV of the Plan.

## 9.   FINAL APPROVAL AND PAYMENT OF PROFESSIONAL FEES

**9.1**   **Procedures For Payment of Professional Fee Claims**.   Notwithstanding any other provision of the Plan dealing with Unclassified Claims, any Person asserting a Professional Fee Claim shall, no later than the Effective Date, provide the Debtors with a summary of the compensation for services rendered and expense reimbursement that such Person will seek to be allowed, on a final basis, as a Professional Fee Claim (which summary shall include, without limitation, a good faith estimate of accrued but unbilled fees and expenses through the Confirmation Date) (for each Person, its "Professional Fee Summary"), and shall, no later than 30 days after the Effective Date, File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date. Objections to any final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date shall be due 30 days after such application is Filed.  To the extent that such a Person's final fee application is Allowed by the Bankruptcy Court, the requesting Person shall receive: (i) payment of Cash from the Professional Fee Claims Escrow Account in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made before the later of (a) the Effective Date or (b) three Business Days after the order Allowing such Person's final fee application, or (ii) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Fee Claim and Liquidating SRC (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases).  All Professional Fee Claims for services rendered after the Confirmation Date shall be paid by the Debtors or Liquidating SRC, as applicable, upon receipt of an invoice therefor, or on such other terms as Liquidating SRC and the Professional may agree, without the requirement of any order of the Bankruptcy Court.

**9.2    Professional Fee Claims Escrow Account.** On the Effective Date, the Debtors shall establish and fund the Professional Fee Claims Escrow Account in an amount sufficient to pay, in full, any then unpaid fees and expenses (including, without limitation, any estimated, accrued but unbilled fees and expenses through the Confirmation Date set forth in the Professional Fee Summary) owed to any Person asserting a Professional Fee Claim. Amounts held in the Professional Fee Claims Escrow Account shall not constitute property of the Debtors or the Liquidating Debtors and shall only be distributed in accordance with this Section 9.2. Each Person asserting a Professional Fee Claim shall be entitled to a maximum amount from the Professional Fee Claims Escrow Amount equal to the amount of the Professional Fee Summary submitted by such Person less all interim compensation paid to such Person during the Chapter 11 Cases. In the event there is a remaining balance in the Professional Fee Claims Escrow Account following payment of all Allowed Professional Fee Claims in accordance with Section 9.1 of the Plan, such remaining amount, if any, shall be paid into the Wind-Down Funds Account. In the event that there are insufficient funds in the Professional Fee Claims Escrow Account to pay any Allowed Professional Fee Claims in accordance with the terms of the Professional Fee Claims Escrow Account, the unpaid portion of such Allowed Professional Fee Claims shall be paid by Liquidating SRC.

**10.    NOTICE**

**10.1    Notice and Service of Documents.** All notices, requests, and demands required or permitted to be provided to the Debtors, the Liquidating Debtors, the Committee, or the Trustee's under the Plan or the respective Trust Agreements shall be in writing and shall be deemed to have been duly given or made when actually delivered by overnight delivery, addressed as follows:

> **If to the Debtors (before the Effective Date):**
>
> WilliamsMarston LLC
> Attn: Landen C. Williams
> 16th Floor
> 800 Boylston Street
> Boston, MA 02199
>
> With a copy to:
>
> Gibson, Dunn & Crutcher LLP
> Attn: Michael A. Rosenthal and Jeremy L. Graves
> 200 Park Avenue, Suite 4700
> New York, New York 10166-0193
>
>
> **If to the Committee, the GUC Trust, or (after the effective date) the Liquidating Debtors:**
>
> EisnerAmper LLP
> Attn: Anthony R. Calascibetta
> 111 Wood Avenue South

Iselin, NJ 08830-2700

With a copy to:

Lowenstein Sandler LLP
Attn:   Sharon Levine, Wojciech F. Jung, and Andrew Behlmann
65 Livingston Avenue
Roseland, NJ 07068

**If to the Secured Creditor Trust**:

Wilmington Trust Company
Attn: Institutional Client Services
Rodney Square North
1100 North Market Street
Wilmington, DE  19890

With a copy to:

Pepper Hamilton LLP
Attn: David M. Fournier and John Henry Schanne II
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19801

## 11.     REQUEST FOR CONFIRMATION

**11.1     Request for Confirmation.**  The Debtors request Confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

IN WITNESS WHEREOF, the Debtors have executed the Plan this 18th day of November, 2015.

**SRC LIQUIDATION COMPANY, ON ITS OWN BEHALF AND ON BEHALF OF IT CHAPTER 11 AFFILIATES**


By:     */s/ Landen C. Williams*
      Name:  Landen C. Williams
      Title: Chief Restructuring Officer

## EXHIBIT A TO
## SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION
## FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES (WITH TECHNICAL MODIFICATIONS)

### DEFINITIONS AND INTERPRETATION

A. **Rules of Interpretation.** Unless otherwise specified, all Section, Article, and Exhibit references in the Plan are to the respective Section in, Article of, or Exhibit to the Plan, as the same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Words denoting the singular number shall include the plural number and vice versa, unless the context requires otherwise. Pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole, and not to any particular Section, Subsection, or clause contained in the Plan. In construing the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

B. **Definitions.** Terms and phrases, whether capitalized or not, that are used and not defined in the Plan, but that are defined in the Bankruptcy Code or Bankruptcy Rules, have the meanings ascribed to them in the Bankruptcy Code or Bankruptcy Rules, as applicable. Unless otherwise provided in the Plan, the following terms have the respective meanings set forth below, and such meanings shall be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires.

1. "Adequate Assurance Deposit Account" means the Adequate Assurance Deposit Account established pursuant to, and as defined in, the Utilities Order.

2. "Administrative Expense Claim" means a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under sections 503(b) or 507(a)(2) of the Bankruptcy Code. Administrative Expense Claims shall, without limitation, include Professional Fee Claims, claims under section 503(b)(9) of the Bankruptcy Code, and cure claims arising from the assumption of Executory Contracts and Unexpired Leases by Taylor in connection with the Asset Purchase Agreement.

3. "Administrative Expense Claim Bar Date" means 4:00 p.m. (Prevailing U.S. Eastern time) on the date that is 30 days after the Effective Date.

4. "Allowed" means, with reference to any Claim, (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent or unknown and for which no contrary proof of Claim has been Filed, (b) any Claim listed on the Schedules or timely Filed proof of Claim, as to which no objection to allowance has been interposed in accordance with the Plan by the Claims Objection Deadline or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder of such Claim, (c) any

Claim expressly allowed by a Final Order or under the Plan, or (d) any Claim that is allowed pursuant to Section 4.2 of the Plan.

5. "Assets" means any and all right, title, and interest in and to property of whatever type or nature.

6. "Asset Purchase Agreement" means the Asset Purchase Agreement by and among the Debtors and Taylor, dated as of June 19, 2015 (collectively with all related agreements, amendments, documents or instruments, and all exhibits, schedules and addenda to any of the foregoing).

7. "Assumed Liabilities" means those liabilities of the Debtors assumed by Taylor as Assumed Liabilities under the Asset Purchase Agreement.

8. "Avoidance Actions" means any and all of the Debtors' Causes of Action for avoidance or equitable subordination or recovery under chapter 5 of the Bankruptcy Code or similar state law and all proceeds thereof, excluding only such Causes of Action that were transferred to Taylor pursuant to the Asset Purchase Agreement (and, accordingly, identified in the Do Not Sue List provided by Taylor on October 29, 2015) or released pursuant to the Committee Settlement.

9. "Ballot" means a ballot, in the form approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each Holder of a Claim entitled to vote to accept or reject the Plan, on which such Holder may vote to accept or reject the Plan.

10. "Balloting and Claims Agent" means Prime Clerk LLC, retained by the Debtors in the Chapter 11 Cases.

11. "Bankruptcy Code" means Title 11 of the United States Code, sections 101–1532, as now in effect or as hereafter amended.

12. "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or, if such court ceases to exercise jurisdiction, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases.

13. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended and promulgated under section 2075 of Title 28 of the United States Code, together with (a) the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware as now in effect or as the same may from time to time hereafter be amended and (b) the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.

14. "Bar Date" means the date by which a proof of Claim is required to be Filed with respect to a Claim pursuant to the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 449], this Plan, or any subsequent order of the Bankruptcy Court.

15. "BofA Cash Collateral Account" means the account maintained at Bank of America, N.A. which contains the cash that secures the Debtors' obligations under the BofA Cash Collateral Agreement.

16. "BofA Cash Collateral Agreement" means that certain Cash Collateral Agreement Regarding Letters of Credit contained in the letter dated as of July 31, 2015, by and between The Standard Register Company and Bank of America, N.A.

17. "Business Day" means any day that is not a Saturday, Sunday, or "legal holiday" within the meaning of Bankruptcy Rule 9006(a).

18. "Cash" means lawful currency of the United States and its equivalents.

19. "Causes of Action" means any action, class action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include: (a) any right of setoff, counterclaim, or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim or cause of action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code or similar state law; and (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

20. "Chubb Settlement Agreement" means that certain Settlement Agreement and Environmental Site Release, dated as of February 10, 2009 and entered into by and among The Standard Register Company (now known as SRC Liquidation Company), Federal Insurance Company and Vigilant Insurance Company.

21. "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 15-10541 (BLS).

22. "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors or the Estates whether or not asserted or Allowed.

23. "Class" means one of the categories of Claims or Equity Interests established under Article 3 of the Plan in accordance with sections 1122 and 1123(a) of the Bankruptcy Code.

24. "Claim Objection Deadline" has the meaning set forth in Section 4.1 hereof.

25. "Committee" means the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee for the District of Delaware on March 24, 2015 in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as the composition of such Committee may be altered from time to time.

26. "Committee Settlement" means that certain *Settlement Agreement Among Debtors, Silver Point Finance, LLC & Official Committee Of Unsecured Creditors* attached as

Exhibit A to the Notice of Filing of Settlement Agreement that was Filed as Docket Number 696 in the Chapter 11 Cases.

27. "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

28. "Confirmation Hearing" means the hearing(s) before the Bankruptcy Court in accordance with section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing(s) may be delayed, continued, or rescheduled.

29. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with section 1129 of the Bankruptcy Code, as such order may be amended, modified, or supplemented.

30. "Creditor" means any Person that has a Claim against one or more of the Debtors.

31. "D&O Insurance" means all of the Debtors' director and officer insurance and any and all proceeds therefrom.

32. "D&O Policies" means any and all policies providing D&O Insurance.

33. "Debtors" means, collectively, (a) SRC Liquidation Company f/k/a The Standard Register Company, (b) SR Liquidation Holding Company f/k/a Standard Register Holding Company, (c) SR Liquidation Technologies, Inc. f/k/a Standard Register Technologies, Inc., (d) SR Liquidation International, Inc. f/k/a Standard Register International, Inc., (e) iMLiquidation, LLC f/k/a iMedConsent, LLC, (f) SR Liquidation of Puerto Rico Inc. f/k/a Standard Register of Puerto Rico Inc., (g) SR Liquidation Mexico Holding Company f/k/a Standard Register Mexico Holding Company, (h) SR Liquidation Technologies Canada ULC f/k/a Standard Register Technologies Canada ULC, (i) Standard Register Holding, S. de R.L. de C.V.,[2] (j) Standard Register de México, S. de R.L. de C.V.,[3] and (k) Standard Register Servicios, S. de R.L. de C.V.,[4] or any successors thereof.

34. "DIP Financing Order" means the *Final Order (I) Authorizing Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. § 364; and (III) Providing Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364* [Docket No. 290], entered in the Chapter 11 Cases on April 16, 2015.

---

[2]    Pursuant to an agreement with Taylor, Standard Register Holding, S. de R.L. de C.V. will change its name to SR Liquidation Holding, S. de R.L. de C.V. following a certain post-sale transitionary period.

[3]    Pursuant to an agreement with Taylor, Standard Register de México, S. de R.L. de C.V. will change its name to SR Liquidation de México, S. de R.L. de C.V. following a certain post-sale transitionary period.

[4]    Pursuant to an agreement with Taylor, Standard Register Servicios, S. de R.L. de C.V. will change its name to SR Liquidation Servicios, S. de R.L. de C.V. following a certain post-sale transitionary period.

35. "Disallowed Claim" means a Claim or portion thereof that (a) has been disallowed by a Final Order, (b) is identified in the Schedules in the amount of zero dollars or as contingent, unliquidated, or disputed and as to which a proof of Claim was not Filed on or before the applicable Bar Date, (c) is not identified in the Schedules and as to which no proof of Claim has been Filed or deemed Filed on or before the applicable Bar Date, as applicable, (d) was not Filed in a timely manner as provided by the Plan, the Confirmation Order, or other relevant order of the Bankruptcy Court, or (e) is disallowed by agreement with the Creditor in accordance with Section 4.2 of the Plan.

36. "Disclosure Statement" means the disclosure statement with respect to the Plan, approved by the Bankruptcy Court as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of the Plan, as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

37. "Disputed" means any Claim or any portion thereof that is not an Allowed Claim or a Disallowed Claim.

38. "Disputed Claims Reserve" means the reserve established pursuant to Section 3.3 of the Plan to hold funds distributable to Holders of Priority Claims that are not Allowed as of the Effective Date. For the avoidance of doubt, except when released in accordance with Subsection 3.3.2 of the Plan (as such Subsection relates to reserves for Disallowed Priority Claims), the funds in the Disputed Claim Reserve shall not constitute Assets of the GUC Trust. The Disputed Claims Reserve shall be maintained in a separate account by and under the control of Liquidating SRC.

39. "Distribution" means any distribution to the Holder of an Allowed Claim in accordance with the Plan.

40. "Effective Date" has the meaning set forth in Section 3.1 hereof.

41. "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

42. "Equity Interest" means any ownership interest or share in any of the Debtor Entities (including all options, warrants, or other rights to obtain such an interest or share in the Debtor Entities) whether or not transferable, preferred, common, voting, or denominated as "stock" or a similar security.

43. "Estate(s)" means, individually, the estate created for each of the Debtors and, collectively, the estates created for all the Debtors pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

44. "Estate Assets" means the respective Assets of the Debtors and their Estates as of the Effective Date, including any and all proceeds, rents, products, offspring, and profits arising from or generated by such property after the Effective Date.

45. "Executory Contracts and Unexpired Leases" means, collectively, "executory contracts" and "unexpired leases" of the Debtors as of the Petition Date as such terms are used within section 365 of the Bankruptcy Code; *provided, however*, that for the avoidance of doubt, "Executory Contract and Unexpired Leases" excludes the Asset Purchase Agreement, the MTSA, the Side Letter, and all other documents executed by the Debtors in connection with the closing of the sale contemplated by the Asset Purchase Agreement.

46. "Exculpated Parties" has the meaning set forth in Section 7.3 hereof.

47. "File", "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

48. "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

49. "Final Order" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court, or by any state, provincial, or other federal court or other tribunal having jurisdiction over the subject matter thereof, which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which: (a) the time to appeal or petition for review, rehearing, or certiorari or move for reargument has expired or shall have been waived in writing in form and substance satisfactory to the Debtors and as to which no appeal or petition for review, rehearing, or certiorari or motion for reargument is pending; or (b) any appeal or petition for review, rehearing, certiorari, or reargument has been finally decided and no further appeal or petition for review, rehearing, certiorari, or reargument can be taken or granted; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order shall not cause such order not to be a Final Order.

50. "First Lien Term Loan Facility" means the credit facility pursuant to that certain First Lien Credit Agreement dated as of August 1, 2013 by and among The Standard Register Company, WorkflowOne, LLC, the subsidiary guarantors party thereto, the lenders party thereto, and Silver Point Finance, LLC, as amended, restated, supplemented, or modified from time to time.

51. "General Unsecured Claim" means any Claim that is not an Administrative Expense Claim, a Priority Claim, an Other Secured Claim, a Second Lien Secured Claim, an Intercompany Claim, a Subordinated Claim, or an Equity Interest, including any Second Lien Deficiency Claim and any portion of an Other Secured Claim that exceeds the value of the collateral securing such Other Secured Claim unless an election has been made under section 1111(b) of the Bankruptcy Code.

52. "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

53. "GUC Cash Payment" means the payment of $5 million that was made to the GUC Trust by Taylor on or about July 31, 2015 in accordance with the terms of the Committee Settlement.

54. "GUC Trust" means that certain trust established pursuant to the terms of the GUC Trust Agreement. References to the GUC Trust shall include references to the GUC Trustee, acting for the benefit of the GUC Trust Beneficiaries pursuant to the terms of the GUC Trust Agreement.

55. "GUC Trust Adversary Complaint" means the amended adversary complaint filed in the GUC Trust Adversary Proceeding on August 4, 2015.

56. "GUC Trust Adversary Proceeding" means the adversary proceeding styled as EisnerAmper LLP, not in its Individual Capacity but as Trustee of the SRC

Liquidating GUC Trust v. Joseph P. Morgan, Jr., et al., Adv. Pro. No. 15-50771 (BLS), pending in the Bankruptcy Court.

57. "GUC Trust Agreement" means that certain Standard Register Company General Unsecured Creditors' GUC Trust Agreement, dated as of July 31, 2015, by and among the Debtors and the GUC Trustee.

58. "GUC Trust Assets" means (a) the Assets of the Debtors transferred to the GUC Trust on the closing of the Taylor Sale (including without limitation, the right to any proceeds of the D&O Insurance), (b) the Liquidating SRC Membership Interests, and (c) the GUC Trust Causes of Action.

59. "GUC Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims.

60. "GUC Trust Causes of Action" means any and all Causes of Action that have been asserted in the GUC Trust Adversary Complaint (including those certain Avoidance Actions asserted therein) or that could be asserted based on the facts and circumstances alleged in the GUC Trust Adversary Complaint (other than any Causes of Action against the Released Parties).

61. "GUC Trust Oversight Committee" means the GUC Trust Oversight Committee created pursuant to the GUC Trust Agreement.

62. "GUC Trust Seed Funding Amount" means the $600,000 that was loaned to the GUC Trust by the Debtors from the Wind-Down Amount on or about July 31, 2015 in accordance with the terms of the Committee Settlement.

63. "GUC Trustee" means the trustee of the GUC Trust, as appointed in accordance with the GUC Trust Agreement.

64. "Holder" means the Person that is the record owner of a Claim or Equity Interest, as applicable.

65. "Impaired" means a Claim or a Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

66. "Implementation Memorandum" means the memorandum, in form and substance acceptable to the Committee and the Second Lien Agent, describing the restructurings, transfers, and other corporate transactions that the Debtors determine to be necessary or appropriate to effectuate the Plan in compliance with the Bankruptcy Code and other applicable law and, to the maximum extent possible, in a tax efficient manner. The Plan Supplement will include a substantially final form of the Implementation Memorandum.

67. "Intercompany Claims" means any Claim held by a Debtor against another Debtor.

68. "Liens" means a lien as defined in section 101(37) of the Bankruptcy Code.

69. "Life Insurance Policies" means the Life Insurance Policies identified on Exhibit B to the Committee Settlement, together with any and all proceeds thereof.

70. "Liquidating Debtor(s)" means the Debtors as reorganized on the Effective Date pursuant to the implementation of the Plan.

71. "Liquidating SRC" means SRC Liquidation Company as reorganized as an Ohio limited liability company on the Effective Date pursuant to the implementation of the Plan.

72. "Liquidating SRC Membership Interests" means membership interests issued by Liquidating SRC on the Effective Date, representing 100% of the Equity Interests in Liquidating SRC.

73. "Mexico Bank Accounts" means the bank accounts maintained at Bank of America by the Mexico Debtors.

74. "Mexico Consideration Tax Treatment Agreement" means that certain Mexico Consideration Tax Treatment Agreement dated as of July 31, 2015, by and among The Standard Register Company; Standard Register Holding Company; Standard Register Mexico Holding Company; Standard Register Holding, S. de R.L. de C.V.; and Standard Register de México, S. de R.L. de C.V.

75. "Mexico Debtors" means Standard Register Holding, S. de R.L. de C.V.; Standard Register de México, S. de R.L. de C.V.; and Standard Register Servicios, S. de R.L. de C.V.

76. "Mexico Holding Debtors" means SR Liquidation Mexico Holding Company and SR Liquidation Holding Company.

77. "MTSA" means that certain Master Transition Services Agreement, dated as of July 31, 2015 and entered into by and among the Debtors and Taylor.

78. "Other Secured Claim" means any Secured Claim that is not a Second Lien Secured Claim.

79. "Other Utility Deposits" means all funds deposited in the Adequate Assurance Deposit Account established pursuant to the Utilities Order other than the Taylor Utility Deposits.

80. "Penalty Claim" means any Claim for a fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim as set forth in section 726(a)(4) of the Bankruptcy Code.

81. "Person" means person, including without limitation, any individual, Entity, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, estate, trust, unincorporated association or organization, official committee, ad hoc committee or group, governmental agency or political subdivision thereof, the U.S. Trustee, and any successors or assigns of any of the foregoing.

82. "Petition Date" means March 12, 2015.

83. "Plan" means this Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates (with Technical Modifications) (including all exhibits annexed hereto and the Plan Supplement), as it may be altered, amended, or modified from time to time in accordance with the provisions hereof and of the Bankruptcy Code and the Bankruptcy Rules.

84. "Plan Supplement" means the collection of Plan-related documents to be Filed with the Court, which may consist of one or multiple Filings.

85. "Priority Claim" means a Claim, other than an Administrative Expense Claim, entitled to priority in right of payment under section 502(i) or 507(a) of the Bankruptcy Code.

86. "Priority Tax Claim" means a Priority Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code.

87. "Pro Rata Share" means, the proportion that the Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of (a) Allowed Claims or Allowed Equity Interests in such Class as of the date of determination, plus (b) Disputed Claims or Disputed Interests in such Class as of the date of determination, in their aggregate face amounts or such other amount: (i) as determined by an Order of the Bankruptcy Court estimating any Disputed Claim; or (ii) as directed by a Final Order of the Bankruptcy Court.

88. "Professional" means any Person employed or to be compensated pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

89. "Professional Fee Claim" means a Claim by a Professional for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 Cases.

90. "Professional Fee Claims Escrow Account" means an escrow account at JPMorgan Chase Bank N.A., or such other U.S. financial institution acceptable to the Committee and the Debtors, established by the Debtors on or prior to the Effective Date for the payment of Professional Fee Claims in accordance with Article 9 of the Plan.

91. "Rabbi Trust" means that certain trust, effective as of January 1, 1998, between The Standard Register Company and Key Trust Company of Ohio, National Association.

92. "Rabbi Trust Proceeds" means (i) Debtors' interest in the Rabbi Trust, and (ii) the Life Insurance Policies and any and all proceeds thereof. Notwithstanding the foregoing, Rabbi Trust Proceeds do not include any Assets or proceeds of the Rabbi Trust other than the Life Insurance Policies and the proceeds of such policies.

93. "Record Holder" means the holder of a Claim Interest as of the Confirmation Date.

94. "Released Party" has the meaning set forth in Section 7.4 hereof.

95. "Sale Order" means that certain Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, claims, Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief [Docket No. 698].

96. "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs Filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

97. "Second Lien Agent" means Silver Point Finance, LLC, or its successor, in its capacity as the agent under the Second Lien Term Loan Facility.

9

98. "Second Lien Secured Claim" means any Claim derived from, based upon, relating to, or arising from the Second Lien Term Loan Facility, other than a Second Lien Deficiency Claim.

99. "Second Lien Deficiency Claim" means any Claim derived from, based upon, relating to, or arising from the Second Lien Term Loan Facility, to the extent that such Claim is not a Secured Claim. For the avoidance of doubt, the Second Lien Deficiency Claims shall be deemed allowed for voting purposes only, but the Holders thereof shall not be entitled to any Distribution on account of such Claims under the Plan, including from the GUC Trust.

100.   "Second Lien Term Loan Facility" means the credit facility pursuant to that certain Second Lien Credit Agreement dated as of August 1, 2013 by and among The Standard Register Company, WorkflowOne, LLC, the subsidiary guarantors party thereto, the lenders party thereto, and Silver Point Finance, LLC, as amended, restated, supplemented, or modified from time to time.

101.   "Second Lien Term Lenders" means the lenders from time to time party to the Second Lien Term Loan Facility.

102.   "Secured Claim" means a Claim that is secured (a) by a Lien that is valid, perfected, and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of a Final Order, or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in such property (unless an election has been made under section 1111(b) of the Bankruptcy Code on or prior to the Confirmation Date) or to the extent of the amount subject to such setoff, as applicable.

103.   "Secured Creditor Trust" means that certain trust established pursuant to the Secured Creditor Trust Agreement. For the avoidance of doubt, the Secured Creditor Trust may, in the sole discretion of the Second Lien Agent, be one or more trusts, may own Equity Interests in wholly owned subsidiaries, and may be established prior to the Effective Date.

104.   "Secured Creditor Trust Agreement" means the agreement establishing and delineating the terms and conditions of the Secured Creditor Trust. The Secured Creditor Trust shall not impose any obligations on the Debtors or the Liquidating Debtors without the consent of the Debtors and the Committee.

105.   "Secured Creditor Trust Assets" means all of the Debtors' Assets other than (i) the Rabbi Trust Proceeds, (ii) the Wind-Down Amount other than the Wind-Down Settlement Payment, (iii) the Wind-Down Funds Account, (iv) the Avoidance Actions, (v) the GUC Trust Causes of Action and proceeds thereof, (vi) the D&O Insurance and D&O Policies, (vii) the Taylor Utility Deposits, (viii) those GUC Trust Assets transferred to the GUC Trust in connection with closing of the Taylor Sale in accordance with the Committee Settlement, (ix) the obligation of Taylor to pay the Taylor Payment Receivable, (x) the obligation of the GUC Trust to repay the GUC Trust Seed Funding Amount, (xi) Terre Haute (as defined in the Wind-Down Settlement), and (xii) the Equity Interests in any of the Debtors or Liquidating Debtors; *provided, however*, that Secured Creditor Trust Assets shall not include any

Assets that the Agent, the Second Lien Lenders, and any of their professionals and other advisors relinquished pursuant to Section 1 of the Wind-Down Settlement.

106.  "Secured Creditor Trustee" means the trustee or trustees of the Secured Creditor Trust, as appointed in accordance with the Secured Creditor Trust Agreement.

107.  "Securities Law Claim" means any Claim that is subject to subordination under section 510(b) of the Bankruptcy Code, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of any equity securities of any Debtor or an affiliate of any Debtor, (b) for damages arising from the purchase or sale of any such equity security, (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims, or (d) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including, without limitation (i) any prepetition indemnification, reimbursement or contribution obligations of the Debtors, pursuant to the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Petition Date, or otherwise, and relating to Claims otherwise included in the foregoing clauses (a) through (c), and (ii) Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the sale of equity securities, or otherwise subject to section 510(b) of the Bankruptcy Code.

108.  "Side Letter" means that certain Side Letter to Master Transition Services Agreement, dated as of July 31, 2015 and entered into by and among the Debtors and Taylor.

109.  "Silver Point Entities" means Silver Point Capital Fund, L.P.; Silver Point Finance, LLC; SPCP Group III LLC; Silver Point Capital Fund, L.P.; SPF CDO I, Ltd.; SPCP Group, LLC; Silver Point Capital Offshore Fund, Ltd.; Silver Point Capital Master Fund, L.P.; Standard Acquisition Holdings, LLC, in its own capacity and in its capacity as Back-Up Bidder (as defined in the Asset Purchase Agreement) and as sub-agent to Silver Point Finance, LLC, as administrative agent under the First Lien Term Loan Facility and Second Lien Term Loan Facility; and, solely in their capacities as such, each of their general partners, directors, and managers.

110.  "Solicitation Order" means the *Order (I) Scheduling Combined Hearing on Approval of Disclosure Statement and Confirmation of Plan, (II) Establishing Procedures for Solicitation and Tabulation of Votes on Plan, and (III) Approving Related Matters* [Docket No. 1073].

111.  "Subordinated Claim" means any Penalty Claim, Securities Law Claim, or other Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order of the Bankruptcy Court.

112.  "Taylor" means Taylor Corporation and any Designated Buyer (as that term is defined in the Asset Purchase Agreement).

113.  "Taylor Claims" means any Claims that Taylor is obligated to satisfy pursuant to the Asset Purchase Agreement, the MTSA, the Side Letter, or otherwise.

114. "Taylor Payment Receivable" means the obligation of Taylor to pay certain obligations of the Debtors, including without limitation, Assumed Liabilities and various employee liabilities, as provided in the Asset Purchase Agreement, the MTSA, the Side Letter, or otherwise.

115. "Taylor Sale" means the sale of substantially all of the Debtors' Assets to Taylor pursuant to the Sale Order, which Taylor Sale closed on July 31, 2015.

116. "Taylor Utility Deposits" means the funds deposited in the Adequate Assurance Deposit Account established pursuant to the Utilities Order, which deposits are attributable to owned or leased facilities that constitute Transferred Assets (as defined in the Asset Purchase Agreement).

117. "Third Party Opt-Out Election" means the election made on the Ballot submitted by a Holder of a Class III or Class IV Claim to opt-out of the Third Party Release.

118. "Third Party Release" means the release granted by Holders of Class I-IV Claims pursuant to Section 7.4 of the Plan.

119. "Trust Agreements" means the GUC Trust Agreement and the Secured Creditor Trust Agreement.

120. "Trust Protected Parties" means the Trustees and any other employees, advisors, professionals, or agents and advisors of the Trusts (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Entities), but solely in their capacities as such.

121. "Trusts" means the GUC Trust and the Secured Creditor Trust.

122. "Trustees" means the GUC Trustee and the Secured Creditor Trustee.

123. "Unclassified Claims" means all Administrative Expense Claims.

124. "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

125. "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

126. "Utilities Order" means the *Final Order (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment* [Docket No. 171].

127. "Voting Deadline" means the deadline set by the Bankruptcy Court for parties to submit their Ballots to accept or reject the Plan.

128. "Wind-Down Amount" means the Wind-Down Amount, as defined in the Asset Purchase Agreement), funded by Taylor into the Wind-Down Funds Account on July 31, 2015 in connection with the closing of the sale to Taylor pursuant to the Asset Purchase Agreement. For the avoidance of doubt, except when released in accordance with Subsection 3.3.2 of the Plan, the Wind-Down Amount shall not constitute GUC Trust Assets.

129.     "Wind-Down Funds Account" means the segregated account established by the Debtors in connection with the closing of the sale to Taylor pursuant to the Asset Purchase Agreement, and any additional segregated accounts established by the Debtors, to hold the Wind-Down Amount (and any refunds, repayments (including repayment of the GUC Trust Seed Funding) or returns of security deposits, loans or other amounts originating from the Wind-Down Amount), any proceeds from Assets released from the security interest of the Second Lien Lenders pursuant to the Committee Settlement (including Rabbi Trust Proceeds and proceeds of Avoidance Actions) and any reimbursements related to, or other amounts entitled to be retained by the Debtors pursuant to, the Wind-Down Settlement.

130.     "Wind-Down Settlement" means that certain Standard Register Wind-Down Settlement, by and among the Debtors, Silver Point Finance, LLC, in its capacity as administrative agent under the Debtors' Second Lien Term Loan Facility, and Taylor, dated as of October 29, 2015.

131.     "Wind-Down Settlement Payment" means the amount, if any, paid by the Debtors to the Second Lien Agent (or any of its professionals) and/or the Secured Creditor Trust pursuant to the Wind-Down Settlement.  For the avoidance of doubt, any portion of the Wind-Down Settlement Payment paid to the Second Lien Agent or its professionals prior to the Effective Date shall reduce, dollar for dollar, the amount of Wind-Down Settlement Payment that is included as a Secured Creditor Trust Asset.

**EXHIBIT B**

**Form of Final Decree**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SRC Liquidation Company, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-10541 (BLS)<br><br>**Re: Docket No. ___** |
| In re:<br><br>SR Liquidation Holding Company,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10542 (BLS) |
| In re:<br><br>SR Liquidation Technologies, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10543 (BLS) |
| In re:<br><br>SR Liquidation International, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10544 (BLS) |
| In re:<br><br>iMLiquidation, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10540 (BLS) |

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

01:17932331.2

| In re:                                          | Chapter 11              |
| SR Liquidation of Puerto Rico Inc.,             | Case No. 15-10545 (BLS) |
| Debtor.                                         |                         |

| In re:                                          | Chapter 11              |
| SR Liquidation Mexico Holding Company,          | Case No. 15-10546 (BLS) |
| Debtor.                                         |                         |

| In re:                                          | Chapter 11              |
| Standard Register Holding, S. de R.L. de C.V.,  | Case No. 15-10547 (BLS) |
| Debtor.                                         |                         |

| In re:                                          | Chapter 11              |
| Standard Register de México, S. de R.L. de C.V.,| Case No. 15-10548 (BLS) |
| Debtor.                                         |                         |

| In re:                                          | Chapter 11              |
| Standard Register Servicios, S. de R.L. de C.V.,| Case No. 15-10549 (BLS) |
| Debtor.                                         |                         |

| In re:                                          | Chapter 11              |
| SR Liquidation Technologies Canada ULC,         | Case No. 15-10550 (BLS) |
| Debtor.                                         |                         |

01:17932331.2

## FINAL DECREE CLOSING CERTAIN CASES
## AND AMENDING CAPTION OF REMAINING CASE

Upon consideration of the Certification of Counsel,[2] submitted by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in accordance with paragraph [###] of the *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Second Amended Chapter 11 Plan of Liquidation* [Docket No. ___] (the "Confirmation Order") and Section 8.11 of the *First Amended Chapter 11 Plan of Liquidation* [Docket No. 1086] (the "Plan"), requesting entry of (i) a final decree order closing the chapter 11 cases of certain of the Debtors and (ii) an order amending the case caption of the remaining case of the Debtor; and upon entry of the Confirmation Order and the Plan having gone effective on _____, 2015,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      Each of the following cases (collectively, the "Closing Cases") shall be closed, effective as of the date of this Order:

| Name of Debtor | Case Number |
|---|---|
| SR Liquidation Holding Company | 15-10542 (BLS) |
| SR Liquidation Technologies, Inc. | 15-10543 (BLS) |
| SR Liquidation International, Inc. | 15-10544 (BLS) |
| iMLiquidation, LLC | 15-10540 (BLS) |
| SR Liquidation of Puerto Rico Inc. | 15-10545 (BLS) |
| SR Liquidation Mexico Holding Company | 15-10546 (BLS) |
| Standard Register Holding, S. de R.L. de C.V. | 15-10547 (BLS) |
| Standard Register de México, S. de R.L. de C.V. | 15-10548 (BLS) |
| Standard Register Servicios, S. de R.L. de C.V. | 15-10549 (BLS) |
| SR Liquidation Technologies Canada ULC | 15-10550 (BLS) |

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Certification of Counsel.

01:17932331.2

2.      A docket entry shall be made in each of the Closing Cases reflecting entry of this Order.

3.      Entry of this Order is without prejudice to the rights of any Debtor or other party in interest to seek to reopen any of the Closing Cases for cause pursuant to section 350(b) of the Bankruptcy Code.

4.      Case No. 15-1-541 (the "Remaining Case") shall remain open and shall be administered under the following amended caption:

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC Liquidation Company,[1] | Case No. 15-10541 (BLS) |
| Debtor | |

---

[1]  The last four digits of the Debtor's taxpayer identification number are 5440.  Inquiries regarding the Debtor should be directed to the GUC Trustee, c/o EisnerAmper LLP, 111 Wood Avenue South, Iselin, NJ 08830-2700 (Attn: Anthony R. Calascibetta) and, until the Effective Date of the Plan, to counsel for the Debtor, Gibson Dunn & Crutcher LLP, 200 Park Avenue, 47th Floor, New York 10166 (Attn: Michael A. Rosenthal).

5.      All contested matters relating to each of the Debtors, including objections to claims, shall be administered and heard in the Remaining Case, in accordance with the terms of the Plan.

6.      The Debtors shall complete all remaining quarterly reports and pay all quarterly fees due and owing in the Closing Cases within thirty days of entry of this Order.

Dated: _____ ___, 2015
            Wilmington, Delaware

_____
Brendan L. Shannon
Chief United States Bankruptcy Judge

01:17932331.2

- 4 -

**EXHIBIT C**

**Notice of Confirmation and Effective Date**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |

## NOTICE OF EFFECTIVE DATE OF SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE THAT:**

1. **Confirmation Order.** On November 19, 2015, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order (the "Confirmation Order") confirming the *Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates* (the "Plan"), dated November ____, 2015. Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan. The Effective Date of the Plan occurred on _____, 2015.

2. **Plan Injunction. Confirmation of the Plan shall operate as an injunction against the commencement or continuation of any act or action to collect, recover, or offset from the Estates (unless such offset rights were asserted in writing prior to the Confirmation Date), the GUC Trust, the Secured Creditor Trust, or any of their property, any Claim or Equity Interest treated in the Plan or any actions to interfere with the implementation and consummation of the Plan, except as otherwise expressly permitted by the Plan or the Confirmation Order or by Final Order enforcing the terms of the Plan. The Bankruptcy Court shall have jurisdiction to determine and award damages and/or other appropriate relief at law or in equity for any violation of such injunction, including compensatory damages, professional fees and expenses, and exemplary damages for any willful violation of said injunction.**

3. **Executory Contracts and Unexpired Leases Deemed Rejected.** On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors that have not been assumed and assigned, or rejected, prior to the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order, as of the Confirmation Date, provided that to the extent the D&O Policies, the Chubb Settlement Agreement, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor are executory, the D&O Policies, the Chubb Settlement Agreement, the Asset Purchase Agreement, the MTSA, the Side Letter, and any other related agreements with Taylor shall not be deemed rejected but shall be deemed assumed by the Liquidating Debtors as of the Effective Date and shall remain in full force and effect following the occurrence of the Effective Date.

4. **Cancellation of Equity Interests.** In accordance with Section 1.7 of the Plan, on the Effective Date, except as otherwise set forth in the Plan, and except for purposes of evidencing a timely asserted Claim, all notes, stock, instruments, certificates, and other documents evidencing any Claims or Equity Interests shall be cancelled,

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or an any way related thereto shall be discharged.

5. **Bar Date For Rejection Damages.** If the rejection by the Debtors of an Executory Contract or an Unexpired Lease pursuant to Section 5.1 of the Plan results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a proof of Claim is filed with Prime Clerk LLC (the "Claims Agent") at the following address:

>   SRC Liquidation Claims Processing Center
>   c/o Prime Clerk, LLC
>   830 Third Avenue, Third Floor
>   New York, New York 10022

A proof of Claim will be deemed timely only if the original proof of Claim is mailed or delivered by hand, courier or overnight service so as to be **actually received** by the Claims Agent **on or before 4:00 p.m. (prevailing Eastern Time) on December 21, 2015**. Proofs of Claim may not be sent by facsimile, telecopy, electronic mail or other form of electronic transmission. A claimant who wishes to receive acknowledgement of receipt of its proof of Claim may submit a copy of the Proof of Claim and a self-addressed, stamped envelope to the Claims Agent along with the original Proof of Claim.

If you file a proof of Claim, your proof of Claim must: (a) be written in the English language; (b) be denominated in lawful currency of the United States as of the Petition Date; (c) conform substantially to the enclosed proof of claim form or Official Bankruptcy Form No. 10 ("Official Form 10");[2] (d) set forth with specificity the legal and factual basis for the alleged Claim; (e) include supporting documentation (or, if such documentation is voluminous, a summary of such documentation) or an explanation as to why such documentation is not available; and (f) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.

**Any Person that is required to file a proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Claim. All such Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 7.2 of the Plan and the Confirmation Order.**

6. **Applications for Professional Fees.** All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is thirty (30) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim.

7. **Administrative Expense Claims Bar Date.** Holders of Administrative Expense Claims (other than Professional Fees) accruing from March 12, 2015 through the Effective Date must file requests for payment of Administrative Expense Claims so as to be **actually received** on or before 4:00 p.m. (prevailing Eastern Time) on December 21, 2015 by the Claims Agent at the following address:

>   SRC Liquidation Claims Processing Center
>   c/o Prime Clerk, LLC
>   830 Third Avenue, Third Floor
>   New York, New York 10022

---

[2]   Official Form 10 can be found at www.uscourts.gov/bkforms/index.html, the Official Website for the United States Bankruptcy Courts.

All such requests for payment must: (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (ii) be written in the English language; (iii) denominate the claim in lawful currency of the United States as of the Administrative Expense Bar Date; (iv) indicate the particular Debtor against which the claim is asserted; and (v) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available.

The following Claims are not required to be filed on or before the Administrative Expense Claims Bar Date:

    (a) Professional Fee Claims;

    (b) any Administrative Expense Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise or (ii) have otherwise been satisfied;

    (c) any Administrative Expense Claims previously filed with the Claims Agent or the Court;

    (d) any Administrative Expense Claim that has been Allowed by prior order of the Bankruptcy Court;

    (e) any claims by any officer or director of the Debtors immediately prior to the Effective Date;

    (f) any claims for bonus payments arising under the Key Employee Incentive Plan approved by order of the Bankruptcy Court [Docket No. 503];

    (g) any claims by any direct or indirect non-debtor subsidiary or affiliate of the Debtors;

    (h) any claims for fees payable to the Clerk of this Court;

    (i) any U.S. Trustee Fees; and

    (j) any claim by a governmental unit for a tax or penalty described in section 503(b)(1)(B) and (C) of the Bankruptcy Code, as provided for in section 503(b)(1)(D).

**Any Person that is required to file a request for payment of an Administrative Expense Claim under the Plan and that fails to timely do so shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim, and such Administrative Expense Claim shall not be enforceable against the Secured Creditor Trust, the GUC Trust, the Liquidating Debtors, the Estates, and their respective properties, and the Secured Creditor Trust, the GUC Trust, the Liquidating Debtors, the Estates, and their respective properties shall be forever discharged from any and all Liability with respect to such Administrative Expense Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Administrative Expense Claims shall, as of the Effective Date, be subject to the permanent injunction pursuant to Section 7.2 of the Plan and the Confirmation Order.**

8.   **Inquiries by Interested Parties.** For questions about the Plan, the Confirmation Order, this Notice, or the Effective Date, parties should contact the Debtors' Claims Agent, Prime Clerk, LLC, at (855) 842-4124. The Plan, the Confirmation Order, and related documents may be examined free of charge at http://cases.primeclerk.com/standardregister. The Plan and the Confirmation Order are also on file with the Court and may be viewed by accessing the Court's website at www.deb.uscourts.gov. To access documents on the Court's website, you will need a PACER password and login, which you can be obtained at www.pacer.psc.uscourts.gov. **PLEASE DO NOT CONTACT THE BANKRUPTCY COURT.**

Dated: _____, 2015
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ _____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (NY No. 4697561)
Jeremy L. Graves (CO No. 45522)
Matthew G. Bouslog (CA No. 280978)
200 Park Avenue
New York, New York 10166-0193
Chicago, IL 60654-5313
Telephone: (212) 351-4000
Facsimile: (312) 351-4035

*Counsel to the Debtors and Debtors in Possession*

01:17956660.2

4

# Exhibit 8

## Summary of Industry Affiliate Investment Disclosures[1]

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Weil Gotshal & Manges LLP**<br><br>*In re Sears Holdings Corporation,* Case No. 18-23538-RDD (Bankr. S.D.N.Y.)<br><br>*In re Claire's Stores, Inc.,* Case No. 18-10584-MWF (Bankr. D. Del.)<br><br>*In re Waypoint Leasing Holdings Ltd.,* Case No. 18-13648-SMB (Bankr. S.D.N.Y.) | "Weil compared the names of [clients] for which professional time was recorded during the two (2) years prior to the comparison." [Schrock Declaration ¶ 5(d), *Claire's,* Docket No. 191, 3/30/18] | None described. | "Weil has represented, and may currently represent, entities that hold, or may in the future hold, certain of the Debtors' debt in beneficial accounts on behalf of unidentified parties. Because distressed debt is actively traded in the commercial markets, Weil may be unaware of the actual holder of such debt at any given moment. Weil also represents numerous entities in unrelated matters that may buy and/or sell distressed debt of chapter 11 debtors. Moreover, from time to time, Weil is engaged by various entities that buy and/or sell distressed debt to analyze the capital structure of a distressed company based on a review of publicly available information. The Firm does not undertake such reviews after it has been engaged to represent any such company, including the Debtors, and does not view any public debt review as an adverse representation to a | None described. | "Weil compiled responses to the foregoing inquiries for the purposes of preparing this Declaration. Responses to the inquiry described in Paragraph 5(g) hereof indicate that, as of the Commencement Date, and except as otherwise disclosed herein, no Weil attorneys and/or support staff and/or their family members: (i) own any debt or equity securities of any of the Debtors or their non-Debtor affiliates; (ii) hold a claim against or interest adverse to any of the Debtors; (iii) are or were officers, directors, or employees of any of the Debtors; (iv) are related to or have any connections to Bankruptcy Judges in the District of Delaware; or (v) are related to or have any connections to anyone working in the Office of the U.S. Trustee." [Schrock Declaration ¶ 6, *Claire's,* Docket No. 191, 3/30/18] | None mentioned. |

[1] This chart is based on a review of the sample retention applications listed in column A and does not include any subsequently filed supplemental declarations. Each professional's disclosures were substantially similar in all sample engagements, unless otherwise noted.

Capitalized terms used but not defined in the excerpts quoted herein have the meanings ascribed to such terms in the applicable retention application.

| | LAW FIRMS | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | | debtor.<br><br>Despite the efforts described herein to identify and disclose Weil's connections with the parties in interest in these chapter 11 cases, because of the Debtors' numerous relationships, Weil is unable to state with absolute certainty that every client relationship or other connection has been disclosed. Weil will continue to follow the Firm Disclosure Procedures, and if any new material relevant facts or relationships are discovered or arise, Weil will promptly file a supplemental disclosure detailing the same with the Court." [Schrock Declaration ¶¶ 17-18, *Claire's*, Docket No. 191, 3/30/18] | | "Certain Weil personnel or members of the household of the Firm's personnel may unknowingly hold certain interests in the Debtors through blind or discretionary accounts." [Holtzer Declaration ¶ 6 n.4, *Waypoint Leasing*, Docket No. 162, 12/23/18] | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| **Kirkland & Ellis LLP**<br><br>*In re Things Remembered, Inc.*, Case No. 19-10234-KG (Bankr. D. Del.)<br><br>*In re Synergy Pharmaceuticals Inc.*, Case No. 18-14010-JLG (Bankr. S.D.N.Y.)<br><br>*In re ATD Corporation*, Case No. 18-2221-KJC (Bankr. D. Del.) | "To the extent that I have been able to ascertain that Kirkland has been retained within the last three years to represent any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 2 attached hereto." [Greco Declaration ¶ 21, *Things Remembered*, Docket No. 115, 2/13/19] | See column F regarding employee investments. | "Generally, it is Kirkland's policy to disclose entities in the capacity that they first appear in a conflicts search. For example, if an entity already has been disclosed in this Declaration in one capacity (e.g., a customer), and the entity appears in a subsequent conflicts search in a different capacity (e.g., a vendor), Kirkland does not disclose the same entity again in supplemental declarations, unless the circumstances are such in the latter capacity that additional disclosure is required." [Greco Declaration ¶ 29, *Things Remembered*, Docket No. 115, 2/13/19] | "Furthermore, prior to joining Kirkland, certain Kirkland attorneys represented clients adverse to Kirkland's current and former restructuring clients. Certain of these attorneys (the 'Screened Kirkland Attorneys') will not perform work in connection with Kirkland's representation of the Debtors and will not have access to confidential information related to the representation. Kirkland's formal ethical screen provides sufficient safeguards and procedures to prevent imputation of conflicts by isolating the Screened Kirkland Attorneys and protecting confidential information.<br><br>Under Kirkland's screening procedures, Kirkland's conflicts department distributes a memorandum to all Kirkland attorneys and legal assistants directing them as follows: (a) not to discuss any aspects of Kirkland's representation of the Debtors with the Screened Kirkland Attorneys; (b) to conduct meetings, phone | "From time to time, Kirkland partners, of counsel, associates, and employees personally invest in mutual funds, retirement funds, private equity funds, venture capital funds, hedge funds, and other types of investment funds (the 'Investment Funds'), through which such individuals indirectly acquire an interest in debt or equity securities of many companies, one of which may be one of the Debtors, their creditors, or other parties in interest in these chapter 11 cases, often without Kirkland's knowledge. Each Kirkland person generally owns substantially less than one percent of such Investment Fund, does not manage or otherwise control such Investment Fund, and has no influence over the Investment Fund's decision to buy, sell, or vote any particular security. The Investment Fund is generally operated as a blind pool, meaning that when the Kirkland persons make an investment in the Investment Fund, he, she, or they do not know what securities the blind pool Investment Fund | Kirkland explicitly seeks to also retain Kirkland & Ellis International LLP and appears to search both firms' clients. |

| | | | | | | |
|---|---|---|---|---|---|---|
| **LAW FIRMS** | | | | | | |
| **A** | **B** | **C** | **D** | **E** | **F** | **G**<br>**Are international affiliates included with connections?** |
| **Professional** | **Look-back period** | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | |
| | | | | conferences, and other communications regarding Kirkland's representation of the Debtors in a manner that avoids contact with the Screened Kirkland Attorneys; (c) to take all measures necessary or appropriate to prevent access by the Screened Kirkland Attorneys to the files or other information related to Kirkland's representation of the Debtors; and (d) to avoid contact between the Screened Kirkland Attorneys and all Kirkland personnel working on the representation of the Debtors unless there is a clear understanding that there will be no discussion of any aspects of Kirkland's representation of the Debtors. Furthermore, Kirkland already has implemented procedures to block the Screened Kirkland Attorneys from accessing files and documents related to the Debtors that are stored in Kirkland's electronic document managing system." [Greco Declaration ¶¶ 52-53, *Things Remembered*, Docket No. 115, 2/13/19] | will purchase or sell, and have no control over such purchases or sales.<br><br>From time to time one or more Kirkland partners and of counsel voluntarily choose to form an entity (a 'Passive-Intermediary Entity') to invest in one or more Investment Funds. Such Passive-Intermediary Entity is composed only of persons who were Kirkland partners and of counsel at the time of the Passive-Intermediary Entity's formation (although some may later become former Kirkland partners and of counsel). Participation in such a Passive-Intermediary Entity is wholly voluntary and only a portion of Kirkland's partners and of counsel choose to participate. The Passive-Intermediary Entity generally owns substantially less than one percent of any such Investment Fund, does not manage or otherwise control such Investment Fund, and has no influence over the Investment Fund's decision to buy, sell, or vote any particular security. Each Investment Fund in which a | |

| | | | | | | |
|---|---|---|---|---|---|---|
| LAW FIRMS | | | | | | |
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| | | | | | Passive-Intermediary Entity invests is operated as a blind pool, so that the Passive-Intermediary Entity does not know what securities the blind pool Investment Funds will purchase or sell, and has no control over such purchases or sales. And, indeed, the Passive-Intermediary Entity often arranges for statements and communications from certain Investment Funds to be sent solely to a blind administrator who edits out all information regarding the identity of the Investment Fund's underlying investments, so that the Passive-Intermediary Entity does not learn (even after the fact) the identity of the securities purchased, sold, or held by the Investment Fund. To the extent the Passive-Intermediary Entity is or becomes aware of the identity of the securities purchased, sold, or held by the Investment Funds ('Known Holdings'), such Known Holdings are submitted to Kirkland's conflict checking system.<br><br>From time to time, Kirkland partners, of counsel, | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **LAW FIRMS** | | | | | | |
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | **Are international affiliates included with connections?** |
| | | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | |
| **Professional** | **Look-back period** | | | | | |
| | | | | | associates, and employees personally directly acquire a debt or equity security of a company which may be (or become) one of the Debtors, their creditors, or other parties in interest in these chapter 11 cases. Kirkland has a long-standing policy prohibiting attorneys and employees from using confidential information that may come to their attention in the course of their work, so that, all Kirkland attorneys and employees are barred from trading in securities with respect to which they possess confidential information." [Greco Declaration ¶¶ 42-44, *Things Remembered*, Docket No. 115, 2/13/19] | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Jones Day**<br><br>*In re M&G USA Corporation,* Case No. 17-12307-BLS (Bankr. D. Del.)<br><br>*In re Paragon Offshore PLC,* Case No. 16-10386 (Bankr. D. Del.)<br><br>*In re Toys "R" Us Property Company I, LLC,* Case No. 18-31429-KLP (Bankr. E.D. Va.) | "To the extent that I have been able to ascertain that Jones Day has been retained within the last two (2) years to represent any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 3 attached hereto." [Levinson Declaration ¶ 15, *Paragon Offshore,* Docket No. 1604, 6/6/17] | None described. | "The disclosure of stockholder interests or other affiliate relationships among potentially related entities reflects only information known to Jones Day through its conflict reporting system. Jones Day has not performed independent research to identify all stockholder interests or other affiliate relationships with respect to interested parties. Moreover, Jones Day has not disclosed representations of trade associations and similar industry or special interest organizations in which interested parties are members." [Levinson Declaration, Schedule 3 n.1, *Paragon Offshore,* Docket No. 1604, 6/6/17] | None described. | "Jones Day has more than 2,500 attorneys in 43 offices around the world. It is possible that certain Jones Day attorneys or employees hold the Debtors' securities or interests in mutual funds or other investment vehicles that own the Debtors' securities or the securities of entities that own the Debtors' securities." [Moss Declaration ¶ 13(f), *Toys "R" Us,* Docket No. 280, 6/29/18]<br><br>No similar disclosure in *Paragon Offshore.* | None mentioned . |

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Akin Gump Strauss Hauer & Feld LLP**<br><br>*In re FirstEnergy Solutions Corp.*, Case No. 18-5057-AMK (Bankr. D.D. Ill.)<br><br>*In re Emerald Oil, Inc.*, Case No. 16-10704-KG (Bankr. D. Del.)<br><br>*In re Hercules Offshore, Inc.*, Case No. 16-11385-KJC (Bankr. D. Del.) | None specified | None described. | None described. | None described. | "To the best of my knowledge and information based on the responses received to the foregoing information request, no member or employee of Akin Gump holds any of the Debtors' equity or notes. It is possible that a professionally managed retirement plan on behalf of Akin Gump employees or members of a 401(k) type plan may hold equity interests in or other securities of the Debtors, but it is unknown to me at this time." [Botter Declaration ¶ 23, *Emerald Oil*, Docket No. 321, 5/16/16]<br><br>No similar disclosure in *FirstEnergy* or *Hercules*. | None mentioned. |

| | LAW FIRMS | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Milbank LLP**<br><br>*In re M & G USA Corporation,* Case No. 17-12307-BLS (Bankr. D. Del.)<br><br>*In re Remington Outdoor Company, Inc.,* Case No. 18-10684-BLS (Bankr. D. Del.)<br><br>*In re Westinghouse Electric Company LLC,* Case No. 17-10751-MEW (Bankr. S.D.N.Y.) | "To the extent that such searches indicated that Milbank has or had a relationship with any such entity within the last three years, the identity of such entity, and Milbank's relationship therewith, are set forth on Schedule 2 attached hereto and incorporated herein." [Raval Declaration ¶ 15, *M & G*, Docket No. 361, 12/5/17] | None described. | "The Debtors have numerous relationships and creditors. Consequently, although every reasonable effort has been made to discover and eliminate the possibility of any connection or conflict, including the efforts outlined above, Milbank is unable to state with certainty which of its clients or such clients' affiliated entities hold claims or otherwise are parties in interest in these Chapter 11 Cases." [Raval Declaration ¶ 22, *M & G*, Docket No. 361, 12/5/17] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal | |
| Professional | Look-back period | | | | investment disclosures, if any | |
| Skadden, Arps, Slate, Meagher & Flom LLP<br><br>*In re Exide Technologies*, Case No. 13-11482-KJC (Bankr. D. Del.)<br><br>*In re SunEdison, Inc.,* Case No. 16-10992-SMB (Bankr. S.D.N.Y.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.) | None specified. | See column F regarding employee investments. | "Skadden has instituted and is currently engaged in extensive further inquiry regarding the Debtor's constituencies through further inquiries of its partners, counsel and associates with respect to the matters contained herein, including the circulation of a special disinterestedness questionnaire to each of the approximately 1,700 partners, counsel and associates in the Firm's numerous domestic and international offices. Skadden will promptly file a supplemental declaration should the results of this inquiry or any further inquiries reveal material facts not disclosed herein. Skadden will continue to comply with its ongoing duty under the Bankruptcy Code to notify this Court if any actual conflict arises and, if necessary, arrange for an 'ethical wall' with respect to the Skadden attorney who worked on such matter." [Ziman Declaration ¶ 45, *Exide*, Docket No. 145, 6/19/13] | "Prior to the Petition Date, Skadden, Arps established a formal screening procedure or 'Ethical Wall' to ensure that lawyers and legal assistants ('Professional Staff') who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representation of Citigroup or Barclays regarding the Joint Venture, on the one hand, and Professional Staff who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representation of the Debtors, on the other hand, do not exchange any information protected as confidential with respect to either Citigroup or Barclays, on the one hand, or the Debtors, on the other hand. In addition, prior to the Petition Date, Skadden, Arps obtained specific waivers relating to this representation of Barclays. Skadden, Arps continues to represent Barclays in these matters; however, Skadden, Arps has made it clear to Barclays that | "In addition, some of the Firm's professionals have assets managed by financial advisors or hold mutual funds which are managed by third party fund managers. Neither the Firm nor its professionals have any control over the investments in such funds, including investment purchases, sales and the timing of such activities. Securities of the Debtor or potential parties in interest may be held through the foregoing investments. In addition, certain professionals may hold securities of potential parties in interest or their affiliates in the ordinary course. To the best of my knowledge, no employee of the Firm working directly on this engagement holds securities of the Debtor." [Ziman Declaration ¶ 40, *Exide*, Docket No. 145, 6/19/13]<br><br>"Skadden maintains three retirement plans (the 'Plan(s)') into which contributions are made by attorneys and employees and/or by the firm on their behalf ('Employee Contribution(s)'). Attorneys and employees of the firm serve as trustees of the Plans | None mentioned . |

| | | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? | |
| | | | | it is prohibited from appearing or taking positions adverse to the Debtors on Barclays' behalf." [Goffman Declaration ¶ 14, *SunEdison*, Docket No. 100, 4/26/16]<br><br>"Out of an abundance of caution, Skadden established a formal screening procedure or 'Ethical Wall' to ensure that lawyers and legal assistants ('Professional Staff') who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representations of Eco-Bat, on the one hand, and Professional Staff who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representation of the Debtor, on the other hand, do not exchange any information protected as confidential with respect to either Eco-Bat or Exide." [Ziman Declaration ¶ 38(a), Exide, Docket No. 145, 6/19/13]<br><br>No similar disclosure in *Synergy*. | (the 'Trustees'). With respect to one of the Plans, the Trustees select mutual funds and similar investment vehicles ('Fund(s)') and individual participants direct into which of those Funds their contributions will be invested. Regarding the other two Plans, the Trustees select the Funds in which such Plans invest Employee Contributions. The Trustees only decide whether Employee Contributions are invested in a particular Fund or whether a participant may direct that his/her Employee Contributions should be invested in such Funds. Neither Skadden nor the Trustees have any ability to (i) cause the Funds to invest Employee Contributions in any particular investment opportunity or (ii) know whether the Funds are invested in clients of the Firm and/or in entities as to which the Firm has an adverse representation. It is possible that the Funds including the component of the Funds which are 'Hedge Funds' may have invested in debt or equity securities of Synergy Pharmaceuticals Inc. or Synergy Advanced Pharmaceuticals, Inc. No | | |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A** **Professional** | **B** **Look-back period** | **C** **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** **Explanation of limits on conflict of interest check and disclosure** | **E** **Description of information screen and other protective measures** | **F** **Employee personal investment disclosures, if any** | **G** **Are international affiliates included with connections?** |
| | | | | | investment by any Plan in any particular Hedge Fund exceeds 2.6% of the total value of such Plan." [Meisler Declaration ¶ 17, *Synergy*, Docket No. 122, 12/26/18] The second paragraph above appears only in *Synergy*, and not *Exide* or *SunEdison*. | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br><br>*In re Cumulus Media Inc.,* Case No. 17-13381-SCC (Bankr. S.D.N.Y.)<br><br>*In re Sears Holdings Corporation,* Case No. 18-23538-RDD (Bankr. S.D.N.Y.)<br><br>*In re The Bon-Ton Stores, Inc.,* Case No. 18-10248-MWF (Bankr. D. Del.) | "Paul, Weiss currently represents, or has in the past three years represented, the Potential Parties-in-Interest, or parties who may be affiliated with such Potential Parties-in-Interest, set forth in Schedule 2 hereto, in matters unrelated to the Debtors and these Chapter 11 Cases." [Cornish Declaration ¶ 3, *Bon-Ton,* Docket No. 181, 2/14/18] | None described. | "In light of the extensive number of the Debtors' creditors and parties in interest and because definitive lists of all such creditors and other parties have not yet been obtained, neither I nor the Firm are able to conclusively identify all potential relationships at this time, and we reserve the right to supplement this disclosure as additional relationships come to our attention. To the extent that I become aware of any additional relationships that may be relevant to Paul, Weiss's representation of the Debtors, I will promptly file a supplemental declaration." [Basta Declaration ¶ 23, *Sears,* Docket No. 417, 11/1/18] | None described. | None described. | None mentioned. |

| | LAW FIRMS | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Gibson, Dunn & Crutcher LLP**<br><br>*In re Energy Future Holdings Corp.*, Case No. 14-10979-CSS (Bankr. D. Del.)<br><br>*In re Sports Authority Holdings, Inc.*, Case No. 16-10527-MFW (Bankr. D. Del.)<br><br>*In re Brookstone Holdings Corp.*, Case No. 18-11780-BLS (Bankr. D. Del.)<br><br>*In re RCS Capital Corporation, et al.*, Case 16-10223-MFW (Bankr. D. Del.) | "To the extent that Gibson Dunn currently represents, or has represented within the last three years, any of the Interested Parties, the identities of such entities is set forth in Exhibit 4, which is attached hereto. In determining whether a client is presently represented by Gibson Dunn, I relied on the existence of an 'active' notation on the report to reflect current representation. With respect to matters showing as 'inactive,' I relied on the 'closed date' to determine whether the representation occurred within the past three years. If an 'inactive' matter showed no 'closed date,' I assumed for purposes of this disclosure that the matter was inactive during the past three years and did not include the client on Exhibit 4, except | None described. | "Gibson Dunn is confident that its diligence has resulted, to the greatest extent possible, in the disclosure of all potential conflicts. However, despite the efforts described above to identify and disclose Gibson Dunn's connections with parties in interest in the Chapter 11 Cases, Gibson Dunn is unable to state with absolute certainty that every client representation or other connection has been disclosed, because Gibson Dunn is an international law firm with over 1,200 attorneys across the globe." [Klyman Declaration ¶ 23, *Sports Authority*, Docket No. 233, 3/8/16] | None described. | "Gibson Dunn has over 1,200 attorneys. A general inquiry of all Gibson Dunn attorneys was sent by electronic mail to determine whether any such individuals holds claims against, or stock or securities of the Debtors (other than in connection with investments in mutual funds, blind trusts or other investments as to which such individual has no discretion as to the selection of the individual underlying assets). As of the date hereof, no Gibson Dunn attorneys reported owning any debt or equity securities of the Debtors (other than securities that may be owned in connection with investments in mutual funds, blind trusts or other investments as to which such individual has no discretion as to the selection of the individual underlying assets)." [Klyman Declaration ¶ 21(c), *Sports Authority*, Docket No. 233, 3/8/16] | None mentioned. |

| | LAW FIRMS | | | | | |
|---|---|---|---|---|---|---|
| **A** <br><br><br> **Professional** | **B** <br><br><br> **Look-back period** | **C** <br><br> **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** <br><br> **Explanation of limits on conflict of interest check and disclosure** | **E** <br><br> **Description of information screen and other protective measures** | **F** <br><br> **Employee personal investment disclosures, if any** | **G** <br> **Are international affiliates included with connections?** |
| | 'inactive' matters opened on or after December 14, 2012 which showed no 'closed date' for which the client is included on Exhibit 4." [Klyman Declaration ¶ 20(c), *Sports Authority*, Docket No. 233, 3/8/16] | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **LAW FIRMS** | | | | | | |
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal | |
| **Professional** | **Look-back period** | **disclosure, if any** | **disclosure** | **measures** | **investment disclosures, if any** | **connections?** |
| **Proskauer Rose LLP**<br><br>*In re Breitburn Energy Partners LP,* Case No. 16-11390-SMB (Bankr. S.D.N.Y.)<br><br>*In re Energy Future Holdings Corp.,* Case No. 14-10979-CSS (Bankr. D. Del.)<br><br>*In re PES Holdings, LLC,* Case No. 18-10122-KG (Bankr. D. Del.) | "Proskauer compared the names of each of the Potential Parties in Interest against the names contained in Proskauer's Conflicts Database for which professional time was recorded during the two (2) years prior to the comparison." [Abelson Declaration ¶ 20(c), *Breitburn Energy*, Docket No. 921, 1/9/18]<br><br>"Specifically, Proskauer obtained from Kirkland the names of individuals and entities that may be parties in interest in these chapter 11 cases (the 'Potential Parties in Interest') and such parties are listed on Schedule 1 hereto. Proskauer has searched on its electronic database for its connections to the entities listed on Schedule 1 hereto. To the extent that I have been able to ascertain that Proskauer has been retained within | None described. | None described. | None described. | "From time to time, Proskauer partners, of counsel, associates, and employees personally invest in mutual funds, retirement funds, private equity funds, venture capital funds, hedge funds, and other types of investment funds (the 'Investment Funds'), through which such individuals indirectly acquire a debt or equity security of many companies, one of which may be the Debtor or an affiliate, often without Proskauer's knowledge. Each Proskauer person generally owns substantially less than one percent of such Investment Fund, does not manage or otherwise control such Investment Fund, and has no influence over the Investment Fund's decision to buy, sell, or vote any particular security. The Investment Fund is generally operated as a blind pool, meaning that when the Proskauer persons make an investment in the Investment Fund, he, she, or they do not know what securities the blind pool Investment Fund will purchase or sell, and have no control over such purchases or sales. | None mentioned. |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | the last three years to represent any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 2 attached hereto." [Young Declaration ¶ 20, PES Holdings, Docket No. 144, 2/2/18]<br><br>"Proskauer compared each of the Potential Parties in Interest to the names that Proskauer has compiled into a master client database from its conflicts clearance and billing records, comprised of the names of the entities for which any attorney time charges have been billed since the database was first created (the 'Client Database')." [Marwil Declaration ¶ 22(b), EFH, Docket No. 3037, 12/16/14] | | | | From time to time, Proskauer partners, of counsel, associates and employees personally directly acquire a debt or equity security of a company which may be the Debtor or an affiliate. Proskauer has a long-standing policy prohibiting attorneys and employees from using confidential information that may come to their attention in the course of their work. In this regard, all Proskauer attorneys and employees are barred from trading in securities with respect to which they possess confidential information." [Young Declaration ¶¶ 34-35, *PES Holdings*, Docket No. 144, 2/2/18]<br><br>No similar disclosure in *Breitburn* or *EFH*. | |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br>Explanation of limits on conflict of interest check and disclosure | **E**<br>Description of information screen and other protective measures | **F**<br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| **Willkie Farr & Gallagher LLP**<br><br>*In re Aralez Pharmaceuticals US Inc.,* Case No. 18-12425-MG (Bankr. S.D.N.Y)<br><br>*In re DACCO Transmission Parts (NY), Inc.,* Case No. 16-13245-MKV (Bankr. S.D.N.Y.)<br><br>*In re AOG Entertainment, Inc.,* Case No. 16-11090-SMB (Bankr. S.D.N.Y.)<br><br>*In re Rural/Metro Corporation,* Case No. 13-11952-KJC (Bankr. D. Del.)<br><br>*In re Otelco Inc.,* Case No. | "WF&G has in the past five (5) years represented the Potential Parties in Interest or their affiliates listed on Schedule 2 hereto." [Shalhoub Declaration ¶ 6(b), *Aralez*, Docket No. 55, 8/27/18] | None described. | None described. | None described. | "In reviewing its records and the relationships of its attorneys, WF&G did not seek information as to whether any WF&G attorney or member of his/her immediate family: (a) indirectly owns, through a public mutual fund or through partnerships in which certain WF&G partners have invested but as to which such partners have no control over or knowledge of investment decisions, securities of any party in interest; or (b) has engaged in any ordinary course consumer transaction with any party in interest. If any such relationship does exist, I do not believe it would impact WF&G's disinterestedness or otherwise give rise to a finding that WF&G holds or represents an interest adverse to the Debtors' estates." [Shalhoub Declaration ¶ 4(c) n.3, *Aralez*, Docket No. 55, 8/27/18]<br><br>"Certain of my partners at WF&G and certain of the associates and counsel to, WF&G and certain of such persons' relatives may directly or indirectly be | None mentioned. |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>Professional | **B**<br><br><br><br>Look-back period | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| 13-10593 (Bankr. D. Del.)<br><br>*In re Broadview Networks Holdings, Inc.,* Case No. 12-13581-SCC (Bankr. S.D.N.Y.)<br><br>*In re Carey Limousine L.A., Inc.,* Case No. 12-12664-BLS (Bankr. D. Del.) | | | | | shareholders of creditors of the Debtors, competitors of the Debtors and/or other Parties in Interest in these cases." [Shalhoub Declaration ¶ 6(e), *Aralez*, Docket No. 55, 8/27/18]<br><br>"In addition, certain partners of WF&G are limited partners of a WF&G partnership that is itself a limited partner of Warburg Pincus Private Equity X, LP ('WP X'), the majority equity holder of Rural/Metro Corporation, and certain of its affiliates (collectively, 'Warburg'). WP X holds large and diverse interests, of which the Debtors' stock constitutes only a small percentage. Based on the information provided to me, I believe such holdings are insignificant and none of the attorneys controls or has any influence over Warburg in connection with this matter. Moreover, the investment by certain partners in the WF&G partnership which has invested in WP X are not material to any individual partner. Finally, none of the partners who is invested in the WF&G partnership will | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **LAW FIRMS** | | | | | | |
| A | B | C | D | E | F | G |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| | | | | | represent the Debtors. I do not believe any of these interests, considered separately or collectively, are material." [Strickland Declaration ¶ 4(f), *Rural/Metro*, Docket No. 70, 8/7/13][2] | |

[2] This disclosure appears specific to *Rural/Metro* and did not appear in the other searched Willkie cases, due to the relationship between Warburg Pincus and that particular debtor.

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** Are international affiliates included with connections? |
| **Professional** | **Look-back period** | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | |
| **Kramer Levin Naftalis & Frankel LLP**<br><br>*In re CHC Group Ltd.,* Case No. 16-31854-BJH (Bankr. N.D. Tex.)<br><br>*In re VER Technologies Holdco LLC,* Case No. 18-10834-KG (Bankr. D. Del.)<br><br>*In re Toys "R" Us, Inc.,* Case No. 17-34665-KLP (Bankr. E.D. Va.)<br><br>*In re Residential Capital, LLC,* Case No. 12-12020-MG (Bankr. S.D.N.Y.)<br><br>*In re Patriot Coal Corporation,* Case No. 12- | "Those connections in which Kramer Levin had represented the client or an affiliate within the last two years were compiled for purposes of being disclosed in this Declaration." [Mannal Declaration ¶ 18(c), *CHC*, Docket No. 302, 6/10/16] | None described. | None described. | "To the extent any employee of Kramer Levin has a relationship that, in the view of Kramer Levin, could give rise to an actual or potential conflict, an ethical screen will be put in place to ensure that such employee does not have access to information related to Kramer Levin's representation of the Committee." [Mannal Declaration ¶ 24, *CHC*, Docket No. 302, 6/10/16] | "Based upon an email inquiry made of all Kramer Levin personnel, and the lack of any affirmative replies to such inquiry, it is my understanding that no Kramer Levin attorney or their respective immediate family members own any debt or equity securities (ticker symbol 'HELI' or 'HELIF') of any of the Debtors or their non-Debtor affiliates. The Debtors' stock has been placed on Kramer Levin's 'restricted list' since June 6, 2016. Kramer Levin attorneys invest in a broad array of mutual funds and 'exchange-traded funds', some number of which either currently or may in the future own securities of the Debtors, their non-Debtor affiliates, or some of its creditors." [Mannal Declaration ¶ 23, *CHC*, Docket No. 302, 6/10/16] | None mentioned. |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>Professional | **B**<br><br><br>Look-back period | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| 12900-SCC (Bankr. S.D.N.Y.)<br><br>*In re Hostess Brands, Inc.,* Case No. 12-22052-RDD (Bankr. S.D.N.Y.) | | | | | | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| **Latham & Watkins LLP**<br><br>*In re Imerys Talc America, Inc.,* Case No. 19-10289-LSS (Bankr. D. Del.)<br><br>*In re Enduro Resource Partners LLC,* Case No. 18-11174-KG (Bankr. D. Del.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.) | None specified. | None described. | "Although L&W has undertaken, and continues to undertake, extensive efforts to identify connections with the Debtors and other Potential Parties in Interest, it is possible that connections with some Potential Parties in Interest have not yet been identified. Should L&W, through its continuing efforts, learn of any new connections of the nature discussed herein, L&W will so advise the Court in a timely manner as soon as reasonably practicable." [Reckler Declaration ¶ 27, *Enduro,* Docket No. 78, 5/21/18] | None described. | "Shortly after the Petition Date, L&W intends to circulate a memorandum to attorneys requiring that all attorneys who own any equity securities issued by the Debtors or any note or other debt instrument issued by the Debtors provide the details of such ownership. I will supplement this Declaration, as necessary, based on any affirmative responses to the memorandum that are received as soon as reasonably practicable." [Reckler Declaration ¶ 17, *Enduro,* Docket No. 78, 5/21/18] | None mentioned. |

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A** **Professional** | **B** **Look-back period** | **C** **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** **Explanation of limits on conflict of interest check and disclosure** | **E** **Description of information screen and other protective measures** | **F** **Employee personal investment disclosures, if any** | **G** **Are international affiliates included with connections?** |
| **Young Conaway Stargatt & Taylor, LLP** *In re: David's Bridal, Inc.,* Case No. 18-12635-LSS (Bankr. D. Del.) *In re Mattress Firm, Inc.,* Case No. 18-12241-CSS (Bankr. D. Del.) *In re The Bon-Ton Stores, Inc.,* Case No. 18-10248-MFW (Bankr. D. Del.) | None specified | None described. | "Based upon its review of the Interested Parties, Young Conaway has determined that it does not represent any party in these proceedings with a material adverse interest with respect to the Debtors. Young Conaway will supplement this Declaration, as necessary, with additional information or disclosures in the event that additional information is developed." [Morgan Declaration ¶ 5, *Bon-Ton,* Docket No. 182, 2/14/18] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| Haynes and Boone LLP<br><br>*In re MF Global Inc.,* Case No. 11-02790-MG (Bankr. S.D.N.Y.)<br><br>*In re Global Aviation Holdings Inc.,* Case No. 13-12945-MFW (Bankr. D. Del.)<br><br>*In re Panda Temple Power, LLC*, Case No. 17-10839-LSS (Bankr. D. Del.) | "H&B entered the names of the Potential Parties-in-Interest into a computer database containing the names of all clients and conflict information concerning such clients of H&B. This inquiry revealed that certain of the Potential Parties-in-Interest are current, or were H&B clients within the past two years." [Powers Declaration ¶ 12, *Panda Temple*, Docket No. 180, 6/6/17] | None described. | "The disclosures identified above are based upon all information reasonably available to Haynes and Boone at the time of submission of the Application to the Bankruptcy Court for approval. Haynes and Boone will, to the extent necessary, supplement this Declaration as may be required by the Bankruptcy Code and Rules if and when any other relationships exist or are modified such that further disclosure is required." [Kattner Declaration ¶ 14, *Global Aviation*, Docket No. 100, 11/22/13]<br><br>"…H&B intends to disclose clients in the capacity that they first appear in a conflicts search. For example, if a client has already been disclosed in this Declaration in one capacity (i.e., a bank), and the client appears in a subsequent conflicts search in a different capacity (i.e., a major contract counterparty), then H&B does not intend to disclose the same client again in supplemental declarations, unless the circumstances are such in the latter capacity that additional disclosure is required." [Powers Declaration ¶ 14, *Panda Temple*, Docket No. | "Haynes and Boone will implement appropriate internal procedures to protect the interests of the Debtors in connection with the representations and relationships set forth above." [Kattner Declaration ¶ 14, Global Aviation, Docket No. 100, 11/22/13] | None described. | None mentioned. |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>Professional | **B**<br><br><br>Look-back period | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | | 180, 6/6/17]<br><br>"H&B's investigation and research of the Potential Parties-in-Interest has thus far failed to eliminate the possibility that Potential Parties-in-Interest other than those listed on Appendix 2 hereto may be current or recent former clients of H&B because: (a) the names of the Potential Parties-in-Interest are similar to, but not identical to, current or former H&B clients; or (b) the names of the Potential Parties-in-Interest are common names that appeared on our conflict search results, but do not appear to be the same individuals or entities that are parties-in-interest herein." [Powers Declaration ¶ 16, *Panda Temple*, Docket No. 180, 6/6/17]<br><br>"Although H&B has undertaken, and continues to undertake, extensive efforts to identify connections with the Debtors and other Potential Parties-in-Interest, it is possible that connections with some Potential Parties-in-Interest have not yet been identified. Should H&B, through its continuing efforts, learn of any new connections of the nature | | | |

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | | discussed herein, H&B will so advise the Court in a timely manner as soon as reasonably practicable." [Powers Declaration ¶ 17, *Panda Temple*, Docket No. 180, 6/6/17] | | | |

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | **Are international affiliates included with connections?** |
| **Professional** | **Look-back period** | | | | | |
| **Togut, Segal & Segal LLP**<br><br>*In re Pacific Drilling S.A.,* Case No. 17-13193-MEW (S.D.N.Y.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.)<br><br>*In re Trident Holding Company, LLC,* Case No. 19-10384-SHL (Bankr. S.D.N.Y.) | "Other than as set forth herein, neither I nor any member, attorney or employee of the Togut Firm has ever been a member, officer or employee of the Debtors or had an interest materially adverse to the interests of the Debtors' estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or any of the other Debtors." [Oswald Declaration ¶ 14, *Trident*, Docket No. 94, 2/20/2019] | None described. | Limits representation of having no connections to potential parties in interest to "the directors and officers of the Debtors; the Debtors' lenders and lienholders; [and] the Debtors' 20 largest unsecured creditors (on a consolidated basis)." [Oswald Declaration ¶ 13, *Trident*, Docket No. 94, 2/20/2019]<br><br>"The Togut Firm will periodically review its files during the pendency of these Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the Togut Firm will use its reasonable efforts to identify any such further developments and will promptly file a supplemental affidavit as required by Bankruptcy Rule 2014(a)." [Oswald Declaration ¶ 18, *Trident*, Docket No. 94, 2/20/2019] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A** <br><br><br> **Professional** | **B** <br><br><br> **Look-back period** | **C** <br><br> **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** <br><br> **Explanation of limits on conflict of interest check and disclosure** | **E** <br><br> **Description of information screen and other protective measures** | **F** <br><br> **Employee personal investment disclosures, if any** | **G** <br> **Are international affiliates included with connections?** |
| **Vinson & Elkins LLP** <br><br> *In re Stallion Oilfield Services Ltd.*, Case No. 09-13562-BLS (Bankr. D. Del.) <br><br> *In re Trico Marine Services, Inc.*, Case No. 10-12653-BLS (Bankr. D. Del.) <br><br> *In re Blockbuster, Inc.*, Case No. 10-14997-CGM (Bankr. S.D.N.Y.) | Listed on Schedule 3 to this Declaration are the results of the conflicts searched of the entities listed on Schedule 2. <br><br> As referenced in Schedule 3 the term 'current' client means a client to whom time was posted in the 12 months preceding the Petition Date. As referenced in Schedule 3 the term 'former' client means a client to whom time was posted between 12 and 36 months preceding the Debtor's petition date, but for which the client representation has been closed. As referenced in Schedule 3, the term 'closed' client means a client to whom time was posted in the 36 months preceding the Debtor's petition date, but for which the client representations has been closed." [Collins Declaration ¶ 6 and n.2, *Stallion*, | None described. | "Despite the efforts described above to identify and disclose Vinson & Elkins's connections with the parties in interest in these chapter 11 cases, because Vinson & Elkins is a large firm with many personnel, and because the Debtors are a large enterprise, Vinson & Elkins is unable to state with certainty that every client relationship or other connection with it or its affiliates has been disclosed. In this regard, if Vinson & Elkins discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court." [Collins Declaration ¶ 11, *Stallion*, Docket No. 256, 12/28/09] | None described. | None described. | None mentioned. |

| | | LAW FIRMS | | | | |
|---|---|---|---|---|---|---|
| **A** <br><br><br> **Professional** | **B** <br><br><br> **Look-back period** | **C** <br><br> **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** <br><br> **Explanation of limits on conflict of interest check and disclosure** | **E** <br><br> **Description of information screen and other protective measures** | **F** <br><br> **Employee personal investment disclosures, if any** | **G** <br> **Are international affiliates included with connections?** |
| | Docket No. 256, 12/28/09] <br><br> None specified in *Trico* or *Blockbuster*. | | | | | |

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Cadwalader Wickersham & Taft**<br><br>*In re Vertis Holdings, Inc.*, Case No. 12-12821-BLS (Bankr. D. Del. 2012)<br><br>*In re Sbarro, Inc.*, Case No.11-11527-SCC (Bankr. S.D.N.Y. 2011)<br><br>*In re Acorn Elston, LLC*, Case No. 10-14807-SHL (Bankr. S.D.N.Y. 2010) | "Since 1963, CWT has maintained a database containing the names of each current and former client, the names of the parties who are or were related or adverse to such current or former clients, and the names of the CWT personnel who are or were responsible for current or former matters for such clients (the 'Database'). CWT updates the Database periodically to include additional entities that become related to current and former clients. Using the information contained in the Database and its billing records, CWT compiled the names of the entities for which any CWT attorney time charges were recorded at any time during the past three (3) years (the 'Client Compilation')." [Block Declaration ¶ | None described. | None described. | None described. | "Responses to the inquiry described in paragraph 8(f) of this declaration indicate that no CWT employee or anyone in the immediate family of a CWT employee holds any claims against, stock of, or other interests in any of the Debtors and that no such individuals were ever employed by any of the Debtors." [Rapisardi Declaration ¶ 12, Vertis, Docket No. 211, 11/02/12] | None mentioned. |

| | | **L**AW **F**IRMS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>Professional | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | 10(b), *Sbarro*, Docket No. 102, 4/19/11] | | | | | |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| **AlixPartners, LLP**<br><br>*In re David's Bridal, Inc.,* Case No. 18-12635-LSS (Bankr. D. Del.)<br><br>*In re Bon-Ton Stores, Inc.,* Case No. 18-10248-MWF (Bankr. D. Del.)<br><br>*In re Charming Charlie Holdings Inc.,* Case No. 17-12906-CSS (Bankr. D. Del.) | "A search was performed for connections to the Potential Parties in Interest within the past five (5) years, and results were disclosed as to AlixPartners Holdings, LLP ('Holdings'), AlixPartners' parent company, and each of AlixPartners Holdings' U.S. and non-U.S. subsidiary affiliates." [Basler Declaration ¶ 26, *David's Bridal,* Docket No. 132, 11/29/18] | "AlixPartners is a wholly owned subsidiary of Holdings. The equity capital of Holdings is owned individually by: (i) the Managing Directors of AlixPartners; (ii) Lakeview Capital Holdings, Inc., the Jay Alix Living Trust and other affiliates of Jay Alix (collectively the 'Lakeview Parties'); (iii) affiliates of each of (a) Caisse de dépôt et placement du Québec ('CDPQ'), (b) Investcorp Bank B.S.C. ('IVC'), and (c) Public Sector Pension Investment Board ('PSP Investments'); and (iv) other individuals and trusts. Neither CDPQ, nor IVC, nor the Lakeview Parties, nor PSP Investments (collectively, the 'Investors'), nor any Managing Director, other individual or trust separately owns a majority of the equity capital of Holdings directly or indirectly or separately controls the Boards of either Holdings or AlixPartners. None of the Investors own any of the bank or other debt of AlixPartners.<br><br>CDPQ is an institutional investor that manages funds primarily on behalf of a number of Quebec-based public pension and insurance plans. As one of | "AlixPartners has searched the names of the Debtors and the list of Potential Parties in Interest against the names of (i) the Investors, (ii) the subsidiaries of the Investors that either hold a direct position in Holdings or hold a direct position in the entity that holds a direct position in Holdings (collectively, the 'InvestCos'), and (iii) the subsidiaries of the Investors that hold, directly or indirectly, positions in the respective InvestCos. In addition, AlixPartners has searched and/or will request each Investor to search the names of the Debtors against the companies that the InvestCos have a direct greater than 10% investment in (collectively, with (i) – (iii) the 'Investor Conflicts Parties'). AlixPartners has determined, to the best of its knowledge based solely on that search, that there are no connections with the Investor Conflicts Parties that require disclosure other than as noted herein. Because of the information barriers described above, the sheer size of the investment portfolios of the Investor Conflicts Parties, and any applicable securities laws, | "Designees of the Investors or their subsidiaries serve as some of the members of the Boards of Directors of each of AlixPartners and Holdings (collectively, the 'Boards'). In addition to their investments in Holdings, all of the Investors have substantial investments unrelated to AP. Accordingly, as a precautionary matter, AP maintains information barriers designed to prevent confidential client information, including the names of clients likely to be involved in reorganization proceedings under the Bankruptcy Code, from being shared with the Investors or their designees on the Boards.<br><br>To that end, no material nonpublic information about the Debtors has been or will be furnished by AP to the Investors, the InvestCos (as defined below) or their Board designees, and AP will continue to abide by its confidentiality obligations to the Debtors. AP operates | "To the best of my knowledge, none of the members of the engagement team or AP is a direct holder of any of the Debtors' securities. It is possible that members of the engagement team or certain of AlixPartners employees, managing directors, board members, equity holders, or an affiliate of any of the foregoing, may own interests in mutual funds or other investment vehicles (including various types of private funds) that own the Debtors' or other parties in interest's debt or equity securities or other financial instruments, including bank loans and other obligations. Typically, the holders of such interests have no control over investment decisions related to such investment funds or financial instruments. AlixPartners' policy prohibits its employees from personally trading in the Debtors' securities." [Basler Declaration ¶ 31, *David's Bridal,* Docket No. 132, 11/29/18] | Yes, see column B. |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Professional | Look-back period | | | | | |
| | | Canada's leading institutional fund managers, CDPQ invests globally in major financial markets, private equity, infrastructure and real estate.<br><br>Investcorp is a leading global provider and manager of alternative investment products.<br><br>The Lakeview Parties and related entities are entities owned or controlled by Jay Alix that, among other things, make investments on behalf of Mr. Alix and his family." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18]<br><br>"PSP Investments manages a diversified global portfolio composed of investments in public financial markets, private equity, infrastructure, natural resources, real estate and private debt." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18]<br><br>"Although AlixPartners has performed a conflicts check of the Investor Conflicts Parties as set forth above, as a result of, among other things, the sheer size of the investments of the Investor Conflicts Parties, one or more of the Investor Conflicts Parties may, | prior to the Petition Date, AlixPartners was unable to further investigate any potential or actual connections between the Investor Conflicts Parties and the Debtors and the Potential Parties in Interest. To the extent any potential or actual connections are discovered after the Petition Date, if there exists a material connection, AlixPartners will promptly supplement this disclosure.<br><br>Notwithstanding the foregoing, AlixPartners' conflicts check did not and will not extend to entities owned by mutual funds in which an Investor Conflicts Party has an interest; entities owned by separate accounts managed by non-affiliates for an Investor Conflicts Party; entities owned by private equity funds in which an Investor Conflicts Party has a limited partnership interest managed by non-affiliates (even though the particular Investor Party may be represented on the limited partner advisory board or investor committee and even though the particular Investor Conflicts Party may have a passive interest in the general partner); entities where any of the Investor Conflicts Parties | independently of the Investor Conflicts Parties (as defined below), and does not share employees, officers or other management with any such Investor Conflicts Parties (as defined below). AP and each of the Investor Conflicts Parties have separate offices in separate buildings, use separate Internet email addresses, and do not otherwise share IT systems. No personnel of the Investor Conflicts Parties work on AlixPartners client matters or have access to AlixPartners client information or client files or client personnel. No AP executive or employee is a director, officer or employee of any Investor. Each Investor is governed by its own board of directors or similar body and managed by its own management team. Each Investor is independent of each other Investor." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18] | "Certain of AlixPartners' employees, managing directors, board members, equity holders, or an affiliate of any of the foregoing may have financial accounts or insurance relationships with a potential party in interest." [Basler Declaration ¶ 33, *David's Bridal,* Docket No. 132, 11/29/18] | |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
|  |  | Format and scope of affiliate investment activity and extent of | Explanation of limits on conflict of interest check and | Description of information screen and other protective | Employee personal investment disclosures, if | Are international affiliates included with |
| Professional | Look-back period | disclosure, if any | disclosure | measures | any | connections? |
|  |  | in the ordinary course and from time to time, hold, control and/or manage loans to, or investments in, the Debtors and/or Potential Parties in Interest and/or may trade debt and/or equity securities in the Debtors and/or Potential Parties in Interest. In addition, one or more of the Investor Conflicts Parties may also have had, currently have, or may in the future have business relationships or other connections with the Debtors or other Potential Parties in Interest. To the extent AlixPartners learns of material business relationships or other material connections that are not included herein, AlixPartners will promptly file a supplemental disclosure.<br><br>Other than as specifically noted herein, AlixPartners has not undertaken to determine the existence, nature, and/or full scope of any business relationships or connections that the Investor Conflicts Parties may have with the Potential Parties in Interest, the Debtors and their affiliates, or these chapter 11 cases.<br><br>Further, AlixPartners may have had, currently have or may in the future have business relationships | serves as general partner or investment manager holding interests representing, directly or indirectly, 10% or less. Nor does it or will it necessarily include indirect investments, such as businesses owned or investments made by an Investor Conflicts Party's portfolio company(ies), or passive investments held or managed by any of the Investor Conflicts Parties. In addition, because of the sheer size of the investments of the Investors and their respective affiliates and subsidiaries, except as described herein, AlixPartners' conflicts check did not and it will not necessarily include any other affiliates or subsidiaries owned, directly or indirectly, by each Investor, or any investments made by such other affiliates or subsidiaries, nor will it include, to the extent applicable, any depositors of the Investors." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18]<br><br>"Despite the efforts described above to identify and disclose the connections that AP has with parties in interest in these chapter 11 cases, because the Debtors form a large enterprise with numerous creditors and |  |  |  |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | with, among other entities, portfolio companies of the Investors and portfolio companies of private equity funds in which they are limited partners, in matters unrelated to the Debtors or their affiliates in these chapter 11 cases. Based on, among other things, the business separation between each of the Investor Conflict Parties and AlixPartners, the contractual client confidentiality obligations of AlixPartners and the information barriers referred to above, AlixPartners believes that it does not hold or represent an interest adverse to the estate with respect to the engagement." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18] | other relationships, AlixPartners is unable to state with certainty that every client relationship or other connection has been identified and disclosed." [Basler Declaration ¶ 34, *David's Bridal,* Docket No. 132, 11/29/18] | | | |

| | | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **E&Y**<br><br>*In re Walter Investment Management Corp.*, Case No. 17-13446-JLG (Bankr. S.D.N.Y.)<br><br>*In re Eaglet Corporation*, Case No. 18-12439-BLS (Bankr. D. Del.)<br><br>*In re One Aviation, Corp.*, Case No. 18-12309-CSS (Bankr. D. Del.) | "EY searched or caused to be searched certain databases to determine whether it has provided in the recent past or is currently providing services to the parties listed on the October 24 List. To the extent that EY's research of relationships with the parties listed on the October 24 List indicated that EY has in the recent past, or currently has, a client relationship with such parties in interest in matters unrelated to this Chapter 11 Case, it has so indicated on Exhibit 'B-1' to this Declaration." [Haines Declaration ¶ 21, Walter Investment Management, Docket No. 119, 12/22/17] | None described. | "Despite the efforts described above to identify and disclose connections with parties in interest in this case, because the Debtor is a large enterprise with numerous creditors and other relationships, EY is unable to state with certainty that every client representation or other connection of EY with parties in interest in this case has been disclosed herein. In this regard, if EY discovers additional information that requires disclosure, EY will file appropriate supplemental disclosures with this Court." [Haines Declaration ¶ 37, *Walter Investment Management*, Docket No. 119, 12/22/17] | None described. | "EY has thousands of professional employees. It is possible that certain employees of EY may have business associations with parties in interest in this case or hold securities of the Debtor or interests in mutual funds or other investment vehicles that may own securities of the Debtor." [Haines Declaration ¶ 36, *Walter Investment Management*, Docket No. 119, 12/22/17] | Mentioned.[3] |

---

[3] The declarations mention Ernst & Young Global Network which provides certain administrative services to EY, including performing conflict checks. Such costs are not billed to the debtors. [Haines Declaration ¶ 25, *Walter Investment Management*, Docket No. 119, 12/22/17]

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | **Are international affiliates included with connections?** |
| **Professional** | **Look-back period** | | | | | |
| **Alvarez and Marsal North America, LLC**<br><br>*In re Aralez Pharmaceuticals US Inc.,* Case No. 18-12425-MG (Bankr. S.D.N.Y.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.)<br><br>*In re Tintri, Inc.,* Case No. 18-11625-KJC (Bankr. D. Del.) | None specified. | None described. | None described. | "A&M's affiliate, Alvarez & Marsal Valuation Services, LLC ('A&M VS'), provides portfolio valuation services to various clients in the financial industry. A&M VS provides such services to Silver Lake Kraftwerks and/or its affiliates ('Silver Lake') solely for financial reporting purposes including a portfolio that formerly contained an interest in the Debtor. No persons providing A&M's services related to the Debtor in the Chapter 11 case are involved in such valuation services for Silver Lake and A&M VS has not been asked to perform valuation services for Silver Lake in matters related to its interest in the Debtor since the first quarter of 2017. In addition, in an abundance of caution, A&M has instituted an information barrier to ensure that confidentiality of information is protected." [Newman Declaration ¶ 4(b), *Tintri,* Docket No. 133, 8/7/17] | "In reviewing its records and the relationships of its professionals, A&M did not seek information as to whether any A&M professional or member of his/her immediate family: (a) indirectly owns, through a public mutual fund or through partnerships in which certain A&M professionals have invested but as to which such professionals have no control over or knowledge of investment decisions, securities of the Debtor or other parties in interest; or (b) has engaged in any ordinary course consumer transaction with any party in interest." [Newman Declaration ¶ 2(c) n.4, *Tintri,* Docket No. 133, 8/7/17]<br><br>"It is also noted that in the course of our review it came to A&M's attention that A&M personnel hold *de minimis* investments, representing not more than 0.01% of the equity interests in various Potential Parties in Interest, including but not limited to AT&T, Comcast, Time Warner Cable, | None mentioned. |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | | | | Verizon and Wells Fargo."<br>[Greenberg Declaration ¶<br>1(c) n.4, *Synergy*, Docket<br>No. 243, 1/17/19] | |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **FTI Consulting, Inc.**<br><br>*In re Geokinetics Inc.*, Case No. 18-33410-DRJ (Bankr. S.D. Tex.)<br><br>*In re R.E. Gas Development, LLC*, Case No. 18-22032-JAD (Bankr. W.D. Pa.)<br><br>*In re Tops Holding II Corporation*, Case No. 18-22279-RDD (Bankr. S.D.N.Y.) | Reviewed database of "current and former clients." [Buenzow Declaration ¶ 2(b), *Tops*, Docket No. 111, 3/6/18]<br><br>Reviewed "present or recent former clients of FTI." [Conly Declaration ¶ 2, *R.E. Gas Development*, Docket No. 190, 6/1/18] | None described. | None described. | None described. | None described. | None mentioned. |

| | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Goldin Associates**<br><br>*In re Real Industry, Inc.,* Case No. 17-12464-KJC (Bankr. D. Del.)<br><br>*In re Wonderwork, Inc.,* Case No. 16-13607-MKV (Bankr. S.D.N.Y.) | "Goldin's research of its relationships with Interested Parties covered the past three (3) years." [Polkowitz Declaration ¶ 17, *Real Industry*, Docket No. 193, 12/20/17] | None described. | "Goldin's review has identified certain connections that have been disclosed in connection with Goldin's Application, but such review was restricted to the individuals and entities listed in Schedule 1 and may not include all parties related to the Debtor." [Polkowitz Declaration ¶ 21(a), *Real Industry*, Docket No. 193, 12/20/17] | None described. | "Goldin and its affiliates have numerous employees, some of whom may have personal investments in the Debtors. However, no member, investor or controlling party of Goldin has any investment in the Debtors." [Polkowitz Declaration ¶ 21(e), *Real Industry*, Docket No. 193, 12/20/17] | None mentioned. |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Prime Clerk**<br><br>*In re Altegrity, Inc.,* Case No. 15-10226-LSS (Bankr. D. Del.)<br><br>*In re Nine West Holdings, Inc.,* Case No. 18-10947-CSS (Bankr. S.D.N.Y.)<br><br>*In re Orchard Acquisition Company, LLC,* Case No. 17-12914-KG (Bankr. D. Del.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.) | None specified. | "On December 7, 2017, Prime Clerk received an investment from an investment vehicle formed by Carlyle Strategic Partners IV, L.P. ('CSP IV'), an investment fund managed by Carlyle Investment Management L.L.C., each affiliates of The Carlyle Group (together with its subsidiaries, 'Carlyle'). As a result of the transaction, Prime Clerk and CSP IV are affiliates under applicable law. As of the date hereof, CSP IV is not identified on the Potential Parties in Interest list. However, the following disclosure is made out of an abundance of caution and in an effort to comply with the Bankruptcy Code and Bankruptcy Rules." [Steele Declaration ¶ 8, *Nine West*, Docket No. 205, 5/6/18]<br><br>"Carlyle is a global alternative asset manager with approximately 1,550 employees in 19 countries over six continents that manages over $170 billion in over 300 investment vehicles spanning Corporate Private Equity, Real Assets, Global Credit, and Investment Solutions. Carlyle's Corporate Private Equity funds, Real Assets funds, Global Credit funds, and Investment Solutions funds (collectively, the 'Funds') | "Prime Clerk has searched the names of the Debtors and the names of the potential parties in interest provided by the Debtors against: (i) the names of the CSP funds, (ii) the names of Carlyle's other Global Credit funds, and (iii) the names of the Corporate Private Equity funds. Prime Clerk also has searched the names of the Debtors against the publicly-known investments of the Corporate Private Equity funds as set forth in the list most recently provided to Prime Clerk by Carlyle's internal compliance department ('Carlyle Compliance'). The conflicts search does not include the names of the Real Assets funds, the Investment Solutions funds or any of their or the other Global Credit funds' investments, nor does it include any portfolio companies of any of the Funds (other than those of CSP and the Corporate Private Equity funds as described above)." [Steele Declaration ¶ 11, *Nine West*, Docket No. 205, 5/6/18]<br><br>"Because of any applicable securities laws and the fact that Prime Clerk and Carlyle operate independently, prior to the | "Prime Clerk has a policy prohibiting its partners and employees from using confidential information that may come to their attention in the course of their work. In this regard, all Prime Clerk partners and employees are barred from trading in securities with respect to which they possess confidential information." [Schrag Declaration ¶ 12, *Altegrity*, Docket No. 132, 2/27/15]<br><br>"Designees of CSP IV are members of the Board of Managers of Prime Clerk's ultimate parent company ('Parent Board Designees'), Prime Clerk Holdings LLC ('HoldCo'). HoldCo wholly owns Prime Clerk MidCo Holding LLC ('MidCo'), which wholly owns Prime Clerk. No Carlyle designees are Board members of MidCo or Prime Clerk. Further, Prime Clerk and CSP IV have the following restrictions in place (collectively, the 'Barrier'): (i) prior to the Debtors commencing these cases, Prime Clerk did not share the names or any other | "From time to time, Prime Clerk partners or employees personally invest in mutual funds, retirement funds, private equity funds, venture capital funds, hedge funds and other types of investment funds (the 'Investment Funds'), through which such individuals indirectly acquire a debt or equity security of many companies, one of which may be one of the Debtors or their affiliates, often without Prime Clerk's or its personnel's knowledge. Each Prime Clerk partner or employee generally owns substantially less than one percent of such Investment Fund, does not manage or otherwise control such Investment Fund and has no influence over the Investment Fund's decision to buy, sell or vote any particular security. The Investment Fund is generally operated as a blind pool, meaning that when the Prime Clerk partners or employees make an investment in the Investment Fund, he, she or they do not know what securities the blind pool Investment Fund will purchase or sell, and have no | None mentioned. |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| | | are managed independently from each other, and Carlyle maintains an internal information barrier between its Global Credit funds and the rest of the Carlyle funds. CSP IV, Carlyle Strategic Partners II, L.P. and Carlyle Strategic Partners III, L.P. (collectively, 'CSP') are Global Credit funds that each are owned by a diverse group of limited partners, which exert no control over CSP's investment decisions, and a general partner affiliated with Carlyle.  All CSP investment professionals involved with Prime Clerk are dedicated solely to CSP and are not involved in the Corporate Private Equity, Real Assets, or Investment Solutions businesses, although, from time to time, one or more CSP investment professionals may sit on the investment committee of another Global Credit fund. CSP operates autonomously from and makes independent investment decisions from the other Global Credit funds, the Corporate Private Equity funds, the Real Assets funds, and the Investment Solutions funds." [Steele Declaration ¶ 9, *Nine West*, Docket No. 205, 5/6/18]<br><br>"Based on, among other things, | Petition Date, Prime Clerk was unable to further investigate with Carlyle Compliance, to the extent necessary, any potential or actual connection between any of CSP, the other Global Credit funds, and the Corporate Private Equity funds, and the Debtors and the potential parties in interest.  In addition, after the Petition Date, Prime Clerk has requested Carlyle Compliance to search the names of the Debtors against CSP's respective investments.  To the extent Prime Clerk learns of any material connections involving such entities and/or such investments with the Debtors, Prime Clerk will promptly file a supplemental disclosure." [Steele Declaration ¶ 11, *Nine West*, Docket No. 205, 5/6/18] | information identifying the Debtors with the Parent Board Designees; (ii) Prime Clerk has not and will not furnish any material nonpublic information about the Debtors to CSP, the Parent Board Designees or any Carlyle entity; (iii) no CSP personnel nor any other Carlyle personnel work on Prime Clerk client matters or have access to Prime Clerk client information, client files or client personnel; (iii) no CSP personnel nor any other Carlyle personnel work in Prime Clerk's offices; (iv) other than the Parent Board Designees, Prime Clerk operates independently from Carlyle, including that it does not share any employees, officers or other management with Carlyle, has separate offices in separate buildings, and has separate IT systems; and (v) no Prime Clerk executive or employee is a director, officer or employee of Carlyle (or vice versa other than the Parent Board Designees)."  [Steele Declaration ¶ 10, *Nine West*, Docket No. 205, 5/6/18] | control over such purchases or sales." [Steele Declaration ¶ 19, *Nine West*, Docket No. 205, 5/6/18; Steele Declaration ¶ 19, *Synergy Pharmaceuticals*, Docket No. 131, 12/28/18]<br><br>"From time to time, Prime Clerk partners or employees may personally directly acquire a debt or equity security of a company which may be one of the Debtors or their affiliates." [Steele Declaration ¶ 20, *Nine West*, Docket No. 205, 5/6/18] | |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | the business separation between Prime Clerk and Carlyle and in light of the administrative nature of the services proposed to be performed by Prime Clerk for the Debtors, Prime Clerk believes that it does not hold or represent an interest adverse to the Debtors with respect to its engagement." [Steele Declaration ¶ 14, *Nine West*, Docket No. 205, 5/6/18] | | "Further, Carlyle maintains an internal information barrier between its Global Credit funds and the rest of the Carlyle funds. Accordingly, the conflicts search does not include the names of the Real Assets funds, the Investment Solutions funds or any of their or the other Global Credit funds' investments, nor does it include any portfolio companies of any of the Funds (other than those of CSP and the Corporate Private Equity funds as described above)." [Steele Declaration ¶ 11, *Synergy Pharmaceuticals*, Docket No. 131, 12/28/18] | | |

| | INVESTMENT BANKS | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br>**Professional** | **B**<br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Rothschild Inc.**<br><br>*In re Cenveo, Inc.*, Case No. 18-22178-RDD (Bankr. S.D.N.Y.)<br><br>*In re GenOn Energy, Inc.*, Case No. 17-33695-DRJ (Bankr. S.D. Tex.)<br><br>*In re Terravia Holdings, Inc.*, Case No. 17-11655-CSS (Bankr. D. Del.) | None specified. | "Rothschild is an indirect subsidiary of Rothschild & Co. ('Holdings'), a foreign holding company. Through Holdings, Rothschild has affiliate relationships with numerous direct and indirect affiliates of Holdings located worldwide that engage in investment banking, asset management, debt fund management (including collateralized loan obligation management), private equity, merchant banking, and other financial service and investment advisory businesses (collectively, the 'Affiliated Entities'). However, none of the Affiliated Entities are being retained in connection with this engagement, and none of the professionals or employees of the Affiliated Entities will provide services to the Debtors in connection with this engagement." [Snyder Declaration ¶ 26(d), *GenOn*, Docket No. 122, 6/23/17] | "As Rothschild is the only entity being retained by the Debtors (of entities affiliated with Rothschild), we have researched only the electronic client databases of Rothschild, not of all its affiliates, to determine if Rothschild has connections with any Potential Parties in Interest, and Rothschild makes no representation as to the disinterestedness of its affiliates or their respective professionals or employees in respect of the Debtors' chapter 11 cases." [Snyder Declaration ¶ 20, *GenOn*, Docket No. 122, 6/23/17]<br><br>"One or more of the Affiliated Entities may in the ordinary course from time to time hold or manage funds that hold investment positions in the Debtors and/or parties in interest in these chapter 11 cases; however, based on the business separation and compliance information barriers referred to above, the Affiliated Entities' business activities do not constitute a conflict of interest that would disqualify Rothschild from providing the services as described in the Engagement Letter." [Snyder Declaration ¶ 26(d), *GenOn*, Docket No. 122, 6/23/17] | "Rothschild's business is and will continue to be operated in a legal entity separate from the Affiliated Entities. Rothschild and the Affiliated Entities maintain strict compliance information barriers to ensure that (i) no information will be provided to the Affiliated Entities, and (ii) none of the professionals or employees of the Affiliated Entities will disclose any confidential or non-public information concerning any investment position or intention to the team working on these cases. Thus, there has not been and will not be any flow of information between the professionals or employees of Rothschild providing services to the Debtors in connection with this engagement and the Affiliated Entities with respect to any matter pertaining to the Debtors or these chapter 11 cases." [Snyder Declaration ¶ 26(d), *GenOn*, Docket No. 122, 6/23/17] | Not addressed. | Mentioned, but no disclosures made. See explanation in columns C&D. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| Moelis & Company LLC<br><br>*In re iHeartMedia, Inc.,* Case No. 18-31274-MI (Bankr. S.D. Tex.)<br><br>*In re Global A&T Electronics Ltd.,* Case No. 17-23931-RDD (Bankr. S.D.N.Y.)<br><br>*In re Cumulus Media Inc.,* Case No. 17-13381-SCC (Bankr. S.D.N.Y.) | "To the extent that I have been able to ascertain to date that Moelis has been engaged within the last two years or is currently engaged by any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 2 attached hereto. Schedule 2 also sets forth certain other relationships Moelis has with certain Potential Parties in Interest." [Keil Declaration ¶ 27, *iHeartMedia,* Docket No. 266, 3/22/18] | "Moelis Asset Management has a separate private equity business ('Moelis Capital Partners'), which holds investment positions in various entities, some of which may be parties in interest in these chapter 11 cases. To the best of my knowledge, Moelis Capital Partners does not hold any investment positions that constitute a conflict of interest that would disqualify Moelis from providing services described in the Engagement Letter. The Moelis professionals providing services to the Debtors will not share confidential or otherwise non-public information they receive in the course of this engagement with Moelis Capital Partners." [Keil Declaration ¶ 31, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management also has an economic interest in NexPhase Fund III, a private equity fund managed by NexPhase Capital LP ('NexPhase Capital'), a private equity manager formed by the former Managing Partners of Moelis Capital Partners. NexPhase Capital LLC and NexPhase Fund III Capital are not affiliates of Moelis. NexPhase Capital is owned and controlled by its | "Given the large number of parties in interest in these chapter 11 cases, despite the efforts described above to identify and disclose Moelis' relationships with parties in interest in these chapter 11 cases, Moelis is unable to state with certainty that every client relationship or other connection has been disclosed. In particular, among other things, Moelis may have relationships with persons who are beneficial owners of parties in interest and persons whose beneficial owners include parties in interest or persons who otherwise have relationships with parties in interest. Moreover, Moelis' employees may have relationships with Potential Parties in Interest, persons that may become parties in interest in these cases, and/or persons that have business relationships with the Debtors, are competitors of the Debtors, or that are customers of the Debtors." [*See also* Keil Declaration ¶ 28, *iHeartMedia,* Docket No. 266, 3/22/18] | "Moelis Asset Management is operated separately from the public company Moelis & Company and its subsidiaries, including Moelis. The executive officers of Moelis & Company are different from the executive officers of Moelis Asset Management." [Keil Declaration ¶ 30, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>See column C for protective measures for the Gracie Credit, Freeport, and Steele Creek affiliates. [Keil Declaration ¶¶ 33, 34 and 35, *iHeartMedia,* Docket No. 266, 3/22/18] | "To the best of my knowledge, information, and belief, some of Moelis' present and future employees may have, or may in the future have, personal investments in funds, or other investment vehicles, over whose investment decisions such employees have no input or control. Such entities may have made, or may in the future make, investments in the claims or securities of the Debtors, or those of their creditors, or other parties in interest in these chapter 11 cases." [Keil Declaration ¶ 36, *iHeartMedia,* Docket No. 266, 3/22/18] | None mentioned. |

| | INVESTMENT BANKS | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | investment management team. Moelis, Moelis Asset Management and Kenneth Moelis do not have control or influence or participate in the investment decisions of NexPhase Capital. Moelis Asset Management is entitled to 25% of the carried interest of NexPhase Fund III. In addition, Moelis Asset Management and Kenneth Moelis own up to $7.5 million and $7.5 million, respectively, of limited partnership interests in NexPhase Fund III. NexPhase Fund III holds investment positions in various entities, some of which may be parties in interest in these chapter 11 cases." [Keil Declaration ¶ 32, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management has a separate credit focused investment management business ('Gracie Credit'). Gracie Credit is operated as a separate business from Moelis, and Gracie Credit will continue to be operated in separate legal and operating entities from Moelis. Gracie Credit employees will not work on these cases and Moelis employees working on these cases will not have any involvement in Gracie Credit's investment decisions. Moelis and Gracie Credit maintain strict | | | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | Are international affiliates included with |
| | | Format and scope of affiliate investment activity and extent of | Explanation of limits on conflict of interest check and | Description of information screen and other protective | Employee personal investment disclosures, if | affiliates included with |
| **Professional** | **Look-back period** | **disclosure, if any** | **disclosure** | **measures** | **any** | **connections?** |
| | | compliance information barriers between Moelis on the one hand and Gracie Credit on the other hand to ensure that: (a) no Moelis employee will disclose any non-public information concerning the Debtors or these cases to any Gracie Credit employee; and (b) no Gracie Credit employee will disclose any non-public information concerning a Gracie Credit position or Gracie Credit's intention with respect to any consent, waiver, tender, or vote decision to any Moelis employee. Moelis and Gracie Credit currently have separate offices with access to the other's offices physically restricted and use the separate Internet email addresses (@moelis.com and @graciecap.com, respectively). Gracie Credit may in the ordinary course from time to time hold investment positions in the Debtors and parties in interest in these cases."  [Keil Declaration ¶ 33, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management has a separate direct lending business, Freeport Financial Group ('Freeport'). Freeport is operated as a separate business from Moelis, and Freeport will continue to be operated in separate legal | | | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | Are international affiliates included with connections? |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| | | and operating entities from Moelis. Freeport employees will not be working on these chapter 11 cases and Moelis employees working on these chapter 11 cases will not have any involvement in Freeport's investment decisions. Moelis and Freeport maintain strict compliance information barriers between Moelis on the one hand and Freeport on the other hand to ensure that: (a) no Moelis employee will disclose any non-public information concerning the Debtors or these chapter 11 cases to any Freeport employee and (b) no Freeport employee will disclose any non-public information concerning a Freeport position or Freeport's intention with respect to any consent, waiver, tender, or vote decision to any Moelis employee. Moelis and Freeport both currently have offices in Chicago in the same building with access to each other's offices restricted. The Moelis team on these chapter 11 cases is not located in the Chicago office. Moelis and Freeport also currently use separate Internet email addresses (@moelis.com and @freeportfinancial.com, respectively). Freeport may in the ordinary course from time to time hold investment positions in the | | | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | Debtors and parties in interest in these cases." [Keil Declaration ¶ 34, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management has a business of managing collateralized loan obligations through a subsidiary Steele Creek Investment Management LLC ('Steele Creek'). Steele Creek is operated as a separate business from Moelis, and Steele Creek will continue to be operated in separate legal and operating entities from Moelis. Steele Creek employees will not be working on these chapter 11 cases and Moelis employees working on these chapter 11 cases will not have any involvement in Steele Creek's investment decisions. Moelis and Steele Creek maintain strict compliance information barriers between Moelis on the one hand and Steele Creek on the other hand to ensure that: (a) no Moelis employee will disclose any non-public information concerning the Debtors or these chapter 11 cases to any Steele Creek employee and (b) no Steele Creek employee will disclose any non-public information concerning a Steele Creek position or Steele Creek's intention with respect to any consent, waiver, tender or vote | | | | |

| | | | INVESTMENT BANKS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | decision to any Moelis employee. Moelis and Steele Creek currently have separate offices. Moelis and Steele Creek also currently use separate Internet email addresses (@moelis.com and @freeportfinancial.com, respectively). Steele Creek may in the ordinary course from time to time hold investment positions in the Debtors and parties in interest in these cases." [Keil Declaration ¶ 35, *iHeartMedia,* Docket No. 266, 3/22/18] | | | | |

| | | | INVESTMENT BANKS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Lazard Frères & Co. LLC**<br><br>*In re Sears Holding Corporation*, Case No. 18-23528-RDD (Bankr. S.D.N.Y.)<br><br>*In re Beauty Brands, LLC*, Case No. 19-10031-CSS (Bankr. D. Del.)<br><br>*In re Nine West Holdings Inc.*, Case No. 10947-SCC (Bankr. S.D.N.Y.) | "Lazard then compared the names of the Potential Parties in Interest with the names of entities that have entered into engagement agreements with Lazard in the last three years." [Aebersold Declaration ¶ 5, *Sears*, Docket No. 345, 10/26/18] | "Lazard also has asset management affiliates, Lazard Asset Management LLC ('LAM') and Lazard Frères Gestion SAS ('LFG'), and an affiliate, Edgewater HoldCo LLC, that hold interests in the management companies for certain private funds (collectively, 'Edgewater'). Although Lazard receives payments from LAM, LFG, and Edgewater generated by their respective business operations, each of LAM, LFG, and Edgewater is operated as a separate and distinct affiliate and is separated from Lazard's other businesses.  As part of their regular business operations, LAM and LFG may act as investment advisor for or trade securities (including in discretionary client accounts, and through the operation of hedge funds and mutual funds, in which cases investment decisions are made by LAM or LFG), including on behalf of creditors, equity holders or other parties in interest in these cases, and Lazard or its respective affiliates, managing directors and employees. Some of these LAM or LFG accounts and funds may have held, may now hold or may in the future hold debt or equity securities of the Debtors or the Debtors' creditors, equity holders, | "Lazard is a U.S. operating subsidiary of an international investment banking, financial advisory, and asset management firm and thus has legally separate and distinct affiliates. Although it is possible that employees of certain affiliates may assist Lazard in connection with Lazard's engagement, as only Lazard is being retained in these chapter 11 cases, we have researched only the electronic client files and records of Lazard, not of all of its affiliates, to determine connections with any Potential Parties in Interest." [Aebersold Declaration ¶ 7, *Sears*, Docket No. 345, 10/26/18] | "Lazard has in place compliance procedures to ensure that no confidential or nonpublic information concerning the Debtors has been or will be available to employees of LAM, LFG, or Edgewater." [Aebersold Declaration ¶ 9, *Sears*, Docket No. 345, 10/26/18]<br><br>See column C for additional disclosures regarding LAM, LFG and Edgewater. | "In addition, as of the date hereof, Lazard and its affiliates have approximately 2,800 employees worldwide. It is possible that certain of Lazard's and its affiliates' respective directors, officers, and employees may have had in the past, may currently have, or may in the future have connections to (a) the Debtors, (b) Potential Parties in Interest, or (c) funds or other investment vehicles that may own debt or securities of the Debtors or Potential Parties in Interest." [Aebersold Declaration ¶ 8, *Sears*, Docket No. 345, 10/26/18] | Mentioned, but no disclosures made.  See column D. |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Professional | Look-back period | disclosure, if any | disclosure | measures | any | |
| | | or other parties in interest in these cases, and LAM or LFG may have relationships with such parties. Furthermore, some of the investment funds managed by Edgewater may have held, may now hold or may in the future hold debt or equity securities of the Debtors or the Debtors' creditors, equity holders, or other parties in interest in these cases. Additionally, the Debtors, their creditors, equity holders, or other parties in interest in these cases, and Lazard or its affiliates, managing directors, and employees, may be investors in investment funds that are managed by Edgewater. Lazard has in place compliance procedures to ensure that no confidential or nonpublic information concerning the Debtors has been or will be available to employees of LAM, LFG, or Edgewater." [Aebersold Declaration ¶ 9, *Sears*, Docket No. 345, 10/26/18] | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Guggenheim Securities, LLC**<br><br>*In re Limited Stores Company, LLC*, Case No. 17-10124-KJC (Bankr. D. Del.)<br><br>*In re Appvion, Inc.*, Case No. 17-12082-KJC (Bankr. D. Del.)<br><br>*In re Mattress Firm*, Inc., Case No. 18-12241-CSS (Bankr. D. Del.) | "To the extent that this inquiry has revealed that certain Potential Parties in Interest were current or former investment banking clients of Guggenheim Securities within the past three years, these parties have been identified on a list (the 'Client Match List') attached hereto as Schedule 2." [Savini Declaration ¶ 7, *Limited Stores*, Docket No. 126, 1/26/17] | "As noted above, Guggenheim Securities is part of a global financial services firm which provides a broad range of services to its clients. Guggenheim Securities' financial advisory and investment banking services are provided primarily through its investment banking department (the 'Investment Banking Department')." [Savini Declaration ¶ 10, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Additionally, certain affiliated and related entities of Guggenheim Securities (the 'Investment Advisor Affiliates') serve as managers for a number of funds and other investment vehicles (the 'Managed Funds'). The Managed Funds are intended principally for investments by third parties unrelated to Guggenheim Securities. However, such investors may also include financial institutions (some of which may be parties in interest in these cases), or affiliated and related entities of Guggenheim Securities and various of its directors, officers and employees (some of which may include Guggenheim Securities' employees providing services in connection with these cases). Guggenheim Securities' | "The Debtors have numerous creditors and relationships with various individuals and entities that may be parties in interest in these cases. Consequently, although every reasonable effort has been made to identify such connections, including the efforts outlined above, Guggenheim Securities is unable to state with certainty whether any of its clients or an affiliated entity of a client holds a claim or otherwise is a party in interest in these cases. Additionally, Guggenheim Securities may be involved in litigation from time to time that may, or may in the future, involve entities that may be parties in interest in these cases. If Guggenheim Securities discovers any information that is contrary to or pertinent to the statements made herein, Guggenheim Securities will promptly disclose such information to the Court. Also, as noted above, Guggenheim Securities is part of a global financial services firm and thus has several legally separate and distinct foreign and domestic affiliated and related entities. Although employees of certain affiliated and related entities may sometimes assist Guggenheim Securities in | "Information barriers exist between Guggenheim Securities' Investment Banking Department and the remainder of Guggenheim Securities (including the fixed income and equity departments of Guggenheim Securities, the 'Sales and Trading Department'), Guggenheim Partners and its affiliates. These information barriers include physical and technological barriers, compliance and surveillance mechanisms and policies and procedures designed to prevent confidential information from being shared improperly." [Savini Declaration ¶ 10, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>'Guggenheim Securities' employees providing services in connection with these cases have no control over investment decisions or business decisions made for the Managed Funds." [Savini Declaration ¶ 14, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"In order to comply with | "As of the date hereof, Guggenheim Securities and its affiliated and related entities have approximately 2,500 employees worldwide. It is possible that certain of Guggenheim Securities' and its affiliated and related entities' respective directors, officers, and employees may have had in the past, may currently have, or may in the future have connections to (i) the Debtors, (ii) Potential Parties in Interest, or (iii) funds or other investment vehicles that may own debt or securities of the Debtors or other Potential Parties in Interest. To the best of my knowledge, and except as otherwise disclosed herein, Guggenheim Securities' professionals that will be responsible for this engagement do not have any material business associations with, or hold any material interests in or adverse to, the Debtors or Potential Parties in Interest in these cases. Such professionals, however, may personally own and/or continue to own securities or other interests or investments in various of the Potential Parties in Interest (all | Mentioned, but no disclosures made. See column D. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | | | | | Are international affiliates included with connections? |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| | | employees providing services in connection with these cases have no control over investment decisions or business decisions made for the Managed Funds." [Savini Declaration ¶ 14, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Among other things, the Managed Funds are (i) active investors in a number of portfolio companies (the 'Equity Investment') and (ii) investors in a variety of debt instruments and mezzanine loans or similar securities (the 'Debt Investments' and together with the Equity Investments, the 'Fund Investments')[.]" [Savini Declaration ¶ 14(a), *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"The Guggenheim Partners portfolio managers with fund management responsibilities for the Managed Funds maintain investment discretion and control over investment decisions with respect to the Fund Investments unless such investment discretion is outsourced to a third-party fund manager unrelated to Guggenheim Partners. Many financial institutions and parties in interest who may be involved in these cases may also be investors in the Managed Funds. Moreover the | connection with a restructuring engagement, as Guggenheim Securities is the only entity being retained in these cases, the Client Match List described in Paragraph 7 above reflects solely such Potential Parties in Interest that are or were current or former investment banking clients of Guggenheim Securities, and not of all of its affiliated and related entities." [Savini Declaration ¶ 18, *Limited Stores*, Docket No. 126, 1/26/17] | securities laws, and to avoid any appearance of impropriety, the employees of the Managed Funds are strictly separated from the employees of Guggenheim Securities, including Guggenheim Securities' professionals expected to provide services to the Debtors, by an information barrier, as described in Paragraph 10 above." [Savini Declaration ¶ 14(b), *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Guggenheim Securities, however, will not hold any securities or other instruments of the Debtors on behalf of itself or its affiliated and related entities during the pendency of these cases. Moreover, any Guggenheim Securities Sales and Trading Department operations are separated from Guggenheim Securities' Investment Banking Department (including the investment banking professionals working on these cases) by an information barrier." [Savini Declaration ¶ 15, *Limited Stores*, Docket No. | unrelated to the Debtors and these cases)." [Savini Declaration ¶ 11, *Limited Stores*, Docket No. 126, 1/26/17] | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>Professional | **B**<br><br><br>Look-back period | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | Managed Funds may invest from time to time in Fund Investments of or relating to the Debtors or parties in interest in these cases." [Savini Declaration ¶ 14(b), *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"In addition, as part of their regular business operations, Guggenheim Securities and its affiliated and related entities may trade securities and other instruments of the Debtors and/or the Potential Parties in Interest on behalf of third parties (some of whom may be parties in interest in these cases) or on their own behalf, including, without limitation, through Guggenheim Securities' Sales and Trading Department." [Savini Declaration ¶ 15, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Guggenheim Securities also has an affiliate that provides funding solutions for financial institutions as the manager of a series of debt programs (the 'Institutional Finance Group'). Many financial institutions and parties in interest who may be involved in these cases may also be clients of the Institutional Finance Group and/or investors in one or more of the Institutional Finance Group's debt | | 126, 1/26/17]<br><br>"In order to comply with securities laws, and to avoid any appearance of impropriety, the employees of the Institutional Finance Group and the Insurance Company Affiliates are strictly separated from the employees of Guggenheim Securities, including Guggenheim Securities' professionals expected to provide services to the Debtors, by an information barrier, as described in Paragraph 10 above." [Savini Declaration ¶ 16, Limited Stores, Docket No. 126, 1/26/17]<br><br>"Consistent with applicable legal and regulatory requirements, Guggenheim Securities has adopted policies, procedures, and information barriers to maintain the independence of the Equity Research Department's personnel." [Savini Declaration ¶ 17, *Limited Stores*, Docket No. 126, 1/26/17] | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>Professional | **B**<br><br><br><br>Look-back period | **C**<br><br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br><br>Description of information screen and other protective measures | **F**<br><br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | programs. Additionally, certain affiliated and related entities of Guggenheim Securities are insurance companies that may invest in securities or other financial instruments for their own account (the 'Insurance Company Affiliates'). The Insurance Company Affiliates may also retain the services of investment advisors to manage their investment portfolios, which may then invest on behalf of the relevant Insurance Company Affiliate for its account. Such investments may from time to time include securities or other financial instruments of or relating to the Debtors or Potential Parties in Interest." [Savini Declaration ¶ 16, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Guggenheim Securities also has a research department that publishes equity research (the 'Equity Research Department'). During the course of these cases, Guggenheim Securities' research analysts may hold views, make statements or investment recommendations, or publish research reports with respect to the Debtors or other Potential Parties in Interest. Such views may or may not differ from the views of Guggenheim Securities' | | | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | Investment Banking Department personnel." [Savini Declaration ¶ 17, *Limited Stores*, Docket No. 126, 1/26/17] | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A** **Professional** | **B** **Look-back period** | **C** **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** **Explanation of limits on conflict of interest check and disclosure** | **E** **Description of information screen and other protective measures** | **F** **Employee personal investment disclosures, if any** | **G** **Are international affiliates included with connections?** |
| **PJT Partners LP** *In re VER Technologies Holdco LLC,* Case No. 18-10834-KG (Bankr. D. Del.) *In re Bon-Ton Stores, Inc.,* Case No. 18-10248 (Bankr. D. Del.) *In re Ascent Resources Marcellus Holdings LLC*, Case No. 18-10265-LSS (Bankr. D. Del.) | None specified. | As part of the conflict results, PJT discloses connections of certain affiliates, but does not describe the investment activities of its affiliates. [Flanagan Declaration ¶ 5, *VER Technologies*, Docket No. 148, 4/27/18] | "Given the large number of parties in interest in these chapter 11 cases, despite the efforts to identify and disclose PJT's relationships with the Parties-In-Interest, I am unable to state with absolute certainty that every client relationship or other connection has been disclosed in this Declaration. PJT, therefore, has informed the Debtors that PJT will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, PJT will promptly file a supplemental declaration with the Court as required by Local Bankruptcy Rule 2014-1(a)." [Leone Declaration ¶ 22, *VER Technologies*, Docket No. 148, 4/27/18] | None described. | "Partners and/or employees of PJT or its affiliates may, from time to time, directly or indirectly hold equity and/or debt in certain of the [Parties-In-Interest]. However, to the best of my knowledge, none of PJT, its affiliates or any partner or employee of PJT or its affiliates currently holds any direct or indirect interest in any debt or equity securities of the Debtors." [Flanagan Declaration ¶ 6, *VER Technologies,* Docket No. 148, 4/27/18] | None mentioned. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | **Are international affiliates included with connections?** |
| **Professional** | **Look-back period** | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | |
| **Evercore Group L.L.C.**<br><br>*In re Southeastern Grocers, LLC,* Case No. 18-10700-MWF (Bankr. D. Del.)<br><br>*In re New Mach Gen, LLC,* Case No. 18-11368-MWF (Bankr. D. Del.)<br><br>*In re Enduro Resource Partners LLC,* Case No. 18-11174-KG (Bankr. D. Del.) | None specified. | "Evercore also operates an Institutional Equities ('IE') business. As part of its regular business operations as an introducing broker, IE is engaged in sales, trading and research activities with its institutional clients, some of which may be creditors, equity holders or other parties-in-interest in these cases. Some of these IE clients may now or in the future hold debt or equity securities of the Debtors or other parties-in-interest in these cases. There is an information barrier in place between the investment bank and IE. Evercore has in place compliance procedures to ensure that no confidential or non-public information concerning the Debtors has or will be available to employees of IE." [Goldstein Declaration ¶ 30(d), *Southeastern Grocers,* Docket No. 179, 1/26/17]<br><br>"Evercore has two U.S. affiliates that are in the asset management business: Evercore Wealth Management, LLC ('EWM') and Evercore Trust Company, N.A. ('ETC'). As part of its regular business operations, EWM, a registered investment adviser with the U.S. Securities and Exchange Commission, acts as an investment advisor (whether on a | None described. | "There is an information barrier in place between the investment bank and IE. Evercore has in place compliance procedures to ensure that no confidential or non-public information concerning the Debtors has or will be available to employees of IE." [Goldstein Declaration ¶ 30(d), *Southeastern Grocers,* Docket No. 179, 1/26/17]<br><br>"There is an information barrier in place between Evercore, on the one hand, and EWM and ETC, on the other, and Evercore has in place compliance procedures to ensure that no confidential or non-public information concerning the Debtors has or will be available to employees of EWM and ETC. Evercore's parent company also invests, directly or indirectly, in securities issued by various companies, which may include creditors, equity holders or other parties-in-interest in these cases; however, the parent company does not hold any equity or debt securities issued by the Debtors or | "Certain professionals employed by Evercore may have mortgages, consumer loans, investment, brokerage accounts, or other banking, brokerage, or other customer relationships with institutions that are creditors, equity holders or other parties-in-interest in these chapter 11 cases or with funds sponsored by or affiliated with such parties. Evercore does not believe that these relationships create a conflict of interest regarding the Debtors or their chapter 11 cases." [Goldstein Declaration ¶ 30(g), *Southeastern Grocers,* Docket 179, 1/26/17]<br><br>"Certain professionals employed by Evercore may hold, directly or indirectly, debt or equity securities issued by, or other economic interests in, creditors, equity holders or other parties-in-interest in these chapter 11 cases. To the best of my knowledge, (i) none of these professionals' holdings would be considered material from the perspective of the issuers of | None mentioned. |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | | | | | Are international affiliates included with connections? |
| **Professional** | **Look-back period** | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | |
| | | discretionary or non-discretionary basis) for its clients, and ETC, a national trust bank limited to fiduciary activities, acts as an independent fiduciary, trustee or custodian for its clients. In both cases, such clients may be creditors, equity holders or other parties-in-interest in these cases. Some of these client accounts may now or in the future hold debt or equity securities of the Debtors or other parties-in-interest in these cases."  [Goldstein Declaration ¶ 30(e), *Southeastern Grocers,* Docket No. 179, 1/26/17]<br><br>"(Evercore also has several affiliated private equity funds (the 'Funds'). The Funds invest, directly or indirectly, in securities issued by various companies, which may include creditors, equity holders or other parties-in-interest in these cases; however, the Funds do not hold any equity or debt securities issued by the Debtors or their affiliates, nor will they acquire any such securities while Evercore remains employed by the Debtors. Certain institutional investors that are limited partners in the Funds also may be creditors, equity holders or other parties-in-interest in these chapter 11 cases. In addition, the Funds may be co-investors with | | their affiliates, nor will it acquire any such securities while Evercore remains employed by the Debtors." [Goldstein Declaration ¶ 30(e), *Southeastern Grocers,* Docket No. 179, 1/26/17] | such securities, and (ii) as described in more detail in Exhibit 2 hereto, no professional employed by Evercore holds a material interest in debt or equity securities issued by the Debtors." [Goldstein Declaration ¶ 30(h), *Southeastern Grocers,* Docket No. 179, 1/26/17] | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br><br>**Description of information screen and other protective measures** | **F**<br><br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | interested parties in these cases in certain investments." [Goldstein Declaration ¶ 30(f), *Southeastern Grocers,* Docket No. 179, 1/26/17] | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Jefferies LLC**<br><br>*In re Forbes Energy Services Ltd.,* Case No. 17-20023-DRJ (Bankr. S.D. Tex.)<br><br>*In re Goodman Networks Incorporated,* Case No. 17-31575-MI (Bankr. S.D. Tex.)<br><br>*In re Gibson Brands, Inc.,* Case No. 18-11025-CSS (Bankr. D. Del.) | "To the extent that this inquiry has revealed that certain Potential Parties in Interest were current or former investment banking clients of Jefferies within the past three years, these parties have been identified on Schedule 2 hereto (the 'Client Match List')." [White Declaration ¶ 10, *Forbes Energy Services*, Docket No. 106, 2/3/17] | "Certain affiliates of Jefferies serve as managers for a number of investment vehicles (collectively, the 'Managed Funds'). The Managed Funds are principally intended for investments by third parties unrelated to Jefferies. Such investors may, however, also include financial institutions (some of which may be parties in interest in these chapter 11 cases), affiliates of Jefferies, or their respective officers and employees (some of whom may be Jefferies' employees providing services in connection with these chapter 11 cases). Jefferies' employees working in connection with these chapter 11 cases have no control over or involvement in investment decisions made for the Managed Funds. With respect to the Managed Funds, Jefferies makes the following additional disclosures: (a) Among other things, the Managed Funds are (i) active direct investors in a number of portfolio companies (the 'Equity Investments') and (ii) investors in a variety of debt instruments and mezzanine loans or similar securities (the 'Income Investments' and, together with the Equity Investments, the 'Portfolio Holdings'); and (b) The fund managers of the Managed Funds maintain control over | "Jefferies is a global investment banking firm with broad activities covering, in addition to its investment banking and financial advisory practice, trading in equities, convertible securities, and corporate bonds. With more than 80,000 customer accounts and thousands of relationships and transactions around the world, it is possible that one or more of Jefferies' clients or a counterparty to a securities transaction may hold a claim or interest or otherwise be Potential Parties in Interest in these chapter 11 cases and that Jefferies and/or its affiliates may have other business relationships and/or connections with such Potential Parties in Interest. Further, as a major market maker in equity securities as well as a major trader of corporate bonds and convertible securities, including those of creditors or parties in interest in these chapter 11 cases, Jefferies regularly enters into securities transactions with other registered broker-dealers as a part of its daily activities. Some of these counterparties may be creditors, equity holders or other parties in interest in these cases. Jefferies believes that none of these business relationships | "The fund managers of the Managed Funds maintain control over investment decisions with respect to the Portfolio Holdings. Many financial institutions and parties in interest who may be involved in these chapter 11 cases may also be investors in the Managed Funds. Moreover, the Managed Funds may invest from time to time in Portfolio Holdings relating to the Debtors or the Potential Parties in Interest. In order to comply with securities laws and to avoid any appearance of impropriety, the employees of the Managed Funds are strictly separated from the employees of Jefferies. Jefferies maintains a strict separation between its employees assigned to these chapter 11 cases and employees involved in the management of Jefferies' investment banking division, on the one hand, and other employees of Jefferies (e.g., sales and trading employees) and its affiliates (including the employees of the Managed Funds), on the other hand. This separation is maintained through the use | "In addition, as of the date hereof, Jefferies and its affiliates have thousands of employees worldwide. It is possible that certain of Jefferies' and its affiliates' respective directors, officers and employees may have had in the past, may currently have, or may in the future have connections to (i) the Debtors, (ii) the Potential Parties in Interest and/or (iii) funds or other investment vehicles that may own debt or securities of the Debtors or other Potential Parties in Interest. Furthermore, in addition to the Potential Parties in Interest, Jefferies may also represent, or may have represented, affiliates, equity holders and/or sponsors of the Potential Parties in Interest. Certain of the Potential Parties in Interest may also be vendors or insurers of Jefferies and/or have other non-investment banking relationships with Jefferies." [White Declaration ¶ 13, *Forbes Energy Services*, Docket No. 106, 2/3/17] | Mentioned, but no disclosures made. See column D. |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G**<br>**Are**<br>**international**<br>**affiliates**<br>**included with**<br>**connections?** |
| **Professional** | **Look-back period** | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | |
| | | investment decisions with respect to the Portfolio Holdings. Many financial institutions and parties in interest who may be involved in these chapter 11 cases may also be investors in the Managed Funds. Moreover, the Managed Funds may invest from time to time in Portfolio Holdings relating to the Debtors or the Potential Parties in Interest." [White Declaration ¶ 14, *Forbes Energy Services*, Docket No. 106, 2/3/17]<br><br>"In addition, as part of its regular business operations, Jefferies may trade securities and other instruments of the Debtors on behalf of third parties (some of which may be parties in interest in these chapter 11 cases). Jefferies may also trade securities and other instruments of the Potential Parties in Interest on behalf of itself or its affiliates or third parties. Any such trading operations are separated from Jefferies' investment banking department and its managing directors and employees (including the investment banking professionals working on these chapter 11 cases) by an information barrier." [White Declaration ¶ 15, *Forbes Energy Services*, Docket No. 106, 2/3/17] | constitute interests adverse to the interests of the Debtors' estates or of any class of creditors or equity security holders in matters upon which Jefferies is to be employed, and none are in connection with these chapter 11 cases." [White Declaration ¶ 12, *Forbes Energy Services*, Docket No. 106, 2/3/17]<br><br>"The Debtors have numerous creditors and relationships with a large number of individuals and entities that may be parties in interest in these chapter 11 cases. Consequently, although every reasonable effort has been made to discover Jefferies' connections with the Potential Parties in Interest, Jefferies is unable to state with certainty whether any of its clients or an affiliated entity of a client holds a claim or otherwise is a party in interest in these chapter 11 cases. If Jefferies discovers any information that is contrary or pertinent to the statements made herein, Jefferies will promptly disclose such information to the Court. Additionally, as noted above, Jefferies is part of a global investment banking firm and thus has several legally separate and distinct foreign and domestic affiliates. Although | of information walls. These information walls include physical and technological barriers, compliance, and surveillance mechanisms and policies and procedures designed to prevent confidential information from being shared improperly. Consequently, as no confidential information concerning the Debtors is permitted to be communicated to any persons working for the Managed Funds, Jefferies does not believe that the relationships outlined above constitute interests adverse to the estates or render Jefferies not disinterested in these chapter 11 cases." [White Declaration ¶ 14(b), *Forbes Energy Services*, Docket No. 106, 2/3/17] | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | | employees of certain affiliates may sometimes assist Jefferies in connection with a restructuring engagement, <u>as</u> Jefferies is the only entity being retained in these cases, we have researched only the electronic client files and records of Jefferies, not of all of its affiliates, to determine connections with any Potential Parties in Interest." [White Declaration ¶ 16, *Forbes Energy Services*, Docket No. 106, 2/3/17] | | | |

# Exhibit 9

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - x

In Re:

    WESTMORELAND COAL COMPANY, et al

              Debtors.

- - - - - - - - - - - - - - - - - - - x


       Videotaped deposition of MARK
HOJNACKI, was held at the office of
SELENDY & GAY 1290 Avenue of the
Americas, New York, New York, commencing
December 31, 2018, 7:59 a.m., on the
above date, before Leslie Fagin, a Court
Reporter and Notary Public in the State
of New York.


              - - -


          MAGNA LEGAL SERVICES
   320 West 37th Street, 12th Floor
     New York, New York 10018
       (866) 624-6221



## Page 2

```
1
2    APPEARANCES:
3
     BOIES SCHILLER FLEXNER LLP
4    Attorneys for Mar-Bow Value Partners
          575 Lexington Avenue
5         New York, New York,10022
6    BY:    MICHAEL E. PETRELLA, ESQUIRE
7
8
     DIAMOND McCARTHY, LLP
9    Attorneys for Mar-Bow Value Partners
          Two Houston Center
10        909 Fannin Street
          Houston, Texas 77010
11
     BY:    CHRISTOPHER R. MURRAY, ESQUIRE
12
13
14   SELENDY & GAY PLLC
     Attorneys for the McKinsey RTS and the
15   Witness
          1290 Avenue of the Americas
16        New York, New York 10104
17   BY:    FAITH E. GAY, ESQUIRE
          JOSHUA S. MARGOLIN, ESQUIRE
18        ABBIE PUGH, ESQUIRE
19
20   HOGAN LOVELLS US LLP
     Attorneys for the McKinsey RTS and the
21   Witness
          875 Third Avenue
22        New York, New York
     BY:    PETER A. IVANICK, ESQUIRE
23
24
25
```

## Page 3

```
1
2    APPEARANCES, (CONTINUED)
3    KIRKLAND & ELLIS, LLP
     Attorneys for Westmoreland
4         609 Main Street
          Houston, Texas 77002
5
     BY:    ORLA O'CALLAGHAN, ESQUIRE
6    (Via telephone)
7
8    ALSO PRESENT:
9        RODOLFO DURAN, VIDEOGRAPHER
          MAGNA LEGAL SERVICES
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1
2         THE VIDEOGRAPHER:  This is the
3    start of media label No. 1 of the video
4    recorded deposition of Mark Hojnacki in
5    the matter In Re Westmoreland Coal
6    Company, et al., in the United States
7    Bankruptcy Court for the Southern
8    District of Texas, Houston Division.
9    Today is December 31, 2018.  The time is
10   7:59 a.m. and we are located at 1290
11   Avenue of the Americas New York New
12   York.  My name is Rodolfo Duran, I am
13   the legal video specialist.  The court
14   reporter is Leslie Fagin.  We are both
15   in association with Magna Legal
16   Services.  Will counsel please introduce
17   themselves.
18        MR. PETRELLA:  Mike Petrella, Boies
19   Schiller Flexner for Mar-Bow.
20        MR. MURRAY:  Christopher Murray,
21   Diamond Murray for Mar-Bow.
22        MS. GAY:  Good morning, Faith Gay,
23   Selendy & Gay for the deponent Mark
24   Hojnacki and McKinsey RTS.
25        MR. MARGOLIN:  Joshua Margolin,
```

## Page 5

```
1         Hojnacki
2    Selendy & gay also for Mr. Hojnacki and
3    McKinsey RTS.
4         MS. PUGH:  Abbie Pugh, Selendy &
5    Gay for the deponent and McKinsey RTS.
6         MR. IVANICK:  Peter Ivanick, Hogan
7    Lovells also for Mark Hojnacki and
8    McKinsey RTS.
9    M A R K  H O J N A C K I,  called as a
10   witness, having been duly sworn by a Notary
11   Public, was examined and testified as
12   follows:
13   EXAMINATION BY
14   MR. PETRELLA:
15        MS. GAY:  I want to note for the
16   record Mr. Hojnacki is appearing in part
17   pursuant to the order of U.S. Bankruptcy
18   Judge David R. Jones dated December 20,
19   2018 and the purpose is as follows:  He
20   has to appear by December 31, 2018 for a
21   deposition not to exceed seven hours
22   excluding breaks and the purpose of the
23   deposition is the basis and
24   authorization of his statement set forth
25   at docket numbers 452 and 810 of the
```



2 (Pages 2 to 5)

Hojnacki

1
2 Westmoreland Coal Company Bankruptcy
3 record and on top of that, the judge has
4 made clear that in terms of any
5 statements that Mr. Hojnacki refers to
6 concerning his two declarations that are
7 those of a third party, there is no
8 privilege that applies except for fifth
9 amendment privilege so we will honor
10 that to the fullest and with regard to
11 David Jones record or his order, we will
12 mark that as, how do you want us to mark
13 the exhibits.
14     MR. PETRELLA: Let's make it
15 Hojnacki 1.
16     (Hojnacki Exhibit 1 Order marked
17     for identification.)
18 Q.   You are a practice leader at RTS?
19 A.   Yes, sir.
20 Q.   Does that come with a specialty
21 designation or is it just practice leader?
22 A.   Just be a little more specific on
23 specialty designation.
24 Q.   Is there practice leader, this
25 specialty, this division or just practice?

Hojnacki

1
2 A.   Just practice.
3 Q.   And how many practice leaders are
4 there at RTS?
5 A.   RTS U.S. probably 15 or so.
6 Q.   You are also a partner at McKinsey
7 & Company Inc., correct?
8 A.   Yes.
9 Q.   Are there any practice leaders at
10 RTS that aren't also partners of McKinsey &
11 Company, Inc.?
12 A.   Can you restate your question.
13 Q.   Of the practice leaders, you said
14 there are about 15 at RTS.  Of those 15 or
15 so, are any of those not also McKinsey &
16 Company, Inc. partners?
17 A.   I'm not aware of any.
18 Q.   Can you just give me your
19 understanding of what Bankruptcy Code Section
20 327 requires of a professional seeking
21 employment in a Chapter 11 case?
22 A.   I'm not an attorney but it's my
23 understanding that 327 is the section of the
24 code that's required -- that allows for
25 retention of professionals by debtors in

Hojnacki

1
2 Chapter 11 cases.
3 Q.   What quality does the professional
4 have to have under Section 327?
5     MS. GAY:  In terms of his
6 understanding?
7     MR. PETRELLA:  Yes.
8 A.   In terms of my understanding, to be
9 disinterested.
10 Q.   And what is your understanding of
11 what rule 2014A of the bankruptcy rule say
12 about what connections with interested
13 parties the professional has to disclose?
14 A.   Again, I'm not a lawyer but my
15 understanding is that it requires to make
16 appropriate disclosures to demonstrate that
17 you are disinterested.
18 Q.   And what is your understanding of
19 the purposes of rule 2014A?
20     MS. GAY:  Objection to the form.
21 A.   Just repeat your question.
22 Q.   What is your understanding, if any,
23 of the purposes of Bankruptcy Rule 2014A?
24 A.   It's just -- it's designed to help
25 make sure the professional is able to provide

Hojnacki

1
2 unbiased support for its client, the debtors.
3 Q.   And do you have an understanding of
4 what qualifies as a disinterested person
5 under 11 USC 10114?
6 A.   Again, I'm not a lawyer but it's my
7 understanding would be that it requires the
8 professional to demonstrate that it doesn't
9 hold any interest that would cause it to be
10 conflicted in its ability to provide unbiased
11 support for the debtors.
12 Q.   And your declaration that you filed
13 in this case, it is in accordance with
14 Section 327A of Bankruptcy Code as well as
15 Rule 2014A as well as some others, right?
16     MS. GAY:  Mr. Petrella, which
17 declaration are you referring to?
18     MR. PETRELLA:  I'm really referring
19 to both.
20 A.   What was your question, I'm sorry.
21 Q.   I'm just asking those declarations
22 that you submitted in this case, they have
23 been submitted pursuant to Section 327A of
24 the Bankruptcy Code and Rule 2014A of
25 Bankruptcy Rules?

MAGNA
LEGAL SERVICES

Page 10

Hojnacki

1
2    A.   I believe that's the case but if
3  you want me to reference the declaration
4  specifically to point to the paragraph, I'm
5  happy to do that.
6    Q.   In connection with the preparation
7  of your declarations in this case, what
8  advice did you receive from legal counsel
9  concerning Rule 327 -- Section 327A of the
10 Bankruptcy Code?
11    A.   So as my declaration states, I did
12 rely on people in the McKinsey general
13 counsel's office as well as others reporting
14 to me in the preparation.  Those people
15 include or those individuals include Peter
16 Ivanick at Hogan Lovells and he advised that
17 the preparation of these declarations was
18 consistent with those sections.
19    Q.   And did he give you any general
20 advice on Section 327A of the code?
21    MS. GAY:  With respect to the
22    declarations?
23    MR. PETRELLA:  In connection with
24    the declarations.
25    A.   I don't recall.

Page 11

Hojnacki

1
2    Q.   How about Rule 2014A?
3    A.   Just again, as I stated previously,
4  just that the preparations of these
5  declarations was consistent with the
6  requirements under those provisions.
7    Q.   And what is your understanding of a
8  professional's fiduciary obligations in a
9  Chapter 11 case?
10    A.   My understanding of a
11 professional's fiduciary obligations is just
12 that they look out for the best interest of
13 the debtors.
14    Q.   I'm going to show you an exhibit
15 that we will mark as Hojnacki 2.  I ask you
16 to take a look at that document briefly and
17 the first question is, just do you recognize
18 the document.
19    (Hojnacki Exhibit 2 Post petition
20    engagement letters marked for
21    identification.)
22    A.   Yes, I recognize the document.
23    Q.   What is it?
24    A.   It's our post petition engagement
25 letters with the debtors.

Page 12

Hojnacki

1
2    Q.   So it's the engagement letter that
3  governs the Westmoreland case with McKinsey
4  RTS, is that fair?
5    A.   Yes.
6    Q.   I would like to direct your
7  attention to section 11, if you would, it's
8  on page 7.
9    MS. GAY:  While Mr. Hojnacki is
10    looking for that, can you slow down just
11    a half hair because it's bouncing a
12    little on the realtime, so I would
13    appreciate that.
14    MR. PETRELLA:  I will try.
15    Q.   Do you have section 11, sir?
16    A.   I do.
17    Q.   About four lines down, do you see a
18 statement that says that RTS -- neither RTS,
19 its affiliates, et cetera shall be acting in
20 a fiduciary capacity?
21    A.   Correct.
22    Q.   And do you see the top, if you look
23 at the top of page 8, it also says that RTS,
24 et cetera will not be deemed a fiduciary?
25    A.   I see that.

Page 13

Hojnacki

1
2    Q.   Below that by two lines, do you see
3  where it says that essentially that nothing
4  will give rise to a fiduciary status on
5  behalf of RTS?
6    MS. GAY:  Where exactly are you
7    reading, Mr. Petrella?
8    MR. PETRELLA:  Top of page 8, third
9    line down.
10    A.   Do you mind if I read the whole
11 paragraph instead of the three statements
12 that you cited?
13    Q.   Sure.
14    A.   Thank you.
15    Q.   Got it?
16    A.   Yes, sir.
17    Q.   Doesn't the law provide that RTS is
18 in fact a fiduciary to the debtor in this
19 case?
20    MS. GAY:  Objection to the form.
21    He is not a lawyer.  Do you mean his
22    understanding, Mr. Petrella?
23    MR. PETRELLA:  Sure his
24    understanding.  I believe he testified
25    it's his understanding.



Page 14

Hojnacki

1
2       MS. GAY: I just want to make the
3  record clear. Thank you.
4       A.  So again, I'm not a lawyer, my
5  understanding is that the declaration that we
6  provided, that I signed was in compliance
7  with the law and the law's requirements.
8  This is specifically stating the actual roles
9  that we would be playing within the
10  assignment to the debtors.
11       Q.  I'm not sure I understand.
12       Section 11 says that McKinsey shall
13  not be deemed a fiduciary, correct, in words
14  or substance?
15       A.  It does have comments about being
16  deemed a fiduciary, yes.
17       Q.  It has three of them, right, saying
18  you are not a fiduciary, right?
19       A.  It does have comments about not
20  being not deemed a fiduciary, yes.
21       Q.  It is your understanding of the law
22  that McKinsey RTS is in fact a fiduciary to
23  the debtor in this case, correct?
24       A.  It's my understanding that we
25  filled out the declarations with the intent

Page 15

Hojnacki

1
2  of complying with the law, that is what we
3  were guided by counsel in preparation of
4  that. This is focused on the roles that we
5  will be playing and performing on behalf of
6  the debtor and the services that we are
7  providing, specifically.
8       Q.  You said a few times now that you
9  are not a lawyer. Was there any discussion
10  in the course of leading up to your
11  declarations, was there any discussion of
12  having a lawyer sign these declarations
13  instead of a layman?
14       A.  There was not.
15       Q.  Because I'm asking because in your
16  declaration very early on it lists a bunch of
17  legal provisions that your declaration is
18  pursuant to. Are you aware that in the A&R
19  case in Richmond Virginia, Judge Hannigan
20  advised McKinsey RTS on the record that it
21  was in fact a fiduciary in these Chapter 11
22  cases?
23       MS. GAY: Objection. He is not
24  going to answer questions about A&R.
25       MR. PETRELLA: He lists A&R in his

Page 16

Hojnacki

1
2  declaration as a qualifying basis for
3  RTS' employment.
4       MS. GAY: It's fine if you want to
5  ask questions about the subject matter
6  of that bankruptcy in terms of what
7  industry or something like that but this
8  is not about the A&R litigation and we
9  will not go into that today.
10       MR. PETRELLA: I disagree with
11  that. I think the judge's order is
12  clear that this is to delve into the
13  basis for his declarations and I think
14  his declaration, in fact, touts the A&R
15  case as one of the qualifications for
16  RTS as a --
17       MS. GAY: You can put a declaration
18  in front of him and he can answer the
19  questions about the declaration but not
20  about what Judge Hannigan said in A&R,
21  it's well beyond the bounds of the
22  declaration.
23       MR. PETRELLA: We will disagree on
24  that and I will move on.
25       Q.  The RTS offices are at 55 East 52nd

Page 17

Hojnacki

1
2  Street, is that right?
3       A.  Yes, RTS has an office there.
4       Q.  And are those offices only RTS
5  offices or is it RTS and other McKinsey
6  affiliates?
7       A.  It's a broad based McKinsey office
8  that includes RTS and others.
9       Q.  And what other affiliates have
10  offices there that you can think of?
11       A.  I can't state specifically. I just
12  know there are other McKinsey practitioners
13  that are in that office.
14       Q.  Can you give me an estimate of
15  approximately how many McKinsey professionals
16  are resident in that particular office?
17       A.  In the 55 East --
18       Q.  Yes.
19       A.  No.
20       Q.  Is it more than a hundred, less
21  than a hundred, can you do that?
22       MS. GAY: Mr. Petrella, slow down
23  it's hard to even hear you from here.
24       A.  It's more than a hundred.
25       Q.  Is it more than 200?



                    Hojnacki
1
2      A.  I would estimate yes.
3      Q.  How about more than 300?
4      A.  I don't know.
5      Q.  Does RTS have offices anywhere
6   other than 55 East 52nd?
7      A.  I'm not aware of them.
8      Q.  And the number of professional RTS
9   employees at 55 East 52nd, I believe you
10  already testified would be approximately 15,
11  is that fair, excluding support staff and so
12  forth?
13     A.  The 15 that I referenced earlier
14  are resident all around the country.
15     Q.  So how many RTS professionals are
16  actually resident in the 55 East 52nd office?
17     A.  I don't know specifically.
18     Q.  Can you estimate, is it two?
19     A.  I don't know.
20     Q.  Are you the only one?
21     A.  I am in the office in Stamford,
22  Connecticut.
23     Q.  Okay.  Can you just name me any RTS
24  professionals that you know of that are in
25  the 55 East 52nd Street office?

                    Hojnacki
1
2      A.  Not off the top of my head.
3      Q.  How many other RTS professionals
4   are there in Stamford with you?
5      A.  I can recall one.
6      Q.  Who is that?
7      A.  Pietro Sorrentino.
8      Q.  That's all you can think of?
9      A.  Yes, sir.
10     Q.  Does RTS have its own HR
11  department?
12     A.  Would you ask it one more time.
13     Q.  Does RTS have an HR department
14  dedicated just to RTS?
15     A.  We have a people development
16  function which is a term we refer to which is
17  a function that's designed to manage the
18  people development function, the development
19  of our people within McKinsey RTS
20  specifically.
21     Q.  And who is, that's a function, how
22  about -- who is the person that handles HR
23  for RTS?
24     A.  I don't know.  I know who handles
25  it for me personally.

                    Hojnacki
1
2      Q.  Who is that?
3      A.  I don't recall her name.
4      Q.  Does that person have a role in
5   McKinsey outside of RTS, to your knowledge?
6      A.  She does.
7      Q.  What is that role?
8      A.  She is the local HR person for the
9   Stamford office.
10     Q.  So she handles everybody in the
11  Stamford office?
12     A.  Correct.
13     Q.  And I believe you already testified
14  but just to confirm, there are other McKinsey
15  professionals in that Stamford office that
16  are not RTS employees or practice leaders, is
17  that fair?
18     A.  Yes.
19     Q.  Does RTS have its own IT
20  department?
21     A.  It does not.
22     Q.  How about its own legal department?
23     A.  To the best of my knowledge it does
24  not.
25     Q.  Does it share its legal department

                    Hojnacki
1
2   with any other McKinsey entities?
3      A.  It's my understanding it's part of
4   McKinsey's broader office of the general
5   counsel.
6      Q.  So is it your understanding that
7   McKinsey has one general counsel's office and
8   that covers all McKinsey affiliates?
9      A.  I can't speak to the composition of
10  the entire general counsel's office.
11     Q.  Let's actually mark your first
12  declaration.  We will call that Hojnacki 3.
13         (Hojnacki Exhibit 3 Declaration
14      marked for identification.)
15     Q.  I ask you take a brief look at that
16  and leaf through it and just confirm that
17  that's your first declaration in this matter
18  for Westmoreland?
19     A.  Yes, sir, it appears to be.
20     Q.  If you could look at page 3,
21  paragraph 7, just a little piece at the
22  bottom and it goes over to page 4.
23     A.  Yes, sir.
24     Q.  Then starting there and going
25  through paragraph 10, you talk about two



Page 22

```
1              Hojnacki
2    practices.  The EPNG and basic materials
3    practice.
4          Do you see that?
5       A.   Yes.
6       Q.   Are people from those practices
7    being used on the Westmoreland engagement?
8       A.   Generally speaking, yes.
9       Q.   What does that mean, generally
10   speaking?
11      A.   The practice groups are loose
12   affiliations of people with a specific
13   interest in either topics related to a
14   specific sector, economic sector, in this
15   case EPNG or basic materials or a passion for
16   serving clients in those spaces.  So they
17   affiliate themselves with these practice
18   areas, but ultimately they are assigned to
19   other actual legal affiliates.
20      Q.   But in your declaration here you
21   don't disclose the individuals from these
22   practices that are working on the engagement,
23   correct?
24      A.   Would you ask your question again,
25   please.
```

Page 23

```
1              Hojnacki
2       Q.   In your declaration, you don't
3    identify the individuals from these practice
4    groups that are working on the engagement, is
5    that correct?
6       A.   By name, no.
7       Q.   Approximately how many people,
8    between these two practice groups are working
9    on the engagement?
10         MS. GAY:  On the Westmoreland
11      engagement?
12         MR. PETRELLA:  Correct.
13      A.   I would only be able to estimate
14   because again these are loose affiliations
15   with people, so one individual's choice to
16   associate themselves with that practice would
17   be a personal decision and so it's hard for
18   me to say whether or not they choose to
19   individually assign themselves or associate
20   themselves with these practice areas.
21      Q.   But you are either assigned to it
22   or you are not, you can't float in and out of
23   the assignment, can you?
24      A.   Over time, people do move between
25   practice areas if they are in a longer period
```

Page 24

```
1              Hojnacki
2    of time with McKinsey.
3       Q.   I'm not talking about that.  I'm
4    talking about this engagement.  If I am on
5    the EPNG team and I decide to work on the
6    Westmoreland engagement, am I allowed to just
7    say, you know what, I don't have a passion
8    for this anymore, I'm out of here, I'm going
9    to do something else.  Can they do that?
10         MS. GAY:  Just to clarify whether
11      you can move out of Westmoreland or
12      EPNG?
13      Q.   I'm saying, if you are in the EPNG
14   group, are you allowed to basically decide in
15   the middle of the engagement that you prefer
16   not to be on the engagement anymore?
17      A.   I think you are trying to draw a
18   finer line than there really is.  A person,
19   as part of their career at McKinsey, can
20   associate themselves with these practices and
21   it can be as hard as they want an association
22   or light as an association as they want,
23   depending on what their own individual growth
24   platform and trajectory is.
25         So it's hard for me to say that I
```

Page 25

```
1              Hojnacki
2    can by name go through the entire
3    Westmoreland engagement team and say yes or
4    no.
5       Q.   Can you just give me a rough
6    estimate of how many people at McKinsey are
7    on the Westmoreland engagement team?
8       A.   Immediately prior to the holidays,
9    I estimate, it's 19 people.
10      Q.   What about after the holidays?
11      A.   Starting after New Years?
12      Q.   You made a distinction based on the
13   holidays, so it sounded like the number was
14   going to change based on that, so I'm
15   inquiring as to that.
16      A.   I anticipate it to be the same.
17   I'm saying the last factual data is prior to
18   the holidays.
19      Q.   So there are about 19 people on the
20   team.  Are you able to identify any of those
21   people who are at least, in your mind, are on
22   the EPNG team, the practice group?
23      A.   I can tell you that I would
24   affiliate myself with the EPNG group.
25      Q.   Anybody else?
```



Page 26

Hojnacki

1
2    A.  By name?
3    Q.  Yes.
4    A.  Chris Hagidorn (phonetic).  Any
5    others, you know, again, I can't say their
6    own personal preference to be associated with
7    this group or not.
8    Q.  So yourself and Chris Hagidorn and
9    you can't verify anymore beyond that?
10   A.  No.
11   Q.  How about the basic materials
12   group, anyone you can identify that was in
13   that group, is in that group?
14      MS. GAY:  Who is on the
15   Westmoreland engagement team?
16      MR. PETRELLA:  Correct.
17   A.  The two that I would identify would
18   be Eugene Schmitt and Joe Basar (phonetic).
19   Q.  How many RTS professionals are
20   working on the Westmoreland engagement?
21   A.  Again, using the reference of at
22   the time of the holidays here, just a couple
23   of weeks here, seven.
24   Q.  Who are those people?
25   A.  Myself.

Page 27

Hojnacki

1
2    Q.  Right.
3    A.  Kevin Carmidi, Chris Hagidorn, Rob
4    Montgomery, Becca Bauman, Raj Roy and Elliot
5    Neil (phonetic).
6    Q.  Are those all practice leaders?
7    A.  No.
8    Q.  Can you identify, you and Mr.
9    Carmidi, are practice leaders, I assume, is
10   that correct?
11   A.  Correct.
12   Q.  Chris?
13   A.  Chris Hagidorn.
14   Q.  Chris Hagidorn?
15      MS. GAY:  You guys can't talk over
16   each other and slow down.  The court
17   reporter she can't get it down and you
18   will regret it.
19      MR. PETRELLA:  We have the video.
20   Q.  Chris is a male or female?
21   A.  Chris is a male.
22   Q.  Practice leader, is Chris a
23   practice leader?
24   A.  Yes.
25   Q.  Montgomery, is that a practice

Page 28

Hojnacki

1
2    leader?
3    A.  No.
4    Q.  What is their title?
5    A.  He is a senior vice-president.
6    Q.  How about Bauman?
7    A.  She is a vice-president.
8    Q.  Roy?
9    A.  He is a senior associate.
10   Q.  Is practice leader the highest
11   designation at RTS?
12   A.  Yes.
13   Q.  My understanding, so far and
14   correct me if I am wrong is the EPNG and
15   basic materials are essentially practice
16   groups within McKinsey, is that fair?
17   A.  As opposed to?
18   Q.  As opposed to legal entities?
19   A.  Yes.
20   Q.  What legal entities are they part
21   of?
22   A.  I can't say specifically.  My
23   assumption is, again, because as I defined
24   it, it's an affiliation of people with the
25   desire to serve clients or build knowledge in

Page 29

Hojnacki

1
2    a specific area and so it likely crosses
3    multiple legal entities.
4    Q.  Do you know what competitors of
5    Westmoreland people from the EPNG practice
6    group have served?
7    A.  Can you be more specific?
8    Q.  I'm just saying, of the people in
9    the EPNG practice group, do you know what
10   competitors of Westmoreland those people have
11   provided services to?
12   A.  Of the EPNG group more broadly or
13   those that are members of the service team
14   and the engagement team serving Westmoreland.
15   Q.  Let's start with the latter.  The
16   service team and engagement team?
17   A.  So any party that's on the
18   interested parties list that's served by the
19   services team is disclosed in the
20   declaration.
21   Q.  And how about the broader group of
22   EPNG, have they --
23      MS. GAY:  Objection to the form.
24   Be clear on what your question is if you
25   can, Mr. Petrella.



Hojnacki

1
2     Q.   The broader group of EPNG, of those
3     individuals, do you know whether they have
4     served any competitors of Westmoreland?
5     A.   So as it states in the declaration
6     and I'm happy to go through it in detail, we
7     have tried to identify for McKinsey RTS or
8     any affiliate whether or not there is a
9     client that is being served that is in a
10    direct commercial relationship with the
11    debtors.
12    Q.   Did you find any?
13    A.   They are disclosed in the
14    declaration if we did.
15    Q.   Just sitting here right now, you
16    don't know?
17    A.   We can go through the declaration
18    and look.
19    Q.   You submitted two declarations in
20    this case, the second one was December 17,
21    2018, is that correct?
22    A.   I have submitted two.  The specific
23    dates, I would have to check the dates of the
24    filings.
25    Q.   We will look at your supplemental

Hojnacki

1
2     declaration a little later.
3         How were you selected to be the
4     signatory on these declarations?
5     A.   I am the practice leader that's in
6     charge of the Westmoreland assignment.
7     Q.   So is that essentially the policy
8     that the practice leader of the assignment
9     signs the declaration?
10    A.   I don't know if it's a specific
11    policy but it's the expectation that the
12    partner in charge of -- the practice leader
13    in charge of the assignment for serving the
14    debtors would sign the declarations.
15    Q.   Who is it that decides ultimately
16    at McKinsey what connections get disclosed
17    and which don't?
18    A.   So again, I'm happy to go through
19    the details that we do to identify
20    connections.  Ultimately those, that
21    information that comes through the various
22    sources that we check is reviewed by internal
23    and external counsel to identify the
24    disclosures that are made.
25    Q.   In the course of preparing your two

Hojnacki

1
2     declarations, do you recall any disagreements
3     over what should be disclosed or what kind of
4     connections ought to be disclosed?
5     A.   I don't recall any, no.
6     Q.   And that includes legal counsel?
7     A.   Between myself and legal counsel or
8     amongst themselves.
9     Q.   I'm just asking, any disagreement
10    that you are aware of of any kind with
11    anybody about what disclosures belong in your
12    declarations and what don't?
13    A.   I can't speak to that.
14    Q.   By definition you can.  I'm asking
15    about your awareness.
16    A.   I can't speak to disagreements that
17    happened to people outside of myself.
18    Q.   I understand that.
19        Did you hear about any
20    disagreements about the scope of the
21    connections that had to be disclosed in your
22    declarations?
23        MS. GAY:  Objection to the form.
24        Just make sure the question is clear.
25    A.   Would you ask specifically what

Hojnacki

1
2     disagreements you are asking if I am aware
3     of.
4     Q.   I'm asking about any disagreement
5     of any kind that you heard about or that you
6     are aware of concerning what connections
7     should or should not be disclosed in your
8     declarations?
9     A.   I'm not aware of any.
10    Q.   Other than Mar-Bow and the trustee,
11    to your knowledge, has anyone outside of
12    McKinsey expressed a view in any way that
13    your disclosures were insufficient in this
14    case, in any way?
15    A.   Would you restate the question.
16    Q.   Can you read it back?  I thought it
17    was pretty clear.
18        (Record read.)
19    A.   So I think the only thing with the
20    question is, I don't think we've disagreed
21    that our disclosures -- McKinsey or McKinsey
22    RTS has disagreed that our disclosures are
23    insufficient.  It's only the U.S. Trustee and
24    Mar-Bow at this point.
25    Q.   You are not aware of anybody else

**MAGNA**
**LEGAL SERVICES**

1           Hojnacki
2   that expressed that view?
3       A.  I am not aware of anybody else.
4       Q.  Either prior to or subsequent to
5   signing your declarations?
6       A.  In the Westmoreland case?
7       Q.  Correct.
8       A.  No.  Will you state the question
9   again because you are bringing multiple
10  periods of time into one question.
11      Q.  I'm trying to be as broad as
12  possible.  I'm talking about at any time
13  leading up to your declarations or after your
14  declarations, other than Mar-Bow or the U.S.
15  Trustee, are you aware of anybody anywhere
16  that's expressed any -- has expressed any
17  view that your disclosures in the case are
18  insufficient?
19      A.  Specific to Westmoreland?
20      Q.  Yes.  Your Westmoreland disclosures
21  in this case.
22      A.  So I know that our counsel had
23  discussions with the U.S. Trustee in advance
24  of filing to make sure that the U.S. Trustee
25  was comfortable with the approach that we

1           Hojnacki
2   were using.  I am not aware that Mar-Bow had
3   any disagreement to our disclosures prior to
4   the filing of our declaration.
5       Q.  Are you finished?
6       A.  Yes.
7       Q.  I just wanted to know if you were
8   still thinking or not.
9           So it sounds like, other than U.S.
10  Trustee, other than Mar-Bow, you are not
11  aware of any view that your disclosures in
12  this case are insufficient?
13      MS. GAY:  That misstates his
14  answer.
15      Q.  Why don't you answer that question
16  then.
17      A.  Would you ask the question again?
18      Q.  The question is, are you aware of
19  anybody who has expressed the view that your
20  disclosures in this case, the Westmoreland
21  case are insufficient other than the U.S.
22  Trustee or Mar-Bow?
23      A.  I am not aware of anybody else.
24      Q.  Who was involved in drafting your
25  declarations?

1           Hojnacki
2       A.  The McKinsey legal department and
3   external counsel.
4       Q.  And external counsel?
5       A.  Yes.
6       Q.  And who specifically at the
7   McKinsey legal department?
8       A.  So I can't state who specifically
9   was drafting the document.  The person that I
10  interacted with most is Laurie Basch.
11      Q.  Do you know of anyone else at
12  McKinsey legal that worked on your
13  declarations in Westmoreland?
14      A.  Are you asking just within McKinsey
15  legal.
16      Q.  For now, right, yes.
17      A.  Victoria Crane.
18      Q.  Anyone else?
19      A.  I am not aware of anybody else.
20      Q.  How about outside lawyers?
21      A.  Peter Ivanick at Hogan Lovells and
22  another member of his team, I believe the
23  name is Alex.
24      Q.  He is also at Hogan Lovells?
25      A.  Yes, sir.

1           Hojnacki
2       Q.  Anyone else you are aware of from
3   outside counsel?
4       A.  No.
5       Q.  Ms. Gay's firm was not involved?
6       A.  Not in the drafting of the
7   document.  They provided -- they provided
8   comments in support.
9       Q.  Who was primarily responsible for
10  drafting the words in your declaration?
11      A.  Like I said, I didn't sit next to
12  them as they drafted the words but the person
13  that I interacted most with was Laurie Basch.
14      Q.  Is it your understanding that
15  McKinsey legal drafted the words and then
16  maybe Mr. Ivanick had some input on it, is
17  that how it worked?
18      A.  I can't say specifically the
19  distribution of the workload.
20      Q.  Do you know whether Mr. Ivanick's
21  firm did the first draft of your
22  declarations?
23      A.  I don't know specifically, again,
24  the drafting of the document.
25      Q.  But in any event, did you write any



Page 38

```
1            Hojnacki
2  of the words in your declarations?
3       A.  I did not -- I provided comments
4  and edits to the document at various points
5  in time, yes.
6       Q.  How many different drafts of your
7  declarations did you see?
8       A.  I can't recall the specific number
9  but it was several.
10      Q.  It was several, would you say more
11 or less than ten?
12      A.  Probably more.
13      Q.  And you say you made edits to the
14 documents?
15      A.  Edits and provided comments, yes.
16      Q.  Is that true of both your
17 declarations or just your first?
18      A.  Both.
19      Q.  Same thing, more than ten drafts
20 for both?
21      A.  I would estimate, yes.
22      Q.  When you made edits, did you make
23 them by hand with pen or did you make them on
24 the computer?
25      A.  Typically on the computer.
```

Page 39

```
1            Hojnacki
2       Q.  Did you do it like a red line with
3  comments or did you just type out a memo or
4  email and said here are my comments?
5       A.  Probably a little bit of both.
6       Q.  Did you retain the different drafts
7  that you did?
8       A.  I shared the drafts back with
9  Laurie and Peter.
10      Q.  So presumably those are still in
11 existence, correct?
12      A.  I can't say.
13      Q.  Do you have any reason to believe
14 they are not still in existence?
15      A.  No.
16      Q.  Did you make any edits by hand?
17      A.  I don't recall any.
18      Q.  How many hours would you say that
19 you worked total on the process leading up to
20 your declarations and editing your
21 declarations?
22      A.  Hours leading up to and editing?
23      Q.  I'm kind of asking for the whole
24 boat here.  From the time you started the
25 process of working on your -- preparing to
```

Page 40

```
1            Hojnacki
2  prepare your declaration and sign your
3  declaration and editing the declaration,
4  start to finish, what would you say your
5  total hours were that you spent on that?
6       A.  I don't recall specifically but it
7  was many.
8       Q.  Would you say it's more than a
9  hundred hours?
10      MS. GAY:  On each declaration?  I
11 want to make this as clear as possible.
12      Q.  Let's break it down.  How about on
13 your first declaration, would you say you
14 spent more than a hundred hours on that?
15      A.  Probably not more than a hundred
16 but more than 40.
17      Q.  Somewhere between 40 and a hundred
18 is fair.
19      How about your second declaration?
20      A.  Likely similar amount of time.
21      Q.  And do you log that time; do you
22 record that time?
23      A.  Not typically.  I don't usually
24 bill that time to the client.
25      Q.  So in the event that there is a fee
```

Page 41

```
1            Hojnacki
2  application by McKinsey in this case, those
3  hours will not be claimed?
4       A.  Certainly not to the level that I
5  actually spent in doing it.
6       Q.  In other words, some hours may be
7  claimed but not all of them?
8       A.  Yes, yes.
9       Q.  So your timesheets will reflect --
10 withdrawn.
11      The timesheets that you submit to
12 the court will reflect some fraction of the
13 hours that you actually spent?
14      MS. GAY:  Let's be clear, on
15 preparing the declarations.
16      MR. PETRELLA:  Working on the
17 declarations, broadly construed.  Go
18 ahead.
19      A.  Any time that's submitted to the
20 court will be a fraction of what I actually
21 spent in preparation of these declarations.
22      Q.  Is there any other work that RTS
23 has done or plans to do that will not be
24 billed in full to the debtor?
25      A.  We don't bill all of our travel
```



Page 42

```
1          Hojnacki
2  time. I think it's customary that 50 percent
3  of the our travel time is actually billed to
4  the debtor, to the extent it is not actually
5  productive working on the matter but
6  generally the rest of our time would be
7  billed to the debtor.
8      Q.  So it's only the preparation of the
9  disclosure declarations where there is kind a
10 haircut on time, is that fair?
11     A.  I wouldn't call it a haircut on
12 time. I would state that the amount of time
13 that I spent to prepare these is substantial
14 and I take all the necessary time to make
15 sure that it's completed and I don't charge
16 the debtor for all of that time.
17     Q.  Will your timesheets, if you submit
18 them to the court, will they reflect the time
19 you actually spent and then show here is the
20 fraction that we are claiming?
21     A.  I don't understand your question.
22     Q.  In other words, when you put your
23 timesheets in for a fee application, will you
24 list all the time that you actually spent and
25 then say, make some notation and say we are
```

Page 43

```
1          Hojnacki
2  not claiming all this time, we only want X
3  hours, will you do anything like that?
4      A.  Show the gross and then the net?
5      Q.  Yes.
6      A.  No, it would show just the fraction
7  that is being charged to the debtors.
8      Q.  And you would decide what fraction
9  that is, right?
10     A.  I would record my time entries and
11 I would choose, yes.
12     Q.  You would choose what fraction to
13 submit?
14     A.  I would choose any sort of time
15 entry that I wanted to charge to the debtor
16 in relation to retention documents.
17     Q.  And you don't need authority or
18 approval or anything to charge the debtor
19 less than the time you actually spent?
20     A.  No. I think the debtor would
21 actually appreciate charging less time.
22     Q.  I'm just saying internal to
23 McKinsey, do you have the authority to do
24 that?
25     A.  Yes.
```

Page 44

```
1          Hojnacki
2      Q.  Was there anything that counsel or
3  anyone at McKinsey wanted to say in your
4  declaration that you either refused to say or
5  declined to say?
6      A.  I don't recall anything.
7      Q.  Do you recall taking out any
8  language that you didn't like or you didn't
9  want?
10     A.  Again, I provided edits, the
11 specific details of all those edits, I don't
12 recall at this time.
13     Q.  Do you remember any of those edits
14 being particularly controversial, being the
15 subject of extended discussion either
16 internally or with legal counsel?
17         MS. GAY:  Objection to the form.
18     You can answer.
19     A.  We had lengthy conversations about
20 a variety of topics but typically it was
21 around making sure that I as the declarant
22 was extremely comfortable and understood to
23 the best of my ability what was being
24 included.
25     Q.  What was the single most discussed
```

Page 45

```
1          Hojnacki
2  topic to your recollection?
3         MS. GAY:  Objection to the form.
4     You can answer.
5     A.  I don't recall.
6     Q.  Do you recall any particular topic
7  of what you would characterize as extended
8  discussion?
9     A.  There were topics around -- in
10 which declaration?
11     Q.  Let's start with your first.
12     A.  I don't recall any in the first.
13     Q.  How about the second?  That was
14 just a few weeks ago?
15     A.  Sure. In the second, there was
16 conversation around the willingness to waive
17 the $96,000 claim in response to the U.S.
18 Trustee's objection to the additional details
19 of the confidential client that still
20 remains. Those are two. I'm sure there are
21 many more.
22     Q.  Were there differing views on
23 whether to waive that $96,000 sum?
24     A.  I don't think there was differing
25 views. I mean certainly we believed that the
```



Page 46

Hojnacki
1
2    $96,000 is covered by the retainer that is
3    held at the time of filing but we are happy
4    to do it and contribute those funds back to
5    the debtor for the services that were
6    provided.
7        Q.   So to your recollection the
8    discussion was, we should waive the $96,000,
9    everyone agreed and that was it?
10       A.   I don't want to like
11   mischaracterize a long series of
12   conversations with a simple sentence but
13   again, it was trying to understand what the
14   basis was for the U.S. Trustee's objection
15   and then coming to the conclusion that it was
16   the best way to handle it by waiving it.
17       Q.   So was there some sort of extended
18   analysis of whether it was appropriate or
19   required to waive the $96,000?
20       A.   There was multiple conversations
21   had with internal counsel and external
22   counsel about it.
23       Q.   Before Mar-Bow's objection was
24   filed, was there any consideration of waiving
25   that $96,000 sum?

Page 47

Hojnacki
1
2        A.   I don't recall one, no.
3            I'm sorry, before you proceed, we
4    had a conversation about the $96,000 that was
5    due for the one day prior to the last day
6    that the debtors made payment and the date of
7    their Chapter 11 filing.  We knew what the
8    amount was, we articulated the amount and we
9    knew that there was a retainer in place at
10   the time of filing to cover it.
11       Q.   When was that conversation?
12       A.   In advance of filing the original
13   declaration.
14       Q.   We've talked about Mr. Ivanick's
15   firm, we talked about McKinsey legal.
16           Anyone else that you can recall
17   that was involved in the process of preparing
18   your declarations?
19       A.   McKinsey finance is involved.
20       Q.   And who at McKinsey finance is
21   involved in that?
22       A.   I don't know the direct individual.
23       Q.   Who else; anyone else?
24       A.   That's all I recall.
25       Q.   How about searches for connections

Page 48

Hojnacki
1
2    and so forth, who was involved in that?
3        A.   Those searches are performed on our
4    global client database by McKinsey finance,
5    at the direction of the legal team working at
6    my direction.
7        Q.   So legal is working at your
8    direction and legal is kind of directing
9    finance on these searches, is that fair?
10       A.   That's fair.
11       Q.   How about, you talked about email
12   surveys in your declaration.  Who was
13   involved in that?
14       A.   They're prepared by Laurie Basch
15   and her team.
16       Q.   Again, in terms of the actual
17   individuals that did the database searches,
18   you don't know any names of those?
19       A.   No, sir.
20       Q.   Approximately how many
21   conversations did you have with Ms. Basch
22   about your declarations, the contents of your
23   declarations?
24       A.   Both declarations?
25       Q.   Yes.

Page 49

Hojnacki
1
2        A.   I couldn't tell you specifically
3    but it was, I would estimate it to be several
4    dozen.
5        Q.   Tell me what you recall about the
6    substance of the discussions you had
7    regarding your first declaration with Ms.
8    Basch?
9        A.   Is there is a specific --
10       Q.   Anything you can remember, as much
11   as can you remember.
12       A.   We discussed a general approach
13   that was being followed for the preparation
14   of the disclosures.  We discussed the various
15   analyses that were included in there in terms
16   of the both, as I mentioned the $96,000 claim
17   as well as the other payments that were made
18   prior to the filing date.  Those were the
19   general matters of topics but again we spent
20   substantial time going through it in detail
21   and providing comments back and forth.
22       Q.   Can you remember anything else
23   about those conversations?
24       A.   Not at the moment.
25       Q.   You said you had discussions about

**MAGNA** ▶
LEGAL SERVICES

1              Hojnacki
2    the general approach.  Tell me about those
3    conversations?
4        A.  It was, again, the approach to
5    review all the connections for the service
6    team as defined in the declaration and then
7    to use the approach of surveying the partners
8    of McKinsey RTS and its affiliate to identify
9    any instances where members -- parties on the
10   interested parties list were involved in a
11   direct commercial relationship with the
12   debtor.
13       Q.   Is that an approach you were
14   familiar -- withdrawn.
15            Is that an approach you were
16   familiar with prior to this engagement, the
17   Westmoreland engagement?
18       A.  I understand that it's an approach
19   that's been used before.
20       Q.   But is it one that you were
21   familiar with?
22       A.  It's one that I, based on my
23   conversations with counsel, we have used in
24   situations before.
25       Q.   For example, you were involved in

1              Hojnacki
2    signing the declarations in the Sun Edison
3    case, weren't you?
4        A.  Yes.
5        Q.   Did the approach in Sun Edison
6    differ from the approach in the Westmoreland
7    case?
8        A.  It's my understanding that the
9    approach that we used here in Westmoreland is
10   consistent with the approach that we worked
11   with the U.S. Trustee on and the trustee
12   agreed to in the Sun Edison case.
13       Q.   So in other words, you had a
14   conversation with the trustee in Sun Edison,
15   agreed upon an approach and you used that
16   same approach here in Westmoreland?
17       A.  I did not have a conversation
18   directly with the trustee.
19       Q.   Someone did and they related that
20   conversation to you?
21       A.  I can't speak to specific
22   conversations that were had.  It was relayed
23   to me that this is the same approach that we
24   followed in that case, in the Sun Edison
25   case.

1              Hojnacki
2        Q.   So did you know about these
3    conversations with the trustee at the time of
4    the Sun Edison case or is this something you
5    just learned in connection with Westmoreland?
6        A.  I signed the declaration for Sun
7    Edison a long time ago so specifically what I
8    recall from that is -- I don't know.
9        Q.   In connection with the preparation
10   of your declarations in Westmoreland though,
11   do you recall Ms. Basch telling you, look we
12   are using the same approach that we used in
13   Sun Edison which was kind of okayed by the
14   trustee's office?
15       A.  I don't remember if it was Ms.
16   Basch specifically but in conversations in
17   preparation of filing this, whether it was
18   Ms. Basch or Mr. Ivanick, we had the
19   conversations relative to that.
20       Q.   Were you surprised then when the
21   trustee objected to your declarations?
22       MS. GAY:  In Westmoreland?
23       Q.   In Westmoreland.
24       A.  So it's my understanding that prior
25   to the filing of the original declaration,

1              Hojnacki
2    Mr. Ivanick had conversations with the U.S.
3    Trustee about applying the same approach, the
4    approach that was applied in Sun Edison in
5    this case and there was no concern and those
6    were the topics of conversation all the way
7    up until the U.S. Trustee filed their
8    objection in this case.
9        Q.   So you understand from Mr. Ivanick
10   that before you filed your first declaration
11   in Westmoreland, he had a conversation with
12   the U.S. Trustee's office where they agreed
13   with the same approach that had been used in
14   Sun Edison, is that right?
15       A.  I can't speak to the specifics of
16   the conversation because I wasn't a party to
17   it.
18       Q.   I understand.  It's just your
19   understanding --
20       A.  It's my understanding from my
21   conversations with Mr. Ivanick that he had
22   conversations with the U.S. Trustee's office
23   and there was not concerns raised relative to
24   the approach we were employing.
25       Q.   That was before you actually filed

**MAGNA** ▶
LEGAL SERVICES

Page 54

Hojnacki
1       Hojnacki
2  the declaration itself, right?
3       A.  I don't recall, I don't recall.
4       Q.  Do you know whether Mr. Ivanick
5  provided the trustee's office with a draft of
6  your first declaration in Westmoreland before
7  it was filed?
8       A.  Will you ask the question again?
9       Q.  Do you know whether before you
10  filed your first declaration in this case, do
11  you know whether Mr. Ivanick provided the
12  trustee's office with a draft of your
13  proposed declaration?
14      A.  I can't state specifically that he
15  did, but I do recall conversations of him
16  discussing the intent to.
17      Q.  In other words, before your first
18  declaration was filed, Mr. Ivanick told you
19  that he planned to provide a draft to the
20  U.S. Trustee's office, is that fair?
21      A.  I don't recall.
22      Q.  You said Ms. Gay's firm had some
23  involvement in the preparation of your
24  declarations.  Can you tell me who you worked
25  with on that?

Page 55

1       Hojnacki
2       A.  It would predominantly have been
3  Mr. Margolin or Ms. Chung.
4       Q.  Tell me as much as you can remember
5  about your conversations with Ms. Chung.
6       A.  I don't recall the substance of
7  those conversations.
8       Q.  Did you speak with Ms. Chung in
9  connection with both your declarations or
10  just the first one?
11      A.  I don't recall.
12      Q.  So you don't remember anything you
13  discussed with Ms. Chung leading up to your
14  declarations?
15      A.  No.
16      Q.  How about Mr. Margolin?
17      A.  Same.
18      MS. GAY:  Margolin.
19      MR. MARGOLIN:  Margolin.
20      Q.  Let's go back to Mr. Ivanick.
21      Tell me anymore conversations you
22  can recall with him leading up to either your
23  first declaration or your second declaration?
24      A.  Again, the specific details of the
25  many conversations we have are going to

Page 56

1       Hojnacki
2  escape me right now.
3       Q.  You had a couple of specifics so
4  far, so let's see if you can do better.  Keep
5  going.
6       MS. GAY:  Objection to the form.
7       Maybe if you can tie it to a paragraph
8       you will get there.
9       MR. PETRELLA:  I'm not trying to
10      tie it to a paragraph.
11      Q.  You had conversations with Mr.
12  Ivanick, right?
13      A.  Yes.
14      Q.  In connection with your
15  declarations, right?
16      A.  Yes.
17      Q.  About how many?
18      A.  Again, the specific number I don't
19  recall but I would estimate it to be several
20  dozen.
21      Q.  So just any specific conversations
22  that you can recall as you sit here today,
23  just let me know what they were?
24      A.  Again, there were many, but I mean
25  there were specific conversations about the

Page 57

1       Hojnacki
2  payments leading up to the -- the payments
3  received in the 90 days prior to the filing.
4  The $96,000 claim for the day immediately
5  prior to the bankruptcy filing.  The fact
6  that we were using the template that was
7  agreed to by the U.S. Trustee in the Sun
8  Edison case in this matter and again, many
9  more but those are just specific things that
10  stand out beyond the general preparation of
11  the documents and the comments and the back
12  and forth associated with the preparation of
13  this.
14      Q.  Did you follow all the advice that
15  Mr. Ivanick gave you?
16      A.  Can you be more specific?
17      Q.  Well, I don't want to be too more
18  specific.  All I want to know is, is there
19  any advice that Mr. Ivanick gave you where
20  either you or someone inside McKinsey legal,
21  anyone else said, thanks for the advice, we
22  are not going to go that way?
23      A.  I can't speak for anybody else
24  inside McKinsey.
25      Q.  Just asking to your knowledge.

Page 58

Hojnacki

1
2     A.   Are you asking about myself or to
3  the best of my knowledge?
4     Q.   To the best of your knowledge,
5  whether it was conveyed to you directly or
6  whether you heard about it from someone else?
7     A.   I am not aware.
8     Q.   You are not aware of any instances
9  where Mr. Ivanick gave you advice and you
10  declined to take that advice, is that fair?
11     A.   At this moment I don't recall any.
12     Q.   And you don't recall hearing, you
13  don't recall hearing of any advice that Mr.
14  Ivanick gave to RTS that someone else at RTS
15  or someone else at McKinsey decided not to
16  take?
17        MS. GAY:  Objection to the form.
18        If you can understand it, you can answer
19        it.
20     A.   Can you break it into two
21  questions?
22     Q.   I will rephrase it.
23        MS. GAY:  Thanks.
24     Q.   Are you aware, in any way, of any
25  advice that Mr. Ivanick gave to RTS that

Page 59

Hojnacki

1
2  McKinsey, anyone inside McKinsey declined to
3  accept or declined to take?
4     A.   I am not aware of any, no.
5     Q.   In preparing your declarations, did
6  you discuss with counsel any of the
7  allegations raised by Mar-Bow in this case or
8  Jay Alix in any other case?
9        MS. GAY:  Objection to the form.
10     A.   Would you restate your question or
11  ask again, please?
12     Q.   You are aware that, for example, in
13  the A&R case there is a challenge by Mar-Bow
14  to McKinsey's disclosures, is that fair?
15     A.   I am aware of that, yes.
16     Q.   You are aware of the lawsuit here
17  in the Southern District of New York?
18     A.   Specifically which one?
19     Q.   The RICO action.
20     A.   I am aware of that, yes.
21     Q.   The allegations in A&R and the
22  allegations in the RICO action in the
23  Southern District, did you discuss those with
24  counsel during the preparation of your
25  declarations?

Page 60

Hojnacki

1
2     A.   We discussed the existence of the
3  two lawsuits.
4     Q.   What else did you discuss about
5  them?
6        MS. GAY:  In connection with the
7        preparation of the declarations?
8        MR. PETRELLA:  Yes. Only in
9        connection with the preparation of the
10        declarations.
11     A.   I mean we discussed the existence
12  of them and certainly there is paragraphs in
13  here that address specific items associated
14  with those litigations that we wanted to
15  include.
16     Q.   Who were those conversations with?
17     A.   Mr. Ivanick and Ms. Basch,
18  primarily.
19     Q.   Anyone else?
20     A.   I don't recall.
21     Q.   As you sit here today, are you
22  aware of any other McKinsey connections
23  related to the Westmoreland case that have
24  not yet been disclosed?
25     A.   I believe with the filing of our

Page 61

Hojnacki

1
2  second -- first supplemental declaration,
3  every connection that we identified pursuant
4  to the searches that we did have been
5  disclosed.
6     Q.   So all the interested parties on
7  Schedule I and Schedule II to your original
8  declaration, from your perspective, those are
9  covered, is that fair?
10     A.   Do you want to just reference which
11  schedules you are talking about.
12     Q.   Sure.  There are two schedules to
13  your declaration.  Do you recall that?
14        And they each have sub schedules.
15  Go ahead and take a look at the back, it
16  starts on page 71 of 194, if you look in the
17  upper right-hand corner.  There is a Schedule
18  I and all the way to the back on page 194 of
19  194 that's the end of the second schedule.
20     A.   Is this document that I have here
21  both the first and second?
22     Q.   I'm talking about your first right
23  now.
24        MS. GAY:  Are you talking about
25        Exhibit 3?



Page 62

1           Hojnacki
2     MR. PETRELLA:  Hojnacki 3.
3     MS. GAY:  The question is?
4     MR. PETRELLA:  I will give him a
5  chance to look at Schedule I and
6  Schedule II.
7     Q.   My question is, to your knowledge
8  are RTS's disclosures complete as to all the
9  interested parties on these schedules?
10    A.   So this is just the original
11 declaration?
12    Q.   Correct.
13    A.   You need to include the
14 supplemental declaration and with the filing
15 of the supplemental declaration, all of the
16 connections that we identified through our
17 searches have been identified with that
18 filing.
19    Q.   So just not to put too fine a point
20 on it, as far as you are concerned, you are
21 done in terms of identifying connections, is
22 that fair?
23    A.   As it states in both the original
24 and the supplemental, we reserve the right to
25 continue to file additional supplementals

Page 63

1           Hojnacki
2  additional connections are identified.
3     Q.   As you sit here now, you are not
4  aware of any more disclosures that need to be
5  made?
6     A.   With the filing of the first
7  supplemental, the second declaration, we had
8  made every disclosure that we felt necessary.
9     MS. GAY:  Just to correct for the
10    record to make sure the record is clear,
11    the first supplemental is the same thing
12    as the second declaration.
13    MR. PETRELLA:  Correct.
14    Q.   The first supplemental is the
15 December 17th declaration, right?
16    A.   Yes, sir.
17    Q.   Which post dates your original
18 declaration which is Hojnacki 3 which you are
19 looking at right now, correct?
20    A.   Yes, sir.
21    Q.   Have there been any efforts to
22 identify additional connections since your
23 first supplemental declaration on December
24 17th?
25    A.   Not that I am aware of.

Page 64

1           Hojnacki
2     Q.   Has any attorney advised you or
3  anyone else at McKinsey, to your knowledge,
4  that any particular entity should be
5  disclosed by McKinsey in the Westmoreland
6  case but that entity has not yet been
7  disclosed?
8     MS. GAY:  Objection to the form.
9     You can answer if you can understand it.
10    A.   So I can't speak to anybody else at
11 McKinsey.  I have never been advised that
12 there is a name that should have been
13 disclosed that wasn't.
14    Q.   But have you heard that such a
15 thing happened?
16    A.   Heard from whom.
17    Q.   From anyone.  A colleague down the
18 hall say, you know they told us we ought to
19 put in XYZ corp., we haven't done it yet,
20 anything like that?
21    A.   That's a very hypothetical scenario
22 but no I have not heard of that.
23    Q.   Who does Laurie Basch report to?
24    A.   I don't know the full composition
25 of the office of the general counsel but the

Page 65

1           Hojnacki
2  general counsel is Jean Molino.
3     Q.   So ultimately everyone in legal
4  reports to her?
5     A.   That's my understanding.
6     Q.   Do you know whether Ms. Molino
7  reviewed your declarations in this case?
8     A.   I don't know specifically.
9     Q.   You don't know whether she approved
10 them before they were filed?
11    A.   I don't know.
12    Q.   Do you know who is the highest
13 level person in McKinsey legal that approved
14 your declarations?
15    MS. GAY:  Objection to the form.
16    You can answer.
17    A.   I don't know.
18    Q.   Do you know who the highest level
19 official is at McKinsey corporate that
20 reviewed and approved your declarations?
21    MS. GAY:  Objection to the form.
22    You can answer.
23    A.   What do you mean by corporate?
24    Q.   I mean anyone outside of legal from
25 any McKinsey entity.



Hojnacki

1    A.   I filed this as the practice
2 leader.  This is my declaration.
3    Q.   So you didn't need to go to anyone
4 else at any McKinsey entity and seek approval
5 before you signed those?
6    A.   No.
7    Q.   At the last hearing in this case
8 there was a Mr. Pincus with you, is that
9 right?
10    A.   Yes, sir.
11    Q.   What's his name again?
12    A.   Gary.
13    Q.   Did he review your first
14 supplemental declaration before it was filed?
15    A.   No, he did not.  To the best of my
16 knowledge, no, he did not.
17    Q.   Let's turn to paragraph 32 of your
18 declaration.
19       MS. GAY:  Is this a good spot for a
20 break.
21       THE VIDEOGRAPHER:  The time is 9:15
22 a.m. and we are going off the record.
23       (Recess.)
24       THE VIDEOGRAPHER:  This is the

Hojnacki

1 start of media label No. 2.  The time
2 now is 9:25 a.m. and we are back on the
3 record.
4    Q.   Mr. Hojnacki, to your knowledge,
5 does RTS have any employees that work
6 exclusively for RTS?
7    A.   When you say exclusively for RTS,
8 what do you mean?
9    Q.   Meaning the only entity they work
10 for is RTS, they don't do any work outside of
11 that entity?
12    A.   I don't know.
13    Q.   Let's go to paragraph 32 of your
14 declaration?
15       MS. GAY:  Hojnacki 3?
16       MR. PETRELLA:  Hojnacki 3.
17    A.   Which paragraph.
18    Q.   Thirty-two.
19       In that paragraph you talk about
20 the global client database, right?
21    A.   Yes.
22    Q.   When was that database created?
23    A.   I don't know.
24    Q.   Presumably, you also don't know the

Hojnacki

1 purpose it was created for, is that fair?
2    A.   Not specifically, no.
3    Q.   How long have you been with
4 McKinsey?
5    A.   Five and a half years
6 approximately.
7    Q.   Have you been aware of this
8 database during that entire time?
9    A.   Yes.
10    Q.   Is access to the database
11 restricted in any way within McKinsey?
12    A.   It's highly restricted, meaning
13 that I don't have access to it directly,
14 which is why we rely on McKinsey finance to
15 access it in preparation for this
16 declaration.
17    Q.   So it's not like you can just go to
18 your computer at work and pull up the global
19 client database, is that fair?
20    A.   No, sir.
21    Q.   Do you know what software it's
22 hosted on?
23    A.   I don't.
24    Q.   Do you know whether it's an Excel

Hojnacki

1 spreadsheet or whether it's something more or
2 different than that?
3    A.   I don't know specifically what it
4 is.
5    Q.   Have you ever seen a computer
6 monitor with the global client database up on
7 it?
8    A.   No.
9    Q.   To your knowledge, what kind of
10 information is in the global client database?
11    A.   It's a record of all clients that
12 McKinsey and McKinsey RTS or including
13 McKinsey RTS served globally.  It lists the,
14 to the best of my knowledge, the partner
15 who's in charge of that relationship, as well
16 as a very brief description of the type of
17 services that we're providing to that client.
18    Q.   So it's got client names, right?
19    A.   Yes.
20    Q.   And then does it have like an
21 engagement, like engagement names under each
22 client for the different engagements?
23    A.   I don't know specifically, I
24 haven't seen it.

1          Hojnacki
2      Q.   But to the best of your knowledge,
3  does the database also have information on
4  the various engagements that the firm has for
5  a particular client?
6      A.   I don't know.
7      Q.   And so for each client, it also
8  gives you the name of the McKinsey partner
9  that's primarily responsible for the
10  relationship?
11      A.   That's my understanding.
12      Q.   Do you know whether it also gives
13  the name of the partner that's responsible
14  for a particular engagement for that client?
15      A.   I don't know.
16      Q.   Is it typical within McKinsey that
17  a partner that would be responsible for a
18  client would also actually work on all their
19  engagements?
20      A.   Would you ask it again?
21      Q.   Sure.  Like for example, in a law
22  firm, you might have a partner that has a big
23  client and they might -- a new matter might
24  come in and that partner may say, I'm not
25  going to work on this, I'm going to give this

1  to Joe and he is going to work on it and I'm
2  not going to bother with it at all.
3          Is that something, to your
4  knowledge, that happens at McKinsey or if you
5  are the partner responsible for a client, do
6  you always work on their engagements in some
7  capacity?
8      A.   I can't speak to every possible
9  scenario that exists within the firm but
10  typically the partner that's in charge of the
11  client is aware of the activities that are
12  going on at the client.
13      Q.   You said that there is a brief
14  description of the work that's being done for
15  the client, is that fair?
16      A.   That's my understanding.
17      Q.   And so it sounds like there is a
18  description, at least generally, of each
19  engagement that the firm has for a particular
20  client, is that your understanding?
21      A.   I don't want to -- my knowledge of
22  the details of the global client database are
23  fairly vague but I understand there to be a
24  brief description of the overall services to

1          Hojnacki
2  the client.
3      Q.   When these searches of the database
4  are done, is there like -- no one comes and
5  hands you a printout of the results or
6  anything like that, right?
7      A.   No.
8      Q.   That all gets filtered through
9  legal?
10      A.   Yes.  In preparation for the
11  declaration, yes.
12      Q.   So in terms of what connections
13  there are, you have to rely almost entirely
14  on legal, is that fair?
15      A.   Yes.
16      Q.   And legal, in turn, has to rely
17  almost entirely on finance, is that fair?
18          MS. GAY:  Objection to the form.
19      A.   When you say rely on.
20      Q.   Finance is doing the searches,
21  right, for the database?
22      A.   I can't speak to the interaction
23  between the two.  I know finance accesses the
24  database.
25      Q.   Do you know if legal accesses the

1          Hojnacki
2  database?
3      A.   I don't know.
4      Q.   Do you know anything about the
5  search functions of the database?
6      A.   No, sir.
7      Q.   So you wouldn't know how to do a
8  search for a -- let's say I give you an
9  interested party name, you wouldn't know how
10  they go about searching for that?
11      A.   No.
12      Q.   You don't know if they type in the
13  name, hit enter and...
14      A.   I don't know.
15      Q.   Do you know under what
16  circumstances, if any, finance does not
17  report all results from the global client
18  database to legal?
19      A.   No, I don't know.
20      Q.   You don't know if they can search
21  multiple interested parties at once?
22      A.   I don't know how they search.
23      Q.   Do you know if the global client
24  database can tell you anything other than
25  whether an interested party either is or was

Hojnacki
1
2 a McKinsey client?
3     A.   Sorry.  Ask your question again.
4     Q.   Sure.  The database in its most
5 boiled down, it's a list of McKinsey clients,
6 there is other information but at bottom it's
7 a list of McKinsey clients, correct?
8     A.   It's a database of clients that
9 McKinsey and its affiliates, including
10 McKinsey RTS have served, either past or
11 present.
12    Q.   What I'm basically asking is, when
13 they search for an interested party in the
14 global client database, basically, all it can
15 really tell you is, was that interested party
16 a former client or is it a current client, is
17 that your understanding?
18    A.   Along with the partner that's
19 responsible for the services to that client.
20    Q.   Right, but you wouldn't know that
21 until --
22        MS. GAY:  Don't speak over each
23    other.
24    Q.   Finish up.  I'm sorry.
25    A.   Would you ask your question again.

Hojnacki
1
2     Q.   I think you've answered my
3 question.  I know you are saying about the
4 responsible partners there but to have any
5 information about the responsible partner,
6 you would first need to have the fact that
7 they are a client, correct?
8        MS. GAY:  Objection to the form.
9     A.   Again, the search parameters and
10 the approach for search, I am not familiar
11 with.
12    Q.   Do you know, for the Westmoreland
13 case, do you know when the global client
14 database search started?
15    A.   I believe if we reference back to
16 the document, although I don't recall which
17 paragraph, it indicates when we started our
18 retention application but I don't recall the
19 date off the top of my head.
20    Q.   And to your knowledge, when was the
21 last global client database search for the
22 Westmoreland case?
23    A.   I don't know.
24    Q.   Do you know whether it was before
25 or after your first supplemental declaration,

Hojnacki
1
2 meaning your December declaration?
3     A.   I do know that it was searched in
4 preparation of the first supplemental
5 declaration.
6     Q.   So to your knowledge, the last
7 search would have been at sometime before
8 your supplemental declaration, is that fair?
9     A.   We would have accessed the global
10 client database in preparation for filing of
11 the first supplemental declaration.
12    Q.   How often do you recheck the global
13 client database in the course of an
14 engagement?
15    A.   I don't know.
16    Q.   Who would know that, legal?
17    A.   I don't know.
18    Q.   When the interested parties are run
19 through the global client database, does
20 McKinsey then disclose all the results it
21 receives?
22    A.   Would you ask your question again,
23 please.
24    Q.   When the interested party names
25 from the schedules are searched in the global

Hojnacki
1
2 client database, does McKinsey take those
3 results, the results of the search and then
4 disclose those?
5     A.   So McKinsey RTS, when it performs a
6 search of the global client database and one
7 of the hits on that search is related to a
8 member of the service team, those connections
9 are disclosed, with certain exceptions that
10 are identified within the declaration in a
11 specific paragraph, but I don't recall which
12 paragraph.
13    Q.   I'm sure we will get to it.
14        Can you tell from the global client
15 database whether an engagement is over or
16 not?
17    A.   I am not aware.
18    Q.   Do you know whether it has the
19 dates of the engagements, dates they started?
20    A.   I am not aware.
21    Q.   Do you know whether the results of
22 the global client database search are used
23 for anything other than formulating the email
24 survey that's referenced in your declaration?
25        MS. GAY:  Objection to the form.

**MAGNA**
LEGAL SERVICES

Page 78

1           Hojnacki
2      A.  Can you be more specific.
3      Q.  Let me withdraw it.
4         Are the results of the global
5  client database search used to perform the
6  email survey that you discuss in your
7  declaration?
8      A.  Can you be more specific to like
9  what you are asking.
10     Q.  Let me back up for a second.
11        Your declaration talks about a
12 global client database search, right?
13     A.  Yeah.
14     Q.  And then also an email survey,
15 right?
16     A.  Correct.
17     Q.  And maybe one other thing?
18     A.  There are a couple of other things.
19     Q.  What I'm saying is, you do the
20 global client database search, are those
21 results used purely for the purpose of
22 performing the email survey or are they used
23 for something else?
24     A.  There is multiple different
25 surveys.  As it relates to the service team,

Page 79

1           Hojnacki
2  the service team is asked and provided -- is
3  provided and asked to review the entire
4  potential interested parties list,
5  irregardless of the search done on the global
6  client database.
7      Q.  All I'm saying --
8         MS. GAY:  Can you let him finish.
9      Q.  Are you done with your answer?
10     A.  The search of the global client
11 database is specific to the survey that's
12 sent out to partners of McKinsey RTS and
13 affiliates for the sake of identifying
14 whether or not any of the hits on that are
15 direct commercial relationships.
16     Q.  So my question is, is any use made
17 of the results of the global client database
18 search other than to formulate one of the
19 email surveys?
20     A.  So the results, again, the results
21 of the search on the global client database
22 are used to identify any instances where the
23 service team has provided consulting services
24 to any company that's on the interested
25 parties list and any of those connections,

Page 80

1           Hojnacki
2  all of those connections are disclosed with
3  the exception of certain exceptions that are
4  noted in the declaration.
5      Q.  Let's look at paragraph 4 of your
6  declaration.
7         MS. GAY:  Again, the first
8      declaration, just to make the record
9      pristine.
10        MR. PETRELLA:  Absolutely.
11     Hojnacki 3.  The first declaration.
12     A.  Can you get me to the right page
13 number?
14     Q.  Page 2, real close up front.
15 Paragraph 4.
16     A.  Got it.
17     Q.  You got it?
18     A.  Paragraph 4.
19     Q.  I'm sorry, rather paragraph 3.
20        So in paragraph 3 you define the
21 service team, right?
22     A.  Yes.
23     Q.  And I think you gave me some names
24 of the service team members earlier, right?
25     A.  I gave you a couple in reference to

Page 81

1           Hojnacki
2  a different question.
3      Q.  I think you said there was about 19
4  people on the service team, is that right?
5      A.  No.  The service team is, again,
6  prior to the -- immediately prior to the
7  filing is 79 people.
8      Q.  Oh wow.  Okay.
9         MS. GAY:  If I may, there are two
10     different sets of terms --
11        MR. PETRELLA:  I will get to that
12     and I will figure that out.
13        MS. GAY:  It's fine for me if you
14     want to --
15        MR. PETRELLA:  Let's do it now.
16     Q.  You have a term in your
17 declaration, you have a service team and an
18 engagement team?
19     A.  Yes.
20     Q.  Which one is bigger?
21     A.  The service team.
22     Q.  What's the relationship between the
23 service team and the engagement team?
24     A.  The service team reflects all
25 directors, officers and employees of McKinsey



Page 82

Hojnacki

1  RTS U.S., as well as or in addition to any
2  consultant that's borrowed from an affiliate
3  for purposes of serving the Westmoreland
4  debtors.
5
6      Q.  You told me before that roughly 15
7  max are RTS professional employees, right?
8      A.  I don't believe that's the question
9  you asked or the response I gave.
10     Q.  I asked you, is that practice
11 leaders that I asked you before?
12     A.  We can check the record.
13     Q.  How many -- let's do it again.
14         How many practice leaders in RTS,
15 to your knowledge?
16     A.  I estimated approximately 15 in
17 McKinsey RTS.
18     Q.  How many total professional
19 employees at RTS, to your knowledge?
20     A.  There are -- I have this answer, I
21 just have to fish it out.  There are
22 approximately 50.
23     Q.  And if you could just give me the
24 titles that fall -- I'm not asking you to
25 name the 50 people but rather, what are the

Page 83

Hojnacki

1  titles that fall into those 50 people?
2      A.  Sure.  You have senior partners and
3  partners which comprise practice leaders,
4  senior vice presidents, vice presidents,
5  associates and senior associates and then you
6  have certain administrative professionals.
7  Those are the titles of the consulting
8  service staff.  There are other members of
9  McKinsey RTS that aren't in client service
10 functions, so we have, I don't know if this
11 is his title, but a dedicated director of
12 communications.  As I mentioned earlier, a
13 dedicated people development manager, a
14 dedicated practice manager, a dedicated
15 knowledge or learning coordinator.  Those are
16 the ones that I recall at the moment.
17     Q.  So the 50 number, is that inclusive
18 of the 15 or exclusive of the 15?
19     A.  Inclusive.
20     Q.  And between partners, vice
21 presidents and associates of all ranks, how
22 much of that 50 does that comprise?
23     A.  The majority.
24     Q.  Can you estimate any better than

Page 84

Hojnacki

1  that?
2      MS. GAY:  Objection to the form.
3  You can answer.
4      A.  Of the 50, the majority are
5  consulting staff.  The exceptions are
6  predominantly the other titles that I gave
7  you that are dedicated folks to RTS.
8      Q.  The administrators and so forth?
9      A.  Yes, sir.
10     Q.  The administrators and other people
11 that don't have an associate or partner or
12 vice-president rank, would you say those are
13 10 people, 15 people, 5 people?
14     A.  I don't know off the top of my head
15 or I don't recall off the top of my head but
16 it's just that handful of people.
17     Q.  In paragraph 3 you talk about
18 certain consultants borrowed from affiliates
19 of McKinsey RTS.
20         Do you see that?
21     A.  Yes.
22     Q.  Who are those consultants for the
23 Westmoreland case?
24     A.  You would like me to list all of

Page 85

Hojnacki

1  them.
2      Q.  Sure.
3      A.  So as I stated earlier, the service
4  team was, immediately prior to the holidays,
5  right, was 19 people.  Seven of those are RTS
6  people that I believe I had given you their
7  names already.
8      Q.  You did.
9      A.  Off the top of my head the others
10 would be Eugene Schmitt, Curtis Peenes, Tony
11 Tusant, Fannie Trembler, Taru Sharma, Joe
12 Basar, Henry Su, Rob Dunne, Tal Maravich,
13 Gilad Ben Yuda (phonetic) and there is I
14 believe one other that I am not recalling at
15 this moment.
16     Q.  Can you give me the -- all those
17 people just to be clear, they are not RTS
18 employees?
19     A.  That last list of people are
20 borrowed affiliates, consultants borrowed
21 from affiliates.
22     Q.  So Schmitt, can you give me his
23 title and what affiliate he works for?
24     A.  He is a partner, I believe of



Page 86

Hojnacki
1      Hojnacki
2  McKinsey & Company U.S.
3      Q.  Peenes same question?
4      A.  Peenes is an implementation leader
5  and I believe McKinsey & Company U.S.
6      Q.  Tusant?
7      A.  He is an associate, McKinsey and
8  company U.S.
9      Q.  Trembler?
10     A.  She is a business analyst, McKinsey
11  & Company U.S.
12     Q.  Sharma?
13     A.  She is -- I don't know her specific
14  title, she is borrowed from, if we can
15  reference the second declaration, we
16  disclosed the names of the affiliates that
17  are not McKinsey & Company U.S. and she is
18  the one from India.
19     Q.  Basa?
20     A.  Basar.
21     Q.  Basar.
22     A.  He is an implementation leader,
23  McKinsey and company U.S.
24     Q.  Su?
25     A.  He is a business analyst and again

Page 87

Hojnacki
1      Hojnacki
2  if we reference the paragraph in the
3  supplemental declaration, he is borrowed from
4  the Canadian affiliate and is -- he is
5  providing services to mines in Canada
6  currently.
7      Q.  Dunne?
8      A.  Rob Dunne, he is an associate,
9  McKinsey & Company U.S.
10     Q.  Maravich?
11     A.  He is an implementation leader
12  McKinsey & Company U.S.
13     Q.  And Ben Yura?
14     A.  He is a business analyst, McKinsey
15  & Company U.S.
16     Q.  Let's mark your supplemental, first
17  supplemental declaration as Hojnacki 4?
18        (Hojnacki Exhibit 4 First
19     supplemental declaration marked for
20     identification.)
21     Q.  Just leave three there and just
22  confirm that's a copy of your supplemental
23  declaration.
24     Is it?
25     A.  Yes.

Page 88

Hojnacki
1      Hojnacki
2      Q.  If you can look at paragraph 4
3  there.  I just want to take a look at the
4  affiliates you have been referencing in your
5  answers to make sure we are talking about the
6  same thing.
7      A.  Is there -- what's the question?
8      Q.  The question is, are those -- those
9  are the affiliates you were talking about
10  earlier in your answer, correct?
11     A.  When I referred to --
12     Q.  The Canadian --
13     A.  Taru Sharma, she is borrowed from
14  the entity know as McKinsey Knowledge Center
15  India Private Limited and Henry Su is
16  borrowed from the affiliate McKinsey &
17  Company Canada, McKinsey e'Campion Canada.
18     Q.  So are these the only three
19  affiliates from which team members have been
20  borrowed?
21     A.  To the best of my knowledge, yes.
22     Q.  What led to disclosure of the
23  identities of these affiliates in your
24  supplemental declaration?
25     A.  This was in response to a question

Page 89

Hojnacki
1      Hojnacki
2  following the filing of the original
3  declaration from the U.S. Trustee and this
4  was intended to address that question that
5  had come in.
6      MS. GAY:  We apparently lost our
7     dial in.  We don't need to do anything,
8     we just need to pause for a second.
9      THE VIDEOGRAPHER:  The time is 9:51
10     a.m. and we are going off the record.
11     (Off the record.)
12     THE VIDEOGRAPHER:  This is the
13     start of media label No. 3.  The time
14     now is 9:53 a.m. we are back on the
15     record.
16     Q.  If you can look at paragraph 9 of
17  your supplemental declaration, Hojnacki 4.
18  The first line you say, Five new colleagues
19  were staffed on the service team since the
20  petition date, right?
21     A.  Yes.
22     Q.  And are those five people among the
23  ones you've listed for me already?
24     A.  I believe some of them are.  I
25  recall that the service team includes



Page 90

1          Hojnacki
2    members, officers and directors and employees
3    of McKinsey RTS more broadly, even if they
4    are not serving the debtor, so there were I
5    believe two individuals who joined McKinsey
6    RTS during that time and got added to the
7    service team.
8        Q.   Who are they?
9        A.   I don't recall both.  I know one is
10   an individual named Radika Roy, Radika Ray,
11   excuse me.
12       Q.   You said there is another?
13       A.   Yes.
14       Q.   You don't remember their name?
15       A.   I don't.
16       Q.   The three others are among the list
17   you already gave me, is that fair?
18       A.   Yes.
19       Q.   Ms. Ray, who does she work for?
20       A.   McKinsey RTS U.S.
21       Q.   These five new colleagues, were
22   they added to the team before or after your
23   first declaration, Hojnacki 3?
24       A.   I don't recall the exact timing of
25   when they joined the service team.

Page 91

1          Hojnacki
2        Q.   Has RTS disclosed all of RTS's
3    connections to interested parties or only
4    connections of RTS employees working on the
5    Westmoreland team?
6        A.   The service team includes all
7    officers, directors and employees of McKinsey
8    RTS U.S. and between the original declaration
9    and the supplemental declaration, all
10   connections on the interested parties list
11   with the service team have been disclosed,
12   with the exception of certain limitations
13   that are defined in the declaration.
14       Q.   But if you borrow a professional
15   for the service team from an affiliate
16   outside RTS, do you disclose all the
17   connections of that affiliate or just the
18   connects of the individual?
19       A.   The connections of the individual
20   on the service team.
21       Q.   And is it your belief that that
22   complies with Rule 2014A of Bankruptcy Rules?
23       A.   It's my understanding from
24   conversation with counsel that the process
25   that we go through in preparation of these

Page 92

1          Hojnacki
2    declarations, one was, you know, approved by
3    the U.S. Trustee in advance of the filing of
4    their objection and is consistent with the
5    application of 2014.
6        Q.   Have you had a conversation with
7    counsel about the legality of disclosing only
8    the connections of service team members from
9    outside RTS as opposed to the connections of
10   the entity they come from, generally?
11       A.   I'm not a lawyer, so I can't opine
12   on the legality of any matters.
13       Q.   I'm just asking if you had a
14   conversation with counsel about that issue.
15       A.   We've had counsels and I'm
16   comfortable that based on their guidance that
17   what we have done here is consistent with the
18   application of 2014.
19       Q.   I'm saying, have you had a
20   specific conversation with counsel about this
21   issue?
22       A.   About which issue.
23       Q.   The issue of whether it's
24   appropriate to limit disclosures for service
25   team members added from outside of RTS,

Page 93

1          Hojnacki
2    whether it's appropriate to limit disclosures
3    just to their connections as opposed to the
4    connections of the affiliate they come from?
5          MS. GAY:  Objection to the form.
6    Misstates what she testified to.
7        A.   Again, I'm not a lawyer so I can't
8    speak to the bounds of 2014 and the outer
9    limits of 2014, but I had conversations that
10   the approach that we followed here was,
11   again, approved by the U.S. Trustee and was
12   consistent with the application of 2014.
13       Q.   And just to be clear, the approach
14   that we are talking about here is if RTS
15   borrows a service team member from outside of
16   RTS, the connections that are going to be
17   disclosed as to that individual are that
18   individual's connections, not that of the
19   affiliate they came from, is that correct?
20       A.   So again we can go through the
21   different paragraphs of how it's described in
22   the approach but any connection of the
23   service team with the party on the interested
24   parties list is disclosed.  We also through
25   various, the survey methods that you are



Page 94

Hojnacki

1          Hojnacki
2  referring to previously, we survey partners
3  of McKinsey & Company U.S. and all affiliates
4  globally, even if we don't borrow affiliates
5  consultants from them to identify whether any
6  of their clients have any direct commercial
7  relationship with the debtors.  We also
8  through the client global database identify
9  any clients that are on the interested
10 parties list that have -- that we've
11 previously served, we reach out to the
12 partners that's responsible -- the partners
13 responsible for those relationships and
14 inquire whether or not those relationships
15 have a direct commercial relationship and
16 that's done globally across all affiliates
17 that provide consultants, even if we don't
18 borrow the consultant from them.
19     Q.  If you borrow a consultant from
20 McKinsey & Company U.S., do you disclose all
21 the connections of McKinsey & Company U.S.?
22     A.  Say that again.
23     Q.  If you borrow a team member from
24 McKinsey & Company U.S., do you disclose all
25 the connections to interested parties of

Page 95

Hojnacki

1          Hojnacki
2  McKinsey & Company U.S.?
3     A.  If we borrow somebody from McKinsey
4  & Company U.S., that individual becomes a
5  member of the service team, we disclose the
6  connections of that individual.
7     Q.  Not McKinsey & Company U.S. as a
8  whole, fair?
9          MS. GAY:  Misstates his prior
10 testimony.  Tell him again.
11     A.  I think I stated exactly what we
12 do.
13     Q.  State it again.
14     A.  We borrow a consultant from any
15 affiliate, whether McKinsey & Company U.S. or
16 the others or any affiliate globally that
17 provides consulting services and that member
18 becomes part of the service team.
19     Q.  Yes.
20     A.  Any connection of those individuals
21 that are part of the service team are
22 disclosed.
23     Q.  Right.  But not all the connections
24 of the affiliate they come from, is that
25 right?

Page 96

Hojnacki

1          Hojnacki
2     A.  The second set we do is we search,
3  we do a survey of all partners globally of
4  any affiliate and identify whether any or not
5  any of the clients that they are serving have
6  a direct commercial relationship with the
7  debtors and those are disclosed.
8     Q.  Let me ask you one more time.  If
9  RTS borrows a service team member from
10 McKinsey & Company Inc., U.S. Inc., you
11 disclose the connections of that individual
12 to the interested parties, correct?
13     A.  If we borrow a member from any
14 affiliate and they become a member of the
15 service team, we search and we disclose those
16 connections of the individual.
17     Q.  Assuming that individual came from
18 McKinsey & Company U.S. Inc., you do not
19 further then disclose all the connections of
20 McKinsey & Company U.S. Inc. to the
21 interested parties, correct?
22     A.  Unless there is a direct commercial
23 relationship.  If there is a direct
24 commercial relationship between an entity on
25 the interested parties list that's -- that is

Page 97

Hojnacki

1          Hojnacki
2  a client of an affiliate, we do disclose
3  those.
4     Q.  Let's look at paragraph 14 of
5  Hojnacki 3, your original declaration.
6     A.  Paragraph 14?
7     Q.  Paragraph 14, correct.
8          Have any services been provided by
9  McKinsey beyond those listed in paragraph 14?
10     A.  As it relates to the engagement
11 letter that governs the retention, our
12 retention in these cases.
13     Q.  To the debtor, have you provided
14 any services beyond what's listed in 14?
15     A.  These are the services that are
16 consistent with the scope of services that
17 are in the engagement letter that was signed
18 -- referred to as the engagement letter in
19 this declaration.
20     Q.  Have you done anything else?
21     A.  I think this summarizes the support
22 that we provided.
23     Q.  Has RTS been involved in
24 structuring the sale of Westmoreland's
25 assets?



Page 98

Hojnacki

1           Hojnacki
2     A.   No.
3     Q.   Let's look at paragraph 30.
4           MS. GAY:  Paragraph 30 of Exhibit
5     3.
6           MR. PETRELLA:  Correct.  Hojnacki
7     3.
8     Q.   The first line of 30 you talk about
9     RTS U.S. and its consulting affiliates,
10    right?
11          Do you see it?
12    A.   Yes.
13    Q.   Who are the consulting affiliates
14    of RTS U.S.?
15    A.   Is your question who is a
16    consulting affiliate of McKinsey RTS U.S.?
17    Q.   You say McKinsey RTS U.S. and its
18    affiliates.
19          Do you see that?
20    A.   Yes.
21    Q.   I'm focusing on the four words and
22    its consulting affiliates, I want to know who
23    those affiliates are?
24    A.   I can't name every affiliate of --
25    every consulting affiliate of McKinsey RTS

Page 99

Hojnacki

1           Hojnacki
2     U.S.
3     Q.   How many are there?
4     A.   I don't know off the top of my
5     head.
6     Q.   Is it every other McKinsey entity?
7     A.   Those that provide consulting --
8     that are consulting affiliates.
9     Q.   How many McKinsey RTS affiliates
10    are there that do not provide consulting
11    services?
12    A.   I don't know entirely.  I do know
13    we make reference to one specifically in this
14    document.
15    Q.   Which one is that?
16    A.   MIO partners.
17    Q.   As you sit here now, can you think
18    of any other RTS U.S. affiliates that do not
19    provide consulting services other than MIO?
20    A.   Not off the top of my head, no.
21    Q.   Can you estimate for me how many
22    there are?
23    A.   No, I don't know.
24    Q.   Do you think MIO is the only one?
25    A.   I don't know.

Page 100

Hojnacki

1           Hojnacki
2     Q.   Can you estimate for me how many
3     consulting affiliates there are to RTS U.S.?
4     A.   I don't know how many consulting
5     affiliates there are.
6     Q.   Do you think there are 1000?
7     A.   I couldn't speculate.
8     Q.   You couldn't even narrow it to like
9     100, 200, 300, something like that?
10    A.   No.
11    Q.   And you say in paragraph 30 that
12    RTS and its consulting affiliates serve
13    companies with competing interests, right?
14    A.   We have a policy of serving
15    companies with competing -- serving competing
16    companies.
17    Q.   So that's something that happens
18    all the time, correct?
19    A.   I can't speak to your definition of
20    all the time but we certainly have a policy
21    of doing it.
22    Q.   And that's a policy of
23    longstanding, correct?
24    A.   It's a longstanding policy.
25    Q.   If you go further down in paragraph

Page 101

Hojnacki

1           Hojnacki
2     30 here, you say because of its practice of
3     serving clients with overlapping or competing
4     interests, these consulting affiliates do not
5     have in place any centralized conflicts
6     identification process.  And it goes on.
7           Do you see that?
8     A.   Yes.
9     Q.   What is it about the global client
10    database in your mind that disqualifies it as
11    a centralized conflict identification
12    process?
13    A.   Would you ask your question again.
14    Q.   Let me kind of rephrase it.
15          You have a global client database,
16    right?
17    A.   We have a global -- yes.
18    Q.   In this paragraph, you are saying,
19    we don't have in place or the consulting
20    affiliates do not have in place any
21    centralized conflicts identification process.
22          Do you see that?
23    A.   Yes.
24    Q.   My question is, why isn't that
25    global client database your centralized



1             Hojnacki
2   conflicts identification process?
3       A.   Because it doesn't keep track of
4   inner connections between various parties
5   that are associated with any name that's
6   included in the global clients database.
7       Q.   You also say in paragraph 30 that
8   the global database is primarily for
9   recordkeeping purposes.
10          Do you see that?
11      A.   Yes.
12      Q.   What is the global client database
13  used for other than searching for connections
14  in Chapter 11 cases?
15      A.   I can't speak to all of the uses of
16  the global client database.
17      Q.   Give me one, other than searching
18  for connections, obviously.
19      A.   Maintaining a record of the clients
20  that we serve over time.
21      Q.   That's kind of a description of the
22  database itself.  What else --
23          MS. GAY:  Objection to the form.
24      Q.   How is it -- what other uses does
25  it have?

1             Hojnacki
2       A.   I can't speak to them.
3       Q.   Let's look at paragraph 31, right
4   below it.
5           Actually take a look at Hojnacki 2
6   if you would.  If you turn to the first page,
7   there is a reference to, in the first
8   paragraph of the letter, there is a reference
9   to July 17, 2018.
10          Do you see that?
11      A.   Yes.
12      Q.   What does that date represent?
13      A.   July 17, 2018 is the date that we
14  commenced our services for Westmoreland Coal
15  Company.
16      Q.   And it says here that the agreement
17  that we are looking at supersedes an earlier
18  agreement that's dated July 17, 2018.
19          Do you see that?
20      A.   Yes.
21      Q.   And what entity was that agreement
22  with?
23      A.   The prepetition agreement?
24      Q.   Pardon me.
25      A.   The prepetition agreement?

1             Hojnacki
2       Q.   Correct.
3       A.   Which entity of --
4       Q.   McKinsey.
5       A.   McKinsey RTS U.S.
6       Q.   So that prepetition agreement was
7   also with RTS?
8       A.   Yes.
9       Q.   Was there any prepetition work done
10  prior to July 17th of this year?
11      A.   No.
12      Q.   As of July 17th, is it fair to say
13  McKinsey knew that Westmoreland was likely
14  headed for bankruptcy?
15      A.   We were aware that they were in
16  discussions with their first lien lender
17  group about resolution of the capital
18  structure issue and that Chapter 11 was a
19  potential outcome.
20      Q.   At that point did you start looking
21  for connections to interested parties?
22      A.   I can't speak to the exact date
23  that we began looking for interested parties.
24      Q.   So you don't know?
25      A.   I can't speak to it, no.

1             Hojnacki
2       Q.   At what point does RTS decide
3   whether it has a disqualifying conflict in
4   the case?
5       A.   Can you state your question again.
6       Q.   Sure at what point in the process;
7   is it prepetition, post petition; at what
8   point does RTS decide whether it has a
9   disqualifying conflict in the case?
10      A.   I don't know if there is a standard
11  point in time in any case.
12      Q.   To your knowledge, has RTS or
13  McKinsey & Company ever determined that it
14  has a disqualifying conflict in the Chapter
15  11 case?
16      A.   Can you ask your question again.
17      Q.   Sure.  To your knowledge, has
18  McKinsey or RTS ever turned down a Chapter 11
19  assignment as a professional because they
20  believed they had a disqualifying conflict?
21      A.   I can't speak to that.
22      Q.   You don't know?
23      A.   I can't speak to it.
24      Q.   Can you -- what do you mean you
25  can't speak to it, you are not allowed to?

MAGNA ▶
LEGAL SERVICES

```
 1            Hojnacki
 2     A.  I am not aware.
 3     Q.  You don't know, you don't know,
 4  yes?
 5     A.  I'm not aware of any situations
 6  where we turned down a case.
 7     Q.  Can you imagine any scenario in
 8  which RTS or McKinsey might determine that
 9  they have a disqualifying conflict in a case?
10     A.  Can you ask your question again.
11     Q.  Sure.
12         Can you imagine any scenario in
13  which RTS might determine that it has a
14  disqualifying conflict in a case?
15     MS. GAY:  Objection to the form.
16     A.  If we had a conflict that was
17  identified through our search process which
18  we determined would prohibit us from
19  providing the best possible services or the
20  services outlined under the terms of our
21  agreement to the debtors.
22     Q.  What kind of conflict might that
23  be?
24     A.  I can't speculate.
25     Q.  You can't give me a concrete
```

```
 1            Hojnacki
 2  example of the type of relationship that
 3  might cause McKinsey to say, look we just
 4  can't engage in this project?
 5     A.  No.
 6     Q.  The petition in Westmoreland was
 7  filed on October 9, 2018, correct?
 8     A.  Yes.
 9     Q.  And the application to hire
10  McKinsey was filed on November 8, right?
11     A.  I don't have the date in front of
12  me, but I'm sure the docket would show --
13     Q.  Just to help you out, on Hojnacki 3
14  at the top of the page, you see there a
15  legend there from the filing with the court
16  system.
17     A.  Okay.
18     Q.  Can you see November 8th?
19     A.  Yes.
20     Q.  Your declaration was part of that
21  application, is that right?
22     A.  Yes.
23     Q.  So according to paragraph 31, I
24  believe of your declaration, you got an
25  initial list of interested parties on October
```

```
 1            Hojnacki
 2  16, 2018, correct?
 3     A.  Paragraph 31?
 4     Q.  Yes.
 5     MS. GAY:  Of Exhibit 3.
 6     MR. PETRELLA:  Of Exhibit 3.
 7     A.  Yes.
 8     Q.  And that list is represented in
 9  Schedule I to your declaration here, correct,
10  Hojnacki 3?
11     A.  Yes.  I'm just confirming which is
12  one and which was Schedule II.
13     Q.  You got that list about three weeks
14  before your application, fair?
15     A.  We received it on October 16.
16     Q.  Which is a little over three weeks
17  before the application, right?
18     A.  Yes.
19     Q.  Who did you get the list from?
20     A.  We received it from debtors'
21  counsel, Kirkland & Ellis.
22     Q.  So at that point on October 16,
23  2018, how many people were assigned to search
24  for connections to interested parties at that
25  point?
```

```
 1            Hojnacki
 2     A.  I can't say.  I don't do the
 3  searches myself.  It was all directed by the
 4  McKinsey legal department.
 5     Q.  You don't know how many people are
 6  assigned on a full-time base to search for
 7  those connections?
 8     A.  No, I don't.
 9     Q.  The people who are engaged in that
10  effort, do they log their hours?
11     A.  No, not that I am aware of.
12     Q.  But certainly RTS understood that
13  this was an important process and they
14  treated it as a priority, is that right?
15     A.  Absolutely.
16     Q.  So later you got another list,
17  right, according to 31?
18     A.  Yes.
19     Q.  And that list is represented in
20  Schedule II to your declaration, fair?
21     A.  Correct.
22     Q.  And you say you also got that from
23  Kirkland & Ellis?
24     A.  Yes, we did.
25     Q.  When did you get that list?
```



Hojnacki
1    Hojnacki
2    A.   I don't recall the specific date
3    but it would have been, it was right after
4    Kirkland & Ellis filed their retention
5    application.
6    Q.   So whatever the date is on Kirkland
7    & Ellis' disclosure declaration, it would
8    have been right around that time?
9    A.   Yes.
10   Q.   And according to paragraph 31, the
11   second list had --
12   A.   Just --
13   Q.   If you want to correct something,
14   go ahead.
15   A.   Just to be clear, it was after, not
16   around that date, it was after the date.
17   Q.   So Kirkland filed their disclosures
18   and then gave you the second list?
19   A.   That's my understanding, yes.
20   Q.   So according to 31, that second
21   list contained about 230 new entities?
22   A.   Correct.
23   Q.   And do you know why there was a lag
24   between the first list and the second list?
25   A.   I don't know.

1    Hojnacki
2    Q.   When did the process of searching
3    for those additional 230 entities start?
4    A.   I don't know.
5    Q.   Do you recall approximately how far
6    after Kirkland filed their disclosure
7    declarations that they provided you with the
8    second list?
9    A.   No, I don't.
10   Q.   You can't remember if it was a
11   week, was it a day, a month?
12   A.   I don't know.
13   Q.   You just don't know, okay.
14       Hojnacki 3, your original
15   declaration, that is complete as to Schedule
16   I, is that fair?
17   A.   Yes.   Declaration one is complete
18   as -- including Schedule I, again with the
19   exceptions noted in a supplemental paragraph
20   here.   It also notes the intention of filing
21   a supplemental declaration in the future.
22   Q.   But it says that the supplemental
23   declaration is going to cover Schedule II,
24   right?
25   A.   It says that the -- yes, the

1    Hojnacki
2    supplemental declaration will include the
3    connections of those additional entries to
4    the extent that they're required.
5    Q.   So with respect to Schedule I only,
6    your first declaration, Hojnacki 3 is
7    complete as to Schedule I, is that fair?
8    A.   Can you define what you mean by
9    complete.
10   Q.   All the connections you believe you
11   needed to make as to the people and entities
12   on Schedule I are made in this declaration.
13   A.   We used Schedule I to follow the
14   process that we included in this declaration
15   and made the disclosures based on that.
16   Q.   And in your mind, you had made
17   complete disclosures as to Schedule I as of
18   the filing of this first declaration,
19   correct?
20   A.   Yes, but again, we recognized the
21   fact there was additional names that we still
22   had to search and we were clear about doing
23   that and we also noted certain exceptions to
24   Schedule I in a supplemental paragraph here
25   that weren't included in those disclosures.

1    Hojnacki
2    Q.   What is that supplemental paragraph
3    that you are referring to?
4    A.   I believe it's 33.   So we excluded
5    24 intercompany entities which was consistent
6    with the approach that Kirkland had used.   We
7    did not search employees, some individual
8    employees of the debtors and then there is
9    some reference to the category of vendors and
10   the level in which we had gone down to at
11   that time, the level of annual spend.
12   Q.   So with the exception of the
13   exceptions you just pointed out in 33, your
14   view is, when you filed your first
15   declaration, your disclosures were complete
16   as to Schedule I only, is that fair?
17   A.   With the exception of the
18   exceptions and the exceptions of the
19   acknowledgment that there were other entities
20   that we had received, it was complete.
21   Q.   Those were on Schedule II.   I'm
22   only asking about Schedule I.
23   A.   Yes.
24   Q.   You are aware that there are
25   connections to interested parties disclosed

MAGNA
LEGAL SERVICES

1            Hojnacki
2  for the first time in your supplemental
3  declaration even though those interested
4  parties were listed on Schedule I, is that
5  right?
6        A.  Yes, that's possible.
7        Q.  And give me the reasons why that's
8  possible?
9        A.  Well as I mentioned, we had new
10  members that were added to the service team
11  with the filing of the supplemental
12  declaration and those people that were added
13  to the service team were required to review
14  both the Schedule I list of interested
15  parties and the Schedule II list of
16  interested parties.  So to the extent we
17  identified a connection with anyone of those
18  service members to somebody on Schedule I, we
19  filed that with the supplemental declaration.
20        Q.  Any other reasons that you are
21  aware of why that might happen?
22        A.  No.
23        Q.  So any instance in which I see a
24  disclosure of a connection in your
25  supplemental declaration that relates to an

1            Hojnacki
2  interested party on Schedule I, that factor
3  is the explanation of the additional service
4  team member, is that fair?
5        A.  As I recall right now, yes.
6        Q.  I think we already discussed, you
7  signed the disclosure declarations in Sun
8  Edison, correct?
9        A.  Yes.
10        Q.  In that case there was an amended
11  declaration and three supplements as well, do
12  you recall that?
13        MS. GAY:  I will restrict this
14        because at this point, you are getting
15        way far afield on the subject matter of
16        this particular deposition which are
17        these two declarations submitted in the
18        Westmoreland case, so I would not have
19        him answer those.
20        MR. PETRELLA:  Just to be clear, I
21        believe that particularly since No. 1,
22        the Sun Edison case is referenced in his
23        declaration as a qualification.  No. 2,
24        I believe these questions are
25        appropriate as to the basis of his

1            Hojnacki
2  fuller discussion of the different
3  procedures that are used to search but
4  if you are going to instruct him not to
5  answer, that's your prerogative.
6        MS. GAY:  I let him answer some
7        questions about Sun Edison in terms of
8        background to be fair to you, Mr.
9        Petrella.  I will not let him be asked
10        about his submissions in the Sun Edison
11        case when the specific purpose of this
12        deposition are his two submissions in
13        the Westmoreland case.
14        MR. PETRELLA:  In my view, this
15        does relate to the two submissions in
16        the Westmoreland case but I guess we
17        will have to agree to disagree on that.
18        Q.  Let's look at paragraph 32.  You
19  say in this paragraph that the global client
20  database covers RTS and all affiliates that
21  provide consulting services, right?
22        A.  This is Exhibit 3?
23        Q.  Right.  Hojnacki 3.  Correct.
24        Paragraph 32 if you got it.
25        A.  Yes.  Yes to having it.  Can you

1            Hojnacki
2  ask your question again.
3        Q.  There you talk about how the global
4  client database covers RTS and all affiliates
5  that provide consulting services, right?
6        A.  Yes.
7        Q.  If you look-back at 30, you use
8  similar language but not quite the same, you
9  use the language RTS and its consulting
10  affiliates and my question is really, is
11  there any reason for the change in
12  terminology?
13        MS. GAY:  I will object to the
14        form.  You can answer if you understand
15        it.
16        A.  I am not aware.
17        Q.  You don't know whether that change
18  in terminology is significant in any way?
19        A.  I do not know.
20        Q.  The global client database includes
21  all affiliates of RTS that provide consulting
22  services, right?
23        A.  Yes.
24        Q.  And you've already testified that
25  those, the number of those affiliates is too

**MAGNA**
LEGAL SERVICES

1              Hojnacki
2  large really to list for me, is that right?
3       A.  I don't think that's exactly what I
4  said.  I said I don't know exactly how many
5  it is.
6       Q.  Certainly you are not able to list
7  them all?
8       A.  No.
9       Q.  And you are not able to estimate
10  how many there are either, is that fair?
11       A.  I don't know how many there are.
12       Q.  But you know there is a large
13  number of them, right?
14       A.  I know that I don't know them.
15       Q.  The affiliates of RTS U.S. include
16  McKinsey & Company Inc.?
17       A.  Sorry.  Ask the names of the
18  entities again.
19       Q.  Sure.  Do the affiliates of RTS
20  that provide consulting services include
21  McKinsey & Company Inc.?
22       A.  I'm trying to refresh myself on the
23  order of the legal entity chart.  I don't
24  know.
25       Q.  Do the consulting affiliates of

1              Hojnacki
2  McKinsey RTS U.S. include McKinsey & Company
3  Inc. U.S.?
4       A.  The affiliates -- are you
5  referencing a specific paragraph in one of
6  declarations that I can refer to?
7       Q.  32 we were on.
8          Again, it says McKinsey RTS U.S.
9  and all affiliates that provide consulting
10  services.
11          Do you see that?
12       A.  Yes.
13       Q.  You said you don't know whether one
14  of those affiliates is McKinsey & Company
15  Inc.
16          Now I'm asking you, is one of those
17  affiliates McKinsey & Company Inc. U.S.?
18       A.  Yes.  I believe we state in here
19  the entities, I think it's actually on the
20  second declaration, the entities that we
21  borrow from.
22       Q.  That you borrow from.
23          Are you saying the global client
24  database only includes the entities you
25  borrowed from in this particular case?

1              Hojnacki
2       A.  No.
3       Q.  Let's go back to 32 because maybe
4  we are getting some crossed signals here.
5          You say that you searched the
6  global client database.
7          Do you see that?
8       A.  Uh-huh.
9       Q.  Which covers clients of McKinsey
10  RTS U.S. and all affiliates that provide
11  consulting services, right?
12       A.  Yes.
13       Q.  So what we are talking about is the
14  composition of the global client database
15  here, right?
16       A.  Yes.
17       Q.  So focusing just on that language
18  there and all affiliates that provide
19  consulting services.  My question is, is one
20  of those affiliates McKinsey & Company Inc.
21  U.S.?
22       A.  To the extent McKinsey & Company
23  U.S. provides consulting services.
24       Q.  So your language here in 32, this
25  language, and all affiliates that provide

1              Hojnacki
2  consulting services, as you sit here today,
3  you really don't know what those affiliates
4  are, fair?
5       A.  That provide consulting services?
6       Q.  Yes.
7       A.  I don't know every entity of
8  McKinsey that provides consulting services.
9       Q.  And you don't know whether one of
10  them is McKinsey & Company Inc., right?
11       A.  So I'm trying not to like not
12  answer the question.  I think we were clear
13  in here, the legal entity structure of the
14  different entities and where we borrowed the
15  consultants from.
16       Q.  I'm not talking about where you
17  borrowed consultants from.  I'm asking about
18  who was in that group in 32, the affiliates
19  that provide consulting services, and all I'm
20  asking is one member of that group McKinsey &
21  Company Inc. U.S.?
22       A.  I don't know.
23       Q.  You also don't know whether one
24  member of that group is McKinsey and company
25  Inc., fair?

MAGNA
LEGAL SERVICES

Hojnacki

1
2     A.   I don't know.
3     Q.   I believe you testified earlier
4  that the only entity that you can think of
5  that is excluded from this group, by this
6  group, I mean all affiliates that provide
7  consulting services is MIO, is that right?
8     A.   Certainly MIO is not an entity that
9  provides consulting services.
10    Q.   In 32, you also say there was a
11 review of the billing records of the service
12 team?
13    A.   Correct.
14    Q.   And who did that?
15    A.   Specifically, I don't know.
16    Q.   Do you know how many people were
17 involved in that process?
18    A.   No.
19    Q.   Do you know how far back they
20 looked at the billing records?
21    A.   No.  I don't know how far they
22 reviewed billing records.  I know for
23 purposes of these declarations, we applied a
24 two-year look-back period.
25    Q.   So is your understanding of the

Hojnacki

1
2  process, that they take everybody who is on
3  the service team and they look at all their
4  billing records going back two years?
5     A.   That's my understanding, yes, as
6  one component of our process.
7     Q.   And when they're doing this review,
8  what are they looking for?
9     A.   Situations where members of the
10 service team served a party that's on the
11 interested parties list.
12    Q.   And another aspect of the process
13 at the very end of 32 is, you compiled and
14 reviewed the list of all clients identified
15 in McKinsey's financial records as clients of
16 McKinsey RTS U.S.
17       Do you see that?
18    A.   Yes.
19    Q.   Do you know who did that?
20    A.   I don't.
21    Q.   What financial records are you
22 referring to there?
23    A.   Just the financial records of the
24 clients that we serve.
25    Q.   Specifically though what financial

Hojnacki

1
2  records are you talking about?
3     A.   I don't know.  I didn't do the
4  review.
5     Q.   In what way do those records
6  identify which are clients of RTS?
7     A.   McKinsey RTS maintains its own
8  books and records, so we know which clients
9  are actually part of the books and records of
10 McKinsey RTS U.S.
11    Q.   Let's look at paragraph 34.  And
12 focusing on, there is kind of four
13 subsections of 34, A through D.
14       Do you see that?
15    A.   Yes.
16    Q.   Let's focus first on subpart A, all
17 right?
18    A.   Uh-huh.
19    Q.   What this says, this deals with an
20 email survey that was done to search for
21 connections, right?
22    A.   Correct.
23    Q.   When did that email survey process
24 begin for Westmoreland?
25    A.   When you say begin?

Hojnacki

1
2     Q.   When did they start sending out
3  emails?
4     A.   I don't recall off the top of my
5  head.
6     Q.   Who was in charge of this email
7  survey process?
8     A.   The team in the McKinsey legal
9  department that supports the preparation of
10 the declaration.
11    Q.   Is it your understanding that
12 Laurie Basch was primarily responsible for
13 that process for this case?
14    A.   She is certainly involved, yes.
15    Q.   But in terms of anyone she reports
16 to that might have been ultimately
17 responsible other than Ms. Molino, do you
18 know who that might be?
19    A.   No.
20    Q.   Do you know whether Ms. Molino has
21 any involvement in the email survey process?
22    A.   I don't know.
23    Q.   So looking at the four categories,
24 you have A, B, C and D, is there a single
25 form email for all four categories or are

Page 126

1              Hojnacki
2  there different emails for different
3  categories?
4        A.  There are different emails for
5  different categories.  And one just point of
6  clarification.  The surveying is done via an
7  online surveying tool.  It's distributed to
8  people by email.
9        Q.  So in other words, the relevant
10  people get an email that says please take
11  this survey?
12       A.  Correct.
13       Q.  And they have to click on a link
14  and it takes them to some internal or
15  external website?
16       A.  Yes.
17       Q.  I believe you said somewhere in
18  here or McKinsey said in this case that this
19  survey went to roughly 2000 partners at
20  McKinsey consulting affiliates worldwide,
21  does that sound right?
22       A.  Specifically I believe it's -- let
23  me see if I can quickly reference the letter,
24  one of the surveys sent is to all partners
25  globally which is the roughly 2000 member

Page 127

1              Hojnacki
2  that you are making reference to.  All
3  partners globally, regardless of whether or
4  not we borrow a consultant from that entity.
5        Q.  The survey is only sent to
6  partners, is that fair?
7        A.  The survey is sent to partners for
8  -- that specific survey.  There are other
9  surveys, again, we can go through them in
10  detail if you want to understand the
11  specifics, that don't just survey partners.
12       Q.  Of A, B, C and D, which ones are
13  sent to more than just partners?
14       A.  So A is a survey that is sent to
15  the service team, that includes more than
16  just partners.
17       Q.  Okay.
18       A.  B includes members of the service
19  team which is more than just partners but
20  also partners.  C is just partners and D is
21  all employees of McKinsey RTS and its
22  affiliates globally regardless of whether
23  they are a partner or an administrative staff
24  member.
25       Q.  Are all these survey emails sent

Page 128

1              Hojnacki
2  out by Ms. Basch or is there kind of -- is
3  there an anonymous sender that sends these?
4        A.  What do you mean by an anonymous
5  sender?
6        Q.  A name that's not a human name,
7  just a group name or administrator name or
8  something like that?
9            MS. GAY:  Objection to the form.
10  You can answer if you know.
11       A.  I don't recall the specific
12  mechanism for sending it.
13       Q.  You received this survey, right?
14       A.  Yes.
15       Q.  Do you remember who sent it to you?
16       A.  I don't recall right now.
17       Q.  Are all the responses to the
18  surveys retained?
19       A.  I don't have a record of them.
20       Q.  But are they retained?
21       A.  I don't know.
22       Q.  Was the response rate of the
23  surveys for categories A through D 100
24  percent?
25       A.  I don't know for every category in

Page 129

1              Hojnacki
2  A through D.  I know for No. 1 that it's a
3  required 100 percent response rate.
4        Q.  It's required, but was it in fact
5  100 percent?
6        A.  I don't know.
7        Q.  Is there a process for making sure
8  that everybody responds to the survey?
9        A.  Everybody in survey A or everybody
10  in every survey?
11       Q.  Everybody in every survey.
12       A.  There is a fairly meticulous
13  follow-up process.
14       Q.  Tell me about that.
15       A.  It involves following up via email
16  to get everybody to respond.
17       Q.  So if employee A gets a survey
18  email and X amount of time passes they will
19  then get another email saying please fill out
20  your survey?
21       A.  Yes.
22       Q.  What if that employee receives
23  multiple follow-up ones and still doesn't
24  fill out the survey?
25       A.  For which?

MAGNA
LEGAL SERVICES

1          Hojnacki
2     Q.   Any of them.
3     A.   I don't know.
4     Q.   Does someone from HR or someone
5  else go to that employee directly and say you
6  need to fill this out?
7     A.   I don't know.
8     Q.   Do you know who would know the
9  response rate to these surveys?
10    A.   I don't know.  Ms. Basch I would
11  believe would.
12    Q.   This online survey, how many pages
13  is it?
14    A.   They are all different surveys so I
15  can't speak to each one but there are
16  different questions -- several questions that
17  are asked.
18    Q.   Which of these four categories did
19  you receive?
20    A.   Item A.  I am a member of the
21  service team.
22    Q.   Let me withdraw that question and
23  ask you another one because it might be
24  easier this way.
25        Are there four different surveys

1  for each category?  Withdrawn.
2        Is there a different survey for
3  each of the four categories?
4     A.   Different groups of people receive
5  different surveys, but -- receive different
6  questions, so if you are a member of the
7  service team which I am, there was a set of
8  questions associated with survey A and survey
9  B that would have been included in a single
10  survey.
11    Q.   You lost me a little bit on that
12  last answer.  Is there a distinct survey for
13  each of categories A, B, C and D?
14    A.   There is different questions that
15  are asked of different parties based on the
16  information that is being discussed here in
17  each of these.
18    Q.   Does everyone get the same survey
19  except some people are only asked to fill out
20  one part and other people are asked to fill
21  out another part?
22    A.   If one of the questions that's
23  asked doesn't relate to you, you don't get
24  the question.

1          Hojnacki
2     Q.   But everyone gets the same survey?
3     A.   I'm not sure what you mean by
4  survey.
5     Q.   You said there was a link, right,
6  to the survey?
7     A.   Correct.
8     Q.   You click on the link, the survey
9  pops up, right?
10    A.   Yes.
11    Q.   The survey that pops up, is that
12  the the same for every person in categories A
13  through D?
14    A.   No.
15    Q.   So some people's surveys look
16  different than other peoples?
17    A.   Yes, they get different questions.
18    Q.   Does each category get different
19  questions?
20    A.   What do you mean by category?
21    Q.   A, B, C, D.  In other words, is
22  there one survey for B and D and another
23  survey for A and C, or is there one survey
24  for A, one for B, one for C and one for D or
25  something different?

1          Hojnacki
2     A.   Maybe just for my own benefit,
3  should we go through each of these to talk
4  about like the information that's, you know,
5  trying to be identified in each of these
6  surveys.
7     Q.   I don't think we need to do that.
8  I want to know whether the survey is the same
9  or not for any one or more of these
10  categories?
11    A.   I don't know.  Again, I want to
12  make sure I'm understanding the question
13  correctly because you asked me is the survey
14  the same and I believe I answered that there
15  are different questions that are asked of
16  each group that's being surveyed based on
17  what we are trying to get at.
18    Q.   Which of these four groups are you
19  a member?
20    A.   So I am a member of the service
21  team.
22    Q.   That's A?
23    A.   That's A.  B, I'm member of the
24  service team and I'm partner at McKinsey &
25  Company U.S. and its affiliates globally.

Hojnacki
1
2    Q.   Yes.
3    A.   So, C, I don't recall that I was a
4  partner identified through the search of the
5  global client database bearing
6  responsibility, but I was asked about direct
7  commercial relationships to the debtor in B.
8  And then D, I am an employee of McKinsey RTS
9  U.S. and its affiliates globally.
10   Q.   You are in three of those four
11 categories?
12   A.   Yes.
13   Q.   But you got one survey?
14   A.   Yes.
15   Q.   You only had to fill out one?
16   A.   As I recall, yes.
17   Q.   Back to where all this started
18 before we went down the rabbit hole.
19       You click on the survey, it pops
20 up.  How many computer pages is the survey?
21   A.   It's an online survey, I didn't
22 print it.  It's probably four pages.
23   Q.   And what questions does it ask?
24   A.   I don't have -- I don't recall the
25 specific questions off the top of my head.

Hojnacki
1
2    Q.   Do you remember generally what any
3  of them were?
4    A.   Not to the specific wording.  The
5  nature is included and described in the
6  results of this declaration though.
7    Q.   Do you know if any partners
8  received the survey and then called either
9  you or someone in legal to talk about whether
10 something needed to be disclosed or not?
11   A.   I'm not aware.
12   Q.   Certainly no one called you and
13 said, hey Mark, I got this survey, I have a
14 question, I have this relationship, does this
15 count, does this not count, did nothing like
16 that happen?
17   A.   Nobody had those conversations with
18 me.  People did comment that they received
19 the survey and my response was, it must be
20 filled out.
21   Q.   How about, are you aware that
22 anyone in legal fielded a phone call like
23 that from a partner that was confused or
24 unsure as to whether something should be
25 disclosed or not?

Hojnacki
1
2    A.   I mean I wasn't there for any of
3  those phone calls but I understand that there
4  were -- people called and asked questions
5  about the survey.
6    Q.   And do you know how many people
7  called and asked questions?
8    A.   No, I don't.
9    Q.   And who dealt with those phone
10 calls?
11   A.   I don't know everybody, but I would
12 refer Ms. Basch.
13   Q.   Do the -- does the survey specify
14 the look-back date that you used in this
15 case, the October 1, 2016 date?
16   A.   Yes.
17   Q.   When the partners receive or --
18 withdrawn.
19       When the recipients receive this
20 survey, how is it that they go about
21 searching for responsive information?
22   A.   Can you be more specific about what
23 you mean.
24   Q.   Each of these categories is asked
25 for in some form, at least, work they've done

Hojnacki
1
2  in the past, right?
3    A.   Yes.
4    Q.   Are they supposed to derive that
5  information from memory or is there some sort
6  of set procedure to search?
7    A.   There is not directions given to
8  how to answer the questions.  There is
9  specificity to the questions and guidance or
10 details in the questions but it doesn't
11 provide them a protocol to follow.
12   Q.   So fair to say as to any individual
13 recipient of the survey, other than yourself
14 you don't know how they went about searching
15 for responsive information?
16   A.   No, I don't.
17   Q.   How often is the service team
18 survey updated?
19   A.   You are asking how often does the
20 service team receive a new survey?
21   Q.   Right -- withdrawn.
22       Is there one survey sent at the
23 beginning of the engagement and that's it or
24 is the survey sent out at the beginning and
25 another survey sent in another six months and

MAGNA
LEGAL SERVICES

1                Hojnacki
2  another one in another six months, something
3  like that?
4      A.   So I don't know specific rules but
5  any time we received an updated interested
6  parties list from the debtors or debtors
7  counsel and are preparing for a supplemental
8  declaration which we reserved the right to do
9  at times, we would run an update.
10     Q.   But these are surveys presumably
11  you received for years at McKinsey, is that
12  fair?
13         MS. GAY:  Objection to the form.
14     A.   I received them related to other
15  matters.
16     Q.   And you've received them the entire
17  time you were there, right, on a fairly
18  regular basis?
19     A.   Every time there is a survey sent,
20  because I am a member of RTS and a member of
21  any service team, I receive a survey.
22     Q.   The whole time you have been at
23  McKinsey, from time to time you have received
24  these surveys, right?
25     A.   Yes.

1                Hojnacki
2      Q.   In the course of that experience,
3  have you noticed that you received surveys
4  more than once for the same engagement?
5      A.   Yes.
6      Q.   As an engagement proceeds, work at
7  the firm continues, right, new matters are
8  added, new clients are added, is that right?
9      A.   The firm being?
10     Q.   McKinsey as a whole.
11     A.   Yes, McKinsey has new client
12  matters.
13     Q.   So do they update the survey as the
14  engagement proceeds to catch maybe new
15  clients that have been added in the interim,
16  new engagements that have been added in the
17  interim?
18     A.   Can you be clear on what you are
19  asking.
20     Q.   I think you already testified that,
21  to your knowledge, the only time the survey
22  is updated is when the interested parties
23  list is updated, is that fair?
24     A.   So we have, again, it comments in
25  here, there is steps that are in place to

1                Hojnacki
2  notify the partners that are surveyed and the
3  service team and we would do so again upon
4  being retained to notify us of any change in
5  whether or not a client relationship they
6  have becomes a direct commercial relationship
7  with the debtors or they begin service with
8  the party on the interested parties list to
9  the extent it's a member of the service team.
10     Q.   Let's say I am a partner and I
11  filled out my survey, right?
12     A.   Yes.
13     Q.   For the Westmoreland engagement and
14  let's say --
15     A.   You are a partner of McKinsey &
16  Company or McKinsey RTS?
17     Q.   Any McKinsey entity that receives
18  the survey.  And I fill out my survey and
19  then a month later into the engagement, I am
20  then working on a new matter.  I had
21  forgotten the survey, I'm working on a new
22  matter for a client that is an interested
23  party on the list.
24         Does anyone come to me as a partner
25  and say, hey look, I need you to update your

1                Hojnacki
2  response to this survey based on events that
3  happened since you filled out your survey?
4      A.   Are you a member of the service
5  team?  You have to be more specific about who
6  you are an what you are doing.
7      Q.   I am a relevant recipient of the
8  survey.
9          MS. GAY:  Objection to the form.
10     A.   Again, there are a couple of
11  different surveys and target audiences that
12  are referred to here so can you just specify
13  which one you are looking to understand.
14         MS. GAY:  Or go through each
15         category so we can do it in a way that
16         is clear for the record.  Up to you.
17     Q.   Is it true of any of these
18  categories?
19         MS. GAY:  Is what true?
20         MR. PETRELLA:  The question I asked.
21         MS. GAY:  I will object to the form
22         of the last three questions, I'm sorry
23         to do it but they are incredibly vague,
24         I apologize.
25     Q.   Let's focus on subsection B.  I am

1          Hojnacki
2    a partner at McKinsey RTS U.S. -- I'm a
3    partner of an affiliate of McKinsey RTS U.S..
4          Do you follow me so far?
5      A.   Yes.
6      Q.   And I got a survey at the beginning
7    of the engagement.
8      A.   Yes.
9      Q.   And I filled it out.
10         Are you with me so far?
11     A.   Yes.
12     Q.   And then a month passes and I start
13   working on another engagement for a new
14   client that's on the interested parties list.
15         Are you with me?
16     A.   Yes.
17     Q.   Does anyone come to me and say, hey
18   partner, we need you to update your response
19   to this survey based on things that have
20   happened since you first filled out your
21   survey?
22     A.   So we, like I said, we've notified
23   those partners and we will notify them again
24   upon getting retained that if any client
25   service that they have is for a client, has a

1          Hojnacki
2    direct commercial relationship with the
3    debtors, that they need to notify the office
4    of the general counsel.
5      Q.   Any time a new client comes in, you
6    send out a notice to all 2000 recipients and
7    you say, hey this new client is in here, you
8    need to update the survey if there is a
9    direct commercial relationship?
10     A.   I don't think that's what I said.
11     Q.   That's how I understood it, so
12   please try it again.
13     A.   I said that all the partners for
14   affiliates globally have been notified and
15   will be notified again upon actual retention
16   to notify the office of the general counsel
17   to the extent that any future client
18   relationships they have have a direct
19   commercial relationship with the debtors.
20         If it's a member of the service
21   team, right, which would include partners of
22   McKinsey RTS U.S., then it wouldn't just be
23   restricted to direct commercial
24   relationships.
25     Q.   Have partners called and after

1          Hojnacki
2    filling out a survey and said I've just been
3    retained by a new client and they are on the
4    interested party list in your case and you
5    need to update it, you need to update your
6    disclosures?
7      A.   If they have, they have been
8    disclosed, I am not aware of any other than
9    what's been disclosed.
10     Q.   Are you aware of that actually
11   happening, though?
12     A.   A partner calling, what
13   specifically?
14     Q.   A partner calling post filling out
15   the survey and saying I just got retained by
16   a new client, they are on your interested
17   parties list, you need to update your
18   disclosures.  Has that ever happened?
19         MS. GAY:  Objection to the form.
20   You can answer.
21     A.   Did the relationship have a direct
22   commercial relationship.
23     Q.   It's irrelevant to the question?
24         MS. GAY:  Then object to the form
25   because it's totally unclear.  You are

1          Hojnacki
2    melding categories, Mr. Petrella, all
3    over the place.
4          MR. PETRELLA:  I'm doing it on
5    purpose because it doesn't matter which
6    category.
7      Q.   All that matters is, I got a survey
8    from McKinsey and I got a new client that I'm
9    working on and all I'm asking you, has any
10   recipient of any email survey of the type
11   that you list here in 34, have they ever
12   called up after filling out the survey and
13   say I just got retained by a new client or
14   something different happened, something new
15   happened, I am on a new engagement, anything,
16   and said, you need to know about this, you
17   need to update your disclosures?
18         MS. GAY:  Objection to the form.
19     A.   Am I aware of any phone call that's
20   come in the general counsel's office that
21   relates to --
22     Q.   Any contact to anyone --
23         MS. GAY:  Let him finish the answer
24   please.
25         MR. PETRELLA:  It's not an answer,

1        Hojnacki
2   but go ahead.
3        MS. GAY:  What's the question,
4   there is no pending question, there is
5   just a speech.
6        MR. PETRELLA:  That's a question,
7   it's right there on the screen.
8   A.  I don't have a screen, I'm sorry.
9   Q.  Again, has any email -- I will try
10  it again.
11       Has any recipient of one of these
12  email surveys, anybody in any of these
13  categories A through D, have they ever called
14  up or contacted you or anyone on your team,
15  anyone in counsel's office, anyone at
16  McKinsey at all, have they ever contacted
17  them after filling out the survey and said to
18  them, I have just been engaged by a new
19  client, a new matter, something has happened
20  whatever it is, anything, I need to update
21  you on this and you need to update the
22  disclosures.
23       MS. GAY:  Are you asking with
24  respect to Westmoreland, Mr. Petrella.
25       MR. PETRELLA:  I'm asking this as

1        Hojnacki
2   to any Chapter 11 case.
3        MS. GAY:  Then he shouldn't answer.
4   This is about these two affidavits, so
5   can you clarify it and pin it to a
6   question about Westmoreland, these two
7   affidavits.  It's hypothetical.  It's
8   way far afield.
9        MR. PETRELLA:  I won't do that but
10  you can instruct him not to answer it
11  which it sounds like you are doing in
12  which case -- are you in fact
13  instructing him not to answer that.
14       MS. GAY:  I'm asking you to ask a
15  question that relates to these two
16  affidavits.  You said it's a global
17  question about any time, anyplace
18  anywhere, we are here about these two
19  affidavits.
20       MR. PETRELLA:  We are here about
21  these two affidavits which describe a
22  process and the court is interested in
23  the basis for the information that's in
24  these declarations.  And the questions I
25  am asking now is to test the -- how

1        Hojnacki
2   robust that process is.
3   Q.  And what I'm suggesting to you,
4   sir, is that once people fill out these
5   surveys, time goes on, events develop,
6   matters progress and no one thinks about your
7   survey anymore, isn't that right?
8        MS. GAY:  Objection to the form.
9   A.  I don't think that's right.  I
10  think the partners in McKinsey & Company and
11  McKinsey RTS take this process very seriously
12  and they take their duties very seriously so
13  I trust them to listen to the guidelines and
14  the instructions they're provided.
15  Q.  In fact, they have come to you
16  after the survey and said, there is a new
17  development here, I'm working for a new
18  client, let's update the disclosures, that's
19  happened?
20       MS. GAY:  Again, I'm objecting to
21  the form.  It's not connected to this
22  case but you can answer.
23  A.  You are asking generally in any
24  case that McKinsey has filed since I have
25  been with the firm, am I aware of that?

1        Hojnacki
2   Q.  Yes.  In Any Chapter 11 case.
3   A.  I can't speak to that.
4   Q.  You can, it would have happened to
5   you, so did it happen or not?
6        MS. GAY:  Objection to the form as
7   argumentative, don't answer.
8   Reformulate your question counsel.
9   Q.  Has it happened or not, sir?
10       MS. GAY:  What is that.
11  Q.  It's the question I put, I asked
12  the question now probably 14 times, 15 times.
13  A.  So in any case -- in any case has
14  any other partner at McKinsey & Company came
15  and said that something has changed in a case
16  that I'm not even involved in.
17  Q.  Or you are.
18  A.  Westmoreland or another case?
19  Q.  Any case, any Chapter 11 case.
20  A.  I can't speak to that.
21  Q.  Why can't you speak to it?
22  A.  Because I wouldn't be -- I'm not
23  the declarant in every case, I am not
24  involved in every case, I would not be the
25  person that is called in every case.

**MAGNA**
LEGAL SERVICES

Hojnacki

1
2  Q.  That means it hasn't happened?
3     MS. GAY:  Objection to the form.
4  That's not what he said.
5  Q.  You haven't received any such call
6  or contact?
7     MS. GAY:  Mr. Petrella, I will cut
8  off this line of questioning, if you
9  have questions about these two
10  affidavits which are marked for the
11  record, Hojnacki 3 and 4, ask them,
12  otherwise let us go home.
13     MR. PETRELLA:  I don't think you
14  need to cut it off because it's pretty
15  clear I'm not going to get an answer to
16  that question.  Let's take a quick
17  break.
18     THE VIDEOGRAPHER:  The time is
19  11:02 and we are going off the record.
20     (Recess.)
21     THE VIDEOGRAPHER:  This is the
22  start of media label No. 4.  The time
23  now is 11:18 a.m. and we are back on the
24  record.
25  Q.  So we left off at paragraph 34.

Hojnacki

1
2     MS. GAY:  Of Exhibit 3.
3  Q.  Of Exhibit 3, Hojnacki 3.  Let's
4  focus on sub B, 34 and subsection B there.
5  So in B and in D below that, you say that the
6  email went to partners of RTS and its
7  affiliates globally that provide consulting
8  services.
9     Do you see that?
10  A.  Yes.  It says service team and
11  partners of McKinsey RTS and its affiliates
12  globally, yes.
13  Q.  I'm really focused on the word
14  globally in B and D.
15     Do you see that?
16  A.  Yes.
17  Q.  If you go back to 32, the phrase
18  used in the third line is, this is talking
19  about the -- this is talking about the
20  contents of the global client database, all
21  affiliates that provide consulting services.
22     MS. GAY:  Where are you?
23     MR. PETRELLA:  I'm in 32, I'm
24  contrasting 34B and D have the word
25  globally after affiliates.

Hojnacki

1
2
3  Q.  Do you see that?
4  A.  Sorry was that a question for me.
5  Q.  I just want to make sure you see
6  it, it's not so much as a question as trying
7  to orient you.  In sub B the second line, it
8  says affiliates globally?
9  A.  Yes.
10  Q.  And then sub D further down, it
11  says affiliates globally?
12  A.  Yes.
13  Q.  In 32 you just say the affiliates
14  that provide consulting services.
15     My only question is, is there a
16  reason why globally was added in 34 but not
17  in 32?
18  A.  I'm not aware.
19  Q.  Are the affiliate groups in B and D
20  different from the affiliate group whose
21  clients appear in the global client database?
22     MS. GAY:  Again, referring to
23  paragraph 34?
24     MR. PETRELLA:  34 and 32 both.
25  A.  Your question is, is the affiliate

Hojnacki

1
2  group referred to here as affiliates globally
3  is that different than what's referred to in
4  the paragraph 32 as all affiliates that
5  provide consulting services.
6  Q.  Right.
7  A.  I'm not aware.
8  Q.  So to your knowledge, is the global
9  client database limited to the clients of RTS
10  consulting affiliates that are based in the
11  U.S.?
12  A.  That's not my understanding, no.
13  Q.  Your understanding is that the
14  global client database includes RTS
15  consulting affiliates no matter where they
16  are in the world?
17  A.  Yes.
18  Q.  So back to 34 and specifically sub
19  B.  You talk about a direct commercial
20  relationship or transaction.
21     Do you see that?
22  A.  Yes.
23  Q.  What is a direct commercial
24  relationship or transaction?
25  A.  So in the survey that's sent out

MAGNA
LEGAL SERVICES

1           Hojnacki
2  specific to this subsection and I believe --
3  specific to this subsection and I believe
4  subsection D which also refers to direct
5  commercial relationship, there is guidance in
6  the survey of what constitutes a direct
7  commercial relationship and the three broad
8  categories are, there is some direct
9  commercial relationship between the two
10  entities, customer vendor type relationship,
11  that is there is ongoing or pending
12  litigation between the two parties or that
13  there is a potential M&A or sales type
14  transaction between the two parties.
15       Q.   Who drafts the survey by the way?
16       A.   I believe the McKinsey legal
17  department.
18       Q.   Do you know who specifically at
19  McKinsey legal drafted the survey for this
20  case?
21       A.   I do not.
22       MS. GAY:  Make sure you guys don't
23    talk over each other, we want a very
24    clear record for the court.
25       Q.   According to the survey, would an

1           Hojnacki
2  indirect relationship be one that fell into
3  none of those three categories?
4       MS. GAY:  Objection to the form.
5       A.   I can't speak to what you may refer
6  to as an indirect relationship but there is
7  specific guidance provided which is intended
8  to define for folks the definition of a
9  direct commercial relationship.
10       Q.   You said there were three broad
11  categories in the survey that define a direct
12  commercial relationship, right?
13       A.   There is three criteria that are
14  provided.
15       Q.   You said that the first is, there
16  is some direct commercial relationship
17  between the two entities, right?
18       A.   Such as a customer vendor type
19  relationship.
20       Q.   Is that the example that's given in
21  the survey?
22       A.   I know it's a commercial
23  relationship.  I'm defining for purposes of
24  this deposition it to be customer vendor but
25  that would be a typical commercial type

1           Hojnacki
2  relationship for organizations like
3  Westmoreland.
4       Q.   What makes that relationship
5  direct, what is it about it that's direct?
6       A.   A customer vendor relationship,
7  customers and vendors buy and sell from each
8  other.
9       Q.   So it's the dealing directly with
10  each other that makes it direct?
11       A.   They deal with each other directly.
12       Q.   That's why it's direct?
13       A.   Yes.
14       Q.   Does the survey provide any
15  examples to the recipients about what
16  constitutes a direct relationship, direct
17  commercial relationship?
18       A.   Beyond the three criteria that I
19  just mentioned in terms of it being
20  commercial relationship between the two,
21  litigation or pending litigation or some sort
22  of sale or M&A type transaction.  Those are
23  the examples that are provided and I think
24  there are some additional specificity that I
25  can't recall to each of those to help clarify

1           Hojnacki
2  it.
3       Q.   I was really -- I should have
4  rephrased the question.
5       I was really talking about the
6  first criteria, is the customer vendor
7  example given in the survey?
8       A.   I don't have -- I don't recall the
9  details.
10       Q.   Do you recall whether there is any
11  kind of specific example given for the first
12  criteria, the first of the three?
13       A.   The commercial example?
14       Q.   You said there are three criteria.
15  The first criteria, is there any type of
16  example given with respect to that first
17  criteria?
18       A.   I don't recall.
19       Q.   Can an indirect relationship with
20  the debtor create an interest that's
21  materially adverse to the estate, creditors
22  or the equity security holders?
23       MS. GAY:  Objection to the form.
24       A.   Would you ask it again a little
25  slower for me.

MAGNA
LEGAL SERVICES

1          Hojnacki
2      Q.   Can an indirect relationship with
3  the debtor in a case create an interest
4  that's materially adverse to either the
5  estate, the creditors, or the equity security
6  holders?
7      A.   Can you define what you mean by
8  indirect commercial or an indirect
9  relationship?
10     Q.   Your legal department apparently
11 has laid out the criteria of a direct
12 commercial relationship.  So therefore it
13 must have some idea of what is an indirect
14 commercial relationship, so I would put that
15 question back to you and say, what is your
16 understanding that distinguishes an indirect
17 commercial relationship from a direct
18 commercial relationship?
19     A.   Well, an indirect -- we've defined
20 what a direct commercial relationship is,
21 right, so the -- an indirect relationship
22 could potentially be anything that doesn't
23 involve a direct -- direct commercial
24 relationship as defined or as described with
25 the debtors.

1          Hojnacki
2      Q.   Does the Bankruptcy Code speak to
3  indirect relationships with the debtor?
4      MS. GAY:  Objection to the form.
5  He is not a lawyer.
6      A.   I am a not a lawyer, I can't speak
7  to the specifics of the Bankruptcy Code.
8      Q.   So you don't know?
9      A.   I can't speak to the specifics of
10 the Bankruptcy Code.
11     Q.   So you don't know?
12     A.   I don't know --
13     Q.   The answer to the question.
14     A.   Can you restate your question.
15     Q.   Your survey only asks for direct
16 commercial relationships, correct?
17     A.   That's -- I think if we are
18 referencing to survey B or survey C, those
19 surveys and the questions that are asked
20 there are intended to identify direct
21 commercial relationships but as it relates to
22 other surveys, specifically the one in A, as
23 it relates to the service team which is the
24 team that actually served -- McKinsey RTS
25 U.S. and the affiliates that are borrowed

1          Hojnacki
2  that are serving the debtors, that doesn't
3  just focus on direct commercial
4  relationships, that focuses on all
5  relationships.
6      Q.   Focusing on sub B, that focuses on
7  work that the service team and partners at
8  RTS and its affiliates globally that provide
9  consulting services, that focuses on services
10 that constitute a direct commercial
11 relationship or transaction, correct?
12     A.   The content of the survey discussed
13 here in B is intended to flesh out any direct
14 commercial relationships, but again, as it
15 relates to the service team which is surveyed
16 separately or kind of has additional detail
17 that's included as it relates to all
18 relationships, not just direct commercial
19 relationships.
20     Q.   Focusing on subsection B only, what
21 you are asking for there is direct commercial
22 relationships, right?
23     A.   The specifics of that subsection,
24 yes.
25     Q.   So you are not asking for indirect

1          Hojnacki
2  commercial relationships in that subsection,
3  correct?
4      A.   No, we are focused on direct
5  commercial relationships.
6      Q.   You are excluding indirect
7  commercial relationships, is that fair?
8      A.   We are focused on direct commercial
9  relationships.
10     Q.   You don't know whether under the
11 code a professional can be considered not
12 disinterested as a result of an indirect
13 commercial relationship, is that fair?
14     MS. GAY:  Objection to the form.
15     A.   I'm not a lawyer, so the specifics
16 that are included in the code, I am not aware
17 of.
18     Q.   But the legal department, they are
19 lawyers, right?
20     A.   The McKinsey legal department does
21 have lawyers in it, yes.
22     Q.   They're the ones that assisted you
23 in preparing these declarations, right?
24     A.   They were one party that assisted
25 in addition to outside counsel from Hogan

Page 162

1          Hojnacki
2   Lovells, the McKinsey finance department and
3   so I think as I stated before, I relied on
4   them to help identify that this was
5   consistent with what's required under the
6   bankruptcy code.  It was also consistent with
7   the, what had been agreed to or discussed
8   with the U.S. Trustee prior to the filing of
9   their objection.
10      Q.   Who came up with this direct
11  commercial relationship standard?
12      A.   I don't know.
13      Q.   How long has it been in use at RTS?
14      A.   To the best of my knowledge, it was
15  part of the approach of resolving the
16  objection from the U.S. Trustee in the Sun
17  Edison case.
18      Q.   So it's your understanding that the
19  trustee agreed to that standard?
20      A.   It's my understanding that the
21  trustee was comfortable with the approach
22  that was applied, yes.
23      Q.   And have you ever discussed with
24  counsel this issue of direct commercial
25  relationship, what it means and whether it

Page 163

1          Hojnacki
2   complies with the law?
3          MS. GAY:  In the context of the
4   Westmoreland case?
5          MR. PETRELLA:  In the context of
6   any case.
7          MS. GAY:  In that case, we are not
8   going to go beyond -- we are already
9   being extremely generous about
10  conversations with counsel.  The court
11  order directs us to make those
12  conversations available in the four
13  corners of these two affidavits but I
14  don't want to go beyond that.
15         MR. PETRELLA:  These affidavits are
16  based in large part on the concept of a
17  direct commercial relationship.  It's a
18  phrase he used many times in this
19  deposition before I even asked him about
20  it.  I'm pretty sure the judge is going
21  ton want to know what the basis for that
22  standard is and where it came from and
23  whether it's been vetted by counsel.
24         MS. GAY:  I'm giving you as much
25  leeway as I can, I'm just saying,

Page 164

1          Hojnacki
2   restrain your questions about
3   attorney/client communications to the
4   Westmoreland affidavits, that's all.
5          MR. PETRELLA:  I don't read the
6   court's order to be limited in quite
7   that way.  As long as the question
8   relates to the basis for the
9   declarations in Westmoreland, my
10  understanding of the court's order is
11  that is fair game, it's not my
12  understanding that every question must
13  relate directly to the Westmoreland case
14  in the sense that you are saying but in
15  any event, let's try the question on
16  Westmoreland and see what happens.
17      Q.   In connection with the Westmoreland
18  case, did you have any discussions with
19  counsel, specifically about the issue of what
20  constitutes a direct commercial relationship
21  or whether that standard complies with the
22  law?
23      A.   So I had conversations with counsel
24  that discussed obviously the criteria that
25  was used to define direct commercial

Page 165

1          Hojnacki
2   relationship that we discussed in the prior
3   question and we discussed the fact that the
4   approach that we were using was -- that the
5   U.S. Trustee supported it and had accepted it
6   in prior situations and we discussed that the
7   declaration as signed was what was necessary
8   under law.
9       Q.   Who were those conversations with?
10      A.   Ms. Basch and Mr. Ivanick.
11      Q.   And during those conversations,
12  beyond just a general conversation that look,
13  hey the approach we are using here is
14  consistent with what the U.S. Trustee
15  approved, did the words direct commercial
16  relationship pass between you, did those come
17  out of anybody's mouth?
18      A.   In the context of what?
19      Q.   Your conversations with counsel
20  that you just testified to.
21      A.   Yes.
22      Q.   It did?
23      A.   Yes.
24      Q.   Whose mouth did they come out of,
25  yours?

MAGNA
LEGAL SERVICES

Hojnacki

1    Hojnacki
2    A.  No -- well we were having a
3  conversation.
4    Q.  What did you say about direct
5  commercial relationship?
6    A.  We were having a conversation about
7  it, so I can't state that I didn't say the
8  words but we were having a conversation about
9  the use of direct commercial relationships as
10  part of the -- one of the mechanisms that we
11  searched to make our disclosures.
12    Q.  And what was the substance of that
13  conversation?
14    A.  That it was an approach that was
15  accepted by the U.S. trustees office.
16    Q.  Anything beyond that?
17    A.  I don't recall.
18    Q.  So just to be clear, as far as your
19  recollection goes, you had a conversation
20  with Mr. Ivanick and Ms. Basch.  Was it
21  separate conversations or together?
22    A.  Probably both.
23    Q.  And in that conversation, one of
24  them or both of them said to you, this
25  concept of direct commercial relationship has

1    Hojnacki
2  been approved by the U.S. Trustee, in words
3  or substance, is that fair?
4    A.  We had discussions and, again, I
5  don't want to characterize it as one
6  discussion because it was many, there were
7  many discussions that went into the
8  preparation of this.  We had a discussion
9  about the use of a direct commercial
10  relationship as an approach that was
11  acceptable by the U.S. Trustee in the
12  preparation of the declaration, yeah.
13    Q.  Is that the only conversation you
14  had specifically about the concept of a
15  direct commercial relationship?
16    A.  Can you give me an example of what
17  other conversations.
18    Q.  No, I can't because I didn't have
19  the conversation, you did.
20      MS. GAY:  Can we clarify the
21    record.  I think he said he had several
22    conversations.  Mr. Petrella, I don't
23    think he is understanding what you are
24    saying.
25      MR. PETRELLA:  He is saying he had

1    Hojnacki
2  several conversations on the topic of
3  the approach.
4      MS. GAY:  Correct.
5    Q.  I'm asking about specific
6  conversations about the concept of direct
7  commercial relationship, okay.  If those
8  words weren't used during the conversation,
9  you don't have to tell me about it, okay.  I
10  only want to know about conversations that
11  you had with counsel where the words, direct
12  commercial relationship, passed between you,
13  okay.
14    A.  Right.
15    Q.  You told me about one conversation
16  where you were essentially told that, hey the
17  U.S. attorneys office is -- the U.S.
18  Trustee's office is fine with the direct
19  commercial relationship standard, in words or
20  sub stand stands, right?
21    A.  Right.
22    Q.  Are there anymore conversations
23  about direct commercial relationships
24  specifically those words, that phrase?
25    A.  Right.  But I think you are

1    Hojnacki
2  mischaracterizing what I said.  There were
3  many conversations with counsel and I don't
4  recall exactly which ones or how many but
5  more than one of them related to the concept
6  of direct commercial relationship and the
7  confirmation that it followed an approach
8  that was agreed to by the U.S. Trustee.
9    Q.  So you are saying you basically had
10  the same conversation multiple times, is that
11  right?
12      MS. GAY:  Objection to the form.
13    It's not what he is saying.
14    A.  We discussed the topic multiple
15  times.  I wouldn't characterize it as the
16  same conversation.
17    Q.  You had at least one conversation
18  where your discussion with counsel was, hey
19  the U.S. Trustee's office is okay with the
20  direct commercial relationship standard,
21  right, you had at least one of those, right?
22    A.  Yes.
23    Q.  Did you have any other
24  conversations about a different topic that
25  relates to the concept of direct commercial

MAGNA
LEGAL SERVICES

1             Hojnacki
2  relationship?
3        A.  Not that I recall.
4        Q.  Do you know whether the concept of
5  a direct commercial relationship or
6  transaction was developed by inside counsel
7  or outside counsel?
8        A.  I don't know.
9        Q.  Let's look at -- stay on 34, look
10 at subsection D?
11       A.  D.
12       Q.  D.
13         MS. GAY:  Exhibit 3 for the record.
14       Q.  You identify a group here and you
15 say they were asked about any equity
16 ownership in the debtors, right?
17       A.  Correct.
18       Q.  And why did the survey ask that
19 question?
20       A.  To identify whether or not they
21 were employees of McKinsey RTS U.S. and its
22 affiliates that owned equity ownership in the
23 debtors.
24       Q.  Why does that matter, how is that
25 relevant to your disclosures?

1             Hojnacki
2        A.  To just be as open and transparent
3  as possible.
4        Q.  Were they asked about equity
5  ownership in competitors?
6        A.  Not that I am aware of.
7        Q.  How about customers?
8        A.  You are saying just customers of
9  the debtors in general.
10       Q.  Right.  Were they asked about
11 equity ownership in customers of the debtors?
12       A.  I don't believe so.
13       Q.  Were they asked about equity
14 ownership in suppliers of the debtors?
15       A.  I don't believe so.
16       Q.  Let's look at 42, paragraph 42 of
17 Hojnacki 3.
18         So in this paragraph you say, RTS
19 itself does not hold or represent any
20 interest adverse to the debtors estates or
21 any class of creditors or equity security
22 holders by reason of any direct or indirect
23 relationship to, in connection with or
24 interest in the debtors.
25         Do you see that?

1             Hojnacki
2        A.  Yes.
3        Q.  Were RTS employees and partners
4  asked whether they hold any such adverse
5  interest?
6        A.  So this paragraph relates to the
7  conclusion that was arrived at based on the
8  thorough searches that are described in the
9  rest of the declaration in terms of
10 identifying where there were connections to
11 the debtors.
12       Q.  Were RTS employees or partners
13 asked whether they -- withdrawn.
14         Were RTS employees or partners
15 asked whether they had any interest adverse
16 to the debtors estates or any class of
17 creditors or equity security holders by
18 reason of any direct or indirect relationship
19 to or connection with or interest in the
20 debtors?
21       A.  Is this again specific to paragraph
22 42?
23       Q.  Yes.  That's where the language I'm
24 reading you comes from.
25       A.  Paragraph 42 is the conclusion that

1             Hojnacki
2  was drawn based on the outputs of all of the
3  other processes that were gone through to
4  identify any situations where there was a
5  connection to the debtor that would cause us
6  to violate the disinterested person's
7  definition.
8        Q.  Look at subparagraph C of 42.  So
9  it's here you say that RTS does not hold or
10 represent any interest adverse to the debtors
11 estate or any class of creditors or equity
12 security holders by reason of any direct or
13 indirect relationship in connection with or
14 interest in the debtors.
15         Do you see that language?
16       A.  Yes.
17       Q.  My question is, were RTS employees
18 or partners asked whether they hold any such
19 adverse interest?
20         MS. GAY:  Asked and answered.  You
21       can answer it again.
22       A.  So that specific phrase if turned
23 into a question was not directly asked of RTS
24 employees but the process that we describe
25 and we've been discussing that we've gone

1                    Hojnacki
2    through was intended to identify those
3    situations and allowed us to come to this
4    conclusion that's stated in this paragraph.
5         Q.   Let's look at paragraph 55.  It's a
6    long paragraph but about three quarters of
7    the what down, there is an item, three
8    confidential clients, right?
9         A.   Yes.
10        Q.   You later disclose two of those
11   clients in your supplemental declaration,
12   correct?
13        A.   Yes.
14        Q.   That was after Mar-Bow's objection
15   had been filed, correct?
16        A.   It was also a question that was
17   raised by the U.S. Trustee in conversations
18   with counsel after the filing of the
19   declaration.
20        Q.   So was the disclosure of those two
21   confidential clients in your supplemental
22   declaration, was that prompted by a request
23   from the trustee's office?
24        A.   I believe so.
25        Q.   Why were you willing to disclose

1                    Hojnacki
2    two of the clients after talking with the
3    Trustee's office when you weren't willing to
4    disclose them in the first place?
5         A.   I don't know the specifics.  I just
6    understand that the -- whatever was requiring
7    the need to keep them confidential at the
8    time had been removed.
9         Q.   So is it your testimony that
10   something had changed, that the need for
11   confidentiality was no longer as serious as
12   it was when you first filed your declaration?
13        A.   I wouldn't characterize it that way
14   because I don't know, but I understand based
15   on the preparation of the supplement that
16   whatever the restrictions were or
17   requirements were at that time had changed as
18   far as the disclosure.
19        Q.   It was your understanding there was
20   some sort of changed circumstances that
21   allowed for the disclosure?
22        A.   Yes.
23        Q.   And those circumstances were
24   something other than just a conversation with
25   the U.S. Trustee's office, I assume, is that

1                    Hojnacki
2    right?
3         A.   I don't know.
4         Q.   So the circumstance simply might
5    have been the trustee's office came to
6    counsel and said we want you to disclose
7    these clients so you disclosed them?
8         A.   I don't know.
9         Q.   Who makes the decision as to
10   whether a client is confidential such that it
11   should not be disclosed in a declaration like
12   the one you prepared?
13        A.   I don't know specifically who makes
14   that decision.
15        Q.   Do you know whether it's someone in
16   legal or someone in corporate?
17        A.   Can you define the difference
18   between legal and corporate?
19        Q.   Legal would be anyone employed by
20   McKinsey's legal department.  Corporate would
21   be anyone else.
22        A.   I don't know.
23        Q.   We talked I think briefly about the
24   two-year or we touched on the two-year
25   look-back that was employed in connection

1                    Hojnacki
2    with your search for connections in this
3    case, do you remember that?
4         A.   Yes.
5         Q.   And in your declarations,
6    connections with interested parties that are
7    more than two years old are not disclosed, is
8    that fair?
9         A.   Yes, as part of the application of
10   the two-year look-back period, we looked back
11   two years.
12        Q.   So the exact date that's used for
13   the look-back in your declaration is October
14   1, 2016, is that right?
15        A.   Yes.
16        Q.   Why was that specific date
17   selected?
18        A.   Why was October 1, 2016?
19        Q.   Yes.
20        A.   It's my understanding that two
21   years -- a two-year look-back period is
22   commonplace in these situations.
23        Q.   But when are you looking back from?
24        A.   The petition date.
25        Q.   The petition date was October 9,

Hojnacki

1
2  right?
3      A.  Yes, but let's be clear, right, the
4  two-year look-back period is as of the
5  petition date, goes back to October 1, 2016.
6      Q.  Right.
7      A.  Right.  We are using that date
8  for -- as the look-back period for all
9  subsequent searches that happen even after
10  the petition date.
11      Q.  So as time moves on, the look-back
12  becomes longer than two years, right?
13      A.  Yes.
14      Q.  So when you did your supplemental
15  declaration, you didn't move the look-back
16  date forward in time, you kept it at October
17  1, 2016, right?
18      A.  Can we reference back to the
19  supplemental declaration and see which date
20  it refers to?
21      Q.  Sure.  That's Exhibit 4.
22          I don't know about you but I'm
23  seeing a lot of October 1, 2016s.
24          MS. GAY:  So you will be clear,
25      that was not a question, he was just

Hojnacki

1
2  being helpful.
3          MR. PETRELLA:  That is right.
4  Paragraph 7, paragraph 10.
5          MS. GAY:  Referring to Exhibit 4,
6  Mr. Petrella.
7          MR. PETRELLA:  Correct.  Paragraph
8  12, paragraph 13.
9      Q.  Do you see how you are using that
10  date?
11      A.  Yes.
12      Q.  That's consistent with your
13  recollection?
14      A.  Yes.
15      Q.  We looked at the engagement letter
16  before.  McKinsey was first retained in July
17  17, 2018, right?
18      A.  That sounds correct, yes.
19      Q.  And I think you previously
20  testified that, you know, McKinsey at that
21  time or RTS at that time knew it was at least
22  a possibility that Westmoreland may be headed
23  for bankruptcy, right?
24      A.  I stated that we were aware they
25  were in discussions with their first lien

Hojnacki

1
2  lender steering committee about options to
3  resolve the capital structure issue and that
4  could include a bankruptcy filing.
5      Q.  At that point did RTS owe
6  Westmoreland a fiduciary duty at the time it
7  was retained prepetition?
8      A.  I don't know.
9      Q.  Have you ever had any discussions
10  with counsel about whether it might be
11  appropriate to set the look-back date two
12  years from the date of prepetition retention
13  as opposed to retention for petition and
14  afterwards?
15      A.  No.  We only discussed that a
16  two-year look-back period from the petition
17  date was customary and commonplace in these
18  type of situations.
19      Q.  Who did you discuss that issue
20  with, in terms of legal counsel?
21      A.  Again, Ms. Basch and Mr. Ivanick.
22      Q.  In terms of it being customary,
23  what were you told about that?
24      A.  It's the approach that's applied by
25  many other professionals that are retained in

Hojnacki

1
2  Chapter 11 situations, including others that
3  are retained in this case.
4      Q.  And for how long has that been the
5  case?
6      A.  Has what been the case?
7      Q.  That that's been customary to use a
8  two-year look-back period?
9      A.  I'm not sure.
10      Q.  You don't have any sense of how
11  long this tradition of using a two-year
12  look-back period has been in place?
13      A.  No.
14      Q.  But that look-back period was
15  selected by counsel, correct?
16      A.  We were advised by counsel that it
17  was appropriate to use in these cases, yes.
18      Q.  Was that McKinsey legal, was that
19  Mr. Ivanick or someone else?
20      A.  I don't recall.
21      Q.  Is that the universe of attorneys
22  it might have been those, either Mr. Ivanick
23  or someone from McKinsey legal?
24      A.  Yes.
25      Q.  Are there any formal written



1              Hojnacki
2   policies on this two-year look-back period of
3   McKinsey?
4       A.   The two-year look-back period in
5   relation to disclosures.
6       Q.   In relation to disclosure
7   declarations of the type that you prepared in
8   this case?
9       A.   No.
10      Q.   When was the first time that
11  McKinsey RTS used this two-year look-back
12  period?
13          MS. GAY:  That's well beyond the
14      four corners of these two affidavits,
15      Mr. Petrella.
16          MR. PETRELLA:  I don't agree with
17      that at all.
18          MS. GAY:  Why don't you answer the
19      question and we can move on.
20      A.   I don't know.
21      Q.   Is this case the first time you've
22  used a two-year look-back period, you
23  personally?
24      A.   The only other case where I was the
25  declarant was in Sun Edison and I don't

1              Hojnacki
2   recall what we used in that case.
3       Q.   Do you have a sense of when this
4   two-year look-back policy was established?
5       A.   No.
6       Q.   Are there any exceptions to this
7   two-year look-back policy?
8       A.   I don't know.
9       Q.   Were you shown any legal authority
10  to support this two-year look-back period
11  before you signed your declaration?
12      A.   Can you define what legal authority
13  is.
14      Q.   A case, a statute, a rule?
15      A.   No, it was just discussed in
16  conversation with counsel.
17      Q.   You don't recall who that counsel
18  was that you had that discussion with?
19      A.   It was Ms. Basch and Mr. Ivanick.
20      Q.   Both together?
21      A.   It was in a phone conversation that
22  I recall had both of them on it.
23      Q.   And words or substance, Ms. Basch
24  and Mr. Ivanick said a two-year look-back
25  period was appropriate, is that fair?

1              Hojnacki
2       A.   Yes.
3       Q.   And is customary?
4       A.   Yes.
5       Q.   And it complies with the law?
6       A.   I'm not a lawyer so I can't state
7   --
8       Q.   I'm not asking whether it actually
9   complies with the law.  I'm asking whether
10  you were told it complies with the law.
11      A.   I don't remember the specific
12  details of everything that was discussed, but
13  it was pointed out that this is -- that a
14  two-year look-back period is customary and
15  commonplace and, in fact, used by other
16  professionals in this case and others.
17      Q.   As part of that conversation, was
18  there any indication that there might be some
19  problems with using a two-year look-back
20  period?
21      A.   Not that I recall.
22      Q.   For a connection to be two years
23  old, it has to end two years earlier, right?
24          MS. GAY:  Objection to the form.
25      You can answer if you understand it.

1              Hojnacki
2       A.   Would you mind asking it again.
3       Q.   Let me go about it a different way.
4          If a connection is ongoing, the
5   two-year look-back period is irrelevant,
6   right?
7       A.   I guess, can you be more specific
8   about what you...
9       Q.   Specifics are irrelevant.  If you
10  have a connection with an interested party.
11          THE VIDEOGRAPHER:  We lost power.
12      (Off the record.)
13          THE VIDEOGRAPHER:  This is the
14      start of media label No. 5.  The time
15      now is 12:07 p.m. and we are back on the
16      record.
17      Q.   So before our little break there.
18  What we were talking about, is in this case
19  you don't disclose connections if they ended
20  greater than two years from the petition
21  date, is that right?
22      A.   If it was a connection outside of
23  the two-year look-back window, it's not
24  disclosed.
25      Q.   So let's say we are talking about a

**MAGNA** ▶
LEGAL SERVICES

1              Hojnacki
2    connection, a client relationship with a
3    competitor of the debtor.  Okay.
4        A.  Okay.
5        Q.  You wouldn't disclose that
6    connection if that relationship ended greater
7    than two years from the petition date, right?
8        A.  If I just state it in my own words,
9    if it wasn't a relationship within the
10   two-year look-back period, we wouldn't
11   disclose it.
12       Q.  How do you determine whether it's
13   within the -- whether the relationship
14   existed within the look-back period?
15       A.  Can you be more specific about what
16   you mean.
17       Q.  Not really.  How do you figure out
18   what's within and without the look-back
19   period, give me -- let's use the example of
20   the client relationship with a competitor.
21   How do you figure it out?
22       A.  If it was a client that we served
23   within the two-year look-back period, that
24   was served by a member of the service team,
25   for instance, we would disclose that

1              Hojnacki
2    relationship.
3        Q.  And how do you figure out when you
4    served the client?
5        A.  Again we go through the steps that
6    we used to identify things including the
7    review of the global client database, the
8    review of financial records of RTS, the
9    review of time records of the service team
10   and then the survey that is sent out to both
11   the service team as well as partners of
12   affiliates globally on various topics.  So we
13   use that to identify when there is an ongoing
14   relationship within the two-year look-back
15   period.
16       Q.  So if there is a particular
17   interested party and there is no billing
18   records that show time to that interested
19   party, right, and no one reports that they
20   had done work for that interested party
21   during that two-year period, then you would
22   say, that's outside the two-year period, is
23   that fair?
24       A.  There is also the review of the
25   global client database, right, which tracks

1              Hojnacki
2    all of the McKinsey's client relationships
3    for all of its consulting affiliates
4    globally.
5        Q.  Does that tell you when you did
6    work for the client?
7        A.  I don't know specifically what's
8    involved in that but I know it's certainly a
9    big step in our process.
10       Q.  Right.  But I'm focused on how
11   figure out what is within and without the
12   two-year look-back period.  What I'm saying,
13   the client database, at least as I understand
14   your testimony, doesn't really help you make
15   that determination in and of itself, is that
16   right?
17       A.  I just said, I don't know exactly
18   the details included in that client global
19   database are, so you mischaracterized my
20   words.
21       Q.  I'm not trying to mischaracterize
22   your words.  I'm just saying, as far as you
23   know, it doesn't tell you one way or the
24   other whether you did work for a particular
25   client within the last two years or not?

1              Hojnacki
2        A.  I didn't say that.
3        Q.  Do you know whether the global
4    client database tells you whether a
5    particular client or engagement is active
6    within the last two years?
7        A.  I don't know if those details are
8    included in the global client database.
9        Q.  With respect to clients for whom
10   services were provided in the past but have
11   not been provided within the two years from
12   the petition date, does McKinsey make efforts
13   to stay in touch with clients and check in
14   with them, see how they're doing, talk to
15   them about potential new engagements, does
16   that happen?
17       A.  So you are saying, if it's a client
18   that we worked with historically outside of
19   the two-year look-back period, do we stay in
20   touch with them.
21       Q.  Yes.
22       A.  I suppose.  I can't speak to every
23   client situation that McKinsey ever had or
24   every situation.
25       Q.  Just in working at McKinsey, it's

**MAGNA** ▶
LEGAL SERVICES

Hojnacki
1
2  fairly common practice to contact former
3  clients and check in with them, see how
4  they're doing, talk with them about their
5  family, maybe what's going on with their
6  business, things of that nature?
7         MS. GAY:  Is that a question?
8         MR. PETRELLA:  Yes.
9      A.  What's the question.
10     Q.  Isn't that fairly common at
11 McKinsey?
12     A.  To keep in touch with clients even
13 if we are not serving them?
14     Q.  Former clients.
15     A.  Potentially.
16     Q.  So if an engagement, if a past
17 engagement is over, but you are in
18 communication with that client about
19 potential future business, does that extend
20 the two years, does that stop the two years
21 from running?
22        MS. GAY:  Objection to the form.
23     A.  Can you be specific about what time
24 periods you are referencing and what specific
25 conversations you are implying are happening.

Hojnacki
1
2      Q.  I'm talking about a two-year
3  look-back period.  Let's say you have a
4  client where you haven't provided any
5  services to them within the last two years,
6  but within the last two years, okay, you've
7  been in touch with the client about potential
8  future engagements, okay.  Does that get
9  disclosed or not disclosed?
10     A.  If we are not actively serving
11 them, in any capacity then it would not get
12 disclosed.
13     Q.  If a McKinsey partner or partners
14 was actively pitching a former client for a
15 new engagement, that might give them an
16 incentive to favor them potentially, correct?
17     A.  Can you be specific about what --
18     Q.  If I want business from you and I'm
19 talking to you about potentially getting
20 business from you, I have an incentive to
21 help you, don't I?
22        MS. GAY:  Objection to the form.
23     You can answer.
24     A.  Are you the client or am I the
25 client, I want to make sure who is the

Hojnacki
1
2  client.
3      Q.  It doesn't matter who the client
4  is, me and you, let's say me Mike you Mark.
5      A.  Right.
6      Q.  I want to sell you something, I
7  want to do business with you, okay and let's
8  say I spent a couple of weeks trying to
9  convince you you do business with me.  Under that
10 dynamic, that circumstance, I might have an
11 incentive to do you a favor, to benefit you
12 in some way, is that fair?
13     A.  That doesn't sound at all correct,
14 the way McKinsey works.
15     Q.  I wasn't asking about how McKinsey
16 works, I was asking, you are the one who
17 wanted the specifics, then I gave you the
18 specifics and then you went back to McKinsey.
19        Between me and you, the
20 hypothetical I actually gave you, does it
21 make sense that I might have some incentive
22 to do you a favor, confer some benefit on
23 you?
24     A.  No.  Again you are creating a
25 hypothetical situation that --

Hojnacki
1
2      Q.  Yes.
3         MS. GAY:  Let's let each other
4      finish.  Why don't you finish the
5      answer.
6      A.  What type of transaction?  Again,
7  there -- it's so vague of what you are trying
8  to ask me, I'm misunderstanding what scenario
9  you are trying to say that this involves.
10     Q.  Let's say I'm trying to sell you 20
11 cars, okay, I want you to buy my 20 cars.
12        Do you follow that so far?
13     A.  I got that.
14     Q.  I've been talking to you for a
15 month about trying to sell those cars to you.
16 Does it make sense to you that I might
17 because I'm looking for you to do business
18 with me, to buy those cars from me, does it
19 make sense to you that I might have some sort
20 of incentive to favor you in some way?
21     A.  I don't know what your motive would
22 be to sell me the 20 cars.
23     Q.  So in your view, if McKinsey is
24 pitching a past client for additional
25 business, you don't view that as a situation

MAGNA
LEGAL SERVICES

1         Hojnacki
2  where McKinsey might have an incentive to
3  favor that past client?
4       A.  No, I don't think that's how it
5  would work.
6       Q.  If you can turn, Hojnacki 3, if you
7  can turn to Schedule I, specifically 1L.  I
8  will try to get a page for you in a second.
9  Using the page numbers at the top, it's 116
10 of 194.
11        Do you have that?
12       A.  I believe I do, yes.
13       Q.  There is two entities on this list,
14 Aspen Bermuda Limited, Aspen Insurance U.K.
15 Limited.
16        Do you see that?
17       A.  Yes.
18       Q.  Are those entities that McKinsey
19 serves?
20       A.  I don't know, unless it's disclosed
21 in this declaration.
22       Q.  I will represent to you that it's
23 not disclosed in either of your declarations
24 but you are obviously free to check it,
25 preferably on a lunch break and correct me if

1         Hojnacki
2  I am wrong.
3         Let me show you, can we mark this
4  Hojnacki 5?
5        (Hojnacki Exhibit 5 Article marked
6      for identification.)
7       Q.  It's not too long but please read
8  it over and let me know when you are
9  finished.
10        Have you read it?
11       A.  I have read it.
12       Q.  This seems to indicate some sort of
13 client relationship between McKinsey and an
14 entity called Aspen.
15        Do you see that?
16       A.  Yes.
17       Q.  Do you know what Aspen entity that
18 is?
19       A.  I do not, you are saying the one
20 referenced in Exhibit 5.
21       Q.  Correct.  In Hojnacki 5.
22       A.  No, I don't.
23       Q.  Are you aware of any work that
24 McKinsey is doing for Aspen?
25       A.  I am not.

1         Hojnacki
2       Q.  Do you know whether McKinsey is in
3  fact doing work for Aspen?
4       MS. GAY:  Any Aspen or the Aspen in
5  Exhibit 5?
6       Q.  For either the entities in Schedule
7  I-L or any of their affiliates?
8       A.  I am not.
9       Q.  You don't know one way or the
10 other?
11       A.  I am not aware that we are doing
12 any work for Aspen one way or the other.
13       Q.  That was really what I wanted to
14 get to.
15        You don't know who the responsible
16 partner is for any relationship that might
17 exist between McKinsey and Aspen?
18       A.  The Aspen referenced in this news
19 article you gave me?
20       Q.  Yes.
21       A.  No, I don't.
22       Q.  We've discussed a couple of times
23 that you signed the disclosure declarations
24 in the Sun Edison case, right?
25       A.  Yes.

1         Hojnacki
2       Q.  And do you recall in that case RTS
3  also applied a two-year look-back as we did
4  in this case, do you remember that?
5       A.  I think I stated earlier I don't
6  recall which look-back period we used in that
7  case.
8       Q.  Do you recall in the three cases
9  prior to that McKinsey used a three-year
10 look-back?
11       A.  I don't recall that.
12       Q.  So you don't know whether in the
13 A&R case, the Standard Registered Case or the
14 NII Holdings case, you don't know whether
15 McKinsey used a three-year look-back in any
16 of those cases?
17       A.  As I sit here now, I don't know.
18       MS. GAY:  We are getting pretty far
19 afield here from the two affidavits that
20 Mr. Hojnacki has signed.
21       MR. PETRELLA:  I don't think we
22 are.  I think we are delving into the
23 basis for the two-year look-back used in
24 those declarations.
25       Q.  During Sun Edison, did you have any

1        Hojnacki
2   conversation with anybody including counsel
3   to the effect that hey look, we are changing
4   from a three-year look-back to a two-year
5   look-back?
6        MS. GAY:  Don't answer that.  We
7   are not going into conversations with
8   counsel in other cases, Mr. Petrella, I
9   already stated that.
10       Q.   Did you have a conversation with
11  anyone other than counsel in the Sun Edison
12  case where it was indicated to you in any way
13  that the firm was switching from a three-year
14  look-back to a two-year look-back?
15       A.   I don't recall any conversations
16  that I had in the preparation of the Sun
17  Edison declarations at this point in time.
18       Q.   But that move from a three-year to
19  a two-year look-back, that was done so that
20  McKinsey would have to disclose less,
21  correct?
22       MS. GAY:  I object to that and also
23  misstates his testimony.  We are also
24  getting way far afield from the two
25  Westmoreland declarations.  The judge's

1        Hojnacki
2   order says that you may ask questions
3   about these two declarations.  That is
4   the only purpose of this deposition,
5   sir.
6        MR. PETRELLA:  These two
7   declarations have a two-year look-back
8   date throughout them and your colleague
9   Ms. Chung at the last hearing went on at
10  some length about the two-year look-back
11  and identified it as a very important
12  issue.  So I do think that not only it
13  within the scope of the judge's order,
14  this questioning, I think it's also
15  something Judge Jones is going to be
16  very interested to hear, why and when
17  McKinsey decided that a two-year
18  look-back was customary and appropriate
19  and lawful when just a few years ago, it
20  believed that a three-year look-back was
21  customary and lawful and appropriate.
22       MS. GAY:  Hold on, can you hand me
23  the judge's order in this case.
24       MR. PETRELLA:  Hojnacki 1.
25       MS. GAY:  Thank you.  Hojnacki 1

1        Hojnacki
2   paragraph 2 reads, The subject matter of
3   Mr. Hojnacki's deposition is limited to
4   the basis and authorization for the
5   statements set forth in the declaration
6   of Mr. Hojnacki filed at docket numbers
7   452 and 810.  With regard to that, you
8   may ask him all the questions you want
9   about the basis and authorization for
10  the statements set forth in his
11  declaration.  The declaration references
12  a specific look-back period.  You may
13  ask him about that, you may not ask him,
14  even though I've given you very generous
15  leeway, anymore questions about other
16  bankruptcies or other affidavits.
17       MR. PETRELLA:  I simply disagree
18  with your analysis.  I think that the
19  declarations talk about a two-year
20  look-back period.
21       MS. GAY:  Ask him about that.
22       MR. PETRELLA:  I'm inquiring into
23  the basis of that.  That being said I
24  will ask my questions.  You instruct him
25  to answer or not.

1        Hojnacki
2        Q.   To your knowledge, does Rule 2014,
3   Bankruptcy Rule 2014 have any time limitation
4   on the connections that have to be disclosed?
5        A.   Again, I'm not a lawyer so the
6   strict interpretation of 2014 I can't opine
7   on.
8        Q.   If McKinsey dropped down from a
9   three-year look-back to a two-year look-back,
10  can't it drop down from a two-year look-back
11  to a one-year look-back?
12       MS. GAY:  Objection to the form.
13  You can answer if you know.
14       A.   Are you asking, can we perform
15  searches based on different periods of time
16  or a shorter period of time?
17       Q.   What I'm asking is, if you can
18  change from a three-year look-back to a
19  two-year look-back why not change from a
20  two-year look-back to a one-year look-back or
21  a one-month look-back for that matter?
22       MS. GAY:  Objection to the form.
23       A.   We would rely on the advice of our
24  counsel to help us make the interpretations
25  of the laws and the rules in order to make

**MAGNA** ▶
LEGAL SERVICES

Page 202

```
1           Hojnacki
2  sure that we comply.
3      Q.  Has anyone told you that industry
4  custom has changed in the last couple of
5  years such that it used to be three years but
6  now it's two years?
7      MS. GAY:  Don't answer.  If you are
8      asking questions about the Westmoreland
9      affidavits, I will permit him to answer
10     questions about third parties who had
11     input into those affidavits.  You are
12     going way far afield and infringing on
13     attorney client privilege.  In addition,
14     it's not within the four corners of the
15     subject matter of the deposition.
16     MR. PETRELLA:  Again, we disagree
17     on this issue.
18     MS. GAY:  We do.
19     MR. PETRELLA:  We will move on from
20     here.
21     MS. GAY:  Good.
22     Q.  The two-year look-back approach
23  essentially means that a connection that
24  would be disclosable on day 730 becomes
25  nondisclosable on day 731, is that fair?
```

Page 203

```
1           Hojnacki
2      MS. GAY:  You can answer if you
3  understand.
4      A.  I think we talked about it.  If a
5  connection is outside of the look-back
6  period, that goes back to October 1, 2016,
7  it's outside of the look-back period.
8      Q.  So two years roughly 730 days,
9  right, so 730 days goes by, the connection
10  exists, right, the connection exists, on the
11  730th day, you would have to make the
12  disclosure.  The next day 731, you wouldn't
13  make the disclosure, right?
14     A.  I guess that's the interpretation
15  of a look-back period.
16     Q.  And does RTS advise debtors on the
17  timing of its petitions in bankruptcy?
18     A.  Is this specific to Westmoreland?
19     Q.  Sure.  Start with Westmoreland.
20     MS. GAY:  Let's start and leave it
21     with Westmoreland.  You can answer the
22     question.
23     A.  McKinsey RTS did not advise the
24  debtors in this case on the timing of its
25  Chapter 11 filing.
```

Page 204

```
1           Hojnacki
2      Q.  Does it ever advise debtors on the
3  timing of its petitions?
4      MS. GAY:  Don't answer that, this
5      is not within the four corners of these
6      two affidavits.  This is not a general
7      deposition on all of McKinsey's
8      bankruptcy practices.
9      MR. PETRELLA:  Again, I think this
10     is within the scope of the basis for the
11     statements in his declarations.
12     MS. GAY:  I disagree with you.  We
13     can debate it later.
14     MR. PETRELLA:  This is actually
15     probably a good time for lunch if that
16     works for everyone else because I'm
17     about to start something else that I
18     will not want to stop once I get going.
19     MS. GAY:  That sounds ominous.
20     Let's have lunch.
21     THE VIDEOGRAPHER:  The time is
22     12:29 and we are going off the record.
23     (Recess.)
24     A F T E R N O O N   S E S S I O N
25     (Time noted:  1:05 p.m.)
```

Page 205

```
1           Hojnacki
2  M A R K   H O J N A C K I,    resumed and
3  testified as follows:
4  EXAMINATION BY (Cont'd.)
5  MR. PETRELLA:
6      THE VIDEOGRAPHER:  This is the
7      start of media label No. 6.  The time
8      now is 1:05 p.m. and we are back on the
9      record.
10     Q.  Going back to Hojnacki 3.  In
11  paragraphs 36 through 41, you talk about the
12  MIO, is that correct?
13     A.  Yes.
14     Q.  So for the partners of McKinsey
15  entities other than MIO, how many of them
16  have a role or a position within the MIO?
17     A.  State specifically your question
18  again for me.
19     Q.  I will try it a different way.
20  Take the MIO out of the picture for a second.
21  Let's focus on any other McKinsey entity
22  other than MIO, you got me?
23     A.  Yes.
24     Q.  Take the partners, just the
25  partners of those entities, are you with me?
```

**MAGNA**
LEGAL SERVICES

1              Hojnacki
2     A.  Yes.
3     Q.  Of those partners, how many have
4  some role or position within MIO?
5     A.  I'm not sure the exact number.
6  There is no, there are no employees that are
7  shared between the entities, between the MIO
8  partners and any of the other McKinsey
9  affiliates including RTS with the exception
10 of any members that would serve on the board
11 of directors of MIO.
12    Q.  When you use the term employees,
13 are you including partners?
14    A.  Partners that may serve on the
15 board of directors of MIO, that's the only
16 situation in which and there would be any
17 overlap of employees, partners or otherwise.
18    Q.  So there are no partners of any
19 McKinsey entity that have a role within MIO
20 other than the ones on the board of
21 directors, is that correct?
22    A.  Correct.
23    Q.  How many are there that have that
24 role on the board of directors?
25    A.  I don't know exactly.

1              Hojnacki
2     Q.  Can you just give me a rough, the
3  best you can do, is it 40, 10, 5, you don't
4  know?
5     A.  It's more than one and less than 40
6  is my estimate.
7     Q.  So other than the board of
8  directors, everybody else that works for MIO
9  in any way is limited to MIO, is that right?
10    A.  Everybody else who works for MIO is
11 limited to MIO.
12    Q.  How about -- now, are there any RTS
13 practice leaders on the MIO board?
14    A.  Currently, I believe as it's stated
15 in here, let me just find it, bear with me
16 because I have something in mind that I
17 believe we referenced but I want to point you
18 to -- sorry, I can't find it but would you
19 mind asking your question again just so I can
20 respond to it appropriately.
21    Q.  To your knowledge are there any RTS
22 practice leaders that serve on the MIO board?
23    A.  Not -- I don't believe currently,
24 no.
25    Q.  You have no position or role of any

1              Hojnacki
2  kind with respect to the MIO?
3     A.  I have absolutely no involvement in
4  MIO.
5     Q.  Including investments?
6     A.  I have funds that are invested in
7  the pension, the investment pension plans.
8     Q.  Do you know who Casey Livskim
9  (phonetic) is?
10    A.  I only recently became aware of his
11 name, I never met him in person.
12    Q.  Do you know what his title is?
13    A.  Not specifically, no.
14    Q.  Do you know whether he is the
15 general counsel of MIO?
16    A.  Again, I have never met him.  I've
17 recently became aware of him being referenced
18 in that capacity.
19    Q.  Is he also a member of the McKinsey
20 legal department?
21    A.  I don't know.
22    Q.  I just mention it because his
23 LinkedIn page indicates he is both the
24 general counsel of MIO and also an associate
25 counsel of McKinsey.

1              Hojnacki
2     Were you aware of that?
3     A.  I haven't ever looked at his
4  LinkedIn page.
5     Q.  So who are the partners on the MIO
6  board, if you know?
7     A.  I don't know specifically or can't
8  recall them by name.  I think it's made up of
9  a combination of retired McKinsey partners
10 and potentially some current partners but I
11 can't speak to the make up of the board other
12 than my own detail.  I am not familiar with
13 it.
14    Q.  And of the McKinsey partners that
15 are on the board, do you know what entity
16 they're a partner of, is it McKinsey &
17 Company Inc., McKinsey & Company --
18    A.  I honestly don't know.
19    Q.  In paragraph 36 you say that the
20 MIO invests pension funds and they also make
21 direct investments, right?
22    A.  MIO invests, from my understanding,
23 in two types of programs, the pension funds
24 and then current partners, former partners or
25 their family can choose to invest money into

**MAGNA**
LEGAL SERVICES

1           Hojnacki
2  MIO or MIO to direct elsewhere or invest
3  elsewhere.
4      Q.  I think you just said you had some
5  pension funds invested in the MIO, correct?
6      A.  Part of my compensation that I've
7  earned over the years is in the form of
8  retirement contributions and they're invested
9  in these pension plans.
10     Q.  Of your retirement funds, do you
11 know what percentage roughly is in MIO as
12 opposed to other places?
13     A.  Of my entire?
14     Q.  Retirement funds, not your entire
15 everything you own, just retirement funds.
16     A.  Specific to any retirement funds I
17 have as an individual or those I have that I
18 earned through McKinsey & Company?
19     Q.  Well, is there a difference -- if
20 you earned it through McKinsey, then they're
21 yours, right?
22     A.  That's correct.  But I have been
23 employed at other employers prior to McKinsey
24 and I have retirement funds from those so are
25 you speaking about the collective pool of any

1           Hojnacki
2  retirement funds as an individual that I have
3  ever earned.
4      Q.  That's right.  Just as a percentage
5  in the MIO?
6      A.  Again the money I haven't earned in
7  my time at McKinsey & Company.
8      Q.  What I'm saying is you have
9  retirement funds in various different places,
10 is that right?
11     A.  Correct.
12     Q.  Take that whole, what percentage of
13 that whole is in the MIO?
14     A.  Probably about 40 percent.
15     Q.  And do you get regular statements
16 concerning your MIO investments?
17     A.  I'm able to access a website that
18 gives me access to monthly statements that
19 simply shows the allocation of my funds into
20 different investment strategies.  It doesn't
21 show anything about what those funds are
22 actually invested in besides the strategy in
23 which that is used.
24     Q.  No one mails actual statements to
25 your house or anything like that?

1           Hojnacki
2      A.  I don't believe I get that to my
3  house, no.
4      Q.  The statements that you access
5  online, are those monthly statements or is it
6  just like it's constantly updated, so if you
7  go on one day it has the information as of
8  that day and you go on --
9      A.  I believe it's a once a month
10 statement.
11     Q.  So statements, how many pages are
12 they?
13     A.  From what I recall, four or five.
14     Q.  How many different investment
15 strategies are there in the MIO?
16     A.  That the MIO offers?
17     Q.  Yes.
18     A.  I don't know.  I only know the ones
19 I am involved in.
20     Q.  How many are you involved in?
21     A.  Four.
22     Q.  So what other information are on
23 the statements other than what strategies you
24 are in and how much that strategy account is
25 worth?

1           Hojnacki
2      A.  So if I recall, it's the allocation
3  of the strategy, four in my instance, you
4  know, the dollar amount of money that I have
5  allocated, my total portfolio across those
6  four strategies, each month there is the
7  performance of that strategy up or down and
8  then kind of the new holding, if you will,
9  it's like a roll forward, beginning balance,
10 change in the month, ending balance.
11     Q.  So when you said new holding, you
12 meant ending balance, is that right or did I
13 misunderstand?
14     A.  I think of it as classic roll
15 forward.  This is what the holding was at the
16 beginning of December, during the month of
17 December it went up or down, end of December
18 it's worth X.
19     Q.  Is it fair to say the statements
20 are essentially limited to the list your four
21 strategies, they tell you what it was worth,
22 what's it's worth now and maybe give a
23 percent up or down, is that fair?
24     A.  Will you repeat the three or four
25 things you just said.

Hojnacki

1
2    Q.   Correct me if I'm wrong.  I'm just
3    trying to make sure I understand what you are
4    saying.  The statements basically have your
5    four strategies listed there, they have a
6    beginning balance for the month essentially,
7    an ending balance for the month and maybe
8    some sort of metric of it's up 3 percent,
9    down 4 percent whatever is, is that basically
10   it?
11       A.   I don't specifically recall the
12   percentage, but that's just a mathematical
13   calculation in my mind.
14       Q.   What I'm really asking is, other
15   than that information, is there anything else
16   on these statements?
17       A.   Not that I recall.
18       Q.   That takes up four or five pages to
19   list that?
20       A.   Yeah.  They show you a graph, and
21   show you the listing of the strategies broken
22   down independently so it's kind of a build up
23   from the highest level of, what are you
24   holding to what are you holding here to what
25   are you holding here, so they use three pages

Hojnacki

1
2    to break it down for you.
3        Q.   Were you trying to give me one of
4    those statements yesterday, is that what you
5    were trying to give me?
6        A.   I don't know.
7        Q.   Do you get any newsletters
8    regarding your investments?
9        A.   Occasionally I receive an email
10   from MIO that typically talks about a new
11   investment strategy as I describe them.
12       Q.   What sort of information will they
13   give you about the strategy?
14       A.   Just very high level about what the
15   strategy entails, the type of risk it's
16   pursuing how you might think about it in
17   relation to any other holdings you might
18   have, other strategies you are invested,
19   very, very high level information.
20       Q.   So you don't know -- withdrawn.
21       You have about 40 percent of your
22   retirement funds in MIO and you don't know
23   what that money is actually invested in, is
24   that right?
25       A.   I don't know beyond the four, in my

Hojnacki

1
2    case, four asset strategies that I choose.
3        Q.   So in those strategies, you don't
4    know what funds are in those strategies,
5    right?
6        A.   No.
7        Q.   And you don't know what the
8    holdings of those funds are, right?
9        A.   I do not.
10       Q.   So I mean, have you ever tried to
11   see if you could find out what the holdings
12   are, I know I would if I had 40 percent of my
13   retirement money in something, I would be
14   looking under every rock to try to figure
15   what my retirement money was in, have you
16   ever tried to do that?
17       MS. GAY:  Objection to the form.
18   You can answer.
19       A.   I have looked at the statement that
20   I can access through this website and I
21   clicked on all the graphs and I clicked on
22   all the bars and I tried to look, there is
23   nothing there.  It's absolutely not available
24   to me and I have not taken any other measures
25   to try to find what those are invested in.

Hojnacki

1
2        Q.   You are just hoping for the best?
3        A.   As we are all with our investment
4    portfolios.
5        Q.   Have you become aware at any point
6    prior to the Westmoreland case that you
7    actually can find out through public means
8    what funds are held by, on the pension side
9    that are held by the MIO?
10       A.   Can you ask your question again,
11   I'm sorry.
12       Q.   It doesn't really matter what you
13   became aware.
14       Are you aware there are publicly
15   filed forms with the Department of Labor,
16   forms 5500 that do, in fact, list the funds
17   that are held by the pension side of the MIO?
18       A.   I've become aware recently again
19   through I believe the discussions about the
20   Mar-Bow litigation that there is information
21   available on websites.  I never accessed it,
22   I never looked at it and I have been told
23   it's extremely historical and outdated.
24       Q.   It's historical by one year, right,
25   it's historical in the sense that a tax

MAGNA
LEGAL SERVICES

1          Hojnacki
2  return is historical, right?
3          MS. GAY:  Objection to the form.
4  You can answer.
5      A.  I don't know how historical it is,
6  I have never referenced those documents or
7  those sites.
8      Q.  You don't intend to do so?
9      A.  No.
10     Q.  But it's your understanding that
11 somebody who was interested and who did want
12 to do that would be able to do that?
13         MS. GAY:  Objection to the form.
14 Able to do what.
15         MR. PETRELLA:  To go on and access
16     those forms and look at the holdings of
17     the funds.
18         MS. GAY:  Objection to the form.
19 That's not what he said.
20     A.  What's your question, I'm sorry.
21     Q.  You said that you've learned at
22 some point that there are these form 5500s
23 filed with the Department of Labor that are
24 publicly available and list the holdings of
25 the investment strategies for the MIO pension

1          Hojnacki
2  investments, is that right?
3      A.  I've been told that there is
4  something called a form 5500 that has some
5  information related to the MIO strategies or
6  MIO partners.  Specifically what it is and
7  what level of detail I can't speak to.
8      Q.  Would you agree that once you know
9  the fund that you are invested in, there are
10 various ways to find out what the holdings of
11 those funds are?
12         MS. GAY:  Objection to the form.  I
13 will give you a little leeway on this.
14     A.  Are you saying in general, do other
15 -- are there ways in which you can get
16 details about what different funds are
17 invested in?
18     Q.  Right.
19         MS. GAY:  As a general matter is
20     what you are asking?
21         MR. PETRELLA:  Sure.
22     A.  As a general matter, yes.
23     Q.  Are you aware that you can go to
24 the form 5500s, find out what funds the MIO
25 is invested in and then use that information

1          Hojnacki
2  to find out what those funds hold?
3      A.  I haven't ever tried to do that
4  myself.
5      Q.  Do you believe it's possible to do
6  that though?
7          MS. GAY:  Objection to the form.
8  Asking him to speculate.
9      A.  I haven't tried it, so I don't know
10 that it is.
11     Q.  You know that Mar-Bow has raised an
12 allegation that the MIO is invested in White
13 Box, correct?
14     A.  Yeah, I mention that in the
15 declaration.
16     Q.  And you are aware that the
17 allegation is that White Box in turn invests
18 in a company called Contura that has an
19 interest in the A&R case, are you aware of
20 those allegations?
21     A.  I heard of them as part of the
22 Mar-Bow litigation.
23     Q.  Are you aware that Mar-Bow found
24 out about White Box's investment in Contura
25 just by searching the internet?

1          Hojnacki
2      A.  I don't know how Mar-Bow became
3  aware of what he found.
4      Q.  Are you familiar with SEC form
5  13Fs?
6      A.  No.
7      Q.  You know John Garcia?
8      A.  I do know John Garcia.
9      Q.  How long have you known him?
10     A.  Since I joined McKinsey.
11     Q.  That was you said I think five
12 years ago?
13     A.  Five and a half.
14     Q.  How many conversations have you had
15 with him?
16         MS. GAY:  In those five years?
17         MR. PETRELLA:  Right.
18     A.  I have no idea.
19     Q.  It's a lot, right?
20     A.  It's certainly more than one but I
21 don't speak to John on a day-to-day basis.
22     Q.  Give me an estimate in the five
23 years -- let me back up.
24         Did you know John Garcia before you
25 joined McKinsey other than through maybe

1          Hojnacki
2    recruiting you over?
3         A.  I only met him in the process of
4    joining McKinsey RTS.
5         Q.  Give me an estimate during those
6    five years how many times did you talk to
7    him, 100 times, 1000 times, 10 times, best
8    you can do?
9         A.  Over a five and a half year period
10   how many times have I spoken to John Garcia,
11   roughly?
12        Q.  Right.
13        A.  Maybe a hundred times.
14        Q.  He is not like a social friend of
15   yours, you don't socialize with him outside
16   of work or anything like that?
17        A.  No.
18        Q.  Mr. Garcia is currently the
19   president of RTS, is that right?
20        A.  That's my understanding, yes.
21        Q.  And he has been the president of
22   RTS since it was founded in 2010, correct?
23        A.  That's my understanding, yes.
24        Q.  For all of those years up until
25   June 2017 he was also a director of the MIO,

1          Hojnacki
2    correct?
3         A.  That's what I have been told.
4         Q.  He was also on the audit committee
5    and the investment committee of the MIO
6    board, is that right?
7         A.  I don't know that.
8         Q.  Have you reviewed any of the
9    submissions in the A&R case?
10        A.  Which submissions, which case?
11        Q.  A&R.
12           MR. PETRELLA:  Can you tie this to
13   a provision of either of the affidavits
14   here.
15           MR. PETRELLA:  Paragraphs 36
16   through 41.
17           MS. GAY:  Specifically where?
18           MR. PETRELLA:  The numerous
19   portions and especially 40 where Mr.
20   Hojnacki talks about the separateness of
21   the MIO and the rest of McKinsey.
22           MS. GAY:  It has nothing to do with
23   A&R.
24           MR. PETRELLA:  This case --
25           MS. GAY:  Let me read paragraph 40

1          Hojnacki
2    for the record, this is Exhibit 3,
3    Hojnacki, this is the first declaration
4    of Mr. Hojnacki, paragraph 40 which you
5    are referring to says, The cause of the
6    separateness of MIO partners from
7    McKinsey RTS U.S. and its consulting
8    affiliates, McKinsey RTS U.S. has not
9    asked MIO partners to search for
10   connections to the potential parties in
11   interest.
12           MR. PETRELLA:  That's what we are
13   talking about the separateness here.
14        Q.  Members of the MIO board can become
15   aware of MIO direct investments as opposed to
16   pension investments, is that right?
17        A.  I don't know what information the
18   MIO board has about MIO specifically.
19        Q.  Do you know what positions Mr.
20   Garcia held on the MIO board when he was on
21   it?
22        A.  No, I don't.
23        Q.  So you don't know whether directors
24   of the MIO approved investments, become aware
25   of investments, become aware of money

1          Hojnacki
2    managers, that sort of thing?
3         A.  I don't know what information the
4    board of MIO partners receives.
5         Q.  Now, in June of 2016, you said
6    under oath in the Sun Edison case that the
7    MIO was a blind trust.
8            Do you recall saying that?
9            MS. GAY:  Again, let me note my
10   objection, this is not a deposition
11   concerning Sun Ed so I'm going to direct
12   him not to answer.
13           MR. PETRELLA:  I agree it's not a
14   declaration -- I agree it's not a
15   deposition having to do with Sun Ed
16   except to the extent that Sun Ed has
17   been specifically referenced in the
18   declaration as a qualification for RTS
19   but regardless of the specific case it's
20   about, it is about the basis for the
21   statements in this declaration and the
22   statements in this declaration speak to
23   the purported separateness of MIO from
24   the rest of McKinsey and that is what
25   these questions are directed at.

MAGNA
LEGAL SERVICES

1          Hojnacki
2          So you are directing him not to
3   answer whether he said in Sun Edison
4   that the MIO is a blind trust.
5          MS. GAY:  Can you point me again to
6   the paragraph you are relating this
7   question to in his Westmoreland
8   affidavit?
9          MR. PETRELLA:  I relate it all to
10  36 to 41.
11         MS. GAY:  Let me stop and read it.
12         MR. PETRELLA:  It's also relevant
13  to the change in terminology from one
14  case to the other, whether there is any
15  significance to that.
16         MS. GAY:  That I do not accept.
17  This is about this affidavit and the
18  prior one, I will let him answer the
19  question and we will see where you go.
20  Q.   Do you remember the question?
21  A.   No, if you don't mind repeating it,
22  please.
23  Q.   Do you recall in June 2016 you said
24  under oath in the Sun Edison case that the
25  MIO is a blind trust or is essentially a

1          Hojnacki
2   blind trust in words or substance?
3          MS. GAY:  Are you quoting.
4          MR. PETRELLA:  Yes.
5          MS. GAY:  Do you want to show him
6   what he said.
7   Q.   This is Hojnacki 6.
8          (Hojnacki Exhibit 6 Amended
9   declaration of Mark Hojnacki marked for
10  identification.)
11         MS. GAY:  Which paragraph, Mr.
12  Petrella?
13         MR. PETRELLA:  Paragraph 67.
14         MS. GAY:  Where are you reading
15  from in paragraph 67.
16         MR. PETRELLA:  The sentence begins,
17  MIO investors make investments.
18  Q.   Do you see that?
19         MS. GAY:  What's your question.
20  Q.   Just if he sees it first.
21  A.   I see the reference to blind trust
22  in roughly the sixth line of that paragraph.
23  Q.   Do you recall making this statement
24  in Sun Edison?
25  A.   I acknowledge this is the

1          Hojnacki
2   declaration that I signed in Sun Edison, yes.
3   Q.   This line about blind trust, that
4   was not drafted by you, I assume, is that
5   right?
6   A.   No, as in Westmoreland I relied on
7   the McKinsey legal department and counsel and
8   others in preparation for this declaration in
9   Sun Edison.
10  Q.   At the time you made this
11  statement, were you aware that John Garcia
12  was both the president of RTS and a board
13  member at MIO?
14  A.   I think if you continue later in
15  the paragraph 67, it actually indicates that
16  there is certain MIO board of directors are
17  also employees of McKinsey RTS including one
18  director who is also a director.
19  Q.   Right.  But it doesn't name -- it
20  doesn't say John Garcia is the president of
21  RTS, he is also on the board of MIO, right?
22  A.   It does indicate there is a
23  director, a board of directors of MIO that's
24  also an officer, director or officer of
25  McKinsey RTS.

1          Hojnacki
2   Q.   But it doesn't say, by the way that
3   person is the president of RTS?
4          MS. GAY:  Why don't you read the
5   paragraph into the record.  One of you
6   to make sure we have a clear record for
7   the record, or I can.
8          MR. PETRELLA:  You want to read the
9   whole paragraph into the record.
10         MS. GAY:  Make sure we are clear,
11  67, Sun Edison says, Two of McKinsey
12  RTS's affiliates, MIO Partners Inc. and
13  MIO Partners do not provide consulting
14  services and were not included in the
15  above inquiries.  MIO serves McKinsey's
16  pension plans, partners and former
17  partners by offering a portfolio of
18  investment products with a variety of
19  structures, risk levels and currencies.
20  The team primarily uses third party fund
21  managers to make investment decisions
22  independently of MIO.  MIO investors
23  make investments with MIO essentially on
24  a blind trust basis with such MIO
25  investors having no access to

**MAGNA** ▶
LEGAL SERVICES

```
1            Hojnacki
2  information about the underlying
3  holdings of the third party funds.  MIO
4  is managed independently and all its
5  investment activities are separate from
6  McKinsey's consulting operations.  As
7  such, MIO does not make any investment
8  decisions based on the use of McKinsey
9  RTS and affiliates client information.
10 Certain members MIO board of directors
11 are also employees of McKinsey RTS and
12 its affiliates, including one director
13 who is also director and officer of
14 McKinsey RTS.  MIO's board of directors
15 through the investment committee of that
16 board which generally meets on a
17 quarterly basis is primarily responsible
18 for overseeing, reviewing and approving
19 MIO's overall allocation amongst the
20 various MIO managed investment products.
21     That's the Sun Ed paragraph you are
22 referring to.
23     MR. PETRELLA:  Right.  I hope we
24 don't have to read every paragraph I
25 refer to in the rest of the deposition,
```

```
1            Hojnacki
2  I hope we don't have to read the entire
3  paragraph.
4     MS. GAY:  You are talking about a
5  different affidavit from the subject of
6  his deposition and I want to make sure
7  we are clear for the court exactly what
8  you were doing.
9     MR. PETRELLA:  I think the court
10 will have the exhibits to the deposition
11 and that the court can read.
12 Q.  Are you aware that the trustees
13 office in the A&R case has concluded that
14 your statements here in paragraph 67 among
15 several others over the years have been
16 misleading?
17     MS. GAY:  Now you have gone too
18 far.  We are talking about the
19 Westmoreland affidavits.  I gave you the
20 benefit of the doubt on Sun Ed, but you
21 misread the paragraph.  We are not going
22 into other bankruptcies, Mr. Petrella.
23 If that's all you are going to ask about
24 we can end right now.  Ask him about the
25 Westmoreland affidavits or we will end
```

```
1            Hojnacki
2  the deposition.
3     MR. PETRELLA:  I am asking about
4  the Westmoreland affidavits in which he
5  --
6     MS. GAY:  Why don't you do that.
7     MR. PETRELLA:  I have been but you
8  are directing him not to answer.
9     MS. GAY:  Let me read the question
10 back for the record then, we will make
11 the record clear.
12     MR. PETRELLA:  The record is clear,
13 it's on the record, you are reading
14 something already on the record and also
15 wasting my time.
16     MS. GAY:  Then don't ask questions
17 not about Westmoreland.
18     MR. PETRELLA:  I am asking
19 questions about Westmoreland.
20     MS. GAY:  Your question was are you
21 aware the trustees office in the A&R
22 case have concluded that your statements
23 here in paragraphs 67 of the Sun Ed case
24 among several others over the years have
25 been misleading.  I will not let him
```

```
1            Hojnacki
2  answer that.
3     MR. PETRELLA:  Let me be clear why
4  I am asking about this.  In Sun Edison
5  he said it was essentially a blind
6  trust, the blind trust language doesn't
7  appear in Westmoreland anymore but the
8  concept of separateness does still
9  appear in Westmoreland, which is why I'm
10 asking these questions.  Okay.  And I
11 think it's important for the court to
12 know that over the years McKinsey has
13 made many statements to courts under
14 oath indicating that there is virtual
15 total separation, no way that any one
16 could ever find out what these
17 investments of MIO were, when, in fact,
18 the very president of RTS was a member
19 of the board of MIO, knew all the
20 investments, ratified all the
21 investments, knew everything that was
22 going on and that's not me saying it.
23 That's McKinsey officials saying it
24 under oath in the A&R case, so I think
25 it's very important that Judge Jones
```

1           Hojnacki
2    understands when he reads this
3    deposition that whatever McKinsey says
4    about the MIO is subject to change and
5    at least by the U.S. Trustee's lights
6    has determined it to be, to put it
7    mildly, inaccurate in the past and less
8    than forthcoming.
9           MS. GAY:  You made your speech and
10    Judge Jones has indicated lawyers
11    statements are not evidence.  Ask the
12    affiant and the deponent any questions
13    you want about the Westmoreland
14    affidavit.
15    Q.   Does the MIO invest either directly
16    or indirectly in any interested party in the
17    Westmoreland Coal case?
18    A.   I don't know, I don't have access
19    to their investments.
20    Q.   As you say in your declaration,
21    that search was not done, is that fair?
22    A.   Nobody at McKinsey & Company
23    outside of the board of directors which does
24    have members that are partners of McKinsey &
25    Company on it has access to the investments

1           Hojnacki
2    of MIO.  Can't influence it, can't choose
3    them for them, can't do anything to direct or
4    know of what those investments are.
5    Q.   Except -- that's true as of June
6    2017, right, for seven years before that,
7    that wasn't a true statement, was it?
8           MS. GAY:  That's not what he said.
9    Misstates his testimony.
10    A.   I don't know what you are
11    referencing, specifically.
12    Q.   I wasn't characterizing your
13    testimony.  I was asking you a question.
14           MS. GAY:  What's the question, you
15    just made a speech, what's the question.
16    Q.   The question is, up until June 2017
17    for the seven years prior to that, in fact,
18    RTS did know what was going on at MIO, didn't
19    it?
20           MS. GAY:  Objection to the form.
21    You can answer.
22    A.   I don't think RTS did.  I don't
23    know specifically what you are referencing
24    but RTS didn't know.  The only people that
25    are part of McKinsey & Company or its

1           Hojnacki
2    affiliates that have access to anything at
3    MIO are the members of the board of
4    directors.
5    Q.   Which was John Garcia for seven
6    years, correct?
7    A.   You're conflating John's
8    responsibility as a board member of RTS or of
9    MIO and his role as the president of RTS.
10    Q.   So he can compartmentalize in his
11    brain, if he learns something at MIO, that
12    isn't used for any other purposes, is that
13    right?
14           MS. GAY:  Objection to the form.
15    A.   I know he has two different
16    responsibilities.  I know MIO has its own
17    investment professionals that follow their
18    own investment theses and work with their own
19    people to make the investments at MIO.  What
20    role specifically the board or any board
21    member plays in that process, I don't know.
22    I can tell you specific to the work, the team
23    that's focused on Westmoreland, nobody has
24    any access to the investments that's MIO
25    makes.

1           Hojnacki
2    Q.   Unless they look on the internet?
3           MS. GAY:  Objection to the form.
4    Q.   Right?
5           MS. GAY:  That misstates what he
6    said.
7           MR. PETRELLA:  I'm not
8    characterizing what he said.  I'm asking
9    a question.
10           MS. GAY:  Make it a little clearer
11    what your question is.
12    A.   What's your question?
13    Q.   Do you know for a fact that none of
14    your colleagues have searched the internet
15    for the holdings of the MIO?
16    A.   None of my colleagues at McKinsey &
17    Company or...
18    Q.   Yes.  Or RTS or anyone at McKinsey.
19    A.   I am not aware.
20    Q.   Do you know why Mr. Garcia left the
21    MIO board in June of 2017?
22    A.   I do not.
23    Q.   In paragraph 39 you say, there are
24    data protection protocols that segregate --
25    A.   Which exhibit?

Page 238

Hojnacki

1          Hojnacki
2   Q.  Hojnacki 3.
3   A.  Okay.  I have paragraph 39.
4   Q.  You see your reference to data
5   protection protocols that segregate McKinsey
6   client information from MIO employees?
7   A.  I see the statement, yes.
8   Q.  What if someone from RTS wanted to
9   call over to MIO and talk to somebody and
10  say, tell me what's going on with the
11  investments, what am I invested in here, is
12  that prohibited?
13  A.  We have -- there is a specific
14  policy in place that governs the relationship
15  or provides a protocol for communications
16  between MIO and consulting staff and so --
17  Q.  Consulting staff within or without
18  MIO?
19  A.  I'm sorry -- MIO doesn't have
20  consulting staff, MIO does not provide
21  consulting services.
22  Q.  Of any kind?
23  A.  Of any kind.
24  Q.  Doesn't it provide consulting
25  services to its investors?

Page 239

Hojnacki

1          Hojnacki
2   A.  I think I would characterize that
3   as investment advice not consulting services
4   in the sense that McKinsey does.
5   Q.  So there are written protocols on
6   the flow of information between MIO and the
7   rest of McKinsey, is that right?
8   A.  Yes.
9   Q.  What do they say?
10  A.  They say that, one specifically to
11  what's here, all information whether it's
12  relative to McKinsey on the consulting side
13  or related to MIO on the MIO partner side is
14  explicitly separate, separate systems,
15  separate email servers, no access between the
16  two of them and one party cannot access that
17  of the other.
18  Q.  So do the protocols say, no one
19  from MIO is allowed to speak with anyone
20  outside of MIO about any investment of the
21  MIO, do they say that in words or substance?
22  A.  In words or substance -- certainly
23  in substance there is direct language in the
24  protocol that says that communications
25  between the two should not be had that would

Page 240

Hojnacki

1          Hojnacki
2   at all jeopardize the independence of either
3   side.
4   Q.  Should not be had or must not be
5   had?
6   A.  I don't recall the specific word
7   that's used but the point is that it is
8   extremely clear that those conversations
9   should not be had.
10  Q.  Ever?
11  A.  As opposed to...
12  Q.  Pardon me?
13  A.  As opposed to?
14  Q.  As opposed to exceptions, as
15  opposed to under certain circumstances, is
16  there a flat clear ban that says, no one from
17  McKinsey -- no one from MIO shall communicate
18  with anyone outside of MIO regarding any of
19  its investments, period, no exceptions.
20      Is that what the protocol says?
21  A.  I'm sure with any policy, they have
22  the ability to get approved exceptions.  What
23  specifically those are, I can't speak to
24  right here as we sit.
25  Q.  You looked at it in preparation for

Page 241

Hojnacki

1          Hojnacki
2   your deposition, right?
3   A.  I have, yes.
4   Q.  Did you look at it yesterday?
5   A.  Yesterday, probably.
6   Q.  What are the exceptions?
7   A.  There is a procedure that you would
8   have to go and request in writing in order to
9   get exceptions, I don't know exactly, I never
10  requested an exception, I never intended to
11  request an exception, I have no intent to do
12  so.  I just know there is a protocol, like
13  any policy, to get exceptions.
14  Q.  The exception we are talking about
15  is an exception to speak -- is this a
16  protocol for someone outside of MIO to speak
17  with someone in MIO or the other way around
18  or both?
19  A.  I don't know.
20  Q.  Who makes the decision on whether
21  to approve an exception?
22  A.  As we sit here right now, I can't
23  recall.
24  Q.  Does the protocol talk about, under
25  what circumstances it is appropriate for MIO

MAGNA ►
LEGAL SERVICES

```
 1            Hojnacki
 2  and individuals at McKinsey outside of MIO to
 3  communicate about MIO investments?
 4      A.  Can you ask your question again
 5  please.
 6      Q.  Sure.  Does the protocol discuss
 7  what type of circumstances under which it
 8  might be appropriate to have communications
 9  between MIO and McKinsey people outside of
10  MIO discuss an investment of the MIO?
11        MS. GAY:  I can't follow that, but
12     if you can answer.
13      A.  I'm not sure I follow the question,
14  I apologize.
15      Q.  We were talking about exceptions,
16  exceptions to the I guess the prohibitions
17  against communications about investments.
18  Does the protocol define what those
19  exceptions are?
20      A.  I don't recall.
21      Q.  Are you aware of any circumstances
22  in which such an exception has been approved?
23      A.  I am not aware of any.
24      Q.  Do the exceptions relate to verbal
25  conversations or do they relate to any kind
```

```
 1            Hojnacki
 2  of communication?
 3      A.  I'm not sure I understand what you
 4  are asking.
 5      Q.  Withdrawn.
 6        Do the exceptions relate to,
 7  spoken, oral conversations or do they relate
 8  to any kind of communication?
 9      A.  I'm not clear, are you referring to
10  a specific exception or a general exception
11  or are you just implying that a conversation
12  might happen.
13      Q.  What I'm saying is, does the
14  protocol say, employee of McKinsey & Co. Inc.
15  may have a conversation with an employee of
16  MIO partners under the following exceptions?
17      A.  No, it says permission must be
18  granted before an exception is approved.
19      Q.  And permission must be granted to
20  do what, to speak in any way, to communicate
21  in any way, shape or form?
22      A.  Correct.
23      Q.  Let's go back to your supplemental
24  declaration for a second.  That's Hojnacki 4.
25  Specifically paragraph 5.
```

```
 1            Hojnacki
 2        Have you read that to yourself?
 3      A.  Yes, sir.
 4      Q.  This paragraph says that no service
 5  team member is on the MIO board or works with
 6  board members in that capacity, right?
 7      A.  Correct.
 8      Q.  Do you know if any service team
 9  members worked with MIO investment managers?
10      A.  Will you ask your question again.
11      Q.  Sure.  Do you know if any service
12  team members work with MIO investment
13  managers?
14      A.  I don't believe that the service
15  team knows who the MIO investment managers
16  are.
17      Q.  But in terms of my question, do you
18  know whether they work together?
19      A.  No, I don't know if they -- they
20  wouldn't know they're investment managers of
21  MIO.
22      Q.  It doesn't matter.  I'm just
23  saying, do you know whether they worked
24  together, whether they know it or not?
25      A.  No.
```

```
 1            Hojnacki
 2      Q.  Do you know whether --
 3        MS. GAY:  No you don't know or no
 4     they not.
 5      A.  No, I do not.
 6      Q.  Do any service team members work
 7  with MIO investment employees?
 8      A.  The employees of the service team
 9  and the employees of MIO are completely
10  separate and don't work together.
11      Q.  Do you know if any service team
12  members work with MIO board members outside
13  their capacity as MIO board members?
14      A.  Just state again the relationship
15  you are looking to connect.
16      Q.  I'm trying to see whether you know
17  if any of the members of your service team
18  whether they work with people who are MIO
19  board members except their work with those
20  board members doesn't relate to their service
21  on the board?
22        MS. GAY:  Objection to the form.
23     Answer if you can.
24      A.  I don't know.
25      Q.  I believe you also say in this
```

1          Hojnacki
2  paragraph that McKinsey RTS has uncovered no
3  relationships between members of the service
4  team and members of the board of directors of
5  MIO partners that McKinsey RTS U.S. believes
6  would disqualify it from serving the debtors
7  in this Chapter 11 case.
8          Do you see that?
9      A.  Yes.
10     Q.  Does that mean there are
11  relationships between members of the service
12  team and the MIO board, it's just that RTS
13  doesn't believe that they're disqualifying?
14     A.  So, as it indicates here, we
15  surveyed -- a survey was sent in addition to
16  those that were surveyed that were described
17  in other paragraphs of the supplemental
18  declaration and others.  We sent surveys to
19  all members of the service team to identify
20  whether or not they have any relationships
21  with the MIO board of directors in their
22  capacity as board of directors to MIO
23  Partners and through that survey we uncovered
24  there is no relationship to those -- that
25  there is no -- let me make sure I get it

1          Hojnacki
2  correct here as I stated it.  No member of
3  the service team has worked with those board
4  members in their capacity as a board member.
5      Q.  So there is working together, it's
6  just that the working together doesn't
7  involve the board members' work as a board
8  member of MIO, is that fair?
9      A.  I think you are expanding on a
10  statement that I just said.  We identified
11  that there is not any sort of relationship on
12  their working together in their capacity as
13  board members.
14     Q.  Let me try it a different way, the
15  fourth line, right, the second line, based on
16  the survey sent to all members of the service
17  team McKinsey RTS U.S. uncovered no
18  relationships between members of the service
19  team and members of the board of directors of
20  MIO Partners.
21         Do you see that, are you following
22  me that far?
23     A.  Yes.
24     Q.  Let's put a period right after
25  partners.  My question is --

1          Hojnacki
2      A.  You are putting a period in the
3  middle of which sentence?
4      Q.  In the middle of where it says
5  board of directors of MIO Partners on the
6  fourth line.
7          Do you see that?
8      A.  Correct.
9      Q.  So let's just say for purposes of
10  this question, let's put a period there.  Why
11  couldn't you just put the period there.  Why
12  did you need the extra language?  Why
13  couldn't you just say there is no
14  relationships period, end of sentence, the
15  end, what's the qualifier for?
16     A.  Because specifically what this
17  declaration is stating is our point of view
18  on being a disinterested party.
19     Q.  So in this paragraph, you made the
20  judgment that the relationships that exist
21  are not disqualifying, fair?
22         MS. GAY:  Objection.  Misstates his
23  testimony.  You can answer.
24     A.  We've reviewed the relationships
25  that exist between any members of the service

1          Hojnacki
2  team and any members of the MIO board of
3  directors.  We surveyed to understand what
4  those relationships involve and come to the
5  determination that it shouldn't disqualify
6  McKinsey RTS from serving the debtor in this
7  case.
8      Q.  Is that your call to make?
9      A.  I relied on members -- people
10  working for me to help draft this.
11     Q.  I'm talking about McKinsey.  Is
12  that McKinsey's call to make?
13     A.  I relied on counsel to help prepare
14  this.
15     Q.  Because I mean, doesn't Judge Jones
16  get to decide whether a relationship is
17  disqualifying or not?
18     A.  I think Judge Jones will review the
19  whole body of work in both this supplemental
20  and all the materials related to MIO and all
21  the effort to identify the separateness of
22  MIO both included in the supplemental
23  declaration and paragraphs of the original
24  and can understand exactly how separate they
25  are and how little information the service

Hojnacki
1    Hojnacki
2    team has about the investments of MIO and
3    certainly can understand that there is no way
4    that anything that the consulting group, the
5    consulting service team is doing can be
6    influenced by MIO and vice-versa, that MIO
7    could not be influenced by the service team.
8        Q.   Unless they go on the internet,
9    right?
10       MS. GAY:  Objection to the form.
11       Argumentative.
12       A.   I didn't say that.
13       Q.   For paragraph 5, Judge Jones
14   basically has to take your word for it that
15   these relationships are not disqualifying,
16   right?
17       MS. GAY:  Objection to the form.
18       Q.   You don't give him any information
19   to help him make that assessment for himself,
20   do you?
21       A.   We've tried to be clear about
22   exactly what we did, the relationships that
23   we evaluated, the question that we asked in
24   terms of what the relationship is and
25   therefore made the statement that we did.

1    Hojnacki
2        Q.   Why not at least tell him the
3    general nature of the relationship so that he
4    could at least see what kind of relationship
5    you are talking about here because all you
6    are saying here is there are relationships,
7    we looked at them, they don't disqualify
8    them, go away?
9        MS. GAY:  Objection to the form.
10       A.   We did state it's specifically they
11   do not work with such board members in their
12   capacity as board members.  We did state that
13   specific piece.
14       Q.   A lot of McKinsey's work for its
15   clients receives media coverage, correct?
16       A.   State your question again.
17       Q.   A lot of the work that McKinsey
18   does for its clients receives coverage in the
19   media, is that right?
20       A.   There is -- we do a lot of work
21   globally so I think a percentage of the work
22   that we do globally for the matters that we
23   do it on, the portions picked up by the media
24   are relatively small, but there are some,
25   yes.

1    Hojnacki
2        Q.   The work that RTS does in
3    particular, a lot of that is public, right,
4    it's all reflected in public filings and
5    bankruptcy court dockets and there are
6    hundreds and hundreds of documents, is that
7    fair?
8        A.   Certainly any work that we do in
9    the Chapter 11 space is public.
10       Q.   Is MIO allowed to use that kind of
11   public information to make investment
12   decisions?
13       A.   I can't speak to what information
14   MIO uses to make its investment decisions.
15       Q.   Is there any protocol that
16   prohibits that kind of activity?
17       A.   The policy specifically prohibits
18   MIO from accessing any information that is
19   used by the consulting staff or the
20   consulting portion of McKinsey & Company.
21       Q.   But does it prohibit, for example,
22   if someone from MIO is reading the Wall
23   Street Journal and they read something about
24   something McKinsey is doing or something that
25   is going on with a McKinsey client, are they

1    Hojnacki
2    allowed to use that information to make an
3    investment decision?
4        A.   I think as I just stated, I don't
5    know what information MIO is allowed to use.
6        Q.   Does MIO have access to the global
7    client database?
8        A.   I don't know -- actually, I believe
9    not.
10       Q.   What's your basis for that belief?
11       A.   It's just what I believe.
12       Q.   But what's it based on?
13       A.   That there is no information shared
14   between McKinsey's consulting arm and MIO
15   Partners and the global client database is
16   managed and owned and run by the consulting
17   arm.
18       Q.   But you don't know whether MIO has
19   a list of McKinsey clients is that fair?
20       A.   I know that according to the
21   policy, right which I have reviewed in
22   preparation for preparing this declaration
23   and reviewed again as part of preparing for
24   this deposition, that the sharing of
25   information between the two entities is

1      Hojnacki
2  prohibited.
3      Q.  Does that protocol specifically
4  speak about client identities?
5      A.  It does mention client identities,
6  yes.
7      Q.  In that capacity it prohibits MIO
8  from knowing who McKinsey's clients are,
9  unless there is an exception, is that right?
10     A.  From what I recall, my review of
11 the policy.
12     Q.  So no one from outside of MIO can
13 tell anyone from MIO who McKinsey's clients
14 are and MIO is not allowed to know, is that
15 fair?
16     A.  Would you state it again?
17     Q.  Sure.  According to this protocol
18 that you reviewed, no one from outside MIO is
19 allowed to tell anyone at MIO who McKinsey's
20 clients are and no one at MIO is allowed to
21 know, is that fair?
22     A.  Correct.
23     Q.  Unless they are a board member,
24 right?
25     A.  Again, I can't speak to what

1      Hojnacki
2  information the board shares between the
3  board and MIO partners.
4      Q.  Well, it's not sharing so much as,
5  if you are a human being and you know
6  something, you can't just flush your head of
7  all knowledge when you act in another
8  capacity, right?
9          MS. GAY:  Objection to the form.
10     Q.  If there is a McKinsey partner that
11 does work for McKinsey, right, he knows who
12 his clients are, that doesn't change when he
13 joins the MIO board, does it?
14         MS. GAY:  Objection to the form,
15     again.
16     A.  I guess what's your specific
17 question?
18     Q.  The question I just asked.
19     A.  Sorry, I don't have a screen in
20 front of me.
21     Q.  McKinsey partners, right, they're
22 off working on their consulting assignments,
23 right?
24     A.  Correct.
25     Q.  They have clients and they have

1      Hojnacki
2  engagements and so forth and they are doing
3  their daily duties, fair?
4      A.  Serving clients.
5      Q.  Some of those partners also serve
6  on the board of MIO, right?
7      A.  Yes.
8      Q.  So by definition, they are on the
9  board of MIO and they know who McKinsey's
10 clients are, right?
11     A.  They would only know who their
12 clients are, again, there is a longstanding
13 policy within McKinsey of serving
14 competitors, right, I stated it in here, I
15 think we talked about it before.  Part of
16 that is maintaining your client confidences
17 including the fact that we serve other
18 clients very close, right, keeping it very
19 close and so a partner of McKinsey doesn't
20 know all of the other clients that McKinsey
21 serves, they only know the ones that they
22 serve.
23     Q.  Let's say I'm partner at McKinsey
24 and I have a friend who is also a partner at
25 McKinsey and we work on different stuff, I am

1      Hojnacki
2  not allowed to go and have a beer and talk
3  about what is going on with our different
4  clients?
5      A.  No, you are not supposed to.
6      Q.  Is there a protocol about that too?
7      A.  There is, I will forget the name of
8  the policy, but there is a policy about
9  serving competitors and the way in which we
10 protect those client confidences and how it's
11 one of our most important professional
12 responsibilities and there is additional
13 information about, specific to the sharing of
14 information and that information that's
15 obtained by a service team is intended to be
16 confidential for that service team alone.
17     Q.  And there is a written protocol at
18 McKinsey that you have seen that prohibits
19 partners from telling each other who their
20 clients are?
21     A.  So the practice is that, again when
22 you are in certain roles, right, it becomes
23 necessary to know what another client is,
24 right.  In the context of preparing this
25 declaration, I have become aware of a bunch

**MAGNA**
LEGAL SERVICES

Hojnacki

1
2  of other clients that are clients of McKinsey
3  that I don't currently serve but I am on a
4  need to know basis for the preparation of
5  this declaration, but they're not clients of
6  mine. I don't have any information beyond
7  what we've disclosed in these declarations
8  about the service that we provide to those
9  clients.
10     Q. So you said, part of your answer
11  was that's the practice. What I'm asking
12  you, is there a formal written policy or
13  protocol that says McKinsey partners cannot
14  share client identities with each other
15  unless there is a business need?
16     A. So the policy does state that the
17  sharing of information and even the sharing
18  of a client's specific name is confidential.
19     Q. Are you talking about, is this the
20  MIO protocol you are talking about or is this
21  something different?
22     A. I believe it's in, I forget the
23  name of the policy, but the policy that
24  governs the fact that we serve competitive
25  clients.

Hojnacki

1
2     Q. Have you seen that protocol
3  recently or that policy?
4     A. Yes.
5     Q. Did you see it yesterday?
6     A. I saw it in preparation of this
7  declaration.
8     Q. So are there separate protocols for
9  information flow into and out of MIO, is that
10  a separate protocol or is it all one
11  protocol?
12     A. They're separate. There is one
13  that governs any sort of relationship between
14  the consulting staff as I will call it or the
15  consulting arm and MIO and then there is a
16  separate one that governs how we handle the
17  fact that client confidences is one of our
18  most important professional responsibilities
19  and we don't share that information outside
20  of our service teams.
21     Q. Let's go back to Hojnacki 3,
22  paragraph 41. This says, RTS performed an
23  independent search related to White Box,
24  right?
25     A. Paragraph 41 Exhibit 3, yes. There

Hojnacki

1
2  is a statement here about as the results of
3  an independent search.
4     Q. Independent of whom?
5     A. I'm not sure I understand your
6  question.
7     Q. You used the word independent, you
8  could have just said as a result of a search
9  but you said as a result of an independent
10  search, so what I'm asking you is what do you
11  mean by independent, independent of whom or
12  what was the search conducted?
13     A. I didn't conduct or wasn't part of
14  the search myself so I can't speak to the
15  specifics of it. In terms of the specific
16  language here, this is where I relied on
17  others to help me draft this paragraph.
18     Q. Who did do that search?
19     A. I don't know.
20     Q. Do you know whether it was someone
21  from legal?
22     A. I don't know who conducted the
23  search.
24     Q. You don't know what the search
25  involved?

Hojnacki

1
2     A. I'm sorry, I'm just reading the
3  paragraph again as we sit here.
4        Sorry, what was your question.
5     Q. My last question was do you know
6  what the search involved? Do you know what
7  was done in connection with the search?
8     A. Again, I didn't do the search and
9  wasn't involved in the search, so
10  specifically I don't know.
11     Q. Do you know what the purpose of the
12  search was?
13     A. What I know is included here in
14  this paragraph 41 in relation to allegations
15  made by Alix in reference to Alpha Natural
16  Resources.
17     Q. Was the search done for the
18  purposes of preparing this paragraph of your
19  declaration?
20     A. I don't know what the purpose of
21  the search was.
22     Q. So someone just put this in your
23  declaration and said basically sign, fair?
24        MS. GAY: Objection to the form.
25     A. I went through as I described

MAGNA
LEGAL SERVICES

1          Hojnacki
2  before a very careful process and spent a lot
3  of time in reviewing these.  I did rely on
4  others in preparation of this.  This
5  specifically is a paragraph that related to
6  something that I'm not involved in that I
7  relied on others for.
8      Q.  Did you discuss paragraph 41 with
9  anyone before you signed it?
10     A.  I don't recall a specific
11  discussion of it.
12     Q.  How did you learn that MIO had an
13  investment relationship with White Box?
14     A.  In preparation for this declaration
15  is when I learned about it and in just the
16  news that's been out there in all of the
17  allegations filed by Alix.
18     Q.  Did you learn about it through news
19  or the allegations from Alix or did you first
20  learn about it when you got a draft of your
21  declaration that had paragraph 41 in it?
22     A.  I don't recall the specific timing
23  of when I learned about it.
24     Q.  It says the search was done in
25  April of 2018, is that right?

1          Hojnacki
2      A.  That's what this paragraph states,
3  yes.
4      Q.  And the next line says that it says
5  relating to an April 27, 2008 Wall Street
6  Journal article.
7      Do you see that?
8      MR. MARGOLIN:  2018.
9      Q.  2018.  Do you see that part?
10     A.  Yeah I see the first two lines,
11  that independent search relating to the
12  publication of an article dated April 27,
13  2018 in the Wall Street Journal.
14     Q.  Do you know whether it was the
15  article that prompted the search?
16     A.  I don't know.
17     Q.  There is some reference down here
18  to pleadings in Alpha Natural Resources and
19  the Alix case in the Southern District.
20     Do you see those?
21     A.  In the same paragraph?
22     Q.  Yes.
23     A.  Yes.
24     Q.  Do you know whether those pleadings
25  are what prompted the search you reference

1          Hojnacki
2  here?
3      A.  No.  Like I said, I didn't have any
4  involvement in the search and don't know
5  specifically what prompted it.
6      Q.  I think we discussed earlier that
7  RTS is a fiduciary to the debtor, correct?
8      A.  Can you refer me back to the
9  specific question or document that we
10  referenced.
11     Q.  Rather than dig through.  You agree
12  that RTS is a fiduciary for the debtor in
13  Westmoreland, don't you?
14     A.  Again, just reference me to what
15  document you want me to --
16     Q.  I don't want you to reference a
17  document.  I just want to know, I'm surprised
18  you are having this much trouble answering
19  this.
20     Is RTS a fiduciary to the debtor in
21  the Westmoreland case?
22     A.  We as part of our role in serving
23  the client under some of the provisions
24  listed, have fiduciary obligations to the
25  debtors.

1          Hojnacki
2      Q.  Why can't you just say yes to that?
3      MS. GAY:  Objection to the form.
4  He is trying to understand what you
5  said.  He is trying to listen to you.
6      MR. PETRELLA:  He is trying to
7  understand a ten word sentence.
8      A.  I'm trying to best answer the
9  questions.
10     Q.  Do you agree it's important for a
11  fiduciary to avoid the appearance of
12  inappropriately?
13     A.  Can you be specific about what you
14  mean.
15     Q.  I mean a situation that potentially
16  looks bad even though it may not actually be
17  bad.  It may be bad, it may not but
18  regardless it looks bad?
19     MS. GAY:  Objection to the form.
20     Q.  Do you understand what I'm talking
21  about?
22     A.  There is a lot of hypotheticals.
23     Q.  It's not a hypothetical.
24     A.  If you explain it to me again, I
25  will do my best.

MAGNA
LEGAL SERVICES

1          Hojnacki
2     Q.  I'm saying, for example, if -- you
3  don't know whether it's true that MIO
4  actually invests in Contura through White
5  Box, do you?
6     A.  I have no knowledge of specifically
7  what MIO invests in beyond the asset
8  allocations I mentioned in our discussion of
9  MIO earlier.
10    Q.  If it is true, you agree that
11  doesn't look very good to the public?
12        MS. GAY:  Objection to the form.
13    A.  I think they're completely
14  separate, right.  I think that the work being
15  done on behalf of debtors, in this case
16  Westmoreland, is completely separate from any
17  decisions that MIO Partners is making to
18  invest its funds.
19    Q.  Do you have an understanding of the
20  factual allegations regarding Contura and
21  White Box, do you understand what the
22  allegations are?
23    A.  I haven't spent a ton of time
24  reviewing the allegations that have been made
25  outside in other cases, no.

1          Hojnacki
2     Q.  Let me just go through them briefly
3  and you tell me whether you formed an
4  understanding of that prior to today.
5         Do you understand the allegation is
6  that the MIO invests in a fund called White
7  Box?
8     A.  I understand it based on what I've
9  disclosed here in this paragraph.
10    Q.  Do you understand also that an
11  allegation has been made that White Box in
12  turn holds an investment in a company called
13  Contura?
14    A.  Okay.  I haven't reviewed
15  documents.  If you have a document you want
16  me to read to review it.
17    Q.  I'm just saying, prior to today,
18  did you have an understanding of that?
19    A.  I know there is many allegations
20  that have been made by Alix and Mar-Bow
21  against McKinsey and McKinsey RTS.
22    Q.  Did you read this Wall Street
23  Journal article here in paragraph 41?
24    A.  There has been many Wall Street
25  Journals, I don't remember if I read the one

1          Hojnacki
2  dated April 27th.
3     Q.  But assuming that, I will go back
4  to my question, assuming that MIO invests in
5  White Box and assuming that White Box invests
6  in Contura and Contura benefited
7  significantly from the A&R, the outcome of
8  the A&R bankruptcy, do you agree that doesn't
9  look good to the public?
10        MS. GAY:  Objection to the form.
11     You are getting very far afield from the
12     Westmoreland affidavit but go ahead.
13        MR. PETRELLA:  Except this is
14     expressly addressed in it, but go ahead.
15    A.  Will you please restate your
16  question for me.
17    Q.  I'm saying, if it's true that the
18  MIO invests in White Box and White Box
19  invests in Contura and as a result of the
20  plan in the A&R bankruptcy that McKinsey
21  helped develop, Contura benefited financially
22  significantly, to the tune of approximately
23  $50 million, do you agree that that is not a
24  good look for the bankruptcy process for the
25  public?

1          Hojnacki
2        MS. GAY:  Objection to the form.
3     A.  So the fact that a team is serving
4  a debtor that has no knowledge of the
5  investments that are being made by a
6  completely separate entity into funds that
7  may invest in something that's three levels
8  removed, that they have no knowledge of, I
9  don't understand how they would even know
10  that's happening.
11    Q.  Well, Jay Alix figured it out,
12  didn't he, using public sources?
13        MS. GAY:  Objection to the form.
14    Q.  That's how?
15    A.  I can't speak to what Mr. Alix did
16  or didn't do.
17    Q.  How do you know one of your
18  colleagues didn't do the same thing?
19        MS. GAY:  Again, objection to the
20     form.  All of this is argumentative and
21     speculative.
22        MR. PETRELLA:  It's a question.
23    Q.  How do you know your colleagues
24  didn't do the same thing?
25        MS. GAY:  What is the same thing.

Hojnacki
1
2    Q.   Same thing Jay Alix did, which is
3   go on public sources and figure it out,
4   fairly quickly and easily I might add.
5        A.   I don't know what Mr. Alix did or
6   didn't do to come up with his allegations and
7   so I can tell you that teams like the service
8   team serving Westmoreland don't have any
9   knowledge of the investments or any
10   connection with the MIO Partners and the
11   ability to understand or influence their
12   investment decisions that are being made on a
13   day-to-day basis.
14        Q.   Do you agree that the MIO issue and
15   the allegations that Mr. Alix has raised and
16   Mar-Bow has raised regarding the MIO, do you
17   agree that those issues are essentially
18   irrelevant as long as everyone at McKinsey is
19   playing by the rules?
20        MS. GAY:  Objection to the form.
21        Q.   As long as they are following the
22   protocols you reviewed?
23        MS. GAY:  Again, same objection.
24        A.   Can you -- I think there might be
25   two questions in there or multiple statements

Hojnacki
1
2   buried into a question.  Can you be specific
3   about what you are asking.
4        Q.   Let me rephrase it.
5        Do you agree as long as everyone at
6   McKinsey follows the protocols that you
7   reviewed, it shouldn't matter what MIO was
8   invested in?
9        MS. GAY:  Again, I object to the
10        form.  You can answer if you can
11        decipher it.
12        A.   So I believe that there is and
13   again we have tried to be as fully
14   transparent about the separateness of the two
15   entities, the fact that they don't share
16   servers, they don't share employees, there is
17   policies in place to govern any or prohibit
18   any sort of share of information and so I
19   think it demonstrates the separateness that
20   we characterize through this declaration and
21   the supplemental declaration.
22        Q.   As someone who acts as a fiduciary,
23   does it trouble you at all that MIO might be
24   investing in companies with a financial stake
25   in the bankruptcies that RTS is handling?

Hojnacki
1
2        A.   Again, I think I stated this before
3   but to the extent that I have no idea and no
4   control over what they're doing and the fact
5   that they have no knowledge other than I
6   suppose what's available in public documents
7   to anything being done on the consulting
8   side, it's so separate to me, it doesn't
9   influence what we do on a day-to-day basis on
10   the consulting side and I don't know how it
11   would at all inform what they are trying to
12   do on the investing side.
13        MS. GAY:  Can we clarify, when you
14        are saying they, you are talking about.
15        A.   The employee and the investment
16   professionals of MIO Partners.
17        Q.   In terms of the firm as a whole,
18   you don't know what information anyone other
19   than you might have about what's going on at
20   MIO?
21        A.   So I know what I receive, right, I
22   think we talked about it and I have read the
23   policy and understand what information is
24   prohibited.  I can't speak for every
25   individual of McKinsey RTS or McKinsey &

Hojnacki
1
2   Company but I'm comfortable that they don't
3   have any information that I wouldn't have
4   access to.
5        Q.   Let's look at paragraph 73 of your
6   declaration.
7        MS. GAY:  Can we take a two minute
8        bathroom break.
9        THE VIDEOGRAPHER:  The time is 2:25
10        and we are going off the record.
11        (Recess.)
12        THE VIDEOGRAPHER:  This is the
13        start of media label No. 7.  The time
14        now is 2:48 p.m. and we are back on the
15        record.
16        Q.   Let's go back to Hojnacki 3.  And
17   specifically paragraph 73.  Just read through
18   73 for yourself and let me know when you are
19   done.
20        A.   Okay.
21        Q.   So in this paragraph you are
22   talking about RTS and its affiliates
23   provision of analysis and advice to
24   competitors of the debtors, right?
25        A.   So it's specific to providing

1          Hojnacki
2    analysis and advice to companies in the
3    wholesale power in the North American Coal
4    sectors.
5        Q.   Which include competitors of the
6    debtor in this case, correct?
7        A.   Sure, I think it's a wider view
8    than just competitors of the debtors but
9    there might be some competitors of the
10   debtors in that space.
11       Q.   On page 30, paragraph 73, let's
12   start over on 73, McKinsey RTS and affiliates
13   do from time to time provide overall
14   strategic analysis and advice to companies
15   that operate in the wholesale power
16   generation and North American coal mining
17   sectors in which the debtors operate which
18   analysis and advice could include review and
19   comment on publicly available information and
20   strategic considerations with respect to the
21   debtors as well as other companies.
22          Then you go on to say McKinsey RTS
23   U.S. and affiliates service to other
24   companies in the industry in which the
25   debtors operate may focus on the macro

1          Hojnacki
2    landscape of the industry but should have no
3    direct effect on the debtors given the nature
4    of the market.
5        Do you see that?
6        A.   Yes.
7        Q.   I read that as a fairly big hedge.
8        Who made this determination?
9        MS. GAY:  Objection to the form.
10       A.   I guess when you refer to this
11   determination, which determination are you
12   referring to.
13       Q.   The determination that this advice
14   and analysis should have no direct effect on
15   the debtors?
16       A.   So the paragraph is intended to
17   help provide complete transparency to the
18   type of work that McKinsey RTS U.S. and its
19   affiliates state in terms of, just globally,
20   if an affiliate has a client that comes to it
21   and says we would like some information on,
22   you know, the macro landscape or helping us
23   review some publicly available information,
24   et cetera, et cetera, that that type of work
25   if it's performed by some party that's not a

1          Hojnacki
2    member of the service team or that doesn't
3    have, in which case any relationship would
4    have already been disclosed, or it's not
5    involved in a direct commercial relationship
6    with the debtors which would have also been
7    disclosed, then we do that work but it's kind
8    of unimportant to the debtors.
9        Q.   Right.  So who performed the
10   analysis that determined that this analysis
11   and advice should have no direct effect on
12   the debtors?
13       A.   As I described, the intent of this
14   paragraph and the work we are describing here
15   and what we are trying to describe, I think
16   from my point of view it's clear that it
17   wouldn't have any direct, what does it say,
18   no direct effect on the debtors.
19       Q.   I believe you said this paragraph
20   was designed to give complete transparencies,
21   did I get that right?
22       A.   I don't recall the specific words
23   that I used but it's intended to provide
24   transparency to different types of work.
25       Q.   Saying that the services to the

1          Hojnacki
2    other companies in the industry may focus on
3    the macro landscape of the industry but
4    should have no direct effect on the debtors
5    given the nature of the market, do you view
6    that as a completely transparent statement?
7        A.   I'm comfortable with the language
8    included in the declaration, yes.
9        Q.   Did anyone perform a written
10   analysis of the effect that this kind of
11   industry advice and analysis might have on
12   the debtor in this case?
13       A.   Not that I am aware of.
14       Q.   Let's look at paragraph 75, just
15   read that to yourself and let me know when
16   you are done.
17          Do you have it?
18       A.   I'm just reading footnote 10.
19   Okay.
20       Q.   The last sentence of 75 says, In
21   addition to the best of my knowledge, no
22   member of the service team McKinsey RTS U.S.
23   and its consulting affiliates or their family
24   members hold equity securities of the
25   debtors.



1          Hojnacki
2      Do you see that?
3      A.  Yes.
4      Q.  Do you know if that's true of
5  partners of McKinsey & Company Inc.?
6      A.  So this is true with respect as it
7  states to the service team McKinsey RTS U.S.
8  and its consulting affiliates and their
9  family members.
10      Q.  Does that include, leaving the
11  affiliates aside, does it include the
12  individual partners of McKinsey & Company
13  Inc.?
14      A.  You said besides the consulting
15  affiliates.
16      Q.  The partners, as opposed to the
17  affiliates themselves.
18      Were the partners of McKinsey & Co.
19  Inc. asked whether they own equity securities
20  of the debtor?
21      A.  We should reference back to all the
22  surveys that were sent and just --
23      Q.  Okay.  Go ahead.
24      A.  So paragraph 34D, the survey we
25  talked about in reference to that subsection.

1          Hojnacki
2      Q.  Right.
3      A.  All employees of McKinsey RTS U.S.
4  and its affiliates globally that provide
5  consulting services to determine any personal
6  or family relationship with or employment by
7  the debtors, the U.S. Trustee for region 7,
8  attorneys, employees at the office of
9  U.S. Trustee's office for region 7 and the
10  bankruptcy judges in the Southern District of
11  Texas as well as any equity ownership of the
12  debtors.
13      Q.  So is it your testimony that the
14  affiliates globally there, that would include
15  the partners of McKinsey & Company Inc.?
16      A.  Yes.
17      Q.  How about McKinsey & Company Inc.
18  U.S.?
19      A.  Yes.
20      Q.  Let's go back to your supplemental
21  declaration, Hojnacki 4.  And specifically
22  paragraph 6.  Just let me know when you are
23  done reading it.
24      A.  Okay.
25      Q.  When I read this, it sounded to me

1          Hojnacki
2  like what originally appeared to be 5 percent
3  or more shareholders turned out not to be, is
4  that a fair characterization of what you are
5  saying here?
6      A.  The parties that were listed under
7  the 5 percent shareholders category were not
8  indeed 5 percent shareholders.
9      Q.  Do you have any information or
10  knowledge as to how that happened, why
11  someone thought they were but it turned out
12  they weren't?
13      A.  I don't have any knowledge.  We
14  didn't prepare the interested party list.
15      Q.  Pardon me?
16      A.  McKinsey RTS didn't prepare the
17  interested party list.
18      Q.  You haven't had a conversation with
19  anyone in which they explained to you why the
20  interested parties listed as 5 percent or
21  more shareholders turned out, in fact, not to
22  be 5 percent or more shareholders?
23      A.  I did not, no.
24      MR. IVANICK:  Off the record.
25      (Off the record.)

1          Hojnacki
2      Q.  Back to your supplemental
3  declaration, Hojnacki 4, paragraph 7.  Just
4  let me know when you are done reading it.
5      A.  Yes.
6      Q.  In this paragraph you say that
7  there was a search for client services
8  provided to entities on the first
9  supplemental list of potential parties in
10  interest since October 1, 2016.
11      Do you see that?
12      A.  In this paragraph, yes.
13      Q.  Did you check to see if McKinsey
14  and its affiliates owned debt or equity in
15  the interested parties?
16      A.  If employees -- can you ask your
17  question specifically of who you are
18  inquiring about?
19      Q.  I'm asking about McKinsey RTS and
20  its affiliates and whether you did a search
21  to see if any of them owned debt or equity in
22  the interested parties, any of the interested
23  parties?
24      A.  The entities themselves?
25      Q.  The entities or their partners?

MAGNA ▶
LEGAL SERVICES

Page 282

Hojnacki

1
2       MS. GAY:  I think it's getting late
3   and you are dropping your voice a little
4   bit, Mr. Petrella, it might be the mike
5   too.
6       Q.   Did you hear what I said?
7       A.   For the sake of clarity would you
8   mind repeating one more time for me, please.
9       Q.   Sure.  Referring you back to that
10  sentence, where you say you searched the
11  first supplemental list of potential parties
12  et cetera, you saw that?
13      A.   Correct.
14      Q.   What I'm asking is, if McKinsey and
15  its affiliates, did you check to see whether
16  McKinsey, their affiliates or their partners
17  owned any debt or equity in any of the
18  interested parties?
19      A.   So I think that the supplement lays
20  out what we did with respect to the actions
21  taken in filing the supplemental declaration.
22  I think the first declaration lays out the
23  thorough process that we did and I think we
24  just discussed the survey question that was
25  asked to identify whether or not the -- all

Page 283

Hojnacki

1
2   employees of McKinsey RTS and its affiliates
3   -- I'm going to read the paragraph again or
4   at least the beginning of it, I have to just
5   find it.
6       Paragraph 34, letter D, about the
7   question in the survey that was provided to
8   the employees of McKinsey RTS U.S. and its
9   affiliates globally and the last section
10  focuses on equity ownership of the debtors.
11      Q.   Let's look at paragraph 22 of the
12  supplement.  There it references a $1.24
13  million payment being wired back to the
14  debtor.
15      A.   Sorry I lost the paragraph number.
16      MS. GAY:  22.
17      Q.   Page 10.
18      A.   Yes, sir.
19      Q.   Does RTS acknowledge that this sum
20  here is a preference?
21      A.   So we acknowledged that the
22  payments received on account of services
23  provided were in excess of the retainer
24  advance payment that we had received from the
25  debtors and we were advised by counsel that

Page 284

Hojnacki

1
2   that could be a preference so we have
3   voluntarily wired the funds back and those
4   funds have been sent.
5       Q.   When did you receive that advice
6   from counsel?
7       A.   We received that advice from
8   counsel, I don't recall specifically the
9   timing of it.
10      Q.   Was it before or after your
11  supplemental declaration?
12      A.   Before or after -- in this
13  supplemental declaration, we've indicated the
14  offer to repay the shortfall and the intent
15  to -- the process of starting the wiring of
16  the funds back.
17      Q.   So it's before?
18      A.   It's before.
19      Q.   Was it before or after your first
20  declaration?
21      A.   I think we acknowledged, let's go
22  back to what is specifically in here.
23      Q.   I'm talking about the advice that
24  it could be a preference and that it should
25  be repaid.

Page 285

Hojnacki

1
2       Did you get that before or after
3   your first declaration?
4       A.   What advice are you alluding to?
5       Q.   The advice you testified to in
6   which counsel told you that the 1.24 million
7   could be a preference and should be repaid.
8       A.   So again, I think the page 12 of
9   the declaration which includes the analysis.
10      Q.   Hojnacki 3?
11      A.   I'm sorry, yes, Hojnacki 3, we kind
12  of laid out the entire table of all of the
13  activities associated with the payments that
14  we received prior to the filing date and
15  specifically noted the potential preference
16  issue and the fact that we had offered to
17  repay the money to the debtors and we, in
18  fact, followed through with that and
19  disclosed it in the supplemental declaration.
20      Q.   So you got the advice before the
21  first declaration?
22      A.   We were aware of all of the
23  activity that we put into this table at the
24  time of filing this original declaration in
25  Exhibit 3.

MAGNA
LEGAL SERVICES

Page 286

1            Hojnacki
2    Q.   Why did it take over a month to
3 wire the money back -- withdrawn.
4         Has it actually been wired back
5 yet?
6    A.   The debtors received the money
7 back.
8    Q.   Why did it take over a month to do
9 it?
10    A.   We approved the payment, put in the
11 wire request as fast as possible, it took
12 that long, it's been paid to the debtors.
13    Q.   When did you put the wire request
14 in?
15    A.   I don't remember exactly.
16    Q.   Can you estimate, roughly?
17    A.   I don't have a guess, no.
18    Q.   Let's go back to Hojnacki 4,
19 paragraph 23.  Do you see that?  Read it and
20 let me know when you are done.  I want to
21 make sure you read it.
22    A.   I see paragraph 23, yes.
23    Q.   At the end of paragraph 23, you
24 say, without prejudice or admission, McKinsey
25 RTS U.S. hereby agrees to waive the 96,000

Page 287

1            Hojnacki
2 prepetition amount.
3         Do you see that?
4    A.   The last sentence of paragraph 23,
5 yes.
6    Q.   What does that mean, without
7 prejudice or admission?
8    A.   At the time of filing, the $96,000
9 is an account of the one day between the last
10 day that the debtor made payments prior to
11 the filing date and the filing date on
12 October 9th so effectively the October 8th we
13 held a retainer in excess of that amount at
14 that time but we are happy to contribute the
15 $96,000 back and waive any claim against the
16 debtors for that amount of services.
17    Q.   Without prejudice?
18    A.   We are happy to do it.  Contribute
19 those funds back to the debtor.
20    Q.   Without prejudice, right?
21       MS. GAY:  Is that a question?
22    Q.   What is your understanding of what
23 without prejudice means, as you use it here
24 in this paragraph?
25    A.   I am not a lawyer, so I am not

Page 288

1            Hojnacki
2 going to try to define or characterize what
3 without prejudice means in this context, but
4 I can tell you, we are happy to waive the
5 claim and happy to give the money back to the
6 debtors or not be paid on account of the
7 services that were provided to the debtor, we
8 are happy to do it.
9    Q.   Did you ask counsel what this
10 means, without prejudice or admission?
11    A.   I didn't ask counsel specifically
12 what those two words mean.
13    Q.   But you can't reinstate this claim
14 at any point, can you?
15    A.   We have no intent of reinstating
16 this claim.
17    Q.   But can you?
18    A.   I don't know what the context of
19 those words mean or the ability to reinstate
20 this claim.  I can tell you we have no intent
21 of doing so.
22    Q.   Are there any written guidelines or
23 protocols on when it's appropriate to
24 withhold a client's name from a disclosure
25 like this and treat them as a confidential

Page 289

1            Hojnacki
2 client?
3    A.   Will you ask your question again.
4    Q.   Sure.  In your original
5 declaration, we will just stick to that,
6 initially at least there were three
7 confidential clients disclosed, they were
8 called confidential clients but the names
9 weren't given.
10         Do you remember that?
11    A.   Yes.
12    Q.   What I'm asking, are there any
13 written protocols or guidelines that govern
14 when it's appropriate in a disclosure like
15 this to withhold the client's name and call
16 them a confidential client as opposed to give
17 their actual name?
18    A.   So as we I think discussed earlier,
19 two of those three have been disclosed --
20       MS. GAY:  Let him finish.
21       MR. PETRELLA:  He is not answering
22 the question. Go ahead.
23    Q.   I'm just asking if there are any
24 protocols or guidelines on it?
25    A.   In other instances, it's when the



1              Hojnacki
2    circumstances around the disclosure might
3    prohibit or unduly harm the confidential
4    client.
5        Q.   And again, is that a written policy
6    or protocol or is that just a practice at
7    McKinsey?
8        A.   So I can't speak -- I'm not aware
9    of the written protocol.  I know each is done
10   on a case by case basis to understand the
11   facts and circumstances around what would
12   restrict us from disclosing it.
13       Q.   Are you aware of whether there is a
14   written protocol or not?
15       A.   I'm not aware.
16       Q.   As you sit here now, have you ever
17   been involved in providing services to any of
18   the interested parties in this case, to your
19   knowledge?
20       A.   Ever in the course of my career?
21       Q.   Correct.
22       A.   I didn't use that language when I
23   reviewed the list of interested parties.
24       Q.   You are sitting here right now, can
25   you think of any?  Are there any that jump to

1              Hojnacki
2    mind, I know this is an interested party in
3    this case that I provided services for in my
4    career?
5        A.   In my career at McKinsey or prior
6    to McKinsey?
7        Q.   At any time.
8        A.   Again, I didn't -- I would have to
9    go back and look through -- I didn't apply
10   that lens when I looked at and reviewed --
11       Q.   I'm not asking to go through the
12   schedules and look at them all.  If I ask you
13   the question right here, without looking at
14   anything, is there anything that pops to
15   mind, I know this is an interested party, I
16   did a long project for them, for this company
17   I provided services, any of them?
18       A.   Irrespective of time at McKinsey,
19   this could include time at my prior employer
20   or my prior employer before to that?
21       Q.   Right.
22       A.   I'm happy to --
23       Q.   I'm just saying as you sit here
24   right now as you sit here, does any name come
25   to mind?

1              Hojnacki
2        A.   I know one of the names on here is
3    AIG, I previously did work for AIG prior to
4    my time at McKinsey.
5        Q.   How about any names from your time
6    at McKinsey, do you know of any of those?
7        A.   Irrespective of time?
8        Q.   Yes.
9        A.   That's not the lens that I used
10   when I reviewed the interested parties list.
11       Q.   I know.
12       A.   I would have to go through --
13       Q.   I'm not asking you to go through.
14   Without looking at the list and whether you
15   used that as a lens or not, just sitting
16   here, are there any that pop into your head,
17   I know at McKinsey I worked on this client, I
18   know they're an interested party in this
19   case?
20       A.   None come to mind sitting here
21   right now.
22       Q.   Let's go back to Hojnacki 3 and
23   specifically paragraph 20.  Give that a read
24   and let me know when you are done.
25       A.   Okay.

1              Hojnacki
2        Q.   It says in here that RTS follows
3    it's own RTS reimbursement policy.
4            Do you see that?
5        A.   It says it developed its own
6    official reimbursement policy with respect to
7    its professionals' documentation of expenses,
8    the RTS reimbursement policy.
9        Q.   Right.
10       A.   Okay.
11       Q.   Is that the policy that McKinsey is
12   using for this case or RTS is using for this
13   case?
14       A.   Yes.
15       Q.   And does the U.S. Trustee have any
16   guidelines on professional expense
17   reimbursement?
18       A.   I'm not aware of the U.S. Trustee's
19   guidelines but I don't believe they provided
20   any comments on this aspect of our engagement
21   letter or our retention application.
22       Q.   And therefore you don't know
23   whether those guidelines are mandatory or
24   optional?
25           MS. GAY:  Objection to the form.

MAGNA ▶
LEGAL SERVICES

1          Hojnacki
2     You can answer.
3     A.   Again, I am not aware that we
4 received any comments from the U.S. Trustee
5 with respect to what we've talked about here.
6     Q.   You don't know whether any such
7 guidelines exist and therefore you don't know
8 whether, if they exist, they're mandatory or
9 optional, is that fair?
10     A.   I do not know.
11     Q.   And therefore you also don't know
12 how the RTS reimbursement policies may differ
13 from the U.S. Trustee's guidelines, is that
14 fair?
15     MS. GAY:  Objection to the form.
16     You can answer.
17     A.   I am not familiar with the
18 guidelines so I can't opine how they would
19 apply.
20     Q.   Let's talk about the documents that
21 you reviewed in preparation for your
22 deposition today.
23     Can you tell me what those were?
24     A.   I reviewed in detail my Exhibit 3,
25 my first declaration.  Exhibit 4 my second

1          Hojnacki
2 declaration and a handful of policies, some
3 of which we've discussed during this
4 deposition, in preparation for this
5 deposition.
6     Q.   Did those policies have any
7 particular numbers, were they numbered?
8     A.   No.
9     Q.   They just kind of have a heading at
10 the top, is that fair?
11     A.   That's how I recall them, sitting
12 here right now.
13     Q.   Tell me the policies you reviewed
14 that we haven't discussed today?
15     A.   The one I recall is the personal
16 investments policy.
17     Q.   What does that say?
18     A.   It's a policy that governs any
19 employee of McKinsey, their personal
20 investment abilities, the fact that it's
21 prohibited from trading on any material
22 nonpublic information that we receive about
23 clients.
24     Q.   Any others that you remember,
25 policies that you reviewed?

1          Hojnacki
2     A.   I think I've mentioned the others
3 in the context of this discussion.
4     Q.   And are those policies available on
5 a McKinsey website or anything like that?
6     A.   I'm not aware.
7     Q.   Do you know whether those have ever
8 been filed anywhere publicly?
9     A.   I am not aware.
10     Q.   Okay, so you reviewed your
11 declarations there and you reviewed these
12 policies, did you review anything else in
13 preparation?
14     A.   I reviewed my MIO statements or the
15 most recent month statement.  I reviewed a
16 handful of MIO newsletters that we discussed.
17     Q.   Anything else you can remember?
18     A.   Those are the items that I remember
19 as we sit here right now.
20     MR. PETRELLA:  Why don't we take a
21     break and see what we can do to wrap it
22     up.
23     THE VIDEOGRAPHER:  The time is 3:23
24     and we are off the record.
25     (Recess.)

1          Hojnacki
2     THE VIDEOGRAPHER:  This is the
3     start of media label number 8.  The time
4     now is 3:37 p.m. and we are back on the
5     record.
6     Q.   Who actually signed your paycheck,
7 is it McKinsey & Company Inc. or is it RTS?
8     A.   I get a direct deposit so I'm not
9 sure I have actually seen a paycheck to know
10 who the signatory is.
11     Q.   But you get like a statement,
12 right, that shows taxes that have been taken
13 out, things of that nature?
14     A.   I can have access to them on an
15 online site.
16     Q.   Have you ever looked at them and
17 see where the money is coming from, whether
18 McKinsey & Company or RTS Inc.?
19     A.   I don't know off the top of my
20 head.
21     Q.   Do you have an understanding one
22 way or the other of who pays you?
23     A.   As we sit here right now, I don't
24 know the entity that pays my paycheck.
25     Q.   Do you hold an equity or debt

**MAGNA** ▶
LEGAL SERVICES

Page 298

1          Hojnacki
2  interest of any kind in the debtors?
3      A.   Not that I am aware of.
4      Q.   How about in the debtors creditors?
5      A.   Not directly.  I have investments
6  through various funds through MIO and others
7  that we spoke about that I don't know the
8  holdings of all those assets.
9      Q.   Does McKinsey RTS have any offices
10  that are dedicated solely to RTS?
11      A.   Not that I know of.
12      Q.   What is the shareholders council?
13      A.   It's, to the best of my knowledge,
14  a group of senior partners that function as
15  the board of directors, if you will, of
16  McKinsey & Company.
17          MS. GAY:  Was this relevant to the
18  two affidavits.
19          MR. PETRELLA:  I think that --
20      Q.   Let me ask you this.  Mr. Pincus,
21  he was with you at the hearing?
22      A.   Yes.
23      Q.   Before Judge Jones?
24      A.   Yes.
25      Q.   Did he have anything to do with

Page 299

1          Hojnacki
2  your disclosures?
3      A.   He wasn't involved in the
4  preparation of them, no.
5      Q.   Was he involved in them in any way,
6  shape or form?
7      A.   He is a partner of McKinsey &
8  Company and so he would have received some of
9  the surveys that we referenced through the
10  discussion that were sent to partners in
11  McKinsey & Company.
12      Q.   But beyond that he had no role in
13  the preparation of your declaration?
14      A.   Correct.
15      Q.   And who is the other gentleman who
16  was with you at the hearing, was his name
17  Raj?
18      A.   Rok Kana (phonetic).
19      Q.   Did he have anything to do with
20  your disclosures?
21      A.   Again, he is a partner of McKinsey
22  & Company so he would have received the
23  survey that we discussed before and some of
24  the declarations, but beyond that, not that I
25  know of.

Page 300

1          Hojnacki
2      Q.   And in the course of preparing your
3  declarations, did you have any conversations
4  about your declarations with McKinsey
5  management?
6      A.   When you say management, who do you
7  mean.
8      Q.   I mean officers, directors of
9  McKinsey & Co. Inc.?
10      A.   McKinsey & Co.?
11      Q.   Yes.
12      A.   Or McKinsey RTS?
13      Q.   McKinsey & Co. Inc.
14      A.   Not that I know of.
15      Q.   Did you have any conversations
16  about your declarations with other managers
17  at RTS beyond the ones that you've identified
18  already today?
19      A.   Before I answer that.  Can I
20  clarify, I don't know all the officers and
21  directors of McKinsey & Company Inc. to be
22  able to state specifically without exception
23  to the question I think you are asking me.
24          Did you ask me a follow-up question
25  or second question I skipped before I

Page 301

1          Hojnacki
2  answered that.
3      Q.   I understand you don't know who
4  they are, but the ones that you do know, did
5  you have any conversations with them about
6  your declaration?
7      A.   No.
8          MS. GAY:  Then you skipped a
9  question, I think.
10      A.   I interrupted you.
11          MS. GAY:  You asked whether he had
12  conversations with any one else at
13  McKinsey RTS that he hasn't previously
14  mentioned in connection with his
15  declaration and he didn't answer.
16      Q.   So answer that one.
17      A.   So any other discussions with
18  people at McKinsey RTS?
19      Q.   Right.
20      A.   Ms. Molino who is part of McKinsey
21  RTS, part of the service team.  I had
22  discussions with her.  That's who I recall in
23  preparation of the declarations, yes.
24      Q.   What were your conversations with
25  Ms. Molino?



Hojnacki

1
2     A.  I think we discussed many
3   conversations over many, many hours, both in
4   the preparation of the original declaration
5   and then the supplemental, both in terms of
6   some of the disclosures that I relied upon
7   her and her team for, as well as just the
8   general preparation of them.
9         Sorry, I completely misspeaking,
10  Ms. Basch.
11    Q.  I thought you had said --
12    A.  I misused the name, Ms. Basch.
13    Q.  So the record is clear, Ms. Molino,
14  did you have any conversations with her at
15  all about your declarations?
16    A.  No, sir.
17    Q.  Did you have any communications
18  with the managing partner of McKinsey about
19  this case?
20    A.  About this case?
21    Q.  About the Westmoreland case
22  generally.
23    A.  No I received a text message from
24  Mr. Sneider (phonetic) prior to the holidays
25  wishing me a happy holiday and recognizing

Hojnacki

1
2   that there was going to be a significant
3   amount of work done over the holidays in
4   preparation for this deposition but nothing
5   substantive.
6     Q.  Nothing substantive about the case?
7     A.  No.
8     Q.  And Mr. Sneider had no role in the
9   preparation of your declarations, is that
10  right?
11    A.  No, sir.
12    Q.  Who are the officers and directors
13  of RTS, if you know?
14    A.  I don't know all of them off the
15  top of my head.
16    Q.  Name as many as you can?
17    A.  Mr. Garcia, Ms. Basch.
18    Q.  What's her title?
19    A.  I don't recall.  I just recall
20  seeing it in reference to an officer role.
21    Q.  Go ahead.
22    A.  Mr. Yakola are the three that I
23  recall as we sit here right now.
24    Q.  Are you saying Yakola?
25    A.  Yakola with a Y.

Hojnacki

1
2     Q.  What's his title?
3     A.  He is a senior partner in McKinsey
4   & Company and a practice leader of RTS.
5     Q.  Is he involved in this engagement?
6     A.  He is not part of the engagement
7   team but he is part of the service team.
8     Q.  But everybody is part of the
9   service team right, isn't that what you said?
10    A.  The service team includes all
11  officers, directors, employees of McKinsey
12  RTS.
13    Q.  Can you be on the service team and
14  do no work with respect to an engagement?
15    A.  Yes.
16    Q.  Do you know when McKinsey plans on
17  filing its first fee application in this
18  case?
19    A.  It would be after our retention is
20  approved but specifically the date I don't
21  know, but hopefully -- I don't know
22  specifically.
23    Q.  I want to talk just a little bit
24  more about, I know you said you did a lot of
25  work in preparation for your -- in

Hojnacki

1
2   preparation for your declarations and on your
3   declarations and you mentioned that you
4   edited your declarations, can you give me a
5   better sense of what exactly it was that you
6   did leading up to your declarations in terms
7   of the work that you did?
8     A.  So I would characterize it in a
9   couple of buckets.  One is reviewing drafts
10  of the declaration as it was prepared and
11  providing comments to those drafts back to
12  Ms. Basch and Mr. Ivanick.  Having phone
13  conversations with typically one or often
14  both of them to discuss the comments, to make
15  sure they were clear and that I was getting
16  responses to the comments and then asking
17  additional verbal questions.
18        Those were the main items that I
19  did in preparation of filing these.
20    Q.  Do you know how far back the
21  information in the global client database
22  goes?
23    A.  I do not.
24    Q.  Do you know whether information
25  drops out of it automatically once it becomes

Page 306

```
 1              Hojnacki
 2  a certain age?
 3      A.  I do not.
 4      Q.  We talked a lot about the phrase,
 5  direct commercial relationship or
 6  transaction.
 7          Do you remember that?
 8      A.  Direct commercial relationship?
 9      Q.  Or transaction I think was the
10  phrase.  Do you want to look at it, go back
11  to Hojnacki 3 and look at, I think it was 34
12  so under sub B there, do you see where it
13  says direct commercial relationship or
14  transaction?
15      MS. GAY:  33 or 34.
16      Q.  34B.
17      A.  Yes.
18      Q.  I assume that direct modifies both
19  commercial relationship and transaction, is
20  that right?
21      A.  Yes.  Direct commercial, I think
22  modifies both of those.
23      MR. PETRELLA:  No further
24  questions.
25      MS. GAY:  We reserve our questions
```

Page 307

```
 1              Hojnacki
 2  for trial.  We appreciate you coming
 3  over on New Years Eve.
 4      THE VIDEOGRAPHER:  The time is 3:48
 5  p.m. and we are going off the record.
 6      (Time Noted:  3:48 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 308

```
 1
 2          - - -
 3        I N D E X
 4          - - -
 5
 6  MARK HOJNACKI              PAGE
 7    By Mr. Petrella          5
 8
 9          - - -
10      E X H I B I T S
11          - - -
12  HOJNACKI EXHIBIT          PAGE
13  Exhibit 1    Order          6
14  Exhibit 2    Post Petition engagement
15      Letters        11
16  Exhibit 3    Declaration      21
17  Exhibit 4    Supplemental declaration 87
18  Exhibit 5    Article        195
19  Exhibit 6    Amended declaration  227
20
21
22
23
24
25
```

Page 309

```
 1
 2          - - -
 3    DEPOSITION SUPPORT INDEX
 4          - - -
 5  Direction to Witness Not to Answer
    Page Line    Page Line  Page Line
 6  None
 7
 8  Request for Production of Documents
    Page Line    Page Line  Page Line
 8  None
 9
          - - -
10
    Stipulations
11  Page Line    Page Line  Page Line
    None
12          - - -
13  Questions Marked
    Page Line    Page Line  Page Line
14  None
15
    To Be Filled In
16  Page Line    Page Line  Page Line
    None
17          - - -
18
19
20
21
22
23
24
25
```

MAGNA
LEGAL SERVICES

Page 310

```
1
2            CERTIFICATE
3
         I HEREBY CERTIFY that the witness,
4   MARK HOJNACKI, was duly sworn by me and that
    the deposition is a true record of the
5   testimony given by the witness.
6
    Leslie Fagin,
7   Registered Professional Reporter
    Dated: December 31, 2018
8
9
10
         (The foregoing certification of
11  this transcript does not apply to any
    reproduction of the same by any means, unless
12  under the direct control and/or supervision
    of the certifying reporter.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 311

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3        I,              , do hereby
    certify that I have read the foregoing pages,
4   and that the same is a correct transcription
    of the answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or substance,
6   if any, noted in the attached Errata Sheet.
7
8
    MARK HOJNACK              DATE
9
10
    Subscribed and sworn
11  to before me this
        day of           , 2018.
12
    My commission expires:
13
14  Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 312

```
1
2        - - - - - -
         E R R A T A
3        - - - - - -
    PAGE LINE CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MAGNA
LEGAL SERVICES

**A**

**Abbie** 2:18 5:4
**abilities** 295:20
**ability** 9:10 44:23
  240:22 270:11
  288:19
**able** 8:25 23:13
  25:20 118:6,9
  211:17 218:12,14
  300:22
**absolutely** 80:10
  109:15 208:3
  216:23
**accept** 59:3 226:16
**acceptable** 167:11
**accepted** 165:5
  166:15
**access** 68:11,14,16
  211:17,18 212:4
  216:20 218:15
  229:25 234:18,25
  236:2,24 239:15
  239:16 253:6
  273:4 297:14
**accessed** 76:9
  217:21
**accesses** 72:23,25
**accessing** 252:18
**account** 212:24
  283:22 287:9
  288:6
**acknowledge**
  227:25 283:19
**acknowledged**
  283:21 284:21
**acknowledgment**
  113:19 311:2
**act** 255:7
**acting** 12:19
**action** 59:19,22
**actions** 282:20
**active** 189:5
**actively** 191:10,14
**activities** 71:12
  230:5 285:13

**activity** 252:16
  285:23
**acts** 271:22
**actual** 14:8 22:19
  48:16 143:15
  211:24 289:17
**add** 270:4
**added** 90:6,22
  92:25 114:10,12
  139:8,8,15,16
  152:16
**addition** 82:2
  161:25 202:13
  246:15 277:21
**additional** 45:18
  62:25 63:2,22
  111:3 112:3,21
  115:3 156:24
  160:16 193:24
  257:12 305:17
**address** 60:13 89:4
**addressed** 268:14
**administrative**
  83:7 127:23
**administrator**
  128:7
**administrators**
  84:9,11
**admission** 286:24
  287:7 288:10
**advance** 34:23
  47:12 92:3 283:24
**adverse** 157:21
  158:4 171:20
  172:4,15 173:10
  173:19
**advice** 10:8,20
  57:14,19,21 58:9
  58:10,13,25
  201:23 239:3
  273:23 274:2,14
  274:18 275:13
  276:11 277:11
  284:5,7,23 285:4
  285:5,20
**advise** 203:16,23

  204:2
**advised** 10:16
  15:20 64:2,11
  181:16 283:25
**affiant** 234:12
**affidavit** 226:8,17
  231:5 234:14
  268:12
**affidavits** 147:4,7
  147:16,19,21
  150:10 163:13,15
  164:4 182:14
  197:19 200:16
  202:9,11 204:6
  223:13 231:19,25
  232:4 298:18
**affiliate** 22:17
  25:24 30:8 50:8
  82:3 85:24 87:4
  88:16 91:15,17
  93:4,19 95:15,16
  95:24 96:4,14
  97:2 98:16,24,25
  142:3 152:19,20
  152:25 275:20
**affiliates** 12:19
  17:6,9 21:8 22:19
  74:9 79:13 84:19
  85:21,22 86:16
  88:4,9,19,23 94:3
  94:4,16 98:9,13
  98:18,22,23 99:8
  99:9,18 100:3,5
  100:12 101:4,20
  116:20 117:4,10
  117:21,25 118:15
  118:19,25 119:4,9
  119:14,17 120:10
  120:18,20,25
  121:3,18 122:6
  126:20 127:22
  133:25 134:9
  143:14 151:7,11
  151:21,25 152:8
  152:11,13 153:2,4
  153:10,15 159:25

  160:8 170:22
  187:12 188:3
  196:7 206:9 224:8
  229:12 230:9,12
  236:2 273:22
  274:12,23 275:19
  277:23 278:8,11
  278:15,17 279:4
  279:14 281:14,20
  282:15,16 283:2,9
**affiliation** 28:24
**affiliations** 22:12
  23:14
**afield** 115:15 147:8
  197:19 198:24
  202:12 268:11
**age** 306:2
**ago** 45:14 52:7
  199:19 221:12
**agree** 116:17
  182:16 219:8
  225:13,14 264:11
  265:10 266:10
  268:8,23 270:14
  270:17 271:5
**agreed** 46:9 51:12
  51:15 53:12 57:7
  162:7,19 169:8
**agreement** 103:16
  103:18,21,23,25
  104:6 106:21
**agrees** 286:25
**ahead** 41:18 61:15
  110:14 146:2
  268:12,14 278:23
  289:22 303:21
**AIG** 292:3,3
**al** 1:6 4:6
**Alex** 36:23
**Alix** 59:8 261:15
  262:17,19 263:19
  267:20 269:11,15
  270:2,5,15
**allegation** 220:12
  220:17 267:5,11
**allegations** 59:7,21

  59:22 220:20
  261:14 262:17,19
  266:20,22,24
  267:19 270:6,15
**allocated** 213:5
**allocation** 211:19
  213:2 230:19
**allocations** 266:8
**allowed** 24:6,14
  105:25 174:3
  175:21 239:19
  252:10 253:2,5
  254:14,19,20
  257:2
**allows** 7:24
**alluding** 285:4
**Alpha** 261:15
  263:18
**amended** 115:10
  227:8 308:19
**amendment** 6:9
**American** 274:3,16
**Americas** 1:11 2:15
  4:11
**amount** 40:20
  42:12 47:8,8
  129:18 213:4
  287:2,13,16 303:3
**analyses** 49:15
**analysis** 46:18
  200:18 273:23
  274:2,14,18
  275:14 276:10,10
  277:10,11 285:9
**analyst** 86:10,25
  87:14
**and/or** 310:12
**annual** 113:11
**anonymous** 128:3,4
**answer** 15:24 16:18
  35:14,15 44:18
  45:4 58:18 64:9
  65:16,22 79:9
  82:20 84:4 88:10
  115:19 116:5,6
  117:14 121:12



128:10 131:13
137:8 144:20
145:23,25 147:3
147:10,13 148:22
149:7 150:15
159:13 173:21
182:18 184:25
191:23 193:5
198:6 200:25
201:13 202:7,9
203:2,21 204:4
216:18 218:4
225:12 226:3,18
232:8 233:2
235:21 242:12
245:23 248:23
258:10 265:8
271:10 294:2,16
300:19 301:15,16
309:5
answered 75:2
133:14 173:20
301:2
answering 264:18
289:21
answers 88:5 311:4
anticipate 25:16
anybody 25:25
32:11 33:25 34:3
34:15 35:19,23
36:19 57:23 64:10
146:12 198:2
anybody's 165:17
anymore 24:8,16
26:9 55:21 148:7
168:22 200:15
233:7
anyplace 147:17
apologize 141:24
242:14
apparently 89:6
158:10
appear 5:20 152:21
233:7,9
appearance 265:11
APPEARANCES

2:2 3:2
appeared 280:2
appearing 5:16
appears 21:19
application 41:2
42:23 75:18 92:5
92:18 93:12 107:9
107:21 108:14,17
110:5 177:9
293:21 304:17
applied 53:4
122:23 162:22
180:24 197:3
applies 6:8
apply 291:9 294:19
310:11
applying 53:3
appreciate 12:13
43:21 307:2
approach 34:25
49:12 50:2,4,7,13
50:15,18 51:5,6,9
51:10,15,16,23
52:12 53:3,4,13
53:24 75:10 93:10
93:13,22 113:6
162:15,21 165:4
165:13 166:14
167:10 168:3
169:7 180:24
202:22
appropriate 8:16
46:18 92:24 93:2
115:25 180:11
181:17 183:25
199:18,21 241:25
242:8 288:23
289:14
appropriately
207:20
approval 43:18
66:5
approve 241:21
approved 65:9,13
65:20 92:3 93:11
165:15 167:2

224:24 240:22
242:22 243:18
286:10 304:20
approving 230:18
approximately
17:15 18:10 23:7
48:20 68:7 82:16
82:22 111:5
268:22
April 262:25 263:5
263:12 268:2
area 29:2
areas 22:18 23:20
23:25
argumentative
149:7 250:11
269:20
arm 253:14,17
259:15
arrived 172:7
article 195:5
196:19 263:6,12
263:15 267:23
308:18
articulated 47:8
aside 278:11
asked 79:2,3 82:9
82:10,11 116:9
130:17 131:16,20
131:21,24 133:13
133:15 134:6
136:4,7,24 141:20
149:11 159:19
163:19 170:15
171:4,10,13 172:4
172:13,15 173:18
173:20,23 224:9
250:23 255:18
278:19 282:25
301:11
asking 9:21 15:15
32:9,14 33:2,4
36:14 39:23 57:25
58:2 74:12 78:9
82:24 92:13
113:22 119:16

121:17,20 137:19
139:19 145:9
146:23,25 147:14
147:25 148:23
160:21,25 168:5
184:8,9 185:2
192:15,16 201:14
201:17 202:8
207:19 214:14
219:20 220:8
232:3,18 233:4,10
235:13 237:8
243:4 258:11
260:10 271:3
281:19 282:14
289:12,23 291:11
292:13 300:23
305:16
asks 159:15
aspect 123:12
293:20
Aspen 194:14,14
195:14,17,24
196:3,4,4,12,17
196:18
assessment 250:19
asset 216:2 266:7
assets 97:25 298:8
assign 23:19
assigned 22:18
23:21 108:23
109:6
assignment 14:10
23:23 31:6,8,13
105:19
assignments 255:22
assisted 161:22,24
associate 23:16,19
24:20 28:9 84:12
86:7 87:8 208:24
associated 26:6
57:12 60:13 102:5
131:9 285:13
associates 83:6,6,22
association 4:15
24:21,22

assume 27:9 175:25
228:4 306:18
assuming 96:17
268:3,4,5
assumption 28:23
attached 311:6
attention 12:7
attorney 7:22 64:2
202:13
attorneys 2:4,9,14
2:20 3:3 168:17
181:21 279:8
attorney/client
164:3
audiences 141:11
audit 223:4
authority 43:17,23
183:9,12
authorization 5:24
200:4,9
automatically
305:25
available 163:12
216:23 217:21
218:24 272:6
274:19 275:23
296:4
Avenue 1:11 2:4,15
2:21 4:11
avoid 265:11
aware 7:17 15:18
18:7 32:10 33:2,6
33:9,25 34:3,15
35:2,11,18,23
36:19 37:2 58:7,8
58:24 59:4,12,15
59:16,20 60:22
63:4,25 68:8
71:12 77:17,20
104:15 106:2,5
109:11 113:24
114:21 117:16
135:11,21 144:8
144:10 145:19
148:25 152:18
153:7 161:16



171:6 179:24
195:23 196:11
208:10,17 209:2
217:5,13,14,18
219:23 220:16,19
220:23 221:3
224:15,24,25
228:11 231:12
232:21 237:19
242:21,23 257:25
277:13 285:22
290:8,13,15
293:18 294:3
296:6,9 298:3
**awareness** 32:15
**A&R** 15:18,24,25
16:8,14,20 59:13
59:21 197:13
220:19 223:9,11
223:23 231:13
232:21 233:24
268:7,8,20
**a.m** 1:12 4:10 66:23
67:3 89:10,14
150:23

---

**B**

**B** 125:24 127:12,18
131:10,14 132:21
132:22,24 133:23
134:7 141:25
151:4,4,5,14
152:7,19 153:19
159:18 160:6,13
160:20 306:12
308:10
**back** 33:16 39:8
46:4 49:21 55:20
57:11 61:15,18
67:3 75:15 78:10
89:14 120:3
122:19 123:4
134:17 150:23
151:17 153:18
158:15 177:10,23
178:5,18 185:15

192:18 203:6
205:8,10 221:23
232:10 243:23
259:21 264:8
268:3 273:14,16
278:21 279:20
281:2 282:9
283:13 284:3,16
284:22 286:3,4,7
286:18 287:15,19
288:5 291:9
292:22 297:4
305:11,20 306:10
**background** 116:8
**bad** 265:16,17,17
265:18
**balance** 213:9,10
213:12 214:6,7
**ban** 240:16
**bankruptcies**
200:16 231:22
271:25
**bankruptcy** 1:2 4:7
5:17 6:2 7:19 8:11
8:23 9:14,24,25
10:10 16:6 57:5
91:22 104:14
159:2,7,10 162:6
179:23 180:4
201:3 203:17
204:8 252:5 268:8
268:20,24 279:10
**bars** 216:22
**Basa** 86:19
**Basar** 26:18 85:13
86:20,21
**Basch** 36:10 37:13
48:14,21 49:8
52:11,16,18 60:17
64:23 125:12
128:2 130:10
136:12 165:10
166:20 180:21
183:19,23 302:10
302:12 303:17
305:12

**base** 109:6
**based** 17:7 25:12
25:14 50:22 92:16
112:15 131:16
133:16 141:2
142:19 153:10
163:16 172:7
173:2 175:14
201:15 230:8
247:15 253:12
267:8
**basic** 22:2,15 26:11
28:15
**basically** 24:14
74:12,14 169:9
214:4,9 250:14
261:23
**basis** 5:23 16:2,13
46:14 115:25
138:18 147:23
163:21 164:8
197:23 200:4,9,23
204:10 221:21
225:20 229:24
230:17 253:10
258:4 270:13
272:9 290:10
**bathroom** 273:8
**Bauman** 27:4 28:6
**bear** 207:15
**bearing** 134:5
**Becca** 27:4
**beer** 257:2
**began** 104:23
**beginning** 137:23
137:24 142:6
213:9,16 214:6
283:4
**begins** 227:16
**behalf** 13:5 15:5
266:15
**belief** 91:21 253:10
**believe** 10:2 13:24
18:9 20:13 36:22
39:13 60:25 75:15
82:8 85:7,15,25

86:5 89:24 90:5
107:24 112:10
113:4 115:21,24
119:18 122:3
126:17,22 130:11
133:14 154:2,3,16
171:12,15 174:24
194:12 207:14,17
207:23 212:2,9
217:19 220:5
244:14 245:25
246:13 253:8,11
258:22 271:12
276:19 293:19
**believed** 45:25
105:20 199:20
**believes** 246:5
**belong** 32:11
**Ben** 85:14 87:13
**benefit** 133:2
192:11,22 231:20
**benefited** 268:6,21
**Bermuda** 194:14
**best** 11:12 20:23
44:23 46:16 58:3
58:4 66:16 69:15
70:2 88:21 106:19
162:14 207:3
217:2 222:7 265:8
265:25 277:21
298:13
**better** 56:4 83:25
305:5
**beyond** 16:21 26:9
57:10 97:9,14
156:18 163:8,14
165:12 166:16
182:13 215:25
258:6 266:7
299:12,24 300:17
**big** 70:22 188:9
275:7
**bigger** 81:20
**bill** 40:24 41:25
**billed** 41:24 42:3,7
**billing** 122:11,20

122:22 123:4
187:17
**bit** 39:5 131:12
282:4 304:23
**blind** 225:7 226:4
226:25 227:2,21
228:3 229:24
**board** 206:10,15,20
206:24 207:7,13
207:22 209:6,11
209:15 223:6
224:14,18,20
225:4 228:12,16
228:21,23 230:10
230:14,16 233:19
234:23 236:3,8,20
236:20 237:21
244:5,6 245:12,13
245:19,20,21
246:4,12,21,22
247:3,4,7,7,13,19
248:5 249:2
251:11,12 254:23
255:2,3,13 256:6
256:9 298:15
**boat** 39:24
**body** 249:19
**Boies** 2:3 4:18
**boiled** 74:5
**books** 124:8,9
**borrow** 91:14 94:4
94:18,19,23 95:3
95:14 96:13
119:21,22 127:4
**borrowed** 82:3
84:19 85:21,21
86:14 87:3 88:13
88:16,20 119:25
121:14,17 159:25
**borrows** 93:15 96:9
**bother** 71:3
**bottom** 21:22 74:6
**bouncing** 12:11
**bounds** 16:21 93:8
**Box** 220:13,17



259:23 262:13
266:5,21 267:7,11
268:5,5,18,18
**Box's** 220:24
**brain** 236:11
**break** 40:12 58:20
66:21 150:17
185:17 194:25
215:2 273:8
296:21
**breaks** 5:22
**brief** 21:15 69:17
71:14,25
**briefly** 11:16
176:23 267:2
**bringing** 34:9
**broad** 17:7 34:11
154:7 155:10
**broader** 21:4 29:21
30:2
**broadly** 29:12
41:17 90:3
**broken** 214:21
**buckets** 305:9
**build** 28:25 214:22
**bunch** 15:16
257:25
**buried** 271:2
**business** 86:10,25
87:14 190:6,19
191:18,20 192:7,9
193:17,25 258:15
**buy** 156:7 193:11
193:18

**C**

**C** 5:9 125:24
127:12,20 131:14
132:21,23,24
134:3 159:18
173:8 205:2
**calculation** 214:13
**call** 21:12 42:11
135:22 145:19
150:5 238:9 249:8
249:12 259:14

289:15
**called** 5:9 135:8,12
136:4,7 143:25
145:12 146:13
149:25 195:14
219:4 220:18
267:6,12 289:8
**calling** 144:12,14
**calls** 136:3,10
**Canada** 87:5 88:17
88:17
**Canadian** 87:4
88:12
**capacity** 12:20 71:8
191:11 208:18
244:6 245:13
246:22 247:4,12
251:12 254:7
255:8
**capital** 104:17
180:3
**career** 24:19
290:20 291:4,5
**careful** 262:2
**Carmidi** 27:3,9
**cars** 193:11,11,15
193:18,22
**case** 7:21 9:13,22
10:2,7 11:9 12:3
13:19 14:23 15:19
16:15 22:15 30:20
33:14 34:6,17,21
35:12,20,21 41:2
51:3,7,12,24,25
52:4 53:5,8 54:10
57:8 59:7,8,13
60:23 64:6 65:7
66:8 75:13,22
84:24 105:4,9,11
105:15 106:6,9,14
115:10,18,22
116:11,13,16
119:25 125:13
126:18 136:15
144:4 147:2,12
148:22,24 149:2

149:13,13,15,18
149:19,19,23,24
149:25 154:20
158:3 162:17
163:4,6,7 164:13
164:18 177:3
181:3,5,6 182:8
182:21,24 183:2
183:14 184:16
185:18 196:24
197:2,4,7,13,13
197:14 198:12
199:23 203:24
216:2 217:6
220:19 223:9,10
223:24 225:6,19
226:14,24 231:13
232:22,23 233:24
234:17 246:7
249:7 263:19
264:21 266:15
274:6 276:3
277:12 290:10,10
290:18 291:3
292:19 293:12,13
302:19,20,21
303:6 304:18
**cases** 8:2 15:22
97:12 102:14
181:17 197:8,16
198:8 266:25
**Casey** 208:8
**catch** 139:14
**categories** 125:23
125:25 126:3,5
128:23 130:18
131:4,14 132:12
133:10 134:11
136:24 141:18
145:2 146:13
154:8 155:3,11
**category** 113:9
128:25 131:2
132:18,20 141:15
145:6 280:7
**cause** 9:9 107:3

173:5 224:5
**Center** 2:9 88:14
**centralized** 101:5
101:11,21,25
**certain** 77:9 80:3
83:7 84:19 91:12
112:23 228:16
230:10 240:15
257:22 306:2
**certainly** 41:4
45:25 60:12
100:20 109:12
118:6 122:8
125:14 135:12
188:8 221:20
239:22 250:3
252:8
**CERTIFICATE**
310:2
**certification** 310:10
**certify** 310:3 311:3
**certifying** 310:12
**cetera** 12:19,24
275:24,24 282:12
**challenge** 59:13
**chance** 62:5
**change** 25:14
117:11,17 140:4
201:18,19 213:10
226:13 234:4
255:12 312:3
**changed** 149:15
175:10,17,20
202:4
**changes** 311:5
**changing** 198:3
**Chapter** 7:21 8:2
11:9 15:21 47:7
102:14 104:18
105:14,18 147:2
149:2,19 181:2
203:25 246:7
252:9
**characterization**
280:4
**characterize** 45:7

167:5 169:15
175:13 239:2
271:20 288:2
305:8
**characterizing**
235:12 237:8
**charge** 31:6,12,13
42:15 43:15,18
69:16 71:11 125:6
**charged** 43:7
**charging** 43:21
**chart** 118:23
**check** 30:23 31:22
82:12 189:13
190:3 194:24
281:13 282:15
**choice** 23:15
**choose** 23:18 43:11
43:12,14 209:25
216:2 235:2
**Chris** 26:4,8 27:3
27:12,13,14,20,21
27:22
**Christopher** 2:11
4:20
**Chung** 55:3,5,8,13
199:9
**circumstance** 176:4
192:10
**circumstances**
73:16 175:20,23
240:15 241:25
242:7,21 290:2,11
**cited** 13:12
**claim** 45:17 49:16
57:4 287:15 288:5
288:13,16,20
**claimed** 41:3,7
**claiming** 42:20
43:2
**clarification** 126:6
**clarify** 24:10 147:5
156:25 167:20
272:13 300:20
**clarity** 282:7
**class** 171:21 172:16



173:11
**classic** 213:14
**clear** 6:4 14:3 16:12
 29:24 32:24 33:17
 40:11 41:14 63:10
 85:18 93:13
 110:15 112:22
 115:20 121:12
 139:18 141:16
 150:15 154:24
 166:18 178:3,24
 229:6,10 231:7
 232:11,12 233:3
 240:8,16 243:9
 250:21 276:16
 302:13 305:15
**clearer** 237:10
**click** 126:13 132:8
 134:19
**clicked** 216:21,21
**client** 9:2 30:9
 40:24 45:19 48:4
 67:21 68:20 69:7
 69:11,18,19,23
 70:5,7,14,18,23
 71:6,12,13,16,21
 71:23 72:2 73:17
 73:23 74:2,14,16
 74:16,19 75:7,13
 75:21 76:10,13,19
 77:2,6,14,22 78:5
 78:12,20 79:6,10
 79:17,21 83:10
 94:8 97:2 101:9
 101:15,25 102:12
 102:16 116:19
 117:4,20 119:23
 120:6,14 134:5
 139:11 140:5,22
 142:14,24,25
 143:5,7,17 144:3
 144:16 145:8,13
 146:19 148:18
 151:20 152:21
 153:9,14 176:10
 186:2,20,22 187:4

187:7,25 188:2,6
 188:13,18,25
 189:4,5,8,17,23
 190:18 191:4,7,14
 191:24,25 192:2,3
 193:24 194:3
 195:13 202:13
 230:9 238:6
 252:25 253:7,15
 254:4,5 256:16
 257:10,23 258:14
 259:17 264:23
 275:20 281:7
 289:2,16 290:4
 292:17 305:21
**clients** 22:16 28:25
 69:12 74:5,7,8
 94:6,9 96:5 101:3
 102:6,19 120:9
 123:14,15,24
 124:6,8 139:8,15
 152:21 153:9
 174:8,11,21 175:2
 176:7 189:9,13
 190:3,12,14
 251:15,18 253:19
 254:8,13,20
 255:12,25 256:4
 256:10,12,18,20
 257:4,20 258:2,2
 258:5,9,25 289:7
 289:8 295:23
**client's** 258:18
 288:24 289:15
**close** 80:14 256:18
 256:19
**coal** 1:6 4:5 6:2
 103:14 234:17
 274:3,16
**code** 7:19,24 9:14
 9:24 10:10,20
 159:2,7,10 161:11
 161:16 162:6
**colleague** 64:17
 199:8
**colleagues** 89:18

90:21 237:14,16
 269:18,23
**collective** 210:25
**combination** 209:9
**come** 6:20 70:24
 89:5 92:10 93:4
 95:24 140:24
 142:17 145:20
 148:15 165:16,24
 174:3 249:4 270:6
 291:24 292:20
**comes** 31:21 72:4
 143:5 172:24
 275:20
**comfortable** 34:25
 44:22 92:16
 162:21 273:2
 277:7
**coming** 46:15
 297:17 307:2
**commenced** 103:14
**commencing** 1:11
**comment** 135:18
 274:19
**comments** 14:15,19
 37:8 38:3,15 39:3
 39:4 49:21 57:11
 139:24 293:20
 294:4 305:11,14
 305:16
**commercial** 30:10
 50:11 79:15 94:6
 94:15 96:6,22,24
 134:7 140:6 143:2
 143:9,19,23
 144:22 153:19,23
 154:5,7,9 155:9
 155:12,16,22,25
 156:17,20 157:13
 158:8,12,14,17,18
 158:20,23 159:16
 159:21 160:3,10
 160:14,18,21
 161:2,5,7,8,13
 162:11,24 163:17
 164:20,25 165:15

166:5,9,25 167:9
 167:15 168:7,12
 168:19,23 169:6
 169:20,25 170:5
 276:5 306:5,8,13
 306:19,21
**commission** 311:12
**committee** 180:2
 223:4,5 230:15
**common** 190:2,10
**commonplace**
 177:22 180:17
 184:15
**communicate**
 240:17 242:3
 243:20
**communication**
 190:18 243:2,8
**communications**
 83:13 164:3
 238:15 239:24
 242:8,17 302:17
**companies** 100:13
 100:15,16 271:24
 274:2,14,21,24
 277:2
**company** 1:6 4:6
 6:2 7:7,11,16
 79:24 86:2,5,8,11
 86:17,23 87:9,12
 87:15 88:17 94:3
 94:20,21,24 95:2
 95:4,7,15 96:10
 96:18,20 103:15
 105:13 118:16,21
 119:2,14,17
 120:20,22 121:10
 121:21,24 133:25
 140:16 148:10
 149:14 209:17,17
 210:18 211:7
 220:18 234:22,25
 235:25 237:17
 252:20 267:12
 273:2 278:5,12
 279:15,17 291:16

297:7,18 298:16
 299:8,11,22
 300:21 304:4
**compartmentalize**
 236:10
**compensation**
 210:6
**competing** 100:13
 100:15,15 101:3
**competitive** 258:24
**competitor** 186:3
 186:20
**competitors** 29:4
 29:10 30:4 171:5
 256:14 257:9
 273:24 274:5,8,9
**compiled** 123:13
**complete** 62:8
 111:15,17 112:7,9
 112:17 113:15,20
 275:17 276:20
**completed** 42:15
**completely** 245:9
 266:13,16 269:6
 277:6 302:9
**compliance** 14:6
**complies** 91:22
 163:2 164:21
 184:5,9,10
**comply** 202:2
**complying** 15:2
**component** 123:6
**composition** 21:9
 64:24 120:14
**comprise** 83:4,23
**computer** 38:24,25
 68:19 69:6 134:20
**concept** 163:16
 166:25 167:14
 168:6 169:5,25
 170:4 233:8
**concern** 53:5
**concerned** 62:20
**concerning** 6:6
 10:9 33:6 211:16
 225:11



**concerns** 53:23
**concluded** 231:13
　232:22
**conclusion** 46:15
　172:7,25 174:4
**concrete** 106:25
**conduct** 260:13
**conducted** 260:12
　260:22
**confer** 192:22
**confidences** 256:16
　257:10 259:17
**confidential** 45:19
　174:8,21 175:7
　176:10 257:16
　258:18 288:25
　289:7,8,16 290:3
**confidentiality**
　175:11
**confirm** 20:14
　21:16 87:22
**confirmation** 169:7
**confirming** 108:11
**conflating** 236:7
**conflict** 101:11
　105:3,9,14,20
　106:9,14,16,22
**conflicted** 9:10
**conflicts** 101:5,21
　102:2
**confused** 135:23
**connect** 245:15
**connected** 148:21
**Connecticut** 18:22
**connection** 10:6,23
　52:5,9 55:9 56:14
　60:6,9 61:3 93:22
　95:20 114:17,24
　164:17 171:23
　172:19 173:5,13
　176:25 184:22
　185:4,10,22 186:2
　186:6 202:23
　203:5,9,10 261:7
　270:10 301:14
**connections** 8:12

31:16,20 32:4,21
33:6 47:25 50:5
60:22 62:16,21
63:2,22 72:12
77:8 79:25 80:2
91:3,4,10,17,19
92:8,9 93:3,4,16
93:18 94:21,25
95:6,23 96:11,16
96:19 102:4,13,18
104:21 108:24
109:7 112:3,10
113:25 124:21
172:10 177:2,6
185:19 201:4
224:10
**connects** 91:18
**consideration**
　46:24
**considerations**
　274:20
**considered** 161:11
**consistent** 10:18
　11:5 51:10 92:4
　92:17 93:12 97:16
　113:5 162:5,6
　165:14 179:12
**constantly** 212:6
**constitute** 160:10
**constitutes** 154:6
　156:16 164:20
**construed** 41:17
**consultant** 82:3
　94:18,19 95:14
　127:4
**consultants** 84:19
　84:23 85:21 94:5
　94:17 121:15,17
**consulting** 79:23
　83:8 84:6 95:17
　98:9,13,16,22,25
　99:7,8,10,19
　100:3,4,12 101:4
　101:19 116:21
　117:5,9,21 118:20
　118:25 119:9

120:11,19,23
121:2,5,8,19
122:7,9 126:20
151:7,21 152:14
153:5,10,15 160:9
188:3 224:7
229:13 230:6
238:16,17,20,21
238:24 239:3,12
250:4,5 252:19,20
253:14,16 255:22
259:14,15 272:7
272:10 277:23
278:8,14 279:5
**contact** 145:22
　150:6 190:2
**contacted** 146:14
　146:16
**contained** 110:21
**content** 160:12
**contents** 48:22
　151:20
**context** 163:3,5
　165:18 257:24
　288:3,18 296:3
**continue** 62:25
　228:14
**CONTINUED** 3:2
**continues** 139:7
**contrasting** 151:24
**contribute** 46:4
　287:14,18
**contributions**
　210:8
**control** 272:4
　310:12
**controversial** 44:14
**Contura** 220:18,24
　266:4,20 267:13
　268:6,6,19,21
**Cont'd** 205:4
**conversation** 45:16
　47:4,11 51:14,17
　51:20 53:6,11,16
　91:24 92:6,14,20
　165:12 166:3,6,8

166:13,19,23
167:13,19 168:8
168:15 169:10,16
169:17 175:24
183:16,21 184:17
198:2,10 243:11
243:15 280:18
**conversations**
　44:19 46:12,20
　48:21 49:23 50:3
　50:23 51:22 52:3
　52:16,19 53:2,21
　53:22 54:15 55:5
　55:7,21,25 56:11
　56:21,25 60:16
　93:9 135:17
　163:10,12 164:23
　165:9,11,19
　166:21 167:17,22
　168:2,6,10,22
　169:3,24 174:17
　190:25 198:7,15
　221:14 240:8
　242:25 243:7
　300:3,15 301:5,12
　301:24 302:3,14
　305:13
**conveyed** 58:5
**convince** 192:9
**coordinator** 83:16
**copy** 87:22
**corner** 61:17
**corners** 163:13
　182:14 202:14
　204:5
**corp** 64:19
**corporate** 65:19,23
　176:16,18,20
**correct** 7:7 12:21
　14:13,23 20:12
　22:23 23:5,12
　26:16 27:10,11
　28:14 30:21 34:7
　39:11 62:12 63:9
　63:13,19 74:7
　75:7 78:16 88:10

93:19 96:12,21
97:7 98:6 100:18
100:23 104:2
107:7 108:2,9
109:21 110:13,22
112:19 115:8
116:23 122:13
124:22 126:12
132:7 159:16
160:11 161:3
168:4 170:17
174:12,15 179:7
179:18 181:15
191:16 192:13
194:25 195:21
198:21 205:12
206:21,22 210:5
210:22 211:11
214:2 220:13
222:22 223:2
236:6 243:22
244:7 247:2 248:8
251:15 254:22
255:24 264:7
274:6 282:13
290:21 299:14
311:4
**corrections** 311:5
**correctly** 133:13
**council** 298:12
**counsel** 4:16 10:8
　15:3 21:5 31:23
　32:6,7 34:22 36:3
　36:4 37:3 44:2,16
　46:21,22 50:23
　59:6,24 64:25
　65:2 91:24 92:7
　92:14,20 108:21
　138:7 143:4,16
　149:8 161:25
　162:24 163:10,23
　164:19,23 165:19
　168:11 169:3,18
　170:6,7 174:18
　176:6 180:10,20
　181:15,16 183:16



183:17 198:2,8,11
201:24 208:15,24
208:25 228:7
249:13 283:25
284:6,8 285:6
288:9,11
**counsels** 92:15
**counsel's** 10:13
21:7,10 145:20
146:15
**count** 135:15,15
**country** 18:14
**couple** 26:22 56:3
78:18 80:25
141:10 192:8
196:22 202:4
305:9
**course** 15:10 31:25
76:13 139:2
290:20 300:2
**court** 1:2,12 4:7,13
27:16 41:12,20
42:18 107:15
147:22 154:24
163:10 231:7,9,11
233:11 252:5
**courts** 233:13
**court's** 164:6,10
**cover** 47:10 111:23
**coverage** 251:15,18
**covered** 46:2 61:9
**covers** 21:8 116:20
117:4 120:9
**Crane** 36:17
**create** 157:20 158:3
**created** 67:23 68:2
**creating** 192:24
**creditors** 157:21
158:5 171:21
172:17 173:11
298:4
**criteria** 155:13
156:18 157:6,12
157:14,15,17
158:11 164:24
**crossed** 120:4

**crosses** 29:2
**currencies** 229:19
**current** 74:16
209:10,24
**currently** 87:6
207:14,23 222:18
258:3
**Curtis** 85:11
**custom** 202:4
**customary** 42:2
180:17,22 181:7
184:3,14 199:18
199:21
**customer** 154:10
155:18,24 156:6
157:6
**customers** 156:7
171:7,8,11
**cut** 150:7,14

**D**
**D** 124:13 125:24
127:12,20 128:23
129:2 131:14
132:13,21,22,24
134:8 146:13
151:5,14,24
152:10,19 154:4
170:10,11,12
283:6 308:3
**daily** 256:3
**data** 25:17 237:24
238:4
**database** 48:4,17
67:21,23 68:9,11
68:20 69:7,11
70:3 71:23 72:3
72:21,24 73:2,5
73:18,24 74:4,8
74:14 75:14,21
76:10,13,19 77:2
77:6,15,22 78:5
78:12,20 79:6,11
79:17,21 94:8
101:10,15,25
102:6,8,12,16,22

116:20 117:4,20
119:24 120:6,14
134:5 151:20
152:21 153:9,14
187:7,25 188:13
188:19 189:4,8
253:7,15 305:21
**date** 1:12 47:6
49:18 75:19 89:20
103:12,13 104:22
107:11 110:2,6,16
110:16 136:14,15
177:12,16,24,25
178:5,7,10,16,19
179:10 180:11,12
180:17 185:21
186:7 189:12
199:8 285:14
287:11,11 304:20
311:8
**dated** 5:18 103:18
263:12 268:2
310:7
**dates** 30:23,23
63:17 77:19,19
**David** 5:18 6:11
**day** 47:5,5 57:4
111:11 202:24,25
203:11,12 212:7,8
287:9,10 311:11
**days** 57:3 203:8,9
**day-to-day** 221:21
270:13 272:9
**deal** 156:11
**dealing** 156:9
**deals** 124:19
**dealt** 136:9
**debate** 204:13
**debt** 281:14,21
282:17 297:25
**debtor** 13:18 14:23
15:6 41:24 42:4,7
42:16 43:15,18,20
46:5 50:12 90:4
97:13 134:7
157:20 158:3

159:3 173:5 186:3
249:6 264:7,12,20
269:4 274:6
277:12 278:20
283:14 287:10,19
288:7
**debtors** 1:7 7:25
9:2,11 11:13,25
14:10 30:11 31:14
43:7 47:6 82:5
94:7 96:7 106:21
108:20 113:8
138:6,6 140:7
143:3,19 158:25
160:2 170:16,23
171:9,11,14,20,24
172:11,16,20
173:10,14 203:16
203:24 204:2
246:6 264:25
266:15 273:24
274:8,10,17,21,25
275:3,15 276:6,8
276:12,18 277:4
277:25 279:7,12
283:10,25 285:17
286:6,12 287:16
288:6 298:2,4
**December** 1:12 4:9
5:18,20 30:20
63:15,23 76:2
213:16,17,17
310:7
**decide** 24:5,14 43:8
105:2,8 249:16
**decided** 58:15
199:17
**decides** 31:15
**decipher** 271:11
**decision** 23:17
176:9,14 241:20
253:3
**decisions** 229:21
230:8 252:12,14
266:17 270:12
**declarant** 44:21

149:23 182:25
**declaration** 9:12,17
10:3,11 14:5
15:16,17 16:2,14
16:17,19,22 21:12
21:13,17 22:20
23:2 29:20 30:5
30:14,17 31:2,9
35:4 37:10 40:2,3
40:3,10,13,19
44:4 45:10 47:13
48:12 49:7 50:6
52:6,25 53:10
54:2,6,10,13,18
55:23,23 61:2,8
61:13 62:11,14,15
63:7,12,15,18,23
66:3,15,19 67:15
68:17 72:11 75:25
76:2,5,8,11 77:10
77:24 78:7,11
80:4,6,8,11 81:17
86:15 87:3,17,19
87:23 88:24 89:3
89:17 90:23 91:8
91:9,13 97:5,19
107:20,24 108:9
109:20 110:7
111:15,17,21,23
112:2,6,12,14,18
113:15 114:3,12
114:19,25 115:11
115:23 119:20
125:10 135:6
138:8 165:7
167:12 172:9
174:11,19,22
175:12 176:11
177:13 178:15,19
183:11 194:21
200:5,11,11
220:15 224:3
225:14,18,21,22
227:9 228:2,6
234:20 243:24
246:18 248:17



249:23 253:22
257:25 258:5
259:7 261:19,23
262:14,21 271:20
271:21 273:6
277:8 279:21
281:3 282:21,22
284:11,13,20
285:3,9,19,21,24
289:5 294:25
295:2 299:13
301:6,15 302:4
305:10 308:16,17
308:19
**declarations** 6:6
9:21 10:7,17,22
10:24 11:5 14:25
15:11,12 16:13
30:19 31:4,14
32:2,12,22 33:8
34:5,13,14 35:25
36:13 37:22 38:2
38:7,17 39:20,21
41:15,17,21 42:9
47:18 48:22,23,24
51:2 52:10,21
54:24 55:9,14
56:15 59:5,25
60:7,10 65:7,14
65:20 92:2 111:7
115:7,17 119:6
122:23 147:24
161:23 164:9
177:5 182:7
194:23 196:23
197:24 198:17,25
199:3,7 200:19
204:11 258:7
296:11 299:24
300:3,4,16 301:23
302:15 303:9
305:2,3,4,6
**declined** 44:5 58:10
59:2,3
**dedicated** 19:14
83:12,14,15,15

84:8 298:10
**deemed** 12:24
14:13,16,20
**define** 80:20 112:8
155:8,11 158:7
164:25 176:17
183:12 242:18
288:2
**defined** 28:23 50:6
91:13 158:19,24
**defining** 155:23
**definition** 32:14
100:19 155:8
173:7 256:8
**delve** 16:12
**delving** 197:22
**demonstrate** 8:16
9:8
**demonstrates**
271:19
**department** 19:11
19:13 20:20,22,25
36:2,7 109:4
125:9 154:17
158:10 161:18,20
162:2 176:20
208:20 217:15
218:23 228:7
**depending** 24:23
**deponent** 4:23 5:5
234:12 311:2
**deposit** 297:8
**deposition** 1:10 4:4
5:21,23 115:16
116:12 155:24
163:19 199:4
200:3 202:15
204:7 225:10,15
230:25 231:6,10
232:2 234:3 241:2
253:24 294:22
295:4,5 303:4
309:3 310:4
**derive** 137:4
**describe** 147:21
173:24 215:11

276:15
**described** 93:21
135:5 158:24
172:8 246:16
261:25 276:13
**describing** 276:14
**description** 69:17
71:15,19,25
102:21
**designation** 6:21,23
28:11
**designed** 8:24
19:17 276:20
**desire** 28:25
**detail** 30:6 49:20
127:10 160:16
209:12 219:7
294:24
**details** 31:19 44:11
45:18 55:24 71:23
137:10 157:9
184:12 188:18
189:7 219:16
**determination**
188:15 249:5
275:8,11,11,13
**determine** 106:8,13
186:12 279:5
**determined** 105:13
106:18 234:6
276:10
**develop** 148:5
268:21
**developed** 170:6
293:5
**development** 19:15
19:18,18 83:14
148:17
**dial** 89:7
**Diamond** 2:8 4:21
**differ** 51:6 294:12
**difference** 176:17
210:19
**different** 38:6 39:6
69:3,23 78:24
81:2,10 93:21

116:2 121:14
126:2,2,4,5
130:14,16,25
131:3,5,6,6,15,16
132:16,17,18,25
133:15 141:11
145:14 152:20
153:3 169:24
185:3 201:15
205:19 211:9,20
212:14 219:16
231:5 236:15
247:14 256:25
257:3 258:21
276:24
**differing** 45:22,24
**dig** 264:11
**direct** 12:6 30:10
47:22 50:11 79:15
94:6,15 96:6,22
96:23 134:6 140:6
143:2,9,18,23
144:21 153:19,23
154:4,6,8 155:9
155:11,16 156:5,5
156:10,12,16,16
158:11,17,20,23
158:23 159:15,20
160:3,10,13,18,21
161:4,8 162:10,24
163:17 164:20,25
165:15 166:4,9,25
167:9,15 168:6,11
168:18,23 169:6
169:20,25 170:5
171:22 172:18
173:12 209:21
210:2 224:15
225:11 235:3
239:23 275:3,14
276:5,11,17,18
277:4 297:8 306:5
306:8,13,18,21
310:12
**directed** 109:3
225:25

**directing** 48:8
226:2 232:8
**direction** 48:5,6,8
309:5
**directions** 137:7
**directly** 51:18 58:5
68:14 130:5 156:9
156:11 164:13
173:23 234:15
298:5
**director** 83:12
222:25 228:18,18
228:23,24 230:12
230:13
**directors** 81:25
90:2 91:7 206:11
206:15,21,24
207:8 224:23
228:16,23 230:10
230:14 234:23
236:4 246:4,21,22
247:19 248:5
249:3 298:15
300:8,21 303:12
304:11
**directs** 163:11
**disagree** 16:10,23
116:17 200:17
202:16 204:12
**disagreed** 33:20,22
**disagreement** 32:9
33:4 35:3
**disagreements** 32:2
32:16,20 33:2
**disclosable** 202:24
**disclose** 8:13 22:21
76:20 77:4 91:16
94:20,24 95:5
96:11,15,19 97:2
174:10,25 175:4
176:6 185:19
186:5,11,25
198:20
**disclosed** 29:19
30:13 31:16 32:3
32:4,21 33:7



60:24 61:5 64:5,7
64:13 77:9 80:2
86:16 91:2,11
93:17,24 95:22
96:7 113:25
135:10,25 144:8,9
176:7,11 177:7
185:24 191:9,9,12
194:20,23 201:4
258:7 267:9 276:4
276:7 285:19
289:7,19
**disclosing** 92:7
290:12
**disclosure** 42:9
63:8 88:22 110:7
111:6 114:24
115:7 174:20
175:18,21 182:6
196:23 203:12,13
288:24 289:14
290:2
**disclosures** 8:16
31:24 32:11 33:13
33:21,22 34:17,20
35:3,11,20 49:14
59:14 62:8 63:4
92:24 93:2 110:17
112:15,17,25
113:15 144:6,18
145:17 146:22
148:18 166:11
170:25 182:5
299:2,20 302:6
**discuss** 59:6,23
60:4 78:6 180:19
242:6,10 262:8
305:14
**discussed** 44:25
49:12,14 55:13
60:2,11 115:6
131:17 160:12
162:7,23 164:24
165:2,3,6 169:14
180:15 183:15
184:12 196:22

264:6 282:24
289:18 295:3,14
296:16 299:23
302:2
**discussing** 54:16
173:25
**discussion** 15:9,11
44:15 45:8 46:8
116:2 167:6,8
169:18 183:18
262:11 266:8
296:3 299:10
**discussions** 34:23
49:6,25 104:16
164:18 167:4,7
179:25 180:9
217:19 301:17,22
**disinterested** 8:9
8:17 9:4 161:12
173:6 248:18
**disqualifies** 101:10
**disqualify** 246:6
249:5 251:7
**disqualifying** 105:3
105:9,14,20 106:9
106:14 246:13
248:21 249:17
250:15
**distinct** 131:13
**distinction** 25:12
**distinguishes**
158:16
**distributed** 126:7
**distribution** 37:19
**District** 1:3 4:8
59:17,23 263:19
279:10
**division** 1:4 4:8
6:25
**docket** 5:25 107:12
200:6
**dockets** 252:5
**document** 11:16,18
11:22 36:9 37:7
37:24 38:4 61:20
75:16 99:14 264:9

264:15,17 267:15
**documentation**
293:7
**documents** 38:14
43:16 57:11 218:6
252:6 267:15
272:6 294:20
309:7
**doing** 41:5 72:20
100:21 112:22
123:7 141:6 145:4
147:11 189:14
190:4 195:24
196:3,11 231:8
250:5 252:24
256:2 272:4
288:21
**dollar** 213:4
**doubt** 231:20
**dozen** 49:4 56:20
**draft** 37:21 54:5,12
54:19 249:10
260:17 262:20
**drafted** 37:12,15
154:19 228:4
**drafting** 35:24 36:9
37:6,10,24
**drafts** 38:6,19 39:6
39:8 154:15 305:9
305:11
**draw** 24:17
**drawn** 173:2
**drop** 201:10
**dropped** 201:8
**dropping** 282:3
**drops** 305:25
**due** 47:5
**duly** 5:10 310:4
**Dunne** 85:13 87:7,8
**Duran** 3:9 4:12
**duties** 148:12 256:3
**duty** 180:6
**dynamic** 192:10

─────────────
E
─────────────
**E** 2:6,17 204:24,24

308:3,10 312:2
**earlier** 18:13 80:24
83:13 85:4 88:10
103:17 122:3
184:23 197:5
264:6 266:9
289:18
**early** 15:16
**earned** 210:7,18,20
211:3,6
**easier** 130:24
**easily** 270:4
**East** 16:25 17:17
18:6,9,16,25
**economic** 22:14
**Ed** 225:11,15,16
230:21 231:20
232:23
**Edison** 51:2,5,12
51:14,24 52:4,7
52:13 53:4,14
57:8 115:8,22
116:7,10 162:17
182:25 196:24
197:25 198:11,17
225:6 226:3,24
227:24 228:2,9
229:11 233:4
**edited** 305:4
**editing** 39:20,22
40:3
**edits** 38:4,13,15,22
39:16 44:10,11,13
**effect** 198:3 275:3
275:14 276:11,18
277:4,10
**effectively** 287:12
**effort** 109:10
249:21
**efforts** 63:21
189:12
**either** 22:13 23:21
34:4 44:4,15
55:22 57:20 73:25
74:10 118:10
135:8 158:4

181:22 194:23
196:6 223:13
234:15 240:2
**Elliot** 27:4
**Ellis** 3:3 108:21
109:23 110:4,7
**email** 39:4 48:11
77:23 78:6,14,22
79:19 124:20,23
125:6,21,25 126:8
126:10 129:15,18
129:19 145:10
146:9,12 151:6
215:9 239:15
**emails** 125:3 126:2
126:4 127:25
**employed** 176:19
176:25 210:23
**employee** 129:17
129:22 130:5
134:8 243:14,15
272:15 295:19
**employees** 18:9
20:16 67:6 81:25
82:7,19 85:19
90:2 91:4,7 113:7
113:8 127:21
170:21 172:3,12
172:14 173:17,24
206:6,12,17
228:17 230:11
238:6 245:7,8,9
271:16 279:3,8
281:16 283:2,8
304:11
**employer** 291:19
291:20
**employers** 210:23
**employing** 53:24
**employment** 7:21
16:3 279:6
**ended** 185:19 186:6
**engage** 107:4
**engaged** 109:9
146:18
**engagement** 11:20



11:24 12:2 22:7
22:22 23:4,9,11
24:4,6,15,16 25:3
25:7 26:15,20
29:14,16 50:16,17
69:22,22 70:14
71:20 76:14 77:15
81:18,23 97:10,17
97:18 137:23
139:4,6,14 140:13
140:19 142:7,13
145:15 179:15
189:5 190:16,17
191:15 293:20
304:5,6,14 308:14
**engagements** 69:23
70:4,19 71:7
77:19 139:16
189:15 191:8
256:2
**entails** 215:15
**enter** 73:13
**entire** 21:10 25:2
68:9 79:3 138:16
210:13,14 231:2
285:12
**entirely** 72:13,17
99:12
**entities** 21:2 28:18
28:20 29:3 110:21
111:3 112:11
113:5,19 118:18
119:19,20,24
121:14 154:10
155:17 194:13,18
196:6 205:15,25
206:7 253:25
271:15 281:8,24
281:25
**entity** 64:4,6 65:25
66:5 67:10,12
88:14 92:10 96:24
99:6 103:21 104:3
118:23 121:7,13
122:4,8 127:4
140:17 195:14,17

205:21 206:19
209:15 269:6
297:24
**entries** 43:10 112:3
**entry** 43:15
**EPNG** 22:2,15 24:5
24:12,13 25:22,24
28:14 29:5,9,12
29:22 30:2
**equity** 157:22
158:5 170:15,22
171:4,11,13,21
172:17 173:11
277:24 278:19
279:11 281:14,21
282:17 283:10
297:25
**Errata** 311:6
**escape** 56:2
**especially** 223:19
**ESQUIRE** 2:6,11
2:17,17,18,22 3:5
**essentially** 13:3
28:15 31:7 168:16
202:23 213:20
214:6 226:25
229:23 233:5
270:17
**established** 183:4
**estate** 157:21 158:5
173:11
**estates** 171:20
172:16
**estimate** 17:14 18:2
18:18 23:13 25:6
25:9 38:21 49:3
56:19 83:25 99:21
100:2 118:9 207:6
221:22 222:5
286:16
**estimated** 82:16
**et** 1:6 4:6 12:19,24
275:24,24 282:12
**Eugene** 26:18
85:11
**evaluated** 250:23

**Eve** 307:3
**event** 37:25 40:25
164:15
**events** 141:2 148:5
**everybody** 20:10
123:2 129:8,9,9
129:11,16 136:11
207:8,10 304:8
**evidence** 234:11
**exact** 90:24 104:22
177:12 206:5
**exactly** 13:6 95:11
118:3,4 169:4
188:17 206:25
231:7 241:9
249:24 250:22
286:15 305:5
**EXAMINATION**
5:13 205:4
**examined** 5:11
**example** 50:25
59:12 70:21 107:2
155:20 157:7,11
157:13,16 167:16
186:19 252:21
266:2
**examples** 156:15
156:23
**exceed** 5:21
**Excel** 68:25
**exception** 80:3
91:12 113:12,17
206:9 241:10,11
241:14,15,21
242:22 243:10,10
243:18 254:9
300:22
**exceptions** 77:9
80:3 84:6 111:19
112:23 113:13,18
113:18 183:6
240:14,19,22
241:6,9,13 242:15
242:16,19,24
243:6,16
**excess** 283:23

287:13
**excluded** 113:4
122:5
**excluding** 5:22
18:11 161:6
**exclusive** 83:19
**exclusively** 67:7,8
**excuse** 90:11
**exhibit** 6:16 11:14
11:19 21:13 61:25
87:18 98:4 108:5
108:6 116:22
151:2,3 170:13
178:21 179:5
195:5,20 196:5
224:2 227:8
237:25 259:25
285:25 294:24,25
308:12,13,14,16
308:17,18,19
**exhibits** 6:13
231:10
**exist** 196:17 248:20
248:25 294:7,8
**existed** 186:14
**existence** 39:11,14
60:2,11
**exists** 71:10 203:10
203:10
**expanding** 247:9
**expectation** 31:11
**expense** 293:16
**expenses** 293:7
**experience** 139:2
**expires** 311:12
**explain** 265:24
**explained** 280:19
**explanation** 115:3
**explicitly** 239:14
**expressed** 33:12
34:2,16,16 35:19
**expressly** 268:14
**extend** 190:19
**extended** 44:15
45:7 46:17
**extent** 42:4 112:4

114:16 120:22
140:9 143:17
225:16 272:3
**external** 31:23 36:3
36:4 46:21 126:15
**extra** 248:12
**extremely** 44:22
163:9 217:23
240:8
**e'Campion** 88:17

---
### F
---

**F** 204:24
**fact** 13:18 14:22
15:21 16:14 57:5
75:6 112:21 129:4
147:12 148:15
165:3 184:15
196:3 217:16
233:17 235:17
237:13 256:17
258:24 259:17
269:3 271:15
272:4 280:21
285:16,18 295:20
**factor** 115:2
**facts** 290:11
**factual** 25:17
266:20
**Fagin** 1:12 4:14
310:6
**fair** 12:4 18:11
20:17 28:16 40:18
42:10 48:9,10
54:20 58:10 59:14
61:9 62:22 68:2
68:20 71:16 72:14
72:17 76:8 90:17
95:8 104:12
108:14 109:20
111:16 112:7
113:16 115:4
116:8 118:10
121:4,25 127:6
137:12 138:12
139:23 161:7,13



164:11 167:3
177:8 183:25
187:23 192:12
202:25 213:19,23
234:21 247:8
248:21 252:7
253:19 254:15,21
256:3 261:23
280:4 294:9,14
295:10
**fairly** 71:24 129:12
138:17 190:2,10
270:4 275:7
**Faith** 2:17 4:22
**fall** 82:24 83:2
**familiar** 50:14,16
50:21 75:10
209:12 221:4
294:17
**family** 190:5
209:25 277:23
278:9 279:6
**Fannie** 85:12
**Fannin** 2:10
**far** 28:13 56:4
62:20 111:5
115:15 122:19,21
142:4,10 147:8
166:18 175:18
188:22 193:12
197:18 198:24
202:12 231:18
247:22 268:11
305:20
**fast** 286:11
**favor** 191:16
192:11,22 193:20
194:3
**fee** 40:25 42:23
304:17
**fell** 155:2
**felt** 63:8
**female** 27:20
**fiduciary** 11:8,11
12:20,24 13:4,18
14:13,16,18,20,22

15:21 180:6 264:7
264:12,20,24
265:11 271:22
**fielded** 135:22
**fifth** 6:8
**figure** 81:12 186:17
186:21 187:3
188:11 216:14
270:3
**figured** 269:11
**file** 62:25
**filed** 9:12 46:24
53:7,10,25 54:7
54:10,18 65:10
66:2,15 107:7,10
110:4,17 111:6
113:14 114:19
148:24 174:15
175:12 200:6
217:15 218:23
262:17 296:8
**filing** 34:24 35:4
46:3 47:7,10,12
49:18 52:17,25
57:3,5 60:25
62:14,18 63:6
76:10 81:7 89:2
92:3 107:15
111:20 112:18
114:11 162:8
174:18 180:4
203:25 282:21
285:14,24 287:8
287:11,11 304:17
305:19
**filings** 30:24 252:4
**fill** 129:19,24 130:6
131:20,21 134:15
140:18 148:4
**filled** 14:25 135:20
140:11 141:3
142:9,20 309:15
**filling** 144:2,14
145:12 146:17
**filtered** 72:8
**finance** 47:19,20

48:4,9 68:15
72:17,20,23 73:16
162:2
**financial** 123:15,21
123:23,25 187:8
271:24
**financially** 268:21
**find** 30:12 207:15
207:18 216:11,25
217:7 219:10,24
220:2 233:16
283:5
**fine** 16:4 62:19
81:13 168:18
**finer** 24:18
**finish** 40:4 74:24
79:8 145:23 193:4
193:4 289:20
**finished** 35:5 195:9
**firm** 37:5,21 47:15
54:22 70:4,22
71:10,20 139:7,9
148:25 198:13
272:17
**first** 11:17 21:11,17
37:21 38:17 40:13
45:11,12 49:7
53:10 54:6,10,17
55:10,23 61:2,21
61:22 63:6,11,14
63:23 66:14 75:6
75:25 76:4,11
80:7,11 87:16,18
89:18 90:23 98:8
103:6,7 104:16
110:24 112:6,18
113:14 114:2
124:16 142:20
155:15 157:6,11
157:12,15,16
175:4,12 179:16
179:25 182:10,21
224:3 227:20
262:19 263:10
281:8 282:11,22
284:19 285:3,21

294:25 304:17
**fish** 82:21
**five** 68:6 89:18,22
90:21 212:13
214:18 221:11,13
221:16,22 222:6,9
**flat** 240:16
**flesh** 160:13
**Flexner** 2:3 4:19
**float** 23:22
**Floor** 1:19
**flow** 239:6 259:9
**flush** 255:6
**focus** 124:16
141:25 151:4
160:3 205:21
274:25 277:2
**focused** 15:4
151:13 161:4,8
188:10 236:23
**focuses** 160:4,6,9
283:10
**focusing** 98:21
120:17 124:12
160:6,20
**folks** 84:8 155:8
**follow** 57:14 112:13
137:11 142:4
193:12 236:17
242:11,13
**followed** 49:13
51:24 93:10 169:7
285:18
**following** 89:2
129:15 243:16
247:21 270:21
**follows** 5:12,19
205:3 271:6 293:2
**follow-up** 129:13
129:23 300:24
**footnote** 277:18
**foregoing** 310:10
311:3
**forget** 257:7 258:22
**forgotten** 140:21
**form** 8:20 13:20

29:23 32:23 44:17
45:3 56:6 58:17
59:9 64:8 65:15
65:21 72:18 75:8
77:25 84:3 93:5
102:23 106:15
117:14 125:25
128:9 136:25
138:13 141:9,21
144:19,24 145:18
148:8,21 149:6
150:3 155:4
157:23 159:4
161:14 169:12
184:24 190:22
191:22 201:12,22
210:7 216:17
218:3,13,18,22
219:4,12,24 220:7
221:4 235:20
236:14 237:3
243:21 245:22
250:10,17 251:9
255:9,14 261:24
265:3,19 266:12
268:10 269:2,13
269:20 270:20
271:10 275:9
293:25 294:15
299:6 311:5
**formal** 181:25
258:12
**formed** 267:3
**former** 74:16 190:2
190:14 191:14
209:24 229:16
**forms** 217:15,16
218:16
**formulate** 79:18
**formulating** 77:23
**forth** 5:24 18:12
48:2 49:21 57:12
84:9 200:5,10
256:2
**forthcoming** 234:8
**forward** 178:16



213:9,15
**found** 220:23 221:3
**founded** 222:22
**four** 12:17 98:21
124:12 125:23,25
130:18,25 131:4
133:18 134:10,22
163:12 182:14
202:14 204:5
212:13,21 213:3,6
213:20,24 214:5
214:18 215:25
216:2
**fourth** 247:15
248:6
**fraction** 41:12,20
42:20 43:6,8,12
**free** 194:24
**friend** 222:14
256:24
**front** 16:18 80:14
107:11 255:20
**full** 41:24 64:24
**fuller** 116:2
**fullest** 6:10
**fully** 271:13
**full-time** 109:6
**function** 19:16,17
19:18,21 298:14
**functions** 73:5
83:11
**fund** 219:9 229:20
267:6
**funds** 46:4 208:6
209:20,23 210:5
210:10,14,15,16
210:24 211:2,9,19
211:21 215:22
216:4,8 217:8,16
218:17 219:11,16
219:24 220:2
230:3 266:18
269:6 284:3,4,16
287:19 298:6
**further** 96:19
100:25 152:10

306:23
**future** 111:21
143:17 190:19
191:8

---

**G**

**game** 164:11
**Garcia** 221:7,8,24
222:10,18 224:20
228:11,20 236:5
237:20 303:17
**Gary** 66:13
**gay** 1:11 2:14,17
4:22,22,23 5:2,5
5:15 8:5,20 9:16
10:21 12:9 13:6
13:20 14:2 15:23
16:4,17 17:22
23:10 24:10 26:14
27:15 29:23 32:23
35:13 40:10 41:14
44:17 45:3 52:22
55:18 56:6 58:17
58:23 59:9 60:6
61:24 62:3 63:9
64:8 65:15,21
66:20 67:16 72:18
74:22 75:8 77:25
79:8 80:7 81:9,13
84:3 89:6 93:5
95:9 98:4 102:23
106:15 108:5
115:13 116:6
117:13 128:9
138:13 141:9,14
141:19,21 144:19
144:24 145:18,23
146:3,23 147:3,14
148:8,20 149:6,10
150:3,7 151:2,22
152:22 154:22
155:4 157:23
159:4 161:14
163:3,7,24 167:20
168:4 169:12
170:13 173:20

178:24 179:5
182:13,18 184:24
190:7,22 191:22
193:3 196:4
197:18 198:6,22
199:22,25 200:21
201:12,22 202:7
202:18,21 203:2
203:20 204:4,12
204:19 216:17
218:3,13,18
219:12,19 220:7
221:16 223:17,22
223:25 225:9
226:5,11,16 227:3
227:5,11,14,19
229:4,10 231:4,17
232:6,9,16,20
234:9 235:8,14,20
236:14 237:3,5,10
242:11 245:3,22
248:22 250:10,17
251:9 255:9,14
261:24 265:3,19
266:12 268:10
269:2,13,19,25
270:20,23 271:9
272:13 273:7
275:9 282:2
283:16 287:21
289:20 293:25
294:15 298:17
301:8,11 306:15
306:25
**Gay's** 37:5 54:22
**general** 10:12,19
21:4,7,10 49:12
49:19 50:2 57:10
64:25 65:2 143:4
143:16 145:20
165:12 171:9
204:6 208:15,24
219:14,19,22
243:10 251:3
302:8
**generally** 22:8,9

42:6 71:19 92:10
135:2 148:23
230:16 302:22
**generation** 274:16
**generous** 163:9
200:14
**gentleman** 299:15
**getting** 115:14
120:4 142:24
191:19 197:18
198:24 268:11
282:2 305:15
**Gilad** 85:14
**give** 7:18 10:19
13:4 17:14 25:5
62:4 70:25 73:8
82:23 85:17,23
102:17 106:25
114:7 167:16
186:19 191:15
207:2 213:22
215:3,5,13 219:13
221:22 222:5
250:18 276:20
288:5 289:16
292:23 305:4
**given** 85:7 137:7
155:20 157:7,11
157:16 200:14
275:3 277:5 289:9
310:5 311:4
**gives** 70:8,12
211:18
**giving** 163:24
**global** 48:4 67:21
68:19 69:7,11
71:23 73:17,23
74:14 75:13,21
76:9,12,19,25
77:6,14,22 78:4
78:12,20 79:5,10
79:17,21 94:8
101:9,15,17,25
102:6,8,12,16
116:19 117:3,20
119:23 120:6,14

134:5 147:16
151:20 152:21
153:8,14 187:7,25
188:18 189:3,8
253:6,15 305:21
**globally** 69:14 94:4
94:16 95:16 96:3
126:25 127:3,22
133:25 134:9
143:14 151:7,12
151:14,25 152:8
152:11,16 153:2
160:8 187:12
188:4 251:21,22
275:19 279:4,14
283:9
**go** 16:9 25:2 30:6
30:17 31:18 41:17
55:20 57:22 61:15
66:4 67:14 68:18
73:10 91:25 93:20
100:25 110:14
120:3 127:9 130:5
133:3 136:20
141:14 146:2
150:12 151:17
163:8,14 185:3
187:5 212:7,8
218:15 219:23
226:19 241:8
243:23 250:8
251:8 257:2
259:21 267:2
268:3,12,14 270:3
273:16 274:22
278:23 279:20
284:21 286:18
289:22 291:9,11
292:12,13,22
303:21 306:10
**goes** 21:22 101:6
148:5 166:19
178:5 203:6,9
305:22
**going** 11:14 15:24
21:24 24:8 25:14



49:20 55:25 56:5
57:22 66:23 70:25
70:25 71:2,3,13
89:10 93:16
111:23 116:4
123:4 150:15,19
163:8,20 190:5
198:7 199:15
202:12 204:18,22
205:10 225:11
231:21,23 233:22
235:18 238:10
252:25 257:3
272:19 273:10
283:3 288:2 303:2
307:5
**good** 4:22 66:20
202:21 204:15
266:11 268:9,24
**govern** 271:17
289:13
**governs** 12:3 97:11
238:14 258:24
259:13,16 295:18
**granted** 243:18,19
**graph** 214:20
**graphs** 216:21
**greater** 185:20
186:6
**gross** 43:4
**group** 24:14 25:22
25:24 26:7,12,13
26:13 29:6,9,12
29:21 30:2 104:17
121:18,20,24
122:5,6 128:7
133:16 152:20
153:2 170:14
250:4 298:14
**groups** 22:11 23:4
23:8 28:16 131:5
133:18 152:19
**growth** 24:23
**guess** 116:16 185:7
203:14 242:16
255:16 275:10

286:17
**guidance** 92:16
137:9 154:5 155:7
**guided** 15:3
**guidelines** 148:13
288:22 289:13,24
293:16,19,23
294:7,13,18
**guys** 27:15 154:22

## H

**H** 5:9 205:2 308:10
**Hagidorn** 26:4,8
27:3,13,14
**hair** 12:11
**haircut** 42:10,11
**half** 12:11 68:6
221:13 222:9
**hall** 64:18
**hand** 38:23 39:16
199:22
**handful** 84:17
295:2 296:16
**handle** 46:16
259:16
**handles** 19:22,24
20:10
**handling** 271:25
**hands** 72:5
**Hannigan** 15:19
16:20
**happen** 114:21
135:16 149:5
178:9 189:16
243:12
**happened** 32:17
64:15 141:3
142:20 144:18
145:14,15 146:19
148:19 149:4,9
150:2 280:10
**happening** 144:11
190:25 269:10
**happens** 71:5
100:17 164:16
**happy** 10:5 30:6

31:18 46:3 287:14
287:18 288:4,5,8
291:22 302:25
**hard** 17:23 23:17
24:21,25
**harm** 290:3
**head** 19:2 75:19
84:15,16 85:10
99:5,20 125:5
134:25 255:6
292:16 297:20
303:15
**headed** 104:14
179:22
**heading** 295:9
**hear** 17:23 32:19
199:16 282:6
**heard** 33:5 58:6
64:14,16,22
220:21
**hearing** 58:12,13
66:8 199:9 298:21
299:16
**hedge** 275:7
**held** 1:10 46:3
217:8,9,17 224:20
287:13
**help** 8:24 107:13
156:25 162:4
188:14 191:21
201:24 249:10,13
250:19 260:17
275:17
**helped** 268:21
**helpful** 179:2
**helping** 275:22
**Henry** 85:13 88:15
**hey** 135:13 140:25
142:17 143:7
165:13 168:16
169:18 198:3
**high** 215:14,19
**highest** 28:10 65:12
65:18 214:23
**highly** 68:13
**hire** 107:9

**historical** 217:23
217:24,25 218:2,5
**historically** 189:18
**hit** 73:13
**hits** 77:7 79:14
**Hogan** 2:20 5:6
10:16 36:21,24
161:25
**HOJNACK** 311:8
**Hojnacki** 1:10 4:4
4:24 5:1,2,7,16
6:1,5,15,16 7:1
8:1 9:1 10:1 11:1
11:15,19 12:1,9
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1,12
21:13 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1,2
63:1,18 64:1 65:1
66:1 67:1,5,16,17
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1,11 81:1 82:1
83:1 84:1 85:1
86:1 87:1,17,18
88:1 89:1,17 90:1
90:23 91:1 92:1
93:1 94:1 95:1
96:1 97:1,5 98:1,6
99:1 100:1 101:1
102:1 103:1,5

104:1 105:1 106:1
107:1,13 108:1,10
109:1 110:1 111:1
111:14 112:1,6
113:1 114:1 115:1
116:1,23 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
150:11 151:1,3
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1,17
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1,6
195:1,4,5,21
196:1 197:1,20
198:1 199:1,24,25
200:1,6 201:1
202:1 203:1 204:1
205:1,10 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1,20
224:1,3,4 225:1



226:1 227:1,7,8,9
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1,2
239:1 240:1 241:1
242:1 243:1,24
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1,21 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1,16 274:1
275:1 276:1 277:1
278:1 279:1,21
280:1 281:1,3
282:1 283:1 284:1
285:1,10,11 286:1
286:18 287:1
288:1 289:1 290:1
291:1 292:1,22
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1,11
307:1 308:6,12
310:4
**Hojnacki's** 200:3
**hold** 9:9 171:19
172:4 173:9,18
199:22 220:2
277:24 297:25
**holders** 157:22
158:6 171:22
172:17 173:12
**holding** 213:8,11
213:15 214:24,24
214:25
**holdings** 197:14
215:17 216:8,11

**holds** 267:12
**hole** 134:18
**holiday** 302:25
**holidays** 25:8,10,13
25:18 26:22 85:5
302:24 303:3
**home** 150:12
**honestly** 209:18
**honor** 6:9
**hope** 230:23 231:2
**hopefully** 304:21
**hoping** 217:2
**hosted** 68:23
**hours** 5:21 39:18
39:22 40:5,9,14
41:3,6,13 43:3
109:10 302:3
**house** 211:25 212:3
**Houston** 1:4 2:9,10
3:4 4:8
**HR** 19:10,13,22
20:8 130:4
**human** 128:6 255:5
**hundred** 17:20,21
17:24 40:9,14,15
40:17 222:13
**hundreds** 252:6,6
**hypothetical** 64:21
147:7 192:20,25
265:23
**hypotheticals**
265:22

_____
**I**
**idea** 158:13 221:18
272:3
**identification** 6:17
11:21 21:14 87:20
101:6,11,21 102:2
195:6 227:10
**identified** 61:3
62:16,17 63:2
77:10 106:17

114:17 123:14
133:5 134:4
199:11 247:10
300:17
**identify** 23:3 25:20
26:12,17 27:8
30:7 31:19,23
50:8 63:22 79:22
94:5,8 96:4 124:6
159:20 162:4
170:14,20 173:4
174:2 187:6,13
246:19 249:21
282:25
**identifying** 62:21
79:13 172:10
**identities** 88:23
254:4,5 258:14
**II** 61:7 62:6 108:12
109:20 111:23
113:21 114:15
**imagine** 106:7,12
**immediately** 25:8
57:4 81:6 85:5
**implementation**
86:4,22 87:11
**implying** 190:25
243:11
**important** 109:13
199:11 233:11,25
257:11 259:18
265:10
**inaccurate** 234:7
**inappropriately**
265:12
**incentive** 191:16,20
192:11,21 193:20
194:2
**include** 10:15,15
60:15 62:13 112:2
118:15,20 119:2
143:21 180:4
274:5,18 278:10
278:11 279:14
291:19
**included** 44:24

49:15 102:6
112:14,25 131:10
135:5 160:17
161:16 188:18
189:8 229:14
249:22 261:13
277:8
**includes** 17:8 32:6
89:25 91:6 117:20
119:24 127:15,18
153:14 285:9
304:10
**including** 69:13
74:9 111:18 181:2
187:6 198:2 206:9
206:13 208:5
228:17 230:12
256:17
**inclusive** 83:18,20
**incredibly** 141:23
**independence**
240:2
**independent**
259:23 260:3,4,7
260:9,11,11
263:11
**independently**
214:22 229:22
230:4
**INDEX** 309:3
**India** 86:18 88:15
**indicate** 195:12
228:22
**indicated** 198:12
234:10 284:13
**indicates** 75:17
208:23 228:15
246:14
**indicating** 233:14
**indication** 184:18
**indirect** 155:2,6
157:19 158:2,8,8
158:13,16,19,21
159:3 160:25
161:6,12 171:22
172:18 173:13

**indirectly** 234:16
**individual** 24:23
47:22 90:10 91:18
91:19 93:17 95:4
95:6 96:11,16,17
113:7 137:12
210:17 211:2
272:25 278:12
**individually** 23:19
**individuals** 10:15
22:21 23:3 30:3
48:17 90:5 95:20
242:2
**individual's** 23:15
93:18
**industry** 16:7 202:3
274:24 275:2
277:2,3,11
**influence** 235:2
270:11 272:9
**influenced** 250:6,7
**inform** 272:11
**information** 31:21
69:11 70:3 74:6
75:5 131:17 133:4
136:21 137:5,15
147:23 212:7,22
214:15 215:12,19
217:20 219:5,25
224:17 225:3
230:2,9 238:6
239:6,11 249:25
250:18 252:11,13
252:18 253:2,5,13
253:25 255:2
257:13,14,14
258:6,17 259:9,19
271:18 272:18,23
273:3 274:19
275:21,23 280:9
295:22 305:21,24
**infringing** 202:12
**initial** 107:25
**initially** 289:6
**inner** 102:4
**input** 37:16 202:11



**inquire** 94:14
**inquiries** 229:15
**inquiring** 25:15
200:22 281:18
**inside** 57:20,24
59:2 170:6
**instance** 114:23
186:25 213:3
**instances** 50:9 58:8
79:22 289:25
**instruct** 116:4
147:10 200:24
**instructing** 147:13
**instructions** 148:14
**insufficient** 33:13
33:23 34:18 35:12
35:21
**Insurance** 194:14
**intend** 218:8
**intended** 89:4
155:7 159:20
160:13 174:2
241:10 257:15
275:16 276:23
**intent** 14:25 54:16
241:11 276:13
284:14 288:15,20
**intention** 111:20
**interacted** 36:10
37:13
**interaction** 72:22
**intercompany**
113:5
**interest** 9:9 11:12
22:13 157:20
158:3 171:20,24
172:5,15,19
173:10,14,19
220:19 224:11
281:10 298:2
**interested** 8:12
29:18 50:10 61:6
62:9 73:9,21,25
74:13,15 76:18,24
79:4,24 91:3,10
93:23 94:9,25

96:12,21,25
104:21,23 107:25
108:24 113:25
114:3,14,16 115:2
123:11 138:5
139:22 140:8,22
142:14 144:4,16
147:22 177:6
185:10 187:17,18
187:20 199:16
218:11 234:16
280:14,17,20
281:15,22,22
282:18 290:18,23
291:2,15 292:10
292:18
**interests** 100:13
101:4
**interim** 139:15,17
**internal** 31:22
43:22 46:21
126:14
**internally** 44:16
**internet** 220:25
237:2,14 250:8
**interpretation**
201:6 203:14
**interpretations**
201:24
**interrupted** 301:10
**introduce** 4:16
**invest** 209:25 210:2
234:15 266:18
269:7
**invested** 208:6
210:5,8 211:22
215:18,23 216:25
219:9,17,25
220:12 238:11
271:8
**investing** 271:24
272:12
**investment** 208:7
211:20 212:14
215:11 217:3
218:25 220:24

223:5 229:18,21
230:5,7,15,20
236:17,18 239:3
239:20 242:10
244:9,12,15,20
245:7 252:11,14
253:3 262:13
267:12 270:12
272:15 295:20
**investments** 208:5
209:21 211:16
215:8 219:2
224:15,16,24,25
227:17 229:23
233:17,20,21
234:19,25 235:4
236:19,24 238:11
240:19 242:3,17
250:2 269:5 270:9
295:16 298:5
**investors** 227:17
229:22,25 238:25
**invests** 209:20,22
220:17 266:4,7
267:6 268:4,5,18
268:19
**involve** 158:23
247:7 249:4
**involved** 35:24 37:5
47:17,19,21 48:2
48:13 50:10,25
97:23 122:17
125:14 149:16,24
188:8 212:19,20
260:25 261:6,9
262:6 276:5
290:17 299:3,5
304:5
**involvement** 54:23
125:21 208:3
264:4
**involves** 129:15
193:9
**irregardless** 79:5
**irrelevant** 144:23
185:5,9 270:18

**Irrespective** 291:18
292:7
**issue** 92:14,21,22
92:23 104:18
162:24 164:19
180:3,19 199:12
202:17 270:14
285:16
**issues** 270:17
**item** 130:20 174:7
**items** 60:13 296:18
305:18
**Ivanick** 2:22 5:6,6
10:16 36:21 37:16
52:18 53:2,9,21
54:4,11,18 55:20
56:12 57:15,19
58:9,14,25 60:17
165:10 166:20
180:21 181:19,22
183:19,24 280:24
305:12
**Ivanick's** 37:20
47:14
**I-L** 196:7

**J**
**J** 5:9 205:2
**Jay** 59:8 269:11
270:2
**Jean** 65:2
**jeopardize** 240:2
**Joe** 26:18 71:2
85:12
**John** 221:7,8,21,24
222:10 228:11,20
236:5
**John's** 236:7
**joined** 90:5,25
221:10,25
**joining** 222:4
**joins** 255:13
**Jones** 5:18 6:11
199:15 233:25
234:10 249:15,18
250:13 298:23

**Joshua** 2:17 4:25
**Journal** 252:23
263:6,13 267:23
**Journals** 267:25
**judge** 5:18 6:3
15:19 16:20
163:20 199:15
233:25 234:10
249:15,18 250:13
298:23
**judges** 279:10
**judge's** 16:11
198:25 199:13,23
**judgment** 248:20
**July** 103:9,13,18
104:10,12 179:16
**jump** 290:25
**June** 222:25 225:5
226:23 235:5,16
237:21

**K**
**K** 5:9,9 205:2,2
**Kana** 299:18
**keep** 56:4 102:3
175:7 190:12
**keeping** 256:18
**kept** 178:16
**Kevin** 27:3
**kind** 32:3,10 33:5
39:23 42:9 48:8
52:13 69:10
101:14 102:21
106:22 124:12
128:2 157:11
160:16 208:2
213:8 214:22
238:22,23 242:25
243:8 251:4
252:10,16 276:7
277:10 285:11
295:9 298:2
**Kirkland** 3:3
108:21 109:23
110:4,6,17 111:6
113:6



**knew** 47:7,9 104:13
179:21 233:19,21
**know** 17:12 18:4,17
18:19,24 19:24,24
24:7 26:5 29:4,9
30:3,16 31:10
34:22 35:7 36:11
37:20,23 47:22
48:18 52:2,8 54:4
54:9,11 56:23
57:18 64:18,24
65:6,8,9,11,12,17
65:18 67:13,24,25
68:22,25 69:4,24
70:6,12,15 72:23
72:25 73:3,4,7,9
73:12,14,15,19,20
73:22,23 74:20
75:3,12,13,23,24
76:3,15,16,17
77:18,21 83:11
84:15 86:13 88:14
90:9 92:2 98:22
99:4,12,12,23,25
100:4 104:24
105:10,22 106:3,3
109:5 110:23,25
111:4,12,13
117:17,19 118:4
118:11,12,14,14
118:24 119:13
121:3,7,9,22,23
122:2,15,16,19,21
122:22 123:19
124:3,8 125:18,20
125:22 128:10,21
128:25 129:2,6
130:3,7,8,8,10
133:4,8,11 135:7
136:6,11 137:14
138:4 145:16
154:18 155:22
159:8,11,12
161:10 162:12
163:21 168:10
170:4,8 175:5,14

176:3,8,13,15,22
178:22 179:20
180:8 182:20
183:8 188:7,8,17
188:23 189:3,7
193:21 194:20
195:8,17 196:2,9
196:15 197:12,14
197:17 201:13
206:25 207:4
208:8,12,14,21
209:6,7,15,18
210:11 212:18,18
213:4 215:6,20,22
215:25 216:4,7,12
218:5 219:8 220:9
220:11 221:2,7,8
221:24 223:7
224:17,19,23
225:3 233:12
234:18 235:4,10
235:18,23,24
236:15,16,21
237:13,20 241:9
241:12,19 244:8
244:11,18,19,20
244:23,24 245:2,3
245:11,16,24
253:5,8,18,20
254:14,21 255:5
256:9,11,20,21
257:23 258:4
260:19,20,22,24
261:5,6,10,11,13
261:20 263:14,16
263:24 264:4,17
266:3 267:19
269:9,17,23 270:5
272:10,18,21
273:18 275:22
277:15 278:4
279:22 281:4
286:20 288:18
290:9 291:2,15
292:2,6,11,17,18
292:24 293:22

294:6,7,10,11
296:7 297:9,19,24
298:7,11 299:25
300:14,20 301:3,4
303:13,14 304:16
304:21,21,24
305:20,24
**knowing** 254:8
**knowledge** 20:5,23
28:25 33:11 57:25
58:3,4 62:7 64:3
66:17 67:5 69:10
69:15 70:2 71:5
71:22 75:20 76:6
82:15,19 83:16
88:14,21 105:12
105:17 139:21
153:8 162:14
201:2 207:21
255:7 266:6 269:4
269:8 270:9 272:5
277:21 280:10,13
290:19 298:13
**known** 221:9
**knows** 244:15
255:11

_____

**L**

**label** 4:3 67:2 89:13
150:22 185:14
205:7 273:13
297:3
**Labor** 217:15
218:23
**lag** 110:23
**laid** 158:11 285:12
**landscape** 275:2,22
277:3
**language** 44:8
117:8,9 120:17,24
120:25 172:23
173:15 233:6
239:23 248:12
260:16 277:7
290:22
**large** 118:2,12

163:16
**late** 282:2
**Laurie** 36:10 37:13
39:9 48:14 64:23
125:12
**law** 13:17 14:7,21
15:2 70:21 163:2
164:22 165:8
184:5,9,10
**lawful** 199:19,21
**laws** 201:25
**lawsuit** 59:16
**lawsuits** 60:3
**lawyer** 8:14 9:6
13:21 14:4 15:9
15:12 92:11 93:7
159:5,6 161:15
184:6 201:5
287:25
**lawyers** 36:20
161:19,21 234:10
**law's** 14:7
**layman** 15:13
**lays** 282:19,22
**leader** 6:18,21,24
27:22,23 28:2,10
31:5,8,12 66:3
86:4,22 87:11
304:4
**leaders** 7:3,9,13
20:16 27:6,9
82:11,14 83:4
207:13,22
**leading** 15:10 34:13
39:19,22 55:13,22
57:2 305:6
**leaf** 21:16
**learn** 262:12,18,20
**learned** 52:5
218:21 262:15,23
**learning** 83:16
**learns** 236:11
**leave** 87:21 203:20
**leaving** 278:10
**led** 88:22
**leeway** 163:25

200:15 219:13
**left** 150:25 237:20
**legal** 1:18 3:9 4:13
4:15 10:8 15:17
20:22,25 22:19
28:18,20 29:3
32:6,7 36:2,7,12
36:15 37:15 44:16
47:15 48:5,7,8
57:20 65:3,13,24
72:9,14,16,25
73:18 76:16 109:4
118:23 121:13
125:8 135:9,22
154:16,19 158:10
161:18,20 176:16
176:18,19,20
180:20 181:18,23
183:9,12 208:20
228:7 260:21
**legality** 92:7,12
**legend** 107:15
**lender** 104:16
180:2
**length** 199:10
**lengthy** 44:19
**lens** 291:10 292:9
292:15
**Leslie** 1:12 4:14
310:6
**letter** 12:2 97:11,17
97:18 103:8
126:23 179:15
283:6 293:21
**letters** 11:20,25
308:15
**let's** 6:14 21:11
29:15 40:12 41:14
45:11 55:20 56:4
66:18 67:14 73:8
80:5 81:15 82:13
87:16 97:4 98:3
103:3 116:18
120:3 124:11,16
140:10,14 141:25
148:18 150:16



151:3 164:15
170:9 171:16
174:5 178:3
185:25 186:19
191:3 192:4,7
193:3,10 203:20
204:20 205:21
243:23 247:24
248:9,10 256:23
259:21 273:5,16
274:11 277:14
279:20 283:11
284:21 286:18
292:22 294:20
**level** 41:4 65:13,18
113:10,11 214:23
215:14,19 219:7
**levels** 229:19 269:7
**Lexington** 2:4
**lien** 104:16 179:25
**light** 24:22
**lights** 234:5
**limit** 92:24 93:2
**limitation** 201:3
**limitations** 91:12
**limited** 88:15 153:9
164:6 194:14,15
200:3 207:9,11
213:20
**limits** 93:9
**line** 13:9 24:18 39:2
89:18 98:8 150:8
151:18 152:7
227:22 228:3
247:15,15 248:6
263:4 309:5,5,5,8
309:8,8,11,11,11
309:13,13,13,16
309:16,16 312:3
**lines** 12:17 13:2
263:10
**link** 126:13 132:5,8
**LinkedIn** 208:23
209:4
**list** 29:18 42:24
50:10 74:5,7 79:4

79:25 84:25 85:20
90:16 91:10 93:24
94:10 96:25
107:25 108:8,13
108:19 109:16,19
109:25 110:11,18
110:21,24,24
111:8 114:14,15
118:2,6 123:11,14
138:6 139:23
140:8,23 142:14
144:4,17 145:11
194:13 213:20
214:19 217:16
218:24 253:19
280:14,17 281:9
282:11 290:23
292:10,14
**listed** 89:23 97:9,14
114:4 214:5
264:24 280:6,20
**listen** 148:13 265:5
**listing** 214:21
**lists** 15:16,25 69:14
**litigation** 16:8
154:12 156:21,21
217:20 220:22
**litigations** 60:14
**little** 6:22 12:12
21:21 31:2 39:5
108:16 131:12
157:24 185:17
219:13 237:10
249:25 282:3
304:23
**Livskim** 208:8
**LLP** 2:3,8,20 3:3
**local** 20:8
**located** 4:10
**log** 40:21 109:10
**long** 46:11 52:7
68:4 162:13 164:7
174:6 181:4,11
195:7 221:9
270:18,21 271:5
286:12 291:16

**longer** 23:25
175:11 178:12
**longstanding**
100:23,24 256:12
**look** 11:12,16 12:22
21:15,20 30:18,25
52:11 61:15,16
62:5 80:5 88:2,3
89:16 97:4 98:3
103:3,5 107:3
116:18 123:3
124:11 132:15
140:25 165:12
170:9,9 171:16
173:8 174:5 198:3
216:22 218:16
237:2 241:4
266:11 268:9,24
273:5 277:14
283:11 291:9,12
306:10,11
**looked** 122:20
177:10 179:15
209:3 216:19
217:22 240:25
251:7 291:10
297:16
**looking** 12:10
63:19 103:17
104:20,23 123:8
125:23 141:13
177:23 193:17
216:14 245:15
291:13 292:14
**looks** 265:16,18
**look-back** 117:7
122:24 136:14
176:25 177:10,13
177:21 178:4,8,11
178:15 180:11,16
181:8,12,14 182:2
182:4,11,22 183:4
183:7,10,24
184:14,19 185:5
185:23 186:10,14
186:18,23 187:14

188:12 189:19
191:3 197:3,6,10
197:15,23 198:4,5
198:14,14,19
199:7,10,18,20
200:12,20 201:9,9
201:10,11,18,19
201:20,20,21
202:22 203:5,7,15
**loose** 22:11 23:14
**lost** 89:6 131:12
185:11 283:15
**lot** 178:23 221:19
251:14,17,20
252:3 262:2
265:22 304:24
306:4
**Lovells** 2:20 5:7
10:16 36:21,24
162:2
**lunch** 194:25
204:15,20

———————————
**M**

**M** 5:9 205:2
**macro** 274:25
275:22 277:3
**Magna** 1:18 3:9
4:15
**mails** 211:24
**main** 3:4 305:18
**maintaining** 102:19
256:16
**maintains** 124:7
**majority** 83:24
84:5
**making** 44:21
127:2 129:7
227:23 266:17
**male** 27:20,21
**manage** 19:17
**managed** 230:4,20
253:16
**management** 300:5
300:6
**manager** 83:14,15

**managers** 225:2
229:21 244:9,13
244:15,20 300:16
**managing** 302:18
**mandatory** 293:23
294:8
**Maravich** 85:13
87:10
**Margolin** 2:17 4:25
4:25 55:3,16,18
55:19,19 263:8
**mark** 1:10 4:4,23
5:7 6:12,12 11:15
21:11 87:16
135:13 192:4
195:3 227:9 308:6
310:4 311:8
**marked** 6:16 11:20
21:14 87:19
150:10 195:5
227:9 309:13
**market** 275:4 277:5
**Mar-Bow** 2:4,9
4:19,21 33:10,24
34:14 35:2,10,22
59:7,13 217:20
220:11,22,23
221:2 267:20
270:16
**Mar-Bow's** 46:23
174:14
**material** 295:21
**materially** 157:21
158:4
**materials** 22:2,15
26:11 28:15
249:20
**mathematical**
214:12
**matter** 4:5 16:5
21:17 42:5 57:8
70:23 115:15
140:20,22 145:5
146:19 153:15
170:24 192:3
200:2 201:21



202:15 217:12
219:19,22 244:22
271:7
**matters** 49:19
92:12 138:15
139:7,12 145:7
148:6 251:22
**max** 82:7
**McCARTHY** 2:8
**McKinsey** 2:14,20
4:24 5:3,5,8 7:6
7:10,15 10:12
12:3 14:12,22
15:20 17:5,7,12
17:15 19:19 20:5
20:14 21:2,7,8
24:2,19 25:6
28:16 30:7 31:16
33:12,21,21 36:2
36:7,12,14 37:15
41:2 43:23 44:3
47:15,19,20 48:4
50:8 57:20,24
58:15 59:2,2
60:22 64:3,5,11
65:13,19,25 66:5
68:5,12,15 69:13
69:13,14 70:8,16
71:5 74:2,5,7,9,10
76:20 77:2,5
79:12 81:25 82:17
83:10 84:20 86:2
86:5,7,10,17,23
87:9,12,14 88:14
88:16,17 90:3,5
90:20 91:7 94:3
94:20,21,24 95:2
95:3,7,15 96:10
96:18,20 97:9
98:16,17,25 99:6
99:9 104:4,5,13
105:13,18 106:8
107:3,10 109:4
118:16,21 119:2,2
119:8,14,17 120:9
120:20,22 121:8

121:10,20,24
123:16 124:7,10
125:8 126:18,20
127:21 133:24
134:8 138:11,23
139:10,11 140:15
140:16,17 142:2,3
143:22 145:8
146:16 148:10,11
148:24 149:14
151:11 154:16,19
159:24 161:20
162:2 170:21
179:16,20 181:18
181:23 182:3,11
189:12,23,25
190:11 191:13
192:14,15,18
193:23 194:2,18
195:13,24 196:2
196:17 197:9,15
198:20 199:17
201:8 203:23
205:14,21 206:8
206:19 208:19,25
209:9,14,16,17
210:18,20,23
211:7 221:10,25
222:4 223:21
224:7,8 225:24
228:7,17,25
229:11 230:8,11
230:14 233:12,23
234:3,22,24
235:25 237:16,18
238:5 239:4,7,12
240:17 242:2,9
243:14 246:2,5
247:17 249:6,11
251:17 252:20,24
252:25 253:19
255:10,11,21
256:13,19,20,23
256:25 257:18
258:2,13 267:21
267:21 268:20

270:18 271:6
272:25,25 274:12
274:22 275:18
277:22 278:5,7,12
278:18 279:3,15
279:17 280:16
281:13,19 282:14
282:16 283:2,8
286:24 290:7
291:5,6,18 292:4
292:6,17 293:11
295:19 296:5
297:7,18 298:9,16
299:7,11,21 300:4
300:9,10,12,13,21
301:13,18,20
302:18 304:3,11
304:16
**McKinsey's** 21:4
59:14 123:15
176:20 188:2
204:7 229:15
230:6 249:12
251:14 253:14
254:8,13,19 256:9
**mean** 13:21 22:9
45:25 56:24 60:11
65:23,24 67:9
105:24 112:8
122:6 128:4 132:3
132:20 136:2,23
158:7 186:16
216:10 246:10
249:15 260:11
265:14,15 287:6
288:12,19 300:7,8
**meaning** 67:10
68:13 76:2
**means** 150:2
162:25 202:23
217:7 287:23
288:3,10 310:11
**meant** 213:12
**measures** 216:24
**mechanism** 128:12
**mechanisms**

166:10
**media** 4:3 67:2
89:13 150:22
185:14 205:7
251:15,19,23
273:13 297:3
**meets** 230:16
**melding** 145:2
**member** 36:22 77:8
93:15 94:23 95:5
95:17 96:9,13,14
115:4 121:20,24
126:25 127:24
130:20 131:7
133:19,20,23
138:20,20 140:9
141:4 143:20
186:24 208:19
228:13 233:18
236:8,21 244:5
247:2,4,8 254:23
276:2 277:22
**members** 29:13
50:9 80:24 83:9
88:19 90:2 92:8
92:25 114:10,18
123:9 127:18
206:10 224:14
230:10 234:24
236:3 244:6,9,12
245:6,12,12,13,17
245:19,20 246:3,4
246:11,19 247:4,7
247:13,16,18,19
248:25 249:2,9
251:11,12 277:24
278:9
**memo** 39:3
**memory** 137:5
**mention** 208:22
220:14 254:5
**mentioned** 49:16
83:13 114:9
156:19 266:8
296:2 301:14
305:3

**message** 302:23
**met** 208:11,16
222:3
**methods** 93:25
**meticulous** 129:12
**metric** 214:8
**MICHAEL** 2:6
**middle** 24:15 248:3
248:4
**mike** 4:18 192:4
282:4
**mildly** 234:7
**million** 268:23
283:13 285:6
**mind** 13:10 25:21
101:10 112:16
185:2 207:16,19
214:13 226:21
282:8 291:2,15,25
292:20
**mine** 258:6
**mines** 87:5
**mining** 274:16
**minute** 273:7
**MIO** 99:16,19,24
122:7,8 205:12,15
205:16,20,22
206:4,7,11,15,19
207:8,9,10,11,13
207:22 208:2,4,15
208:24 209:5,20
209:22 210:2,2,5
210:11 211:5,13
211:16 212:15,16
215:10,22 217:9
217:17 218:25
219:5,6,24 220:12
222:25 223:5,21
224:6,9,14,15,18
224:18,20,24
225:4,7,23 226:4
226:25 227:17
228:13,16,21,23
229:12,13,15,22
229:22,23,24
230:3,7,10,20



233:17,19 234:4
234:15 235:2,18
236:3,9,11,16,19
236:24 237:15,21
238:6,9,16,18,19
238:20 239:6,13
239:13,19,20,21
240:17,18 241:16
241:17,25 242:2,3
242:9,10,10
243:16 244:5,9,12
244:15,21 245:7,9
245:12,13,18
246:5,12,21,22
247:8,20 248:5
249:2,20,22 250:2
250:6,6 252:10,14
252:18,22 253:5,6
253:14,18 254:7
254:12,13,14,18
254:19,20 255:3
255:13 256:6,9
258:20 259:9,15
262:12 266:3,7,9
266:17 267:6
268:4,18 270:10
270:14,16 271:7
271:23 272:16,20
296:14,16 298:6
**MIO's** 230:14,19
**mischaracterize**
46:11 188:21
**mischaracterized**
188:19
**mischaracterizing**
169:2
**misleading** 231:16
232:25
**misread** 231:21
**misspeaking** 302:9
**misstates** 35:13
93:6 95:9 198:23
235:9 237:5
248:22
**misunderstand**
213:13

**misunderstanding**
193:8
**misused** 302:12
**modifies** 306:18,22
**Molino** 65:2,6
125:17,20 301:20
301:25 302:13
**moment** 49:24
58:11 83:17 85:16
**money** 209:25
211:6 213:4
215:23 216:13,15
224:25 285:17
286:3,6 288:5
297:17
**monitor** 69:7
**Montgomery** 27:4
27:25
**month** 111:11
140:19 142:12
193:15 212:9
213:6,10,16 214:6
214:7 286:2,8
296:15
**monthly** 211:18
212:5
**months** 137:25
138:2
**morning** 4:22
**motive** 193:21
**mouth** 165:17,24
**move** 16:24 23:24
24:11 178:15
182:19 198:18
202:19
**moves** 178:11
**multiple** 29:3 34:9
46:20 73:21 78:24
129:23 169:10,14
270:25
**Murray** 2:11 4:20
4:20,21
**M&A** 154:13
156:22

——————— **N** ———————

**N** 5:9 204:24,24,24
205:2 308:3
**name** 4:12 18:23
20:3 23:6 25:2
26:2 36:23 64:12
66:12 70:8,13
73:9,13 82:25
90:14 98:24 102:5
128:6,6,7,7
208:11 209:8
228:19 257:7
258:18,23 288:24
289:15,17 291:24
299:16 302:12
303:16
**named** 90:10
**names** 48:18 69:19
69:22 76:24 80:23
85:8 86:16 112:21
118:17 289:8
292:2,5
**narrow** 100:8
**Natural** 261:15
263:18
**nature** 135:5 190:6
251:3 275:3 277:5
297:13
**necessary** 42:14
63:8 165:7 257:23
**need** 43:17 62:13
63:4 66:4 75:6
89:7,8 130:6
133:7 140:25
142:18 143:3,8
144:5,5,17 145:16
145:17 146:20,21
150:14 175:7,10
248:12 258:4,15
**needed** 112:11
135:10
**Neil** 27:5
**neither** 12:18
**net** 43:4
**never** 64:11 208:11
208:16 217:21,22
218:6 241:9,10

**new** 1:11,11,13,19
1:19 2:5,5,16,16
2:22,22 4:11,11
25:11 59:17 70:23
89:18 90:21
110:21 114:9
137:20 139:7,8,11
139:14,16 140:20
140:21 142:13
143:5,7 144:3,16
145:8,13,14,15
146:18,19 148:16
148:17 189:15
191:15 213:8,11
215:10 307:3
**news** 196:18 262:16
262:18
**newsletters** 215:7
296:16
**NII** 197:14
**nondisclosable**
202:25
**nonpublic** 295:22
**North** 274:3,16
**Notary** 1:13 5:10
311:14
**notation** 42:25
**note** 5:15 225:9
**noted** 80:4 111:19
112:23 204:25
285:15 307:6
311:6
**notes** 111:20
**notice** 143:6
**noticed** 139:3
**notified** 142:22
143:14,15
**notify** 140:2,4
142:23 143:3,16
**November** 107:10
107:18
**number** 18:8 25:13
38:8 56:18 80:13
83:18 117:25
118:13 206:5
283:15 297:3

**numbered** 295:7
**numbers** 5:25
194:9 200:6 295:7
**numerous** 223:18

——————— **O** ———————

**O** 5:9 204:24,24,24
205:2
**oath** 225:6 226:24
233:14,24
**object** 117:13
141:21 144:24
198:22 271:9
**objected** 52:21
**objecting** 148:20
**objection** 8:20
13:20 15:23 29:23
32:23 44:17 45:3
45:18 46:14,23
53:8 56:6 58:17
59:9 64:8 65:15
65:21 72:18 75:8
77:25 84:3 92:4
93:5 102:23
106:15 128:9
138:13 141:9
144:19 145:18
148:8 149:6 150:3
155:4 157:23
159:4 161:14
162:9,16 169:12
174:14 184:24
190:22 191:22
201:12,22 216:17
218:3,13,18
219:12 220:7
225:10 235:20
236:14 237:3
245:22 248:22
250:10,17 251:9
255:9,14 261:24
265:3,19 266:12
268:10 269:2,13
269:19 270:20,23
275:9 293:25
294:15



obligations 11:8,11
264:24
obtained 257:15
obviously 102:18
164:24 194:24
Occasionally 215:9
October 107:7,25
108:15,22 136:15
177:13,18,25
178:5,16,23 203:6
281:10 287:12,12
offer 284:14
offered 285:16
offering 229:17
offers 212:16
office 1:10 10:13
17:3,7,13,16
18:16,21,25 20:9
20:11,15 21:4,7
21:10 52:14 53:12
53:22 54:5,12,20
64:25 143:3,16
145:20 146:15
166:15 168:17,18
169:19 174:23
175:3,25 176:5
231:13 232:21
279:8,9
officer 228:24,24
230:13 303:20
officers 81:25 90:2
91:7 300:8,20
303:12 304:11
offices 16:25 17:4,5
17:10 18:5 298:9
official 65:19 293:6
officials 233:23
Oh 81:8
okay 18:23 81:8
107:17 111:13
127:17 168:7,9,13
169:19 186:3,4
191:6,8 192:7
193:11 233:10
238:3 267:14
273:20 277:19

278:23 279:24
292:25 293:10
296:10
okayed 52:13
old 177:7 184:23
ominous 204:19
once 73:21 139:4
148:4 204:18
212:9 219:8
305:25
ones 83:17 89:23
127:12 129:23
161:22 169:4
206:20 212:18
256:21 300:17
301:4
one-month 201:21
one-year 201:11,20
ongoing 154:11
185:4 187:13
online 126:7 130:12
134:21 212:5
297:15
open 171:2
operate 274:15,17
274:25
operations 230:6
opine 92:11 201:6
294:18
opposed 28:17,18
92:9 93:3 180:13
210:12 224:15
240:11,13,14,15
278:16 289:16
optional 293:24
294:9
options 180:2
oral 243:7
order 5:17 6:11,16
16:11 118:23
163:11 164:6,10
199:2,13,23
201:25 241:8
308:13
organizations
156:2

orient 152:7
original 47:12
52:25 61:7 62:10
62:23 63:17 89:2
91:8 97:5 111:14
249:23 285:24
289:4 302:4
originally 280:2
ORLA 3:5
ought 32:4 64:18
outcome 104:19
268:7
outdated 217:23
outer 93:8
outlined 106:20
outputs 173:2
outside 20:5 32:17
33:11 36:20 37:3
65:24 67:11 91:16
92:9,25 93:15
161:25 170:7
185:22 187:22
189:18 203:5,7
222:15 234:23
239:20 240:18
241:16 242:2,9
245:12 254:12,18
259:19 266:25
overall 71:25
230:19 274:13
overlap 206:17
overlapping 101:3
overseeing 230:18
owe 180:5
owned 170:22
253:16 281:14,21
282:17
ownership 170:16
170:22 171:5,11
171:14 279:11
283:10
O'CALLAGHAN
3:5

_____
P
_____
page 12:8,23 13:8

21:20,22 61:16,18
80:12,14 103:6
107:14 194:8,9
208:23 209:4
274:11 283:17
285:8 308:6,12
309:5,5,5,8,8,8,11
309:11,11,13,13
309:13,16,16,16
312:3
pages 130:12
134:20,22 212:11
214:18,25 311:3
paid 286:12 288:6
paragraph 10:4
13:11 21:21,25
56:7,10 66:18
67:14,18,20 75:17
77:11,12 80:5,15
80:18,19,20 84:18
87:2 88:2 89:16
97:4,6,7,9 98:3,4
100:11,25 101:18
102:7 103:3,8
107:23 108:3
110:10 111:19
112:24 113:2
116:18,19,24
119:5 124:11
150:25 152:23
153:4 171:16,18
172:6,21,25 174:4
174:5,6 179:4,4,7
179:8 200:2
209:19 223:25
224:4 226:6
227:11,13,15,22
228:15 229:5,9
230:21,24 231:3
231:14,21 237:23
238:3 243:25
244:4 246:2
248:19 250:13
259:22,25 260:17
261:3,14,18 262:5
262:8,21 263:2,21

267:9,23 273:5,17
273:21 274:11
275:16 276:14,19
277:14 278:24
279:22 281:3,6,12
283:3,6,11,15
286:19,22,23
287:4,24 292:23
paragraphs 60:12
93:21 205:11
223:15 232:23
246:17 249:23
parameters 75:9
Pardon 103:24
240:12 280:15
part 5:16 21:3
24:19 28:20 95:18
95:21 107:20
124:9 131:21,22
162:15 163:16
166:10 177:9
184:17 210:6
220:21 235:25
253:23 256:15
258:10 260:13
263:9 264:22
301:20,21 304:6,7
304:8
particular 17:16
45:6 64:4 70:5,14
71:20 115:16
119:25 187:16
188:24 189:5
252:3 295:7
particularly 44:14
115:21
parties 8:13 29:18
50:9,10 61:6 62:9
73:21 76:18 79:4
79:25 91:3,10
93:24 94:10,25
96:12,21,25 102:4
104:21,23 107:25
108:24 113:25
114:4,15,16
123:11 131:16



138:6 139:22
140:8 142:14
144:17 154:12,14
177:6 202:10
224:10 280:6,20
281:9,15,22,23
282:11,18 290:18
290:23 292:10
**partner** 7:6 31:12
69:15 70:8,13,17
70:22,24 71:6,11
74:18 75:5 84:12
85:25 127:23
133:24 134:4
135:23 140:10,15
140:24 142:2,3,18
144:12,14 149:14
191:13 196:16
209:16 239:13
255:10 256:19,23
256:24 299:7,21
302:18 304:3
**partners** 2:4,9 7:10
7:16 50:7 75:4
79:12 83:3,4,21
94:2,12,12 96:3
99:16 126:19,24
127:3,6,7,11,13
127:16,19,20,20
135:7 136:17
140:2 142:23
143:13,21,25
148:10 151:6,11
160:7 172:3,12,14
173:18 187:11
191:13 205:14,24
205:25 206:3,8,13
206:14,17,18
209:5,9,10,14,24
209:24 219:6
224:6,9 225:4
229:12,13,16,17
234:24 243:16
246:5,23 247:20
247:25 248:5
253:15 255:3,21

256:5 257:19
258:13 266:17
270:10 272:16
278:5,12,16,18
279:15 281:25
282:16 298:14
299:10
**party** 6:7 29:17
53:16 73:9,25
74:13,15 76:24
93:23 115:2
123:10 140:8,23
144:4 161:24
185:10 187:17,19
187:20 229:20
230:3 234:16
239:16 248:18
275:25 280:14,17
291:2,15 292:18
**pass** 165:16
**passed** 168:12
**passes** 129:18
142:12
**passion** 22:15 24:7
**pause** 89:8
**paycheck** 297:6,9
297:24
**payment** 47:6
283:13,24 286:10
**payments** 49:17
57:2,2 283:22
285:13 287:10
**pays** 297:22,24
**Peenes** 85:11 86:3,4
**pen** 38:23
**pending** 146:4
154:11 156:21
**pension** 208:7,7
209:20,23 210:5,9
217:8,17 218:25
224:16 229:16
**people** 10:12,14
19:15,18,19 22:6
22:12 23:7,15,24
25:6,9,19,21
26:24 28:24 29:5

29:8,10 32:17
81:4,7 82:25 83:2
83:14 84:11,14,14
84:14,17 85:6,7
85:18,20 89:22
108:23 109:5,9
112:11 114:12
122:16 126:8,10
131:5,20,21
135:18 136:4,6
148:4 235:24
236:19 242:9
245:18 249:9
301:18
**peoples** 132:16
**people's** 132:15
**percent** 42:2
128:24 129:3,5
211:14 213:23
214:8,9 215:21
216:12 280:2,7,8
280:20,22
**percentage** 210:11
211:4,12 214:12
251:21
**perform** 78:5
201:14 277:9
**performance** 213:7
**performed** 48:3
259:22 275:25
276:9
**performing** 15:5
78:22
**performs** 77:5
**period** 23:25
122:24 177:10,21
178:4,8 180:16
181:8,12,14 182:2
182:4,12,22
183:10,25 184:14
184:20 185:5
186:10,14,19,23
187:15,21,22
188:12 189:19
191:3 197:6
200:12,20 201:16

203:6,7,15 222:9
240:19 247:24
248:2,10,11,14
**periods** 34:10
190:24 201:15
**permission** 243:17
243:19
**permit** 202:9
**person** 9:4 19:22
20:4,8 24:18 36:9
37:12 65:13
132:12 149:25
208:11 229:3
**personal** 23:17
26:6 279:5 295:15
295:19
**personally** 19:25
182:23
**person's** 173:6
**perspective** 61:8
**Peter** 2:22 5:6
10:15 36:21 39:9
**petition** 11:19,24
89:20 105:7 107:6
177:24,25 178:5
178:10 180:13,16
185:20 186:7
189:12 308:14
**petitions** 203:17
204:3
**Petrella** 2:6 4:18,18
5:14 6:14 8:7 9:16
9:18 10:23 12:14
13:7,8,22,23
15:25 16:10,23
17:22 23:12 26:16
27:19 29:25 41:16
56:9 60:8 62:2,4
63:13 67:17 80:10
81:11,15 98:6
108:6 115:20
116:9,14 141:20
145:2,4,25 146:6
146:24,25 147:9
147:20 150:7,13
151:23 152:24

163:5,15 164:5
167:22,25 179:3,6
179:7 182:15,16
190:8 197:21
198:8 199:6,24
200:17,22 202:16
202:19 204:9,14
205:5 218:15
219:21 221:17
223:12,15,18,24
224:12 225:13
226:9,12 227:4,12
227:13,16 229:8
230:23 231:9,22
232:3,7,12,18
233:3 237:7 265:6
268:13 269:22
282:4 289:21
296:20 298:19
306:23 308:7
**phone** 135:22 136:3
136:9 145:19
183:21 305:12
**phonetic** 26:4,18
27:5 85:14 208:9
299:18 302:24
**phrase** 151:17
163:18 168:24
173:22 306:4,10
**picked** 251:23
**picture** 205:20
**piece** 21:21 251:13
**Pietro** 19:7
**pin** 147:5
**Pincus** 66:9 298:20
**pitching** 191:14
193:24
**place** 47:9 101:5,19
101:20 139:25
145:3 175:4
181:12 238:14
271:17
**places** 210:12 211:9
**plan** 268:20
**planned** 54:19
**plans** 41:23 208:7



210:9 229:16
304:16
**platform** 24:24
**playing** 14:9 15:5
270:19
**plays** 236:21
**pleadings** 263:18
263:24
**please** 4:16 22:25
59:11 76:23
126:10 129:19
143:12 145:24
195:7 226:22
242:5 268:15
282:8
**PLLC** 2:14
**point** 10:4 33:24
62:19 104:20
105:2,6,8,11
108:22,25 115:14
126:5 180:5
198:17 207:17
217:5 218:22
226:5 240:7
248:17 276:16
288:14
**pointed** 113:13
184:13
**points** 38:4
**policies** 182:2
271:17 294:12
295:2,6,13,25
296:4,12
**policy** 31:7,11
100:14,20,22,24
183:4,7 238:14
240:21 241:13
252:17 253:21
254:11 256:13
257:8,8 258:12,16
258:23,23 259:3
272:23 290:5
293:3,6,8,11
295:16,18
**pool** 210:25
**pop** 292:16

**pops** 132:9,11
134:19 291:14
**portfolio** 213:5
229:17
**portfolios** 217:4
**portion** 252:20
**portions** 223:19
251:23
**position** 205:16
206:4 207:25
**positions** 224:19
**possibility** 179:22
**possible** 34:12
40:11 71:9 106:19
114:6,8 171:3
220:5 286:11
**post** 11:19,24 63:17
105:7 144:14
308:14
**potential** 79:4
104:19 154:13
189:15 190:19
191:7 224:10
281:9 282:11
285:15
**potentially** 158:22
190:15 191:16,19
209:10 265:15
**power** 185:11
274:3,15
**practice** 6:18,21,24
6:25 7:2,3,9,13
20:16 22:3,11,17
23:3,8,16,20,25
25:22 27:6,9,22
27:23,25 28:10,15
29:5,9 31:5,8,12
66:2 82:10,14
83:4,15 101:2
190:2 207:13,22
257:21 258:11
290:6 304:4
**practices** 22:2,6,22
24:20 204:8
**practitioners** 17:12
**predominantly**

55:2 84:7
**prefer** 24:15
**preferably** 194:25
**preference** 26:6
283:20 284:2,24
285:7,15
**prejudice** 286:24
287:7,17,20,23
288:3,10
**preparation** 10:6
10:14,17 15:3
41:21 42:8 49:13
52:9,17 54:23
57:10,12 59:24
60:7,9 68:16
72:10 76:4,10
91:25 125:9 167:8
167:12 175:15
198:16 228:8
240:25 253:22
258:4 259:6 262:4
262:14 294:21
295:4 296:13
299:4,13 301:23
302:4,8 303:4,9
304:25 305:2,19
**preparations** 11:4
**prepare** 40:2 42:13
249:13 280:14,16
**prepared** 48:14
176:12 182:7
305:10
**preparing** 31:25
39:25 41:15 47:17
59:5 138:7 161:23
253:22,23 257:24
261:18 300:2
**prepetition** 103:23
103:25 104:6,9
105:7 180:7,12
287:2
**prerogative** 116:5
**present** 3:8 74:11
**president** 222:19
222:21 228:12,20
229:3 233:18

236:9
**presidents** 83:5,5
83:22
**presumably** 39:10
67:25 138:10
**pretty** 33:17 150:14
163:20 197:18
**previously** 11:3
94:2,11 179:19
292:3 301:13
**primarily** 37:9
60:18 70:9 102:8
125:12 229:20
230:17
**print** 134:22
**printout** 72:5
**prior** 25:8,17 34:4
35:3 47:5 49:18
50:16 52:24 57:3
57:5 81:6,6 85:5
95:9 104:10 162:8
165:2,6 197:9
210:23 217:6
226:18 235:17
267:4,17 285:14
287:10 291:5,19
291:20 292:3
302:24
**priority** 109:14
**pristine** 80:9
**Private** 88:15
**privilege** 6:8,9
202:13
**probably** 7:5 38:12
39:5 40:15 134:22
149:12 166:22
204:15 211:14
241:5
**problems** 184:19
**procedure** 137:6
241:7
**procedures** 116:3
**proceed** 47:3
**proceeds** 139:6,14
**process** 39:19,25
47:17 91:24 101:6

101:12,21 102:2
105:6 106:17
109:13 111:2
112:14 122:17
123:2,6,12 124:23
125:7,13,21 129:7
129:13 147:22
148:2,11 173:24
188:9 222:3
236:21 262:2
268:24 282:23
284:15
**processes** 173:3
**Production** 309:7
**productive** 42:5
**products** 229:18
230:20
**professional** 7:20
8:3,13,25 9:8 18:8
82:7,18 91:14
105:19 161:11
257:11 259:18
293:16 310:7
**professionals** 7:25
17:15 18:15,24
19:3 20:15 26:19
83:7 180:25
184:16 236:17
272:16 293:7
**professional's** 11:8
11:11
**programs** 209:23
**progress** 148:6
**prohibit** 106:18
252:21 271:17
290:3
**prohibited** 238:12
254:2 272:24
295:21
**prohibitions**
242:16
**prohibits** 252:16,17
254:7 257:18
**project** 107:4
291:16
**prompted** 174:22



263:15,25 264:5
**proposed** 54:13
**propounded** 311:5
**protect** 257:10
**protection** 237:24
238:5
**protocol** 137:11
238:15 239:24
240:20 241:12,16
241:24 242:6,18
243:14 252:15
254:3,17 257:6,17
258:13,20 259:2
259:10,11 290:6,9
290:14
**protocols** 237:24
238:5 239:5,18
259:8 270:22
271:6 288:23
289:13,24
**provide** 8:25 9:10
13:17 54:19 94:17
99:7,10,19 116:21
117:5,21 118:20
119:9 120:10,18
120:25 121:5,19
122:6 137:11
151:7,21 152:14
153:5 156:14
160:8 229:13
238:20,24 258:8
274:13 275:17
276:23 279:4
**provided** 14:6
29:11 37:7,7 38:3
38:15 44:10 46:6
54:5,11 79:2,3,23
97:8,13,22 111:7
148:14 155:7,14
156:23 189:10,11
191:4 281:8 283:7
283:23 288:7
291:3,17 293:19
**provides** 95:17
120:23 121:8
122:9 238:15

**providing** 15:7
49:21 69:18 87:5
106:19 273:25
290:17 305:11
**provision** 223:13
273:23
**provisions** 11:6
15:17 264:23
**public** 1:13 5:11
217:7 252:3,4,9
252:11 266:11
268:9,25 269:12
270:3 272:6
311:14
**publication** 263:12
**publicly** 217:14
218:24 274:19
275:23 296:8
**Pugh** 2:18 5:4,4
**pull** 68:19
**purely** 78:21
**purported** 225:23
**purpose** 5:19,22
68:2 78:21 116:11
145:5 199:4
261:11,20
**purposes** 8:19,23
82:4 102:9 122:23
155:23 236:12
248:9 261:18
**pursuant** 5:17 9:23
15:18 61:3
**pursuing** 215:16
**put** 16:17 42:22
62:19 64:19
149:11 158:14
234:6 247:24
248:10,11 261:22
285:23 286:10,13
**putting** 248:2
**p.m** 185:15 204:25
205:8 273:14
297:4 307:5,6

---
**Q**

**qualification**

115:23 225:18
**qualifications**
16:15
**qualifier** 248:15
**qualifies** 9:4
**qualifying** 16:2
**quality** 8:3
**quarterly** 230:17
**quarters** 174:6
**question** 7:12 8:21
9:20 11:17 22:24
29:24 32:24 33:15
33:20 34:8,10
35:15,17,18 42:21
54:8 59:10 62:3,7
74:3,25 75:3
76:22 79:16 81:2
82:8 86:3 88:7,8
88:25 89:4 98:15
101:13,24 105:5
105:16 106:10
117:2,10 120:19
121:12 130:22
131:25 133:12
135:14 141:20
144:23 146:3,4,6
147:6,15,17 149:8
149:11,12 150:16
152:4,6,15,25
157:4 158:15
159:13,14 164:7
164:12,15 165:3
170:19 173:17,23
174:16 178:25
182:19 190:7,9
203:22 205:17
207:19 217:10
218:20 226:7,19
226:20 227:19
232:9,20 235:13
235:14,15,16
237:9,11,12 242:4
242:13 244:10,17
247:25 248:10
250:23 251:16
255:17,18 260:6

261:4,5 264:9
268:4,16 269:22
271:2 281:17
282:24 283:7
287:21 289:3,22
291:13 300:23,24
300:25 301:9
**questioning** 150:8
199:14
**questions** 15:24
16:5,19 58:21
115:24 116:7
130:16,16 131:7,9
131:15,23 132:17
132:19 133:15
134:23,25 136:4,7
137:8,9,10 141:22
147:24 150:9
159:19 164:2
199:2 200:8,15,24
202:8,10 225:25
232:16,19 233:10
234:12 265:9
270:25 305:17
306:24,25 309:13
311:4
**quick** 150:16
**quickly** 126:23
270:4
**quite** 117:8 164:6
**quoting** 227:3

---
**R**

**R** 2:11 5:9,18
204:24 205:2
312:2,2
**rabbit** 134:18
**Radika** 90:10,10
**raised** 53:23 59:7
174:17 220:11
270:15,16
**Raj** 27:4 299:17
**rank** 84:13
**ranks** 83:22
**rate** 128:22 129:3
130:9

**ratified** 233:20
**Ray** 90:10,19
**reach** 94:11
**read** 13:10 33:16
33:18 164:5 195:7
195:10,11 223:25
226:11 229:4,8
230:24 231:2,11
232:9 244:2
252:23 267:16,22
267:25 272:22
273:17 275:7
277:15 279:25
283:3 286:19,21
292:23 311:3
**reading** 13:7
172:24 227:14
232:13 252:22
261:2 277:18
279:23 281:4
**reads** 200:2 234:2
**real** 80:14
**really** 9:18 24:18
74:15 117:10
118:2 121:3
151:13 157:3,5
186:17 188:14
196:13 214:14
217:12
**realtime** 12:12
**reason** 39:13
117:11 152:16
171:22 172:18
173:12
**reasons** 114:7,20
**recall** 10:25 19:5
20:3 32:2,5 38:8
39:17 40:6 44:6,7
44:12 45:5,6,12
47:2,16,24 49:5
52:8,11 54:3,3,15
54:21 55:6,11,22
56:19,22 58:11,12
58:13 60:20 61:13
75:16,18 77:11
83:17 84:16 89:25



90:9,24 110:2
111:5 115:5,12
125:4 128:11,16
134:3,16,24
156:25 157:8,10
157:18 166:17
169:4 170:3
181:20 183:2,17
183:22 184:21
197:2,6,8,11
198:15 209:8
212:13 213:2
214:11,17 225:8
226:23 227:23
240:6 241:23
242:20 254:10
262:10,22 276:22
284:8 295:11,15
301:22 303:19,19
303:23
**recalling** 85:15
**receive** 10:8 130:19
131:5,6 136:17,19
137:20 138:21
215:9 272:21
284:5 295:22
**received** 57:3
108:15,20 113:20
128:13 135:8,18
138:5,11,14,16,23
139:3 150:5
283:22,24 284:7
285:14 286:6
294:4 299:8,22
302:23
**receives** 76:21
129:22 140:17
225:4 251:15,18
**Recess** 66:24
150:20 204:23
273:11 296:25
**recheck** 76:12
**recipient** 137:13
141:7 145:10
146:11
**recipients** 136:19

143:6 156:15
**recognize** 11:17,22
**recognized** 112:20
**recognizing** 302:25
**recollection** 45:2
46:7 166:19
179:13
**record** 5:16 6:3,11
14:3 15:20 33:18
40:22 43:10 63:10
63:10 66:23 67:4
69:12 80:8 82:12
89:10,11,15
102:19 128:19
141:16 150:11,19
150:24 154:24
167:21 170:13
185:12,16 204:22
205:9 224:2 229:5
229:6,7,9 232:10
232:11,12,13,14
273:10,15 280:24
280:25 296:24
297:5 302:13
307:5 310:4
**recorded** 4:4
**recordkeeping**
102:9
**records** 122:11,20
122:22 123:4,15
123:21,23 124:2,5
124:8,9 187:8,9
187:18
**recruiting** 222:2
**red** 39:2
**refer** 19:16 119:6
136:12 155:5
230:25 264:8
275:10
**reference** 10:3
26:21 61:10 75:15
80:25 86:15 87:2
99:13 103:7,8
113:9 126:23
127:2 178:18
227:21 238:4

261:15 263:17,25
264:14,16 278:21
278:25 303:20
**referenced** 18:13
77:24 115:22
195:20 196:18
207:17 208:17
218:6 225:17
264:10 299:9
**references** 200:11
283:12
**referencing** 88:4
119:5 159:18
190:24 235:11,23
**referred** 88:11
97:18 141:12
153:2,3
**referring** 9:17,18
94:2 113:3 123:22
152:22 179:5
224:5 230:22
243:9 275:12
282:9
**refers** 6:5 154:4
178:20
**reflect** 41:9,12
42:18
**reflected** 252:4
**reflects** 81:24
**Reformulate** 149:8
**refresh** 118:22
**refused** 44:4
**regard** 6:10 200:7
**regarding** 49:7
215:8 240:18
266:20 270:16
**regardless** 127:3,22
225:19 265:18
**region** 279:7,9
**Registered** 197:13
310:7
**regret** 27:18
**regular** 138:18
211:15
**reimbursement**
293:3,6,8,17

294:12
**reinstate** 288:13,19
**reinstating** 288:15
**relate** 116:15
131:24 164:13
226:9 242:24,25
243:6,7 245:20
**related** 22:13 51:19
60:23 77:7 138:14
169:5 219:5
239:13 249:20
259:23 262:5
**relates** 78:25 97:10
114:25 145:21
147:15 159:21,23
160:15,17 164:8
169:25 172:6
**relating** 226:6
263:5,11
**relation** 43:16
182:5,6 215:17
261:14
**relationship** 30:10
50:11 69:16 70:10
81:22 94:7,15
96:6,23,24 107:2
135:14 140:5,6
143:2,9,19 144:21
144:22 153:20,24
154:5,7,9,10
155:2,6,9,12,16
155:19,23 156:2,4
156:6,16,17,20
157:19 158:2,9,12
158:14,17,18,20
158:21,24 160:11
161:13 162:11,25
163:17 164:20
165:2,16 166:5,25
167:10,15 168:7
168:12,19 169:6
169:20 170:2,5
171:23 172:18
173:13 186:2,6,9
186:13,20 187:2
187:14 195:13

196:16 238:14
245:14 246:24
247:11 249:16
250:24 251:3,4
259:13 262:13
276:3,5 279:6
306:5,8,13,19
**relationships** 79:15
94:13,14 134:7
143:18,24 159:3
159:16,21 160:4,5
160:14,18,19,22
161:2,5,7,9 166:9
168:23 188:2
246:3,11,20
247:18 248:14,20
248:24 249:4
250:15,22 251:6
**relative** 52:19
53:23 239:12
**relatively** 251:24
**relayed** 51:22
**relevant** 126:9
141:7 170:25
226:12 298:17
**relied** 162:3 228:6
249:9,13 260:16
262:7 302:6
**rely** 10:12 68:15
72:13,16,19
201:23 262:3
**remains** 45:20
**remember** 44:13
49:10,11,22 52:15
55:4,12 90:14
111:10 128:15
135:2 177:3
184:11 197:4
226:20 267:25
286:15 289:10
295:24 296:17,18
306:7
**removed** 175:8
269:8
**repaid** 284:25
285:7



**repay** 284:14
  285:17
**repeat** 8:21 213:24
**repeating** 226:21
  282:8
**rephrase** 58:22
  101:14 271:4
**rephrased** 157:4
**report** 64:23 73:17
**reporter** 1:13 4:14
  27:17 310:7,12
**reporting** 10:13
**reports** 65:4 125:15
  187:19
**represent** 103:12
  171:19 173:10
  194:22
**represented** 108:8
  109:19
**reproduction**
  310:11
**request** 174:22
  241:8,11 286:11
  286:13 309:7
**requested** 241:10
**required** 7:24
  46:19 112:4
  114:13 129:3,4
  162:5
**requirements** 11:6
  14:7 175:17
**requires** 7:20 8:15
  9:7
**requiring** 175:6
**reserve** 62:24
  306:25
**reserved** 138:8
**resident** 17:16
  18:14,16
**resolution** 104:17
**resolve** 180:3
**resolving** 162:15
**Resources** 261:16
  263:18
**respect** 10:21 112:5
  146:24 157:16

189:9 208:2
  274:20 278:6
  282:20 293:6
  294:5 304:14
**respond** 129:16
  207:20
**responds** 129:8
**response** 45:17
  82:9 88:25 128:22
  129:3 130:9
  135:19 141:2
  142:18
**responses** 128:17
  305:16
**responsibilities**
  236:16 257:12
  259:18
**responsibility**
  134:6 236:8
**responsible** 37:9
  70:9,13,17 71:6
  74:19 75:4,5
  94:12,13 125:12
  125:17 196:15
  230:17
**responsive** 136:21
  137:15
**rest** 42:6 172:9
  223:21 225:24
  230:25 239:7
**restate** 7:12 33:15
  59:10 159:14
  268:15
**restrain** 164:2
**restrict** 115:13
  290:12
**restricted** 68:12,13
  143:23
**restrictions** 175:16
**result** 161:12 260:8
  260:9 268:19
**results** 72:5 73:17
  76:20 77:3,3,21
  78:4,21 79:17,20
  79:20 135:6 260:2
**resumed** 205:2

**retain** 39:6
**retained** 128:18,20
  140:4 142:24
  144:3,15 145:13
  179:16 180:7,25
  181:3
**retainer** 46:2 47:9
  283:23 287:13
**retention** 7:25
  43:16 75:18 97:11
  97:12 110:4
  143:15 180:12,13
  293:21 304:19
**retired** 209:9
**retirement** 210:8
  210:10,14,15,16
  210:24 211:2,9
  215:22 216:13,15
**return** 218:2
**review** 50:5 66:14
  79:3 114:13
  122:11 123:7
  124:4 187:7,8,9
  187:24 249:18
  254:10 267:16
  274:18 275:23
  296:12
**reviewed** 31:22
  65:7,20 122:22
  123:14 223:8
  248:24 253:21,23
  254:18 267:14
  270:22 271:7
  290:23 291:10
  292:10 294:21,24
  295:13,25 296:10
  296:11,14,15
**reviewing** 230:18
  262:3 266:24
  305:9
**Richmond** 15:19
**RICO** 59:19,22
**right** 9:15 14:17,18
  17:2 27:2 30:15
  36:16 43:9 53:14
  54:2 56:2,12,15

61:22 62:24 63:15
  63:19 66:10 67:21
  69:19 72:6,21
  74:20 78:12,15
  80:12,21,24 81:4
  82:7 85:6 89:20
  95:23,25 98:10
  100:13 101:16
  103:3 107:10,21
  108:17 109:14,17
  110:3,8 111:24
  114:5 115:5
  116:21,23 117:5
  117:22 118:2,13
  120:11,15 121:10
  122:7 124:17,21
  126:21 128:13,16
  132:5,9 137:2,21
  138:8,17,24 139:7
  139:8 140:11
  143:21 146:7
  148:7,9 153:6
  155:12,17 158:21
  160:22 161:19,23
  168:14,20,21,25
  169:11,21,21
  170:16 171:10
  174:8 176:2
  177:14 178:2,3,6
  178:7,12,17 179:3
  179:17,23 184:23
  185:6,21 186:7
  187:19,25 188:10
  188:16 192:5
  196:24 203:9,10
  203:13 207:9
  209:21 210:21
  211:4,10 213:12
  215:24 216:5,8
  217:24 218:2
  219:2,18 221:17
  221:19 222:12,19
  223:6 224:16
  228:5,19,21
  230:23 231:24
  235:6 236:13

237:4 239:7
  240:24 241:2,22
  244:6 247:15,24
  250:9,16 251:19
  252:3 253:21
  254:9,24 255:8,11
  255:21,23 256:6
  256:10,14,18
  257:22,24 259:24
  262:25 266:14
  272:21 273:24
  276:9,21 279:2
  287:20 290:24
  291:13,21,24
  292:21 293:9
  295:12 296:19
  297:12,23 301:19
  303:10,23 304:9
  306:20
**right-hand** 61:17
**rise** 13:4
**risk** 215:15 229:19
**Rob** 27:3 85:13
  87:8
**robust** 148:2
**rock** 216:14
**Rodolfo** 3:9 4:12
**Rok** 299:18
**role** 20:4,7 205:16
  206:4,19,24
  207:25 236:9,20
  264:22 299:12
  303:8,20
**roles** 14:8 15:4
  257:22
**roll** 213:9,14
**rough** 25:5 207:2
**roughly** 82:6
  126:19,25 203:8
  210:11 222:11
  227:22 286:16
**Roy** 27:4 28:8
  90:10
**RTS** 2:14,20 4:24
  5:3,5,8 6:18 7:4,5
  7:10,14 12:4,18



12:18,23 13:5,17
14:22 15:20 16:3
16:16,25 17:3,4,5
17:8 18:5,8,15,23
19:3,10,13,14,19
19:23 20:5,16,19
26:19 28:11 30:7
33:22 41:22 50:8
58:14,14,25 67:6
67:7,8,11 69:13
69:14 74:10 77:5
79:12 82:2,7,14
82:17,19 83:10
84:8,20 85:6,18
90:3,6,20 91:2,4,8
91:16 92:9,25
93:14,16 96:9
97:23 98:9,14,16
98:17,25 99:9,18
100:3,12 104:5,7
105:2,8,12,18
106:8,13 109:12
116:20 117:4,9,21
118:15,19 119:2,8
120:10 123:16
124:6,7,10 127:21
134:8 138:20
140:16 142:2,3
143:22 148:11
151:6,11 153:9,14
159:24 160:8
162:13 170:21
171:18 172:3,12
172:14 173:9,17
173:23 179:21
180:5 182:11
187:8 197:2
203:16,23 206:9
207:12,21 222:4
222:19,22 224:7,8
225:18 228:12,17
228:21,25 229:3
230:9,11,14
233:18 235:18,22
235:24 236:8,9
237:18 238:8

246:2,5,12 247:17
249:6 252:2
259:22 264:7,12
264:20 267:21
271:25 272:25
273:22 274:12,22
275:18 277:22
278:7 279:3
280:16 281:19
283:2,8,19 286:25
293:2,3,8,12
294:12 297:7,18
298:9,10 300:12
300:17 301:13,18
301:21 303:13
304:4,12
**RTS's** 62:8 91:2
229:12
**rule** 8:11,11,19,23
9:15,24 10:9 11:2
91:22 183:14
201:2,3
**rules** 9:25 91:22
138:4 201:25
270:19
**run** 76:18 138:9
253:16
**running** 190:21

---

### S

**S** 2:17 204:24,24,24
308:10
**sake** 79:13 282:7
**sale** 97:24 156:22
**sales** 154:13
**saw** 259:6 282:12
**saying** 14:17 24:13
25:17 29:8 43:22
75:3 78:19 79:7
92:19 101:18
119:23 129:19
144:15 163:25
164:14 167:24,25
169:9,13 171:8
188:12,22 189:17
195:19 211:8

214:4 219:14
225:8 233:22,23
243:13 244:23
251:6 266:2
267:17 268:17
272:14 276:25
280:5 291:23
303:24
**says** 12:18,23 13:3
14:12 103:16
111:22,25 119:8
124:19 126:10
151:10 152:8,11
199:2 224:5
229:11 234:3
239:24 240:16,20
243:17 244:4
248:4 258:13
259:22 262:24
263:4,4 275:21
277:20 293:2,5
306:13
**scenario** 64:21
71:10 106:7,12
193:8
**schedule** 61:7,7,17
61:19 62:5,6
108:9,12 109:20
111:15,18,23
112:5,7,12,13,17
112:24 113:16,21
113:22 114:4,14
114:15,18 115:2
194:7 196:6
**schedules** 61:11,12
61:14 62:9 76:25
291:12
**Schiller** 2:3 4:19
**Schmitt** 26:18
85:11,23
**scope** 32:20 97:16
199:13 204:10
**screen** 146:7,8
255:19
**search** 73:5,8,20,22
74:13 75:9,10,14

75:21 76:7 77:3,6
77:7,22 78:5,12
78:20 79:5,10,18
79:21 96:2,15
106:17 108:23
109:6 112:22
113:7 116:3
124:20 134:4
137:6 177:2 224:9
234:21 259:23
260:3,8,10,12,14
260:18,23,24
261:6,7,8,9,12,17
261:21 262:24
263:11,15,25
264:4 281:7,20
**searched** 76:3,25
120:5 166:11
237:14 282:10
**searches** 47:25 48:3
48:9,17 61:4
62:17 72:3,20
109:3 172:8 178:9
201:15
**searching** 73:10
102:13,17 111:2
136:21 137:14
220:25
**SEC** 221:4
**second** 30:20 40:19
45:13,15 55:23
61:2,19,21 63:7
63:12 78:10 86:15
89:8 96:2 110:11
110:18,20,24
111:8 119:20
152:7 194:8
205:20 243:24
247:15 294:25
300:25
**section** 7:19,23 8:4
9:14,23 10:9,20
12:7,15 14:12
283:9
**sections** 10:18
**sector** 22:14,14

**sectors** 274:4,17
**securities** 277:24
278:19
**security** 157:22
158:5 171:21
172:17 173:12
**see** 12:17,22,25
13:2 22:4 38:7
56:4 84:21 98:11
98:19 101:7,22
102:10 103:10,19
107:14,18 114:23
119:11 120:7
123:17 124:14
126:23 151:9,15
152:3,5 153:21
164:16 171:25
173:15 178:19
179:9 189:14
190:3 194:16
195:15 216:11
226:19 227:18,21
238:4,7 245:16
246:8 247:21
248:7 251:4 259:5
263:7,9,10,20
275:5 278:2
281:11,13,21
282:15 286:19,22
287:3 293:4
296:21 297:17
306:12
**seeing** 178:23
303:20
**seek** 66:5
**seeking** 7:20
**seen** 69:6,25 257:18
259:2 297:9
**sees** 227:20
**segregate** 237:24
238:5
**selected** 31:3
177:17 181:15
**Selendy** 1:11 2:14
4:23 5:2,4
**sell** 156:7 192:6



193:10,15,22
**send** 143:6
**sender** 128:3,5
**sending** 125:2
128:12
**sends** 128:3
**senior** 28:5,9 83:3,5
83:6 298:14 304:3
**sense** 164:14
181:10 183:3
192:21 193:16,19
217:25 239:4
305:5
**sent** 79:12 126:24
127:5,7,13,14,25
128:15 137:22,24
137:25 138:19
153:25 187:10
246:15,18 247:16
278:22 284:4
299:10
**sentence** 46:12
227:16 248:3,14
265:7 277:20
282:10 287:4
**separate** 166:21
230:5 239:14,14
239:15 245:10
249:24 259:8,10
259:12,16 266:14
266:16 269:6
272:8
**separately** 160:16
**separateness**
223:20 224:6,13
225:23 233:8
249:21 271:14,19
**separation** 233:15
**series** 46:11
**serious** 175:11
**seriously** 148:11,12
**serve** 28:25 100:12
102:20 123:24
206:10,14 207:22
256:5,17,22 258:3
258:24

**served** 29:6,18 30:4
30:9 69:14 74:10
94:11 123:10
159:24 186:22,24
187:4
**servers** 239:15
271:16
**serves** 194:19
229:15 256:21
**service** 29:13,16
50:5 77:8 78:25
79:2,23 80:21,24
81:4,5,17,21,23
81:24 83:9,10
85:4 89:19,25
90:7,25 91:6,11
91:15,20 92:8,24
93:15,23 95:5,18
95:21 96:9,15
114:10,13,18
115:3 122:11
123:3,10 127:15
127:18 130:21
131:8 133:20,24
137:17,20 138:21
140:3,7,9 141:4
142:25 143:20
151:10 159:23
160:7,15 186:24
187:9,11 244:4,8
244:11,14 245:6,8
245:11,17,20
246:3,11,19 247:3
247:16,18 248:25
249:25 250:5,7
257:15,16 258:8
259:20 270:7
274:23 276:2
277:22 278:7
301:21 304:7,9,10
304:13
**services** 1:18 3:9
4:16 15:6 29:11
29:19 46:5 69:18
71:25 74:19 79:23
87:5 95:17 97:8

97:14,15,16 99:11
99:19 103:14
106:19,20 116:21
117:5,22 118:20
119:10 120:11,19
120:23 121:2,5,8
121:19 122:7,9
151:8,21 152:14
153:5 160:9,9
189:10 191:5
229:14 238:21,25
239:3 276:25
279:5 281:7
283:22 287:16
288:7 290:17
291:3,17
**serving** 22:16 29:14
31:13 82:4 90:4
96:5 100:14,15
101:3 160:2
190:13 191:10
246:6 249:6 256:4
256:13 257:9
264:22 269:3
270:8
**set** 5:24 96:2 131:8
137:6 180:11
200:5,10
**sets** 81:10
**seven** 5:21 26:23
85:6 235:6,17
236:5
**shape** 243:21 299:6
**share** 20:25 258:14
259:19 271:15,16
271:18
**shared** 39:8 206:7
253:13
**shareholders** 280:3
280:7,8,21,22
298:12
**shares** 255:2
**sharing** 253:24
255:4 257:13
258:17,17
**Sharma** 85:12

86:12 88:13
**Sheet** 311:6
**shorter** 201:16
**shortfall** 284:14
**show** 11:14 42:19
43:4,6 107:12
187:18 195:3
211:21 214:20,21
227:5
**shown** 183:9
**shows** 211:19
297:12
**side** 217:8,17
239:12,13 240:3
272:8,10,12
**sign** 15:12 31:14
40:2 261:23
**signals** 120:4
**signatory** 31:4
297:10
**signed** 14:6 52:6
66:6 97:17 115:7
165:7 183:11
196:23 197:20
228:2 262:9 297:6
**significance** 226:15
**significant** 117:18
303:2
**significantly** 268:7
268:22
**signing** 34:5 51:2
**signs** 31:9
**similar** 40:20 117:8
**simple** 46:12
**simply** 176:4
200:17 211:19
**single** 44:25 125:24
131:10
**sir** 6:19 12:15 13:16
19:9 21:19,23
36:25 48:19 63:16
63:20 66:11 68:21
73:6 84:10 148:4
149:9 199:5 244:3
283:18 302:16
303:11

**sit** 37:11 56:22
60:21 63:3 99:17
121:2 197:17
240:24 241:22
261:3 290:16
291:23,24 296:19
297:23 303:23
**site** 297:15
**sites** 218:7
**sitting** 30:15
290:24 292:15,20
295:11
**situation** 189:23,24
192:25 193:25
206:16 265:15
**situations** 50:24
106:5 123:9 165:6
173:4 174:3
177:22 180:18
181:2
**six** 137:25 138:2
**sixth** 227:22
**skipped** 300:25
301:8
**slow** 12:10 17:22
27:16
**slower** 157:25
**small** 251:24
**Sneider** 302:24
303:8
**social** 222:14
**socialize** 222:15
**software** 68:22
**solely** 298:10
**somebody** 95:3
114:18 218:11
238:9
**Sorrentino** 19:7
**sorry** 9:20 47:3
74:3,24 80:19
118:17 141:22
146:8 152:4
207:18 217:11
218:20 238:19
255:19 261:2,4
283:15 285:11



302:9
**sort** 43:14 46:17
 137:5 156:21
 175:20 193:19
 195:12 214:8
 215:12 225:2
 247:11 259:13
 271:18
**sound** 126:21
 192:13
**sounded** 25:13
 279:25
**sounds** 35:9 71:18
 147:11 179:18
 204:19
**sources** 31:22
 269:12 270:3
**Southern** 1:3 4:7
 59:17,23 263:19
 279:10
**space** 252:9 274:10
**spaces** 22:16
**speak** 21:9 32:13
 32:16 51:21 53:15
 55:8 57:23 64:10
 71:9 72:22 74:22
 93:8 100:19
 102:15 103:2
 104:22,25 105:21
 105:23,25 130:15
 149:3,20,21 155:5
 159:2,6,9 189:22
 209:11 219:7
 221:21 225:22
 239:19 240:23
 241:15,16 243:20
 252:13 254:4,25
 260:14 269:15
 272:24 290:8
**speaking** 22:8,10
 210:25
**specialist** 4:13
**specialty** 6:20,23
 6:25
**specific** 6:22 22:12
 22:14 29:2,7

30:22 31:10 34:19
 38:8 44:11 49:9
 51:21 55:24 56:18
 56:21,25 57:9,16
 57:18 60:13 77:11
 78:2,8 79:11
 86:13 92:20 110:2
 116:11 119:5
 127:8 128:11
 134:25 135:4
 136:22 138:4
 141:5 154:2,3
 155:7 157:11
 168:5 172:21
 173:22 177:16
 184:11 185:7
 186:15 190:23,24
 191:17 200:12
 203:18 210:16
 225:19 236:22
 238:13 240:6
 243:10 251:13
 255:16 257:13
 258:18 260:15
 262:10,22 264:9
 265:13 271:2
 273:25 276:22
**specifically** 10:4
 14:8 15:7 17:11
 18:17 19:20 28:22
 32:25 36:6,8
 37:18,23 40:6
 49:2 52:7,16
 54:14 59:18 65:8
 68:3 69:4,24
 99:13 122:15
 123:25 126:22
 144:13 153:18
 154:18 159:22
 164:19 167:14
 168:24 176:13
 188:7 194:7
 205:17 208:13
 209:7 214:11
 219:6 223:17
 224:18 225:17

235:11,23 236:20
 239:10 240:23
 243:25 248:16
 251:10 252:17
 254:3 261:10
 262:5 264:5 266:6
 273:17 279:21
 281:17 284:8,22
 285:15 288:11
 292:23 300:22
 304:20,22
**specificity** 137:9
 156:24
**specifics** 53:15 56:3
 127:11 159:7,9
 160:23 161:15
 175:5 185:9
 192:17,18 260:15
**specify** 136:13
 141:12
**speculate** 100:7
 106:24 220:8
**speculative** 269:21
**speech** 146:5 234:9
 235:15
**spend** 113:11
**spent** 40:5,14 41:5
 41:13,21 42:13,19
 42:24 43:19 49:19
 192:8 262:2
 266:23
**spoke** 298:7
**spoken** 222:10
 243:7
**spot** 66:20
**spreadsheet** 69:2
**staff** 18:11 83:9
 84:6 127:23
 238:16,17,20
 252:19 259:14
**staffed** 89:19
**stake** 271:24
**Stamford** 18:21
 19:4 20:9,11,15
**stand** 57:10 168:20
**standard** 105:10

162:11,19 163:22
 164:21 168:19
 169:20 197:13
**stands** 168:20
**start** 4:3 29:15 40:4
 45:11 67:2 89:13
 104:20 111:3
 125:2 142:12
 150:22 185:14
 203:19,20 204:17
 205:7 273:13
 274:12 297:3
**started** 39:24 75:14
 75:17 77:19
 134:17
**starting** 21:24
 25:11 284:15
**starts** 61:16
**state** 1:13 17:11
 34:8 36:8 42:12
 54:14 95:13 105:5
 119:18 166:7
 184:6 186:8
 205:17 245:14
 251:10,12,16
 254:16 258:16
 275:19 300:22
**stated** 11:3 85:4
 95:11 162:3 174:4
 179:24 197:5
 198:9 207:14
 247:2 253:4
 256:14 272:2
**statement** 5:24
 12:18 212:10
 216:19 227:23
 228:11 235:7
 238:7 247:10
 250:25 260:2
 277:6 296:15
 297:11
**statements** 6:5
 13:11 200:5,10
 204:11 211:15,18
 211:24 212:4,5,11
 212:23 213:19

214:4,16 215:4
 225:21,22 231:14
 232:22 233:13
 234:11 270:25
 296:14
**states** 1:2 4:6 10:11
 30:5 62:23 263:2
 278:7
**stating** 14:8 248:17
**status** 13:4
**statute** 183:14
**stay** 170:9 189:13
 189:19
**steering** 180:2
**step** 188:9
**steps** 139:25 187:5
**stick** 289:5
**Stipulations** 309:10
**stop** 190:20 204:18
 226:11
**strategic** 274:14,20
**strategies** 211:20
 212:15,23 213:6
 213:21 214:5,21
 215:18 216:2,3,4
 218:25 219:5
**strategy** 211:22
 212:24 213:3,7
 215:11,13,15
**Street** 1:19 2:10 3:4
 17:2 18:25 252:23
 263:5,13 267:22
 267:24
**strict** 201:6
**structure** 104:18
 121:13 180:3
**structures** 229:19
**structuring** 97:24
**stuff** 256:25
**Su** 85:13 86:24
 88:15
**sub** 61:14 151:4
 152:7,10 153:18
 160:6 168:20
 306:12
**subject** 16:5 44:15



115:15 200:2
202:15 231:5
234:4
submissions 116:10
116:12,15 223:9
223:10
submit 41:11 42:17
43:13
submitted 9:22,23
30:19,22 41:19
115:17
subparagraph
173:8
subpart 124:16
Subscribed 311:10
subsection 141:25
151:4 154:2,3,4
160:20,23 161:2
170:10 278:25
subsections 124:13
subsequent 34:4
178:9
substance 14:14
49:6 55:6 166:12
167:3 183:23
227:2 239:21,22
239:23 311:5
substantial 42:13
49:20
substantive 303:5,6
suggesting 148:3
sum 45:23 46:25
283:19
summarizes 97:21
Sun 51:2,5,12,14,24
52:4,6,13 53:4,14
57:7 115:7,22
116:7,10 162:16
182:25 196:24
197:25 198:11,16
225:6,11,15,16
226:3,24 227:24
228:2,9 229:11
230:21 231:20
232:23 233:4
supersedes 103:17

supervision 310:12
supplement 175:15
282:19 283:12
supplemental
30:25 61:2 62:14
62:15,24 63:7,11
63:14,23 66:15
75:25 76:4,8,11
87:3,16,17,19,22
88:24 89:17 91:9
111:19,21,22
112:2,24 113:2
114:2,11,19,25
138:7 174:11,21
178:14,19 243:23
246:17 249:19,22
271:21 279:20
281:2,9 282:11,21
284:11,13 285:19
302:5 308:17
supplementals
62:25
supplements
115:11
suppliers 171:14
support 9:2,11
18:11 37:8 97:21
183:10 309:3
supported 165:5
supports 125:9
suppose 189:22
272:6
supposed 137:4
257:5
sure 8:25 13:13,23
14:11 32:24 34:24
42:15 44:21 45:15
45:20 61:12 63:10
70:21 74:4 77:13
83:3 85:3 88:5
105:6,17 106:11
107:12 118:19
129:7 132:3
133:12 152:5
154:22 163:20
178:21 181:9

191:25 202:2
203:19 206:5
214:3 219:21
229:6,10 231:6
240:21 242:6,13
243:3 244:11
246:25 254:17
260:5 274:7 282:9
286:21 289:4
297:9 305:15
surprised 52:20
264:17
survey 77:24 78:6
78:14,22 79:11
93:25 94:2 96:3
124:20,23 125:7
125:21 126:11,19
127:5,7,8,11,14
127:25 128:13
129:8,9,10,11,17
129:20,24 130:12
131:3,9,9,11,13
131:19 132:2,4,6
132:8,11,22,23,23
133:8,13 134:13
134:19,20,21
135:8,13,19 136:5
136:13,20 137:13
137:18,20,22,24
137:25 138:19,21
139:13,21 140:11
140:18,18,21
141:2,3,8 142:6
142:19,21 143:8
144:2,15 145:7,10
145:12 146:17
148:7,16 153:25
154:6,15,19,25
155:11,21 156:14
157:7 159:15,18
159:18 160:12
170:18 187:10
246:15,23 247:16
278:24 282:24
283:7 299:23
surveyed 133:16

140:2 160:15
246:15,16 249:3
surveying 50:7
126:6,7
surveys 48:12
78:25 79:19
126:24 127:9
128:18,23 130:9
130:14,25 131:6
132:15 133:6
138:10,24 139:3
141:11 146:12
148:5 159:19,22
246:18 278:22
299:9
switching 198:13
sworn 5:10 310:4
311:10
system 107:16
systems 239:14

T

T 204:24 308:10
312:2
table 285:12,23
take 11:16 21:15
42:14 58:10,16
59:3 61:15 77:2
88:3 103:5 123:2
126:10 148:11,12
150:16 205:20,24
211:12 250:14
273:7 286:2,8
296:20
taken 216:24
282:21 297:12
takes 126:14
214:18
Tal 85:13
talk 21:25 27:15
67:20 84:18 98:8
117:3 133:3 135:9
153:19 154:23
189:14 190:4
200:19 205:11
222:6 238:9

241:24 257:2
294:20 304:23
talked 47:14,15
48:11 176:23
203:4 256:15
272:22 278:25
294:5 306:4
talking 24:3,4
34:12 61:11,22,24
88:5,9 93:14
120:13 121:16
124:2 151:18,19
157:5 175:2
185:18,25 191:2
191:19 193:14
224:13 231:4,18
241:14 242:15
249:11 251:5
258:19,20 265:20
272:14 273:22
284:23
talks 78:11 215:10
223:20
target 141:11
Taru 85:12 88:13
tax 217:25
taxes 297:12
team 24:5 25:3,7,20
25:22 26:15 29:13
29:14,16,16,19
36:22 48:5,15
50:6 77:8 78:25
79:2,23 80:21,24
81:4,5,17,18,21
81:23,23,24 85:5
88:19 89:19,25
90:7,22,25 91:5,6
91:11,15,20 92:8
92:25 93:15,23
94:23 95:5,18,21
96:9,15 114:10,13
115:4 122:12
123:3,10 125:8
127:15,19 130:21
131:8 133:21,24
137:17,20 138:21



140:3,9 141:5
143:21 146:14
151:10 159:23,24
160:7,15 186:24
187:9,11 229:20
236:22 244:5,8,12
244:15 245:6,8,11
245:17 246:4,12
246:19 247:3,17
247:19 249:2
250:2,5,7 257:15
257:16 269:3
270:8 276:2
277:22 278:7
301:21 302:7
304:7,7,9,10,13
**teams** 259:20 270:7
**telephone** 3:6
**tell** 25:23 49:2,5
50:2 54:24 55:4
55:21 73:24 74:15
77:14 95:10
129:14 168:9
188:5,23 213:21
236:22 238:10
251:2 254:13,19
267:3 270:7 288:4
288:20 294:23
295:13
**telling** 52:11
257:19
**tells** 189:4
**template** 57:6
**ten** 38:11,19 265:7
**term** 19:16 81:16
206:12
**terminology** 117:12
117:18 226:13
**terms** 6:4 8:5,8
16:6 48:16 49:15
62:21 72:12 81:10
106:20 116:7
125:15 156:19
172:9 180:20,22
244:17 250:24
260:15 272:17

275:19 302:5
305:6
**test** 147:25
**testified** 5:11 13:24
18:10 20:13 93:6
117:24 122:3
139:20 165:20
179:20 205:3
285:5
**testimony** 95:10
175:9 188:14
198:23 235:9,13
248:23 279:13
310:5
**Texas** 1:3 2:10 3:4
4:8 279:11
**text** 302:23
**Thank** 13:14 14:3
199:25
**thanks** 57:21 58:23
**theses** 236:18
**thing** 33:19 38:19
63:11 64:15 78:17
88:6 225:2 269:18
269:24,25 270:2
**things** 57:9 78:18
142:19 187:6
190:6 213:25
297:13
**think** 16:11,13
17:10 19:8 24:17
33:19,20 42:2
43:20 45:24 75:2
80:23 81:3 95:11
97:21 99:17,24
100:6 115:6 118:3
119:19 121:12
122:4 133:7
139:20 143:10
148:9,10 150:13
156:23 159:17
162:3 167:21,23
168:25 176:23
179:19 194:4
197:5,21,22
199:12,14 200:18

203:4 204:9 209:8
210:4 213:14
215:16 221:11
228:14 231:9
233:11,24 235:22
239:2 247:9
249:18 251:21
253:4 256:15
264:6 266:13,14
270:24 271:19
272:2,22 274:7
276:15 282:2,19
282:22,23 284:21
285:8 289:18
290:25 296:2
298:19 300:23
301:9 302:2 306:9
306:11,21
**thinking** 35:8
**thinks** 148:6
**third** 2:21 6:7 13:8
151:18 202:10
229:20 230:3
**Thirty-two** 67:19
**thorough** 172:8
282:23
**thought** 33:16
280:11 302:11
**three** 13:11 14:17
87:21 88:18 90:16
108:13,16 115:11
134:10 141:22
154:7 155:3,10,13
156:18 157:12,14
174:6,7 197:8
202:5 213:24
214:25 269:7
289:6,19 303:22
**three-year** 197:9
197:15 198:4,13
198:18 199:20
201:9,18
**tie** 56:7,10 223:12
**time** 4:9 19:12
23:24 24:2 26:22
34:10,12 38:5

39:24 40:20,21,22
40:24 41:19 42:2
42:3,6,10,12,12
42:14,16,18,24
43:2,10,14,19,21
44:12 46:3 47:10
49:20 52:3,7
66:22 67:2 68:9
89:9,13 90:6 96:8
100:18,20 102:20
105:11 110:8
113:11 114:2
129:18 138:5,17
138:19,22,23,23
139:21 143:5
147:17 148:5
150:18,22 175:8
175:17 178:11,16
179:21,21 180:6
182:10,21 185:14
187:9,18 190:23
198:17 201:3,15
201:16 204:15,21
204:25 205:7
211:7 228:10
232:15 262:3
266:23 273:9,13
274:13,13 282:8
285:24 287:8,14
291:7,18,19 292:4
292:5,7 296:23
297:3 307:4,6
**times** 15:8 138:9
149:12,12 163:18
169:10,15 196:22
222:6,7,7,7,10,13
**timesheets** 41:9,11
42:17,23
**timing** 90:24
203:17,24 204:3
262:22 284:9
**title** 28:4 83:12
85:24 86:14
208:12 303:18
304:2
**titles** 82:24 83:2,8

84:7
**today** 4:9 16:9
56:22 60:21 121:2
267:4,17 294:22
295:14 300:18
**told** 54:18 64:18
82:6 168:15,16
180:23 184:10
202:3 217:22
219:3 223:3 285:6
**ton** 163:21 266:23
**Tony** 85:11
**tool** 126:7
**top** 6:3 12:22,23
13:8 19:2 75:19
84:15,16 85:10
99:4,20 107:14
125:4 134:25
194:9 295:10
297:19 303:15
**topic** 45:2,6 168:2
169:14,24
**topics** 22:13 44:20
45:9 49:19 53:6
187:12
**total** 39:19 40:5
82:18 213:5
233:15
**totally** 144:25
**touch** 189:13,20
190:12 191:7
**touched** 176:24
**touts** 16:14
**track** 102:3
**tracks** 187:25
**trading** 295:21
**tradition** 181:11
**trajectory** 24:24
**transaction** 153:20
153:24 154:14
156:22 160:11
170:6 193:6 306:6
306:9,14,19
**transcript** 310:11
**transcription** 311:4
**transparencies**



276:20
**transparency**
275:17 276:24
**transparent** 171:2
271:14 277:6
**travel** 41:25 42:3
**treat** 288:25
**treated** 109:14
**Trembler** 85:12
86:9
**trial** 307:2
**tried** 30:7 216:10
216:16,22 220:3,9
250:21 271:13
**trouble** 264:18
271:23
**true** 38:16 141:17
141:19 235:5,7
266:3,10 268:17
278:4,6 310:4
**trust** 148:13 225:7
226:4,25 227:2,21
228:3 229:24
233:6,6
**trustee** 33:10,23
34:15,23,24 35:10
35:22 51:11,11,14
51:18 52:3,21
53:3,7 57:7 89:3
92:3 93:11 162:8
162:16,19,21
165:5,14 167:2,11
169:8 174:17
279:7 293:15
294:4
**trustees** 166:15
231:12 232:21
**trustee's** 45:18
46:14 52:14 53:12
53:22 54:5,12,20
168:18 169:19
174:23 175:3,25
176:5 234:5 279:9
293:18 294:13
**try** 12:14 143:12
146:9 164:15

194:8 205:19
216:14,25 247:14
288:2
**trying** 24:17 34:11
46:13 56:9 118:22
121:11 133:5,17
152:6 188:21
192:8 193:7,9,10
193:15 214:3
215:3,5 245:16
265:4,5,6,8
272:11 276:15
**tune** 268:22
**turn** 66:18 72:16
103:6 194:6,7
220:17 267:12
**turned** 105:18
106:6 173:22
280:3,11,21
**Tusant** 85:12 86:6
**two** 2:9 6:6 13:2
18:18 21:25 23:8
26:17 30:19,22
31:25 45:20 58:20
60:3 61:12 72:23
81:9 90:5 115:17
116:12,15 123:4
147:4,6,15,18,21
150:9 154:9,12,14
155:17 156:20
163:13 174:10,20
175:2 177:7,11,20
178:12 180:11
182:14 184:22,23
185:20 186:7
188:25 189:6,11
190:20,20 191:5,6
194:13 197:19
198:24 199:3,6
202:6 203:8 204:6
209:23 229:11
236:15 239:16,25
253:25 263:10
270:25 271:14
273:7 288:12
289:19 298:18

**two-year** 122:24
176:24,24 177:10
177:21 178:4
180:16 181:8,11
182:2,4,11,22
183:4,7,10,24
184:14,19 185:5
185:23 186:10,23
187:14,21,22
188:12 189:19
191:2 197:3,23
198:4,14,19 199:7
199:10,17 200:19
201:9,10,19,20
202:22
**type** 39:3 69:17
73:12 107:2
145:10 154:10,13
155:18,25 156:22
157:15 180:18
182:7 193:6
215:15 242:7
275:18,24
**types** 209:23
276:24
**typical** 70:16
155:25
**typically** 38:25
40:23 44:20 71:11
215:10 305:13

---

**U**

**Uh-huh** 120:8
124:18
**ultimately** 22:18
31:15,20 65:3
125:16
**unbiased** 9:2,10
**unclear** 144:25
**uncovered** 246:2
246:23 247:17
**underlying** 230:2
**understand** 14:11
32:18 42:21 46:13
50:18 53:9,18
58:18 64:9 71:24

117:14 127:10
136:3 141:13
175:6,14 184:25
188:13 203:3
214:3 243:3 249:3
249:24 250:3
260:5 265:4,7,20
266:21 267:5,8,10
269:9 270:11
272:23 290:10
301:3
**understanding**
7:19,23 8:6,8,10
8:15,18,22 9:3,7
11:7,10 13:22,24
13:25 14:5,21,24
21:3,6 28:13
37:14 51:8 52:24
53:19,20 65:5
70:11 71:17,21
74:17 91:23
110:19 122:25
123:5 125:11
133:12 153:12,13
158:16 162:18,20
164:10,12 167:23
175:19 177:20
209:22 218:10
222:20,23 266:19
267:4,18 287:22
297:21
**understands** 234:2
**understood** 44:22
109:12 143:11
**unduly** 290:3
**unimportant** 276:8
**United** 1:2 4:6
**universe** 181:21
**unsure** 135:24
**update** 138:9
139:13 140:25
142:18 143:8
144:5,5,17 145:17
146:20,21 148:18
**updated** 137:18
138:5 139:22,23

212:6
**upper** 61:17
**USC** 9:5
**use** 50:7 79:16
117:7,9 162:13
166:9 167:9 181:7
181:17 186:19
187:13 206:12
214:25 219:25
230:8 252:10
253:2,5 287:23
290:22
**uses** 102:15,24
229:20 252:14
**usually** 40:23
**U.K** 194:14
**U.S** 5:17 7:5 33:23
34:14,23,24 35:9
35:21 45:17 46:14
51:11 53:2,7,12
53:22 54:20 57:7
82:2 86:2,5,8,11
86:17,23 87:9,12
87:15 89:3 90:20
91:8 92:3 93:11
94:3,20,21,24
95:2,4,7,15 96:10
96:18,20 98:9,14
98:16,17 99:2,18
100:3 104:5
118:15 119:2,3,8
119:17 120:10,21
120:23 121:21
123:16 124:10
133:25 134:9
142:2,3 143:22
153:11 159:25
162:8,16 165:5,14
166:15 167:2,11
168:17,17 169:8
169:19 170:21
174:17 175:25
224:7,8 234:5
246:5 247:17
274:23 275:18
277:22 278:7



283:8 286:25
293:15,18 294:4
294:13

**V**

**vague** 71:24 141:23
193:7
**Value** 2:4,9
**variety** 44:20
229:18
**various** 31:21 38:4
49:14 70:4 93:25
102:4 187:12
211:9 219:10
230:20 298:6
**vendor** 154:10
155:18,24 156:6
157:6
**vendors** 113:9
156:7
**verbal** 242:24
305:17
**verify** 26:9
**vetted** 163:23
**vice** 83:5,5,21
**vice-president** 28:5
28:7 84:13
**vice-versa** 250:6
**Victoria** 36:17
**video** 4:3,13 27:19
**VIDEOGRAPH...**
3:9 4:2 66:22,25
89:9,12 150:18,21
185:11,13 204:21
205:6 273:9,12
296:23 297:2
307:4
**Videotaped** 1:10
**view** 33:12 34:2,17
35:11,19 113:14
116:14 193:23,25
248:17 274:7
276:16 277:5
**views** 45:22,25
**violate** 173:6
**Virginia** 15:19

**virtual** 233:14
**voice** 282:3
**voluntarily** 284:3

**W**

**waive** 45:16,23
46:8,19 286:25
287:15 288:4
**waiving** 46:16,24
**Wall** 252:22 263:5
263:13 267:22,24
**want** 5:15 6:12 10:3
14:2 16:4 24:21
24:22 40:11 43:2
44:9 46:10 57:17
57:18 61:10 71:22
81:14 88:3 98:22
110:13 127:10
133:8,11 152:5
154:23 163:14,21
167:5 168:10
176:6 191:18,25
192:6,7 193:11
200:8 204:18
207:17 218:11
227:5 229:8 231:6
234:13 264:15,16
264:17 267:15
286:20 304:23
306:10
**wanted** 35:7 43:15
44:3 60:14 192:17
196:13 238:8
**wasn't** 53:16 64:13
136:2 186:9
192:15 235:7,12
260:13 261:9
299:3
**wasting** 232:15
**way** 33:12,14 46:16
53:6 57:22 58:24
61:18 68:12
115:15 117:18
124:5 130:24
141:15 147:8
154:15 164:7

175:13 185:3
188:23 192:12,14
193:20 196:9,12
198:12,24 202:12
205:19 207:9
229:2 233:15
241:17 243:20,21
247:14 250:3
257:9 297:22
299:5
**ways** 219:10,15
**website** 126:15
211:17 216:20
296:5
**websites** 217:21
**week** 111:11
**weeks** 26:23 45:14
108:13,16 192:8
**went** 126:19 134:18
137:14 151:6
167:7 192:18
199:9 213:17
261:25
**weren't** 51:3
112:25 168:8
175:3 280:12
289:9
**West** 1:19
**Westmoreland** 1:6
3:3 4:5 6:2 12:3
21:18 22:7 23:10
24:6,11 25:3,7
26:15,20 29:5,10
29:14 30:4 31:6
34:6,19,20 35:20
36:13 50:17 51:6
51:9,16 52:5,10
52:22,23 53:11
54:6 60:23 64:5
75:12,22 82:4
84:24 91:5 103:14
104:13 107:6
115:18 116:13,16
124:24 140:13
146:24 147:6
149:18 156:3

163:4 164:4,9,13
164:16,17 179:22
180:6 198:25
202:8 203:18,19
203:21 217:6
226:7 228:6
231:19,25 232:4
232:17,19 233:7,9
234:13,17 236:23
264:13,21 266:16
268:12 270:8
302:21
**Westmoreland's**
97:24
**we're** 69:18
**we've** 33:20 47:14
92:15 94:10
142:22 158:19
173:25,25 196:22
248:24 250:21
258:7 284:13
294:5 295:3
**White** 220:12,17,24
259:23 262:13
266:4,21 267:6,11
268:5,5,18,18
**wholesale** 274:3,15
**wider** 274:7
**willing** 174:25
175:3
**willingness** 45:16
**window** 185:23
**wire** 286:3,11,13
**wired** 283:13 284:3
286:4
**wiring** 284:15
**wishing** 302:25
**withdraw** 78:3
130:22
**withdrawn** 41:10
50:14 131:2
136:18 137:21
172:13 215:20
243:5 286:3
**withhold** 288:24
289:15

**witness** 2:15,21
5:10 309:5 310:3
310:5
**word** 151:13,24
240:6 250:14
260:7 265:7
**wording** 135:4
**words** 14:13 37:10
37:12,15 38:2
41:6 42:22 51:13
54:17 98:21 126:9
132:21 165:15
166:8 167:2 168:8
168:11,19,24
183:23 186:8
188:20,22 227:2
239:21,22 276:22
288:12,19
**work** 24:5 41:22
67:6,10,11 68:19
70:18,25 71:2,7
71:15 90:19 104:9
136:25 139:6
160:7 187:20
188:6,24 194:5
195:23 196:3,12
222:16 236:18,22
244:12,18 245:6
245:10,12,18,19
247:7 249:19
251:11,14,17,20
251:21 252:2,8
255:11 256:25
266:14 275:18,24
276:7,14,24 292:3
303:3 304:14,25
305:7
**worked** 36:12
37:17 39:19 51:10
54:24 189:18
244:9,23 247:3
292:17
**working** 22:22 23:4
23:8 26:20 39:25
41:16 42:5 48:5,7
91:4 140:20,21



142:13 145:9
148:17 189:25
247:5,6,12 249:10
255:22
**workload** 37:19
**works** 85:24 192:14
192:16 204:16
207:8,10 244:5
**world** 153:16
**worldwide** 126:20
**worth** 212:25
213:18,21,22
**wouldn't** 42:11
73:7,9 74:20
143:22 149:22
169:15 175:13
186:5,10 203:12
244:20 273:3
276:17
**wow** 81:8
**wrap** 296:21
**write** 37:25
**writing** 241:8
**written** 181:25
239:5 257:17
258:12 277:9
288:22 289:13
290:5,9,14
**wrong** 28:14 195:2
214:2

---

**X**

**x** 1:5,8 43:2 129:18
213:18 308:3,10
**XYZ** 64:19

---

**Y**

**Y** 303:25
**Yakola** 303:22,24
303:25
**yeah** 78:13 167:12
214:20 220:14
263:10
**year** 104:10 217:24
222:9
**years** 25:11 68:6

123:4 138:11
177:7,11,21
178:12 180:12
184:22,23 185:20
186:7 188:25
189:6,11 190:20
190:20 191:5,6
199:19 202:5,5,6
203:8 210:7
221:12,16,23
222:6,24 231:15
232:24 233:12
235:6,17 236:6
307:3
**yesterday** 215:4
241:4,5 259:5
**York** 1:11,11,13,19
1:19 2:5,16,16,22
2:22 4:11,12
59:17
**York,10022** 2:5
**Yuda** 85:14
**Yura** 87:13

---

**$**

**$1.24** 283:12
**$50** 268:23
**$96,000** 45:17,23
46:2,8,19,25 47:4
49:16 57:4 287:8
287:15

---

**1**

**1** 4:3 6:15,16
115:21 129:2
136:15 177:14,18
178:5,17,23
199:24,25 203:6
281:10 308:13
**1L** 194:7
**1.24** 285:6
**1:05** 204:25 205:8
**10** 21:25 84:14
179:4 207:3 222:7
277:18 283:17
**100** 100:9 128:23

129:3,5 222:7
**1000** 100:6 222:7
**10018** 1:19
**10104** 2:16
**10114** 9:5
**11** 7:21 8:2 9:5 11:9
12:7,15 14:12
15:21 47:7 102:14
104:18 105:15,18
147:2 149:2,19
181:2 203:25
246:7 252:9
308:15
**11:02** 150:19
**11:18** 150:23
**116** 194:9
**12** 179:8 285:8
**12th** 1:19
**12:07** 185:15
**12:29** 204:22
**1290** 1:11 2:15 4:10
**13** 179:8
**13Fs** 221:5
**14** 97:4,6,7,9,14
149:12
**15** 7:5,14,14 18:10
18:13 82:6,16
83:19,19 84:14
149:12
**16** 108:2,15,22
**17** 30:20 103:9,13
103:18 179:17
**17th** 63:15,24
104:10,12
**19** 25:9,19 81:3
85:6
**194** 61:16,18,19
194:10
**195** 308:18

---

**2**

**2** 11:15,19 67:2
80:14 103:5
115:23 200:2
308:14
**2:25** 273:9

**2:48** 273:14
**20** 5:18 193:10,11
193:22 292:23
**200** 17:25 100:9
**2000** 126:19,25
143:6
**2008** 263:5
**2010** 222:22
**2014** 92:5,18 93:8,9
93:12 201:2,3,6
**2014A** 8:11,19,23
9:15,24 11:2
91:22
**2016** 136:15 177:14
177:18 178:5,17
203:6 225:5
226:23 281:10
**2016s** 178:23
**2017** 222:25 235:6
235:16 237:21
**2018** 1:12 4:9 5:19
5:20 30:21 103:9
103:13,18 107:7
108:2,23 179:17
262:25 263:8,9,13
310:7 311:11
**21** 308:16
**22** 283:11,16
**227** 308:19
**23** 286:19,22,23
287:4
**230** 110:21 111:3
**24** 113:5
**27** 263:5,12
**27th** 268:2

---

**3**

**3** 21:12,13,20 61:25
62:2 63:18 67:16
67:17 80:11,19,20
84:18 89:13 90:23
97:5 98:5,7
107:13 108:5,6,10
111:14 112:6
116:22,23 150:11
151:2,3,3 170:13

171:17 194:6
205:10 214:8
224:2 238:2
259:21,25 273:16
285:10,11,25
292:22 294:24
306:11 308:16
**3:23** 296:23
**3:37** 297:4
**3:48** 307:4,6
**30** 98:3,4,8 100:11
101:2 102:7 117:7
274:11
**300** 18:3 100:9
**31** 1:12 4:9 5:20
103:3 107:23
108:3 109:17
110:10,20 310:7
**32** 66:18 67:14
116:18,24 119:7
120:3,24 121:18
122:10 123:13
151:17,23 152:13
152:17,24 153:4
**320** 1:19
**327** 7:20,23 8:4
10:9
**327A** 9:14,23 10:9
10:20
**33** 113:4,13 306:15
**34** 124:11,13
145:11 150:25
151:4 152:16,23
152:24 153:18
170:9 283:6
306:11,15
**34B** 151:24 306:16
**34D** 278:24
**36** 205:11 209:19
223:15 226:10
**37th** 1:19
**39** 237:23 238:3

---

**4**

**4** 21:22 80:5,15,18
87:17,18 88:2



89:17 150:11,22
178:21 179:5
214:9 243:24
279:21 281:3
286:18 294:25
308:17
**40** 40:16,17 207:3,5
211:14 215:21
216:12 223:19,25
224:4
**41** 205:11 223:16
226:10 259:22,25
261:14 262:8,21
267:23
**42** 171:16,16
172:22,25 173:8
**452** 5:25 200:7

---
### 5
**5** 84:14 185:14
195:4,5,20,21
196:5 207:3
243:25 250:13
280:2,7,8,20,22
308:7,18
**50** 42:2 82:22,25
83:2,18,23 84:5
**52nd** 16:25 18:6,9
18:16,25
**55** 16:25 17:17 18:6
18:9,16,25 174:5
**5500** 217:16 219:4
**5500s** 218:22
219:24
**575** 2:4

---
### 6
**6** 205:7 227:7,8
279:22 308:13,19
**609** 3:4
**624-6221** 1:20
**67** 227:13,15
228:15 229:11
231:14 232:23

---
### 7

**7** 12:8 21:21 179:4
273:13 279:7,9
281:3
**7:59** 1:12 4:10
**71** 61:16
**73** 273:5,17,18
274:11,12
**730** 202:24 203:8,9
**730th** 203:11
**731** 202:25 203:12
**75** 277:14,20
**77002** 3:4
**77010** 2:10
**79** 81:7

---
### 8
**8** 12:23 13:8 107:10
297:3
**8th** 107:18 287:12
**810** 5:25 200:7
**866** 1:20
**87** 308:17
**875** 2:21

---
### 9
**9** 89:16 107:7
177:25
**9th** 287:12
**9:15** 66:22
**9:25** 67:3
**9:51** 89:9
**9:53** 89:14
**90** 57:3
**909** 2:10
**96,000** 286:25



# Exhibit 10

**EXHIBIT B**

**Declaration of Kevin McShea**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALTEGRITY, INC., *et al.*,[1] | Case No. 15-10226 (LSS) |
| Debtors. | Jointly Administered |

## DECLARATION OF KEVIN MCSHEA IN SUPPORT OF THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY ALIXPARTNERS LLP AS RESTRUCTURING ADVISOR EFFECTIVE *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

I, Kevin McShea, make this Declaration pursuant to 28 U.S.C. § 1746, and state:

1.      I am a Managing Director with AlixPartners LLP ("**AlixPartners**"), an internationally recognized consulting firm that has a wealth of experience in providing restructuring advisory services both in and out-of-court, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

2.      I submit this declaration on behalf of AlixPartners (the "**Declaration**") in support of the application (the "**Application**")[2] of the debtors and debtors in possession (collectively, the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Altegrity, Inc. (9985); Albatross Holding Company, LLC (2688); Albatross Marketing and Trading, LLC (8643); Altegrity Acquisition Corp. (1480); Altegrity Holding Corp. (1481); Altegrity Risk International LLC (6350); Altegrity Security Consulting, Inc. (5452); CVM Solutions, LLC (9526); D, D & C, Inc. (9552); Engenium Corporation (2269); FDC Acquisition, Inc. (2387); HireRight Records Services, Inc. (1944); HireRight Solutions, Inc. (8954); HireRight Technologies Group, Inc. (1660); HireRight, Inc. (5016); John D. Cohen, Inc. (1738); KCMS, Inc. (0085); KIA Holding, LLC (1333); Kroll Associates, Inc. (6880); Kroll Background America, Inc. (4830); Kroll Crisis Management Group, Inc. (3811); Kroll Cyber Security, Inc. (2393); Kroll Factual Data, Inc. (9911); Kroll Holdings, Inc. (4648); Kroll Inc. (1019); Kroll Information Assurance, Inc. (2283); Kroll Information Services, Inc. (2381); Kroll International, Inc. (1243); Kroll Ontrack Inc. (1650); Kroll Recovery LLC (7082); Kroll Security Group, Inc. (5514); National Diagnostics, Inc. (7132); Ontrack Data Recovery, Inc. (3148); Personnel Records International, LLC (0716); The Official Information Company (1805); US Investigations Services, LLC (9260); USIS International, Inc. (3617); and USIS Worldwide, Inc. (4258). The location of the Debtors' corporate headquarters is 7799 Leesburg Pike, Suite 1100 North, Falls Church, VA 22043.

"**Debtors**"), in the above-captioned chapter 11 cases for an order authorizing the employment and retention of AlixPartners as restructuring advisor under the terms and conditions set forth in the Application.  Except as otherwise noted,[3] I have personal knowledge of the matters set forth herein. If called and sworn as a witness, I could, and would, testify competently to the matters set forth herein.

3.      AlixPartners has provided and agrees to continue to provide assistance to the Debtors in accordance with the terms and conditions set forth in that certain engagement letter, dated as of September 18, 2014, attached as **Exhibit 1** to **Exhibit A**, the first addendum to the engagement letter, dated November 17, 2014, attached as **Exhibit 2** to **Exhibit A**, and the second addendum to the engagement letter, dated January 20, 2015, attached as **Exhibit 3** to **Exhibit A**, (collectively, the "**Engagement Letter**").

4.      Since approximately September 18, 2014, AlixPartners has provided services to the Debtors in connection with their restructuring efforts.  In providing such prepetition professional services to the Debtors, AlixPartners has become familiar with the Debtors and their businesses, including the Debtors' financial affairs, debt structure, operations, and related matters.  Having worked closely with the Debtors' management and their other advisors, AlixPartners has developed relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases.  Accordingly, AlixPartners is both well-qualified and uniquely able to represent the Debtors in these chapter 11 cases in an efficient and timely manner.

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

[3]     Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at AlixPartners and are based on information provided by them.

5.      All of the services that AlixPartners will provide to the Debtors will be (a) at the request of the Debtors and (b) performed in accordance with customary market practice of the restructuring advisory profession.

**<u>Professional Compensation</u>**

6.      AlixPartners intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses, and any other applicable procedures and orders of the Court and consistent with the proposed compensation agreed to by the Debtors and set forth in the Engagement Letter (the "**Fee Structure**").

7.      The current standard hourly rates, subject to periodic adjustments, charged by AlixPartners in respect of the professionals anticipated to be assigned to this case are as follows:

| | |
|---|---|
| Managing Director | $915 - 1,055 |
| Director | $695 - 850 |
| Vice President | $510 - 615 |
| Associate | $350 - 455 |
| Analyst | $305 - 335 |
| Paraprofessional | $230 - 250 |
| Developer | $190 - 385 |

AlixPartners reviews and revises its billing rate on January 1 of each year.

8.      AlixPartners often works for compensation that includes base fee and contingent incentive compensation earned upon achieving meaningful results. In these chapter 11 cases, pursuant to the Engagement Letter, the Debtors and AlixPartners have agreed that AlixPartners will earn a success fee of $1,500,000 (the "**Success Fee**") if the Debtors (a) confirm a chapter 11 plan of reorganization that becomes effective; or (b) complete one or more transactions that

substantially transfer a significant portion (i.e., more than two-thirds of the pro forma revenues or operating assets) of the business as a going concern to another entity.

9.      AlixPartners will apply to the Court for approval of the Success Fee at the conclusion of these chapter 11 cases, and such application will be subject to a reasonableness standard under section 330 of the Bankruptcy Code.

10.      I believe the Engagement Letter and the hourly rates and Success Fee contemplated therein are consistent with and typical of compensation arrangements entered into by AlixPartners and other comparable firms in connection with the rendering of similar services under similar circumstances.  I believe that the terms and conditions in the Engagement Letter are in fact reasonable, consistent with the market for providers of similar services, and designed to compensate AlixPartners fairly for its work.

11.      AlixPartners has received no promises regarding compensation in these chapter 11 cases other than in accordance with the Bankruptcy Code, the Engagement Letter, and as set forth in this declaration.  AlixPartners has no agreement with any nonaffiliated entity to share any compensation earned in these chapter 11 cases.

**Indemnification Provisions**

12.      The Debtors have agreed to indemnify, hold harmless and defend AlixPartners from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with AlixPartners' retention by the Debtors, all as more fully described in the indemnification section of the Engagement Letter and the Application.

13.      AlixPartners believes that the indemnification terms, as modified by the proposed order, are customary and reasonable for advisory engagements, both in and out-of-court, and

reflect the qualifications and limitations on indemnification provisions that are customary in this district.

### Efforts to Avoid Duplication of Services

14.     AlixPartners intends to complement, and not duplicate, the services to be rendered by any other professional retained in these chapter 11 cases. AlixPartners understands that the Debtors have chosen Evercore Group LLC ("**Evercore**") to act as its investment banker and financial advisor and PricewaterhouseCoopers ("**PwC**") to act as its independent auditor and financial consultant.  AlixPartners has and will continue to work closely with Evercore and PwC to prevent any duplication of efforts in the course of advising the Debtors.

### AlixPartners' Disinterestedness

15.     In connection with its proposed retention by the Debtors in these chapter 11 cases, AlixPartners undertook a lengthy review to determine whether it had any conflicts or other connections that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors.  Specifically, AlixPartners obtained from the Debtors, and/or their representatives, the names of individuals and entities that may be parties-in-interest in these chapter 11 cases (the "**Potential Parties-in-Interest**").  Such parties are listed on **Schedule 1**, attached hereto. A search was performed for connections to the Potential Parties-in-Interest within the past ten years, and results were disclosed as to AlixPartners Holdings, LLP ("**AP Holdings**"), AlixPartners' parent company, and each of AP Holdings' U.S. and non-U.S. subsidiary affiliates. In addition, AlixPartners sends a firm-wide email to all of its professionals inquiring of any potential connections.

16.     Based on that review, AlixPartners represents that, to the best of its knowledge, AlixPartners knows of no fact or situation that would represent a conflict of interest for

AlixPartners with regard to the Debtors. Unless otherwise noted, references to AlixPartners in the disclosures below collectively refer to AlixPartners, AP Holdings, and each of their subsidiary affiliates. AlixPartners wishes to disclose the following:

- Funds managed by subsidiaries of CVC Capital Partners SICAV-FIS S.A. ("**CVC**"), a private equity and investment advisory firm, own a controlling stake in AP Holdings, the parent of AlixPartners. CVC Credit Partners, L.P. ("**CVC Credit Partners**") is a global debt management business and a majority owned subsidiary of CVC.

  CVC's private equity funds ("**CVC Funds**") and debt funds ("**CVC Credit Partners' Funds**") are managed independently from each other, with no overlap in membership of the relevant investment committees or boards of entities with responsibility for investment decisions. CVC has in place an internal information barrier between the CVC Funds and the CVC Credit Partners' Funds. All CVC Credit Partners investment professionals are dedicated to CVC Credit Partners and are not involved in the private equity business. CVC Credit Partners also has separate IT systems and workspaces.

  No material nonpublic information about the Debtors has been furnished by AlixPartners to CVC or any CVC managed funds or their portfolio companies, including without limitation, CVC Credit Partners (collectively, the "**CVC Entities**") and AlixPartners will continue to abide by its confidentiality obligations to the Debtors. AlixPartners operates independently of the CVC Entities, and does not share employees or officers with the CVC Entities. A managing partner of CVC is on the Board of Directors of AlixPartners, LLP and AP Holdings and on the advisory board to CVC Credit Partners, and a managing director of CVC Credit Partners is on the Board of Directors of AlixPartners, LLP. Certain other CVC executives, who are not connected with CVC Credit Partners, are also on either the Board of Directors of AlixPartners, LLP or the Board of Directors of AlixPartners Holdings, LLP. AlixPartners and the CVC Entities have separate offices in separate buildings and use separate Internet email addresses. AlixPartners financial performance is not directly impacted by the success or failure of the CVC Entities.

  As a component of its conflict checking system, AlixPartners has searched the names of CVC, CVC Credit Partners, the CVC Credit Partners' Funds, the CVC Funds, each managing partner of CVC and each portfolio company of the CVC Funds (the "**CVC Conflict Parties**") against the list of Potential Parties in Interest, and AlixPartners has determined to the best of its knowledge it has no connection or relationship with the CVC Conflict Parties that requires disclosure other than as noted herein. The

term "portfolio company" means any business in which a CVC fund has a direct controlling or minority interest. The term "portfolio company" does not include indirect investments such as businesses owned or investments made by a CVC Funds portfolio company or investments made by the CVC Credit Partners' Funds. CVC Credit Partners Funds, as well as other CVC Entities, may in the ordinary course from time to time hold, control and/or manage loans to, or investments in the Debtors and parties in interest in these cases. Further, the CVC Entities may have had, currently have or may in the future have business relationships or connections with the Debtors or other Potential Parties in Interest in matters related to or unrelated to the Debtors or their affiliates or these chapter 11 cases. Furthermore, AlixPartners has provided to CVC the list of Debtors and has performed appropriate checks to determine if there exists any material connection or relationship between the CVC Conflict Parties and the Debtors. AlixPartners will supplement this disclosure if it obtains information regarding any such connection. Other than as specifically noted herein, AlixPartners has not undertaken to determine the existence, nature and/or full scope of any business relationships or connections that the CVC Entities may have with the Potential Parties in Interest, the Debtors and their affiliates or these chapter 11 cases.

Certain of the CVC Credit Partners' Funds act as lenders to AlixPartners. Further, AlixPartners may have had, currently has or may in the future have other business relationships with, among other entities, portfolio companies or managed funds of CVC in matters unrelated to the Debtors or their affiliates in these chapter 11 cases. Based on, among other things, the business separation between the CVC Funds and the CVC Credit Partners' Funds, the business separation between the CVC Entities and AlixPartners, and the confidentiality obligations referred to above, AlixPartners believes that it does not hold or represent an interest adverse to the estate with respect to the engagement.

- The Department of the United States Treasury is an interested party in this bankruptcy matter. AlixPartners has relationships with certain other departments of the United States government, including, without limitation, the Internal Revenue Service ("**IRS**"), who is a creditor, adverse party, and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. The IRS is the previous employer of current AlixPartners employees. The Department of Justice ("**DOJ**") is a current and former client of AlixPartners in matters unrelated to the Debtors. The DOJ has also been an adverse party and customer to current and former AlixPartners clients in matters unrelated to the Debtors. In addition, the United States SEC, the United States Department of Labor and the US Attorneys' Office are current and former clients of AlixPartners in matters unrelated to the Debtors.

- Certain of the parties in interest may have extended credit or provided services, or may in the future extend credit or provide services to AlixPartners.

- There are five confidential clients of AlixPartners that are vendors and landlords to the Debtors as well as professionals in interest in the bankruptcy matter.  The confidential clients are current and former AlixPartners clients in matters unrelated to the Debtors.

- ACE American Insurance Company ("**ACE**"), an insurance provider to the Debtors, is an insurance provider, creditor and vendor to current and former AlixPartners clients in matters unrelated to the Debtors.  Ace is a vendor to AlixPartners.

- Aegis USA Inc., a vendor to the Debtors, is affiliated with entities that are material contract parties, creditors, adverse parties, litigation parties, insurance providers, lessors, and shareholders to current and former AlixPartners clients in matters unrelated to the Debtors.  Aegis Medical France is a former AlixPartners client in matters unrelated to the Debtors.

- Altegrity, Inc. is a current and former AlixPartners client.

- Apollo, lenders and noteholders to the Debtors, is affiliated with entities that are lenders, bondholders, adverse parties, significant shareholders, co-defendants, customers, investors, joint venture entities, parent companies, shareholders, sellers, vendors, and lessors to current and former AlixPartners clients in matters unrelated to the Debtors.  Apollo is a current and former AlixPartners client in matters unrelated to the Debtors.

- Apple, a customer to the Debtors, is a creditor, material contract party and lessee to current and former AlixPartners clients in matters unrelated to the Debtors.  Apple is a co-defendant to a former AlixPartners client and a former AlixPartners client, all in matters unrelated to the Debtors.  Apple is the former employer of a current AlixPartners employee.

- Arch Insurance Company, an insurance provider to the Debtors, is an insurance provider, co-defendant, lender and material contract party to current and former AlixPartners clients in matters unrelated to the Debtors.  Arch Insurance is a former AlixPartners client in matters unrelated to the Debtors.

- AT&T, a customer to the Debtors, is affiliated with entities that are creditors, material contract parties, vendors, lenders, adverse parties, co-

defendants, director-affiliated companies, material contract parties, lessees, lessors, vendors, and shareholders to current and former AlixPartners clients in matters unrelated to the Debtors. Affiliated entities of AT&T are former AlixPartners clients in matters unrelated to the Debtors. AT&T is a vendor to AlixPartners.

- Baker Hughes, a customer to the Debtors, is a litigation party to a current AlixPartners client. Baker Hughes is a current AlixPartners client in matters unrelated to the Debtors.

- Bank of America and Bank of America Merrill Lynch Proprietary Trading ("**Bank of America**"), lenders, landlords, and customers to the Debtors, are affiliated with entities that are material contract parties, creditors, adverse parties, bondholders, indenture trustees, investors, co-defendants, co-plaintiffs, director-affiliated companies, executory contract counterparties, litigation parties, lessors, professionals in interest, significant shareholders, vendors, and lenders to current and former AlixPartners clients in matters unrelated to the Debtors. Bank of America is affiliated with entities that are current and former AlixPartners clients in matters unrelated to the Debtors. Bank of America is the former employer of a current AlixPartners employee.

- Bank of Tokyo-Mitsubishi ("**Bank of Tokyo**"), a customer to the Debtors, is a lender, lessor, creditor, co-defendant, and professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors. Bank of Tokyo is a current and former AlixPartners client in matters unrelated to the Debtors.

- Barclays Capital, Inc. ("**Barclays**"), a lender, noteholder, and customer to the Debtors, is affiliated with entities that are creditors, significant shareholders, adverse parties, lenders, co-defendants, co-plaintiff, material contract parties, indenture trustees, investors, professionals in interest, vendors, and bondholders to current and former AlixPartners clients in matters unrelated to the Debtors. Barclays is a current AlixPartners client in matters unrelated to the Debtors. Barclays is a vendor to AlixPartners. Barclays is the former employer of a current AlixPartners employee.

- Bayer, a customer to the Debtors, is a potential acquirer, customer, lessor, adverse party, creditor, and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. Bayer AG is the former employer of a current AlixPartners employee.

- Beazley Insurance Company, Inc. ("**Beazley**"), an insurance provider to the Debtors, is an insurer and adverse party to current and former AlixPartners clients in matters unrelated to the Debtors. Beazley provides insurance services to AlixPartners.

- BlackRock Advisors, LLC ("**Blackrock**"), a lender and noteholder to the Debtors, is a lender, creditor, bondholder, and executory contract counterparty to current and former AlixPartners clients in matters unrelated to the Debtors. Blackrock and/or its affiliates are current and former AlixPartners clients in matters unrelated to the Debtors. Blackrock Realty Advisors, a subsidiary of Blackrock, is a lessor to a current AlixPartners client in matters unrelated to the Debtors.

- Branch Banking & Trust, a landlord to the Debtors, is a co-defendant, lender, litigation party, shareholder and vendor to current and former AlixPartners clients in matters unrelated to the Debtors.

- CapGemini US LLC ("**CapGemini**"), a vendor to the Debtors, is affiliated with an entity that is a creditor to former AlixPartners clients in matters unrelated to the Debtors. CapGemini is the former employer of current AlixPartners employees.

- Carlyle Investment Management LLC ("**Carlyle**"), a lender and noteholder to the Debtors, is affiliated with entities that are lenders, creditors and vendors to current and former AlixPartners clients in matters unrelated to the Debtors. In addition, The Carlyle Group and certain affiliated entities are current and former clients in matters unrelated to the Debtors.

- Caspian, a lender and noteholder to the Debtors, is a bondholder and lender to current and former AlixPartners clients in matters unrelated to the Debtors. An affiliate, Caspian Capital, is a current AlixPartners client in matters unrelated to the Debtors.

- Caterpillar, Inc., a customer to the Debtors, is a vendor, customer, adverse party, lender, creditor, bondholder, material contract party, joint venture entity, lessor, litigation party and director-affiliated company to current and former AlixPartners clients in matters unrelated to the Debtors. Caterpillar is a current and former AlixPartners client in matters unrelated to the Debtors. Caterpillar is a former employer of current AlixPartners employees.

- CBRE, a landlord to the Debtors, is a professional in interest, material contract party, co-defendant, and lessor to current and former AlixPartners clients in matters unrelated to the Debtors. CBRE is a current and former AlixPartners client in matters unrelated to the Debtors. CBRE is an advisor and broker to AlixPartners in matters unrelated to the Debtors.

- CDW LLC, a vendor to the Debtors, is affiliated with entities that are co-defendants, creditors, material contract parties and vendors to current and former AlixPartners clients in matters unrelated to the Debtors. CDW and affiliated entities are vendors to AlixPartners.

- Citi, Citibank and Citigroup Global Markets, Inc. ("**Citi**"), lenders, landlords and noteholders to the Debtors, are affiliated with entities that are creditors, lenders, bondholders, shareholders, adverse parties, professionals in interest, material contract parties, investors, vendors and lessors to current and former AlixPartners clients in matters unrelated to the Debtors. Citi affiliated entities are former AlixPartners clients in matters unrelated to the Debtors.

- CNA and Continental Casualty Company ("**CNA**"), customers and insurance providers to the Debtors, are affiliated with entities that are bondholders, creditors, co-defendants, customers, material contract parties, insurance providers, lenders, lessors, professionals in interest, vendors and adverse parties to current and former AlixPartners clients in matters unrelated to the Debtors. CNA is a former AlixPartners client in matters unrelated to the Debtors. CNA is the former employer of a current AlixPartners employee.

- Convergys, a customer to the Debtors, is a creditor and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. Convergys is a current AlixPartners client in matters unrelated to the Debtors.

- Credit Suisse ("**CS**"), a lender and noteholder to the Debtors, is affiliated with entities that are lenders, creditors, bondholders, shareholders, limited partners, adverse parties, co-defendants, indenture trustees, investors, material contract parties, vendors and professionals in interest to current and former AlixPartners clients in matters unrelated to the Debtors. Credit Suisse is affiliated with entities that are current and former AlixPartners clients in matters unrelated to the Debtors. CS is the former employer of a current AlixPartners employee.

- CT Corporation, a landlord to the Debtors, is professional in interest, creditor, vendor and litigation party to current and former AlixPartners clients in matters unrelated to the Debtors.  CT Corporation is a vendor to AlixPartners.

- Cumberland Mall, a landlord to the Debtors, is affiliated with an entity that is a former AlixPartners client in matters unrelated to the Debtors.

- Dar Al Arkan Real Estate Development Company, a litigant to the Debtors, is a current AlixPartners client in matters unrelated to the Debtors.

- Davidson Kempner, a lender and noteholder to the Debtors, is affiliated with entities that are lenders and bondholders to current and former AlixPartners clients in matters unrelated to the Debtors. An affiliate, Davidson Kempner Capital Management, is a current AlixPartners client in matters unrelated to the Debtors.

- D.E. Shaw & Company, L.P. ("**D.E. Shaw**"), a lender and noteholder to the Debtors, is a former AlixPartners client in matters unrelated to the Debtors.  D.E. Shaw is a lender, bondholder, creditor, parent company and shareholder to former AlixPartners clients in matters unrelated to the Debtors.

- Debevoise & Plimpton, a professional in interest in this Bankruptcy matter, is counsel, opposing counsel and professional in interest to current and former AlixPartners client in matters unrelated to the Debtors.  Debevoise & Plimpton is a current AlixPartners client in matters unrelated to the Debtors.

- Dell Financial Services, a vendor to the Debtors, is affiliated with entities that are creditors, vendors, material contract parties, customers, bondholders and litigation parties to current and former AlixPartners clients in matters unrelated to the Debtors.  Dell is a current and former AlixPartners client in matters unrelated to the Debtors.   Dell is an AlixPartners vendor.  Dell is the former employer of current AlixPartners employees.

- Dennis Dracup, an officer to the Debtors, is an officer and shareholder to a current AlixPartners client in matters unrelated to the Debtors.

- Evercore Partners, a professional in interest in this bankruptcy matter, is a creditor, lender, bondholder, investor, director-affiliated company,

shareholder and professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors. Evercore Partners and affiliated entities are AlixPartners vendors.

- Experian, a vendor to the Debtors, is a professional in interest to a former AlixPartners client in matters unrelated to the Debtors. Experian is the former employer of current AlixPartners employees.

- Fannie Mae – Customer Tech Services ("**Fannie Mae**"), a vendor to the Debtors, is a creditor and co-defendant to former AlixPartners clients in matters unrelated to the Debtors.

- Federal Insurance Co., ("**Chubb**"), an insurance provider and landlord to the Debtors, is an adverse party, lender, insurance provider, bondholder, parent company, vendor, and material contract party to current and former AlixPartners clients in matters unrelated to the Debtors. Chubb is a former AlixPartners client in matters unrelated to the Debtors. Chubb is a current insurance provider to AlixPartners.

- First Group, a customer to the Debtors, is a current AlixPartners client. First Group America is an AlixPartners vendor.

- Freddie Mac, a customer to the Debtors, is affiliated with entities that are co-clients, material contract parties, lenders and litigation parties to current and former AlixPartners clients in matter unrelated to the Debtors. Freddie Mac is the former employer of current AlixPartners employees.

- Goldman Sachs, Goldman, Sachs & Co., and Goldman Sachs Asset Management, L.P. (U.S.) ("**Goldman**"), professionals in interest in this bankruptcy matter and lenders, noteholders and customers to the Debtors, are affiliated with entities that are lenders, litigants, adverse parties, indenture trustees, lessees, bondholders, professionals in interest, co-defendants, creditors, director-affiliated companies, material contract party, investors, vendors, and shareholders to current and former AlixPartners clients in matters unrelated to the Debtors. Goldman Sachs is a former AlixPartners client in matters unrelated to the Debtors. Also, a current AlixPartners board member sits on the board of Goldman Sachs Capital Partners. Lastly, Goldman Sachs is the former employer of current AlixPartners employees.

- Great West, a customer to the Debtors, is a creditor, material contract party, insurance provider, lessor and shareholder to current and former AlixPartners clients in matters unrelated to the Debtors. Great West Life

Assurance Company is a former AlixPartners client in matters unrelated to the Debtors.  Great West Life Assurance Company is an AlixPartners vendor.

- Greenberg Traurig LLP, a landlord to the Debtors, is a professional in interest, counsel, creditor, opposing counsel, litigation party and vendor to current and former AlixPartners clients in matters unrelated to the Debtors.  Greenberg Traurig is a current and former AlixPartners client in matters unrelated to the Debtors.  Greenberg Traurig is the former employer of current AlixPartners employees.

- Haynes and Boone, LLP, a landlord to the Debtors, is a professional in interest, counsel, material contract party, opposing counsel and vendor to current and former AlixPartners clients in matters unrelated to the Debtors.  Haynes and Boone, LLP is a current and former AlixPartners client in matters unrelated to the Debtors.  Haynes and Boone, LLP is a vendor to AlixPartners.

- HireRight Records Services, Inc., HireRight Solutions, Inc., HireRight Technologies Group, Inc., HireRight, Inc., HireRight Estonia, HireRight Limited (UK), HireRight Poland Sp.zo.o., ul., HireRight Powerchex Limited, HireRight SP, LLC (Russia), and HireRight UK Holding Limited ("HireRight"), affiliates to the Debtors, are affiliated with entities that are subsidiaries and adverse parties to current and former AlixPartners clients in matters unrelated to the Debtors.  HireRight, Inc. is an AlixPartners vendor.

- Houlihan Lokey ("**Houlihan**"), a professional in interest in this bankruptcy matter, is a professional in interest, material contract party, vendor and investment banker to current and former AlixPartners clients in matters unrelated to the Debtors.  Houlihan is an affiliate to a former AlixPartners client in matters unrelated to the Debtors.

- Insight Corporate Solutions and Insight Direct USA, Inc. ("Insight"), vendors to the Debtors, are affiliated with entities that are vendors, material contract parties, creditors, parent companies, investors and shareholders to current and former AlixPartners clients in matters unrelated to the Debtors.  An affiliate, Insight Venture Partners, LLC, is a current AlixPartners client in matters unrelated to the Debtors.  Insight is a vendor to AlixPartners.

14

- Internap Network Services Corporation, a landlord to the Debtors, is a vendor to AlixPartners.

- Iron Mountain Information Management, LLC, a landlord to the Debtors, is a vendor, creditor, customer, material contract party, and professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors.  Iron Mountain is a vendor to AlixPartners.

- Ironshore Specialty ("**Ironshore**"), an insurance provider to the Debtors, is a co-defendant and insurance provider to current and former AlixPartners client in matters unrelated to the Debtors.  Ironshore is a former AlixPartners client in matters unrelated to the Debtors.

- Isom Company and Isom SP, LLC ("**Isom**"), landlords to the Debtors, are affiliated with an entity that is a current AlixPartners client in matters unrelated to the Debtors.

- Joele Frank, Wilkinson, Brimmer & Katcher, a professional in interest in this bankruptcy matter, is a professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors.

- Jones Lang LaSalle Americas, Inc., a landlord to the Debtors, is a director-affiliated company, creditor, professional in interest, lessee, co-defendant and lessor to current and former AlixPartners clients in matters unrelated to the Debtors.  Jones Lang LaSalle is the former employer of a current AlixPartners employee.  Jones Lang LaSalle Americas, Inc. is a vendor to AlixPartners.

- JP Morgan Chase & Co. ("**JPM**"), a customer to the Debtors, is affiliated with entities that are lenders, shareholders,  bondholders, adverse parties, co-defendant, material contract parties, customers, investors, joint venture entities, shareholders, vendors, and creditors to current and former AlixPartners clients in matters unrelated to the Debtors. JPM and affiliated entities are current and former AlixPartners clients in matters unrelated to the Debtors.  JPM affiliated entities are the former employers of current AlixPartners employees.

- Julian Markby, an officer to the Debtors, is an officer to a current AlixPartners client in matters unrelated to the Debtors.

- Kirkland & Ellis LLP, a professional in interest in this bankruptcy matter, is counsel, opposing counsel, creditor, defendant, material contract party, vendor and professional in interest to current and former AlixPartners

clients in matters unrelated to the Debtors. Kirkland & Ellis, LLP is a current and former AlixPartners client in matters unrelated to the Debtors. In addition, Kirkland & Ellis, LLP currently provides services to AlixPartners. Kirkland & Ellis, LLP is the former employer of current AlixPartners employees.

- Knighthead, a lender and noteholder to the Debtors, is a lender and investor to current and former AlixPartners clients in matters unrelated to the Debtors.

- Kohlberg Kravis Roberts & Company ("**KKR**"), a customer to the Debtors, is a lender, shareholder and creditor to current and former AlixPartners clients in matters unrelated to the Debtors. KKR is a current and former AlixPartners client in matters unrelated to the Debtors. An affiliate, KKR Asia, is a former AlixPartners client in matters unrelated to the Debtors.

- Kroll Associates, Inc., Kroll Background America, Inc., Kroll Crisis Management Group, Inc., Kroll Cyber Security, Inc., Kroll Factual Data, Inc., Kroll Holdings, Inc., Kroll Inc., Kroll Information Assurance, Inc., Kroll Information Services, Inc., Kroll International, Inc., Kroll Ontrack Inc., Kroll Recovery LLC, and Kroll Security Group, Inc. ("Kroll"), affiliates to the Debtors, are affiliated with entities that are adverse parties, creditors, material contract parties and vendors to current and former AlixPartners clients. Kroll Associates was the previous employer of current AlixPartners employees. AlixPartners' Information Management Services group performs some services similar to those offered by Kroll affiliates.

- Latham & Watkins LLP, a professional in interest in this bankruptcy matter, is client counsel, opposing counsel, creditor, lender, material contract party, lender, vendor and professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors.

- LexisNexis, a vendor to the Debtors, is a material contract party, professional in interest and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. LexisNexis is an AlixPartners vendor. LexisNexis is the former employer to current AlixPartners employees.

- Liberty Insurance Corporation and Liberty Mutual Insurance Company ("**Liberty**"), insurance providers to the Debtors, are affiliated with entities

that are creditors, vendors, adverse parties, material contract parties, insurers and lenders to current and former AlixPartners clients in matters unrelated to the Debtors.  An affiliate of Liberty is a former AlixPartners client in matters unrelated to the Debtors.

- Lloyds Banking Group PLC ("**Lloyds**"), a litigant to the Debtors, is a creditor, material contract party, lender, insurance provider, vendor, litigation party, material contract party and adverse party to current and former AlixPartners clients in matters unrelated to the Debtors.  Lloyds is a current and former AlixPartners client in matters unrelated to the Debtors.  Lloyds is a vendor to AlixPartners.

- LNR Partners Inc. ("**LNR**"), a landlord to the Debtors, is a lender to current and former AlixPartners clients in matters unrelated to the Debtors. LNR is a current AlixPartners client in matters unrelated to the Debtors.

- LS, a customer to the Debtors, is affiliated with entities that are creditors, parent companies and lenders to current and former AlixPartners clients in matters unrelated to the Debtors.  LS is affiliated with entities that are current and former AlixPartners clients in matters unrelated to the Debtors.

- Macquarie, a lender and noteholder to the Debtors, is affiliated with entities that are adverse parties, material contract parties, investors, lenders, lessors, litigation parties, parent companies, professionals in interest and shareholders to current and former AlixPartners clients in matters unrelated to the Debtors.  Macquarie is affiliated with entities that are current and former AlixPartners clients in matters unrelated to the Debtors.  Macquarie is an AlixPartners vendor. Macquarie is the former employer of current AlixPartners employees.

- Microsoft Corporation and Microsoft Services ("**Microsoft**"), vendors to the Debtors, are affiliated with entities that are lenders, creditors, co-defendants, joint venture entities, material contract parties, lessors, professionals in interest, vendors, and customers to current and former AlixPartners clients in matters unrelated to the Debtors.  An affiliate is a vendor to AlixPartners.  Microsoft is a current AlixPartners client in matters unrelated to the Debtors.  Microsoft is an AlixPartners vendor. Microsoft is the former employer of a current AlixPartners employee.

- Moelis & Company, a professional in interest in this bankruptcy matter, is a professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors.

- Nipponkoa Insurance Co. Ltd. ("**Nipponkoa**"), an insurance provider to the Debtors, is a former AlixPartners client in matters unrelated to the Debtors.

- Novartis Pharma ("**Novartis**"), a customer to the Debtors, is affiliated with entities that are co-defendants and potential acquirers to current and former AlixPartners clients in matters unrelated to the Debtors. A Novartis affiliate is a current AlixPartners client in matters unrelated to the Debtors.

- O'Melveny & Myers, a professional in interest in this bankruptcy matter, is a creditor, professional in interest and client counsel to former AlixPartners clients in matters unrelated to the Debtors.

- Oaktree Capital Management, L.P. ("**Oaktree**"), a lender and noteholder to the Debtors, is affiliated with entities that are bondholders, parent companies, lenders, vendors, significant shareholders, co-clients and creditors to current and former AlixPartners clients in matters unrelated to the Debtors. Oaktree is affiliated with entities that are current and former clients to AlixPartners in matters unrelated to the Debtors.

- Paul, Weiss, Rifkind, Wharton & Garrison LLP, a professional in interest in this bankruptcy matter, is client counsel, material contract party, professional in interest, vendor and opposing counsel to current and former AlixPartners clients in matters unrelated to the Debtors. Paul Weiss Rifkind & Garrison is a current and former AlixPartners client in matters unrelated to the Debtors. Paul, Weiss, Rifkind, Wharton & Garrison LLP is an AlixPartners vendor.

- Paychex, a customer to the Debtors, is the former employer of current AlixPartners employees.

- PricewaterhouseCoopers, LLP ("PWC"), a professional in interest and vendor in this bankruptcy matter, is a professional in interest, opposing counsel, and creditor to current and former AlixPartners clients in matters unrelated to the Debtor. PWC provides tax and related consulting services to AlixPartners. PWC is the previous employer of a number of current AlixPartners employees. AlixPartners provides services to PWC in the ordinary course in matters unrelated to the Debtor. PWC is a former

employer of certain employees, officers, directors, and shareholders of AlixPartners.

- Prime Clerk LLC, a professional in interest in this bankruptcy, is a professional interest to current AlixPartners clients in matters unrelated to the Debtors.

- Providence Equity Partners VI L.P., Providence Equity Partners VI-A L.P., and Providence Equity Partners, Inc. ("**Providence**"), lenders, noteholders and shareholders to the Debtors, are affiliated with entities that are lenders, shareholders, material contract parties and parent companies to current and former AlixPartners clients in matters unrelated to the Debtors. Providence is a current AlixPartners client in matters unrelated to the Debtors.

- RBS, a customer to the Debtors, is affiliated with entities that are lenders, material contract parties, adverse parties, bondholders, co-defendants, parent companies, professionals in interest, shareholders and creditors to current and former AlixPartners clients in matters unrelated to the Debtors. A former AlixPartners employee is currently the UK Head of the Global Restructuring Group of The Royal Bank of Scotland, but had no involvement with this matter while employed at AlixPartners. RBS is a current and former AlixPartners client in matters unrelated to the Debtors. RBS is a former employer to current AlixPartners employees.

- Redwood Capital Management, LLC ("**Redwood**"), a lender and noteholder to the Debtors, is affiliated with entities that are shareholders, creditors, bondholders, material contract parties, litigation parties and lenders to former AlixPartners clients in matters unrelated to the Debtors.

- Salesforce.com Inc., a vendor to the Debtors, is a creditor, vendor and co-defendant to current and former AlixPartners clients in matters unrelated to the Debtors. Salesforce.com is the former employer of a current AlixPartners employee.

- Sheppard Mullin Richter & Hampton ("**Sheppard Mullin**"), a vendor to the Debtors, is a professional in interest, creditor, litigation party, counsel and opposing counsel to former AlixPartners clients in matters unrelated to the Debtors. Sheppard Mullin is a former AlixPartners client in matters unrelated to the Debtors.

- Sprint, a customer to the Debtors, is a creditor, vendor, co-defendant, co-plaintiff and material contract party to current and former AlixPartners

clients in matters unrelated to the Debtors. Sprint is a current and former AlixPartners client in matters unrelated to the Debtors. Sprint is the former employer of current AlixPartners employees.

- State Street and State Street Global Advisors (SSgA) ("**State Street**"), customers, lenders and noteholders to the Debtors, are affiliated with entities that are lenders, creditors, bondholders, vendors, shareholders, adverse parties, material contract parties, co-defendants, lessors, and trustees to current and former AlixPartners clients in matters unrelated to the Debtors. State Street is the former employer of current AlixPartners employees.

- Teachers Insurance and Annuity Association of America, a shareholder to the Debtors, is a lender, creditor, lessor and litigation party to current and former AlixPartners clients in matters unrelated to the Debtors. The Teachers Insurance and Annuity Association is an AlixPartners vendor.

- Tenet, a customer to the Debtors, is affiliated with entities that are material contract parties and related parties to former AlixPartners clients in matters unrelated to the Debtors. Tenet Tech is the former employer of current AlixPartners employees.

- Third Avenue Business Center, LLC, Third Avenue Management, LLC and Third Avenue Tower Owner LLC ("**Third Avenue**"), landlords, lenders and noteholders to the Debtors, was a dip lender to a former chapter 11 engagement of AlixPartners in matters unrelated to the Debtors. Third Avenue and affiliated entities are indenture trustees, bondholders, adverse parties, creditors, and lenders to current and former AlixPartners clients in matters unrelated to the Debtors.

- TrialGraphix Holdings, Inc. and TrialGraphix, Inc., affiliates to the Debtors, are AlixPartners vendors.

- United Parcel Service ("**UPS**"), a customer to the Debtors, is a vendor, material contract party, lender, vendor and creditor to current and former AlixPartners clients in matters unrelated to the Debtors. UPS is a vendor to AlixPartners. UPS is a current client as part of a representative creditors committee in matters unrelated to the Debtors. UPS is the former employer of current AlixPartners employees.

- Verizon Wireless ("**Verizon**"), a vendor to the Debtors, is affiliated with entities that are creditors, co-defendants, customers, material contract parties, and vendors to current and former AlixPartners clients in matters

unrelated to the Debtors. Verizon is a former AlixPartners client in matters unrelated to the Debtors. Verizon is a vendor to AlixPartners.

- Weil, Gotshal & Manges LLP, a professional in interest in this bankruptcy matter, is a professional in interest, counsel, creditor, opposing counsel and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. Weil, Gotshal & Manges LLP is a current and former AlixPartners client in matters unrelated to the Debtors. Weil, Gotshal & Manges LLP is the former employer of current AlixPartners employees.

- Wells Fargo Bank, an indenture trustee to the Debtors, is affiliated with entities that are lenders, creditors, lessors, bondholders, indenture trustees, co-defendants, adverse parties, insurance providers, investors, material contract parties, professionals in interest, shareholders, trustees and vendors to current and former AlixPartners clients in matters unrelated to the Debtors. Wells Fargo is a current and former AlixPartners client in matters unrelated to the Debtors. Wells Fargo is a vendor to AlixPartners.

- Williams & Connolly LLP, a vendor to the Debtors, is counsel, opposing counsel and professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors. Williams & Connolly LLP is a current and former AlixPartners client in matters unrelated to the Debtors.

- Wilmer Cutler Pickering Hale and Dorr LLP ("**WilmerHale**"), a professional in interest in this bankruptcy matter, is a current and former AlixPartners client in matters unrelated to the Debtors.

- Wilmington Trust, an indenture trustee to the Debtors, is a bondholder, material contract party, creditor, lessor, adverse party, professional in interest, shareholder, trustee and indenture trustee to current and former AlixPartners clients in matters unrelated to the Debtors. Wilmington Trust is a current and former AlixPartners client and a client related party to current AlixPartners clients, all in matters unrelated to the Debtors. Wilmington Trust is affiliated with entities that are vendors to AlixPartners.

- WPP LLC and WPP LLC Westport Plaza ("**WPP**"), landlords to the Debtors, are affiliated with entities that are co-defendants, adverse parties and vendors to current and former AlixPartners clients in matters unrelated to the Debtors. An affiliate, WPP Holdings, is a former AlixPartners client in matters unrelated to the Debtors.

21

- Zurich American Insurance Company ("**Zurich**"), an insurance provider to the Debtors, is affiliated with entities that are creditors, vendors, material contract parties, co-defendants, insurance providers, lenders and adverse parties to current and former AlixPartners clients in matters unrelated to the Debtors. Zurich is a former AlixPartners client in matters unrelated to the Debtors. Zurich is an insurance provider to AlixPartners.

17.     AlixPartners and its subsidiary affiliates are claims agents, advisors and crisis managers providing services and advice in many areas, including restructuring and distressed debt. As part of its diverse practice, AlixPartners appears in numerous cases, proceedings and transactions involving many different attorneys, accountants, investment bankers and financial consultants, some of whom may represent claimants and parties in interest in these chapter 11 cases. Furthermore, AlixPartners has in the past, and may in the future, be represented by various attorneys and law firms, some of whom may be involved in these chapter 11 cases. In addition, AlixPartners has been in the past, and likely will be in the future, engaged in matters unrelated to the Debtors or these chapter 11 cases in which it works with or in opposition to other professionals involved in these chapter 11 cases. Moreover, AlixPartners might have referred work to other professionals who are retained in these chapter 11 cases. Likewise, certain such professionals who are retained in these chapter 11 cases might have referred work to AlixPartners. To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, none of these business relationships constitute interests adverse to the Debtor.

18.     From time to time, AlixPartners has provided services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties adverse to the Debtors in matters wholly unrelated to these chapter 11 cases. As described herein, however, AlixPartners has undertaken a detailed search to determine, and to disclose, whether it is providing or has provided services to any significant creditor, equity security holder, insider or other party-in-interest in such unrelated matters.

19.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, except as otherwise disclosed herein, neither I nor any of AlixPartners' professional employees or representatives: (a) have any connection with the Debtors, their creditors, or any other Potential Parties-in-Interest in these chapter 11 cases; nor (b) are related or connected to any United States Bankruptcy Judge for the District of Delaware, any of the District Judges for the District of Delaware who handle bankruptcy cases, the U.S. Trustee or any employee in the Office of the U.S. Trustee, except as otherwise set forth herein.

20.     To the best of my knowledge, neither AlixPartners nor any of its professionals is a direct holder of any of the Debtors' securities.   It is possible that certain of AlixPartners' employees, managing directors, board members, equity holders, or an affiliate of any of the foregoing, may own investment interests in mutual funds or other investment vehicles (including various types of private funds) that own the Debtors' or other parties in interests' debt or equity securities, or other financial instruments, including bank loans or other obligations.   Typically, the holders of such investment interests are passive investors and have no role in management of the investment vehicle and no control over investment decisions related to such investment funds or financial instruments.   AlixPartners' policy prohibits its employees from personally trading in the Debtors' securities.

21.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, AlixPartners has not been retained to assist any entity or person other than the Debtors on matters relating to, or in direct connection with, these chapter 11 cases. AlixPartners will continue to provide professional services to entities that may be creditors or equity security holders of the Debtors or other parties in interest in these chapter 11 cases, provided

that such services do not relate to, or have any direct connection with, these chapter 11 cases or the Debtor.

22.      Despite the efforts described above to identify and disclose the connections that AlixPartners and its affiliates have with parties-in-interest in these chapter 11 cases, because the Debtors is a large enterprise with numerous creditors and other relationships, AlixPartners is unable to state with certainty that every client relationship or other connection has been disclosed.

23.      AlixPartners received advance retainer payments aggregating to $600,000 (the "**Retainer**").  Pursuant to the Engagement Letter, invoiced amounts have been offset against the Retainer, and payments on the invoices have been used to replenish the Retainer.  During the 90 days prior to the commencement of these chapter 11 cases, the Debtors paid AlixPartners a total of $4,421,389.63, incurred in providing services to the Debtors in contemplation of, and in connection with, prepetition restructuring activities.  AlixPartners' current estimate is that it received unapplied advance payments from the Debtors in excess of prepetition billings of approximately $84,977.46, which is subject to final determination after all prepetition billings and collections are reconciled.

24.      Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the Commencement Date, AlixPartners may have incurred but not billed fees and reimbursable expenses during which relate to the prepetition period.  Approval is sought from this Court for AlixPartners to apply the Retainer to these amounts.  Upon the entry of an order approving the relief sought, the Debtors will not owe AlixPartners any sums for prepetition services.  To the extent AlixPartners incurred any unbilled fees or reimbursable expenses in excess of the Retainer, AlixPartners has agreed not to seek

payment of such amounts and to waive any claim against Debtors for such amounts.  Accordingly,

Debtors do not owe AlixPartners any sums for prepetition services.

26. In accordance with section 504 of the Bankruptcy Code and Bankruptcy Rule 2016,

neither I nor AlixPartners has entered into any agreements, express or implied, with any other party

in interest, including the Debtors, any creditor, or any attorney for such party in interest in these

chapter 11 cases, (a) for the purpose of sharing or fixing fees or other compensation to be paid to

any such party in interest or its attorneys for services rendered in connection therewith, (b) for

payment of such compensation from the assets of the estates in excess of the compensation allowed

by this Court pursuant to the applicable provisions of the Bankruptcy Code, or (c) for payment of

compensation in connection with these chapter 11 cases other than in accordance with the

applicable provisions of the Bankruptcy Code.

26. Accordingly, except as otherwise set forth herein, insofar as I have been able to

determine, none of AlixPartners, I, nor any employee of AlixPartners who will work on the

engagement holds or represents any interest adverse to the Debtors or their estates, and

AlixPartners is a "disinterested person" as that term is defined in section 101(14) of the

Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that AlixPartners

and its professionals and employees who will work on the engagement:

    (a)    are not creditors, equity security holders, or insiders of the Debtors;

    (b)    were not, within two years before the Commencement Date, a director, officer or employee of the Debtors; and

    (c)    do not have an interest materially adverse to the interest of the Debtors' estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

26. If AlixPartners discovers additional information that requires disclosure,

AlixPartners will promptly file a supplemental disclosure with this Court as required by

Bankruptcy Rule 2014.  AlixPartners reserves the right to supplement this Declaration in the event that AlixPartners discovers any facts bearing on matters described in this Declaration regarding AlixPartners' employment by the Debtor.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on FEB 17, 2015

By: _____

Name: Kevin McShea

Title: Managing Director, AlixPartners LLP

## <u>Schedule 1</u>

**Parties in Interest Reviewed for Current Relationships**

# **Interested Parties List**

# DEBTORS AND NONDEBTOR AFFILIATES

**Debtor Entities**

Albatross Holding Company, LLC
Albatross Marketing and Trading, LLC
Altegrity Acquisition Corp.
Altegrity Holding Corp.
Altegrity Risk International LLC
Altegrity Security Consulting, Inc.
Altegrity, Inc.
CVM Solutions, LLC
D, D & C, Inc.
Engenium Corp.
FDC Acquisition, Inc
HireRight Records Services, Inc.
HireRight Solutions, Inc.
HireRight Technologies Group, Inc.
HireRight, Inc.
John D. Cohen, Inc.
KCMS, Inc.
KIA Holding, LLC
Kroll Associates, Inc.
Kroll Background America, Inc.
Kroll Crisis Management Group, Inc.
Kroll Cyber Security, Inc.
Kroll Factual Data, Inc.
Kroll Holdings, Inc.
Kroll Inc.
Kroll Information Assurance, Inc.
Kroll Information Services, Inc.
Kroll International, Inc.
Kroll Ontrack Inc.
Kroll Recovery LLC
Kroll Security Group, Inc.
National Diagnostics, Inc.
Ontrack Data Recovery, Inc.
Personnel Records International, LLC
The Official Information Company
US Investigations Services, LLC
USIS International, Inc.
USIS Worldwide, Inc.

**Nondebtor Affiliates**

964886 Ontario, Inc
CVM Solutions Private Ltd. (India)
Datamine Corp.
DCC Ventures Pte Ltd. (Singapore)
DCC Ventures, Inc.
FPR Ltd.
HireRight Estonia
HireRight Limited (UK)
HireRight Poland Sp.zo.o., ul.
HireRight Powerchex Limited
HireRight SP, LLC (Russia)
HireRight UK Holding Limited
Ibas AS
Ibas Danmark Aps
Ibas Holding AS
Ibas Laboratories AB
IFR Investigative Research, Inc.
K Services De Mexico
KA de Mexico S. de R.L. de C.V.
Kroll Advisory LLC (Russia)
Kroll Associates (Asia) Ltd.
Kroll Associates (Colombia) S.A.
Kroll Associates (India) Private Ltd.
Kroll Associates Brasil Ltda.
Kroll Associates Chile S.A.
Kroll Associates Iberia S.L.
Kroll Associates International Holdings, Inc.
Kroll Associates Philippines, Inc.
Kroll Associates Pte Ltd. (Singapore)
Kroll Associates Pty Ltd. (Australia)
Kroll Associates S.A. (Argentina)
Kroll Associates SA (France)
Kroll Associates SAS France (CARG Co.)
Kroll Associates Srl (Italy)
Kroll Background America
Kroll Background America Corp Canada
Kroll Background America Corp.
Kroll Beijing Business Risk Mgmt.
Kroll Consulting Canada
Kroll Consulting GmbH
Kroll Consultoria de Seguridad y Control de
    Crisis Iberia S.L.
Kroll Emerging Markets

**Nondebtor Affiliates (cont'd)**

Kroll Germany GmbH
Kroll Holdings Ltd. (UK)
Kroll Ontrack (HK) Ltd.
Kroll Ontrack AS (Norway)
Kroll Ontrack Canada Co.
Kroll Ontrack GmbH
Kroll Ontrack GmbH, Zweigniederlassung
    Osterreich
Kroll Ontrack Iberia, S.L.
Kroll Ontrack Legal Technologies Ltd.
Kroll Ontrack Ltd. (Ireland)
Kroll Ontrack Ltd. (UK)
Kroll Ontrack Pty Ltd. (Austria)
Kroll Ontrack S.a.g.l.
Kroll Ontrack s.r.l. (Italy)
Kroll Ontrack Sarl
Kroll Ontrack Singapore Pte
Kroll Ontrack Sp. z.o.o.
L.A.M.B. Acquisition II, Inc.
L.A.M.B. Acquisition, Inc.
Mortgage Information Source, Inc.
Oy Norman Ibas Ab (Finland)
Personnel Risk Management Ltd.
Quorum Acquisition Corp.
Quorum Lanier Philippines, Inc.
Quorum Litigation Services, LLC
Risk Co. B (Philippines)

**Recent Former Affiliates**

Corporate Risk International Ltd.
Corporate Risk International, (Asia) Ltd.
Fact Finders (Singapore) Pte Ltd.
Ibas (Netherlands)
Kroll Associates (South Africa)
Kroll Associates Uruguay SRL
Kroll Buchler Phillips
Kroll Catalyst Partners
Kroll Corporate Finance
Kroll Electronic Recovery, Inc.
Kroll Fact Finders (HK)
Kroll Forensic Accounting Ltd.
Kroll Lindquist Avery
Kroll Restructuring Ltd.
Kroll Restructuring UK LLP
Kroll Security International
Labat-Anderson, Inc.
Nandix
Quality Facts, Inc.
Scientific Testing Labs
TrialGraphix Holdings, Inc.
TrialGraphix, Inc.
US Investigations Services, Professional
    Services Division, Inc.
Vogon (Norway)
Vogon (UK)

1000417752v6

## CURRENT AND RECENT FORMER DIRECTORS AND OFFICERS

| | |
|---|---|
| Adrian Douglas Briscoe | Jay Sheridan |
| Angel Orfano | Jeffrey S. Campbell |
| Anku Undale | Jenifer Deloach |
| Alan Thomas Hartley | Jennifer L. Maddigan |
| Alan Edward Brill | Jeremy C. Wensinger |
| Alexander Lebedev | Jill Putnam |
| Alfred Mockett | John Fennelly |
| Amanda Markwith | Johnny L. Tharp |
| Andrew E. Grimmig | Juan Cruz Amirante |
| Brendan Taylor | Juan Diego Rodriguez |
| Brett Weinblatt | Judy Smith |
| Brian Lapidus | Julian Markby |
| Brian Pierson | Julie G. Richardson |
| Carole Yanofsky | Karen Mennite |
| Charles E. Gottdiener | Keith E. Bernius |
| Christopher P. Halpin | Keith R. Simmons |
| Christopher Ragona | Kristin Nimsger |
| Colum Bancroft | Kunio Sakaide |
| Craig Olsen | Lee Krischbaum |
| Dan Shoemaker | Lian Kim Seng |
| Daniel Karson | Malcolm Draffin |
| Danielle Mumford | Matias Nahon |
| David R. Fontaine | Michael Beane |
| Dean Hager | Michael Logan |
| Debra Horne Davis | Michael Petrullo |
| Dennis Dracup | Nada Al Nasser |
| Donald I. Buzinkai | Nicholas Blank |
| Ellen Abbott | Oyvind Nyland |
| Emanuele Conti | Paul Dujancourt |
| Evgeny Shagarin | Penelope Lepeudry |
| Francis Meyer | Peter Boehret |
| Garrett Norb | R. Davis Noell |
| Garth D. Williams | Rebekah Raymond |
| Gemma Postlethwaite | Reshmi Khurana |
| Grace de la Cruz | Rhonda Freeman |
| Gregg Freeman | Ricaredo Romero |
| Gregory A. Olson | Richard Daily |
| Hans Berg | Robert Brenner |
| Hector Rodriguez | Rod Bazzani |
| Helen Chia | Ronald Willemse |
| Ho Sock Chin | Russ Donnan |
| J. Philip Casey | Sandra de Risio |
| James J. McWeeney | Sandy Yam |
| James Philip Casey | Sharon T. Rowlands |
| Jason Wright | Sreeniva Mudaliar |

Sterling Phillips, Jr.
Steven Girdler
Steven Millington
Steven W. Alesio
Tadashi Kageyama
Teague Ryan
Timothy L. Diehm
Thomas Dahl
Thomas Everett Heath
Todd Johnson
Tom Hartley
Tommy Helsby
Vander Aloisio Giordano
Violet Ho
Vladislav Gussev
Warren Taylor
Yaser Dajani

# SHAREHOLDERS

**Shareholders of Altegrity Holding Corp.**
**5% or greater**
Providence Equity Partners VI L.P.
Providence Equity Partners VI-A L.P.

**Less than 5%**
Randy E. Dobbs
Timothy P. Dowd
Michael G. Fraser
David A. Whitmore
James J. Choi
John E. Moore
Phillip R. Greene
William G. Stewart
David Kaminsky
Paul Raymond Kelly
Teachers Insurance and Annuity Association
    of America
CFIG Ocean Co-Invest SPV, LLC
Bart Witteveen
James Degenstein
Alexander Munro
Michael Beber
Jeffrey S. Campbell
James Philip Casey
Michael Cherkasky
David R. Fontaine
Michael W. John
William C. Mixon

Barbara M. Nieto Revocable Trust, Barbara
Nieto, Trustee
Michael A. Petrullo
Spannare Living Trust, David S. Spannare
    and Rosalind K. Spannare, Trustees
Bette Drury
Beth Hardison
Sherry Stroup
Douglas Steele
Salvatore Fazzolari
Steven Webb
Monica Moore
Thomas Eggenberger
Jon Hemze
Scott Zick
Shane Anderson
DeLonn Crosby
Mark Thompson
Mary Ellen Gowday
Danielle Nast
Michael Santelli
Rolland L. Head
Andre Oberholzer
James McWeeney
Thomas McWeeney
Arthur K. Scott
Sharon Rowlands
Colleen Scully
Philip T. Sweeney
Susan C. Sweeney

# INDENTURE TRUSTEES

Wells Fargo Bank
Wilmington Trust

**INSURERS**

ACE American Insurance Company
Affiliated FM Insurance Company
Aioi Nissay Dowa ins. Co Ltd
American Guarantee & Liability Ins. Co
Arch Insurance Company
AXIS Reinsurance Company (AXIS)
Beazley Insurance Company, Inc.
Continental Casualty Company (CNA)
Darwin Select Ins. Co (AWAC)
Federal Insurance Company (Chubb)
General Casualty Company of Wisconsin
Greenwich Insurance Co (XL)
Illinois Union Insurance Company (ACE)
Ironshore Specialty
Liberty Insurance Corporation
Liberty Mutual Insurance Company
National Union Fire Insurance Co. of PA
Navigators Insurance Company
Nipponkoa Insurance Co. Ltd
North Rock Insurance Co. Ltd. (C N A)
Praetorian Insurance Company
QBE Insurance Corporation
Scottsdale Indemnity Company
US Specialty Insurance Company
Zurich American Insurance Company

## LANDLORDS AND RECENT FORMER LANDLORDS

1100 H Street, LLC c/o R B Properties, Inc.

11301 Lakeline, LP

1255 Collier Investor Group, LLC

153-01 Jamaica Realty LLC, c/o BLDG Management Co., Inc.

1666 Main Street , LLC

1666 N. Main Street LLC

183 Parkline Shopping Center, LP, c/o Ironwood Real Estate Management

311 S. Wacker Building, LLC

3141 Fairview LLC

441 Lexington Avenue Co., LP

475 Sansome, LLC

639 Granite LLC, c/o The Simon Companies, LP

7799 Leesburg Pike, LLLP, c/o Lerner Corporation

80-90 Maiden Lane Del LLC, c/o A.M. Property Holding Corp. II

A & R Katz Management, Inc.

Airpark Nashville, LLC

Alamo Investment Company

Alertus Technologies, LLC

American Chartered Bank

American Sunrise, LLC

American-Asia, Inc.

Archer & Greiner, P.C.

AT Charles Baltimore LLC, c/o Cornerstone Real Estate Advisers LLC

Ballston Gateway AP, LLC, File 1512

Ballston Gateway, LLC c/o American Realty Advisors

Bank of Idaho c/o C&J Kelley LLP

Beacon Center, LLC, c/o Arcis Investments, Inc.

Beretta Investment Group

Boston Federal Associates, c/o Farley White Management Company, LLC

Branch Banking & Trust

Brandywine AI Venture LLC

Brandywine Realty Trust

BRCP Greenwood Corporate Plaza, LLC

Bretwood Centre, LLC c/o CWD Real Estates Investment

Brickyard Ltd. - Riverside

Broadreach Capital Partners, LLC

Buena Park Shopping Center LLC, c/o Triwell Properties Inc.

BWIN Investments, Ltd. d/b/a Woodbridge Phase II.

C & J Kelly LLP c/o Axiom Properties & Development, LLC

C&J Kelly Limited Partnership

C&R 250 Associates, LLC

California State Teachers' Retirement System, c/o Thomas Properties Group, LP

Carrollton Enterprises Associates, LLLP

CB Richard Ellis, Inc.

CBREI, AAF 475 Sansome, LLC

Centerpointe (Fairfax) Holdings LLC, c/o Carr Properties

CESC Commerce Executive Park L.L.C., c/o Vornado/Charles E. Smith L.P.

CFS Partners Limited Partnership

CGC Investments Group, Inc.

Chambers Plaza, LLC Investments c/o Freund Investments

Christina Enterprises, LLC c/o ARZ Management LLC

Citibank

Collier Partners, LLP

Commerce Center TN Tower L.P., c/o Colliers Turley Martin Tucker

Community Work Services

Community Workshops, Inc.

Courtesy/ Katz Limited Partnership & A & R Katz Management, Inc.

Crestway Centre LP

Crossroads S. C. One c/o Brekke Real Estate, Inc.

CT Corporation System

Cumberland Mall

D' Errico Dreeben, LLP

David H. Roberts and Leonard D. Nasatir

David S. Messer, Esq.

DDW Investments c/o David Blood

Donald H. & Shirley Hambey Trust c/o Beacon Associates Real Estate PAM

Eastern Holdings LLC

ECTC1 Limited Partnership
Edgewater Holdings, LLC
EG Ventures, LLC
Engel Realty Company, LLC
Estoril Incorporated
Excelerate Discovery
Fairfield Property Associates LLC c/o Denholtz Management Corp.
FDC Office I, LLC, c/o McWhinney Management Co. LLC
FDC Office II, LLC
FDC Office IV, LLC
Federal Insurance Company
FI Associates, LLC
Formation Data Systems
Fox River Commons Shopping Center LLC
Francisco M. Perez & Associates LLC
G&S Port Chester Unit 4A, LLC
Garrison Orlando Flex Airport, LLC c/o Lincoln Property Company
Gateway South Limited Partnership c/o Hyatt Commercial
Glenmont Commercial Limited Partnership
Glenmont Commercial LP
Gold Coast Development Partners, Inc.
Greenberg Traurig LLP
GSMS 2004-GG2 Hampden Office LLC
GVH (Grove City), LP.
Hagerman & Company, Inc.
Haines Station, LLC
Haynes and Boone, LLP
HBR Realty, LLC
Heidner Property Management Company, Inc.
IF Properties LLC, c/o Diepenbrock & Cotter, LLP
Integrity Management Partners LLC
Internap Network Services Corporation
Iron Mountain Information Management, LLC
Isaacson, Rosenbaum, Woods & Levy, P.C.
Isleta Arenal Partners, LLC, c/o Oak Realty Partners, Inc.
Isom SP, LLC c/o Isom Company
Jabe Ventures, Ltd., c/o International Office Solutions

Jack Arian and Sylvia Arian Inter Vivos Trust c/o Trinity Interests, Inc.
Jack Arian and Sylvia Arian Inter Vivos Trust, c/o The Woodmont Company
JK2 Investments, Inc.
Jones Lang LaSalle Americas, Inc.
K & A Investments, L.P.
K & N Investors c/o Bray & Co. Property Management
Kalifa's Western Wear, Inc.
Kansas Court Associates, LLC
KDPMC, LLC
Khoury & Turk, LLC
Kinsley Equities Limited Partnership
Koll/Per Woodland, LLC, c/o Transwestern
Kraus Development, LLC
L & T Group of Companies, Ltd. D/B/A TSL Plaza
L Street, LLC c\o The Tower Companies
Landmark Loop 820, Ltd. c/o TMC Management Company
LBA IV-PPI, LLC
Liberty Property Limited Partnership
LNR Partners Inc.
Long Ridge Office Portfolio, L.P.
Looney & Grossman LLP
LSOP NJ LLC, c/o Somerset Properties, Inc.
Malouf Lynch Jackson Swinson PC
Mary 1827 Westchester, LLC, c/o Fine Fare
Mary Favalon
Mc Candless Land & Cattle Company, LLC c/o Infinity Commercial Real Estate
McFadden Real Estate LLC
Means-Knaus Partners, L.P.
MEF Realty, LLC, c/o The Muller Company
MEF Realty, LLC/Palms
Merit Partners, LLC
MGT LLC
Mission SanLapas, LLC c/o CityCom Real Estate Services
MJT Investments, LLC
MSWP The Palms, LLC
NBRE 12, LLC
Nirenblatt, Nirenblatt, and Hoffman, LLP
Opus Corporation
Opus Northwest Management, L.L.C.

10

Opus Real Estate MN VIII PW, L.L.C.
Pacifica Lascolinas, L.P.
Penn 800, LLC
Petov, L.P.
Pinnacle Real Estate, Inc.
Property ID Corporation
PS Business Parks, L.P.
PSB 8000 West Park LLC, c/o PS Business Parks, Inc.
R and E Properties, LLC
RAP Management LLC
RB Properties, Inc.
Richard E. Eldred
Rosenberg & Rosenberg, LLP
Sam D. Hodges, III, Esquire
Samson Management, LLC
San Marcos Pavilion, LLC, c/o MS Management
Sandner Commercial Real Estate, Inc.
Sealy Airpark Nashville, LP
Secaucus 300, LLC
Severn Savings Bank, FSB
Standard Bank and Trust Company
STM Learning, Inc.
Stockdale Town Center, LLC, C/o M.D. Atkinson Company, Inc.
Susan Aguirre (Facilities Adm.)
SVHS Management Corp
TAC Holdings, L.P., c/o Percival McGuire Commercial Real Estate

Talcott III Chase Center, LLC
Taylor Financial Group
TDC Park Abbey, LLC c/o The Dilweg Companies
Terramar Retail Centers, LLC
The Donald H. and Shirley Hambey Trust for Hambey's Kings Canyon Road, LLC
The Koll Company
The Merchants National Bank of Sacramento
Third Avenue Business Center, LLC
Third Avenue Tower Owner LLC
Thrivent Financial for Lutherans
Tower 10, LLC
Uni Lex Partners, LLC
United States Government, Department of the Air Force
Vintaco Inc. - GM Plaza Co-Tenancy, c\o Beretta Property Management
W. M. Grace Development Company
William Tom & Gertrude J. Tom Family Trust
Winfield Partners II, LLC, c/o Orbis Properties, LLC
Woodland Layton Offices, LLC
WPP LLC Westport Plaza
WPP LLC, c/o Lodging/Hospitality Management Corporation
Zeller Realty Group

11

# LENDERS AND NOTEHOLDERS

Apollo
Archview
Aristeia
Bank of America
Bank of America Merrill Lynch Proprietary Trading
Barclays Capital, Inc.
Beach Point Capital Management, L.P.
Benefit Street Partners, LLC
BlackRock Advisors, LLC
Capital Research & Management Company (U.S.)
Carlyle Investment Management, LLC
Caspian
Citi
Citigroup Global Markets, Inc.
Credit Suisse
D.E. Shaw & Company, L.P.
Davidson Kempner
Ellis Lake Capital, LLC
Goldman Sachs
Goldman Sachs Asset Management, L.P. (U.S.)
Graham Capital Management, L.P.
Hutchin Hill Capital, L.P.
Intermarket Corporation
Kamunting Street Capital
Kingsland Capital Management, LLC
Knighthead
Litespeed Management, LLC
Macquarie
Magnetar Financial, LLC
Mudrick Capital Management, L.P.
Oaktree Capital Management, L.P.
Onex Credit Partners, LLC
P. Schoenfeld Asset Management, L.P.
Phoenix Investment Adviser, LLC
Providence Equity Partners, Inc.
Redwood Capital Management, LLC
Regiment Capital Advisors
Rimrock Capital Management, LLC
Roystone Capital Management, L.P.
Sentinel Dome Partners
SIX SIS AG
State Street Global Advisors (SSgA)
Third Avenue Management, LLC
Verition Fund Management, LLC

**LITIGANTS**

Antonio Carrilo
Bank Alkhair BSC
Blake Percival
Blanca Watkins
Carla Rawlings
Carrie E. Wirt
Cornelius L. Shaw
Dar Al Arkan Real Estate Development Company
Diane S. Hunter
Dina Dickerson
Eileen Connor
Gail G. Marquette
Heidi Gaiennie
Herman Thibodeaux
I.J. Sherman, Jr.
II City Plaza, LLC
Jackson Allen Pace
Jason Hutchinson
John B. Thibodeaux
Jose Gonzalez
Joseph J. Gomez
Kenneth Bird
Linda Pace
Lynn D. Wiggins
Maria Carrillo
Milford Wampold Support Foundation
Monya Paul
Nolan Gilbert Hutchinson Testamentary Trust
Numa L. Marquette, Jr.
Office of Personnel Management
Patricia T. Thibodeaux
Patricia W. Shaw
Ramona Hunter
Raymond K. Hunter
Shelby B. Ortis
Steven E. Johnson
Teresa Lampke
Thomas Karaniewsky
Tony W. Harper
Wampold & Company, Inc.

## PROFESSIONALS

AlixPartners
Debevoise & Plimpton LLP
Evercore Partners
Goldman Sachs
Houlihan Lokey
Joele Frank, Wilkinson, Brimmer & Katcher
Kirkland & Ellis LLP
Latham & Watkins LLP
Moelis & Company
Paul, Weiss, Rifkind, Wharton & Garrison LLP
PricewaterhouseCoopers LLP
Prime Clerk LLC
Weil, Gotshal & Manges LLP
Wilmer Cutler Pickering Hale and Dorr LLP

# SIGNIFICANT CUSTOMERS

Apple
AT&T
Baker Hughes
Bank of America Corporation
Bank of Toyko – Mitsubishi
Barclays
Bayer
BrightLine GRC, LLC
Caterpillar, Inc.
Chase Bank/Master Bill
CNA
Convergys
Cornerstone Home Lending, Inc.
Department of Homeland Security
Department of Justice
Education Management Corporation
Fairway Independent Mortgage Corporation
First Group
Freddie Mac
Goldman, Sachs & Co.
Great West
HSBC
JP Morgan Chase & Co.
KKR & Co. LP
Lloyds
LS
Network Appliance
Novartis Pharma
Paychex
Primelending
Royal Bank of Scotland
Sprint
State Street
Tenet
Third Security, LLC
United Parcel Service
United States Government
Waterstone Mtg. Corp.

# SIGNIFICANT VENDORS

7799 Leesburg Pike LP
Accusearch, Inc.
Aegis USA Inc.
Aetna - Middletown
American Driving Records Inc.
Bank of America Card Services
Capgemini US LLC
CDW LLC
Connecting Point
Corelogic Consumer Services, Inc.
Datalink Corporation
Dell Financial Services
Dept. of Highway Safety & Motor Vehicles
Direct Technologies, Inc.
Driasi
Equifax Credit Information Service
Experian
Fannie Mae – Customer Tech Services
FDC Office IV, LLC
FIA Card Services NA
Gelco dba GE Fleet Services
Georgia Technology Authority
Illinois Secretary of State Audit Division
Insight Corporate Solutions
Insight Direct USA, Inc.
Internal Revenue Services
Labcorp
Lexis-Nexis
Microsoft Corporation
Microsoft Services
Mississippi Interactive LLC
MVR's, Inc.
National Information Consortium
  Technology
National Student Clearinghouse
Netforce Global LLC
Next Generation Enrollment, Inc.
NICUSA-Oklahoma Information Division
Nightowl Document
NYS Office of Court Administration
O'Melveny & Myers LLP
Payflex Systems USA Inc.
Pennsylvania Interactive LLC
Quest Diagnostics
Salesforce.com Inc.

Sheppard Mullin Richter & Hampton
TALX Corp. - The Work Number
Texas Department of Public Safety
The Goyak Group
Three Deep, Inc.
Trans Union Corporation
Trust Department Texas Funds
US Office of Personnel Management –
  Federal Investigation Services
USIS LLC Health Plan Veba
Verizon Wireless
Williams & Connolly LLP

## UNITED STATES TRUSTEE AND BANKRUPTCY JUDGES FOR
## THE DISTRICT OF DELAWARE (AND KEY STAFF MEMBERS)

Benjamin Hackman
Brendan L. Shannon
Christine Green
Christopher S. Sontchi
David Buchbinder
David D. Bird
Diane Giordano
Dion Wynn
James R. O'Malley
Jane Leamy
Jeffrey Heck
Juliet Sarkessian
Lauren Attix
Laurie Selber Silverstein
Kevin Gross
Kevin J. Carey
Mark Kenney
Mary F. Walrath
Michael Panacio
Michael West
Ramona Vinson
Richard Schepacarter
Shakima L. Dortch
T. Patrick Tinker
Tiiara Patton
Timothy J. Fox, Jr.
Tony Murray