# Exhibit 11

<center>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

</center>

------------------------------------------------------x
                     :

| | |
|---|---|
| **In re** : | **Chapter 11** |
| : | |
| **BASIC ENERGY** : | **Case No. 16-_____ (___)** |
| **SERVICES, INC.,** *et al.*, : | |
| : | **Joint Administration Requested** |
| **Debtors.**[1] : | |
| : | |

------------------------------------------------------x

<center>

**DECLARATION OF DAVID C. JOHNSTON IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND RELATED REQUESTS FOR RELIEF**

</center>

       I, David C. Johnston, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

       1.      I am a Managing Director in the Turnaround and Restructuring Services Group at AP Services, LLC ("*AP Services*"), an affiliate of AlixPartners, LLP.  Since August 2016, I have been advising Basic Energy Services, Inc. ("*Basic Parent*"), the publicly-traded parent company of each of the other above-captioned debtors (collectively, the "*Debtors*" or "*Basic*").  In my capacity as Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, books and records, and business and financial affairs.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

2.      I have over 18 years of experience in the restructuring and turnaround

management industry and have successfully led the restructurings of a variety of businesses,

including energy businesses.  My prior energy-related engagements include Metrofuel Oil Corp.,

PostRock, Linn Energy, Calpine Corp., Calpine Canada, Sem Canada, Biofuel Energy, Metro

Energy, AxeonSP, and LCRA.

3.      I submit this declaration (this "**Declaration**") to assist the Court and other

parties in interest in understanding the circumstances that compelled the commencement of these

Chapter 11 Cases (these "**Chapter 11 Cases**") and in support of (i) the Debtors' voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

**Code**") filed with the United States Bankruptcy Court for the District of Delaware (the

"**Bankruptcy Court**") on the date hereof (the "**Petition Date**") and (ii) the request for related

relief, in the form of motions and applications that the Debtors have filed with the Court (the

"**First Day Papers**").

4.      The First Day Papers seek relief intended to preserve the value of the

Debtors and maintain continuity of operations by, among other things, (i) preserving the

Debtors' relationships with their customers, vendors, suppliers, and employees; (ii) ensuring

continued employee morale; (iii) providing access to postpetition financing and use of cash

collateral; (iv) maintaining the Debtors' cash management systems and other business operations

without interruption; and (v) establishing certain administrative procedures to facilitate an

orderly transition into, and uninterrupted operations throughout, these Chapter 11 Cases.  This

relief is critical to the Debtors' restructuring efforts and, without it, the Debtors' businesses

would suffer immediate and irreparable harm.

WEIL:\95879425\17\22010.0003

5.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with the members of the Debtors' senior management, information provided to me by employees working under my supervision or the Debtors' professional advisors Weil, Gotshal & Manges LLP ("**Weil**"), as legal restructuring counsel, and Moelis & Company LLC ("**Moelis**"), as investment banker, and other representatives of AP Services, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the oilfield services industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

# I.

## Overview[2]

6.      Like many of its customers and peers in the oil and gas industry, Basic has suffered from the dramatic and persistent drop in oil prices that began in 2014.  As prices tumbled and stayed low, many exploration and production companies ("**E&P Companies**") hunkered down to ride out the market by significantly cutting capital and operating expenditures, and others simply succumbed to liquidation.  Companies, like Basic, that provide services to distressed E&P Companies are feeling the ripple effects of the drastically decreased spending on well development and maintenance in their top line revenues and EBITDA.  As a result, Basic, like many of its peers, is seeking to restructure its obligations to ensure its long-term survival and competitiveness.

7.      Today, Basic commenced these cases to implement through a chapter 11 proceeding a fully negotiated, comprehensive, consensual restructuring proposal (the

---

[2] Capitalized terms used but not defined shall have the meaning subsequently ascribed to them in this Declaration.

3

"**Restructuring**") of its balance sheet that will provide it the deleveraging it needs, and the additional capital it needs, to help position it to survive an extended market downturn, exploit potential consolidation and growth opportunities in the future, and continue to provide its customers with the high-quality, dependable services that are its hallmark.

8.      Under the terms of the Restructuring, which are set forth in greater detail in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Basic Energy Services, Inc. and its Affiliated Debtors* (the "**Prepackaged Plan**"), which was filed contemporaneously herewith, Basic will meaningfully deleverage its balance sheet by equitizing all $824.6 million of its unsecured bond obligations and substantially bolster its liquidity position through a $125 million rights offering of mandatorily convertible debt, to be backstopped by certain unsecured noteholders.  Certain of Basic's prepetition secured term loan lenders and unsecured bondholders have also agreed, subject to the Court's approval, to provide a $90 million debtor-in-possession credit facility (the "**DIP Financing**") to help fund the costs of the Restructuring.

9.      The effect of the restructuring on the Debtors' capital structure is summarized as follows:

| Current | Reorganized |
| --- | --- |
| $100 million Secured ABL Facility with $100 L/C Facility Sublimit, under which approximately $51 million in undrawn L/C's have been issued and no other amounts are outstanding[3] | Amended and Restated or otherwise treated in a manner acceptable to the ABL Lenders |
| $165 million Secured Term Loan | Amended and Restated |
| $475 million Senior Notes due 2019 | Reorganized Basic Common Equity and subscription rights for eligible holders to participate in a Rights Offering for $125 million in New Convertible Notes |
| $300 million Senior Notes due 2022 | |

[3] Figure is as of September 30, 2016.

4

| $78.5 million in Capital Leases[4] | Assumed/Unimpaired |
| Basic Parent Common Equity | Reorganized Basic Common Equity & Warrants |

10.     Basic's creditors throughout its capital structure overwhelmingly support the Restructuring.  Pursuant to the Restructuring Support Agreement annexed hereto at **Exhibit A** (as amended from time to time and including all exhibits thereto, the "***RSA***"), 100% of Basic's prepetition secured term loan lenders and the holders of over 80% of unsecured 2019 Notes and 2022 Notes (collectively, the "***Required Restructuring Support Parties***"), have agreed, subject to the terms and conditions of the RSA, to vote in favor of the Prepackaged Plan. Moreover, Basic has kept its prepetition secured ABL Lenders involved in negotiations regarding the terms of the Prepackaged Plan and DIP Financing.

11.     To reap the full benefits of the Restructuring, the Debtors must exit these Chapter 11 Cases quickly.  The Debtors have agreed under the RSA to use reasonable best efforts to meet certain milestones for the restructuring process set forth in the RSA, including that confirmation of the Prepackaged Plan occurs no later than seventy-five (75) days after the Petition Date, and that the Prepackaged Plan becomes effective no later than ninety (90) days after the Petition Date.  To meet these deadlines, the Debtors have proposed the following timetable for the Restructuring:

| Proposed Timetable | |
| --- | --- |
| Voting Record Date | October 11, 2016 |
| Commencement of Solicitation | October 24, 2016 |
| Petition Date | October 25, 2016 |
| Mailing of Combined Notice | October 27, 2016 |
| Rights Offering Record Date and | October 27, 2016 |

[4] Figure is as of September 30, 2016.

5

| Rights Offering Launch Date | |
|---|---|
| Plan Supplement Filing Deadline | November 22, 2016 |
| Objection Deadline | November 28, 2016 at 4:00 p.m. (Prevailing Eastern Time) |
| Plan Voting Deadline and Rights Expiration Time | November 29, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Reply Date (if any) | December 5, 2016, at 5:00 p.m. (Prevailing Eastern Time) |
| Combined Hearing | December 7, 2016, at 10:00 a.m. (Prevailing Eastern Time) |

12.     In keeping with the desire to limit the length of these Chapter 11 Cases, the Debtors began soliciting votes on the Prepackaged Plan before filing their chapter 11 petitions for relief.  On October 24, 2016, the Debtors served the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and Its Affiliated Debtors* (the "***Disclosure Statement***") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code on holders of impaired claims entitled to vote and have requested the voting creditors to submit their ballots after the Petition Date, by the voting deadline of November 29, 2016, at 5:00 p.m. (Prevailing Eastern Time).  The Debtors expect that the votes tabulated and received from the voting creditors will, consistent with the RSA, overwhelmingly support confirmation of the Prepackaged Plan.

WEIL:\95879425\17\22010.0003

## II.

## Background

### A.    Corporate History and Structure

13.    Since the incorporation of Basic Parent in 1992, the Company has grown through both the strategic acquisition of other businesses and the organic expansion of its fleet of equipment.  The various businesses acquired were either absorbed as new subsidiaries of Basic Parent or merged with existing subsidiaries.  Other than Basic Energy Services L.P. ("**BES**") and Taylor Industries, LLC ("**Taylor**"), all other Debtor entities are remnants of these prior acquisitions and mergers and are shell entities with no material assets.  A diagram that reflects the Debtors' current corporate structure is annexed hereto as **Exhibit B**.

### B.    Key Assets and Operations

14.    Basic, which is headquartered in Fort Worth, Texas, provides high-quality, dependable well site services to over 2,000 land-based oil and natural gas producing companies throughout the United States.  It services geographic areas with over 800,000 active hydrocarbon wells, and its customers include both major E&P Companies and small, independent E&P Companies that in the aggregate produce a significant amount of the oil and gas in the United States.

15.    Basic's footprint spans the heartland of domestic onshore production; it operates in six geomarkets:  (i) the Texas Gulf Coast region, (ii) the Central region (consisting of the Mid-Continent and Ark-La-Tex regions), (iii) the Permian Basin of West Texas, (iv) California, (v) the Appalachian region, and (vi) the Rocky Mountains.  The geographical spread of Basic's operations is reflected in the following graphic:

**Basic Operating Footprint**



16.      Basic holds a leading position in the nation's most active and resilient

energy-producing regions, the most significant of which is the Permian Basin.  The Permian

Basin provides more than 45% of Basic's current revenue stream and is the region where more

than 40% of all U.S. land drilling rigs are located.  The following chart depicts the revenue Basic

generated by geography for the fiscal year ended December 31, 2015:



17.      The day-to-day operations and business of Basic are principally conducted

through BES and Taylor.  BES is responsible for providing the majority of services offered by

8

the Debtors in all four of its operating segments and employs over 3,500 individuals. Taylor is an original equipment manufacturer ("**OEM**") and derives its revenues from sales of OEM equipment, parts, and related maintenance services provided to BES and third parties. Taylor employs approximately 43 individuals. Aside from BES and Taylor, none of the other Debtors engage in any day-to-day operating activities or employ any individuals.

18.     The company maintains a leadership position within its core operating regions by differentiating itself from its peers through its decentralized operations. Its operations are managed locally by experienced leaders with intimate knowledge of customers' specific needs, which enables it to respond quickly to customers' concerns. Basic's operations are regionally managed from over 100 locations (the "**Operational Yards**") located in Texas, New Mexico, Oklahoma, Arkansas, Kansas, Louisiana, Wyoming, North Dakota, Colorado, Utah, Montana, West Virginia, California, Ohio, and Pennsylvania. From these Operational Yards, it provides services to customers in all 48 contiguous states.

19.     Basic serves as a "one stop shop" for all its customer's needs from the beginning to the end of a well's life cycle through its four business segments, each of which is discussed in more detail below: (i) completion and remedial services, (ii) fluid services, (iii) well servicing, and (iv) contract drilling.

20.     The majority of Basic's revenues are earned through servicing the productive life of a well, as opposed to through contract drilling, which makes Basic's businesses and income stream more stable than some of its peers. For the twelve months ended December 31, 2015, Basic's revenues were $805.6 million and were attributable to its various business segments as follows: (i) approximately 38% to completion and remedial services, (ii) approximately 32% to fluid services, (iii) approximately 27% to well servicing, and

(iv) approximately 3% to contract drilling.  The following graphic depicts the revenues Basic generated by business segment in 2015:



### i.  **Completion and Remedial Services**

21.    The Debtors' completion and remedial services segment engages in "well completion," which are services designed to stimulate safe and efficient production from an oil or gas well after initial drilling operations have been completed, and "remediation," which are services designed to repair leaks and close non-productive perforations in well casings, and ultimately plug the well at the end of its productive life.  The Debtors' completion and remedial services segment operates a fleet of pumping units, an array of specialized rental equipment and fishing tools, coiled tubing units, snubbing units, thru-tubing, air compressor packages specially configured for underbalanced drilling operations, cased-hole wireline units, and nitrogen units. The largest portion of this business segment consists of pumping services focused on cementing, acidizing and fracturing services in niche markets.

### ii.  **Fluid Services**

22.    The Debtors' fluid services segment utilizes a fleet of 972 fluid service trucks (as of September 2016) and related assets, including specialized tank trucks, storage tanks, water wells, disposal facilities, water treatment and construction and other related equipment. These assets provide, transport, store and dispose of a variety of fluids, as well as provide well

10

site construction and maintenance services.  These services are required in most workover, completion and remedial projects and are routinely used in daily producing well operations.

23.     The Debtors' fluid services business comprises the sale, transportation, storage and disposal of fluids used in fracturing, workover and drilling activity as well as produced water, and is the most stable of the Debtors' businesses.  A significant part of Basic's activities involves its saltwater disposal network, which includes eighty-five (85) salt-water disposal sites, one of the largest saltwater disposal networks in the country.  The company's focus on produced water hauling and on anchoring its fleet around an extensive saltwater disposal well network has helped it to sustain its utilization levels while keeping a low cost structure.  This low cost structure, combined with more stable utilization rates, has equated to improved market share in the currently depressed industry cycle.  Basic's best performing market for fluid services last year was the Permian Basin—a region with high produced water volumes and attractive economics—where it maintains one of the highest numbers of saltwater disposal wells in the market.

### iii.   **Well Servicing**

24.     The Debtors' well servicing segment operates a fleet of 421 well servicing rigs (as of September 2016) and related equipment— one of the largest in the nation.  This business segment encompasses a full range of services performed with a mobile well servicing rig, including the installation and removal of downhole equipment and elimination of obstructions in the well bore to facilitate the flow of oil and natural gas.  These services are performed to establish, maintain and improve production throughout the productive life of an oil and natural gas well and to plug and abandon a well at the end of its productive life.  The Debtors' well servicing equipment and capabilities also facilitate most other services performed on a well.

11

25.     Basic's network of over forty (40) well servicing yards are strategically located nationwide where activity is greatest, enabling the company to keep transportation costs low and its equipment readily available to meet its customers' needs.  Additionally, with Basic's wholly owned subsidiary Taylor, it has the ability to build any type of well servicing rig, including fit-for-purpose rigs that may be needed for large completion jobs.

### iv.  Contract Drilling

26.     The Debtors' contract drilling segment operates a fleet of twelve (12) drilling rigs and related equipment.  The Debtors use these assets to penetrate the earth to a desired depth and initiate production from a well.

### III.

### Capital Structure and Prepetition Indebtedness

### A.    Equity Ownership

27.     Basic Parent was organized as a Delaware corporation in 1992 under the name Sierra Well Service, Inc., and changed to its current name in 2000.  Basic Parent was first listed on the New York Stock Exchange ("***NYSE***") on December 9, 2005.  Basic Parent files annual reports with, and furnishes other information to, the SEC.  Shares of common stock of Basic Parent are traded on the NYSE under the symbol "BAS."  As of the date hereof, Basic Parent had 42,758,940 issued and outstanding shares of common stock.  All other Debtors are 100 percent owned either directly or indirectly by Basic Parent.

28.     On August 19, 2016, Basic Parent received written notice (the "***NYSE Notice***") from the NYSE that Basic Parent did not presently satisfy the NYSE's continued listing

12

standards.[5]  Upon filing the Prepackaged Plan, the NYSE will have broad discretion to suspend trading in Basic Parent's shares and commence delisting proceedings.  As a part of the Restructuring, Basic Parent has agreed to use its reasonable best efforts to list the New Common Shares on a nationally recognized exchange as soon as practicable subject to meeting the applicable listing requirements following the Effective Date.

### B.    Prepetition Indebtedness

29.    As of the date hereof, the Debtors' significant prepetition indebtedness is approximately $1.1 billion, which includes secured financing obligations in the principal amount of approximately $164.175 million, contingent letter of credit exposure in the approximate amount of $51 million, unsecured financing obligations in the principal amount of approximately $775 million, and capital lease obligations in the principal amount of approximately $78.5 million.

### i.  Secured ABL Credit Facility

30.    The Debtors are party to that certain Amended and Restated Credit Agreement, dated as of November 26, 2014, by and among Basic Parent, as the borrower, the guarantors named therein, Bank of America, N.A., as administrative agent, swing line lender, and L/C issuer, Wells Fargo Bank, N.A., as syndication agent, Capital One, National Association, as documentation agent and L/C issuer, and other lender parties listed therein (collectively, the "***ABL Lenders***"), as amended, modified, or otherwise supplemented from time

---

[5] The NYSE continued listing standards (i) prohibit Basic Parent's average global market capitalization over a consecutive thirty-day trading period from being less than $50 million at the same time its stockholders' equity is less than $50 million; and (ii) requires the average closing price of Basic Parent's common shares to be at least $1.00 per share over a consecutive thirty day trading-day period.  As of August 18, 2016, the NYSE noted that (i) the average market capitalization of Basic Parent over the preceding thirty trading-day period was approximately $41.7 million and the last reported stockholders' deficit was approximately ($62.4) million as of June 30, 2016, and (ii) the average closing price of Basic Parent's common shares over the preceding thirty trading-day period was $0.98 per share.

13

to time (the "*ABL Credit Agreement*") and under which Basic Parent received a $300 million revolving credit facility, including a letter of credit sublimit in an equal amount and a swing line sublimit in an aggregate amount of up to $10 million (the "*ABL Facility*").  The ABL Credit Agreement was subsequently amended on April 21, 2015, to reduce the maximum aggregate commitments thereunder from $300 million to $250 million.

31.     In connection with the closing of the Term Loan, which occurred on February 26, 2016, Basic Parent entered into a further amendment to the ABL Credit Agreement that, among other things, further reduced the maximum aggregate commitments thereunder from $250 million to $100 million.  The ABL Credit Agreement has a maturity date of November 26, 2019 with a springing maturity of August 17, 2018 if the Debtors are unable to refinance the 2019 Notes (as defined below) by August 17, 2018.  As of the date hereof, the Debtors had approximately $51 million in letters of credit issued under the ABL Credit Agreement but no borrowings outstanding under the ABL Facility.

32.     The obligations of the Debtors under the ABL Credit Agreement are secured pursuant to that certain Second Amended and Restated Security Agreement dated as of February 26, 2016 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "*ABL Security Agreement*").  Pursuant to the ABL Security Agreement, the Debtors each granted a security interest in the ABL Facility Priority Collateral, as that term is defined in the Intercreditor Agreement (as defined below).  The ABL Facility Priority Collateral includes, among other things, the Debtors' right, title, and interest in certain cash, deposit accounts, and receivables—other than certain deposit accounts that contain only the proceeds of the Term Loan Priority Collateral or the proceeds of the Term Loan.

### ii.  The Secured Term Loan

33.    The Debtors are party to that certain Term Loan Agreement, dated as of February 17, 2016, by and among Basic Parent as Borrower, the guarantors named therein, U.S. Bank National Association, as Administrative Agent, and the lenders party thereto (collectively, the "***Term Loan Lenders***") (as amended, modified, or otherwise supplemented from time to time "***Term Loan Agreement***"), pursuant to which the Term Loan Lenders agreed to make a term loan (the "***Term Loan***") to Basic Parent comprised of: (i) a $165 million term loan, the proceeds of which were deposited into the Escrow Account and subject to the terms of the Escrow Agreement (as each is defined in the Term Loan Agreement) on February 26, 2016, and (ii) up to an additional $15 million delayed draw facility available upon the satisfaction of certain conditions precedent, which conditions were not satisfied as of the Petition Date.  The Term Loan has a maturity date of February 26, 2021 with a springing maturity of November 17, 2018 if the Debtors are unable complete an acceptable refinancing of the 2019 Notes by November 17, 2018.  As of the date hereof, the aggregate amount outstanding under the Term Loan Agreement is $164.175 million in unpaid principal, plus interest, fees, and other expenses.[6]

34.    The obligations of the Debtors under the Term Loan Agreement are secured pursuant to that certain Security Agreement, dated as of February 26, 2016 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "***Term Loan Security Agreement***").  Pursuant to the Term Loan Security Agreement and certain other local

---

[6] As of the Petition Date, approximately $20.3 million in proceeds from the Term Loan remain in the Escrow Account due to the failure of the Debtors to satisfy certain perfection requirements related to the Term Loan collateral that are set forth in the Escrow Agreement.  Furthermore, the Debtors' failure to make the interest payment due on August 15, 2016 under the 2019 Notes Indenture constituted a default under the Term Loan Credit Agreement, and under the terms of the Escrow Agreement no funds held in the Escrow Account may be released to the Debtors if a default has occurred and is continuing under the Term Loan Credit Agreement.  In addition, the commencement of these Chapter 11 Cases triggered a make-whole premium (the "***Make-Whole***") under the Term Loan Agreement of $58 million.  However, as discussed below, the Term Loan Lenders have agreed to forego payment of that amount under the Prepackaged Plan.

law collateral agreements, the Debtors each granted a first priority lien on and security interest in

the Term Loan Priority Collateral (as that term is defined in the Intercreditor Agreement) and a

second priority lien on and security interest in the ABL Facility Priority Collateral.  The Term

Loan Priority Collateral includes, subject to certain exclusions, substantially all the property of

the Debtors including equipment, fixtures, goods, inventory, real property, intellectual property,

and all other property other than the ABL Facility Priority Collateral.

### iii.  Secured Creditor Intercreditor Agreement

35.    The rights of the Term Loan Lenders and the ABL Lenders with respect to

their shared collateral are governed by that certain Intercreditor Agreement dated as of February

26, 2016, by and among Bank of America, N.A., as administrative agent under the ABL Credit

Agreement, U.S. Bank National Association, as administrative agent under the Term Loan Credit

Agreement and the Debtors (as amended, restated, supplemented, waived or otherwise modified

from time to time, the "***Intercreditor Agreement***").

36.    The Intercreditor Agreement governs, among other things, the priority of

distribution of property pledged as collateral under each of the Term Loan Agreement and the

ABL Credit Agreement.  In accordance with the Intercreditor Agreement: (i) the ABL Lenders

are afforded first priority with respect to ABL Facility Priority Collateral; and (ii) the Term Loan

Lenders are afforded second priority with respect to the ABL Facility Priority Collateral and first

priority with respect to the Term Loan Priority Collateral.

### iv.  7.75% Senior Unsecured Notes due 2019

37.    The Debtors are party to that certain Indenture (the "***2019 Notes***

***Indenture***"), dated as of February 15, 2011, by and among Basic Parent, as issuer, each of the

guarantors named therein, and Wilmington Trust, N.A. (as successor to Wells Fargo Bank,

N.A.), as trustee, as amended, modified, or otherwise supplemented pursuant to which Basic

WEIL:\95879425\17\22010.0003

Parent issued 7.75% Senior Unsecured Notes due 2019 in the aggregate principal amount of

$275 million (the "*Initial 2019 Notes*").  The Initial 2019 Notes were issued at par and mature on

February 15, 2019.  On June 13, 2011, the Debtors issued additional 2019 Notes (the "*Additional*

*2019 Notes*" and, collectively with the Initial 2019 Notes, the "*2019 Notes*" and the holders of

such notes, the "*2019 Noteholders*") pursuant to the 2019 Notes Indenture in the aggregate

principal amount of $200 million.  The Additional 2019 Notes were issued at 101% of their

principal amount, plus accrued interest from February 15, 2011, and mature on February 15,

2019.  The Additional Notes are identical to and are treated together with the Initial 2019 Notes

as a single class of debt securities under the 2019 Notes Indenture.

38.     Interest on the 2019 Notes is payable semi-annually in arrears on February

15 and August 15 of each year.  As of the date hereof, the aggregate amount outstanding under

the 2019 Notes is approximately $475 million in unpaid principal and approximately $25.8

million in unpaid interest.

### v.   7.75% Senior Unsecured Notes due 2022

39.     The Debtors are party to that certain Indenture (the "*2022 Notes*

*Indenture*"), dated as of October 16, 2012, by and among Basic Parent, as issuer, each of the

guarantors named therein, and Wilmington Trust, N.A. (as successor to Wells Fargo Bank,

N.A.), as trustee, as amended, modified, or otherwise supplemented, pursuant to which Basic

Parent issued 7.75% Senior Unsecured Notes due 2022 in the aggregate principal amount of

$300 million (the "*2022 Notes*" and the holders of such notes, the "*2022 Noteholders*").  The

2022 Notes were issued at par and mature on October 15, 2022.

40.     Interest on the 2022 Notes is payable semi-annually in arrears on April 15

and October 15 of each year.  As of the date hereof, the aggregate amount outstanding under the

2022 Notes is approximately $300 million in unpaid principal and approximately $12.3 million in unpaid interest.

### vi. Capital Lease Obligations

41.     As of the date hereof, the Debtors estimate they have approximately $78.5 million in outstanding capital lease obligations in connection with various specialized equipment.

### IV.

### Events Leading to Chapter 11

### A.    The Sustained Drop in Oil & Gas Prices

42.     The oil and gas industry has been in one of the longest, steepest and most sustained declines in oil and gas prices in recent history.  This decline has led E&P Companies, whose businesses are directly impacted by price swings in commodities, to sizably reduce their capital and operating expenditures relating to hydrocarbon production and drilling activities.  As a result, numerous North American oilfield services companies, whose businesses are dependent on the spending of E&P Companies have filed bankruptcy proceedings during 2015 and 2016.

43.     Basic's businesses are geographically diverse and primarily focus on maintaining and increasing the productive capacity of existing wells.  Thus, it is better able to withstand the significant decrease in activity in the E&P sector than many of its peers, Basic is not immune to the effects of the larger industry downturn.  From June 2014, at the inception of the downturn, the company's revenues have dropped by more than 50% and its EBITDA has dropped to negative levels.

### B.    The Company Responds to the Market Downturn

44.     The Debtors have implemented various cost-cutting measures to adjust to the market downturn and corresponding pressure placed on its margins.  Specifically, over the

course of 2015, Basic initiated plans to deal with the diminished level of customer activity by

reducing its capital expenditures to from $75.2 million in 2014 to a projected $40 million in

2016, scaling down operations to fit cash flow, stacking equipment with higher operating costs,

and preserving liquidity by postponing asset acquisitions.  In addition, Basic exited markets

where margins fell below levels that justified current sustaining capital expenditures and worked

with its vendors and suppliers to lower input costs.  The company also implemented across-the-

board salary and wage reductions, and cut its workforce by over 30% in comparison to its 2014

workforce levels.

45.     These cost-cutting measures, however, did not fully offset Basic's lower

revenues and the company continued to deplete its cash reserves.  By the end of 2015, Basic

realized that it would need to seek additional financing to be able to either (i) ride out the

downturn, if a recovery took hold in the near-term, or (ii) provide it enough runway to negotiate

a deleveraging transaction, if no near-term recovery materialized.  It determined that its balance

sheet, which consisted primarily of the unsecured 2019 Notes and 2022 Notes at that time, could

support an additional loan secured by substantially all its existing assets.

46.     After a marketing process that yielded few lenders willing to provide the

company financing on commercially sustainable terms, the Debtors were able to negotiate and

enter into the Term Loan with the Term Loan Lenders.  The Term Loan was the product of arm's

length negotiations between the Debtors and the Term Loan Lenders.

47.     Oil prices did not sufficiently rebound in 2016 to turn around the Debtors'

business, and the Company has now run out of available financing options.  With no clear timing

for a recovery on the horizon, the Debtors have determined that surviving through the downturn

would require both a significant deleveraging of its capital structure and an infusion of additional

19

capital. Several of Basic's competitors have completed or are implementing deleveraging transactions in chapter 11 to remain competitive. To ensure that Basic can continue to compete successfully against its substantially deleveraged peers, it will similarly need to right-size its balance sheet. Basic will also need to raise additional capital to support its negative EBITDA while a recovery takes hold and provide it the funds it needs to exploit opportunities to consolidate its weaker peers.

## C.      Negotiations with Stakeholders

48.      Although the Debtors have historically maintained operations at profitable levels, the significant decline in oil prices and the resulting decrease in demand for oil and gas services referred to above have cast uncertainty on the viability of the Debtors' current capital structure going forward. Moreover, several of Basic's competitors have deleveraged their own balance sheets through chapter 11 processes, thus forcing even solvent companies to explore similar options to remain competitive moving forward.

49.      In light of these circumstances, the Debtors engaged Weil as legal restructuring counsel and Moelis as a financial advisor to work with Basic Parent's management to evaluate strategic deleveraging options and to engage key debtholders and their advisers in good faith negotiations to explore a possible restructuring and assist in implementing the Restructuring. The Debtors subsequently engaged AP Services, LLC as restructuring advisors and to assist them with operating during bankruptcy.

50.      In the spring of 2016, the Debtors initiated discussions with an ad hoc group (the "*Ad Hoc Group*") of certain of the 2019 Noteholders and 2022 Noteholders (collectively, the "*Noteholders*"), which at that time was comprised of members Ascribe Capital, LLC, Brigade Capital Management, LLC, and Silver Point Capital, L.P. The Ad Hoc Group

20

engaged Fried, Frank, Harris, Shriver & Jacobson LLP as its legal counsel and GLC Advisors & Co., LLC as its financial advisor.

51.     For several months, the Debtors and the Ad Hoc Group discussed the potential contours of an out-of-court restructuring.  During the course of these discussions, it became clear to both the Debtors and the Ad Hoc Group that the substantial deleveraging both parties sought would most effectively be accomplished through an in-court transaction.  Accordingly, beginning early in the summer of 2016, the Debtors, the Ad Hoc Group, and the Term Loan Lenders began negotiations regarding the terms of a chapter 11 restructuring, with a fully consensual prepackaged plan as the ultimate goal.

52.     In June 2016, the Board of Directors of Basic Parent (the "**Board**") appointed a special restructuring committee (the "**Restructuring Committee**") to explore various restructuring alternatives and to monitor the negotiations between Basic's management team and advisors, on the one hand, and the Term Loan Lenders and Ad Hoc Group and their respective advisors on the other hand.  In the months leading up to the signing of the Restructuring Support Agreement, the Restructuring Committee met almost every week to consider proposals received from the Ad Hoc Group and the Term Loan Lenders, authorize Basic's counterproposals and discuss updates and general restructuring strategy and considerations.  Likewise, the Board also met periodically to consider the various proposals and counterproposals presented, the recommendations of the Restructuring Committee, and other related matters.  These matters included the decision of whether to make an interest payment due on August 15, 2016 to the 2019 Noteholders or not make the payment and utilize the 30-day grace period under the 2019 Notes Indenture to provide additional time to negotiate a chapter 11 restructuring with its creditors.

WEIL:\95879425\17\22010.0003

D.    **Negotiation of Forbearance and Waivers**

53.    On August 15, 2016, to preserve liquidity and provide additional time for

the parties to progress in negotiations, the Board elected to utilize a 30-day grace period with

respect to, and not to make, the interest payment due under the 2019 Notes Indenture of

approximately $18.4 million.  On September 13, 2016, before the expiration of the 2019 Grace

Period, the Debtors entered into a forbearance agreement with holders of 81% of the 2019 Notes

(the "***Forbearance Agreement***").  Under the Forbearance Period, such holders of 2019 Notes

agreed to forbear from exercising their rights and remedies relating to the non-payment of

interest, including the right to accelerate any indebtedness, through September 28, 2016.

54.    In conjunction with the Forbearance Agreement, the Term Loan Lenders

and the ABL Lenders agreed to provide temporary waivers of certain and future defaults related,

in part, to the missed interest payment, and a potential breach of a minimum liquidity covenant

under the Term Loan Agreement, through September 28, 2016.  The purpose of the Forbearance

Agreement and the temporary waivers was to provide the Debtors with additional flexibility to

continue discussions with their creditors and to pursue the Restructuring.

55.    On September 28, 2016, the Debtors and holders of over 81% of the 2019

Notes agreed to extend the Forbearance Period through October 16, 2016.  The Term Loan

Lenders and the ABL Lenders also agreed to provide extensions of the waivers provided on

September 28, 2016 through October 16, 2016.  Subsequently, to provide the Debtors with

additional time to finalize the documentation of the Restructuring, the Debtors reached an

agreement with holders of over 81% of the 2019 Notes to further extend the Forbearance

Agreement by eight days, through October 24, 2016, subject to certain terms and conditions

(including the extension of the Forbearance Extension Period by Term Loan Lenders and ABL

Lenders) (the "***Additional Extension Period***").  The Term Loan Lenders and the ABL Lenders

22

also agreed to provide an extension of their temporary waivers through the Additional Extension Period.

E.    **The Terms of the Restructuring and RSA**

56.    The Debtors used the time afforded by the waivers and forbearances to negotiate a comprehensive, consensual restructuring with both the Term Loan Lenders and the Ad Hoc Group.  The terms of the restructuring are reflected in the Prepackaged Plan.  On October 23, 2016, the Debtors and the Required Restructuring Support Parties entered into the RSA whereby the Required Restructuring Support Parties have committed, subject to the terms and conditions of the RSA, to support the Debtors in their efforts to confirm the Prepackaged Plan.

57.    Upon its full implementation, the Prepackaged Plan will effect a significant deleveraging of the Debtors' capital structure by wiping out $775 million in principal amount of unsecured bond debt.  The reduced debt burden will provide the Debtors with sufficient liquidity not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Debtors will not only be competitive, but will remain a leader in their industry.

58.    The Prepackaged Plan equitizes the 2019 Notes and 2022 Notes (collectively, the "*Unsecured Notes*"), providing the holders of $775 million in allowed claims arising under the Unsecured Notes (collectively, the "*Unsecured Noteholders*") their pro rata share of 99.5% of new common stock in the reorganized Debtors (the "*New Common Stock*") as of the Effective Date (which will be 51.22% of the New Common Stock upon conversion of the New Convertible Notes (as defined below), assuming such conversion occurs 36 months after the Effective Date) (subject to dilution by the Management Incentive Plan (as defined in the

23

Prepackaged Plan) and the New Common Stock issued upon exercise of the Warrants (as defined below)).

59.     The Prepackaged Plan also provides the Debtors with additional working capital in the form of a $125 million rights offering (the "***Rights Offering***") pursuant to which the Unsecured Noteholders shall have the right to subscribe to purchase their pro rata share of mandatorily convertible notes (collectively, the **"*New Convertible Notes*"**).  The New Convertible Notes will convert into 46.21% of the outstanding shares of the New Common Stock no later than 36 months after all conditions to effectiveness of the Prepackaged Plan have been met (the "***Effective Date***") and will accrue paid-in-kind interest at an annual rate of 9% until they convert in 2019.  Additionally, certain of the Unsecured Noteholders (collectively, the "***Backstop Parties***") have entered into a backstop agreement (the "***Backstop Agreement***") to ensure that the Rights Offering is fully subscribed.  In exchange for their obligation to backstop the Rights Offering, the Backstop Parties will receive 5% of the New Convertible Notes with an aggregate principal value of $6.25 million (the "***Backstop Put Premium***").  The Term Loan Lenders and certain of the Unsecured Noteholders have also committed to providing the Debtors with $90 million in DIP Financing to fund the Restructuring.  Claims arising under the Debtors' postpetition debtor-in-possession financing facility will be paid in full in cash on the Effective Date from cash on hand as well as the proceeds of the Rights Offering.

60.     On the Effective Date of the Prepackaged Plan, the Term Loan will be amended and restated (the "***Amended and Restated Term Loan***") in an aggregate principal amount of $164.175 million with an annual interest rate of 13.5% and an outside maturity date of February 17, 2021.  The Amended and Restated Term Loan will be subject to terms and conditions that are identical to the terms and conditions set forth in the Term Loan Agreement,

WEIL:\95879425\17\22010.0003

---

subject to certain modifications specified in the Prepackaged Plan.  In addition, to facilitate a consensual deal among the Debtors, the Unsecured Noteholders and various other stakeholders and subject to the terms of the Prepackaged Plan, the Term Loan Lenders have agreed to waive payment of the Make-Whole, providing substantial savings to the Debtors' estates.  The ABL Facility will also be amended and restated on the effective date on terms mutually agreeable to the ABL Lenders or replaced.

61.     All prepetition equity interests ("***Existing Equity Interests***") will be cancelled on the Effective Date.  In exchange for their cooperation with expeditiously concluding these fully consensual Chapter 11 Cases, the holders of Existing Equity Interests will receive (i) their pro rata share of 0.5% of all outstanding New Common Stock as of the Effective Date (which will be 0.26% of New Common Stock upon conversion of the New Convertible Notes (as defined below), assuming such conversion occurs 36 months after the Effective Date) (subject to dilution by the Management Incentive Plan and the New Common Stock issued upon exercise of the Warrants) and (ii) warrants (the "***Warrants***") to purchase 6 % of the total outstanding New Common Stock (after giving effect to the conversion of the New Convertible Notes) exercisable for a seven (7) year period at a per share price based upon a total equity value of $1.789 billion of reorganized Basic Parent, which reflects an exercise price at which the New Common Stock distributed to Unsecured Noteholders under the Prepackaged Plan has a value of $775 million plus accrued and unpaid interest on the Unsecured Notes through an estimated Effective Date of December 31, 2016.

## F.     Chapter 11 Case Milestones

62.     The RSA contemplates that the Debtors will proceed expeditiously through chapter 11.  The Debtors have agreed in the RSA to use commercially reasonable efforts to implement the Chapter 11 Cases in accordance with the following milestones:

WEIL:\95879425\17\22010.0003

- Commencing solicitation of the Prepackaged Plan by 11:59 p.m. prevailing Eastern Time on October 24, 2016 (the "**Solicitation Commencement Date**");

- Commencing the Chapter 11 Cases by 11:59 p.m. prevailing Eastern Time on October 24, 2016;

- Filing a motion seeking approval of the Backstop Agreement and the Rights Offering Procedures Plan by 11:59 p.m. prevailing Eastern Time on October 25, 2016 (the "**Rights Offering Approval Motion**").

- Entry of an order approving the Rights Offering Approval Motion by 11:59 p.m. prevailing Eastern Time on November 2, 2016, (the "**Rights Offering Approval Order**");

- Entry of an order confirming the Debtors' Prepackaged Plan and approving the Disclosure Statement (the "**Confirmation Order**") no later than January 8, 2017; and

- Occurrence of the Prepackaged Plan's effective no later than January 23, 2017.

63.    Failure to meet any of the milestones may result in the Required Restructuring Support Parties terminating the RSA, as well as an event of default under the DIP Financing and a termination of the consensual use of cash collateral.  Such a result could potentially and disastrously derail the Debtors' emergence from chapter 11 and the prospects of reorganizing as a deleveraged and properly capitalized company poised to succeed in a difficult oil and gas market.

## V.

## Relief Sought in First Day Papers[7]

### Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases

64.     In this motion, the Debtors request entry of an order directing joint administration of their Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Basic Parent.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases of the Debtors other than Basic Parent to indicate the joint administration of the Chapter 11 Cases.

65.     Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  I believe that an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the United States Trustee for the District of Delaware (the "*U.S. Trustee*") and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

### Application of Debtors For Order Authorizing Retention and Employment of Epiq Bankruptcy Solutions LLC as Claims and Noticing Agent to the Debtors *Nunc Pro Tunc* the Petition Date Pursuant to 28 U.S.C. §§ 156(c),11 U.S.C. § 105(a), and Local Rule 2002-1(f)

66.     By this application, pursuant to section 156(c) of title 28 of the United States Code, section 105(a) of the Bankruptcy Code, and Local Rule 5075-1, the Debtors request

---

[7] Terms used but not defined in this section shall have the meanings ascribed to them in the respective motion.

authority to appoint Epiq Bankruptcy Solutions, LLC ("*Epiq*") as claims and noticing agent in

the Debtors' Chapter 11 Cases, in accordance with the terms and conditions of that certain

engagement agreement dated as of September 1, 2016, effective *nunc pro tunc* to the Petition

Date.

67.     The Debtors request entry of an order appointing Epiq as the Claims and

Noticing Agent for the Debtors and their Chapter 11 Cases, including assuming full

responsibility for the distribution of notices and the maintenance, processing, and docketing of

proofs of claim filed in the Debtors' Chapter 11 Cases.  Although the Debtors have not yet filed

their schedules of assets and liabilities, they anticipate that there will be in excess of 34,000

entities to be noticed on their creditor matrix.  In view of the number of anticipated claimants and

the complexity of the Debtors' businesses, I believe that the appointment of Epiq as claims and

noticing agent is in the best interests of both the Debtors' estates and their creditors.

**Motion of Debtors for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy Act and Bankruptcy Rules 6003 and 6004**

68.     In this motion (the "*Tax Motion*"), the Debtors seek entry of interim and

final orders (i) authorizing, but not directing, the Debtors to pay various local, state, and federal

taxing authorities (collectively, the "*Taxing Authorities*")[8] all Franchise Taxes, Sales and Use

Taxes, Property Taxes, Excise Taxes, Well Servicing Taxes, Production (Severance) Taxes,

Margin Taxes, and Other Taxes (each as defined in the Employee Motion, and collectively, the

"*Taxes*") that arose before the Petition Date, including all Taxes subsequently determined by

---

[8] The definition of "Taxing Authorities" includes, but is not limited to, those parties set forth on the Taxing Authority List (as defined in the Tax Motion).  The inclusion of any entity on, or the omission of any entity from, the Taxing Authority List is not an admission by the Debtors that such entity is, or is not, a Taxing Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

audit or otherwise to be owed for periods before the Petition Date, and (ii) authorizing applicable banks and financial institutions (collectively, the "***Banks***") to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

69.    The Debtors seek to pay the prepetition Taxes to, among other things, discourage the Taxing Authorities from taking actions that may interfere with the Debtors' continued business operations.  Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, asserting liens, seeking to lift the automatic stay, or revoking or suspending necessary licenses, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

70.    Certain prepetition Taxes, such as Sales and Use Taxes, are held on trust by the company and, as a consequence, are not property of the Debtors' estates.  Instead, those prepetition Taxes must be remitted to the relevant Taxing Authorities. Failure to these and other Taxes may also inhibit the Debtors' reorganization efforts.  Certain of the states in which the Debtors operate have specific tax laws that hold officers and directors of collecting entities personally liable for certain taxes owed by those entities and impose criminal penalties for failure to pay certain taxes

71.    Failure to satisfy the prepetition Taxes may also jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.  Failure to make timely payment of certain Taxes, such as Excise Taxes, may result in the interruption of the Debtors' business operations. Certain, but not all, Excise Taxes relating to the consumption of fuel are paid in accordance with the International Fuel Tax Agreement ("***IFTA***").  If those

Excise Taxes are not paid in accordance with the Debtors' IFTA obligations, the Debtors' IFTA license may be suspended. Without an IFTA license, the Debtors would not be able to operate their vehicles on public roads, which would be a costly interruption to the Debtors' business operations.  Further, failure to pay Excise Taxes, apart from IFTA related taxes, would also result in the suspension of the Debtors' ability to operate their vehicles on public roads, which would have similar costly consequences for the Debtors' businesses.

72.     The Debtors must continue to pay the prepetition Taxes to continue operating in certain jurisdictions and to avoid costly distractions during the Chapter 11 Cases. Specifically, it is my understanding that the Debtors' failure to pay the prepetition Taxes could adversely affect the Debtors' business operations because the governmental authorities could assert liens on the Debtors' property, assert penalties and/or significant interest on past-due taxes, or possibly bring personal liability actions against directors, officers, and other employees in connection with non-payment of the prepetition Taxes, thus distracting the Debtors' management and employees from their important reorganization efforts.

73.     The Debtors file approximately twenty (20) tax returns monthly within the twenty-three (23) states in which they have a tax nexus.  The failure to remit prepetition Taxes, such as Sales and Use Taxes, and certain Other Taxes, significantly increases the Debtors' officers' and directors' exposure to possible personal liability during the pendency of these Chapter 11 Cases.  The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their officers and directors from important tasks during a critical time.  This would be detrimental to parties in interest because the dedicated and active participation of the Debtors' officers and directors is integral to the Debtors' continued operations and essential to the orderly administration of these Chapter 11 Cases.  The Debtors'

30

estates are best served by eliminating the possibility of these distractions at the outset of these

Chapter 11 Cases.  Accordingly, because the proposed relief is in the best interests of the

Debtors' estates, the Court should authorize the Debtors to pay the prepetition Taxes.

**Motion of Debtors for Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service Pursuant to Sections 105(a) and 366 of the Bankruptcy Code**

74.     To ensure the uninterrupted supply of water, electricity, natural gas, waste

management, telephone, and other utility services (collectively, the "***Utility Services***"), which are

critical to the operations of the Debtors' sub-component manufacturing and supply businesses, in

this motion (the "***Utilities Motion***")  the Debtors request entry of interim and final orders

(i) approving the Debtors' proposed form of adequate assurance of payment for postpetition

Utility Services (as hereinafter defined); (ii) establishing procedures for resolving objections by

Utility Companies (as hereinafter defined) relating to the adequacy of the proposed adequate

assurance; and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing

service to, or discriminating against, the Debtors on the basis of the commencement of these

Chapter 11 Cases or that a debt owed by the Debtors for Utility Services rendered before the

Petition Date (as hereinafter defined) was not paid when due.

75.     To operate their businesses and manage their properties, including their

manufacturing facilities, the Debtors obtain Utility Services from a number of utility companies

or their brokers. Uninterrupted Utility Services are essential to the Debtors' ongoing operations,

and, therefore, the success of the Debtors' reorganization.  Indeed, any interruption in Utility

Services, even for a brief period of time, would disrupt the Debtors' ability to continue

operations and service their customers.  This disruption would adversely impact customer

relationships and result in a decline in the Debtors' revenues and profits.  Such a result could

31

seriously jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and creditor recoveries.  It is, therefore, critical that Utility Services continue uninterrupted during these Chapter 11 Cases.

76.     I believe and am advised that the proposed procedures are necessary to the success of the Debtors' Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by utility companies for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases. Moreover, a Utility Company could blindside the Debtors by unilaterally deciding—on or after the thirtieth day following the Petition Date—that it is not adequately protected and threatening to discontinue service or making an exorbitant demand for payment to continue service. Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and creditor recoveries.

**Motion of Debtors for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of General Unsecured Creditors and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Sections 105(a), 362(d), 363(b), and 503 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004**

77.     In this motion (the "***All Trade Motion***"), the Debtors seek entry interim and final orders (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, allowed prepetition claims (collectively, the "***Trade Claims***") of general unsecured creditors that provide goods or services related to the Debtors' operations (collectively, the "***Trade Creditors***"); and (ii) authorizing applicable Banks to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

78.     As described this Declaration, the Debtors provide various well site services to over 2,000 land-based oil and natural gas producing companies.  The Debtors' service

32

operations primarily include completion and remedial services, fluid services, and well servicing, but a segment of their operations is also dedicated to contract drilling.  To perform each of these services, the Debtors require various specialized materials, tools, and equipment.  For instance, the Debtors operate a customized fleet of pumping units, coiled-tubing units, and snubbing units to complete and remediate wells, which further requires access to certain supplies such as cement and acid.  The Debtors' fluid services segment similarly involves industry-specific equipment and facilities such as tank trunks, storage tanks, and water wells, as well as goods such as glass and chlorine dioxide.  The Debtors also utilize a dedicated fleet of well servicing rigs as well as specialized fishing equipment to support their well servicing operations.  Many of these services also require significant amounts of long-distance transport, which entails substantial fuel consumption by the Debtors' vehicles.  Certain Trade Creditors provide the Debtors with fuel cards, which enable the Debtors to track fuel usage and to purchase fuel in certain isolated well sites.

79.    Separately, through their manufacturing business, the Debtors produce and repair equipment related to well site services including, among other things, well service rigs, cementing units, pumping units, accumulators, water well units, and swab units.  In manufacturing these units, the Debtors incorporate certain components, such as engines, transmissions, valves, and derricks, which are purchased from third-party original equipment manufacturers.  The Debtors use this manufacturing business segment in part to support their own well site services business, but also to sell equipment to third-party customers.  Through the retail portion of their manufacturing business, the Debtors offer customers a limited one (1) year guaranty on certain equipment and components sold (the "***Warranty Program***").  For equipment manufactured directly by the Debtors, the Warranty Program provides for the repair or

33

replacement of products containing defects in material or workmanship.  Because such repair or replacement often requires the Debtors to incorporate parts or components into the defective equipment, claimants under the Warranty Program for prepetition purchases are categorized as Trade Creditors.[9]

80.     The Trade Creditors provide the Debtors with uninterrupted access to key resources and enable them to operate their businesses smoothly.  The Trade Creditors store goods and customized equipment, deliver crucial components and materials, and provide information technology services, financial services, maintenance services, legal services, human resources services, and consulting and advisory services—all of which enable the Debtors' businesses to function smoothly.

81.     The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  For the six (6) months before the Petition Date, the Debtors' average monthly payment to Trade Creditors was approximately $45.5 million.

82.     The Debtors estimate that, as of the Petition Date, approximately $39.3 million of undisputed Trade Claims have accrued.  The following table summarizes the types of Trade Claims held by the Trade Creditors and provides the Debtors' estimate of the total amount of each type of Trade Claim outstanding as of the Petition Date, including estimates for the portion of such total coming due within the interim period.

---

[9] The total expenses of the Warranty Program consist of labor costs and material costs.  For purposes of the All Trade Motion, however, the Trade Claims attributable to the Warranty Program only reflect the costs of materials. The labor costs are covered separately in the *Motion of Debtors for Interim and Final Orders (I) Authorizing  (A) Payment of Prepetition Wages, Salaries,  Employee Benefits, and Other Compensation, (B)  Maintenance of Employee Benefit Programs and  Payment of Related Administrative Obligations, and  (C) Payment of Independent Contractors, and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Pursuant to Sections 105(a), 363(b), 503(c)(1), and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004*, filed contemporaneously herewith.

34

| Category | Description of Goods and Services Provided | Estimated Total Amount Outstanding as of Petition Date | Estimated Amount Due Within Interim Period |
|---|---|---|---|
| Operational | Materials and supplies, fuel and transportation, maintenance and repairs, utilities, Warranty Program costs, fuel card providers, GPS services, and other operating expenses. | $35,055,000 | $22,650,000 |
| SG&A | Office rent, professional fees, marketing, information technology, and other infrastructure costs. | $1,270,000 | $864,000 |
| Shipping & Warehousing | Storage and transport of goods and equipment. | $2,670,000 | $1,844,000 |
| Rental/Lease | Lease equipment, saltwater disposal wells, water wells, rights of way, and easements. | $300,000 | $300,000 |
| **Total:** | | **$39,292,046** | **$39,295,000** |

83.     The goal of these prepackaged Chapter 11 Cases is to deleverage the

Debtors' balance sheet with minimal interruption of their business operations.  Disrupting the

flow of necessary goods and services could hamper the Debtors' ability to perform well site

services, which would damage their leading market reputation and possibly result in the

termination of customer contracts.  To avoid this scenario, it is imperative that the Debtors

maintain positive relationships with their suppliers, who are essential to the Debtors' business

operations, throughout the course of these Chapter 11 Cases.  The Debtors negotiated the terms

of the Prepackaged Plan with this goal in mind: under the Prepackaged Plan, the legal, equitable,

and contractual rights of holders of Administrative Expense Claims, Priority Tax Claims, Priority

Non-Tax Claims, Other Secured Claims, and General Unsecured Claims (each as defined in the

Prepackaged Plan), which includes the Trade Claims, will be unaltered.  Moreover, as more fully

described in this Declaration, the Prepackaged Plan is supported by requisite majority of

creditors in amount in the only creditor classes that are impaired under the Prepackaged Plan.

Accordingly, the relief requested in the All Trade Motion furthers the Debtors' overarching restructuring goals without prejudice to the Debtors' stakeholders.

**Motion of Debtors For Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Employee Wages and Salaries, Employee Benefits, and Other Compensation, (B) Maintenance of Employee Benefit Programs; and Payment of Related Administrative Obligations, and (C) Payment of Independent Contractors, and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Sections 105(a), 362(b), 503(c)(1) and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004**

84.     In this motion  (the "***Employee Motion***") the Debtors seek orders (i) authorizing the Debtors to (a) pay, in their sole discretion, all obligations incurred directly or indirectly, under or relating to the Compensation Obligations, Reimbursable Expenses, Withholding Obligations, Contractor Obligations, the Employee Benefit Program, the Employee Assistance Program, the Quarterly Bonus Program, all related expenses, and all fees and costs incidental to the foregoing, including amounts owed to third-party administrators (each as each is defined in the Employee Motion, and together, with any costs or related administrative or incidental expenses, the "***Employee Obligations***"); (b) maintain and continue to honor and pay, in their sole discretion, all amounts with respect to the Debtors' business practices, programs, and policies for their Employees (as herein defined), as those practices, programs, and policies were in effect at the Petition Date and as those practices, programs, and policies may be modified, amended, or supplemented from time-to-time in the ordinary course of the Debtors' businesses, and to honor any related administrative costs and obligations arising thereunder; and (c)  pay, in their sole discretion, the Debtors' Contractor Obligations (as defined herein); and (ii) authorizing applicable Banks to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

85.     The Employees perform a wide variety of services that are critical to the Debtors' businesses and restructuring efforts.  The majority of Employees provide operational

36

on-site services in the Debtors' well site service business to oil and natural gas companies in all

48 contiguous states.  The Employees' skills, knowledge, and understanding of the Debtors'

infrastructure and operations are essential to the continued operation and viability of the Debtors'

businesses and preserving operational stability and efficiency.  Many of the Employees are

highly trained personnel who are not easily replaced. [10]  Without the Employees' continued,

uninterrupted services, an effective reorganization of the Debtors will not be possible.

86.     In addition to their Employees, the Debtors also employ approximately

fifteen (15) independent contractors to perform resource planning implementation services,

information technology services, and related financial projects (the "***Independent***

***Contractors***").[11]

87.     The vast majority of the Employees rely exclusively on their

compensation and benefits to pay their daily living expenses and support their families.  Thus,

Employees will be exposed to significant financial hardship if the Debtors are not permitted to

continue payment of their compensation, provide benefits, and maintain existing programs.  The

Debtors seek to minimize the personal hardship the Employees would suffer if the employee

obligations described herein were not satisfied by the Debtors when due or expected.  The

Debtors intend to continue their prepetition employee practices, programs, and policies in the

---

[10] As part of their employment, Employees undergo various training programs.  For example field Employees participate in the Debtors' proprietary training program "Basics to Success", which is a multi-level training program designed to prepare field employees to understand and achieve safety objectives and industry and company terminology, as well as to ensure a clean and healthy work environment.  Each of the Debtors' management Employees undergoes a "Management & Leadership Skills" course designed to expand the skill set of newly promoted managers as well as those who already have experience.  Many of the Employees also hold specialized licenses that enable them to operate the various vehicles utilized in the Debtors' businesses.

[11] By the Employee Motion, the Debtors are not seeking authority to pay prepetition amounts owed to staffing agencies on account of temporary workers.

ordinary course of business on a postpetition basis, and subject to the Court's approval of the

relief sought in the Employee Motion, to pay prepetition amounts (if any) related thereto

88.     The Debtors believe that, as of the Petition Date, the aggregate amount of

their prepetition Employee Obligations is approximately $13.5 million, approximately $4.4

million of which relates to prepetition Compensation Obligations.[12]  By the Employee Motion,

the Debtors are not seeking authority to pay to any individual any amount in compensation or

benefits that collectively would exceed the $12,850 priority cap imposed by section 507(a)(4) of

the Bankruptcy Code (the "***Prepetition Compensation Cap***").  The various components of the

Prepetition Employee Obligations are described in further detail in the Employee Motion.

89.     The Employees and Independent Contractors are the most important part

of the Debtors' businesses.  The Debtors cannot operate without them.  The value of the Debtors'

other assets would materially decline without the continued support of the Employees and

Independent Contractors.  Any delay in paying or failure to pay any of the Employee Obligations

or Contractor Obligations could irreparably impair the morale of the Debtors' workforce at the

time when Employees' and Independent Contractors' dedication, confidence, retention, and

cooperation are most crucial.  It could also inflict a significant financial hardship on Employees,

and Independent Contractors, and their families.  The Debtors cannot risk such a substantial

disruption to their business operations, and it is inequitable to put Employees and Independent

Contractors at risk of such hardship.

90.     Payment of the Employee Obligations and Contractor Obligations in the

ordinary course of business would enable the Debtors to focus on completing a successful

reorganization, which would benefit all parties in interest.  Without this relief, otherwise-loyal

---

[12] This amount does not include non-cash pay obligations (such as paid vacation time), any Reimbursable Expenses
that may be outstanding, or Withholding Obligations.

Employees and Independent Contractors may seek other work opportunities, thereby putting at

risk the Debtors' continued operation as a reorganized enterprise.  Payment of the Employee

Obligations and Contractor Obligations will enable the Debtors to continue to operate their

business in an economic and efficient manner without disruption.  The total amount sought to be

paid by the Employee Motion is modest compared to the magnitude of the Debtors' overall

business and the importance of the Employees and Independent Contractors to the value of the

Debtors' estates.

91.     Paying the Reimbursable Expenses is necessary because any other

treatment of Employees would be highly inequitable.  Employees who have incurred Expenses

should not be forced personally to bear the cost of the Expenses, especially because the

Employees incurred the Expenses for the Debtors' benefit, in the course of their employment by

the Debtors, and with the understanding that they would be reimbursed for doing so.

92.     Payment of Withholding Obligations would not prejudice other creditors

because Withholding Obligations generally give rise to priority claims under section 507(a)(8) of

the Bankruptcy Code.  In any event, Withholding Obligations that the Debtors withhold are held

in trust for the Taxing Authorities, and are not property of the Debtors' estates.

93.     Payment of amounts owing under the Quarterly Bonus Program (as

defined in the Employee Motion) is essential to the continued morale and retention of Employees

engaged in key aspects of the Debtors' businesses, and incentivizes them to meet or exceed the

Quarterly Bonus Metrics for their respective Operational Region (as those terms are defined in

the Employee Motion, respectively).  The Quarterly Bonus Program is a key element of

maintaining morale and retention of "rank and file" operational Employees.  The Quarterly

Bonus Program has been in place since about 2005 and the Employees have come to rely upon

WEIL:\95879425\17\22010.0003

the bonuses they receive under the program as a supplement to their ordinary wages.  If the

Debtors are not able to make payments under the Quarterly Bonus Program to Employees who

have qualified, there is a risk that some Employees may seek employment at competitor

companies where similar programs are offered.  Finally, even if each qualifying Employee

receives his or her bonus pursuant to the relief requested herein, it is still the case that no

Employee will receive any amount in excess of the $12,850 prepetition cap.

> 94.    Payment of administrative fees to the administrators of the Employee

Benefit Programs is also necessary.  Without the continued service of these administrators, the

Debtors will be unable to continue to honor their obligations to Employees under the Employee

Benefit Plan in an efficient and cost-effective manner.  The Debtors do not seek to alter any of

the Employee Benefit Programs.  The Employee Motion requests only permission for the

Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent

that such payments could otherwise be inconsistent with the provisions of the Bankruptcy Code

and (ii) continue to honor practices, programs, and policies with respect to Employees as such

were in effect before the Petition Date.

> 95.    In these Chapter 11 Cases, all of the prepetition Compensation

Obligations, and the Debtors' obligations under the Employee Benefit Programs and Quarterly

Bonus Program constitute priority claims under sections 507(a)(4) and (a)(5) of the Bankruptcy

Code.  As of the Petition Date, the Debtors do not owe any single Employee an amount in excess

of $12,850 or an amount that falls outside of the statutory priorities granted in sections 507(a)(4)

and (a)(5).  As priority claims, the Compensation Obligations, and obligations under the

Employee Benefit Programs and Quarterly Bonus Program must be paid in full before the

Debtors may make distributions on account of their general unsecured obligations.  Moreover,

WEIL:\95879425\17\22010.0003

because the Debtors intend to consummate the Prepackaged Plan, which pays all general

unsecured creditors in full, the relief requested herein will not prejudice the rights of general

unsecured creditors or other parties in interest.

96.     To the extent that any Employee or Independent Contractor is in fact owed

any amount that either exceeds the statutory threshold or otherwise is not covered by sections

507(a)(4) or (a)(5), the payment of such amount is both necessary and appropriate to administer

the Debtors' estates and may be authorized under section 363(b) of the Bankruptcy Code and

section 105(a) of the Bankruptcy Code pursuant to the doctrine of necessity.  The Debtors cannot

operate their business without their Employees and Independent Contractors.  Failure to pay any

amounts owed to Employees or Independent Contractors for work they have already performed

would be strongly detrimental to the morale of the Debtors' workforce and could cause a crisis of

confidence among Employees and Independent Contractors.  The Debtors cannot be put at risk

of such avoidable instability in their business—particularly where the Prepackaged Plan provides

that all such claims will be paid in full.  Accordingly, the Court should authorize the Debtors to

pay all amounts currently owed to their Employees and Independent Contractors.

97.     The Debtors also believe that it is necessary to pay the administrative costs

of the Employee Obligations owed to third-party vendors who provide compensation-,

reimbursement- and other benefit-related services and products.  Absent the relief requested, the

Debtors will be unable to maintain their compensation, benefit, and retirement programs in an

efficient and cost-effective manner and important programs may be severely interrupted.

**Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program and (B) Pay All Obligations with Respect Thereto; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Modifying the Automatic Stay With Respect to the Workers' Compensation Program Pursuant to Sections 105(a), 362, 363(b), 507(a), and 541 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004**

98.     Through the Insurance Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors (a) to continue their Insurance Programs and Surety Bond Program (each as defined in the Insurance Motion) in the ordinary course of business and (b) to pay any prepetition obligations arising with respect thereto; (ii) authorizing all financial institutions to honor all related checks and transfers; and (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the Workers' Compensation Programs (as defined in the Insurance Motion).

99.     In the ordinary course of their business, the Debtors participate in various insurance programs (each, an "*Insurance Program*") in accordance with their respective insurance policies (each, an "*Insurance Policy*") with several insurance carriers (each, an "*Insurance Carrier*"), including:  (i) general coverage of workers' compensation and employer liability; (ii) general coverage of the property used in connection with the Debtors' businesses; (iii) general coverage of the Debtors' well servicing and pressure pumping equipment; (iv) coverage of the Debtors' general liability and pollution; (v) coverage of the Debtors' trucks and automobiles; (vi) coverage related to other Insurance Programs that provides increased limits of liability coverage; (vii) general, excess, and tail coverages of director and officer liability and indemnification; and (viii)  other insurance policies relevant to their business.

100.     As of the Petition Date, the Debtors are obligated to make payments under insurance financing arrangements or to make premium installment payments related to several Insurance Policies, which total approximately $10 million, of which approximately $1.6 million

is due during the interim period.  Although these amounts primarily consist of postpetition

obligations, the Debtors are seeking relief to pay these amounts out of an abundance of caution.

      101.    In addition, In the ordinary course of business, the Debtors are required to

provide surety bonds to certain third parties, often governmental units or other public agencies

(the "***Obligees***") to secure the Debtors' performance of certain obligations in connection with

permits issued by the Obligees and to assure that funds are available to remediate the worksite if

the Debtors are unable to complete the work themselves (the "***Surety Bond Program***").  These

obligations arise from, among other things:  (i) the operation of disposal and treatment facilities;

(ii) oil and natural gas plugging and pit closures; (iii) contractors' licenses; (iv) reclamation

performance; (v) the performance of certain jobs; and (vi) requirements to comply with various

applicable laws and regulations.  The Debtors estimate that as of the Petition Date, the total

principal amount on all surety bonds is approximately $4 million, which obligations are partially

collateralized be a letter of credit in the amount of $1.2 million.

      102.    In my opinion, the Insurance Programs are vital to the Debtors' continued

operations.  Specifically, applicable state laws mandate that certain Debtors maintain workers'

compensation coverage for their employees.  The Debtors' failure to pay their obligations under

the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to

significant liability in fines by state workers' compensation boards.  In addition, the Debtors

cannot engage in their operations without providing proof of existing general liability, pollution,

and energy policies to the customers on whose wells the Debtors perform work and to the owners

of the land where the Debtors dispose fluids extracted from the wells.  Moreover, under the laws

of the states where the Debtors do business, they cannot operate their fleet of heavy trucks and

light vehicles without auto liability insurance.  Furthermore, in my opinion, the obligations to

make the remaining payments under the IPFS Premium Financing Agreement relate to

postpetition coverage and, therefore, must be met in order to comply with applicable regulations.

103.    In addition, because Aspen UK is an important business partner of the

Debtors, the payment of 2012/2013 Loss Load/Reinstatement Premium in the ordinary course is

justified.  A non-payment of the 2012/2013 Loss Load/Reinstatement Premium, may erode the

goodwill that exists between the Debtors and Aspen UK, and Aspen UK may refuse to renew the

First Layer Excess Liability Policy or refuse to provide the reinstatement of the policy once

current availability is exhausted on the favorable terms, *i.e.* without charging a reinstatement

premium that it presently provides.  Accordingly, I believe that the Debtors must continue to

make payments related to these programs in the ordinary course.

104.    With respect to the Surety Bond Program, I believe that to continue their

business operations during the reorganization process, the Debtors must be able to provide

financial assurances to state governments, regulatory agencies, and other third parties.  This

requires the Debtors to maintain their existing Surety Bond Program, including the payment of

surety bond premiums as and when they come due, providing the sureties with collateral,

renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of

the Debtors' business, and executing other indemnity agreements, as needed, in connection with

the Surety Bond Program.

**Motion of Debtors for Interim and Final Orders Authorizing (A) Continuation of
Existing Cash Management System, (B) Maintenance of Existing Business Forms
and Bank Accounts, (C) Continuation of Intercompany Transactions, and
(D) Payment of Related Prepetition Obligations Pursuant to Sections 105(a), 363(b),
and 363(c) of Bankruptcy Code And Bankruptcy Rules 6003 and 6004**

105.    Through this motion, the Debtors request entry of interim and final orders

(i) authorizing the Debtors to (a) continue using their existing cash management system,

(b) continue using their existing business forms and bank accounts, (c) continue their

intercompany transactions, and (d) pay related prepetition obligations.  The Debtors also request

that the Court authorize the Banks (as defined in the Cash Management Motion) to honor

prepetition checks and continue to provide the Debtors with cash management and credit card

services and to charge related Bank Fees (as defined in the Motion) pursuant to prepetition

agreements.  The Debtors also request that the Court authorize the Banks (as defined below) to

honor prepetition checks and continue to provide the Debtors with cash management and credit

card services and to charge related Bank Fees (as defined below) pursuant to prepetition

agreements.

      106.     Before the Petition Date, the Debtors employed a cash management

system to collect funds generated by their operations and to disburse funds to satisfy obligations

incurred in the ordinary course of their business (the "***Cash Management System***").  The Cash

Management System consists of twenty one (21) bank accounts (the "***Bank Accounts***") with four

(4) different Banks; thirteen (13) with Bank of America, National Association ("***BofA***"), which

is the Debtors' primary cash management provider and the administrative agent under the ABL

Facility; five (5) with Capital One Financial Corporation ("***Capital One***"); two (2) with U.S.

Bank National Association ("***U.S. Bank***"); and one (1) with Bank of Texas.  A list of the Bank

Accounts is attached to the motion as Exhibit C.  Upon my review of the relevant account

documents, each of the Banks is designated as an authorized depository by the Office of the

United States Trustee for Region 3 (the "***U.S. Trustee***") pursuant to the U.S. Trustee's Operating

Guidelines for Chapter 11 Cases (the "***UST Operating Guidelines***").  Furthermore, my review of

the account documentation obtained from various Banks showed that all of the Debtors' accounts

are deposit accounts, and none of the Debtors funds are invested in money market funds.

Accordingly, the Debtors comply with the requirements of section 345(b) of the Bankruptcy

Code.  A diagram depicting the Cash Management System, including the flow of funds between the Bank Accounts, is attached as Exhibit D to the motion.

107.    All but two Bank Accounts are held in the name of BES and Taylor. Accordingly, the Cash Management System consists of two groups of Bank Accounts, each of which is designed to perform a specific function, such as collections and disbursements, as further described in the motion.  While the Cash Management System is functionally bifurcated, transfers between the BES and Taylor accounts occur in the ordinary course of business, as further described below.  The remaining two (2) Bank Accounts, the Term Loan Escrow Account and Term Loan Escrow Proceeds Account, are held in the name Basic Parent, which is the borrower under the Term Loan.  In addition, the Debtors hold restricted cash in three different accounts pursuant to the Term Loan and ABL Facility documents – the Term Loan Escrow Account that, as of the Petition Date, holds approximately $20.3 million in restricted Term Loan funds, the LC Collateral Account that holds approximately $5.9 million held as collateral supporting the borrowing base that backs letters of credit issued under the ABL Facility, and the Credit Card Collateral Account that holds $2 million securing the Debtors' obligations under the BofA Credit Card Program.

108.    In my opinion, the Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, reduce borrowing costs and administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices.  The use of the Cash Management System has historically reduced the Debtors' expenses by enabling the Debtors to use funds in an optimal and efficient manner.  I

46

believe that the continued use of the Cash Management System without interruption is vital to

the Debtors' business operations and the success of these Chapter 11 Cases.

> **Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b), and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)**

109.    Through this motion (the "***DIP and Cash Collateral Motion***"),[13] the

Debtors request entry of interim and final orders: (i) authorizing the Debtors to obtain senior

secured, superpriority, postpetition financing (the "***DIP Facility***"); (ii) authorizing the Debtors to

use cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "***Cash Collateral***");

(iii) granting adequate protection to the Prepetition Secured Parties (as defined in the Interim

Order (as defined below)); (iv) modifying the automatic stay imposed under section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim

Order; and (v) scheduling a hearing to consider the relief requested herein on a final basis (the

"***Final Hearing***").

110.    In addition to financing these Chapter 11 Cases by utilizing the DIP

Facility, the Debtors intend to use the Cash Collateral, which consists of the unrestricted cash on

hand as of the Petition Date and the cash generated postpetition that is the proceeds of the

collateral subject to the liens of the Prepetition Secured Parties.  The use of the Cash Collateral

and the DIP Facility are necessary to maintain the Debtors' operations and to fund their expenses

during these Chapter 11 Cases.  As of the Petition Date, the Debtors had approximately $6.1

million in their operating accounts.  The Debtors, with the assistance of AP Services, have

---

[13] Capitalized terms used but not defined in this section have the meaning ascribed to them in the DIP and Cash Collateral Motion and the Interim Order.

WEIL:\95879425\17\22010.0003

developed detailed projections of the anticipated receipts and disbursements that will be incurred during these Chapter 11 Cases, which projections are reflected in the 13-week budget attached to the DIP and Cash Collateral Motion (the "**Interim DIP Budget**").  The Interim DIP Budget reflects a reasonable and detailed estimate of the Debtors' need to pay various trade vendors and employees and other obligations in the ordinary course of business during the initial 13 weeks of these cases.  The Initial Advance of $30 million under the DIP Facility is necessary to fund the Debtors' operations during the interim period and to comply with the $25 million minimum liquidity covenant under the DIP Credit Agreement.  The funding contemplated by the proposed Interim and Final DIP Orders and the use of the Cash Collateral guarantee that the Debtors' cash needs will be fulfilled, provide comfort to customers and trade vendors, and minimize the potential for business disruption and loss of value during the pendency of these Chapter 11 Cases.

111.    To compensate the Prepetition Secured Parties for the use of the Cash Collateral and for the diminution of the value of the Prepetition Secured Parties' collateral, the Debtors, with the assistance of their advisors, have negotiated reasonable adequate protection packages.  In addition to the customary replacement liens, superpriority claims, postpetition cash payments, and payment of fees and expenses of the Prepetition Secured Parties, the Prepetition ABL Lenders required that the Debtors protect them through continuing to abide by the Borrowing Base (as defined in the ABL Credit Agreement) formula in the ABL Credit Agreement.  After several rounds of negotiations with the Prepetition ABL Lenders, the Debtors were able to negotiate more favorable new terms for calculating the Borrowing Base for the purposes of valuing the ABL Facility collateral, which terms provide credit for (a) 75% of the Debtors' accounts receivable and (b) 70% of the unbilled accounts, subject to a cap of $25

48

million.  The Borrowing Base, in combination with approximately $5.9 million held in a certain collateral account (the "*L/C Collateral*"), will be measured against the Total Outstandings (as defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Facility.  The Debtors and their advisors have negotiated that the prepetition minimum liquidity covenant in the ABL Credit Agreement that required that such availability be above $15 million will not apply under the Interim DIP Order.  In addition, with respect to the reimbursement of the ABL Lenders for any draws under the letters of credit, the ABL Lenders will first apply the L/C Collateral, after which the Debtors will have up to 40 days to reimburse the ABL Lenders for the remainder (if any) of the amount of a letter of credit draw.

112.    The Interim DIP Budget takes into account, among other things, the adequate protection payments to the Prepetition Secured Parties and the payments to the beneficiaries of the letters of credit, assuring that, absent unforeseen circumstances, the Debtors will comply with the terms of the use of the Cash Collateral under the Interim DIP Order.  If the Debtors are unable to use Cash Collateral and provide adequate protection related thereto, they may be forced to cease operations, which would result in irreparable harm to their businesses. Accordingly, the proposed terms of adequate protection are appropriate and consistent with the terms generally provided in comparable Chapter 11 Cases.

**Motion of Debtors for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in, and Claims Against, the Debtors Pursuant to Sections 362 and 105(a) of the Bankruptcy Code**

113.    In this motion (the "*NOL Motion*") Pursuant to sections 105(a) and 362 of title 11 of the Bankruptcy Code, the Debtors request entry of interim and final orders authorizing the Debtors to establish procedures (the "*Procedures*") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("*NOLs*") for use in connection with the

49

Debtors' reorganization.  The Procedures apply to common stock of Basic Energy Services, Inc. (the "***Common Stock***") and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire such stock ("***Options***" and together with Common Stock, the "***Basic Stock***").  The Debtors are also seeking to expressly reserve the right, in the event the Prepackaged Plan is withdrawn, to seek amendments to the Procedures to also apply to claims against one or more of the Debtors.

114.    The Debtors have certain valuable tax attributes, which include, as of the Petition Date, estimated NOLs in excess of $450 million (the "***Tax Attributes***").  Title 26 of the United States Code (the "***Tax Code***") generally permits corporations to carry forward their tax attributes to reduce future taxable income.  Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.  Accordingly, I believe the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtors' efforts toward a successful reorganization.

115.    The Debtors' ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations.  Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("***Section 382***" and such ownership change, an "***Ownership Change***").  Pursuant to section 382, an Ownership Change generally occurs when the percentage of a corporation's equity held by its "5-percent shareholders" (within the meaning of section 382) increases by more than 50 percentage points

WEIL:\95879425\17\22010.0003

above the lowest percentage of ownership owned by such shareholder(s) at any time during the relevant testing period (usually three years).

116.    I believe that the Debtors' Tax Attributes would be adversely affected (and could be effectively eliminated) by an Ownership Change during the pendency of these cases.  If such an Ownership Change occurs, the valuation for determining the annual amount of useable Tax Attributes is expected to be at or close to zero, which may effectively eliminate the availability of such Tax Attributes.  It is therefore in the best interests of the Debtors and their stakeholders to restrict trading that could result in an Ownership Change before the effective date of a chapter 11 plan or other applicable bankruptcy court order.  This would protect the Debtors' ability to use the Tax Attributes during the pendency of these Chapter 11 Cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.  Although the limitations imposed by Section 382 may be significantly lessened when an Ownership Change occurs pursuant to a confirmed chapter 11 plan (or applicable court order), the benefits of a confirmed plan (or court order) would not be applied retroactively to reduce limitations on tax attributes imposed by a previous Ownership Change.

117.    It is likely that any chapter 11 plan that contemplates a reorganization of the Debtors will involve the issuance of new common stock in the Debtors (or any successor to the Debtors) and the distribution of such stock to certain creditors in satisfaction, in whole or in part, of their respective claims against the Debtors.  This issuance and distribution likely would result in an Ownership Change.  In such event, it is possible that the special relief afforded by section 382(l)(5) of the Tax Code could be available to and beneficial for the Debtors, and that the Debtors would, therefore, seek to qualify the restructuring for such relief.  The Prepackaged

WEIL:\95879425\17\22010.0003

Plan is not predicated on qualifying for such relief.  However, in the event the Prepackaged Plan

is withdrawn, such relief may become unavailable if certain procedures and potential restrictions

relating to the trading and accumulation of certain claims prior to the effective date of a chapter

11 plan are not effective *nunc pro tunc* to the Petition Date.  Accordingly, in the event the

Prepackaged Plan is withdrawn, the Debtors expressly reserve the right to request a court order

amending the Procedures.

118.    I believe the Procedures are necessary to preserve the Debtors' ability to

use their Tax Attributes, while providing certain latitude for trading.  The Debtors' ability to

preserve their Tax Attributes may be seriously jeopardized unless procedures are established

immediately and *nunc pro tunc* to the Petition Date to ensure that trading in certain interests in is

either precluded or closely monitored and made subject to Court approval.

**Motion of Debtors for Order (I) Scheduling Combined Hearing to Consider (A) Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of Prepackaged Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (IV) Conditionally Waiving Requirement of Filing Statement of Financial Affairs and Schedules of Assets and Liabilities; (V) Conditionally Waiving Requirement to Convene the Section 341 Meeting of Creditors; and (VI) Approving (A) the Rights Offering Procedures, (B) Backstop Agreement, and (C) the Backstop Put Premium, Transaction Expenses and Indemnification Obligations in Connection therewith Pursuant to sections 105(a), 363(b), 341, 521(a), 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 1007, 3017, 6003, and 6004**

119.    In this motion (the "***Scheduling Motion***") the Debtors seek an order of the

Bankruptcy Court (A) scheduling a combined hearing to consider (i) the adequacy of the

*Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Basic Energy Services, Inc. and*

*Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the

"***Disclosure Statement***"); (ii) approval of the solicitation of votes on the Prepackaged Plan in

connection therewith (the "***Solicitation***"); (iii) confirmation of the Prepackaged Plan; and

(B) approving the form and manner of notice of the Combined Hearing, the Objection Deadline, and notice of commencement; (C) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "***Schedules and Statements***") and conditionally waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of the Prepackaged Plan; (D) conditionally waiving the requirement to convene the meeting of creditors under section 341 of the Bankruptcy Code; and (F) approving (i) the proposed procedures for the conduct of the Rights Offering (the "***Rights Offering Procedures***"), (ii) the Backstop Agreement, and (iii) payment by the Debtors of the Backstop Put Premium, the Transaction Expenses, and the Indemnification Obligations.

120.    The table above in paragraph 11 of this Declaration summarizes the relevant dates related to the Solicitation and the Rights Offering and sets forth the Debtors' proposed dates for the combined hearing on the Prepackaged Plan and Disclosure Statement (the "***Combined Hearing***") and related objection deadline, as well as the mailing of the combined notice (the "***Combined Notice***") of the Combined Hearing and commencement of the Debtors' Chapter 11 Cases.

121.    The Debtors anticipate that notice of the disclosure statement hearing and the confirmation hearing will be published and mailed to all known holders of claims or interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.  I believe this satisfies the Federal Rules of Bankruptcy Procedure 2002(a) and 3017(a) and Local Rules of Bankruptcy Practice and Procedure of the United States District Court for the District of Delaware 3017-1, thereby providing notice of the combined hearing on the Prepackaged Plan and Disclosure Statement  (and related deadlines) so that all parties-in-interest have sufficient

time to review the Prepackaged Plan and Disclosure Statement and determine if, and how, to assert their rights with respect to, any claims against, or interests in the property of, the Debtors .

       122.     The Debtors are also seeking approval of the procedures for the execution of the Rights Offering.  In connection with the Prepackaged Plan, the Debtors intend, upon approval of the Rights Offering Procedures, to launch a rights offering to which parties eligible to participate in the Rights Offering ("***Eligible Offerees***") will be entitled to receive their pro rata share of non-transferable subscription rights to acquire up to $125 million of the New Convertible Notes.  To fully exercise its right to participate in the Rights Offering (the "***Subscription Rights***"), an Eligible Offeree must (i) complete the Rights Exercise Form (as defined in the Rights Offering Procedures) entitling such holder to exercise its Subscription Rights and (ii) pay the purchase price, which is an amount equal to its pro rata share of $125 million, with such pro rata share to be calculated as the proportion that an Eligible Offeree's claim bears to the aggregate of all claims arising under the Unsecured Notes.  In most Chapter 11 Cases in which rights offerings are conducted, the rights offering is commenced after the bankruptcy court has approved the adequacy of the information contained in the debtors' disclosure statement.  In this case, although the Rights Offering will be commenced before approval of the Disclosure Statement, the Rights Offering will not be consummated—and the New Convertible Notes will not be issued—until after the Court approves the adequacy of the Disclosure Statement.  I believe this approach ensures that all creditors entitled to participate in the Rights Offering will have received adequate information before they make their investment. The Rights Offering will be backstopped by the Backstop Parties, who have agreed, severally and not jointly, pursuant to the Backstop Agreement, to purchase all New Convertible Notes that are not purchased by other parties eligible to participate in the Rights Offering.

123.     In exchange for the commitments offered by the Backstop Parties, the Debtors have agreed to, among other things, pay the Backstop Put Premium in an amount equal to 5% of the Rights Offering in the form of New Convertible Notes in an aggregate principal amount of $6.25 million and to pay or reimburse the Backstop Parties for their reasonable out-of-pocket expenses and professional fees incurred by in connection with the Backstop Agreement (the "**Transaction Expenses**").  The Backstop Agreement also obligates the Debtors to indemnify the Backstop Parties for certain losses, claims, damages, liabilities, costs and expenses arising out of or in connection with, among other things, the Backstop Agreement, the Prepackaged Plan, and the Rights Offering (the "**Indemnification Obligations**").  Additionally, the Debtors may be required to pay a termination fee in the amount of $6.25 million (the "**Termination Fee**," and, together with the Backstop Put Premium, the Indemnification Obligations, and the Transaction Expenses, the "**Backstop Obligations**") to non-defaulting Noteholder parties to the Backstop Agreement (the "**Backstop Parties**") if the Backstop Agreement is terminated as a result of Basic Energy Inc.'s board of directors exercising its fiduciary duties and terminating the Restructuring Support Agreement, this court entering an order refusing to confirm the Prepackaged Plan, or an injunction being issued against consummation of the transaction.  The Backstop Obligations are an integral part of the Backstop Agreement, and I believe that without approval of the Backstop Obligations, the Backstop Parties would not have agreed to commit to purchase the Subscription Rights in the Rights Offering.  Further, I believe that the Backstop Agreement is integral to the Prepackaged Plan because it ensures that the capital required to fund the Prepackaged Plan is committed prior to the commencement of the Rights Offering.  The Backstop Parties already have invested significant time and effort in pursuing the transactions set forth in the Backstop Agreement,

55

including conducting diligence on the Debtors' businesses and reviewing and negotiating the

Prepackaged Plan, the Backstop Agreement, and various related documents and agreements.  It is

customary to pay to parties that have committed to the Debtors' estates—whether in the form of

DIP financing, exit financing, or, as here, backstopping a rights offering—a fee that represents a

percentage of such commitment as well as reimbursement of the parties' expenses, and I believe

that such reimbursement is reasonable here.  Additionally, a portion of the proceeds of the Rights

Offering will be used to pay down the Debtors' DIP Facility Claims while the remainder will

serve as exit financing upon emergence from chapter 11.  Furthermore, the entry of an order

approving the Backstop Agreement and the Rights Offering Procedures within eight (8) calendar

days from the Petition Date is a key milestone in the Restructuring Support Agreement, and the

failure to meet such a milestone could result in the Term Loan Lenders and the Ad Hoc Group

withdrawing their support of the Prepackaged Plan.  I believe that the Backstop Parties'

participation in the negotiation of the Prepackaged Plan and their funding of the Rights Offering

have been essential to the Debtors' reorganization and emergence from chapter 11, conferring a

benefit to the Debtors in the operation and restructuring of their businesses.  Accordingly, I

believe the obligation of the Debtors with respect to the Backstop Obligations are reasonable and

should be approved because they are part of the inducement to the Backstop Parties to backstop

the Rights Offering and in so doing, benefit the Debtors' estates.

WEIL:\95879425\17\22010.0003

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.


Dated: October 25, 2016
        Fort Worth, Texas

                              /s/ *David C. Johnston*
                      Name:    David C. Johnston
                      Title:   Chief Restructuring Officer

57

**Exhibit A**

**Restructuring Support Agreement**

**EXECUTION VERSION**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "***Agreement***"), dated as of October 23, 2016, is entered into by and among:

(i) Basic Energy Services, Inc. ("***Basic***" or the "***Company***") and Basic Energy Services GP, LLC, Basic Energy Services LP, LLC, Basic ESA, Inc., Basic Energy Services, L.P., SCH Disposal, L.L.C., Sledge Drilling Corp., Admiral Well Service, Inc., Basic Marine Services, Inc., Chaparral Service, Inc., JS Acquisition LLC, Permian Plaza, LLC, Maverick Coil Tubing Services, LLC, First Energy Services Company, JetStar Holdings, Inc., Xterra Fishing & Rental Tools Co., Maverick Solutions, LLC, LeBus Oil Field Service Co., Acid Services, LLC, Taylor Industries, LLC, Maverick Stimulation Company, LLC, Globe Well Service, Inc., JetStar Energy Services, Inc., Platinum Pressure Services, Inc., Maverick Thru-Tubing Services, LLC, MCM Holdings, LLC, MSM Leasing, LLC and The Maverick Companies, LLC, each such entity a subsidiary of the Company (such entities, together with Basic, the "***Basic Parties***");

(ii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain Term Loan Credit Agreement (collectively, the "***Term Loan Lenders***"), dated as of February 17, 2016 (as amended, restated, modified or otherwise supplemented from time to time, the "***Term Loan Facility***" or the "***Term Loan Agreement***") by and among Basic, as Borrower, U.S. Bank National Association, as Administrative Agent (the "***Term Loan Agent***"), and the Term Loan Lenders, together with their respective successors and permitted assigns and any subsequent Term Loan Lender that becomes party hereto in accordance with the terms hereof (collectively, the "***Consenting Term Loan Lenders***");

(iii) the undersigned beneficial holders, or investment advisers or managers for the account of beneficial holders (collectively, the "***2019 Noteholders***") of the 7.75% Senior Notes due 2019 (the "***2019 Notes***") issued pursuant to that certain indenture dated February 15, 2011 (the "***2019 Notes Indenture***") among Basic, as Issuer, each of the guarantors named therein, and Wells Fargo Bank, N.A. as Trustee, together with their respective successors and permitted assigns that subsequently become party hereto in accordance with the terms hereof (collectively, the "***Consenting 2019 Noteholders***"); and

(iv) the undersigned beneficial holders, or investment advisers or managers for the account of beneficial holders (collectively, the "***2022 Noteholders***") of the 7.75% Senior Notes due 2022 (the "***2022 Notes***" and, together with the 2019 Notes, the "***Notes***") issued pursuant to that certain indenture dated October 16, 2012 (the "***2022 Notes Indenture***" and, together with the 2019 Notes Indenture, the "***Indentures***") among Basic, as Issuer, each of the guarantors named therein, and Wells Fargo Bank, N.A. as Trustee, together with their respective successors and permitted assigns that subsequently become party hereto in accordance with the terms hereof (collectively, the "***Consenting 2022 Noteholders***" and, together with the Consenting 2019 Noteholders, the "***Consenting Noteholders***").

WEIL:\95912669\1\22010.0003

The Consenting Term Loan Lenders and Consenting Noteholders are collectively referred to herein as the "**_Consenting Creditors_**". Each of the Basic Parties, the Consenting Creditors and any subsequent person or entity ("**_Person_**") that becomes a party hereto in accordance with the terms hereof is referred to herein as a "**_Party_**" and collectively as the "**_Parties_**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Basic Plan (as defined herein) annexed hereto as **Exhibit A** (including all exhibits thereto).

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's length and agreed to undertake a financial restructuring of existing debt and equity interests of the Company, to be implemented by each of the Basic Parties commencing a voluntary case (collectively, the "**_Chapter 11 Cases_**") under chapter 11 of title 11 of the United States Code (the "**_Bankruptcy Code_**") in the United States Bankruptcy Court for the District of Delaware (the "**_Bankruptcy Court_**") to pursue a pre-packaged chapter 11 plan of reorganization (the "**_Basic Plan_**") all in accordance with the terms set forth in this Agreement and the Definitive Documents (as defined below) (the "**_Restructuring_**");

**WHEREAS**, as of the date hereof, the Consenting Term Loan Lenders, in the aggregate, hold not less than $164,175,000 (100%) of the aggregate outstanding principal amount of the Term Loan Facility;

**WHEREAS**, as of the date hereof, the Consenting Noteholders, in the aggregate, hold approximately $628,320,000 (81.07%) of the aggregate outstanding principal amount of the 2019 Notes and the 2022 Notes;

**WHEREAS**, the Company, the Consenting Term Loan Lenders and the lenders (collectively, the "**_ABL Lenders_**") party to that certain Amended and Restated Credit Agreement, dated November 26, 2014 (as amended, restated, modified or supplemented from time to time, the "**_ABL Facility_**" or the "**_ABL Agreement_**"), have reached an agreement for the consensual use of "cash collateral" pursuant to the terms and conditions set forth in the interim and final orders approving, among other things, the Basic Parties' entry into the DIP Facility (as defined below), to be entered by the Bankruptcy Court (each, a "**_DIP Order_**") substantially in the form of order attached hereto as **Exhibit C** (the "**_Form of DIP Order_**") or otherwise in form and substance mutually acceptable to the Company, the ABL Lenders and the Requisite Creditors;

**WHEREAS**, in connection with the Restructuring, it is expected that certain of the Consenting Noteholders (collectively, the "**_Backstop Parties_**") will agree to backstop a rights offering for $125,000,000 of Mandatorily Convertible Notes (the "**_Rights Offering_**") in accordance with the terms and conditions specified in this Agreement, the Basic Plan, a backstop commitment agreement to be entered into (the "**_Backstop Agreement_**") substantially in the form attached hereto as **Exhibit E**, and the procedures related to the Rights Offering (the "**_Rights Offering Procedures_**") substantially in the form attached as **Exhibit B** to the Backstop Agreement; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Basic Plan and hereunder.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

1.    <u>**Certain Definitions**</u>.

As used in this Agreement, the following terms have the following meanings:

(a)    "***Consenting Class***" means the Consenting Term Loan Lenders or the Consenting Noteholders, as applicable.

(b)    "***Disclosure Statement***" means the disclosure statement in the form attached hereto as **<u>Exhibit F</u>** or otherwise in form and substance mutually acceptable to the Company and the Requisite Creditors.

(c)    "***Effective Date***" means the date on which all the conditions to the occurrence of the effective date set forth in the Basic Plan have been satisfied or waived and the Basic Plan shall have become effective.

(d)    "***Mandatorily Convertible Notes***" means those certain convertible unsecured notes to be issued by the Company in connection with the Rights Offering on the Effective Date, which shall be mandatorily convertible into shares of the reorganized Basic Parties' common stock in accordance with the terms of the Basic Plan.

(e)    "***Requisite Creditors***" means the Requisite Term Loan Lenders and the Requisite Noteholders.

(f)    "***Requisite Noteholders***" means the Consenting Noteholders holding at least a majority of the outstanding principal amount of the Notes held by all Consenting Noteholders.

(g)    "***Requisite Term Loan Lenders***" means the Consenting Term Loan Lenders holding at least a majority in amount of the outstanding Term Loan Claims held by all Consenting Term Loan Lenders.

(h)    "***SEC***" means the United States Securities and Exchange Commission.

(i)    "***Support Effective Date***" means the date on which counterpart signature pages to this Agreement, pursuant to the conditions set forth in <u>Section 12</u> herein, shall have been executed and delivered by: (w) the Basic Parties, (x) Consenting Term Loan Lenders holding 100% in aggregate Term Loan Claims outstanding under the Term Loan (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) and (y) Consenting Noteholders holding at least 66.67% in aggregate principal amount outstanding of the Notes (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code).

**2.      Basic Plan**.  The terms and conditions of the Restructuring are set forth in the Basic Plan (including all exhibits thereto); provided that the Basic Plan is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Basic Plan, the terms of the Basic Plan shall govern.

**3.      Bankruptcy Process**.

(a)      Commencement of the Chapter 11 Cases.  Each Basic Party hereby agrees that, as soon as reasonably practicable, but in no event later than 11:59 p.m. prevailing Eastern Time on October 25, 2016 (the date on which such filing occurs, the "***Commencement Date***"), such Basic Party shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the chapter 11 case of such Basic Party.

(b)      Filing of the Basic Plan.  On the Commencement Date, the Basic Parties shall file the Basic Plan along with the Disclosure Statement.

(c)      Confirmation of the Basic Plan. The Basic Parties shall use reasonable best efforts to obtain confirmation of the Basic Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor shall use its reasonable best efforts to cooperate fully in connection therewith.

(d)      DIP Order.  The Basic Parties shall on or within one (1) business day after the Commencement Date file a motion with the Bankruptcy Court seeking interim and final approval of the DIP Order.

(e)      Backstop Agreement and Rights Offering.  The Basic Parties shall file with the Bankruptcy Court a motion seeking approval of the Backstop Agreement and the Rights Offering Procedures within one (1) business day after the execution of the Backstop Agreement.

**4.      Agreements of the Consenting Creditors.**

(a)      Voting, Support.  So long as this Agreement has not been terminated with respect to such Consenting Creditor in accordance with the terms hereof, each Consenting Creditor agrees that it shall, subject to the terms and conditions hereof:

(i)      subject to the receipt by such Consenting Creditor of the Disclosure Statement and other solicitation materials in respect of the Basic Plan, vote all of its claims against the Basic Parties or hereafter owned by such Consenting Creditor (or for which such Consenting Creditor now or hereafter has voting control over) to accept the Basic Plan, by delivering its duly executed and completed ballots accepting the Basic Plan on a timely basis following the commencement of the solicitation and, to the extent it is permitted to elect whether to opt out of the releases set forth in the Basic Plan, not "opt out" of any releases under the Basic Plan by timely delivering its duly executed and completed ballot or ballots indicating such election;

WEIL:\95912669\1\22010.0003

(ii)     not (A) direct any administrative agent, collateral agent or indenture trustee (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent, collateral agent or indenture trustee takes any action inconsistent with such Consenting Party's obligations under this Agreement, such Consenting Party shall use its reasonable best efforts to request that such administrative agent, collateral agent or indenture trustee (as applicable) cease and refrain from taking any such action, (B) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company except in a manner consistent with this Agreement, the DIP Order, and the Basic Plan, as applicable, or (C) amend, change or withdraw (or cause to be amended, changed or withdrawn) its vote to accept the Basic Plan; and

(iii)     not (A) object to, delay, impede or take any other action to interfere with, delay, or postpone acceptance, confirmation, or implementation of the Basic Plan, (B) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to Section 363 of the Bankruptcy Code), merger, workout or plan of reorganization for any of the Basic Parties other than the Basic Plan or (C) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring.

(b)     <u>Transfers</u>.

(i)     Each Consenting Creditor agrees that, for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated with respect to such Consenting Creditor in accordance with <u>Section 6</u>, such Consenting Creditor shall not (A) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Consenting Creditor's claims against any Basic Party, as applicable, in whole or in part, or (B) deposit any of such Consenting Creditor's claims against in any Basic Party, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims (the actions described in clauses (A) and (B) are collectively referred to herein as a "***Transfer***" and the Consenting Creditor making such Transfer is referred to herein as the "***Transferor***"), unless such Transfer is to another Consenting Creditor or any other entity that first agrees in writing to be bound by the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Basic Parties prior to such Transfer) by executing and delivering to counsel to the Debtors, counsel to the Consenting Term Loan Lenders and counsel to the Consenting Noteholders, a Transferee Joinder substantially in the form attached hereto as **<u>Exhibit D</u>** (the "***Transferee Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Weil, Gotshal & Manges LLP ("***Weil***"), counsel to the Company, (ii) Fried, Frank, Harris, Shriver & Jacobson LLP ("***Fried Frank***") counsel to the *ad hoc* group of Noteholders (the "***Ad Hoc Group***") and (iii) Davis Polk & Wardwell LLP ("***Davis Polk***" and together with Fried Frank, "***Consenting Creditors' Counsel***") as counsel to the Term Loan Lenders.  With respect to claims against or interests in a Basic Party held by the relevant transferee upon

consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Creditor, as applicable, set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this subsection (b) of Section 4 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Basic Parties and/or any Consenting Creditor, and shall not create any obligation or liability of any Basic Party or any other Consenting Creditor to the purported transferee. Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, if any Party executes and becomes bound by this Agreement solely as to a specific business unit, division or desk, no affiliate of such Party or other business unit, division or desk within any such Party shall be subject to this Agreement unless they separately execute a Transferee Joinder Agreement.

(ii) Notwithstanding Section 4(b): (A) a Consenting Creditor may Transfer any claim to an entity that is acting in its capacity as a Qualified Marketmaker (as defined herein) (a "***Qualified Transfer***") without the requirement that the Qualified Marketmaker be or become a Consenting Creditor, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers all right, title and interest in such claim to a transferee that is a Consenting Creditor (or becomes a Consenting Creditor at the time of the Transfer pursuant to a Transferee Joinder Agreement) and (B) if a Consenting Creditor, acting in its capacity as a Qualified Marketmaker, acquires a claim from a holder of claims that is not a Consenting Creditor, it may Transfer such claim without the requirement that the transferee be or become a Consenting Creditor. Notwithstanding the foregoing, if, at the time of the proposed Transfer of such claims to the Qualified Marketmaker, such claims (x) may be voted on the Basic Plan, the proposed Transferor must first vote such claims in accordance with the requirements of Section 4(a), or (y) have not yet been and may not yet be voted on the Basic Plan and such Qualified Marketmaker does not Transfer such claims to a subsequent transferee prior to the fifth (5th) business day prior to the expiration of the voting deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first business day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such claims in accordance with the terms hereof (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such claims at such time that the transferee of such claims becomes a Consenting Creditor with respect to such claims). For purposes hereof, a "Qualified Marketmaker" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

WEIL:\95912669\1\22010.0003

(c)   <u>Additional Claims</u>. This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Claims or transferring Claims in accordance with this <u>Section 4</u>, and each Consenting Creditor agrees that if any Consenting Creditor acquires additional Claims or transfers Claims, then (i) such Claims shall be subject to this Agreement (including the obligations of the Consenting Creditors under this <u>Section 4</u>) and (ii) such Consenting Creditor shall notify its counsel and Weil of such acquisition or transfer (as applicable), in each case other than with respect to any Claims acquired by such Consenting Creditor in its capacity as a Qualified Marketmaker.  This Agreement shall in no way be construed to limit or otherwise restrict the rights of the Consenting Creditors to transfer or vote any Existing Equity Interests held thereby.  The confidential schedule of the principal amount of debt held by the Consenting Creditors and any transfer notices provided to the applicable Consenting Creditors' Counsel in connection with the foregoing will be made available by such Consenting Creditors' Counsel on a confidential basis to Weil and shall not be disclosed by Weil to any third party except as required by law, subpoena, or other legal process or regulation, or on a confidential basis to the Company and its financial advisors.

(d)   <u>Management Incentive Plan</u>. The Consenting Creditors agree that the Management Incentive Plan to be adopted in connection with the Basic Plan shall be in accordance with the term sheet attached hereto as **Exhibit G**.

(e)   <u>DIP Credit Agreement</u>.  The Consenting Term Loan Lenders and certain Consenting Noteholders (in their capacities as such, the "***DIP Lenders***") agree to provide to the Basic Parties a debtor-in-possession financing facility (the "***DIP Facility***") in an amount up to $90 million, pursuant to the terms and conditions substantially as set forth in the Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement annexed hereto as **Exhibit B** (the "***DIP Credit Agreement***") or otherwise mutually acceptable to the Company and the Requisite Creditors.

(f)   The agreements of the Consenting Creditors in this <u>Section 4</u> shall be solely on such Consenting Creditor's own behalf and not on behalf of any other Consenting Creditors and shall be several and not joint.

5.   **<u>Agreements of the Basic Parties</u>**.

(a)   Each Basic Party, jointly and severally, agrees, from the Support Effective Date and for so long as this Agreement has not been terminated in accordance with the terms hereof, that such Basic Party shall:

(i)   take reasonably necessary and proper actions and use reasonable best efforts to: (A) obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the DIP Order; (B) subject to counsel's professional responsibilities, timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person with respect to entry of the DIP Order or with respect to any adequate protection proposed to be granted or granted to the Term Loan Lenders pursuant to the DIP Order; (C) subject to counsel's professional responsibilities, prosecute and defend any appeals related to the DIP Order; (D) support and consummate the Restructuring in accordance with this Agreement, including the good faith

WEIL:\95912669\1\22010.0003

negotiation, preparation and filing within the time frame provided herein or in the Definitive Documents; (E) execute and deliver any other required agreements to effectuate and consummate the Restructuring; and (F) operate its business in the ordinary course, taking into account the Restructuring;

        (ii)     provide reasonably prompt written notice (in accordance with Section 22 hereof) to the Consenting Creditors between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (1) any covenant of any Basic Party contained in this Agreement not to be satisfied in any material respect or (2) any condition precedent contained in the Basic Plan not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any notice from any governmental unit with jurisdiction in connection with this Agreement or the transactions contemplated by the Restructuring, (D) receipt of any notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (E) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

        (iii)    act in good faith and use reasonable best efforts to support and complete successfully the solicitation in accordance with the terms of this Agreement and the transactions contemplated by the DIP Credit Agreement;

        (iv)    use reasonable best efforts to meet the milestones set forth in clauses (ii) through (ix) and clause (xxv) in Section 6(b) of this Agreement;

        (v)     not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or any other document related to the DIP Facility or the Restructuring in a manner that is materially inconsistent with this Agreement;

        (vi)    subject to counsel's professional responsibilities, timely file a formal objection to any motion filed with the Bankruptcy Court by any individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association seeking the entry of an order modifying or terminating the Basic Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Cases or for relief that (x) is inconsistent with this Agreement in any material respect or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

        (vii)    use reasonable best efforts to obtain any and all required regulatory approvals and third-party approvals of the Restructuring;

(viii)    not take any actions inconsistent with, or is intended or is reasonably likely to interfere with, this Agreement, the DIP Credit Agreement, the Basic Plan and any other related documents executed by the Basic Parties;

(ix)    not directly or indirectly seek or solicit any discussions relating to, or enter into any agreements relating to, any alternative proposal other than the Restructuring, nor shall any Basic Party solicit or direct any person or entity to undertake any of the foregoing;

(x)    provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, the Basic Plan, the Disclosure Statement, ballots and other solicitation materials in respect of the Basic Plan (collectively, the "***Solicitation Materials***") and any proposed amended version of the Basic Plan or the Disclosure Statement, and a proposed confirmation order for the Basic Plan (the "***Confirmation Order***")) any Basic Party intends to file with the Bankruptcy Court to the Consenting Creditors' Counsel, at least three (3) business days prior to the date when the applicable Basic Party intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Basic Plan, the Disclosure Statement, the Solicitation Materials, the Confirmation Order or the DIP Order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing, but in no event later than one (1) business day in advance of any filing thereof) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(xi)    pay the reasonable and documented fees and expenses of the DIP Lenders and the Backstop Parties in the manner, and to the extent provided for, in the DIP Order and the Backstop Order, respectively; and

(xii)    support and take all actions that are necessary and appropriate to facilitate approval of the Disclosure Statement, confirmation of the Basic Plan and consummation of the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in <u>Section 6</u>);

<u>provided</u> that no Basic Party shall be obligated to agree to any modification of any document that is inconsistent with the Basic Plan.

(b)    <u>Professional Fees</u>.  The Basic Parties agree to pay all the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter, as the case maybe, of (a) Fried Frank, (b) GLC Advisors & Co., as financial advisor to the Ad Hoc Group, (c) Davis Polk and (d) PJT Partners, as financial advisor to the Term Loan Lenders; <u>provided</u> that the Basic Parties shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters upon the termination of this Agreement, but, without limiting any obligation of any Basic Party under the Term Loan Agreement, the DIP Credit Agreement, the DIP Order or any other agreement, shall not be responsible hereunder for any fees and expenses incurred after termination.

(c)    <u>Automatic Stay</u>.  The Basic Parties acknowledge and agree and shall not dispute that after the Commencement Date, the termination of this Agreement and the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each Basic Party hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice).

## 6.    <u>Termination of Agreement</u>.

(a)    This Agreement shall automatically terminate upon the later of (i) 36 hours or (ii) one Business Day following the delivery of written notice, which notice may be rescinded or re-delivered within such period (and which re-delivered notice shall be deemed to be delivered as of the time such notice was first delivered), to the other Parties (in accordance with <u>Section 22</u>) from any of the Requisite Term Loan Lenders or the Requisite Noteholders, as applicable, at any time after and during the continuance of any Creditor Termination Event; provided, that termination by any of the Requisite Term Loan Lenders or the Requisite Noteholders shall only be effective as to the applicable Consenting Class.  In addition, this Agreement shall automatically terminate with respect to the applicable Consenting Class upon the later of (i) 36 hours or (ii) one Business Day following the delivery of written notice, which notice may be rescinded or re-delivered within such period (and which re-delivered notice shall be deemed to be delivered as of the time such notice was first delivered), from the Company to such Consenting Class (in accordance with <u>Section 22</u>) at any time after the occurrence and during the continuance of any Company Termination Event.  This Agreement shall terminate automatically without any further required action or notice on the Effective Date of the Basic Plan.

(b)    A "<u>Creditor Termination Event</u>" shall mean any of the following:

(i)    The breach in any material respect by any Basic Party of any of the undertakings, representations, warranties or covenants of the Basic Parties set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from any of the Requisite Creditors pursuant to this <u>Section 6</u> and in accordance with <u>Section 22</u> (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above.

(ii)    At 11:59 p.m. prevailing Eastern Time on October 24, 2016 (the "***Solicitation Commencement Date***") unless the Basic Parties, either directly, or through their designated voting agent, have commenced the solicitation of votes on the Basic Plan.

(iii)    At 11:59 p.m. prevailing Eastern Time on October 25, 2016, unless the Basic Parties have commenced the Chapter 11 Cases and filed the Basic Plan and the Disclosure Statement.

(iv)    At 11:59 p.m. prevailing Eastern Time on October 25, 2016, unless the Basic Parties have filed with the Bankruptcy Court a motion seeking approval of the

Backstop Agreement and the Rights Offering Procedures (the "***Rights Offering Approval Motion***").

(v)     At 11:59 p.m. prevailing Eastern Time on November 2, 2016, if the order approving the Rights Offering Approval Motion (the "***Rights Offering Approval Order***") shall not have been entered by the Bankruptcy Court.

(vi)     At 11:59 p.m. prevailing Eastern Time on October 26, 2016, if the Backstop Agreement is not effective in accordance with its terms.

(vii)     At 11:59 p.m. prevailing Eastern Time on January 8, 2017 (the "***Confirmation Date***"), if the Bankruptcy Court shall not have entered an order in form and substance reasonably satisfactory to the Basic Parties and the Requisite Creditors confirming the Basic Plan and approving the Disclosure Statement.

(viii)     At 11:59 p.m. prevailing Eastern Time on the date that is January 23, 2017 days after the Commencement Date (the "***Outside Date***"), if the Effective Date shall not have occurred.

(ix)     The Basic Parties withdraw the Basic Plan or Disclosure Statement, or the Basic Parties file any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Basic Plan and such motion or pleading has not been withdrawn prior to the earlier of (i) two (2) business days after the Basic Parties receive written notice from Requisite Term Loan Lenders or Requisite Noteholders (in accordance with Section 22) that such motion or pleading is inconsistent with this Agreement or the Basic Plan and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading.

(x)     Any Basic Party files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases.

(xi)     An examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases or if the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or have been dismissed by order of the Bankruptcy Court.

(xii)     Any Basic Party files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting Creditor arising under or relating to the Term Loan Agreement or the Indentures.

(xiii)     The Bankruptcy Court enters an order avoiding, disallowing, subordinating or recharacterizing, other than in a de minimis amount, any claim, lien, or interest held by any Consenting Creditor arising under the Term Loan Agreement or the Indentures, unless (A) the Basic Parties have sought a stay of such order within five (5) business days after the date of such issuance and such order is stayed within ten (10)

business days after the date of such issuance and (B) such order is reversed or vacated within twenty (20) business days after the date of such issuance.

(xiv)    The Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Basic Parties have sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance.

(xv)    The Basic Parties file, propound or otherwise support any plan of reorganization other than the Basic Plan.

(xvi)    Any Basic Party files any motion or application seeking authority to sell all or a material portion of its assets.

(xvii)    The termination of the consensual use of cash collateral as provided in the DIP Order.

(xviii)    At the option of a non-terminating Consenting Class, if the Consenting Term Loan Lenders or the Consenting Noteholders give a notice of termination of this Agreement.

(xix)    On the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Basic Plan or refusing to approve the Disclosure Statement, provided that the Consenting Class shall not have the right to terminate this Agreement pursuant to this clause (b)(xxi) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Basic Plan subject only to modifications to the Basic Plan or Disclosure Statement which (i) are not inconsistent with the Basic Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (ii) do not create any new material obligation on any Party, and (iii) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Basic Plan that results in a diminution of the value of the property to be received by a Consenting Class under the Basic Plan shall be deemed to adversely affect such Class) whether such change is made directly to the treatment of a Consenting Class or to the treatment of another Consenting Class or otherwise.

(xx)    At 11:59 p.m. prevailing Eastern Time on the date (x) that is four (4) business days after the Commencement Date if the Bankruptcy Court shall not have entered the DIP Order on an interim basis and (y) that is forty five (45) calendar days after the Commencement Date if the Bankruptcy Court shall not have entered the DIP Order on a final basis.

(xxi)    The failure by the Basic Parties to comply with the DIP Orders, including, without limitation, failure to make adequate protection payments when due, which remains uncured for a period of five (5) business days after the receipt of written notice of such event, or is not otherwise waived in accordance with the terms thereof.

(xxii)   The acceleration of the obligations or termination of commitments under the DIP Facility.

(xxiii)  The termination of the Backstop Agreement in accordance with its terms.

(xxiv)  Any of the Definitive Documentation shall have been modified in a manner adverse in any material respect to any Consenting Creditor, without the prior written consent of the Requisite Creditors.

(xxv)   The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Basic Plan, the DIP Facility or the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within ten (10) business days after such issuance.

(c)      A "Company Termination Event" shall mean the occurrence of any of the following events after two (2) business days' prior written notice, delivered in accordance with Section 22 hereof:

(i)      The breach in any material respect by one or more of the Consenting Creditors in any Consenting Class, of any of the undertakings, representations, warranties or covenants of the Consenting Creditors set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 6 and Section 22 (as applicable), but only if the non-breaching Consenting Creditors in such Consenting Class own less than 66.67% of such Consenting Class, and only with respect to such breaching Class.

(ii)     The board of directors, board of managers, or such similar governing body of any Basic Party reasonably determines in good faith based on advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company or another Basic Party provides notice of such determination to the Consenting Creditors within two (2) business days after the date thereof.

(iii)    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order enjoining the consummation of a material portion of the Restructuring, which ruling, judgment or order has not been stayed, reversed or vacated within twenty (20) business days after such issuance; provided, that, for the avoidance of doubt, a ruling by the Bankruptcy Court that the Basic Plan is not confirmable as a result of terms included therein shall not, by itself, constitute a termination event pursuant to this Section 6(c).

(iv)     At 11:59 p.m. prevailing Eastern Time on the Confirmation Date, if the Bankruptcy Court shall not have entered the Confirmation Order in form and substance reasonably satisfactory to the Basic Parties and the Requisite Creditors.

(v)     At 11:59 p.m. prevailing Eastern Time on October 26, 2016, if the Backstop Agreement is not effective in accordance with its terms.

(vi)     At 11:59 p.m. prevailing Eastern Time on the Outside Date, if the Effective Date shall not have occurred.

(vii)     On the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Basic Plan or refusing to approve the Disclosure Statement, provided that the Basic Parties shall not have the right to terminate this Agreement pursuant to this clause (c)(vii) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Basic Plan subject only to modifications to the Basic Plan or Disclosure Statement which (i) are not inconsistent with the Basic Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (ii) do not create any new material obligation on any Party, and (iii) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Basic Plan that results in a diminution of the value of the property to be received by a Consenting Class under the Basic Plan shall be deemed to adversely affect such Class) whether such change is made directly to the treatment of a Consenting Class or to the treatment of another Consenting Class or otherwise.

(viii)     If the Requisite Term Loan Lenders or the Requisite Noteholders give a notice of termination of this Agreement.

(ix)     The termination of the Backstop Agreement in accordance with its terms.

Notwithstanding any provision in this Agreement to the contrary, upon written consent of the Requisite Creditors, each of the dates set forth in Section 6(b)(ii)-(x) and (xxvi), and upon written consent of the Company, the dates set forth in Section 6(c)(iv)-(vi), may be extended prior to or upon such date and such later dates agreed to in lieu thereof and shall be of the same force and effect as the dates provided herein.

(d)     Mutual Termination.  This Agreement may be terminated by mutual written agreement of the Company and the Requisite Creditors upon the receipt of written notice delivered in accordance with Section 22.

(e)     Individual Consenting Creditor Termination.  At 11:59 p.m. prevailing Eastern Time on the date that is 365 days after the Support Effective Date, each Consenting Creditor may terminate this Agreement, solely as to such terminating Consenting Creditor, by written notice to the Company.

(f)     Effect of Termination.  Subject to the provisions contained in Section 15, upon the termination of this Agreement in accordance with this Section 6, this Agreement shall become void and of no further force or effect with respect to any Party, and, except as otherwise provided in this Agreement, each Party shall be immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and shall have all the

rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon any such termination of this Agreement, any and all consents and ballots tendered by the Consenting Creditors prior to such termination shall be deemed, for all purposes, automatically null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Basic Plan and this Agreement or otherwise, and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission), and the Company shall not oppose any such change or resubmission.

7.    **Definitive Documents; Good Faith Cooperation; Further Assurances**. The Definitive Documents shall include all (i) documents implementing, achieving, and relating to the Restructuring, including, without limitation, the Basic Plan, the Disclosure Statement, the DIP Order, the Plan Supplement (as defined in the Basic Plan) and its exhibits, solicitation procedures, commitment agreements, exit financing agreements, collateral or other related documents, the Backstop Agreement, the Rights Offering Procedures, organizational documents (including, without limitation, the organizational and governance documents for the reorganized Basic Parties), shareholder and member related agreements, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Basic Plan and the exhibits thereto), (ii) motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion to approve the Disclosure Statement, confirm the Basic Plan, approve the DIP Facility, approve the Rights Offering, approve the Backstop Agreement, ratify the solicitation procedures, and schedule a joint hearing, and (iii) orders approving the DIP Facility, the Disclosure Statement, the Rights Offering, the Backstop Agreement, the solicitation procedures, the Basic Plan, and scheduling of a joint hearing. The Definitive Documents, whether filed with the Bankruptcy Court or otherwise finalized, shall be consistent with this Agreement, the Basic Plan and the Form of DIP Order in all respects, and shall otherwise be acceptable to the Company and the Requisite Creditors, each acting reasonably; provided that the Amended and Restated Term Loan Agreement shall satisfy the definition in the Basic Plan with any amendments to that definition being acceptable to the Term Loan Lenders in their sole discretion and acceptable to the Requisite Noteholders in their reasonable discretion; provided, further, that the Basic Plan, the Confirmation Order, the Disclosure Statement, the Rights Offering Procedures and the Backstop Agreement shall be in form and substance acceptable to the Requisite Creditors in their sole discretion, it being understood that the form of the Basic Plan, the Backstop Agreement and the Disclosure Statement attached hereto as Exhibits A, E and F, respectively, and the Rights Offering Procedures attached as Exhibit B to the Backstop Agreement, are acceptable to the Requisite Creditors. Any amendments, modifications or supplements to the Definitive Documents, whether filed with the Bankruptcy Court or otherwise finalized, shall be consistent with this Agreement, the Basic Plan and the Form of DIP Order in all respects, and in form and substance acceptable to the Requisite Creditors, in their sole discretion; provided, however, that the DIP Credit Agreement may be amended, modified or supplemented in accordance with its terms. Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring, as well as the negotiation,

drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**8.    Representations and Warranties**.

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)    Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder.  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(ii)    The execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Basic Parties, for the filing of the Chapter 11 Cases.

(iii)    The execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary or required by the SEC or other securities regulatory authorities under applicable securities laws.

(iv)    This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)    Each Consenting Creditor severally (and not jointly) represents and warrants to the Basic Parties that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) (x) is the holder of the aggregate principal amount under the (A) Term Loan set forth below its name on the signature page hereto and/or (B) the Notes set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof), or (y) is the nominee, investment manager, or advisor for one or more beneficial holders thereof, and/or (ii) has, with respect to the beneficial owner(s) of the

aggregate principal amount under the (x) Term Loan set forth below its name on the signature page hereto and/or (y) the Notes set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof), (A) sole investment or voting discretion with respect to the Term Loan or the Notes, (B) full power and authority to vote on and consent to matters concerning the Term Loan or the Notes or to exchange, assign and transfer the Term Loan or the Notes, and (C) full power and authority to bind or act on the behalf of, such beneficial owner(s).

(c)     Each Consenting Creditor, and any holder for which any such person acts as investment adviser or manager, is an Accredited Investor (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act).

9.     **Disclosure; Publicity**.   The Company shall submit drafts to each Consenting Creditors' Counsel of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any Person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company, the principal amount or percentage of Loans or Notes held by any Consenting Creditor, in each case, without such Consenting Creditor's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of the Term Loan or the Notes held by all the Consenting Creditors collectively, and (c) any Party may disclose information requested by a regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other Person.  Notwithstanding the provisions in this Section 9, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditor (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

10.     **Creditors' Committee**.  The Parties agree not to request that the United States Trustee appoint an official committee of creditors in the Chapter 11 Cases. Notwithstanding anything herein to the contrary, if any Consenting Creditor is appointed to and serves on an official committee of unsecured creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Creditor's exercise of its fiduciary duties to any Person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement.  All Parties agree they shall not oppose the participation of any of the Consenting Creditors or the trustee under any applicable indenture on any official committee of unsecured creditors formed in the Chapter 11 Cases.

**11.** **Amendments and Modifications**. Except as otherwise expressly set forth herein, this Agreement, including any exhibits or schedules hereto, and the Basic Plan may not be waived, modified, amended or supplemented except in a writing signed by the Company and the Requisite Creditors; provided, that (a) any modification, amendment or change to this Section 11 shall require the written consent of all Parties, (b) any modification, amendment or change to Section 6(e) of this Agreement or to the definition of Consenting Class, Requisite Creditors, Requisite Term Loan Lenders or Requisite Noteholders shall require the written consent of each Consenting Creditor affected thereby, (c) any waiver, change, modification or amendment to this Agreement or the Basic Plan that would have the effect of materially and adversely affecting any Consenting Noteholder in a manner that is disproportionate to any other Consenting Noteholder or the Consenting Noteholders as a whole shall require the written consent of each such Consenting Creditor materially and disproportionately affected thereby, and (d) any waiver, change, modification or amendment to this Agreement or the Basic Plan that would have the effect of adversely affecting the economic recoveries or treatment of any Consenting Creditor compared to the recoveries or treatment set forth in the Basic Plan attached hereto as of the Support Effective Date (it being agreed that, for the avoidance of doubt, any change to this Agreement or the Basic Plan that results in a diminution of the value of the property to be received by a Consenting Class under the Basic Plan or a Consenting Class' proportionate share of the aggregate value to be distributed to all creditors under the Basic Plan shall be deemed to materially adversely affect such Class, whether such change is made directly to the treatment of a Consenting Class or to the treatment of another class or otherwise), may not be made without the written consent of each such adversely affected Consenting Creditor. In the event that an adversely affected Consenting Creditor ("**Non-Consenting Creditor**") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 66.67% of the outstanding relevant debt of the affected Consenting Class of which such Non-Consenting Creditor is a member, this Agreement shall continue in full force and effect with respect to all members of the Consenting Class. Notwithstanding the foregoing, the Basic Parties may amend, modify or supplement the Basic Plan, from time to time, without the consent of any Consenting Creditor, in order to cure any ambiguity, defect (including any technical defect) or inconsistency, provided that any such amendments, modifications or supplements do not adversely affect the rights, interests or treatment of such Consenting Creditors under the Basic Plan.

**12.** **Effectiveness**. This Agreement shall become effective and binding on all Parties on the Support Effective Date; provided that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors' Counsel in a redacted form that removes such Consenting Creditors' holdings of the Loans and Notes and (b) Weil in an unredacted form (to be held by Weil on a confidential and professionals' eyes only basis, provided that Weil may disclose on a confidential basis to the Company and its financial advisors).

**13.** **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof. Each of the Parties irrevocably agrees that any

WEIL:\95912669\1\22010.0003

legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "***New York Courts***"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement and the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the New York Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court.  Each of the Parties further agrees that notice as provided in <u>Section 22</u> shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that a proceeding in any New York Court is brought in an inconvenient forum or the venue of such proceeding is improper.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 13(a)</u> shall be brought in the Bankruptcy Court.

(b)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).

**14.     <u>Specific Performance Sole and Exclusive Remedy</u>**.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.  Specific performance and injunctive or other equitable relief (including attorneys' fees and costs) shall be the sole and exclusive remedy for any breach of this Agreement by any Party.

**15.     <u>Survival</u>**.  Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u>, <u>Sections 9</u>, <u>10</u>, <u>13</u> and <u>15</u> shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; <u>provided</u> that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

**16.     <u>Headings</u>**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**17.     <u>Successors and Assigns; Severability</u>**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; <u>provided</u> that nothing contained in this <u>Section 17</u> shall be deemed to permit Transfers of the Loans, Notes or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such

WEIL:\95912669\1\22010.0003

provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18.      **Several, Not Joint, Obligations**.   The agreements, representations and obligations of each Consenting Creditor under this Agreement are, in all respects, several and not joint, and are made in favor of the Basic Parties only and not in favor of or for the benefit of any other Consenting Creditor.  The agreements, representations and obligations of the Basic Parties under this Agreement are, in all respects, joint and several.

19.      **Relationship Among Parties**.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third-party beneficiary hereof.  No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

20.      **Prior Negotiations; Entire Agreement**.  This Agreement, including the exhibits and schedules hereto (including the Basic Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Company and each Consenting Creditor prior to the execution of this Agreement shall continue in full force and effect for the duration of such confidentiality agreements.

21.      **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

22.      **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(a)      If to any Basic Party, to:

Basic Energy Services, Inc.
801 Cherry Street, Suite 2100
Fort Worth, Texas 76102
Attention:    T. M. "Roe" Patterson, President, Chief Executive Officer and Alan Krenek, Senior Vice President, Chief Financial Officer, Treasurer and Secretary
Email:  Roe.Patterson@basicenergyservices.com  and
        Alan.Krenek@basicenergyservices.com

20

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP (as counsel to the Company)
767 Fifth Avenue
New York, NY 10153
Facsimile:  (212) 310-8007
Attention:    Ray Schrock and Ronit Berkovich
Email: Ray.Schrock@weil.com and Ronit.Berkovich@weil.com

(b)      If to the Term Loan Lenders, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Facsimile:  212-701-5099
Attention:  Marshall S. Huebner and Darren S. Klein
Email: marshall.huebner@davispolk.com and darren.klein@davispolk.com

(c)      If to the Noteholders, to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Facsimile: (212)299-6650
Attention:    Brad Eric Scheler and Peter Siroka
Email: Brad.Eric.Scheler@friedfrank.com and Peter.Siroka@friedfrank.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

   **23.**      **Qualification on Consenting Creditor Representations**.   The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Creditor that are not held through accounts managed by such investment manager.

   **24.**      **Settlement Discussions**.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

   **25.**      **No Solicitation; Adequate Information**.  This Agreement is not and shall not be deemed to be a solicitation for consents to the Basic Plan.  The votes of the holders of claims against the Basic Parties will not be solicited until such holders who are entitled to vote

on the Basic Plan have received the Basic Plan, the Disclosure Statement and related ballots, and other required solicitation materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any Person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

### 26.   <u>Reservation of Rights</u>.

(a)   Except as expressly provided in this Agreement or the Basic Plan, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

(b)   If the Basic Plan is not consummated in the manner set forth, and on the timeline set forth in this Agreement and the Basic Plan, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses. This Agreement, the Basic Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 27.   <u>Interpretation; Rules of Construction; Representation by Counsel</u>.

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**BASIC PARTIES**

**BASIC ENERGY SERVICES, INC.**


By:      /s/ David C. Johnston
Name:  David C. Johnston
Title:   Chief Restructuring Officer


**BASIC ENERGY SERVICES GP, LLC**
**BASIC ENERGY SERVICES LP, LLC**
**BASIC ESA, INC.**
**BASIC ENERGY SERVICES, L.P.**
**CHAPARRAL SERVICE, INC.**
**SCH DISPOSAL, L.L.C.**
**SLEDGE DRILLING CORP.**
**ADMIRAL WELL SERVICE, INC.**
**BASIC MARINE SERVICES, INC.**
**JS ACQUISITION LLC**
**PERMIAN PLAZA, LLC**
**MAVERICK COIL TUBING SERVICES, LLC**
**FIRST ENERGY SERVICES COMPANY**
**JETSTAR HOLDINGS, INC.**
**XTERRA FISHING & RENTAL TOOLS CO.**
**MAVERICK SOLUTIONS, LLC**
**LEBUS OIL FIELD SERVICE CO.**
**ACID SERVICES, LLC**
**TAYLOR INDUSTRIES, LLC**
**MAVERICK STIMULATION COMPANY, LLC**
**GLOBE WELL SERVICE, INC.**
**JETSTAR ENERGY SERVICES, INC.**
**PLATINUM PRESSURE SERVICES, INC.**
**MAVERICK THRU-TUBING SERVICES, LLC**
**MCM HOLDINGS, LLC**
**MSM LEASING, LLC**
**THE MAVERICK COMPANIES, LLC**


By:      /s/ David C. Johnston
Name:  David C. Johnston
Title:   Chief Restructuring Officer

**BASIC ENERGY SERVICES, L.P.**

By:  Basic Energy Services GP, LLC, its sole general partner

By:  Basic Energy Services, Inc., its sole member


By:      /s/ David C. Johnston
Name:  David C. Johnston
Title:    Chief Restructuring Officer

ASCRIBE CAPITAL LLC
(ON BEHALF OF ITSELF AND CERTAIN FUNDS)

By:      /s/ Lawrence First

Name:    Lawrence First

Title:   Chief Investment Officer

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

ATLAS ENHANCED MASTER FUND, LTD. and
ATLAS MASTER FUND, LTD.
.

By:      /s/ Scott Schroeder

Name:    Scott Schroeder

Title:   Director

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

BALIUS CAYMAN, L.P.,
as a Term Loan Lender
By:  Broad Street Energy Advisors, L.L.C.,
its General Partner

By:      /s/ Charlie Gailliot

Name:    Charlie Gailliot

Title:    Vice President

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

BLACKGOLD CAPITAL MANAGEMENT LP

By:      /s/ Pravin Kanneganti

Name:    Pravin Kanneganti

Title:   COO/CCO

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

BRIGADE CAPITAL MANAGEMENT LLC

By:     <u>/s/ Scott Hoffman</u>

Name:   <u>Scott Hoffman</u>

Title:    <u>Senior Analyst</u>

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

COVALENT PARTNERS LLC

By:      /s/ William Stone

Name:    William Stone

Title:    Authorized Signatory

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

CVI OPPORTUNITIES FUND I, LLLP

By: Susquehanna Advisors Group, Inc.

By:        /s/ Kathy Harley

Name:      Kathy Harley

Title:     Assistant Vice President

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, if any Party signs onto this Agreement solely as to a specific business unit or desk, no Affiliate of such Party or other business unit or desk within any such Party shall be subject to this Agreement unless they separately become a party hereto.

**GOLDMAN, SACHS & CO.,**
solely with respect to
the Multi-Strategy Investing Desk of the
Americas Special Situations Group
By:         /s/ Daniel S. Oneglia_____

Name:    Daniel S. Oneglia_____

Title:      Authorized Signatory_____

Principal Amount of the Term Loan Facility: $_____
Principal Amount of the 2019 Notes: $_____
Principal Amount of the 2022 Notes: $_____

**GOLDMAN, SACHS & CO.**,
solely as to the division that acts as
Investment Advisor to, and on behalf of,
certain Term Loan Lenders

By:      /s/ Charlie Gailliot

Name:    Charlie Gailliot

Title:     Managing Director

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

RIVERSTONE VI BASIC HOLDINGS, L.P.,
as a Term Loan Lender

By:  Riverstone Energy Partners IV, L.P.,
its General Partner

By:  Riverstone Energy GP VI, LLC,
its General Partner

By:        /s/ Thomas J. Walker

Name:    Thomas J. Walker

Title:      Authorized Person

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

PHOENIX INVESTMENT ADVISER LLC

By:     <u>/s/ Robert Yowee</u>

Name:   <u>Robert Yowee</u>

Title:    <u>CFO/COO</u>

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

SILVER POINT CAPITAL, L.P.

By:      /s/ Michael A. Gatto

Name:    Michael A. Gatto

Title:    Authorized Signatory

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

WEST STREET ENERGY PARTNERS, L.P.,
as a Term Loan Lender

By:  Broad Street Energy Advisors, L.L.C.,
its General Partner

By:      /s/ Charlie Gailliot

Name:    Charlie Gailliot

Title:    Vice President

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

Case 15-12820    Doc 14    Filed 10/25/16    Page 96 of 373

WHITEBOX ADVISORS LLC

By:      /s/ Mark Strefling

Name:    Mark Strefling

Title:   COO/General Counsel

Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____

# EXHIBIT A

**Plan of Reorganization**

# EXHIBIT B

**DIP Credit Agreement**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT

Dated as of [_____], 2016

among

BASIC ENERGY SERVICES, INC., a Debtor and Debtor-in-Possession under Chapter
11 of the Bankruptcy Code,
as the Borrower,

THE SUBSIDIARIES OF THE BORROWER PARTY HERETO,
each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Guarantors,

U.S. BANK NATIONAL ASSOCIATION,
as Administrative Agent,

and

THE LENDERS PARTY HERETO

1

# TABLE OF CONTENTS[1]

PAGE

## ARTICLE I DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.    *Defined Terms* ...................................................................................1
Section 1.02.    *Other Interpretive Provisions* .........................................................31
Section 1.03.    *Accounting Terms* ...........................................................................32
Section 1.04.    *Rounding* .........................................................................................32
Section 1.05.    *Times of Day* ...................................................................................33
Section 1.06.    *Currency Equivalents Generally* ....................................................33
Section 1.07.    *Uniform Commercial Code* .............................................................33

## ARTICLE II THE COMMITMENTS AND LOANS

Section 2.01.    *The Loans* ........................................................................................33
Section 2.02.    *Borrowings of Loans* ......................................................................34
Section 2.03.    *[Reserved]* .......................................................................................35
Section 2.04.    *[Reserved]* .......................................................................................35
Section 2.05.    *Prepayments* ....................................................................................35
Section 2.06.    *Termination or Reduction of Commitments* ....................................37
Section 2.07.    *Repayment of Loans* ........................................................................37
Section 2.08.    *Interest* ............................................................................................38
Section 2.09.    *Fees* .................................................................................................38
Section 2.10.    *Computation of Interest and Fees; Retroactive Adjustments of*
        *Applicable Rate* ..............................................................................39
Section 2.11.    *Evidence of Debt* .............................................................................39
Section 2.12.    *Payments Generally; Administrative Agent's Clawback* ..................40
Section 2.13.    *Sharing of Payments by Lenders* .....................................................42
Section 2.14.    *Priority and Liens; No Discharge.* ...................................................43
Section 2.15.    *Payment of Obligations* ..................................................................47
Section 2.16.    *Defaulting Lenders* .........................................................................47
Section 2.17.    ........................................................................................................ 47

## ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01.    *Taxes* ................................................................................................48
Section 3.02.    *[Reserved]* .......................................................................................53
Section 3.03.    *[Reserved]* .......................................................................................53
Section 3.04.    *Increased Costs* ...............................................................................53
Section 3.05.    *[Reserved]* .......................................................................................54
Section 3.06.    *Mitigation Obligations; Replacement of Lenders* ...........................54
Section 3.07.    *Survival* ...........................................................................................55

---

[1] NTD: To be updated.

## ARTICLE IV CONDITIONS PRECEDENT

Section 4.01.    *Conditions to the Closing Date* ................................................55
Section 4.02.    *Conditions to Borrowing Any Advance* ................................................58

## ARTICLE V REPRESENTATIONS AND WARRANTIES

Section 5.01.    *Existence, Qualification and Power* ................................................60
Section 5.02.    *Authorization; No Contravention* ................................................60
Section 5.03.    *Governmental Authorization; Other Consents* ................................................60
Section 5.04.    *Binding Effect* ................................................60
Section 5.05.    *Financial Statements; No Material Adverse Effect* ................................................61
Section 5.06.    *Litigation* ................................................62
Section 5.07.    *No Default* ................................................62
Section 5.08.    *Ownership of Property; Liens; Investments* ................................................62
Section 5.09.    *Environmental Compliance* ................................................62
Section 5.10.    *Insurance* ................................................63
Section 5.11.    *Taxes* ................................................63
Section 5.12.    *ERISA Compliance* ................................................64
Section 5.13.    *Subsidiaries; Equity Interests; Loan Parties* ................................................64
Section 5.14.    *Margin Regulations; Investment Company Act* ................................................65
Section 5.15.    *Disclosure* ................................................65
Section 5.16.    *Compliance with Laws* ................................................65
Section 5.17.    *Intellectual Property; Licenses, Etc* ................................................66
Section 5.18.    *[Reserved.]* ................................................66
Section 5.19.    *Casualty, Etc* ................................................66
Section 5.20.    *Labor Matters* ................................................66
Section 5.21.    *Collateral Documents* ................................................66
Section 5.22.    *Sanctions and Anti-Corruption Concerns* ................................................66

## ARTICLE VI AFFIRMATIVE COVENANTS

Section 6.01.    *Financial Statements* ................................................67
Section 6.02.    *Certificates; Other Information* ................................................69
Section 6.03.    *Notices* ................................................72
Section 6.04.    *Payment of Obligations* ................................................72
Section 6.05.    *Preservation of Existence, Etc* ................................................73
Section 6.06.    *Maintenance of Properties* ................................................73
Section 6.07.    *Maintenance of Insurance* ................................................73
Section 6.08.    *Compliance with Laws* ................................................74
Section 6.09.    *Books and Records* ................................................74
Section 6.10.    *Inspection Rights* ................................................74
Section 6.11.    *Use of Proceeds* ................................................75
Section 6.12.    *Covenant to Guarantee Obligations and Give Security* ................................................75
Section 6.13.    *Compliance with Environmental Laws* ................................................77
Section 6.14.    *Preparation of Environmental Reports* ................................................78
Section 6.15.    *Further Assurances* ................................................78

ii

Section 6.16.    *Compliance with Terms of Leaseholds* ...................................................79
Section 6.17.    *Material Contracts* ...................................................79
Section 6.18.    *Appraisals* ...................................................79
Section 6.19.    *Administration of Deposit Accounts* ...................................................79
Section 6.20.    *Certain Case Milestones* ...................................................80
Section 6.21.    *Certain Orders* ...................................................80
Section 6.22.    *Cash Management System* ...................................................81

## ARTICLE VII NEGATIVE COVENANTS

Section 7.01.    *Liens* ...................................................81
Section 7.02.    *Indebtedness* ...................................................83
Section 7.03.    *Investments* ...................................................84
Section 7.04.    *Fundamental Changes* ...................................................85
Section 7.05.    *Dispositions* ...................................................85
Section 7.06.    *Restricted Payments* ...................................................86
Section 7.07.    *Change in Nature of Business* ...................................................86
Section 7.08.    *Transactions with Affiliates* ...................................................86
Section 7.09.    *Burdensome Agreements* ...................................................86
Section 7.10.    *Use of Proceeds* ...................................................87
Section 7.11.    *Budget Variance* ...................................................87
Section 7.12.    *Capital Expenditures and Capitalized Lease Payments* ...................................................87
Section 7.13.    *Amendments of Organization Documents* ...................................................88
Section 7.14.    *Accounting Changes* ...................................................88
Section 7.15.    *Prepayments, Etc. of Indebtedness* ...................................................88
Section 7.16.    *Amendment, Etc. of Indebtedness* ...................................................88
Section 7.17.    *Sanctions* ...................................................88
Section 7.18.    *Additional Bankruptcy Matters* ...................................................88

## ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES

Section 8.01.    *Events of Default* ...................................................89
Section 8.02.    *Remedies upon Event of Default* ...................................................94
Section 8.03.    *Application of Funds* ...................................................95

## ARTICLE IX ADMINISTRATIVE AGENT

Section 9.01.    *Appointment and Authority* ...................................................96
Section 9.02.    *Rights as a Lender* ...................................................96
Section 9.03.    *Exculpatory Provisions* ...................................................97
Section 9.04.    *Reliance by Administrative Agent* ...................................................98
Section 9.05.    *Delegation of Duties* ...................................................99
Section 9.06.    *Resignation of Administrative Agent* ...................................................99
Section 9.07.    *Non-Reliance on Administrative Agent and Other Lenders* ...................................................100
Section 9.08.    *[Reserved]* ...................................................101
Section 9.09.    *Administrative Agent May File Proofs of Claim; Credit Bidding* ...................................................101
Section 9.10.    *Collateral and Guaranty Matters* ...................................................102

iii

## ARTICLE X MISCELLANEOUS

Section 10.01.     *Amendments, Etc* .................................................................104
Section 10.02.     *Notices; Effectiveness; Electronic Communications* .........................106
Section 10.03.     *No Waiver; Cumulative Remedies; Enforcement* ...............................108
Section 10.04.     *Expenses; Indemnity; Damage Waiver* ...........................................108
Section 10.05.     *Payments Set Aside* ...............................................................111
Section 10.06.     *Successors and Assigns* ...........................................................111
Section 10.07.     *Treatment of Certain Information; Confidentiality* ...........................117
Section 10.08.     *Right of Setoff* .....................................................................118
Section 10.09.     *Interest Rate Limitation* ..........................................................119
Section 10.10.     *Counterparts; Integration; Effectiveness* .......................................119
Section 10.11.     *Survival of Representations and Warranties* ....................................119
Section 10.12.     *Severability* ..........................................................................120
Section 10.13.     *Replacement of Lenders* ...........................................................120
Section 10.14.     *Governing Law; Jurisdiction; Etc* ................................................121
Section 10.15.     *Waiver of Jury Trial* ...............................................................122
Section 10.16.     *No Advisory or Fiduciary Responsibility* .........................................122
Section 10.17.     *Electronic Execution of Assignments and Certain Other
                   Documents* ...........................................................................123
Section 10.18.     *USA PATRIOT Act* ..................................................................123
Section 10.19.     *[Reserved]* ...........................................................................124
Section 10.20.     *Acknowledgement and Consent to Bail-In of EEA Financial
                   Institutions* ..........................................................................124
Section 10.21.     *ENTIRE AGREEMENT* ..............................................................124

## ARTICLE XI GUARANTY

Section 11.01.     *Guaranty* ..............................................................................125
Section 11.02.     *No Setoff or Deductions; Taxes; Payments* ......................................125
Section 11.03.     *Rights of Administrative Agent and Lenders* ....................................126
Section 11.04.     *Certain Waivers* .....................................................................126
Section 11.05.     *Obligations Independent* ...........................................................126
Section 11.01.     Subrogation ............................................................................127
Section 11.02.     Termination; Reinstatement .........................................................128
Section 11.03.     *Subordination* ........................................................................128
Section 11.06.     *Condition of Borrower* ..............................................................130
Section 11.07.     *Covenant* ..............................................................................130
Section 11.08.     *Additional Guarantors* ..............................................................130
Section 11.09.     *Several Enforcement* ................................................................130

iv

**SCHEDULES**

1.01   Commitments and Applicable Percentages
5.08   Real Property Matters
5.13   Subsidiaries and Other Equity Investments; Loan Parties
6.12   Guarantors
6.19   Deposit Accounts
7.02   Existing Indebtedness
7.03   Investments
7.09   Burdensome Agreements
10.02  Administrative Agent's Office, Certain Addresses for Notices
10.06  Existing Noteholder Lenders

**EXHIBITS**

Form of

A        Loan Notice
B        DIP Budget
C        Note
D        Compliance Certificate
E-1      Assignment and Assumption
E-2      Administrative Questionnaire
F        Notice of Loan Prepayment
G        Initial Rolling Budget
H        Interim Order
I-1 –I-4        U.S. Tax Compliance Certificate

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN
CREDIT AGREEMENT**

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN
CREDIT AGREEMENT is entered into as of [-], 2016 among Basic Energy Services,
Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of
the Bankruptcy Code (the "**Borrower**"), the Subsidiaries of the Borrower from time party
hereto as Guarantors, each lender from time to time party hereto (collectively, the
"**Lenders**" and individually, a "**Lender**"), and U.S. Bank National Association, as
Administrative Agent.

**PRELIMINARY STATEMENTS:**

WHEREAS, on [___], 2016 (the "**Petition Date**"), the Borrower and certain of its
Subsidiaries (the "**Debtors**") filed voluntary petitions with the Bankruptcy Court
initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code
(the cases of each of the Borrower and each other Debtor, each a "**Case**", and
collectively the "**Cases**") and have continued in the possession of their assets and the
management of their business pursuant to sections 1107 and 1108 of the Bankruptcy
Code.

WHEREAS, the Borrower has requested that the Lenders provide a multiple
delayed draw term loan facility denominated in Dollars in an aggregate principal amount
not to exceed $90,000,000 (the "**Facility**"), with all of the Borrower's obligations under
the Facility to be guaranteed by each Guarantor, and the Lenders have indicated their
willingness to lend on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the
parties hereto covenant and agree as follows:

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.  *Defined Terms*.  As used in this Agreement, the following terms
shall have the meanings set forth below:

"**100 Day Anniversary**" means the date that is 100 days after the Closing Date.

"**2019 Senior Notes**" means the 7-3/4% senior unsecured notes of the Borrower
due 2019 in an aggregate principal amount of $475,000,000 issued and sold pursuant to
the 2019 Senior Notes Documents.

"**2019 Senior Notes Documents**" means (a) the Indenture for the 2019 Senior
Notes dated as of February 15, 2011, (b) the 2019 Senior Notes and (c) all other
agreements, instruments and other documents pursuant to which the 2019 Senior Notes
have been issued or otherwise setting forth the terms of the 2019 Senior Notes.

"**2022 Senior Notes**" means the 7-3/4% senior unsecured notes of the Borrower due 2022 in an aggregate principal amount of $300,000,000 issued and sold pursuant to the 2022 Senior Notes Documents.

"**2022 Senior Notes Documents**" means (a) the Indenture for the 2022 Senior Notes dated as of October 16, 2012, (b) the 2022 Senior Notes and (c) all other agreements, instruments and other documents pursuant to which the 2022 Senior Notes have been issued or otherwise setting forth the terms of the 2022 Senior Notes.

"**ABL Agent**" shall mean Bank of America, N.A., in its capacity as "Administrative Agent" under the ABL Credit Agreement.

"**ABL Collateral Primed Liens**" has the meaning specified in Section 2.14(a).

"**ABL Collateral Priming Liens**" has the meaning specified in Section 2.14(a).

"**ABL Credit Agreement**" means the Amended and Restated Credit Agreement dated as of November 26, 2014, among the Borrower, each lender from time to time party thereto, and Bank of America, N.A., as administrative agent, swing line lender and L/C issuer, as amended, amended and restated, refinanced, renewed, replaced, extended, supplemented or otherwise modified from time to time, in each case in accordance with the terms of the Prepetition Intercreditor Agreement.

"**ABL Credit Agreement Loan Documents**" means the Loan Documents under (and as defined in) the ABL Credit Agreement.

"**ABL Facility Priority Collateral**" has the meaning specified in the Prepetition Intercreditor Agreement.

"**ABL Lenders**" means the Lenders under (and as defined in) the ABL Credit Agreement.

"**ABL Postpetition Collateral**" has the meaning specified in the Orders.

"**Acceptable Disclosure Statement**" means the disclosure statement relating to the Acceptable Plan of Reorganization in the form attached to the Restructuring Support Agreement as Exhibit [F], with changes to such form as are satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion).

"**Acceptable Plan of Reorganization**" means a Reorganization Plan for each of the Cases in the form attached to the Restructuring Support Agreement as Exhibit [A], with changes to such form as are satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion).

2

"**Acquisition**" means the acquisition, directly or indirectly, by any Person of (a) not less than a majority of the Equity Interests of another Person, (b) all or substantially all of the assets of another Person or (c) all or substantially all of a line of business or division of another Person, in each case (i) whether or not involving a merger or a consolidation with such other Person and (ii) whether in one transaction or a series of related transactions.

"**Ad Hoc Note Holder Committee**" means the ad hoc group of holders that own or manage with the authority to act on behalf of the beneficial owners of the 2019 Senior Notes and the 2022 Senior Notes, consisting of Ascribe Capital LLC, Brigade Capital Management, L.P. and Silver Point Capital, L.P., and such other entities that may join such ad hoc group from time to time.

"**Adequate Protection Liens**" has the meaning specified in the Orders.

"**Adequate Protection Payment**" has the meaning specified in the Orders.

"**Administrative Agent**" means U.S. Bank National Association in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit E-2 or any other form approved by the Administrative Agent.

"**Advances**" means, collectively, the Initial Advance, the Second Advance, the Third Advance and the Final Advance.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Superpriority Secured Debtor-in-Possession Term Loan Credit Agreement.

"**Anti-Corruption Laws**" has the meaning specified in Section 5.22.

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time, subject to adjustment as provided in Section 2.16. If the commitment of each Lender to make Loans has been

terminated pursuant to Section 8.02, or if the Commitments have expired, then the Applicable Percentage of each Lender in respect of the Aggregate Commitments shall be determined based on the Applicable Percentage of such Lender in respect of the Aggregate Commitments most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 1.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Applicable Premium**" has the meaning specified in Section 2.05(c).

"**Applicable Rate**" means 12.00% per annum.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E-1.

"**Assignment Triggering Event**" means each of the following events: (i) entry of an order, or any other similar decree, by the Bankruptcy Court that expands, or has the effect of expanding, the rights granted to the Existing Noteholder Lenders pursuant to the Loan Documents unless the Required Lenders have consented to such expansion, (ii) the taking of any action by an Existing Noteholder Lender which, if taken by any Loan Party, would constitute an Event of Default hereunder, (iii) the taking of any action (or the failure to take any action) by an Existing Noteholder Lender that results in such Existing Noteholder Lender becoming a Defaulting Lender, including the failure of any Existing Noteholder Lender to fund all or any of its Applicable Percentage of any Loan within two Business Days of the date on which such Loan is required to be funded or (iv) in the event that an Existing Noteholder Lender has the right to consent to an amendment, waiver, consent or other modification to any of the Loan Documents that has the effect of extending the Scheduled Maturity Date to a date that is later than the twelve (12) month anniversary of the Closing Date, the failure by such Existing Noteholder Lender to timely deliver its consent to such amendment, waiver, consent or other modification.

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

4

"**Audited Financial Statements**" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2015, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"**Avoidance Action**" has the meaning specified in Section 2.14.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Beneficiaries**" has the meaning specified in Section 11.01.

"**Board**" means the board of directors (or equivalent governing body) of the Borrower and each committee thereof.

"**Borrower**" has the meaning specified in the introductory paragraph hereto.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrower Notice**" shall have the meaning assigned to such term in the definition of Flood Zone Requirements.

"**Borrowing**" means a borrowing consisting of simultaneous Loans made by each of the Lenders pursuant to Section 2.01.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"**Capital Expenditures**" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding normal replacements and maintenance which are properly charged to current operations). For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the amount by

<center>5</center>

which such purchase price exceeds the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such insurance proceeds, as the case may be.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"**Carve-Out**" has the meaning specified, and shall be construed and interpreted in accordance with, the Orders.

"**Carve-Out Notice**" has the meaning specified in the definition of Trigger Date in Section 1.01.

"**Cases**" has the meaning specified in the introductory paragraph hereto.

"**Cash Collateral**" has the meaning specified in the Orders.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any of its Subsidiaries free and clear of all Liens (other than Liens created under the Orders and the Collateral Documents and other Liens permitted hereunder):

(a)        readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)        time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of not less than $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)        commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "**Prime-1**" (or the then equivalent grade) by Moody's or at least "**A-1**" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof; and

(d)        Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the

6

portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"**Cash Management Order**" shall mean one or more orders, in form and substance satisfactory to the Required Lenders in their sole discretion, authorizing, among other things, the continuation of the Debtors' existing cash management systems and arrangements (as may be amended, supplemented or modified from time to time after entry thereof with the written consent of the Required Lenders, in their sole discretion).

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**CFC**" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority, provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "**Change in Law**", regardless of the date enacted, adopted or issued.

"**Change of Control**" means an event or series of events by which:

(a)    any "**person**" or "**group**" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "**beneficial owner**" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "**beneficial ownership**" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "**option right**")), directly or indirectly, of 35% or more of the equity securities of the Borrower entitled to vote for members of the Board or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such "**person**" or "**group**" has the right to acquire pursuant to any option right); or

(b)    during any period of 12 consecutive months, a majority of the members of the Board or other equivalent governing body of the Borrower cease to be composed of

<center>7</center>

individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination not less than a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination not less than a majority of that board or equivalent governing body; or

(c)    the passage of 30 days from the date upon which any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the equity securities of the Borrower entitled to vote for members of the Board or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing 35% or more of the combined voting power of such securities; or

(d)    a "**change of control**" or any comparable term under, and as defined in, any credit agreement, indenture or other similar agreement governing any material post-petition debt shall have occurred;

provided that, notwithstanding the foregoing, the Acceptable Plan of Reorganization or the Restructuring Support Agreement shall not constitute a Change of Control.

"**Closing Date**" means [-], 2016, so long as on or prior to such date all the conditions precedent in Section 4.01 have been satisfied or waived in accordance with Section 10.01.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all of the "**Collateral**" referred to in the Collateral Documents, the Interim Order or the Final Order and all of the other property that is or is intended under the terms of the Collateral Documents, the Interim Order or the Final Order to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Collateral Documents**" means, collectively, this Agreement, the Security Agreement, the Intellectual Property Security Agreement, the Intercompany Note, each of the Mortgages (if any), collateral assignments, Security Agreement Supplements, IP Security Agreement Supplements, security agreements, pledge agreements, landlord's agreements, control agreements or other similar agreements delivered to the Administrative Agent pursuant to Sections 4.01 and 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.  The Collateral

8

Documents shall supplement, and shall not limit, the security interests granted to the Administrative Agent for the benefit of the Secured Parties pursuant to the Orders.

"**Commitment**" means, as to each Lender, its obligation to make Loans to the Borrower pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1.01 under the caption "Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit D.

"**Consummation Date**" means the date of the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Credit Card Cash Collateral**" means an amount not to exceed $2,000,000 pledged to Bank of America, N.A., and deposited in the Bank of America, N.A. Account No. XXXXXX5481, pursuant to the Credit Card Control Agreement as security exclusively for the obligations under the P-Card Agreements.

"**Credit Card Control Agreement**" means that certain Treasury Management Services Security and Control Agreement dated as of September 14, 2016 between Bank of America, N.A. and Basic Energy Services L.P., as may be amended, modified or supplemented from time to time.

"**Creditors' Committee**" has the meaning specified in the definition of "Carve-Out" in Section 1.01.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning specified in the introductory paragraphs hereto.

9

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (i) the Applicable Rate plus (ii) 3% per annum.

"**Defaulting Lender**" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (iii) become the subject of a Bail-in Action.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each other Lender promptly following such determination.

10

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory is the subject of any Sanctions (currently, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"**DIP Budget**" means a monthly line item budget for the Borrower and its Subsidiaries, substantially in the form attached hereto as Exhibit B, covering a period from the Petition Date through the Scheduled Maturity Date, and dated as of a date that is no earlier than three Business Days prior to the Closing Date.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above or (c) contains any repurchase obligation.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.06(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.06(b)(iii)).

11

"**Environmental Laws**" means any and all federal, state, local and foreign statutes, laws (including common law), regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to Hazardous Materials, pollution and the protection of the environment or the release of any materials into the environment, including those related to air emissions and discharges to waste or public systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of or relating to the Borrower, any other Loan Party or any of their respective Subsidiaries and directly or indirectly resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license, franchise, certificate or other authorization relating to or required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination (provided, however, that debt securities that are or by their terms may be convertible or exchangeable into or for Equity Interests shall not constitute Equity Interests prior to conversion or exchange thereof).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "**substantial employer**" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial

12

withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excluded Taxes**" means, with respect to any Recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the United States, any State or the District of Columbia (or any political subdivision thereof) or by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits Taxes imposed by the United States, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 10.13), any United States withholding Tax that (i) is required to be imposed on amounts payable to such Foreign Lender pursuant to the Laws in force at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or (ii) is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with clause (B) of Section 3.01(e)(ii), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a) and (d) any U.S. federal withholding Taxes imposed by FATCA.

"**Existing Noteholder Lender**" means, at any time, any Lender specified on Schedule 10.06, any Affiliate thereof or any of their successors or permitted assigns.

"**Exit Fee**" means the fee payable pursuant to Section 2.09(c).

"**Extraordinary Receipts**" means the Net Proceeds of any payments received by any Loan Party or any of its Subsidiaries not in the ordinary course of business and consisting, or otherwise in respect, of (a) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action or claim under color of

13

law (including, in each case, any payments arising from, or in connection with, any non-judicial proceeding or alternative dispute resolution procedure), (b) indemnity payments, (c) tax refunds, (d) any purchase price adjustment (other than a working capital adjustment) received in connection with any acquisition or any other purchase agreement (whether in respect of assets or Equity Interests) and (e) any other extraordinary receipt.

"**Facility**" has the meaning specified in the introductory paragraph hereto.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to U.S. Bank National Association on such day on such transactions as determined by the Administrative Agent; *provided* that if the Federal Funds Rate shall be less than zero, such rate shall be deemed zero for all purposes of this Agreement.

"**Fee Letter**" means the letter agreement, dated as of the Closing Date, between the Borrower and the Administrative Agent.

"**Final Advance**" has the meaning specified in Section 2.01(d).

"**Final Advance Amount**" has the meaning specified in Section 2.01(d).

"**Final Advance Date**" has the meaning specified in Section 2.01(d).

"**Final Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Loans and the transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders in their sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

14

"**Flood Zone Requirements**" means, with respect to any improved Real Property of any Loan Party that is Collateral, to the extent required to comply with the National Flood Insurance Reform Act of 1994 and related legislation (included the regulations of the Board of Governors of the Federal Reserve System), to the extent applicable to the Administrative Agent or any Lender: (1) a completed standard flood hazard determination form, (2) if the improvement(s) to any such improved Real Property is located in a special flood hazard area, a notice to the Borrower (a "**Borrower Notice**") and, if applicable, notification to such Loan Party that flood insurance coverage under the National Flood Insurance Program (the "**NFIP**") is not available because the community does not participate in the NFIP, (3) documentation evidencing the applicable Loan Party's receipt of the Borrower Notice and (4) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of the flood insurance policy, such Loan Party's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Administrative Agent and the federally regulated Lenders.

"**Foreign Lender**" means any Lender that is not a U.S. Person.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession) including the FASB Accounting Standards Codification, that are applicable to the circumstances as of the date of determination, consistently applied and subject to Section 1.03.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**GS Approved Party**" means any of The Goldman Sachs Group, Inc. and its Affiliates ("**GS**"), and any funds, investments, Persons, vehicles or accounts that are managed or sponsored by GS or for which GS acts as investment advisor.

"**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing

15

any Indebtedness or other obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (i) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (ii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iii) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning specified in Section 11.01.

"**Guarantors**" means, collectively, the Subsidiaries of the Borrower listed on Schedule 6.12 and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12.

"**Guaranty**" means the Guaranty made by the Guarantors in Article XI in favor of the Secured Parties, together with each other guaranty and guaranty supplement delivered pursuant to Section 6.12.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum, its derivatives, by-products and other hydrocarbons, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

16

(b)      the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 60 days after the date on which such trade account was created);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; provided that, if such indebtedness is limited in recourse, then the amount of such indebtedness for purposes of this Agreement will not exceed the fair market value of such property;

(f)      all Attributable Indebtedness in respect to Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Loan Party or Subsidiary valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitees**" has the meaning specified in Section 10.04(b).

"**Information**" has the meaning specified in Section 10.07.

"**Initial Advance**" has the meaning specified in Section 2.01(a).

"**Initial Advance Amount**" has the meaning specified in Section 2.01(a).

"**Initial Advance Date**" has the meaning specified in Section 2.01(a).

17

"**Initial Tranche**" has the meaning specified in Section 2.01(b).

"**Insolvency Proceeding**" means any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code of the United States, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its property; or (c) an assignment or trust mortgage for the benefit of creditors.

"**Intellectual Property Security Agreement**" has the meaning specified in Section 6.12.

"**Intercompany Note**" means the Intercompany Note to be executed by the Borrower and each Subsidiary of the Borrower, in form and substance reasonably satisfactory to the Required Lenders, as supplemented from time to time.

"**Interest Payment Date**" means the last Business Day of each calendar month and the Maturity Date.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing and approving on an interim basis, among other things, the Loans and the transactions contemplated by this Agreement in the form attached to the Restructuring Support Agreement as Exhibit [C] (and also attached hereto for reference as Exhibit H), with changes to such form as are satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion).

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person or (c) an Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP Rights**" has the meaning specified in Section 5.17.

"**IP Security Agreement Supplement**" means any Copyright Security Agreement Supplement, Patent Security Agreement Supplement or Trademark Security Agreement Supplement, as such terms are defined in the Security Agreement.

"**IRS**" means the United States Internal Revenue Service.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by

18

any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lender**" has the meaning specified in the introductory paragraph hereto.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**License**" means any license or agreement under which a Loan Party is authorized to use IP Rights in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of property or any other conduct of its business.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means any loan by a Lender to the Borrower under Article II.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) the Collateral Documents, (d) the Fee Letter and (e) the Orders.

"**Loan Notice**" means a notice of a Borrowing substantially in the form of Exhibit A, appropriately completed and signed by a Responsible Officer of the Borrower.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower or the Borrower and its Subsidiaries taken as a whole, other than as a result of events leading up or related to the Cases and as customarily occurs following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Cases or as a result of matters publicly disclosed prior to the filing of the Cases or as a result of actions required by, or as a result of failing to take actions that are restricted by, the Orders; (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

19

"**Material Contract**" means, with respect to any Person, any agreement or instrument to which such Person is a party which is material to the business, condition (financial or otherwise), operations, performance or properties of such Person.

"**Material Real Property**" means (i) any parcel or parcels of land together with related improvements thereon (including Salt Water Disposal Assets) owned in fee by any Loan Party and (ii) any parcel or parcels of land leased by any Loan Party, together with any Salt Water Disposal Assets thereon, underlying, providing access to or otherwise related to Salt Water Disposal Assets; provided that, Material Real Property shall exclude any lease of real property which by its express terms prohibits the grant of a security interest or requires a landlord consent, except to the extent such prohibition is ineffective under the UCC or the Bankruptcy Code, or rendered ineffective by the Orders or the Bankruptcy Court, and the landlord thereunder refuses to execute and deliver such consent notwithstanding Borrower's commercially reasonable efforts (which, for the avoidance of doubt, will not require the expenditure of any consent fee, other than reimbursement of costs, to the landlord).

"**Maturity Date**" means the earliest of (i) the Scheduled Maturity Date, (ii) the effective date of a Reorganization Plan or plan of liquidation in the Cases, (iii) the date of filing by the Borrower of a Reorganization Plan that is not an Acceptable Plan of Reorganization or (iv) the date of termination of the Commitments and the acceleration of the Loans pursuant to Article VIII.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgages**" means any mortgages or deeds of trust or other similar security documents creating and evidencing a Lien on any Real Property or any Salt Water Disposal Assets made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, suitable for recording or filing in the appropriate jurisdiction, in form and substance reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Multiple Employer Plan**" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) not less than two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or

20

similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) the amount of all taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (iii) the amount of any reserves established in accordance with GAAP consistently applied to fund contingent liabilities under any indemnification obligations and any purchase price adjustments associated with a sale, transfer or other disposition of an asset that are directly attributable to such event.

"**NFIP**" shall have the meaning assigned to such term in the definition of Flood Zone Requirements.

"**Non-Consenting Lender**" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.01 and (b) has been approved by the Required Lenders.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Note**" means a promissory note made by the Borrower in favor of a Lender evidencing Loans made by such Lender, substantially in the form of Exhibit C.

"**Notice of Loan Prepayment**" means a notice of prepayment with respect to a Loan, which shall be substantially in the form of Exhibit F, appropriately completed and signed by a Responsible Officer.

"**NPL**" means the National Priorities List under the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Orders**" means, collectively, the Interim Order and the Final Order.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable

21

constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Superpriority Claim**" means a superpriority administrative expense claim against any of the Debtors with priority over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code other than the Superpriority Claims described in Section 2.14.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06(b)).

"**Outstanding Amount**" means, with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"**P-Card Agreements**" means, collectively, (i) that certain Bank of America Corporate Purchasing Card Agreement between Bank of America, N.A. and Basic Energy Services L.P., dated on or around July 21, 2005 and (ii) that certain Commercial Prepaid Card Purchase Agreement between Bank of America, N.A. and Basic Energy Services L.P., dated on our around March 14, 2006, each as may be amended, supplemented or modified from time to time.

"**Participant**" has the meaning specified in Section 10.06(d).

"**Participant Register**" has the meaning specified in Section 10.06.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Act**" means the Pension Protection Act of 2006.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Pension Plan**" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"**Permitted Liens**" means any Liens permitted by Section 7.01 and any Liens otherwise permitted or created or established by the Orders.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the introductory paragraph hereto.

"**Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Equity**" has the meaning specified in the Security Agreement.

"**Prepetition ABL Adequate Protection Liens**" has the meaning specified in the Orders.

"**Prepetition Cash Management System**" has the meaning specified in Section 6.22.

"**Prepetition Intercreditor Agreement**" means the Intercreditor Agreement, dated as of February 26, 2016, by and among the Prepetition Term Loan Administrative Agent, the ABL Agent and the Loan Parties under (and as defined in) the Prepetition Term Loan Credit Agreement party thereto, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced in accordance with the terms thereof.

"**Prepetition Payment**" means a payment (by way of adequate protection, set off or otherwise) of principal, interest or otherwise on account of any (i) Indebtedness of any

23

Debtor outstanding and unpaid on the date on which such Person becomes a Debtor, (ii) "critical vendor payments" or (iii) trade payables (including in respect of reclamation claims) or other pre-petition claims against any Debtor.

"**Prepetition Term Loan Administrative Agent**" means the Administrative Agent under (and as defined in) the Prepetition Term Loan Credit Agreement.

"**Prepetition Term Loan Credit Agreement**" means the Term Loan Credit Agreement dated as of February 17, 2016, among Basic Energy Services, Inc., as borrower, the lenders from time to time party thereto and the Prepetition Term Loan Administrative Agent, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced in accordance with the terms thereof.

"**Prepetition Term Loan Credit Agreement Loan Documents**" means the Loan Documents under (and as defined in) the Prepetition Term Loan Credit Agreement.

"**Prepetition Term Loan Lenders**" means the Lenders under (and as defined in) the Prepetition Term Loan Credit Agreement.

"**Prepetition Term Loans**" means the Loans under (and as defined in) the Prepetition Term Loan Credit Agreement.

"**Primed Liens**" has the meaning specified in Section 2.14.

"**Priming Liens**" has the meaning specified in Section 2.14.

"**Public Lender**" has the meaning specified in Section 6.02.

"**Qualified Capital Stock**" of any Person shall mean any capital stock of such person that is not Disqualified Capital Stock; provided that such capital stock shall not be deemed Qualified Capital Stock to the extent sold or owed to a Subsidiary of such person or financed, directly or indirectly, using funds (1) borrowed from such person or any Subsidiary of such person until and to the extent such borrowing is repaid or (2) contributed, extended, guaranteed or advanced by such person or any Subsidiary of such person (including in respect of any employee stock ownership or benefit plan). Unless otherwise specified, Qualified Capital Stock refers to Qualified Capital Stock of Borrower.

"**Real Estate Collateral Requirement**" means the requirement that the Administrative Agent shall have received a Mortgage for each Material Real Property, which includes to the extent reasonably available, with respect to any Salt Water Disposal Well, a specific reference to the API number for such well and any lease (if applicable), together with the following documents: (a) with respect to each Material Real Property that has a net book value of $500,000 or more, a title report and a fully paid policy of title insurance (or "*pro forma*" or marked up commitment having the same effect of a title insurance policy) (i) in a form approved by the Administrative Agent, at the direction of

24

the Required Lenders (such approval not to be unreasonably withheld) insuring the Lien of the Mortgage encumbering such property as a valid first priority Lien, (ii) in an amount reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders, (iii) issued by a nationally recognized title insurance company reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders (the "**Title Company**"), (iv) containing no exceptions other than (A) the Liens described in Sections 7.01(a), (c), (d), (g) and (j) and (B) Liens that are otherwise acceptable to the Administrative Agent and the Required Lenders and (v) that includes (A) such coinsurance and direct access reinsurance as the Required Lenders may reasonably deem necessary or desirable and (B) such endorsements or affirmative insurance reasonably required by the Administrative Agent, at the direction of the Required Lenders, and available in the applicable jurisdiction, (b) with respect to each Material Real Property that has a net book value of between $100,000 and $500,000, a title report, (c) to the extent required by Required Lenders pursuant to Section 6.18, an appraisal complying with the requirements of the Financial Institutions Reform Recovery and Enforcement Act of 1989, by a third-party appraiser selected by the Administrative Agent, (d) with respect to each Material Real Property, an opinion of local counsel reasonably acceptable to the Administrative Agent and the Required Lenders and in form and substance satisfactory to the Administrative Agent and the Required Lenders, (e) with respect to each Material Real Property on which is located a building or mobile home, to the extent applicable to the Administrative Agent or any Lender, satisfy the Flood Zone Requirements, (f) to the extent required by the Administrative Agent, environmental assessment reports, including existing reports, each in scope, form and substance reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders and (g) with respect to any leased real property related to Salt Water Disposal Assets, to the extent required by the applicable lease, Borrower shall use commercially reasonable efforts to obtain the consent of the lessor of such real property to the Mortgage of such lease in form and substance reasonably acceptable to the Administrative Agent, at the direction of the Required Lenders (which, for the avoidance of doubt, will not require the expenditure of any consent fee, other than reimbursement of costs, to the landlord).  For the purposes of determining relevant net book value with respect to any Material Real Property, such value shall (x) with respect to Material Real Property as of the Closing Date, equal the amount set forth opposite such Material Real Property on Schedule 5.08, (y) with respect to Material Real Property that is leased or acquired by a Loan Party after the Closing Date, be reasonably determined on the date of acquisition of such Material Real Property and (z) with respect to Material Real Property owned or leased by an entity which becomes a Loan Party after the Closing Date, be reasonably determined on the date on which such entity becomes a Loan Party, in each case as determined by the Administrative Agent at the direction of the Required Lenders. Notwithstanding the foregoing, the Borrower will not be required to deliver a title policy with respect to (i) any Salt Water Disposal Asset that is uninsurable due to the nature of the Borrower's interest in such Salt Water Disposal Asset or (ii) any Salt Water Disposal Asset for which the issuance of a title policy requires documentation from a third party that has been requested but has not been delivered after the Borrower has used commercially reasonable efforts (without the expenditure of funds) to obtain such documentation.

<div align="center">25</div>

"**Real Property**" means any parcel or parcels of land together with related improvements thereon owned in fee or leased by any Loan Party (including Salt Water Disposal Assets).

"**Recipient**" means (a) any Lender and (b) the Administrative Agent, as applicable.

"**Register**" has the meaning specified in Section 10.06(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, attorneys and representatives of such Person and of such Person's Affiliates.

"**Removal Effective Date**" has the meaning set forth in Section 9.06.

"**Reorganization Plan**" means a plan of reorganization in any or all of the Cases.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, Lenders holding more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments; provided that the unused Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender or, subject to Section 10.06(b)(vii), any Existing Noteholder Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Resignation Effective Date**" has the meaning set forth in Section 9.06.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party, solely for purposes of the delivery of incumbency certificates pursuant to Section 4.01, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. To the extent requested by the Administrative Agent or the Required Lenders, each Responsible Officer will provide an incumbency certificate and to the extent requested by the Administrative Agent or the Required Lenders, appropriate authorization documentation, in form and substance satisfactory to the Administrative Agent, at the direction of the Required Lenders.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of October [ ], 2016, among the Borrower, the Guarantors, the Prepetition Term Loan Lenders, certain holders of the 2019 Senior Notes and the 2022 Senior Notes and the other parties thereto (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof).

"**Rolling Budget**" means a projected statement of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis, covering the 13 calendar weeks immediately succeeding the week during which such Rolling Budget is required to be delivered hereunder, including the anticipated use of the cash proceeds of Loans made hereunder and of Cash Collateral for each week during such period and setting forth, among other things, on a cumulative roll-forward basis the projected cash disbursements and projected cash receipts for each applicable week, in form substantially similar to the initial Rolling Budget attached hereto as Exhibit G (unless otherwise reasonably agreed by the Required Lenders) and in substance reasonably satisfactory to the Required Lenders (which Rolling Budget shall be deemed reasonably satisfactory if the Required Lenders do not provide notice of dispute to such Rolling Budget within three Business Days after delivery thereof).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Salt Water Disposal Assets**" means assets used by any Loan Party in connection with the operation of a commercial salt water and non-hazardous oil and gas waste disposal facility, including any Salt Water Disposal Well and any tankage or equipment used in connection therewith.

"**Salt Water Disposal Well**" means an underground well used for the disposal of fluids associated with oil and gas production.

"**Sanctions**" means any sanction administered or enforced by the United States Government (including OFAC and the United States Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

27

"**Scheduled Maturity Date**" means [-], 2017[2]; provided that, if such date is not a Business Day, the Scheduled Maturity Date shall be the next preceding Business Day.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Advance**" has the meaning specified in Section 2.01(b).

"**Second Advance Amount**" has the meaning specified in Section 2.01(b).

"**Second Advance Date**" has the meaning specified in Section 2.01(b).

"**Second Tranche**" has the meaning specified in Section 2.01(d).

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"**Security Agreement**" means the Security Agreement dated as of the Closing Date, as amended and supplemented from time to time, executed by each of the Loan Parties in favor of the Administrative Agent.  The Security Agreement shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

"**Security Agreement Supplement**" means the form of supplement attached to the Security Agreement as Annex I.

"**Senior Notes**" means (a) the 2019 Senior Notes and (b) the 2022 Senior Notes.

"**Senior Notes Documents**" means (a) the 2019 Senior Notes Documents and (b) the 2022 Senior Notes Documents.

"**Subject Obligations**" has the meaning specified in Section 11.06(b).

"**Subordinated Obligations**" has the meaning specified in Section 11.08(a).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of the Borrower.

---

[2] [NTD: To be the date that is eight months after the Closing Date.]

"**Superpriority Claim**" has the meaning specified in Section 2.14.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Debt**" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "**Indebtedness**" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed

29

by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan Priority Collateral**" has the meaning specified in the Prepetition Intercreditor Agreement.

"**Term Loan Priority Collateral Primed Liens**" has the meaning specified in Section 2.14(a).

"**Term Loan Priority Collateral Priming Liens**" has the meaning specified in Section 2.14(a).

"**Term Loan Proceeds Collateral Account**" has the meaning assigned to such term in the in the Prepetition Term Loan Credit Agreement.

"**Testing Date**" means the last Business Day of each week occurring after the Closing Date, which initial Testing Date shall be [November 4, 2016].

"**Testing Period**" has the meaning set forth in Section 6.01(h).

"**Title Company**" has the meaning assigned to such term in the definition of Real Estate Collateral Requirement.

"**Third Advance**" has the meaning specified in Section 2.01(c).

"**Third Advance Amount**" has the meaning specified in Section 2.01(c).

"**Third Advance Date**" has the meaning specified in Section 2.01(c).

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Trigger Date**" means the earlier of (i) the first business day after the occurrence of an Event of Default and delivery by the Lenders of notice thereof (the "**Carve-out Notice**") to (A) the United States Trustee and (B) the Borrower's lead restructuring counsel (and, upon receipt, Borrower's lead restructuring counsel shall promptly deliver such Carve-out Notice to the United States Trustee) and (ii) the Maturity Date.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**United States**" and "**U.S.**" mean the United States of America.

30

"**U.S. Person**" means any Person that is a "**United States person**" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning specified in Section 3.01(e)(ii).

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.  *Other Interpretive Provisions*.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "**include,**" "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation.**"  The word "**will**" shall be construed to have the same meaning and effect as the word "**shall.**"  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including the Loan Documents and any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, extended, restated, replaced or supplemented from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "**hereto,**" "**herein,**" "**hereof**" and "**hereunder,**" and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, extended, restated, replaced or supplemented from time to time, and (vi) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "**from and including;**" the words "**to**" and "**until**" each mean "**to but excluding;**" and the word "**through**" means "**to and including.**"

31

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03.   *Accounting Terms.*

(a)     *Generally.*  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)     *Changes in GAAP.*  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, there shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

(c)     *Consolidation of Variable Interest Entities.*  All references herein to consolidated financial statements of the Borrower and its Subsidiaries or to the determination of any amount for the Borrower and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrower is required to consolidate pursuant to FASB ASC 810 as if such variable interest entity were a Subsidiary as defined herein.

Section 1.04.   *Rounding.*  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

32

Section 1.05.  *Times of Day*.  Unless otherwise specified, all references herein to times of day shall be references to Central time (daylight or standard, as applicable).

Section 1.06.  *Currency Equivalents Generally*.  Any amount specified in this Agreement (other than in Articles II and IX) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars.  For purposes of this Section 1.06, the "**Spot Rate**" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 10:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

Section 1.07.  *Uniform Commercial Code*.  Terms relating to Collateral used and not otherwise defined herein that are defined in the UCC shall have the meanings set forth in the UCC, as applicable and as the context requires.

ARTICLE II
THE COMMITMENTS AND LOANS

Section 2.01.  *The Loans*.

(a)     *The Initial Advance*.  Subject to the terms and conditions set forth herein and in the Orders, each Lender severally agrees to make a loan to the Borrower on the Closing Date (such loan, the "**Initial Advance**") in an amount equal to its Applicable Percentage of the lesser of (i) $30,000,000 and (ii) the amount authorized by the Bankruptcy Court in the Interim Order (such lesser amount, the "**Initial Advance Amount**").  Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed.

(b)     *The Second Advance*.  Subject to the terms and conditions set forth herein (including Section 2.02(a)) and in the Orders, each Lender severally agrees to make a loan to the Borrower on any Business Day during the period commencing on the date of the Final Order and ending at 5:00 p.m. (New York City time) on the date that is one day prior to the 100 Day Anniversary (such loan, the "**Second Advance**"; the Commitments with respect thereto and with respect to the Initial Advance (in an aggregate amount equal to $40,000,000), the "**Initial Tranche**"; the date the Second Advance is made, the "**Second Advance Date**") in an amount equal to its Applicable Percentage of the lesser of (i) $10,000,000 and (ii) the incremental amount in excess of the Initial Advance authorized by the Bankruptcy Court in the Final Order (such lesser amount, the "**Second Advance Amount**").  Amounts borrowed under this Section 2.01(b) and repaid or prepaid may not be reborrowed.

33

(c)     *The Third Advance.*  Subject to the terms and conditions set forth herein (including Section 2.02(a)) and in the Orders, each Lender severally agrees to make a loan to the Borrower on any Business Day during the period commencing on the later of (x) the date of the Final Order and (y) the 100 Day Anniversary and ending on the date that is two months prior to the Scheduled Maturity Date (such loan, the "**Third Advance**" and the date such loan is made, the "**Third Advance Date**") in an amount equal to its Applicable Percentage of the lesser of (i) $40,000,000 and (ii) the incremental amount in excess of the Initial Advance authorized by the Bankruptcy Court in the Final Order less the Second Advance Amount (such lesser amount, the "**Third Advance Amount**").  Amounts borrowed under this Section 2.01(c) and repaid or prepaid may not be reborrowed.

(d)     *The Final Advance.*  Subject to the terms and conditions set forth herein (including Section 2.02(a)) and in the Orders, each Lender severally agrees to make a loan to the Borrower on any Business Day during the period commencing on the later of (x) the date of the Final Order and (y) the 100 Day Anniversary and ending on the date that is two months prior to the Scheduled Maturity Date (such loan, the "**Final Advance**"; the Commitments with respect thereto and with respect to the Third Advance (in an aggregate amount equal to $50,000,000), the "**Second Tranche**"; the date the Final Advance is made, the "**Final Advance Date**") in an amount equal to its Applicable Percentage of the lesser of (x) the remaining Commitments and (y) the incremental amount in excess of the Initial Advance authorized by the Bankruptcy Court in the Final Order less the Second Advance Amount and the Third Advance Amount (such lesser amount, the "**Final Advance Amount**").  Amounts borrowed under this Section 2.01(d) and repaid or prepaid may not be reborrowed.

Section 2.02.   *Borrowings of Loans.*

(a)     Each Borrowing shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by: (i) telephone or (ii) a Loan Notice.  A Loan Notice in respect of the Initial Advance shall be delivered on the Closing Date in accordance with Section 4.02 and each other notice must be received by the Administrative Agent not later than 11:00 a.m. (i) in the case of the Second Advance, at least seven days prior to the requested date of such Borrowing and (ii) in the case of the Third Advance and the Final Advance, at least 24 days prior to the requested date of such Borrowing.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.   Each Loan Notice and each telephonic notice shall specify (i) whether the Borrower is requesting the Initial Advance, the Second Advance, Third Advance or the Final Advance, (ii) the requested date of the Borrowing (which shall be a Business Day) and (iii) the principal amount of Loans to be borrowed (which (w) in the case of the Initial Advance, shall be in an amount equal to the Initial Advance Amount, (x) in the case of the Second Advance, shall be in an amount equal to the Second Advance Amount, (y) in the case of the Third Advance, shall be in an amount equal to the Third Advance Amount and (z) in the case of the Final Advance, shall be in an amount equal to the Final Advance Amount).

34

(b)     Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans.  Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 12:00 noon on the Business Day specified in the applicable Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

Section 2.03.  *[Reserved]*.

Section 2.04.  *[Reserved]*.

Section 2.05.  *Prepayments*.

(a)     *Optional*.  The Borrower may, upon notice to the Administrative Agent pursuant to delivery to the Administrative Agent of a Notice of Loan Prepayment, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty, except as set forth in Section 2.05(c); provided that (i) such notice must be received by the Administrative Agent not later than 10:00 a.m. one Business Day prior to the date of such prepayment and (ii) any prepayment of Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Loan shall be accompanied by all accrued interest on the amount prepaid.  Subject to Section 2.16, each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)     *Mandatory*.

(i)     *[Reserved]*.

(ii)     *Sales of Assets*.  Upon receipt of Net Proceeds from (A) the sale or other disposition of any property or assets of any Loan Party or any of its Subsidiaries (other than inventory sold in the ordinary course) or (B) any casualty insurance pursuant to Section 6.07 or business interruption insurance, or if any of such property or assets are comprised of real property subject to a mortgage that is damaged, destroyed or taken by condemnation, in whole or in part, the Borrower shall pay or cause such Loan Party or its Subsidiaries to pay to the Administrative Agent, for the ratable benefit of the Lenders, an amount equal to 100% of such

35

Net Proceeds as a mandatory prepayment of the Obligations; provided that, no proceeds realized in a transaction or series of transactions which would otherwise be subject to the prepayment requirements under the foregoing clause (A) or (B) shall constitute Net Proceeds for purposes of this Section 2.05(b)(ii) until the aggregate proceeds from all such transactions exceed $100,000 over the term of this Agreement (and thereafter all such proceeds, including the initial $100,000 of such proceeds, shall constitute Net Proceeds for purposes of this Section 2.05(b)(ii) and be subject to the prepayment requirement included herein); *provided* that Net Proceeds from the sale or other disposition of ABL Facility Priority Collateral shall be applied in accordance with the Orders.

(iii)    *Proceeds from Issuance of Indebtedness*.  If any Loan Party or any of its Subsidiaries issues any Indebtedness (other than Indebtedness permitted pursuant to Section 7.02), the Borrower shall pay, or cause such Loan Party or its Subsidiaries to pay, to the Administrative Agent, for the ratable benefit of the Lenders, when and as received by such Loan Party or its Subsidiaries, as a mandatory prepayment of the Obligations, an amount equal to 100% of the Net Proceeds of such issuance of Indebtedness.

(iv)    *Proceeds from Issuance of Equity Interests*.  If any Loan Party or any of its Subsidiaries issues any of its Equity Interests, the Borrower shall pay, or cause such Loan Party or its Subsidiaries to pay, to the Administrative Agent, for the ratable benefit of the Lenders, when and as received by such Loan Party or its Subsidiaries, as a mandatory prepayment of the Obligations, an amount equal to 100% of the Net Proceeds of such issuance of Equity Interests.

(v)    *Extraordinary Receipts*.  Upon receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall pay, or cause such Loan Party or Subsidiary to pay, to the Administrative Agent, for the ratable benefit of the Lenders, when and as received by such Loan Party or Subsidiary and as a mandatory prepayment of the Obligations, an amount equal to 100% of such Extraordinary Receipts.

(vi)    *[Reserved]*.

(vii)    *Right to Decline Mandatory Prepayments*.  Any mandatory prepayment (other than pursuant to clause (iii) above) may be declined by any Lender without prejudice to such Lender's rights hereunder to accept or decline any future mandatory prepayment, and any such election to decline a prepayment shall not be construed as a waiver of any other requirement (including the requirement to repay all Obligations) hereunder.  If a Lender chooses to decline a mandatory prepayment, such Lender shall provide written notice thereof to the Administrative Agent and the Borrower not less than one (1) Business Day prior to the date on which such mandatory prepayment is due (or within one (1) Business Day of receipt of such prepayment notice), if such prepayment was not provided by the Borrower not less than one (1) Business Day prior to the making of such prepayment (return of such prepayment to accompany any such notice),

36

and the Lenders that accept such mandatory prepayment shall share the proceeds thereof on a pro rata basis as determined among the Lenders electing to participate in such mandatory prepayment (and if declined by all Lenders, the amount of such mandatory prepayment shall be retained by the Borrower).

(c)     *Applicable Premium*.  With respect to (x) each repayment or prepayment of Loans under Section 2.05(a) and Section 2.05(b)(iii), in each case, prior to the Maturity Date, and (y) any repayment upon acceleration of the Loans pursuant to Article VIII prior to the Scheduled Maturity Date, the Borrower shall be required to pay with respect to the amount of the Loans repaid or prepaid, in each case, concurrently with such repayment or prepayment, a premium in an amount equal to 3.00% of the amount of the Loans being repaid or prepaid (the "**Applicable Premium**").

(d)     *Application of Payments and Prepayments*.  Subject to Section 2.05(b)(vii) and Section 2.16, each prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.  For the avoidance of doubt, all such payments will reduce the principal amount of Loans net of any interest, fees, charges, premiums or other amounts due and payable hereunder at the time of such payment.

Section 2.06.    *Termination or Reduction of Commitments*.

(a)     *Optional*.  The Borrower may not terminate or reduce the Commitments, other than as a result of a Borrowing made in accordance with this Agreement.

(b)     *Mandatory*.  (i) The Commitments shall be automatically and permanently reduced by an amount equal to the Initial Advance upon the earlier of (a) the borrowing of the Initial Advance and (b) 12:01 a.m. New York City time on the day immediately succeeding the Closing Date, (ii) the Commitments shall be automatically and permanently further reduced by an amount equal to the Second Advance upon the earlier of (a) the borrowing of the Second Advance and (b) 12:01 a.m. New York City time on the day immediately succeeding the last day upon which the Second Advance may be made pursuant to Section 2.01(b), (iii) the Commitments shall be automatically and permanently further reduced by an amount equal to the Third Advance upon the earlier of (a) the borrowing of the Third Advance and (b) 12:01 a.m. New York City time on the day immediately succeeding the last day upon which the Third Advance may be made pursuant to Section 2.01(c) and (iv) the Commitments shall be automatically and permanently further reduced by an amount equal to the Final Advance upon the earlier of (a) the borrowing of the Final Advance and (b) 12:01 a.m. New York City time on the day immediately succeeding the last day upon which the Final Advance may be made pursuant to Section 2.01(d).

(c)     *Maturity Date*.  The aggregate Commitment shall be automatically and permanently reduced to zero on the Maturity Date.

Section 2.07.    *Repayment of Loans*.  The Borrower shall repay to the Lenders on the Maturity Date the aggregate principal amount of all Loans outstanding on such date,

together with all other amounts due under this Agreement or the other Loan Documents, including the Exit Fee.

Section 2.08.  *Interest*.

(a)     Subject to the provisions of Section 2.08(b), each Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Applicable Rate.

(b)     If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(c)     If any amount (other than principal of any Loan) payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders (i) all Obligations consisting of the principal amount of Loans outstanding hereunder and (ii) all overdue amounts other than in respect of such principal of Loans shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(d)     Upon the request of the Required Lenders, while any Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(e)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09.  *Fees*.

(a)     *Commitment Fee*.  The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage a commitment fee in Dollars equal to 5.00% per annum of the actual daily amount of the aggregate unused Commitments commencing on the Closing Date until such Commitment is terminated pursuant to Section 2.06(b), including at any time during which one or more of the conditions in Article IV is not met, which fee shall be due and payable monthly in arrears on the last Business Day of each month; *provided* that, with respect to an amount of Commitments equal to the Second Tranche, no commitment fee shall be payable if the Maturity Date has occurred prior to the 100 Day Anniversary, but thereafter such commitment fee with respect to such Commitments that has accrued since the Closing Date shall be payable on the 100 Day Anniversary, and the commitment fee in respect of

38

the remaining undrawn Commitments shall continue to accrue thereafter and be payable monthly in arrears as set forth in this Section 2.09(a) and on the Maturity Date.

(b)    *Administrative Agent Fee and Upfront Fees*.

(i)    The Borrower shall pay to the Administrative Agent for its own account, in Dollars, fees in the amounts and at the times specified in the Fee Letter between the Administrative Agent and the Borrower.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(ii)    The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage an upfront fee equal to 4.00% of the aggregate principal amount of Commitments equal to the Initial Tranche (which may take the form of original issue discount at the election of the Required Lenders), which such fee shall be earned, due and payable in full on the Closing Date.  Notwithstanding the foregoing, no applicable original issue discount applied to the principal amount of the Loans shall reduce the amount of Obligations below 100% of the original aggregate principal amount of such Loans.

(iii)    If the Maturity Date has not occurred prior to the 100 Day Anniversary, the Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage a fee equal to 4.00% of the aggregate principal amount of Commitments equal to the Second Tranche, which such fee shall be earned, due and payable in full on the 100 Day Anniversary.

(c)    *Exit Fee*.  Other than with respect to a repayment or prepayment of Loans that is subject to the Applicable Premium, the Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage an exit fee in an amount equal to 1.00% of the principal amount of the Loans repaid at or following the Maturity Date or following any acceleration thereof.  The exit fee shall be payable on the date of such repayment of the Loans.

Section 2.10.    *Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate*.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11.    *Evidence of Debt*.  The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the

Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

Section 2.12.  *Payments Generally; Administrative Agent's Clawback*.

(a)    *General*.  All payments to be made by the Borrower shall be made free and clear and without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)

(i)    *Funding by Lenders; Presumption by Administrative Agent*.  Unless the Administrative Agent shall have received notice from a Lender prior to 11:00 a.m. on the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available in accordance with and at the time required by Section 2.02 and may, but in no event shall it be obligated to, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the

40

Borrower to but excluding the date of payment to the Administrative Agent, at
(A) in the case of a payment to be made by such Lender, the greater of the Federal
Funds Rate and a rate determined by the Administrative Agent in accordance with
banking industry rules on interbank compensation, plus any administrative,
processing or similar fees customarily charged by the Administrative Agent in
connection with the foregoing and (B) in the case of a payment to be made by the
Borrower, the Applicable Rate.  If the Borrower and such Lender shall pay such
interest to the Administrative Agent for the same or an overlapping period, the
Administrative Agent shall promptly remit to the Borrower the amount of such
interest paid by the Borrower for such period.  If such Lender pays its share of the
applicable Borrowing to the Administrative Agent, then the amount so paid shall
constitute such Lender's Loan included in such Borrowing.  Any payment by the
Borrower shall be without prejudice to any claim the Borrower may have against
a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    *Payments by Borrower; Presumptions by Administrative Agent*.
Unless the Administrative Agent shall have received notice from the Borrower
prior to the time at which any payment is due to the Administrative Agent for the
account of the Lenders hereunder that the Borrower will not make such payment,
the Administrative Agent may assume that the Borrower has made such payment
on such date in accordance herewith and may, but in no event shall it be obligated
to, in reliance upon such assumption, distribute to the Lenders the amount due.  In
such event, if the Borrower has not in fact made such payment, then each of the
Lenders severally agrees to repay to the Administrative Agent forthwith on
demand the amount so distributed to such Lender, in immediately available funds
with interest thereon, for each day from and including the date such amount is
distributed to it to but excluding the date of payment to the Administrative Agent,
at the greater of the Federal Funds Rate and a rate determined by the
Administrative Agent in accordance with banking industry rules on interbank
compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect
to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    *Failure to Satisfy Conditions Precedent*.  If any Lender makes available to
the Administrative Agent funds for any Loan to be made by such Lender as provided in
the foregoing provisions of this Article II, and such funds are not made available to the
Borrower by the Administrative Agent because the conditions to the applicable
Borrowings set forth in Article IV are not satisfied or waived in accordance with the
terms hereof, the Administrative Agent shall return such funds (in like funds as received
from such Lender) to such Lender, without interest.

(d)    *Obligations of Lenders Several*.  The obligations of the Lenders hereunder
to make Loans and to make payments pursuant to Section 10.04(c) are several and not
joint.  The failure of any Lender to make any Loan, to fund any such participation or to
make any payment under Section 10.04(c) on any date required hereunder shall not
relieve any other Lender of its corresponding obligation to do so on such date, and no

Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.04(c).

(e)    *Funding Source*.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    *Insufficient Funds*.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of fees then due hereunder of the Administrative Agent, (ii) second, toward payment of interest and fees then due hereunder, ratably among the other parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (iii) third, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.13.    *Sharing of Payments by Lenders*.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of the amount of such Obligations due and payable to such Lender at such time to the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of the amount of such Obligations owing (but not due and payable) to such Lender at such time to the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to any payment made by or on behalf of the Borrower pursuant to and in accordance

42

with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 2.14.   *Priority and Liens; No Discharge.* [3]

(a)      Each of the Loan Parties hereby covenants and agrees that upon the entry of an Interim Order (and, when applicable, the Final Order) its obligations hereunder and under the other Loan Documents shall be subject to the Carve-Out and: (i) pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed superpriority administrative expense claim in the Case of such Loan Party (collectively, the "**Superpriority Claims**"); (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority security interest in and Lien on the Collateral of each Loan Party (A) to the extent such Collateral is not subject to valid, perfected and non-avoidable Liens as of the Petition Date and (B) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively, "**Avoidance Actions**") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, such security interest and Lien shall attach to any proceeds of Avoidance Actions), provided that such security interest in and Lien on ABL Postpetition Collateral shall be subject and subordinate to the Prepetition ABL Adequate Protection Liens; (iii) except as otherwise provided in the immediately following clause (iv), pursuant to section 364(c)(3) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected second priority security interest in and Lien on the ABL Facility Priority Collateral, junior only to the security interest and Liens of the ABL Agent and the ABL Lenders with respect to such ABL Facility Priority Collateral; and (iv) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by (A) a valid, binding, continuing, enforceable perfected first priority priming security interest in and Lien on the Term Loan Priority Collateral of each Loan Party (the "**Term Loan Priority Collateral Priming Liens**") to the extent that such Collateral is subject to existing Liens that secure the obligations of the applicable Loan Party under the Prepetition Term Loan Credit Agreement (collectively, the "**Term Loan Priority Collateral Primed Liens**") and (B) a valid, binding, continuing, enforceable perfected second priority priming security interest in and Lien on the ABL Facility Priority Collateral of each Loan Party (the "**ABL Collateral Priming Liens**" and, together with the Term Loan Priority

---

[3] NTD:  To conform to final version of the Interim Order.

WEIL:\95912472\1\22010.0003

Collateral Priming Liens, the "**Priming Liens**") to the extent that such Collateral is subject to existing second priority Liens that secure the obligations of the applicable Loan Party under Prepetition Term Loan Credit Agreement (collectively, the "**ABL Collateral Primed Liens**" and, together with the Term Loan Priority Collateral Primed Liens, the "**Primed Liens**"), all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first or second priority Liens, as the case may be, to be granted to the Administrative Agent for the benefit of the Secured Parties, which Priming Liens in favor of the Administrative Agent for the benefit of the Secured Parties shall also prime any Liens (other than, with respect to the ABL Facility Priority Collateral and the ABL Postpetition Collateral, the Prepetition ABL Adequate Protection Liens) granted after the commencement of the Cases to provide adequate protection Liens in respect of any of the Primed Liens, subject to the Carve-Out.

(b)    (i)    Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of such Loan Party's Collateral, which includes all of such Loan Party's Real Property, shall be created and perfected without the recordation or filing in any land records or filing offices of any Mortgage, assignment or similar instrument. All of the Liens described in this Section 2.14 shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order.

(c)(ii)    Further to Section 2.14(b)(i) and the Interim Order (and, when entered, the Final Order), subject to Section 2.14(a) above and 2.14(d) below, to secure the full and timely payment and performance of the Obligations, each Loan Party hereby GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, ASSIGNS and SETS OVER to the Administrative Agent for the ratable benefit of the Secured Parties, with power of sale (if applicable), all of the types and items of real and personal property and interests whether now owned by or hereafter acquired by such Loan Party, including such Loan Party's right, title and interest in and to: (i) Salt Water Disposal Assets; (ii) land; (iii) leases demising land or improvements, including all amendments, supplements, consolidations, extensions, renewals and other modifications now or hereafter entered into; (iv) any and all buildings, structures, improvements, alterations or appurtenances; (v) all (1) streets, roads, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to any land or leased premises of such Loan Party, (2) strips or gores between parcels of land and abutting or adjacent properties, (3) options to purchase land or demised premises or any portion thereof or interest therein, and any greater estate in land, demises premises or improvements, and (4) water and water rights, timber, crops and mineral interests on or pertaining to land owned or leased by such Loan Party; (vi) all fixtures, equipment, systems, machinery, furniture, furnishings, appliances, goods, building and construction materials, supplies, and articles of personal property, of every kind and character, tangible and intangible (including software embedded therein),

44

now owned or hereafter acquired by such Loan Party, including, but not limited to, any and all oil wells, gas wells, injection wells, salt water disposal wells, or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing), product marketing terminal, storage tanks (including tank bottoms and substances lying below the outlet flange), and pipelines (including line fill), and all renewals and replacements of, substitutions for and additions to the foregoing; (vii) all (A) plans and specifications for improvements; (B) all commitments, insurance policies (or additional or supplemental coverage related thereto), contracts and agreements for the design, construction, operation or inspection of the improvements or equipment or the operation thereof; (viii) all intangible property used by such Loan Party, including, without limitation, all contract rights, guarantees, permits, consents of governmental authorities, licenses, franchises, certificates, development rights, commitments and rights for utilities, and other rights and privileges relating solely to the ownership, operation or maintenance of land, leased premises, improvements or equipment, and all of such Loan Party's right, title and interest in and to all proceeds of the conversion, whether voluntary or involuntary, of any of the above-described property into cash as illiquid claims including, without limitation, all awards, payments or proceeds, including interest thereon, and the right to receive the same, which may be made as a result of casualty, any exercise of the right of eminent domain or deed in lieu thereof, the alteration of the grade of any street and any injury to or decrease in the value thereof, and any rights to a rebate, offset or other assignment, warranty or service under a purchase order, invoice or purchase agreement with any manufacturer or supplier of any portion of the foregoing; (ix) leases, rents, royalties, bonuses, issues, profits, revenues and other benefits of land, demised premises, improvements or equipment; (xi) as-extracted collateral; (xii) engineering, accounting, title, legal, and other technical or business data which are in the possession of such Loan Party or in which such Loan Party can otherwise grant a security interest, including but not limited to proceeds of any sale, lease or other disposition thereof, proceeds of each policy of insurance (or additional or supplemental coverage related thereto); and (xiii) all articles of personal property of every kind and nature whatsoever owned by such Loan Party, or in which such Loan Party has or shall have an interest, including without limitation, all building equipment, materials and supplies and any of the Collateral which may be subject to any security interests, foregoing rights, interests and properties, and all rights, estates, powers and privileges appurtenant thereto, unto the Administrative Agent, and its successors and assigns, for the ratable benefit of the Secured Parties, in trust, forever, to secure the Obligations.  Each Loan Party hereby agrees to warrant and forever defend, all and singular, title to the foregoing property and interests forever against every person whomsoever lawfully claiming, or to claim, the same or any part thereof, subject, however, to Permitted Liens.  Notwithstanding the foregoing, excluded from the foregoing grant of Lien is any right, title and interest of any Loan Party in and to any (i) Real Property improved by a Building or Manufactured (Mobile) Home and no such

45

property shall be "Collateral" hereunder to the extent and for so long as the Flood Zone Requirements with respect to such property has not been satisfied to the satisfaction of each federally regulated Lender and (ii) property and assets described in Section 2.14(d) below.

(d)(iii)    Each Loan Party further agrees that, upon the request of the Administrative Agent, in the exercise of its business judgment, such Loan Party shall execute and deliver to the Administrative Agent, as soon as reasonably practicable following such request but in any event within 60 days following such request (or such longer periods as agreed by the Administrative Agent, at the direction of the Required Lenders (which, for the avoidance of doubt, may be provided via email), in their sole discretion), Mortgages in recordable form with respect to such Material Real Property owned or leased by such Loan Party and identified by the Administrative Agent on terms reasonably satisfactory to the Administrative Agent and including the deliverables (as applicable) as necessary to satisfy the Real Estate Collateral Requirement within the time periods specified therein.

(c)    Notwithstanding anything to the contrary herein, in no event shall the Collateral include (a) any Equipment (as defined in the UCC) owned by any Debtor on the date hereof or hereafter acquired that is subject to a Permitted Lien if the contract or other agreement in which such Lien is granted validly prohibits the creation of any other Lien on such Equipment except to the extent such prohibition is ineffective under the UCC or rendered ineffective by the Orders or the Bankruptcy Code; provided that such contractual prohibition existed on the Closing Date, or, with respect to any Subsidiary acquired after the Closing Date (and so long as such contractual prohibition was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired; (b) General Intangibles, Contracts, and Investment Property (each as defined in the UCC) which by their respective express terms prohibit the grant of a security interest, except to the extent such prohibition is ineffective under the UCC or rendered ineffective by the Orders or the Bankruptcy Code; provided that such contractual prohibition existed on the Closing Date, or, with respect to any Subsidiary acquired after the Closing Date (and so long as such contractual prohibition was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired; (c) permits and licenses to the extent the grant of a security interest therein is prohibited under applicable Law or regulation or by their express terms, except to the extent such prohibition is ineffective under the UCC or rendered ineffective by the Orders or the Bankruptcy Code; (d) 34% of the Equity Interests in each direct Subsidiary of any Loan Party that is a "controlled foreign corporation" under the Code; and (e) until such time as the Credit Card Control Agreement is terminated or otherwise no longer in effect, the Credit Card Cash Collateral; *provided* that the Collateral shall include the Borrower's interests in the Credit Card Cash Collateral, including any residual interest therein after payment in full of the Borrower's obligations under the P-Card Agreements.

(e)    (d)    The relative priorities of the Liens described in this Section 2.14 with respect to the Collateral of the Debtors shall be as set forth in the Interim Order (and, when entered, the Final Order).  In the event of any inconsistency between this

Section 2.14 and the terms of the Interim Order (and, when entered, the Final Order), the terms of the Interim Order (and, when entered, the Final Order) shall govern.

(f)    (e)    Each of the Loan Parties agrees that to the extent that its obligations under the Loan Documents have not been satisfied when due in full in cash, its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Loan Parties, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and the Superpriority Claims granted to the Administrative Agent and the Lenders pursuant to the Orders and the Liens granted to the Administrative Agent and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

Section 2.15.  *Payment of Obligations*.  Subject to the last paragraph of Section 8.02, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Loan Parties under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

Section 2.16.  *Defaulting Lenders*.

(a)    *Adjustments*.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    *Waivers and Amendments*.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(ii)    *Reallocation of Payments*.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 10.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy potential future obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or

47

Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the applicable conditions set forth in Article IV were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     *[Reserved]*.

(c)     *Defaulting Lender Cure*.  If the Borrower and the Administrative Agent, at the direction of the Required Lenders, agree in writing in their sole discretion that a Defaulting Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided,  further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.17.

# ARTICLE III
# TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01.   *Taxes*.

(a)     *Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes*.

48

(i)    Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable Laws require an applicable withholding agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by the Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If any applicable withholding agent shall be required to withhold or deduct any Taxes, including both United States federal backup withholding and withholding Taxes, from any payment, then such withholding agent shall withhold or make such deductions as are determined by such withholding agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, such withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Law, and if such Tax subject to withholding or deduction is an Indemnified Tax or Other Tax, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    *Payment of Other Taxes by the Borrower*.  Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    *Tax Indemnifications*.

(i)    Without limiting the provisions of subsection (a) or (b) above, the Borrower shall, and does hereby, indemnify each Recipient and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted by the Borrower or the Administrative Agent or paid by the applicable Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The Borrower shall also, and does hereby, indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required by clause (ii) of this subsection.  A certificate as to the amount of any such payment or liability delivered to the Borrower by a Recipient (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

49

(ii)     Without limiting the provisions of subsection (a) or (b) above, each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by any Governmental Authority as a result of the failure by such Lender to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any documentation required to be delivered by such Lender to the Administrative Agent pursuant to subsection (e).  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)     *Evidence of Payments*.  Upon request by the Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by the Borrower or the Administrative Agent to a Governmental Authority as provided in this Section 3.01, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(e)     *Status of Lenders; Tax Documentation*.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) or (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

50

(A)      any Lender that is a U.S.  Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit I-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c) (3)(B) of the Code, or a "CFC" described in Section 881(c)(3)(C) of the Code (a "U.S.  Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable); or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-2 or Exhibit I-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign

51

Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-4 on behalf of each such direct or indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming an exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

(iii)     Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     *Treatment of Certain Refunds*.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender, as the case may be. If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or

with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Lender or Administrative Agent be required to pay any amount to the Administrative Agent or Borrower pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)    *Survival*.  Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 3.02.    *[Reserved]*.

Section 3.03.    *[Reserved]*.

Section 3.04.    *Increased Costs*.

(a)    *Increased Costs Generally*.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Recipient in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Taxes described in clauses (a) or (b) of the definition of Excluded Tax payable by such Recipient); or

53

(iii)    impose on any Lender any other condition, cost or expense affecting this Agreement or the Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    *Delay in Requests*.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.05.    *[Reserved]*.

Section 3.06.    *Mitigation Obligations; Replacement of Lenders*.

(a)    *Designation of a Different Lending Office*.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender

54

pursuant to Section 3.01, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, and in each case, would not subject such Lender, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    *Replacement of Lenders*.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, and in each case such Lender has declined or is unable to designate a different lending office in accordance with Section 3.06(a), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, replace such Lender in accordance with Section 10.13.

Section 3.07.  *Survival*.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

ARTICLE IV
CONDITIONS PRECEDENT

Section 4.01.  *Conditions to the Closing Date*.  The effectiveness of this Agreement on the Closing Date is subject to the satisfaction of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and each of the Lenders:

(i)    executed counterparts of this Agreement, sufficient in number for distribution to the Administrative Agent, each Lender, the Borrower and each Guarantor;

(ii)    resolutions, written consents, incumbency certificates and/or other organizational documents certified by a Responsible Officer of each Loan Party in a form substantially consistent with those delivered in connection with the Prepetition Term Loan Credit Agreement;

55

(iii)    good standing certificates (or similar document, as applicable in the applicable jurisdiction) for each Loan Party;

(iv)    a certificate signed by a Responsible Officer of the Borrower certifying (i) that the conditions specified in Sections 4.02(b), (c), (h) and (i) have been satisfied and (ii) that there has been no event or circumstance since June 30, 2016 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect other than events or circumstances that affect the oil field service industry generally;

(v)    (A) the DIP Budget and (B) the initial Rolling Budget;

(vi)    a Note executed by the Borrower in favor of each Lender requesting a Note;

(vii)    the Fee Letter executed by the parties thereto;

(viii)    executed counterparts of the Security Agreement, in form and substance satisfactory to the Lenders, duly executed by the parties thereto, together with:

(A)    certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank; provided that the foregoing shall be deemed to be satisfied to the extent such certificates or instruments in existence on the Closing Date have been delivered to the Pre-Petition Term Loan Administrative Agent, and

(B)    Uniform Commercial Code financing statements in form appropriate for filing in all jurisdictions that the Administrative Agent may deem necessary or desirable in order to perfect the Liens created under the Security Agreement, covering the Collateral described in the Security Agreement.

(ix)    unless the Administrative Agent shall have otherwise agreed to that the following requirements may be satisfied after the Closing Date pursuant to arrangements to be agreed, evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitute Collateral.

(b)    The Administrative Agent shall have received not less than three Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "**know your customer**" and anti-money laundering rules and regulations, including the USA PATRIOT Act that has been

56

requested by the Administrative Agent in writing not less than five Business Days prior to the Closing Date.

(c)     The Restructuring Support Agreement shall become effective and binding pursuant to Section 12 thereof, and shall not have been terminated.

(d)     The Acceptable Plan of Reorganization and the Acceptable Disclosure Statement shall have been filed in each of the Cases on the Petition Date.

(e)     The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(f)     No trustee under Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases of the Debtors.

(g)     All "first day" orders and all related pleadings intended to be entered on or prior to the date of entry of the Interim Order shall have been entered by the Bankruptcy Court, shall not have been modified, stayed or vacated (except with the consent of the Required Lenders, and shall be reasonably satisfactory in form and substance to the Required Lenders, [it being understood that drafts approved by counsel to the Required Lenders prior to the Petition Date are reasonably satisfactory.]^4

(h)     Within four business days after the Petition Date (or such later date as the Required Lenders may agree in their sole discretion), the Bankruptcy Court shall have entered the Interim Order.

(i)     The Borrower shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made (i) with the consent of the Required Lenders in their sole discretion or (ii) pursuant to "first day" orders reasonably acceptable to the Required Lenders.

(j)     The entry into this Agreement and the other Loan Documents shall not violate any requirement of law and shall not be temporarily, preliminarily or permanently enjoined.

(k)     The unrestricted cash balances and Cash Equivalents of the Borrower and its consolidated Subsidiaries shall not be less than $2,500,000.

(l)     The Borrower shall have satisfied all requirements set forth in Section 4.02 with respect to the Initial Advance and shall have borrowed the Initial Advance substantially simultaneously with the satisfaction of the conditions set forth in this Section 4.01.

---

^4 [NTD: Brackets to be removed once "first days" are satisfactory.]

WEIL:\95912472\1\22010.0003

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02.  *Conditions to Borrowing Any Advance.*  The obligation of each Lender to fund any Advance hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Closing Date shall have occurred.

(b)    The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the date of such Advance, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in (x) Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(a) and (b), respectively, and (y) Section 5.05(c) with respect to Rolling Budgets shall be deemed to refer to the most recent Rolling Budget furnished pursuant to Section 6.01(g).

(c)    No Default shall exist, or would result from the Borrowing of such Advance or from the application of the proceeds thereof.

(d)    The Administrative Agent shall have received a Loan Notice with respect to such Borrowing in accordance with the requirements hereof.

(e)    All fees required to be paid to the Administrative Agent and the Lenders on or before the date of such Advance shall have been paid.

(f)    The Borrower shall have paid all fees, charges and disbursements of counsel to the Administrative Agent and the Lenders (directly to such counsel if requested by the Administrative Agent or the Lenders, as applicable) to the extent invoiced prior to or on the date of such Advance, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through such Advance (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent and the Lenders, as applicable).

(g)    (i) The making of such Advance shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently and (ii) no law or

58

regulation shall be applicable in the judgment of the Required Lenders that imposes materially adverse conditions upon the Loans or the transactions contemplated by this Agreement.

(h)    There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect.

(i)    All consents, licenses, approvals, waivers, acknowledgements and other agreements required in connection with the execution, delivery and performance by such Loan Party, and the validity against such Loan Party, of the Loan Documents to which it is a party shall be in full force and effect (without the imposition of any adverse conditions that are not reasonably acceptable to the Required Lenders).

(j)    The Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified (other than pursuant to the Final Order) without the prior written consent of Required Lenders and, solely with respect to amendments or modifications adversely affecting its rights granted under the Interim Order, the Administrative Agent, in their sole discretion.

(k)    Other than with respect to the making of the Initial Advance, the Bankruptcy Court shall have entered the Final Order and such Final Order shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of Required Lenders and, solely with respect to amendments or modifications adversely affecting its rights granted under the Final Order, the Administrative Agent, in their sole discretion.

(l)    Other than with respect to the making of the Initial Advance, the most recent Rolling Budget delivered hereunder projects the unrestricted cash and Cash Equivalents of the Borrower and its consolidated Subsidiaries to be below $40,000,000 on the proposed date of Borrowing set forth in the applicable Loan Notice.

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the applicable Advance specifying its objection thereto.

<div align="center">

ARTICLE V
REPRESENTATIONS AND WARRANTIES

</div>

Each Loan Party represents and warrants to the Administrative Agent and the Lenders that:

<div align="center">59</div>

Section 5.01.  *Existence, Qualification and Power*.  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject to entry of the Orders and subject to any restrictions arising on account of any Loan Party's status as a "debtor" under the Bankruptcy Code, has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02.  *Authorization; No Contravention*.  Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not contravene the terms of any of such Person's Organization Documents; conflict with or result in any breach or contravention of, or require any payment to be made under, any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, except for conflicts, breaches or contraventions that could not reasonably be expected to result in a Material Adverse Effect; violate any Law or any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or result in the creation or imposition of any Lien on any property of the Borrower or any Subsidiary except Liens created under the Loan Documents.

Section 5.03.  *Governmental Authorization; Other Consents*.  Subject to the entry of the Orders and subject to the terms thereof, no approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or continuance of the Liens created under the Collateral Documents (including the priority thereof as set forth in Section 2.14) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the authorizations, approvals, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect, are required by the Loan Documents, or in the case of any authorization, approval, action, notice or filing from or with a Person other than a Governmental Authority, the failure to have could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04.  *Binding Effect*.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by

each Loan Party that is party thereto.  Subject to the entry of the Orders and subject to the terms thereof, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

Section 5.05.  *Financial Statements; No Material Adverse Effect.*

(a)

(i)    The audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2015, and each audited balance sheet of the Borrower and its Subsidiaries subsequently delivered under Section 6.01(a), and the related consolidated statements of operations, stockholders' equity, and cash flows for such fiscal year, were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations and cash flows for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and show or describe all material indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(ii)    The consolidated balance sheet of the Borrower and its Subsidiaries for the most recent fiscal quarter ended, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for such fiscal quarter, fairly present in all material respects the financial position, results of operations cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

(b)    Since June 30, 2016, there has been no event or circumstance that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect other than those affecting the oil field service industry generally.

(c)    The DIP Budget, each Rolling Budget, the consolidated forecasted balance sheet, statements of income and cash flows of the Borrower and its Subsidiaries, in each case, delivered pursuant to Section 4.01 or 6.01, as applicable, were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's best estimate of its future financial condition and performance, recognizing that there are industry-wide risks normally associated with the types of business conducted by the Borrower and its Subsidiaries and that the Borrower does not warrant that such forecasts and estimates will ultimately prove to have been accurate.

Section 5.06.  *Litigation*.  Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that purport to affect or pertain to this Agreement, any other Loan Document or, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect or is not subject to the automatic stay as a result of the Case.

Section 5.07.  *No Default*.  Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to, or a party to, any Contractual Obligation (other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court) that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.08.  *Ownership of Property; Liens; Investments*.  Other than as a result of the Case, Loan Party and each of its Subsidiaries has good title to, or valid leasehold interests in, all of their respective property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No such property is subject to a Lien, other than Permitted Liens.  As of the Closing Date, to the Borrower's knowledge Schedule 5.08 lists all Material Real Property.

Section 5.09.  *Environmental Compliance*.

(a)    The Loan Parties and their respective Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential Environmental Liability on their respective businesses, operations and properties, and as a result thereof the Borrower has reasonably concluded that such Environmental Laws and Environmental Liabilities could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    None of the properties currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property.  Except as in accordance in all material respects with the requirements of all Environmental Laws: (i) there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to the best of the knowledge of the Loan Parties, on any property formerly owned, leased or operated by any Loan Party or any of its Subsidiaries and (ii) Hazardous Materials have not been released, discharged or disposed of (x) on, at, under, to, from, or in any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries or (y) by any Loan Party or any of their respective Subsidiaries at any

62

other property, facility or location. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there is no asbestos or asbestos-containing material on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries.

(c)     Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for any investigations, assessments or remedial or response actions not reasonably expected to result in a material Environmental Liability. All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been disposed of in accordance with the requirements of all Environmental Laws in all material respects and in a manner not reasonably expected to result in a material Environmental Liability.

(d)     The Loan Parties and each of their respective Subsidiaries have obtained all Environmental Permits necessary for the ownership and operation of their properties and assets and the conduct of their business except where the failure to do so could not, either individually or in the aggregate, reasonably be expected to result a material Environmental Liability. Except where the failure to do so could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Loan Parties and their respective Subsidiaries have been and are in compliance with all Environmental Laws and the terms and conditions of applicable Environmental Permits. There are no pending or, to the best knowledge of the Borrower, threatened, claims against any Loan Party or any of its Subsidiaries under any Environmental Laws and neither the Loan Parties nor any of their respective Subsidiaries has received any written notice of alleged non-compliance with applicable Environmental Laws or Environmental Permits which could, in each case, either individually or in the aggregate, reasonably be expected to result in a material Environmental Liability.

Section 5.10.   *Insurance*. The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates.

Section 5.11.   *Taxes*. The Borrower and its Subsidiaries have filed all federal, state and other material Tax returns and reports required to be filed, and have paid all federal, state and other material Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those (x) that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP or (y) that need not be paid pursuant to an order of the

Bankruptcy Court or pursuant to the Bankruptcy Code. There is no proposed Tax assessment against the Borrower or any Subsidiary that would, if made, have a Material Adverse Effect. Neither any Loan Party nor any Subsidiary thereof is party to any Tax sharing agreement

Section 5.12. *ERISA Compliance.*

(a) Except to the extent excused by the Bankruptcy Code or as a result of the filing of the Cases, the Borrower, its Subsidiaries and each ERISA Affiliate have maintained each Plan (other than a Multiemployer Plan) in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state laws.

(b) There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) Other than as a result of the Cases, except as could not, either individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect: (i) no ERISA Event has occurred, and neither the Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) the Borrower and each ERISA Affiliate have met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither the Borrower nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) neither the Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

Section 5.13. *Subsidiaries; Equity Interests; Loan Parties.* No Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except Permitted Liens. No Loan Party has any equity investments in any other corporation or entity other than those

64

specifically disclosed in Part (b) of Schedule 5.13.  Set forth on Part (c) of Schedule 5.13 is a complete and accurate list of all Loan Parties, showing (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number or, in the case of any non-U.S.  Loan Party that does not have a U.S. taxpayer identification number, its unique identification number issued to it by the jurisdiction of its incorporation.

Section 5.14.  *Margin Regulations; Investment Company Act.*

(a)     The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  Following the application of the proceeds of each Borrowing, not more than 25% of the value of the assets (either of the Borrower only or of the Borrower and its Subsidiaries on a consolidated basis) subject to the provisions of Section 7.01 or 7.05 or subject to any restriction contained in any agreement or instrument between the Borrower and any Lender or any Affiliate of any Lender relating to Indebtedness and within the scope of Section 8.01(e) will be margin stock.

(b)     None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is or is required to be registered as an "**investment company**" under the Investment Company Act of 1940.

Section 5.15.  *Disclosure.*  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any other Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, recognizing that there are industry-wide risks normally associated with the types of business conducted by the Borrower and its Subsidiaries and that the Borrower does not warrant that such projections and estimates will ultimately prove to have been accurate.

Section 5.16.  *Compliance with Laws.*  Each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the

WEIL:\95912472\1\22010.0003

failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.17.  *Intellectual Property; Licenses, Etc.*

(a)      The Borrower and each of its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, Licenses and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Borrower or any of its Subsidiaries infringes upon any rights held by any other Person.  No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b)      To the knowledge of the Borrower and each of its Subsidiaries, on and as of the date hereof, there is no material violation by any Person of any right of the Borrower or any of its Subsidiaries with respect to any IP Rights included in the Collateral, pledged by it under the name of the applicable Loan Party.

Section 5.18.  *[Reserved.]*

Section 5.19.  *Casualty, Etc.*  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.20.  *Labor Matters.*  There are no collective bargaining agreements or Multiemployer Plans covering the employees of the Borrower or any of its Subsidiaries and neither the Borrower nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

Section 5.21.  *Collateral Documents.*  Subject to, and upon the entry of, the Orders, the Orders and the provisions of the Collateral Documents are or will be effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien with the priorities set forth in Section 2.14 on all right, title and interest of the respective Loan Parties in the Collateral described therein.  Except for filings completed as contemplated hereby and by the Collateral Documents, no filing or other action will be necessary to perfect or protect such Liens.

Section 5.22.  *Sanctions and Anti-Corruption Concerns.*  No Loan Party, nor any Subsidiary, nor, to the knowledge of the Loan Parties and their Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is a Person that is, or is

owned or controlled by one or more Persons that are, (a) currently the subject or target of any Sanctions or (b) located, organized or resident in a Designated Jurisdiction. The Loan Parties and their Subsidiaries are in compliance in all material respects with applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and all other applicable anti-corruption laws ("**Anti-Corruption Laws**").

ARTICLE VI
AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03 and 6.11) cause each Subsidiary to:

Section 6.01.   *Financial Statements*.  Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)      as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower (or, if earlier, 15 days after the date required to be filed with the SEC (without giving effect to any extension permitted by the SEC)) (commencing with the fiscal year ending December 31, 2016), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in stockholders' equity, and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "**going concern**" or like qualification or exception or any qualification or exception as to the scope of such audit (except for a qualification or exception in respect of the financial condition of the Borrower and its Subsidiaries);

(b)      as soon as available, but in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower (or, if earlier, five days after the date required to be filed with the SEC (without giving effect to any extension permitted by the SEC)) (commencing with the fiscal quarter ending September 30, 2016), (A) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in stockholders' equity, and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, certified by the chief executive officer, chief financial officer, treasurer or controller of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and (B) desktop

67

appraisals with respect to the Collateral as of the last day of each fiscal quarter by an appraiser reasonably acceptable to the Required Lenders and the Administrative Agent;

(c)     as soon as available, but in any event within 30 days after the end of each month,  a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for such month and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, certified by the chief executive officer, chief financial officer, treasurer or controller of the Borrower as fairly presenting in all material respects the financial condition, results of operations, and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(d)     as soon as available, but in any event not later than 45 days after the end of each fiscal year of the Borrower, a financial forecast of the Borrower and its Subsidiaries on a consolidated basis prepared by management of the Borrower, in form satisfactory to the Administrative Agent and the Required Lenders, including consolidated balance sheets and statements of income or operations and cash flows of the Borrower and its Subsidiaries on a quarterly basis for the immediately following fiscal year (including the fiscal year in which the Maturity Date occurs);

(e)     [reserved];

(f)     as soon as available, but in any event no later than 5:00 p.m. (New York City time) on [October 31, 2016] and the first Business Day of each week thereafter, a report of the unrestricted cash and Cash Equivalents of the Borrower and its consolidated Subsidiaries as of the close of the last Business Day of the preceding week;

(g)     as soon as available, but in any event no later than 5:00 p.m. (New York City time) on [November 4, 2016] and the last Business Day of the first week of each month thereafter, a Rolling Budget; and

(h)     as soon as available, but in any event no later than 5:00 p.m. (New York City time) on [November 4, 2016] and each Testing Date thereafter, a variance report setting forth (1) actual cash receipts and disbursements (excluding professional fees and expenses) made by the Borrower and its Subsidiaries for the applicable Testing Period ending on the last Business Day of the prior week, (2) variances, on a line-item basis, of the receipts and disbursements of the Borrower and the Subsidiaries for such Testing Period against the line-item receipts and disbursements (other than in respect of professional fees and expenses) set forth for such period in an appendix to the most recent Rolling Budget on a weekly basis and (3) an explanation, in reasonable detail, for any material variance, and a certification of a Responsible Officer of the Borrower of compliance with Section 7.11; and as used herein "**Testing Period**" means (i) in respect of the first Testing Date covered in the most recent Rolling Budget, the one-week period ending on the last Business Day of the week prior to the week of such Testing Date, (ii)

68

in respect of the second Testing Date covered in the most recent Rolling Budget, the two-week period ending on the last Business Day of the week prior to the week of such Testing Date, (iii) in respect of the third Testing Date covered in the most recent Rolling Budget, the three-week period ending on the last Business Day of the week prior to the week of such Testing Date and (iv) in respect of any subsequent Testing Date covered in the most recent Rolling Budget, the four-week period ending on the last Business Day of the week prior to the week of such Testing Date.

As to any information contained in materials furnished pursuant to Section 6.02(d), the Borrower shall not be separately required to furnish such information under Section 6.01(a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in Sections 6.01(a) and (b) above at the times specified therein.

Section 6.02.   *Certificates; Other Information*.  Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)     concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default under the financial covenants set forth herein or, if any such Default shall exist, stating the nature and status of such event;

(b)     concurrently with the delivery of the financial statements referred to in Sections 6.01(a), (b) and (c) a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower (which delivery may, unless the Administrative Agent, or a Lender requests executed originals, be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes);

(c)     promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the Board (or the audit committee of the Board) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them;

(d)     promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries

69

pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(f)     as soon as available, but in any event within 30 days after the end of each fiscal year of the Borrower, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably specify;

(g)     promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(h)     not later than five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all material notices, requests and other documents (including amendments, waivers and other modifications) received under or pursuant to any instrument, indenture, loan or credit or similar agreement and, from time to time upon request by the Administrative Agent, or any Lender through the Administrative Agent, such information and reports regarding such instruments, indentures and loan and credit and similar agreements as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably request;

(i)     promptly after the assertion or occurrence thereof, notice of (x) any action or proceeding against any Loan Party or any of its Subsidiaries related to any Environmental Law or Environmental Permit or (y) noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit, in each case that could reasonably be expected to have a Material Adverse Effect;

(j)     (i) as soon as reasonably practicable in advance of filing with the Bankruptcy Court or delivering to any statutory committee appointed in the Cases or the U.S. Trustee, as the case may be, the Final Order and all other proposed orders and pleadings related to or affecting the Loans, the Prepetition Term Loans, the Prepetition Term Loan Credit Agreement Loan Documents and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Reorganization Plan and/or any disclosure statement related thereto and (ii) not later than the earlier of (A) three Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than one Business Day prior to being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Cases, the Creditors' Committee, the Ad Hoc Note Holder Committee or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or any

70

request for relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure; and

(k)      promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each Lender (by fax transmission or e-mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks, Debt Domain, Syndtrak, ClearPar, or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "**PUBLIC**" which, at a minimum, shall mean that the word "**PUBLIC**" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "**PUBLIC**," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute

Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "**PUBLIC**" are permitted to be made available through a portion of the Platform designated "**Public Side Information;**" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "**PUBLIC**" as being suitable only for posting on a portion of the Platform not designated "**Public Side Information**".

 Section 6.03.  *Notices*.  Promptly notify the Administrative Agent and each Lender:

 (a)    of the occurrence of any Default;

 (b)    of (i) the breach or non-performance of, or any default under, a Contractual Obligation of the Borrower or any Subsidiary; (ii) any dispute, litigation, investigation, proceeding or suspension between the Borrower or any Subsidiary and any Governmental Authority; (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower or any Subsidiary; or (iv) any other matter; in each case, that has resulted or could reasonably be expected to result in a Material Adverse Effect;

 (c)    of the commencement of, or any material development in, any investigation, litigation or proceeding affecting the Borrower or any Subsidiary pursuant to any applicable Environmental Laws which could, either individually or in the aggregate, reasonably be expected to result in a material Environmental Liability;

 (d)    of the occurrence of any ERISA Event; and

 (e)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof.

 Each notice pursuant to Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

 Section 6.04.  *Payment of Obligations*.  In the case of any Debtor, in accordance with the Bankruptcy Code and subject to obtaining any required approval by the Bankruptcy Court, pay and discharge as the same shall become due and payable, in each case as permitted by the applicable Rolling Budget, all its material obligations and liabilities (in the case of any Debtor, solely to the extent arising post-petition), including (a) all Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and

WEIL:\95912472\1\22010.0003

when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

Section 6.05.  *Preservation of Existence, Etc*.  (a) Preserve, renew and maintain in full force and effect the Borrower's and the Loan Parties' legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, copyrights, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

Section 6.06.  *Maintenance of Properties*.  (a) Maintain, preserve and protect all of its material properties and any equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

Section 6.07.  *Maintenance of Insurance*.  (a) Maintain insurance with respect to the Collateral, covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A+, unless otherwise approved by the Administrative Agent, at the direction of the Required Lenders, in their discretion) satisfactory to the Administrative Agent, at the direction of the Required Lenders.  All proceeds under each policy covering Collateral shall be payable to the Administrative Agent as a lender loss payee.  From time to time upon request, the Borrower shall deliver to the Administrative Agent the originals or certified copies of its insurance policies.  Unless the Administrative Agent, at the direction of the Required Lenders, shall agree otherwise, each policy shall include satisfactory endorsements that (i) provide for not less than 30 days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance (ii) with respect to insurance covering Collateral, name the Administrative Agent as loss payee, and (iii) specify that the interest of the Administrative Agent shall not be impaired or invalidated by any act or negligence of any Loan Party or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy.  If the Borrower fails to provide and pay for any insurance, the Administrative Agent may, at its option, but shall not be required to, procure the insurance and charge the Borrower therefor.  The Borrower agrees to deliver to the Administrative Agent, promptly as rendered, copies of all reports made to insurance companies.  While no Event of Default exists, the Loan Parties may settle, adjust or compromise any insurance claim, as long as the proceeds are delivered to the Administrative Agent.  If an Event of Default exists, only the Administrative Agent shall be authorized to settle, adjust and compromise such claims; and (b) in addition to the insurance required under clause (a) with respect to Collateral, maintain insurance with insurers (with a Best's Financial Strength Rating of at least A+, unless otherwise approved by the Administrative Agent in its discretion)

73

satisfactory to the Administrative Agent, at the direction of the Required Lenders, with respect to the properties and business of the Loan Parties, of such type (including product liability, workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are at the time of placing such insurance customary for companies similarly situated and which are available at commercially reasonable rates.

Section 6.08.    *Compliance with Laws*.  Except as otherwise excused by the Bankruptcy Court, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 6.09.    *Books and Records*.  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be.

Section 6.10.    *Inspection Rights*.  (a) Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

(b)    Subject to the reimbursement limitations contained in the next sentence, at any time upon the Administrative Agent's or the Required Lenders' request, the Loan Parties will allow the Administrative Agent (or its designee) to conduct field examinations to ensure the adequacy of Collateral and related reporting and control systems, and prepared on a basis reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders, such field examinations to include information required by applicable law and regulations.  The Borrower shall reimburse the Administrative Agent for all reasonable and documented charges, costs and expenses (including a reasonable per diem field examination charge and out of pocket expenses) related thereto with respect to no more than one such field examination during each calendar year; provided that if an Event of Default has occurred and is continuing, (x) the Borrower shall reimburse the Administrative Agent for all reasonable charges, costs and expenses (including a per diem field examination charge and out of pocket expenses)

74

related to a second such field examination during such calendar year; and (y) there shall be no limitation on the number or frequency of field examinations that shall be at the sole expense of the Borrower.

Section 6.11.  *Use of Proceeds.*  Subject to the terms of the Orders, use the proceeds of the Loans only for the following purposes, in each case in accordance with the Rolling Budget and any variances to the Rolling Budget permitted herein: (a) to fund working capital needs, capital improvements and expenditures of the Debtors in the Cases; (b) to pay fees and expenses related to the Cases, including professional fees and expenses; and (c) to pay Adequate Protection Payments and reimburse drawings under Letters of Credit (as defined in the ABL Credit Agreement).

Section 6.12.  *Covenant to Guarantee Obligations and Give Security.*  (a)  The formation or acquisition of any new direct or indirect Subsidiary after the Closing Date shall occur only with the consent of the Required Lenders.  With respect to any Person that becomes a direct or indirect Subsidiary after the Closing Date (other than a CFC, a Subsidiary that is held directly or indirectly by a CFC or as otherwise agreed by the Required Lenders), the Borrower shall, at the Borrower's expense:

(i)      within 15 days after such formation or acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), cause such Subsidiary, and cause each direct and indirect parent of such Subsidiary (if it has not already done so), to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance satisfactory to the Administrative Agent, at the direction of the Required Lenders, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)      within 30 days after such formation or acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail satisfactory to the Administrative Agent, at the direction of the Required Lenders,

(iii)      within 15 days after such formation or acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to duly execute and deliver to the Administrative Agent Security Agreement Supplements, IP Security Agreement Supplements and other security and pledge agreements, as specified by and in form and substance satisfactory to the Administrative Agent, at the direction of the Required Lenders (including delivery of all Pledged Equity in and of such Subsidiary, and other instruments of the type specified in Section 4.01(a)(vii)(A)), securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on all such personal properties, as required by the Security Agreement,

75

(iv)    within 15 days after such formation or acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the opinion of the Administrative Agent, at the direction of the Required Lenders, to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the properties purported to be subject to Security Agreement Supplements, IP Security Agreement Supplements and security and pledge agreements delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms, as required by the Security Agreement,

(v)    [Reserved],

(vi)    upon the request of the Administrative Agent, at the direction of the Required Lenders, in the exercise of its business judgment, within 90 days after such formation or acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), deliver to the Administrative Agent with respect to all Material Real Property owned, leased or held by the entity that is the subject of such formation or acquisition, evidence that the Real Estate Collateral Requirement has been satisfied with respect to such Material Real Property; provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any item of diligence such as title information, environmental or engineering reports or surveys, with respect to such Material Real Property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent.

(b)    Upon the acquisition of any property by any Loan Party, if such property, in the judgment of the Lenders, shall not already be subject to a perfected security interest with the priorities set forth in Section 2.14 in favor of the Administrative Agent for the benefit of the Secured Parties, then the Borrower shall, at the Borrower's expense:

(i)    within 30 days after such acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), furnish to the Administrative Agent a description of the property so acquired in detail satisfactory to the Administrative Agent,

(ii)    within 15 days after such acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), (A) cause the applicable Loan Party to duly execute and deliver to the Administrative Agent Security Agreement Supplements, IP Security Agreement Supplements and other security and pledge agreements, as specified by and in form and substance satisfactory to the Administrative Agent, at the

76

direction of the Required Lenders, securing payment of all the Obligations of the applicable Loan Party under the Loan Documents and constituting Liens on all such personal properties and (B) cause the applicable Loan Party to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the opinion of the Required Lenders to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on such property, enforceable against all third parties,

(iii)    [Reserved],

(iv)    within 30 days after any acquisition of any Material Real Property, notify the Administrative Agent and the Lenders of such acquisition and, upon the request of the Administrative Agent, in the exercise of its business judgment, within 60 days after any such acquisition (or such longer period as may be agreed by the Administrative Agent, at the direction of the Required Lenders, in their sole discretion), satisfy the Real Estate Collateral Requirement; provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any item of diligence such as title information, environmental or engineering reports or surveys, in satisfaction of such requirement with respect to such Material Real Property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent.

(c)    At any time upon request of the Administrative Agent, at the direction of the Required Lenders, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent, at the direction of the Required Lenders, may reasonably deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, Security Agreement Supplements, IP Security Agreement Supplements (each intellectual property security agreement and intellectual property security agreement supplement currently in effect and hereafter delivered pursuant to this Section 6.12, in each case in form and substance reasonably satisfactory to the Required Lenders and as amended, the "**Intellectual Property Security Agreement**") and other security and pledge agreements.

(d)    No later than 60 days after the Closing Date (or such longer periods as agreed by the Administrative Agent, at the direction of the Required Lenders (which, for the avoidance of doubt, may be provided via email), in their sole discretion), enter into the Control Agreements (as defined in the Security Agreement and in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent) required pursuant to Section 4.07 of the Security Agreement.

Section 6.13.    *Compliance with Environmental Laws*.  Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain,

77

maintain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials (i) from any of its properties and (ii) released, discharged or disposed of by any Loan Party or its Subsidiaries at any other property, facility or location, in each case in accordance with the requirements of all Environmental Laws in all material respects; provided, however, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 6.14.  *Preparation of Environmental Reports*.  At the request of the Required Lenders during the existence of any Default, provide to the Lenders within 60 days (or such longer period as the Administrative Agent, at the direction of the Required Lenders, may agree in their sole discretion) after such request, at the expense of the Borrower, an environmental site assessment report for any of its properties described in such request, prepared by an environmental consulting firm acceptable to the Administrative Agent, indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance, removal or remedial action in connection with any Hazardous Materials on such properties.  Without limiting the generality of the foregoing, if the Administrative Agent determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may, at the direction of the Required Lenders, retain an environmental consulting firm to prepare such report at the expense of the Borrower, and the Borrower hereby grants and agrees to cause any Loan Party or Subsidiary that owns any property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment.

Section 6.15.  *Further Assurances*.  Promptly upon the reasonable request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents or the Orders, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents or the Orders, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder or under the Orders and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be

78

granted to the Secured Parties under any Loan Document or the Orders or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

Section 6.16.  *Compliance with Terms of Leaseholds*.  In the case of any Debtor, in accordance with the Bankruptcy Code and subject to obtaining any required approval by the Bankruptcy Court, make all payments (to the extent permitted by the applicable Rolling Budget) and otherwise perform all obligations in respect of all leases of real property to which the Borrower or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

Section 6.17.  *Material Contracts*.  In the case of any Debtor, in accordance with the Bankruptcy Code and subject to obtaining any required approval by the Bankruptcy Court, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent, at the direction of the Required Lenders, and, upon request of the Administrative Agent, at the direction of the Required Lenders, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 6.18.  *Appraisals*.  At any time upon the Required Lenders' request, promptly provide the Administrative Agent with appraisals thereof of the Loan Parties' Collateral from an appraiser selected and engaged by the Administrative Agent, at the direction of the Required Lenders, and prepared on a basis reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders, such appraisals to include information required by applicable law and regulations.  The Borrower shall reimburse the Administrative Agent for all reasonable and documented charges, costs and expenses related thereto with respect to one appraisal during each calendar year; provided, however, that when an Event of Default exists there shall be no limitation on the number or frequency of appraisals that shall be at the sole expense of the Borrower.

Section 6.19.  *Administration of Deposit Accounts*.  Schedule 6.19 sets forth all deposit accounts maintained by the Loan Parties.  The applicable Loan Party shall be the sole account holder of each deposit account and shall not allow any other Person (other than the Administrative Agent, the Prepetition Term Loan Administrative Agent and, except with respect to the Term Loan Proceeds Collateral Account, the ABL Agent) to

have control over a deposit account or any property deposited therein.  The proceeds of all Loans shall be deposited in the Term Loan Proceeds Collateral Account and, thereafter until such proceeds are used by the Borrower, shall be held solely in the Term Loan Proceeds Collateral Account.  Funds in the Term Loan Proceeds Collateral Account may be transferred to other deposit accounts of the Loan Parties if and to the extent such funds are to be disbursed to third parties and, in such case, such transfer shall occur substantially concurrently with or reasonably in advance of such disbursement.  The Borrower shall promptly notify the Administrative Agent of any opening or closing of a deposit account by any Loan Party and, with the consent of Administrative Agent, will amend Schedule 6.19 to reflect the same.

Section 6.20.  *Certain Case Milestones.*

(a)    No later than 45 calendar days after the Petition Date (or such later date as the Required Lenders may agree in their sole discretion), obtain the entry of the Final Order;

(b)    as promptly as possible, but in no event later than 75 calendar days after the Petition Date (or such later date as the Required Lenders may agree in their sole discretion) (the "**Disclosure Statement/Plan Deadline**"), (i) the Acceptable Disclosure Statement shall have been approved by the Bankruptcy Court, and the Bankruptcy Court's approval of the Acceptable Disclosure Statement shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the Required Lenders in their sole discretion and (ii) the Acceptable Plan of Reorganization shall have been confirmed by an order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Required Lenders in their sole discretion and shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the Required Lenders in their sole discretion.

(c)    no later than 90 calendar days after the Petition Date (or such later date as the Required Lenders may agree in their sole discretion) cause the Consummation Date to occur.

Section 6.21.  *Certain Orders.*  (i) Cause all proposed (A) "first day" orders, (B) "second day" orders, (C) orders related to or affecting the Loans, the Prepetition Term Loans, the Prepetition Term Loan Credit Agreement Loan Documents and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Reorganization Plan and/or any disclosure statement related thereto, (D) orders concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (E) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in all respects[, it being understood and

80

agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects][5] and (ii) once entered by the Bankruptcy Court, comply with any order listed in clause (i) of this Section 6.21 in all material respects.

Section 6.22.  *Cash Management System*.  Obtain entry of the Cash Management Order and use a cash management system that is the same as or substantially similar to the cash management system in effect immediately prior to the Petition Date (the "**Prepetition Cash Management System**").  Any material changes made to the Prepetition Cash Management System must be acceptable to the Required Lenders in their reasonable discretion.

ARTICLE VII
NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly:

Section 7.01.  *Liens*.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower or any of its Subsidiaries as debtor, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document or the Orders;

(b)    Liens in favor of the Prepetition Term Loan Administrative Agent to secure Indebtedness under the Prepetition Term Loan Credit Agreement;

(c)    Liens for (i) pre-petition Taxes not yet due as of the Petition Date or which are being contested in good faith and by appropriate proceedings diligently conducted or (ii) post-petition Taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, in each case, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which do not secure Indebtedness for borrowed money and which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

---

[5] [NTD: Brackets to be removed once "first days" are satisfactory.]

(e)       pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)       deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; provided that the sum of the aggregate amount of obligations secured thereby and the aggregate amount of such deposits and Liens shall not exceed $4,000,000 outstanding at any time;

(g)       easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)       Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h);

(i)       Liens securing Indebtedness permitted under Section 7.02(f), including such Liens outstanding on the date hereof; provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(j)       Leases with respect to the assets or properties of any of the Borrower or any Subsidiary, in each case entered into in the ordinary course of such Person's business so long as such leases are subordinate in all respects to the Liens granted and evidenced by the Collateral Documents or the Orders and do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary or (ii) materially impair the use (for its intended purposes) or the value of the property subject thereto;

(k)       Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary in the ordinary course of business in accordance with the past practices of such Person;

(l)       Liens of the ABL Agent to secure the Indebtedness under the ABL Credit Agreement permitted by Section 7.02(d) hereof; provided, that, such Liens are secured solely by ABL Facility Priority Collateral and the ABL Postpetition Collateral and subject to the Prepetition Intercreditor Agreement;

(m)       Liens in favor of Bank of America, N.A. on the Credit Card Cash Collateral to secure obligations of any Loan Party under the P-Card Agreements;

(n)     Liens on Real Property that are disclosed in any policy of title insurance delivered pursuant to the Prepetition Term Loan Credit Agreement or under the Real Estate Collateral Requirement;

(o)     Liens in favor of the ABL Agent to secure Indebtedness permitted by Section 7.02(l) hereof; provided that (i) such Liens are secured solely by ABL Facility Priority Collateral, (ii) such Liens are subject to the Prepetition Intercreditor Agreement and (iii) such Indebtedness arises under a Secured Cash Management Agreement (as defined in the ABL Credit Agreement as in effect on February 17, 2016) and is otherwise permitted under the ABL Credit Agreement.

    Section 7.02.  *Indebtedness*.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     [Reserved];

(b)     Indebtedness among the Borrower and its wholly owned Subsidiaries, which Indebtedness shall (i) in the case of Indebtedness owed to a Loan Party, be evidenced by the Intercompany Note, (ii) in the case of Indebtedness owed by any Loan Party to a Subsidiary that is not Loan Party, be unsecured, evidenced by the Intercompany Note and subordinated in right of payment to the Obligations, and (iii) be otherwise permitted under the provisions of Section 7.03;

(c)     Indebtedness under the Loan Documents;

(d)     Indebtedness outstanding on the date hereof that is listed on Schedule 7.02 and Indebtedness outstanding on the date hereof under the Prepetition Term Loan Credit Agreement, the 2019 Senior Notes, the 2022 Senior Notes and the ABL Credit Agreement;

(e)     Guarantees of the Borrower or any Subsidiary in respect of Indebtedness otherwise permitted hereunder of the Borrower or any Guarantor;

(f)     Indebtedness in respect of Capitalized Leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i); provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding (including any such Indebtedness outstanding on the date hereof) shall not exceed $85,000,000; *provided*, further, that the Borrower shall not, nor shall it permit any Subsidiary to, (x) amend, modify or otherwise change any agreement or other document governing such Indebtedness existing as of the date hereof in order to (i) add any liquidity, financial maintenance or other similar covenant or (ii) make any such covenant existing as of the date hereof more restrictive as to the Borrower or any Subsidiary or (y) on or after the date hereof, enter into any agreement or other document governing any such Indebtedness that includes, whether on the date of inception or at a later date, any liquidity, financial maintenance or other similar covenant;

(g)     [Reserved];

83

(h)     Indebtedness in respect of workers' compensation claims, self-insurance obligations, performance bonds, surety appeal or similar bonds and completion guarantees provided by the Borrower or a Subsidiary in the ordinary course of its business and consistent with the applicable Rolling Budget, giving effect to Section 7.11;

(i)     Indebtedness in respect of (i) self-insurance obligations or completion, bid, performance, appeal or surety bonds issued for the account of the Borrower or any wholly-owned Subsidiary in the ordinary course of business and consistent with the applicable Rolling Budget, giving effect to Section 7.11, including guarantees or obligations of the Borrower or any wholly-owned Subsidiary with respect to letters of credit supporting such self-insurance, completion, bid, performance, appeal or surety obligations (in each case other than for an obligation for money borrowed) or (ii) obligations represented by letters of credit for the account of the Borrower or any wholly-owned Subsidiary, as the case may be, in order to provide security for workers' compensation claims;

(j)     [Reserved];

(k)     [Reserved];

(l)     Indebtedness arising under any Cash Management Agreement (as defined in the ABL Credit Agreement as in effect on February 17, 2016) entered into by any Loan Party so long as (i) such Cash Management Agreement is entered into by such Loan Party in the ordinary course of business and is consistent with the applicable Rolling Budget, giving effect to Section 7.11 and (ii) such Indebtedness is in an aggregate principal amount at any one time outstanding not to exceed $3,500,000;

Section 7.03.   *Investments*.  Make or hold any Investments, except:

(a)     Investments held by the Borrower and its Subsidiaries in the form of Cash Equivalents;

(b)     [Reserved];

(c)     (i) Investments by the Borrower and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof and identified on Schedule 7.03, (ii) additional Investments by the Borrower and its Subsidiaries in Loan Parties and (iii) additional Investments by Subsidiaries of the Borrower that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and consistent with the applicable Rolling Budget, giving effect to Section 7.11, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

84

(e)    Guarantees permitted by Section 7.02; and

(f)    Investments existing on the date hereof (including those referred to in Section 7.03(c)(i)) and identified on Schedule 7.03.

Section 7.04.  *Fundamental Changes*.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)    (i) the Borrower may merge with one or more of its Subsidiaries, provided that the Borrower shall be the continuing or surviving Person, and (ii) any of its Subsidiaries may merge with any of its other Subsidiaries provided that if any of such Subsidiaries is a Guarantor, a Guarantor shall be the surviving Person;

(b)    any Guarantor may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Guarantor; and

(c)    any Subsidiary that is not a Guarantor may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to the Borrower or another Subsidiary.

Section 7.05.  *Dispositions*.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)    Dispositions of inventory in the ordinary course of business and consistent with the applicable Rolling Budget, giving effect to Section 7.11;

(c)    Dispositions of equipment to the extent that (i) such equipment is exchanged for credit against the purchase price of similar replacement equipment or (ii) the proceeds of such Disposition are (x) paid solely in cash, (y) reinvested in replacement equipment within 30 days of receipt and during such period the proceeds of such Disposition are deposited in the Term Loan Proceeds Collateral Account  and (z) if the equipment subject to such Disposition was Collateral, such replacement equipment is or becomes Collateral subject to a perfected Lien in favor of the Administrative Agent for the benefit of the Secured Parties substantially contemporaneously with the consummation of such replacement;

(d)    Dispositions of property by any Subsidiary to the Borrower or to a wholly-owned Subsidiary; provided that if the transferor of such property is a Guarantor, the transferee thereof must either be the Borrower or a Guarantor;

(e)    Dispositions permitted by Section 7.04;

85

(f)    *[Reserved]*; and

(g)    non-exclusive licenses or sublicenses to use the patents, trade secrets, know-how and other intellectual property, and licenses, leases or subleases of other assets, of the Borrower or any wholly-owned Subsidiary in the ordinary course of business consistent with past practices and consistent with the applicable Rolling Budget, giving effect to Section 7.11;

*provided, however*, that any Disposition pursuant to Section 7.05(a) through Section 7.05(e) (other than Dispositions to a Loan Party) shall be for fair market value.

Section 7.06.  *Restricted Payments*.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom each Subsidiary may make Restricted Payments to the Borrower, any Subsidiaries of the Borrower that are Guarantors and any other Person (to the extent the proceeds of such Restricted Payments are being passed through by such other Person substantially concurrently with the receipt thereof to a Guarantor or the Borrower) that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made.

Section 7.07.   *Change in Nature of Business*.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

Section 7.08.  *Transactions with Affiliates*.  Enter into or permit to exist any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate; provided that the foregoing restriction shall not apply to transactions between or among the Loan Parties or the transactions contemplated by the Restructuring Support Agreement.

Section 7.09.  *Burdensome Agreements*.  Enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document or the ABL Agreement as in effect on the date hereof) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to or invest in the Borrower or any Guarantor, except for any agreement in effect (A) on the date hereof and set forth on Schedule 7.09 or (B) at the time any Subsidiary becomes a Subsidiary of the Borrower, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of the Borrower, (ii) of any Subsidiary to Guarantee the Obligations or (iii) of the Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens on its property to secure the Obligations; provided, however, that this clause (iii) shall not prohibit any negative pledge incurred or

86

provided in favor of any holder of Indebtedness existing as of the date hereof and permitted under Section 7.02(f) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure the Obligations.

Section 7.10.   *Use of Proceeds.*  Use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

Section 7.11.   *Budget Variance.*  As of any Testing Date, for the Testing Period ending on such Testing Date, the Borrower shall not permit (a) the aggregate receipts of the Borrower and its Subsidiaries for such Testing Period to be less than, in the aggregate, (i) 75% of the aggregate receipts line item for the Borrower and its Subsidiaries for the first such Testing Period covered in the appendix to the applicable Rolling Budget, (ii) 75% of the aggregate receipts line item for the Borrower and its Subsidiaries for the second such Testing Period covered in the appendix to the applicable Rolling Budget, (iii) 80% of the aggregate receipts line item for the Borrower and its Subsidiaries for the Testing Period after the second Testing Period covered in the appendix to the applicable Rolling Budget and each Testing Period thereafter beginning on or prior to the 100 Day Anniversary and (iv) 85% of the aggregate receipts line item for the Borrower and its Subsidiaries for each Testing Period beginning after the 100 Day Anniversary, and (b) the aggregate operating disbursements (excluding professional fees and expenses) made by the Borrower and its Subsidiaries for such Testing Period to be greater than (i) 125% of the aggregate operating disbursements line item for the first such Testing Period covered in the appendix to the applicable Rolling Budget, (ii) 125% of the aggregate operating disbursements line item for the second such Testing Period covered in the appendix to the applicable Rolling Budget, (iii) 120% of the aggregate operating disbursements line item for the Testing Period after the second Testing Period covered in the appendix to the applicable Rolling Budget and each Testing Period thereafter beginning on or prior to the 100 Day Anniversary and (iv) 115% of the aggregate operating disbursements line item for each Testing Period beginning after the 100 Day Anniversary, in each case set forth in the most recent Rolling Budget covering such Testing Period.

Section 7.12.   *Capital Expenditures and Capitalized Lease Payments.*  Make or become legally obligated to make (without duplication) any Capital Expenditure or make or become legally obligated to make any payment in respect of a Capitalized Lease, except for Capital Expenditures and Capitalized Lease payments that are made in the ordinary course of business consistent with the applicable Rolling Budget, giving effect to Section 7.11; provided that, in each case, as of the date of any such Capital Expenditure or Capitalized Lease payment (and giving pro forma effect to such Capital Expenditure or Capitalized Lease payment and any concurrent incurrence of Indebtedness) no Default exists and such Capital Expenditure or Capitalized Lease payment could not reasonably be expected to cause a Default.

<div align="center">87</div>

Section 7.13.  *Amendments of Organization Documents*.  Amend any of its Organization Documents in a manner which could materially and adversely affect the interests of the Administrative Agent or the Lenders.

Section 7.14.  *Accounting Changes*.  Make any change in (a) its accounting policies or reporting practices, except as required by GAAP, or (b) its fiscal year.

Section 7.15.  *Prepayments, Etc. of Indebtedness*.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any post-petition Indebtedness or any Indebtedness existing on the Petition Date, except (i) the prepayment of the Loans in accordance with the terms of this Agreement and (ii) in the case of such Indebtedness in existence on the Petition Date, (A) as expressly provided for in the "first day" orders entered by the Bankruptcy Court that are reasonably acceptable to the Required Lenders, (B) payments that are made substantially simultaneous with or following the termination of the Commitments and the repayment of the Obligations in cash in full and are provided for in the Acceptable Plan of Reorganization and (C) Adequate Protection Payments.

Section 7.16.  *Amendment, Etc. of Indebtedness*.  Amend, modify or change in any manner any term or condition of the ABL Credit Agreement, the Senior Notes, the Senior Notes Documents or any Indebtedness set forth on Schedule 7.02, except for with respect to the Senior Notes and the Senior Notes Documents, any amendments or modifications made to (i) cure any ambiguity, defect or inconsistency, (ii) evidence or provide for the acceptance of appointment by a successor trustee or effect any similar immaterial administrative modifications or (iii) supplemental indentures to the Senior Notes Documents made solely to add guarantors.

Section 7.17.  *Sanctions*.  Directly or indirectly, use any Loan or the proceeds of any Loan, or lend, contribute or otherwise make available such Loan or the proceeds of any Loan to any Person, to fund any activities of or business with any Person that, at the time of such funding, is the subject of Sanctions, or in any country or territory that, at the time of such funding, is a Designated Jurisdiction, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions or Anti-Corruption Laws.

Section 7.18.  *Additional Bankruptcy Matters*.  Without the Required Lenders' prior written consent, do any of the following:

(a)      assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against the Administrative Agent or the Lenders;

(b)      subject to the terms of the Orders and Section 8.01, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and

88

remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that any Loan Party may contest or dispute whether an Event of Default has occurred); or

(c)    except (i) as expressly provided or permitted hereunder (including to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement), (ii) with the prior consent of the Required Lenders in their sole discretion or (iii) as provided pursuant to any other order of the Bankruptcy Court reasonably acceptable to the Required Lenders, make any payment or distribution to any non-Debtor Affiliate or insider of the Borrower outside of the ordinary course of business or any Prepetition Payment.

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

Section 8.01.    *Events of Default*.  Any of the following shall constitute an Event of Default:

(a)    *Non-Payment*.  The Borrower or any other Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or (ii) pay within three days after the same becomes due, any interest on any Loan, or any fee due hereunder or (iii) pay within five days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    *Specific Covenants*.  (i) The Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 2.14, 6.01, 6.02(a), 6.02(b), 6.03(a), 6.03(b), 6.05, 6.07, 6.10, 6.11, 6.12, 6.14, 6.19, 6.20, 6.21 or 6.22 or Article VII or (ii) the Borrower fails to perform or observe any term, covenant or agreement contained in Section 6.02 (other than Section 6.02(a) and 6.02(b)) or Section 6.03 (other than Section 6.03(a) and 6.03(b)) and such failure continues for five days; or

(c)    *Other Defaults*.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    *Cross-Default*.  (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and

89

including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $3,000,000 or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, in each case with respect to clause (B) only, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than $3,000,000; provided, that this clause (e) shall not apply to any Indebtedness of any Debtor that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor); or

(f)     *Insolvency Proceedings, Etc.*  Any Subsidiary (other than a Debtor) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; unless (x) prior to any of the foregoing described in clause (f), such Subsidiary becomes a Loan Party, (y) within five (5) Business Days of such action, such Subsidiary's insolvency proceeding becomes jointly administered with that of the Borrower and (iii) each of the Interim Order (within five (5) Business Days of the commencement of such proceeding or such other circumstance) and Final Order (within forty-five (45) days of the commencement of such proceeding or such other circumstance) are made applicable to such Subsidiary; or

(g)     *Inability to Pay Debts; Attachment.*  (i) Any Subsidiary (other than a Debtor) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Loan Party and is not released, vacated or fully bonded within 30 days after its issue or levy; or

90

(h)     *Judgments*.  There is entered against any Loan Party or any Subsidiary thereof (which, in the case of the Debtors only, arose post-petition) (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $3,000,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M.  Best Company, has been notified of the potential claim and does not dispute coverage) or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     *ERISA*.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on the assets of a Loan Party or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and such failure to pay has resulted or could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on the assets of a Loan Party; or

(j)     *Invalidity of Loan Documents*.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(k)     *Minimum Liquidity.* As of any date on or after the Closing Date (after giving effect to the Initial Advance), the unrestricted cash balances and Cash Equivalents of the Borrower and its consolidated Subsidiaries shall be less than (i) unless clause (ii) applies, $25,000,000 or (ii) if the Final Order has not been entered by the Bankruptcy Court on or prior to November 18, 2016, from November 18, 2016 until the earlier of (x) the date the  Second Advance is made, after giving effect to such Borrowing, and (y) the date on which all funds in the Escrow Account (as defined in the Prepetition Term Loan Credit Agreement) are released to the Term Loan Proceeds Collateral Account, after giving effect to the receipt of such funds, $20,000,000.

(l)     *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.12 or the Orders shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected Lien on the Collateral (with the priorities set forth in Section 2.14) having an aggregate fair market value in excess of $5,000,000 that is purported to be covered thereby unless such occurrence results solely

91

from action of the Administrative Agent or any Lender and involves no Default by the Borrower or any Guarantor hereunder or under any Collateral Document; or

    (m)    *Cases.*

        (i)    Any of the Cases shall be dismissed or converted into a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of the Cases under section 1112 of the Bankruptcy Code or otherwise; or

        (ii)    A trustee, responsible officer or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the any of the Cases, any Loan Party applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment; or

        (iii)    An application shall be filed by any Debtor for the approval of any Other Superpriority Claim, or an order of the Bankruptcy Court shall be entered granting any Other Superpriority Claim (other than with respect to (A) the Carve-Out in any of the Cases or (B) any application or order that provides for immediate indefeasible payment in full in cash of the Obligations) that is *pari passu* with or senior to (x) the claims of the Administrative Agent or the Lenders against any Loan Party under any Loan Document, (y) the claims of the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Lenders against any Loan Party under the Prepetition Term Loan Credit Agreement or any other Prepetition Term Loan Credit Agreement Loan Documents or (z) the claims of the ABL Agent or the ABL Lenders against any Loan Party under the ABL Credit Agreement or any other ABL Credit Agreement Loan Document, or there shall arise or otherwise be granted any such *pari passu* or senior Other Superpriority Claim, in each case other than the Superpriority Claims, any Other Superpriority Claims of the Prepetition Term Loan Administrative Agent, the ABL Agent, the ABL Lenders or the Prepetition Term Loan Lenders or with respect to the Carve-Out; or

        (iv)    The Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is *pari passu* with or senior to any Liens under the Loan Documents or the adequate protection Liens granted under the Interim Order, other than the Liens permitted to have such priority under the Loan Documents and the Orders; or

        (v)    The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay application under section 362 of the Bankruptcy Code (or equivalent) so as to (A) permit a third party to proceed on any assets of any of the Debtors which have a value in excess of $500,000 in the aggregate or (B) permit other actions that would result in a Material Adverse Effect; or

<div align="center">92</div>

(vi)    (A) An order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of seven (7) days or more, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, or a Loan Party shall apply for the authority to do so; (B) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties and the Loan Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Required Lenders; (C) the Interim Order (prior to the entry of the Final Order) or the Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral with the priority described in this Agreement and the Orders or grant the Superpriority Claims in respect of the Loan or to be in full force and effect; (D) the entry of an order in any of the Cases (other than the Orders) granting adequate protection to any other Person; (E) an order shall have been entered by the Bankruptcy Court modifying the adequate protection obligations granted in any Order, (F) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, (G) any Loan Party shall file a motion or other request with the Bankruptcy Court seeking any financing under section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations or (H) a final non-appealable order in the Cases shall be entered charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Lenders, or the commencement of any other actions by the Loan Parties that challenges the rights and remedies of the Administrative Agent or the Lenders in any of the Cases or that is inconsistent with the Loan Documents; or

(vii)    Except as permitted by the Orders or by Section 7.18(c) hereof, any Debtor shall make any Prepetition Payment other than Prepetition Payments authorized by the Bankruptcy Court in accordance with the orders of the Bankruptcy Court reasonably acceptable to the Required Lenders; or

(viii)    A Reorganization Plan that is not the Acceptable Plan of Reorganization shall be (A) confirmed by the Bankruptcy Court or (B) confirmed or filed by any Loan Party in any of the Cases, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations and continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnification obligations not yet due and payable) or any of the Debtors shall seek confirmation or support any other entity seeking confirmation of any such plan or entry of any such order; or

(ix)    Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any motion to, (A) disallow in whole or in part any of the Obligations, (B) disallow in whole or in part any of the Indebtedness owed by the Loan Parties under the Prepetition

93

Term Loan Credit Agreement Loan Documents, (C) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in any Order in favor of the Administrative Agent or (D) challenge the validity and enforceability of the Liens or security interests granted under the Prepetition Term Loan Credit Agreement Loan Documents or in any Order in favor of the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Lenders; or

(x)     Termination, reduction or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a Reorganization Plan; or

(xi)     Termination of the Restructuring Support Agreement as to any party thereto in accordance with its terms; or

(xii)     Noncompliance by any Loan Party or any of its Subsidiaries with the terms of the Interim Order or the Final Order in any material respect or the occurrence of a Termination Event (as defined in the Orders); or

(xiii)     The Loan Parties shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Prepetition Term Loan Administrative Agent or any of the Prepetition Term Loan Lenders regarding the obligations of any Loan Party under the Prepetition Term Loan Credit Agreement or Liens granted to the Prepetition Term Loan Administrative Agent or any of the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement Loan Documents or (B) the Administrative Agent or any of the Lenders regarding their respective rights and remedies under the Loan Documents in the Cases in a manner inconsistent with the Loan Documents; or

(xiv)     Any Loan Party shall file any motion seeking authority to consummate the sale of assets of any Loan Party that is Collateral (other than any such sale that is permitted under the Loan Documents or an Acceptable Plan of Reorganization) pursuant to section 363 of the Bankruptcy Code; or

(xv)     Any Loan Party or other Subsidiary shall take any action in support of any matter set forth in paragraphs (i)-(viii) and (xiii) above or in support of any filing by any Person of a Reorganization Plan that is not an Acceptable Plan of Reorganization and the relief requested is granted in an order that is not stayed pending appeal.

(n)     *Change of Control*.  A Change of Control shall have occurred.

Section 8.02.  *Remedies upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable (an "acceleration"), which amount shall include the Exit Fee in effect on the date of such acceleration, as if such acceleration were an optional or mandatory prepayment on the principal amount of Loans accelerated, whereupon they shall be due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)    subject to the proviso below, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents, the Orders or applicable Law or equity;

*provided, however*, that, notwithstanding the foregoing, with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (c) under the Loan Documents, the Orders or applicable Law or equity, the Administrative Agent shall provide the Borrower with five (5) Business Days' written notice prior to taking the action contemplated thereby (in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing).

Section 8.03.    *Application of Funds*.  After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations shall, subject to the provisions of Section 2.16, be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued interest on the Loans and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

95

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Administrative Agent and the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to payment of all other Obligations ratably among the Secured Parties; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

ARTICLE IX
ADMINISTRATIVE AGENT

Section 9.01.   *Appointment and Authority*.

(a)      Each of the Lenders hereby irrevocably appoints, designates and authorizes U.S. Bank National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "**agent**" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)      The Administrative Agent shall also act as the "**collateral agent**" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "**collateral agent**" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX and Article XI (including Section 10.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "**collateral agent**" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02.   *Rights as a Lender*.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender (to the extent it is or becomes a Lender) as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "**Lender**" or "**Lenders**" shall,

96

unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of banking, trust, financial, advisory, underwriting or other business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or to provide notice to or consent of the Lenders with respect thereto.

Section 9.03.  *Exculpatory Provisions*.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent and its Related Parties:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by the Borrower or a Lender.

Neither the Administrative Agent nor any of its Related Parties have any duty or obligation to any Lender or participant or any other Person to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document

97

or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 9.04.   *Reliance by Administrative Agent*.  The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying upon and shall not incur any liability for relying upon, any notice, request, certificate, communication, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall be fully protected in relying and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  For purposes of determining compliance with the conditions specified in Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the applicable Advance, specifying its objections.

The Administrative Agent shall not be liable for any action taken (x) in good faith and reasonably believed by it to be within the powers conferred upon it, or taken by it pursuant to any direction or instruction by which it is governed, or omitted to be taken by it by reason of the lack of direction or instruction required hereby for such action (including for refusing to exercise discretion or for withholding its consent in the absence of its receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instruction to exercise such discretion or grant such consent from any such Lender, as applicable) or (y) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02).  The Administrative Agent shall not be liable for any error of judgment made in good faith unless it shall be proven that Administrative Agent was grossly negligent in ascertaining the relevant facts.  Nothing herein or in any Loan Documents or related documents shall obligate the Administrative Agent to advance, expend or risk its own funds, or to take any action which in its reasonable judgment may cause it to incur any expense or financial or other liability for

which it is not adequately indemnified.  The Administrative Agent shall not be liable for any indirect, special or consequential damages (including but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.  Any permissive grant of power to Administrative Agent hereunder shall not be construed to be a duty to act.  Administrative Agent shall have only the duties and responsibilities as are specifically set forth in this Agreement and no covenants or obligations shall be implied in this Agreement against the collateral agent.   Before acting hereunder, Administrative Agent shall be entitled to request, receive and rely upon such certificates and opinions as it may reasonably determine appropriate with respect to the satisfaction of any specified circumstances or conditions precedent to such action.

The Administrative Agent shall not be responsible or liable for delays or failures in performance resulting from acts beyond its control.  Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters.

Section 9.05.   *Delegation of Duties*.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06.   *Resignation of Administrative Agent*.

(a)     *Notice*.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     *Defaulting Lender.*  If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable Law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     *Effect of Resignation or Removal.*  With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.01(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub‑agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 9.07.  *Non-Reliance on Administrative Agent and Other Lenders.*  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it

shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08.  *[Reserved]*.

Section 9.09.  *Administrative Agent May File Proofs of Claim; Credit Bidding*.

(a)     In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under sections 363, 1123 or 1129 of the Bankruptcy

101

Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (h) of Section 10.01 of this Agreement, and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.10.   *Collateral and Guaranty Matters.*

(a)     Each of the Lenders irrevocably authorizes the Administrative Agent, at its option and in its discretion,

(i)     to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full in cash of all Obligations (other than contingent indemnification obligations), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with Section 10.01;

(ii)     to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

102

(iii)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

(b)    The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(c)    The Administrative Agent shall have no liability for losses arising from (i) any cause beyond its control, (ii) any delay, error, omission or default of any mail, telegraph, cable or wireless agency or operator, or (iii) the acts or edicts of any government or governmental agency or other group or entity exercising governmental powers.  The Administrative Agent shall not be responsible for any special, exemplary, punitive or consequential damages.

(d)    The Administrative Agent shall not be responsible for the preparation or filing of any UCC financing statements or the correctness of any financing statements filed in connection with this Agreement or the validity or perfection of any lien or security interest created pursuant to this Agreement or the other Loan Documents.

(e)    The Administrative Agent shall not be liable for interest on any money received by it except as the Administrative Agent may agree in writing with the Borrower.  The Administrative Agent shall not be required to expend or risk its own funds in the performance of its duties hereunder.  For the avoidance of doubt, all of the Administrative Agent's rights, protections and immunities provided herein shall apply to the Administrative Agent for any actions taken or omitted to be taken under any Loan Documents and any other related agreements in any of its capacities.  All protections provided herein shall apply to U.S. Bank National Association in its various capacities hereunder.

(f)    It is expressly agreed and acknowledged that the Administrative Agent is not guaranteeing performance of or assuming any liability for the obligations of the other parties hereto or any parties to the Collateral.

103

(g)    If, in performing its duties under this Agreement, the Administrative Agent is required to decide between alternative courses of action, the Administrative Agent may request written instructions from the Required Lenders as to the course of action desired by it.  If the Administrative Agent does not receive such instructions within three Business Days after it has requested them, the Administrative Agent may, but shall be under no duty, to take or refrain from taking any such courses of action.  The Administrative Agent shall act in accordance with instructions received after such three-Business Day period except to the extent it has already taken, or committed itself to take action inconsistent with such instructions.

(h)    The Administrative Agent shall have no liability for any failure, inability or unwillingness on the part of any Lender or the Borrower to provide accurate and complete information on a timely basis to the Administrative Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall have no liability for any inaccuracy or error in the performance or observance on the Administrative Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

## ARTICLE X
## MISCELLANEOUS

Section 10.01. *Amendments, Etc*.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in Section 4.01 or Section 4.02 without the written consent of each Lender;

(b)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(c)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to any Lender without the written consent of such Lender;

(d)    subject to Section 10.06(b)(vii), reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "**Default Rate**" or to waive any obligation of the Borrower to pay

104

interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(e)     change Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(f)     change any provision of this Section 10.01 or the definition of "**Required Lenders**" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender;

(g)     release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(h)     amend or modify the Superpriority Claim status of the Lenders or the Administrative Agent under the Orders or under any Loan Document or release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone);

and *provided, further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to the other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary herein the Administrative Agent may, at the direction of the Required Lenders, with the prior written consent of the Borrower only, amend, modify or supplement this Agreement or any of the other Loan Documents to cure any ambiguity, omission, mistake, defect or inconsistency.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, the Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by

such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

Section 10.02. *Notices; Effectiveness; Electronic Communications.*

(a)     *Notices Generally.*   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax transmission or e-mail transmission as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Borrower, any other Loan Party or the Administrative Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, fax number, e-mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).   Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     *Electronic Communications.*   Notices and other communications to the Administrative Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FPML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.   The Administrative Agent or the Borrower may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "**return**

WEIL:\95912472\1\22010.0003

**receipt requested**" function, as available, return e-mail or other written acknowledgement) and (ii) notices and other communications posted to an Internet or intranet website shall be deemed received by the intended recipient upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "**return receipt requested**" function, as available, return e-mail address or other written acknowledgement) indicating that such notice or communication is available and identifying the website address therefor; provided that for both clauses (i) and (ii), if such notice or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

     (c)    The Platform. THE PLATFORM IS PROVIDED "**AS IS**" AND "**AS AVAILABLE.**" THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging services, or through the Internet.

     (d)    *Change of Address, Etc*. The Administrative Agent or any Loan Party may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and e-mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause not less than one individual at or on behalf of such Public Lender to at all times have selected the "**Private Side Information**" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "**Public Side Information**" portion of the Platform and that may

contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

(e)    *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic or electronic notices, Loan Notices and Notice of Loan Prepayment) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03. *No Waiver; Cumulative Remedies; Enforcement*.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided, however,* that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04. *Expenses; Indemnity; Damage Waiver*.

108

(a)    *Costs and Expenses*.  The Loan Parties shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and the Lenders and their Affiliates (including (x) the reasonable fees, charges and disbursements of counsel for each of the Administrative Agent and the Lenders and (y) the reasonable fees, charges and disbursements relating to financial diligence and third-party appraisers retained by or on behalf of the Administrative Agent and the Lenders), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by each of the Administrative Agent and any Lender (including (x) the fees, charges and disbursements of any counsel for each of the Administrative Agent and any Lender and (y) the reasonable fees, charges and disbursements relating to financial diligence and third-party appraisers retained by or on behalf of the Administrative Agent and the Lenders), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    *Indemnification by the Borrower*.  Each Loan Party shall indemnify the Administrative Agent (and any sub-agent thereof) and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel or financial advisors for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned, leased or operated by the Loan Parties or any of their respective Subsidiaries, or any Environmental Liability related in any way to the Loan Parties or any of their respective Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; provided that such indemnity shall not, as to any Indemnitee, be

109

available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) arose out of any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Borrower, any other Loan Party or any of their Affiliates and that is brought solely by an Indemnitee against another Indemnitee; provided that the Administrative Agent shall remain indemnified in such capacities.

(c)    *Reimbursement by Lenders*.  To the extent that any Loan Party for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of the Administrative Agent, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such or against any Related Party of the Administrative Agent acting for the Administrative Agent (or any such sub-agent).  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    *Waiver of Consequential Damages, Etc.*  To the fullest extent permitted by applicable law, no Loan Party shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    *Payments*.  All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f)    *Survival*.  The agreements in this Section and the indemnity provisions of Section 10.02(e) shall survive the resignation of the Administrative Agent, the

110

replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

(g)     *Waiver*.  The Borrower acknowledges and agrees that if payment of the Obligations are accelerated or the Loans and other Obligations otherwise become due prior to the Maturity Date, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Exit Fee will also be due and payable as though the Loans were redeemed and shall constitute part of the Obligations, by mutual agreement of the parties. The Borrower agrees that the Exit Fee is reasonable under the circumstances currently existing. The Exit Fee shall also be payable in the event the Loans are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. THE BORROWER EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING EXIT FEE IN CONNECTION WITH ANY SUCH ACCELERATION. The Borrower expressly agrees (to the fullest extent it may lawfully do so) that: (a) the Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (b) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made; (c) there has been a course of conduct between holders and the Borrower giving specific consideration in this transaction for such agreement to pay the Exit Fee; and (d) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower expressly acknowledges that its agreement to pay the Exit Fee to Lenders as herein described is a material inducement to Lenders to make the Loans.

Section 10.05. *Payments Set Aside*.  To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.06. *Successors and Assigns*.

(a)     Successors and Assigns Generally.  The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(e) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     *Minimum Amounts*.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal not less than the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "**Trade Date**" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed).

(ii)     *Proportionate Amounts*.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement and the other Loan Documents with respect to the Loans or the Commitment assigned.

112

(iii)    *Required Consents*.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required for any assignment of unfunded Commitments unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender, a GS Approved Party or an Approved Fund or any Person disclosed to the Borrower by the Lender prior to the Closing Date; provided that the Borrower shall be deemed to have consented to any such assignment (for which its consent is required) unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; provided further that the Borrower shall have no consent rights over any assignment of Loans; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender, an Approved Fund with respect to a Lender or a GS Approved Party.

(iv)    *Assignment and Assumption*.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    *No Assignment to Certain Persons*.  No such assignment shall be made (A) to the Borrower or any of the Borrower's Affiliates or Subsidiaries, or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) to a natural person.

(vi)    *Certain Additional Payments*.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then

113

owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(vii)    *Assignments to Existing Noteholder Lenders.*  Notwithstanding anything in this Agreement to the contrary:

(A)    Existing Noteholder Lenders will not attend or participate in meetings attended solely by the Lenders and the Administrative Agent;

(B)    (A) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under, this Agreement or any other Loan Document, each Existing Noteholder Lender will be deemed to have consented in the same proportion as the Lenders that are not Existing Noteholder Lenders consented to such matter, unless such matter (x) adversely affects such Existing Noteholder Lender more than other Lenders in any material respect, (y) modifies or extends the Maturity Date, the commitment termination date or date fixed for final payment of principal, in each case applicable to such Existing Noteholder Lender to be a date that is later than the twelve (12) month anniversary of the Closing Date or (z) increases the commitment of or reduces the principal of Loans of such Existing Noteholder Lender or modifies the rate of interest on any Loan of such Existing Noteholder Lender and (B) each Existing Noteholder Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Existing Noteholder Lender's attorney-in-fact, with full authority in the place and stead of such Existing Noteholder Lender and in the name of such Existing Noteholder Lender (solely in respect of Loans therein and not in respect of any other claim or status such Existing Noteholder Lender may otherwise have), from time to time in the Administrative Agent's discretion to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary or appropriate to carry out the provisions of this clause (B);

(C)    the Existing Noteholder Lenders will not be entitled to bring actions against the Administrative Agent, in its role as such, or receive advice of counsel or other advisors to the Administrative Agent or any other Lenders or challenge the attorney client privilege of their respective counsel; and

(D)     each Existing Noteholder Lender agrees to provide all information relating to itself and its Affiliates as the Borrower or the Administrative Agent may reasonably request in connection with the Borrower's motion to the Bankruptcy Court seeking approval by the Bankruptcy Court of the Facility under the Bankruptcy Code.

(viii)   *Assignment Triggering Events*.   Upon the occurrence of any Assignment Triggering Event, each applicable Existing Noteholder Lender and, solely with respect to an event described in clause (i) of the definition thereof, any other Existing Noteholder Lender specified by the Required Lenders shall, at the request of the Required Lenders in their sole discretion, assign its portion of the Loans at par and any unfunded Commitments to, at the election of the Required Lenders in their sole discretion, those Lenders who are Prepetition Term Loan Lenders (or any Affiliate thereof) and/or any other Eligible Assignee, subject to Section 10.06(b)(iii).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     *Register*.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for U.S. Tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the

115

contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    *Participations*. Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.04(c) without regard to the existence of any participations.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than those in the proviso in Section 10.01(d)) that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.06 and 10.13 as if it were an assignee under paragraph (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.06 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any

116

commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 10.07. *Treatment of Certain Information; Confidentiality*. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, (i) to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) to any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Borrower and its obligations, or (iii) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the credit facilities provided hereunder, (B) the provider of any Platform or other electronic delivery service used by the Administrative Agent to deliver Borrower Materials or notices to the Lenders or (C) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower. For purposes of this Section, "**Information**" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their

117

respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary, provided that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States federal and state securities Laws.

The Loan Parties and their Affiliates agree that they will not in the future issue any press releases or other public disclosure using the name of the Administrative Agent or any Lender or their respective Affiliates or referring to this Agreement or any of the Loan Documents without the prior written consent of the Lenders, unless (and only to the extent that) the Loan Parties or such Affiliate is required to do so under law and, in such event, the Loan Parties or such Affiliate will, in each case to the extent permitted by law, prior to issuance thereof, provide such press release or other public disclosure (including any earnings reports) to the Lenders and incorporate any reasonable comments from the Lenders to such press release or other public disclosure (including any earnings reports).

The Loan Parties consent to the publication by the Administrative Agent or any Lender of customary advertising material relating to the transactions contemplated hereby using the name, product photographs, logo or trademark of the Loan Parties.

Section 10.08. *Right of Setoff.*  If an Event of Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or any other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or any other Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be

segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have.  Each Lender a agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.09. *Interest Rate Limitation*.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.10. *Counterparts; Integration; Effectiveness*.  This Agreement and each of the other Loan Documents may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement or any other Loan Document, or any certificate delivered thereunder, by fax transmission or e-mail transmission (e.g., "**pdf**" or "**tif**") shall be effective as delivery of a manually executed counterpart of this Agreement or such other Loan Document or certificate.

Section 10.11. *Survival of Representations and Warranties*.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of the making of any Loan, and shall continue in

119

full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.12. *Severability*. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.13. *Replacement of Lenders*. If the Borrower is entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws; and

(e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

120

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 10.14. *Governing Law; Jurisdiction; Etc.*

(a)     *GOVERNING LAW.*  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(b)     *SUBMISSION TO JURISDICTION.*  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE

BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE
COURTS OF ANY JURISDICTION.

(c)    *WAIVER OF VENUE*.  EACH LOAN PARTY IRREVOCABLY AND
UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER
HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING
ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN
DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS
SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES,
TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE
OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR
PROCEEDING IN ANY SUCH COURT.

(d)    *SERVICE OF PROCESS*.  EACH PARTY HERETO IRREVOCABLY
CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR
NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT
THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER
MANNER PERMITTED BY APPLICABLE LAW

Section 10.15. *Waiver of Jury Trial*.  EACH PARTY HERETO HEREBY
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY
LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE
TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED
ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A)
CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY
OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT
SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO
ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT
AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO
THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER
THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.16. *No Advisory or Fiduciary Responsibility*.  In connection with all
aspects of each transaction contemplated hereby (including in connection with any
amendment, waiver or other modification hereof or of any other Loan Document), the
Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that:
(a) (i) any arranging and/or other activities or services regarding this Agreement (and the
Loan Documents) provided by the Administrative Agent and any Affiliate thereof, and
the Lenders are arm's-length commercial transactions between the Borrower, each other
Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent
(and as applicable, its Affiliates) and the Lenders and their Affiliates (collectively, solely
for purposes of this Section, the "**Lenders**"), on the other hand, (ii) each of the Borrower
and the other Loan Parties has consulted its own legal, accounting, regulatory and tax
advisors to the extent it has deemed appropriate, and (iii) the Borrower and each other

122

Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Administrative Agent and its Affiliates and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, any other Loan Party or any of their respective Affiliates, or any other Person and (ii) neither the Administrative Agent, any of its Affiliates nor any Lender or its Affiliates has any obligation to the Borrower, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent and its Affiliates and the Lenders and their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and neither the Administrative Agent, any of its Affiliates nor any Lender or any of its Affiliates has any obligation to disclose any of such interests to the Borrower, any other Loan Party or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, any of its Affiliates, or any Lender or any of its Affiliates  with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

Section 10.17. *Electronic Execution of Assignments and Certain Other Documents*.  The words "**delivery,**" "**execute,**" "**execution,**" "**signed,**" "**signature,**" and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

Section 10.18. *USA PATRIOT Act*.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub.  L.  107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other

information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "**know your customer**" and anti-money laundering rules and regulations, including the Act.

Section 10.19. *[Reserved]*.

Section 10.20. *Acknowledgement and Consent to Bail-In of EEA Financial Institutions*.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

    (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

    (b) the effects of any Bail-in Action on any such liability, including, if applicable:

        (i) a reduction in full or in part or cancellation of any such liability;

        (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

        (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.21. *ENTIRE AGREEMENT*.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.  TO THE EXTENT THAT ANY PROVISION HEREIN IS INCONSISTENT WITH ANY TERM OF THE ORDERS, THE ORDERS SHALL CONTROL.

ARTICLE XI
GUARANTY

Section 11.01. *Guaranty*.  Each Guarantor hereby absolutely and unconditionally guarantees, as a guaranty of payment and not as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and including any amounts which would become due but for the operation of an automatic stay under any Debtor Relief Law, and at all times thereafter, of any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or involuntary and whether for principal, interest, premiums, fees, indemnities, damages, costs, expenses or otherwise, owing by the Borrower or any other Loan Party to the Administrative Agent and the Lenders (the "**Beneficiaries**") arising under, pursuant to, or in connection with this Agreement or under any other Loan Document (including all renewals, extensions, amendments and other modifications thereof and, as provided in the Loan Documents, all costs, attorneys' fees and expenses incurred by Administrative Agent or any Beneficiary in connection with the collection or enforcement thereof), and whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including obligations, liabilities, and indebtedness arising or accruing after the commencement of any proceeding under any Debtor Relief Laws with respect to any Borrower or any Guarantor or which would have arisen or accrued but for the commencement of such proceeding and including all Obligations, liabilities and indebtedness arising from any extensions or credit under or in connection with any Loan Document from time to time, regardless of whether such interest and fees are allowed claims in such proceeding (collectively, the "**Guaranteed Obligations**"). The Administrative Agent's books and records showing the amount of the Guaranteed Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon the Guarantors and conclusive, absent manifest error, for the purpose of establishing the amount of the Guaranteed Obligations. This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of any Guarantor under this Guaranty other than the indefeasible payment in full of the Guaranteed Obligations, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.  Unless otherwise agreed by the Administrative Agent (at the direction of the Required Lenders) and the Guarantors in writing, this Guaranty is not intended to supersede or otherwise affect any other guaranty now or hereafter given by any Loan Party for the benefit of the Administrative Agent or any other Beneficiary or any term or provision thereof.

Section 11.02. *No Setoff or Deductions; Taxes; Payments*.  Each Guarantor represents and warrants that it is organized and resident in the United States of America. Each Guarantor shall make all payments hereunder without condition or deduction for

125

any counterclaim, defense, recoupment, or setoff. Any and all payments by each Guarantor hereunder shall be made in accordance with the requirements of Section 3.01 and each Guarantor shall comply with the requirements of Section 3.01, in each case as if each reference to the Borrower therein were a reference to such Guarantor, and regardless of whether this Agreement remains in effect. The obligations of each Guarantor under this Section 11.02 shall survive the payment in full of the Guaranteed Obligations and termination of this Guaranty.

Section 11.03. *Rights of Administrative Agent and Lenders.* Each Guarantor consents and agrees that the Administrative Agent and the other Beneficiaries may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Guaranteed Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or any Guaranteed Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent, at the direction of the Required Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of such Guarantor under this Guaranty or which, but for this provision, might operate as a discharge of such Guarantor.

Section 11.04. *Certain Waivers.* Each Guarantor waives (a) any defense arising by reason of any disability or other defense of the Borrower or any other Guarantor, or the cessation from any cause whatsoever (including any act or omission of any Beneficiary) of the liability of the Borrower other than due to the indefeasible payment in full in cash of the Guaranteed Obligations; (b) any defense based on any claim that such Guarantor's obligations exceed or are more burdensome than those of the Borrower or any other guarantor; (c) any right to require the Administrative Agent or any other Beneficiary to proceed against the Borrower, proceed against or exhaust any security for the Guaranteed Obligations, or pursue any other remedy in the Administrative Agent's or any other Beneficiary's power whatsoever; (d) any benefit of and any right to participate in any security now or hereafter held by the Administrative Agent or any other Beneficiary; and (e) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties. Each Guarantor expressly waives, to the maximum extent permitted by applicable law, all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Guaranteed Obligations, and all notices of acceptance of the terms set forth in this Guaranty or of the existence, creation or incurrence of new or additional Guaranteed Obligations.

Section 11.05. *Obligations Independent.* The obligations of each Guarantor hereunder are those of primary obligor, and not merely as surety, and are separate and

distinct from the Guaranteed Obligations of the Borrower and the obligations of any other guarantor, and a separate action may be brought against each Guarantor to enforce this Guaranty whether or not the Borrower, any other Guarantor, or any other person or entity is joined as a party.

Section 11.01. Subrogation.  (a) No Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty (including with respect to all "claims" (as defined in section 101(5) of the Bankruptcy Code)) against Borrower or any other Guarantor arising in connection with, or any Collateral securing the Guaranteed Obligations (including rights of subrogation (whether contractual, under section 509 of the Bankruptcy Code or otherwise) contribution, and the like) until all of the Guaranteed Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and any commitments of the Beneficiaries or the facility provided by the Beneficiaries with respect to the Guaranteed Obligations are terminated. If any amounts are paid to a Guarantor in violation of the foregoing limitation (whether contractual, under section 509 of the Bankruptcy Code or otherwise), then such amounts shall be held in trust for the benefit of the Beneficiaries and shall forthwith be paid to the Administrative Agent for the benefit of the Beneficiaries to reduce the amount of the Guaranteed Obligations, whether matured or unmatured.

(b)      The Guarantors hereby agree, as among themselves, that if any Guarantor or any other guarantor of the Guaranteed Obligations shall become an Excess Funding Guarantor (as defined below) (but subject to the succeeding provisions of this Section 11.06), to pay to such Excess Funding Guarantor an amount equal to such Guarantor's Pro Rata Share (as defined below and determined, for this purpose, without reference to the properties, assets, liabilities and debts of such Excess Funding Guarantor) of such Excess Payment (as defined below). The payment obligation of any Guarantor to any Excess Funding Guarantor under this Section 11.06(b) shall be subordinate and subject in right of payment to the prior payment in full of the obligations of such Guarantor under the other provisions of this Guaranty, and such Excess Funding Guarantor shall not exercise any right or remedy with respect to such excess except as provided in Section 11.06(a) or in any similar provision of any other guaranty of the Guaranteed Obligations. For purposes hereof, (A) "**Excess Funding Guarantor**" shall mean, in respect of any obligations arising under the other provisions of this Guaranty and any similar provisions of any other guaranty of the Guaranteed Obligations (hereafter, the "**Subject Obligations**"), a Guarantor or any other guarantor of the Guaranteed Obligations that has paid an amount in excess of its Pro Rata Share of the Subject Obligations; (B) "**Excess Payment**" shall mean, in respect of any Subject Obligations, the amount paid by an Excess Funding Guarantor in excess of its Pro Rata Share of such Subject Obligations; and (C) "**Pro Rata Share**", for purposes of this Section 11.06(b) shall mean, for any Guarantor or any other guarantor of the Guaranteed Obligations, the ratio (expressed as a percentage) of (x) the amount by which the aggregate present fair saleable value of all of its assets and properties exceeds the amount of all debts and liabilities of such guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such guarantor under this Guaranty or the other applicable

guaranty) to (y) the amount by which the aggregate present fair saleable value of all assets and other properties of the Borrower, all of the Guarantors and all of the other guarantors of the Guaranteed Obligations exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Borrower under this Agreement, the Guarantors hereunder and any other guarantors of the Guaranteed Obligations under the applicable guaranties) of the Borrower, all of the Guarantors and all of the other guarantors of the Guaranteed Obligations, all as of the Closing Date (if any Guarantor becomes a party hereto (or any other guarantor of the Guaranteed Obligations becomes a party to the applicable guaranty) subsequent to the Closing Date, then for purposes of this Section 11.06(b) such subsequent guarantor shall be deemed to have been a guarantor of the Guaranteed Obligations as of the Closing Date and the information pertaining to, and only pertaining to, such guarantor as of the date such guarantor became a guarantor of the Guaranteed Obligations shall be deemed true as of the Closing Date).

Section 11.02. Termination; Reinstatement.  (a) This Guaranty is a continuing and irrevocable guaranty of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect; provided that the Guarantors shall be released from their respective guarantee obligations and other obligations under this Guaranty as follows: (i) with respect to all Guarantors, upon the termination of the Aggregate Commitments and indefeasible payment in full in cash of all Guaranteed Obligations (other than contingent indemnification obligations), (ii) with respect to any Guarantor that ceases to be a Subsidiary as a result of a transaction permitted under this Agreement, automatically upon such Guarantor so ceasing to be a Subsidiary, and (iii) with respect to any other release of a Guarantor, upon approval, authorization or ratification in writing in accordance with Section 10.01.

(b)     Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of the Borrower or any other Loan Party is made, or the Administrative Agent or any other Beneficiary exercises its right of setoff, in respect of the Guaranteed Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent (at the direction of the Required Lenders) or any other Beneficiary in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, to the extent of such payment, all as if such payment had not been made or such setoff had not occurred and whether or not the Administrative Agent or any other Beneficiary is in possession of or has released this Guaranty and regardless of any prior revocation, rescission, termination or reduction. The foregoing obligations of each Guarantor under paragraph (b) of this Section shall survive termination of this Guaranty.

Section 11.03. *Subordination*.  All Subordinated Obligations (as defined below) of a Guarantor shall be subordinate and junior in right of payment and collection to the payment and collection in full of all Guaranteed Obligations as described below:

WEIL:\95912472\1\22010.0003

(a)    As used herein, the term "**Subordinated Obligations**" for a Guarantor means: (i) all present and future indebtedness, liabilities, and obligations of any kind owed to such Guarantor by the Borrower or any other Loan Party liable for the payment or performance of the Guaranteed Obligations, including debt obligations, equity obligations, and other contractual obligations requiring payments of any kind to be made to such Guarantor and including any right of subrogation (including any statutory rights of subrogation under section 509 of the Bankruptcy Code, 11 U.S.C. § 509, or under Chapter 43 of the Texas Civil Practice and Remedies Code), contribution, indemnification, reimbursement, exoneration, or any right to participate in any claim or remedy of any Beneficiary against the Borrower or any other Loan Party liable for the payment or performance of the Guaranteed Obligations, or any collateral which the Administrative Agent now has or may acquire, and (ii) any increases, extensions, and rearrangements of the foregoing obligations under any amendments, supplements, and other modifications of the documents and agreements creating the foregoing obligations.

(b)    Until all Guaranteed Obligations have been irrevocably paid in full in cash (and therefore the payment thereof is no longer subject to being set aside or returned under the law), no Guarantor shall take any action to enforce payment of the Subordinated Obligations of such Guarantor, but this standstill is not intended as a permanent waiver of the subrogation, contribution, indemnification, reimbursement, exoneration, participation, or other rights of such Guarantor.

(c)    Following notice from the Administrative Agent to the Borrower that an Event of Default exists, unless otherwise consented in writing by the Administrative Agent at the direction of the Required Lenders, no further payments shall be made on the Subordinated Obligations of any Guarantor, and all amounts due with respect to the Guaranteed Obligations shall be paid in full before any Guarantor shall be entitled to collect or receive any payment with respect to the Subordinated Obligations of such Guarantor.

(d)    Any lien, security interest, or assignment securing the repayment of the Subordinated Obligations of any Guarantor shall be fully subordinate to any lien, security interest, or assignment in favor of the Administrative Agent  which secures the Guaranteed Obligations. At the request of the Administrative Agent (at the direction of the Required Lenders), each Guarantor will take any and all steps necessary to fully evidence the subordination granted hereunder, including amending or terminating financing statements and executing and recording subordinations of liens.

(e)    This is an absolute and irrevocable agreement of subordination and the Administrative Agent may, at the direction of the Required Lenders, without notice to any Guarantor, take any action described in this Agreement, this Guaranty or in any other Loan Document without impairing or releasing the obligations of any Guarantor hereunder.

(f)    No Guarantor shall assign or otherwise transfer to any other Person other than a Loan Party any interest in the Subordinated Obligations of such Guarantor without the prior written permission of the Lenders.

129

(g)     If any amount shall be paid to any Guarantor in violation of this Section 11.08, such amount shall be held in trust for the benefit of the Administrative Agent on behalf of the Beneficiaries and immediately turned over to the Administrative Agent, with any necessary endorsement, to be applied to the Guaranteed Obligations.

Section 11.06. *Condition of Borrower*.  Each Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of obtaining from the Borrower and any other guarantor such information concerning the financial condition, business and operations of the Borrower and any such other guarantor as such Guarantor requires, and that neither the Administrative Agent nor any other Beneficiary has any duty, and such Guarantor is not relying on the Administrative Agent or any other Beneficiary at any time, to disclose to such Guarantor any information relating to the business, operations or financial condition of the Borrower or any other guarantor (the Guarantor waiving any duty on the part of the Administrative Agent or any other Beneficiary to disclose such information and any defense relating to the failure to provide the same).

Section 11.07. *Covenant*.  Each Guarantor hereby agrees to take, or refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or refrain from taking such action by such Guarantor or any of its Subsidiaries.

Section 11.08. *Additional Guarantors*.  Any Subsidiary of the Borrower that is required pursuant to this Agreement to enter into a guaranty on substantially similar terms as those set forth herein after the date hereof shall become a Guarantor for all purposes of this Guaranty upon execution and delivery by such Subsidiary of a Security Agreement Supplement.

Section 11.09. *Several Enforcement*.  This Guaranty shall apply to each Guarantor and may be enforced against each Guarantor as if each Guarantor had executed a separate agreement. Except as expressly set forth in this Guaranty, no Guarantor shall have any contractual rights or obligations against any other Guarantor under this Guaranty, including any rights to have this Guaranty enforced ratably or any right to restrict the amendment or waiver hereof with respect to another Guarantor.

WEIL:\95912472\1\22010.0003

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BASIC ENERGY SERVICES, INC.**

By: _____
     Name: T.M. "Roe" Patterson
     Title:  President and Chief Executive Officer

[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

**GUARANTORS:**

**ACID SERVICES, LLC**
**ADMIRAL WELL SERVICE, INC.**
**BASIC ENERGY SERVICES GP, LLC**
**BASIC ESA, INC.**
**BASIC MARINE SERVICES, INC.**
**CHAPARRAL SERVICE, INC.**
**FIRST ENERGY SERVICES
        COMPANY**
**GLOBE WELL SERVICE, INC.**
**JETSTAR ENERGY SERVICES, INC.**
**JETSTAR HOLDINGS, INC.**
**JS ACQUISITION LLC**
**LEBUS OIL FIELD SERVICE CO.**
**MAVERICK COIL TUBING
        SERVICES, LLC**
**MAVERICK SOLUTIONS, LLC**
**MAVERICK STIMULATION
        COMPANY, LLC**
**MAVERICK THRU-TUBING
        SERVICES, LLC**
**MCM HOLDINGS, LLC**
**MSM LEASING, LLC**
**PERMIAN PLAZA, LLC**
**PLATINUM PRESSURE SERVICES,
        INC.**
**SCH DISPOSAL, L.L.C.**
**SLEDGE DRILLING CORP.**
**TAYLOR INDUSTRIES, LLC**
**THE MAVERICK COMPANIES, LLC**
**XTERRA FISHING & RENTAL TOOLS
        CO.**

By: _____
Name:  Alan Krenek
Title:   Senior Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

**BASIC ENERGY SERVICES, L.P.**

By:  Basic Energy Services GP, LLC, its
sole general partner

By:  Basic Energy Services, Inc., its sole
member


By: _____
Name: Alan Krenek
Title:   Senior Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

**BASIC ENERGY SERVICES LP, LLC**

By: _____
Name: Jerry Tufly
Title:   Sole Manager and President

[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

**WEST STREET ENERGY PARTNERS, L.P.**, as a Lender

By:   Broad Street Energy Advisors, L.L.C., its General Partner


By: _____
Name:
Title:


**BALIUS CAYMAN L.P.**, as a Lender

By:   Broad Street Energy Advisors, L.L.C., its General Partner


By: _____
Name:
Title:


**GOLDMAN, SACHS & CO.**, as Investment Advisor to certain Lenders


By: _____
Name:
Title:


[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

**RIVERSTONE VI BASIC HOLDINGS, L.P.,**
as Lender

By: Riverstone Energy GP VI, LLC, its General Partner


By: _____
     Name:
     Title:

[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

**U.S. BANK NATIONAL
ASSOCIATION,**
as Administrative Agent


By: _____
     Name:
     Title:




[Signature Page to Debtor-In-Possession Term Loan Credit Agreement]

## EXHIBIT C

**Form of DIP Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                :
In re                           :   Chapter 11
                                :
BASIC ENERGY                    :   Case No. 16-_____ (___)
SERVICES, INC., et al.,¹        :
                                :   Joint Administration Requested
            Debtors.            :
                                :
-------------------------------------------------------x
```

## INTERIM ORDER (I) AUTHORIZING DEBTORS
### (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
### 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND
### 364(e) AND (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,
### (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES
### PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b), AND (III) SCHEDULING
### <u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)</u>

Upon the motion (the "**Motion**"),² dated October 25, 2016, of Basic Energy Services, Inc.

("**Basic**" or the "**Borrower**") and the direct and indirect subsidiaries of the Borrower that are

debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Guarantors**";

the Guarantors collectively with the Borrower, the "**Debtors**" or the "**Loan Parties**"), pursuant

to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e)

and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy**

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic Energy Services, Inc. (1194); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Basic ESA, Inc. (2279); Chaparral Service, Inc. (6424); SCH Disposal, L.L.C. (8335); Sledge Drilling Corp. (3140); Admiral Well Service, Inc. (4899); Basic Marine Services, Inc. (4888); JS Acquisition LLC (9500); Permian Plaza, LLC (3425); Maverick Coil Tubing Services, LLC (3281); First Energy Services Company (4993); JetStar Holdings, Inc. (4248); Xterra Fishing & Rental Tools Co. (7818); Maverick Solutions, LLC (2876); LeBus Oil Field Service Co. (3125); Acid Services, LLC (0455); Taylor Industries, LLC (7037); Maverick Stimulation Company, LLC (4572); Globe Well Service, Inc. (4275); JetStar Energy Services, Inc. (5237); Platinum Pressure Services, Inc. (8379); Maverick Thru-Tubing Services, LLC (1902); MCM Holdings, LLC (0949); MSM Leasing, LLC (9182); The Maverick Companies, LLC (4170). The Debtors' mailing address is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

² Capitalized terms used, but not defined herein, shall have the meanings set forth in the DIP Documents (as defined below).

Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), seeking,

among other things:

(a)     authorization for the Borrower to obtain secured postpetition financing (the "**DIP Financing**"), and for the Guarantors to guaranty the Borrower's obligations in connection with the DIP Financing, consisting of a superpriority secured multiple delayed-draw term loan facility (the "**DIP Facility**") in an aggregate principal amount of $90 million, with U.S. Bank National Association, acting as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), and the DIP Lenders (as defined below), all on the terms and conditions set forth in this Interim Order and the DIP Documents (each as defined below), pursuant to which DIP Facility the Borrower is authorized, on an interim basis, to borrow from the DIP Lenders an aggregate principal amount on the Closing Date (as defined in the DIP Credit Agreement (as defined below)) not to exceed $30 million;

(b)     authorization for the Loan Parties to execute, deliver, and enter into the Superpriority Secured Debtor-in-Possession Credit Agreement to be dated on or around October [•], 2016, among the Borrower, the Guarantors party thereto, the lenders from time to time party thereto (collectively, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), and the DIP Agent, substantially in the form attached to the Motion as <u>Exhibit B</u> (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, including, without limitation, the Security Agreement, dated as of the Closing Date, among the Loan Parties and the DIP Agent (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Security Agreement**"), the "**DIP Documents**") and the other DIP Documents and to perform all such other and further acts as may be required in connection with the DIP Documents;

(c)     the granting of adequate protection to the Prepetition ABL Agent and the Prepetition ABL Lenders (each as defined below) under or in connection with (i) that certain Amended and Restated Credit Agreement, dated as of November 26, 2014, by and among the Borrower, the subsidiary loan parties party thereto and the lenders from time to time party thereto (collectively, in such capacities, the "**Prepetition ABL Lenders**") and Bank of America, N.A., as administrative agent, swing line lender and an L/C issuer (in such capacities, the "**Prepetition ABL Agent**" and, together with the Prepetition ABL Lenders, the "**Prepetition ABL Secured Parties**") (as amended, supplemented or otherwise modified prior

2

to the date hereof, the "**Prepetition ABL Credit Agreement**") and (ii) that certain Second Amended and Restated Security Agreement, dated as of February 26, 2016, between the Borrower, the Prepetition ABL Agent and subsidiaries of the Borrower party thereto (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Prepetition ABL Security Agreement**" and, collectively with the Prepetition ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "**Prepetition ABL Loan Documents**"), whose liens on and security interests in the ABL Facility Priority Collateral (as defined in the ICA (as defined below)) and the ABL Postpetition Collateral (as defined below) will be senior to the DIP Liens (as defined below);

(d)  the granting of adequate protection to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders (each as defined below) under or in connection with (i) that certain Term Loan Credit Agreement, dated as of February 17, 2016, by and among the Borrower and the other subsidiaries of the Borrower party thereto, the lenders from time to time party thereto (collectively, in such capacities, the "**Prepetition Term Loan Lenders**") and U.S. Bank National Association, as Administrative Agent (in such capacity, the "**Prepetition Term Loan Agent**" and, together with the Prepetition Term Loan Lenders, the "**Prepetition Term Loan Secured Parties**" and together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**") (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Credit Agreement**"), (ii) that certain Security Agreement, entered into in connection with the Prepetition Term Loan Credit Agreement and dated as of February 26, 2016 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Security Agreement**"), (iii) that certain Term Loan Escrow Agreement, entered into in connection with the Prepetition Term Loan Credit Agreement and dated as of February 26, 2016 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Escrow Agreement**") and (iv) such other mortgages and all other agreements and documentation executed in connection with the Prepetition Term Loan Credit Agreement (collectively, with the Prepetition Term Loan Credit Agreement, the Prepetition Term Loan Security Agreement and the Prepetition Term Loan Escrow Agreement, the "**Prepetition Term Loan Documents**" and, together with the Prepetition ABL Loan Documents, the "**Existing Agreements**"), whose liens and security interests in respect of the Debtors are being primed by the DIP Liens (as defined below);

(e)  subject to the restrictions set forth in the DIP Documents and this Interim Order, authorization for the Loan Parties to continue to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral and the other Prepetition Collateral;

3

(f)        subject to certain challenge rights of parties in interest set forth herein, approval of certain stipulations by the Debtors with respect to the Existing Agreements and the liens and security interests arising therefrom;

(g)        the grant of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties' estates (other than the Excluded Property (as defined in the DIP Documents)) and all proceeds thereof (including, subject only to and effective upon entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject only to (i) the Carve-Out and (ii) solely with respect to the ABL Facility Priority Collateral and the ABL Postpetition Collateral, the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens (as each is defined below);

(h)        subject only to and effective upon entry of the Final Order, the waiver of the Debtors' right to surcharge the Prepetition Collateral and the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(i)        modification of the automatic stay to the extent set forth herein and in the DIP Documents;

(j)        pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of an order granting the Motion on an interim basis (this "**Interim Order**"); and

(k)        that this Court schedule a final hearing (the "**Final Hearing**") to be held within forty (40) calendar days of the entry of this Interim Order to consider entry of a final order (the "**Final Order**") approving the relief granted herein on a final basis and authorizing the Borrower to borrow from the DIP Lenders under the DIP Documents the remainder of the amount of the DIP Financing in the manner and at the times set forth in the DIP Facility and the Guarantors to guaranty all obligations owing to the DIP Lenders under the DIP Documents;

and due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on (i) the Office of the United States Trustee for the District of Delaware ("**U.S. Trustee**"), (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis, (iii) Davis Polk & Wardwell LLP and Potter Anderson & Corroon LLP as counsel to certain of the DIP Lenders and the Prepetition Term Loan Lenders,

4

(iv) Lowenstein Sandler LLP as counsel to the DIP Agent and the Prepetition Term Loan Agent,

(v) Fried, Frank, Harris, Shriver & Jacobson LLP and Blank Rome LLP as counsel to the ad hoc

group of holders of the Basic's 7.75% Senior Notes due 2019 and 7.75% Senior Notes due 2022

(the "**Ad Hoc Group**"), (vi) Vinson & Elkins LLP and Morris, Nichols, Arsht & Tunnell LLP as

counsel to the Prepetition ABL Agent, (vii) the Internal Revenue Service, (viii) the Securities

and Exchange Commission, (ix) the Environmental Protection Agency, (x) the United States

Attorney's Office for the District of Delaware, (xi) the office of the attorneys general for the

states in which the Debtors operate, (xii) all parties known by the Debtors to hold or assert a lien

on any asset of any Debtor, (xiii) all relevant state taxing authorities, (xiv) all of the Debtors'

landlords, and owners and/or operators of premises at which any of the Debtors inventory and/or

equipment is located, (xv) any party that has requested notice pursuant to Bankruptcy Rule 2002,

and (xvi) any other party entitled to notice pursuant to Local Rule 9013-1(m); and it appearing

that no other or further notice need be provided; and the Court having reviewed the Motion; and

the Interim Hearing having been held by this Court on [●], 2016; and the relief requested in the

Motion being in the best interests of the Debtors, their creditors and their estates and all other

parties-in-interest in the Cases (as defined below); and the Court having determined that the

relief requested in the Motion is necessary to avoid immediate and irreparable harm; and the

Court having determined that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and upon the record made by the Debtors in the Motion, the

*Declaration of Adam Keil in Support of Motion of Debtors for Interim and Final Orders*

*(I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361,*

*362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Use Cash*

*Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition*

5

Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling *Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (D.I. [___]) (the "**Keil Declaration**"), the *Declaration of David C. Johnston in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (D.I. [___]) (the "**Johnston Declaration**"), and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.*  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.    *Jurisdiction.*  This Court has core jurisdiction over the Cases (as defined below), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice.*  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion, the relief requested at the Interim Hearing or the entry of this Interim Order shall be required, except as set forth in paragraph 36 below. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

4.    *Debtors' Stipulations.*  Without prejudice to the rights of any party in interest (but subject to the limitations thereon contained in paragraphs 18 and 19 below), the Debtors admit, stipulate and agree that:

6

(a)    (i) as of the date (the "**Petition Date**") of the filing of the Debtors' chapter 11 cases (the "**Cases**"), the Debtors were justly and lawfully indebted and liable to (A) the Prepetition ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate face amount of not less than $51,062,000 in respect of letters of credit issued by certain of the Prepetition ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition ABL Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition ABL Loan Documents (collectively, the "**Prepetition ABL Secured Debt**"), which Prepetition ABL Secured Debt has been guaranteed on a joint and several basis by all of the Guarantors and (B) the Prepetition Term Loan Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $164,175,000 in respect of loans made pursuant to, and in accordance with the terms of, the Prepetition Term Loan Credit Agreement and the other Prepetition Term Loan Documents, plus the Applicable Premium (as defined in the Prepetition Term Loan Credit Agreement) in the amount of not less than $58,000,000, accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Term Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Term Loan Documents (collectively, the "**Prepetition Term Loan Secured Debt**" and, together with the Prepetition ABL Secured Debt, the "**Prepetition**

7

**Secured Debt**"), which Prepetition Term Loan Secured Debt has been guaranteed on a joint and several basis by all of the Guarantors; (ii) the Prepetition Secured Debt constitutes the legal, valid and binding obligations of the Borrower and the Guarantors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iii) no portion of the Prepetition Secured Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Existing Agreements prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b)    the liens and security interests granted to the Prepetition ABL Secured Parties (the "**Prepetition ABL Liens**") pursuant to and in connection with the Prepetition ABL Loan Documents: (i) are valid, binding, perfected, enforceable, first-priority liens and security interests in the ABL Facility Priority Collateral; (ii) were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value; (iii) are not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, are subject and subordinate only to valid, perfected and unavoidable liens to the extent that such liens are senior to the liens of the Prepetition ABL Agent on the Prepetition Collateral;

(c)    the liens and security interests granted to the Prepetition Term Loan Secured Parties (the "**Prepetition Term Loan Liens**" and, together with the Prepetition ABL Liens, the "**Prepetition Liens**") pursuant to and in connection with the Prepetition Term Loan

8

Credit Agreement and the other Prepetition Term Loan Documents: (i) are legal, valid, binding, perfected, enforceable, first-priority liens and security interests in the Term Loan Priority Collateral (as defined in the ICA) (the "**Term Loan Priority Collateral**" and, together with the ABL Facility Priority Collateral, the "**Prepetition Collateral**"); (ii) are legal, valid, binding, perfected, enforceable, second-priority liens and security interests in the ABL Facility Priority Collateral; (iii) were granted to, or for the benefit of, the Prepetition Term Loan Secured Parties for fair consideration and reasonably equivalent value; (iv) are not subject to avoidance, recharacterization, subordination (other than as provided in the ICA), recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (v) as of the Petition Date are subject and subordinate only to (A) in the case of the ABL Facility Priority Collateral, the liens and security interests in favor of the Prepetition ABL Secured Parties and (B) valid, perfected and unavoidable liens to the extent that such liens are senior to the liens of the Prepetition Term Loan Agent on the Prepetition Term Loan Collateral;

(d)     none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from any of the Existing Agreements;

(e)     the Debtors and their estates have no claims or causes of action against, or with respect to, the Prepetition Secured Parties;

(f)     effective as of the date of entry of this Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective Representatives (as defined below) (collectively, the "**Released**

**Parties**") from any and all obligations and liabilities to the Debtors (and their successors and
assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts,
liabilities, actions and causes of action arising prior to the Petition Date (collectively, the
"**Released Claims**") of any kind, nature or description, whether known or unknown, foreseen or
unforeseen, liquidated or unliquidated, arising in law or equity or upon contract or tort or under
any state or federal law or otherwise, arising out of or related to (as applicable) any of the
Existing Agreements, the obligations owing and the financial obligations made thereunder, the
negotiation thereof and of the deal reflected thereby, and the obligations and financial
obligations made thereunder, in each case that the Debtors at any time had, now have or may
have, or that their successors or assigns hereafter can or may have against any of the Released
Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any
time on or prior to the date of this Interim Order, whether such Released Claims are matured or
unmatured or known or unknown;

    (g)  that certain Intercreditor Agreement dated as of February 26, 2016 among
the Prepetition ABL Agent, the Prepetition Term Loan Agent and the grantors party thereto (as
amended, supplemented or otherwise modified prior to the date hereof, the "**ICA**"), is binding
and enforceable against the Borrower and the Guarantors in accordance with its terms, and the
Borrower and the Guarantors are not entitled to take any action that would be contrary to the
provisions thereof; and

    (h)  all cash, securities or other property of the Loan Parties (and the proceeds
therefrom) as of the Petition Date, including, without limitation, all cash, securities or other
property (and the proceeds therefrom) and other amounts on deposit or maintained by the Loan
Parties in any account or accounts with any depository institution (collectively, the "**Depository**

10

Institutions"), were subject to rights of set-off and valid, perfected, enforceable, first priority liens under the Existing Agreements and applicable law, for the benefit of the Prepetition ABL Secured Parties or the Prepetition Term Loan Secured Parties, as applicable.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

5.    *Findings Regarding the DIP Financing and Cash Collateral.*

(a)    Good and sufficient cause has been shown for the entry of this Interim Order.

(b)    The Loan Parties have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, to pay the Adequate Protection Payments (as defined below) and to fund administration of the Cases, including, without limitation, payment of Professional Fees (as defined below).  The access of the Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Loan Parties and to a successful reorganization of the Loan Parties.

WEIL:\95911414\1\22010.0003

(c)     The Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Loan Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Loan Parties granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (as defined below) and incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(d)     Based on the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the Adequate Protection Obligations granted to the Prepetition Secured Parties and the terms on which the Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed under the ICA to have consented to the Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(f)     The DIP Financing, as well as the terms of the Adequate Protection Obligations and Adequate Protection Liens, and the use of the Prepetition Collateral (including

12

Cash Collateral) have been negotiated in good faith and at arm's length among the Loan Parties, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties and all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, (i) all loans made to and guarantees issued by the Loan Parties pursuant to the DIP Documents (collectively, the "**DIP Loans**") and (ii) any "**Obligations**" (as defined in the DIP Credit Agreement) of the Debtors owing to the DIP Agent, any DIP Lender or any of their respective affiliates, in accordance with the terms of the DIP Documents, including any obligations, to the extent provided for in the DIP Documents, to indemnify the DIP Agent or the DIP Lenders and to pay any fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the DIP Documents), amounts, charges, costs, indemnities and other obligations that are chargeable or reimbursable under this Interim Order, the Final Order or the DIP Documents (the foregoing in clauses (i) and (ii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Prepetition Secured Parties have acted in good faith regarding the Loan Parties' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting

13

of the Adequate Protection Liens), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof), and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)     The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; provided, however, that nothing in this Interim Order or the other DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the ICA, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties.

(h)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Interim Order, the Loan Parties' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of

14

Prepetition Collateral, including Cash Collateral, in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Loan Parties' estates and consistent with the Loan Parties' exercise of their fiduciary duties.

6.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized to forthwith borrow money pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty the Borrower's obligations with respect to such borrowings, up to an aggregate principal amount equal to $30 million under the DIP Facility (plus interest, fees, prepayment premiums, expenses (including professional fees and expenses) and other amounts, in each case, as provided for in the DIP Documents), subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents (and subject to the terms and conditions set forth herein and therein), and for other general corporate purposes of, the Loan Parties, including the payment of expenses of administration in the Cases and the Adequate Protection Obligations.

(b)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Documents;

(ii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Loan Parties, the DIP Agent and the requisite DIP Lenders may agree with, where practicable, prior notice of three business days for substantive amendments to the Creditors' Committee (as defined below) and the U.S. Trustee, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii)      the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all fees, including, without limitation, any closing fee, commitment fee, exit fee, prepayment fee or agency fee (which fees shall be, and shall be deemed to have been, approved upon entry of this Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, by any party) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Loan Parties, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any

16

WEIL:\95911414\1\22010.0003

of the DIP Agent or DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; and

        (iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting and perfection of the DIP Liens and the DIP Superpriority Claims as permitted herein and therein.

        (c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party party thereto in accordance with the terms of the DIP Documents and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination (except as provided herein), disallowance, impairment, cross-claim, claim or counterclaim.

        7.    *DIP Superpriority Claims.*

        (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with, except as provided in this Interim Order, priority over any and all administrative expenses, diminution in value claims (including all Adequate Protection Claims) and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all

17

administrative expenses of the kind specified in sections 503(b) and 507(b) (including all 507(b) Claims (as defined below)) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Claims), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof, including, without limitation, any and all cash and Cash Collateral of the Loan Parties (excluding the Loan Parties' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but, subject only to and effective upon entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")), subject only to payment of the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  Notwithstanding the foregoing, the DIP Superpriority Claims shall not be payable from or have recourse to the ABL Facility Priority Collateral or the ABL Postpetition Collateral unless and until the Prepetition ABL Secured Debt has been satisfied in full in cash and all Letters of Credit (as defined in the Prepetition ABL Credit Agreement) have been terminated or Cash Collateralized in Full (as

18

defined below) or the Prepetition ABL Secured Parties have agreed in writing to a different treatment of the Prepetition ABL Secured Debt and all Letters of Credit.

(b)     For purposes hereof, the "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000, (iii) to the extent ultimately allowed by the Court, all accrued and unpaid claims for fees, costs, disbursements and expenses incurred by persons or firms retained by the Debtors, or by the official committee of unsecured creditors in the Cases, if any (the "**Creditors' Committee**") (but excluding fees and expenses of any professionals employed individually by members of the Creditors' Committee and any restructuring fee, sale fee, transaction fee or other success fee of any investment banker or financial advisor of the Debtors or the Creditors' Committee), whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 363 (solely with respect to AP Services, LLC), or 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**," and the fees, costs and expenses of the Professional Persons, the "**Professional Fees**"), to the extent such Professional Fees are incurred at any time on or prior to the Trigger Date (as defined below) regardless of when such fees are allowed by the Bankruptcy Court and (iv) any Professional Fees of the Professional Persons incurred after the Trigger Date and allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date, whether by interim order, procedural order or otherwise, in an amount not to exceed $1.0 million in the aggregate (the "**Post-Trigger Date Carve-Out Cap**") (the obligations of the Debtors with respect to the Carve-Out, the "**Carve-Out Obligations**");

19

provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.  For the avoidance of doubt, subject to clauses (i) and (ii) above, only Professional Persons shall be entitled to payment from the funds constituting the Carve-Out; provided that the DIP Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent shall be entitled to gain possession of the funds constituting the Carve-Out after payment of the fees and expenses of Professional Persons that are payable from the Carve-Out and allowed on a final basis by the Court and paid in full.

(c)     For purposes hereof, the "**Trigger Date**" shall mean the earlier of:  (i) the first business day after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and delivery (including via email) by the DIP Lenders of notice thereof (the "**Carve-Out Notice**") to the Borrower's lead restructuring counsel (and, upon receipt, Borrower's lead restructuring counsel shall promptly deliver such Carve-Out Notice to the U.S. Trustee), or (ii) the Maturity Date (as defined in the DIP Credit Agreement).

(d)     On the Trigger Date, the Debtors shall be required to transfer from their accounts (other than the ABL Segregated Cash Collateral Account (as defined below)) to a segregated account (the "**Carve-Out Account**") not subject to the control of the DIP Agent an amount equal to the Post-Trigger Date Carve-Out Cap <u>plus</u> an amount equal to the aggregate unpaid fees, costs and expenses described in clauses (i)-(iii) of paragraph 7(b) above, in each case as determined by a good faith estimate of the applicable Professional Person.  The proceeds on deposit in the Carve-Out Account shall be available first to satisfy the Carve-Out Obligations, and (1) the DIP Agent shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (2) the Prepetition ABL Agent (solely to the extent of any funds from

20

accounts constituting ABL Facility Priority Collateral or ABL Postpetition Collateral, respectively, transferred to the Carve-Out Account), the Prepetition Term Loan Agent and the DIP Agent shall each have a security interest in any residual interest in the Carve-Out Account available following satisfaction in full of all the Carve-Out Obligations.

(e) For the avoidance of doubt, the Carve-Out Obligations shall be senior to any obligations or claims arising under or relating to (including any liens securing such obligations or claims) the DIP Loan, the Prepetition ABL Credit Agreement and the Prepetition Term Loan Credit Agreement, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests (it being understood and agreed that the Carve-Out shall, as among the Prepetition Secured Parties, be allocated and deemed allocated for all purposes 16.67% to the ABL Facility Priority Collateral and 83.33% to the Term Loan Priority Collateral); *provided* that, notwithstanding the foregoing and for the avoidance of doubt, such allocation shall not affect the funding of the Carve-Out, and all Collateral (save and except for Cash Collateral in the ABL Segregated Cash Collateral Account) shall be available to fund the Carve-Out; *provided* further that, for the avoidance of doubt, upon the funding of the Carve-Out, the DIP Secured Parties and the Prepetition Secured Parties shall have no further obligation whatsoever to fund or otherwise ensure payment of fees, costs and expenses payable from the Carve-Out.  Notwithstanding the foregoing, prior to the Trigger Date, the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by the Bankruptcy Court.

(f) Notwithstanding the foregoing, (x) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation (other than, prior to the Trigger Date, as permitted under paragraph 19 of this

21

Interim Order), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, or assert any defense or counterclaim, against any of the DIP Lenders, the DIP Agent, the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition ABL Lenders or the Prepetition ABL Agent, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations (including, without limitation, any obligations arising from or related to the Applicable Premium (as defined in the Prepetition Term Loan Credit Agreement)) and the liens and security interests granted under the DIP Documents or the Existing Agreements (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders, the DIP Agent or the Prepetition Secured Parties; (c) attempts to prevent, hinder or otherwise delay any of the DIP Lenders' or the DIP Agent's assertion, enforcement or realization upon any DIP Collateral (as defined below) or Term Loan Priority Collateral in accordance with the DIP Documents and the Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing; (d) attempts to prevent, hinder or otherwise delay any of the Prepetition Secured Parties assertion, enforcement or realization upon any of the ABL Facility Priority Collateral or ABL Postpetition Collateral in accordance with the Existing Agreements, this Interim Order and the Final Order; or (e) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court, and (y) prior to the Trigger Date, the Carve-

WEIL:\95911414\1\22010.0003

Out shall not be reduced by the payment of Professional Fees allowed at any time by the Bankruptcy Court.

8.      *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent of, or over, all owned or hereafter acquired assets and property of the Loan Parties and the proceeds thereof, other than the Excluded Property (the foregoing, together with any other property identified in clauses (a), (b) and (c) below being referred to collectively, as the "**Collateral**"), the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders, subject only to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

(a)      First Lien On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "**Unencumbered Property**"), including, without limitation, any and all unencumbered cash of the Loan Parties (whether maintained with the DIP Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition

23

intercompany claims against the Loan Parties and their non-Debtor affiliates), contracts, litigation claims, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than: (i) the Excluded Property, but including any proceeds of the Excluded Property that do not otherwise constitute Excluded Property; and (ii) Avoidance Actions, but subject only to and effective upon entry of the Final Order, including Avoidance Proceeds; provided that such security interest in and lien on ABL Postpetition Collateral shall be subject and subordinate to the Prepetition ABL Adequate Protection Liens on the terms provided for herein;

      (b)    <u>Liens Priming Prepetition Term Loan Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming security interest in and lien upon all pre- and postpetition property of each Loan Party (including, without limitation, any and all cash and cash collateral (whether maintained with the DIP Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims against the Loan Parties and their non-Debtor affiliates), contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries,

24

WEIL:\95911414\1\22010.0003

wherever located, and the proceeds, products, rents and profits of the foregoing), whether now existing or hereafter acquired, subject to the Prepetition Term Loan Liens, which shall be senior in all respects to the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens but shall be junior and subordinate to, solely with respect to the ABL Facility Priority Collateral and the ABL Postpetition Collateral, the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens;

(c)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party subject to valid, binding and unavoidable liens on the Petition Date (including, without limitation, any and all cash and cash collateral of the Loan Parties (whether maintained with the DIP Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims against the Loan Parties and their non-Debtor affiliates), contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, in each case other than (x) the Excluded Property, but including any proceeds of Excluded Property that do not constitute Excluded Property and (y) the Avoidance Actions), junior and subordinate to (i) solely with respect to the ABL Facility Priority Collateral and the ABL Postpetition Collateral, the Prepetition ABL Liens

25

and the Prepetition ABL Adequate Protection Liens, (ii) any valid, perfected and unavoidable liens (other than the Prepetition Liens) in existence immediately prior to the Petition Date to the extent such liens are senior or *pari passu* to the Prepetition Liens, and (iii) any such valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case (ii) and (iii) above other than the security interests and liens securing the Prepetition Term Loan Secured Debt (including, without limitation, the Prepetition Term Loan Adequate Protection Liens); *provided*, that nothing in the foregoing clauses (ii) and (iii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(d)    Liens Senior to Certain Other Liens.  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other foreign or domestic governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties, other than the Prepetition ABL Adequate Protection Liens (solely with respect to the ABL Facility Priority Collateral and the ABL Postpetition Collateral) or (C) any intercompany or affiliate liens or security interests of the Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code or otherwise other than the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens (solely with respect to the ABL Facility Priority

26

Collateral and the ABL Postpetition Collateral), and except as otherwise permitted pursuant to the DIP Credit Agreement.  Until such time as the Control Agreement (as defined below) is terminated or otherwise no longer in effect, the DIP Liens and the Adequate Protection Liens shall not attach to the funds, in the amount not to exceed $2,000,000, pledged to Bank of America, N.A. ("**BofA**"), and deposited in the BofA Account No. XXXXXX5481, pursuant to that certain Treasury Management Services Security and Control Agreement dated as of September 14, 2016 between BofA and Basic (the "**Control Agreement**") as security exclusively for the obligations under that under that certain Bank of America Corporate Purchasing Card Agreement between BofA and Basic Energy Services L.P. dated on or around July 21, 2005 and that certain Commercial Prepaid Card Purchase Agreement between BofA and the Basic dated on our around March 14, 2006 (each as amended, supplemented or modified from time to time, collectively, the "**P-Card Agreements**"); *provided* that the DIP Liens shall attach to the Debtors' interests in such property and to any residual interest after the indefeasible payment in full, in cash, of the Debtors' obligations (excluding any unasserted contingent obligations) and the termination of BofA's obligations under the P-Card Agreements.

9.      *Protection of DIP Lenders' Rights.*

(a)      So long as there are any DIP Obligations outstanding (other than contingent indemnity obligations as to which no claim has been asserted when all other DIP Obligations have been indefeasibly paid in full in cash and the Commitments (as defined in the DIP Credit Agreement) have been terminated) or the DIP Lenders have any outstanding Commitments under the DIP Credit Agreement, (i) the Prepetition Term Loan Secured Parties shall: (A) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted on the Prepetition Collateral pursuant to the Prepetition Term Loan

27

Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against any Collateral or the Prepetition Term Loan Adequate Protection Liens; (B) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (C) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in any Collateral unless, solely as to this clause (C), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (D) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent, the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of any Collateral subject to any sale or disposition; and (ii) the Prepetition Term Loan Agent shall assert its rights under the ICA for the benefit of, and at the direction of, the DIP Lenders.

(b)    Unless and until the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement), enforces any of its rights and remedies under the DIP Documents and this Interim Order with respect to the Collateral, or a Borrowing Base Default (as defined below) has occurred and is continuing for a period of more than five (5) days or as otherwise expressly provided in this Interim Order including in paragraph 14(i) below, the Prepetition ABL Secured Parties shall take no action to foreclose upon, or recover in

28

connection with, the liens granted on the ABL Facility Priority Collateral or the ABL
Postpetition Collateral pursuant to the Prepetition ABL Loan Documents or this Interim Order,
or otherwise seek to exercise or enforce any rights or remedies against any ABL Facility
Priority Collateral or the ABL Postpetition Collateral or the Prepetition ABL Adequate
Protection Liens; *provided* that, to the extent a Borrowing Base Default has occurred and is
continuing for a period of more than five (5) business days, the rights of the Prepetition ABL
Secured Parties may be exercised only with respect to ABL Facility Priority Collateral or ABL
Postpetition Collateral of an aggregate value not greater than the amount of funds required to
cure such Borrowing Base Default, which funds shall be transferred by the Debtors to the ABL
Segregated Cash Collateral Account, to the extent the balance in such account is insufficient to
cure such Borrowing Base Default as of the date thereof.  Nothing in this Interim Order shall
prohibit the Debtors from seeking a determination from the Court at any time that no Out-of-
Formula Event (as defined below), Borrowing Base Default, Letter of Credit Default (as defined
below) or Event of Default occurred under this Interim Order.

(c)    To the extent any Prepetition Secured Party has possession of any
Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or
Collateral, or has been noted as secured party on any certificate of title for a titled good
constituting Prepetition Collateral or Collateral, then such Prepetition Secured Party shall be
deemed to maintain such possession or notation or exercise such control as a gratuitous bailee
and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and
the Prepetition Term Loan Agent shall comply with the instructions of the DIP Agent with
respect to the exercise of such control.

29

(d)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent, acting at the direction of the requisite DIP Lenders, and the DIP Lenders to enforce all of their rights under the DIP Documents and this Interim Order and (i) immediately upon the occurrence and during the continuance of an Event of Default, without further order of or application or motion to this Court, declare (A) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains and (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties and (ii) upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "**Remedies Notice Period**") via email to counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee for the purpose of permitting the DIP Lenders to do any of the following: (x) foreclose on the Collateral (other than the ABL Facility Priority Collateral or the ABL Postpetition Collateral, without the prior written consent of the Prepetition ABL Agent or unless the Prepetition ABL Secured Debt has been paid in full in cash and all Letters of Credit (as defined in the Prepetition ABL Credit Agreement) have been terminated or the Prepetition ABL Debt has been Cash Collateralized in Full (as defined below)) and (y) enforce all of the rights under the DIP Documents (except with respect the ABL Facility Priority Collateral and the ABL Postpetition Collateral, without the prior written consent of the Prepetition ABL Agent or unless the Prepetition ABL Secured Debt has been paid in full in cash and all Letters of Credit (as defined in the Prepetition ABL Credit Agreement) have been terminated or the Prepetition ABL Secured Debt has been Cash Collateralized in Full).  In any hearing on any request to re-impose

30

or continue the automatic stay of section 362(a) of the Bankruptcy Code, the only issue that may be raised by the Debtors or the Prepetition Secured Parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing under the DIP Documents, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Interim Order or the DIP Documents.  In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, absent the express written consent of such party.  Further, subject only to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the claims of the Prepetition Secured Parties.  For purposes of this Interim Order, the term "Cash Collateralized in Full" means the deposit of cash into the ABL Segregated Cash Collateral Account in an amount equal to 105% of the then outstanding amount of the Prepetition ABL Secured Debt (including, without limitation, the aggregate outstanding face amount of any undrawn Letters of Credit (as defined in the Prepetition ABL Credit Agreement)). In the event the Prepetition ABL Secured Debt is Cash Collateralized in Full, the Debtors shall continue to make the Prepetition ABL Adequate Protection Payments (as defined below) and all other payments set forth in paragraph 14 of this Interim Order.

(e)      No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported

31

termination of the Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

10.    *Limitation on Charging Expenses Against Collateral.*    Subject only to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition Term Loan Agent or the Prepetition ABL Agent, as the case may be and in each case acting at the written direction of the requisite percentage of DIP Lenders, Prepetition Term Loan Lenders or Prepetition ABL Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the Prepetition Term Loan Agent or other Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

11.    *Payments Free and Clear.*    Subject only to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent on behalf of itself and the DIP Lenders, the Prepetition ABL Lenders or the Prepetition Term Loan Lenders, as the case may be, in each case pursuant to the provisions of this Interim

32

Order or the Final Order or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability.

12.    *Use of Cash Collateral.*  Subject to the terms and conditions of this Interim Order and the DIP Documents, the Loan Parties are hereby authorized to use Cash Collateral during the period beginning on the Petition Date and ending on the date on which a Termination Event (as defined below) occurs for disbursements set forth in the Rolling Budget (as defined in the DIP Credit Agreement, and as such budget may be modified from time to time by the Loan Parties with the prior written consent of the DIP Agent at the direction of the Required Lenders, as defined in the DIP Credit Agreement) (such initial Rolling Budget, the "**Interim DIP Budget**," attached to the DIP Credit Agreement as **Exhibit G**) and, solely if such modified budget contemplates an Out-of-Formula Event, the Prepetition ABL Agent, subject to any permitted variances as set forth in the DIP Credit Agreement); *provided* that (a) the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.  For purposes of this Interim Order, a "**Termination Event**" shall occur with respect to each of the following, if:

> (i)    (A) an Event of Default has occurred, (B) the DIP Agent delivered a notice to the Debtors' lead counsel that an Event of Default has occurred, and (C) the Debtors have not cured such an Event of Default or obtained a ruling from the Bankruptcy Court that no Event of Default has occurred, in each case within five (5) business days following such notice;

33

(ii)  (A) an event listed in paragraph 17(b) of this Interim Order has

occurred, (B) the Prepetition Term Loan Agent or the Prepetition

ABL Agent delivered a notice to the Debtors' lead counsel that

such an event has occurred, and (C) solely with respect to an event

listed in clauses (i) or (ii) of paragraph 17(b), the Debtors have not

cured such an event within five (5) business days following such

notice (the five day period described in clauses (i) and (ii) above,

the "**Cash Collateral Access Grace Period**");

(iii)  a Borrowing Base Default has occurred; or

(iv)  a Letter of Credit Default has occurred.

13.    *Adequate Protection of Prepetition Term Loan Secured Parties*.  The Prepetition

Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507

of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral,

including the Cash Collateral, for and equal in amount to the aggregate diminution in the value

of the Prepetition Secured Parties' prepetition security interests in all Prepetition Collateral

(including Cash Collateral) from and after the Petition Date, if any, for any reason provided for

under the Bankruptcy Code, including, without limitation, any such diminution resulting from

the depreciation, sale, lease or use by the Loan Parties (or other decline in value) of the

Prepetition Collateral, the priming of the Prepetition Term Loan Secured Parties' security

interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to

the DIP Documents and this Interim Order, or the imposition of the automatic stay pursuant to

section 362 of the Bankruptcy Code (the "**Prepetition Term Loan Adequate Protection**

**Claim**").  As adequate protection of the Prepetition Term Loan Adequate Protection Claim, the

WEIL:\95911414\1\22010.0003

Prepetition Term Loan Secured Parties are hereby granted the following (collectively, the "**Prepetition Term Loan Adequate Protection Obligations**"):

(a)    <u>Prepetition Term Loan Secured Parties Adequate Protection Liens</u>.  The Prepetition Term Loan Agent (for itself and for the benefit of the Prepetition Term Loan Lenders) is hereby granted (automatically effective and perfected upon the Petition Date and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), to secure the amount of the Prepetition Term Loan Adequate Protection Claim, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all of the Collateral (including, without limitation, Unencumbered Property and, subject to entry of the Final Order, Avoidance Proceeds), subject and subordinate only to: (i) the DIP Liens and any liens to which the DIP Liens are junior (including, without limitation, with respect to the ABL Facility Priority Collateral and the ABL Postpetition Collateral, the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens) and (ii) the Carve-Out (the "**Prepetition Term Loan Adequate Protection Liens**").

(b)    <u>Prepetition Term Loan Secured Parties Section 507(b) Claim</u>.  The Prepetition Term Loan Secured Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Term Loan Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition Term Loan Secured Parties 507(b) Claim**").  The Prepetition Term Loan Secured Parties 507(b) Claim shall have recourse to and be payable from all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Prepetition Term

35

Loan Secured Parties 507(b) Claim shall be (i) subject and subordinate only to (x) the Carve-Out and (y) the DIP Superpriority Claims granted in respect of the DIP Obligations and (ii) *pari passu* with the Prepetition ABL Secured Parties 507(b) Claim (as defined below).  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition Term Loan Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Term Loan Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in full in cash in accordance with the DIP Documents and the Commitments have been terminated.  Notwithstanding the foregoing, the Prepetition Term Loan Secured Parties 507(b) Claim shall not be payable from or have recourse to the ABL Facility Priority Collateral or the ABL Postpetition Collateral unless and until the Prepetition ABL Secured Debt has been satisfied in full in cash and all Letters of Credit have been terminated or Cash Collateralized in Full or the ABL Secured Parties have agreed in writing to a different treatment of the Prepetition ABL Secured Debt and all Letters of Credit.

(c)    <u>Prepetition Term Loan Lender Cash Payments</u>.    The Prepetition Term Loan Agent shall receive from the Debtors for the benefit of itself and the Prepetition Term Loan Secured Parties, (i) to the extent not already received, upon entry of this Interim Order and receipt of an invoice for such amounts, immediate cash payment of all accrued and unpaid interest on the Prepetition Term Loan Secured Debt at the default rate provided for in the Prepetition Term Loan Documents through the date of entry of this Interim Order and all other accrued and unpaid fees and expenses owing to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders and, in each case, chargeable and reimbursable under the

36

Prepetition Term Loan Documents incurred prior to the Petition Date, (ii) cash payments, on the first business day of each month, in an amount equal to the non-default interest payable under the Prepetition Term Loan Credit Agreement, but not including payment of the Applicable Premium; *provided* that the Prepetition Term Loan Lenders reserve the right to assert interest at the default rate; *provided*, further, that the Prepetition Term Loan Lenders shall (x) forbear from exercising such right so long as an Event of Default has not occurred and (y) waive such right upon the Debtors' emergence pursuant to an Acceptable Plan of Reorganization (as defined in the DIP Credit Agreement); *provided, further,* that the payments made under this paragraph 13(c)(ii) shall be without prejudice to the right of any party as to whether such payments constitute postpetition interest allowable under section 506(b) of the Bankruptcy Code or are in respect of principal, and (iii) cash payments of principal in the amount, and on the dates, set forth in section 2.07 of the Prepetition Term Loan Credit Agreement (clauses (i), (ii), and (iii) collectively, the "**Prepetition Term Loan Adequate Protection Payments**").

(d)   Prepetition Term Loan Secured Parties Fees and Expenses.   Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of this Interim Order, the Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional fees, expenses and disbursements payable to the advisors to the Prepetition Term Loan Agent (including, without limitation, Lowenstein Sandler LLP) and the Prepetition Term Loan Lenders (including, without limitation, Davis Polk & Wardwell LLP, Potter Anderson & Corroon LLP and PJT Partners) that have accrued as of the Petition Date promptly upon the receipt of invoices therefor and (ii) the Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional fees, expenses and disbursements payable to the advisors to the Prepetition Term Loan Agent (including, without limitation, Lowenstein Sandler

37

LLP) and the Prepetition Term Loan Lenders (including, without limitation, Davis Polk &

Wardwell LLP, Potter Anderson & Corroon LLP and PJT Partners) that have accrued on or

after the Petition Date.  The payment of the fees, expenses and disbursements set forth in clause

(ii) of the foregoing sentence shall be made within ten (10) days (which time period may be

extended by the applicable professional) after the receipt by the Debtors, the Creditors'

Committee and the U.S. Trustee (the "**Term Loan Fees Review Period**") of invoices therefor

(the "**Term Loan Invoiced Fees**") and without the necessity of filing formal fee applications.

The invoices for such Term Loan Invoiced Fees shall include the number of hours billed (except

for financial advisors compensated on other than an hourly basis) and a reasonably detailed

description of services provided and the expenses incurred by the applicable professional;

provided, however, that any such invoice: (i) may be redacted to protect privileged, confidential

or proprietary information and (ii) shall not be required to contain individual time detail

(*provided*, that such invoice shall contain (except for financial advisors compensated on other

than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper

for the applicable professional and such timekeepers' hourly rates).  The Debtors, the Creditors'

Committee and the U.S. Trustee may object to any portion of the Term Loan Invoiced Fees (the

"**Term Loan Disputed Invoiced Fees**") within the Term Loan Fees Review Period by filing

with the Court a motion or other pleading, on at least ten (10) days' prior written notice to the

Prepetition Term Loan Agent and the Prepetition Term Loan Lenders of any hearing on such

motion or other pleading, setting forth the specific objections to the Term Loan Disputed

Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that

payment of any undisputed portion of Term Loan Invoiced Fees shall be paid within the time

frame set forth above and shall not be delayed based on any objections thereto; *provided,*

WEIL:\95911414\1\22010.0003

*further,* that the applicable parties shall endeavor to consensually resolve any such dispute in good faith prior to the filing of any such motion or pleading.

(e)    <u>Adequate Protection Milestones and Covenants</u>.  The Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Lenders, is hereby entitled to performance of those certain case milestones set forth in section 6.20 of the DIP Credit Agreement and those certain covenants set forth in section 6.07 and section 8.01(k) of the DIP Credit Agreement, in each case as may be waived, amended, modified or extended from time to time by the Required Lenders (as defined in the DIP Credit Agreement) (the "**Adequate Protection Milestones and Covenants**").

(f)    <u>Information Rights</u>.  The Debtors shall promptly provide the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Lenders, with all required written financial reporting and other periodic reporting that is provided to the DIP Agent or the DIP Lenders.  In addition, the Prepetition Term Loan Lenders are hereby entitled to the rights set forth in section 6.10(c) of the Prepetition Term Loan Credit Agreement.

(g)    The Adequate Protection Milestones and Covenants and reporting obligations in subparagraphs (e) and (f) above shall survive any termination of the DIP Credit Agreement or the Commitments thereunder.  Following any such termination of the DIP Credit Agreement or the Commitments thereunder, the Adequate Protection Milestones and Covenants may be waived, amended, modified or extended from time to time solely by the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement) in their sole discretion.

14.    *Adequate Protection of Prepetition ABL Secured Parties*.  The Prepetition ABL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the ABL Facility Priority Collateral,

WEIL:\95911414\1\22010.0003

including the Cash Collateral, for and equal in amount to the aggregate diminution in the value of the Prepetition ABL Secured Parties' prepetition security interests in the ABL Facility Priority Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Loan Parties (or other decline in value) of the ABL Facility Priority Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition ABL Adequate Protection Claim**" and, together with the Prepetition Term Loan Adequate Protection Claim, the "**Adequate Protection Claims**"). As adequate protection of the Prepetition ABL Adequate Protection Claim, the Prepetition ABL Secured Parties are hereby granted the following (collectively, the "**Prepetition ABL Adequate Protection Obligations**" and, together with the Prepetition Term Loan Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

(a)     _Prepetition ABL Secured Parties Adequate Protection Liens_.    The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Lenders) is hereby granted (automatically effective and perfected upon the Petition Date and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), to secure the amount of the Prepetition ABL Adequate Protection Claim, a valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien upon all of the ABL Facility Priority Collateral created or acquired on or after the Petition Date (including, all proceeds, products, or profits of such ABL Facility Priority Collateral created or acquired on and after the Petition Date to the extent such proceeds, products or profits themselves constitute ABL Facility Priority Collateral (the "**ABL Postpetition Collateral**")) (the "**Prepetition ABL Adequate Protection Liens**" and, together

40

WEIL:\95911414\1\22010.0003

with the Prepetition Term Loan Adequate Protection Liens, the "**Adequate Protection Liens**"),

subject and subordinate only to the Carve-Out and valid, perfected and unavoidable liens

existing as of the Petition Date to the extent that such liens are senior to the liens of the

Prepetition ABL Secured Parties on the ABL Postpetition Collateral.  For the avoidance of

doubt, (i) the ABL Postpetition Collateral shall include, without limitation, all accounts

(including unbilled accounts and accounts which constitute proceeds of inventory and are

treated as account receivable on the books of a Loan Party but excluding accounts arising solely

from the sale, lease, license, assignment or other disposition of Term Loan Priority Collateral

other than inventory) of the Borrower and the Guarantors generated on and after the Petition

Date and all proceeds, products or profits of such accounts to the extent such proceeds, products

or profits themselves constitute ABL Facility Priority Collateral, (ii) the Prepetition ABL

Adequate Protection Liens shall be senior in priority to the DIP Liens, the Prepetition Term

Loan Liens and the Prepetition Term Loan Adequate Protection Liens with respect to the ABL

Facility Priority Collateral and the ABL Postpetition Collateral and (iii) there shall be no

Prepetition ABL Adequate Protection Liens on, and there are no Prepetition ABL Liens on, (x)

the Unencumbered Property that is not ABL Postpetition Collateral or (y) the Term Loan

Priority Collateral.

> (b)    Prepetition ABL Secured Parties Section 507(b) Claim.  The Prepetition

ABL Secured Parties are hereby granted, subject to the Carve-Out, an allowed superpriority

administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the

amount of the Prepetition ABL Adequate Protection Claim (the "**Prepetition ABL Secured**

**Parties 507(b) Claim**" and together with the Prepetition Term Loan Secured Parties 507(b)

Claim, the "**507(b) Claims**").  The Prepetition ABL Secured Parties 507(b) Claim shall have

recourse to and be payable from all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds; provided, however, the Prepetition ABL Secured Parties 507(b) Claim shall be (i) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims granted in respect of the DIP Obligations and (ii) *pari passu* with the Prepetition Term Loan Secured Parties 507(b) Claim.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition ABL Secured Parties shall not receive or retain any payments, property or other amounts solely on account of the Prepetition ABL Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in full in cash in accordance with the DIP Documents and the Commitments have been terminated.

(c)    Prepetition ABL Lender Cash Payments.  The Prepetition ABL Agent shall receive from the Debtors for the benefit of itself and the Prepetition ABL Secured Parties, (i) to the extent not already received, upon entry of this Interim Order and receipt of an invoice for such amounts, immediate cash payment of all accrued and unpaid fees with respect to the Prepetition ABL Secured Debt at the rates provided for in the Prepetition ABL Loan Documents and all other accrued and unpaid fees and expenses owing to the Prepetition ABL Agent and the Prepetition ABL Lenders and, in each case, chargeable and reimbursable under the Prepetition ABL Loan Documents incurred prior to the Petition Date (including, for the avoidance of doubt, payment of all prepetition accrued and unpaid letter of credit fees and commitment fees), (ii) with respect to outstanding Letters of Credit, cash payments, paid on each date and in the manner specified in Section 2.03(h) and Section 2.03(i) of the Prepetition ABL Credit Agreement, in an amount equal to the Letter of Credit Fee (as defined in the Prepetition ABL

42

Credit Agreement and based on the default rate) and the fronting, issuance, presentation, amendment and other processing fees and other standard costs and charges and (iii) cash payment of accrued interest on any "Unreimbursed Amount" (as defined in the Prepetition ABL Credit Agreement) in accordance with paragraph 14(i) of this Interim Order (clauses (i), (ii) and (iii), collectively, the "**Prepetition ABL Adequate Protection Payments**" and, together with the Prepetition Term Loan Adequate Protection Payments, the "**Adequate Protection Payments**").

(d)     <u>Prepetition ABL Secured Parties Fees and Expenses</u>.  (i) Upon entry of this Interim Order, the Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional fees, expenses and disbursements payable to the advisors to the Prepetition ABL Agent (including, without limitation, Vinson & Elkins LLP and Morris, Nichols, Arsht & Tunnell LLP) or any of the Prepetition ABL Lenders that have accrued as of the Petition Date promptly upon the receipt of invoices therefor and (ii) the Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional fees, expenses and disbursements payable to the advisors to the Prepetition ABL Agent (including, without limitation, Vinson & Elkins LLP and Morris, Nichols, Arsht & Tunnell LLP) or any of the Prepetition ABL Lenders that have accrued on or after the Petition Date.  The payment of the fees, expenses and disbursements set forth in clause (ii) of the foregoing sentence shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the Creditors' Committee and the U.S. Trustee (the "**ABL Fees Review Period**") of invoices therefor (the "**ABL Invoiced Fees**") and without the necessity of filing formal fee applications.  The invoices for such ABL Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably

43

detailed description of services provided and the expenses incurred by the applicable professional; provided, however, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (*provided*, that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates). The Debtors, the Creditors' Committee and the U.S. Trustee may object to any portion of the ABL Invoiced Fees (the "**ABL Disputed Invoiced Fees**") within the ABL Review Fees Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice to the Prepetition ABL Agent and the Prepetition ABL Lenders of any hearing on such motion or other pleading, setting forth the specific objections to the ABL Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that payment of any undisputed portion of ABL Invoiced Fees shall be paid within the time frame set forth above and shall not be delayed based on any objections thereto; *provided, further,* that the applicable parties shall endeavor to consensually resolve any such dispute in good faith prior to the filing of any such motion or pleading.

(e)    Information Rights. The Debtors shall provide the Prepetition ABL Secured Parties with all required written financial and other periodic reporting, and shall permit the Prepetition ABL Agent to exercise inspection rights (including conducting a field examination), in each case in accordance with the terms of the Prepetition ABL Loan Documents; provided, however, the Debtors stipulate and agree that a Weekly BBC Trigger Period (as defined in the Prepetition ABL Credit Agreement) is in effect and thus the Debtors shall deliver to the Prepetition ABL Agent a weekly Borrowing Base Certificate (as defined in

WEIL:\95911414\1\22010.0003

the Prepetition ABL Credit Agreement) on the third (3rd) business day after the end of each calendar week.  In addition, the Debtors shall promptly provide the Prepetition ABL Agent, on behalf of itself and the other Prepetition ABL Lenders, with copies of all required written financial reporting and other periodic reporting that is provided to the DIP Agent or the DIP Lenders including without limitation the variance report required by Section 6.01 (h) of the DIP Credit Agreement.

        (f)     <u>Borrowing Base</u>.  Effective as of the Petition Date, the definition of Borrowing Base as set forth in the Prepetition ABL Credit Agreement shall be amended and restated as follows:

> "<u>Borrowing Base</u>" means, on any date of determination, an amount equal to the lesser of (a) $51,062,139; or (b) the sum, without duplication, of the following:
>
> (i)     75% of the Value of Eligible Accounts, <u>plus</u>
>
> (ii)    the lesser of (A) 70% of the Value of Eligible Unbilled Accounts and (B) $25,000,000, <u>minus</u>
>
> (iii)   the Availability Reserve.

If for any reason the Total Outstandings (as defined in the Prepetition ABL Credit Agreement) at any time exceeds the Borrowing Base at such time (an "**Out-of-Formula Event**"), the Debtors shall, within five (5) business days after receipt of notice by e-mail from the lead counsel to the Prepetition ABL Agent to lead counsel to the Debtors, the U.S. Trustee and counsel to the Prepetition Term Loan Lenders of such Out-of-Formula event, deposit cash into the ABL Segregated Cash Collateral Account in an aggregate amount equal to such excess.  In the event the Debtors fail to timely satisfy their obligations under the immediately preceding sentence (such failure, a "**Borrowing Base Default**"), the Debtors' right to use any Cash Collateral that is ABL Facility Priority Collateral or ABL Postpetition Collateral shall be automatically terminated

45

without further notice, application, hearing or order of the Court unless and until such default is cured. The "**ABL Segregated Cash Collateral Account**" means that certain segregated Cash Collateral account, BofA Account No. XXXXXX8520, established with and pledged to the Prepetition ABL Agent (which Cash Collateral and account shall constitute ABL Facility Priority Collateral and ABL Postpetition Collateral for all purposes hereunder), which has a balance of $5.9 million as of the date hereof. The ABL Segregated Cash Collateral Account shall be under the exclusive dominion and control of the Prepetition ABL Agent and the Debtors shall have no right or ability to withdraw or otherwise use the Cash Collateral on deposit therein absent the written consent of the Prepetition ABL Agent.

(g)    <u>Commitments</u>. No commitments to make loans or issue or renew Letters of Credit shall remain in effect under the Prepetition ABL Credit Agreement from and after the Petition Date, and the only obligations of the Prepetition ABL Secured Parties under the Prepetition ABL Credit Agreement after the Petition Date shall be solely with respect to the drawings under Letters of Credit in existence immediately prior to the Petition Date.

(h)    <u>Liability Payments</u>. Subject to entry of an appropriate order of the Court, the Debtors shall continue to pay when due in the ordinary course all claims and liabilities that are supported by any Letter of Credit issued under the Prepetition ABL Credit Agreement.

(i)    <u>Reimbursement</u>. The Debtors shall reimburse the L/C Issuers (under and as defined in the Prepetition ABL Credit Agreement) on the "Honor Date" (as defined therein) in accordance with the terms of Section 2.03(c) of the Prepetition ABL Credit Agreement, including the payment of interest on any unreimbursed amount accrued at a rate per annum equal to the base rate plus 4.25% in accordance with the terms thereof for any payment under a Letter of Credit honored by any of the L/C Issuers (an "**L/C Draw**"). In the event the Debtors

WEIL:\95911414\1\22010.0003

fail to pay the "Unreimbursed Amount" (as defined in the Prepetition ABL Credit Agreement) in full in cash by 11:00 am Central time on the next business day with respect to an L/C Draw as to which the Debtors receive notice before 3:00 pm Central time on the day on which the L/C Draw occurred, then the Prepetition ABL Agent shall be entitled (without further notice, application, hearing or order of the Court) at any time thereafter to apply funds in the ABL Segregated Cash Collateral Account to pay such Unreimbursed Amount, including all applicable accrued and unpaid interest and fees.  If the amount of funds in the ABL Segregated Cash Collateral Account is insufficient to pay in full such Unreimbursed Amount, including all applicable accrued and unpaid interest and fees, then within 30 days after the Honor Date, the Prepetition ABL Agent shall be entitled to apply the ABL Facility Priority Collateral and/or the ABL Postpetition Collateral collected and deposited into any deposit account with the Prepetition ABL Agent or any Prepetition ABL Lender  to pay any Unreimbursed Amount, including all applicable accrued and unpaid interest and fees.  In the event the Unreimbursed Amount remains unsatisfied, including all applicable accrued and unpaid interest and fees, within 40 days after the Honor Date because of the insufficiency of the foregoing two enumerated sources or for any other reason (a "**Letter of Credit Default**"), the Debtors' right to use any Cash Collateral that is ABL Facility Priority Collateral or ABL Postpetition Collateral shall be automatically terminated without further notice, application, hearing or order of the Court.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to allow the Prepetition ABL Agent and the Prepetition ABL Lenders to enforce all rights provided for in this paragraph.

15.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code,

47

including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties. Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant to this Interim Order is without prejudice to the right of any of the Prepetition Secured Parties upon a change in circumstances to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection and all other parties' rights to contest such request (subject to the ICA); *provided* that any such additional or modified adequate protection (other than the Prepetition ABL Adequate Protection Liens on ABL Facility Priority Collateral and ABL Postpetition Collateral) shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Documents.

16.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, notate its name as secured party on any certificates of title for a titled good, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders, the Prepetition ABL Agent, on behalf of the Prepetition ABL Lenders, or the Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Lenders, shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar

48

instruments, or take possession of or control over any cash or securities, notate its name as

secured party on any certificates of title for a titled good, or otherwise confirm perfection of the

liens and security interests granted to them hereunder, such liens and security interests shall be

deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge,

dispute or subordination (other than as provided in this Interim Order), as of the Petition Date.

Upon the request of the DIP Agent, the Prepetition Term Loan Agent, or the Prepetition ABL

Agent, each of the Loan Parties, without any further consent of any party, is authorized and

directed to take, execute, deliver and file such instruments (in each case, without representation

or warranty of any kind) to enable the DIP Agent, the Prepetition Term Loan Agent or the

Prepetition ABL Agent to further validate, perfect, preserve and enforce the DIP Liens or the

Prepetition Adequate Protection Liens (as the case may be).  All such documents will be

deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP

Agent, the Prepetition Term Loan Agent or the Prepetition ABL Agent, be filed with or

recorded in filing or recording offices in addition to or in lieu of such financing statements,

mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and

directed to accept such certified copy of this Interim Order for filing and/or recording, as

applicable.  For the avoidance of doubt, the automatic stay provisions of section 362(a) of the

Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent, the

Prepetition Term Loan Agent or the Prepetition ABL Agent to take all actions, as applicable,

referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

49

WEIL:\95911414\1\22010.0003

17.    *Preservation of Rights Granted Under This Interim Order.*

(a)    Other than the Carve-Out and other claims and liens expressly granted by this Interim Order, absent the express written consent of the DIP Lenders, the Prepetition Secured Parties and the Debtors, in their sole discretion, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding other than valid, perfected and otherwise unavoidable prepetition liens to which the DIP Liens or the Adequate Protection Obligations, as applicable, are subject and subordinate pursuant to this Interim Order, and, except as otherwise expressly provided in paragraphs 8 or 13(a) of this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Loan Parties.

(b)    If (A) any of the Loan Parties, without the prior written consent of the Required Lenders (as defined in each of the DIP Credit Agreement, the Prepetition Term Loan Credit Agreement and the Prepetition ABL Agreement) and, in addition, solely with respect to (iii) below, the Prepetition Term Loan Agent and the DIP Agent, seeks, proposes or supports

50

(whether by way of motion or other pleadings filed with the Court or any other writing executed by any Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)     a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition Secured Parties when due;

(ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect;

(iii)   any modifications, amendments, reversal or extensions of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

(iv)    an order converting or dismissing any of the Cases;

(v)     an order appointing a chapter 11 trustee in the Cases;

(vi)    an order appointing an examiner with enlarged powers in the Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vii)   a plan of reorganization other than an Acceptable Plan of Reorganization (as defined in the DIP Credit Agreement) or confirmation thereof;

(viii)  confirmation of a plan that does not provide for the indefeasible payment in full in cash of the Prepetition ABL Secured Debt and termination of all Letters of Credit, or such other treatment of the Prepetition ABL Secured Debt and all Letters of Credit as may be agreed to in writing by the Debtors and the Prepetition ABL Agent;

(ix)    the sale of all or substantially all of the assets of the Loan Parties (except to the extent permitted under the DIP Documents), which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made) and for the indefeasible payment in full in cash of the Prepetition ABL Secured Debt and termination of all Letters of Credit or for the Prepetition ABL Secured Debt to be Cash Collateralized in Full upon the consummation thereof, or such other treatment of the Prepetition ABL Secured Debt and all Letters of Credit as may be agreed to by the Debtors and the Prepetition ABL Agent; or

51

(x)  a failure of the Debtors to pay in full in cash the Prepetition ABL Secured Debt and to terminate all Letters of Credit, or provide such other treatment of the Prepetition ABL Secured Debt as may be agreed to in writing by the Debtors and the Prepetition ABL Agent by the Maturity Date (as defined in the DIP Credit Agreement);

(B) the Prepetition Term Loan Credit Agent or the Prepetition ABL Agent delivers to the Debtors' lead counsel notice that one of the events set forth above has occurred; and (C) solely with respect to clauses (i) and (ii) above, the Debtors fail to cure such an event during the Cash Collateral Grace Period, then a Termination Event under this Interim Order shall occur. Notwithstanding any order that may be entered dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered:  (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order. Notwithstanding anything to the contrary in this paragraph 17(b) or elsewhere in this Interim Order, the Debtors shall have the right, regardless of whether an Event of Default under this Interim Order has occurred, or whether a Cash Collateral Access Grace Period has commenced and is continuing, to seek non-consensual use of Cash Collateral of the Prepetition Secured Parties (whether by way of motion or other pleadings filed with the Court, or any other writing executed by any loan Party, or by oral argument).

52

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the Loan Parties to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by:  (i) the entry of an order converting any of the Cases to a case under chapter 7,

53

dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission; (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations and the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the Commitments have been terminated.

18. *Effect of Stipulations on Third Parties.* The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or

WEIL:\95911414\1\22010.0003

formed in the Cases (including the Creditors' Committee, if any) and any other person or entity

acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11

trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all

purposes unless: (a) such committee or any other party in interest (subject in all respects to any

agreement or applicable law that may limit or affect such entity's right or ability to do so), in

each case, with requisite standing granted by the Court, has timely filed an adversary proceeding

or contested matter (subject to the limitations contained herein, including, *inter alia*, in this

paragraph 18) by no later than (i) (x) with respect to parties in interest other than the Creditors'

Committee, 75 calendar days after entry of this Interim Order and (y) with respect to the

Creditors' Committee, 60 calendar days after the appointment of the Creditors' Committee, if

any, (ii) any such later date as has been agreed to, in writing, by the Prepetition ABL Agent (with

the consent of the Required Lenders (as defined in the Prepetition ABL Credit Agreement)) and

the Prepetition Term Loan Agent (with the consent of the Required Lenders (as defined in the

Prepetition Term Loan Credit Agreement)), as applicable, and (iii) any such later date as has

been ordered by the Court for cause upon a motion filed and served within any applicable period

of time set forth in this paragraph (the time period established by the foregoing clauses (i), (ii),

and (iii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity,

perfection, enforceability, priority or extent of the Prepetition Secured Debt or the Prepetition

Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers

or conveyances, other avoidance power claims or any other claims, counterclaims or causes of

action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition

Secured Parties or their respective subsidiaries, officers, directors, managers, principals,

employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants,

representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Existing Agreements, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 4 of this Interim Order, shall be binding on all parties in interest, including, without limitation, the Creditors' Committee; (b) the obligations of the Loan Parties under the Existing Agreements, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination (except as provided in the ICA or with respect to valid, perfected and otherwise unavoidable prepetition liens to which such Prepetition Liens are subject and subordinate), avoidance or other defense; and (d) the Prepetition Secured Debt and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the Creditors' Committee, any non-statutory

56

committees appointed or formed in the Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by the Creditors' Committee, any non-statutory committees appointed or formed in the Cases, or any other party acting or seeking to act on behalf of the Debtors' estates , including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Existing Agreements shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 4 of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Cases, including the Creditors' Committee, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee or any non-statutory committees appointed or formed in the Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Existing Agreements, the Prepetition Secured Debt or the Prepetition Liens.

19.    *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding anything herein or in any other order by this Court to the contrary, no DIP Loans, Cash Collateral, Collateral, Prepetition Collateral, proceeds of any of the foregoing or the Carve-Out may be used: (a) for professional fees and expenses incurred for (i) any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise, including any investigation in connection with litigation or threatened litigation) against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or for the purpose of objecting to or challenging the amount, validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or (ii) asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations, the Prepetition Secured Debt, including, without limitation, any obligations arising from or related to the Applicable Premium (as defined in the Prepetition Term Loan Credit Agreement) (including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise), the DIP Liens or the Prepetition Liens or against any of the DIP Agent, the DIP Lenders, Prepetition Secured Parties or their respective Representatives; (b) to prevent, hinder or otherwise delay any of the DIP Agent's or the Prepetition Secured Parties' assertion, enforcement or realization on the Prepetition Collateral or the Collateral in accordance with the DIP Documents, the Existing Agreements or this Interim Order other than to seek a determination that an Event of Default has not occurred or is not continuing; (c) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties under this Interim Order or under the DIP Documents or the Existing Agreements, in each of the foregoing cases without such parties' prior written consent, which may be given or

58

withheld by such party in the exercise of its respective sole discretion, subject to any applicable terms of the ICA, if any; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court (including, without limitation, hereunder) and (ii) permitted under the DIP Documents; *provided* that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 (the "**Investigation Fund**") may be used for allowed fees and expenses incurred solely by the Creditors' Committee during the Challenge Period to investigate the claims and liens of the Prepetition Secured Parties; *provided, further*, that no portion of the Investigation Fund may be used for fees and expenses incurred to litigate, contest, initiate, assert, join, commence, support or prosecute any Challenges.

20.    *Loss or Damage to Collateral.*  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Loan Parties.

59

21.    *Reservation of Rights Under the ICA.*   Except as expressly provided in this Interim Order, nothing in this Interim Order shall amend modify or otherwise waive the terms or provisions of the ICA.

22.    *Interim Order Governs.*   In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents or any other order entered by this Court, the provisions of this Interim Order shall govern.   Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Interim DIP Budget.

23.    *Binding Effect; Successors and Assigns.*   The DIP Documents and the provisions of this Interim Order, including all findings herein (subject to paragraph 18 hereof, if applicable) shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in the Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; provided, however, that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

60

24.   *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not (i) be deemed to be in "control" of the operations of or participating in the management of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

25.   *Release of Term Loan Escrowed Funds*.  Upon entry of the Final Order consented to by the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders consent to release of all funds held in the Escrow Account (as defined in the Prepetition Term Loan Escrow Agreement) (the "**Term Loan Escrow Funds**") and transfer of such funds to the Term Loan Proceeds Collateral Account (as defined in the Prepetition Term Loan Credit Agreement), which Term Loan Escrow Funds that consist of proceeds of the loans made under the Prepetition Term Loan Credit Agreement on February 26, 2016 shall be treated as obligations of the Debtors under the Prepetition Term Loan Credit Agreement.  Pursuant to the ICA, the Term Loan Escrow Funds shall be excluded from the ABL Facility Priority Collateral and no Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent shall be granted with respect to the Term Loan Escrow Funds.

26.   *Master Proof of Claim*.  Neither the Prepetition ABL Agent nor the Prepetition Term Loan Agent shall be required to file proofs of claim in the Cases or any successor case in

61

order to assert claims on behalf of itself and the Prepetition Secured Parties for payment of the Prepetition Secured Debt arising under the Existing Agreements including, without limitation, any principal, unpaid interest, fees, expenses and other amounts. The statements of claim in respect of the Prepetition Secured Debt set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, the Prepetition ABL Agent and the Prepetition Term Loan Agent are each authorized, but not directed, to file in the Debtors' lead chapter 11 case *In re Basic Energy Services, Inc., et al.,* Case No. 16-[●] ([●]), a single, master proof of claim on behalf of itself and the Prepetition Term Loan Secured Parties and the Prepetition ABL Secured Parties, as applicable, on account of any and all of their respective claims arising under the Existing Agreements and hereunder (the "**Master Proof of Claim**") against each of the Debtors. Upon the filing of the Master Proof of Claim against each of the Debtors, (i) the Prepetition ABL Agent and the other Prepetition ABL Secured Parties and (ii) the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the Existing Agreements and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in the Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Cases. Neither the Prepetition ABL Agent nor the Prepetition Term Loan Agent shall be required to identify whether any Prepetition Secured Party acquired its claim from another party and the

identity of any such party or to amend the Master Proof of Claim to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 26 and the Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Cases.  Neither the Prepetition ABL Agent nor the Prepetition Term Loan Agent shall be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition ABL Agent and the Prepetition Term Loan Agent, as applicable.

27.    *Insurance*.  To the extent that the Prepetition Term Loan Agent is listed as loss payee under the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, subject to the Carve-Out, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and <u>second</u>, to the payment of the Prepetition Secured Debt.

28.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable <u>nunc pro tunc</u> to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and

WEIL:\95911414\1\22010.0003

enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

29.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

30.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order *provided*, that the foregoing shall not apply to the receipt of ABL Facility Priority Collateral or ABL Postpetition Collateral (or any proceeds thereof to the extent constituting ABL Facility Priority Collateral or ABL Postpetition Collateral) by any Prepetition ABL Secured Party on account of its security interest in ABL Facility Priority Collateral or ABL Postpetition Collateral.

31.     *Credit Bidding*.  (a) The DIP Agent shall, acting at the direction of the Required Lenders, have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the Collateral, (b) subject to the ICA, the Prepetition Term Loan Agent shall, acting at the direction of the requisite Prepetition Term Loan Secured Parties, have the right to credit bid up to the full amount of the Prepetition Term Loan

64

Secured Debt in any sale of the Collateral, in the case of the Prepetition Term Loan Secured Debt and (c) subject to the ICA, the Prepetition ABL Agent shall, acting at the direction of the requisite Prepetition ABL Secured Parties, have the right to credit bid the full amount of the Prepetition ABL Secured Debt in any sale of the ABL Facility Collateral or ABL Postpetition Collateral, in the case of Prepetition ABL Secured Debt as provided for in section 363(k) of the Bankruptcy Code, and in each case without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

32.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

33.     *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

34.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

35.     *Final Hearing*.  The Final Hearing is scheduled for _____, 2016 at _____ __.m. before this Court.

36.     *Objections*.  Responses or objections, if any, to the relief sought at the Final Hearing must be (i) in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the Bankruptcy Rules and the Local Bankruptcy Rules; (iv) filed with the Clerk of the United States Bankruptcy Court for the District of Delaware and (v) served on: (a) the

WEIL:\95911414\1\22010.0003

Debtors, 801 Cherry Street, Suite 2100, Fort Worth, TX 76102, Attn.: T. M. "Roe" Patterson and Alan Krenek; (b) proposed counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153-0119, Attn: Ray Schrock, P.C. and Ronit Berkovich; (c) proposed local counsel to the Debtors, Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi and Michael J. Merchant; (d) counsel to any statutory committee appointed in these cases; (e) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801; (f) counsel to the Prepetition Term Loan Lenders and certain of the DIP Lenders, (x) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner and Darren S. Klein, and (y) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware, Attn: Jeremy W. Ryan; (g) counsel to the Prepetition Term Loan Agent and the DIP Agent, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, Attn: Theodore Sica, and Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, New Jersey 07068, Attn.: Nicholas B. Vislocky; (h) counsel to the Prepetition ABL Agent, (x) Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3700, Dallas, TX 75201-2975, Attn: James A. Markus and Paul E. Heath and (y) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, DE 19801, Attn.: Robert J. Dehney and Eric D. Schwartz; (i) counsel to the Ad Hoc Group, (x) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004, Attn: Brad Eric Scheler and Peter Siroka and (y) Blank Rome LLP, 1201 N. Market Street Suite 800, Wilmington, DE 19801, Attn.: Michael D. DeBaecke and (j) any other party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than _____, 2016 at 4:00 p.m., prevailing Eastern Time.

37.    *Service*.  The Debtors shall serve copies of this Interim Order within 48 hours of its entry (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee after the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been appointed.

Dated:    October __, 2016
          Wilmington, Delaware

 

_____
THE HONORABLE [  ]
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95911414\1\22010.0003

**EXHIBIT D**

**Form of Joinder Agreement**

# FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of October 23, 2016 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among Basic (the "Company"), the subsidiaries of the Company party thereto, the holders of the principal amounts outstanding under the Term Loan Facility and the Notes (together with their respective successors and permitted assigns, the "Consenting Creditors" and each, a "Consenting Creditor") is executed and delivered by _____ (the "Joining Party") as of _____, 2016. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

       Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

       Representations and Warranties.  With respect to the aggregate principal amount under the Term Loan Facility or the aggregate principal amount of Notes, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 8 of the Agreement to each other Party to the Agreement.

       Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**


By:_____
Name:
Title:


Principal Amount of the Term Loan Facility:  $_____

Principal Amount of the 2019 Notes:  $_____

Principal Amount of the 2022 Notes:  $_____


Acknowledged:

**BASIC ENERGY SERVICES, INC.**

By:_____
Name:
Title:

1

# EXHIBIT E

**Backstop Agreement**

**Execution Version**

BACKSTOP AGREEMENT

AMONG

BASIC ENERGY SERVICES, INC.

AND

CERTAIN INVESTORS

_____

Dated as of October 25, 2016

# TABLE OF CONTENTS

**Page**

1.  The Rights Offering ..................................................................................................2
2.  Call Option ................................................................................................................3
3.  Put Option .................................................................................................................4
4.  The Backstop Commitments ......................................................................................4
5.  Investor Replacement Backstop ................................................................................5
6.  Representations and Warranties of the Company ......................................................7
7.  Representations and Warranties of the Investors ....................................................13
8.  Additional Covenants of the Company ....................................................................15
9.  Additional Covenants of the Investors ....................................................................17
10. Conditions to the Obligations of the Investors .......................................................17
11. Conditions to the Obligations of the Company .......................................................19
12. Survival of Representations and Warranties ...........................................................19
13. Termination .............................................................................................................19
14. Indemnification Obligations ...................................................................................22
15. Notices .....................................................................................................................25
16. Survival ...................................................................................................................26
17. Assignment; Third Party Beneficiaries ...................................................................26
18. Complete Agreement ...............................................................................................27
19. Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial
    by Jury ......................................................................................................................27
20. Counterparts ............................................................................................................27
21. Action by, or Consent or Approval of, the Investors ..............................................27
22. Amendments and Waivers .......................................................................................28
23. Specific Performance ..............................................................................................28
24. Other Interpretive Matters ......................................................................................28

# INDEX OF DEFINED TERMS

Agreement.................................................. 1
Backstop Commitments............................. 5
Backstop Put Premium.............................. 5
Backstop Put Premium Notes ................... 5
Bankruptcy Code ...................................... 1
Bankruptcy Court...................................... 1
Business Day .............................................. 2
Call Option Exercise Period...................... 3
Chapter 11 Cases....................................... 1
Chosen Courts.......................................... 27
Company .................................................... 1
Company Replacement Notice ................. 6
Confirmation Date .................................. 20
Confirmation Order.................................. 1
Debtors ...................................................... 1
Defaulting Investor ................................... 6
Disclosure Statement .............................. 15
Disclosure Statement Order .................... 15
Environmental Law.................................. 10
Exchange Act ............................................ 9
Exchange Act Documents......................... 9
Final Replacement Notice......................... 6
Hazardous Materials ............................... 10
HSR Act ................................................... 16
Indemnified Claim .................................. 23
Indemnified Person ................................. 22
Indenture ................................................... 7
Intellectual Property Rights .................... 11
Investor Default ......................................... 5
Investor Percentages ................................. 1
Investor Replacement................................ 6
Investor Replacement Funds..................... 6

Investor Replacement Notice..................... 6
Investor Termination.................................. 6
Investors.................................................... 1
Losses ...................................................... 22
Material Adverse Effect............................. 8
Outside Date............................................ 20
Participating Investor ................................ 6
Petition Date.............................................. 1
Plan ........................................................... 1
Plan Effective Date ................................... 1
Purchase Notice ........................................ 3
Purchase Price ........................................... 1
Put Option ................................................ 4
Put Option Exercise Period....................... 4
Replacement Right..................................... 6
Requisite Investors.................................... 1
Restructuring Support Agreement ............. 2
Right.......................................................... 1
Rights Expiration Time.............................. 2
Rights Offering ......................................... 1
Rights Offering Notes ............................... 1
Satisfaction Notice .................................... 3
SEC .......................................................... 8
Securities Act .......................................... 14
Subscription Agent.................................... 2
Subscription Form..................................... 2
Taxes ....................................................... 12
Terminating Investor................................. 6
Termination Fee ...................................... 22
Transaction Expenses................................ 5
Unsubscribed Notes .................................. 1

BACKSTOP AGREEMENT

BACKSTOP AGREEMENT (the "***Agreement***"), dated as of October 25, 2016, among Basic Energy Services, Inc., a Delaware corporation (the "***Company***"), and each of the undersigned parties identified on the signature pages hereto (collectively, the "***Investors***"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

WHEREAS, the Company and certain of its subsidiaries (collectively, the "***Debtors***") will file voluntary petitions for relief (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***") before the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") (the date of such filings being referred to herein as the "***Petition Date***");

WHEREAS, subject to the Bankruptcy Court's entry of an order confirming the Plan (the "***Confirmation Order***"), consummation of the Plan, and the other conditions specified in Section 10 and Section 11, the Company proposes to offer and sell convertible subordinated unsecured notes as part of a rights offering (the "***Rights Offering Notes***") with an aggregate exercise price of up to $125,000,000 (the "***Rights Offering***"), whereby Eligible Offerees (as defined in the Rights Offering Procedures) shall be offered a non-transferable right (each, a "***Right***") to purchase up to such Eligible Offeree's pro rata portion of the Rights Offering Notes at a purchase price equal to 100% of the principal amount of such Rights Offering Notes so acquired (the "***Purchase Price***");

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (A) each Investor, severally and not jointly, has agreed to (i) purchase, on the effective date of the Plan (the "***Plan Effective Date***"), and the Company agrees to sell to such Investor, at the Purchase Price, such Investor's percentage, as set forth on Exhibit A (the "***Investor Percentages***"), of the aggregate principal amount of Rights Offering Notes minus the aggregate principal amount of Rights Offering Notes purchased on or before the Expiration Time (as hereinafter defined) in the Rights Offering (such remaining Rights Offering Notes, in the aggregate, the "***Unsubscribed Notes***"), (ii) sell its Put Option to the Company, (iii) acquire its Call Option from the Company, and (iv) exercise its Call Option during the Call Option Exercise Period, and (B) the Company agrees to (i) grant a Call Option to each Investor, (ii) acquire a Put Option from each Investor, and (iii) in consideration for the Backstop Commitments, pay the Backstop Put Premium to the Investors on the Plan Effective Date; and

WHEREAS, the Company will conduct the Rights Offering pursuant to a pre-packaged plan of reorganization, to be filed in connection with the Debtors' Chapter 11 Cases, attached as Exhibit A to the Restructuring Support Agreement (the "***Plan***"). For purposes of this Agreement, "***Requisite Investors***" shall mean those Investors holding a majority of the Backstop Commitments (as hereinafter defined) held by all Investors; and

WHEREAS, certain creditors of the Company have entered into a Restructuring Support Agreement, dated as of the date hereof (the "***Restructuring Support Agreement***"), pursuant to which such parties have agreed to, among other things, vote in favor of the Plan.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Investors agree as follows:

1.    **The Rights Offering**.  The Rights Offering will be conducted in accordance with the Rights Offering Procedures attached hereto as Exhibit B and as follows:

(a)    Subject to the terms and conditions of this Agreement, the Company hereby undertakes to offer Rights Offering Notes for subscription by holders of Rights pursuant to the Plan as set forth in this Agreement.

(b)    In connection with the Plan, the Company shall issue Rights to purchase the Rights Offering Notes.  Each Eligible Offeree as of a record date to be determined by the Company will receive a Right to purchase, at the Purchase Price, up to its pro rata share (measured as the principal amount of Senior Notes Claims held by such Eligible Offeree as compared to the aggregate amount of Senior Notes Claims) against the Debtors.

(c)    Following the Petition Date, the Company will provide, or cause to be provided, to each Eligible Offeree a subscription form (the "***Subscription Form***"), whereby each Eligible Offeree may exercise its Right in whole or in part.  The Rights may be exercised during a period specified in the order approving the Rights Offering, which period will commence on the date the Subscription Forms are distributed and will end at the Rights Expiration Time.  For purposes of this Agreement, the "***Rights Expiration Time***" means 5:00 p.m. New York City time on such date that is specified in the order approving the Rights Offering, or, if by permitted by the order approving the Rights Offering, such other date as the Company, subject to the approval of the Requisite Investors, may specify in a notice provided to the Investors before 9:00 a.m. New York City time on the Business Day before the then-effective Rights Expiration Time.  For purposes of this Agreement, "***Business Day***" means any day of the year on which national banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.  The Plan shall provide that in order to exercise a Right, each Eligible Offeree shall, prior to the Rights Expiration Time, (x) return a duly executed Subscription Form to the subscription agent for the Rights Offering selected by the Company (the "***Subscription Agent***") and (y) pay an amount equal to the full Purchase Price of the Rights Offering Notes elected to be purchased by such Eligible Offeree by wire transfer of immediately available funds prior to the Rights Expiration Time to an account established by the Subscription Agent for the Rights Offering.

(d)    The Company will issue the Rights Offering Notes to the Eligible Offerees with respect to which Rights were validly exercised by such Eligible Offerees upon the Plan Effective Date.  The portion of Rights Offering Notes issued to an Eligible Offeree who elects to acquire such Rights Offering Notes shall be rounded down to the nearest dollar.

(e)    If the Subscription Agent for any reason does not receive from an Eligible Offeree both a timely and duly completed Subscription Form and timely payment for the

Rights Offering Notes being purchased by such Eligible Offeree, the Plan shall provide that, unless otherwise approved by the Company and the Requisite Investors, such Eligible Offeree shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

(f)     The Company hereby agrees and undertakes to give the Investors by email and facsimile transmission the certification by an authorized signatory of the Company conforming to the requirements specified herein for such certification of either (i) a true and accurate calculation of the amount of Unsubscribed Notes, and the aggregate Purchase Price therefor (a "***Purchase Notice***") or (ii) in the absence of any Unsubscribed Notes, the fact that there are no Unsubscribed Notes and that the Backstop Commitments are terminated (a "***Satisfaction Notice***") as soon as practicable after the Rights Expiration Time but in no event less than three (3) Business Days before the Plan Effective Date. The Company agrees to promptly provide any written backup, information and documentation relating to the information contained in the applicable Purchase Notice as any Investor may reasonably request.

2.    **Call Option**.

(a)     <u>Grant of Option</u>. The Company hereby grants to each Investor, and each Investor hereby accepts from the Company, an irrevocable call option (each, a "***Call Option***") to acquire, on the Plan Effective Date, its Investor Percentage of the Unsubscribed Notes, if any, as of the Rights Expiration Time at the Purchase Price.

(b)     <u>Call Option Exercise Period</u>. Each Call Option is exercisable during the time between (i) the date hereof and (ii) ten (10) Business Days prior to the Confirmation Hearing (the "***Call Option Exercise Period***").

(c)     <u>Exercise of Call Option</u>. Upon the exercise of its Call Option by an Investor, this Agreement shall become a contract for the sale of such Investor's Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price, and the Company shall sell, and such Investor shall purchase, on the Plan Effective Date, subject to the terms and conditions as set forth herein, its Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price.  Each Investor shall be deemed to have exercised its Call Option in full at the end of the Call Option Exercise Period, unless such Investor shall have given written notice to the Company on or prior to such date that it has elected not to exercise its Call Option.

(d)     <u>Call Option Termination</u>. Each Investor's Call Option shall terminate automatically, without any further action by either the Company or such Investor, if (i) the Call Option Exercise Period expires without such Call Option having been exercised or deemed exercised, (ii) in the event of an Investor Default or Investor Termination with respect to such Investor, no other Investor has assumed the Call Option in accordance with the terms of <u>Section 5</u>, or (iii) upon termination of this Agreement with respect to such Party in accordance with its terms.

3

3.    **Put Option**.

(a)    <u>Sale of Put Option</u>. The Company hereby agrees to purchase from each Investor, and each Investor hereby agrees to sell to the Company, an irrevocable put option (the "***Put Option***") requiring such Investor to purchase from the Company, on the Plan Effective Date its Investor Percentage of the Unsubscribed Notes, if any, as of the Rights Expiration Time at the Purchase Price.

(b)    <u>Put Option Exercise Period</u>. Each Put Option is exercisable during the time between the Rights Expiration Time and five (5) Business Days thereafter (the "***Put Option Exercise Period***").

(c)    <u>Exercise of Put Option</u>. Upon the exercise of a Put Option by the Company with respect to an Investor, this Agreement shall become a contract for the purchase by such Investor of such Investor's Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price, and such Investor shall purchase, and the Company shall sell, on the Plan Effective Date, subject to the terms and conditions as set forth herein, such Investor's Investor Percentage of the Unsubscribed Notes, if any, at the Purchase Price.  The Company shall be deemed to have exercised each Put Option in full at the end of the Put Option Exercise Period unless the Company shall have given written notice to such Investor on or prior to such date that it has elected not to exercise a Put Option.  Any such election by the Company not to exercise a Put Option shall not be effective and shall be void *ab initio* unless consented to in writing by the Requisite Investors.

(d)    <u>Put Option Termination</u>. Each Investor's obligations with respect to its Put Option shall terminate automatically, without any further action by the Company or any Investor, if (i) the Company has given written notice, with the prior written consent of the Requisite Investors, to the Investors that it has elected not to exercise its Put Options pursuant to <u>Section 3(a)</u> hereof, or (ii) upon valid termination of this Agreement by all Parties hereto pursuant to its terms, or (iii) this Agreement has been terminated by an Investor in accordance with its terms, in which case only the obligations of such Terminating Investor shall automatically terminate.

4.    **The Backstop Commitments**.

(a)    On the basis of the representations and warranties contained herein, but subject to the conditions set forth in <u>Section 10</u>, each of the Investors, severally and not jointly, agrees to:

(i)    subscribe for and purchase, on the Plan Effective Date, at the aggregate Purchase Price therefor, its Investor Percentage of the Unsubscribed Notes as of the Rights Expiration Time;

(ii)    duly exercise its Call Option during the Call Option Exercise Period; and

(iii)     purchase, on the Plan Effective Date, the Unsubscribed Notes, if any, it is required to purchase pursuant to a duly exercised Call Option or Put Option pursuant to the terms hereof (together, the "***Backstop Commitments***").

(b)     On the basis of the representations and warranties herein contained, but subject to the entry of the Confirmation Order, as consideration for the Put Options, the Backstop Commitments and the other undertakings of the Investors herein, the Company will pay to the Investors, in the aggregate, on the Plan Effective Date, a nonrefundable aggregate premium in an amount equal to five (5)% of the aggregate offering amount of the Rights Offering (the "***Backstop Put Premium***"), in the form of $6,250,000 aggregate principal amount of Rights Offering Notes (the "***Backstop Put Premium Notes***"), which shall be allocated among the Investors based on the Investor Percentages (as set forth on Exhibit A) of the Unsubscribed Notes that each Investor has agreed to backstop.  The Backstop Put Premium shall be delivered by the Company on the Plan Effective Date whether or not the Put Options are exercised.

(c)     Subject to the entry of the Confirmation Order, which order shall approve this Section 4(c), upon consummation of the Plan, the Company will reimburse or pay, as the case may be, the out-of-pocket expenses reasonably incurred by the Investors whether prior to or after the date hereof (collectively, "***Transaction Expenses***"), including all reasonable fees with respect to the negotiation, documentation and execution of the transactions and agreements contemplated herein, and including, but not limited to all reasonable fees, expenses and costs relating to the Company's Chapter 11 Cases and including all reasonable fees  and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP and Blank Rome LLP, counsel to the Investors (but no other counsel), in connection with the transactions and agreements contemplated hereby.

(d)     On the Plan Effective Date, the Investors will purchase, and the Company will sell, only such amount of Unsubscribed Notes as is listed in the Purchase Notice, without prejudice to the rights of the Company or the Investors to seek later an upward or downward adjustment if the amount of Unsubscribed Notes in such Purchase Notice is inaccurate.

(e)     Delivery of the Unsubscribed Notes will be made by the Company to the respective Investors on the Plan Effective Date against payment of the aggregate Purchase Price for the Unsubscribed Notes by wire transfer of immediately available funds to the account specified by the Company to the Investors at least twenty four (24) hours in advance.

5.     **Investor Replacement Backstop**.

(a) Replacement Right. If any Investor (x) defaults on any of its Backstop Commitment obligations under this Agreement (such default, an "***Investor Default***", and such Investor a "***Defaulting Investor***"), or (y) validly terminates this Agreement, (such termination, an "***Investor Termination***" and such Investor, a "***Terminating Investor***"), the Company shall, within one (1) Business Day thereof, provide written notice (a "***Company Replacement Notice***") to each Non-Defaulting or Non-Terminating Investor (as applicable) of such Investor Default or

Investor Termination (as applicable).  Each Non-Defaulting or Non-Terminating Investor (as applicable) shall then have the right (the "***Replacement Right***"), but not the obligation, to, within five (5) Business Days of receipt of a Company Replacement Notice to provide written notice (a "***Investor Replacement Notice***") to the Company and the other Investors that such Investor wishes to assume and exercise up to 100% of the Defaulting Investors or the Terminating Investors (as applicable) Backstop Commitment (an "***Investor Replacement***", and such Investor, a "***Participating Investor***"), to be allocated to each Participating Investor based on its Investor Percentage in the event of oversubscription (adjusted, as applicable, for the removal of any Terminating Investor, any Defaulting Investor and any Investor not wishing to exercise its Replacement Right) on the terms and subject to the conditions set forth in this Agreement.

(b) In the event the Participating Investors, in the aggregate, elect to assume and exercise more than 100% of the Defaulting Investors or the Terminating Investors (as applicable) rights and obligations under this Agreement, the allocation of such rights and obligations to each Participating Investor shall be adjusted down proportionate to their respective Investor Percentage, so that the aggregate allocation to the Participating Investors equals 100% of the Defaulting Investors or Terminating Investors (as applicable) rights and obligations under this Agreement.  Within two (2) Business Days following of the deadline for submission of Investor Replacement Notices to the Company, the Company shall provide written notice (a "***Final Replacement Notice***") to each Participating Investor, if any, informing it of the total number of Unsubscribed Notes and the aggregate purchase price thereof (the "***Investor Replacement Funds***") that the Participating Investor is obligated to purchase pursuant to the Investor Replacement.  Each Participating Investor must deliver the Investor Replacement Funds by wire transfer of immediately available funds to the account specified by the Company to the Investors within two (2) Business Days following receipt of the Final Replacement Notice.

(c) For the avoidance of doubt, the assumption by any Participating Investor of any Defaulting Investors obligations under this Agreement shall not relieve such Defaulting Investor of its liability for breach of this Agreement.

WEIL:\95825283\20\22010.0003

6.      **Representations and Warranties of the Company**.  The Company represents and warrants to, and agrees with, the Investors as set forth below, except as set forth in the Schedules.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof.

(a)      Organization and Qualification.  The Company is duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  The Company is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing in each non-Delaware jurisdiction would not be reasonably likely to result in a Material Adverse Effect (as defined in Section 6(e) hereof).

(b)      Power and Authority.

(i)      The Company has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations hereunder, including the issuance of the Rights and the Rights Offering Notes.  The Company has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and the Rights Offering Notes.

(ii)      The Company has the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations thereunder, and will have taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of the Plan.

(c)      Execution and Delivery; Enforceability.

(i)      This Agreement has been and, upon the execution and delivery of the indenture for the Rights Offering Notes (the "***Indenture***"), the Indenture and the Rights Offering Notes will be, duly and validly executed and delivered by the Company, and, subject to entry of the Confirmation Order and consummation of the Plan, constitutes or will constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

(ii)      The Plan will be duly and validly filed with the Bankruptcy Court by the Company in accordance with Section 8(a) and, upon entry of the Confirmation Order and consummation of the Plan, will constitute the valid and binding obligation of the Company, enforceable against it in accordance with its terms.

(d)      Authorized Capital.  Upon the Plan Effective Date, the authorized capital of the Company will conform to the authorized capital set forth in the Plan and Disclosure Statement and the issued and outstanding Rights Offering Notes of the Company will conform to the description set forth in the Plan and Disclosure Statement.

7

(e)    Issuance.  The distribution of the Rights and, subject to entry of the Confirmation Order and consummation of the Plan, the issuance of the Rights Offering Notes, including the Unsubscribed Notes to be issued and sold by the Company to the Investors hereunder, will have been duly and validly authorized and, when the Rights Offering Notes are issued and delivered against payment therefor in the Rights Offering or to the Investors hereunder, will be duly and validly issued and outstanding, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights. Upon the conversion of the Rights Offering Notes to shares of common stock in accordance with the terms of the Indenture and the Rights Offering Notes, such shares, when issued, shall be duly authorized, validly issued, fully-paid and non-assessable.

(f)    No Conflict.  The distribution of the Rights, and, subject to entry of the Confirmation Order and consummation of the Plan, the sale, issuance and delivery of the Rights Offering Notes upon exercise of the Rights, the consummation of the Rights Offering by the Company, the sale, issuance and delivery of the Unsubscribed Notes pursuant to the terms hereof, and the execution and delivery (or, with respect to the Plan, the filing with the Bankruptcy Court) by the Company of this Agreement and the Plan and compliance by it with all of the provisions hereof and thereof and the consummation of the transactions contemplated hereby and thereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of the Company; and (iii) assuming the accuracy of the Investors' representations and warranties in Section 7, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of their properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  For purposes of this Agreement, "*Material Adverse Effect*" means a material adverse effect on (i) the business, assets, properties, results of operations or financial condition of the Company or (ii) the ability of the Debtors, subject to the approvals and other authorizations set forth in Section 6(g), to consummate the transactions contemplated by this Agreement or the Plan, other than, with respect to clauses (i) and (ii), the effect: (A) of any change in the United States or foreign economies or securities or financial markets in general; (B) of any change that generally affects any industry in which Debtors operate; (C) of any change arising in connection with any natural disaster; (D) of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; (E) of any matter disclosed in any filings by the Company with the Securities and Exchange Commission (the "*SEC*"); (F) of any changes in applicable laws or accounting rules; (G) resulting from the filing of the Chapter 11 Cases, any reasonably anticipated effects thereof or from any action approved by the Bankruptcy Court; (H) resulting from the public announcement of

8

this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; or (I) resulting from any act or omission of any of the Company taken with the prior written consent of the Requisite Investors.

(g)     Consents and Approvals.  Assuming the accuracy of the Investors' representations and warranties in Section 7, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of the Rights Offering Notes upon exercise of the Rights, the issuance, sale and delivery of Unsubscribed Notes to the Investors hereunder, the consummation of the Rights Offering by the Company and the execution and delivery by the Company of this Agreement or the Plan and performance of and compliance by them with all of the provisions hereof and thereof (including payment of the Backstop Put Premium and Transaction Expenses of the Investors as required hereby) and the consummation of the transactions contemplated hereby and thereby, except (i) the entry of the Confirmation Order and (ii) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h)     Financial Statements.  The financial statements and the related notes thereto of the Company and its consolidated subsidiaries included or incorporated by reference in the documents filed by the Company with the SEC under the Securities Exchange Act of 1934 and the rules and regulations of the SEC thereunder (the "***Exchange Act***") since January 1, 2016 and prior to the date of this Agreement (the "***Exchange Act Documents***") present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods specified.  Such financial statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Exchange Act Documents).

(i)     Exchange Act Documents.  The Exchange Act Documents, when they became effective or were filed with the SEC, as the case may be, conformed in all material respects to the requirements of the Exchange Act, and none of such Exchange Act Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed and incorporated by reference when such documents are filed with the SEC, will conform in all material respects to the requirements of the Exchange Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(j)     No Violation.  The Company is not, except as a result of the Chapter 11 Cases or as disclosed prior to the date of this Agreement in the Exchange Act Documents, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such default or violation

that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(k)    <u>Legal Proceedings</u>.  Except as disclosed prior to the date of this Agreement in the Exchange Act Documents, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending or, to the knowledge of the Company, threatened, in each case, to which the Company is or may be a party or to which any property of the Company is or may be the subject that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect.

(l)    <u>No Broker's Fees</u>.  Except for Moelis & Company, the Company is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against it or the Investors for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Rights or the Rights Offering Notes.

(m)    <u>Absence of Certain Changes</u>. Since January 1, 2016, no change, event, circumstance effect, development, occurrence or state of facts has occurred or exists that have had or are reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(n)    <u>Environmental</u>.   Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, claim, demand, request for information, order, complaint or penalty has been received by the Company, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company, (ii) the Company is in compliance with Environmental Law and has obtained, maintains in full force and effect, and is in compliance with all permits, licenses and other approvals currently required under any Environmental Law for conduct of its business as presently conducted by the Company, and (iii) no Hazardous Materials have been released by the Company at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company under any Environmental Laws. For purposes of this Agreement, "***Environmental Law***" means all applicable foreign, federal, state and local conventions, treaties, protocols, laws, statutes, rules, regulations, ordinances, orders and decrees relating in any manner to contamination, pollution or protection of the environment or exposure to hazardous or toxic substances, materials or wastes, and "***Hazardous Materials***" means all materials, substances, chemicals, or wastes (or combination thereof) that is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Environmental Law.

(o)    <u>Insurance</u>.  The Company has insured its respective properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses. All premiums due and payable in respect of material insurance policies maintained by the Company have been paid. As of the date hereof, to the knowledge of the Company, the Company has not received notice from any insurer or agent of such

insurer with respect to any material insurance policies of the Company of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

(p)    Intellectual Property. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, licenses, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**_Intellectual Property Rights_**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other person, (ii) to the knowledge of the Company, neither the Company nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by the Company, is infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any person, and (iii) no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Company, threatened.

(q)    No Undisclosed Relationship. No relationship, direct or indirect, exists between or among the Company, on the one hand, and the directors, officers and 10% stockholders of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that are not so described in such filings, except for the transactions contemplated by this Agreement.

(r)    Money Laundering Laws. The operations of the Company are and have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company operates (and the rules and regulations promulgated thereunder) and any related or similar laws and no material legal proceeding by or before any governmental entity or any arbitrator involving the Company with respect to such laws is pending or, to the knowledge of the Company, threatened.

(s)    Sanctions Laws. Neither the Company nor, to the knowledge of the Company, any of its respective directors, officers, employees or other persons acting on its behalf with express authority to so act are currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, for the purpose of financing the activities of any person that, to the knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

(t)    Foreign Corrupt Practices Act. The Company has no knowledge of any actual or alleged material violations of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable anti-corruption or anti-bribery laws in any jurisdiction other than the United States, by the Company or any of its respective officers, directors, agents, distributors, employees or any other person acting on behalf of the Company.

(u)      <u>Taxes</u>.

(i)      The Company and each of its subsidiaries have paid, or will pay in full pursuant to the Plan, all material income, gross receipts, license, payroll, employment, excise, severance, occupation, premium, windfalls profits, customs duties, capital stock, franchise, profits, withholding, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other taxes levied by a governmental authority, including interest and penalties thereon ("***Taxes***") imposed on it or its assets, business or properties, or, to the extent not yet due, such Taxes have been accrued and fully provided for in accordance with generally accepted accounting principles. The Company and each of its subsidiaries has timely filed all returns, information statements or reports required to be filed with any governmental authority with respect to Taxes.

(ii)      There are no material Liens for Taxes on any asset of the Company or its subsidiaries other than liens for Taxes not yet delinquent or for Taxes contested in good faith by appropriate proceedings.

(iii)      The Company and its subsidiaries have no liability for any material amount of Taxes of any other person or entity, either by operation of law, by contract or as a transferee or successor. The Company and its subsidiaries are not a party to any material Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into in the ordinary course of business consistent with past practice (such as a lease or a license) the principal purpose of which is not the sharing, assumption or indemnification of Tax).

(iv)      As of the date hereof, there is no outstanding audit, assessment, dispute or claim concerning any material Tax liability of the Company and its subsidiaries (taken as a whole), and the Company and its subsidiaries have not received from any governmental authority any written notice regarding any contemplated or pending audit, examination or other administrative proceeding or court proceeding concerning any material amount of Taxes imposed thereon.

(v)      All material Taxes that the Company and its subsidiaries (taken as a whole) were (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(vi)      None of the Company and any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under any law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its current or past Subsidiaries are or were the only members).

(vii)      None of the Company and any of its subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the

last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "Code"), is applicable.

(viii)   None of the Company and any of its subsidiaries has been requested in writing, and, to the knowledge of the Company, there are no claims against the Company or any of its subsidiaries, to pay any liability for Taxes of any person (other than the Company or its subsidiaries) that are material to the Company and its subsidiaries taken as a whole, arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor.

(ix)   The Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five (5) year period ending on the date hereof.

(v)   <u>Title to Property</u>.

(i)   <u>Personal Property</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) the Company has good title to, free and clear of any and all Liens, or a valid leasehold interest in, all personal properties, machinery, equipment and other tangible assets of the business necessary for the conduct of the business as presently conducted by the Company and (B) such properties, (x) are in the possession or control of the Company; and (y) are in good and operable condition and repair, reasonable wear and tear excepted.

(ii)   <u>Leased Real Property</u>. The Company has complied with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Company enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

7.   **Representations and Warranties of the Investors**.  Each of the Investors severally represents and warrants to, and agrees with, the Company as set forth below.  Each representation, warranty and agreement is made as of the date hereof.

(a)   <u>Formation</u>.  Such Investor has been duly organized or formed, as applicable, and is validly existing as a corporation or other entity in good standing under the applicable laws of its jurisdiction of organization or formation.

(b)   <u>Power and Authority</u>.  Such Investor has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)     <u>Execution and Delivery</u>.  This Agreement has been duly and validly executed and delivered by such Investor and constitutes its valid and binding obligation, enforceable against such Investor in accordance with its terms.

(d)     <u>Securities Laws Compliance</u>.  The Unsubscribed Notes and Backstop Put Premium Notes will not be offered for sale, sold or otherwise transferred by such Investor except pursuant to an effective registration statement under the Securities Act of 1933 and the rules and regulations of the SEC thereunder (the "***Securities Act***") or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)     <u>Purchase Intent</u>.  Such Investor is acquiring Unsubscribed Notes and Backstop Put Premium Notes for its own account or for the accounts for which it is acting as investment advisors or manager, and not with a view to distributing or reselling such Unsubscribed Notes or Backstop Put Premium Notes or any part thereof or the shares of common stock issuable upon the conversion thereof.  Such Investor understands that such Investor must bear the economic risk of this investment indefinitely, unless the Unsubscribed Notes and Backstop Put Premium Notes are registered pursuant to the Securities Act and any applicable state securities or Blue Sky laws or an exemption from such registration is available, and further understands that the Company has no present intention of registering the resale of any Unsubscribed Notes or Backstop Put Premium Notes.

(f)     <u>Investor Status</u>.  Such Investor is an "accredited investor" as defined in Rule 501(a) under the Securities Act.

(g)     <u>Reliance on Exemptions</u>.  Such Investor understands that the Unsubscribed Notes and Backstop Put Premium Notes are being offered and sold to such Investor in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Investor's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Investor set forth herein in order to determine the availability of such exemptions and the eligibility of such Investor to acquire Unsubscribed Notes and Backstop Put Premium Notes.

(h)     <u>Sophistication</u>.  Such Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Rights Offering Notes and Backstop Put Premium Notes.  Such Investor understands and is able to bear any economic risks associated with such investment (including the necessity of holding the Rights Offering Notes and Backstop Put Premium Notes for an indefinite period of time) and is able to afford a loss of its investment in the Rights Offering Notes.

(i)     <u>Access to Information</u>.  Such Investor acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

<div align="center">14</div>

(j)     Legend.  Such Investor understands that the Unsubscribed Notes and the Backstop Put Premium Notes acquired by it under this Agreement (to the extent certificated) shall bear a customary Securities Act legend.

8.     **Additional Covenants of the Company**.  The Company agrees with the Investors as follows:

(a)     Plan and Disclosure Statement.  The Company shall: (i) file as soon as practicable after the Petition Date, the Plan and a related disclosure statement (the "***Disclosure Statement***") with the Bankruptcy Court, each in form and substance acceptable to the Requisite Investors, and that is consistent in all material respects with the Plan or as otherwise approved by the Requisite Investors, it being understood that the form of Plan and the form of the Disclosure Statement attached as Exhibit A and Exhibit F, respectively, to the Restructuring Support Agreement are acceptable to the Requisite Investors; (ii) seek the entry of an order by the Bankruptcy Court, in form and substance reasonably acceptable to the Requisite Investors, approving the Disclosure Statement (the "***Disclosure Statement Order***") as soon as practicable after the Petition Date; and (iii) seek the entry of a Confirmation Order by the Bankruptcy Court, in form and substance acceptable to the Requisite Investors, as soon as practicable.  The Company will, not later than four (4) days prior to the filing thereof, provide to the Investors and their counsel a draft copy of the Plan and the Disclosure Statement and any other filing with the Bankruptcy Court to be made pursuant to this Agreement and shall afford the Investors and their counsel a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court.  In addition, the Company will provide to the Investors and their counsel a draft copy of the Disclosure Statement Order and Confirmation Order and a reasonable opportunity to review and comment on such orders prior to such orders being filed with the Bankruptcy Court.

(b)     Rights Offering.  The Company shall effectuate the Rights Offering in accordance with the Plan.

(c)     Unsubscribed Notes.  The Company, in consultation with counsel for the Investors, shall determine the amount of Unsubscribed Notes, if any, and, in good faith, provide a Purchase Notice or a Satisfaction Notice that accurately reflects the amount of Unsubscribed Notes as so determined and to provide to the Investors a certification by the Subscription Agent of the Unsubscribed Notes or, if such certification is not available, such written backup to the determination of the Unsubscribed Notes as the Investors may reasonably request.

(d)     Approvals. Except as set forth in this Agreement or with the prior written consent of the Requisite Investors, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Company shall use reasonable best efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Investors as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary or advisable in connection with seeking any governmental approval, exemption or

15

authorization from any governmental authority, including under any Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement. The Company shall reasonably promptly notify the Investors (and furnish to them copies of, if requested) any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Investors in advance to the extent permitted by applicable law and gives the Investors a reasonable opportunity to attend and participate thereat. The Company shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by this Agreement. For purposes of this Agreement, "Antitrust Laws" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "*HSR Act*") and any similar law enforced by any governmental antitrust entity of any jurisdiction regarding pre-acquisition notifications for the purpose of competition reviews of mergers and acquisitions, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and all other applicable laws that are designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition or effectuating foreign investment.

(e)     Conduct of Business.  The Company shall carry on its business in the ordinary course and use its commercially reasonable efforts to (i) preserve intact its business, (ii) keep available the services of its officers and employees and (iii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company in connection with its business. The Company shall not enter into (A) any transaction that is material to its business other than transactions in the ordinary course of business and (B) other transactions after prior notice to the Investors to implement tax planning which transactions are not reasonably expected to materially adversely affect any Investor.

(f)     Access to Information.   The Company shall (i) afford the Investors and their respective representatives upon request and reasonable notice, from the period commencing on the date hereof and through the Plan Effective Date, reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's business or operations, to the Company's employees, properties, books, contracts and records and (ii) during such period, furnish promptly to such parties all reasonable information concerning the Company's business, properties and personnel as may reasonably be requested by any such party, provided that the foregoing shall not require the Company (x) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the shall have used its reasonable best efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (y) to disclose any legally privileged information of the Company or (z) to violate any applicable laws or orders.

(g)     Further Assurances.  Without in any way limiting any other obligation of the Company in this Agreement, the Company shall use commercially reasonable efforts

WEIL:\95825283\20\22010.0003

to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, and as any Investor may reasonably request, in order to consummate and make effective the transactions contemplated by this Agreement. The Company furthermore agrees that it shall perform any and all of its covenants, agreements and obligations under this Agreement and not take any actions that would be inconsistent with such obligations

(h)    Tax Treatment of Call Options and Put Options. The Company agrees to treat its Put Options and its corresponding Call Options as forward contracts for U.S. federal income tax purposes, and to treat the Backstop Put Premium as an adjustment to the number of Rights Offering Notes acquired pursuant to the transactions contemplated by this Agreement.

9.    **Additional Covenants of the Investors**. Each of the Investors agrees, severally and not jointly, with the Company:

(a)    Approvals. Except as set forth in this Agreement or with the prior written consent of the Company, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Requisite Investors shall use reasonable best efforts to promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary or advisable in connection with seeking any governmental approval, exemption or authorization from any governmental authority, including under any Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement.

(b)    Tax Treatment of Call Options and Put Options.  Each Investor agrees to treat its Call Option and its corresponding Put Option as a single forward contract for U.S. federal income tax purposes, and to treat the Backstop Put Premium as an adjustment to the number of Rights Offering Notes acquired pursuant to the transactions contemplated by this Agreement.

10.    **Conditions to the Obligations of the Investors**.  The obligations of the Investors to purchase Unsubscribed Notes pursuant to their respective Backstop Commitments (including obligations to fund amounts due in respect of the Call Options or the Put Options) on the Plan Effective Date are subject to the satisfaction of the following conditions (unless waived by the Requisite Investors):

(a)    Plan and Confirmation Order.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court and which shall have become a Final Order, shall each be in the form and substance approved by the Requisite Investors, with only such amendments, modifications or changes that are satisfactory to the Requisite Investors.

(b)  Conditions to Plan Effective Date.  The conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived by the Requisite Investors) in accordance with the Plan and the Plan Effective Date shall have occurred.

(c)  Rights Offering.  The Company shall have commenced the Rights Offering, the Rights Offering shall have been conducted in all material respects in accordance with this Agreement, and the Rights Expiration Time shall have occurred.

(d)  Purchase Notice or Satisfaction Notice.  The Investors shall have received a Purchase Notice or Satisfaction Notice from the Company, as applicable, in accordance with Section 1(f).

(e)  Valid Issuance.  The Rights Offering Notes shall be, upon (i) payment of the aggregate Purchase Price as provided herein and (ii) the Plan Effective Date, validly issued and outstanding, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights.

(f)  No Restraint.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated hereby.

(g)  Representations and Warranties.  The representations and warranties of the Company set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true and correct at and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct that, individually and in the aggregate, would not be reasonably likely to result in a Material Adverse Effect.

(h)  Covenants.  The Company shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Plan Effective Date.

(i)  Option Exercise.  Either a Call Option or a Put Option shall have been exercised with respect to the Unsubscribed Notes, if any.

(j)  Backstop Put Premium, etc.  All premiums and other amounts, including the Backstop Put Premium, required to be paid or reimbursed by the Company to the Investors as of the Plan Effective Date shall have been so paid or reimbursed.

(k)  Material Adverse Effect.  Since January 1, 2016, there shall not have occurred, and there shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect.

(l)  Officer's Certificate.  The Investors shall have received on and as of the Plan Effective Date a certificate of the chief executive officer or chief financial officer of

18

the Company, in their capacity as such and not in their individual capacity, confirming that the conditions set forth in Sections 10(g) and 10(h) have been satisfied.

11. **Conditions to the Obligations of the Company**.  The obligations of the Company to sell Unsubscribed Notes pursuant to this Agreement on the Plan Effective Date are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with this Agreement:

> (a)    Confirmation Order.  The Confirmation Order, in form and substance acceptable to each of the Company and the Requisite Investors, shall have been entered by the Bankruptcy Court, and such order shall have become final.

> (b)    Conditions to Confirmation.  The conditions to confirmation and the conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived by the Company) in accordance with the Plan and the Plan Effective Date shall have occurred.

> (c)    No Restraint.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated hereby.

> (d)    Representations and Warranties.  The representations and warranties of the Investors set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date).

> (e)    Covenants.  The Investors shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Investors on or prior to the Plan Effective Date.

12. **Survival of Representations and Warranties**.  The representations and warranties made in this Agreement will not survive the Plan Effective Date.  Covenants and agreements that by their terms are to be satisfied after the Plan Effective Date shall survive until satisfied in accordance with their terms.

13. **Termination**.

> (a)    Mutual Termination. The Company and the Requisite Investors may terminate this Agreement by mutual written consent.

> (b)    Investor Termination. At 11:59 p.m. prevailing Eastern Time on the date that is 365 days after the effective date of the Restructuring Support Agreement, each Investor may terminate this Agreement, solely as to such terminating Investor, by written notice to the Company.

(c)    <u>Termination by the Requisite Investors</u>.  The Requisite Investors may terminate this Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following:

(i)    upon the breach in any material respect by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from any of the Requisite Investors pursuant to this <u>Section 13</u> and in accordance with <u>Section 12</u> (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(ii)    at 11:59 p.m. prevailing Eastern Time on October 25,  2016, unless the Debtors  have filed with the Bankruptcy Court a motion seeking approval of this Agreement and the procedures related to the Rights Offering;

(iii)    at 11:59 p.m. prevailing Eastern Time on November 2, 2016, if the order approving this Agreement and procedures with respect to the Rights Offering shall not have been entered by the Bankruptcy Court;

(iv)    at 11:59 p.m. prevailing Eastern Time on January 8, 2017(the "***Confirmation Date***"), if the Bankruptcy Court shall not have entered an order in form and substance satisfactory to the Company and the Requisite Investors confirming the Plan and approving the Disclosure Statement;

(v)    at 11:59 p.m. prevailing Eastern Time on January 23, 2017 (the "***Outside Date***"), if the Plan Effective Date shall not have occurred;

(vi)    at 11:59 p.m. prevailing Eastern Time on the date that is eight (8) Business Days after issuance of Company Replacement Notice, if Investor Terminations or Investor Defaults (as applicable) representing more than 33% of the Backstop Commitments in the aggregate, have not been assumed by Participating Investors pursuant to <u>Section 5</u>;

(vii)    at 11:59 p.m. prevailing Eastern Time on the date that is eight (8) Business Days after issuance of Company Replacement Notice, if the other Investors have failed to assume 100% of the rights and obligations of the Defaulting Investors or the Terminating Investors, as applicable, pursuant to <u>Section 5</u>, <u>unless</u> the Company provides evidence reasonably satisfactory to the Non Defaulting Investors that such Investor Defaults or Investor Terminations, as applicable, would not otherwise prevent consummation of the Plan in accordance with the milestones set forth in the Restructuring Support Agreement;

(viii)   if an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases or if the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or have been dismissed by order of the Bankruptcy Court;

(ix)    if the Debtors file, propound or otherwise support any plan of reorganization other than the Plan;

20

(x)      on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement, underlined provided that the Requisite Investors shall not have the right to terminate this Agreement pursuant to this clause (x) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement which (i) are not inconsistent with the Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (ii) do not create any new material obligation on any Party, and (iii) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Requisite Investor under the Plan shall be deemed to adversely affect such Investors);

(xi)      upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within twenty (20) business days after such issuance;

(xii)      upon the failure of any of the conditions set forth in Section 10 to be satisfied when required to be satisfied; or

(xiii)      upon the termination of the Restructuring Support Agreement.

(d)      Termination by the Company.  The Company may terminate this Agreement by written notice to the Investors upon the occurrence of any of the following:

(i)      upon the breach in any material respect by one or more of the Investors of any of the undertakings, representations, warranties or covenants of the Investors set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Company pursuant to this Section 13 and in accordance with Section 14 (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(ii)      upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within twenty (20) business days after such issuance;

(iii)      at 11:59 p.m. prevailing Eastern Time on the Confirmation Date, if the Bankruptcy Court shall not have entered an order in form and substance satisfactory to the Company and the Requisite Investors confirming the Plan and approving the Disclosure Statement;

(iv)      at 11:59 p.m. prevailing Eastern Time on the Outside Date, if the Plan Effective Date shall not have occurred;

21

(v)     upon the failure of any of the conditions set forth in <u>Section 10</u> to be satisfied when required to be satisfied;

(vi)    upon the termination of the Restructuring Support Agreement; or

(vii)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement, provided that the Requisite Investors shall not have the right to terminate this Agreement pursuant to this <u>Section 13(d)(vii)</u> if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement which (i) are not inconsistent with the Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (ii) do not create any new material obligation on any Party, and (iii) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Requisite Investor under the Plan shall be deemed to adversely affect such Investors).

(e)     <u>Effect of Termination</u>.  Subject to <u>Section 16</u>, upon termination of this Agreement, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the transactions contemplated hereby or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Notwithstanding anything contained herein, if this Agreement is terminated as a result of a breach of this Agreement by a party hereto, such party shall not be released and shall remain liable for any damages resulting from such termination.

(f)     <u>Termination Fee</u>.  To the extent this Agreement is terminated in accordance with (x) <u>Sections 13(c)(xi)</u> or <u>13(d)(ii)</u> or (y) <u>13(c)(xiii)</u> or <u>13(d)(vi)</u> hereof (but solely if the Restructuring Support Agreement was terminated pursuant to sections 6(b)(xix) (but solely upon entry of an order denying confirmation of the Basic Plan), 6(b)(xxv), 6(c)(ii), 6(c)(iii) or (6)(c)(vii) (but solely upon entry of an order denying confirmation of the Basic Plan) thereof), the Company shall pay or cause to be paid to the Investors that are not Defaulting Investors (pro rata in accordance with their Investor Percentages) a non-refundable cash fee in an aggregate amount equal to $6,250,000 (the "***Termination Fee***"). The claim of the Investors that are not Defaulting Investors for the Termination Fee shall be subordinated in right of payment to the Allowed Claims of the ABL Facility Lenders, the DIP Facility Lenders and the Term Loan Lenders and shall not be paid by the Company unless the ABL Facility Claims, the DIP Facility Claims and the Term Loan Claims have been paid in full in cash or have otherwise been satisfied in full.

14.   **Indemnification Obligations.**

(a)     Following the entry of the Backstop Order, the Company shall indemnify and hold harmless each Investor and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling

persons (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Investors except to the extent otherwise provided for in this Agreement) (collectively, "***Losses***") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Commitments, the Rights Offering, the payment of the Backstop Put Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, its equity holders, Affiliates, creditors or any other person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Investor that has defaulted on its obligation to exercise its Rights under the Rights Offering or to pay the Purchase Price for such Investor's Backstop Commitment of any Unsubscribed Notes or any Indemnified Person related thereto, caused by such default by such Investor, or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

(b)    Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "***Indemnified Claim***"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (A) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (B) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Section 14.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of

23

such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company.

(c)     Settlement of Indemnified Claims. The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 14.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     Contribution. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject

to indemnification pursuant to Section 14(a), then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Unsubscribed Notes in the Rights Offering contemplated by this Agreement and the Plan, bears to (ii) the Backstop Premium paid or proposed to be paid to the Investors. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other person in connection with an Indemnified Claim.

      (e)      Treatment of Indemnification Payments. All amounts paid by an Indemnifying Party to an Indemnified Person under this Section 14 shall, to the extent permitted by applicable law, be treated as adjustments to the Purchase Price for the Unsubscribed Notes purchased by such Indemnified Person for all Tax purposes. The provisions of this Section 14 are an integral part of the transactions contemplated by this Agreement and without these provisions the Investors would not have entered into this Agreement, and the obligations of the Company under this Section 14 shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and the Company may comply with the requirements of this Section 14 without further order of the Bankruptcy Court.

15.    **Notices**. All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission), (c) five (5) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (e) when sent by electronic mail (with acknowledgment received), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party hereto may have specified by like notice):

      If to Investors, to each of the undersigned Investors at the addresses listed on the signatures pages hereto,

WEIL:\95825283\20\22010.0003

with a copy to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention:      Brad Eric Scheler, Peter Siroka and Josh Wechsler
Facsimile:      (212) 299-6650
Email:          Brad.Eric.Scheler@friedfrank.com and
                Peter.Siroka@friedfrank.com
                Joshua.Wechsler@friedfrank.com

If to the Company, to:

Basic Energy Services, Inc.
801 Cherry Street, Suite 2100
Fort Worth, Texas 76102
Attention:    T. M. "Roe" Patterson, President, Chief Executive Officer and Alan
Krenek, Senior Vice President, Chief Financial Officer, Treasurer and Secretary
Facsimile: (817) 344-4101
Email:  Roe.Patterson@basicenergyservices.com  and
        Alan.Krenek@basicenergyservices.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:      Ray C. Schrock, P.C.
                Ronit J. Berkovich, Esq.
Facsimile:      (212) 310-8007
Email:          ray.schrock@weil.com
                ronit.berkovich@weil.com

16.    **Survival**.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in Section 13(e) and Sections 14 through 22 shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof.

17.    **Assignment; Third Party Beneficiaries**.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the parties hereto without the prior written consent of the other parties hereto.  Notwithstanding the previous sentence, the Investors' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate (as defined in Rule 12b-2 under the Exchange Act) of such Investor over which such Investor or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights; provided that any such assignee assumes the obligations of the assigning Investor hereunder and agrees in writing prior to such

assignment to be bound by the terms of this Agreement in the same manner as the assigning Investor. Notwithstanding the foregoing or any other provisions herein, no such assignment will relieve the assigning Investor of its obligations hereunder if such assignee fails to perform such obligations. This Agreement (including the documents and instruments referred to herein) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

18.    **Complete Agreement**. This Agreement (including the Exhibits, the Schedules, and the other documents and instruments referred to herein constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will continue in full force and effect.

19.    **Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury**. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement (including the exhibits and schedules hereto), or the negotiation, execution, termination, performance or nonperformance of this Agreement (including the exhibits and schedules hereto), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof. Each party hereto agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this agreement, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan of New York City (the "***Chosen Courts***"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto; provided that upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court. Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

20.    **Counterparts**. This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

21.    **Action by, or Consent or Approval of, the Investors**. Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Investors, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Requisite Investors.

22.    **Amendments and Waivers**.

(a)    This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Requisite Investors and subject, to the extent required after the Petition Date, to the approval of the Bankruptcy Court; provided that any modification of, or amendment or supplement to, this Agreement that would (i) have the effect of materially and adversely affecting any Investor in a manner that is disproportionate to any other Investor or the Investors as a whole, or increasing or decreasing an Investor's Investor Percentage (as set forth on Exhibit A) shall require the prior written consent of such Investor, or (ii) be inconsistent with the Plan or would have the effect of modifying this sentence shall require the prior written consent of all of the Investors; provided, further, that any modification of, or amendment or supplement to Section 13(b) hereof shall require the prior written consent of each such Investor affected thereby.

(b)    No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

23.    **Specific Performance**.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the parties hereto agree that in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

24.    **Other Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) any reference in this Agreement to $ shall mean U.S. dollars; (iii) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (iv) words imparting the singular number only shall include the plural and vice versa; (v) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (vi) the word "including" or any variation thereof means "including, without limitation" and shall

28

not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vii) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (viii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

29

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

BASIC ENERGY SERVICES, INC.

By: _____

Name: David C. Johnston

Title: Chief Restructuring Officer

[Signature Page to Backstop Agreement]

**ASCRIBE CAPITAL LLC**
**(ON BEHALF OF ITSELF AND CERTAIN**
**FUNDS)**

By: _____
Name: _Lawrence A. First_
Title: _Managing Director_

Address:   299 Park Avenue, 34th Floor
           New York, NY 10171
Attention: Lawrence First
Facsimile: (212) 697-5524
email:     lfirst@ascribecapital.com

[*Signature page to Backstop Agreement*]

**ATLAS MASTER FUND, LTD.**

By: _____
Name: Scott Schroeder
Title: Director


Address: c/o Balyasny Asset Management L.P.
        181 W. Madison St., Suite 3600
        Chicago, IL 60602 USA
Attention: Legal
Facsimile: 312-499-2998
email: legal@bamfunds.com


**ATLAS ENHANCED MASTER FUND, LTD.**

By: _____
Name: Scott Schroeder
Title: Director


Address: c/o Balyasny Asset Management L.P.
        181 W. Madison St., Suite 3600
        Chicago, IL 60602 USA
Attention: Legal
Facsimile: 312-499-2998
email: legal@bamfunds.com

*[Signature page to Backstop Agreement]*

BlackGold Opportunity Fund LP

By: _____

Name:    PRAVIN KANNEGANTI

Title:    COO/CCO


Address:    109 North Post Oak Lane, Suite 520
            Houston, TX 77024
Attention:  Jim Rollyson
Facsimile:  713-400-6810
email:      jrollyson@blackgoldcap.com

*[Signature page to Backstop Agreement]*

**Brigade Capital Management LLC**

By: _____

Name:  Scott Hoffman

Title:  Senior Analyst

Address:     399 Park Avenue, 16th Floor
             New York, NY 10022
Attention:   Scott Hoffman
Facsimile:   212-745-9701
email:       SH@brigadecapital.com

**Covalent Capital Partners Master Fund, L.P. by
and through Covalent Partners LLC, in its
capacity as investment advisor**

By: _William C. Stone_

Name: _William C. Stone_

Title: _Authorized Signatory_

| | |
|---|---|
| Address: | 930 Winter Street, Suite 2800 |
| | Waltham, MA 02451 |
| Attention: | William Stone |
| Facsimile: | 617-658-5550 |
| email: | wcs@covalentpartnersllc.com |

*[Signature page to Backstop Agreement]*

**CVI Opportunities Fund I, LLLP**

**By: Susquehanna Advisors Group, Inc., its authorized agent**

By: _____
Name: Kathy Harley
Title: Assistant Vice President

Address:   CVI Opportunities Fund I, LLLP
c/o Susquehanna Advisors Group, Inc.
401 City Avenue, Suite 220
Bala Cynwyd, PA 19004
Attention: Converts Operations
Facsimile: 610-617-2910
email:      convertsops@sig.com

*[Signature page to Backstop Agreement]*

**GOLDMAN, SACHS & CO.,**
solely with respect to
the Multi-Strategy Investing Desk of the
Americas Special Situations Group

By: _____

Name: DANIEL S. ONEGLIA

Title: AUTHORIZED SIGNATORY


Address:    200 West Street, 15th Floor
            New York, NY 10282
Attention:  Luke C. Dixon
Facsimile:  917-977-3305
email:      luke.dixon@gs.com

*[Signature page to Backstop Agreement]*

**JLP Credit Opportunity Master Fund Ltd**

By: _____
Name:  Jeffrey Peskind
Title:  Director

Address:  420 Lexington Avenue, Suite 2040
          New York, NY 10170
Attention: Lance Friedler
Facsimile: 212-359-6200
email:    lfriedler@phoenixinvadv.com

**Mercer QIF Fund PLC - Mercer Investment Fund 1**

By: _____
Name:  Jeffrey Peskind
Title:  Managing Member

By: Phoenix Investment Adviser LLC, Sub - Investment Manager

Address:  420 Lexington Avenue, Suite 2040
          New York, NY 10170
Attention: Lance Friedler
Facsimile: 212-359-6200
email:    lfriedler@phoenixinvadv.com

*[Signature page to Backstop Agreement]*

**Silver Point Capital Fund, L.P.**

By: _____

Name:    Michael A. Gatto
Title:    Authorized Signatory

Address:    Two Greenwich Plaza
            Greenwich, CT 06830
Attention:  General Counsel
Facsimile:  203-542-4300
email:      mehmer@silverpointcapital.com

**Silver Point Capital Offshore Master Fund, L.P.**

By: _____

Name:    Michael A. Gatto
Title:    Authorized Signatory

Address:    Two Greenwich Plaza
            Greenwich, CT 06830
Attention:  General Counsel
Facsimile:  203-542-4300
email:      mehmer@silverpointcapital.com

*[Signature page to Backstop Agreement]*

DocuSign Envelope ID: B96711C6-4D57-432A-9EFA-437AD5409020

**Whitebox Relative Value Partners, LP**

10/21/2016 | 10:22 PDT

By: _____
EFEC9660E2574B9...

Name: Mark Strefling
Title: Chief Operating Officer and General Counsel

Address: 3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention: Cindy Chen Delano
Phone: 612-355-2004
email:   Cdelano@whiteboxadvisors.com

Address: 3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:   jmercer@whiteboxadvisors.com

**Whitebox Credit Partners, LP**

10/21/2016 | 10:22 PDT

By: _____
EFEC9660E2574B9...

Name: Mark Strefling
Title: Chief Operating Officer and General Counsel

Address: 3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention: Cindy Chen Delano
Facsimile: 612-355-2004
email:   Cdelano@whiteboxadvisors.com

Address: 3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:   jmercer@whiteboxadvisors.com

*[Signature page to Backstop Agreement]*

DocuSign Envelope ID: B96711C6-4D57-432A-9EFA-437AD5409020

**Whitebox GT Fund, LP**

10/21/2016 | 10:22 PDT    By: _____
EFEC9660E2574B9...

Name: Mark Strefling
Title: Chief Operating Officer and General Counsel


Address:   3033 Excelsior Boulevard, Suite 300
           Minneapolis, MN 55416
Attention: Cindy Chen Delano
Facsimile: 612-355-2004
email:     Cdelano@whiteboxadvisors.com

Address:   3033 Excelsior Boulevard, Suite 300
           Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:     jmercer@whiteboxadvisors.com


**Whitebox Multi-Strategy Partners, LP**

10/21/2016 | 10:22 PDT    By: _____
EFEC9660E2574B9...

Name: Mark Strefling
Title: Chief Operating Officer and General Counsel


Address:   3033 Excelsior Boulevard, Suite 300
           Minneapolis, MN 55416
Attention: Cindy Chen Delano
Facsimile: 612-355-2004
email:     Cdelano@whiteboxadvisors.com


Address:   3033 Excelsior Boulevard, Suite 300
           Minneapolis, MN 55416
Attention: Jacob Mercer
Phone: 612-253-6049
email:     jmercer@whiteboxadvisors.com


*[Signature page to Backstop Agreement]*

**Exhibit B**

**Rights Offering Procedures**

## RIGHTS OFFERING PROCEDURES

### I.    Introduction

Basic Energy Services, Inc. (the "***Debtor***") and certain of its subsidiaries collectively, the "***Debtors***")[1] are pursuing a proposed financial restructuring of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "***Plan***") in connection with a chapter 11 bankruptcy case, in accordance with the terms and conditions set forth in the Restructuring Support Agreement, dated as of October 23, 2016 (the "***Restructuring Support Agreement***"), by and among the Debtors, the lenders party to the debtor's existing secured term loan agreement and certain holders of Unsecured Notes Claims.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth for such terms in the Plan or the Backstop Agreement (as hereinafter defined).

On [●], 2016, the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") entered an order (the "***Rights Offering Approval***") that approved, among other things, the form and manner of the Debtor's rights offering (the "***Rights Offering***").  In connection with the Plan, and in accordance with these procedures (the "***Rights Offering Procedures***"), the Debtor will launch the Rights Offering to Eligible Offerees (as defined below),  pursuant to which Eligible Offerees will be entitled to receive their pro rata portion of non-transferable subscription rights to acquire $125 million of 9% mandatorily convertible unsecured PIK notes (the "***New Convertible Notes***") issued by the Debtor, on the terms and conditions set forth in the Plan at a purchase price equal to 100% of the principal amount of such New Convertible Notes so acquired. An "***Eligible Offeree***" is a holder of an Allowed Unsecured Notes Claim as of the Rights Offering Record Date (as defined below).

Only Eligible Offerees may participate in the Rights Offering.  The Rights Offering Procedures will govern the ability of Eligible Offerees to participate in the Rights Offering.

All questions relating to these Rights Offering Procedures, other documents associated with the Rights Offering, or the requirements to participate in the Rights Offering should be directed to Epiq Systems, the subscription agent (the "***Subscription Agent***") retained by the Debtors at:

**Epiq Corporate Restructuring**
**777 Third Avenue, 12th Floor**
**New York, New York, 10017**
**Attention: Basic Energy Processing**
**Tel: (866) 734-9393 or (646) 282-2500**

**Questions (but not documents) may be directed to tabulation@epiqsystems.com**

---

[1] The entities included in the definition of "Debtors" are as follows: Basic Energy Services, Inc.; Basic Energy Services GP, LLC; Basic Energy Services LP, LLC; Basic Energy Services, L.P.; Basic ESA, Inc.; Chaparral Service, Inc.; SCH Disposal, LLC; Sledge Drilling Corp.; Admiral Well Service, Inc.; Basic Marine Services, Inc.; JS Acquisition LLC; Permian Plaza, LLC; Maverick Coil Tubing Services, LLC; First Energy Services Company; JetStar Holding, Inc.; Xterra Fishing & Rental Tools Co.; Maverick Solutions, LLC; LeBus Oil Field Service Co.; Acid Services, LLC; Taylor Industries, LLC; Maverick Stimulation Company, LLC; Globe Well Service, Inc.; JetStar Energy Services, Inc.; Platinum Pressure Services, Inc.; Maverick Thru-Tubing Services, LLC; MCM Holdings, LLC; MSM Leasing, LLC; The Maverick Companies, LLC.

(please reference "Basic Energy" in the subject line)

***THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH ELIGIBLE OFFEREE PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE RIGHTS OFFERING, INCLUDING THE SECTIONS ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," "VALUATION ANALYSIS," "RIGHTS OFFERING PROCEDURES" AND "FINANCIAL INFORMATION AND PROJECTIONS." THE DISCLOSURE STATEMENT IS AVAILABLE ON THE DEBTOR'S RESTRUCTURING WEBSITE AT HTTP://DM.EPIQ11.COM/BASICENERGY AND COPIES ARE ALSO AVAILABLE UPON REQUEST FROM THE SUBSCRIPTION AGENT.***

## II.   Rights Offering

To fully exercise its right to participate in the Rights Offering (the "***Subscription Rights***"), an Eligible Offeree must (i) complete the rights offering subscription exercise form (the "***Rights Exercise Form***"), which has been distributed with these Rights Offering Procedures to Eligible Offerees and (ii) pay the purchase price, which is an amount equal to its pro rata share of $125 million (the "***Rights Exercise Price***"), such pro rata share to be calculated as the proportion that an Eligible Offeree's Allowed Unsecured Notes Claim bears to the aggregate of all Allowed Unsecured Notes Claims as of October 27, 2016 (the "***Rights Offering Record Date***"), rounded down to the nearest dollar.

Each Eligible Offeree may exercise (in whole dollar increments) all, some, or none of such pro rata share, and the Rights Exercise Price for such Eligible Offeree will be adjusted accordingly (in whole dollar increments).  The portion of New Convertible Notes issued to an Eligible Offeree who elects to acquire such New Convertible Notes shall be rounded down to the nearest dollar.  No compensation shall be paid, whether in cash or otherwise, in respect of such rounded-down amounts.

The Subscription Rights shall not be transferable, assignable, or detachable.

## III.   The Backstop

The Rights Offering will be backstopped by the Backstop Parties.  Each of the Backstop Parties, severally and not jointly, has agreed, pursuant to the Backstop Agreement, to purchase all New Convertible Notes that are not purchased by other Eligible Offerees pursuant to the Rights Offering (the "***Unsubscribed Notes***") on a pro rata basis in accordance with the percentages set forth in Exhibit A to the Backstop Agreement.  As consideration for their undertakings in the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium set forth in the Backstop Agreement.  The Backstop Parties will be provided with a special form (the "***Backstop Addendum"***) to attach to their Rights Exercise Form(s).

There will be no over-subscription privilege in the Rights Offering.  The Unsubscribed Notes will not be offered to other Eligible Offerees but will be purchased by the Backstop Parties in accordance with the Backstop Agreement.

## IV.     Commencement/Expiration of the Rights Offering

The Rights Offering shall commence on the day upon which the Rights Exercise Form is first mailed or made available to Eligible Offerees (the "***Rights Commencement Date***"), which is expected to be the first Business Day after receipt of the Rights Offering Approval.  The Rights Offering shall expire at 5:00 p.m. New York City time on the date specified in the Rights Offering Approval, which is expected to be the 20th Business Day after the Rights Commencement Date, unless, if permitted by the Rights Offering Approval, extended by the Debtor with the consent of the Requisite Investors (as defined in the Backstop Agreement) (such time and date, as may be amended, the "***Rights Expiration Time***").  The Debtor shall promptly notify the Eligible Offerees of any extension and of the new Rights Expiration Time by press release or otherwise.

The Debtor will furnish, or cause to be furnished, Rights Exercise Forms to the Eligible Offerees and/or, to the extent applicable, their brokers, dealers, commercial banks, trust companies, or other agents or nominees (the "***Subscription Nominees***").   Each Subscription Nominee is entitled to receive sufficient copies of these Rights Offering Procedures and the Rights Exercise Form for distribution to the beneficial owners of the Unsecured Notes for whom such Subscription Nominee holds such Unsecured Notes.

## V.     Exercise of Subscription Rights

Each Eligible Offeree that elects to participate in the Rights Offering must affirmatively make a binding, irrevocable election to exercise its Subscription Rights (the "***Binding Rights Election***") before the Rights Expiration Time.

<div style="border:1px solid">

### The Binding Rights Election, upon receipt by the Subscription Agent, cannot be withdrawn.

</div>

Each Eligible Offeree will be entitled to participate in the Rights Offering solely to the extent provided in these Rights Offering Procedures, except in the case of Eligible Offerees who are Backstop Parties, who are entitled to participate in the Rights Offering to the extent also provided in Backstop Agreement.  The Debtor will accept a Binding Rights Election by delivery of written notice to each participating Eligible Offeree and the Subscription Agent (the "***Acceptance Notice***").

### A.     Exercise by Eligible Offerees

To exercise the Subscription Rights, each Eligible Offeree must (i) return a duly completed Rights Exercise Form to the Subscription Agent so that the duly completed Rights Exercise Form is *actually received* by the Subscription Agent on or before the Rights Expiration Time and (ii)

pay to the Subscription Agent, by wire transfer of immediately available funds, the Rights
Exercise Price, so that payment of the Rights Exercise Price is *actually received* by the
Subscription Agent on or before the Rights Expiration Time; provided, that the Backstop Parties
(in their capacities as Eligible Offerees) shall not be required to pay their respective Rights
Exercise Prices until the effective date of the Plan (the "***Effective Date***"), in accordance with
these Rights Offering Procedures, and the Backstop Agreement.

In order to exercise its Subscription Rights, any Eligible Offeree who holds Allowed Unsecured
Note Claims through a Subscription Nominee must return a duly completed Rights Exercise
Form to its Subscription Nominee or otherwise instruct its Subscription Nominee as to its
instructions for the Subscription Rights (in each case in sufficient time to allow such
Subscription Nominee to deliver the Rights Exercise Form to the Subscription Agent prior to the
Rights Expiration Time) in accordance with procedures established by its Subscription Nominee,
which, in turn, must comply with clauses (i) and (ii) of the immediately preceding paragraph.

For purposes of this Rights Offering, Wilmington Trust, National Association, in its capacity as
Indenture Trustee for the each of the series of Unsecured Notes, shall not constitute a
Subscription Nominee and shall have no responsibility with respect to sending any Rights
Offering information or collecting any Rights Exercise Forms.

B.    Deemed Representations and Acknowledgements

Any Eligible Offeree that participates in the Rights Offering is deemed to have made the
following representations and acknowledgements:

(i)    Such Eligible Offeree recognizes and understands that the Subscription Rights are
not transferable (see Section II above for details) and that the benefits of the
Subscription Rights are not separable from the claim or securities with respect to
which the Subscription Rights have been granted. Such creditor represents and
warrants that it is an Eligible Offeree.

(ii)    Such Eligible Offeree represents and warrants that it will not accept a distribution
of New Convertible Notes if at such time, it does not hold all of the Allowed
Unsecured Notes Claim associated with its Subscription Rights and, by accepting
a distribution of New Convertible Notes, such Eligible Offeree will be deemed to
be the owner thereof.

C.    Failure to Exercise Subscription Rights

**Unexercised Subscription Rights will be relinquished at the Rights Expiration Time.** If, on
or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive
from an Eligible Offeree or its Subscription Nominee a duly completed Rights Exercise Form,
such Eligible Offeree shall be deemed to have irrevocably relinquished and waived its right to
participate in the Rights Offering.

Any attempt to exercise Subscription Rights after the Rights Expiration Time shall be null and
void and the Debtor shall not be obligated to honor any such purported exercise received by the

4

Subscription Agent after the Rights Expiration Time regardless of when the documents relating thereto were sent.

**The method of delivery of the Rights Exercise Form and any other required documents is at each Eligible Offeree's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. Delivery by reputable overnight courier is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to the Rights Expiration Time.**

**The risk of non-delivery of the Rights Exercise Form and any other required documents sent to the Subscription Agent in connection with the exercise of the Subscription Rights lies solely with the holders of the Allowed Unsecured Notes Claims, and none of the Debtors, the reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisers, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

        D.     <u>Payment for Subscription Rights</u>

If, on or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive on behalf of an Eligible Offeree immediately available funds by wire transfer in an amount equal to the total Rights Exercise Price for such Eligible Offeree's Subscription Rights, such Eligible Offeree shall be deemed to have relinquished and waived its Subscription Rights, subject to the next paragraph; *provided*, that the Backstop Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until the Effective Date.

        E.     <u>Disputes, Waivers, and Extensions</u>

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be addressed in good faith by the Debtor in consultation with the Backstop Parties, the determinations of which shall be final and binding. The Debtor, with the approval of the Requisite Investors, may (i) waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported exercise of any Subscription Rights for which the Rights Exercise Form and/or payment includes defects or irregularities. Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured. The Debtor reserves the right, with the approval of the Requisite Investors, to give notice to any Eligible Offeree regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Eligible Offeree and the Debtor may, with the approval of the Requisite Investors, permit such defect or irregularity to be cured; it being understood, that none of the Debtor, the Subscription Agent, or the Backstop Parties (or any of their respective officers, directors, employees, agents or advisors) shall incur any liability for failure to give such notification.

The Debtor, with the approval of the Bankruptcy Court (if applicable) and the Requisite Investors, may (i) extend the duration of the Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Subscription

Rights; and (ii) make such other changes to the Rights Offering, including changes that affect which parties constitute Eligible Offerees.

F.    Funds

The payments made to acquire New Convertible Notes pursuant to the Rights Offering (the "***Rights Offering Funds***") shall be deposited when made and held by the Subscription Agent pending the Effective Date in a segregated account or accounts (i) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien, encumbrance, or cash collateral arrangements and (ii) which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.   The Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtor on the Effective Date or as otherwise set forth in these Rights Offering Procedures or in the Plan, and, until released in accordance with the foregoing, the Rights Offering Funds will not be deemed part of the Debtors' bankruptcy estate.   The Subscription Agent shall not permit the Rights Offering Funds to be encumbered by any lien, encumbrance, or cash collateral obligation.  No interest will be paid to participating Eligible Offerees on account of any amounts paid in connection with their exercise of Subscription Rights under any circumstances.

Notwithstanding anything to the contrary herein, each Backstop Party shall make all payments in connection with the Rights Offering directly to the Debtor on the Effective Date.

G.    Participating Eligible Offeree Release

See Section 10.7 of the Plan for important information regarding releases.

## VI.    Miscellaneous

A.    Issuance

The New Convertible Notes to be issued pursuant to the Rights Offering are expected to be delivered to Eligible Offerees that have properly exercised their Subscription Rights on or as soon as practicable following the Effective Date.  See Section VII.  The New Convertible Notes will be issued in book-entry form.

B.    Securities Law and Related Matters

The New Convertible Notes issued to the Eligible Offerees participating in the Rights Offering will be exempt from registration under the Securities Act of 1933, as amended (the "***Securities Act***"), and any other applicable federal and state securities laws pursuant to Section 1145 of the Bankruptcy Code, and may be resold, without registration under the Securities Act or other applicable federal and state securities laws, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code.

There is not and there may not be a public market for the New Convertible Notes, and the Debtor does not intend to seek any listing of the New Convertible Notes on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active

WEIL:\95911279\1\22010.0003

trading market for the New Convertible Notes will ever develop or, if such a market does develop, that it will be maintained. The Company has agreed to use its reasonable best efforts to list its  common stock, for which the New Convertible Notes are convertible, on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the Effective Date. However, there can be no assurance that the existing New York Stock Exchange listing will be maintained or a new listing will be achieved or that an active trading market for the shares of common stock of the Debtor will ever develop or, if such a market does develop that it will be maintained.

## VII.    Rights Offering Conditioned Upon Effectiveness of the Plan; Reservation of Subscription Rights; Return of Rights Offering Amount

All exercises of Subscription Rights are subject to and conditioned upon the effectiveness of the Plan.   The Debtor will accept a Binding Rights Election only upon the confirmation and effectiveness of the Plan.   Notwithstanding anything contained herein, in the Disclosure Statement or in the Plan to the contrary, the Debtor reserves the right, with the approval of the Requisite Investors, not to be unreasonably withheld, to modify these Rights Offering Procedures or adopt additional detailed procedures if necessary in the Debtor's business judgment to more efficiently administer the distribution and exercise of the Subscription Rights or comply with applicable law.

In the event that (i) the Rights Offering is terminated, (ii) the Debtor revokes or withdraws the Plan, or (iii) the Effective Date of the Plan does not occur on or before January 23, 2017 (which is the "Outside Date," as defined in the Restructuring Support Agreement, and may be extended in accordance with the terms thereof), the Subscription Agent shall, within five (5) Business Days of such event, return all amounts received from Eligible Offerees, without any interest, and, in the case of clauses (ii) and (iii) above, the Rights Offering shall automatically be terminated.

WEIL:\95911279\1\22010.0003

## EXHIBIT F

**Disclosure Statement**

## Exhibit G

**Management Incentive Plan Term Sheet**

**Basic Energy Services, Inc.**

**Post-Emergence Management Incentive Plan Term Sheet**

The following describes the principal terms of the management incentive plan (the "<u>Plan</u>") to be adopted by Basic Energy Services, Inc., a Delaware corporation (the "<u>Company</u>"), in connection with its chapter 11 restructuring, and the initial grant of awards immediately after the Company's emergence from chapter 11 (the "<u>Emergence Awards</u>"). This term sheet does not contain all of the terms and conditions of the Plan.

**TERMS OF THE PLAN**

| Category | Terms |
|---|---|
| **Effective Date** | The Plan (and the Emergence Awards) shall be effective on the effective date of the Company's chapter 11 plan of reorganization (the "<u>Effective Date</u>"). |
| **Administration** | The Compensation Committee of the Board of Directors of the reorganized Company (the "<u>Compensation Committee</u>") shall administer the plan and make all determinations with respect to awards granted under the Plan. |
| **Participants** | Officers and employees of the reorganized Company who are designated by the Compensation Committee to receive awards under the Plan. |
| **Award Pool** | • 10% of the outstanding equity securities of the reorganized Company, on a fully diluted basis (taking into account shares to be issued in respect of the New Convertible Notes and awards issuable under the Plan but excluding shares issued pursuant to the Warrants) as of the Effective Date will be available for grant under the Plan (the "<u>Award Pool</u>").<br><br>• If any outstanding award expires or is forfeited, cancelled or otherwise terminated, the equity underlying such award shall again be available for grant under the Plan.<br><br>• Shares available and granted under the Plan shall be subject to equitable adjustments in the event of capital restructuring events. |
| **Plan Awards** | • The Plan will be an "omnibus" incentive plan (similar to the Company's Amended and Restated 2003 Incentive Plan) which will permit the Compensation Committee to grant various types of equity awards, including:<br><br>▪ stock options (ISOs and NQSOs)<br>▪ stock appreciation rights<br>▪ restricted stock<br>▪ restricted stock units<br>▪ other stock-based awards. |
| **Vesting of Awards** | • Vesting of awards may be time-based or performance-based, and may include provisions for acceleration of vesting under certain circumstances. |

| Category | Terms |
|---|---|
| **Anti-dilution / Adjustment** | • Awards will be subject to customary anti-dilution and other adjustments for changes in capitalization and other events. |

## TERMS OF EMERGENCE AWARDS

| Category | Terms |
|---|---|
| **Participants** | The Emergence Awards will be allocated to the top 28 management and key employees, including executive officers, as set forth in <u>Exhibit A</u> (the "<u>Emergence Participants</u>"), as such allocations may be modified as set forth below under "*Emergence Award Pool.*" <br><br> Within 90 days of the Effective Date, the Compensation Committee and the Board of Directors of the reorganized Company, as applicable, will in good faith take such actions as may be necessary or desirable to grant the Emergence Awards. <br><br> Recipients of any future awards will be determined by the Compensation Committee in consultation with the CEO, as appropriate. |
| **Emergence Award Pool** | 70% of the Award Pool will be granted upon the Effective Date, pursuant to the schedule attached hereto as <u>Exhibit A</u>. With respect to the allocations for the Time-based RSUs and Time-based Options (as each is defined below), the allocations set forth on Exhibit A may not be modified by the Compensation Committee without the approval of the CEO. With respect to the Performance-based RSUs and Performance-based Options (as each is defined below), it is anticipated that the award allocations will be in accordance with the schedule set forth on Exhibit A, but such allocations may be modified by the Compensation Committee in consultation with the CEO, provided that half of the award allocations set forth on Exhibit A shall be time-based awards in the form and percentage described in "*Form of Emergence Awards*" below. |
| **Form of Emergence Awards** | • 25% of the Award Pool upon emergence will be time-based restricted stock units ("<u>Time-based RSUs</u>"). <br><br> • 25% of the Award Pool upon emergence will be performance-based restricted stock units ("<u>Performance-based RSUs</u>"). <br><br> • 20% of the Award Pool upon emergence will be non-qualified stock options, with the exercise price equal to the fair market value of a share of common stock of the Company upon emergence, of which: <br><br>      o 10% of the Award Pool will be non-qualified stock options and will provide for performance-based vesting ("<u>Performance-based Options</u>"); and <br><br>      o 10% of the Award Pool will be non-qualified stock options and will provide for time-based vesting ("<u>Time-based Options</u>"). <br><br> • RSUs are based on value of the common stock, together with dividend equivalent rights (which will be accumulated and reinvested in RSUs or distributed to participants, as determined by the Compensation Committee). |

2

| Category | Terms |
|---|---|
| **Vesting for Emergence Awards** | • Time-based RSUs – one-third (1/3) of the Time-based RSUs will vest immediately on the Effective Date, one-third (1/3) will vest on the first anniversary of the Effective Date and one-third (1/3) will vest on the second anniversary of the Effective Date, provided that the participant remains employed on each vesting date. |
| | • Performance-based RSUs/Performance-based Options – reasonable performance metrics and performance period will be set by the Compensation Committee (in consultation with the CEO of the Company) prior to grant in consideration of performance period in equal annual installments over three (3) years. Performance-based awards will vest as to performance upon each installment vesting date (subject to the Compensation Committee determining that the performance metrics have been achieved), and will be subject to the participant's continued employment through the one-year anniversary of such date. Notwithstanding the foregoing, after the first anniversary of the date of grant, the Compensation Committee may (in consultation with the CEO) adjust the duration of the performance periods of any unvested award to a maximum of 3 years from the grant date.  The grant date of the Performance-based RSUs and Performance-based Options shall be deemed to occur on the Effective Date. |
| | • Time-based Options – one-third (1/3) of the Time-based Options will vest on the first anniversary of the Effective Date, one-third (1/3) will vest on the second anniversary of the Effective Date and one-third (1/3) will vest on the third anniversary of the Effective Date, provided that the participant remains employed on each vesting date. |
| **Accelerated Vesting for Emergence Awards** | • Upon (i) termination by Company without "cause," or (ii) resignation by participant for "good reason": (x) in respect of any unvested Time-based RSUs, unvested Time-based Options, unvested Performance-based RSUs for which the performance metrics have previously been achieved and unvested Performance-based Options for which the performance metrics have previously been achieved, that portion of such award that would have otherwise vested during twelve (12) month period following the termination date, if the termination event had not occurred, will become vested as of the participant's termination date, and (y) in respect of any unvested Performance-based RSUs and unvested Performance-based Options for which the performance metrics have not previously been achieved, one-third (1/3) of such awards will remain outstanding until the expiration of the relevant performance period and will vest or not at the end of the applicable performance period based on actual Company performance and, if such performance metric is achieved and such awards become so vested, will not be subject to any future service requirement. |
| | • Upon the participant's death or permanent disability, any awards that are unvested at such time will fully vest. |
| | • Upon a "change of control," (i) any unvested Time-based Options, unvested Time-based RSUs, unvested Performance-based RSUs for which the performance metrics have previously been achieved and unvested Performance-based Options for which the performance metrics have previously been achieved shall fully vest on the date of such change of control and (ii) with respect to Performance-based Options and Performance-based RSUs, the portion of the awards that would have vested as of the date of such change of control (assuming performance metrics for |

3

| Category | Terms |
|----------|-------|
| | such awards have been met) shall fully vest, provided that, a minimum performance threshold has been achieved, such threshold to be determined by the Compensation Committee in consultation with the CEO at the time of the awards, and it being understood that such threshold is intended to be materially less difficult to achieve than the performance vesting metrics for the awards generally.<br><br>• The definition of a "change of control" in the Plan to be drafted in a manner that is typical and customary for a public company and is consistent with the standards of a change of control under Section 409A of the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder. |
| **Terms for Future Awards** | • Vesting, acceleration and other terms applicable to any future awards (i.e., other than the Emergence Awards) to be determined by the Compensation Committee in consultation with the CEO prior to the grant of such awards. |
| **Settlement** | Net settlement promptly following vesting or exercise (as applicable) in shares of common stock, net of applicable withholding taxes and exercise price (if applicable); Company option to settle in cash. |

4

## Exhibit B

## Corporate Structure Chart



Basic Energy Services, Inc.
Delaware (Formerly BES Holding Co.)
54-2091194
100%
100%
100%
Basic Energy Services GP, LLC
Delaware
54-2091197
Basic Energy Services LP, LLC
Delaware
54-2091195
Basic ESA, Inc.
Texas
75-1772279
0.01%
99.99%
1%
Basic Energy Services, L.P.
Delaware
75-2441819
100%
Basic Energy Services International, LLC
Delaware
27-0216025
99%
ESA de Mexico S.A. de C.v
Debtor
Non-Debtor
Chaparral Service, Inc.
New Mexico
85-0206424
SCH Disposal, L.L.C.
Texas
75-2788335
Sledge Drilling Corp.
Texas
20-4223140
Admiral Well Service, Inc.
Texas
26-3164899
Basic Marine Services, Inc.
Delaware
20-2274888
JS Acquisition LLC
Delaware
26-2529500
Permian Plaza, LLC
Texas
26-0753425
Maverick Coil Tubing
Services, LLC
Colorado
84-1563281
First Energy Services
Company
Delaware
84-1424993
JetStar Holdings, Inc.
Delaware
74-3144248
Xterra Fishing & Rental Tools
Co.
Texas
76-0647818
Maverick Solutions, LLC
Colorado
20-0122876
LeBus Oil Field Service Co.
Texas
75-2073125
Acid Services, LLC
Kansas
48-1180455
Taylor Industries, LLC
Texas
27-2417037
Maverick Stimulation
Company, LLC
Colorado
84-1354572
Globe Well Service, Inc.
Texas
75-1634275
JetStar Energy Services, Inc.
Texas
68-0605237
Platinum Pressure Services,
Inc.
Texas
26-1338379
Maverick Thru-Tubing
Services, LLC Colorado
27-1501902
MCM Holdings, LLC
Colorado
84-1520949
MSM Leasing, LLC
Colorado
27-0629182
The Maverick Companies,
LLC
Colorado
20-5244170
Robota Energy Equipment,
LLC
Texas

# Exhibit 12

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>ALPHA NATURAL RESOURCES, INC., *et al.*,<br><br>         Debtors. | Chapter 11<br><br>Case No. 15-33896-KRH<br>(Jointly Administered) |
| MAR-BOW VALUE PARTNERS, LLC,<br><br>         Movant,<br><br>    – against –<br><br>McKINSEY RECOVERY AND<br>TRANSFORMATION SERVICES U.S., LLC,<br><br>         Respondent. | **Re: ECF Nos. 4122, 4124, and 4128** |

## DECLARATION OF CASEY LIPSCOMB

Casey Lipscomb declares under penalty of perjury:

1.) I am the General Counsel and Secretary of MIO Partners, Inc. ("MIO") and have held that position or its equivalent for approximately 13 years. I understand that this declaration will be used in connection with McKinsey's participation in the Alpha Natural Resources Chapter 11 case in the Eastern District of Virginia, Richmond Division (Case No. 15-33896 (KRH)).

2.) I make this declaration based on personal knowledge, except to the extent I identify business records of MIO maintained in the regular course of its activities from which I've obtained information reported here.

3.) MIO manages assets for (i) certain pension plans sponsored by McKinsey ("Plans") in which certain current and former McKinsey employees participate ("Participants"), and (ii) privately offered investment vehicles ("Funds") in which McKinsey partners, former partners and their immediate family members ("Investors") can invest. MIO is a wholly-owned

indirect subsidiary of McKinsey.  In addition to Investors and Participants, MIO personnel are participants in some of the Plans, and are also permitted to invest in the Funds ("MIO Investors").  Members of the Board of Directors of MIO ("MIO Board Members"), who may be Participants and Investors, have oversight responsibilities with respect to the Plans and the Funds as described below.

4.) MIO Partners, Inc. employs more than 150 staff, and is registered with the U.S. Securities and Exchange Commission as an investment adviser.  As an investment adviser, MIO has fiduciary obligations towards the Plans and the Funds.

5.) The Plans and Funds typically invest in:

   i.   limited partnership interests or interests in other limited liability vehicles established and operated by asset managers that are neither owned nor controlled directly or indirectly by MIO or McKinsey ("Fund Investments");

   ii.  investment vehicles established, controlled and operated by MIO ("MIO Investment Vehicles"), investment discretion over which is retained by MIO with respect to a portion of the assets in those vehicles as described below in Paragraph 6, and granted to one or more Third Party Managers (defined below) with respect to the balance of the assets.

6.) The Plans and the Funds also make investments through MIO Investment Vehicles that are directed by MIO's professional staff as described below in Paragraph 10 ("MIO Direct Investments").

7.) Subject to paragraph 3 above with respect to MIO Board Members, Participants and Investors have no control over the investments made by the Plans and the Funds and have no ability to direct purchases or sales of any asset in the Plans or the Funds.

8.) MIO is overseen by a board of directors (the "MIO Board") with 11 members.  Prior to November 1, 2017, all members of the MIO Board were current or former McKinsey partners.  As of November 1, 2017, the MIO Board had ten current or former McKinsey partners, and two directors who were not current or former McKinsey partners.  As of August

31, 2018, the MIO Board has nine current or former McKinsey partners, and two directors who are not current or former McKinsey partners. Based upon MIO business records that I have reviewed, Jon Garcia served as a Director of MIO from December 8, 2006 through June 9, 2017.

9.) The MIO Board is not responsible for making investment decisions on behalf of the Plans or the Funds. Rather, the MIO Board delegates responsibility for making investment decisions on behalf of the Plans and the Funds, and engaging and supervising Third Party Managers, to MIO's professional staff. The staff is responsible for principally using third party fund managers who make investment decisions based on their own investment discretion, without input from or consultation with, MIO ("Third Party Managers").

10.) The MIO Board is not responsible for making MIO Direct Investments on behalf of the Plans or Funds and does not exercise investment discretion with respect to such investments. Rather, the MIO Board delegates responsibility for making MIO Direct Investments to MIO's professional staff.

11.) Through its oversight and supervisory functions or other board activities, members of the MIO Board may become aware of MIO Direct Investments, the identities of Third Party Managers with whom money has been invested, and individual investments made by such Third Party Managers.

12.) In June and July 2016, I oversaw the preparation of MIO's responses to requests from McKinsey internal counsel and external counsel for RTS seeking information regarding any overlap between a list of names provided to me and investments made by MIO on behalf of the Plans or the Funds.

13.)    On June 28, 2016, I received from internal counsel at McKinsey a document entitled
"Schedule 2 Alpha Natural Resources, Inc. et al. Interested Parties," bearing a draft date of
August 1, 2015 (the "Interested Parties List").  I was asked by internal counsel at McKinsey
and external counsel for RTS to compare the names on the Interested Parties List with Third
Party Managers with whom MIO has invested money on behalf of the Plans or the Funds,
and MIO Direct Investments that MIO has made on behalf of the Plans or the Funds, and to
report any matches to internal counsel at McKinsey and external counsel for RTS.

14.)    Following the review of the Interested Parties List and information related to investments
made by MIO on behalf of the Plans or the Funds as of May 31, 2016, certain names on the
Interested Parties List did correspond to Third Party Managers with whom money had been
invested on behalf of the Plans or the Funds, or to MIO Direct Investments.  I reported these
matching names to internal McKinsey counsel and external counsel for RTS on July 5, 2016.

15.)    I have reviewed the Interested Parties List in connection with preparing this Declaration
and have confirmed that Whitebox Advisors was not included on the Interested Parties List
that I received.

    Dated:  September 12, 2018

# Exhibit 13

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>ALPHA NATURAL RESOURCES, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-33896-KRH<br>(Jointly Administered) |
| MAR-BOW VALUE PARTNERS, LLC,<br><br>Movant,<br><br>– against –<br><br>McKINSEY RECOVERY AND TRANSFORMATION SERVICES U.S., LLC,<br><br>Respondent. | **Re: ECF Nos. 4122, 4124, and 4128** |

## SUPPLEMENTAL DECLARATION OF CASEY LIPSCOMB

Casey Lipscomb declares under penalty of perjury:

1.) I am the General Counsel and Secretary of MIO Partners, Inc. ("MIO") and have held that position or its equivalent for more than 14 years. I make this declaration to supplement my prior declaration dated September 12, 2018 ("Lipscomb I"), which was submitted in connection with McKinsey's opposition to the motion of Mar-Bow Value Partners, LLC to re-open the Alpha Natural Resources Chapter 11 case in the Eastern District of Virginia, Richmond Division (Case No. 15-33896 (KRH)) (the "ANR Case")[1] and to provide

---

[1]  Capitalized terms not defined herein shall have the same meaning ascribed to them in Lipscomb I.

information at the request of counsel to McKinsey in connection with certain follow-up questions posed by the Office of the United States Trustee to counsel for McKinsey.

2.) I make this declaration based on, and to the best of, my personal knowledge, except to the extent I identify business records of MIO maintained in the regular course of its activities from which I have obtained information reported here, or discussions with other knowledgeable MIO personnel with whom I have consulted to obtain information reported here.

3.) As explained in my prior declaration, MIO manages assets for (i) certain pension plans sponsored by McKinsey (defined previously as the "Plans") in which certain current and former McKinsey employees participate (defined previously as "Participants"), and (ii) privately offered investment vehicles (defined previously as the "Funds" [2]) in which McKinsey partners, former partners and their immediate family members (defined previously as "Investors") can invest.[3]

4.) I have been informed by counsel to McKinsey that certain questions from the United States Trustee seek information regarding the extent to which information regarding MIO investments is made available to Participants and Investors, many of whom provide consulting services to McKinsey clients and, the extent to which information regarding McKinsey consulting work may be shared with MIO. MIO is operated separately from McKinsey's consulting services, including those of RTS. The investment staff of MIO

---

[2]     As set forth in Paragraph 10 below, many of these Funds use the brand name "Compass."

[3]     Certain McKinsey affiliates, not including McKinsey RTS US LLC, have also invested in Compass Funds for the purpose of satisfying their obligations under certain of their defined-benefit pension plans, or incentive compensation plans for MIO personnel.

2

works only for MIO.  No staff member of MIO is engaged in the client service activities of

McKinsey, including RTS, or is an employee of any McKinsey affiliate that provides

consulting services to clients.  Based upon my fourteen years of experience at MIO and my

discussions with knowledgeable MIO personnel, it is the deliberate practice of MIO not to

use or access any client related insights generated by McKinsey from McKinsey's client

engagements in making their investment decisions.  The operational separation is intended to

restrict the flow of information between MIO and McKinsey and ensure that McKinsey client

engagements are not influenced by MIO's investments, and that MIO's investment decisions

are not influenced by McKinsey's client engagements.

5.) I have been asked to address the extent to which electronically stored information relating to

MIO investments may be available to anyone at McKinsey through shared information

technology systems.   In connection with preparing this Declaration, I conferred with MIO

personnel knowledgeable about MIO's information technology systems.  I have been advised

that MIO maintains information (electronic documents and files) related to its past and

existing investments on servers located in New Jersey and Illinois that are controlled by

MIO, and that only New York based MIO employees have access to the information

contained on these servers.[4]  I have been further advised that MIO personnel do not have

access to McKinsey's systems where client engagement materials are stored.

---

[4]    MIO's investment team and operations are located in New York, and I have been advised
that Non-U.S. based MIO personnel do not have access to the servers where MIO stores
its past and present investment information.

3

6.) I have also been asked to address the ratification by the MIO Board of MIO investments in funds and Separate Accounts[5] managed by Third-Party Managers, and the materials provided to the MIO Board in connection with such ratification.  On a quarterly basis, consistent with their fiduciary duties to the Funds managed by MIO, the Investment Committee of the MIO Board reviews a list of redemption and allocation decisions made by MIO's professional investment staff.  Redemptions are decisions to reduce the amount of, or eliminate, an investment in a fund or Separate Account managed by a Third-Party Manager, and allocations are decisions to establish, or increase the amount of, an investment in a fund or Separate Account managed by a Third-Party Manager.  In connection with this quarterly process, the Investment Committee reviews materials prepared by the MIO staff.

7.) In connection with preparing this declaration, I reviewed the portion of the materials prepared for the Investment Committee during 2015 that relate to the MIO Board's ratification process.  The lists of allocations and redemptions that I reviewed do not refer to specific investments made by Third-Party Managers in the funds or Separate Accounts they manage.  Whitebox is among the dozens of Third-Party Managers listed in the materials I reviewed.

8.) Prior to September 11, 2017, the Investment Committee was responsible for taking a vote to ratify the allocation and redemption decisions presented to the Investment Committee.  After September 11, 2017, the Investment Committee continued to receive the same information for monitoring and oversight purposes but discontinued its practice of ratifying the allocations.  The materials I reviewed reflect that, at each quarterly meeting, approximately

---

[5]        As defined below in Paragraph 12.

Case 15-33896-KRH Doc 4160 Filed 12/09/18 Page 385 of 818

15 minutes was typically allocated for discussion of these materials and the ratification

procedure, and there were typically dozens of allocations and redemptions to be reviewed.

The Investment Committee no longer ratifies the allocation and redemption decisions made

by the MIO investment staff because it determined that such ratification was not necessary

given other steps that are taken to discharge fully the MIO Board's monitoring and oversight

duties.

9.)   I have also been asked to explain what the MIO Compass Funds are, and the information

available to MIO investment staff regarding the underlying investments made by the

Compass Funds.

10.)    Many of the Funds use the brand name "Compass."  Certain of the Compass Funds were

available to Investors from 2015 to the present (the "Investable Compass Funds").   Other

Compass Funds are not open to Investors; they are only available to be invested in by the

Investable Compass Funds and the Plans (the "Non-Investable Compass Funds").

11.)    The Investable Compass Funds use a "fund-of-funds" approach to investment.   The

Investable Compass Funds may invest in funds managed by Third-Party Managers,[6] or in

other Compass Funds.  Third-Party Managers make investment decisions based on their own

investment discretion.[7]  With varying degrees of frequency and detail, some of these Third-

Party Managers provide MIO investment staff with information identifying underlying

---

[6]     *See* Lipscomb I at 5.i, 9.

[7]     I stated in Lipscomb I that Third-Party Managers make their investment decisions
without input from or consultation with MIO.  The MIO investment staff, of course,
confers on an as needed basis with Third-Party Managers in the exercise of their
oversight responsibilities, including about particular investments in some cases.
Nevertheless, the investment decision remains with the Third-Party Manager.

investments, while others do not provide any such information. MIO's investment staff may also make MIO Direct Investments on behalf of the Investable Compass Funds.[8] As set forth below in Paragraphs 14-23, MIO does not typically provide information to Investors regarding the identity of Third-Party Managers, specific investments made by those Third-Party Managers, or specific MIO Direct Investments.

12.)    The Non-Investable Compass Funds may (i) invest in funds managed by Third-Party Managers[9]; (ii) invest in other Non-Investable Compass Funds; or (iii) allow a Third-Party Manager[10] to manage a specified sum of money in an account of the Non-Investable Compass Fund (a "Separate Account").[11] As part of its management and operation of the Non-Investable Compass Funds, MIO has visibility into the underlying holdings of Separate Accounts. MIO's professional investment staff may also make MIO Direct Investments on behalf of the Non-Investable Compass Funds.[12] Investors do not receive information from MIO regarding specific investments in the Non-Investable Compass Funds, except as provided below in Paragraphs 14 - 23.

13.)    In connection with preparing this Declaration, I caused MIO Direct Investments (*i.e.*, the only investments where MIO professional investment staff made the investment decision) for

---

[8]      *See* Lipscomb I at 6, 10.

[9]      *See* Lipscomb I at 5.i. Such Third-Party Managers make investment decisions based on their own investment discretion. *See* n.7 above. With varying frequency and detail, some of these Third-Party Managers provide MIO with information identifying underlying investments, while others do not.

[10]     Such Third-Party Managers make investment decisions based on their own investment discretion. *See* n.7 above.

[11]     *See* Lipscomb I at 5.ii.

[12]     *See* Lipscomb I at 6, 10.

the period 2010 through 2016 to be reviewed.  That review did not identify any instance in
which MIO directed a purchase, sale or holding of the stock of Alpha Natural Resources, or
any instance during 2010 and 2011 in which MIO directed a purchase, sale or holding of the
stock of Massey Energy.[13]

14.)   Finally, I have been asked to address investment performance information that is made
available to Participants and Investors by MIO.

15.)   When Participants select investment options offered in the Plans, the Participants are
given a choice of portfolios to which they can allocate portions of their balances in the Plan.
Some examples of investment options available for selection by Participants are *Passive US
Equities Portfolio*, *Passive US Bonds Portfolio,* and *Passive Inflation-Linked Bonds
Portfolio*.

16.)   Participants are provided with historical performance of the investment options available
in the Plans and information regarding the appreciation or depreciation of their account
balances based on the performance of the investment options they have selected.  Since 2017,
the Third-Party Manager for certain investment options in the Plans is identified to
participants as State Street Global Advisors ("State Street").  State Street operates SEC-
registered investment funds that I understand are widely used by U.S.-based retirement plans.
State Street provides information to Participants that identifies the top ten holdings in its
funds.  In connection with preparing this declaration, I reviewed the materials that were used
for 2015 and 2016 to prepare the website for U.S. Participants in the U.S. McKinsey
sponsored Plans to make their investment allocation decisions on an annual basis.  Based on

---

[13]     I understand from press reports that Massey Energy merged with ANR in 2011.

that review, Participants did not receive any disclosures in 2015 or 2016 regarding Third-Party Managers directing investments in the Plans.

17.)   The Investable Compass Funds are available to Investors for investment at different offering periods during the year, and Investors may request offering and subscription materials for the Funds in which they wish to invest.  Those offering materials do not identify Third-Party Managers to whom the Investable Compass Funds allocate monies for investment, or the underlying investments made by such managers.

18.)   Once an Investor makes an investment in an Investable Compass Fund, they receive (or can access on a website) from MIO several categories of performance-related information.[14]

19.)   First, Investors receive (or have access to) periodic reports regarding the performance of the Funds, as well as the appreciation or diminution of their personal investment balances.  These performance reports do not disclose the identities of Third-Party Managers, specific investments made by those Third-Party Managers, or specific MIO Direct Investments.

20.)   Second, Investors receive (or have access to) annual financial statements for any Investable Compass Funds in which they are invested.  The financial statements identify any MIO Direct Investments or allocations to Third-Party Managers that exceed 5% of the assets of the Investable Compass Fund.  The financial statements do not disclose underlying investments made by Third-Party Managers.

21.)   In connection with preparing this Declaration, I caused the annual financial statements of the Investable Compass Funds for 2015 and 2016 to be reviewed.  That review did not

---

[14]   This Declaration discusses information that MIO provides directly to Investors and Participants, and does not address information contained in publicly available filings that MIO is required to make under applicable laws and regulations.

identify any instance in which Whitebox Advisors was identified in the annual financial statements.

22.) Third, Investors in the Investable Compass Funds receive (or have access to) periodic newsletters, prepared by the MIO staff, about each Fund and its performance. In connection with preparing this Declaration, I caused the newsletters for the Investable Compass Funds for 2015 and 2016 to be reviewed. That review did not identify any instance in which Whitebox Advisors was identified in the newsletters. Indeed, the newsletters do not identify MIO Direct Investments, the Third-Party Managers to whom allocations have been made, or the underlying investments made by those Third-Party Managers, with one exception described in Paragraph 23 that has no relation to Whitebox or Alpha Natural Resources.

23.) As of 2015, certain of the Investable Compass Funds invest in private equity funds managed by Third-Party Managers (the "Compass Private Investment Funds"). Those externally managed private equity funds generally purchase portfolio companies, attempt to increase the value of those companies through active management, and then sell those companies at a profit. The newsletters for the Compass Private Investment Funds have occasionally identified portfolio companies that were already sold by a private equity fund in which the Compass Private Investment Fund had invested.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 9, 2018

_____

9

# Exhibit 14

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF MARK W. HOJNACKI IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AS PERFORMANCE IMPROVEMENT ADVISOR FOR THE DEBTORS AND DEBTORS IN POSSESSION EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE AND (II) GRANTING RELATED RELIEF

I, Mark W. Hojnacki, under penalty of perjury, declare as follows:

1. I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS US")[2] with an office at 55 East 52nd Street, New York, NY 10055. I am also a partner at McKinsey & Company, Inc. ("McKinsey"). I am duly authorized to make this Declaration on behalf of McKinsey RTS US in support of the application (the "Application") of the Westmoreland Coal Company and certain of its affiliates, other than Westmoreland Resource Partners GP,

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] All capitalized terms used but not defined herein shall have the meanings set forth in the Application or the Engagement Letter, as appropriate.

LLC, Westmoreland Resource Partners, LP, and its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") for entry of an order authorizing the employment and retention of McKinsey RTS US as performance improvement advisor for the Debtors and Debtors in Possession, effective *nunc pro tunc* to the Petition Date under the terms and conditions set forth in the postpetition engagement letter dated as of October 9, 2018 (the "Engagement Letter"), attached as **Exhibit 1** to **Exhibit A** of the Application.  I submit this Declaration (the "Declaration") in accordance with section 327(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a), 2016, and 5002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

2.      Except as otherwise noted, the statements set forth herein are based on my employment position and diligence undertaken by McKinsey's legal department or myself or professionals reporting to me, and if called and sworn as a witness, I would testify competently thereto.

### Qualifications of McKinsey RTS US

3.      The "Service Team," as used in this Declaration, includes (a) the directors, officers and employees of McKinsey RTS US, and (b) certain consultants borrowed from affiliates of McKinsey RTS US for the purpose of serving the Debtors in these chapter 11 cases.

4.      Members of the Service Team are employed by McKinsey RTS US and McKinsey & Company, Inc. United States and other affiliates that provide consulting services.

2

5.      McKinsey RTS US is a direct wholly-owned subsidiary of McKinsey & Company, Inc. United States, which in turn is a direct wholly-owned subsidiary of McKinsey Holdings, Inc., which in turn is a direct wholly-owned subsidiary of McKinsey.

6.      The Debtors seek to retain McKinsey RTS US as their performance improvement advisor based on its qualifications, skill, and expertise.  McKinsey RTS US is a global, full service advisory firm that draws on unmatched industry and functional expertise to support companies through all aspects of transformation.  Its members have extensive experience in improving the operational performance of financially troubled companies.  McKinsey RTS US is deeply experienced in working with clients to execute transformation plans that are focused on improving top-line, bottom-line, capital expenditures, and working capital.  McKinsey RTS US has been or is currently involved in numerous large and complex restructurings, including but not limited to: *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 25, 2017) (*ad hoc* lenders' committee); *In re GenOn Energy, Inc.*, 17-33695 (DRJ) (Bankr. S.D. Tex. July 13, 2017); *In re Sun Edison, Inc*., 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2016); *Alpha Natural Resources, Inc*., 15-33896 (KRH) (Bankr. E.D. Va. Aug. 3, 2015); *The Standard Register Company*, 15-10541 (BLS) Mar. 12, 2015); and *NII Holdings, Inc*., 14-12611 (SCC) (Bankr. S.D.N.Y. Sept. 15, 2014).[3]

7.      In addition, when relevant to a particular engagement, McKinsey RTS US utilizes the expertise of colleagues in the Electric Power and Natural Gas ("EPNG") and

---

[3]    Because of the voluminous nature of the orders cited in this Declaration, they are not attached to this Declaration. Copies of these orders are available upon request to McKinsey RTS US.

Basic Materials industry practices.[4]  The EPNG practice serves integrated electric utilities, independent power producers ("IPPs"), renewable players, new entrants, and transmission, distribution, and natural gas players.  The practice has done 2,045 projects in the sector over the past five years.  Over this time, the practice has served 70% of the 40 largest players and utilities in the sector globally, distributed across all geographies.  The EPNG practice helps clients shape leading growth strategies at a time of disruption in the industry, transform operational performance, achieve step-change in efficiency, and build an agile organization and culture for the future.  The EPNG practice also has proprietary power market analysis tools, providing rigorous strategic insights into forward looking market demand by segment, region, market structure, and expected shifts in operating margins across the value chain.  The EPNG practice has helped clients drive significant cash improvement  by  driving  best-practices  in  supply  chain  (contractor  productivity, asset/MRO procurement), power plant improvements, lean corporate center, optimizing back-office G&A, and driving capital excellence and productivity across the enterprise.

8.     The Basic Materials practice, which covers global metals & mining activity, has been engaged by clients on nearly 1,000 studies in the mining industry over the last five years and serves the majority of the world's top major diversified mining companies and many of the leading specialist mining companies (including many of the top coal producers).  This experience has given the Engagement Team (defined below) a unique understanding of industry trends and of key strategic operational success factors for the Debtors' business.

---

[4]     As also set forth in Paragraph 3, to the extent McKinsey RTS US borrowed any consultant associated with the EPNG and Basic Materials practices from an affiliate for the purpose of serving the Debtors in these chapter 11 cases, they have been defined to be a part of the Engagement Team, as that term is used in this Declaration.

9.      The Basic Materials practice includes a dedicated team of nearly 100 technical experts supporting a group of nearly 500 consultants continuously serving our clients around the globe.  These experts include numerous mine engineers, metallurgists, geologists, and business managers, each with deep operational experience in mining.  The practice is backed by an extensive program of proprietary research, high-impact management tools, and information experts who (a) provide insight into industry structure and dynamics (including supply, demand, trade flows, and future prospects for all major mining commodities) and (b) ensure that consulting teams have access to the latest thinking, approaches, and analyses on financial, market, operational, organizational, and strategic matters.  The Basic Materials practice has also implemented several knowledge development initiatives in the mining sector, including multi-year research projects addressing the most urgent client topics (e.g., a "Cost-Curve Initiative" looking at mining cost-economics of numerous commodities and several proprietary benchmarks  including a benchmark that allows mine operators to assess performance against a broad set of peers and the "McKinsey Mining Productivity Index," which tracks and compares the productivity of worldwide mining operations).  These initiatives, projects, and benchmarks ensure that the Basic Materials practice remains at the forefront of industry information and trends.

10.     The EPNG and Basic Materials practices include general consultants, dedicated practice consultants, and experts with relevant industry experience and academic backgrounds.  The practices are backed by dedicated research and information experts who provide insight into industry structure and dynamics and ensure that teams have access to the latest approaches and analyses on financial, market, operational, organizational, and

strategic matters for the consulting teams.  The experience of McKinsey RTS US, along with the experience of the EPNG and Basic Materials practices offers an extensive knowledge and expert base which will benefit the Debtors in these chapter 11 cases.

11.     Given McKinsey RTS US's substantial experience, prior to the filing of these chapter 11 cases, the Debtors, through McKinsey RTS US, retained members of the Service Team (all individuals retained to serve the Debtors in these bankruptcy cases, whether employed by McKinsey RTS US or borrowed from affiliates of McKinsey RTS US, are referred to in this Declaration as the "Engagement Team") to serve as their performance improvement advisor pursuant to an agreement dated July 17, 2018 (the "Prepetition Agreement"), which engagement was principally for the purpose of providing an initial diligence assessment to rapidly test areas of performance improvement opportunities, and to identify performance improvement initiatives with the intention to enhance the Debtors' performance.  The scope of the services provided under the Prepetition Agreement also included developing the infrastructure to support a broader execution program, supporting the Debtors in discussions with the *ad hoc* group of the Debtors' first lien creditors and the *ad hoc* group of the secured term lenders of Westmoreland Resource Partners LP, and providing other advisory services mutually agreed upon by the Debtors and McKinsey RTS US.

12.     As a result of the prepetition work performed on behalf of the Debtors by McKinsey RTS US, the Engagement Team is familiar with the Debtors and their businesses, including the Debtors' financial affairs, debt structure, operations, employee groups, cost structures, and related matters.  Since McKinsey RTS US's initial engagement, members of the Engagement Team have worked closely with the Debtors' management

and other professionals on numerous tasks related to performance improving opportunities, revenue drivers, and cost reduction opportunities.  Moreover, as a result of the services provided under the Prepetition Agreement, the Engagement Team has substantial knowledge of the Debtors' and non-Debtor subsidiaries' operating assets.  Consequently, the Engagement Team has developed significant relevant experience and expertise regarding the Debtors and the circumstances of these chapter 11 cases and has the skills, qualifications, and expertise necessary to assist the Debtors with their performance improvement efforts in an efficient and cost-effective manner.

**Terms and Scope of Engagement**

13.    The parties have entered into the Engagement Letter, the terms of which will govern the Debtors' retention of McKinsey RTS US during these chapter 11 cases, except as explicitly set forth in any order granting the Application.  As contemplated by Section 12 of the Engagement Letter, McKinsey RTS US requests approval of the Engagement Letter *nunc pro tunc* to the Petition Date.  The Engagement Letter was negotiated between the Debtors and McKinsey RTS US at arm's length and in good faith and reflects the parties' mutual agreement as to the substantial efforts that will be required during the course of this engagement.

14.    The Engagement Team will perform a broad range of services during these chapter 11 cases, including, without limitation, the following:[5]

■    <u>Operational Improvement Planning</u> – Assist the Debtors with identifying and planning detailed initiatives to support improvements in operating

---

[5]    Any references to, or descriptions of, the Engagement Letter herein are qualified by the express terms of the Engagement Letter, which shall govern in the event of any conflict between the Engagement Letter and the descriptions provided herein.

performance in mining operations, corporate functions, and commercial agreements.

■   Operational Support – Provide the Debtors with hands-on support to implement the detailed initiatives to support operational improvements.

■   Business Plan – Support the Debtors and their Restructuring Advisor, Alvarez & Marsal North America, LLC, with incorporating the operational improvement plans into the Debtors' business plan, disclosure statement, and plan(s) of reorganization.

■   Constituent Management – Assist in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend diligence sessions and working meetings with various stakeholders and constituents, and provide related *ad hoc* support to the management team on matters related to the operational improvement plans.

■   Other Operational Services – As appropriate, assist the Debtors with other matters as may be requested by the Debtors and that are mutually agreed upon between McKinsey RTS US and the Debtors.

15.     The services provided by the Engagement Team are necessary to enable the Debtors to maximize the value of their estates.  Specifically, the Engagement Team is instrumental in helping the Debtors develop and execute strategies related to significant operational improvements.

16.     The Engagement Team will complement, and not duplicate, the services rendered by any other professionals retained in these chapter 11 cases.  In particular, McKinsey RTS US has been retained to provide, and will carry out, unique functions that are not duplicative of the work performed by Centerview Partners LLC or Alvarez & Marsal North America, LLC and will coordinate with the Debtors and their other retained professionals to avoid the unnecessary duplication of services.  To the extent that the Debtors request services other than those detailed in the Engagement Letter, the Debtors will seek further approval from the Court for a supplement to the retention of McKinsey RTS US and any related modifications to the Engagement Letter, and such application shall

set forth, in addition to the additional services to be performed, the additional fees sought to be paid.

### Fee and Expense Structure

17.     Subject to Court approval, the Debtors will compensate McKinsey RTS US in accordance with the terms and conditions of the Engagement Letter, which provides a compensation structure (the "Fee and Expense Structure") as outlined below.

18.     Hourly Rates:  McKinsey RTS US's fees are to be based on the hours worked by members of the Engagement Team at the following hourly billing rates:

| Title of Professional | Hourly Rate |
| --- | --- |
| Practice Leader: | $995-$1,150 |
| Senior Vice President: | $735-$925 |
| Vice President: | $640-$735 |
| Senior Associate: | $530-$615 |
| Associate: | $425-$515 |
| Analyst: | $300-$425 |
| Paraprofessional: | $250-$275 |

Such rates and ranges will be subject to adjustment annually at such time as McKinsey RTS US adjusts its rates generally.

19.     At this time, it is not possible to estimate the number of professional hours that will be required to perform the services contemplated by the Engagement Letter. Accordingly, it is not possible to estimate the total compensation to be paid to McKinsey RTS US under the Engagement Letter.

20.     Expenses:  The Debtors will reimburse McKinsey RTS US for all reasonable and necessary out-of-pocket expenses incurred in connection with the engagement, such as, but not limited to, travel, consultants, case administrators, lodging,

postage, and communications charges following McKinsey RTS US's standard expense reporting. As McKinsey RTS US clients frequently request that McKinsey RTS US professionals travel to their offices and work there for extended periods of time, McKinsey RTS US developed its own official reimbursement policy with respect to its professionals' documentation of expenses (the "RTS Reimbursement Policy"). More specifically, members of the Engagement Team will seek reimbursement for expenses over thirty-five dollars ($35) that (a) have been charged on a McKinsey RTS US-provided corporate credit card or have a receipt, and (b) have a receipt for lodging. For amounts under thirty-five dollars ($35), members of the Engagement Team will seek reimbursement when exact amounts are submitted in lieu of a receipt. McKinsey RTS US intends to maintain detailed documentation of its professionals' actual and necessary costs and expenses in accordance with the RTS Reimbursement Policy.

21. Consistent with the scope of services to be provided by the Engagement Team, the Debtors and McKinsey RTS US negotiated and agreed upon the Fee and Expense Structure described above. In addition, McKinsey RTS US believes that the Fee and Expense Structure is reasonable and market-based and consistent with McKinsey RTS US's normal and customary billing levels for comparably sized and complex cases, both in and out-of-court, involving the services to be provided to the Debtors by the Engagement Team. To the best of my knowledge, the compensation arrangement reflected herein is consistent with, and typical of, arrangements entered into by other advisory firms rendering similar services for clients such as the Debtors.

22. Pursuant to the Prepetition Agreement, the Debtors paid McKinsey RTS US a retainer in the amount of $1,500,000 (the "Retainer") on August 1, 2018 in connection

with prepetition services to be performed by McKinsey RTS US. The Prepetition Agreement further provided that the Debtors would pay McKinsey RTS US the amount of $325,000 per week in exchange for the services set forth therein. On or about September 17, 2018, the parties entered into an oral agreement (the "Oral Agreement") to increase the weekly compensation payable to McKinsey RTS US to $480,000 based upon additional services related to a bottom-up planning analysis that McKinsey RTS agreed to provide. Accordingly, pursuant to the Prepetition Agreement, McKinsey RTS US was paid $325,000 per week for the period from July 23, 2018 through and including September 16, 2018, and pursuant to the Oral Agreement, McKinsey RTS US was paid $480,000 per week from September 17, 2018 through and including October 5, 2018.

23. McKinsey RTS US periodically invoiced the Debtors for its prepetition services. The Retainer was applied to McKinsey RTS US's prepetition invoices in accordance with the table set forth in paragraph 24 below, and such payments were used to replenish the Retainer. As of the Petition Date, the Retainer balance was $1,500,000.

24. During the ninety (90) days prior to the Petition Date, the Debtors paid McKinsey RTS US a total of $5,540,000 (inclusive of the Retainer and reimbursable expenses), in connection with prepetition services, as set forth below:

| Date of invoice | Date of payment receipt | Description | Transaction Type | Billed | Payment/Application | Fee Advance Balance |
|---|---|---|---|---|---|---|
| July 27, 2018 | August 1, 2018 | Fee Advance | ACH | | $1,500,000 | $1,500,000 |
| August 29, 2018 | September 17, 2018 | Services through 7/27/2018 | Bill | $325,000 | -$325,000 | $1,175,000 |
| August 29, 2018 | September 17, 2018 | Services through 8/3/2018 | Bill | $325,000 | -$325,000 | $850,000 |
| August 29, 2018 | September 17, 2018 | Services through 8/10/2018 | Bill | $325,000 | -$325,000 | $525,000 |
| August 29, 2018 | September 17, 2018 | Services through 8/17/2018 | Bill | $325,000 | -$325,000 | $200,000 |
| August 29, 2018 | September 17, 2018 | Fee Advance | ACH | | $1,300,000 | $1,500,000 |
| September 21, 2018 | October 5, 2018 | Services through 8/24/2018 | Bill | $325,000 | -$325,000 | $1,175,000 |
| September 21, 2018 | October 5, 2018 | Services through 8/31/2018 | Bill | $325,000 | -$325,000 | $850,000 |
| September 21, 2018 | October 5, 2018 | Services through 9/7/2018 | Bill | $325,000 | -$325,000 | $525,000 |
| September 21, 2018 | October 5, 2018 | Services through 9/14/2018 | Bill | $325,000 | -$325,000 | $200,000 |
| October 3, 2018 | October 5, 2018 | Services through 9/21/2018 | Bill | $480,000 | -$480,000 | -$280,000 |
| October 3, 2018 | October 5, 2018 | Services through 9/28/2018 | Bill | $480,000 | -$480,000 | -$760,000 |
| October 3, 2018 | October 5, 2018 | Services through 10/5/2018 | Bill | $480,000 | -$480,000 | -$1,240,000 |
| September 21, 2018 | October 5, 2018 | Fee Advance | ACH | | $1,300,000 | $60,000 |
| October 3, 2018 | October 5, 2018 | Fee Advance | ACH | | $1,440,000 | $1,500,000 |

25.     McKinsey RTS US received no other payments from the Debtors during the ninety (90) days immediately preceding the Petition Date.[6]

26.     As of the Petition Date, the Debtors owed McKinsey RTS US $96,000 in fees and expenses incurred prior to the Petition Date (the "Prepetition Balance").[7]  By this Application, the Debtors seek to modify the automatic stay to allow McKinsey RTS US to apply the Retainer to the Prepetition Balance.  Any remaining amounts of the Retainer after reconciliation with its outstanding prepetition fees and expenses will be applied as a credit toward postpetition fees and expenses, after such postpetition fees and expenses are approved in accordance with any applicable procedures and orders of the Court awarding fees and expenses to McKinsey RTS US.

**Record Keeping**

27.     McKinsey RTS US intends to apply to this Court for allowance of compensation for professional services rendered and reimbursement of expenses incurred

---

[6]     The Retainer shortfall for the prepetition work noted above resulted from delays of days or weeks in payments or invoicing for work performed by McKinsey RTS US. To resolve any preference issue, McKinsey RTS US has offered to repay that shortfall and to waive any claim under Section 502(h) of the Bankruptcy Code.

[7]     Specifically, the Prepetition Balance comprises services provided and expenses incurred by McKinsey RTS US on behalf of the Debtors on October 8, 2018.

in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable procedures and orders of the Court.

28.     Such applications will include time records setting forth, in reasonable detail, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors. McKinsey RTS US will maintain and file contemporaneous time records in one-tenth hour (.1) increments.  McKinsey RTS US also will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the services as discussed above.

### Indemnification Provisions

29.     As part of the overall compensation payable to McKinsey RTS US under the terms of the Engagement Letter, the Debtors have agreed to certain indemnification and contribution provisions described in the Engagement Letter (the "Indemnification Provisions").  The Indemnification Provisions provide that the Debtors will indemnify, hold harmless, and defend McKinsey RTS US (including its past, present, and future affiliates) and each of their directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors, and controlling persons (each, an "Indemnified Party," and collectively, the "Indemnified Parties") against liabilities arising out of (directly or indirectly) the Engagement Letter and/or McKinsey RTS US's retention by the Debtors in these chapter 11 cases, except for any liabilities judicially determined by a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of any of McKinsey RTS US or the other Indemnified Parties in connection with McKinsey RTS US's services provided under the Engagement Letter.  In addition, if indemnification or reimbursement obligations are held to be unavailable by any court

13

(other than in circumstances where a court determines that liability is from the willful misconduct or gross negligence of the Indemnified Party), the Engagement Letter allocates contribution obligations based on the relative benefits and faults of McKinsey RTS US and the Debtors.  The Engagement Letter further sets forth that McKinsey RTS US's aggregate liability shall be no more than the amount of its fees actually received under the Engagement Letter.

### **Disclosure Regarding Disinterestedness of McKinsey RTS US**

30.    McKinsey RTS US and its consulting affiliates have a long-standing policy of serving competing companies and do so in a manner that protects the confidentiality of each client's information.  Because of its practice of serving clients with overlapping or competing interests, these consulting affiliates do not have in place any centralized conflicts identification process, and instead have a global database of clients and engagements performed for those clients, which is kept principally for record keeping purposes and does not contain detailed descriptions of the client support.

31.    In anticipation of its proposed retention, on October 16, 2018 McKinsey RTS US received a list of potential parties in interest provided by the Debtors directly or through their other professional advisors (the "October 16, 2018 List") and, but for certain exceptions described below, reviewed the parties on that list for connections (the "Potential Parties in Interest").  The Potential Parties in Interest reviewed by McKinsey RTS US are reproduced as Schedule 1.  After Debtors' counsel, Kirkland & Ellis, LLP ("K&E") filed its Declaration, McKinsey RTS US learned that K&E had generated a new list of potential parties in interest (reproduced here as **Schedule 2**), which included approximately 230 entities not previously identified on the October 16, 2018 List.  The searches described in this Declaration were conducted based on the list attached as **Schedule 1** which has been

14

organized so that the categories of Potential Parties in Interest track the categories used by K&E in **Schedule 2**. McKinsey RTS US has started the process of searching the additional entities included on **Schedule 2** that were not searched as part of the **Schedule 1** search and will submit a supplemental declaration prior to the hearing date to identify any connections to those additional entities.

32.    To determine the existence of any client services provided to Potential Parties in Interest since October 1, 2016, McKinsey RTS US: searched the global client database, which covers clients of McKinsey RTS US and all affiliates that provide consulting services; reviewed billing records for members of the Service Team; and compiled and reviewed the list of all clients identified in McKinsey's financial records as clients of McKinsey RTS US.

33.    To date and to the best of my knowledge McKinsey RTS US has searched its global client database for the names of all entities on the October 16, 2018 List provided to McKinsey RTS US on October 16, 2018 with the following exceptions. Consistent with the search conducted by <u>K&E</u> relating to its retention, McKinsey RTS US did not search employees set forth on the October 16, 2018 List, or twenty-four (24) "Intercompany" entities that were determined by K&E to be inapplicable to these chapter 11 cases. McKinsey RTS US also searched entities in the category called Vendors in the October 16, 2018 List to the extent the entity spend was $500,000 or more from January 1, 2017 through August 14, 2018.[8]

---

[8]    Unlike K&E, McKinsey RTS US did not search approximately 150 Vendors with a spend of as low as $1,000 during this time period, and intends to do so and provide any applicable search results in a supplement to this Declaration.

34.     In anticipation of its proposed retention, McKinsey RTS US also surveyed by email: (a) members of the Service Team to determine the existence of any client services provided by members of the Service Team to the Potential Parties in Interest on **Schedule 1** and to identify any former employers or relationships, that members of the Service Team had or have with individuals or officers or directors at companies listed as Potential Parties in Interest on **Schedule 1**, since October 1, 2016, 2018, (b) members of the Service Team and partners at McKinsey RTS US and its affiliates globally that provide consulting services to determine the existence of client services provided since October 1, 2016 to any client that focused on a direct commercial relationship or transaction with the Debtors, (c) partners identified through its search of the global client database as bearing primary responsibility for services provided to Potential Parties in Interest listed on **Schedule 1** since October 1, 2016 to determine whether that service focused on a direct commercial relationship or transaction with the Debtors, and (d) all employees of McKinsey RTS US and its affiliates globally that provide consulting services to determine any personal or family relationships with, or employment by, the Debtors, the U.S. Trustee for Region 7, attorneys and employees at the Office of the U.S. Trustee for Region 7, and the bankruptcy judges in the Southern District of Texas, as well as any equity ownership in the Debtors.

35.     Based upon responses to the above inquiries, McKinsey RTS US included disclosures in this Declaration to the extent that (i) any member of the Service Team, since October 1, 2016, has provided consulting services to any of the Potential Parties in Interest on **Schedule 1**, or since October 1, 2016 was employed by or had relationships with individuals or officers or directors at companies listed as Potential Parties in Interest on **Schedule 1,** other than transient, incidental relationships; (ii) any member of the Service

16

Team or a partner at McKinsey RTS US or one of its consulting affiliates, since October 1, 2016 has provided services to any client focused on a direct commercial relationship or transaction with the Debtors; and (iii) any employee of McKinsey RTS US or its consulting affiliates, or any of their family members, since October 1, 2016, has had a personal relationship with or has been employed by the Debtors, the U.S. Trustee for Region 7, attorneys and employees at the Office of the U.S. Trustee for Region 7, or the bankruptcy judges in the Southern District of Texas, other than in the case of a transient, incidental relationship, or held equity ownership in the Debtors.  In respect of (i) above, to the best of my knowledge, all consulting services provided by the Service Team to Potential Parties in Interest on **Schedule 1**, and former employers or relationships with individuals or directors and officers of companies (other than transient, incidental relationships) on the list of Potential Parties in Interest included in **Schedule 1** are disclosed in paragraphs 47 through 71 below.  In respect of (ii) above, to the best of my knowledge, no member of the Service Team or partner at McKinsey RTS US or one of its consulting affiliates since October 1, 2016 has provided services to any client that focused on a direct commercial relationship or transaction with the Debtors.  In respect of (iii) above, to the best of my knowledge, no employee of McKinsey RTS US or its consulting affiliates, or any of their family members, since October 1, 2016, has had a personal relationship (other than a transient, incidental one) with or has been employed by the Debtors, the U.S. Trustee for Region 7, attorneys and employees at the Office of the U.S. Trustee for Region 7, or the bankruptcy judges in the Southern District of Texas, or has held equity ownership in the Debtors.

36.     McKinsey RTS US has an affiliate, MIO Partners, Inc. ("MIO Partners"), which is a wholly-owned indirect subsidiary of McKinsey and which is registered with the U.S. Securities and Exchange Commission as an investment adviser.  MIO Partners does not provide consulting services.  It manages assets for (i) pension plans sponsored by McKinsey ("Plans") in which current and former McKinsey employees participate ("Participants"), and (ii) privately offered investment vehicles ("Funds") in which McKinsey partners, former partners and their immediate family members ("Investors") can invest.  Certain McKinsey consulting affiliates, not including McKinsey RTS US, have invested funds with MIO solely for the purpose of satisfying obligations to guarantee benefits to Participants in defined-benefit pension plans.

37.     By design, MIO Partners is operated separately and distinctly from McKinsey's consulting services including for the purpose of ensuring McKinsey's disinterested service to its consulting clients.  The staff of MIO Partners is dedicated to MIO Partners.  No staff member of MIO Partners is engaged in the client service activities of McKinsey or is an employee of any McKinsey affiliate that provides consulting services to clients.  Subject to paragraph 38 below regarding Board members, Participants and Investors have no control over the investments made by the Plans or the Funds.  They have no ability to direct purchases or sales of any asset in the Plans or the Funds.

38.     While members of the Board of Directors of MIO Partners have oversight responsibilities with respect to the Plans and the Funds, no member of the Service Team serves on that Board.  Further, the Board of MIO Partners has delegated responsibility for making investment decisions on behalf of the Plans and the Funds to the professional staff of MIO Partners.  These professional staff are principally responsible for engaging and

supervising third-party managers who make investment decisions based on their own discretion.  MIO Partners' staff also make investment decisions on behalf of the Plans and the Funds in investment vehicles operated by MIO Partners.

39.     Pursuant to McKinsey data protection protocols, client information obtained in the course of serving clients is maintained by McKinsey on servers which employees of MIO Partners lack the credentials to access.  The investment records of MIO Partners are stored on servers maintained by MIO Partners which employees of McKinsey affiliates who provide consulting services lack the credentials to access.

40.     Because of the separateness of MIO Partners from McKinsey RTS US and its consulting affiliates, McKinsey RTS US has not asked MIO Partners to search for connections to the Potential Parties in Interest.

41.     As a result of an independent search performed in April 2018 by McKinsey RTS US relating to the publication of an article dated April 27, 2018 in the *Wall Street Journal*, and allegations set forth in a motion filed in *In re Alpha Natural Resources, Inc.*, Case No. 15-33896-KRH (Bankr. E.D. Va.) and a pleading filed in *Alix v. McKinsey & Co., Inc.,* Case No. 18-04141 (JMF) (S.D.N.Y.), McKinsey RTS US learned that MIO Partners had an investment manager relationship with Whitebox Advisors, Inc. ("Whitebox").  McKinsey RTS US is unaware of whether MIO Partners's connection to Whitebox is ongoing and is also unaware of which Whitebox funds have connections to the Debtors.  Accordingly, McKinsey RTS US is unaware whether any funds invested by MIO Partners are placed with any Whitebox funds with connections to the Debtors.

42.     Based on the searches described above, to the best of my knowledge, after reasonable inquiry, except as set forth herein, including McKinsey RTS US's prepetition

work for the Debtors, McKinsey RTS US (a) does not have any connection with the Debtors or their affiliates, their creditors, or any other Potential Parties in Interest in these cases, (b) is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code, (c) does not hold or represent any interest adverse to the Debtors' estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, (d) is not and has not been a creditor, an equity security holder, or an insider of the Debtors, and (e) is not and has not been, since October 1, 2016, a director, officer, or employee of the Debtors.

43.    Mar-Bow Value Partners, LLC ("Mar-Bow") alleges that it is a creditor of the Debtors.  McKinsey RTS is currently involved in litigation against Mar-Bow. Specifically, Mar-Bow is currently seeking to reopen *In re Alpha Natural Resources, Inc.*, Case No. 15-33896-KRH (Bankr. E.D. Va.), formerly pending before the United States Bankruptcy Court for the Eastern District of Virginia, and to conduct discovery in aid of a motion for relief from judgments on the basis of fraud on the court purportedly committed by McKinsey RTS US.  Mar-Bow's motions are fully briefed and a scheduling conference is scheduled before the court on December 5, 2018.

44.    McKinsey also owns a proprietary program management tool used by McKinsey clients, including clients of McKinsey RTS US and its consulting affiliates.  The tool enables the client service team and the client to define initiatives and track progress.  The tool is created by uploading and processing information obtained from clients; however, confidential information is segregated by client and maintained strictly confidentially.  Access to confidential client information is provided, on a "need to know" basis, to members of the team of McKinsey employees and agents who are dedicated to

supporting the program management tool and are bound to maintain the confidentiality of client information.

45.     McKinsey owns a proprietary knowledge benchmarking tool which incorporates confidential operational data and information of clients in the mining industry who elect to participate in the benchmarking model ("Benchmarking Confidential Information"). The benchmarking tool is maintained by a team of McKinsey professionals (the "Benchmarking Tool Team") who provide it to McKinsey RTS US and its affiliates to use in serving clients. The benchmarking tool is used to enable participants to compare their own data with the aggregated, disguised data of other participants in the benchmark. Benchmarking Confidential Information is maintained strictly confidential and in a manner that does not allow participants to be identified. It is disclosed only to members and agents of the Benchmarking Tool Team on a "need to know" basis.

46.     Based upon the research described above, McKinsey RTS US has ascertained that since October 1, 2016 the Service Team has served, either through McKinsey RTS US or one of its consulting affiliates, the following Potential Parties in Interest, but unless indicated otherwise, on matters unrelated to the Debtors and their chapter 11 cases. More specifically, to the best of my knowledge and belief:

47.     Pursuant to an agreement dated as of March 26, 2018, McKinsey RTS US was retained by Paul, Weiss, Rifkind, Wharton & Garrison LLP, in its capacity as counsel to those certain unaffiliated holders of the 12% Senior Secured Notes due 2021 issued by Tru Taj LLC and TRU Taj Finance, Inc., and guaranteed by Toys "R" Us, Inc. and certain other parties (each a "Member" and collectively, the "Ad Hoc Group") to provide services unrelated to the Debtors, the Debtors' chapter 11 cases, or the claims of any Members of

21

the Ad Hoc Group against the Debtors.  The following Members of the Ad Hoc Group, or their affiliates, are included in the list of Potential Parties in Interest on **Schedule 1**: Barclays Bank PLC, Barclays PLC, Bluemountain CLO Ltd, Bluemountain CLO 2012-2 Ltd, Bluemountain CLO 2013-1 Ltd, Bluemountain CLO 2013-4, Bluemountain CLO 2014-1 Ltd, Bluemountain CLO 2014-3 Ltd, Bluemountain CLO 2014-4, Ltd, Bluemountain CLO 2015-1, Bluemountain CLO 2015-2 Ltd, Bluemountain CLO 2015-4 Ltd, Bluemountain CLO 2016-1 Ltd, Bluemountain CLO 2016-2 Ltd, Bluemountain CLO 2016-3 Ltd, Cerberus Business Finance, LLC, Stonehill Institutional Partners L.P., Stonehill Master Fund Ltd, Stonehill Capital Management Inc., Stonehill Capital Management LLC, York Credit Opportunities Fund L.P., and York Credit Opportunities Investments Master.

48.    **Debtor Affiliates.**  As the Engagement Team is serving the Debtors, members of the Service Team have a connection to affiliates of the Debtors included in this and other categories on the list of Potential Parties in Interest.

49.    **Directors & Officers.**  To the best of my knowledge, no member of the Service Team is related to or has a relationship (outside of service to the Debtors) with any of the individuals identified in this category.

50.    **5% or More Shareholders.**  Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following 5% or More Shareholders: American International Group, American International Group Inc.; Bank of America Corp.; BNP Paribas, BNP Paribas Arbitrage SA; JP Morgan Asset Management, Japan JPMorgan Chase & Co.; State Street Corp.; and one (1) Confidential Client.  Members of the Service Team were previously employed, since October 1, 2016,

by the following 5% or More Shareholders on matters unrelated to the Debtors, the
Debtors' chapter 11 cases, or such 5% or more Shareholders' claims against the Debtors:
JP Morgan Asset Management, Japan JPMorgan Chase & Co.

      51.    **Bank-Lender-Administrative Agents.**  Members of the Service Team,
since October 1, 2016 have served, either through McKinsey RTS US or an affiliate
thereof, the following Bank-Lender-Administrative Agents or entities that are affiliates of
such Bank-Lender-Administrative Agents on matters unrelated to the Debtors, the Debtors'
chapter 11 cases, or such Bank-Lender-Administrative Agents' claims against the Debtors:
Oaktree Capital Management Inc., Oaktree Opportunities Fund X Holding, Oaktree Value
Opportunities Fund, Oaktree Value Opportunities Fund Holdings LP; State Street Corp.;
and US Bank NA.

      52.    **Bankruptcy Judges.**  To the best of my knowledge, no member of the
Service Team, since October 1, 2016 has served or been employed by any of the
Bankruptcy Judges included on the list of Potential Parties in Interest.

      53.    **Bankruptcy Professionals.** Members of the Service Team were previously
employed, since October 1, 2016, by the following Bankruptcy Professionals on matters
unrelated to the Debtors and the Debtors' chapter 11 cases: Alvarez & Marsal North
America LLC; Ernst & Young LLP; and FTI Consulting Inc.

      54.    **Bondholders-Indentured Trustee.**  To the best of my knowledge, no
member of the Service Team, since October 1, 2016 has served or been employed by any
of the Bondholders-Indentured Trustees or entities or individuals that are affiliates of such
Bondholders-Indentured Trustees.

55.    **Contract Counterparties.**  Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following Contract Counterparties  or entities or individuals that are affiliates of such Contract Counterparties on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Contract Counterparties' claims against the Debtors: Bank of America National Trust & Savings Association, Bank of New England, Bank of New England NA; Vistra BV; BHP Billiton, BHP Billiton Ltd., BHP Billiton New Mexico Coal Co., BHP Mine Management Co., BHP Minerals International Inc., BHP Navajo Coal Co.; Alight; BP Canada Energy Group; Caterpillar, Caterpillar Financial, Caterpillar Financial Services, Caterpillar Financial Service Ltd., Caterpillar Financial Services Corp., Caterpillar Financial Services Leasing ULC, Caterpillar Financial Services Ltd., Caterpillar Inc., Mining Financial Services; Duke Energy Kentucky Inc.; HP Channel Services Network; Cyprus Creek Land Co., Cyprus Creek Land Resources, Cyprus Creek Land Resources LLC, Peabody Coal Co. LLC, Peabody Development Co. LLC; Shell Mining Co.; TransAlta Centralia Generation LLC, TransAlta Cogeneration LP, TransAlta Generation Partnership, TransAlta Utilities Corp., Transalta Corp.; Grainger Industrial Supply, Grainger Industrial Supply India Ltd., WW Grainger Inc.; Northern States Power Co., Xcel Energy Services Inc.; Xerox Corp.; Chase Manhattan Bank NA; and three (3) Confidential Clients.  A member of the Service Team, since October 1, 2016 has served, either through McKinsey RTS US or an affiliate thereof a Crown corporation which is controlled by the following Contract Counterparty or one of its related instrumentalities on matters unrelated to the Debtors or the Debtors' chapter 11 cases: Alberta, Province of (Canada), Minister of Finance.  Members of the Service Team, since October 1, 2016 have served, either through

McKinsey RTS US or an affiliate thereof, GenOn Energy, Inc., a wholly owned subsidiary of the following Contract Counterparties or an affiliate of such Contract Counterparties on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Contract Counter-parties' claims against the Debtors: NRG Energy, Inc., NRG Texas Power LLC, and NRG Texas Power LLC as Beneficiary.   Members of the Service Team were previously employed, since October 1, 2016, by the following Contract Counterparties on matters unrelated to the Debtors and the Debtors' chapter 11 cases: Chase Manhattan Bank NA; FTI Consulting Inc.; Enbridge Pipelines (East Texas) LP; Portland General Electric Co., General Electric Capital Corp.; United States Government; and Alvarez & Marsal North America LLC. A member of the Service Team was previously employed, since October 1, 2016, by the following Contract Counterparty on matters unrelated to the Debtors and the Debtors' chapter 11 cases and continues to maintain relationships with certain officers at such Contract Counterparty: Peabody Energy Corporation.

56.   **Customers.**   A member of the Service Team was previously employed, since October 1, 2016, by the following Customer on matters unrelated to the Debtors and the Debtors' chapter 11 cases: Portland General Electric Company.

57.   **Governmental/Regulatory Agencies.**   From time to time, members of the Service Team serve on engagements for departments and agencies of the US Federal government and various state governments as well as instrumentalities or entities under the control of the Canadian government and various provincial governments. To the best of my knowledge and except as set forth in paragraph 55 above, no member of the Service Team since October 1, 2016 has served or been employed by any of the U.S. or Canadian

federal, state or provincial departments, agencies, instrumentalities or controlled entities identified on the list of Potential Parties in Interest.

58.     **HR Benefits**.  Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following entities included in HR Benefits on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such HR Benefits entities' claims against the Debtors: Automatic Data Processing Inc.; and one (1) Confidential Client.

59.     **Insurance.**  Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following Insurance entities or entities or individuals that are affiliates of such Insurance entities on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Insurance entities' claims against the Debtors: AIG Insurance Co. of Canada, and National Union Fire Insurance Company of Pittsburgh.

60.     **Landlords.**  To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Landlords or entities or individuals that are affiliates of such Landlords.

61.     **Litigation.**  To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Litigation parties or entities or individuals that are affiliates of such Litigation parties.

62.     **Ordinary Course Professionals.**   To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Ordinary Course Professionals included on the list of Potential Parties in Interest.

63. **Other Significant Creditors.** To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Other Significant Creditors or entities or individuals that are affiliates of such Other Significant Creditors.

64. **Significant Competitors.** Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following Significant Competitors or entities or individuals that are affiliates of such Significant Competitors on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Significant Competitors' claims against the Debtors: Peabody Energy Corp. A member of the Service Team was previously employed by the following Significant Competitor and continues to maintain relationships with certain officers at such Significant Competitor: Peabody Energy Corporation.[9]

65. **Sureties.** To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Sureties or entities or individuals that are affiliates of such Sureties.

66. **Taxing Authorities.** To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Taxing Authorities or entities that are affiliates of such Taxing Authorities.

67. **Top 50 Creditors.** To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Top 50 Creditors or entities that are affiliates of such Top 50 Creditors.

---

[9]   Peabody Energy Corporation or its affiliates appear in the category Contract Counterparties on the list of Potential Parties in Interest.

Case 16-35672   Document 962   Filed in TXSB on 11/08/18   Page 623 of 194

68.   **U.S. Trustee Office.**   To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by the Office of the U.S. Trustee Office in the Southern District of Texas.

69.   **Unions.**   To the best of my knowledge, no member of the Service Team, since October 1, 2016 has served or been employed by any of the Unions or entities or individuals that are affiliates of such Unions.

70.   **Utilities.**   Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following Utilities or entities or individuals that are affiliates of such Utilities on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Utilities' claims against the Debtors: Dish Network Corp.; Columbia Gas, and Columbia Gas of Ohio Inc.  Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, GenOn Energy, Inc., a wholly owned subsidiary of the following Utilities or an affiliate of such Utilities on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Utilities' claims against the Debtors: NRG Energy, Inc., NRG Texas Power LLC, and NRG Texas Power LLC as Beneficiary.

71.   **Vendors.**   Members of the Service Team, since October 1, 2016 have served, either through McKinsey RTS US or an affiliate thereof, the following Vendors or entities or individuals that are affiliates of such Vendors on matters unrelated to the Debtors, the Debtors' chapter 11 cases, or such Vendors' claims against the Debtors: ADP, ADP, Inc; BHP Billiton New Mexico Coal Inc.; BP Energy Co.; Cat Financial Services Corp., Cat Rental Store, Caterpillar Finance Services, Caterpillar Financial Services, Caterpillar Financial Services Corp; Orica Canada Inc.; U.S. Bank; Acklands – Grainger

Inc., Grainger Inc.; and one (1) Confidential Client. Members of the Service Team were previously employed, since October 1, 2016, by the following Vendors on matters unrelated to the Debtors and the Debtors' chapter 11 cases: General Electric Canada Inc.; Ernst & Young.

72.     In addition, McKinsey RTS US and its affiliates serve clients across a broad range of industries, functions, and geographies, and within industries, serve competitors and do so in a manner that protects the confidentiality of each client's information (including the confidentiality of the engagement itself). Thus, certain affiliates of McKinsey RTS US may have in the past provided services for, may presently be providing services for, and may in the future provide services for entities that are determined to be creditors, lenders, shareholders, insurers, customers, competitors, vendors, or contract counterparties in each case of the Debtors or otherwise Potential Parties in Interest; however, to the best of my knowledge, such services are unrelated to the Debtors and these chapter 11 cases unless explicitly stated otherwise herein, and do not focus on a direct commercial relationship or transaction with the Debtors. If any work for other clients of affiliates of McKinsey RTS US focused on a direct commercial relationship or transaction with the Debtors, it is explicitly stated in this Declaration. Further, if McKinsey RTS US becomes aware of any work for other clients of affiliates of McKinsey RTS US that focuses on a direct commercial relationship or transaction with the Debtors after the date of this Declaration, it will update the Court in a supplement to this Declaration.

73.     McKinsey RTS US and its affiliates do, however, from time to time, provide overall strategic analysis and advice to companies that operate in the wholesale power generation and North American coal mining sectors in which the Debtors operate, which

analysis and advice could include review and comment on publicly available information and strategic considerations with respect to the Debtors, as well as other companies. McKinsey RTS US and affiliates' service to other companies in the industry in which the Debtors operate may focus on the macro landscape of the industry but should have no direct effect on the Debtors given the nature of the market.  If any work for other clients of McKinsey RTS US or its affiliates focused a direct commercial relationship or transaction with the Debtors, it is explicitly stated in this Declaration.  Further, if McKinsey RTS US becomes aware of any work for other clients that focuses on a direct commercial relationship or transaction with the Debtors after the date of this Declaration, it will update the Court in a supplement to this Declaration.

74.    As noted, McKinsey RTS US and its affiliates have a long-standing policy of serving competing companies and do so in a manner that protects the confidentiality of each client's information.  In fact, McKinsey RTS US's expertise which the Debtors desire to utilize for the purposes described herein derives from McKinsey RTS US's and its affiliates' broad-based service in many different aspects of the industry and business sector in which the Debtors operate.

75.    Based upon the responses to the inquiries described in this Declaration, to the best of my knowledge, no members of the Service Team, McKinsey RTS US and its consulting affiliates are or have immediate family members that are related to or employed by (A) the Debtors, (B) the U.S. Trustee for Region 7, Hector Duran, Jr., employees at the Office of the U.S. Trustee, or (C) any judge or employee of the United States Bankruptcy Court for the Southern District of Texas.  In addition, to the best of my knowledge, no

member of the Service Team, McKinsey RTS US, and its consulting affiliates or their family members hold equity securities of the Debtors.[10]

76.    In addition, as part of its practice, McKinsey RTS US and its consulting affiliates provide support to clients on purchasing and supply management relating to direct and indirect materials and services, including in the wholesale power generation and global coal mining sectors.  Generally, the services consist of fact-based analysis to understand the client's costs and who other potential vendors are, support in developing requests for proposal, and analysis of and advice relating to the responses from vendors.  McKinsey RTS US and its affiliates do not directly contact or negotiate with vendors for their clients, except that McKinsey RTS US may negotiate as agreed with its clients in certain circumstances.  While we do not believe that such support is adverse to the interests of the Debtors, out of an abundance of caution, McKinsey RTS US will independently evaluate the request of any member of the Service Team to provide purchasing and supply management support relating to the wholesale power generation and North American coal mining sectors to any company for whom any of the Debtors are either an incumbent provider or a potential vendor, prior to confirming such support.  Further, if McKinsey RTS US becomes aware of any such work for other clients, by McKinsey RTS US or its affiliates that provide client services, that focuses on or is adverse to the interests of the

---

[10]    In reviewing its records and the relationships of its professionals, McKinsey RTS US did not seek information as to whether any member of McKinsey RTS US or its consulting affiliates or their family members: (a) indirectly own, through a public mutual fund, or MIO Partners Plan or Fund, or through partnerships in which certain employees have invested but as to which such professionals have no control over or knowledge of investment decisions, securities of the Debtors; or (b) have engaged in any ordinary course consumer transaction with any party in interest.  If any such relationship does exist, it would not impact McKinsey RTS US's disinterestedness including for the reasons stated elsewhere in this Declaration, or otherwise give rise to a finding that McKinsey RTS US holds or represents an interest adverse to the Debtors' estates.

Debtors after the date of this Declaration, it will update the Court in a supplement to this Declaration.

77.    To the best of my knowledge, JPMorgan Chase & Co. and American International Group each account for slightly more than one (1%) percent of McKinsey RTS US's gross annual revenue as of September 30, 2018.  To the best of my knowledge, GenOn Energy, Inc., an affiliate of NRG Energy, Inc.,[11] accounts for approximately 6.97% of McKinsey RTS US's gross annual revenue as of September 30, 2018, and one Confidential Client[12] accounts for approximately 17.5% of McKinsey RTS US's gross annual revenues as of September 30, 2018.[13]  In each case, McKinsey RTS US's support to JPMorgan Chase & Co., American International Group, GenOn Energy, Inc. and one (1) Confidential Client is on matters unrelated to the Debtors and their chapter 11 cases.

78.    Members of the Service Team served GenOn Energy, Inc. in its chapter 11 cases which were presided over by Judge Jones, but such members had no relationship with Judge Jones other than with respect to their professional services on behalf of GenOn.

79.    McKinsey RTS US has adopted procedures to identify any proposed support by any McKinsey RTS US affiliate that provides client services and focuses on a direct commercial relationship or transaction with the Debtors, so that McKinsey RTS US may either make disclosure of such potential engagement to the Court or take other

---

[11]    As part of the plan of reorganization for GenOn Energy, Inc., NRG's equity interest in GenOn Energy, Inc. will be eliminated as of the Effective Date, which is expected to be within the next thirty (30) days.

[12]    This Confidential Client is included in the following categories on the list of Potential Parties in Interest in **Schedule 1**:  Contract Counterparties, Vendors.

[13]    McKinsey RTS US is a small business within McKinsey and accordingly, clients that account for these percentages of McKinsey RTS US's gross annual revenues in a 12-month period do not account for a significant percent of McKinsey's gross annual revenues in the same period.

appropriate steps.  If and when retained, McKinsey RTS US will again communicate to all partners at McKinsey RTS US and its affiliates directing them to notify the office of McKinsey's General Counsel of any such proposed client engagements.  In addition, McKinsey RTS US will again communicate with all of its members directing them to notify the office of McKinsey's General Counsel of proposed client engagements involving Potential Parties in Interest.

80.     Finally, as part of its diverse practice, McKinsey RTS US and its affiliates are involved in numerous matters and transactions involving many different professionals, including many of the professionals named as Potential Parties in Interest in these chapter 11 cases.  Further, McKinsey RTS US and its affiliates may have in the past been represented by, may currently be represented by, and may in the future be represented by or work with attorneys, law firms, or financial advisors who are involved in these proceedings, including law firms and financial advisors representing the Debtors. Specifically, McKinsey RTS US and its affiliates have been represented, since October 1, 2016, by the following professionals (or affiliates thereof) named as Potential Parties in Interest on **Schedule 1** or have worked alongside them in other matters unrelated to the Debtors and these chapter 11 cases: Jones Day, Schulte Roth & Zabel, LLP, Bryan Cave LLP, Wilmer Cutler Pickering Hale and Dorr, Deloitte & Touche LLP, Ernst & Young LLP, Lazard Freres and Co. LLC, and Pricewaterhouse Coopers.  Further, McKinsey RTS has worked alongside K&E in a prior chapter 11 case, and McKinsey RTS and one of its affiliates have retained K&E on matters unrelated to the Debtors and these chapter 11 cases. McKinsey RTS has retained Morrison & Forester LLP, who is serving as UCC counsel in these chapter 11 cases, and BRG Financial Services (Berkeley Research Group), financial

advisor to the UCC, in matters unrelated to the Debtors and these chapter 11 cases. McKinsey RTS US and its affiliates may in the past have served, may currently serve, and may in the future serve professionals in these cases on matters unrelated to these chapter 11 cases. In addition, as noted above, McKinsey RTS US and its affiliates in the past have worked with, or currently work with, many of the professionals named as Potential Parties in Interest on **Schedule 1**, and likely will continue in the future to work with professionals involved in these cases, on matters unrelated to these chapter 11 cases. Lastly, McKinsey RTS US and its affiliates may have in the past contracted with, may currently contract with, and may in the future contract with certain service providers listed as Potential Parties in Interest for necessary business services. Specifically, McKinsey RTS US and its affiliates have contracted with, since October 1, 2016, the following service providers (or affiliates thereof) named as Potential Parties in Interest or worked with them on other matters unrelated to the Debtors and these chapter 11 cases: Aon PLC and Iron Mountain. McKinsey RTS US does not have a specific agreement to refer or accept referrals from any professional in these chapter 11 cases. Further, McKinsey RTS US does not receive a significant portion of its referrals from any professional retained in these chapter 11 cases. To the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors herein on matters upon which the Service Team is to be employed, and none are in connection with these chapter 11 cases.

81. McKinsey RTS US has not shared or agreed to share any of its compensation from the Debtors with any other person, other than as permitted by section 504 of the Bankruptcy Code.

82.     Based upon the foregoing, I believe that McKinsey RTS US does not hold an adverse interest to the Debtors' estates, and that McKinsey RTS US is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code.

83.     McKinsey RTS US reserves the right to supplement this Declaration in the event it becomes aware of any relationship or other information that requires disclosure, pursuant to its ongoing internal conflict checking process.  McKinsey RTS US understands it has the obligation pursuant to Bankruptcy Rule 2014 to further supplement its declarations in the event it becomes aware of any relationship or other information that requires disclosure.


[*Remainder of page left intentionally blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: November 8, 2018
        New York, New York

                                                    */s/ Mark W. Hojnacki*
                                                    Mark W. Hojnacki
                                                    Practice Leader

## **SCHEDULE 1**

The following lists contain the names of reviewed entities as described more fully in the *Declaration of Mark W. Hojnacki in Support of the Debtors' Application for the Entry of an Order Authorizing the Retention and Employment of McKinsey RTS US as Performance Improvement Advisor for the Debtors and Debtors in Possession, Effective Nunc Pro Tunc to the Petition Date* (the "Hojnacki Declaration").[1] Where the names of the entities reviewed are incomplete or ambiguous, the scope of the search was intentionally broad and inclusive, and McKinsey RTS US reviewed each entity in its records, as more fully described in the Hojnacki Declaration, matching the incomplete or ambiguous name.

| **Schedule** | **Category** |
| --- | --- |
| 1(a) | Debtor Affiliates |
| 1(b) | Directors & Officers |
| 1(c) | 5% or More Shareholders |
| 1(d) | Bank-Lender-Administrative Agents |
| 1(e) | Bankruptcy Judges |
| 1(f) | Bankruptcy Professionals |
| 1(g) | Bondholders – Indentured Trustee |
| 1(h) | Contract Counterparties |
| 1(i) | Customers |
| 1(j) | Governmental/Regulatory Agencies |
| 1(k) | HR Benefits |
| 1(l) | Insurance |
| 1(m) | Landlords |
| 1(n) | Litigation |
| 1(o) | Ordinary Course Professionals |
| 1(p) | Other Significant Creditors |
| 1(q) | Significant Competitors |
| 1(r) | Sureties |
| 1(s) | Taxing Authorities |
| 1(t) | Top 50 Creditors |
| 1(u) | Unions |
| 1(v) | US Trustee Office |
| 1(w) | Utilities |
| 1(x) | Vendors |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Hojnacki Declaration.

# SCHEDULE 1 (a)

## Debtor Affiliates

Absaloka Coal, LLC
Basin Resources, Inc.
Buckingham Coal Company, LLC
Dakota Westmoreland Corporation
Daron Coal Company, LLC
Harrison Resources, LLC
Haystack Coal Company
Oxford Conesville, LLC
Oxford Mining Company - Kentucky, LLC
Oxford Mining Company, LLC
Prairie Mines & Royalty ULC
San Juan Coal Company
San Juan Transportation Company
Texas Westmoreland Coal Company
WCC Holding B.V.
WCC Land Holding Company, Inc.
WEI - Roanoke Valley, Inc.
WRI Partners, Inc.
Western  Energy Company
Westmoreland - Roanoke Valley, LP
Westmoreland Canada Holdings Inc.
Westmoreland Canada LLC
Westmoreland Canadian Investments, LP
Westmoreland Coal Company
Westmoreland Coal Company Asset Corp
Westmoreland Coal Sales Company, Inc.
Westmoreland Energy Services New York, Inc.
Westmoreland Energy Services, Inc.
Westmoreland Energy, LLC
Westmoreland Kemmerer Fee Coal Holdings, LLC
Westmoreland Kemmerer, LLC
Westmoreland Mining LLC
Westmoreland North Carolina Power, LLC
Westmoreland Partners
Westmoreland Power, Inc.
Westmoreland Prairie Resources Inc.
Westmoreland Resource Partners, LP

Westmoreland Resources GP, LLC
Westmoreland Resources, Inc.
Westmoreland Risk Management, Inc.
Westmoreland San Juan Holdings, Inc.
Westmoreland San Juan, LLC
Westmoreland Savage Corporation

## <u>SCHEDULE 1 (b)</u>

### <u>Directors & Officers</u>

Alessi, Keith E.
Bachynski, Terry
Clutterbuck, Robert T.
Flexon, Robert C.
Grafton, Jennifer S.
Hamilton, Gail E.
Honish, Gregory J.
Horton, Keith
Hutchinson, Michael G.
Klein, Laurentius Ireneus Winfridus
Klingaman, Richard M.
Kohn,  Gary A.
Kost, Kurt D.
Mackus, Craig R.
Meyer, Michael J.
Packwood, Jan B.
Paprzycki, Kevin A.
Scharp, Robert C.
Stein, Jeffrey S.
Tinstman, Robert A.
Troup, Nathan M.
Tywoniuk, Gerald A.
Ungurean, Charles C.
Veenstra, Jason W.

# SCHEDULE 1 (c)

## 5% or More Shareholders

Alliance Bernstein
Alliance Bernstein LP
Allianz Global Investors of America LP
Allianz SE
Allianz of America
American International Group
American International Group Inc.
BNP Paribas
BNP Paribas Arbitrage SA
Bachynski, Terry J.
Bank of America Corp.
Bank of New York Mellon Corp.
Barclays PLC
BlackRock Inc.
Blackrock Advisors LLC
Blackrock Fund Advisors
Blackrock Institutional Trust
Blackrock Investment Management LLC
Boston Partners
Citigroup Inc.
Clarke, Ana M.
Connecticut General Life Insurance Co.
Deutsche Asset Management
Deutsche Bank AG
Fidelity Investments
Fidelity Management & Research
Flexon, Robert C.
Gendell, Jeffrey L.
Grafton, Jennifer S.
Hamilton, Gail E.
Hutchinson, Michael G.
JP Morgan Asset Management
Japan JPMorgan Chase & Co.
Kohn, Gary A.
Lyxor
Lyxor International Asset Management
Mackus, Craig R.
Mangrove Partners
Mangrove Partners Master Fund Ltd.
Manulife Financial Corp.

Micheletti, Joseph E.
Morgan Stanley
Morgan Stanley & Co. LLC
Morgan Stanley Smith Barney LLC
Nationwide Financial Services Inc.
Nationwide Fund Advisors
Pacific Investment Management Co.
Packwood, Jan B.
Paprzycki, Kevin A.
Parametric Portfolio Associates
Power Corp. of Canada
Prelude Capital Management LLC
Principal Financial Group Inc.
Principal Management Corp.
ProShare Advisors LLC
ProShares Advisors LLC
Prudential Financial Inc.
Prudential Insurance Co. of America
Prudential Retirement Insurance & Annuity
RBC Capital Markets Arbitrage
RBC Trust Co. Delaware Ltd.
Renaissance Technologies LLC
RhumbLine Advisers
Robeco USA LLC
Royal Bank of Canada
Russell Investment Management
Russell Investments Canada Ltd.
Russell Investments Group Ltd.
Russell Investments Ireland Ltd.
Rydex Investments
SEI Investment Management Corp.
SEI Investments Co.
SEI Investments Fund Management
SG Americas Securities LLC
SSGA Funds Management Inc.
STRS Ohio
Schadan, John A.
Scharp, Robert C.
Security Investors LLC
Sigma Planning Corp.

Simplex Trading LLC
State Board of Administration of Florida
    Retirement System
State Farm Investment Management Corp.
State Farm Mutual Auto Insurance
State Street Corp.
Stein, Jeffrey S.
Stone Ridge Asset Management LLC
Stonehill Capital Management Inc.
Stratos Wealth Partners Ltd.
SunAmerica Asset Management LLC
SunTrust Plan
T. Rowe Price Associates
T. Rowe Price Group Inc.
TFS Capital LLC
Teachers Advisors Inc.
Teachers Insurance & Annuity Association-
    College Retirement Equities Fund
The Manulife Asset Management US LLC
Tinstman, Robert A.
Tower Research Capital LLC
Troup, Nathan M.
UBS
UBS Group AG
Veenstra, Jason W.
Voya Investment Management LLC
Voya Investments LLC
Wells Fargo & Co.
Wells Fargo Advisors LLC
Wells Fargo Bank NA
Wells Fargo Securities LLC
Westmoreland Coal Co.

## SCHEDULE 1 (d)

### Bank Lender Administrative Agents

Adams Mill CLO Ltd.
Allianz Global Investors of America LP
Allianz SE
Argo Group International Holding
Aviva Group
Aviva Investors
Aviva plc
BMO Capital Markets Corp.
Bank of Montreal
Bank of Tokyo-Mitsubishi UFJ Ltd.
Barclays Bank PLC
Blackrock Capital Investment Corp.
BlueMountain CLO 2012-2 Ltd.
BlueMountain CLO 2013-1 Ltd.
BlueMountain CLO 2013-4
BlueMountain CLO 2014-1 Ltd.
BlueMountain CLO 2014-3 Ltd.
BlueMountain CLO 2014-4, Ltd.
BlueMountain CLO 2015-1
BlueMountain CLO 2015-2 Ltd.
BlueMountain CLO 2015-4 Ltd.
BlueMountain CLO 2016-1 Ltd.
BlueMountain CLO 2016-2 Ltd.
BlueMountain CLO 2016-3 Ltd.
BlueMountain CLO Ltd.
Brinker Capital Inc.
CIFC Asset Management LLC
CIFC Funding 2012-I Ltd.
CIFC Funding Ltd.
Canyon Capital CLO Ltd.
Canyon Partners LLC
Canyon Value Realization, The
Chou America Management Inc.
Clarington Capital Management Inc.
Cross Sound Distressed Opportunities
Cross Sound Distressed Opportunities Fund
    LP
Cross Sound Management LLC
Danske Bank A/S
Deutsche Bank Securities Inc.
Deutsche Bank Securities USA LLC
Franklin Advisers Inc.
Franklin Floating Lower Tier

Franklin Floating Rate Master
Franklin Investors Securities
Franklin Resources
Franklin Resources  Inc.
Franklin Strategic Income Fund
Franklin Templeton Investments
Franklin Templeton Investments Corp.
Franklin Templeton Series II Funds
Franklin US Floating Rate Master
Greenwich Street Advisors
Greenwich Street Advisors LLC
IA Clarington Investments
Ivy Apollo Multi Asset Income
Ivy Apollo Strategic Income Fund
Ivy High Income Fund
Ivy High Income Opportunities
Ivy Investment Management
Ivy Investment Management Co.
Ivy VIP High Income
JH Lane Partners
JH Lane Partners Master Fund LP
Jackson Mill CLO Ltd.
Kentucky, Commonwealth of, Retirement
    Systems
Kentucky, Commonwealth of, Teachers'
    Retirement System
LM Asset Services LLC
Legg Mason
Legg Mason Inc.
Legg Mason Partners Fund Advisor
Legg Mason Partners Fund Advisor LLC
Lyxor
Lyxor International Asset Management
MSD Credit Opportunity Master Fund LP
    MSD Partners LP
Mangrove Partners Master Fund Ltd., The
Marathon CLO Ltd.
Marathon CLO V Ltd.
Marathon CLO VI Ltd.
Marathon CLO VII Ltd.
Marathon CLO VIII Ltd.
NM Capital Utility Corp.
NN Group NV

Nationwide Fund Advisors
Northeast Investors Trust
Northeast Investors Trust Co.
Northwest Mutual Funds Inc.
OCP CLO 2012-2 Ltd.
OCP CLO 2013-4 Ltd.
OCP CLO 2014-5 Ltd.
OCP CLO 2014-6 Ltd.
OCP CLO 2014-7 Ltd.
OCP CLO 2015-10 Ltd.
OCP CLO 2015-8 Ltd.
OCP CLO 2015-9 Ltd.
OCP CLO 2016-11 Ltd.
OCP CLO Ltd.
OCP Senior Credit Fund
Oaktree Capital Management Inc.
Oaktree Opportunities Fund X Holding
Oaktree Value Opportunities Fund
Oaktree Value Opportunities Fund Holdings
    LP
Onex Credit Partners LLC
Onex Debt Opportunity Fund Ltd.
Onex Senior Credit Fund LP
Onex Senior Credit II LP
PIMCO
PIMCO Bermuda Trust II
PIMCO Bermuda Trust II: Pimco Bermuda
    Income Fund (M)
PIMCO Cayman Trust
PIMCO Corporate & Income Opportunity
PIMCO Corporate & Income Strategy
PIMCO Corporate & Income Strategy Fund
PIMCO Dynamic Credit And Mortgage
    Income Fund
PIMCO Flexible Credit Income Fund
PIMCO Funds
PIMCO Funds Ireland PLC
PIMCO Funds: Global Investors Series PLC
    Income Fund
PIMCO Funds: PIMCO Income Fund
PIMCO Funds: PIMCO Investment Grade
    Corporate Bond Fund
PIMCO Funds: PIMCO Long-Term Credit
    Fund
PIMCO Global Credit Opportunities
PIMCO Global Income Opportunities Fund
PIMCO Global Stocksplus & Income Fund

PIMCO High Income Fund
PIMCO Income Fund
PIMCO Income Strategy Fund
PIMCO Income Strategy Fund II
PIMCO Investment G
PIMCO Loan Interests & Credit
PIMCO Monthly Income Fund (Canada)
PIMCO Senior Floating
Pacific Investment Management Co.
Pacific Investment Management Co. LLC
Pacific Investment Management Co.,
    Employees' Retire
PCM Fund Inc.
Privatebank & Trust Co.
QS Investors LLC
RiverPark Advisors LLC
Rogge Global Partners Ltd.
Rogge Global Partners plc
Sagitta Asset Management Ltd.
Salomon Brothers Asset Management
Salomon Brothers Asset Management Ltd.
Sentinel Advisors
Sentinel Advisors Co.
Sentinel Asset Management Inc.
Sentinel Multi Asset Income Fund
Shenkman Capital Management Inc.
Shenkman Floating Rate High Income
Sierra Income Corp.
Smith Barney Fund Management LLC
South Dakota, State of, Investment Council
State Street Corp.
Stonehill Capital Management LLC
Stonehill Institutional Partners LP
Stonehill Master Fund Ltd.
Teachers Insurance & Annuity Association-
    College Retirement Equities Fund
Templeton Management Ltd.
Tennenbaum Capital Partners LLC
UBS
UBS AG
US Bank NA
University of Missouri
Waddell & Reed Financial Inc.
Waddell & Reed Investment Management
Waddell & Reed Investment Management
    Co.
Washington Mill CLO

Washington Mill CLO Ltd.
Wellington Shields & Co. LLC
Western Asset Global High Income
Western Asset Management Co.
Western Asset Management Co. LLC
Western Asset Management Co. Ltd.
Western Asset Middle Market Debt
Western Asset Middle Market Income
Wolverine Asset Management LLC
Wolverine Flagship Fund Trading Ltd.
York Credit Opportunities Fund LP
York Credit Opportunities Investments
  Master Fund LP
ZAIS CLO 1 Ltd.
ZAIS CLO 2 Ltd.
ZAIS CLO 3 Ltd.
ZAIS CLO 4 Ltd.
ZAIS CLO 5 Ltd.
ZAIS CLO 6 Ltd.
ZAIS Opportunity Master Fund Ltd.

## <u>SCHEDULE 1 (e)</u>

### <u>Bankruptcy Judges</u>

Bohm, Jeff
Bradley, David J.
Huennekens, Kevin R.
Isgur, Marvin
Jones, David
Norman, Jeffrey P.
Phillips, Keith L.
Rodriguez, Eduardo V.

# SCHEDULE 1 (f)

## Bankruptcy Professionals

Alessi, Keith E.
Alvarez & Marsal North America LLC
Beyer, Michael
Centerview Partners LLC
Deloitte & Touche LLP
Donlin Recano & Co. Inc.
Ernst & Young LLP
FTI Consulting Inc.
Fasken Martineau DuMoulin LLP
Houlihan Lokey Inc.
Kramer Levin Naftalis & Frankel
Lazard
McKinsey Recovery & Transformation Service US LLC
Schulte Roth & Zabel
Stein Advisors LLC

# SCHEDULE 1 (g)

## Bondholders Indentured Trustee

Lyxor Asset Management SA
Lyxor International Asset Management SA

# SCHEDULE 1 (h)

## Contract Counterparties

1090931 BC Ltd.
1683740 Alberta Ltd.
1814100 Alberta ULC
1836774 Ontario Ltd.
290 LLC
3D Service LLC
3D-P
AEM Corp.
AEP Generation Resources Inc.
AEP Land Management Office
AIC Solutions Group Inc.
AMAX Inc., The
AMC Billboard Co. Ltd.
AON Risk Services Northeast Inc.
AQYRE
AT&T Corp.
ATCO Electric
ATCO Power (2002) Ltd.
ATCO Power Ltd.
AU Mines Inc.
Abbey Family Partnership
Abbey, Alan
Abbey, Alice
Absaloka Mine
Acclaim Ability Management Inc.
Acme Inc.
Action Car & Truck Accessories
Adams, Robert
Addy, Carolyn
Adkins, Dora
Advanced Protection Systems Inc.
Aikins MacAulay & Thorvaldson LLP
Albert Power Ltd.
Alberta Power (2000) Ltd.
Alberta Power (2001) Ltd.
Alberta Power (2002) Ltd.
Alberta Power Ltd.
Alberta, Province of (Canada), Minister of
    Finance

Alberta, Province of (Canada), Municipal
    Affairs
Alight
Allen & Imler Coal Sales
Allen, Amanda K.
Allen, Beth M.
Allen, Calvin A.
Allen, Christine M.
Allen, Diana
Allen, Diane
Allen, Fairy M.
Allen, Francis E.
Allen, Gerald J.
Allen, Gloria L.
Allen, James A.
Allen, Jeannie Marie
Allen, Ken
Allen, Lori McDougal
Allen, Robert L.
Allen, Rosemary
Allen, Stanley E.
Alpha Natural Resources Inc.
Alta Land & Cattle
Altheir's Oil Inc.
Altier Oil Inc.
Altius Minerals Corp.
Altius Prairie Royalties Corp.
Alvarez & Marsal North America LLC
Amax Inc.
AmeriBen/IEC Group
American Electric Power Co. Inc.
American Electric Power Co. Inc., Office of
    General Counsel
American Electric Power Service Corp.
American Express Travel Related Services
    Co. Inc.
American Guarantee & Liability Insurance
    Co.
Amsden, Charles W.
Anadarko Land Corp.

Anderson, Lynn C.
Anderson, Martha
Andrews Consulting Group Inc.
Andrews International
Anecia B. Wall & James R. Wall Revocable
    Living Trust, The
Anisoft
Annie Nanny
Anthem Blue Cross & Blue Shield
Antolak, Linda
Antolak, Margaret
Antolak, Richard
Antolak, Stanley
Aon Consulting Inc.
Aon Hewitt Inc.
Apache Canada Ltd.
Archdiocesan Priests Relief Fund Inc.
Argonaut Insurance Co.
Arial Photography Services
Arizona Public Service Co.
Armells Creek Land & Cattle Co.
Armstrong Energy Inc.
Armstrong, E. Taylor
Arnold, Bonnie I.
Arnold, Dean A.
Arnold, Harold A.
Ashenhurst Ranch Inc.
Ashton, Anthony
Ashton, Karen
Asset Management Innovations Corp.
Aukland, Donna
AvePoint Inc.
Ayrshire Collieries Corp.
Azima DLI LLC
BF Oxford SPE LLC
BHP Billiton
BHP Billiton Ltd.
BHP Billiton New Mexico Coal Co.
BHP Mine Management Co.
BHP Minerals International Inc.
BHP Navajo Coal Co.
BJ's Refrigeration
BLC Development Co.

BMO Capital Markets Investment & Corp.
    Banking
BMO Nesbitt Burns Inc.
BP Canada Energy Group
Babich, Nona McDougal
Badget , Russell, III
Baggs, Ernie
Baggs, Kathy
Baird, Marion McKinney
Baird, Marion McKinny
Baker,  Joe
Baker, Anthony J.
Baker, Bertha L.
Bandy, Exie
Bandy, W. Edwin
Bank of America National Trust & Savings
    Association
Bank of New England
Bank of New England NA
Bank of Oklahoma
BankDirect Capital Finance
Bannowsky, Mary Irene
Barbe, Donald
Barbe, Eric
Barbe, Larry
Barbe, Paula
Barbe, Sherry
Barbe, Terry
Barker, Mart D.
Barker, Marty D.
Barrick Gold Exploration Inc.
Barricklow, Larry
Barringer, John W.
Barringer, Lewis T., Jr.
Barron, Gina M.
Bartels, Diane
Bartels, Edward
Basin Electric Power Cooperative
Basinger, Naomi
Bates, John
Bates, Ruth
Bau, Ann
Bau, Peter
Baumgard, Joseph J.

Baumgard, Mildred
Baxter, Douglas E.
Baz, Arthur
Baz, Jane
Beacon Aviation Inc.
Beal, Gerald
Beal, Vera
Bear Valley Communications Inc.
Beatrice, Mark A.
Beaver Overhead Door Co.
Bedway Land & Minerals Co.
Beer, Diane
Beer, Joseph
Belmont Coal
Belmont Jefferson Beagle Club Inc., The
Belmont, County of (OH), Board of
    Commissioners
Belmont, County of (OH), Port Authority
Benally, Alexander
Benally, Ambrose
Benally, Mae
Benally, Virgil
Benedict, Judy
Bengough No. 40, Rural Municipality of
    (Saskatchewan)
Bensinger DuPont & Associates Inc.
Beowulf Energy LLC
Bergquist, Agnes
Bergquist, Gerald
Bergquist, Kris
Bergquist, Lyell
Bergquist, Michael
Berlin Mineral Co.
Berry, Dean A.
Bessie W. Worrell Living Trust
Betts, Corinne
Betts, Corinne A.
Betts, Richard
Betts, Richard G.
Beulah Mine
Bieber, Elizabeth A.
Bieber, Roger L.
Big Sky Coal Co.
Biggs, Laura

Biggs, Laura Lee
Bison Engineering Inc.
Bivin, Betty
Bivin, Ruth Ann Walters
Black Earth Humic LP
Black, Leonard E.
Blackhand Environmental LLC
Blackrock Kelso Capital Corp.
Blake Cassels & Graydon LLP
Blanchard, Catherine M.
Blanchard, Cindy
Blanchard, David. F.
Blanchard, Helen T.
Blanchard, Mary C.
Blanchard, Patricia
Blanchard, Stephen L.
Blanchard, Thomas E.
Blue Marble
Bluff Terminal Co.
Bobby Gene McGuyer Testamentary Trust
Boeckel, Allegra
Boeckel, LeRoy
Boeckman, Elizabeth Mayer
Boedecker, Brett
Boggess & Boggess Inc.
Boggess, James
Boggess, Janet
Boggess, Joseph
Boggess, Mollie
Boggess, Paul
Boich, Wayne
Boland, EP
Boland, Eward W.
Boland, Joan
Bonavista Energy Corp.
Bond Safeguard Insurance Co. Inc.
Bond, Mae W.
Booker, Marty D.
Booth Brothers Land & Livestock
Booth Land & Livestock Co.
Booth, Gary
Booth, Mark
Booth, Phyllis
Borgel, Gerald

Borgrink, Henry F.
Borgrink, Leah Sandra
Borgrink, Sherrian Marie
Bosler Family, The
Bosler, Elizabeht
Bosler, Elizabeth R.
Bosler, H. James
Bosler, James
Bowen, Earl R., Jr.
Bowers, Karen
Bowers, Karl
Bowers, Karla
Bowers, Nolan
Bowers, Shirley
Bowie Resource Partners LLC
Bowles, Donald E
Boyer, Barbara L.
Brackett,  Jeff  D.
Brackett, James C.
Brackett, Lori
Brake, Lonnie J.
Brandeis Machinery
Branham, Michael W.
Brant,  Anna  L.
Braun, Angeline
Brennan, Gwenolyn
Brewer, Cathy L.
Brewer, Deedra McDougal
Brewer, Jackie L.
Brewer, Joan
Brewer, Joan B.
Bricker & Eckler LLP
Bridgestone Mining Solutions
Brier Ridge Real Estate Inc.
Brimhall Family Trust
Brimhall, Agnes
Brimhall, Floyd D.
Brimhall, Gerald
Brimhall, Karen
Brimhall, Karl Ray
Brimhall, Mary E.
Brimhall, Troy W.
Brimhall, Wayne C.
Broadridge Corp. Issuer Solutions Inc.

Broadridge Corporate Issuer Solutions Inc.
Broadridge Investor Communication
    Solutions Inc.
Brodie, Jan Marie
Brodie, Nell H.
Broken Hill Proprietary (USA) Inc.
Brokenshire, Wayne
Brooks, Irma
Brooks, Michael
Brown Cattle Co. Shareholders Coal Trust,
    The
Brown Cattle Coal Co.
Brownstein Hyatt Farber Schreck LLP
Brown's Shoe Fit Co.
Bruner Land Co. Inc.
Brunton, Dorothy R.
Brunton, Trevison D.
Bryant, William W.
Buchanan, Amanda
Buckeye Industrial Mining Co.
Buckeye Management
Buckeye Management Enterprises
Buckeye Management Enterprises Inc.
Buckeye Power Inc.
Budzik, Margaret A.
Budzik, Ronald A.
Burch, Mary Jane
Burlington Northern Inc.
Burlington Northern Railroad Co.
Burlington Resources
Burlington Resources Oil & Gas Co. LP
Burns, David
Burns, Marie W.
Busath, Louise
C&E Coal Inc.
C&R Coal Co. Inc.
CCC Group Inc.
CDDB Holdings LLC
CDG Engineers Inc.
CG Joyce Jr. Investments LP
CNX Center
CNX Gas Co. LLC
CSE Inc.
CSX Transportation Inc.

CTL Hosting Customers
Calibre Energy Inc.
Calumet Specialty Product Partners LP
Camaron, Kirsten
Camaron, Lucas
Cameron, Kirsten
Cameron, Lucas
Cameron, Lucas M.
Campbell, Beulah M.
Campbell, Cecil L.
Campbell, Charlene
Campbell, Cliff
Campbell, Joyce A.
Campbell, Ricky C.
Campbell, Steven P.
Campbell, Terri L.
Campbell, Terry
Campion Resources Ltd.
CanEra Energy Corp.
Canada, Government of, Revenue Agency
Canadian Pacific Railway
Cannon, Kenton
Cannon, Kenton C.
Cannon, Sharon
Cannon, Sharon J.
Canter, Ralph I.
Cantrell, Gelinda M.
Capitol Network LLC
Capstone Holding Co.
Capstone Holding Co. LLC
Carbon Development Partnership
Cardinal Trust LLC
Career Builder
Carnes, Dorthy
Carnes, James
Carnes, James E.
Carney, Homer T.
Carvat Coal Co.
Cascade Bottled Water & Coffee Service
Cassels Brock & Blackwell LLP
Catalyst Environmental Solutions
Catapult Systems LLC
Caterpillar

Caterpillar Financial Caterpillar Financial
    Servcies
Caterpillar Financial Service Ltd.
Caterpillar Financial Services Corp.
Caterpillar Financial Services Leasing ULC
Caterpillar Financial Services Ltd.
Caterpillar Inc., Mining Financial Services
Cedar Creek Associates Inc.
Cenovich, Marilyn Gail Cunningham
Cenovus Energy Inc.
Centerview Partners LLC
Central States Coal Reserves of Kentucky
    LLC
Century Wireless Services
Cerberus Business Finance LLC
Chambers Development of Ohio Inc.
Charlie C. Jameson Testamentary Trust
Charlton, Nora
Charolais Corp.
Charolais Mining Co. LLC
Charter Communications Operating LLC
Charters, William H.
Chase Manhattan Bank NA, The
Chesapeake Exploration LLC
Chevron Mining
Chevron Mining Inc.
Chevron USA Inc.
Chumney, Eugene
Chumney, Shirley
Cinquepalmi, Gannett
Cinquepalmi, Robert
Citicorp USA Inc.
Citizens National Bank of McConnelsville,
    The
Clapper, Leslie
Clapper, Teresa
Clarence S. & Bobbie J. Pertl Living Trust
Clark McCall Land & Cattle LLLP
Clay, Township of (OH)
Clay, Township of (OH), Board of Trustees
Clearfield Bituminous Coal Co.
Clearfly Communications
Clements, Grace A.
Clifton Larson Allen LLP

Cline Group LLC, The
Cline Sailer, Gladys I.
Cline, Donald V.
Cline, Maxine C.
Clites, Leona
Clorox Co. of Canada Ltd., The
Clorox Co., The
Clunk, Dennis R.
Coal Reserve Holding LLC
Coal Reserve Holding Ltd. Liability Co.
Coal Reserve Holding Ltd. Liability Co.
   No.1
Coal Service Design, General Director
Coal Valley Mine (Alberta)
Coal Valley Resources Inc.
Cobb, Karen
Cobb, Matthew
Cognition LLP
Coleman, James
Coleman, Judith
Collins, Clifford W.
Collins, Donna
Collins, Paula A.
Collins, Perry
Collins, Rebecca
Collins, Stanley
Collins, Terry
Collins, Virginia D.
Collyer, Bertram W.
Collyer, Darlene
Collyer, Darlene M.
Collyer, James B., Jr.
Colonial American Casualty & Surety Co.
Colorado Life & Health Insurance
   Protection Association
Colorado, State of
Colstrip Community Services Co.
Colstrip Electric Inc.
Colstrip Energy LP
Columbiana, County of (OH), Auditor
Columbus & Southern Ohio Electric Co.
Columbus Southern Power Co.
ComResource Inc.
Comcast Business Communications LLC

Comcast Cable Communications
   Management LLC
Commonwealth Land Title Insurance Co.
Commonwealth Mining LLC
Communications Energy & Paperworkers
   Union of Canada, Local 649
Company, Rhonda F.
Comstock, Bruce A.
Comstock-Abel, Beulah F.
Comtech (Communication Technologies)
   Ltd.
Comtech (Telecom Solutions) Ltd.
Comtech Telecommunications Solutions
   Ltd.
Conesville Coal Preparation Co.
Conoco Phillips Canada Resources Corp.
Conotton Land Co.
Conradson, Conrad G.
Conservation Fund, The
Consol Mining Co.
Consol Mining Co. LLC
Consol of Ohio LLC
Consolidated Land Co.
Consolidation Coal Co.
Consolidation Coal Co., The
Continental Heritage Insurance Co.
Coomer, Brenda
Coomer, Frank
Cooperrider, Beth M.
Cowgill, Karen
Cowgill, Steven
Cowgill, Steven E.
Coyote Partners
Coyote Partners SAS
Coyote Station
Craig, David
Craig, David L.
Craig, Holly M.
Craig, Stacy
Craig, Stacy L.
Cravat Coal Co.
Crescent Point Resources Partnership
Crew Energy Inc.
CridCo Water Treatment

Cripps Sears & Partners
Crittenden County Coal Inc.
Crooksville Coal Co. Inc.
Cross Borders Drilling
Crossman, David
Crossman, Vickie
Crossman, Vickie M.
Crosson, Betty
Crow Farms
Crow Tribe of Indians (MT), Executive
    Branch
Crow Tribe of Indians (MT), Legal
    Department
Crum, Marie L.
Crum, Ron
Crum, Ronald
Crum, Stephanie
Cryder, Bruce
Cryder, Bruce E.
Cundiff, Anna Loraine
Cundiff, Loraine McFadden
Curts, Mike
Cybereason Inc.
Cylance Professional Services
Cyprus Amax Royalty Co.
Cyprus Creek Land Co.
Cyprus Creek Land Resources
Cyprus Creek Land Resources LLC
Cyxtera Communications LLC
D&P Land Investments LLC
D&R Disposal
D.  Lamont Palmer & Sandra Palmer Family
    Trust
DLJ Consulting
Dakota Coal Co.
Damet Services Ltd.
Daron Coal Co.
Daron Coal Co. Inc.
Darryl L. James Consulting LLC
Darwin H. Mueller Trust No. 1
Data Systems International Inc.
Davidson, Pam
Davidson, Tommy
Davis Graham & Stubbs

Davis, Dorthy
Day,  James
Day, Deborah
Day, Deborah S.
Day, James E.
Deal IQ Inc.
Deibel, Diane
Dentons Canada LLP
Denver Series of Lockton Cos. LLC
Derenburger, David E.
Derenburger, Edgar C.
Derenburger, Sandra
Des Marais, Elta V.
Des Marais, Michael M.
Deshazo Crane Co. LLC
Deutsche  Bank
Deutsche Bank AG
Development Design & Construction LLC
Devon Canada Corp.
Dextraze, Gregory
Dextraze, Marjorie
Digneo, Edward M.
Digneo, Stella B.
Dillion,  Rochelle
Dillion, Fredrick
Dillon,  Frederick
Dillon, Rochelle
Diocese of Gallup (NM)
Dockins,  William
Dockins, Brenda
Dodds Property
Dodds, Diana
Dodds, Gary
Dodds, Gerrie
Dodds, Harry
Dodds, John
Dodds, Susan
Donato, June
Donlin Recano & Co. Inc.
Dorchester Energy Inc.
Dorothy N. Pollock Trust
Doughty, Charles S., Jr.
Doughty, Leanna
Doughty, Leanna, Jr.

Douglas, Dean
Douglas, Jill
Douglass, Brenda
Douglass, Mark
Douglass, Normain
Douglass, Patricia
Dover, City of (DE)
Downcon Enterprises Ltd.
Drives & Control Services Inc.
Ducharme McMillen & Associates Inc.
Dudley, Marla McDougal
Dukart, Darcy
Duke Energy Kentucky Inc.
Dukelow Family Trust
Dukelow, Rose L.
Dukes, Bobby
Dukes, Jonnie
Dukes, Marjorie
Duncan, Brooke
Duncan, Thomas Bradley
Dunlap Creek Ranch Inc.
Dunlap, Ann
Dunlap, Anna L.
Dunlap, Jim T.
Dunlap, Joyce
Dunlap, Lewis A.
Dunsch, Daniel
Dunsch, Martha
Dupech Inc.
DynoConsult
E-Commodities Holdings Ltd.
ENBALA Power Networks Inc.
ENMAX Energy Corp.
EPN Field Services LLC
Eagle Creek Farm Properties
Eagle Creek Farm Properties Inc.
East Central Gas Co-Op Ltd.
East Kentucky Power Cooperative Inc.
East Ohio Properties LLC
East West Bank
Eastham, Frostie
Eastham, Frostie A.
Eastham, William
Ecosphere Environmental Services

Edmonson Fuels LLC
Edmonton Power
Edwards, James H.
Egypt Valley Stone Inc.
El Paso Natural Gas Co. LLC
Eldor-Wal Registrations 1987 Ltd.
Elkol-Sorensen Mine
Ellis,  John
Ellis, Alice
Ellis, Cathi
Ellis, Fern V.
Ellis, Frank E.
Ellis, Frank E., Jr.
Ellis, Joe
Ellis, Joseph
Ellis, William J.
Ellison Family Trust
Elwood Staffing Services Inc.
Emeco Canada Ltd.
Enbridge Pipelines (East Texas) LP
Energy Laboratories Inc.
Enerwise Global Technologies Inc.
Engbrecht, Pearl
Enterprise FM Trust
Enterprise Fleet Management Canada Inc.
Enterprise Fleet Management Inc.
Enzsol Enterprises Inc.
Erickson Contract Surveying Inc.
Erm-West Inc.
Estate of Agnes D. Washington
Estate of Amelia Samet Kornfeld
Estate of Carrie F. Roundface
Estate of Charles C. Core
Estate of Deejay Roundface
Estate of Dorothy Dimple Mitchell
Estate of Dorothy H. Evans, The
Estate of Elizabeth Smith Tribble
Estate of Gail Geibel
Estate of James H. Pollock
Estate of John T. Blazek
Estate of Johnnie B. Ruffeno
Estate of Joseph Sipe
Estate of Karen Estelle Dockins
Estate of Lena Marie Achgill

Estate of Luther F. Weaver
Estate of Mabel Slevin
Estate of Melinda Armstrong-Kirsch
Estate of Nell Dezelle Morrow
Estate of Ruth I. Core
Estate of Sipe
Estate of Victor Lee Pate
Estate of Virginia Harrah
Estate of Virginia Harris
Estate of Virginia S. Whitmer, The
Estate of Ylena Russell
Estevan Coal (1996) Corp.
Estevan Coal Corp.
Etzel, Norma
Eubanks, Jeff
Eubanks, Tom
Evelyn Power Craddock Family Irrevocable
    Trust
Evergreen Mineral Co. Inc.
Everly, Doug
Everly, Norma
Evers, Ann
Evers, Michael
Experis US Inc.
F&D Holdings LLC
FMC Corp.
FTI Consulting Inc.
Fairchild, John
Fairchild, Lisa
Fairfield, John
Fairfield, Lisa
Fairmont Road South LLC
Fairview Land Co.
Farley Inc.
Farley, Burton
Farley, J. Burton
Farley's Inc.
Farm Credit Services of Mid-America
    FLCA
Farmington Electric Utility System
Farmington, City of (NM), Electric Utility
    System
Farnsworth, Ferrell
Farnsworth, Omer

Farstad Oil Inc.
Faye Keogh Revocable Trust
Federal Land Bank of Saint Paul, The
Feil, Judith G.
Felicca, Phillip S.
Fenner Dunlop Conveyor Systems &
    Services Inc.
Fentch, Barbara
Fentch, Wilfred
Ferris Coal Co. Inc.
Ferris Lands LLC
Fetch, Barbara
Fetch, William
Fidelity & Deposit Co. of Maryland
Financial Reporting Advisors LLC
Finning
Finning (Canada)
Firestone, Daryl
First Bank NA
First Interstate Wealth Management
First Light Funding I Ltd.
First Presbyterian Church of Stephenville
Fisher, John
Fister, Joeseph
Fister, Joseph
Fister, Theresa
Fitch, Sharon Kay
Fiutem, Linda
Fiutem, Paul
Fluharty, Fred
Fluharty, Greg
Fluharty, Randall
Flushing, Township of (MI)
Flushing, Township of (OH)
Foley, Lillian A.
Foley, Oney L.
Foothills Manufactured Home Community
Foottit, Lynn Norsworthy
Fording Coal Ltd.
Forestburg Collieries (1984) Ltd., The
Forestburg Collieries Ltd.
FortisAlberta Inc.
Foundation Royalty Co.
Four Seasons Equipment Inc.

Four Star Oil & Gas Co.
Fouts, William Bruce
Foutz, Cindra
Foutz, Joel W.
Foutz, Martin Dirk
Foutz, Phil Blaine
Foutz, Sherry Ann
Fox, Robert
Frame, Goldie Harris
Frame, Raymond B.
Franklin Real Estate Co.
Frantz, Amy L.
Fregiato, Frank A.
Frink, Brady
Frink, Tina M.
Fruitland Land & Cattle Co.
Fugro EarthData Inc.
Fugro Horizons Inc.
Fulkerson, Goldie
Fulkerson, John
Fuller, Stacy
G4S Secure Solutions (USA) Inc.
G4S plc
GCF Oxford SPE LLC
GCM Services Inc.
GMHR
GNP LLC
GS Energy
GS Energy LLC
GTG Corp. Pty. Ltd.
Gadd, Cindy
Gallatin Scales
Galyen, Doug
Galyen, Jane
Gamut Capital Management LP
Garau, John A.
Gardner, Patricia H.
Garfield, Genie
Garfield, Russell
Garlikov & Associates Inc.
Garris, Randy
Gehris, Tanya
Geibel Family
Geibel Family Trust

Geibel Lumber Co.
Geibel Lumber Co. Inc.
Geibel, Gail
Geibel, John
Geibel, Jon
Geibel, Lydia
General Electric Capital Corp.
General Equipment & Supplies Inc.
Genesee & Wyoming Inc.
Genesee Coal Mine Joint Venture
George R. Smouse Estate
Giebel, John
Gilbert, Alice
Gilbert, Nelson
Gillen, Joe E.
Gillen, DeRon
Gillen, Ronald L.
Gilshannon, Joan M.
Gilshannon, Thomas B.
Glacier Park Co.
Gladd, Cindy E.
Gladdish, Kent
Glass, William R.
Glauser, Walter
Glen Cowan & Associates Real Property
    Appraisals Ltd.
Glen Peterson Construction Ltd.
Glenn O. Hawbaker Inc.
Global Systems Integration Inc.
Godbersen, Greg
Golden Eagle Mine
Golen, John Van
Goodman, Janice
Goodman, Richard L.
Grable, Sue
Grable, William
Graham, Bryan H.
Graham, Carolyn
Graham, Clay
Graham, James
Graham, James F.
Grainger Industrial Supply
Grainger Industrial Supply India Ltd.
Grand Quadri Cattle Co.

Gray, Sandra
Great Northern Properties LP
Green, Susan K.
Green-Crawf Farm LLC
Greenebaum Doll & McDonald PLLC
Greenfly Networks Inc.
Greenleaf Land & Livestock
Greenwich Insurance Co.
Greibel, Jon
Greibel, Lydia
Grishkowsky, Martha
Grishkowsky, Reinhart
Grissom, Danny
Grissom, Peggy
Groombridge, Cliff
Grubb, Gloria A.
Grubb, Richard E.
Gulf Oil Corp.
Gulfport Energy Corp.
Gustafson, Mike T.
HCR Holding LLC
HCR Holdings LLC
HP Channel Services Network
HYG Financial Services Inc.
Haaga, Matt
Haas, Martha
Half, Robert
Halls, Beatrice G.
Halls, Winston J.
Halsey, Edwin
Halsey, Thelma
Hampton, Cynthia Kaye Kennedy
Hancock, C.R.
Hancock, CR
Handa, Patsy
Handa, William
Hanna Coal Co.
Harkins, Dwain
Harkins, Paula
Harris Oilfield Construction Ltd.
Harris, C. Fay
Harris, John E.
Harris, Joyce
Harrison Leasing Co.

Harrison Leasing Co. Inc.
Harrison Resources LLC
Harrison, County of (OH)
Harrison, Robert
Hart Butte No. 11, Rural Municipality of
   (Saskatchewan)
Hartley, Betty
Hartley, Brett
Hartley, Earl
Harverfield, Mary
Harvey, David A.
Harvey, Erica
Haukness, Leonard
Haverfield, Beverley
Haverfield, Elizabeth O.
Haverfield, Janet
Haverfield, Richard
Haverfield, Thomas N.
Hayes, Joe P.
Heath, Bill C.
Heath, Rose M.
Hedden, Ruth M.
Hedge, Marlan R
Hedges, John J.
Helmig, Shirley
Henderson, Debbie
Henderson, Dorthy
Henderson, Ralph
Henderson, William B.
Henley, R. Page, Jr.
Hepner,  Vivian  M.
Her Majesty the Queen
Her Majesty the Queen in Right of
   Saskatchewan
Herman, Carl A.
Herman, Charles I.
Herman, Darell
Herman, Darell J.
Herman, Marguerite F.
Herman, Margurite F.
Herman, Sherry
Herman, Wilfred A.
Hesketh,  Keith  E.
Hesketh, Keith

Hess Corp.
Hess Ohio Developments LLC
Heth, Author M.
Heth, Joyce
Heth, Karen A.
Heth, Rose M.
Heth, Ruth
Heth, William
Heth, William C.
Hetzler, Jennifer McDougal
Hewlett-Packard Financial Services Co.
Higginbotham, GP
Higginbotham, Glenn
Higginbotham, JL
Higginbotham, JL, Jr.
Higgins Drilling
High, Treva
Hill Crest Inc.
Hill, Margaret C.
Hilltop Haven Inc.
Hilstrom, Donald
Hines, Gerald D.
Hisrich, Thomas
Hisrich, Thomas H.
Hochstetler Family Retreat LLC, The
Hochstetler Family, The
Hochstetler, Abe J.
Hochstetler, Anna E.
Hollon, Shirley
Hollon, Thomas
Holmes Limestone Co.
Holmes Limestone Ltd.
Holmes Minerals Ltd.
Holmes Woodland Inc.
Holmes, Everett
Holmes, James
Holmes, Joan
Holt Co.
Home Equity Investments
Homles, Joan
Honeywell Building Solutions Inc.
Hook, James D.
Hook, James Dale
Hook, Sharon

Hoops, Jarrod
Hoops, Scott
Hopedale Mining LLC
Horizon Coal Corp.
Horn, Janet
Horn, Jerry
Horn, John Wesley
Horstman, Jerry
Houser, Doris
Houser, Howard
Houser, Raymond
Houser, William
Houston Lignite LP
Howdyshell, Mark J.
Hubbard, Karen
Huberta Coal Co. Inc.
Hudock, Larry W.
Huff, Donald F.
Huh, Gon
Huh, Kevin
Humphrey, Jennie
Humphrey, Roger
Hunt , Robert R.
Hunt, Brian
Hunt, Darryl
Hunt, Robert
Huntington Center Associates LLC
Huntington National Bank
Huntington National Bank, Trust
    Department
Husky Oil Operations Ltd.
Hutchison, Lee M.
Hydrometrics Inc.
IBM Canada Ltd.
ICF Jones & Stokes Inc.
IEC Group Inc.
Iball Solutions Inc.
Iball Solutions Ltd.
Immersive Technologies Pty. Ltd.
Impact Fire Services LLC
Indemnity Insurance Co. of North America
Industrial Scientific Corp.
Indybuck Coal Co.
Info-Tech Research Group

InfoMine
Infront Webworks
Inman, Deborah
Inman, Joe
Insurance Co. of North America
IntelliGO Networks Inc.
Inter-Mountain Laboratories
Inter-Mountain Labs
Intermountain Research & Development
    Corp.
International Brotherhood of Electrical
International Union of Operating Engineers,
    Local 953
International Union of Operating Engineers,
    Local Union No. 400
International Union of Operating Engineers,
    Local Union No. 955
Interstate Power Co.
Ionno, John
Iron Mountain Canada Corp.
Iron Mountain Inc.
Iron Mountain Information Management
    LLC
JB&D Holdings Ltd.
JB7D Holdings Ltd.
JBLCo Services
JD Edwards Canada Ltd.
JEFFCO Resources Inc.
Jackie L. & Cathy L. Brewer UTD March 3,
    2004
Jackson Kelly PLLC
Jahn, Lorne
James F. Graham Revocable Trust No. 1,
    Co-Trustees
James F. Graham Revocable Trust Number
    1
James H. Pollock Trust
James L. Rogers Jr. Testamentary Trust
James Miller & John Ionno Partnership
James, Norman
Jameson, David
Jean Jones Trust
Jeff & Deb Mercer Family LLC
Jefferson, County of (OH)

Jeffrey H. Samet Non-Exempt Trust
Jennings, Jamie
Jennings, Steven
Jensen & Curtis Inc.
Jerry & Martha Webb Cook Ranch
    Partnership Ltd., The
Jerry & Travis Ann Webb Dorough Ranch
    Partnership Ltd., The
Jicarilla Apache Indian Tribe
Joan Shepard Trust
John Mitchell Craddock Sr. Family
    Irrevocable Trust
John Mitchell Craddock Sr. Irrevocable
    Trust
John T. Boyd Co.
Johnson, Chad W.
Johnson, Edie McDougal Johnson, James
Johnson, Mark
Johnson, Rhonda Leigh
Johnson, Sue
Johnson, Thomas
Johnson, William R.
Johnston, James
Johnston, Jessie
Johnston, Leslie
Johnston, Walter
Jones, Ann E.
Jordan, Cecil L.
Jorgenson, Bernadette
Jorgenson, Ronald
Joy Mining Machinery
Jude, Bob
Jude, Mary
Julian Land & Livestock Co.
K&S Shugert Farms Family LP
K&S Shugert Farms LP
KO Mining Co. Inc.
KO Mining Inc.
KRJA Systems Inc.
KS Shugert Farms Family LP
Kalis Capital Corp.
Kasich, John
Kasler, Edward
Kasler, Jack

Kasler, Kathryn
Katie Shugert, Robert
Keen IM LLC
Keener, Carrol Z.
Keener, Carroll Z.
Keener, Linda K.
Keffer, George
Keffer, Marilyn
Keister, James
Keister, Mary
Keleher, Michael L.
Keller, Janice
Keller, Jeffery
Kelly Family Land Co.
Kennedy Minerals LLC
Kennedy, Shelley A.
Kentucky Power Cooperative Inc.
Kentucky, Commonwealth of, Department
   of Military Affairs
Keogh, Brooks
Keogh, Faye
Keogh, Priscilla
Keogh, Proseilla A.
Keogh, Robert
Kesterson, Rick
Kesterson, Ronald
Kesterson, Seth
Kettler, Lynn
Kevin Cannon Surveying
Key-Rite Security Lock & Safe Inc.
KeyBanc Capital Markets Inc.
Kiesal, Lennard
Kiewit Mining Properties Inc.
Kilcher, Nancy
Kimball, Sarah Lousie
Kimble Resources
Kinetic Leasing Inc.
King,  Flowel
King, Flowele
King, Frank S., III King, Jeffrey J.
King, Jeffrey J., Jr.
King, Karen M.
King, Sharon
King, Thomas P.

King, Thomas P., Jr.
King, William
Kingsford Manufacturing Co.
Kinney, Debra
Kinsey, John R., Jr.
Kinsey, Joseph
Kinsey, Rebecca
Kirkpatrick, Rhetta J.
Kirtley, Billy Kirtley,
Kneeland, Les
Knife Coal Mining Co.
Knife River
Knife River Coal Co.
Knife River Coal Mining Co.
Knife River Corp.
Knife River Mining Corp.
Knight, Corinne
KnowBe4 Inc.
Koenraadt, Jan
Komatsu
Komatsu America Corp.
Komatsu Equipment
Komatsu Financial LP
Komatsu International (Canada) Inc.
Komatsu Mining Germany GmbH
Konieczny, Susan
Konieczny, Susan L.
Koogler, Clement
Koogler, Elisa
Kopka, Joanne
Kopka, Joanne Kay
Kramer Levin Naftalis & Frankel LLP
Kratrenstein, Dandi
Krell, George Christopher
Krol, William F., Jr.
Kron, Marvin
Krulock Coal Co.
Krulock General Power of Appointment
   Trust, The
Krulock, Daniel
Krulock, Daniel J.
Krulock, David
Krulock, David G.
Krulock, Florence

Kuttie, Anthony J.
Kyle LP
LCC Kentucky LLC
LPT Management Inc.
La Plata Feed & Livestock
LaFrentz, Rick
Lacombe, Gracie
Ladd Petroleum Co.
Lance Oil & Gas Co.
Landerman, Donald F.
Landerman, Karen L.
Landerman, Terry
Landrum, Jill L.
Lange, Debbie E.
Lapanja, Catherine
Lapanja, Edward
Lapanja, Edward L.
Lapanja, Mabel
Lawson Lundell LLP
Lawson, Amos L.
LeBlanc, Marlin
Lear, Donald
Lear, Herbert
Lear, Ileme
Lear, Judy
Leatherwood Farm Ltd.
Ledger, Judith
Ledger, Judith A.
Ledger, William
Ledger, William P.
Lee, Aaron
Lee, Donald
Lee, Ellen
Lee, Hutchison M.
Lee, Jill B.
Lee, Kay
Lee, Loren
Leeper Family Trust, The
Legacy Oil + Gas Inc.
Leibelt, Jonathan W.A.
Leighton, Charles
Leighton, Michele
Leon, County of (TX), Auditor
Leroy, Belinda

Leroy, Wayne
Lesser, David
Lesser, F. D.
Lesser, Matthew
Lester, Bill
Lester, Mabel W.
Lewis, Brian
Lewis, Liz
Lewis, William T.
Lexington Coal Co. LLC
Lhoist North America of Texas Ltd.
Liberty Life Assurance Co. of Boston
Liebelt, Johathan W.A.
Liebelt, Jonathan W.A.
Liebelt, Merilynn
Liggett Enterprises Ltd.
Lighthouse Resources Inc.
Lightstream Resources Partnership
Liles, Geral
Liles, Gerald
Liles, Judith
Linard, Robert
Linard, Robert, Jr.
Link Farms Ltd.
Linn Engineering Inc.
Lockon Cos. LLC
Lockton Financial Advisors LLC
Long, Darrell
Long, Karen
Long, Phyllis
Lopez, Gerard
Lopez, Irene
Lorch, Alice E.
Lorch, Howard G.
Lorch, Kenneth R.
Love, Fred
Love, Fred T.
Love, Mary
Love, Mary Jane
Lowe, James R.
Lowe, Sandra L.
Lucas, Beverly
Lucas, Carol Ann
Lucas, Carolyn Ann

Lucas, Donald
Lucas, Jo
Lucas, Joe
Luckett, Gene
Luckett, Wanda
Luscar Ltd.
Luscar Sterco (1977) Ltd.
Lusch,  Vivian
Lusch, Donald
Lusch, Donald A.
Luther, Bonnie Harris
Luther, Joe
Luther, Joseph M.
Luther, Kandin J.
Lykins Oil Co.
Lynx Inc.
Lyons, Jack
M&C Transport Inc.
MLK Ltd. LLC
MP Mine Operations LLC
MRP
MUFG Union Bank NA
MacDowell, Mabel
MacDowell, R.E.
MacPherson Leslie Tyerman LLP
Macdonald, Janet
Mack, Stephen
Magnitude Software
Magnitude Software Inc.
Mahoney, Frances Stallings
Manalta Coal Ltd.
Mangis, Elinor E.
Mangis, Robert A.
Mangrove Partners
Mann,  Jody
Mantei Farms Ltd.
Mantei, Terry
Manufacturers Life Insurance Co., The
    Maptek Pty. Ltd.
Marathon Pipe Line LLC
Marie L. Crum Trust
Marion, Susan
Marion, Susan K.
Markell, James

Markell, Sue
Markwell, James
Markwell, Sue
Markwest Liberty Midstream & Resources
    LLC
Marquette Exploration LLC
Marth Ann Rogers 1996 Revocable Trust
Martha Rogers Haas 1996 Revocable Trust
Martha Rogers Haas Revocable Trust
Martin Family Trust
Martin Marietta Inc.
Martin Marietta Magnesia Specialties LLC
Martin Marietta Materials Inc.
Martin, Ann Pedigo
Martin, Edward
Martin, Jean E.
Martin, Sally McDougal
Martin, Wanda L.
Martin, William C.
Martin, William Grier
Martinek, Robert
Marubeni Corp.
Mary B. Turner Revocable Trust
Mary Webb Lawrence Ranch Partnership
    Ltd., The
Mason Dixon Energy LLC
Mason Farms Inc.
Mast, Nelson
Masterson, Nancy
Masterson, Rex
Matrix Acquisition Group LLC
Matusek, Arleen
Matusek, Jack
Mauersberger, Christine
Mauersberger, Christine M.
Mauersberger, George
Mauersberger, George A.
Mauersberger, John
Mauersberger, John S.
Mauersberger, Susan
Maurer, Winifred T.
Mayer, Fredrica H.
Mayes, Steven D.
Mayes, Teresa L.

McCabe, Leona G.
McCabe, Stanley
McCain, John
McCain, Kevin P.
McCauley, Clara
McCauley, George
McCauly, Clara
McCauly, George
McCay, Freda
McCay, Terry
McCoy, Mary Jo
McCulloch, Anna H.
McCulloch, Frank E.
McDermitt, Arthur C.
McDermitt, Melissa L.
McDonald, Adelia
McDonald, Bruce
McDonald, Donald
McDonald, Donna
McDonald, Douglas W.
McDonald, Gary
McDonald, Greg
McDonald, Joanna
McDonald, Keith
McDonald, Kevin
McDonald, Marilyn
McDonald, Mona
McDonald, Mya
McDonald, Roger
McDonald, Ron
McDonald, Sandra
McDonald, Suzie
McDonald, Virginia
McDonald, Virginia Avanell
McDougal Coffee, Rebecca
McEndree, Lucretia
McEndree, S.R.
McGee, David V.
McGillicky, Guy
McGuyer, Bobby Gene
McKee, Richard K.
McLaughlin, Darald G.
McLennan Ross LLP
McMenamin, Marguerite L.

McNally, Naomi
McNeish, Charlene
McNeish, Jeffrey
McNiven, Mike
McPherson, Florence
McPherson, Virgil
Mead Trust, Ethel Nadine
Mead, Nadine Ethel
Mead, Patricia Ida
Meadowlark Inc.
Meadows, Bobby L.
Meadows, Dova
Meadows, Laurel
Mel-Tina Ltd.
Mellon Bank NA
Merida Natural Resources LLC
Meridian Minerals Co.
Meridian OneCap Credit Corp.
Merrion Oil & Gas Corp.
Mexia Pest Control Services
Meyer, Charlotte H.
Michelin North America (Canada) Inc.
Midsouth Energy Inc.
Miliken, Nancy
Millar, James Clay
Millcreek Mining Group
Miller Engineers Inc.
Miller, Brenda K.
Miller, David A.
Miller, Ellen McDougal
Miller, James
Miller, Joan J.
Miller, Katherine
Miller, Leroy
Miller, Mattie
Miller, Nancy
Miller, Ronald M.
Miller, Russell E.
Miller, Sharon L. Winkler
Miller, Vickie R.
Mills, James
Mills, Linda
Mine Site Technologies Pty. Ltd.
MineWare Inc.

MineWare Pty. Ltd.
Ministry of Energy & Resources
Minor, Barbara Sue
Minor, Walter D.
Missouri Valley Properties Co.
Mitsubishi Corp. RtM Japan Ltd.
Mizer, Linn
Mobil Mining & Minerals Inc.
Mobil Oil Co.
Modrall Sperling Roehl Harris & Sisk PA
Molopo Energy Canada Ltd.
Monroe, Township of (NJ), Board of
    Trustees
Monsanto Co.
Monsen Engineering Co. Inc.
Montana Power Co.
Montana Power Co., Real Estate
    Department, The
Montana Power Co., The
Montana, State of, Department of Natural
    Resources & Conservation
Montana, State of, Department of Natural
    Resources & Conservation, ELO, Lands
    Program Manager
Montem Resources Ltd.
Moore, James
Moore, Linda
Moore, Patricia
Moore, Patrick
Moore, Thomas
Moore, Wilbur
Morgan Stanley Smith Barney LLC
Moroz, Gary
Morris, Darlene
Morrison-Maierle Inc.
Morstad, Wesley
Moseer, Geoffrey B.
Mosser, Geoffery B.
Mountain States Environmental Services
    Inc.
Mountain States Telephone & Telegraph
    Co., The
Mouse, Lester James
Mueller,  Darwin

Mularcik, Kathryn
Mularcik, Stephen
Mumford, Amista
Muncy Farms Inc.
Murray Energy Corp.
Murrell, Nell Pollock
Mutschelknaus, Clarence W.
Mutschelknaus, Clarence W., Jr.
Mutti, Rachel
Mutti, Vernon
Myers Mining Co.
Myers, Craig A.
NACR Inc.
NAL Resources Ltd.
NBCLH LP
NOW CFO LLC
NRG Energy Inc.
NRP LLC
Nalco Co. LLC
Nash Heirs Coal Lease
Nash Royalty Lease
Nash, Ronald D.
National Corp. Research
National Energy Transfer LLC
Natural Resource Partners LLC
Navajo Mine Retirement Plan
Navajo Nation, The
Navasota Valley Electric Cooperative
Navigant Consulting Inc.
Neuberger, Ella
Neumann, Neil
Neumann, Raymond
New Elk Preparation Plant
New Lexington Tree Farm LLC
New Lexington, City of (OH), Board of
    Education
New Mexico, State of, Commissioner of
    Public Lands
New Mexico, State of, Department of
    Transportation
New Mexico, State of, State Land Office
New Mexico, State of, State Land Office,
Newman, Barbarra
Newman, Phillis

Newman, Ray
Newman, Yost
Nicklin Earth & Water Inc.
Norit Actieve Kool Holding BV
Norit Americas Inc.
Norit Canada Inc.
Norit NV
Norsworthy, Amy
Norsworthy, Jase O.
Norsworthy, Margaret B.
Norsworthy, Sally
North American Coal Corp.
North American Coal Royal, The
North American Coal Royalty Co.
North Dakota State University
North Dakota, State of, Department of
    Human Services, State Hospital
North Dakota, State of, Department of Trust
    Lands, Board of University & School
    Lands
North Western Corp.
Northern Plains Transport
Northern States Power Co.
Northwest Pipeline Corp.
Northwestern Corp.
Northwestern Power Co.
Northwestern Resources Co.
Norton Rose Fulbright Canada LLP
Nottingham, Township of (PA), Board of
    Trustees
Nu-Line Powerline Contractors Ltd.
OMCO Leasing Corp.
Obsidian Energy Ltd.
Office Shop Inc., The
Ogden, Doris Jean
Ohio American Energy Inc.
Ohio Indemnity Co.
Ohio Oil Gathering Corp. II
Ohio Oil Gathering II
Ohio Power Co.
Ohio River Collieries Co.
Ohio, State of
Ohio, State of, Department of Natural
    Resources

Ohio, State of, Department of Natural
    Resources, Division of Forestry
Old Coyote, Darrin
Old Investments LLC
Old Mount Zion Cemetery Association
Old Spring Seat Baptist Church Inc.
Olen, Paul
Olio Inc.
Olivito, Anthony J., Jr.
OptumHealth Financial Services Inc.
Orbit Oil & Gas Ltd.
Order, James Van
Oregon Short Line Railroad Co.
Orrville City of (OH), Department of Public
    Utilities
Orth, Bertha
Orth, Julis
Otter Tail Corp.
Owen, Charles
Owen, Charles W., Jr.
Owen, Frances J.
Owen, Kathryan
Owen, Kathryn
Owen, Kathryn E.
Owen, Kathy
Owens, Charles
Owens, Kathryn
Owensboro National Bank, The
Oxford Mining Co.
Oxford Mining Co. LLC
Oxford Oil Co., The
Oxford Resource Partners LP
Oxford Resources
O'Farrell, V. Virginia
P&M Coal Mining Co.
PACCAR Financial Corp.
PHH Vehicle Management Services Inc.
PLL Montana LLC
PNE Wind USA Inc.
PNM Resources Inc.
PPL EnergyPlus LLC
PPL Generation LLC
PPL Montana LLC
PSST LLC

PacifiCorp
PacifiCorp Energy
PacifiCorp Legal
Pacific Employers Insurance Co.
Pacific Power & Light Co.
Pacific Steel & Recycling
Palaterra USA LLC
Palmer, Barton L.
Palmer, Elmo L.
Palmer, Ethel A.
Palmer, Pearla Rosell
Palmer, Richard E.
Paragon Resources Inc.
Park Cities Bank & Co.
Parry, Gary W.
Pasco, Doris J.
Pastor Behling & Wheeler LLC
Patriot Reserve Holdings LLC
Patsy Kluver, Kirby
Pay Governance LLC
PayFactors Group LLC
Payton Kinney Tardio Davis & Sparks
Peabody Coal Co. LLC
Peabody Development Co. LLC
Peltz, John
Peltz, Joyce
Pengrowth Energy Corp.
Penn Virginia Operating Co. LLC
Penn-Ohio Coal Co.
Penniman, Charlotte A.
Penniman, William David
Pennington, Earlene
Pennington, Travis
PeopleSoft USA Inc.
Permann, George J. Margaret, Jr.
Perry County Industrial Co. Ltd.
Perry County Industrial Development Co.
     Ltd.
Perry, County of (OH), Commissioners
Personnel Management Group Inc.
Persta Resources Inc.
Pest Arrest Exterminating Inc.
Peters, Dan
Peters, Daniel

Peters, Donald
Peters, Hazel Doris Smouse
Peters, Jeffery J.
Peters, Regenia D.
Petersburg Co. Inc.
Peterson, Hugh, Jr.
Peterson, John R.
Peterson, Laura M.
Peterson, Patience Elizabether Russell
Petro Ventures Ltd.
PetroQuest Energy Inc.
Petrobank Energy & Resources Ltd.
Petrozzi, Barbara
Petrozzi, James John
Petrozzi, Richard
Petrozzi, Susan
Phillips, Ken
Phillips, Keneth
Phillips, Kurtis
Phoenix Coal Co.
Phoenix Coal Corp.
Phoenix Coal Inc.
Phoenix Coal Processing Co.
Phoenix Coal Processing Co. LLC
Phoenix Coal Processing LLC
Phoenix Newco LLC
Phoenix-Greenhill Partners LLP
Phoenix-Greenlawn Partners LP
Pickett, James R.
Piergallini, Lucille
Piergallini, Raymond
Piper, Robert Edward
Pitney Bowes of Canada Ltd.
Pittsburgh & Midway Coal Co.
Pittsburgh & Midway Coal Mining
Pittsburgh & Midway Coal Mining Co., The
Pivot Data Centres Inc.
Plainsmen Petroleum Inc.
Platt, Raymond P.
Pleasant, Phillip
Poag, John
Poag, Robert
Poag, Shirely
Poag, Shirley

Poag, Terry
Pocahontas Coalfield
Pollock Family Holdings LLC
Pollock, Calvin E.
Pollock, Cornelia A.
Pollock, James H.
Pollock, Jessie Mae
Pollock, R. Jeffrey
Pollock, William D.
Pompey, Elisabeth A.
Pompey, Leona M.
Pompey, Michael H.
Pompey, Michael J.
Pompey, Michael Joseph, Jr.
Ponsart, James
Pontius Construction
Poore , Bami L.
Poore, Bambi L.
Poore, Randy
Poplar River Mine
Porterfield, Judith
Porterfield, Kirke
Portland General Electric
Post, Barbara
Post, George
Potash Royalty LP
Potter Grandchildren LLC
Potter, Kiley E.
Poulos, George
Poulos, Martha
Powel, Otto H.
Powell, Ann
Powell, Joseph
Powell, Lisbeth
Powell, Michael
Powell, Otto H.
Prairie Coal Ltd.
Predator Oil Ltd.
Preferred Strategies LLC
Premium Funding Associates Inc.
Preventive Health Now LLC
Price, Charles W.
Price, David B.
PricewaterhouseCoopers LLP

Private Bank & Trust Co.
Privatebank & Trust Co., The
Privatebank & Trust Co., The, Asset
Pronghorn Geologic Services Inc.
Prosek LLC
Prudential Retirement Insurance & Annuity
    Co.
Public Service Co. of New Mexico
Puget Sound & Light Co.
Puget Sound Energy Inc.
Puget Sound Power & Light Co.
Pugh, Rosemary
Puskarich, Belle
Puskarich, Mary Belle
Puskarich, Michael T.
Pyeatt, Grace S.
QSW&P Inc.
Quintana Minerals Corp.
Quinwood Coal Co. LLC
Qwest Corp.
R Plus Simmentals
R&B Gravel
R&F Coal Co.
R&G Leasing
R&G Leasing LLC
R&L Winn Inc.
R&R Cleaning
RLI Insurance Co.
RME Land Corp.
RPM Global
RPM Global USA Inc.
RPM Software International Pty. Ltd.
RPM Software USA Inc.
RRKK LLC
Ragsdale, Anthony Steven
Ragsdale, Linda Lee
Rail Link Inc.
Rall, Dave
Rambo, Barbara Jean
Rambo, Lynn Allyson
Rambo, Terry L.
Ramirez, Terri J.
RapidDecision
Rawson, Amos

Rawson, Amos L.
Rawson, Lois
Ray, Carol A.
Ray, Deborah
Ray, Don
Ray, Glenn
Ray, Jeanne
Ray, Virgene
Rayle Coal Co.
Real Estate & Improvement Co. of
    Baltimore City, The
Red Pepper Pipeline LLC
Redburn Tire Co.
Redwolf Production Inc.
Reed, Jean
Reed, Cristina
Reed, David
Reed, Jean Ann
Reed, Jeffrey
Reed, Robert
Reed, Scott
Reed, Thomas
Reed, Wanda
Reed, Wendie
Reger, James R.
Reger, James W.
Reger, Maree
Reger, Steven L.
Reich, Joyce Boland
ReliaStar Life Insurance Co.
Reliance Medical Group LLC
Renfro Equipment Inc.
Renfro, Robin
Renfro, Stuart
Rensi, Lana F.
ReportsNow Inc.
Reserve Coal Properties Co.
Revlett, Elaine
Revlett, Howard
Reynolds, Curtis
Rhodes, Candida
Rice Family Farms Inc.
Richard K. McKee Family Trust
Richard, Ronald

Richard, William
Richards, James
Richards, Peggy
Richardson Operating Co.
Richardson Production Co.
Richardson, Scott D.
Richardson, Vivian Theresa
Riggs, Elliott A.
Riggs, Ramona M.
Rinkes Properties LLC
Rinkes, Denise
Rinkes, Gary
Risebud Temp Services LLC
Rising Sun LLC
Rising Sun Resources
Ritchey, Corrine
Ritchey, Elvin T.
River Edge Dairy & Farms
Robert J. Peternal Revocable Trust
Rock Ridge Properties Inc.
Rock Springs Royalty Co.
Rocky Mountain Hospital & Medical
    Service Inc.
Rocky Mountain Power Inc.
Rocky Mountain Power LLC
Rodriguez, Ricardo
Rodriguez, Vicki
Rogers Family LLC
Rogers, Jean
Rogers, Gloria
Rogers, JL
Rogers, James
Rogers, James L., III
Rogers, James, III
Rogers, Joan
Rogers, Jonathan
Rogers, Jonathan L.
Rogers, Martha
Rogers, Mary
Rogers, Matha
Rogers, TG
Rogers, TG, Jr.
Rogers, Talmage
Rogers, Talmage, Jr.

Romine, James
Ronald E. Co.
Roquemore Family LP
Rose, Ann
Rose, Charles
Rose, John
Rose, Linda
Rosebud Energy Corp.
Rosebud Engineering Inc.
Rosebud Mine
Rosebud Mining Co.
Rosebud Temp Services
Ross L-Seven Ranch Ltd.
Ross, Chad
Rowe, Eleanor L.
Royal Energy Resources Inc.
Roynat Inc.
Ruckstuhl, Grace
Ruff, Richard L.
Runge Inc.
RungePincockMinarco Ltd.
Rural Municipality of Estevan No. 5
Rush Run Community Chapel
Russell, David E.
Russell, Geraldine
Russell, Tamra
Ryan, Patricia Lucy Stallings
S&D Construction Co.
S. Mack Farms Ltd.
SAP Canada Inc.
SAS Consulting Inc.
SMS Equipment Co.
STORM Consulting LLC
Salem, City of (OH), Board of Trustees
San Juan, County of (NM)
Sandhoff, Sharon
Santana, Shelley
Santana, Shelley A.
Santo, Andrew M.
Santo, David E.
Santo, Ellen
Santo, John
Santo, John J.
Santo, Mary

Santo, Mary E.
Sarcee Holdings Ltd.
SaskEnergy Inc.
SaskTel
Saskatchewan Power Corp.
Saskatchewan, Province of (Canada),
Saskatchewan, Province of (Canada),
    Ministry of Energy & Resources, Mines
    Branch, Director
Saskatchewan, Province of (Canada),
    Ministry of the Economy, Mineral
    Tenure, Director
Sattler, Rebecca M.
Sattler, Tracy A.
Saunders, Evelyn D.
Savage Mine
Schafer Ltd. LLC
Scheler, Carol
Scheler, Gary
Schiestel, David
Schmidt, Caroline
Schmidt, Henry
Schnaidt, Marleen T.
Schoate Mining Co. LLC
Schulte, Lorn
Schupp, James
Schupp, Jerry
Schupp, Pearl
Schwalbe, Claire
Schwalbe, Claire C.
Seaway Coal Co.
Secrest, Karen A.
Secure-24 Inc.
Securitas Security Services Inc.
Sedgman Canada Ltd.
Selby's Services
Sentry Royalty Co.
Sessions, Leroy
Shaffer, Ronald
Shaffer, Sharon
Shaw Business
Shea Maroon V LLC
Shea Properties
Shearer, Eugene M.

Shell Mining Co.
Shepard, Jeannie
Shepard, R. Michael
Sheperd, Esthel
Sheperd, H. Jeannie
Sheperd, Hilda
Sheperd, Linda
Sheperd, Nathan
Sheperd, R. Michael
Sheperd, William E.
Shepherd, Joseph
Shepherd, Marion
Shepherd, Marion L.
Shepherd, Shelly M.
Sherman & Howard LLC
Shinaberry, Lester
Shinaberry, Norma
Short Creek Coal Co.
Short Creek, Township of (OH)
Shugert, Robert
Shugert, Robert A.
Shumway, Nedra Alice
Sidco Development Inc.
Sidney Sugars Inc.
Siegfried Group LLP, The
Sill, Winifred B.
Simms, Crystal
Simms, Jon
SimplexGrinnell LP
Simpson, Richard P.
Sinopec Canada Energy Ltd.
Sipe, Joseph
Sipe, Michael
Slatzer, David
Slatzer, Sandra
Smith Living Trust, The
Smith Power Products Inc.
Smith,  Donald
Smith, Angela K.
Smith, Donald F.
Smith, Robert V.
Smouse, DeForrest
Smouse, Donald L.
Smouse, Douglas E.

Smouse, Evelyn
Smouse, Frederick B.
Smouse, Gregory B.
Smouse, Harry E.
Smouse, James
Smouse, Janice
Smouse, Marshal
Smouse, Mary
Smouse, Michael D.
Smouse, Mollie Frances
Smouse, Robert
Smouse, Ruth A.
Smouse, Samuel T.
Solvay Soda Ash Joint Venture
Souder Miller & Associates
Sound Energy plc
Souris Valley Paving
Southall, Paul W.
Southern Salvage Inc.
Southern Ute Indian Tribe, The
Sovell, Myron
Sowles Co.
Spartan Controls Ltd.
Spicer, Manila B.
Spirit Services Co.
Spring Mill Coal LLC
Spring Run Acres LLC
Springhouse Farm LLC
Sproul, Steve
Squire Sanders & Dempsey (US) LLP
Squire Sanders & Dempsey LLP
St. Joseph Literary Society
St. Paul Fire & Marine Insurance Co.
Stallings, Lawrence Warren
Stallion Farms Ltd.
Standard Laboratories Inc.
Stanfield Living Trust, The
Stanley, John
Star Drilling Ltd.
Stark, Tony
Starlin, Daniel James, Jr.
Starlin, Holly M.
Starner, Harold A.
Starvaggi Industries Inc.

Starwood Land Co. LLC
Steen, Mark
Steen, Mary
Stein Advisors LLC
Stenson, John
Steuben Coal-Anthony Mining Ltd.
Stevens, Donnie
Stevens, Mary Helen
Stevens, Sandra
Steward, Chester E.
Steward, Dorothy M.
Stewart, Larry
Stewart, Virginia
Stikeman Elliott LLP
Stiles, Bruce
Stiles, Jo Ann
Stiles, Leslie
Stiles, Mark
Stillion, Randy
Stimson Ltd.
Stratton, Lewis G.
Stratton, Wanda
Stratton, Wanda F.
Sun City Prop Busters
Suncor Energy Inc.
Suncor Energy Resources Partnership
Sunday Creek Coal Co.
Sunlight Development Co.
Sunnyhill Coal Sales Co., The
Sunoco Pipeline
Syntax Software Corp.
System Improvements
System Improvements Inc.
T&C Holdco LLC
TAQA North Ltd.
TC Holdco LLC
TEPCO Fuel & Power Inc.
TG Haas
TOF Oxford SPE LLC
Tableland Grain Farm Ltd.
Talen Montana LLC
Tanner, Beth M.
Tanner, Boyad M.
Tardio, James

Tata Chemicals (Soda Ash) Partners
Tata Chemicals North America Inc.
Taylor, Bonita
Taylor, Bonita K.
Taylor, CJ
Taylor, Jennifer
Taylor, Richard
Taylor, Shirely
Taylorton Energy Inc.
Teck Coal Partnership
Teck Resources Ltd.
Tembec Industries Inc.
Temme, Helga
Temme, Louis
Tennenbaum Opportunities Fund VI LLC
Tennenbaum Opportunities Partners
Tennenbaum Opportunities Partners V LP
Tennison,  William
Tennison, Linda
Terteling Brothers Inc.
Tetra Tech Inc.
Texas Westmoreland Coal Co.
Thatcher, Judy A.
Thelma's Cleaning
Thomas Engineering & Surveying Co., The
Thomas Fregiato Myser Hanson & Davies
Thomas, Betty Jo
Thomas, Rudy
Thomas, William R.
Thomason, Nurman
Thompson, Chiara
Thompson, Mark R.
Thornton Grout Finnigan LLP
Thunderbird Mining Systems
Tickhill, Betty Loise
Tickhill, Betty Louise
Tickhill, William
Tierney, Rosemary
Time Warner Cable
Timler, Virginia L.
Timmons, Agnes
Timmons, Diane
Timmons, Donna
Timmons, Jane

Timmons, Jeffery
Timmons, Kenneth
Timmons, Nancy Jo
Timmons, Robert
Timmons, Shelley
Timmons, Thomas
Tippett, Russell K.
Tollgate Holdings LLC
Toptal LLC
Tory's LLP
Tourmaline Oil Corp.
TransAlta Centralia Generation LLC
TransAlta Cogeneration LP
TransAlta Generation Partnership
TransAlta Utilities Corp.
Transalta Corp.
Travelers Bond & Special Insurance
Travelers Casualty & Surety Co. of America
Trend Gathering & Treating LP
Tri-County Lands Co.
Trustmark National Bank
Tucson Electric Power Co.
Tucson Gas & Electric Co.
Tunnel Hill Reclamation
Tunnel Hill Reclamation LLC
Turnbull, Brenda
Turner, John
Tuscarawas, County of (OH)
Tuscarawas, County of (OH), Engineers
Tuscawaras, County of (OH),
Tusky Coal LLC
Twin Mineral Land
Twin Mineral Land Ltd.
Tyco Integrated Fire & Security Canada Inc.
Tyco SimplexGrinnell
UCHealth
Umsted, Curtis
Umsted, Gerald Berquist
Umsted, Micheal
Umsted, Patricia
Umsted, Petricia
UniFirst Corp.
Unifor, Local 649
Union Pacific Land Resources Corp.

United Mine Workers of America, Health & Retirement Funds
United Mine Workers of America, Health & Retirement Funds, 1974 Pension Plan & Trust
United Mine Workers of America, Health & Retirement Funds, 1992 Benefit Plan
United Mine Workers of America, Health & Retirement Funds, Combine Benefit Fund
United Mine Workers of America, Local 7606
United Mine Workers of America, The - International Union
United Rentals (North America) Inc.
United States, Government of the
United States, Government of the, Department of the Interior, Bureau of Indian Affairs, Ute Mountain Agency, Superintendent
United States, Government of the, Department of the Interior, Bureau of Land Management
United States, Government of the, Department of the Interior, Bureau of Land Management, General Land Office
United States, Government of the, Department of the Interior, Bureau of Land Management, High Desert District, Kemmerer Field Office
United States, Government of the, Department of the Interior, Bureau of Land Management, Kemmerer Resource Area
United States, Government of the, Department of the Interior, Bureau of Land Management, New Mexico State Office
United States, Government of the, Department of the Interior, Bureau of Land Management, Wyoming State Office
United States, Government of the, Department of the Interior, Office of

Surface Mining Reclamation &
Enforcement Western Region
Unity Connected Solutions Inc.
Universal Protection Service LP
University of Wyoming
Unterseher, Cary
Unterseher, Edna
Unterseher, Jake
Utah Construction & Mining Co.
Utah International Inc.
Ute Mountain Ute Indian Tribe, The
Utelite Corp.
VMI Inc.
VMI Operating Inc.
VSP
Valencia Energy Co.
Valley Mining Inc.
Van Horn, Michael L.
Van Horn, Teresa L.
Van Order, Patricia A.
Vanbibber, Amy Jo
Vanfossen, Deborah
Vanfossen, John
Vaninetti, Jerry
Varibus LLC
Vaught,  Lisa
Vaught, John
Vaught, Kenny
Vaught, Michelle
Vedder Price PC
Verhovec, Evelyn
Verhovec, Mark
Verna M. Bazy Trust
Vibra-Tech Inc.
Vincent, Gerald
Vincent, Ione
Vincent, Mary
Virginia S. Whitmer
Vision Insurance Plan Insurance Co.
Vista Cos.
Vistra BV
Vita Cos., The
Voigt, Casey
Voohies, Nellwyn

W&F Eastham
W&M Thoman Ranches LLC
W. Ben Reeder Family Trust
WBM Office Systems Inc.
WBM Plus Service
WBM Protection Plus Service
WGR Asset Holding Co. LLC
WW Grainger Inc.
Wadella, Julius
Wadella, Mary
WageWorks Inc.
Wagner, Lorne
Wagon Rod Ranch LLC
Wahl, Jeffery R.
Waldeck, William G.
Walgenbach, Rhonda
Walker, Gerald F.
Walker, Robert D.
Walker, Victor H.
Walsh Services LLC
Walter Sarpy Creek Farm Inc.
Walters, Joleen H.
Walters, Patrick M.
Walton, Tyler
Wanner, Carter
Wanner, David
Wanner, Myles
Wanner, Trent
Ward, Linda M.
Ward, William R.
Warren Transport Inc.
Wasara, Kathleen M.
Wasara, Wayne M.
Washington Group International Inc.
Water & Environmental Technologies Inc.
Water Gas Resources Inc.
Watts, Carol A.
Watts, Carwin L.
Watts, Janet O.
Watts, Joseph Laverne
Weatherford, Louise T.
Weaver, Christopher M.
Weaver, Christpher M.
Weaver, Clara

Weaver, Daniel L.
Weaver, Jane H.
Weaver, Luther
Weaver, Luther F.
Weber, James A., II
Weightech Co.
Weiker, Nancy A.
Weil, Herbert
Weil, Leona
Weir International Inc.
Welch Bros. Inc.
Welch, Dennis
Welch, Kathryn
Welch, Thomas
WellDyneRx LLC
Wellness by Wishlist Inc.
Wells Fargo Insurance Services of West
    Virginia Inc.
Wells, Connie
Wells, James
WesBanco
West Fraser Mills Ltd.
Westcan Bulk Transport Ltd.
Westech Environmental Services Inc.
Western Coal Co.
Western Fuels Association Inc.
Western Gas Processors Ltd.
Western Gas Resources Inc.
Western Sugar Cooperative, The
Western Water Consultants Inc.
Westfall, Daniel J.
Westhafer, Ronald
Westhafer, Shirley
Westmoreland Kemmerer Inc.
Westmoreland Resources Inc.
Westmoreland Terminal Co.
Wetzel, Don
Whipple, Shirley
Whipple, W. Walden
White, William M.
Whitehead, William D.
Whitmer, Allan L.
Whitson, Bobby
Whitson, Jennifer

Wild Oat Consulting Inc.
Wilden, Denise
William Everett Craddock Family
William Everett Craddock Irrevocable Trust
Williams, Chuck
Williams, Martha
Williams, Ralph
Williams, Richard
Williams, Sharon K.
Williams, T. Steve
Williams, T. Steven
Williams, Thomas R.
Williams, Tonya
Williams, Valerie
Williams, Valerie L.
Willis Towers Watson plc
Willow Bunch No. 42, Rural Municipality
    of (Saskatchewan)
Willowvan Mining Ltd.
Wilson, Ellen Ruth
Wilson, Robert D.
Winkler, Lee Roy
Winkler, Lyle
Winkler, Patricia
Winkler, Sharon
Winkler, Sharon L.
Winston & Sandra Davis Family LP
Wolf, Mary M.
Wolf, Mary Margaret
Wooten, Joan
Wooten, Terry
Workers, Local Union 2067, The
Workforce Software LLC
Workiva Inc.
Worner, Margaret
Worrell, Bessie W.
Worthington, Betty
Worthington, William Alan
Wycinshi, Mary Lou
Wyoming, State of
Wyoming, State of, Department of
    Transportation
Wyoming, State of, Office of State Lands &
    Investments

XL Specialty Insurance Co.
XTO Energy Inc.
Xcel Energy Services Inc.
Xerox Corp.
Y Pino, Evangeline Ortiz
Y Pino, Peter Ortiz
Yoder, Ervin
Yoder, Lydia
Yontz, Cathy J.
Yontz, William A.
Z-Mack Enterprises Inc.
Zaccagnini, Dennis
Zaccagnini, Julia
Zimnox Coal Co., The
iSP3 Solution Providers Inc.

# SCHEDULE 1 (i)

## Customers

Dover, City of (OH)
NDSU - Fargo
North Dakota, State of, Hospital
Orrville, City of (OH)
Portland General Electric Co.
Tata Chemicals Partners
Tronox
Wyoming Lime Producers

# SCHEDULE 1 (j)

## Governmental/Regulatory Agencies

Alberta Energy Regulator
Alberta, Province of (Canada)
Belmont, County of (OH), Treasurer
Big Horn, County of (MT), Treasurer
British Columbia, Province of (Canada),
    Minister of Finance
Buffalo Independent School District (TX),
    Tax Assessor/Collector, Carolyn Ballard
Canada, Government of, Receiver General
Carroll, County of (OH), Municipal Court
Coalfields No. 4, Rural Municipality of
    (Saskatchewan)
Columbiana, County of (OH), Treasurer
Coshocton Chamber of Commerce
Coshocton, County of (OH), Municipal
    Court
Coshocton, County of (OH), Treasurer,
    Janette Donaker
Delaware,  State  of
Delaware, State of, Secretary
Douglas, County of (CO), Treasurer
Estevan No. 5, Rural Municipality of
    (Saskatchewan)
Flagstaff, County of (Alberta)
Freestone, County of (TX), Tax Assessor
    Collector
Halifax, County of (NC), Tax Collector
Harrison, County of (OH), Treasurer, Vicki
    Sefsick
Hinton, Town of (Alberta)
Kentucky, Commonwealth of, Department
    for Natural Resources
Kentucky, Commonwealth of, Department
    of Revenue
Kentucky, Commonwealth of, State
    Treasurer
Leduc, County of (Alberta)
Leon Independent School District (TX), Tax
    Assessor Collector

Leon, County of (TX), Tax Assessor
    Collector
Lincoln County School District #1 (WY)
Lincoln, County of (WY), Office of P&D
Lincoln, County of (WY), Public Health
Lincoln, County of (WY), Treasurer
M. Hosom
Mercer, County of (ND), Road Department
    Mercer, County of (ND), Treasurer
Minnesota, State of, Department of Revenue
Montana State Fund
Montana, State of, Department of
    Environmental Quality
Montana, State of, Department of
    Environmental Quality, Air Division
Montana, State of, Department of
    Environmental Quality, Mining Division
Montana, State of, Department of
    Environmental Quality, Water Division
Montana, State of, Department of
    Environmental Quality, Water Protection
    Bureau
Montana, State of, Department of Labor &
    Industry
Montana, State of, Department of Natural
    Resources
Montana, State of, Department of Revenue
Montana, State of, Department of State
    Lands
Montana, State of, Treasurer
Morgan, County of (OH), Clerk of Courts,
    Carma Johnson
Morgan, County of (OH), Treasurer, Dawn
Muskingum, County of (OH), Treasurer
New Mexico,  State of
New Mexico, State of, Bureau of Mine
    Safety
New Mexico, State of, Commissioner of
    Public Lands

New Mexico, State of, Department of
Workforce

New Mexico, State of, Mining & Minerals
Division

New Mexico, State of, Mining Department,
Air Quality Bureau

New Mexico, State of, Mining Department,
Ground Water Quality Bureau

New Mexico, State of, Mining Department,
Mining Environmental Compliance
Section

New Mexico, State of, Taxation & Revenue

New Mexico, State of, Taxation & Services

Noble, County of (OH), Treasurer

North Carolina, State of, Department of
Environmental Quality

North Carolina, State of, Department of
Environmental Quality, Water Resources

North Carolina, State of, Department of
Revenue

North Dakota, State of

North Dakota, State of, Department of
Health

North Dakota, State of, Department of
Health, Air Division

North Dakota, State of, Department of
Health, Water Division

North Dakota, State of, Office of State Tax
Commission

North Dakota, State of, Office of Tax
Commissioner

North Dakota, State of, Public Service
Commission

Ohio, State of, Department of Revenue

Ohio, State of, Department of Taxation,
Treasurer

Ohio, State of, Division of Natural
Resources, Division of Mineral
Resources

Ohio, State of, Environmental Protection
Agency, Division of Air Pollution
Control

Ohio, State of, Environmental Protection
Agency, Division of Surface Water

Ohio, State of, Treasurer

Oliver, County of (ND), Treasurer

Paintearth, County of (Alberta)

Perry, County of (OH), Court

Perry, County of (OH), Treasurer, Melissa
Walters

Richland, County of (MT), Treasurer

Rosebud, County of (MT), Sheriff

Rosebud, County of (MT), Treasurer

San Juan, County of (NM), Treasurer

Saskatchewan, Province of (Canada),
Ministry of Highways & Infrastructure

Texas, State of, Commission on
Environmental Quality, Air Division

Texas, State of, Commission on
Support Payment Clearinghouse

Texas, State of, Comptroller of Public
Accounts

Treasure, County of (MT), Treasurer

Tuscarawas, County of (OH), Treasurer

United States, Government of the,
Department of Labor, Mine Safety &
Health Administration

United States, Government of the,
Department of the Interior, Office of
Surface Mining

United States, Government of the,
Department of the Interior, Office of
Surface Mining & Reclamation

United States, Government of the,
Department of the Interior, Office of
Surface Mining Reclamation &
Enforcement

United States, Government of the,
Department of the Treasury United
States, Government of the, Department of
the Treasury, Internal Revenue Service

Utah, State of

West Virginia, State of, Department of
Environmental Protection

West Virginia, State of, Department of
Environmental Protection Water & Waste
Management

Wyoming, State of, Department of
Environmental Quality, Air Quality
Division

Wyoming, State of, Department of
Environmental Quality, Land Quality
Division

Wyoming, State of, Department of
Workforce Services

# SCHEDULE 1 (k)

## HR Benefits

AON PLC
Acclaim
Acclaim Ability Management
AmeriBen
Automatic Data Processing Inc.
Bryan Cave Leighton Paisner LLP
CareerBuilder Employment Screening LLC
CareerBuilder LLC
EKS&H
EKS&H LLLP
George, Anthony
Global Retirement Partners LLC
Greenshield
HealthSmart Holdings Inc.
Holland & Hart LLP
Homewood Health Inc.
Industrial Alliance Insurance & Financial Services Inc.
InfoMine Inc.
Liberty Mutual
Lockton Cos. Inc.
Manulife Financial Corp.
Mornuea Sheppell Ltd.
Mountain States Employers Council Inc.
Optum Inc.
OptumRx Administrative Services LLC
Part D Advisors Inc.
PayFactors
Preventive Health Now
Prudential Financial Inc.
Sun Life Financial Inc.
SureHire
TeleDoc Inc.
ThrivePass
United Mine Workers of America
Voya Financial
Voya Services Co.
Willis Towers Watson
Workers' Compensation Board - Alberta
Zurich Insurance Group AG

# SCHEDULE 1 (l)

## Insurance

ACE American Insurance Co.
ACE Property & Casualty Insurance Co.
AIG Insurance Co. of Canada
AXIS Insurance Co.
AXIS Reinsurance Co.
AXIS Surplus Insurance Co.
Allied World Assurance Co. Ltd.
Allied World Specialty Insurance Co.
American Longshore Mutual Association
Ariel Re BDA Ltd.
Ariel Syndicate 1910
Aspen Bermuda Ltd.
Aspen Insurance UK Ltd.
BankDirect Capital Finance LLC
Barbican Bermuda
Chubb Bermuda Insurance Ltd.
Chubb Indemnity Insurance Co.
Federal Insurance Co.
Ironshore Europe Ltd.
Ironshore Insurance Ltd.
Ironshore Specialty Insurance Co.
Lloyd's
Lloyd's of London
Markel Bermuda Ltd.
National Union Fire Insurance Co. of Pittsburgh
North Dakota State Fund
Northbridge Financial Corp.
Novae Bermuda Underwriting Ltd.
Ohio State Fund
Oil Casualty Insurance Ltd.
Sompo International
Steadfast Insurance Co.
Syndicate 2007
Travelers Property Casualty Co. of America
Westmoreland Risk Management Inc.
Wyoming State Fund
XL Europe Ltd.
Zurich American Insurance Co.
Zurich American Insurance Co. of Illinois
Zurich Insurance Co. Ltd.

# SCHEDULE 1 (m)

## Landlords

D&P Land Investments LLC
Luscar Ltd.

# SCHEDULE 1 (n)

## Litigation

Baisden, Michael
Blackhawk Land & Resources LLC
Butler, Craig W.
Canadian National Railway Co.
Cozort, Floyd
Crow Tribe of Indians (MT)
Dillion, Vivian
Eichelberger, Jon
Ensigner, Pamela
Freeman, Everitte
Freeman, Phyllis
Heritage Coal Co. LLC
Kinder Morgan
Kinder Morgan Utopia LLC
Montana, State of, Environmental
    Information Center
North Carolina, State of, Division of Water
    Resources
Ohio Gathering Co. LLC
Otter Tail Power Co.
Philippines, Government of the,
    Commission on Human Rights
Ramsey, Donna
Ramsey, Michael
Ramsey, Mike
Sergeant Stone Inc.
Shelly & Sands Inc.
Sierra Club
Spires, Brenda
Spires, Karl
Suazo, James
Talmar of FL LLC
United States, Government of the,
    Department of Interior, Bureau of Indian
    Affairs
United States, Government of the,
    Department of Labor, Associate Regional
    Solicitor
United States, Government of the,
    Department of Labor, District Director

United States, Government of the,
    Environmental Protection Agency
Wild Earth Guardians

## SCHEDULE 1 (o)

### Ordinary Course Professionals

Capitol Network LLC
Darryl L. James Consulting LLC
Wilmer Cutler Pickering Hale & Dorr LLP

# SCHEDULE 1 (p)

## Other Significant Creditors

1481604 Alberta Ltd.
Bank of Montreal, The
CCA Group LLC
Capital Power GP Holdings Inc.
DMA33 Enterprises Ltd.
Farm Credit Leasing Services Corp.
First Business Equipment Finance LLC
First Security Bank
Instow Enterprises Ltd.
Integrated Distribution Systems LP
JM Mullin Enterprises Ltd.
John Deere Financial Inc.
KL Uptown Enterprises Ltd.
LEM Enterprises LLC
MCP Funding I LLC
MK3 Enterprises Ltd.
Merchants Capital Resources Inc.
Modern Office Methods Inc.
NMHG Financial Services Inc.
North Central Rental & Leasing LLC
Obsidian Agency Services Inc.
Pacific & Western Bank of Canada
RJF Enterprises
Russell Metals Inc.
Starion Financial
Tri-State Truck & Equipment Inc.
Wells Fargo Equipment Finance Inc.

# <u>SCHEDULE 1 (q)</u>

## <u>Significant Competitors</u>

Alliance Resource Partners LP
Foresight Energy LP
Hallador Energy Co.
Peabody Energy Corp.
Rhino Resource Partners LP

# SCHEDULE 1 (r)

## Sureties

ACE INA Group
Argo Group
Evergreen National Indemnity Co.
First Surety Corp.
Indemnity National Insurance Co.
Lexon Insurance Co.
Travelers Property Casualty Group
Zurich Insurance Group

# SCHEDULE 1 (s)

## Taxing Authorities

Athens, County of (OH), Treasurer, Bill Bias
Hart Butt No. 11, Rural Municipality of (Saskatchewan)
Jefferson, County of (OH), Treasurer, Raymond M. Agresta
Lincoln, County of (WY), Treasurer - Other
Ohio, State of, Bureau of Workers' Compensation
Ohio, State of, Department of Agriculture
Ohio, State of, Department of Commerce
Ohio, State of, Department of Taxation
Ohio, State of, Environmental Protection Agency
Texas, State of, Railroad Commission
Uinta, County of (WY), Treasurer
United States, Government of the, Department of Education
United States, Government of the, Department of the Interior
United States, Government of the, Department of the Interior, Bureau of Indian Affairs

# SCHEDULE 1 (t)

## Top 50 Creditors

Bradken Inc.
Cummins Bridgeway LLC
Jennmar Corp. of Utah Inc.
Mesa Ready Mix Inc.
Paprzycki, Kevin A.
Pension Benefit Guaranty Corp.
Pro-Ex Canada Inc.
United States, Government of the, Department of the Interior, Minerals Management Service

# SCHEDULE 1 (u)

## Unions

Communications Energy & Paperworkers Union of Canada, Local 649
International Brotherhood of Electrical Workers, Local 2067
International Union of Operating Engineers, Local 953
International Union of Operating Engineers, Local 955
International Union of Operating Engineers, Local Union 400
International Union of Operating Engineers, Local Union 400, AFL-CIO
International Union, United Mine Workers of America
United Mine Workers of America
United Mine Workers of America, Local 7606

# SCHEDULE 1 (v)

## US Trustee Office

Boykin, Jacqueline
Duran, Hector
Fitzgerald, John P., III
Flinchum, Peggy T.
Griffin, Barbara
Johnson-Davis, Luci
Livingstone, Diane
March, Christine
McPherson, Theresa E.
Motton, Linda
Otto,  Glenn
Pecoraro, Shannon F.
Schmidt, Patricia
Smith, Gwen
Statham, Stephen
Turner, June E.
Van Arsdale, Robert B.
Waxton, Clarissa

# SCHEDULE 1 (w)

## Utilities

AT&T Inc.
AT&T Long Distance
AT&T Mobility LLC
Advanced Communications Technology Inc.
Alberta Water & Wastewater
Bellaire, City of (OH), Water Department
Beulah, City of (ND)
Burr Oak Regional Water District (OH)
Cabot-Norit Americas Inc.
Capital Power LP
Century Wireline Services
CenturyLink
CenturyLink Business Services
CenturyLink Inc.
Colstrip, City of (MT)
Columbia Gas
Columbia Gas Tranmission
Columbia Gas of Ohio Inc.
Comcast Cable Communications LLC
Coshocton, City of (OH), Water Department
DirecTV LLC
Dish Network Corp.
Dominion East of Ohio
Dominion Energy Inc.
Eastern Ohio Regional Wastewater
Eastern Ohio Regional Wastewater
    Authority
Edmonton, City of (Alberta)
Energy Cooperative, The
Estevan, City of (Saskatchewan)
Farmington, City of (NM)
FastTrack Communications
FastTrack Communications Inc.
Foraker Gas Co. Inc.
Four Corners Propane
Frontier Communications Corp.
Frontier Power Co., The
Granite Telecommunications LLC
Guernsey Muskingum Electric Cooperative
    Inc.

Hazen, City of (ND)
Kemmerer Diamondville Water &
    Wastewater Joint Powers Board (WY)
Kemmerer, City of (WY)
Kimble Recycling & Disposal
Level 3 Communications Inc.
MCI Communications Corp.
Madison Energy Cooperative Association
    Inc.
Mid-Rivers Telephone Cooperative Inc.
Mid-Yellowstone Electric Cooperative Inc.
Miles City Sanitation
Miller's Garbage Service Inc.
Montana, State of, Department of
    Environmental Quality, Hazardous Waste
    Program
Muhlenberg County Water District (KY)
Muhlenberg, County of (KY), Water District
Muskingum, County of (OH), Utilities
Muskingum, County of (OH), Utilities
    Department Navasota Valley Electric
NorthWestern Energy NRG Texas Power
    LLC
Ohio, State of, Environmental Protection
    Agency, Burr Oak Regional Water
    District
PNM
Perry, County of (OH), Southern Perry
    County Water District
Range Telephone Cooperative Inc.
Republic Services
Republic Services Inc.
Reservation Telephone Cooperative Inc.
Rocky Mountain Power
Roughrider Electric Cooperative Inc.
Safety-Kleen Systems Inc.
Signal Direct Communications Ltd.
South Central Power Co.
South Central Power Co. Inc.
Southern Perry County Water District (OH)

Special Areas, Rural Municipality of
    (Alberta), Big Country Waste
    Management Commission

Spectrum Business

Suburban Propane Partners LP

Superior Propane

TCT

Telus  Mobility

Terex Utilities South

Texas Water Utilities Association

Time Warner Cable Northeast

Tongue River Electric Cooperative, Inc.

TouchTone Communications Inc.

Union Telephone Co.

Waste Management of New Mexico

Waste Management of Ohio Inc.

West River Telecommunications

Windstream Holdings Inc.

Wyoming Waste Systems

Wyoming, State of, Water Development
    Commission

# SCHEDULE 1 (x)

## Vendors

3B Dozer Service LLC
4M Solutions Inc.
A Plus Well Service Inc.
ADP
ADP Inc.
AU Mines
Acklands-Grainger Inc.
Acme Soil Remediation Inc.
Alberta Energy
Allstate Fire Equipment of Texas Inc.
AmeriBen Solutions
American Electric Power
Anadarko Petroleum Corp.
Anthem
Anthony Mining Co. Inc.
Aon Reed Stenhouse
Aon Reed Stenhouse Inc.
Aon Risk Insurance Services West Inc.
Applied Industrial Technologies
Arnold Machinery Co.
Axis Services Inc.
BHP Billiton New Mexico Coal Inc.
BMO Capital Markets
BNSF Railway Co.
BP Energy Co.
Bachynski, Terrance
Baker & Hostetler LLP
Baldor Electric Co.
Bennett Jones LLP
Berner Trucking Inc.
Black Butte Coal Co.
Black Lung
Bowles Rice LLP
Bradken Canada Manufactured Products
    Ltd.
Brandeis Machinery & Supply Co.
Bridgestone
Bridgestone Americas Tire Operations LLC
Bridgestone Canada Inc.
Bridgestone Firestone North American Tire
Buckingham Coal Co.
Buckley Powder Co.
Butler Machinery Co.

CDM ElectroMech Technical Services
Cabot Canada Ltd.
Cabot Norit Canada Inc.
Cadomin Mountain Contracting Ltd.
Can-Jer Industrial Lube
Can-Jer Industrial Lubricant Ltd.
Canadian National Railways
Cat Financial Services Corp.
Cat Rental Store, The
Catalyst Environmental Solutions Corp.
Caterpillar Finance Services
Caterpillar Financial Services
Caterpillar Financial Services Corp.
Chevron Products Co.
Chromate Industrial
Cimarron Coal Co.
Cincinnati Mine Machinery Co., The
Citizens Asset Finance Inc.
Clearfork Trucking
Coal Royalty LP
Coal Valley Investment Corporation
Columbus Equipment Co.
Conn-Weld Industries Inc.
Consol Energy Inc
Cornerstone Energy Corp.
Coshocton Trucking Inc.
Cross Borders Consulting Ltd.
Cummins Rocky Mountain Inc.
Cummins Western Canada
Cylance Inc.
Damet Services
Deloitte & Touche LLP
Destech Mining Consulting Inc.
Dominion North Carolina
Dover Hydraulics Inc.
Drives & Controls Services Inc.
Dugan Production Corp.
ESCO
ESCO Supply
Ecosphere Environmental Services Inc.
Edwards Law Firm
Egypt Valley Stone LLC
Element Fleet Management

Ellingford Bros Inc.
Energcomm Federal Credit Union
Enterprise Fleet Management
Equipment Sales & Services
Ernst & Young
Fairmont Supply Co.
Fenner Dunlop CSS New Mexico LLC
Finning Canada
Finning International Inc.
Firestone
First Interstate Bank
Flanders Electric of Canada ULC
Four Corners Materials
GCR Tire Center
GCR Tires & Service
Gas Alberta Energy
General Aggregate Equipment Sales
General Electric Canada
Genesee Royalty LP
Golden Arrow School & Charter Buses Ltd.
Grainger Inc.
Green Shield Canada
H&E Equipment Services Inc.
HD Northern Equipment Sales & Rentals
HOLT CAT
Healthsmart Benefit Solutions Inc.
Heavy Metal Equipment & Rentals
Heavytech Industries
Hexagon Mining Inc.
Highway Machine Co. Inc.
Holland & Hart LLP
Honstein Oil & Distributing LLC
Hotel Talisa
Houlihan Lokey Capital Inc.
ICL-IP America
Imperial Credit Corp.
Imperial Oil
International Union of Operating Engineers
JK Wilson Inc.
JL Rogers Family LLC
Jennmar
John E. Retzner Oil Co.
Jones Day
Joy Global
Joy Global Canada Ltd.
Joy Global Surface Mining Inc.
Joy Global Underground Mining LLC

KLS Earthworks & Environmental
KNS Communications Consultants
KVC Developments Ltd.
Kal Tire
Kelly Panteluk Construction
Kiewit Mining Group Inc.
Kimble Co.
Komatsu Equipment Co.
Komatsu Financial
Komatsu Financial LP
Komatsu Southwest
L&H Industrial Inc.
LML Industrial Contractors Ltd.
Land Services USA Inc.
Lazard Freres & Co. LLC
Liberty Mutual Group
Lykins Energy Solutions
M&C Transportation LLC
M4 Maroon V LLC
Mancal Coal Inc.
Manulife Financial
Marietta Coal Co.
Matrix Design Group LLC
Matrix Solutions Inc.
McComb Automotive Supply Ltd.
McCoy Equipment Co. Inc.
Michelin North America Inc.
Microsoft Corp.
Millennium EMS Solutions Ltd.
Mineral Trucking Inc.
Minova USA Inc.
Modern Machine Works Inc.
Modern Machinery Co. Inc.
Montana OECI Trust Fund
Montana Operating Engineers
Montana, State of, Treasurer
Montana-Dakota Utilities Co.
Morgan Advanced Materials
Motion Industries Canada Inc.
Motion Industries Inc.
Nalco Co.
Natural Resource Partners LP
Navakai Inc.
Navasota Valley Electric Cooperative Inc.
Navigant
Nelson Brothers Mining Services LLC
Norit EAPA Holding BV

North American Energy
Nu-Northern Tractor Rentals
Odyssey Relocation Management
Ohio Cat
Ohio Central Railroad Inc.
OptumHealth
Oracle Corp. Canada Inc.
Orica Canada Inc.
P&H Minepro
PNC Bank NA
PNM Resources Inc.
Paul's Hauling Ltd.
Pleasant Valley Trucking Inc.
Polar Rubber Products
Prairie Mines & Royalty Ltd.
Prairie Mines & Royalty Ulc
Prairie North Construction Ltd.
Praxair Inc.
PricewaterhouseCoopers
Private Bank
Professional Highwall Mining Services LLC
Prudential Financial
Prudential Retirement
Quadra Chemicals Ltd.
Quality Environmental Services Inc.
RJ Wright & Sons Ltd.
RM of Estevan
ROMCO Equipment Co. LLC
RPMGlobal USA Inc.
Randy V. Moore
Rhino Energy LLC
Ridley Terminals Inc.
Rimpull Corp.
River Trading Co. Ltd.
Rocko's Rentals & Services Ltd.
Rocky Mountain Brake Supply Inc.
Rocky Mountain Coal Mining Institute
Rodey Dickason Sloan Akin & Robb PA
Rosebud Temp Services LLC
Rova Ventures LLC
Rud Oil & Gas Co.
Runge Mining Inc.
Rural Municipality of Coalfields No. 4
Rural Municipality of Hart Butte No. 11
S&S Machine Inc.
SGS North America Inc.
SMS Equipment Inc.

San Juan Coal Co.
San Juan County Museum
San Juan, County of (WA), Treasurer
SaskPower
Saskatchewan, Province of (Canada),
    Ministry of the Economy
Schulte Roth & Zabel LLP
Shearman & Sterling LLP
Sherritt International Corp.
Skylift Services Inc.
Smiley Excavating LLC
Stantec Consulting Services Inc.
Steel Works Manufacturing Ltd.
Stein, Jeffrey S.
Summit Machining & Welding Ltd.
Sun Coast Resources Inc.
Sun Life Assurance Co. of Canada
Superior Industrial Solutions
Talmar LLC
Taylor Brothers Welding Service Inc.
Texas Capital Bank NA
Texcan
Tiger Valuation Services LLC
Town & Country Supply Association
Tractor & Equipment Co.
Trafigura Pte. Ltd.
Transwest Mining Systems
Trent's Tire
Tribbie Plummer Church & Laplante LLC
Tunnel Ridge LLC
UGM Addcar Systems LLC
UMWA Combined Benefit Fund
US Bank
USC Consulting Group LLC
United Mine Workers of America
United States, Government of the, Bureau of
    Indian Affairs
United States, Government of the,
    Department of the Interior, Bureau of
    Indian Affairs, Ute Mountain Ute Agency
United States, Government of the,
    Department of the Interior, Minerals
    Management Service
United States, Government of the,
    Department of the Treasury, Internal
    Revenue Service, Black Lung Excise Tax

United States, Government of the, Office of
    Natural Resources Revenue
Universal Protection Service
Valor LLC
Vandeburg Excavation Inc.
Velocity Technology Solutions Inc.
Venture Technologies Inc.
WBM Technologies Inc.
Wagner Equipment Co.
Wajax Equipment
Wampum Hardware Co.
Warren Fabricating Corp.
Waukesha-Pearce Industries Inc.
Wells, Todd
Westcan Bulk Transport
Westmoreland Canada Holdings Inc.
Westmoreland Coal Co.
Westmoreland Kemmerer LLC
Westmoreland Resource Partners LP
Westmoreland Risk Management
Wheeler Machinery Co.
William Albert Inc.
Willis Ltd.
Willis of Tennessee Inc.
Wilmington Savings Fund Society FSB
Wire Rope Industries Ltd.
Wirerope Works Inc.
Worker's Compensation Board - Alberta
Wyoming, State of, Department of Revenue
Xenmax
Xenmax Commercial Energy Marketing Inc.
Xylem Dewatering Solutions Inc.
Yellowhead, County of (Alberta)

**Schedule 2**

| **Schedule** | **Category** |
|---|---|
| 1(a) | Debtor Affiliates |
| 1(b) | Directors & Officers |
| 1(c) | 5% or More Shareholders |
| 1(d) | Bank-Lender-Administrative Agents |
| 1(e) | Bankruptcy Judges |
| 1(f) | Bankruptcy Professionals |
| 1(g) | Bondholders - Indentured Trustee |
| 1(h) | Contract Counterparties |
| 1(i) | Customers |
| 1(j) | Governmental/Regulatory Agencies |
| 1(k) | HR Benefits |
| 1(l) | Insurance |
| 1(m) | Landlords |
| 1(n) | Litigation |
| 1(o) | Ordinary Course Professionals |
| 1(p) | Other Significant Creditors |
| 1(q) | Significant Competitors |
| 1(r) | Sureties |
| 1(s) | Taxing Authorities |
| 1(t) | Top 50 Creditors |
| 1(u) | Unions |
| 1(v) | US Trustee Office |
| 1(w) | Utilities |
| 1(x) | Vendors |

---

# SCHEDULE 2(a)

## Debtor Affiliates

Absaloka Coal, LLC
Basin Resources, Inc.
Buckingham Coal Company, LLC
Dakota Westmoreland Corporation
Daron Coal Company, LLC
Harrison Resources, LLC
Haystack Coal Company
Oxford Conesville, LLC
Oxford Mining Company - Kentucky, LLC
Oxford Mining Company, LLC
Prairie Mines & Royalty ULC
San Juan Coal Company
San Juan Transportation Company
Texas Westmoreland Coal Company
WCC Holding B.V.
WCC Land Holding Company, Inc.
WEI - Roanoke Valley, Inc.
Western  Energy Company
Westmoreland - Roanoke Valley, LP
Westmoreland Canada Holdings Inc.
Westmoreland Canada LLC
Westmoreland Canadian Investments, LP
Westmoreland Coal Company
Westmoreland Coal Company Asset Corp
Westmoreland Coal Sales Company, Inc.
Westmoreland Energy Services New York,
    Inc.
Westmoreland Energy Services, Inc.
Westmoreland Energy, LLC
Westmoreland Kemmerer Fee Coal
    Holdings, LLC
Westmoreland Kemmerer, LLC
Westmoreland Mining LLC
Westmoreland North Carolina Power, LLC
Westmoreland Partners
Westmoreland Power, Inc.
Westmoreland Prairie Resources Inc.
Westmoreland Resource Partners, LP
Westmoreland Resources GP, LLC
Westmoreland Resources, Inc.
Westmoreland Risk Management, Inc.
Westmoreland San Juan Holdings, Inc.

Westmoreland San Juan, LLC
Westmoreland Savage Corporation
WRI Partners, Inc.

## SCHEDULE 2(b)

### Directors & Officers

Alessi, Keith E.
Bachynski, Terry
Clutterbuck, Robert T.
Flexon, Robert C.
Grafton, Jennifer S.
Hamilton, Gail E.
Honish, Gregory J.
Horton, Keith
Hutchinson, Michael G.
Klein, Laurentius Ireneus Winfridus
Klingaman, Richard M.
Kohn,  Gary A.
Kost, Kurt D.
Mackus, Craig R.
Meyer, Michael J.
Packwood, Jan B.
Paprzycki, Kevin A.
Scharp, Robert C.
Stein, Jeffrey S.
Tinstman, Robert A.
Troup, Nathan M.
Tywoniuk, Gerald A.
Ungurean, Charles C.
Veenstra, Jason W.

## <u>SCHEDULE 2(c)</u>

### <u>5% or More Shareholders</u>

Acadian Asset Management LLC
AGF Investments Inc.
AGF Management Ltd.
Alliance Bernstein
AllianceBernstein LP
Allianz Global Investors of America LP
Allianz of America
Allianz SE
American Century Cos. Inc.
American Century Investment Management
American Family Mutual Insurance
American Family Mutual Insurance Co. SI
American International Group
American International Group Inc.
Ameritas Investment Partners Inc.
Analytic Investors LLC
Apollo Management Holdings LP
AQR Capital Management LLC
ART Advisors LLC
Bachynski, Terry J.
Balyasny Asset Management LLC
Bank of America Corp.
Bank of New York Mellon Corp.
Bankinter Gestion de Activos SA
Bankinter SA
Barclays PLC
Barings LLC
Blackrock Advisors LLC
Blackrock Fund Advisors
BlackRock Inc.
Blackrock Institutional Trust
Blackrock Investment Management LLC
BNP Paribas
BNP Paribas Arbitrage SA
Bogle Investment Management LP
Boston Partners
Bridgeway Capital Management Inc.
Brown Advisory Inc.
Brown Advisory LLC
Charles Schwab Corp.
Charles Schwab Investment Management
Cigna Corp.

Citadel Advisors LLC
Citigroup Inc.
Clarke, Ana M.
Con Edison, Retiree Plan
Connecticut General Life Insurance Co.
Consulting Group Advisory Services
Corsair Capital Management LP
Creative Planning
Credit Suisse AG
Credit Suisse Group AG
Cutler Group LP
D. E. Shaw & Co. LP
Deutsche Asset Management
Deutsche Bank AG
Dimensional Fund Advisors LP
Dimensional Fund Advisors Ltd.
Federated Investors Inc.
Federated MDTA LLC
Fidelity Investments
Fidelity Management & Research
FIL Ltd.
Flexon, Robert C.
FMR LLC
Gendell, Jeffrey L.
Geode Capital Management LLC
Goldman Sachs Group Inc.
Grafton, Jennifer S.
Great West Capital Management LLC
Great West Life Assurance Co.
Group One Trading LP
Guggenheim
Hamilton, Gail E.
Hartford Financial Services Group Inc.
Hartford Life Insurance Co.
HighTower Advisors LLC
Hutchinson, Michael G.
IFP Advisors Inc.
IndexIQ Advisors LLC
Invesco Ltd.
Invesco Powershares Capital Management
    LLC

John Hancock Investment Management
    Services
JP Morgan Asset Management Japan
JPMorgan Chase & Co.
Kohn, Gary A.
Legal & General Group PLC
LWI Financial Inc.
Lyxor
Lyxor International Asset Management
Mackus, Craig R.
Macquarie Group
Macquarie Group Ltd.
Mangrove Partners
Mangrove Partners Master Fund Ltd., The
Manulife Asset Management US LLC
Manulife Financial Corp.
Massachusetts Mutual Life Insurance
Massachusetts Mutual Life Insurance Co.
Meeder Asset Management
Menta Capital LLC
Micheletti, Joseph E.
Millennium Management LLC
Morgan Stanley
Morgan Stanley & Co. LLC
Morgan Stanley Smith Barney LLC
Nationwide Financial Services Inc.
Nationwide Fund Advisors
New York, State of
New York, State of, Common Retirement
    Fund
Northern Trust Co.
Northern Trust Corp.
Numeric Investors LLC
Nuveen Fund Advisors
Nuveen Fund Advisors LLC
Olive Street Investment Advisers
Oppenheimer Funds Inc.
Oxford Asset Management
Pacific Investment Management Co.
Packwood, Jan B.
PanAgora Asset Management Inc.
Paprzycki, Kevin A.
Parametric Portfolio Associates
Power Corp. of Canada
Prelude Capital Management LLC
Principal Financial Group Inc.

Principal Management Corp.
ProShare Advisors LLC
ProShares Advisors LLC
Prudential Financial Inc.
Prudential Insurance Co. of America
Prudential Retirement Insurance & Annuity
RBC Capital Markets Arbitrage
RBC Trust Co. Delaware Ltd.
Renaissance Technologies LLC
RhumbLine Advisers
Robeco USA LLC
Royal Bank of Canada
Russell Investment Management
Russell Investments Canada Ltd.
Russell Investments Group Ltd.
Russell Investments Ireland Ltd.
Rydex Investments
Schadan, John A.
Scharp, Robert C.
Security Investors LLC
SEI Investment Management Corp.
SEI Investments Co.
SEI Investments Fund Management
SG Americas Securities LLC
Sigma Planning Corp.
Simplex Trading LLC
SSGA Funds Management Inc.
State Board of Administration of Florida
    Retirement System
State Farm Investment Management Corp.
State Farm Mutual Auto Insurance
State Street Corp.
Stein, Jeffrey S.
Stone Ridge Asset Management LLC
Stonehill Capital Management Inc.
Stratos Wealth Partners Ltd.
STRS Ohio
SunAmerica Asset Management LLC
SunTrust Plan
T. Rowe Price Associates
T. Rowe Price Group Inc.
Teachers Advisors Inc.
Teachers Insurance & Annuity Association-
    College Retirement Equities Fund
TFS Capital LLC
Tinstman, Robert A.

Tower Research Capital LLC
Troup, Nathan M.
Tudor Investment Corp.
Two Sigma
Two Sigma Advisers LP
Two Sigma Investments LLC
UBS
UBS Group AG
United Services Automobile Association
USAA Asset Management Co.
VALIC Co. I
Vanguard Group
Vanguard Group Inc.
Vanguard Group Ireland Ltd.
Vanguard Investments UK Ltd.
Vantagepoint Investment Advisers
Veenstra, Jason W.
Venor Capital Management LP
Voya Investment Management LLC
Voya Investments LLC
Wellington Management Group LLP
Wells Fargo & Co.
Wells Fargo Advisors LLC
Wells Fargo Bank NA
Wells Fargo Securities LLC
Western Standard LLC
Westmoreland Coal Co.
Whittier Trust Co.

## SCHEDULE 2(d)

### Bank-Lender-Administrative Agents

Adams Mill CLO Ltd.
Allianz Global Investors of America LP
Allianz SE
Argo Group International Holding
Aviva Group
Aviva Investors
Aviva plc
Bank of Montreal
Bank of Tokyo-Mitsubishi UFJ Ltd.
Barclays Bank PLC
Blackrock Capital Investment Corp.
BlueMountain CLO 2012-2 Ltd.
BlueMountain CLO 2013-1 Ltd.
BlueMountain CLO 2013-4
BlueMountain CLO 2014-1 Ltd.
BlueMountain CLO 2014-3 Ltd.
BlueMountain CLO 2014-4, Ltd.
BlueMountain CLO 2015-1
BlueMountain CLO 2015-2 Ltd.
BlueMountain CLO 2015-4 Ltd.
BlueMountain CLO 2016-1 Ltd.
BlueMountain CLO 2016-2 Ltd.
BlueMountain CLO 2016-3 Ltd.
BlueMountain CLO Ltd.
BMO Capital Markets Corp.
Bowery Funding ULC
Brinker Capital Inc.
Canyon Capital CLO Ltd.
Canyon Partners LLC
Canyon Value Realization, The
Chou America Management Inc.
CIFC Asset Management LLC
CIFC Funding 2012-I Ltd.
CIFC Funding Ltd.
Clarington Capital Management Inc.
Cohanzick Management LLC
Collins Long/Short Credit Fund
Credos Floating Rate Fund LP
Cross Sound Distressed Opportunities
Cross Sound Distressed Opportunities Fund
   LP
Cross Sound Management LLC

Danske Bank A/S
Deutsche Bank Securities Inc.
Deutsche Bank Securities USA LLC
Dryden Senior Loan Fund
Franklin Advisers Inc.
Franklin Floating Lower Tier
Franklin Floating Rate Master
Franklin Investors Securities
Franklin Resources
Franklin Resources  Inc.
Franklin Strategic Income Fund
Franklin Templeton Investments
Franklin Templeton Investments Corp.
Franklin Templeton Series II Funds
Franklin US Floating Rate Master
Greenwich Street Advisors
Greenwich Street Advisors LLC
IA Clarington Investments
Ivy Apollo Multi Asset Income
Ivy Apollo Strategic Income Fund
Ivy High Income Fund
Ivy High Income Opportunities
Ivy Investment Management
Ivy Investment Management Co.
Ivy VIP High Income
Jackson Mill CLO Ltd.
JH Lane Partners
JH Lane Partners Master Fund LP
John Hancock Funds II Floating Rate
Kansas Public Employees Retire
Kentucky, Commonwealth of, Retirement
   Systems
Kentucky, Commonwealth of, Teachers'
   Retirement System
Legg Mason
Legg Mason Inc.
Legg Mason Partners Fund Advisor
Legg Mason Partners Fund Advisor LLC
Lincoln Square Funding ULC
LM Asset Services LLC
Lyxor
Lyxor International Asset Management

Mangrove Partners Master Fund Ltd., The
Marathon CLO Ltd.
Marathon CLO V Ltd.
Marathon CLO VI Ltd.
Marathon CLO VII Ltd.
Marathon CLO VIII Ltd.
Marneu Holding Co.
Medley Capital Corp.
Mountain Hawk III CLO Ltd.
MSD Credit Opportunity Master Fund LP
MSD Partners LP
Nationwide Fund Advisors
Nebraska Investment Council
NM Capital Utility Corp.
NN Group NV
Northeast Investors Trust
Northeast Investors Trust Co.
Northwest Mutual Funds Inc.
Oaktree Capital Management Inc.
Oaktree Opportunities Fund X Holding
Oaktree Value Opportunities Fund
Oaktree Value Opportunities Fund Holdings
    LP
OCP CLO 2012-2 Ltd.
OCP CLO 2013-4 Ltd.
OCP CLO 2014-5 Ltd.
OCP CLO 2014-6 Ltd.
OCP CLO 2014-7 Ltd.
OCP CLO 2015-10 Ltd.
OCP CLO 2015-8 Ltd.
OCP CLO 2015-9 Ltd.
OCP CLO 2016-11 Ltd.
OCP CLO Ltd.
OCP Senior Credit Fund
Onex Credit Partners LLC
Onex Debt Opportunity Fund Ltd.
Onex Senior Credit Fund LP
Onex Senior Credit II LP
Pacific Investment Management Co.
Pacific Investment Management Co. LLC
Pacific Investment Management Co.,
    Employees' Retire
PCM Fund Inc.
PIMCO
PIMCO Bermuda Trust II

PIMCO Bermuda Trust II: Pimco Bermuda
    Income Fund (M)
PIMCO Cayman Trust
PIMCO Corporate & Income Opportunity
PIMCO Corporate & Income Strategy
PIMCO Corporate & Income Strategy Fund
PIMCO Dynamic Credit And Mortgage
    Income Fund
PIMCO Flexible Credit Income Fund
PIMCO Funds
PIMCO Funds Ireland PLC
PIMCO Funds: Global Investors Series PLC
    Income Fund
PIMCO Funds: PIMCO Income Fund
PIMCO Funds: PIMCO Investment Grade
    Corporate Bond Fund
PIMCO Funds: PIMCO Long-Term Credit
    Fund
PIMCO Global Credit Opportunities
PIMCO Global Income Opportunities Fund
PIMCO Global Stocksplus & Income Fund
PIMCO High Income Fund
PIMCO Income Fund
PIMCO Income Strategy Fund
PIMCO Income Strategy Fund II
PIMCO Investment G
PIMCO Loan Interests & Credit
PIMCO Monthly Income Fund (Canada)
PIMCO Senior Floating
Privatebank & Trust Co.
Providence Health & Services I
QS Investors LLC
Redwood Capital Management LLC
Redwood Opportunity Master Fund
RiverPark Advisors LLC
Rogge Global Partners Ltd.
Rogge Global Partners plc
Sagitta Asset Management Ltd.
Salomon Brothers Asset Management
Salomon Brothers Asset Management Ltd.
Sentinel Advisors
Sentinel Advisors Co.
Sentinel Asset Management Inc.
Sentinel Multi Asset Income Fund
Shenkman Capital Management Inc.
Shenkman Floating Rate High Income

Sierra Income Corp.
Smith Barney Fund Management LLC
South Dakota, State of, Investment Council
State Street Corp.
Stonehill Capital Management LLC
Stonehill Institutional Partners LP
Stonehill Master Fund Ltd.
Teachers Insurance & Annuity Association-
    College Retirement Equities Fund
Templeton Management Ltd.
Tennenbaum Capital Partners LLC
UBS
UBS AG
University of Missouri
US Bank NA
Waddell & Reed Financial Inc.
Waddell & Reed Investment Management
Waddell & Reed Investment Management
    Co.
Washington Mill CLO
Washington Mill CLO Ltd.
Wellington Shields & Co. LLC
Western Asset Global High Income
Western Asset Management Co.
Western Asset Management Co. LLC
Western Asset Management Co. Ltd.
Western Asset Middle Market Debt
Western Asset Middle Market Income
Whitebox Advisors LLC
Wolverine Asset Management LLC
Wolverine Flagship Fund Trading Ltd.
York Credit Opportunities Fund LP
York Credit Opportunities Investments
    Master Fund LP
ZAIS CLO 1 Ltd.
ZAIS CLO 2 Ltd.
ZAIS CLO 3 Ltd.
ZAIS CLO 4 Ltd.
ZAIS CLO 5 Ltd.
ZAIS CLO 6 Ltd.
ZAIS Opportunity Master Fund Ltd.

## **SCHEDULE 2(e)**

### **Bankruptcy Judges**

Bohm, Jeff
Bradley, David J.
Huennekens, Kevin R.
Isgur, Marvin
Jones, David
Norman, Jeffrey P.
Phillips, Keith L.
Rodriguez, Eduardo V.

# SCHEDULE 2(f)

## Bankruptcy Professionals

Alessi, Keith E.
Alvarez & Marsal North America LLC
Beyer, Michael
Centerview Partners LLC
Deloitte & Touche LLP
Donlin Recano & Co. Inc.
Ernst & Young LLP
Fasken Martineau DuMoulin LLP
FTI Consulting Inc.
Houlihan Lokey Inc.
Kramer Levin Naftalis & Frankel
Kurtzman Carson Consultants LLC
Lazard
McKinsey Recovery & Transformation Service US LLC
Schulte Roth & Zabel
Stein Advisors LLC

# SCHEDULE 2(g)

## Bondholders - Indentured Trustee

Lyxor Asset Management SA
Lyxor International Asset Management SA

# SCHEDULE 2(h)

## Contract Counterparties

1090931 BC Ltd.
1683740 Alberta Ltd.
1814100 Alberta ULC
1836774 Ontario Ltd.
290 LLC
3D Service LLC
3D-P
Abbey Family Partnership
Abbey, Alan
Abbey, Alice
Absaloka Mine
Acclaim Ability Management Inc.
Acme Inc.
Action Car & Truck Accessories
Adams, Robert
Adaptive Insights Inc.
Addy, Carolyn
Adkins, Dora
Advanced Protection Systems Inc.
AEM Corp.
AEP Generation Resources Inc.
AEP Land Management Office
AG Golden
Agapito Associates Inc.
AIC Solutions Group Inc.
Aikins MacAulay & Thorvaldson LLP
Albert Power Ltd.
Alberta Power (2000) Ltd.
Alberta Power (2001) Ltd.
Alberta Power (2002) Ltd.
Alberta Power Ltd.
Alberta, Province of (Canada), Minister of
    Finance
Alberta, Province of (Canada), Municipal
    Affairs
Alight
Allen & Imler Coal Sales
Allen, Amanda K.
Allen, Beth M.
Allen, Calvin A.
Allen, Christine M.
Allen, Diana

Allen, Diane
Allen, Fairy M.
Allen, Francis E.
Allen, Gerald J.
Allen, Gloria L.
Allen, James A.
Allen, Jeannie Marie
Allen, Ken
Allen, Lori McDougal
Allen, Robert L.
Allen, Rosemary
Allen, Stanley E.
Alpha Natural Resources Inc.
Alsco
Alta Land & Cattle
Altheir's Oil Inc.
Altier Oil Inc.
Altius Minerals Corp.
Altius Prairie Royalties Corp.
Alvarez & Marsal North America LLC
Amax Inc.
AMAX Inc., The
AMC Billboard Co. Ltd.
AmeriBen/IEC Group
American Electric Power Co. Inc.
American Electric Power Co. Inc., Office of
    General Counsel
American Electric Power Service Corp.
American Express Travel Related Services
    Co. Inc.
American Guarantee & Liability Insurance
    Co.
America's Job Exchange Inc.
Amsden, Charles W.
Anadarko Land Corp.
Anderson, Lynn C.
Anderson, Martha
Andrews Consulting Group Inc.
Andrews International
Anecia B. Wall & James R. Wall Revocable
    Living Trust, The
Anisoft

Annie Nanny
Anthem Blue Cross & Blue Shield
Antolak, Linda
Antolak, Margaret
Antolak, Richard
Antolak, Stanley
Aon Consulting Inc.
Aon Hewitt Inc.
AON Risk Services Northeast Inc.
Apache Canada Ltd.
AQYRE
Archdiocesan Priests Relief Fund Inc.
Argonaut Insurance Co.
Arial Photography Services
Arizona Public Service Co.
Armells Creek Land & Cattle Co.
Armstrong Energy Inc.
Armstrong, E. Taylor
Arnold, Bonnie I.
Arnold, Dean A.
Arnold, Harold A.
Ashenhurst Ranch Inc.
Ashton, Anthony
Ashton, Karen
Asset Management Innovations Corp.
AT&T Corp.
ATCO Electric
ATCO Power (2002) Ltd.
ATCO Power Ltd.
AU Mines Inc.
Aukland, Donna
AvePoint Inc.
Avista Corp.
Ayrshire Collieries Corp.
Azima DLI LLC
Babich, Nona McDougal
Badget , Russell, III
Baggs, Ernie
Baggs, Kathy
Baird, Marion McKinney
Baird, Marion McKinny
Baker, Anthony J.
Baker, Bertha L.
Baker,  Joe
Bandy, Exie
Bandy, W. Edwin

Bank of America National Trust & Savings
    Association
Bank of New England
Bank of New England NA
Bank of Oklahoma
Bank of Oregon
BankDirect Capital Finance
Bannowsky, Mary Irene
Barbe, Donald
Barbe, Eric
Barbe, Larry
Barbe, Paula
Barbe, Sherry
Barbe, Terry
Barker, Mart D.
Barker, Marty D.
Barrick Gold Exploration Inc.
Barricklow, Larry
Barringer, John W.
Barringer, Lewis T., Jr.
Barron, Gina M.
Bartels, Diane
Bartels, Edward
Basin Electric Power Cooperative
Basinger, Naomi
Bates, John
Bates, Ruth
Bau, Ann
Bau, Peter
Baumgard, Joseph J.
Baumgard, Mildred
Baxter, Douglas E.
Baz, Arthur
Baz, Jane
Beacon Aviation Inc.
Beal, Gerald
Beal, Vera
Bear Valley Communications Inc.
Beatrice, Mark A.
Beaver Overhead Door Co.
Bedway Land & Minerals Co.
Beer, Diane
Beer, Joseph
Belmont Coal
Belmont Jefferson Beagle Club Inc., The

Belmont, County of (OH), Board of
    Commissioners
Belmont, County of (OH), Port Authority
Benally, Alexander
Benally, Ambrose
Benally, Mae
Benally, Virgil
Benedict, Judy
Bengough No. 40, Rural Municipality of
    (Saskatchewan)
Bensinger DuPont & Associates Inc.
Beowulf Energy LLC
Bergquist, Agnes
Bergquist, Gerald
Bergquist, Kris
Bergquist, Lyell
Bergquist, Michael
Berlin Mineral Co.
Berry, Dean A.
Bessie W. Worrell Living Trust
Betts, Corinne
Betts, Corinne A.
Betts, Richard
Betts, Richard G.
Beulah Mine
BF Oxford SPE LLC
BHP Billiton
BHP Billiton Ltd.
BHP Billiton New Mexico Coal Co.
BHP Mine Management Co.
BHP Minerals International Inc.
BHP Navajo Coal Co.
Bieber, Elizabeth A.
Bieber, Roger L.
Big Sky Coal Co.
Big Sky Linen & Uniform
Biggs, Laura
Biggs, Laura Lee
Bison Engineering Inc.
Bivin, Betty
Bivin, Ruth Ann Walters
BJ's Refrigeration
Black Earth Humic LP
Black, Leonard E.
Blackhand Environmental LLC
Blackrock Kelso Capital Corp.

Blake Cassels & Graydon LLP
Blanchard, Catherine M.
Blanchard, Cindy
Blanchard, David. F.
Blanchard, Helen T.
Blanchard, Mary C.
Blanchard, Patricia
Blanchard, Stephen L.
Blanchard, Thomas E.
BLC Development Co.
Blue Marble
Bluff Terminal Co.
BMO Capital Markets Investment & Corp.
    Banking
BMO Nesbitt Burns Inc.
Bobby Gene McGuyer Testamentary Trust
Boeckel, Allegra
Boeckel, LeRoy
Boeckman, Elizabeth Mayer
Boedecker, Brett
Boggess & Boggess Inc.
Boggess, James
Boggess, Janet
Boggess, Joseph
Boggess, Mollie
Boggess, Paul
Boich, Wayne
Boland, EP
Boland, Eward W.
Boland, Joan
Bonavista Energy Corp.
Bond Safeguard Insurance Co. Inc.
Bond, Mae W.
Booker, Marty D.
Booth Brothers Land & Livestock
Booth Land & Livestock Co.
Booth, Gary
Booth, Mark
Booth, Phyllis
Borgel, Gerald
Borgrink, Henry F.
Borgrink, Leah Sandra
Borgrink, Sherrian Marie
Bosler Family, The
Bosler, Elizabeht
Bosler, Elizabeth R.

Bosler, H. James
Bosler, James
Bowen, Earl R., Jr.
Bowers, Karen
Bowers, Karl
Bowers, Karla
Bowers, Nolan
Bowers, Shirley
Bowie Resource Partners LLC
Bowles, Donald E
Boyer, Barbara L.
BP Canada Energy Group
Brackett, James C.
Brackett, Jeff D.
Brackett, Lori
Bradsby Group
Brake, Lonnie J.
Brandeis Machinery
Branham, Michael W.
Brant, Anna L.
Braun, Angeline
Brennan, Gwenolyn
Brewer, Cathy L.
Brewer, Deedra McDougal
Brewer, Jackie L.
Brewer, Joan
Brewer, Joan B.
Bricker & Eckler LLP
Bridgestone Mining Solutions
Brier Ridge Real Estate Inc.
Brimhall Family Trust
Brimhall, Agnes
Brimhall, Floyd D.
Brimhall, Gerald
Brimhall, Karen
Brimhall, Karl Ray
Brimhall, Mary E.
Brimhall, Troy W.
Brimhall, Wayne C.
Broadridge Corp. Issuer Solutions Inc.
Broadridge Corporate Issuer Solutions Inc.
Broadridge Investor Communication
    Solutions Inc.
Brodie, Jan Marie
Brodie, Nell H.
Broken Hill Proprietary (USA) Inc.

Brokenshire, Wayne
Brooks, Irma
Brooks, Michael
Brown Cattle Co. Shareholders Coal Trust,
    The
Brown Cattle Coal Co.
Brown's Shoe Fit Co.
Brownstein Hyatt Farber Schreck LLP
Bruner Land Co. Inc.
Brunton, Dorothy R.
Brunton, Trevison D.
Bryant, William W.
BS Development
Buchanan, Amanda
Buckeye Industrial Mining Co.
Buckeye Management
Buckeye Management Enterprises
Buckeye Management Enterprises Inc.
Buckeye Power Inc.
Budzik, Margaret L.
Budzik, Ronald A.
Burch, Mary Jane
Burlington Northern Inc.
Burlington Northern Railroad Co.
Burlington Resources
Burlington Resources Oil & Gas Co. LP
Burns, David
Burns, Marie W.
Busath, Louise
C&E Coal Inc.
C&R Coal Co. Inc.
Cabin LLC, The
Calibre Energy Inc.
Calumet Specialty Product Partners LP
Camaron, Kirsten
Camaron, Lucas
Cameron, Kirsten
Cameron, Lucas
Cameron, Lucas M.
Campbell, Beulah M.
Campbell, Cecil L.
Campbell, Charlene
Campbell, Cliff
Campbell, Joyce A.
Campbell, Ricky C.
Campbell, Steven P.

Campbell, Terri L.
Campbell, Terry
Campion Resources Ltd.
Canada, Government of, Revenue Agency
Canadian Pacific Railway
CanEra Energy Corp.
Cannon, Kenton
Cannon, Kenton C.
Cannon, Sharon
Cannon, Sharon J.
Canon Financial Services Inc.
Canter, Ralph I.
Cantrell, Gelinda M.
Capitol Network LLC
Capstone Holding Co.
Capstone Holding Co. LLC
Carbon Development Partnership
Cardinal Trust LLC
Career Builder
Carnes, Dorthy
Carnes, James
Carnes, James E.
Carney, Homer T.
Carvat Coal Co.
Cascade Bottled Water & Coffee Service
Cassels Brock & Blackwell LLP
Catalyst Environmental Solutions
Catapult Systems LLC
Catena Consulting LLC
Caterpillar
Caterpillar Financial
Caterpillar Financial Servcies
Caterpillar Financial Service Ltd.
Caterpillar Financial Services Corp.
Caterpillar Financial Services Leasing ULC
Caterpillar Financial Services Ltd.
Caterpillar Inc., Mining Financial Services
CCC Group Inc.
CCG Advisors LLC
CDDB Holdings LLC
CDG Engineers Inc.
CE Martin Heirs LLC
Cedar Creek Associates Inc.
Cenovich, Marilyn Gail Cunningham
Cenovus Energy Inc.
Centerview Partners LLC

Central States Coal Reserves of Kentucky LLC
Century Wireless Services
Cerberus Business Finance LLC
CG Joyce Jr. Investments LP
Chambers Development of Ohio Inc.
Charlie C. Jameson Testamentary Trust
Charlton, Nora
Charolais Corp.
Charolais Mining Co. LLC
Charter Communications Operating LLC
Charters, William H.
Chase Manhattan Bank NA, The
Cheryl Lee Cunningham Castle
Chesapeake Exploration LLC
Chevron Mining
Chevron Mining Inc.
Chevron USA Inc.
Chumney, Eugene
Chumney, Shirley
Cinquepalmi, Gannett
Cinquepalmi, Robert
Citicorp USA Inc.
Citizens National Bank of McConnelsville, The
Clapper, Leslie
Clapper, Teresa
Clarence S. & Bobbie J. Pertl Living Trust
Clark McCall Land & Cattle LLLP
Clay, Township of (OH)
Clay, Township of (OH), Board of Trustees
Clearfield Bituminous Coal Co.
Clearfly Communications
Clements, Grace A.
Clifton Larson Allen LLP
Cline Group LLC, The
Cline Sailer, Gladys I.
Cline, Donald V.
Cline, Maxine C.
Clites, Leona
Clorox Co. of Canada Ltd., The
Clorox Co., The
Clunk, Dennis R.
CNX Center
CNX Gas Co. LLC
Coal Reserve Holding LLC

Coal Reserve Holding Ltd. Liability Co.
Coal Reserve Holding Ltd. Liability Co. No. 1
Coal Service Design, General Director
Coal Valley Mine (Alberta)
Coal Valley Resources Inc.
Cobb, Karen
Cobb, Matthew
Cognition LLP
Coleman, James
Coleman, Judith
Collins, Clifford W.
Collins, Donna
Collins, Paula A.
Collins, Perry
Collins, Rebecca
Collins, Stanley
Collins, Terry
Collins, Virginia D.
Collyer, Bertram W.
Collyer, Darlene
Collyer, Darlene M.
Collyer, James B., Jr.
Colonial American Casualty & Surety Co.
Colorado Life & Health Insurance Protection Association
Colorado, State of
Colstrip Community Services Co.
Colstrip Electric Inc.
Colstrip Energy LP
Colstrip Medical Center
Colstrip Steam Electric Station
Columbiana, County of (OH), Auditor
Columbus & Southern Ohio Electric Co.
Columbus Southern Power Co.
Comcast Business Communications LLC
Comcast Cable Communications Management LLC
Commonwealth Land Title Insurance Co.
Commonwealth Mining LLC
Communications Energy & Paperworkers Union of Canada, Local 649
Company, Rhonda F.
ComResource Inc.
Comstock, Bruce A.
Comstock-Abel, Beulah F.

Comtech (Communication Technologies) Ltd.
Comtech (Telecom Solutions) Ltd.
Comtech Telecommunications Solutions Ltd.
Conesville Coal Preparation Co.
Conoco Phillips Canada Resources Corp.
Conotton Land Co.
Conradson, Conrad G.
Conservation Fund, The
Consol Mining Co.
Consol Mining Co. LLC
Consol of Ohio LLC
Consolidated Land Co.
Consolidation Coal Co.
Consolidation Coal Co., The
Continental Heritage Insurance Co.
Coomer, Brenda
Coomer, Frank
Cooperrider, Beth M.
Coshocton, County of (OH), Title Department
Cowgill, Karen
Cowgill, Steven
Cowgill, Steven E.
Coyote Partners
Coyote Partners SAS
Coyote Station
Craig, David
Craig, David L.
Craig, Holly M.
Craig, Stacy
Craig, Stacy L.
Cravat Coal Co.
Creek Coal Co.
Crescent Point Resources Partnership
Crew Energy Inc.
CridCo Water Treatment
Cripps Sears & Partners
Crittenden County Coal Inc.
Crooksville Coal Co. Inc.
Cross Borders Drilling
Crossman, David
Crossman, Vickie
Crossman, Vickie M.
Crosson, Betty

Crow Farms
Crow Tribe of Indians (MT), Executive
    Branch
Crow Tribe of Indians (MT), Legal
    Department
Crum, Marie L.
Crum, Ron
Crum, Ronald
Crum, Stephanie
Cryder, Bruce
Cryder, Bruce E.
CSE Inc.
CSX Transportation Inc.
CTL Hosting Customers
Cundiff, Anna Loraine
Cundiff, Loraine McFadden
Curts, Mike
Custom Recyclers
Cybereason Inc.
Cylance Professional Services
Cyprus Amax Royalty Co.
Cyprus Creek Land Co.
Cyprus Creek Land Resources
Cyprus Creek Land Resources LLC
Cyxtera Communications LLC
D&P Land Investments LLC
D&R Disposal
D. Joan Shepard Trust
Dakota Coal Co.
Dament Services Ltd.
Damet Services Ltd.
Daron Coal Co.
Daron Coal Co. Inc.
Darryl L. James Consulting LLC
Darwin H. Mueller Trust No. 1
Data Systems International Inc.
Davidson, Pam
Davidson, Tommy
Davis Graham & Stubbs
Davis, Dorthy
Day, Deborah
Day, Deborah S.
Day,  James
Day, James E.
Deal IQ Inc.
Deibel, Diane

Dentons Canada LLP
Denver Series of Lockton Cos. LLC
Derenburger, David E.
Derenburger, Edgar C.
Derenburger, Sandra
Des Marais, Elta V.
Des Marais, Michael M.
Deshazo Crane Co. LLC
Deutsche  Bank
Deutsche Bank AG
Development Design & Construction LLC
Devon Canada Corp.
Dextraze, Gregory
Dextraze, Marjorie
Digneo, Edward M.
Digneo, Stella B.
Dillion, Fredrick
Dillion,  Rochelle
Dillon,  Frederick
Dillon, Rochelle
Diocese of Gallup (NM)
DLJ Consulting
Dockins, Brenda
Dockins,  William
Dodds Property
Dodds, Diana
Dodds, Gary
Dodds, Gerrie
Dodds, Harry
Dodds, John
Dodds, Susan
Donato, June
Donlin Recano & Co. Inc.
Dorchester Energy Inc.
Dorothy N. Pollock Trust
Doughty, Charles S., Jr.
Doughty, Leanna
Doughty, Leanna, Jr.
Douglas, Dean
Douglas, Jill
Douglass, Brenda
Douglass, Mark
Douglass, Normain
Douglass, Patricia
Dover, City of (DE)
Downcon Enterprises Ltd.

Drives & Control Services Inc.
Drydock Coal Co.
Ducharme McMillen & Associates Inc.
Dudley, Marla McDougal
Duff & Phelps LLC
Dukart, Darcy
Duke Energy Kentucky Inc.
Dukelow Family Trust
Dukelow, Rose L.
Dukes, Bobby
Dukes, Jonnie
Dukes, Marjorie
Duncan, Brooke
Duncan, Thomas Bradley
Dunlap Creek Ranch Inc.
Dunlap, Ann
Dunlap, Anna L.
Dunlap, Jim T.
Dunlap, Joyce
Dunlap, Lewis A.
Dunsch, Daniel
Dunsch, Martha
Dupech Inc.
DynoConsult
E. Lamont Palmer & Sandra Palmer Family
    Trust
Eagle Creek Farm Properties
Eagle Creek Farm Properties Inc.
East Central Gas Co-Op Ltd.
East Kentucky Power Cooperative Inc.
East Ohio Properties LLC
East West Bank
Eastham, Frostie
Eastham, Frostie A.
Eastham, William
E-Commodities Holdings Ltd.
Ecosphere Environmental Services
Edmonson Fuels LLC
Edmonton Power
Edwards, James H.
Egypt Valley Stone Inc.
El Paso Natural Gas Co. LLC
Eldor-Wal Registrations 1987 Ltd.
Elkol-Sorensen Mine
Ellis, Alice
Ellis, Cathi

Ellis, Fern V.
Ellis, Frank E.
Ellis, Frank E., Jr.
Ellis, Joe
Ellis,  John
Ellis, Joseph
Ellis, William J.
Ellison Family Trust
Elwood Staffing Services Inc.
Emeco Canada Ltd.
ENBALA Power Networks Inc.
Enbridge Pipelines (East Texas) LP
EnCana Corp.
Energy Laboratories Inc.
Enerwise Global Technologies Inc.
Engbrecht, Pearl
ENMAX Energy Corp.
Enterprise Fleet Management Canada Inc.
Enterprise Fleet Management Inc.
Enterprise FM Trust
Enzsol Enterprises Inc.
EPN Field Services LLC
Erickson Contract Surveying Inc.
Erm-West Inc.
Estate of Agnes D. Washington
Estate of Amelia Samet Kornfeld
Estate of Carrie F. Roundface
Estate of Charles C. Core
Estate of Deejay Roundface
Estate of Dorothy Dimple Mitchell
Estate of Dorothy H. Evans, The
Estate of Elizabeth Smith Tribble
Estate of Gail Geibel
Estate of James H. Pollock
Estate of John T. Blazek
Estate of Johnnie B. Ruffeno
Estate of Joseph Sipe
Estate of Karen Estelle Dockins
Estate of Lena Marie Achgill
Estate of Luther F. Weaver
Estate of Mabel Slevin
Estate of Melinda Armstrong-Kirsch
Estate of Nell Dezelle Morrow
Estate of Ruth I. Core
Estate of Sipe
Estate of Victor Lee Pate

Estate of Virginia Harrah
Estate of Virginia Harris
Estate of Virginia S. Whitmer, The
Estate of Ylena Russell
Estevan Coal (1996) Corp.
Estevan Coal Corp.
Etzel,   Norma
Eubanks,  Jeff
Eubanks, Tom
Evelyn Power Craddock Family Irrevocable
    Trust
Evergreen Mineral Co. Inc.
Everly, Doug
Everly, Norma
Evers, Ann
Evers, Michael
Experis US Inc.
F&D Holdings LLC
Fairchild, John
Fairchild, Lisa
Fairfield, John
Fairfield, Lisa
Fairmont Road South LLC
Fairview Land Co.
Farley Inc.
Farley, Burton
Farley, J. Burton
Farley's Inc.
Farm Credit Services of Mid-America
    FLCA
Farmington Electric Utility System
Farmington, City of (NM), Electric Utility
    System
Farnsworth, Ferrell
Farnsworth, Omer
Farstad Oil Inc.
Faye Keogh Revocable Trust
Federal Land Bank of Saint Paul, The
Feil, Judith G.
Felicca, Phillip S.
Fenner Dunlop Conveyor Systems &
    Services Inc.
Fentch, Barbara
Fentch, Wilfred
Ferris Coal Co. Inc.
Ferris Lands LLC

Fetch, Barbara
Fetch, William
Fidelity & Deposit Co. of Maryland
Financial Reporting Advisors LLC
Finning
Finning (Canada)
Firestone, Daryl
First Bank NA
First Interstate Wealth Management
First Light Funding I Ltd.
First Presbyterian Church of Stephenville
Fisher, John
Fister, Joeseph
Fister, Joseph
Fister, Theresa
Fitch, Sharon Kay
Fiutem, Linda
Fiutem, Paul
Fluharty, Fred
Fluharty, Greg
Fluharty, Randall
Flushing, Township of (MI)
Flushing, Township of (OH)
FMC Corp.
Foley, Lillian A.
Foley, Oney L.
Foothills Manufactured Home Community
Foottit, Lynn Norsworthy
Fording Coal Ltd.
Forestburg Collieries (1984) Ltd., The
Forestburg Collieries Ltd.
FortisAlberta Inc.
Foundation Royalty Co.
Four Seasons Equipment Inc.
Four Star Oil & Gas Co.
Fouts, William Bruce
Foutz, Cindra
Foutz, Joel W.
Foutz, Martin Dirk
Foutz, Phil Blaine
Foutz, Sherry Ann
Fox, Robert
Frame, Goldie Harris
Frame, Raymond B.
Franklin Real Estate Co.
Frantz, Amy L.

Fregiato, Frank A.
Frink, Brady
Frink, Tina M.
Fruitland Land & Cattle Co.
FTI Consulting Inc.
Fugro EarthData Inc.
Fugro Horizons Inc.
Fulkerson, Goldie
Fulkerson, John
Fuller, Stacy
G4S plc
G4S Secure Solutions (USA) Inc.
Gadd, Cindy
Gallatin Scales
Galyen, Doug
Galyen, Jane
Gamut Capital Management LP
Garau, John A.
Gardner, Patricia H.
Garfield, Genie
Garfield, Russell
Garlikov & Associates Inc.
Garris, Randy
GCF Oxford SPE LLC
GCM Services Inc.
Gehris, Tanya
Geibel Family
Geibel Family Trust
Geibel Lumber Co.
Geibel Lumber Co. Inc.
Geibel, Gail
Geibel, John
Geibel, Jon
Geibel, Lydia
General Electric Capital Corp.
General Equipment & Supplies Inc.
Genesee & Wyoming Inc.
Genesee Coal Mine Joint Venture
George R. Smouse Estate
Giebel, John
Gilbert, Alice
Gilbert, Nelson
Gillen, DeRon
Gillen, Joe E.
Gillen, Ronald L.
Gilshannon, Joan M.

Gilshannon, Thomas B.
Glacier Park Co.
Gladd, Cindy E.
Gladdish, Kent
Glass, William R.
Glauser, Walter
Glen Cowan & Associates Real Property
    Appraisals Ltd.
Glen Peterson Construction Ltd.
Glenn O. Hawbaker Inc.
Global Systems Integration Inc.
GMHR
GNP LLC
Godbersen, Greg
Golden Eagle Mine
Golen, John Van
Goodman, Janice
Goodman, Richard L.
Grable, Sue
Grable, William
Graham, Bryan H.
Graham, Carolyn
Graham, Clay
Graham, James
Graham, James F.
Grainger Industrial Supply
Grainger Industrial Supply India Ltd.
Grand Quadri Cattle Co.
Gray, Sandra
Great Northern Properties LP
Green, Susan K.
Green-Crawf Farm LLC
Greenebaum Doll & McDonald PLLC
Greenfly Networks Inc.
Greenleaf Land & Livestock
Greenwich Insurance Co.
Greibel, Jon
Greibel, Lydia
Grishkowsky, Martha
Grishkowsky, Reinhart
Grissom, Danny
Grissom, Peggy
Groombridge, Cliff
Grubb, Gloria A.
Grubb, Richard E.
GS Energy

GS Energy LLC
GTG Corp. Pty. Ltd.
Gulf Oil Corp.
Gulfport Energy Corp.
Gustafson, Mike T.
Haaga, Matt
Haas, Martha
Half, Robert
Halls, Beatrice G.
Halls, Winston J.
Halsey, Edwin
Halsey, Thelma
Hampton, Cynthia Kaye Kennedy
Hancock, C.R.
Hancock, CR
Handa, Patsy
Handa, William
Hanna Coal Co.
Harkins, Dwain
Harkins, Paula
Harris Oilfield Construction Ltd.
Harris, C. Fay
Harris, John E.
Harris, Joyce
Harrison Leasing Co.
Harrison Leasing Co. Inc.
Harrison Resources LLC
Harrison, County of (OH)
Harrison, Robert
Hart Butte No. 11, Rural Municipality of
    (Saskatchewan)
Hartley, Betty
Hartley, Brett
Hartley, Earl
Harverfield, Mary
Harvey, David A.
Harvey, Erica
Haukness, Leonard
Haverfield, Beverley
Haverfield, Elizabeth O.
Haverfield, Janet
Haverfield, Richard
Haverfield, Thomas N.
Hayes, Joe P.
Haynes & Boone LLP
HCR Holding LLC

HCR Holdings LLC
Heath, Bill C.
Heath, Rose M.
Hedden, Ruth M.
Hedge, Marlan R
Hedges, John J.
Helmig, Shirley
Henderson, Debbie
Henderson, Dorthy
Henderson, Ralph
Henderson, William B.
Henley, R. Page, Jr.
Hepner,  Vivian  M.
Her Majesty the Queen
Her Majesty the Queen in Right of
    Saskatchewan
Herman, Carl A.
Herman, Charles I.
Herman, Darell
Herman, Darell J.
Herman, Marguerite F.
Herman, Margurite F.
Herman, Sherry
Herman, Wilfred A.
Hesketh, Keith
Hesketh,  Keith  E.
Hess Corp.
Hess Ohio Developments LLC
Heth, Author M.
Heth, Joyce
Heth, Karen A.
Heth, Rose M.
Heth, Ruth
Heth, William
Heth, William C.
Hetzler, Jennifer McDougal
Hewlett-Packard Financial Services Co.
Higginbotham, Glenn
Higginbotham, GP
Higginbotham, JL
Higginbotham, JL, Jr.
Higgins Drilling
High, Treva
Hill Crest Inc.
Hill, Margaret C.
Hilltop Haven Inc.

Hilstrom, Donald
Hines, Gerald D.
Hisrich, Thomas
Hisrich, Thomas H.
Hochstetler Family Retreat LLC, The
Hochstetler Family, The
Hochstetler, Abe J.
Hochstetler, Anna E.
Hollon, Shirley
Hollon, Thomas
Holmes Limestone Co.
Holmes Limestone Ltd.
Holmes Minerals Ltd.
Holmes Woodland Inc.
Holmes, Everett
Holmes, James
Holmes, Joan
Holt Co.
Home Equity Investments
Homles, Joan
Honeywell Building Solutions Inc.
Hook, James D.
Hook, James Dale
Hook, Sharon
Hoops, Jarrod
Hoops, Scott
Hopedale Mining LLC
Horizon Coal Corp.
Horn, Janet
Horn, Jerry
Horn, John Wesley
Horstman, Jerry
Houser, Doris
Houser, Howard
Houser, Raymond
Houser, William
Houston Lignite LP
Howdyshell, Mark J.
HP Channel Services Network
Hubbard, Karen
Huberta Coal Co. Inc.
Hudock, Larry W.
Huff, Donald F.
Huh, Gon
Huh, Kevin
Humphrey, Jennie

Humphrey, Roger
Hunt , Robert R.
Hunt, Brian
Hunt, Darryl
Hunt, Robert
Huntington Center Associates LLC
Huntington National Bank
Huntington National Bank, Trust
    Department
Husky Oil Operations Ltd.
Hutchison, Lee M.
Hydrometrics Inc.
HYG Financial Services Inc.
Iball Solutions Inc.
Iball Solutions Ltd.
IBM Canada Ltd.
ICF Jones & Stokes Inc.
IEC Group Inc.
Immersive Technologies Pty. Ltd.
Impact Fire Services LLC
Indemnity Insurance Co. of North America
Industrial Scientific Corp.
Indybuck Coal Co.
InfoMine
Info-Tech Research Group
Infront Webworks
Inman, Deborah
Inman, Joe
Insurance Co. of North America
Integrated Weed Services LLC
IntelliGO Networks Inc.
Inter-Mountain Laboratories
Inter-Mountain Labs
Intermountain Research & Development
    Corp.
International Brotherhood of Electrical
    Workers, Local Union 2067, The
International Union of Operating Engineers,
    Local 953
International Union of Operating Engineers,
    Local Union No. 400
International Union of Operating Engineers,
    Local Union No. 955
Interstate Power Co.
Ionno, John
Iron Mountain Canada Corp.

Iron Mountain Inc.
Iron Mountain Information Management
    LLC
iSP3 Solution Providers Inc.
Jackie L. & Cathy L. Brewer UTD March 3,
    2004
Jackson Kelly PLLC
Jahn, Lorne
James F. Graham Revocable Trust No. 1,
    Co-Trustees
James F. Graham Revocable Trust Number
    1
James H. Pollock Trust
James L. Rogers Jr. Testamentary Trust
James Miller & John Ionno Partnership
James, Norman
Jameson, David
JB Maintenance Service
JB&D Holdings Ltd.
JB7D Holdings Ltd.
JBLCo Services
JD Edwards Canada Ltd.
Jean Jones Trust
Jeff & Deb Mercer Family LLC
JEFFCO Resources Inc.
Jefferson, County of (OH)
Jeffrey H. Samet Non-Exempt Trust
Jennings, Jamie
Jennings, Steven
Jensen & Curtis Inc.
Jerry & Martha Webb Cook Ranch
    Partnership Ltd., The
Jerry & Travis Ann Webb Dorough Ranch
    Partnership Ltd., The
Jicarilla Apache Indian Tribe
John Mitchell Craddock Sr. Family
    Irrevocable Trust
John Mitchell Craddock Sr. Irrevocable
    Trust
John T. Boyd Co.
Johnson, Chad W.
Johnson, Edie McDougal
Johnson, James
Johnson, Mark
Johnson, Rhonda Leigh
Johnson, Sue

Johnson, Thomas
Johnson, William R.
Johnston, James
Johnston, Jessie
Johnston, Leslie
Johnston, Walter
Jones, Ann E.
Jordan, Cecil L.
Jorgenson, Bernadette
Jorgenson, Ronald
Joy Mining Machinery
Jude, Bob
Jude, Mary
Julian Land & Livestock Co.
K&S Shugert Farms Family LP
K&S Shugert Farms LP
Kalis Capital Corp.
Kasich, John
Kasler, Edward
Kasler, Jack
Kasler, Kathryn
Katie Shugert, Robert
Keen IM LLC
Keener, Carrol Z.
Keener, Carroll Z.
Keener, Linda K.
Keffer, George
Keffer, Marilyn
Keister, James
Keister, Mary
Keleher, Michael L.
Keller, Janice
Keller, Jeffery
Kelly Family Land Co.
Kennedy Minerals LLC
Kennedy, Shelley A.
Kentucky Power Cooperative Inc.
Kentucky, Commonwealth of, Department
    of Military Affairs
Keogh, Brooks
Keogh, Faye
Keogh, Priscilla
Keogh, Proseilla A.
Keogh, Robert
Kesterson, Rick
Kesterson, Ronald

Kesterson, Seth
Kettler, Lynn
Kevin Cannon Surveying
KeyBanc Capital Markets Inc.
Key-Rite Security Lock & Safe Inc.
Kiesal, Lennard
Kiewit Mining Properties Inc.
Kilcher, Nancy
Kimball, Sarah Lousie
Kimble Resources
Kinetic Leasing Inc.
King,  Flowel
King, Flowele
King, Frank S., III
King, Jeffrey J.
King, Jeffrey J., Jr.
King, Karen M.
King, Sharon
King, Thomas P.
King, Thomas P., Jr.
King, William
Kingsford Manufacturing Co.
Kinney, Debra
Kinsey, John R., Jr.
Kinsey, Joseph
Kinsey, Rebecca
Kirkpatrick, Rhetta J.
Kirtley, Billy Kirtley,
Patsy Kluver, Kirby
Kneeland, Les
Knife Coal Mining Co.
Knife River
Knife River Coal Co.
Knife River Coal Mining Co.
Knife River Corp.
Knife River Mining Corp.
Knight, Corinne
KnowBe4 Inc.
KO Mining Co. Inc.
KO Mining Inc.
Koenraadt, Jan
Komatsu
Komatsu America Corp.
Komatsu Equipment
Komatsu Financial  LP

Komatsu International (Canada) Inc.
Komatsu Mining Germany GmbH
Konieczny, Susan
Konieczny, Susan L.
Koogler, Clement
Koogler, Elisa
Kopka, Joanne
Kopka, Joanne Kay
Kramer Levin Naftalis & Frankel LLP
Kratrenstein, Dandi
Krell, George Christopher
KRJA Systems Inc.
Krol, William F., Jr.
Kron, Marvin
Krulock Coal Co.
Krulock General Power of Appointment
    Trust, The
Krulock, Daniel
Krulock, Daniel J.
Krulock, David
Krulock, David G.
Krulock, Florence
KS Shugert Farms Family LP
Kuttie, Anthony J.
Kyle LP
La Plata Feed & Livestock
Lacombe, Gracie
Ladd Petroleum Co.
LaFrentz, Rick
Lance Oil & Gas Co.
Landerman, Donald F.
Landerman, Karen L.
Landerman, Terry
Landrum, Jill L.
Lange, Debbie E.
Lapanja, Catherine
Lapanja, Edward
Lapanja, Edward L.
Lapanja, Mabel
Lawrence, Township of (OH), Board of
    Trustees
Lawson Lundell LLP
Lawson, Amos L.
LCC Kentucky LLC
Lear, Donald
Lear, Herbert

Lear, Ileme
Lear, Judy
Leatherwood Farm Ltd.
LeBlanc, Marlin
Ledger, Judith
Ledger, Judith A.
Ledger, William
Ledger, William P.
Lee, Aaron
Lee, Donald
Lee, Ellen
Lee, Hutchison M.
Lee, Jill B.
Lee, Kay
Lee, Loren
Leeper Family Trust, The
Legacy Oil + Gas Inc.
Leibelt, Jonathan W.A.
Leighton, Charles
Leighton, Michele
Leon, County of (TX), Auditor
Leroy, Belinda
Leroy, Wayne
Lesser, David
Lesser, F. D.
Lesser, Matthew
Lester, Bill
Lester, Mabel W.
Lewis, Brian
Lewis, Liz
Lewis, William T.
Lexington Coal Co. LLC
Lhoist North America of Texas Ltd.
Liberty Life Assurance Co. of Boston
Liebelt, Johatan W.A.
Liebelt, Jonathan W.A.
Liebelt, Merilynn
Liggett Enterprises Ltd.
Lighthouse Resources Inc.
Lightstream Resources Partnership
Liles, Geral
Liles, Gerald
Liles, Judith
Linard, Robert
Linard, Robert, Jr.
Link Farms Ltd.

Linn Engineering Inc.
Lockon Cos. LLC
Lockton Financial Advisors LLC
Long, Darrell
Long, Karen
Long, Phyllis
Lopez, Gerard
Lopez, Irene
Lorch, Alice E.
Lorch, Howard G.
Lorch, Kenneth R.
Love, Fred
Love, Fred T.
Love, Mary
Love, Mary Jane
Lowe, James R.
Lowe, Sandra L.
LPT Management Inc.
Lucas, Beverly
Lucas, Carol Ann
Lucas, Carolyn Ann
Lucas, Donald
Lucas, Jo
Lucas, Joe
Luckett, Gene
Luckett, Wanda
Luscar Ltd.
Luscar Sterco (1977) Ltd.
Lusch, Donald
Lusch, Donald A.
Lusch,  Vivian
Luther, Bonnie Harris
Luther, Joe
Luther, Joseph M.
Luther,  Kandin  J.
Lykins Oil Co.
Lynx Inc.
Lyons, Jack
M&C Transport Inc.
M&H Partnership
Macdonald, Janet
MacDowell, Mabel
MacDowell, R.E.
Mack, Stephen
MacPherson Leslie Tyerman LLP
Magnitude Software

Magnitude Software Inc.
Mahoney, Frances Stallings
Manalta Coal Ltd.
Mangis, Elinor E.
Mangis, Robert A.
Mangrove Partners
Mann, Jody
Mantei Farms Ltd.
Mantei, Terry
Manufacturers Life Insurance Co., The
Maptek Pty. Ltd.
Marathon Pipe Line LLC
Marco Technologies LLC
Marie L. Crum Trust
Marion, Susan
Marion, Susan K.
Markell, James
Markell, Sue
Markwell, James
Markwell, Sue
Markwest Liberty Midstream & Resources
    LLC
Marquette Exploration LLC
Marth Ann Rogers 1996 Revocable Trust
Martha Rogers Haas 1996 Revocable Trust
Martha Rogers Haas Revocable Trust
Martin Family Trust
Martin Marietta Inc.
Martin Marietta Magnesia Specialties LLC
Martin Marietta Materials Inc.
Martin, Ann Pedigo
Martin, Edward
Martin, Jean E.
Martin, Sally McDougal
Martin, Wanda L.
Martin, William C.
Martin, William Grier
Martinek, Robert
Marubeni Corp.
Mary B. Turner Revocable Trust
Mary Webb Lawrence Ranch Partnership
    Ltd., The
Mason Dixon Energy LLC
Mason Farms Inc.
Mast, Nelson
Masterson, Nancy

Masterson, Rex
Matrix Acquisition Group LLC
Matusek, Arleen
Matusek, Jack
Mauersberger, Christine
Mauersberger, Christine M.
Mauersberger, George
Mauersberger, George A.
Mauersberger, John
Mauersberger, John S.
Mauersberger, Susan
Maurer, Winifred T.
Mayer, Fredrica H.
Mayes, Steven D.
Mayes, Teresa L.
McCabe, Leona G.
McCabe, Stanley
McCain, John
McCain, Kevin P.
McCauley, Clara
McCauley, George
McCauly, Clara
McCauly, George
McCay, Freda
McCay, Terry
McCoy, Mary Jo
McCulloch, Anna H.
McCulloch, Frank E.
McDermitt, Arthur C.
McDermitt, Melissa L.
McDonald, Adelia
McDonald, Bruce
McDonald, Donald
McDonald, Donna
McDonald, Douglas W.
McDonald, Gary
McDonald, Greg
McDonald, Joanna
McDonald, Keith
McDonald, Kevin
McDonald, Marilyn
McDonald, Mona
McDonald, Mya
McDonald, Roger
McDonald, Ron
McDonald, Sandra

McDonald, Suzie
McDonald, Virginia
McDonald, Virginia Avanell
McDougal Coffee, Rebecca
McEndree, Lucretia
McEndree, S.R.
McGee, David V.
McGillicky, Guy
McGuyer, Bobby Gene
McKee, Richard K.
McLaughlin, Darald G.
McLennan Ross LLP
McMenamin, Marguerite L.
McMillan LLP
McNally, Naomi
McNeish, Charlene
McNeish, Jeffrey
McNiven, Mike
McPherson, Florence
McPherson, Virgil
Mead Trust, Ethel Nadine
Mead, Nadine Ethel
Mead, Patricia Ida
Meadowlark Inc.
Meadows, Bobby L.
Meadows, Dova
Meadows, Laurel
Mellon Bank NA
Mel-Tina Ltd.
Merida Natural Resources LLC
Meridian Minerals Co.
Meridian OneCap Credit Corp.
Merrion Oil & Gas Corp.
Mexia Pest Control Services
Meyer, Charlotte H.
Michelin North America (Canada) Inc.
Midsouth Energy Inc.
Miliken, Nancy
Millar, James Clay
Millcreek Mining Group
Miller Engineers Inc.
Miller Thomson LLP
Miller, Brenda K.
Miller, David A. Miller,
Ellen McDougal Miller,
James

Miller, Joan J.
Miller, Katherine
Miller, Leroy
Miller, Mattie
Miller, Nancy
Miller, Ronald M.
Miller, Russell E.
Miller, Sharon L. Winkler
Miller, Vickie R.
Mills, James
Mills, Linda
Mine Site Technologies Pty. Ltd.
MineWare Inc.
MineWare Pty. Ltd.
Minor, Barbara Sue
Minor, Walter D.
Missouri Valley Properties Co.
Mitsubishi Corp. RtM Japan Ltd.
Mizer, Linn
MLK Ltd. LLC
Mobil Mining & Minerals Inc.
Mobil Oil Co.
Modrall Sperling Roehl Harris & Sisk PA
Molopo Energy Canada Ltd.
Monroe, Township of (NJ), Board of
   Trustees
Monsanto Co.
Monsen Engineering Co. Inc.
Montana Power Co.
Montana Power Co., Real Estate
   Department, The
Montana Power Co., The
Montana, State of, Department of Natural
   Resources & Conservation
Montana, State of, Department of Natural
   Resources & Conservation, ELO, Lands
   Program Manager
Montem Resources Ltd.
Moore, James
Moore, Linda
Moore, Patricia
Moore, Patrick
Moore, Thomas
Moore, Wilbur
Morgan Stanley Smith Barney LLC
Moroz, Gary

Morris, Darlene
Morrison-Maierle Inc.
Morstad, Wesley
Moseer, Geoffrey B.
Mosser, Geoffery B.
Mountain States Environmental Services
    Inc.
Mountain States Telephone & Telegraph
    Co., The
Mouse, Lester James
MP Mine Operations LLC
MRP
Mueller,  Darwin
MUFG Union Bank NA
Mularcik, Kathryn
Mularcik, Stephen
Mumford, Amista
Muncy Farms Inc.
Murray Energy Corp.
Murrell, Nell Pollock
Mutschelknaus, Clarence W.
Mutschelknaus, Clarence W., Jr.
Mutti, Rachel
Mutti, Vernon
Myers Mining Co.
Myers, Craig A.
NACR Inc.
NAL Resources Ltd.
Nalco Co. LLC
Nash Heirs Coal Lease
Nash Royalty Lease
Nash, Ronald D.
National Corp. Research
National Energy Transfer LLC
Natural Resource Partners LLC
Navajo Mine Retirement Plan
Navajo Nation, The
Navasota Valley Electric Cooperative
Navigant Consulting Inc.
NBCLH LP
Neuberger, Ella
Neumann, Neil
Neumann, Raymond
New Elk Preparation Plant
New Lexington Tree Farm LLC

New Lexington, City of (OH), Board of
    Education
New Mexico, State of, Commissioner of
    Public Lands
New Mexico, State of, Department of
    Transportation
New Mexico, State of, State Land Office
New Mexico, State of, State Land Office,
    Commissioner of Public Lands
Newman, Barbarra
Newman, Phillis
Newman, Ray
Newman, Yost
Nicklin Earth & Water Inc.
Norit Actieve Kool Holding BV
Norit Americas Inc.
Norit Canada Inc.
Norit NV
Norsworthy, Amy
Norsworthy, Jase O.
Norsworthy, Margaret B.
Norsworthy, Sally
North  American  Coal  Corp.
North American Coal Royal, The
North American Coal Royalty Co.
North Dakota State University
North Dakota, State of, Department of
    Human Services, State Hospital
North Dakota, State of, Department of Trust
    Lands, Board of University & School
    Lands
North Western Corp.
Northern Municipal Power Agency
Northern Plains Transport
Northern States Power Co.
Northwest Pipeline Corp.
Northwestern Corp.
Northwestern Power Co.
Northwestern Resources Co.
Norton Rose Fulbright Canada LLP
Nottingham, Township of (PA), Board of
    Trustees
NOW CFO LLC
NRG Energy Inc.
NRP LLC
Nu-Line Powerline Contractors Ltd.

Obsidian Energy Ltd.
O'Farrell, V. Virginia
Office Shop Inc., The
Ogden, Doris Jean
Ohio American Energy Inc.
Ohio Indemnity Co.
Ohio Oil Gathering Corp. II
Ohio Oil Gathering II
Ohio Power Co.
Ohio River Collieries Co.
Ohio, State of
Ohio, State of, Department of Natural
    Resources
Ohio, State of, Department of Natural
    Resources, Division of Forestry
Old Coyote, Darrin
Old Investments LLC
Old Mount Zion Cemetery Association
Old Spring Seat Baptist Church Inc.
Olen, Paul
Olio Inc.
Olivito, Anthony J., Jr.
OMCO Leasing Corp.
OptumHealth Financial Services Inc.
Orbit Oil & Gas Ltd.
Order, James Van
Oregon Short Line Railroad Co.
Orrville City of (OH), Department of Public
    Utilities
Orth, Bertha
Orth, Julis
Osler Hoskin & Harcourt LLP
Otter Tail Corp.
Owen, Charles
Owen, Charles W., Jr.
Owen, Frances J.
Owen, Kathryan
Owen, Kathryn
Owen, Kathryn E.
Owen, Kathy
Owens, Charles
Owens, Kathryn
Owensboro National Bank, The
Oxford Mining Co.
Oxford Mining Co. LLC
Oxford Oil Co., The

Oxford Resource Partners LP
Oxford Resources
P&M Coal Mining Co.
PACCAR Financial Corp.
Pacific Employers Insurance Co.
Pacific Power & Light Co.
Pacific Steel & Recycling
PacifiCorp
PacifiCorp Energy
PacifiCorp Legal
Palaterra USA LLC
Palmer, Barton L.
Palmer, Elmo L.
Palmer, Ethel A.
Palmer, Pearla Rosell
Palmer, Richard E.
Paragon Resources Inc.
Park Cities Bank & Co.
Parry, Gary W.
Pasco, Doris J.
Pastor Behling & Wheeler LLC
Patriot Reserve Holdings LLC
Pay Governance LLC
PayFactors Group LLC
Payton Kinney Tardio Davis & Sparks
Peabody Coal Co. LLC
Peabody Development Co. LLC
Peltz, John
Peltz, Joyce
Pengrowth Energy Corp.
Penn Virginia Operating Co. LLC
Penniman, Charlotte A.
Penniman, William David
Pennington, Earlene
Pennington, Travis
Penn-Ohio Coal Co.
PeopleSoft USA Inc.
Permann, George J. Margaret, Jr.
Perry County Industrial Co. Ltd.
Perry County Industrial Development Co.
    Ltd.
Perry, County of (OH), Commissioners
Personnel Management Group Inc.
Persta Resources Inc.
Pest Arrest Exterminating Inc.
Peters, Dan

Peters, Daniel
Peters, Donald
Peters, Hazel Doris Smouse
Peters, Jeffery J.
Peters, Regenia D.
Petersburg Co. Inc.
Peterson, Hugh, Jr.
Peterson, John R.
Peterson, Laura M.
Peterson, Patience Elizabether Russell
Petro Ventures Ltd.
Petrobank Energy & Resources Ltd.
PetroQuest Energy Inc.
Petrozzi, Barbara
Petrozzi, James John
Petrozzi, Richard
Petrozzi, Susan
PHH Vehicle Management Services Inc.
Phillips, Ken
Phillips, Keneth
Phillips, Kurtis
Phoenix Coal Co.
Phoenix Coal Corp.
Phoenix Coal Inc.
Phoenix Coal Processing Co.
Phoenix Coal Processing Co. LLC
Phoenix Coal Processing LLC
Phoenix Newco LLC
Phoenix-Greenhill Partners LLP
Phoenix-Greenlawn Partners LP
Pickett, James R.
Piergallini, Lucille
Piergallini, Raymond
Piper, Robert Edward
Pitney Bowes of Canada Ltd.
Pittsburgh & Midway Coal Co.
Pittsburgh & Midway Coal Mining
Pittsburgh & Midway Coal Mining Co., The
Pivot Data Centres Inc.
Plainsmen Petroleum Inc.
Platt, Raymond P.
Pleasant, Phillip
PLL Montana LLC
PNE Wind USA Inc.
PNM Resources Inc.
Poag, John

Poag,  Robert
Poag, Shirely
Poag, Shirley
Poag, Terry
Pocahontas Coalfield
Pollock Family Holdings LLC
Pollock, Calvin E.
Pollock, Cornelia A.
Pollock, James H.
Pollock, Jessie Mae
Pollock, R. Jeffrey
Pollock, William D.
Pompey, Elisabeth A.
Pompey, Leona M.
Pompey, Michael H.
Pompey, Michael J.
Pompey, Michael Joseph, Jr.
Ponsart, James
Pontius Construction
Poore , Bami L.
Poore, Bambi L.
Poore, Randy
Poplar River Mine
Porterfield, Judith
Porterfield, Kirke
Portland General Electric
Post, Barbara
Post, George
Potash Royalty LP
Potter Grandchildren LLC
Potter, Kiley E.
Poulos, George
Poulos, Martha
Powel, Otto H.
Powell, Ann
Powell, Joseph
Powell, Lisbeth
Powell, Michael
Powell, Otto H.
PPL EnergyPlus LLC
PPL Generation LLC
PPL Montana LLC
Prairie Coal Ltd.
Predator Oil Ltd.
Preferred Strategies LLC
Premium Funding Associates Inc.

Preventive Health Now LLC
Price, Charles W.
Price, David B.
PricewaterhouseCoopers LLP
Private Bank & Trust Co.
Privatebank & Trust Co., The
Privatebank & Trust Co., The, Asset
    Management Arm
Pronghorn Geologic Services Inc.
Prosek LLC
Prudential Retirement Insurance & Annuity
    Co.
PSST LLC
Public Service Co. of New Mexico
Puget Sound & Light Co.
Puget Sound Energy Inc.
Puget Sound Power & Light Co.
Pugh, Rosemary
Puskarich, Belle
Puskarich, Mary Belle
Puskarich, Michael T.
Pyeatt, Grace S.
QSW&P Inc.
Quintana Minerals Corp.
Quinwood Coal Co. LLC
Qwest Corp.
R Plus Simmentals
R&B Gravel
R&F Coal Co.
R&G Leasing
R&G Leasing LLC
R&L Winn Inc.
R&R Cleaning
Ragsdale, Anthony Steven
Ragsdale, Linda Lee
Rail Link Inc.
Rall, Dave
Rambo, Barbara Jean
Rambo, Lynn Allyson
Rambo, Terry L.
Ramirez, Terri J.
RapidDecision
Rawson, Amos
Rawson, Amos L.
Rawson, Lois
Ray, Carol A.

Ray, Deborah
Ray, Don
Ray, Glenn
Ray, Jeanne
Ray, Virgene
Rayle Coal Co.
Real Estate & Improvement Co. of
    Baltimore City, The
Red Pepper Pipeline LLC
Redburn Tire Co.
Redwolf Production Inc.
Reed, Cristina
Reed, David
Reed,  Jean
Reed, Jean Ann
Reed, Jeffrey
Reed, Robert
Reed, Scott
Reed, Thomas
Reed, Wanda
Reed, Wendie
Reger, James R.
Reger, James W.
Reger, Maree
Reger, Steven L.
Reich,  Joyce  Boland
Reliance Medical Group LLC
ReliaStar Life Insurance Co.
Renfro Equipment Inc.
Renfro, Robin
Renfro, Stuart
Rensi, Lana F.
ReportsNow Inc.
Reserve Coal Properties Co.
Revlett, Elaine
Revlett,  Howard
Reynolds,  Curtis
Rhodes, Candida
Rice Family Farms Inc.
Richard K. McKee Family Trust
Richard, Ronald
Richard, William
Richards,  James
Richards, Peggy
Richardson Operating Co.
Richardson Production Co.

Richardson, Scott D.
Richardson, Vivian Theresa
Riggs, Elliott A.
Riggs, Ramona M.
Rinkes Properties LLC
Rinkes,  Denise
Rinkes, Gary
Risebud Temp Services LLC
Rising Sun LLC
Rising Sun Resources
Ritchey, Corrine
Ritchey, Elvin T.
River Edge Dairy & Farms
RLI Insurance Co.
RME Land Corp.
Robert J. Peternal Revocable Trust
Rock Ridge Properties Inc.
Rock Springs Royalty Co.
Rocky Mountain Hospital & Medical
    Service Inc.
Rocky Mountain Power Inc.
Rocky Mountain Power LLC
Rodriguez, Ricardo
Rodriguez, Vicki
Rogers Family LLC
Rogers, Gloria
Rogers, James
Rogers, James L., III
Rogers, James, III
Rogers,  Jean
Rogers, JL
Rogers, Joan
Rogers, Jonathan
Rogers, Jonathan L.
Rogers, Martha
Rogers, Mary
Rogers, Matha
Rogers, Talmage
Rogers, Talmage, Jr.
Rogers, TG
Rogers, TG, Jr.
Romine,  James
Ronald E. Co.
Roquemore Family LP
Rose, Ann
Rose, Charles

Rose, John
Rose, Linda
Rosebud Energy Corp.
Rosebud Engineering Inc.
Rosebud Mine
Rosebud Mining Co.
Rosebud Temp Services
Ross L-Seven Ranch Ltd.
Ross, Chad
Rowe, Eleanor L.
Royal Energy Resources Inc.
Roynat Inc.
RPM Global
RPM Global USA Inc.
RPM Software International Pty. Ltd.
RPM Software USA Inc.
RRKK LLC
Ruckstuhl, Grace
Ruff, Richard L.
Runge Inc.
RungePincockMinarco Ltd.
Rural Municipality of Estevan No. 5
Rush Run Community Chapel
Russell, David E.
Russell, Geraldine
Russell, Tamra
Ryan, Patricia Lucy Stallings
S&D Construction Co.
S. Mack Farms Ltd.
Salem, City of (OH), Board of Trustees
San Juan, County of (NM)
Sandhoff, Sharon
Santana, Shelley
Santana, Shelley A.
Santo, Andrew M.
Santo, David E.
Santo, Ellen
Santo, John
Santo, John J.
Santo, Mary
Santo, Mary E.
SAP Canada Inc.
Sarcee Holdings Ltd.
SAS Consulting Inc.
Saskatchewan Power Corp.

Saskatchewan, Province of (Canada),
    Ministry of Energy & Resources
Saskatchewan, Province of (Canada),
    Ministry of Energy & Resources, Mines
    Branch, Director
Saskatchewan, Province of (Canada),
    Ministry of the Economy, Mineral
    Tenure, Director
SaskEnergy Inc.
SaskTel
Sattler, Rebecca M.
Sattler, Tracy A.
Saunders, Evelyn D.
Savage  Mine
Schafer Ltd. LLC
Scheler, Carol
Scheler, Gary
Schiestel, David
Schmidt, Caroline
Schmidt, Henry
Schnaidt, Marleen T.
Schoate Mining Co. LLC
Schulte, Lorn
Schupp, James
Schupp, Jerry
Schupp, Pearl
Schwalbe, Claire
Schwalbe, Claire C.
Seaway Coal Co.
Secrest, Karen A.
Secure-24 Inc.
Securitas Security Services Inc.
Sedgman Canada Ltd.
Selby's Services
Sentry Royalty Co.
Sessions, Leroy
Shaffer, Ronald
Shaffer, Sharon
Shaw Business
Shea Maroon V LLC
Shea Properties
Shearer, Eugene M.
Shell Mining Co.
Shepard, Jeannie
Shepard, R. Michael
Sheperd, Esthel

Sheperd, H. Jeannie
Sheperd, Hilda
Sheperd, Linda
Sheperd, Nathan
Sheperd, R. Michael
Sheperd, William E.
Shepherd, Joseph
Shepherd, Marion
Shepherd, Marion L.
Shepherd, Shelly M.
Sherman & Howard LLC
Shinaberry, Lester
Shinaberry, Norma
Short Creek Coal Co.
Short Creek, Township of (OH)
Shugert, Robert
Shugert, Robert A.
Shumway, Nedra Alice
Sidco Development Inc.
Sidney Sugars Inc.
Siegfried Group LLP, The
Sill, Winifred B.
Simms, Crystal
Simms, Jon
SimplexGrinnell LP
Simpson, Richard P.
Sinopec Canada Energy Ltd.
Sipe, Joseph
Sipe,  Michael
Slatzer,  David
Slatzer, Sandra
Smith Living Trust, The
Smith Power Products Inc.
Smith, Angela K.
Smith,  Donald
Smith, Donald F.
Smith, Robert V.
Smouse, DeForrest
Smouse, Donald L.
Smouse, Douglas E.
Smouse, Evelyn
Smouse, Frederick B.
Smouse, Gregory B.
Smouse, Harry E.
Smouse, James
Smouse, Janice

Smouse, Lester James
Smouse, Marshal
Smouse, Mary
Smouse, Michael D.
Smouse, Mollie Frances
Smouse, Robert
Smouse, Ruth A.
Smouse, Samuel T.
SMS Equipment Co.
Solvay Soda Ash Joint Venture
Souder Miller & Associates
Sound Energy plc
Souris Valley Paving
Southall, Paul W.
Southern Salvage Inc.
Southern Ute Indian Tribe, The
Sovell, Myron
Sowles Co.
Spartan Controls Ltd.
Spicer, Manila B.
Spirit Services Co.
Spring Mill Coal LLC
Spring Run Acres LLC
Springhouse Farm LLC
Sproul, Steve
Squire Sanders & Dempsey (US) LLP
Squire Sanders & Dempsey LLP
St. Joseph Literary Society
St. Paul Fire & Marine Insurance Co.
Stallings, Lawrence Warren
Stallion Farms Ltd.
Standard Laboratories Inc.
Stanfield Living Trust, The
Stanley, John
Star Drilling Ltd.
Stark, Tony
Starlin, Daniel James, Jr.
Starlin, Holly M.
Starner, Harold A.
Starvaggi Industries Inc.
Starwood Land Co. LLC
Steen, Mark
Steen, Mary
Stein Advisors LLC
Stenson, John
Steuben Coal-Anthony Mining Ltd.

Stevens, Donnie
Stevens, Mary Helen
Stevens, Sandra
Steward, Chester E.
Steward, Dorothy M.
Stewart, Larry
Stewart, Virginia
Stikeman Elliott LLP
Stiles, Bruce
Stiles, Jo Ann
Stiles, Leslie
Stiles, Mark
Stillion, Randy
Stimson Ltd.
STORM Consulting LLC
Stratton, Lewis G.
Stratton, Wanda
Stratton, Wanda F.
Sun City Prop Busters
Suncor Energy Inc.
Suncor Energy Resources Partnership
Sunday Creek Coal Co.
Sunlight Development Co.
Sunnyhill Coal Sales Co., The
Sunoco Pipeline
Syntax Software Corp.
System Improvements
System Improvements Inc.
T&C Holdco LLC
Tableland Grain Farm Ltd.
Talen Montana LLC
Tanner, Beth M.
Tanner, Boyad M.
TAQA North Ltd.
Tardio, James
Tata Chemicals (Soda Ash) Partners
Tata Chemicals North America Inc.
Taylor, Bonita
Taylor, Bonita K.
Taylor, CJ
Taylor, Jennifer
Taylor, Richard
Taylor, Shirely
Taylorton Energy Inc.
TC Holdco LLC
Teck Coal Partnership

Teck Resources Ltd.
Tembec Industries Inc.
Temme, Helga
Temme, Louis
Tennenbaum Opportunities Fund VI LLC
Tennenbaum Opportunities Partners
Tennenbaum Opportunities Partners V LP
Tennison, Linda
Tennison, William
TEPCO Fuel & Power Inc.
Terteling Brothers Inc.
Tetra Tech Inc.
Texas Westmoreland Coal Co.
TG Haas
Thatcher, Judy A.
Thelma's Cleaning
Thomas Engineering & Surveying Co., The
Thomas Fregiato Myser Hanson & Davies
Thomas, Betty Jo
Thomas, Rudy
Thomas, William R.
Thomason, Nurman
Thompson, Chiara
Thompson, Mark R.
Thornton Grout Finnigan LLP
Thunderbird Mining Systems
Tickhill, Betty Loise
Tickhill, Betty Louise
Tickhill, William
Tierney, Rosemary
Time Warner Cable
Timler, Virginia L.
Timmons, Agnes
Timmons, Diane
Timmons, Donna
Timmons, Jane
Timmons, Jeffery
Timmons, Kenneth
Timmons, Nancy Jo
Timmons, Robert
Timmons, Shelley
Timmons, Thomas
Tippett, Russell K.
TOF Oxford SPE LLC
Tollgate Holdings LLC
Toptal LLC

Tory's LLP
Tourmaline Oil Corp.
TransAlta Centralia Generation LLC
TransAlta Cogeneration LP
Transalta Corp.
TransAlta Generation Partnership
TransAlta Utilities Corp.
Travelers Bond & Special Insurance
Travelers Casualty & Surety Co. of America
Trend Gathering & Treating LP
Tri-County Lands Co.
Trustmark National Bank
Tucson Electric Power Co.
Tucson Gas & Electric Co.
Tunnel Hill Reclamation
Tunnel Hill Reclamation LLC
Turnbull, Brenda
Turner, John
Tuscarawas, County of (OH)
Tuscarawas, County of (OH), Engineers
Tuscawaras, County of (OH),
    Commissioners
Tusco Land Co.
Tusky Coal LLC
TW Telecom Inc.
Twin Mineral Land
Twin Mineral Land Ltd.
Tyco Integrated Fire & Security Canada Inc.
Tyco SimplexGrinnell
Tyrone Synfuels LP
UCHealth
Uinta, County of (WY)
Umsted, Curtis
Umsted, Gerald Berquist
Umsted, Micheal
Umsted, Patricia
Umsted, Petricia
UniFirst Corp.
Unifor, Local 649
Union Pacific Land Resources Corp.
Union Pacific Railroad Co. Inc.
United Mine Workers of America, Health &
    Retirement Funds
United Mine Workers of America, Health &
    Retirement Funds, 1974 Pension Plan &
    Trust

United Mine Workers of America, Health & Retirement Funds, 1992 Benefit Plan

United Mine Workers of America, Health & Retirement Funds, Combine Benefit Fund

United Mine Workers of America, Local 7606

United Mine Workers of America, The - International Union

United Rentals (North America) Inc.

United States, Government of the

United States, Government of the, Department of the Interior, Bureau of Indian Affairs, Ute Mountain Agency, Superintendent

United States, Government of the, Department of the Interior, Bureau of Land Management

United States, Government of the, Department of the Interior, Bureau of Land Management, General Land Office

United States, Government of the, Department of the Interior, Bureau of Land Management, High Desert District, Kemmerer Field Office

United States, Government of the, Department of the Interior, Bureau of Land Management, Kemmerer Resource Area

United States, Government of the, Department of the Interior, Bureau of Land Management, New Mexico State Office

United States, Government of the, Department of the Interior, Bureau of Land Management, Wyoming State Office

United States, Government of the, Department of the Interior, Office of Surface Mining Reclamation & Enforcement Western Region

Unity Connected Solutions Inc.

Universal Protection Service LP

University of Wyoming

Unterseher, Cary

Unterseher, Edna

Unterseher, Jake

Utah Construction & Mining Co.

Utah International Inc.

Ute Mountain Ute Indian Tribe, The

Utelite Corp.

Valencia Energy Co.

Valley Mining Inc.

Van Horn, Michael L.

Van Horn, Teresa L.

Van Order, Patricia A.

Vanbibber, Amy Jo

Vanfossen, Deborah

Vanfossen, John

Vaninetti, Jerry

Varibus LLC

Vaught, John

Vaught, Kenny

Vaught, Lisa

Vaught, Michelle

Vedder Price PC

Verhovec, Evelyn

Verhovec, Mark

Verna M. Bazy Trust

Vibra-Tech Inc.

Vincent, Gerald

Vincent, Ione

Vincent, Mary

Virginia S. Whitmer

Vision Insurance Plan Insurance Co.

Vista Cos.

Vistra BV

Vita Cos., The

VMI Inc.

VMI Operating Inc.

Voigt, Casey

Voohies, Nellwyn

VSP

W&F Eastham

W&M Thoman Ranches LLC

W. Ben Reeder Family Trust

Wadella, Julius

Wadella, Mary

WageWorks Inc.

Wagner, Lorne

Wagon Rod Ranch LLC

Wahl, Jeffery R.

Waldeck, William G.
Walgenbach, Rhonda
Walker, Gerald F.
Walker, Robert D.
Walker, Victor H.
Walsh Services LLC
Walter Sarpy Creek Farm Inc.
Walters, Joleen H.
Walters, Patrick M.
Walton, Tyler
Wanner, Carter
Wanner, David
Wanner, Myles
Wanner, Trent
Ward, Linda M.
Ward, William R.
Warren Transport Inc.
Wasara, Kathleen M.
Wasara, Wayne M.
Washington Group International Inc.
Water & Environmental Technologies Inc.
Water Gas Resources Inc.
Watts, Carol A.
Watts, Carwin L.
Watts, Janet O.
Watts, Joseph Laverne
WB Coal Co. Inc.
WBM Office Systems Inc.
WBM Plus Service
WBM Protection Plus Service
Weatherford, Louise T.
Weaver, Christopher M.
Weaver, Christpher M.
Weaver, Clara
Weaver, Daniel L.
Weaver, Jane H.
Weaver, Luther
Weaver, Luther F.
Weber, James A., II
Weightech Co.
Weiker, Nancy A.
Weil, Herbert
Weil, Leona
Weir International Inc.
Welch Bros. Inc.
Welch, Dennis

Welch, Kathryn
Welch, Thomas
WellDyneRx LLC
Wellness by Wishlist Inc.
Wells Fargo Insurance Services of West
    Virginia Inc.
Wells, Connie
Wells, James
WesBanco
West Fraser Mills Ltd.
Westcan Bulk Transport Ltd.
Westech Environmental Services Inc.
Western Coal Co.
Western Fuels Association Inc.
Western Gas Processors Ltd.
Western Gas Resources Inc.
Western Sugar Cooperative, The
Western SynCoal LLC
Western Water Consultants Inc.
Westfall, Daniel J.
Westhafer, Ronald
Westhafer, Shirley
Westmoreland Kemmerer Inc.
Westmoreland Resources Inc.
Westmoreland Terminal Co.
Wetzel, Don
WGR Asset Holding Co. LLC
Whipple, Shirley
Whipple, W. Walden
White, William M.
Whitehead, William D.
Whitmer, Allan L.
Whitson, Bobby
Whitson, Jennifer
Wild Oat Consulting Inc.
Wilden, Denise
William Everett Craddock Family
    Irrevocable Trust
William Everett Craddock Irrevocable Trust
Williams, Chuck
Williams, Martha
Williams, Ralph
Williams, Richard
Williams, Sharon K.
Williams, T. Steve
Williams, T. Steven

Williams, Thomas R.
Williams, Tonya
Williams, Valerie
Williams, Valerie L.
Willis of Texas Inc.
Willis Towers Watson plc
Willow Bunch No. 42, Rural Municipality
    of (Saskatchewan)
Willowvan Mining Ltd.
Wilson, Ellen Ruth
Wilson, Robert D.
Winkler, Lee Roy
Winkler, Lyle
Winkler, Patricia
Winkler, Sharon
Winkler, Sharon L.
Winston & Sandra Davis Family LP
Wolf, Mary M.
Wolf, Mary Margaret
Wooten, Joan
Wooten, Terry
Workforce Software LLC
Workiva Inc.
Worner, Margaret
Worrell, Bessie W.
Worthington, Betty
Worthington, William Alan
WW Grainger Inc.
Wycinshi, Mary Lou
Wyoming, State of
Wyoming, State of, Department of
    Transportation
Wyoming, State of, Office of State Lands &
    Investments
Xcel Energy Services Inc.
Xerox Corp.
XL Specialty Insurance Co.
XTO Energy Inc.
Y Pino, Evangeline Ortiz
Y Pino, Peter Ortiz
Yoder, Ervin
Yoder, Lydia
Yontz, Cathy J.
Yontz, William A.
Zaccagnini, Dennis
Zaccagnini, Julia

Zee's Cleaning
Zimnox Coal Co., The
Z-Mack Enterprises Inc.

# SCHEDULE 2(i)

## Customers

Dover, City of (OH)
NDSU - Fargo
North Dakota, State of, Hospital
Orrville, City of (OH)
Portland General Electric Co.
Tata Chemicals Partners
Tronox
Wyoming Lime Producers

## SCHEDULE 2(j)

### Governmental/Regulatory Agencies

Alberta Energy Regulator
Alberta, Province of (Canada)
Belmont, County of (OH), Treasurer
Big Horn, County of (MT), Treasurer
British Columbia, Province of (Canada),
    Minister of Finance
Buffalo Independent School District (TX),
    Tax Assessor/Collector, Carolyn Ballard
Canada, Government of, Receiver General
Carroll, County of (OH), Municipal Court
Coalfields No. 4, Rural Municipality of
    (Saskatchewan)
Columbiana, County of (OH), Treasurer
Coshocton Chamber of Commerce
Coshocton, County of (OH), Municipal
    Court
Coshocton, County of (OH), Treasurer,
    Janette Donaker
Delaware,  State  of
Delaware, State of, Secretary
Douglas, County of (CO), Treasurer
Estevan No. 5, Rural Municipality of
    (Saskatchewan)
Flagstaff, County of (Alberta)
Freestone, County of (TX), Tax Assessor
    Collector
Halifax, County of (NC), Tax Collector
Harrison, County of (OH), Treasurer, Vicki
    Sefsick
Hinton, Town of (Alberta)
Kentucky, Commonwealth of, Department
    for Natural Resources
Kentucky, Commonwealth of, Department
    of Revenue
Kentucky, Commonwealth of, State
    Treasurer
Leduc, County of (Alberta)
Leon Independent School District (TX), Tax
    Assessor Collector
Leon, County of (TX), Tax Assessor
    Collector

Lincoln County School District #1 (WY)
Lincoln, County of (WY), Office of P&D
Lincoln, County of (WY), Public Health
Lincoln, County of (WY), Treasurer
Maricopa, County of (AZ), Superior Court,
    Support Payment Clearinghouse
Mercer, County of (ND), Road Department
Mercer, County of (ND), Treasurer
Minnesota, State of, Department of Revenue
Montana State Fund
Montana, State of, Department of
    Environmental Quality
Montana, State of, Department of
    Environmental Quality, Air Division
Montana, State of, Department of
    Environmental Quality, Mining Division
Montana, State of, Department of
    Environmental Quality, Water Division
Montana, State of, Department of
    Environmental Quality, Water Protection
    Bureau
Montana, State of, Department of Labor &
    Industry
Montana, State of, Department of Natural
    Resources
Montana, State of, Department of Revenue
Montana, State of, Department of State
    Lands
Montana, State of, Treasurer
Morgan, County of (OH), Clerk of Courts,
    Carma Johnson
Morgan, County of (OH), Treasurer, Dawn
    M. Hosom
Muskingum, County of (OH), Treasurer
Natrona, County of (WY), Clerk of District
    Court
New Mexico Mine Health & Safety
    Conference
New Mexico,  State of
New Mexico, State of, Bureau of Mine
    Safety

New Mexico, State of, Commissioner of
    Public Lands
New Mexico, State of, Department of
    Workforce
New Mexico, State of, Mining & Minerals
    Division
New Mexico, State of, Mining Department,
    Air Quality Bureau
New Mexico, State of, Mining Department,
    Ground Water Quality Bureau
New Mexico, State of, Mining Department,
    Mining Environmental Compliance
    Section
New Mexico, State of, Taxation & Revenue
New Mexico, State of, Taxation & Services
Noble, County of (OH), Treasurer
North Carolina, State of, Department of
    Environmental Quality
North Carolina, State of, Department of
    Environmental Quality, Water Resources
North Carolina, State of, Department of
    Revenue
North Dakota, State of
North Dakota, State of, Department of
    Health
North Dakota, State of, Department of
    Health, Air Division
North Dakota, State of, Department of
    Health, Water Division
North Dakota, State of, Office of State Tax
    Commission
North Dakota, State of, Office of Tax
    Commissioner
North Dakota, State of, Public Service
    Commission
Ohio, State of, Department of Revenue
Ohio, State of, Department of Taxation,
    Treasurer
Ohio, State of, Division of Natural
    Resources, Division of Mineral
    Resources
Ohio, State of, Environmental Protection
    Agency, Division of Air Pollution
    Control
Ohio, State of, Environmental Protection
    Agency, Division of Surface Water

Ohio, State of, Treasurer
Oliver, County of (ND), Treasurer
Paintearth, County of (Alberta)
Perry, County of (OH), Court
Perry, County of (OH), Treasurer, Melissa
    Walters
Richland, County of (MT), Treasurer
Rosebud, County of (MT), Sheriff
Rosebud, County of (MT), Treasurer
San Juan, County of (NM), Treasurer
Saskatchewan, Province of (Canada),
    Ministry of Highways & Infrastructure
Texas, State of, Commission on
    Environmental Quality, Air Division
Texas, State of, Commission on
    Environmental Quality, Water Division
Texas, State of, Comptroller
Texas, State of, Comptroller of Public
    Accounts
Treasure, County of (MT), Treasurer
Tuscarawas, County of (OH), Treasurer
Uinta, County of (WY)
United States, Government of the,
    Department of Labor, Mine Safety &
    Health Administration
United States, Government of the,
    Department of the Interior, Office of
    Surface Mining
United States, Government of the,
    Department of the Interior, Office of
    Surface Mining & Reclamation
United States, Government of the,
    Department of the Interior, Office of
    Surface Mining Reclamation &
    Enforcement
United States, Government of the,
    Department of the Treasury
United States, Government of the,
    Department of the Treasury, Internal
    Revenue Service
Utah, State of
West Virginia, State of, Department of
    Environmental Protection
West Virginia, State of, Department of
    Environmental Protection Water &
    Waste Management

Wyoming, State of, Department of
    Environmental Quality, Air Quality
    Division
Wyoming, State of, Department of
    Environmental Quality, Land Quality
    Division
Wyoming, State of, Department of
    Workforce Services

# SCHEDULE 2(k)

## HR Benefits

ACA Track
Acclaim
Acclaim Ability Management
AmeriBen
America's Job Exchange LLC
AON PLC
Automatic Data Processing Inc.
Bryan Cave Leighton Paisner LLP
CareerArc Group LLC
CareerBuilder Employment Screening LLC
CareerBuilder LLC
Copeman Healthcare Centres
Culpepper
Culpepper & Associates Inc.
EKS&H
EKS&H LLLP
FirstHealth
George, Anthony
Global Retirement Partners LLC
Greenshield
HealthSmart Holdings Inc.
Holland & Hart LLP
Homewood Health Inc.
Industrial Alliance Insurance & Financial
    Services Inc.
InfoMine Inc.
K-Mart Corp.
Liberty Mutual
Lockton Cos. Inc.
Manulife Financial Corp.
Mercer LLC
Mercer US Inc.
Mornuea Sheppell Ltd.
Mountain States Employers Council Inc.
Mutual of Omaha Insurance Co.
National Jewish Health
Optum Inc.
OptumRx Administrative Services LLC
Part D Advisors Inc.
PayFactors
Preventive Health Now
Provident Life & Accident

Prudential Financial Inc.
Sun Life Financial Inc.
SureHire
TeleDoc Inc.
ThrivePass
United Mine Workers of America
University of Colorado Hospital
Unum Group
Unum Insurance Co.
Vision Service Plan
Voya Financial
Voya Services Co.
WCC RMSA
WellDyneRx
Willis Towers Watson
Workers' Compensation Board - Alberta
Zurich Insurance Group AG

# SCHEDULE 2(l)

## Insurance

ACE American Insurance Co.
ACE Property & Casualty Insurance Co.
AIG Insurance Co. of Canada
Allied World Assurance Co. Ltd.
Allied World Specialty Insurance Co.
American Longshore Mutual Association
Ariel Re BDA Ltd.
Ariel Syndicate 1910
Aspen Bermuda Ltd.
Aspen Insurance UK Ltd.
AXIS Insurance Co.
AXIS Reinsurance Co.
AXIS Surplus Insurance Co.
BankDirect Capital Finance LLC
Barbican Bermuda
Chubb Bermuda Insurance Ltd.
Chubb Indemnity Insurance Co.
Federal Insurance Co.
Ironshore Europe Ltd.
Ironshore Insurance Ltd.
Ironshore Specialty Insurance Co.
Lloyd's
Lloyd's of London
Markel Bermuda Ltd.
National Union Fire Insurance Co. of Pittsburgh
North Dakota State Fund
Northbridge Financial Corp.
Novae Bermuda Underwriting Ltd.
Ohio State Fund
Oil Casualty Insurance Ltd.
Sompo International
Steadfast Insurance Co.
Syndicate 2007
Travelers Property Casualty Co. of America
US Specialty Insurance Co.
Westmoreland Risk Management Inc.
Wyoming State Fund
XL Europe Ltd.
Zurich American Insurance Co.
Zurich American Insurance Co. of Illinois
Zurich Insurance Co. Ltd.

# **SCHEDULE 2(m)**

## **Landlords**

D&P Land Investments LLC
Luscar Ltd.

# SCHEDULE 2(n)

## Litigation

Baisden, Michael
Blackhawk Land & Resources LLC
Butler, Craig W.
Canadian National Railway Co.
Cozort, Floyd
Crow Tribe of Indians (MT)
Dillion, Vivian
Eichelberger, Jon
Ensigner, Pamela
Freeman, Everitte
Freeman, Phyllis
Heritage Coal Co. LLC
Kinder Morgan
Kinder Morgan Utopia LLC
Montana, State of, Environmental Information Center
North Carolina, State of, Division of Water Resources
Ohio Gathering Co. LLC
Otter Tail Power Co.
Philippines, Government of the, Commission on Human Rights
Ramsey, Donna
Ramsey, Michael
Ramsey, Mike
Sergeant Stone Inc.
Shelly & Sands Inc.
Sierra Club
Spires, Brenda
Spires, Karl
Suazo, James
Talmar of FL LLC
United States, Government of the, Department of Interior, Bureau of Indian Affairs
United States, Government of the, Department of Labor, Associate Regional Solicitor
United States, Government of the, Department of Labor, District Director
United States, Government of the, Environmental Protection Agency
Wild Earth Guardians

## SCHEDULE 2(o)

### Ordinary Course Professionals

Capitol Network LLC
Darryl L. James Consulting LLC
Wilmer Cutler Pickering Hale & Dorr LLP

# SCHEDULE 2(p)

## Other Significant Creditors

1481604 Alberta Ltd.
Bank of Montreal, The
Capital Power GP Holdings Inc.
CCA Group LLC
DMA33 Enterprises Ltd.
Farm Credit Leasing Services Corp.
First Business Equipment Finance LLC
First Security Bank
Instow Enterprises Ltd.
Integrated Distribution Systems LP
JM Mullin Enterprises Ltd.
John Deere Financial Inc.
KL Uptown Enterprises Ltd.
LEM Enterprises LLC
MCP Funding I LLC
Merchants Capital Resources Inc.
MK3 Enterprises Ltd.
Modern Office Methods Inc.
NMHG Financial Services Inc.
North Central Rental & Leasing LLC
Obsidian Agency Services Inc.
Pacific & Western Bank of Canada
RJF Enterprises
Russell Metals Inc.
Starion Financial
Tri-State Truck & Equipment Inc.
Wells Fargo Equipment Finance Inc.

# SCHEDULE 2(q)

## Significant Competitors

Alliance Resource Partners LP
Foresight Energy LP
Hallador Energy Co.
Peabody Energy Corp.
Rhino Resource Partners LP

# SCHEDULE 2(r)

## Sureties

ACE INA Group
Argo Group
Evergreen National Indemnity Co.
First Surety Corp.
Indemnity National Insurance Co.
Lexon Insurance Co.
Travelers Property Casualty Group
Zurich Insurance Group

## SCHEDULE 2(s)

### Taxing Authorities

Athens, County of (OH), Treasurer, Bill Bias
Hart Butt No. 11, Rural Municipality of (Saskatchewan)
Jefferson, County of (OH), Treasurer, Raymond M. Agresta
Lincoln, County of (WY), Treasurer - Other
Ohio, State of, Bureau of Workers' Compensation
Ohio, State of, Department of Agriculture
Ohio, State of, Department of Commerce
Ohio, State of, Department of Taxation
Ohio, State of, Environmental Protection Agency
Oxford, City of (OH), Clerk of Courts
Texas, State of, Railroad Commission
Uinta, County of (WY), Treasurer
United States, Government of the, Department of Education
United States, Government of the, Department of the Interior
United States, Government of the, Department of the Interior, Bureau of Indian Affairs

## SCHEDULE 2(t)

### Top 50 Creditors

Bradken Inc.
Cummins Bridgeway LLC
H-E Parts International LLC
Jennmar Corp. of Utah Inc.
Mesa Ready Mix Inc.
Paprzycki, Kevin A.
Pension Benefit Guaranty Corp.
Pro-Ex Canada Inc.
United States, Government of the, Department of the Interior, Minerals Management Service
Warfab Field Machining & Erection Corp.

# SCHEDULE 2(u)

## Unions

Communications Energy & Paperworkers Union of Canada, Local 649
International Brotherhood of Electrical Workers, Local 2067
International Union of Operating Engineers, Local 953
International Union of Operating Engineers, Local 955
International Union of Operating Engineers, Local Union 400
International Union of Operating Engineers, Local Union 400, AFL-CIO
International Union, United Mine Workers of America
United Mine Workers of America
United Mine Workers of America, Local 7606

# SCHEDULE 2(v)

## US Trustee Office

Boykin, Jacqueline
Duran, Hector
Fitzgerald, John P., III
Flinchum, Peggy T.
Griffin, Barbara
Johnson-Davis, Luci
Livingstone, Diane
March, Christine
McPherson, Theresa E.
Motton, Linda
Otto,  Glenn
Pecoraro, Shannon F.
Schmidt, Patricia
Smith, Gwen
Statham, Stephen
Turner, June E.
Van Arsdale, Robert B.
Waxton, Clarissa

# SCHEDULE 2(w)

## Utilities

Advanced Communications Technology Inc.
Advanced Waste Water Specialists
Alberta Water & Wastewater
AmeriGas Propane
AT&T Inc.
AT&T Long Distance
AT&T Mobility LLC
Bellaire, City of (OH), Water Department
Beulah, City of (ND)
Burr Oak Regional Water District (OH)
Cabot-Norit Americas Inc.
Capital Power LP
Cellco Partnership Inc.
Century Wireline Services
CenturyLink
CenturyLink Business Services
CenturyLink Inc.
Colstrip, City of (MT)
Columbia Gas
Columbia Gas of Ohio Inc.
Columbia Gas Tranmission
Comcast Cable Communications LLC
Coshocton, City of (OH), Water Department
DirecTV LLC
Dish Network Corp.
Dominion East of Ohio
Dominion Energy Inc.
Eastern Ohio Regional Wastewater
Eastern Ohio Regional Wastewater
    Authority
Edmonton, City of (Alberta)
Energy Cooperative, The
EPCOR Utilities Inc.
Estevan, City of (Saskatchewan)
Farmington, City of (NM)
FastTrack Communications
FastTrack Communications Inc.
Foraker Gas Co. Inc.
Four Corners Propane
Frontier Communications Corp.
Frontier Power Co., The
GFL Environmental Corp.

GFL Environmental Inc.
Granite Telecommunications LLC
Guernsey Muskingum Electric Cooperative
    Inc.
Hazen, City of (ND)
Hinton Scrap Metal Ltd.
Kemmerer Diamondville Water &
    Wastewater Joint Powers Board (WY)
Kemmerer, City of (WY)
Kentucky Utilities Co.
Kimble Recycling & Disposal
Level 3 Communications Inc.
Madison Energy Cooperative Association
    Inc.
MCI Communications Corp.
Mid-Rivers Telephone Cooperative Inc.
Mid-Yellowstone Electric Cooperative Inc.
Miles City Sanitation
Miller's Garbage Service Inc.
Montana, State of, Department of
    Environmental Quality, Hazardous
    Waste Program
Morad Communications Ltd.
Muhlenberg County Water District (KY)
Muhlenberg, County of (KY), Water District
Muskingum, County of (OH), Utilities
Muskingum, County of (OH), Utilities
    Department
Navasota Valley Electric
NorthWestern Energy
NRG Texas Power LLC
Ohio, State of, Environmental Protection
    Agency, Burr Oak Regional Water
    District
Perry, County of (OH), Southern Perry
    County Water District
PNM
Range Telephone Cooperative Inc.
Republic Services
Republic Services Inc.
Reservation Telephone Cooperative Inc.
Rocky Mountain Power

Roughrider Electric Cooperative Inc.
Safety-Kleen Systems Inc.
Signal Direct Communications Ltd.
South Central Power Co.
South Central Power Co. Inc.
Southern Perry County Water District (OH)
Special Areas, Rural Municipality of
    (Alberta), Big Country Waste
    Management Commission
Spectrum Business
Suburban Propane Partners LP
Superior Propane
TCT
Telus  Mobility
Terex Utilities South
Texas Water Utilities Association
Time Warner Cable Northeast
Tongue River Electric Cooperative, Inc.
TouchTone Communications Inc.
Union Telephone Co.
Union Telephone Co. Inc.
Waste Industries Inc.
Waste Management of New Mexico
Waste Management of Ohio Inc.
West River Telecommunications
Windstream Holdings Inc.
Wyoming Waste Systems
Wyoming, State of, Water Development
Commission

# SCHEDULE 2(x)

## Vendors

3B Dozer Service LLC
4M Solutions Inc.
A Plus Well Service Inc.
Acklands-Grainger Inc.
Acme Soil Remediation Inc.
ADP
ADP Inc.
Alberta Energy
Allstate Fire Equipment of Texas Inc.
AmeriBen Solutions
American Electric Power
Anadarko Petroleum Corp.
Anthem
Anthony Mining Co. Inc.
Aon Reed Stenhouse
Aon Reed Stenhouse Inc.
Aon Risk Insurance Services West Inc.
Applied Industrial Technologies
Arnold Machinery Co.
AU Mines
Axis Services Inc.
B&G Machine Inc.
Bachynski, Terrance
Baker & Hostetler LLP
Baldor Electric Co.
Beacon Hill Staffing Group LLC
Bennett Jones LLP
Berner Trucking Inc.
BHP Billiton New Mexico Coal Inc.
Bill Miller Equipment Sales Inc.
Black Butte Coal Co.
Black Lung
BMO Capital Markets
BNSF Railway Co.
BNY Trust Co. of Canada
Bowles Rice LLP
BP Energy Co.
Bradken Canada Manufactured Products
    Ltd.
Brake Supply Co.
Brandeis Machinery & Supply Co.
Bridgestone

Bridgestone Americas Tire Operations LLC
Bridgestone Canada Inc.
Bridgestone Firestone North American Tire
Buck Mountain Gas Co-Op Ltd.
Buckingham Coal Co.
Buckley Powder Co.
Butler Machinery Co.
C&E Concrete
C. Stull Excavating LLC
Cabot Canada Ltd.
Cabot Norit Canada Inc.
Cadomin Mountain Contracting Ltd.
Canadian Dewatering Ltd.
Canadian National Railways
Can-Jer Industrial Lube
Can-Jer Industrial Lubricant Ltd.
Cat Financial Services Corp.
Cat Rental Store, The
Catalyst Environmental Solutions Corp.
Cate Drilling Solutions
Cate Idaho Equipment Rental & Sales LLC
Caterpillar Finance Services
Caterpillar Financial Services
Caterpillar Financial Services Corp.
CDM ElectroMech Technical Services
Chevron Products Co.
Chromate Industrial
Cimarron Coal Co.
Cincinnati Mine Machinery Co., The
Citizens Asset Finance Inc.
Clad-All Construction Ltd.
Clearfork Trucking
Coal Royalty LP
Coal Valley Investment Corporation
Columbus Equipment Co.
Conn-Weld Industries Inc.
Consol Energy Inc
Cornerstone Energy Corp.
Coshocton Trucking Inc.
Cross Borders Consulting Ltd.
Cummins Rocky Mountain Inc.
Cummins Western Canada

CXtec Inc.
Cylance Inc.
Damet Services
Deloitte & Touche LLP
Destech Mining Consulting Inc.
DocuSign Inc.
Dominion North Carolina
Dover Hydraulics Inc.
Drives & Controls Services Inc.
Dugan Production Corp.
Ecosphere Environmental Services Inc.
Edwards Law Firm
Eecol Electric Ltd.
Egypt Valley Stone LLC
Element Fleet Management
Ellingford Bros Inc.
Energcomm Federal Credit Union
Enterprise Fleet Management
Equipment Sales & Services
Ernst & Young
ESCO
ESCO Supply
Fairmont Supply Co.
Fenner Dunlop CSS New Mexico LLC
Finning Canada
Finning International Inc.
Firestone
First Interstate Bank
Flanders Electric of Canada ULC
FLOCOR Inc.
Four Corners Materials
Gangster Enterprises Ltd.
Gas Alberta Energy
GCR Tire Center
GCR Tires & Service
General Aggregate Equipment Sales
General Electric Canada
Genesee Royalty LP
Global Public Affairs Inc.
Golden Arrow School & Charter Buses Ltd.
Grainger Inc.
Great Bear Native Plants LLC
Green Shield Canada
H&E Equipment Services Inc.
HD Northern Equipment Sales & Rentals
Healthsmart Benefit Solutions Inc.

Heavy Metal Equipment & Rentals
Heavytech Industries
Hexagon Mining Inc.
Highland Machinery Co.
Highway Machine Co. Inc.
Holland & Hart LLP
HOLT CAT
Honstein Oil & Distributing LLC
Hotel Talisa
Houlihan Lokey Capital Inc.
Houthoff Buruma Coöperatief UA
ICL-IP America
Imperial Credit Corp.
Imperial Oil
Industrial Software Solutions Pty Ltd.
International Union of Operating Engineers
Jennchem LLC
Jennmar
JK Wilson Inc.
JL Rogers Family LLC
John E. Retzner Oil Co.
Jones Day
Joy Global
Joy Global Canada Ltd.
Joy Global Surface Mining Inc.
Joy Global Underground Mining LLC
Kal Tire
Kelly Panteluk Construction
Kiewit Mining Group Inc.
Kimble Co.
KLS Earthworks & Environmental
KNS Communications Consultants
Komatsu Equipment Co.
Komatsu Financial
Komatsu Financial LP
Komatsu Southwest
KVC Developments Ltd.
L&H Industrial Inc.
Land Services USA Inc.
Lazard Freres & Co. LLC
Liberty Mutual Group
LML Industrial Contractors Ltd.
Lykins Energy Solutions
M&C Transportation LLC
M4 Maroon V LLC
Mancal Coal Inc.

Manulife Financial
Marietta Coal Co.
Matrix Design Group LLC
Matrix Solutions Inc.
McComb Automotive Supply Ltd.
McCoy Equipment Co. Inc.
Mercury Plastics of Canada Inc.
MetaSource LLC
Michelin North America Inc.
Microsoft Corp.
Millennium EMS Solutions Ltd.
Mineral Trucking Inc.
Mining & Reclamation Inc.
Minova USA Inc.
Modern Machine Works Inc.
Modern Machinery Co. Inc.
Montana OECI Trust Fund
Montana Operating Engineers
Montana, State of, Treasurer
Montana-Dakota Utilities Co.
Morgan Advanced Materials
Morgantown Machine
Mo-Te Drilling Co. Inc.
Motion Industries Canada Inc.
Motion Industries Inc.
Nalco Co.
Natural Resource Management Solutions
Natural Resource Partners LP
Navakai Inc.
Navasota Valley Electric Cooperative Inc.
Navigant
Nelson Brothers Mining Services LLC
Norit EAPA Holding BV
North American Energy
Nu-Northern Tractor Rentals
Odyssey Relocation Management
Ohio Cat
Ohio Central Railroad Inc.
Optiv Security Inc.
OptumHealth
Oracle Corp. Canada Inc.
Orica Canada Inc.
P&H Minepro
Paul's Hauling Ltd.
Pleasant Valley Trucking Inc.
PNC Bank NA

PNM Resources Inc.
Polar Rubber Products
Prairie Mines & Royalty Ltd.
Prairie Mines & Royalty Ulc
Prairie North Construction Ltd.
Praxair Inc.
PricewaterhouseCoopers
Private Bank
Professional Highwall Mining Services LLC
Prudential Financial
Prudential Retirement
Quadra Chemicals Ltd.
Quality Environmental Services Inc.
Randy V. Moore
Rhino Energy LLC
Ridley Terminals Inc.
Rimpull Corp.
River Trading Co. Ltd.
RJ Wright & Sons Ltd.
RM of Estevan
Rocko's Rentals & Services Ltd.
Rocky Mountain Brake Supply Inc.
Rocky Mountain Coal Mining Institute
Rodey Dickason Sloan Akin & Robb PA
ROMCO Equipment Co. LLC
Rosebud Temp Services LLC
Rova Ventures LLC
RPMGlobal USA Inc.
Rud Oil & Gas Co.
Runge Mining Inc.
Rural Municipality of Coalfields No. 4
Rural Municipality of Hart Butte No. 11
S&S Machine Inc.
San Juan Coal Co.
San Juan County Museum
San Juan, County of (WA), Treasurer
Saskatchewan, Province of (Canada),
    Ministry of the Economy
SaskPower
Schulte Roth & Zabel LLP
SGS North America Inc.
Shearman & Sterling LLP
Sherritt International Corp.
Skylift Services Inc.
Smiley Excavating LLC
SMS Equipment Inc.

Stantec Consulting Services Inc.
Steel Works Manufacturing Ltd.
Stein, Jeffrey S.
Summit Machining & Welding Ltd.
Sun Coast Resources Inc.
Sun Life Assurance Co. of Canada
Superior Industrial Solutions
Talmar LLC
Taylor Brothers Welding Service Inc.
Texas Capital Bank NA
Texcan
Tiger Valuation Services LLC
Town & Country Supply Association
Tractor & Equipment Co.
Trafigura Pte. Ltd.
Transwest Mining Systems
Trent's Tire
Tribbie Plummer Church & Laplante LLC
Tunnel Ridge LLC
UGM Addcar Systems LLC
UMWA Combined Benefit Fund
United Central
United Central Industrial Supply Co.
United Mine Workers of America
United States, Government of the, Bureau of
    Indian Affairs
United States, Government of the,
    Department of the Interior, Bureau of
    Indian Affairs, Ute Mountain Ute
    Agency
United States, Government of the,
    Department of the Interior, Minerals
    Management Service
United States, Government of the,
    Department of the Treasury, Internal
    Revenue Service, Black Lung Excise
    Tax
United States, Government of the, Office of
    Natural Resources Revenue
Universal Protection Service
University of Denver Bursar's Office
US Bank
USC Consulting Group LLC
Valor LLC
Vandeburg Excavation Inc.
Velocity Technology Solutions Inc.

Venture Technologies Inc.
Vision Service Plan Inc.
Wagner Equipment Co.
Wajax Equipment
Wampum Hardware Co.
Warren Fabricating Corp.
Waukesha-Pearce Industries Inc.
WBM Technologies Inc.
Wells, Todd
Westate Machinery Co.
Westcan Bulk Transport
Western Energy Co.
Westmoreland Canada Holdings Inc.
Westmoreland Coal Co.
Westmoreland Kemmerer LLC
Westmoreland Resource Partners LP
Westmoreland Risk Management
Westquip Diesel Sales Ltd.
Wheeler Machinery Co.
William Albert Inc.
Willis Ltd.
Willis of Tennessee Inc.
Wilmington Savings Fund Society FSB
Wire Rope Industries Ltd.
Wirerope Works Inc.
Worker's Compensation Board - Alberta
Wyoming, State of, Department of Revenue
Xenmax
Xenmax Commercial Energy Marketing Inc.
Xhill Crest Inc.
Xylem Dewatering Solutions Inc.
Yellowhead, County of (Alberta)

# Exhibit 15

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-03283 (LTS)<br><br>(Jointly Administered) |

## INFORMATIVE MOTION REGARDING PUBLICATION AND FILING OF
## FINAL INVESTIGATIVE REPORT – MCKINSEY & COMPANY, INC.

**PLEASE TAKE NOTICE** that Luskin, Stern & Eisler LLP, special counsel to the

Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as

representative of the Debtors pursuant to section 315(b) of the *Puerto Rico Oversight,*

*Management, and Economic Stability Act* ("PROMESA"),[2] hereby files its Final Investigative

Report – McKinsey & Company, Inc. (the "Report"). The Report is attached as Exhibit A and

will also available on the Oversight Board's official website at https://oversightboard.pr.gov/.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

Dated: New York, New York
       February 18, 2019

Respectfully submitted,

/s/ Michael Luskin
Michael Luskin (admitted *pro hac vice*)
Stephan E. Hornung (admitted *pro hac vice*)
Lucia T. Chapman (admitted *pro hac vice*)

**LUSKIN, STERN & EISLER LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 597-8200
Facsimile:  (212) 974-3205

*Special Counsel to the Financial Oversight
and Management Board for Puerto Rico*

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, Puerto Rico 00918-1813
New York, New York 10036
Telephone: (787) 764-8181
Facsimile:  (787) 753-8944

*Co-Counsel for the Financial Oversight and
Management Board for Puerto Rico*

**EXHIBIT A**

**Final Investigative Report – McKinsey & Company, Inc.**

**Prepared for**

**The Financial Oversight & Management Board for Puerto Rico**

**By**

**Luskin, Stern & Eisler LLP**

**February 18, 2019**

# Table of Contents

I.      Introduction ................................................................................................................ 1

II.     Events Leading to Investigation ............................................................................... 6

        A.      News Articles ................................................................................................ 6

        B.      Litigation Relating to McKinsey and its Affiliates ...................................... 8

        C.      Congressional Inquiries .............................................................................. 14

III.    Scope of Investigation ............................................................................................ 15

        A.      Purpose of Investigation ............................................................................ 15

        B.      Description of Investigation ....................................................................... 15

                1.  Documents ....................................................................................... 15

                2.  Interviews ........................................................................................ 16

                3.  Legal Research ................................................................................ 17

IV.     The Oversight Board's Selection of a Strategic Consultant in 2016 ...................... 17

        A.      The Request for Proposal – Strategic Consulting Firm ............................. 18

        B.      Responses to the RFP and Selection of McKinsey as Strategic Consultant ......... 21

        C.      McKinsey's Disclosures ............................................................................. 22

V.      McKinsey's Scope of Work .................................................................................... 24

        A.      Initial Engagement ..................................................................................... 24

        B.      Continuing Non-Title III Work .................................................................. 27

        C.      Title III Work ............................................................................................. 29

        D.      Relevant Contract Provisions ..................................................................... 33

        E.      McKinsey Staffing ..................................................................................... 36

        F.      Compensation ............................................................................................. 37

VI.     Disclosure Law and Obligations ............................................................................ 39

        A.      Bankruptcy Code and PROMESA .............................................................. 39

        B.      The Proposed Puerto Rico Recovery Accuracy in Disclosures Act .......... 41

VII.    Oversight Board Conflict Policies and Procedures ................................................ 42

        A.      Oversight Board Code of Conduct .............................................................. 43

        B.      Vendor Code of Conduct ............................................................................ 43

        C.      Ethics Advisor ............................................................................................ 45

VIII.   McKinsey's Corporate Structure ............................................................................ 45

IX.     MIO Partners .......................................................................................................... 47

        A.      MIO Investments ....................................................................................... 48

                1.  Third-Party Funds ........................................................................... 50

|  | 2. | Separately Managed Accounts | 50 |
|  | 3. | MIO Direct Investments | 51 |
| B. | | Investment Decisions | 51 |
| C. | | Investment Advisors | 54 |
| D. | | Information Available to Investors | 55 |
|  | 1. | Investment Prospectus | 55 |
|  | 2. | Periodic Account Statements | 55 |
|  | 3. | Periodic Newsletters and Reports | 56 |
|  | 4. | Audited Financial Statements | 56 |
|  | 5. | Publicly-Available Information | 57 |
| X. | | McKinsey and MIO Conflict Policies and Training | 59 |
| A. | | MIO – CSP Collaboration Policy | 59 |
| B. | | McKinsey Information Sharing Guidelines and Conflicts of Interest Mitigation Processes | 61 |
| C. | | MIO Trading Policy | 62 |
| D. | | McKinsey Personal Investments Policy | 63 |
| E. | | MIO Personal Investment and Trading Policy and Code of Ethics | 64 |
| F. | | MIO Board Conflict and Confidentiality Policy | 64 |
| G. | | Training and Certification | 66 |
| XI. | | MIO Investments in Puerto Rico Public Debt | 66 |
| A. | | Separately Managed Accounts | 67 |
| B. | | Third-Party Funds | 70 |
| C. | | MIO Direct Investments | 72 |
| XII. | | McKinsey's Involvement in the COFINA Settlement and Plan of Adjustment | 72 |
| XIII. | | Analysis and Conclusions | 78 |
| A. | | McKinsey Made All Disclosures Required by Applicable Law and Requested by the Oversight Board | 78 |
|  | 1. | The Strategic Consultant RFP | 78 |
|  | 2. | The Vendor Code of Conduct | 79 |
|  | 3. | The September 1, 2018 Core Contract | 79 |
|  | 4. | PROMESA | 80 |
| B. | | McKinsey's Procedures and Policies Mitigated any Conflicts Arising from MIO's Investments in Puerto Rico Public Debt | 81 |
| C. | | Had the Oversight Board Known about MIO's Investments in Puerto Rico Public Debt, It Would Have Sought Additional Disclosure | 82 |

XIV.   Recommendations ......................................................................................... 83

    A.   Recommendation No. 1 – Vendors Should Disclose Affiliate Relationships ...... 85

    B.   Recommendation No. 2 – The Interested Parties List Should Be Expanded ........ 86

    C.   Recommendation No. 3 – Direct Relationships, and to What Extent,
        if Any, They Raise Conflicts, Should Be Described in Detail ............................. 87

    D.   Recommendation No. 4 – Indirect Relationships, and to What Extent,
        if Any, They Raise Conflicts, Should Be Described ........................................... 89

    E.   Recommendation No. 5 – Vendors Should Disclose Relevant Data
        in Their Public Filings ....................................................................................... 92

    F.   Recommendation No. 6 – Vendors Should Describe the Policies, Practices,
        and Procedures That They Have or Will Have to Guard Against Conflicts ........ 93

    G.   Recommendation No. 7 – Disclosures Must Be Updated
        and Certified Periodically .................................................................................. 94

    H.   Recommendation No. 8 – Oversight Board Forms Should Be
        Reviewed and Revised ....................................................................................... 94

XV.   Conclusion ................................................................................................... 95

Case: 15-10541-BLS Doc: 2406-28 Filed: 04/11/19 Page 559 of 818

## I.   Introduction

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board")
retained Luskin, Stern & Eisler LLP ("LS&E") to conduct an investigation into its relationship
with its strategic consultant, McKinsey & Company, Inc. Washington D.C. ("McKinsey USG,"
and together with its other consulting affiliates, "McKinsey"), following reports in the press
about investments by McKinsey's investment affiliate, MIO Partners, Inc. ("MIO"), in Puerto
Rico public debt.  McKinsey's disclosures about MIO and MIO's holdings have also been the
focus of other press reports and of litigation in other cases unrelated to these PROMESA
proceedings, and have been the subject of Congressional inquiries and of proposed changes to
PROMESA governing disclosures required of retained professionals.

The Oversight Board's relationship with McKinsey raises issues that are important to
how the Court overseeing the PROMESA proceedings, the parties to those proceedings, and the
public perceive the PROMESA process.  We, therefore, investigated the Oversight Board's
retention of McKinsey, paying particular attention to what disclosures the Oversight Board
required in its Strategic Consultant Request for Proposal; what applicable law required
McKinsey to disclose; what the parties' agreements required McKinsey to disclose; what
McKinsey did in fact disclose; and whether or not McKinsey has any conflicts of interest, and if
it does, what McKinsey and the Oversight Board have done and will do to mitigate their impact.
The Oversight Board also asked that we consider what recommendations we would make to
improve the Oversight Board's policies and procedures so as to ensure that full disclosure by its
vendors (including its retained professionals) is made and that the impact of any conflicts or
perceived conflicts is minimized.

We have concluded that McKinsey USG made the disclosures required by the Oversight
Board and by applicable law, and that McKinsey's policies, procedures, and practices ensured

and continue to ensure that McKinsey's consulting work and MIO's investment management
work were and are separate and that there is no information sharing between them.  We have also
found, however, that MIO did hold a direct investment in Puerto Rico public debt that it
controlled while McKinsey was engaged by the Oversight Board and that, as reported in the
press, MIO has held or holds investments in Puerto Rico public debt through third-party funds
and separately managed accounts over which MIO exercises no investment discretion.  These
investments could be perceived as a conflict.

     MIO is an SEC-registered investment manager that manages pre-tax pension plans
sponsored by McKinsey and after-tax investment vehicles in which McKinsey partners, former
partners, and their immediate family members may invest.  MIO does not trade for its own
account, but rather for the benefit of current and former McKinsey employees who are invested
through MIO.  MIO generally employs a "fund of funds" strategy, with approximately 90% of its
assets managed by third-party asset managers.  The remaining 10% is directly invested by MIO.

     MIO's direct investment (liquidated in January 2017 and April 2018) was in bonds issued
by the Puerto Rico Sales Tax Financing Corporation ("COFINA").  However, we have seen no
evidence suggesting that the McKinsey consultants working for the Oversight Board knew about
this direct investment, let alone altered their behavior because of it, or that MIO had access to
McKinsey's confidential consulting work for the Oversight Board, or altered its investment
strategy because of it.  And, in any event, McKinsey did not work on the Commonwealth-
COFINA settlement or the COFINA plan of adjustment, both of which are built on an agreed-
upon allocation of sales and use tax proceeds between the Commonwealth and COFINA that was
negotiated by the COFINA Agent and the Creditors Committee on behalf of the Commonwealth,
not by McKinsey.  In particular, neither the Oversight Board nor McKinsey played any role in

negotiating the sales and use tax allocation that is at the center of the COFINA plan of adjustment. The Oversight Board was involved in negotiating the terms of the plan of adjustment and the terms of the new securities, but was assisted in this task by its financial advisor, Citigroup Global Markets Inc. ("Citi"), not by McKinsey.

Had PROMESA or the Oversight Board required disclosure of MIO's direct investment in COFINA bonds (it did not), the Oversight Board likely would have regarded the investment as a potential conflict and would have required divestiture of the bonds or an explanation as to why ownership of these bonds did not present a disabling conflict (for instance, because the investment was *de minimis* or because McKinsey was not providing consulting advice regarding the COFINA bonds). In fact, neither the Oversight Board nor McKinsey's consulting side learned of this direct investment in COFINA bonds until this investigation, and that is testimony to the effectiveness of the information barriers between MIO's investment business and McKinsey's consulting business. Those policies, procedures, and practices are intended to ensure that MIO's investment decisions are not based on McKinsey's consulting work and that McKinsey's consulting advice is not based on MIO's investments. McKinsey employees are not provided with information related to MIO's underlying investments and have no ability to influence MIO's investment decisions. However, we now know that MIO has in the past made direct investments in Puerto Rico public debt, and there is no policy preventing MIO from doing so in the future. Accordingly, we recommend that McKinsey update its disclosures to alert the Oversight Board whether its affiliate MIO has any such direct investments. We also recommend that going forward, all vendors be required to update their disclosures with respect to direct investments held by them or their investment affiliates.

The vast majority of MIO's investments are through third-party funds or separately

managed accounts managed by third-party asset managers over which MIO exercises no

investment discretion.  Although MIO has known at all relevant times that these third-party fund

managers have made investments in Puerto Rico public debt, MIO does not share that

information with McKinsey consulting professionals, and again, we have seen no evidence that

anyone working on McKinsey's Puerto Rico service team was aware of these investments until

the press became involved.  However, had the Oversight Board known of these investments in

Puerto Rico public debt at the outset, it would have asked for additional information about how

the bonds were held, what discretion MIO had over investment decisions involving the bonds,

whether any information about the bonds was shared with McKinsey's consulting business or

with MIO's investors, and what policies and procedures McKinsey and MIO had in place to

ensure that information was not shared between McKinsey's consulting and MIO's investment

businesses.  The Oversight Board could then have assessed whether these investments

constituted a disabling conflict, or whether their size, MIO's lack of investment discretion and

control over them, the various information barriers, and limitations on McKinsey's scope of

work reduced the risk of a conflict to an acceptable level.

McKinsey did not disclose MIO's non-discretionary investments to the Oversight Board

as part of the RFP process – it was not required to – and neither the Oversight Board nor

McKinsey's consulting side learned of the investments until the press began reporting on them.

As the articles make clear, however, there is enough publicly-available information to enable a

determined investigator to uncover, for example, that three of MIO's investment funds filed

proofs of claim in the Title III proceedings or that MIO might have an indirect investment in

Puerto Rico public debt through a third-party asset manager that has been active in the Title III

proceedings. We assume that similar investments will be made in the future by the third-party-

managers through which MIO primarily invests, so again, as we do with respect to direct

investments, we recommend that McKinsey now update its disclosures to alert the Oversight

Board to any MIO investments in Puerto Rico public debt controlled by third-parties it is able to

disclose or, if disclosure is not possible (because it does not know or is prevented by contract

from disclosing), to describe with particularity the safeguards it has in place to ensure the

investments do not present a conflict. Going forward, all vendors should be required to update

their disclosures about such investments.

        As the Recommendations at the end of this Report make clear, we do not believe that

every connection with Puerto Rico a potential vendor might have presents a conflict, and we do

believe that the Oversight Board must be practical in setting the parameters for its vendors'

disclosures. The economy of the entire Commonwealth is implicated in the PROMESA

proceedings, and it is hard to imagine there are any vendors who are in a position to serve the

Oversight Board and who do not also have relationships with the bankers, advisors, investors,

and other vendors who do business with or are invested in Puerto Rico.

        Accordingly, we have attempted to strike a balance. We recommend that the Oversight

Board take steps to ensure that vendors like McKinsey USG make full disclosure about their own

businesses (*e.g.*, McKinsey's consulting business) and the businesses of their affiliates

(*e.g.*, MIO's investment business). We recommend that vendors be responsible for checking

their own public filings (*e.g.*, regulatory filings, proofs of claim, etc.) for relevant names and

relationships. Vendors should then cross-check the relevant names (*e.g.*, clients, funds and fund

managers, etc.) against an expanded list of interested parties. We recommend that the Oversight

Board expand the list of interested parties to include investors, creditors, banks, insurers,

litigation parties, and other parties with significant roles in the PROMESA proceedings.  The list
should be updated periodically, and vendors should be required to update their conflict checks
against the updated list and to certify that they have done so.  Vendors should also disclose their
own policies, procedures, and practices that they have or will put in place to ensure that the
impact of any conflict is minimized.

      The Oversight Board should review and revise its current conflict and disclosure policies
and its RFP and disclosure forms in light of our Recommendations, and the Oversight Board
should be responsible for updating the list of interested parties.  In addition, the Oversight Board
should set reasonable disclosure parameters on a vendor-by-vendor basis.  For example, major
vendors like McKinsey, who undertake a very broad scope of work, should be required to do
more due diligence to uncover potential conflicts and to run more exhaustive conflict checks than
a smaller vendor doing routine work for the Oversight Board.  In the end, though, the Oversight
Board must require sufficient due diligence and disclosure so it can assess any conflicts,
minimize their impact, and ensure that the Oversight Board's selection process and its vendors'
work for the Oversight Board will be seen as unbiased and free of influence by actual or
perceived conflicts.

II.    **Events Leading to Investigation**

    A.    **News Articles**

      On June 19, 2018, the *Wall Street Journal* reported on allegations that McKinsey's
restructuring unit, McKinsey Recovery and Transformation Services US, LLC ("McKinsey
RTS"), failed to disclose MIO investments in two hedge funds – Whitebox Advisors, LLC
("Whitebox") and Strategic Value Partners LLC – that gave McKinsey a financial interest in six

companies in bankruptcy for which McKinsey was providing consulting services.[1]  The

Oversight Board learned of MIO and its investment in Whitebox in May 2018, when the *Wall

Street Journal* contacted the Oversight Board for comment related to that story.  At that time,

based on conversations with McKinsey and a review of public filings, and on representations

concerning the separation of MIO from McKinsey's consulting business, the Oversight Board

determined that McKinsey's prior disclosures were appropriate and that no conflict existed.

On September 26, 2018, the *New York Times* reported that McKinsey, through its

affiliate, MIO, and specifically through three MIO investment funds – Compass CSS High Yield

Fund LLC, Compass ESMA LP, and Compass TSMA LP – owned at least $20 million in Puerto

Rico public debt.[2]  The story noted that these investments were not disclosed previously (nor was

there any requirement to disclose them under PROMESA) but came to light only through three

proofs of claim filed by the Compass funds in the Title III proceedings.  The article also reported

that, as of December 31, 2016, MIO held an investment in a fund called Pandora Select, which is

managed by Whitebox, an asset manager that has been active in the Title III proceedings.

Following publication of the *New York Times* article, the Oversight Board retained LS&E

to conduct an examination of the underlying facts, consequences, and implications of these

---

[1] Gretchen Morgenson and Tom Corrigan, *McKinsey Investments Weren't Disclosed in Bankruptcy Cases*, Wall Street Journal, June 19, 2018.  MIO itself was the subject of coverage by the *Financial Times*, which in June of 2016 reported on the existence of a "secretive $5bn internal investment arm that manages the fortunes of past and present partners, raising questions over possible conflicts of interest."  Miles Johnson and Harriet Agnew, *McKinsey's secret $5bn fund in spotlight*, Financial Times, June 5, 2016.

[2] Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 566 of 818

disclosures.[3] The Oversight Board instructed LS&E to coordinate with the Oversight Board's

Ethics Advisor, and to investigate the circumstances surrounding McKinsey's and its affiliates'

holdings of Puerto Rico public debt, to analyze McKinsey's disclosure obligations under

PROMESA and pursuant to the Oversight Board's RFP procedures and McKinsey's contractual

arrangements with the Oversight Board, and to recommend any corrective action and

improvements that might be warranted.

### B.   Litigation Relating to McKinsey and its Affiliates

Contemporaneously with the *Wall Street Journal* and *New York Times* articles, there was

a flurry of activity in two bankruptcy cases involving McKinsey RTS as either the approved

professional, in the case of *In re Alpha Natural Resources, Inc.*, Case No. 15-33896 (KRH)

(Bankr. E.D. Va.) ("*ANR*"), or as a professional applying for approval of its retention, in the case

of *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.)

("*Westmoreland*").  The following summary of these litigations is not meant to be a

comprehensive review of all of the facts or arguments made by the parties, and is provided

primarily to provide context for this investigation.  We take no position on the merits of the

allegations in any of these disputes.[4]

---

[3] The Oversight Board asked LS&E to conduct the investigation because its lead outside United
States counsel, Proskauer Rose LLP ("Proskauer"), represents McKinsey in separate litigation
related to McKinsey's disclosures in other proceedings.  LS&E has also acted as special counsel
to the Oversight Board in certain litigation matters before and since commencement of the
PROMESA Title III proceedings.

[4] Towards the end of our investigation, there was additional activity in a third bankruptcy case,
discussed more fully below.  *See In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr.
S.D.N.Y.) ("*SunEdison*"), ECF No. 5751.

-8-

In *ANR*, the debtors retained McKinsey RTS to serve as their turnaround advisor.[5]  The United States Trustee believed that McKinsey RTS's disclosures were inadequate and, in May 2016, filed a motion to compel McKinsey RTS to comply with Bankruptcy Rule 2014 by disclosing the identities of parties-in-interest with whom McKinsey RTS and its affiliates had connections.[6]  McKinsey RTS filed a supplemental declaration that satisfied the concerns of the United States Trustee.[7]

Unsatisfied with McKinsey's disclosures, Mar-Bow Value Partners, LLC ("Mar-Bow"), an entity formed and owned by Jay Alix, a self-described "industry leader in the restructuring sector" and founder of AlixPartners, purchased a claim in the *ANR* bankruptcy and filed its own motion to compel McKinsey RTS to make further disclosures concerning its connections to the Debtors, creditors, and parties-in-interest.[8]  On July 1, 2016, the Court granted Mar-Bow's motion in part, directing, *inter alia*, McKinsey RTS to provide the Court for *in camera* review a list containing the names of 121 undisclosed connections; identification of interested parties that manage investments for MIO; and identification of interested parties in which MIO owns securities, except in cases where MIO invests in "funds of funds, funds, or third party managers, and has no input or control over investment decisions," in which case McKinsey RTS needed only to disclose any such funds that were interested parties.[9]  To the extent MIO "directed an

---

[5] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 212.

[6] *Id.*, ECF No. 2308.

[7] *Id.*, ECF Nos. 2464, 2474.

[8] *Id.*, ECF No. 2603 nn.1, 2.

[9] *Id.*, ECF No. 2895.

investment with its investment discretion," the Court ordered McKinsey RTS to disclose any "[i]nterested [p]arties whose names match with names on MIO's ledger of investments."[10] McKinsey RTS complied with the Court order and provided *in camera* disclosures to the Court.[11]

The Court confirmed the *ANR* plan of reorganization and approved McKinsey RTS's final fee application, both over Mar-Bow's objection.[12]  As part of the plan, ANR's pre-petition secured lenders, which included Whitebox, were given equity in the reorganized debtors.  Mar-Bow appealed the confirmation order, the order approving McKinsey RTS's fee application, and the orders related to McKinsey RTS's disclosures.  On September 30, 2017, the United States District Court for the Eastern District of Virginia dismissed Mar-Bow's appeals as equitably moot or for lack of standing.[13]  On September 6, 2018, the Fourth Circuit Court of Appeals affirmed the District Court orders dismissing the appeals.[14]  On January 22, 2019, Mar-Bow filed a petition for certiorari with the United States Supreme Court.[15]

---

[10] *Id.* ¶ 2(c)(ii).

[11] *Id.*, ECF No. 4198.

[12] *Id.*, ECF Nos. 3038, 3666.

[13] *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, No. 16-cv-612 (MHL) (E.D. Va.), ECF No. 50; *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, No. 16-cv-799 (MHL) (E.D. Va.), ECF No. 52.

[14] *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, 736 F. App'x 412 (4th Cir. 2018).

[15] *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, Case No. 18-974 (Sup. Ct.).

On June 28, 2018, the Court entered a final decree closing the *ANR* bankruptcy cases.[16]
On July 18, 2018, Mar-Bow filed a motion to reopen the *ANR* bankruptcy cases and for relief
from prior denials of its requests for additional disclosure based on evidence that MIO owned
previously-undisclosed interests in certain Whitebox funds that had received a substantial equity
interest in the reorganized debtors through the plan.[17]  The United States Trustee supported the
Mar-Bow motion, citing to allegedly "inaccurate" characterizations of MIO as a "blind trust" and
calling that explanation, "at best, misleading in a way that deflected further questions about MIO
at the outset."  According to the United States Trustee, McKinsey RTS was "not forthcoming"
about the role Jon Garcia, the president of McKinsey RTS, played on the MIO Board of
Directors.[18]

By order dated January 16, 2019, the Court granted Mar-Bow's motion to reopen the
main *ANR* bankruptcy case for the limited purpose of addressing Mar-Bow's allegations and the
United States Trustee's concerns, and directed McKinsey RTS to file its July 2016 *in camera*
disclosures on the public docket.[19]  McKinsey RTS complied with the disclosure order the same
day.[20]  The *in camera* disclosures included: (1) the names of the 121 previously-undisclosed
connections, along with each interested party's relationship to the Debtors; (2) the names of nine
interested parties that "manage investments in funds, funds of funds, or third-party managers

---

[16] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4119.

[17] *Id.*, ECF Nos. 4122, 4124.

[18] *Id.*, ECF Nos. 4126, 4164.

[19] *Id.*, ECF No. 4194.

[20] *Id.*, ECF No. 4195.  The Court also opened a miscellaneous proceeding for purposes of addressing the dispute.  *See OLD ANR, LLC*, Case No. 19-00302 (KRH) (Bankr. E.D. Va.).

where MIO has no input or control over investment decisions"; (3) the names of twelve

interested parties "whose name match with names on MIO's ledger of investments where MIO

has directed an investment with its investment discretion"; and (4) information concerning

response rates to email surveys related to McKinsey RTS's conflicts check.[21]

     In *Westmoreland*, Mar-Bow challenged the debtors' application to retain McKinsey RTS

as "performance improvement advisors" in a lengthy objection alleging that McKinsey was not

disinterested and had concealed a large number of MIO investments.[22]  The objection catalogued

allegedly similar behavior in other, unrelated bankruptcies (including *ANR*)  in which McKinsey

RTS had been retained by the debtor.[23]  By order dated November 30, 2018, the Court directed

the United States Trustee to review Mar-Bow's allegations and to make a written

recommendation to the Court, noting that the conduct alleged by Mar-Bow, "if true, could

violate Title 18."[24]  On December 14, 2018, the United States Trustee filed its response to the

---

[21] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4195. According to MIO's counsel, the names of the twelve interested parties "whose name match with names on MIO's ledger of investments where MIO has directed an investment with its investment discretion" are entities that "served as lenders, counterparties, or brokers to MIO or appeared on the basis of the name to be an affiliate of an institution that served in such capacity, and for which MIO manages its credit exposure through credit default swaps."

[22] *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF Nos. 452, 629.

[23] *Id.*, ECF No. 629.

[24] *Id.*, ECF No. 632.  Title 18 of the United States Code is the main Federal criminal code.  The Court also noted that Mar-Bow's objection was "filed subject to Bankruptcy Rule 9011" which, *inter alia*, provides that parties signing a filing make certain certifications regarding the basis of statements in the filing and are subject to sanctions should the Court determine that the Rule has been violated.  *Id.*; *see* Fed. R. Bankr. P. 9011.

Court's November 30, 2018 Order.[25] The United States Trustee took the position that McKinsey RTS's disclosures were "not transparent and by its own admission are incomplete," as they omitted "critical details" about McKinsey RTS's connections to interested parties, including a "Confidential Client" that accounts for 17.5% of McKinsey RTS's gross annual revenue.[26] After depositions of both Jay Alix and a McKinsey representative, Judge Jones reiterated that McKinsey could have a Title 18 problem if statements made by Jay Alix at his deposition were true. He cautioned, however, that if those statements were not true, Alix could have one.[27]

In addition to raising issues relating to the adequacy of McKinsey RTS's disclosures in *ANR* and *Westmoreland*, Jay Alix personally filed a lawsuit in the United States District Court for the Southern District of New York against McKinsey, certain affiliates, and several senior partners alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1962, and asserting other contract and tort causes of action.[28] McKinsey moved to dismiss the case.[29] The motion is *sub judice*.

On January 16, 2019, Judge Jones (in *Westmoreland*) and Judge Huennekens (in *ANR*) entered a joint order directing Mar-Bow and McKinsey RTS to mediate those disputes before

---

[25] *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF No. 785.

[26] *Id.*

[27] *Id.*, Jan. 3, 2019, Hr'g Tr. at 28:2–10, ECF No. 943 (hearing transcript available to the public April 4, 2019); *see* ECF No. 905 (deposition transcripts).

[28] *Alix v. McKinsey & Co., Inc.*, Case No. 18-CV-04141 (JMF) (S.D.N.Y.) ("*JayAlix*"), ECF No. 73.

[29] *Id.*, ECF No. 88.

Bankruptcy Judge Marvin Isgur of the United States Bankruptcy Court for the Southern District
of Texas.[30]  The mediation is ongoing.

On January 22, 2019, Mar-Bow filed a motion in the *SunEdison* bankruptcy, asking the
Court to vacate its orders approving McKinsey RTS's retention and final fee applications.[31]  The
motion repeats the allegations made in *ANR* and *Westmoreland* and accuses McKinsey RTS of
perpetrating a fraud on the Court by failing to disclose connections to the debtors and other
parties-in-interest.  On January 25, 2019, the Court ordered the parties to include the *SunEdison*
dispute in the matters being mediated before Judge Isgur.[32]

## C.    <u>Congressional Inquiries</u>

In late December 2018, both McKinsey and the Oversight Board received letters from
members of Congress with questions and concerns relating to the facts reported in the
September, 26, 2018, *New York Times* article, and in the case of the inquiry addressed to
McKinsey, to the *ANR* and *Westmoreland* chapter 11 cases and the *JayAlix* lawsuit in New York.
The Oversight Board's response, dated January 2, 2019, informed the inquiring Senators that
LS&E is conducting an investigation which would address the issues raised in connection with
the Oversight Board's retention and employment of McKinsey and noted that the investigation
would examine McKinsey's disclosure obligations under current law and pursuant to its
contracts with the Oversight Board and would result in a public report that would address any
corrective action and improvements that might be warranted.  McKinsey's response, dated

---

[30] *OLD ANR, LLC*, Case No. 19-00302 (KRH) (Bankr. E.D. Va.), ECF No. 5; *In re
Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF No. 1088.

[31] *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y.), ECF No. 5751.

[32] *Id.*, ECF No. 5756.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 573 of 818

January 15, 2019, disagreed with the assertions in the letter it received, emphasized the separateness and independence of MIO from McKinsey, and disputed any implication that McKinsey had leveraged its relationship with the Oversight Board for purposes of financial gain. We take no position on the Congressional inquiries.[33]

## III.  Scope of Investigation

### A.  Purpose of Investigation

The Oversight Board directed LS&E to conduct an investigation into McKinsey's disclosures in connection with its retention and continued employment by the Oversight Board and any conflicts of interest; to review the policies and procedures of the Oversight Board relating to retention of advisors and relationships with third-party vendors; and to make recommendations to the Oversight Board.

### B.  Description of Investigation

#### 1.  Documents

We obtained and reviewed documents from public sources, the Oversight Board, McKinsey, and MIO.[34]  Public sources included news articles, court filings, and regulatory filings.  We reviewed court filings in *ANR*, *Westmoreland*, *SunEdison*, *JayAlix*, and the Commonwealth and COFINA Title III cases.  Among them were the declarations filed by McKinsey and MIO personnel in the *ANR* and *Westmoreland* cases, the Mar-Bow objections and McKinsey responses in those cases and in *SunEdison*, various hearing transcripts, the *JayAlix* complaint and motion papers, and the McKinsey and Jay Alix depositions in the *Westmoreland* case.  Among the regulatory filings we reviewed were Department of Labor Forms 5500 filed by

---

[33] Congress is considering changes to PROMESA that would alter current disclosure requirements.  The proposed legislation is described in Section VI.B below.

[34] We did not serve subpoenas on McKinsey or MIO.  All documents were provided voluntarily.

the McKinsey Master Retirement Trust ("MMRT") and Forms ADV filed by MIO with the

Securities and Exchange Commission ("SEC"). From the Oversight Board, we received and

reviewed contracts, policies and procedures, letters, and emails, both internal and with

McKinsey. The documents produced by McKinsey and MIO included contracts, policies and

procedures, organizational charts, bylaws, public filings, McKinsey's response to the RFP for a

strategic consultant issued by the Oversight Board, letters, fee applications, communications with

the Title III Fee Examiner, and email communications related to negotiation of McKinsey's

contracts with the Oversight Board.

       2.     **Interviews**

We conducted interviews of 13 witnesses, some multiple times. Those witnesses

included:

- Senior partners at McKinsey USG and its consulting affiliates who are in charge
  of McKinsey's work for the Oversight Board;

- MIO's chief investment officer and co-CEO and the portfolio managers at MIO
  with responsibility for MIO's direct and third-party managed holdings of Puerto
  Rico public debt;

- Members of the Oversight Board's Selection Committee appointed to conduct the
  strategic consultant RFP process;

- The Oversight Board's Executive Director;

- The Oversight Board's General Counsel;

- The Oversight Board's Ethics Advisor; and

- The Oversight Board's outside counsel at Proskauer.

We also followed up with certain of these witnesses either directly or through counsel as
needed, and had numerous conversations, meetings, and telephone calls with counsel for the
Oversight Board, McKinsey, and MIO.

### 3.    Legal Research

We performed legal research as required.

## IV.    The Oversight Board's Selection of a Strategic Consultant in 2016

The Oversight Board was established by the bipartisan Puerto Rico Oversight,
Management, and Economic Stability Act ("PROMESA"), which was signed into law by
President Obama on June 30, 2016, to address the economic crisis in Puerto Rico and to provide
Puerto Rico with the tools it needed to restructure its debts and embark on a path to economic
recovery.  On August 31, 2016, President Obama appointed José B. Carrión, Andrew G. Biggs,
José R. González, Ana J. Matosantos, Carlos M. García, Arthur J. González, and David A. Skeel
to the Oversight Board.[35]

PROMESA provided the broad policy framework and a considerable toolbox to
restructure Puerto Rico's crippling debt, but left the nuts and bolts to the Oversight Board itself.
When the Oversight Board was appointed, there were no offices, no staff, no telephones, no
email addresses, no bylaws, and no instruction manuals, policies, or procedures in place.  The
task of getting the Oversight Board up and running was left to the individual members of the

---

[35] Pursuant to Section 101 of PROMESA, the "Governor, or the Governor's designee, shall be an
ex officio member of the Oversight Board without voting rights."  48 U.S.C. § 2121(e)(3).  The
current ex officio member of the Oversight Board is Christian Sobrino.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 576 of 818

Oversight Board.  It was immediately apparent to the Oversight Board that it needed a strategic

consulting firm to help make the Oversight Board operational.[36]

### A.   The Request for Proposal – Strategic Consulting Firm

In October 2016, the Oversight Board appointed three of its members to a Selection

Committee to lead the search for a strategic consultant:  Carlos M. García, Ana J. Matosantos,

and José R. González.  On October 20, 2016, the Oversight Board issued the Request for

Proposal for Strategic Consulting Firm (the "Initial Consultant RFP").[37]  On October 24, 2016,

the Oversight Board issued clarifications and additional guidelines to the Initial Consultant RFP

(as clarified, the "Consultant RFP").[38]

---

[36] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.  Beginning over the summer of 2016
and continuing into the fall of 2016, various creditors and monoline insurers had sought relief
from the automatic stay imposed by PROMESA § 405.  *See* 20 U.S.C. § 2194.  In early
October 2016, the Oversight Board retained LS&E to intervene in these actions and to protect the
Oversight Board's interests while the Oversight Board retained lead counsel and established its
operating structure.  The Oversight Board issued a Request for Proposal for Outside Legal
Counsel on the same day it issued the Initial Consultant RFP.  A copy of the Request for
Proposal for Outside Counsel is available on the Oversight Board's website at https://drive.
google.com/file/d/1McTD5d_oTbfMut6eGjUpm14xj4ElaAD4/view.  The Oversight Board
announced its retention of Proskauer on November 27, 2016, the same day it announced its
retention of McKinsey.  A copy of the Oversight Board's press release announcing the retention
of Proskauer and McKinsey is available on the Oversight Board's website at https://drive.google.
com/file/d/1meBQhCh9AG6QjQHi0SrCG9jej4zvB_sU/view.

[37] A copy of the Initial Consultant RFP is available on the Oversight Board's website at
https://drive.google.com/file/d/1ahH7EPmcUU18s4pNSWq4JR9N7QWnB3kX/view.

[38] A copy of the Clarifications and Additional Guidelines to the Response to the RFP for
Strategic Consultant is available on the Oversight Board's website at https://drive.google.com
/file/d/1AHqf1Q8xaWt6B8BYcdwA-SWMJueTPVrE/view.

The Consultant RFP sought a global strategic consulting firm that was capable of

assisting the Oversight Board with eleven projects:

1.      Assist in designing a comprehensive planning process in line with the requirements of PROMESA (including each title of the statute) under a project management office (PMO) approach.

2.      Develop an actionable initial strategic plan, including a projected budget for its implementation and the critical work streams to address in the next 120 days.

3.      Develop recommendations regarding the plan's implementation and support structure, including staffing levels, initial policies and guidelines, and a proposed organizational structure to support the [Oversight] Board in carrying out its duties as envisioned in the statute as soon as possible.

4.      Assist in the development of a fact-based framework to evaluate and certify fiscal plans and annual budgets presented to the [Oversight] Board by covered entities under PROMESA, including an initial assessment and stress test about the Commonwealth of Puerto Rico fiscal year 2017 budget and the Fiscal and Economic Growth Plan (FEGP) presented by the Governor of Puerto Rico to the [Oversight] Board.

5.      Collaborate with the [Oversight] Board's legal advisors in the development of a framework and guidelines to address litigation and legal proceedings, including operational implications.

6.      Provide a fact-based framework to evaluate critical projects under PROMESA.

7.      Present to the [Oversight] Board a set of initiatives and "quick-wins" for Puerto Rico related to: (i) creating the foundation for economic growth and (ii) improving government services to the people of Puerto Rico, specifically in the areas of technology, welfare programs, health, and education.

8.      Provide a framework and proposed process to address debt restructuring negotiations.

9.      Provide a framework, initial assessment and benchmarks to evaluate the structure of the Government of Puerto Rico, its agencies, instrumentalities and public corporations, including their productivity, efficiency and performance.

10.     Provide a framework, initial assessment and benchmarks to evaluate the pension system.

11.     Provide best practices and recommendations to promote transparency and public participation, including, but not limited to, format and structure for public hearings, use of social media and technology, and the design, content, and technological platform of the [Oversight] Board's website.

The Consultant RFP made clear that the selection criteria and process would include a "[c]onflicts of interest review" and asked each applicant to:

- include "**a list and description of any connections, past and present, with Puerto Rico and any work that your firm has performed or is performing for the Government of Puerto Rico or any of its instrumentalities**"; and

- "**state if you have any conflict of interest or potential appearance of conflict of interest in taking this engagement by virtue of your firm's current or prior engagements with other parties**."[39]

The Consultant RFP did not specifically ask applicants about their affiliates or whether applicants had an investment arm or whether they had pension funds or other investment vehicles with investments in Puerto Rico public debt. As the Selection Committee explained, the issue was simply not on its radar.[40] Given the unique – and indeed unprecedented – nature of the initial engagement, the Selection Committee's concern with conflicts led it to focus on work prospective consulting firms had done, or were doing, for the Government of Puerto Rico, including its various agencies and departments and related entities. Although prospective applicants would have known, for example, the identities of the "covered" Commonwealth instrumentalities and the names of the members of the Oversight Board and could have identified parties to litigations against the Commonwealth seeking relief from the PROMESA stay, applicants were not provided an "interested parties list" containing the names of major investors, creditors, banks, advisors, insurers, litigation parties, and other parties-in-interest against which to check connections.[41]

---

[39] Initial Consultant RFP at 3 (emphasis in original).

[40] Oversight Board Interview, Dec. 14, 2018.

[41] By contrast, when the Oversight Board issued its Request for Proposal for Financial Advisor (the "FA RFP") in December 2016, it asked applicants to conduct their own review of public

B.      **Responses to the RFP and Selection of McKinsey as Strategic Consultant**

The Oversight Board received 18 responses to the Consultant RFP by the

October 27, 2016 deadline and, based upon the written submissions, narrowed the field down to

three global, "brand name" finalists.[42]  The Selection Committee held in-person interviews with

the three finalists and, ultimately, selected McKinsey USG based on, *inter alia*, the strength of

the McKinsey team, its familiarity with Puerto Rico, and its proposed fee structure, which was

considerably less costly than the next best proposal.[43]

---

court filings to see if the applicant had any connections with major bondholders and litigation
parties.  The FA RFP stated:

> Please include in your submission a list and description of any connections, past
> and present, with Puerto Rico and its financial crisis, including its creditors and
> other constituencies of which you are aware or can identify from pending
> litigation.  Although there are no publicly available "lists" of litigations related to
> the Commonwealth of Puerto Rico, there are a number of litigations that provide
> some information about creditors participating in those litigations.  So to the extent
> applicant represents creditors of the Commonwealth of Puerto Rico, whether
> related to the fiscal crisis or not, such relationships should be identified in the
> response to the RFP as best you can.  Further, applicants should set forth any direct
> or indirect connection applicant has with members of the [Oversight] Board or
> their families.

FA RFP at 2.  A copy of the FA RFP is available on the Oversight Board's website at
https://drive.google.com/file/d/10EahJn5tDyj8uppKdQUqAj2p_L032SGe/view.  However, the
Oversight Board only asked applicants to disclose actual or potential conflicts of interest based
upon the applicant's "current or prior engagements."  *Id.*

[42] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

[43] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

## C.    McKinsey's Disclosures

McKinsey USG's response to the Consultant RFP stated that it was "not conflicted" and

that it could "credibly act without conflicts or bias."[44]  It also stated:

> McKinsey [USG] does not have any current contracts with the Government of
> Puerto Rico or any of its instrumentalities.  Further, to the best of McKinsey
> [USG]'s knowledge and belief, McKinsey [USG] does not currently have any
> conflict of interest or potential appearance of conflict of interest caused by any
> contract resulting from this request for proposal.  Should McKinsey [USG]
> become aware of any actual or potential conflict of interest, McKinsey [USG] will
> provide notice to and work with the [Oversight] Board to provide a detailed
> mitigation plan if requested.[45]

With respect to work done for the Government of Puerto Rico, McKinsey USG's

response to the Oversight Board disclosed prior work that McKinsey affiliates had done in 2007,

in connection with Puerto Rico supply chain management and inventory; in 2007 and 2008, in

connection with the Central American and Caribbean Games for 2010; and in 2015, with the

Puerto Rico Science, Technology, and Research Trust relating to manufacturing facilities to

support bio-medical manufacturing on the island.  McKinsey also disclosed to the Selection

Committee work that McKinsey had done for the Puerto Rico Government and Department of

Education in 2003; certain due diligence work by McKinsey on the Puerto Rico economy and

related issues on behalf of a private sector client related to a public/private partnership involving

the purchase of one of Puerto Rico's toll roads in 2012; and prior work that McKinsey had done

---

[44] McKinsey Response to Consultant RFP, dated Oct. 27, 2016.  According to McKinsey, all of
its government contracts are with this entity.  McKinsey often uses the acronym "USG" –
meaning United States Government – and we have adopted that acronym in this Report.

[45] *Id.*

for a Puerto Rican bank.[46]  Finally, McKinsey disclosed that one of the lead partners on the engagement provided consulting services to a client whose interests were or could be implicated by a specific provision of the Puerto Rico tax code.  McKinsey confirmed to the Oversight Board that this partner would recuse himself from any work or conversations about issues relating to that provision, should they arise.[47]

As the members of the Oversight Board's Selection Committee and McKinsey have made clear to us, the Oversight Board was primarily focused on whether the consultants being considered had worked for the Government of Puerto Rico, since whatever firm won the engagement would need to work closely with the Government as well as with the Oversight Board.  While some of the major investors, creditors, banks, advisors, insurers, litigation parties, and other parties-in-interest were named in the public record, the Oversight Board did not specifically request and McKinsey did not perform any checks against any of those parties during the RFP process.[48]

McKinsey did not disclose the existence or ownership of MIO or its place in McKinsey's corporate structure or its relationship to McKinsey USG, or its purpose as an investment vehicle for current and former McKinsey partners and their families.[49]  Nor did McKinsey USG disclose that MIO was invested (both directly and through third-party funds) in Puerto Rico public debt.

---

[46] *Id.*; McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018; Oversight Board Interviews, Dec. 10 & 17, 2018.  McKinsey notified the bank team that any future interactions with that client needed to be brought to the lead partner's attention.  McKinsey Interview, Nov. 20, 2018.

[47] Oversight Board Interview, Dec. 17, 2018.

[48] McKinsey Interviews, Nov. 20, 2017, Dec. 12, 2018, Feb. 1, 2019; Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

[49] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

To be sure, while the McKinsey partners working on the Puerto Rico engagement were aware of MIO's existence, this investigation has uncovered no evidence that MIO shared information related to its investments in Puerto Rico public debt with anyone on the Puerto Rico engagement team or that the partners leading the Puerto Rico engagement were aware of MIO's Puerto Rico investments until 2018, at the time, or shortly before, it was reported in the press.

## V.   McKinsey's Scope of Work

### A.   Initial Engagement

It was clear in early November 2016 that McKinsey would be selected as the strategic consultant, but it took until the end of November to finalize the agreement.  Ultimately, McKinsey USG and the Oversight Board executed an initial consulting agreement dated as of November 27, 2016 (the "Initial Consulting Agreement"; as amended from time to time, the "Core Consulting Agreement"), which set forth the terms of McKinsey USG's initial engagement on a "Firm Fixed Price" basis.[50]  As discussed more fully in Section V.D below, the Core Consulting Agreement contains three complementary provisions that govern the use of confidential information and conflicts of interest.

The Initial Consulting Agreement laid out in broad terms the planned scope of McKinsey's work for the Oversight Board.  The Oversight Board needed assistance in becoming a workable organization.  McKinsey was to assist in developing a planning process for the Oversight Board's organization, develop a 120-day work plan, and design the Oversight Board's organizational and support structure – essentially to get the Oversight Board up and running.  In addition, McKinsey was to help establish "frameworks" to support the Oversight Board's

---

[50] A copy of the Initial Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1qeH3RM1Ic0q0N0qLb8fa9o-s-la_3AZ3/view.

deliberations and decision-making.  McKinsey would help the Oversight Board prioritize short- and long-term initiatives, and would provide a team member, selected by the Governor of Puerto Rico, to serve as the Commonwealth's interim Revitalization Coordinator.[51]

McKinsey assembled a team that had familiarity with Puerto Rico, as well as expertise in government consulting; infrastructure, strategy, and organization; organization and investments of state pension funds; sovereign balance sheet and debt management; restructuring; and tax.[52] Aaron Bielenberg, a McKinsey associate principal, was appointed the interim Chief Revitalization Officer.[53]

The team began to assess how best to approach the problems in Puerto Rico, identifying and interacting with key members of the Commonwealth administration to understand the issues and to lay out a timeline.  The initial intent was for the team to gather a general sense of revenues and expenses of different government agencies.  The parties contemplated that one of McKinsey's primary responsibilities would be to stress-test the Commonwealth's fiscal plan. However, it soon became clear to both McKinsey and the Oversight Board that the scope of McKinsey's work would be far greater than initially envisioned.  Reliable revenue and expense-

---

[51] Initial Consulting Agreement, Attachment 1.  Section 502 of PROMESA required the Governor, in consultation with the Oversight Board, to appoint a Revitalization Coordinator from a list of nominees proposed by the Oversight Board.  The Oversight Board was required to provide the Governor a list of three nominees within 60 days of its full appointment. 48 U.S.C. § 2212(b).

[52] McKinsey's public sector work does not typically involve distressed municipalities; the incidence of distressed municipalities is, in fact, fairly low.  McKinsey Interview, Dec. 12, 2018. However, according to its response to the Consultant RFP, McKinsey has advised distressed municipalities and countries, including Detroit, Morocco, and Ukraine.  McKinsey Response to Consultant RFP, dated Oct. 27, 2016.

[53] Then-Governor García-Padilla selected Mr. Bielenberg from three finalists for the position.

related data was not available, meaning that McKinsey had to spend considerable time
developing baseline revenue and cost data to be able to assess and stress test multiple
Government fiscal plan submissions, ultimately leading to a certified fiscal plan. Work on
revenue projections, expenses, and fiscal plans, therefore, constituted the bulk of McKinsey's
work for the Oversight Board from the outset.[54]

      Prior to McKinsey's engagement, the Oversight Board had determined which agencies
were "covered" instrumentalities.[55] The Oversight Board determined that the Puerto Rico
Electric Power Authority ("PREPA"), the Puerto Rico Aqueduct and Sewer Authority
("PRASA"), the Puerto Rico Highways and Transportation Authority ("HTA"), the Public
Corporation for the Supervision and Insurance of Cooperatives ("COSSEC"), the University of
Puerto Rico ("UPR"), and the Government Development Bank ("GDB") accounted for the vast
majority of the Government budget (other than the Commonwealth central government agencies
and departments). Accordingly, McKinsey and the Oversight Board focused their attention and
efforts on those six instrumentalities.[56] However, as it became clear that McKinsey and the
Oversight Board would need to take on additional tasks, some functions enumerated in the Initial
Consulting Agreement fell off the scope of McKinsey's work, including, for example,
developing a litigation framework and strategy and a restructuring framework and process.[57]

---

[54] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018.

[55] Pursuant to Section 101(d) of PROMESA, the Oversight Board was authorized to "designate
any territorial instrumentality as a covered territorial instrumentality that is subject to the
requirements" of PROMESA. 48 U.S.C. § 2121(d).

[56] McKinsey Interview, Nov. 20, 2018.

[57] *Id.* The Initial Consulting Agreement envisioned that McKinsey would work with the
Oversight Board's counsel "to build a baseline assessment of legal proceedings and litigation,
develop a framework and guidelines to enable the [Oversight] Board to develop a strategy for

For a variety of reasons, data collection and analysis turned out to be much more difficult

than McKinsey originally anticipated.  It became clear to the Oversight Board at an early point

that McKinsey would need to play a major role in the development of the Commonwealth's

fiscal plan.  Despite significant challenges, and after several Government fiscal plan submissions

and revisions, the Oversight Board with McKinsey's support was able to certify a fiscal plan on

March 13, 2017.  After that, McKinsey continued to monitor implementation of the

Commonwealth fiscal plan and to develop a budget.[58]

### B.    Continuing Non-Title III Work

The Core Consulting Agreement was amended by agreement dated March 9, 2017

(the "March 9, 2017 Amendment").[59]  The March 9, 2017 Amendment revised McKinsey's

scope of work and added, for the first time, a "Vendor Conflict of Interest Disclosure

Certification" (described more fully below) that required McKinsey to certify that it had no

specified conflicts of interest based upon connections to certain "Interested Parties" (the

members of the Oversight Board and its designated staff, the Commonwealth, and its

---

managing existing claims (*e.g.*, Covina [sic] related claims and amounts due to contractors and
taxpayers), and then put in place a robust framework for evaluation of potential litigation risk
and trade-offs that will support the [Oversight] Board in developing its debt restructuring and
stakeholder engagement strategy."  McKinsey was also expected to "[d]esign with the
[Oversight] Board a bespoke restructuring process and strategy to restructure Puerto Rico's
public debt across all of its sovereign and sub-sovereign issuers."  Initial Consulting Agreement,
Attachment 1.

[58] McKinsey Interview, Nov. 20, 2018.

[59] A copy of the March 9, 2017 Amendment is available on the Oversight Board's website at
https://drive.google.com/file/d/1n5u9kDhqHoIemLhSfGc0Q-W2PTx0oeuU/view.

instrumentalities).[60]  The March 9, 2017 Amendment provided for McKinsey to provide project

management office and organization support; to perform stress-tests of fiscal plans for various

covered instrumentalities, including PRASA, PREPA, GDB, HTA, COSSEC, and UPR; to

provide implementation planning; to provide support for "critical projects" aimed at involving

the private sector; to identify which critical projects the Oversight Board should select to fast-

track; and to continue to provide a Revitalization Coordinator.[61]

       By July 1, 2017 – the beginning of the Commonwealth's fiscal year – McKinsey and the

Oversight Board had worked with the Government to develop a budget and had begun working

on how to implement the fiscal plan.  After that, McKinsey continued monitoring the activities of

the covered instrumentalities and providing support as needed, as well as executing necessary

planning.  Hurricanes Maria and Irma in September 2017 complicated these tasks; the

destruction they caused required that the Commonwealth, the Oversight Board, and McKinsey

revisit virtually every assumption underlying the budget and fiscal plans.  The nature of

McKinsey's non-Title III work – work on developing, stress testing and implementing fiscal

plans for the Commonwealth and select instrumentalities – remained substantially the same,

however.[62]

       McKinsey and the Oversight Board entered into a second amendment (the "Second

Amendment") to the Core Consulting Agreement dated January 1, 2018, that provided, *inter*

*alia*, that McKinsey would work on stress testing and supporting fiscal plans and annual budgets

---

[60] The March 9, 2017 Amendment was signed by McKinsey & Company, Inc., United States, not
McKinsey USG.  The change appears to have been a drafting error.

[61] March 9, 2017 Amendment.

[62] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018.

for non-Title III instrumentalities (PRASA, COSSEC, and UPR); review government-recovery
related contracts over $10 million; and work with the Oversight Board's financial advisor, Citi,
to ensure that fiscal plans were "aligned with restructuring strategy and pension reforms."[63]

On September 1, 2018, the parties entered into a new Independent Contractor Services
Agreement that provided that McKinsey would "[s]upport implementation related to the Fiscal
Plans for the Title III entities (Commonwealth, PREPA and HTA) and PRASA, COSSEC, and
UPR" as well as continue to review proposed government contracts as needed and to work with
Citi to ensure that fiscal plans aligned with restructuring strategy.[64]

### C.    Title III Work

It was apparent from the outset of the Oversight Board's and McKinsey's work that a
Title III filing was likely if not inevitable.  The original pre-Title III stay under PROMESA was
extended to May 1, 2017, permitting mediation with the major bondholders.  Ultimately,
however, the mediation was not successful, and various bondholder groups filed actions against
the Commonwealth and COFINA.  On May 3 and 5, 2017, the Oversight Board filed Title III
petitions on behalf of the Commonwealth and COFINA, respectively.  The Oversight Board
subsequently filed Title III petitions on behalf of HTA, ERS, and PREPA.  As a result,

---

[63] A copy of the Second Amendment is available on the Oversight Board's website at
https://drive.google.com/file/d/1Y_ixsfwgosD8IC73G9R_HUeCsytxw0O1/view.  The Second
Amendment had a term of six months.  The parties subsequently signed a third amendment,
dated July 1, 2018 (the "Third Amendment"), that extended the engagement for an additional
two months.  A copy of the Third Amendment is available on the Oversight Board's website at
https://drive.google.com/file/d/1wEP8BSDBZAQrz1btUCtKlJwH8Qj9lXdY/view.

[64] Independent Contractor Services Agreement (McKinsey & Company, Inc. Washington DC),
effective September 1, 2018 (the "September 1, 2018 Core Consulting Agreement").  A copy of
the September 1, 2018 Core Consulting Agreement is available on the Oversight Board's website
at https://drive.google.com/file/d/1xRRLnxH5RWWGten23w97uV6uorlPlR7T/view.

McKinsey established another team – with some overlap with the non-Title III team at the leadership level only – to work on the Title III-related matters.[65]

The Oversight Board entered into a separate Consulting Agreement with McKinsey USG (the "Title III Consulting Agreement," and together with the Core Consulting Agreement, the "Consulting Agreements") dated as of July 3, 2017, which delineated McKinsey's scope of work in the Commonwealth, PREPA, and HTA Title III cases.[66]  The Title III Consulting Agreement envisioned that McKinsey would provide litigation and mediation support and liquidity analysis for the Commonwealth case.[67]  In the PREPA and HTA cases, McKinsey USG was to "[c]oordinate and provide analysis related to development of the transformation plan and plan of arrangement" for the two agencies.[68]  With respect to conflicts of interest, the Title III Consulting Agreement contains identical language to the Core Consulting Agreement (described in Section V.D below).[69]

In connection with the Title III cases, the Oversight Board asked McKinsey to educate the Oversight Board's other advisors – including its primary financial advisor, Citi, and its law firm, Proskauer – about the fiscal plan, to support litigation, to perform some liquidity planning relating to the implementation of the fiscal plan, and to support the Oversight Board in mediation

---

[65] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018.

[66] A copy of the Title III Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1iV82ACFcYQfgtCq02v8rk19nx-g4_VA7/view.

[67] Title III Consulting Agreement, Attachment 1.

[68] *Id.*, Attachments 2 & 3.

[69] There was a minor change to the confidentiality provision in the Title III consulting agreement related to the Oversight Board's ability to disclose certain information.  However, the change had no impact on the conflict of interest provisions.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 589 of 818

sessions, which began soon after the Title III filings. McKinsey's liquidity planning efforts

centered primarily on the Commonwealth and to a lesser extent on PREPA, but not GDB.[70]

Although the Title III Consulting Agreement contemplated that McKinsey would provide

mediation support, McKinsey's role in the Commonwealth-COFINA mediation (discussed more

fully in Section XII below) was purely informative. During the summer of 2017, there were

several day-long mediation sessions with large groups of creditors in which members of the

Court-appointed mediation panel, along with individuals from McKinsey and Ernst & Young (an

advisor to the Oversight Board), answered pre-submitted questions.[71] The participants prepared

in advance for the sessions with Judge Barbara Houser, whom Judge Swain had appointed to

chair the mediation panel. McKinsey was not involved in or privy to conversations relating to

how any settlement would be structured or how available funds would be allocated.[72]

---

[70] McKinsey Interview, Nov. 20, 2018; *see In re Fin. Oversight & Mgmt. Bd. for P.R.*,
Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 2073 ¶ 13, Ex. C.

[71] By agreement dated February 15, 2017, the Oversight Board retained Ernst & Young Puerto
Rico LLC to provide certain analyses concerning the Government of Puerto Rico's audited 2014
financials and the 2017 fiscal plan proposed by the Government of Puerto Rico (the "Financial
Bridge"). Copies of the Ernst & Young engagement letter and the Financial Bridge Analysis are
available on the Oversight Board's website at https://drive.google.com/file/d/1WWHcS_Uv8fL
Z43J215KQRGZdOyzh88ai/view (E&Y Engagement Letter) and https://drive.google.com/file/d
/1ZGT6oeZP3c8BFpGr93vr5ZaV3ymcu75N/view (Financial Bridge Analysis).

[72] McKinsey Interview, Nov. 20, 2018. Those mediation efforts during the summer of 2017 did
not succeed. On September 8, 2017, the Oversight Board-appointed representative of the
Commonwealth commenced an adversary proceeding to resolve the Commonwealth-COFINA
Dispute. *See Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v.
Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Adv. Proc. No. 17-257-LTS (D.P.R.). The
parties recommended mediation following oral argument on motions for summary judgment, and
on June 7, 2018, announced an Agreement in Principle. Although the Oversight Board believed
that the Agreement in Principle exceeded the scope of the mediation order in the adversary
proceeding, the Oversight Board supported the Agreement's core provision governing how to
allocate sales and use tax revenue between the Commonwealth and COFINA. More mediation

The Oversight Board realized that in the cases of PREPA and HTA, there were likely to be structural transformations, and asked McKinsey to take the lead in the transformation plans for those entities. McKinsey worked with those entities to develop fully fleshed-out transformation plans with six-year terms. McKinsey helped with the practicalities of implementing the proposed transformation plans and worked with the Oversight Board's other financial advisors to develop a workable timeline.[73]

When the hurricanes hit Puerto Rico in the fall of 2017, McKinsey and the Oversight Board again had to revise McKinsey's scope of work. As noted above, the destruction caused by the hurricanes rendered many of the assumptions underlying the Commonwealth fiscal plan obsolete and necessitated a wholesale review of the fiscal plans for the Commonwealth and its instrumentalities. The revised scope of work was memorialized in the First Amendment to the Title III Consulting Agreement dated November 1, 2017.

McKinsey USG and the Oversight Board entered into a Second Amendment to the Title III Consulting Agreement, dated April 1, 2018, which extended the term of that agreement through June 30, 2019, and fine-tuned McKinsey's scope of work for HTA and the Commonwealth.[74]

---

ensued, and the parties ultimately entered into a Plan Support Agreement on August 29, 2018, and an amended Plan Support Agreement dated September 20, 2018. *See* Section XII below.

[73] McKinsey Interview, Nov. 20, 2018; Title III Consulting Agreement, Attachments 2 & 3; *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 2073 ¶ 13, Ex. C.

[74] A copy of the Second Amendment to the Title III Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1xeRQxneihzth19WBCOLyNtxX9-iGVgOu/view.

## D.    **Relevant Contract Provisions**

The Consulting Agreements contain three provisions related to conflicts of interest.

<u>First</u>, the Consulting Agreements contain a confidentiality provision limiting who at McKinsey may receive "Confidential Information" (those "who have a need to know and are bound to keep it confidential") and how it may be used (for providing services to the Oversight Board).[75]

<u>Second</u>, the Consulting Agreements disclosed McKinsey's long-standing policy of serving competing clients and competitors, and provided that anyone who received Confidential Information would be prohibited from working on a competitively-sensitive project for one year. Each of the Consulting Agreements provides:

> 6.    <u>SERVING COMPETITORS</u>.  It is McKinsey's long-standing policy to serve competing clients and clients with potentially conflicting interests as well as counter-parties in merger, acquisition and alliance opportunities, and to do so without compromising McKinsey's professional responsibility to maintain the confidentiality of client information. Consistent with such practice and McKinsey's confidentiality obligations to its other clients, McKinsey is not able to advise or consult with the Client about McKinsey's serving the Client's competitors or other parties.  To avoid situations of potential conflict, McKinsey will not, for a period of one year following an engagement for the Client, assign any consultant who receives Confidential Information in connection with such engagement to a competitively sensitive project, **including a directly-conflicting engagement with the Government of Puerto Rico.  Notwithstanding the foregoing, the Client understands and agrees that so long as McKinsey has appropriate procedures in place to mitigate any potential conflict, it may serve the Government of Puerto Rico on related matters.**[76]

---

[75] Initial Consulting Agreement § 3.

[76] *Id.* § 6 (emphasis added).

With the exception of the bold language added as part of the negotiations with the Oversight

Board, this is a standard provision found in McKinsey's consulting agreements.[77]  The final

sentence was added as part of the negotiations between the Oversight Board and McKinsey to

provide flexibility to the parties.  For example, fiscal plan implementation might be better

handled directly with the Government of Puerto Rico (as opposed to through the Oversight

Board).  Accordingly, McKinsey USG and the Oversight Board agreed that McKinsey could

work with the Government of Puerto Rico on "related" matters, provided, however, that

McKinsey put in place adequate procedures to mitigate against any conflicts of interest.  The

specific procedures were not discussed, but the Selection Committee understood that McKinsey

would come back to the Oversight Board if the Government of Puerto Rico sought to retain

McKinsey.[78]  In fact, after discussing it with the Oversight Board and giving the Oversight

Board assurances that McKinsey personnel working for the Oversight Board would not be

involved, McKinsey did a small project for the Puerto Rico Education Foundation that benefited

the Puerto Rico Department of Education in September 2018.[79]

   Finally, the Consulting Agreements provide that McKinsey USG may work for the

Government of Puerto Rico or other stakeholders subject to the restrictions set forth in Section 6

(which requires that proper safeguards be in place and that no consultant who receives

---

[77] McKinsey Response to Consultant RFP, dated Oct. 27, 2016; *see In re Alpha Nat. Res., Inc.*,
Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 212 at 25 ¶ 7; *In re Westmoreland Coal
Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF No. 452 at 30 ¶ 9.

[78] Oversight Board Interview, Dec. 10, 2018.

[79] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018, Feb. 1, 2019.

confidential information work on a competitively-sensitive project for at least one year).

Section 9 of the Consulting Agreements provides:

> 9.    CONFLICTS OF INTEREST.  The Client agrees that performance of
> Services hereunder shall not conflict McKinsey from serving the Government of
> Puerto Rico or any stakeholders to the work, subject to the restrictions in
> Section 6 – "Serving Competitors."[80]

Again, we understand this is a standard provision that is included in all McKinsey contracts.

None of the amendments to the consulting agreements changed the provisions related to conflicts of interest.  However, the March 9, 2017 Amendment required McKinsey to complete a "Vendor Conflict of Interest Disclosure Certification" (the "Disclosure Certification").[81]  As discussed more fully in Section VII below, the Disclosure Certification requires a vendor to certify that it does not have a conflict of interest and to disclose connections between certain identified "Interested Parties" or any person associated with any Interested Party and the vendor. The Disclosure Certification contains seven questions which primarily focus on determining whether any Interested Party has a financial interest in the vendor, as opposed to whether the vendor has a financial interest in or connection to the Interested Party.[82]

The September 1, 2018 Core Consulting Agreement contains an expanded conflict of interest provision that prohibits McKinsey USG from accepting any work "inconsistent or incompatible" with its contractual obligations to the Oversight Board or to take any actions "that would constitute or could create the appearance of a conflict of interest with the [Oversight]

---

[80] Initial Consulting Agreement § 9.

[81] March 9, 2017 Amendment, App'x A & Sched. A.  While the Disclosure Certification is attached to the Oversight Board's Vendor Code of Conduct, the March 9, 2017 Amendment does not include the Vendor Code of Conduct.

[82] *See* Section VII.B below.

Board's mission or the work performed by [McKinsey] for the [Oversight] Board."[83]  The

"serving competitors" policy remains in the September 1, 2018 Core Consulting Agreement, but

now requires the Oversight Board's express written consent before McKinsey may undertake an

engagement for the Government of Puerto Rico on a "related" matter.[84]

In response to reporting by the *Wall Street Journal*, McKinsey provided the Oversight

Board certain information regarding McKinsey's corporate structure, the separation of MIO from

McKinsey's consulting business, and MIO's investments in Whitebox.  However, other than

information provided in response to this investigation, McKinsey did not provide information

concerning MIO's direct investments in Puerto Rico public debt.

### E.   McKinsey Staffing

At the very outset, McKinsey USG made clear that its team would include experts from

various McKinsey consulting affiliates, as well as from the McKinsey Global Institute, a think

tank that performs research for the firm and which could provide an economist if needed.  The

standard team structure at McKinsey, which held true in its work for the Oversight Board,

included a layered staff consisting of:

- a Director (or Directors) of Client Services (typically one or two senior partners who take responsibility for client service);

- one or more Engagement Directors (partners who lead delivery of the work);

- one or more Engagement Managers (partners who lead specific work streams under an Engagement Director);

- associates and analysts; and

---

[83] September 1, 2018 Core Consulting Agreement § 7.

[84] *Id.* § 10.

- other people as needed, bringing in particular expertise.[85]

McKinsey USG ultimately "borrowed" team members from four McKinsey consulting affiliates.[86]

## F.    <u>Compensation</u>

McKinsey – and to a limited extent, the Oversight Board – have come under criticism for the sheer amount of fees charged.  According to the September 26, 2018 *New York Times* article McKinsey has received more than $50 million in payment for its work for the Oversight Board.[87] But one of the major reasons that the Oversight Board selected McKinsey USG over another major consulting firm with similar expertise and depth was that McKinsey's proposed fees were significantly lower even after the competitor lowered its proposed rates.[88]

Moreover, as a retained professional, McKinsey must file fee applications with the Court seeking approval of its fees for its Title III-related work.  McKinsey's fees are reviewed by the Court-appointed Title III Fee Examiner, Brady Williamson.[89]  In his Third Interim Report on Professional Fees and Expenses dated October 31, 2018, the Fee Examiner concluded, after an in-depth review, that "the fees the Oversight Board has agreed to pay McKinsey [in the Title III

---

[85] McKinsey Interview, Nov. 20, 2018.

[86] *See* Section VIII below.

[87] Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018.

[88] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

[89] McKinsey's non-Title III work is not subject to review by Mr. Williamson.  The Oversight Board retained Robert Keach to act as a fee examiner to review non-Title III work.  However, the Oversight Board determined that it was not cost effective to have Mr. Keach separately analyze McKinsey's fees because McKinsey works on a fixed-fee basis.

proceedings] are reasonable."[90]  The Fee Examiner observed that "[i]n response to the Fee

Examiner's initial comments, and the Court's instructions, McKinsey has added significant detail

to its monthly fee statements, including a listing of all team members by name and title/position,

stating whether each team member performed services on a full-time or part-time basis, and

detailed descriptions of the services performed, including specific activities and work product."[91]

Moreover, as discussed in detail in the Fee Examiner's report, the fees that McKinsey charges to

the Oversight Board are based on a schedule established by the United States General Services

Administration.[92]  Given the Fee Examiner's close review of McKinsey's fees, we saw no reason

to investigate this further.

Finally, the Oversight Board and its staff have been pleased with McKinsey's work.

From the outset, McKinsey team has worked tirelessly – often times around the clock – and

provided broad-based experience and expertise across a wide-range of areas to provide a skill set

that few can match, and would be impossible for the Oversight Board to replicate internally.[93]

Accordingly, we did not investigate the quality of McKinsey's work; this was simply not an

issue.

---

[90] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.),
ECF No. 4126 at 13.

[91] *Id.* at 10–11 (footnote omitted).

[92] *Id.*

[93] *Id.* at 10; Oversight Board Interviews, Dec. 10, 14, & 17. 2018, Jan. 28, 2019.

## VI.    Disclosure Law and Obligations

### A.    Bankruptcy Code and PROMESA

In a typical Chapter 11 bankruptcy (but not in a municipal bankruptcy under Chapter 9 or

in cases under PROMESA), Section 327(a) of the Bankruptcy Code applies and empowers a

trustee, subject to approval by the Court, to employ professionals "that do not hold or represent

an interest adverse to the estate, and that are disinterested persons, to represent or assist the

trustee in carrying out the trustee's duties under this title."[94]  Under the Bankruptcy Code a

"disinterested person" is a person that:

(a)    is not a creditor, equity security holder, or an insider;

(b)    is not and was not, within two (2) years before the date of the filing of the
petition, a director, officer, or employee of the debtor; and

(c)    does not have an interest materially adverse to the interest of the estate or of any
class of creditors or equity security holders, by reason of any direct or indirect
relationship to, connection with, or interest in, the debtor, or for any other
reason.[95]

Rule 2014 of the Federal Rules of Bankruptcy Procedure requires a professional to submit in

support of its retention application a verified statement disclosing the professional's connections

with the "debtor, creditors, any other party in interest, their respective attorneys and accountants,

the United States trustee, or any person employed in the office of the United States trustee."[96]

Ordinarily, in a case where Section 327 and Bankruptcy Rule 2014 apply, a professional would

review a list of "interested parties" (*e.g.*, creditors, debtor affiliates, business counter-parties,

---

[94] 11 U.S.C. § 327; *see* 11 U.S.C. § 901 (listing provisions of Chapter 11 of the Bankruptcy Code
applicable to a case under Chapter 9).

[95] 11 U.S.C. § 101(14).

[96] Fed. R. Bankr. P. 2014(a).

etc.) prepared by debtor's counsel and file a declaration supporting its application disclosing any

connections.[97]  However, as is well documented, in drafting PROMESA, Congress chose not to

include Section 327 of the Bankruptcy Code, leaving out the requirement that the Oversight

Board's retention of professionals be approved by the Court, that the Oversight Board's

professionals be "disinterested,"[98] and that the Oversight Board's professionals be required to

file a Rule 2014 declaration disclosing "connections" to the debtors, creditors and other parties-

in-interest.[99]

　　　　PROMESA contains two provisions governing disclosure of potential conflicts of

interest, but neither of those provisions applies to McKinsey.  Section 108 of PROMESA

requires the Oversight Board's legal counsel to comply with "applicable professional rules of

---

[97] Local court rules may further refine or impose additional disclosure obligations.  For example, Rule 2014-1 of the Puerto Rico Local Bankruptcy Rules requires a professional to affirm under penalty of perjury that the firm is disinterested and provides additional guidance regarding what "connections" must be disclosed.  P.R. LBR 2014-1.

[98] *See* 48 U.S.C. § 2161 (listing Bankruptcy Code provisions applicable to PROMESA Title III proceedings); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4126 n.17; Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018.  The Oversight Board may retain professionals in its "sole discretion."  48 U.S.C. §§ 2176–77.

[99] PROMESA provides that the Federal Rules of Bankruptcy Procedure are generally applicable to Title III proceedings.  48 U.S.C. § 2170.  However, Bankruptcy Rule 2014 by its terms applies only to retention applications filed under Sections 327, 1103 and 1114 of the Bankruptcy Code.  *See* Fed. R. Bankr. P. 2014(a).  While Congress elected not to include Section 327 of the Bankruptcy Code, it did include Section 1103, which requires court approval of attorneys and accountants retained by any committee and prohibits such advisors from representing "any other entity having an adverse interest in connection with the case."  11 U.S.C. § 1103(b).  Thus, professionals employed by the Official Committee of Unsecured Creditors and the Official Committee of Retired Employees have filed Bankruptcy Rule 2014 disclosures in the Commonwealth's Title III case.  *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF Nos. 610, 611, 615, 670, 671, 2325.

conduct governing conflicts of interest."[100]  Section 109 of PROMESA imposes Federal conflict

of interest rules on the Oversight Board and staff designated by the Oversight Board.[101]

As McKinsey USG was not required (and was not asked) to comply with Bankruptcy

Rule 2014, and there is ongoing litigation concerning the disclosures required by Bankruptcy

Rule 2014 in the unrelated litigations involving McKinsey and Jay Alix, we take no position on

what disclosures Bankruptcy Rule 2014 would require if it were applicable here or whether

McKinsey USG would be "disinterested" under the Bankruptcy Code were Section 327

applicable.

### B.    The Proposed Puerto Rico Recovery Accuracy in Disclosures Act

On December 19, 2018, as a direct consequence of the reporting by the *New York Times*,

Representative Nydia M. Velázquez introduced the Puerto Rico Recovery Accuracy in

Disclosures Act (the "PRRADA").[102]  The PRRADA would impose Bankruptcy Code-like

disclosure obligations on professionals working in the Title III proceedings.[103]  Specifically, it

would require professionals to disclose their "connections with the debtor, creditors, any other

parties in interest, their respective attorneys and accountants, the Oversight Board, and any

person employed by the Oversight Board" prior to being compensated under PROMESA

---

[100] 48 U.S.C. § 2128(b).

[101] 48 U.S.C. § 2129.

[102] Puerto Rico Recovery Accuracy in Disclosures Act of 2018, H.R. 7355, 115th Cong. (2018).

[103] The bill was co-sponsored by Representative Rob Bishop (Utah), then chair of the House
Natural Resources Committee, Representative Raúl M. Grijalva (Arizona), incoming chair of the
House Natural Resources Committee, and Representative Jennifer González-Colón (Puerto
Rico).  The House Natural Resources Committee has jurisdiction over United States territories
and drafted PROMESA.  *See* Mary Williams Walsh, *Transparency of Puerto Rico Bankruptcy Is
the Aim of a New Bill*, N.Y. Times, Dec. 19, 2018.

§ 316.[104]  Professionals would be required to update their disclosures as additional information

becomes known and to file an annual notice confirming the accuracy of their disclosures.[105]

Although the PRRADA does not incorporate Section 327 of the Bankruptcy Code into

PROMESA, the proposed legislation would authorize (but not require) the Court to deny a fee

application if the professional person:  (1) fails to file the required disclosures or has filed

inadequate disclosures; (2) is not disinterested as defined in 11 U.S.C. § 101(14); or

(3) represents, or holds an interest adverse to, the interest of the estate with respect to the matter

on which such professional person is employed.[106]

On January 17, 2019, the PRRADA was reintroduced in the new Congress.[107]  We take

no position on this legislation or what disclosures McKinsey would be required to make in the

event the legislation is passed.

## VII.    Oversight Board Conflict Policies and Procedures

On January 28, 2017, the Oversight Board approved amended bylaws that, *inter alia*,

required (1) the Oversight Board's General Counsel to retain an "Ethics Advisor" to oversee the

Oversight Board and its staff's compliance with Section 109 of PROMESA;[108] and (2) the

---

[104] PRRADA, H.R. 7355 §§ 2(a), (d).

[105] *Id.* § 2(a).

[106] *Id.* § 2(d).

[107] Puerto Rico Recovery Accuracy in Disclosures Act of 2019, H.R. 683, 116th Cong. (2019).

[108] Financial Oversight and Management Board for Puerto Rico Bylaws, as amended
Jan. 28, 2017 (the "Oversight Board Bylaws"), § 11.4.  The Oversight Board Bylaws are
available on the Oversight Board's website at https://drive.google.com/file/d/1oW2VE5RPYb4
c85TBq-ao6wWX0TM9y27r/view.

Oversight Board to adopt a "Code of Conduct to govern the operations of the [Oversight] Board and its members, the ex officio member and staff."[109]

### A.    Oversight Board Code of Conduct

The Oversight Board Code of Conduct primarily governs "Covered Persons" (*e.g.*, the Oversight Board and its full-time staff) and, for example, prohibits Covered Persons from owning Puerto Rico public securities while serving on or working for the Oversight Board.[110] With respect to third-party vendors employed by the Oversight Board, the Oversight Board Code of Conduct requires the Oversight Board to ensure that each "third-party vendor has agreed to comply with the [Oversight] Board's Vendor/Consultant/Representative Code of Conduct" (the "Vendor Code of Conduct").[111]

### B.    Vendor Code of Conduct

Among other things, the Vendor Code of Conduct requires vendors to "promptly inform the Executive Director, the General Counsel, or a member of the Oversight Board when any situation develops that causes, or may cause, the Vendor to violate any provision of [the Vendor] Code of Conduct."[112]  With respect to Conflicts of Interest, the Vendor Code of Conduct provides:

> **Conflicts of Interest**.  Vendors shall scrupulously avoid any conflict, real or perceived, direct or indirect, between their own individual, professional, or business interests and the interests of the [Oversight] Board.  Among other things,

---

[109] *Id.* § 6.9.

[110] Oversight Board Code of Conduct § 5.  The Oversight Board's current Code of Conduct is available on the Oversight Board's website at https://drive.google.com/file/d/1Zi4nojiQ4t55Swu wXGkqjP0Wv8mhwVaE/view.

[111] *Id.* § 12.

[112] September 1, 2018 Core Consulting Agreement, App'x B.

Vendors must not deal directly with any [Oversight] Board member or ex officio
member or employee whose spouse, domestic partner, or other family member or
relative is associated with and/or holds any ownership or other financial interest in
the Vendor. In the course of negotiating the Vendor agreement or performing the
Vendors obligations, dealing directly with a Vendor personnel's spouse, domestic
partner, or other family member or relative employed by the [Oversight] Board is
also prohibited. Complying with this requirement includes, but is not limited to,
each Vendor's completion of the Vendor Conflict of Interest Disclosure
Certification [(the "Disclosure Certification")] . . . . [113]

The Disclosure Certification Provides:

Except as otherwise fully disclosed below . . . the Vendor affirms, to the best of
its knowledge, information and belief, that no Interested Party (as defined in
Schedule A hereto), nor any person associated with any Interested Party, is an
employee, Director or Trustee, Officer or consultant to/of, or has any financial
interest, direct or indirect, in the Vendor, or has received or will receive any
financial benefit, directly or indirectly, from the Vendor or from the contract
associated with this certification. [114]

The Disclosure Certification requires a vendor to respond to seven questions concerning

connections any "Interested Party" or any person associated with any Interested Party has with

the vendor: [115]

1.      Is any Interested Party, or any person associated with any Interested Party,
        associated with any employee, Director or Trustee, Officer or consultant to/of the
        Vendor?

2.      Does any Interested Party, or any person associated with an Interested Party, have
        an ownership interest in the Vendor's company?

---

[113] *Id.*

[114] *See id.*, App'x C. The "Interested Parties" list includes 75 persons and entities consisting of
the members of the Oversight Board and its designated staff, the Commonwealth, and its
instrumentalities. It does not include investors, creditors, banks, advisors, insurers, litigation
parties, and other parties-in-interest. *See id.*, Sched. A.

[115] The Disclosure Certification provides that "'associated' persons include: a spouse, domestic
partner, child, parent or sibling of an Interested Party; a person with whom an Interested Party
has a business or other financial relationship, including but not limited to employees of an
Interested Party and/or a spouse, domestic partner, child, parent or sibling of such employees;
and each firm in which an Interested Party has a present or potential interest."

3.      Has any Interested Party, or any person associated with an Interested Party, received, or will any Interested Party, or any person associated with an Interested Party receive, a financial benefit from the Vendor or from this contract?

4.      Is any Interested Party, or any person associated with an Interested Party, contemporaneously employed or prospectively to be employed with the Vendor?

5.      Is any Interested Party, or any person associated with an Interested Party, acting as a consultant for the Vendor?

6.      Has the Vendor provided, or will the Vendor provide, any gifts or hospitality of any dollar value or any other gratuities to any Interested Party or elected official to obtain or maintain a contract?

7.      Has any Interested Party, or any person associated with an Interested Party, provided any gifts of any dollar value or any other gratuities to Vendor?

Any Vendor that answers "yes" to any of the questions is required to provide additional information.

### C.      Ethics Advisor

In accordance with Section 11.4 of the Oversight Board's Bylaws, by agreement dated March 13, 2017, the Oversight Board retained GEC Risk Advisory LLC to provide the services of Andrea Bonime-Blanc as external Ethics Advisor to the Oversight Board.  Dr. Bonime-Blanc is an expert on ethics, governance, compliance, and risk management.  The Ethics Advisor reports to the Oversight Board's General Counsel and provides a wide array services as needed, including helping the Oversight Board to evaluate and determine the appropriate course of action to take with respect to real or perceived conflicts of interest.[116]

## VIII.   McKinsey's Corporate Structure

The Oversight Board's Consulting Agreements are with McKinsey USG – the McKinsey subsidiary that provides services to its government clients.  However, McKinsey USG has

---

[116] A copy of the Ethics Advisor's agreement with the Oversight Board is available on the Oversight Board's website at https://drive.google.com/file/d/1QXzZSWfrtNhg4WRoWWYsb TEht3AaNQE5/view.

"borrowed" the majority of the consultants who have worked on the engagement for the

Oversight Board from other McKinsey entities, including McKinsey & Company, Inc. United

States, McKinsey RTS, McKinsey & Company Colombia, Inc., and McKinsey and Company

Canada.

The below diagram depicts the corporate structure of McKinsey & Company, Inc. and the

subsidiaries that have "loaned" consultants who have provided services to the Oversight Board,

as well as the relationship between the McKinsey consulting affiliates and MIO.



Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 605 of 818

As discussed more fully in Section IX.B below, while there is shared ownership, the only overlap between the McKinsey consulting entities and MIO is at the Board of Directors level. Currently, the MIO Board of Directors (the "MIO Board") consists of nine current or former McKinsey partners and two independent directors who are not current or former McKinsey partners, none of whom is on the McKinsey Puerto Rico service team.[117]

## IX.   MIO Partners

MIO is registered with the SEC as an investment adviser.[118]  By design, MIO is operated separately and distinctly from McKinsey's consulting business.  MIO has its own offices separate from those of McKinsey.  The MIO staff of approximately 150 is dedicated exclusively to MIO.  MIO staff do not provide consulting services.  MIO's investment professionals do not share office space, infrastructure, computer systems, or email addresses with McKinsey's consulting business, and do not provide consulting services.[119]

MIO manages assets for (1) pension plans sponsored by McKinsey ("Plans") in which current and former McKinsey employees participate ("Participants") and (2) privately-offered investment vehicles ("Funds") in which McKinsey partners, former partners, and their immediate

---

[117]  Non-Title III Staffing List, dated Nov. 9, 2018; Title III Staffing List, dated Nov. 9, 2018; *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 8; MIO Form ADV, dated Dec. 11, 2018, Schedule A.  Prior to November 1, 2017, all members of the MIO Board were current or former McKinsey partners.  *In re Alpha Nat. Res.*, *Inc.*, Case No. 15-33896 (KRH), ECF No. 4152 ¶ 8.

[118] MIO also has a European counterpart, MIO Partners (EU) Limited, which is authorized and regulated by the Financial Conduct Authority in the United Kingdom.

[119] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 4; ECF No. 4160 ¶ 4; MIO Interview, Dec. 7, 2018.

family members may invest ("Investors").[120]  According to its publicly-available website, MIO

"makes investments essentially on a 'blind trust' basis, with MIO investors having no access to

information about the underlying holdings in the third-party funds.  This helps McKinsey

partners and staff minimize any perceived or actual conflict of interest associated with investing

themselves."[121]

### A.  MIO Investments

Eligible Participants and Investors may invest both on a before tax (*e.g.*, pension funds)

and an after-tax basis.  Participants (pension fund investors) may invest in "passive" portfolios

that are managed by State Street Global Advisors ("SSGA")[122] or in the MIO "Special Situations

Portfolios" of McKinsey's U.S. Pension Plan.[123]  Investors (after tax investors) may invest in the

Special Situations Fund.[124]

---

[120] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 3; MIO Interview, Dec. 7, 2018.  Many of the funds use the brand name "Compass."  *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH), ECF No. 4160 ¶ 10.

[121] https://www.miopartners.com.  McKinsey's characterization of this relationship as a "blind trust" has been criticized by the United States Trustee and the Court in *ANR*.  *See* Section II.B above.  As discussed more fully below, although there is very minimal visibility through MIO-provided sources, a determined investigator could uncover certain connections based upon publicly-available information, especially now given the recent news and court filings explaining how to make the connections, although much of the information revealed by such an exercise would be dated and incomplete.

[122] *E.g.*, Passive U.S. Dollar Money Markets Portfolio; Passive German Bonds Portfolio; Passive Inflation-Linked Bonds Portfolio; Passive U.S. Bonds Portfolio; Passive Non-U.S. Equities Portfolio; Passive US Equities Portfolio; Target Retirement Funds.  *See* Financial Statements and Report of Independent Certified Public Accounts, McKinsey & Company, Inc. Partner Cash Balance Plan, Dec. 31, 2017 and 2016 at 20–22.  These passive funds are managed by SSGA.

[123] *Id.* at 20–21.  The Special Situations Portfolios include the Special Situations Portfolio and the Special Situations Enhanced Liquidity Portfolio USD.

[124] MIO Interview, Dec. 7, 2018.

The Special Situations Fund is actually comprised of multiple separate legal entities.[125]
The Special Situations Funds are sometimes referred to as "Investable Compass Funds" because
Participants and Investors are able to invest directly in those funds.[126] Where a Participant's or
Investor's investment is placed depends on the geographic location of the investor (domestic or
foreign) and whether the investment is pre-tax or after-tax. In addition, there are various
currency-hedged fund options for foreign partners to protect against changes in exchange rates.
However, the investment makeup of each of the Special Situations Funds is substantially the
same.[127]

MIO – through the Investable Compass Funds – generally employs a "fund of funds"
strategy. The funds fall into two buckets: (1) funds (generally third-party limited partnerships)
managed by third-party asset managers ("Third-Party Managers" and "Third-Party Funds,"
respectively); and (2) other MIO-owned and created investment vehicles ("MIO Investment
Vehicles"; sometimes referred to as "Non-Investable Compass Funds").[128]

The Non-Investable Compass Funds may (1) invest in Third-Party Funds; (2) invest in
other Non-Investable Compass Funds; (3) retain a Third-Party Manager to manage a specified

---

[125] The Special Situations Funds include Compass Special Situations Fund LLC, Compass
Special Situations IRA Fund LLC, Compass Offshore Special Situations Fund PCC Limited, and
Special Situations Investment Fund LP. Pre-tax investments are made through the Special
Situations Portfolios in the MMRT and SSALT Fund Ltd. MIO Interview, Dec. 7, 2018.

[126] McKinsey partners may also invest in Compass-branded private equity funds that employ the
same fund of funds approach described below. However, the bulk of MIO's assets under
management are in the Special Situations Fund. *Id.*

[127] *Id.*

[128] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 5;
MIO Interview, Dec. 7, 2018; MIO Form ADV Part 2A, dated March 28, 2018, Item 4.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 608 of 818

sum of money (an "allocation") in the name of a Non-Investable Compass Fund (a "Separately

Managed Account"); or (4) make "direct" investments in securities ("MIO Direct Invest-

ments").[129]

Thus, MIO has three main categories of investments: (1) Third-Party Funds,

(2) Separately Managed Accounts, and (3) Direct Investments.

### 1. Third-Party Funds

Approximately 50% to 60% of MIO's assets under management are invested in Third-

Party Funds that are managed by Third-Party Managers. Investment decisions are made by the

Third-Party Managers in their sole discretion. The degree to which MIO knows what individual

investments are made by the Third-Party Funds depends on, *inter alia*, the particular manager

and the terms of the agreements with the Third-Party Manager. However, the investment

decision remains with the Third-Party Manager, and while MIO may discuss individual

investments with the Third-Party Manager, MIO does not make the underlying investment

decisions.[130]

### 2. Separately Managed Accounts

Separately Managed Accounts make up approximately 30 to 40% of MIO's assets under

management.[131] A Separately Managed Account is a portfolio of individual securities managed

on behalf of a Non-Investable Compass Fund and MIO by a Third-Party Manager. The Non-

---

[129] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 12;
MIO Interview, Dec. 7, 2018; MIO Form ADV Part 2A, dated March 28, 2018, Item 4.

[130] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160
¶ 11 n.7; MIO Interviews, Dec. 7, 2018, Jan. 11, 2019, Feb. 1, 2019.

[131] The relative breakdown between Third-Party Funds and Separately Managed Accounts varies
over time. MIO Interview, Feb. 1, 2019.

Investable Compass Funds own the individual securities and MIO knows what securities are held

through each account.  MIO enters into a written agreement with each Third-Party Manager that

authorizes the Third-Party Manager to make investment decisions on behalf of the fund in

accordance with written investment guidelines that are annexed to the agreement.  While the

individual securities are owned by one of the Compass funds and MIO may discuss investments

with the Third-Party Manager, as with Third-Party Funds, the Third-Party Manager makes all

investment decisions.[132]

### 3.    MIO Direct Investments

The remaining roughly 10% of MIO's assets under management are MIO Direct

Investments, where MIO makes the investment decisions regarding individual securities on

behalf of the Compass funds.[133]

### B.    <u>Investment Decisions</u>

Investment decisions are overseen by MIO's Chief Investment Officer, who oversees a

team of portfolio managers.  Portfolio managers specialize in various asset classes, and the CIO

speaks to the portfolio managers daily on position changes, asset managers being proposed,

investment proposals and, generally, in making sure that MIO's investment strategy is being

---

[132] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 9;
ECF No. 4160 ¶ 11 n.7; MIO Interviews, Dec. 7, 2018, Feb. 1, 2019.

[133] Thus, at a minimum, MIO has the ability to view the individual securities that account for
approximately 40 to 50% of its assets under management (those investments that are held in
MIO Investment Vehicles either through Separately Managed Accounts or as MIO Direct
Investments).

followed.  All MIO investment decisions are approved by the CIO.[134]  Participants and Investors

have no control whatsoever over the individual investments made by the Plans or the Funds.[135]

The MIO Board has delegated responsibility for making investment decisions to MIO's

investment team.  On a quarterly basis, the Investments Committee of the MIO Board reviews a

list of redemptions (a decision to eliminate or reduce the amount of an investment with a Third-

Party Manager) and allocations (a decision to establish or increase the amount of an investment

with a Third-Party Manager) made by the MIO investment team.  Until September 11, 2017, the

Investments Committee of the MIO Board "ratified" or approved fund-level redemption and

allocation decisions made by MIO's investment team in the prior quarter.[136]

The MIO Board ended the "ratification" process in September 2017.[137]  However, the

MIO Board (and in particular, the Investments Committee) continues to oversee and monitor, in

their capacities as fiduciaries to the Funds managed by MIO, redemption and allocation decisions

made by the MIO investment team.  In connection with this quarterly review process, the MIO

Board receives a quarterly investment report prepared primarily by the MIO staff.  It is very

unusual for the quarterly investment report to refer to an individual security or for the MIO

Board to discuss an individual security at a quarterly meeting.  However, from time to time

individual investments may be disclosed.  Generally, the quarterly investment report shows how

---

[134] MIO Form ADV Part 2A, dated March 28, 2018, Item 13; MIO Interview, Dec. 7, 2018.

[135] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 7; MIO Interview, Dec. 7, 2018.

[136] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4159 ¶ 4; ECF No. 4160 ¶ 6; MIO Interview, Dec. 7, 2018.

[137] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4159 ¶ 4; ECF No. 4160 ¶ 8; MIO Interview, Dec. 7, 2018.

the Special Situations Fund is performing against various measuring criteria.[138]  The quarterly

investment report includes a schedule that discloses changes in assets and identifies Third-Party

Funds and Third-Party Managers, and where an investment is made with a new Third-Party

Manager, the report includes a writeup containing, *inter alia*, facts about the manager and its

principals, the asset manager's strategy, and MIO's rationale for investing with the manager.[139]

Although members of the MIO Board have oversight responsibilities with respect to the

Plans and the Funds, no member of the Puerto Rico service team currently serves or has served

on the MIO Board during the engagement with the Oversight Board.[140]  If MIO makes a new

investment in a Third-Party Fund or a new allocation to a new Third-Party Fund Manager, the

MIO Board is notified after the investment decision has already been made.  The MIO Board is

generally not provided any information related to Direct Investments made by MIO, nor is the

MIO Board provided a specific rationale underlying individual direct investment decisions.[141]

Individual MIO Board members do not have direct access to information related to investments

in individual securities held in Non-Investable Compass Funds (either MIO Direct Investments

---

[138] MIO Interview, Dec. 7, 2018; MIO Investments Committee Quarterly Report, dated
Mar. 3, 2017.

[139] MIO Interview, Dec. 7, 2018; MIO Investments Committee Quarterly Report, dated
Mar. 3, 2017.

[140] Non-Title III Staffing List, dated Nov. 9, 2018; Title III Staffing List, dated Nov. 9, 2018.
From December 8, 2006, through June 9, 2017, Jon Garcia, who is the president of McKinsey
RTS, served on the Investments Committee of the MIO Board.  As noted in Section VI above,
McKinsey RTS employees have provided services to the Oversight Board.  *See In re Alpha Nat.
Res. Inc.*, Case. No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4159 ¶¶ 1, 7; MIO Interview,
Dec. 7, 2018.  However, Mr. Garcia is not on the McKinsey Puerto Rico service team.

[141] MIO Interviews, Dec. 7, 2018, Feb. 1, 2019.  MIO's counsel reviewed all quarterly
investment reports from 2014 through 2018, and has represented to us that no investments in
Puerto Rico public debt were discussed in the quarterly investment reports.

or Separately Managed Accounts). Members of the MIO Board do not maintain offices at MIO and do not have MIO email addresses.[142]

Currently, the MIO Board consists of nine current or former McKinsey Partners and two independent directors who are not current or former McKinsey partners.[143] The Investments Committee consists of four current or former McKinsey partners and one independent director who is not a current or former McKinsey partner.[144]

### C.    Investment Advisors

MIO's investment advisors provide financial advice and wealth management services to Participants and Investors. MIO's investment advisors operate independently from MIO's investment management team, and are not incentivized to raise assets for MIO-managed or sponsored investment products. The Investment Advisors are technically hired by MIO, but they are compensated by McKinsey & Company Inc. and their services are provided to McKinsey employees free of charge. They do not maintain offices at MIO. The Investment Advisors are not provided any information regarding the underlying investments held by the Third-Party Funds or the Non-Investable Compass Funds.[145] The Investment Advisors are generally

---

[142] MIO Interview, Dec. 7, 2018.

[143] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 8; MIO Form ADV, dated Dec. 11, 2018, Schedule A. Prior to November 1, 2017, all members of the MIO Board were current or former McKinsey partners. *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH), ECF No. 4152 ¶ 8.

[144] MIO Board of Directors and Committees, dated October 17, 2018.

[145] MIO Interview, Dec. 7, 2018.

provided with the same types and level of information related to the underlying holdings as are the Participants and Investors, which as discussed more fully below, is quite limited.[146]

### D.    Information Available to Investors

#### 1.    Investment Prospectus

Participants and Investors are provided options to invest in the Special Situations Fund (after tax) or Portfolio (pre-tax) and various passive funds managed by State Street Global Advisors.  While Participants and Investors are provided general information related to the holdings (*e.g.*, asset class allocations), they are not provided information identifying the underlying investments (*e.g.*, individual securities or Third-Party Funds) held by the either the Investable or Non-Investable Compass Funds.  Participants and Investors are provided periodic windows to make new investments, make withdrawals, and reallocate assets, but they do not (and cannot) direct investments in particular securities or particular Third-Party Funds.[147]

#### 2.    Periodic Account Statements

Participants and Investors are provided periodic account statements that set forth their holdings in MIO-managed Plans and Funds.  As part of our investigation, we reviewed a redacted account statement for one of the partners involved in the Puerto Rico engagement.  The statements provide the number of units or shares in the Special Situations Fund and the value of the investment and various metrics regarding profits, losses, additions and withdrawals.  The statements do not provide information regarding the underlying funds owned by the Special Situations Funds (*e.g.*, Non-Investable Compass Funds or the Third-Party Funds) or any of the

---

[146] *Id.*

[147] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4150 ¶ 4; ECF No. 4160 ¶ 17; McKinsey Interview, Nov. 20, 2018; MIO Interview, Dec. 7, 2018.

underlying investments (*e.g.*, individual securities) held by any of the funds, and the partners could not obtain this information from MIO.[148]

### 3.    Periodic Newsletters and Reports

Investors in the after-tax Special Situations Fund are provided periodic reports and an annual newsletter.  Generally, the annual newsletters and reports describe the fund's performance.  They do not disclose specific investments (*e.g.*, investments in underlying securities) or investments with specific Third-Party Managers.  Rather, they review the performance of the Special Situations Fund against various metrics and benchmarks.  The annual newsletter may also provide information related to the performance of any private equity investments.[149]

### 4.    Audited Financial Statements

Investors in the after-tax Special Situations Funds are provided (or given access to) audited annual financial statements for the Fund in which the Investor is invested.  The financial statements identify any MIO Direct Investments or allocations to Third-Party Managers that exceed 5% of the Fund's assets.[150]  They do not disclose underlying investments in securities made by Third-Party Managers or the Non-Investable Compass Funds.  The 2016 audited financial statements for the Special Situations Funds we reviewed disclose that those funds were invested in the three Compass Funds that filed proofs of claim in the Title III proceedings.

---

[148] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 19; MIO Interview, Dec. 7, 2018.

[149] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 4; ECF No. 4160 ¶ 22–23; MIO Interview, Dec. 7, 2018.

[150] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 20; MIO Interview, Dec. 7, 2018.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 615 of 818

Specifically, as of December 31, 2016, Compass Special Situations Fund LLC was invested in Compass CSS High Yield LLC and Compass TSMA LP, and Compass Offshore Special Situations PCC Limited was invested in Compass ESMA LP.  However, the financial statements we reviewed do not disclose the identities of any Third-Party Managers or Third-Party Funds or any investments held by any of the underlying funds or any investments held by the Non-Investable Compass Funds, including any investments in Puerto Rico public debt.

### 5.    Publicly-Available Information

In addition to information provided directly to Participants and Investors, certain information is publicly available, including Forms ADV filed with the SEC, Forms 5500 filed with the Department of Labor, court filings, and news articles.  Each is summarized below.

### a)    Forms ADV

A Form ADV is used by investment advisers to register with the SEC.[151]  It contains information concerning, *inter alia*, the identities of auditors, fund managers and funds, and the location of books and records.  In Part 2A of Form ADV: Firm Brochure, a registrant discloses further information about the investment advisor's operations, the fees it charges, its investment strategies and potential risks, and certain policies and procedures.

Investment advisors update their Form ADV periodically.  The most recent form is generally available on the SEC's website and easily found through a simple internet search.[152]  MIO has updated its Form ADV two times since the *New York Times* reported MIO's investments in Puerto Rico public debt.  The first update, filed on October 1, 2018, discloses that

---

[151] https://www.sec.gov/fast-answers/answersformadvhtm.html.

[152] https://www.adviserinfo.sec.gov/IAPD/Default.aspx.

MIO is investment advisor to Compass CSS High Yield LLC and Compass TSMA LP – two of the three Compass funds that filed proofs of claim in the Title III proceedings in late May 2018. The second, filed on December 1, 2018, no longer lists Compass TSMA LP.[153]

### b)    Department of Labor Form 5500

The McKinsey Master Retirement Trust, the McKinsey & Company, Inc. Partner Cash Balance Plan, and the McKinsey & Company, Inc. Money Purchase Pension Plan file annual reports on Form 5500 with the Department of Labor.[154]  The annual report for the MMRT includes a schedule listing assets that were "acquired and disposed of" during the prior calendar year and a "schedule of assets held for investment" as of the end of a particular fiscal year.[155] These forms generally must be filed within nine and a half months of the end of the plan year.[156] The MMRT's most recent Form 5500 was filed on October 10, 2018, and discloses investments that were held as of December 31, 2017.[157]  It lists investments in the Pandora Select Fund Ltd., managed by Whitebox, and Compass ESMA LP.[158]

---

[153] Compass CSS High Yield LLC and Compass TSMA LP are both listed on MIO's March 28, 2018, Form ADV.

[154] These filings only include retirement assets.  They do not disclose investments made by the after-tax Special Situations Funds.

[155] The MMRT's Forms 5500 are available from the United States Department of Labor website at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e1s1.

[156] https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2017-instructions.pdf.

[157] MMRT Form 5500 for the year ended Dec. 31, 2017, Statement # 1.

[158] *Id.*  These investments were also disclosed in the MMRT's Form 5550 for the year ended December 31, 2015, filed on September 29, 2016, and the MMRT's Form 5500 for the year ended December 31, 2016, filed on October 11, 2017.

c) **Court Filings and News Articles**

Both MIO and McKinsey (and the general public) have access to public court filings (like
the Title III proceedings, *ANR, Westmoreland*, *SunEdison* and *JayAlix*) and news articles (like
those published by the *New York Times* and the *Wall Street Journal*) disclosing, for example, that
MIO, through three Compass-branded funds, holds or has held millions of dollars in COFINA
bonds and explaining where to find information related to MIO's investments.[159]

X. **McKinsey and MIO Conflict Policies and Training**

McKinsey and MIO have multiple complementary and overlapping policies designed to
avoid conflicts of interest. Those policies include: (1) the MIO – CSP Collaboration Policy;
(2) the McKinsey Information Sharing Guidelines and Conflicts of Interest Mitigation Processes;
(3) the MIO Trading Policy; (4) the McKinsey Personal Investments Policy; (5) the MIO
Personal Investment and Trading Policy and Code of Ethics; and (6) the MIO Board Conflict and
Confidentiality Policy. These policies, summarized below, are designed to ensure that the
consulting (McKinsey) and investment (MIO) sides do not share information and do not engage
in activities that result in actual or perceived conflicts of interest.[160]

A. **MIO – CSP Collaboration Policy**

The MIO – CSP Collaboration Policy (the "Collaboration Policy") is intended to guard
against "potential real or perceived conflicts of interest" which "may create reputational harm

---

[159] *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y.), ECF No. 5751 ¶ 6 n.4.

[160] McKinsey has other policies in place that, for example, govern organizational conflicts of
interest in connection with the procurement of government contracts. Those policies are not
relevant here.

both to [McKinsey] and MIO."[161]  It addresses communications between McKinsey consultants
and MIO employees and sets forth policies to ensure that confidential information and potential
conflicts of interest are managed appropriately.

The Collaboration Policy includes an "information barrier" between McKinsey's
consulting activities and MIO's investment activities and dictates that the two must be managed
independently and with separate operations, including separate offices, IT systems (including
email servers) and, with limited exceptions (*e.g.*, certain employees of the McKinsey legal
department), employees.[162]  Except for limited disclosures to the MIO Board and parties
providing oversight over the pension plans or as required by law (*e.g.*, disclosures to the SEC or
Department of Labor), McKinsey consultants are not provided information related to MIO's
investments.  Likewise, McKinsey's consulting relationships are not shared with MIO personnel.
MIO does not have regular access to McKinsey consultants and does not participate in client
interactions on the consulting side.[163]  There are certain restrictions on the sharing of information
between McKinsey consultants and MIO, including general prohibitions against:

- McKinsey providing client information to MIO in connection with a proposed
  transaction for any purpose;

---

[161] MIO-CSP Collaboration Policy, dated Sept. 2017.  "CSP" stands for Client Service
Professionals.  The Collaboration Policy was substantially revised in December 2016, at
approximately the same time McKinsey was retained by the Oversight Board, to further restrict
sharing of information regarding the identities of McKinsey's clients and MIO's investments and
generic market or industry-wide information.  The Collaboration Policy was revised again in
May 2017 and in September 2017.  We reviewed each iteration of the Collaboration Policy that
has applied during the McKinsey engagement.

[162] MIO may hire former McKinsey consultants only after the consultant has officially left the
consulting side and after the passage of a reasonable period of time between the last time the
consultant performed any client-related work and his or her start date at MIO.

[163] Both MIO and McKinsey may make introductions of potential clients or managers, provided
there is no further involvement.

- MIO employees attending McKinsey practice meetings;

- MIO discussing specific investments with McKinsey client service professionals (outside of the MIO Board governance context);

- McKinsey consultants disclosing to MIO whether or not McKinsey is serving a particular client; and

- MIO disclosing to McKinsey consultants the entities in which MIO holds investments.

The Collaboration Policy requires interactions between MIO and McKinsey to be limited and, to the extent practicable, monitored.  MIO may retain McKinsey consulting on the same terms as any other engagement, provided, however, McKinsey cannot be retained to identify or assess any investment opportunity.

Exceptions to the Collaboration Policy require approval by the Chairman of the MIO Board.  Employees violating the Collaboration Policy are subject to remedial actions, which can range from a warning to termination or referral to civil or governmental authorities.

### B.    McKinsey Information Sharing Guidelines and Conflicts of Interest Mitigation Processes

Pursuant to the McKinsey Firmwide Information Sharing Policy, confidential information acquired or developed may only be shared within the firm on a need-to-know basis.  In particular, information (whether written or not) developed from non-public client sources is confidential to that client (including information from third-party sources that is available to the client service team only through access provided by the client).  Such information may not be shared outside of the client service team.  Pursuant to the Conflicts of Interest Mitigation Processes, McKinsey uses password-protected "virtual team rooms."  Employees are required to sign non-disclosure agreements which prohibit disclosure of confidential information, even to

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 620 of 818

other employees of the firm.  Employees are required to report potential or actual violations of McKinsey's policies.[164]

### C.    MIO Trading Policy

The MIO Trading Policy is intended "to manage the reputational risk that could arise if MIO inadvertently traded securities related to clients of [McKinsey]."[165]  "The general spirit of the policy is to enable MIO to acquire macro-style or asset class-type exposures without seeking board pre-approval, but to not allow trading in individual name securities similar to what the Firm's Personal Trading Policy intends to achieve."[166]

Although there is no express policy that prohibits MIO from investing in McKinsey's consulting clients, MIO's trading policy is intended to eliminate the possibility of MIO directly making such an investment.[167]  With limited exceptions (*e.g.*, certain basket trades),[168] MIO is prohibited from purchasing single name corporate issuer securities and debt instruments. Nevertheless, MIO is permitted to invest freely in bonds issued by sovereigns, municipalities, and government agencies including their issuing entities, which would include bonds issued by the Commonwealth of Puerto Rico and its instrumentalities, so long as MIO is not in possession of material non-public information ("MNPI").  MIO may also trade credit default swaps, futures, and total return swaps on those bonds.[169]

---

[164] McKinsey Information Sharing Guidelines, dated Nov. 2, 2017; McKinsey Conflicts of Interest Mitigation Processes.

[165] MIO Trading Policy, dated Mar. 5, 2018.

[166] *Id.* The MIO Personal Trading Policy is described in Section X.E below.

[167] MIO Form ADV Part 2A, dated Mar. 28, 2018, Item 11; MIO Interview, Dec. 7, 2018.

[168] A basket trade is an order to buy or sell a group of securities simultaneously.

[169] MIO Trading Policy, dated Mar. 5, 2018.

According to MIO, this long-standing exception to the trading policy was intended to achieve a balance between avoiding conflicts of interest, on the one hand, and allowing MIO to make direct investments to achieve its desired asset exposure in an area where conflicts with McKinsey's consulting business are less likely, on the other.  Historically, trading in sovereign, state, and local municipal debt has been regarded as a "safe" space because there have been few bankruptcies in this sector and McKinsey has done limited work for distressed government entities.[170]

### D.    McKinsey Personal Investments Policy

McKinsey employees are prohibited from buying or selling securities while in the possession of MNPI and from buying or selling publicly-traded securities of any McKinsey client.[171]  Employees must "pre-clear" all trades, and if the security was issued by a McKinsey client, the employee will be informed that the investment is prohibited.[172]  Additionally, employees may not:

- Serve a non-public client and simultaneously hold any investment whatsoever in that client (*e.g.*, a private equity firm);

- Make investments that conflict with one's firm or client responsibilities;

- Engage in activities that impact one's commitment to the firm or its clients;

- Share MNPI with others where it appears likely that others will misuse such information; or

- Recommend the purchase or sale of a security to another while in possession of MNPI about the security or the issuer.

---

[170] MIO Interviews, Jan. 25, 2019, Feb. 1, 2019.

[171] McKinsey Personal Investments Policy, dated Feb. 2019.

[172] There are exclusions from the policy, including, for example, mutual funds, ETFs, and other investments where the employee has no input about purchases or sales of specific securities.

Until February 2019, trading in state, local, and municipal securities was permissible (and did not require pre-clearance) provided that (1) the firm member or household member did not have any MNPI about the entity or the security, and (2) in the case of industrial revenue bonds, the employee was not serving the entity that would receive or benefit from such bond.  As of February 2019, trading in these securities is prohibited if McKinsey serves the issuing entity or the entity that will receive or benefit from such security.[173]

### E.    MIO Personal Investment and Trading Policy and Code of Ethics

MIO's Personal Investment and Trading Policy and Code of Ethics is intended to ensure that "Supervised Persons" (*e.g.*, MIO officers, directors, and employees) put the interests of MIO ahead of their own.  There are detailed principles and standards of conduct that require Supervised Persons to act with competence, dignity, and integrity, and in an ethical manner.  The Code of Ethics places considerable restrictions on the trading activities of Supervised Persons and requires annual certifications from all Supervised Persons that they have read the policy, understand its terms and are bound by it.  The MIO Policies and Procedures to Detect and Prevent Insider Trading likewise restricts trading on MNPI.[174]

### F.    MIO Board Conflict and Confidentiality Policy

The MIO Board Conflict and Confidentiality Policy, implemented in June 2018, recognizes that potential conflicts are inherent in MIO's structure as a subsidiary of McKinsey, and the various activities, actions, and investments of the individual board members.  The MIO Board Conflict and Confidentiality Policy lays out the MIO Board's main concerns, which

---

[173] McKinsey Personal Investments Policy, dated July 2017; McKinsey Personal Investments Policy, dated Feb. 2019.

[174] MIO Partners, Inc. and MIO Order Funds Personal Investments and Trading Policy and Code of Ethics, dated March 2016; MIO Partners, Inc. and MIO Order Funds Personal Investments and Trading Policy and Code of Ethics, dated June 2017.

include, *inter alia*, avoiding real and perceived conflicts of interest. For example, the policy

states that McKinsey partners may not advise a client in its investment decision-making for

trading public equity or public debt. The MIO Board Conflict and Confidentiality Policy

additionally provides that MIO Board members may not advise asset managers for two years

following their Board tenure.[175]

The Governance Committee of the MIO Board is responsible for monitoring conflict

issues and ensuring implementation of MIO Board's policies in coordination with the Board

Chair, MIO's General Counsel, and McKinsey's Legal Department. The MIO Board Conflict

and Confidentiality Policy includes the following provisions:

- MIO Board members' engagements are reviewed to determine whether any conflicts exist.

- All MIO Board members must disclose potential conflicts to the board's governance committee and recuse themselves from any discussion.

- All MIO Board members are subject to Collaboration Policy (described in Section X.A. above) and are obligated to guard client confidences (if applicable) and MIO's intellectual property.

- Board members who are active partners of McKinsey are subject to McKinsey's personal trading policy (described in Section X.D above).

Each MIO Board member must annually certify adherence to (a) the MIO Board Conflict and

Confidentiality Policy; (b) the Collaboration Policy; and (c) if on the Investments Committee, the

Investments Committee Personal Account Trading Policy. Each active McKinsey partner must

also review his or her client service with the Governance Committee to confirm there are no

conflicts of interest.[176]

---

[175] MIO Board Conflict and Confidentiality Policy, dated June 2018.

[176] *Id.*

The Investments Committee Personal Account Trading Policy imposes further restrictions on the members of the Investments Committee.  In recognition of the additional information provided to Investments Committee members, the policy imposes enhanced reporting and places additional restrictions on the ability of Investments Committee members to make personal investments.[177]

### G.    Training and Certification

McKinsey and MIO employees are required to complete annual policy certifications confirming that they have read and understand the various policies and will continue to abide by them.  In addition, McKinsey employees are required to complete training modules, and there are periodic presentations regarding the McKinsey and MIO policies.  The McKinsey and MIO personnel we interviewed confirmed their participation in the training programs, their periodic certifications, and their compliance with the policies and procedures.[178]

## XI.    MIO Investments in Puerto Rico Public Debt

MIO has held at least five direct or indirect investments in Puerto Rico public debt during the course of McKinsey's engagement by the Oversight Board.  It is clear that at all relevant times, MIO's portfolio managers and CIO knew that MIO was invested directly and indirectly in Puerto Rico public debt.  However, we have uncovered no evidence that information in MIO's possession concerning these investments was shared with the McKinsey Puerto Rico service team or any other McKinsey consultant.  Nevertheless, a McKinsey consulting professional investing through MIO theoretically could have determined that MIO was invested in Puerto

---

[177] Investments Committee Personal Account Trading Policy, dated July 2016.

[178] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018, Feb. 1, 2019; MIO Interviews, Dec. 7, 2018, Jan. 11, 2019, Feb. 1, 2019.

Rico public debt by reviewing publicly-available (albeit usually dated and incomplete) information.  Each of MIO's investments and the publicly-available information related to that investment is discussed below.

### A.    Separately Managed Accounts

As disclosed in the September *New York Times* article and confirmed to LS&E, MIO funds hold or have held investments in Puerto Rico public debt through three Separately Managed Accounts, where a Third-Party Manager filed a proof of claim on behalf of a Non-Investable Compass Fund.  Those proofs of claim are set forth below:

| Claimant | Date Filed | Asset Manager | Bond | Claim Amount |
|---|---|---|---|---|
| Compass CSS High Yield LLC[179] | May 22, 2018 | ASA Managed Account Managers LLC ("ASA") | COFINA PREPA AFICA | $16,276,085.64 in principal and accrued interest |
| Compass TSMA LP[180] | May 25, 2018 | Aristeia Capital LLC ("Aristeia") | COFINA | $2,277,657.46 in principal and accrued interest, plus unliquidated amounts |
| Compass ESMA LP[181] | May 25, 2018 | Aristeia | COFINA | $1,570,572.67 in principal and accrued interest, plus unliquidated amounts |

---

[179] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), Claim No. 18575.

[180] *Id.*, Claim Nos. 34183, 38948.

[181] *Id.*, Claim Nos. 22063, 32025.  The proofs of claim filed by Compass ESMA LP and Compass TSMA LP were withdrawn as part of the confirmation of the COFINA plan of adjustment.  *Id.*, ECF Nos. 4996, 5047.

As discussed more fully in Section X.A.2 above, investments through Separately
Managed Accounts, while made in the name of and nominally owned by an MIO-controlled
Compass fund, are made by Third-Party Managers – in this case, ASA and Aristeia.  Each of
ASA and Aristeia was delegated authority to invest and reinvest in the name of the particular
fund in accordance with investment guidelines attached to their agreements with MIO and the
fund.  MIO exercises no discretion over these investments; they are managed by ASA and
Aristeia, respectively.  MIO's investments through these Third-Party Managers pre-dated
McKinsey USG's retention by the Oversight Board.[182]  At all relevant times, MIO's investment
team was aware that these Third-Party Fund Managers had made investments in Puerto Rico
public debt.[183]

We have seen no information indicating that a Participant or Investor would have been
able to confirm that MIO was invested in Puerto Rico public debt through ASA and Compass
CSS High Yield LLC until May 22, 2018, when ASA filed a proof of claim on behalf of
Compass CSS High Yield LLC.  Although ASA is listed in MIO's March 28, 2018 Form ADV,
ASA was not active in the Title III proceedings.[184]  However, upon filing of the proof of claim, a
determined investigator could have "connected the dots" and determined that MIO was invested
in Puerto Rico public debt by comparing the proof of claim to MIO's most recent publicly-filed
Form ADV, which discloses Compass CSS High Yield LLC's relationship to MIO.

---

[182] MIO Interviews, Dec. 7, 2018, Jan. 11, 2019.

[183] MIO Interviews, Dec. 7, 2018, Jan. 11, 2019.

[184] MIO Form ADV, dated Mar. 28, 2018.

With respect to the investments managed by Aristeia, an investigator could have
determined based upon MIO's publicly-filed June 9, 2017 Form ADV that Aristeia had invested
on behalf of MIO's fund Compass TSMA LP and that funds owned or controlled by Aristeia
were invested in COFINA bonds at least as early as July 25, 2017, when Aristeia's name
appeared in the Senior COFINA Bondholders' Coalition's Bankruptcy Rule 2019 disclosure.[185]
However, no one could have confirmed based upon publicly-available information that Compass
TSMA LP or Compass ESMA LP was invested in Puerto Rico public debt until Aristeia filed
proofs of claim on their behalf on May 25, 2018.

MIO's counsel has confirmed to us that, as of September 30, 2018, Compass ESMA LP
and Compass TSMA LP are no longer invested in COFINA bonds through these Separately
Managed Accounts. All securities from the Separately Managed Accounts that Aristeia managed
for Compass ESMA LP and Compass TSMA LP were transferred (based on market valuations of
the relevant securities at the time of transfer) to Aristeia-controlled funds; this included all Puerto
Rico public debt obligations held in the accounts at the time of transfer. MIO is now invested in
Aristeia Partners LP and Aristeia International Limited, both of which are feeder funds for
Aristeia Master LP (managed by Aristeia), over which MIO has no control or investment
discretion.

MIO's counsel has also represented to us that, as of February 7, 2019, the Plans and
Funds no longer hold any investments in Puerto Rico public debt through Separately Managed
Accounts. However, investment discretion is vested with the Third-Party Managers and it is

---

[185] MIO Form ADV, dated June 9, 2017; *In re Fin. Oversight & Mgmt. Bd. for P.R.*,
Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 749. Bankruptcy Rule 2019 requires groups or
committees that consist of or represent and every entity that represents multiple unrelated
creditors or equity security holders that are acting to advance their common interests to make
certain disclosures, including their identities and economic interests. *See* Fed. R. Bankr. P. 2019.

possible that MIO may in the future hold positions in Puerto Rico public debt through a

Separately Managed Account.

## B.    Third-Party Funds

As was also reported by the *New York Times* and confirmed to LS&E, MIO has an

indirect investment in Pandora Select Partners, LP ("Pandora Select Partners") managed by a

Third-Party Manager, Whitebox.[186]  Pandora Select Partners filed three proofs of claim in the

Title III proceedings as set forth below:

| Pandora Select Partners Claim | Date Filed | Asset Manager | Bond | Claim Amount |
|---|---|---|---|---|
| Claim Nos. 100667, 109765 | June 29, 2018 | Whitebox | COFINA | $368,211.93, plus unliquidated amounts |
| Claim No. 50742[187] | June 20, 2018 | Whitebox | GO | $8,876,500.00 |

According to MIO, Whitebox has complete discretionary authority with respect to these

investments, and MIO cannot and does not direct Whitebox with respect to Pandora Select

Partners' investments in Puerto Rico public debt or generally.[188]

---

[186] Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018; MIO Interview, Feb. 1, 2019.  The MMRT's Form 5500 for the year ended December 31, 2017 lists an investment in Pandora Select Fund Ltd., which we understand is an offshore feeder fund for Pandora Select Partners, LP.  *See* Whitebox Form ADV Part 2A, dated Mar. 28, 2018.

[187] Pandora Select Partners acquired this claim on August 28, 2018, from Syncora Guarantee Inc. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 3872. The face amount of the claim filed by Syncora is more than $108 million.  However, Pandora Select Partners acquired only a portion of the claim.  The remainder was assigned to other Whitebox-managed entities.

[188] MIO Interviews, Dec. 7, 2018, Feb. 1, 2019.

By reviewing the MMRT's 2015 Form 5500 filed with the Department of Labor on September 29, 2016, and litigation filed by Pandora Select Partners in New York State Court on April 12, 2017,[189] and in the Title III proceedings against Pandora Select Partners by the Bank of New York Mellon ("BNYM") on May 16, 2017,[190] an investigator could have surmised that MIO was invested in Puerto Rico public debt through Pandora Select Partners. However, the age of the information contained in the Forms 5500 makes it impossible to confirm, based upon publicly-available information, whether and to what extent those investments still existed at the time the litigations were filed or at any time afterward (including now).[191]

MIO did not provide us with a list of Third-Party Managers, so we could not compare the list of Third-Party Managers and Third-Party Funds to the list of claims filed in the Title III

---

[189] *Whitebox Multi-Strategy Partners, L.P. v. Bank of N.Y. Mellon Corp.*, Index No. 651969/2017 (Sup. Ct. N.Y. Cnty.). On May 18, 2017, the case was removed to the United States District Court for the Southern District of New York and subsequently transferred to the United States District Court for the District of Puerto Rico. *See Whitebox Multi-Strategy Partners, L.P. v. Bank of N.Y. Mellon Corp.*, Adv. Proc. No. 17-143-LTS (D.P.R.).

[190] BNYM also filed a declaratory action in the COFINA Title III proceedings against Pandora Select Partners L.P. *See Bank of N.Y. Mellon v. P.R. Sales Tax Fin. Corp. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Adv. Proc. No. 17-133-LTS (D.P.R.).

[191] The September 2018 *New York Times* article reported that Whitebox held more than $140 million of Puerto Rico bonds. It is not clear how the *New York Times* calculated that amount, but public filings indicate that, as of October 31, 2018, Whitebox managed approximately $310 million in Puerto Rico public debt, not just the $140 million disclosed in the article. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4332. However, only approximately $9.3 million is held by Pandora Select Partners. The other approximately $300 million is held in other funds managed by Whitebox, including Whitebox Asymmetric Partners LP (Claim Nos. 23452, 50742, 102245, & 115134); Whitebox Multi-Strategy Partners, LP (Claim Nos. 32093, 65838, 27008, 118254 & 50742); Whitebox Term Credit Fund I LP (Claim Nos. 28605, 31755); Whitebox GT Fund, LP (Claim No. 50742); Whitebox Institutional Partners LP (Claim Nos. 43498, 25609, 36206, 66556, 115673); and Whitebox Caja Blanca Fund, LP (Claim Nos. 32265, 52002, 27429, 51434, 50742). MIO has represented to us that it does not currently have any investments in these other Whitebox-managed funds.

proceedings, and we have not been able to confirm that no other investments exist. Both

McKinsey and MIO acknowledged that it was possible that there may be additional holdings

through Third-Party Funds, but reiterated that MIO has no discretion to control the underlying

investments made by these Third-Party Funds.

### C. MIO Direct Investments

MIO also held a direct investment in COFINA bonds through a Non-Investable Compass

Fund. In 2014, MIO purchased $58,345,000 par value of COFINA bonds at a steep discount.

MIO disposed of $8,345,000 par value in three transactions in the first quarter of 2017, and

disposed of the remaining $50,000,000 par value in two transactions in April 2018. The Non-

Investable Compass Fund realized a total profit of approximately $765,000 on this investment.

MIO made the decision to dispose of the investment independently and without information

received from the consulting side of McKinsey.[192] This investment was not disclosed in any

public filings and no one working on McKinsey's Puerto Rico service team would have been

able to learn of this investment at any time prior to the filing of this Report. MIO has

represented to LS&E that it does not currently have any other Direct Investments in Puerto Rico

public debt.

### XII. McKinsey's Involvement in the COFINA Settlement and Plan of Adjustment

Because of MIO's direct and indirect investments in COFINA bonds, we believe it was

important to investigate and determine what, if any, involvement McKinsey had in the

development and formulation of the COFINA plan of adjustment and the allocation of the sales

and use tax revenue to be used to pay COFINA bondholder claims. As discussed more fully

below, we have not seen any evidence that a member of the McKinsey Puerto Rico service team

---

[192] MIO Interviews, Dec. 7, 2018, Jan. 11, 2019.

was aware of MIO's investments in COFINA bonds or other Puerto Rico public debt. Moreover,

even if an individual team member had been aware of those investments, McKinsey did not

participate in any of the negotiations that led to the COFINA settlement or the COFINA plan of

adjustment.

On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure

to Resolve Commonwealth-COFINA Dispute*.[193] Pursuant to the Stipulation, the Oversight

Board authorized (1) "the statutory committee of unsecured claimholders appointed by the

United States Trustee on June 15, 2017 (the "Creditors' Committee") to serve as the

Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on

behalf of the Commonwealth (the "Commonwealth Agent")" and (2) "Bettina Whyte to serve as

the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on

behalf of COFINA" (the "COFINA Agent" and together with the Commonwealth Agent, the

"Agents").[194]

On June 5, 2018, the Agents filed the *Joint Urgent Motion of Commonwealth Agent and

COFINA Agent Requesting that Court Hold Decision on Motions for Summary Judgment in

Abeyance for 60-Day Period*.[195] On June 7, 2018, the Agents filed the *Joint Informative Motion*

---

[193] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.),
ECF No. 996.

[194] *Id.* ¶ 4(a), (b).

[195] *Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Whyte
(In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Adv. Proc. No. 17-257-LTS (D.P.R.), ECF No. 484.

Case 15-10541-BLS Doc 2406-3 Filed 04/11/19 Page 632 of 818

*of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle.*[196]  As set forth

in the COFINA Fiscal Plan, the Agreement in Principle is premised on:

> splitting the 'Pledged Sales Tax Base Amount' ("PSTBA") between the
> Commonwealth and COFINA.  The PSTBA is an amount established under Act
> 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended
> and restated on June 10, 2009 (the "Bond Resolution"), that, under current law,
> must be received by COFINA from 5.5% of the SUT before the Commonwealth
> can receive any of the other 5.5% SUT.  Under the [Agreement in Principle],
> COFINA will receive (a) 53.65% of the yearly scheduled PSTBA beginning with
> payments made on July 1, 2018 and (b) all of the cash held in trust at [BNYM], as
> trustee under the Bond Resolution, as of June 30, 2018 (approximately $1.2
> billion).  The Commonwealth will receive the remaining 46.35% of the
> PSTBA.[197]

Beginning in July, the Oversight Board engaged in more than two weeks of mediation

among interested parties on a COFINA plan of adjustment and the attendant issues that needed to

be resolved for a viable plan to be proposed, including the relative rights between senior and

junior COFINA bondholders.[198]  On August 8, 2018, the Oversight Board and the Government

of Puerto Rico announced that an agreement had been reached with Senior and Junior COFINA

bondholders and monoline insurers on the economic treatment of COFINA bondholders and on

the terms of new COFINA securities.[199]

---

[196] *Id.*, ECF No. 486.

[197] COFINA Fiscal Plan, as Certified by the Financial Oversight and Management Board for
Puerto Rico, Oct. 18, 2018 ("COFINA Fiscal Plan"), at 5.  A copy of the COFINA Fiscal Plan is
available on the Oversight Board's website at https://drive.google.com/file/d/1iotA4SxTa19aXk
_3BwMyepe6n84v8SjZ/view.

[198] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.),
ECF No. 4756 ¶ 26; ECF No. 4758 ¶ 22.

[199] *Id.*, ECF No. 4758 ¶ 22.  A copy of the Oversight Board's press release is available on the
Oversight Board's website at https://oversightboard.pr.gov/oversight-board-reaches-deal-with-
cofina-bondholders/?mod=article_inline.

The Oversight Board, COFINA, the Puerto Rico Fiscal Agency & Financial Advisory

Authority ("AAFAF"), certain holders of Senior COFINA Bonds, certain holders of Junior

COFINA Bonds, certain monoline insurers, and Bonistas del Patio, Inc. (collectively, the

"Settlement Parties") entered into a Plan Support Agreement, dated as of August 29, 2018

(the "Original Plan Support Agreement"), that contemplates, *inter alia*, (a) terms to the

compromise and settlement of the Commonwealth-COFINA Dispute developed by the Oversight

Board and consistent with the terms of the Agreement in Principle which, *inter alia*, allocates an

amount up to (53.65%) of the annual PSTBA to COFINA, and confirms that COFINA is the sole

owner of the amounts held at BNYM as of June 30, 2018, and (b) terms of the treatment between

Junior and Senior COFINA Bondholders.[200]

After further mediation, on September 20, 2018, the Settlement Parties entered into an

amended Plan Support Agreement (the "A&R Plan Support Agreement") that included

additional bondholders, all of whom are holders of GO Bonds.[201]

Neither the Oversight Board nor McKinsey was a party to the negotiations that led to the

settlement of the Commonwealth-COFINA Dispute or in the PBSTA allocation.[202]  As noted

above, the Agreement in Principle was reached by two independent agents who negotiated on

behalf of COFINA and the Commonwealth.  Neither the Oversight Board nor McKinsey was "at

the negotiating table," and although the Oversight Board was actively involved in negotiation of

---

[200] A copy of the Original Plan Support Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1YfGXodyeTEezi56XEbYH-YpTVV1sqGuY/view.

[201] A copy of the A&R Plan Support Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1yp6WR-lE6KwPH8DrQjIDf4Ty4IAl0qYr/view.

[202] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 5047 ¶ 34.

the subsequent plan of adjustment, the Oversight Board was aided by its financial advisor, Citi, not by McKinsey, and the economics of the PSTBA allocation did not change from the June 2018 Agreement in Principle.[203]

McKinsey's primary role (after making the Oversight Board operational) has been to "stress test" fiscal plans for the Commonwealth and certain of its instrumentalities. The Commonwealth fiscal plan does not differentiate between the sources of available revenue or indicate how much should be paid to particular bondholders or other creditors. McKinsey has played no role in setting the allocations of revenue available for debt service for the various bondholders (*e.g.*, COFINA, GO, PREPA, HTA, etc.) or in developing the terms of the new securities that will be issued pursuant to the COFINA plan of adjustment, which were developed by Citi.[204]

As disclosed in McKinsey's contract with the Oversight Board and in its fee applications filed with the Court, McKinsey did provide "mediation support" to the Oversight Board.[205] McKinsey's role in the mediation was limited to providing information to the various creditor constituencies so that creditors could understand the particular provisions of the fiscal plans and

---

[203] McKinsey Interview, Dec. 12, 2018; Proskauer Interview, Dec. 28, 2018; Oversight Board Interviews, Dec. 10 & 17, 2018, Jan. 28, 2019.

[204] McKinsey Interview, Dec. 12, 2018; Proskauer Interview, Dec. 28, 2018; Oversight Board Interviews, Dec. 10 & 17, 2018, Jan. 28, 2019. As is contemplated by Section 201 of PROMESA, the COFINA Fiscal Plan was prepared by AAFAF and revised with input from the Oversight Board and its advisors (primarily Citi). McKinsey was involved in conforming the COFINA Fiscal Plan to the Commonwealth Fiscal Plan insofar as the macroeconomic analysis of Puerto Rico was incorporated into the COFINA Fiscal Plan. Oversight Board Interview, Jan. 31, 2019; McKinsey Interview, Feb. 1, 2019; *compare* COFINA Fiscal Plan Ch. 5 *with* Commonwealth Fiscal Plan Ch. 4.

[205] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 3580 at 13–14, 132; Title III Consulting Agreement, Attachment 1.

the assumptions that underlay them.  There were multiple sessions where McKinsey personnel
provided answers to questions so that all constituencies could be working with the same set of
operative facts.  The sessions generally involved McKinsey personnel providing answers to
questions (in one case more than 1,000) that had been posed by the creditor constituencies ahead
of time.[206]

Similarly, McKinsey did not and has not taken any position on the seniority or
entitlement of bondholders to the various revenue streams.  McKinsey provided the "bottom
line" number, but even that was only a recommendation to the Oversight Board, which
ultimately made its own decision whether or not to certify the Commonwealth's fiscal plan.
Importantly, McKinsey was not and is not involved in the allocation of revenue among
bondholders and creditors.  McKinsey was not involved in negotiating the COFINA settlement
or plan of adjustment, developing the terms of the new securities that have now been issued
under the COFINA plan of adjustment, framing any legal arguments in connection with the
Commonwealth-COFINA Dispute, or reviewing draft documents in connection with the
COFINA settlement or plan of adjustment.  While McKinsey was aware of ongoing negotiations
between the Agents, McKinsey did not learn of the settlement until it became public.[207]

---

[206] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018, Feb. 1, 2019; Oversight Board
Interviews, Dec. 17, 2018, Jan. 28, 2019; Proskauer Interview, Dec. 28, 2018.

[207] McKinsey Interview, Dec. 12, 2018.  As noted above, McKinsey played a limited role in the
preparation of the COFINA Fiscal Plan after the economics of the COFINA settlement had
already been agreed upon.  On February 4, 2019, the Court entered orders approving the
settlement of the Commonwealth-COFINA Dispute and confirming the Third Amended
COFINA Plan of Adjustment.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17 BK 2383-
LTS (D.P.R.), ECF Nos. 5045, 5055.

## XIII.   Analysis and Conclusions

Based upon our investigation, we have concluded that McKinsey USG complied with all legal and contractual requirements.  However, MIO's direct and third-party managed investments in Puerto Rico public debt could create the appearance of a potential conflict.  The Oversight Board likely would have considered MIO's direct investments in Puerto Rico public debt a conflict and would have required MIO to divest or to explain why the investments did not present a disabling conflict had it known about the investment at the outset.  The Oversight Board also would have sought additional information on MIO's third-party managed investments in Puerto Rico public debt – how they were held, the extent of MIO's control over investment decisions involving the bonds, what information MIO shared with the consulting side or investors, and what policies or procedures are in place to mitigate any potential conflicts.  Only then could the Oversight Board have made its own informed determination whether there was a conflict and, if so, whether it was disabling.

### A.   McKinsey Made All Disclosures Required by Applicable Law and Requested by the Oversight Board

#### 1.   The Strategic Consultant RFP

The Consultant RFP did not ask applicants to disclose whether the applicant, or its affiliates, had any investments in Puerto Rico public debt.  Instead, the Consultant RFP focused on conflicts of interest related to past and present work performed by the applicant for the Government of Puerto Rico and its instrumentalities, and asked applicants to disclose potential conflicts of interest arising out of "current or prior engagements with other parties."[208]  The Consultant RFP did not ask applicants to identify their affiliates or any connections those

---

[208] Consultant RFP at 3.

affiliates might have, and McKinsey USG fairly responded, based upon the information available

to it and the parameters set by the Oversight Board, that it did not have any conflicts of interest.

### 2.    The Vendor Code of Conduct

Similarly, McKinsey USG complied with the Oversight Board's Vendor Code of

Conduct and Disclosure Certification.  Although COFINA is listed as an "Interested Party," none

of the seven questions can reasonably be interpreted as seeking disclosure of the existence of

MIO or of MIO's investments in Puerto Rico public debt.  Rather, the questions are all aimed at

determining whether any Interested Party or any person associated with any Interested Party has

a financial interest in the vendor.  And even if these questions arguably required disclosure of an

investment held by MIO in Puerto Rico public debt, we have uncovered no evidence that the

McKinsey employees working on the Oversight Board engagement were aware of any MIO

investments in COFINA bonds.  McKinsey and MIO have strict policies in place to make sure

that McKinsey consultants never learn about such investments, and the McKinsey partners in

charge of the Oversight Board engagement did not, in fact, know about MIO's investments in

Puerto Rico public debt.

### 3.    The September 1, 2018 Core Contract

As discussed in Section V.C above, the Oversight Board signed a new agreement with

McKinsey USG in September 2018 governing McKinsey's non-Title III work.  That agreement

contains the following provision – now standard in Oversight Board contracts – addressing

conflicts of interest:

> **7. No Conflict of Interest**.  During the term of this Agreement, Contractor
> will not accept work, enter into a contract, or accept an obligation from any third
> party, inconsistent or incompatible with Contractor's obligations, or the scope of
> services rendered for the [Oversight] Board, under this Agreement or any Project
> Assignment.  Contractor shall not take actions during the term of this Agreement
> or any Project Assignment that would constitute or could create the appearance of

a conflict of interest with the [Oversight] Board's mission or the work performed
by the Contractor for the [Oversight] Board. . . .[209]

Again, nothing in this provision – applicable to McKinsey USG – would, on its face, cover

investments held by or through MIO.

### 4.    PROMESA

Finally, McKinsey complied with all disclosure obligations and conflict of interest rules

imposed by PROMESA.  Two provisions in PROMESA address Oversight Board conflicts of

interest, but neither is applicable to McKinsey.  The first – Section 108 of PROMESA –

authorizes the Oversight Board to choose counsel in "any action brought by, on behalf of, or

against the Oversight Board . . . so long as the representation complies with the applicable

professional rules of conduct governing conflicts of interest."[210]  The second – Section 109 of

PROMESA – requires the Oversight Board and its staff to comply with "Federal conflict of

interest requirements described in Section 208 of title 18, United States Code" and requires the

Oversight Board and staff designated by the Oversight Board to "disclos[e] their financial

interests" in conformity with Section 102 of the Ethics in Government Act of 1978 (5. U.S.C.

App.).[211]  By their clear terms, neither is applicable to McKinsey.

Section 327 of the Bankruptcy Code was not included in PROMESA, so professionals

like McKinsey USG retained by the Oversight Board are not required to disclose their

"connections" to the Debtors, their creditors, and other parties-in-interest or to establish that they

---

[209] September 1, 2018 Core Consulting Agreement § 7.

[210] 48 U.S.C. § 2128(b).

[211] 48 U.S.C. § 2129.  Section 208 generally prohibits officers and employees of specified
governmental branches or agencies from participating personally and substantially in
government matters in which they or their immediate family members have a financial interest.
18 U.S.C. § 208.

are "disinterested."  As noted above, we take no position regarding what McKinsey would have
been required to disclose if its retention had been governed by Section 327 of the Bankruptcy
Code and Bankruptcy Rule 2014 or whether McKinsey USG would be able to establish that it is
disinterested.

**B.**      **McKinsey's Procedures and Policies Mitigated any Conflicts Arising from
            MIO's Investments in Puerto Rico Public Debt**

The McKinsey consulting arm is effectively walled off from its investment arm, and there
is no sharing of confidential information or resources, except in very limited circumstances, none
of which is implicated here.  There are physical information barriers – for example, separate
offices, email accounts, and computer systems – as well as detailed policies designed to ensure
that client information is kept confidential and not shared between the consulting and investment
sides, and that if it is, the information is not acted on.  Indeed, even on the consulting side,
McKinsey has robust policies in place to ensure that information is shared only on a "need to
know" basis, and for example, uses password-protected document repositories to ensure that
information is not shared beyond the client service team.  MIO and McKinsey personnel are
required to undergo training, to review the policies on an annual basis, to certify their
compliance with these policies, and to report any violations.

The only overlap between the two sides is at the MIO Board level, which does include
current McKinsey consulting professionals (though no one on the Puerto Rico service team).
However, the MIO Board has delegated all investment making discretion to MIO's investment
professionals.  While certain investment level information is available to the MIO Board (for
example, the identities of Third-Party Funds and Third-Party Managers), none of the MIO Board
members is on the McKinsey Puerto Rico service team.  And, in recognition of the fact that
investment information is shared with the MIO Board, MIO has policies in place to address and

mitigate any potential conflicts that may arise from any active McKinsey partners' consulting
activities.

MIO has during the course of McKinsey's engagement for the Oversight Board held
direct (now liquidated) and third-party managed (still in existence) investments in Puerto Rico
public debt.  However, we have seen no evidence indicating that McKinsey consulting personnel
knew about those investments prior to the inquiries from the *Wall Street Journal* and the *New
York Times* or that McKinsey personnel were in a position to take or actually took any action
intended to influence the terms of the COFINA settlement.  Indeed, McKinsey did not have any
involvement in the negotiations related to the PSBTA allocation, the COFINA plan of
adjustment, or the terms of the securities that have now been issued pursuant to the confirmed
COFINA plan of adjustment.

Theoretically, a McKinsey professional might have been able to determine that MIO had
investments in Puerto Rico public debt by reviewing information (much of it stale and
incomplete) contained in publicly-available regulatory and court filings.  But even if a McKinsey
professional were aware of such an investment, the McKinsey professional could not have
known for certain whether that investment was still in place until May 2018, and would not have
known what action to take had the professional wanted to influence the investment; and the
professional could not have done so without using material non-public information – a violation
of multiple McKinsey policies, fiduciary duties, and applicable securities laws.

C.    **Had the Oversight Board Known about MIO's Investments in Puerto Rico
Public Debt, It Would Have Sought Additional Disclosure**

Although as a result of the newspaper articles and this investigation, the Oversight Board
has now received information related to MIO, its investments in Puerto Rico public debt, and
McKinsey's and MIO's practices and policies, neither the Oversight Board nor PROMESA

required McKinsey to make these disclosures, and the Oversight Board did not have the opportunity to determine at the outset of McKinsey's engagement whether MIO's holdings in Puerto Rico debt constituted a conflict or, if they did, whether the conflict was significant enough to require MIO to sell those investments in Puerto Rico public debt or take any other ameliorative action. Nor did the Oversight Board have the opportunity then to review McKinsey's and MIO's policies and procedures designed to avoid or eliminate conflicts, or to consider whether those policies and procedures effectively mitigated the impact of any potential conflicts.

When the Oversight Board first learned of MIO and of MIO's investments in Whitebox in May 2018, the Oversight Board spoke with McKinsey, and determined based on conversations with McKinsey and a review of public filings, and on representations concerning the separation of MIO from McKinsey's consulting business, that McKinsey's prior disclosures were appropriate and that no conflict existed. After the *New York Times* reported that three MIO-controlled funds owned additional Puerto Rico public debt, the Oversight Board directed LS&E to conduct this investigation and asked that we consider what recommendations we would make to improve the Oversight Board's disclosure policies and procedures.

## XIV. <u>Recommendations</u>

The heart of this matter is disclosure. The Oversight Board is committed to transparency in its work, and that includes its relationships with its vendors, including consultants like McKinsey. The Oversight Board is also keenly aware that its creation by Congress as an instrumentality of the Commonwealth, its powers over the restructuring and revitalization processes, and its role in the generation and approval of fiscal plans, budgets, transformation plans, and plans of arrangement are not without controversy. This only heightens the need for

the Oversight Board to avoid even the appearance of bias and to be particularly vigilant in

identifying and dealing with conflicts and potential conflicts of interest.

As described elsewhere in this Report, the Oversight Board has over the course of its

short life developed policies and procedures governing conflicts, initially on its own and since

March 2017, with the assistance of its Ethics Advisor.  Detailed disclosure, and particularly

financial disclosure, is required of all members of the Oversight Board and key staff in order to

ferret out connections to Puerto Rico's government and agencies (the "covered instrumentalities"

under PROMESA), including as holders of Puerto Rico public debt.  The same kind of detailed

disclosure has not been required of or made by the Oversight Board's vendors, and that has led to

inconsistencies and uncertainties about disclosure requirements and how to deal with conflicts

that are disclosed.[212]

McKinsey's case is not unique:  it is a very large organization with thousands of

employees and thousands of clients spread across the globe.  It is acutely aware of the

confidential nature of its work.  It has organized itself and adopted policies and procedures,

which it has enforced and continues to enforce, that are designed to, and in fact do, maintain

client confidences, ensure that information does not leak between the consulting side and the

investing side of McKinsey's business, and minimize the likelihood of conflicts.

The Recommendations that follow take this into account and attempt to strike a balance

between the Oversight Board's need to know, to assess the likelihood and avoid even the

appearance of conflicts (on the one hand), and the Oversight Board's recognition that precisely

because large organizations have erected information barriers and other procedures to ensure

---

[212] We have reviewed responses by many of the Oversight Board's vendors and potential
vendors, and the degree of disclosure regarding connections to Puerto Rico and conflict
mitigation policies varied widely from vendor to vendor.

confidentiality and to minimize conflicts, not every fact bearing on every possible conflict is readily obtainable (on the other). If the facts are known, steps can be taken to eliminate the conflict entirely or to mitigate against the impact a conflict might have. And, in the end, the Oversight Board recognizes that not every potential conflict is disabling.

## A. Recommendation No. 1 – Vendors Should Disclose Affiliate Relationships

While the Oversight Board's vendor contacts are generally with one particular entity within a much larger organization (*e.g.*, McKinsey USG), relationships that other entities within the organization have that could give rise to conflicts should be disclosed. Trading in Puerto Rico public debt is particularly problematic, as it gives rise to the appearance of conflict: Will investments influence advice, and vice versa; will advice influence investments? Vendors' relationships with Puerto Rico, directly or through investment vehicles holding and trading in Puerto Rico public debt, should be disclosed to the extent feasible.

Large organizations (not just McKinsey) have affiliates that oversee retirement and other investments for employees or are themselves major players in the financial world as bankers, investors, market makers, underwriters, and advisors. While these affiliates are not themselves the Oversight Board's vendors and are not themselves providing goods or services to the Oversight Board, their activities might touch on Puerto Rico in one way or another, and it is important that the Oversight Board know this. Thus, for instance, while McKinsey may have every confidence that the activities of its investment arm (MIO) are completely walled off from the activities of its consulting arm (McKinsey), the fact is that MIO now has, has had in the past, or could have in the future, investments in Puerto Rico public debt, some or all of which are already (*e.g.*, COFINA) or will be subject to plans of adjustment proposed by the Oversight

-85-

Board and, if confirmed by the Court, implemented under PROMESA. Other Oversight Board vendors are in similar situations.

From the Oversight Board's perspective, it is important that the Oversight Board know about these situations so it can decide whether it needs more information to assess whether there is a conflict or the appearance of a conflict, and so it can take appropriate action. This cannot happen if the Oversight Board does not have the facts. Accordingly, the Oversight Board's RFP and disclosure forms should be modified to call for a list of the vendor's affiliates and a description of any that have connections to Puerto Rico, and a description of what those connections are. The Oversight Board should encourage the submission of organization charts, descriptions of lines of business conducted by affiliates, and similar documents that will give the Oversight Board a better understanding of who its vendors are.

## B.    <u>Recommendation No. 2 – The Interested Parties List Should Be Expanded</u>

The Oversight Board is currently using an interested party list of 75 parties, consisting of the Oversight Board's members and key personnel, the Commonwealth and its "covered instrumentalities" and various government agencies, authorities, public corporations, and retirement systems.[213] It does not list investors, creditors, banks, advisors, insurers, litigation parties, or other parties with significant roles in the Title III proceedings. The Oversight Board should consider using a broader list, adding, for instance, those on the Master Service list[214] and

---

[213] *See, e.g.*, September 1, 2018 Core Consulting Agreement, App'x C, Sched. A.

[214] The Master Service List is available on Primeclerk's website at https://cases.primeclerk.com/puertorico/. Pursuant to the Case Management Order, it is updated every 15 days. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4866 § II.E.

those who have filed proofs of claim above a sensible threshold amount.[215]  Typically, the

identities of interested parties will not be fully known before a case is filed but will come to light

only weeks or months later.  This means the process of identifying interested parties is ongoing

and the list will have to be updated every few months.  Vendors should be required to update

their conflict checks periodically and whenever the list is updated.  Updating the list is a task that

calls for coordination between the Oversight Board and the Commonwealth to streamline the

process and avoid duplication.  Once the list is updated, vendors should be required to re-run

their conflicts checks against the new list.

Clearly, this is a task that must vary by vendor – the larger the vendor and the scope of

the engagement, the broader the required cross-check.  Not every vendor should be required to

check for relationships with every interested party.  The scope of the search should be agreed on

a case-by-case basis.[216]

### C.    Recommendation No. 3 – Direct Relationships, and to What Extent, if Any, They Raise Conflicts, Should Be Described in Detail

Vendors and their affiliates who have direct relationships with Puerto Rico must disclose

them.  If the vendor is doing work for the Commonwealth or its instrumentalities, it must

disclose them and must describe any steps it will take to prevent conflicts.  This is fairly

straightforward.  Investments are more complex.  If the relationship involves a direct investment

in Puerto Rico public debt over which the vendor or its affiliate can exercise discretion, details of

---

[215] There are more than 165,000 proofs of claim totaling approximately $43.5 trillion on file in
the Title III proceedings.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-
LTS (D.P.R.), ECF No. 4052 ¶ 7.  We are confident that the Oversight Board will be able to
eliminate duplicate and erroneous claims and identify the major creditors to include in its
conflicts check procedures.

[216] How to deal with investments is discussed in the following Recommendations Nos. 3 and 4.

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 646 of 818

all holdings and trades since the beginning of 2016 should be itemized.  The vendor or its

affiliate should state whether or not it has divested or will divest any holdings, and if not, why

not, and should explain why in its view the holdings are not a conflict – for instance, because

they are *de minimis*; or because all decisions with respect to the holdings are made by an affiliate

(like McKinsey's MIO) that is walled off and has no access to the work being done by the

vendor (and vice versa); or because the contract party's scope of work will have no impact on the

particular holding.  Of course, disclosing these details and offering to adopt remedial measures

does not mean that the Oversight Board will agree there is no conflict, but if these details are not

disclosed, the Oversight Board cannot decide.  As the Oversight Board's Disclosure Certification

provides:

> Disclosing a potential conflict of interest will not automatically disqualify the
> Vendor.  The potential conflict of interest will be investigated to determine
> whether it precludes the contract award.  In the event, however, that the Vendor
> does not disclose potential conflicts of interest and they are discovered by the
> [Oversight] Board, the Vendor will be barred from doing business with the
> [Oversight] Board.[217]

This provision places the burden of disclosure squarely on the vendor, and not on the Oversight

Board, and we recommend that it stay there.

Accordingly, we recommend that the Oversight Board's RFP and disclosure forms be

reviewed and modified as necessary to require these disclosures.  Vendors, including McKinsey,

should make and update their disclosures to describe any direct relationships the vendor or its

affiliates have with Puerto Rico and, in particular, any direct investments in Puerto Rico public

debt and any work it has done for interested parties since January 1, 2016.

---

[217] September 1, 2018 Core Consulting Agreement, App'x C.

### D. Recommendation No. 4 – Indirect Relationships, and to What Extent, if Any, They Raise Conflicts, Should Be Described

How to deal with vendors' indirect relationships that bear on Puerto Rico and the Oversight Board's work is much more difficult. The PROMESA proceedings involve the economy of the entire Commonwealth. It is hard to imagine a major vendor that would be retained by the Oversight Board in these cases that has no dealings with any Commonwealth instrumentality, or with any other vendor or banker or customer of any Commonwealth instrumentality, or with any investor in Commonwealth public debt, or with any advisor to any such instrumentalities, vendors, bankers, customers, or investors. Determining how many "degrees of separation"[218] to investigate should be done on a case-by-case basis. The Oversight Board must exercise its judgment and common sense to determine how far to dig, keeping in mind that the purpose of the exercise is to ensure that the relationship will not bias the vendor's work for the Oversight Board.

In McKinsey's case, investments made through Third-Party Funds and Separately Managed Accounts are challenging. As described earlier in this Report, approximately 90% of MIO's investments are managed by Third-Party Managers, and by contract, MIO delegates investment discretion to these Third-Party Managers. It does not exercise discretion over which individual securities to buy, hold, or sell.

MIO knows, or at a minimum has access to, information detailing the underlying securities that account for 40 to 50% of its assets under management that are Direct Investments or held through Separately Managed Accounts.[219] For MIO's remaining investments in Third-

---

[218] *See* John Guare, *Six Degrees of Separation* (1990).

[219] *See* Section IX above.

Party Funds, the degree of visibility depends on the fund, the asset manager, and the governing agreement. While MIO has investment-level information, MIO does not share it with McKinsey consultants, and it is not otherwise accessible by the consulting side. Indeed, the McKinsey partners we interviewed did not learn of MIO's third-party investments in Puerto Rico bonds (through certain Compass and Whitebox funds) until the press became interested.[220] However, even though the McKinsey partners did not know this information, as reporters and the litigants in *ANR*, *Westmoreland* and *SunEdison* have pointed out, some information is obtainable by parsing the public record.[221] It should not be up to the Oversight Board to ferret out vendors' indirect investments and trades that could present conflicts. Vendors should be required to:

### 1.    Describe details of indirect relationships, including third-party investments

Which affiliates are doing what, and under whose direction? What have those affiliates done in the past, and what do they anticipate doing in the future? For example, vendors should describe any investment affiliates, what they do, and whether and how those affiliates make investment decisions. Vendors should make clear the degree of control that the investment affiliate has over individual investment decisions.

---

[220] This is why, for instance, the Oversight Board's own financial disclosure forms do not require investments held through large mutual funds to be disclosed. Oversight Board Bylaws, Attachment B.

[221] And, as already noted, just because a Third-Party Fund in which MIO has invested owns Puerto Rico public debt, it does not mean that MIO's fund owns all of it, just its own allocable interest. Nor does the mere fact of the fund's ownership of the bond tell us whether the bond is insured or whether the fund's investment is hedged. This information is not public, and without it, it would be impossible to know what one would have to do to influence its value even if one were in a position to do so and not otherwise prevented by law from doing so.

**2.      Describe how third-party investments are reported, and to whom**

What information is reported to the vendor by the affiliate or fund?  The vendor should

describe what investment information the investment affiliate receives, and what if anything the

investment affiliates reports to its investors.  If no information related to individual investments

is disclosed, the vendor should say so.

**3.      Disclose actual knowledge of third-party investments that could give rise to
         conflicts**

It is difficult to impose blanket rules without knowing the particular facts, policies, and

procedures in place, and disclosure with respect to third-party investments must, therefore, be

tailored to the particular vendor.  With that in mind, generally, if a vendor affiliate has actual

knowledge of a relationship with Puerto Rico or the Oversight Board, it should disclose it.  For

example, MIO should disclose investments in Puerto Rico public debt made through Separately

Managed Accounts even though they are managed by a Third-Party Manager because MIO has

access to information detailing those holdings.  Similarly, if MIO receives periodic account

statements in the ordinary course that disclose securities owned by Third-Party Funds and learns

of an investment in Puerto Rico public debt, that should be disclosed to the Oversight Board.

Where an investment affiliate receives specific and systematic disclosures, requiring disclosure

should not be a terrible burden.  Finally, vendors should check lists of third-party funds and

managers against the interested parties list and disclose any connections.

However, we recognize there may be legal or practical hurdles to disclosing indirect

investments (for example, confidentiality agreements with third-party managers or possible

breach or impairment of the very information barriers and other measures designed to prevent

conflicts).  Accordingly, one option would be to have the vendor's investment affiliate report

directly to the Oversight Board without making any disclosure to the vendor itself.  This would

Case 15-10541-BLS Doc 2406-2 Filed 04/11/19 Page 650 of 818

enable the Oversight Board to conduct its own "*in camera*" inspection of the information and

then to determine what additional steps to take, while leaving the vendor's information barriers

intact. Alternatively, to the extent a vendor or its affiliate is unable or unwilling to disclose this

information to the Oversight Board, the Oversight Board could just assume that the vendor has a

significant indirect investment in Puerto Rico public debt and evaluate any potential conflict in

light of that assumption. The Oversight Board would then consider how the vendor proposes to

mitigate the impact of the apparent conflict. If the vendor cannot convince the Oversight Board

that its conflict mitigation measures are adequate to eliminate the conflict, the Oversight Board

would not engage the vendor.

### E.    Recommendation No. 5 – Vendors Should Disclose Relevant Data in Their Public Filings

Vendors should monitor their and their affiliates' public filings for disclosures regarding

their relationships with Puerto Rico and the Oversight Board. For example, the Oversight Board

should not have to search SEC and Department of Labor filings; vendors should, and they should

cross-check them against the interested parties list. Vendors should also be familiar with court

filings made on their or their affiliates' behalf, although, again, we recognize that this may not

always be easy. For instance, in McKinsey's case, two asset managers filed proofs of claim on

behalf of Compass CSS High Yield LLC, Compass TSMA LP, and Compass ESMA LP in the

Title III proceedings relating to COFINA, PREPA, and AFICA bonds. Under this

Recommendation, these filings would trigger updated disclosures.[222] Vendors should review

their and their affiliates' public filings in real time. If a vendor determines based upon a public

---

[222] Proofs of claim are typically not filed for weeks or months after the petition date. Here, they were filed more than one year after the Title III petitions were filed – hence, the recommendation that vendors update their disclosures periodically.

filing that it has additional disclosures to make, the vendor should promptly make them to the Oversight Board.

**F.    Recommendation No. 6 – Vendors Should Describe the Policies, Practices, and Procedures That They Have or Will Have to Guard Against Conflicts**

Vendors should be required to describe their policies, practices, and procedures regarding conflicts. We have learned, for example, that McKinsey and MIO have robust written confidentiality and conflict of interest policies and procedures; they train their personnel in them; they require annual certification of compliance; and they enforce their policies. Vendors' RFP responses and disclosures should give particulars about their policies and practices, information barriers and security, staffing "black-outs," and so on. The Oversight Board should know that all of its vendors address conflicts seriously.

In addition, vendors should describe what they have done to mitigate the impact of any conflicts, with reference both to past work for the Oversight Board or other clients and with respect to any potential conflicts that might arise from the vendor's proposed or current work for the Oversight Board, or from a vendor or vendor affiliate's investments, past, present, or future. This might require new procedures to ensure that personnel working on Oversight Board matters do no other work related to Puerto Rico, at least not for a set period of time and not without prior Oversight Board consent.[223] It might also require divestiture of an investment or termination of another advisory relationship. We recognize that these are extreme measures and may not be warranted or possible in all cases, but the decision on whether to require these measures should be the Oversight Board's, and the decision must be based on full disclosure of the conflict or potential conflict by the vendor. The burden of explanation should be on the vendor.

---

[223]  Indeed, both are part of the Oversight Board's standard Independent Contract Services Agreement, including the September 1, 2018, Core Consulting Agreement that it signed with McKinsey extending the non-Title III engagement.

**G.**   **Recommendation No. 7 – Disclosures Must Be Updated
and Certified Periodically**

The Oversight Board should update its list of interested parties periodically.  We
recommend that this be done quarterly, and take into account any significant new filings –
*e.g.*, new parties to adversary proceedings and contested matters in the Title III cases; new
creditors who file large proofs of claim (above a sensible threshold); new parties to the Title VI
proceedings; parties to mediations; and so on.  Significant disclosures (*e.g.*, new possible filings,
new direct investments, etc.) should be made as soon as they are known without waiting for the
next scheduled periodic update.

Vendors should run conflict checks against the updated interested party lists and should
supplement the lists with names of their own – for instance, by adding the names of any new
clients and affiliates with relationships that could present conflicts.  This will probably require
that vendors have their affiliates review the lists and understand their disclosure obligations, but
that seems the only way to ensure that relationships are uncovered.

Vendors should also periodically (at least annually) certify that they have conducted
conflict searches for themselves and relevant affiliates and have reported all material
relationships that could give rise to conflicts.

**H.**   **Recommendation No. 8 – Oversight Board Forms Should Be
Reviewed and Revised**

The Oversight Board, with the assistance of its General Counsel and its Ethics Advisor,
should review all of its RFP and contract, disclosure, and certification forms and revise them to
take these Recommendations into account.  This will enable the Oversight Board to make better
informed decisions regarding whether or not to retain a vendor.

## XV.    <u>**Conclusion**</u>

The Oversight Board will make a copy of this Report available on its website at

<u>https://oversightboard.pr.gov/</u> and file a copy of this Report on the public docket in the

Commonwealth Title III proceedings.

Dated: New York, New York
        February 18, 2019

Respectfully submitted,

LUSKIN, STERN & EISLER LLP
Michael Luskin
Stephan E. Hornung
Lucia T. Chapman
Eleven Times Square
New York, New York 10036
(212) 597-8200

# Exhibit 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., et al., | Case No. 15-33896 (KRH) |
| Debtors. | Jointly Administered |

MAR-BOW VALUE PARTNERS, LLC.,

                  Movant,

v.

MCKINSEY RECOVERY & TRANSFORMATION

SERVICES U.S., LLC,

                  Respondent.

## SUPPLEMENTAL DECLARATION OF JON GARCIA

I, Jon Garcia, under penalty of perjury, declare as follows:

1. I am the President of McKinsey Recovery & Transformation Services U.S., LLC
   ("RTS") and have held that position since 2010. From December 8, 2006 through June 9,
   2017, I also served as a member of the board of directors ("Board") of MIO Partners, Inc.
   ("MIO"), the entity that manages McKinsey & Company's pension and investment
   programs and their assets held by McKinsey Master Retirement Trust.

2. I submit this supplemental declaration to further respond to certain questions asked by the
   United States Trustee in his pleading entitled "United States Trustee's Response to Mar-
   Bow Partners LLC's (I) Motion to Reopen Case and (II) Motion for Relief from
   Judgments and for Indicative Ruling," dated July 31, 2018 ("Mar-Bow's Motion") [Doc.

#4126] in the Alpha Natural Resources chapter 11 case in the Eastern District of

Virginia, Richmond Division (Case No. 15-33896 (KRH)). This declaration supplements

my prior declaration in this matter, which was filed on September 12, 2018.

3. I make this declaration based on personal knowledge, recollection, and memory except to

the extent I identify public records or business records maintained in the regular course of

RTS or MIO's activities from which I have obtained information reported here.

4. During my time on the MIO Board, I was a member of the Investments Committee, a

subcommittee of the full Board that would meet to discuss issues related to investments,

including the ratification of certain investment decisions made by MIO's professional

staff. I understood ratification in this context to mean the approval of fund-level

allocation and redemption decisions made by MIO's professional staff in the previous

quarter. Allocations and redemptions are increases and reductions in the amount of

money designated for a third-party managed fund. To the best of my recollection, I was

never asked to ratify allocation or redemption decisions related to specific investments

made by the third-party managers. Because the MIO Board delegated responsibility for

making investments to MIO's professional staff, we reviewed those investments at a high

level, to exercise our fiduciary responsibilities. Unless an investment posed a specific

issue—for example, an investment in a particular fund that brought MIO close to a pre-

established risk threshold—we typically did not discuss these investments at board

meetings.

5. The Investments Committee would from time to time discuss whether or not to invest

with a new third-party fund manager. These conversations were about general issues

related to the manager's track record and performance rather than information about

particular investments the manager made or planned to make. It was rare for discussions about a particular manager to take up significant time during board or committee meetings. I do not recall any discussions about approving managers toward the end of my Board service in 2017—the function was fully delegated to the MIO staff.

6.   I have no recollection of discussing Whitebox during my time on the MIO Board.

7.   In June 2017, I stepped down from my role on the MIO Board. While I do not believe there was any conflict that arose from my position on the board, I generally understood that there had been some external challenges to RTS's bankruptcy disclosures and it would streamline RTS's disclosure process going forward if I did not serve on the MIO board.

8.   I also am aware, from my consulting work for McKinsey RTS, that McKinsey maintains a number of policies and procedures designed, among other things, to safeguard confidential client information. In particular, every other year McKinsey mandates that each member of the Firm complete training modules designed to ensure compliance with its policies on confidentiality and, in particular, the importance of maintaining information relating to client engagements in strictest confidence – *e.g.*, only sharing such information on a "need to know" basis. In practice, that means that the information relating to a client engagement would remain within the members of the client service team ("CST") for a particular engagement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


_____
Jon Garcia

President


3

McKinsey Recovery & Transformation
Services U.S., LLC

# Exhibit 17

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., et al., | Case No. 15-33896 (KRH) |
| Debtors. | Jointly Administered |

MAR-BOW VALUE PARTNERS, LLC.,

Movant,

v.

MCKINSEY RECOVERY & TRANSFORMATION

SERVICES U.S., LLC,

Respondent.

## DECLARATION OF SELEMBE CHAMBERS

I, Selembe Chambers, under penalty of perjury, declare as follows:

1. I am a litigation paralegal in the legal department of McKinsey & Co., Inc. ("McKinsey")
   and have held that role since 2009.

2. I submit this declaration in support of the responses that McKinsey Recovery &
   Transformation Services U.S., LLC ("RTS") is making to address certain follow-up
   questions posed by the Office of the United States Trustee to counsel for McKinsey.

3. I make this declaration based on personal knowledge.

4. On Friday, October 12, 2018, I sent emails to the 34 members of the ANR Client Service
   Team ("ANR CST") who are still employed by McKinsey. The ANR CST consists of
   the McKinsey and RTS consultants who served Alpha Natural Resources during the

chapter 11 engagement. I also sent emails to 53 RTS-related individuals that I understand are surveyed for purpose of the legal department's check for connections to interested parties in bankruptcy engagements ("RTS Team"). The RTS Team consists of the current consultants and administrative personnel listed by McKinsey's Human Resources department as employed by RTS as well as the Directors and Officers of RTS.

5. The emails I sent to the RTS Team had the following two questions:

    a. Have you ever been involved in preparing any Form 5500 for any McKinsey retirement plan?

    b. Did you ever play any role in reviewing draft Forms 5500 for any McKinsey retirement plan before such forms were filed with the Department of Labor?

        i. Have you ever seen a Form 5500?

        ii. Are you otherwise familiar with Form 5500?

6. The emails I sent to the ANR CST had the two questions listed in paragraphs 5(a) and (b), above, as well as the following two questions:

    a. At any time from January 1, 2014 to December 31, 2016 did you review a Department of Labor Form 5500 ("Annual Return/Report of Employee Benefit Plan") available on the Department of Labor website for any McKinsey pension plan?

        i. Have you ever seen a Form 5500?

        ii. Are you otherwise familiar with Form 5500?

    b. At any time from January 1, 2015 to December 31, 2016, were you aware whether any estate professionals retained in ANR relied upon an Interested Party list that was different from the Interested Party list relied upon by McKinsey.

2

      i. If yes, please explain.

7. As of the date of this declaration, I received responses from all members of the ANR CST currently employed by McKinsey and all RTS team individuals, for a total of 87 responses. According to the results of the survey, no ANR CST member prepared or reviewed a Form 5500 between January 1, 2014 and December 31, 2016 or at any other time. No ANR CST member had knowledge of whether another professional retained in the *ANR* bankruptcy relied upon an Interested Party list different from the Interested Party list on which RTS relied.

8. According to the results of the survey, no RTS Team member prepared or reviewed Forms 5500 during the *ANR* bankruptcy. One RTS Team member stated that he has recently reviewed Forms 5500 in the course of his legal work in the ongoing litigations filed by Mar-Bow Value Partners LLC and Jay Alix. The General Counsel of McKinsey, who is also on the board of RTS, stated that she has reviewed Forms 5500 as part of her ongoing support of litigation matters. McKinsey's Global Director of Finance is also the CFO of RTS and stated that he has, during his time at McKinsey, reviewed Forms 5500. He does not recall reviewing Forms 5500 during the ANR bankruptcy.

9. On Wednesday, October 24, 2018, I sent a second survey email to the 34 ANR CST members. This email survey included the following question: "Did you ever discuss with anyone at MIO any potential or actual MIO investment, unrelated to your personal McKinsey retirement account or investments in MIO managed after tax funds?"

10. As of the date of this declaration, I received responses from all members of the ANR CST currently employed by McKinsey. One member of the ANR CST left the firm on October 19, 2018, after I sent the first survey and before I sent the second survey.

3

According to the results of the survey I received, no ANR CST member discussed any

potential or actual MIO investments unrelated to their personal McKinsey retirement

accounts or investments in MIO-managed after-tax funds.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Selembe Chambers

Paralegal

McKinsey & Company, Inc.

4

# Exhibit 18

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

**THIRD SUPPLEMENTAL DECLARATION OF KEVIN CARMODY IN SUPPORT OF APPLICATION OF THE DEBTORS, PURSUANT TO SECTIONS 327(a), 328(a) AND 1107(b) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2014(a) AND LOCAL BANKRUPTCY RULE 2014-1, FOR AN ORDER AUTHORIZING THEM TO RETAIN AND EMPLOY MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AS TURNAROUND ADVISOR FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE**

I, Kevin Carmody, under penalty of perjury, declare as follows:

1.      On August 3, 2015 (the "<u>Petition Date</u>"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  By order of the Court (Docket No. 129), the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      I submit this Third Supplemental Declaration (the "<u>Third Supplemental Declaration</u>") as a supplement to the declaration dated August 24, 2015 (the "Original Declaration"), to the Supplemental Declaration dated November 9, 2015 (the "Supplemental Declaration"), and to the Second Supplemental Declaration dated March 25, 2016  (the "Second Supplemental Declaration", and together with the Original Declaration and Supplemental

Declaration, the "Prior Declarations"), in support of the application (the "<u>Application</u>") of Alpha

Natural Resources, Inc. ("<u>ANR</u>") and certain of its direct and indirect subsidiaries, as debtors and

debtors in possession (collectively, the "<u>Debtors</u>"), to retain and employ McKinsey RTS <u>nunc</u> <u>pro</u>

<u>tunc</u> as of August 3, 2015, as Turnaround Advisor to the Debtors (Docket No. 212), in order

to provide certain additional information as set forth below. Capitalized terms not expressly

defined herein shall have the meanings ascribed to them in the Application and Original

Declaration.

        3.      Except as otherwise noted, the statements set forth herein are as a result of

my employment position and diligence undertaken by me or by professionals working under my

direction and, if called and sworn as a witness, I would testify competently thereto.

        4.      I am making this Third Supplemental Declaration to provide certain

clarifications and additional information as set forth below.

        5.      Members of the McKinsey RTS Team are employed by McKinsey

Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States,

McKinsey & Company, Inc. Canada, McKinsey & Company, Inc. France, McKinsey Solutions

SPRL, McKinsey Knowledge Centre Belgium, Inc., LLC McKinsey & Company CIS, McKinsey

Knowledge Centre India Private Limited, McKinsey & Company Inc do Brasil Consultoria Ltda,

McKinsey & Company, Inc. United Kingdom, McKinsey & Company, Inc. (Malaysia), McKinsey

& Consulting Company Inc., Shanghai.

        6.      McKinsey Recovery & Transformation Services U.S., LLC is a direct

wholly-owned subsidiary of McKinsey & Company, Inc. United States which, in turn, is a direct

wholly-owned subsidiary of McKinsey Holdings, Inc. which, in turn, is a direct wholly-owned

subsidiary of McKinsey & Company, Inc.

7.      In preparing its Original Declaration, McKinsey RTS searched its client database which covers clients of all its consulting affiliates.

8.      Neither McKinsey RTS nor any of its consulting affiliates has ownership in any of the Debtors, or entities that are stalking horses or potential buyers, or has submitted a bid for the assets of the Debtors, (including credit bids).

9.      One confidential client, identified on the list of Interested Parties as a Major Competitor, accounts for more than one percent, but less than 1.2%, of McKinsey RTS and affiliates' annual gross revenue on a consolidated basis as of year ended December 2015.

10.      This Third Supplemental Declaration supplements the disclosures of McKinsey RTS's client services to certain Interested Parties that were made on a no-names basis in the Prior Declarations, and is based upon the further review of such Interested Parties that is described below.

11.      In order to provide the names of Interested Parties to which McKinsey RTS and the McKinsey RTS Team have rendered services or have connections, McKinsey RTS has reviewed the list of Interested Parties to identify lenders included on the Interested Parties list, stalking horse bidder(s) as identified in the Disclosure Statement with Respect to Plan of Reorganization of Debtors and Debtors in Possession [Docket No. 1703], members of the Official Committee of Unsecured Creditors (such Interested Parties being referred to herein as "Major Stakeholders") and Major Competitors to which it has rendered client services.

12.      McKinsey RTS has reviewed its confidentiality obligations to each of its clients identified as a Major Stakeholder or Major Competitor and, to the extent necessary, instructed the relationship partner for each affected client to request the consent of such client to disclose its name in connection with this Third Supplemental Declaration.  Those clients that

did not provide the consent described in the preceding sentence are identified herein as "confidential clients".

13. McKinsey RTS compared the results of this review of the Interested Parties list to the disclosures made in the Prior Declarations. McKinsey RTS now discloses by name that certain members of McKinsey RTS and/or the McKinsey RTS Team have served the following Major Stakeholders and Major Competitors or affiliates thereof:

i. 3i Debt Management US LLC, identified on the list of Interested Parties as a Secured Term Loan Lender;

ii. Allianz Global US, identified on the list of Interested Parties as a Secured Term Lender;

iii. Anglo American Plc, identified on the list of Interested Parties as a Major Competitor;

iv. Apollo Global Management, LLC, identified on the list of Interested Parties (via itself or an affiliate thereof) as a Revolving Facility Lender and a Secured Term Loan Lender;

v. Bank of America, identified on the list of Interested Parties (via itself or an affiliate thereof) as a Debtors' Professional, Consultant and Service Provider, Depository and Disbursement Bank, Revolving Facility Lender and Secured Term Loan Lender;

vi. Citigroup Global Markets, identified on the list of Interested Parties as a Revolving Facility Lender;

vii. Deutsche Bank, identified on the list of Interested Parties as a Major Equity Holder, Depository and Disbursement Bank, Revolving Facility Lender and Secured Term Loan Lender;

viii.     Goldman Sachs Bank USA, identified on the list of Interested Parties as a Revolving Facility Lender;

ix.     General Electric Capital Corporation, identified on the list of Interested Parties as a Lender Under A/R Facility;

x.     JPMorgan Chase Bank, N.A., identified on the list of Interested Parties (via itself or an affiliate thereof)  as a Depository and Disbursement Bank, Revolving Facility Lender and Secured Term Loan Lender;

xi.     Onex Credit Partners, LLC, identified on the list of Interested Parties as a Secured Term Loan Lender;

xii.     Peabody Energy, Inc., identified on the list of Interested Parties (via itself or an affiliate thereof)  as a Party to Joint Ventures with the Debtors, Major Customer of the Debtor and Major Competitor.

xiii.     Bain Capital, an affiliate of Sankaty Advisors, LLC, which is identified on the list of Interested Parties as a Secured Term Loan Lender, Second Lien Noteholder, Major Unsecured Noteholder and Major Equity Holder;

xiv.     Sumitomo Mitsui Banking Corporation, identified on the list of Interested Parties as a Depository and Disbursement Bank and Revolving Facility Lender;

xv.     Teck Resources, Ltd., identified on the list of Interested Parties as a Major Competitor;

xvi.     UBS, identified on the list of Interested Parties (via itself or an affiliate thereof) as a Depository and Disbursement Bank, Major Equity Holder and Revolving Facility Lender;

xvii.    Walter Energy, Inc., identified on the list of Interested Parties as a Major

Competitor;

xviii.    one confidential client that is a Major Stakeholder; and

xix.    two confidential clients that are Major Competitors.

In addition, certain members of McKinsey RTS and/or the McKinsey RTS Team served an

informal creditors' group of Arch Coal, Inc., identified on the list of Interested Parties as a Major

Competitor, a Party to Joint Ventures with the Debtors and a Party to Material Unexpired Leases

of the Debtors.

14.    As to each of these connections, McKinsey RTS has re-confirmed that its

services rendered to such entity in the past two years has been rendered on matters unrelated to

the Debtors and their chapter 11 cases.

15.    McKinsey RTS does not have a specific agreement to refer or accept

referrals from any professional in this case. Further, McKinsey RTS does not receive a significant

portion of its referrals from any professional retained in this case. As previously disclosed, as part

of its diverse practice, McKinsey RTS and its affiliates are involved in numerous matters and

transactions involving many different professionals, including attorneys, accountants and financial

consultants, some of which may represent the Debtors or claimants and Interested Parties in the

Debtors' chapter 11 cases.  For instance, McKinsey RTS and its affiliates may have in the past

been represented by, may currently be represented by, and may in the future be represented by

attorneys, law firms or financial advisors who are involved in these proceedings, including law

firms and financial advisors representing the Debtors.  Further, McKinsey RTS and its affiliates

may in the past have served, may currently serve, and may in the future serve professionals in these

cases on matters unrelated to the Debtors' chapter 11 cases.  In addition, McKinsey RTS and its

Case 15-10541-BLS   Doc 2406   Filed 04/11/16   Page 671 of 818

affiliates may in the past have worked with, may currently work with, and likely will in the future work with professionals in these cases on matters unrelated to these cases.  Lastly, McKinsey RTS and its affiliates may have in the past contracted with, may currently contract with, and may in the future contract with certain service providers listed on the Interested Parties List for necessary business services.  Based upon my current knowledge of the professionals involved, to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors herein in matters upon which McKinsey RTS is to be employed, and none are in connection with these cases.

16.    The following members of the McKinsey RTS Team were previously employed by certain Interested Parties, or affiliates thereof, as described below:

i.    Ignace Proot – ArcelorMittal Flat Carbon Europe (identified on the list of Interested Parties (via itself or an affiliate thereof) as a Party to Material Unexpired Leases with the Debtor, Major Customer of the Debtor, and a Major Competitor) – worked on operational improvement programs for the Strategy Definition and Support team and the Leadership Progress Academy from January 2009 until December 2012.

ii.    Rick Notarianni – BENTEK Energy, LLC, a subsidiary of the The McGraw-Hill Companies, Inc., the parent of Standard & Poor's (identified on the list of Interested Parties as a Debtors' Professional, Consultant and /or Service Provider) – worked as an Energy Analyst and Manager for BENTEK's Oil and Gas group from June 2012 to March 2014. Rick is no longer an employee of McKinsey & Company, Inc.

iii.    Brian Green –Nalco Champion, the oil and gas products unit of Nalco Co., identified on the list of Interested Parties as a Major Supplier of Goods and Services – worked as a MBA Finance Summer Intern from June 2014 to August 2014.

iv.       Heather Eisenman – GE Oil & Gas (identified on the list of Interested

Parties (via itself or an affiliate thereof) as a Lender Under A/R Facility) – worked as a Sales

Application Engineer and Manufacturing Engineer from July 2010 to July 2013.

17.      To the best of my knowledge none of McKinsey RTS or its affiliates serve

Rice Energy Holdings LLC or Rice Drilling B LLC or any of their affiliates.

18.      As previously stated, "McKinsey RTS and its affiliates . . . . provide overall

strategic analysis and advice to companies that operate in the industries in which the Debtors

operate, which analysis and advice could include review and comment on publicly available

information and strategic considerations with respect to the Debtors, as well as other companies."

McKinsey RTS and affiliates' service to other companies in the industry in which the Debtors

operate may focus on the macro landscape of the industry but should have no direct effect on

the Debtors given the nature of the market. If any work for other clients of McKinsey RTS or

its affiliates specifically focused on or affected the Debtors, it would have been explicitly stated

in the Prior Declarations.

19.      Although not a party on the Interested Parties List, McKinsey RTS was

made aware that there is a company that may make a confidential offer for certain assets of the

Debtors. While McKinsey RTS has not provided services to such company or its parent company,

it provided services last year to an affiliate of such company on matters unrelated to the Debtors

and these chapter 11 cases.

20.      MIO Partners, Inc. and MIO Partners (EU) (together "MIO") serves

McKinsey's pension plans, partners, and former partners by offering a portfolio of investment

products with a variety of structures, risk levels, and currencies.  The team primarily uses third-

party fund managers who make investment decisions independently of MIO.  MIO investors

Case 15-10541-BLS Doc 2406 Filed 04/11/19 Page 673 of 818

make investments with MIO essentially on a "blind trust" basis, with such MIO investors having no access to information about the underlying holdings in the third-party funds. MIO is managed independently, and all its investment activities are separate from McKinsey's consulting operations. As such, MIO does not make any investment decisions based on the use of McKinsey RTS and affiliates' client information. Certain members of MIO's board of directors are also employees of McKinsey RTS and its affiliates, including one director who is also a director and officer of McKinsey RTS. MIO's board of directors (through the investment committee of that board which generally meets on a quarterly basis) is primarily responsible for overseeing, reviewing and approving MIO's overall allocation amongst the various MIO managed investment products.

21.    The search results described in this Third Supplemental Declaration are based on research conducted by McKinsey RTS in order to prepare the disclosures set forth in the Prior Declarations.

22.    The Supplemental Declaration and the Second Supplemental Declaration updated McKinsey RTS's disclosures to reflect the addition of new individuals to the McKinsey RTS Team. The updated research conducted to make those disclosures related only to the newly-added individual McKinsey RTS Team members, not to members of McKinsey RTS who were not part of the McKinsey RTS Team.

23.    McKinsey RTS has not conducted new firm-wide surveys or research to determine whether new client service relationships have been formed since the surveys and research conducted in connection with the Original Declaration.

24.     McKinsey RTS understands it has the obligation pursuant to Bankruptcy
Rule 2014 to further supplement its declarations in the event it becomes aware of any relationship
or other information that requires disclosure.

25.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the
foregoing is true and correct.

Dated:  May 18, 2016
        Chicago, Illinois


_____
Kevin Carmody
Practice Leader
McKinsey Recovery &
Transformation Services U.S., LLC

# Exhibit 19

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., et al., | Case No. 15-33896 (KRH) |
| Reorganized Debtors. | (Jointly Administered) |

## DECLARATION OF KEVIN CARMODY IN RESPECT OF RECOMMENDATION OF UNITED STATES TRUSTEE PURSUANT TO PARAGRAPH 'D' OF ORDER DATED JULY 15, 2016 [DOCKET # 3055]

I, Kevin Carmody, under penalty of perjury, declare as follows:

1. On August 3, 2015 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By order dated July 12, 2016 [Docket # 3038] the Bankruptcy Court confirmed the Debtors' chapter 11 plan (the "Plan"), and on July 26, 2016 the Debtors filed their notice [Docket # 3152] that the "Effective Date" of the Plan occurred.

2. By order dated September 17, 2015 [Docket # 0476], the Bankruptcy Court authorized the Debtors to retain McKinsey Recovery & Transformations Services U.S., LLC ("McKinsey RTS US") pursuant to their engagement letter attached to the Debtor's application dated August 24, 2016 for an order authorizing such retention [Docket # 0212]. I am the Practice Leader at McKinsey RTS US in charge of the services it rendered to the Debtors. The information provided in this disclosure was compiled at my request, is as a result of my

employment position and diligence undertaken by me or by professionals working under my direction, and is true to the best of my knowledge, information, and belief.

3.     By order dated July 1, 2016 [Docket # 2895], the Bankruptcy Court directed McKinsey RTS US to provide *in camera* certain information (the "Data").  That order directed that, pursuant to certain confidentiality provisions, the Data would be shared with the United States Trustee and the legal professionals for (a) the Debtors and (b) the statutory creditors' committee (the "Committee").  Pursuant to paragraph 'D' of its order dated July 15, 2016 [Docket # 3055], the Bankruptcy Court authorized the United States Trustee to file a recommendation as to whether any of the Data should be publicly disclosed.  The United States Trustee advised McKinsey RTS US as to what the United States Trustee believed should be publicly disclosed, and McKinsey RTS US is submitting this declaration to provide that disclosure.

4.     In this declaration "McKinsey RTS" includes (i) McKinsey RTS US and its directors, officers, and employees, and (ii) the consultants borrowed from affiliates of McKinsey RTS US for the purpose of serving the Debtors in these Chapter 11 cases.

5.     This declaration provides  the names of the interested parties identified by the Debtors (the "Interested Parties") that matched with (a) clients served by McKinsey RTS US or served by personnel borrowed from an affiliate thereof, during the three years prior to the Debtors' Petition Date, (b)  clients served by any consultant at any affiliate of McKinsey RTS US on matters focused on a direct commercial relationship or transaction with the Debtors during the three years prior to the Debtors' petition date, and (c) Interested Parties that had employed personnel of McKinsey RTS. There were no matches in category 5(b).  All matches involved services provided that were unrelated and not adverse to the Debtors.  "Direct commercial

relationship or transaction with the Debtors" includes services related to all matters in which the client of an affiliate of McKinsey RTS US was acting or considering acting in concert with the Debtors, with or without a formal contract, or acting or considering acting adverse to the Debtors, with or without a formal contract. As aforesaid, there were no matters involving clients acting or considering acting adverse to the Debtors.

6.      The name disclosures below, together with the categories of Interested Parties with which they matched, are fewer than the number of entities originally described in my original declaration due to the elimination of duplicate matches, matches of the same Interested Party in more than one category, and name coincidences that turned out not be Interested Parties or affiliates of Interested Parties.

7.      McKinsey RTS personnel have served the following entities or affiliates thereof:

a.      **Beneficiaries of Letters of Credit**: National Union Fire Insurance and Zurich American Insurance Co.

b.      **Debtors' Largest Unsecured Creditors (Excluding Noteholders)**: AEP River Operations LLC and Nelson Brothers LLC

c.      **Debtors' Professionals, Consultants and Service Providers**: Bank of America; Siemens Industry Pace Global; Thomson Reuters; Thomson Reuters GRC, Inc.; Thomson Tax & Accounting; and Willis of New York

d.      **Depository and Disbursement Banks**: Australia and New Zealand Banking Group Ltd. (ANZ); Bank of America; Deutsche Bank; JPMorgan Chase & Co., nka JPMorgan Chase, National Association; Sumitomo Mitsui Banking Corporation (SMBC) and UBS

e.      **Insurers, Insurance Brokers and Third-Party Administrators**: AIG Specialty Insurance Company; American Guarantee & Liability (Zurich); Chartis Specialty Insurance Company; Commerce and Industry Insurance Company; Lexington Insurance Company (US); Munich Re and Zurich Insurance Group

f.      **Lenders Under A/R Facility**: General Electric Capital Corporation

g.  **Major Competitors**: Anglo American Plc; ArcelorMittal Princeton; BHP Billiton; Peabody Energy, Inc.; Teck Resources, Ltd. and Walter Energy, Inc.  In addition, certain personnel of McKinsey RTS served an informal creditors' group of Arch Coal, Inc.

h.  **Major Customers of the Debtors**: American Electric Power/Appalachian Power Company; ArcelorMittal Sourcing, S.A.; Enel Trade SpA; Homer City Generation, L.P.; Indiana Michigan Power Company; Peabody COALTRADE LLC; Tata Steel Global Procurement Co. Pte., Ltd. and United States Steel

i.  **Major Equity Holders**: Deutsche Asset Management Investmentgesellschaft mbH (DeAM); Sankaty Advisors LLC; SSgA Funds Management, Inc.; UBS Financial Services, Inc. and Vanguard Group, Inc.

j.  **Major Unsecured Noteholder**: J.P. Morgan Securities LLC; Oaktree Capital Management, L.P.; Sankaty Advisors LLC and State Street Global Advisors (SSgA)

k.  **Material Sureties**: Zurich Insurance Group

l.  **Other Major Suppliers of Goods and Services**: GE Fairchild LLC

m.  **Parties to Joint Ventures with the Debtors**: Peabody Energy Corp.; Peabody Holding Co., Inc.; Peabody Powder River Operations, LLC. In addition, certain personnel of McKinsey RTS served an informal creditors' group of Arch Coal, Inc.

n.  **Parties to Material Contracts with the Debtors**: Nexans Amercable Inc.

o.  **Parties to Material Unexpired Leases with the Debtors**: AIG Commercial Equipment Finance; Banc of America Leasing & Capital; Caterpillar Financial Services; Pristine Resources, Inc. (Arcelor Mittal); Siemens Financial Services and Staples Advantage. In addition, certain personnel of McKinsey RTS served an informal creditors' group of Arch Coal, Inc.

p.  **Revolving Facility Lenders**: Apollo Global Management LLC; Bank of America, N.A; Barclays Bank PLC; Citigroup Global Market; Deutsche Bank; Goldman Sachs Bank USA; JPMorgan Chase Bank, N.A.; Sumitomo Mitsui Banking Corporation and UBS Stamford Branch TRS

q.  **Second Lien Noteholders**: Sankaty Advisors LLC

r.  **Secured Term Loan Lenders**: 3i Debt Management US LLC; Allianz Global US; Apollo Global Management; Bank of America, N.A.;

Barclays Bank PLC; Deutsche Bank; JPMorgan Chase Bank, N.A.; Onex Credit Partners, LLC and Sankaty Advisors, LLC

     s.    **Significant Utility Providers**: American Electric Power; Appalachian Power Company; AT&T; AT&T Mobility

8.    The following McKinsey RTS personnel were previously employed by certain Interested Parties, or affiliates thereof, during the three year period preceding the Debtor's petition date:

     a.    Ignace Proot – ArcelorMittal Flat Carbon Europe, identified on the list of Interested Parties (via itself or an affiliate thereof) as a Party to Material Unexpired Leases with the Debtor, Major Customer of the Debtor, and a Major Competitor.

     b.    Rick Notarianni – BENTEK Energy, LLC, a subsidiary of The McGraw-Hill Companies, Inc., the parent of Standard & Poor's, identified on the list of Interested Parties as a Debtors' Professional, Consultant and /or Service Provider.

     c.    Brian Green – Nalco Champion, the oil and gas products unit of Nalco Co., identified on the list of Interested Parties as a Major Supplier of Goods and Services.

     d.    Heather Eisenman – GE Oil & Gas, identified on the list of Interested Parties (via itself or an affiliate thereof) as a Lender Under A/R Facility.

     e.    Kyle Sturgeon, Jeff Gordon, Neil Christie, Keith Beattie, Chris Moye, Michael Pesche, Geoff White,  Joao Carlos Frenades, and Richard Hudson - Alvarez & Marsal, identified on the list of Interested Parties (via itself or an affiliate thereof) as one of the Debtors' Professionals Consultants and Service Providers.

     f.    Matt Johnston - KPMG LLP, identified on the list of Interested Parties under Debtors' Professionals Consultants and Service Providers.

9.    McKinsey RTS US or one or more of its affiliates were represented during the three years prior to the Debtors' petition date by the following professionals (or affiliates thereof) named under the category "Debtors' Professionals, Consultants and Service Providers" on the list of Interested Parties: Accountemps; Bank of America; Bloomberg Finance, L.P.; Cherry Bekaert LLP; Cleary Gottlieb Steen & Hamilton LLP; Corporate Executive Board; CT

Corporation System D/B/A CT Lien Solutions; Davis Polk & Wardwell LLP; Deloitte Tax

LLP; Ernst & Young; Houlihan Lokey, Inc.; Hunton & Williams LLP; Jones Day; KPMG

LLP; Moody's Investors Service; Siemens Industry Pace Global; Standard & Poor's; Thomson

Reuters; Towers Watson; Willis of New York; Kirkland & Ellis; Mcguire Woods LLP;

Protiviti; Quinn Emanuel and Stroock & Stroock & Lavan LLP.

      10.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  August 5, 2016
      Chicago, Illinois

_____
Kevin Carmody
Practice Leader
McKinsey Recovery &
Transformation Services U.S., LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of August, 2016, the foregoing Declaration of Kevin Carmody in Respect of Recommendation of United States Trustee Pursuant to Paragraph 'D' of Order Dated July 15, 2016 [Docket # 3055] was filed with the Court through the Clerk's CM/ECF filing system and served on all parties receiving electronic notice in these cases and/or electronic mail to all parties on the attached Service List.


/s/ Christopher L. Perkins
Local Counsel

Case 15-10541-BLS Doc 2406/25/15 Filed 04/11/18 Page 683 of 818

## SERVICE LIST

Robert B. Van Arsdale
Office of the U.S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219
E-mail: Robert.B.Van.Arsdale@usdoj.gov
*Assistant United States Trustee*

David R. Ruby
William D. Prince, IV
ThompsonMcMullan, P.C.
100 Shockhoe Slip, Third Floor
Richmond, VA 23219
E-mail: druby@t-mlaw.com
E-mail: wprince@t-mlaw.com
*Local Counsel for Mar-Bow Value
Partners, LLC*

Steven Rhodes
Steven Rhodes Consulting, LLC
1610 Arborview Boulevard
Ann Arbor, MI 48103
E-mail: rhodessw@comcast.net

Judith K. Fitzgerald
Tucker Arensberg, PC
1500 One PPG Place
Pittsburg, PA 15222
E-mail: jfitzgeral@tuckerlaw.com

Susan M. Freeman
Lewis Roca Rothgerber Christie LLP
201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595
E-mail: sfreeman@lrrc.com

Lois R. Lupica
Maine Law Foundation Professor of Law
University of Maine School of Law
246 Deering Avenue
Portland, ME 04012
E-mail: lupica@maine.edu

Steven M. Biskupic
Biskupic & Jacobs, S.C.
1045 W. Glen Oaks Lane, Suite 106
Mequon, WI 53092
E-mail: sbiskupic@biskupicjacobs.com

and

John A.E. Pottow
John Philip Dawson Collegiate
Professor of Law
University of Michigan Law School
625 South State Street
Ann Arbor, MI 48109
E-mail: pottow@umich.edu
*Of Counsel for Mar-Bow Value
Partners, LLC*

Richard H. Verheij
Alpha Natural Resources, Inc.
Executive Vice President, General Counsel
& Corporate Secretary
One Alpha Place
Bristol, VA 24209
E-mail: rverheij@alphanr.com

Tyler P. Brown
J.R. Smith
Henry P. Long, III
Justin F. Paget
Hunton & Williams
951 East Byrd Street
Richmond, VA 23219
E-mail: tpbrown@hunton.com
E-mail: jrsmith@hunton.com
E-mail: hlong@hunton.com
E-mail: jpaget@hunton.com

and

### SERVICE LIST

Carl E. Black
David G. Heiman
Thomas A. Wilson
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
E-mail: ceblack@jonesday.com
E-mail: dgheiman@jonesday.com
E-mail: tawilson@jonesday.com
*Counsel for Debtors*

Hugh M. Bernstein
Office of the United States Trustee
District of Maryland
101 West Lombard Street, Suite 2625
Baltimore, MD 21201
E-mail: Hugh.M.Bernstein@usdoj.gov

Elisabetta G. Gasparini
Office of the United States Trustee
1835 Assembly Street, Suite 953
Columbia, SC 29201
E-mail: elisabetta.g.gasparini@usdoj.gov

Dennis F. Dunne
Evan R. Fleck
Erick K. Stodola
Milbank, Tweed, Hadley & McCoy LLP
28 Liberty Street
New York, NY 10005
E-mail: ddunne@milbank.com
E-mail: efleck@milbank.com
E-mail: estodola@milbank.com

Andrew L. LeBlanc
Milbank, Tweed, Hadley & McCoy LLP
1850 K Street, N.W., Suite 1100
Washington, D.C. 20006
E-mail: aleblanc@milbank.com

and

William A. Gray
W. Ashley Burgess
Roy M. Terry
Sands Anderson P.C.
P.O. Box 1998
Richmond, VA 23218-1998
E-mail: BGray@sandsanderson.com
E-mail: ABurgess@SandsAnderson.com
E-mail: RTerry@SandsAnderson.com
*Counsel to Creditors Committee*

Lynn L. Tavenner
Paula S. Beran
David N. Tabakin
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, VA 23219
E-mail: ltavenner@tb-law.com
E-mail: pberan@tb-law.com
E-mail: dtabakin@tb-law.com

and

John R. Owens
Jeremy D. Capps
Melissa Y. York
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA 23235
E-mail: jowen@hccw.com
E-mail: jcapps@hccw.com
E-mail: myork@hccw.com
*Counsel to Retiree Committee*

Damian S. Schaible
Damon P. Meyer
Bradley A. Schecter
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10117
E-mail: damian.schaible@davispolk.com
E-mail: damon.meyer@davispolk.com
E-mail: Bradley.schecter@davispolk.com

## SERVICE LIST

and

Dion W. Hayes
Sarah B. Boehm
K. Elizabeth Sieg
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
E-mail:  dhayes@mcguirewoods.com
E-mail:  sboehm@mcguirewoods.com
E-mail:  bsieg@mcguirewoods.com
        *Counsel to DIP Agent and First Lien
        Agent*

Paul M. Basta
Stephen E. Hessler
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
E-mail:  paul.basta@kirkland.com
E-mail:  stephen.hessler@kirkland.com

Gregory F. Pesce
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
E-mail:  gregory.pesce@kirkland.com

and

Michael A. Condyles
Peter J. Barrett
Jeremy S. Williams
Kutak Rock LLP
1111 East Main Street, Suite 800
Richmond, VA 23219-3500
E-mail:  michael.condyles@kutakrock.com
E-mail:  peter.barrett@kutakrock.com
E-mail:  jeremy.williams@kutakrock.com
        *Counsel to Ad Hoc Committee of
        Second Lien Noteholders*

Debra A. Dandeneau
John J. Dedyo
Weil, Gosthal & Manges LLP
767 Fifth Avenue
New York, NY 10153
E-mail:  debra.dandeneau@weil.com
E-mail:  john.dedyo@weil.com
        *Counsel to General Electric Credit
        Corporation*

Jayne T. Goldstein
Kenneth Pasquale
Gabriel E. Sasson
Strook, Strook & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
E-mail:  jgoldstein@strook.com
E-mail:  kpasquale@strook.com
E-mail:  gsasson@strook.com
        *Counsel to Second Lien Notes
        Trustee*

Sharon L. Levine
Paul Kizel
Philip J. Gross
Nicole M. Brown
LowensteinSandler LLP
65 Livingston Avenue
Roseland, NJ 07068
E-mail:  slevine@lowenstein.com
E-mail:  pkizel@lowenstein.com
E-mail:  pgross@lowenstein.com
E-mail:  nbrown@lowenstein.com

and

Troy Savenko
Kaplan Voekler Cunningham & Frank, PLC
1401 East Cary Street
Richmond, VA 2319
E-mail:  tsavenko@kv-legal.com
        *Counsel to UMWA*

Case 15-10541-BLS Doc 2406-25 Filed 04/11/18 Page 686 of 818

### SERVICE LIST

Grant Crandall
United Mine Workers of America
18354 Quantico Gateway Drive, Suite 200
Triangle, VA 22172
E-mail:  gcrandall@umwa.org
     *United Mine Workers of America*

Kurtzman Carson Consultants LLC
Attn:  Joe Morrow
2335 Alaska Avenue
El Segundo, CA 90245
E-mail:  alphanrinfo@kccllc.com
     *Claims and Noticing Agent*

Harold L. Kaplan
Mark F. Hebbeln
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
E-mail:  hkaplan@foley.com
E-mail:  mhebbeln@foley.com
     *Counsel to the Indenture Trustee for*
     *the Debtors' Secured and Unsecured*
     *Notes*

# Exhibit 20

# In Re:

*SYNERGY PHARMACEUTICALS INC., et al.*
*Main Case No. 18-14010-jlg*

*February 6, 2019*

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

To purchase copies of this transcript, please contact us by phone



Min-U-Script® with Word Index

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  SYNERGY PHARMACEUTICALS INC., et al.,    Main Case No.

8          Debtors.                        18-14010-jlg

9

10  - - - - - - - - - - - - - - - - - - - -x

11

12            United States Bankruptcy Court

13            One Bowling Green

14            New York, New York

15

16            February 6, 2019

17            4:40 PM

18

19

20

21  B E F O R E:

22  HON. JAMES L. GARRITY, JR.

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    1) Application to employ Centerview Partners LLC as investment

3    banker and financial advisor to Debtors (Doc #135)

4

5    Objection of the United States Trustee (Doc #194)

6

7    Reply in support of Debtors' application (Doc #231)

8

9    Supplemental reply to U.S. Trustee objection and in support of

10   Debtors' application (Doc #252)

11

12   Further response of the United States Trustee (Doc #273)

13

14   Declaration of Gary G. Gemignani (Doc #298)

15

16   Declaration of Amanda Kosowsky in support (Doc #299) -

17   continued from 1/17/2019

18

19

20   Transcribed by:  Melissa Looney

21   eScribers, LLC

22   352 Seventh Avenue, Suite #604

23   New York, NY 10001

24   (973)406-2250

25   operations@escribers.net

1

2  A P P E A R A N C E S:

3  TOGUT, SEGAL & SEGAL LLP

4         Attorneys for Debtors

5         One Penn Plaza

6         New York, NY 10119

7

8  BY:   KYLE J. ORTIZ, ESQ.

9         ALBERT TOGUT, ESQ.

10        PATRICK MARECKI, ESQ.

11        AMY M. ODEN, ESQ.

12

13

14  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

15        Attorney for Debtors

16        155 North Wacker Drive

17        Chicago, IL 60606

18

19  BY:   RON E. MEISLER, ESQ.

20

21

22

23

24

25

4

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          201 Varick Street

5          Suite 1006

6          New York, NY 10014

7

8  BY:   GREG M. ZIPES, ESQ.

9

10

11  LATHAM & WATKINS LLP

12          Attorney for Official Committee of Unsecured Creditors

13          53rd at Third, 885 Third Avenue

14          New York, NY 10022

15

16  BY:   BLAKE T. DENTON, ESQ.

17

18

19  VENABLE LLP

20          Attorney for CRG Servicing, LLC, DIP Agent

21          1270 Avenue of the Americas

22          New York, NY 10020

23

24  BY:   JEFFREY S. SABIN, ESQ.

25

1

2  GIBSON, DUNN & CRUTCHER, LLP

3         Attorneys for Official Committee of Equity-Security

4         Holders

5         200 Park Avenue

6         New York, NY 10160

7

8  BY:   ALAN MOSKOWITZ, ESQ.

9         MATTHEW KELSEY, ESQ.

10

11

12  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

13         Attorney for Centerview Partners LLC

14         1285 6th Avenue

15         New York, NY 10019

16

17  BY:   BRIAN S. HERMANN, ESQ.

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2           THE COURT:  Jonathan, are you all set?  Thank you.

3           All right.  Good afternoon.  I apologize for keeping

4    you waiting.

5           MR. ORTIZ:  Good afternoon, Your Honor.  Kyle Ortiz

6    with Togut, Segal, & Segal on behalf of the debtors.

7           THE COURT:  All right.

8           MR. ORTIZ:  I'm in the courtroom today with Ron

9    Meisler of Skadden Arps; Al Togut, Patrick Marecki, and Amy

10   Oden from Togut, Segal; and Brian Hermann from Paul, Weiss, who

11   is counsel to Centerview.

12          THE COURT:  All right.

13          MR. ORTIZ:  Your Honor, at Your Honor's request, we

14   did file two additional declarations.  The declaration of Gary

15   Gemignani at docket number 298, which covers Your Honor's

16   questions about the licensing agreement and the declaration of

17   Amy Kosowsky, the chief compliance officer at Centerview, which

18   addresses the questions concerning exactly what Centerview does

19   for Ironwood.

20          With that, based on Your Honor's comments from the

21   last hearing, I would just sit down.  But I should note there

22   was an objection from a shareholder, Charles Fisher (ph.) that

23   was filed just a few moments ago at docket 310.

24          I did want to let Your Honor know that we did speak to

25   Mr. Fisher last night for about an hour.  I do think his

1   objection is mostly about the sale and not as much about

2   Centerview, and that his issues are covered by the declarations

3   we've already put in.  I do believe he's on the phone and we're

4   happy to address that objection if you'd like us to, Your

5   Honor.

6           THE COURT:  No.  No.  You don't need to.  Does anyone

7   else wish to be heard just on any preliminary matters?

8           All right.  I've had an opportunity -- first off, is

9   Mr. Fisher on the phone?  I guess if he is, he's maybe a listen

10  only.  But I do want to say I just got the objection, so I

11  haven't had an opportunity to review it.

12          Moreover, while I most assuredly recognize the

13  interest that the individual shareholders have, the

14  significance of this case to them, the financial hardship that

15  some, if not all, are experiencing, or at least as far as their

16  communications with the Court -- they're experiencing with

17  regard -- and based upon the filing of this case, I am, most

18  respectfully, not going to consider the objection.  Not merely

19  because it's not timely -- I did consider the matters raised

20  and the positions taken by the ad hoc committee of

21  shareholders.  And so with that, I also didn't have the time or

22  the opportunity to consider it.  To the extent that it is

23  really more in the nature of an objection to the sale, we can

24  consider it at that time.

25          Now, I've also had an opportunity to review the

1    declarations that were filed on Monday.  Just as a preliminary

2    matter, I want to say that how much I appreciate the efforts

3    that the U.S. Trustee, with regard to the disclosure in this

4    matter.  I think I mentioned last week, I thought or believed

5    that the disclosure was deficient.  But I am satisfied that

6    based upon the various supplements to the initial disclosure in

7    the application, I'm satisfied that it complies with Rule 2014.

8    I also note that the U.S. Trustee has indicated that based upon

9    the disclosure subsequent to the initial disclosure, its

10   office's concerns have been met, at least with respect to that.

11        So as I said, I've had an opportunity to consider the

12   matters and I will issue my ruling now.

13        Synergy Pharmaceuticals, Inc. and Synergy Advance

14   Pharmaceuticals, and I'll collectively refer to them as the

15   debtors, are Chapter 11 debtors in this Court.

16        The matter before the Court is their application for

17   the entry of an order authorizing the employment and retention

18   of Centerview Partners LLC as an investment banker and

19   financial advisor to the debtors, nunc pro tunc to the petition

20   date; two, approving the terms of the Centerview engagement

21   letter; three, waiving certain time keeping requirements; and

22   four, granting related relief.  You'll find that at ECF number

23   135.  I'll refer to that as the Centerview application.

24        The Office of the United States Trustee objects to the

25   applications.  See ECF number 194.  In substance, in support of

1    the objection, the U.S. Trustee asserts that the application

2    runs afoul of Bankruptcy Rule 2014 because the declaration of

3    Samuel Greene, a partner and cohead of the debt advisory and

4    restructuring group of Centerview submitted in support of the

5    application failed to provide a transparent and complete

6    listing of Centerview's connections to the debtor, creditors,

7    and any parties in interest.  In response to the objection,

8    Centerview has supplemented Mr. Greene's declaration with

9    additional information.

10           Just so that our record is clear, that had been

11   supplemented by the Kosowsky declaration that's dated February

12   4, 2019.  That's at ECF number 299.  The Gemignani declaration

13   dated February 4th, 2019.  That's at ECF number 298.  The

14   Greene declaration was the original declaration dated December

15   28, 2018, that's at ECF number 135-2.  The supplemental Greene

16   declaration dated January 16, 2019, ECF number 231-1.  The

17   second supplemental Greene declaration dated January 22nd, 2019

18   at ECF number 252-1.

19           The U.S. Trustee advises the additional evidence

20   submitted by Mr. Greene and others addresses its concerns

21   regarding adequacy of Centerview's disclosure.  However, he

22   advises that he believes that Centerview is not a disinterested

23   person as that term is defined in Section 327 of the Bankruptcy

24   Code, by reason of the fact that Centerview is representing

25   Ironwood Pharmaceuticals LLC.  I'll refer to them as Ironwood,

1   a creditor, competitor, and licensor of Synergy in matters

2   unrelated to this Chapter 11 case.  For that reason, the U.S.

3   Trustee objects to the Centerview application.

4          For the reasons set forth herein, the Court overrules

5   the U.S. Trustee's objection and grants the Centerview

6   application.

7          On December 12th, 2018, which is the petition date,

8   the debtors filed voluntary petitions for relief under Chapter

9   11 of the Bankruptcy Code in this Court.  On December 14, 2018,

10  the Court entered an order authorizing the joint administration

11  and procedural consolidation of the debtors' Chapter 11 cases,

12  pursuant to Bankruptcy Rule 1015(b).  See docket number 52.

13         The debtors continue to operate their businesses and

14  manage their properties as debtors-in-possession -- debtors and

15  debtors-in-possession, pursuant to Bankruptcy Code Sections

16  1107(a) and 1108.

17         On December 20, 2018, the office of the United States

18  Trustee appointed a creditors' committee in the Chapter 11

19  case.  See docket number 92.  No trustee or examiner has been

20  appointed in the cases.

21         The debtors comprise a biopharmaceutical company

22  focused on the development and commercialization of novel

23  gastrointestinal therapies.  See Centerview application,

24  paragraph 6.

25         Their only commercial product is a drug called

1  Trulance.  The debtors also have a second product candidate,

2  which is referred to as Dulkitide (ph.).  See the application

3  at 6.

4          The debtors commenced these cases with the intention

5  of selling substantially all their assets to Bausch Health

6  Companies and its wholly owned subsidiary, Bausch Health

7  Ireland Limited -- I'll collectively refer to them as Bausch --

8  or a qualified bidder who makes a higher and better offer for

9  the assets.

10         On the petition date, the debtors filed a motion

11 seeking an order approving, among other things:  one, bidding

12 procedures for the sale of substantially all of the debtors'

13 assets to a successful bidder at an auction for those assets;

14 two, procedures for the assumption and assignment of certain

15 executory contracts; three, the debtors' entry into its certain

16 stalking horse asset purchase agreement with Bausch.  See

17 docket number 15.  We refer to that as the sale motion.

18         On January 7, 2019, the Court entered an order

19 approving the relief requested in the sale motion.  That's at

20 docket number 18.  The debtors seek to retain Centerview as

21 their financial advisor and investment banker with respect to a

22 possible restructuring financing and/or sale as those terms are

23 defined in the agreement.  And with respect to such other

24 financial matters as the company and Centerview may agree in

25 writing during the term of the engagement.

1       As relevant to the resolution of the U.S. Trustee's

2   objection, the Court notes that in its application Centerview

3   identified Ironwood as a potential party in interest that is

4   either a current or former client.

5       The evidence of record show that there are three parts

6   to Ironwood's relationship with Synergy.  First, Ironwood is a

7   competitor of Synergy.  Synergy's sole commercial product is

8   Trulance.  Ironwood produces Linzess, which is a drug that

9   competes with Trulance.

10      Second, Ironwood is a licensor to Synergy.  Ironwood

11  is a party to a patent licensing agreement with the debtors

12  dated September 14, 2012 as amended by the first amendment to

13  the binding term sheet, effective October 17, 2018.  I'll refer

14  to that as the license agreement.

15      Under the license agreement, Ironwood granted Synergy

16  a license to certain method of use patterns on Trulance.  I'll

17  refer to those as the royalty product.  And Synergy agreed to

18  pay royalties to Ironwood based on Synergy's net sales of the

19  royalty product.  Those are the royalty payments.

20      Royalty payments are due within forty-five days of the

21  end of each calendar quarter for the preceding quarter during

22  the applicable royalty term, based on reporting by Synergy

23  provided to Ironwood.

24      On November 14, 2018 Ironwood received the most recent

25  royalty payment in respect to the royalty product sales between

1  July 1 and September 30, 2018.

2           Potential purchasers of the debtors' assets are

3  expected to assume the license agreement in connection with any

4  sale of the debtors' Trulance related assets.  Indeed, Bausch's

5  assumption of the license agreement is a condition precedent to

6  Bausch closing under the sale agreement in its stalking horse

7  agreement.

8           On January 23, 2019, pursuant to the bidding

9  procedures order, the debtors provided notice that they are

10  seeking to assume and assign the license agreement to the

11  successful bidder.

12           On February 6th, Ironwood filed its limited objection

13  to the debtors' notice of cure payment relating to the proposed

14  assumption and assignment of license agreement.  That's at ECF

15  number 307.

16           Without limitation, in that limited objection,

17  Ironwood advises that it, "does not objection to the assumption

18  and assignment of the license agreement provided that any order

19  approving the assumption and assignment of the license

20  agreement" which they define as the assumption order,

21  "expressly provides that:  one, all amounts due and payable as

22  to the date of the entry of such order be paid within seven

23  days following entry of the assumption order; and two, Bausch

24  or the debtors shall pay any amount that becomes due and

25  payable under the license agreement after entry of the

1   assumption order, in accordance with the terms and conditions

2   of the license agreement."  See the limited objection at

3   paragraph 13.

4           The Court notes that Ironwood filed, with this limited

5   objection, a full reservation of rights, including the right to

6   supplement, modify, or amend the objection and make such other

7   and further objections to the cure notice or assumption and

8   assignment of the license agreement until such time as a final

9   order is entered approving the cure payment with respect to the

10  license agreement.  That's the limited objection at paragraph

11  14.

12          It also provides that, "Nothing set forth herein shall

13  constitute a waiver, discharge, or allowance of any and all

14  claims, rights, claims, causes of actions, and defenses.  In

15  addition, nothing set forth herein shall be construed as a

16  waiver, release, discharge, or disallowance of any and all

17  administrative claims of Ironwood against the debtors."  That's

18  at 14.

19          Third, Ironwood is a creditor of Synergy.  On November

20  14, 2018, Ironwood received the most recent royalty payment in

21  respect of royalty product sales between July 1 and September

22  30, 2018.

23          On December 21, Synergy filed its schedule of assets

24  and liabilities -- that's at docket number 106 -- which listed

25  Ironwood was a creditor holding a non-priority, pre-petition

 1  unsecured claim on account of royalties in the amount of
 2  $235,799.33.  Ironwood's claim was not designated as disputed,
 3  contingent, unliquidated, or subject to a setoff.
 4       The Court now considers Centerview's relationship with
 5  Ironwood.  Centerview has been acting as a financial advisor to
 6  Ironwood since the spring of 2018.  At that time, upon its
 7  retention by Ironwood, Centerview's engagement consisted of:
 8  one, acting as financial advisor to Ironwood with respect to
 9  Ironwood's intention to pursue a spinoff of certain portions of
10  its research and development business from its commercial and
11  gastrointestinal business, and two, providing financial
12  advisory services related to shareholder activism and potential
13  alternate transactions to the spinoff that were considered by
14  Ironwood.
15       Since then the scope of the retention has narrowed.
16  Now Centerview is only advising Ironwood in connection with the
17  spinoff.  Centerview's engagement with Ironwood will
18  automatically terminate on completion of the spinoff.
19       Centerview is not engaged to provide financial
20  advisory services to Ironwood in connection with acquisition
21  transactions or restructuring matters.  It is not representing
22  Ironwood in this case.  None of Centerview's work for Ironwood
23  relates to Synergy in any respect.  Thus, should Ironwood
24  decide to bid on Synergy's assets -- Centerview advises that
25  should Ironview (sic) decide to bid on Synergy's assets, it

1  would not provide any advice to or otherwise represent Ironwood

2  in connection with any such bid.  Moreover, Centerview will not

3  represent Ironwood in connection with its license with Synergy

4  as Centerview further advises that, in fact, it's engagement

5  with Ironwood specifically excludes from its scope any advice

6  or services relating to licensing agreements.

7       Because Ironwood and the debtors are commercial

8  competitors, Centerview maintains separate teams with no

9  overlapping membership for the Ironwood matter in these Chapter

10  11 cases.  In addition, during the entire period where

11  Centerview has been engaged by both Synergy and Ironwood, each

12  team has separate electronic deal folder which is inaccessible

13  by any person who has not been granted permission to access the

14  deal folder.

15       No member of the Synergy team has access to the

16  Ironwood deal folder and no member of the Ironwood team has

17  access to the Synergy deal folder.  Access to the deal folders

18  is controlled by the internal compliance group which sits above

19  the deal teams.  There are no overlapping members of the

20  compliance group and the investment banking group.

21       Centerview has in place electronic information

22  barriers to ensure that no confidential information or

23  documents regarding either matter will be shared between the

24  two teams.  Centerview also has firm-wide policies and

25  procedures designed to prevent the misuse of material nonpublic

1   information.   Furthermore, Centerview operates on a strict

2   need-to-know basis, with respect to confidential client

3   information.   Employees are required to affirm their adherence

4   to the firm's compliance policies on an annual basis.

5   Centerview's legal and compliance teams routinely stress the

6   importance of maintaining the confidentiality of client

7   information.

8           Upon the commencement of a Chapter 11 proceeding, "A

9   debtor continues to operate its business pursuant to 1107 and

10  1108 of the Code, but assumes fiduciary duties and obligations

11  to all parties in interest without fear or favor.   The pre-

12  petition debtor does not have many of these post-petition

13  obligations.   It is mandatory the debtors' professionals be

14  abler to act in the best interest of the bankruptcy case, free

15  of any prior or ongoing commitments.   Because of these

16  limitations, a Chapter 11 debtor does not have the absolute

17  right to professionals of its choice."   In re:   Envirodyne

18  Industries Inc., 150 B.R. 1008 at 1018 Bankruptcy Court N.D. of

19  Illinois, 1993.

20          Still, public policy favors parties to retain --

21  favors permitting parties to retain professional of their

22  choice.   See, for example, in re:   Caldor Inc., 193 B.R. 165,

23  170, Bankruptcy of the S.D.N.Y. 1996.   See also, in re:

24  Codesco Inc., 18 B.R. 997, 999, Bankruptcy Court S.D.N.Y. 1982

25  where the court stated, "Only in the rarest cases should the

1    trustee be deprived of the privilege of selecting its own

2    counsel."  Citations omitted.

3          Section 327 of the Bankruptcy Code permits a debtor-

4    in-possession to employ professionals to represent the estate

5    during bankruptcy with court approval.  See, for example, in

6    re:  Project Orange Associates, LLC., 431 B.R. 363, 393

7    Bankruptcy S.D.N.Y. 2010.

8          Section 327(a) sets forth a two-part test that is

9    generally applicable to debtors seeking to retain professionals

10   in their cases.  Under that section, a debtor may hire only

11   those professionals that:  one, do not hold or represent an

12   interest adverse to the estate, and two, or disinterested

13   persons.

14         The statute reads as follows:  "Except as otherwise

15   provided in this section, the trustee, with the court's

16   approval, may employ one or more attorneys, accountants,

17   appraisers, auctioneers, or other professional persons, that do

18   not hold or represent an interest adverse to the estate, and

19   that are disinterested persons, to represent or assist the

20   trustee in carrying out the trustee's duties under this title."

21   See 11 U.S.C. Section 327(a).

22         Section 327(c) and 327(e) provide limited exceptions

23   to the general rule.  Section 327(e) governs the debtors'

24   retention of an attorney, "for a specified special purpose,

25   other than to represent the debtor in conducting the case."  11

1    U.S.C. Section 327(e).  It is not applicable in this case,

2    neither is Section 327(c).  Without limitation, it provides

3    that in a case under Chapter 11, "A person is not disqualified

4    for employment solely because of such person's employment by or

5    representation of a creditor, unless there is objection by

6    another creditor or the United States Trustee, in which case,

7    the court shall disapprove such employment if there is an

8    actual conflict of interest."  11 U.S.C. Section 327(c).

9         As noted, Centerview is representing Ironwood in the

10   spinoff transaction, but not in this case.  And Ironwood is a

11   creditor of the debtor.  However, as it relates to Ironwood,

12   the U.S. Trustee's objection to Centerview's retention is not

13   predicated solely on Centerview's dual representation of the

14   debtor and Ironwood as a creditor in this case, rather, it's

15   based on Ironwood's status as a competitor of the debtor and as

16   the licensor under the license agreement.

17        Section 327(c) is not applicable in this case because

18   it "addresses the situation where dual representation of a

19   creditor and a debtor is the only reason advanced for

20   disqualification and the professional is otherwise qualified."

21   See, in re:  Interwest Business Equipment, Inc., 23 F.3d, 311,

22   316, Tenth Circuit, 1994.

23        Accordingly, in resolving the U.S. Trustee's

24   objection, the Court will focus on Section 327(a) of the

25   Bankruptcy Code.  As the Second Circuit notes, this provision,

1    "serves the important policy of ensuring that all professionals

2    appointed to represent the debtor tender undivided loyalty and

3    provided untainted advice and assistance in furtherance of

4    their fiduciary responsibilities."  See, Bank Brussels Lambert

5    v. Comb, in re:  Arochem Corp., 176 F.3d 610, 621, Second

6    Circuit 1999, quoting in re:  Leslie Fay Companies, 175 B.R.

7    525, 532, Bankruptcy S.D.N.Y, 1994, which in turn was quoting

8    Rome v. Braunstein, 19 F.3d, 54, 58, First Circuit, 1994.

9          To be employed, to be retained under Section 327(a), a

10   professional must be both disinterested and not hold or

11   represent any interest adverse to the estate.  See, in re:

12   Arochem Corp., 176 F.3d, at 621.  As relevant to the matters at

13   issue, Section 101(14) of the Bankruptcy Code defines the term,

14   "disinterested person" to mean a person that, "does not have an

15   interest materially adverse to the interest of the estate or

16   any class of creditors or equity security holders by reason of

17   any direct or indirect relationship to, connection with, or

18   interest in the debtor or for any other reason."  See, 11

19   U.S.C. Section 101(14)(c).

20         Courts recognize that this catch-all provision of the

21   disinterestedness definition overlaps with the interest adverse

22   language in the first prong of Section 327(a).  And together

23   they form "a single test to judge conflicts of interest".  See,

24   in re:  Worldcom Inc., 311 B.R. 151, 164, Bankruptcy S.D.N.Y.

25   2004.  See also, in re:  Granite Partners, LP, 219 B.R. 22, 33,

1  Bankruptcy S.D.N.Y., 1998.

2         Accordingly, to qualify under Section 327(a), a

3  professional must not "hold or represent an interest adverse to

4  the estate".  In re:  Arochem Corp., 176 B.R. 622, to 23.

5         The Bankruptcy Code does not define what it means to

6  hold or represent an interest adverse to the estate.  The

7  Second Circuit recognizes the following definition.  One, that

8  to hold is to possess or assert any economic interest that

9  would tend to lessen the value of the bankruptcy estate or that

10  would either -- that would create either an actual or potential

11  dispute in which the estate is a rival claimant; or two, to

12  possess a predisposition under circumstances that render such a

13  bias against the estate.  See, Arochem Corp. 176 F.3d, 621.

14  See also, in re:  Innomed Labs, LLC, 2008 Westlaw 276490, 2,

15  S.D.N.Y. January 29, 2018.

16         Whether an adverse interest exists is "best determined

17  on a case by case basis".  In re:  Ampal-American Israel Corp.,

18  534 B.R. 569, 580, Bankruptcy S.D.N.Y. 2015.  Internal

19  citations omitted.  See also Collier on Bankruptcy, paragraph

20  327.042 at 327-32, Richard Levin and Harry J. Sommers (sic),

21  edition editors, 16th edition, 2018, where they note, "the

22  better approach on disinterestedness would appear to be the one

23  most generally used.  Examine the facts to assess the ability

24  of the professional to serve in the best interest of the estate

25  while preserving the integrity of the bankruptcy process,

1   rather than employing a per se test of any sort beyond those

2   enumerated by the statute."

3          Indeed, the Second Circuit states that, "When

4   evaluating proposed retention, the Bankruptcy Court should

5   exercise its discretionary powers over the approval of

6   professionals in a manner which takes into account, the

7   particular facts and circumstances surrounding each case and

8   proposed retention before making a decision."  In re:  Arochem,

9   176 F.3d, 621, internal citations omitted.

10         See also, in re:  Leslie Fay Companies, Inc., 175 B.R.

11  532, where the court was discussing the debate over the proper

12  interpretation of what is an adverse interest, noted that "it

13  may be more semantic than substantive for a close review of the

14  cited cases indicates that the results were largely driven by

15  the facts of each case."  The court noted that "indeed in the

16  context of Section 327, that is precisely the way it should

17  be."

18         As noted, the debtors seek to retain Centerview as

19  their financial advisor and investment banker with respect to a

20  possible restructuring, financing, and/or sale, as those terms

21  are defined in the agreement.  The sale services that

22  Centerview will provide are relevant to this matter.  The

23  retention agreement states that, to the extent requested by the

24  company, Centerview shall:  one, provide financial advice and

25  assistance to the company in connection with the sale,

1   identifying potential acquirers, and at the company's request,

2   contacting such potential acquirers; and two, assist the

3   company and/or participate in the negotiations with potential

4   acquirers.

5           The court considers whether Centerview holds or

6   represents an interest adverse to the estate.  A professional

7   will hold an adverse interest if it is a pre-petition creditor

8   of the estate or personally possesses any claims or interest

9   contrary to the estate.  See, Arochem, in re:  Arochem, 176

10  F.3d, 623.  Centerview is not a pre-petition creditor of the

11  debtor.  The U.S. Trustee contends that the fee it will be paid

12  by Ironwood for the work done on the spinoff saddles Centerview

13  with an interest adverse to the estate because it potentially

14  compromises Centerview's loyalty to the estate on matters

15  relating to Ironwood to the detriment of the estate and

16  creditors.

17          It also contends that Centerview may represent an

18  interest adverse to the estate if Ironwood is a bidder for the

19  debtors' assets.

20          In resolving these objections, the Court considers the

21  nature and extent of Ironwood's interest in this case and its

22  relationship to the debtor.  The debtor has determined that it

23  will assume and assign the license agreement as part of the

24  sale transaction.  In doing so, among other things, the debtor

25  must cure any pre- or post-petition arrearages under the

1 license agreement.  As such, the fact that Ironwood is a pre-

2 petition creditor of Synergy is irrelevant to the retention of

3 Centerview since that claim will be paid in full.

4       Likewise, Ironwood's status as a licensor under the

5 license agreement is not a bar to Centerview's retention,

6 because the agreement will be assumed and assigned under the

7 sale agreement.  That does not flow from Ironwood's retention

8 of Centerview.  Rather, Bausch insists on it, and it is likely

9 that every bidder for the Trulance related assets will do so as

10 well.

11       The Court notes that at this time, Ironwood does not

12 object to the transfer of the license to Bausch under the sale

13 agreement subject to the payment of cure payments.  The Court

14 notes that if Ironwood ultimately objects to the assumption of

15 the license, it's unlikely that Centerview will play any role

16 in resolving whether the debtor is authorized to assume or

17 assign the license under the applicable provisions of the

18 Bankruptcy Code.

19       Turning to Ironwood's relationship with the debtor as

20 a competitor of the debtor, the Court notes that a

21 professional's representation of a creditor of a debtor is not

22 a per se bar to the retention of that professional.  See for

23 example, in re:  Aloha Air Group, Inc., 2005 Westlaw 1156094 at

24 2 bankruptcy, the Bankruptcy Court in Hawaii, March 11, 2005

25 where the court was overruling the U.S. Trustee's objection to

1   the debtor's application to retain counsel, explaining that, "A
2   professional's simultaneous representation of a debtor-in-
3   possession, and a competitor of the debtor does not, in and of
4   itself, render the professional not disinterested or require
5   disqualification of the professional.  Instead, the facts and
6   circumstances of the case must be examined."

7           See also, in re:  Aloha Air Group Inc., 2005 Westlaw
8   1156092 at 1 and note 1.  Bankruptcy Court for the District of
9   Hawaii, February 24, 2005 overruling the U.S. Trustee's
10  objection to the debtor's application to retain a financial
11  advisor because it had been retained by the Chapter 11 debtor
12  trustee of the debtor's competitor.

13          "Generally an adverse interest takes the form of a
14  competing economic interest to diminish estate values or to
15  create a potential or actual dispute in which the estate is a
16  rival claimant."  See, Caldor, 193 B.R. 171.  Likewise a
17  professional possess an adverse interest when it has "a
18  meaningful incentive to act contrary to the best interest of
19  the estate and its sundry creditors."  In re:  Martin 817 F.2d
20  175, 180, First Circuit 1987.

21          Thus "an actual conflict exists when there is an act
22  of competition between two interests in which one interest can
23  only be served at the expense of the other."  See, in re:
24  Midway Motor Sales Inc., 353 B.R. 26, 33 Bankruptcy Court, N.D.
25  Ohio 2006.  Citations and internal quotation marks omitted.

1           The structure of the fee to be paid to Centerview

2    clearly incentivizes Centerview to obtain the highest and best

3    return for the assets of the estate, irrespective of its

4    representation of Ironwood in the unrelated spinoff

5    transaction.  It does not have a competing economic interest

6    with the estate.  Under its agreement, Centerview's sale fee is

7    based on aggregate consideration and calculated as follows.  2

8    million dollars plus 2.375 percent of any amounts of aggregate

9    consideration in excess of 100 million dollars up to 200

10   million, plus 3.5 percent of any amounts of aggregate

11   consideration in excess of 200 million up to 350 million, plus

12   4 percent of any amounts of aggregate consideration in excess

13   of 350 million.

14           Centerview's economic interests are consistent with

15   those of the estate, does not have a competing economic

16   interest with the estate.  Moreover, Mr. Greene testified that

17   Ironwood has advised that it will not be bidding on the -- at

18   this time, will not be bidding on the assets.

19           In that light, and under the facts of this case, the

20   Court finds that Ironwood's status as a competitor of the

21   debtor does not bar the debtor from retaining Centerview.

22   Moreover, the Court finds that because Centerview has a unity

23   of interest with the debtor, it does not possess a bias against

24   the estate.  See, in re:  Caesars Entertainment Operating

25   Company, Inc., 561 B.R. 420, 436, Bankruptcy for the N.D. of

1   Illinois, 2015, where the court found that despite noteholders'
2   committee objection, counsel had no bias against the estates
3   and described how the applicant's actions in furtherance of the
4   debtor's objection in a case were indication of loyalty to the
5   estate.  See also, in re:  Looking River Mining, LLC, 2015,
6   Westlaw 5601284 Bankruptcy Eastern District of Kentucky,
7   September 27, 2015, noting that the special counsel's
8   contingency fee arrangement ensured its interests were aligned
9   with the trustee.
10          Based upon all of the foregoing, the Court approves
11   the Centerview application.  The motion is granted.  If you'll
12   please submit an order.  Thank you very much.
13          IN UNISON:  Thank you, Your Honor.
14       (Whereupon these proceedings were concluded at 5:15 PM)
15
16
17
18
19
20
21
22
23
24
25

28

1
2                              I N D E X
3  RULINGS:                                    PAGE   LINE
4  Application to employ Centerview            8      12
5  Partners LLC as investment bank and
6  financial advisor to the debtors.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                          C E R T I F I C A T I O N

3

4    I, Melissa Looney, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    *Melissa Looney*

9    _____

10   Melissa Looney (CET-607)

11   AAERT Certified Electronic Transcriber

12

13   eScribers

14   352 Seventh Ave., Suite #604

15   New York, NY 10001

16

17   Date:  February 7, 2019

18

19

20

21

22

23

24

25

Case 15-10541-BLS    Doc 2406-2    Filed 04/11/19    Page 718 of 818
SYNERGY PHARMACEUTICALS INC., et al.
Main Case No. 18-14010-jlg

February 6, 2019

**$**

**$235,799.33 (1)**
15:2

**A**

**ability (1)**
21:23
**abler (1)**
17:14
**above (1)**
16:18
**absolute (1)**
17:16
**access (4)**
16:13,15,17,17
**accordance (1)**
14:1
**Accordingly (2)**
19:23;21:2
**account (2)**
15:1;22:6
**accountants (1)**
18:16
**acquirers (3)**
23:1,2,4
**acquisition (1)**
15:20
**act (3)**
17:14;25:18,21
**acting (2)**
15:5,8
**actions (2)**
14:14;27:3
**activism (1)**
15:12
**actual (4)**
19:8;21:10;25:15,
21
**ad (1)**
7:20
**addition (2)**
14:15;16:10
**additional (3)**
6:14;9:9,19
**address (1)**
7:4
**addresses (3)**
6:18;9:20;19:18
**adequacy (1)**
9:21
**adherence (1)**
17:3
**administration (1)**
10:10
**administrative (1)**
14:17
**Advance (1)**
8:13
**advanced (1)**
19:19

**adverse (15)**
18:12,18;20:11,15,
21;21:3,6,16;22:12;
23:6,7,13,18;25:13,
17
**advice (4)**
16:1,5;20:3;22:24
**advised (1)**
26:17
**advises (5)**
9:19,22;13:17;
15:24;16:4
**advising (1)**
15:16
**advisor (6)**
8:19;11:21;15:5,8;
22:19;25:11
**advisory (3)**
9:3;15:12,20
**affirm (1)**
17:3
**afoul (1)**
9:2
**afternoon (2)**
6:3,5
**against (4)**
14:17;21:13;
26:23;27:2
**Agent (1)**
4:20
**aggregate (4)**
26:7,8,10,12
**ago (1)**
6:23
**agree (1)**
11:24
**agreed (1)**
12:17
**agreement (28)**
6:16;11:16,23;
12:11,14,15;13:3,5,
6,7,10,14,18,20,25;
14:2,8,10;19:16;
22:21,23;23:23;24:1,
5,6,7,13;26:6
**agreements (1)**
16:6
**Air (2)**
24:23;25:7
**Al (1)**
6:9
**ALAN (1)**
5:8
**aligned (1)**
27:8
**allowance (1)**
14:13
**Aloha (2)**
24:23;25:7
**alternate (1)**
15:13
**amend (1)**
14:6

**amended (1)**
12:12
**amendment (1)**
12:12
**Americas (1)**
4:13
**among (2)**
11:11;23:24
**amount (2)**
13:24;15:1
**amounts (5)**
13:21;26:8,10,12
**Ampal-American (1)**
21:17
**Amy (2)**
6:9,17
**and/or (3)**
11:22;22:20;23:3
**annual (1)**
17:4
**apologize (1)**
6:3
**appear (1)**
21:22
**applicable (5)**
12:22;18:9;19:1,
17;24:17
**applicant's (1)**
27:3
**application (13)**
8:7,16,23;9:1,5;
10:3,6,23;11:2;12:2;
25:1,10;27:11
**applications (1)**
8:25
**appointed (3)**
10:18,20;20:2
**appraisers (1)**
18:17
**appreciate (1)**
8:2
**approach (1)**
21:22
**approval (3)**
18:5,16;22:5
**approves (1)**
27:10
**approving (5)**
8:20;11:11,19;
13:19;14:9
**Arochem (7)**
20:5,12;21:4,13;
22:8;23:9,9
**Arps (1)**
6:9
**arrangement (1)**
27:8
**arrearages (1)**
23:25
**assert (1)**
21:8
**asserts (1)**
9:1

**assess (1)**
21:23
**asset (1)**
11:16
**assets (13)**
11:5,9,13,13;13:2,
4;14:23;15:24,25;
23:19;24:9;26:3,18
**assign (3)**
13:10;23:23;24:17
**assigned (1)**
24:6
**assignment (5)**
11:14;13:14,18,
19;14:8
**assist (2)**
18:19;23:2
**assistance (2)**
20:3;22:25
**Associates (1)**
18:6
**assume (4)**
13:3,10;23:23;
24:16
**assumed (1)**
24:6
**assumes (1)**
17:10
**assumption (10)**
11:14;13:5,14,17,
19,20,23;14:1,7;
24:14
**assuredly (1)**
7:12
**Attorney (4)**
4:12,20;5:13;
18:24
**Attorneys (2)**
5:3;18:16
**auction (1)**
11:13
**auctioneers (1)**
18:17
**authorized (1)**
24:16
**authorizing (2)**
8:17;10:10
**automatically (1)**
15:18
**Avenue (4)**
4:13,21;5:5,14

**B**

**Bank (1)**
20:4
**banker (3)**
8:18;11:21;22:19
**banking (1)**
16:20
**Bankruptcy (30)**
9:2,23;10:9,12,15;
17:14,18,23,24;18:3,

5,7;19:25;20:7,13,
24;21:1,5,9,18,19,
25;22:4;24:18,24,24;
25:8,24;26:25;27:6
**bar (3)**
24:5,22;26:21
**barriers (1)**
16:22
**based (9)**
6:20;7:17;8:6,8;
12:18,22;19:15;
26:7;27:10
**basis (3)**
17:2,4;21:17
**Bausch (8)**
11:5,6,7,16;13:6,
23;24:8,12
**Bausch's (1)**
13:4
**becomes (1)**
13:24
**behalf (1)**
6:6
**believes (1)**
9:22
**best (5)**
17:14;21:16,24;
25:18;26:2
**better (2)**
11:8;21:22
**beyond (1)**
22:1
**bias (3)**
21:13;26:23;27:2
**bid (3)**
15:24,25;16:2
**bidder (5)**
11:8,13;13:11;
23:18;24:9
**bidding (4)**
11:11;13:8;26:17,
18
**binding (1)**
12:13
**biopharmaceutical (1)**
10:21
**BLAKE (1)**
4:16
**both (2)**
16:11;20:10
**BR (13)**
17:18,22,24;18:6;
20:6,24,25;21:4,18;
22:10;25:16,24;
26:25
**Braunstein (1)**
20:8
**BRIAN (2)**
5:17;6:10
**Brussels (1)**
20:4
**business (4)**
15:10,11;17:9;

19:21
**businesses (1)**
10:13

## C

**Caesars (1)**
26:24
**calculated (1)**
26:7
**Caldor (2)**
17:22;25:16
**calendar (1)**
12:21
**called (1)**
10:25
**can (2)**
7:23;25:22
**candidate (1)**
11:1
**carrying (1)**
18:20
**case (21)**
7:14,17;10:2,19;
15:22;17:14;18:25;
19:1,3,6,10,14,17;
21:17,17;22:7,15;
23:21;25:6;26:19;
27:4
**cases (7)**
10:11,20;11:4;
16:10;17:25;18:10;
22:14
**catch-all (1)**
20:20
**causes (1)**
14:14
**Centerview (45)**
5:13;6:11,17,18;
7:2;8:18,20,23;9:4,8,
22,24;10:3,5,23;
11:20,24;12:2;15:5,
16,19,24;16:2,4,8,11,
21,24;17:1;19:9;
22:18,22,24;23:5,10,
12,17;24:3,8,15;
26:1,2,21,22;27:11
**Centerview's (13)**
9:6,21;15:4,7,17,
22;17:5;19:12,13;
23:14;24:5;26:6,14
**certain (5)**
8:21;11:14,15;
12:16;15:9
**Chapter (10)**
8:15;10:2,8,11,18;
16:9;17:8,16;19:3;
25:11
**Charles (1)**
6:22
**chief (1)**
6:17
**choice (2)**

17:17,22
**Circuit (7)**
19:22,25;20:6,8;
21:7;22:3;25:20
**circumstances (3)**
21:12;22:7;25:6
**Citations (4)**
18:2;21:19;22:9;
25:25
**cited (1)**
22:14
**claim (3)**
15:1,2;24:3
**claimant (2)**
21:11;25:16
**claims (4)**
14:14,14,17;23:8
**class (1)**
20:16
**clear (1)**
9:10
**clearly (1)**
26:2
**client (3)**
12:4;17:2,6
**close (1)**
22:13
**closing (1)**
13:6
**Code (9)**
9:24;10:9,15;
17:10;18:3;19:25;
20:13;21:5;24:18
**Codesco (1)**
17:24
**cohead (1)**
9:3
**collectively (2)**
8:14;11:7
**Collier (1)**
21:19
**Comb (1)**
20:5
**commenced (1)**
11:4
**commencement (1)**
17:8
**comments (1)**
6:20
**commercial (4)**
10:25;12:7;15:10;
16:7
**commercialization (1)**
10:22
**commitments (1)**
17:15
**Committee (5)**
4:12;5:3;7:20;
10:18;27:2
**communications (1)**
7:16
**Companies (3)**
11:6;20:6;22:10

**company (6)**
10:21;11:24;
22:24,25;23:3;26:25
**company's (1)**
23:1
**competes (1)**
12:9
**competing (3)**
25:14;26:5,15
**competition (1)**
25:22
**competitor (7)**
10:1;12:7;19:15;
24:20;25:3,12;26:20
**competitors (1)**
16:8
**complete (1)**
9:5
**completion (1)**
15:18
**compliance (5)**
6:17;16:18,20;
17:4,5
**complies (1)**
8:7
**comprise (1)**
10:21
**compromises (1)**
23:14
**concerning (1)**
6:18
**concerns (2)**
8:10;9:20
**concluded (1)**
27:14
**condition (1)**
13:5
**conditions (1)**
14:1
**conducting (1)**
18:25
**confidential (2)**
16:22;17:2
**confidentiality (1)**
17:6
**conflict (2)**
19:8;25:21
**conflicts (1)**
20:23
**connection (7)**
13:3;15:16,20;
16:2,3;20:17;22:25
**connections (1)**
9:6
**consider (5)**
7:18,19,22,24;8:11
**consideration (4)**
26:7,9,11,12
**considered (1)**
15:13
**considers (2)**
15:4;23:5,20
**consisted (1)**

15:7
**consistent (1)**
26:14
**consolidation (1)**
10:11
**constitute (1)**
14:13
**construed (1)**
14:15
**contacting (1)**
23:2
**contends (2)**
23:11,17
**context (1)**
22:16
**contingency (1)**
27:8
**contingent (1)**
15:3
**continue (1)**
10:13
**continues (1)**
17:9
**contracts (1)**
11:15
**contrary (2)**
23:9;25:18
**controlled (1)**
16:18
**Corp (5)**
20:5,12;21:4,13,17
**counsel (4)**
6:11;18:2;25:1;
27:2
**counsel's (1)**
27:7
**COURT (36)**
6:2,7,12;7:6,16;
8:15,16;10:4,9,10;
11:18;12:2;14:4;
15:4;17:18,24,25;
18:5;19:7,24;22:4,
11,15;23:5,20;24:11,
13,20,24,25;25:8,24;
26:20,22;27:1,10
**courtroom (1)**
6:8
**Courts (1)**
20:20
**court's (1)**
18:15
**covered (1)**
7:2
**covers (1)**
6:15
**create (2)**
21:10;25:15
**creditor (12)**
10:1;14:19,25;
19:5,6,11,14,19;
23:7,10;24:2,21
**Creditors (5)**
4:12;9:6;20:16;

23:16;25:19
**creditors' (1)**
10:18
**CRG (1)**
4:20
**CRUTCHER (1)**
5:2
**cure (5)**
13:13;14:7,9;
23:25;24:13
**current (1)**
12:4

## D

**date (4)**
8:20;10:7;11:10;
13:22
**dated (6)**
9:11,13,14,16,17;
12:12
**days (2)**
12:20;13:23
**deal (6)**
16:12,14,16,17,
19
**debate (1)**
22:11
**debt (1)**
9:3
**debtor (25)**
9:6;17:9,12,16;
18:10,25;19:11,14,
15,19;20:2,18;23:11,
22,22,24;24:16,19,
20,21;25:3,11;26:21,
21,23
**debtor- (1)**
18:3
**debtor-in- (1)**
25:2
**debtors (19)**
6:6;8:15,15,19;
10:8,13,14,21;11:1,
4,10,20;12:11;13:9,
24;14:17;16:7;18:9;
22:18
**debtors' (9)**
10:11;11:12,15;
13:2,4,13;17:13;
18:23;23:19
**debtor's (4)**
25:1,10,12;27:4
**debtors-in-possession (2)**
10:14,15
**December (5)**
9:14;10:7,9,17;
14:23
**decide (2)**
15:24,25
**decision (1)**
22:8
**declaration (10)**

6:14,16;9:2,8,11,
12,14,14,16,17
**declarations (3)**
6:14;7:2;8:1
**defenses (1)**
14:14
**deficient (1)**
8:5
**define (2)**
13:20;21:5
**defined (3)**
9:23;11:23;22:21
**defines (1)**
20:13
**definition (2)**
20:21;21:7
**DENTON (1)**
4:16
**DEPARTMENT (1)**
4:2
**deprived (1)**
18:1
**described (1)**
27:3
**designated (1)**
15:2
**designed (1)**
16:25
**despite (1)**
27:1
**determined (2)**
21:16;23:22
**detriment (1)**
23:15
**development (2)**
10:22;15:10
**diminish (1)**
25:14
**DIP (1)**
4:20
**direct (1)**
20:17
**disallowance (1)**
14:16
**disapprove (1)**
19:7
**discharge (2)**
14:13,16
**disclosure (6)**
8:3,5,6,9,9;9:21
**discretionary (1)**
22:5
**discussing (1)**
22:11
**disinterested (6)**
9:22;18:12,19;
20:10,14;25:4
**disinterestedness (2)**
20:21;21:22
**dispute (2)**
21:11;25:15
**disputed (1)**
15:2

**disqualification (2)**
19:20;25:5
**disqualified (1)**
19:3
**District (2)**
25:8;27:6
**docket (7)**
6:15,23;10:12,19;
11:17,20;14:24
**documents (1)**
16:23
**dollars (2)**
26:8,9
**done (1)**
23:12
**down (1)**
6:21
**driven (1)**
22:14
**drug (2)**
10:25;12:8
**dual (2)**
19:13,18
**due (3)**
12:20;13:21,24
**Dulkitide (1)**
11:2
**DUNN (1)**
5:2
**during (4)**
11:25;12:21;
16:10;18:5
**duties (2)**
17:10;18:20

**E**

**Eastern (1)**
27:6
**ECF (8)**
8:22,25;9:12,13,
15,16,18;13:14
**economic (5)**
21:8;25:14;26:5,
14,15
**edition (2)**
21:21,21
**editors (1)**
21:21
**effective (1)**
12:13
**efforts (1)**
8:2
**either (4)**
12:4;16:23;21:10,
10
**electronic (2)**
16:12,21
**else (1)**
7:7
**employ (2)**
18:4,16
**employed (1)**

20:9
**Employees (1)**
17:3
**employing (1)**
22:1
**employment (4)**
8:17;19:4,4,7
**end (1)**
12:21
**engaged (2)**
15:19;16:11
**engagement (5)**
8:20;11:25;15:7,
17;16:4
**ensure (1)**
16:22
**ensured (1)**
27:8
**ensuring (1)**
20:1
**entered (3)**
10:10;11:18;14:9
**Entertainment (1)**
26:24
**entire (1)**
16:10
**entry (5)**
8:17;11:15;13:22,
23,25
**enumerated (1)**
22:2
**Envirodyne (1)**
17:17
**Equipment (1)**
19:21
**equity (1)**
20:16
**Equity-Security (1)**
5:3
**ESQ (6)**
4:8,16,24;5:8,9,17
**estate (27)**
18:4,12,18;20:11,
15;21:4,6,9,11,13,
24;23:6,8,9,13,14,15,
18;25:14,15,19;26:3,
6,15,16,24;27:5
**estates (1)**
27:2
**evaluating (1)**
22:4
**evidence (2)**
9:19;12:5
**exactly (1)**
6:18
**Examine (1)**
21:23
**examined (1)**
25:6
**examiner (1)**
10:19
**example (3)**
17:22;18:5;24:23

**Except (1)**
18:14
**exceptions (1)**
18:22
**excess (3)**
26:9,11,12
**excludes (1)**
16:5
**executory (1)**
11:15
**exercise (1)**
22:5
**exists (2)**
21:16;25:21
**expected (1)**
13:3
**expense (1)**
25:23
**experiencing (2)**
7:15,16
**explaining (1)**
25:1
**expressly (1)**
13:21
**extent (3)**
7:22;22:23;23:21

**F**

**F2d (1)**
25:19
**F3d (7)**
19:21;20:5,8,12;
21:13;22:9;23:10
**fact (3)**
9:24;16:4;24:1
**facts (5)**
21:23;22:7,15;
25:5;26:19
**failed (1)**
9:5
**far (1)**
7:15
**favor (1)**
17:11
**favors (2)**
17:20,21
**Fay (1)**
20:6;22:10
**fear (1)**
17:11
**February (4)**
9:11,13;13:12;
25:9
**fee (4)**
23:11;26:1,6;27:8
**few (1)**
6:23
**fiduciary (2)**
17:10;20:4
**file (1)**
6:14
**filed (7)**

6:23;8:1;10:8;
11:10;13:12;14:4,23
**filing (1)**
7:17
**final (1)**
14:8
**financial (11)**
7:14;8:19;11:21,
24;15:5,8,11,19;
22:19,24;25:10
**financing (1)**
11:22;22:20
**find (1)**
8:22
**finds (2)**
26:20,22
**firm's (1)**
17:4
**firm-wide (1)**
16:24
**first (6)**
7:8;12:6,12;20:8,
22;25:20
**Fisher (3)**
6:22,25;7:9
**flow (1)**
24:7
**focus (1)**
19:24
**focused (1)**
10:22
**folder (4)**
16:12,14,16,17
**folders (1)**
16:17
**following (2)**
13:23;21:7
**follows (2)**
18:14;26:7
**foregoing (1)**
27:10
**form (2)**
20:23;25:13
**former (1)**
12:4
**forth (4)**
10:4;14:12,15;
18:8
**forty-five (1)**
12:20
**found (1)**
27:1
**four (1)**
8:22
**free (1)**
17:14
**full (2)**
14:5;24:3
**further (2)**
14:7;16:4
**furtherance (1)**
20:3;27:3
**Furthermore (1)**

Case 15-10541-BLS    Doc 2406-2    Filed 04/11/19    Page 721 of 818
SYNERGY PHARMACEUTICALS INC., et al.
Main Case No. 18-14010-jlg

February 6, 2019

17:1

## G

**GARRISON (1)**
5:12
**Gary (1)**
6:14
**gastrointestinal (2)**
10:23;15:11
**Gemignani (2)**
6:15;9:12
**general (1)**
18:23
**generally (3)**
18:9;21:23;25:13
**GIBSON (1)**
5:2
**Good (2)**
6:3,5
**governs (1)**
18:23
**Granite (1)**
20:25
**granted (3)**
12:15;16:13;27:11
**granting (1)**
8:22
**grants (1)**
10:5
**Greene (6)**
9:3,14,15,17,20;
26:16
**Greene's (1)**
9:8
**GREG (1)**
4:8
**group (6)**
9:4;16:18,20,20;
24:23;25:7
**guess (1)**
7:9

## H

**happy (1)**
7:4
**hardship (1)**
7:14
**Harry (1)**
21:20
**Hawaii (2)**
24:24;25:9
**Health (2)**
11:5,6
**heard (1)**
7:7
**hearing (1)**
6:21
**herein (3)**
10:4;14:12,15
**HERMANN (2)**
5:17;6:10

**higher (1)**
11:8
**highest (1)**
26:2
**hire (1)**
18:10
**hoc (1)**
7:20
**hold (7)**
18:11,18;20:10;
21:3,6,8;23:7
**Holders (2)**
5:4;20:16
**holding (1)**
14:25
**holds (1)**
23:5
**Honor (5)**
6:5,13,24;7:5;
27:13
**Honor's (3)**
6:13,15,20
**horse (2)**
11:16;13:6
**hour (1)**
6:25

## I

**identified (1)**
12:3
**identifying (1)**
23:1
**Illinois (2)**
17:19;27:1
**importance (1)**
17:6
**important (1)**
20:1
**inaccessible (1)**
16:12
**Inc (11)**
8:13;17:18,22,24;
19:21;20:24;22:10;
24:23;25:7,24;26:25
**incentive (1)**
25:18
**incentivizes (1)**
26:2
**including (1)**
14:5
**Indeed (3)**
13:4;22:3,15
**indicated (1)**
8:8
**indicates (1)**
22:14
**indication (1)**
27:4
**indirect (1)**
20:17
**individual (1)**
7:13

**Industries (1)**
17:18
**information (6)**
9:9;16:21,22;17:1,
3,7
**initial (2)**
8:6,9
**Innomed (1)**
21:14
**in-possession (1)**
18:4
**insists (1)**
24:8
**Instead (1)**
25:5
**integrity (1)**
21:25
**intention (2)**
11:4;15:9
**interest (34)**
7:13;9:7;12:3;
17:11,14;18:12,18;
19:8;20:11,15,15,18,
21,23;21:3,6,8,16,
24;22:12;23:6,7,8,
13,18,21;25:13,14,
17,18,22;26:5,16,23
**interests (3)**
25:22;26:14;27:8
**internal (4)**
16:18;21:18;22:9;
25:25
**interpretation (1)**
22:12
**Interwest (1)**
19:21
**into (2)**
11:15;22:6
**investment (4)**
8:18;11:21;16:20;
22:19
**Ireland (1)**
11:7
**Ironview (1)**
15:25
**Ironwood (50)**
6:19;9:25,25;12:3,
6,8,10,10,15,18,23,
24;13:12,17;14:4,17,
19,20,25;15:5,6,7,8,
14,16,17,20,22,22,
23;16:1,3,5,7,9,11,
16,16;19:9,10,11,14;
23:12,15,18;24:1,11,
14;26:4,17
**Ironwood's (9)**
12:6;15:2,9;19:15;
23:21;24:4,7,19;
26:20
**irrelevant (1)**
24:2
**irrespective (1)**
26:3

**Israel (1)**
21:17
**issue (2)**
8:12;20:13
**issues (1)**
7:2

## J

**January (5)**
9:16,17;11:18;
13:8;21:15
**JEFFREY (1)**
4:24
**joint (1)**
10:10
**Jonathan (1)**
6:2
**judge (1)**
20:23
**July (2)**
13:1;14:21
**JUSTICE (1)**
4:2

## K

**keeping (2)**
6:3;8:21
**KELSEY (1)**
5:9
**Kentucky (1)**
27:6
**Kosowsky (2)**
6:17;9:11
**Kyle (1)**
6:5

## L

**Labs (1)**
21:14
**Lambert (1)**
20:4
**language (1)**
20:22
**largely (1)**
22:14
**last (3)**
6:21,25;8:4
**LATHAM (1)**
4:11
**least (2)**
7:15;8:10
**legal (1)**
17:5
**Leslie (2)**
20:6;22:10
**lessen (1)**
21:9
**letter (1)**
8:21
**Levin (1)**

21:20
**liabilities (1)**
14:24
**license (21)**
12:14,15,16;13:3,
5,10,14,18,19,25;
14:2,8,10;16:3;
19:16;23:23;24:1,5,
12,15,17
**licensing (3)**
6:16;12:11;16:6
**licensor (5)**
10:1;12:10;19:16;
24:4
**light (1)**
26:19
**likely (1)**
24:8
**Likewise (2)**
24:4;25:16
**limitation (2)**
13:16;19:2
**limitations (1)**
17:16
**Limited (7)**
11:7;13:12,16;
14:2,4,10;18:22
**Linzess (1)**
12:8
**listed (1)**
14:24
**listen (1)**
7:9
**listing (1)**
9:6
**LLC (7)**
4:20;5:13;8:18;
9:25;18:6;21:14;
27:5
**LLP (4)**
4:11,19;5:2,12
**Looking (1)**
27:5
**loyalty (3)**
20:2;23:14;27:4
**LP (1)**
20:25

## M

**maintaining (1)**
17:6
**maintains (1)**
16:8
**makes (1)**
11:8
**making (1)**
22:8
**manage (1)**
10:14
**mandatory (1)**
17:13
**manner (1)**

Case 15-10541-BLS    Doc 2406-2    Filed 04/11/19    Page 722 of 818
SYNERGY PHARMACEUTICALS INC., et al.
Main Case No. 18-14010-jlg

February 6, 2019

22:6

**many (1)**
17:12
**March (1)**
24:24
**Marecki (1)**
6:9
**marks (1)**
25:25
**Martin (1)**
25:19
**material (1)**
16:25
**materially (1)**
20:15
**matter (6)**
8:2,4,16;16:9,23;
22:22
**matters (8)**
7:7,19;8:12;10:1;
11:24;15:21;20:12;
23:14
**MATTHEW (1)**
5:9
**may (5)**
11:24;18:10,16;
22:13;23:17
**maybe (1)**
7:9
**mean (1)**
20:14
**meaningful (1)**
25:18
**means (1)**
21:5
**Meisler (1)**
6:9
**member (2)**
16:15,16
**members (1)**
16:19
**membership (1)**
16:9
**mentioned (1)**
8:4
**merely (1)**
7:18
**met (1)**
8:10
**method (1)**
12:16
**Midway (1)**
25:24
**million (6)**
26:8,9,10,11,11,13
**Mining (1)**
27:5
**misuse (1)**
16:25
**modify (1)**
14:6
**moments (1)**
6:23

**Monday (1)**
8:1
**more (3)**
7:23;18:16;22:13
**Moreover (4)**
7:12;16:2;26:16,
22
**MOSKOWITZ (1)**
5:8
**most (5)**
7:12,17;12:24;
14:20;21:23
**mostly (1)**
7:1
**motion (4)**
11:10,17,19;27:11
**Motor (1)**
25:24
**much (3)**
7:1;8:2;27:12
**must (3)**
20:10;21:3;23:25;
25:6

**N**

**narrowed (1)**
15:15
**nature (2)**
7:23;23:21
**ND (3)**
17:18;25:24;26:25
**need (1)**
7:6
**need-to-know (1)**
17:2
**negotiations (1)**
23:3
**neither (1)**
19:2
**net (1)**
12:18
**New (5)**
4:6,14,22;5:6,15
**night (1)**
6:25
**None (1)**
15:22
**non-priority (1)**
14:25
**nonpublic (1)**
16:25
**note (4)**
6:21;8:8;21:21;
25:8
**noted (4)**
19:9;22:12,15,18
**noteholders' (1)**
27:1
**notes (6)**
12:2;14:4;19:25;
24:11,14,20
**notice (3)**

13:9,13;14:7
**noting (1)**
27:7
**novel (1)**
10:22
**November (2)**
12:24;14:19
**number (14)**
6:15;8:22,25;9:12,
13,15,16,18;10:12,
19;11:17,20;13:15;
14:24
**nunc (1)**
8:19
**NY (5)**
4:6,14,22;5:6,15

**O**

**object (1)**
24:12
**objection (24)**
6:22;7:1,4,10,18,
23;9:1,7;10:5;12:2;
13:12,16,17;14:2,5,
6,10;19:5,12,24;
24:25;25:10;27:2,4
**objections (2)**
14:7;23:20
**objects (3)**
8:24;10:3;24:14
**obligations (2)**
17:10,13
**obtain (1)**
26:2
**October (1)**
12:13
**Oden (1)**
6:10
**off (1)**
7:8
**offer (1)**
11:8
**Office (3)**
4:3;8:24;10:17
**officer (1)**
6:17
**office's (1)**
8:10
**Official (2)**
4:12;5:3
**Ohio (1)**
25:25
**omitted (4)**
18:2;21:19;22:9;
25:25
**one (9)**
11:11;13:21;15:8;
18:11,16;21:7,22;
22:24;25:22
**ongoing (1)**
17:15
**only (7)**

7:10;10:25;15:16;
17:25;18:10;19:19;
25:23
**operate (2)**
10:13;17:9
**operates (1)**
17:1
**Operating (1)**
26:24
**opportunity (5)**
7:8,11,22,25;8:11
**Orange (1)**
18:6
**order (12)**
8:17;10:10;11:11,
18;13:9,18,20,22,23;
14:1,9;27:12
**original (1)**
9:14
**Ortiz (4)**
6:5,5,8,13
**others (1)**
9:20
**otherwise (3)**
16:1;18:14;19:20
**out (1)**
18:20
**over (2)**
22:5,11
**overlapping (2)**
16:9,19
**overlaps (1)**
20:21
**overrules (1)**
10:4
**overruling (2)**
24:25;25:9
**own (1)**
18:1
**owned (1)**
11:6

**P**

**paid (4)**
13:22;23:11;24:3;
26:1
**paragraph (4)**
10:24;14:3,10;
21:19
**Park (1)**
5:5
**part (1)**
23:23
**participate (1)**
23:3
**particular (1)**
22:7
**parties (4)**
9:7;17:11,20,21
**partner (1)**
9:3
**Partners (3)**

5:13;8:18;20:25
**parts (1)**
12:5
**party (2)**
12:3,11
**patent (1)**
12:11
**Patrick (1)**
6:9
**patterns (1)**
12:16
**PAUL (1)**
5:12;6:10
**pay (2)**
12:18;13:24
**payable (2)**
13:21,25
**payment (5)**
12:25;13:13;14:9,
20;24:13
**payments (3)**
12:19,20;24:13
**per (2)**
22:1;24:22
**percent (3)**
26:8,10,12
**period (1)**
16:10
**permission (1)**
16:13
**permits (1)**
18:3
**permitting (1)**
17:21
**person (5)**
9:23;16:13;19:3;
20:14,14
**personally (1)**
23:8
**persons (3)**
18:13,17,19
**person's (1)**
19:4
**petition (5)**
8:19;10:7;11:10;
17:12;24:2
**petitions (1)**
10:8
**ph (2)**
6:22;11:2
**Pharmaceuticals (3)**
8:13,14;9:25
**phone (2)**
7:3,9
**place (1)**
16:21
**play (1)**
24:15
**please (1)**
27:12
**plus (3)**
26:8,10,11
**PM (1)**

27:14
**policies (2)**
16:24;17:4
**policy (2)**
17:20;20:1
**portions (1)**
15:9
**positions (1)**
7:20
**possess (4)**
21:8,12;25:17;
26:23
**possesses (1)**
23:8
**possession (1)**
25:3
**possible (2)**
11:22;22:20
**post-petition (2)**
17:12;23:25
**potential (8)**
12:3;13:2;15:12;
21:10;23:1,2,3;25:15
**potentially (1)**
23:13
**powers (1)**
22:5
**pre- (3)**
17:11;23:25;24:1
**precedent (1)**
13:5
**preceding (1)**
12:21
**precisely (1)**
22:16
**predicated (1)**
19:13
**predisposition (1)**
21:12
**preliminary (2)**
7:7;8:1
**pre-petition (3)**
14:25;23:7,10
**preserving (1)**
21:25
**prevent (1)**
16:25
**prior (1)**
17:15
**privilege (1)**
18:1
**pro (1)**
8:19
**procedural (1)**
10:11
**procedures (4)**
11:12,14;13:9;
16:25
**proceeding (1)**
17:8
**proceedings (1)**
27:14
**process (1)**

21:25
**produces (1)**
12:8
**product (7)**
10:25;11:1;12:7,
17,19,25;14:21
**professional (11)**
17:21;18:17;
19:20;20:10;21:3,
24;23:6;24:22;25:4,
5,17
**professionals (7)**
17:13,17;18:4,9,
11;20:1;22:6
**professional's (2)**
24:21;25:2
**Project (1)**
18:6
**prong (1)**
20:22
**proper (1)**
22:11
**properties (1)**
10:14
**proposed (3)**
13:13;22:4,8
**provide (6)**
9:5;15:19;16:1;
18:22;22:22,24
**provided (5)**
12:23;13:9,18;
18:15;20:3
**provides (3)**
13:21;14:12;19:2
**providing (1)**
15:11
**provision (2)**
19:25;20:20
**provisions (1)**
24:17
**public (1)**
17:20
**purchase (1)**
11:16
**purchasers (1)**
13:2
**purpose (1)**
18:24
**pursuant (4)**
10:12,15;13:8;
17:9
**pursue (1)**
15:9
**put (1)**
7:3

## Q

**qualified (2)**
11:8;19:20
**qualify (1)**
21:2
**quarter (2)**

12:21,21
**quotation (1)**
25:25
**quoting (2)**
20:6,7

## R

**raised (1)**
7:19
**rarest (1)**
17:25
**rather (3)**
19:14;22:1;24:8
**re (22)**
17:17,22,23;18:6;
19:21;20:5,6,11,24,
25;21:4,14,17;22:8,
10;23:9;24:23;25:7,
19,23;26:24;27:5
**reads (1)**
18:14
**really (1)**
7:23
**reason (5)**
9:24;10:2;19:19;
20:16,18
**reasons (1)**
10:4
**received (2)**
12:24;14:20
**recent (2)**
12:24;14:20
**recognize (2)**
7:12;20:20
**recognizes (1)**
21:7
**record (2)**
9:10;12:5
**refer (7)**
8:14,23;9:25;11:7,
17;12:13,17
**referred (1)**
11:2
**regard (2)**
7:17;8:3
**regarding (2)**
9:21;16:23
**related (4)**
8:22;13:4;15:12;
24:9
**relates (2)**
15:23;19:11
**relating (3)**
13:13;16:6;23:15
**relationship (5)**
12:6;15:4;20:17;
23:22;24:19
**release (1)**
14:16
**relevant (2)**
12:1;20:12;22:22
**relief (3)**

8:22;10:8;11:19
**render (2)**
21:12;25:4
**reporting (1)**
12:22
**represent (12)**
16:1,3;18:4,11,18,
19,25;20:2,11;21:3,
6;23:17
**representation (6)**
19:5,13,18;24:21;
25:2;26:4
**representing (3)**
9:24;15:21;19:9
**represents (1)**
23:6
**request (2)**
6:13;23:1
**requested (2)**
11:19;22:23
**require (1)**
25:4
**required (1)**
17:3
**requirements (1)**
8:21
**research (1)**
15:10
**reservation (1)**
14:5
**resolution (1)**
12:1
**resolving (3)**
19:23;23:20;24:16
**respect (10)**
8:10;11:21,23;
12:25;14:9,21;15:8,
23;17:2;22:19
**respectfully (1)**
7:18
**response (1)**
9:7
**responsibilities (1)**
20:4
**restructuring (4)**
9:4;11:22;15:21;
22:20
**results (1)**
22:14
**retain (7)**
11:20;17:20,21;
18:9;22:18;25:1,10
**retained (2)**
20:9;25:11
**retaining (1)**
26:21
**retention (12)**
8:17;15:7,15;
18:24;19:12;22:4,8,
23;24:2,5,7,22
**return (1)**
26:3
**review (3)**

7:11,25;22:13
**Richard (1)**
21:20
**RIFKIND (1)**
5:12
**right (6)**
6:3,7,12;7:8;14:5;
17:17
**rights (2)**
14:5,14
**rival (2)**
21:11;25:16
**River (1)**
27:5
**role (1)**
24:15
**Rome (1)**
20:8
**Ron (1)**
6:8
**routinely (1)**
17:5
**royalties (2)**
12:18;15:1
**royalty (9)**
12:17,19,19,20,22,
25,25;14:20,21
**Rule (4)**
8:7;9:2;10:12;
18:23
**ruling (1)**
8:12
**runs (1)**
9:2

## S

**SABIN (1)**
4:24
**saddles (1)**
23:12
**sale (15)**
7:1,23;11:12,17,
19,22;13:4,6;22:20,
21,25;23:24;24:7,12;
26:6
**sales (4)**
12:18,25;14:21;
25:24
**Samuel (1)**
9:3
**satisfied (2)**
8:5,7
**schedule (1)**
14:23
**scope (2)**
15:15;16:5
**SDNY (8)**
17:23,24;18:7;
20:7,24;21:1,15,18
**se (2)**
22:1;24:22
**second (7)**

9:17;11:1;12:10;
19:25;20:5;21:7;
22:3
**Section (19)**
9:23;18:3,8,10,15,
21,22,23;19:1,2,8,17,
24;20:9,13,19,22;
21:2;22:16
**Sections (1)**
10:15
**security (1)**
20:16
**seek (2)**
11:20;22:18
**seeking (3)**
11:11;13:10;18:9
**Segal (3)**
6:6,6,10
**selecting (1)**
18:1
**selling (1)**
11:5
**semantic (1)**
22:13
**separate (2)**
16:8,12
**September (4)**
12:12;13:1;14:21;
27:7
**serve (1)**
21:24
**served (1)**
25:23
**serves (1)**
20:1
**services (4)**
15:12,20;16:6;
22:21
**Servicing (1)**
4:20
**set (4)**
6:2;10:4;14:12,15
**setoff (1)**
15:3
**sets (1)**
18:8
**seven (1)**
13:22
**shall (5)**
13:24;14:12,15;
19:7;22:24
**shared (1)**
16:23
**shareholder (2)**
6:22;15:12
**shareholders (2)**
7:13,21
**sheet (1)**
12:13
**show (1)**
12:5
**sic (2)**
15:25;21:20

**significance (1)**
7:14
**simultaneous (1)**
25:2
**single (1)**
20:23
**sit (1)**
6:21
**sits (1)**
16:18
**situation (1)**
19:18
**Skadden (1)**
6:9
**sole (1)**
12:7
**solely (2)**
19:4,13
**Sommers (1)**
21:20
**sort (1)**
22:1
**speak (1)**
6:24
**special (2)**
18:24;27:7
**specifically (1)**
16:5
**specified (1)**
18:24
**spinoff (7)**
15:9,13,17,18;
19:10;23:12;26:4
**spring (1)**
15:6
**stalking (2)**
11:16;13:6
**stated (1)**
17:25
**STATES (7)**
4:2,3;8:24;10:17;
19:6;22:3,23
**status (3)**
19:15;24:4;26:20
**statute (2)**
18:14;22:2
**Still (1)**
17:20
**Street (1)**
4:4
**stress (1)**
17:5
**strict (1)**
17:1
**structure (1)**
26:1
**subject (2)**
15:3;24:13
**submit (1)**
27:12
**submitted (2)**
9:4,20
**subsequent (1)**

8:9
**subsidiary (1)**
11:6
**substance (1)**
8:25
**substantially (2)**
11:5,12
**substantive (1)**
22:13
**successful (2)**
11:13;13:11
**Suite (1)**
4:5
**sundry (1)**
25:19
**supplement (1)**
14:6
**supplemental (2)**
9:15,17
**supplemented (2)**
9:8,11
**supplements (1)**
8:6
**support (2)**
8:25;9:4
**surrounding (1)**
22:7
**Synergy (17)**
8:13,13;10:1;12:6,
7,10,15,17,22;14:19,
23;15:23;16:3,11,15,
17;24:2
**Synergy's (4)**
12:7,18;15:24,25

**T**

**team (3)**
16:12,15,16
**teams (4)**
16:8,19,24;17:5
**tend (1)**
21:9
**tender (1)**
20:2
**Tenth (1)**
19:22
**term (5)**
9:23;11:25;12:13,
22;20:13
**terminate (1)**
15:18
**terms (4)**
8:20;11:22;14:1;
22:20
**test (3)**
18:8;20:23;22:1
**testified (1)**
26:16
**therapies (1)**
10:23
**Third (3)**
4:13,13;14:19

**thought (1)**
8:4
**three (3)**
8:21;11:15;12:5
**Thus (2)**
15:23;25:21
**timely (1)**
7:19
**title (1)**
18:20
**today (1)**
6:8
**together (1)**
20:22
**Togut (3)**
6:6,9,10
**transaction (3)**
19:10;23:24;26:5
**transactions (2)**
15:13,21
**transfer (1)**
24:12
**transparent (1)**
9:5
**Trulance (6)**
11:1;12:8,9,16;
13:4;24:9
**Trustee (16)**
4:3;8:3,8,24;9:1,
19;10:3,18,19;18:1,
15,20;19:6;23:11;
25:12;27:9
**Trustee's (7)**
10:5;12:1;18:20;
19:12,23;24:25;25:9
**tunc (1)**
8:19
**turn (1)**
20:7
**Turning (1)**
24:19
**two (10)**
6:14;8:20;11:14;
13:23;15:11;16:24;
18:12;21:11;23:2;
25:22
**two-part (1)**
18:8

**U**

**ultimately (1)**
24:14
**under (18)**
10:8;12:15;13:6,
25;18:10,20;19:3,16;
20:9;21:2,12;23:25;
24:4,6,12,17;26:6,19
**undivided (1)**
20:2
**UNISON (1)**
27:13
**UNITED (5)**

4:2,3;8:24;10:17;
19:6
**unity (1)**
26:22
**unless (1)**
19:5
**unlikely (1)**
24:15
**unliquidated (1)**
15:3
**unrelated (2)**
10:2;26:4
**Unsecured (2)**
4:12;15:1
**untainted (1)**
20:3
**up (2)**
26:9,11
**upon (6)**
7:17;8:6,8;15:6;
17:8;27:10
**USC (4)**
18:21;19:1,8;
20:19
**use (1)**
12:16
**used (1)**
21:23

**V**

**value (1)**
21:9
**values (1)**
25:14
**Varick (1)**
4:4
**various (1)**
8:6
**VENABLE (1)**
4:19
**voluntary (1)**
10:8

**W**

**waiting (1)**
6:4
**waiver (2)**
14:13,16
**waiving (1)**
8:21
**WATKINS (1)**
4:11
**way (1)**
22:16
**week (1)**
8:4
**WEISS (2)**
5:12;6:10
**Westlaw (4)**
21:14;24:23;25:7;
27:6

**WHARTON (1)**
  5:12
**Whereupon (1)**
  27:14
**wholly (1)**
  11:6
**wish (1)**
  7:7
**within (2)**
  12:20;13:22
**Without (3)**
  13:16;17:11;19:2
**work (2)**
  15:22;23:12
**Worldcom (1)**
  20:24
**writing (1)**
  11:25

## Y

**York (5)**
  4:6,14,22;5:6,15

## Z

**ZIPES (1)**
  4:8

## 1

**1 (4)**
  13:1;14:21;25:8,8
**100 (1)**
  26:9
**10014 (1)**
  4:6
**10019 (1)**
  5:15
**10020 (1)**
  4:22
**10022 (1)**
  4:14
**1006 (1)**
  4:5
**1008 (1)**
  17:18
**10114 (1)**
  20:13
**10114c (1)**
  20:19
**1015b (1)**
  10:12
**10160 (1)**
  5:6
**1018 (1)**
  17:18
**106 (1)**
  14:24
**11 (15)**
  8:15;10:2,9,11,18;
  16:10;17:8,16;18:21,
  25;19:3,8;20:18;

  24:24;25:11
**1107 (1)**
  17:9
**1107a (1)**
  10:16
**1108 (2)**
  10:16;17:10
**1156092 (1)**
  25:8
**1156094 (1)**
  24:23
**1270 (1)**
  4:21
**1285 (1)**
  5:14
**12th (1)**
  10:7
**13 (1)**
  14:3
**135 (1)**
  8:23
**135-2 (1)**
  9:15
**14 (6)**
  10:9;12:12,24;
  14:11,18,20
**15 (1)**
  11:17
**150 (1)**
  17:18
**151 (1)**
  20:24
**16 (1)**
  9:16
**164 (1)**
  20:24
**165 (1)**
  17:22
**16th (1)**
  21:21
**17 (1)**
  12:13
**170 (1)**
  17:23
**171 (1)**
  25:16
**175 (3)**
  20:6;22:10;25:20
**176 (6)**
  20:5;12;21:4,13;
  22:9;23:9
**18 (2)**
  11:20;17:24
**180 (1)**
  25:20
**19 (1)**
  20:8
**193 (2)**
  17:22;25:16
**194 (1)**
  8:25
**1982 (1)**
  17:24

**1987 (1)**
  25:20
**1993 (1)**
  17:19
**1994 (3)**
  19:22;20:7,8
**1996 (1)**
  17:23
**1998 (1)**
  21:1
**1999 (1)**
  20:6

## 2

**2 (3)**
  21:14;24:24;26:7
**2.375 (1)**
  26:8
**20 (1)**
  10:17
**200 (3)**
  5:5;26:9,11
**2004 (1)**
  20:25
**2005 (4)**
  24:23,24;25:7,9
**2006 (1)**
  25:25
**2008 (1)**
  21:14
**201 (1)**
  4:4
**2010 (1)**
  18:7
**2012 (1)**
  12:12
**2014 (2)**
  8:7;9:2
**2015 (4)**
  21:18;27:1,5,7
**2018 (12)**
  9:15;10:7,9,17;
  12:13,24;13:1;14:20,
  22;15:6;21:15,21
**2019 (6)**
  9:12,13,16,17;
  11:18;13:8
**21 (1)**
  14:23
**219 (1)**
  20:25
**22 (1)**
  20:25
**22nd (1)**
  9:17
**23 (3)**
  13:8;19:21;21:4
**231-1 (1)**
  9:16
**24 (1)**
  25:9
**252-1 (1)**

  9:18
**26 (1)**
  25:24
**27 (1)**
  27:7
**276490 (1)**
  21:14
**28 (1)**
  9:15
**29 (1)**
  21:15
**298 (2)**
  6:15;9:13
**299 (1)**
  9:12

## 3

**3.5 (1)**
  26:10
**30 (2)**
  13:1;14:22
**307 (1)**
  13:15
**310 (1)**
  6:23
**311 (2)**
  19:21;20:24
**316 (1)**
  19:22
**327 (3)**
  9:23;18:3;22:16
**327.042 (1)**
  21:20
**327-32 (1)**
  21:20
**327a (6)**
  18:8,21;19:24;
  20:9,22;21:2
**327c (4)**
  18:22;19:2,8,17
**327e (3)**
  18:22,23;19:1
**33 (2)**
  20:25;25:24
**350 (2)**
  26:11,13
**353 (1)**
  25:24
**363 (1)**
  18:6
**393 (1)**
  18:6

## 4

**4 (2)**
  9:12;26:12
**420 (1)**
  26:25
**431 (1)**
  18:6
**436 (1)**

  26:25
**4th (1)**
  9:13

## 5

**5:15 (1)**
  27:14
**52 (1)**
  10:12
**525 (1)**
  20:7
**532 (2)**
  20:7;22:11
**534 (1)**
  21:18
**53rd (1)**
  4:13
**54 (1)**
  20:8
**5601284 (1)**
  27:6
**561 (1)**
  26:25
**569 (1)**
  21:18
**58 (1)**
  20:8
**580 (1)**
  21:18

## 6

**6 (2)**
  10:24;11:3
**610 (1)**
  20:5
**621 (4)**
  20:5,12;21:13;
  22:9
**622 (1)**
  21:4
**623 (1)**
  23:10
**6th (2)**
  5:14;13:12

## 7

**7 (1)**
  11:18

## 8

**817 (1)**
  25:19
**885 (1)**
  4:13

## 9

**92 (1)**
  10:19

**SYNERGY PHARMACEUTICALS INC., et al.**
Main Case No. 18-14010-jlg

**997 (1)**
  17:24
**999 (1)**
  17:24

# Exhibit 21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **WESTMORELAND COAL COMPANY**, *et* | § | **CASE NO: 18-35672** |
| *al* | § | **CHAPTER 11** |
| | § | **(Jointly Administered)** |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | § | |
| **SUNEDISON, INC.**, *et al.* | § | **CASE NO: 18-35672** |
| | § | **CHAPTER 11** |
| | § | **(Jointly Administered)** |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **OLD ANR, LLC**, *et al.* | § | **CASE NO: 19-00302 (KRH)** |
| | § | **MISCELLANEOUS PROCEEDING** |

## MEDIATOR'S NOTICE TO COURT

The Court-ordered mediation commenced on February 7, 2019. I report:

1.    The United States Trustee, McKinsey, the Mar-Bow entities, and Westmoreland Coal each appeared at mediation, and each proceeded with the mediation. Attendance by other entities was optional, and no other entities participated. All parties spent extensive time conferring with me both before and during the mediation. Extensive discussions continued after February 7, 2019 as well. I report to you that all parties complied with your respective orders and participated in good faith.

2.    McKinsey and Mar-Bow have not reached a settlement. They have agreed to suspend the mediation, with my renewed involvement as a mediator, as appropriate from time-to-time. Subject to any contrary orders, I have agreed to that proposal.

3.    I am pleased to report that the United States Trustee and McKinsey have reached a definitive settlement of all issues between those parties. Based on my observations, the proposed settlement between the United States Trustee and McKinsey resolves the parties' good faith disputes concerning the application of Bankruptcy Rule 2014. A copy of the definitive term sheet is attached as Exhibit "A". I anticipate that the motion to approve the settlement will be filed shortly.

1 / 2

4.    I am also pleased to inform you that McKinsey and Westmoreland have reached a definitive agreement.  A copy of their agreement is attached as Exhibit "B".  I anticipate that a motion seeking implementation and approval of that agreement will be filed shortly.

Respectfully submitted,

Marvin Isgur

# EXHIBIT "A"

## MEDIATED SETTLEMENT TERM SHEET
## BETWEEN THE UNITED STATES TRUSTEE PROGRAM
## AND THE MCKINSEY ENTITIES

1.  McKinsey[1] will pay:

    a.  $5 million to the reorganized debtors in the Alpha cases.
    b.  $5 million to the reorganized debtors in the SunEdison cases.
    c.  $5 million to the bankruptcy estate in the Westmoreland cases.

2.  The payments identified in Paragraph 1 will be distributed in accordance with the terms of the confirmed plans in those cases or other applicable law. If any of the $15 million is distributed to McKinsey, it will be refunded by McKinsey to the distributing party.

3.  The United States Trustee Program will release all claims against McKinsey (and all of its agents, directors, officers, attorneys and employees acting on its behalf, solely with respect to actions taken in the course and scope of their duties with McKinsey regarding disclosures in the cases referenced below), and refrain from instituting, directing or maintaining any contested matter, adversary proceeding, or miscellaneous proceeding, or participating in any contested matter, miscellaneous proceeding, or adversary proceeding by a third party (except that the United States Trustees may participate in an action to the extent ordered by a court provided that the United States Trustees may not seek such a court order formally or informally), against McKinsey in which:

    (a)  it is alleged that McKinsey failed to (i) make full and complete disclosure under applicable law; or (ii) fully comply with Fed. R. Bankr. P. 2014; or

    (b)  any remedy is sought that would be barred by *res judicata* or collateral estoppel principles if McKinsey had (i) made full and complete disclosures in accordance with applicable law; and (ii) fully complied with Fed. R. Bankr. P. 2014.

    For the avoidance of doubt, with respect to paragraph 3(b) above, (x) in the event of: (i) fraud or a material misrepresentation on the record that would have rendered McKinsey "not disinterested" in any of these bankruptcy cases or that would otherwise have disqualified McKinsey from retention, or (ii) a material omission of fact that if made on the record would have rendered McKinsey "not disinterested" in any of these bankruptcy cases or that would otherwise have disqualified McKinsey from retention, (y) the United States Trustee Program may pursue appropriate relief including seeking disqualification, and McKinsey reserves all rights to object to such relief.

---

[1] For purposes of this Settlement Term Sheet, "McKinsey" means, collectively, McKinsey & Company, Inc., McKinsey Holdings, Inc., McKinsey & Company, Inc. United States and McKinsey Recovery & Transformation Services U.S., LLC."

The release will apply in the following bankruptcy cases (including any jointly administered cases pertaining to the listed cases):

- Westmoreland Coal Company, Case No. 18-35672 (Bankr. S.D. Tex.);
- SunEdison, Inc., Case No. 16-10992 (Bankr. S.D.N.Y);
- Alpha Natural Resources, Inc., Case No. 15-33896 (Bankr. E.D. Va.);
- The Hayes Lemmerz International, Inc., Case No. 01-11490 (Bankr. D. Del.);
- UAL Corporation, Case No. 02-48191 (Bankr. N.D. Ill.);
- Mirant Corp., Case No. 03-46590 (Bankr. N.D. Tex.);
- Lyondell Chemical Company, Case No. 09-10023 (Bankr. S.D.N.Y.);
- Harry & David Holdings, Inc., Case No. 11-10884 (Bankr. D. Del.);
- AMR Corp., Case No. 11-15463 (Bankr. S.D.N.Y.);
- AMF Bowling Worldwide, Inc., Case No. 12-36495 (Bankr. E.D. Va.);
- Edison Mission Energy, Case No. 12-49219 (Bankr. N.D. Ill.);
- NII Holdings, Inc., Case No. 14-12611 (Bankr. S.D.N.Y.);
- SRC Liquidation, LLC (f/k/a The Standard Register Company), Case No. (Bankr. D. Del.); and
- GenOn Energy, Inc., Case No. 17-33695 (Bankr. S.D. Tex.).

4.  McKinsey will release all claims against the United States Trustee Program and all of its current and former employees, including all claims under the Equal Access to Justice Act, 28 U.S.C. § 2412, based on the United States Trustee Program's investigation and prosecution of claims arising out of or pertaining to the adequacy of McKinsey's disinterestedness or disclosures in the cases referenced in paragraph 3.

5.  The United States Trustee Program reserves all rights to object to McKinsey's disinterestedness or its retention in the Westmoreland case on any grounds other than the adequacy of its past retention related disclosures in the cases referenced in paragraph 3. The existing objection by the United States Trustee is resolved by this Agreement, without prejudice to the rights of the United States Trustee to assert any issue in any new objection that might be filed.

6.  McKinsey will request the United States Bankruptcy Court for the Southern District of Texas to defer consideration of McKinsey's retention application until after McKinsey has made additional disclosures[2] in the Westmoreland case. The United States Trustee will consent to the requested extension.

---

[2] McKinsey will file an appropriate motion before the Bankruptcy Court in which the continuance is requested.

2

7. This Settlement Term Sheet will be filed of record in the SunEdison, Alpha and Westmoreland bankruptcy cases.  Thereafter, the Settlement Term Sheet will be incorporated into a proposed agreed order filed in, and subject to the approval of each of the United States Bankruptcy Courts for the Eastern District of Virginia, the United States Bankruptcy Court for the Southern District of New York, and the United States Bankruptcy Court for the Southern District of Texas.

8. Among other things, the final document will include the United States Trustee Program's usual and customary language concerning the preservation of all other rights by the United States, the right to share information with other agencies of the United States, and an acknowledgement that the agreement set forth herein does not impact the rights of non-parties.

9. Neither this Settlement Term Sheet nor the final documentation will constitute an admission of liability, wrongdoing or misconduct by McKinsey, its employees, officers, directors or agents.

# EXHIBIT "B"

# MEDIATED TERM SHEET
## BETWEEN WESTMORELAND COAL AND
## MCKINSEY RECOVERY & TRANFORMATION SERVICES U.S, LLC

1.     Westmoreland has requested that McKinsey continue to serve as its financial advisor in the Westmoreland bankruptcy cases. McKinsey has agreed to do so, subject to appropriate approval by the United States Bankruptcy Court for the Southern District of Texas.

2.     Westmoreland and McKinsey believe that McKinsey has provided unvarnished and independent advice to Westmoreland in these cases. Although Westmoreland has received allegations that McKinsey has conflicted interests, Westmoreland has observed no conflict and believes that it has received unconflicted advice.

3.     McKinsey has requested that Westmoreland file a motion with the United States Bankruptcy Court for the Southern District of Texas asking that the Court defer consideration of McKinsey's retention pending the following:

     a.   The adoption by McKinsey of a protocol for a review of its connections in bankruptcy cases to assure that McKinsey's disclosures in these cases is full, complete, and in compliance with Fed. R. Bankr. P. 2014.

     b.   The application of the protocol by McKinsey in this case to allow the preparation of revised disclosures.

     c.   Westmoreland's review of the revised disclosures to determine whether, in Westmoreland's view, McKinsey may serve under 11 U.S.C. § 327.

     d.   The filing of the revised disclosures by McKinsey.

Westmoreland has agreed to the request in this paragraph 3.

4.     McKinsey has informed Westmoreland of McKinsey's settlement with the United States Trustees Program. Westmoreland fully supports the settlement.

# Exhibit 22

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 1286** |

## NOTICE OF FILING OF PLAN SUPPLEMENT

PLEASE TAKE NOTICE THAT the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") hereby file the Plan Supplement in accordance with the *Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and Its Affiliates*, filed on November 11, 2015 [Docket No. 1286] (as it may be amended, modified, or supplemented from time to time, the "<u>Plan</u>").[2]

PLEASE TAKE FURTHER NOTICE that attached hereto as <u>Exhibits 1</u> through <u>4</u> are the documents comprising the Plan Supplement:

| | |
|---|---|
| **Exhibit 1:** | **Form of *Final Decree Closing Certain Cases and Amending Caption of Remaining Case*** |
| **Exhibit 2:** | **Form of *Implementation Memorandum with Respect to Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and its Affiliates*** |
| **Exhibit 3:** | **Form of *Secured Creditor Trust Agreement*** |

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001).  The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2]   Capitalized terms used, but not otherwise defined, herein shall assume the meanings ascribed to them in the Plan.

01:17950779.1

**Exhibit 4:** **Form of *Standard Register Company General Unsecured Creditors' GUC Trust Agreement***

PLEASE TAKE FURTHER NOTICE that the Debtors reserve the right to amend the Plan Supplement at any time prior to the Effective Date of the Plan.

Dated:    November 17, 2015
          Wilmington, Delaware          */s/ Andrew L. Magaziner*
                                        Michael R. Nestor (No. 3526)
                                        Kara Hammond Coyle (No. 4410)
                                        Andrew L. Magaziner (No. 5426)
                                        YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone:  (302) 571-6600
                                        Facsimile:  (302) 571-1253
                                        mnestor@ycst.com
                                        kcoyle@ycst.com
                                        amagaziner@ycst.com

                                        -and-

                                        Michael A. Rosenthal (NY No. 4697561)
                                        Jeremy L. Graves (CO No. 45522)
                                        Matthew G. Bouslog (CA No. 280978)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        New York, New York 10166-0193
                                        Telephone:  (212) 351-4000
                                        Facsimile:  (212) 351-4035
                                        mrosenthal@gibsondunn.com
                                        jgraves@gibsondunn.com
                                        mbouslog@gibsondunn.com

                                        *Counsel to the Debtors and*
                                        *Debtors in Possession*

01:17950779.1

2

**Exhibit 1**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SRC Liquidation Company, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | **Re: Docket No. ___** |
| In re: | Chapter 11 |
| SR Liquidation Holding Company, | Case No. 15-10542 (BLS) |
| Debtor. | |
| In re: | Chapter 11 |
| SR Liquidation Technologies, Inc., | Case No. 15-10543 (BLS) |
| Debtor. | |
| In re: | Chapter 11 |
| SR Liquidation International, Inc., | Case No. 15-10544 (BLS) |
| Debtor. | |
| In re: | Chapter 11 |
| iMLiquidation, LLC, | Case No. 15-10540 (BLS) |
| Debtor. | |

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

| | |
|---|---|
| In re:<br><br>SR Liquidation of Puerto Rico Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10545 (BLS) |
| In re:<br><br>SR Liquidation Mexico Holding Company,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10546 (BLS) |
| In re:<br><br>Standard Register Holding, S. de R.L. de C.V.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10547 (BLS) |
| In re:<br><br>Standard Register de México, S. de R.L. de C.V.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10548 (BLS) |
| In re:<br><br>Standard Register Servicios, S. de R.L. de C.V.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10549 (BLS) |
| In re:<br><br>SR Liquidation Technologies Canada ULC,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-10550 (BLS) |

01:17932331.2

## FINAL DECREE CLOSING CERTAIN CASES
## AND AMENDING CAPTION OF REMAINING CASE

Upon consideration of the Certification of Counsel,[2] submitted by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in accordance with paragraph [###] of the *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Second Amended Chapter 11 Plan of Liquidation* [Docket No. ___] (the "Confirmation Order") and Section 8.11 of the *First Amended Chapter 11 Plan of Liquidation* [Docket No. 1086] (the "Plan"), requesting entry of (i) a final decree order closing the chapter 11 cases of certain of the Debtors and (ii) an order amending the case caption of the remaining case of the Debtor; and upon entry of the Confirmation Order and the Plan having gone effective on _____, 2015,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      Each of the following cases (collectively, the "Closing Cases") shall be closed, effective as of the date of this Order:

| Name of Debtor | Case Number |
|---|---|
| SR Liquidation Holding Company | 15-10542 (BLS) |
| SR Liquidation Technologies, Inc. | 15-10543 (BLS) |
| SR Liquidation International, Inc. | 15-10544 (BLS) |
| iMLiquidation, LLC | 15-10540 (BLS) |
| SR Liquidation of Puerto Rico Inc. | 15-10545 (BLS) |
| SR Liquidation Mexico Holding Company | 15-10546 (BLS) |
| Standard Register Holding, S. de R.L. de C.V. | 15-10547 (BLS) |
| Standard Register de México, S. de R.L. de C.V. | 15-10548 (BLS) |
| Standard Register Servicios, S. de R.L. de C.V. | 15-10549 (BLS) |
| SR Liquidation Technologies Canada ULC | 15-10550 (BLS) |

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Certification of Counsel.

2.      A docket entry shall be made in each of the Closing Cases reflecting entry of this Order.

3.      Entry of this Order is without prejudice to the rights of any Debtor or other party in interest to seek to reopen any of the Closing Cases for cause pursuant to section 350(b) of the Bankruptcy Code.

4.      Case No. 15-1-541 (the "Remaining Case") shall remain open and shall be administered under the following amended caption:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SRC Liquidation Company,[1] | Case No. 15-10541 (BLS) |
| Debtor | |

---

[1]  The last four digits of the Debtor's taxpayer identification number are 5440.  Inquiries regarding the Debtor should be directed to the GUC Trustee, c/o EisnerAmper LLP, 111 Wood Avenue South, Iselin, NJ 08830-2700 (Attn: Anthony R. Calascibetta) and, until the Effective Date of the Plan, to counsel for the Debtor, Gibson Dunn & Crutcher LLP, 200 Park Avenue, 47th Floor, New York 10166 (Attn: Michael A. Rosenthal).

5.      All contested matters relating to each of the Debtors, including objections to claims, shall be administered and heard in the Remaining Case, in accordance with the terms of the Plan.

6.      The Debtors shall complete all remaining quarterly reports and pay all quarterly fees due and owing in the Closing Cases within thirty days of entry of this Order.

Dated: _____ ___, 2015
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　Brendan L. Shannon
　　　　　　　　　　　　　　　　Chief United States Bankruptcy Judge

# Exhibit 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*,[1] | Case No. 15-10541 (BLS) |
| Debtors. | Jointly Administered |

## IMPLEMENTATION MEMORANDUM WITH RESPECT TO SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR SRC LIQUIDATION COMPANY AND ITS AFFILIATES

SRC Liquidation Company and its above-captioned affiliated debtors and debtors in possession (each, a "<u>Debtor</u>," and collectively, the "<u>Debtors</u>") hereby file this Implementation Memorandum with respect to the Debtors' *Second Amended Chapter 11 Plan of Liquidation for SRC Liquidation Company and Its Affiliates* [Docket No. 1286] (as amended from time to time, the "<u>Plan</u>"):[2]

## IMPLEMENTATION STEPS

On the Effective Date, the following actions shall be taken in the order deemed appropriate by the Debtors and Liquidating Debtors:

1. Pursuant to the provisions of the Confirmation Order and without any requirement to obtain approval of Holders of existing Equity Interests of SRC Liquidation Company, SRC Liquidation Company shall be converted from an Ohio corporation into an Ohio limited liability company. Upon conversion, SRC Liquidation Company shall be referred to as "Liquidating SRC." To document the conversion, SRC Liquidation Company shall file the relevant documents with the Ohio Secretary of State and/or any other relevant office.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: SRC Liquidation Company (5440); SR Liquidation Holding Company (3186); SR Liquidation Technologies, Inc. (3180); SR Liquidation International, Inc. (1861); iMLiquidation, LLC (6337); SR Liquidation of Puerto Rico Inc. (0578); SR Liquidation Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and SR Liquidation Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2.  All of the Equity Interests in Liquidating SRC in existence immediately prior to its conversion into an Ohio limited liability company (including all instruments evidencing such Equity Interests) shall be automatically deemed cancelled and extinguished without the requirement of any further action under any applicable agreement, law, regulation, or rule.

3.  Liquidating SRC shall issue all of the Liquidating SRC Membership Interests to the GUC Trust.

4.  The GUC Trust shall hold such Liquidating SRC Membership Interests for the benefit of the GUC Trust Beneficiaries.

5.  The Debtors and the Secured Creditor Trustee shall ratify the Secured Creditor Trust Agreement and shall confirm that the trust referred to in such Agreement is the Secured Creditor Trust pursuant to the Plan

6.  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, except as provided in the Wind-Down Settlement, the Debtors shall transfer to the Secured Creditor Trust all of their right, title, and interest in and to all of the Secured Creditor Trust Assets not already transferred to the Secured Creditor Trust pursuant to the Wind-Down Settlement, if any. The BofA Cash Collateral Agreement shall be deemed assigned, by virtue of the Plan and the Confirmation Order, to the Secured Creditor Trust on the Effective Date, and the Secured Creditor Trust shall be deemed the successor to the Debtors for the purposes of the BofA Cash Collateral Agreement and shall have the right to enforce any rights of the Debtors thereunder.

7.  The Debtors and the GUC Trustee shall ratify the GUC Trust Agreement and shall confirm that the trust referred to in such Agreement is the GUC Trust pursuant to the Plan.

8.  Notwithstanding any restriction on or prohibition of assignability under applicable non-bankruptcy law the Debtors shall transfer, to the extent not previously transferred pursuant to the Committee Settlement and the GUC Trust Agreement, all of their right, title, and interest in and to the GUC Trust Assets to the GUC Trust in trust for the benefit of the GUC Trust Beneficiaries and, in accordance with section 1141 of the Bankruptcy Code, all such Assets shall automatically vest in the GUC Trust, free and clear of all Claims and liens, subject only to repayment of the GUC Trust Seed Funding Amount and the expenses of the GUC Trust as set forth herein and in the GUC Trust Agreement.

9.  All Assets of the Debtors not otherwise transferred either to the GUC Trust or the Secured Creditor Trust shall vest in Liquidating SRC free and clear of all Claims, Equity Interests, liens, charges or other encumbrances.

10. The Debtors other than Liquidating SRC and the Mexico Debtors shall be dissolved without the need for any filings with the Secretary of State or other

requisite governmental official in each Debtor's respective jurisdiction of formation.

11. To the extent they are not dissolved on the Effective Date pursuant to the Confirmation Order, the applicable governing documents of the Liquidating Debtors shall be amended, if necessary, to prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.   To document the dissolution, if ordered pursuant to the Confirmation Order, SRC Liquidation Company, in its discretion, shall file or cause to be filed the Confirmation Order or any other relevant dissolution documents with the appropriate state offices.

12. Liquidating SRC shall take such further and other actions as are consistent with the Plan and Confirmation Order and are deemed necessary to implement the Plan.

IMPLEMENTATION MEMO.DOCX

# **Exhibit 3**

PH Comments
11/16/15

**SECURED CREDITOR TRUST AGREEMENT**


**By and Among**


**THE DEBTORS NAMED HEREIN,**


**as Settlors,**


**WILMINGTON TRUST COMPANY,**


**as Trustee,**


**CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC,**


**as Advisor,**


**and**


**SILVER POINT FINANCE, LLC,**


**as Sole Member of the Oversight Committee**


**Dated as of                              , 2015**

## Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I NAME AND DEFINITIONS | | 2 |
| 1.1 | Creation of Trust and Name | 2 |
| 1.2 | Certain Terms Defined | 2 |
| ARTICLE II NATURE OF TRANSFER | | 4 |
| 2.1 | Purpose of Secured Creditor Trust. | 4 |
| 2.2 | Prohibited Activities | 5 |
| 2.3 | No Reversion to the Debtors | 5 |
| 2.4 | Instruments of Further Assurance | 5 |
| 2.5 | Transfer of Secured Creditor Trust Assets Free and Clear; Payment of Liabilities | 5 |
| 2.6 | Incidents of Ownership | 6 |
| ARTICLE III BENEFICIARIES | | 6 |
| 3.1 | Rights of Beneficiaries | 6 |
| 3.2 | Transfer of Interests of Beneficiaries | 6 |
| ARTICLE IV DURATION AND TERMINATION OF TRUST | | 7 |
| 4.1 | Duration | 7 |
| 4.2 | Other Obligations of Trustee, Advisor or Oversight Committee upon Termination | 7 |
| ARTICLE V ADMINISTRATION OF TRUST ASSETS | | 7 |
| 5.1 | Sale of Trust Assets | 7 |
| 5.2 | Payment of Claims, Expenses and Liabilities | 7 |
| 5.3 | Interim Distributions | 8 |
| 5.4 | Final Distribution | 8 |
| 5.5 | Federal Income Tax Information | 8 |
| 5.6 | Employment of Agents. | 9 |
| ARTICLE VI POWERS OF AND LIMITATIONS ON THE TRUSTEE, ADVISOR AND OVERSIGHT COMMITTEE | | 10 |
| 6.1 | Limitations on Trustee, Advisor and Oversight Committee | 10 |
| 6.2 | Specific Powers of Trustee, Advisor and Oversight Committee | 10 |
| ARTICLE VII CONCERNING THE TRUSTEE, ADVISOR, OVERSIGHT COMMITTEE, SECOND LIEN AGENT, BENEFICIARIES, EMPLOYEES AND AGENTS | | 13 |
| 7.1 | Generally | 13 |
| 7.2 | Reliance by Trustee, Advisor or Oversight Committee | 14 |
| 7.3 | Liability to Third Persons | 15 |
| 7.4 | Recitals | 15 |
| 7.5 | Indemnification | 15 |
| 7.6 | Rights of Trustee, Advisor, Oversight Committee Members, Employees, Independent Contractors and Agents to Engage in Other Business | 16 |
| ARTICLE VIII PROTECTION OF PERSONS DEALING WITH THE TRUSTEE, ADVISOR OR OVERSIGHT COMMITTEE | | 17 |
| 8.1 | Action by Trustees, Advisors or Oversight Committee Members | 17 |
| 8.2 | Delegation | 17 |
| 8.3 | Reliance on Statement by Trustee, Advisor or Oversight Committee Member | 18 |

ARTICLE IX COMPENSATION OF TRUSTEE, ADVISOR AND OVERSIGHT
     COMMITTEE ...................................................................................... 18
  9.1     Amount of Compensation ............................................................... 18
  9.2     Expenses ......................................................................................... 18
ARTICLE X TRUSTEES, ADVISORS, OVERSIGHT COMMITTEE MEMBERS AND
     SUCCESSORS .................................................................................... 19
  10.1   Number and Qualification of Trustees, Advisors and Oversight Committee
     Members ......................................................................................... 19
  10.2   Resignation and Removal of Trustees, Advisors and Oversight Committee
     Members ......................................................................................... 19
  10.3   Appointment of Successor Trustee, Advisor or Oversight Committee
     Member ........................................................................................... 20
  10.4   Acceptance of Appointment by Successor Trustee, Advisor or Oversight
     Committee Member ........................................................................ 20
  10.5   Bonds ............................................................................................. 21
  10.6   Directions in Writing ..................................................................... 21
  10.7   Rules Governing Advisor ............................................................... 21
  10.8   Rules Governing Oversight Committee .......................................... 21
ARTICLE XI CONCERNING THE BENEFICIARIES .............................................. 21
  11.1   Evidence of Action by Beneficiaries ............................................. 21
  11.2   Limitation on Suits by Beneficiaries ............................................. 22
  11.3   Requirement of Undertaking .......................................................... 22
ARTICLE XII AMENDMENTS ............................................................................... 23
  12.1   Amendment of Agreement ............................................................. 23
  12.2   Notice and Effect of Amendment .................................................. 23
ARTICLE XIII MISCELLANEOUS PROVISIONS .................................................. 23
  13.1   Filing Documents ........................................................................... 23
  13.2   Intention of Parties to Establish Trust ........................................... 23
  13.3   Governing Law ............................................................................... 24
  13.4   Severability .................................................................................... 24
  13.5   Notices ........................................................................................... 24
  13.6   Interpretation ................................................................................. 26
  13.7   Counterparts ................................................................................... 27

SECURED CREDITOR TRUST AGREEMENT

THIS SECURED CREDITOR TRUST AGREEMENT (this
"Agreement"), dated as of November [•], 2015, by and among (i) SRC Liquidation
Company, SR Liquidation Holding Company, SR Liquidation Technologies, Inc., SR
Liquidation International, Inc., iMLiquidation, LLC, SR Liquidation of Puerto Rico Inc.,
SR Liquidation Mexico Holding Company, Standard Register Holding, S. de R.L. de
C.V., Standard Register de México, S. de R.L. de C.V., Standard Register Servicios, S. de
R.L. de C.V. and SR Liquidation Technologies Canada ULC (collectively, the
"Debtors"), as settlors, (ii) Wilmington Trust Company, as trustee (the "Trustee" and,
together with any other persons serving as trustees hereunder, the "Trustees"),
(iii) Clingman & Hanger Management Associates, LLC, as advisor (the "Advisor" and,
together with any other persons serving as advisors hereunder, the "Advisors"), and
(iv) Silver Point Finance, LLC (solely in its capacity as Second Lien Agent), as sole
member of the Oversight Committee (as defined in Section 1.2 of this Agreement), is
executed to facilitate the implementation of the Second Amended Chapter 11 Plan of
Liquidation for SRC Liquidation Company and its Affiliates (as amended or
supplemented from time to time, the "Plan"), filed with the United States Bankruptcy
Court for the District of Delaware (the "Bankruptcy Court") in case number 15-10541 on
November 11, 2015.

**WHEREAS**, the Bankruptcy Court has scheduled November 19, 2015
as the date of the confirmation hearing to consider entry of an order confirming the Plan
in accordance with section 1129 of the United States Bankruptcy Code, 11 U.S.C. §§
101-1532, as amended (the "Confirmation Order"); and

**WHEREAS**, (i) on the date hereof, this Agreement shall be executed by
the Debtors and the Trustee, establishing the trust hereunder (the "Secured Creditor
Trust"), and (ii) pursuant to the terms of the Plan and the Confirmation Order, effective
as of the Effective Date (as defined in the Plan), Secured Creditor Trust Assets (as
defined in the Plan) that have not previously vested in the Secured Creditor Trust shall be
deemed to have been granted, transferred, conveyed and delivered to the Trustee on
behalf of, and for the benefit of, the Holders of Allowed Class III Second Lien Secured
Claims (as each such term is defined in the Plan) (each such Holder, a "Beneficiary", and
collectively, the "Beneficiaries"); and

**WHEREAS**, the Secured Creditor Trust is established for the primary
purpose of liquidating the Secured Creditor Trust Assets in an expeditious but orderly
manner for the benefit of the Beneficiaries and distributing the proceeds therefrom to the
Second Lien Agent on behalf of, and for the benefit of, the Beneficiaries, with no
objective to continue or engage in the conduct of a trade or business, except to the extent
reasonably necessary to, and consistent with, the liquidating purpose of the Secured
Creditor Trust and the respective provisions of the Plan and the Confirmation Order; and

**WHEREAS**, the Secured Creditor Trust is intended to qualify as a
"grantor trust" for federal, state and local income tax purposes, pursuant to Sections 671-
677 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"),

and any analogous provision of state or local law, with the Beneficiaries treated as grantors and owners of the Secured Creditor Trust; and

**WHEREAS**, each of the Trustee, the Advisor and the Oversight Committee shall have all necessary authority and power to take whatever actions are reasonably necessary to implement the provisions of this Agreement consistent with the respective provisions of the Plan and the Confirmation Order.

**NOW, THEREFORE**, in consideration of the foregoing premises, the parties hereto agree as follows:

## ARTICLE I

## NAME AND DEFINITIONS

1.1     *Creation of Trust and Name*.  There is hereby created a trust which shall be known as the "Secured Creditor Trust," in accordance with the Plan.

1.2     *Certain Terms Defined*.  For all purposes of this Agreement, unless the context otherwise requires:

(a)     *Advisor* shall have the meaning given to such term in the preamble to this Agreement.

(b)     *Agent* shall have the meaning given to such term in Section 5.6 of this Agreement.

(c)     *Agreement* shall mean this instrument as originally executed, as it may from time to time be amended pursuant to the terms hereof.

(d)     *Bankruptcy Court* shall have the meaning given to such term in the preamble to this Agreement.

(e)     *Beneficial Interest* shall mean each Beneficiary's proportionate share of the Secured Creditor Trust Assets, as determined in accordance with the Plan and the Confirmation Order.

(f)     *Beneficiaries* shall have the meaning given to such term in the preamble to this Agreement.

(g)     *Confirmation Order* shall have the meaning given to such term in the preamble to this Agreement.

(h)     *Debtors* shall have the meaning given to such term in the preamble to this Agreement.

(i)     *Effective Date* shall have the meaning given to such term in the Plan.

(j)      *GUC Trust* shall have the meaning given to such term in the Plan.

(k)      *Indemnified Person* shall have the meaning given to such term in Section 7.5 of this Agreement.

(l)      *Internal Revenue Code* shall have the meaning given to such term in the preamble to this Agreement.

(m)      *Liquidating Debtors* shall have the meaning given to such term in the Plan.

(n)      *Oversight Committee* means a committee comprised of one or more individuals or entities to perform certain oversight functions delegated to it hereunder.  The initial member of the Oversight Committee shall be the Second Lien Agent.

(o)      *Person* shall mean an individual, a corporation, a partnership, an association, a joint stock company, a limited liability company, a trust, a joint venture, any unincorporated organization or a government or political subdivision thereof.

(p)      *Plan* shall have the meaning given to such term in the preamble to this Agreement.

(q)      *Revenue Procedure 82-58* shall mean and refer to the revenue procedure issued by the Internal Revenue Service and reported at 1982-2 C.B. 847, as amplified by Revenue Procedure 91-15, and as the same may be further amended, supplemented or modified.

(r)      *Second Lien Agent* shall have the meaning given to such term in the Plan.

(s)      *Secured Creditor Trust* shall mean the trust created by this Agreement.

(t)      *Secured Creditor Trust Assets* shall have the meaning given to such term in the Plan.

(u)      *Taylor* shall have the meaning given to such term in the Plan.

(v)      *Trust Assets* shall mean all the property held from time to time by the Trustee under this Agreement, which may include, without limitation, the Wind-Down Settlement Payment and, as of the Effective Date, the Secured Creditor Trust Assets granted, assigned and conveyed to the Trustee by the Debtors pursuant to the Plan or the Confirmation Order, and, in addition, shall thereafter include all dividends, income, proceeds and other receipts of, from, or attributable to any assets held

934155.02A-CHISR01A - MSW

by the Secured Creditor Trust. The Trust Assets may be contributed to one or more limited liability companies or other suitable entities formed by the Trustee for the purpose of holding such Trust Assets, in which case, the membership interest in such entity shall also be held by the Trustee and constitute a Trust Asset.

(w)     *Trustee* shall have the meaning given to such term in the preamble to this Agreement.

(x)     *Wind-Down Settlement* means that certain agreement between the Debtors, Taylor, and the Second Lien Agent dated as of October 29, 2015.

(y)     *Wind-Down Settlement Payment* means the $750,000.00 payment to be made by the Debtors pursuant to the Wind-Down Settlement. The Wind-Down Settlement Payment will be made first to the Second Lien Agent to satisfy the professionals fees incurred by the Second Lien Agent as of the date of payment, with the remainder of the Wind-Down Settlement Payment to be made to the Secured Creditor Trust to be administered as a Secured Creditor Trust Asset.

ARTICLE II

NATURE OF TRANSFER

2.1     *Purpose of Secured Creditor Trust.*

(a)     The sole purpose of this Secured Creditor Trust is to hold the Trust Assets in a manner calculated to collect and distribute the income and proceeds of the Trust Assets to the Second Lien Agent on behalf of, and for the benefit of, the Beneficiaries, in as prompt and orderly fashion as practicable after the payment of, or provision for, expenses and liabilities of the Secured Creditor Trust, including, without limitation, payments to Persons who are identified in, or entitled to be indemnified under, Section 7.5 of this Agreement.

(b)     The Secured Creditor Trust Assets granted, released, assigned, conveyed and delivered to the Trustee subject to the terms and provisions hereof will be held in the Secured Creditor Trust, and the Trustee, at the direction of the Advisor, acting with the consent of the Oversight Committee, will: (i) further liquidate the Secured Creditor Trust Assets if necessary or appropriate to carry out the purpose of the Secured Creditor Trust and facilitate distribution of the Trust Assets; (ii) allocate, protect and conserve the Trust Assets in accordance with the terms and conditions hereof; (iii) complete the winding up of the affairs of the Debtors as and to the extent set forth in the Plan and Confirmation Order; and (iv) distribute the Trust Assets in accordance with the terms and conditions hereof.

(c)     The Debtors are granting, assigning and conveying the Secured Creditor Trust Assets to the Trustee pursuant hereto as agent for, and on behalf of, the Beneficiaries. Accordingly, it is intended that the granting, assignment and conveyance of the Secured Creditor Trust Assets by the Debtors to the Trustee pursuant hereto shall be treated for federal and state income tax purposes as if the Debtors made

4

such distributions directly to the Beneficiaries. It is further intended that for federal, state and local income tax purposes the Secured Creditor Trust shall be treated as a liquidating trust under Treasury Regulation Section 301.7701-4(d) and any analogous provision of state or local law, and the Beneficiaries shall be treated as the owners of their respective shares of the Secured Creditor Trust pursuant to Sections 671 through 677 of the Internal Revenue Code and any analogous provision of state or local law and shall be taxed on their respective shares of the Secured Creditor Trust's taxable income (including both ordinary income and capital gains) pursuant to Section 671 of the Internal Revenue Code and any analogous provision of state or local law. The Trustee, at the direction of the Advisor, acting with the consent of the Oversight Committee, shall file or cause to be filed all tax returns required to be filed with any governmental agency consistent with this position, including, but not limited to, any tax returns required of grantor trusts pursuant to Treasury Regulation Section 1.671-4(a).

2.2     *Prohibited Activities*. The Secured Creditor Trust shall not continue or engage in the conduct of any trade or business or reinvestment of proceeds (except solely temporary reinvestments as expressly provided in this Agreement), and the Trustee is expressly prohibited from, and shall have no power or authority to, continue or engage in the conduct of any trade or business or reinvestment of proceeds (except solely temporary reinvestments as expressly provided in this Agreement) on behalf of the Secured Creditor Trust, the Second Lien Agent or the Beneficiaries, and all of the terms and conditions hereof shall be construed accordingly.

The Secured Creditor Trust shall not receive transfers of any unlisted stock of a single issuer that represents eighty percent (80%) or more of the outstanding stock of such issuer.

2.3     *No Reversion to the Debtors*. In no event shall any part of the Secured Creditor Trust Assets revert to or be distributed to the Debtors or any person other than the Second Lien Agent, on behalf of, and for the benefit of, the Beneficiaries.

2.4     *Instruments of Further Assurance*. Such Persons as shall have the right and power to so act on behalf of the Debtors shall, upon reasonable request by the Trustee, the Advisor or the Oversight Committee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to carry out effectively the purposes of this Agreement, to confirm or effectuate the transfer to the Trustee of any property intended to be covered hereby, and to vest in the Trustee, its successors and assigns, the estate, powers, instruments or funds in trust hereunder.

2.5     *Transfer of Secured Creditor Trust Assets Free and Clear; Payment of Liabilities*. Pursuant to the Plan, the Debtors shall transfer to the Secured Creditor Trust all of their right, title and interest in and to all of the Secured Creditor Trust Assets, including any portion of the Wind-Down Settlement Payment not paid to the Second Lien Agent in accordance with the Wind-Down Settlement, which assets shall automatically vest in the Secured Creditor Trust pursuant to section 1141 of the Bankruptcy Code free and clear of all Claims and Liens (as defined in the Plan) other than the Claims and Liens of the Second Lien Agent (as defined in the Plan) and, solely

as to the BofA Cash Collateral Account (as defined in the Plan), Bank of America, N.A. Accordingly, the Trustee shall not, either in its capacity as trustee or in its individual capacity, assume any claims, liabilities or obligations (including unascertained or contingent liabilities and expenses) of the Debtors with respect to the Secured Creditor Trust Assets, other than as set forth in the Plan or Confirmation Order.  Should any liability nonetheless be asserted against the Trustee as the transferee of the Secured Creditor Trust Assets, the Trustee may use such part of the Secured Creditor Trust Assets as may be necessary or appropriate in contesting any such liability or in payment thereof, but in no event shall the Trustee, the Second Lien Agent, the Beneficiaries or employees or agents of the Secured Creditor Trust or their respective officers, employees or agents be personally liable, nor shall resort be had to the private property of such Persons, in the event the Secured Creditor Trust Assets are not sufficient to satisfy the liabilities of the Secured Creditor Trust.

2.6     _Incidents of Ownership_.  The Beneficiaries shall be the beneficial owners of the Secured Creditor Trust and the Trustee shall retain only such incidents of legal ownership as are necessary to undertake the actions and transactions authorized herein.

## ARTICLE III

## BENEFICIARIES

3.1     _Rights of Beneficiaries_.  Each Beneficiary shall be entitled to participate in the rights and benefits due to a Beneficiary hereunder according to its Beneficial Interest.  Each Beneficiary shall take and hold the same subject to all the terms and provisions of this Agreement.  A Beneficiary shall have no title to, right to, possession of, management of, or control of, the Trust Assets except as herein expressly provided.  The whole title to all the Trust Assets shall be vested in the Trustee and the sole interest of the Beneficiaries shall be the rights and benefits given to such Beneficiaries under this Agreement.

3.2     _Transfer of Interests of Beneficiaries_.  The Beneficial Interest of a Beneficiary may not be transferred, in whole or in part, by the Beneficiary acting through any Person (including a properly appointed legal representative of the Beneficiary) without the prior written consent of the Trustee, nor may a Beneficiary have authority to sell, assign, transfer, encumber, or in any other manner anticipate or dispose of, in whole or in part, its Beneficial Interest without such prior written consent; provided, however, that the Beneficial Interest shall be assignable or transferable by operation of law without such prior written consent.

The Beneficial Interests of the Beneficiaries hereunder shall not be subject to attachment, execution, sequestration or any order of a court, nor shall such interests be subject to the contracts, debts, obligations, engagements or liabilities of any Beneficiary, but the interest of a Beneficiary shall be paid by the Trustee, at the direction of the Advisor, acting with the consent of the Oversight Committee, to the Second Lien Agent, on behalf of, and for the benefit of, the Beneficiary free and clear of all

6

assignments, attachments, anticipations, levies, executions, decrees and sequestrations, and shall become the property of the Beneficiary only when actually received by such Beneficiary.

## ARTICLE IV

## DURATION AND TERMINATION OF TRUST

4.1    *Duration*.  The existence of this Secured Creditor Trust shall terminate upon the earliest of (i) a termination required by the applicable laws of the State of Delaware, (ii) a termination due to the distribution of all the Trust Assets as provided in Section 5.4 of this Agreement, or (iii) the expiration of a period of two (2) years from the date of the creation of the Secured Creditor Trust, unless the Bankruptcy Court, upon a motion filed on or before such second (2nd) anniversary or the end of any extension period approved by the Bankruptcy Court (the filing of which motion shall automatically extend the term of the Secured Creditor Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary or appropriate to facilitate or complete the recovery and liquidation of the Trust Assets.  Any such extension must comply in all respects with the provisions of the Plan.  Notwithstanding the foregoing clause (iii), the Secured Creditor Trust shall not in any event terminate pursuant to such clause (iii) prior to the date the Trustee is directed to make a final distribution in accordance with Section 5.4 of this Agreement.

4.2    *Other Obligations of Trustee, Advisor or Oversight Committee upon Termination*.  Upon distribution of all the Trust Assets, the Trustee shall provide for the retention of the books, records, lists of holders of Beneficial Interests and files which shall have been delivered to or created by the Trustee.  At the Trustee's discretion, all of such records and documents may be destroyed at any time after six (6) years from the distribution of all the Trust Assets.  Except as otherwise specifically provided herein, upon the distribution of all the Trust Assets, no Trustee, Advisor or member of the Oversight Committee shall have any further duties or obligations hereunder.

## ARTICLE V

## ADMINISTRATION OF TRUST ASSETS

5.1    *Sale of Trust Assets*.  The Advisor may, at such times as it may deem appropriate and acting with the consent of the Oversight Committee, direct the Trustee to transfer, assign, or otherwise dispose of all or any part of the Trust Assets as the Advisor deems appropriate at public auction or at private sale for cash, securities or other property, or upon credit (either secured or unsecured as the Advisor, acting with the consent of the Oversight Committee, shall determine).

5.2    *Payment of Claims, Expenses and Liabilities*.  The Trustee, at the direction of the Advisor, acting with the consent of the Oversight Committee, shall pay from the Trust Assets all claims, expenses, charges, liabilities, and obligations of the

Secured Creditor Trust and all liabilities and obligations which the Trustee, in its capacity as trustee and not in its individual capacity, specifically assumes and agrees to pay pursuant to this Agreement and such transferee liabilities which the Trustee may be obligated to pay, in its capacity as trustee and not in its individual capacity, as transferee of the Trust Assets, including, and without limiting the generality of the foregoing, interest, penalties, taxes, assessments and public charges of every kind and nature and the costs, charges, and expenses connected with or growing out of the execution or administration of this Secured Creditor Trust and such other payments and disbursements as are provided in this Agreement or which may be determined to be a proper charge against the Trust Assets by the Trustee, acting at the direction of the Advisor, with the consent of the Oversight Committee.  Notwithstanding a termination of the Secured Creditor Trust for any reason, the Advisor may, in its discretion, acting with the consent of the Oversight Committee (which shall not be unreasonably withheld), direct the Trustee to make provisions by reserve or otherwise out of the Trust Assets, for such amount as the Advisor in good faith may determine to be necessary or appropriate to meet present or future claims and liabilities of the Secured Creditor Trust, whether fixed or contingent.

5.3     _Interim Distributions_.  If at any time the Advisor determines that the then fair market value of the Trust Assets exceeds the value that the Advisor in good faith determines may be necessary or appropriate to meet present or future claims and liabilities of the Secured Creditor Trust, whether fixed or contingent (such excess value, the "_Distributable Amount_"), the Advisor may, at such times as it may deem appropriate and acting with the consent of the Oversight Committee, direct the Trustee to distribute such portion or all of the Distributable Amount as the Advisor deems appropriate to the Second Lien Agent, on behalf of, and for the benefit of, the Beneficiaries, to be distributed to the Beneficiaries in proportion to their interests in the Trust Assets.

5.4     _Final Distribution_.  If the Advisor reasonably determines that all claims, expenses, charges, liabilities and obligations of the Secured Creditor Trust have been paid, discharged or otherwise provided for pursuant to Section 5.2 of this Agreement, or if the existence of the Secured Creditor Trust shall terminate pursuant to Section 4.1 of this Agreement and the Advisor has reasonably determined that all claims, expenses, charges, liabilities and obligations of the Secured Creditor Trust have been paid, discharged or otherwise provided for pursuant to Section 5.2 of this Agreement, the Advisor, acting with the consent of the Oversight Committee, shall direct the Trustee, as expeditiously as is consistent with the conservation and protection of the Trust Assets, to distribute the Trust Assets to the Second Lien Agent, on behalf of, and for the benefit of, the Beneficiaries, to be distributed to the Beneficiaries in proportion to their interests therein.

5.5     _Federal Income Tax Information_.  As soon as practicable after the close of each taxable year, the Advisor shall direct the Trustee to mail to each Beneficiary at the close of the year, a statement showing on a unit basis (i) the dates and amounts of all distributions made by the Trustee, (ii) all items of income, gain, deductions and credits

8

against federal income tax of the Secured Creditor Trust for the preceding year and (iii) such other information as is reasonably available to the Trustee which may be helpful in determining the amount of taxable income attributable to the Secured Creditor Trust that such Beneficiary should include in such Beneficiary's federal income tax return for the preceding year.  In addition, after receipt of a request in good faith, or in its discretion without such request, or at the direction of the Advisor or the Oversight Committee in its respective discretion, or if required by applicable law, the Trustee shall furnish to a Person who has been a Beneficiary at any time during the preceding year a statement containing such further information as is reasonably available to the Trustee which may be helpful in determining the amount of taxable income which such Person should include in such Person's federal income tax return.

 5.6 *Employment of Agents.*

 (a) The Trustee, acting together with the Advisor and the Oversight Committee pursuant to this Agreement, shall be responsible for the general policies of the Secured Creditor Trust and for the general supervision of the activities of the Secured Creditor Trust conducted by all agents, employees, advisors or managers of the Secured Creditor Trust.  However, none of the Trustee, the Advisor or the Oversight Committee shall be required personally to conduct the activities of the Secured Creditor Trust required of such Trustee, Advisor or Oversight Committee pursuant to this Agreement, and, consistent with their ultimate responsibility as stated above, each of the Trustee, the Advisor and the Oversight Committee shall have the power to appoint, employ or contract with any Person or Persons (including one or more of themselves or any corporation, partnership, or trust in which one or more of them may be directors, officers, partners or trustees) as the Trustee, the Advisor or the Oversight Committee, as the case may be, may deem necessary or appropriate for the transaction of the activities of the Secured Creditor Trust.  Each of the Trustee, the Advisor and the Oversight Committee may therefore employ or contract with such Person or Persons (herein referred to as an "Agent") and may grant or delegate such authority to the Agent as the Trustee, the Advisor or the Oversight Committee, as the case may be, may in its sole discretion deem necessary or appropriate to carry out the purpose of the Secured Creditor Trust without regard to whether such authority is normally granted or delegated by trustees, advisors or any other governing body.  Each of the Trustee, the Advisor and the Oversight Committee may exercise broad discretion in allowing the Agent to administer and regulate the operations of the Secured Creditor Trust, to act as agent for the Secured Creditor Trust, to execute documents on behalf of the Trustee, the Advisor or the Oversight Committee, as the case may be, and to make executive decisions which conform to general policies and general principles previously established by the Trustee, the Advisor or the Oversight Committee on whose behalf such Agent is acting.

 (b) The Agent or other Person employed by the Trustee, the Advisor or the Oversight Committee, as the case may be, shall not be required to administer the Secured Creditor Trust as its sole and exclusive function and may have other business interests and may engage in other activities similar or in addition to those relating to the Secured Creditor Trust, including the rendering of advice or services of any kind to investors or any other Persons and the management of other investments.

9

ARTICLE VI

POWERS OF AND LIMITATIONS ON THE TRUSTEE, ADVISOR AND
OVERSIGHT COMMITTEE

6.1    *Limitations on Trustee, Advisor and Oversight Committee*.  None
of the Trustee, the Advisor or the Oversight Committee shall, at any time, on behalf of
the Secured Creditor Trust, the Second Lien Agent or the Beneficiaries, enter into or
engage in any trade or business or reinvestment of proceeds (except solely temporary
reinvestments as expressly provided in this Agreement), and no part of the Trust Assets
shall be used or disposed of by the Trustee, the Advisor or the Oversight Committee in
furtherance of any trade or business or reinvestment of proceeds (except solely temporary
reinvestments as expressly provided in this Agreement).  The Trustee shall be restricted
to the holding and collection of the Trust Assets and the sale and redemption thereof and
the subsequent payment and distribution thereof for the purposes set forth in this
Agreement and the administration thereof in accordance with the provisions of this
Agreement, and neither the Advisor nor the Oversight Committee shall act or give any
direction in contravention of such restriction.  In no event shall the Trustee, the Advisor
or the Oversight Committee receive any property, make any distribution, satisfy or
discharge any claims, expenses, charges, liabilities or obligations or otherwise take any
action (including directing any of the foregoing) which would jeopardize the status of the
Secured Creditor Trust as a "liquidating trust" for federal income tax purposes within the
meaning of Treasury Regulation Section 301.7701-4(d).  This limitation shall apply
irrespective of whether the conduct of any such action is deemed by the Trustee, the
Advisor or the Oversight Committee, as the case may be, to be necessary or appropriate
for the conservation and protection of the Trust Assets.  None of the Trustee, the Advisor
or the Oversight Committee shall invest (or direct the investment of) any of the funds
held as Trust Assets, except that the Trustee may continue to hold assets in the form
transferred to the Secured Creditor Trust and may, at the direction of the Advisor, acting
with the consent of the Oversight Committee, invest any portion of the Trust Assets in (i)
direct obligations of the United States of America or obligations of any agency or
instrumentality thereof which mature not later than six (6) months from the date of
acquisition thereof, (ii) money market deposit accounts or funds, checking accounts,
savings accounts, or certificates of deposit, or other time deposit accounts which mature
not later than six (6) months from the date of acquisition thereof which are issued by a
commercial bank or savings institution organized under the laws of the United States of
America or any state thereof, (iii) non-interest bearing accounts, or (iv) any other
investments which may be determined by the Trustee to be permissible under Revenue
Procedure 82-58.

6.2    *Specific Powers of Trustee, Advisor and Oversight Committee*.
Subject to the provisions of Section 6.1 of this Agreement, each of the Trustee, the
Advisor and the Oversight Committee shall have the following specific powers in
addition to any powers conferred upon the Trustee, the Advisor or the Oversight
Committee, as the case may be, by any other Section or provision of this Agreement or
any statutory laws of the State of Delaware; provided, however, that the enumeration of
the following powers shall not be considered in any way to limit or control the power of

10

the Trustee, the Advisor or the Oversight Committee to act as specifically authorized by any other Section or provision of this Agreement and to act in such a manner as the Trustee, the Advisor or the Oversight Committee, as the case may be, may deem necessary or appropriate to conserve and protect the Trust Assets or to confer on the Beneficiaries (or on the Second Lien Agent, on behalf of, and for the benefit of, the Beneficiaries) the benefits intended to be conferred upon them by this Agreement:

        (a)     To determine the nature and amount of the consideration to be received with respect to the sale or other disposition of, or the grant of interests in, the Trust Assets.

        (b)     To collect, liquidate or otherwise convert into cash, or such other property as it deems appropriate, all property, assets and rights in the Trust Assets, and to pay, discharge and satisfy all other claims, expenses, charges, liabilities, and obligations existing with respect to the Trust Assets, the Secured Creditor Trust, the Advisor, the Oversight Committee or the Trustee.

        (c)     To elect, appoint, engage, retain or employ any Persons as agents, representatives, employees, or independent contractors (including, without limitation, investment advisors, custodians, accountants, administrators, transfer agents, attorneys-at-law, advisors, appraisers, brokers, or otherwise) in one or more capacities, and to pay compensation from the Trust Assets for services in as many capacities as such Person may be so elected, appointed, engaged, retained or employed, to prescribe the titles, powers and duties, terms of service and other terms and conditions of the election, appointment, engagement, retention or employment of such Persons and, except as prohibited by law, to delegate any of the powers and duties of the Trustee, the Advisor or the Oversight Committee to any one or more Trustees, Advisors, agents, officers, representatives, employers, independent contractors or other Persons.

        (d)     To retain and set aside such funds out of the Trust Assets as the Trustee or Advisor (with the consent of the Oversight Committee) shall deem necessary or expedient to pay, or provide for the payment of, (i) unpaid claims, expenses, charges, liabilities, and obligations of the Secured Creditor Trust or the Debtors with respect to the Secured Creditor Trust Assets, (ii) contingencies, and (iii) expenses of administering the Trust Assets.

        (e)     To do and perform any and all acts necessary or appropriate for the conservation and protection of the Trust Assets, including acts or things necessary or appropriate to maintain assets held by the Trustee pending sale or other disposition thereof or distribution thereof to the Second Lien Agent, on behalf of, and for the benefit of, the Beneficiaries.

        (f)     To hold legal title to property of the Secured Creditor Trust in the name of the Secured Creditor Trust, or in the name of the Trustee, or of any other Person, without disclosure of the interest of the Secured Creditor Trust therein.

(g)     To cause any investments or any part of the Trust Assets to be registered and held in the name of the Trustee or in the names of a nominee or nominees without increase or decrease of liability with respect thereto.

(h)     To institute or defend actions or declaratory judgments or other actions and to take such other action, in the name of the Secured Creditor Trust, the Trustee or the Debtors with respect to the Secured Creditor Trust Assets or as otherwise required, as the Trustee or Advisor (with the consent of the Oversight Committee) may deem necessary or desirable to enforce any instruments, contracts, agreements, causes of action or rights relating to or forming a part of the Trust Assets, or in connection with, related to or arising from the activities of the Debtors with respect to the Secured Creditor Trust Assets, and to pay the Trust Assets to Persons who are entitled to be indemnified by the Secured Creditor Trust pursuant to the Plan or other contracts to which the Trustee is a party.

(i)     To determine conclusively from time to time the value of and to revalue the securities and other property of the Secured Creditor Trust, in accordance with public market quotations, independent appraisals or other information as the Trustee, the Advisor or the Oversight Committee, as case may be, deems satisfactory.

(j)     To cancel, terminate, or amend any instruments, contracts, agreements, obligations or causes of action relating to or forming a part of the assets or liabilities of the Secured Creditor Trust, and to execute new instruments, contracts, agreements, obligations or causes of action, notwithstanding that the terms of any such instruments, contracts, agreements, obligations or causes of action may extend beyond the terms of this Secured Creditor Trust, provided that no such new instrument, contract, agreement, obligation or cause of action shall permit the Trustee, the Advisor or the Oversight Committee to engage in any activity prohibited by Section 6.1 of this Agreement.

(k)     To vote by proxy or otherwise on behalf of the Beneficiaries and with full power of substitution of all securities held by the Trustee hereunder and to exercise every power, election, discretion, option and subscription right and give every notice, make every demand, and to do every act or thing in respect to any securities held by the Trustee which the Trustee might or could do if it were the absolute owner thereof.

(l)     In connection with the sale or other disposition or distribution of any securities held by the Trustee, to comply with the applicable Federal and state securities laws, and to enter into agreements relating to sale or other disposition or distribution thereof.

(m)     To authorize transactions between corporations or other entities whose securities or other interests therein (either in the nature of debt or equity) are held by the Trustee as part of the Trust Assets.

12

(n)     To perform any act authorized, permitted, or required under any instrument, contract, agreement, right, obligation or cause of action relating to or forming a part of the Trust Assets whether in the nature of an approval, consent, demand or notice thereunder or otherwise, unless such act would require the consent of the Beneficiaries in accordance with the express provisions of this Agreement.

<div align="center">ARTICLE VII</div>

<div align="center">CONCERNING THE TRUSTEE, ADVISOR, OVERSIGHT COMMITTEE, SECOND LIEN AGENT, BENEFICIARIES, EMPLOYEES AND AGENTS</div>

7.1     *Generally*.  Each of the Trustee, the Advisor and the initial member of the Oversight Committee accepts and undertakes to discharge the Secured Creditor Trust upon the terms and conditions hereof on behalf of the Beneficiaries.  The Trustee, the Advisor and the Oversight Committee shall exercise such of the rights and powers vested in each of them by this Agreement, and use the same degree of care and skill in their exercise as is required of each of them under the laws of the State of Delaware.  No provision of this Agreement shall be construed to relieve the Trustee, the Advisor or the Oversight Committee from liability resulting from their respective willful misconduct, gross negligence or fraud.

(a)     No Trustee, Advisor or Oversight Committee member shall be responsible for the acts or omissions of any other Trustee, Advisor, Oversight Committee member or Beneficiary if done or omitted without its actual knowledge or consent unless it shall be proved that such Trustee, Advisor or Oversight Committee member was grossly negligent in ascertaining the pertinent facts, and no successor Trustee, successor Advisor or new member of the Oversight Committee shall be in any way responsible for the acts or omissions of any Trustee, Advisor or Oversight Committee member in office prior to the date on which it becomes a Trustee, Advisor or Oversight Committee member, as the case may be.

(b)     No Trustee, Advisor or Oversight Committee member shall be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Trustee, Advisor or any Oversight Committee member.

(c)     In the absence of bad faith on the part of the Trustee, the Advisor or an Oversight Committee member, the Trustee, the Advisor and any Oversight Committee member may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee, the Advisor and/or any Oversight Committee member and conforming to the requirements of this Agreement.

(d)     No Trustee, Advisor or Oversight Committee member shall be liable for any error of judgment made in good faith.

<div align="center">13</div>

(e)      Whenever, pursuant to the terms of this Agreement, a Trustee acts at the direction of the Advisor and/or the Oversight Committee as to any particular matter, such Trustee shall, as provided in Section 3313 of Title 12 of the Delaware Code, have no liability with respect to such matter except in cases of the Trustee's own willful misconduct, gross negligence or fraud, proven by clear and convincing evidence in the court then having primary jurisdiction over the Secured Creditor Trust.

Notwithstanding the foregoing, the Trustee shall act solely at the direction, and with the prior consent, of the Advisor and, where the consent of the Oversight Committee is required, the Oversight Committee, except as to functions which are purely clerical or administrative in nature.

7.2      _Reliance by Trustee, Advisor or Oversight Committee_.  Except as otherwise provided in Section 7.1 of this Agreement:

(a)      The Trustee, the Advisor and the Oversight Committee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(b)      The Trustee, the Advisor and the Oversight Committee may consult with legal counsel, auditors, actuaries, tax professionals or other experts to be selected by them, including firms of which a Trustee, Advisor or member of the Oversight Committee may be a member or with which a Trustee, Advisor or member of the Oversight Committee may be associated, and the advice or opinion of such counsel, auditors or other experts shall be full and complete personal protection to each Trustee, Advisor, member of the Oversight Committee, officer, employee and agent of the Secured Creditor Trust in respect of any action taken or suffered by them in good faith and in reliance on, or in accordance with, such advice or opinion.

(c)      Persons dealing with the Trustee, the Advisor or the Oversight Committee shall look only to the Trust Assets to satisfy any liability incurred by the Trustee, the Advisor or the Oversight Committee to such Person in carrying out the terms of this Secured Creditor Trust, and neither the Trustee, the Advisor nor any member of the Oversight Committee shall have any personal or individual obligation to satisfy any such liability.

(d)      Each of the Trustee, the Advisor and the Oversight Committee shall cause the following legend to be included in all correspondence and any written instrument creating an obligation of the Secured Creditor Trust:

"Pursuant to the Secured Creditor Trust Agreement dated as of October [•], 2015 (the "Trust Agreement"), and subject to all of the provisions of the Trust Agreement, none of the Beneficiaries, the Second Lien Agent, the Trustee, the Advisor, the Oversight Committee or any of its members

14

(as each such term is defined in the Trust Agreement) or any officer, employee or agent of the Secured Creditor Trust shall be personally liable to any third party in respect of any claim or obligation, and any such third party shall look solely to the Secured Creditor Trust's assets for the payment of any such claim or the performance of any such obligation."

However, the omission of such provision from any such instrument shall not render the Beneficiaries, the Second Lien Agent, the Trustee, the Advisor, the Oversight Committee or their respective agents liable, nor shall the Trustee, the Advisor or the Oversight Committee be liable to anyone for such omission.

7.3 _Liability to Third Persons_.  Neither the Second Lien Agent nor any Beneficiary or Debtor shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Trust Assets or the affairs of this Secured Creditor Trust; and no Trustee, Advisor, Oversight Committee member, officer, employee or agent of this Secured Creditor Trust shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Trust Assets or the affairs of this Secured Creditor Trust, except for his or its own willful misconduct, knowingly and intentionally committed in bad faith; and all such other Persons shall look solely to the Trust Assets for satisfaction of claims of any nature arising in connection with the affairs of this Secured Creditor Trust.  The Advisor, acting with the consent of the Oversight Committee, may direct the Trustee to maintain insurance for the protection of the Trust Assets, the Beneficiaries, the Second Lien Agent, the Trustee, the Advisor, the Oversight Committee or the officers, employees and agents of the Secured Creditor Trust in such amount as the Advisor (with the consent of the Oversight Committee) shall deem adequate to cover all foreseeable liability to the extent available.

7.4 _Recitals_.  Any act or written instrument creating an obligation of this Secured Creditor Trust shall be conclusively taken to have been executed or done by the Trustee, the Advisor, member of the Oversight Committee or an officer, employee or agent of this Secured Creditor Trust only in its capacity as Trustee, Advisor or member of the Oversight Committee under this Agreement or in its capacity as officer, employee or agent of the Secured Creditor Trust.

7.5 _Indemnification_.  Each Trustee, Advisor, Oversight Committee member, officer, employee and agent (including any Agent) of the Secured Creditor Trust (each, an "Indemnified Person", and collectively, the "Indemnified Persons") shall be indemnified out of the Trust Assets against all liabilities, damages and expenses, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and counsel fees, reasonably incurred by such Indemnified Person in connection with the defense or disposition of any action, suit or other proceeding by the Secured Creditor Trust or any other Person, whether administrative, civil or criminal, in which such Indemnified Person may be involved or with which such Indemnified Person may be threatened (i) in the exercise and performance of any of its powers and duties hereunder and (ii) in the case of any Trustee, Advisor, Oversight Committee member or

15

any officer, employee or agent of the Secured Creditor Trust, while in office or thereafter, by reason of its being or having been such a Trustee, Advisor, Oversight Committee member, officer, employee or agent of the Secured Creditor Trust; provided, however, that an Indemnified Person shall not be entitled to such indemnification in respect of any matter which has been determined by a final judgment (after exhaustion of all appeals) of a court of competent jurisdiction to have resulted from such Indemnified Person's willful misconduct, gross negligence or fraud.  The rights accruing to any Indemnified Person under these provisions shall not exclude any other right to which the Indemnified Person may be lawfully entitled; provided, however, that no Indemnified Person may satisfy any right of indemnity or reimbursement granted herein or to which the Indemnified Person may be otherwise entitled except out of the Trust Assets, and neither the Second Lien Agent nor any Beneficiary shall be personally liable to any Person with respect to any claim for indemnity or reimbursement or otherwise.  The Advisor, acting with the consent of the Oversight Committee, may direct the Trustee to make advance payments in connection with indemnification under this Section, provided that the Indemnified Person shall have given a written undertaking to the Trustee, the Advisor and the Oversight Committee to repay any amount advanced to the Indemnified Person and to reimburse the Secured Creditor Trust in the event it is subsequently determined by a final judgment of a court of competent jurisdiction, after exhaustion of all appeals, that pursuant to the first sentence of this Section 7.5 the Indemnified Person is not entitled to such indemnification.  The Advisor, acting with the consent of the Oversight Committee, may direct the Trustee to purchase such insurance as the Advisor feels, in the exercise of its discretion, adequately insures that each Indemnified Person shall be indemnified against any such loss, liability or damage pursuant to this Section.  Notwithstanding the foregoing, nothing contained herein shall restrict the right of the Advisor, acting with the consent of the Oversight Committee, to direct the Trustee to indemnify or reimburse an Indemnified Person in any proper case even though not specifically provided for herein, nor shall anything contained herein restrict the right of any Indemnified Person to contribution under applicable law.

7.6     _Rights of Trustee, Advisor, Oversight Committee Members, Employees, Independent Contractors and Agents to Engage in Other Business_.  Any Trustee, Advisor, Oversight Committee member, officer, employee, manager, independent contractor or agent may, in his or its personal capacity or in a capacity of Trustee, Advisor, officer, director, partner, member, agent, employee of any Person or otherwise, have business interests and holdings similar to or in addition to those relating to the Secured Creditor Trust.  Subject to the provisions of Article V hereof, any Trustee, Advisor, Oversight Committee member, officer, employee, manager, independent contractor or agent of the Secured Creditor Trust may be a trustee, advisor, officer, director, partner, member, agent, employee or independent contractor of, or otherwise have a direct or indirect interest in, any Person who may be engaged to render advice or services to the Secured Creditor Trust, and may receive compensation from such Person as well as compensation as Trustee, Advisor, Oversight Committee member, officer, employee, manager, independent contractor or agent or otherwise hereunder.  None of these activities shall be deemed to conflict with his or its duties as Trustee, Advisor, Oversight Committee member, employee, independent contractor or agent.

16

# ARTICLE VIII

## PROTECTION OF PERSONS DEALING WITH THE TRUSTEE, ADVISOR OR OVERSIGHT COMMITTEE

8.1     _Action by Trustees, Advisors or Oversight Committee Members_.  If more than one Trustee, Advisor or member of the Oversight Committee of the Secured Creditor Trust, respectively, is serving, all action required or permitted to be taken by the Trustee, Advisor or Oversight Committee, as the case may be, in such respective capacities, shall be taken (i) at a meeting at which a quorum is present, having been duly called by one or more of the Trustees, Advisors or Oversight Committee members, as the case may be, on at least twenty-four (24) hours prior written or telephonic notice to all of the Trustees, Advisors or Oversight Committee members then serving, or (ii) without a meeting, by a written consent, vote, resolution, or other writing signed by all the Trustees, Advisors or Oversight Committee members then serving, as the case may be. Notice of a meeting may be waived in writing by any Trustee, Advisor or Oversight Committee member, as applicable, either before or after such meeting and the attendance of a Trustee, Advisor or Oversight Committee member shall constitute a waiver of notice of such meeting except where a Trustee, Advisor or Oversight Committee member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting has not been lawfully called or convened.  All or any one or more Trustees, Advisors, or Oversight Committee members, as the case may be, may participate in the meeting of the Trustees, Advisors or Oversight Committee, as applicable, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and participation in a meeting pursuant to which such communications are used by a Trustee, Advisor or Oversight Committee member shall constitute presence in person at such meeting.  Except where this Agreement otherwise provides, all action taken at such a meeting shall be by vote or resolution of a majority of such of the Trustees, Advisors or Oversight Committee members, as the case may be, as are present, and shall have the same force and effect as if taken by all the Trustees, Advisors or Oversight Committee members, as the case may be.  A majority of each of the Trustees, Advisors or Oversight Committee members, as applicable, then serving shall constitute a quorum.  Any action taken by the Trustees, Advisors or Oversight Committee members, as applicable, pursuant to this Section 8.1 may be implemented by any one Trustee, Advisor or Oversight Committee member, as the case may be, unless otherwise specified by the Trustees, Advisors or Oversight Committee members authorizing or approving such action.  Such implementation may include, without limitation, the execution and delivery of documents.  Without limiting any of the foregoing provisions of this Article VIII and subject to the approval of the Trustees, Advisors or Oversight Committee as herein provided, any one Trustee may hold title to, or an interest in, any and all of the Trust Assets, for and on behalf of the Secured Creditor Trust and the Trustees.

8.2     _Delegation_.  Subject to prior approval by the Oversight Committee, any Trustee or Advisor may, at any time and from time to time, by an instrument in writing, delegate any or all of its rights, powers, duties, authority and privileges, whether or not discretionary, to any other Trustee or Advisor, as the case may

17

be, for such period or periods of time as may be specified in such written instrument; provided, however, that any such instrument shall be revocable at any time and that any Trustee or Advisor who is granted any discretionary power hereunder may not delegate such discretionary power to any Trustee or Advisor who is not granted such discretionary power.

   8.3 *Reliance on Statement by Trustee, Advisor or Oversight Committee Member*.  Any Person dealing with a Trustee, Advisor or Oversight Committee member shall be fully protected in relying upon the Trustee's, Advisor's or Oversight Committee member's certificate signed by any one or more of the Trustees, Advisors or Oversight Committee members, as the case may be, that they have authority to take any action under this Secured Creditor Trust.  Any Person dealing with a Trustee, Advisor or Oversight Committee member shall be fully protected in relying upon the Trustee's, Advisor's or Oversight Committee member's certificate setting forth the facts concerning the calling of any meeting of the Trustees, Advisors or Oversight Committee, the giving of notice thereof, and the action taken at such meeting.

<div align="center">ARTICLE IX</div>

<div align="center">COMPENSATION OF TRUSTEE, ADVISOR AND OVERSIGHT COMMITTEE</div>

   9.1 *Amount of Compensation*.  Each of the Trustee and Advisor shall receive compensation from the Trust Assets for all services rendered in the performance of its duties in accordance with this Agreement.  The fees shall be paid in the ordinary course without further Court order.

   For compensation for services rendered, Advisor shall be paid its customary hourly rate for services performed by its professionals that are in effect from time to time. Advisor's current customary hourly rate for its professionals is $395.  Any increase in the $395 hourly rate shall be subject to approval by the Oversight Committee, which approval shall not be unreasonably withheld.

   For compensation for services rendered, Trustee shall be paid its fees as set forth in its Fee Proposal to Serve as Trustee, dated as of November 3, 2015, a copy of which has been reviewed and approved by each of the signatories to this Agreement.  For the avoidance of doubt, no fees shall be paid or payable by the Debtors or Liquidating Debtors.

   9.2 *Expenses*.  Each Trustee, Advisor, Oversight Committee member, officer or employee of the Secured Creditor Trust shall be reimbursed from the Trust Assets for all expenses incurred by him, her or it in the performance of his, her or its duties in accordance with this Agreement.  The expenses incurred (including, without limitation, costs for fees and expenses of legal counsel, auditors, actuaries, tax professionals, or other experts to be employed under Section 7.2 of this Agreement) shall be paid in the ordinary course without further Court order.  For the avoidance of doubt, all expenses shall be paid out of the Trust Assets and no expenses shall be paid or payable by the Debtors or Liquidating Debtors.

ARTICLE X

TRUSTEES, ADVISORS, OVERSIGHT COMMITTEE MEMBERS AND
SUCCESSORS

10.1  *Number and Qualification of Trustees, Advisors and Oversight Committee Members*.  Subject to the provisions of Section 10.3 of this Agreement relating to the period pending the appointment of a successor Trustee, Advisor or Oversight Committee member, (i) there shall always be at least one Trustee of this Secured Creditor Trust who shall be authorized to act as a corporate fiduciary under the laws of the State of Delaware (a "Delaware Trustee"), (ii) there shall always be at least one Advisor of this Secured Creditor Trust, (iii) there shall always be at least one Oversight Committee member of this Secured Creditor Trust, and (iv) each Trustee, Advisor and Oversight Committee member of this Secured Creditor Trust shall be a citizen and resident of or a corporation or limited liability company which is incorporated under the laws of a state of the United States.  Within the limits set forth in this Section 10.1, the number of Trustees, Advisors or Oversight Committee members may be increased or decreased from time to time by the Advisor, in its discretion, acting with the consent of the Oversight Committee.

If any corporate Trustee, Advisor or Oversight Committee member shall ever change its name, or shall reorganize or reincorporate, or shall merge with or into or consolidate with any other bank or trust company, such corporate Trustee, Advisor or Oversight Committee member shall be deemed to be a continuing entity and shall continue to act as a Trustee, Advisor or Oversight Committee member hereunder, as the case may be, with the same liabilities, duties, powers, titles, discretions and privileges as are herein specified for such Trustee, Advisor or Oversight Committee member.

10.2  *Resignation and Removal of Trustees, Advisors and Oversight Committee Members*. Any Trustee, Advisor or Oversight Committee member may resign and be discharged from the Secured Creditor Trust hereby created by giving written notice thereof to each remaining Trustee, Advisor and Oversight Committee member at their respective addresses as they appear herein or in the records of the Trustee.  Such resignation shall become effective on the day specified in such notice or upon the appointment of such Trustee's, Advisor's or Oversight Committee member's successor and such successor's acceptance of such appointment, whichever is earlier; provided, however, that any such resignation by a Trustee who is the sole Delaware Trustee shall not become effective until a successor Delaware Trustee has been appointed and has accepted such appointment.  If no successor Delaware Trustee shall have been appointed and accepted its appointment as provided in this Section 10.2 within ninety (90) days after delivery of an instrument of resignation in accordance with this Section 10.2, the resigning Delaware Trustee or the Advisor, acting with the consent of the Oversight Committee (which shall not be unreasonably withheld), may petition at the expense of the Secured Creditor Trust any court of competent jurisdiction for the appointment of a successor Delaware Trustee.  Such court may thereupon, after prescribing such notice, if any, as it may deem proper and prescribe, appoint a successor Delaware Trustee.

19

(b)      Any Trustee or Advisor may be removed by the Oversight Committee by giving written notice thereof to each remaining Trustee or Advisor, as the case may be, at their respective addresses as they appear in the records of the Trustee. Any such removal shall become effective on the day specified in such notice or upon the appointment of such Trustee's or Advisor's successor and such successor's acceptance of such appointment, whichever is earlier; provided, however, that any such removal of a Trustee who is the sole Delaware Trustee shall not become effective until a successor Delaware Trustee has been appointed and has accepted such appointment.  If no successor Delaware Trustee shall have been appointed and accepted its appointment as provided in this Section 10.2 within ninety (90) days after delivery of an instrument of removal in accordance with this Section 10.2, the Advisor, acting with the consent of the Oversight Committee (which shall not be unreasonably withheld), may petition at the expense of the Secured Creditor Trust any court of competent jurisdiction for the appointment of a successor Delaware Trustee.  Such court may thereupon, after prescribing such notice, if any, as it may deem proper and prescribe, appoint a successor Delaware Trustee.

10.3      *Appointment of Successor Trustee, Advisor or Oversight Committee Member*.  Should at any time a Trustee, Advisor or Oversight Committee member resign or be removed, die, become mentally incompetent or incapable of action (as determined by the Oversight Committee, in its sole discretion), or be adjudged bankrupt or insolvent, a vacancy shall be deemed to exist and a successor may be appointed by the Advisor, acting with the consent of the Oversight Committee (if a member of the Oversight Committee is then serving).  If at any time there shall be no Advisor of this Secured Creditor Trust for any reason, the Oversight Committee may appoint a successor Advisor.  If at any time there shall be no member of the Oversight Committee of this Secured Creditor Trust for any reason, the Advisor or, if no Advisor is then serving, a majority of the Beneficiaries may appoint a successor member of the Oversight Committee.  Pending the appointment of a successor Trustee, Advisor or member of the Oversight Committee, the remaining Trustees, Advisors or members of the Oversight Committee then serving, as the case may be, if any, may take any action in the manner set forth in Section 8.1 of this Agreement.

10.4      *Acceptance of Appointment by Successor Trustee, Advisor or Oversight Committee Member*.  Any successor Trustee, Advisor or Oversight Committee member appointed hereunder shall execute an instrument accepting such appointment hereunder and shall deliver a counterpart thereof to each other Trustee, Advisor and Oversight Committee member and, in case of a resignation, to the retiring Trustee, Advisor or Oversight Committee member, as the case may be.  Thereupon such successor Trustee, Advisor or Oversight Committee member shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Secured Creditor Trust hereunder with like effect as if originally named herein; provided, however, that a retiring Trustee, Advisor or Oversight Committee member shall, when requested in writing by a successor Trustee, Advisor or Oversight Committee member or by the remaining Trustees, Advisors or Oversight Committee members, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee, Advisor or Oversight Committee member, all the estates, properties,

rights, powers and trusts of such retiring Trustee, Advisor or Oversight Committee member, and shall duly assign, transfer and deliver to such successor Trustee, Advisor or Oversight Committee member all property and money held by it hereunder.

10.5     _Bonds_.  Unless a bond is required by law, no bond shall be required of any original Trustee, Advisor or Oversight Committee member hereunder. Unless required by a majority vote of the Trustees, Advisors or Oversight Committee members prior to a successor Trustee's, Advisor's or Oversight Committee member's acceptance of an appointment as such pursuant to Sections 10.2 and 10.4, as applicable, or unless a bond is required by law and such requirement cannot be waived by or with approval of the Beneficiaries, no bond shall be required of any successor Trustee, Advisor or Oversight Committee member hereunder.  If a bond is required by law, no surety or security with respect to such bond shall be required unless required by law and such requirement cannot be waived by or with approval of the Beneficiaries.  If a bond is required by a majority vote of the Trustees, Advisors or Oversight Committee members, the Trustees,  Advisors or Oversight Committee members, as the case may be, shall determine whether, and to what extent, a surety or security with respect to such bond shall be required.

10.6     _Directions in Writing_.  Notwithstanding any other provision of this Agreement, any direction required or permitted to be made to a Trustee or any consent required or permitted to be given to an Advisor under the terms of this Agreement shall be delivered to the Trustee or Advisor, as the case may be, in writing.

10.7     _Rules Governing Advisor_.  The initial Advisor, acting with the consent of the Oversight Committee, shall establish internal rules of operation for the Advisor, including the manner in which decisions shall be made.  The Advisor shall promptly inform the Trustee and the Oversight Committee, in writing, of its initial rules and any changes thereto.

10.8     _Rules Governing Oversight Committee_

The initial member of the Oversight Committee shall establish internal rules of operation for the Oversight Committee, including the manner in which decisions shall be made. The Oversight Committee shall promptly inform the Advisor, in writing, of its initial rules and any changes thereto.

ARTICLE XI

CONCERNING THE BENEFICIARIES

11.1     _Evidence of Action by Beneficiaries_.  Whenever in this Agreement it is provided that the Beneficiaries may take any action (including the making of any demand or request, the giving of any notice, consent, or waiver, the appointment of a successor member of the Oversight Committee, or the taking of any other action), the fact that the Beneficiaries have taken such action shall be evidenced by an instrument or any

21

number of instruments of similar tenor executed by the Beneficiaries in person or by their agent or attorney appointed in writing.

11.2   _Limitation on Suits by Beneficiaries_.   No Beneficiary shall have any right by virtue of any provision of this Agreement to institute any action or proceeding at law or in equity against any party other than the Trustee, Advisor or Oversight Committee upon or under or with respect to the Secured Creditor Trust estate or the agreements relating to or forming part of the Secured Creditor Trust estate, and the Beneficiaries do hereby waive any such right, unless the Beneficiaries shall have made written request upon the Advisor, acting with the consent of the Oversight Committee, to direct the Trustee to institute such action or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee reasonable indemnity against the costs and expenses to be incurred therein or thereby, and (i) the Advisor for thirty (30) days after its receipt of such notice and request shall have unreasonably failed to direct the Trustee to institute any such action or proceeding (including any such unreasonably failure attributable to the Oversight Committee's unreasonable failure to consent to such action) or (ii) the Trustee for thirty (30) days after its receipt of such direction shall have failed to institute any such action or proceeding.

11.3   _Requirement of Undertaking_.   The Trustee, the Advisor or the Oversight Committee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee, the Advisor or the Oversight Committee for any action taken or omitted by it as Trustee, Advisor or Oversight Committee, as the case may be, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided, however, that the provisions of this Section shall not apply to any suit by the Trustee.

## ARTICLE XII

## AMENDMENTS

12.1    _Amendment of Agreement_.  This Agreement may be amended from time to time by the Trustee, at the direction of the Advisor, acting with the consent of the Oversight Committee, to better give effect to the purposes of this Agreement (including to satisfy the requirements of the Internal Revenue Code and Treasury Regulations thereunder with respect to liquidating trusts and grantor trusts), provided such amendment does not result in the material alteration of beneficial interests of the Beneficiaries; provided further that no such amendment shall impose any obligations, financial or otherwise on the Debtors, Liquidating Debtors, or the GUC Trust, or violate any provision of the Plan or Confirmation Order.  Any amendment of this Agreement pursuant to this Section 12.1 shall be made by a written declaration of such amendment executed by the Trustee.

12.2    _Notice and Effect of Amendment_.  Promptly after the execution by the Trustee of any such declaration of amendment, the Trustee shall give notice of the substance of such amendment to the Debtors or the Liquidating Debtors (as applicable), the Second Lien Agent and to the Beneficiaries or, in lieu thereof, the Trustee may send a copy of the amendment to the Debtors or the Liquidating Debtors (as applicable), the Second Lien Agent, and to each Beneficiary.  Upon the execution of any such declaration of amendment by the Trustee, this Agreement shall be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties, and immunities of the Trustee, the Advisor, the Oversight Committee, the Second Lien Agent and the Beneficiaries under this Agreement shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modification and amendments, and all the terms and conditions of any such amendment shall be thereby deemed to be part of the terms and conditions of this Agreement for any and all purposes.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1    _Filing Documents_.  This Agreement shall be filed or recorded in such office or offices as the Trustee may determine to be necessary or desirable or as the Advisor, acting with the consent of the Oversight Committee, shall direct.  A copy of this Agreement and all amendments hereto shall be maintained in the offices of  the Advisor (or any successor Advisor) and shall be available at all times during regular business hours for inspection by the Second Lien Agent or by any Beneficiary or their respective duly authorized representatives.

13.2    _Intention of Parties to Establish Trust_.  This Agreement is not intended to create and shall not be interpreted as creating a corporation, association, partnership, or joint venture of any kind for purposes of federal income taxation or for

934155.02A-CHISR01A - MSW

any other purpose.  This Agreement is intended to create a trust, and the Secured Creditor Trust created hereunder shall be governed and construed in all respects as a trust.

13.3    _Governing Law_.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  The Debtors, the Trustee, the Advisor, the Oversight Committee and the Beneficiaries consent and agree that this Agreement shall be governed by and construed in accordance with such laws.

13.4    _Severability_.  In the event any provision of this Agreement or the application thereof to any Person or circumstances shall be finally determined by a court of proper jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

13.5    _Notices_.  Any notice or other communication by the Trustee or the Advisor to the Second Lien Agent or to any Beneficiary shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Second Lien Agent or such Beneficiary, as the case may be, at its address as shown in the records of the Secured Creditor Trust.

All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, by any form of public or private mail or courier, or by fax, email or other electronic means to the Trustee, the Advisor, the Debtors, the Liquidating Debtors, or the Oversight Committee, as the case may be, at the following addresses or at such other addresses as shall be specified by the Trustee, the Advisor, the Debtors, the Liquidating Debtors,  or the Oversight Committee by like notice:

**If to the Trustee**


Wilmington Trust Company
Attn: Institutional Client Services
Rodney Square North
1100 North Market Street
Wilmington, DE  19890

with a copy to:

Pepper Hamilton LLP
Attn: David M. Fournier and John H. Schanne II
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19801

24

**If to the Advisor**

Clingman & Hanger Management Associates, LLC
Attn: W. Edward Clingman, Jr. and Teresa S. Hanger
880 Technology Park Drive
Glen Allen, VA 23059

with a copy to:

Pepper Hamilton LLP
Attn: David M. Fournier and John H. Schanne II
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19801

**If to Silver Point Finance, LLC**


Silver Point Finance, LLC
Attn: Anthony J. DiNello
2 Greenwich Plaza
Greenwich, CT 06380


**If to the Debtors (before the Effective Date):**

WilliamsMarston LLC
Attn:  Landen C. Williams
16th Floor
800 Boylston Street
Boston, MA 02199

With a copy to:

Gibson, Dunn & Crutcher LLP
Attn:  Michael A. Rosenthal and Jeremy L. Graves
200 Park Avenue, Suite 4700
New York, New York 10166-0193

**If to the Liquidating Debtors (after the Effective Date):**


EisnerAmper LLP
Attn: Anthony R. Calascibetta
111 Wood Avenue South
Iselin, NJ 08830-2700

With a copy to:

Lowenstein Sandler LLP
Attn:  Sharon Levine, Wojciech F. Jung, and Andrew Behlmann
65 Livingston Avenue
Roseland, NJ 07068


      13.6    *Interpretation*. All paragraph and section headings and captions herein are used for reference only and in no way limit or describe the scope or intent of, or in any way affect, this Agreement.

      (b)     Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular.  All pronouns and variations of a

934155.02A-CHISR01A - MSW

pronoun in this Agreement will be deemed to refer to the feminine, masculine, or neuter, and to the singular or plural, as the identity of the Person or Persons referred to may require.

13.7     *Counterparts*.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, each of the Debtors has caused this Agreement to be executed by an authorized signatory, and each of the Trustee, the Advisor and the Oversight Committee member herein has executed this Agreement, as Trustee, Advisor or Oversight Committee member, as the case may be, and not in its individual capacity, this [•] day of November, 2015.


**[SIGNATURES]**

**Exhibit 4**

**Execution Version**

# STANDARD REGISTER COMPANY GENERAL
## UNSECURED CREDITORS' GUC TRUST AGREEMENT

This *Standard Register Company General Unsecured Creditors' GUC Trust Agreement* (the "GUC Trust Agreement") dated as of July 31, 2015, is entered into by and between The Standard Register Company, Standard Register Holding Company, Standard Register Technologies, Inc., Standard Register International, Inc., iMedConsent, LLC, Standard Register of Puerto Rico Inc., Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de México, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V. and Standard Register Technologies Canada ULC (collectively, the "Settlor" or "Debtors"), on the one hand, and EisnerAmper LLP (the "GUC Trustee") and Anthony R. Calascibetta as the authorized representative of the GUC Trustee, on the other hand, for the benefit of the Beneficiaries (defined below) pursuant to the terms of the *Settlement Agreement Among Debtors, Silver Point Finance, LLC & Official Committee Of Unsecured Creditors* attached as Exhibit A to the *Notice of Filing of Settlement Agreement* [D.I. 696] (the "Settlement"), which Settlement was approved by the *Order (I) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests; (II) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (III) Granting Certain Related Relief* dated June 19, 2015 [D.I. 698] (the "Sale and Settlement Order") entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the jointly administered Chapter 11 cases captioned *In re The Standard Register Company, et al.*, Case No. 15-10541 (BLS) (collectively, the "Chapter 11 Cases").

**WITNESSETH**

**WHEREAS**, the GUC Trust (defined below) is created pursuant to, and to effectuate, the Settlement and the Sale and Settlement Order; and

**WHEREAS**, the GUC Trust is created on behalf, and for the sole benefit, of the Beneficiaries pursuant to the Settlement and the Sale and Settlement Order; and

**WHEREAS**, the GUC Trust is established as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d) for the sole purpose of collecting, liquidating, and distributing the Net Proceeds in an expeditious and orderly manner for the benefit of the Beneficiaries in accordance with the terms of this GUC Trust Agreement and the Settlement with no objective to continue or engage in the conduct of a trade or business; and

**WHEREAS**, the GUC Trust is intended to qualify and be treated as a grantor trust for U.S. federal income tax purposes pursuant to Sections 671 through 677 of the Internal Revenue Code of 1986 (as amended, the "<u>Tax Code</u>"); and

**WHEREAS**, pursuant to the Settlement and this GUC Trust Agreement, the Settlor, the GUC Trustee and the Beneficiaries are required to treat the transfer of the Distributable Assets to the GUC Trust, for all U.S. federal income tax purposes, as a transfer of the Distributable Assets by the Settlor to the Beneficiaries in satisfaction of their Allowed Claims followed by a transfer of the Distributable Assets by the Beneficiaries to the GUC Trust in exchange for their beneficial interests herein, and to treat the Beneficiaries as the grantors and owners of the GUC Trust in accordance with Treasury Regulation section 301.7701-4; and

**NOW**, **THEREFORE**, in consideration of the promises and the mutual covenants contained herein and in the Settlement, the Settlor and the GUC Trustee agree as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATIONS

1.1     Definitions.

1.1.1    "Allowed Claim"   means a General Unsecured Claim (or any portion thereof) (a) that has been allowed by a Final Order of the Bankruptcy Court (or such court as the Debtors (or successor estate representative), the GUC Trustee and the holder of any such claim agree may adjudicate such claim and any objections thereto), or (b) that either (x) has been scheduled as a liquidated, non-contingent, and undisputed claim in an amount greater than zero on the Debtors' schedules, or (y) is the subject of a timely filed proof of claim as to which either (i) no objection to its allowance has been filed (either by way of objection or amendment to the schedules) within the periods of limitation fixed by the Bankruptcy Code or by any Final Order of the Bankruptcy Court or (ii) any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order *provided*, *however*, that for purposes of determining the status of a particular claim, any such claim which has not been previously allowed or disallowed by a Final Order of the Bankruptcy Court shall be deemed a Disputed Claim unless such claim is specifically identified by the Debtors (or successor estate representative) and/or the GUC Trustee as being an Allowed Claim.

1.1.2    "Assets" means the Distributable Assets and the GUC Trust Seed Funding Amount.

1.1.3    "Available GUC Trust Cash" means the gross proceeds generated through the liquidation and monetization of Distributable Assets or any portion thereof, less (a) charges, costs and expenses that are rightly deducted and attributable to the liquidation and monetization of the Distributable Assets including, but not limited to, all costs, expenses, and obligations incurred by the GUC Trust and GUC Trustee (or professionals who may be employed by the

GUC Trustee in administering the GUC Trust) in carrying out the obligations and responsibilities under this GUC Trust Agreement and the Settlement; *provided*, *however*, no such fees shall be paid from the GUC Cash Payment; and (b) the Disputed Claims Reserve.

       1.1.4   "Beneficiaries" means the General Unsecured Creditors whether their claims are Allowed before or after the Effective Date.

       1.1.5   "Claims" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

       1.1.6   "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

       1.1.7   "D&O Claims" has the meaning ascribed to it in the Settlement.

       1.1.8   "Disallowed Claim" means a General Unsecured Claim that is disallowed by Final Order or agreement between the Debtors and/or GUC Trustee and the applicable claimant.

       1.1.9   "Disputed Claims Reserve" means cash in an amount equal to the Distributions which would have been made to Beneficiaries on account of Disputed Claims if such claims were Allowed or such other amount as may be ordered by the Bankruptcy Court.

       1.1.10   "Disputed Claims" means the General Unsecured Claims that are not Allowed Claims or Disallowed Claims.

       1.1.11   "Distributable Assets" means the assets (and proceeds thereof) transferred to and vested in the GUC Trust on the Effective Date (as defined below) or subsequent thereto that are available for Distribution, which assets are comprised of the GUC Cash Payment, the D&O Claims, the Sharing Payment (as defined in the Settlement), and any other funds or assets

that are available for the benefit of General Unsecured Creditors and are subsequently transferred to the GUC Trust by the Settlor.

     1.1.12 "<u>Distribution</u>" means a distribution of property to a Beneficiary in accordance with this GUC Trust Agreement.

     1.1.13 "<u>Distribution Date</u>" means any date on which Distributions are made in accordance with this GUC Trust Agreement.

     1.1.14 "<u>Encumbrances</u>" means rights, Liens, Claims, liabilities, interests, or other encumbrances of any kind, whether direct, residual, contingent or otherwise.

     1.1.15 "<u>Entity</u>" has the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

     1.1.16 "<u>Final Order</u>" means an order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed, such appeal has been resolved by a Final Order or agreement of all the parties to such appeal.

     1.1.17 "<u>General Unsecured Claim</u>" means a general unsecured claim filed or scheduled against any of the Debtors.

     1.1.18 "<u>General Unsecured Creditor</u>" means a holder of an Allowed Claim.

     1.1.19 "<u>GUC Cash Payment</u>" has the meaning ascribed to it in the Settlement, which payment the GUC Trustee shall receive on the Effective Date and deposit into a separate and segregated account to be used solely and exclusively to make Distributions to the Beneficiaries.

     1.1.20 "<u>GUC Trust</u>" means the liquidating trust established pursuant to the terms of this GUC Trust Agreement, the Settlement, and the Sale and Settlement Order.

1.1.21 "GUC Trustee" means (a) initially, the person or corporation defined as the "GUC Trustee" above, and (b) any successors or replacements duly appointed under the terms of this GUC Trust Agreement, and is the person referred to as the "GUC Trustee" in the Settlement.

1.1.22 "GUC Trust Oversight Committee" means those members of the Creditors' Committee who agree to serve as members of the GUC Trust Oversight Committee. The initial members of the GUC Trust Oversight Committee shall be all of the current members of the Creditors' Committee.

1.1.23 "GUC Trust Agreement" means this *The Standard Register Company General Unsecured Creditors' GUC Trust Agreement*.

1.1.24 "GUC Trust Seed Funding Amount" has the meaning ascribed to it in the Settlement.

1.1.25 "Lien" has the meaning ascribed to it in section 101(37) of the Bankruptcy Code.

1.1.26 "Net Proceeds" shall mean cash Distributable Assets of the GUC Trust net of all reserves, costs, fees, and expenses of the GUC Trust and GUC Trustee.

1.1.27 "Permitted Investments" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Bankruptcy Court may approve from time to time, or (d) demand deposits, money market account, or certificates of deposit at any bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000, *provided*, *however*, that

the scope of any Permitted Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, and to the investment guidelines of section 345 of the Bankruptcy Code, *provided*, *further*, *however*, the requirement of complying with the investment guidelines of section 345 of the Bankruptcy Code may be waived by the GUC Trustee with the approval of the GUC Trust Advisory Board.

1.1.28  "Standing Order" means the Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates [D.I. 648].

1.2   Use of Settlement Definitions.  All terms which are used in this GUC Trust Agreement but not defined herein shall have the meaning set forth in the Settlement or Sale and Settlement Order.

1.3   Headings; Interpretation.  The headings in this GUC Trust Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this GUC Trust Agreement.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

1.4   Particular Words.  Reference in this GUC Trust Agreement to any Section or Article is, unless otherwise specified, to that Section or Article under this GUC Trust Agreement. The words "hereof," "herein," "hereunder," and similar terms shall refer to this GUC Trust Agreement and not to any particular Section or Article of this GUC Trust Agreement.

## ARTICLE II

## DECLARATION OF TRUST

2.1    <u>Creation and Name</u>.    Pursuant to the Settlement and the Sale and Settlement Order, the Settlor hereby establishes and creates the GUC Trust, on behalf of, and for the benefit of the Beneficiaries as of the date hereof (the "<u>Effective Date</u>").    The GUC Trustee may conduct the affairs of the GUC Trust under the name "SRC Liquidating GUC Trust," and is the GUC Trust referred to as the "GUC Trust" in the Settlement.

2.2    <u>Purpose of GUC Trust</u>.    This GUC Trust Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a grantor trust.    The Settlor and the GUC Trustee, pursuant to the Settlement and Sale and Settlement Order hereby create the GUC Trust solely for the purpose of, liquidating and distribution the Distributable Assets in accordance with the terms of this GUC Trust Agreement, the Settlement and Sale and Settlement Order with no objective to continue or engage in the conduct of a trade or business.    The GUC Trustee shall engage only in activities reasonably necessary to, and consistent with the liquidating purpose of the GUC Trust including, but not limited to, (a) investigating and, if appropriate, pursuing, settling or abandoning causes of action, including but not limited to the D&O Claims not otherwise released under the Settlement, (b) administering and liquidating the Assets, (c) resolving all Disputed Claims and (d) making Distributions from the GUC Trust as provided for in the Settlement and this GUC Trust Agreement.    The activities of the GUC Trust shall be limited to those activities set forth in this GUC Trust Agreement.

2.3    <u>Transfer of Distributable Assets</u>.    Pursuant to the Settlement and the Sale and Settlement Order, the Settlor hereby grants, releases, assigns, conveys, transfers and delivers, on behalf of the Beneficiaries, all of the Settlor's rights, title and interest in the Distributable Assets

in trust for the benefit of the Beneficiaries, free and clear of all Encumbrances of all other Entities for the uses and purposes as specified in the Settlement and this GUC Trust Agreement, it being understood that the GUC Cash Payment shall only be used for Distributions to Beneficiaries.  For the avoidance of doubt, the costs and expenses of the GUC Trust shall be funded exclusively from the Assets, exclusive of the GUC Cash Payment.

2.4    Securities Law.  It is intended that the interests of the Beneficiaries in the GUC Trust and the entitlements hereunder (the "Beneficial Interests"), if any, of such Beneficiaries, shall not constitute "securities."   To the extent applicable and to the extent the Beneficial Interests or any entitlements of the Beneficiaries are deemed to be "securities," the issuance of the Beneficial Interests or the entitlements hereunder or under any Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code from Section 4(a)(2) of the Securities Act and any state and local laws requiring registration of securities.   If the GUC Trustee determines, with the advice of counsel, that the GUC Trust is required to comply with the registration and reporting requirements of the Securities Act of 1933, as amended, the Securities and Exchange Act of 1934, as amended (collectively, the "Securities Act), the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), or the Investment Company Act of 1940, as amended (the "Investment Company Act") , then the GUC Trustee shall take any and all actions to comply with such registration and reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.  Notwithstanding the foregoing, nothing contained herein shall be deemed to preclude the GUC Trustee from amending this GUC Trust Agreement to make such changes as are deemed necessary or appropriate by the GUC Trustee, with the advice of counsel, to ensure that the GUC Trust is not subject to registration and/or reporting requirement of the Securities Act, the Trust Indenture Act or the Investment Company Act,

provided that such amendments do not adversely affect the Distributions to be made under the terms of this GUC Trust Agreement.

2.5     <u>Appointment and Acceptance of GUC Trustee</u>.  The GUC Trustee accepts the GUC Trust created by this GUC Trust Agreement and the grant, assignment, transfer, conveyance, and delivery to the GUC Trustee, on behalf, and for the benefit, of the Beneficiaries, by the Debtors of all of their respective right, title, and interest in the Distributable Assets, upon and subject to the terms and conditions set forth in this GUC Trust Agreement, the Settlement and the Settlement Order and any subsequent order of the Bankruptcy Court that is consistent with the terms and purpose of the Settlement.

2.6     <u>Transfer of D&O Claims</u>.  The Debtors agree and authorize the GUC Trustee to (a) prosecute, settle, compromise and/or dismiss the claims authorized by the Standing Order, including the D&O Claims, on behalf of, and in the name of, the Debtors and their estates (b) be substituted as plaintiff for the Creditors' Committee in the adversary proceeding captioned *Official Committee of Unsecured Creditors of The Standard Register Company, et al. v. Silver Point Capital, L.P. et al.*, Adv. Proc. No. 15-50771 (BLS) (Bankr. D. Del.), as the same may be amended from time to time, including in accordance with the Settlement.  To the extent that Debtors or their estates receive any recovery from the prosecution of the D&O Claims, including, without limitation, from any applicable insurance provider, the Debtors agree to promptly turn such recovery over to the GUC Trust.

2.7     <u>No Reversion to Debtors or Others</u>.  The Distributable Assets shall be free and clear of all Encumbrances of the Debtors or any other Entity.

2.8     <u>Funding of the GUC Trust Seed Funding Amount</u>.  On the Effective Date, the Debtors shall advance the GUC Trust Seed Funding Amount to the GUC Trust as a loan.  The

GUC Trust shall repay the GUC Trust Seed Funding Amount without interest to the Debtors or their successors or assigns from either the GUC Trust Seed Funding Amount not used to pay costs and expenses of administering the GUC Trust and/or the Net Proceeds, if any, of the liquidation of the Distributable Assets (other than the GUC Cash Payment which shall be utilized exclusively for the payment of Distributions to Beneficiaries).  Except for the obligation of the GUC Trust to repay the GUC Trust Seed Funding Amount as set forth this Section 2.8, the GUC Trust Seed Funding Amount shall be free and clear of all Encumbrances of the Debtors or any other Entity.

## ARTICLE III

## ADMINISTRATION OF THE GUC TRUST

3.1     <u>Rights, Powers, and Privileges</u>.  The GUC Trustee shall have only the rights, powers and privileges expressly provided in this GUC Trust Agreement and in any order of the Bankruptcy Court that is not, absent the consent of the GUC Trustee, inconsistent with the terms and purpose of the Settlement and GUC Trust Agreement.  Subject to the terms of this GUC Trust Agreement, GUC Trustee shall have the power to take the actions specified in this Section 3.1 and any actions reasonably incidental thereto, which the GUC Trustee reasonably determines to be necessary or appropriate to fulfill the purpose of the GUC Trust, including but not limited to:

A.      exercise all power and authority that may be necessary to implement the Settlement on behalf of the GUC Trust and enforce all provisions thereof;

B.      open and maintain bank accounts, make Distributions and take other actions consistent with the Settlement and this GUC Trust Agreement, including the maintenance of appropriate reserves (including the Disputed Claim Reserve), in the name of the GUC Trust;

C.      maintain the books and records of the GUC Trust, including any books and records of the Debtors transferred to the GUC Trust;

D.      incur and pay reasonable and necessary expenses in connection with the implementation and consummation of the Settlement;

E.      make decisions without court approval, regarding the retention or engagement of professionals or other Entities, and to pay, without court approval, all reasonable fees and expenses of the GUC Trust accruing from and after the Effective Date;

F.      collect and liquidate all Assets transferred or to be transferred to the GUC Trust;

G.      prepare and file tax returns and related forms and filings on behalf of the GUC Trust;

H.      investigate, prosecute and/or settle or abandon causes of action, including but not limited to the D&O Claims, not otherwise released pursuant to the Settlement and transferred to the GUC Trust;

I.      seek a determination of tax liability under section 505 of the Bankruptcy Code or otherwise and to pay, or cause to be paid, from the Assets any taxes incurred by the GUC Trustee on or after the Effective Date;

J.      invest, or cause to be invested, cash as deemed appropriate by the GUC Trustee, provided, however, such investments shall be Permitted Investments;

K.      enter, or cause to be entered, into any agreement or execute any document required by or consistent with this GUC Trust Agreement and the Settlement;

L.      abandon, or cause to be abandoned, in any commercially reasonable manner any Distributable Assets that the GUC Trustee reasonably concludes are burdensome or of inconsequential value and benefit to the GUC Trust without any need for Bankruptcy Court approval;

M.      prepare and file post-Effective Date operating reports as set forth in this GUC Trust Agreement;

N.      take all other actions not inconsistent with the provisions of this GUC Trust Agreement and the Settlement which the GUC Trustee deems reasonably necessary or desirable in connection with the administration and consummation of the GUC Trust and Settlement; and

O.      exercise such other powers as may be vested in the GUC Trustee, consistent with the intent and purpose of the GUC Trust Agreement and Settlement, by order of the Bankruptcy Court.

3.2   <u>Transfer of Privileges</u>.   On the Effective Date, the Debtors shall be deemed to transfer to the GUC Trustee the Debtors' evidentiary privileges, including the attorney/client privilege, that relate solely to the Distributable Assets transferred to the GUC Trust.  From and after such transfer, the Debtors and their Estates shall have no further rights or obligations with respect thereto.   Such privileged communications may be shared among the GUC Trustee, attorneys, financial advisors, accountants or other professionals and employees as the GUC Trustee and the GUC Trust Oversight Committee without compromising the privileged nature of such communications, in accordance with the "joint interest" doctrine.

3.3   <u>Agents and Professionals</u>.   The GUC Trustee may, but shall not be required to, consult with and retain Lowenstein Sandler LLP, Zolfo Cooper LLC and such other attorneys, disbursing agent, financial advisors, accountants or other professionals and employees as the GUC Trustee deems appropriate in the reasonable exercise of its discretion, and who the GUC Trustee reasonably determines to have qualifications necessary to assist the GUC Trustee in the proper administration of the GUC Trust after consultation with the GUC Trust Oversight Committee.  Subject to Section 7.9 of this GUC Trust Agreement, the GUC Trustee may pay the reasonable fees, costs and expenses of such persons out of the Assets (excluding the GUC Cash Payment) in the ordinary course of business and, except as set forth below, without any further notice to any party or action, order or approval of the Bankruptcy Court.  The GUC Trustee may retain professionals who previously were employed by the Creditors' Committee or the Debtors. Professionals retained by the GUC Trustee shall receive compensation and reimbursement of expenses in a manner to be determined by the GUC Trustee, after consultation with the GUC Trust Oversight Committee, and in accordance with the payment procedures set forth in Section 7.9 of this GUC Trust Agreement.

3.4    <u>Safekeeping of Distributable Assets.</u>    All Distributable Assets shall, until distributed as provided herein, be held in trust for the benefit of the Beneficiaries in accordance with the Settlement and this GUC Trust Agreement.  The GUC Trustee shall be under no liability for interest or producing income on any Distributable Assets received by it hereunder and held for Distribution to the Beneficiaries, except as such interest or income shall actually be received by the GUC Trustee.

3.5    <u>Fiduciary Duties of the GUC Trustee.</u>  The GUC Trustee shall act in a fiduciary capacity on behalf of the interests of all Beneficiaries who are entitled to receive Distributions pursuant to the terms of the Settlement and this GUC Trust Agreement.

3.6    <u>Limitations on GUC Trustee.</u>  The GUC Trustee shall not at any time, on behalf of the GUC Trust or Beneficiaries, enter into or engage in any trade or business, and no part of the Assets, revenue, or income therefrom shall be used or disposed of by the GUC Trust in furtherance of any trade or business.  The GUC Trustee shall not pursue, commence or settle any cause of action, including but not limited to the D&O Claims not otherwise released pursuant to the Settlement without the prior consent of the GUC Trust Oversight Committee.

3.7    <u>Other Activities.</u>  Any individual serving as the GUC Trustee, other than in his or her individual capacity as such, shall be entitled to perform services for and be employed by third parties, *provided, however*, that such performance or employment affords such individual sufficient time to carry out his or her responsibilities as the GUC Trustee.  In addition, the GUC Trustee shall not be prohibited from engaging in any trade or business on its own account, provided that such activity does not interfere or conflict with the GUC Trustee's administration of the GUC Trust.

3.8     Investments.  The GUC Trustee may only invest funds held in the GUC Trust in Permitted Investments and, provided that the GUC Trustee does so, it shall have no liability in the event of insolvency of any institution in which the GUC Trustee has invested any of the Assets or any proceeds, revenue, or income therefrom.  The GUC Trustee may expend the cash of the GUC Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets during liquidation, (b) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the GUC Trust) and (c) to satisfy other liabilities incurred by the GUC Trust in accordance with the Settlement and this GUC Trust Agreement (including, without limitation, the payment of any taxes), provided, however, the GUC Cash Payment shall be used exclusively to make Distributions to Beneficiaries.

3.9     GUC Trustee Action.  The GUC Trustee shall hold, collect, conserve, protect and administer the GUC Trust in accordance with the provisions of this GUC Trust Agreement and the Settlement, and pay and distribute amounts as set forth herein for the purposes set forth in this GUC Trust Agreement.  The GUC Trustee shall exercise its business judgment for the benefit of the Beneficiaries in order to maximize the value of the Assets and Distributions, giving due regard to the cost, risk, and delay of any course of action.  Any good faith determination by the GUC Trustee as to what actions are in the best interests of the GUC Trust shall be determinative.

3.10    Bankruptcy Court Approval of GUC Trustee Actions.  Except as provided in this GUC Trust Agreement, the GUC Trustee need not seek or obtain an order or approval of the Bankruptcy Court or any other court in the exercise of any power, rights, or discretion conferred hereunder, or account to the Bankruptcy Court or any other court.  Notwithstanding the foregoing in this Section 3.10, the GUC Trustee may submit to the Bankruptcy Court any matter

-15-

regarding which the GUC Trustee may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the GUC Trustee with respect to the Assets, the GUC Trust, the GUC Trust Agreement, the Settlement, or the Debtors, including the administration and Distribution of the Assets.  The Bankruptcy Court shall retain jurisdiction for such purposes and shall approve or disapprove any such proposed action upon a motion filed by the GUC Trustee.  In addition, the GUC Trustee shall have the authority, but not the obligation, to seek Bankruptcy Court approval to sell any Asset free and clear of any and all Encumbrances (to the extent any Asset is not already free and clear of any all such Encumbrances).

3.11    GUC Trust Oversight Committee.    Members of the GUC Trust Oversight Committee shall serve without compensation, provided, however, members of the GUC Trust Oversight Committee shall be entitled to reimbursement from the GUC Trust for their reasonable and necessary out of pocket expenses incurred in connection with their service as members of the GUC Trust Oversight Committee.

3.12    GUC Trust Oversight Committee.    The GUC Trust Oversight Committee shall be established on the Effective Date and will remain and continue in full force and effect until the GUC Trust is dissolved in accordance with the terms of this GUC Trust Agreement.  The GUC Trust Oversight Committee shall have the rights and obligations set forth in this GUC Trust Agreement.  In all circumstances, the GUC Trust Oversight Committee shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the GUC Trust. Notwithstanding anything contained in this GUC Trust Agreement, the GUC Trust Oversight Committee shall not take any action which will cause the GUC Trust to fail to qualify as a "liquidating trust" for U.S. federal income tax purposes.

3.13   <u>GUC Trust Oversight Committee Tenure and Replacement.</u>   Each member of the GUC Trust Oversight Committee will serve until death, incapacitation or resignation.  A member of the GUC Trust Oversight Committee may resign at any time by providing a written notice of resignation to the GUC Trustee and remaining members of the GUC Trust Oversight Committee. Upon the resignation, death or incapacity of a GUC Trust Oversight Committee member, a successor member may, but shall not be required to, be appointed by a majority of the remaining members of the GUC Trust Oversight Committee.

3.14   <u>GUC Trust Oversight Committee Action.</u>   Except as may otherwise be provided herein, a majority of the members of the GUC Trust Oversight Committee shall constitute a quorum for any action by the GUC Trust Oversight Committee, and the act of a majority of those present at any meeting at which a quorum is present, shall be the act of the GUC Trust Oversight Committee.  In the event of a tie vote, the GUC Trustee shall be deemed a voting member for the sole purpose of breaking any such tie vote of the GUC Trust Oversight Committee.  Any or all members of the GUC Trust Oversight Committee may participate in a regular or special meeting by use of telephone, or similar communications equipment by means of which all persons participating in the meeting may hear each other.  The GUC Trust Oversight Committee may adopt, by majority vote of all members, by-laws or other rules of procedure that are not inconsistent with the terms of this GUC Trust Agreement.  Notwithstanding anything contained in this section 3.14, a GUC Trust Oversight Committee member shall be recused from the GUC Trust Oversights Committee's deliberations and votes on any matters as to which such member has a conflicting interest as determined by both the GUC Trustee and the other members of the GUC Trust Oversight Committee.

3.15 <u>GUC Trust Oversight Committee Action Without a Meeting</u>.  Any action required or permitted to be taken by the GUC Trust Oversight Committee may be taken without a meeting if the action is taken by unanimous written consent, as evidenced by one or more written consents describing the action taken, signed by the members of the GUC Trust Oversight Committee or by such other procedures as may be agreed upon by a majority of the GUC Trust Oversight Committee, including negative notice procedures.

3.16 <u>Periodic Consultation with GUC Trust Oversight Committee</u>.  In addition to any other consultation and reporting requirements set forth in this GUC Trust Agreement, the GUC Trustee shall report and consult with the GUC Trust Oversight Committee at its discretion or as reasonably requested by the GUC Trust Oversight Committee or any member thereof concerning the status and administration of the GUC Trust and the Assets.

3.17 <u>Insurance</u>.  The GUC Trustee may use Assets (other than the GUC Cash Payment) in the GUC Trustee's reasonable business judgment to maintain customary insurance coverage, if available, for the protection of the Assets.  The GUC Trustee shall obtain insurance coverage with respect to the liabilities and obligations of the GUC Trustee and the GUC Trust Oversight Committee (in the form of an errors and omissions policy or otherwise) unless both the GUC Trustee and Liquidating GUC Trust Oversight Committee unanimously agree that such insurance shall not be required.

3.18 <u>Confidentiality</u>.  Any GUC Trustee and members of the GUC Trust Oversight Committee shall, during the period that they serve in such capacity under this GUC Trust Agreement, after removal, incapacitation or resignation, and after dissolution of the GUC Trust, hold strictly confidential and not use for personal gain any material, non-public information of or

pertaining to any Entity to which any of the Assets relates or which it has become aware of in its capacity as GUC Trustee or GUC Trust Oversight Committee member.

## ARTICLE IV

## DISTRIBUTIONS FROM THE GUC TRUST

4.1   <u>Distributions</u>.  Except as provided herein, Distributions of Available GUC Trust Cash shall be made to Beneficiaries on a *pro rata* basis, no less frequently than once annually, such period to be measured from the Effective Date *provided*, *however*, that the GUC Trustee may, after consultation with the GUC Trust Oversight Committee (i) defer a Distribution to the next Distribution Date if the GUC Trustee determines, in the reasonable exercise of the GUC Trustee's discretion, that the amount available for Distribution at such time is insufficient to justify the cost of effecting the Distribution (ii) make more frequent Distributions if the GUC Trustee determines that such interim distributions are warranted and economical; *provided*, *however*, that the GUC Trustee may, in the reasonable exercise of the GUC Trustee's discretion, cause the GUC Trust to retain an amount of Available GUC Trust Cash reasonably necessary to maintain the value of the Assets or to meet GUC Trust liabilities, including maintenance of the Disputed Claims Reserve, and withhold such cash from Distributions to Beneficiaries.  The GUC Trustee shall not make any Distributions of Assets to the Beneficiaries unless the GUC Trustee retains and reserves in the Disputed Claims Reserve such amounts as are reasonably necessary to satisfy amounts that would have been distributed in accordance with this Article IV in respect of Disputed Claims if the Disputed Claims were determined to be Allowed Claims immediately prior to such proposed Distribution to the Beneficiaries. The GUC Trustee shall not make any Distributions to Beneficiaries unless and until the GUC Trust Seed Funding Amount is repaid to the Debtors in accordance with Section 2.8 hereof, *provided, however*, the GUC Trustee may

distribute the GUC Cash Payment to the Beneficiaries prior to the repayment of the GUC Trust Seed Funding Amount.

4.2     Location of Distributions.  Distributions to the Beneficiaries shall be made (a) at the addresses set forth on the claims register maintained in the Chapter 11 Cases or (b) at the addresses set forth in any written notices of address changes delivered to the GUC Trustee after the Effective Date.  The GUC Trustee shall have no obligation to make any effort to determine the correct address of any Beneficiary.

4.3     No Interest on Claims.   Interest shall not accrue on any claims held by the Beneficiaries.

4.4     Fractional Dollars; De Minimis Distributions.  The GUC Trustee shall (a) not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with fractions equal to or greater than half a dollar being rounded up, and fractions less than half a dollar rounded down; and (b) have no duty to make a Distribution on account of any Allowed Claim on a Distribution Date (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $1,000,000.00, in which case such Distributions shall be deferred to the next Distribution Date or (ii) if the amount to be distributed to a Beneficiary on a particular Distribution Date is less than $50.00, in which case such Distribution shall be deferred to the next Distribution Date (unless such Distribution is the final Distribution to a Beneficiary, in which case such Distribution shall revert to the GUC Trust to be reallocated and distributed to the remaining Beneficiaries).  After final Distributions have been made in accordance with the terms of this GUC Trust Agreement, if the amount held by the GUC Trust becomes, in the sole

discretion of the GUC Trustee, after consultation with the GUC Trust Advisory Committee, too small to cost-effectively make further distributions, the GUC Trustee may make a charitable donation of the funds to a charitable institution to be selected by the GUC Trustee.

4.5   <u>Compliance with Tax Requirements</u>.   The GUC Trustee shall be authorized to require each Beneficiary to provide it with a current executed Form W-9, W-8, or similar tax form as a condition precedent to being sent a Distribution.   The GUC Trustee shall provide advance written notice of any such requirement to each Beneficiary affected thereby.   The notice shall provide each Beneficiary with a minimum of 60 days after the date of mailing of such notice to provide a current executed Form W-9, W-8, or similar tax form to the GUC Trustee and shall expressly state that a failure to provide such form within the stated period shall result in a forfeiture of the right to receive any Distribution, that any such Distribution shall revert to the GUC Trust for distribution on account of other Allowed Claims and that the claim of the Beneficiary originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.   If a Beneficiary does not provide the GUC Trustee with a current executed Form W-9, W-8 or similar tax form within the time period specified in such notice, or such later time period agreed to by the GUC Trustee in writing in its discretion, such Beneficiary shall be deemed to have forfeited the right to receive any Distribution, any such Distribution shall revert to the GUC Trust for distribution to other Beneficiaries and the claim originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

4.6   <u>Distributions After Allowance or Disallowance of a Disputed Claim</u>.   At the GUC Trustee's reasonable discretion, within 30 days of a Disputed Claim becoming an Allowed Claim, or on the next Distribution Date after the Disputed Claim becomes an Allowed Claim, the

GUC Trustee shall distribute to the Beneficiary thereof, from the Disputed Claims Reserve, such amount of Available GUC Trust Cash as would have been distributed to such Beneficiary if its claim had been an Allowed Claim on the Effective Date.

4.7     Undeliverable Distributions and Unclaimed Property.  If the Distribution to any Beneficiary is returned as undeliverable, no additional Distributions shall be made to such Beneficiary unless and until the GUC Trustee is notified in writing of such Beneficiaries' then-current address, at which time such Distribution shall be made without interest, *provided, however*, that unless a Beneficiary asserts a claim for an undeliverable Distribution within 120 days after such Distribution is returned undelivered such Distribution shall be deemed unclaimed property and all title to and beneficial interest in the Assets represented by any such undeliverable Distributions shall be cancelled and revert to and/or remain in the GUC Trust automatically and without need for further order by the Bankruptcy Court (notwithstanding any applicable federal, state or other escheat, abandoned or unclaimed property laws to the contrary), and such undeliverable Distributions shall be distributed to other Beneficiaries on account of their Allowed Claims.  Nothing contained in this GUC Trust Agreement shall require the GUC Trustee to attempt to locate any Beneficiary.  In the event any check sent to a Beneficiary respecting a Distribution has not been cashed within six (6) months after the Distribution Date, the GUC Trustee may cancel such check and such Distribution shall be deemed unclaimed property and all title to and beneficial interest in the Assets represented by any such undeliverable Distributions shall be cancelled and revert to and/or remain in the GUC Trust automatically and without need for further order by the Bankruptcy Court (notwithstanding any applicable federal, state or other escheat, abandoned or unclaimed property laws to the contrary).

4.8     Payments Limited to Distributable Assets.   Until such time as the GUC Trust Seed Funding Amount is repaid all Distributions to be made by the GUC Trustee to or for the benefit of any Beneficiary shall be made only from the Distributable Assets.

## ARTICLE V

## BENEFICIARIES

5.1     Incidents of Ownership.   The Beneficiaries shall be the sole beneficiaries of the GUC Trust and the Distributable Assets, and the GUC Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this GUC Trust Agreement and Settlement.

5.2     Interest Beneficial Only.   The ownership of a beneficial interest in the GUC Trust shall not entitle any Beneficiary or the Settlor to any title in or to the Assets or to any right to call for a partition or division of such Assets or to require an accounting, except as may specifically be provided herein or in any order of the Bankruptcy Court.

5.3     Evidence of Beneficial Interest.   Ownership of a beneficial interest in the Assets shall not be evidenced by any certificate, security, or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the GUC Trust by the GUC Trustee.  In maintaining the GUC Trustee's register of beneficial interest, the GUC Trustee may rely upon the Debtors' schedules and the official claims register maintained in the Chapter 11 Cases.

5.4     Limits on Transfers and Notice of Transfer of Beneficial Interest.   The interests of Beneficiaries are not negotiable and not transferable except (a) pursuant to applicable laws of descent and distribution or (b) by operation of law.  The GUC Trustee shall not be required to record any transfer which, in the GUC Trustee's sole discretion may be construed to create any uncertainty or ambiguity as to the identity of the holder of the interest in the GUC Trust.  Until

-23-

appropriate notification and proof thereof, in a form satisfactory to the GUC Trustee in the exercise of its reasonable discretion, is submitted to the GUC Trustee by registered or certified United States mail, return receipt requested, the GUC Trustee may continue to pay all amounts to or for the benefit of the original Beneficiary.  The GUC Trustee may rely without any further investigation upon any notification and proof of a transfer of a beneficial interest in the GUC Trust submitted in accordance with this Section 5.4 that the GUC Trustee reasonably believes to be genuine.

## ARTICLE VI

## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

6.1     <u>Reliance</u>.  The GUC Trustee may absolutely and unconditionally rely, and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document that the GUC Trustee reasonably believes in good faith to be genuine.

6.2     <u>Parties Dealing With the GUC Trustee</u>.  In the absence of actual knowledge to the contrary, any Entity dealing with the GUC Trust or the GUC Trustee shall be entitled to rely on the authority of the GUC Trustee or any of the GUC Trustee's agents to act in connection with the Assets and this GUC Trust Agreement.  There shall be no obligation on any Entity dealing with the GUC Trustee to inquire into the validity, expediency or propriety of any transaction by the GUC Trustee or any agent of the GUC Trustee.

6.3     <u>Limited Recourse</u>.  Except as otherwise provided in this GUC Trust Agreement, Entities (including any professionals retained by the GUC Trustee in accordance with this GUC Trust Agreement) engaged in transactions with the GUC Trust or the GUC Trustee shall look only to the Assets (exclusive of the GUC Cash Payment) to satisfy any liability incurred in connection with carrying out the terms of this GUC Trust Agreement.

6.4    <u>Limitation of Liability</u>.   Except as expressly set forth in this GUC Trust

Agreement, on and after the Effective Date, the GUC Trust shall have no liability on account of

any claims.   Neither the GUC Trustee, the GUC Trust Oversight Committee, their respective

members, designees or professionals, or any of their duly designated agents or representatives

(collectively, the "<u>Covered Persons</u>"), shall be held personally liable for any claim asserted

against them or the GUC Trust in connection with their duties and responsibilities relating to the

Assets and GUC Trust.   Without limiting the generality of the foregoing, none of the Covered

Persons shall be liable for any action taken or omitted to be taken in furtherance of their

responsibilities hereunder, except to the extent that their conduct is determined by Final Order to

be due to their own willful misconduct, gross negligence, self-dealing, or fraud.   The GUC Trust

Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and

privileges of an official committee of unsecured creditors.   All Entities dealing with the GUC

Trustee, GUC Trust or GUC Trust Oversight Committee shall only look to the Assets (other than

the GUC Cash Payment), or any insurance that may cover such claim, to satisfy any liability

incurred by the GUC Trustee or GUC Trust Oversight Committee.   Nothing contained in this

GUC Trust Agreement or the Settlement shall be deemed to be an assumption by the GUC Trust

or GUC Trustee of any of the liabilities, obligations or duties of the Debtors or the Beneficiaries.

The transfer of the Assets by the Debtors to the GUC Trust is made pursuant to a prior order of

the Bankruptcy Court and the Debtors shall have no liability with respect to such transfer.

6.5    <u>Non-Liability for Acts of Others</u>.   The GUC Trustee and the GUC Trust Oversight

Committee may, in connection with the performance of their functions, and in their sole and

absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall

not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with

advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the GUC Trustee nor the GUC Trust Oversight Committee shall be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the GUC Trustee or GUC Trust Oversight Committee or their respective members and/or designees.  Any successor GUC Trustee may accept and rely upon any accounting made by or on behalf of any predecessor GUC Trustee hereunder, and any statement or representation made by a predecessor GUC Trustee or its agents as to the Assets or as to any other fact bearing upon the prior administration of the GUC Trust, so long as it has a good faith basis to do so.  A successor GUC Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement, or representation if it is later proved to be incomplete, inaccurate, or untrue.  A successor GUC Trustee shall not be liable for any act or omission of any predecessor GUC Trustee, nor have a duty to enforce any claims against any predecessor GUC Trustee on account of any such act or omission.

6.6     Indemnification.  The GUC Trust shall indemnify and hold harmless, to the fullest extent permitted by law, the GUC Trustee, the GUC Trust Oversight Committee and their employees, members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such; each, an "Indemnified Party" and collectively, the "Indemnified Parties"), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such Indemnified Parties may incur or to which such Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such Indemnified Party arising out of or due to their acts or omissions, or

consequences of such acts or omissions, with respect to the implementation or administration of the GUC Trust or the Settlement or the discharge of their duties under this GUC Trust Agreement; *provided, however*, that no such indemnification will be made to such persons for actions or omissions that are determined by a Final Order to be a result of such persons' willful misconduct, gross negligence, self-dealing or fraud.  Entities dealing with the GUC Trustee and GUC Trust Oversight Committee may only look to the Assets (other than the GUC Cash Payment) and any applicable insurance coverage to satisfy any liability incurred by the GUC Trustee or the GUC Trust Oversight Committee to such Entity in carrying out the terms of this GUC Trust Agreement, and neither the GUC Trustee nor the GUC Trust Oversight Committee shall have any personal obligation to satisfy any such liability.  Notwithstanding any provision in this GUC Trust Agreement to the contrary, an Indemnified Party shall be entitled to request advances from the GUC Trust to cover reasonable fees and necessary expenses incurred in connection with defending itself in any action brought against it as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such; *provided*, *however*, that the GUC Trustee shall not be required to make any such advances; *provided further*, *however*, that any Indemnified Parties receiving such advances shall repay the amounts so advanced to the GUC Trust upon the entry of a Final Order of a court of competent jurisdiction finding that such Indemnified Parties were not entitled to such indemnity under the provisions of this Section 6.6.   This indemnification shall survive the death, dissolution, resignation, or removal, as may be applicable, of the Indemnified Parties, or the termination of the GUC Trust, and shall inure to the benefit of the Indemnified Parties' heirs and assigns.

## ARTICLE VII

## SELECTION, REMOVAL AND COMPENSATION OF THE GUC TRUSTEE

7.1     <u>Initial GUC Trustee</u>.  Pursuant to the Settlement, the initial GUC Trustee was selected by the Creditors' Committee.

7.2     <u>Term of Service</u>.  The GUC Trustee shall serve until (a) the completion of all the GUC Trustee's duties, responsibilities and obligations under this GUC Trust Agreement (b) termination of the GUC Trust in accordance with this GUC Trust Agreement, or (c) the GUC Trustee's death or dissolution, incapacitation, resignation, or removal.

7.3     <u>Removal of a GUC Trustee</u>.  Any Entity serving as GUC Trustee may be removed at any time and for any reason by action of the GUC Trust Oversight Committee or upon the determination of the Bankruptcy Court on a motion for cause shown.  Any GUC Trustee so removed is entitled to payment of fees and expenses accrued prior to removal subject to the terms of this GUC Trust Agreement.  Any dispute regarding the compensation to be paid shall be determined by the Bankruptcy Court.

7.4     <u>Resignation of GUC Trustee</u>.  The GUC Trustee may resign at any time by giving the GUC Trust Oversight Committee at least 30 days' written notice of the GUC Trustee's intention to do so or such shorter time as agreed to by the GUC Trust Oversight Board.  Any resigning GUC Trustee is entitled to payment of fees and expenses accrued prior to resignation subject to the terms of this GUC Trust Agreement.  Any dispute regarding the compensation to be paid shall be determined by the Bankruptcy Court.

7.5     <u>Accounting in the Event of Removal or Resignation</u>.  In the event of removal or resignation, the removed or resigning GUC Trustee shall render to the GUC Trust Oversight Committee a full and complete accounting of monies and Assets received, disbursed, and held during the term of office of that GUC Trustee and such other information reasonably requested

by the GUC Trust Advisory Committee. Unless an earlier date is agreed to by the removed or resigning GUC Trustee, the removal or resignation shall be effective on the later of (a) the date specified in the notice; (b) the date that is 30 days after the date the notice is delivered; or (c) the date the accounting described in the preceding sentence is delivered.

7.6    Appointment of Successor GUC Trustee. Upon the resignation, death, incapacity, or removal of a GUC Trustee, the GUC Trust Oversight Committee shall appoint a successor GUC Trustee to fill the vacancy so created. Any successor GUC Trustee so appointed shall consent to and accept in writing the terms of this GUC Trust Agreement and agree that the provisions of this GUC Trust Agreement shall be binding upon and inure to the benefit of the successor GUC Trustee and all of the successor GUC Trustee's heirs and legal and personal representatives, successors or assigns. Notwithstanding anything in this GUC Trust Agreement, in the event that a successor GUC Trustee is not appointed within 60 days of the occurrence or effectiveness, as applicable, of the prior GUC Trustee's resignation, death, incapacity, or removal, the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the GUC Trust, shall approve a successor to serve as the GUC Trustee.

7.7    Powers and Duties of Successor GUC Trustee. A successor GUC Trustee shall have all the rights, privileges, powers, and duties of the predecessor GUC Trustee under this GUC Trust Agreement, the Settlement, or as provided in a further order of the Bankruptcy Court.

7.8    GUC Trust Continuance. The death, incapacity, resignation or removal of the GUC Trustee shall not terminate the GUC Trust or revoke any existing agency created pursuant to this GUC Trust Agreement or invalidate any action theretofore taken by the GUC Trustee.

7.9    Compensation and Costs of Administration. The GUC Trustee shall be compensated hourly with actual expenses reimbursed, or on such other reasonable terms as

determined initially by the Creditors' Committee and then by GUC Trust Oversight Committee, as appropriate; *provided*, *however*, that the GUC Trustee shall be compensated and reimbursed, as applicable, for services provided and expenses incurred in connection with the formation and implantation of the GUC Trust prior to the Effective Date, on such terms as previously agreed to by the GUC Trust Advisory Committee and the GUC Trustee.  Subsequent to the establishment of the initial compensation terms, the GUC Trustee, with the prior written approval of the GUC Trust Oversight Committee, may agree to modify the compensation structure.  The GUC Trustee may retain and compensate professionals as provided for in Section 3.3 of this GUC Trust Agreement.  The reasonable fees and actual and necessary expenses of such professionals, the GUC Trustee and any disbursing agent shall be paid by the GUC Trustee upon each monthly submission of a fee statement to the GUC Trustee and/or the GUC Trust Oversight Committee, as applicable, in accordance with the following procedures.  The GUC Trustee shall deliver his or her invoices or fee statements to the GUC Trust Oversight Committee before payment from the GUC Trust Assets therefor shall be allowed.  Any professionals retained by the GUC Trustee pursuant to this GUC Trust Agreement shall deliver their invoices or fee statements to the GUC Trustee and the GUC Trust Oversight Committee before payment from the GUC Trust Assets therefor shall be allowed.  Any Entity selected as disbursing agent by the GUC Trustee pursuant to this GUC Trust Agreement and the Settlement shall deliver their invoices or fee statements to the GUC Trustee and the GUC Trust Oversight Committee before payment from the GUC Trust Assets therefor shall be allowed.  The GUC Trustee and GUC Trust Oversight Committee, as applicable, shall have 15 days from the delivery of any invoice or fee statement to provide notice of an objection to the fee statement to the professional or Entity seeking compensation or reimbursement of expenses (including the GUC Trustee).  For an objection to be valid, it shall be

-30-

in writing and set forth in detail the specific fees objected to and the basis for the objection.  The uncontested portion of each invoice shall be paid within 25 days after its original delivery to the GUC Trustee.  Any objection that remains unresolved 15 days after it is made shall be submitted to the Bankruptcy Court for resolution.

## ARTICLE VIII

## REPORTING AND TAX MATTERS

8.1     <u>Reporting and Filing Requirements</u>.  Within 60 days after December 31 of each calendar year in which the GUC Trust shall remain in existence, the GUC Trustee shall file a report with the Bankruptcy Court of all Assets received by the GUC Trust, all Available GUC Trust Cash disbursed to Beneficiaries, all Assets held by the GUC Trust and all fees, income, and expenses related to the GUC Trust during the preceding calendar year and such other information as the GUC Trustee deems appropriate.  The GUC Trustee's report shall be provided to the GUC Trust Oversight Committee upon filing with the Bankruptcy Court and shall be available to any Beneficiary upon written request.

8.2     <u>Filing of Tax Returns</u>.  The GUC Trustee shall file tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other applicable laws or regulations; *provided*, *however*, that the GUC Trustee may, in the GUC Trustee's reasonable discretion, determine the best way to report for tax purposes with respect to the Disputed Claims Reserve, including (i) filing a tax election to treat any and all reserves for Disputed General Unsecured Claims as a disputed ownership fund ("<u>DOF</u>") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the GUC Trust or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report the Disputed Claims Reserve as a DOF, the GUC Trust shall comply with all federal and state tax reporting and tax compliance

-31-

requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.

8.3    Preparation of Statements.    To the extent reasonably practicable and unless otherwise ordered by the Bankruptcy Court, the GUC Trustee shall, in conjunction with filing the GUC Trust's annual tax return, send to each Beneficiary a statement setting forth the Beneficiary's share of items of income, gain, loss, deduction, or credit and will instruct all such Beneficiaries to report such items on their federal income tax returns.    A final such statement shall also be sent to each Beneficiary within 75 days after the dissolution of the GUC Trust.    The GUC Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to provisions of the Settlement and any confirmation order entered by the Bankruptcy Court relating to Disputed Claims) to the Beneficiaries in accordance with their relative beneficial interests in the GUC Trust, as determined pursuant to this GUC Trust Agreement and the Settlement.

8.4    Valuation of Assets.    As soon as practicable after the Effective Date, the GUC Trustee, to the extent that it deems it necessary or appropriate in the reasonable exercise of its discretion, shall, in good faith, value the Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including the Debtors, the GUC Trustee and the Beneficiaries) for all federal income tax purposes.    The GUC Trustee shall be under no obligation to hire an expert to make such a valuation.

## ARTICLE IX

## MAINTENANCE OF RECORDS

9.1    Books and Records. The GUC Trustee shall maintain books and records containing a description of all property from time to time constituting the Assets and an accounting of all receipts and disbursements.    Said books and records shall be open to inspection

by any Beneficiary at any reasonable time during normal business hours and after reasonable advance notice.   The GUC Trustee shall furnish to any Beneficiary upon written request an annual statement of receipts and disbursements, including a summary of all income and expenses of the GUC Trust.

<div align="center">

## ARTICLE X

## DURATION OF TRUST

</div>

10.1     Duration.   The GUC Trust shall become effective upon the Effective Date of the Settlement, and the GUC Trust and its provisions herein shall remain and continue in full force and effect until the GUC Trust is terminated.

10.2     Termination.   The GUC Trust shall terminate upon the occurrence of the earlier of (a) the final liquidation, administration, and Distribution of the Distributable Assets in accordance with this GUC Trust Agreement and the Settlement and the full performance of all other duties and functions of the GUC Trustee set forth in this GUC Trust Agreement and any further order of the Bankruptcy Court, (b) the fifth anniversary of the Effective Date. Notwithstanding the foregoing, the duration of the GUC Trust may be extended for multiple fixed terms upon motion of the GUC Trustee if approved by the Bankruptcy Court for cause shown prior to the termination of the GUC Trust.  Any such motion shall be filed no earlier than six months prior to the expiration of the term of the GUC Trust and each extended term.  The aggregate of all such extensions shall not exceed three years, unless the GUC Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the GUC Trust as a liquidating trust within the meaning of section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (i) the final Distributions pursuant to the Settlement, (ii) the filing by or on behalf of the GUC Trust of a certification of dissolution with the Bankruptcy Court and (iii) any other action deemed appropriate by the GUC Trustee, the

GUC Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

10.3    <u>Continuance of GUC Trust for Winding Up</u>.  After the termination of the GUC Trust and for the purpose of liquidating and winding up the affairs of the GUC Trust, the GUC Trustee shall continue to act as such until the GUC Trustee's duties have been fully performed, including, without limitation, such tasks as necessary to wind-up the affairs of the GUC Trust. After the termination of the GUC Trust, the GUC Trustee shall retain for a period of six months the books, records, Beneficiary lists, and certificates and other documents and files which shall have been delivered to or created by the GUC Trustee.  At the GUC Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after such six month period.  Except as otherwise specifically provided herein, upon the discharge of all liabilities of the GUC Trust and final Distributions pursuant to this GUC Trust Agreement, the GUC Trustee shall have no further duties or obligations hereunder.  For the avoidance of doubt, the limitations on liability contained in this GUC Trust Agreement shall apply to any actions taken by the GUC Trustee during the course of winding up the affairs of the GUC Trust.

## ARTICLE XI

## MISCELLANEOUS

11.1    <u>Jurisdiction</u>.  The Bankruptcy Court shall have exclusive jurisdiction over (a) the GUC Trust and the GUC Trustee with respect to the administration of and activities relating to the GUC Trust, and (b) any issues or disputes arising out of this GUC Trust Agreement; *provided*, *however*, that notwithstanding the foregoing, the GUC Trustee shall have the power and authority to bring any action in any court of competent jurisdiction to prosecute any cause of

action that constitutes an Asset, including but not limited to the D&O Clams not otherwise
released pursuant to the Settlement.

11.2     Notices.  All notices to be given to Beneficiaries may be given by ordinary mail,
or may be delivered personally, to the holders at the addresses appearing on the books kept by
the GUC Trustee.  Any notice or other communication which may be or is required to be given,
served, or sent to the GUC Trustee shall be in writing and shall be sent by registered or certified
United States mail, return receipt requested, postage prepaid, or transmitted by email, telex, or
facsimile (if receipt is confirmed) addressed as follows:

> If to the GUC Trust/GUC Trustee:
>
> EisnerAmper LLP
> Attn: Anthony R. Calascibetta
> 111 Wood Avenue South
> Iselin, NJ  08830-2700
> Telephone: 732.243.7389
> Fax: 732.951.7589
> E-mail: anthony.calascibetta@eisneramper.com
>
> With a copy to:
>
> LOWENSTEIN SANDLER LLP
> Attn: Sharon L. Levine & Wojciech F. Jung
> 65 Livingston Avenue
> Roseland, NJ 07068
> Telephone: 973.597.2500
> Fax: 973.597.2465 and 973.597.2375
> E-mail: slevine@lowenstein.com and wjung@lowenstein.com

or to such other address as may from time to time be provided in a written notice by the GUC
Trustee.

11.3     Bond.  The GUC Trustee may serve with a bond, the terms of which shall be
agreed to by the GUC Trust Oversight Committee, and the cost and expense of which shall be
borne by the GUC Trust and paid for from the Assets (other than form the GUC Cash Payment).

11.4    Governing Law.  This GUC Trust Agreement shall be governed by and construed in accordance with the laws of the State of [New York], without giving effect to conflicts of law principles.

11.5    Successors and Assigns.  This GUC Trust Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

11.6    No Execution.  All funds in the GUC Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Entity can bind, pledge, encumber, execute upon, garnish, or attach the Assets in any manner or compel payment from the GUC Trust except by Final Order of the Bankruptcy Court.

11.7    Amendment.  The GUC Trustee, with the prior written approval of a majority of the existing members of the GUC Trust Oversight Committee and, until the effective date of a plan of reorganization/liquidation that may be confirmed in the Debtors' chapter 11 cases, the Debtors, may amend, supplement, or waive any provision of this GUC Trust Agreement, without notice to or the consent of any Beneficiary or the approval of the Bankruptcy Court, in order to: (i) cure any ambiguity, omission, defect, or inconsistency in this GUC Agreement; *provided*, *however*, that such amendments, supplements or waivers shall not be inconsistent with the terms of the Settlement Agreement or adversely affect the Distributions to any of the Beneficiaries or adversely affect the federal income tax status of the GUC Trust as a "liquidating trust"; (ii) comply with any requirements in connection with the  federal income tax status of the GUC Trust as a "liquidating trust"; and (iii) comply with any requirements in connection with maintaining that the GUC Trust is not subject to registration or reporting requirements of the Securities Act, the Trust Indenture Act, or the Investment Company Act.  Any substantive

provision of this GUC Trust Agreement may be amended or waived by the GUC Trustee, after consultation with the GUC Trust Oversight Committee and with the approval of the Bankruptcy Court (upon notice and an opportunity for a hearing); *provided, however*, that no change may be made to this Agreement that would (a) adversely affect the (i) Distributions to any of the Beneficiaries, or (ii) the federal income tax status of the Trust as a "liquidating trust" or (b) modify the stated purpose of the GUC Trust as described in this GUC Trust Agreement). Notwithstanding this Section 11.7, any amendments or modifications to this GUC Trust Agreement shall not be inconsistent with the purpose and intention of the GUC Trust to liquidate in an expeditious but orderly manner the Assets in accordance with Treasury Regulation Section 301.7701- 4(d).

 11.8 <u>Severability</u>. If any term, provision, covenant or restriction contained in this GUC Trust Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this GUC Trust Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

 11.9 <u>Counterparts</u>. This GUC Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and such counterparts shall together constitute but one and the same instrument. A facsimile or electronic mail signature of any party shall be considered to have the same binding effect as an original signature.

IN WITNESS WHEREOF, the parties have executed this GUC Trust Agreement (or are

deemed to have so executed this GUC Trust Agreement) as of the day and year written above.


EisnerAmper LLP                          The Standard Register Company, on behalf of
GUC Trustee                              itself and affiliated Debtors


By: _____    By: _____
    Name: Anthony R. Calascibetta         Name:  Gerard D. Sowar
    Title: Its Representative              Title:  Executive Vice President, General
                                                   Counsel, and Secretary